**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129- NYW-SKC

ERIC COOMER, Ph.D.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT**

---

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

      Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), files this Response to Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [CM-ECF Dkt. 38] (the Motion), and states as follows:

## I.    INTRODUCTION

      1.    This case arises from ongoing efforts by Defendant Lindell and his related companies MyPillow Inc. (MyPillow) and Frankspeech LLC (Frankspeech) to perpetuate the spread of dangerous and obviously false lies about Dr. Coomer.  In the Motion, Defendants implausibly suggest that they did not know their defamatory statements were false, or have any doubts concerning the truthfulness of their statements.  Plaintiff's First Amended Complaint [CM-ECF Dkt. 21], however, details numerous statements made by Defendants after they had already been served with a then 67-page lawsuit which laid out

1

in painstaking detail the logical impossibility of their statements, the documented fabrication of evidence upon which their statements were premised, the utter lack of evidence supporting their claims, and references to countless authorities that had conclusively dismantled every baseless theory upon which Defendants' claims could have possibly been premised.

2.      But Defendants did not need a lawsuit to know that their claims were lies. They have always known.  As detailed in Plaintiff's First Amended Complaint (FAC), Defendants were on constant notice that they were publishing outright falsehoods about the 2020 election in general and about Dr. Coomer specifically.  Lindell's own employees have made public statements detailing their first-hand knowledge that Lindell knew he was promulgating falsehoods and blindly persisted anyway.  The only source for Lindell's claims in this case is Joe Oltmann (Oltmann), a Colorado based conspiracy theorist who fabricated evidence to support his lies and then went on to lie about that falsified evidence under oath.  To this day, Oltmann has never produced a shred of evidence that Dr. Coomer actually partook in an "Antifa conference call," that he claimed on that call to have rigged the election, or that he did in fact rig the election.  Nor can he.  The entire story is a complete and total fabrication.  Despite possessing no evidence whatsoever or attempting to confirm a word of Oltmann's claims, Defendants have instead wholeheartedly adopted them and repeatedly accused Dr. Coomer of treason, all the while desperately trying to outrun the truth at every turn.  Throughout this sordid, deceitful, and reprehensible affair, Defendants' conduct has been rife with every permutation of actual malice recognized by the law.

3.     Given the foregoing, it is unsurprising that Defendants now fear this Court's ability to expose the truth.  They seek through the Motion to ensure that the evidence of their reckless grift never comes to light.  But this Court should not be swayed.  Defendants' lies are injecting poison into the lifeblood of American society on a daily basis.  They must be made to answer for what they have done, and the Motion should be denied accordingly.

## II.     LEGAL STANDARD

4.     To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A plaintiff must allege sufficient facts to "nudge [] [his] claims across the line from conceivable to plausible."  *Id.* at 680. The purpose of this pleading standard is to require fair notice to opposing parties of the claims levied against them and to prevent the assertion of claims with no legal basis. *See Twombly*, 550 U.S. at 555.

## III.     ARGUMENT

## A.     Dr. Coomer has stated a claim for defamation.

5.     Dr. Coomer has sufficiently pleaded facts that state a claim for defamation against Defendants.    Under Colorado law, the elements for defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability

of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication. *Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*, 866 P.2d 908, 911 n.4 (Colo. 1993).

6.       The scope of Defendants' challenge to Dr. Coomer's claim for defamation is limited.  Defendants do not challenge the defamatory statements at issue or that these statements injured Dr. Coomer.  *See* Def. Mot. at pp. 5-15.  Nor could they.  The statements are unequivocally false.  *See* FAC ¶¶ 1-4, 26, 28-30, 49-52, 55-56, 62-63, 81, 87-88, 94, 99-100, 118-120.  And the statements are defamatory per se as they impute improper business practices and criminal conduct of the highest order.  *See Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004).  Instead, the Motion is limited to challenging Defendants' liability for the defamation under the fault standard in element three. *See* Def. Mot. at pp. 5-9.  This challenge fails as Dr. Coomer is a private citizen whose conduct was not a public concern.  *See* FAC, at ¶¶ 1, 4, 118.  As such, Dr. Coomer need only show negligence, which he has done.  Even were Dr. Coomer required to show actual malice, he has more than sufficiently pleaded facts that show at a minimum Defendant published the statements with a reckless disregard for their truth.  *See* FAC, at ¶¶ 105-111.

### a.       *Dr. Coomer's private conduct was not a matter of public concern and, therefore, he must only show negligence.*

7.       Defendants first assert that the actual malice standard must apply because this dispute arises from a matter of public concern.  Defendants' analysis of public concern is remarkable for its brevity and little else.  Rather than engage in the nuanced, fact-specific analysis the law requires, Defendants flatly conclude that his defamatory statements involve a matter of public concern because the 2020 presidential election was

a matter of public concern, arguing that "Plaintiff disputes statements concerning the security and accuracy of the 2020 Presidential election.  This is a quintessential public issue."  Def. Mot. at p. 7.  This superficial analysis fails as the matter at issue concerns Dr. Coomer, a private individual, who was privately employed, and privately conducting his work.  *See* FAC, at ¶¶ 1, 4, 118.  Dr. Coomer was not "the election," and the statements at issue in this dispute are not statements "concerning the security and accuracy of the 2020 Presidential election," but rather statements repeatedly accusing Plaintiff of treason during multiple national publications on the basis of no evidence whatsoever.

8.      Whether a statement is a matter of public concern is determined by "the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record."  *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008).  Generally, a matter is of public concern when the public may have a "*legitimate* interest in what is being published" or when it involves an issue "about which information is needed or appropriate."  *Williams v. Cont. Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) (emphasis added).  When determining whether a matter is a public concern, courts have considered the scope and nature of the alleged public interest;[1] plaintiff's involvement in the alleged interest;[2] and whether the alleged public interest

---

[1] Courts consider whether the matter affects a broad segment of the public, occurred publicly, or affects the public.  *Compare, e.g.*, *Diversified Mgmt., Inc.*, 653 P.2d at 1108 (widespread ongoing land-development scheme), *Lewis v. McGraw-Hill Broad. Co., Inc.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992) (community's involvement in a prominent civil rights case), *with, e.g. Williams*, 943 P.2d at 17-18 (pilot's private employment for prominent airline), *McIntyre*, 194 P.3d at 525-26 (bookkeeper's private employment for HOA).

[2] Courts require some nexus between the plaintiff and the public matter.  *See e.g.*, *DiLeo v. Koltnow,* 613 P.2d 318, 320-23 (Colo. 1980) (looking to the plaintiff's conduct, not the defendant's to determine public concern); *Diversified Mgmt., Inc.*, 653 P.2d at 1107-08 (same); *Quigley*, 327 F.3d at 1061 (same).

existed prior to the defamatory statements published.[3]   Here, Dr. Coomer was unquestionably a private figure about whom the public had no legitimate interest before the defamatory campaign against him.[4]  There was no interest in his private employment or private job performance.[5]  There was no nexus between his employment and the allegations of voter fraud.[6]  The public interest only arose because of the defamatory statements that Defendants perpetuated.[7]  Therefore, the balance of factors necessarily weighs against finding that Defendants' defamatory statements qualify as a matter of public concern.

9.     This is consistent with constitutional doctrine that precludes a defendant from creating his own defense.  *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *Diversified Mgmt., Inc.*, 653 P.2d at 1107.  In short, a defendant cannot manufacture the public concern.  *Snead v. Redland Aggregates, Ltd.*, 998 F.2d 1325, 1330 (5th Cir.1993) ("A speaker cannot turn his speech into a matter of public concern simply by issuing a press release.").  But that is precisely

---

[3] Courts require the public interest to exist prior to and separate from the defamatory statements.  *See e.g.*, *Diversified Mgmt., Inc.*, 653 P.2d at 1107-08 ("those charged with defamation cannot, by their own conduct, create their own defense"); *Quigley*, 327 F.3d at 1061 (same); *see also Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994) (identifying "whether the public controversy existed prior to the publication of the defamatory statements" as a factor to consider).

[4] *See* FAC at ¶¶ 1, 4, 118; *see also Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 86 (1971) (dissent, J. Marshall) (defining private figures as "persons first brought to public attention by the defamation that is the subject of the lawsuit").

[5] *See* FAC at ¶¶ 1, 4, 118; *see also Williams*, 943 P.2d at 17-18 (private employment); *McIntyre*, 194 P.3d at 525-26 (private employment).

[6] *See* FAC at ¶¶ 1, 4, 118; *see also Quigley*, 327 F.3d at 1061 (defendant's conduct cannot create the public interest).

[7] *See* FAC at § V(A)–(D).

what Defendants have done here.  Defendants perpetuated baseless allegations that Dr. Coomer subverted the presidential election.  The only "public concern" is the one Defendants created by falsely and repeatedly suggesting that Dr. Coomer was part of a plot to overturn the election.[8]  Defendants should not be permitted to manufacture their own defense to defamation through their own defamatory conduct.

10.    There is no constitutional protection for malicious publications.  When a defendant is in a position to know, and indeed knew or should have known, that the allegations he raised are baseless, he cannot then avail himself of the heightened standard by simply alleging a "public concern."  *Quigley v. Rosenthal*, 327 F.3d 1044, 1061 (10th Cir. 2003) (citing *Kemp v. State Bd. of Agric.*, 803 P.2d 498, 504 (Colo.1990).

### b.    Dr. Coomer is not a limited public figure.

11.    Defendants next allege that the actual malice standard applies to Plaintiff's claims because Plaintiff is a limited purpose public figure.  This assertion similarly fails.  As Defendants note, a plaintiff is a limited purpose public figure if the defamatory statement involves a matter of public concern, and the level of plaintiff's participation in the controversy invites scrutiny.  Def. Mot. at 7 (*citing Lewis*, 832 P.2d at 1122).  As

---

[8] In her May 13, 2022 Order denying all defendants' anti-SLAPP motions to dismiss in their entirety in *Coomer v. Donald J. Trump for President, et. al.*, Case No. 2020cv034319, Judge Moses held that the statements at issue in that proceeding pertained to a matter of public concern because "those statements related to existing public concerns about security of voting machines and thus, their statements have 'the potential to impact many members of the public or the public as a whole.'"  *Id.* at ¶ 142.  Judge Moses' analysis is undoubtedly thorough and persuasive, but on this point Dr. Coomer disagrees with that court's ruling to the extent it serves to conflate Dr. Coomer with the security of voting machines.  Just as he is not "the election," he is not "the voting machines."  Dr. Coomer had never been personally implicated in those pre-existing concerns until Defendants themselves implicated him.

discussed above, the defamatory statements involved in this dispute do not involve a matter of public concern.

12.     Defendants rely primarily on *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000), for their claim that Dr. Coomer is a limited public figure, stating that the Tenth Circuit has defined a limited purpose public figure as a person who "voluntarily injects himself or is drawn into a public controversy and thereby becomes a public figure for a limited range of issues." *Id.*  In *Schwartz*, the Court addressed a case where a doctor published an editorial article impugning the defendant, and then gave a nationally televised interview on the topic, which in turn provoked a response from the defendant that the plaintiff deemed defamatory.  *Id.* at 1142.  The facts of this case are distinct from those in *Schwartz*, most notably in that "Dr. Schwartz [did] not dispute that he [had] injected himself into the public controversy involved in this case." *Id.* at 1145.  Here, Dr. Coomer has done nothing to inject himself into the knowingly bad faith series of falsehoods alleging with no evidence that Dominion Voting Systems somehow played a role in rigging the presidential election, other than to simply deny the allegations.  "The first remedy of any victim of defamation is self-help – using available opportunities to contradict the lie or correct the error and thereby minimize its adverse impact on reputation." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974).

13.     In the context of limited purpose public figures, courts have found a private individual's private acts to be of public interest only when the individual invited public scrutiny. *Compare DiLeo v. Koltnow*, 613 P.2d 318, 322 (Colo. 1980) (finding a plaintiff's

discharge from the police force was a matter of public concern solely because the plaintiff sought press coverage instead of "quietly seeking to exert his legal rights") and *Lewis v. McGraw-Hill Broad. Co., Inc.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992) (finding a prominent civil rights case was a matter of public concern in part because plaintiff's counsel actively sought community involvement and conducted public interviews with the press), with *Hutchinson*, 443 U.S. at 135 (finding a researcher's receipt of a federal grant was insufficient to establish a particular matter of public concern and, instead, only established a general concern about public expenditures that would apply "to everyone who received or benefitted from the myriad public grants for research"). *See also Rosenbloom*, 403 U.S., at 86 (dissent, J. Marshall) (defining private figures as "persons first brought to public attention by the defamation that is the subject of the lawsuit").

### c. Even were Dr. Coomer's conduct a matter of public concern, he has alleged actual malice.

14. Because Dr. Coomer is not a public official or figure, and because Defendants' statements do not involve a matter of public concern, Dr. Coomer does not need to prove actual malice as an element of his defamation claim.[9]  However, even were the heightened actual malice standard to apply, Dr. Coomer has sufficiently alleged that Defendants acted with actual malice in publishing their defamatory statements.

15. Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S.

---

[9] *See Enigma Software Grp. USA, LLC v. Beeping Computer LLC*, 194 F. Supp. 3d 263, 288 (S.D.N.Y. 2016) (rejecting challenges to actual malice in a motion to dismiss, finding "[t]his argument fails at the threshold" because the Court could not *on the pleadings* conclude the actual malice standard applied.).

657, 686 (1989); *Diversified Mgmt., Inc.*, 653 P.2d at 1110-11.  To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity."  *Lewis v. McGraw-Hill Broad. Co., Inc.,* 832 P.2d 1118, 1122-23 (Colo. App. 1992).  Here, Defendants premise their argument entirely on their subjective knowledge of the falsity of their statements and make no argument with respect to their reckless disregard for the truth.  Plaintiff's First Amended Complaint, however, pleads numerous facts that are sufficient to establish actual malice by a variety of different means, only one of which is necessary for the Court to deny the Motion.

16.   Courts have considered countless circumstantial factors as sufficient to establish that a defendant has acted with actual malice, including: when a story is fabricated by a defendant or is the product of his imagination;[10] when a defendant relies on anonymous sources;[11] when a defendant had reason to know his source was unreliable;[12] when the allegations made are inherently improbable;[13] when a defendant

---

[10] *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968).

[11] *Id.*; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

[12] *St. Amant*, 390 U.S. at 732 (""[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000); *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283 (D.D.C. 2017) ("[I]f there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice."); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice).

[13] *St. Amant*, 390 U.S. at 732 (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F. Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ("when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" is evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd.*, 350 F.3d 1272 (D.C. Cir. 2003) (same).

intentionally avoids the truth;[14] when a defendant's allegations conform to a preconceived storyline;[15] and when a defendant has a financial incentive to make the defamatory statements.[16]

17.     Here, Dr. Coomer makes all of these allegations against Defendants, which must be accepted as true.  *See Lobato*, 218 P.3d at 367.  First, Dr. Coomer sufficiently alleged that Oltmann fabricated the false allegations against Dr. Coomer, which Defendants adopted.  *See* FAC at ¶¶ 2, 29, 44, 106, 110, 120.  Second, Dr. Coomer alleged that Oltmann's story was premised on anonymous sources, which Defendants equally relied upon.  *Id.* at ¶¶ 2, 28, 29, 55, 108, 120.  Third, Dr. Coomer alleged that Defendants had several reasons to know that their source, Oltmann, was unreliable and his story inherently improbable.   Oltmann does not have any relevant credentials or official verification of his hearsay claims about Dr. Coomer.  *Id.* at ¶¶ 106-07, 120.  Oltmann conducted no legitimate investigation in support of his story and purposefully avoided the truth of it.  *Id.* at ¶¶ 3, 29, 60, 106-07, 120.  Oltmann had no evidence in support of his story.  *Id.*  Instead, Oltmann's story is built on an alleged Google search of anonymous

---

[14] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 693 (noting that "evidence of an intent to avoid the truth was . . . sufficient to satisfy the more demanding [actual malice standard]" which included the failure to review available evidence and failure to attempt to interview known key witnesses); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth."); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361 (Colo. 1983).

[15] *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often provide to be quite powerful evidence."); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 674-75 (W.D. Va. 2019); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

[16] *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (finding circumstantial evidence of motive can establish actual malice).

speakers from an unrecorded call that he claims to have infiltrated.  *Id.*  at ¶¶ 2, 28, 56, 109.  In reality, Oltmann made up that story and instead conducted the alleged Google search on November 11, 2020, two days after his initial claims about Dr. Coomer, and deliberately altered the title of the screenshot to suggest a September 26, 2020 search date, then lied about having done that under oath.  *Id.* at ¶¶ 2, 28, 56, 60, 109.  Oltmann then kept this alleged call secret for two months—despite almost daily podcasts—only to remember *after* the election and *after* advancing other election fraud theories.  *Id.* at ¶¶ 2, 28-29, 57.  Fourth, the story he advanced involves facially impossible election interference.  *Id.* at ¶¶ 4, 17-26, 41, 120.  Fifth, like Defendants, Oltmann had a preconceived storyline of election fraud and desire to prove it.  *Id.* at ¶¶ 2, 29, 40, 44, 120. Sixth, like Defendants, Oltmann had political motivations and general ill will.  *Id.* at ¶¶ 27, 35, 39, 120.  Seventh, like Defendants, Oltmann had financial incentive to defame Dr. Coomer.  *Id.* at ¶¶ 2, 4, 53, 70, 120.  That Defendants relied on Oltmann as their sole source to advance allegations against Dr. Coomer constitutes actual malice.  *Id.* at ¶¶ 27, 38, 105, 120.  Eighth, Dr. Coomer also alleged Defendants intentionally avoided the truth. Defendants did not contact Dr. Coomer or Dominion regarding the allegations; disregarded reliable sources refuting the allegations; and conducted no investigation before actively promoting the allegations.  *Id.* at ¶¶ 4, 17-26, 28, 41, 120.  Ninth, Defendants have yet to issue a retraction or remove the defamatory posts, further evidencing their actual malice.  *Id.* at ¶¶ 5, 133 (demanding retraction).  And tenth, Defendants have persisted in repeating their defamatory statements multiple times since being served with a lengthy lawsuit that spelled out in painstaking detail the numerous

ways in which their claims were not and could not possibly be true. *Id.* at ¶¶ 94-96, 98, 100. Any one of these allegations alone could support a finding that Defendants acted with actual malice when they published false statements about Dr. Coomer. That Dr. Coomer has sufficiently alleged all of them warrants denial of the Motion.

### d.  *Defendants' statements are not protected statements of opinion.*

18.   For a statement to be actionable as defamatory, it must express or imply a verifiably false fact about the plaintiff. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990). "An opinion based on undisclosed facts is contrasted with an opinion which is based on circumstances set forth by the publisher and which support the proffered opinion." *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1359 (Colo. 1983). Opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation. *Id.* at 1360. "If a listener cannot evaluate the alleged defamatory language because no basis for the statement has been disclosed, a defamation action may properly be brought." *Id.*

19.   Here, all of the statements at issue either expressly state the verifiably false facts that Dr. Coomer partook in an Antifa conference call, that he claimed on that call to have rigged the election, and that he did in fact rig the election, or they necessarily imply those verifiably false facts or rely upon stated facts that are verifiably false. As discussed above, the false claims about Dr. Coomer derive from a single source: Oltmann and his fabricated story that he overheard Dr. Coomer claim on an Antifa conference call that he had rigged the election. As such, any claims about Dr. Coomer by Defendants necessarily imply and rely upon the verifiably false claims at issue in this dispute.

20.     Defendants' statements are also premised on numerous undisclosed facts, which remain undisclosed to this day and serve to prevent Defendants' listeners from evaluating the basis for the statements.  For example, at no point have Defendants ever disclosed numerous essential facts about their false claims regarding Dr. Coomer, including, but not limited to, facts surrounding the call itself, the other participants on the call, Oltmann's fabrication of evidence to support his narrative about the call, Oltmann's repeated admissions both in writing and on video that he could not confirm the anonymous speaker's identity, and various other matters essential to constitute a full disclosure of relevant facts.  *See* FAC, ¶¶ 60, 81.  "When one uses language which invites an inference that an individual has acted significantly at variance with community standards, and one fails to provide a factual basis for the derogatory characterization, then one 'knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections.'"  *Burns*, 659 P.2d at 1362 (*citing Kuhn v. Tribune-Republican Publishing Co.*, 637 P.2d at 319).

21.     Furthermore, Defendants themselves have also repeatedly insisted that they are not presenting their opinions, but instead verifiable facts.  Defendants have assured their audience that they were presenting "truth," that they have "proof" and "evidence" for their claims, and that "this is real!"  *See* FAC at ¶¶ 18, 51, 58, 73, 81, 83, 87, 92, 98.

**e.     *Plaintiff has adequately pleaded his claims against both MyPillow and Frankspeech.***

22.     Defendants claim that "agency law does not impute liability to MyPillow for Lindell's statements."  Def. Mot. at 10.  As discussed below, this is inaccurate, but it also

overlooks the factual pleadings in Plaintiff's First Amended Complaint that speak directly to MyPillow's own affirmative actions promoting lies about the 2020 election independent of statements from Lindell, including lies about Dr. Coomer. For example, MyPillow proactively worked to spread falsehoods through the "Women for America First" bus tour that it sponsored, which traveled the country hosting various speakers at events calling the election results into question. *See* FAC at ¶ 40. MyPillow went on to offer discounts to customers who used the promo code "FightForTrump" during the January 6, 2021 attack on the US Capitol. *Id.* at ¶ 42. These independent efforts are evidence of MyPillow's belief that the 2020 election was rigged, its incorporation of that belief into its business model, and its utilization of that political belief to turn a profit.

23. MyPillow's preconceived narrative then seamlessly transitioned to proactive promotion of false claims about Dr. Coomer. For example, MyPillow offered and continues to offer discounts to viewers of Oltmann's podcast, which defames Dr. Coomer on a nearly daily basis. *Id.* at ¶¶ 46, 68. For his part, Oltmann understood Lindell to be acting as a representative of MyPillow from the time of his very first appearance on Conservative Daily, where Lindell was introduced as "Mr. Mike Lindell, the CEO of MyPillow, affectionately known as the MyPillow guy." *Id.* Lindell made no effort then, nor has he ever, to disabuse Oltmann's viewers of the obvious inference that Lindell's appearances with Oltmann, and his corresponding claims of election fraud, are part of his role in promoting and selling MyPillow products. Oltmann too understands MyPillow to be an active promoter of false claims of election fraud, and has equated their

efforts in the same breath, stating "We will be a tireless advocate for MyPillow.  We'll be a tireless advocate for what we're doing the election integrity issue, or side." *Id.*

24.     MyPillow continued its promotion of and profiteering off of defamatory publications about Dr. Coomer during a May 3, 2021 interview with Oltmann that it sponsored on Frankspeech.  *Id.* at ¶ 53.  More overtly, the MyPillow webpage itself produced and hosted (and still hosts to this day) promotional material for the Cyber Symposium, which defamed Dr. Coomer at length and for days on end.  *Id.* at ¶ 70.

25.     Even if these independent acts publishing and promoting defamatory content about Dr. Coomer were not sufficient to establish liability for MyPillow absent an agency relationship with Lindell, MyPillow leaves no doubt that Lindell is its agent and is acting within the scope of his role as CEO when he promotes false claims of election fraud in order to induce sales of MyPillow products.  MyPillow even published a video of Lindell promoting the Symposium, conflating himself with the company, stating, "All of you know what MyPillow and myself have gone through in the last 5 months, in my effort to bring forward the truth." *Id.* at n. 104.  Lindell went on to emphasize the coordination of both MyPillow and Frankspeech in the production of and profiting from the Symposium, stating, "To help support this Cyber Symposium event, I am offering some of the best prices ever on MyPillow products, but they're only offered on FrankSpeech.com." *Id.*

26.     In addition to always introducing himself as the CEO of MyPillow and constantly promoting MyPillow products at all of his election-related speaking events, Lindell has in fact openly acknowledged that his statements and activities regarding election fraud are part of his work for MyPillow, and that he is acting on MyPillow's behalf

when claiming election fraud.  At a rally promoting election fraud lies on May 6, 2022, for example, Lindell stated:

> Everything, you name it, everything is on sale today.  This is a very important day.  All of these rallies are so important because it gets the word out.  So if you guys want to support both RSBM, myself, MyPillow, everything I'm doing, everything we're all doing together, people say 'Mike, well what can I do?'  You know what, you can buy something right now and use promo code RSBN.  I take all of that, and believe me, I can, if you call my company, every dime I get I just pour back in to help this country.

*Id*. at ¶ 102.

27.    Whether an agency relationship exists is ordinarily a question of fact. *Christoph v. Colo. Commc'ns Corp*., 946 P.2d 519 (Colo. App. 1997); *see also* RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006) (whether relationship is characterized as agency in agreement between parties or in context of industry or popular usage is not controlling).  However, if evidence as to an agent's authority is undisputed, or if only one reasonable and logical inference could be drawn from the evidence, the question of the existence of the agency relationship is one of law to be determined by the trial court.  *Kelly v. Cent. Bank & Tr. Co*., 794 P.2d 1037 (Colo. App. 1989).

28.    The common law of agency attributes the legal consequences of one person's action to another person on three distinct bases: actual authority, apparent authority, and respondeat superior.  *State Farm Mut. Ins. Co. v. Johnson*, 396 P.3d 651, 655 (Colo. 2017).  An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act.  *Id*. at 356 (*citing* RESTATEMENT (THIRD) OF AGENCY § 2.01).  An agent has apparent

authority to affect a principal's relations with a third party when the third party reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal.  *Id*. (*citing* RESTATEMENT (THIRD) OF AGENCY § 2.03). Under the respondeat superior doctrine, an employer is liable for torts of an employee acting within the scope of employment.  The employer is liable if the employee's conduct was motivated by an intent to serve the employer's interests and connected to acts the employee was authorized to perform.  *Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 693 (Colo. App. 2006).

29.    An agency relationship can exist even where the parties "do not subjectively intend that legal consequences flow from their relation.  The critical determination is whether the parties materially agreed to enter into a particular relation to which the law of agency attached." *W. Fire Truck, Inc.*, *v. Emergency One, Inc*., 134 P.3d 570, 576 (Colo. App. 2006).

30.    Here, given MyPillow's history of independently promoting false claims of election fraud, Lindell was acting with at least apparent authority and potentially actual authority from MyPillow when he made the statements at issue in this dispute.  Lindell's frequent sales pitches for MyPillow products before, during, and after his public statements about Dr. Coomer, often after identifying himself as the CEO of MyPillow, also establish respondeat superior liability for MyPillow, which profits from these marketing efforts undertaken by Lindell.

31.    In denying MyPillow's motion to dismiss the defamation claim filed against it in *U.S. Dominion, Inc. et. al. v. MyPillow, Inc., et. al*., the United States District Court

for the District of Columbia found MyPillow's identical argument in that proceeding unavailing.[17]   Noting Lindell's constant promotion of MyPillow products at election-related events, and MyPillow's provision of promotional codes directly tied to election fraud themes, the Court found that "a corporation may be liable for an executive's conduct when the executive was acting within the scope of his employment and in furtherance of the company's business." *Id.* at p. 27, n. 13 (*citing Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) (determining that a complaint stated a claim for defamation against *The New York Times* where it alleged facts giving rise to a plausible inference that the paper's agents recklessly disregarded the truth); *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 202-04 (D.N.J. 2011) (deciding that a complaint stated a claim for defamation against a corporation where CEO made allegedly defamatory statements)).

32.   Given the foregoing, there can be no doubt that here too, MyPillow is both independently liable for the production and publication of defamatory content about Dr. Coomer, and also liable for Lindell's defamation of Dr. Coomer while acting as an agent for MyPillow.  Plaintiff's First Amended Complaint adequately makes numerous factual allegations supporting such a finding.  *See* FAC, at ¶¶ 8, 40, 46, 53, 70, 71, 89, 100-02.

33.   With respect to Frankspeech, Defendants do not argue that Plaintiff's claim fails for inability to sufficiently plead an agency relationship.  Instead, they focus on just

---

[17] *See U.S. Dominion, Inc. et. al. v. MyPillow, Inc., et. al.*, Case No. 1:21-cv-00445 (CJN) (Dist. Ct. Dist. D.C.), Memorandum Opinion (Document 54), Aug. 11, 2021.

one of the numerous defamatory statements published by Frankspeech and described in the Complaint, the May 3, 2021 interview with Brannon Howse.  *See* Def. Mot. at pp. 11-12.  Defendants contend that Frankspeech cannot be liable for this publication, claiming that "Oltmann disclosed to his audience the source of his conclusion to connect the Antifa call member to Plaintiff[.]"  This is false.  As discussed in paragraph 60 of Plaintiff's First Amended Complaint, Oltmann concealed numerous facts underlying his conclusion, and provided no information whatsoever that would allow the Frankspeech audience to actually make an informed decision regarding his claims.

34.    As noted, Defendants do not argue, nor could they, that Frankspeech is not liable for any of the other various defamatory statements indisputably published by Frankspeech and described with particularity in Plaintiff's First Amended Complaint, including the May 9, 2021 Lindell interview (¶ 61), the Cyber Symposium (¶¶ 70-89), or the April 6, 2022 Lindell interview (¶¶ 95-97).

## B.    Dr. Coomer has stated a claim for intentional infliction of emotional distress.

35.    Dr. Coomer has pleaded facts that establish a claim for intentional infliction of emotional distress.  The facts supporting that claim include and build upon the facts underlying Dr. Coomer's defamation claim.[18]   A claim for intentional infliction of emotional distress requires proof that "(1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe

---

[18] *See* FAC. at ¶¶ 61, 85, 94-96, 98, 100 (describing Dr. Coomer as "a traitor," "disgusting," "treasonous," "the man that pulled the trigger," "corrupt," "a criminal," someone who "belongs behind bars," "part of the biggest crime this world has ever seen," "evil," and someone who "did crimes against the United States and quite frankly all of humanity.")

emotional distress, and (3) causing the plaintiff severe emotional distress." *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (citing *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004)). Here, the scope of Defendants' challenge to Dr. Coomer's claims is also limited. *See* Def. Mot. at pp. 12-13. Again, Defendants do not challenge the specific conduct underlying this claim. Instead, Defendants primarily challenge their liability for this conduct—specifically, whether their conduct was extreme and outrageous under element one and whether they are at fault for this conduct under element two. *See id.* at p. 12.

36. Dr. Coomer alleged Defendants engaged in extreme and outrageous conduct when they defamed Dr. Coomer. Extreme and outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 963 (Colo. App. 2009). Courts have found allegations of extreme and outrageous conduct sufficient in:

a. Unverified statements by a newspaper that a wife failed to testify in her husband's murder trial, impugning the wife's integrity and implying the wife was disloyal;[19]

b. Statements that a tenant would have special influence in a judicial proceeding against a landlord and mocking the landlord's serious and unfortunate physical condition;[20]

c. Reports of child abuse by an unlicensed mental health provider when allegedly made in bad faith;[21]

---

[19] *Han Ye Lee*, 222 P.3d at 963-65.

[20] *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. App. 1978).

[21] *Montoya v. Bebensee*, 761 P.2d 285, 286-90 (Colo App. 1988).

      d.      Repeated accusations of theft with no evidence beyond a polygraph test when questioning the employee;[22]

      e.      Repeated requests for payment and threats to garnish wages without judgment;[23]

      f.      Derogatory comments by a supervisor to pregnant employees;[24] and

      g.      Racial slurs directed in an employment setting.[25]

37.     These cases illustrate that statements—when they defame, denigrate, harass, and threaten—can constitute extreme and outrageous conduct. Here, it is difficult to comprehend statements more extreme and more damaging than the ones Defendants made regarding Dr. Coomer both in nature and scope. Defendants repeatedly, without evidence, falsely accused Dr. Coomer of conspiring to overturn the presidential election. This is alleged criminal conduct committed against every citizen of the United States. Defendants branded Dr. Coomer a traitor, impugned his personal and professional reputation, and incited the threat of real violence against him. Then, when Defendants got sued and became undeniably aware that their conduct was resulting in death threats, they actually doubled down, going on a new defamation spree that persists to this day. These facts are more than sufficient to give rise to a claim for intentional infliction of emotional distress against Defendants. *See Han Ye Lee*, 222 P.3d at 963-64.

38.     Defendants' efforts to apply the heightened fault standard of actual malice to Dr. Coomer's claims of intentional infliction of emotional distress are flawed. First,

---

[22] *Ellis v. Buckley*, 790 P.2d 875, 877 (Colo. App. 1990).

[23] *Rugg v. McCarty*, 476 P.2d 753, 754-56 (Colo. 1970).

[24] *Donaldson v. Am. Banco Corp. Inc.*, 945 F. Supp. 1456, 1465-66 (D. Colo. 1996).

[25] *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530 1543-44 (D. Colo. 1992).

Defendants misstate the appellate court's determination in *Lewis v. McGraw-Hill Broad. Co., Inc.* Neither *Lewis* nor *Hustler Magazine v. Falwell* nor principles emanating from *New York Times v. Sullivan* require actual malice for *all* intentional infliction of emotional distress claims arising from defamation.[26] The appellate court in *Lewis* did not require actual malice because the intentional infliction of emotional distress claim there arose from defamation. *Lewis*, 832 P.2d at 1121-25. Rather, the appellate court required actual malice because the underlying defamation was a matter of public concern. *Id.* Courts have not deviated from limiting actual malice to matters involving public officials, public figures, and public concern in the context of intentional infliction of emotional distress claims. Rather, courts merely apply that standard to ancillary claims when implicated in the defamation claim. Second, Dr. Coomer is not a public official or figure, and Defendants' defamatory statements against him were not a matter of public concern. As such, Dr. Coomer does not need to prove actual malice as an element of his intentional infliction of emotional distress claim. Third, even were the heightened actual malice standard to apply, Dr. Coomer has sufficiently alleged that Defendants acted with actual malice in publishing his defamatory statements, as discussed above. As Dr. Coomer has sufficiently pled his claim for intentional infliction of emotional distress, Dr. Coomer respectfully requests the Court deny Defendants' 12(b)(6) challenge to this claim.

---

[26] *See Lewis*, 832 P.2d at 1121-25 (involving a matter of public concern); *Hustler Magazine v. Falwell*, 485 U.S. 46, 50-57 (1988) (involving a public figure); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (involving a public official).

**C.   Dr. Coomer has stated a claim for civil conspiracy.**

39.    Dr. Coomer has alleged facts that establish Defendants engaged in civil conspiracy.  The facts underlying this civil conspiracy claim include and build upon the facts that support Dr. Coomer's defamation and intentional infliction of emotional distress claims.  To prevail on a claim for civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

40.    Here, Dr. Coomer alleged Defendants conspired to defame Dr. Coomer so as to promote baseless allegations of election fraud.  But Defendants do not actually engage with Dr. Coomer's civil conspiracy allegations.  Instead, they argue that the claim must be dismissed because no underlying crime or tort occurred.  As argued above, Dr. Coomer has sufficiently pleaded claims for both defamation and intentional infliction of emotional distress, and either or both are sufficient to sustain a finding of civil conspiracy.  As a result, and because Defendants do not challenge the merits of the civil conspiracy claim itself, Defendants' motion to dismiss Dr. Coomer's claim for civil conspiracy should be denied.

**D.   Dr. Coomer has stated a claim for injunctive relief.**

41.    Injunctive relief is a remedy Dr. Coomer has sought in the event he prevails on his claims against Defendants.  As such, review of that relief at this stage of the proceeding is premature.  Even were this relief subject to review at this time, Dr. Coomer

has made a prima facie showing for permanent injunctive relief, and, as discussed above, has adequately pleaded a basis for relief on his other claims as well.

## PRAYER

For these reasons, Plaintiff Eric Coomer, Ph.D. respectfully requests that the Court deny Defendants Michael J. Lindell, Frankspeech LLC, and My Pillow, Inc.'s Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6).   Plaintiff Eric Coomer, Ph.D. requests such other and further relief to which he may justly be entitled.

Dated this 11th day of August 2022.

Respectfully submitted,

_____/s/Charles J. Cain_____
Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
**CAIN & SKARNULIS PLLC**
P. O. Box 1064/101 N. F Street, Suite 207
Salida, Colorado 81201
719-530-3011/512-477-5011 (Fax)
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Response to Defendants' Motion to Dismiss has been served on all counsel on this 11th day of August 2022, using the CM/ECF system which will send notification of such filing to the following email addresses:

R. Scott Reisch (CO Bar # 26892)
scott@reischlawfirm.com

Jessica L. Hays (CO Bar # 53905)
jessica@reischlawfirm.com

Andrew D. Parker (MN Bar #195042)
parker@parkerdk.com

Abraham S. Kaplan (MN Bar #399507)
kaplan@parkerdk.com

Jesse H. Kibort (MN Bar #328595)
kibort@parkerdk.com

Ryan Malone (MN Bar # 395795)
malone@parkerdk.com

_/s/Charles J. Cain_
Charles J. Cain