**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

**EXHIBIT 2**

---

**TINA PETERS - November 7, 2022**

---

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF COLORADO

3  Civil Action No. 1:22-cv-01129-WJM

4  _____

5  VIDEOTAPED DEPOSITION OF TINA PETERS

6  November 7, 2022

7  _____

8  ERIC COOMER, PH.D.,

9  Plaintiff,

9  vs.

10  MICHAEL J. LINDELL, FRANKSPEECH LLC, AND MY PILLOW, INC.,

11  Defendants.

12  _____

13

14

15  Pursuant to Notice and the Colorado Rules

16  of Civil Procedure, the videotaped deposition of

17  TINA PETERS, called by Plaintiff, was taken on

18  Monday, November 7, 2022, commencing at 10:19 a.m.,

19  at Hotel Maverick, 840 Kennedy Avenue, Grand

20  Junction, Colorado, before Candice F. Flowers,

21  Certified Shorthand Reporter and Notary Public

22  within and for the State of Colorado.

23

24

25

---

**Page 2**

1  APPEARANCES:

2

3  APPEARING ON BEHALF OF PLAINTIFF:

4  CAIN & SKARNULIS PLLC
   Charles J. Cain, Esq.

5  Bradley A. Kloewer, Esq.
   101 North F Street, Suite 207

6  P.O. Box 1064
   Salida, Colorado 81201

7  Email: ccain@cstrial.com
   Email: bkloewer@cstrial.com

8

9  and

10  RECHT KORNFELD PC
   Trey Rogers, Esq.

11  1600 Stout Street
   Suite 1400

12  Denver, Colorado 80202
   Email: trey@rklawpc.com

13  (via videoconference)

14  APPEARING ON BEHALF OF DEFENDANTS:

15  PARKER DANIELS KIBORT
   Ryan Malone, Esq.

16  Jesse H. Kibort, Esq.
   888 Colwell Building

17  123 North Third Street
   Minneapolis, Minnesota 55401

18  Email: malone@parkerdk.com
   Email: kibort@parkerdk.com

19  (via videoconference)

20

21

22

23

24

25

---

**Page 3**

1  APPEARANCES: (cont'd)

2

3  APPEARING ON BEHALF OF THE DEPONENT:

4  GESSLER BLUE LLC
   Scott E. Gessler, Esq.

5  7350 East Progress Place
   Suite 100

6  Greenwood Village, Colorado 80111
   Email: sgessler@gesslerblue.com

7  and

8

9  SPRINGER & STEINBERG, PC
   Stephen F. Prager, Esq.

10  1600 Broadway Street
   Suite 1200

11  Denver, Colorado 80202
   (via videoconference)

12

13

14

15  Also Present:  Jeremy Signorini, Videographer

16  Jared Cowart

17

18

19

20

21

22

23

24

25

---

**Page 4**

1  **I N D E X**

2  **PAGE**

3  EXAMINATION OF TINA PETERS

4  By Mr. Cain                                6

5  By Mr. Kloewer                            --

6  By Mr. Rogers                             --

7  By Mr. Malone                             --

8  By Mr. Kibort                             --

9  By Mr. Gessler                            --

10  By Mr. Prager                            --

11

12

13

14  EXHIBITS                    INITIAL REFERENCE

15  Exhibit 1  Subpoena                     14

16  Exhibit 2  Screenshot of Twitter exchange     40

17  Exhibit 3  USB drive of video clips       50

18  Exhibit 4  Report by Daniel P. Rubinstein    118

19

20

21

22

23

24

25

---

TINA PETERS - November 7, 2022

Page 5

1  **P R O C E E D I N G S**
2  THE VIDEOGRAPHER: We are on the record
3  at 10:19 a.m. Today is November 7, 2022. This
4  begins the videotaped deposition of Tina Peters.
5  This is Case No. 1:22-cv-01129-WJM filed in the
6  United States District Court for the District of
7  Colorado, taken by the plaintiff in the matter of
8  Eric Coomer, Ph.D. versus Michael J. Lindell,
9  FrankSpeech LLC, and MyPillow, Inc.
10  We are located at Hotel Maverick, 840
11  Kennedy Avenue, Grand Junction, Colorado 81510.
12  The court reporter is Candice Flowers. The
13  videographer is Jeremy Signorini.
14  Counsel will introduce themselves and the
15  parties they represent beginning with plaintiff's
16  counsel first.
17  MR. CAIN: Charlie Cain and Brad Kloewer
18  on behalf of the plaintiff.
19  MR. MALONE: Ryan Malone and Jesse Kibort
20  on behalf of all defendants.
21  MR. PRAGER: Steve Prager on behalf of
22  the witness, Ms. Peters.
23  MR. GESSLER: Scott Gessler on behalf of
24  Ms. Peters as well.
25  THE VIDEOGRAPHER: Is that everybody?

Page 6

1  MR. ROGERS: Trey Rogers on behalf of the
2  plaintiff also.
3  THE VIDEOGRAPHER: Will the court
4  reporter please swear in the witness.
5  **TINA PETERS,**
6  having been first duly sworn to state the whole
7  truth, testified as follows:
8  **EXAMINATION**
9  BY MR. CAIN:
10  Q  Good morning, Ms. Peters. How are you?
11  A  Good morning. Perfect.
12  Q  Can you state your full name, please.
13  A  Tina Marie Peters.
14  Q  I met you, I think, about three minutes
15  ago for the first time; is that right?
16  A  That's right.
17  Q  Have you given sworn testimony before?
18  A  I have.
19  Q  On how many occasions?
20  A  Let's see. I don't recall.
21  Q  Approximately.
22  A  I don't recall.
23  Q  When was the last time?
24  A  On Thursday.
25  Q  In what matter?

Page 7

1  A  I was with the --
2  MR. PRAGER: Objection. I'm instructing
3  my client not to answer based on her Fifth
4  Amendment privilege.
5  THE DEPONENT: Thank you.
6  A  I take the advice of my counsel.
7  Q  (By Mr. Cain) All right. Let's do this
8  before we get too much further, Ms. Peters.
9  MR. CAIN: First of all, who was the
10  lawyer that just made the objection?
11  MR. PRAGER: Steve Prager.
12  MR. CAIN: Mr. Prager, have you made an
13  appearance in this case?
14  MR. PRAGER: In the -- no, I have not --
15  excuse me. No, I have not.
16  MR. CAIN: Are you going to file an
17  appearance in the case?
18  MR. PRAGER: I'll have to speak to
19  Mr. Steinberg about that.
20  MR. CAIN: Well, I need to know who's
21  going to be asserting objections on behalf of the
22  witness. If you're not representing a party in the
23  case and you're not counsel of record and you
24  haven't made an appearance in the case, then why
25  are you making objections in this deposition?

Page 8

1  MR. GESSLER: He and I both represent
2  Tina Peters.
3  THE DEPONENT: That's right.
4  MR. GESSLER: We don't have to enter an
5  appearance into a case in order to represent a
6  deponent.
7  MR. CAIN: So, Mr. Prager, you're
8  representing Ms. Peters here today as well?
9  MR. PRAGER: Yes.
10  MR. CAIN: Okay. Who's going to be
11  making the objections?
12  MR. GESSLER: Steve, I'll make the
13  objections, okay?
14  MR. PRAGER: Okay.
15  MR. CAIN: And if there is -- if you-all
16  don't mind on the Zoom, if you do have something to
17  say, please identify yourself before you make your
18  statement just so we know who's talking.
19  Q  (By Mr. Cain) Okay. So I asked you about
20  a deposition on Thursday and you've asserted the
21  Fifth Amendment privilege, correct?
22  A  That's right.
23  Q  All right. Before we get too much
24  further into this, we neglected, when we did
25  announcements, to recognize a gentleman I'm looking

Page 9

1  at right now who appears to be security for you; is
2  that right?
3          MR. GESSLER:  I'll advise my client not
4  to -- to decline to answer based on Fifth Amendment
5  grounds.  I'm happy to say, yes, he is serving as
6  security for Ms. Peters.
7      Q  (By Mr. Cain) And then there's a -- looks
8  like a dog.
9          Is that your dog here?
10         MR. GESSLER:  I'll advise my client not
11 to answer on Fifth Amendment grounds.  It is his
12 security dog.
13     Q  (By Mr. Cain) Okay.  Before we started
14 this deposition, we had an agreement and I will put
15 it on the record, ma'am.  I spoke to your counsel,
16 but in my view, security is not an appropriate
17 person to be in the room in a deposition.  The
18 rules state who can be here and who cannot, and he
19 ain't one of them.
20         That said, we agreed -- because you had
21 indicated you would leave -- that he could be in
22 the room sitting out back behind you, at least for
23 the time that you're in this room.
24         Do you understand that?  That's our
25 agreement.

Page 10

1          MR. GESSLER:  This is our agreement.  I
2  can advise you that that is an agreement we've had.
3          THE DEPONENT:  Okay.  Thank you.
4      Q  (By Mr. Cain) All right.  So you said you
5  were in a deposition last Thursday.  You've
6  asserted privilege on that.
7          The question on the table, though, ma'am,
8  was:  How many depositions have you given?  And you
9  indicated you couldn't recall all of them.
10     A  I've answered that question.  Thank you.
11     Q  Prior to the Thursday deposition, what
12 was the last time -- or when was the last time, I
13 should say, you were deposed?
14         MR. GESSLER:  So I'm going to advise my
15 client to decline to answer that question on Fifth
16 Amendment grounds.
17         MR. CAIN:  Counsel --
18     Q  (By Mr. Cain) I'm sure you've had some
19 time to prepare to give testimony today; is that
20 right?
21         MR. GESSLER:  I'm going to advise my
22 client to decline to answer that question on Fifth
23 Amendment grounds as well.
24     Q  (By Mr. Cain) Did you meet with your
25 lawyer to prepare?  Mr. Gessler?

Page 11

1          MR. GESSLER:  I'm going to advise my
2  client to decline to answer that question on Fifth
3  Amendment grounds.
4      Q  (By Mr. Cain) Ma'am, if you don't answer
5  a question when he gives you that advice, is it
6  safe for me to assume that you're going to agree
7  with your counsel's advice so we don't have to go
8  through that every time?
9      A  That's correct.
10     Q  Okay.  So he's invoking the Fifth
11 Amendment privilege on your behalf.
12     A  That's correct.
13     Q  And you're okay with that?
14     A  I'm very much okay with that.
15     Q  All right.  Are you taking any medication
16 or any substance today that would affect your
17 ability to give truthful testimony?
18         MR. GESSLER:  So I'm going to advise my
19 client to decline to answer that question on Fifth
20 Amendment grounds.
21     Q  (By Mr. Cain) Have you spoken to anybody
22 other than your lawyer -- I should say, plural,
23 lawyers since we have Mr. Prager on the line?
24         Have you spoken to anybody other than
25 your lawyers about your testimony here today?

Page 12

1          MR. GESSLER:  And I'll advise my client
2  to decline to answer that question on Fifth
3  Amendment grounds.
4      Q  (By Mr. Cain) When is the last time you
5  spoke to Mike Lindell?
6          MR. GESSLER:  And I'll advise my client
7  to decline to answer that question on Fifth
8  Amendment grounds.
9      Q  (By Mr. Cain) Did you discuss your
10 deposition testimony with Mr. Lindell at any time?
11         MR. GESSLER:  And I'll advise my client
12 to decline to answer that question on Fifth
13 Amendment grounds.
14     Q  (By Mr. Cain) How about Mr. Oltmann, did
15 you discuss the fact that you were giving
16 deposition testimony in this case with Joe Oltmann?
17         MR. GESSLER:  I'll advise my client to
18 decline to answer that question on Fifth Amendment
19 grounds.
20     Q  (By Mr. Cain) When's the last time you
21 spoke to Mr. Oltmann?
22         MR. GESSLER:  I'll advise my client to
23 decline to answer that question on Fifth Amendment
24 grounds.
25     Q  (By Mr. Cain) Who's paying for your

Page 13

1  lawyer to be here?
2          MR. GESSLER:   I'll advise my client to
3  decline to answer that question on Fifth Amendment
4  grounds.
5      Q   (By Mr. Cain) Is Mr. Lindell paying for
6  any part of your defense, either the criminal
7  defense or your lawyer being here in this civil
8  case?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11     Q   (By Mr. Cain) Have you understood all of
12  my questions to this point in the deposition?
13         MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15     Q   (By Mr. Cain) Has Mike Lindell paid you
16  any consideration, either nonmonetary consideration
17  or actual consideration, since November 2020?
18         MR. GESSLER:   I'll advise my client to
19  decline to answer on Fifth Amendment grounds.
20     Q   (By Mr. Cain) You were served with a
21  subpoena to be here, weren't you?
22         MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24     Q   (By Mr. Cain) Let's do this.  Candice is
25  our court reporter.  I don't know if you had a

Page 14

1  chance to introduce yourself to her.  She's taking
2  down everything you're not saying.  I'm going to
3  have her give you some documents, ma'am.  There
4  aren't many.  But I want to take a look at a few
5  with you during the course of your deposition.
6          The first is going to be the subpoena
7  that I just referenced.  It will be marked as
8  Exhibit 1.
9          (Exhibit 1 was marked.)
10         MR. MALONE:   This is Ryan Malone.  Would
11  it be possible to do some sort of a screen share so
12  that we can view this exhibit as well?
13         MR. CAIN:   Unfortunately, no.  We didn't
14  upload them because it wasn't a Zoom deposition.
15  Ryan, we'll have a few deposition exhibits but not
16  many because we didn't get much in the way of
17  production to this point.  This one I'll just
18  advise you is the -- was filed with the court.
19  It's a copy of the subpoena duces tecum for -- for
20  Ms. Peters today, so it should be in the court
21  file.
22         MR. MALONE:   Understood.  Thank you.
23     Q   (By Mr. Cain) Is this a copy of the
24  subpoena that was served on you on or about
25  September 7th of this year?

Page 15

1          MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3      Q   (By Mr. Cain) You do remember being
4  served out at the courthouse with the deposition
5  subpoena, don't you?
6          MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) In fact, didn't you go on
9  Lindell TV shortly thereafter to explain the
10  service of this subpoena to Brannon Howse?
11         MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13     Q   (By Mr. Cain) When you got the subpoena,
14  a return of which has been filed indicating you
15  were served, did you review the requirements on
16  Page 3 as to what your obligations were to respond
17  to the subpoena?
18         MR. GESSLER:   I'll advise my client to
19  decline to answer on Fifth Amendment grounds.
20     Q   (By Mr. Cain) Did you file with the
21  federal court that this case is pending any
22  objections to the request that we made of you to
23  bring documents with you here today?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 16

1      Q   (By Mr. Cain) Did you file a motion or
2  have -- cause your counsel to file a motion to
3  quash or otherwise modify this subpoena?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain) Did you review this
7  document, ma'am, and look at what your duties are
8  in responding to this subpoena?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11     Q   (By Mr. Cain) According to the rule
12  that's cited here, a party responding to a subpoena
13  must produce responsive documents as they are kept
14  in the ordinary course of your business.
15         Have you produced any documents to us
16  here today?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19     Q   (By Mr. Cain) Ma'am, when you got the
20  subpoena, did you go to the -- looks like it's the
21  last page.  Can you turn to the last page with me,
22  please.  This is the last page of Exhibit 1.
23         Do you see where it says "Documents
24  Requested" up top?
25         MR. GESSLER:   I'll advise my client to

TINA PETERS - November 7, 2022

Page 17

1  decline to answer on Fifth Amendment grounds.
2      Q   (By Mr. Cain)  When you got the subpoena,
3  did you review the eight categories of documents
4  that we requested you provide to us?
5          MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7      Q   (By Mr. Cain)  Ma'am, No. 1 indicates that
8  we requested that you produce all written
9  communications between you and Lindell,
10  FrankSpeech, or MyPillow between January 1, 2020
11  and the present, including, but not limited to, all
12  written communications relating to Dr. Coomer or
13  Dominion Voting Systems.
14          Have you produced any communications with
15  Mike Lindell today?
16          MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18      Q   (By Mr. Cain)  Do communications between
19  you and Mike Lindell exist?  And by -- before he
20  says something, by "communications," I mean, for
21  example, text messages or e-mails.
22          MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24      Q   (By Mr. Cain)  Do you communicate with
25  Mr. Lindell via a messaging app?

Page 18

1          MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3      Q   (By Mr. Cain)  Do you have a text
4  messaging account?
5          MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7      Q   (By Mr. Cain)  Do you carry -- do you have
8  a cell phone with you here today?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11      Q   (By Mr. Cain)  What -- what is your cell
12  phone number?
13          MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15      Q   (By Mr. Cain)  Have you had the same cell
16  phone since the election in November of 2020?
17          MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19      Q   (By Mr. Cain)  Who's your provider?  Who
20  provides the service for a cell phone if you have
21  one?
22          MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24      Q   (By Mr. Cain)  Have you deleted any
25  communications between yourself and Mr. Lindell or

Page 19

1  anybody associated with FrankSpeech or MyPillow
2  since you were served with the subpoena?
3          MR. GESSLER:   I'll advise my client to --
4          THE DEPONENT:   May I have a tissue?
5          MR. CAIN:   Of course.
6          MR. GESSLER:   I'll advise my client
7  to decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain)  Are you ready?
9      A   Uh-huh.
10      Q   All right.  Document Request No. 2, do
11  you see that?
12          MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14      Q   (By Mr. Cain)  Is this the first time
15  you're looking at Document Exhibit Request No. 2?
16          MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18      Q   (By Mr. Cain)  This request, ma'am, is for
19  all written communications between you and Joseph
20  Oltmann between January 1, 2020 and the present,
21  including, but not limited to, all written
22  communications discussing Dr. Coomer or Dominion
23  Voting Systems.
24          Do any such documents exist?
25          MR. GESSLER:   I'll advise my client to

Page 20

1  decline to answer on Fifth Amendment grounds.
2      Q   (By Mr. Cain)  Do you have any text
3  messages with Joe Oltmann during this time period?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain)  Do you back up any of your
7  communications on the cloud?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10      Q   (By Mr. Cain)  Request No. 3, ma'am, can
11  you look at that with me.  This one requests all
12  documents and communications authored, sent, or
13  received by you relating to concerns about the
14  accuracy, reliability, verifiability -- that's a
15  mouthful -- or truthfulness of the information
16  published during the cyber symposium.
17          Did you bring any documents that are
18  responsive to Request No. 3 with you here today?
19          MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21      Q   (By Mr. Cain)  Who did you communicate
22  with via text messaging or a similar app during the
23  Lindell cyber symposium?
24          MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 21

1    Q.  (By Mr. Cain) How did you communicate
2  with individuals associated with that cyber
3  symposium, either through e-mail or text or
4  otherwise?  How did you do that?
5         MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7    Q.  (By Mr. Cain) I did receive a link that
8  indicated that there was -- were some documents
9  that were produced to us shortly before this
10 deposition.  It looks, to me, like -- I'll just
11 make this representation to counsel and everyone
12 else, including the dog, that we got 20 e-mails
13 that appear to be either promotional e-mails for
14 MyPillow or some orders with MyPillow.  For
15 example, you appeared to order some slippers at one
16 point, moccasins perhaps.
17        Did you -- did you gather this
18 information as a result of receiving this subpoena
19 and provide it to your counsel?
20        MR. GESSLER:   I'll advise my client to
21 decline to answer on Fifth Amendment grounds.
22   Q.  (By Mr. Cain) Do you know why we have
23 promotional material in response to the subpoena we
24 issued?
25        MR. GESSLER:   I'll advise my client to

Page 22

1  decline to answer on Fifth Amendment grounds.
2    Q.  (By Mr. Cain) Have you ever been on
3  Mr. Lindell's payroll?
4         MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6    Q.  (By Mr. Cain) And I touched on this a
7  little earlier.  I want to make sure I get a --
8  hopefully a response.
9         How many times have you flown on his
10 private airplane to go to events like the cyber
11 symposium?
12        MR. GESSLER:   I'll advise my client to
13 decline to answer on Fifth Amendment grounds.
14   Q.  (By Mr. Cain) Did he fly you to Texas
15 after the cyber symposium?
16        MR. GESSLER:   I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18   Q.  (By Mr. Cain) Has he put you up either in
19 one of the properties he owns or paid -- paid for
20 you to stay somewhere other than your residence?
21        MR. GESSLER:   I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23   Q.  (By Mr. Cain) Bear with me, ma'am, just a
24 minute.  I'm looking at the documents that we did
25 get.

Page 23

1         Ma'am, the documents that I've, I guess,
2  generically described, I should say, has an e-mail
3  address from MyPillow to tm.peters@live.com.
4         Is that your personal e-mail address?
5         MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7    Q.  (By Mr. Cain) Do you have any other
8  potential e-mail addresses, other than
9  tm.peters@live.com?
10        MR. GESSLER:   I'll advise my client to
11 decline to answer on Fifth Amendment grounds.
12   Q.  (By Mr. Cain) You do not have access, do
13 you, as you sit here, to the County Clerk e-mail
14 that you would have had while you were actively
15 serving as the County Clerk, do you?
16        MR. GESSLER:   I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18   Q.  (By Mr. Cain) In other words, you can't
19 log on to your County e-mail address at this point,
20 can you?
21        MR. GESSLER:   I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23   Q.  (By Mr. Cain) Directing you back to
24 Exhibit No. 1, Request No. 4, it's a little longer
25 request so I'm going to pare it down.  But

Page 24

1  essentially it's requesting communications between
2  you and what they called the Red Team at the cyber
3  symposium, and then we indicated members of those
4  teams including Phil Waldron, Doug Logan, Conan
5  Hayes, Ron Watkins, Mark Cook, Shawn Smith, Lisa
6  Draza and/or Joe Oltmann between October 1, 2020
7  and the present.  So we're asking you for
8  communications between you, if any, and those
9  individuals.
10        Did you bring any such communications or
11 copies of documents, electronic records, that would
12 be responsive to Request No. 4?
13        MR. GESSLER:   I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15   Q.  (By Mr. Cain) When's the last time you
16 talked to Conan Hayes?
17        MR. GESSLER:   I'll advise my client to
18 decline to answer on Fifth Amendment grounds.
19   Q.  (By Mr. Cain) Have you ever spoken to
20 Phil Waldron?
21        MR. GESSLER:   I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23   Q.  (By Mr. Cain) Do you know Ron Watkins?
24        MR. GESSLER:   I'll advise my client to
25 decline to answer on Fifth Amendment grounds.

TINA PETERS - November 7, 2022

Page 25

1    Q   (By Mr. Cain) Have you ever spoken to Ron
2  Watkins?
3         MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5    Q   (By Mr. Cain) Do you know how Ron Watkins
6  got a copy of an image of a hard drive from the
7  County Clerk's office?
8         MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10   Q   (By Mr. Cain) Request No. 5, Ms. Peters,
11 if you will review that along with me. That
12 requests any documents and communications authored,
13 sent, or received by you specifically linking Dr.
14 Coomer to specific acts of interference,
15 manipulation, or alteration of the 2020
16 presidential election results.
17        You didn't bring anything responsive to
18 that either, did you?
19        MR. GESSLER:   I'll advise my client to
20 decline to answer on Fifth Amendment grounds.
21   Q   (By Mr. Cain) Are you aware of any such
22 communications that exist where you authored
23 something -- and I'll -- I'll just paraphrase it.
24        Were you sent a text, were you sent an
25 e-mail and the substance of which was you

Page 26

1  discussing the rigging of the 2020 election and Dr.
2  Coomer's involvement or Dominion Voting System's
3  involvement in the rigging of the election?
4         MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6    Q   (By Mr. Cain) Do those communications
7  exist or not?
8         MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10   Q   (By Mr. Cain) Well, you talk about them
11 publicly quite a bit, so why are you not talking
12 about these issues with me here today?
13        MR. GESSLER:   I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15   Q   (By Mr. Cain) Is it because you're under
16 oath now?
17        MR. GESSLER:   I'll advise my client to
18 decline to answer on Fifth Amendment grounds.
19   Q   (By Mr. Cain) Request No. 6, all
20 documents and communications authored, sent, or
21 received by you describing the credentials,
22 qualifications, or work experience of Conan James
23 Hayes, including, but not limited to,
24 communications with any third parties who claim to
25 be able to vouch for those credentials,

Page 27

1  qualifications or work experience.
2         Do you have any such communications in
3  your possession, custody, or control?
4         MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6    Q   (By Mr. Cain) You'd agree with me, given
7  my characterization at least of the few orders we
8  got from MyPillow, you haven't brought with you in
9  response to the subpoena any such communications
10 with Mr. Hayes, true?
11        MR. GESSLER:   I'll advise my client to
12 decline to answer on Fifth Amendment grounds.
13   Q   (By Mr. Cain) Who paid for him?
14        MR. GESSLER:   I'll advise my client to
15 decline to answer on Fifth Amendment grounds.
16   Q   (By Mr. Cain) Who paid for his work here
17 in Mesa County?
18        MR. GESSLER:   I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20   Q   (By Mr. Cain) Request No. 7, all
21 documents and communications authored, sent, or
22 received by you relating to any surveillance of,
23 threats directed towards, or harassment of
24 Dr. Coomer between January 1, 2020 and the present.
25        Do you know of any such documents in your

Page 28

1  possession, custody, or control?
2         MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4    Q   (By Mr. Cain) Surely you've seen some of
5  the threats that have been directed towards him,
6  haven't you?
7         MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9    Q   (By Mr. Cain) Have you made any threats
10 to Dr. Coomer?
11        MR. GESSLER:   I'll advise my client to
12 decline to answer on Fifth Amendment grounds.
13   Q   (By Mr. Cain) Online or otherwise?
14        MR. GESSLER:   I'll advise my client to
15 decline to answer on Fifth Amendment grounds.
16   Q   (By Mr. Cain) Request No. 8, all
17 documents or communications authored, sent, or
18 received by you discussing any visits by Conan
19 James Hayes to Mesa County, Colorado between
20 January 1, 2020 and the present, including, but not
21 limited to, any communications identifying all
22 individuals who interacted with Conan James Hayes
23 during his time in Colorado.
24        Have you brought any such communications
25 or documents with you here today?

Page 29

1   MR. GESSLER:   I'll advise my client to
2   decline to answer on Fifth Amendment grounds.
3       Q    (By Mr. Cain)  Who else was working, if
4   anyone, with Mr. Hayes in the work that he did here
5   in Mesa County in imaging the hard drives?
6   MR. GESSLER:   I'll advise my client to
7   decline to answer on Fifth Amendment grounds.
8       Q    (By Mr. Cain)  What conversations -- we
9   did see -- Mr. Kloewer probably could tell me where
10  it was, but --
11      MR. CAIN:   Kloewer is K-L-O-E-W-E-R.
12      MR. GESSLER:   How do you spell that
13  again?
14      MR. CAIN:   K-L-O-E-W-E-R.  I have to do
15  this at the courthouse every time with him.  I tell
16  the judge just it rhymes with flavor and just put a
17  K on it.  It's not spelled that way.  It makes no
18  sense, but that is what it is, and he's a hell of a
19  lawyer.  Sorry.  Bear with me.  Let me silence my
20  phone.
21      Q    (By Mr. Cain)  Anyway, there was an image
22  taken of your cell phone and it had an address in
23  California where you were sending -- or someone at
24  the County Clerk's office was sending information
25  to Mr. Hayes.

Page 30

1       Do you remember someone taking a picture
2   of your cell phone containing that address out in
3   California?
4   MR. GESSLER:   I'll advise my client to
5   decline to answer on Fifth Amendment grounds.
6       Q    (By Mr. Cain)  Did you send any of the
7   electronic data that was copied from the County
8   Clerk's office to Mr. Hayes in California?
9   MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11      Q    (By Mr. Cain)  Did you direct anyone to
12  send that information to Mr. Hayes?
13      MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15      Q    (By Mr. Cain)  Was Mike Lindell aware
16  that, to your knowledge -- and his awareness would
17  be as a result of you actually talking to him, but
18  was he aware that Mr. Hayes was making an image of
19  the hard drive of the election software in Mesa
20  County?
21      MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23      Q    (By Mr. Cain)  Did you talk to him about
24  it --
25      MR. MALONE:   This is Ryan Malone also

Page 31

1   objecting on form and foundation.
2       MR. CAIN:   Okay.
3       MR. GESSLER:   I'm sorry.  Is there a
4   pending question right now?
5       MR. CAIN:   No.
6       MR. GESSLER:   Okay.
7       MR. CAIN:   It was the last one he thought
8   was bad, but we'll move forward.
9       Q    (By Mr. Cain)  So you didn't talk -- well,
10  you're not answering whether or not you spoke with
11  Mr. Lindell about the copying of the hard drives.
12      Do you know how that information -- in
13  other words, the electronic images of the hard
14  drives -- made its way to the cyber symposium?
15      MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17      Q    (By Mr. Cain)  Do you remember how you
18  made your way to the cyber symposium in South
19  Dakota?
20      MR. GESSLER:   I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22      Q    (By Mr. Cain)  If I need to go to the
23  judge and request that certain information and data
24  be compelled, where would I specifically direct the
25  Court to that information?  In other words, where

Page 32

1   would this data -- to the extent that it exists,
2   whether it's in paper form, printed out e-mail, or
3   it's on a computer that you have, a personal laptop
4   or personal device, where would those types of data
5   storage units be located?
6       MR. GESSLER:   I'll advise my client to
7   decline to answer on Fifth Amendment grounds.
8       Q    (By Mr. Cain)  Are you currently employed?
9       MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11      Q    (By Mr. Cain)  My understanding is you may
12  be on some form of leave from the clerk's office,
13  but your duties as the Mesa County Clerk have been
14  either suspended or you're no longer able to
15  perform those duties; is that true?
16      MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18      Q    (By Mr. Cain)  Are you prohibited at this
19  stage from communicating with County officials
20  concerning the operations of the County Clerk's
21  office?
22      MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24      Q    (By Mr. Cain)  Is this your first term as
25  a County Clerk?

Page 33

1    MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3    Q   (By Mr. Cain)  Did you have any experience
4  in elections, running elections in an official
5  capacity prior to your first term as County Clerk
6  in Mesa County?
7    MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9    Q   (By Mr. Cain)  Did Mr. Lindell support
10  your campaign for County Clerk here in Mesa when
11  you ran initially?
12    MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain)  And by support I mean
15  either rah, rah cheerleading support or financial
16  support.
17    MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19    Q   (By Mr. Cain)  How about Joe Oltmann, same
20  question.
21    MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23    Q   (By Mr. Cain)  Do you have any educational
24  background or training that would suggest that you
25  were qualified to run the 2020 -- November 2020

Page 34

1  election here in Mesa County?
2    MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4    Q   (By Mr. Cain)  Training perhaps with
5  Dominion, things of that nature?
6    MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8    Q   (By Mr. Cain)  Experience in cyber
9  security, do you have any such experience or do you
10  rely on others for that?
11    MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13    Q   (By Mr. Cain)  Any computer forensic
14  background of note?
15    MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17    Q   (By Mr. Cain)  I think you worked in
18  construction; is that right?
19    MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21    Q   (By Mr. Cain)  Ma'am, pardon me.  I was
22  looking at -- and I will just cite for the record
23  *U.S. v. Clark,* which is a 10th Circuit case that
24  describes the parameters of the invocation of the
25  Fifth Amendment, and I think we're well outside of

Page 35

1  when it's appropriate to invoke the Fifth.  And I'm
2  going to state that for the record so counsel, if
3  he so chooses, can refresh his recollection on that
4  particular case because we're going to be arguing
5  in court about it, I'm certain.
6    As it relates to the questions, I'm
7  prepared to sit here for five hours and ask you the
8  questions I have, so I'm going to do that.
9    A   That's good.  That's good.  Thank you.
10    Q   And we'll see how much information we can
11  obtain today, if any.  Before I made that
12  statement, I was asking you about training, so let
13  me kind of circle back to that.
14    Were you actually trained on how to
15  use --
16    A   Excuse me for a moment.
17    Q   Yes, ma'am.
18    A   If we're going to do that, I need to run
19  to the restroom.  Okay.  All right.
20    Q   Just a second.  Let me -- let me --
21    MR. GESSLER:   Let's finish the question
22  and --
23    THE DEPONENT:   Okay.  All right.
24    Q   (By Mr. Cain)  Yeah, and I apologize,
25  ma'am.  I should --

Page 36

1    A   That's okay.
2    Q   I should have told you a couple of things
3  that I normally say, so let me say them now.
4    A   Okay.
5    Q   In almost every deposition, the lawyer
6  will say if you don't understand my question, then
7  they will ask you to rephrase -- you know, tell me
8  you don't understand it and then we can rephrase it
9  so you and I are talking the same language.  Since
10  you haven't answered any questions, I'm going to
11  assume, unless you say otherwise, you've understood
12  the questions that I have asked you here today to
13  this point; is that fair?
14    MR. GESSLER:   You can answer the
15  question.
16    A   That's fair.
17    Q   (By Mr. Cain)  Okay.  Thank you.
18    The other thing is the break.  That's
19  what Mr. Gessler was just talking about.  It's not
20  appropriate to take a break when a question is
21  pending.  It is appropriate to take a break to
22  accommodate you and I'm happy to do that, and so
23  I'm going to give you a freebie and I'm going to
24  let you take a break now, even though I started a
25  question.

TINA PETERS - November 7, 2022

Page 37

1    A    No. Go ahead and finish your question
2    and then I'll go. I can wait.
3    Q    Okay. Well, here's what we were talking
4    about. We were talking about whether you had any
5    training -- or I was asking you whether you had any
6    training on Dominion products. And then my next
7    question, which I'll slightly rephrase, is for you
8    to describe to me whether you had any interactions
9    with Dominion employees while you were County Clerk
10   and specifically relating to the November 2020
11   election.
12        Did you have any interactions with
13   Dominion employees?
14        MR. GESSLER:   I'll advise my client to
15   decline to answer on Fifth Amendment grounds.
16        MR. CAIN:   All right. Let's take a
17   break.
18        THE DEPONENT:   Okay.
19        THE VIDEOGRAPHER:   The time on the video
20   monitor says 11:56, but the actual time is 10:55.
21   We're off the record.
22        (Recess taken.)
23        THE VIDEOGRAPHER:   The time is 11:13.
24   We're back on the record.
25        Q    (By Mr. Cain) Are you ready to proceed,

Page 38

1    ma'am?
2    A    I certainly am.
3    Q    You can -- that exhibit in front of you,
4    you can put that aside so it doesn't get all
5    cluttered in front of you. We're done talking
6    about that for the time being.
7    A    All right.
8    Q    When we broke, I asked you about
9    interactions with Dominion employees and training,
10   things of that nature.
11        Do you -- do you recall if you ever met
12   with Dr. Coomer in connection with learning about
13   the Dominion product line?
14        MR. GESSLER:   I'll advise my client to
15   decline to answer on Fifth Amendment grounds.
16        Q    (By Mr. Cain) Do you think you have ever
17   met him?
18        MR. GESSLER:   I'll advise my client to
19   decline to answer on Fifth Amendment grounds.
20        Q    (By Mr. Cain) Because you have made
21   public statements about him, so my question is
22   really geared towards how did you gain any personal
23   knowledge about Dr. Coomer through direct
24   interactions, if at all?
25        MR. GESSLER:   I'm sorry. Is that a

Page 39

1    question?
2        MR. CAIN:   Yeah.
3        MR. GESSLER:   Go ahead. Finish. I'm not
4    trying to be difficult.
5        MR. CAIN:   No, I know you're not. It
6    ended with a question mark, but it was a long,
7    drawn-out question. Let me ask it a little --
8    hopefully in a more truncated fashion. That's a
9    lawyer word for short.
10   Q    (By Mr. Cain) Do you have any personal
11   knowledge about Dr. Coomer?
12        MR. GESSLER:   I'll advise my client to
13   decline to answer on Fifth Amendment grounds.
14   Q    (By Mr. Cain) Have you ever talked to
15   him?
16        MR. GESSLER:   I'll advise my client to
17   decline to answer on Fifth Amendment grounds.
18   Q    (By Mr. Cain) Ever spoken to him on the
19   telephone?
20        MR. GESSLER:   I'll advise my client to
21   decline to answer on Fifth Amendment grounds.
22   Q    (By Mr. Cain) Ever made public statements
23   about him?
24        MR. GESSLER:   I'll advise my client to
25   decline to answer on Fifth Amendment grounds.

Page 40

1    Q    (By Mr. Cain) Ever Tweeted about him?
2        MR. GESSLER:   I'll advise my client to
3    decline to answer on Fifth Amendment grounds.
4    Q    (By Mr. Cain) Are you on Twitter?
5        MR. GESSLER:   I'll advise my client to
6    decline to answer on Fifth Amendment grounds.
7        (Exhibit 2 was marked.)
8        MR. CAIN:   The court reporter has marked
9    Deposition Exhibit 2. While you're looking at it,
10   for the folks on the Zoom, this is a one-page
11   document. I don't have it scanned. Let me
12   characterize it for you so you know what we're
13   looking at. It purports to be a printout of some
14   Twitter exchanges. There's some statements by --
15   purporting to be from Senator Pat Toome, and this
16   is then responded to by Tina Marie Peters at B, the
17   letter B, healthynow. That's the Twitter handle.
18   It appears to be a response to some statements made
19   by Pat Toome regarding the election. And since --
20   Q    (By Mr. Cain) Well, actually, ma'am, can
21   you read the entry below Tina Marie Peters into the
22   record for the lawyers.
23        MR. GESSLER:   I'll advise my client to
24   decline to answer on Fifth Amendment grounds.
25   Q    (By Mr. Cain) I'll read it, then, ma'am.

Page 41

1  It says in response to Pat Toome:  Shame on you!
2  As one that administers elections in my County, you
3  apparently have no idea how it is possible to No.
4  1, tabulate more than once ballots -- and that's
5  how it's written, once.  I think it means one.  So
6  No. 1, I'll read it how I think it's supposed to
7  be, tabulate more than one ballot favoring a
8  candidate, No. 2, change algorithm in a voting
9  machine (see Eric Coomer from Dominion's Facebook
10  Rants).  You are dirty or ignorant.  Time stamp
11  7:24 a.m., January 3, 2021.
12      Did you send or make this posting on
13  Twitter, Ms. Peters?
14      MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16      Q   (By Mr. Cain) What were you referring to,
17  if you know, about this concept of tabulating more
18  than one ballot favoring a candidate?
19      MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21      Q   (By Mr. Cain) You reference in this Tweet
22  purporting to be from you the ability to change the
23  algorithm in a voting machine, and then you
24  reference Dr. Coomer.
25      What are you referring to there?

Page 42

1      MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3      Q   (By Mr. Cain) This Tweet was actually
4  deleted, but we preserved a copy.
5      Did you delete this Tweet yourself?
6      MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) Do you know why you deleted
9  this Tweet?
10      MR. GESSLER:   I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12      Q   (By Mr. Cain) Do you remember sitting
13  down and thinking, well, maybe -- this was three
14  days before the insurrection -- maybe I need to
15  delete this Tweet?
16      MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18      Q   (By Mr. Cain) Why is that funny?
19      MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21      Q   (By Mr. Cain) Is this your Twitter
22  handle?
23      MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25      Q   (By Mr. Cain) Well, here you're talking

Page 43

1  about purporting to talk about Eric Coomer on
2  January 3rd of 2021.
3      Where did you get your knowledge about
4  changing an algorithm in a voting machine when you
5  referenced Dr. Coomer?
6      MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) Who told you about that?
9      MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11      Q   (By Mr. Cain) Or did you come to this
12  conclusion on your own based on research that you
13  did?
14      MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16      Q   (By Mr. Cain) Do you have any evidence,
17  ma'am, that Dr. Coomer had anything to do with
18  betraying his country or rigging the election?
19      MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21      Q   (By Mr. Cain) You've made other public
22  statements, haven't you, about Dr. Coomer, not just
23  on Twitter?
24      MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 44

1      Q   (By Mr. Cain) Do you believe he's a
2  criminal?
3      MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5      Q   (By Mr. Cain) You would agree with me
6  that committing election fraud is a felony?
7      MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9      Q   (By Mr. Cain) And, again, I'm going to do
10  this periodically, but we've had the invocation of
11  the Fifth over 100 times now.
12      You're going to take your lawyer's advice
13  and have to this point when he invokes the Fifth on
14  your behalf, correct?
15      MR. GESSLER:   You can answer the
16  question.
17      A   That's correct.
18      Q   (By Mr. Cain) Okay.  And can we just have
19  a standing agreement -- maybe this is easier,
20  actually, now that I'm thinking about it.
21      Unless you tell me otherwise, I'm going
22  to assume that you're taking your lawyer's advice
23  when he invokes the Fifth Amendment on your behalf;
24  is that fair?
25      A   I'll always take my lawyer's advice.

Page 45

1  That's fair.
2      Q   (By Mr. Cain)  Others, including
3  Mr. Lindell, have called Dr. Coomer a traitor and
4  that he's treasonous.
5          Do you share that same belief?
6          MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain)  If you haven't met him -- I
9  presume that to be true -- how do you know that he
10  rigged the election?
11         MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13     Q   (By Mr. Cain)  How many people do you
14  know, ma'am, who now believe that Dr. Coomer had
15  something to do with rigging the 2020 presidential
16  election?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19     Q   (By Mr. Cain)  I mean, based on the public
20  statements you've made, you obviously believe he
21  had a hand in doing that, right?
22         MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24     Q   (By Mr. Cain)  And you obviously believe
25  that his reputation as an election worker is

Page 46

1  less -- I'll put it nicely -- is less than stellar.
2          MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4      Q   (By Mr. Cain)  Just estimate for me the
5  number of people in your sphere who, as a result of
6  the statements that have been made about Dr.
7  Coomer, believe that he betrayed his country?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q   (By Mr. Cain)  Based on what you've
11  learned about Dr. Coomer from any source, how did
12  he, quote, change an algorithm, close quote, in the
13  Mesa County election management system?
14         MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16     Q   (By Mr. Cain)  You've also publicly talked
17  about Dr. Coomer being on an Antifa call.
18         Do you remember doing that?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21     Q   (By Mr. Cain)  Do you believe he's a
22  member of Antifa and do you firmly hold that
23  belief?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 47

1      Q   (By Mr. Cain)  Do you even know what
2  Antifa is?  Do you have a definition of that
3  organization, if it is one?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain)  I mean, are there members
7  of this group, Antifa?  Do they have a membership
8  role like, say, the NRA?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11     Q   (By Mr. Cain)  Is it -- is it a political
12  organization like -- like the Republican or
13  Democratic Party?
14         MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16     Q   (By Mr. Cain)  Do you believe that only
17  people who hold a specific political viewpoint --
18  for example, conservative -- can work in elections
19  or can Democrats do that too?
20         MR. GESSLER:   I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22     Q   (By Mr. Cain)  To your knowledge, did you
23  have any Democrats working in the Mesa County
24  Clerk's office in November of 2020?
25         MR. GESSLER:   I'll advise my client to

Page 48

1  decline to answer on Fifth Amendment grounds.
2      Q   (By Mr. Cain)  You probably don't ask, do
3  you?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain)  Because I suspect you don't
7  choose who's going to administer the elections in
8  this county, at least when you had the authority to
9  do so, based on a person's political persuasion one
10  way or the other, do you?
11         MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13     Q   (By Mr. Cain)  Even Republicans -- I read
14  the other day Dan Crenshaw -- do you know who he
15  is, a congressman?
16         MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18     Q   (By Mr. Cain)  He was quoted last week as
19  saying -- I wrote it down -- it was always a lie.
20  The whole thing was always a lie, and it was a lie
21  meant to rile people up.  That's what Congressman
22  Crenshaw says.
23         Do you agree with that statement?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 49

1      A    I want to understand what you mean by
2  that.
3          MR. GESSLER:   Let us not speak, please.
4          THE DEPONENT:   Okay.
5          MR. GESSLER:   Unless he asks a question.
6      Q   (By Mr. Cain) Did you not understand my
7  question?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q   (By Mr. Cain) Then I'm going to assume
11  you did. Well, actually, let's do this. We're
12  going to mix it up a little bit. We've got some
13  clips that I'm going to play for you from time to
14  time.
15         MR. CAIN:   And we've marked two exhibits
16  and, unless you have an objection, I think what we
17  should do is I've got a thumb drive -- and guys on
18  the Zoom, we'll have to upload this or I'll -- at a
19  break I'll have Scotti upload it so you will have
20  access to it. These are video clips that I'm going
21  to have the court reporter mark -- she's been
22  provided with a thumb drive -- as Exhibit 3, and
23  then there are multiple clips under that.
24         Did you give Scott a copy of that?
25         (Discussion off the record.)

Page 50

1          MR. CAIN:   Let's go off the record
2  briefly for this.
3          THE VIDEOGRAPHER:   The time is 11:27.
4  We're off the record.
5          (Off the record.)
6          (Exhibit 3 was marked.)
7          THE VIDEOGRAPHER:   The time is 11:31.
8  We're back on the record.
9      Q   (By Mr. Cain) Ma'am, the day you were
10  served with this deposition subpoena to appear, you
11  made a video presentation or communicated, I guess,
12  via -- it looks like Facetime with Brannon Howse on
13  Lindell TV.
14         Do you remember that -- doing that?
15         MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17     Q   (By Mr. Cain) Do you remember how it was
18  you got booked to appear on that program on the day
19  that you were served with this subpoena?
20         MR. GESSLER:   I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22     Q   (By Mr. Cain) Part of the -- do you
23  recall part of what you were talking about, at
24  least before this clip, was attempting to take the
25  deposition of a judge and perhaps the district

Page 51

1  attorney?
2          Do you remember that?
3          MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5      Q   (By Mr. Cain) And then you had some
6  technical difficulties with your phone, and so that
7  part of the video stopped and then you came back
8  on, and that's where we're going to pick back up.
9  So this is about four minutes in. This is Clip 10.
10  I'm going to have some questions for you about this
11  appearance after we play it.
12         (Video playing.)
13         BRANNON HOWSE:   Tina, so you were
14  mentioning the man that you were subpoenaed
15  by, he worked at one time for Dominion; is
16  that correct?
17         TINA PETERS:   That's correct. He was the
18  one that was in charge of the patents for the
19  algorithm that is inside the Dominion voting
20  machine and actually bragged on an Antifa
21  call, that he was a member of, that he would
22  make sure that -- that Trump wouldn't get in,
23  that he made effing sure of it. And that's
24  what got Joe Oltmann -- Joe Oltmann was on
25  that call, and that's what got him involved in

Page 52

1  the fight.
2          Well, Eric Coomer is now subpoenaing me
3  against our beloved patriot, Mike Lindell, and
4  this is going to happen November 7th right
5  here in Grand Junction where they are going to
6  subpoena me and interrogate me to try to gen
7  up some kind of information about our patriot,
8  Mike Lindell. Not going to happen. You know,
9  it's just -- you know, it's like throw another
10  one on the pile, like Mike says. But,
11  nevertheless, their assaults keep coming. And
12  what happened today with the -- with the
13  Supreme Court of Colorado --
14         MR. CAIN:   We can pause it there. I
15  think she goes...
16         (Video stopped.)
17     Q   (By Mr. Cain) You go on to talk about
18  another topic, obviously, there.
19         MR. CAIN:   I'm hearing some feedback.
20         THE VIDEOGRAPHER:   How about that?
21         MR. CAIN:   Testing. It's better. Thank
22  you.
23     Q   (By Mr. Cain) Anyway, ma'am, you just
24  heard yourself recounting that Dr. Coomer was on
25  this Antifa call, and that was a statement of fact

Page 53

1  that you made, that he, in fact, was the person
2  that was on that call; isn't that true?
3       MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5    Q   (By Mr. Cain) And you republished the
6  statement that Dr. Coomer bragged on the call that
7  he was going to make effing sure that Trump would
8  not win the election.  You repeated that statement,
9  didn't you?
10      MR. GESSLER:   I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12    Q   (By Mr. Cain) And that was a statement of
13  fact, too, wasn't it?
14      MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16    Q   (By Mr. Cain) In other words, it wasn't
17  some opinion you were sharing that maybe, in your
18  opinion, this -- this occurred.  This was a
19  statement of fact you made, wasn't it?
20      MR. GESSLER:   I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22    Q   (By Mr. Cain) You also stated as a matter
23  of fact that Joe Oltmann was on this alleged call,
24  didn't you?
25      MR. GESSLER:   I'll advise my client to

Page 54

1  decline to answer on Fifth Amendment grounds.
2    Q   (By Mr. Cain) That, too, is not a
3  statement of opinion.  That is a statement of fact
4  that you repeated, correct?
5       MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7    Q   (By Mr. Cain) And all of this matters in
8  the sense of the election fraud narrative because
9  you, among others, indicated that Dr. Coomer had
10  the ability to act on his supposed bias; isn't that
11  true?
12      MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain) And the matters that you
15  were talking about on this Clip 10, the Antifa call
16  and all that business that we've gone through,
17  where did you get that information from?  Who was
18  your source?
19      MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21    Q   (By Mr. Cain) Did you get it from Joe
22  Oltmann?
23      MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25    Q   (By Mr. Cain) Oh, actually, before I

Page 55

1  forget -- that's an odd spot to stop the video.
2       B66 promo code, do you have any promo
3  codes associated with anything you do on Lindell TV
4  or FrankSpeech?
5       MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7    Q   (By Mr. Cain) Do you know how Mr. Lindell
8  monetizes appearances such as you on Lindell TV?
9       MR. GESSLER:   I'll advise my client to --
10      MR. MALONE:   This is Ryan Malone.  Sorry.
11  Object to the form and foundation.
12      MR. GESSLER:   And I'll advise my client
13  to decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain) I mean, do you have a promo
15  code that's associated with any appearances you
16  make?
17      MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19    Q   (By Mr. Cain) Back to Mr. Oltmann, when
20  did you first meet him, do you remember?
21      MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23    Q   (By Mr. Cain) Did you ever ask
24  Mr. Oltmann how it was that he supposedly got on
25  this Antifa call?

Page 56

1       MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3    Q   (By Mr. Cain) In other words, you're on
4  Lindell TV making these statements of fact about
5  Dr. Coomer.
6       Did you ever think to ask Mr. Oltmann:
7  Did you record that Antifa call?  Can you actually
8  show us some proof that he was on it?  Did you ever
9  ask him that?
10      MR. GESSLER:   I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12    Q   (By Mr. Cain) Did you ever ask
13  Mr. Oltmann who was his conduit?  How did he get on
14  that call, that supposed call?  Did you ever ask
15  him that question before making statements like
16  this?
17      MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19    Q   (By Mr. Cain) Did you ever ask
20  Mr. Oltmann how it was that he gained access to a
21  private Facebook page associated with Dr. Coomer?
22      MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24    Q   (By Mr. Cain) It's fair to say that Joe
25  Oltmann and Eric Coomer are probably not Facebook

TINA PETERS - November 7, 2022

Page 57

1  friends.  Is that a fair statement?
2           MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4      Q   (By Mr. Cain) Did he tell you who got him
5  onto the Facebook?
6           MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) Well, you're frequently in
9  contact with Mr. Oltmann, aren't you?
10          MR. GESSLER:   I'll advise my client to
11 decline to answer on Fifth Amendment grounds.
12     Q   (By Mr. Cain) And you've appeared --
13 you've appeared on Conservative Daily roughly how
14 many times?
15          MR. GESSLER:   I'll advise my client to
16 decline to answer on Fifth Amendment grounds.
17     Q   (By Mr. Cain) And, in fact, we're sitting
18 here and I'm asking you questions about your
19 conduct, in part, at least as the Mesa County
20 Clerk, and you've actually discussed that on the
21 Conservative Daily podcast, haven't you?
22          MR. GESSLER:   I'll advise my client to
23 decline to answer on Fifth Amendment grounds.
24     Q   (By Mr. Cain) And you've joked with
25 Mr. Oltmann -- well, I don't want to characterize

Page 58

1  it.
2           You've discussed with Mr. Oltmann the
3  idea that Gerald Woods was aware that his identity
4  was being used to access -- to gain access by a
5  non-County employee.  Remember that?
6           MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) When was the last time you
9  were on Conservative Daily, do you remember?
10          MR. GESSLER:   I'll advise my client to
11 decline to answer on Fifth Amendment grounds.
12     Q   (By Mr. Cain) All right.  Well, let's do
13 this.  Let's -- let's look at Clip 12.
14          MR. CAIN:   And I don't know if we need to
15 tell them to mute or whatnot, but I want to make
16 sure that we don't get feedback, you know, because
17 they're on -- so if you can't play it through Zoom
18 and avoid that feedback, then I'd say just play it
19 locally.  Your call.
20          THE VIDEOGRAPHER:   I need to mute us and
21 then turn on the house sound.
22          MR. CAIN:   Okay.
23          THE VIDEOGRAPHER:   We're muted.
24          (Video playing.)
25          TINA PETERS:   -- that's not illegal.  It

Page 59

1  is stealing Gerald Wood's identity.
2           JOE OLTMANN:   But you didn't steal Gerald
3  Wood's identity at all.
4           TINA PETERS:   No --
5           JOE OLTMANN:   And I was in that -- I was
6  in that plane when he said that I was involved
7  in this and I feel like this is necessary
8  and -- and he was the one that said that.  I
9  didn't even -- I just asked him how he was
10 doing.  Like how are you doing?  Like they
11 just raided your house.  You were gone.  How
12 are you doing?  And he's like I'm fine, I'm
13 good.  We're going to -- we're going to fight
14 for our nation.  And he sat there and said,
15 Oh, my gosh, I can't wait until somebody calls
16 me and says Joe --
17          (Video stopped.)
18          MR. CAIN:   Just tell me when I...
19          THE VIDEOGRAPHER:   You can go now.
20          MR. CAIN:   Thank you.
21     Q   (By Mr. Cain) All right.  So isn't my
22 statement true?  You've -- you've actually publicly
23 discussed the Gerald Woods identity issue and
24 his -- the use of his badge on Conservative Daily
25 with Joe Oltmann, didn't you?

Page 60

1           MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3      Q   (By Mr. Cain) And he referenced -- he,
4  Mr. Oltmann, referenced being on this plane with
5  Mr. Woods.
6           Were you also on the plane at that point?
7           MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9      Q   (By Mr. Cain) I believe you had indicated
10 that Mr. Woods showed up at the cyber symposium,
11 and I want to talk to you about the symposium.
12          But did you communicate with Mr. Woods at
13 the symposium?
14          MR. GESSLER:   I'll advise my client to
15 decline to answer on Fifth Amendment grounds.
16     Q   (By Mr. Cain) Did you know that he was
17 going up there as well?
18          MR. GESSLER:   I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20     Q   (By Mr. Cain) All right.  Well, if we're
21 not going to talk about Mr. Oltmann, let's -- you
22 know, and I -- I alluded to this earlier on, but I
23 want to make sure that I understand your
24 relationship with Mike Lindell, so let's shift to
25 him, from Oltmann to Lindell.

TINA PETERS - November 7, 2022

Page 61

1    Can you tell me when you first met him,
2    Mike Lindell?
3         MR. GESSLER:   I'll advise my client to
4    decline to answer on Fifth Amendment grounds.
5         Q.   (By Mr. Cain) Who introduced you to him?
6         MR. GESSLER:   I'll advise my client to
7    decline to answer on Fifth Amendment grounds.
8         Q.   (By Mr. Cain) Have you spoken to Mike
9    Lindell about Dr. Eric Coomer at any time?
10        MR. GESSLER:   I'll advise my client to
11   decline to answer on Fifth Amendment grounds.
12        Q.   (By Mr. Cain) Does -- has he indicated to
13   you that he agrees with the statements that you
14   made on Lindell TV about Dr. Coomer being on the
15   Antifa call and bragging about the election and the
16   like?
17        MR. GESSLER:   I'll advise my client to
18   decline to answer on Fifth Amendment grounds.
19        Q.   (By Mr. Cain) And has Mr. Lindell
20   explained to you, if ever, how he monetizes this
21   whole election fraud narrative?  Is it just through
22   the promo codes or there's another stream of
23   revenue?
24        MR. GESSLER:   I'll advise my client to
25   decline to answer on Fifth Amendment grounds.

Page 62

1         Q.   (By Mr. Cain) For example, the cyber
2    symposium, you were at that, right?
3         MR. GESSLER:   I'll advise my client to
4    decline to answer on Fifth Amendment grounds.
5         Q.   (By Mr. Cain) You appeared on -- on the
6    stage at one point, didn't you?
7         MR. GESSLER:   I'll advise my client to
8    decline to answer on Fifth Amendment grounds.
9         Q.   (By Mr. Cain) Were you planning on
10   speaking at that event before you went there?
11        MR. GESSLER:   I'll advise my client to
12   decline to answer on Fifth Amendment grounds.
13        Q.   (By Mr. Cain) Or did something happen
14   that caused you to go up on stage?
15        MR. GESSLER:   I'll advise my client to
16   decline to answer on Fifth Amendment grounds.
17        Q.   (By Mr. Cain) And tell me about your
18   discussions with Mr. Lindell, if you had them, and
19   Mr. Oltmann about having a panel where Mr. Oltmann
20   was going to recount this same narrative about
21   Dr. Coomer.
22        MR. GESSLER:   I'll advise my client to
23   decline to answer on Fifth Amendment grounds.
24        Q.   (By Mr. Cain) Somewhat related question:
25   You know, we looked at the statements about

Page 63

1    Dr. Coomer's supposed ability to change an
2    algorithm within the software.
3         Did you have any discussions --
4    technical, more technical discussions with
5    Mr. Lindell concerning that subject, how he did it?
6         MR. GESSLER:   I'll advise my client to
7    decline to answer on Fifth Amendment grounds.
8         Q.   (By Mr. Cain) Or Mr. Oltmann?
9         MR. GESSLER:   I'll advise my client to
10   decline to answer on Fifth Amendment grounds.
11        Q.   (By Mr. Cain) I mean, did you have any --
12   you obviously appeared on Conservative Daily.
13        Did you have any discussions while the
14   video wasn't rolling where -- where Mr. Oltmann
15   told you how Dr. Coomer rigged the election?
16        MR. GESSLER:   I'll advise my client to
17   decline to answer on Fifth Amendment grounds.
18        Q.   (By Mr. Cain) Same question for -- for
19   Conan Hayes.
20        Did you have any discussions with him
21   about how or whether Dr. Coomer had some role in
22   rigging the 2020 election?
23        MR. GESSLER:   I'll advise my client to
24   decline to answer on Fifth Amendment grounds.
25        Q.   (By Mr. Cain) When did you first meet

Page 64

1    Mr. Hayes, if ever?
2         MR. GESSLER:   I'll advise my client to
3    decline to answer on Fifth Amendment grounds.
4         Q.   (By Mr. Cain) What did he tell you about
5    his background in computer forensics that led you
6    to believe that he should have access to Mesa
7    County computer systems?
8         MR. GESSLER:   I'll advise my client to
9    decline to answer on Fifth Amendment grounds.
10        Q.   (By Mr. Cain) Did he take a forensic
11   image or not?
12        MR. GESSLER:   I'll advise my client to
13   decline to answer on Fifth Amendment grounds.
14        Q.   (By Mr. Cain) Did you authorize him to do
15   so?
16        MR. GESSLER:   I'll advise my client to
17   decline to answer on Fifth Amendment grounds.
18        Q.   (By Mr. Cain) Well, you were the chief
19   election official for the November 2020 election,
20   weren't you, in Mesa County?
21        MR. GESSLER:   I'll advise my client to
22   decline to answer on Fifth Amendment grounds.
23        Q.   (By Mr. Cain) And just think back to that
24   election. I think it was your first election here.
25   Tell me if it was not.

TINA PETERS - November 7, 2022

Page 65

1    MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3    Q   (By Mr. Cain) And I presume, given your
4  duties, you were -- you were on-site on election
5  day engaged with your deputy clerks and the staff
6  there, weren't you?
7    MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9    Q   (By Mr. Cain) Did you perceive any
10  problems in realtime with the election?  Like were
11  there any issues with the adjudication system, with
12  tabulators, anything like that?
13    MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15    Q   (By Mr. Cain) Well, I know as a clerk,
16  you don't necessarily administer the elections in a
17  hands-on way.  You have other people that you rely
18  on to assist you in that regard.
19    What did you do as part of the November
20  2020 election on election day?
21    MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23    Q   (By Mr. Cain) It's true, though, on
24  election night as votes were being counted, you
25  didn't have any concerns, in your mind, over the

Page 66

1  accuracy of the tabulation that was going on at
2  your office, did you?
3    MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5    Q   (By Mr. Cain) For example, did you
6  instruct any of your staff members to contact
7  Dominion Voting Systems to address issues that
8  you-all were having with the computer software?
9    MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11    Q   (By Mr. Cain) Because isn't it true
12  Dominion, the voting system company and its
13  employees, they don't actually administer the
14  election themselves, do they?
15    MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17    Q   (By Mr. Cain) That -- that function is
18  and should be with the people employed by the
19  County that run the elections, your folks, right?
20    MR. GESSLER:   I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22    Q   (By Mr. Cain) So if there's an issue, at
23  least on the personnel side, with administering the
24  election, that's because of a County official, not
25  a Dominion official, right?

Page 67

1    MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3    Q   (By Mr. Cain) A lot of the public I don't
4  think understand what the role of a voting company
5  is as opposed to the people that actually run the
6  elections.  And it's fair to say that the -- a
7  group like Dominion supplies the hardware, may
8  lease it to the County.  I think in this case that
9  was -- that was what happened.
10    But they don't actually run the election
11  itself, as we've indicated, right?
12    MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain) And isn't it true that
15  there's this -- well, let me ask you.
16    Do you know what the term "air-gapped"
17  means?  Have you heard that term before?
18    MR. GESSLER:   I'll advise my client to
19  decline to answer on Fifth Amendment grounds.
20    Q   (By Mr. Cain) Isn't it true that the Mesa
21  County election management software, the
22  tabulators, voting machines during the November
23  2020 election, none of those were connected to the
24  Internet, were they?
25    MR. GESSLER:   I'll advise my client to

Page 68

1  decline to answer on Fifth Amendment grounds.
2    Q   (By Mr. Cain) In other words, are you
3  contending that -- under oath that there was an
4  outside -- an outsider -- in other words, someone
5  outside of the local area network at Mesa County --
6  that gained access to the Mesa County system and
7  specifically Dr. Coomer?
8    MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10    Q   (By Mr. Cain) Or a foreign country like
11  China, did you see any evidence of that?
12    MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain) You didn't, did you?
15    MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17    Q   (By Mr. Cain) And am I correct -- I
18  don't -- I'm sure counties do things differently,
19  but in Mesa County, is it true that there are paper
20  ballots?  There's a paper ballot associated with
21  every vote cast?  Is that the general backup system
22  that you have?
23    MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25    Q   (By Mr. Cain) In other words, I was

Page 69

1 looking at -- I don't know if I want to -- I don't
2 think that I marked that.
3        I was looking at the vote totals during
4 the November 3rd, 2020 election, and this is
5 published -- those vote totals are published on the
6 Mesa County Clerk's website, are they not?
7        MR. GESSLER:  I'll advise my client to
8 decline to answer on Fifth Amendment grounds.
9        Q   (By Mr. Cain) We could literally go there
10 right now and they're still published for the
11 public, aren't they?
12       MR. GESSLER:  I'll advise my client to
13 decline to answer on Fifth Amendment grounds.
14       Q   (By Mr. Cain) And according to the
15 publication on the Mesa County Clerk's website --
16 and forgive me. I know you didn't answer this, but
17 it's my understanding that you still at least are
18 employed by Mesa County until your term expires; is
19 that true?
20       MR. GESSLER:  I'll advise my client to
21 decline to answer on Fifth Amendment grounds.
22       Q   (By Mr. Cain) But according to the
23 website, there were 91,505 voters who cast ballots
24 during the November 2020 election, of which 82,643
25 did so by mail and 8,862 did so in person for a

Page 70

1 turnout of almost 80 percent.
2        Does that -- does that sound about right
3 based on your recollection of the election?
4        MR. GESSLER:  I'll advise my client to
5 decline to answer on the basis of the Fifth
6 Amendment.
7        Q   (By Mr. Cain) And so isn't it true that
8 whether you vote by mail and deposit it in a box or
9 you show up to a precinct and vote in person, that
10 there should be and is a paper trail for the
11 ballots that were cast?
12       You can answer.
13       MR. GESSLER:  I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15       Q   (By Mr. Cain) And ultimately if there is
16 a hand recount, those can actually be reviewed and
17 compared to the records that the County maintains,
18 right?
19       MR. GESSLER:  I'll advise my client to
20 decline to answer on Fifth Amendment grounds.
21       Q   (By Mr. Cain) And the official reported
22 results, true?
23       MR. GESSLER:  I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25       Q   (By Mr. Cain) So do you have any reason,

Page 71

1 as you sit here, to doubt the accuracy of the
2 reported results for the Mesa County election on
3 November 3rd, 2020?
4        MR. GESSLER:  I'll advise my client to
5 decline to answer on Fifth Amendment grounds.
6        Q   (By Mr. Cain) Do you have proof -- well,
7 let me put it this way.
8        You don't have any proof, actually, that
9 any votes were switched by some outside party, do
10 you?
11       MR. GESSLER:  I'll advise my client to
12 decline to answer on Fifth Amendment grounds.
13       Q   (By Mr. Cain) You've got a wry smile. If
14 you have it, let me hear it. Now is your time.
15       A   I'm just -- I'm just a --
16       MR. GESSLER:  I'll advise my --
17       A   -- careful person.
18       MR. GESSLER:  I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20       Q   (By Mr. Cain) Well, you may be the only
21 person -- well, certainly in this room -- that can
22 speak to this issue.
23       Do you have any doubt in your mind that
24 those vote totals are accurate, yes or no?
25       MR. GESSLER:  I'll advise my client to

Page 72

1 decline to answer on Fifth Amendment grounds.
2        MR. CAIN:  Can I have an Angel Soft
3 tissue? Thank you. It's a misleading name. All
4 right.
5        Q   (By Mr. Cain) Part of what I was hoping
6 to hear from you -- you know, in this county,
7 Donald Trump won approximately 65 percent of the
8 vote. He had 56,000-and-change to Biden's
9 31,000-and-change based on your reporting.
10       So is it your position that votes were
11 switched from -- from Trump to Biden embedded
12 within those numbers, and essentially Trump should
13 have gotten more votes in Mesa County?
14       MR. GESSLER:  I'll advise my client to
15 decline to answer on Fifth Amendment grounds.
16       Q   (By Mr. Cain) Lauren Boebert, do you know
17 her?
18       MR. GESSLER:  I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20       Q   (By Mr. Cain) Did you have any
21 discussions with Lauren Boebert about the imaging
22 of the hard drives at Mesa County in November
23 2020 -- well, after the November 2020 election, I
24 should say?
25       MR. GESSLER:  I'll advise my client to

TINA PETERS - November 7, 2022

Page 73

1  decline to answer on Fifth Amendment grounds.
2      Q   (By Mr. Cain)  Because help me with the --
3  the timeline.  I would love for you to help me with
4  the timeline, I should say.  There was the election
5  in November 2020, and then thereafter there was
6  this process called the trusted build.
7          You know what that is, right?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q   (By Mr. Cain)  And that trusted build went
11  as required by statute and you didn't have any
12  concerns arising from that, did you?
13         MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15     Q   (By Mr. Cain)  If there was any issue in
16  the trusted build as it relates to the conduct of
17  the Secretary of State's office, please provide me
18  with that information now.
19         MR. GESSLER:   Is that a question?
20         MR. CAIN:   Yes.
21         MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23     Q   (By Mr. Cain)  Discoverable if you write
24  it down, ma'am.
25     A   Oh, okay.

Page 74

1      Q   You might want to cross it out.
2      A   Are you telling me to delete something?
3          MR. GESSLER:   Let's --
4      Q   (By Mr. Cain)  You can either give it to
5  me -- but if you're going to write down notes
6  relating to your testimony in aid of your
7  testimony, it's discoverable.
8      A   I'm just...
9          MR. GESSLER:   Okay.  Let's...
10     A   Okay.  Go ahead.
11     Q   (By Mr. Cain)  Was Ms. Boebert part of
12  either talking to Conan Hayes about imaging or were
13  you in communication with her when this was
14  occurring?
15         MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17     Q   (By Mr. Cain)  Or since then.  Since the
18  April time frame in 2021, have you had any
19  discussions with Ms. Boebert about the imaging that
20  occurred of the Mesa County server?
21         MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23     Q   (By Mr. Cain)  Or any discussions with her
24  about the conduct of Dominion and specifically
25  Dr. Coomer as it relates to manipulation of the

Page 75

1  databases at Mesa County, the election databases.
2          MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4      Q   (By Mr. Cain)  And specifically the
5  tabulation databases.
6          MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain)  Can you even give me like a
9  rough estimate of the -- of the percentage of votes
10  you claim were switched from one party to another
11  or from one candidate to another?
12         MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14     Q   (By Mr. Cain)  After the vote was
15  completed, did you certify the election results on
16  behalf of Mesa County?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19     Q   (By Mr. Cain)  Did you participate in a
20  risk-limiting audit after the election was over to
21  determine whether or not the results were accurate?
22         MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24     Q   (By Mr. Cain)  Because you know that the
25  risk-limiting audits involve a comparison of a

Page 76

1  certain number of ballots to the electronic
2  records, so you go back and double-check to make
3  sure that that was accurate, right?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain)  And while I'm thinking
7  about it, you know what adjudication is, obviously,
8  given your position, right?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11     Q   (By Mr. Cain)  In Mesa County when there
12  were ballots flagged for adjudication, those
13  ballots would go to a bipartisan group -- in other
14  words, one Republican and one Democrat -- for them
15  to review the questioned ballot, right?
16         MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18     Q   (By Mr. Cain)  And then doesn't the
19  Dominion Voting Systems software create a record of
20  the adjudication so you know who was involved with
21  it and what the decision was made when there's a
22  question ballot?  Doesn't it do that for you?
23         MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25     Q   (By Mr. Cain)  I'm just trying to figure

Page 77

1  out, since you've made these statements about
2  algorithms publicly and Dr. Coomer, how did he do
3  it, you know?  How did he -- how did he commit this
4  crime, ma'am?
5          MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7      Q   (By Mr. Cain) Or how did -- how did
8  Dominion do it, for that matter?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11     Q   (By Mr. Cain) The truth is you don't
12  know.  Isn't that true?  You don't know.
13         MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15     Q   (By Mr. Cain) It hasn't stopped you from
16  making public statements, but you don't know.
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19     Q   (By Mr. Cain) Did your office maintain
20  copy -- we touched on this, but I just want to make
21  sure I've asked it correctly.
22         Did your office maintain copies of the
23  paper record of the November 2020 election?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 78

1      Q   (By Mr. Cain) And I also alluded to this,
2  but at the end of the day, despite what you're
3  saying now, you called this a gold standard
4  election, or some -- some words to that effect.
5          Do you remember doing that?
6          MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) But something changed and I
9  want to ask you about that, but before we do that,
10  let's look at what I'm referring to because I've
11  got a clip of it.
12         MR. CAIN:   Clip 9.  Let's see if we can
13  get some volume.  It'd probably help.
14         (Video playing.)
15         TINA PETERS:   I believe the night of the
16         2020 election, I ran a gold standard election.
17         I sincerely do.  And then after, you know, a
18         month or so, people kept coming to me and kept
19         coming to me.  You know, there's something not
20         right.  And I knew there were things that
21         didn't look right across the country, but I
22         didn't think it happened in our town.  I
23         really didn't.  I had no reason to think that
24         until April.
25         (Video stopped.)

Page 79

1      Q   (By Mr. Cain) So that was Clip 9.  And
2  that was from a program called Selection Code,
3  right?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain) So while I'm thinking about
7  it, so that was published -- I actually don't
8  remember when it was published, so I won't make a
9  representation.
10         But how did that production come about?
11  Why did you decide to make a program called
12  Selection Code?
13         MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15     Q   (By Mr. Cain) Mr. Kloewer says August
16  2020 is when Selection Code came out.  Is that --
17  2022.  Pardon me.
18         Does that sound about right to you?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21     Q   (By Mr. Cain) And as I was saying, do you
22  know who produced it?  Who produced that video?
23         MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25     Q   (By Mr. Cain) Essentially that Selection

Page 80

1  Code was a program designed to highlight the
2  alleged irregularities with the Mesa County
3  election and your role, right?
4          MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain) Were you paid actually to
7  appear in that, or what benefit was it to you?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q   (By Mr. Cain) Do you have any written
11  communications with either the producers -- well,
12  the producers of that video about why you were
13  going to be appearing in it and the purpose of you
14  appearing in it?
15         MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17     Q   (By Mr. Cain) Looping back to that, I
18  asked a temporal question.  That's lawyer for time
19  or timing.  That was August of 2022, and we know
20  from public statements that your devices were
21  taken, raided, seized, fill-in-the-whatever at some
22  point in time.
23         Were they taken before August of 2022 or
24  after or both?  When were they seized?
25         MR. GESSLER:   I'll advise my client to

Page 81

1 decline to answer on Fifth Amendment grounds.
2     Q  (By Mr. Cain) And have you -- have you
3 received any of those devices back? You know, they
4 may image them and then return the originals to
5 you. Have they?
6         MR. GESSLER:  I'll advise my client to
7 decline to answer on Fifth Amendment grounds.
8     Q  (By Mr. Cain) Isn't it true you appeared
9 in Selection Code, at least in part, to continue
10 the narrative that the 2020 election was stolen?
11         MR. GESSLER:  I'll advise my client to
12 decline to answer on Fifth Amendment grounds.
13     Q  (By Mr. Cain) And you're doing that same
14 narrative to this day, aren't you?
15         MR. GESSLER:  I'll advise my client to
16 decline to answer on Fifth Amendment grounds.
17     Q  (By Mr. Cain) Why did you say that it was
18 a gold standard election?
19         MR. GESSLER:  I'll advise my client to
20 decline to answer on Fifth Amendment grounds.
21     Q  (By Mr. Cain) Well, we looked at -- well,
22 strike that.
23         You also said towards the end of that
24 clip something happened in April of 2021 that
25 changed your mind.

Page 82

1         Do you remember that statement?
2         MR. GESSLER:  I'll advise my client to
3 decline to answer on Fifth Amendment grounds.
4     Q  (By Mr. Cain) You also said people kept
5 coming at you saying there's irregularities, or
6 words to that effect, leading up to April of 2021.
7         Remember that?
8         MR. GESSLER:  I'll advise my client to
9 decline to answer on Fifth Amendment grounds.
10     Q  (By Mr. Cain) So what happened in April
11 of 2021 that changed your mind allegedly about the
12 handling of the election?
13         MR. GESSLER:  I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15     Q  (By Mr. Cain) Because you know it's one
16 thing to go on a podcast or a TV show and say one
17 thing. It's another thing to sit here under oath
18 and actually explain what you mean by those things.
19         So what did you mean when you said
20 something happened in April 2021 that changed your
21 mind?
22         MR. GESSLER:  I'll advise my client to
23 decline to answer on Fifth Amendment grounds.
24     Q  (By Mr. Cain) Well, we know that the
25 trusted build -- was that scheduled for May of

Page 83

1 2021?
2         MR. GESSLER:  I'll advise my client to
3 decline to answer on Fifth Amendment grounds.
4     Q  (By Mr. Cain) May 26, somewhere around
5 there. Does that strike a bell?
6         MR. GESSLER:  I'll advise my client to
7 decline to answer on Fifth Amendment grounds.
8     Q  (By Mr. Cain) So before May -- this is
9 the way the calendar works -- April occurred. So
10 something in April before the trusted build changed
11 your mind about how the election was run.
12         Is that a fair statement?
13         MR. GESSLER:  I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15     Q  (By Mr. Cain) And that's when you
16 decided, as the Mesa County Clerk, to have the hard
17 drive imaged prior to the trusted build, right?
18         MR. GESSLER:  I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20     Q  (By Mr. Cain) Did you know -- at the time
21 of the trusted build, did you know a gentleman by
22 the name of Patrick Byrne?
23         MR. GESSLER:  I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25     Q  (By Mr. Cain) Can you describe what your

Page 84

1 relationship is with Patrick Byrne, if any?
2         MR. GESSLER:  I'll advise my client to
3 decline to answer on Fifth Amendment grounds.
4     Q  (By Mr. Cain) Did you contact Mr.
5 Byrne -- or let me put it this way.
6         Were you in contact with Mr. Byrne
7 regarding the trusted build and the fact that there
8 would be a non-County employee present? Were you
9 in contact with Mr. Byrne about that?
10         MR. GESSLER:  I'll advise my client to
11 decline to answer on Fifth Amendment grounds.
12     Q  (By Mr. Cain) And specifically I'm asking
13 whether or not you were in contact with Mr. Byrne
14 about Conan Hayes attending.
15         MR. GESSLER:  I'll advise my client to
16 decline to answer on Fifth Amendment grounds.
17     Q  (By Mr. Cain) Did you see Mr. Hayes on
18 his phone communicating with Patrick Byrne during
19 the trusted build?
20         MR. GESSLER:  I'll advise my client to
21 decline to answer on Fifth Amendment grounds.
22     Q  (By Mr. Cain) And just to put this in
23 perspective -- and part of the reason I'm asking
24 you these questions is the overall narrative of the
25 election being rigged. And as I understand the

Page 85

1  timeline -- correct me if I'm wrong -- you had
2  Mr. Hayes come in and image the hard drives in
3  April, then you had the trusted build in May, and
4  then after the trusted build, you had a separate
5  image done so that you could kind of have a before
6  and after.
7          That's essentially what happened, right?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q    (By Mr. Cain)  Why can't -- while I'm
11  thinking about it, if -- if all of this software
12  and tabulators are allegedly hooked into the
13  Internet, why can't the Secretary of State's office
14  just do this remotely?
15         MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17     Q    (By Mr. Cain)  And the answer is -- the
18  reason is is because they are not connected to the
19  Internet and the Secretary of State can't do it
20  remotely; isn't that true?
21         MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23     Q    (By Mr. Cain)  In fact, it's standard
24  practice for members of the Secretary of State's
25  office to personally appear along with members of

Page 86

1  the voting system company during the trusted build
2  process, true?
3          MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5      Q    (By Mr. Cain)  And part of what they say
6  to you, and did in this case, is when that process
7  is going to happen, correct?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q    (By Mr. Cain)  And they -- they request
11  and you are required to tell them who from the
12  County is going to be present during the trusted
13  build process, true?
14         MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16     Q    (By Mr. Cain)  And so as it happens,
17  Mr. Wood wasn't there, but it was Mr. Hayes with
18  Mr. Wood's badge, true?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21     Q    (By Mr. Cain)  I mean, you've said as much
22  publicly, so what is this -- what about being under
23  oath is causing you to have some fear of criminal
24  prosecution for this?
25         MR. GESSLER:   I'll advise my client to

Page 87

1  decline to answer on Fifth Amendment grounds.
2      Q    (By Mr. Cain)  Cat's out of the bag.  That
3  is not a question.
4          Let's talk -- I do want to ask you about
5  Byrne.  I know you haven't answered any questions
6  about him yet, but let's look at Clip 11.  It's a
7  short clip of Mr. Byrne regarding this issue.
8          (Video playing.)
9          PATRICK BYRNE:   He actually called me
10     from the middle -- he was sitting next to them
11     at one point that day.  This was back, I
12     think, in May, May or June of last year.  He
13     actually called me on Facetime and he sat
14     there telling me I can't believe what I'm
15     seeing.  I'm seeing these people commit a
16     fel -- a million felonies right next to me.
17     And he had the Facetime up so I could see the
18     people doing what they were doing.  And he
19     also took some videos of them doing what they
20     were doing, which is highly illegal.
21         (Video stopped.)
22     Q    (By Mr. Cain)  Did you see or witness any
23  of this exchange that Mr. Byrne is referring to on
24  this video?
25         MR. GESSLER:   I'll advise my client to

Page 88

1  decline to answer on Fifth Amendment grounds.
2      Q    (By Mr. Cain)  He also referenced some
3  video being taken.
4          Are you in possession of any of that
5  video?
6          MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q    (By Mr. Cain)  In fact, you took some
9  video, didn't you, yourself of the trusted build?
10  Like you did it on your device, didn't you?
11         MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13     Q    (By Mr. Cain)  So going back to Byrne, did
14  he have a financial role in underwriting any of
15  these activities of Mr. Hayes?  Like did he pay for
16  Mr. Hayes to be there?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19     Q    (By Mr. Cain)  Same question for
20  Mr. Lindell.  Do you know whether or not he
21  financially supported the activities of Mr. Hayes
22  in scanning the hard drives and copying them?
23         MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25     Q    (By Mr. Cain)  And once you got these

TINA PETERS - November 7, 2022

Page 89

1  images, identify every person, to your knowledge,
2  that actually received a copy of the image, if you
3  know?
4  MR. GESSLER:  I'll advise -- I'll advise
5  my client to decline to answer on Fifth Amendment
6  grounds.
7  Q  (By Mr. Cain) Do you know whether or
8  not -- well, strike that.
9  You do know just as a matter of fact that
10 those images appeared during the cyber symposium.
11 That was part of one of the presentations, wasn't
12 it?
13 MR. GESSLER:  I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15 Q  (By Mr. Cain) Because -- because that
16 cyber symposium, as you understood it, was going to
17 be Mr. Lindell's vehicle for presenting election
18 fraud data, whether it was in the form of the
19 images you acquired or something called PCAPs.
20 Is that your understanding?
21 MR. GESSLER:  I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23 MR. CAIN:  PCAPs is P-C-A-P. I believe
24 it stands for packet captures. I have now
25 exhausted my entire knowledge of it.

Page 90

1  Q  (By Mr. Cain) Were you involved at all
2  in -- either your office or yourself in analyzing
3  any of the packet capture data that was presented
4  or to be presented at the cyber symposium?
5  MR. GESSLER:  I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7  Q  (By Mr. Cain) Because you were there
8  we've -- well, I've asked you that and you haven't
9  answered it, but we do have video of you being
10 there. We'll show that.
11 But were you -- were you paid to attend
12 this symposium? Is that why you were there?
13 MR. GESSLER:  I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15 Q  (By Mr. Cain) And you weren't planning on
16 being a presenter, but you ended up being a
17 presenter, in part at least, right?
18 MR. GESSLER:  I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20 Q  (By Mr. Cain) And just describe for me
21 the events leading up to your attendance at the
22 cyber symposium and specifically your interactions
23 with Mr. Lindell.
24 MR. GESSLER:  I'll advise my client to
25 decline to answer on Fifth Amendment grounds.

Page 91

1  Q  (By Mr. Cain) Did he personally invite
2  you?
3  MR. GESSLER:  I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5  Q  (By Mr. Cain) And did he come to Grand
6  Junction where we're here sitting today and pick
7  you up on his plane and take you to South Dakota
8  with him?
9  MR. GESSLER:  I'll advise my client to
10 decline to answer on Fifth Amendment grounds.
11 Q  (By Mr. Cain) And was Mr. Oltmann on that
12 flight with you up to South Dakota?
13 MR. GESSLER:  I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15 Q  (By Mr. Cain) Did you have the occasion
16 to talk to Mr. Oltmann and Mr. -- with Mr. Lindell
17 in his presence about Dr. Coomer and Dominion?
18 MR. GESSLER:  I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20 Q  (By Mr. Cain) Because everything -- it's
21 true. Everything you know about Dr. Coomer
22 ultimately originated with Joe Oltmann, didn't it?
23 MR. GESSLER:  I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25 Q  (By Mr. Cain) And were you there when

Page 92

1  Mr. Oltmann told his story about Dr. Coomer at the
2  cyber symposium?
3  MR. GESSLER:  I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5  Q  (By Mr. Cain) Because really what I'm --
6  I'm here, in part, to find out is what happened in
7  that symposium? Were -- were there breakout
8  sessions where you had discussions with Mr. Lindell
9  and Mr. Oltmann where the topic of Eric Coomer came
10 up or Dominion came up, and can you describe those
11 for us?
12 MR. GESSLER:  I'll advise my client to
13 decline to answer on Fifth Amendment grounds.
14 Q  (By Mr. Cain) Because the jury in our
15 case, ultimately, they're going to want to hear, I
16 believe, about those discussions, if they occurred.
17 This is your chance to tell them what happened.
18 Can you tell us about any discussions you
19 had with Mr. Lindell and Mr. Oltmann during this
20 symposium about Dr. Coomer?
21 MR. GESSLER:  I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23 Q  (By Mr. Cain) So I think the symposium --
24 correct me if I'm wrong -- was three days? And it
25 was day three that Mr. Oltmann was on his panel?

Page 93

1  Sorry. I'm asking Brad. He knows the answer to
2  that one. I don't.
3         Were you there on day three, do you
4  remember?
5         MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7     Q   (By Mr. Cain) Well, I want to see if you
8  were there for this particular portion, and then,
9  you know, what your reaction was to it, if you had
10  any. So let's look at Clip 8.
11         MR. CAIN:   And play it as loud -- a
12  little louder, if you can, because Candice is
13  having a hard time hearing.
14         (Video playing.)
15         DAVID CLEMENTS:   So let's -- let's
16  connect another dot really quick. You have to
17  keep in mind that one of the major players in
18  this is Eric Coomer. Eric Coomer was -- was
19  or is a vice president of Dominion Systems.
20         JOE OLTMANN:   Yes.
21         DAVID CLEMENTS:   And what particular
22  title does he have as vice president?
23         JOE OLTMANN:   He was -- he was the
24  director of security and strategy for Dominion
25  Voting Systems. He holds the adjudication

Page 94

1  patent that was assigned to, I think, HSBC as
2  a -- as a guarantor on it.
3         DAVID CLEMENTS:   Well, follow me here.
4  There's a few other questions. Now, you
5  mentioned that your presiding judge was
6  marching in Antifa rallies last summer.
7         JOE OLTMANN:   Yes.
8         DAVID CLEMENTS:   Were you not the person
9  who disclosed screenshots of social media
10  posts that also shows that Eric Coomer has
11  deep ties with Antifa?
12         JOE OLTMANN:   100 percent.
13         DAVID CLEMENTS:   Okay. And were you not
14  also on a phone call with Eric Coomer or some
15  recording where he made a particular
16  controversial statement about our then
17  president?
18         JOE OLTMANN:   Yeah. So -- yes.
19         DAVID CLEMENTS:   What was that statement?
20         JOE OLTMANN:   He said that don't worry
21  about the election -- what's that?
22         PHIL WALDRON: He's in full-on lawyer
23  mode. He's like...
24         JOE OLTMANN:   Yeah, he's a lawyer. I'm
25  like, yes, sir. Don't worry about the

Page 95

1  election. Trump's not going to win. I made
2  effing sure of it. I'm a Christian, so I'm
3  not going to use that word.
4         DAVID CLEMENTS:   Okay. So this is --
5  this is firsthand knowledge.
6         JOE OLTMANN:   Yeah.
7         DAVID CLEMENTS:   This isn't -- he's
8  telling you -- in a court of law, we should be
9  able -- you know, Eric Coomer can confront his
10  accusers. He's been accused of something --
11         JOE OLTMANN:   Yeah.
12         DAVID CLEMENTS:   -- pretty salacious.
13  But when you look at the screenshots, what are
14  some of the things that you can show us, and
15  perhaps you'll show us later today --
16         JOE OLTMANN:   Yeah.
17         DAVID CLEMENTS:   -- that has been posted
18  by Eric Coomer? Because we've got this Antifa
19  judge with a person that's affiliated with
20  Antifa that's made a promise about the
21  election outcome.
22         JOE OLTMANN:   Well, I think the important
23  part --
24         (Video stopped.)
25     Q   (By Mr. Cain) Okay. So, you know, this

Page 96

1  panel went on for a while, but as it relates to
2  Coomer, were you sitting there when they were
3  talking about this?
4         MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6     Q   (By Mr. Cain) That fellow on the right,
7  do you know who he is, looking back at the clip?
8  He's got a baseball cap on. Do you know who he is?
9         MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11     Q   (By Mr. Cain) Did you have any contact
12  with a gentleman named Josh Merritt during the
13  cyber symposium?
14         MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16     Q   (By Mr. Cain) Were you aware of
17  Mr. Merritt's position about the fact that the PCAP
18  data that was supposedly being supplied did not --
19  let's just say it wasn't what was represented.
20         Do you remember any discussions about
21  that?
22         MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24     Q   (By Mr. Cain) This whole symposium, isn't
25  it your view, was to show proof, as Mike Lindell

Page 97

1 would say, about the evidence of the rigging of the
2 2020 election; is that fair?
3 MR. GESSLER: I'll advise my client to
4 decline to answer on Fifth Amendment grounds.
5 Q (By Mr. Cain) So what part of what was
6 presented did you find to be particularly credible,
7 if anything?
8 MR. GESSLER: I'll advise my client to
9 decline to answer on Fifth Amendment grounds.
10 Q (By Mr. Cain) And how many times have you
11 heard Joe Oltmann tell this story, including this
12 time at the cyber symposium? Can you estimate that
13 for me?
14 MR. GESSLER: I'll advise my client to
15 decline to answer on Fifth Amendment grounds.
16 Q (By Mr. Cain) And if you look at this
17 where we stopped it, it references free programming
18 at Lindell TV and then something called
19 FrankSpeech.com.
20 Do you have any affiliations with any of
21 those entities, either Lindell TV, FrankSpeech,
22 anything related to Mike Lindell?
23 MR. GESSLER: I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25 Q (By Mr. Cain) And while I'm -- while I'm

Page 98

1 on that -- that subject, there's a lawsuit -- our
2 lawsuit, I should say, also has included as
3 defendants the MyPillow organization
4 and FrankSpeech.
5 Have you had any discussions with
6 individuals you understand to be either officers,
7 directors, or employees of either of those
8 companies about Dr. Coomer?
9 MR. GESSLER: I'll advise my client to
10 decline to answer on Fifth Amendment grounds.
11 Q (By Mr. Cain) Have you had any
12 discussions with anybody associated with MyPillow
13 or FrankSpeech about their role, if any, in the
14 cyber symposium? Did they talk to you about their
15 relationship?
16 MR. GESSLER: I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18 Q (By Mr. Cain) Did you have -- and pardon
19 me. I don't remember if I asked you this, but I
20 may have.
21 But how much did it cost you to attend
22 that symposium?
23 MR. GESSLER: I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25 Q (By Mr. Cain) And do you remember what

Page 99

1 other attendees were charged to be there?
2 MR. GESSLER: I'll advise my client to
3 decline to answer on Fifth Amendment grounds.
4 Q (By Mr. Cain) And approximately how many
5 people were in attendance during the time that you
6 were there?
7 MR. GESSLER: I'll advise my client to
8 decline to answer on Fifth Amendment grounds.
9 Q (By Mr. Cain) All right. Ma'am, at one
10 point, Ron Watkins made an appearance at the
11 symposium, and we touched on him earlier. Remind
12 me -- strike remind me.
13 When did you first meet Ron Watkins, if
14 at all?
15 MR. GESSLER: I'll advise my client to
16 decline to answer on Fifth Amendment grounds.
17 Q (By Mr. Cain) Who would have introduced
18 you to him?
19 MR. GESSLER: I'll advise my client to
20 decline to answer on Fifth Amendment grounds.
21 Q (By Mr. Cain) What do you know about Ron
22 Watkins' background?
23 MR. GESSLER: I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25 Q (By Mr. Cain) I mean, you know he's

Page 100

1 associated or was associated with the QAnon group
2 or movement, right?
3 MR. GESSLER: I'll advise my client to
4 decline to answer on Fifth Amendment grounds.
5 Q (By Mr. Cain) You know about his role at
6 4chan, for example?
7 MR. GESSLER: I'll advise my client to
8 decline to answer on Fifth Amendment grounds.
9 MR. CAIN: That's the number 4-C-H-A-N.
10 Q (By Mr. Cain) Are you still -- or, well,
11 are you in touch with Mr. Watkins at this point?
12 MR. GESSLER: I'll advise my client to
13 decline to answer on Fifth Amendment grounds.
14 Q (By Mr. Cain) For example, when was the
15 last time you guys had a conversation or a
16 communication?
17 MR. GESSLER: I'll advise my client to
18 decline to answer on Fifth Amendment grounds.
19 Q (By Mr. Cain) But you do remember him
20 having an issue with actually reviewing the data
21 that was provided from your office as a result of
22 imaging these hard drives. Don't you remember
23 that?
24 MR. GESSLER: I'll advise my client to
25 decline to answer on Fifth Amendment grounds.

Page 101

1    Q   (By Mr. Cain) And this is what I'm
2  referring to.
3           MR. CAIN:   Let's look at Clip 1.
4           (Video playing.)
5           RON WATKINS:   My lawyer -- my lawyer just
6  called me, Ty Clevenger, Mr. Ty Clevenger, and
7  he said that I should put out this statement.
8  And I just learned that Conan James Hayes may
9  have taken, without authorization, the actual
10  hard drives from the Mesa County -- or the
11  Mesa, Colorado County Clerk, and he needs to
12  produce those hard drives immediately and
13  return them to the clerk, and we should stop
14  this data review until he produces the hard
15  drives.
16           DOUGLAS FRANK:   Repeat that.
17           UNIDENTIFIED SPEAKER:   Ron, Ron, did you
18  just say --
19           DOUGLAS FRANK:   Everybody, this is
20  important.
21           UNIDENTIFIED SPEAKER:   Quiet, quiet.
22           UNIDENTIFIED SPEAKER:   Yeah, this is
23  really important, guys.
24           DOUGLAS FRANK:   This is important, this
25  is important.  Everybody quiet.

Page 102

1           UNIDENTIFIED SPEAKER:   Ron, did you just
2  say that someone took all of the hard drives
3  from the Mesa County office just now?
4           RON WATKINS:   So what I said was I just
5  learned that Conan James Hayes may have taken,
6  without authorization, the actual hard drives
7  from the Mesa Colorado County Clerk, and he
8  needs to produce those hard drives immediately
9  and return them to the clerk.
10           UNIDENTIFIED SPEAKER:   No.
11           UNIDENTIFIED SPEAKER:   Hold on.
12           RON WATKINS:   And we should stop this
13  data review --
14           UNIDENTIFIED SPEAKER:   Hold on.
15           UNIDENTIFIED SPEAKER:   Somebody from --
16  from Mesa.  He knows.
17           UNIDENTIFIED SPEAKER:   No.  Tina said,
18  no, that didn't happen.
19           UNIDENTIFIED SPEAKER:   No, that did not
20  happen.
21           UNIDENTIFIED SPEAKER:   Tina just told me
22  that.
23           UNIDENTIFIED SPEAKER:   Tina just said
24  that did not happen.
25           RON WATKINS:   The actual physical hard

Page 103

1  drives.
2           UNIDENTIFIED SPEAKER:   Hold on.  No.
3  Tina -- Tina says, no, that did not happen.
4  Okay.  Ron, you may have heard that
5  incorrectly, then.  Thanks.  Okay.
6           RON WATKINS:   How about can Tina explain
7  this, then, because I just got a call from my
8  lawyer that he talked to Tina -- Tina to tell
9  me that.
10           UNIDENTIFIED SPEAKER:   Can we get Tina?
11           RON WATKINS:   So now I'm confused.
12           UNIDENTIFIED SPEAKER:   Hey, Beth, can you
13  have Tina call her lawyer?  Isn't this cool?
14  This is real life right here, man.  You know,
15  20 years from now, you're going to be telling
16  your kids, I was there that day.
17           UNIDENTIFIED SPEAKER:   Can I -- can I
18  just -- about your audits, that we did an
19  audit --
20           (Video stopped.)
21    Q   (By Mr. Cain) So you were in the
22  audience, obviously, when -- when that occurred,
23  right?
24           MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 104

1    Q   (By Mr. Cain) And you actually -- as I
2  alluded to, you actually got up to explain the
3  situation shortly thereafter, right?
4           MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6    Q   (By Mr. Cain) Because the -- the truth
7  was that the actual hard drives weren't taken.
8  They were just imaged.  That's the distinction,
9  right?
10           MR. GESSLER:   I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12    Q   (By Mr. Cain) The physical hard drives
13  stayed on County property, didn't they?
14           MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16    Q   (By Mr. Cain) So why -- I'm just -- kind
17  of a 10,000-foot view of this.
18           What was Mr. Lindell telling you on the
19  sidelines of this about why this information was
20  being presented to members of this symposium, if
21  anything?
22           MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24    Q   (By Mr. Cain) Why did you feel like you
25  had to explain what was going on during the

Page 105

1  symposium after Mr. Watkins said something about
2  it?
3         MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5     Q   (By Mr. Cain) Because you weren't
6  scheduled to actually be on stage, were you?
7         MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9     Q   (By Mr. Cain) Let's take a look at your
10 explanation.
11        MR. CAIN:   It's Clip 3.
12        (Video playing.)
13        TINA PETERS:   I can assure you that none
14 of Mesa County or the Secretary of State or
15 any type of -- of property was taken off of
16 my -- off the -- my -- my office.  Let me just
17 put it that way.
18        DOUGLAS FRANK:   How do you know?  You're
19 not there.
20        TINA PETERS:   Well, now, they came in and
21 did a -- a raid of my office, so it could have
22 been.
23        DOUGLAS FRANK:   Maybe that's what this
24 report is, that when they went in and raided
25 you, they took it then.

Page 106

1         TINA PETERS:   Okay.  Well, then, what we
2  need to do is we need to do another backup,
3  and we need to find out what they did when
4  they were there yesterday.
5         DOUGLAS FRANK:   I didn't mean to argue
6  against you.  I mean, I'm just trying to
7  understand you.
8         TINA PETERS:   Yeah.
9         DOUGLAS FRANK:   So could you say again
10 what you just told us and what it really
11 means?  I didn't understand.
12        TINA PETERS:   Okay.
13        DOUGLAS FRANK:   Yes.
14        TINA PETERS:   There was -- there was
15 not -- nothing, no hard drives that belonged
16 to our equipment that were taken off the
17 premises from our election voting equipment.
18        AUDIENCE MEMBER:   (Unintelligible.)
19        TINA PETERS:   Unless it happened when?
20        AUDIENCE MEMBER:   During the raid.
21        TINA PETERS:   Unless it happened during
22 the raid.  And that -- and they did not allow
23 anyone to be in there.  There were no
24 bipartisan judges that were allowed to be in
25 my election department yesterday.  There was

Page 107

1  not my chief deputy, who is the acting clerk
2  in my absence.  No one was allowed to be in
3  there with them when they were there
4  yesterday, so --
5         DOUGLAS FRANK:   Is there anything else
6  you want to say to us, because we are not
7  allowed legally to let you answer Q and A
8  right now.
9         TINA PETERS:   Okay.
10        DOUGLAS FRANK:   I just got the notice.
11        TINA PETERS:   All right.
12        DOUGLAS FRANK:   Anything else you want to
13 say?
14        TINA PETERS:   No, I just -- I think
15 Amer --
16        DOUGLAS FRANK:   Besides the fact that
17 you're amazing.
18        (Video stopped.)
19    Q   (By Mr. Cain) So that was you, right, up
20 on stage?
21        MR. GESSLER:   I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23    Q   (By Mr. Cain) Your hair was a little
24 longer, but it sure -- it looks and sounds like
25 you.  That was you, right?

Page 108

1         MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3     Q   (By Mr. Cain) And then that quacking
4  sound that we heard at the end, that was -- that
5  was actual -- someone off stage indicating that
6  they needed to stop discussion at that point,
7  right?
8         MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10    Q   (By Mr. Cain) Who -- which -- did you
11 have lawyers with you at the cyber symposium?
12        MR. GESSLER:   I'll advise my client to
13 decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain) Who was -- who was
15 representing you at that point, if you know?
16        MR. GESSLER:   I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18    Q   (By Mr. Cain) And who was -- and, again,
19 I'm not sure of the timing, but it's true, is it
20 not, that you did have some forensic auditors work
21 with your attorneys as consultants in order to
22 produce reports about the election -- the Mesa
23 County election databases; isn't that true?
24        MR. GESSLER:   I'll advise my client to
25 decline to answer on Fifth Amendment grounds.

TINA PETERS - November 7, 2022

Page 109

1    Q   (By Mr. Cain) It was kind of a long
2  question, but basically what I'm asking you is:
3  People associated with you, whether it's your
4  attorneys or otherwise, have hired at least two
5  individuals to review the hard drive data and to
6  opine on alleged issues with the databases
7  themselves, right?
8          MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10   Q   (By Mr. Cain) And those folks -- bear
11  with me for just a second. I'm referring to --
12         MR. CAIN:   Are you okay?
13         THE REPORTER:   Uh-huh.
14   Q   (By Mr. Cain) I'm referring to a
15  gentleman named Jeffrey O'Donnell and a gentleman
16  named Dr. Walter Daugherity.
17        Do you know who they are?
18         MR. GESSLER:   I'll advise my client to
19  decline to answer on Fifth Amendment grounds.
20   Q   (By Mr. Cain) These are folks that have
21  looked at the data -- the same data that Ron
22  Watkins was concerned about in the clip that we
23  just saw, right?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 110

1    Q   (By Mr. Cain) Who's paying those two
2  guys, O'Donnell and Daugherity?
3          MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5    Q   (By Mr. Cain) You're actually supporting
6  them in the notion that there was an issue or
7  multiple issues with the adjudication databases,
8  aren't you?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11   Q   (By Mr. Cain) You're actually arguing now
12  that the gold standard election has issues with the
13  databases that are the result of outside and
14  nefarious actors, right?
15         MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17   Q   (By Mr. Cain) And so looping back to that
18  video that we just saw, do you know who it was that
19  was advising you or the group to stop the
20  discussion about the hard drives?
21         MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23   Q   (By Mr. Cain) I mean, what made you
24  decide that you needed to go up on that stage,
25  ma'am?

Page 111

1          MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3    Q   (By Mr. Cain) And who was that other
4  fellow with the bow tie on the stage with you?
5          MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7    Q   (By Mr. Cain) Is that Dr. Frank? Can you
8  identify him?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11   Q   (By Mr. Cain) Didn't that fellow -- we'll
12  call him Dr. Frank.
13        Didn't he come down here and meet with
14  you to discuss this issue with the databases?
15         MR. GESSLER:   I'll advise my client to
16  decline to answer on Fifth Amendment grounds.
17   Q   (By Mr. Cain) What is his affiliation
18  with Mr. Lindell, if any?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21   Q   (By Mr. Cain) You probably know the
22  answer to that, don't you?
23         MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25   Q   (By Mr. Cain) Are you still in contact or

Page 112

1  are you in contact -- let me say it that way --
2  with Dr. Frank at this point?
3          MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5    Q   (By Mr. Cain) And how about Sherronna
6  Bishop? We haven't talked about her.
7          MR. CAIN:   Let's look at Clip 2 from
8  this, and I've got a few questions about her role,
9  if any.
10        (Video playing.)
11         RON WATKINS:   -- that Ty Clevenger
12  received was from Sherronna Bishop and now she
13  has informed Mr. Clevenger that Conan did have
14  permission to take the hard drive but did not
15  have permission to upload it. Ms. Bishop
16  indicated to Mr. Clevenger that she was an
17  affiliate of Ms. Peters and now Mr. Clevenger
18  is not sure whether that is in truth.
19         UNIDENTIFIED SPEAKER:   So the question
20  earlier was who's running our elections. I
21  think that --
22        (Video stopped.)
23   Q   (By Mr. Cain) That was a change of
24  subject at the end. The initial part is what I
25  want to ask you about.

TINA PETERS - November 7, 2022

Page 113

1    Who is Sherronna Bishop and what was her
2    role, if any, in the imaging of the hard drives?
3    MR. GESSLER:   I'll advise my client to
4    decline to answer on Fifth Amendment grounds.
5    Q   (By Mr. Cain) And you heard Ron Watkins
6    say that Sherronna Bishop was -- he used the word,
7    I think, "affiliate" or something like that.
8    But was she authorized to act on your
9    behalf at the cyber symposium?
10   MR. GESSLER:   I'll advise my client to
11   decline to answer on Fifth Amendment grounds.
12   Q   (By Mr. Cain) And was she part of or
13   aware of the plan to image the hard drives prior to
14   the trusted build?
15   MR. GESSLER:   I'll advise my client to
16   decline to answer on Fifth Amendment grounds.
17   Q   (By Mr. Cain) And was she in the loop, if
18   you know, on not just the imaging, but the
19   dissemination of that data outside of the County
20   Clerk's office?
21   MR. GESSLER:   I'll advise my client to
22   decline to answer on Fifth Amendment grounds.
23   THE REPORTER:   I think both the witness
24   and I need a break.
25   MR. GESSLER:   Yeah, so it's 12:45.

Page 114

1    THE DEPONENT:   Thank you.
2    MR. CAIN:   Let's go off the record.
3    THE VIDEOGRAPHER:   Okay. The time is
4    12:46. We're off the record.
5    (Lunch recess.)
6    THE VIDEOGRAPHER:   The time is 1:56.
7    We're back on the record.
8    Q   (By Mr. Cain) How was your lunch?
9    A   It was good. What did you have?
10   Q   I had the chili.
11   A   Was it good?
12   Q   Yes, it was. It was delightful. Thank
13   you for asking. A little rich.
14   A   I had the salmon BLT. Yeah, their food
15   is very rich, but it's good.
16   Q   Well, let's jump back in. Before lunch,
17   we were talking about Sherronna Bishop a little
18   bit, but I want to ask you about another person by
19   the name of Phil Waldron.
20   Do you know Phil Waldron?
21   MR. GESSLER:   I'll advise my client to
22   decline to answer on Fifth Amendment grounds.
23   Q   (By Mr. Cain) Mr. Waldron appeared on
24   numerous panels during the cyber symposium.
25   Did you speak with Mr. Waldron during the

Page 115

1    symposium?
2    MR. GESSLER:   I'll advise my client to
3    decline to answer on Fifth Amendment grounds.
4    Q   (By Mr. Cain) Mr. Waldron is affiliated
5    with a group called ASOG.
6    Are you -- or do you know anybody at
7    ASOG?
8    MR. GESSLER:   I'll advise my client to
9    decline to answer on Fifth Amendment grounds.
10   Q   (By Mr. Cain) And did they have any
11   input, anyone at ASOG, on any of the reports that
12   were produced by the two consultants we discussed
13   earlier?
14   MR. GESSLER:   I'll advise my client to
15   decline to answer on Fifth Amendment grounds.
16   Q   (By Mr. Cain) When I took Mr. Giuliani's
17   deposition, he indicated that Mr. Waldron was
18   someone who provided him with a substantial amount
19   of information concerning alleged hacking into the
20   2020 election.
21   Did Mr. Waldron provide you with any
22   information regarding Dr. Coomer being involved in
23   hacking the 2020 election?
24   MR. GESSLER:   I'll advise my client to
25   decline to answer on Fifth Amendment grounds.

Page 116

1    Q   (By Mr. Cain) So another gentleman that
2    was on the clip that we looked at earlier where
3    Mr. Oltmann was talking about Dr. Coomer and he
4    made a reference to the lawyer asking him questions
5    and they had a chuckle, that lawyer is a guy named
6    David Clements.
7    Do you know Mr. Clements?
8    MR. GESSLER:   I'll advise my client to
9    decline to answer on the basis of the Fifth
10   Amendment.
11   Q   (By Mr. Cain) Did you discuss with
12   Mr. Clements any aspect of Dr. Coomer's role in the
13   2020 election and supposedly being involved in
14   rigging it?
15   MR. GESSLER:   I'll advise my client to
16   decline to answer on Fifth Amendment grounds.
17   Q   (By Mr. Cain) Do you know what the
18   relationship, if any, between David Clements is
19   with Mike Lindell?
20   MR. GESSLER:   I'll advise my client to
21   decline to answer on Fifth Amendment grounds.
22   Q   (By Mr. Cain) And I neglected to mention
23   this when I was asking about Mr. Waldron.
24   Do you know whether there's any
25   relationship between Mr. Waldron and Mr. Lindell,

1  and, if so, what?
2         MR. GESSLER:  I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4         Q   (By Mr. Cain)  Now, do you remember the
5  timing -- and, again, another item we touched on,
6  but I want to try to get this straight in my head.
7         When did you actually complete your
8  participation in the Selection Code video that we
9  saw a clip from?
10        MR. GESSLER:  I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12        Q   (By Mr. Cain)  Do you know whether that
13  was before or after the district attorney,
14  Mr. Rubinstein, published his report on May 19th of
15  2022?
16        MR. GESSLER:  I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18        Q   (By Mr. Cain)  In other words, were you in
19  possession of the district attorney's report before
20  you provided your statements in the Selection Code
21  film?
22        MR. GESSLER:  I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24        MR. CAIN:  Well, let's do this.
25        Will you mark this.

1         (Exhibit 4 was marked.)
2         MR. CAIN:  For those of you, Ryan in
3  particular, we're marking Deposition Exhibit 4, and
4  it is, I'm sure, available online, but I'll
5  describe it briefly.  It's dated May 19, 2022
6  directed to the Mesa County Commissioners and the
7  Grand Junction City Council.  Its author is Daniel
8  Rubinstein and he's the district attorney of Mesa
9  County, and it's about -- I thought it was about
10  20-some-odd pages, 20 -- 24 pages.  And I'm going
11  to let the witness familiarize herself with it
12  before I ask a question.
13        Q   (By Mr. Cain)  I'll just wait for you to
14  look up, ma'am.
15        A   Okay.
16        (Deponent reviewing document.)
17        Q   And, ma'am, I'm not asking you to read a
18  28-page report line for line.
19        A   Well, there's a lot of pictures.  What
20  would you like for me to do here?
21        Q   Familiarize yourself with it, at least
22  enough to answer this question.
23        A   Okay.
24        Q   Have you seen it before I just handed it
25  to you today?

1         MR. GESSLER:  I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3         Q   (By Mr. Cain)  You'd agree with me that
4  this report was published on or about May 19, 2022,
5  right?
6         MR. GESSLER:  I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8         Q   (By Mr. Cain)  And, again, I like
9  timelines.  We talked about the Selection Code and
10  when that came out, and that came out about the
11  same time you were served with my subpoena to be
12  here today.  And I'll represent to you that day was
13  September 7, 2022; is that accurate?
14        MR. GESSLER:  I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16        Q   (By Mr. Cain)  So you would have at least
17  had access to this report before you made the
18  statements about Dr. Coomer on the video we saw the
19  day you were served, right?
20        MR. GESSLER:  I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22        Q   (By Mr. Cain)  Do you know why the
23  district attorney was issuing what appears to be a
24  responsive report to the two experts associated
25  with you, Mr. O'Donnell and Mr. Daugherity?

1         MR. GESSLER:  I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3         Q   (By Mr. Cain)  And as to those folks, it's
4  fair to say that this report was in response to the
5  third report that was issued by those two
6  consultants, true?
7         MR. GESSLER:  I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9         Q   (By Mr. Cain)  And so that we have this in
10  one spot, as it relates to the third report, who
11  paid Mr. O'Donnell and Mr. Daugherity to perform
12  the work in Report No. 3?
13        MR. GESSLER:  I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15        Q   (By Mr. Cain)  At that time, when the
16  third report was issued, which I believe was just a
17  couple of months before this, was Mr. Lindell
18  financing your legal team?
19        MR. GESSLER:  I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21        Q   (By Mr. Cain)  Or Mr. Byrne?
22        MR. GESSLER:  I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24        Q   (By Mr. Cain)  Assuming you -- well, you
25  had access to this report.  It was publicly

1    available, was it not?

2            MR. GESSLER:   I'll advise my client to

3    decline to answer on Fifth Amendment grounds.

4        Q    (By Mr. Cain) And I know you just looked

5    at it. Did you read the part on the first page in

6    the middle of the paragraph where attorney --

7    District Attorney Rubinstein says:  This

8    investigation -- referring to the investigation his

9    office performed.  This investigation has revealed

10   that the second adjudication database in both the

11   November 2020 general election and the April '21

12   Grand Junction municipal election was caused by

13   direct action of the former back office elections

14   manager, Sandra Brown.

15           You read that, didn't you?

16           MR. GESSLER:   I'll advise my client to

17   decline to answer on Fifth Amendment grounds.

18       Q    (By Mr. Cain) So isn't it true, ma'am,

19   that just in terms of the issues -- the so-called

20   issues with the databases, that the district --

21   your own district attorney concluded that any

22   modifications to those databases or the creation of

23   a new database was the result of a County

24   official's input in resetting that database.

25           You know that, right?

1            MR. GESSLER:   I'll advise my client to

2    decline to answer on Fifth Amendment grounds.

3        Q    (By Mr. Cain) I mean, you know, because

4    you worked in elections, that when you have --

5    let's say it's an issue with adjudication and you

6    realize you have the wrong parameters set up, a

7    hypothetical.  You have it set up to address

8    undervotes, you know, when there's -- someone

9    hasn't filled out the entire ballot, and your

10   adjudicator is catching that for adjudication and

11   maybe you don't want that to happen because state

12   law says you don't do that at -- at least at that

13   stage.

14           So are you with me on that general setup?

15           MR. GESSLER:   I'll advise my client to

16   decline to answer on Fifth Amendment grounds.

17       Q    (By Mr. Cain) Don't you know or weren't

18   you advised that if a County official restarts or

19   resets the adjudicator -- or the adjudication

20   software at that point -- for example, Oh, look,

21   we've got an issue, we've got to restart it -- that

22   the system is designed to set -- to save the old

23   database and then to create a new database based on

24   a change in parameters?

25           Are you familiar with that?

1            MR. GESSLER:   I'll advise my client to

2    decline to answer on Fifth Amendment grounds.

3        Q    (By Mr. Cain) In other words, there are

4    safeguards within the election software itself to

5    preserve the history of the election.

6            Do you understand that?

7            MR. GESSLER:   I'll advise my client to

8    decline to answer on Fifth Amendment grounds.

9        Q    (By Mr. Cain) Did you tell Mr. Lindell,

10   for example, that the issues with the database had

11   been addressed, the so-called issues, by the

12   district attorney before the Selection Code was

13   published?  Do you understand what I'm asking you?

14           MR. GESSLER:   I'll advise my client to

15   decline to answer on Fifth Amendment grounds.

16       Q    (By Mr. Cain) Something to the effect of,

17   Look, Mike, you know, we've got these consultants,

18   but we've got this other report from the district

19   attorney that indicates that that happens when a

20   County official makes this restart of the program.

21           Did you have any discussions like that

22   with Mr. Lindell?

23           MR. GESSLER:   I'll advise my client to

24   decline to answer on Fifth Amendment grounds.

25       Q    (By Mr. Cain) Or with the producers of

1    the Selection Code to the extent that they differ

2    from Mr. Lindell, did you have any of those

3    discussions?

4            MR. GESSLER:   I'll advise my client to

5    decline to answer on Fifth Amendment grounds.

6        Q    (By Mr. Cain) Did your office reach out,

7    to your knowledge, to Dominion Voting Systems or

8    Dr. Coomer to ask for an explanation regarding any

9    changes in the databases associated with the

10   election software?

11           MR. GESSLER:   I'll advise my client to

12   decline to answer on Fifth Amendment grounds.

13       Q    (By Mr. Cain) In other words, don't you

14   think it would have been important for these paid

15   consultants, Mr. O'Donnell and Mr. Daugherity, to

16   actually discuss their findings with Dominion

17   before trying to publish a report?

18           MR. GESSLER:   I'll advise my client to

19   decline to answer on Fifth Amendment grounds.

20       Q    (By Mr. Cain) And before you made these

21   allegations about so-called -- what did you say

22   about Dr. Coomer? Bear with me for a second.

23   Where's that Tweet?

24           Before you said something to the effect

25   of how it's possible for someone like Dr. Coomer to

TINA PETERS - November 7, 2022

Page 125

1 change the algorithm in the voting machine?
2 MR. GESSLER: I'll advise my client to
3 decline to answer on Fifth Amendment grounds.
4 Q (By Mr. Cain) I mean, you made that
5 statement, if we're to believe this deleted Tweet,
6 Exhibit 2, back in January of 2021 about
7 Dr. Coomer.
8 Remember that?
9 MR. GESSLER: I'll advise my client to
10 decline to answer on Fifth Amendment grounds.
11 Q (By Mr. Cain) And a little over a year
12 later, in May of 2022, you have a specific report
13 from the district attorney saying here's what's
14 happened, and he has screenshots of Sandra Brown
15 doing it, making the inputs.
16 So why haven't you retracted this idea
17 that Dr. Coomer could change the algorithm in a
18 voting machine? Why haven't you retracted that?
19 MR. GESSLER: I'll advise my client to
20 decline to answer on Fifth Amendment grounds.
21 Q (By Mr. Cain) Why haven't you said
22 something to clear his name after impugning his
23 character? Why haven't you issued a retraction?
24 MR. GESSLER: I'll advise my client to
25 decline to answer on Fifth Amendment grounds.

Page 126

1 Q (By Mr. Cain) Has anybody accused you of
2 rigging the 2020 election?
3 MR. GESSLER: I'll advise my client to
4 decline to answer on Fifth Amendment grounds.
5 Q (By Mr. Cain) If they had, would you
6 demand a retraction? You'd want to clear your
7 name, wouldn't you?
8 MR. GESSLER: I'll advise my client to
9 decline to answer on Fifth Amendment grounds.
10 Q (By Mr. Cain) Are you in communication
11 with Sandra Brown?
12 MR. GESSLER: I'll advise my client to
13 decline to answer on Fifth Amendment grounds.
14 Q (By Mr. Cain) You have been ordered not
15 to communicate with officials -- current or former
16 officials with the district clerk's office,
17 right -- or the County Clerk's office? Pardon me.
18 MR. GESSLER: I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20 Q (By Mr. Cain) Did Sandra Brown explain to
21 you that she -- after the attorney -- district
22 attorney issued this report, that she was -- she
23 recalled that she was involved in restarting the
24 system and, thus, causing the change in the
25 database?

Page 127

1 MR. GESSLER: I'll advise my client to
2 decline to answer on Fifth Amendment grounds.
3 Q (By Mr. Cain) And even if that needed to
4 be investigated, don't you have the tools within
5 the County Clerk's office to perform an audit or a
6 recount, to look at the actual ballots? Don't you
7 have that available to you?
8 MR. GESSLER: I'll advise my client to
9 decline to answer on Fifth Amendment grounds.
10 Q (By Mr. Cain) It's fair to say, at least
11 in elections based on your experience, that voting
12 machine companies like Dominion are in contact with
13 the County Clerk's offices looking to both improve
14 the system and improve security features on the
15 system, right?
16 MR. GESSLER: I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18 Q (By Mr. Cain) Did you ever reach out to
19 anyone associated with Dominion Voting Systems to
20 discuss your concerns about potential hacking of
21 their machines?
22 MR. GESSLER: I'll advise my client to
23 decline to answer on Fifth Amendment grounds.
24 Q (By Mr. Cain) In other words, if --
25 wouldn't a prudent County Clerk, to the extent that

Page 128

1 she believes there may be vulnerabilities, wouldn't
2 they want to reach out or wouldn't you want to
3 reach out to either the Secretary of State's office
4 or to the voting company itself and start a
5 dialogue about where those vulnerabilities are
6 coming from and how they might be addressed?
7 MR. GESSLER: I'll advise my client to
8 decline to answer on Fifth Amendment grounds.
9 Q (By Mr. Cain) Instead of blaming an
10 official with the voting company for hacking into
11 the County's election system, which is what you
12 essentially did, right?
13 MR. GESSLER: I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15 Q (By Mr. Cain) Based on no evidence.
16 Because if you've got evidence that Dr. Coomer
17 hacked into this system, I'm all ears. This is
18 your time to tell me.
19 MR. GESSLER: Is that a question?
20 Q (By Mr. Cain) What is -- what's your
21 evidence? That's the question.
22 MR. GESSLER: I'll advise my client to
23 decline to answer on Fifth Amendment grounds.
24 Q (By Mr. Cain) This report that we
25 looked -- started to look at, Exhibit 4, as you

Page 129

1  pointed out, it's got pictures and it's lengthy and
2  we're not going to go through it.  But it does
3  contain a summary at the end, and I just need your
4  input on your opinion, if you have one, based on
5  what the findings were.  The district attorney
6  summarizes his findings, and I will skip some of
7  the stuff that's just directly related -- well,
8  it's short.  Maybe I won't.
9           The first sentence says:  The
10  investigation is being closed with no findings of
11  probable cause that a crime was committed by any
12  person.
13           And I'll just point you back to they were
14  looking at Sandra Brown's conduct during the
15  election to determine whether there's probable
16  cause that she had done something in her role as
17  elections manager.
18           He goes on to say:  There appears to be
19  anomalies in the election logs caused by the
20  intentional actions of Sandra Brown, the elections
21  manager for the Mesa County Clerk's office.  No
22  evidence exists that would indicate that Ms. Brown
23  had any nefarious or criminal motive in those
24  actions but, rather, appears to have been
25  troubleshooting problems in the flow of the

Page 130

1  adjudication process during the elections.
2           Do you have any reason to doubt that
3  conclusion, ma'am?
4           MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q   (By Mr. Cain) Did you witness Sandra
7  Brown doing anything that you thought was either
8  nefarious or potentially criminal in how she
9  conducted the election in November of 2020?
10           MR. GESSLER:   I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12      Q   (By Mr. Cain) The district attorney goes
13  on to say:  These actions were verified to have
14  been done by her through video evidence -- I'll
15  stop there.
16           The video machines -- the cameras is
17  probably a better word.  Video machines really
18  isn't a word, I don't think.
19           Anyway, the cameras were on and recording
20  during the period immediately prior to the election
21  and during the election and thereafter, right?
22           MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24      Q   (By Mr. Cain) I mean, you know that there
25  is a period of time by state law that you have to

Page 131

1  have the cameras on, right?
2           MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4      Q   (By Mr. Cain) And you left the cameras on
5  during that statutory period during the November
6  2020 election, didn't you?
7           MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9      Q   (By Mr. Cain) And those cameras actually
10  had been taken offline at your direction prior to
11  the trusted build process, right?
12           MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14      Q   (By Mr. Cain) Whereas before, after you
15  took them offline, they had been online
16  continuously previously, hadn't they?
17           MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19      Q   (By Mr. Cain) And you took them offline
20  because you wanted to conceal the identity of
21  Mr. Hayes appearing at your office to make the copy
22  that he made of the software, right?
23           MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25      Q   (By Mr. Cain) Back to the summary.  We

Page 132

1  were talking about cameras and I said video
2  machines.  The sentence says:  These actions were
3  verified to have been done by her, meaning Ms.
4  Brown, through video evidence, corroboration of
5  records, audit of randomly selected ballot images,
6  interviews with witnesses and experts, and
7  recreation of the certain scenarios using a test
8  election environment and prove that the conclusions
9  of Report 3 -- meaning your consultants or those
10  consultants, we'll call them -- the conclusions of
11  Report 3 are incorrect claims of what may have
12  occurred.
13           Do you agree or disagree with that
14  statement?
15           MR. GESSLER:   I'll advise my client not
16  to answer on Fifth Amendment grounds.
17      Q   (By Mr. Cain) I mean, did your
18  consultants actually interview members of the
19  County Clerk's office as part of their work, do you
20  know?
21           MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23      Q   (By Mr. Cain) They didn't actually do
24  that, did they?
25           MR. GESSLER:   I'll advise my client to

TINA PETERS - November 7, 2022

Page 133

1  decline to answer on Fifth Amendment grounds.
2      Q (By Mr. Cain) The summary of the report
3  by the district attorney concludes by saying: At
4  this time, no evidence suggests that these actions
5  negatively impacted the election -- referring back
6  again to what Ms. Brown was doing.
7      Do you have any reason to doubt that
8  conclusion?
9      MR. GESSLER: I'll advise my client to
10 decline to answer on Fifth Amendment grounds.
11     Q (By Mr. Cain) I mean, there's -- I guess
12 there's another -- I didn't even think about this.
13 There may be another theory of the case that --
14 that it wasn't Dr. Coomer that did something with
15 the databases remotely, because he wasn't there
16 during the election, right, so he couldn't have
17 done it in person, true?
18     MR. GESSLER: I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20     Q (By Mr. Cain) Or any other Dominion
21 official, they weren't on-site during the election
22 punching the keys, were they?
23     MR. GESSLER: I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25     Q (By Mr. Cain) So perhaps there's a theory

Page 134

1  that you hold that somehow it was Sandra Brown and
2  not Dominion or not some remote actor that caused
3  some corruption of the databases or otherwise
4  changed votes.
5      Do you believe that?
6      MR. GESSLER: I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q (By Mr. Cain) Or any other County
9  employee -- former County employee that worked with
10 you, do you believe any of them had something to do
11 with spoiling this gold standard election that you
12 held?
13     MR. GESSLER: I'll advise my client to
14 decline to answer on Fifth Amendment grounds.
15     Q (By Mr. Cain) And what do you have in
16 terms of evidence of -- if any, of outside Internet
17 traffic into your office; in other words, someone
18 logging on to a server that's connected to the
19 Internet during the period where early voting
20 started through the election? What evidence do you
21 have of that?
22     MR. GESSLER: I'll advise my client to
23 decline to answer on Fifth Amendment grounds.
24     Q (By Mr. Cain) Have your consultants given
25 you an IP address that they've triangulated to be

Page 135

1  the source of an outside hacker that somehow
2  manipulated the election results here in Mesa
3  County?
4      MR. GESSLER: I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6      Q (By Mr. Cain) And what about Mr.
7  Lindell's theory about Hammer and Scorecard in a
8  foreign country, such as China, that's hacking into
9  the American election? Have you had any
10 discussions with Mr. Lindell about that theory?
11     MR. GESSLER: I'll advise my client to
12 decline to answer on Fifth Amendment grounds.
13     Q (By Mr. Cain) Do you believe, as you sit
14 here today, that there's any validity to that?
15     MR. GESSLER: I'll advise my client to
16 decline to answer on Fifth Amendment grounds.
17     Q (By Mr. Cain) Have you seen any evidence
18 or did you at the cyber symposium, whether it's
19 through an analysis of the PCAPs or otherwise, that
20 there were foreign actors that interfered in our
21 election, not just in Mesa County but anywhere in
22 the United States?
23     MR. GESSLER: I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25     Q (By Mr. Cain) I mean, you have been very

Page 136

1  public about your concerns with the election, but
2  it's more than just concerns. There is a claim
3  that there was manipulation of the data, including
4  here in Mesa County, and I just want to know
5  what -- what is the evidence of any of that?
6  Please just tell me that.
7      MR. GESSLER: I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9      Q (By Mr. Cain) Why have you continued --
10 given some of what we've discussed, looking at the
11 report, your experience to date, why have you
12 continued to make public appearances talking about
13 the Mesa County election and your imaging of the
14 election server here in Mesa County? Why are you
15 continuing to speak publicly on that?
16     MR. GESSLER: I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18     Q (By Mr. Cain) Because you're not
19 answering questions here today, but you're
20 talking about it. You were talking about it on
21 September 24th of 2022 on a podcast.
22     Do you remember that?
23     MR. GESSLER: I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25     Q (By Mr. Cain) Let's -- let's look at the

Page 137

1  one I'm thinking of, and I'll have a few follow-up
2  questions.
3         MR. CAIN:   Can we look at Clip 4.
4         (Video playing.)
5         TINA PETERS:   And then get this:  This
6  gentleman, Gerald Wood, was at the symposium
7  when all this broke.  He sat in for hours with
8  me and my two attorneys, and then he flew back
9  to Grand Junction, to Mesa County, on Mike
10  Lindell's plane.  Mike Lindell paid for his --
11  I mean, talked to all the people to look
12  how -- how grateful he was.  He talked to all
13  the cyber experts at the symposium, and then
14  he pretends like, Well, I was hoping to do
15  work with Tina and then she took my badge and
16  never called me again.  It's just --
17         (Video stopped.)
18     Q   (By Mr. Cain)  Okay.  So that is you on
19  some form of a podcast.  Who is -- who's that
20  person that you're talking to?  I'm not familiar
21  with this one.
22         MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24     Q   (By Mr. Cain)  Why did you decide to make
25  statements about Mr. Woods on this podcast?

Page 138

1         MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3     Q   (By Mr. Cain)  And is -- I said it's
4  Mr. Woods, and I keep going back and forth.  It's
5  Wood, singular, right?
6         MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8     Q   (By Mr. Cain)  In any event, do you have
9  any reason to doubt that you were talking about
10  Mr. Wood on September 24 of 2022?
11         MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13     Q   (By Mr. Cain)  And you did reference that
14  Mr. Lindell, I believe you were saying, paid for
15  him or provided transportation for him, at least,
16  back from the cyber symposium; is that true?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19     Q   (By Mr. Cain)  Do you know why Mr. Lindell
20  would do that?
21         MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23     Q   (By Mr. Cain)  And you referenced these
24  two attorneys, which is why I asked you earlier.
25         Are you prepared to tell me which

Page 139

1  attorneys -- given that they may be someone who has
2  factual knowledge of these events, are you prepared
3  to tell me who these two attorneys are?
4         MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6     Q   (By Mr. Cain)  Is one of them sitting in
7  this room?
8         MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10     Q   (By Mr. Cain)  And why is it important for
11  you, at least if we take you at your word on this
12  podcast, to suggest that Mr. Wood was consenting to
13  this arrangement to hide the identity of Mr. Hayes?
14         MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16     Q   (By Mr. Cain)  And was Mr. Lindell part of
17  the discussions with Mr. Wood and Mr. Hayes about
18  this identity change?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21         MR. CAIN:   All right.  Let's look at the
22  next clip, Clip 5.
23         (Video playing.)
24         TINA PETERS:   So there was -- there was a
25  gentleman that had -- there was a high-level

Page 140

1  Top Hat forensic cyber expert, and he had
2  agreed to come in and do the image.  The
3  problem with it were two things:  He had --
4  but he had just exposed a very -- a very
5  high-profile, large organization that was an
6  anti-trafficking organization called
7  (inaudible).  He'd asked me -- he said if you
8  will keep my identity secret, because at that
9  point, he had -- it had just gone down.  It
10  was pretty broad, you know, and these guys are
11  not -- they don't play nice.
12         ZAK PAINE:   Sure.
13         TINA PETERS:   These human traffickers,
14  and I agreed to do that.
15         (Video stopped.)
16     Q   (By Mr. Cain)  Okay.  So you agreed -- if,
17  again, we take you at your word -- to conceal the
18  identity of this Top Hat cyber expert, true?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21     Q   (By Mr. Cain)  I think you said high-level
22  Top Hat, and that high-level Top Hat expert is the
23  Mr. Hayes we've been talking about, right?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

TINA PETERS - November 7, 2022

Page 141

1    Q   (By Mr. Cain) He's the one that you gave
2   us information on that suggested he exposed some
3   human trafficking ring, right?
4        MR. GESSLER:   I'll advise my client to
5   decline to answer on Fifth Amendment grounds.
6    Q   (By Mr. Cain) So in truth, Mr. Hayes is
7   or was a surfer, wasn't he?
8        MR. GESSLER:   I'll advise my client to
9   decline to answer on Fifth Amendment grounds.
10    Q   (By Mr. Cain) I think he was a
11   professional surfer, right?
12        MR. GESSLER:   I'll advise my client to
13   decline to answer on Fifth Amendment grounds.
14    Q   (By Mr. Cain) And did he -- oh, no.
15        MR. CAIN:   Restaurant?
16        MR. KLOEWER:   Clothing company.
17    Q   (By Mr. Cain) Clothing company, right?
18   You know that about him, too, right?
19        MR. GESSLER:   I'll advise my client to
20   decline to answer on Fifth Amendment grounds.
21    Q   (By Mr. Cain) What made you think he was
22   qualified -- taking aside the legalities of the
23   situation -- to come into Mesa County and image the
24   election server hardware here or software?
25        MR. GESSLER:   I'll advise my client to

Page 142

1   decline to answer on Fifth Amendment grounds.
2    Q   (By Mr. Cain) All right.  You said even
3   more in this podcast.  I have one more clip from
4   it.  Let's look at it real quick.  You said a lot
5   more, but we don't have time, obviously, to go
6   through it all.
7        MR. CAIN:   Let's look at Clip 6.
8        (Video playing.)
9        TINA PETERS:   I could have had him in
10   there.  The only thing is the Secretary of
11   State had sent an e-mail because she was so
12   paranoid about this -- about people knowing
13   what she was doing.  She sent out an e-mail
14   that said when we get there, if there are
15   people other than -- other than me and the
16   employees -- in my case, it was two employees;
17   in other counties, you can have eight, and
18   myself.  If anyone other than the employees
19   that you have said are going to be there -- so
20   we had to let them know five days in advance
21   what employees were going to be there for this
22   trusted build.
23        So Gerald Wood stepped up and said I will
24   do this for my country.  I will give my name
25   and I will go get the badge and you can use

Page 143

1   that.  So that's exactly how that went down.
2   And -- and so -- but in this e-mail, she said
3   when we get there, when Dominion Voting
4   Systems and the Secretary of State employees
5   get there, if there's anybody in the room
6   that's not on this list, we will turn around,
7   we will leave, and you will have to ship your
8   equipment to us for us to do the trusted build
9   at your cost, and then turn around when we're
10   done and ship it back.  And I thought there is
11   no way I'm letting this election equipment
12   leave and get into this criminal's hands.  So
13   that's how that went down.
14        And so I'm being -- this whole
15   indictment that -- we found out later that
16   this man, his attorney, was -- was best
17   friends with this crooked DA and he had got
18   him to flip on me and saying that I had stolen
19   his identity, you know, and criminal
20   impersonation and all these kinds of things.
21   That's what the indictment's about.
22        And then get this:  This gentleman,
23   Gerald Wood, was at the symposium when all
24   this broke.  He sat in for hours with me and
25   my two attorneys, and then he flew back to

Page 144

1   Grand Junction, to Mesa County, on Mike
2   Lindell's plane.  Mike Lindell paid for his --
3   I mean, talked to all the people to look
4   how -- how grateful he was.  He talked to all
5   the cyber experts at the symposium, and then
6   he pretends like, Well, I was hoping to do
7   work with Tina and then she took my badge and
8   never called me again.  It's just -- it's
9   craziness.  Craziness.
10        ZAK PAINE:   This was -- this was one of
11   the most shocking things for me to hear in
12   Selection Code, because it means that
13   virtually the entirety of this indictment
14   against you is a complete fiction.  It's
15   completely made up and I just -- knowing the
16   deep-rooted connection that this man had to
17   everything that was going on in a positive
18   way.  Knowing that he flipped and is telling
19   this lie and you may end up in some serious
20   trouble as a result of it, I mean that's
21   just -- that's horrific.  You're at the mercy
22   of someone who is being completely dishonest.
23        And, you know, so my question is, you
24   know, how are we going to prove or can we -- I
25   don't know if you can talk about that, I mean,

TINA PETERS - November 7, 2022

Page 145

1  because this is probably going to deal with
2  your defense. But is there a way that we can
3  prove that what he's saying didn't actually
4  happen? I mean, is there anything that we can
5  put out there or that we can present to show
6  that he's lying?
7       TINA PETERS:  Well, there were plenty of
8  witnesses there.
9       ZAK PAINE:  Okay.
10      TINA PETERS:  There were plenty of
11 witnesses that were on the plane with him.
12 Joe Oltmann was on the plane with him and he
13 was bragging to Joe Oltmann about how -- how
14 he was so proud to be doing this for his
15 country and all of this, so -- you know, and
16 Mike Lindell was paying for his attorney.
17      ZAK PAINE:  Uh-huh.
18      TINA PETERS:  You know, I mean, Mike
19 Lindell is a patriot.
20      ZAK PAINE:  He is.
21      TINA PETERS:  He has spent $35 million of
22 his own money to -- to protect the integrity
23 of our elections, to expose the problems so
24 they can be fixed with these elections. And
25 here this man turns around and changes his

Page 146

1  story. You know, who knows what he was
2  promised or who knows what he was threatened
3  with.
4       ZAK PAINE:  That was my next question.
5  You know, I mean, like what possibly could
6  they have done to him. I mean either by
7  promising, you know, wealth, riches, or, you
8  know, who knows what or by threatening to put
9  him in prison. I mean -- so, I mean, this is
10 an officially sanctioned activity that you, as
11 the Mesa County Clerk and Recorder, have the
12 legal right and responsibility to do.
13      TINA PETERS:  Right.
14      ZAK PAINE:  And you are bringing him in,
15 making him part of the team. It's official.
16 All right. And, you know, who better to do it
17 than somebody with his credentials. You know,
18 so perhaps they might have threatened him or
19 his family or something like that. I don't
20 know. Hopefully he'll end up testifying in
21 the trial and perhaps he can perjure himself a
22 little bit more.
23      TINA PETERS:  Uh-huh, uh-huh.
24      (Video stopped.)
25      Q  (By Mr. Cain) So the -- just the lineup

Page 147

1  of people you referred to on this, you talked about
2  the crooked district attorney.
3       That was referring to Mr. Rubinstein,
4  right?
5       MR. GESSLER:  I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7       Q  (By Mr. Cain) And then you said -- by the
8  way, looking at this, were you in Colorado?
9  Doesn't matter what town, but were you physically
10 in Colorado when you were making these statements?
11      MR. GESSLER:  I'll advise my client to
12 decline to answer on Fifth Amendment grounds.
13      Q  (By Mr. Cain) And the other gentleman --
14 well, I said the other gentleman.
15      The gentleman on the screen, do you know
16 whether he was physically in Colorado or not when
17 you were having this interview?
18      MR. GESSLER:  I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20      Q  (By Mr. Cain) In other words, was he in a
21 different state from you at the time you were
22 making these statements?
23      MR. GESSLER:  I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25      Q  (By Mr. Cain) And the purpose of you

Page 148

1  making these statements or appearing on this show,
2  in part, was, I gather from your comments, to
3  promote the Selection Code video that had come out
4  or was coming out; is that true?
5       MR. GESSLER:  I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7       Q  (By Mr. Cain) And when you said there
8  were plenty of witnesses, people on the plane, I
9  want to know who was on that plane and whether you
10 were as well.
11      MR. GESSLER:  Is that a question?
12      Q  (By Mr. Cain) You can answer. Yeah.
13 Question mark.
14      MR. GESSLER:  I'll advise my client to
15 decline to answer on Fifth Amendment grounds.
16      Q  (By Mr. Cain) And this idea that Mike
17 Lindell was paying for Gerald Wood's attorney, how
18 do you know that?
19      MR. GESSLER:  I'll advise my client to
20 decline to answer on Fifth Amendment grounds.
21      Q  (By Mr. Cain) Mr. Lindell would have told
22 you that directly, right?
23      MR. GESSLER:  I'll advise my client to
24 decline to answer on Fifth Amendment grounds.
25      Q  (By Mr. Cain) And I suspect he's not

TINA PETERS - November 7, 2022

Page 149

1  doing that anymore, right?
2         MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4      Q   (By Mr. Cain) And the Secretary of State
5  that you referred to, you mentioned, who was that
6  at the time?
7         MR. GESSLER:   I'll advise my client to
8  decline to answer on Fifth Amendment grounds.
9      Q   (By Mr. Cain) Have you appeared on any
10  other podcasts or shows like Conservative Daily
11  since this podcast occurred where you discussed
12  either the election being rigged or your legal
13  troubles here in Mesa County?
14         MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16      Q   (By Mr. Cain) The other comment on that
17  last clip that struck me was your statement that
18  Mike Lindell had paid about $35 million as of that
19  point dealing with some of these issues, election
20  issues.
21         How do you know that?
22         MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24      Q   (By Mr. Cain) And I believe -- Mr.
25  Kloewer can correct me if I'm wrong -- Mr. Lindell

Page 150

1  has been quoted as saying he's given $800,000 for
2  Tina Peters' legal defense fund; is that true?
3         MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5      Q   (By Mr. Cain) All right.  After -- so
6  right now we're kind of talking about stuff that
7  happened after the election.  There was reporting
8  that Mr. Lindell flew you out to Texas to get away
9  from the Secretary of State investigation, or words
10  to that effect.  There was an article on Vice, is
11  the one I'm referring to.
12         Is that true?  Did you do that?
13         MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15      Q   (By Mr. Cain) And if so, why did you go
16  to Texas?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19      Q   (By Mr. Cain) But then you had to leave
20  after just a few days because someone in the
21  security team, I guess, let it out where your
22  location was.
23         Do you remember that happening?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 151

1      Q   (By Mr. Cain) Mr. Lindell is reported to
2  have flown several Coloradans with the U.S.
3  Election Integrity Project back to Colorado on his
4  private jet after four days in Tennessee.
5         Are you affiliated with the USEIP at all?
6         MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) Do you know -- well, did
9  you spend any time with -- based on this reporting
10  and presuming it happened, did you spend any time
11  in Tennessee with anybody associated with that
12  project in November of 2021?
13         MR. GESSLER:   I'll advise my client to
14  decline to answer on Fifth Amendment grounds.
15      Q   (By Mr. Cain) Do you know Ash Epp, for
16  example?
17         MR. GESSLER:   I'll advise my client to
18  decline to answer on Fifth Amendment grounds.
19      Q   (By Mr. Cain) Holly Kasun?
20         MR. GESSLER:   I'll advise my client to
21  decline to answer on Fifth Amendment grounds.
22         MR. CAIN:   That's K-A-S-U-N.
23      Q   (By Mr. Cain) Do you know Shawn Smith?
24         MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

Page 152

1      Q   (By Mr. Cain) Are you associated in any
2  way with the organization Cause of America?
3         MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5      Q   (By Mr. Cain) Have you attended any
6  rallies that were put on by a group called FEC
7  United?
8         MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10      Q   (By Mr. Cain) And you know that group is
11  associated with Joe Oltmann, don't you?
12         MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14      Q   (By Mr. Cain) And just to wrap up
15  Mr. Oltmann maybe for this deposition, has he --
16  well, strike that.
17         Have you provided, through your campaign,
18  money to a group called PIN Business Network, Inc.?
19         MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21      Q   (By Mr. Cain) I mean, your campaign spent
22  $50,000 with that organization, didn't it?  50,000.
23         MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25      Q   (By Mr. Cain) The ostensible purpose of

Page 153

1 that was to market -- to provide it, quote-unquote,
2 Internet advertising. At least that's what the
3 disclosure says, right?
4        MR. GESSLER:   I'll advise my client to
5 decline to answer on Fifth Amendment grounds.
6        Q   (By Mr. Cain) I mean, you have to report
7 those contributions and expenditures, don't you, by
8 state law?
9        MR. GESSLER:   I'll advise my client to
10 decline to answer on Fifth Amendment grounds.
11       Q   (By Mr. Cain) So what did PIN Business
12 Network -- well, strike that.
13          That group or that organization, it's
14 actually a corporation, is owned in part by
15 Mr. Oltmann, right?
16       MR. GESSLER:   I'll advise my client to
17 decline to answer on Fifth Amendment grounds.
18       Q   (By Mr. Cain) The same Mr. Oltmann whose
19 statements you have been repeating publicly about
20 Dr. Coomer, right?
21       MR. GESSLER:   I'll advise my client to
22 decline to answer on Fifth Amendment grounds.
23       Q   (By Mr. Cain) So what did PIN Business
24 Network do for your campaign for $50,000?
25       MR. GESSLER:   I'll advise my client to

Page 154

1 decline to answer on Fifth Amendment grounds.
2        Q   (By Mr. Cain) According to the
3 expenditure detail published by the State, there
4 was a one-month period of time from May 27th of
5 2022 to June 28th of 2022 where these so-called
6 services were provided; is that true?
7        MR. GESSLER:   I'll advise my client to
8 decline to answer on Fifth Amendment grounds.
9        Q   (By Mr. Cain) We've looked for this
10 advertising online to see if we could tie it up but
11 have not been able to find anything like $50,000
12 worth of Internet advertising. I want you to
13 explain to the jury what that advertising was, what
14 it looked like, and what PIN Business Network did
15 for you or your campaign.
16       MR. GESSLER:   That's not a question.
17       MR. CAIN:   Question mark.
18       MR. GESSLER:   It's still not a question.
19       MR. CAIN:   Read it back. I can't
20 remember it. It was probably too long anyway. Let
21 me do this. I'll make it a little more succinct.
22 Fingers crossed.
23       Q   (By Mr. Cain) What did PIN Business
24 Network do during the period of time I mentioned
25 that constituted $50,000 in Internet advertising?

Page 155

1        MR. GESSLER:   I'll advise my client to
2 decline to answer on Fifth Amendment grounds.
3        Q   (By Mr. Cain) And have you made, either
4 directly or through a campaign committee or other
5 venture, any other financial payments to Joe
6 Oltmann or entities associated with Joe Oltmann?
7        MR. GESSLER:   I'll advise my client to
8 decline to answer on Fifth Amendment grounds.
9        Q   (By Mr. Cain) And had you provided
10 through a campaign or personally -- provided is the
11 wrong word. I'll use a different verb.
12          Had you paid any business associated with
13 Joe Oltmann any consideration prior to that date
14 range that I just showed you? In other words, I'm
15 asking you: Was there a financial relationship
16 before this 50,000-dollar campaign contribution
17 occurred?
18       MR. GESSLER:   I'll advise my client to
19 decline to answer on Fifth Amendment grounds.
20       Q   (By Mr. Cain) Did Mr. Lindell or any
21 entity associated with him contribute to your
22 campaign for -- during the primary for Secretary of
23 State?
24       MR. GESSLER:   I'll advise my client to
25 decline to answer on Fifth Amendment grounds.

Page 156

1        Q   (By Mr. Cain) Or for your prior campaign
2 when you were elected to Mesa County Clerk?
3        MR. GESSLER:   I'll advise my client to
4 decline to answer on Fifth Amendment grounds.
5        Q   (By Mr. Cain) All right. Good news and
6 bad news. The good news is I'm going to be a lot
7 shorter than I represented before lunch. The bad
8 news is I need to take a break and we have one more
9 segment, but that should be a short segment, so you
10 can take that as you want.
11       MR. CAIN:   But if you don't mind, let's
12 go off the record.
13       MR. GESSLER:   Okay.
14       THE VIDEOGRAPHER:   The time is 2:49.
15 We're off the record.
16          (Recess taken.)
17       THE VIDEOGRAPHER:   The time is 3:10.
18 We're back on the record.
19       Q   (By Mr. Cain) Ms. Peters, like I said
20 before, I have just a few more questions and we
21 should be able to get out of here. Some of them
22 involve at least potential witnesses in this case.
23 I'd like to know your association with them or not.
24          On or about March 7th of this year, you
25 appeared on the Conservative Daily -- we didn't

1  look at the clip -- to discuss the Mesa County
2  forensic examination and analysis report written by
3  Doug Gould, G-O-U-L D. I believe this was the
4  second report.
5       Who is Mr. Gould?
6            MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8       Q   (By Mr. Cain) And kind of similar to the
9  other questions, do you know, as you sit here, who
10  was paying Mr. Gould to provide an examination and
11  analysis report?
12           MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14       Q   (By Mr. Cain) Was Mr. Lindell involved in
15  that second report?
16           MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18       Q   (By Mr. Cain) On the podcast, Mr. Oltmann
19  noted that Doug Gould is a consultant for ASOG, and
20  ASOG is retained by the Tina Peters legal defense
21  team; is that true?
22           MR. GESSLER:   I'll advise my client to
23  decline to answer on Fifth Amendment grounds.
24       Q   (By Mr. Cain) Have you had any other
25  associations with Mr. Gould prior to the second

1  forensic examination and analysis report?
2            MR. GESSLER:   I'll advise my client to
3  decline to answer on Fifth Amendment grounds.
4       Q   (By Mr. Cain) And that appearance on the
5  Conservative Daily was on or about, as I said,
6  March 7th, which was two days before your
7  indictment on March 9 of 2022. And then the next
8  month, April of 2022, is when Mike Lindell held the
9  rally at the steps of the Capitol.
10       Were you there in person at Mike
11  Lindell's rally?
12           MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14       Q   (By Mr. Cain) Did Mike Lindell -- well,
15  did you have any discussions with Mr. Lindell about
16  supporting your then-candidacy by appearing with
17  you on the steps of the Capitol on April 5th of
18  2022?
19           MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21       Q   (By Mr. Cain) And you did -- you did make
22  a speech there, didn't you?
23           MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25       Q   (By Mr. Cain) And you recall that at that

1  event is when Mr. Lindell was served with my
2  lawsuit.
3       Do you remember that?
4            MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6       Q   (By Mr. Cain) And were you there when
7  Mr. Lindell spoke? I think he spoke after you.
8            MR. GESSLER:   I'll advise my client to
9  decline to answer on Fifth Amendment grounds.
10       Q   (By Mr. Cain) And did you hear
11  Mr. Lindell discuss Dr. Coomer?
12           MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14       Q   (By Mr. Cain) And repeat some of the
15  statements -- defamatory statements that we allege
16  have harmed Dr. Coomer in this case. Did you hear
17  those statements?
18           MR. GESSLER:   I'll advise my client to
19  decline to answer on Fifth Amendment grounds.
20       Q   (By Mr. Cain) And after that lawsuit was
21  served on Mr. Lindell at that rally, did you have
22  any discussions with Mr. Lindell about Dr. Coomer
23  and the filing of this suit?
24           MR. GESSLER:   I'll advise my client to
25  decline to answer on Fifth Amendment grounds.

1       Q   (By Mr. Cain) Did you have any
2  discussions with Mr. Lindell about the fact that
3  you may end up being a witness in his lawsuit?
4            MR. GESSLER:   I'll advise my client to
5  decline to answer on Fifth Amendment grounds.
6       Q   (By Mr. Cain) And I'm talking timing
7  again. When I -- when I mentioned the April 5th
8  date, part of what I want to know is: Between that
9  point and now, have you had any discussions with
10  Mr. Lindell about your testimony -- giving
11  testimony on his behalf in this case?
12           MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14       Q   (By Mr. Cain) Did Mr. Lindell ever advise
15  you not to respond to my questions here today? Did
16  you-all have that discussion where the subject of
17  whether you would be responsive to my questions
18  came up?
19           MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21       Q   (By Mr. Cain) Do you share any attorneys
22  with Mr. Lindell? In other words, do they
23  represent him on matters that you're also
24  represented by the same firm or lawyers?
25           MR. GESSLER:   I'll advise my client to

TINA PETERS - November 7, 2022

Page 161

1  decline to answer on Fifth Amendment grounds.
2      Q   (By Mr. Cain) Other potential witnesses
3  include Mike Flynn.
4          Do you know Mr. Flynn?
5          MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7      Q   (By Mr. Cain) Have you had any
8  discussions with Mr. Flynn about election integrity
9  issues and specifically either Dr. Coomer or
10  Dominion Voting Systems?
11          MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13      Q   (By Mr. Cain) Now, Mr. Flynn is appearing
14  on the Reawaken America tour.
15          Have you appeared on that tour yourself?
16          MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18      Q   (By Mr. Cain) Are you being
19  compensated -- let's say outside of whatever
20  potential money that you're still receiving from
21  the County, but are you being compensated by the
22  Reawaken America tour for any appearances?
23          MR. GESSLER:   I'll advise my client to
24  decline to answer on Fifth Amendment grounds.
25      Q   (By Mr. Cain) And let me broaden that.

Page 162

1  After you've made these allegations of election
2  irregularities, have you received money from any of
3  these tours, whether it's the symposium, Reawaken
4  America, or similar tours?
5          MR. GESSLER:   I'll advise my client to
6  decline to answer on Fifth Amendment grounds.
7      Q   (By Mr. Cain) Joe Flynn.  Do you know
8  Mr. -- the other Mr. Flynn?
9          MR. GESSLER:   I'll advise my client to
10  decline to answer on Fifth Amendment grounds.
11      Q   (By Mr. Cain) Have you had any
12  discussions with Mr. Flynn, Joe Flynn, about
13  election integrity issues, including any aspect of
14  Dominion Voting Systems or Dr. Coomer's role in the
15  election?
16          MR. GESSLER:   I'll advise my client to
17  decline to answer on Fifth Amendment grounds.
18      Q   (By Mr. Cain) This name's a little harder
19  for me.  Steve Lucescu, are you familiar with that
20  person?
21          MR. GESSLER:   I'll advise my client to
22  decline to answer on Fifth Amendment grounds.
23      Q   (By Mr. Cain) I'll spell the last name if
24  that helps, because I'm sure I butchered it.
25  L-U-C-E-S-C-U, do you know him?

Page 163

1          MR. GESSLER:   I'll advise my client to
2  decline to answer on Fifth Amendment grounds.
3      Q   (By Mr. Cain) Have you had any
4  discussions -- we'll call him Steve -- with Steve
5  about election integrity issues -- I'm going to
6  lengthen this a little bit to shorten -- hopefully
7  shorten it -- election integrity issues, Dominion
8  Voting Systems, Dr. Coomer, or any films that Steve
9  may have produced about those topics?
10          MR. GESSLER:   I'll advise my client to
11  decline to answer on Fifth Amendment grounds.
12      Q   (By Mr. Cain) Do you know who The America
13  Project is?
14          MR. GESSLER:   I'll advise my client to
15  decline to answer on Fifth Amendment grounds.
16      Q   (By Mr. Cain) Are you familiar with a
17  contribution by The America Project to the Citizens
18  for Election Integrity?
19          MR. GESSLER:   I'll advise my client to
20  decline to answer on Fifth Amendment grounds.
21      Q   (By Mr. Cain) Did you have any
22  discussions with this group -- it may be a PAC, I'm
23  not sure, but the group Citizens for Election
24  Integrity?
25          MR. GESSLER:   I'll advise my client to

Page 164

1  decline to answer on Fifth Amendment grounds.
2      Q   (By Mr. Cain) Isn't it true that The
3  America Project made one donation to that group for
4  the purpose of, quote, running attack ads on Pam
5  Anderson, close quote?
6          MR. GESSLER:   I'll advise my client to
7  decline to answer on Fifth Amendment grounds.
8      Q   (By Mr. Cain) And are you familiar with
9  the attack ads that that group ran as a result of
10  this contribution?
11          MR. GESSLER:   I'll advise my client to
12  decline to answer on Fifth Amendment grounds.
13      Q   (By Mr. Cain) I think we've covered at
14  least the questions -- most of the questions that I
15  had for you.  Earlier -- well, actually, before I
16  ask that question -- he gave me a note.
17          As it relates to Mr. Oltmann, I asked you
18  earlier -- there was an objection to it or advice
19  from your counsel not to answer, but I asked you
20  something to the effect of had you had any
21  discussions with Mr. Oltmann about giving a
22  deposition here today, and you were instructed not
23  to answer that.
24          Has Mr. Oltmann directed you not to
25  respond to my questions in any way, made a request

Page 165

1  or a direction to you not to be responsive to me
2  today?
3          MR. GESSLER:   I'll advise my client to
4  decline to answer on Fifth Amendment grounds.
5      Q    (By Mr. Cain) I also -- I think you
6  started to answer a question when I quoted
7  Congressman Crenshaw talking about the election was
8  always a lie or words to that effect.
9          Has -- has Mr. Lindell ever told you that
10  he's aware that the election fraud allegations are
11  false, they're a lie?
12          MR. GESSLER:   I'll advise my client to
13  decline to answer on Fifth Amendment grounds.
14      Q    (By Mr. Cain) Well, ma'am, other than the
15  content of my questions, which you may or may not
16  have enjoyed or liked, have I been professional to
17  you and polite?
18          MR. GESSLER:   I'll advise my client to
19  decline to answer on Fifth Amendment grounds.
20          MR. CAIN:   I'll take it as a yes.  Thank
21  you.  I appreciate your time.  That's all the
22  questions I have.
23          THE DEPONENT:   Thank you.
24          THE VIDEOGRAPHER:   Okay.  So this
25  concludes the day's proceedings of the video

Page 166

1  deposition of Tina Peters consisting of an
2  approximate running time of three hours and ten
3  minutes.  The time is 3:21.  We're off the record.
4          (Proceedings concluded at 3:21 p.m.)
5          (Reading and signing not requested.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 167

1  STATE OF COLORADO)
2          )ss.   REPORTER'S CERTIFICATE
3  COUNTY OF MESA   )
4      I, Candice F. Flowers, do hereby certify that
5  I am a Certified Shorthand Reporter and Notary
6  Public within the State of Colorado; that previous
7  to the commencement of the examination, the
8  deponent was duly sworn to testify to the truth.
9      I further certify that this deposition was
10  taken in shorthand by me at the time and place
11  herein set forth, that it was thereafter reduced to
12  typewritten form, and that the foregoing
13  constitutes a true and correct transcript.
14      I further certify that I am not related to,
15  employed by, nor counsel for any of the parties or
16  attorneys herein, nor otherwise interested in the
17  result of the within action.
18      In witness whereof, I have affixed my
19  signature this 20th day of November, 2022.
20      My commission expires February 14, 2024.
21
22
23          *Candice F Flowers*
24          Candice F. Flowers, CSR
            671 Alexia Court
25          Grand Junction, CO 81505