# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

## EXHIBIT 4

---

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 2
       ERIC COOMER, Ph.D.,            )
 3                                    )
          Plaintiff,                  )
 4                                    )
       v.                             ) Civil Action No.
 5                                    ) 1:22-v-01129-WJM
       MICHAEL J. LINDELL,            )
 6     FRANKSPEECH LLC, AND MY        )
       PILLOW, INC.,                  )
 7                                    )
          Defendants.                 )
 8
 9     ********************************************************
10             ORAL AND VIDEOTAPED DEPOSITION OF
11                       JOSHUA MERRITT
12                     NOVEMBER 14, 2022
13     ********************************************************
14        ORAL AND VIDEOTAPED DEPOSITION OF JOSHUA MERRITT,
15     produced as a witness at the instance of the Plaintiff,
16     and duly sworn, was taken in the above-styled and
17     numbered cause on the 14th day of November, 2022, from
18     10:18 a.m. to 4:01 p.m., before Julie C. Brandt, RMR,
19     CRR, and CSR in and for the State of Texas, reported by
20     machine shorthand at the offices of Tollefson Bradley
21     Mitchell & Melendi, LLP, 2811 McKinney Avenue, Suite
22     250, Dallas, Texas, pursuant to the Federal Rules of
23     Civil Procedure.
24
25
                                                Page 1
```

```
 1        APPEARANCES
 2 FOR THE PLAINTIFF:
 3    Bradley A. Kloewer
 4    Charles J. Cain
 5    CAIN & SKARNULIS PLLC
 6    101 N. F Street, Suite 207
 7    Salida, Colorado 81201
 8    719-530-3011
 9    bkloewer@cstrial.com
10    ccain@cstrial.com
11
12 FOR THE DEFENDANTS:
13    Ryan Malone (appeared remotely)
14    Jesse Kibort (appeared remotely)
15    PARKER DANIELS KIBORT
16    888 Colwell Building
17    123 North Third Street
18    Minneapolis, Minnesota 55401
19    612-355-4100
20    malone@parkerdk.com
21    kibort@parkerdk.com
22
23 ALSO PRESENT: Shawn Smith (appeared remotely)
24
25 VIDEOGRAPHER: Luis Acevedo - Veritext Legal Solutions
```
Page 2

```
 1             PROCEEDINGS
 2        THE VIDEOGRAPHER: We're on the record
 3 for the deposition of Joshua Merritt. The time is 10:18
 4 a.m. on November 14, 2022, in the matter of Eric Coomer
 5 versus Michael J. Lindell, et al., Civil Action No.
 6 1:22-cv-01129-WJM, being held in the United States
 7 District Court for the District of Colorado.
 8        The court reporter is Julie Brandt. The
 9 videographer is Luis Acevedo.
10        Will counsel state their appearances for the
11 record.
12        MR. KLOEWER: This is Brad Kloewer, here
13 on behalf of the Plaintiff Eric Coomer. I am joined by
14 Charlie Cain.
15        MR. MALONE: Ryan Malone, on behalf of
16 all Defendants, joined by Jesse Kibort and Defendants'
17 expert Shawn Smith.
18        MR. KLOEWER: All right. We'll get
19 started.
20        JOSHUA MERRITT,
21 having been first duly sworn, testified as follows:
22             EXAMINATION
23 BY MR. KLOEWER:
24   Q.  Mr. Merritt, my name is Brad Kloewer. We just
25 met outside the conference room here and spoke briefly
```
Page 4

```
 1             INDEX
 2                       PAGE
 3 Appearances.................................    2
 4 Proceedings.................................    4
 5 Stipulations................................. 184
 6
 7 JOSHUA MERRITT
 8    Examination by Mr. Kloewer...............    4
 9    Examination by Mr. Malone................ 169
10 Reporter's Certificate........................ 185
11
12 DEPOSITION EXHIBITS           IDENTIFIED
13 Exhibit 5   Text string printout   160
14 Exhibit 6   Plaintiff's Notice of Intent to  164
15           Take Oral and Videotaped
16           Deposition of Joshua Merritt
17 Exhibit 7   Software/Data Nondisclosure  168
18           Agreement (unsigned)
19 Exhibit 8   Software/Data Nondisclosure  173
20           Agreement signed by Joshua
21           Merritt, Aug. 3, 2021
22 Exhibit 9   Declaration of Joshua Merritt in  178
23           Case 1:20-cv-04809-TCB
24 Exhibit 10   Declaration of Joshua Merritt in  180
25           Case 2:20-cv-13134-LVP-RSW
```
Page 3

```
 1 on the phone last week.
 2        Before we get started, can you just state your
 3 name for the record.
 4   A.  Yes. My name is Joshua Alexander Merritt.
 5   Q.  And have you ever been deposed before,
 6 Mr. Merritt?
 7   A.  Yes, I have. Last year I was deposed by the
 8 January 6th Committee, and a month and a half ago I was
 9 deposed by the Texas Bar Association.
10   Q.  Okay. Well, I will give you some basic ground
11 rules just to refresh your memory on how a deposition
12 works.
13        I will try to speak slowly. That's for the
14 benefit of our court reporter here. I would ask you to
15 try to do the same. That way we don't talk over each
16 other so she can make a good record.
17        If I ask any question that you don't
18 understand or if you need me to repeat it, please just
19 ask me and I will be happy to rephrase or repeat the
20 question so you understand.
21        If you need to take a break for any reason, go
22 to the restroom or whatever, let me know. The one rule
23 we do have is that you can't leave in the middle of a
24 question. So I do ask you, if there's a question on the
25 table, to respond to that first. But, you know, this is
```
Page 5

2 (Pages 2 - 5)

1 not a marathon; if you need a break, we can do that. So
2 just let me know if you need that as well.
3    A.   Yes, sir.
4    Q.   Okay. I guess we'll just jump right in here.
5 Before we get into the substance of this particular
6 dispute, I want to know a little bit about your
7 background and how you -- what sort of work you do.
8 So what do you do for a living right now?
9    A.   Right now I'm a network engineer. I work
10 actually for a manufacturing company. I work as a
11 cybersecurity consultant as well.
12    Q.   And how long have you been in that line of
13 work?
14    A.   I have worked in the line of cybersecurity
15 consulting since approximately 2014.
16    Q.   2014. What sort of training did you have
17 before you got into that?
18    A.   Before joining the United States Army in 2003,
19 I worked as a system designer. I designed systems for
20 aviation and engineering companies. I was a CAD
21 designer and a CAD engineer designing electrical and
22 mechanical systems. So I had a lot of dual role within
23 that work. While I was in the Army, I held multiple --
24 I had multiple MOSs while I was there. Some of them, of
25 course, up for contention by the media.

Page 6

1    After -- while I was in the Army, I was
2 involved in online cyber operations ranging from what's
3 known as Anonymous. We assisted in hunting bad guys
4 globally and passing information up.
5    After I left the United States Army, I worked
6 at Cyber Defense Labs. And I was an intern under a
7 gentleman named Kevin Hinson, who was a cyber engineer
8 as well as a nuclear physicist who had worked at CERN.
9    While I was at Cyber Defense Labs, I
10 specialized in Tor and deep web research. I also
11 specialized in open-source intelligence collection. I
12 helped write doctrine and even assisted in teaching at
13 Cyber -- at the CyberPatriot program, which is a program
14 to teach high school students how to be hackers before
15 they go to college and work for the NSA.
16    I taught in a number of community colleges in
17 other areas along the lines of open-source intelligence
18 collection and what we call mapping the networks. And
19 then after I finished college in 2017, because I was
20 going to school to get actually degreed and my
21 certifications, I was hired to be the vice president of
22 cyber operations for Allied Security Operations.
23    Q.   Okay. Let's pause there for one second. You
24 mentioned before -- and I am probably going to do this a
25 few times throughout the deposition because I don't have

Page 7

1 your same background here. You mentioned MOSs. Can you
2 explain what that acronym means?
3    A.   MOS is military occupation specialty.
4    Q.   Okay.
5    A.   It's our job titles basically.
6    Q.   Okay. I'll, like I said, probably have a
7 couple of those questions for you as we go.
8    Okay. So we've got up to 2017, you finished
9 your education and you said you just started a new
10 position with the Allied Security Operations Group. Can
11 you tell me, how did you find out about that
12 organization?
13    And for Julie's benefit, moving forward we'll
14 probably refer to them as ASOG. Is that -- so that's
15 A-S-O-G is the acronym.
16    A.   Okay.
17    Q.   How did you hear about ASOG?
18    A.   Whenever I was working and interning at Cyber
19 Defense Labs, there was a gentleman I was introduced to
20 by the name of Jason Alpers. Jason Alpers had told me
21 that there was a new company opening up and they needed
22 a person who understood various areas within the cyber
23 world, and it was Jason who introduced me to Adam Kraft,
24 who was the CEO of the company.
25    Q.   And what did you understand ASOG's business to

Page 8

1 be?
2    A.   In the very beginning, their business model
3 was a private intelligence company for citizens that
4 emulated what the military was capable of doing. So our
5 tasking was securing networks, was identifying threats
6 and enumerating threats and securing internal and
7 external threats from within like family offices and
8 private companies.
9    Q.   Did Mr. Alpers think you would be a good
10 candidate for that position based on your military
11 experience?
12    A.   Yes, and we had worked together prior to that
13 on a number of collection events where we would pull
14 information and pass it up to higher authorities.
15    Q.   And you mentioned that Adam Kraft was the CEO
16 at that time. Is that correct?
17    A.   Yes. He was the founding CEO of ASOG.
18    Q.   Did you interview with him for the position?
19    A.   Yes, I did. I had met with him. Jason Alpers
20 was president, and we had met at their office in
21 Addison, Texas.
22    Q.   Anyone else with ASOG that you interviewed
23 with?
24    A.   At the time the only other people who were
25 there was just myself, Jason and Adam.

Page 9

3 (Pages 6 - 9)

1 Q. So you were -- there were other employees at
2 ASOG at the time. Correct?
3 A. Yes.
4 Q. You just interviewed with Adam?
5 A. Correct. Yes, sir.
6 Q. And was it just one interview? Did you get
7 the job that day or --
8 A. It was one interview, and I got the job. I
9 was told about a week later that they would bring me on.
10 Q. What type of work were you doing when you
11 first started at ASOG?
12 A. So I was responsible for everything cyber
13 within the company. I set up the servers for the
14 company, securing those servers, setting up the VoIP
15 phones within the company, building all of the desktops
16 for everyone within the company and securing them. And
17 then when we started getting work requests, then we
18 would begin doing cyber research. So there was -- I
19 think I sort of fell under about four different roles in
20 my position.
21 Q. That was my next question. So you were the
22 ASOG in-house person to deal with all their computer
23 systems, as well as doing work for clients?
24 A. Yes, that's correct.
25 Q. What sorts of projects did ASOG take on in the

Page 10

1 beginning that -- after you got everything set up for
2 the company, what sorts of work were you doing with
3 them?
4 A. We set up a crypto mine using Antminers from a
5 company called Bitmain. We were doing research on
6 cryptocurrency to find hidden information, whether it
7 was how they were decrypting the hashes, where the
8 hashes came from, where it was feeding information out,
9 which we found it was tied in with CCP organizations and
10 was feeding information out to them.
11 We also helped a gentleman who owned a -- an
12 SSL certificate company. They made security
13 certificates, and he had a company that was stolen from
14 him in another country. So we assisted in litigation
15 in collection of information off of his computer systems
16 that were outside of the United States.
17 Q. And just going back a little bit, you
18 mentioned crypto mining. Were you mining crypto for
19 profit or just doing this for some sort of analysis
20 purposes? Can you describe?
21 A. It was sort of both. ASOG put, I believe,
22 about $80,000 into building a mine with 12 miners,
23 because we had to put three air-conditioning units in a
24 room to run them. So the money that was coming from
25 Bitcoin was then being returned to ASOG's bank accounts

Page 11

1 whenever they would get cashed in.
2 Q. And just to rewind a little bit here. I'm
3 sorry, I didn't finish this line of questioning before.
4 You said you finished your education in 2017.
5 What was your degree in at the time?
6 A. My degree was in network system
7 administration.
8 Q. From which university?
9 A. I went to ITT.
10 Q. ITT?
11 A. Yes.
12 Q. And one other acronym you mentioned, CCP
13 organizations.
14 A. Chinese Communist Party.
15 Q. So you did a bit of forensic work for, it
16 sounds like, a foreign agent who -- or a foreign client,
17 rather, who had a company that you described as being
18 stolen in another country. Any other work with ASOG
19 that you recall in those -- in those early days in 2017?
20 A. We did have other work, but most of it sort of
21 fell under work product for other attorneys so I
22 couldn't really expand on a lot of that.
23 Q. And who were you primarily working with at
24 ASOG at the time? Was there someone else in your
25 department or that had your similar responsibilities?

Page 12

1 A. Adam Kraft was my boss, so there was no one
2 really within my area.
3 Kevin Hinson didn't come into the company
4 until 2019. He was the computer scientist within ASOG,
5 and he was there up until I left. And then I believe
6 about two weeks after I left, he passed away from an
7 aneurysm.
8 Q. Kevin Hinson started in 2019, you said?
9 A. Yes, he started working then.
10 Q. Why was he brought in?
11 A. We were working on research projects in
12 regards to SCADA, finding ways to be able to secure
13 SCADA systems, as well as drone denial technology.
14 Q. Okay. Can you -- what is a SCADA system?
15 A. SCADA systems are PLC controllers for oil
16 and gas. It's a -- it's a microcontroller that
17 controls a motor or a valve that you use for critical
18 infrastructure, and it's a vulnerability for a lot of
19 foreign intel services outside of the United States who
20 are wanting to cause problems within the US.
21 Q. Did Kevin Hinson have a similar skillset to
22 yours, or did he build on your existing knowledge?
23 A. Kevin had a very extensive skillset within
24 cybersecurity. He had written multiple papers. He
25 warned DHS, Department of Homeland Security, about SCADA

Page 13

4 (Pages 10 - 13)

1 vulnerabilities within the United States. I assisted
2 him on research projects with companies like Oracle and
3 IBM. So he had a very heavy background within
4 cybersecurity. He had done quite a bit of teaching and
5 was one of the main consultants at Cyber Defense Labs.
6    Q.   Did you or Kevin have anyone working under you
7 at the time, or were you the -- the entirety of ASOG's
8 cyber team?
9    A.   No, we were the entirety. Jason Alpers, who
10 was working at ASOG at the time, was involved in
11 business development. We had Russ Ramsland, who was the
12 chief financial officer. We had Keet Lewis, who was the
13 political consultant. And then we had a former Secret
14 Service member who was our operations officer and
15 handled physical security.
16    Q.   And when did Russ Ramsland come onboard?
17    A.   Russ Ramsland was one of the original people
18 within ASOG.
19    Q.   He was there when you started?
20    A.   When it started. Yeah, he was there before
21 me. Him and Adam had started ASOG in the beginning.
22    Q.   Were you working with or under Russ Ramsland
23 in these early years at ASOG?
24    A.   No, he -- we worked around each other, and
25 sometimes he would have acquaintances that he would

Page 14

1 to say there. So prior to the midterms, Ramsland
2 started to raise concerns about election integrity. Do
3 you know what the basis for his concerns was?
4    A.   So a lot of it was, I think, a follow-through.
5 Russ was a member of the Tea Party movement in the very
6 beginning of the twenty-teens. I think even possibly
7 further back than that. So there were already
8 discussions about election fraud issues. So it had been
9 an off-and-on discussion at ASOG, and Russ started
10 bringing it up as a way to be able to build a department
11 within ASOG for investigating election fraud.
12       One briefing that I had made, we were working
13 on the idea of building a security operations center, or
14 what we call a SOC, to actually be able to track
15 elections across the country, and there was an attempted
16 funds-raise for a while on that subject. I believe the
17 original asking line on that was about $2 million for
18 building a security operations center, and that was
19 prior to the midterm election.
20    Q.   Did ASOG succeed in raising those $2 million?
21    A.   No, they didn't. And Adam himself did not
22 want to get into the politics of it, because a lot of us
23 as service members have friends on both sides of the
24 aisle and we knew that this was a situation that was a
25 lot of contention politically. So Adam did not really

Page 16

1 bring in to be clients. But for the most part, Russ
2 handled the financial side and didn't have much dealings
3 with the cyber side.
4    Q.   How was Ramsland bringing clients into ASOG at
5 the time?
6    A.   He had a background in oil and gas, and he had
7 a pretty lengthy client list of people he had worked
8 with. So when someone had a problem, they would call
9 him, and he would bring them in, and they would debrief
10 us, explain to us what was going on, and then we would
11 work on ways to be able to fix whatever issues they had.
12    Q.   Around this time -- I think we're getting into
13 probably about 2018 -- ASOG started to change its focus
14 into election work. Is that a correct characterization,
15 or how would you describe how ASOG started looking at
16 election integrity?
17    A.   Leading up to the 2018 midterms, there were a
18 few discussions that were brought up by Russ Ramsland
19 about researching election fraud.
20       Then when the midterms took place, we had --
21 Russ had a number of meetings with politicians and
22 members of the Republican Party who were asking to look
23 into elections across the country. So our first
24 research project was Matt Bevin's election in Kentucky.
25    Q.   Let's unpack that a bit. You just had a lot

Page 15

1 want to deal we election fraud, especially because they
2 saw a bit of conflict of interest because Russ had
3 previously ran for political office.
4    Q.   Was Russ looking exclusively to Republican
5 candidates for office to run these investigations?
6    A.   Yes. There was one request by a Democrat
7 which I very much was wanting to help on. It had to
8 do with a primary election in Maryland, but Russ
9 specifically said he wouldn't help any Democrats, that
10 it was only Republicans he would be willing to work
11 with.
12    Q.   Did Ramsland ever express any concerns about
13 election fraud potentially benefitting Republicans?
14    A.   No. And that was, I think, at times a bit of
15 a problem within discussions within the company,
16 especially between Adam and Russ, because Russ did sort
17 of see it one-sided, whereas me and Adam sort of said,
18 no, we thought it was all sides.
19    Q.   So you mentioned the first case you started
20 looking at was the Bevin's campaign, and that's in
21 Kentucky. Is that correct?
22    A.   I believe so.
23    Q.   Okay. And did Bevin come to ASOG directly, or
24 was he somebody that Ramsland reached out to to offer
25 ASOG's services?

Page 17

5 (Pages 14 - 17)

**Page 18**

1    A.   I believe Keet Lewis is the one who had spoken
2  with Republican members to be able to work with Bevin on
3  that investigation.  But as far as I knew, it was, hey,
4  this is where you're going to go and this is what you're
5  going to look at.  So I really didn't have any dealings
6  with a lot of the politicians up to that time.
7    Q.   Did you personally go to Kentucky --
8    A.   Yes.
9    Q.   -- to conduct this investigation?
10    A.   Yes, I did.
11    Q.   Did you go with -- well, correct me if I'm
12  wrong on the timeline here.  Kevin Hinson wasn't working
13  at ASOG at the time?
14    A.   No.  It was only Russ Ramsland and myself who
15  went.
16    Q.   Just the two of you.  And how long were you in
17  Kentucky?
18    A.   Five days, I believe.
19    Q.   What was -- what did your investigation look
20  like?  Were you getting access to election equipment,
21  for example?
22    A.   No.  We didn't get a chance to look at
23  election equipment.  What we got to deal with was
24  precinct vote results.  So every location where there
25  was a precinct and the vote numbers that we had access

**Page 19**

1  to, we were doing statistical analysis on those numbers
2  that would come in.
3         So if you have a precinct -- for example, we
4  had precincts that had zero people registered to vote in
5  them, yet a thousand people who voted in it.  So we
6  would collect information like that, codify it into a
7  report, and then pass our information up as areas of
8  concern.  Because when you're looking at possible
9  election fraud, all you can see are signs and symptoms
10  of it until you can actually have a forensic audit done.
11    Q.   What was the conclusion of your investigation
12  of Bevin's campaign?
13    A.   Matt Bevin was told by the Republican Party to
14  concede, and the investigation was squashed.
15    Q.   So you never had an opportunity to finish what
16  you were doing in Kentucky?
17    A.   No.  We passed the information up.  I know
18  Russ and others had meetings on those, but all my
19  tasking was was gathering any signs.  And we found a
20  video from CNN where you could see votes getting removed
21  from Bevin and added to his opponent.  So all I did was
22  just the collection and analysis.
23    Q.   Were there any other groups in Kentucky at the
24  time doing similar work, similar investigations?
25    A.   There were some Republican members that

**Page 20**

1  were -- we were -- we were at a house where we were
2  doing our investigation.  We had dealings with a lady
3  by the name of Terpischere Maras, who was one of the
4  other analysts who was looking at information, but I
5  think my -- the number of people I had face to face with
6  was fewer than five.
7    Q.   Okay.  And Ms. Maras, am I correct in
8  understanding that's an individual who also goes by the
9  name of Tore?
10    A.   Correct.
11    Q.   That's T-O-R-E?
12    A.   Yes, sir.
13    Q.   And she runs various social media accounts
14  under the name of Tore Says?
15    A.   Correct.
16    Q.   Do you know who Tore was working with at the
17  time?
18    A.   At the time she was working with Patrick
19  Byrne.  Russ had communications and dealings with
20  Patrick Byrne whenever we first started looking into
21  election fraud.  We even went and had a -- well, Russ
22  went and had a meeting with him.  I stayed and met with
23  some other former service members, but we went to
24  Phoenix, Arizona in 2018 to -- for Russ to facilitate
25  that meeting.

**Page 21**

1    Q.   So you weren't present at the meeting with
2  Patrick Byrne at the time?
3    A.   No, I wasn't.  I was actually dealing with
4  some former Navy SEALs that were involved in
5  anti-trafficking operations.
6    Q.   Did you understand that Mr. Byrne would be
7  sending clients to ASOG after that?
8    A.   Russ never stipulated what all was going on.
9  Just he told me that Byrne was discussing heavily the
10  topic of election fraud.
11    Q.   Did you know at the time why Byrne had an
12  interest in election fraud?
13    A.   No, sir.  That was -- that was never explained
14  to me.
15    Q.   Okay.  We may circle back and I may have more
16  questions about Patrick Byrne moving forward, but let's
17  try to proceed through the timeline a bit.
18         So following the 2018 elections, you worked on
19  an investigation of the Matt Bevin campaign.  Anybody
20  else at that time?  Any other campaigns that ASOG was
21  looking at?
22    A.   Yes.  We also investigated Pete Sessions's
23  election in Dallas.  He lost to Colin Allred.  We had
24  done the same type of analysis where we were looking
25  at precinct level number shifts.  We also got access

**Page 22**

1 to system logs from ES&S systems. I was asked to
2 investigate a number of companies ranging from Scytl
3 to Tenex. So we did external penetration testing.
4 We did open-source intelligence collection on a number
5 of election companies and found vulnerabilities or
6 information that was being leaked out publicly.
7         After we started on the Kentucky
8 investigation, then it sort of cascaded, and we added
9 more and more to the scope of what we were looking at.
10     Q.   Okay. That was a long one. There was a lot
11 to unpack there as well.
12         So Pete Sessions, his campaign came to ASOG or
13 did ASOG make a pitch to Mr. Sessions to investigate the
14 results of his --
15     A.   He -- I believe Keet brought him in as well.
16 Russ had actually run against Pete Sessions, I believe
17 it was 2012, so they had a history with one another. So
18 I believe Keet had brought him in after Pete had
19 specified that they had seen troubling numbers within
20 certain precincts.
21     Q.   So Keet was also actively seeking out these
22 candidates to do election fraud work with ASOG?
23     A.   I do believe he was going out and talking to
24 people. I know he did have -- that was his expertise
25 was dealing with the political landscape.

**Page 24**

1 We used a number of tools, whether it was Maltego, which
2 we had the full version of, as well as another program
3 called Social Links. And these are tools that you can
4 be able to search the internet through different
5 websites, through different social media groups for any
6 information that's floating around. So if I want to
7 find a PDF that mentions a specific companies, I can use
8 Maltego to go out and look for that information and
9 catalog it. So we had a suite of probably 30 to
10 40 pieces of software that we would use for open source
11 collection and external pen testing.
12     Q.   What specific information are you looking for
13 with all these different programs that you're using?
14 Are you trying to find the -- to understand the source
15 code of these companies, or what exactly -- what is the
16 goal of those investigations?
17     A.   The first beginning part is just to find out
18 if there is any malicious activity within those
19 websites. If there are any type of redirects that
20 someone has written into a website to watch information
21 that passes through there, because there are certain
22 ways you can program other websites to monitor a
23 specific site. So we would just look through the
24 internet to see what things we could find of concern
25 within these specific election companies that we were

**Page 23**

1     Q.   Did he share Ramsland's, I guess, enthusiasm
2 for this kind of work?
3     A.   Very much so. He had a very long history of
4 dealing within the Republican Party and dealing with
5 this sort of evangelical undertow within the Republican
6 Party.
7     Q.   So you said, as part of your investigation for
8 Pete Sessions, you looked at ES&S?
9     A.   Yes, sir.
10     Q.   What is ES&S?
11     A.   ES&S is an election equipment manufacturing
12 company headquartered out of Nebraska.
13     Q.   You mentioned looking at open source
14 information as part of your investigation of ES&S. What
15 did that mean? What was the world of information you
16 were looking at to understand how ES&S operated?
17     A.   So when I first look at a company, what I do
18 is a find their website. I run them through a number of
19 pieces of software. I started using a website called
20 Robtex, which maps the backend of a website. I look for
21 any signs of external connections within the website.
22         I use what's called Google dorking, which is
23 a programming code line that you can put into Google to
24 be able to narrow your searches. You can find
25 vulnerabilities within a website using Google dorking.

**Page 25**

1 tasked at looking at.
2     Q.   Were you looking at any of the employees of
3 those companies or just looking at the websites and the
4 security concerns those might raise?
5     A.   When we start, we enumerate the C-suite level
6 of all the people within the company. I specifically
7 always look for system administrators.
8         Humans have a bad habit of using the same
9 password for everything, and we found this in a number
10 of companies where someone would write the default
11 password within their manual, but that was the actual
12 password they were using for their personal emails or
13 their company emails.
14         Now I will caveat that by saying we never
15 breached anyone's emails; we just cataloged that that
16 was a possible vector to be able to get into someone's
17 systems. By what I've always been told, you can walk up
18 to the door, but you can't walk in without permission.
19     Q.   So it sounds like your investigation was
20 primarily geared towards identifying potential security
21 vulnerabilities. Is that accurate?
22     A.   Correct.
23     Q.   And what was the conclusion of your
24 investigation of the Pete Sessions campaign?
25     A.   When we looked at ES&S within Dallas County

7 (Pages 22 - 25)

1 votes, that was where we found the system log that
2 showed multiple vulnerabilities within the system. One
3 is called a timestamp mismatch which is a sign of a
4 man-in-the-middle attack, and that is my clock on my
5 server is not the same as the clock on the server that
6 I'm communicating with, and a man-in-the-middle attack
7 is someone sitting in between two communication lines
8 that are intercepting that communication.
9         So we found signs that that had gone on, as
10 well as within the log, we had found that the ES&S
11 representative had uploaded the vote counts, cleared all
12 of that vote count out after he printed it and then
13 re-uploaded it, five, six different times, each time
14 having a different result. So we were seeing
15 manipulation, that information being uploaded and then
16 deleted and then re-uploaded until the desired effect
17 was gotten. Now this log was given to us by Dr. Laura
18 Pressley, who had brought the information into ASOG,
19 which Russ had given to me to look over, and that was
20 one of the parts that we had found. So we had seen
21 within the logs that problem.
22         Then we got into the election night reporting
23 company Scytl, which we did a background research into
24 the company, found their company history, that they were
25 a foreign company with an office here in the US, and we

Page 26

1 I'm probably not the best at. I'm a collector, so I'm
2 not the main person who always would handle the
3 executive briefings.
4         At ASOG, we would have individuals come in,
5 and we would give a briefing about whatever findings
6 had been as we had gone through these different
7 investigations. Russ gave different pitches to
8 different companies. And around this time I even
9 started doing -- making videos on the Kevin Freeman show
10 called the Economic War Room where we were enumerating a
11 lot of findings that we found in 2018, and Russ would
12 use that even during his briefings that he would give to
13 other politicians and to business people across the US.
14     Q.  Do you recall any of the politicians that he
15 was giving these presentations to?
16     A.  We had given a brief explanation, or a pretty
17 lengthy at times, to Pete Sessions. He attempted to
18 brief Ted Cruz; Ted Cruz would not take our briefing.
19 We attempted to brief Bill Barr; he would not take our
20 briefing. We did give a briefing to John Ratcliffe
21 prior to him being the head of ODNI.
22         We had gone to DC a number of times during
23 this and had given -- Russ had given briefings. I would
24 just sort of be there for the technical aspects, even --
25 we were at a Center for Security Policy event in 2019,

Page 28

1 had found that there were vulnerabilities within their
2 systems due to them being connected outside of the
3 United States and had listed that as a point of
4 vulnerability.
5         The last company we looked at, which was a
6 company named Tenex, they ran the poll pads. And
7 Tenex's systems were so bad, literally 12-year-old kids
8 could have gotten into it. They had text files that
9 were public facing that had passwords to every level of
10 their system. We've seen the aftereffects of that here
11 recently with Konnech because their database of election
12 poll workers, we originally saw that in 2019 on Tenex's
13 site in a program called Moodle, and the password to get
14 into that was pink and the username to get into it was
15 pink, and that was saved in a text file. So a lot of
16 those were things that we discovered when we were
17 looking at different election equipment tied to Dallas.
18     Q.  Okay. I want to go back a little bit and
19 shift gears. You mentioned presenting this information
20 to legislators and sort of making a sales pitch for
21 ASOG. What were these -- what were these meetings that
22 you mentioned?
23     A.  For the most part, Russ handled the sales
24 pitch meetings. My only scope within it was actually
25 explaining the technical side, which I think at times

Page 27

1 and I wasn't told until the last minute I was there to
2 do what we call electronic warfare, which was watching
3 for any malicious wireless activities of anyone in the
4 area.
5     Q.  Do you recall ever giving a presentation to
6 Sidney Powell at the time?
7     A.  Yes. Sidney Powell was later. You know, we
8 had an overall briefing. Sidney Powell, Allen West,
9 Herman Cain. There was probably 20 to 25 individuals
10 that were in our conference room. Russ at the time was
11 not there, so I had the reigns for giving the briefing.
12 So I kept it to the -- to the mild technical side, not
13 delving too deep, but at least to the point where I
14 could explain sort of the immediate vulnerabilities that
15 we were seeing within the systems.
16     Q.  So 20 to 25 people, that sounds like a big
17 briefing. Was that -- were there invitations sent out?
18 Do you know how that was organized?
19     A.  I believe they were all sort of set up
20 privately between Russ and Keet. We had a protocol at
21 ASOG where no one was allowed to bring any electronic
22 devices in; you had to keep them in a desk outside of
23 the office. And then I had monitoring systems in place
24 inside and outside of the company to be able to watch
25 for any type of recording devices or other digital

Page 29

8 (Pages 26 - 29)

1 equipment.

2     Q.  And did you speak with Sidney Powell

3 personally at the time?

4     A.  Briefly, just an explanation of what we had

5 seen.  Even at one point during the briefing, I had

6 shown a video clip from Dennis Montgomery that was on

7 YouTube, during a private conversation him and Mark

8 Zullo had, and listed that as one of the possible

9 vectors of attack within the election system.

10     Q.  I will have more questions about Dennis

11 Montgomery later, but we can proceed a little bit here.

12       So this was -- do you recall when this

13 presentation was given?  Was it 2019?  Was it 2020?

14     A.  It was 2019.  I believe mid to end January, if

15 I remember.

16     Q.  Did ASOG continue giving these presentations

17 throughout 2020?

18     A.  2019 and 2020, yes.  There was a lot of trying

19 to catch people up to speed, getting information to

20 people, numerous attempts to try and get information

21 passed up to the President to be able to give him a

22 brief, none of which succeeded.

23       I believe the closest that ever happened was a

24 one-page memo was handed to Madeleine Westerhout, which

25 was Trump's secretary at the time; and instead of

Page 30

---

1 Madeleine handing it to Trump, she gave it to a reporter

2 at medium.com.  But every attempt to try and at least

3 get the information up for someone else -- some other

4 people to investigate and look at it never did -- never

5 came to fruition.

6     Q.  It sounds like ASOG's goal at the time was to

7 get this information to Trump?

8     A.  Yes.  We were building at least a signs and

9 symptoms report of possible things that we had

10 encountered so that he could at least have an

11 understanding of what we had seen.

12     Q.  Why was that ASOG's intent at this time?

13     A.  We were trying to at least warn him or get him

14 to understand the potential of issues that were showing

15 up within the election system, especially on the foreign

16 side, because at the time I had been collecting

17 information on foreign intel services that were running

18 collection information and vulnerability assessments of

19 the election system.

20     Q.  So let's talk about the 2020 election.  I

21 assume you were monitoring results as they came in?

22     A.  Yes, I was.

23     Q.  Did -- when did you first have concerns about

24 the results?

25     A.  Prior to November 3, 2020 -- or November 4th,

Page 31

---

1 we -- CISA had put out a memo they called the Iran Memo.

2 It was October 26th, I believe, where they were talking

3 about the Iranians were using a program called Acunetix

4 as an attempt to get into the voter rolls and election

5 poll workers.  That was one of the capabilities that we

6 had seen through open source collection.  I had seen it

7 through Telegram, which is a social media program.

8 There are a number of leakers from within Iran who were

9 discussing the operations that the Iranian Advanced

10 Persistent Threat, or APT, teams were working on.

11       So I started looking at where the election

12 data would begin to get posted.  New York Times was

13 building their information.  We could see a number of

14 companies, such as Scytl or Edison Research, who were

15 posting their source code on a website called GitHub.

16 So we could publicly see their operating systems that

17 they were going to be using for the 2020 election.

18       Also prior to that, I was working with Phill

19 Kline, who had ended up working at The Amistad Project,

20 and we had been doing research for the Center for Tech

21 and Civic Life, which was involved in putting in over

22 $500 million into the 2020 election.  So leading up to

23 it, we were still looking at everything to the left of

24 boom, the signs and the symptoms that there was going to

25 be an attempt to fraud the election.

Page 32

---

1     Q.  And when did ASOG first -- let me rephrase

2 that.

3       Were you looking primarily at -- you mentioned

4 an investigation of ES&S previously.  It sounds like

5 your initial concerns were about foreign interference.

6 Is that correct?

7     A.  In some realms.  So at the very beginning, we

8 just had dealings with Texas.  I mean, we did have

9 dealings with Kentucky under Matt Bevin, but when we

10 were investigating Pete Sessions's election, we focused

11 everything on Texas.  Texas has never certified

12 Dominion.  So we focused on ES&S, Hart, Tenex, Scytl,

13 and I started doing the background research into

14 Smartmatic and Diebold, the first generation of all of

15 the election equipment.

16     Q.  And when did ASOG first develop concerns about

17 Dominion?

18     A.  That didn't come up until election 2020, and

19 that was because we had never had any dealings with them

20 before.  I had never done any research on them, and I

21 had never been asked to do any research on them, and we

22 didn't specifically target them.

23       What had happened was on 2020, we said what

24 are the commonality factors within these locations we

25 were seeing problems.  So we looked at the battleground

Page 33

9 (Pages 30 - 33)

1 states, and we said what are the -- what equipment are
2 they using?  Who are they staffing?  You know, I looked
3 at all of the indicators.
4      One of the things that I found was the State
5 Department had done an investigation into Ukrainian
6 elections in 2009 and 2014, and they had written an
7 extensive report of what things they used as signs of
8 manipulation in their investigation.  There was eight --
9 eight datasets that they used.  So I took that as my
10 footprint, one of my main footprints for investigating.
11 And out of all eight of those, I was finding
12 battleground states and other places within the United
13 States that all eight of those metrics were falling
14 within the State Department guidelines.
15      So when I looked at the battleground states, I
16 said what equipment are they using?  Anytime there's an
17 election, it's the first thing I do.  I go on Google --
18 we did the same thing with -- I've done an election
19 investigation in Uganda, I've done them in Mongolia.
20 I've done them in Kenya.  After the 2020, I've done a
21 lot of OCONUS investigations for people I've worked for
22 before.  And that's the first thing I do, is who has
23 the equipment that does their election?  So when we did
24 that same footprint in 2020, that was one of the
25 commonalities that we found.

Page 34

1      So then I said, okay, now I need to research
2 this company.  So we do a website research.  I do an
3 external penetration test.  I used all open source
4 tools, because I always believe what goes out in a
5 report has to be something that the public can recreate.
6 Because in cybersecurity tools, you know, if you're
7 using a program like Burp Suite or some of these other
8 programs, they can cost you thousands of dollars, so the
9 average Joe isn't going to have that capability.  So
10 when I put my information out on 2020, I made sure
11 everything could be found using online websites to be
12 able to pull that information.
13      Q.  Would you say it's a fair characterization
14 that ASOG began focusing on Dominion fairly quickly
15 after the election?
16      A.  I was not working for ASOG at that time.  I
17 left ASOG in November of 2019 because I had to get a
18 pacemaker.  I've been blown up eight times while I was
19 in the Army, and half of my heart -- I had a left bundle
20 branch blockage in my heart and required a pacemaker.
21 So November of 2019, I left ASOG.  January of 2020, I
22 get a pacemaker.  I was doing consulting work off and on
23 for ASOG.  So whatever Russ's focus was or how he was
24 handling it, I wasn't privy to.
25      Q.  Do you know who was working at ASOG at the

Page 35

1 time under Russ who maybe took over your prior position
2 or anybody doing similar work with them at the time?
3      A.  Up until the end of November of 2020, Kevin
4 Hinson was taking over what I was doing, but at the end
5 of November of 2020, Kevin Hinson had an aneurysm and
6 died.
7      Q.  So we can probably assume that Hinson was
8 involved with ASOG's work surrounding the 2020 election
9 at the time?
10      A.  Mostly analysis on information I had already
11 collected, but, yes, sir.
12      Q.  So you were still consulting as an independent
13 contractor.  Did I hear you correctly when you said
14 that?
15      A.  Yes, sir, I was.
16      Q.  You still do -- were you still doing reports
17 for ASOG in particular or for other entities around that
18 industry?
19      A.  Up until the elections in 2020, I was only
20 working directly with Russ Ramsland.  Once the election
21 had taken place, I started writing buildup reports that
22 would later be turned into affidavits that would be
23 turned over to different attorneys.  I never had any
24 dealings with those attorneys.  I went through
25 intermediaries, because at the time certain attorneys

Page 36

1 had dealt with clients who were under previous FISA
2 warrants and I did not want to fall under the one or two
3 degree of separation stipulations within those FISA
4 warrants.
5      Q.  Were you marketing your services to these
6 attorneys at the time, or were you referred by Ramsland?
7 How did you get in contact with these folks if you
8 weren't contacting them directly?
9      A.  Russ Ramsland had me talk to Kevin Freeman.
10 Kevin Freeman then had me speak to another individual
11 who I don't know, like I've never met the person, but
12 that person is who I was working with to build a work
13 product for an affidavit.
14      Q.  Okay.  And who was that person?
15      A.  His name was Benjamin Noosma.  I will have to
16 get you the spelling.  But that was the gentleman that
17 Kevin Freeman had me speak with.
18      Q.  And who was Benjamin Noosma?
19      A.  Someone that Kevin Freeman was using for
20 building his website called Every Vote Counts.
21      Q.  And he was a website developer, or he was a
22 political operative of some sort, or what --
23      A.  Well, no.  He was -- he was a website
24 developer, but he also ran his own company doing data
25 collection.

Page 37

10 (Pages 34 - 37)

1    Q.   And Mr. Noosma put you in touch with others
2  who used your work?
3    A.   I worked directly with him.  I passed my
4  information to him, and he would feed it up the chain.
5    Q.   We've seen an interview with Russ Ramsland
6  shortly after the election that he did with an
7  individual named L. Todd Wood.  Does that name ring a
8  bell to you?
9    A.   I've heard about him, yes.
10    Q.   What do you know about Mr. Wood?
11    A.   Just that Russ had dealings with him.  I
12  never -- I never had any dealings with L. Todd Wood at
13  all.
14    Q.   Had you ever heard of an entity called
15  Constructive Destruction Media?
16    A.   No, sir.
17    Q.   Or Creative Destruction Media?
18    A.   No, sir.
19    Q.   Moving forward then, through -- after the
20  election, it sounds like you were just providing
21  consulting work through third parties.  Are you familiar
22  with ASOG's work in Antrim County.
23    A.   I am familiar with it, but I had no dealings
24  with that.
25    Q.   You weren't working for ASOG at the time?

1    A.   No, sir.
2    Q.   So you didn't travel with the team up to
3  Michigan?
4    A.   No, sir.
5    Q.   Were you in touch with anybody at ASOG during
6  this time?  Were you speaking with Russ Ramsland?
7    A.   No, sir, I wasn't.
8    Q.   Do you know who Russ Ramsland was working with
9  on producing these reports?
10    A.   In conversations that I had with Russ after he
11  had specified that they were working with Cyber Ninjas
12  on Antrim, but that was as far as he had discussed with
13  it.  Past that, I didn't have any other dealing with
14  anything having to do with Antrim.
15    Q.   So subsequent reporting has indicated that
16  folks like Doug Logan started working, maybe not
17  necessarily for ASOG, but around ASOG or possibly
18  working with them.  Do you know when he came into the
19  fold?
20    A.   No, sir.  Like I said, I wasn't there, so I
21  wasn't privy to that information when -- when Doug Logan
22  was brought around.
23    Q.   Do you know Doug Logan?
24    A.   No, sir, I don't.  I've never talked to him.
25  I've never met with him.

1    Q.   So I assume then that you're not familiar with
2  the investigation of Coffee County, Georgia either?
3    A.   No, sir.  Some of the Georgia information, I
4  had worked on background investigation.  I believe a
5  couple of my affidavits made their way into Georgia.  We
6  had done some cybersecurity research on everything from
7  vulnerabilities within the equipment to individuals that
8  were involved, but the entire time during the 2020
9  election investigations, I literally didn't leave my
10  house.  I didn't go around anybody.  I didn't meet with
11  anyone.  If I even went out in public, all my digital
12  equipment stayed in my house.
13    Q.   So these affidavits you were producing that
14  went through Benjamin Noosma, were these -- were you
15  taking requests from potential clients that wanted you
16  to look at specific information, or was this sort of
17  your own investigations that you forwarded to him when
18  you found something that you thought was noteworthy?
19    A.   I worked with a group of cybersecurity
20  professionals.  We were sort of a conglomerate of
21  researchers.  So as we would find information and pieces
22  of information that were important, I would collect it
23  all together and put it into affidavits that I would
24  pass up through Benjamin and say this piece is
25  important, this piece is important.  So it was -- I was

1  never tasked up to that point.  I believe the first time
2  I started getting asked to look in specific directions
3  was around April of 2021.
4    Q.   So these other people you were working with,
5  was that part of a specific organization?
6    A.   Just a group of all of us who are
7  cybersecurity researchers.  Some own their own
8  companies, some work within other companies, and I sort
9  of was the spokesperson for everybody to keep everyone
10  from worrying about having what happened to me to happen
11  to them.
12    Q.   So some of your work product then,
13  presumably -- did it include work product of some of
14  these other individuals?
15    A.   No.  They would give me information, and I
16  would develop the work product.  So what I was doing was
17  basically intelligence collection, and then I would
18  research that information that was given to me.  And
19  then if I could triangulate it and it was something that
20  I could very easily show that, yes, this is the case,
21  that's whenever I would put it into an affidavit.
22    Q.   So who -- who exactly are these folks that
23  you're referring to?
24    A.   A lot of them are hackers, security guys,
25  people who we've talked to on various social media

1 platforms who said, hey, I'm looking at this and I'm
2 seeing this as an area of concern.  So it's -- it was a
3 lot of citizenry that was working in the background who
4 didn't really have an outlet or somewhere to be able to
5 take information.
6         So a lot of people would -- we would all
7 have groups where we would talk about this and put it
8 together, and a number of people I would talk to, I
9 said, okay, I'm going to bring this under what we're
10 working on and we're going to put this out.  So it was
11 just people who didn't want their information public,
12 but they were involved in doing research.
13     Q.  So when you say what happened to me you didn't
14 want to happen to them, what are you referring to?
15     A.  November 23rd, whenever Benjamin Noosma posted
16 one of -- the first affidavit I worked on, he posted it
17 on Every Vote Counts, but the stipulations that I had
18 laid out to everyone was that if any of my affidavits
19 were ever to get submitted, that my personal
20 information, or PII, were to be kept private because I
21 didn't want anyone coming after me, and because of my
22 former military work and other things I did, I demanded
23 anonymity.
24         And on the 23rd of November, he posted my
25 affidavit on Every Vote Counts, but he had saved my Word
Page 42

1 doc into a PDF under my name.  So whenever he posted it
2 on to Every Vote Counts, it was up literally for three
3 minutes, and my crawlers that I use for watching social
4 media just started moving everywhere as everyone started
5 looking at my name, because I watch for if anyone would
6 look up information about me.
7         So I could look on Twitter, and I saw this
8 circle of about 150 researchers just start finding my
9 information and posting it everywhere.  And so I knew,
10 okay, now I have to switch tracks from being a collector
11 to now I was going to end up being some type of a
12 spokesman to explain what we were dealing with, which is
13 a different mindset.
14         If you're a collector, you -- you just focus
15 on data and that's your circle, and you don't have to
16 worry about all of the white noise of the media and
17 politics.  But once I got doxed because of that one
18 document -- like as soon as I saw it went up, I was
19 like, dude, what are you doing?  Take that down.
20         He took it down, and it amazed me how fast
21 three minutes spun into -- I think a week later I got my
22 first phone call from Emma Brown from WaPo, and that's
23 when I just started having this flood of media starting
24 to look into me, especially my background because -- I
25 was trying to keep everyone from messing with my active
Page 43

1 duty unit, because whenever I was active duty and I
2 deployed to Iraq and Afghanistan, I was in one unit
3 whenever I did that, and that unit deploys every six
4 months.
5         And it was an awesome group of guys.  It was
6 a field artillery unit, but I did not want my field
7 artillery unit to have to deal with the circus that I
8 knew would be unfurled onto them.  So I put a training
9 unit that I had trained with as a way to keep from
10 having my military involvement quickly identified, which
11 then, you know, once sent and has ended up becoming a
12 huge point of contention nationwide apparently.
13     Q.  So did you continue doing investigations at
14 this time, or did you --
15     A.  No, I kept -- I kept going.  I just kept
16 trying to push as much as I could media-wise away so I
17 could get back to working.
18         I've got five computers and three servers
19 running at my house most of the time, and that's where
20 I really like keeping my focus instead of having to
21 juggle the mindset.  Because if I'm putting any
22 information out to the media, I have two, three days of
23 narrative shaping I have to do.  I have to figure out
24 what things I'm going to say, who I'm going to say them
25 to, because specific things are told to specific people
Page 44

1 to make sure nothing gets misconstrued, and if it does,
2 then I can figure out who.
3         So for me, if I'm talking to the media, I'm
4 having to lay out a battle space to make sure certain
5 activities that I believe the media is involved in don't
6 take place.
7     Q.  So did you continue producing more research
8 that you provided to Mr. Noosma at this time then?
9     A.  Up until about January to February, I was
10 dealing with Benjamin, and then I would start passing it
11 off to other individuals.  I believe March was around
12 the first time I had spoken with Howard Kleinhendler,
13 which was -- I did not know he was one of Sidney's
14 attorneys.  He was an attorney that I was told to get in
15 contact with to help doing research for, and so I would
16 be involved in researching companies and individuals.  A
17 lot of them weren't even election related.  There were
18 other directions of information that was needed.  So
19 that was whenever really the tasking sort of begins.
20     Q.  That was March 2021?
21     A.  Correct, yes, sir.  That was March 2021.
22     Q.  So if I understand correctly then, even in
23 this November 2020, December 2020 timeframe you never
24 spoke with Sidney Powell directly?
25     A.  No.  My first conversation with Sidney Powell
Page 45

Veritext Legal Solutions
800-336-4000

1 was May of 2021, and I did that on purpose. I did not
2 want to physically have any contact with her because of
3 her doing investigations and being Michael Flynn's
4 lawyers when he was under FISA warrants.
5 Q. So she never reached out to you to discuss the
6 information that you had provided?
7 A. No, sir.
8 Q. Why did you reach out to her in May of 2021?
9 A. The discussion that we had briefly just had to
10 do with collection of algorithms. The Balind [SP]
11 equation had to do with math, and it had to do with
12 natural progression of numbers, and it actually tied
13 back to some research some other people were working on.
14 That was the only discussion I ever had with her.
15 Q. And she called you for that?
16 A. Negative. I called her.
17 Q. Because you had information you wanted to
18 provide her?
19 A. I was sort of trying to course correct on that
20 subject, because I know that they handed it off to
21 Dr. Shiva, who was their math expert, but I was trying
22 to direct how that information was originated from this
23 2014 State Department investigation into Ukraine's
24 elections.
25 Q. Were you working with Dr. Shiva's team at the

Page 46

1 time?
2 A. No, I never had contact with Dr. Shiva. I
3 just worked in similar investigations.
4 Q. How did you know that he was working on
5 something for Sidney Powell at the time?
6 A. I don't know if he was working with, like I
7 was never specifically told, but it was the same,
8 similar subject matter we had worked on since back in
9 December. Because when I was finding Balind equation
10 irregularities, that was one of this things I had
11 brought up, and that's how, I think, that whole subject
12 matter got spun up.
13 Q. You mentioned before that you weren't taking
14 assignments from people until April of 2021?
15 A. Correct.
16 Q. Which would have been just prior to this call
17 to Sidney Powell. Which -- what assignment did you
18 start working on in April?
19 A. Some of that's work product with an attorney,
20 so that work product with an attorney I can't disclose.
21 Q. Was that related to the work you provided to
22 Sidney Powell?
23 A. No. The affidavits all had to do with
24 research that me and some of the other people I was
25 involved in, but the work product stuff, I can't divulge

Page 47

1 what that is.
2 Q. Was it election security related?
3 A. No.
4 Q. All right. Let's -- let's proceed forward
5 here a little bit. So we're in May --
6 MR. KLOEWER: We can take a little break
7 if you would like.
8 THE WITNESS: All right.
9 MR. KLOEWER: Let's do that. Let's go
10 off the record for a bit.
11 THE VIDEOGRAPHER: Off the record at
12 11:21 a.m.
13 (Break from 11:21 a.m. to 11:31 a.m.)
14 THE VIDEOGRAPHER: We're on the record.
15 The time is 11:31.
16 Q. (BY MR. KLOEWER) All right. We'll get
17 started here again. Mr. Merritt, when we left off, we
18 were just getting into about mid 2021. May of '21 I
19 think is as far as we had gotten, and I think that's
20 getting close to the Cyber Symposium. But can you tell
21 me, when do you recall first hearing about the Cyber
22 Symposium?
23 A. I was having interviews and having discussions
24 with a gentleman by the name of David Clements. I first
25 reached out to him to talk about election fraud dealings

Page 48

1 I believe it was March of 2021. So I started doing
2 online interviews with him. He had a channel on Rumble,
3 and we started talking about our findings going back to
4 2018. In private conversation, about May --
5 THE VIDEOGRAPHER: Hang on. I think we
6 just lost him.
7 It's connecting. We're back.
8 MR. KLOEWER: Are you there, Ryan? Can
9 you hear us?
10 We paused audio as soon as you dropped off
11 there, so I'll just rewind a bit.
12 Q. (BY MR. KLOEWER) So, Mr. Merritt, you were
13 just saying in March of 2021 you were speaking with
14 David Clements, that you had spoken to him on some of
15 his online channels. Did you say you did an interview
16 with him?
17 A. Yes. I did multiple interviews on his
18 channel.
19 Q. Is that The Professor's Record?
20 A. Yes, correct.
21 Q. And you -- did you publish those interviews?
22 A. He did, and then later deleted those.
23 Q. And so you were speaking with him in the
24 spring then, and how does that tie into the Cyber
25 Symposium?

Page 49

13 (Pages 46 - 49)

1    A.   Around May to June timeframe, Mr. Clements had
2  brought up that there was a Cyber Symposium that was
3  going to take place and that he asked if I wanted to
4  participate in that.  He had told me a few things that
5  would be laid out and what it had to do with, and I was
6  told I would be working under Phil Waldron.  And I had
7  spoken with Phil maybe once prior to all of that.  So I
8  believe it was about June was the second time I had
9  talked to Phil Waldron in regards to the possibility of
10 being at the Cyber Symposium and that it was going to be
11 in August and in South Dakota.
12    Q.   Okay.  We'll talk about Phil in a minute.
13 Let's rewind a little bit there.
14         Were you discussing the symposium on these
15 interviews that you did with David Clements?  Was that
16 the subject of those interviews?
17    A.   No, I don't believe so.
18    Q.   Okay.  Do you know -- you mentioned that he
19 had deleted those interviews.  Do you know why he would
20 have done that?
21    A.   Because of the fallout from the symposium.
22    Q.   All right.  I will make a note of that and we
23 can -- we can circle back there, I guess, to see how
24 that ties in, but --
25         Okay.  So you're -- you're speaking with him

Page 50

1  at the time.  He said you would be working with Phil
2  Waldron.  And who is Phil Waldron?
3    A.   Phil Waldron was one of the experts who
4  testified in Georgia, in Wisconsin, Arizona, a number of
5  states in regards to a lot of the collected information
6  as to signs of possible fraud in the 2020 election.
7    Q.   And was he working with ASOG at the time, do
8  you know?
9    A.   I am not aware of it.  I didn't have any --
10 like I said, I didn't have any dealings with ASOG.  All
11 I know is that Colonel Waldron was presenting a lot of
12 information that I had fed up the chain through various
13 court hearings and other events nationwide.
14    Q.   And did Clements introduce you to Waldron?
15    A.   No.  I had talked to Waldron before I knew
16 Clements, just briefly over content of information.  In
17 the military, we call it back briefings.  So I had back
18 briefings a couple of times with Colonel Waldron, but --
19    Q.   Did he call you for those, or did you reach
20 out to him?
21    A.   I reached out to him.  I was given his contact
22 data, and I reached out to him to ask to at least
23 explain some of my information.
24    Q.   Who gave you his contact information?
25    A.   I believe it may have been Russ.  I don't

Page 51

1  exactly recollect.
2    Q.   So when Clements said you would be working
3  with Phil Waldron, you were already acquainted with
4  Waldron at that point?
5    A.   Roger, yes, sir.
6    Q.   How did you meet David Clements?
7    A.   I reached out to David Clements because I saw
8  a news report about him, about him getting in trouble
9  for not wearing a mask as a teacher at a university.  So
10 once I saw that interview, I reached out to him to sort
11 of discuss some things, and then that's when he decided
12 he wanted to start talking about election integrity and
13 that's when we started doing interviews.
14    Q.   Did you know that he was involved with The
15 Professor's Record or election integrity issues before
16 reaching out to him about the mask issue?
17    A.   No, sir.
18    Q.   So that was just a coincidence?
19    A.   Well there's no coincidences in the universe,
20 but it seemed to be something that ended up getting
21 plugged in.  It was -- no one ever directed me to him.
22 No one ever said anything.  I just one day was going
23 through my data and information, and I see him on this
24 news report.  And I said I want to reach out to him and
25 hand him a few tidbits of data, and it spun from there,

Page 52

1  and I think we did 18, 20 different interviews.
2    Q.   So you mentioned that this was in June that
3  you first heard about the symposium from Clements who
4  suggested it would be upcoming?
5    A.   Yes, sir.
6    Q.   Do you know what the purpose of the symposium
7  was at the time?
8    A.   So what we were all explained was that there
9  was evidence of election fraud that Mr. Lindell had that
10 he wanted a red team to look over, and it was generic
11 and not specific in detail whenever we were first told
12 about it.
13    Q.   So you didn't have any idea what the nature of
14 the evidence he was going to present was?
15    A.   Correct.
16    Q.   Did I understand that correctly?
17    A.   In the very beginning, yes, sir.
18    Q.   So that was in June.  You mentioned that you
19 would be working with a red team.  What does red team
20 refer to?
21    A.   A red team is a term for cybersecurity
22 researchers.  They are people who are acting as what we
23 call a black hat.  They're people who are trying to find
24 a vulnerability or trying to find a flaw within data
25 that they're being presented.

Page 53

14 (Pages 50 - 53)

1     Q.   And who else was on this red team?  Did you
2  know at that point?
3     A.   In June, no, I did not.  I did not know who
4  all was on the red team until the first time we all met
5  face to face.
6     Q.   So did you understand that Clement's role here
7  was to assemble the red team?
8     A.   No.  He -- all he told me was that he was
9  going to be there to speak and do a few things.  But I
10  think it was just sort of an add-on, like, hey, I want
11  you to be on the red team with this event.
12        Personally, I had specifically stated in the
13  very beginning I was sort of against it, because I've
14  always tried keeping my face or my name out of the
15  public, but considering how I failed terribly at that, I
16  had figured what am I going to lose?
17     Q.   Okay.  So that was June.  When did you first
18  speak with Waldron -- or let me rephrase that.
19        Did Clements put you in touch with Lindell?
20     A.   No, I never -- the first time I spoke to
21  Lindell was when he picked us up in his airplane at
22  ASOG's hangar.  That was the first time I ever spoke to
23  or met with him.
24     Q.   Okay.  We'll get there pretty shortly, I'm
25  sure, but I'm just trying to -- I'm trying to understand

Page 54

1     A.   In a text message, yes, sir.
2     Q.   Okay.  And were you just communicating with
3  him directly over Signal or --
4     A.   Directly over Signal, yes, sir.
5     Q.   Okay.  And do you still have those
6  communications you had with Mr. Waldron?
7     A.   No, I do not.  Those -- all my messages and my
8  social media apps last about three to four days and then
9  dissipate.
10     Q.   And is that because you've set them to
11  automatically delete or --
12     A.   Yes, across all of my platforms, whether it's
13  Telegram, whether it's Wickr, Signal, any of them.
14     Q.   And were you just communicating with Waldron
15  at the time, or was this like an open channel with other
16  members of the red team?
17     A.   My initial communications up until August 4th
18  were all directly with Waldron via Signal.
19     Q.   So on August 4th then it sounds like you got
20  some different form of communication from him or --
21     A.   So on August 4th, he had me get in touch with
22  Kurt Olson, which is one of Mr. Lindell's attorneys, and
23  I was emailed a PDF document which was the NDA agreement
24  that we would be asked to sign before we would see the
25  data.  So I took that NDA -- and I don't have my own

Page 56

1  how you got to that airplane in the first place.
2        So David Clements talks to you in June, says I
3  would like you to be on this team, you're going to be
4  working with Phil Waldron.  What happened next?
5     A.   So I reached out to Phil.  Phil sort of gave
6  me the details, said we'll be given data to -- to look
7  through and just said to be ready in the beginning of
8  August, and so it was sort of thinly detailed up until
9  August 4th, when we were beginning our proceedings.
10     Q.   Did you understand this would be a paid
11  position?
12     A.   Verbally, yes.  Waldron specified to me that I
13  would be doing one week's worth of work for a pay of
14  $30,000 for a week's worth of work.  However, it was
15  never laid out in any paperwork or in contract.
16     Q.   So you were never provided any documentation
17  to support that?
18     A.   Correct.
19     Q.   And were you communicating with Waldron
20  primarily over the phone?  You said that was a verbal
21  agreement.  Were you --
22     A.   We were using a phone app called Signal to
23  communicate.
24     Q.   Okay.  So did he put this $30,000 offer in
25  writing at the time?

Page 55

1  attorney; however, I do work with an attorney who is a
2  paymaster outside of state.  I took that NDA and I
3  passed it to him before I signed it and asked, hey, what
4  issues are there with this NDA?  He enumerated the
5  number of issues that I had and asked him, you know,
6  what are my order of effects on signing this?  So I had
7  to understand what was going to happen from me signing
8  it and what my left and right limits were.
9     Q.   What did you understand the purpose of that
10  NDA was at the time?
11     A.   What we were specified was the NDA was there
12  to keep anyone from putting out information on the data
13  that we were given.
14     Q.   So this was August 4th.  The symposium was a
15  week later.  Had you seen the advertisements that Mike
16  Lindell had put out for the symposium prior to that
17  time?
18     A.   Everywhere I turned.
19     Q.   And what did you understand the information
20  was that he was going to be presenting?  Did you even
21  know at that point?
22     A.   Not until we were -- until we were given the
23  data.  Now we'll talk with these PCAPs, what he
24  eventually produced, but did you know that it was going

Page 57

15 (Pages 54 - 57)

1 to be PCAPs that you were looking at?

2    A.  No, not until we were given the data.

3    Q.  Did you know -- did Phil Waldron have that

4 information?  Did he tell you what he --

5    A.  If he knew, he never told me.

6    Q.  Okay.  Do you know if any of the other members

7 of the red team were aware of what the information was?

8    A.  I am not aware of it.

9    Q.  Okay.  And what are PCAPs?  We'll talk about

10 those a bit, but let's -- let's get that out now.

11 That's an acronym, PCAP.  Can you explain what those

12 are?

13    A.  A PCAP is a packet capture.  It is basically

14 an envelope trading between a computer.  So when a

15 computer communicates with another computer, it

16 encapsulates a certain level of that communication, and

17 that is a packet.  And so normally your computer, that's

18 how it's communicating with another computer, is it's

19 sending out in binary these digital packets of data that

20 the other computer then captures and then loads into its

21 system.

22    Q.  And when was the first that you heard about

23 PCAPs?

24    A.  I believe about the 5th was whenever we

25 started actually -- it was the night of the 4th, the

1 morning of the 5th is when we started looking at data

2 and everyone started explaining after we signed the NDA.

3 So we signed the NDA, and then we get sort of an

4 explanation over what we're going to be looking at, and

5 we get our first drop of data, which is a file -- it was

6 a bin file.

7        And I remember as soon as I got the bin

8 file -- normally when you get a bin file, you put it

9 into a program called Wireshark, and what you do is you

10 covert it into what's called an ascii character,

11 A-S-C-I-I.  So you convert it into ascii characters, and

12 then you can load it into Wireshark to be able to read

13 what those -- those packets actually say.

14        So that's what we were starting to do, but

15 when we loaded it, it wouldn't -- it wouldn't load the

16 way I've normally seen packet capture data get loaded

17 whenever I've brought it in from a bin file.

18    Q.  Okay.  Let's sort of paint this scene here a

19 little bit.  You said this was on August 5th.  So you

20 signed the NDA on August 4th?

21    A.  Right.

22    Q.  The next day you're provided with this

23 information.  Were you physically present in the -- at

24 the Cyber Symposium at that point, or this was

25 information that was provided to you to prepare for

1 that?

2    A.  This was information that was provided to us

3 to prepare for it.

4    Q.  Okay.

5    A.  I was at my -- my residence.

6    Q.  Okay.

7    A.  And we all started communicating through a

8 chat app known as Element --

9    Q.  Okay.

10    A.  -- to discuss what we were doing and what we

11 were looking at.

12    Q.  When you say we all, who are you referring to

13 there?

14    A.  The people I saw who were in the chat app.  So

15 when I first got into it, I saw there was Colonel Shawn

16 Smith.  There was Mark Cook.  There was Ron Watkins,

17 known as Code Monkey.  Doug Logan was in the first day I

18 was in there.  Colonel Waldron was in the room, as well

19 as Kurt Olson.  And Todd was -- Todd Sanders was also in

20 the chat room, as well as Conan James Hayes.  So I

21 believe there was approximately 10 to 15 people who were

22 in that chat room.

23    Q.  And we've discussed a couple of those people

24 already.  We talked about Phil Waldron.  I don't think

25 we've discussed some of the others.

1        Had you worked with Shawn Smith before?  Did

2 you recognize that name?

3    A.  No, I hadn't.

4    Q.  Okay.  Had you worked with Todd Sanders

5 before?

6    A.  No.  I had not worked with any of the other

7 individuals other than Colonel Waldron.

8    Q.  Did you recognize any of their names?  Did you

9 know them by reputation?

10    A.  I knew their names by seeing other

11 investigations.  I knew the Cyber Ninja individuals

12 because of Antrim and the Arizona audit.  I was familiar

13 with pretty much everybody in the room.  Ron Watkins, I

14 had been reading his information going back even prior

15 to the 2018 election.  He ran 4chan and then another

16 site called 8kun, so he was within the cyber undertow

17 that's out there.  He was a leading figure in that.

18    Q.  So had you ever spoken with Ron Watkins

19 before --

20    A.  No.

21    Q.  -- being on the red team?

22        And at this time when the red team started,

23 were all of your communications with the other members

24 through this channel or did you have direct contact

25 with, you know, anybody else?

1    A.  In totality, most of the discussions all
2  were in the Element chat app.  There were a few
3  communications that would take place, whether it was
4  from Signal -- it would just be, hey, do you see this or
5  do you understand that?  Ancillary discussions.  But the
6  main discussions were in Element.
7    Q.  Okay.  And you said you were sharing this bin
8  file that you received.  I assume, did everybody --
9  every member of the team have the same information at
10 that time?
11   A.  Yes.
12   Q.  Did you understand that that was going to be
13 everything that you would receive, or did you know there
14 would be more information coming later?
15   A.  So we were told that that was -- because they
16 called the file slice.bin, so we were told it was a
17 slice of the overall data that was there.
18   Q.  And where did that data come from that you saw
19 in that first bin file?
20   A.  At that point in time on August 5th, there was
21 not an explanation as to where that information had come
22 from.
23   Q.  But it was provided by Phil Waldron initially?
24   A.  No.  Initially, that information was provided
25 to us by Mark Cook.

Page 62

1  captures.  However, they weren't -- a lot of the guys I
2  know who deal with system analysis, as I've looked
3  through them before, you have to have sort of a chain of
4  custody within a packet to be able to know authenticity,
5  and we weren't able to gather that.  We weren't able to
6  be told that.  It was just, here's some information,
7  look it over.
8    A lot of those packets had errors in them,
9  like they were malformed.  So immediately as soon as we
10 start seeing the information, all of us in the room
11 start having questions as to the authenticity of the
12 information that was presented, and there was numerous
13 layouts and discussions over that within the proceeding
14 days.
15   Q.  Did anyone in the red team sort of put those
16 concerns to rest?  Did you feel like you got answers to
17 your questions about the accuracy of the information?
18   A.  No.  And even up until the day that I got on
19 the plane -- Mr. Lindell's plane at ASOG's office, we
20 were still sort of trying to figure out what the basis
21 of validation for the data really was, because what we
22 were seeing, there was no way to be able to validate the
23 information as it was presented to us.  So much so,
24 whenever I got on the plane -- when I finally get on the
25 plane at ASOG, that's the first thing I do whenever I'm

Page 64

1    Q.  Mark Cook.  Okay.  Tell me about Mark Cook.
2  Who is that?
3    A.  Mark Cook owns his own cybersecurity company
4  in Colorado called WizWare Tech.  He also worked with
5  Colorado USEIP, which is US Election Integrity Project.
6  So I believe he was sort of doing the same kind of
7  things I had done but over in Colorado.
8    Q.  Okay.  And you didn't know where Mr. Cook got
9  this information?
10   A.  It wasn't specified to us at -- on August 5th,
11 it was not specified to us.
12   Q.  Okay.  So you began looking at this
13 information.  What happened next as we get closer to the
14 symposium?  Did you get more information in the coming
15 days, or was that all that you received?
16   A.  So the first part of data that was given to
17 us, that slice.bin file, we couldn't actually get it to
18 unpack at first.  So in the chat room we kept asking
19 what needs to happen to be able to do this.  So Conan
20 would chime in and said we needed to use these other
21 programs.  One was called C extractor.  These were some
22 other programs that were provided to us to supposedly
23 decompile the information inside this bin file.
24   So the first attempt to decompile the
25 information, we did start seeing portions of packet

Page 63

1  sitting in Mr. -- next to Mr. Lindell.  I start asking
2  him what a normal red team person would ask, which was
3  where did the information come from?  How was the
4  information collected?  I went down my Five W list: who,
5  what, when, where, why and how.  So I'm asking him those
6  kinds of questions.
7    The first question I asked him was, well, have
8  you ever read any of my affidavits or any of my
9  research?
10   And he goes, no, I don't know who you are.
11   Q.  Okay.  So we're sitting on the runway in his
12 plane when he picks you up in Addison to go to the
13 symposium?
14   A.  Our first stop was in Colorado.
15   Q.  Okay.
16   A.  We stopped in Colorado to pick up Colonel
17 Smith and to pick up Mark Cook.
18   Q.  Okay.  So prior to this -- so I want to talk
19 about Lindell obviously, but just to be sure I
20 understand the timeline leading up to it.
21   At this time when you're trying to figure out
22 this information that Mark Cook provided, did -- was
23 Mark Cook able to explain what it was and what it was
24 supposed to be?
25   A.  No.  Not even Conan James Hayes, who was

Page 65

17 (Pages 62 - 65)

1 supposedly the person who was directly dealing with
2 where the origin of the data was, he couldn't explain to
3 us how to recreate its extraction, how the software was
4 working. And we even were given copies of the software
5 to be able to open in Visual Studio Code, which is a
6 program for looking at source code within software.
7       And that's when -- as soon as I saw that --
8 because one of my projects that I worked on is I helped
9 Kevin Hinson and a team of other people whenever Stuxnet
10 first went public. And so I've decompiled software and
11 able to read through it and reconstruct how someone
12 writes a program.
13      So as soon as we get C Extractor, and I think
14 there was two other programs, and I start looking
15 through it -- first off, because at this time that's
16 when everyone in the room starts figuring out this is
17 supposedly Hammer and Scorecard stuff. Hammer and
18 Scorecard are two supposed programs that are run by
19 Dennis Montgomery. Hammer has to do with brute force,
20 which is a way to be able to crack passwords very
21 quickly. It will run like a billion passwords an hour.
22 And then Scorecard is supposedly the command and control
23 system that was claimed to have the interconnection into
24 the background of all the election systems.
25      Because one of the research that we had done,

Page 66

1 Scorecard information was not included in the -- in the
2 information you were provided before the Cyber
3 Symposium?
4    A.  Leading up to, no. That was something we all
5 sat and went, okay, why does this look like packet
6 captures that we had all seen previously back during
7 Absolute Proof, when Mary Fanning was posting data and
8 the 6 million spreadsheet? I think all of us in the red
9 team sort of extrapolated it was the same regurgitation
10 from back in December of 2020.
11   Q.  Okay. And you mentioned Mary Fanning. Who
12 was that?
13   A.  Mary Fanning was another lady who had worked
14 with Lindell who had posted this Hammer, Scorecard
15 information. There was, you know, a high-speed
16 JavaScript map that they posted that shows little packet
17 capture attacks, which later on we would see even that
18 was created. It wasn't authenticated.
19      So she had originally tried presenting this
20 information back in December of 2020, and from what I --
21 what I saw after the symposium, Brannon Howse was the
22 one who claimed to bring that information to
23 Mr. Lindell.
24   Q.  Okay. And have you ever met Mary Fanning
25 personally?

Page 68

1 going back to 2018, I had created this hypothesis that
2 all election systems were ran by the same skeletal
3 framework known as GEMS, or Global Election Management
4 Systems.
5      So it's just like with AWS. We worked with
6 Oracle -- prior to the election research, we had worked
7 with Oracle to research AWS when they were involved in a
8 program called the JEDI program, where they were
9 creating a cloud system for the US government, and AWS
10 has a backbone cloud that people can access if there's a
11 known vulnerability. Well, we were finding the same
12 thing within GEMS. So that's supposedly how Scorecard
13 exploits the system, is through that backbone. So --
14   Q.  Okay. So you're mentioning Hammer and
15 Scorecard, and you said supposedly a few times. Is this
16 a program that actually exists?
17   A.  It's claimed. However, when we looked at the
18 source code, if the NSA is actually using it, they're
19 using a program that looks like it was written by a
20 12-year-old, because he hid website links within his
21 programming in hexadecimal, which is a step above
22 binary. Instead of 0s and 1s, it's A, B, C, D, E, F and
23 then a 0 or a 1. And he was hiding a web address that
24 had certificate passwords in his source code in hex.
25   Q.  Okay. But this -- this supposed Hammer,

Page 67

1    A.  No.
2    Q.  Never spoken with her?
3    A.  No.
4    Q.  Do you know anyone who has?
5    A.  Not that I'm aware of.
6    Q.  Okay. Is she a real person?
7    A.  I can't speculate. I've never met her, so I
8 don't know.
9    Q.  Okay. All right. We -- I keep getting
10 distracted here, but -- so we're on the plane about to
11 fly to the symposium. You've had an opportunity to
12 review some information, but it sounds like nobody
13 really knows what that information is or what it's
14 supposed to mean. Is that correct?
15   A.  We see it, but when we're looking through it,
16 we're noticing a lot of problems with it. We were
17 noticing that the packets were malformed. We were
18 seeing that IP addresses, computer addresses weren't
19 linking up correctly. The MAC addresses were
20 nonexistent, which is the -- the unique identification
21 for each computer, which when you look back in December
22 when Mary Fanning presented that information, they
23 included the MAC addresses, but they claim that it was
24 all randomized. And so a lot of people across the
25 country who were investigating this, that raised a huge

Page 69

18 (Pages 66 - 69)

1  amount of concern, because if you see randomized MAC
2  addresses that aren't pointing to a legitimate system,
3  you can't really authenticate what type of system it's
4  coming out of.
5      Q.  Are these sorts of problems difficult to
6  identify?
7      A.  When you're working at the source level, it
8  shouldn't be.  You know, if I'm looking at -- even in
9  Level 2 switches, Level 3 switches, I can see that
10 level -- that type of information in them.  One of the
11 cloud providers that I work for, we do our own packet
12 capture, so I look at that data every day most of the
13 time.
14     Q.  So you mentioned before that it was
15 immediately apparent to, not only yourself, but
16 everybody in the red group that these -- that these --
17 this information was not what it purported to be.  Is
18 that?
19     A.  Yes.  In our --
20         MR. MALONE:  This is -- sorry, excuse me,
21 Mr. Kloewer.  This is Ryan Malone.  I object to form and
22 foundation on that question.
23     Q.  (BY MR. KLOEWER) He will object sometimes.
24 You can still answer.
25         I should have mentioned that at the beginning.

Page 70

1  Sometimes Mr. Malone will object to questions.  That's
2  to preserve an objection later, but if he does object,
3  you're still able to answer the question.  So he was
4  objecting to form and foundation there as far as the --
5  your knowledge of the PCAPs is concerned.
6          So anyways, back to my question.  I think
7  you've just answered it, but you said before that it was
8  immediately apparent that these -- these were -- were
9  not what they purported to be?
10     A.  Yes.  To all of us in the red team, whenever
11 we looked through the data in the chat room itself, we
12 all specified multiple concerns.  Not just to each
13 other, because I had conversations with Mark Cook over
14 it, I had conversations with Colonel Smith over it, Ron
15 Watkins.  I talked to people individually, as well as
16 within our group, and we all sort of came to the sole
17 collective conclusion that there was something wrong
18 with what was being presented.
19     Q.  And did you bring that information to
20 Mr. Lindell?  I know we keep dancing around this first
21 meeting where you speak with him in the plane, but prior
22 to this time -- I guess, let me ask the first question.
23 Who was the intermediary between the red team and Mike
24 Lindell?
25     A.  That would be his attorney Kurt Olson.

Page 71

1      Q.  Okay.  And you were all -- you had shared
2  these concerns with Kurt Olson at this time?
3      A.  Yes.  Many of us were literally almost jumping
4  up and down trying to say, hey, we need to postpone
5  this, there's something wrong.
6      Q.  Okay.  And how were those communications
7  brought to Mr. Olson?  Were you texting him?  Were you
8  calling him?  Were these face-to-face conversations?
9      A.  Up until August 9th, it was all through the
10 Element chat board.
11     Q.  Okay.  And was Mr. Olson a member of the chat
12 group?
13     A.  Yes, he was in the chat group.
14     Q.  Was he participating?
15     A.  He was engaging with us whenever we were
16 discussing the concerns that we had, and he stated he
17 was going to be relaying that.
18     Q.  And you said that he's Mr. Lindell's personal
19 attorney?
20     A.  I don't know what --
21         MR. MALONE:  Form and foundation.
22     A.  I don't know who -- like, whether he's an
23 individual or corporate, any of that.  I just know that
24 he was represented as Mr. Lindell's attorney.
25     Q.  (BY MR. KLOEWER) Okay.  And did you ever

Page 72

1  hear from Mr. Olson that he had relayed these things to
2  Mr. Lindell or just that he was going to?
3      A.  Leading up to the symposium, he just said he
4  was going to, but that was as far as we had heard.
5      Q.  Okay.  And was there any member of the red
6  team that disagreed with what you described as sort of
7  the collective conclusion that this information was not
8  accurate?
9      A.  No.  All of us --
10         MR. MALONE:  Object to form and
11 foundation.
12     A.  All of us were more hopeful within the chat
13 where we discussed, and said we're hoping that perhaps
14 there will be better information once we get to South
15 Dakota, because what we were seeing we were having
16 issues with.
17     Q.  (BY MR. KLOEWER) Had you seen the
18 advertisements promoting the $5 million reward that was
19 offered at the symposium?
20     A.  Yes.  And I made an off-color joke in our chat
21 board about it, because when we were looking through the
22 data and we were having issues with it, I made a joke
23 where I said, hey, once all this is done, I think all of
24 us should get the million and split it amongst all of
25 us, because I had made a joke about how it looked -- it

Page 73

19 (Pages 70 - 73)

1 didn't live up to what the claim was.
2    Q. This was just a few days before the symposium.
3 Were you surprised that this was the information that
4 you were looking at that close to the event?
5    A. We were concerned, because I mean all of us
6 had put a lot of time and effort into this type of
7 research. You know, the whole time I was working on
8 election fraud investigation in order to keep any
9 impropriety from being claimed, I refused to get paid
10 for any of my work. So I was having to do my own side
11 contracts away from my cybersecurity research on
12 elections.
13      So a lot -- you know, whether it was me,
14 Colonel Smith, Colonel Waldron, all of us had a ton of
15 skin in the game. So, of course, we all had an interest
16 in, hey, if it's real, yeah, let's put it front and
17 center. But if it's bull crap, if it was garbage data,
18 then what we need to do is we need to figure out our
19 way forward and figure out, okay, where's the point of
20 failure to be able to correct these issues?
21      And that's -- in discussion with one another,
22 that's what we had discussed, because we all had been
23 coming to the same conclusions. We had all been working
24 on the same things.
25    Q. And on the topic of having skin in the game,

Page 74

1 Q. Okay.
2 A. Because we left on a Saturday to go to the
3 hotel in South Dakota.
4 Q. Okay. All right. So you wanted to speak with
5 Kurt Olson personally. Did you get that opportunity?
6 A. No, not until we got on the plane, and I
7 didn't get to speak to him as much as I would have
8 liked. I got to speak to him for a moment before we got
9 to Colorado. And then once we got to Colorado, me and
10 Olson, we were sitting further back, while Shawn Smith
11 and Mark Cook were sitting a little bit further forward
12 to talk to Mr. Lindell.
13 Q. Okay. And do you know were Mr. Smith and
14 Mr. Cook, were they conveying these concerns to Lindell?
15 Were you able to hear their conversation?
16 A. I didn't listen to their conversations, no,
17 sir.
18 Q. Okay. But you said that you eventually got a
19 chance to speak with Lindell yourself?
20 A. Prior to us landing in Colorado, I was sitting
21 next to Mr. Lindell, and I started asking him chain of
22 custody questions, just sort of red team assessment
23 questions that I had ground into my head by my professor
24 that you should ask when doing red team work.
25 Q. Okay. So you mention mentioned before that

Page 76

1 did you -- did you ever discuss with the other members
2 of the red team had they been extended the same offer
3 of $30,000 for this week of work? Do you know if that
4 was --
5 A. No, I never asked anyone about that.
6 Q. Okay. Okay. So I think we're about caught up
7 to the point when Mike Lindell plane lands in Addison,
8 Texas, to pick you up to take to you South Dakota.
9 A. Correct.
10 Q. Who was on the plane when it landed?
11 A. So when I got to ASOG -- I took an Uber to get
12 to ASOG. I get to ASOG with my suitcase. I go in.
13 Russ Ramsland opens the door and lets me in. Kurt Olson
14 is in the conference room, and he was on the phone the
15 entire time, because I wanted to get a chance to talk to
16 Kurt Olson face-to-face to discuss the problems we had
17 been having since the 4th, but he was on the phone the
18 whole time.
19 Q. So what day is this, just to clarify?
20 A. This would be, I believe, August 9th.
21 Q. Okay. So the day before the symposium
22 started?
23 A. Then it would be the 8th.
24 Q. Okay. So two days prior is when you --
25 A. Correct.

Page 75

1 that was your who, what, when, where, why questions.
2 Let's just start at the top. You asked Mr. Lindell who
3 he got this information from?
4 A. Correct. And he -- as I started asking him
5 questions, he became more and more visibly flustered,
6 like frustrated that I was asking him questions,
7 because that was about the third question I asked him.
8 The first question I asked him is if he knew who I was
9 or if he had read any of my affidavits previously, and
10 he said, no, I don't know who you are. And then I
11 started asking him about the data, and he started
12 becoming visibly flustered and almost frustrated that
13 I was questioning him about the data.
14 Q. Okay. So I take that to mean he didn't tell
15 you who provided him the information?
16 A. At that point, no, he did not.
17 Q. And so you moved on to the next question, what
18 is this data?
19 A. Correct. I was asking him, well, what
20 specifically is the data behind this? What collection
21 methods were used to be able to gather it? And none of
22 my 5 Ws were answered by Mr. Lindell.
23 Q. Did he even tell you they were PCAPs at the
24 time?
25 A. At the time, no, he didn't even though we had

Page 77

20 (Pages 74 - 77)

1 already seen them, which, I mean, I sort of assumed that
2 Mr. Lindell is not exactly a technical person. He's a
3 sales guy, so I wasn't expecting him to understand what
4 the data actually was. I believe he was just referring
5 to what his experts or people working for him were
6 telling him the data actually said.
7 　　Q.　And did he tell you when he had gotten the
8 information?
9 　　A.　No, sir. He never specified when they had
10 gotten it.
11 　　Q.　Did he tell you where he got the information?
12 　　A.　No, sir, he did not.
13 　　Q.　At this time did he mention Dennis Montgomery?
14 　　A.　No, sir. And that was -- while we were in the
15 plane, that wasn't even something I was wanting to bring
16 up, because in the chat boards when we were discussing
17 it, we noticed that that was something that was
18 purposefully not being discussed, was his name.
19 　　Q.　Let's talk about that a bit. Did you know who
20 Dennis Montgomery was before this time?
21 　　A.　Yes. I was the one who had brought his name
22 up after the 2018 election fraud that we had seen. I
23 had presented his information to Sidney Powell, as well
24 as to Allen West and Herman Cain and a number of others
25 who were at our conference room, whenever I had given

Page 78

1 my first major presentation on election fraud, and
2 especially playing snippets from the video that I had
3 found on YouTube where he discussed the use of Hammer
4 and Scorecard in the 2008 and 2012 elections.
5 　　Q.　So why were you concerned that Dennis
6 Montgomery was -- could be involved here?
7 　　A.　I was concerned because of a known case where
8 Mr. Joe Arpaio, a sheriff from Arizona, and Mark Zullo,
9 who was one of his investigators, had filed a fraud
10 claim against Mr. Montgomery in regards to those actual
11 packet captures that he had talked about in the video in
12 2008 and 2012.
13 　　Q.　So it sounds like you had concerns about
14 Mr. Montgomery's reliability?
15 　　A.　At least the production of the information.
16 Later I would be told exactly sort of the methodology,
17 because a lot of times when you're dealing with --
18 Dennis Montgomery had been putting software out to the
19 NSA and other intelligence agencies. He would be deemed
20 a national asset, so he would have certain protections
21 under the US government.
22 　　So what it seemed was he was trying to put
23 information out; however, he was concerned of actually
24 putting the information out. So he would get people
25 like right to the 5-yard line and then get cold feet and

Page 79

1 pull back because he was afraid he was going to lose his
2 national asset status.
3 　　That's why I believe here recently they had
4 attempted to remove the gag order off of him, because
5 that supposedly is what holding him back from
6 discussing or showing the actual information that he
7 claimed he had.
8 　　Q.　Okay. You also said that the other members of
9 the red team were avoiding discussion of Mr. Montgomery.
10 Did I hear you correctly, or what do you mean by that?
11 　　A.　Yes. There was a concerted effort to keep
12 certain keywords from being discussed, whether it was
13 Hammer and Scorecard, Dennis Montgomery, even Mary
14 Fanning, there were certain phrases that they did not
15 want discussed.
16 　　Q.　How do you know that? Was there a band list
17 of words that was shared on the channel?
18 　　A.　No.
19 　　Q.　Did you --
20 　　A.　In discussion, there were -- there were
21 moments where they said, well, we're not going to
22 discuss that, we're not going to discuss Dennis
23 Montgomery, we're not going to talk about it publicly.
24 And that was -- from the very beginning, that was
25 something that was made apparent, was that there were

Page 80

1 certain key phrases that could not be discussed.
2 　　Q.　And just to be sure I understand, was that
3 concern, did it arise from not wanting to disclose
4 Montgomery as a source or not wanting to engage with
5 some of the concerns about him as a source?
6 　　　　MR. MALONE: Object to form, foundation.
7 　　A.　I'm not certain as to what their motivation
8 was. That was never fully specified to us.
9 　　Q.　(BY MR. KLOEWER) Okay. So, you said you're
10 speaking with Mr. Lindell, you raised these issues and
11 he was getting flustered. Did you convey to him at the
12 time that you did not believe the information was what
13 it purported to be?
14 　　A.　No, because what he was telling us was that
15 whenever we would land in South Dakota, that there would
16 be more information provided for us to go through.
17 　　Q.　Okay. Who did he say would be providing more
18 information?
19 　　A.　He did not -- initially, he didn't specify.
20 Once we landed in South Dakota, that's when he explained
21 some of the other key figures that would be showing up.
22 One of which was Conan James Hayes. He told us that
23 Conan had the extent of more data that we would all get
24 a chance to look through.
25 　　Q.　Okay. Let's talk about Conan James Hayes.

Page 81

21 (Pages 78 - 81)

1 Who is that?
2     A.   Conan James Hayes was one of the red team
3 members, who was also someone I believe who had worked
4 with Doug Logan. I know a lot of information sort of
5 out there as to who all he was working with, but in my
6 dealings with him, he popped up a few times and was
7 doing forensic analysis and other bits of extraction of
8 data.
9     Q.   Had you ever met him before?
10    A.   No, sir.
11    Q.   Had you ever spoken to him before?
12    A.   No, sir.
13    Q.   Was he contributing to the group chats at the
14 time, the red team?
15    A.   Minimally.  He did not -- within the first two
16 or three days of all of us working on the data, we
17 didn't really hear a whole lot out of him.  Whenever we
18 started raising concerns over the actual data and how we
19 were having problems looking at the packet captures, he
20 would chime in sometimes and say, oh, well, we need to
21 use this program to look at the information.  So he was
22 somewhat in the very beginning a very minimal amount of
23 help.
24    Q.   So it sounds like he had some familiarity with
25 the information before it was presented to you, if he

Page 82

1 knew how to open up these documents, for example?
2     A.   Yes, and as specified in the chat room when we
3 were talking, he was the one who was holding all of the
4 information and was disseminating it to Mark Cook and to
5 Code Monkey, or Ron Watkins.
6     Q.   So did you understand then that he was an
7 intermediary to the provider of this information?
8     A.   At that point in time, no.  Not until a couple
9 of days into the symposium did we know that tidbit of
10 information.
11    Q.   And Mr. Lindell told you on the flight that
12 when you landed in South Dakota, Conan Hayes would
13 provide more information.  Is that --
14    A.   He said -- yes, he said once we got there,
15 then we would have a hard drive that I specifically
16 would be handed to go through the information.
17    Q.   Okay.  So at that point, you arrive in South
18 Dakota.  Where did you go from there?
19    A.   So we landed at the airport at South Dakota.
20 We had a -- it was a Ford and a GMC SUV that showed up
21 to pick us up.  One was gray and one was black.  They
22 showed up, picked us up, took us to the Sheraton Hotel.
23 We all stayed down in the courtyard.
24        There was -- when you walk into the front
25 door, to the left there was an angled wall that had a

Page 83

1 door on it, and that was a conference room, and in that
2 room was where we had our red team room.  So we would
3 meet there and we would all discuss.
4         I walked into the front.  They were already
5 starting to stage equipment in the room.  I walked over
6 to go, sort of, see what all was in the room.  They
7 already had some boards up with white paper.  So there
8 had been some people already there working on going
9 through information.
10    Q.   Do you know who those people were?  You said
11 they.  Obviously not the folks that were on the plane
12 with you?
13    A.   No.  And I didn't -- I didn't know who had
14 been in that room prior to us showing up.  I just -- I
15 could see on the paper that there was writing and
16 information written on it.  So I walk in.  I take my lay
17 of the room.  I see there's about four clear tubs that
18 were sitting in the back right-hand corner of the room.
19 Just took a lay of the land.  In the middle of the
20 courtyard, there was a little bar and some tables and
21 then another bar in the back and another seating area in
22 the back left.
23        So as I'm walking in, one of Mr. Lindell's
24 assistants come in, and she starts coordinating on
25 working on getting our rooms, and I was given a room on

Page 84

1 the third floor.  And they didn't even put the rooms
2 under our names.  I believe they were all just put under
3 Mr. Lindell's name.  So they made it to where in one
4 could tell who was in what rooms.
5         So we get to -- we get our rooms.  I go put
6 my stuff up in my room.  At the time, I had one suitcase
7 and a computer bag.  My computer bag was my Iraq bag.  I
8 had my -- I have four laptops.  At the time, I only took
9 two with me, and those were my public laptops.  So I had
10 a Gateway laptop with a -- it's a stylus pen screen that
11 turns 270 degrees.  That was my boot to Linux that I run
12 my forensic analysis on.  And then I had a Dell laptop
13 that I used for my hypervisors and my virtual machines.
14        So I took my computer bag, I went back
15 downstairs.  I went to the red team room to try and
16 start talking with everybody and going over information.
17 I believe we stayed in that room until approximately
18 midnight.  I believe we landed and we got there, it was
19 around 4, 5 o'clock in the afternoon.  I stayed in there
20 until midnight.  They brought us food the first night.
21 And after we were done, I stayed in the courtyard.
22        Whenever I do ops like this, I sleep four
23 hours.  So I stayed in the courtyard until 003 to figure
24 out who was coming through, figure out patterns.  What people were
25 watched people, how they moved through, what people were

Page 85

22 (Pages 82 - 85)

1  coming. I saw a number of key individuals, like Harri
2  Hursti, Robert Graham, a number of other individuals. I
3  didn't engage and talk with them, but I see them.
4  Q. So --
5  A. But I meet Joe Oltmann. I believe he was
6  there that first night. And -- no, he was there the
7  second night, not the first night.
8  Q. Okay. So just to confirm, this is the
9  Saturday night when you arrive?
10  A. Correct.
11  Q. You still have one entire full day before the
12  symposium starts on Monday?
13  A. Correct.
14  Q. Okay. So this first night, you're seeing
15  folks coming in and you worked with the red team until
16  midnight that night. Did you make any progress in
17  further understanding the information that first night?
18  A. No. We -- there were a number of times -- I
19  believe there was twice when Waldron and Olson came in,
20  and that's where we kept voicing our opinions of the
21  problems. And it wasn't just me who was voicing our
22  opinions.
23  On Saturday, I actually was trying to stay
24  less vocal so I could get a landscape of leadership and
25  who was really sort of in charge of everything. But we

Page 86

1  had voiced our opinions to Waldron. Waldron had talked
2  to Kurt Olson about it. Olson comes into the room, and
3  we all sort of start talking about, hey, what's going on
4  with the data here, because this isn't -- this isn't
5  jiving? And Olson says I'll talk to Lindell about it.
6  Q. And was Conan Hayes there at that point?
7  A. No. No, he was not.
8  Q. So he was not there with additional
9  information to provide as Lindell had suggested?
10  A. No, he was not.
11  Q. Okay. I am going to ask a couple more
12  questions here just generally about the symposium, and
13  then maybe we can see about breaking for lunch. I just
14  want to wrap up this first day here.
15  So you mentioned folks coming through the
16  lobby, like Harri Hursti and others? What was your
17  understanding of what the purpose of the symposium was?
18  Like, why was a guy like Harri Hursti there?
19  MR. MALONE: Object to foundation.
20  A. So on television, there was a claim of a
21  $5 million contest to refute the data to be able to show
22  that China had altered the US elections. So the
23  contest, I think to a certain degree, was the beginning
24  motivator for a lot of these people coming in.
25  All of us on the red team, we were there

Page 87

1  mainly because I think a lot of us had worked on this
2  data so much, we wanted to see if this was truly the
3  smoking gun. But I looked at it like a radio station,
4  right? If you're working at a radio station and you're
5  running a contest, of course you're not eligible to be
6  able to take part in it. So I already knew I wasn't
7  eligible for $5 million, considering I was supposed to
8  be an employee, but I just sort of made jokes about it.
9  And a lot of the guys who -- the cyber experts
10  who were downstairs, which some of them I knew, some of
11  them I didn't know, I was trying to get a feel for their
12  mood, and most of the guys that ended up in the cyber
13  expert room were actually there because they wanted to
14  see the data. They didn't really care about the
15  contest. They wanted to see if the data held up to the
16  claim because they were all concerned about the
17  elections.
18  Q. (BY MR. KLOEWER) So help me understand this
19  then. If Lindell has put out this public invitation to
20  cyber experts to confirm the data, what was the point of
21  red team? If he was already going to have people
22  verifying this information, what was your role supposed
23  to be?
24  MR. MALONE: Object to form.
25  A. In the very beginning, we were specified we

Page 88

1  were brought in to verify the information. What we
2  didn't know until afterwards is Mr. Lindell had never
3  even seen the source data, which he admitted on August
4  16th on FrankSpeech, that he had never even seen the
5  data prior to the symposium. So I believe he brought us
6  in to actually look and validate the information before
7  it went out publicly.
8  And for the days leading up, from the 4th
9  until the 9th or when the symposium started, all of us
10  were, you know, throwing spears saying, hey, this isn't
11  good. I believe at one point on the Sunday, all of --
12  Mr. Lindell's in the room, Olson's in the room, Waldron
13  is in the room, and I finally speak up and I say
14  something. I said, look, we need to cancel or postpone
15  this because the information doesn't uphold with what
16  the claim is, and Mr. Lindell started yelling at me
17  directly. I remember, because at one point afterwards,
18  I looked over and said if it had been anyone else, I
19  would have punched him in the face.
20  Q. (BY MR. KLOEWER) Do you recall what
21  specifically he said?
22  A. He told us that his other experts had
23  validated the information and that we knew -- he knew
24  for a fact a hundred percent that the information was
25  legitimate.

Page 89

23 (Pages 86 - 89)

1 Q. Who were those other experts?
2 A. That was never specified. All we knew was
3 that Conan and Todd -- Todd Sanders -- Sanders I believe
4 is his last name -- were some of the people who had seen
5 the data. And so Colonel Smith, myself, Mark Cook, all
6 of us turned to Waldron and say, I want Conan here to
7 explain all this because right now it's not jiving.
8 We hadn't seen from him. Every time we tried
9 asking him to speak up and get involved, he wouldn't say
10 anything. So I believe it was Sunday night he rolls in
11 at the same time as Tina Peters is brought in. Conan
12 comes in, and we're all supposed to see him at like
13 10 o'clock, and they kept trying to push it back. So it
14 was obvious they didn't want us to question Conan.
15 Todd was in the room for a little while prior.
16 They had three MacBook Pros. They were up against the
17 back wall, and there was a couple of hard monitors that
18 were on the desk. So Todd was sort of hiding behind the
19 monitor on his computer. And we kept pushing for Conan
20 to come in.
21 I remember Mr. Lindell lectured all of us, and
22 he said now Conan has had a really tough day, so y'all
23 are only going to get an hour to talk to him and he's
24 going to go to bed, because he's got to get up early
25 when the symposium starts.

Page 90

1 And then he didn't show up until midnight. So
2 he comes in the room at midnight, and my Army hat comes
3 on.
4 Q. So just to be sure I understand, this is
5 midnight on Sunday?
6 A. Check.
7 Q. The symposium is going to start Monday
8 morning?
9 A. Yes, sir.
10 Q. Your understanding was they were going to
11 present this information the next day?
12 A. Yes, sir.
13 Q. And throughout this day Sunday, the members
14 of the red team are speaking directly with Mike Lindell
15 telling him this information is not accurate?
16 A. Correct. At least five times we all told him
17 to his face.
18 Q. And do you know if he was responding in the
19 same way to others as he responded to you? You said he
20 yelled at you and --
21 A. I don't know what his behavior was towards
22 other people. All I know is that objections whenever I
23 was discussing it with all of us in the room, he
24 directed his frustration and anger towards me.
25 Q. Okay. And this is going to sound like a

Page 91

1 stupid question, but do you understand -- what was your
2 understanding of why Mr. Lindell was so upset to hear
3 that?
4 A. I can -- I have an opinion, but I don't know
5 for a fact what his thought process was. What my -- my
6 opinion in it is, is that more than likely he had
7 peppered the media about this event so much that there
8 was no way that he could back out of it. So it was,
9 pardon the expression, in for a penny, in for a pound.
10 So it came down to, okay, it's go time. There's no way
11 to pull back from it.
12 Q. And the purpose of this event was to present
13 evidence that the election was rigged?
14 A. It was to show that China had interfered in
15 the election, because that was the biggest focal point
16 whenever he was talking about the symposium.
17 Q. And you said Conan showed up Sunday night
18 about midnight?
19 A. Correct. So we got about an hour of time to
20 question him, and no one really questioned him, so I
21 jumped into it.
22 And to give an explanation on this, in 2008,
23 the unit that I was assigned to at Fort Lewis,
24 Washington, we were supposed to be prison guards. That
25 was one of the missions we were going to be given in my

Page 92

1 unit. So we all had to go through detainee operations
2 training. We had to go through interrogation training,
3 how to interrogate a person once you capture them.
4 I got certified. The only certifying body for
5 detainee operations training in the Army is the Marine
6 Corps. So you get a Marine Corps plaque that you hold
7 onto dear life for your whole life, because to earn this
8 you have to get sprayed in the face with OC and tased.
9 So, it's like the most important certificate you get in
10 the Army.
11 And we lost that mission. And in 2009, we
12 go to Afghanistan to do route clearance. My job was to
13 pull IEDs out of the road, but we also detained persons
14 of interest that were around us when we got blown up to
15 be interrogated. So if there's a guy within, you know,
16 half a mile when an IED goes off, I'm going to detain
17 that guy so I can have an interrogator to question him.
18 So, we get trained in signs of deception, so when I get
19 that initial prisoner and I'm questioning him, I can
20 tell if he's lying to me. Men have more -- or women
21 have more signs that they're lying than men do. Women
22 have 21 signs. Men have 17.
23 So when Conan walks in, my Army hat comes on
24 and I go into interrogation mode. No one is asking him
25 questions, so I started asking him. And as I'm watching

Page 93

24 (Pages 90 - 93)

1 Conan, sweat forms on his brow, eyes start shifting.
2 He's thumbing around. He's sitting back. Like you can
3 tell he's physically frustrated. He showed seven of --
4 seven signs of deception as we're asking him questions.
5        So I said there's something horrifically
6 wrong in this. And I even said it afterwards, after he
7 left -- because in that hour, he was visibly flustered,
8 and so was Todd. Todd didn't answer a single question
9 because we were asking how do we get C Extractor to
10 work? How do we get these other programs that you
11 provided to work? And then he couldn't even open it in
12 Visual Studio.
13        So I'm thinking if he's a cyber expert who was
14 working on all these things, why is he having problems
15 manipulating it in Visual Studio? Why is he having
16 problems showing all this? I mean, because if he had
17 been involved in all of these different things that
18 everyone had said he did, you shouldn't have any issue
19 with this. So that's where bigger questions start
20 coming to mind.
21    Q.  So he eventually just left the conversation?
22    A.  Him and Todd, they left right in the middle
23 while we were questioning them. Like, they were visibly
24 frustrated, couldn't answer our questions. We even had
25 another person that was in the room. So it was the red

Page 94

1 team, but we also had Lisa Draza in the room with us.
2 And we were -- we were like asking that guy questions
3 pretty rapidly. Like I started it, I asked him a couple
4 of questions, and then Mark starts asking questions. So
5 it starts going back and forth, and --
6    Q.  So what info did you get from Hayes, if any?
7    A.  Not much that was intelligible. He almost
8 tried to make it sound like all of us in the room just
9 didn't know what we were doing. He was like, oh, well,
10 this is how you open this program and it just works.
11    Q.  Did he show you how to do that?
12    A.  Not in the room. He showed us in the chat
13 room on Element, and he explained it a couple times.
14 He even sent the file to us. But in the room he
15 couldn't get it running or explaining, and that was --
16 because earlier in the day when Tina Peters and Conan
17 shows up, that's when Lindell hands me this hard drive.
18 He hands me -- it's a black Samsung drive, and he said
19 here's the bulk of the information.
20    Q.  This was Sunday afternoon?
21    A.  Correct. This was right when they land at the
22 airport. Tina Peters and Conan are there. They hand me
23 the hard drive. And I'm like, okay, I want to skip out
24 on everybody and go run my own analysis, but I can't do
25 it until later that night. So we question Conan. We're

Page 95

1 going through all this stuff. We're not getting any
2 answers.
3        I do my usual; I stayed downstairs. And I
4 watched everyone who was there, talked to a number of
5 people. I had a friend of mine who was there with me,
6 Brian Lupo, who is a former Marine. He's now a reporter
7 for Gateway Pundit. He was pretty much -- I tried to
8 make sure he was right by me all the time, mainly
9 because I was concerned of -- in those type of
10 scenarios, the first thing in my mind from the intel
11 world is watch out for females. We call them red
12 sparrows, so it's a female who is sent in to try and
13 target you and to get close to gain your confidence.
14 So I'm putting backstops to make sure there were no
15 incidents like that going on. So I've got a male who's
16 next to me. My other pattern of behavior is I don't
17 stay around a female longer than five seconds. Like, I
18 tap my foot, one, two, three, four, five and then I
19 move.
20        So, I'm down in the courtyard area talking to
21 a number of people. Said hello to David Clements
22 briefly. Also, one of my other friends was there, Pete
23 Santilli, who I had known since 2014. And at that
24 moment, what I found out later is that me talking to
25 Pete Santilli, Lindell's girlfriend saw me talking to

Page 96

1 him and complained to Lindell that I was speaking to a
2 reporter, even though I had been friends with Santilli
3 since 2014 and the Bundy Ranch incident.
4        So, I stayed -- I think it was about 2:30,
5 3 o'clock, I go up to my room. I bust out my laptop,
6 talk to my wife briefly via Signal, explain my concerns
7 and the things that we had been seeing going on; and my
8 wife's like, you need to get the heck out of there,
9 because I told her this is going to get messy. I said
10 let me look through the data, maybe there's something
11 hidden that, you know, maybe we haven't figured out.
12        So I start going through the hard drive, and
13 it was pretty much the exact same things that we had
14 already seen on the Element chat board with a few extras
15 added in. One thing that I found peculiar --
16        THE VIDEOGRAPHER:  We just lost them.
17        MR. KLOEWER:  Let's just go off the
18 record.
19        THE VIDEOGRAPHER:  Off the record, 12:37.
20        (Break from 12:37 p.m. to 12:38 p.m.)
21        THE VIDEOGRAPHER:  We're on the record.
22 The time is 12:38 p.m.
23    Q.  (BY MR. KLOEWER)  Okay. I think we'll rewind
24 a little bit there, because we lost the signal briefly.
25        So, Mr. Merritt, when we -- when it appeared

Page 97

25 (Pages 94 - 97)

1 that Mr. Malone dropped off the screen here, you were
2 explaining how on that Sunday night, you returned to
3 your hotel room with the new hard drive that Mr. Lindell
4 had provided you, which had additional information from
5 Mr. Hayes, and you were conducting your own analysis of
6 that information.
7     Tell us what you found when you were looking
8 into that data.
9     A.  So one of the things that I found and I voiced
10 concerns to the red team other members about was we
11 found folders of Edward Snowden documents in it, and we
12 had seen those in the very beginning.  So, to me, it was
13 one of those, okay, are you trying to validate the
14 information because Snowden said it?
15     Q.  There was information from Edward Snowden --
16     A.  Correct.
17     Q.  -- suggesting that --
18     A.  Some of his pubically leaked information
19 that included information on Hammer and Scorecard, so
20 I believe, to a certain degree, they were using that as
21 a way to validate it.
22     Q.  Was there any information about the election
23 results from Edward Snowden?
24     A.  No, just NSA leaks that Snowden was involved
25 in.  And I'm glad I still didn't have a clearance.  If

Page 98

1 anyone who looked at that information had a clearance,
2 they would immediately lose it because that's all TS/SCI
3 leaked information.
4     So I'm looking through, I see that, and then
5 we start seeing previous information from Mary Fanning.
6 I find the 6M spreadsheet, which is an Excel spreadsheet
7 that's got all of the data that you see on TV that
8 cascades down.  All of that data is in this Excel
9 spreadsheet, but this one is minus the MAC addresses.
10 There was a lot of information that was missing out of
11 it, but some of the other information that I find in
12 there becomes damning, and that's whenever I said okay,
13 and I called my attorney friend.  And I said, look, I
14 know the NDA said all of this, but I'm finding signs of
15 fraud and I'm finding signs of manipulation.
16     Q.  What were those signs of fraud?
17     A.  So the signs of fraud that I found, first off,
18 had to do with a packet capture from a device called an
19 IxVeriWave.  IxVeriWave is what -- it's a white noise
20 generator that you use whenever you're putting in WiFi
21 access points in a commercial building.  It's about a
22 $30,000 piece of equipment.  It just sends out blank
23 packets through your -- through your WiFi device.
24     Q.  What is the purpose of that?
25     A.  To be able to test the range of an access

Page 99

1 point within a building.  So if I put an access point in
2 the hallway, I'm going to check in each office to make
3 sure that office has maximized coverage.  But I found
4 packets that had IxVeriWave signatures in them, and then
5 I started finding --
6     Q.  How is that indicative of fraud?
7     A.  Because if you have a list of packets that are
8 supposed to be election communications, if it's supposed
9 to be from election offices or communications from Scytl
10 or Smartmatic or Dominion, any of those, there would be
11 no reason for there to be a white noise generator put
12 into it.
13     Now, one of the claims was that there was 35
14 terabytes of data that showed manipulation of the
15 election, and that was the lead-up to the symposium.
16 Now when we finally get the data, we get about 38 gig --
17 I believe it was 38 gig -- I believe it was 38 gig in
18 total data and all of these IxVeriWave packets.  So if
19 I'm tying numbers together, if I've only got 37 gig but
20 I needed to make it look 37 terabytes, I'm going to fill
21 it with white noise.
22     Q.  So that signature indicated to you that the
23 numbers were artificially inflated?
24     A.  Correct.  And then --
25     Q.  Were you able to tell who had done that

Page 100

1 manipulation?
2     A.  Yes.  Within the packet -- within all of the
3 grouping of packets that I found, there were other
4 packets that I found that had a point of origin that
5 came from CJH MacBook Pro, and that was a point of
6 contention later on.  I found packets from Lake County's
7 County Clerk's Office, from Clark County's County
8 Clerk's Office, and then from Mesa County's County Clerk
9 Office.
10     Q.  What did you understand CJH to mean?
11     A.  Conan James Hayes' MacBook Pro.  So I'm seeing
12 his laptop popping up with all these different locations
13 and different devices being used.  At that point that's
14 when I said, okay, I have a sign of fraud.
15     Q.  Okay.
16     THE VIDEOGRAPHER:  Hold on.
17     MR. KLOEWER:  Did we lose the signal
18 again?
19     THE VIDEOGRAPHER:  Yes.
20     MR. CAIN:  Same deal, we have to go off
21 the record.
22     THE VIDEOGRAPHER:  Off the record, 12:43.
23     (Break from 12:44 p.m. to 12:53 p.m.)
24     THE VIDEOGRAPHER:  We're on the record.
25 The time is 12:53.

Page 101

26 (Pages 98 - 101)

1  Q.  (BY MR. KLOEWER)  Okay.  Mr. Merritt, we had
2  some technical difficulties there, but we are back on
3  the record.
4      You were just explaining your review of the
5  hard drive that was provided to you by Conan -- or by
6  Mr. Lindell, which you stated that he told you that it
7  contained additional information from Conan Hayes, and
8  you were analyzing that information in your hotel room
9  and had just seen a signature CJH, which you understood
10 to be Conan James Hayes.
11     Have I stated that correctly?
12 A.  Yes, sir.
13 Q.  And you had mentioned before that, that you
14 had seen some signs of fraud in the information.  I
15 don't need you to repeat what you already said, but was
16 there anything else that gave you concern about the
17 information you had seen?
18 A.  Yes.  One of the other pieces that I saw was
19 in the Absolute Proof video, there is an infographic
20 that's a map that shows -- it's almost made to look like
21 a website called Norse IP Viking, where it's an image of
22 the United States and these little cursors coming in
23 looking like packets traveling into the United States.
24     So every one of those images were saved in a
25 Java file.  There's thousands of these still images.

Page 102

1  Q.  Is that information publicly available
2  typically?
3  A.  No.  Normally, you would have to be inside
4  some sort of a system, a government system for that kind
5  of information.
6  Q.  And this was on the hard drive that was
7  provided to you?
8  A.  Check.  Yes, sir.
9  Q.  So was it your understanding that Mr. Hayes
10 had put that information on that hard drive?
11 A.  That is what had been relayed --
12     MR. MALONE:  Objection.
13 A.  Everything that was on that hard drive,
14 Mr. Lindell relayed that that was put on there by
15 Mr. Hayes.
16 Q.  (BY MR. KLOEWER)  Okay.  And anything else
17 that gave you concern in the files that you were
18 reviewing?
19 A.  Up to -- up to that point, I was looking at
20 the PCAP information.  After I find that, I actually
21 placed a marker.  So if anyone ever tried to walk back,
22 they could find my exact moment whenever I said here's a
23 sign of fraud.
24     I turned on the shower full blast in the hotel
25 room at about 3:15 that morning, and it set off the

Page 104

1  So if you have a program, you could run it to look the
2  exact same way.  So it would be an artificially
3  generated packet visualizer.  That was another sign.
4      Then one of the other pieces that I started
5  seeing was we start seeing files of cataloging all the
6  email addresses of election workers across the country,
7  which I can write a program that -- if I have all of the
8  hundreds of thousands of email addresses, I can write a
9  program that extrapolates those email addresses down to
10 the IP of where the server is.  So if I have that,
11 that's how I can formulate where those clerk offices are
12 coming from.  So if I want to forge a packet, now I know
13 where my inbounds are because I have every election
14 worker's email address nationwide, or the county clerk.
15 So it's a spreadsheet with all the county clerks's email
16 addresses on it.  I even find a file in there called
17 IRS.txt which had IRS records of a lot of those
18 individuals as well, all of what we call their PII, or
19 their personal --
20 Q.  Of election workers?
21 A.  Correct.
22     So all of their personal identifiable
23 information was in on that folder as well, their home
24 addresses, Social Security numbers, all of that kind of
25 data.

Page 103

1  smoke detector.  So for about an hour, from about 3:15
2  to about 4 o'clock, the smoke detector comes off and the
3  firefighters came in.  I said, oh, sorry, I didn't know
4  my shower set off the smoke detector.  But I had to put
5  a marker.
6  Q.  And this was on the morning of Monday, August
7  10th, the first day of the symposium?
8  A.  Right.
9  Q.  And you did that to, as you just indicated, to
10 create a marker of when you discovered what you
11 understood to be signs of fraud?
12 A.  Correct.  And that's before I delved into the
13 next part, which was looking at the images -- well, we
14 hadn't gotten that yet.  I don't think we got that until
15 Monday night, the Mesa County stuff.
16 Q.  Well, we'll get to Monday in a bit.  I want
17 to rewind just a little bit, because we didn't -- I had
18 a couple more questions about when you were speaking
19 with Mr. Hayes about this information.
20     So you said he arrived Sunday night, you
21 spoke with him for about an hour and many people were
22 asking him questions.  When he left the room, did you
23 understand that he was coming back or was it clear that
24 he was leaving?
25 A.  No, it was clear that he was leaving.

Page 105

27 (Pages 102 - 105)

1    Q.   Okay.
2    A.   He didn't answer any questions.  Mr. Lindell's
3  like he needs to go to bed because he needs all of his
4  energy for tomorrow.
5    Q.   So is Mr. Lindell present for this
6  conversation with Mr. Hayes?
7    A.   No, not during the conversation.  Whenever
8  he wanted him to leave the room is when he showed up,
9  and roughly they only gave us about an hour of time to
10  question him.
11    Q.   Okay.  And after Mr. Hayes left the room, did
12  you discuss it with the other members of the red team,
13  what had just occurred?
14    A.   Yes.  We all looked -- we all looked around
15  and started talking, and that's when I said -- I started
16  specifying to everybody he's showing signs of deception,
17  he didn't know how to use his own software.  I was going
18  through all of those same, exact points.  And I'm, like,
19  this needs to be canceled or postponed, and a lot of us
20  came to the same conclusion, even at that point.
21    Q.   Who do you mean by a lot of us?
22    A.   The red team members, so --
23    Q.   Which members specifically?
24    A.   Mark Cook, I think, maybe once agreed.  He was
25  the least vocal person in the room.  We all voiced our

Page 106

1  concerns to Waldron because, you know, our complaints
2  moved up the chain.
3    So we would all complain to Waldron.  Waldron
4  would get visibly frustrated.  He would bring Kurt Olson
5  back in.  Kurt Olson almost looked like he didn't know
6  how to handle it.  He was, like, I'm not going to tell
7  that guy.  That's sort of how he looked as we would
8  explain things.  And then when Lindell would finally
9  come in, and about five, six times we told him look, you
10  need to cancel or postpone this, Lindell was verbally
11  angered, raising his voice, yelling.  You could tell he
12  wasn't having it, before and after our questioning of
13  Conan.  So that was when we all sort of went our own
14  ways and said, well, we'll see what happens tomorrow.
15    Q.   So you did speak with Lindell; Lindell did
16  come into the room with the red team after Conan left?
17    A.   For a moment whenever he pulled Conan.  So he
18  comes in, he says, okay, everybody, y'all got to talk to
19  Conan, it's time for him to go.
20    And we're all saying, well, we really didn't
21  get a chance to ask him or find out, we don't have a
22  resolution.
23    And he said -- and Mr. Lindell said, oh, well,
24  we'll tell you -- we'll deal with it tomorrow.
25    Q.   Okay.

Page 107

1    A.   We'll deal with it later.
2    Q.   But he understood that Conan had not put your
3  concerns to rest?
4    MR. MALONE:  Objection.
5    A.   Correct.  And we had specified many times that
6  we did not get the answers we were looking for.
7    Q.   (BY MR. KLOEWER)  Now this hard drive that you
8  had, were copies of that provided to every member of the
9  red team --
10    A.   No.
11    Q.   -- or just one?
12    A.   Just me.
13    Q.   Okay.
14    A.   And it was put in my hand, and I kept it in my
15  hand.  And then when it was in the hotel room, the first
16  day it was in a locked pocket in my suitcase, because I
17  have it there for my other hard drives.  So everything
18  was on lock and key.
19    And then I did my usual security procedures.
20  When I leave my room, I put a piece of paper in the door
21  when I close it to make sure no one's come in.  So when
22  I open it, if that paper falls to the floor, that tells
23  me no one's been in there.  My original plan was to
24  bring a camera, but I didn't have a chance to do that,
25  so I had to go with the best methods I had at the time.

Page 108

1    And then after we left the room, that night
2  was when -- what's his name?  I can't remember his name
3  right now.  Joel.  Joel Oltmann -- "Joe" Oltmann, that
4  was when he handed me a box with a white hard drive in
5  it, and I asked him what's this box?
6    And he said it's the Antrim forensic analysis.
7    And I said, well, what am I supposed to do
8  with it?
9    And he said, well, I know you've been asking
10  for it.
11    Because I had previously been asked for the
12  legitimate one, but it was under a lock by the judge in
13  Antrim.  It was never supposed to be public.
14    So Oltmann comes up, hands me the hard drive
15  in the box.  And that night I was so delved into dealing
16  with the black drive, but I didn't even touch that one
17  yet.
18    As the firefighters turn off the smoke
19  detector, I look at my computer for a little bit and
20  then I go to bed.  It was approximately about 4:30, 4:45
21  when I go to bed.  And that gets me to Monday.
22    Q.   Okay.  So I have a few follow-up questions on
23  that.  Let's see if we can get up to the symposium, and
24  then we can break for lunch here.
25    Do you know why you were given the hard drive

Page 109

28 (Pages 106 - 109)

1 from Conan Hayes and not anyone else?

2     MR. MALONE: Object to foundation.

3   A. I do not know. I just know Mr. Lindell handed

4 it to me and said here's the source data for y'all to go

5 through.

6   Q. (BY MR. KLOEWER) But if I understand

7 correctly, you were utilizing that hard drive when you

8 spoke with Mr. Hayes, right? Or did he walk you through

9 the contents of that hard drive?

10   A. The only thing we asked him about was the

11 slice.bin files and the subsequent programs for

12 decompiling the slice.bin file.

13   Q. Okay. And I know you mentioned that Mark Cook

14 seemed to share your concerns. Were there other members

15 of the red team like -- I know there were some folks who

16 weren't present physically. Like Ron Watkins, was he

17 partaking in these conversations at the time? Was he

18 livestreaming or anything?

19     MR. MALONE: Object to form.

20   A. Yes. Mark -- Mark set up his cell phone. So

21 whenever we were talking, going over information, Mark

22 Cook's cell phone in the Element chat, you'd see Ron

23 Watkins' face, and he was in the room listening with us.

24   Q. (BY MR. KLOEWER) And did Mr. Watkins express

25 concerns about this information as well?

Page 110

1   A. Yes. Going all the way back to the 5th in our

2 chat rooms, he had come to sort of the same conclusions

3 that the rest of us did, that the provided data from the

4 slice.bin file did not even show a coherent level of

5 packet captures enough to even reach a coherent

6 conclusion.

7   Q. And what about Shawn Smith?

8   A. I talked to Shawn a couple of times back and

9 forth. He voiced his concern in our chats, but you

10 could tell visibly in the red team room he was just sort

11 of in observation mode, which I'm guessing, considering

12 who he worked with before, that's what he did, so --

13   Q. What about Lisa Draza?

14   A. Lisa Draza was sort of a volunteer who showed

15 up, so she wasn't making -- she didn't want to say

16 anything. She was just looking at data and trying to be

17 as quiet of a person in the room as possible.

18   Q. Okay. So it sounds like primarily you and to

19 a lesser extent Mr. Cook were voicing these objections?

20   A. A few of us. And really it was mostly just

21 between all ourselves, and I guess I was the only sucker

22 who was willing to really speak up and say, hey, there's

23 some problems.

24   Q. Okay. And was Mr. Oltmann present in the room

25 at the time?

Page 111

1   A. No. Oltmann mostly stayed out in the

2 courtyard. Occasionally, he would pop his head in, but

3 he would -- there was very -- it was sort of controlled

4 as to who came into the red team room.

5   Q. Okay. And other than Mr. Oltmann handing off

6 the Antrim County hard drive to you, did you discuss

7 anything else with him?

8   A. No. I limited my conversations as much as I

9 possibly could with most people I didn't know.

10   Q. Okay. And you hadn't met Oltmann before that

11 time?

12   A. No, I never had. I had just heard about him

13 in reputation and that was it.

14   Q. What had you heard about Mr. Oltmann?

15   A. I had just heard about the drama he was having

16 with Eric Coomer, about the video meeting that he had

17 where he listened to Eric Coomer supposedly with a group

18 of Antifa members.

19   Q. And did you -- this is more a general question

20 which we'll get into more specifically later, but did

21 you know if there was going to be a schedule of

22 appearances for the Cyber Symposium the next couple

23 days? Like was there a calendar or a --

24   A. There was a claim --

25     MR. MALONE: Object to form.

Page 112

1   A. There was a claim that there was an

2 organization methodology to this, but there really

3 wasn't. I mean, it was sort of an okay, let's go do

4 this, let's go do that, let's put these people up here.

5 That's the way it sort of came off to, I think, most of

6 us. I actually -- because there's the cyber expert

7 room, which was in the back, you had the front entrance,

8 and then you had the main coliseum room with a display

9 room where they had set up like how to show SQL

10 databases could get hacked and some other print machines

11 and scan machines.

12     For the most part, I was trying to centralize

13 myself in the room so I could stay quiet and not have

14 anyone ask me questions, but I would start walking out.

15 As the symposium was going, I would walk out around the

16 crowd. I was wearing a hoodie at the time, and on the

17 back of my hoodie, it had a skull and cross bones. And

18 I was wearing my yellow shooting sunglasses -- or my

19 shooting lenses, because I have mild dyslexia. So I

20 have to wear colored lenses to help me with black and

21 white contrast.

22     So I was wearing my yellow glasses as I walked

23 around everywhere. I would talk to -- you know, I would

24 talk to a few people I knew. I remember I stopped

25 specifically, and I talked to Brian Cates, because Brian

Page 113

29 (Pages 110 - 113)

1 Cates had been attacking me all through the media. And
2 I said if you have any problems with me, talk to me in
3 person. He's deaf, so I angled myself in front of him
4 so I could be able to express myself. Because I had
5 seen on Telegram he works with The Epoch Times and some
6 of these other groups, so I told him specifically if you
7 have any problems with me, call me and I will clear the
8 air, because he was making a lot of really crummy claims
9 about me, even leading up to the symposium. So I
10 stopped and I talked to him.
11      I met a couple of guys that I had talked in
12 person before. I met Dr. Frank. I really just sort of
13 was trying to get a feel for the room, who all was
14 there, what all was going on, but trying never to stay
15 in one place for very long.
16    Q. (BY MR. KLOEWER) Okay.
17         MR. KLOEWER: Well, I think -- are we
18 ready to break for lunch?
19         THE WITNESS: Yes, sir.
20         MR. KLOEWER: Want to take break here.
21 Does that work for you, Ryan?
22         MR. MALONE: It does.
23         MR. KLOEWER: I think we break for, say,
24 45 minutes. Well, it's 10 after 1 o'clock, or is it? I
25 haven't even changed my watch since I got to Texas. It

Page 114

1 is.
2         THE VIDEOGRAPHER: Go off the record?
3         MR. KLOEWER: Yeah, we'll go off the
4 record, sorry.
5         THE VIDEOGRAPHER: Off the record 1:10.
6         (Break from 1:10 p.m. to 2:03 p.m.)
7         THE VIDEOGRAPHER: We're on the record.
8 The time is 2:03.
9    Q. (BY MR. KLOEWER) All right. Mr. Merritt,
10 when we left off before lunch, we were discussing -- I
11 think we got right up until the night of I guess it
12 would be Sunday, August 9th, and we were discussing how
13 you were reviewing the hard drive that had been provided
14 to you.
15      So this was right on the -- this was the night
16 before the Cyber Symposium started in South Dakota, so I
17 want to discuss the Cyber Symposium itself a bit. Now
18 you said you were up pretty late that Sunday night,
19 until 3:30 or 4:00 o'clock at least. When the symposium
20 started on Monday, was it your understanding that
21 Mr. Lindell still intended to present the PCAP
22 information?
23    A. Yes. After all --
24         MR. MALONE: Object to form, foundation.
25    A. After all of us voiced our objections, the

Page 115

1 symposium was still moving forward.
2    Q. (BY MR. KLOEWER) Did you say anything to him
3 that morning before he went on stage to present that
4 information?
5    A. No. I stayed out of it. I was trying to stay
6 out of everybody's way and not be seen, so I didn't
7 confront or talk to hardly anybody.
8    Q. And what were you doing that first day of the
9 symposium?
10    A. The first day they were setting up the
11 demonstration room that was in the main area, and they
12 had all the computers and the printers in there, and
13 they were trying to show how easy it was to get into the
14 SQL databases. So I sort of, for the most part, tried
15 staying to that room.
16    Q. What is an SQL database?
17    A. That is a -- it's --
18         MR. CAIN: Your collar --
19         THE WITNESS: My apologies.
20         MR. KLOEWER: Your jacket collar is up, I
21 think. Yeah, there you go.
22         MR. CAIN: I do it all the time.
23    A. SQL is a language for databases, query
24 language. I can't remember the first part, sequential
25 query language. It's how you build databases, and most

Page 116

1 election systems use SQL for storage of election
2 rosters.
3    Q. (BY MR. KLOEWER) So when you said they were
4 trying to show how easy it is, what do you mean by that?
5 Were there stations set up with computers to show --
6    A. Yes. There was a room where there were two
7 tables, and Shawn Smith, Lisa Draza, Mark Cook and
8 myself all sort of stayed in that room and were setting
9 up the equipment and getting ready to be able to show
10 the vulnerabilities within the SQL systems that existed.
11    Q. And that was just a presentation that you were
12 going to be putting on?
13    A. Yes, for people to be able to walk around and
14 walk into and see.
15    Q. So it wasn't interactive for the public to be
16 able to attempt these things; they were just watching
17 you do it?
18    A. Yes and no. I do know there was one gentleman
19 who used his cell phone to penetrate into the system and
20 actually did get in and change the database, unbeknownst
21 to even all the people in that room. So it was just
22 sort of open, so some people could be able to find it.
23 You know, we had a building full of about 60, 70
24 different cyber experts. So there were things coming in
25 all directions.

Page 117

30 (Pages 114 - 117)

Page 118

1 Q. Before, you said that the presentations
2 weren't really planned. Was this one planned? Did you
3 prepare to put this on for folks?
4 A. Yes. The red team, we had very specific
5 things that we were working on doing presentations on.
6 In -- in my discussions with Colonel Waldron, there was
7 even a discussion of they were going to be setting up
8 expert panels for us to go up and discuss research that
9 we've done, some of the vulnerabilities that existed,
10 and I think Waldron had sort of asked permission of
11 everyone involved if they would be willing to be on the
12 panels, of which I agreed to.
13 Q. Was there a list of what those panel topics
14 would be, for example?
15 A. If there was, I had never seen it. I was not
16 aware.
17 Q. So when they -- so tell me how this SQL
18 presentation came to be. Did you just speak with Lisa
19 Draza and someone else and say, well, why don't we do
20 this? Or how did this happen?
21 A. No, I believe it was -- it was preplanned
22 before the symposium that that was one of the items for
23 presentation. We -- all the equipment was already
24 staged in there, so it was in the red team room. So
25 that morning whenever we go over to the building, we had

Page 119

1 some of the little trolleys to move those printers and
2 some of the other systems over to the building that
3 everything was in.
4 Q. Okay. So this was in -- this was a room
5 separate from the main room where people could come to
6 see something other than what was going on in the main
7 stage?
8 A. Correct. When you walked in, it was
9 immediately to the right but in front, or right behind
10 where there was a whole little food court that everyone
11 was getting -- able to get lunch later. So it was
12 between the food court and the front entrance.
13 Q. Okay. So were you in there all day long?
14 A. No. I walked around. I would go into that
15 room, probably spend 10 to 15 minutes in there. That
16 was sort of where I was hiding, per se, and then I
17 would walk throughout the building to just sort of get
18 an idea of what all was going on, talk to a few people
19 occasionally. Like I said, Pete Santilli, Brian Cates,
20 a few others that I would stop and have a conversation
21 with, and then that was the room I would always end up
22 going back to.
23 Q. What else was going on that day?
24 A. So the cyber experts were given a portal to
25 analyze information. I believe about the first hour

Page 120

1 they were looking over data that was being put on a WiFi
2 access point that Conan was upstairs putting information
3 into for them to look at.
4 Q. So Conan was still present at the time?
5 A. Yes, but we didn't -- during the symposium, we
6 didn't see him. He was up in one of the rooms upstairs.
7 Q. And tell me a little bit about the people who
8 attended the symposium. I know you mentioned -- there
9 was at least one expert you mentioned, Harri Hursti.
10 Who else was there?
11 A. Robert Graham, who invented a software called
12 BlackICE, a couple of other pen testing softwares. The
13 room was full of cyber people. One of the -- there was
14 an Army major who was there who worked for Cybercom.
15 There were -- there was one reporter that was in the
16 room, female type, she was in the back left corner.
17 There was -- there was two rooms. The first
18 room was the larger room, and that's where Harri Hursti
19 and Robert Graham and all of them were. There was a
20 smaller room that had approximately 12 to 15 individuals
21 in it. Most of those guys were retired military. There
22 was a couple of experts from companies like Oracle,
23 Amazon, Microsoft. So this was a room with probably
24 $150,000 to $200,000 an hour run rate worth of experts.
25 Q. Were all those people invited?

Page 121

1 A. Yes. Lindell had put out an invitation, even
2 provided them with hotel rooms when they came.
3 Q. Was the event open to the public?
4 A. Yes, there were -- there was quite a
5 substantial on the first day, a heavy amount of public
6 individuals that were there.
7 Q. So what was the process for these -- we
8 discussed before there was the $5 million reward that
9 was offered. Were these people when they arrived
10 provided with this -- the same information that you had
11 been, the PCAPs?
12 A. No, they were given select information that
13 was coming through the wireless access point. And if I
14 remember correctly, they reported there were five files
15 that they were given, and they looked over the files,
16 and I believe I was told by them that in under an hour
17 they realized there was problems with the data.
18 Q. And was that data -- I know you said it wasn't
19 all of the same data that you had, but was it some of
20 the same data?
21 A. Yeah, it was data that we had looked over, but
22 it wasn't the full drive of information.
23 Q. Who decided what to provide them?
24 A. I believe that was Conan who was doing that.
25 He was the one who was at the helm of setting the

31 (Pages 118 - 121)

1 information on the drive.
2   Q.  So he was selecting information that -- from
3 the larger dataset that you had that would be provided
4 to these experts to --
5   A.  That's correct.
6     MR. MALONE:  Objection, foundation.
7   Q.  (BY MR. KLOEWER)  What was the response to the
8 information that was provided to the experts?
9   A.  About an hour into the symposium, Colonel
10 Waldron and Kurt Olson pulled me aside and asked me to
11 go talk to the people in the cyber expert room.
12     So I went into the cyber expert room not
13 knowing what was going on.  I walked in and the first
14 person who talked to me was Harri Hursti, and Harri
15 immediately started complaining.  He said I don't know
16 what this data is, but this is nowhere near what was
17 claimed it should be.
18     And as we call it in the military, I sort of
19 had my moment of truth moment at that moment.  I don't
20 know why Waldron and Olson sent me in, but when I'm
21 being confronted by a bunch of guys who -- right, left,
22 I didn't care what their political ideas were, but they
23 knew tech.  I was going to be respectful because it's
24 the field we all worked in.  And considering I hold
25 certs that, if I have an integrity issue, I could lose

Page 122

1 and that's, you know, how I feed my kids, I couldn't
2 lie.
3     So I looked at all of them and I say, look, I
4 came to the same conclusion you guys did and so did the
5 whole red team, that this data is not good, that it's
6 BS, and I said we're trying to work through and deal
7 with all of this.  And I started saying, what questions
8 did y'all have?  How can we work through this?
9     And I started talking to them.  I can't answer
10 a lot of their questions.  So my brain tells me don't
11 let them be limited with data, So I went and I grabbed
12 the drives.  I grabbed both drives.  They were in my
13 computer bag, which was in the presentation room for the
14 database vulnerability.  So I grabbed the black drive
15 and the white drive.  I walked both drives into the
16 cyber expert room, and I handed them to Harri Hursti,
17 and I said y'all can look through these.
18     Now the first day, it was just the Antrim
19 information and the supposed PCAP information.
20   Q.  So these -- that was my next question.  Just
21 to confirm, that black drive is the one you had looked
22 at the night before and had concerns about the potential
23 fraud, and the white one is what Joe Oltmann handed you
24 with the Antrim County data?
25   A.  Correct.

Page 123

1   Q.  Was there anything else on either of those
2 drives?
3   A.  At that point, no, there wasn't.
4   Q.  Okay.
5   A.  I add data, but it's later.
6   Q.  So you brought these to them.
7     Well, just do rewind a little bit, what sorts
8 of questions were they asking that you couldn't answer?
9   A.  They were asking chain of custody on the data.
10     They were asking why they were told that there
11 would be all of this packet capture showing China hacked
12 the elections, but these don't even look like legitimate
13 packet captures.
14     They were asking how the information was being
15 extracted.
16     So it was the same questions that all of us
17 were asking Conan whenever we had our chances to ask
18 him.
19   Q.  You said before that the night before you were
20 speaking with Phil Waldron about your concerns about
21 this data.  Do you know why he would have sent you into
22 the room to speak with them?
23   A.  No, I don't.
24     MR. MALONE:  Objection, foundation.
25     (Reporter clarification.)

Page 124

1   A.  I did have my personal thought process and
2 feeling on it, but they never specified why they put me
3 in there.
4   Q.  (BY MR. KLOEWER)  What was your feeling about
5 it?
6   A.  Later, after everything happened, I had a
7 feeling that I was sent in there because I was the one
8 person who objected and that when things would start
9 having problems, that they could point the finger at me.
10   Q.  And did these -- okay.  Let's talk about the
11 drives that you brought in, the black and the white one.
12 What was the response to those drives?
13   A.  So in discussions with Robert Graham, who was
14 one of the other experts that was there, he was actually
15 posting his findings immediately on GitHub.  He was
16 also discussing it on Twitter.  And he very quickly, I
17 would say in under an hour or two of going through the
18 information, said that him and everyone in those rooms
19 came to the same conclusion that we had.
20   Q.  And was that timeframe, that one to two hours,
21 was that about the same amount of time it took you to
22 have concerns about this information when you first saw
23 it?
24   A.  Yes.  As soon as we finally got to see PCAPs
25 once the slice.bin file got opened, everyone was sort of

Page 125

32 (Pages 122 - 125)

1 coming to that realization fairly quickly.
2   Q.   Do you recall about what time of day this
3 would have been?
4   A.   So this is about an hour into the symposium.
5 So I would say it was around 10, maybe 11 o'clock a.m.
6   Q.   So did the plan -- and I know you already
7 have said there wasn't really a set schedule for
8 presentations, but how did this realization affect what
9 was being presented on stage?
10          MR. MALONE:  Object to foundation.
11   A.   As far as stuff on stage, I didn't know
12 exactly at that point what was going on with anything.
13 All I was dealing with at the time was the cyber experts
14 and trying to keep them from leaving the building.
15   Q.   (BY MR. KLOEWER)  And those two drives you
16 provided, just circling back real quick, did Lindell's
17 team or did anybody authorize you to give those drives
18 to the experts to take a look at that information?
19   A.   No, they didn't.
20   Q.   And -- okay.  So -- so the programming on
21 stage -- let me go back.
22          Did Lindell continue presenting this PCAP
23 information as authentic at that point when the
24 complaints started to come back?
25          MR. MALONE:  Object to form.

Page 126

1   A.   I don't believe at that point they had really
2 heard anything coming out of the cyber expert room.  It
3 may have been an hour or so after I talked to them that
4 they started hearing them saying -- saying anything.
5          I didn't hear anything until the next day any
6 issues about what they were finding, which I was trying
7 to explain to them, look, you know, at the time we were
8 being told there was some other incoming information.
9 So what I was trying to do was, as I said in The
10 Washington Times, I was trying to polish a turd.
11          So I was trying to keep them all present, get
12 them -- because I knew if I went in and BS'd those guys,
13 they would have picked up on it immediately, so I went
14 in and I told the truth.  And I said, look, we came to
15 the same conclusion, but there's some other information
16 that's coming, so just hold off.
17   Q.   (BY MR. KLOEWER)  And when you said that, were
18 you referring to the black and the white drive?
19   A.   No.
20   Q.   Or did you understand there was additional
21 information?
22   A.   We were already being told that there was
23 going to be forensic EnCase images of the Dominion
24 machine from Mesa County, Arizona.
25   Q.   Was that the first time you heard about this

Page 127

1 information?
2   A.   We heard about it Sunday night and, yes, that
3 was the first time I had heard of it.  I believe Code
4 Monkey knew about it, because he had some videos.  What
5 I had thought had happened was they had just captured
6 video of this trusted build that had taken place in May
7 of 2021.  I didn't -- up until Sunday, I didn't know
8 anything about there being a EnCase image of the
9 Dominion machine.  Then they told us about it, and
10 that's when my brain said the most we could be able to
11 do to salvage things is going to be to lift off of the
12 PCAPs, which we could all blatantly tell didn't live up
13 to the claim.  But the Mesa County information very well
14 possibly could have lived up to a claim of fraud, and so
15 my attempt was to keep everything on hold until that was
16 going to be -- until I had my hands on it to be able to
17 show it.
18   Q.   Do you know why that information wasn't
19 provided to you at the same time as the black hard drive
20 the night before?
21          MR. MALONE:  Object to foundation.
22   A.   No, I do not.  I was not specified as to why
23 it was compartmentalized.
24   Q.   (BY MR. KLOEWER)  And you mentioned that Conan
25 Hayes arrived with Tina Peters.  Is that correct?

Page 128

1   A.   Yes.  That's what we were told by Mr. Lindell
2 in the red team room.
3   Q.   Did you know who Tina Peters was at that time?
4   A.   Not a clue.
5   Q.   And you didn't speak with her that night when
6 she arrived?
7   A.   No, I did not.
8   Q.   When did -- when did you realize who Tina
9 Peters was?
10   A.   Well, after they explained, and then I went --
11 after Sunday night, whenever I was doing my research, I
12 pulled up as much as I could find open source on her.  I
13 used Maltego to look her up.  I pulled up -- she had
14 about four email addresses that had been in previous
15 breach releases, so I was looking to see if any of her
16 breaches were tied to her work at the -- as a clerk to
17 see if anyone had possibly tried getting into any of her
18 work computers, because I try and look for any possible
19 order of effects or other claims someone could make.
20   Q.   And so if I understand correctly, she road on
21 the plane with Conan Hayes?  They both flew directly
22 from Mesa County.  Did you know that or --
23   A.   No, that's what Mr. Lindell specified.
24   Q.   Was it the same plane that you flew out on?
25          MR. MALONE:  Object to speculation.

Page 129

33 (Pages 126 - 129)

1   A.   I believe so, at least by tracking, because I
2   tracked it on flight -- flight tracking software, and
3   that's how I was able to back check that that's what
4   happened.
5   Q.   (BY MR. KLOEWER)   So the plane dropped you
6   off, turned around, and went straight back to Colorado?
7   A.   On that Sunday, that plane was heavily used.
8   It was being flown all over the country picking up
9   people nationwide.
10   Q.   Do you know if Joe Oltmann rode in on that
11   same plane?
12   A.   I'm not aware.
13   Q.   But he didn't -- did he arrive at the same
14   time as Conan and Tina Peters?
15   A.   I saw him that day that they supposedly
16   arrived.   So it's a possibility, but I don't know.
17   Q.   And when did you first see the Mesa County
18   information?
19   A.   I didn't see it until that -- until the next
20   morning or that evening.   After we were done at the
21   symposium, we all went back and we were given a copy of
22   the EnCase files.   I took the drive, put it in -- I have
23   a connector into my laptop that is a read-only USB
24   connector, so I wouldn't leave any forensic trails on
25   the drive that it was on.   I connected it to my

Page 130

1   computer.   My computer, my laptop has four M.2 drives,
2   which are -- they're like USB cards.   So I copied all
3   of them, put them in a secure drive that's
4   compartmentalized from the rest of my system, and then I
5   locked that drive to be able to keep it hidden.
6   I had a discussion with Ron Watkins.   Ron
7   Watkins had asked me to put the EnCase files onto a
8   BitTorrent file, which I wouldn't do.
9   Q.   Okay.   Let's pause there.   EnCase files, what
10   do you mean by that?
11   A.   EnCase files -- EnCase is a program used --
12   and it's recognized for courts and other systems for
13   doing forensic analysis on systems.   So it's to take an
14   image of an entire computer system and save it at that
15   moment in time so it could be examined later.
16   Q.   And when you say you spoke to Ron Watkins, did
17   you call him on the phone?   Was this text message?
18   A.   No, we talked on the -- the chat app, that
19   Element chat app that we had been going through.
20   Q.   And this request to put everything on
21   BitTorrent, was that visible to everyone or just to you?
22   A.   Just to me.   The only thing that I did was I
23   actually put it into an Ethereum trace.   So I made an
24   Ethereum post and posted about it, but I left it at
25   that.   So I had initially put it up under dummy

Page 131

1   BitTorrent addresses.
2   Q.   Okay.   I'm going to need to unpack a little
3   bit of that.   What is an Ethereum post?
4   A.   On Ethereum, you can post messages if you --
5   Q.   Are you talking about the cryptocurrency --
6   A.   Yes.
7   Q.   -- Ethereum?
8   A.   Yes.
9   Q.   Okay.   So you could post a message --
10   A.   On the blockchain.
11   Q.   -- on the blockchain that was publicly visible
12   or just --
13   A.   Yes.
14   Q.   Okay.   Okay.   So you posted something about
15   this hard drive onto the Ethereum blockchain?
16   A.   About the EnCase files, yes.
17   Q.   What did you post there?
18   A.   I just posted two links to a BitTorrent link
19   that had not been set up yet.
20   And, again, I was making a marker.
21   Q.   Did you alert Mr. Watkins that you had placed
22   those links there?
23   A.   Yes.   I sent him the link.   I sent him the
24   blockchain number, the address of that transaction so he
25   could see it.

Page 132

1   Q.   Would you need that address in order to access
2   that information?
3   A.   To see it, yes, or I believe you can actually
4   search for it.   I'd have to double-check, but I do
5   believe it's searchable on the blockchain for Ethereum.
6   Q.   But if somebody was just -- and forgive my
7   ignorance here.   If I was just clicking around that
8   afternoon, would I have come across it publicly?   Was it
9   out in the open for people to find?
10   A.   There was some posts on Twitter that day, that
11   someone had posted on Twitter about that posting because
12   it came up in my -- my robot.
13   Q.   And why did you put that information where you
14   did in that format?
15   A.   Because I knew it was something that would be
16   public, but only public for tech people and not average
17   Joe.
18   Q.   So you wanted the public to get a look at this
19   information?
20   A.   At least that that was starting to get moved
21   into those directions, yes.
22   Q.   And Mr. Watkins asked you to make a BitTorrent
23   file out of that information.   Is that what you said?
24   A.   Correct.
25   Q.   And correct me if I'm using the wrong language

Page 133

34 (Pages 130 - 133)

1 here. Why did you object to that request?
2     A. Because all election software is under the
3 purview of the Office of Director of National
4 Intelligence. I know this because of my briefing I gave
5 to Congressman Ratcliffe. So if any election software
6 is obtained through illicit manners or posted publicly,
7 then that puts it under the purview of ODNI and that
8 puts it under the control of a national security
9 problem.
10     So that's why, as I started having to deal
11 with the Mesa County issue, I had to go through
12 extremely careful steps, because I knew how high up this
13 would go through that chain.
14     Q. And that manner of posting information
15 implicated those concerns in a way that the Ethereum
16 post did not?
17     A. Correct.
18     Q. Okay. Do you know why Mr. Watkins would
19 contact you directly as opposed to posting that in the
20 group thread?
21     MR. MALONE: Object to foundation.
22     A. I do not know. Again, my personal speculation
23 was I have a feeling after all of my objections was they
24 realized I was going to be the person who would object
25 to a lot of the stuff that was going on.

Page 134

1     Q. (BY MR. KLOEWER) And did you discuss the Mesa
2 County information with Mr. Watkins any further beyond
3 this post?
4     A. We had talked about a lot of the evidence that
5 we had seen, the video evidence. I mainly discussed
6 with him about the iDRAC vulnerabilities that I saw on
7 the Optiplex server.
8     I also discussed the use of standard
9 passwords, because the one video that didn't go public
10 at the time, because I think his lawyer told him not to,
11 was the video that had all of the passwords within the
12 system.
13     Q. Whose lawyer? Watkins?
14     A. Ron Watkins, his lawyer was Ty Clevenger. So
15 we were talking about the problems with the passwords
16 because I had collected all of Dominion's user manuals
17 and was finding the same default passwords that were
18 written in the manuals still being used in play in Mesa
19 County.
20     Q. Do you know where Mr. Watkins was at the time?
21 I know he wasn't physically present there, but do you
22 know where he physically was present?
23     A. He claimed to me at the time that he was in
24 Japan.
25     Q. In Japan.

Page 135

1     Okay. So it sounds like, and correct me if
2 I'm wrong, the focus on day two shifted from PCAPs to
3 the Mesa County information?
4     A. Correct.
5     Q. Were there discussions about shifting that
6 focus amongst the red team?
7     A. I sort of alluded to it. I had already sort
8 of formulated the plan in my head, especially after what
9 I had dealt with in the red team room and all the people
10 who were close to walking out. So -- and later on
11 Wednesday, whenever The Washington Times reporter was
12 near me and Kirk Wiebe, that was where my statement of
13 "I was trying to polish a turd into a diamond" came
14 from.
15     Q. Do you know if there was an intention to
16 present the Mesa County information at the symposium, I
17 don't know, before concerns about the PCAPs arose?
18     MR. MALONE: Object to form, foundation.
19     A. That's absolutely what it looked like, just
20 because of the fact they had Tina Peters and Conan
21 staged and ready to bring them in. Those pieces were
22 all sort of being formulated, and I think that was being
23 done while the symposium was being popularized, put out
24 into the media.
25     Q. (BY MR. KLOEWER) Did you ever speak with Tina

Page 136

1 Peters throughout this timeframe?
2     A. Three times. The first time I spoke to her
3 was on the Wednesday morning whenever I had given a copy
4 of the EnCase files to the people in the cyber expert
5 room, namely -- again, I gave it to Harri Hursti.
6     And I will say, a lot of people had issues
7 with Harri. Harri is known for being a lefty. I had a
8 few beers with Harri in the bar, which got me in trouble
9 apparently with Lindell and a number of other people.
10 However, he's a Finnish combat -- or Finnish military
11 veteran. So my Army brain said don't be an a-hole and
12 sit down and actually have a conversation to get to know
13 him. And he gave me some good pieces of information, a
14 lot of things people didn't know about, the Albert
15 sensors, the Einstein SIEM that DHS uses to monitor the
16 election systems. So I -- he's a 20-year expert in
17 election systems, so it would be foolish for me not to
18 have the chance to discuss things like that with him.
19 So I gave him that respect.
20     I also gave Robert Graham that respect,
21 especially because I remember using BlackICE when I was
22 in my 20s getting started. So I treated everyone like I
23 was -- to me, like I was supposed to. I treated
24 everyone as a professional.
25     I walked into the room. I talked to Harri

Page 137

35 (Pages 134 - 137)

1 Hursti and I say, hey, we've got in EnCase files that
2 come from Mesa County.  Supposedly, it's a before and
3 after imaging of what they called the trusted build.
4 This may have something to it.  Who knows?  But if y'all
5 want to look through it, it's here for y'all.
6     Q.   Had you reviewed that information yourself at
7 that point?
8     A.   Yes, I did.  I had looked at it the night
9 prior to handing it to the cyber experts.  When I looked
10 at it, I found sort of the same beginning concerns.  I
11 was finding different UUID numbers, which is unique
12 identification number for computer systems.  So the
13 computer system from the first image had a different
14 UUID number than the second image.  I was finding
15 drivers for the computer from the before image that
16 weren't on the second image, that it looked like two
17 separate computer systems all together.
18     Q.   And the same question I asked you before about
19 the black and white ones.  Did Lindell -- did the
20 Lindell team, did anybody authorize you to provide that
21 information to Harri Hursti or the group or was that --
22     A.   No, I did that on my own.
23     Q.   Okay.
24     A.   I felt with the amount of people that were
25 there and what people were doing, the least I could do

Page 138

1     Q.   Why?
2     A.   Because of the implications to ODNI, because
3 of the implications in national security, and because
4 that is a situation that -- since it's considered black
5 box software, when that's being presented publicly, now
6 we're giving a recorded piece of evidence to the
7 Iranians that we knew were trying to get in the system,
8 the Russians who just last week admitted have been
9 getting into the election systems, the Chinese, and
10 every other foreign intel service who wants access.
11     Q.   Did you know at that point that the Mesa
12 County clerk's office had been -- I don't know if
13 "raided" is the right word, but there was a search of
14 the offices taking place?
15     A.   Gerald Wood was one of the cyber experts in
16 the room.  So when we began to present the information
17 to the cyber experts, as soon as the Mesa County thing
18 came up, not even an hour later, Gerald Wood in the
19 middle of the cyber expert room says my house just got
20 raided.  Yeah, we knew that his house got raided.
21     Q.   And that was your first indication that this
22 had occurred?
23     A.   Correct.
24     Q.   Did you know who Gerald Wood was beforehand?
25     A.   Not a clue.  I didn't even know he was tied to

Page 140

1 was at least try and work with them, and that's what I
2 felt to a certain degree Waldron and Olson had sent me
3 in there to do, was to make sure we kept them there to
4 work through this situation.
5     Q.   So with the new -- so circling back to my
6 prior question, was there ever any stated intention to
7 shift focus to the Mesa stuff or to leave the PCAPs
8 behind, I guess?
9          MR. MALONE:  Object to form.
10     A.   That -- that didn't start coming up until
11 there was the presentation that we had on the main
12 stage.
13     Q.   (BY MR. KLOEWER)  Which presentation are you
14 referring to?
15     A.   There was a presentation that Mark Cook,
16 myself and Ron Watkins gave of the Mesa County images.
17 I was first doing it through Teams.  I was using my
18 laptop to connect through, but I was having some
19 problems with it down on the stage first, and then my
20 brain told me I should probably find the quickest route
21 to get up to the backroom, because once I started
22 realizing they were going to show everybody the Dominion
23 software, that it wasn't going to look good.  For lack
24 of a better term, the birdie on my shoulder said get the
25 heck off of the stage.

Page 139

1 Mesa County.  In the room, he -- you know, day one, he
2 very politely came up and talked to me.  We were talking
3 about the packet captures.  He didn't even allude to any
4 dealings in Colorado.  So I didn't realize those back
5 ties until he himself said his house just got raided.
6     Q.   Did he travel out with Conan and Tina Peters?
7     A.   I don't know.
8     Q.   We started talking a minute ago about the
9 conversations you had with Ms. Peters and then shifted
10 off a little bit.  Can we circle back there?  When did
11 you first speak with Tina?
12     A.   So the first conversation I had with Tina, she
13 had come into the red team room a little while after she
14 had gotten there.  She just sort of said hello to
15 everyone.  We really didn't know everything about Mesa
16 County at that point.  All we knew is Tina Peters was
17 coming in with Conan.  So I met her.
18          Then after I handed the forensic EnCase files
19 to the cyber experts, about 40 minutes later I come
20 walking back in, and Harri Hursti starts asking me
21 questions, and he says this looks like it's two separate
22 computers, it's not the same computer.  And I said let
23 me go find out.
24          So I go walking upstairs.  In the main area,
25 I go up the stairs and there's a green room, and Tina

Page 141

1 Peters and Sherronna Bishop and her little entourage are
2 all up there.  And I walked up to Tina, and I said I
3 have a question for you.
4        She said what?
5        I said when you have these systems imaged, is
6 it the same computer, or did they just pull out the
7 server and replace it with a new one?
8        She said, no, it was the same system, they
9 just put a disk in and reformatted the system with that
10 disk.
11       And I said so you were present when this took
12 place?
13       She said yes.
14       And then I said what happened to the drives
15 afterwards, because I was seeing these weird UUID
16 numbers.  And on the second EnCase image -- you know,
17 both images I could see the computer that took the
18 image, which those both come up CJH MacBook Pro.  But
19 the second one we could see that there was an internet
20 connection, and that internet connection for the second
21 EnCase image was coming out of Florida.
22       And so I asked her specifically how did they
23 do the second image on those systems in Mesa County, and
24 then she tells me she took those drives and mailed them
25 to Conan the day after they do the imaging, they do the

Page 142

1 trusted build.  So she mailed it to Conan.  And I said
2 are they still in his possession or are they back here?
3 And she said, no, they're still in his possession.
4     Q.  She mailed them to Conan where?
5     A.  To wherever his residence is in Florida.
6     Q.  In Florida.
7        Okay.  Did he -- and he still was in
8 possession of those at the time?
9     A.  I was under the understanding of that, yes.
10    Q.  All right.  So that was your first
11 conversation with Tina?
12    A.  That was my second.
13    Q.  The second.
14    A.  The first was at the red team room.
15    Q.  Right.  And what was the third conversation?
16    A.  The third conversation was that Wednesday
17 night.  We were in the red team room after everything
18 had gone on, and I was talking to Tina Peters about why
19 I was happy about getting the job and 30 grand.  I was
20 like, this would be nice to get stuff situated.
21       And she goes, oh, don't worry about it.  If
22 you're working with Lindell, he'll pay off your house
23 for you.
24       I go, excuse me?
25       She said, yeah, he'll pay off all your stuff

Page 143

1 for you.
2        I said, I don't work that way, ma'am.
3        And that was sort of when I had to pause and
4 take a look back at sort of some of the things that
5 were going on.  I remember it because I had my back
6 against -- when you walked in the door, to the back
7 right-hand side, I was sitting on the floor with my back
8 to the wall.  Tina Peters was sitting on the floor next
9 to me, and Lisa Draza was sitting on the other side of
10 Tina Peters, and we were all just sort of in a team
11 meeting, all talking.  And that was one of the things
12 they said, and that was sort of one of the first moments
13 that set me back with everything that was going on.
14    Q.  What do you mean it set you back?
15    A.  It was odd.  Because as a forensic examiner,
16 whenever I examined things, you're always supposed to
17 check what your motivation in something is to make sure
18 someone can't skew it.
19       So if I'm pulling -- for example, whenever I
20 was hunting ISIS, whenever I'm hunting and going after a
21 terrorist, one wants to make sure they're doing it for
22 an honorable reason.  Just like if I'm a cyber expert
23 working for an attorney, I have to make sure I don't
24 have any conflicts of interest that other attorneys can
25 say, oh, well, his information is invalid.  So I'm

Page 144

1 always having to check myself as I do things to make
2 sure motivations are in check.  When I hear someone say
3 something like that, especially in a -- especially an
4 elected official, it raises a huge flag.
5     Q.  Did Peters give any further context to that
6 comment?
7     A.  No, because I sort of stood up and walked
8 away.  After that conversation got to that level, I
9 said, no, I'm not continuing it.
10    Q.  So you hadn't heard anything else, any other
11 specific statements about compensation she had received,
12 for example?
13    A.  No.  That was just -- she just said it in
14 generality of don't worry about it, Lindell will pay
15 stuff off for you.
16    Q.  Do you recall when Peters was on stage
17 presenting the Mesa County information?
18    A.  Yes.  I was up in the control room upstairs
19 overlooking.
20    Q.  Was that a planned appearance?
21       MR. MALONE:  Object, speculation.
22    A.  I wasn't privy to that information, but I
23 believe since Lindell brought her in that, yes, that was
24 planned.
25    Q.  (BY MR. KLOEWER)  And she appeared on stage

Page 145

37 (Pages 142 - 145)

| | |
|---|---|
| 1 with somebody else, a guy wearing a bow tie by the name | 1 Kirk Wiebe is an NSA whistleblower who had a lot of |

**Page 146**

1 with somebody else, a guy wearing a bow tie by the name
2 of Dr. Frank?
3    A.  Yes.
4    Q.  Do you know Dr. Frank?
5    A.  I had met him a couple of times.  One of the
6 times he actually got into an argument with an Army
7 major who wanted to peer review his data.
8    Q.  This was an argument he got into at the
9 symposium?
10    A.  At the hotel.
11    Q.  At the hotel?
12    A.  After the symposium.  I believe it was Tuesday
13 night.
14    Q.  And you were -- did you overhear this argument
15 or --
16    A.  Yes, we were all sitting.  There was a little
17 sitting area to the back left-hand side of the building.
18 There was this Army major, a couple other -- I believe a
19 retired sergeant major and a retired colonel, and they
20 were all talking to Dr. Frank asking to peer review his
21 data, and Dr. Frank was yelling at the major saying I
22 don't need to give you the information, you can find
23 that publicly, which to me was odd because both men were
24 Ph.D.s and I know Ph.D.s, that's their bread and butter
25 is peer review.

Page 146

1    Q.  Did you speak with Dr. Frank yourself at any
2 point?
3    A.  No, nothing more than hello or walking by.
4 Even when that display happened, I observed more often
5 during that event.  So I didn't say anything, I just
6 observed.
7    Q.  Did you know who he was before the symposium?
8    A.  I had seen some of his information.  I knew he
9 had been sort of criss-crossing the country going to
10 county clerks and other events to tell people about
11 election fraud.
12    Q.  What about Lindell?  Did you have any more
13 direct interactions with him on day two of this --
14    A.  Day two and day three I didn't have any
15 interactions with anyone more than maybe Kurt Olson.
16 Kurt Olson was pretty much the last person I really
17 had -- second to last person I really had any dealings
18 with.
19         Wednesday night Kurt Olson after The
20 Washington Times article hit the news, which The
21 Washington Times reporter was a former Naval
22 intelligence guy in the -- he was Naval intelligence in
23 the Navy.  He had showed up with Kirk Wiebe.  I was
24 outside having a vape and talking to Kirk Wiebe, because
25 Kirk Wiebe had been let in that morning, and he's --

Page 147

1 Kirk Wiebe is an NSA whistleblower who had a lot of
2 dealings with Dennis Montgomery.
3         So when he showed up, he started -- when he
4 showed up, he walked into the cyber expert room.  He
5 started telling all the cyber experts about Dennis
6 Montgomery himself and the problems that had arised from
7 him over the few years, and that's when a cyber expert
8 started telling Kirk Wiebe about what all was going on.
9         That Washington Times reporter had walked
10 through the facility, had talked to Waldron, had talked
11 to Kurt Olson and a number of other people and was
12 annotating the statements they were making.
13         Then I went outside to have a vape.  I talked
14 to Pete Santilli, who was standing out in front.  Kirk
15 Wiebe was there.  I started engaging Kirk Wiebe and
16 talking to him about issues with Dennis Montgomery and
17 the data.
18         That Washington Times reporter comes up and
19 sort of interjects himself into the discussion.  And it
20 looked like within ten minutes of him interjecting
21 himself into the discussion, it hits Washington Times.
22         Not even two minutes after it hits Washington
23 Times, Mike Flynn calls Mike Lindell who is on stage
24 live at the time.  He walks off of the stage to answer
25 his phone because it's Flynn.  Flynn tells him that that

Page 148

1 article hit the air, and Lindell immediately goes
2 looking for Kurt Olson.
3    Q.  So how do you know that Mike Flynn was calling
4 Mike Lindell?
5    A.  Because Kurt Olson told me later that it was
6 Flynn who called to say, hey, that news article just
7 hit.  So my guess is Flynn has either -- which I know he
8 has NSA guys working for him, but someone was watching
9 all the media to see what was going on.
10    Q.  Was Flynn involved with the Cyber Symposium in
11 any way?
12    A.  He was supposed to show up on Thursday, but
13 because of the events that took place and because of the
14 news article that hit Wednesday, he cut sling.  He
15 wouldn't show up.  I had Seth Keshel.  He actually
16 called me on Monday night and asked my opinion if he
17 should show up.  And I told him, no, don't show up, the
18 info was bogus.
19         That same Monday Dave Clements in the hotel
20 asked me my opinion, but I told Clements, well, we're
21 still looking through the data.  And I told him that
22 because, for one, I trusted Keshel.  Keshel was a
23 captain in the Army.  So I know if I told him something,
24 he wasn't going to stab me in the back.  Clements I had
25 known to a certain degree, but I treat civilian guys

Page 149

1 differently than I treat military guys.  I trust someone
2 who I've shed blood with, but civilians, that has to be
3 earned.  So I told Clements everything was fine, which
4 later he would get butt hurt and mad and called me a
5 liar because I told him everything was fine.
6         So Wiebe explains everything.  We're all
7 standing out there.  Kurt Olson comes out the front door
8 visibly angered, calls me into the front and just starts
9 yelling at me.  Why did you talk to the press?
10        And I said what?  I was just outside having a
11 vape.  We were having a discussion.  And it spun into
12 this whole thing.
13        Kurt Olson tells me I need to go back to the
14 hotel, so I go back to the hotel.  He then calls me and
15 says you need to call the reporter and have the reporter
16 change information that's in that news article.  Because
17 I went on about everything, I went on about Dennis
18 Montgomery, I went on about the PCAPs.  I told the truth
19 about everything that was going on from my perspective.
20        So I called the reporter and I said, look,
21 Kurt Olson wants me to have you change what's in the
22 article.  And The Washington Times reporter, of course,
23 comes back and goes, no, I'm not changing anything.
24 Which I expect that, he's a journalist.
25        So later -- later that evening on Wednesday,

1 was somebody on either side of the floor that I was on
2 most part of the day.  There was one point when they
3 weren't there, and that was around -- right at the
4 beginning of lunchtime.  There was a former Marine, who
5 later I was talking to him, and he admitted he was doing
6 security that was there.  And I dipped out at about
7 11:30, and I think I came back at about 2:00.
8         And then Waldron sent me a text message in the
9 evening and told me my runtime was at 3:30, that I was
10 to be ready to get on a flight to go home at 0430.  I
11 said okay, which, of course, I couldn't go to sleep
12 because it was a little crazy.
13        So I was down in the courtyard all the
14 morning -- or all the night into the morning at the
15 hotel.  At 3:30 Waldron comes down and then says you've
16 been bumped off of the flight, you're not going on the
17 plane, we're taking Tina Peters to Dallas.
18        And I said, well, y'all flew me to a ASOG.
19 How am I going to get home?  And he said, well, we're
20 going to get you an American Airlines flight back to
21 Dallas.  He said, call this lady, which it was one of
22 Lindell's staff, to schedule the flight home, which I
23 think my flight was at 9:30, 10:00 o'clock on American
24 Airlines.  So I immediately went to the airport.  Like,
25 I dipped out.  I wanted to get out of everything that

1 Kurt Olson calls me into the red team room.  No one's in
2 there but me, and Kurt Olson tells me, of course, I'm in
3 a world of trouble.  He tells me that Thursday I am to
4 be relegated to the hotel room.  He said I am not to
5 leave my hotel room, I am to stay there.
6         So I called my wife.  I called my friend who
7 is an attorney in Delaware, and I told him -- you know,
8 I had been telling him what was going on because I was
9 at least -- he was at least one attorney I could bounce
10 some things off of to know what my left and right limits
11 were.  And I said here's the case of what happened, here
12 is how it happened.  And he said if you know anyone in a
13 three letter agency, you need to report this up.  So I
14 said, well, it's not going to take long because I don't
15 think I'm going to need to report it to them.
16        So Thursday I was relegated to the hotel room.
17 I stayed there.  Every time I opened my door -- because
18 I would open my door and look out.  I even took my cell
19 phone and put it under the door and was looking.  And
20 they had people posted in the hotel watching me to see
21 if I tried to leave my room, which at one point I did
22 sneak out, but that's -- but I did.
23        Q.  And when you say they had people posted, who
24 do you mean by "they"?
25        A.  Either Olson or Lindell or somebody, but there

1 was going on there.
2         I took the flight home on American.  When I
3 got home, I explained to my wife everything that was
4 going on.  I was sort of a little wigged out over
5 everything.  And I called Pete Santilli, because I had
6 dealings -- I had known Santilli for a long time.  He
7 was a former Marine, so I trusted him.  I called him,
8 and mainly it was to complain about the flight issue,
9 because I was like, you know, Waldron stiffed me and
10 didn't tell me until 30 minutes before I was supposed to
11 leave that I was going commercial.  Well, little known
12 to me --
13        Q.  And how did you know Santilli?
14        A.  I knew Santilli because of an incident that
15 happened in 2014 called the Bundy Ranch incident.  I was
16 the person who called Santilli after a retired colonel
17 called me and told me they were going to use drones in
18 the Bundy Ranch.  So I called Santilli and Stewart
19 Rhodes and told them, you know, cover your -- your areas
20 with Mylar or do something to hide your people because
21 supposedly they're going to be using drones.  This came
22 from a reliable source, which he was a member of Obama's
23 transition team, the guy who told me.  So that's how I
24 had been friends with Santilli.
25        Q.  So you called him when you got back to Dallas?

Page 154

1  A. I called him. I told him what the situation
2  was. I complained. Unbeknownst to me, he recorded the
3  entire conversation and gave to it Mike Lindell, which
4  it made sense afterwards because then Pete Santilli got
5  a channel on Lindell TV, which there was -- that was
6  sort of a consistent pattern.
7  Q. Okay. So going back a little bit, after --
8  after the Peters presentation -- well, let's talk about
9  when Peters was on stage presenting the Mesa County
10  information.
11  There was some confusion with Ron Watkins, and
12  he made an announcement midway through that he had
13  gotten a call from his attorney. Do you remember that?
14  A. Yes. That's when Ty Clevenger called him.
15  Q. Okay. And did you speak to Watkins about
16  hearing from Ty Clevenger at all?
17  A. Not until afterwards. He told me afterwards
18  his attorney said you don't want your fingerprints on
19  any of this at all.
20  Q. And what was the nature of that conversation?
21  Did you call Watkins afterwards to discuss what had
22  happened, or did he text you?
23  A. No, we talked about it on that Element chat
24  board.
25  Q. And this was just a direct message between the

Page 155

1  two of you, not on the --
2  A. Correct.
3  Q. And he told you that his lawyer said we don't
4  want anything to do with this?
5  A. Correct because, for one, chain of custody;
6  for two, the information we were learning as to how that
7  operation had taken place.
8  Q. When Peters was presenting or when she was
9  answering some questions, there was a sound off stage.
10  It sounded like a duck quacking. Do you recall that at
11  all?
12  A. No, I was upstairs. I don't remember hearing
13  that.
14  Q. Okay. You don't --
15  Okay. There were other presentations during
16  the symposium that you partook in, though, right, after
17  this?
18  A. There was only -- that was the only one I was
19  in on. After the Mesa County presentation, that's when
20  that Washington Times article hit, and then they made
21  sure I was out of the area after that.
22  Q. So you didn't partake in a panel discussion
23  later with Joe Oltmann and David Clements, Pat Colbeck
24  and Phil Waldron?
25  A. I believe that was -- I believe that was

Page 156

1  before the Dominion presentation.
2  Q. Okay. Maybe I have my timeline mixed up then.
3  Tell me a little bit about that panel presentation that
4  you were on. Did you know about this beforehand?
5  A. No. I was just told --
6  MR. MALONE: Object to form.
7  A. -- we were going to have a discussion about
8  election fraud and election fraud investigations, and
9  they said -- Waldron said, hey, why don't you get up
10  there and discuss your experience and stuff, and I did.
11  Q. (BY MR. KLOEWER) So you mentioned before that
12  you spoke briefly with Joe Oltmann and that he gave you
13  the Antrim data. Did you have any other conversations
14  with him before you did that panel conversation?
15  A. We had -- a couple of times we would talk to
16  each other in passing. He -- the night he gave me the
17  hard drive, he talked about how he had skipped out on a
18  deposition he was supposed to do in Colorado so he could
19  be at the symposium, and he said he didn't care how much
20  money he was going to lose over it. He sort of bragged
21  about how he was skipping out on all his court stuff.
22  Q. And did he tell you what the nature of the
23  case was that he was skipping out of?
24  A. All he had stated was it was a case in regards
25  to Eric Coomer, which I had read over some of his

Page 157

1  postings and information about it, so I was already
2  familiar with that case.
3  Q. Okay. And so with David Clements, did you
4  prepare for that presentation with him at all or was it
5  just a --
6  A. It was ad hoc. It was just we went up and
7  gave a presentation off the top of our heads.
8  Q. What about I believe his name is Patrick
9  Colbeck?
10  A. Patrick Colbeck, yes.
11  Q. Did you know him beforehand?
12  A. Yes. I've worked with Colbeck extensively on
13  mapping networks and figuring out how system designs
14  were, going through system manuals and helping with some
15  of his infographics on different election systems.
16  Q. When did you work with him before?
17  A. I started working with him in 2021. I would
18  say at least back in March of 2021.
19  Q. And was that paid work or was that --
20  A. No. The only time I ever had paid work was
21  ancillary information that wasn't election related.
22  Q. All right. So it's your recollection then
23  that the panels with Oltmann preceded the Tina Peters
24  information?
25  A. If I remember. I may be off on my timeline

1 just because of the hustle and craziness of it, but I
2 know those two were back to back to each other.
3    Q.  So would that panel have occurred after the
4 concerns about the PCAPs areas?
5    A.  Yes, that was -- that happened day one.  Day
6 one of the symposium in an hour into it, the cyber
7 experts already knew that the data was bogus, or at
8 least not what was claimed.
9    Q.  So we talked before about the $5 million
10 reward that was offered.  Did -- did this realization
11 that the data wasn't good, did people start -- did
12 anyone request that $5 million reward?
13    A.  One gentleman presented a report to Kurt
14 Olson.  I believe it was on that Wednesday -- it had to
15 have been that Wednesday; I was standing there when he
16 did it.  He gave a report to Kurt Olson about the PCAP
17 data was false, did not live up to the claim, and he
18 was making claim on the 5 million.  And Kurt Olson said
19 he was making a scene and threatened to have him ejected
20 from the symposium.
21    Q.  And did Lindell know that people were
22 demanding the reward?
23    A.  I don't know.
24       MR. MALONE:  Object to the form.
25    A.  I don't know what Lindell's communications

Page 158

1 with Olson at that point were.  I wasn't privy to that.
2    Q.  (BY MR. KLOEWER)  Did you have any discussions
3 with other members of the red team about people wanting
4 this reward?
5    A.  By that point, I sort of was isolated.  I
6 mean, we would talk about stuff at the symposium, but I
7 really wasn't going into explaining a lot of my thought
8 process and concerns or anything that was going on,
9 because I -- considering my line of work at times, I
10 have issue -- I have trust issues with people I work
11 around, so I tend to try and keep to myself.
12    Q.  You had said before you were still in contact
13 with Kurt Olson from time to time.  Did he seem
14 concerned about this award issue, about potentially
15 having to issue the award?
16       MR. MALONE:  Object to foundation.
17    A.  The only time it ever came up was that one
18 moment.  There was a moment in the red team room
19 whenever Lindell and Olson had a conversation in all of
20 our presence, and Lindell was checking with Olson on the
21 wording of the contest.  And Lindell asked him, said is
22 there any discrepancy in the wording to the contest to
23 where someone could move forward on it?  And Olson
24 looked at him and said, no, we made sure that it was
25 worded correctly.  So in the background they were having

Page 159

1 discussions to make sure that no one would be able to
2 make claim on it.
3    Q.  (BY MR. KLOEWER)  So Lindell was concerned
4 that somebody was going to be able to claim that?
5    A.  By the wording in --
6       MR. MALONE:  Objection, foundation.
7    A.  By the wording in the contest, yes.
8       (Reporter clarification.)
9       MR. MALONE:  Objection to foundation and
10 asked and answered.
11       (Reporter clarification.)
12       MR. KLOEWER:  Can we take a short break?
13       THE VIDEOGRAPHER:  Off the record, 3:05.
14       (Break from 3:05 p.m. to 3:15 p.m.)
15       THE VIDEOGRAPHER:  We're on the record.
16 The time is 3:15.
17    Q.  (BY MR. KLOEWER)  All right.  We left off just
18 finishing up pretty much what seemed like the end of the
19 symposium when you flew back to Texas.
20       I want to show you a couple of exhibits here.
21 The first one we'll mark as Exhibit 5.
22       (Exhibit 5 marked.)
23       MR. CAIN:  Ryan, can you hear me?  I
24 think it's best that we run the exhibits sequentially
25 across the depositions so we don't have to recopy stuff.

Page 160

1 Is that okay with you guys?
2       MR. MALONE:  That's just fine.
3       MR. CAIN:  This Exhibit 5 is -- and I'm
4 sorry to jump in.  I'll have Scotty send it to you
5 because it's -- well, you may have seen it, but I just
6 want you to have a copy.  She's going to send it as soon
7 as I text her.  Sorry.
8       MR. KLOEWER:  Okay.
9    Q.  (BY MR. KLOEWER)  All right.  Mr. Merritt, do
10 you recognize the document I just handed you?
11    A.  Yes, I do.
12    Q.  And what are we looking at here?
13    A.  This is a screenshot that was taken from my
14 phone, which was a Samsung Note 10.  This was a
15 conversation in the Element chat of all the cyber
16 experts, and this chat conversation is -- if I remember
17 correctly, this was from Ron Watkins.
18    Q.  And had you shared this information publicly
19 before?
20    A.  Yes.  I posted these screenshots on Twitter on
21 the Saturday following the symposium.
22    Q.  Okay.  And I'm looking through this document
23 here.  And maybe you can help me.  There's circles that
24 indicate what I presume are the names of the speakers in
25 this group chat here.  There's a blue letter P with a

Page 161

41 (Pages 158 - 161)

1 shield on it. Who would be speaking when these
2 statements are made from this account?
3    A.   The letter P is coming from Ron Watkins.
4    Q.   Is Ron Watkins, okay. So this first page
5 where it says my prelim and quick comments, that whole
6 section is coming from Watkins?
7    A.   Correct.
8    Q.   So if we look down maybe six or eight lines
9 from the bottom, it says why zero information describing
10 what it is we are looking at to substantiate the claims?
11 Do you see that?
12    A.   Yes.
13    Q.   So was this Mr. Watkins -- what's your
14 understanding of that question, why he was asking it?
15    A.   That question was that none of the information
16 that we were looking at substantiated the claims that we
17 were all supposed to be in support of. So we were
18 seeing no data that said these were packet captures that
19 showed signs of election manipulation from China.
20    Q.   And do you recall -- I know you said this was
21 before the symposium. Do you have a guess as to what
22 date these would have occurred? I don't see a date
23 stamp on this.
24    A.   The date --
25        MR. MALONE:  Objection to foundation.

Page 162

1    A.   The dates on these, there are other
2 screenshots that show time and date. They range from
3 the 5th to the 7th.
4    Q.   (BY MR. KLOEWER)  Okay.
5    A.   Yes, here's one on page 5, it shows August 7,
6 2021. So this would be in that time range.
7    Q.   Okay. And if we look at the second page of --
8 and I apologize, these may be out of order. I'm
9 realizing they might not be correct now as you point out
10 the date.
11        The second page of the copy I've handed you
12 includes an orange letter Z. Do you know who would have
13 been speaking with those -- when those comments were
14 made?
15    A.   The Z -- hold on, I am looking through. Okay.
16 I'm -- the Z is -- off the top of my head, I can't
17 remember. I'd have to double-check my notes on these,
18 because this all ties in with the data we were seeing
19 later as well.
20    Q.   Okay. What about that second letter P with
21 the green background?
22    A.   That one is Colonel Waldron.
23    Q.   Okay. And the second to last page of my copy,
24 I see a purple letter J towards the bottom.
25    A.   Yes. That is -- that is my posting.

Page 163

1    Q.   That's yours, okay.
2    A.   Correct.
3    Q.   And then the very last page, I also see an
4 orange letter P. Do you know who that one might have
5 been?
6    A.   That letter P --
7    Q.   It says thank you for the update.
8    A.   Yes. I believe that was Kurt Olson. Because
9 a lot of -- everyone's names weren't under their actual
10 names. A lot of their names were various characters.
11 But I believe that one was from Olson because it was
12 updating all the information that was being put
13 together.
14    Q.   Okay. Great. I am going to hand you another
15 exhibit here in one minute. You can set that one aside
16 for now.
17        (Exhibit 6 marked.)
18    Q.   (BY MR. KLOEWER)  We'll mark that as
19 Exhibit 6. Do you recognize that document, Mr. Merritt?
20    A.   Yes, sir, I do.
21    Q.   What is this?
22    A.   This is the subpoena that I received in
23 regards to me speaking today about the Mike Lindell and
24 Eric Coomer case.
25    Q.   So you're giving this deposition pursuant to

Page 164

1 this subpoena?
2    A.   Yes, sir, I am.
3    Q.   And you're not here voluntarily today?
4    A.   Correct.
5    Q.   And I just want to follow up briefly on the
6 aftermath of this whole saga. After you returned home
7 to Texas, was that the end of this story for you or did
8 you -- did it continue?
9    A.   No, that was just the beginning.
10        So the Friday, I had the conversation with
11 Santilli who recorded it. Saturday he handed it to
12 Michael Lindell. Or Friday night I believe he handed it
13 to Lindell. Lindell claimed that it was a recording of
14 me speaking to a reporter from The Washington Post. He
15 then went on various media groups ranging from his own
16 on FrankSpeech, to Steve Bannon's group on War Room and
17 started peppering the media, making claims against me.
18        I believe by Monday he was on FrankSpeech on a
19 two-hour discussion and had said that if America falls
20 to China, it was Joshua Merritt's fault. So he was sort
21 of trying to get ahead of anything I could have said, of
22 which my opinion was I wasn't saying anything. I was
23 going to see what the fallout from the situation was,
24 but he decided to use the media to start trying to come
25 after me and make false claims when he himself told me

Page 165

42 (Pages 162 - 165)

1 he didn't know anything about me.
2    Q.  And did that -- did you hear from anybody else
3 following these statements from Lindell, or was it just
4 from him?
5    A.  No. His followers harassed and also accosted
6 my wife. I had one gentleman, who was a former special
7 forces member from Dallas, specifically say he was going
8 to burn my house down with my wife and my children in
9 it. He told my wife that directly. And then he told my
10 wife -- and this was in Lindell's Telegram page that he
11 personally ran -- this former Special Forces member then
12 told my wife that after she was burned and turned into a
13 corpse, he was going to stomp a hole in her female
14 parts.
15      I had to run off private investigators who
16 were in front of my house. I had social media where
17 people were accosting my children. People would send
18 messages to my son and daughter over social media, as
19 well as my wife. My wife runs a true crime podcast, so
20 she had to deal with -- oddly, after I got doxxed in
21 November of 2020 -- or I was revealed publicly in
22 November 2020, I never once received a death threat
23 from anyone on the left. However, I think the count my
24 wife had was after the Lindell symposium, it was
25 something like 120, 130 the first month after of

Page 166

1      (Reporter clarification.)
2    Q.  (BY MR. KLOEWER) I'll rephrase it.
3      Did you ever get paid for your work at the
4 symposium, Mr. Merritt?
5    A.  No, I did not. And the numerous requests that
6 I had directly to Kurt Olson after the symposium, he
7 expressly told me that they would not be paying me.
8    Q.  Did he acknowledge the agreement to pay you
9 beforehand?
10    A.  So he acknowledged that Waldron was authorized
11 to specify that we would be paid for our work, yes.
12    Q.  Okay. One more here I am going to hand you.
13 We'll mark this as Exhibit 7.
14      (Exhibit 7 marked.)
15      MR. KLOEWER: Ryan, I am handing
16 Mr. Merritt a copy of the nondisclosure agreement
17 that we've shared here. We'll provide you a link with
18 all these documents afterwards, as Charlie indicated,
19 but -- or this is the copy that you provided us.
20      MR. MALONE: Oh, that we provided?
21      MR. KLOEWER: Yes.
22      MR. MALONE: Okay. Thank you.
23    Q.  (BY MR. KLOEWER) Mr. Merritt, have you seen
24 this document before?
25    A.  Yes, sir.

Page 168

1 separate text messages where people were threatening to
2 kill me, my wife, my children, burn our house down,
3 people threatening the work that I was doing, which
4 caused a huge problem in that realm. And there have
5 been a ton of order of effects since the symposium.
6    Q.  At the beginning of this deposition, we talked
7 a little bit about David Clements and how he deleted all
8 your interviews after the symposium. Do you know why he
9 would have done that?
10    A.  Well, other than he told everyone publicly
11 that I lied, he actually flipped out on me the last day
12 I talked to him because I told him I wasn't Christian.
13 I told him that I was an Odinist, because I was actually
14 one of the guys who had to fight in the Army in 2003.
15 It took me two years to be able to put Odinist on my dog
16 tags. And I'm an Odinist because my ancestors are from
17 Scotland and from England and from Norway, so it's an
18 ancestral thing for me. So in a lot of realms, I was
19 gaslit and literally talked down to because of my
20 religion.
21    Q.  And did you ever receive the $30,000 you had
22 been promised for the Cyber Symposium?
23    A.  No, sir.
24      MR. MALONE: Object to the form of that
25 question.

Page 167

1    Q.  And what are we looking at here?
2    A.  This is the nondisclosure agreement that Kurt
3 Olson had provided me on August 4, 2021.
4    Q.  Okay. And we're not going to go through here
5 line by line and read all this, but have you provided us
6 with copies of any of the data that you received at the
7 symposium?
8    A.  No, sir. As per an agreement that was
9 demanded by Mr. Lindell, I do not have any digital
10 copies of the evidence that I accumulated during the
11 symposium.
12    Q.  Okay.
13      MR. KLOEWER: I think that's all I have
14 for you, Mr. Merritt. I don't know if Mr. Malone has
15 any questions, but that's all from plaintiff.
16      MR. MALONE: Thank you.
17      EXAMINATION
18 BY MR. MALONE:
19    Q.  Good afternoon, Mr. Merritt. Can you hear me
20 okay over this Zoom connection?
21    A.  Yes, sir, I hear you fine.
22    Q.  Thank you. My name is Ryan Malone, and I
23 represent the defendants in this action, which include
24 Mr. Lindell, My Pillow and FrankSpeech.
25      Do you have a copy of what's been marked as

Page 169

43 (Pages 166 - 169)

1 Exhibit 6 handy?  That would be the subpoena to appear
2 today.
3     A.   Yes, sir, I do.
4     Q.   And, Mr. Merritt, do you see on what is the
5 last page of that exhibit, page 12, that there is a
6 heading that reads "Documents Requested"?
7     A.   Page 12, communication, oral or written
8 communication of which you have knowledge, information
9 or belief, yes, sir.
10     Q.   I want to make sure that we are on the same
11 page here literally.  So the copy that I have says
12 "Documents Requested," and this is on page 12 of
13 Exhibit 6.  And it has a No. 1 and it says, quote, "All
14 written communications between you and Lindell,
15 FrankSpeech or My Pillow."  Do you see where I'm
16 referring?
17     A.   I don't see that on 6.
18     Q.   Well, let me ask it this way, sir.  Did
19 you bring any documents with you to testify today?
20     A.   No, sir, I did not.
21     Q.   Did you review any documents to -- prior to
22 providing testimony today?
23     A.   There was information that had been previously
24 posted publicly, and that was forwarded to the attorney
25 but that was all that was posted.

1     Q.   I'm not sure I understand.  What information,
2 if you can describe with a little bit more specificity,
3 sir, are you referring to?
4     A.   A document that was given to my attorney and
5 given for public release titled "The Lindell Saga."
6     Q.   Okay.  And what is the name of the attorney
7 that you're referring to?
8     A.   My previous attorney last year, her name is
9 Kellye SoRelle.
10     Q.   And Ms. SoRelle is the attorney to whom that
11 information was forwarded?
12     A.   No, that was where it originated.  It was
13 forwarded to Mr. Cain upon receipt of the subpoena.
14 That was the only document that I forwarded because it
15 was publicly available.
16     Q.   I see.  Do you have any other communications
17 directly with Mr. Cain?
18     A.   No, sir.
19     Q.   Did you have any communications with
20 Mr. Kloewer other than the deposition today?
21     A.   No, sir.
22     Q.   Okay.  Point of clarification, Mr. Merritt.  I
23 think there were a number of times today where we
24 discussed the agreement that's been marked as Exhibit 7.
25 Do you still have a copy of that handy?

1     A.   Yes, sir, the nondisclosure agreement.
2     Q.   Okay.  Let's see if we have better luck with
3 the last page of this one.  If you can scroll to the
4 signature page there.
5     A.   I have a question, sir.  Is this the version
6 that Mr. Lindell had turned over to you?
7     Q.   Just as a point of clarification, Mr. Merritt,
8 I am not here to answer your questions.  I can do my
9 best to clarify any questions that you have to answer my
10 questions, but I just want to make sure that you're
11 referring to the same document here --
12     A.   Yes, sir.
13     Q.   -- because the document that I have has what
14 appears to be your signature, and it appears to be dated
15 August 3, 2021.  Do you see where I am referring?
16     A.   Yeah, but I don't see it on this document.
17 That's why I was asking you.
18     Q.   Okay.  Let's try it this way.
19         MR. MALONE:  If we could go off the
20 record for just a moment here.  Is that okay with
21 everyone?
22         MR. KLOEWER:  Sure.
23         THE VIDEOGRAPHER:  Off the record at
24 3:33.
25         (Break from 3:33 p.m. to 3:43 p.m.)

1         THE VIDEOGRAPHER:  We're on the record.
2 The time is 3:43.
3         (Exhibit 8 marked.)
4     Q.   (BY MR. MALONE)  Mr. Merritt, we were looking
5 at what has been now marked as Exhibit No. 8, which is a
6 document titled "Software/Data Nondisclosure Agreement."
7 Do you see that document, sir?
8     A.   Yes, sir.
9     Q.   Have you had a chance to review that document?
10     A.   Yes, sir, I have.
11     Q.   And in scrolling or looking at the signature
12 page of the document, would you agree that this
13 indicates it was signed on August 3, 2021?
14     A.   Yes, sir, that's my digital signature.
15     Q.   And do you recall the circumstances under
16 which you provided a digital signature?
17     A.   This document was sent to me via Adobe by Kurt
18 Olson.  I signed it via an app called Adobe Sign, and
19 then I resubmitted it back to him for them to collect
20 signatures.
21     Q.   And from your testimony earlier today and I
22 believe what has been previously marked as Exhibit No.
23 7, do I understand that there may be another copy of
24 this nondisclosure agreement?
25     A.   This is the copy that was -- No. 7 was the one

1 that was originally transmitted to me without my
2 signature on it at all.
3    Q.  I see.  I see.  So are you aware of any other
4 signed versions of this August 2021 nondisclosure
5 agreement?
6    A.  No, sir.  These are the only copies that I
7 know to exist.
8    Q.  Are you aware of any other nondisclosure
9 agreements between yourself and Michael Lindell?
10    A.  No, sir.
11    Q.  Are you aware of any nondisclosure agreements
12 between yourself and My Pillow?
13    A.  No, sir.
14    Q.  Are you aware of any other nondisclosure
15 agreements between yourself and FrankSpeech?
16    A.  No, sir.
17    Q.  And are you aware of any nondisclosure
18 agreements between yourself and between Lindell
19 Management?
20    A.  No, sir.
21    Q.  I believe a few minutes ago, before we went on
22 break, you mentioned that there were several
23 correspondences with Kurt Olson regarding the Cyber
24 Symposium.  Do you recall testifying about those?
25    A.  In person and digitally, yes, sir.

Page 174

---

1 20 -- was it 2022?  Yes, sir, 2022.
2    Q.  The agreement to follow his directive, can you
3 expand on that?
4    A.  The agreement that Mr. Lindell's attorneys
5 from Houston specified to my attorney, Kellye SoRelle,
6 was three stipulations:
7       One, that I destroy all digital evidence that
8 I had collected from the Cyber Symposium.
9       Two was that I give a chain of custody of
10 anyone that I gave that information to.
11       And number three was that I no longer spoke
12 publicly about the Cyber Symposium.
13    Q.  Is it your testimony that all three of those
14 items have been done?
15    A.  Yes, sir.
16    Q.  You understand that you're here today to
17 provide testimony in a lawsuit that was brought by Eric
18 Coomer.  Correct?
19    A.  Yes, sir.
20    Q.  You mentioned earlier that you had a
21 conversation with Mr. Oltmann about Mr. Coomer.  Do I
22 have that correct as well?
23    A.  Yes, sir, Mr. Oltmann had discussed Mr. Coomer
24 with me.
25    Q.  And he mentioned that he was at the symposium

Page 176

---

1    Q.  Do you still have copies of those digital
2 correspondences?
3    A.  No, sir, I do not.  They were all done through
4 Signal, and those messages were not retained, sir.
5    Q.  When you say they were not retained, can you
6 clarify a bit what you mean by that?
7    A.  My phone messages are set to erase themselves
8 after 48 hours, sir.
9    Q.  And is that with all text messages?
10    A.  Yes, sir.  Throughout all of my apps that I
11 use for text messaging, they delete the messages
12 automatically.
13    Q.  Are you still in possession of any digital
14 copies of any text messages regarding the Cyber
15 Symposium at all?
16    A.  No, sir.  I was directed to destroy all
17 digital records that I had, sir.
18    Q.  And who directed you to do that?
19    A.  Mr. Lindell through his attorney, sir.
20    Q.  Are you referring to Mr. Olson?
21    A.  And Tredennick, whenever I was put under
22 arbitration by Mr. Lindell.
23    Q.  Do you recall when that was?
24    A.  He first filed it in September of 2021, and
25 the agreement to follow his directive was in April of

Page 175

---

1 instead of providing testimony in that case.  Is that
2 your testimony?
3    A.  Yes, sir.
4    Q.  Do you recall anything else that Mr. Oltmann
5 said to you about Mr. Coomer?
6    A.  No, sir.
7    Q.  Do you recall anything that Mr. Oltmann said
8 about Mr. Coomer on stage at the symposium?
9    A.  No, sir.  I had done extensive amount of
10 research.  So if he had talked about it, it's probably
11 along the lines of some of the information I had looked
12 at before, sir.
13    Q.  Were you physically present when Mr. Oltmann
14 was on stage at the Cyber Symposium?
15    A.  Yes.  I do believe I was sitting at the other
16 end of the table, sir.
17    Q.  At the other end of the table on --
18    A.  On stage, yes, sir.
19    Q.  While Mr. Oltmann was there?
20    A.  One of the times.  I'm not certain if the time
21 you're referencing I was on stage at the time.
22    Q.  Okay.  And during that time when both yourself
23 and Mr. Oltmann were on stage, do you recall any
24 statements Mr. Oltmann made about Mr. Coomer?
25    A.  Not off the top of my head, no, sir, I don't

Page 177

45 (Pages 174 - 177)

1 recall.
2    Q.  What about Mr. Lindell? Have you ever heard
3 Mr. Lindell say anything about Eric Coomer?
4    A.  Personally, no, I haven't.
5    Q.  Okay. And you say personally. Can you expand
6 on what you mean by that?
7    A.  Meaning in person, live on a show or in
8 digital, my eyes and my ears haven't seen anything.
9    Q.  Thank you.
10      Are you able to see my screen, sir? Can you
11 see me?
12    A.  I see you, yes, sir.
13    Q.  Okay. Let's try this. Can you see a document
14 on your screen now?
15    A.  No, sir. Now it's coming up.
16    Q.  Okay. Great. Thank you.
17      On screen is a document that will be marked, I
18 believe, as Deposition Exhibit 9.
19      (Exhibit 9 marked.)
20    Q.  (BY MR. MALONE) Sir, do you see in the
21 upper -- I guess the top center of the screen, that
22 there is a marking indicating that this was a document
23 filed on November 25, 2020?
24    A.  Yes, sir, I see it on screen.
25    Q.  Okay. Do you recognize this document by any

Page 178

1 that.
2      MR. KLOEWER: Yeah, I know there were two
3 of these filed on this same day. I'm blanking over
4 here, too. I think one of ours -- ours is probably from
5 King v. Whitmer, the Michigan case. And if yours is the
6 Georgia case, then my assumption with these is that
7 these would be identical, but I'm not sure so I'm glad
8 we got them both marked here.
9      MR. MALONE: Yeah, we'll mark them both,
10 and I think we can move forward here with that issue.
11      MR. KLOEWER: Okay.
12      MR. MALONE: I think that's just fine.
13      (Exhibit 10 marked.)
14    Q.  (BY MR. MALONE) Okay. So, Mr. Merritt, I
15 understand that you are reviewing the document that's
16 from your perspective been labeled Exhibit 10.
17    A.  Yes, sir.
18    Q.  Does the document that you're looking at,
19 Exhibit 10, say "Declaration of" and then --
20    A.  Redacted.
21    Q.  -- redacted?
22    A.  Yes, sir.
23    Q.  Redaction.
24      Would you agree that this is your declaration?
25    A.  Yes, sir.

Page 180

1 chance?
2    A.  Until I have it on my -- in my hands, no, sir.
3 Hold on, let me see.
4      MR. KLOEWER: Ryan, I have a copy here I
5 can hand him. This is -- well, I don't see a case. Let
6 me see. Some case number 20:cv -- ours is 13134. It
7 looks like you've got a different lawsuit there. This
8 may not be the same one.
9      MR. MALONE: Possibly. I would propose
10 that we mark both documents as Exhibits 9 and 10. The
11 document that you have in front of you, Counsel, let's
12 mark that as Exhibit 10 and provide that to the
13 witness --
14      MR. KLOEWER: Sure.
15      MR. MALONE: -- if that's acceptable.
16      MR. KLOEWER: Yeah, that's fine.
17      THE REPORTER: Give me a second here.
18 Thanks.
19      MR. KLOEWER: Ryan, do you have in front
20 of you which case this is from, the name of the case?
21      MR. MALONE: It's from one of the
22 Raffensperger cases in the Northern District of Georgia.
23 And I don't have offhand who is the plaintiff. I can
24 pull that up. Just a moment.
25      Well, how about this? I will follow up with

Page 179

1    Q.  Okay. Does paragraph 2 of the document that
2 you're looking at, Exhibit 10, say, I was an electronic
3 intelligence analyst under the 305th Military
4 Intelligence with experience gathering SAM missile
5 system electronic intelligence?
6    A.  Yes, sir.
7    Q.  Is that an accurate statement?
8    A.  I attended the school at Fort Huachuca under
9 305th Military Intelligence. As I previously stated, I
10 listed my TRADOC school so as not to expose my active
11 duty unit, yes, sir.
12    Q.  Okay. Is there any statement in this
13 declaration here, which on my end Exhibit 9 appears to
14 be 17 pages and 21 paragraphs -- so let me ask it this
15 way. Is that the same number of pages and paragraphs
16 that you see?
17    A.  Yes, sir, it is.
18    Q.  And does the concluding paragraph, No. 21, in
19 your exhibit say, In my professional opinion, this
20 affidavit presents unambiguous evidence that Dominion
21 Voter Systems and Edison Research have been accessible
22 and were critically compromised by rogue actors, such as
23 Iran and China?
24    A.  Yes, sir.
25    Q.  Okay. So we're looking at the same thing, I

Page 181

46 (Pages 178 - 181)

**Page 182**

1 think. And my question to you, sir, is whether there is
2 any statement in this declaration that you, as you sit
3 here today, disagree with?
4    A.  No, sir.
5    Q.  Let me stop the share here.
6       I think you've been very clear, sir, that
7 you've testified you've deleted all documents related to
8 the Cyber Symposium. I don't think I've heard what
9 happened to the black hard drive, the 38 gigs of data
10 that you reviewed. Was that on Sunday night before the
11 symposium?
12    A.  The one that was handed to me by Mr. Lindell
13 was left in the red team room on Wednesday night as I
14 specified to Kurt Olson, and it was my understanding it
15 was Mark Cook who was in receipt of that hard drive.
16    Q.  On what do you base that understanding?
17    A.  Because he was the one who was in charge of
18 that room and later told me that that hard drive was in
19 that room. The black hard drive was never in my
20 possession, sir.
21    Q.  I'm not sure I understand. The black hard
22 drive, that was never in your possession?
23    A.  After I left -- after I left South Dakota.
24 Before I left South Dakota, I left it in the red team
25 room.

**Page 183**

1    Q.  I see. Do you know where that hard drive is
2 currently located?
3    A.  No, sir, I do not.
4    Q.  Do you know whether it has been destroyed?
5    A.  No, sir, I do not.
6    Q.  One moment here. One of my follow-up
7 questions, sir, earlier in your deposition today you
8 referred to an entity I believe known as Tenex?
9    A.  Tenex, sir.
10    Q.  You can probably see why I'm asking. What's
11 the spelling of that entity?
12    A.  Tango Echo November Echo X-Ray.
13    Q.  I see. So not 1, 0, and then the letter X?
14    A.  Correct, sir.
15    Q.  All right. Thank you.
16       MR. MALONE: All right. Mr. Merritt,
17 thank you for your time today.
18       THE WITNESS: Yes, sir.
19       MR. MALONE: That concludes all the
20 questions I have.
21       MR. KLOEWER: No further questions here
22 from plaintiff.
23       THE VIDEOGRAPHER: Off the record at
24 3:59.
25       (Off record from 3:59 p.m. to 4:01 p.m.)

**Page 184**

1       THE WITNESS: I will waive my signature.
2       (Proceedings ended at 4:01 p.m.)

**Page 185**

1       REPORTER'S CERTIFICATE
2       The undersigned Certified Shorthand Reporter
3 licensed in the State of Texas does hereby certify:
4       I am authorized to administer oaths or
5 affirmations, and prior to being examined, the witness
6 was duly administered an oath by me.
7       I am not a relative or employee or attorney or
8 counsel of any of the parties, nor am I a relative or
9 employee of such attorney or counsel, nor am I
10 financially interested in the outcome of this action.
11       I am the deposition officer who
12 stenographically recorded the testimony in the foregoing
13 deposition, and the foregoing transcript is a true
14 record of the testimony given by the witness.
15       Before completion of the deposition, review of
16 the transcript [ ] was [X] was not requested. If
17 requested, any changes made by the deponent (and
18 provided to the reporter) during the period allowed are
19 appended hereto.
20       In witness whereof, I have subscribed my name
21 this 17th day of November, 2022.
22
23
24 Julie C. Brandt, CSR, RMR, CRR
25 TX CSR No. 4018, Exp. 10/31/23

47 (Pages 182 - 185)