IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, Ph.D.,
    Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,
    Defendants

---

**PLAINTIFF'S OBJECTION TO THIRD-PARTY CD SOLUTIONS INC.'S CONFIDENTIALITY DESIGNATIONS**

---

> "First of all, I think all proceedings should be public proceedings, should be subject to being recorded, just like police interactions.  Judges should not have free reign over the court and be able act with impunity behind a wall where nobody could see it.  That is absolutely what I believe.  And matter of fact, if you're in a free society, that's the way it should be."
>
> - **Joe Oltmann, during an interview with Tina Peters on Conservative Daily, January 31, 2023**[1]

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), through counsel, files this Objection to Third-Party CD Solutions Inc.'s Confidentiality Designations, as follows:

### CERTIFICATE OF CONFERRAL

The parties had a telephone conference to discuss CD Solutions, Inc.'s (CDS) confidentiality designations on February 17, 2023.  Plaintiff summarized those objections

---

[1] Joe Oltmann, *Tina Peters Joins to Discuss the Ongoing Fight for Free and Fair Elections*, CONSERVATIVE DAILY Podcast, Jan. 31, 2023, https://caincloud.egnyte.com/fl/c8iS34H4nW/Coomer_Objections_to_CD_Solutions_Confidential_Designations_(20230224)_ .

1

in a follow up email the same day with corresponding documentation, and further expanded on the designations Plaintiff agreed to in a follow up email on February 21. Despite these efforts, CDS has only agreed to withdraw its confidentiality designations with respect to a single document, the affidavit that Joseph Oltmann (Oltmann) provided to Sidney Powell on November 13, 2020. This document has been publicly available since at least December 2020.

## INTRODUCTION

The false claims at issue in this dispute originated with Oltmann, a podcaster and conspiracy theorist who spoke at the Ellipse in Washington, D.C. on January 5, 2021. Oltmann fabricated a story about overhearing Dr. Coomer on an "antifa conference call" wherein he supposedly bragged about having rigged the 2020 presidential election. This story was published on Oltmann's podcast Conservative Daily on November 9, 2020, and likely represents the genesis of the Dominion Voting Systems conspiracy theory. The theory was adopted by former President Trump and eventually culminated in the insurrection at the U.S. Capitol on January 6, 2021. After first airing on Conservative Daily, the claims were subsequently adopted, ratified, republished, and promoted by Defendants in this case.

Max McGuire (McGuire) is Oltmann's long-time business partner and former podcast host. McGuire was deposed on November 17, 2022 pursuant to a subpoena that was served on August 30, 2022 [Dkt. 49].[2] McGuire worked with Oltmann for many

---

[2] The transcript of McGuire's Nov. 17, 2022 deposition is attached hereto as **Exhibit 1**. The green highlighted portions of Exhibit 1 represent the testimony that Plaintiff concedes is subject to the 2021 NDA. The yellow highlighted portions of Exhibit 1 represent the portions of McGuire's testimony that CDS asserts is "confidential," but which designation Plaintiff disputes.

2

years, including co-hosting Conservative Daily for several years before the claims at issue in this dispute, and for eighteen months thereafter, during which time the false claims about Dr. Coomer were republished literally hundreds of times. McGuire has unique insight into the origins of the claims against Dr. Coomer, the investigations that surrounded them, and the psyche and motivations of Oltmann. He was deposed on a wide variety of topics that are indisputably in the public interest, as are the thousands of pages of text and email communications supporting his testimony.

McGuire's testimony is devastating to the proponents of the Big Lie in general, and to believers in the lies about Dr. Coomer in particular. McGuire testified that Oltmann never provided him evidence to support the claims about Dr. Coomer,[3] that he personally does not believe Oltmann's story,[4] that Oltmann is a habitual liar with a habit of grafting himself onto other people's stories,[5] and that he believes Oltmann is a "grifter."[6] His personal text messages to Oltmann and others refer to the claims at issue here as "the Coomer bit"[7] and mock Oltmann's efforts to transfer his assets out of state in order to evade an eventual judgment in *Coomer v. Donald J. Trump for President, Inc., et. al.*[8]

---

[3] **Exhibit 1**, at 129:15-131:7, 145:17-21, 149:18-150:2, 151:14-24, 156:14-157:8, 172:6-23, 182:9-20, 220:7-20, 221:5-24.

[4] *Id.*, at 163:9-164:5, 219:1-22, 221:5-24, 222:22-25.

[5] *Id.*, at 131:23-133:12, 220:7-20, 233:7-10.

[6] *Id.*, at 257:17-25; 260:3-8.

[7] *Id.*, at 247:17-25; *see also* **Exhibit 8**, p. 85 (McGuire: "I've stood by you on everything, even the Eric Coomer bit. You haven't shown me any of the evidence on that.")

[8] *See* **Exhibit 6**, p. 7 (McGuire ("Watney"): "Are you still planning on skipping town if you lose so you don't have to pay? With all your assets in a trust? . . . Purchasing a house in another state with the intent of fleeing a court judgment? Is that standing in the gap?")

To conceal this and other damning evidence, Oltmann authorized CDS,[9] the entity that currently controls the Conservative Daily podcast, to seek a protective order in this case under the guise of two nondisclosure agreements previously signed by McGuire. The first nondisclosure agreement, signed in September 2015, is with a separate entity owned by Oltmann and has no bearing on this dispute. The second, signed in September 2021 with CDS, is narrow in scope and cannot possibly encompass the blanket assertion of confidentiality attempted by CDS here. Far from being "trade secrets," the overwhelming majority of the information designated as confidential here are personal opinions and communications that are embarrassing to Oltmann and problematic for Defendants, who persist in their reliance on Oltmann and in their refusal to retract their false claims about Dr. Coomer. These confidentiality designations, which CDS has no standing to assert, represent the latest attempt in Oltmann's yearslong efforts to conceal the truth at all costs, and to prevent the public from learning that the origin of the Big Lie is, itself, a big lie.

## BACKGROUND

1. On August 29, 2022, Plaintiff issued a subpoena to testify and produce documents to McGuire. The subpoena was served on September 13 [Dkt. 49], and established a deposition date of November 17, 2022. The subpoena, as well as proof of service thereof are attached as **Exhibit 2**.

2. On November 9, counsel for CDS entered an appearance in this case. [Dkts. 72-73]. The next day, November 10, counsel for CDS emailed Dr. Coomer's counsel

---

[9] Based on information and belief, Oltmann owns a controlling interest in CDS and manages its publications.

4

to alert him to the existence of a nondisclosure agreement between McGuire and CDS on September 1, 2021. **Exhibit 3**. He asserted that "Mr. McGuire is prohibited from answering any questions or provide any documentation related to the majority of conversations with Mr. Oltmann, the podcast, CDS, or any topics listed in the Non-Disclosure Agreement related to CDS or its affiliates." *Id.*, p. 3. Counsel for Plaintiff responded the same day and requested a conferral call the following morning. *Id.*, p. 2.

3.      In light of Oltmann's long history of obstruction, delay, and relentless efforts to preclude his claims from being subjected to scrutiny, and in order to fully apprise counsel for CDS of the context in which this dispute arises, Plaintiff's counsel provided copies of the multiple sanctions orders that had been issued against Oltmann by both the Denver District Court and the Colorado Court of Appeals. Since that time, the Denver District Court has issued an additional sanction of $20,682.50. **Exhibit 4**. These multiple sanctions orders arise from Oltmann's refusal to appear at a court ordered deposition after falsely claiming he was afraid of catching COVID-19,[10] his repeated refusal to provide court-ordered testimony related to his false allegations against Plaintiff, and his frivolous appeal of those prior sanctions orders. To date, Oltmann has paid $53,671.14 in sanctions for his conduct.

4.      Oltmann has mirrored this contempt for the rule of law in this proceeding, where he spent months desperately trying to avoid providing sworn testimony, and falsely claimed ignorance of the subpoena that had been issued. *See generally*, Dkts. 53, 55, 63.

---

[10] As described in Plaintiff's First Amended Complaint [Dkt. 21], Oltmann was actually defaming Dr. Coomer live onstage at Lindell's Cyber Symposium in South Dakota during his scheduled deposition in Denver.

In reality, Oltmann knew about the subpoena within days of it being provided to his counsel on August 29, and sent a text message to Defendant Lindell just two days later asking how Lindell wanted him to respond. **Exhibit 5**.

5. On November 14, CDS filed a motion seeking a protective order that would limit the scope of questions Plaintiff could ask. [Dkt. 75]. On November 15, the Court denied Defendants' then pending Motion to Stay Discovery [Dkt. 76]. On November 16, the Court issued the Protective Order at issue here [Dkt. 77], and issued a minute order denying CDS' Motion for Protective Order, simultaneously ordering the McGuire deposition to proceed on November 17.

6. McGuire was represented by Randy Corporon (Corporon) at his deposition. Corporon is a named defendant in related proceeding *Coomer v. Salem Media of Colorado, Inc., et. al.* Case No. 2021CV33632, currently pending before the Hon. David Goldberg, Denver County District Court. In addition to representing McGuire for his deposition, Corporon is also counsel of record for TGP Communications, LLC dba The Gateway Pundit in related proceeding *Coomer v. Donald J. Trump for President, Inc. et. al.*, Case No. 2020CV034319, pending before the Hon. Martin F. Egelhoff. Corporon has also served as legal counsel for Tina Peters in her ongoing criminal proceedings, as well as counsel for John Eastman. Corporon's possible involvement in fabrication of evidence in this case remains an unresolved topic of contention in *Coomer v. Salem et. al.* McGuire testified that Corporon's representation was paid for by "Joe Oltmann or one of Joe Oltmann's companies."[11]

---

[11] **Exhibit 1** at 11:6-14.

7. McGuire testified to a wide variety of topics in his deposition, and his testimony was supported by a substantial body of corresponding documents that he produced in response to the subpoena.

8. On December 14, 2022, CDS filed a Notice of Confidential Information [Dkt. 91]. The notice designates a vast swath of information that is not reasonably subject to either NDA. Instead, the notice encompasses well over a thousand pages of personal text messages and emails between McGuire and Oltmann, as well as messages between McGuire and various other third-parties, including former Conservative Daily producer Josh Hammerling[12] and even messages with McGuire's own mother.[13]

9. The confidentiality designations with respect to McGuire's deposition testimony are similarly broad, and likewise encompass a broad spectrum of material not reasonably subject to the NDAs. The various topics addressed in the deposition and objected to by CDS are summarized in **Exhibit 15**.[14]

## LEGAL STANDARD

10. What constitutes a trade secret is a question of fact for the trial court. *Saturn Systems, Inc. v. Militare*, 252 P.3d 516, 521 (Colo. App. 2011) (*citing Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990).

---

[12] *See* **Exhibit 6** – 220524 Joe Oltmann Messages to Max McGuire on Max, called Paul Watney (McGuire testified that "Paul Watney" was a pseudonym he used on a burner account); **Exhibit 7** – Aggregate Messenger with Hammerling (1).pdf; **Exhibit 8** – Joe Texts to Max 210 Number; **Exhibit 9**, Josh Texts 3.pdf; **Exhibit 10** – All documents contained in Request Folder 4; **Exhibit 11** – All documents contained in Request Folder 5; **Exhibit 12** – All documents contained in Request Folder 6; **Exhibit 13** – Text with Jimmy Sengenberger re_Joe on Antifa Call.docx; **Exhibit 14** – All documents contained in Request Folder 10.

[13] *See* **Exhibit 11**, pp. 185-190.

[14] The highlighted portions of this document represent testimony that Plaintiff accepts as being subject to the 2021 NDA. This document was provided to counsel for CDS on February 17.

11. The Colorado Uniform Trade Secrets Act (UTSA) defines a trade secret as:

[T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.

C.R.S. § 7-74-102(4).

12. Colorado courts consider several factors to make the factual determination of whether a trade secret exists under this definition, including: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, such as the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Network Telecomms., Inc.,* 790 P.2d at 903 (citing *Porter Indus., Inc. v. Higgins,* 680 P.2d 1339 (Colo.App.1984)).

13. "A nondisclosure agreement is overly broad if the restriction is '[un]necessary for the protection of the employer's business,' 'unreasonably restrictive of the employees' rights,' and 'prejudicial to the public interest.'" *TLS Management and Marketing Services, LLC v. Rodriguez-Toledo*, 966 F.3d 46, 58 (1st Cir. 2020) (*citing Revere Traducers, Inc. v. Deere & Co*., 595 N.W.2d 751, 760-62 (Iowa 1999). Contractual provisions that "restrict communication of ideas in general" are impermissible. *Retiree,*

8

*Inc. v. Anspach*, 660 Fed. Appx. 582, 587 (10th Cir. 2016) (*citing Puritan-Bennett Corp. v. Richter*, 679 P.2d 206, 211 (Kan. 1984).

14. Colorado adheres to the "long-standing principle of contract law that a contractual provision is void if the interest in enforcing the provision is clearly outweighed by a contrary public policy." *Johnson Family Law, P.C. v. Bursek*, 515 P.3d 179, 189 (Colo. App. 2022) (*citing F.D.I.C. v. Am. Cas. Co.*, 843 P.2d 1285, 1290 (Colo. 1992); *see also Calvert v. Mayberry*, 440 P.3d 424 (Colo. App. 2019) ("[A] contract is unenforceable by either party if it is against public policy.") "Public policy 'is that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good.'" *Id.*, (*citing Russell v. Courier Printing & Publ'g Co.*, 95 P. 936, 938 (Colo. 1908)).

## ARGUMENT

### A.    CDS lacks standing to make the designations at issue here.

15. As a preliminary matter, CDS has no standing to assert confidentiality designations here. The protective order allows that "Any ***Producing Party*** may designate any Discovery Material as 'Confidential Material' under the terms of this Order . . . ." Dkt. 77, ¶ 1 (emphasis added). The documents and testimony at issue were provided by McGuire, not CDS. McGuire's employment with CDS ended on April 8, 2022.[15] McGuire has not designated any testimony or documents as confidential, and no

---

[15] **Exhibit 1** at 239:6-19.

9

document is labeled as such, despite McGuire having received the Protective Order prior to his production.

16. Unlike Rule 45, F.R.C.P. 26(c) expressly limits who may move for a protective order to parties or the person from whom discovery is sought. *S.E.C. v. Dowell*, 144 Fed. Appx. 716, 722 (10th Cir. 2005). "Our precedent clearly states that 'the correct procedure for a nonparty to challenge a protective order is through intervention for that purpose.'" *Id.*, (*citing United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990); *SEC v. Tucker*, 130 F.R.D. 461, 462 (S.D. Fla. 1990) (holding that third-party may not move for Rule 26(c) protective order when movant is not a party to the underlying action, has not intervened, and is not the party from whom discovery is sought); *see also* F.R.C.P. 26(c)(1)(G) ("***A party or any person from whom discovery is sought*** may move for a protective order in the court where the action is pending") (emphasis added).

17. Here, as in *Dowdell*, CDS is not a party, has not intervened, and is not the party from whom discovery was sought. The unequivocal holding in *Dowdell* is and has been known to CDS, which cited the opinion in their original motion for protective order. *See* Dkt. 75, p. 8.

**B.   The 2015 NDA is not applicable here.**

18. CDS asserts that the entirety of McGuire's testimony and document production is subject to nondisclosure on account of two separate NDAs, one entered into with PIN Business Network, Inc., dba DoBizLo on September 3, 2015, (2015 NDA, **Exhibit 16**), and another between McGuire and CDS signed on September 1, 2021

10

(2021 NDA, **Exhibit 17**). The 2015 NDA does not encompass the disclosures at issue here and, therefore, does not allow CDS to assert any confidentiality designations prior to September 1, 2021.

19. PIN Business Network is a separate entity partially owned and operated by Oltmann. It is a Greenwood Village-based entity that offers targeted advertising for local businesses.[16] McGuire testified that the 2015 NDA with PIN had no bearing on his work for the Conservative Daily podcast.[17] Instead, it was required on account of his attendance at "shareholders' meetings, partner meetings, related to the goings-on of PIN Business Network."[18] He stated, "I was working for Shuffling Madness Media specifically for work under Conservative Daily from 2014 through to that new contract, [Exhibit 17]."[19] As a result, the "Confidential Information" described in that agreement could not have been any of the information at issue in this dispute, but rather confidential information belonging to PIN. CDS was not even established as an entity until years later, in 2018.

**C. With few exceptions, CDS' confidentiality designations should be stricken.**

20. The only potentially relevant NDA here is the 2021 NDA, but by its express terms, it does not and cannot serve to shield the information at issue here from disclosure. On the contrary, the 2021 NDA expressly defines the type of information it covers, and that information closely aligns with what Colorado courts have traditionally considered

---

[16] See generally https://pinbusinessnetwork.com/

[17] **Exhibit 1**, at 62:22-64:1.

[18] *Id.*, at 63:2-9.

[19] *Id.*, at 63:17-19.

to meet the definition of "trade secrets." *See* C.R.S. § 7-74-102(4). The 2021 NDA defines confidential information as follows:

> (a) all information concerning the Disclosing Party's and its affiliates', and their customers', suppliers', and other third parties' past, present, and future business affairs including, without limitation, finances, customer information, supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies;
>
> (b) the Disclosing Party's unpatented inventions, ideas, methods and discoveries, trade secrets, knowhow, unpublished patent applications, and other confidential intellectual property;
>
> (c) all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing
>
> (d) any third-party confidential information included with, or incorporated in, any information provided by the Disclosing Party to the Recipient or its Representatives; and
>
> (e) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials (the "Notes") prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

**Exhibit 17**, p. 9.

21. To the extent that any of the confidentiality designations at issue here meet these definitions, Plaintiff has already conceded those designations in conferral with CDS. *See* **Exhibit 18**. What remains is a variety of personal text messages and emails between McGuire and various individuals that cannot reasonably be considered to fall under any of these umbrellas. For example, CDS has attempted to designate over a thousand pages

12

of personal text messages between McGuire and former Conservative Daily producer Josh Hammerling, whose employment with CDS ended prior to McGuire's.

22. With respect to McGuire's deposition testimony, CDS has attempted to conceal a wide variety of McGuire's personal opinions, including that he does not believe Oltmann's lies about Plaintiff, that he has never seen evidence for them, and that Oltmann is a habitual liar. *See generally*, Supra n. 4-6. These are not trade secrets. They are just bad facts for both Defendants and CDS.

23. Just as Fox News' private admissions that they knew they were lying to their audience were not subject to a protective order in ongoing litigation against Dominion Voting Systems,[20] so too should the behind-the-scenes admissions of CDS staff be subject to public scrutiny here. These lies have poisoned our public discourse and created a real threat of political violence. Allowing CDS to continue concealing the truth on these matters is not in the public interest.

D. **The *Porter* factors weigh against confidentiality here.**

24. As noted above, Colorado courts look to six different factors when determining whether information constitutes a "trade secret." *See Porter Indus., Inc. v. Higgins,* 680 P.2d 1339 (Colo. App. 1984). Those factors all either weigh against the designations asserted by CDS here, or are neutral.

---

[20] *See* Paul Farhi et. al., *'Incredibly damning': Fox News documents stun some legal experts*, WASHINGTON POST, Feb. 23, 2023, https://www.washingtonpost.com/media/2023/02/23/fox-news-dominion-lawsuit-legal-analysis/

13

### a. *The extent to which the information is known outside the business.*

25.     McGuire has made numerous public statements about Oltmann and CDS since leaving the podcast ten months ago. He has published multiple episodes of his own podcast, The Max McGuire Show,[21] wherein he discussed many of the topics that CDS now seeks to conceal. Indeed, much of the testimony that CDS seeks to restrict addressed statements and memes[22] that McGuire previously published, including in one lengthy interview with Josh Hammerling.

### b. *The extent to which it is known to those inside the business, such as the employees.*

26.     The communications that CDS seeks to conceal are between McGuire and virtually every other known member of the CDS staff. For example, they seek to protect over a thousand pages of text messages with former producer Josh Hammerling,[23] numerous emails with the president of CDS, Keith Sawarynski,[24] and other podcast contributors such as Greg Pappas, Jake Freijo, and others. These communications make

---

[21] Max McGuire, *Responding to Joe Oltmann (feat. Mr. Producer Josh)*, THE MAX MCGUIRE SHOW, May 3, 2022, https://rumble.com/v13dtop-pride-cometh-before-the-fall.html ; Max McGuire, *Another Classic Joe Oltmann Attack*, THE MAX MCGUIRE SHOW, May 17, 2022, https://rumble.com/v152tpk-another-classic-joe-oltmann-attack....html ; *see also* **Exhibit 19** – McGuire social media posts.

[22] *See* **Exhibit 19**, pp. 7-8.

[23] **Exhibit 7**.

[24] **Exhibit 14**.

14

clear that McGuire's concerns about Oltmann's truthfulness, his recklessness,[25] and his constant calls for political violence[26] were well known within the company.

### c. *The precautions taken by the holder of the trade secret to guard the secrecy of the information.*

27. With the exception of the designations at issue here, CDS has not made any effort to "guard the secrecy" of McGuire's personal opinions and communications. The 2021 NDA does not address these matters, and there is no indication that CDS had any policies or procedures with respect to (former) employees engaging in personal communications. All of the documents at issue were still in McGuire's possession eight months after his departure from the company, and there is no indication that CDS ever attempted to retrieve them. Oltmann too was provided a copy of the Protective Order and was deposed on many of the same topics, but he never made any effort thereafter to assert similar confidentiality arguments, including with respect to some of the exact same topics and documents at issue here.[27]

---

[25] **Exhibit 10**, p. 25 (McGuire: "Joe hasn't sent me any of this evidence yet, but says he plans to use today's podcast to discuss a "theory" he has, so he doesn't have to provide concrete evidence. He said that a lawyer recommended this to him, but wasn't comfortable telling me who the lawyer was over the phone because the FBI could be listening.") **Exhibit 14**, p. 1 (McGuire: "I know he means well, but he is going to get us taken down if he keeps posting everything that comes across his newsfeed without vetting it first.")

[26] **Exhibit 10**, p. 4 (McGuire: "I need Joe on the morning strategy call. Every time he talks, he changes the subject. We have to be united in what we're going to talk about. Call to violence after call to violence.") *Id.*, p. 7 (McGuire: "He was rattling off all the topics we aren't allowed to talk about. Vaccine mortality, threats of violence, election stolen. Literally everything, just in off topic rants. He shouted that the Left are all retards, Josh had to bleep it out for the audio version.")

[27] *See* **Exhibit 20**, Oltmann Depo. Tr., Dec. 16, 2022, at 26:12-27:3; 28:4-29:14; 200:11-206:15; 221:24-225:20; 249:23-250:1; 251:16-24; 321:13-325:11; 327:10-329:2; 349:11-350:15; 351:12-352:12; 364:19-365:11.

### d. *The savings effected and the value to the holder in having the information as against competitors.*

28. There is no indication that there will be any "savings effected" by concealing McGuire's personal opinions and communications, nor is it at all clear who CDS's "competitors" are in this context. To the extent that consumers of disinformation podcasts like Conservative Daily may respond negatively to evidence that at least one of the hosts does not believe the lies they have been telling for years, it is possible that this information could result in some marginal loss of market share for CDS. This is not, however, a legitimate reason to shield CDS from public scrutiny.

### e. *The amount of effort or money expended in obtaining and developing the information.*

29. Here again, there is no indication that CDS has spent any effort or money in obtaining the information they seek to conceal. The overwhelming majority of the designated documents were never in their possession in the first place, and McGuire's opinions are inherently his own. With respect to information pertaining to the false claims about Dr. Coomer, no effort or money was ever spent on "obtaining" this information. It is just a lie that Oltmann simply made up and has never provided any evidence to support.

### f. *The amount of time and expense it would take for others to acquire and duplicate the information.*

30. This factor is inapplicable here, as no one else does or could ever acquire or duplicate the knowledge and communications that CDS seeks to conceal here.

16

### E. Request for Sanctions.

31. The confidentiality designations at issue here were not asserted in good faith. The argument that the 2015 NDA is in any way relevant here, when that NDA was signed to protect the confidential information of *an entirely different entity*, and entered into *years before CDS even existed*, is completely without merit. CDS' blanket invocation of confidentiality over more than a thousand pages of personal text messages with third-parties that were never even in their possession in the first place is similarly baseless. With the stroke of a pen, non-party CDS effectively imposed numerous hours of work on Plaintiff for no valid reason at all.

32. The needless work forced on Plaintiff through non-specific, blanket assertions of privilege over more than a thousand pages of third-party communications is especially frustrating in light of Plaintiff's unreciprocated good faith efforts to narrow the scope of this dispute. Plaintiff created and shared detailed breakdowns of the confidentiality designations that CDS asserted, and made various and likely gratuitous concessions as a show of good faith.[28] In contrast, CDS made no effort whatsoever to revisit or reexamine its confidentiality designations here. Instead, it has blindly adhered to its transparent efforts to conceal the truth of the origins of the Big Lie, all in hopes of protecting Defendants and sparing Oltmann the consequences of his dangerous and reckless lies.

---

[28] **Exhibit 15**.

33. Accordingly, Plaintiff reserves the right to seek appropriate sanctions for this frivolous, vexatious, deliberately dilatory conduct at such time as this dispute is resolved and the matter is ripe for the Court's consideration.

## CONCLUSION

For the foregoing reasons, Plaintiff Eric Coomer, Ph.D. respectfully requests an Order striking all of CD Solutions, Inc.'s remaining confidentiality designations.

Respectfully submitted this 24th day of February 2023.

       */s/ Bradley A. Kloewer*
Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
David E. Jennings, No. 54643
djennings@cstrial.com
Steve Skarnulis
skarnulis@cstrial.com
Zachary H. Bowman
zbowman@cstrial.com
**Cain & Skarnulis PLLC**
P. O. Box 1064
Salida, Colorado 81201
and
303 Colorado Street, Suite 2850
Austin, Texas 78701
719-530-3011/512-477-5011 (Fax)

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
**RechtKornfeld PC**
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900
**ATTORNEYS FOR PLAINTIFF**