IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Nina Y. Wang**

Civil Action No. 22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

     Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC, and
MY PILLOW, INC.,

     Defendants.

---

## ORDER ON MOTION TO DISMISS

---

This matter is before the Court on Defendants' Corrected Rule 12(b)(6) Motion to Dismiss Amended Complaint and Supporting Memorandum of Law (the "Motion" or "Motion to Dismiss") [Doc. 38]. The Court has reviewed the Motion, the related briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth herein, the Motion to Dismiss is respectfully **DENIED**.

### BACKGROUND

The Court takes the following facts from Plaintiff's First Amended Complaint and Jury Demand (the "Amended Complaint") [Doc. 21] and presumes they are true for purposes of this Order. Plaintiff Eric Coomer ("Plaintiff" or "Dr. Coomer") is the former Director of Product Strategy and Security for Dominion Voting Systems ("Dominion"), which provides election support services throughout the United States. [Doc. 21 at ¶ 16]. Dominion provided its services to at least 30 different states during the 2020 presidential election. [*Id.*].

President Joe Biden won the 2020 presidential election.  [*Id.* at ¶ 17].  Plaintiff alleges that Defendants Michael J. Lindell ("Mr. Lindell"), My Pillow, Inc. ("MyPillow"), and Frankspeech LLC ("Frankspeech") "have been among the most prolific vectors of baseless conspiracy theories claiming election fraud in the 2020 election," [*id.* at ¶ 1], in that they "began promoting a variety of claims that the November 2020 election had been rigged against former President Trump very shortly after the election was called for President Biden."  [*Id.* at ¶ 40].

Defendants relied upon non-party Joe Oltmann ("Mr. Oltmann"), who hosts a podcast called "Conservative Daily," "as the sole source of their defamation against Dr. Coomer."  [*Id.* at ¶ 27].  On November 9, 2020, Mr. Oltmann began an episode of his podcast by stating:

> Let's not sugar coat this, we're going to expose someone inside of Dominion Voting Systems specifically related to Antifa and related to someone that is so far left and is controlling the elections, and his fingerprints are in every state.  So, I want you guys to understand that what we're about to show you, you have to share. The conversation will be about a man named Eric Coomer.  C-O-O-M-E-R.

[*Id.* at ¶ 28 (alteration omitted)].  Mr. Oltmann went on to claim that, in late September 2020, he had infiltrated an "Antifa conference call" with unknown and unverified participants.  [*Id.*]. According to Mr. Oltmann, one of the participants on this conference call was named "Eric" and was referred to as "the Dominion guy."  [*Id.*].  Mr. Oltmann claimed that when one participant asked, "What are we gonna do if f-ing Trump wins? [sic]," the aforementioned "Eric" responded, as paraphrased by Mr. Oltmann, "Don't worry about the election, Trump is not gonna win.  I made f-ing sure of that.  Hahahaha [sic]."  [*Id.*].  Mr. Oltmann then declared that, by Googling "Eric," "Dominion," and "Denver, Colorado," he had identified Dr. Coomer and Dominion Voting

Systems. [*Id.*].[1]  Mr. Oltmann began discussing Dr. Coomer on his podcast on an almost daily basis. [*Id.* at ¶ 34].

On March 11, 2021, Mr. Lindell appeared as a guest on Mr. Oltmann's podcast and was introduced as "Mr. Mike Lindell, the CEO of MyPillow, affectionately known as the MyPillow guy." [*Id.* at ¶ 46].  During the interview, Mr. Lindell informed Conservative Daily's listeners that they could use a unique promotional code for discounts on MyPillow products.  [*Id.*].  Mr. Oltmann concluded the interview by promoting Mr. Lindell's forthcoming social media platform, "Frankspeech," stating: "We will be a tireless advocate for MyPillow.  We'll be a tireless advocate for what we're doing on the election integrity issue, or side, and we will make sure people know about the platform."  [*Id.*].

Frankspeech launched in April 2021.  [*Id.* at ¶¶ 47–48].  Plaintiff alleges that "Defendants utilized Frankspeech to defame Dr. Coomer to an online audience around the world, including Colorado, where their defamatory conduct took a variety of forms, including republication of defamatory articles that had been retracted by other outlets, publication of defamatory interviews conducted by Frankspeech hosts, and publication of defamatory statements by Lindell himself." [*Id.* at ¶ 49].  For example, the Frankspeech website re-published Mr. Oltmann's podcast episodes containing "almost daily publications defaming Dr. Coomer with ongoing allegations that he participated in an Antifa conference call, claimed on that call that he intended to subvert the results of the 2020 election, and then did in fact subvert the presidential election."  [*Id.* at ¶ 50].

---

[1] Plaintiff alleges that "[i]n reality, however, Oltmann actually fabricated evidence of his supposed Google search on November 11, 2020, two days after his initial claims about Dr. Coomer, by deliberately altering a screenshot image to suggest the search had occurred in late September." [Doc. 21 at ¶ 28].

On May 3, 2021, Frankspeech anchor Brannon Howse interviewed Mr. Oltmann.  [*Id.* at ¶ 53].  Mr. Howse began the interview by stating, "[a]gain, I want to remind you before we go to our next guest in Colorado, he's going to tell you about a live conference call with one of the leaders of Dominion voting machines.  Before we go to that guest, don't forget, go to mypillow.com if you would.  Use the promo code FRANK and save up to 66%."  [*Id.* at ¶ 53]. During this interview, Mr. Oltmann repeated his claims about the conference call, specifically identifying Dr. Coomer.  [*Id.* at ¶¶ 54–55].  He again explained that he identified Plaintiff as the "Eric" on the conference call using Google, stating he "started doing research" and "it didn't take [him] much to figure out who [Eric] was.  I Googled 'Eric Dominion Denver Colorado' and up pops all this information on Eric Coomer of Dominion Voting Systems and what he did."  [*Id.* at ¶ 56].

On May 9, 2021, Mr. Lindell appeared on Frankspeech.  [*Id.* at ¶ 61].  He stated, with respect to Plaintiff:

> Yeah, Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation so maybe, just maybe, that you get immunity and you only get to do, I don't know, ten, twenty years.  I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America.  And you know what?  I can say that, just like I can about Brian Kemp and Brad Raffensberger.  These are things that I have evidence of.  The evidence is there.  You know, it's sitting there.  Well Mike, 'Why don't you turn it all in to the Supreme Court and bring it to the FBI?' Oh, it's getting to the Supreme Court, everybody.

[*Id.* (emphasis omitted)].  According to Plaintiff, Mr. Lindell's reference to "deals at Newsmax" refers to Newsmax's on-air retraction of similar claims about—and apology to—Dr. Coomer just days prior.  [*Id.* at ¶ 62].  Then, in August 2021, Mr. Lindell hosted a "Cyber Symposium" that was "created, run, and produced by" Mr. Lindell, MyPillow, and Frankspeech.  [*Id.* at ¶ 70].

Throughout the symposium, Defendants published statements repeating the false allegations against Dr. Coomer.  *See, e.g.*, [*id.* at ¶¶ 82, 84–89].

Defendants were served with this lawsuit just before a "Colorado Election Truth Rally" on April 4, 2022.  [*Id.* at ¶¶ 92–93].  After receiving service of process, Mr. Lindell gave a speech; referring to supposed election fraud, he stated: "It started with Eric Coomer and Dominion based right here in Colorado.  By the way, [Plaintiff] just sued me as I walked up on the stage.  Just sued me, I just got papers.  Thanks, Eric!  Now Eric will be the first one behind bars when we melt down the machines."  [*Id.* at ¶ 94].  The next day, Frankspeech published another statement from Mr. Lindell:

> So everybody, if you want to know just how corrupt, the corruption we're up against.  Eric Coomer served, had served papers to me before I was going onstage at the Capitol.  I've never talked about Eric Coomer.  He's the, apparently he's the president of Dominion, the criminal crime family here in Denver. . . .
>
> Eric Coomer, you are a criminal.  Eric Coomer, your lawyers better look out.  I'm not putting up with this.  My Pillow doesn't even know who you are.  My employees, I have 2,700 employees.  Shame on you Eric Coomer.  You did a very, very stupid move, Mr. Coomer.  You're going to be the first one, right behind Rafsenberger [sic] and Jena Griswold behind bars. . . .  You've been a part of the biggest crime this world has ever seen.  Eric Coomer, president of Dominion, you have even said what you did or what you were going to do.  You're disgusting.  You're disgusting, you're evil, you belong behind bars, and we will not stop until you are behind bars.  We're going to melt down your little machines and you're going to hang on to your little prison bars.  "Let me out, let me out!"  Should have thought about that, Eric Coomer, before you did crimes against the United States and quite frankly all of humanity.  It's disgusting what you've done.  You and Dominion.  And Jena Griswold.

[*Id.* at ¶ 95].

Dr. Coomer alleges that as a result of Defendants' conduct, he "has received countless credible death threats, and continues to receive those threats on a regular basis."  [*Id.* at ¶ 112].  He asserts that he has "been forced to take [measures] to protect himself" due to Defendants' conduct and that he has experienced and will continue to experience serious and emotional physical distress

due to Defendants' actions. [*Id.* at ¶ 116]. He claims harm to his reputation, privacy, safety, and earnings. [*Id.*].

Plaintiff initiated this lawsuit on April 4, 2022 in the District Court of Denver County, Colorado, [Doc. 4], and Defendants removed the case to federal court on May 5, 2022. [Doc. 1]. In his Amended Complaint, Plaintiff asserts three causes of action against all Defendants: (1) defamation, (2) intentional infliction of emotional distress, and (3) civil conspiracy. [Doc. 21 at ¶¶ 117–30].[2]  Defendants now move to dismiss each of these claims under Rule 12(b)(6). *See generally* [Doc. 38].[3]

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather,

---

[2] The Amended Complaint seeks a permanent injunction, which is delineated under a separate heading immediately preceding Plaintiff's recitation of claims. *See* [Doc. 21 at 73]. Defendants interpret this as a separate cause of action, *see* [Doc. 38 at 6]; *see also* [*id.* at 14 (arguing that "Plaintiff's claims seeking injunctive relief and retraction" must fail)], and Plaintiff states, in his Response, that he "has stated a claim for injunctive relief." [Doc. 45 at 24]. However, injunctive relief is a type of remedy, not a standalone claim. *See zvelo, Inc. v. Akamai Techs., Inc.*, No. 19-cv-00097-PAB-SKC, 2019 WL 4751809, at *6 (D. Colo. Sept. 30, 2019) ("Injunctive relief is not a separate cause of action; rather it is one form of the relief for the other legal violations alleged." (alterations omitted)). For this reason, the Court does not construe Plaintiff as asserting a separate cause of action, but merely delineating one type of relief sought should Plaintiff succeed on the merits of his claims. *See id.*

[3] Defendants' Motion to Dismiss is not raised under Colorado's anti-SLAPP statute, Colo. Rev. Stat. § 13-20-1101. *See generally* [Doc. 38].

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible").  The ultimate duty of the Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

### I.   Defamation

"Defamation is a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage," *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994), and a common-law cause of action exists to "compensate individuals who have suffered harm to their reputations due to the careless or malicious communications of others." *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008).  To state a defamation claim under Colorado law,[4] a plaintiff must allege facts plausibly establishing "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court*, 866 P.2d 908, 911 n.4 (Colo. 1993).

---

[4] Neither side engages in a choice-of-law analysis, but both sides proceed as if Colorado law applies. *See, e.g.*, [Doc. 38 at 7–10; Doc. 45 at 3–5].  The Court thus assumes that Colorado law applies in this case. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

However, if a statement "concerns a public figure or a matter of public concern, it is subject to heightened standards." *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1287 (Colo. App. 2022).  This is because "[t]he interest in protecting an individual's reputation is not paramount in all circumstances," and that interest "must be weighed against society's interest in encouraging and fostering vigorous public debate, an interest protected by the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution." *McIntyre*, 194 P.3d at 524.  Relevant here, to succeed on a defamation claim based on a statement related to a public concern, "all plaintiffs, public or private, must prove actual malice," as opposed to negligence.  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017) (applying Colorado law) (footnote omitted) (citing *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1105–06 (Colo. 1982)).

## A.    Matters of Public Concern

In their Motion to Dismiss, Defendants argue that the heightened "actual malice" standard applies to Plaintiff's defamation claim.  [Doc. 38 at 7].  Their argument is two-fold: first, they assert that the alleged defamatory statements relate to an issue of public concern because "[i]n this case, Plaintiff disputes statements concerning the security and accuracy of the 2020 Presidential election," and "[c]ourts have recognized that protecting elections is a matter of public concern." [*Id.* at 8].  In the alternative, they contend that Plaintiff is a "limited public figure" because, "[b]y accepting responsibility concerning election related services, security, and fairness, Plaintiff became a limited purpose public figure with respect to issues of election services, security, and fairness." [*Id.* at 9].  Dr. Coomer disagrees, arguing that (1) his private conduct is not a matter of public concern, and (2) he is not a public figure because he has done nothing to inject himself into the public sphere.  [Doc. 45 at 6–8].

Whether a statement involves a matter of public concern is a question of law and is determined on a case-by-case basis. *Examination Bd. of Pro. Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, 519 F. Supp. 3d 893, 908 (D. Colo. 2021), *aff'd*, 36 F.4th 1238 (10th Cir. 2022); *accord Lawson v. Stow*, 327 P.3d 340, 346 (Colo. App. 2014). "The boundaries of public concern cannot be readily defined," but Colorado courts recognize that "a matter is of public concern whenever it embraces an issue about which information is needed or is appropriate, or when the public may reasonably be expected to have a legitimate interest in what is being published." *Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) (quotation omitted). "Somewhat more specifically, a matter is of public concern when 'it can be fairly considered as relating to any matter of political, social, or other concern to the community.'" *McIntyre*, 194 P.3d at 525 (quoting *Barrett v. Univ. of Colo. Health Scis. Ctr.*, 851 P.2d 258, 263 (Colo. App. 1993)). But courts have also "made clear that 'essentially private concerns or disagreements do not become public controversies simply because they attract attention.'" *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1176 (D. Colo. 1999) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)).

To determine whether a statement involves a matter of public concern, the Court reviews the "content, form, and context of the speech." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quotation omitted). Here, Plaintiff alleges that Defendants made or published false statements claiming that Plaintiff "participated in a conspiracy that undermined the integrity of the election; disenfranchised millions of voters; and fraudulently elected the president of the United States." [Doc. 21 at ¶ 119]; *see also, e.g.*, [*id.* at ¶¶ 2–4, 46, 49–56, 80–89, 94, 98].

The Court agrees that the challenged statements relate to a "matter of political, social, or other concern to the community" and thus involve a matter of public concern. *See Mauff v. People*,

123 P. 101, 103 (Colo. 1912) ("It is a matter of general public concern that, at all elections, . . . safeguards be afforded."). A number of courts have recently reached this same conclusion, including two Colorado state trial courts adjudicating other litigation involving Plaintiff. *See Coomer v. Salem Media of Colo., Inc.*, No. 2021CV33632, slip op. at 5 (Denver Dist. Ct. Aug. 15, 2022) ("*Salem Media*") ("The Court finds this matter is a public concern because the public has a real legitimate interest in fair and secure elections as part of the democratic election process."); *Coomer v. Donald J. Trump for President, Inc.*, No. 2020CV034319, slip op. at 72 (Denver Dist. Ct. May 13, 2022) ("In this case, the Defendants' statements concerning Coomer's alleged involvement in election fraud [relate to matters of public concern] because those statements related to existing public concerns about security of voting machines and thus, their statements have 'the potential to impact many members of the public or the public as a whole.'" (quoting *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1037 (10th Cir. 2013)); *Smartmatic USA Corp. v. Lindell*, No. 22-cv-00098 (WMW/JFD), 2022 WL 4343299, at *3 (D. Minn. Sept. 19, 2022) ("The invalidity of a presidential election as a result of hacking is a matter of public concern."); *cf. Coomer v. Make Your Life Epic LLC*, No. 21-cv-03440-WJM-KLM, 2023 WL 2390711, at *5 (D. Colo. Mar. 7, 2023) ("*Make Your Life Epic LLC*") (concluding in the anti-SLAPP context that "election security and administration" is a public issue, rendering the plaintiff's case within the scope of the anti-SLAPP statute). Because the alleged defamatory statements relate to a matter of public concern, the "actual malice" standard applies to Plaintiff's defamation claim. *Brokers' Choice*, 861 F.3d at 1109.[5]

---

[5] Having made this determination, the Court need not decide whether Dr. Coomer is a public figure. *See Shoen v. Shoen*, 292 P.3d 1224, 1229 (Colo. App. 2012).

### B.     Actual Malice

"A statement is published with actual malice if it is published with actual knowledge that it was false or with reckless disregard for whether it was true." *L.S.S.*, 523 P.3d at 1288.  "Actual malice can be shown if the defendant entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity," *Brokers' Choice*, 757 F.3d at 1136, or if the speaker "willfully chose not to learn the truth." *McIntyre*, 194 P.3d at 530.  Furthermore, "[t]he motivation behind a publication is a factor to consider in determining whether the evidence shows a publisher acted with actual malice," but a "publisher's motive in publishing a story cannot, by itself, provide a sufficient basis for finding actual malice." *Spacecon*, 713 F.3d at 1042–43 (citations omitted).

"At the motion to dismiss stage, 'a . . . plaintiff must plead plausible grounds to infer actual malice by alleging enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice.'" *Farmland Partners Inc. v. Rota Fortunae*, No. 18-cv-02351-KLM, 2020 WL 12574993, at *21 (D. Colo. May 15, 2020) (quoting *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17-cv-07568-PGG-KHP, 2018 WL 847014, at *8 (S.D.N.Y. Jan. 12, 2018), *report and recommendation adopted*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (to plausibly allege actual malice, the complaint must "lay out enough facts from which malice might reasonably be inferred").  Indeed, the Court's function here "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted." *Brokers' Choice*, 757 F.3d at 1135.

Defendants argue that Plaintiff's defamation claim must be dismissed under Rule 12(b)(6) for failure to plausibly allege that Defendants acted with knowledge or reckless disregard of the

falsity of their published statements.  [Doc. 38 at 9].  They assert that "it [is not] enough for a defamation plaintiff to plead that others disagree [with the statement], or that evidence contrary to a politically charged statement exists.  To plead actual malice, a defamation plaintiff must plead facts showing personal conduct or words by the defendant exhibiting knowledge of falsity or reckless disregard as to truthfulness."  [*Id.* (emphasis omitted)].  Defendants cite no legal authority in support of their suggestion that allegations of "personal conduct or words" are required to state a defamation claim under Rule 12(b)(6).  *See generally* [*id.*].  "It is not this Court's job to find case law to support a party's motion."  *KeyBank Nat'l Ass'n v. Williams*, No. 19-cv-03714-CMA-SKC, 2022 WL 4549473, at *2 (D. Colo. May 10, 2022).[6]

In any event, Defendants' argument—that Plaintiff must allege conduct or words from Defendants establishing their knowledge—is inconsistent with the established requirements for pleading actual malice.  Actual malice may be demonstrated through a showing that the publisher's statements "are so inherently improbable that only a reckless man would have put them in circulation" or if there are "obvious reasons to doubt the veracity of the informant or the accuracy of his reports."  *Talley v. Time, Inc.*, 923 F.3d 878, 896–97 (10th Cir. 2019); *see also Fink v. Combined Commc'ns Corp.*, 679 P.2d 1108, 1111 (Colo. App. 1984) (recognizing that "a complete failure to investigate sources of corroboration of published statements may be evidence of actual malice").

---

[6] Similarly, Defendants go on to argue that the Amended Complaint "pleads only conclusory accusations about [Defendants'] subjective knowledge and beliefs," and that "[w]here it pleads specific facts concerning subjective knowledge and beliefs, it states only allegations concerning *other* people." [Doc. 38 at 9 (emphasis in original)].  But Defendants provide no citations to which allegations they deem conclusory or insufficiently specific to support a plausible actual-malice theory.  *See* [*id.*].

Contrary to Defendants' suggestion, Plaintiff does not merely allege that "others disagree" with Defendants' assertions or that evidence contrary to their statements exists.[7]  Plaintiff alleges more.  Specifically, he alleges that the "sole source" of Defendants' statements was Mr. Oltmann, [Doc. 21 at ¶ 105], who claimed to have deduced that Dr. Coomer interfered with the election when he joined an "Antifa conference call," learned of a participant named "Eric," and then Googled "Eric Dominion Denver Colorado." [*Id.* at ¶¶ 28, 56].  But Plaintiff also alleges facts that would permit a factfinder to conclude that Defendants conducted no investigation into the veracity of Mr. Oltmann's assertions prior to promoting or publishing their own statements, despite "obvious reasons to doubt the veracity" of his claims.  *Talley*, 923 F.3d at 896; *see, e.g.*, [Doc. 21 at ¶¶ 18–21, 62, 120]; *see also US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021) (finding allegations sufficient to establish actual malice where the complaint alleged "that Lindell recklessly disregarded the truth by relying on obviously problematic sources to support a preconceived narrative he had crafted for his own profit"); *Make Your Life Epic LLC*, 2023 WL 2390711, at *9 ("There is substantial circumstantial evidence . . . that Defendants acted with reckless disregard of the truth. . . . Defendants made the[ir] statement based on uncorroborated assertions by Oltmann about a conference call that allegedly occurred months earlier and was not recorded.").

Further, the Amended Complaint also contains allegations suggesting that Defendants "disregarded reliable sources refuting their claims" and continued to publish defamatory, false statements about Plaintiff despite publicly available information contradicting their claims, including official government statements and findings; court rulings; and retractions and public

---

[7] Defendants do not raise separate arguments as to any particular Defendant and instead refer collectively to "Defendants," [Doc. 38 at 9–10], and so the Court follows this practice here.

apologies from other sources that had previously published similar claims. *See, e.g.*, [Doc. 21 at ¶¶ 18–22, 24–26, 41, 62, 64]; *see also Smartmatic*, 2022 WL 4343299, at *4–5 (finding allegations sufficient to allege actual malice where the defendants continued making defamatory statements "even after receiving contradictory information"); *Talley*, 923 F.3d at 896. And finally, with respect to MyPillow specifically, Plaintiff alleges that it "has sponsored and sought to profit from the false and defamatory publications by co-Defendants Lindell and Frankspeech." [Doc. 21 at ¶ 8]; *see, e.g.*, [*id.* at ¶¶ 53, 70, 102]; *Spacecon*, 713 F.3d at 1042–43 ("The motivation behind a publication is a factor to consider in determining whether the evidence shows a publisher acted with actual malice."). These allegations, taken together and assumed true, are sufficient to raise "a reasonable expectation that discovery will reveal evidence of actual malice,'" *Farmland Partners*, 2020 WL 12574993, at *21, and are sufficient to plausibly allege actual malice. *Smartmatic*, 2022 WL 4343299, at *5.

### C.  Statements of Opinion

In the alternative, Defendants argue that Dr. Coomer cannot state a defamation claim against Mr. Lindell because all of the challenged statements are opinion statements, which cannot give rise to a defamation claim. [Doc. 38 at 10]. Defendants argue that Plaintiff's "allegations concerning Lindell are heavy on conclusory guilt by association and light on statements about Plaintiff," and suggest that the Court should focus only on "Lindell's alleged statements that mention Plaintiff." [*Id.*]. Again, Defendants do not cite to any allegations in particular that they deem conclusory or insufficiently specific or direct the Court to the allegations they believe the Court should focus on. *See generally* [*id.*].

In a footnote, Defendants reference a number of statements that they contend are "without doubt sharp and unpleasant," but nevertheless entitled to First Amendment protection. [*Id.* at 10

n.4 (referencing statements set forth in Doc. 21 at ¶¶ 61, 94–95, 103)].   Defendants argue that "[t]he statements by Lindell alleged in the Amended Complaint all fall into the category of opinion," as "'[d]isgusting' and 'traitor' are nonactionable opinion and rhetoric in the context of a contested political matter."  [*Id.* at 11].

"Statements of pure opinion are constitutionally protected – that is, they are not actionable defamation." *Lawson*, 327 P.3d at 348.  But there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990).  "To be entitled to full constitutional protection, the statement must not contain a provably false factual connotation or, if it does, it must not be such that it could reasonably be interpreted as stating actual facts." *Lawson*, 327 P.3d at 348.

Colorado courts employ a two-part framework to determine whether a statement is a protected statement of opinion.   "First, the court must determine if the statement is 'sufficiently factual to be susceptible of being proved true or false.'" *Id.* (quoting *Milkovich*, 497 U.S. at 21). "Second, the court must determine 'whether reasonable people would conclude that the assertion is one of fact.'" *Id.* (quoting *Keohane*, 882 P.2d at 1299).  The factors relevant to the second question are: "(1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed." *Keohane*, 882 P.2d at 1299.  A determination that reasonable people could conclude that the statement is an assertion of fact requires only that a "substantial and respectable minority" of the community consider the statement defamatory. *Id.* at 1299 n.9.

Plaintiff alleges that Mr. Lindell, in the context of discussing election fraud and Plaintiff's alleged involvement therein, stated that Plaintiff was "treasonous" and "a traitor to the United

States of America," and seemingly implied that Newsmax's retraction of its statements about Dr. Coomer were due to a "deal" between Dr. Coomer and Newsmax. [Doc. 21 at ¶¶ 61–62]. Furthermore, Plaintiff alleges that Mr. Lindell stated, at the "Colorado Election Truth Rally," which "CALL[ED] ALL FREEDOM Loving American Patriot's [sic] to the steps of the State Capital [sic] to voice concerns about FREE & FAIR ELECTIONS," [*id.* at ¶ 92], that the purported election fraud "started with Eric Coomer and Dominion based right here in Colorado. . . [Dr. Coomer] will be the first one behind bars when we melt down the machines." [*Id.* at ¶ 94].[8] Dr. Coomer avers that Mr. Lindell has repeated the notion that Dr. Coomer is a "criminal," "did crimes against the United States and quite frankly all of humanity," participated in "the biggest crime this world has ever seen," and that he "belong[s] behind bars." [*Id.* at ¶ 95]; *see also* [*id.* at ¶ 98].

Mr. Lindell's alleged statements are sufficiently factual to be susceptible of being proved true or false: Dr. Coomer's actions with regard to the Dominion voting machines either interfered in the 2020 presidential election or they did not. *See US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 31–32 (D.D.C. 2022) (rejecting argument that challenged statements were mere opinions, where the statements were "either true or false" and thus, a reasonable juror could conclude that the defendant's statements "expressed or implied a verifiably false fact about" the plaintiff). And considering the phrasing, context, and circumstances of these statements, as the Court must, the Court concludes that reasonable people could conclude that Mr. Lindell's statements were statements of fact. *Lawson*, 327 P.3d at 348. Mr. Lindell did not frame these assertions as statements of opinion, instead emphasizing that "[t]hese are things that I have evidence of. The evidence is there. You know, it's sitting there," and suggesting that this "evidence" would "[get]

---

[8] Defendants do not argue that Plaintiff cannot rely on statements made by Defendants after the filing of this lawsuit. *See* [Doc. 38].

to the Supreme Court." [Doc. 21 at ¶ 61]. He repeated these sentiments at the "Colorado Election Truth Rally." [*Id.* at ¶ 92 (emphasis added)]. Thus, Plaintiff has sufficiently alleged facts demonstrating that Mr. Lindell expressed or implied a verifiably false fact about Dr. Coomer, and dismissal is not warranted on this basis.

### D.  Vicarious Liability

Defendants next contend that any liability for Mr. Lindell's alleged defamatory statements cannot, as a matter of law, be imputed onto MyPillow. [Doc. 38 at 11]. First, Defendants state that "agency law does not impute liability to MyPillow for Lindell's statements," relying on both Colorado and Minnesota law. [*Id.* at 11–12]. Defendants do not explain the basis for their invocation of Minnesota law except to state that MyPillow is incorporated in Minnesota. [*Id.* at 12]. It is not this Court's duty to perform legal research on behalf of a party or find legal support for a party's unsupported arguments. *See Lebahn v. Owens*, 813 F.3d 1300, 1307–08 (10th Cir. 2016); *Phoenix Ins. Co. v. Trinity Universal Ins. Co. of Kan.*, No. 12-cv-01553-REB-KLM, 2013 WL 4594529, at *2 (D. Colo. Aug. 29, 2013). Because Defendants fail to explain why Minnesota agency law would apply in the context of Plaintiff's Colorado-based defamation claim, and because Defendants do not contend that there is a dispositive choice-of-law issue here, *see* [Doc. 38 at 12 (stating that Minnesota and Colorado law are "similar")]; *see also McLaughlin Grp., Inc. v. Vac-Tron Holdings, Inc.*, No. 20-cv-03531-PAB-SKC, 2022 WL 900155, at *4 (D. Colo. Mar. 28, 2022) ("[A] court should not engage in a choice-of-law analysis unless the choice of law would be dispositive."), the Court will not engage in a choice-of-law analysis here.

Defendants argue that Plaintiff's Amended Complaint fails to plausibly allege that Mr. Lindell's statements were made within the scope of his employment with MyPillow because the Amended Complaint does not allege (1) that Mr. Lindell's employment duties include political

activities or (2) that MyPillow has authorized Mr. Lindell to engage in political commentary on its behalf. [Doc. 38 at 12]. Defendants cite no legal authority establishing that either category of allegations is necessary to state a claim for defamation against a company based on statements made by the company's employees. *See generally* [*id.*]. In his Response, Plaintiff asserts that MyPillow can be held liable for Mr. Lindell's statements under the doctrines of apparent authority, actual authority, and respondeat superior. [Doc. 45 at 18].

Defendants counter in their Reply that the respondeat superior doctrine is inapplicable here because the doctrine applies only to a master-servant relationship, which requires that the employer have the right to control the physical activity of the employee. [Doc. 47 at 11]. Relying on *Grease Monkey International, Inc. v. Montoya*, 904 P.2d 468 (Colo. 1995), Defendants contend that "a corporation does not possess the right to control the physical movements or activities of their Chief Operating Officer" and "[a] COO is only expected to perform certain tasks." [Doc. 47 at 11]. It follows, according to Defendants, that Mr. Lindell's position as CEO of MyPillow is "identical to the COO in *Grease Monkey*" and thus, respondeat superior does not apply here. [*Id.*]. The Court is not persuaded that *Grease Monkey*, which involved an appeal after the entry of judgment, *see* 904 P.2d at 470, is dispositive here. *Grease Monkey* does not stand for the broad proposition that respondeat superior can never apply to hold a corporation liable for an executive-level employee's tortious conduct; rather, the *Grease Monkey* court concluded that the doctrine of respondeat superior did not apply to render a corporation liable for its chief operating officer's tortious acts because, *based on the evidence before it*,

> [i]n the present case, Grease Monkey did not possess the right to control the physical movements or activities of . . . [its] Chief Operating Officer[.] [The COO] was expected to perform certain tasks for Grease Monkey. Grease Monkey did not monitor [the COO's] physical activities, but was only concerned with the results achieved.

*Id.* at 474.

Defendants' argument inherently relies upon assumptions about Mr. Lindell's role as CEO that are not reflected in the allegations in the Amended Complaint. While it may ultimately be determined that, based on the nature of the relationship between MyPillow and Mr. Lindell, respondeat superior is inapplicable to this case, this issue cannot be resolved at the pleading stage. *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). The Court thus does not pass on whether any specific theory of vicarious liability is ultimately applicable in this case.

"Liability is determined by considering, from a factual standpoint, whether the tortious act was done while the employee, whether an agent or servant, was acting within the scope of employment." *Richards v. Att'ys' Title Guar. Fund, Inc.*, 866 F.2d 1570, 1572 (10th Cir. 1989) (applying Colorado law). "Under the *respondeat superior* doctrine, an employer is liable for torts of an employee acting within the scope of employment." *Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 693 (Colo. App. 2006). "The employer is liable if the employee's conduct was motivated by an intent to serve the employer's interests and connected to acts the employee was authorized to perform." *Id.* Further, "[a]cts that are apparently authorized or committed within an agent's inherent powers or where the agent's position enables him to commit a tort exemplify the situations where a principal may be liable for the torts of . . . non-servant agents." *Grease Monkey*, 904 P.2d at 473.

Here, Plaintiff alleges that Mr. Lindell acted as an agent of MyPillow and within the scope of his employment with MyPillow when he made his defamatory statements. *See, e.g.*, [Doc. 21 at ¶¶ 8, 71, 100, 102]. Based on the Court's review of the operative pleading, he supports this assertion with specific assertions plausibly alleging that Mr. Lindell acted within the scope of his employment and/or with the authorization of MyPillow. Mr. Lindell and MyPillow sponsored a

"Women for America First" bus tour that traveled the country to discuss purported election fraud, using a bus with the MyPillow logo on it. [*Id.* at ¶ 40]. MyPillow posted a videotaped advertisement of Mr. Lindell promoting the cyber symposium on its official website. [*Id.* at ¶ 70]. Mr. Lindell referenced MyPillow during his public statements, *see, e.g.*, [*id.* at ¶ 100], and Mr. Lindell appeared to speak on behalf of MyPillow at the "Colorado Election Truth Rally," stating that "My Pillow doesn't even know who [Dr. Coomer is]." [*Id.* at ¶ 95]. And sometimes, MyPillow was directly connected to statements about election fraud or Dr. Coomer. *See, e.g.*, [*id.* at ¶ 102 ("So if you guys want to support both RSBM [sic], myself, My Pillow, everything I'm doing, everything we're all doing together, . . . you can buy something right now and use promo code RSBN. I take all that, and believe me, I can, if you call my company, every dime I get I just pour it back in to help this country.")]; *id.* at ¶ 101 ( MyPillow offering listeners of a radio show a discount using the code "Eric")].

The Court concludes that these allegations are sufficient, at the pleading stage, to plausibly establish that Mr. Lindell's statements were made in the scope of his employment and to promote MyPillow's interests or were made with the authorization of MyPillow. *See Smartmatic*, 2022 WL 4343299, at *6 (finding same type of allegations sufficient to plausibly allege vicarious liability); *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 64 n.13 (D.D.C. 2021) (rejecting similar argument, noting that "Dominion alleges that Lindell repeatedly made his statements while being identified as the CEO of MyPillow, . . . and at MyPillow-sponsored rallies at which he furthered those claims, . . . and that MyPillow accepted promotional codes distributed during Lindell's appearances that alluded to those claims"). Dr. Coomer has sufficiently stated a defamation claim against MyPillow.

### E.       Frankspeech

Next, Defendants contend that Plaintiff fails to state a defamation claim against Defendant Frankspeech. [Doc. 38 at 12].[9] Specifically, they maintain that Frankspeech's publication of the interview with Joe Oltmann is insufficient, *alone*, to constitute defamation against Plaintiff because "[t]he only alleged defamatory component is Oltmann's connection of 'Eric the Dominion guy' to Plaintiff," and "because Oltmann disclosed to his audience the source of his conclusion to connect the Antifa call member to Plaintiff (a simple Google search), this permits the listener to form his or her own opinion about whether the facts presented plausibly connect Plaintiff to the call, and the statement is not actionable." [*Id.* at 13]. In support, Defendants cite two First Circuit cases applying Massachusetts and Michigan law, respectively, standing for the proposition that where a speaker discloses facts underlying his opinion and permits the listener to draw their own conclusions, the speaker's statements are not actionable. *See Piccone v. Bartels*, 785 F.3d 766, 772–73 (1st Cir. 2015); *McKee v. Cosby*, 874 F.3d 54, 61 (1st Cir. 2017).

In his Response, Dr. Coomer notes that "Defendants do not argue . . . that Frankspeech is not liable for any of the other various defamatory statements indisputably published by Frankspeech and described with particularity in Plaintiff's First Amended Complaint." [Doc. 45 at 20 (citing Doc. 21 at ¶¶ 61, 70–89, 95–97)]. Plaintiff identifies a number of allegedly

---

[9] Though Defendants state that "Plaintiff does not plead any basis to hold . . . Frankspeech responsible for statements alleged in the Amended Complaint," [Doc. 38 at 11], they do not raise any argument with respect to vicarious liability as to Frankspeech. *See* [*id.* at 11–13]. Instead, they attack one allegation made by Plaintiff, arguing that it is insufficient to state a defamation claim against Frankspeech. [*Id.* at 12–13]. The Reply refers to the corporate Defendants collectively, *see* [Doc. 47 at 10–11], and appears to raise a vicarious liability argument as to Frankspeech. *See* [*id.* at 11 ("Plaintiff's Amended Complaint does not support a finding that . . . FrankSpeech manifested any intent that Lindell should make any statements related to Dr. Coomer.")]. However, because this argument was raised for the first time in a reply brief, it is deemed waived. *Ulibarri v. City & Cnty. of Denver*, 742 F. Supp. 2d 1192, 1218 (D. Colo. 2010).

defamatory statements in his Amended Complaint that were purportedly published by Frankspeech. *See, e.g.*, [Doc. 21 at ¶¶ 61, 81, 85, 87–89, 95]. Defendants do not respond to this argument in their Reply. *See generally* [Doc. 47]. By failing to address these statements and focusing only on the May 3, 2021 interview, Defendants have not established that the defamation claim against Frankspeech must be dismissed. *See Byrne*, 600 F. Supp. 3d at 32 ("The standard is whether the [Amended] Complaint states a claim for relief, not whether each and every statement mentioned in the Complaint states a claim for relief.").

In any event, the Court is unconvinced by Defendants' argument that Frankspeech's publication of the May 3, 2021 interview cannot support a claim for defamation because "Oltmann disclosed to his audience the source of his conclusion to connect the Antifa call member to Plaintiff," thus permitting the listener "to form his or her own opinion about whether the facts presented plausibly connect Plaintiff to the call." [Doc. 38 at 13]. Assuming without deciding that Mr. Oltmann's statements could be couched as opinion statements, this would not necessitate dismissal of Plaintiff's defamation claim against Frankspeech. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 18–19. "Simply couching such statements in terms of opinion does not dispel these implications." *Id.* at 19. As explained by the Tenth Circuit, "*Milkovich* distinguishes between what one scholar has labeled evaluative and deductive opinion[s]." *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv. Servs., Inc.*, 175 F.3d 848, 853 (10th Cir. 1999) (citation omitted). "[E]valuative opinions are those that are not provably false, and a writer or speaker may not be held liable on a defamation claim for expressing them. In contrast, deductive opinions are those

that state or imply assertions that may be proven false; the First Amendment does not immunize them from defamation claims." *Id.*

"To be entitled to full constitutional protection, the statement must not contain a provably false factual connotation or, if it does, it must not be such that it could reasonably be interpreted as stating actual facts." *Lawson*, 327 P.3d at 348. Here, the statement made by Mr. Oltmann— that Dr. Coomer participated in an "Antifa conference call" and, on that call, explained his plans to subvert the 2020 presidential election, [Doc. 21 at ¶ 55–56]—is either true or false; either Dr. Coomer was on the call or he was not. *Byrne*, 600 F. Supp. 3d at 32. Accordingly, Mr. Oltmann's statement contains a provably false factual connotation, and the Court must consider the statement's phrasing, context, and surrounding circumstances to determine whether reasonable people could interpret Mr. Oltmann's statement as an assertion of fact. *Keohane*, 882 P.2d at 1299.

During the interview, Mr. Oltmann was asked "So you were on a phone call with Eric . . . Cooner [sic]? Is that his name again?" Mr. Oltmann responded "Eric Coomer, yes," identifying him as the "Director of Strategy and Security for Dominion Voting Systems, among other things," and repeating his claim that on the conference call, Dr. Coomer admitted to plans to subvert the 2020 election. [Doc. 21 at ¶¶ 54–55]. He then explained how he identified Dr. Coomer: "Now, I got off that call, . . . started doing research, researched, uh, it wasn't that brilliant even though I'm in a data company[;] it didn't take me much to figure out who he was. I Googled 'Eric Dominion Denver Colorado' and up pops all this information on Eric Coomer of Dominion Voting Systems and what he did." [*Id.* at ¶ 56]. When later discussing Dr. Coomer's defamation lawsuit against him, Mr. Oltmann remarked, "the truth hurts, I guess," and "I didn't lie." [*Id.* at ¶ 58].

Contrary to Defendants' argument, these statements do not simply provide an opinion and leave it to the listener to draw their own conclusions; rather, these purported statements are

definitive and conclusive in nature, with Mr. Oltmann stating that he had "figure[d] out who" the Eric on the call was.  [*Id.* at ¶ 56].  Furthermore, Mr. Oltmann's statement in the May 3, 2021 interview followed months of repeated similar statements definitively accusing Dr. Coomer of this activity.  *See, e.g.*, [*id.* at ¶ 28 ("[W]e're going to expose someone inside of Dominion Voting Systems specifically related to Antifa and related to someone that is so far left and is controlling the elections, and his fingerprints are in every state. . . . The conversation will be about a man named Eric Coomer."); *id.* at ¶¶ 32, 34 ("Eric Coomer.  This shitbag and the corrupt asshats in Dominion Voting Systems must not steal our election and our country!")].  While the Court does not pass on whether these statements themselves are actionable, they provide important context to Mr. Oltmann's statements in the May 3, 2021 interview because they suggest Mr. Oltmann's confidence in the factual veracity of his statements.  *See Keohane*, 882 P.2d at 1303 (considering listeners' knowledge of surrounding contextual circumstances to determine whether reasonable people could take assertions as statements of fact).  Reasonable people could construe Mr. Oltmann's statements during the May 3, 2021 interview on Frankspeech as assertions of fact, and for this reason, the defamation claim against Frankspeech is not subject to dismissal at this time.

In sum, the Court is respectfully unpersuaded that dismissal is warranted under the law, and thus, the Motion to Dismiss is **DENIED** with respect to the defamation claim.

## II.   Intentional Infliction of Emotional Distress

Turning to Plaintiff's second claim, Defendants argue that Plaintiff fails to state a claim for intentional infliction of emotional distress ("IIED") because he fails to plead outrageous conduct.  [Doc. 38 at 13–14].  Specifically, they contend that "[h]osting or sponsoring an event where

another person makes allegedly defamatory statements falls far short for the IIED 'outrageous' standard." [*Id.* at 14].  Defendants cite no legal authority in support.  *See* [*id.*].[10]

To state a claim for intentional infliction of emotional distress, a plaintiff must allege facts establishing that "(1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused the plaintiff to suffer severe emotional distress." *English v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004).  "'Outrageous conduct' is defined as conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994) (quoting *Destefano v. Grabrian*, 763 P.2d 275, 286 (Colo. 1988)).  "Although the question whether conduct is outrageous is generally one of fact to be determined by a jury, the trial court is initially responsible for determining whether reasonable persons could differ on the question." *English*, 99 P.3d at 93; *see also* Restatement (Third) of Torts § 46, cmt. g (2012) (explaining that if the conduct alleged "could be found extreme and outrageous," the jury must determine whether the defendant engaged in extreme and outrageous conduct); *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. 1978) ("We believe that the conduct here lies so near the bounds of indecency that the question of whether it is actionably outrageous was properly left to the jury.").

Dr. Coomer alleges that Defendants made and/or published false statements accusing him of interfering in the 2020 presidential election, branding him a "criminal," a "traitor," and "treasonous."  *See, e.g.*, [Doc. 21 at ¶¶ 49–61, 70, 80–89, 95].  He alleges that Defendants knew

---

[10] Defendants also argue that Plaintiff fails to state a claim because he fails to allege actual malice. [Doc. 38 at 13–14].  This argument is foreclosed by the Court's above analysis.

their statements were false or that Defendants had reason to doubt their veracity, [*id.* at ¶¶ 62, 76, 120], as these statements were made or published despite Defendants' knowledge of countervailing evidence calling the veracity of the statements into question.  [*Id.* at ¶¶ 18–22, 24, 26, 61–62, 64]. The Court concludes that reasonable people could conclude that Defendants' conduct was extreme and outrageous, and thus, this question is properly left to the jury.  *See Meiter*, 580 P.2d at 401; *Salem Media*, slip op. at 11 (concluding that statements accusing "Plaintiff of conspiring to alter the results of the 2020 presidential election[,]" "brand[ing] Plaintiff as a traitor, impugn[ing] his personal and professional reputation, and incit[ing] threats of violence against him" were sufficient to allege extreme and outrageous conduct); *cf. Make Your Life Epic LLC*, 2023 WL 2390711, at *9 (in anti-SLAPP context, concluding that Plaintiff established outrageous conduct by "present[ing] evidence that [the defendants], for a period of at least a year, repeatedly accused Dr. Coomer (or amplified others' accusations) of the crimes of election fraud and treason, that they did so in reckless disregard of the truth, and that they persisted in these accusations even after a point in time when they reasonably should have known of the death threats Plaintiff had received"). Because Plaintiff has set forth sufficiently plausibly facts to state an IIED claim, the Motion to Dismiss is **DENIED** with respect to this claim.

## III.   Civil Conspiracy

Lastly, Defendants argue that Plaintiff's civil conspiracy claim must fail because it "is a derivative claim and hinges on the viability of the defamation and IIED claims."  [Doc. 38 at 14]. Because this Court has concluded that dismissal of Plaintiff's first two claims is not warranted, the Court reaches the same conclusion as to the civil conspiracy claim.  The Motion to Dismiss is thus **DENIED** insofar as it seeks dismissal of Plaintiff's civil conspiracy claim.

**CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that:

(1)     Defendants' Corrected Rule 12(b)(6) Motion to Dismiss Amended Complaint and

Supporting Memorandum of Law [Doc. 38] is **DENIED**.


DATED:  March 15, 2023           BY THE COURT:

_____
Nina Y. Wang
United States District Judge