# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

     Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

     Defendants

---

## EXHIBIT 6

---

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
 3     ERIC COOMER, PH.D.,        §
                                  §
 4        PLAINTIFF,              §   CIVIL ACTION NO.
                                  §   1:22-CV-01129-WJM
 5     V.                         §
                                  §
 6     MICHAEL J. LINDELL,        §
       FRANKSPEECH, LLC, AND      §
 7     MY PILLOW, INC.,           §
                                  §
 8        DEFENDANTS.             §
 9
10
11             ORAL AND VIDEOTAPED DEPOSITION OF
                      MAX JOSEPH MCGUIRE
12                    NOVEMBER 17, 2022
13
14
        0000000000000000000000000000000000000000000000000
15      0000000
          ORAL AND VIDEOTAPED DEPOSITION OF MAX JOSEPH
16      MCGUIRE, produced as a witness at the instance of
        the Plaintiff and duly sworn, was taken in the above
17      styled and numbered cause on Thursday, November 17,
        2022, from 10:22 a.m. to 7:11 p.m., before TAMARA
18      CHAPMAN, CSR, RPR-CRR in and for the State of Texas,
        reported by computerized stenotype machine, at the
19      offices of Cain & Skarnulis PLLC, 303 Colorado
        Street, Austin, Texas, pursuant to the Federal Rules
20      of Civil Procedure and any provisions stated on the
        record herein.
21
22
23
24
25
        Job No. TX 5465767

                                                   Page 1
```

```
 1                    A P P E A R A N C E S
 2
       FOR THE PLAINTIFF:
 3         Charles J. Cain
           Bradley A. Kloewer
 4         CAIN & SKARNULIS PLLC
           101 N. F Street, Suite 207
 5         Salida, Colorado 81201
           719-530-3011
 6         ccain@cstrial.com
           bkloewer@cstrial.com
 7
 8     FOR THE DEFENDANTS:
           Ryan Malone (via telephone)
 9         PARKER DANIELS KIBORT
           123 North Third Street
10         Minneapolis, Minnesota 55401
           612-355-4100
11         malone@parkerdk.com
12
       FOR THE WITNESS:
13         Randy B. Corporon
           LAW OFFICES OF RANDY B. CORPORON, PC
14         2821 S. Parker Road, Suite 555
           Aurora, Colorado 80014
15         303-749-0062
           rbc@corporonlaw.com
16
17     FOR CD SOLUTIONS, INC.:
           Daniel R. Coombe
18         COOMBE CURRY RICH & JARVIS
           2000 South Colorado Boulevard
19         Tower II, Suite 1050
           Denver, Colorado 80222
20         303-572-4200
           coombe@ccrjlaw.com
21
22     ALSO PRESENT:
          Peter Zierlein, Videographer
23        Eric Coomer, Plaintiff
24
25
```

Page 2

```
 1                        I N D E X
 2
                                                   PAGE
 3
 4  APPEARANCES................................     2
 5    MAX JOSEPH MCGUIRE
 6  EXAMINATION
       BY MR. CAIN.............................     6
 7
 8  CORRECTION PAGE...........................    271
    SIGNATURE PAGE............................    272
 9  REPORTER'S CERTIFICATION..................    273
10
11                      E X H I B I T S
12  NO.            DESCRIPTION               PAGE
    Exhibit 11     Subpoena to Testify at a
13                 Deposition in a Civil
                   Action
14                 (No Bates - 10 pages)          16
    Exhibit 12     CD Solutions Consulting
15                 Agreement
                   (No Bates - 14 pages)          58
16  Exhibit 13     Non-Disclosure Agreement
                   (No Bates - 10 pages)          61
17  Exhibit 14     Fax Blast
                   (No Bates - 2 pages)           88
18  Exhibit 15     Screen Capture
                   (No Bates - 1 page)            91
19  Exhibit 16     11/07/2020 email from Joe
                   Oltmann, Subject "Fwd:
20                 Election fraud"
                   (No Bates - 82 pages)         111
21  Exhibit 17     11/08/2020 email from Joe
                   Otto, Subject "Dominion
22                 Weblinks"
                   (No Bates - 1 page)           121
23  Exhibit 18     Thumb drive containing 15
                   images
24                 (No Bates)                    125
25

                                            Page  3
```

```
 1                     E X H I B I T S (continued)
 2    NO.              DESCRIPTION                    PAGE
      Exhibit 19    Copy of handwritten notes
 3                  (20CV34319-JODisclosures-
                    000205 -
 4                  20CV34319-JODisclosures-
                    000208)                           127
 5    Exhibit 20    Text exchange between Max
                    McGuire and Jimmy
 6                  Sengenberger
                    (No Bates - 1 page)               140
 7    Exhibit 21    Screenshot of "eric
                    dominion denver colorado"
 8                  taken on 9/26/2020
                    (20CV34319-JOdisclosures-
 9                  0199)                             159
      Exhibit 22    Affidavit
10                  (Powell 000206 - Powell
                    000211)                           164
11    Exhibit 23    03/10/2021 email from Dawn
                    Curtis, Subject "RE:
12                  Conservative Daily Podcast
                    Revenue share items and
13                  Lindell Schedule for
                    Thursday"
14                  (No Bates - 1 page)               184
      Exhibit 24    Parler post by Joe Oltmann
15                  (No Bates - 1 page)               188
      Exhibit 25    Parler post by Joe Oltmann
16                  (No Bates - 1 page)               191
      Exhibit 26    Text communication
17                  (No Bates - 8 pages)
                                                      210
18    Exhibit 27    Text communication
                    (No Bates - 3 pages)              223
19    Exhibit 28    Text communication
                    (No Bates - 1 page)               228
20    Exhibit 29    Text communication
                    (No Bates - 1 page)               232
21    Exhibit 30    Text communication
                    (No Bates - 3 pages)
22                                                    234
      Exhibit 31    Text communication
23                  (No Bates - 1 page)               239
      Exhibit 32    Text communication
24                  (No Bates - 3 pages)
                                                      241
25
```

Page 4

1                   E X H I B I T S (continued)

2   NO.                DESCRIPTION                      PAGE

    Exhibit 33     Text communication

3                   (No Bates - 1 page)               245

    Exhibit 34     Text communications with

4                   Keith Sawarynski

                    (No Bates - 1 page)               248

5   Exhibit 35     Telegram posts

                    (No Bates - 21 pages)             251

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 5

```
 1                    THE VIDEOGRAPHER:  Here begins the
 2    deposition of Max McGuire.  Today's date is
 3    November 17th, 2022, and the time is 10:22 a.m.
 4                    Will counsel please identify
 5    themselves for the record, after which the court
 6    reporter will swear in the witness.
 7                    MR. CAIN:  My name is Charlie Cain.
 8    To my right is Brad Kloewer.  To his right is my
 9    client, Eric Coomer.  For the plaintiff.
10                    MR. CORPORON:  Randy Corporon,
11    attorney for the deponent.
12                    MR. MALONE:  Ryan Malone, counsel for
13    defendants Michael Lindell, FrankSpeech, and My
14    Pillow.
15                    MR. COOMBE:  Daniel Coombe for
16    interested party, CD Solutions.
17                    MAX JOSEPH MCGUIRE,
18    having been first duly sworn, testified as follows:
19                    EXAMINATION
20    BY MR. CAIN:
21        Q.    Good morning.
22        A.    Good morning.
23        Q.    Tell us your full name.
24        A.    Max Joseph McGuire.
25        Q.    Where do you live, Mr. McGuire?
```

Page 6

1       A.      Full address?

2       Q.      Yes, sir.

3       A.      7630 Bismarck Lake, Converse, Texas,

4  78109.

5       Q.      How long have you lived in Texas?

6       A.      I moved here beginning of 2019.

7       Q.      Where did you live before then?

8       A.      I lived in Castle Pines, Colorado.

9       Q.      How long were you a Colorado resident?

10       A.      I moved to Colorado the summer of 2014.

11  So not quite five years.

12       Q.      Since 2019, when you were on the

13  Conservative Daily podcast, were you logging in from

14  Texas to do your part of the show?

15       A.      Yes, with the exception of times where I

16  was in Colorado.

17       Q.      Is it safe to assume when you had the San

18  Antonio backdrop, you were in Texas?

19       A.      Yes.  Yes.

20       Q.      Obviously we're here to take your

21  deposition.  I think I met you about 15 minutes ago

22  for the first time.  Is that right?

23       A.      Yeah.

24       Q.      And you indicated you had not been

25  deposed before.  Is that correct?

Page 7

1       A.    Yes.

2       Q.    We talked a little bit about the ground

3  rules, but I'm going to go over those again, if

4  that's all right.

5       A.    Okay.

6       Q.    You're doing a good job of answering out

7  loud.  You are shaking your head.

8       A.    Uh-huh.

9       Q.    But ultimately you have to --

10      A.    Out loud, yeah.

11      Q.    -- use your speaking voice.

12          We also talked about trying not to talk

13  over each other.  And I often have the problem

14  because I speak deliberately.  And young guys like

15  you speak a lot more quickly that I do.

16          So, please, do your best to let me get my

17  question out before you answer.  Okay?

18      A.    Okay.

19      Q.    The other part to it is you'll have a

20  chance, if you choose, to look at your transcript

21  and correct any errors that you may see, and sign it

22  at the end of all of this, but while we're here, if

23  I ask you something that you don't understand, I

24  don't want you to answer that question.  I want you

25  to tell me that you didn't understand my question

Page 8

1          1 and you ask me to repeat it.  Okay.

2          2     A.    Okay.

3          3     Q.    Okay.  Otherwise I'm going to assume that

4          4 you understood what I was asking you.  Is that fair?

5          5     A.    Yeah.

6          6     Q.    All right.

7          7              THE STENOGRAPHER:  I'm sorry.  Can we

8          8 just take a quick pause for technical...

9          9              THE VIDEOGRAPHER:  Going off the

10        10 record.  The time is      .

11        11              (Break.)

12        12              THE VIDEOGRAPHER:  Back on the

13        13 record.  The time is 10:29.

14        14     Q.    The other thing is if you need a break,

15        15 you're entitled to take one.  We typically go about

16        16 an hour or an hour and a half between breaks.

17        17     A.    Okay.

18        18     Q.    And you're welcome to take a break so

19        19 long as there is not a question pending.

20        20     A.    Okay.

21        21     Q.    You can't go out and figure out the

22        22 answer.

23        23     A.    Makes sense.

24        24     Q.    And then lastly, you started, and we

25        25 started with you being sworn in.  It's the same

Page 9

1    thing as if you were down at the courthouse.  I know

2    we're in my conference room, but I think you

3    understand the importance of that.

4        A.    Yes.

5        Q.    And I won't make you put your hand on the

6    Bible here, but in effect that's what you're doing.

7        A.    Okay.

8        Q.    You've got an attorney here with you,

9    Mr. Corporon.  Is he representing you here today?

10       A.    Yes.

11       Q.    When was he hired?

12               MR. CORPORON:  It's okay.

13       A.    I don't know.  I don't know the exact

14   date.  Because I know that it was --

15               MR. CORPORON:  I don't recall it

16   either.

17       Q.    Approximately?

18       A.    Approximately three weeks ago, right,

19   somewhere around there?

20               MR. CORPORON:  Yeah.

21       Q.    He can't answer questions.  It's really

22   for you.  If you don't know, just tell me you don't

23   know.

24       A.    I don't know.

25       Q.    If I ask you an approximate date, do your

Page 10

1    best to do so.

2          A.    Okay.

3          Q.    Is it fair to say about three weeks ago,

4    give or take?

5          A.    That's fair.  Give or take.

6          Q.    All right.  And do you know who is paying

7    for his services?

8          A.    I do not know the official entity that's

9    paying.

10          Q.    Well, what are the options?

11          A.    The options would be Joel Oltmann or one

12    of Joel Oltmann's companies.  I don't know which

13    signed the check or what bank account it was drawn

14    from.

15          Q.    All right.  Did you have any discussions

16    with Mr. Oltmann about hiring an attorney?

17          A.    He was on an email chain.

18          Q.    When was that email chain?  I presume

19    before Mr. Corporon was hired?

20          A.    Yes.  It would have been roughly two

21    weeks after the subpoena was delivered to me.

22          Q.    All right.  I don't know if that's

23    privileged yet, so I'm not going to ask you about

24    the substance of the chain.

25                I'm just going to ask you about who was

Page 11

1    involved in it.  You said it was Mr. Oltmann,

2    Mr. Corporon, yourself?

3         A.    Mr. Corporon was not on that email.

4         Q.    I apologize.  Okay.  It was Mr. Oltmann?

5         A.    Mr. Oltmann, Mr. Oltmann's personal

6    attorneys.  I don't know their names, but they're

7    representing him in similar matters.  And it was --

8         Q.    Ms. DeFranco?  Does that ring a bell?

9         A.    I don't know.

10        Q.    Andrea Hall?

11        A.    Yes, that rings a bill.

12        Q.    So Mr. Oltmann, Ms. Hall, yourself?

13        A.    Uh-huh.

14        Q.    Yes.

15        A.    And -- and I believe Keith Sawarynski,

16   who is -- Keith Sawarynski and --

17        Q.    Who is he?

18        A.    He is -- I don't know his official title

19   right now, but he is -- he's -- when I was there, he

20   was the president of the company.

21        Q.    Of which company?

22        A.    I don't know the specific title.  The

23   titles have all changed since I've been there.

24        Q.    No, I asked you which company.

25        A.    Oh, that would have been both CD

1   Solutions, I believe.  I -- I don't know.  I don't

2   have the organizational chart in front of me.  But

3   he was involved in PIN Business Network, Shuffling

4   Madness Media, Conservative Daily.  He was involved

5   in all those.

6        Q.    Is there an -- an org chart for those

7   entities that you recall seeing?

8        A.    I don't know.

9        Q.    Are you still a shareholder of any of

10  those entities?

11       A.    I am.

12       Q.    Which ones?

13       A.    All of them.

14       Q.    Okay.  Any -- anyone else -- I'm not

15  going to try to pronounce Keith's last name, but

16  anyone else in this email chain about --

17       A.    Joey -- Joseph Orrino, who is a

18  shareholder of the organizations, and --

19       Q.    And the lawyer?

20       A.    And a lawyer.  And was their in-house

21  counsel.  I don't know if he still is.

22       Q.    And then who else?

23       A.    There was -- I -- I believe there was one

24  other attorney for Joe Oltmann in addition to Andrea

25  on the chain.

Veritext Legal Solutions
800-336-4000

1       Q.     And did you make the request that -- that

2   the entities retain counsel to represent you

3   personally in this case as a witness?

4       A.     Can you -- can you rephrase that?

5       Q.     Yeah.  How did it come about that you --

6   you started emailing with Mr. Oltmann at all about

7   getting you a lawyer?

8       A.     I did not email Mr. Oltmann asking for a

9   lawyer.

10      Q.     Okay.  Then how did that come about?

11      A.     I emailed my -- the company that I'm a

12  shareholder in letting them know that I was served

13  with a subpoena and that I believed that there were

14  documents in my possession that were relevant

15  business-related documents, letting them know that

16  they were in my possession and asking them how they

17  wanted to proceed and explained to them that I

18  didn't know whether I was going to have counsel

19  representing me, but I did believe it was in my best

20  interest to be represented by counsel and asking

21  them if they'd be interested in working with me on

22  that.

23      Q.     Because you knew at the time that you had

24  at least one, maybe two NDAs that might be impacted

25  by your -- the production of documents?

                                        Page 14

1        A.    That -- that's implied, too, yeah.

2        Q.    Is that fair?

3        A.    Yeah.

4        Q.    Okay.  Who made the ultimately decision,

5    if you know, to authorize one or more of these

6    companies to pay for your counsel here?

7        A.    I don't know.

8        Q.    You weren't part of the --

9        A.    No.

10       Q.    -- decision-making?

11             You're answering quick on me.

12       A.    I wasn't.

13       Q.    Okay.

14             MR. CORPORON:  What he's saying is

15    you got to let him finish the question --

16             THE WITNESS:  Yeah.  Sorry, sorry,

17    sorry.

18             MR. CORPORON:  -- before you answer.

19       Q.    Yeah.  So Tamara was getting fidgety.

20       A.    Sorry.

21       Q.    So let's slow our roll, as the kids say.

22             Okay.  So you have this email exchange.

23    Did you actually have any conversations with Joe

24    Oltmann about giving testimony in this case?

25       A.    Can you rephrase that?  I want to make

                                            Page 15

1   sure that I understand precisely what you're asking.

2   About whether or not I would give testimony?

3        Q.    The topic of -- of either giving

4   testimony or the substance of what you would be

5   testifying to.

6        A.    He was involved in that email chain but

7   it was not -- we did not discuss what I would talk

8   about, whether I would talk about anything.  The

9   email was purely about representation.

10       Q.    So it's -- then I take it from your

11  answer that you have not talked to Mr. Oltmann about

12  your testimony?

13       A.    No.

14       Q.    Have you talked to anybody else about

15  giving testimony?

16       A.    My wife.

17       Q.    Okay.  I don't want to get into that.

18  That's privileged.

19       A.    Yeah.

20       Q.    All right.  Now, you mentioned you're

21  here because you received a subpoena.  Correct?

22       A.    That's correct.

23                  (Exhibit 11 was marked.)

24       Q.    All right.  Let's -- let's look at

25  Exhibit 11.  It's 11, as I mentioned before we

Page 16

1    started because we're running these exhibits from

2    deposition to deposition.

3                     MR. CAIN:  Counsel...

4                     MR. CORPORON:  Thank you.

5                     MR. CAIN:  I've got two copies there.

6        Q.    And while you're reviewing that, I

7    mentioned before we started that we're going to kind

8    of do some preliminary stuff, then I'm going to let

9    my staff look at what you brought.

10               Does that appear to be a copy of the

11    subpoena you received?

12       A.    The only difference is I do not believe

13    that Page 2 was filled out when I received it.

14       Q.    Yeah, that's called the proof of service

15    which indicates that you were served on August 30th

16    of 2022.  Correct?

17       A.    Yes.

18       Q.    And that's when you were served

19    personally.  Right?

20       A.    Yes.

21       Q.    So you're not here by an agreement that

22    you and I made.  It's because you were issued a

23    subpoena?

24       A.    Correct.

25       Q.    Your counsel handed me, I'll represent to

1    you because you actually saw it, a thumb drive.

2            MR. MALONE:  It wasn't mine.  I

3    swear.

4        Q.    A thumb drive with some documents.  Is

5    the thumb drive something that you put together from

6    the files that you collected to try to comply with

7    the subpoena?

8        A.    I put together files to comply with the

9    subpoena.  They went to Randy's legal staff.  They

10   put them in two baskets and then this morning I put

11   them on a thumb drive.  I had to drive to Walmart to

12   get the thumb drive.

13       Q.    Thank you.

14             You mentioned two baskets.  Which basket

15   did I get?

16       A.    The same.

17       Q.    Okay.

18       A.    Well -- so there is a basket of files

19   that are nonresponsive and a basket of files that

20   are -- I put in everything I had and then we weeded

21   out.

22       Q.    Okay.  Well, let's just talk about the

23   nonresponsive basket.  Generally, can you describe

24   to me what types of files would be in that basket?

25       A.    Generally, things that do not respond to

Veritext Legal Solutions
800-336-4000

```
 1    any of the 11 paragraphs on the subpoena, text
 2    messages, emails.  In the early part of document
 3    collection, I tried to be overly generous with what
 4    I was producing just in case -- I didn't want to
 5    miss anything and then obviously we would look
 6    through that and figure out what's responsive to the
 7    actual questions.
 8         Q.    Who ultimately made the decision as to
 9    what was responsive and nonresponsive?
10         A.    I mean, technically, I put it on the
11    thumb drive so I guess technically it's me, but it
12    was -- it was me in coordination with Randy and his
13    paralegals.
14         Q.    Got you.  Thank you.
15              So looking at the -- the 11-document
16    request, I'm not going to read those into the
17    record, nor do I want you to because we pay by the
18    word here.  But I've -- I put that thumb drive into
19    this port on my computer just to kind of familiarize
20    myself with it.
21              The first thing that I asked you for,
22    generally speaking, relates to communications
23    between yourself and the Lindell Group, which would
24    be My Pillow and FrankSpeech.  And what I saw you
25    provided us with appears to just be an email
```

Page 19

1    relating to it looks like the advertising on the

2    podcast.  Is that right?

3        A.    That's correct.

4        Q.    All right.  And obviously, we'll talk

5    about that in a little more detail later, but I --

6    just because I have it up here, I'll just represent

7    to you what I'm looking at in response.

8              You've got an email from Mr. Oltmann

9    dated March 10 of 2021 and you're copied on that.

10   Do you remember that email?

11       A.    Yeah.

12       Q.    Okay.  And this appears to be -- well,

13   let me back up.

14             Is March of 2021 when Lindell or My

15   Pillow started advertising with Conservative Daily?

16       A.    I don't know.

17       Q.    Were you still doing the podcast at that

18   time?

19       A.    Yes.

20       Q.    And I -- I'm going to call it a podcast.

21   Is -- is it a podcast?

22       A.    Yeah.

23       Q.    Okay.  And it's -- it's a podcast, but it

24   has -- it's on video so --

25       A.    It's a video podcast.  We have video

Page 20

1    versions, audio versions.

2        Q.    All right.  And why don't you know when

3    Lindell started advertising with -- with CD?

4        A.    That's the only email I had in my files.

5    I do not know -- I don't want to misrepresent facts

6    to you.  I do not know whether there were other

7    emails on my work emails that I no longer have

8    access to.  So I don't want to misrepresent that.

9    That's the only email that was in my possession.

10       Q.    Okay.  I'm going to divorce you now from

11   this exhibit and ask you based on your personal

12   knowledge or memory, do you remember when Lindell or

13   My Pillow began their advertising with Conservative

14   Daily?

15       A.    It would have been right around there,

16   but I don't precisely remember.  There might have

17   been some kind of agreement that I wasn't privy to.

18       Q.    Were you -- what was your role, if you

19   had one, in terms of the advertising component,

20   bringing people in to -- to advertise with

21   Conservative Daily?

22       A.    I do a lot of that, mainly with vendors

23   that I had reached out to and made -- and made

24   agreements with.  But this was not one that I

25   spearheaded.

Page 21

1         Q.    This wasn't -- in essence, this wasn't

2    your account?

3         A.    No.

4         Q.    Whose account was it?

5         A.    I don't know.

6         Q.    And you mentioned other vendors.  Was it

7    the practice of Conservative Daily in 2021 to have

8    written agreements with advertisers who were going

9    to advertise their products on the show?

10         A.    Yes and no.  I worked with a company

11    called AdvertiseCast and we had an agreement with

12    AdvertiseCast built into their terms of service.

13    They would then refer potential clients to us and we

14    would accept those clients or reject them.  We did

15    not have paper agreements with the clients -- the

16    advertising clients that AdvertiseCast recommended

17    to us.

18         Q.    They were the conduit in that sense?

19         A.    Yeah.

20         Q.    And was that the case for My Pillow?

21         A.    I don't know.

22         Q.    This email that you brought talks about

23    setting up a promo code and we're not going to go

24    into that because I don't have it in front of you,

25    at least in detail.  And there's CD21 was the promo

Page 22

1    code for this particular My Pillow?

2        A.    Yes.

3        Q.    Okay.  Tell me how, if you know, the

4    promo code worked in -- in terms of the financial

5    flow from using that promo code?

6        A.    The only knowledge I have on how promo

7    codes work on My Pillow's website are as a customer

8    of My Pillow's website.  I was not privy to the

9    actual financial details about that arrangement.

10        Q.    So you have no knowledge whatsoever about

11    that?

12        A.    I received updates periodically on how

13    much we had generated in revenue from that, but I

14    was not privy to the realtime financials.

15        Q.    Okay.  When you received updates on the

16    revenue, in what form would that take?

17        A.    Usually an email, to my work email or it

18    would be verbally.

19        Q.    And your work email was what?

20        A.    It was Max@pidoxa.com.

21        Q.    Can you spell the last part of that?

22        A.    Sure.  P-I-D-O-X-A.com.

23        Q.    And what is PiDoxa?

24        A.    That is a company that was established to

25    work in this space, the conservative political

Page 23

Veritext Legal Solutions
800-336-4000

1    space.

2        Q.    And are you an owner of that entity?

3        A.    I believe so.

4        Q.    A shareholder?

5        A.    I believe so.

6        Q.    Do you know who else is?

7        A.    I couldn't give that to you off the top

8    of my head.

9        Q.    Is -- is Mr. Oltmann --

10        A.    Yes.

11        Q.    -- part of that?

12        A.    Yes.

13        Q.    Thank you.

14              As it relates, though, to this -- My

15    Pillow promo code, do you know whether or not the --

16    the entity -- or let's just say the podcast, as it

17    may be funneled to different entities, I don't

18    know -- received a portion of the revenue from that

19    sale; in other words, if a -- if a My Pillow

20    customer bought using that promo code CD21, did a

21    portion of that transaction flow back to

22    Conservative Daily?

23        A.    I can't speak to how their system is set

24    up, but generally, that's how promo codes, in my

25    experience, have worked.

```
 1          Q.    Okay.  And if I were to ask the company
 2    that received that revenue for the name of the
 3    reporting of that, what -- what would I ask for?
 4    What --
 5                    MR. CORPORON:  Objection.
 6                    MR. CAIN:  I'm sorry, Randy.
 7          Q.    -- what type of a report would -- would
 8    be appropriate to ask for?
 9          A.    I don't know.  I mean, some general type
10    of financial report.
11          Q.    When you were receiving emails that
12    updated you on revenue, who was reporting that to
13    you?  A CFO or a controller?
14          A.    I don't remember.  It was so long ago.
15    And these were generally just me asking for the
16    purposes of invoicing myself.
17          Q.    Do you have an independent recollection
18    of approximately how much revenue came in as a
19    result of using the CD21 code?
20          A.    I don't.
21          Q.    Do you know whether Mr. Oltmann was
22    tracking that information closely?
23          A.    Yes.
24          Q.    I asked you if you knew.  You said yes.
25    Does that mean he was?
```

Page 25

1    A.    Yes.

2    Q.    All right.  Thank you.

3          And the reason, I -- I take it, that you

4    don't have more documents responsive to No. 1 is

5    because you don't have access to your work email

6    anymore?

7    A.    This wasn't an account that I

8    spearheaded --

9    Q.    Yeah.

10   A.    -- so it would not have gone directly to

11   me.  And I cannot speak to what's in my work emails

12   because I don't have access to them, and it was so

13   long ago.

14   Q.    Okay.  Well, you said your PiDoxa --

15         Am I saying that right?

16   A.    Sure.

17   Q.    -- was the email that you would

18   receive -- this particular email actually went to

19   max.mcguire@conservative --

20   A.    Yes.

21   Q.    -- daily.com?

22   A.    Yes.

23   Q.    All right.  So how many emails were you

24   using, email accounts, I should say?

25   A.    I can't give you a precise number.  I

Page 26

1    can't -- I -- I -- there were a lot of emails.

2        Q.    Why were there so many?

3        A.    I -- there are multiple companies under

4    these umbrellas of different own- -- ownership

5    companies like -- whatever you want to call it.    And

6    I wore multiple hats across those organizations.

7            Generally, there was a -- there wasn't a

8    lot of care often put into making sure that the

9    emails were sent to the proper email address.    Lots

10   of times, emails would be sent to me about business

11   that didn't really apply to the email address that

12   it was being sent to.

13           Does that answer your question?

14       Q.    Yeah.  No, I'm -- I'm -- for example, in

15   this email that we've been talking about, it was

16   sent from Dawn Curtis at My Pillow to

17   Joeoltmann@pinbn.com.  What is that email address

18   related to, if you know?

19       A.    PIN Business Network.  And that's an

20   example of what I'm -- what I was just saying, there

21   wasn't a lot of care put into making sure that the

22   emails used were representative of the businesses

23   that we're getting involved.

24       Q.    In terms of the work that you did

25   relating to the podcast, what would -- what email

1    address would you typically use?

2         A.    Max@pidoxa.com.

3         Q.    Okay.  And which entity or entities,

4    plural, were receiving the revenue associated with

5    the Conservative Daily podcast?

6         A.    I can't give you a precise answer.  I

7    don't know.

8         Q.    Were financial statements for the

9    entities that you were involved with consolidated

10   and reported on one financial statement, if you

11   know?

12        A.    I don't know.  Generally, shareholders

13   would only get those kind of financial things at

14   annual meetings.  I can't speak to whether I

15   received any other ones because I don't have access

16   to that email.  I can't verify.

17        Q.    Did you receive financials at the annual

18   shareholder meetings for these companies?

19        A.    Generally, we do, yeah.

20        Q.    Did you retain any of those?

21        A.    No.

22        Q.    Were those provided to the shareholders

23   electronically or in person or something else?

24        A.    My recollection is that they were

25   provided visually, explained orally, and

Veritext Legal Solutions
800-336-4000

1    shareholders wouldn't take copies with them.

2         Q.    And, typically, when -- and let's just

3    talk in general at this point -- when there were

4    shareholder meetings, were there meetings for the

5    combined companies or were there separate meetings

6    for the different companies you were involved with?

7         A.    Well -- so we would have a shareholders

8    meeting once a year.

9         Q.    Uh-huh.

10        A.    And I can't speak to whether or not

11   certain companies were involved.  I don't remember.

12   It was -- it was a long time ago.

13        Q.    Didn't you just have one, I guess, at the

14   end of last year.  Right?

15        A.    I don't remember when that precisely was,

16   so I can't give you a date that it was at.  I could

17   always go and look maybe later.

18        Q.    I remember you said you called in to a

19   shareholder meeting in all Denver?

20        A.    Yes.  Yes.

21        Q.    That was the last one.  Right?

22        A.    That would have been the most recent one.

23   Yeah.

24        Q.    Okay.  And who would typically present

25   the status of the company at the shareholder

Veritext Legal Solutions
800-336-4000

1  meetings?

2      A.    So many different positions have changed.

3  There were people on that call that I didn't

4  recognize because I'd been out of the company long

5  enough for new people to come in.  So I can't answer

6  that, I don't -- I don't know.

7      Q.    Okay.  And I think we touched on this,

8  but is a fair to say, at this juncture, you -- you

9  have not divested yourself of any shares in any of

10 these companies.  Right?

11     A.    No.

12     Q.    So you still -- and this is not a bad

13 thing, but you still have a financial stake in their

14 success.  Fair?

15     A.    That's fair.

16     Q.    Do you have any present intent to divest

17 from these companies?

18     A.    I don't think that the shareholder

19 agreement allows me to do so.  I think -- my

20 recollection is, I can divest upon the sale of the

21 company.

22     Q.    But these are closely-held companies?

23     A.    My understanding of that definition is

24 yes.

25     Q.    All right.  Okay.  I said we were going

Veritext Legal Solutions
800-336-4000

1    to get through this and take a break and then I

2    started talking.  So let -- let's finish just the

3    document portion of this.

4            The next request was really a -- a

5    request of communications between you and -- and

6    Mr. Oltmann.  Is that fair?

7        A.    This is a request for every written

8    communication between me and Joe Oltmann.  Right.

9        Q.    And did you produce every or is that --

10    did that go into one of the buckets?

11        A.    No, that's every -- every one that I have

12    access to.

13        Q.    There's group conversations that appear

14    to be between you and Mr. Oltmann and another fellow

15    named Chris Wiegand?

16        A.    Wiegand (pronouncing), yes.

17        Q.    Thank you.

18            Who is Chris Wiegand?

19        A.    I believe -- his title might have

20    changed, but when I was there, he was considered the

21    CTO, chief technology officer.

22        Q.    Okay.  And what -- what platform were

23    these conversations taking place on?

24        A.    I believe that is a text message.

25        Q.    Okay.  And you backed up your text

Page 31

1    messages?

2        A.    Yes.  I was able to recover all text

3    messages up until whatever the earliest date is

4    there.

5        Q.    You're pretty savvy with computers.  Is

6    that fair?

7        A.    That was the most difficult part of this

8    entire preparation because I have an Android.

9        Q.    Ah.

10       A.    I used to have a iPhone and it was a lot

11   easier.  Trying to figure out how to back it up on

12   an Android for a request this large generated a file

13   that was so large --

14       Q.    Right.

15       A.    -- it was very difficult to transfer that

16   from my phone to my laptop.

17       Q.    So -- so you were communicating,

18   obviously, via phone text message through the

19   messaging app on your Android.  Right.  And then --

20   well, your iPhone and then your Android?

21       A.    Yes, I no longer have access to the

22   iPhone texts.

23       Q.    Okay.  All right.  So then the question

24   is in terms of instant messaging with Mr. Oltmann,

25   tell me what platforms were used that you can

Page 32

```
1    recall.  It sounds like at least one of them was on

2    just the messaging app on the phone, but there are

3    other platforms, obviously, that you could use.

4         A.    I don't know if I can give you an

5    exhaustive list.  I provided to you everything I

6    could find.

7         Q.    Were you able to recover texts from all

8    of the platforms you used?

9         A.    With the exception of phones that I used

10   before -- I believe it was either 7/20/21.  Some of

11   those I was able to recover because I had a phone

12   number that went through Google Voice.  And for

13   those I was able to recover some texts earlier.

14        Q.    Gotcha.

15        A.    But in terms of text to my personal

16   number, there was only so far back I could go.

17        Q.    All right.  And, obviously, you know who

18   I represent.  He's sitting here.

19              When -- to the extent that you and

20   Mr. Oltmann were talking about Eric Coomer or

21   Coomer-related topics, what would I look to in your

22   production that might reflect that?

23        A.    The -- the request here is so broad and

24   so large.

25        Q.    Well, Brad wrote it, not me.
```

Page 33

1        A.    I cannot -- I mean, we're talking about

2    PDF files that are probably, if you printed them

3    out, hundreds of pages.  I can't point you to

4    specific parts of that.  Since you asked for

5    everything, I gave you everything.  And I know that

6    that's inclusive of what you're asking for right

7    now.

8        Q.    Yeah, you're not getting a grade on that

9    today.  It's really -- what I was asking you is if

10    you can think back to the time in November of 2020,

11    in that period, December-January, how were you

12    communicating with Mr. Oltmann, especially as it

13    relates to Coomer issues?

14        A.    Phone calls.

15        Q.    And we don't have a record of what was

16    said on those, I assume.  Right?

17        A.    No.  I didn't have a court reporter there

18    with me.

19        Q.    All right.  So to the extent that we get

20    into that, it's going to be based on your memory of

21    the calls?

22        A.    Yes.

23        Q.    Okay.  Perfect.  No. 3, Oltmann's

24    personal legal defense fund.  Do you remember him

25    trying to raise money for his defense?

Page 34

1          A.     I do.

2          Q.     And, in fact, that was -- you took issue

3     with that at some point.  Right?

4          A.     I do.

5          Q.     Why did you take issue with that?

6          A.     The reason I -- sorry -- the reason I

7     took issue with that, my contract paid me a

8     percentage of revenue that Conservative Daily

9     generated, and I took issue with the idea of

10    funneling our donor base to another -- another bank

11    account that I couldn't invoice on, and that

12    logically would reduce the amount of money going

13    into the bank accounts that I could invoice on.

14              MR. MALONE:   Charlie, I don't know

15    how you want to handle it.  We're going to get

16    through it eventually.  I'd like to designate that

17    testimony, and anything further along that line as

18    confidential discovery material, pursuant to the

19    order.  I can have that standing or I can interrupt

20    you, which I really don't want to do.

21              MR. CAIN:   I think we used the

22    process that the court indicated, which is to allow

23    the deposition to go forward and not require you to

24    do that, but give you the opportunity to review the

25    transcript and do it subsequent.  That should be --

                                        Page 35

1  and I'm okay with that.  And I think that's the

2  easiest way.

3                MR. MALONE:  That's fine.  And I

4  think there is a little confusion as to whether or

5  not it needed to be stated on the record.  So I

6  wanted to make sure we're clear on that.

7                MR. CAIN:  We'll stipulate.  We're

8  not going to make you do it contemporaneously.

9                MR. MALONE:  Thanks.

10                MR. CORPORON:  So long as we're

11  paused, I was going to mention this when you had a

12  chance to look through the documents and brought

13  them out for further questioning.

14                But the same thing.  In light of the

15  court's order 25 hours ago, and the deposition

16  today, we took no time to try and mark any

17  individual documents as confidential or attorneys'

18  eyes only, but the order provides a provision to do

19  that after the fact.

20                MR. CAIN:  Yeah.

21                MR. CORPORON:  And I just wanted to

22  get that clear on the record.

23                MR. CAIN:  Okay.

24      Q.    Okay.  So back to what you were saying.

25  You took issue -- I'm not going to try to

Page 36

1    characterize it.   But when did this personal legal

2    defense fund issue first crop up, if you remember?

3         A.    I don't remember.   I know that there are

4    some text messages in there with me and Chris

5    Wiegand talking about creating that landing page for

6    that.   So that would have been when that issue came

7    up.

8         Q.    Okay.  And for the nontechnical members

9    of the jury who may be watching this, because this

10   may be played at trial --

11        A.    Uh-huh.

12        Q.    -- explain the landing page and kind of

13   paint the picture of what that looked like for

14   people who might want to donate.

15        A.    Sure.  A landing page, also known as a

16   squeeze page, is a website designed to give people

17   information and then use that information to compel

18   them to either purchase a product, in the case of

19   another type of landing page, or in this case to

20   donate to a specific cause.

21        Q.    And what did the personal legal defense

22   fund landing page look like?

23        A.    I don't -- I haven't looked at that in a

24   long time.  I know that I helped write and edit some

25   of the language in that, but I haven't looked at

Page 37

1    that in a long time, so I can't -- to my

2    recollection, I can't tell you what it looked like.

3        Q.    Well, if you had a problem with this

4    issue, why did you not raise that in the beginning?

5        A.    In the beginning I did not know

6    specifically how that page was going to be used.  I

7    didn't know it was going to be put into the

8    description for all podcast episodes, where podcast

9    listeners and viewers were going to be encouraged.

10           I didn't know how that was going to be

11    used.  For all I knew, it was going to be used

12    separately.  So as soon as I realized that, I

13    began -- began complaining about it.

14        Q.    And how long did it take before you

15    realized that this was going to Mr. Oltmann

16    personally?

17        A.    I can't tell you that.  I don't know.

18        Q.    Okay.  Do you know what the term

19    "self-dealing" means?

20        A.    No, but you can -- I have an idea, but

21    you can describe it.

22        Q.    Well, was one of your concerns that this

23    was a corporate endeavor, and one of the

24    shareholders and/or officers were using that

25    corporate endeavor to pay themselves personally?

Page  38

```
1                    And you can't look at what your lawyer is

2    writing.

3         A.    No, I'm just drinking.

4                    MR. CORPORON:  No one can read what

5    I'm writing.  I promise you.

6                    MR. CAIN:  You should have been a

7    doctor.

8         A.    Can you rephrase that?

9         Q.    Probably not, but I'll try.

10                   The issue that I'm raising is the

11   following:  You've got a corporate endeavor that

12   you've been talking about, and you've got

13   Conservative Daily that's raising -- trying to raise

14   revenue.

15        A.    We did.

16        Q.    All right.  And that revenue should go

17   into the corporate account because it's on behalf of

18   the corporation.  That's your enterprise.  Right?

19        A.    Yes.

20        Q.    You weren't working for Mr. Oltmann

21   individually, were you?

22        A.    No, I was not.

23        Q.    But in this instance you have an officer,

24   because Mr. Oltmann was an officer of the company

25   that owned Conservative Daily.  Right?
```

Page 39

1          A.      I don't know what his specific title was,

2     but he had a majority ownership.

3          Q.      All right.  And speaking of which, when I

4     say the company that owned Conservative Daily, do

5     you know what entity that is?

6          A.      I do not know.

7          Q.      Okay.  Is that something that concerns

8     you as a shareholder in some of these companies?

9          A.      Significantly.

10         Q.     Okay.  Tell -- and, again, we may have

11    jurors who aren't sophisticated in terms of how

12    businesses run.

13              Tell me why that concerns you as a

14    shareholder in at least one or more of these

15    companies.

16         A.      I do not know when corporate ownership of

17    Conservative Daily changed.  I know it did change at

18    a certain point.  And what concerns me is I was

19    never given any type of documentation notifying me

20    that it had formally changed ownership at any given

21    point, nor did I receive any documentation

22    explaining to me how my shares were going to be

23    transferred.

24         Q.      And it went from, let's say, A to B.

25    What was A and what was B?

Veritext Legal Solutions
800-336-4000

1    A.    I don't know the specific umbrella

2    company that it was operating under.  There's so

3    many.

4    Q.    And do you have an understanding of who

5    designed these structures?

6    A.    I do not.

7    Q.    Was there a corporate lawyer that you

8    understood was assisting the various companies and

9    their structure?

10    A.    Joseph Orrino would have been the lawyer

11    that I would presume would have been doing that at

12    the time.

13    Q.    Is it fair to say that your ownership of

14    the various entities may have been inconsistent?

15        In other words, you might have owned

16    40 percent of Company A in my example earlier, but

17    only 27.2 percent in Company B.  Are you -- are you

18    with me on that?

19    A.    My understanding, and I don't have this

20    in front of me, so I can't give it to you with any

21    level of certainty, but my understanding is that

22    when my shares vested, the companies were under one

23    common umbrella company.

24        So my shares -- my share percentage was

25    uniform across all of the companies because I owned

Page 41

1    a -- a percentage of that umbrella company.

2         Q.    Got you.   And the umbrella company is?

3         A.    At the time that my shares vested, I

4    believe the official name of it was Shuffling

5    Madness Media.

6         Q.    Now, going back to what I was discussing

7    with you on the personal legal defense fund, the

8    idea of self-dealing in this instance would be a --

9    an individual obtaining a personal benefit from a

10   company endeavor, as opposed to the company actually

11   getting that revenue.   That's essentially what I was

12   talking to you about.   Okay?

13        A.    Okay.

14        Q.    And that was the concern that you had.

15   Right?

16        A.    I don't know if I would characterize it

17   that way.

18        Q.    How would you characterize it?

19        A.    Well, the reason I would be hesitant to

20   characterize it that way is because companies I

21   owned shares of were also listed as defendants in

22   other legal matters that are pending in Colorado.

23          So the creation of a legal defense fund,

24   until I realized it was a personal legal defense

25   fund, in my mind, could have easily -- I don't --

Page  42

1    I'm not privy to joint defense agreements between

2    the companies and Joe Oltmann, so I can't be sure --

3    I still can't be sure that the companies I own

4    shares in aren't, in some way, benefiting from that.

5        Q.    Right.  What -- what you can be sure of

6    is that part of that, at some point in time, went

7    just directly to Mr. Oltmann?

8        A.    I can't be sure that it went just

9    directly to Mr. Oltmann because I wasn't privy to

10   those bank transfers.

11       Q.    Okay.  But you told me earlier that this

12   was a -- became an issue for you.  What triggered

13   that?

14       A.    The belief that that was happening.  I

15   can't for certainty tell you that -- I -- I don't

16   have access to the bank accounts.

17       Q.    Well --

18       A.    I believe that that was the case.

19       Q.    All right.  You probably didn't wake up

20   one morning believing that.  You probably --

21   something you saw or heard or suspected would have

22   triggered that.  Is that fair?

23       A.    Yeah.

24       Q.    Okay.  So what triggered that belief,

25   back to my question?

Page 43

1          A.     One thing that probably would have

2     triggered that belief was the realization that money

3     going into this account, even if it benefitted

4     companies that I own shares in, was not added to the

5     pool of revenue that I could invoice on.

6                So my contract included a clause that

7     said I was owed a percentage of all revenue

8     generated.

9          Q.     And you invoiced that yourself?

10         A.     Yes.

11         Q.     Okay.  Do you have those invoices?

12         A.     I have some of them.

13         Q.     Okay.  That's not necessarily something I

14    asked you for.  That's why I'm -- I'm trying to --

15    this is called discovery so I'm discovering things

16    today.

17         A.     Yeah, I got paid and I asked to get paid.

18    So yes.

19         Q.     All right.  But that's not something you

20    brought with you here today.  Right?

21         A.     That's not something that was responsive

22    to any of the 11 paragraphs on the subpoena.

23         Q.     Right.  And so that's something I can ask

24    someone else for.

25                When you -- when you sent the invoice in,

Page 44

1    who did you send it to, what entity or person?

2        A.    Most invoices -- most, if not all,

3    invoices were sent to a woman named Lynn Kieffer,

4    K-I-E-F-F-E-R.

5        Q.    Okay.  And you mentioned your shares

6    vesting a couple of times earlier.  Approximately

7    when did your shares in these companies vest?

8        A.    I can't give you an exact date.  2016,

9    2017.

10       Q.    Okay.  So you were fully vested at least

11   as of 2017 based on your recollection?

12       A.    Yes.

13       Q.    All right.  By the way, I'm looking at --

14   just pulled up the first document under Request

15   No. 3 and it appears to be -- well, you probably

16   remember it.  It's dated May 24, 2022, Joe Oltmann.

17   "Max, you are a piece of trash."

18           Number one, did this come to you over

19   some social media account or how did you get this

20   message delivered?

21       A.    That should tell you that in the title of

22   it.  I am not looking at it so I can't answer that.

23       Q.    Oh.  Burner Telegram account.

24       A.    Ah, yes.

25       Q.    What does that mean?

                                        Page 45

1          A.    So I have a personal Telegram account

2    that I use for my own communications, my own social

3    media postings.  I also have a second Telegram

4    account that is not my name, that allows me to

5    follow people who may have blocked me on my personal

6    account and it allows me to comment on things

7    without that being traced back to me.  Though now it

8    will be so I'll need a new burner account now.

9          Q.    Well -- well, I guess we'll get to that.

10               Paul Watney (phonetic), is that your

11   burner account?

12         A.    It is.

13         Q.    All right.  And did Mr. Oltmann know that

14   that was your burner account, if you know?

15         A.    I don't believe that he did.  My instinct

16   is that the reason that communication came to me is

17   because that burner account was listed to an old

18   phone number of mine that Joe had even though it was

19   listed -- it was set up to not share that phone

20   number with anyone.  Him searching by that phone

21   number may have been what allowed him to message me

22   on that.

23         Q.    Yeah.

24         A.    I don't think he understood what he

25   was -- who he was messaging.  I think he was

                                              Page 46

1    messaging my -- my phone number that was attached to

2    it.

3         Q.    I got you.

4              And I -- I meant to ask you this.  Chris

5    Wiegand or Wiegand (pronouncing)?

6         A.    Wiegand.

7         Q.    Who is he?

8         A.    I believe I answered that question

9    already.

10        Q.    Well, I forgot.  What was your answer?

11        A.    My understanding was that, again, he was

12   the chief technology officer.

13        Q.    Yeah, CTO.  I'm sorry.  I recall now.

14              Request No. 4, you can read it, but it

15   appears that a lot of the responses are from texts

16   and from Signal with Mr. Oltmann and others.  Is

17   that -- is that what you were able to --

18                   (Simultaneous speaking.)

19        A.    Generally, these were objections that --

20   in terms of documents responsive to this, written

21   objections would have been found in the -- in the

22   media -- mediums that are in that folder.

23        Q.    In other words, if -- if -- let's say the

24   Coomer podcast was coming up and you wanted to

25   raise -- well, let's not use Coomer.  Let's just be

Page 47

1    general.

2              If you wanted to raise an issue with the

3    content of that day's podcast or perhaps the

4    individual who was going to be on the podcast being

5    interviewed, how would you typically raise those

6    concerns?

7        A.    We would have a standing meeting in the

8    morning where in a perfect world everyone would

9    attend.  In a perfect world, the show topic would be

10   decided in that -- in that morning meeting.  In a

11   perfect world, we would know who the guest is and

12   know everything about the guest.  And in a perfect

13   world, we'd be able to decide whether or not that's

14   something that we should do or should not do.  So

15   most of -- of those discussions would happen in a

16   standing meeting in the morning and then the

17   documents I provided were mostly responding to what

18   was discussed in those morning meetings.

19       Q.    The morning meetings, when would those be

20   scheduled?

21       A.    In the morning.

22       Q.    I knew you were going to say that.  Did

23   the time vary --

24       A.    Time difference.  I say that because the

25   number I give you is -- would be in Texas time.

Page 48

1      Q.    Right.

2      A.    Whereas, it would be a little earlier for

3   them.

4      Q.    Okay.  Let's -- let's work off the time

5   zone in the area that you were in when the meetings

6   occurred.  That would have been Central for a

7   large -- large period of the later shows.  Right?

8      A.    Yes.

9      Q.    Okay.  And 2020 would have been Central.

10  Right?

11     A.    Yes.

12     Q.    In 2020, when were the standing meetings?

13     A.    I can -- I don't know.  I don't know

14  specific time because we changed that.  But it

15  generally would have been my time between the 7:00

16  and 9:00 hours.

17     Q.    You said the -- the -- essentially, the

18  goal was to go through that process, but I -- I

19  heard a bit of frustration in your voice.  Maybe I'm

20  mistaking that.

21          Did -- were you concerned in 2020 that

22  not enough time was being spent in these standing

23  meetings to prepare for shows that were being put

24  on?

25     A.    I wasn't concerned that enough time

Page 49

1    wasn't being -- that's a double-negative.  Let me

2    rephrase that.

3         Q.    Yeah.

4         A.    My concern was not that an insufficient

5    time was being spent.  My main concern was that all

6    of the people who should have attended those

7    meetings were not always in attendance.

8         Q.    Okay.  In 2020, who should have been all

9    of the people in those meetings?

10        A.    It would have been me, Josh Hammerling,

11   my producer.  Some days it would just be me and

12   Keith Sawar- -- Sawarynski.  I don't know the

13   specific date where it became a formalized standing

14   meeting, but Joe was always invited to attend those

15   and sometimes did.

16        Q.    Okay.  And -- and you mentioned Keith

17   earlier.  What was -- what would have been his role

18   in the standing meetings?

19        A.    More of a sound board to bounce ideas off

20   of.

21        Q.    And he was pretty consistently available

22   and attending?

23        A.    Yes, there was a period where I had more

24   editorial control over the podcast and those

25   discussions were almost always between -- between me

                                          Page 50

1    and Keith.

2         Q.      And when did that editorial control phase

3    of your life change?

4         A.      I can't give you a specific date because

5    I don't think a specific date exists.   It's more of

6    a gradient.

7         Q.      Okay.   By November of 2020, where were

8    you on that gradient?

9         A.      Blinded.

10        Q.      Okay.   So 50/50, in that -- in that

11   range?

12        A.      I'm not going to guess.   I can't guess.

13        Q.      Okay.   When did you cease having any

14   significant editorial control, if ever?

15        A.      Are you asking when I ceased having

16   control?

17        Q.      Well, I said editorial.   But --

18        A.      The day I resigned.

19        Q.      Okay.

20        A.      That's the end of the gradient.

21        Q.      All right.   And when did you resign?

22        A.      I believe the date was either March 11th

23   or March 12th.   I don't have that date in front of

24   me, though.   Of 2022.

25        Q.      Why did you resign?

Page 51

1          A.     I resigned because I did not have

2     editorial control anymore.

3          Q.     Is that the only reason?

4          A.     That's the -- that's the reason.

5          Q.     And why didn't you have editorial

6     control?  Who -- who told you that and how did that

7     come about?

8          A.     Joe blocked me from putting -- from

9     presenting a podcast that I had prepared.

10         Q.     What podcast had you prepared?

11         A.     I prepared a podcast going through --

12    going -- going through and debunking claims that

13    Russia had invaded Ukraine because Ukraine was

14    developing biological weapons inside of veterinary

15    clinics and labs.

16         Q.     And what -- why -- what was the expressed

17    reason, if any, that Mr. Oltmann decided to block

18    you?

19         A.     That is in -- the -- the precise quote is

20    in documents that I have given to you.  But to

21    paraphrase it, it was that that podcast topic could

22    not air because it would contradict positions he had

23    already put -- put out there.

24         Q.     Just generally backing up.  Is it fair to

25    say that you and Mr. Oltmann had a differing view of

Page 52

1    how to present the war in Ukraine.

2        A.    Yes.

3        Q.    But had there been issues between you and

4    Mr. Oltmann prior to this point in time?

5        A.    Yes.

6        Q.    Okay.  Can -- I don't want to get into

7    too much dirty laundry, but I -- I do want to

8    understand what happened, you know, to you because

9    there was a point in time, I assume, that you felt

10   good about the show and you and Mr. Oltmann were

11   getting along okay.  Is that fair to say?

12       A.    Yeah.

13       Q.    Okay.  So the best you can, just from

14   your -- looking back on it in retrospect now, tell

15   me how that, you know, devolved?

16             MR. CORPORON:  Object as to

17   relevance.

18             You can answer.

19       A.    So generally, it was put on my shoulders

20   to produced the podcast.  There's different elements

21   of podcast production.  There's technical

22   production, pushing the buttons behind the scene,

23   making sure that signals are going where they need

24   to go.

25             And then there's the producing aspect

Page 53

1    which is picking show topics, researching them and

2    then deciding the best way to present them to the

3    audience.

4             For the longest time that was put on my

5    shoulders, and if you look at earlier episodes of

6    the Conservative Daily podcast, references to Joe

7    coming on were put in the title as him being a guest

8    because he was not the one driving the direction of

9    it.

10            That changed over the course of the time

11   that the podcast aired.  It began by Joe

12   interjecting that he wanted certain things to be

13   the -- the focus at the last minute, to him then

14   hiring people that share his viewpoints, to then him

15   empowering --

16        Q.    Such as?

17        A.    -- them to make decisions.

18        Q.    And I apologize for interrupting.

19              Such as?

20        A.    Greg Papas.  I believe he goes by Apollo.

21              MR. CORPORON:  I'm just going to make

22   a standing objection to relevance to this line of

23   questioning for the record.

24              MR. CAIN:  That's fine.

25              MR. MALONE:  Join in the objection.

Page 54

```
 1                    MR. CAIN:  He joins in the objection.
 2      His name is Ryan Malone.  If there's an objection
 3      from the computer, it's Ryan Malone.
 4           A.     Greg Papas who goes by Apollo --
 5           Q.     Right.
 6           A.     -- would be the one who comes to mind.
 7           Q.     Anyway, were you finished with your
 8      answer?
 9           A.     I don't remember.
10           Q.     We were just talking about how things
11      devolved in general and -- and you mentioned the
12      hiring issues and take me from that point.  When was
13      Mr. Papas hired?
14           A.     I don't know.
15           Q.     To the point where Joe blocked you?  How
16      did that progress after that?
17           A.     So when I signed my last contract, my
18      title was -- it was chief of content.  And my
19      expectation was that I was going to be allowed to
20      continue driving the decision-making on what kind of
21      content we -- we covered and presented.  That was
22      not the case.
23           Q.     And you said when you signed your last
24      con -- contract, what -- what -- I don't think I've
25      seen a contract, at least from just what I've
```

Page 55

1    gathered so far, other than some of the NDAs, is

2    there something different that you're speaking to?

3          A.    I don't know what you've seen.

4          Q.    Let's do this.    I reserve the right to

5    jump around when you say something, so I'm going to

6    do that.    And we'll get back to Exhibit 11 here in a

7    minute.    Actually, I had -- I made a note you said

8    that you had provided us with a responsive document

9    when Joe blocked you.    Tell me in -- in this

10   particular categories which -- would it be one, two,

11   three, four, five, six for --

12         A.    I don't know which one.    It would have --

13   I believe that conversation happened on Signal.

14         Q.    Okay.

15         A.    And those would have been screenshots

16   because I couldn't figure out any other way to

17   download those from Signal.

18         Q.    And you mentioned the chief of content

19   role.    Just tell me what that means in lay terms?

20         A.    In practice, it meant nothing.    I

21   realized that I was the only one who knew that that

22   was my title.    So in practice, it meant absolutely

23   nothing.    And my hope was that it would give me a

24   formal ability to reexert control over the type of

25   content that we -- that we covered.

Page 56

1        Q.     Okay.  Well, obviously I care about

2    mostly the content of the podcast relating to -- to

3    Eric.  Who was responsible for the -- the content of

4    those shows?

5        A.     Joe.

6        Q.     And Joe alone?

7        A.     The original episode, that was driven by

8    Joe.  Subsequent episodes, I cannot recall what role

9    I played in those processes but it was again driven

10   primarily by Joe.

11       Q.     Well, again, we'll veer into this for a

12   minute.  Did you do any independent research in

13   order to lend information to the content of any show

14   relating to Eric Coomer?

15       A.     I'm thinking.  It was a very long time

16   ago.  And I don't have access to any of those emails

17   if they were done through my work email.  But my

18   general recollection is, that, yes, I did try and

19   look into things.

20       Q.     Okay.  What did you try to look into?

21       A.     I just gave you a general recollection.

22   I -- I can't answer that with specificity.

23       Q.     And when you say you don't have access to

24   your work email, to the extent that you were -- your

25   general recollection will help, let's say you were

Veritext Legal Solutions
800-336-4000

1    gathering data or information, what email would we

2    look to, to be able to get that, to that point?

3         A.    I don't know, but it wouldn't be my

4    personal email.

5         Q.    Okay.

6         A.    Because I -- I didn't find it.

7         Q.    So --

8         A.    I mean, there were some emails that Joe

9    sent to my personal email about the Eric Coomer

10   episode.  But in terms of beyond that, I wasn't able

11   to find any responsive documents.

12        Q.    Okay.  And, again, let me make sure I

13   understand the emails because you've already said

14   there are a lot.

15        A.    Uh-huh.

16        Q.    Your personal email address is?

17        A.    Maxjmcguire@gmail.com.

18        Q.    Okay.  And have you produced Gmail emails

19   that are responsive?

20        A.    Yes.

21        Q.    Okay.  Thank you.

22              Back to the topic that you said your last

23   con- -- contract with the company.

24              (Exhibit 12 was marked.)

25        Q.    I'm going to show you what was produced

Page 58

```
 1   to us.  I've marked it as Exhibit 12.

 2        A.    (Pause.)

 3        Q.    Do you recognize that?

 4        A.    Yes.

 5        Q.    What is it?

 6        A.    This is the contract that I signed.

 7        Q.    Okay.  So when you testified earlier, is

 8   this what you were referring --

 9        A.    Yes.

10        Q.    -- to?

11              Okay.  Since we have it in front of us,

12   this is between you and a company called CD

13   Solutions, Inc.  Do you see that?

14        A.    Yes.

15        Q.    And in Section 1.5, there's some initials

16   by that paragraph.  Are those your initials?

17        A.    They are.

18        Q.    The term of this agreement, you've

19   actually crossed-out.  You started it on September 1

20   of 2021.  Is that -- is that accurate?

21        A.    That's correct.

22        Q.    And tell me why you signed this contract

23   in September of 2021?

24        A.    Can you rephrase that?

25        Q.    Yeah.  Well, you were --
```

Page 59

1       A.      There's -- there's a lot of motivations

2    behind signing a contract.

3       Q.      Well, give me the backdrop as to why this

4    came about and why you decided to sign a new

5    contract with this company?

6       A.      The contract I was currently under was

7    dated in 2014 so it predated the existence of the

8    podcast.  And I believe was insufficient in -- in

9    compensating me for the many things that I was doing

10   for the company that did not exist at the time that

11   my 2014 contract was originally signed.

12      Q.      And I've got a -- a separate -- so it's

13   for more money?

14      A.      And --

15      Q.      That's part --

16      A.      -- and the hope that it would formalize

17   for me to actually have more control over what kind

18   of content we aired.

19      Q.      All right.  Because there is a section

20   here, it looks like you were getting 10,000 a month

21   under this contract?

22      A.      Yes.

23      Q.      Plus some bonus -- potential for bonus.

24   Right?

25      A.      Theoretically.

Page 60

1    Q.    Plus then, presumably, on top of that,

2    the potential for a distribution based on your

3    shareholder interest?

4    A.    Against, theoretically.

5    Q.    Did you ever receive distributions from

6    CD Solutions?

7    A.    No.

8    Q.    Or any of the other companies?

9    A.    Not to my knowledge, no.

10    Q.    And then, I -- I don't know that I have a

11    2014 agreement, but let's -- let's put some meat on

12    the bones on that issue too.

13                (Exhibit 13 was marked.)

14    Q.    I'm showing you what I've marked as

15    Exhibit 13.  Do you recognize this?

16    A.    Yes.

17    Q.    This is dated -- it's written in there

18    September 3rd of 2015.  And it's between PI- -- PIN

19    Business Network and you.  Correct?

20    A.    Yes.

21    Q.    Okay.  Is this different than the

22    agreement that you were just testifying about?

23    A.    Yes.

24    Q.    Okay.  So tell me what -- what -- what is

25    the 2014 agreement you're referring to?

Page 61

1          A.     It's a separate agreement between me and

2     Shuffling Madness Media detailing my compensation

3     for revenue generated for Conservative Daily.

4          Q.     Okay.  And how long were you operating

5     under this 24 -- excuse me -- 2014 Shuffling Media

6     Madness agreement?

7          A.     That would have been -- I don't have it

8     in front of me so I can't give you a precise date,

9     but it would have been sometime around 2014 until

10    the new contract went in effect.

11         Q.     The new contract being Exhibit 12?

12         A.     Exhibit 12, yeah.

13         Q.     Okay.  So your compensation from June

14    2014 until September of 2021 was through the

15    Shuffling Madness Media?

16         A.     I believe -- I don't have it in front of

17    me, I believe that is the organization that I had

18    signed a contract with.

19         Q.     And were you a W-2 employee or an

20    independent contractor?

21         A.     Independent contractor.

22         Q.     Do you know, as you sit here, why you

23    were presented with a contract for nondisclosure

24    with this other entity, PIN Business Network?

25         A.     Because I am a partner, even though I

1    never signed a contract to work under PIN Business

2    Network as an employee, I was still in shareholders'

3    meetings, partner meetings, related to the goings-on

4    in PIN Business Network.

5              So this was a requirement -- I believe,

6    if I remember correctly, this was an agreement that

7    all partners sign a nondisclosure agreement whether

8    or not they were actually being compensated by PIN

9    Business Network.

10        Q.    Do you recall actually doing business for

11   that entity -- or excuse me --

12        A.    For a short time, yes.

13        Q.    And what -- talking generally, what

14   companies were you working for?  And you can break

15   them up by lines of business, if that's easier for

16   you.

17        A.    So I was working for Shuffling Madness

18   Media specifically for work under Conservative Daily

19   from 2014 through to that new contract, Exhibit 12.

20              Under PIN Business Network there was a

21   short period of time where I was writing unrelated

22   nonpolitical articles for a blog.  And there was a

23   period of time where I was managing social media

24   personnel and managing other writers --

25        Q.    Okay.

Page 63

1        A.      -- without a formalized contract.

2        Q.      All right.  Is that it?  I mean, that's

3   enough.  I'm not --

4        A.      Yeah.

5        Q.      Okay.  All right.  The -- directing your

6   attention back to Exhibit 12, the CD Solutions

7   agreement.

8               Did all of these companies -- I know it's

9   noted that it's on 6200 Syracuse Way in Greenwood

10  Village.  Did all of those companies operate out of

11  those offices?

12       A.      I don't know.

13       Q.      You didn't -- you didn't typically go

14  into the office because you were in Texas.

15       A.      Yeah.

16       Q.      Is that fair?

17       A.      When I was in Texas I was not regularly

18  walking into the office in Greenwood Village,

19  Colorado.

20       Q.      Okay.  So essentially you were a remote

21  worker?

22       A.      Yes.

23       Q.      Okay.  Has this Exhibit 12, have you

24  provided notice of termination under it?

25       A.      Yes.

Page 64

1      Q.    When did you do that?

2      A.    I don't have the specific date in front

3  of me, but it will be in the documents.  It was

4  March 11th or 12th, somewhere around that range.

5      Q.    Of 2022?

6      A.    Yes.

7      Q.    Oh, when you took the action --

8      A.    Yes.

9      Q.    -- to remove yourself?

10     A.    Yes.  I -- I formally resigned.

11     Q.    Okay.  And there is a writing where you

12  terminated this agreement or gave notice.

13     A.    Yeah.

14     Q.    Okay.

15     A.    There is a -- there is a -- in writing,

16  me saying I resigned, and in writing, me giving

17  notice.

18     Q.    Good.  Directing your attention now back

19  to the subpoena, and we'll finish this up so I can

20  get someone actually looking at the documents in

21  detail.

22           We've got documents -- looking at

23  Request 5, it looks like you've produced texts,

24  including texts with Josh.  And I presume that's the

25  producer you mentioned earlier?

Page 65

1          A.     Josh Hammerling, my former producer.

2          Q.     Okay.  Same for 6.  It looks like Josh's

3     texts would relate to that.

4          A.     The only responsive document I could find

5     about the Cyber Symposium was a text to Josh asking

6     where is Joe, and Josh telling me he's at the Cyber

7     Symposium.

8          Q.     Was that the first time you knew that he

9     was going to the symposium?

10         A.     I don't remember.  I don't know.  It was

11    a long time ago.  I don't know the minute that I

12    learned he was going to the symposium.

13         Q.     Were you invited?

14         A.     No.

15         Q.     Why do you laugh?

16         A.     I laugh because I wasn't invited to a lot

17    of things.

18         Q.     So you -- Mr. Oltmann didn't tell you he

19    was going to the symposium?  You just found out from

20    the producer?

21         A.     I cannot remember conversations that long

22    ago about that.  I know that there was a minute that

23    I found out about the symposium.  And it's my belief

24    that that -- that the moment I found out is

25    reflected in that text message.

Veritext Legal Solutions
800-336-4000

1      Q.   Did you have -- okay.  Well, I think you

2   just answered it.  Never mind.

3           Up until the symposium, did you have any

4   communications with anybody associated with Mike

5   Lindell's -- either him personally or the My Pillow

6   company or the FrankSpeech?

7               MR. MALONE:  Object to the form of

8   that question.

9      Q.   You can answer.

10              MR. CORPORON:  Could you repeat the

11  question?

12     A.   Could you repeat it?

13     Q.   Yeah.  And it probably was difficult.

14              MR. CORPORON:  If you remember, can

15  you repeat it?

16     Q.   So up until the Cyber Symposium -- do you

17  remember when that symposium occurred?

18     A.   I'm reading in front of me that it was

19  between August 10th and August 12th, 2021.

20     Q.   So up and to that point, did you have any

21  communications with anyone you understood to be

22  associated with Mike Lindell, My Pillow, or

23  FrankSpeech?

24     A.   Well, I believe I provided two emails to

25  you.  I can't speak to the dates, though, they're

Page 67

1    right in front of you.

2              Mike Lindell was on our show, so I have

3    to tell you that I did communicate with Mike Lindell

4    when he was on our show.

5              There were meetings.  There was at least

6    one meeting I can remember where a My Pillow --

7    someone representing Mike Lindell was put on the

8    phone, where people pitched her an idea.  That's the

9    extent of -- of instances that I can remember at

10   this moment.

11        Q.    How many times was Mr. Lindell on the

12   Conservative Daily podcast while you were there?

13        A.    I don't know the exact number.

14        Q.    Is it more than one?

15        A.    It's more than one.

16        Q.    Is it less than ten?

17        A.    I don't know.

18        Q.    And this pitch that you referenced on a

19   meeting, put a little more meat on the bones on

20   that.  Where was the meeting?  What was the pitch?

21        A.    It was a meeting of employees and people

22   working on the Conservative Daily podcast, and it

23   was not about -- the meeting was not about pitching

24   Mike Lindell.

25              But I believe, if my recollection is

Page 68

Veritext Legal Solutions
800-336-4000

1    correct, and there should be some mention of this in

2    texts with Josh.  The pitch was made by either Jake

3    Freijo, or Jake Freijo and Greg Papas, trying to get

4    Mike Lindell to go into business with them on

5    coffee.

6        Q.    And that's a new name, Jake Freijo.  Who

7    is he?

8        A.    He is someone that Joe hired.

9        Q.    Okay.  Do you know him?

10        A.    I've met him.

11        Q.    What's his background, if you know?

12        A.    He -- I believe he comes from the real

13    estate industry.  He has some experience in politics

14    in New York.  And then he came to us.

15        Q.    And is he still there, if you know?

16        A.    I don't think he is.  But I don't know

17    for sure.

18        Q.    Do you have any understanding about

19    Mr. Freijo and his association with the Proud Boys?

20        A.    I knew that, yes.

21        Q.    Did that cause a problem for you?

22        A.    It did.

23        Q.    I take it from your prior testimony you

24    were not -- you were not on the hiring committee?

25        A.    I was not.

Page 69

1          Q.     All right.   So walking back, you said

2   something to the effect of Mr. Freijo and Mr. Papas

3   were pitching Mr. Lindell on a coffee idea?

4          A.     Yes.

5          Q.     What do you mean?

6          A.     They wanted to go into business with Mike

7   Lindell on some form of coffee.   That's all I

8   remember from that.

9          Q.     Do you know whether anything was

10  consummated as a result?

11         A.     No.   I do not think that anything was

12  consummated.

13         Q.     And when -- about when was that?

14         A.     I can't tell you.   I don't know.

15         Q.     Was Mr. Oltmann on this pitch?

16         A.     He was in the room.

17         Q.     And were you in the room?

18         A.     I was there remotely.

19         Q.     What room?

20         A.     I don't know what specific room they were

21  in.

22         Q.     Okay.   And was this in 2021?

23         A.     I don't know for sure, but that would be

24  my inclination.

25         Q.     In Request 7, you appear to have attached

Page 70

1    one document, being an Oltmann affidavit.

2        A.    Yes.

3        Q.    It -- I'll just represent to you it looks

4    like it's an email from Joe Oltmann at FEC United to

5    Max McGuire at your personal Gmail.  Does that --

6        A.    Yes.

7        Q.    Okay.  Did you have a role in the

8    creation of that affidavit?

9        A.    No.

10       Q.    Do you know who did?

11       A.    I do not.

12       Q.    Besides the guy who signed it?

13       A.    Well, besides the guy who signed it.  I

14   do not know who helped him.

15       Q.    Do you -- do you remember what the

16   circumstances were that led to him sending you this

17   affidavit?

18       A.    I don't remember the circumstances.  I

19   think I asked for it.  But I don't remember the

20   circumstances.

21       Q.    Did you -- do you recall that you asked

22   for it because it was something that was referenced

23   in the podcast?

24       A.    I don't recall.

25       Q.    Okay.  All right.  And we'll get to the

Page 71

1    contents if we have time.  But fair to say that on

2    November 19th, that was transmitted to you?

3         A.    If that's the date, then, yes.

4         Q.    Okay.  That's the date.  Request 8

5    relates to threats directed towards Mr. Coomer.

6              And you've texted with friends is what

7    it's called:  "Text With Friends, M."

8         A.    Uh-huh.

9         Q.    Tell me what that is.

10        A.    That is a friend of mine who the only

11   reason that that is included is because technically

12   it is responsive to that question.

13        Q.    Okay.  And the M is -- you've redacted

14   that because you don't want the identity of your

15   friend disclosed?

16        A.    I -- I have redacted that because it's my

17   understanding that she has a protected identity

18   under law.

19        Q.    And this --

20              MR. CORPORON:  And I'd object to any

21   further inquiry on that on the record as a result.

22   And I'm not totally privy to the -- the background

23   on this protection, but it sounds very important.

24        Q.    Well, I'm not going to ask you who M is.

25   I think that's the most important thing so...

                                        Page 72

```
 1              But what -- what were you -- why were you
 2   texting with this individual about Coomer?
 3        A.    We -- we were not texting about Coomer.
 4   We were texting about me and my devolving
 5   relationship with Joe and Coomer was mentioned.
 6        Q.    And -- and this is in March of 2022?
 7        A.    Yes.
 8        Q.    Because you actually, after you left,
 9   started getting threats, didn't you?
10        A.    Define "threats."
11        Q.    You -- you define threats.  What does it
12   mean to you?
13        A.    You asked the question.  Can you define
14   what you're asking me to answer?
15        Q.    Well, did you -- did you receive any
16   negative feedback from members of the public after
17   you left Conservative Daily?
18        A.    Yes.
19        Q.    Okay.  What form did those take?
20        A.    Mostly social media posts, comments.
21   Those are the tangible examples.
22        Q.    And did you -- did you get some of those
23   from Mr. Oltmann?
24        A.    Did I get negative messages from
25   Mr. Oltmann?
```

Page 73

1        Q.    Yeah.

2        A.    Yeah.

3        Q.    Okay.  He's associated -- correct me if
4    I'm wrong -- with a group called FEC United?

5        A.    Yes.

6        Q.    And they're associated with a group
7    called UADF?

8        A.    It is my understanding, yes.

9        Q.    Okay.  Are you a member of either of
10   those organizations?

11       A.    I don't believe I am -- I'm not a paid
12   member, I might be on an email list, but I'm not a
13   paid member.

14       Q.    Okay.  Have you received anybody coming
15   to your house making direct threats against you or
16   your family?

17       A.    No one has come to my house.

18       Q.    Has anybody called your phone and made
19   threats?

20       A.    No.  I like to keep my phone number
21   secure.

22       Q.    You do have -- and I -- forgive me, I
23   don't recall the lady's name who had posted about
24   some members of FEC United coming to her home.

25       A.    Yes.

Veritext Legal Solutions
800-336-4000

1          Q.    Okay.  And who is that person?  Is that

2     someone that works with you?

3          A.    Because of the proximity to the objection

4     we just made, I would prefer not to answer that.

5          Q.    Okay.  Well, I'll represent to you that

6     name is public and -- but out of respect for her and

7     you, I don't need it on the record here.  Okay?

8               She did have people come to her house.

9     Right?

10         A.    That is what she told me, yes.

11         Q.    Yeah.  Okay.  9, "Communications relating

12    to the alleged participants of the Antifa call."

13              It looks like you have some -- again,

14    some emails that were back -- from a backup file and

15    it says SyncTech.  What is that?

16         A.    I don't know.

17         Q.    Okay.  It says:  Joe -- Joe text to Max

18    210 number.

19         A.    Oh.  That is the entire document of every

20    text Joe has sent me.

21         Q.    Okay.  So that's -- 9 is the entire

22    document?

23         A.    Uh-huh.

24         Q.    It wasn't that important of a question,

25    but you have to say yes or no.

Veritext Legal Solutions
800-336-4000

1        A.    Yes.

2        Q.    Okay.  10 is "Communications authored,

3   sent, or received by you concerning instances where

4   Oltmann manipulated, fabricated, falsified, or

5   altered in any way any alleged evidence of fraud in

6   the 2020 presidential election," and then it goes

7   on.

8             And it looks to me like you've -- you've

9   found something responsive to that in the form of

10  some additional text messages.  Is that fair?

11       A.    That was emails and text messages

12  including that, I believe, were included to be very

13  broad in what we believe could be responsive to

14  those specific words of "manipulated, fabricated,

15  falsified, or altered."

16       Q.    Did you -- did you, like, perform a word

17  search to try to hone in on responsive documents?

18       A.    I believe that that folder of responsive

19  documents was prepared by the paralegal staff at

20  Randy's office.

21       Q.    I see.  And -- and let me back up, then.

22            This is a document that's dated

23  November 16th of 2022.  It's with the name Keith

24  Sawar- --

25       A.    Sawarynski.

Page 76

1        Q.    That guy.  And then there's some text

2    messages on that.

3            Of the documents' categories that we've

4    been talking about to this point, how many of those

5    have been prepared by the attorney's office as

6    opposed to something that you produced yourself, if

7    that can be determined?

8        A.    I don't know if -- if I can give you a

9    number.  That's --

10       Q.    That's fine.

11           Have these -- have the documents you've

12   been given or that you produced been loaded into a

13   particular software that allows it to be produced?

14   Are you familiar with those types of document --

15   document production softwares where you can search?

16       A.    Like legal?

17       Q.    Yes, sir.

18       A.    I have no knowledge of that.

19       Q.    All right.  The last one is Request For

20   Production 11.  And that relates to a fellow named

21   Joey Camp.  Do you know who he is?

22       A.    Only by what has been told to me or I've

23   seen in the news and on Twitter.

24       Q.    Y'all aren't buddies?

25       A.    I don't know him personally, no.

Page 77

1      Q.    Never talked to him?

2      A.    I don't believe so, no.

3      Q.    Never messaged with him?

4      A.    I don't believe so, no.

5      Q.    The responsive documents there are -- it

6   says texts to Leigh.

7      A.    Yes.

8      Q.    Who is Leigh McGuire?

9      A.    Leigh is my mother.

10     Q.    Okay.  Why were you texting with your

11  mother about Joey Camp?

12     A.    I wasn't texting my mother about Joey

13  Camp.  My mother was texting me about Joey Camp.

14     Q.    What did you understand to be the reason?

15     A.    She wanted to research all of this and

16  she enjoys going on Twitter and going through all

17  the Twitter beef and there were a couple instances

18  where she sent things to me.

19     Q.    Okay.

20     A.    And in one of those instances, I asked

21  her to please stop because I know nothing about Joey

22  Camp, and every time she does that, I have to

23  produce this.

24     Q.    Did you ever have conversations with

25  Mr. Oltmann about Joey Camp?

Page 78

```
 1      A.    I don't believe so.
 2            MR. CAIN:  Okay.  All right.  We've
 3 been going for longer than I anticipated.  I'm going
 4 to do the following.  I'm going to take the thumb
 5 drive you gave and I'm going to give that to my
 6 staff like I mentioned so that they can start
 7 looking through this.  And in the meantime, let's
 8 take about a ten-minute break.
 9            THE WITNESS:  Okay.
10            THE VIDEOGRAPHER:  Going off the
11 record.  The time is 11:52.
12                 (Break.)
13            THE VIDEOGRAPHER:  Back on the
14 record.  This marks the beginning of Media Unit
15 No. 2.  The time is    12:19   .
16      Q.    Let's talk a little bit about some
17 follow-up from the first session from my notes.  You
18 had mentioned the standing meetings.  I was going to
19 make a joke about standing versus sitting.  I didn't
20 do that.  I'm glad I didn't.
21            You said that they were mainly phone
22 conversations.  Is that accurate?
23      A.    Yes.
24      Q.    Okay.  Did you ever take notes of these
25 standing meetings?
```

Page 79

```
 1        A.    No.

 2        Q.    Do you know anybody who did?

 3        A.    No.

 4        Q.    Okay.  So other than your memory of

 5   those, there is no written documentation --

 6        A.    The only time there would be written

 7   documentation would be if action items were given to

 8   me to do a specific task.

 9        Q.    And how would -- and what form would that

10   take?

11        A.    Just me jotting down to myself, I need to

12   do X, Y, Z.

13        Q.    Okay.  On a -- on a pad or in a -- strike

14   that.

15              Are any of these preserved?

16        A.    I don't know.

17        Q.    If you went -- if you needed to go look

18   for them, where would you go?

19        A.    I don't know.  I don't know.  If I jotted

20   things down, they would maybe be in notes, on pieces

21   of paper.

22        Q.    Okay.  Is it possible that you have notes

23   relating to the Coomer podcasts still in your

24   possession, custody, or control?

25        A.    I don't think so, no.
```

Page 80

1    Q.    I was a little confused about the -- the

2    revenue sharing and distribution testimony from the

3    standpoint of your contract that we looked at with

4    CD Solutions appeared to have a flat, 10,000 a month

5    payment.  Right?

6    A.    Yes.

7    Q.    And then the bonus possibility?

8    A.    Yes.

9    Q.    Is there --

10            MR. CORPORON:  Since you're answering

11    before he finishes his questions --

12            THE WITNESS:  Oh.

13            MR. CORPORON:  -- I'm going to just

14    renew my standing objection as to relevance of this

15    line of questioning.

16    Q.    Okay.  The good thing is we don't have to

17    debate those issues now.  We debate them later with

18    the Court.  Possibly.

19            And then you told me that one of the

20    concerns that you had was some of the revenue going

21    into the personal legal fund of Mr. Oltmann.  Right?

22    A.    Yes.

23    Q.    So I -- I'm -- were you receiving a

24    percentage of the revenue generated by the podcast

25    at any point?

Page 81

1       A.      Yes.

2       Q.      Okay.  And that's the invoicing that you

3    told me about earlier?

4       A.      Yes.

5       Q.      I mean, part of that would be reflected

6    on that.  Right?

7       A.      Yes.

8       Q.      You didn't have to invoice, or did you,

9    the -- the flat amount that you were also receiving?

10       A.      The only times that I invoiced on revenue

11    percentage was for the contract that predates the

12    flat payment.

13       Q.      Okay.  And the revenue percentage that

14    you received -- I didn't -- I haven't studied it in

15    detail -- is it reflected in your contract?

16       A.      These two contracts?

17       Q.      Yes.  The -- in particular, the CD

18    Solution contract?

19       A.      No.

20       Q.      So where is that reflected?  How is that

21    calculated, I should say?

22       A.      Can you rephrase that?

23       Q.      How was it calculated?

24       A.      How was my --

25       Q.      Yes.

Page 82

1       A.      My invoice calculated?

2       Q.      Yes.

3       A.      I earned 15 percent of all revenue

4    generated prior to the execution of Exhibit 12.

5       Q.      Okay.  And after the execution of

6    Exhibit 12, you earned?  You said prior to?

7       A.      Yes.

8       Q.      Okay.  After?

9       A.      Oh, that was the question?

10      Q.      Yes.

11      A.      I believe about 10,000 a month.

12      Q.      So back to my -- my confusion.  Help --

13   help me understand.  After you executed Exhibit 12,

14   were you receiving a percentage of revenue or not?

15      A.      No.

16      Q.      And why did that change?

17      A.      Because the contract changed.

18      Q.      And if you weren't receiving a percentage

19   of revenue, why were you concerned about the legal

20   defense fund aspect of this?  Was it because you

21   were also expecting a distribution from the company?

22      A.      It was my job to drive revenue into the

23   company.  If revenue is being driven elsewhere, it's

24   not reflective under the heading of revenue driven

25   into the company.  So if we are driving revenue into

Page 83

1    another entity, I can't take credit for that as a

2    success.

3        Q.    Okay.  So it was a -- a hero sheet issue?

4    You want to show revenue generated by your work

5    product as a -- as a means of gauging your

6    performance?

7        A.    I don't know what a hero sheet is.

8        Q.    Well, it -- it comes in different forms.

9    Strike that part of it.

10            Is that what you wanted?  You wanted to

11   just show the -- the success from your efforts from

12   the company as it reflected by revenue and that's

13   what -- what you've been referring to?

14       A.    The expectation was that I drive revenue.

15   And if money is directed towards a different

16   account, then that would not be reflected in

17   official revenue generated.

18       Q.    Okay.  Well, one other -- while I'm

19   thinking about it.

20            Well, before I get there.  I neglected to

21   ask you -- I -- I don't like to go necessarily into

22   detail about how, you know, you grew up and what

23   high school you went to, but you do have some

24   college degrees behind you, don't you?

25       A.    Yes.

Page 84

```
1          Q.     Okay.  Where did you go to school?

2          A.     I went to Boston College for

3    undergraduate and I received my master's degree from

4    the University of Villa Nova.

5          Q.     Okay.  And that -- was it in political

6    science, I think?

7          A.     Yes.

8          Q.     Okay.  When -- when did those events

9    occur?

10         A.     Which -- can you define "events"?

11         Q.     Getting your degrees.

12         A.     I received my bachelor of arts in 2012

13   and I received my master of arts in 2014.

14         Q.     How old are you?

15         A.     I am 32.

16         Q.     You're -- I'm not going to mark this

17   necessarily.  But your LinkedIn shows that you are a

18   partner in PIN Business Network?  Or it reflects

19   that.  And that's accurate.  Right?

20         A.     Yes.

21         Q.     We talked about that.  It shows that

22   you're a partner in Shuffling Madness Media.

23   Correct?

24         A.     Yes.

25         Q.     It shows that you're an advocacy
```

Page 85

1   director, or were, for Conservative Daily.  Is that

2   correct?

3          A.    Yes.

4          Q.    What does that mean?

5          A.    That is the title that I was given.

6          Q.    Okay.  What were your job

7   responsibilities and duties as the advocacy

8   director?

9          A.    To drive revenue and to produce content.

10         Q.    Okay.  It does not reflect the

11  CD Solutions company on your LinkedIn.  Is there a

12  reason?

13         A.    No.

14         Q.    Okay.  Now, we've talked about companies

15  that you've been involved with and you've indicated

16  a relationship as a shareholder with at least three,

17  CD Solutions, Shuffling Madness and PIN Business.

18  Right?

19         A.    Yes.

20         Q.    Any other companies that are associated

21  with Oltmann that you are a shareholder in?

22         A.    Yes.  But I don't have a list in front of

23  me and I don't have the list memorized.

24         Q.    Okay.  Give me the list as you know it

25  sitting here today?

1        A.      DCF Guns.

2        Q.      Okay.  Is that the gun store?

3        A.      Yes.

4        Q.      Okay.

5        A.      I don't know the exact names of the other

6    entities.

7        Q.      What do they do?

8        A.      One is a car dealership.  One is a repair

9    shop for cars.  And I don't know the other ones off

10   the top of my head.

11                   THE STENOGRAPHER:  Can you raise your

12   microphone up a little bit.

13                   THE WITNESS:  Sorry.

14                   THE STENOGRAPHER:  It's scratching.

15       Q.      You mentioned like an umbrella company,

16   is this DCF under the umbrella with these other

17   companies?

18       A.      I don't know the specific corporate

19   structure.

20       Q.      And forgive me on the PiDoxa part of

21   this, if I'm pronouncing that correctly.  What is

22   the purpose of that company?

23       A.      I don't know.

24       Q.      Who would?

25       A.      Joe Oltmann.

                                          Page  87

1          MR. CORPORON:   What was that company,

2    again?

3          MR. CAIN:   PiDoxa.

4    Q.    P-I-D-O-X-A?

5    A.    Uh-huh.

6    Q.    Yeah.

7          And in terms of, you mentioned driving

8    revenue, you were responsible for the fax

9    blasting --

10   A.    Yes.

11   Q.    -- component?

12   A.    I'm sorry.  Yes.

13   Q.    And I -- I want the jury to kind of just

14   understand these revenue streams to the extent that

15   they end up being relevant.

16         What is fax blasting?

17   A.    Fax blasting is a automated system that

18   allows people to automatically send facsimile

19   messages to members of Congress.

20   Q.    Okay.  And that -- that was part of your

21   responsibility is to handle that line of business?

22   A.    Yes.

23         (Exhibit 14 was marked.)

24   Q.    Is Exhibit 14 an example of a fax blast?

25   A.    Yes.

Page 88

1     Q.    Is -- is this something that you go to

2     the website in order to sign up for?

3     A.    To sign up -- I -- I don't understand the

4     question.

5     Q.    Well, this looks like a form you fill out

6     if you're wanting to have messages sent to a

7     representative.  Right?

8     A.    Yes.

9     Q.    Where does a -- a donor go to find these

10    forms and fill them out and put their credit card

11    in?

12    A.    They can either receive them in their

13    email inbox.  They can be send to them by text or

14    they can access it over the internet.

15    Q.    And there's a button on it that says

16    donate now.  And that's the button you push in order

17    to get, depending on your selection, messages sent

18    to either your state representative, your

19    congressional representative, the entire Congress,

20    et cetera.  Is that fair?

21    A.    Yes.

22    Q.    All right.  And this is -- in terms of

23    the revenue this generates, this is revenue that --

24    that goes directly to Conservative Daily.  Right?

25    A.    Yes.

Page 89

```
 1        Q.    All right.  In other words, it's not a

 2   donation to a political action committee or to a

 3   specific member of Congress.  Right?

 4        A.    No.

 5        Q.    All right.  It's just -- well, you --

 6   you've answered the question.

 7              So that's another revenue stream that was

 8   in place in 2- -- 2020.  Correct?

 9        A.    Yes.

10        Q.    All right.  And in 2021.  Right?

11        A.    Yes.

12        Q.    And how was -- was the revenue generated

13   by fax blasting accounted for separate -- separately

14   from the other revenue sources?

15        A.    Yes.

16        Q.    In other words, how are we doing on fax

17   blasting, you had the ability to see -- to kind of

18   gauge the metrics of that?

19        A.    Yes.

20        Q.    Okay.  We've talked about -- I think I

21   have an example of one, actually.  Just a minute.

22   Maybe I don't.  Oh.  Yeah.  This one.

23              We talked about that email that you

24   brought that we haven't marked yet.  But the one for

25   CD21, the promo code.  Do you remember that
```

Page 90

1    discussion?

2        A.    Yes.

3        Q.    All right.

4              (Exhibit 15 was marked.)

5        Q.    Let's look at Exhibit 15, which I'll

6    represent to you is a -- well, what it purports to

7    look like.  It's a screen capture.

8              And just for people who may be watching

9    this that haven't seen this particular podcast, tell

10   us what we're looking at?

11       A.    This is an episode where Tina Peters

12   appears as a guest.

13       Q.    Who is Tina Peters?

14       A.    Tina Peters is a Colorado political

15   figure.

16       Q.    Okay.  Do you recall -- this looks -- if

17   you look at the date on it, this looks like it was

18   pretty close to when you left, just before.  Right?

19       A.    Yes.

20       Q.    Did you have a problem with Tina Peters

21   appearing on a podcast?

22       A.    I don't recall.

23       Q.    Who booked her?

24       A.    I don't know.

25       Q.    You had said in your social media that

Page 91

1    you -- one of the issues you had is you liked to

2    prepare yourself, know who the guest is, and get

3    ready for the show.  I mean, you're a preparer,

4    basically.  Is that true?

5        A.    Yes.

6        Q.    And one -- one of the issues that you had

7    is that you'd have a sur- -- surprise guest, someone

8    either you didn't want on the podcast or you didn't

9    know about, and you would refrain from appearing on

10   the podcast.  Did that occur?

11       A.    Yes.

12       Q.    All right.  How often did that occur?

13       A.    I don't have a specific number of times.

14       Q.    Who were some of the people that you can

15   think of that caused you to not appear on the

16   podcast?

17       A.    One of the times was a man who had

18   been -- who had been identified as potentially the

19   person behind Q in QAnon.  That is the one -- the

20   one that comes to mind.

21       Q.    Mr. Watkins?

22       A.    I believe that's his name, yes.

23       Q.    First name Ron?

24       A.    That sounds familiar.

25       Q.    Okay.  Anyone else?

Page 92

1          A.     There were others, but the specific

2     instances aren't coming to mind right now.

3          Q.     If you were -- and let's just talk about

4     Mr. Watkins.

5                 Did you consider him to be an unreliable

6     source of information?

7          A.     Can you -- can you explain what you mean

8     by that?

9          Q.     Well, you said he didn't appear because

10     he was associated with QAnon.  Is it -- was it

11     because of that association or were you concerned

12     that whatever information he might be putting out on

13     your podcast was not credible or reliable?

14          A.     It was because of that association.

15          Q.     But if looking at this with Ms. Peters on

16     this podcast, and you appearing, is it fair to

17     assume that you had -- you were comfortable at least

18     being part of that particular podcast?

19          A.     Whether or not I appeared on camera is

20     not representative of my comfort level.  There were

21     certain situations where I felt so uncomfortable

22     that I didn't want to appear.

23          Q.     Okay.  And the only one you can give us,

24     out of all these years and all these podcasts, is

25     the one QAnon?

Page 93

1        A.      There were a couple more.   There -- there

2   are examples in the documentation I provided between

3   texts between me and Josh.   But the one that can

4   come to mind right now, after reviewing that late

5   last night and this morning, is the Ron Watkins

6   episode.

7        Q.      Okay.   Now, this particular exhibit,

8   it's -- it's titled, at least on the top:   Tina

9   Peters reveals undeniable fraud in second Mesa

10  County report.

11              When did -- when did Mr. Oltmann start

12  focusing on election fraud-related issues on the

13  podcast?

14       A.      I don't know a specific date.

15       Q.      Do you remember how that even came about?

16       A.      Can you explain what you're asking me?

17       Q.      Well, you can't tell me when you guys

18  started talking about election fraud.

19              Can you -- can you think -- to use the

20  word I used earlier -- what triggered the focus?   Do

21  you remember a meeting with Mr. Oltmann where he

22  said, you know, we're going to start looking at

23  election fraud issues?

24       A.      I believe we started looking at election

25  fraud issues in the lead-up to the 2020 election.

Page 94

1      Q.      Okay.  Tell me about how -- the meetings

2    that you had that you can remember where, you know,

3    the genesis of that idea formed.  Because I want to

4    get to Mr. Coomer here, but I want to know how this

5    all started.  So what do you remember about that?

6      A.      Can you -- I don't understand the

7    question.

8      Q.      Tell me about the initial meetings where

9    the decision was made to start on election fraud

10   issues.

11     A.      There was no specific meeting that says

12   we're going to focus on election fraud issues that

13   comes to mind.

14     Q.      Do you remember your first election fraud

15   podcast?

16     A.      I do not remember what podcast that was.

17     Q.      Now, you don't consider -- well, that's a

18   negative.

19             Do you consider Mr. Oltmann to have any

20   expertise in election security issues?  And

21   specifically in the cyber-related issues.

22     A.      You're asking experience?

23     Q.      Yes, sir.

24     A.      Can you define "experience"?

25     Q.      Well, what experience did he have leading

Page 95

1    up to these election fraud issues, if any?

2         A.    I don't believe he had specific

3    experience --

4         Q.    I mean, he --

5         A.    -- about election fraud.

6         Q.    -- you don't consider him to be an expert

7    in election fraud or election security issues, do

8    you?

9         A.    No.

10        Q.    So obviously we're looking at -- and I'm

11   going to jump around a little bit in time -- but

12   Tina Peters, we don't need to get into her issues

13   specifically, but in this particular podcast you're

14   talking about the Mesa County issues.   Right?

15        A.    I don't know specifically, but that's

16   what the title says.

17        Q.    Tell me about -- because when I marked

18   this, it was more about the issue of the -- the

19   revenue streams.

20             Is this an example of how the My Pillow

21   component would be advertised on Conservative Daily?

22        A.    Yes.

23        Q.    And then the -- the one above that I'm

24   not familiar with that says promote -- "promo code

25   daily, go to enforce.com (sic) and use promo code

1    CD10" for a -- I guess it's a discount.  What is

2    that?

3         A.    That is a promo code for another company.

4         Q.    And what is enforce.com?

5         A.    Innerforce was a company that we had an

6    agreement with.

7         Q.    Okay.  Innerforce.  I apologize.

8               I know.  But what kind of company is

9    that?

10        A.    I believe that they were an apparel

11   company.

12        Q.    All right.  And does it basically -- or

13   did it basically work the same for Innerforce as it

14   did for My Pillow?

15        A.    I don't know.

16        Q.    Is this an example of, I guess, for lack

17   of a better word, cross-marketing?

18              In other words, you know Mr. Lindell is

19   obviously focused on election security issues in the

20   recent past.  Right?

21        A.    Yes.

22        Q.    Okay.  And you're marketing for him on

23   Conservative Daily, obviously.  We're looking at

24   that.  Right?

25        A.    No.

Page 97

1      Q.     No?

2      A.     He's not paying us to market on his

3  behalf.  We are advertising our promo code.

4      Q.     Okay.  That's a great point.  Because I

5  had asked it both ways earlier, I think, or tried

6  to.

7            When he puts his advertisement or his

8  face on this -- this particular -- in this

9  particular instance with this discount, if someone

10  buys using that promo code, the revenue just is some

11  percentage that comes back to Conservative Daily.

12            In other words, there is not a fee, a

13  separate fee that he pays to advertise.

14      A.     I don't know.

15      Q.     Well, that's what I thought you just

16  said.

17      A.     Well, I don't know if there was -- if he

18  does that generally.  I don't know.

19      Q.     But with respect to Conservative Daily.

20      A.     I -- I don't know.  As I mentioned

21  earlier, this was not my account.

22      Q.     Okay.  Do you know whether he's still

23  advertising with Conservative Daily?

24      A.     I don't know.

25      Q.     You don't watch the show anymore?

1          A.    Not anymore.

2          Q.    Were there other sources?  We looked at

3    fax blast, we looked at promo codes.

4                There is -- we took Mr. Oltmann's

5    deposition, the one that he appeared via Zoom as a

6    representative of CD Solutions.  Have you seen that

7    deposition transcript?

8          A.    I'm not -- I don't follow -- I don't know

9    what case you're referring to.

10         Q.    Okay.  In the original case that we filed

11   against Mr. Oltmann and others, we took his

12   deposition as a representative of CD Solutions.

13               Were you aware of that?

14         A.    Yes.

15         Q.    Okay.  Have you read that transcript?

16         A.    I have read a transcript.

17         Q.    Is that the one that you read?

18         A.    I don't know how many times you've

19   deposed him, but I have read a -- I have read a

20   transcript, yeah.

21         Q.    I guess maybe that also begs the

22   question.

23               Did you do anything to prepare to give

24   testimony, other than the -- gathered the documents

25   you indicated?

Veritext Legal Solutions
800-336-4000

```
1          A.    No.

2          Q.    Did you review anything other than the

3    documents you produced?

4          A.    No.

5          Q.    Why were you reading his transcript?  You

6    said you read --

7          A.    Yes.

8          Q.    -- Mr. Oltmann's transcript.  Why were

9    you reading it?

10          A.    I was an employee at -- I was a

11   contractor at the time of Conservative Daily, and

12   I'm a shareholder in the company he was

13   representing.

14          Q.    Okay.  So you were monitoring -- fair to

15   say you were just monitoring the litigation to see

16   how it was going, to inform yourself?

17          A.    It was so long ago I don't -- I don't

18   know the specific --

19          Q.    Okay.

20          A.    -- motivations behind it.

21          Q.    Well, the reason I asked, in part, is

22   there was some testimony about advocacy action.

23                Do you know what that term means?

24          A.    Advocacy to action.

25          Q.    Oh, "to action."  What is that?
```

Page 100

```
 1        A.    That is the URL that the fax blast system
 2   is run through.
 3        Q.    And, again, for Neanderthals like me,
 4   what -- what does that mean, "URL that it runs
 5   through"?
 6        A.    It is the website name.
 7        Q.    Okay.  That's what you click on in order
 8   to get to this particular fax blast?
 9        A.    Yes.
10        Q.    Okay.  And you can also get to it through
11   other URLs --
12        A.    Yes.
13        Q.    All right.  Including the Conservative
14   Daily?
15        A.    Yes.
16        Q.    Okay.  Any others?
17        A.    I don't know beyond what I already
18   listed.
19        Q.    Okay.  Now, prior to -- this is a little
20   different -- well, strike that.
21              Are there any other revenue streams
22   during 2020 and 2021 for Conservative Daily besides
23   the ones we've already discussed?
24        A.    Yes.
25        Q.    Tell me what those are.
```

Page 101

1       A.    Banner advertisements.   Donations.

2       Q.    Just a flat donation?

3       A.    Uh-huh.   And podcast sponsorships.

4       Q.    And did Lindell sponsor the podcast at

5    any point?

6       A.    I don't know.

7       Q.    And is the -- just the overall concept

8    behind what you guys are doing, or you were doing,

9    the idea to generate traffic, eyeballs, and drive

10   revenue?

11      A.    Can you rephrase that --

12      Q.    Yeah.

13      A.    -- question?

14      Q.    It seems sort of Business School 101.

15   But you were trying to increase the popularity --

16             MR. CORPORON:   Objection; move to

17   strike.

18      Q.    You were trying to increase the

19   popularity of the podcast over time.   You wanted

20   more viewers.   You wanted to attract viewers.   Is

21   that a fair statement?

22      A.    That's one goal, yeah.

23      Q.    Sure.   And the more viewers you get, the

24   more potential you have to drive additional revenue

25   streams.   Correct?

Page 102

1        A.    Sure.

2        Q.    Right.    I mean, that's the goal.

3              So there are metrics, are there not, to

4    show the popularity of a particular podcast?

5        A.    Yes.

6        Q.    And tell me how that -- like, if you

7    wanted to go see where, let's say, Conservative

8    Daily ranked, where would you go look?

9        A.    Apple podcasts.   All the different hosts

10   have rankings.

11       Q.    And at one point, was Apple hosting the

12   Conservative Daily podcast?

13       A.    Yes.

14       Q.    Did that change?

15       A.    I don't know.

16       Q.    In other words, was there a period of

17   time where different platforms dropped the podcast

18   from their plat- -- their platform, such as Apple?

19       A.    I don't know.

20       Q.    So you didn't -- you didn't track that

21   while you were there?

22       A.    I don't know what -- are you asking

23   whether Apple stopped hosting --

24       Q.    Well, that was what I asked and you said

25   you didn't know.

Page 103

```
 1          A.    I don't know.
 2          Q.    Did you track the popularity of the
 3     podcast on any platforms?
 4          A.    Yes.
 5          Q.    Okay.  Which ones?
 6          A.    Apple podcast.
 7          Q.    Okay.
 8          A.    Google podcast, Spotify.
 9          Q.    All right.  Leading up to the election in
10     2020, can you -- do you have any either
11     documentation or recollection of where the podcast
12     was -- let's just use Apple -- on Apple podcasts?
13          A.    I don't know.
14          Q.    Did you ever post election -- I don't
15     like the way that started.
16                Post election, did -- did the podcast
17     experience and uptick in popularity, did it start to
18     gain in the rankings?
19          A.    Yes.
20          Q.    Okay.  And that was coterminous with,
21     sort of, the election-related programming that you
22     did in November of 2020?
23          A.    Yes.
24          Q.    Okay.
25                     THE STENOGRAPHER:  Did you say
```

Page 104

```
 1    November?
 2              MR. CAIN:  Yes, ma'am.
 3         Q.    My compadre here said -- gave me a note
 4    that said that y'all were 119th in the rankings
 5    prior to the election.  Does that sound about right?
 6         A.    Okay.
 7         Q.    No, you don't have to agree with me.
 8         A.    I don't know the exact number.
 9         Q.    Okay.
10         A.    It fluctuates, so I don't know the exact
11    number.
12         Q.    Okay.  Is it fair to say, just as a
13    general proposition -- we don't need to say you were
14    seven or 10 or five or whatever -- but the content
15    that was being produced by Conservative Daily
16    immediately following the election, including the
17    Coomer content, resulted in an increase in the
18    number of viewers to your podcast?
19         A.    We experienced an increased in viewership
20    and listenership around the time of the election.
21         Q.    Okay.  And is there a way to, on an
22    individual basis -- in other words, let's say it's a
23    November 10th podcast or whatever -- to -- that you
24    guys had to -- to see what your viewership was?
25         A.    Yes.
```

Page 105

```
 1        Q.    And tell me, if I need that information,
 2   like if I want to ask for eyeball records,
 3   viewership records, what -- what does that look
 4   like?  Is there a report associated with it?  How do
 5   you -- how do you get that?
 6        A.    I no longer have access to that
 7   information, but you'd have to ask Joe or someone at
 8   CD Solutions.
 9        Q.    Okay.  You can't remember what you were
10   looking at in realtime to look at viewership?
11        A.    I cannot tell you what the process is now
12   because I'm not part of what the process is now.
13        Q.    No, I get it.  And I'm not asking you
14   about it now.  I'm asking you about it when it
15   started to creep up after the election.
16              So if you were finished with a podcast
17   and you wanted to see your viewership, what would
18   you do in order to get that information?
19        A.    I would log into -- Podbean was the
20   actual host hosting the files, and look at metrics
21   that Podbean provided.
22        Q.    And that's Pod, B-E-A-M?
23        A.    P-O-D-B-E-A-N.
24        Q.    N as in Nancy?
25        A.    Yes.
```

                                        Page 106

1     Q.    And are those records archived, or were

2     they while you were there?

3     A.    They were while I was there.

4     Q.    And when you got an uptick post election

5     or you saw one with respect to the ratings, did you

6     also experience an increase in revenue?

7     A.    I don't know.

8     Q.    Bookmark that for a second.  I want to

9     ask you a little -- little bit different line of

10    questioning.

11          When did you first hear about Oltmann's

12    efforts to infiltrate Antifa?

13    A.    The day before we aired the podcast

14    episode about Eric Coomer.

15    Q.    When did you air the Coomer podcast?

16    A.    I don't know the date.

17    Q.    All right.  Tell me what -- did you

18    hear -- I assume you learned it from Mr. Oltmann

19    himself?

20    A.    Yes.

21    Q.    Okay.  And was this in one of the

22    standing meetings?

23    A.    No.

24    Q.    Where was it?

25    A.    If I remember correctly, it was either a

Page 107

1    phone call or a discussion we had after a podcast

2    had stopped broadcasting, but we were still able to

3    talk to each other on each end of the -- of the

4    video screen.

5        Q.    Okay.  So up until -- well, we'll look at

6    the podcast.  I'll -- I'll represent to you now and

7    we can confirm or deny later, but I believe that

8    first podcast was November 9th of 2020.  Okay?

9        A.    I don't know.  I'm not sure.

10       Q.    All right.  Shortly after the election.

11       A.    Yes.

12       Q.    All right.  So up until this -- this

13   instance, the day before the podcast, you had no

14   knowledge that Mr. Oltmann was allegedly trying to

15   infiltrate Antifa?

16       A.    I do not recall having any knowledge

17   before that.

18       Q.    He never mentioned it to you?

19       A.    I don't recall any of that.

20       Q.    Not in September of 2020, not in October

21   of 2020?

22                 MR. CORPORON:  Objection; asked and

23   answered.

24       Q.    You can answer.

25       A.    I do not recall.

Page 108

1      Q.    Okay.  All right.  What do you

2  remember -- I know you said it could have been post

3  podcast or on the phone.  But what do you remember

4  Mr. Oltmann telling you?

5      A.    I remember him telling me that we had to

6  do a topic, a specific topic and that he would be

7  sending me materials for that topic.

8      Q.    Okay.  What else?

9      A.    I don't remember any other specifics

10  about that, but I know that we did talk about that

11  he had a big topic and he would be sending over the

12  cuts or images for that.

13      Q.    And that was the -- the day or night

14  before?

15      A.    I believe so.

16      Q.    Okay.  And that's it?

17      A.    Prior to that first episode?

18      Q.    Yes.

19      A.    Yes.

20      Q.    And when did he send you the cuts?

21      A.    He sent me the cuts the night before.

22      Q.    What did he send you?

23      A.    He sent me a number of emails with

24  attachments.

25      Q.    And I don't -- forgive me, I don't have

Page 109

1    the subpoena.  Are these emails with the attachments

2    something you produced?

3        A.    Yeah.

4        Q.    Okay.  Under what -- which one of these?

5        A.    That should be under the question

6    requiring all communications with Joe Oltmann.

7        Q.    Okay.  How many emails did you receive?

8        A.    I don't know the exact number.

9        Q.    Okay.  All right.  I'm going to call an

10   audible with counsel's agreement.  I think we need

11   to look at that in realtime.  I don't want to move

12   on from this topic.  So if we can take our lunch

13   break now and I can pull those up.  I want to put

14   those in front of you.  Okay?

15                    MR. CORPORON:  No objection.

16                    THE WITNESS:  That's fine.

17                    MR. CAIN:  Okay.  Let's do that.

18                    THE VIDEOGRAPHER:  Going off the

19   record.  The time is 12:58.

20                    (Break.)

21                    THE VIDEOGRAPHER:  Back on the

22   record.  The time is 2:04.

23       Q.    Mr. McGuire, before lunch, you referenced

24   emails with attachments you got from Mr. Oltmann

25   prior to the November 9th, 2020, podcast.  You

                                    Page 110

1    remember that?

2        A.    Yeah.

3        Q.    All right.  The next few documents I'm

4    going to hand you are from your production that you

5    got to us this morning.

6        A.    Uh-huh.

7            (Exhibit 16 was marked.)

8        Q.    And this is Exhibit 16.  Is Exhibit 16 --

9    well, what is Exhibit 16?

10       A.    It is an email from Joe to me with a

11   election fraud ZIP file.

12       Q.    Okay.  Is this one of the emails that you

13   were referencing in your prior testimony?

14       A.    The emails I was referencing in my prior

15   testimony was a number of emails -- different email

16   trails that came in and they had each of these

17   files, each of these images individually attached.

18       Q.    Okay.

19       A.    So I was not referencing this email in

20   particular.

21       Q.    Okay.  Well, this is how we go it.  So

22   can you explain --

23       A.    There should be other ones in there as

24   well.

25       Q.    And are they just transmittal emails?

Page 111

1        A.    Transmittal emails, yeah.

2        Q.    This is a ZIP file, at least it purports

3   to be.  You see that?

4        A.    Yeah, I see that.

5        Q.    Okay.  Are you saying you -- you didn't

6   get this or are you saying you did get this?

7        A.    This was not the email that I was

8   referring to.  When I said I received multiple

9   emails, it was not this email.

10        Q.    All right.  The other emails that you

11   referred to, were they similar in nature?  In other

12   words, they were -- if you look at the back of this,

13   it, you know, appears to be Facebook pages for Eric

14   Coomer attached to it.

15        A.    Yes.

16        Q.    Essentially, what you got was a number of

17   emails, to use your testimony, that provided

18   attachments that you understood to be Eric Coomer's

19   Facebook page?

20        A.    Yes.

21        Q.    Okay.  And can you explain this

22   particular one with the ZIP file that we're looking

23   at in Exhibit 16?

24        A.    I don't know if I -- I don't remember

25   opening this at the time.

Page 112

1        Q.    Okay.

2        A.    Which might -- yeah, I don't remember

3    opening this at the time.  I remember seeing other

4    emails with these attachments.

5        Q.    Okay.  The timing of this is the same as

6    the -- sort of, the multiple emails that you

7    received?

8        A.    I think this one came in a day before the

9    multiple emails that I received.

10       Q.    Okay.  So if we're building the timeline,

11   November 7th was a --

12              MR. KLOEWER:  Saturday.

13       Q.    -- Saturday?

14       A.    I don't know.

15       Q.    Okay.  I'll -- I'll represent to you that

16   we looked at the calendar and it's a Saturday.

17       A.    Okay.

18       Q.    Do you have any reason to dispute that?

19       A.    No.

20       Q.    Okay.  And are you saying -- you're --

21   your memory is you get this email with a ZIP file.

22   You didn't remember looking at it at the time and

23   then subsequently the next day you got multiple

24   emails with the Facebook attachments?

25       A.    What I'm saying is that when we did the

                                        Page 113

1    episode in question, I did not pull these images

2    from this email.

3            Q.    Okay.

4            A.    And I -- I have no recollection of

5    opening or seeing this email.

6            Q.    Okay.  Is there -- since we're trying to

7    get through this, is there any doubt in your mind

8    that these were the images that you got --

9            A.    No.

10           Q.    Okay.  This particular Exhibit 17 --

11   16 -- excuse me -- is a -- purports to be a forward

12   in the subject line.

13           A.    Yes.

14           Q.    Do you know whether there was a forward

15   to Mr. Oltmann of this information from another

16   email account?

17           A.    I don't know.

18           Q.    This shows that you received it at

19   1:17 p.m.  So I want to go back to what I thought

20   you -- you told me, and as you've learned now,

21   sometimes I forget what you tell me.  Was it on

22   the -- the Friday podcast, the end of the podcast

23   where you had a discussion with Mr. Oltmann that

24   there was going to be an election fraud -- the next

25   podcast would be an election fraud podcast?

                                        Page 114

```
 1          A.     That is my recollection, yeah.

 2          Q.     Okay.  And have you told the jury

 3    everything you recall about that conversation --

 4          A.     Yeah.

 5          Q.     -- with Mr. Oltmann?

 6                 Let me finish.

 7          A.     Oh, sorry.

 8          Q.     And then at least we look at Exhibit 16,

 9    it looks like you got a zip file.  Did -- when was

10    the next conversation you had with Mr. Oltmann about

11    the information he started sending you?

12          A.     I do not remember those specifics.

13          Q.     What did he tell you the significance of

14    these Facebook pages was, if you remember?

15          A.     The Facebook pages were -- the Facebook

16    pages were to prove his points.

17          Q.     Okay.  Was this the first time that you

18    heard the name Eric Coomer?

19          A.     Yes.

20          Q.     If you look at this -- the second page,

21    these are double-sided of this Exhibit 16 email

22    forward.  There is what looks to be --

23                 Are you with me?

24          A.     Yes.

25          Q.     -- either cut or pasted or just a series
```

Page 115

1    of links that were attached.

2              Do you see that?

3        A.    Yes.

4        Q.    Do you remember receiving those?

5        A.    No.

6        Q.    Did you investigate any of these links?

7        A.    No.  As I said, when we built the episode

8    the -- when I pulled images to build the episode it

9    was not sent from this email.  This email was sent

10   to me on a Saturday and typically I don't work a

11   whole lot on my Saturdays.

12       Q.    Okay.  You work on Sundays?

13       A.    I work a little bit on Saturday mornings

14   and Sundays, but this wasn't a -- I -- I don't work,

15   like, afternoon on Saturdays and Sundays.

16       Q.    And when did you start your work in terms

17   of pulling images for the -- for the podcast?

18       A.    I don't remember the specific time frame

19   for that?

20       Q.    When was the podcast?  It was

21   November 9th.  Right?

22       A.    Yes.  But I don't know --

23       Q.    You don't --

24       A.    -- I don't remember what time it was.

25       Q.    You don't know if you did it in the

Page 116

1   morning or you did it on a Sunday?

2       A.    I think we did it on the morning, we

3   pulled the cuts.  Typically, we would pull cuts on

4   mornings, that's when we'd be pulling cuts and

5   sending them to the producer.

6       Q.    So walk me through that exercise for this

7   particular podcast.  If it -- if it went like it

8   normally did, tell me how you built the show?

9       A.    For this particular podcast?

10      Q.    Yes, sir.

11      A.    There was an element of chaos to it.  As

12  I said, we didn't pull it from this email, there are

13  other emails that I sent over that were individually

14  sent to me from different emails of Joe's.

15      Q.    You mean different email addresses?

16      A.    Yeah, different email addresses.

17          There was an element of chaos to it

18  because this is lot of images.  The images were not

19  properly named or numbered and it's kind -- we

20  didn't know what to do with it.

21      Q.    Okay.  Well, so how did you sort through

22  that?

23      A.    We didn't sort through it.  The way that

24  episode went down was that Joe was calling images

25  and it was very difficult for us to figure out which

Page 117

1    images he was asking for.

2         Q.    You were just kind of scrolling through

3    them, in essence?

4         A.    Yes, because the images that we were

5    pulling were not from this email.  It was from a

6    series of three or four or five, however, many it

7    was emails, that Joe had sent.

8         Q.    Okay.  So what -- what did you know --

9    kind of going back to what I said before about

10   your -- your preparation for shows.  Did you feel

11   underprepared for this show?

12        A.    Yes.

13        Q.    And what did -- what questions did you

14   have of -- of Mr. Oltmann prior to going live to

15   talk about Eric Coomer, if any?

16        A.    The questions I had for him were -- were

17   the same questions I had for -- for any -- anytime

18   they bring guests forward, are you sure about this.

19        Q.    And what did he say?

20        A.    I don't remember his exact response.

21        Q.    What was his general --

22        A.    General, yes.

23        Q.    He felt good?

24        A.    Yes.

25        Q.    Did you feel good?

Page 118

1        A.      No.

2        Q.      And did you talk to him about how he got

3    access to this particular Facebook account?

4        A.      I did ask him that.   I don't remember if

5    I asked him this before we went to air, but I did

6    ask him that.

7        Q.      And why did you want to know that?

8        A.      Curiosity.   Legitimacy.

9        Q.      Authenticity?

10       A.      Yes.

11       Q.      What did he say?

12       A.      He didn't give me an answer as to who

13   helped him get into it.

14       Q.      Did you find that peculiar?

15       A.      No.

16       Q.      Why not?

17       A.      Joe didn't tell me lots of things.

18       Q.      And so he sort of sprung this episode on

19   you, didn't he?

20       A.      It felt that way, yes.

21       Q.      And since -- since the first episode,

22   have you ever discovered how he got access to this

23   account?

24       A.      No.

25       Q.      How many times have you asked him?

Page 119

1        A.      I did not repeatedly ask him this

2    question, once he gave me his answer, that was kind

3    of it.

4        Q.      At the time that -- well, just kind of

5    leading up to the show, had he told you anything

6    about being on an Antifa call?

7        A.      I don't remember the specifics of what he

8    sent to me in the lead-up to that show.

9        Q.      Okay.  Well, that begs the question, do

10   you have a general recollection?

11       A.      I -- I don't remember the specifics and I

12   don't want to speculate.

13       Q.      Okay.  We'll break that down in a minute.

14   Or unpack it.

15               All right.  Bookmark that for a second.

16   That -- in a -- in a break I'll look to see the --

17   you're pretty sure you produced the individual

18   emails?

19       A.      I know that one of them came from Joe's

20   FEC United emails, so I know -- I know that that was

21   in this.

22       Q.      And in your mind was it similar to what

23   you testified in our first session about there just

24   didn't seem to be a rhyme or reason as to which

25   email address --

Page 120

1     A.    Yes.

2     Q.    -- was being used?

3           Okay.  Let me finish, please.  I'm not

4     scolding you, but I'm just -- want us to be on the

5     same page.

6                 (Exhibit 17 was marked.)

7     Q.    All right.  Let's look at Exhibit 17.

8     And like I said, all of the ones I'm giving you for

9     the time being, are from you -- what we got this

10    morning.

11                MR. CORPORON:  Thank you.

12    Q.    Exhibit 16, while you're looking at that,

13    came from Joe@PINBN, P-I-N-B-N, .com.  This one

14    comes from Joeauto@Conservativedaily.  The subject

15    is Dominion web links.  The date is November 8th of

16    2020.  Tell me, do you remember getting this email

17    as well?

18    A.    I do.

19    Q.    Okay.  And did you review it when you

20    received it?

21    A.    I did.

22    Q.    Why?

23    A.    Because he had sent it to me.

24    Q.    What did you understand the reason that

25    you were receiving information on Dominion at the

Page 121

1    time?

2         A.    This was in a lead-up to the next

3    episode.

4         Q.    I understand that, but you have to

5    understand the context, I assume, before you go

6    to -- to air.   What was the purpose of reviewing the

7    Dominion information at the time?

8         A.    Joe's belief that Dominion was in some

9    way involved in -- in election fraud.

10        Q.    You seem like a careful person to me.

11   What -- what level of discomfort did you have in

12   talking about Dominion or -- or Dr. Coomer, for that

13   matter, being tide to election fraud during these

14   early podcasts?

15        A.    I was extremely uncomfortable that a

16   private corporation has been entrusted with

17   performing a public service.

18        Q.    All right.   And what -- you answered

19   maybe a question I didn't ask.   Personal discomfort,

20   if any, that you had in participating in podcasts

21   that made that allegation?

22        A.    I was not uncomfortable with

23   participating in podcasts looking into allegations.

24        Q.    Y'all ended up doing more than that.   You

25   ended up looking into Dr. Coomer and accusing him of

                                        Page 122

1    being -- participating in election fraud.   At least

2    that's what Oltmann did.   Right?

3        A.    I don't believe I said that.

4        Q.    No.   I said Oltmann did.

5        A.    Your question started with "you guys."

6        Q.    Okay.   Oltmann did.   Right?

7        A.    Yes.

8        Q.    Okay.   What level of discomfort did you

9    have in Mr. Oltmann doing that on this podcast?

10        A.    I had enough discomfort that when it came

11    time to talk about it, I made sure to use the word

12    "allegedly" to discuss the claims.

13        Q.    But he didn't use that term?

14        A.    He did not.

15        Q.    Did you -- and -- and we'll kind of click

16    along with this.   But for this show, you got the

17    Facebook images, it looks like you got some web

18    links.   Did you do anything yourself outside of

19    reviewing the documentation that Oltmann sent you to

20    investigate any of this?

21        A.    I did not do anything myself outside of

22    viewing the images and sending them over to our

23    producer.   This is not something I can investigate

24    myself.   These are images from a private Facebook

25    page that I don't have access to.

Page 123

1      Q.      Well, I'm not going to wrestle with you

2   on that.   One thing you could have done is insisted

3   that Mr. Oltmann give you information as to how,

4   number one, he got access to it, but you didn't do

5   that, did you?

6      A.      Is anyone contending that they're not

7   accurate?

8                  MR. CAIN:  Objection; not responsive.

9      Q.      You didn't insist that you get some

10  information as to how he got access or when for that

11  matter?

12     A.      I did not feel that the method of how he

13  gained access to a Facebook page of which I did not

14  know how private the settings were, that was not

15  something that -- that -- that occurred to me as

16  something that needs to be objected to.

17                 MR. CAIN:  Objection; nonresponsive.

18     Q.      That's the why.  Not -- not the fact that

19  you didn't do it.

20     A.      Can you --

21             (Simultaneous speaking.)

22     Q.      Well, just con --

23     A.      Can --

24     Q.      -- confirm for me?

25     A.      Can you please ask me a question in a way

                                              Page 124

```
 1    that I can -- a simpler form of the question so I

 2    can answer what you're asking?

 3        Q.    You didn't demand that he provide you

 4    that information, how did he get access and when he

 5    got access?

 6        A.    No, I did not.

 7        Q.    All right.  For the reasons you

 8    described?

 9        A.    Yes.

10        Q.    All right.  So the podcast itself, I've

11    got a few clips from it.  I want to pick those up.

12    And they're short.  And that will give us some

13    context for some of these other exhibits and

14    questions.

15            If we get this right the first time, that

16    will be because Brad has prepared.  So the

17    next exhibit, I'm going to put a placeholder.

18                MR. CAIN:  I don't have the thumb

19    drive.  Is that the thumb drive?

20                THE STENOGRAPHER:  (Hands over thumb

21    drive.)

22                MR. CAIN:  Is going to be Exhibit 18.

23                (Exhibit 18 was marked.)

24        Q.    And Exhibit 18 is comprised of 15

25    different audio visual clips.  I doubt we'll have
```

Page 125

1    time to look at all of them.

2              The first two we're going to look at,

3    though, are some clips from the November 9th, 2020,

4    podcast.

5              And just for the lawyers and for you, to

6    the extent that you care, the clips are identified

7    by their date in the -- in the title, so that kind

8    of gives you the cross-reference.

9              All right.  So before I play the first

10   clip, we talked about getting the Facebook images,

11   we talked about the link that you got to Dominion.

12              Were you provided with any other written

13   material by Mr. Oltmann about Eric Coomer prior to

14   the first podcast?

15        A.    I don't believe so.

16        Q.    And have we talked about all your

17   recollections of discussions with him that you have

18   today leading up to that podcast?

19        A.    I believe so.

20              MR. CAIN:  Okay.  Let's look at

21   Clip 3.

22                    (Playing video.)

23              MR. CAIN:  Why don't you pause that

24   real quick?

25        Q.    Do you know what Mr. Oltmann's reading

                                        Page 126

1   from when he says "I'm going to go through my notes

2   here"?

3         A.    No.

4         Q.    Did he ever share any notes --

5         A.    No.

6         Q.    -- with you?

7               Have you ever seen any notes?

8         A.    Only notes that were given in the other

9   court case.

10        Q.    Okay.  Let's -- let's leave that up and

11  I'll pause there.  I want to make sure that we are

12  talking about the same thing.

13              (Exhibit 19 was marked.)

14        Q.    This is Exhibit 19 to your deposition.

15  Let me show you that.

16              MR. CORPORON:  Counsel, Exhibit 19.

17        Q.    Are Exhibit 19 or is Exhibit 19 the notes

18  that you were referring to?

19        A.    I believe so.

20        Q.    Okay.  Did -- and the first time you saw

21  these notes was part of the production from the

22  court case?

23        A.    I believe so.

24        Q.    Have you seen, prior to this -- this show

25  on November 9th, have you seen -- had you seen

                                        Page 127

1    Mr. Oltmann take notes in a -- in a -- I'll call it
2    a binder -- whatever -- however you want to describe
3    it, but in a book like this?
4         A.    Have I ever seen Joe Oltmann take notes?
5         Q.    In a book like this.  It looks like it's
6    sort of a two-page --
7         A.    I can't speak to what kind of book this
8    is.
9         Q.    Okay.  Have you ever seen Mr. Oltmann
10    take notes like this?
11        A.    I've seen Mr. Oltmann take notes.
12        Q.    And if you look at it, are you familiar
13    with his handwriting?
14        A.    Yeah.
15        Q.    Enough to either confirm or deny that
16    this is in his handwriting?
17        A.    I'm not a handwriting specialist, but
18    this appears to be in his handwriting.
19        Q.    Well, you -- by the time of the podcast
20    in 2020, you had been working with him for how long?
21        A.    Six years, give or take.
22        Q.    Okay.  So you guys had a pretty close
23    working relationship.  Is that a fair statement?
24        A.    Yes.
25        Q.    Spoke to him almost every day, I assume?

Page 128

```
 1        A.    No.

 2        Q.    But it's fair to say during the lead-up

 3   to this podcast in question, you hadn't seen these

 4   notes?

 5        A.    I don't believe I had.

 6        Q.    And you don't know or do you know whether

 7   these were the notes that he was looking at when he

 8   was talking in the podcast?

 9        A.    I don't know.

10        Q.    You do know -- well, let me ask it as a

11   question.

12              You know that the Antifa call that he

13   talks about was not a recorded phone call.  Right?

14        A.    Yes, I know that.

15        Q.    But you also know, do you not, that

16   Mr. Oltmann, in the past, had a practice of

17   recording calls that he was on?

18        A.    Yes.

19        Q.    All right.  So talk to the jury a little

20   bit about that.

21              What -- what was his sort of pattern and

22   practice of recording calls that he was on for

23   whatever reason?

24        A.    Joe would commonly and frequently record

25   important phone calls.
```

Page 129

1    Q.    Did he ever tell you whether or not this

2    alleged Antifa call was an actual phone call or, you

3    know, a Zoom-type call?

4    A.    I don't believe that he did.

5    Q.    Did you ask him?

6    A.    I don't remember if I asked him whether

7    it was a phone call or a Zoom call.

8    Q.    Were you surprised by the fact that he

9    did not record this alleged call?

10    A.    Yes.

11    Q.    Did you ask him why he didn't record it?

12    A.    Yes.

13    Q.    What did he say?

14    A.    He didn't have an answer.  Or I can't

15    remember his answer.

16    Q.    Did you ask him how he got on it in the

17    first place?

18    A.    I don't -- I think I -- yeah.  Yeah, I've

19    asked him.

20    Q.    Okay.  And what is his explanation?

21    A.    He didn't have a concrete answer for me.

22    Q.    Did he have any answer?

23    A.    Just that someone had helped him get on,

24    that it was someone who was already scheduled to be

25    on it, and he used -- he piggybacked that.

Page 130

1      Q.    Did he tell you where it occurred, like

2    where he was?

3      A.    No.

4      Q.    Did you ask him who he piggybacked on?

5      A.    I have.

6      Q.    Has he responded to you?

7      A.    He would not tell me.

8      Q.    You're -- you're working on podcasts with

9    him on this topic, and he's not telling you how he

10   got on the call and who put him on it or any of that

11   type of information?

12                   MR. COOMBE:  Object to form.

13     A.    He did not tell me the information that

14   you just listed.

15     Q.    You cared about the accuracy of the

16   content that you were putting out there, didn't you?

17     A.    Yes.

18     Q.    And you cared about -- well, not cared.

19   You were concerned, weren't you, that you weren't

20   getting answers to some basic questions about the

21   information that was being presented?

22     A.    I was concerned, yes.

23     Q.    There's a -- I've asked you this earlier.

24   There's a reference to Joey Camp here on the call,

25   and you've already kind of talked about that.  Did

Page 131

1    you ever consider the possibility that it was --

2    that it was actually Mr. Camp or someone else that

3    was on the call, not Mr. Oltmann?

4        A.    Yes.

5        Q.    You at least had that suspicion?

6        A.    Yes.

7        Q.    Have you done any investigation to either

8    confirm or deny that?

9        A.    No.

10       Q.    And what led you to that suspicion?  What

11   created that in your mind?

12       A.    Joe has a habit of putting himself in

13   other people's stories sometimes.

14       Q.    And when has that happened, other than

15   potentially this time?

16       A.    One example that comes to mind is years

17   ago there was a client that was being onboarded, and

18   Joe was not present for a meeting that he later

19   would tell the story as if he was there.

20       Q.    And that -- was that before this --

21       A.    Yes.

22       Q.    -- particular episode?

23       A.    Before.

24       Q.    Do other examples come to mind?

25       A.    Other similar examples to that.

Page 132

1      Q.    Over the years that you guys worked

2  together, give me an estimate of how many times you

3  heard Joe Oltmann graft himself onto a particular

4  situation.

5      A.    I can't estimate that over eight years of

6  working together.

7      Q.    Okay.  Can you give me, in 2020, on an

8  annual basis, a couple of times, ten times?

9      A.    I can't.

10      Q.    But you'd agree -- I think you used the

11  word -- it was a habit of his of doing so?

12      A.    Yes.

13      Q.    Did you -- and I apologize.  I -- I know

14  I saw the stuff from your mom where she was talking

15  about Joey Camp.  And we may look back at that.

16          It sounds like she did some research on

17  Joey, did she not?

18      A.    It appears so.

19      Q.    Yeah.  And then other -- other than what

20  your mom was sleuthing on, you haven't -- you're not

21  aware of any other person doing research on him, are

22  you?

23      A.    No.

24      Q.    Have you heard of someone who calls

25  themself "The Researcher"?

                                    Page 133

1      A.      You're going to have to be more specific.

2      Q.      Well, I can show you some -- some emails

3   that were sent to Mr. Oltmann from someone called

4   "The Researcher."  Do you know of anybody that goes

5   by that pseudonym?

6      A.      Again, you're going to have to be more

7   specific.

8      Q.      I can't, other than that's what the

9   pseudonym is.

10      A.      Nothing comes to mind, but -- I don't

11   know.

12      Q.      Have you known --

13      A.      I don't know everyone's aliases.

14      Q.      Do you know whether or not Mr. Oltmann

15   has been receiving information directly from Joey

16   Camp?

17      A.      I do not.

18      Q.      Do you believe -- well, just flat out, do

19   you believe that Mr. Camp is a credible source for

20   information?

21      A.      I know nothing about Mr. Camp.

22      Q.      Okay.  All right.  We'll put that aside

23   for a minute.

24              Back to -- so we saw at the beginning of

25   the clip that Mr. Oltmann was looking at some notes,

Page 134

```
 1    it appears to be.  And then let's just pick it up

 2    from there.

 3                    (Playing video.)

 4         Q.    I've seen that clip a number of times,

 5    and I always look at you, in part, because your eyes

 6    are looking around at what appears to be a computer

 7    screen.  What were you doing when he was telling the

 8    story?

 9         A.    I don't know what I was doing at the

10    time.

11         Q.    I speculated that maybe you were just

12    looking through the Facebook stuff trying to put

13    your clips together.  Were you doing that?

14                    MR. CORPORON:  Objection; asked and

15    answered.

16         A.    I don't know what I was doing, but -- I

17    don't know.

18         Q.    Okay.  So was that the first time you

19    heard this recitation?

20         A.    Yes.

21         Q.    In the podcast?

22         A.    Yes.

23         Q.    This is just a body language thing.  You

24    might want to not want to lean on your face --

25         A.    I'm sorry.
```

Page 135

1    Q.    -- just so the jury can see.

2          Okay.  Was that surprising to you?

3    A.    Yes.

4    Q.    Let's look at Clip 5.

5              (Playing video.)

6    Q.    Okay.  So you heard it, but is it your

7    recollection that at least initially -- at least

8    your colleague was saying he wasn't actually certain

9    that it was Eric Coomer on the call.

10   A.    That's what he just said.

11   Q.    Right.  I think I knew the answer to it.

12         That changed over time, though, did it

13   not?

14   A.    His --

15   Q.    Yeah.

16   A.    -- opinion?  Yes.

17   Q.    Yeah.  It went from he couldn't be

18   certain to he -- he was certain it was Eric?

19   A.    Yes.

20   Q.    Do you know what caused that shift?  Was

21   there something that you observed there where he got

22   different or additional evidence or anything of the

23   like?

24   A.    I don't know.

25   Q.    Then fair to say that he didn't -- he

Page 136

1    didn't explain to you what caused that shift?

2        A.    What --

3        Q.    Yeah.

4        A.    What shift?

5        Q.    The early discussions where he wasn't

6    certain that it was Eric to the later episodes

7    where -- and appearances where he was sure it was

8    Eric?

9        A.    I don't know what specifically caused

10    that.

11        Q.    What was the response to that

12    November 9th episode, this one that we've been just

13    looking to -- looking at?

14        A.    Significant.

15        Q.    How so?

16        A.    It was viewed many times.  It was

17    downloaded many times.  It was picked up by outlets,

18    by --

19        Q.    Such as?

20        A.    I can't give you a list.  I just remember

21    that it was picked up by outlets.

22        Q.    Did you get contacted directly about the

23    episode?

24        A.    How so?

25        Q.    Well, did someone text you about it?

Page 137

1    Someone call you about it?   Anything like that?

2    It's not the form of communication that I think

3    matters, but --

4         A.    I -- I talked to people in the time,

5    yeah, after the episode, yeah.

6         Q.    Okay.   Who did you talk to?

7         A.    I don't remember who I talked to after

8    the episode.

9         Q.    Just to rewind.   You first learned about

10   the episode content a few days beforehand.   Right?

11        A.    One to two days, sure.

12        Q.    You got Facebook images that I think to

13   you said it was chaos trying to put those together.

14        A.    Yes.

15        Q.    Is that fair?

16              You didn't have any discussions with

17   Mr. Oltmann about when and where he got that

18   information from?

19        A.    Yes.

20        Q.    You go live with a story about an Antifa

21   call as we just saw?

22        A.    Yes.

23        Q.    Prior to that, you had not received any

24   information, despite asking, from Mr. Oltmann about

25   how he got on that call?

Page 138

1       A.      Yes.

2       Q.      And then the first time you heard the

3    content as recited was live, contemporaneously?

4       A.      The first time I heard him say what he

5    said on that video was live.

6       Q.      And you had a suspicion, did you not,

7    that he may have grafted himself onto someone else's

8    call?

9       A.      Not at the time.

10      Q.      That happened later?

11      A.      Yes.

12      Q.      Did you reach out to -- well, who is

13   Jimmy Sengenberger?

14      A.      Sengenberger.  He is -- is a friend of

15   mine.

16      Q.      What does he do for a living?

17      A.      I don't know what he does now, but is

18   a -- a radio personality.

19      Q.      On what channel?

20      A.      I do not know what station he's on right

21   now.

22      Q.      What station was he on during this --

23      A.      7- --

24      Q.      I'm sorry.

25      A.      I'm sorry.

                                          Page 139

```
 1          Q.     -- during November 9th of 2020?

 2          A.     710 KNUS.

 3          Q.     Okay.  Is that the same one that

 4   Mr. Corporon's on?

 5          A.     I -- yes, yes, I believe so.

 6          Q.     Okay.  Let's look at --

 7                 MR. CAIN:  So we had 18 was the

 8   clips.  19 was the notes.  20 is -- I'm going to go

 9   back to the stuff that you gave us this morning.

10                 (Exhibit 20 was marked.)

11          Q.     Do you remember producing this document,

12   Exhibit 20?

13          A.     Yes.

14          Q.     What is this?

15          A.     This is a text message between me and

16   Jimmy Sengenberger.

17          Q.     And I said Sensenberger.  I think may be

18   he was a --

19          A.     He's a senator.

20          Q.     Senator, yeah.

21          A.     Or -- or -- or a congressman, one or the

22   other.

23          Q.     Well, I have a political science degree,

24   too, but I obviously don't know what you know.

25                 Okay.  So how did this come about that
```

1    you were texting with Mr. Sengenberger?

2          A.    Jimmy texted me.

3          Q.    All right.  Well, let's -- let's just

4    read some of this.  We'll do -- we'll do role play.

5    I'll play Jimmy and you play yourself.

6          A.    I'd prefer not.

7          Q.    Why not?

8          A.    If you want me to answer questions, I'm

9    happy to do so, but I -- I prefer not to read.

10         Q.    You don't like to read your own words?

11         A.    No, I'm -- I'm fine to answer questions.

12   I'd prefer not to read.

13         Q.    Okay.  Do you stand by the words you have

14   in this text string?

15         A.    I stand by that this conversation

16   happened.

17         Q.    Okay.  And we have lots of posts and

18   texts from you.  And I'm not -- this is not -- you

19   may take this the wrong way.  It's not intended that

20   way.  What you've produced to us today that comes

21   from you, either in texts or in posts, are any of

22   those something that you recall intentionally being

23   false where you made a false statement in a text or

24   post?

25         A.    No, I don't recall any time I

                                        Page 141

1    deliberately made a false statement in a text or

2    post.

3        Q.    I didn't think so.  I just want to --

4    that will help streamline some of this.

5            All right.  So Mr. -- was Mr. -- was

6    Jimmy -- we'll just agree to call him Jimmy.  Was he

7    on the radio during this time.  Was he -- had a show

8    at KNUS?

9        A.    He had a show there.  I don't know if he

10   was on the radio while we were on the air.

11       Q.    Okay.  He says:  Hey, Max, I watched your

12   show live today.  Between us, I don't think Coomer's

13   leftism is sufficient -- is nearly sufficient

14   evidence.  In fact, it's known in the election

15   community.  I asked a long -- a former long-time

16   Republican-elected county elections official about

17   Coomer.  Not only does this person know him and of

18   his lefty politics but even says, colon, quote, Yep,

19   he's out there politically.  But I would trust him

20   to run an election where I'm on the ballot any time,

21   close quote.  This is an individual whose judgment I

22   trust on election issues.

23            Did I read that correctly?

24       A.    Yes.

25       Q.    And then he goes on to say:  IMO -- which

                                              Page 142

1    the kids know stands for in my opinion -- your

2    contributions as devil's advocate and about the news

3    stories of chain of custody issues, et cetera was

4    well-done and salient.  Best part of the case.

5              Do you know what he was referring to when

6    he -- when he says "chain of custody issues"?

7         A.    I don't know what he was specifically

8    referring to.

9         Q.    And then you go on -- you're not going to

10   read it?

11        A.    I'd prefer not to.

12        Q.    You say -- confirm that this is your

13   response -- the difference is Joe heard him on a

14   call brag about making it impossible for Trump to

15   win.

16             Did I read that correctly?

17        A.    Yes.

18        Q.    And you go on to say:  I'd also say that

19   a Colorado Republican saying that they trust

20   Cooker -- I believe you mean Coomer.  Did you mean

21   Coomer?

22        A.    Yeah.

23        Q.    -- and Dominion doesn't say much, given

24   how the GOP has fared.

25             What do you mean by that?

Page 143

1        A.    At the time, there were many allegations

2    that Dominion had played a role in affecting

3    election outcomes and the fact that Republicans had

4    done so poorly, this statement speaks for itself.

5        Q.    You correct Cooker to Coomer and then

6    Jimmy goes on to say:  Has he heard his voice

7    elsewhere to be certain that it's the same Eric.

8    And this particular GOP elections official is one I

9    trust explicitly who does not fall into that

10   otherwise accurate category.

11             Did I read that correctly?

12       A.    Yes.

13       Q.    Okay.  So remind me again, how long had

14   you been an acquaintance of -- of Mr. Sengenberger?

15       A.    Give or take, six years.

16       Q.    I'll skip down to the November 9th,

17   8:35 p.m.  This is back from Mr. Sengenberger to

18   you:  Okay.  Thanks.  Wish we had a recording for

19   verification purposes.  I won't run with it yet.

20             So was the discussion there or had y'all

21   been having a discussion about possibly going with

22   this story on KNUS?

23       A.    I had not had a -- I don't believe I've

24   had a conversation with him about dong that, no.

25       Q.    Okay.  He -- he then goes on to say:  But

```
 1    I will be keeping an eye on what you guys put out

 2    moving forward as far as supportive evidence,

 3    et cetera.  It was an interesting show, exclamation

 4    point.

 5                Did -- did Mr. Sengenberger ever come

 6    back to -- to you to -- to see if he could get

 7    either yourself or Mr. Oltmann on the -- on the

 8    radio to talk about this?

 9        A.    I don't recall.

10        Q.    Did you ever appear on KNUS to talk about

11    Eric Coomer?

12        A.    Not to talk about Eric Coomer, no.

13        Q.

14              Other things?

15        A.    Yeah, I appeared on there to discuss

16    other things.

17        Q.    Did you -- and I know we kind of crossed

18    through this earlier.  But he -- he says, he wished

19    he had a recording for verification purposes.  You

20    felt the same way, didn't you?

21        A.    Yeah.

22        Q.    Then it goes down, the next entry -- and

23    this is all within -- if you look at the time

24    stamping, about 10, 11 minutes.  Right?

25        A.    From the beginning to the end, about 30
```

Page 145

```
 1   minutes.

 2        Q.    Oh, pardon me.  I didn't look up quite

 3   that high.

 4             You say:  We're talking with Bannon to

 5   come on his podcast to discuss it.

 6             Is that Steve Bannon?

 7        A.    Yes.

 8        Q.    So the night that this aired --

 9             When did this air, by the way, this

10   podcast?

11        A.    I don't know the specific time that it

12   airs.

13        Q.    When did it normally air?

14        A.    I don't remember at that point in time

15   whether we had switched to a morning and evening

16   podcast.

17        Q.    Okay.

18        A.    Can you tell me when it aired?

19        Q.    I don't.  I don't know.  He can, this guy

20   right here.

21             MR. COOMBE:  When is it?

22             MR. KLOEWER:  I'll do -- very well to

23   find it.

24             THE WITNESS:  I don't know either.

25             MR. CORPORON:  You just got sold out,
```

Page 146

1    Brad.

2        Q.    Okay.  So how did -- and that's -- was

3    there an existing relationship with Steve Bannon, to

4    your knowledge?

5        A.    To my knowledge, no, that's something

6    that Joe said.

7        Q.    You got that information from Joe that:

8    Hey, we've already got Steve Bannon inquiring about

9    this?

10       A.    Joe told me he was going to try to get on

11   Steve Bannon.

12       Q.    And you're relating that to -- to

13   Mr. Sengenberger.  Correct?

14       A.    Yes.

15       Q.    So you go on -- or the string goes on to

16   say:  After talking about Bannon.  Very cool.  It

17   was hard to follow today with all the info and

18   producer limitations.  Ha-ha.

19            Do you know what he meant by "producer

20   limitations"?

21       A.    There were difficulties with the producer

22   being able to pull up the specific image that Joe

23   was referring to, as I mentioned earlier, because of

24   the way it was organized alpha numerically with

25   little rhyme or reason?

                                        Page 147

1          Q.    Then goes on to say:  I'm sure it will be

2   more organized by then.  Send me the link if that

3   comes to fruition.

4                How did you interpret that?

5          A.    That was an accurate statement.

6          Q.    Of the -- I just don't know what he means

7   by "send me the" -- "send me the link if that comes

8   to fruition."

9                Do you know what he meant?

10         A.    I -- I believe that he was talking send

11  me a link to a next -- a future episode.

12         Q.    Oh, okay.  On the topic?

13         A.    Yeah.

14         Q.    You say:  Yeah, Joe was in charge of

15  organizing his thoughts and he just didn't do it.

16                Is that what you were talking about --

17  well, does that refer back to what you were talking

18  about, just sort of the chaos in getting the show

19  prepared?

20         A.    Yes, the chaos.  That this was a show

21  that Joe was spearheading and there wasn't a lot of

22  prep done.

23         Q.    I don't -- I didn't see other texts in

24  the production with Mr. Sengenberger.  Did you

25  produce other texts?

                                        Page 148

```
 1          A.     No.

 2          Q.     Did you guys ever circle back where you

 3     sent him the link and there were additional

 4     discussions?

 5          A.     No, I didn't find anything else that was

 6     responsive.

 7          Q.     Okay.  Do you have a memory as you sit

 8     here of -- of him calling and saying, look, I can

 9     either get you on or I don't want to get you on or

10     something?

11          A.     No.  No.

12          Q.     Okay.  Just let it drop?

13          A.     No specific memories, no.

14          Q.     Are you still in touch with him?

15          A.     Yes.

16          Q.     Okay.  Bear with me.  The longer I take

17     in between questions, the shorter this thing gets.

18                 Well, this is kind of a general question.

19     Since the first episode aired, were you provided

20     with any additional evidence to support the notion

21     that this event, being the Antifa call and posting

22     about rigging the election, actually occurred?

23          A.     Joe's affidavit.

24          Q.     Anything else?

25          A.     Nothing comes to mind, but --
```

Page 149

1     Q.    Okay.   Well --

2     A.       -- I don't know.

3     Q.    You'll have an opportunity to -- we'll

4  talk through it and then if something else comes to

5  mind, you can let me know.   Okay?

6     A.    Okay.

7     Q.    Okay.  So I guess let's fast-forward --

8  or -- or slow forward since it's only a couple of

9  days.  So that was November 9th of 2020.  Let's look

10  at Clip 7, which I'll represent to you is from

11  November 11th of 2020.

12                    (Playing video.)

13     Q.    Fair to characterize this going from not

14  sure it was Eric to putting your finger on the

15  scales of the election and sedition that's

16  punishable by death as an escalation in the rhetoric

17  by Joe Oltmann?

18     A.    Yes.

19     Q.    What -- what happened in these two days

20  between you and him, if anything?

21     A.    I don't remember what specifically

22  happened between these two days, no.

23     Q.    How -- how about your show prep, what --

24  what lead to -- let me just go back to kind of the

25  questions I asked before but with respect to this

                                        Page 150

1    show.  Was there a preproduction meeting about

2    accusing Eric Coomer of sedition?

3        A.    That was not, to my recollection,

4    discussed in a preproduction meeting.

5        Q.    Is it -- this -- the clip that we just

6    looked at, was it like the one we looked at before

7    where you heard it for the first time on the air?

8        A.    I don't know if that's the first time I

9    heard Joe say that, I just know it wasn't discussed

10   in a preproduction meeting.

11       Q.    Were you surprised that he was making

12   these statements during the podcast?

13       A.    Yeah.

14       Q.    Had he talked to you about any evidence

15   that he had acquired to show actual interference by

16   Dr. Coomer with the election?

17       A.    He has not shown me any actual evidence.

18       Q.    So you've never seen any evidence from

19   Joe Oltmann from tip to tail that Dr. Coomer had any

20   actual role in rigging the 2020 Presidential

21   election?

22             MR. CORPORON:   Objection; asked and

23   answered.

24       A.    Beyond the affidavit, no.

25       Q.    Well, the aff- -- affidavit is the

Veritext Legal Solutions
800-336-4000

1    affidavit, it doesn't contain any actual analysis,

2    does it?

3         A.    It's his statement as to what occurred.

4         Q.    And you're making a distinction because

5    of the fact that he swore in that affidavit that

6    what -- what occurred was true?

7         A.    I think there's distinction there, yeah.

8         Q.    I'm just trying to figure out why it's

9    any different than what's on the podcast?

10        A.    When you sign an affidavit you are

11   stating this is a factually accurate statement under

12   penalty of perjury.

13        Q.    Gotcha.  Okay.  So -- by the way, we may

14   look at the affidavit.  Remember we talked about the

15   fact that it was emailed --

16        A.    Uh-huh.

17        Q.    -- to you at one point?

18              Is that a yes?

19        A.    Yes.

20        Q.    Okay.  He mentions in that affidavit if

21   we're talking about, I guess, more technical data,

22   something called an ARIMA analysis.  Have you heard

23   that term before?

24        A.    I've heard him use that term, yes.

25        Q.    Tell me -- tell me in what context you've

Page 152

1    heard Joe Oltmann use that term?

2        A.    I don't know the specifics as to what

3    that term means.  It's just a term he would, over

4    time, he used quite often.

5        Q.    You can't cite an example of when he

6    would use that, outside of this context?

7        A.    Nah, I don't.  I don't know what that

8    term means so it would be difficult to explain

9    specific instances.

10       Q.    Have you ever seen as it relates to the

11   election issue and interference by Dr. Coomer, any

12   technical analysis of, it could be in the form of a

13   PCAP, or an image of a hard drive, or anything along

14   those lines that -- that Mr. Oltmann has presented

15   to you that he represented was proof that Eric

16   Coomer rigged the election?

17       A.    He sent me the Antrim County report that

18   was published.  The only things I saw were different

19   reports, audits that were widely published and

20   disseminated.

21       Q.    Publicly available?

22       A.    Yes.

23       Q.    Did he ever tell you how he got ahold of

24   the hard drive from Antrim County?

25       A.    He did.  He told me that it was given to

                                        Page 153

1    him and it was not under a protection order.

2        Q.    Who gave it to him, Mr. DePerno?

3        A.    I believe so, yes.

4        Q.    Okay.  And, again, kind of the same

5    thought process.  Between 11/9 and 11/11, what --

6    what did you personally do to fact check the Eric

7    Coomer story before this podcast that we just looked

8    at?

9        A.    I looked into publicly available

10   information.

11       Q.    Such as?

12       A.    Mr. Coomer's testimony before different

13   judicial bodies, videos of Mr. Coomer giving

14   demonstrations on different ways to utilize Dominion

15   Voting System equipment.  I believe one of those was

16   a video showing how -- how ballots could be

17   potentially altered for one purpose or another.

18       Q.    I guess that also -- I'm sorry.  Did you

19   complete your answer?

20       A.    Yes.

21       Q.    Okay.  Remember I asked you if -- if you

22   considered Joe Oltmann a election expert and you

23   said no.  You don't consider yourself an election

24   expert, do you?

25       A.    No.

                                        Page 154

1          Q.     So it does sound like you -- you did some

2    of your own investigation and research prior to

3    this -- this sedition podcast.  Is that fair?

4          A.     Yes.

5          Q.     Okay.  You don't believe Eric Coomer

6    committed treason or sedition, do you?

7          A.     I think treason and sedition are a -- a

8    very difficult crime to prove.

9          Q.     So is that -- am I correct?

10         A.     I do --

11         Q.     You're not sitting here calling him a --

12    a trader to our country or a seditionist, are you?

13         A.     I don't know.  I don't know.  It --

14    that's -- that would not be my opinion.

15         Q.     So in terms of the -- the buzz that this

16    was generating, did you continue to get more

17    viewership or see more viewership of your podcast

18    following this November 11th podcast?

19         A.     I believe so.  But we were also covering

20    other important topics about the election.

21         Q.     So you're not ascribing at all to the

22    Coomer story?

23         A.     No.  We had a few different topics that

24    did pretty well.

25         Q.     What other topics were y'all putting out?

Page 155

1     A.     Covering issues like late night

2   deliveries to different ballot counting facilities,

3   ballot harvesting, people dropping off a bunch of

4   ballots at dropboxes.  Most of the big stories that

5   were in the news yeah.

6     Q.     And kind of looking back in retrospect,

7   you've kind of come to your own conclusion -- I'm

8   not saying it's right or wrong -- that if there was

9   any fraud associated with the 2020 election, it most

10  likely was related to either ballot harvesting or

11  mule-type activity.  Is that fair?

12    A.     That is an opinion that I've arrived at

13  simply because that's what evidence I've seen.

14    Q.     Because you haven't seen -- again, you're

15  not an expert, but I do want to know what's in your

16  mind.  You haven't seen information that has

17  convinced you that there was an actual attack on the

18  machines or the software itself, either, you know,

19  externally by a foreign actor, or by someone like

20  Dr. Coomer, have you?

21    A.     No, I have not, but I also haven't seen

22  evidence to suggest that that kind of manipulation

23  couldn't happen.

24    Q.     Well, you -- I mean, it's important to

25  you, I think, to see both sides of the story.

Page 156

1              Right?

2        A.      Generally, yeah.

3        Q.      So, for example, when the interim report

4    came out, did you -- did you look at what the

5    response from the Republican Congress was in

6    Michigan to the report?

7        A.      I don't remember what the Michigan

8    legislature said about the report, no.

9        Q.      By the way, was there -- again, we're

10   kind of in November -- mid-November.  Was there any

11   outreach by either Mike Lindell or people on his

12   team to your podcast at this point?

13       A.      Not that I remember, no.

14       Q.      All right.  Let's go to the next day.  I

15   believe this is Clip 12.

16                    (Playing video.)

17       Q.      Ancillary question, but they're

18   destroying -- they said something about destroying

19   ballots in Philadelphia or something on the bottom.

20   And there's an --

21       A.      Yes, that was the title.

22       Q.      -- 888 number.

23               What -- what was that associated with?

24               MR. CORPORON:  Make sure you let him

25   finish.

                                        Page 157

```
 1                    THE WITNESS:  Okay.
 2          A.    I think that was behavior in certain
 3    counties in Pennsylvania that were either destroying
 4    ballots or destroying ballot envelopes that if done
 5    in that matter, would make it hard or impossible to
 6    reconcile whether the ballots that were counted
 7    actually matched up with a legitimate voter's
 8    signature.
 9          Q.    And, I apologize, I asked a poor
10    question.  I really was asking about -- if I could
11    read that part, I was asking about the phone number.
12    What was the phone number associated with that?
13          A.    Can you show me it again?
14                    (Playing video.)
15          A.    That's our -- that's our call-in number.
16          Q.    So what is -- what do you get when you
17    call in that number?
18          A.    You get screened by a producer.  And if
19    you are relevant to the conversation and you're not
20    judged by him to be someone that shouldn't go on the
21    air, we would potentially put you on the air if we
22    had time.
23          Q.    Like just a viewer?
24          A.    Viewers.  The line would also be used by
25    guests, but --
```

Page 158

```
 1        Q.    I see.

 2        A.    -- mainly viewers.

 3        Q.    Okay.  All right.  So obviously

Mr. Oltmann was talking about his -- Google's

investigation or searching of Mr. Coomer.

 6              (Exhibit 21 was marked.)

 7        Q.    Let me show you what's been marked as

Exhibit 21.  We'll pause this here.

 9              MR. CAIN:  And for you, Ryan, this is

a screenshot of the Google search -- of a Google

search.

12        Q.    Does this appear to be the one that

appeared up on your screen?

14        A.    I believe so, yeah.

15        Q.    Okay.  And this -- are you familiar with

screenshots?

17        A.    Yes.

18        Q.    Are you a Mac guy or are you a PC guy?

19        A.    Both.

20        Q.    Both.  What happens when you take a

screenshot on a Mac?  Is there a date and time

signature associated with it?

23        A.    There -- I'm not an expert on Mac

hardware.

25        Q.    Well, take -- take out the Mac part of
```

Page 159

1    it.  Just on a computer.

2        A.    Generally, that kind of metadata, it's my

3    understanding, would get stored.  Depending on the

4    settings, it would either be stored as a name or

5    somewhere else in metadata.

6        Q.    And can you -- based just on your

7    experience working with computers, where on this

8    exhibit does it purport to show when the screenshot

9    occurred?

10       A.    On the top bar, where it would show the

11   image name.

12       Q.    And is that -- it's got a little -- it

13   looks like a little document icon and it says

14   "screenshot 2020-09-26 at 2:03 and 31 seconds p.m."

15       A.    That's what it says.

16       Q.    Okay.  And are you familiar with our

17   investigation of this particular screenshot?

18       A.    I am.

19       Q.    So you know that our position is this was

20   actually not a screenshot from September 26th.

21             Right?

22       A.    I understand that that's your position.

23       Q.    And -- and do you hold a different view

24   of this?

25       A.    I do not have any evidence one way or the

                                        Page 160

```
 1    other.
 2         Q.    Okay.  So how did -- going back to that
 3    clip.  It was on November 12th.
 4                    (Playing video.)
 5         Q.    And those are the same two Google doodles
 6    from Exhibit 21 and then the clip in question,
 7    aren't they?
 8         A.    Yes.
 9         Q.    Okay.  So you said that you gave credence
10    to the affidavit that Mr. Oltmann executed.  Right?
11         A.    Yes.
12         Q.    And he told us -- well, he told whomever
13    was reading the affidavit -- affidavit at the time
14    that he searched Eric after the call that he
15    supposedly participated on.  Right?
16         A.    That's my recollection, yes.
17         Q.    Okay.  Not sometime later in November.
18    Right?
19         A.    Yes.
20         Q.    So were you aware of any of this sort of
21    dichotomy, potential dichotomy, at the time that you
22    were doing this podcast on the 12th?
23         A.    No, I was not.  I became aware of this
24    issue later.
25         Q.    So was there any discussion between
```

Page 161

1    you -- again, pre-show -- where Mr. Oltmann said,

2    look, this wasn't a screenshot I actually did in

3    September, this is one I did yesterday?

4        A.    That was not -- I don't believe that was

5    explained to me, and I don't -- my recollection is

6    that this is not an image that went through me to

7    the producer.  This is an image that he sent to the

8    producer.

9        Q.    Do you know anything about his

10   computer -- I'm using pronouns -- Mr. Oltmann's

11   computer crashing during this period of time?

12       A.    With specificity, no, but he has -- he is

13   plagued by computer crashes.

14       Q.    I bet.  Did he indicate to you that he

15   had a crash during this period of time?

16       A.    Nothing about what you just said sticks

17   out as a memory that I would have made at this time.

18       Q.    And I know you were in -- well, were you

19   in Commerce at this point?

20       A.    I lived in Texas, yes.

21       Q.    Do you know who was in charge of sort of

22   IT issues, the server, if there was one, or

23   hardware, back at PIN -- fill in the blank?

24       A.    Yes, it would have most likely been Chris

25   Wiegand or there was another gentleman, Mike.  I

Page 162

1    believe his name was Wrate (phonetic).

2        Q.    Can you spell that for us?

3        A.    I can't.  All I remember is it started

4    with W-R.

5        Q.    So I guess back to my -- I think what you

6    told us is you weren't in charge of putting this

7    screenshot up during the podcast.  Right?

8        A.    I did not have the ability to do that.

9        Q.    And as you sit here, have you had any

10   discussions with Joe Oltmann about potentially

11   backdating evidence of his search?

12       A.    I have talked to him about many of these

13   issues.  I do not recall, but I might have.

14       Q.    Okay.  You don't recall his response?

15       A.    I don't recall having that specific

16   conversation.

17       Q.    Okay.  When this issue came to light, is

18   this another issue along the lines that gave you

19   concern like we talked about previously?

20       A.    This is an issue that came to light to me

21   long after that clip here.

22       Q.    Okay.  But -- but now -- now that you

23   understand what the issue is, is this another piece

24   of evidence that gives you concern about the

25   veracity of the Coomer story?

Page 163

```
 1        A.    Unless there is an explanation for the
 2   Google doodle, then, yes.
 3        Q.    Okay.  But you haven't heard one yet,
 4   have you?
 5        A.    No.
 6              MR. CAIN:  Okay.  I sense a general
 7   fatigue in my voice, so I'd like to take a break.
 8   Is that all right?
 9              MR. CORPORON:  What's our time?
10              THE STENOGRAPHER:  Can we talk about
11   that off the record?
12              MR. CORPORON:  Sure.
13              THE VIDEOGRAPHER:  Going off the
14   record.  The time is 3:16.
15                   (Break.)
16              THE VIDEOGRAPHER:  Back on the
17   record.  This marks the beginning of Media Unit
18   No. 3.  The time is 3:46.
19        Q.    Okay, Mr. McGuire.  You had mentioned in
20   the last session an affidavit as being sort of
21   something that you relied on -- well, strike that.
22   I don't even need to preface this.
23              I just want to confirm the affidavit that
24   you're talking about.  So let me mark Exhibit 22.
25                   (Exhibit 22 was marked.)
```

                                            Page 164

1      Q.    And while you're looking at it, the
2  question is going to be is this the affidavit you
3  were referring to?
4      A.    Yes.
5      Q.    Okay.  And this -- this is the same one
6  that you received via that email, I believe, on
7  November 19th.  True?
8      A.    I can't for sure say without comparing
9  them both, but this looks like it, yeah.
10     Q.    Are you aware of Mr. Oltmann signing any
11 other affidavits at or around this time?
12     A.    I am not.
13     Q.    Do you know what the purpose of this
14 affidavit was?
15     A.    From what he had told me, it was to -- to
16 lend further credence to his claims.
17     Q.    Right.  But did you understand that he
18 was going to be filing this in connection with
19 election-related litigation?
20     A.    I don't know if that was ever made aware
21 to me, but it wouldn't surprise me.
22     Q.    Okay.  And your testimony previously was
23 the fact that he swore to the facts that we were
24 looking at, at least some of them in the podcast,
25 was -- sort of gave support, in your mind, that his

Page 165

1    story was credible.  Is -- Is that fair?

2        A.    Yeah.  I take affidavits seriously

3    because of the penalty of -- of lying.

4        Q.    Right.  In -- in terms of content,

5    though, is there anything in the affidavit beyond

6    what we've already discussed that supports sort of

7    your -- your idea that this led credence to his

8    story?

9            Sorry, it's getting a little late for me

10   and I'm already stumbling over my words.

11       A.    That's a complicated question.  Can you

12   say it simpler?

13       Q.    I can.  We've talked about the -- the

14   Google search.  We've talked about the alleged

15   Antifa call and in your prior testimony the Facebook

16   stuff.  Is there anything in this affidavit beyond

17   what we've already talked about that you found

18   particularly compelling?

19       A.    Beyond what we've talked about, no.  I --

20   him recounting -- at the time, him recounting his

21   take on what he overheard under oath under penalty

22   of perjury was compelling to me.

23       Q.    Did you know that -- that Mr. Oltmann was

24   working with this -- this gentleman to your left in

25   preparing this affidavit?

Page 166

1      A.    No, I did not know that.

2      Q.    Did Mr. Oltmann discuss his relationship

3   with Mr. Corporon at this time?

4      A.    No, not on this.  We -- we had had

5   conversations about Randy because he was a political

6   figure and he had a radio show but no, not on this.

7      Q.    And Mr. Corporon hasn't represented you

8   individually prior to this deposition.  Right?

9      A.    No.

10      Q.    And were you privy to any discussions

11   where you were present and Mr. Oltmann was present

12   and Mr. Corporon was present to discuss this

13   affidavit or the related litigation?

14      A.    No.

15      Q.    Do you know of any facts regarding the

16   input Mr. Corporon had into this affidavit, if any?

17      A.    I believe that Joe may have run it by

18   him, but I -- I don't have any real facts.

19      Q.    Were you listening to Mr. Corporon's

20   radio show during this time period?

21      A.    No, I live in Texas and he broadcasts in

22   Colorado.

23      Q.    They don't stream that on the internet?

24      A.    They do.  It's a little bit more

25   complicated than just being able to turn on my radio

Page 167

```
 1   in my car.
 2              MR. CORPORON:  Not a big fan, huh?
 3        Q.    But just kind of reading between the
 4   lines, it didn't sound like you provided any
 5   independent support or evidence that found its way
 6   into this affidavit.  Is that fair?
 7        A.    That I did or that he did?
 8        Q.    That you did.
 9        A.    Did I provide any information that
10   made --
11        Q.    Yes.
12        A.    No.
13        Q.    Yeah, that's what I thought.
14              Were you supportive of Mr. Oltmann going
15   outside of the podcast to -- to tell this particular
16   story about Dr. Coomer?
17        A.    I was on the fence.
18        Q.    Did that change over time?
19        A.    Yes.  Yes.
20        Q.    Okay.  Can you describe that for the
21   jury?
22        A.    I was concerned prior to this Joe was on
23   the podcast on a -- under a pseudonym and he was --
24   he was using that pseudonym for real reasons of not
25   wanting to bring heat onto him or any of our other
```

Page 168

1    companies.  And by signing the affidavit, he had to

2    go on the podcast as his own name.

3        Q.    This was the, kind of, watershed moment

4    for that?

5        A.    Yes.  You can't be on a podcast under a

6    pseudonym and sign an affidavit under your real name

7    and then use both on the same podcast.

8        Q.    And as a shareholder of other companies

9    that had different business plans, did it concern

10    you that he was going public with his name through

11    this affidavit and the impact it might have on those

12    other companies?

13        A.    It's something that definitely had to be

14    thought about.  I don't know if it would rise to a

15    level of -- of true concern, but it's -- it's not

16    something you just ignore.

17        Q.    Okay.  So this was -- do you have an

18    independent recollection of Mr. Oltmann -- you know,

19    we looked at the last -- let me frame it for you.

20    We looked at the sedition podcast that was on the

21    11th.  We looked at that Google search clip that was

22    on the 12th.  We looked -- or looking at Exhibit 22,

23    which was signed the 13th.

24        By the way, Lynn Kieffer, you mentioned

25    her earlier.  She appears to be the notary on this.

Page 169

1       A.     She appears to be a notary public, yes.

2       Q.     Okay.  And remind me again who she worked

3   for if you know.

4       A.     She works for my -- the companies I own

5   shares in doing financial stuff.

6       Q.     Okay.  Were you aware of any of the, sort

7   of, litigation that was starting up with Jenna Ellis

8   and the Trump campaign --

9       A.     Yes.

10      Q.     -- at this time?

11      A.     Sorry.  Yes.

12      Q.     Did you have any -- any participation in

13  meetings with anybody associated with that

14  litigation?

15      A.     I don't believe so, no.

16      Q.     Did Mr. Oltmann describe any such

17  meetings to you?

18      A.     He described on a couple of occasions

19  that he was having phone conversations with

20  different people in the Trump campaign.  Yeah.

21      Q.     Okay.  Any -- do you remember anything

22  about those conversations?

23      A.     I remember him talking about Sidney

24  Powell and -- and getting involved in that.  But I

25  don't -- he didn't share a ton of details about

                                        Page 170

1     those.

2          Q.    Okay.  So is it -- is it true that you

3     were in Texas for all of November of 2020?

4          A.    I don't have my travel in front of me,

5     but it -- I was in Texas, yeah, pretty much.

6          Q.    Okay.  Did -- did you do any -- you

7     mentioned some of the research you did on Dominion,

8     some videos that you saw of Dr. Coomer doing demos

9     for various folks.  Did you do any research in

10    November about the allegation that Dr. Coomer was

11    either a major shareholder of Dominion or had

12    offshore shell companies or owned -- actually owned,

13    as opposed to invented, patents associated with

14    election security?

15         A.    I don't remember learning anything

16    specifically about his business holdings, his bank

17    accounts, or his patents.  I remember doing research

18    and reading about different things that he had

19    invented and presuming that -- as the inventor, that

20    he would retain some ownership in those things.

21         Q.    Okay.  Well -- and -- and again, I'll

22    frame where I'm going with this.  Ultimately,

23    Mr. Oltmann found himself on the stage at the

24    Lindell Cyber Symposium in August of 2021.  Do you

25    remember that?

                                        Page 171

```
 1         A.    Yes.

 2         Q.    Okay.  And you remember he told a lot of

 3   the same stories about Dr. Coomer on that stage.

 4   Right?

 5         A.    Yeah, I believe so, yeah.

 6         Q.    Okay.  So -- now let's rewind the tape

 7   back to November.  That's -- we're going to get to

 8   that point.  And look at a clip from another show

 9   that kind of closed out that month.  I think it's

10   November 30th of 2020.

11                    (Playing video.)

12         Q.    What is the connection between George

13   Soros and Eric Coomer?

14         A.    I don't know.

15         Q.    What evidence have you seen that -- that

16   Dr. Coomer is either a major shareholder or just a

17   pure old-fashioned shareholder in Dominion?

18         A.    I can't recall seeing any evidence to

19   suggest that he owns a piece of Dominion.

20         Q.    What evidence have you seen, if any, that

21   Eric Coomer owns offshore shell companies?

22         A.    I can't remember seeing any evidence to

23   support that claim.

24         Q.    Did you ask Mr. Oltmann in any of the

25   lead-up to -- this is the November 30th, 2020,
```

1  show -- to provide you with any -- any of this

2  information for you to review?

3      A.    Not everything that Joe said on camera

4  was scripted.  Not every thing that he would say on

5  camera was fully prepared.  So it is not possible to

6  preemptively ask for proof about things that I might

7  not know he's about to say.

8      Q.    Well -- so this was unscripted?

9      A.    I don't believe that we scripted that,

10 no.

11     Q.    And I get you can't predict behavior

12 entirely, but you do try to prepare for the show.

13 Right?

14     A.    I do.

15            What was the title of that episode?

16     Q.    You tell me.

17     A.    No, I'm asking.  Can you show me?

18     Q.    Oh, I don't know.  I'm sorry, I thought

19 that was...

20                    (Playing video.)

21     A.    So this was an episode about Georgia

22 trying to wipe Dominion voting machines.  This was

23 not an episode about Eric Coomer.  When he makes

24 that comment, that was not the show topic that we

25 had prepared that day.

1          Q.     Okay.  Thank you.  I'm not criticizing

2     you.

3          A.     I'm just pointing it out.

4          Q.     Okay.  Thank you.

5                 You could go, well, after the fact,

6     that's some interesting information that I learned

7     about Eric Coomer when the show ends.  Did you do

8     that?

9          A.     No.

10         Q.     Did you talk to Mr. Oltmann around this

11    time about why it was important to the narrative

12    to -- to tie Eric Coomer to George Soros and

13    offshore shell companies and these type of things?

14         A.     Did I talk to Joe --

15         Q.     Yeah.

16         A.     -- about the importance for the

17    narrative?

18         Q.     Yeah, the Coomer narrative, the story

19    about Coomer.

20         A.     There wasn't really a narrative, but no,

21    we didn't.

22         Q.     Well, what do you want to call it?

23    I want to make sure I --

24         A.     Well, these are episodes.  These are --

25    these are discussions about topics.  We did not have

                                        Page 174

1    a conversation about an overall narrative, no.

2        Q.    Well, he repeated these same allegations

3    on multiple shows, didn't he?

4        A.    You can show me.  I -- I've done a lot of

5    shows and -- and he's had a lot of off-the-cuff

6    remarks.  I can't remember all of them.

7        Q.    Okay.  And that's fair.  But more than --

8    on more than one occasion.  We've already seen three

9    or four shows.

10       A.    It wouldn't surprise me.

11       Q.    Okay.  Do you have a problem with --

12   well, let me back up.

13             Do you know what doxxing is?

14       A.    I do.

15       Q.    What is that?

16       A.    Well, it depends on the context.  But

17   doxxing would be sharing personally identifiable

18   information about someone when that information

19   wasn't already out there.

20       Q.    And what is -- I've learned some of this

21   stuff just recently myself.  But why do people, just

22   based on your understanding, dox other people?

23       A.    To cause harm, to seek accountability.

24   There could be many reasons.

25       Q.    And has your personal information been

Page 175

1    doxxed?

2         A.     I have been told that it has, yes.

3         Q.     Have you seen instances where Mr. Oltmann

4    doxxed people?

5         A.     Yes.

6         Q.     Tell us about those.

7         A.     Things that come to mind immediately are

8    things that Joe has said about people like Heidi

9    Beedle who's a reporter in Colorado, making efforts

10   to share information about her.

11              He's done that repeatedly with, I

12   believe, journalists.  Those are the things that

13   come to mind.

14        Q.     In fact, we saw -- we didn't -- I didn't

15   focus on it, but that exhibit in front of you he

16   mentions Heidi Beedle, on the bottom of that

17   affidavit, does he not?

18        A.     Yes.

19        Q.     Fair to say he doesn't care for

20   Ms. Beedle?

21        A.     She doesn't care for him.

22        Q.     Did you have any discussions with him

23   while we're -- while I'm looking at it, about this

24   concept that she's the leader of a group called Our

25   Revolution in El Paso County?

Page 176

1        A.    I don't remember any conversations about
2   that specific name, but we have had conversations
3   about her being involved in that kind of movement.
4        Q.    That kind of movement?
5        A.    Yes.
6        Q.    Okay.  Do you know whether as you sit
7   here whether she's a, quote/unquote, leader of that
8   movement Our Revolution, whatever that is?
9        A.    I don't know enough about that
10  organization to comment on that.
11       Q.    Yeah.  And then it -- he says here,
12  Antifa leader in the same area.  I'm interested in
13  what you understand Antifa to be --
14       A.    Uh-huh.
15       Q.    -- just in and of itself.  Can you tell
16  me what your view of that is?
17       A.    My understanding of Antifa is that it is
18  an organization with a horizontal leadership
19  structure without any formal membership of people
20  who share common ideas but there is an
21  organizational component to it because it's not a
22  coincidence when people show up at the protest
23  wearing the same clothes and carrying the same signs
24  and -- and committing acts of violence.
25       Q.    Okay.  So you associate -- when you say

                                        Page 177

1    horizontal organization, what do you mean by that?

2        A.    There's no grand poobah of the Antifa

3    league.

4        Q.    Well, who -- who plays in the league?

5        A.    That's -- that's the difficulty of any

6    organization, it has a horizontal leadership

7    structure.

8        Q.    Okay.  Is there -- is there -- when

9    you -- when I hear the word "organization," I think

10   of something like FEC united that has an, you know,

11   actual corporate structure, nonprofit structure,

12   doesn't have to be necessarily.  But is that what

13   you're referring to or is it more of a loose term?

14       A.    When -- when I say that "there's an

15   organizational structure," I mean that it's not a

16   coincidence that people show up at the same place at

17   the same time, wearing the same clothes, carrying

18   the same signs, committing the same acts of

19   violence.  There has to be some kind of

20   organizational structure there or it's the greatest

21   coincidence of all time.

22       Q.    All right.  So in -- in the context --

23   well, you keep saying "violence," are you saying

24   that all of the people that are associated with

25   Antifa are violent actors?

Veritext Legal Solutions
800-336-4000

1      A.    Enough of them are.

2      Q.    And we can -- we can both agree that

3   violence on both sides is not the answer to

4   political disputes?

5                  MR. CORPORON:  Objection; relevance.

6                  MR. COOMBE:  Join.

7      A.    Yeah.

8      Q.    Right.

9            Other than what you may have construed

10  from Eric Coomer's Facebook posts, do you have any

11  evidence that Eric Coomer's part of this horizontal

12  Antifa structure or has committed violence of a

13  political nature?

14     A.    The Facebook posts that were shown to me

15  convinced me that, at the very least, he is a man

16  sympathetic to that cause.

17     Q.    And in terms of -- well, let me see.

18          You recognize that there are members of

19  conservative folks, liberal folks, Republicans,

20  Democrats, et cetera, that work in elections.

21  Right?

22     A.    Yes.

23     Q.    And you're not suggesting to the jury

24  that because someone has a political -- particular

25  political belief, that that means that they're going

                                          Page 179

1    to have the desire to not perform their function in

2    elections, are you?

3         A.    It is my belief that people who are going

4    to perform this kind of work have an obligation to,

5    at the very least, create the appearance of

6    impartiality.  And when someone violates that

7    obligation and instead, creates the appearance of

8    impropriety, it is the duty of that person to prove

9    that everything is on the up and up.

10        Q.    Well, I asked you earlier, do you know

11   whether Dr. Coomer's Facebook page was private or

12   public and you said -- I don't think you knew?

13        A.    At the time I didn't know.  It's since --

14   I'm since become aware that there was some

15   element -- element of privacy in his settings.

16        Q.    Okay.  Are you aware of any instances,

17   during this period of time when you were doing the

18   research, of Dr. Coomer making public political

19   statements or attending rallies or putting himself

20   out, in essence, publicly about political issues?

21        A.    Yes, on those Facebook posts.

22        Q.    That's not what I'm talking about.  We've

23   talked about the Facebook posts.  You've said there

24   was an element of privacy to it.  So we'll put that

25   in a bucket.

Page 180

1          A.     Uh-huh.

2          Q.     My question is, in public statements,

3    either attendance at a rally, appearances, anything

4    like that that you're aware of that you can tell the

5    jury about, prior to these November podcasts that

6    we've been looking at?

7          A.     Not that I'm aware of, no.

8          Q.     Okay.  Let's go to the -- I think it's

9    Clip 9.  Let's make -- let me make sure I know the

10   date on this one.  I've been -- the clips have been

11   arranged chronologically.  At least that was the

12   intent.

13                MR. CAIN:  What date was Clip 9?

14                MR. KLOEWER:  December 3rd.

15                MR. CAIN:  And what was the last one

16   before that?

17                MR. KLOEWER:

18        A.

19                November 30.

20                MR. CAIN:  Okay.  So December 3rd now,

21   Clip 9.

22                     (Playing video.)

23        Q.     Similar question when we were talking

24   about the shareholders and the shell companies.

25   When he was talking, he, Mr. Oltmann, was talking

Page 181

1    about these forensic auditors that are looking into

2    Dr. Coomer, was that the first you heard of -- of

3    that allegation?

4         A.    I can't -- can't speak to what I was

5    thinking at the time.  I think that what I said on

6    that clip showed what I was most concerned about at

7    that moment.  I don't even know if I -- if in that

8    moment I heard the other things he was saying.

9         Q.    Well, have you -- again, I think I know

10   the answer to this, but I think I need to ask it

11   anyway.  Were you provided with any forensic

12   reporting that showed any of the financial --

13   alleged financial transactions or shell corporations

14   associated with Dr. Coomer?

15        A.    I don't believe so.

16        Q.    Your concern was what?

17        A.    My concern was that if there is evidence

18   of impropriety, if there is evidence of election

19   tampering, then we can make that case without

20   sicking people on another person.

21              MR. CAIN:  Clip -- let's go to

22   Clip 10.  What date is that?

23              MR. KLOEWER:  December 14, 2020.

24              (Playing video.)

25        Q.    Who was he sending to Salida, if you

Page 182

1    know?

2           A.    I don't know.

3           Q.    Did you have the same reaction to this as

4    you just kind of described to the last clip?

5           A.    Yeah.  And you can see me on that clip

6    saying:  Be careful.  Careful.

7           Q.    Well, beyond that, the guy's sitting

8    right here.  It's wholly inappropriate to -- to put

9    out this kind of information about someone.

10   Wouldn't you agree?

11          A.    Oh, absolutely.

12                MR. CORPORON:  Objection; relevance.

13                THE STENOGRAPHER:  Did you say

14   "absolutely"?

15                THE WITNESS:  I think I said I agree.

16                THE STENOGRAPHER:  Okay.  Because

17   they objected over you.

18          Q.    And this all occurred -- ac- -- actually,

19   I forgot to put this in the record.  I had it up.

20   Bear with me for a minute.  Remember, you -- we were

21   talking about early on some emails, I think it was

22   in the first session -- give me just a minute.  The

23   request was something about communications with

24   My Pillow and Lin- -- Lindell --

25          A.    Yeah.

```
 1          Q.      -- and those folks.  Here it is.
 2                  (Exhibit 23 was marked.)
 3          Q.      This is going to be Exhibit 23.  It's --
 4     there you go.
 5                  MR. CORPORON:  Do you have two of
 6     those?
 7                  MR. CAIN:  Oh, I'm sorry.
 8                  MR. CORPORON:  Thank you.
 9                  MR. CAIN:  So Ryan, this is an email
10     dated March 10 of 2021 from Dawn Curtis to Joe
11     Oltmann, cc Max McGuire and Joshua Hammerling.
12                  MR. MALONE:  Thank you.
13          Q.      Okay.  So -- and I apologize for the
14     disassociation perhaps.  What is this email?
15          A.      This is an email explaining to us the
16     kind of script that we can use on air to promote
17     My Pillow and use our promo code to get a
18     commission.
19          Q.      Okay.  So you were copied on this.  It
20     looks like it went to Mr. Oltmann.  Right?
21          A.      It looks like it did, yeah.
22          Q.      Okay.  And just to set the timeline.  We
23     just looked at the last video about folks in Salida.
24     That was in December of 2020 and this is about three
25     months after that.  Right?
```

Page 184

1        A.    Yes.

2        Q.    Okay.    And the -- below is the script you

3    can use, just let the jury in on kind of how these

4    things work with -- with people like My Pillow?    I

5    know we talked about the financial arrangement

6    and -- and your role, you weren't the account person

7    on this, but what do they want you guys to do on air

8    when you're talking about the products?

9                MR. MALONE:    Object to form, and

10    foundation.

11        A.    Generally, when we would work with any

12    kind of advertiser, some would -- some would require

13    us to follow a very script -- strict script, others

14    would give us general guidelines that we could

15    loosely follow, add our own experiences to it.

16                With My Pillow, that was always an

17    account, as it was to me, that we could -- we had a

18    little bit of liberty in -- in how we follow it.

19    And this was not presented to me as a -- as a

20    set-in-stone script that we had to use any time we

21    read one of their promos.

22        Q.    Were you on air reading their promos?

23        A.    I read promos a few times, yeah.

24        Q.    Okay.    Usually it was Mr. Oltmann?

25        A.    Usually it was me.

Page 185

```
 1        Q.    Okay.

 2        A.    But I don't know how many times.

 3        Q.    And how do you know when to read a promo

 4   or not?

 5        A.    That would generally be something that I

 6   would decide, but at the same time I would also get

 7   pinged from a producer either by text, or more often

 8   whatever messaging system we were used to using to

 9   communicate, pinged by him, reminded by him to read

10   the ad.

11        Q.    And let's just kind of bracket this

12   period of time between November and the clips we

13   were looking at in March of the following year in

14   2021.

15              What was the -- what was the advertising?

16   How was that evolving?  Were you guys getting more

17   advertisers, was it staying the same, was it going

18   down?

19        A.    We were generally getting more

20   advertisers.

21        Q.    And how long did that wave last?

22        A.    I don't understand the question.

23        Q.    Well, you said you were getting more

24   advertisers, so there was a little bit of an uptick

25   if you did a line graph.
```

Page 186

1      How long did that trend continue?

2      A.     Well, there was a focus to make sure that

3   the show had advertisers.  So I don't remember the

4   exact time where we started bringing on paid

5   sponsors, but as soon as we started doing that, that

6   never stopped.  We never started getting advertisers

7   and then gave up on it.

8      Q.     Okay.  Did you have more interest from

9   paid sponsors after November of 2020?

10      A.     Did I have more interest?

11      Q.     From.  I used the wrong pronoun.

12      A.     No.  No.  Most of the sponsors that we

13   got were ones that I got, and I got them by reaching

14   out to try and get them, not the other way around.

15      Q.     Got you.  Okay.  And forgive me again,

16   since it's been a few sessions.

17           When you left, you left in May of 2022.

18   Is that correct?

19      A.     That's incorrect.

20      Q.     When was it?

21      A.     It would have been early March of 2022.

22      Q.     Okay.  And was My Pillow one of the paid

23   sponsors during the entire period in between this

24   email, Exhibit 23, and when you left?

25      A.     I would not describe them as a paid

Page 187

1    sponsor.

2        Q.    Okay.  What would you describe them as?

3        A.    I would describe them as an affiliate

4    program, an affiliate deal.  A paid sponsor would be

5    someone who pays for air time, whereas this is we

6    have a promo code.  And my understanding was we only

7    got paid if people bought using our promo code.

8        Q.    I got you.  So using your vernacular, was

9    the affiliate relationship in place during that

10    entire period of time?

11        A.    It is my understanding that it was, yeah.

12        Q.    Okay.  Are you on Parler or were you on

13    Parler?

14        A.    I was for a time.

15        Q.    Let's see if you know anything about this

16    post.

17              (Exhibit 24 was marked.)

18        Q.    This is Exhibit 24.  My colleague

19    indicates that this is a December 5th, 2020, post.

20              And I'm showing my age here.  Do -- I

21    don't know if you sign up for people's -- to be

22    friends with people on Parler.  How does that work,

23    if you remember?

24        A.    How it worked then is you would sign up

25    and you would follow people.

Page 188

```
 1          Q.    Oh, follow.  Like Twitter?

 2          A.    That's my understanding, yeah.

 3          Q.    Okay.  Were you following Mr. Oltmann in

 4    the end of 2020 on Parler?

 5          A.    I was, but Parler was not my primary

 6    social media network.

 7          Q.    Did you see this post that purports to be

 8    from Mr. Oltmann from back then?

 9          A.    I don't believe I've ever seen this

10    before.

11          Q.    Okay.  Did you have any conversations

12    with Mr. Oltmann about photographing Dr. Coomer's

13    home and putting it out on Parler?

14          A.    No, I did not have any conversations

15    about him doing this.

16          Q.    How many times -- it says at the bottom:

17    So it's up to you blow this -- pardon me -- shit up,

18    share, put his name everywhere.  No rest for this

19    shit bag.  Eric Coomer, Eric Coomer, Eric Coomer,

20    this shitbag and the corrupt asshats in Dominion

21    Voting Systems must not steal our election and our

22    country.  Eric, we are watching you.

23          Are saying you had no conversations with

24    Mr. Oltmann about -- well, let me ask a different

25    question.
```

Page 189

```
 1              Is this an example, at least in your mind
 2    of doxxing someone?
 3         A.    This -- yeah, this would come pretty darn
 4    close, if it isn't.
 5         Q.    And you're saying you weren't aware,
 6    during this time period, that Oltmann was out there
 7    making these posts?
 8         A.    I was aware that he was following.  I
 9    mean, we just watched a clip of him saying that he
10    was trying to find him.  So I was aware of that.  I
11    was not aware of this post.
12         Q.    Were you aware that people actually came
13    to his home?
14         A.    I don't know if I was aware of that.
15         Q.    Have you subsequently learned about that?
16         A.    You just told me about that.
17         Q.    Well, that's a great point.
18              I meant before I just told you.
19         A.    I don't know.
20         Q.    Okay.  Why wasn't this sufficient for you
21    or the statements he made to -- to separate yourself
22    from Conservative Daily?
23         A.    I just told you.  It's my belief that I
24    had never seen this before.  If I had never seen it,
25    it couldn't possibly have been used to justify me
```

Page 190

```
 1   quitting my job.
 2        Q.    That's why I said "or the statements you
 3   saw in the clips at Conservative Daily."
 4             Wasn't that enough for you?
 5        A.    My motivations for keeping my job were
 6   very simple.  My wife was out of work.  I was the
 7   only source of income coming into the household.
 8   And it was important to keep my job and do whatever
 9   I could to minimize the kind of damage that we just
10   witnessed, and try and put some guardrails on it.
11   But keep my job because it didn't serve me, my
12   family, or my kids to have a zero-income household.
13        Q.    Yeah.  And you actually used the exact
14   term I was going to use.
15             Did you -- I wasn't going to say
16   "guardrails," but essentially did you try to rein
17   Mr. Oltmann in during this period of time to
18   mitigate against some of the statements that were
19   being made?
20        A.    Yes.
21        Q.    I think I know the answer based on what
22   you just said, but I'll just see if you've seen this
23   before.
24             (Exhibit 25 was marked.)
25        Q.    This is a short one.  This is Exhibit 25.
```

Page 191

1    It's a --

2                    MR. KLOEWER:  December 12th, I

3    believe.

4         Q.    We believe it's a December 12th -- what

5    do they call it, Parlay post?

6         A.    Sure.

7         Q.    From Joe Oltmann.

8               "Eric Coomer, wanted to chat with you,

9    but you were too scared.  How about you put that

10   shotgun down and come out.  Everyone is watching

11   you, Eric, everyone."

12              Is this the first time you've seen this

13   post?

14        A.    This is the first time I've seen this

15   post.  Generally when I use Parler, it was to put

16   information out so people could see it.  I generally

17   did not use Parler as a means of receiving

18   information.

19        Q.    So you don't remember seeing --

20        A.    I've never seen this before on Parler.

21        Q.    Okay.  Do you know about the incident

22   where he's referring to, where Dr. Coomer had a

23   shotgun?

24        A.    No, that's not ringing a bell.

25        Q.    Well, he talked about it or do you

                                            Page 192

```
 1   remember him talking about it on one of the
 2   podcasts?
 3        A.    Eric Coomer with a shotgun is not ringing
 4   a bell at this moment.
 5        Q.    Did he -- he, Mr. Oltmann, ever
 6   identify -- well, let me back up.  I need to
 7   understand.
 8              What's -- what do you understand FEC
 9   United's purpose to be?
10        A.    FEC United was started during the
11   lockdowns as a means to push back against the
12   COVID-19 lockdown, to push for faith, education,
13   commerce, to representing churches, representing
14   parents and schools, and representing local
15   businesses.
16        Q.    Okay.  And then I mentioned the UADF.
17   What do you understand the purpose of that
18   organization?
19        A.    I understand that to be a group of people
20   that is founded or run by John "Tig" Tiegen.  And
21   the way they present themselves, they are a security
22   force.  They are people that -- that protest and --
23   and attend different events.
24        Q.    Do you know whether they have, in the
25   past, provided security for Mr. Oltmann?
```

Page 193

```
 1          A.    I think they have, but I don't have any
 2    documentation.
 3          Q.    Have they provided security for you?
 4          A.    I believe they have on one occasion,
 5    yeah.
 6          Q.    When Mr. Oltmann talks about sending
 7    people to Salida or -- or following Mr. Coomer, do
 8    you know which people he's referring to?
 9          A.    I do not.
10          Q.    And we spoke about the person that --
11    that you redacted, the M person.
12                Do you know whether she identified, or
13    he, the people that appeared at her home or his?
14          A.    I don't know if they identified anyone.
15          Q.    Okay.
16                (Discussion off the written record
17    regarding cake.)
18          Q.    You mentioned you -- pardon me.  That's a
19    little dry now.
20                You mentioned that you had looked at some
21    of the transcripts from the -- from the other
22    litigation where Oltmann was testifying?
23          A.    Yes.
24          Q.    Okay.  And we talked about -- previously
25    about his access to the Facebook pages, and we're
```

Page 194

1    not going to replow that.  I want to see if --

2    though, if you reviewed any of this particular

3    testimony about the Facebook pages from Mr. Oltmann,

4    that I may have some follow-up from that.  This is

5    Clip 11.

6                         (Playing video.)

7         Q.    There's a couple of things to unpack

8    there.  As you see, we haven't gotten, from

9    Mr. Oltmann -- by the way, is that the first time

10   you've seen that clip?

11        A.    I believe that's the first time I've seen

12   the clip, yeah.

13        Q.    He mentions this individual named RD,

14   which is in the notes.  It's one of the initials.

15   And that perhaps may be the person who was his

16   conduit to the Antifa call.

17              Do you know anybody by those initials?

18        A.    Nothing is coming to mind.

19        Q.    Okay.  Did you -- by the way, FEC United

20   meets at -- this may seem as an aside -- but at

21   Bandimere Speedway from time to time?

22        A.    I believe they do, yeah.

23        Q.    Have you been out there to meetings?

24        A.    I've never been out to Bandimere.

25        Q.    Okay.  As it relates to the Facebook

                                          Page 195

1    images that were obtained, has it ever occurred to

2    you that those Facebook postings may have been

3    obtained well before November of 2020?

4        A.    I haven't seen anything that I know of

5    that would suggest that.

6        Q.    Because you don't know when he first got

7    access to this account?

8        A.    No.

9        Q.    And you saw the explanation or you heard

10   the explanation from Mr. Oltmann as to why he

11   wouldn't respond to that particular question.  Have

12   you seen any evidence that Dr. Coomer either doxxed

13   Joe Oltmann or threatened Joe Oltmann in any way?

14       A.    Eric Coomer, no.

15       Q.    And as you sit here -- today is

16   November 17, 2022 -- you have still no idea what Joe

17   Oltmann's source was for the Facebook -- obtaining

18   the private Facebook access or if he was on the

19   call, the Antifa call?

20       A.    I do not know either of those sources'

21   names.

22       Q.    All right.

23               MR. CAIN:  Corporon is yawning.  I

24   don't know if that means it's time for a break --

25               MR. CORPORON:  He has not yawned one

                                    Page 196

1    time since seeing that cake.  I just want to make

2    that clear for the record.

3                    MR. CAIN:  I guess what I'm saying is

4    I'm about to switch topics.  I know we haven't been

5    going that long.

6                    MR. CORPORON:  We -- we don't need to

7    break.

8                    MR. CAIN:  I need a break.

9                    MR. CORPORON:  Can we do one thing

10   before we go off the record?

11                   MR. CAIN:  Of course.

12                   MR. CORPORON:  You referred -- were

13   referring to Exhibits 24 and 25.  25 you identified

14   a date of December 10th and I assume that must be

15   2020.

16                   MR. KLOEWER:  Yes.  And I'll confirm

17   the date during the break and get that for the

18   record.

19                   MR. CORPORON:  Okay.  And then I

20   don't recall a date on Exhibit 24.

21                   MR. KLOEWER:  I'll take a look at

22   both of those.  24 should be December 5th.  And I

23   believe the second one was December 12th, but I'll

24   verify.

25                   MR. CORPORON:  12th.  Thank you.

                                        Page 197

1          MR. CAIN:  Okay.  Let's try to hold

2     to ten minutes and I want to get you out of here.

3     It's 4:00 -- what time is it?  4:30 -- 4:35.

4                    THE VIDEOGRAPHER:  Going off the

5     record.  The time is 4:36.                        0

6                         (Break.)

7                    THE STENOGRAPHER:  Do you get a copy?

8                    MR. COOMBE:  Yes.

9                    MR. CORPORON:  I'll take a copy.

10    Four to a page.

11                   MR. MALONE:  Transcript would be

12    great.  Electronic condensed, if possible.

13                   THE VIDEOGRAPHER:  Back on the

14    record.  The time is 5:23.

15        Q.    Okay.  Hopefully, this is the last little

16    segment of your deposition.  And I apologize for the

17    delay.  We had to go through some more of the texts.

18                   We -- we just looked at that Facebook

19    clip before we broke and then I wanted to kind of

20    segue to the Cyber Symposium.  Now, we -- you've

21    testified that you weren't aware that Mr. Oltmann

22    was going to the symposium before he did so.  Right?

23        A.    Yeah.  The only confirmation I got that

24    he was at the -- at the symposium was when I had

25    that text conversation with Josh.

                                        Page 198

1      Q.    Okay.  And then -- so it's fair to say as

2  far as it relates to the symposium, you weren't

3  asked to put together any content for Mr. Oltmann

4  for whatever presentation he was going to do?

5      A.    I was not asked to prepare anything for

6  the symposium, but I don't know what was shown at

7  the symposium so I don't know if I had a role in

8  preparing something unknowingly.

9      Q.    I see.  And -- and you had -- well, did

10  you have dealings with anyone associated with the

11  Lindell team during the symposium itself?

12                    MR. MALONE:  Object to foundation.

13      A.    I do not believe -- I don't believe so.

14  I mean, there might have been an email to my work

15  email about a promo code or something, but I had no

16  communication with them about the symposium.

17      Q.    Did -- did Mr. Oltmann discuss the fact

18  that he skipped out on a deposition in the Denver

19  courthouse to -- to go to the symposium instead?

20      A.    After the fact, yes.  And I learned -- I

21  believe that the first time I learned about that was

22  watching him on Steve Bannon's show at the

23  symposium.

24      Q.    Okay.  Oh, he appeared as a guest on the

25  Bannon podcast during the symposium?

Page 199

1        A.    Yes.

2        Q.    And -- and pardon me.  I just want to

3   make sure that I'm not missing anything with -- with

4   Lindell.  He appeared on the Conservative Daily show

5   more than once.  Right?

6        A.    Yes.  It's my understanding that he was

7   on more than once with me.

8        Q.    Okay.  But outside of -- were those --

9   actually, let me back up.

10            Was there any prep that you did with --

11   with Lindell before he came on the show?

12        A.    With Lindell, no.

13        Q.    Yeah.  In other words, were your -- was

14   your contact with him limited to, you know, when he

15   was actually on the podcast?

16        A.    To my knowledge, the only contact I've

17   ever had with him was on the podcast.

18        Q.    Do you know if Mr. Oltmann was working

19   with Mr. Lindell on any other projects during the

20   2021 year?

21            MR. MALONE:  Object to foundation.

22        A.    Nothing is coming to mind.

23        Q.    Do you know whether Mr. -- well, anyone

24   associated with the symposium paid CD, Conservative

25   Daily, or Mr. Oltmann for an appearance at the

                                      Page 200

```
 1    symposium?
 2          A.    I don't have any knowledge of that.
 3                  MR. MALONE:   Objection; foundation.
 4          A.    I don't have any knowledge of that.
 5          Q.    Have you been privy to any dealings
 6    between Mr. Oltmann and Phil Waldron?
 7          A.    I don't understand the question.
 8          Q.    Well, have you been, for example, in on
 9    any meetings with Mr. Waldron or any conference
10    calls or discussions with him?
11          A.    The only thing that comes to mind is when
12    he was a guest on the show.
13          Q.    Same question for Josh Merritt?
14          A.    I don't know who that is.
15          Q.    We saw Tina Peters on the show.  Were you
16    privy to any meetings or communications with
17    Ms. Peters outside of her appearance --
18          A.    Yes.
19          Q.    -- on Conservative Daily?
20          A.    Yes.  Sorry.
21          Q.    Okay.  Tell me what you remember about
22    those.
23          A.    It was after an FEC United event that I
24    was invited to speak at, strangely.  We went out and
25    got some food and drinks with her afterwards.
```

Page 201

1        Q.    "We" being whom?

2        A.    Oh, who was there?  It would have been

3    me, her, Joe.  I believe Greg Papas aka Apollo was

4    there and -- and Jake Freijo might have been there.

5    And there were two other people present that were

6    Joe's friends who I don't remember their name.

7        Q.    When did this happen?

8        A.    Oh, I don't have an exact date, but it

9    would have happened when I was in Denver shortly

10   before I quit.

11       Q.    Okay.  So in -- in 2022?

12       A.    That would have been either late

13   February, early March of 2022.

14       Q.    What were you speaking about at the -- at

15   the meeting?

16       A.    I don't know why I was brought on stage.

17   No one -- no one told me why I was going on stage.

18   No one told me what it was about.  It's kind of par

19   for the course, I guess.  I still don't know why I

20   was brought on stage.  It was -- it was an election

21   integrity event and I guess they wanted me on stage.

22       Q.    Well, did you -- well, was Ms. Peters

23   also on stage?

24       A.    She arrived late and she was on stage.

25       Q.    Conan Hayes, have you had any dealings

Page 202

1   with him?

2        A.    I -- that name doesn't ring a bell.

3        Q.    Dennis Montgomery?

4        A.    That name does not ring a bell.

5        Q.    L. Todd Wood?

6        A.    I believe he was a guest on the show, but

7   I might be wrong.

8        Q.    Is that the extent of your knowledge of

9   him?

10       A.    Yeah, that's the only thing that comes to

11  mind.

12       Q.    David Clements?

13       A.    Yes.  I -- he appeared on the show a

14  number of times.

15       Q.    Again, your -- your communications with

16  him would just be related to the show itself?

17       A.    Yeah.  Nothing else is coming to mind and

18  I can't remember any -- any meetings or anything

19  like that.

20       Q.    Anyone that you -- did you have any

21  dealings with anyone that you understood to be

22  associated with the group ASOG?

23       A.    Can you explain what that acronym means?

24            MR. CAIN:  Young Brad can.

25            MR. KLOEWER:  The Allied Security

                                    Page 203

1    Operations Group.

2         A.    I don't know what that is.

3         Q.    Okay.  Do you know anything about

4    Mr. Oltmann getting flown out to the Cyber

5    Symporium (sic) by Mike Lindell?

6         A.    I don't know any details about how he got

7    there.

8         Q.    Do you know whether Mr. Lindell has

9    supported Mr. Oltmann personally on a financial

10   basis, either through a ride on a plane, through

11   providing him with consideration of a personal

12   nature?

13                  MR. MALONE:  Object to form;

14   foundation.

15        A.    Nothing comes to mind.  I'm not aware of

16   any of that.

17        Q.    Have you had any dealings directly with

18   Matt DePerno?  We talked about the Antrim report

19   earlier.  Did you have any dealings with him?

20        A.    With the exception of him coming on the

21   show and maybe being involved in email chains about

22   his work in Antrim, I don't think I was involved in

23   any meetings with him.

24        Q.    When you say the "email chains," what --

25   what are you referring to?

Veritext Legal Solutions
800-336-4000

```
1        A.    I -- if they exist, then they would be in

2   my work emails.  Nothing comes to mind, but I

3   wouldn't be surprised if Joe had forwarded something

4   from him to me.  So technically, there would be a

5   chain.

6        Q.    Okay.  Same question for Patrick Byrne?

7        A.    Patrick Byrne appeared on the show a

8   number of times and I believe I met him at a event

9   briefly once and -- and interviewed him once.

10       Q.    Was it associated with his film, the

11  event that you're referring to?

12       A.    No.

13       Q.    What was it?

14       A.    It was a -- what did they call it?  I

15  forget the name.  It was a speaker series that Joe

16  was on.  They came to San Antonio and had a big

17  event.  It was Clay Clark's.

18       Q.    ReAwaken America?

19       A.    Yeah.  They had an event in San Antonio

20  and the only reason I attended was because it was

21  local to me.

22       Q.    Are when did Mr. Oltmann start going to

23  ReAwaken America tour events?

24       A.    I don't know the first one he attended.

25  I don't -- I don't have a date.
```

Page 205

1     Q.    Do you know whether, similar to my

2   question about the symposium, there was any

3   consideration that flowed back to either him

4   personally or to the Conservative Daily podcast for

5   an appearance?

6     A.    I'm not aware of any financial

7   consideration, no.  I'm not aware of anything like

8   that.

9     Q.    Is the benefit, to your knowledge, just

10  the -- the publicity for -- potentially for the show

11  by appearing in the -- in the tour?

12    A.    To my knowledge, the benefit was not to

13  the show because he very rarely mentioned the show.

14    Q.    Okay.  And you said you went down on --

15  to San Antonio for this event, what -- what did you

16  do with Mr. Byrne when you were down there?

17    A.    I believe -- we had a table set up in

18  media row where our different organizations could

19  interview different attendees.  And we sat -- he sat

20  for an in- -- or he tried to sit for an interview

21  and I believe that we had problems with -- with

22  audio.  It was a very -- very weird setup, and I

23  don't know if we ended up having anything usable

24  with him.  But I did briefly get to speak with him,

25  I know he sat in the chair and I think that was

Page 206

1    pretty much it.

2         Q.    And did Conservative Daily have a booth?

3         A.    Yeah.

4         Q.    Okay.  I want to talk to you a little bit

5    about 2022.  And you've already talked about why you

6    left the show.  So we don't need to re-plow that

7    unless there's something else that you can think of

8    as to the rationale for you leaving.

9         A.    I believe I already told you, and you can

10   correct me, that the issue was me no longer having

11   editorial control.  And one of the other fears that

12   I had was that if I was to say something that Joe

13   disagreed with or whatever wording he used went

14   against what he -- his position was, that that could

15   end up resulting in me being fired for cause.

16        Q.    Yeah, I saw that.

17        A.    So it was -- it seemed in my interest to

18   resign given the fact that I had a clause in my

19   contract that let me have four-weeks' notice rather

20   than allow this tenuous relationship to continue

21   getting worse and me say something that resulted in

22   my firing.

23        Q.    Do you feel like you have an adversarial

24   relationship with Mr. Oltmann to this day?

25        A.    Yes.

Page  207

1      Q.    Why did you agree then to allow them to

2    compensate your attorney for being here?

3      A.    I appreciated the notion of goodwill and

4    saw it as a possible way to rekindle what --

5    previous to everything that went down was actually a

6    nice friendship.

7      Q.    I have a couple of clips sort of at the

8    time that you had left or shortly thereafter.  Let's

9    look at Clip 14.

10                  (Playing video.)

11     Q.    One of those episodes that was obviously

12   not true includes the Dr. Coomer Antifa episode,

13   doesn't it?

14                  MR. CORPORON:   Object to form.

15     A.    I cannot say that right now.

16     Q.    Well, you texted about it very recently,

17   didn't you?

18     A.    Very recently, I have said I don't know

19   if I believe Joe Oltmann, but that is not the same

20   as saying that certain statements are factually

21   incorrect.

22     Q.    Well, we'll look at the text here in a

23   second.

24            The death threats, is that -- or the

25   rhetoric that was going on, that's in addition to

                                        Page 208

```
 1    the editorial control.  That's another reason that
 2    you left.  Right?
 3         A.    In that -- in that video, the death
 4    threats I was referring to were in relationship to
 5    what Josh had experienced.
 6         Q.    Okay.  The blowback on Josh as a result
 7    of what?
 8         A.    Associating with the show, I presume.
 9         Q.    So everything that you were saying in May
10    of 2022 on Clip 14 is how you felt at the time.
11              Right?
12         A.    Yes.
13         Q.    And it's how you feel today, isn't it?
14         A.    Yes.
15         Q.    Okay.  Let's look at Clip 15.
16                   (Playing video.)
17         Q.    One of the lawsuits that you're referring
18    to, I assume, is the one that I brought against him
19    as a result of the Coomer episodes.  Correct?
20         A.    There were other lawsuits that were more
21    timely at the time that I said that, so I don't know
22    if that was top of mind.
23         Q.    Which other lawsuits are you referring
24    to?
25         A.    I believe there was a lawsuit filed
```

Page 209

```
1    against him with regard to comments he made about a
2    reporter in Ukraine, accusing that reporter of doing
3    something, being responsible for an individual's
4    death, I believe.  And it turns out that that
5    individual was alive.
6              I think that was probably more timely
7    than your December 2020 or whenever that one was
8    filed.
9         Q.    Right.  Sarah -- I forget her last name.
10        A.    I don't know that individual's last name.
11              MR. MALONE:  Sarah Ashton-Cirillo.
12        Q.    Does that strike a bell, Sarah
13   Ashton-Cirillo?
14        A.    That -- that sounds right, yeah.
15        Q.    Okay.  All right.  So this next portion
16   of this deposition is what I will call the grab bag
17   portion, where we'll look at documents that you've
18   produced that don't necessarily relate to each
19   other.  Okay?  So I'm going to jump around a little
20   bit.
21        A.    Okay.
22        Q.    So I just -- I need you to authenticate
23   some things that I -- that we found in your records.
24              (Exhibit 26 was marked.)
25        Q.    All right.  The first one is marked as
```

Page 210

```
1    Exhibit 26.  This is from -- the top left -- and

2    this appears to be a text chain, and I'm kind of

3    talking a little louder so Ryan can hear me.

4            But there is a date on the top of

5    10/26/22.  I don't know if that's when -- do you

6    know if that's when this was printed out?

7        A.    I believe that's when I compiled this

8    record, yeah.

9        Q.    I see.  And it purports to be -- what --

10   you tell me what we're looking at.

11       A.    This is -- I don't know what phone number

12   this was sent to because it's not listed, but this

13   is part of -- at least part of the entirety of all

14   the texts Joe sent me.  I mean, this is more than

15   just one chain.  This is -- this is a lot.

16       Q.    Yeah, it looks like it starts in May

17   of 2022, the same month as those clips that we just

18   saw.

19       A.    Yeah.  It looks like this is seven pages

20   out of a document that was 155 pages.

21       Q.    Right.  We've kind of chopped it up a

22   little bit.

23            So -- but just to be clear, you had

24   mentioned this when we looked at the subpoena.

25   You've -- you've compiled all of the texts that you
```

Page 211

1    had between you and Joe Oltmann.

2        A.    Yes.

3        Q.    Right?

4        A.    Yes.

5        Q.    And for the tech-savvy people that

6    probably can understand this, but for me, when it

7    says "received" in the left column, that is -- is

8    that synonymous with a text that you got from

9    Mr. Oltmann?

10        A.    My understanding is that "received" is an

11    incoming message to me, and "sent" is an outgoing

12    message to him.

13        Q.    Okay.  Well, why don't you look -- just

14    look at the first page and confirm that, if you can.

15    I want to make sure that we get the -- who's

16    speaking correct.

17        A.    Yes.

18        Q.    You know, in context.

19        A.    Yes.

20        Q.    Okay.  So if it's received, it's received

21    from Mr. Oltmann.  If it's sent, it's sent to

22    Mr. Oltmann by you.  Right?

23        A.    Yes.

24        Q.    And tell me again how you compiled all of

25    the documents -- excuse me -- all of the texts that

Page 212

1    were sent and received from Joe Oltmann as -- at

2    least a portion of which are represented by

3    Exhibit 26?

4         A.    So for texts sent to my main phone

5    number, I was able to utilize an app that downloaded

6    all of the .xml file associated with any contact or

7    group of contacts, was able to download that, and I

8    utilized an online website -- I believe it's called

9    SyncTech -- to make sense of that .xml file, because

10   without something to read it, it's just a string of

11   code, and it means nothing.

12        Q.    Okay.  So it converts -- that -- that

13   technology converts it to something that's readable?

14        A.    Yes.

15        Q.    All right.  And the phone number -- and

16   I'll stipulate -- I'm not stipulating to anything

17   else in this record, but the phone number that you

18   were using at the time, I'll agree to redact it from

19   the transcript, so that if the transcript is public,

20   in part, that won't be part of it.  Okay?

21        A.    Okay.

22        Q.    So what phone number were you using

23   during this period of time?

24        A.    I had two phone numbers.  The phone

25   number that went directly to my phone was

                                          Page  213

1    210-317-2527.   And I maintained a second phone

2    number from my old phone of 609-240-1932.   But

3    that -- instead of going directly to my phone, that

4    went through a service called Google Voice, which is

5    a call forwarding.

6         Q.    Got you.   But if -- and the reason I

7    asked you that question is if -- if I need to go the

8    third-party route, I don't think I do, to obtain the

9    records from the provider, it would be at the

10   210-317-2527 number?

11        A.    That -- yes.  Yes.

12        Q.    And you may have -- I know you told me

13   the type of phone, but who was your carrier at this

14   time?

15        A.    Sprint/T-Mobile.   They merged.  So I'm

16   not sure which it was at the time.

17        Q.    All right.  Thank you.  Obviously, it's

18   late, so we're not going to look at all of these.

19             But let's go to -- let's start at

20   Page 134 of 155.  Starting kind of in the -- in

21   the -- well, let's start at the beginning.

22             "Sent" -- and this is out of context --

23   "phone showing no calls in months."

24             What are you referring to there, if you

25   remember?

Page 214

1    A.    I'm referring to the fact that Joe had

2    not called me in months.

3    Q.    Okay.  And then received:  I can't see

4    that on my phone, so Erica is getting me into the

5    Verizon account.

6        Who is Erica?

7    A.    Erica is his wife.

8    Q.    And then next line:  Well, this turned

9    into a big deal.  Trying to get into our account

10   after about three years.

11       So tell me what -- what you guys were

12   trying to accomplish here.

13   A.    He had told me that I never took his call

14   and that it was my fault our relationship had

15   deteriorated, when my phone records show that he had

16   not called me in months.

17   Q.    Got you.  It says:  Stand by.

18       And then a couple of days pass.  You go

19   on a -- this is Mr. Oltmann speaking -- or texting,

20   correct me if I'm wrong.

21       "You go on a podcast and tell everyone I

22   lied about Coomer, that it made me money?  You, Max,

23   are a piece of shit."

24       So how did this flare up again?  And what

25   podcast is he referring to, if you know?

Page  215

1          A.    I went on a podcast published by a woman

2     named Madison Marquette and discussed my exit from

3     Conservative Daily, among other things.

4          Q.    And then you say:  I never lied about

5     anything -- or excuse me.  He said:  I never lied

6     about anything.  You are truly pathetic.

7              And I'm going to just read through it so

8     we can expedite it.  Just correct me if I'm getting

9     the speaker wrong.

10             You respond:  What are you talking about?

11    I never once said you lied about Eric Coomer.

12             Oltmann says:  Madison Marquette podcast.

13             You say -- and there's a lot of back and

14    forth.

15             "I didn't say you lied about Eric

16    Coomer."

17             Oltmann said:  Oh, you did, though,

18    clearly.

19             "No, I did not."

20             It goes back and forth.

21             "And I bought snowmobiles and toys and I

22    lived an extravagant lifestyle."

23             What is he referring to there?

24         A.    He is referring to criticisms I had of

25    him that while he was soliciting donations for his

                                        Page 216

1    legal defense fund, he was also purchasing things

2    that some might define as extravagant.

3        Q.    Do you have any evidence that -- we know

4    money is fungible.  Do you have any evidence that

5    that money was redirected to these types of

6    purchases?

7                MR. COOMBE:  Before you answer, I'm

8    going to object to the relevance of all of these

9    questions.  We seem to be talking about a nonparty

10   to this case, who I'm very concerned does not have

11   counsel represented at this deposition.

12               And as we've talked about, has

13   separate lawsuits pending against him.  So it's

14   making me uncomfortable.  I'd like to lodge my

15   objection.

16               MR. CAIN:  Okay.  The court's been

17   very clear, there is no speaking objections.  I

18   understand your point, and I don't agree with it.

19   But let's just move on and get through it.

20       Q.    So going back to what I'm saying, what --

21   what -- what made you think that that money was

22   being redirected to these purchases?

23       A.    Purely the fungibility of money.

24       Q.    All right.  Let's flip over to the next

25   page.  Kind of a quarter of the way down.

                                        Page 217

1            It starts:  Joe, if you want to be a

2    standard bearer in the conservative movement, you

3    have to follow the standards.

4            Do you know what -- what were you talking

5    about here?

6        A.    A number of things.  We witnessed on

7    clips how I was uncomfortable about a lot of things.

8    Elements like that were what I was referring to

9    here.

10       Q.    Okay.

11            "Telling reporters to go fuck themselves.

12   You were off the rails."

13            Those -- that's what you said to him.

14   Right?

15       A.    Yeah.

16       Q.    What reporters are you talking about

17   there?

18       A.    I don't have the email in front of me,

19   but I believe that there was a reporter that emailed

20   him asking for comment.  It might have been Heidi

21   Beedle.  And he responded with what you just read.

22       Q.    I got you.  And you found that

23   inappropriate?

24       A.    For someone claiming to be a standard

25   bearer of the conservative movement, yes.

Page  218

1    Q.    Okay.  Then at 5:27 and 17 seconds you

2    send to him:  I do not believe your Eric Coomer call

3    ever happened.  You have never shown me any evidence

4    that it did.

5         And that's your stated belief to this day

6    under oath, isn't it?

7    A.    I do not believe it.

8    Q.    And then you say:  Not going to come out

9    and say that, though, because that would be

10   devastating to you and a bunch of other people.

11        Who are the other people you're talking

12   about?

13   A.    I don't know who I was referring to in

14   that sentence at the time.

15   Q.    You go on to say:  But these little texts

16   we have where you accuse me of lying, even though

17   you only have partial information, makes me

18   constantly second-guess that decision.

19        Are you referring back to your decision

20   not to publicly say you didn't believe that the call

21   happened?

22   A.    Yes.

23   Q.    And then he says:  Because I did not

24   record it?  LOL.

25        And then:  No, this is you -- this is,

Page 219

1    again, Mr. Oltmann.  Right?

2            "No, this is you doing what you always

3    do.  Passive aggressive, egg people on.

4            Do you know what he's talking about

5    there?

6        A.    No.

7        Q.    Okay.  But you go back to the topic in

8    the next text.

9            You say:  Because you haven't shown me

10   shit.  Because you never told me who your source

11   was.  Because you never showed me your notes.

12   Because you never told me, anyone, who could either

13   give first person or second person testimony, that

14   the call happened.  And because you have a history

15   of embellishing everything, putting yourself into

16   stories you never participated in, and lying.

17           That's how you -- well, that's your

18   belief to this day, isn't it?

19       A.    I believe I've testified today about all

20   that already, yes.

21       Q.    We talked about putting him in stories

22   that he didn't participate.

23           What is his reputation for -- you say

24   he's -- he's lying, he has a history of that.  What

25   is his reputation, in your view, for truthfulness?

                                        Page  220

```
 1                    MR. CORPORON:  Object to form.  Calls
 2    for a legal conclusion.
 3                    MR. MALONE:  Object.  Legal
 4    conclusion.
 5        A.    Everybody lies in different parts of
 6    their life, and I would say the same is true about
 7    Joe.
 8        Q.    To a greater extent than your average
 9    person?
10                    MR. COOMBE:  Same objection;
11    foundation.
12        A.    I can't speculate as to that.
13        Q.    Well, you spent the last eight years of
14    your life with him.
15                    MR. COOMBE:  Objection;
16    argumentative.
17        A.    Yeah, I did.
18        Q.    Does that text that I just read sort of
19    encapsulate the basis for why you thought and
20    believe that the call never happened?
21        A.    I now believe that the call didn't happen
22    because I have not been shown sufficient evidence,
23    beyond his affidavit, proving that the call
24    happened.
25        Q.    Mr. Oltmann responds:  They published the
```

Page 221

1    notes.  Did you conveniently forget about Tig.

2           Now, Tig is Tig Tiegen?

3     A.    John "Tig" Tiegen.

4     Q.    Tiegen.  Pardon me.  That's the UADF

5    fellow that you talked about earlier.

6     A.    He is the hero from Benghazi.

7     Q.    Well, he's with UADF.  I'm not

8    questioning what he did in combat.

9     A.    Well, you're asking me how I would

10   characterize him, and I would characterize him by

11   what he did that night.

12    Q.    All right.  But he's the fellow that we

13   talked about earlier that's associated with UADF.

14           Right?

15    A.    Yes.

16    Q.    So the -- what do you understand that to

17   mean:  "Did you conveniently forget about Tig?"

18    A.    He has told me that Tig knew he was going

19   on the call.

20    Q.    Okay.  Did you talk to Tig about that?

21    A.    No.

22    Q.    Okay.  You say:  I saw the screenshots of

23   your research.  Timing doesn't line up.  Google

24   logos were different on the days you say the

25   screenshots are from.  I do not believe you.

                                   Page 222

```
 1              Now, the Google logos, that's the
 2    discussion we had earlier.
 3         A.    Yes.
 4         Q.    And you're referring to that exhibit we
 5    looked at?
 6         A.    I don't know what number it is, but, yes.
 7         Q.    All right.  There was one more thing that
 8    I had thought I noticed on this chain.  We've got
 9    others to get to.  Give me a minute.  We'll do it on
10    the record against me.
11              (Pause.)
12              That's fine.  That's good for now.
13                   (Exhibit 27 was marked.)
14         Q.    Let me hand you what's been marked as
15    Exhibit 27.  It's got some sort of new staple
16    technology associated with it.
17              All right.  Do you recognize
18    Exhibit 22nd -- excuse me -- 27 as a download of
19    some emails -- or, excuse me, text messages with
20    Josh?
21         A.    Yes.
22         Q.    And Josh is Josh...
23         A.    Josh Hammerling, my old producer.
24         Q.    By the way, are y'all still doing the
25    podcast that we saw on the screen?
```

Page 223

1          A.    No.  Maybe -- maybe later.

2          Q.    Do you mind me asking, what are you doing

3     now for -- for work?

4          A.    I work in tech.

5          Q.    Okay.  That's very general.

6                Do you work for yourself?  Are you a

7     consultant?  Do you work for someone else?

8          A.    I help other organizations reach the

9     right people for different purposes.

10         Q.    What do you call someone who does that?

11         A.    Someone who works in tech.

12         Q.    Like a headhunter?

13         A.    No.

14         Q.    Okay.  And you do that on your own

15    account?

16         A.    Yeah.  I'm a contractor.

17         Q.    For who?

18         A.    For a -- for my father's company.

19         Q.    All right.  So tell me what we're looking

20    at in Exhibit 27.

21         A.    These are texts between me and Josh.

22         Q.    And we don't need to go through it, but I

23    have a few questions.  If you look at Page 41, you

24    say -- well, you -- again, if it's -- if it says

25    "received," it's a -- it's a text you received from

                                              Page 224

1    Josh.  Is that correct?

2        A.    Yes.

3        Q.    Okay.  Up at the top, Josh says:  Yeah --

4    yeah, Joe is costing you money.  Can you demand that

5    PiDoxa pay since it covers a fine and you were

6    employed.

7              What are y'all referring to there?

8        A.    "Since it covers a fine."  I believe Josh

9    was asking me whether there was any way for me to

10   get my former employer to pay for the defense of

11   this deposition.

12       Q.    Got you.  And then you say:  They're

13   fishing because we talked on the podcast about how

14   we always had to fight back against their craziness.

15             "They're fishing."  Are you talking about

16   me?

17       A.    Yeah.

18       Q.    I'll try not to get my feelings hurt on

19   that one.

20       A.    I accurately predicted exactly what clip

21   you were going to play, so I don't think anyone's

22   feelings need to be hurt.

23       Q.    All right.

24             MR. CORPORON:  Objection to the

25   oversensitivity of counsel for plaintiff.

Page 225

```
 1          Q.     You go on to say:  Do you still have our
 2     text from two years ago.
 3              By the way, did you get these texts from
 4     John, or Josh, pardon me, or --
 5          A.     No.
 6          Q.     Okay.  You were able to recover these?
 7          A.     All of these were recovered myself.  I
 8     was asking if he had any texts from before when I
 9     had an iPhone and it broke and I lost everything.
10          Q.     And this is a long way of getting to the
11     next sentence, where you send to him:  I remember
12     during the Eric Coomer episode communicating with
13     you about how ridiculous it was.  I don't remember
14     on what platform we communicated.
15              And he says:  I'm not sure.
16              You say:  I think it was text.  It was
17     either text, Slack, or Facebook.  I don't see the
18     messages on Facebook.
19              You say this.  I'll stop there.  Slack is
20     what?
21          A.     Slack is a kind of like message board
22     that companies use for internal messages.
23          Q.     Yeah.  So in terms of Slack messaging,
24     tell me what the practice was.
25          A.     There was a period in time where all show
```

                                          Page 226

1    communications went through Facebook. I don't know

2    when specifically, but it started shifting over

3    towards -- these communications happening on Slack.

4         Q.    Okay. So just bracket this for me. I --

5    you're one of the first people we've deposed in this

6    case, so it's helpful for me to understand where the

7    evidence may or may not be.

8              Are you saying initially show

9    communications were on the Facebook Messenger?

10        A.    Initially communications between me and

11   my producer were done on Facebook. That eventually

12   shifted over towards more of a focus on all

13   communications behind the scenes happening on Slack.

14        Q.    Okay. And you don't have access, I take

15   it, to the Slack --

16        A.    No, I do not.

17        Q.    -- historical Slack communications?

18        A.    I do not.

19        Q.    Do you know whether those have been

20   preserved?

21        A.    I do not.

22        Q.    Was Slack being used in November of 2020?

23        A.    I don't know. Part of the reason I was

24   asking him.

25        Q.    Well, it says a little further down sent

Page 227

```
 1    to Josh "and Joe didn't preserve Slack."  That's why
 2    I asked.
 3               "He switched to a free account and let
 4    those old messages die."  And then Josh responds
 5    "convenient."
 6               "I thought it was Facebook Messenger" and
 7    then there is a post.  So tell me what -- what is
 8    this that you've posted kind of on the -- the bottom
 9    portion here.  It looks like a screenshot or
10    something from texts.
11         A.    I believe that was -- and I -- absent a
12    time stamp on that, I can't speak to what episode
13    that was, but that was communications between me and
14    Josh where it seems that Josh had told me that he
15    can't do his job as producer as fast as he's being
16    expected to and me saying all he, Joe, had to do was
17    prep -- was help prep.  There's never been anyone so
18    unprepared for a podcast episode.
19         Q.    That's you talking about --
20         A.    Yes.
21         Q.    -- Oltmann?  Okay.
22               (Exhibit 28 was marked.)
23               MR. CORPORON:  Okay.  I'm going to
24    interrupt for just a moment.  That's a hefty stack
25    you still have there.  Can we have a time check,
```

Page 228

1    please?

2                          THE VIDEOGRAPHER:  Just give me a few

3    minutes.

4                          MR. CORPORON:  Okay.  Thank you.

5                          MR. CAIN:  While he's looking...

6         Q.    While you were making these posts that

7    we've been looking at, these texts -- pardon me --

8    the last exhibit, 27, was August of 2022, you were

9    still and are still to this day a shareholder with

10   CD Solutions.  Right?

11        A.    Yes.

12        Q.    And the other companies that we talked

13   about earlier?

14        A.    Yes.

15        Q.    Exhibit 28.  What are we looking at here?

16   Generally describe the exhibit.

17        A.    Texts between me and Josh Hammerling.

18        Q.    Okay.  And these -- the -- the rainbow

19   caught my eye.  Mine is actually in color.  Yours

20   didn't appear to be in color.

21                    Is this a meme you created about

22   Mr. Oltmann?

23        A.    It is.

24        Q.    And other than the obvious, the -- the

25   book that you show here has the title "Everything I

                                              Page 229

1    Don't Like is" -- "is Election Fraud."

2              What -- what were you trying to convey

3    with this meme?

4         A.    This is a meme that -- so this is based

5    on a meme that -- I can't believe I'm saying this in

6    a deposition.  This is based on a meme that is a

7    picture of Adolf Hitler sliding down a rainbow where

8    the title says, "Everything I don't like is Hitler."

9    And it is a commentary on people who reduce

10   arguments down to accusing the other side of being

11   Hitler.  And this is a meme suggesting that every

12   time something doesn't go to way Joe wants it, it

13   must be election fraud.

14        Q.    And in the middle of this exchange, you

15   receive -- there's some discussion and then you

16   receive a text that says:  Yeah, I like that.  Tina

17   Peters paid PIN 50K for election services.

18              What do you know about that transaction,

19   if anything?

20        A.    The only thing I know about that

21   transaction is what appears on that text.  I was not

22   involved in PIN at that time.

23        Q.    Well, prior to leaving, was PIN marketing

24   for campaigns, to your knowledge, either by sending

25   out marketing material, emails, blasts, that sort of

Page 230

1    thing?

2        A.    It was the policy of PIN not to do that.

3        Q.    Okay.  Did that -- when did that change?

4        A.    I don't know.

5        Q.    After you left?

6        A.    I don't know.

7        Q.    Why was it the policy not to do that, if

8    you know?

9        A.    This gets to internal stuff at PIN.  But

10   it was -- it was determined that politics generally

11   is just -- getting involved in politics generally is

12   bad for a business that is exclusively not politics.

13       Q.    An apolitical organization?

14       A.    Yeah.

15       Q.    Okay.

16              MR. CAIN:  Peter, you got the time?

17              THE VIDEOGRAPHER:  Yes.  Four hours

18   and 59 minutes on the record.

19              MR. CAIN:  Plenty of time.  I'm not

20   going to use it.  Don't you worry.

21              MR. CORPORON:  Yeah.  I'll just note

22   it's 6:11 p.m., but I understand what you're dealing

23   with as well.

24       Q.    If you didn't like the book one, I don't

25   know if you'll like this one.

                                        Page 231

```
 1                    (Exhibit 29 was marked.)

 2      Q.    This is Exhibit -- what did we get?  29?

 3            Okay.  This is an interesting one.  On

 4   the -- on the bottom it's you sending or appear to

 5   send Joe Oltmann bingo.

 6      A.    Yes.

 7      Q.    Okay.  Is this something you created?

 8      A.    Yes.

 9      Q.    This was in June of 2022 after you left?

10      A.    Yes.

11      Q.    So when -- when these squares are filled

12   in, are these things that you filled in?

13      A.    I don't understand your question.

14      Q.    Well, I mean, you don't get this off the

15   shelf.  Did you have to create this content?

16      A.    Yes, I said I had created it.

17      Q.    Okay.  There's a couple that stood out to

18   me.  A lot of the ones we've -- we've kind of talked

19   about, but one of the squares is "breaks the law."

20            What did you mean by that?

21      A.    I don't have any specific impulse behind

22   that.  I don't have any specific thing that I was

23   thinking of when I said that.

24      Q.    "Doxxes victims"?

25      A.    That, to me, when I wrote that, that was
```

Page 232

1   referring to things he had -- he had done with

2   reporters, similar to what we just talked about.

3       Q.     "Advocates violence"?

4       A.     Yeah.

5               MR. COOMBE:  I'm going to repeat my

6   earlier objection.

7       Q.     "Lies" in bold.  Why did you put that

8   there?

9       A.     He doesn't always say truthful things,

10  so...

11              Do you understand the -- the point of a

12  bingo game, how that would be played?  You would sit

13  with this card, and if you heard something on a

14  episode, you'd check it off until you have a row and

15  it's bingo.  So it's like that.

16      Q.     Yeah.  No, I understand the humor.

17      A.     Yeah.

18      Q.     Okay.  "Belittles co-host."  Is that you?

19      A.     Yeah.

20      Q.     "Calls himself a tech CEO."  He says that

21  quite a bit, doesn't he?

22      A.     Yeah, this is made up of things that he

23  says frequently to make it easier for a player to

24  get bingo.

25      Q.     What is -- I know we talked about whether

                                        Page 233

```
1    Joe Oltmann was an election expert.  What do you
2    understand his -- his education in anything that
3    relates to technical enterprise to be?
4         A.    I don't -- I'm not knowledgeable enough
5    about his education to be able to comment on where
6    he -- he gets that.
7         Q.    Okay.
8         A.    I mean, I know where he went to college,
9    but in terms other things, I don't know.
10                    (Exhibit 30 was marked.)
11        Q.    Okay.  Let me give you Exhibit 30.  And
12   I'll represent to you more of these were -- this
13   came from that string.  You remember we had -- you
14   told us that there were -- you know, you gave us
15   everything that you had between you and Joe Oltmann
16   via text so this is -- looks like the last few pages
17   of that.  Do you see that?
18        A.    Yes.
19        Q.    This is -- you know, there is -- there is
20   some texts between you and Mr. Oltmann up at the top
21   in May and then there is a -- a large gap between
22   that and the beginning or -- excuse me -- the middle
23   of September of 2022.  Do you see where that jump
24   occurred?
25        A.    Yes.
```

Page 234

1          Q.    So during that gap, were you and

2    Mr. Oltmann out of communication?

3          A.    Without all my other forms of

4    communication, I can't speak to that.  I -- I don't

5    know.  I handed you everything.

6          Q.    Right.  Right.  This occurred, though,

7    after you got the subpoena.  Right?

8          A.    Yes.

9          Q.    Okay.  So it looks -- again, if I'm -- if

10   I'm reading it correctly -- and you correct me if

11   I'm wrong -- you received a text from Joe Oltmann on

12   September 15th at 7:32 p.m. that says:  I'm good, it

13   of town.

14              I assume he means gone, but that's what

15   it says.

16              "But they will represent you.  Pretty

17   easy.  Keith will communicate."

18              So is this referring back to this

19   discussion earlier on about getting Mr. Corporon

20   hired to represent you?

21         A.    This is not.  This is representing --

22   this is referring to an email chain that included a

23   lawyer representing a company I own shares in.  So I

24   would -- I would worry that this is asking me to

25   talk about things that could be privileged

                                          Page 235

1    conversations between me and a lawyer.

2        Q.    Well, there's no lawyer on this email

3    chain.

4        A.    On this text.  But if you're asking me to

5    talk about what it's referring to, that's an email

6    chain that included a lawyer who represents an

7    interest I own a percentage in talking about how

8    this could be defended from that point of view.

9        Q.    Okay.  But it goes back to -- I don't

10   want to get into the substance of lawyer

11   conversations if the topic is sufficient for me to

12   understand whether it's privileged.  It's referring

13   back to the email chain that you referred to earlier

14   in the -- in the deposition?

15       A.    Yes.

16       Q.    Okay.  And -- but the topic was the

17   representation of you?

18       A.    Yes.

19       Q.    All right.  And Keith is the guy that I

20   can't pronounce his last name?

21       A.    Yes.

22       Q.    All right.  And going down, it says:

23   Received.  There was one sent by you and then

24   received that starts:  Then do whatever you want,

25   Max.  And he goes on to say:  I don't trust you and

Page 236

1    have not, which is why you never had access to even

2    the email list.

3              So tell me what the -- he's referring to

4    there, if you know, the email list?

5        A.    He is referring to that -- many years

6    ago.  So my job was to make sure that the daily

7    email was sent out to our email list, and up until a

8    certain period, I had the ability to see who was

9    donating to us, names, and there was a point in time

10   where that authority was taken away from me.

11       Q.    He goes on to say:  You can sleep with

12   Coomer's lawyer for all I care.

13             I'll stop there.  We didn't have any

14   meetings or substantive discussions, have we?

15       A.    I prefer not to sleep with you.

16             And, no, we didn't.

17       Q.    Well, the feeling is mutual.

18             "Ingrid asked you for the subpoena, but

19   you cannot even do that," meaning Mr. Oltmann's

20   personal lawyers asked for a copy of the subpoena

21   sent to you?

22       A.    Yes.

23       Q.    You remember I asked you if you had any

24   discussions with either Mr. Oltmann -- well, with

25   Mr. Oltmann about you giving testimony?  You did

Page 237

```
 1   have some discussions with him about the production
 2   of documents related to the subpoena?
 3         A.    Not -- so what I mentioned was, which
 4   documents would be responsive to the subpoena.  When
 5   I mentioned that earlier, I apologize, I wasn't
 6   referencing the subpoena itself.
 7         Q.    Okay.  He goes on to say:  Joey, et al.
 8   have an obligation to represent you in your
 9   capacity.
10               The Joey is?
11         A.    Joseph Orrino.
12         Q.    Okay.  Well, you're not here, as far as
13   you are concerned in any other capacity than your
14   individual capacity, are you?
15         A.    I'm here as me.
16         Q.    And I'm not, don't take this the wrong
17   way, but have you been promised anything, any
18   consideration for appearing here today?
19         A.    No.
20         Q.    Do you have any meetings planned
21   concerning the divestiture of your shares as you sit
22   here today?
23         A.    Not to my knowledge.
24         Q.    I think this is in your --
25               If I'm skipping through them it means
```

Page 238

 1    we're going to get done quicker.
 2              All right.  More of some of the emails.
 3    Let's go with Exhibit 31 -- excuse me -- texts.
 4    It's getting late to Randy's point.
 5                   (Exhibit 31 was marked.)
 6        Q.    This is Exhibit 31.  This is another
 7    slice of that grouping of 155 pages of texts.  So
 8    just kind of in the middle, this is we're winding
 9    into April:  Mr. Oltmann, please send all email
10    correspondence to Keith.  As for the laptop, unless
11    you send it back, I cannot preserve it.
12              What -- what is he referring to there, if
13    you remember?
14        A.    I was notifying him and the company that
15    I had been -- I had been -- I received a
16    preservation notice from you and your team.  I
17    believe it was the day before my last day or
18    sometime around then, very good research on knowing
19    when my last day was.
20                   MR. CORPORON:  Don't give Brad a big
21    head, please.
22        A.    And I was notifying him that I was under
23    that preservation notice and even though my contract
24    required me to destroy all records or hand it over
25    back to them, I wasn't going to destroy anything.

                                          Page 239

1      Q.    So do you have that -- that laptop in
2   question?  Where is that?
3      A.    I have that, yeah.
4      Q.    And you have the -- you haven't deleted
5   your cookies or any of the cache associated with
6   that?
7      A.    That is something I explained to you back
8   in March or April that it's an unreasonable request
9   for someone in the tech industry to never clear
10  their cookies.
11     Q.    Okay.
12     A.    So I have previously cleared my cookies.
13     Q.    And to be clear, you didn't explain that
14  to me.
15     A.    I explained it to someone on your staff.
16     Q.    Okay.  So the -- there's a statement down
17  here that you sent to Mr. Oltmann:  I wasn't
18  involved in whatever you were doing with Coomer in
19  June 2020, so there's not like there would be
20  anything in my cookies.
21            And then he says:  September, not June.
22            What are you referring to there?
23     A.    I believe that's a reference to the --
24  you can correct me if I'm wrong, I believe that was
25  a reference to the timetable in which your team was

Page 240

```
1   demanding that I hand over cookies.  So the
2   June 2020 comes from that reference.  It's not in --
3   it's not suggesting the existence of a greater
4   conspiracy or anything like that.
5        Q.    Okay.  And then he says:  June is when it
6   all popped off.
7              But that's just referring to the George
8   Floyd situation.  Right?
9        A.    It seems so.
10       Q.    And then you paste at -- I guess not at
11  his request, but you paste in an email that you
12  received from us.  Right?
13       A.    I did.
14       Q.    Well, from me, actually.
15             Okay.  All right.  I understand that.
16                (Exhibit 32 was marked.)
17       Q.    I'm going to try not to take another
18  break and plow through so we can all go home.
19             I'm going to show you Exhibit 32, this is
20  another slice of that 155-page exhibit.  I probably
21  should have copied the whole dang thing.
22             So do you need more context for this?  At
23  the top you received an email:  Never took a dollar.
24  It's not the money, it's the speech.  Never took a
25  dollar from FEC.
```

Page 241

1           What -- what's being referred to here?

2       A.      This generally is a discussion I'm having

3   with him about the danger of doing things through a

4   501(c)(3) because of the strict guardrail setup for

5   what is permissible and what is not.

6       Q.      And the 501(c)(3) that you're referring

7   to is what organization?

8       A.      I believe in this context it's FEC.

9       Q.      And you're saying you received some

10  compensation, they paid for travel.  Is that you?

11      A.      Yes.  I'm -- I'm asking if they have.

12      Q.      Going down:  Any compensation was paid by

13  the booking agency or organization.

14          What -- what do you understand him to be

15  referring to there?

16      A.      I guess he used a booking agency or the

17  organization.

18      Q.      "Never paid to put Tina Peters up in a

19  hotel and then book her on CD the following

20  morning."

21          "That's the" -- your word "shit you got

22  to be careful of, it only takes one prosecutor."

23          That's what you said.  Right?

24      A.      Yes.

25      Q.      And he says:  Nope, Mike paid it.

Page  242

1            What is -- what is that referring to

2    specifically?

3        A.    I don't know.

4              MR. MALONE:    Objection; foundation.

5        A.    I don't know who "Mike paid it" in this

6    context means.

7        Q.    Well, we're talking about Tina Peters

8    above.  So you don't understand that to refer to

9    Mike paying to put Tina Peters up in a hotel?

10       A.    I don't know who he was talking about

11   here.  I'd have to look at the context.  I mean, I'm

12   not going to speculate, but he says "Mike."  That's

13   it.

14       Q.    Okay.  So ask Mr. Oltmann that question?

15       A.    Yes.

16       Q.    I will.

17             And flip over to the next page.  And for

18   context, he was saying -- he, Mr. Oltmann --

19   "Everything is recorded.  Every single thing is" --

20   "every single thing is documented."

21             And you say:  Everything except the Eric

22   Coomer call.

23             And he says:  No personnel gain.

24             Do you understand what that refers to?

25       A.    I believe when he said "no personal

                                        Page 243

1   gain," that was a stream of consciousness from

2   before I said what I said.

3        Q.    Okay.  "I had" -- "I had Tig that was

4   supposed to be on that call.  He signed the

5   affidavit.  He had a trip.  He also knows who the

6   Antifa character is.  I don't typically rec" -- "I

7   don't typically record calls."

8            That's not true, is it?

9        A.    In my experience, that wouldn't be

10  accurate.

11       Q.    "Now, I do, however, every single one of

12  them."

13            And then you go on to say:  The first

14  thing you told me in 2013 was that you record every

15  call.

16            And you remember him telling you that.

17  Right?

18       A.    Explicitly.

19       Q.    Now, going back to that prior comment.

20  "He," referring to Mr. Tiegen or

21  Tiegen (pronouncing)?

22       A.    Tiegen.

23            MR. CORPORON:  Tiegen.

24       Q.    Pardon me.

25            MR. CORPORON:  We all do it.

Page 244

1      Q.      "He also knows who the Antifa character

2   is."

3              But you haven't had -- or have you had

4   conversations with -- I'll call him Tig, to get it

5   right -- about that topic?

6      A.      No.   Unless that came up on air.   He was

7   on air a couple of times, but I don't believe he

8   shared it on air, otherwise you guys would have

9   played it.

10     Q.      Yeah, he -- he hasn't, to our knowledge.

11             Okay.  Done.

12                  (Exhibit 33 was marked.)

13     Q.      I seem to be going to the 155-page

14   document a lot.

15             Exhibit 33, what are we looking at here,

16   sir?

17     A.      These appear to be text messages between

18   me and Joe Oltmann.

19     Q.      This is -- we're rewinding the clock,

20   and, again, forgive me.  This is on March 10, 2022.

21   So, at that time, were you still employed by CD

22   Solutions?

23     A.      I believe that I was, yes.

24     Q.      Okay.  And did you use your personal cell

25   phone for the business of your employer?

                                        Page 245

```
 1         A.    I did not have a work-related cell phone,
 2    so, yes.
 3         Q.    Okay.  Give me the context here if you
 4    can.  There's -- I'm focused on an email you -- or
 5    text you sent March 10 at 12:34 p.m. where it says:
 6    Every time you have ever stepped in shit and caused
 7    blowback on your other partners, you took a step
 8    back and tried to fix it.  PIN for Eric Coomer
 9    blowback, PIN for the Gallows, DCF for Russia.
10              Explain what you mean by this?
11         A.    After the Eric Coomer lawsuit was filed
12    against him, that also corresponded with the
13    inauguration and there was blowback and he stepped
14    down in some capacity.  I don't know the specifics
15    for how it happened, but he stopped serving in his
16    role, official role, at PIN.
17              There were comments on the show about
18    sending elected officials to the gallows.  That
19    caused blowback on PIN and he walked back that
20    statement and tried to temper that rhetoric.
21              And after he came out in support of
22    Russia, DCF Guns, we started getting heat, pushback
23    from people and he stepped back and he tempered that
24    rhetoric.
25         Q.    Okay.  And then you say:  I've -- I've
```

Page 246

1    done more than enough to explain how uncomfortable

2    I -- am finding myself in the New York Times for

3    your Russia comments.  I copystruck those videos for

4    me, Joe.

5                What are you referring to?  That's some

6    jargon that I don't understand.

7        A.    Sure.  There were videos that were being

8    posted onto social media by certain journalists

9    without our approval.  It was our copyrighted

10   material.  And took steps to inform those platforms

11   that these were copyrighted materials that were

12   being shared in violation of our copyright getting

13   those videos taken down.

14       Q.    And those related to Mr. Oltmann's

15   comments on Russia?

16       A.    Yes.

17       Q.    Okay.  And then you go on to say --

18   you -- you talk about the New York Times.  And,

19   again, you say here:  I stood by you on everything,

20   even the Eric Coomer --

21                You call it a bit.

22                -- you haven't shown me any of the

23   evidence on that.

24                Did I read that correctly?

25       A.    Yes.

Page  247

```
 1                   (Discussion off the written record

 2      regarding exhibit stickers.)

 3                   (Exhibit 34 was marked.)

 4      Q.     This is more in the nature of us trying

 5  to figuring out what you provided to us and I think

 6  you touched on this earlier and you may have.  This

 7  is -- it says:  Keith Saw -- can you say that?

 8      A.     Sawarynski.

 9      Q.     Thank you.  And it appears to be some

10  exchanges between you and him in December of 2020 in

11  January -- through January 5th of 2021.

12                   Is that correct?

13      A.     Yes.

14      Q.     And is this -- under what platform was

15  this sent, if you remember?

16      A.     This was sent to my 609 number.

17      Q.     Oh, that's the other one we were talking

18  about.  Correct?

19      A.     Yes.

20      Q.     All right.  You do say in the middle, on

21  January 1st -- when it says "me," that means this is

22  you texting on that device.  Right?

23      A.     Yes.

24      Q.     "Not really comfortable doing an episode

25  like this on a company that is suing us.  What
```

Page 248

```
 1    should I do?"
 2              Who are you referring to there?
 3         A.   I think Dominion, but I don't know.
 4         Q.   Well, did that episode air?
 5         A.   I don't know.
 6         Q.   You say:  It's not ready.  We're 45
 7    minutes from air and Joe is still putting together
 8    the flowchart.
 9              Does that refresh your memory?
10         A.   Yes.  This was a PowerPoint that Joe had
11    put together and has used at a number of different
12    events, showing his theory on how the election was
13    manipulated through electronic means.
14         Q.   That little chart, as you put it, a
15    flowchart?
16         A.   To the extent that this (demonstrating)
17    means something, I'll agree.
18         Q.   Yeah.  Well, it's -- well, it doesn't
19    matter.
20              Okay.  So -- and this goes through
21    January 5th.  Were you in the loop at all in terms
22    of Mr. Oltmann appearing on January 5th to make a
23    speech at the Ellipse?
24         A.   I knew he was making a speech, yes.
25         Q.   How did you know that?
```

Page 249

```
 1          A.    I don't remember who told me, but I knew
 2    he was doing it, and I watched it.
 3          Q.    And you weren't down there?
 4          A.    I was not.
 5          Q.    Did he recount any of his meetings during
 6    that time period at any of the hotels he was staying
 7    at with either Mr. Giuliani or Mr. Ramsland or those
 8    folks?
 9          A.    He has -- yes, he told me about different
10    meetings.  Yes, he has.
11          Q.    Did he tell you why he was meeting in
12    Mr. Giuliani's hotel room?
13          A.    Yes, he did.
14          Q.    What did he tell you?
15                    MR. CORPORON:  Objection to relevance
16    to the Lindell case.
17                    MR. COOMBE:  Join.
18          A.    Just generically, working on stopping an
19    election from being stolen.
20          Q.    Nothing specific?
21          A.    He did not share with me any real
22    specifics.
23          Q.    Anything else he shared with you about
24    his meetings during that time period?
25          A.    It's very hard to remember what he told
```

Page 250

1    me and what I have read through news reporting.  It

2    kind of melds together.

3          Q.    How about meeting with Pompeo?

4          A.    I don't know if he met with Pompeo.

5          Q.    You can put that aside.  Thank you.

6                I'm not going to promise you this is the

7    last exhibit, but I hope it is.

8                      MR. CORPORON:  Finally, unanimity

9    around the table.

10                     (Exhibit 35 was marked.)

11         Q.    Take a look to familiarize yourself with

12   Exhibit 35.  And then if you can identify it for the

13   jury, let us know.

14         A.    This appears to be a compilation of my

15   Telegram posts.

16         Q.    Okay.  So this is -- you post on

17   Telegram, which is a social media account?

18         A.    Yes.

19         Q.    And just -- I need you to confirm for me

20   that this is a true and correct copy of posts that

21   you've made on Telegram during the time period

22   indicated?

23         A.    What's the time period indicated?

24         Q.    Well, up top it says -- May 2nd is where

25   it starts, and then it goes from there.  I believe

                                              Page 251

1   some of them have dates and I believe we tried to

2   put them in --

3        A.    Are you asking me to represent that this

4   is a full and complete archive of everything I

5   posted in that time --

6        Q.    No.

7        A.    -- or just that these things were posted

8   in that time?

9        Q.    Yes, sir, the latter.

10       A.    I have no reason to think that the dates

11  are wrong, and nothing seems out of place.

12       Q.    Okay.  There's one comment in particular

13  I was interested in.  Let me see if I can find it.

14  Let me skim through it.  A lot of these you've

15  touched on.

16            The May 24th -- this isn't the one I

17  was thinking of.  It's the little one line.  The

18  pages aren't numbered, but it says:  If someone

19  tells you for two years that they have the receipts,

20  but they never show you the receipts, then they do

21  not have the receipts.

22            Are you referring to Coomer in this

23  instance?

24       A.    I don't believe I was in that instance,

25  no.

Page 252

1        Q.    Okay.  Do you remember who you were?

2        A.    I believe in this instance I was

3    referring to a number of people who have presented

4    for years that they know precisely how the 2020

5    election was stolen and have not provided that.

6        Q.    Do you include Mr. Lindell in that group?

7        A.    I don't know if I was thinking about

8    Mr. Lindell when I wrote that.

9        Q.    Okay.  But as you sit here today?

10       A.    No.  I -- I don't know if I would

11   characterize him that way.

12       Q.    How would you characterize him?

13       A.    I think I would -- I would characterize

14   him as a man who genuinely means well, who might not

15   always get the best advice from people around him,

16   but who genuinely means well.

17       Q.    Do you know who is advising him?  In my

18   mind I'm thinking of a gentleman name Kurt Olson.

19             Do you know who he is?

20       A.    I do not know who he is.

21                 MR. MALONE:  Object to form and

22   foundation.

23       A.    I do not know who he is, no.

24       Q.    Do you know who Mr. Lindell goes to

25   advise -- goes to for advice?

Page 253

```
 1          A.    I don't know specifically.

 2                 MR. MALONE:  Objection.

 3          A.    I don't know specifically.  When I say

 4    that, I'm referencing something that I believe went

 5    down at the symposium, a deal with packets and

 6    things, where he was given advice by people, and it

 7    ended up being bad advice.

 8          Q.    Yeah.  They turned out that they couldn't

 9    show that the PCAPs were actually authentic and

10    demonstrated interference by the Chinese.  Right?

11          A.    Yeah.

12                 MR. MALONE:  Object to form.

13          Q.    Is that a "yes"?

14          A.    I don't know all the specifics about

15    that, but I know from what I read in news reports

16    that it wasn't what everyone had hoped it would be.

17          Q.    Okay.

18          A.    And he was misled in that regard.

19          Q.    Well, you know, I asked you some names

20    earlier.  You said:  I think he was mislead in that

21    regard.

22                 Do you have someone in mind?  Misled by

23    whom?

24          A.    I don't know who told him that.  I know

25    that he is not a cyber expert.  So obviously for him
```

Page 254

1    to come out and make those claims, someone had to

2    have been telling him.

3         Q.    Okay.  Let's fast-forward to June 27th.

4    And, again, this is of this year.  Right?

5         A.    That is correct.

6         Q.    There's a lengthy post here.  I'll read

7    it, since you won't, and then we can talk about it.

8    In the middle, after you talk about things such as

9    Roe v. Wade, et cetera, you start in the middle

10   saying:  The problem is that this niche audience,

11   people who are only really interested in this topic,

12   gets smaller and smaller.  The grifts start to

13   compete with one another.  It's why you see Byrne

14   fighting with Oltmann, who, in turn, fights with

15   Jovan, who is fighting with Dr. Shiva, who is

16   fighting with Clements.

17             There is a lot to unpack there.  But can

18   you -- put a little meat on the bones on this topic.

19             First, who are the individuals that

20   you're talking about?

21        A.    Patrick Byrne.

22        Q.    Okay.

23        A.    Joe Oltmann.

24        Q.    Yes.

25        A.    Jovan Pulitzer.

1    Q.    Okay.

2    A.    I do not know Dr. Shiva's last name.

3    Q.    The MIT guy?

4    A.    Yes.  And Patrick Clements.

5    Q.    Okay.  And so the niche audience you're

6    referring to is what?

7    A.    I believe you read it, people who are

8    only really interested in 2020 election fraud and

9    nothing else.

10    Q.    And -- and the grifts start to compete

11    with one another.  The grifts are what?  What are

12    you specifically referring to?

13    A.    To this, I'm referring to a growing trend

14    in the conservative movement that activism no longer

15    runs through the party, 501(c)(3) organizations,

16    anything with real accountability, and it ends up

17    running through personal bank accounts.

18    Q.    Meaning the promotion of election fraud

19    issues being monetized into individual bank

20    accounts?

21    A.    Among other things, yes.

22    Q.    And you go on to say:  And the potential

23    audience gets smaller and smaller.

24          Excuse me.

25          As the potential audience gets smaller

Page 256

1    and smaller, it becomes harder for these people --

2    these people's competing theories to peacefully

3    coexist.  And when they're all state -- when they've

4    all staked their livelihoods on donations continuing

5    to come through the door, you can understand why

6    they go to war with one another.

7              Now, Conservative Daily existed under

8    this model, did it not?

9         A.   No.

10         Q.   You had a button for that to donate to

11   the cause, in this case the -- the revenue that was

12   going to be paid to the owners of Conservative

13   Daily.  Right?

14         A.   I've been -- I was doing Conservative

15   Daily since 2014.  So I wouldn't put that under this

16   specific umbrella.

17         Q.   Do you put the misdirection that you

18   described earlier, from revenue going to

19   Conservative Daily to revenue going to the personal

20   legal defense fund in that category of a grift?

21         A.   Not necessarily, but it could be.

22         Q.   Okay.  Do you view Mr. Oltmann as a

23   grifter, as it stands?

24         A.   I think you -- one could make the

25   argument that he is, yeah.

                                        Page 257

1     Q.    I'll skip over the Harry Potter

2    reference.

3          You say:  It's all a zero sum game to

4    them.  In order for one theory to win, the others

5    likely have to lose.  It's why Joe Oltmann would get

6    in screaming matches with me over old --

7    old-fashioned ballad harvesting.  He changed his

8    tune a tiny bit after the "2000 Mules" was released.

9    But the point is if the election was stolen by

10   mules, then the claims against Dominion would start

11   to fall apart.

12          What do you mean by that?

13     A.    The idea that theories are presented as

14   the one true way that the 2020 election was

15   manipulated is harder for everyone to claim to have

16   a different solution because in order for them to

17   have the one true solution, then the others can't be

18   true.

19     Q.    And going back to -- and that's the --

20   that's the dynamic that you were observing in June

21   of this year.  Right?

22     A.    Which is why -- yes, which is why I

23   called it a zero sum game.

24     Q.    Do you -- can you -- after seeing the

25   flowchart and -- and spending the time that you did

                                          Page 258

1    with Mr. Oltmann, can you explain to the jury what

2    his theory of election hacking of the 2020 election

3    is?

4           A.     I haven't seen his flowchart in a long

5    time, but the last time I saw it, I didn't quite

6    understand all of the claims made in it.

7           Q.     You use the term "not necessarily" in

8    this posting, but in other postings, patriots, but

9    it's spelled P-A-Y?

10          A.     Yes.

11          Q.     What does that term mean?

12          A.     In my mind, it's people who present

13   themself as being for the conservative cause, but

14   they also have their hand out.  And it's -- it's

15   more -- it's -- as I mentioned, it's a commentary on

16   the idea that the conservative movement is now being

17   run by -- being led by certain types of campaigns

18   that instead of being run through the party, 501(c)

19   organizations instead goes to personal bank

20   accounts.

21          Q.     Isn't that the model that Mr. Lindell

22   follows?

23          A.     I don't know --

24                 MR. MALONE:  Objection to form;

25   foundation.

Page 259

1          A.    I don't know his -- I don't know his

2    model.

3          Q.    That is the model that Mr. Oltmann is now

4    following, though, isn't it?

5          A.    I have concerns about funneling people

6    into a legal defense fund without necessarily having

7    all of the same safeguards and oversight in place,

8    yes.

9          Q.    There is a better version of the bingo

10   card here and of the book.

11               I don't really want to get into

12   Mr. Oltmann's politics so I don't need to read about

13   that.

14               July 11th:  Tried taking the high road.

15   I unsubscribed from, quote, grifter, close quote,

16   Joe Oltmann and ignored him entirely for the past

17   week.  Went on with my life and, frankly, my life

18   was less -- or excuse me -- was far more enjoyable

19   without him in it at all.  Well, today, quote,

20   grifter, close quote, Joe decided to come onto my

21   Telegram page and slander me further.

22               I'll stop there.  You can read through

23   it.

24               Now why are you calling -- I know you put

25   it in quotes but why do you continue to call him a

                                              Page 260

1    grifter in this post?

2         A.    This was more of a jab at him because I

3    was frustrated with what he was doing and I knew

4    that word would kind of tick him off.

5         Q.    And -- and I'm getting, I guess, to

6    the -- the section that I was more interested in.  I

7    think it may have been in the comments.  There is a

8    screenshot or it may have been a link posted to a --

9    it looks like a 21-second clip.  This is on

10   August 2nd.  Do you see that?

11        A.    I do.

12        Q.    So tell me what -- what was that clip

13   about, if you recall?

14        A.    I was sent a clip of Joe and I believe

15   what's written there on the post is an accurate

16   characterization of what he said in it.  I know he

17   has said that it was out of context.  I don't know

18   if that's the case.  But that he may have confused

19   Eric Coomer of Dominion Voting System with another

20   Eric who works at an HVAC company.

21        Q.    How did you take it?

22        A.    That -- him saying that?

23        Q.    Yes, sir.

24        A.    That was yet another -- so over this

25   deposition, you've asked me how I feel at different

Page 261

1    points.   That was yet another thing for me to

2    question his position.   And I say that right below

3    there.

4         Q.    In the comments?

5         A.    Yes.

6              MR. CAIN:  Okay.  I'm going to -- I

7    am going to take a quick break.  It needs to just be

8    three minutes for me to go caucus with my team.  It

9    sounds official.

10             MR. CORPORON:  We're going to sit

11   here waiting, holding you to that.

12             MR. CAIN:  You're welcome to do that.

13   I -- it won't take me long.  I just want to make

14   sure there's nothing I missed.

15             MR. CORPORON:  Can we clear something

16   up on the record real quickly?  Did you get the

17   dates of Exhibits 24 and 25?

18             MR. KLOEWER:  Let me do that now.  I

19   can do that.

20             THE VIDEOGRAPHER:  Going off the

21   record.  The time is 6:57.

22                  (Break.)

23             THE VIDEOGRAPHER:  Back on the

24   record.  The time is 7:00.

25             MR. KLOEWER:  Just to answer a

                                        Page 262

```
 1   question that was previously asked by Mr. Corporon.
 2   The dates of Exhibits 24 and 25, we did have a
 3   chance to review and confirm those were both from
 4   December 5th of 2020.
 5        Q.    I mentioned at the beginning that you'll
 6   have an opportunity to read and sign your
 7   deposition, but as you sit here, is there any answer
 8   that you've given me that in your mind you think you
 9   need to correct at this point because you think you
10   may have testified in error?
11        A.    No, I don't think so, no.
12        Q.    Have I been polite and professional with
13   you today?
14        A.    Yeah, except you don't want to sleep with
15   me.
16        Q.    I think that's being polite.
17             MR. CAIN:  I'll pass the witness.
18             MR. CORPORON:  No questions.
19             MR. COOMBE:  No questions.
20             (Discussion off the written record.)
21        Q.    Just for clarity, do you know what
22   FrankSpeech is?
23        A.    Yes, I know what FrankSpeech is.
24        Q.    What is your understanding of what
25   FrankSpeech is?
```

Page 263

1      A.    My understanding is that FrankSpeech is a

2    platform that hosts certain types of video content,

3    both prerecorded and live.

4      Q.    Have you ever been involved with any of

5    that video content, either prerecorded or live?

6      A.    I don't know if any of the videos were --

7    I believe that videos I was on were posted to

8    FrankSpeech.  I was not involved in making that

9    happen.

10     Q.    Have you ever communicated with anyone

11   you understood to be working on behalf of

12   FrankSpeech?

13     A.    To my knowledge, no, but there might have

14   been emails to that effect, to my work email because

15   there was a period where we were having technical

16   difficulties and I might have been forwarded one of

17   those email chains.  But to my knowledge, that would

18   be the extent of that.

19     Q.    Okay.  Have you ever communicated or

20   interacted in any way with an individual named

21   Brannon Howse?

22     A.    I do not think so.

23     Q.    I believe you mentioned earlier in your

24   deposition today that the only contact that you've

25   ever had with Mr. Lindell directly is on the

Page 264

1    Conservative Daily podcast.  Is that fair?

2        A.    I believe that is correct, yes.

3        Q.    Did I also hear you mention that there

4    may have been some sort of -- I think I'm using your

5    words -- a coffee pitch that Mr. Lindell was

6    involved in with -- was it Jake Freijo and Greg

7    Papas?

8        A.    There was a pitch.  I do not believe that

9    Mike Lindell was involved.  There was a woman who

10   handles his stuff and -- as a go-between and an

11   informal pitch was spoken to her over the phone.  It

12   took all of maybe two or three minutes.

13       Q.    Got it.

14            So starting with just the interactions on

15   the podcast, did you ever hear Mr. Lindell say

16   anything about Eric Coomer?

17       A.    I haven't rewatched those episodes, but

18   nothing rings a bell.

19       Q.    Outside of the podcasts, have you ever

20   heard Mr. Lindell say anything about Eric Coomer?

21       A.    I have not.

22       Q.    Were you asked any questions today about

23   anything that Mr. Lindell said about Eric Coomer?

24       A.    Apart from what you just asked me, I

25   don't think I was.

Page 265

1      Q.    Have you ever expressed any opinion about

2    Dr. Coomer to Mr. Lindell?

3      A.    Again, I haven't rewatched or listened to

4    those podcast episodes.  I don't believe so.

5      Q.    Was Dr. Coomer mentioned on that coffee

6    pitch that we were discussing just a minute ago?

7      A.    I don't think so, no.

8      Q.    I'm not quite sure how Telegram works so

9    forgive me if I butcher the parlance here.  But

10   does -- do you have followers on Telegram?

11     A.    I do.

12     Q.    Are you aware if Mr. Lindell is one of

13   your followers?

14     A.    I don't know.  I don't go through my

15   followers generally.  I went through once to see if

16   family members of mine were following me.  To my

17   knowledge, I don't know if Mike Lindell is following

18   me on Telegram.  That would be cool if he was, but I

19   don't know.

20     Q.    Do you know if Mr. Lindell has a Telegram

21   account at all?

22     A.    I do not know.

23     Q.    So you've never interacted with him on

24   Telegram in any way?

25     A.    It's hard to say on Telegram because

Page 266

1    there's lots of accounts that claim to be people

2    they aren't, lots of accounts that claim to

3    represent people that they really don't.  I may have

4    gone across one of those pages.  I can't say with

5    any certainty, but as far as the instant messenger

6    part of Telegram, I can say with certainty I have

7    never communicated with him.

8        Q.    At any time that you've ever interacted

9    with Mr. Lindell, which is just on the podcast, did

10   he ever express any doubts about Mr. Oltmann's

11   credibility?

12       A.    No.

13       Q.    Did you ever express any doubts about

14   Mr. Oltmann's credibility to Mr. Lindell?

15       A.    I would not have done that on the show

16   with -- with Mr. Lindell present so I -- I do not

17   believe I would have done that.

18       Q.    So you've never referred to Mr. Oltmann

19   as a grifter to Mr. Lindell?

20       A.    No.

21       Q.    Are you aware of anyone who has done

22   that?

23       A.    No.

24       Q.    I believe you mentioned that you were not

25   at the Cyber Symposium in August of 2021 in South

Page  267

1    Dakota.   Correct?

2        A.     I was not.

3        Q.     Did you watch any of that Cyber

4    Symposium?

5        A.     I watched a bit of it, yes.

6        Q.     Did you watch it live or on tape delay?

7        A.     I watched -- I believe I watched it live.

8        Q.     Which portions of that symposium do you

9    recall watching live if you can describe those?

10        A.     I remember watching Joe's segment, Joe

11   Oltmann's segment.  I remember watching a segment --

12   it might be confusing events, but I believe there

13   was a segment in which he discussed what had just

14   happened to Tina Peters just a day or so previous or

15   maybe even the same day.  Those are the two parts of

16   that symposium that stick out to me right now.

17        Q.     Anything else?

18        A.     Bits and pieces about the packets, but

19   those would be the three that I remember.

20        Q.     And do you recall Mr. Lindell saying

21   anything about Dr. Coomer during that symposium?

22        A.     I haven't gone through that, so I -- I

23   can't say that I remember anything like that, no.

24        Q.     You discussed another lawsuit that

25   Dr. Coomer has brought against Joe Oltmann today.

Page 268

```
 1    Correct?
 2         A.    Yes.
 3         Q.    And, in fact, you've read transcripts
 4    from that lawsuit.  Right?
 5         A.    Yes.
 6         Q.    And as far as you know, clips from that
 7    lawsuit have been played for you today during the
 8    deposition.  Is that right?
 9         A.    Yes.
10         Q.    Were you asked to testify in that
11    lawsuit?
12         A.    I -- I -- can you -- can you clarify what
13    you mean by that?
14         Q.    As best I can.  Sure.
15               Did anyone ask you to provide testimony
16    in the lawsuit that Dr. Coomer has brought against
17    Joe Oltmann?
18         A.    There was a conversation between me and
19    legal counsel as to whether it would make sense for
20    me to testify to a certain part, but it was
21    ultimately decided that it wouldn't make sense for
22    me to do so.  No one else has asked me to testify.
23         Q.    That's fine.  Surely don't tell me
24    anything that you discussed with your own counsel.
25               I think what I'll ask is, did you receive
```

Page 269

1    any subpoena for testimony in that lawsuit?

2        A.    I have not.

3        Q.    Did you receive a subpoena for documents

4    in that lawsuit?

5        A.    I have not.

6        Q.    You mentioned Patrick Byrne today or you

7    were asked about Mr. Byrne today, I should say.  Are

8    you aware that Dr. Coomer has also brought a lawsuit

9    against Mr. Byrne?

10       A.    I had heard something about that, yes.

11       Q.    Have you been asked to testify in that

12   lawsuit by anyone?

13       A.    I have not.

14       Q.    Have you received a subpoena for

15   documents in that lawsuit?

16       A.    I have not.

17       Q.    Okay.

18                MR. MALONE:  That's all the questions

19   I have.  Thank you for your time today, Mr. McGuire.

20                THE WITNESS:  Thanks.

21                MR. CAIN:  Based on that questioning,

22   I do not have any follow-up questions.

23                THE VIDEOGRAPHER:  This concludes the

24   deposition of Max McGuire.  Off the record at 7:11.

25                (Deposition concluded at 7:11 p.m.)    0

Page 270

```
 1                    CORRECTION PAGE

 2    WITNESS NAME:  MAX JOSEPH MCGUIRE  DATE:  11/17/2022

 3    PAGE   LINE   CHANGE              REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

                                             Page 271

1

2                        SIGNATURE PAGE

3

    I, MAX JOSEPH MCGUIRE, have read the foregoing

4   deposition and hereby affix my signature that same

    is true and correct, except as noted on the

5   correction page.

6

7                    _____
                     MAX JOSEPH MCGUIRE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 272

1    1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
2    2
3     ERIC COOMER, PH.D.,         §
                                  §
4        PLAINTIFF,               §    CIVIL ACTION NO.
                                  §    1:22-CV-01129-WJM
5     V.                          §
                                  §
6     MICHAEL J. LINDELL,         §
      FRANKSPEECH, LLC, AND       §
7     MY PILLOW, INC.,            §
                                  §
8        DEFENDANTS.              §
9    9               REPORTER'S CERTIFICATION
                  DEPOSITION OF MAX JOSEPH MCGUIRE
10   10              TAKEN NOVEMBER 17, 2022
11   11    I, TAMARA CHAPMAN, Certified Shorthand Reporter in
12   12 and for the State of Texas, hereby certify to the
13   13 following:
14   14    That the witness, MAX JOSEPH MCGUIRE, was duly
15   15 sworn by the officer and that the transcript of the
16   16 oral deposition is a true record of the testimony
17   17 given by the witness;
18   18    That the original deposition was delivered to
19   19 CHARLES J. CAIN;
20   20    That a copy of this certificate was served on all
21   21 parties and/or the witness shown herein on
22   22 _____.
23   23    I further certify that pursuant to FRCP No.
24   24 30(f)(i) that the signature of the deponent:
25   25        was requested by the deponent or a party before

                                        Page 273

1   the completion of the deposition and that the

2   signature is to be returned within 30 days from date

3   of receipt of the transcript.  If returned, the

4   attached Changes and Signature Page contains any

5   changes and the reasons therefor;

6      X was not requested by the deponent or a party

7   before the completion of the deposition.

8     I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties in

10  the action in which this proceeding was taken, and

11  further that I am not financially or otherwise

12  interested in the outcome of the action.

13     Certified to by me this 22nd day of November, 2022.

14

15

16

17

18

19              _____

                Tamara Chapman, CSR, RPR-CRR

                CSR NO. 7248; Expiration Date: 12-31-22

20              Veritext Legal Solutions

                Firm Registration No. 571

21              300 Throckmorton Street, Suite 1600

                Fort Worth, Texas  76102

22              800-336-4000

23

24

25

                                        Page  274

1    Randy B. Corporon

2    rbc@corporonlaw.com

3                                    November 22, 2022

4    RE: Coomer vs. Lindell

5    DEPOSITION OF: Max Joseph McGuire 5465767

6        The above-referenced witness transcript is

7    available for read and sign.

8        Within the applicable timeframe, 30 days, the witness

9    should read the testimony to verify its accuracy. If

10   there are any changes, the witness should note those

11   on the attached Errata Sheet.

12       The witness should sign and notarize the

13   attached Errata pages and return to Veritext at

14   errata-tx@veritext.com.

15       According to applicable rules or agreements, if

16   the witness fails to do so within the time allotted,

17   a certified copy of the transcript may be used as if

18   signed.

19                               Yours,

20                               Veritext Legal Solutions

21

22

23

24

25

                                              Page  275

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.