**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

**EXHIBIT 6
PLAINTIFF'S MOTION TO COMPEL DEPOSITION TESTIMONY FROM
DEFENDANT MICHAEL J. LINDELL AND MOTION FOR SANCTIONS
PURSUANT TO F.R.C.P. 30 AND F.R.C.P. 37**

---

Deposition Transcript of Michael J. Lindell
Designated Representative of My Pillow, Inc.
Dated 03-08-23

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3    ----------------------------------------------------

 4    Eric Coomer, Ph.D.,

 5                Plaintiff,

 6       vs.            Civil Action No. 1:22-cv-01129-WJM

 7    Michael J. Lindell, Frankspeech LLC,

 8    and My Pillow, Inc.,

 9                Defendants.

10    ----------------------------------------------------

11

12        VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13       DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                 VOLUME I (Pages 1-370)

15

16

17    DATE:   March 8, 2023

18    TIME:   9:30 a.m. CST

19    PLACE:  PARKER DANIELS KIBORT, LLC

20            Colwell Building, Suite 888, 123 North 3rd St

21            Minneapolis, Minnesota 55401

22

23

24    REPORTED BY: KELLEY E. ZILLES, RPR

25    Job No.: 5761446

                                           Page 1
```



```
 1              APPEARANCES
 2
 3   On Behalf of Plaintiff:
 4      CHARLES J. CAIN, ESQ.
 5      Ccain@cstrial.com
 6      BRADLEY A. KLOEWER, ESQ.
 7      Bkloewer@cstrial.com
 8      Cain & Skarnulis PLLC
 9      P.O. Box 1064/101 N. F Street, Suite 207
10      Salida, Colorado 81201
11
12   On Behalf of Defendant:
13      RYAN MALONE, ESQ.
14      Malone@parkerdk.com
15      Parker Daniels Kibort
16      888 Colwell Building
17      123 North Third Street
18      Minneapolis, Minnesota 55401
19
20   ALSO PRESENT:
21      ██████████████████████
22      Adam Wallin, Videographer
23
24   NOTE:  Original deposition transcript will be provided
25   to Charles J. Cain, Esq. as taking party of deposition.
                                                    Page 2
```

```
 1   EXHIBITS MARKED AND REFERRED TO:
 2
 3   Exhibit 60   Plaintiff's First Amended Notice of
 4                Intention to Take Oral and Videotaped
 5                Deposition of the Authorized
 6                Representative(s) of My Pillow, Inc....   8
 7
 8   Exhibit 61   ██████████████████████   121
 9
10   Exhibit 62   ██████████████████████████   152
11
12   Exhibit 63   My Pillow Ads on Fox News Since 2017... 169
13
14   Exhibit 64   My Pillow Flash Sale Ad................ 192
15
16   Exhibit 65   Flash Drive............................ 201
17
18   Exhibit 66   ██████████████████████████   242
19
20   Exhibit 67   ██████████████████████   268
21
22   Exhibit 68   ████████████████████████
23                ██████████████████
24                ██████████████████████   273
25                                                    Page 4
```

```
 1                  INDEX
 2            (Volume 1 - Pages 1-370)
 3
 4
 5
 6   WITNESS:  MICHAEL J. LINDELL          PAGE
 7
 8
 9
10   EXAMINATION BY MR. CAIN............................  6
11   AFTERNOON SESSION.................................. 226
12
13
14
15
16   OBJECTIONS... 12, 15, 38, 39, 40, 42, 49, 60, 69, 84,
17   92, 103, 105, 112, 170, 185, 225, 253, 259, 281, 282,
18   286, 294, 295, 306, 323
19
20
21
22
23
24
25
                                                    Page 3
```

```
 1   Exhibit 69   ██████████████████████████████
 2                ██████████████████████████
 3                ██████████████████████   275
 4
 5   Exhibit 70   ██████████████████████████████
 6                ██████████████████████
 7                ████████████████████████290
 8
 9   Exhibit 71   ████████████████████████████████
10                ██████████████████████████   297
11
12
13   Exhibit 72   ██████████████████████████
14                ████████████████
15                ██████████████████████   309
16
17   Exhibit 73   ██████████████████████████   336
18
19   Exhibit 74   ██████████████████████   355
20
21   Exhibit 75   ████████████████
22                ██████████████████████   358
23
24   (Original exhibits attached to original transcript.
25   Copies attached to transcript copies.)
                                                    Page 5
```

Veritext Legal Solutions
800-336-4000

1      VIDEO TECHNICIAN:  We are going on the
2  record at 9:36 a.m. on March 8th, 2023.  This is the
3  video recorded deposition of designated representative
4  of My Pillow, Incorporated, Michael J. Lindell, being
5  taken by counsel for the plaintiff in the matter of Eric
6  Coomer, Ph.D. versus Michael J. Lindell, Frankspeech,
7  LLC, and My Pillow, Incorporated, in the United States
8  District Court for the District of Colorado, Civil
9  Action No:  1:22-cv-01129-WJM.
10     This deposition is being held in Minneapolis,
11  Minnesota.  My name is Adam Wallin from the firm
12  Veritext and I am the videographer.  The court reporter
13  is Kelley Zilles from the firm Veritext.
14     Will counsel please identify themselves for the
15  record.
16     MR. CAIN:  Charlie Cain, Brad Kloewer for
17  the plaintiff.
18     MR. MALONE:  Ryan Malone for My Pillow,
19  Incorporated.
20     VIDEO TECHNICIAN:  Will the court reporter
21  please swear in the witness.
22            MICHAEL J. LINDELL,
23  duly sworn, was examined and testified as follows:
24            EXAMINATION
25  BY MR. CAIN:

Page 6

1  Q. Tell us your full name, please.
2  A. Michael James Lindell.
3  Q. Well, good morning, Mr. Lindell.  My name is
4  Charlie Cain, we met for the first time --
5  A. Who's paying you?
6  Q. -- about four minutes ago.
7  A. Okay. Go.
8  Q. Is that right?
9  A. What's that?
10  Q. Is that right?
11  A. Is what was the question?
12  Q. We met for the first time --
13  A. Yes, yes.
14  Q. Okay.  Here's what we're going to do, we're
15  going to start slow because the court reporter is trying
16  to take down what you're saying, okay?
17  A. Don't sit and scold me already, Mister.  I'll
18  do, I'll do whatever I have to do.  So you're not,
19  you're just a lawyer, you're an ambulance chasing
20  lawyer, so don't start with me, I got all day, I'll take
21  as much time as you want, so let's go.  You're not my
22  boss, you're just a lawyer, frivolous lawyer.  So go.
23  Don't start scolding me.
24  Q. Well, I'm asking questions, I'm not going to
25  scold you.

Page 7

1  A. Go ahead.
2  Q. All right.  So No. 1, ground rules.  She's
3  trying to take down what you're saying, so it's
4  important that we don't talk over each other.  Do you
5  understand that?
6  A. Yes.
7  Q. Okay.  You understand you're here as a corporate
8  rep for My Pillow?
9  A. Yes.
10  Q. Do you understand that we provided a notice of
11  deposition topics for you to look at in order to prepare
12  to give testimony today?
13  A. Yes.
14  Q. Did you look at them?
15  A. Yes.
16  Q. I'm going to be handing you some exhibits
17  throughout the day.  We've been marking them, so we're
18  already up to Exhibit 60.
19     (Exhibit 60 marked for identification.)
20  Q. Is that a copy of the deposition notice?
21  A. I need my glasses.  Got it.
22  Q. Is that a copy of the notice that you reviewed
23  in order to prepare to give testimony today?
24  A. Yes, it appears to be, yeah.
25  Q. All right.  What, if anything, did you do to

Page 8

1  prepare yourself today?
2  A. I read the case, I read this frivolous case.
3  Q. Okay.  Is that it?
4  A. That's what I did, I read this frivolous case.
5  I answered your question.
6  Q. If there is a question that you don't
7  understand --
8  A. No, I read the, I got it all, I got all these
9  down here, I read this, I read the frivolous case.
10  Q. All right.  If there is a question that you
11  don't understand that I ask you during today.
12  A. Mm-hmm.
13  Q. Will you ask me to clarify that for you?
14  A. Yes.
15  Q. Okay.  Otherwise I'm going to assume that you
16  understand what I'm asking you.
17  A. Right, got it.
18  Q. You're still quick answering on me.
19  A. Mm-hmm.
20  Q. So let me finish my question, okay?
21  A. Yes.
22  Q. I tend to be a slow talker.
23  A. Good for you.
24  Q. I'm from Texas originally.
25  A. Good for you.  I got all day, we'll make a week

Page 9

3 (Pages 6 - 9)

1      VIDEO TECHNICIAN:  We are going on the
2  record at 9:36 a.m. on March 8th, 2023.  This is the
3  video recorded deposition of designated representative
4  of My Pillow, Incorporated, Michael J. Lindell, being
5  taken by counsel for the plaintiff in the matter of Eric
6  Coomer, Ph.D. versus Michael J. Lindell, Frankspeech,
7  LLC, and My Pillow, Incorporated, in the United States
8  District Court for the District of Colorado, Civil
9  Action No:  1:22-cv-01129-WJM.
10      This deposition is being held in Minneapolis,
11  Minnesota.  My name is Adam Wallin from the firm
12  Veritext and I am the videographer.  The court reporter
13  is Kelley Zilles from the firm Veritext.
14      Will counsel please identify themselves for the
15  record.
16      MR. CAIN:  Charlie Cain, Brad Kloewer for
17  the plaintiff.
18      MR. MALONE:  Ryan Malone for My Pillow,
19  Incorporated.
20      VIDEO TECHNICIAN:  Will the court reporter
21  please swear in the witness.
22          MICHAEL J. LINDELL,
23  duly sworn, was examined and testified as follows:
24          EXAMINATION
25  BY MR. CAIN:

Page 6

1  Q. Tell us your full name, please.
2  A. Michael James Lindell.
3  Q. Well, good morning, Mr. Lindell.  My name is
4  Charlie Cain, we met for the first time --
5  A. Who's paying you?
6  Q. -- about four minutes ago.
7  A. Okay. Go.
8  Q. Is that right?
9  A. What's that?
10  Q. Is that right?
11  A. Is what was the question?
12  Q. We met for the first time --
13  A. Yes, yes.
14  Q. Okay.  Here's what we're going to do, we're
15  going to start slow because the court reporter is trying
16  to take down what you're saying, okay?
17  A. Don't sit and scold me already, Mister.  I'll
18  do, I'll do whatever I have to do.  So you're not,
19  you're just a lawyer, you're an ambulance chasing
20  lawyer, so don't start with me, I got all day, I'll take
21  as much time as you want, so let's go.  You're not my
22  boss, you're just a lawyer, frivolous lawyer.  So go.
23  Don't start scolding me.
24  Q. Well, I'm asking questions, I'm not going to
25  scold you.

Page 7

1  A. Go ahead.
2  Q. All right.  So No. 1, ground rules.  She's
3  trying to take down what you're saying, so it's
4  important that we don't talk over each other.  Do you
5  understand that?
6  A. Yes.
7  Q. Okay.  You understand you're here as a corporate
8  rep for My Pillow?
9  A. Yes.
10  Q. Do you understand that we provided a notice of
11  deposition topics for you to look at in order to prepare
12  to give testimony today?
13  A. Yes.
14  Q. Did you look at them?
15  A. Yes.
16  Q. I'm going to be handing you some exhibits
17  throughout the day.  We've been marking them, so we're
18  already up to Exhibit 60.
19      (Exhibit 60 marked for identification.)
20  Q. Is that a copy of the deposition notice?
21  A. I need my glasses.  Got it.
22  Q. Is that a copy of the notice that you reviewed
23  in order to prepare to give testimony today?
24  A. Yes, it appears to be, yeah.
25  Q. All right.  What, if anything, did you do to

Page 8

1  prepare yourself today?
2  A. I read the case, I read this frivolous case.
3  Q. Okay.  Is that it?
4  A. That's what I did, I read this frivolous case.
5  I answered your question.
6  Q. If there is a question that you don't
7  understand --
8  A. No, I read the, I got it all, I got all these
9  down here, I read this, I read the frivolous case.
10  Q. All right.  If there is a question that you
11  don't understand that I ask you during today.
12  A. Mm-hmm.
13  Q. Will you ask me to clarify that for you?
14  A. Yes.
15  Q. Okay.  Otherwise I'm going to assume that you
16  understand what I'm asking you.
17  A. Right, got it.
18  Q. You're still quick answering on me.
19  A. Mm-hmm.
20  Q. So let me finish my question, okay?
21  A. Yes.
22  Q. I tend to be a slow talker.
23  A. Good for you.
24  Q. I'm from Texas originally.
25  A. Good for you.  I got all day, we'll make a week

Page 9

3 (Pages 6 - 9)

**Page 10**

1  of this.  Go ahead.
2  Q.  Probably up to your lawyer, but I'm happy to
3  stay as long as you'd like.
4  A.  Just keep going.
5  Q.  All right.  Why did you call me an ambulance
6  chaser?
7  A.  What?
8  Q.  Why did you call me an ambulance chaser?
9  A.  Because you are.  This is a frivolous case and
10  if you're representing this guy and you've read this
11  case, you are a disgusting lawyer, period.  There's my,
12  that's my, that's my right to say.  You want to sue me
13  too, Mr. Ambulance Chaser.  Are you working on
14  contingency or consignment with the guy, what are you --
15  I can't believe anybody would take this.  This is
16  absolutely disgusting, it's a disgrace to our country,
17  it's a disgrace to you.
18  Q.  Anything else?
19  A.  No, that's it.  You asked me a question, I
20  answered it.
21  Q.  Okay.  Now you, it looks to me based on what you
22  told me off the record before we started that you put
23  some notes on the back of that?
24  A.  Yeah, I put the notes in here.  It says, do you
25  want me to read them?

**Page 11**

1  Q.  Yes, I do, because I looked at them and I
2  couldn't, I couldn't --
3  A.  It says Chris Ruddy emails, it says Eric Coomer
4  emails with Newsmax and Ruddy.  It says, and then it
5  says Coomer, from when I lost business with Eric Coomer
6  I put a note here.  That's the only time I ever, ever
7  said anything before I was filed.  I said one paragraph
8  and that was after Eric Coomer made a deal with Chris
9  Ruddy.  And that's when I lost business.  And then I
10  came out and made the comment that I said.
11      I was just, my notes to tell.  That's the only
12  thing that was ever said.  Everything else that I said
13  came after I was served papers at the capitol in
14  Colorado, it was just my personal notes here.
15      I made one comment in two years and that was
16  after Eric Coomer hurt me by going to Newsmax and
17  whatever he said to them so I couldn't appear on Newsmax
18  anymore and that's it.  And I talked to Ruddy and it was
19  disgusting what he did, Eric Coomer did with Newsmax.
20  So there, that's my, that's what the notes are.
21  Q.  Okay.  Well, let me follow up then.  Who's Chris
22  Ruddy?
23  A.  He's the owner of Newsmax.
24  Q.  And you said a note, email with Chris Ruddy or
25  something to that effect?

**Page 12**

1  A.  No, it was the note to tell my lawyers to get
2  the emails from Chris Ruddy, which we've already
3  subpoenaed you guys but you don't seem to supply
4  anything.  We've already subpoenaed the emails from
5  Ruddy to you, you, Mr. Lawyer, that won't give us those
6  because you don't seem to think you have to give
7  anything because you like your frivolous case.  That's
8  what it is, it's a note for me to tell my lawyer.  But
9  as long as you bring it up, this is when I went out, I
10  didn't even know who Eric Coomer was until he did this
11  dirty deal with Newsmax and Ruddy and hurt my business.
12      MR. CAIN:  Objection, nonresponsive.
13  A.  Huh, say it?
14  Q.  I said, objection, nonresponsive.
15  A.  Well, you don't like that, huh?
16  Q.  Let me explain a few things to you.
17  A.  What?
18  Q.  Let me explain a few more things to you.
19  A.  Mm-hmm.
20  Q.  Have you given a deposition before like this?
21  A.  I've given a ton of depositions.
22  Q.  Okay.  So you, you understand the process
23  somewhat?
24  A.  Mm-hmm, sure do.
25  Q.  Okay.  When I ask you a question, you need to do

**Page 13**

1  your best to respond only to my question.
2  A.  Are you going to arrest me?  I'll say whatever I
3  want and if we have extra, that's too bad.  There's no
4  rule that says I can't give a full answer.  So, you
5  know, I'm telling you the rules.  Have you ever been in
6  a deposition where they can't stand who you are, have
7  you?
8  Q.  A lot more than you, sir.
9  A.  Okay, good.  Keep going.  Don't tell me about my
10  depositions, you're not my boss, you're just some
11  frivolous lawyer in here and you're bringing this
12  frivolous case to me, and especially against a company
13  that had nothing to do with anything.  You're
14  disgusting.  Keep going.
15  Q.  I want you to understand another thing.
16  A.  What's that?
17  Q.  This case is pending in Federal Court.
18  A.  I don't care.  What does that have to do with
19  anything.
20  Q.  Do you understand that?
21  A.  Yes.
22  Q.  All right.  There's a federal judge that's going
23  to likely be reading and watching this deposition.
24  A.  I don't care.
25  Q.  Do you understand that?

4 (Pages 10 - 13)

A. I don't care. She should have dismissed this a long time ago. She hasn't ruled on that, there's a problem, I got a problem with her too.
Q. Okay. The judge has practice standards on how --
A. No, the judge did not dismiss this case. We put in to get it dismissed and she ruled, an unfair ruling saying well, go ahead and do discovery and waste all your time while I'm sitting here not doing nothing. That's what that judge is doing. So don't tell me what the judge is doing. And you just let me worry about the judge reading this, okay.
Q. I just want you to understand.
A. No, you just don't worry about me. You're not out for my benefit, okay, he's out for my benefit, not you. So you can get, don't worry if I say something that offends the judge, okay. You just let me worry about that, you got that.
Q. Yeah, I got it.
A. Okay, good. Keep going.
Q. The reason I bring that up, sir, is if the judge is not pleased with your conduct in this deposition, there may be penalties.
A. Oh, okay, good. You tell, you go ahead. And you think you're worrying about old Mike, you're really,

that's great. You're bringing a frivolous case, you're really up my back. Go ahead, keep going.
That judge, you put this in the record, that judge is a big problem I got. If someone didn't have the money or time to sit through this garbage when I put in to her a summary judgment last summer and she hasn't ruled on it, either say yeah or nay, it's disgusting. It's disgusting to our country that she couldn't make a ruling. But go ahead and do deposition. If there was some guy that didn't have money you would put them under just in this garbage, wasting my day, wasting my time. But think if it was someone on the street, don't you care about people. This is disgusting.
This judge should have ruled a long time ago, either yeah or nay, frivolous or not, but she didn't. She said go ahead and do discovery while I sit and decide what I'm going to do, that's disgusting. I got no problem with you on that, I got a problem with the judge not making a ruling, so there.
Now go ahead. Now that the judge has that on record, now you don't have to worry about what me and the judge think about each other, all right.
MR. CAIN: Objection, nonresponsive.
Q. Here's, here's another thing that I need you to know, Mr. Lindell. If the court determines that you're

not being responsive or acting in good faith today, we may have to come back and do this some more, and I want you to understand that.
A. Oh, I got that.
Q. All right. And if that's the case, I will be asking for attorneys fees and costs.
A. Oh, you will, huh. I'm already asking for them, I might just come after you guys for the most frivolous case ever when this is done. If there is a way to sue you, believe me I'm doing it.
Q. Okay.
A. Okay. Just so you know that, beyond anything you've ever seen, so be prepared.
Q. I'm committed to being polite and professional today.
A. Okay, go ahead. We're getting through that. Now you know where I sit, let's get on with it.
Q. Okay.
A. All right.
Q. Now we talked about the notice, you looked at Exhibit 60.
A. Yep.
Q. You're the only person here on behalf of My Pillow --
A. That's correct.

Q. -- to testify. You need to let me finish my question before you answer, okay?
A. Mm-hmm.
Q. In my estimation you seem agitated this morning. Are you taking any medication or other drugs that would affect your ability to testify?
A. No.
Q. Now I prior to the deposition your counsel Mr. Malone indicated that you'd have an assistant in here today.
A. Mm-hmm.
Q. And that's [redacted]
A. Yes.
MR. CAIN: Hi [redacted]
Q. Her last name is what?
A. [redacted]
Q. Does she work for My Pillow?
A. Yes. No, she doesn't, she works --
THE WITNESS: My Pillow or Lindell Management?
[redacted] Lindell Management.
A. Lindell Management.
Q. Lindell Management.
A. Yeah. She can go in the other room if you want. It was only because if I get an emergency call she has

1 that China was involved because the IP's came from China
2 and this is in the cyber world.
3    Q.  Right.  We're going to get into that topic,
4 those topics.
5    A.  Okay.
6    Q.  Probably a lot more in your individual
7 deposition.  I'm really trying to focus on My Pillow --
8    A.  Okay.
9    Q.  -- here.  But I appreciate that, I'm not
10 quibbling with you, I just --
11    A.  The short answer in January, just so you know,
12 in January nobody talked to me, I didn't talk to the two
13 board members, I found this out way after the fact, you
14 know.  It could have been March when, hey, when I found
15 out did you know back then▮▮▮▮ came back and
16 said it, did you know▮▮▮ probably when we were having
17 our next board meeting we go what do you mean▮▮
18 resigned, this was three months later.
19    Q.  Yeah, that's fine, that's fine.
20    A.  But you're putting it in there like I got warned
21 or something, that did not happen.
22    Q.  No, no, you've clarified it.
23    A.  Okay.
24    Q.  So the subsequent board meetings after your
25 discovery and you went public, all right, in any of the
Page 90

1 subsequent board meetings from then till now has the
2 board ever instructed you to, you got to stop talking
3 about this stuff?
4    A.  No, not that I know of.
5    Q.  It's hurting the company?
6    A.  No.  They said it's hurting the company
7 probably, but I don't know we said it in the board
8 minutes.
9    Q.  Does the board have the authority to fire you?
10    A.  No.
11    Q.  Now you own the company, at least the majority
12 of the shares, right?
13    A.  The majority, right.  They do not have the
14 authority to fire me.
15    Q.  So as far as you know, your understanding of the
16 bylaws of the company, any shareholder agreements that
17 may be there, no one within that company has the
18 authority to fire you?
19    A.  That's correct.  And I'm sure, whatever they
20 said or didn't say, which more things they didn't say,
21 they probably kept it to themselves.
22    Q.  Right.
23    A.  Because they know.  When I got back we probably
24 didn't have a board meeting for five months, I would say
25 maybe even longer because I was, I had to stay out of
Page 91

1 Minnesota.  I had physical threats.  By physical I mean
2 threats, I was the No. 1 threat, here's the evidence and
3 they, they the bad guys, whatever, it was pretty bad
4 then, you know.
5    Q.  But not to get too legalistic, to the extent
6 that you had the authority as the CEO of the company to
7 make statements publicly on behalf of My Pillow, it was
8 you and you alone?
9    A.  I didn't make any statements --
10    Q.  No, no, no, let me finish.
11    A.  -- on behalf of My Pillow.
12    Q.  Let me finish my question.  To the extent that
13 you made statements.
14    A.  Mm-hmm.
15    Q.  On behalf of My Pillow publicly.
16    A.  Mm-hmm.
17    Q.  It was you and you alone that had the authority
18 to do so, right?
19       MR. MALONE:  Object to the form.
20    Q.  In other words, no one in the company could say,
21 you know what, Mr. Lindell, you can't say that, you
22 don't have the authority to say that --
23    A.  Well, they could say it but, they could say
24 anything they wanted.
25    Q.  But it wouldn't matter, it wouldn't matter,
Page 92

1 right?
2    A.  They can't fire me, no.  They could, I could,
3 the whole company could be going down and there is
4 nothing they could do if I'm still out as my own
5 individual capacity, that's correct.
6    Q.  And you had the discretion to do whatever you
7 wanted to in terms of exercising your authority as CEO?
8    A.  Correct.
9    Q.  Yes?
10    A.  Yeah.
11    Q.  Okay.  In other words, if Joe VP box guy says,
12 you know what, Mr. Lindell, you shouldn't be out there
13 talking about this and also selling this product at the
14 same time, maybe people could get confused.
15    A.  What do you mean selling this product at the
16 same time?  I object to that dumb answer.  What are you
17 talking about.  I didn't go out there, melt down our
18 machines and buy a pillow, I mean, what is wrong with
19 you.
20    Q.  So it was a question --
21    A.  Nothing changed with My Pillow other than we
22 were destroyed taking pieces off, that stayed the same.
23 The different variables, I'm out here in my own
24 capacity, which trying to get people to see this
25 evidence and sounding the alarm and getting the
Page 93

24 (Pages 90 - 93)

1   A.  It's the same business model.
2   Q.  I don't really, you probably gathered this, I
3  don't watch much TV, I don't watch --
4   A.  I'm everywhere, I'm on CNN, MSNBC, Fox News,
5  Newsmax.
6   Q.  What, what do you call publicly?
7   A.  Huh?
8   Q.  What, what do you call --
9   A.  Here is what I can't, here's what I can't do
10  now, let me tell you this.
11   Q.  I didn't ask you what you can't.
12   A.  Okay.
13   Q.  I'm asking you what are you, how are you
14  referred to publicly, the My Pillow guy?
15   A.  Yeah.
16   Q.  Right?
17   A.  That, people say that, yeah.
18   Q.  Okay.
19   A.  Now, now when I'm out there now, people are out
20  there, they're going, you know, it's almost probably
21  more so over here to help fix our country, help save our
22  election.  I don't know how people know me.
23   Q.  Do you understand how the public might be
24  confused about you talking about election fraud --
25   A.  Let me tell you something --

Page 98

1   Q.  Hold on, let me --
2   A.  No, let me tell you something.  This is an
3  anomaly in history.  I was on TV 3 million times --
4   Q.  I didn't ask you that.
5   A.  I'm going to explain your question.  I was on TV
6  3 million times up to 2016, so anything I do out there,
7  they're going to associate me with My Pillow.
8   Q.  Of course.
9   A.  Anything I do, that's the way because I'm so
10  branded.  It's like you're branded as a frivolous
11  lawyer, anything you do, well, you'll be branded as that
12  because that's all I know about you right now.  So go.
13  I mean, you know, I don't know what you're saying.
14  You're trying to associate that anything I say becomes
15  part of My Pillow, that's not true.
16   Q.  Well, that's, but you know that's the perception
17  publicly, don't you?
18   A.  No, I don't know that's the perception publicly.
19   Q.  Of course.  If you're talking about election
20  fraud issues and you're the My Pillow guy, you're saying
21  that the public can separate those two out?
22   A.  I would hope they could, why wouldn't they.
23   Q.  Have you ever, have you ever issued a press
24  release or a statement to the public that says any, any
25  discussions that I have publicly about election fraud or

Page 99

1  Dominion or Eric Coomer or any of these things --
2   A.  I've never, I've never --
3   Q.  Let me finish my question.
4   A.  Yeah.
5   Q.  Are not the positions of My Pillow and that they
6  are not --
7   A.  100 percent I've said that.
8   Q.  Okay.  Where?
9   A.  100 percent.  All the time.  I say, you know
10  what, this has nothing to do with My Pillow.  I have
11  said that so many times you can't believe it.  The
12  difference is now I can't go on stations and talk about
13  My Pillow because of people like Coomer that did this to
14  me, it's the other way.
15     Because people associate me over here with the
16  election, fixing our election, now I can't go and be the
17  My Pillow guy.  You're right, I am suppressed from doing
18  that.  It's the opposite of what you think.  Because of
19  over here they recognize me as trying to fix our
20  election, I can no longer on go on all these, it's cost
21  me millions, I can't go on Salem Media, and that was our
22  No. 1 outlet, Fox News, Newsmax, none of them, no media.
23  I can't go on any station at all and talk about My
24  Pillow anymore.  That's why it's cost us so much.
25     I could go on like back in the day go on Imus,

Page 100

1  go on these stations and talk and say, hey, what are we
2  doing with My Pillow, like our new My Pillow 2.0.  I
3  can't do that now.  When I did that we would let people
4  who know about our company.  Now because of this
5  election, trying to save our country, it's crap like
6  this, now I can't go on there and do it because of
7  people like Eric Coomer, that's a fact, that's a fact.
8     All I was trying to do was bring to light that
9  these machine companies and that China intruded in our
10  election, that's reality.  So you are exactly right.
11  They don't know me as the My Pillow guy over there,
12  these stations, they know me as trying to fix our
13  election so I can't even go on and advertise My Pillow.
14  That's why we've been hurt, that's why last year we lost
15  $6 million that we had to go borrow money for my
16  employees so I can keep them all employed.  They have
17  families and stuff.
18     So don't try and flip it the other way because
19  it's only one way.  We keep losing, losing, losing
20  because now I'm branded over here trying to fix our
21  election because media attacks me every day and people
22  like this guy, Eric Coomer, that cost me almost
23  everything when he went and made a deal with Chris Ruddy
24  behind my back and said don't ever have Mike Lindell
25  come on anymore.

Page 101

26 (Pages 98 - 101)

| | |
|---|---|
| 1    I made one comment, there it is circled, that's | 1  one struck a chord. |
| 2  the only one I ever made about Eric Coomer, the only | 2    Q.  No, I just want answers to my questions. |
| 3  thing I ever said, until after he sued me, then there's | 3    A.  Okay, what is it? |
| 4  plenty in here.  That's the only statement right there | 4    Q.  So let's just talk about press releases. |
| 5  that I ever said about this guy I didn't even know, | 5    A.  About what? |
| 6  period. | 6    Q.  Press releases, public statements by My Pillow. |
| 7    Q.  What page are you looking at? | 7    A.  Okay. |
| 8    A.  36.  I looked at this last night, it's | 8    Q.  Okay.  Here's the question, has My Pillow issued |
| 9  disgusting.  That's the only thing I ever said and that | 9  any press releases or public statements in writing |
| 10  was the day after he made the dirty deal with Chris | 10  saying that you do not speak on behalf of the company as |
| 11  Ruddy.  And I called Chris Ruddy up, I go, what are you | 11  it relates to election fraud issues? |
| 12  doing.  I go, what do you mean I can't come on and talk | 12    A.  I believe so, but I'd have to go back because we |
| 13  about My Pillow anymore.  Well, he's done it with this | 13  may have a PR person back then maybe.  I think she did, |
| 14  Eric Coomer.  That's when I made that statement.  I | 14  but I'd have to check on that.  I believe so. |
| 15  never had made one statement, didn't even know who he | 15    Q.  Okay.  So you think as you sit here, I don't |
| 16  was before that. | 16  want you to guess. |
| 17    All that, all this crap about Joe Oltmann who I | 17    A.  I don't know, I don't know, but I would really, |
| 18  didn't even know then and all this stuff about, | 18  because I had a, I think we had a PR person back then, |
| 19  everything after that from this on is after he sued me | 19  this is two years ago now or three years ago. |
| 20  in Colorado, every statement I made.  And I'll continue | 20    Q.  Who, who is that person, are you not going to |
| 21  to make statements about both you and him.  This is why | 21  tell me? |
| 22  this judge should have ruled this as frivolous instead | 22    A.  I don't know, and I'm not giving you her name so |
| 23  of last summer sitting on it for nine months and making | 23  you can attack her. |
| 24  me sit here and waste two days of my life because I | 24    Q.  Do you have any evidence that I've attacked |
| 25  could be helping my employees, trying to keep them | 25  anybody within your company?  Don't show me, don't |
| Page 102 | Page 104 |

| | |
|---|---|
| 1  employed while you people attack.  There's my statement. | 1  show me what you're going to show me. |
| 2    THE WITNESS:  Did you get all that? | 2    A.  Right there, Page 36, Page 36, where you, where |
| 3    MR. CAIN:  Objection, nonresponsive. | 3  I called you lawyers just as bad as him, I called you |
| 4    A.  No, but it's disgusting when you sit here -- | 4  guys criminals. |
| 5    MR. MALONE:  Slow down. | 5    Q.  You did. |
| 6    A.  I'm branded as now election, not My Pillow guy, | 6    A.  Because what you did to my company back then, |
| 7  it's the opposite. | 7  that's when I brought up Eric Coomer.  I had never, I |
| 8    MR. MALONE:  You just got to slow it down. | 8  had never said his name ever in history until he drew |
| 9    THE WITNESS:  I know, but it just pisses me | 9  first.  He went to, he went to Chris Ruddy and made a |
| 10  off. | 10  dirty deal behind my back and then Chris told me I could |
| 11    MR. MALONE:  I understand, they understand. | 11  never come on Newsmax again and talk about My Pillow. |
| 12    THE WITNESS:  So disgusting. | 12    Q.  Did Mr. Ruddy, since you've raised it now maybe |
| 13  BY MR. CAIN: | 13  half a dozen times, did Mr. Ruddy tell you the terms of |
| 14    Q.  You don't remember my question, do you? | 14  the settlement between Dr. Coomer and Newsmax? |
| 15    A.  Yeah, the question is do people know you as the | 15    MR. MALONE:  Object to form. |
| 16  My Pillow guy, blah, blah, blah.  I just gave my answer. | 16    A.  No.  What he said, he said I couldn't come on |
| 17  No, they know me over here as this guy that's trying to | 17  Newsmax anymore even if it was to talk about My Pillow. |
| 18  save our country.  But because of Lawfare and start | 18    Q.  And he, did he say -- |
| 19  dirty things that Eric Coomer did on that one day, which | 19    A.  This was public, it went out publicly, I seen it |
| 20  that's when I called him out, I can't go on my stand, I | 20  publicly. |
| 21  can't, my company has been hurt so bad because of people | 21    Q.  No, no, no. |
| 22  like this Eric Coomer, so bad, tens of millions of | 22    A.  No, this is what I'm telling you, let me tell |
| 23  dollars, hundreds of millions of dollars. | 23  you the answer.  I seen it publicly out there in the |
| 24    Q.  You don't remember my question, do you? | 24  public, this guy named Eric Coomer.  I go who the heck |
| 25    A.  What's your question, give me a new one.  That | 25  is that, then I see he's with Dominion and he made a |
| Page 103 | Page 105 |

Veritext Legal Solutions
800-336-4000

1  evidence and every day I'm losing a box store, every
2  single day.
3     Q.  Right, no, no, no.  I'm actually focused more on
4  the late summer --
5     A.  There were other, there were other stations that
6  threatened to cancel me if I didn't stop talking, there
7  were 12 little stations.  And I told them go ahead and
8  cancel me, if you do you're not coming back, I'm not
9  getting cancelled.  I have to, we have to get this
10  evidence out there.
11        So yes, I did make those statements to them.
12  They decided to stay on with us, it was 12 of them.  And
13  they, I got called by our media buyer and she said we
14  have 12 TV stations I think are going to cancel.  I said
15  tell them if they do they're never coming back because
16  I'm not going to, they're not going to bully me into
17  changing my mind and not showing this evidence to the
18  world.
19     Q.  You mentioned Chris Ruddy earlier and Newsmax.
20  Were there, sort of the opposite of what we were talking
21  about with Fox, were there certain media outlets that
22  were actually helping you promote the Cyber Symposium?
23     A.  No, no.  They all, all of them were just the
24  generic ads.
25     Q.  Okay.

                                            Page 178

1     A.  And, and incidentally now that you ask that,
2  everyone was the same, whether it was ABC, Newsmax or
3  whatever.  But on the first day of the Cyber Symposium
4  Dominion decided to sue OAN and Newsmax, not the rest of
5  ABC, NBC, CBS, NBC.  You wonder why I don't like the
6  name Dominion.  They hurt us there too.  They attacked
7  those two and then OAN, what ends up manifesting from
8  that, they take, AT&T takes them off the news, or Direct
9  TV, we lost that for advertising too because their
10  audience went down to nothing.  So I got Eric Coomer
11  destroying Newsmax for me and Dominion and AT&T and them
12  guys destroying OAN.
13     Q.  I noticed, by the way, there was a Dominion
14  promo code.  Why do you have a Dominion promo code?
15     A.  Because I, you know why, because when I went on
16  TV and they're going, oh, Mike, Dominion sued you, which
17  I asked them to sue me because I wanted the discovery,
18  that's how it was.  I asked them to sue me, did you know
19  that, are you familiar with that.
20        I called up, I called up the Daily Beast and I
21  said why would you tell Dominion to sue me, I got the
22  evidence.  And so he walks over and he tells them that,
23  his name is Asawin.  And he goes yep, they're going to
24  sue you.  And I said, okay, do an article about it, he
25  did.  They didn't sue me for three days.  I had to call

                                            Page 179

1  him up and go Asawin, the Daily Beast is very left, I go
2  you better get back over there and tell Dominion chop,
3  chop or you're going to be known as fake news, that was
4  it.
5        So when they first sued me finally, they sued me
6  and it said, and they sued My Pillow, it said something
7  about promo codes.  So I went on Steve Bannon, the first
8  time I had ever met him in my life.  And I go on there
9  and he goes, Mike, Dominion sued My Pillow and not just
10  you.  And I said yeah, they're disgusting.  And I said,
11  he goes, well, you said they're using promo codes, and I
12  said, yeah, use promo code Dominion to save up to
13  66 percent.  And then he dropped his microphone, it was
14  disgusting.  That's where it came from.
15     Q.  Who dropped his microphone?
16     A.  Steve, he just, he couldn't believe I said that.
17  I said use promo code Dominion.  Just like when the FBI
18  took my phone, I said use promo code FBI.
19     Q.  I thought it was Hardee's.
20     A.  No.  Well, Hardee's was one too, they put their
21  thing out there, you know.
22     Q.  All right.  Let's, let's focus back --
23     A.  In other words, you know, take your lawsuit of
24  promo codes and shove it, that was my, that was my
25  statement to them.

                                            Page 180

1     Q.  Yeah, using the company My Pillow to, to make
2  that statement, right?
3     A.  After the lawsuit, Mr. Twister, after I was
4  sued.  Everything in here in your little lawsuit, other
5  than that one little paragraph, everything I said --
6     Q.  We don't, we don't --
7     A.  -- after he sued me.
8     Q.  We don't need --
9     A.  After Coomer served his papers.
10     Q.  We don't need to replow that, okay, I've heard
11  you say that.
12     A.  Well, then I'm just telling you.  So that's what
13  he, you know, using My Pillow, after.
14     Q.  Let's --
15     A.  And it's a, and it's a joke, you know, shoving
16  it back in you guys' face.  Oh, you think My Pillow
17  benefitted from this, give me a break.  Talk to them
18  employees who are trying to support their families.  You
19  guys are disgusting.  What else you got.
20        It's kind of a sad day for you, isn't it, to see
21  how bad My Pillow is sitting and you're trying to make
22  it look like this was some grand thing to make money.
23  It's just sad, it really is, it's sad.  This is probably
24  the most frivolous lawsuit in the history of the United
25  States, and I mean that.  It's shameful that judge did

                                            Page 181

                                    46 (Pages 178 - 181)

1  to me I consider it criminal.  I don't care what he's
2  done in his past nor do I know what he's done in his
3  past.  Do you get that?
4     Q.  I do.
5     A.  Well, then don't sit here and tell me.  He did
6  this directly to me.
7     Q.  Right.
8     A.  And it's criminal what he's done to me.
9     Q.  And, and --
10    A.  He's a criminal, that's what he is, and that's
11  my opinion.  He did this to me.  I don't care if he,
12  what he's done in his past, I could care less.  I heard
13  once he, that he's got some DWI's, I don't even know, I
14  don't know, I don't know, I don't know his past, I don't
15  know what he's done, I don't know anything about the
16  guy.  But I do know what he did to me.  That's why we're
17  here, what he did to me.  And I will, just like these
18  other people that you hear me bad-mouth, I don't
19  bad-mouth anybody directly unless they, I have the
20  evidence of what they did to me or what, or that, that
21  I've done my due diligence.
22       Eric Coomer did this directly to me.  And I made
23  one statement about him.  Didn't say nothing for a whole
24  year, and then you guys come up and serve me papers in
25  Colorado.  I'll bet there was statements after that,

Page 186

1     A.  She had, I have many, many people, their past,
2  but if they've changed, if they've changed or gotten
3  help, absolutely I hire him.  This is current, this is
4  real.
5     Q.  You struggled with addiction?
6     A.  Oh, yeah, I was a crack addict, yeah.
7     Q.  And Eric Coomer struggled with addiction.
8     A.  I don't know, I don't know.  I feel bad for him,
9  but I hope he got changed, hopefully he found the Lord
10  Jesus Christ, you know, so I can pray for him.  I have
11  prayed for him, believe it or not, I have prayed for
12  him, you know.  I prayed for him, I go why did this
13  person do this to somebody and I prayed for his
14  salvation, for his soul, and for him to get help, you
15  know, as I have lawyers that even back up frivolous
16  cases like this.  And I got to meet the lawyer behind
17  the curtain.  Go ahead.
18    Q.  I'll take whatever I can get.  Okay.  Let's,
19  let's de-escalate and just talk about some numbers,
20  that's a little easier I think in a sense.  Go back to
21  this exhibit, if you would, please, 62.  You've already
22  been quite clear at least in your mind that your
23  activities relating to the election, 2020 election have
24  hurt My Pillow's business?
25    A.  Absolutely.

Page 188

1  wasn't there.  Then everybody knew that what he did to
2  My Pillow and Mike Lindell.  How dare he come and sue My
3  Pillow, he's a scumbag for doing that.
4       THE WITNESS:  Put that in there, scumbag,
5  S-C-U-M, bag.
6     A.  That's what he is for what he did to me.
7     Q.  Okay.  That's not my question.  There were
8  questions to him about his past.
9     A.  Not from me.
10    Q.  And what I'm hearing you say --
11    A.  Not from me.
12    Q.  From your lawyer.
13    A.  Well, I don't know what my lawyer did, that's
14  between my lawyer and him.  You guys, all lawyers do the
15  same stuff, lawyer stuff.
16       MR. MALONE:  Just let him ask the question,
17  see what he has to say.
18    Q.  Okay.  From your perspective as CEO of My
19  Pillow, Eric Coomer's past, whether he had run-ins with
20  the law or, or criminal issues, is of no moment and is
21  irrelevant?
22    A.  Is irrelevant, 100 percent irrelevant, as far as
23  I'm concerned, that's his business.
24    Q.  Because you believe, you said, you know, ████
25  has --

Page 187

1     Q.  In a, in a sort of a shorter area or window, did
2  My Pillow at least around the Cyber Symposium experience
3  an uptick in sales?
4     A.  Huh-un, no.
5     Q.  Okay.
6     A.  And it's hard to tell because, because of drop
7  in the Fox ads, so it's very hard.  But we lost, it's a
8  net net definitely loss.
9     Q.  Well, if you take Fox out of the scenario,
10  because you made the decision to, to cut Fox out, all
11  right.  So put Fox --
12    A.  It's all one thing.
13    Q.  Hold on, hold on.  Put Fox in a box on the side.
14    A.  Okay.
15    Q.  And just, just talking about the other revenue
16  streams.  During the symposium, isn't it true that you
17  had an uptick in revenue from the other sources
18  outside --
19    A.  I, I don't know, I would have to, I have no
20  idea.
21    Q.  Is there something like, I've looked at, there's
22  week -- here's the question, and correct me if I'm
23  wrong.  You both do day, daily reporting where you look
24  at --
25    A.  And weekly reporting, yeah.

Page 189

1 here like your Diamond & Silk, War Room, Alex Jones,
2 Bartz, it's everybody.  This is not My Pillow, they
3 don't get those sales.  Anything that came close to
4 Frankspeech, My Pillow doesn't get them.  Do you get
5 that?
6     Q.  No, I guess I don't.
7     A.  Talk to my employees.  They wouldn't get, they
8 don't get that money.  It's another platform like, like
9 War Room, like Fox News.  They have to pay.  What
10 Frankspeech ends up with with that, My Pillow will get a
11 portion of that for their sales.
12     Q.  Wait, wait, wait.  My Pillow --
13     A.  They don't get anything from Frankspeech.
14 Frankspeech, that's their sales.  Do you get that.  This
15 wasn't a My Pillow, it had nothing to do with My Pillow.
16     Q.  It's the product that was being sold.
17     A.  Right, by using a promo code, right.
18     Q.  Right.  When a pillow is sold, My Pillow gets a
19 portion of the sale?
20     A.  From everywhere I have ads in the world.  What
21 I'm saying is when I do an email blast --
22     Q.  Wait.  You said ten times that My Pillow doesn't
23 get the money.
24     A.  No, you need to understand, that's sold on the
25 Frankspeech platform.

Page 206

1     Q.  I don't care what the platform is, the money is
2 going in part to the platform --
3     A.  That's right.
4     Q.  -- and in part to My Pillow?
5     A.  Just like any other, that's correct.
6     Q.  You're in the pillow business to sell pillows,
7 right?
8     A.  Mm-hmm.
9     Q.  Yes?
10     A.  Sure.
11     Q.  And that's what we're looking at, the
12 ████████████
13     A.  But that was sold on the Frankspeech platform.
14     Q.  I don't care if it was sold on the moon.  The
15 money is going to My Pillow in part?
16     A.  Not all of it, but some of it, yes.
17     Q.  Okay.  And it's going to whomever --
18     A.  Mm-hmm.
19     Q.  -- is advertising that product?
20     A.  Mm-hmm.
21     Q.  Through the promo code, right?
22     A.  Okay.
23     Q.  Are you trying to tell the jury that you're not
24 making money --
25     A.  What jury, what jury are you talking about, why

Page 207

1 are you --
2     Q.  The ones that are looking at this on the video.
3     A.  I'm trying to tell you that you're trying to say
4 we made money there.  We lost $4 million.  And that, I
5 don't know when the promo code audit was set up.  That's
6 a Frankspeech is a platform just like the man on the
7 moon, Fox News, everyone I've been doing for 15 years.
8         Now did they buy more for promo code audit by me
9 saying that, yeah, I said it as a thing, yeah, they did.
10 It looks like they bought more than the day before.  Is
11 that what you want me to say.  Yes, by me saying that on
12 that stage, I'm telling you I didn't do any ads, it was
13 not to run ads at all, and I ran ad free.  Did I say
14 that because of proving a point, you proved my point.
15         Rotten horrible lawyers like you and the media
16 saying, oh, Mike Lindell is trying to save this country
17 just to make money.  I have lost everything I've had so
18 far, you got it.  So don't sit here and take your,
19 because I'm not going to take this garbage you're
20 spewing out.  This is horrific what you're doing, I've
21 said it from the start of this thing, it's disgusting,
22 I've lost millions of dollars.
23         You'd like to be in my shoes, you just can't put
24 it through your head.  Why would anybody hold to his
25 moral compass and say here, I have evidence to save our

Page 208

1 country so you have a job.  And I'm willing to sacrifice
2 every single thing I have, including other people's
3 jobs.  If it takes that, I can't help it, I'll try and
4 do everything I can to help save them.  But you know
5 what, if it comes to that, I will lose everything I have
6 because that's how important it is to fix our elections.
7 That's it.
8         So you can go ahead and say that to the jury and
9 make it look like I was trying to make money.  They
10 heard that statement.  I made a joke about it.  I can't
11 help that that many people bought, but I still lost
12 $4 million that weekend.  That's the bottom line.  So
13 you can sit there and go, look at him.  If there was an
14 ad coming up every two minutes, you could maybe make
15 that argument, but it didn't.  There wasn't even
16 anything on the strips, nothing.  So it's disgusting
17 that you're even insinuating that.  That's all I'm
18 saying.  Go ahead.
19     Q.  You can't bang on the table because you're --
20     A.  That's what I did, I'm sorry, I apologize.  Did
21 it break anything?  I'm just getting, it's disgusting.
22 I can't believe that you're a lawyer, that you would do
23 something like that.  Don't you have a moral compass.  I
24 mean, this is bizarre, this whole thing is bizarre.
25 That I did it to make money with promo codes, really.

Page 209

53 (Pages 206 - 209)

Page 230

1   mind, sarcastic. I'm tired of people thinking that I
2   did this to make money, you know, that was the whole
3   thing.
4     Q. I didn't ask you about money. You know, we got
5   to be on point here.
6     A. Well, then, well, you're asking me. I just told
7   you, it says right here, audit 50 towels, audit 33
8   sheets.
9     Q. All right. You answered part of my question.
10   There is audit --
11     A. It says right there, I'm reading it.
12     Q. Let me finish, please. There's audit 67, audit
13   68, audit 89, audit 98. Which, which vendors were using
14   those audit codes?
15     A. I'll have to check on that, I'll have to check
16   on that. But here it says towels and sheets. I don't
17   know which vendor. So probably, here's my guess, when I
18   said that at the symposium, other vendors out there
19   probably went, hey, can I have an audit code. I don't
20   know, I'd have to check on that, you know, that could
21   be. Or it could be we had to divide them up with the
22   audit code because it was already established. And
23   that's probably it, so people are using an audit code.
24   I had to divide it up to towels and sheets, you know
25   what I mean. We had to put numbers behind it. That's

Page 231

1   probably, that would make more sense. We couldn't use
2   just one code audit or you're not tracking your media.
3     Q. No, you've already talked about --
4     A. Well, that's what it is, that's exactly what it
5   is. It meant nothing as far as auditing somewhere. You
6   had to divide it up between sheets and stuff because I
7   said it at the symposium, so now you have all this,
8   everyone is using promo code audit, I couldn't track a
9   sheet commercial from a towel commercial. Do you follow
10   me?
11     Q. I do follow you.
12     A. That's what we did. So we probably shut off the
13   promo code audit is what, that's my guess. It's like,
14   I'll give you an example. Back when we did originally,
15   what they did way back in the beginning we used promo
16   code My Pillow on all the media in 2012, all, it was
17   just a promo code, My Pillow. And then what happened
18   was we couldn't track it all because it was all going to
19   the same code. So then we had My Pillow 22, My Pillow
20   23, very similar.
21     So when I said that at the symposium, what
22   people had stuck in their head, so when they're seeing
23   commercials on, on Frankspeech, this is probably from
24   Frankspeech, we had to divide them out into numbers,
25   that's all.

Page 232

1     Q. Is there a --
2     A. To get them to quit, to get them to quit using
3   that generic code.
4     Q. Is there a mechanism if let's say ████s in
5   this room with us and I want to know, ████ how much in
6   revenue was done associated with all of the audit codes,
7   is there, is there a way internally to produce that kind
8   of financial reporting?
9     A. From back then, maybe, I would say yes.
10     Q. Okay.
11     A. But then you asked me why, why the number is
12   behind it.
13     Q. You answered my question.
14     A. It's very simple. If people kept using that
15   code audit. It's kind of like Dominion when I threw
16   that out there.
17     Q. Right.
18     A. I had to, I had to actually, first I just
19   disconnect it because people used it and I couldn't
20   track my media.
21     Q. No, I know the tracking part.
22     A. Well, that's the biggest part of it, you have to
23   be able to track your media.
24     Q. We may be asking these, or talking about this
25   for different reasons, so.

Page 233

1     A. Mm-hmm, right.
2     Q. So if, if, for example, Frank33, if I wanted to
3   know how many sales --
4     A. What?
5     Q. Frank33.
6     A. Frank33, right.
7     Q. If I want to know how many sales are associated
8   with that promo code, can you go back or someone --
9     A. Well, I would assume, I don't think we changed
10   our, I don't think we changed our platform.
11     Q. All right. Have you ever asked someone like
12   ████or your controller to give you a report like that
13   that just says, hey, I want to see War Room, I want to
14   see everything --
15     A. Of course I have.
16     Q. Okay.
17     A. Or I can do it myself, you know, I can do it
18   myself.
19     Q. Okay.
20     A. I showed you on my phone. What's wrong with
21   you. I just showed you all the promo codes.
22     Q. Let's, let's not get combative about it.
23     A. Well, no, I'm just telling you. You're asking
24   me something, I just showed you how I can do it.
25     Q. No, you, you didn't produce a report. Oh, you

59 (Pages 230 - 233)

| | |
|---|---|
| 1      MR. KLOEWER:  I'm looking them up right | 1  Montgomery, or did I know those guys, no.  I had been on |
| 2  now. | 2  Brannon Howse's show one time three months prior or |
| 3      THE WITNESS:  ████████ nice | 3  something. |
| 4  guys. | 4     Q.  Did you pay Mr. Howse for access to the -- |
| 5  BY MR. CAIN: | 5     A.  No, 100 percent, no.  I never paid him a dime. |
| 6     Q.  All right. | 6     Q.  You have not paid any amount of money or My |
| 7     A.  Charge ████ hour.  Do you guys make that | 7  Pillow has not paid any amount of money for this data -- |
| 8  much an hour? | 8     A.  No. |
| 9     Q.  No comment. | 9     Q.  -- that you say is under gag order? |
| 10     A.  Or are you making it on this, on frivolous | 10     A.  No, absolutely not, 100 percent no. |
| 11  cases, consignment things? | 11     Q.  Has Mary Fanning ever worked for My Pillow? |
| 12      MR. MALONE:  They won't answer the | 12     A.  No. |
| 13  questions, Mike. | 13     Q.  Have you ever met her? |
| 14      THE WITNESS:  Well, he's asking me stuff | 14     A.  No. |
| 15  that has been completely irrelevant.  I could ask him | 15     Q.  Do you know if she's a real person? |
| 16  some questions, that's crazy. | 16     A.  Yeah, I've talked to her.  She, she helped, she |
| 17      MR. MALONE:  We'll do that later. | 17  helped in two movies, she's definitely a voice. |
| 18     A.  Who owns your airplane, who owns it, you know, | 18     Q.  She's definitely a voice. |
| 19  what does Lindell, what does it have to do with anything | 19     A.  Yeah. |
| 20  you're talking about.  Josh Merritt, I gave a ride to | 20     Q.  But you've never met her in person? |
| 21  the guy on my plane, the guy, I didn't know he was a bad | 21     A.  I've never met her in person.  I've never met a |
| 22  guy, but he's there, I don't know where he came from, I | 22  lot of these people you're talking about in person.  I |
| 23  didn't hire the guy.  He sits up on the thing and says | 23  met, I think I've probably met Joe Oltmann like four |
| 24  this evidence is all good, and then two days later he | 24  times. |
| 25  tries sabotaging the symposium.  And then, and then he | 25     Q.  Dennis Montgomery, does he -- |
| Page 262 | Page 264 |
| 1  about two days or four days after the symposium we get a | 1     A.  I met Dennis many times now because now he does |
| 2  tape that was taped two days before the symposium how | 2  work for me. |
| 3  he's going to take, win the $5 million and sabotage the | 3     Q.  Okay. |
| 4  thing.  Just a disgusting person. | 4     A.  Mike Lindell. |
| 5     Q.  This data we've been talking about, is it the | 5     Q.  He does not work for My Pillow? |
| 6  same data that, that you procured from Patrick Byrne? | 6     A.  No, absolutely not, he does not work for My |
| 7     A.  I didn't purchase anything from Patrick Byrne, I | 7  Pillow, never has. |
| 8  never dealt with Patrick Byrne on anything, purchasing | 8     Q.  Just you personally? |
| 9  any data.  What are you talking about and where did this | 9     A.  Mm-hmm. |
| 10  come from.  Now you're starting to be stupid, now you're | 10     Q.  Is that a yes? |
| 11  really asking some questions.  Where did you even get | 11     A.  Yes. |
| 12  that I purchased any data from Patrick Byrne.  This | 12     Q.  It's just ambiguous if you say mm-hmm. |
| 13  is the most out left field thing I've ever heard.  What | 13     A.  Yes, yes, yes. |
| 14  do you want me to say, oh, no, I didn't purchase it.  I | 14     Q.  It's not clear what that means.  Where is, if I |
| 15  never purchased anything or got anything from Patrick | 15  needed to locate Mr. Montgomery, where would, where |
| 16  Byrne ever. | 16  would I find him, if you know? |
| 17     Q.  Thank you. | 17     A.  I think that's his -- once again, I don't want |
| 18     A.  My evidence came from Brannon Howse on | 18  you attacking him. |
| 19  January 9th, you got that. | 19     Q.  Do you know where he lives? |
| 20     Q.  Who did he get it from? | 20     A.  Yes, I do. |
| 21     A.  I don't know.  Mary Fanning I believe, and then | 21     Q.  Do you have his contact information? |
| 22  they got it from Dennis Montgomery, that's, that's what | 22     A.  Yes, I do. |
| 23  I've heard. | 23     Q.  Do you have his phone number? |
| 24     Q.  Okay. | 24     A.  Yes, I do. |
| 25     A.  And did I know Brannon Howse and Dennis | 25     Q.  Will you provide that information to us? |
| Page 263 | Page 265 |

67 (Pages 262 - 265)

1       Now I'm going to explain this, now I remember.
2 So I had an assistant back then, not ▮▮▮▮ another
3 assistant where we made up cards, Lindell Management
4 cards, okay, so that I wouldn't, you know, and on that
5 card had an email.  People would ask me all the time for
6 a card and I didn't want to use My Pillow, I wanted to
7 use Lindell Management.  So I used that email on that
8 card.  So obviously this guy got one of them cards.  I
9 don't ever converse on the Lindell Management, I bet you
10 I didn't even respond to this, you know.
11     Q.  Okay.
12     A.  This is, other than incoming, give out business
13 cards that, you know, here, I want a business card,
14 well, here, use this.  And once again, I think the
15 assistant then could pull them up and segregate them,
16 like people who wanted my picture and wanted my card.
17 And obviously Shiva got one.  What's the date on this?
18     Q.  February 18, 2021.
19     A.  Yeah.  So that would have been the only thing.
20 He probably got a, he probably got a business card with
21 that on that.  I don't even remember how he ever got
22 ahold of me.
23     Q.  Did Dr. Shiva perform any work or My Pillow?
24     A.  No, no.
25     Q.  As a consultant?

Page 274

1 people call my call center, and these are upset people
2 or anybody, and they bug them enough, because they're on
3 the phone, they have to, at a certain point I said if
4 you can't handle the customer and if they're adamant, I
5 gave them this ▮▮▮ email to use.  It goes into a generic
6 box to a team that just covers like customers that are
7 upset.  Deviations, you know, deviations.  Like this
8 guy, he says, so he was probably very upset, you are
9 very difficult to make contact, I called and waited 20
10 minutes, I'm not, so he was very upset.  Anybody that's
11 so upset about anything, they give them that ▮▮▮ mail.
12     Q.  Gotcha.  So this particular email relates to, if
13 you look in the middle, it actually relates to Dr.
14 Coomer, do you see that?
15     A.  Yep.
16     Q.  Do you remember receiving this?
17     A.  No, I never read this email.  I don't read the
18 ▮▮▮
19     Q.  Okay.  At all?
20     A.  No.  They would be, ▮▮▮▮▮▮ go to a team and
21 usually they've been ordered, back then we got thousands
22 of emails, customers and stuff, so they, so what they do
23 is they go through and take care of the My Pillow
24 customers.  Everything else they're ordered to, we
25 consider a junk mail.

Page 276

1     A.  No, nobody did, no, absolutely not.
2     Q.  All right.
3     A.  He's talking about, this is, this is Alan Duke,
4 he's Lead Stories of the Facebook fact checkers.
5     Q.  You can put that aside.
6     A.  What?
7     Q.  You can put that aside.
8     A.  Okay.
9     Q.  Let's go to 69.
10      (Exhibit 69 marked for identification.)
11     Q.  This is the email portion of your deposition,
12 Mr. Lindell, so we'll just look at a few.  You should
13 give one to your counsel.
14      Okay.  Exhibit 69 at least purports to be, and
15 it's been produced I guess twice in this litigation,
16 purports to be an email from some person named Mark
17 Debarbieri?
18     A.  Yep, yep.
19     Q.  To Mike Lindell at ▮▮▮▮▮▮▮▮▮▮ do you see
20 that?
21     A.  Mm-hmm, yep.
22     Q.  Do you know who this person is?
23     A.  No idea.
24     Q.  Do you know how he got your email address?
25     A.  Yes, I can, that's an easy one to explain.  When

Page 275

1     Q.  Okay.
2     A.  This was never read by me, probably looked at,
3 a boom, gone.
4     Q.  Okay.  And I'm not asking about the lumpy pillow
5 calls.
6     A.  No, they're not lumpy pillows, that's not what
7 they call on, okay.  When you say lumpy pillows, now
8 you're an asshole, you got that, you're an asshole is
9 what you are.
10      MR. MALONE:  Mike.
11      THE WITNESS:  No, he's an asshole, he's an
12 ambulance chasing asshole.
13     A.  That's what you are.  Lumpy pillows, kiss my
14 ass.  Put that in your book.  No, they, they answer
15 anything, any problem customer that wants to reach Mike
16 Lindell, those are the ones, I want to talk to Mike
17 Lindell, I want to talk to Mike Lindell.  They send them
18 to here and they go, and they call about maybe they
19 didn't get their pillow on time because of the Fed Ex or
20 whatever, but we'll cover it even though it could be
21 somebody else's fault.  Nobody calls because of a lumpy
22 pillow.  But good, good one though.
23     Q.  Are you done?
24     A.  Yeah, I'm done.
25     Q.  What I'm saying --

Page 277

70 (Pages 274 - 277)

**Page 278**

1  A. Obviously you don't have a My Pillow too, you
2  don't, do you.
3  Q. What I'm saying is, Mr. Lindell --
4  A. Asshole. But go ahead.
5     THE WITNESS: No, I'm pissed.
6     MR. MALONE: I understand.
7  A. Yeah, go, when you're saying what.
8  Q. The non-customer product complaint calls.
9  A. Anything that comes in where the customer,
10  there's a, they can't get, they got to get, get to, they
11  can't solve the problem if the customer wants to talk to
12  Mike Lindell or if they want to talk about the weather
13  being bad. They say, they, they go give them ████ and
14  it goes into another team of people.
15  Q. Okay.
16  A. And this team take anything that's unrelated to
17  My Pillow and throw it in the garbage.
18  Q. Okay. That's where I'm going. To the extent
19  that My Pillow is receiving emails from people like Mr.,
20  I'm going to butcher his last name, Debarbieri --
21  A. Nobody, the only ones that know --
22  Q. Let me finish my question, please.
23  A. Well, then, okay. Then make sure you be
24  specific. Because people don't, now you asked me how
25  they got that email address. I don't publish it for

**Page 279**

1  everybody. I don't, people try and reach me all the
2  time for different things. You don't have that luxury
3  of being, have people, everyone on the street wants your
4  email whether to get a picture or whether to attack you
5  or whatever it is, you know, people like you that
6  probably call on the phone. But go ahead.
7     I give, they give them the email, it's a thing,
8  catchall so they don't have to take the wrath or an
9  attack or to say I want to talk to Mike Lindell, come
10  on, come on, come on, it's easy, they give them this
11  email. You asked how they got the email, that's it.
12  It's the only way they can get ████
13  Q. Do you need to take a break?
14  A. No, I don't need to take a break.
15  Q. All right.
16  A. Your lumpy pillow question kind of set a nerve.
17  Because obviously, just like your question in here in
18  your little complaint, Mike's frivolous Cyber Symposium.
19  This whole case is frivolous, you should be ashamed of
20  yourself. But go ahead, finish your question on this
21  and try not to talk about, I get personal when you
22  bad-mouth my employees or my pillows or anything like
23  that. Go ahead.
24  Q. I haven't said a single word about your
25  employees and I don't own --

**Page 280**

1  A. You've attacked them, you attacked them, you're
2  part of this, you're getting paid on consignment, you
3  get paid if they get money from my employees, yes, you
4  have attacked them. You personally did this, the
5  Newsmax, you and I call it right out, the criminal
6  lawyers and Coomer when you guys did this to me.
7  Q. Do you not think that, that Eric Coomer rigged
8  the election?
9  A. What?
10  Q. Do you not think that Eric Coomer rigged the
11  election?
12  A. I said, Eric Coomer didn't, I didn't say that, I
13  didn't say that. I said Dominion, they used Dominion
14  machines and all machines. I'm not specific just to
15  Dominion, ES&S, Hart, all of them, we've got to get rid
16  of the computers in our election. I never said anything
17  about Eric Coomer. I called him a traitor what he did
18  to My Pillow and Newsmax.
19     Chris Ruddy called me up and says, sorry, Mike,
20  you can't come on anymore, this guy, I don't know, let's
21  make a deal. Were you involved in that deal? You hurt
22  a lot of innocent people is what you did because that
23  day we couldn't go on. Like right now when we're
24  overdrawn I can't go on Newsmax and say, hey, we got the
25  new My Pillow 2.0, my employees thank all of you, like I

**Page 281**

1  used to do, I'm their host. I can't do that anymore
2  because of you and Coomer. That's reality, that's cost
3  us hundreds of millions of dollars.
4     When I'm done with this, you wait, if there's
5  any way to get your wallet it's going to be, that's what
6  we're going to do because you've hurt us so bad, it's
7  disgusting. And then you call it a lumpy pillow. Put
8  that in there too, huh, are you going to put that out
9  there. Did you use a My Pillow, how dare you. Are you
10  reading this stuff, I don't get it, you're worse than
11  the media. So keep going.
12  Q. I think there was a question in there.
13     MR. CAIN: I'm going to object as
14  nonresponsive.
15  A. The question, the question you asked me, how did
16  they get the ML. I've never read this, anything that
17  came across. We get stuff all the time, it goes right
18  in the garbage.
19  Q. So to that point, the emails that come in that
20  get filtered into ████ --
21  A. That's correct.
22  Q. -- that relate to, let's say it's someone like
23  this gentleman who's calling about or emailing about
24  Coomer or Dominion.
25  A. Garbage.

71 (Pages 278 - 281)

1  interact and say, hey, if you find a screen shot, you
2  will get a reward, you know, you have to take a screen
3  shot, okay. So it solved that problem because people
4  really believed that even though it wasn't true. So
5  that was set up.
6         So anything with the election, whether it was
7  good, even if it was good, hey, I got, like right now if
8  they called up and said, hey, I got a good invention for
9  Mike on MyStore, I need to talk to him, I need to talk
10  to him. My reps instead of saying I can't talk to him,
11  there's no way you can get to him, but does he have an
12  email, you know what, here's his email, that's it,
13  because they don't have time. My Pillow has to
14  function, it doesn't have time to talk about the weather
15  or whatever. So these things go there.
16         And this thing here would have been deleted or
17  at least unchecked and it's sitting there in the server.
18  It was, nothing ever gets double deleted because if they
19  come back to us we have to be able to show the
20  conversation with them. We do that to protect our
21  company.
22         MR. CAIN: Objection, nonresponsive.
23  Q. I'm just trying to get a sense of how many
24  people call your company about the election fraud
25  issues?

Page 286

1  A. How many to nowadays, probably, I don't know,
2  none, a few. Back then in January of '21, a lot. They
3  were all calling in attacking and then, and then we were
4  losing our box stores, you know.
5  Q. They, they were emailing too?
6  A. Not emailing, no. The only to an email
7  probably, I don't know, maybe one a month. I don't
8  know, whatever you got is what we have. Whatever you
9  got, then you know the number. If you did, if you did,
10  had us do a search, whatever you got. And believe me,
11  these guys did it all on their own, the lawyer said, no,
12  we got this third-party to do the stuff, didn't I, I was
13  very adamant about that. You can kiss my butt I said.
14  He goes no, Mike, we have to get them. I said there's
15  no emails that we have between with any of these things.
16         MR. MALONE: Mike, Mike, you know what I'm
17  going to say?
18         THE WITNESS: What?
19         MR. MALONE: You don't have to tell them
20  about what we talked about.
21         THE WITNESS: Okay.
22  A. No, I'm just saying, every, you have every one.
23  So you have your own answer.
24  Q. Okay.
25  A. You have every single one ever done at My Pillow

Page 287

1  with every keyword you gave. There you go.
2  Q. Thank you.
3  A. Yeah, now you got your answer. You already knew
4  the answer, you just was hoping there was more I think.
5  It sucks that you're not going to win all this money,
6  huh. Don't you feel it slipping away because you're all
7  wrong and you realize you shouldn't have done this.
8  Q. I'm not sure you understand how you're
9  perceived.
10  A. I don't care how you think I'm perceived. Let
11  me tell you how you're perceived. You're perceived as
12  an ambulance chaser, you're the reason what's wrong with
13  this country with lawyers, you're disgraceful is what
14  you are.
15         When I read this thing again last night, I
16  thought, one paragraph after you came after me. I
17  didn't know this, whatever this Oltmann, I didn't know
18  him then and I barely know him now. And you guys, and
19  you guys, all the stuff back then the only thing in here
20  was one statement I made after you attacked Newsmax,
21  after Coomer attacked Newsmax. That's the one
22  statement I made, period, I didn't know who Eric Coomer
23  was.
24  Q. We're recycling old testimony. I didn't ask you
25  about that either. So let's, let's stay focused because

Page 288

1  we only have a little bit more time.
2  A. Okay.
3         THE WITNESS: My A plus went out the
4  window.
5         MR. MALONE: Just keep it moving, Mike.
6  Q. By the way, I'm not responding to your name
7  calling and I'm not responding to --
8  A. I know, but I did respond when you said
9  something about my product that about 2,000 employees
10  rely on and they have families. And for you to have,
11  I've sold 80 million My Pillows in 14 years. You don't
12  have one, so you have no right to say that. You took
13  that right off of your corruption that you do. You're
14  probably the one putting out the narrative, it sure
15  seems like it.
16         I read some of the crap in here that you wrote
17  in your brief that's disgusting. The lies in here. One
18  of them says after Mike was with Donald Trump in 2017 at
19  a manufacturers summit, he started doing promo codes on
20  Fox. I was doing it ten years prior. This is a big
21  lie, you're a lying lawyer.
22         MR. MALONE: Mike, you're going to let him
23  finish what he's going to say and I'll object if --
24  A. Go ahead.
25  Q. I'm not going to respond to your personal

Page 289

73 (Pages 286 - 289)

5761446 -ER

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3      -----------------------------------------------------

 4      Eric Coomer, Ph.D.,

 5                    Plaintiff,

 6          vs.               Civil Action No. 1:22-cv-01129-WJM

 7      Michael J. Lindell, Frankspeech LLC,

 8      and My Pillow, Inc.,

 9                    Defendants.

10      -----------------------------------------------------

11

12         VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13        DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                   VOLUME I (Pages 1-370)

15

16

17      DATE:   March 8, 2023

18      TIME:   9:30 a.m. CST

19      PLACE:  PARKER DANIELS KIBORT, LLC

20              Colwell Building, Suite 888, 123 North 3rd St

21              Minneapolis, Minnesota 55401

22

23

24      REPORTED BY: KELLEY E. ZILLES, RPR

25      Job No.: 5761446
```

Page 1

```
1                      REPORTER'S CERTIFICATE
2

3

     STATE OF MINNESOTA    )
4                          ) ss.
     COUNTY OF WASHINGTON )

5

6        I hereby certify that I reported the videotaped
     deposition of Michael J. Lindell, Volume I, on the 8th
7    day of March 2023, in Minneapolis, Minnesota, and that
     the witness was by me first duly sworn to tell the whole
8    truth;
9        That the testimony was transcribed by me and is a
     true record of the testimony of the witness;

10

         That the cost of the original has been charged to
11   the party who noticed the deposition, and that all
     parties who ordered copies have been charged at the same
12   rate for such copies;
13       That I am not a relative or employee or attorney or
     counsel of any of the parties, or a relative or employee
14   of such attorney or counsel;
15       That I am not financially interested in the action
     and have no contract with the parties, attorneys, or
16   persons with an interest in the action that affects or
     has a substantial tendency to affect my impartiality;

17

         That the right to read and sign the deposition by
18   the witness was reserved.
19       WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.
20

21

22

23

24       Kelley E. Zilles, RPR
         Notary Public, Washington County, Minnesota
25       My commission expires 1-31-2025

                                               Page 370
```

**Page 370**

```
 1        REPORTER'S CERTIFICATE
 2
 3
   STATE OF MINNESOTA  )
 4                     ) ss.
   COUNTY OF WASHINGTON )
 5
 6      I hereby certify that I reported the videotaped
   deposition of Michael J. Lindell, Volume I, on the 8th
 7 day of March 2023, in Minneapolis, Minnesota, and that
   the witness was by me first duly sworn to tell the whole
 8 truth;
 9      That the testimony was transcribed by me and is a
   true record of the testimony of the witness;
10
        That the cost of the original has been charged to
11 the party who noticed the deposition, and that all
   parties who ordered copies have been charged at the same
12 rate for such copies;
13      That I am not a relative or employee or attorney or
   counsel of any of the parties, or a relative or employee
14 of such attorney or counsel;
15      That I am not financially interested in the action
   and have no contract with the parties, attorneys, or
16 persons with an interest in the action that affects or
   has a substantial tendency to affect my impartiality;
17
        That the right to read and sign the deposition by
18 the witness was reserved.
19      WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.
20
21
22
23
24  Kelley E. Zilles, RPR
    Notary Public, Washington County, Minnesota
25  My commission expires 1-31-2025
```

**Page 371**

```
 1 Ryan Malone
 2 Malone@parkerdk.com
 3      March 22, 2023
 4 RE:  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 5 3/8/2023, Michael J. Lindell (#5761446)
 6    The above-referenced transcript is available for
 7 review.
 8    Within the applicable timeframe, the witness should
 9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 errata-tx@veritext.com.
16
17 Return completed errata within 30 days from
18 receipt of testimony.
19 If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25
```

**Page 372**

```
 1 Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2 Michael J. Lindell (#5761446)
 3        E R R A T A  S H E E T
 4 PAGE_____ LINE_____ CHANGE_____
 5 _____
 6 REASON_____
 7 PAGE_____ LINE_____ CHANGE_____
 8 _____
 9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Michael J. Lindell        Date
25
```

**Page 373**

```
 1 Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2 Michael J. Lindell (#5761446)
 3      ACKNOWLEDGEMENT OF DEPONENT
 4    I, Michael J. Lindell, do hereby declare that I
 5 have read the foregoing transcript, I have made any
 6 corrections, additions, or changes I deemed necessary as
 7 noted above to be appended hereto, and that the same is
 8 a true, correct and complete transcript of the testimony
 9 given by me.
10
11
12 Michael J. Lindell        Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18 _____
19 NOTARY PUBLIC
20
21
22
23
24
25
```

94 (Pages 370 - 373)