## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

     Plaintiff,

v.

MICHAEL J. LINDELL, FRANKSPEECH
LLC, AND MY PILLOW, INC.,

     Defendants.

---

## DEFENDANTS' OMNIBUS MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

Eric Coomer, Ph.D. ("Coomer" or "Plaintiff") asserts against all Defendants five claims for relief under Colorado law: defamation, intentional infliction of emotional distress, civil conspiracy, permanent injunction, and exemplary damages. Summary judgment should be granted against each of these claims.

After more than a year of discovery, the record does not evince a genuine dispute of facts essential to Coomer's claims, and Coomer's entire action against the Defendants is ripe for dismissal. Alternately, Defendants seek an order granting partial summary judgment dismissing individual Defendants, claims, and alleged defamatory statements unsupported by evidence.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Coomer was the Director of Product Strategy and Security for Dominion Voting Systems ("Dominion"). (ECF #170, Second Am. Compl., ¶ 2). He held this position from November 2013 through May 2021. (Ex. 1 (Restricted), Pl. Dep., at 21:22–25; 90:2–10).

2.      Dominion provided election-related services to at least 30 different states during the 2020 presidential election. (ECF #170, ¶ 17).

3.      Defendant Michael J. Lindell ("Lindell") is the founder and CEO of Defendants My Pillow, Inc. ("MyPillow") and Frankspeech LLC ("Frankspeech"). (ECF #171, Answer Second Am. Compl., ¶ 7).

4.      Nonparty Joseph Oltmann ("Oltmann") serves as a host of the Conservative Daily podcast with videos posted on Conservative Daily's website. (ECF #170, ¶ 28).

5.      Oltmann co-hosted an episode of the Conservative Daily podcast on November 9, 2020. On that episode, Oltmann stated:

> Let's not sugar coat this, we're going to expose someone inside of Dominion Voting Systems specifically related to Antifa and related to someone that is so far left and is controlling the elections, and his fingerprints are in every state. So, I want you guys to understand that what we're about to show you, you have to share . . . The conversation will be about a man named Eric Coomer. C-O-O-M-E-R.

(*Id.* ¶ 29).

6.      Oltmann further stated on the November 9, 2020 podcast episode that he had infiltrated an "Antifa" conference call in September 2020, during which a man identified as "Eric . . . the Dominion guy" proclaimed: "Don't worry about the election, Trump is not gonna [sic] win. I made f-ing sure of that. Hahahaha." (*Id.*).

7.      At some point in the Fall of 2020, Oltmann identified "Eric . . . the Dominion guy" as referring to Coomer and Dominion Voting Systems, Inc. (*Id.*).

8.      During the November 9, 2020 podcast, Oltmann indicated to his audience that he had gotten a "Facebook post" of Coomer's and was "going to build an entire dossier of" Coomer's Facebook posts. (Ex. 2, Defamatory Statement Spreadsheet (Bates Prefix EC 22cv01129), at 000358–59). Oltmann then read and displayed a so-called "rant" Coomer posted on July 21, 2016, about Donald Trump, who was at that time a candidate for President:



(Conservative Daily, *Dominion and How Big Tech Helped Steal the Election*, YouTube (livestreamed Nov. 9, 2020), https://www.youtube.com/watch?v=9tHeiYgErnw, (citing Ex. 3, Pl. Facebook Posts (Pl. Dep. Ex. 8), at 0072), *cited in* Ex. 2 at 000358–59).

9.     Throughout the episode, Oltmann displayed and read a number of other charged Facebook posts Coomer had made:



(*Id.* (citing Ex. 3 at 0068)).

10.    The posts Oltmann re-published ultimately included an "Antifa Manifesto," complete with a list of demands:





(*Id.* (citing Ex. 3 at 0009–12)).

11.     This Facebook post repeatedly refers to former President Trump as a "fascist" and states, "Either you are a decent human being with a conscience, or you are a fascist." (Ex. 3 at 0009). The post also states, "[P]eople like you are easily manipulated in your banal, self-serving ignorance . . . ." (*Id.* at 0010). It demands that the president "resign now and take your VP and cabinet with you." (*Id.* at 0011). The post further states, "You, sir, and yours, are the terrorists, and your victims are done putting up with it." (*Id.* at 0012).

12.     Coomer did, in fact, make the Facebook posts attributed to him by Oltmann. (Ex. 1 at 133:20–134:15).

13.     Shortly after Oltmann's November 9, 2020 podcast, Coomer sent an email in which he admitted that his Facebook posts were a "glaring lapse of judgment," that he should have recognized that his posts "would reflect on our company [Dominion] as a whole," and that, in light of the Facebook posts, "it is likely best for everyone if I resign my position at Dominion."

(Ex. 4 (Restricted), Dominion Doc. Produc. (Dominion Rule 30(b)(6) Dep. Ex. 146), at DOMINION000027 (emphasis added); *see also id.* at DOMINION000033, 37; Ex. 5, Dominion Rule 30(b)(6) Dep. 55:17–19).

14.     Throughout November 2020, Oltmann gave numerous interviews, including a livestreamed November 13, 2020 interview with Michelle Malkin, in which Oltmann repeated his allegations that Coomer had participated in an Antifa conference call, that Coomer claimed to have rigged the election, and that Coomer did in fact rig the election. Oltmann claimed that "the treason is punishable by death" and encouraged Coomer to turn himself in to the Department of Justice. (ECF #170, ¶ 33).

15.     During that same time period, Oltmann gave additional interviews to James Hoft of The Gateway Pundit, Chanel Rion of One America News Network (OANN), nationally syndicated radio host Eric Metaxas, and on Michelle Malkin's Newsmax program "Sovereign Nation." Oltmann also appeared regularly as a guest on various Denver-based talk radio shows, including Colorado Republican National Committeeman Randy Corporon's radio program Wake Up! with Randy Corporon on 710 KNUS. (*Id.*).

16.     On November 17, 2020, Eric Trump posted a link via Twitter to an article on The Gateway Pundit's website titled "Eric Coomer - Dominions Vice President of U.S. Engineering – 'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!'" (Ex. 2 at 000366). This post garnered over 10,000 retweets and over 23,000 "likes."



(Eric      Trump      (@EricTrump),      Twitter,      (Nov.      17,      2020,      1:49      PM),

https://twitter.com/EricTrump/status/1328802449889562626, *cited in* Ex. 2 at 000366*, and* Ex. 6,

First Am. Compl., *Coomer v. Donald J. Trump for President, Inc.*, No. 2020cv034319 (Colo. Dist.

Ct. Feb. 4, 2021), Filing ID 5D2B3A08F794E, ¶ 63).

17.    Rudy Giuliani and Sidney Powell specifically named Coomer during a November

19, 2020 press conference, where they repeated Oltmann's claims about Coomer. (ECF #170,

¶ 34).

18.    On December 5, 2020, Oltmann posted a photo of Coomer's house on social media,

which was accompanied by text reading, "Blow this s*** up. Share, put his name everywhere. No

rest for this s***bag. Eric Coomer, Eric Coomer, Eric Coomer. This s***bag and the corrupt

a**hats in Dominion Voting Systems must not steal our election and our country! Eric we are

watching you . . . ." (*Id.* ¶ 35).

19.    Oltmann has thousands of social media followers. (*Id.*).

7

20.     Oltmann suggested on the December 14, 2020 episode of the Conservative Daily podcast that he may have had people surveilling Coomer. (*Id.*).

21.     Claiming to fear for his safety after Oltmann made his identity public, Coomer hid at a friend's cabin in late November of 2020 and ultimately fled the country in January 2021; Coomer also purchased a gun and installed a security system in his home in December 2020. (Ex. 1 at 104:9–107:23, 110:10–111:12, 152:8–153:10). He returned to his home in February 2021. (*Id.* at 110:10–111:12, 152:8–153:10).

22.     Coomer received psychiatric treatment from Jared Finkell, M.D. from December 9, 2020 through August 31, 2021. (Ex. 7, Finkell Dep., at 20:2–15). Coomer did not mention Lindell, MyPillow, or the Cyber Symposium during the course of this treatment. (*Id.* at 16:2–17:6; 82:14–83:16; 206:7–14; 246:7–21).

23.     Coomer had become a public figure on or before February 4, 2021. (Ex. 1 at 218:1–219:4).

24.     On February 5, 2021, Coomer had the following exchange via text message with his brother:

> [Coomer's Brother]: I know we've discussed this before, but if you are having any second thoughts regarding never working in this industry again, let me reiterate that you need to be done with this s***.
>
> [Coomer]: I am done with this s***!
>
> [Coomer]: No second thoughts whatsoever.

(Ex. 8, Coomer Text Messages, Feb. 5, 2021 (Pl. Dep. Ex. 17), at EC 22cv01129 001261).

25.     Oltmann, the Trump Campaign, Michelle Malkin, James Hoft, TGP Communications LLC dba The Gateway Pundit, Rudy Guiliani, Sidney Powell, and Eric Metaxas are currently defendants in a separate defamation lawsuit filed by Coomer on Dec. 22, 2020, *Coomer v. Donald J. Trump for President, Inc.*, pending as Case Number 2020cv034319 in Denver

County, Colorado, District Court. (ECF #170, ¶ 24 nn.20 (Giuliani) & 22 (Powell), p.15 n.30 (Oltmann), ¶ 33 nn.44–46 (Malkin, Hoft, and TGP) & 49 (Metaxas), ¶ 34 n.53 (Trump Campaign). S*ee generally* Ex. 6).

26.    Chanel Rion and Herring Networks Inc. dba One America News Network ("OANN") were also defendants in *Coomer v. Donald J. Trump for President*. (ECF #170, ¶ 33 nn.47–48). They reached a settlement with Coomer for undisclosed terms, as indicated by a stipulation for dismissal filed in that action on August 30, 2023. (Ex. 9, Stip. Dismissal OANN & Rion, *Coomer v. Donald J. Trump for President, Inc.*, No. 2020cv034319 (Colo. Dist. Ct. Aug. 30, 2023), Filing ID 7EE1BDF514578).

27.    Randy Corporon and Salem Media of Colorado, Inc., which owns 710 KNUS, are currently defendants in a separate defamation lawsuit filed by Coomer on Nov. 13, 2021, *Coomer v. Salem Media of Colorado Inc.*, pending as Case Number 2021cv033632 in Denver County, Colorado, District Court. (ECF #170, ¶ 33 nn.51–52).

28.    Nonparty Newsmax, Inc. ("Newsmax") is a television and internet news organization supported by advertising and subscription revenue. (Ex. 10, Ruddy Dep., at 9:12–10:3). Newsmax's television content is currently available in over 100 million homes through cable, satellite, and digital streaming platforms. (*Id.* at 10:4–15).

29.    Newsmax aired several broadcasts mentioning Coomer specifically throughout November and December of 2020, including:

- A November 17, 2020 episode of "American Agenda" that identified Coomer in relation to allegations of voter fraud with election equipment for Dominion and Smartmatic, a competitor of Dominion (Ex. 6, ¶ 62);

- A November 20, 2020 interview between Newsmax host Howie Carr and Sidney Powell where Powell claimed Coomer made a "confession" of fixing the 2020 presidential election (*Id.*; *see also* Ex. 2 at 000368);

- A November 28, 2020 interview between Newsmax host Michelle Malkin and Oltmann in which Oltmann stated Coomer was "affiliated with or a part of the Antifa movement" and had "the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country" (Ex. 2 at 000372–74); and

- A December 5, 2020 interview between Newsmax host Greg Kelly and author Ken Timmerman in which Timmerman asked "Where is Eric Coomer? Where is Eric Coomer, the Dominion guy who is behind all of this?" (Ex. 6, ¶ 62).

30.     During this time period, specifically as of November 24, 2020, Newsmax broadcast its content to roughly one million viewers per minute. (Ex. 10 at 19:15–21:22).

31.     Coomer reached a settlement agreement with Newsmax, which was announced via an on-air statement on Newsmax on May 7, 2023. (ECF #170, ¶ 33 n.50, ¶ 62). The statement included an apology to Coomer. (*Id.* ¶ 62).

32.     Defendant Lindell advertised MyPillow products on Newsmax for approximately ten years prior to May 2021, frequently appearing personally on Newsmax to talk about MyPillow's products and employees. (Ex. 11, MyPillow Rule 30(b)(6) Dep., at 19:12–19). In these appearances, Lindell often offered viewers a discount on MyPillow purchases if they provided the promotional code "NEWSMAX" at the time of purchase. (Ex. 12 (Restricted), Lindell Dep., at 22:1–15; 112:4–10). Following Coomer's settlement with Newsmax, Lindell could no longer make these live personal appearances on Newsmax. (Ex. 11 at 18:15–19:11). In the ensuing four-month period (May–August 2021), MyPillow sales associated with the "NEWSMAX" promo code decreased by 90%. (*Id.* at 19:20–20:10; Ex. 12 at 15:21–17:23).

33.     Shortly after learning about Coomer's settlement with Newsmax, Lindell spoke with Newsmax's Chief Executive Officer, Christopher Ruddy. (Ex. 10 at 45:5–13; Ex. 11 at 18:11–19:11). Lindell then learned that he "couldn't come on Newsmax anymore to talk about My Pillows or anything because of Eric – a deal [Ruddy] made with Eric Coomer and lawyers for Eric Coomer." (Ex. 13, Frankspeech Dep. at 138:11–17; *see also* Ex. 11 at 19:2–4 ("From that point I

was not allowed, I talked to Ruddy, I was not allowed to go on Newsmax anymore to talk about MyPillow and it hurt my business.")).

34.     In an interview broadcast on Frankspeech on May 9, 2021, Lindell said:

> Yeah, Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation so maybe, just maybe, that you get immunity and you only get to do, I don't know, ten, twenty years. I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America. And you know what? I can say that, just like I can about Brian Kemp and Brad Raffensberger. These are things that I have evidence of. The evidence is there. You know, it's sitting there. Well Mike, ["]Why don't you turn it all in to the Supreme Court and bring it to the FBI?["] Oh, it's getting to the Supreme Court, everybody.

(ECF #170, ¶ 63).

35.     Lindell has not accused Coomer of personally "rigging" the election (Ex. 1 at 32:24–33:8; Ex. 11 at 223:11–23, 280:10–18).

36.     Oltmann sat for an interview with nonparty Brannon Howse, which was broadcast live on the Frankspeech website on May 3, 2021. (ECF #170, ¶ 54). During the interview, Oltmann stated that he participated in an "Antifa" conference call where Coomer stated "'Don't worry about the election, Trump's not going to win. I made f-ing sure of it.'" (*Id.* at ¶¶ 54–57).

37.     Lindell hosted and funded a "Cyber Symposium" event held in Sioux Falls, South Dakota between August 10–12, 2021. (ECF #171, ¶ 72; Ex. 11 at 269:7–23).

38.     The purpose of the Cyber Symposium was to publicize data from the 2020 presidential election showing election interference originating from China. (Ex. 13 at 222:15–20; Ex. 12 at 299:17–23, 313:25–314:15).

39.     Oltmann and David Clements were among the presenters who made statements onstage at the Cyber Symposium. (ECF #170, ¶¶ 84–91). Oltmann and Clements specifically referred to Coomer at various points during their remarks onstage. (*Id.*)

40.     Defendants did not have prior knowledge of what Oltmann would say during the May 3, 2021 Frankspeech interview, nor did Defendants have prior knowledge of what Oltmann or Clements would say at the Cyber Symposium. In fact, Lindell had no prior knowledge that Oltmann and Clements would present on stage at the Cyber Symposium at all. (Ex. 14, Oltmann Dep., at 50:20–54:4; 68:16–20; 131:18–22; Ex. 12 at 307:17–308:12; Ex. 15, Howse Dep., at 120:18–121:22).

41.     Lindell was in Colorado to speak at a rally on April 5, 2022, and he was served with the original complaint in this action just before he was to speak at the rally. (ECF #170, ¶¶ 101–02).

42.     While decrying the "lawfare" tactic of suppressing speech through the judicial process, Lindell said, "It started with Eric Coomer and Dominion based right here in Colorado. By the way, he just sued me as I walked up on the stage. Just sued me, I just got papers. Thanks, Eric! Now Eric will be the first one behind bars when we melt down the machines." (*Id.* ¶ 102; *see* Ex. 12 at 102:5–104:16, 147:24–148:8 (Lindell testifying that the "it" that "started with Eric Coomer and Dominion" was "lawfare"; "Law fair [sic] suing people for -- for free speech" as a means to silence them)).

43.     The following day, Lindell again addressed Coomer:

So everybody, if you want to know just how **corrupt, the corruption we're up against**. Eric Coomer served, had served papers to me before I was going onstage at the Capitol. **I've never talked about Eric Coomer. He's the, apparently he's the president of Dominion**, **the criminal crime family here in Denver**. I guess he's the guy that ran into a building the other day and took off and ran or whatever. Who knows what he did there, but anyway, he served papers, everybody. He has sued, everybody ready for this? Mike Lindell, Frank Speech, and My Pillow.

**Eric Coomer, you are a criminal**. Eric Coomer, your lawyers better look out. I'm not putting up with this. **My Pillow doesn't even know who you are**. My employees, I have 2,700 employees. Shame on you Eric Coomer. **You did a very, very stupid move**, Mr. Coomer. **You're going to be the first one, right behind Rafsenberger [sic] and Jena Griswold behind bars**. You're #1 on my list. You

go after my employees, go after my company again, **you're disgusting**. **You belong behind bars**. **I hear you ran into a building drunk the other day or whatever you were**. You know, whatever you did, "allegedly" [using sarcastic tone] I'll say that so the lawyers don't, so I don't "allegedly" accuse you of something you haven't done, but I will accuse you of this. **You've been a part of the biggest crime this world has ever seen**. Eric Coomer, president of Dominion, **you have even said what you did or what you were going to do**. You're disgusting. **You're disgusting, you're evil, you belong behind bars**, and we will not stop until you are behind bars. We're going to melt down your little machines and you're going to hang on to your little prison bars. "Let me out, let me out!" Should have thought about that, Eric Coomer, **before you did crimes against the United States and quite frankly all of humanity**. It's disgusting what you've done. You and Dominion. And Jena Griswold.

(ECF #170, ¶ 103).

44.    Coomer alleges the bolded statements above are "falsehoods" and "defamatory." (*Id.* ¶ 104).

45.    On May 23, 2022, Lindell again accused Coomer and Dominion of being "corrupt" and that he would be "behind bars" when "we melt down the machines." (*Id.* ¶ 116).

46.    Lindell was deposed as the corporate representative of Defendants MyPillow and Frankspeech on March 8, and 9, 2023. (*See generally* Exs. 11, 13). Lindell stated that he called Coomer a "criminal and traitor [because of] what he did to MyPillow when he went after Newsmax." (Ex. 13 at 53:1–15).

47.    Lindell was asked at his March 8, 2023 deposition as the MyPillow corporate representative "You think [Coomer]'s a criminal, don't you?" (Ex. 11 at 183:9). Lindell explained "I think what he did to me is criminal. What he did to my company when he did that deal with Chris Ruddy I think is criminal, yes. I think he's a traitor and criminal by what he did to My Pillow, that's what I think. There's your answer." (*Id.* at 183:14–18).

48.    Lindell was asked at that same deposition "Do you not think that Eric Coomer rigged the election?" He responded:

I said, Eric Coomer didn't, I didn't say that, I didn't say that. I said Dominion, they used Dominion machines and all machines. I'm not specific just to Dominion, ES&S, Hart, all of them, we've got to get rid of the computers in our election. I never said anything about Eric Coomer. I called him a traitor [for] what he did My Pillow and Newsmax."

(*Id.* at 280:10–18).

49.     Lindell was asked again whether he believed as of his March 9, 2023 deposition that "Eric Coomer is a criminal." He responded:

No. What he did to me was criminal, and I've said that a million times.

What he did to me and My Pillow, and you guys, it's criminal that you sued us. It's criminal that you went and made a dirty deal with Newsmax, and I can't go on [Newsmax].

(Ex. 13 at 108:6–14).

50.     Lindell reiterated this belief throughout his testimony over March 8 and 9, 2023. (*See, e.g.*, Ex. 11 at 19:3–10 ("I was not allowed to go on Newsmax anymore to talk about My Pillow and it hurt my business. And then, and I said Eric Coomer is a traitor what he did, and that's when I made that comment and I stand by that. What he did to My Pillow that day and whatever he made a dirty deal with Chris Ruddy, I'm not allowed to go on Newsmax like I was always on to go and talk about my products . . . ."), 185:25–186:3 ("What he did to me I consider it criminal. I don't care what he's done in his past nor do I know what he's done in his past."); Ex. 13 at 186:1–3 ("I called him treasonous because what he did to my employees at My Pillow."), 138:3–17 ("I know nothing about Eric Coomer. I know nothing about what Joe Oltmann said or what those two did together . . . . I have said one paragraph [within the Complaint], and that was because Chris Ruddy told me I couldn't come on Newsmax anymore to talk about My Pillows or anything because of Eric -- a deal he made with Eric Coomer and lawyers for Eric Coomer. And that was it."); *see also id.* at 194:11–195:18, 281:23–282:4, 304:17–305:18).

51.     Lindell's beliefs regarding Coomer's settlement with Newsmax are distinct from his beliefs regarding interference in the 2020 election. As he explained at his MyPillow deposition:

> This isn't about a Democrat or a Republican, this is about the evidence that China intruded in our election. Did your guy do it, I don't know and I don't care, but I know what he did to me, I know what he did to me at Newsmax. And that's [why] I went after him with one paragraph calling him a traitor, and I did, and a criminal, because what he did My Pillow was criminal. He didn't have to do that to My Pillow and attack my company and my employees so they lose all the money. It's disgusting.
>
> Q. Is that why he's a traitor too, what he did to your company?
>
> A. Mm-hmm, absolutely. . . .

(Ex. 11 at 223:11–23).

52.     Lindell affirmed this stance publicly on March 10, 2023, when stated on Frankspeech:

> [W]hat Eric Coomer and his lawyers did, putting this lawsuit, or making a deal with Chris Ruddy, and then part of the deal is you don't let Mike Lindell come on, think about that! Think about my employees. Think how mad I was. I'm going, you're going to hurt my employees like that?
>
> . . . .
>
> I stand by my words! I called him a criminal! I called his lawyers a criminal! And you know what? I stand by that, because what they did to MyPillow is criminal. What they did to me is criminal. What they did to Frankspeech. It is criminal!

(ECF #170, ¶¶ 128–29).

53.     Lindell sincerely believes what he has said about Coomer and Dominion. (*Id.* ¶ 105; Ex. 1 at 60:3–14 ("Q: Do you have any facts that Mr. Lindell doesn't believe what he has said about Dominion or about you? A: Not that I can -- not that I can recall.")).

## <u>LEGAL STANDARD</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a party seeking summary judgment has the burden of establishing through admissible evidence the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

This Court has already determined that Lindell's statements about Coomer regarded matters of public concern such that the "actual malice" standard from *New York Times* v. *Sullivan* governs. (ECF #119, Order Den. Defs.' Mot. Dismiss Am. Compl., at 10). Accordingly, Coomer must prove by "clear and convincing" evidence that Lindell spoke with "actual malice" when making defamatory statements about Coomer. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986); *Diversified Mgmt., Inc. v. Denver Post*, 653 P.2d 1103, 1108–10 (Colo. 1982) (en banc) (holding that, in a defamation action "involving a private figure in a matter of public or general concern," the plaintiff must, "with convincing clarity," prove the defendant's "reckless disregard" for the truth as defined in *St. Amant v. Thompson*, 390 U.S. 727 (1968)). The decisive question is "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson*, 477 U.S. at 255–56. "Clear and convincing evidence is stronger than a mere 'preponderance'; it is evidence that is highly probable and free from serious or substantial doubt." *Destination Maternity v. Burren*, 463 P.3d 268, 271 (Colo. 2020) (internal quotation omitted); *see Spacecon Specialty Contractors, LLC v. Bensinger,* 782 F. Supp. 2d 1194, 1201–05 (D. Colo. 2011) (granting summary judgment for want of clear and convincing evidence that filmmaker-defendant either "knew that any statements in the film were false, or that [he] pre-screened the film with a high degree of awareness that any of the statements in the film were false"); *Creekside Endodontics, LLC v. Sullivan,* 527 P.3d 424, 431–32 (Colo. Ct. App. 2022) (reversing denial of motion to dismiss where there was "no evidence that [defendant] doubted the opinions of th[ose] on whom

she relied yet published the statements anyway"). "[B]ecause the threat of protracted litigation could have a chilling effect on the constitutionally protected right of free speech, prompt resolution of defamation actions, by summary judgment or motion to dismiss, is appropriate." *Nguyen v. Mai Vu*, No. 18-cv-01132-CMA-NRN, 2018 WL 5622634, at *10 (D. Colo. Oct. 30, 2018) (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191, 1199 (D. Colo. 2015), *aff'd*, 861 F.3d 1081 (10th Cir. 2017)).

The Court previously denied Defendants' motion to dismiss Coomer's claims, but this denial does not preclude summary judgment, for Rule 12 dismissal and Rule 56 summary judgment turn on different considerations. *See, e.g.*, *Springer v. Albin*, 398 F. App'x 427, 431 (10th Cir. 2010) (citation omitted) ("[A Rule 12 motion] focuse[s] on the allegations in the complaint, whereas the court's analysis of [a] motion for summary judgment look[s] to the evidence presented in the light most favorable to [the non-moving party]."); *Gibson v. Brown*, No. 16-cv-2239-MSK-STV, 2020 WL 1815911, at *6–7 (D. Colo. Apr. 9, 2020) ("Although a determination of a Motion to Dismiss affects what claims are considered at the summary judgment stage, specific findings that a claim is plausible has no effect on the determination of a Motion for Summary Judgment.").

After forcing Defendants to engage in over a year of costly discovery, Coomer has not produced, and cannot produce at trial, sufficient evidence to support his claims. Summary judgment against those claims is now necessary.

## ARGUMENT

## I. COOMER'S DEFAMATION CLAIM AGAINST ALL DEFENDANTS SHOULD BE DISMISSED

Under the First Amendment and Colorado law, a plaintiff alleging a statement involving a matter of public was defamatory must prove that the statement was: "(1) Defamatory, (2) Materially false, (3) Concerned the plaintiff, (4) Published to a third party, (5) Published with

actual malice, and (6) Caused actual or special damages." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017) (citations omitted). Coomer cannot make these requisite showings.

### A.    The Complained-Of Statements Are Not Actionable

"When evaluating a defamation claim, a court must examine each published statement individually" to determine whether it is actionable. *Portercare Adventist Health Sys. v. Brown*, No. 2018CV31868, 2019 Colo. Dist. LEXIS 1340, at *7–8 (Colo. Dist. Ct. May 15, 2019) (citing *Keohane v. Stewart*, 882 P.2d 1293, 1299–1300 (Colo. 1994)); *see also Arrieta v. Bennett*, No. 1:17-cv-00986-PJK-KBM, 2019 WL 2905721, at *9 (D.N.M. July 5, 2019) ("Rule 56 allows summary judgment not only for entire claims, but also for parts of claims. The purpose of summary judgment is to narrow the issues for trial, and primarily the factual issues for trial."). Coomer cannot meet his burden for each statement he identifies in the Second Amended Complaint, largely because he has blurred the line between what he claims is defamatory and what is simply "false."

The Second Amended Complaint identifies "**numerous falsehoods and defamatory statements, including, but not limited to**:

     a.     Dr. Coomer is "corrupt";

     b.     Lindell is "up against" "corruption";

     c.     Lindell has never talked about Dr. Coomer;

     d.     Dr. Coomer is the "president of Dominion";

     e.     Dominion is a "criminal crime family";

     f.     Dr. Coomer is "a criminal";

     g.     MyPillow does not know who Dr. Coomer is;

     h.     Dr. Coomer did a "very, very stupid move";

     i.     Dr. Coomer will be "behind bars";

j.      Georgia Secretary of State Brad Raffensperger will be "behind bars";

k.      Colorado Secretary of State Jena Griswold will be "behind bars";

l.      Dr. Coomer is "disgusting";

m.      Dr. Coomer "belong[s] behind bars";

n.      Dr. Coomer "ran into a building drunk the other day";

o.      Dr. Coomer has "been a part of the biggest crime this world has ever seen";

p.      Dr. Coomer "even said what [he] did or [he was] going to do";

q.      Dr. Coomer is "evil";

r.      Dr. Coomer "did crimes against the United States"; and

s.      Dr. Coomer "did crimes against . . . quite frankly all of humanity".

(ECF #170, ¶ 104) (emphasis added). Whether Coomer is actually claiming these statements are "defamatory" or are mere "falsehoods" is unclear, but none of them are actionable as a matter of law.

### i.      "Disgusting," "Evil," and "Stupid Move" Are Constitutionally Protected Statements of Opinion

Subjective statements and statements of opinion are protected by the First Amendment as long as they do not present or imply the existence of defamatory facts which are capable of being proven true or false. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 18–19 (1990). Statements that Coomer is "disgusting" and "evil," or that he made a "stupid move," (ECF #170, ¶ 104 h., l., q.), are clearly constitutionally protected statements of opinion. Although there is no "wholesale defamation exemption" for everything that could be labeled an "opinion," *Milkovich,* 497 U.S. at 18, the statement, to be actionable, must be "sufficiently factual to be susceptible of being proved true or false," *see Keohane v. Stewart*, 882 P.2d 1293, 1299 (Colo. 1994) (en banc) (quoting *Milkovich*, 497 U.S. at 20). "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation" receives full constitutional protection. *Id.*

(quoting *Milkovich,* 497 U.S. at 20). Similarly, "rhetorical hyperbole, a vigorous epithet, and loose, figurative language" are protected speech because they "cannot reasonably be interpreted as stating actual facts." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,* 861 F.3d 1081, 1136 (quotation omitted). "Disgusting" and "evil," and that Coomer made a "stupid move," are protected statements of opinion and thus exempt from tort liability; summary judgment should be granted against Coomer's claims based on the usage of these terms.

### ii. "Treasonous," "Traitor," and "Criminal" Are Hyperbole, Not Defamatory Statements of Fact

Lindell stated Coomer is "treasonous" and "a traitor to the United States of America." (ECF #170, ¶ 63). He further stated that Coomer "is a criminal" and "did crimes against the United States and quite frankly all of humanity." (*Id.* ¶ 103). Defendants freely acknowledge that, *in most cases*, these specific statements ("treasonous," "traitor," "criminal," and "did crimes") would survive summary judgment. "A statement is deemed to be defamatory per se, if, without reference to extrinsic evidence and viewed in its plain and obvious meaning, the statement imputes to plaintiff: the commission of some criminal offense involving moral turpitude; . . . [or] some falsity which prejudices plaintiff in his or her profession or trade . . . ." *Newberry v. Allied Stores, Inc.*, 773 P.2d 1231, 1236 (1989) (citation omitted). This is not one of those cases.

Instead, this is a case akin to *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264 (1974) and *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6 (1970). In *Austin,* a postal workers union published a list of nonunion workers in its monthly newsletter. 418 U.S. at 267. The union published the list under a "List of Scabs" heading accompanied by "a well-known piece of trade union literature, generally attributed to author Jack London, which purported to supply a definition" of the word "scab." *Id.* at 267–68. This definition read:

> After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which He made a *scab*.

A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. *The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.*

*Esau was a traitor to himself; Judas was a traitor to his God; Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family and his class.*

*Id.* at 268. Three nonunion workers identified on the List of Scabs sued the union. *Id.* at 266–67.

The *Austin* Court found in favor of the union and reversed the defamation verdict against it. *Id.* at 287. In so doing, the Court specifically noted that "use of words like 'traitor' cannot be construed as representations of fact. . . . '[T]o use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like "unfair" or "fascist"—is not to falsify facts.'" *Id.* at 284 (quoting *Cafeteria Emps. Local 302 v. Angelos*, 320 U.S. 293, 295 (1943)).

The Court also observed that the *Austin* plaintiffs' claim mirrored one rejected in *Greenbelt*, where the Court held that the defendants' use of the word "blackmail" in characterizing the plaintiff-public figure's actions "could not be the basis of a libel judgment" even though "[defendants] knew that [plaintiff] had committed no such criminal offense." *Id.* at 284. The *Greenbelt* Court determined it was "simply impossible to believe that a reader who reached the word 'blackmail'" would have believed that defendants were charging plaintiff with committing a

criminal offense, as opposed to using "rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff]'s negotiation position extremely unreasonable." *Id.* at 285 (quoting *Greenbelt,* 398 U.S. at 14). Applying that same rationale, the *Austin* Court deemed it:

> similarly impossible to believe that any reader [of the "List of Scabs"] would have understood the newsletter to be charging [plaintiffs] with committing the criminal offense of treason. As in [*Greenbelt*], Jack London's "definition of a scab" is *merely rhetorical hyperbole, a lusty and imaginative expression of the contempt* felt by union members towards those who refuse to join.

*Id.* at 285–86 (emphasis added).

The Colorado Supreme Court's decision in *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351 (Colo. 1983) is similarly instructive. In *Burns*, the Court set forth the Colorado standard for determining whether "rhetorical hyperbole" was opinion or fact, analyzing *Austin* and *Greenbelt*. The Court ultimately endorsed the Ninth Circuit's three-factor approach to "examin[ing] when speech which might be considered protected opinion is in issue." *Burns,* 659 P.2d at 1360. *Burns* rejected tests set out by other courts that could have had the effect of pronouncing certain words or phrases that are always considered "factual" and others that are always "opinion," *id.* at 1358, or that could have had the effect of creating an "unconditional privilege" for the use of "rhetorical hyperbole . . . in a context where the actual malice standard [is] appropriate," *id.* at 1364 (Dubofsky, J., dissenting).

The *Burns* standard was reified and summarized in *Keohane v. Stewart*, 882 P.2d 1293, 1299 (Colo. 1994) as follows:

> *Milkovich* and *Burns* thus provide the necessary framework to determine if a statement is protected. This framework involves two inquiries. The first inquiry is whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 20. The second inquiry is whether reasonable people would conclude that the assertion is one of fact. *Id.* The factors relevant to the second inquiry are: **(1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed**.

(emphasis added) (quoting *Milkovich*, 497 U.S. at 20) (citing *Burns*, 659 P.2d at 1360) (stating that the *Milkovich* Court held "that loose, figurative, or hyperbolic language may indicate that the statement could not reasonably be interpreted as a statement of fact").

In *Keohane,* the Court concluded from "the broader social context" of one of the defendant's remarks made shortly before an election, context including "the well-publicized allegations of corruption against the medical and legal professions in Fremont County," that the statements "could not reasonably be interpreted as stating actual facts about Judge Keohane." *Id.* at 1302. These remarks, including that a "judge is really in a position to clean up financially" if the judge were to approach "an old buddy" suspected of a crime and offer "a way out," were "nothing more than an elaborate hypothetical scenario as a possible explanation of the verdict" in one of the judge's trials. *Id.*

The context of Mr. Lindell's statements would similarly notify the listener that Lindell was directing "epithets" and "hyperbole" to Coomer and was not making any assertions of fact. At no point did Lindell accuse Plaintiff of personally "rigging" the election (Ex. 1 at 32:24–33:8; Ex. 11 at 223:11–23, 280:10–19). When Lindell stated that Coomer is "treasonous" and a "traitor to the United States of America," he did so in the same breath as criticizing Coomer for "making deals at Newsmax" and while referring to Brian Kemp and Brad Raffensberger in kind. (ECF #170, ¶ 63). All of this occurred in the context, like in *Keohane*, of commentary about an election for public office. Lindell's testimony as the MyPillow and Frankspeech corporate representative further confirms the context and intent behind his descriptions of Coomer. (Ex. 11 at 19:3–10, 183:9–18, 185:25–186:3; Ex. 13 at 186:1–3, 194:11–195:18, 281:23–282:4, 304:17–22).

Mr. Lindell similarly stated Coomer is a "criminal," was "part of the biggest crime this world has ever seen," and "did crimes against the United States and quite frankly all of humanity"

the day after he was served with the original complaint. (ECF #170 ¶ 103). Both "the context of the entire statement" and "the circumstances surrounding the assertion," including the medium and the audience, must be considered in determining whether Lindell made factual accusations with respect to Coomer. *Keohane*, 882 P.2d at 1299. Lindell referred to Coomer as a "criminal" in the heated context of his company just having been sued by Coomer, whom Lindell made clear he "doesn't even know." (ECF #170, ¶ 103). He added that he'd "never talked about" Coomer. (*Id.*). A reasonable listener would understand Lindell was irate with Coomer *because he brought this action,* despite Lindell's admitted lack of familiarity with Coomer.

"Even if an expression of opinion may have been skewed by a vindictive motive, if it is 'based on disclosed or assumed nondefamatory facts then it is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is.'" *Yeager v. Nat'l Pub. Radio*, No. 18-4019-SAC-GEB, 2018 WL 3633894, at *12–13 (D. Kan. July 31, 2018) (quoting *Piccone vs. Bartels,* 785 F.3d 766, 774 (1st Cir. 2015)). Here, Lindell's statements that Coomer is a "criminal," a "traitor," and is "treasonous" are based on facts Lindell freely disclosed: 1) Coomer settled with Newsmax; and 2) Coomer sued Lindell, Frankspeech, and MyPillow. The statements are not sufficient for an action of defamation.

### iii.   Vague Language Such As "Corrupt" Is Not Actionable

Coomer alleges that Lindell calling him "corrupt" and stating Coomer "even said what [he] did or [he was] going to do" are defamatory statements. (ECF #170, ¶¶ 103–104). They are not, as "[v]ague language that is subject to multiple interpretations is generally not actionable." *Yeager*, 2018 WL 3633894, at *11–12 (citing numerous cases).

From the statement itself, it is not even clear that Lindell is accusing Coomer himself of being "corrupt." He refers to the lawsuit against him as an example of "the corruption we're up against." (ECF #170, ¶ 103). This is vague, imprecise language that is not defamatory as a matter

of law. The same is true for stating Coomer "even said what [he] did or [he was] going to do," a statement that is far "too nonspecific to sustain a defamatory meaning." *See Hogan v. Winder*, 762 F.3d 1096, 1107 (10th Cir. 2014).

### iv.   Predictions of Future Events ("Will Be Behind Bars") Are Protected Statements of Opinion

Beyond the non-actionable statements that Coomer is a "criminal," Coomer further alleges the statement he will be "behind bars" is independently defamatory. (ECF #170, ¶ 104). However, it is well-settled defamation law that "[a] mere expression of an opinion in the nature of a prophecy as to the happening or non-happening of a future event is not actionable." *Myers v. Alliance for Affordable Servs.*, 371 Fed. Appx. 950, 957 (10th Cir. 2010) (quotation omitted). This statement is ripe for dismissal.

### v.   Statements About Nonparties Such As Dominion, Raffensperger, and Griswold Are Not Actionable

Lindell is accused of stating that "[Georgia Secretary of State] Brad Raffensperger will be 'behind bars'" and "[Colorado Secretary of State] Jena Griswold will be 'behind bars.'" (ECF #170, ¶ 104). Where an allegedly defamatory statement is not about the plaintiff, such a statement is appropriate for dismissal. *See, e.g.*, *Brokers' Choice*, 861 F.3d at 1109 (stating that the plaintiff must prove that the statement concerned plaintiff); *Dorr v. C.B. Johnson Inc.*, 660 P.2d 517, 519 (Colo. Ct. App. 1983) (affirming dismissal where none of defendants' statements concerned plaintiff). In addition to being non-actionable statements of future events, *Myers,* 371 Fed. Appx. at 957, statements about Raffensperger and Griswold should be dismissed because they do not concern Coomer.

Similarly, Lindell is accused of calling Dominion a "criminal crime family." (ECF #170 ¶ 104). Coomer has testified that Lindell only speaks of Dominion in "reference" to Coomer. (Ex. 1 at 34:7–9 ("Every time that I've seen him mention Dominion, he mentions me. So I think it is

one and the same.")). Coomer is demonstrably mistaken on this point. In fact, Lindell and MyPillow are currently engaged in a lawsuit pending in the United States District Court for the District of Columbia over a slew of statements Lindell has allegedly made about Dominion. Coomer's name appears nowhere in Dominion's "heavily footnoted 115-page complaint" against Lindell and MyPillow, which Coomer himself references in his own Second Amended Complaint. (ECF #170, ¶ 46; *see also* Ex. 16, Compl., *U.S. Dominion Inc. v. My Pillow Inc.*, No. 1:21-cv-00445 (D.D.C. Feb. 22, 2021), ECF #1). Lindell and MyPillow deny any statement identified in Dominion's complaint is defamatory, but certainly do not deny that Mr. Lindell has spoken often and critically of Dominion. All the while, Lindell had no knowledge of Coomer personally or what role he may have played at the company. (*See, e.g.*, ECF #170, ¶¶ 103, 126; Ex. 11 at 288:22–23 ("I didn't know who Eric Coomer was.").

Statements that Coomer alleges Defendants made about Dominion and other nonparties here are not actionable by Coomer and should be disposed of by summary judgment.

### vi.   The Substantially True Statements About Coomer Are Not Actionable

Where a plaintiff is a limited purpose public figure, the plaintiff bears the burden of showing the falsity of the statement at issue. *Schwartz v. AMA*, 23 F. Supp. 2d 1271, 1275 (D.N.M. 1998). Coomer cannot meet that burden with respect to the complained-of statement that "Eric Coomer, you are a criminal." (ECF #170, ¶ 103). Though this statement is not actionable because it is mere hyperbole, as discussed above, it is also substantially true. "A defendant asserting truth as a defense in a libel action is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the matter is true." *Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972) (citation omitted). The "gist" of Lindell's statement that Coomer is a criminal is that Coomer has committed crimes. Coomer has been forthright about his past legal

troubles. (*E.g.*, Ex. 1 at 9:13–16:20, 54:17–55:1; Ex. 17, Susan Dominus, *He Was the 'Perfect Villain' for Voting Conspiracists*, N.Y.T. Magazine, (Aug. 24, 2021, 8:22 AM), https://www.nytimes.com/2021/08/24/magazine/eric-coomer-dominion-election.html (Pl. Dep. Ex. 7), at OAN001897 (By 2004, Coomer "had ended up in prison after being charged with several counts of driving under the influence.")). Lindell's statement that Coomer is a "criminal" is nonetheless true.

Coomer also alleges that during an April 6, 2022 broadcast on Frankspeech, Lindell, referring to Coomer, said "I hear you ran into a building drunk the other day or whatever you were. You know, whatever you did, 'allegedly' [using sarcastic tone] I'll say that so the lawyers don't, so I don't 'allegedly' accuse you of something you haven't done . . . ." (ECF #170, ¶ 103). Whether Coomer perceives Lindell's tone as sarcastic or not, Lindell's statement is true. Coomer does not dispute Lindell *did* hear that Coomer ran into a building while intoxicated and that this allegation about Coomer had widespread public circulation by April 6, 2022. (Ex. 1 at 55:7–56:4). By that point, tens of thousands of individuals had seen video of Coomer's September 21, 2021 arrest, which was widely circulated on Internet sources such as the *Gateway Pundit*,[1] YouTube,[2] Rumble,[3] and the *World Tribune*.[4]

---

[1] "BODY CAM FOOTAGE: Dominion Executive Eric Coomer Cuffed and Arrested in Colorado – Video Appears to Show He Drove Truck into Bar, Fled the Scene and Lied to Police." *The Gateway Pundit,* Mar. 1, 2022; https://www.thegatewaypundit.com/2022/03/body-cam-footage-dominion-executive-eric-coomer-cuffed-arrested-colorado-video-appears-show-drove-truck-bar-fled-scene-lied-police/.

[2] "Body Cam Footage of Eric Coomer Being Arrested In Salida Colorado and Lies To Police." YouTube, Feb. 28, 2022, https://www.youtube.com/watch?v=9vUUHFCTRjw.

[3] "Body Cam Footage of Dominion's Eric Coomer ARRESTED." Rumble, https://rumble.com/vw7gqz-body-cam-footage-of-dominions-eric-coomer-arrested.html

[4] "Who is Eric Coomer, Part II: Bizarre arrest video of Dominion Voting exec in Colorado." *World Tribune,* Mar. 1, 2022; https://www.worldtribune.com/who-is-eric-coomer-part-ii-bizarre-arrest-video-of-dominion-voting-exec-in-colorado/

Coomer also appears to allege that being misidentified as the "President of Dominion" is defamatory. (ECF #170, ¶ 104 at d.). It is not. As previously noted, if the substance, gist, or sting of a statement is true, the statement is not defamatory. *Gomba*, 504 P.2d at 339. Coomer was a Vice President at Dominion; though he wasn't the President, "[m]inor inaccuracies do not amount to falsity" in a defamation case. *Brokers' Choice*, 861 F.3d at 1107 (quotation omitted). Being identified as the president of Dominion rather than the vice president could not have caused damage to Coomer. At his deposition, Coomer claimed "being identified as the president of Dominion was a problem" because it continued "a false narrative of who and what I was and did at Dominion" and suggested that Coomer "somehow was this all-powerful person within Dominion that then had some inference that I could control everything that happened there." (Ex. 1 at 57:15–58:6). No reasonable juror could agree. The minor misstatement reflects Lindell's *lack* of familiarity with Coomer other than Commer's settlement with Newsmax, not the perpetuation of a "false narrative" of which Lindell had no knowledge.

Similarly, Coomer appears to allege that Lindell's April 6, 2022 remarks that he had "never talked about" Coomer and that "MyPillow doesn't even know who" Coomer is are defamatory statements. (ECF #170, ¶¶ 103–04). These statements could not possibly have damaged Coomer, and they are substantially true. Lindell was reacting to having been served with a complaint despite having only mentioned Coomer's name on one occasion nearly one year prior. (*Id.* ¶¶ 63, 102–104). Though "never" may have been technically inaccurate, the general thrust of Lindell's point is plain. Also, as a corporation, MyPillow cannot possess knowledge on its own. The substance of Lindell's statement that "MyPillow doesn't know" Coomer is borne out by Lindell's limited statements about Coomer and the lack of an agency relationship between MyPillow and Lindell

when he made those statements. The context of the statements makes it clear that Lindell was incensed MyPillow was sued despite having nothing to do with Coomer whatsoever.

### B.   Defendants Did Not Cause Plaintiff's Alleged Damages

Coomer cannot show that the Defendants are responsible for his alleged damages. Under Colorado law, Coomer must establish actual damages to maintain the action. *See McIntyre v. Jones,* 194 P.3d 519, 524 (Colo. Ct. App. 2008) (citations omitted) (stating that, where the allegedly defamatory statement involves a matter of public concern, "a plaintiff . . . must establish actual damages to maintain the action, even where the statement is defamatory per se"); *Keohane*, 882 P.2d at 1304 (citation omitted) ("A public figure asserting a claim for slander per se must establish actual damages."). Coomer alleges a variety of harms he sustained due to his connection with Dominion and potential election hacking, including "harm to his reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss." ECF #170, ¶ 150. He may well have sustained some or all of these harms at some point—but Defendants did not cause them.

Defendants acknowledge at least some evidence suggests that once Oltmann made Coomer's name public, Coomer may have: lost his job in the elections industry again; received threats; had to install security; bought a gun and learned how to use it; eventually had to go into hiding, even leave the country, for fear of his safety; and had to get therapy. If any of those things happened, however, they happened between *November 2020 and February 2021*.[5] (Ex. 1 at 104:9– 107:23, 113:1–115:13). Though Coomer also seeks to recover against Defendants in this case for those same harms, he admits Lindell did not utter Coomer's name until months later (May 9, 2021). (*Id*. at 54:5–16).

---

[5] Although the plaintiff blames the defendants for needing a second round of therapy, he admitted to being diagnosed with a mental illness in January 2021 and starting therapy then, and then discontinuing it by April 2021. (Ex. 1 at 113:1–115:13).

In reality, Coomer offered to resign his employment from Dominion approximately a day-and-a-half after Oltmann's November 9, 2020 podcast. (Ex. 4 at DOMINION000027; *see also id.* at DOMINION000033, -37; Ex. 5 at 55:17–10). The terms of Coomer's separation from Dominion were finalized by April 14, 2021, weeks before the Defendants were accused of publishing any statement at issue. (*Compare* Ex. 1 at 54:5–16, *with id.* at 90:2–91:8). By that time, Coomer had moved on to a new career as a restauranteur and had firmly decided to leave the election industry behind. He was "done" with the industry by February 5, 2021, and had "[n]o second thoughts whatsoever" about his decision. (Ex. 8 at EC 22cv01129 001261).

Oltmann sat for numerous interviews prior to the Defendants' first statement where Oltmann made allegations against Coomer, including interviews with Michelle Malkin, James Hoft of the Gateway Pundit, Chanel Rion of OANN, and nationally syndicated radio host Eric Metaxas. (ECF #170, ¶ 33). At the same time, Oltmann appeared on Randy Corporon's Denver-based radio program Wake Up! with Randy Corporon on 710 KNUS. (*Id.*). On November 17, 2020, Eric Trump tweeted link to the *Gateway Pundit* titled "Eric Coomer - Dominions Vice President of U.S. Engineering – 'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!'" (Eric Trump (@EricTrump), Twitter, (Nov. 17, 2020, 1:49 PM), https://twitter.com/EricTrump/status/1328802449889562626, *cited in* Ex. 2 at 000366, *and* Ex. 6, ¶ 63). The Tweet was greeted with over 10,000 retweets and over 23,000 "likes." Rudy Giuliani and Sidney Powell specifically named Coomer during a November 19, 2020 press conference, where they repeated Oltmann's claims about Coomer. (ECF #170, ¶ 34).

Oltmann posted a photo of Coomer's house to Oltmann's thousands of social media followers on December 5, 2020 which was accompanied by text reading, "Blow this s*** up. Share, put his name everywhere. No rest for this s***bag. Eric Coomer, Eric Coomer, Eric

Coomer. This s***bag and the corrupt a**hats in Dominion Voting Systems must not steal our election and our country! Eric we are watching you . . . ." (*Id.* ¶ 35). Oltmann suggested on the December 14, 2020 episode of the Conservative Daily podcast that he had people surveilling Coomer. (*Id.*).

Of course, Newsmax—to an audience of roughly a million people per minute in November 2020 (Ex. 10 at 19:15–21:22), aired several broadcasts and mentioning Coomer specifically throughout November and December of 2020, including:

- A November 17, 2020 episode of "American Agenda" that identified Coomer in  relation to allegations of voter fraud with election equipment for Dominion and Smartmatic, a competitor of Dominion (Ex. 6, ¶ 62);

- A November 20, 2020 interview between Newsmax host Howie Carr and Sidney Powell where Powell claimed Coomer made a "confession" of fixing the 2020 presidential election (*Id.* ¶ 66; Ex. 2 at 000368);

- A November 28, 2020 interview between Newsmax host Michelle Malkin and Oltmann in which Oltmann stated Coomer was "affiliated with or a part of the Antifa movement" and had "the ability to put his finger on the scale and has, I believe, put is finger on the scale of the election across our country" (*Id.* at 000373); and

- A December 5, 2020 interview between Newsmax host Greg Kelly and author Ken Timmerman in which Timmerman asked "Where is Eric Coomer? Where is Eric Coomer, the Dominion guy who is behind all of this?" (Ex. 6, ¶ 62).

By February 2021, Coomer made good on his message to his brother and left the elections industry entirely. He went to school, obtained a certificate, and opened his own restaurant. (Ex. 1, 6:21–7:6). He had fully switched careers before the Defendants said anything about him. Even with Coomer's self-admittedly poor judgment on social media, it is unclear how—or if—his reputation was even harmed. Within months after offering to resign for his statements on Facebook, Coomer had received a settlement and public apology from Newsmax, in addition to favorable press coverage from outlets such as the *New York Times* (Ex. 17) and the Associated

Press (Ex. 18, Dominion Worker Eric Coomer Sues Trump Campaign and Conservative Media, NBC, (Dec. 23, 2020, 7:05 am), https://www.nbcnews.com/politics/2020-election/dominion-worker-eric-coomer-sues-trump-campaign-conservative-media-n1252205 (Pl. Dep. Ex. 9)). On December 8, 2020, the *Denver Post* published Coomer's own opinion piece, entitled "I work for Dominion Voting Systems. I did not commit voter fraud. The attacks against me need to stop." (Ex. 19, (Pl. Dep. Ex. 6)). This publication was made despite including Coomer's own inaccurate statement that "any posts on social media channels purporting to be from me have also been fabricated." (*Id.* at OAN001887; *see also* Ex. 1 at 133:20–134:15; Ex. 17 at OAN001902).

To the extent the record shows Coomer could have sustained noneconomic damages, none can be traced to Defendants. For instance, Coomer claims to have "undergone substantial therapy since the time of the false claims against him, and he has been diagnosed with various mental conditions arising from the trauma of this still on-going ordeal." (Ex. 1 at 113:2–6). Coomer did in fact undergo therapy under the care of Jared Finkell, M.D. from December 9, 2020 through August 31, 2021. (Ex. 7 at 20:2–15). However, at no point during their sessions is there any indication Coomer mentioned Lindell or MyPillow. (*Id.* at 16:2–17:6; 82:14–83:16; 206:7–14; 246:7–21). Though Coomer's final session with Finkell took place after the Cyber Symposium, at no point did Coomer ever raise or discuss that event with Finkell. (*Id.* at 246:7–21). Coomer's conclusory assertion that Defendants in this action caused him mental or emotional harm contradicts both the chronology of events and the evidence in the record.

Coomer responded to perceived threats against him by purchasing a gun and installing a security system in his home in December 2020. (Ex. 1 at 105:22–107:15). Claiming to be in fear of his safety, Coomer hid at a friend's cabin in late November of 2020 and ultimately fled the country in January 2021; he returned to his home in February 2021, several months before the

Defendants are accused of publishing any defamatory statement. (*Id*. at 110:10–111:12, 152:8–153:10).

Defendants are not responsible for the content of Coomer's Facebook posts, nor were they responsible for publishing them. If it is indeed false that Coomer was on an "Antifa" call or somehow meddled in the 2020 election, Defendants neither fabricated nor adopted those claims. Nonetheless, Coomer's cause of action against Defendants stems from the same allegations he has made against Oltmann and the other defendants throughout his five pending lawsuits. He has already recovered from some of those defendants (Newsmax, OANN, and/or Rion), and now seeks to recover from over twenty more. That multi-suit strategy presents a clear risk of inconsistent, duplicative, and even multiplicative recoveries to Defendants in this action. For instance, Coomer agrees that Oltmann has also claimed to "have proof that the election was compromised, and that, again, that I'm a traitor, that I'm treasonous and disgusting and evil"—and that Oltmann made these claims before Lindell. (*Id.* at 119:16–120:3). Coomer's grievance lies with Oltmann, whom he has already sued, and not the Defendants here.

Coomer has failed to present evidence of an element of his defamation claim. Defendants are entitled to summary judgment because they could not have caused his claimed damages.

### C.       **MyPillow Cannot Be Liable to Coomer for Defamation**

Coomer's defamation claim should not proceed against MyPillow for the additional, independently sufficient reason that MyPillow never published, authorized, or ratified any statements about Coomer. Corporations such as MyPillow can only act through their agents. *In re Stat-Tech Sec. Litig.,* 905 F. Supp. 1416, 1422 (D. Colo. 1995). Understanding this, Coomer contends that "MyPillow published defamatory statements about Dr. Coomer in Colorado and directed such defamatory statement at Colorado audiences via its agent Lindell." (ECF #170, ¶ 9).

Coomer further alleges that "[a]t all relevant times, Lindell was acting as an agent and representative of MyPillow." *Id.* The record does not support these conclusions.

i.      **No Speaker Acted as an Agent of MyPillow**

None of the statements at issue was made by a speaker acting as a MyPillow agent. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006)*, cited in Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1250–51 (10th Cir. 2020) (noting "there appears to be nothing unique about New Mexico law in this area").

In this case, MyPillow never gave Oltmann or Clements authority to speak on its behalf. No record evidence supports the proposition that MyPillow manifested assent to Oltmann or Clements that they should act on MyPillow's behalf and subject to its control, let alone that Oltmann or Clements consented to so act. Accordingly, MyPillow cannot be held liable for any allegedly defamatory statements made by Oltmann or Clements.

The same is true with respect to the statements at issue made by Lindell. MyPillow never directed or authorized Lindell to make statements about Coomer, election interference, or any other political matter. No record evidence supports Coomer's assertions to the contrary. Lindell's personal opinions, including his opinions about Coomer, are not those of the company. MyPillow does not have the power to prevent Lindell from speaking in his personal capacity, and no evidence in the record even remotely suggests that MyPillow manifested assent to Lindell that he should make statements about Coomer or election interference subject to MyPillow's control. Because MyPillow lacks control over Lindell's personal and political opinions and activities, MyPillow cannot be held liable for any allegedly defamatory statements made by Lindell.

### ii.   MyPillow Ratified No Statement at Issue

Coomer alleges that MyPillow "ratified and endorsed the statements of Lindell and the other Frankspeech hosts who promoted the false claims against Dr. Coomer and are both independently and vicariously liable for the conduct described" in the Complaint. (ECF #170, ¶ 149). "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Restatement (Third) of Agency § 4.01(2); *see also id.* cmt. c ("The agency-law doctrine of ratification . . . requires manifesting assent or otherwise consenting to a prior act done by another person and thereby adopting its legal consequences."). The focus of ratification is choice and consent. The principal must manifest a free choice in order to ratify a prior act. *See id.* § 4.06 cmt. d ("Ratification is the consequence of a choice freely made by the principal."), *cited in Siener v. Zeff*, 194 P.3d 467, 471–72 (Colo. Ct. App. 2008). To exercise free choice and consent, the principal must either know all material facts prior to the action or know facts that would lead a reasonable person to investigate further. *Siener*, 194 P.3d at 472 (citations omitted); *see also Adams v. Paine, Webber, Jackson & Curtis, Inc.,* 686 P.2d 797, 801 (Colo. Ct. App. 1983) ("Full knowledge is essential before a party is held to have ratified the acts of his agent."), *aff'd,* 718 P.2d 508 (Colo. 1986) (en banc.).

MyPillow at no point ratified statements about Coomer. Though MyPillow may have advertised on podcasts, the Cyber Symposium, and other media that mentioned Coomer, that alone is insufficient to establish ratification, which requires a clear choice to consent to a prior act. Plaintiff cannot establish the "full knowledge" that is "essential" for ratification based on pre-existing agreements to advertise, *Adams*, 686 P.2d at 801, and an agreement to advertise on a podcast or sponsor an event does not reasonably give rise to an inference that the advertiser intends to "adopt[ the] legal consequences" of all statements on the podcast or at the event, Restatement

(Third) of Agency § 4.01 cmt. c. *See also Williams v. Burns*, 463 F. Supp. 1278, 1286 (D. Colo. 1979) (holding that seller corporation's reliance upon the advice of the attorney it hired to investigate transaction "did not support the contention that [seller] knew all of the material facts and that it adopted" its counsel's purported defamatory statements concerning buyer). "Furthermore, ratification . . . is not an issue in an action for slander" because liability by ratification "arises only where the original act was done in the interest, and intended to further some purpose, of the person who ratifies the act." *Williams*, 463 F. Supp. at 1287 (quotation omitted).

### iii.    The Four Statements Which Coomer Specifically Alleges Lindell to Have Made as a MyPillow Agent Are Not Defamatory

Where Coomer specifically alleges Lindell acted as an agent of MyPillow, he fails to identify any defamatory statement made in the scope of that agency. Coomer alleges Lindell acted as an agent of MyPillow during: a July 2, 2021 interview on OAN where Lindell claimed to have "packet captures" (ECF #170, ¶ 73); an April 8, 2022 interview on Eric Metaxas's radio show where Lindell accurately stated he was served with process in this case (*Id.* ¶ 108); a July 13, 2022 interview on the Conservative Daily podcast where Lindell promoted his "Moment of Truth Summit" (*Id.* ¶ 117); and a March 10, 2023 interview on Frankspeech where Lindell decried having lost money while defending Coomer's spurious lawsuit and hemorrhaging sales from lost Newsmax appearance. (*Id.* ¶ 128).

Coomer does not specifically identify any of these statements as defamatory, because none are. These statements either: 1) do not concern Coomer; 2) are Mr. Lindell's opinions; or 3) are true. They cannot give rise to defamation liability under an agency theory. After more than a year of discovery, Coomer cannot meet his burden of establishing that any defamatory statements were made by a person within the scope of their agency for MyPillow, and therefore the claims against

MyPillow should be dismissed. *See Bowden v. Mattaway*, No. 21CV30007, 2021 Colo. Dist. LEXIS 1217, at *2 (Dist. Ct. Colo. Nov. 15, 2021) (citing Restatement (Third) of Agency, § 1.02 cmt. d ("The party asserting the existence of an agency relationship has the burden of establishing its existence.")).

### D.   No Defendant Acted with Actual Malice

The First Amendment severely restricts potential state law liability for speech about matters of public concern. Under the landmark case of *New York Times v. Sullivan*, a speaker cannot be held liable under state tort law for speech unless the plaintiff can demonstrate, by clear and convincing evidence, "actual malice," defined as knowing a statement was false when it was made or having had "reckless disregard" for its truth. *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964); *see also Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56 (1988) (extending actual malice standard to intentional infliction of emotional distress claims). Because the alleged defamatory statements relate to a matter of public concern, namely election security, the "actual malice" standard applies to Coomer's claims. *Brokers' Choice*, 861 F.3d at 1109.[6]

Colorado law similarly restricts civil liability for speech-based claims. Article 2, section 10 of the Colorado Constitution provides:

> No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact.

---

[6] In its Order on Defendants' Motion to Dismiss, the Court noted that the "actual malice" standard applies to Coomer's claims because the alleged defamatory statements relate to a matter of public concern. (ECF #119 at 8–10). The actual malice standard would also apply to Coomer's claims because he was a "limited-purpose public figure," a person who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000) (quotation omitted). Coomer does not dispute he was a public figure on or before February 4th, 2021. (Ex. 1 at 218:1–219:4 (referencing Ex. 6)).

Accordingly, a plaintiff cannot recover for either defamation or intentional infliction of emotional distress unless he or she can show actual malice.

Coomer will not be able to present clear and convincing evidence of actual malice in this case. Therefore, even if he were able to show the statements were themselves defamatory, which he cannot, he would still be barred from recovering against Defendants.

### i.   Defendants Did Not Know Any Statement Was False

Where the "actual malice" standard applies, a plaintiff can only avoid summary judgment by presenting affirmative evidence of the defendant's mental state; it is not enough to contend that the jury might not believe him. *Liberty Lobby, Inc.,* 477 U.S. at 256–57 (1986). "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.* at 257. Because "[a]ctual malice is a *subjective* inquiry" and not based on what a "reasonably prudent" person would do, summary judgment is appropriate where a plaintiff "fails to offer *any* evidence concerning defendant's subjective state of mind." *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002) (citing *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989); *Liberty Lobby*, 477 U.S. at 256).

Coomer lacks evidence Lindell doubted what he said was true at any point in time, much less when he made the complained-of statements. Coomer admitted as much at his deposition:

> Q: Do you have any facts that Mr. Lindell doesn't believe what he has said about Dominion or about you?
>
> A: Not that I can — not that I can recall.

(Ex. 1 at 60:11–14.)

Defendants understand that millions of reasonable, well-meaning, and patriotic citizens disagree with Lindell's outspoken views on electronic voting systems. However, widespread disagreement is not material to the question of actual malice, which requires proof of *Defendants'*

state of mind. Lindell believed his statements were true when he said them, and he believes them to be true now. Coomer admits that he lacks any evidence to the contrary, let alone the "clear and convincing evidence" he needs to survive summary judgment. *See Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932, 937 (2d Cir. 1985) (affirming summary judgment under *New York Times* actual malice test where "no serious showing was made that either the author or the editor of the article had the slightest doubt" as to the statement's accuracy).

ii.     **Defendants Made No Statement with Reckless Disregard for the Truth**

"Reckless disregard as to the falsity of a statement that a defendant honestly believed to be true is determined by a subjective inquiry as to the defendant's belief and an objective inquiry as to the inherent improbability of or obvious doubt created by the facts." *Rowe v. DPI Specialty Foods, Inc.,* 727 Fed. Appx. 488, 498 (10th Cir. 2018) (quotation omitted). Coomer cannot establish recklessness under either element of the standard.

a.  **Defendants did not subjectively entertain doubts.**

The seminal case on recklessness under the "actual malice" standard remains *St. Amant v. Thompson*, 390 U.S. 727 (1968). *See Diversified Mgmt.*, 653 P.2d at 1109–10 (expressly adopting *St. Amant* articulation of recklessness for in a Colorado defamation action involving matters of public or general concern without regarding to the plaintiff's identity). To establish recklessness for the purposes of actual malice, a defamation plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731. The *St. Amant* Court recognized that its ruling would permit some wrongdoers to evade liability, but reasoned that First Amendment considerations override this risk:

> It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the

> defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies.

*Id.* at 731–32.

The Supreme Court's recent decision in *Counterman v. Colorado*, 143 S. Ct. 2106 (2023), reaffirmed its view of "recklessness" under the actual malice test as a subjective mental state. In reversing a criminal conviction under Colorado law, the Supreme Court extended the *New York Times* actual malice test to the "true threats" context. *Id*. at 2112–13, 2119. The Court reasoned that applying an actual malice standard that requires at least recklessness comports "with the analysis in our defamation decisions" and offers "enough 'breathing space' for protected speech, without sacrificing too many of the benefits of enforcing the laws against true threats." *Id*. at 2119 (quoting *Elonis v. United States*, 575 U.S. 723, 748 (2015)).

In so holding, the Court explained that assessing "recklessness," a subjective mental state, requires getting into the subjective mindset of the actor. *See id.* at 2113. "A person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another. That standard involves insufficient concern with risk, rather than awareness of impending harm." *Id.* at 2117 (quotations and citations omitted). For liability to attach, the defendant must have made "a *deliberate decision* to endanger another." *Id*. (emphasis added) (quoting *Voisine v. United States*, 579 U.S. 686, 694 (2016)).

Under this standard, Coomer must present evidence sufficient for a reasonable jury to conclude, by clear and convincing evidence, that the Defendants had serious doubts about what they said and had consciousness of a substantial and unjustifiable risk that their statements would

inflict a wrong upon another, but made a deliberate decision to say the statements anyway. Coomer admittedly cannot do this with respect to Lindell. (Ex. 1 at 60:1–14).

In the Order Denying Motion to Dismiss, the Court considered whether Frankspeech could be liable for the May 3, 2021 Oltmann interview by evaluating actual malice from Oltmann's perspective, instead of Frankspeech's perspective. (ECF #119 at 22–24). At the summary judgment stage, the question is not whether Oltmann made a false statement with actual malice; it is whether the *Defendants* demonstrated actual malice in publishing the statement. *Miles v. Nat'l Enquirer*, 38 F. Supp. 2d 1226, 1228. (At summary judgment, a plaintiff "must adduce clear and convincing proof of actual malice to sustain a cause of action for defamation. To meet this burden, Plaintiff must produce 'sufficient evidence to permit the conclusion *that the defendant in fact entertained* serious doubts as to the truth of his publication.'") (quoting *St. Amant*, 390 U.S. at 731) (emphasis added). *See also Harte-Hanks,* 491 U.S. at 688 (1989).

Colorado has specifically adopted the *St. Amant* recklessness standard in reporting on matters of public concern. *Diversified Mgmt. v. Denver Post*, 653 P.2d 1103, 1109–10 (Colo. 1982). Because this is a "subjective" standard, "there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of probable falsity.'" *Id*. (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). A "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. In a case . . . involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Id*. (quoting *St. Amant*, 390 U.S. at 732). "Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant

in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant*, 390 U.S. at 731.

No record evidence shows that any Defendant had prior knowledge of what Oltmann would say during his May 3, 2021 interview. (Ex. 14 at 50:20–54:4, 68:16–20, 131:18–22; Ex. 11 at 307:17–308:8; Ex. 15 at 120:18–121:22). Nor did Defendants know what Oltmann or Clements would say at the Cyber Symposium. Originally, Lindell envisioned being the only speaker Symposium, with periodic interviews between Brannon Howse and audience members. (Ex. 11 at 309:22–25, 313:2–14). Others, including Janet Lynn, ultimately revised the program's agenda and selected the symposium's speakers. (*Id.* at 310:2–22). Lindell was not even present while Oltmann and Clements discussed Coomer at various points throughout the event; he was being interviewed by CNN and other media outlets while they spoke. (*Id.* at 316:17–25, 327:23–328:11). No facts suggest that any Defendant would have—or even could have—entertained the requisite doubts about any statement Lindell, Oltmann, or Clements made about Coomer.

### b. Accusations against Coomer are not "inherently improbable."

Actual malice may also be demonstrated through a showing that the publisher's statements "are so inherently improbable that only a reckless man would have put them in circulation" or if there are "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Talley v. Time, Inc*., 923 F.3d 878, 896–97 (10th Cir. 2019) (quoting *St. Amant*, 390 U.S. 1t 732); *see also Fink v. Combined Commc'ns Corp*., 679 P.2d 1108, 1111 (Colo. Ct. App. 1984) ("Although a complete failure to investigate sources of corroboration of published statements may be evidence of actual malice, where an adequate investigation is conducted it is unnecessary that the truth of each and every statement be supported by the evidence.").

To be clear, Defendants themselves have made no "inherently improbable" claims about Coomer. It is undisputed that Lindell never mentioned Coomer nor was he even aware of Coomer's existence until Lindell learned of Coomer's settlement with Newsmax. It is undisputed that Lindell has never accused Coomer of election fraud. There is no dispute that Lindell has no knowledge of, never entertained theories about, and never made any claims regarding Coomer's role in ballot adjudication. But even if these facts were disputed, and even if the Defendants relied on or amplified Oltmann's claims, Coomer's defamation action against Lindell, Frankspeech, and MyPillow, still could not survive summary judgment. This is because accusations that Coomer somehow meddled in the election, even if proven false, are not sufficiently "inherently improbable" to establish actual malice.

Coomer was the Director of Product Strategy and Security for Dominion Voting Systems, a company which provided election related services to at least 30 different states during the 2020 presidential election. (ECF #170, ¶¶ 2, 17). The very existence of the position reflected the recognition that there were security threats to voting machines; Coomer's job duties included ensuring Dominion's products "were developed with robust security elements that matched both the needs of certification and also the emerging threats as designated under the critical infrastructure designation for election infrastructure." (Ex. 1, 21:1–21). He is listed as the inventor on several patents related to voting security, including Dominion's ballot adjudication and secure ballot tracking patents. (*Id.* at 39:6–23). He previously testified before the U.S. District Court for the Northern District of Georgia as an expert on voting machine vulnerabilities. (*Id.* at 18:4–25). While Coomer admitted "the potential for compromise" of Dominion's operating system and the "inherent variability in all electronic systems" both the court and Coomer's own expert in this case, Alex Halderman, took him to task for downplaying the "significant risk of having the votes altered,

diluted, or effectively not counted." *See Curling v. Raffensperger,* 493 F. Supp. 3d 1264, 1287, 1290, 1295, 1296, 1307, 1323 (N.D. Ga. 2020); (*see also* Ex. 1 at 247:6–18).

Halderman submitted a sworn declaration that "malicious modifications to [Dominion's] software could undermine the integrity of election results in multiple ways, including by changing either the barcodes alone or both the barcodes and the human readable text, with the result that the election outcomes could be changed without detection." (Ex. 20, Halderman Decl., *Curling v. Raffensperger*, No. 1:17-cv-2989-AT (N.D. Ga. Sept. 29, 2020), ECF #923-1 (Pl. Dep. Ex. 15), ¶ 7.[7]

These facts, when viewed alongside Coomer's alarming social media posts, establish that accusations of election interference involving Coomer are not so inherently improbable as to establish actual malice.

Highlights of those posts include:

- Ah . . . Texas . . . The land of racists, idiots, and misogynists. In 2 hours I've heard "what's wrong wif hav'n a relationship with another pow'rful Kuntry (Russia)?" "I luuuv trump", "goddamn Wimmen jus' dun know hor' ta liss'n", "ya know darlin', you're pretty, wish I didn't have to tip you, them robots is comin'" #f***you." (Ex. 3 at 0038);

- Protest all you want, if HRC [Hillary Rodham Clinton] had a penis . . . you f*** head, chuckle f***'s wouldn't have boo to say. I'd respect you more (still less) if you'd admit the obvious. Happy voting. A pox upon us all in these self inflicted end times. The world didn't need a magical non-existent being, just an ignorant populace and a suitable demagogue to bring the apocalypse (*Id.* at 0052);

- Orange narcissist racist xenophobic clown [referring to President Trump] (*Id.* at 0042);

- How the f*** do I have actual relatives/family that gladly donned the "brown shirt"? (*Id.* at 0043);

---

[7] Coomer, for his part, characterized Halderman's testimony as "egregiously" and "completely wrongly" comparing a "de minimis" software change "to the entire automatic air control system of the Boeing 737 Max aircraft." (Ex. 1 at 238:22–239:24).

- Referring to President Trump as "vile," "craven," and a "sociopath," and writing that under his administration the "trains are coming." (*Id.* at 0067);

- Just f***ing vote! And if you voted for a fascist — friend, family, or foe — f***ing un-trump me. I've got no truck for racists." (*Id.* at 0001)

(*See also* Ex. 1 at 156:11–158:10). Coomer's self-described Facebook "rant" lent further credence

to the belief he interfered:

> rant/
>
> Facebook friend land – open call . . .
>
> If you are planning to vote for that autocratic, narcissistic, fascist, a**hat blowhard and his christian jihadist VP UNFRIEND ME NOW! No, I'm not joking. . . . Only an absolute F***ING IDIOT could ever vote for that wind-bag f***-tard FASCIST RACIST F***! No bulls***, I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker . . . UNFRIEND ME NOW. I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason. You are controlled by fear, reaction, and bulls***. Get your s*** together.
>
> Oh, if that doesn't persuade you, F*** YOU! Seriously, this f***ing a**-clown stands against everything that makes this country awesome! You want in on that? You deserve nothing but contempt.
>
> #untrumpme
>
> . . . .

(Ex. 3 at 0072–73).

If that were not enough, Coomer posted what he himself called in his deposition the "Antifa Manifesto," complete with a list of demands. (*Id.* at 009–12). This document: repeatedly refers to President Trump as a "fascist"; states "either you are a decent human being with a conscience, or you are a fascist"; states "people like you are easily manipulated in your banal, self-serving ignorance"; demands that the president "resign now and take your VP and cabinet with you"; and states "you, sir, and yours, are the terrorists, and your victims are done putting up with it." Oltmann repeatedly claimed he personally witnessed the Antifa call, and has offered sworn testimony to

that effect. (ECF #170, ¶¶ 33, 55–57; Ex. 14, pp. 303:7–304:7). Amid this backdrop, claims related to the Antifa call—even if proven false—are not "inherently improbable" for actual malice on the part of any Defendant in this case.

## II. COOMER'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM SHOULD BE DISMISSED

In Colorado, the required elements of a claim for intentional infliction of emotional distress are: "(1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused the plaintiff to suffer severe emotional distress." *English v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004) (citing *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994)); *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo. 1999) (describing this tort as "intentional infliction of emotional distress by outrageous conduct.").

Defendants' statements are constitutionally protected speech and immune from tort liability. Defendants also did not act recklessly, as discussed above in the context of an absence of "actual malice." Defendants certainly did not act with intent to cause Coomer "severe emotional distress," as Lindell has made it abundantly clear that he and MyPillow "do not know who Coomer" is. Moreover, "[t]he level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is extremely high." *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. 2000). Even the statements that Coomer was a "traitor," a "criminal," or "treasonous" do not clear that bar, as "[m]ere insults" are insufficient. *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003); *see also Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988) (noting a "defendant's conduct must be more than unreasonable, unkind or unfair.").

Chronologically, the undisputed facts show that Coomer sought psychiatric treatment from December 9, 2020 through August 31, 2021, but never mentioned Lindell, My Pillow, or the Cyber Symposium during his treatment. Moreover, the earliest statement that Coomer attributes to any Defendant in this action was made on May 9, 2021, while numerous other individuals, many of whom Coomer has sued in other actions, made many statements about Coomer starting in early November 2020. These facts show that if Coomer did experience severe emotional distress at some point in late 2020 or 2021, the cause of his distress is not traceable to any act of the Defendants in this action.

Coomer therefore cannot make a prima facie showing of the necessary elements at trial, and summary judgment against his claim for intentional infliction of emotional distress is necessary.

## III. COOMER'S CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED

To survive a motion for summary judgment, a Colorado claim for civil conspiracy must establish a triable issue as to five elements: "There must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989) (en banc) (quoting *More v. Johnson*, 568 P.2d 437, 439–40 (1977)). Coomer cannot establish a "meeting of the minds" — in other words, an agreement — among two or more defendants on a course of action relating to Coomer, and Coomer cannot show one or more "unlawful overt acts." Because he cannot demonstrate triable factual disputes as to these elements, summary judgment should be entered against him and in favor of MyPillow on his conspiracy claim.

As a general matter, the law of conspiracy "requires collusion between 'two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private

individual can, and it is the general rule that the acts of the agent are the acts of the [principal].'" *Dildine v. Saxon*, 2016 Colo. Dist. LEXIS 1947, No. 2014CV34753, at *12, (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)). Yet the conspiracy alleged here is predicated on the "agreement" of one human being with himself: Mr. Lindell, in his personal capacity; Mr. Lindell, in his capacity as CEO of MyPillow, the pillow company; and Mr. Lindell, in his capacity as CEO of Frankspeech, the media company. Mr. Lindell first learned who Coomer was after Coomer settled with Newsmax. When Coomer sued MyPillow, Lindell admittedly castigated Coomer in several different podcasts and in other media spots. In each instance, and as discussed above*,* Lindell spoke in his personal capacity. Beyond the impossibility of a single human conspiring with himself, Coomer can present no evidence of an agreement between Lindell, MyPillow, and Frankspeech relating to Coomer specifically.

Summary judgment is also appropriate on Coomer's conspiracy claim because he cannot present evidence of an "overt unlawful act." *Jet Courier Serv.*, 771 P.2d at 502. Defendants' statements and conduct that Coomer alleges to be unlawful enjoy full First Amendment protection. Even if they did not, Coomer can establish no damages resulting from Defendants' conduct, as described above. Defendants are entitled to summary judgment on his conspiracy claim.

## IV. COOMER IS NOT ENTITLED TO A PERMANENT INJUNCTION

Coomer "seeks permanent injunctive relief to remove all Defendants' defamatory statements upon final adjudication of the claims at issue." ECF #170, ¶ 161. Defendants made no defamatory statements. Summary judgment against this claim is also in order.

## V. COOMER IS NOT ENTITLED TO EXEMPLARY DAMAGES

Coomer seeks exemplary damages, (ECF #170, ¶¶ 162–74), alleging that "Defendants personally targeted Dr. Coomer in retaliation for his settlement with Newsmax." (*Id.* ¶ 164). "Exemplary damages are available in Colorado only pursuant to statute. And, whether there is

sufficient evidence to justify the submission of that issue to the fact-finder is a question of law." *Amber Props., Ltd. v. Howard Elec. & Mech. Co*., 775 P.2d 43, 46–47 (Colo. Ct. App. 1988) (citations omitted). Coomer does not have evidence to justify such submission here.

Colo. Rev. Stat. § 13-21-102(a) provides that a jury may award exemplary damages to a personal injury plaintiff against a defendant up to the amount of actual damages awarded against that defendant if "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." Section 102(b) defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."

Exemplary damages may be awarded only if "the party asserting the claim proves beyond a reasonable doubt the [defendant's] commission of a wrong under the circumstances set forth in section 13-21-102." Colo. Rev. Stat. § 13-25-127(2). Therefore, on a motion for summary judgment, the Court must determine "[i]f the evidence, viewed in a light most favorable to the injured party, is such that a jury could find, beyond a reasonable doubt, that the injury-causing tortious conduct was attended by circumstances of fraud or malice or [willful and wanton conduct]." *Id.* (construing predecessor of § 13-21-102, as noted in *Cook v. Rockwell Int'l Corp*., 564 F. Supp. 1189, 1209 (D. Col. 2008) ("The Colorado Legislature amended Colo. Rev. Stat. § 13 21 102 . . . to delete 'or insult, or a wanton and reckless disregard of the injured party's rights and feelings' from the statute and replace it with the current 'or willful and wanton conduct.'")).

"Malice" as used in Col. Rev. Stat. § 13-21-102 is different from the defamation-law concept of malice. Colo. Jury Instr. 22:27 (citing *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 251–52 (1974)). It may include "vindictiveness and retaliatory motives." *Id*. at 5:4 (citing *Bonidy*

*v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.,* 232 P.3d 277 (Colo. App. 2010)). Even if Coomer's defamation claim were to survive this motion, a reasonable jury could not find fraud, malice, or willful and wanton conduct beyond a reasonable doubt.

Coomer's exemplary damages claim is confused and inconsistent with the facts. At bottom, the most glaring problem with the exemplary damages claim is the fact that Lindell's statements were based on a sincere belief in the truth of them, which Coomer himself acknowledges. Coomer agrees that Lindell sincerely believes his statements about Coomer and Dominion. (ECF #170, ¶ 105; Ex. 1 at 60:11–14). Thus, even if a jury were to find Lindell acted recklessly in accusing Coomer of election fraud (though he did not), the jury could not also find he engaged in fraud, malice, or willful and wanton conduct beyond a reasonable doubt. Lindell's conduct was, and remains, motivated by his sincere belief. As a matter of law, exemplary damages are not available to Coomer in this action.

## CONCLUSION

Defendants seek an order dismissing this action entirely for the reasons discussed above. In the alternative, Defendants seek an order dismissing all Defendants, causes of action, and/or parts of Plaintiff's causes of action, consistent with the applicable law and with the undisputed facts.

DATED:  September 8, 2023                    **PARKER DANIELS KIBORT LLC**

By: */s/ Ryan P. Malone*
Andrew D. Parker (MN Bar #195042)
Jesse H. Kibort (MN Bar #328595)
Ryan P. Malone (MN Bar #395795)
Abraham S. Kaplan (MN Bar #399507)
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
Facsimile: (612) 355-4101
parker@parkerdk.com
kibort@parkerdk.com
malone@parkerdk.com
kaplan@parkerdk.com

*Counsel for Defendants*