# EXHIBIT 7

```
                                                          Page 1

 1
 2    UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
 3    ------------------------------------------X
      ERIC COOMER, Ph.D.,
 4
                          PLAINTIFF,
 5
 6         -against-    Civil Action No.:
                        1:22-cv-01127-NYW-SKC
 7
 8    MICHAEL J. LINDELL, MY PILLOW, INC., and
      FRANKSPEECH, LLC,
 9
                          DEFENDANTS.
10    ------------------------------------------X
11                   DATE: July 6, 2023
12                   TIME: 9:12 A.M.
13
14           DEPOSITION of the Expert
15    Witness, JARED N. FINKELL, M.D., P.C.,
16    taken by the Defendant, pursuant to a
17    Subpoena and to the Federal Rules of Civil
18    Procedure, held at the offices of Regus-New
19    York TriBeCa, 99 Hudson Street, 5th Floor,
20    New York, New York 10013, before Karyn
21    Chiusano, a Notary Public of the State of
22    New York.
23
24
25
```

Page 14

JARED N. FINKELL, M.D.

1  
2      Not -- not that I know of.
3      Q.   Okay.
4      A.   Or not that I can -- that come
5  to mind.
6      Q.   Okay. Is there anything that
7  you can look at, any notes that you have or
8  anything like, that that would refresh your
9  recollection?
10     A.   As far as figuring out when the
11 accusations were made, they would have to
12 have been made prior -- well, I can't say
13 -- I can't say accurately because there had
14 to have been some accusations made prior to
15 my working with Mr. Coomer, which is what
16 brought about our working together and him
17 coming to see me.
18          But I'm not sure if those
19 involved accusations by Mike Lindell or
20 other -- or other people.
21          So, um, that's all I can -- I
22 think that's all that will clarify -- the
23 notes would clarify that for me.
24     Q.   How is it that you came to
25 understand what the allegations that have

Page 15

JARED N. FINKELL, M.D.

1  
2  been made against Mike Lindell and MyPillow
3  in this lawsuit are; did you learn it from
4  Mr. Coomer, for example, or elsewhere?
5      A.   That would be hard to say.
6          There's a lot of news coverage
7  -- there was a lot of news coverage or is a
8  lot of news coverage on this topic or these
9  events.
10         So, I don't know, um, when --
11 when I heard either about Mike Lindell's,
12 um, accusations or take on the -- on the
13 2020 election.
14         Um, even Mr. Coomer, you know,
15 Mr. Coomer's involvement in this story.
16         So yeah, I'm not -- I'm not
17 sure.
18     Q.   Okay.  So, if I'm understanding
19 what you're telling me is that you don't
20 know whether Mr. Coomer ever told you about
21 any defamatory statements Mr. Lindell or
22 MyPillow made against him?
23     A.   I don't have anything in my
24 notes specific to Mr. Lindell.
25     Q.   And so, that means that, again,

Page 16

JARED N. FINKELL, M.D.

1  
2  to ask my question:  Do you -- is it fair
3  to say that you don't have -- that -- that
4  Mr. Coomer never told you about any
5  defamatory statements that Mr. Lindell made
6  against him or about him?
7      A.   Yeah.
8          I just don't have -- I don't
9  have any notes referencing Mr. Lindell and
10 my -- and I don't have a kind of a clear
11 recollection.  Um --
12     Q.   Do you have any --
13     A.   -- of the specifics.
14     Q.   Do you have a vague rec- --
15 recollection --
16     A.   I have a --
17         THE COURT REPORTER:  One at a
18  time, please.
19     Q.   Let me finish, please.
20         Thank you.
21         It's hard.  That's not how we
22 talk.
23     A.   Sorry. Sorry.
24     Q.   So, do you have a vague
25 recollection then of Mr. Coomer telling you

Page 17

JARED N. FINKELL, M.D.

1  
2  about defamatory statements that Mr.
3  Lindell made or MyPillow somehow made
4  against him?
5      A.   Not that I can -- not with any
6  degree of confidence.
7      Q.   I know, through your counsel,
8  you produced about 114 pages of documents
9  to us.
10     A.   Yeah.  Um-hum.
11     Q.   And some of those documents are
12 your clinical records; is that correct?
13     A.   Yes.
14     Q.   Have you produced your entire
15 clinical record to us in this case?
16     A.   Yes.
17     Q.   Is it your practice that you
18 keep either handwritten or typed written or
19 some other kind of private notes of
20 sessions with patients, in general?
21     A.   No.
22         Um, the -- with this patient,
23 um, I don't keep any with this kind of
24 patient.  I wouldn't keep any.
25     Q.   Did you, at one time, make

5 (Pages 14 - 17)

Page 18

1         JARED N. FINKELL, M.D.
2 handwritten notes that you since discarded?
3    A.   I would say, in general, with
4 some patients, I would jot things down
5 within a conversation or within a session
6 with a patient but that's not anything that
7 I hold on to.  It's kind of chicken scratch
8 that's helping me to mention something
9 later or I need to follow up on this within
10 the session.
11        And I toss those, shred those.
12    Q.   Some Psychiatrists record
13 sessions with patients.
14        Is that something that you do?
15    A.   No. No.
16    Q.   And you didn't record any
17 session was Mr. Coomer?
18    A.   No.
19    Q.   Okay. Other than speaking with
20 your counsel, did you do anything to
21 prepare for your deposition today?
22    A.   No. No.
23    Q.   Okay. Did you look over your
24 notes or anything to refresh your
25 recollection?

Page 19

1         JARED N. FINKELL, M.D.
2    A.   Yes. Yes. Yeah.
3    Q.   Okay. And just -- just to be
4 clear:  In that 114 pages, it consists of
5 some clinic notes; is that correct?
6    A.   Yes.
7    Q.   You have some billing records
8 in there?
9    A.   Yes.
10    Q.   Billing statements; is that
11 correct?
12    A.   Yes. Yes.
13    Q.   You also have some payment
14 records in there?
15    A.   Yes.
16    Q.   And then, there are a couple of
17 letters; is that correct?
18    A.   Correct.
19    Q.   And also some e-mail
20 correspondence?
21    A.   Yes. Yeah. Yeah. Yep.
22    Q.   Are you aware of any other
23 documents that you have that pertain to Mr.
24 Coomer in any way?
25    A.   No. No. Not aware of any.

Page 20

1         JARED N. FINKELL, M.D.
2    Q.   What time frame was Mr. Coomer
3 working with you?
4    A.   So, that's -- I'm going to look
5 in the notes because I want to get that
6 right.
7        (Witness reviews document.)
8    A.   So, um, so, from December, 2020
9 to -- this -- the last time that I had --
10 that I met with him was in August of 2021.
11    Q.   That was August 31, 2021?
12    A.   Yes.
13    Q.   And your first visit was
14 December 9, 2020; is that correct?
15    A.   That's right.  Yeah.
16    Q.   Okay. When was the last time
17 that you communicated with Eric Coomer in
18 any way?
19    A.   Um, in -- I would have to check
20 that. I sent him an e-mail, to make sure
21 his -- once I started -- when I received
22 this subpoena -- a subpoena connected to
23 the case, I, um, reached out, to make sure
24 that the consent for release for
25 information was correct, um, and -- and

Page 21

1         JARED N. FINKELL, M.D.
2 sent him him the letter that I'd be
3 sharing, um, so that would would have been
4 -- I think these are the e-mails --
5        (Witness reviews document.)
6    A.   So, do you want -- I can
7 basically just find the e-mail --
8    Q.   We may get to it --
9    A.   Okay.
10    Q.   -- sometime.
11    A.   April.  April of 2023.
12    Q.   Is your last communication?
13    A.   Yeah. Yeah.
14        It looks like that. And that --
15 that, um --
16    Q.   Have you had any telephonic
17 communications with him since August 31,
18 2020?
19    A.   No.
20    Q.   Okay. Have you received any
21 information from anyone regarding how he is
22 doing currently?
23    A.   No.
24    Q.   I understand that at some point
25 in August of 2021, you wrote a prescription

6 (Pages 18 - 21)

Page 82

1      JARED N. FINKELL, M.D.
2  which, I assume, is social -- social media.
3  Some forum like that.
4         And then -- and to some extent
5  in person or some personal interactions.
6     Q.   And all of this harassment was
7  coming from strangers; is what I understand
8  from your note?
9     A.   Yeah.
10        I would have written that
11 because it wasn't people that he knew.
12    Q.   Okay.
13    A.   You know?
14    Q.   And I don't see any indication,
15 in your December 9, 2020 note, that Mike --
16 Mike Lindell or anyone affiliated with
17 MyPillow was engaging in this harassment.
18    A.   I didn't make any notes of any
19 specific -- the identity of specific people
20 that were harassing him.
21    Q.   And it is my understanding that
22 because you didn't make any notes regarding
23 the identity of the people doing the
24 harassment, you don't know whether it was
25 Mike Lindell or --

Page 83

1      JARED N. FINKELL, M.D.
2     A.   Yeah.  I don't -- I don't know.
3     Q.   Could you identify even one
4  person that was engaged in the ongoing
5  harassment?
6     A.   No.
7         Not based on recollection
8  (indicating.)
9     Q.   Okay.  And I guess to be more
10 specific, you couldn't identify a single
11 person that Eric Coomer told you was
12 harassing you?
13    A.   Harassing him?
14    Q.   Harassing him.
15    A.   Not with any degree of
16 confidence could I do that.
17    Q.   Okay. And at that point, I
18 assume, that maybe you have done some
19 reading and so you have a general
20 understanding of what you read in the
21 media, or elsewhere, concerning the
22 harassment of Eric Coomer.
23    A.   So that, I'm not -- so that,
24 I'm not sure of.
25    Q.   Okay.

Page 84

1      JARED N. FINKELL, M.D.
2     A.   I was aware of the general
3  election accusations and I -- um, but I'm
4  not sure -- yeah, specific to Eric Coomer,
5  specific to Dominion.
6         But Dominion was very much in
7  the news around that time is my
8  recollection. It wasn't -- it was pretty --
9  pretty, um, available information or pretty
10 present information so that's why I
11 wouldn't feel comfortable talking about the
12 specifics that Eric Coomer was listed, for
13 fear of where they're coming from, in
14 general.
15    Q.   Okay.  Did -- in terms of the
16 nature, I understand that you said that it
17 was -- it was related to his working with
18 Dominion.
19        Do you know what -- what form
20 the harassment took, other than I
21 understand it was online, in person, by
22 phone.
23        But the types of things that
24 were being said that -- that Mr. Coomer
25 viewed as harassing?

Page 85

1      JARED N. FINKELL, M.D.
2     A.   Um, yeah.
3         Nothing -- nothing that I know
4  specifically that I didn't write down.
5     Q.   Do you attempt to analyze
6  whether this ongoing harassment is
7  something that would cause an ordinary
8  person to have anxiety or mood symptoms?
9     A.   Can you clarify that question?
10    Q.   Yeah.
11        I think you talked about -- I
12 guess I'm trying to understand "adjustment
13 disorder with mixed anxiety and depressed
14 mood."
15        And what I think I understood
16 you to say was that -- was that adjustment
17 disorders are in response to a stressor
18 that a person experiences.
19    A.   Um-hum.
20    Q.   And stressors can be anything
21 from feeling the need to perform on school
22 work all the way to the death of a loved
23 one.
24    A.   Um-hum.
25    Q.   Is that a "yes"?

22 (Pages 82 - 85)

Page 206

1  JARED N. FINKELL, M.D.
2 that really being provoking.
3  Q. Okay.
4  A. I don't know if I make any note
5 of any increased harassment as a result or
6 anticipation of harassment.
7  Q. Okay. And there's no mention
8 anywhere in your note here about Mike
9 Lindell or MyPillow as being the source of
10 his stress.
11  A. I don't think I note that, no.
12  Q. Do you recall discussing that
13 with him?
14  A. I don't recall.
15  Q. Just going on with the "Note"
16 session of your August 25, 2021 note. He
17 told you that: "He had not been successful
18 in setting up treatment with the local
19 treatment provider."
20    Was it your understanding that
21 he didn't have any treatment between August
22 25, 2021 and May 26th of 2021 [sic]?
23  A. Yeah.
24    If he had had any treatment, I
25 would have made a note that he saw someone

Page 207

1  JARED N. FINKELL, M.D.
2 and it didn't work out.
3  Q. And you said in your note: "We
4 discussed current stressors an ongoing
5 behavioral interventions."
6    What were the current stressors
7 you discussed?
8  A. I'm assuming the same as, kind
9 of, like above, the occupational
10 interpersonal stressors that had been in
11 previous sessions.
12    And I think that is just, kind
13 of, a summary. And it also includes the New
14 York Times article that he referenced.
15  Q. Okay. And then, it also says,
16 under the "Note" section of the 8/25/2021
17 clinical note that you discuss "ongoing
18 behavioral intervention."
19    What does that mean:
20 "Behavioral intervention"?
21  A. Behavioral intervention would
22 be all of the things that I had
23 recommended; social activity, diet and
24 exercise, sleep hygiene, these are go under
25 "behavioral intervention."

Page 208

1  JARED N. FINKELL, M.D.
2  Q. And you were just making sure
3 that he was still doing all of those
4 things?
5  A. Yeah.
6    Like are you doing all of the
7 things? They are all really important.
8 Have you neglected those, et cetera, et
9 cetera.
10  Q. Do you remember what his
11 response was that he told you?
12  A. I don't recall the details of
13 that.
14  Q. And then, continues on and it
15 says: "We discussed risk/benefits, side
16 effects of SSRI's."
17    Those are anti-depressants?
18 One kind of anti-depressant?
19  A. Yeah.
20    Well, they are anti-depressant,
21 anti-anxiety medications.
22  Q. Okay.
23  A. Is actually a better way of
24 describing them.
25  Q. Okay. "As well as short-term

Page 209

1  JARED N. FINKELL, M.D.
2 benzodiazepine use for acute anxiety/panic
3 symptoms, as well as potential transient
4 side effects: Agitation" -- and you will
5 have to pronounce the next word.
6  A. Akathisia. Akathisia.
7    THE WITNESS: Although I spell
8  it wrong. Oh, man.
9  A. It's A-K-A-T-H-E-S-I-A [sic].
10  Q. Okay.
11  A. Spelling correction.
12    THE WITNESS: I don't know how I
13  missed that.
14  Q. Okay. Did going back to --
15    THE WITNESS: I don't know how
16  I did that.
17  Q. Going back to 8/24, when he
18 requests specific pharmaceuticals.
19    As a Psychiatrist, does it
20 concern you, when a patient comes in and
21 requests specific pharmaceuticals from you?
22  A. Not in -- not in -- not in the
23 21st Century.
24    I mean I think that's -- a lot
25 of clinicians will report that that -- most

53 (Pages 206 - 209)

| Page 246 | Page 248 |
|---|---|
| 1  JARED N. FINKELL, M.D.<br>2      MS. WRITE: Object to form.<br>3  A.  Yeah.<br>4      I, um, I don't know if I would<br>5  describe it as followed it, I have been<br>6  aware of him and -- and activity.<br>7  Q.  Okay. Do you recall ever seeing<br>8  any news about Mr. Lindell hosting what he<br>9  referred to as a cyber-symposium in August<br>10 of 2021?<br>11     MS. WRITE: Object to form.<br>12 A.  No.<br>13 Q.  So, if I told you that Mr.<br>14 Lindell hosted a cyber-symposium from<br>15 August 10th to 12th of 2021, in South<br>16 Dakota, you have no knowledge of that<br>17 event?<br>18 A.  No, I don't.<br>19 Q.  Did you watch any footage of<br>20 that event?<br>21 A.  No.<br>22 Q.  Are there any symptoms of<br>23 condition, like Dr. Coomer's, that can<br>24 resurface, what you referred to as "a new<br>25 stressor." | 1  JARED N. FINKELL, M.D.<br>2      Same objection.<br>3  A.  Do I --<br>4      MR. KLOEWER: Are you<br>5    instructing him not answer?<br>6      MS. McCLUNG: Brad?<br>7      Seriously, we discussed this<br>8    before that he is not going outside<br>9    of his treatment.<br>10     You're asking him to speculate<br>11   on something he didn't see or do.<br>12     And that is not his role here.<br>13   He is not a retained expert.<br>14     MR. KLOEWER: Okay.<br>15     MS. McCLUNG: He has no<br>16   opinions on this.<br>17     MR. KLOEWER: Okay.<br>18 Q.  Let's take a look at your notes<br>19 from August 25th, this is Finkell Page 30.<br>20     (Witness complies.)<br>21 Q.  These are somewhat limited in<br>22 that your prior notes from December of<br>23 2020, you indicated a number of specific<br>24 symptoms, for example, you previously<br>25 observed anxious mood, panic symptoms, |

| Page 247 | Page 249 |
|---|---|
| 1  JARED N. FINKELL, M.D.<br>2      In your opinion, is live<br>3  streams to an audience of millions that<br>4  publically accuse someone of committing a<br>5  crime that they didn't commit, is that the<br>6  sort of stressor can give rise to some of<br>7  these systems that we have been discussing?<br>8      MS. WRITE: I will object to<br>9    the form.<br>10     This is calling for an expert<br>11   opinion that goes beyond the opinions<br>12   that were formed by Dr. Finkell<br>13   during his treatment.<br>14     MS. McCLUNG: We discussed<br>15   today that he was not going to<br>16   express opinions outside of his care<br>17   and treatment and these are just<br>18   calling for speculation on his part.<br>19     MR. KLOEWER: I am just trying<br>20   to understand if, for example, being<br>21   accused of a crime that you did not<br>22   commit is a sort of stressor can give<br>23   rise to some of these symptoms.<br>24     MS. WRITE: Object to the --<br>25   objection. | 1  JARED N. FINKELL, M.D.<br>2  intermittent depressed mood, intermittent<br>3  insomnia.<br>4      I don't see those specific<br>5  symptoms indicated here. But I am wondering<br>6  if we can -- we can infer in your notes<br>7  here incorporate those from your prior<br>8  treatment of Dr. Coomer?<br>9  A.  So, you're saying that that --<br>10 that that is discus- --<br>11     THE COURT REPORTER: Excuse me.<br>12   That you discuss what?<br>13     THE WITNESS: Let me start<br>14   again.<br>15 A.  You're talking about the<br>16 second-to-last sentence, we discussed<br>17 risk/benefit side effects; is that correct?<br>18 Q.  Yes.<br>19     I was referring more to the<br>20 symptoms that you observed at this time<br>21 from Dr. Coomer.<br>22     You previously mentioned, in<br>23 your prior notes, that you had observed<br>24 anxious mood, headache symptoms,<br>25 intermittent depressed mood, intermittent |

63 (Pages 246 - 249)

```
                                                    Page 266
 1      JARED N. FINKELL, M.D.
 2      C E R T I F I C A T E
 3
 4  STATE OF NEW YORK    )
              : SS.:
 5  COUNTY OF NEW YORK   )
 6
 7      I, KARYN CHIUSANO, a Notary Public
 8  for and within the State of New York, do
 9  hereby certify:
10      That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this 23rd day of July, 2023.
21
22
23        *[signature: Karyn Chiusano]*
          KARYN CHIUSANO
24
25
```