# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
------------------------------------------X
ERIC COOMER, Ph.D.,

                PLAINTIFF,

  -against-    Civil Action No.:
                 1:22-cv-01127-NYW-SKC

MICHAEL J. LINDELL, MYPILLOW, INC., and
FRANKSPEECH, LLC,

                DEFENDANTS.
------------------------------------------X
              DATE: August 18, 2023
              TIME: 9:00 A.M.

      DEPOSITION of the Expert
Witness, CHRISTOPHER RUDDY, taken by the
Defendant, pursuant to a Subpoena and to
the Federal Rules of Civil Procedure, held
at the offices of Duane Morris, LLP, 230
Park Avenue, Suite 1130, New York, New York
10169, before Karyn Chiusano, a Notary
Public of the State of New York.

Page 6

1    CHRISTOPHER RUDDY
2    truth, so help you, God?
3        THE WITNESS:  I do.
4  C H R I S T O P H E R    R U D D Y,
5    called as a witness, having been first duly
6    sworn by a Notary Public of the State of
7    New York, was examined and testified as
8    follows:
9        THE COURT REPORTER:  Wonderful,
10   sir.
11       Can I kindly have your name,
12   spelling, please?
13       THE WITNESS:  Christopher
14   Ruddy.  C-H-R-I-S-T-O-P-H-E-R, Ruddy,
15   R-U-D-D-Y.
16       THE COURT REPORTER:  Can I
17   kindly have your address, sir?
18       THE WITNESS:  1120 Bear Island
19   Drive, West Palm Beach, Florida
20   33479.
21       THE COURT REPORTER:  Any time
22   you're ready, Mr. Malone, I'm ready
23   for you, sir.
24       MR. FISH:  Pardon me.  Before
25   the questioning begins, let me make a

Page 7

1    CHRISTOPHER RUDDY
2    note for the record, that the
3    parties -- both counsel are appearing
4    remotely which is probably obvious.
5        But we are stipulating to the
6    means and methods of this deposition
7    being remote and neither party
8    intends and shall raise any objection
9    to the admissibility of any testimony
10   or evidence based solely on the means
11   and methods of taking this
12   deposition.
13       Is that our agreement?
14       MR. MALONE:  The rebuttal is so
15   stipulated.
16       MR. FISH:  Pardon me.
17       Thank you.
18 EXAMINATION BY
19 MR. MALONE:
20   Q.   Mr. Ruddy, would you please
21   state your job title?
22   A.   Chief Executive Officer.
23   Q.   And you're the Chief Executive
24 Officer of Newsmax?
25   A.   Correct.

Page 8

1    CHRISTOPHER RUDDY
2    Q.   How long have you held that
3  title?
4    A.   Approximately twenty-five
5  years.
6    Q.   Staring in, roughly, 1998?
7    A.   Correct.
8    Q.   What jobs did you hold before
9  you held your current position?
10   A.   I was a national correspondent
11 at the Pittsburgh-Tribune-Review.  I was a
12 reporter at the New York Post.  I was a
13 school teacher in the City of New York
14 after college.
15   Q.   And Newsmax begin its operation
16 in 1998?
17   A.   It did.
18   Q.   At that time, how would you
19 characterize Newsmax's business model?
20   A.   I would say that it was a mixed
21 revenue model to -- we offered content and
22 sold advising, and we also sold
23 subscriptions to a -- a newsletter.
24   Q.   And that content was
25 distributed through cable television; is

Page 9

1    CHRISTOPHER RUDDY
2  that accurate?
3    A.   No.
4        It was digital website means.
5  We also had a print product, the newsletter
6  that later became the magazine.
7    Q.   I see.
8        So Newsmax started as an online
9  and a print operation; is that accurate?
10   A.   Correct.
11   Q.   Thank you.
12       And at some point, I understand
13 that that business model changed, that
14 Newsmax offered content through cable
15 television; is that accurate?
16   A.   Correct.
17   Q.   And when did that start?
18   A.   We did not go on cable until --
19 until 2014.
20   Q.   Okay.  And when Newsmax went on
21 cable, did it continue to offer online
22 content?
23   A.   Yes.
24   Q.   And it offers online content
25 and content through cable television

3 (Pages 6 - 9)

Page 10

CHRISTOPHER RUDDY

Q. distributors; is that accurate?
A. Correct.
Q. How many homes is Newsmax -- I'll refer to it as Newsmax TV available on?
A. Probably over $100 million -- $110 million.
Q. And that's through cable and satellite TV distributors; is that accurate?
A. And a -- yes, and streaming.
Q. And streaming through digital platforms?
A. Yes, like, Roku.
Q. I see.
So, that hundred million is just through cable, satellite and streaming; is that accurate?
A. Yes. That's an estimate.
Q. Okay. And is there a similar estimate available as to how many individuals access Newsmax's content online?
A. We get data from -- we have

Page 11

CHRISTOPHER RUDDY

internal Google data, and we have data from Comscore, and we average anywhere from -- I think -- I haven't looked at the recent numbers, maybe four to eight million people a month.
Q. Four to eight million online?
A. Four to eight million online.
Q. Okay. We'll look at a few numbers from Comscore in a bit.
First, I'd like to ask you, Mr. Ruddy, what did you do to prepare for your deposition today?
A. I just had a meeting with my -- my lawyer and my in-house counsel a couple of days ago, and we just discussed what issues we might be -- you guys might be raising and that was it.
Q. Understood.
I am going to try share my screen, and we will identify this document. I believe we left off at 161.
MR. MALONE: Brad or Charlie, is that accurate from --
MR. FISH: Yeah, that's the

Page 12

CHRISTOPHER RUDDY

next one, 161.
MR. MALONE: Okay.
It appears, though, I'm not permitted to do a screen share. Is there any way we can change that?
THE COURT REPORTER: Hold, please.
THE VIDEOGRAPHER: We are going off the record at 9:20.
(Whereupon, an off-the-record discussion was held.)
THE VIDEOGRAPHER: We are back on the record at 9:22.
Q. Okay. Mr. Ruddy, what is being displayed on the screen is a subpoena which will be identified as Exhibit 161, which I'll represent to you is a subpoena to Newsmax Media Incorporated and it is dated February 13, 2023.
(Whereupon, Subpoena was marked as Exhibit 161 for identification as of this date by the Reporter.)
Q. Have you seen this document before?

Page 13

CHRISTOPHER RUDDY

A. No.
Q. Do you understand that Newsmax has produced documents in this litigation?
A. I am -- I don't know what documents have been produced.
Q. Okay. One of the documents that has been produced has been identified as NMXLIND1, and we will identify that as Exhibit 162, and I will share that on the screen.
(Whereupon, Nielsen Ratings was marked as Exhibit 162 for identification as of this date by the Reporter.)
Q. Can you see that document, Mr. Ruddy?
A. Yeah. It's Nielsen ratings.
Q. And have you seen this particular document before?
A. That specific one, I'm not aware.
Q. Understood.
I do have some questions about the data that we are looking at that I

4 (Pages 10 - 13)

Page 18

1         CHRISTOPHER RUDDY
2  viewers?
3      A.   Correct.
4      Q.   And that's data that's
5  aggregated over the course of eight weeks.
6           So, the average is based on the
7  16th through the 22nd; is that what we're
8  looking at in Column M here?
9      A.   Yeah.
10          I'm assuming that's how they
11 define a week, yeah.
12     Q.   Okay.  And the -- the
13 difference here -- well, let me ask it this
14 way:  What does the November, 2020 actuals
15 refer to in your understanding?
16     A.   Well, I would -- how many
17 actually came in.  How many average viewers
18 they had in the month of November.
19     Q.   Is that just based on -- the
20 average of Columns K through N here?  I'm
21 indicating.
22     A.   I'm -- I'm guessing.
23          Yeah.  I'm not -- I'm guessing,
24 I have no, you know --
25          MR. FISH:  Don't guess, Chris.

Page 19

1         CHRISTOPHER RUDDY
2      Okay.
3          THE WITNESS:  Yeah.
4      Q.   Okay.  The difference indicated
5  in Column Q here, on Exhibit 161, do you
6  see that?
7          (Witness reviews document.)
8      A.   Well, Q is blocked by all of
9  the images on the screen of you guys.
10     Q.   Let's see what we can do about
11 that, sir.
12          Can you see it better now?
13     A.   Slightly, but not really, no.
14 Now I can see it.
15     Q.   Let's go forward, for example,
16 taking American Agenda in Rows 30 through
17 37 again.
18          You see that, for example, the
19 increase in viewership of American Agenda
20 was 935 percent month over month in 2020.
21          Is that what this column is
22 indicating?
23     A.   Yes.
24     Q.   Okay.  It's fair to say that
25 Newmax's viewership was robust in November

Page 20

1         CHRISTOPHER RUDDY
2  of 2020 following the election; is that
3  right?
4      A.   Correct.
5      Q.   Do you recall -- giving an
6  interview about Newmax's viewership at that
7  time?
8      A.   I gave many.  I don't know
9  which one you're referring to.
10     Q.   In particular, I'm referring to
11 what will be identified as Exhibit 163.
12          (Whereupon, Interview was
13          marked as Exhibit 163 for
14          identification as of this date by the
15          Reporter.)
16     Q.   Do you see that document
17 displayed on your screen?
18     A.   Yes.
19     Q.   So, this is an interview with
20 the New Yorkers', Isaac Chotiner, dated
21 November 24th, 2020.  It's an interview
22 with you.
23          I'm scrolling down to Page 10
24 of this document which quotes you as
25 saying, "The news cycle is red hot and

Page 21

1         CHRISTOPHER RUDDY
2  Newsmax is getting $1 million people per
3  minute according to Nielsen tuning into
4  Newsmax TV.  I think that's good?"  End
5  quote.
6          Do you see that?
7          (Witness reviews document.)
8      A.   Yes.
9      Q.   And that was accurate at that
10 time, November 24th, 2020?
11     A.   I -- I believe it is.  I don't
12 have the tape recording of it.
13     Q.   Understood.
14          So, the quote is accurate as
15 far as you know; correct?
16     A.   Yeah.  I mean, I have no reason
17 to dispute it.
18     Q.   And then, follow-up question
19 is:  Is that number accurate, as far as you
20 know, the $1 million per minute as of
21 November 24th?
22     A.   Yeah.
23          I -- I -- I -- I don't know.  I
24 don't remember all of the data at that
25 time.  But, based on the data you just

Page 42

CHRISTOPHER RUDDY

1
2  every expressed any doubt about that belief
3  of his?
4      A.  Not that I'm aware of.
5      Q.  Is it accurate, sir, that after
6  Mr. Sellers walked off the program that you
7  and Mike had a conversation; right?
8      A.  Correct.
9      Q.  And Mr. Lindell returned to the
10 Newsmax airwaves later that same day?
11     A.  I believe that's true.
12         MR. MALONE:  One moment.
13         I'm going to pull up that.
14     Q.  Okay.  This will be Exhibit, I
15 believe, 166 -- 167.
16         MR. MALONE:  167, as I was
17     saying.
18         (Whereupon, Video was marked
19     as Exhibit 167 for identification as
20     of this date by the Reporter.)
21     Q.  Okay.  And it appears from the
22 Newsmax website, sir, that that segment
23 would have aired on February 2nd of 2021.
24         Do you have any reason to doubt
25 that?

Page 43

CHRISTOPHER RUDDY

1
2      A.  No.
3      Q.  Do I understand correctly that
4  Mr. Lindell spoke to you between the
5  segment where Mr. Sellers walked of the air
6  and the segment that each of us watched?
7      A.  Correct.
8      Q.  And was it your decision to, I
9  guess, put him back on the air?
10     A.  Well, certainly, to let him go
11 back on.  He may have been booked.  A lot
12 of times we'll book a guest for daytime and
13 prime time, so, he may have been previously
14 booked for that, so -- but -- but there was
15 a discussion about him.
16         I know when we chatted on the
17 phone about coming on in the future, and I
18 said I had no issue with that as long as he
19 didn't talk about the election, and he
20 insured me that he wouldn't do that again.
21         MR. FISH:  Brian, if there's a
22     convenient time, can we take a break?
23     I don't want to interrupt your
24     questioning, but could we get a
25     break.

Page 44

CHRISTOPHER RUDDY

1
2         MR. MALONE:  Sorry, Andrew, you
3     cut out there.
4         MR. FISH:  Sorry.  At a
5     convenient time, can we take a break?
6         MR. MALONE:  Absolutely.  Let's
7     take one right now.
8         THE VIDEOGRAPHER:  This will
9     end Media Unit Number One.
10        Going off the record at 10:05.
11        (Whereupon, a short recess was
12    taken.)
13        THE VIDEOGRAPHER:  We're back
14    on the record at 10:17.
15        This will begin Media Unit Two.
16    Q.  Mr. Ruddy, I'd like to return
17 to something we were talking about just
18 before the break which is your conversation
19 with Mr. Lindell before he went on the air
20 on February 2, 2021.
21        And I believe you had mentioned
22 that Newsmax had covered a lot of issues
23 related to the 2020 election; fair?
24    A.  Yes.
25    Q.  Do you recall talking to Mr.

Page 45

CHRISTOPHER RUDDY

1
2  Lindell about Eric Coomer at all during
3  that conversation?
4      A.  I don't remember.
5      Q.  Do you recall ever talking to
6  Mr. Lindell about Eric Coomer?
7      A.  Yes.
8      Q.  When did that conversation
9  happen?
10     A.  After we had settled the
11 agreement, at some point, Michael -- Mike
12 Lindell reached out to me to talk to me
13 about the settlement.
14     Q.  Okay.  I think I know what
15 you're referring to, Mr. Ruddy.  I want to
16 make sure, though.
17        So, what I'll do is display on
18 my screen what be Exhibit 168.
19        (Whereupon, Complaint was
20    marked as Exhibit 168 for
21    identification as of this date by the
22    Reporter.)
23        MR. MALONE:  It looks as though
24    screen share -- oh.  It's working
25    again.

12 (Pages 42 - 45)

Veritext Legal Solutions

www.veritext.com                                                                 888-391-3376

Page 70

1 CHRISTOPHER RUDDY
2 We are going off the record at
3 10:52, 8/18/23.
4 THE COURT REPORTER: Mr. Cain,
5 would you like a copy of the
6 transcript?
7 MR. CAIN: Yes, I would.
8 Condensed.
9 (Whereupon, at 10:52 A.M., the
10 Examination of this witness was
11 concluded.)
12
13    ○   ○   ○   ○
14
15
16
17
18
19
20
21
22
23
24
25

Page 71

1 CHRISTOPHER RUDDY
2    E X H I B I T S
3
4 PLAINTIFF'S EXHIBITS
5
6 EXHIBIT   EXHIBIT              PAGE
7 NUMBER    DESCRIPTION
8 161       Subpoena                12
9 162       Nielsen Ratings         13
10 163      Interview               20
11 123      Comscore Program in DX  27
12 165      Document                29
13 166      Video                   33
14 167      Video                   42
15 168      Complaint               45
16 169      Settlement Agreement    46
17 170      Text Messages           53
18 177      Video                   60
19
20
21
22 (Exhibits retained by Court Reporter.)
23
24
25

Page 73

1 CHRISTOPHER RUDDY
2    C E R T I F I C A T E
3
4 STATE OF NEW YORK    )
                      : SS.:
5 COUNTY OF NEW YORK   )
6
7    I, KARYN CHIUSANO, a Notary Public
8 for and within the State of New York, do
9 hereby certify:
10    That the witness whose examination is
11 hereinbefore set forth was duly sworn and
12 that such examination is a true record of
13 the testimony given by that witness.
14    I further certify that I am not
15 related to any of the parties to this
16 action by blood or by marriage and that I
17 am in no way interested in the outcome of
18 this matter.
19    IN WITNESS WHEREOF, I have hereunto
20 set my hand this 22nd day of August, 2023.
21
22                    *Karyn Chiusano*
23                  _____
                    KARYN CHIUSANO8
24
25

19 (Pages 70, 71, 73)