# EXHIBIT 11

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3   ----------------------------------------------------------

 4   Eric Coomer, Ph.D.,

 5                   Plaintiff,

 6      vs.             Civil Action No. 1:22-cv-01129-WJM

 7   Michael J. Lindell, Frankspeech LLC,

 8   and My Pillow, Inc.,

 9                   Defendants.

10   ----------------------------------------------------------

11

12        VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13       DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                   VOLUME I (Pages 1-370)

15

16

17   DATE:   March 8, 2023

18   TIME:   9:30 a.m. CST

19   PLACE:  PARKER DANIELS KIBORT, LLC

20           Colwell Building, Suite 888, 123 North 3rd St

21           Minneapolis, Minnesota 55401

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR

25   Job No.: 5761446
```

Page 1

| | |
|---|---|
| 1 to take it. | 1 don't, I never met the guy. |
| 2   Q.  Well, given that she's not an employee -- | 2   Q.  Because you wanted to talk about election fraud |
| 3   A.  That's fine, she can go out there. | 3 issues on Newsmax? |
| 4      THE WITNESS:  Just go.  It's no big deal. | 4   A.  No, My Pillow, do you get it, My Pillow.  I |
| 5      (Katelyn Gamlin left the deposition.) | 5 couldn't go on there to talk about My Pillow.  And I |
| 6   A.  Okay. | 6 asked him why I couldn't talk about my new platform |
| 7   Q.  All right.  Now is there anyone, Mr. Lindell, in | 7 Frankspeech or My Pillow.  I couldn't have my ads there, |
| 8 your view that's more knowledgeable about your company | 8 he wouldn't let me run Frankspeech ads after that |
| 9 My Pillow than yourself? | 9 either.  He let me run plenty of Frankspeech ads, |
| 10   A.  No. | 10 wouldn't let me run that. |
| 11   Q.  You mentioned Mr. Ruddy and then we kind of got | 11   I couldn't go on to talk, I'm friends with all |
| 12 sidetracked and you talked about lost business as a | 12 the hosts there, we would go on and they would say, hey, |
| 13 result of Eric Coomer, is that correct? | 13 you hired so many people today, hey, Made in America. |
| 14   A.  That's correct. | 14 He, he, I could never go on again and talk about My |
| 15   Q.  Explain that to me, how did you lose business. | 15 Pillow and it hurt our sales.  Sure, we run the ads, but |
| 16   A.  Chris Ruddy, apparently Eric Coomer when I found | 16 sales would spike if you could go on and say how many, |
| 17 out the spring of '21 he sued, I guess at some point he | 17 Made in America, talking about your number of employees, |
| 18 must have used Newsmax, okay.  And when he did, when he | 18 hiring, you know, you're hiring employees, new things |
| 19 made a deal with Newsmax, which I believe was the | 19 that would develop at My Pillow, new products.  From |
| 20 spring, it was right before the statement I made here on | 20 that day I've never been able to go back on there |
| 21 Page 36.  The only comment I ever made about, I didn't | 21 because of Eric Coomer.  And I didn't know who the guy |
| 22 know who Eric Coomer was, and when I made the statement | 22 was, I don't know why he did this to me. |
| 23 it was I believe the day after I heard Chris Ruddy | 23   Q.  Would sales spike when you talked about election |
| 24 announce that there was no, they found no evidence of | 24 fraud issues? |
| 25 crime or whatever, blah, blah, blah, and this guy named | 25   A.  No, no.  You're talking about the Cyber |
| <div align="right">Page 18</div> | <div align="right">Page 20</div> |
| 1 Eric Coomer had, it was a case with Eric Coomer. | 1 Symposium, I lost $4 million over that because of that, |
| 2      From that point I was not allowed, I talked to | 2 at least, maybe more. |
| 3 Ruddy, I was not allowed to go on Newsmax anymore to | 3   Q.  All right.  We'll get to that. |
| 4 talk about My Pillow and it hurt my business.  And then, | 4   A.  And when I talked about election, when I talked |
| 5 and I said Eric Coomer is a traitor what he did, and | 5 about election things I lost $100 million in one month |
| 6 that's when I made that comment and I stand by that. | 6 going forward.  Right now I probably lost a quarter, at |
| 7 What he did to My Pillow that day and whatever he made a | 7 least 250 million.  I've had to borrow money, my company |
| 8 dirty deal with Chris Ruddy, I'm not allowed to go on | 8 is down, it's way down. |
| 9 Newsmax like I was always on to go and talk about my | 9   Q.  And you're here on behalf of My Pillow, so I |
| 10 products and talk about anything that's out there in the | 10 want to make the record clear. |
| 11 news.  They had me on all the time for ten years. | 11   A.  Yep. |
| 12   Q.  Is My Pillow not running advertisements on | 12   Q.  When you say I lost 4 million. |
| 13 Newsmax? | 13   A.  My Pillow has, My Pillow, it's just My Pillow. |
| 14   A.  Yeah, we run advertisements, we have since 2011 | 14 You're correct.  So you want me to answer My Pillow all |
| 15 on every station, every single station, ABC, CNN, all of | 15 the time? |
| 16 them.  But what happened is when I would go on there he | 16   Q.  Well, I just don't want -- |
| 17 would have me on to talk about My Pillow, just like on a | 17   A.  My Pillow has lost millions and millions, |
| 18 newscast, talk about my employees, talk about, talk | 18 hundreds of millions. |
| 19 about the business, Made in America. | 19   Q.  And My Pillow lost $4 million in connection with |
| 20      But I from that point, from the time Eric Coomer | 20 the Cyber Symposium? |
| 21 did this, whatever deal they made, I was shut out of | 21   A.  Probably more than that because we made a |
| 22 Newsmax, I never appeared on there since.  One time in a | 22 decision when Fox wouldn't run the ads and everybody |
| 23 recording, one time in a recording when they, and that's | 23 else did, ABC, NBC, CBS, CNN, everybody ran the ads, |
| 24 it, it was shut off.  And I was very upset with this guy | 24 Newsmax, OAN, they all ran the ads to advertise for this |
| 25 Eric Coomer.  I had no idea who this guy was, still | 25 symposium.  Fox would not take the ad and then we |
| <div align="right">Page 19</div> | <div align="right">Page 21</div> |

<div align="right">6 (Pages 18 - 21)</div>

1 not dismiss this last summer when she, when it was
2 brought up for dismissal, it's shameful.
3     Q. Are you through?
4     A. Okay. What else do you want to know in here.
5     Q. All right. Flip to, if you look at the bottom
6 right, Page 2138.
7     A. Yep.
8     Q. By the way, did you read Dr. Coomer's
9 deposition?
10     A. What's that?
11     Q. Do you know that Dr. Coomer gave a deposition in
12 this case?
13     A. Who's Dr. Coomer, is that Eric?
14     Q. Yeah, he's, he's a Ph.D.
15     A. I didn't, I wasn't at his deposition.
16     Q. I said did you read it?
17     A. No.
18     Q. Okay.
19     A. Was that a requirement? This whole case is
20 frivolous, you guys are already wasting so much of my
21 time that I'm here. And let's finish, okay. No, I did
22 not read his deposition. I don't know the guy.
23     Q. Okay. In his deposition he was asked about
24 run-ins with the law, criminal conduct.
25     A. Okay.

Page 182

1     Q. Are you aware of that?
2     A. He was, he was, he was part of criminal conduct,
3 I'm unaware.
4     Q. Okay. He was asked about that in his
5 deposition.
6     A. If he's a criminal?
7     Q. Yeah.
8     A. Did he, did he come clean?
9     Q. You think he's a criminal, don't you?
10     A. Did he come clean?
11     Q. You think he's a criminal, don't you?
12     A. Do I think he's a criminal?
13     Q. Yeah.
14     A. I think what he did to me is criminal. What he
15 did to my company when he did that deal with Chris Ruddy
16 I think is criminal, yes. I think he's a traitor and
17 criminal by what he did to My Pillow, that's what I
18 think. There's your answer. And I stated it very, very
19 fine in here after he, after he attacked me.
20 100 percent, there it is, yeah, Eric Coomer, if I knew
21 right now instead of turning and making deals with
22 Newsmax, why don't you turn yourself in to get less
23 time. I hope, I hope he does get time for what he did
24 to us. Oh, you don't, you don't, we haven't pressed
25 charges yet, but let's get rid of this frivolous lawsuit

Page 183

1 and then we'll see what I can, we'll see what kind of a
2 lawyer you are then. Keep going, what's your point.
3     Q. Do you hire criminals?
4     A. What?
5     Q. Do you hire criminals?
6     A. Do I hire criminals, ex-criminals, yeah. I have
7 people that have been, have done all kinds of stuff and
8 I have a company of second chances. I get them off of
9 addiction, I get them to Jesus, yes. I have hired
10 people that have been criminals, that have done criminal
11 things. I have a criminal record, so. And now you're
12 going to go what is it. Look it up, read my book.
13     Q. I actually don't care.
14     A. Okay.
15     Q. But the point has been made and I think I even
16 noticed in some of your documents that, some texts where
17 you're talking about Eric Coomer --
18     A. Only after the fact.
19     Q. -- being detained by the police?
20     A. Only after you guys served me these papers. And
21 whatever you found was after you have sued me. There's
22 only one statement I ever made about this man was after
23 he did this at Newsmax.
24     Q. Okay.
25     A. That's fact, I read this. Unless you got more

Page 184

1 that you didn't put in there, I read this. Everything I
2 said was after you served me papers in Colorado.
3     Q. I'm just asking you --
4     A. And everything I said I meant it.
5     MR. MALONE: Mike, just listen to his
6 questions.
7     Q. Does My Pillow, I'm just asking if there's a
8 double standard at My Pillow. On the one hand we're
9 looking at some texts about Eric Coomer running in,
10 having a run-in with the law, right, and then on the
11 other hand you've said yourself you have a criminal
12 record. You know Dawn has a criminal record, don't you?
13     A. Yeah, sure.
14     Q. I mean, she has a felony conviction, doesn't
15 she?
16     A. Yeah.
17     MR. MALONE: Object to the form, outside
18 the scope. You can answer.
19     A. I know all the things, yeah, and they got help,
20 and yes, she got help and she's fine.
21     Q. I just want to make sure that when we try this
22 case My Pillow isn't going to castigate Dr. Coomer
23 because he's had run-ins with the law himself?
24     A. Listen to me. I don't know his run-ins with the
25 law. You're misunderstanding what I said. What he did

Page 185

47 (Pages 182 - 185)

1 to me I consider it criminal.  I don't care what he's
2 done in his past nor do I know what he's done in his
3 past.  Do you get that?
4     Q.  I do.
5     A.  Well, then don't sit here and tell me.  He did
6 this directly to me.
7     Q.  Right.
8     A.  And it's criminal what he's done to me.
9     Q.  And, and --
10     A.  He's a criminal, that's what he is, and that's
11 my opinion.  He did this to me.  I don't care if he,
12 what he's done in his past, I could care less.  I heard
13 once he, that he's got some DWI's, I don't even know, I
14 don't know, I don't know, I don't know his past, I don't
15 know what he's done, I don't know anything about the
16 guy.  But I do know what he did to me.  That's why we're
17 here, what he did to me.  And I will, just like these
18 other people that you hear me bad-mouth, I don't
19 bad-mouth anybody directly unless they, I have the
20 evidence of what they did to me or what, or that, that
21 I've done my due diligence.
22        Eric Coomer did this directly to me.  And I made
23 one statement about him.  Didn't say nothing for a whole
24 year, and then you guys come up and serve me papers in
25 Colorado.  I'll bet there was statements after that,

Page 186

1 wasn't there.  Then everybody knew that what he did to
2 My Pillow and Mike Lindell.  How dare he come and sue My
3 Pillow, he's a scumbag for doing that.
4        THE WITNESS:  Put that in there, scumbag,
5 S-C-U-M, bag.
6     A.  That's what he is for what he did to me.
7     Q.  Okay.  That's not my question.  There were
8 questions to him about his past.
9     A.  Not from me.
10     Q.  And what I'm hearing you say --
11     A.  Not from me.
12     Q.  From your lawyer.
13     A.  Well, I don't know what my lawyer did, that's
14 between my lawyer and him.  You guys, all lawyers do the
15 same stuff, lawyer stuff.
16        MR. MALONE:  Just let him ask the question,
17 see what he has to say.
18     Q.  Okay.  From your perspective as CEO of My
19 Pillow, Eric Coomer's past, whether he had run-ins with
20 the law or, or criminal issues, is of no moment and is
21 irrelevant?
22     A.  Is irrelevant, 100 percent irrelevant, as far as
23 I'm concerned, that's his business.
24     Q.  Because you believe, you said, you know, Dawn
25 has --

Page 187

1     A.  She had, I have many, many people, their past,
2 but if they've changed, if they've changed or gotten
3 help, absolutely I hire him.  This is current, this is
4 real.
5     Q.  You struggled with addiction?
6     A.  Oh, yeah, I was a crack addict, yeah.
7     Q.  And Eric Coomer struggled with addiction.
8     A.  I don't know, I don't know.  I feel bad for him,
9 but I hope he got changed, hopefully he found the Lord
10 Jesus Christ, you know, so I can pray for him.  I have
11 prayed for him, believe it or not, I have prayed for
12 him, you know.  I prayed for him, I go why did this
13 person do this to somebody and I prayed for his
14 salvation, for his soul, and for him to get help, you
15 know, as I have lawyers that even back up frivolous
16 cases like this.  And I got to meet the lawyer behind
17 the curtain.  Go ahead.
18     Q.  I'll take whatever I can get.  Okay.  Let's,
19 let's de-escalate and just talk about some numbers,
20 that's a little easier I think in a sense.  Go back to
21 this exhibit, if you would, please, 62.  You've already
22 been quite clear at least in your mind that your
23 activities relating to the election, 2020 election have
24 hurt My Pillow's business?
25     A.  Absolutely.

Page 188

1     Q.  In a, in a sort of a shorter area or window, did
2 My Pillow at least around the Cyber Symposium experience
3 an uptick in sales?
4     A.  Huh-un, no.
5     Q.  Okay.
6     A.  And it's hard to tell because, because of drop
7 in the Fox ads, so it's very hard.  But we lost, it's a
8 net net definitely loss.
9     Q.  Well, if you take Fox out of the scenario,
10 because you made the decision to, to cut Fox out, all
11 right.  So put Fox --
12     A.  It's all one thing.
13     Q.  Hold on, hold on.  Put Fox in a box on the side.
14     A.  Okay.
15     Q.  And just, just talking about the other revenue
16 streams.  During the symposium, isn't it true that you
17 had an uptick in revenue from the other sources
18 outside --
19     A.  I, I don't know, I would have to, I have no
20 idea.
21     Q.  Is there something like, I've looked at, there's
22 week -- here's the question, and correct me if I'm
23 wrong.  You both do day, daily reporting where you look
24 at --
25     A.  And weekly reporting, yeah.

Page 189

48 (Pages 186 - 189)

1 various platforms because of the, the Cyber Symposium
2 being that week, right?
3    A. Well, good for them, they did good I guess for
4 two days.
5    Q. Okay. Well, so did My Pillow in the sense
6 that --
7    A. No, My Pillow lost $4 million. How many times
8 do I have to tell you that.
9    Q. Did My Pillow -- yeah, you've told me multiple
10 times.
11    A. If you take the numbers, if you take the Cyber
12 Symposium out and if you put what we normally do, we're
13 down $4 million. Now you can say, well, it was your
14 choice to drop Fox. Yeah, it was, it was your choice to
15 do this. I didn't charge for the symposium. Maybe I
16 could have charged, maybe I should have ran ads like
17 RSBN, maybe then I would have maybe broke even, but I
18 lost $4 million. And I knew I was going to take a hit,
19 I didn't care.
20        You asked me, well, why did you drop Fox, you
21 knew you were going to take a hit. Because they
22 wouldn't take my ads and advertisements on election
23 crime, that's it. I don't care about this thing here, I
24 have to save the country here and get the word out. If
25 you had the evidence I would hope you would do the same

Page 222

1 obviously knew it because he told Newsmax not to have me
2 on anymore, I think. They didn't have me on, Ruddy says
3 I can't have you on after your boy here, your, your
4 money cash cow, whoever is paying you. I hope he's
5 paying you, you know, I hope you get paid or you're just
6 doing it on, think you're going to get a big payday
7 here, you know.
8    Q. Is Chris Ruddy a traitor too for what he did?
9    A. I told him that, and I go Chris, you're a
10 traitor if you do that. I called Fox, said why don't
11 you watch. I said, Chris, here, if you do that, I said
12 you're a traitor. I bad-mouthed him every day after
13 that for at least a week and he goes Mike, will you quit
14 bad-mouthing me. I go okay, I will, and I bad-mouthed
15 Newsmax and I have ever since.
16        Newsmax, Salem Media and Fox I bad-mouth almost
17 every day that they won't put the evidence, they won't
18 talk about elections, nobody, because it's called
19 Lawfare. It's what your guy started, you started, even
20 before Smartmatic started Lawfare. On February 4, 2021
21 when Smartmatic sued Fox News, it changed our country
22 forever. Nobody can go on, evidence or not. Even 2,000
23 meals when they had cameras, they wouldn't even have
24 them on at Newsmax or Salem Media, or I mean or Fox
25 News.

Page 224

1 thing. This isn't money driven, this isn't, I don't
2 care how much money I've spent. You can sit out there,
3 I've spent over $40 million of my own money. I have no
4 money left. Every dime I've had to save this country to
5 get this out there, and you guys know that, you see me
6 every day. Do I say, oh, I'm going to back down now,
7 and no, it doesn't matter because I know what I have.
8 And if I don't finish it, you're done, you don't have a
9 job in a couple years, it's over, you will never have an
10 election again.
11        This isn't about a Democrat or a Republican,
12 this is about the evidence that China intruded in our
13 election. Did your guy do it, I don't know and I don't
14 care, but I know what he did to me, I know what he did
15 to me at Newsmax. And that's what I went after him with
16 one paragraph calling him a traitor, and I did, and a
17 criminal, because what he did My Pillow was criminal.
18 He didn't have to do that to My Pillow and attack my
19 company and my employees so they lose all the money.
20 It's disgusting.
21    Q. Is that why he's a traitor too, what he did to
22 your company?
23    A. Mm-hmm, absolutely. He did it, he did it there
24 to suppress, to attack Newsmax and suppress what --
25 everybody knew what I was trying to get out there and he

Page 223

1        This is where we're at, this is Lawfare. It's
2 absolutely insane. You attack companies so they drop My
3 Pillow. They tried to put me out and this whole thing,
4 let's just break Mike Lindell, run him out of money, run
5 his company down so he shuts up. That's the game.
6 Whether you're a part of that game or not, I don't care.
7 Anyone that gets in my way of getting this out, they're
8 a traitor, period, they are a traitor to our country.
9 Because no one, just let me out and let me show this to
10 the world. It's up on Frankspeech right now, but no
11 reporters report it, instead it's that's what comes out
12 of here, Mike Lindell sued by Dominion for $6.3 billion
13 and at the capitol when I'm trying to get the word out,
14 they got sued by a guy named Eric Coomer, who I didn't
15 know from the man on the moon, you know.
16    Q. All right.
17    A. It's just bizarre.
18        MR. CAIN: I'm going to object as
19 nonresponsive.
20    Q. Here's what we're going to do. We're going to
21 give her a break, sir, and I'm going to reiterate what I
22 told you earlier. As much as I'm enjoying my time with
23 you, I may have to ask for more of it because --
24    A. What's that now, ask what?
25    Q. Can you put your phone down, please.

Page 225

57 (Pages 222 - 225)

1    A.  No, I will not because that's the last person I
2  want you to attack.  He's been attacked enough, you
3  guys, maybe not you, but Dominion makes a really good
4  case of that.  You want him, subpoena him.
5    Q.  I'm sorry, I missed the part about Dominion
6  makes really?
7    A.  Dominion has got his number and everything, you
8  guys call them up, I'm sure -- by the way, do you ever
9  talk to their lawyers, can I subpoena that, your guys'
10  text messages?  We'll have to talk about that afterwards
11  when we're off the record.  When we go out to lunch
12  tonight, let's talk about that, huh.
13    Q.  I already had lunch.
14    A.  Oh, okay, dinner.
15    Q.  Oh, you mentioned, let's stick on the symposium.
16  We talked a little bit about --
17    A.  Do a lot of people call you Perry Mason?
18    Q.  No.
19      MR. MALONE:  Mike, just answer questions,
20  let's keep it moving here.
21    A.  Okay.  Did I mention what?
22    Q.  You had mentioned you had to get back, you had
23  food to order, this is for the symposium.
24    A.  Yeah, because nothing was planned.
25    Q.  Why was that, why was nothing planned?

Page 266

1    A.  Because I was just going to get up there for
2  72 hours myself and just talk, talk and put evidence
3  out, that's all I was going to do.  It was nothing
4  planned.  I had, the food was all planned, but I
5  micromanage, I wanted to make sure that everyone had a,
6  where their seating was, where the food was, because the
7  continuous food, I didn't want anyone, I wanted everyone
8  to be attentive.  I wanted to, it was a big thing to me,
9  everything was on the line.
10      I wanted to, you know, these guys are sitting
11  there trying to put evidence in a thing or whatever, we
12  had to get there.  And a copy he said could have took up
13  to two, three more hours and I was, you know, wanted to
14  get there and make sure that they, as people come in to
15  set the thing up and make sure everybody, everything was
16  right, you know, from food to seating to everything.
17  You know, this was put on, this was an event put on at
18  the spur of the moment basically, you only had, what,
19  three or four weeks when I decided to do it because, you
20  know.
21    Q.  Okay.  And, and My Pillow produced a spreadsheet
22  with the some of the expenses associated with that.  Let
23  me just show you this real quick.
24    A.  How would My Pillow produce that.  This is
25  Lindell Management you mean.  My Pillow had nothing to

Page 267

1  do with any expenses at the Cyber Symposium, just let's
2  make that clear in the record.
3      And I had people that had My Pillow emails, they
4  worked for Lindell Management, that's their email, okay.
5  They don't work for My Pillow, that's still their email.
6  They might have worked for My Pillow at some point like
7  my niece.  You probably got this, my niece Sarah, Sarah
8  Cronin works for, she's my chief of staff at Lindell
9  Management.  That's probably where you got those, so
10  don't say you got them from My Pillow.
11    Q.  My Pillow produced them is what I'm saying.
12      THE WITNESS:  Why would My Pillow give it
13  to them, how did they get them?
14      MR. MALONE:  Mike, we'll talk about that,
15  just answer his questions.
16    A.  Okay.  I haven't seen them, I can't see it, I
17  want to see it, where are they.
18    Q.  It's because you haven't stopped talking and so
19  they can't mark it yet, so let her mark it.
20    A.  Okay.
21      (Exhibit 67 marked for identification.)
22    Q.  Okay.  Before she marked this we were talking
23  about expenses.
24    A.  Yeah.
25    Q.  Have you ever seen this --

Page 268

1    A.  No.
2    Q.  -- spreadsheet before?
3    A.  No.
4    Q.  And it had a column, the second page is I guess
5  the last column, it that just bled over.
6    A.  Mm-hmm.
7    Q.  But in terms of the expenses associated with the
8  Cyber Symposium, you just testified that that would not
9  have been incurred by My Pillow?
10    A.  That's correct.
11    Q.  Okay.  Does, do you know who incurred those
12  expenses?
13    A.  Lindell Management.
14    Q.  Okay.
15    A.  Lindell Management put on the whole thing.
16    Q.  Okay.  Lindell Management.
17    A.  Yep, Mike Lindell, which is I'm 100 percent Mike
18  Lindell.
19    Q.  Okay.  And did Lindell Management get reimbursed
20  for any of these expenses from any third-party?
21    A.  No.  Lindell Management paid these.  And if
22  there wasn't money in the Lindell Management account,
23  Mike Lindell had to personally pay for it in there.
24  It's possible that this was a check written out on Mike
25  Lindell, you know, but it was Lindell Management.  So

Page 269

68 (Pages 266 - 269)

**Page 278**

1    A.  Obviously you don't have a My Pillow too, you
2  don't, do you.
3    Q.  What I'm saying is, Mr. Lindell --
4    A.  Asshole.  But go ahead.
5       THE WITNESS:  No, I'm pissed.
6       MR. MALONE:  I understand.
7    A.  Yeah, go, when you're saying what.
8    Q.  The non-customer product complaint calls.
9    A.  Anything that comes in where the customer,
10  there's a, they can't get, they got to get, get to, they
11  can't solve the problem if the customer wants to talk to
12  Mike Lindell or if they want to talk about the weather
13  being bad.  They say, they, they go give them the ML and
14  it goes into another team of people.
15    Q.  Okay.
16    A.  And this team take anything that's unrelated to
17  My Pillow and throw it in the garbage.
18    Q.  Okay.  That's where I'm going.  To the extent
19  that My Pillow is receiving emails from people like Mr.,
20  I'm going to butcher his last name, Debarbieri --
21    A.  Nobody, the only ones that know --
22    Q.  Let me finish my question, please.
23    A.  Well, then, okay.  Then make sure you be
24  specific.  Because people don't, now you asked me how
25  they got that email address.  I don't publish it for

**Page 279**

1  everybody.  I don't, people try and reach me all the
2  time for different things.  You don't have that luxury
3  of being, have people, everyone on the street wants your
4  email whether to get a picture or whether to attack you
5  or whatever it is, you know, people like you that
6  probably call on the phone.  But go ahead.
7       I give, they give them the email, it's a thing,
8  catchall so they don't have to take the wrath or an
9  attack or to say I want to talk to Mike Lindell, come
10  on, come on, come on, it's easy, they give them this
11  email.  You asked how they got the email, that's it.
12  It's the only way they can get that ML email.
13    Q.  Do you need to take a break?
14    A.  No, I don't need to take a break.
15    Q.  All right.
16    A.  Your lumpy pillow question kind of set a nerve.
17  Because obviously, just like your question in here in
18  your little complaint, Mike's frivolous Cyber Symposium.
19  This whole case is frivolous, you should be ashamed of
20  yourself.  But go ahead, finish your question on this
21  and try not to talk about, I get personal when you
22  bad-mouth my employees or my pillows or anything like
23  that.  Go ahead.
24    Q.  I haven't said a single word about your
25  employees and I don't own --

**Page 280**

1    A.  You've attacked them, you attacked them, you're
2  part of this, you're getting paid on consignment, you
3  get paid if they get money from my employees, yes, you
4  have attacked them.  You personally did this, the
5  Newsmax, you and I call it right out, the criminal
6  lawyers and Coomer when you guys did this to me.
7    Q.  Do you not think that, that Eric Coomer rigged
8  the election?
9    A.  What?
10    Q.  Do you not think that Eric Coomer rigged the
11  election?
12    A.  I said, Eric Coomer didn't, I didn't say that, I
13  didn't say that.  I said Dominion, they used Dominion
14  machines and all machines.  I'm not specific just to
15  Dominion, ES&S, Hart, all of them, we've got to get rid
16  of the computers in our election.  I never said anything
17  about Eric Coomer.  I called him a traitor what he did
18  to My Pillow and Newsmax.
19       Chris Ruddy called me up and says, sorry, Mike,
20  you can't come on anymore, this guy, I don't know, let's
21  make a deal.  Were you involved in that deal?  You hurt
22  a lot of innocent people is what you did because that
23  day we couldn't go on.  Like right now when we're
24  overdrawn I can't go on Newsmax and say, hey, we got the
25  new My Pillow 2.0, my employees thank all of you, like I

**Page 281**

1  used to do, I'm their host.  I can't do that anymore
2  because of you and Coomer.  That's reality, that's cost
3  us hundreds of millions of dollars.
4       When I'm done with this, you wait, if there's
5  any way to get your wallet it's going to be, that's what
6  we're going to do because you've hurt us so bad, it's
7  disgusting.  And then you call it a lumpy pillow.  Put
8  that in there too, huh, are you going to put that out
9  there.  Did you use a My Pillow, how dare you.  Are you
10  reading this stuff, I don't get it, you're worse than
11  the media.  So keep going.
12    Q.  I think there was a question in there.
13       MR. CAIN:  I'm going to object as
14  nonresponsive.
15    A.  The question, the question you asked me, how did
16  they get the ML.  I've never read this, anything that
17  came across.  We get stuff all the time, it goes right
18  in the garbage.
19    Q.  So to that point, the emails that come in that
20  get filtered into this ML account --
21    A.  That's correct.
22    Q.  -- that relate to, let's say it's someone like
23  this gentleman who's calling about or emailing about
24  Coomer or Dominion.
25    A.  Garbage.

71 (Pages 278 - 281)

1  interact and say, hey, if you find a screen shot, you
2  will get a reward, you know, you have to take a screen
3  shot, okay.  So it solved that problem because people
4  really believed that even though it wasn't true.  So
5  that was set up.
6       So anything with the election, whether it was
7  good, even if it was good, hey, I got, like right now if
8  they called up and said, hey, I got a good invention for
9  Mike on MyStore, I need to talk to him, I need to talk
10 to him.  My reps instead of saying I can't talk to him,
11 there's no way you can get to him, but does he have an
12 email, you know what, here's his email, that's it,
13 because they don't have time.  My Pillow has to
14 function, it doesn't have time to talk about the weather
15 or whatever.  So these things go there.
16      And this thing here would have been deleted or
17 at least unchecked and it's sitting there in the server.
18 It was, nothing ever gets double deleted because if they
19 come back to us we have to be able to show the
20 conversation with them.  We do that to protect our
21 company.
22      MR. CAIN:  Objection, nonresponsive.
23 Q.  I'm just trying to get a sense of how many
24 people call your company about the election fraud
25 issues?
Page 286

1  with every keyword you gave.  There you go.
2  Q.  Thank you.
3  A.  Yeah, now you got your answer.  You already knew
4  the answer, you just was hoping there was more I think.
5  It sucks that you're not going to win all this money,
6  huh.  Don't you feel it slipping away because you're all
7  wrong and you realize you shouldn't have done this.
8  Q.  I'm not sure you understand how you're
9  perceived.
10 A.  I don't care how you think I'm perceived.  Let
11 me tell you how you're perceived.  You're perceived as
12 an ambulance chaser, you're the reason what's wrong with
13 this country with lawyers, you're disgraceful is what
14 you are.
15      When I read this thing again last night, I
16 thought, one paragraph after you came after me.  I
17 didn't know this, whatever this Oltmann, I didn't know
18 him then and I barely know him now.  And you guys, and
19 you guys, all the stuff back then the only thing in here
20 was one statement I made after you attacked Newsmax,
21 after Coomer attacked Newsmax.  That's the only
22 statement I made, period, I didn't know who Eric Coomer
23 was.
24 Q.  We're recycling old testimony.  I didn't ask you
25 about that either.  So let's, let's stay focused because
Page 288

1  A.  How many to nowadays, probably, I don't know,
2  none, a few.  Back then in January of '21, a lot.  They
3  were all calling in attacking and then, and then we were
4  losing our box stores, you know.
5  Q.  They, they were emailing too?
6  A.  Not emailing, no.  The only to an email
7  probably, I don't know, maybe one a month.  I don't
8  know, whatever you got is what we have.  Whatever you
9  got, then you know the number.  If you did, if you did,
10 had us do a search, whatever you got.  And believe me,
11 these guys did it all on their own, the lawyer said, no,
12 we got this third-party to do the stuff, didn't I, I was
13 very adamant about that.  You can kiss my butt I said.
14 He goes no, Mike, we have to get them.  I said there's
15 no emails that we have between with any of these things.
16      MR. MALONE:  Mike, Mike, you know what I'm
17 going to say?
18      THE WITNESS:  What?
19      MR. MALONE:  You don't have to tell them
20 about what we talked about.
21      THE WITNESS:  Okay.
22 A.  No, I'm just saying, every, you have every one.
23 So you have your own answer.
24 Q.  Okay.
25 A.  You have every single one ever done at My Pillow
Page 287

1  we only have a little bit more time.
2  A.  Okay.
3      THE WITNESS:  My A plus went out the
4  window.
5      MR. MALONE:  Just keep it moving, Mike.
6  Q.  By the way, I'm not responding to your name
7  calling and I'm not responding to --
8  A.  I know, but I did respond when you said
9  something about my product that about 2,000 employees
10 rely on and they have families.  And for you to have,
11 I've sold 80 million My Pillows in 14 years.  You don't
12 have one, so you have no right to say that.  You took
13 that right off of your corruption that you do.  You're
14 probably the one putting out the narrative, it sure
15 seems like it.
16      I read some of the crap in here that you wrote
17 in your brief that's disgusting.  The lies in here.  One
18 of them says after Mike was with Donald Trump in 2017 at
19 a manufacturers summit, he started doing promo codes on
20 Fox.  I was doing it ten years prior.  This is a big
21 lie, you're a lying lawyer.
22      MR. MALONE:  Mike, you're going to let him
23 finish what he's going to say and I'll object if --
24 A.  Go ahead.
25 Q.  I'm not going to respond to your personal
Page 289

73 (Pages 286 - 289)

1 you're talking after lawsuit, there's two different
2 things, after you screwed me and before, you got that,
3 after you screwed my employees and before.  This whole
4 thing in the back where I called him, absolutely, that's
5 after you did this to my company.
6       Q.  So you think it's okay to defame someone after
7 they sue you?
8             MR. MALONE:  Object to form.
9       A.  No, it's not defaming him, I'm telling you what
10 you did to my company.  And I will sit there and say
11 that's subjective.  I can say anything I want.  I can
12 call you a criminal because I feel like you are what you
13 did to my company, and you were part of that as much as
14 Coomer, both you two, and, and Chris Ruddy, whatever he
15 had to do with it, but he's the one that told me I can't
16 have you on anymore, Mike.  I go who's Eric Coomer, what
17 do I, what do I know about Eric Coomer.
18       You guys wait a year and then you serve me
19 papers on the steps in Colorado.  After that, that's
20 when I really went after you, remember that part, after
21 this lawsuit.  One, only one thing was ever said about
22 you, about you, and that's after the Newsmax incident in
23 the spring of '21.  I never talked about you.
24       After I left, after that it was different news
25 after a week or two after Newsmax, I bad-mouthed him

1 every single day for two weeks, and then I probably had
2 more stuff I had to do because, you know, this was the
3 spring of '21.  You guys from that point on, any time I
4 bad-mouthed, any time anything came up, it was all that
5 week after you sued me.
6       I bet you can't even find anything in the last
7 year.  I don't bring up Eric Coomer.  This is what you
8 did to me.  I reread this last night and that's why I'm
9 so upset about it.  This is the most frivolous thing
10 I've ever seen.  And, and I was coming here, I was so
11 mad this morning, I go I didn't do anything, I said one
12 thing after they attacked my company.  Everything else
13 in here, bringing up stuff at symposium and all that,
14 you guys, you guys attacked me in the, in the spring of
15 '21.  I didn't know anything, anything about Eric Coomer
16 before that.
17       Q.  Is that why you were okay with Oltmann coming
18 into the symposium and talking about Coomer?
19       A.  I didn't bring Oltmann into the symposium, I had
20 nothing to do with that.  I had nothing to do with that.
21 I didn't know who was coming, I didn't invite him, I
22 didn't invite him.  There was a vetting of people that
23 had to vet.  You got to be invited if you were the
24 media, a cyber person, or, or worked in government, in
25 those were the three criteria.  So obviously he put in

1 an application to get in based on his podcast, I don't
2 know, or a cyber guy, I don't know.  I didn't invite him
3 on that stage, I didn't invite him to the thing, period.
4       Q.  So you didn't vet the people that were going to
5 be talking --
6       A.  No, there was a team, there was a team.  No, no,
7 no, Kurt Olsen and other people decided that, I didn't
8 decide.  I was going on the stage myself for 72 hours.
9 I didn't have anybody scheduled for that stage.  You
10 can, you can ask the guys that put it on.  I was the
11 only one scheduled when I got there, it was going to be
12 all me for three days, period.
13       That's a fact, you can ask anybody that was
14 there.  And then all of a sudden this red team shows up
15 and Kurt Olsen and Janet Lynn, they're saying, well, we
16 got the schedule, we want these people up there.  No
17 idea who they were.  All these people I met for the
18 first time.  That's the first time I met Joe Oltmann, I
19 didn't even remember who he was.  He wasn't, he wasn't
20 on the stage, you know.  There's a picture I guess of
21 where he said hello.  I never, you know, he said he met
22 me there, I didn't know, I didn't know him from Adam.
23 A lot of people that were at the symposium, I can't tell
24 you if they were there or not.  The only reason I say
25 Joe Oltmann was there is because you guys told me in

1 this.
2       Q.  Pause button.  Deep breath.  We're going to take
3 a break because the court reporter is getting tired, and
4 frankly, I am too.
5             MR. CAIN:  So let's go off the record.
6             VIDEO TECHNICIAN:  We are going off the
7 record at 4:38 p.m.
8             (A break was taken at 4:38 p.m.)
9             VIDEO TECHNICIAN:  We are back on the
10 record at 4:52 p.m.
11             (Exhibit 72 marked for identification.)
12 BY MR. CAIN:
13       Q.  Okay.  Let's look at Exhibit 72, Mr. Lindell.
14 I'll just give you a second on this.  This is, well,
15 I'll characterize it while you're looking at it.
16 Exhibit 72 is another symposium related email that
17 you're copied on.  Do you see you being copied on the
18 front page?
19       A.  Mm-hmm.
20       Q.  We know that's a yes, but can you answer yes.
21       A.  I said yes, yeah.
22       Q.  Okay.  All right.  And this kind of follows from
23 what your testimony was earlier that it was supposed to
24 be Mike Lindell for 72 hours and things changed?
25       A.  Yeah.  I don't know who James Oaks is.

Case No. 1:22-cv-01129-NYW-SKC   Document 177-9   filed 09/08/23   USDC Colorado   pg 11 of 14

Page 310

1  Q. Okay.
2  A. And I don't, and Janet, whatever, she wrote
3  this. We worked off this updated program agenda. I
4  have no idea what she worked out with him. I didn't
5  have, I never had any plan going into the Cyber
6  Symposium or scheduled speakers, and Janet will testify
7  to that. Because when we went there I go, they told me
8  to get off, she goes get off, you need to get off the
9  stage, I'm not getting off the stage. And then they
10  went to take a break, I go there's no breaks, that's
11  right, take a break from the stage. She goes well, we
12  have these other people. I go, good for you, I didn't,
13  I'm speaking.
14  Q. Well, that's what I'm trying to get to the
15  disconnect because this program agenda --
16  A. What program agenda?
17  Q. The one that's attached at the end of this,
18  which is Page 122, okay?
19  A. Yeah, I never seen this.
20  Q. Okay. So that's, there's some, some disconnect
21  here that I --
22  A. I have never seen this in my life.
23  Q. Okay.
24  A. So whatever Janet Lynn did with, with who is she
25  here with, Brannon Howse and Kurt Olsen and Tim Tunes,

Page 311

1  they certainly didn't work this out with me.
2  Q. But you were, there's a couple emails here.
3  That email was sent to your My Pillow email on
4  July 30th, "Hi, Mike," it talks about the stage
5  production flow.
6  A. Did I answer, no, I didn't read this email.
7  Q. Okay.
8  A. You need to understand, I don't, I rarely if
9  ever read emails.
10  Q. Okay. Well --
11  A. Ever, and they know that. So whatever they did
12  here, that's their deal. And this kind of, this kind of
13  makes more sense now why they argued with me when I got
14  there. I go, what are you talking about, this isn't,
15  this isn't what we're doing.
16  Q. Okay. Well --
17  A. I guess they got Phil Waldron. I mean, if you
18  look what happened the first day, it probably doesn't
19  match this. I guess it does say you have Dr. Frank,
20  Phil Waldron and Mike, the rest is Mike Lindell so, you
21  know, I guess that's, that kind of makes sense. I do, I
22  think I knew Dr. Frank was going to speak, that's the
23  only one I knew of.
24  Q. Yeah, maybe this one will refresh your
25  recollection a little bit. At the beginning of this

Page 312

1  exhibit Dr. Janet Lynn is saying, "We worked out this
2  updated program agenda with Mike late last night. Days
3  2 to 3 will be similar, but with new speakers, panel
4  guests and cyber data updates," okay?
5  A. Yep.
6  Q. All right. Do you remember that happening?
7  A. No, I don't remember. If we were on the phone
8  talking through what are we going to do, I don't
9  remember -- I remember Doug Frank was going to be there
10  because I wanted him there, he's the one guy I wanted
11  there because he had evidence that he had been in
12  scientific proof, and Phil Waldron because Phil Waldron
13  had also been in there, Phil Waldron had evidence.
14  Those are the only two I see on here.
15  Now they're going, if she says well, I'm going
16  to find other speakers, or Kurt Olsen, I don't know. So
17  there was no, this thing here, if you watch it, it
18  wasn't, this schedule was not followed. I don't know
19  where this came from, I never seen it. Did I talk to
20  them about it, about this first day, she says I did,
21  ongoing, it says right here if you look at it, this Mike
22  Lindell and you got two speakers. I don't know, it
23  doesn't say, speaker 2 to be announced. This is all
24  Kurt Olsen, Janet Lynn. These guys took over the thing,
25  I had no, I didn't schedule one person on this thing, on

Page 313

1  the Cyber Symposium, not one, other than myself.
2  Q. All right. So let's just, from your
3  recollection let's just break down the timeline leading
4  up to the symposium. And you've told us that you were
5  going to be there for three days talking, that was in
6  your mind originally?
7  A. Yep, yep.
8  Q. Right?
9  A. And actually, there was two things, I forgot to
10  tell you one thing. In my mind Brannon Howse was going
11  to be in a booth where we would, he'd be like a
12  reporter, let's go back to the booth, and he would be
13  mostly from a booth interviewing people, cyber guests
14  and people in the audience, that was my plan.
15  So he would be interviewing like, like, you
16  know, hey, how is, you know, what do you think about
17  what Mike is saying, and it would be me on stage and it
18  would go back and forth. That ship sailed when I got
19  there because then we, I got so busy on stage. And
20  Brannon, he was actually upset, he goes, well, don't I
21  get to talk or whatever. I go no, there's, right now we
22  got to get to, I have to talk, you know.
23  Q. That ship sailed when you got there --
24  A. Because there was, it was all, there was too
25  much that I had to say and we didn't have Brannon

79 (Pages 310 - 313)

Veritext Legal Solutions
800-336-4000

Page 314

```
 1  going -- here's what I set up.  I wanted four things
 2  going, I had a cyber room, the evidence would go down to
 3  the cyber room, okay, this is what I set up.  I don't
 4  know about all this stuff for this, for this stage part
 5  she said to be announced, to be announced.
 6       My setup that I set up the cyber thing was four
 7  things, I wanted this is where all the eating is going
 8  to be, this is the cyber room, we're going to feed
 9  evidence to the cyber guys, this is the election room
10  where you could go in there and do election and watch
11  how they flip it in real-time, any cyber guy, which we
12  did and the guy hacked it right from the table.  So you
13  had machines in there, voting machines showing
14  real-time, so show people here's how they did it, here
15  it was easy, okay.  And then, and then we had another
16  place where you could go and tune in your county and see
17  what happened in the election, that was that space.  And
18  then we had Brannon Howse in a booth for Frankspeech.
19       And as far as, as far as the stage up here, I
20  didn't really care.  I know I was going to be up there
21  as much as I could and then I would be doing interviews.
22  And the rest was Janet Lynn and Kurt Olsen, whatever
23  they wanted to put up there.  My thing was, the whole
24  purpose of the whole event was here's the evidence,
25  bring your own cyber guy, and you have legislators or
```

Page 315

```
 1  any governor, we invited both Democrat and Republicans
 2  across the country and the media.
 3       So here's the cyber guys, wow, yes, this
 4  happened, and then this is from the 2020 election.  And
 5  then over here these guys would go here, it's right from
 6  their own guys, and the media would report it.  That's
 7  how it was supposed to go.  This wasn't a thing of a,
 8  other than Dr. Frank, I did want him to show his
 9  algorithms because those come right from the voter rolls
10  that we had, it's a different evidence.
11       Q.  When did you realize that you were not going to
12  be able to show the entirety of the PCAP data?
13       A.  No, we had the whole, we had the PCAP data.  It
14  was Saturday night when I was physically attacked and
15  Waldron said don't bring down the China stuff, he said
16  they're going to put that in the data.  We were
17  releasing data.  The thing was, the data we were
18  releasing, we couldn't release the China, this is what
19  he told me, you can't release stuff, and this was after
20  I was attacked.  I mean, there were two separate
21  incidents.  And he said we have a report they're going
22  to put a poison pill in the data because they knew that
23  that part of the data would show China intrusion,
24  100 percent it showed China was in the room.  It doesn't
25  say they did anything, but they were in the room, they
```

Page 316

```
 1  were in our whole election system.
 2       That's what you're going to see very shortly.
 3  In fact, I might just throw that at you, you can get a
 4  copy when we throw out the evidence, that would make it
 5  nice and public.  That was just that one piece that they
 6  seen when I was told by this colonel not to put it out.
 7       Q.  Okay.  Well, it sounds like, I don't want to put
 8  words in your mouth, but it sounds like you had one
 9  vision for the symposium and Kurt and Janet Lynn --
10       A.  No, there was, whoever, this red team that came
11  in there, this red team, I don't know where they came
12  from.  Kurt, Janet, Phil Waldron, whoever was, you know,
13  and probably six other people in that room, they had
14  their own little idea what they were going to put up to
15  go out there.  All these people that were invited, all
16  of a sudden they get to go up on stage, it was crazy.
17       I'd be up doing an interview with CNN and I'd
18  look down and there's a, what's his name, that Professor
19  Clements I met, who is that guy.  All these guys coming
20  I never met before in my life.  And I didn't invite
21  them, they were invited as cyber experts.  So they must
22  have cleared, cleared, what do you call, the screening
23  team, you had to show you were either someone in
24  government or media or cyber, you had worked in that
25  realm.
```

Page 317

```
 1       Q.  Was -- well, strike that.  I know you, you
 2  quibble with the idea of a red team, but you had a room
 3  set up for cyber --
 4       A.  I didn't set that up, that was, no, the red team
 5  was at the hotel.  There was a room they got that I
 6  think Kurt Olsen got.  All those fellows, Kurt Olsen was
 7  driving the bus on that.
 8       Q.  Okay.  All right.
 9       A.  That was a, I walked in there, I go who are all
10  these guys.  I didn't know anyone that room except for
11  Doug Frank I had met before one time, I think one time,
12  that might have been the first time we met.  No, the
13  second time because he was in Absolute Interference, so
14  I met him one other time.  And I had not met, or then,
15  I'm trying to think who else, and I met this Todd that
16  was in the room.  Other than that, I never met anyone in
17  the room, I go who are these people.
18       And they're telling me how they're going to run
19  the Cyber Symposium.  I go, I go, you ain't running it,
20  this is my event, I'm getting the word out.  They're
21  trying to tell me, well, we're going to get this speaker
22  and that speaker.  I'm going, you know what, I'm doing
23  this.  And finally the second day I just went, I had
24  interviews to do, I said, you know what, I'm losing my
25  voice, go ahead, and whatever they did, they did.
```

80 (Pages 314 - 317)

1  was going to be talking.  You need to understand this
2  part.  I, I had it set up where the, Brannon Howse was
3  going to be, I wasn't even going to be a host, I was
4  going to tell my evidence, tell my thing, and then dump
5  it to the cyber guys and everybody, it would be an
6  interaction thing where people would be walking around
7  and they would be interviewing.  Everyone had their own
8  booth.
9        But what it became, all of a sudden CNN,
10 everybody shows up and all the cameras are in the back.
11 So I'm going okay, we've got to keep going and talk to
12 this these people, in my mind.  So I stayed on stage if
13 you know the first day, I think the whole day almost, I
14 don't think I left that stage.  I don't know, you know.
15 I know at one time they wanted to take a break and I go
16 no, we can't take a break.  And that's why I know it was
17 commercial free because there wasn't one minute of
18 break.
19        And but my mind was this, I would be throwing
20 the camera back to Brannon Howse, he would be
21 interviewing, like let's say governors or legislators or
22 senators and say, hey, what do you think so far, what do
23 you think so far.  That's what I wanted it to be.  It
24 was just to, imagine, you know, because nobody would
25 listen, no judges would look at the evidence or nothing.

Page 326

1  That's all I wanted.
2        Q.  But again, the disconnect in my mind is you had
3  the absolute authority of how to run the symposium,
4  didn't you?
5        A.  And I set up -- no, not really.
6        Q.  Why?
7        A.  If I wanted to sit there and say, I got tired, I
8  mean, I was on that stage, I didn't leave that stage, I
9  said my speak.  The hour the cameras didn't work, they
10 attacked them, made the biggest attack on the cameras.
11 I told my whole story of crack addiction at one point,
12 you know, I did almost for an hour.  And I'm going, and
13 I kept putting there.
14        And then I go okay, you cyber guys, you can all
15 go, and they started dumping evidence.  But I wanted to
16 keep, keep the camera moving, I never put it back to
17 Brannon Howse.  At one point Janet Lynn said these guys
18 are going up.  I go no, they're not, who said you're
19 running the show.  I said I'm going to keep talking.
20 They wanted me, the one guy said get him off the stage.
21 I go no, I'm not leaving, I want to tell, you know,
22 because I wanted to get the word out on this.
23        And then, then by the night, I think it was, I
24 don't know at one point it was, for sure the next day, I
25 said you know what, you guys do what you want, I'm going

Page 327

1  to go interview with CNN.  I was losing my voice, I went
2  and did interviews almost all day, CNN because they were
3  there, another outfit.  I was two hours interviewing
4  with one outfit, at least an hour and a half with CNN,
5  and I just went to the media, right to the media and got
6  interviewed.
7        I had no idea, at one point I looked down the
8  stage and I had Dr. Doug Frank on the side sitting
9  there, I go, I did call down, I go tell him to get off
10 the side of the stage and get up, you know, because it
11 just looked bad cosmetically.
12        Q.  Did you not know, you said at some point or at
13 one point you just turned it over to them, I --
14        A.  No, no, it was them kind of from the beginning.
15 But when I went on that stage, I got on the stage, I
16 controlled when I got on that stage, everything else was
17 them.
18        Q.  And the them was Janet and Kurt Olsen?
19        A.  Kurt Olsen, Janet and whoever they were talking
20 to in that room.  And I don't know who else was involved
21 in that planning, I don't, I absolutely don't to this
22 day.
23        Q.  Did you want Tina Peters on the stage?
24        A.  When Tina Peters, I never met her before in my
25 life.

Page 328

1        Q.  That wasn't my question.
2        A.  Okay.  Well, I'm going to tell you, explain
3  that.  When they came to the symposium, the Colorado
4  group, when they got there she said she had just got her
5  door bashed in.  I said well, you should take her up and
6  tell her story on the stage.  I didn't know who she was
7  or why they bashed her door.  She said they had bashed
8  it and broke in her office.  I'm going, she should get
9  on the stage.  And then she has a couple lawyers go,
10 well, we don't think so.  I go why wouldn't she tell
11 that about getting your door bashed in.  That's all I
12 knew.  And the lawyers finally said okay, Tina, it's up
13 to you, and she went on the stage.  No idea who she was.
14 She was up there with I think with three other people, I
15 think there was Mark Cook maybe or Janet, or I mean
16 Shiroma might have been there.  There was other people
17 that were, that came on that bus.
18        You got to realize, the planes came in, I had no
19 idea who was on these planes.  These were people that
20 vetted that who we could get rides because my plane all
21 over the country brought in as many people as they could
22 whether, we didn't know them, but they were vetted to be
23 there.
24        Q.  So you didn't know then that they were going to
25 present the Mesa County data?

Page 329

83 (Pages 326 - 329)

```
 1        REPORTER'S CERTIFICATE
 2
 3
   STATE OF MINNESOTA  )
 4                     ) ss.
   COUNTY OF WASHINGTON )
 5
 6     I hereby certify that I reported the videotaped
   deposition of Michael J. Lindell, Volume I, on the 8th
 7 day of March 2023, in Minneapolis, Minnesota, and that
   the witness was by me first duly sworn to tell the whole
 8 truth;
 9     That the testimony was transcribed by me and is a
   true record of the testimony of the witness;
10
       That the cost of the original has been charged to
11 the party who noticed the deposition, and that all
   parties who ordered copies have been charged at the same
12 rate for such copies;
13     That I am not a relative or employee or attorney or
   counsel of any of the parties, or a relative or employee
14 of such attorney or counsel;
15     That I am not financially interested in the action
   and have no contract with the parties, attorneys, or
16 persons with an interest in the action that affects or
   has a substantial tendency to affect my impartiality;
17
       That the right to read and sign the deposition by
18 the witness was reserved.
19     WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.
20
21
22
23
24        Kelley E. Zilles
          Kelley E. Zilles, RPR
          Notary Public, Washington County, Minnesota
25        My commission expires 1-31-2025

                                              Page 370
```

```
 1 Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2 Michael J. Lindell (#5761446)
 3        E R R A T A   S H E E T
 4 PAGE_____ LINE_____ CHANGE_____
 5 _____
 6 REASON_____
 7 PAGE_____ LINE_____ CHANGE_____
 8 _____
 9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Michael J. Lindell          Date
25

                                              Page 372
```

```
 1 Ryan Malone
 2 Malone@parkerdk.com
 3        March 22, 2023
 4 RE:   Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 5      3/8/2023, Michael J. Lindell (#5761446)
 6   The above-referenced transcript is available for
 7 review.
 8      Within the applicable timeframe, the witness should
 9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

                                              Page 371
```

```
 1 Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2 Michael J. Lindell (#5761446)
 3      ACKNOWLEDGEMENT OF DEPONENT
 4   I, Michael J. Lindell, do hereby declare that I
 5 have read the foregoing transcript, I have made any
 6 corrections, additions, or changes I deemed necessary as
 7 noted above to be appended hereto, and that the same is
 8 a true, correct and complete transcript of the testimony
 9 given by me.
10
11 _____  _____
12 Michael J. Lindell          Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25

                                              Page 373
```

Veritext Legal Solutions
800-336-4000