# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CIVIL ACTION NUMBER: 1:22-CV-01129-NYW-SKC

ERIC COOMER, PH.D.,

Plaintiff

V.

MICHAEL J. LINDELL, FRANKSPEECH LLC,

AND MY PILLOW, INC.,

Defendants

**CERTIFIED TRANSCRIPT**

DEPONENT: JOSEPH OLTMANN

DATE: DECEMBER 16, 2022

REPORTER: DARIANA CABRERA ALVAREZ



AdvancedONE LEGAL (866) 715-7770 advancedONE.com

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                                    Pages 50..53
JOSEPH OLTMANN, 12/16/2022

Page 50

1   correct?
2   A   I -- I have a show on Frank Speech.
3   Q   You have a show on -- other than Conservative
4   Daily, or just --
5   A   On Conservative Daily, but it's on Frank
6   Speech.
7   Q   Okay.
8   A   Is that what you're talking about?
9   Q   Well, I'm talking more about, you know, Frank
10  Speech also hosts live, you know, Lindell TV Program for
11  example.
12  A   Uh-huh.
13  Q   And you've been a -- a guest on interviews
14  conducted by Brannon Howse, for example, is that
15  correct?
16  A   I think I've done that a couple times.
17  Q   Okay.  Do you have an idea about how many
18  times you've appeared in that capacity?
19  A   A couple times, probably.
20  Q   Okay.  I'm going to play you an audio clip
21  from what we understand to be your first interview on
22  Frank Speech, and you can correct me if I'm wrong, this
23  is from May 3rd of 2021, it's just a brief clip with
24  Brannon Howse.  I'm going to play this portion where he
25  sort of describes meeting you and how that relationship

Page 51

1   started.  Going to play Clip 2.
2       (AUDIO PLAYED)
3   A   When was this?
4       (AUDIO PLAYED)
5   Q   May 3, 2021.
6       (AUDIO PLAYED)
7       THE WITNESS:  I can't see it.
8       MR. CAIN:  It's just audio.
9       THE WITNESS:  Oh, okay.  Sorry.
10      MR. CAIN:  Let's start it over.
11      THE WITNESS:  Yeah, let's restart that.
12      (AUDIO PLAYED)
13  BY MR. KLOEWR:
14  Q   Okay.  So you recall that FrankAthon event --
15  A   I don't.
16  Q   -- that Mr. Howse is referring to?
17  A   I don't.
18  Q   Do you remember meeting Mr.    Howse at that
19  event?
20  A   I don't even remember a FrankAthon at all, so
21  I don't --
22  Q   It was a promotional event that coincided with
23  the launch of Frank Speech in late April 2021?
24  A   Was it an event people attended?
25  Q   Well, that's what I'm asking you.  I -- I

Page 52

1   wasn't there.  I don't know.
2   A   No.  I mean, I -- I would probably have
3   remembered if there was a launch party.
4   Q   Okay, but you don't recall meeting Brannon
5   Howse for the first time?
6   A   I think I met him for the first time in -- at
7   the symposium, I think.
8   Q   Okay.  Well, the -- the interview that I just
9   played you a clip from was from May of 2021, which
10  would've proceeded the symposium by about three months.
11  A   It preceded the symposium?
12  Q   That's correct, yes.
13  A   When was the symposium?
14  Q   It was in August of 2021.
15  A   Well, so I had never met him before then, I
16  don't think.
17  Q   Well, the interview I just played you a clip
18  from was from months prior.  That was very shortly after
19  the Newsmax settlement in this case; do you recall that?
20  Or in -- in the other case.
21  A   You mean -- what settlement?
22  Q   Well, you recall Newsmax settling with
23  Dr. Coomer in this case, correct?
24  A   It didn't settle.  They -- they said that they
25  would not say anything else and that they would -- so

Page 53

1   they didn't have any evidence.  It was --
2   Q   Well --
3   A   I guess you'd call that settlement.  A zero
4   cash settlement to walk away and bolster your claim, I
5   guess.
6   Q   Mr. Oltmann, we're not going to discuss the
7   terms of that settlement, but your counsel is here and
8   has been provided a notice of that -
9       -
10  A   All right.
11  Q   -- through the prior case.  I'm just asking
12  you if you recall the timeline, which would've been late
13  April?
14  A   I -- I don't actually, but --
15  Q   Okay.  So this meeting -- I'm curious how you
16  came to be a guest on Frank Speech in this capacity?
17  A   I don't recall.
18  Q   Did Mr. Howse e-mail you?
19  A   I don't recall.
20  Q   Well, this was an interview that lasted about
21  an hour.  Do you remember receiving any communications
22  about what sort of information you would present on that
23  interview?
24  A   I don't recall.
25  Q   In any of the times you've been on Frank

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                                   Pages 54..57
JOSEPH OLTMANN, 12/16/2022

Page 54

1  Speech, has anyone from Frank Speech tried to discuss
2  the -- the nature of your -- the interview prior to the
3  time of airing?
4      A    No, I don't think so.
5      Q    So in your experience, whenever you've gone on
6  Frank Speech there's no preparation for the interviews?
7      A    No, I don't actually prepare for interviews,
8  typically.
9      Q    Okay, but has anyone from Frank Speech ever
10 attempted to prepare for an interview before having you
11 on?
12     A    No, I don't think so.
13     Q    So in those instances when you've appeared
14 there, it's just sort of a -- a general free for all of
15 -- of discussion topics?
16     A    Honestly, yeah.
17     Q    Okay.
18     A    I mean, mostly.  I mean, I think that you'd
19 probably asked me a bunch of questions.
20     Q    Okay.
21     A    I'm not a -- I mean, it -- it -- it is a
22 interview type of format, so they just ask you questions
23 and you kind of just talk.
24     Q    Okay.  And have they ever asked you to provide
25 any -- any evidence for any of the things you've stated

Page 55

1  on Frank Speech?
2      A    Like what things that I stated on Frank
3  Speech?
4      Q    Well, for example, in this interview you
5  discussed your claims about Dr. Coomer at length --
6      A    Oh --
7      Q    -- and I'm wondering if Frank Speech requested
8  any evidence to support those claims prior to having you
9  on the air?
10     A    I don't know.  I'm probably -- I -- I probably
11 -- if they did, I probably sent them all the information
12 that I had, that you have in the other case.
13     Q    But you don't know that they ever requested
14 that information?
15     A    I don't recall.
16     Q    And you don't recall having sent them that
17 information on your own?
18     A    I've sent that information to a lot of people,
19 so I could have, but I don't know.
20     Q    And -- and following your interviews, have you
21 ever gotten any requests for clarification or
22 documentation to support claims that you made on the air
23 on Frank Speech?
24     A    They weren't claims.  I want to just -- I want
25 to really clarify that and -- they're not claims.  I

Page 56

1  didn't just wake up one day and say, "I'm going to turn
2  my life upside down."
3      Q    Any --
4      A    Just get involved in something --
5      Q    I'll rephrase the question.
6      A    -- advertising clicks.  It's just not
7  something that I'm -- I find myself doing just for fun.
8      Q    Okay.  I'm not looking to get into a semantics
9  dispute with you.
10     A    It's not semantics, it's the truth.  So the
11 truth is not actually semantics.  The truth is the
12 truth.  You can't make up a different truth.  It either
13 is a truth or it isn't a truth.
14     Q    Mr. Oltmann, I'll ask the questions here.  The
15 -- have you ever received a request from anyone at Frank
16 Speech, following an interview you conducted there where
17 they requested any evidence to support statements you
18 made --
19     A    I don't recall.
20     Q    -- during that?  Okay.  Has anyone at Frank
21 Speech ever asked you for information or sources for the
22 statements you have made?
23     A    I think that they understand that that
24 information is -- is the timeline and the information
25 provided is pretty concrete.  It's pretty solid.  From

Page 57

1  beginning to end, it's solid.
2      Q    When you say you think they understand that,
3  what do you mean? Who -- who is they?
4      A    I think that anyone that would ask me for
5  information knows that I'm an open book and that
6  information has been readily available.  Everything from
7  the -- the affidavits from people that were with me on
8  the six affidavits from John Tig -- Tiegen, who by the
9  way is an American hero, guy spent all of his time on --
10 13 hours on top of a roof actually --
11     Q    I'm -- I'm familiar with Mr. Tiegen.
12     A    Well, I -- I'm not finished talking.  I -- I'm
13 going to finish the entire -- it'll answer your
14 question.  John Tiegen, who was supposed to be on that
15 call with me to the October 16th article that was
16 written where I had been investigating journalists
17 because they were running bad things about me --
18     Q    Okay.
19     A    -- related to it, and then if you go further -
20 -
21     Q    But you haven't identified any of the other
22 participants on that call, for example, have you?
23     A    What do you mean I haven't identified?  I
24 provided notes --
25     Q    Well, we've asked you for the identities of

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                              Pages 66..69
JOSEPH OLTMANN, 12/16/2022

Page 66
1   A   I -- yeah, vaguely.
2   Q   And did Mr. Lindell speak at this event,
3   Bandimere Speedway in June?
4   A   He did not.
5   Q   Why not?
6   A   I think there were still restrictions, and
7   they were still in a court battle with -- with the
8   county.
9   Q   Okay, but it sounds like -- I mean, obviously
10  you're still maintaining direct contact with Mr. Lindell
11  throughout this late-May --
12  A   Yeah.
13  Q   -- early-summer time frame.  How frequently
14  would you say you were in contact with Mr. Lindell at
15  that time?
16  A   Not very often.
17  Q   Okay.  Did you ever, you know, were you
18  calling him to chat or was it this sort of, you know,
19  sporadic messaging from time to time?
20  A   I mean, I would call to chat -- to chat with
21  him, just to say hello, but not -- not very often.
22  Q   Okay.
23  A   I don't think I call anybody very often.
24  Q   Okay.  Well, what I'm trying to understand is
25  that we're -- we're getting up closer to the time of the

Page 67
1   Cyber Symposium.  Which, as we've discussed before,
2   occurred in August of 2021.
3   A   Okay.
4   Q   So I'm trying to understand your relationship
5   with Mr. Lindell throughout that time period, because
6   you obviously presented at the Cyber Symposium on a
7   number of occasions.  We'll look at some of that video.
8   I'm just trying to understand how you found yourself
9   there.  So did Mr. Lindell invite you to the symposium?
10  A   I don't recall who invited me.  Somebody
11  invited me.  I think it was Sherronna Bishop.
12  Q   Okay.  Did she send you an invite, did she
13  call you?
14  A   Uh-uh.
15  Q   Was that the first you heard of the Cyber
16  Symposium, when Ms. Bishop invited you to it?
17  A   Well, I had been given and been invited to be
18  a part of conference calls.
19  Q   Okay.
20  A   Where they would discuss the information to be
21  discussed at the symposium.
22  Q   Okay.
23  A   And I would bring up things that -- that they
24  were just questions about what they were suggesting or
25  theorizing on.

Page 68
1   Q   Okay.  And you said you were on conference
2   calls.  Were -- how -- how many conference calls do you
3   recall being on to discuss the content --
4   A   I've probably been on --
5   Q   -- of the symposium?
6   A   -- 400 to 500 calls --
7   Q   Well --
8   A   -- with people over the last two years.
9   Q   I'm just referring specifically to the Cyber
10  Symposium?
11  A   Yeah, so I don't remember.  I don't recall.
12  Q   Okay.  Who else would've been on those calls
13  other than Sherronna Bishop?
14  A   Other people related to -- to election
15  integrity.
16  Q   So would Mike Lindell have partaken in those
17  calls about the information that would be presented at
18  the symposium?
19  A   No.  They had a group of people that I wasn't
20  associated with, that I wasn't a part of.
21  Q   Okay.
22  A   Core group, and then I would -- you know, I
23  didn't -- I don't really -- I don't ask to be involved
24  in it.  If somebody asks me to, I will get involved in
25  it.  But I don't try to get involved in all

Page 69
1   conversations, I -- I take a more humble approach to
2   service.  So if they want me and they need me, I'll --
3   I'll help them.  But I'm not necessarily going to just,
4   you know, go out there and be the brightest bulb in the
5   room, which is typically not the case.
6   Q   So did Mr. Lindell, was he aware that these
7   calls that you were on were taking place?
8   A   I -- I have no -- I don't have any idea if he
9   did or didn't it.
10  Q   Well, it -- it sounds like you were discussing
11  the information that would be presented at the
12  symposium.  And I'm trying to understand, were you
13  presenting ideas of what should be presented there?
14  A   No.  So in -- when you're dealing with
15  technology and things moving very fast, you find
16  yourself -- there's a lot of people, you can't tell if
17  they're good people or bad people, that are -- you know,
18  that want to influence the direction of the conversation
19  or what's happening.  It's opportunity in chaos.  And so
20  I would be brought in, and they'd say, "Well, what's the
21  likelihood of this being the reality from a systematic
22  standpoint, that this is how the system operated?"  And
23  since I'm a -- kind of a bookworm when it comes to
24  reading about Dominion, ES&S, Smartmatic, got access to
25  those things and I was able to study the -- the process.

COOMER, PH.D. vs MICHAEL J. LINDELL, et alPages 130..133
JOSEPH OLTMANN, 12/16/2022

Page 130
1  -- was I the only one in the room that heard that?  I
2  mean, how do you -- how do you walk away from that?
3      Q    So was Mr. Lindell present for any of these
4  meetings --
5      A    No.
6      Q    Did you ever have any interactions with
7  Mr. Lindell in Washington while you were there?
8      A    No.
9      Q    And we discussed before, you didn't meet him
10 until February, is that right?
11     A    March.
12     Q    Early March of 2021?
13     A    I -- I don't -- yeah, whatever this is.
14     Q    Yeah.  So were you aware that Mr. Lindell was
15 in Washington at the time?  Did you hear about any
16 conversations with them?  Any -- let's -- we -- we've
17 gotten sidetracked here.  Let's get back into this once
18 again, into the symposium.  So you arrived at the
19 symposium, you spoke with Tina Peters on the phone that
20 night?
21     A    Yeah, that day.
22     Q    Okay.  And did you fly in on Lindell's plane
23 to get there?
24     A    No.
25     Q    Did you fly commercial?

Page 131
1      A    I did.
2      Q    Okay.  And --
3      A    Can you tell me what question you asked me to
4  go get information on though?
5      Q    Yeah, I had requests -- well, previously I had
6  -- you got it, Ingrid?  Thank you.  Okay.  So Tina
7  Peters arrived that first night.  Did you speak with her
8  in person once she got off the plane and was there?
9      A    No.  No, no.  I -- and -- and I was given a
10 badge.  I was told that -- so they had metal detectors
11 that when he came in, and said nobody with a weapon come
12 in.  I -- I guess I'm not calling in because I'm not
13 going anywhere without a gun.  And so I went to walk
14 outside.  Somebody came up and said, oh, that's Joe.  He
15 can get through no problem.  He can have a gun on him.
16 So they walked me around the metal detectors, and I was
17 inside with a -- with a weapon.
18     Q    Okay.  So Mr. Lindell was expecting you, it
19 sounds like?  You said he had invited you?
20     A    I don't think he directly invited me.  I think
21 I was invited -- I think it was Sharon Bishop that
22 invited me.
23     Q    So I'm just wondering who made an exception to
24 get you around that, the metal detector?  It seems like
25 they would've been concerned about security.

Page 132
1      A    Yeah, I don't think I was considered a concern
2  or security threat.
3      Q    I'm just wondering.
4      A    I was Perfectly okay leaving.  Like I got
5  there.  I was perfectly okay leaving, but I was not
6  going to walk into a place that I knew nothing about
7  with a bunch of people that could be CIA.  I just was --
8  I -- I do not respect nor do I trust the government
9  apparatus.
10     Q    Yeah, that's fine.  I -- I understand all
11 that.  I'm just asking who -- who, you know, went over
12 management's head to say, Joe Oltmann is a good guy, let
13 him through.  Was it -- did Lindell say, I don't care,
14 he can bring a gun?
15     A    No, he was not -- he was not a part of any of
16 that conversation.
17     Q    But presumably somebody from his team said,
18 this is not a security risk that we're concerned about?
19     A    Yes.
20     Q    Was that Kurt Olson?
21     A    No.
22     Q    No?
23     A    The first time I met Kurt Olson was behind the
24 stage.  We started talking.  He asked me a bunch of
25 questions.  I told him that I would not put Tina Peters

Page 133
1  on the stage, so I became really unpopular to another
2  team that Mike has.
3      Q    They wanted to put her on stage, and you
4  thought that was --
5      A    I think that's the dumbest thing ever.  I
6  think that they should have -- I mean, I -- I'll just
7  tell you, I mean, I don't think that was a good move,
8  right?  Because the -- the people in the audience are
9  going to clap and then she's going to get, you know,
10 more emboldened in what -- where she is.  And then she's
11 going to get anxiety and then that's going to lead to
12 her being more fresh.  It is human nature to do what she
13 -- what -- what happened when she got on the stage.
14     Q    So was Kurt Olsen kind of calling the shots
15 for the symposium then?  Who was on stage and when?  Is
16 that his role?
17     A    No, no, he's -- he's -- he's a really good
18 lawyer.  He's a really, really good lawyer.  And he --
19 he even made the comment that maybe we should, you know,
20 hit the pause button.  But there was just other people
21 that were in that -- that were running it.  And then
22 when she got up there, she actually started doing really
23 well.  I just said, I'm not sure that I would've done it
24 without a little more.
25     Q    So Mr. Mr. Olsen said maybe we should hit the

COOMER, PH.D. vs MICHAEL J. LINDELL, et al          Pages 302..305
JOSEPH OLTMANN, 12/16/2022

Page 302
1  the notes you were given.  Can you check your notes, or
2  no?  Same thing.  Are you looking at the Dropbox?
3         MS. DEFRANCO:  I know it what we produced.
4      A  I should have brought my computer.
5      Q  So if you still have this notebook, presumably
6  you would have some notes you took both before and after
7  this event --
8      A  Yeah.
9      Q  -- in that same notebook?  And it's possible
10 those notes could serve to place these notes within a
11 time range, correct?
12     A  Yeah, actually they could.  I think that we
13 actually talked about that.
14     Q  Is this -- is this the first time it's
15 occurring to you, Mr. Oltmann, that these notes could
16 serve to establish a date for the Antifa call?
17     A  We know what the date was for the Antifa call.
18 We know what date range for the Antifa call.  We already
19 know, because Tig was supposed to be on that call.
20     Q  Okay.  Well, Mr. Oltmann, we requested these
21 before.  We requested them again today.  If we need to
22 go off the record and take a break for you to find those
23 and produce them, we can do that.
24        MS. DEFRANCO:  Let's do that.
25        MR. KLOEWR:  Let's do that.  We'll go off the

Page 303
1  record.
2        VIDEOGRAPHER:  Okay.  Time is 15:34.
3           (OFF THE RECORD)
4        VIDEOGRAPHER:  Okay.  Time is 15:37 p.m.  Back
5     on the record with Joseph Oltmann.
6  BY MR. KLOEWR:
7      Q  Okay.  Before we went off the record, you were
8  going to try to find your notes.  Were you able to
9  confirm whether these four pages that were previously
10 disclosed are the entirety of the notes you took?
11     A  They are.
12     Q  They are?  There's no fifth page?
13     A  No, there is not a fifth page, but there is
14 notes related to what Randy asked me to write down on
15 what happened in that call.  So that's information that,
16 when he asked me to go through all the information that
17 I had, I had information that I had written down that
18 was between me and Randy.
19     Q  So you had a separate set of notes that you
20 created for Mr. Corporon describing your recollection of
21 the call?  What do you mean?  I -- I'm not sure I
22 understand you.
23     A  Yeah.  So Randy asked me what information you
24 collected on that call.  I walked through that
25 information and recalling what happened on the call with

Page 304
1  -- with Coomer.  So I had these notes and then I had the
2  notes that I wrote out to talk to Randy about when I was
3  going through the information related to gathering the
4  information about Randy or Eric Coomer.
5      Q  Okay.  But what we're looking at now are the
6  ones you took in real time, on the call?
7      A  Correct.
8      Q  Okay.  Let's take a look at what has been
9  previously marked as Exhibit 18, Clip 3.
10        MS. DEFRANCO:  It's a video.
11        THE WITNESS:  Oh, all right.
12        MR. KLOEWR:  18, Clip 3.  Yes.
13          (VIDEO PLAYED)
14 BY MR. KLOEWR:
15     Q  All right, Mr. Oltmann, can you take a minute
16 to review your notes and show me where the phrase, "We
17 have prepared for the new future where we put down these
18 fascist F's," is included in your notes?
19     A  No, because these were show notes.  These are
20 the notes that I wrote out of my recollection on what
21 happened in the event.
22     Q  So that statement, well now, wait just a
23 minute.  You said, "Let me read through my notes.  I
24 took detailed notes."  So you were not reading from your
25 notes from the Antifa call in this episode?

Page 305
1      A  No, we sat down.  So Max probably had the
2  conversation with you where we sat down and talked
3  about, "All right, tell me what happened on the call?"
4  So Max and I walked through, this is the stuff that
5  happened on the call.
6      Q  You're telling me you had a conversation with
7  Max McGuire prior to this episode where you walked
8  through the claims you were going to make?
9      A  No, I talked to him about the things that I
10 was going to talk about on the show.
11     Q  So if Mr. McGuire testified that you did not
12 have a conversation about the contents of this prior to
13 going on air?
14     A  But that's not what he said, I read his entire
15 deposition.
16     Q  Okay.
17     A  He didn't just say, "Hey, let's willy-nilly go
18 on to this call."  I called him and said, "This is what
19 we're going to discuss.  This is what's happening."
20     Q  You read Mr. McGuire's entire deposition?
21     A  No.  Just parts of it.
22     Q  Where did you get a copy of that?
23     A  I got information from Dan Kuhn.
24     Q  He provided you a copy of the deposition
25 transcript of Max McGuire?

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                               Pages 366..369
JOSEPH OLTMANN, 12/16/2022

Page 366

1  already established that you were talking to
2  Mr. Corporon on November 6th before any of these claims
3  occurred.
4       A    No, you established that I was talking to him
5  on November 6th. He said that, right? I haven't seen
6  that.
7       Q    Yes, that was what --
8       A    Maybe we did on his radio program.
9       Q    He said he got a -- a text message from you at
10 11:00 p.m. on the sixth describing your claim.
11      A    Well, so then I would definitely go -- by the
12 way, no one was talking about Dominion on November 6th.
13 No one. It wasn't even a thing.
14      Q    Which is -- it speaks exactly to my point,
15 which is why you -- you were working with Mr. Corporon
16 prior to anyone began attacking you as I understand it,
17 correct?
18      A    Yeah. But the breakdown of -- of how you --
19 when you've never been attacked like this, the breakdown
20 of just going to fight, fight, fight, fight happens when
21 people start attacking your family and start attacking
22 you.
23      Q    So was there --
24           VIDEOGRAPHER: For the record I have 5:00.
25      Sorry.

Page 367

1           MR. KLOEWR: All right. Well, we'll call in at
2  that then.
3           VIDEOGRAPHER: Okay. The time is 5:01 p.m.
4  Let's see, the 17th. Let me --
5           THE WITNESS: I have some stuff that I have to
6  provide?
7           VIDEOGRAPHER: Yeah, so doesn't include what we
8  asked for today.
9           MR. MALONE: For today.
10          VIDEOGRAPHER: For today of 12-16 -- at -- at
11 12-16-2022. This is the conclusion of this
12 particular deposition on this day, case
13 1:22-CV-0129-WJF.
14          COURT REPORTER: Okay. And then before I go
15 off the record, Mr. Kloewr, how did you want a copy
16 of the transcript?
17          MR. KLOEWR: Our usual arrangement if you've
18 got that on file. Otherwise, I want it expedited
19 e-transcript.
20          MR. MALONE: Yeah.
21          MR. KLOEWR: Yeah.
22          COURT REPORTER: Okay. And then did you want a
23 copy of the video?
24          MR. KLOEWR: Yes.
25          MR. MALONE: We'll take electronic condensed

Page 368

1  with video, as well.
2           COURT REPORTER: Okay. And then Ms. DeFranco?
3           MS. DEFRANCO: He's reading, please. Reading
4  and signing.
5           (DEPOSITION CONCLUDED AT 5:02 P.M.)

Page 369

1                    CERTIFICATE OF REPORTER
2                       STATE OF COLORADO
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof by me
7  after first being duly sworn to testify the truth, the
8  whole truth, and nothing but the truth; and that the
9  said matter was recorded digitally by me and then
10 reduced to typewritten form under my direction, and
11 constitutes a true record of the transcript as taken,
12 all to the best of my skills and ability. I certify
13 that I am not a relative or employee of either counsel,
14 and that I am in no way interested financially,
15 directly or indirectly, in this action.
16
17
18
19
20
21
22 DARIANA CABRERA ALVAREZ,
23 COURT REPORTER / NOTARY
24 COMMISSION EXPIRES ON: 10/22/2025
25 SUBMITTED ON: 12/29/2022