# EXHIBIT 12

# CONFIDENTIAL
# FILED UNDER SEAL

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
         -----------------------------------------


          Eric Coomer, Ph.D.,


                    Plaintiff,


          vs.              No. 1:22-cv-01129-NYW-SKC


          Michael J. Lindell, Frankspeech LLC,
          and My Pillow, Inc.,


                    Defendants.

         -----------------------------------------


                         DEPOSITION


          of Michael Lindell, taken pursuant to
          notice to take oral deposition, at the
          Law Office of Parker Daniels Kibort, 888
          Colwell Building, 123 North Third
          Street, Minneapolis, Minnesota, on the
          23rd day of August, 2023, before Nathan
          D. Engen, a notary public in and for the
          State of Minnesota.
```

Page 1

```
 1      have not.
 2   Q  Okay.
 3   A  I got two of them right before you
 4      walked in the room.
 5   Q  What one piece of paper did you look
 6      at?
 7             THE WITNESS:  Can I ask him
 8      what page it's on?
 9             MR. MALONE:  Mike, you don't
10      want to tell him anything that we
11      talked about.
12             THE WITNESS:  Okay.
13             MR. MALONE:  If you know the
14      answer --
15             THE WITNESS:  Okay.
16             MR. MALONE:  -- then you can
17      say it.  If you don't know the answer,
18      then that's your answer.
19             THE WITNESS:  Well, I can
20      try and find it if you want -- if you
21      want me to go through it.  I don't know
22      if it came from here or not.
23             I asked him, my lawyer,
24      something for a very specific.  I
25      didn't review this -- this complaint or
```
Page 14

```
 1   any papers.  I asked him for two
 2   things.
 3          I asked him how much money
 4   that My Pillow had lost to get me that
 5   piece of paper which we had that we had
 6   lost because of your client.
 7          And then I also asked him
 8   what was said, or what did they have,
 9   that was said on my show.  And -- and
10   can he -- and he went and either he
11   printed it off, whatever, I can't find
12   it.
13          And he said, it was just a
14   quote and it said --
15          MR. MALONE:  Mike --
16          THE WITNESS:  -- you falsely
17   accused me.  I falsely said something.
18   Which I didn't.
19
20   By Mr. Cain:
21 Q The information that you requested with
22   respect to My Pillow, and the money
23   that you claimed you lost, you reviewed
24   that to prepare today --
25 A -- no, I just wrote down two numbers.
```
Page 15

```
 1      I said what are those numbers again.
 2   Q  What are the those numbers again?
 3   A  That -- the numbers that from Newsmax
 4      from January to April that I -- that
 5      was taken as $3,055,534.18.
 6             And then after your -- after
 7      Eric Coomer, the dirty deal made with
 8      Chris Rutty, from that point on the
 9      Newsmax would not have My Pillow on.
10             And from my -- from the same
11      time period, Monday until August
12      another four-month time period, we took
13      in $300,661, 10 percent, a 90% percent
14      loss.
15             Ninety percent My Pillow was
16      tanked because of -- directly because
17      of you.
18   Q  Okay.  Let's -- let's break that down.
19      What -- and you -- you went through
20      that fairly quickly.  So I'm gonna slow
21      you down again.
22             You wrote down multiple
23      numbers that you're claiming.
24   A  No, there's only two numbers, sir,
25      don't say multiple.  Two.
```
Page 16

```
 1   Q  Well, multiple is more than one.
 2   A  Okay.
 3   Q  All right.  The first is $3 million...
 4      Repeat that?
 5   A  $3,055,534.18.
 6   Q  And what does that number represent?
 7   A  That number is sales for My Pillow from
 8      January to April, January 1st to end of
 9      April, a four-month period.
10   Q  Okay.
11   A  Leading up to when you -- when Chris
12      Ruddy no -- told me I could no longer
13      come on Newsmax because of some
14      settlement with your client.
15             And he -- and -- and then
16      I'm -- from May 1st to August 31st,
17      that now number instead of being our
18      normal $3 million fifty five whatever,
19      it went to $300,661.59.
20             And the reason for that is
21      because he would no longer let me come
22      on to talk about My Pillow products,
23      period.
24             And that's what I was upset
25      about on -- when I made the one
```
Page 17

5 (Pages 14 - 17)

**Page 22**

1   But let's go back to your
2   claim about Newsmax.  January 1 to
3   April the first sales period that
4   you're referring to that's in 2021;
5   correct?
6   A   Right.
7   Q   And May through August, the 90-percent
8   reduction that you just referred to,
9   that's also in 2021?
10  A   Correct.
11  Q   And what you're referring to in terms
12      of the reduction, is that tracked
13      through a promo code?
14  A   Yes.  The promo code Newsmax that we
15      always use.  Yes.
16  Q   Okay.  Now, I asked you what you did to
17      prepare to give testimony.  Did you
18      review Mr. Ruddy's deposition?
19  A   No.
20  Q   Do you know that he have testified
21      about this --
22  A   Yes.
23  Q   -- very same issue?
24  A   Yes.
25  Q   Do you know that he disagrees with what

**Page 23**

1       your contention is here?
2   A   From what I heard, he doesn't really
3       disagree.  I -- in front of -- I've
4       talked to my lawyers and we -- and he
5       doesn't disagree at all.
6           MR. MALONE:  Mike, you have
7       to --
8           THE WITNESS:  Okay.
9           MR. MALONE:  -- tell them
10      what we talked about.
11          THE WITNESS:  Got it.  No,
12      he doesn't disagree.  He knows what we
13      talked about; he just don't have it in
14      writing.
15          MR. CAIN:  Well, let's --
16          THE WITNESS:  -- he's --
17      he's never let me on since -- to this
18      day.  And we just talked another three
19      months ago.  He said, "I'm not -- I
20      can't have you back on yet, Mike."
21      Fact.
22
23          By Mr. Cain:
24  Q   Let's break this down a little bit
25      more.  I took your deposition before on

**Page 24**

1       behalf -- when you were acting on
2       behalf of My Pillow, and you made this
3       same claim in your prior deposition;
4       didn't you?
5   A   (Indicating).
6   Q   Is that a yes?
7   A   Yes.
8   Q   Okay.
9   A   If it -- it's night and day whatever
10      Ruddy says, the proof is in the
11      pudding.  He's never had me back on.
12          So, you can sit there and
13      say, "Oh, I'd have him on," and he
14      never has.  He won't let me on.  I've
15      asked numerous, numerous times.
16          So -- even to talk about
17      bringing pillows to the hurricane
18      victims down there.  "No you can't come
19      on, Mike."  "No, you can't come on,
20      Mike."
21  Q   Now in your prior deposition you
22      claimed the same thing that there was
23      some agreement between Dr. Coomer and
24      Newsmax to keep you off the air; right?
25  A   Sure seems --

**Page 25**

1           MR. MALONE:  -- object to
2       the form.
3           THE WITNESS:  Sure seems
4       like that; doesn't it?
5
6       By Mr. Cain:
7   Q   That's -- and that's very clearly
8       angered you; is that a fair statement?
9   A   When he told me -- when Chris Ruddy
10      told me at the beginning of May of
11      2021, "Mike, I can no longer have you
12      on," and I was very upset.
13          I said because you made a
14      dirty deal with a -- with a -- this
15      Eric Coomer guy, whoever he is?  And
16      Chris says, "Mike, I'm sorry.  I have
17      other lawsuits going on."
18          And I said, "Well, what does
19      that have to do with My Pillow?"  He
20      says, "I'm sorry."
21          That's what he said numerus
22      times, "I'm sorry, I can't have you on
23      even to talk about pillows like I've
24      always said, but --"  "Mike, I've
25      always backed you.

```
 1     evidence against these machine
 2     companies than you'll ever need in
 3     history.
 4  Q  Okay.
 5  A  It has nothing to do with (inaudible).
 6  Q  I just, again, I know you have your
 7     break, let me follow up on this line.
 8     (Clearing throat).
 9         What does Dominion have to
10     do with the registered voter rolls
11     maintained by the Colorado Secretary of
12     State, for example?
13  A  What's that?
14  Q  What does Dominion have to do with the
15     registered voter rolls maintained by
16     the State?
17  A  Because -- no, we -- we get them.  We
18     got them all under the Freedom of
19     Information Act.
20         I had to pay for them and
21     stuff, it shows computer manipulation,
22     it shows all this, that inside machine
23     manipulation.
24  Q  I asked -- I asked you about what
25     Dominion did, and you're saying that
```
Page 110

```
 1     out there.
 2         It had nothing to do with
 3     Eric Coomer.
 4         THE WITNESS:  I got to get
 5     on my show.  So we're going to have to
 6     take a break.  I can't get around --
 7         MR. CAIN:  -- let me just --
 8         THE WITNESS:  -- I'm not
 9     gonna have you cost me more money.
10         MR. CAIN:  I understand.
11
12     By Mr. Cain:
13  Q  Are -- are you saying though that
14     Dominion machines have the registered
15     voter roll data on -- on them,
16     specifically?
17  A  No, I didn't -- who said that?
18  Q  I'm asking --
19  A  -- I said we get these -- you need to
20     understand, the voter rolls --
21  Q  -- I asked you -- listen you -- you --
22         MR. MALONE:  -- Mike.
23
24     By Mr. Cain:
25  Q  I asked you about what Dominion did,
```
Page 112

```
 1     the registered voter rolls were
 2     manipulated by presumably some external
 3     factor; right?
 4  A  They -- they -- the inside that they --
 5     them -- inside the machines, they were
 6     -- they were manipulated all the -- all
 7     of our voting, all of your evidence of
 8     the -- the -- our 2020 election was
 9     manipulated.
10         And -- and in -- and in
11     Colorado we even have more because
12     there was a down -- a down election
13     that was manipulated.
14         This is hard evidence
15     sitting up on Frankspeech.  It says,
16     "Inside the machine," 100 percent
17     evidence.  There's -- you can't get
18     around it, it's just it's never gotten
19     any media attention because it's been
20     suppressed and suppressed.
21         That's why if you remember I
22     asked Dominion to sue me, remember that
23     part?  Do you remember that?  Do you
24     recall that?  When I asked them to sue
25     me and so I could get all the evidence
```
Page 111

```
 1     you gave me the top three, Cast Vote
 2     records, registered voter rolls, Mesa
 3     County images?
 4  A  Right.
 5  Q  I asked you then what does the
 6     registered 'manipulation' as you put
 7     it, of the registered voter rolls, have
 8     to do with Dominion?  What's that --
 9  A  -- when they go through -- these
10     machines are all online; okay?  When
11     they go through -- when the registered
12     voters -- when we went -- after the
13     fact, like I say Alabama, I had to pay
14     $40 thousand to get their voter roll.
15         Who voted, what -- when they
16     voted and then who was taken off the
17     voter rolls.  And you look in the
18     inside of the machines these come from
19     -- come from -- they all go through the
20     machine.
21         So all this data that went
22     through these computers, we've took the
23     data, experts have taken the data, and
24     showed that there was -- that the --
25     that the elections were manipulated.
```
Page 113

29 (Pages 110 - 113)

```
 1      data."
 2          And then -- and I said well
 3      to have the source code, you would need
 4      the source code I guess to validate
 5      intrusions and all stuff like that.
 6      These were things that were told me
 7      back then and I -- and I...
 8          But back then, data it's all
 9      from the same thing, capture data from
10      the 2020 election.  This guy Josh said,
11      "We don't have anything here from the
12      2020 election."  That's what he said.
13          And -- and it's probably --
14      if you -- if this was time-stamped, I
15      guarantee it was the same -- right
16      after I was in that room with that red
17      team when they all went on this attack.
18   Q  So are you telling us, me, everyone in
19      this room, and the -- and the jury's
20      watching now, that you didn't make a
21      representation to the public that you
22      were gonna present PCAP data that
23      showed Chinese hacking of the 2020
24      election?
25          Are you saying you never
                                      Page 298
```

```
 1      to me it's all the same.
 2   Q  But it isn't the same and you know
 3      that.
 4   A  I don't -- I know now that -- and --
 5      and I really don't know now.  It's the
 6      same data, you're just taking it and
 7      forming it into a PCAP as far as I
 8      know.  You're taking the data and
 9      you're putting into this little
10      capture.
11          So you're taking from one
12      end -- from what I understand, one end
13      of the terabytes to the other, you're
14      grabbing all this data, putting in this
15      little bucket, so you can look at this
16      -- like if you took all of that and put
17      it in a folder.
18          That's what I -- that's, in
19      my mind, that's what I believe it is.
20      So you have all the data that was
21      sucked from the election, and you go
22      through and you form, here's one PCAP,
23      just like you guys have now, I think
24      you got, I don't know 18 or 20 of them
25      that he was able to collect.
                                      Page 300
```

```
 1      made that representation?
 2          MR. MALONE:  Object to form.
 3          THE WITNESS:  The -- what --
 4      yeah.  What I said was -- yeah, I said
 5      that what the challenge was that the
 6      data was from the 2020 election.
 7          And also, I just told you
 8      why I couldn't put the China stuff
 9      down.  It was stopped by Phil Waldren
10      and stopped by a physical attack which
11      is in the police report in Sioux Falls,
12      South Dakota.
13          MR. CAIN:  Okay.
14
15
16      By Mr. Cain:
17   Q  I don't care about your challenge;
18      that's not what I'm asking you about at
19      this point.  I'm asking about what the
20      intent was to show and --
21   A  -- to show data from the 2020 election.
22      Absolutely.  Call it PCAP data, call it
23      whatever data you want.
24   Q  Okay.
25   A  If I use that, the word PCAP or data,
                                      Page 299
```

```
 1          And I finally said, "Dennis,
 2      quit grabbing that.  We've got to get
 3      these devices made, we've got other
 4      stuff to do."  That's what I told him.
 5          It takes a long time to put
 6      -- to put it into this bucket or
 7      whatever you want to call it.
 8          MR. CAIN:  Objection;
 9      non-responsive.
10
11
12      By Mr. Cain:
13   Q  Let's do this, if you go back to your
14      text -- well, actually before I go
15      there.
16          I think I asked you this,
17      and I apologize if I did during you're
18      my Pillow deposition, but you're
19      clearly not an expert in election
20      security or cyber of any sort; are you?
21   A  Not of cyber.  Not of cyber -- I don't
22      know cyber.  I don't know how to read
23      it, neither do you.  I don't know how
24      to read it.  Right.
25   Q  Okay. So you say to Mary Fanning in
                                      Page 301
```

76 (Pages 298 - 301)

Veritext Legal Solutions
800-336-4000

**Page 310**

1  between Josh Merit and Sidney Powell,
2  and Dennis now knowing Josh Merit was a
3  traitor, or whatever he is here, was
4  upset to know that he knew Sidney
5  Powell.
6        I don't know. I'm only
7  reading these texts. And then it says,
8  "He -- he told me he gave Conan the --
9  he gave it to Conan." Which he did.
10 See, if you read the rest of the text
11 there, "He gave it to Conan," which he
12 did. Was it the whole 32 terabytes
13 bites? No.
14       MR. CAIN: Object to that as
15 well as non-responsive.
16       THE WITNESS: You want
17 answers, that's your answer.
18       MR. CAIN: All right.
19
20
21 By Mr. Cain:
22 Q  So your words, "Dennis didn't give us
23    anything to bring here. No PCAPs. He
24    got really upset when I picked up Conan
25    and I asked for the evidence."

**Page 311**

1        Tell me -- tell me what you
2  remember about this --
3  A  -- I asked him for my copy and my 32,
4     and he said I'm still working on one
5     piece.
6        And I said, "Okay," we'll go
7  -- and I said, "I need it right now.
8  I've got to get on a plane." And he
9  got upset with me, he goes by -- and I
10 -- I said, "We'll let's go -- and I'll
11 -- we'll go have breakfast." Whatever.
12       Then Conan and I went and
13 had breakfast and I said, "You know
14 what, I got to get these," -- he had
15 given this one hard drive -- that hard
16 drive I took.
17       And I said, just give me
18 what you got -- what he's got and we --
19 rather than go get mine out of whatever
20 he's doing -- and the -- and the source
21 code.
22       Because Conan had that, I
23 guess. They put it -- they -- Dennis
24 -- they put it in storage, the both of
25 them. So I said let, "I got to get to

**Page 312**

1  Texas," because I was worried -- there
2  was a whole event and nothing had been
3  planned, what we were gonna to do.
4  and --
5  Q  Okay, but --
6  A  -- so I left.
7  Q  So did Dennis know you were gonna show
8     up, look for the --
9  A  Yeah.
10 Q  -- for the evidence?
11 A  Yeah. Yeah, yeah, he -- he knew that.
12    But he wasn't -- he wasn't ready with
13    one part of it yet.
14 Q  (Inaudible).
15 A  And I go to Conan and Conan -- I go,
16    "Dennis, I said I need this right now.
17    I have to go." I got upset with him
18    because I wanted to get going.
19 Q  How much lead time -- I mean, we -- we
20    looked at the acquisitions of the
21    blxware.
22       Some of that paperwork, and
23    assuming it has something to do with
24    this data, how much time did -- did
25    Dennis Montgomery have to put together

**Page 313**

1  the evidence that you expected to
2  receive when you landed in Florida?
3       MR. MALONE: Object to form
4  and foundation.
5       THE WITNESS: I don't know
6  what you're talking about. He had
7  already made the -- the wheels that I
8  wanted.
9       Those were already done. I
10 had those two, three weeks prior.
11 Those were the wheels that showed it
12 was 100 percent from the -- from the
13 2020 election. I had those.
14       I'm going, "You know what?
15 Whatever else gets -- whatever else he
16 has ready, it's fine." You know, the
17 -- and we ran those on the front screen
18 the whole time.
19       And that's where even the
20 Facebook fact checker said, "Yes, it's
21 real."
22
23
24 By Mr. Cain:
25 Q  You're talking about the scrolling text

**Page 314**

```
 1      data?
 2   A  Right.
 3   Q  That's was being run?
 4   A  Right.  Right.
 5   Q  Okay.  And you believe that is evidence
 6      of the election -- data from the
 7      election showing that votes had been
 8      changed?
 9   A  No, I never said that.
10   Q  I am asking you.
11   A  The whole thing was it's from the 2020
12      election, and we had -- we showed that
13      China could -- intruded into our
14      election.  That's what -- that's what
15      the whole thing was about.
16   Q  Okay.  But the scrolling Hex data --
17   A  -- that's the one thing I already had,
18      and I was there and I said, "Here's
19      what I want made.  I want this made..."
20      I even sent that to a lot of the news
21      station.
22          "Check this out, is this for
23      real?"  And they said, "Yes."  I sent
24      it to the Facebook fact checkers, Allen
25      Duke and Martin over in Belgium, they
```

**Page 315**

```
 1      said, "Yes, it's time-stamped."  Any
 2      cyber guy can read that.
 3          And the other stuff we had
 4      -- when Josh Merit got there, it kind
 5      of upset the apple cart.  I'm going,
 6      "What?"
 7   Q  (Inaudible).
 8   A  I said, "Don't sit here and tell me
 9      Dennis Montgomery's stuffs all real,
10      then we get here and you say oh,
11      there's nothing on there."
12          So as soon as Conan got
13      there, we were able to show him because
14      he -- he either couldn't find it in the
15      file, in that hard drive -- by the way,
16      I think we even -- I believe he even
17      stole that hard drive from the
18      symposium.
19          I believe he stole that, so
20      -- and I think that's why we took him
21      to court.  We took Josh Merit to court.
22      He stole -- he tried to sabotage the
23      whole symposium.
24          And I was checking with Mary
25      going, "Did, you know, did Dennis not
```

**Page 316**

```
 1      give us something on there?  Or is Josh
 2      Merit a sabotager?"
 3          It turns out Josh Merit was
 4      a sabotager.  And, yeah, we took him to
 5      court right after that.
 6   Q  Mr. Lindell, you're -- you're so far
 7      from the question that we had.
 8   A  Well, you're so far, but this had
 9      nothing to do with Eric Coomer.  This
10      is bizarre.  I've never seen anything
11      like it.
12   Q  So what you -- well, what you said is
13      -- and maybe I missed this because it
14      was buried in what you just told me,
15      that the people, the media people, that
16      you sent the data to before the
17      symposium included -- it included CNN;
18      didn't it?
19   A  That what?
20   Q  CNN had the data, whatever data, or at
21      least a piece of the data before --
22   A  -- I sent it to reporters.  I sent some
23      screen shots of it and not one of them
24      said it wasn't from the 2020 election.
25          I wanted to get them so
```

**Page 317**

```
 1      hopefully they would report about it.
 2      The only one that said 100 percent was
 3      Martin from Lead -- from the Allen Duke
 4      Lead Stories.
 5          And I gave him permission
 6      because he's validated ahead of time
 7      that you could have Skype in because
 8      he's over in Belgium.  So he had a
 9      cyber guy there.
10          He's the one that told me
11      two of these streams, the Wisconsin and
12      Pennsylvania were the same.  I said,
13      "But it's from the 2020 election?"
14          And he said, "Yeah, they're
15      -- it's the time-stamp."  And he
16      agreed.  So I go, "Okay, good."
17          MR. MALONE:  Mike, do you
18      need a break to deal with...
19          THE WITNESS:  What?
20          MR. MALONE:  Do you need a
21      break to deal with...
22          THE WITNESS:  I got to just
23      send him a text here.
24          MR. CAIN:  You send that
25      off.  Let's do it off the record.
```

80 (Pages 314 - 317)

```
 1   A   I had 30 days to bring it to court, and
 2       I brought it to court.  And that will
 3       be sometime next year.  A year from
 4       now.  It's funny they pushed it off to
 5       2024.  That's weird.
 6   Q   Are you saying to the jury that Mr.
 7       Zeidman didn't receive an award from
 8       the arbitrators -- you haven't paid it
 9       yet, I understand that.
10   A   It's in court.
11   Q   Five million dollars.
12   A   It's in court.
13   Q   Did he get the award or not?
14   A   No, he didn't get a reward because it's
15       in court.
16   Q   That was the determination from the
17       panel.  I know it hasn't been
18       finalized, that's a different issue.
19       But he was given a $5 --
20   A   -- it has to go through the courts.  We
21       -- did they rule?  These judges saying,
22       "Yeah, we're gonna give you -- we're
23       gonna award 5 million dollars."  Now
24       here, take it to court, that's where
25       we're going.  So yeah.
                                    Page 326
```

```
 1       my lawyers have said.  So it's going to
 2       court.
 3   Q   Right.  But you're being evasive; you
 4       know what I'm asking you.
 5   A   You're asking if he got an award.  No.
 6       I've not -- I've not paid him because
 7       it's going to court.  100 percent.
 8           I'm not paying him, is it's
 9       going to court.  You think I'm gonna
10       pay him -- pay for something I didn't
11       -- he is not entitled to?
12   Q   You're --
13   A   -- ana a hundred other people say it's
14       from the 2020 election.  And he's the
15       only one in the world -- and all of
16       sudden he shows up with some attorney
17       that would -- that knew all about
18       Dennis Montgomery and the evidence
19       because he was involved, and he got
20       money for it?  Unbelievable.
21   Q   All right.
22           MR. CAIN:  So object to all
23       of as evasive and non-responsive.
24
25
                                    Page 328
```

```
 1   Q   Did he get the award of 5 million
 2       dollars?
 3   A   No, it's in the court.  What's the
 4       matter with you?  It's in court -- it's
 5       maybe a year from now.  He did not get
 6       an award of 5 million dollars.  I'm not
 7       gonna pay for something he's not
 8       entitled to.
 9           It's going to court.  Do you
10       get that?
11   Q   Yeah, I get exactly what's going on.
12   A   (Laughing).
13   Q   I don't think you do.  All right.  So
14       the arbitration panel that heard the
15       evidence determined that he was
16       entitled to 5 million dollars because
17       there wasn't evidence presented related
18       to the 2020 election --
19   A   That's --
20   Q   -- isn't that true?
21   A   That's -- he -- they said he -- he has
22       an award, that's what the panel said.
23       Now what was presented, I have no idea
24       what -- what -- they did some very -- a
25       lot of things wrong there, that's what
                                    Page 327
```

```
 1       By Mr. Cain:
 2   Q   Josh Merit told you the data was not
 3       what it purported to be.  Mr. Zeidman
 4       has an arbitration ruling for 5
 5       million --
 6   A   -- that's not true.
 7   Q   Dollars --
 8   A   -- that's not true what you just said.
 9       Josh Merit said 100 percent Dennis
10       Montgomery's stuff, 100 percent, he had
11       checked it all out, it was 100 percent
12       bonafide good evidence.
13           And he said that to the
14       cyber guys down -- or I mean, to aids
15       off down there on a chalkboard.  He
16       said it then.  We get up there, he said
17       -- he didn't say it was bad evidence,
18       he said there was nothing there.  Then
19       when Conan Hayes said, "Oh, here's
20       where it is on the hard drive."
21           Josh Merit said, "Yes, it's
22       from the 2020 election."  That's what
23       Josh Merit said.  So that's not true.
24           And we have Josh Merit on
25       tape going, "We're going to steal this
                                    Page 329
```

```
 1    STATE OF MINNESOTA )
 2                       )  ss.
 3    CROW WING COUNTY   )
 4
 5
 6         I, Nathan D. Engen do hereby
 7    certify that the foregoing transcript in
 8    the matter of Eric Coomer, Ph.D. vs.
 9    Michael J. Lindell, Frankspeech LLC, and
10    My Pillow, Inc., is true, correct and
11    accurate:
12         That said transcript was prepared
13    under my direction and control from my
14    stenographic shorthand notes.
15         That I am not related to any of
16    the parties in this matter, nor am I
17    interested in the outcome of this
18    action.
19
20    Witness my hand and seal this 28th day
21    of August, 2023.
22
23
24
                            Nathan D. Engen
25
```

Page 370

```
 1  malone@parkerdk.com
 2             August 28, 2023
 3  RE: Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 4  DEPOSITION OF: Michael J. Lindell (# 6025415)
 5     The above-referenced witness transcript is
 6  available for read and sign.
 7     Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18             Yours,
19             Veritext Legal Solutions
20
21
22
23
24
25
```

Page 371

94 (Pages 370 - 371)