**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants.

---

# EXHIBIT – 1

---

S. HRG. 115–92

# RUSSIAN INTERFERENCE IN THE 2016 U.S. ELECTIONS

# HEARING

BEFORE THE

## SELECT COMMITTEE ON INTELLIGENCE

OF THE

## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

WEDNESDAY, JUNE 21, 2017

Printed for the use of the Select Committee on Intelligence



Available via the World Wide Web: http://www.fdsys.gov

U.S. GOVERNMENT PUBLISHING OFFICE

26–125 PDF             WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

Chairman BURR. Thank you, Mr. Sandvoss.
Dr. Halderman.

**STATEMENT OF J. ALEX HALDERMAN, Ph.D., PROFESSOR OF COMPUTER SCIENCE AND ENGINEERING, UNIVERSITY OF MICHIGAN**

Dr. HALDERMAN. Chairman Burr, Vice Chairman Warner, and members of the Committee: Thank you for inviting me to speak with you today about the security of U.S. elections.

I'm a Professor of Computer Science and have spent the last 10 years studying the electronic voting systems that our Nation relies on. My conclusion from that work is that our highly computerized election infrastructure is vulnerable to sabotage and even to cyber attacks that could change votes. These realities risk making our election results more difficult for the American people to trust.

I know America's voting machines are vulnerable because my colleagues and I have hacked them repeatedly as part of a decade of research studying the technology that operates elections and learning how to make it stronger. We've created attacks that can spread from machine to machine, like a computer virus, and silently change election outcomes. We've studied touchscreen and optical scan systems, and in every single case we found ways for attackers to sabotage machines and to steal votes. These capabilities are certainly within reach for America's enemies.

As you know, states choose their own voting technology and, while some states are doing well with security, others are alarmingly vulnerable. This puts the entire Nation at risk. In close elections, an attacker can probe the most important swing states or swing counties, find areas with the weakest protection, and strike there. In a close election year, changing a few votes in key localities could be enough to tip national results.

The key lesson from 2016 is that these threats are real. We've heard that Russian efforts to target voter registration systems struck 21 states, and we've seen reports detailing efforts to spread an attack from an election technology vendor to local election offices. Attacking vendors and municipalities could have put Russia in a position to sabotage equipment on Election Day, causing machines or poll books to fail, and causing long lines or disruption. They could have engineered this chaos to have a partisan effect by striking places that lean heavily towards one candidate.

Some say the fact that voting machines aren't directly connected to the Internet makes them secure, but unfortunately, this is not true. Voting machines are not as distant from the Internet as they may seem. Before every election, they need to be programmed with races and candidates. That programming is created on a desktop computer, then transferred to voting machines. If Russia infiltrated these election management computers, it could have spread a vote-stealing attack to vast numbers of machines.

I don't know how far Russia got or whether they managed to interfere with equipment on Election Day, but there's no doubt that Russia has the technical ability to commit widespread attacks against our voting system, as do other hostile nations. I agree with James Comey when he warned here two weeks ago: We know

73

they're coming after America, and they'll be back. We must start preparing now.

Fortunately, there's a broad consensus among cybersecurity experts about measures that would make America's election infrastructure much harder to attack. I've co-signed a letter that I've entered into the record from over 100 leading computer scientists, security experts, and election officials that recommends three essential steps.

First, we need to upgrade obsolete and vulnerable voting machines, such as paperless touchscreens, and replace them with optical scanners that count paper ballots. This is a technology that 36 states already use. Paper provides a physical record of the vote that simply can't be hacked.

President Trump made this point well on Fox News the morning after—the morning of the election. He said, "There's something really nice about the old paper ballot system. You don't worry about hacking."

Second, we need to use the paper to make sure that the computer results are right. This is a common-sense quality control and it should be routine. Using what's known as a risk-limiting audit, officials can check a small, random sample of the ballots to quickly and affordably provide high assurance that the election outcome was correct. Only two states, Colorado and New Mexico, currently conduct audits that are robust enough to reliably detect cyber attacks.

Lastly, we need to harden our systems against sabotage and raise the bar for attacks of all sorts by conducting comprehensive threat assessments and applying cybersecurity best practices to the design of voting equipment and the management of elections.

These are affordable fixes. Replacing insecure paperless voting machines nationwide would cost $130 million to $400 million. Running risk-limiting audits nationally for Federal elections would cost less than $20 million a year. These amounts are vanishingly small compared to the national security improvement they buy.

State and local election officials have an extremely difficult job, even without having to worry about cyber attacks by hostile governments. But the Federal Government can make prudent investments to help them secure elections and uphold voters' confidence. We all want election results that we can trust.

If Congress works closely with the states, we can upgrade our election infrastructure in time for 2018 and 2020. But if we fail to act, I think it's only a matter of time until a major election is disrupted or stolen in a cyber attack.

Thank you for the opportunity to testify today and for your leadership on this critical matter. I look forward to answering any questions.

[The prepared statement of Dr. Halderman follows:]

74

## U.S. Senate Select Committee on Intelligence

*Russian Interference in the 2016 U.S. Elections*

## Expert Testimony by
## J. Alex Halderman
## Professor of Computer Science, University of Michigan

### June 21, 2017

Chairman Burr, Vice Chairman Warner, and members of the Committee, thank you for inviting me to speak today about the security of U.S. elections. I'm here to tell you not just what I think, but about concerns shared by hundreds of experts from across cybersecurity research and industry. Such expertise is relevant because elections—the bedrock of our democracy—are now on the front lines of cybersecurity, and they face increasingly serious threats. Our interest in this matter is decidedly non-partisan; our focus is on the integrity of the democratic process, and the ability of the voting system to record, tabulate, and report the results of elections accurately.

My research in computer science and cybersecurity tackles a broad range of security challenges.[1] I study attacks and defenses for the Internet protocols we all rely on every day to keep our personal and financial information safe. I also study the capabilities and limitations of the world's most powerful attackers, including sophisticated criminal gangs and hostile nation states. A large part of my work over the last ten years has been studying the computer technology that our election system relies on.[2] In this work, I often lead the "red team," playing the role of a potential attacker to find where systems and practices are vulnerable and learn how to make them stronger.

I know firsthand how easy it can be to manipulate computerized voting machines. As part of security testing, I've performed attacks on widely used voting machines, and I've had students successfully attack machines under my supervision.

---

[1] My curriculum vitae and research publications are available online at https://jhalderm.com.
[2] For an accessible introduction to the security risks and future potential of computer voting technologies, see my online course, *Securing Digital Democracy*, which is available for free on Coursera: https://www.coursera.org/learn/digital-democracy.

75

## U.S. Voting Machines Are Vulnerable

As you know, states choose their own voting technology.[3] Today, the vast majority of votes are cast using one of two computerized methods. Most states and most voters use the first type, called optical scan ballots, in which the voter fills out a paper ballot that is then scanned and counted by a computer. The other widely used approach has voters interact directly with a computer, rather than marking a choice on paper. It's called DRE, or direct-recording electronic, voting. With DRE voting machines, the primary records of the vote are stored in computer memory.[4]

Both optical scanners and DRE voting machines are computers. Under the hood, they're not so different from your laptop or smartphone, although they tend to use much older technology—sometimes decades out of date.[5] Fundamentally, they suffer from security weaknesses similar to those of other computer devices. I know because I've developed ways to attack many of them myself as part of my research into election security threats.

Ten years ago, I was part of the first academic team to conduct a comprehensive security analysis of a DRE voting machine. We examined what was at that time the most widely used touch-screen DRE in the country,[6] and spent several months probing it for vulnerabilities. What we found was disturbing: we could reprogram the machine to invisibly cause any candidate to win. We also created malicious software—vote-stealing

---

[3] In many states, the technology in use even differs from county to county. Verified Voting maintains an online database of the equipment in use in each locality: https://www.verifiedvoting.org/verifier/.
[4] Some DREs also produce a printed record of the vote and show it briefly to the voter, using a mechanism called a voter-verifiable paper audit trail, or VVPAT. While VVPAT records provide a physical record of the vote that is a valuable safeguard against cyberattacks, research has shown that VVPAT records are difficult to accurately audit and that voters often fail to notice if the printed record doesn't match their votes. For these reasons, most election security experts favor optical scan paper ballots. See: S. Goggin and M. Byrne, "An Examination of the Auditability of Voter Verified Paper Audit Trail (VVPAT) Ballots." In *Proceedings of the 2007 USENIX/ACCURATE Electronic Voting Technology Workshop*, August 2007. Available at: http://www.accurate-voting.org/wp-content/uploads/2007/08/evt07-goggin.pdf. See also: B. Campbell and M. Byrne, "Now Do Voters Notice Review Screen Anomalies?" In *Proceedings of the 2009 USENIX/ACCURATE/IAVoSS Electronic Voting Technology Workshop*, August 2009. Available at: http://chil.rice.edu/research/pdf/CampbellByrne_EVT_(2009).pdf.
[5] In 2016, 43 states used computer voting machines that were at least 10 years old—close to the end of their design lifespans. Older hardware and software generally lacks defenses that guard against more modern attack techniques. See: L. Norden and C. Famighetti, "America's Voting Machines at Risk," Brennan Center, 2015. https://www.brennancenter.org/publication/americas-voting-machines-risk. See also: S. Checkoway, A. Feldman, B. Kantor, J. A. Halderman, E. W. Felten, and H. Shacham, "Can DREs Provide Long-Lasting Security? The Case of Return-Oriented Programming and the AVC Advantage." In *Proceedings of the 2009 USENIX/ACCURATE/IAVoSS Electronic Voting Technology Workshop*, August 2009. Available at: https://jhalderm.com/pub/papers/avc-evt09.pdf.
[6] The machine was the Diebold AccuVote TS, which is still used statewide in Georgia in 2017.

2

76

code—that could spread from machine-to-machine like a computer virus, and silently change the election outcome.[7]

Vulnerabilities like these are endemic throughout our election system. Cybersecurity experts have studied a wide range of U.S. voting machines—including both DREs and optical scanners—and in *every single case*, they've found severe vulnerabilities that would allow attackers to sabotage machines and to alter votes.[8] That's why there is overwhelming consensus in the cybersecurity and election integrity research communities that our elections are at risk.

## Cyberattacks Could Compromise Elections

Of course, interfering in a state or national election is a bigger job than just attacking a single machine. Some say the decentralized nature of the U.S. voting system and the fact that voting machines aren't directly connected to the Internet make changing a state or national election outcome impossible. Unfortunately, that is not true.[9]

Some election functions are actually quite centralized. A small number of election technology vendors and support contractors service the systems used by many local governments. Attackers could target one or a few of these companies and spread malicious code to election equipment that serves millions of voters.

Furthermore, in close elections, decentralization can actually work against us. An attacker can probe different areas of the most important "swing states" for vulnerabilities, find the areas that have the weakest protection, and strike there.[10] In a close election, changing a few votes may be enough to tip the result, and an attacker can choose where—and on which equipment—to steal those votes. State and local elections are also at risk.

---

[7] A. J. Feldman, J. A. Halderman, and E. W. Felten, "Security Analysis of the Diebold AccuVote-TS Voting Machine." In *Proceedings of the 2007 USENIX/ACCURATE Electronic Voting Technology Workshop* (EVT), August 2007. The research paper and an explanatory video are available at: https://citp.princeton. edu/research/voting/.

[8] For a partial bibliography of voting machine attack research, see: J. A Halderman, "Practical Attacks on Real-world E-voting." In F. Hao and P. Y. A. Ryan (eds.), *Real-World Electronic Voting: Design, Analysis and Deployment*, CRC Press, December 2016. Available at: https://jhalderm.com/pub/papers/ch7-evoting-attacks-2016.pdf.

[9] I explained how attackers can bypass these obstacles in a recent congressional briefing: *Strengthening Election Cybersecurity*, May 15, 2017. The video is available at https://www.electiondefense.org/congressional-briefings-cyber-security/.

[10] For a more detailed description of how adversaries might select targets, see J. A. Halderman, "Want to Know if the Election was Hacked? Look at the Ballots," November 2016, available at: medium.com/@jhalderm/want-to-know-if-the-election-was-hacked-look-at-the-ballots-c61a6113b0ba.

77

Our election infrastructure is not as distant from the Internet as it may seem.[11] Before every election, voting machines need to be programmed with the design of the ballot, the races, and candidates. This programming is created on a desktop computer called an election management system, or EMS, and then transferred to voting machines using USB sticks or memory cards. These systems are generally run by county IT personnel or by private contractors.[12] Unfortunately, election management systems are not adequately protected, and they are not always properly isolated from the Internet. Attackers who compromise an election management system can spread vote-stealing malware to large numbers of machines.[13]

### Russian Attack Attempts: The Threats Are Real

The key lesson from 2016 is that hacking threats are real.

This month, we've seen reports detailing Russian efforts to target voter registration systems in up to 39 states[14] and to develop a capability to spread an attack from an election technology vendor to local election offices.[15] Attacking the IT systems of

---

[11] Fortunately, the U.S. has resisted widespread use of Internet voting—a development that would paint a fresh bull's eye on our democratic system. I myself have demonstrated attacks against Internet voting systems in Washington, D.C., Estonia, and Australia. See:
S. Wolchok, E. Wustrow, D. Isabel, and J. A. Halderman, "Attacking the Washington, D.C. Internet Voting System," In *Proceedings of the 16th Intl. Conference on Financial Cryptography and Data Security*, February 2012. Available at: https://jhalderm.com/pub/papers/dcvoting-fc12.pdf.
D. Springall, T. Finkenauer, Z. Durumeric, J. Kitcat, H. Hursti, M. MacAlpine, and J. A. Halderman, "Security Analysis of the Estonian Internet Voting System." In *Proceedings of the 21st ACM Conference on Computer and Communications Security* (CCS), November 2014. Available at: https://jhalderm.com/pub/papers/ivoting-ccs14.pdf.
J. A. Halderman and V. Teague, "The New South Wales iVote System: Security Failures and Verification Flaws in a Live Online Election." In *Proceedings of the 5th International Conference on E-voting and Identity*, September 2015. Available at: https://arxiv.org/pdf/1504.05646v2.pdf.
For a broader discussion of why secure Internet voting systems are likely decades away, see:
R. Cunningham, M. Bernhard, and J. A. Halderman, "The Security Challenges of Online Voting Have Not Gone Away." IEEE Spectrum, November 3, 2016. http://spectrum.ieee.org/tech-talk/telecom/security/the-security-challenges-of-online-voting-have-not-gone-away.
[12] In my own state, Michigan, about 75% of counties outsource pre-election programming to a pair of independent service providers. These are small companies with 10–20 employees that are primarily in the business of selling election supplies, including ballot boxes and "I Voted" stickers.
[13] See, for example, J. Calandrino, et al., "Source Code Review of the Diebold Voting System," part of the California Secretary of State's "Top-to-Bottom" Voting Systems Review, July 2007. Available at: https://jhalderm.com/pub/papers/diebold-ttbr07.pdf.
[14] M. Riley and J. Robertson, "Russian Cyber Hacks on U.S. Electoral System Far Wider Than Previously Known." *Bloomberg*, June 13, 2017. https://www.bloomberg.com/politics/articles/2017-06-13/russian-breach-of-39-states-threatens-future-u-s-elections.
[15] M. Cole, R. Esposito, S. Biddle, and R. Grim, "Top-secret NSA Report Details Russian Hacking Efforts Days Before 2016 Election." *The Intercept*, June 5, 2017. https://theintercept.com/2017/06/05/top-secret-nsa-report-details-russian-hacking-effort-days-before-2016-election/.

78

vendors and municipalities could put the Russians in a position to sabotage equipment on election day, causing voting machines or electronic poll books to fail, resulting in long lines or other disruptions. The Russians could even have engineered this chaos to have a partisan effect, by targeting localities that lean heavily towards one candidate or another.

Successful infiltration of election IT systems also could have put the Russians in a position to spread an attack to the voting machines and potentially steal votes. Although the registration systems involved were generally maintained at the state level, and most pre-election programming is performed by counties or outside vendors, counties tend to be even less well defended than state governments. They typically have few IT support staff and little, if any, cybersecurity expertise.

Another approach that the Russians might have been planning is to tamper with the voting system in an obvious, easily discovered way, such as causing reporting systems to send the news media incorrect initial results on election night. Even if the problem was corrected and no actual votes were changed, this would cause uncertainty in the results and widespread distrust of the system, which would injure our democratic processes. If voters cannot trust that their votes are counted honestly, they will have reason to doubt the validity of elections.[16]

I don't know how far the Russians got in their effort to penetrate our election infrastructure, nor whether they interfered with equipment on election day. (As far as the public knows, no voting equipment has been forensically examined to check whether it was successfully attacked.) But there is no doubt that Russia has the technical ability to commit widescale attacks against our voting system, as do other hostile nations. As James Comey testified here two weeks ago, we know "They're coming after America," and "They'll be back."[17]

### Practical Steps to Defend Election Infrastructure

We must start preparing now to better defend our election infrastructure and protect it from cyberattacks before the elections in 2018 and 2020. The good news is, we know how to accomplish this. Paper ballots, audits, and other straightforward steps can make elections much harder to attack.

---

[16] See, as one example, E. H. Spafford, "Voter Assurance." NAE *The Bridge*, December 2008. https://www.nae.edu/19582/Bridge/VotingTechnologies/VoterAssurance.aspx.
[17] Testimony of former FBI Director James B. Comey before the Senate Select Committee on Intelligence, June 8, 2017.

79

I have entered into the record a letter from over 100 computer scientists, security experts, and election officials. This letter recommends three essential measures that can safeguard U.S. elections:

- First, we need to replace obsolete and vulnerable voting machines, such as paperless systems, with optical scanners and paper ballots—a technology that 36 states already use. Paper provides a resilient physical record of the vote[18] that simply can't be compromised by a cyberattack. President Trump made this point well shortly before the election in an interview with Fox News. "There's something really nice about the old paper-ballot system," he said. "You don't worry about hacking. You don't worry about all the problems that you're seeing."[19]

- Second, we need to consistently and routinely check that our election results are accurate, by inspecting enough of the paper ballots to tell whether the computer results are right.[20] This can be done with what's known as risk-limiting audits.[21] Such audits are a common-sense quality control.[22] By manually checking a relatively small random sample of the ballots, officials can quickly and affordably provide high assurance that the election outcome was correct.

Optical scan ballots paired with risk-limiting audits provide a practical way to detect and correct vote-changing cyberattacks. They may seem low-tech, but they are a reliable, cost-effective defense.[23]

---

[18] Of course, paper ballots can be tampered with too, by people handling them. Optical scan tabulation has the advantage that it produces both paper and electronic records. As long as officials check that both sets of records agree, it would be very difficult for criminals to alter the election outcome without being detected, whether by a cyberattack or by old-fashioned ballot manipulation.

[19] See: http://www.businessinsider.com/donald-trump- election-day-fox-news-2016-11.

[20] At least 29 states already require some form of post-election audit. However, since the procedures in most states are not designed as a cyber defense, the number of ballots that are audited may be much too low or geographically localized to reliably detect an attack. Some states also allow auditing by rescanning paper ballots through the same potentially compromised machines. Results from paperless DRE voting machines cannot be strongly audited, since there is no physical record to check. For state-by-state details, see National Conference of State Legislatures, "Post-election Audits," June 2017. Available at: http://www.ncsl.org/research/elections-and-campaigns/post-election-audits635926066.aspx.

[21] For a detailed explanation of risk-limiting audits, see J. Bretschneider et al., "Risk-Limiting Post-Election Audits: Why and How." Available at: https://www.stat.berkeley.edu/~stark/Preprints/RLAwhitepaper12.pdf. New Mexico already requires something similar to a risk-limiting audit, and Colorado is implementing risk-limiting audits starting in 2017. Risk-limiting audits have been tested in real elections in California, Colorado, and Ohio.

[22] One of the reasons why post-election audits are essential is that pre-election "logic and accuracy" testing can be defeated by malicious software running on voting machines. Vote-stealing code can be designed to detect when it's being tested and refuse to cheat while under test. Volkswagen's emission-control software did something similar to hide the fact that it was cheating during EPA tests.

[23] Former CIA director James Woolsey and Lt. Col. Tony Shaffer call for paper ballots and auditing in a May 12, 2017 op-ed in Fox News: "Ultimately, we believe the solution to election insecurity lies in

80

- Lastly, we need to raise the bar for attacks of all sorts—including both vote tampering and sabotage—by conducting comprehensive threat assessments and by applying cybersecurity best practices to the design of voting equipment[24] and the management of elections.

These fixes aren't expensive. Replacing insecure paperless systems nationwide would cost between $130 million and $400 million.[25] Running risk-limiting audits nationally for federal elections would cost less than $20 million a year.[26] These amounts are vanishingly small compared to the national security improvement the investment buys. Yet such measures could address a prime cyber challenge, boost voter confidence, and significantly strengthen a crucial element of our national security. They would also send a firm response to any adversaries contemplating interfering with our election system.

Election officials have an extremely difficult job, even without having to worry about cyberattacks by hostile governments. The federal government can make prudent and cost-effective investments to help them defend our election infrastructure and uphold voters' confidence. With leadership from across the aisle, and action in partnership with the states, our elections can be well protected in time for 2018 and 2020.

Thank you for the opportunity to testify. I look forward to answering any questions.

---

President Reagan's famous old adage: 'trust but verify'." http://www.foxnews.com/opinion/2017/05/12/america-s-voting-systems-need-security-upgrades-it-s-time-to-beef-up-cybersecurity.html.
[24] One notable effort to develop secure voting equipment is STAR-Vote, a collaboration between security researchers and the Travis County, Texas elections office. STAR-Vote integrates a range of modern defenses, including end-to-end cryptography and risk limiting audits. See S. Bell et al., "STAR-Vote: A Secure, Transparent, Auditable, and Reliable Voting System." USENIX Journal of Election Technology and Systems (JETS) 1(1), August 2013. https://www.usenix.org/system/files/conference/evtwote13/jets-0101-bell.pdf.
[25] Brennan Center, "Estimate for the Cost of Replacing Paperless, Computerized Voting Machines," June 2017. https://www.brennancenter.org/sites/default/files/analysis/New_Machines_Cost_Across_Paperless_Jurisdictions%20%282%29.pdf. This cost might be significantly reduced by developing voting equipment based on open-source software and commercial off-the-shelf (COTS) hardware.
[26] This estimate assumes that auditing a federal race will have an average cost similar to manually recounting 10% of precincts. In a risk-limiting audit, the actual number of ballots that must be checked varies with, among other factors, the margin of victory.

Chairman BURR. Dr. Halderman, thank you.

The Chair would recognize himself for five minutes. Members will be recognized by seniority.

Secretary Lawson, in how many states is the secretary of state in charge of the elections process, do you know?

Ms. LAWSON. Yes, sir. It's 40.

I'm sorry. Yes, sir. It's 40.

Chairman BURR. Okay. Would you be specific: What do the secretary of states do—what is it they do not like about elections being designated critical infrastructure?

Ms. LAWSON. The most important issue, sir, is that there have been no clear parameters set and, even after the three calls that we had with Secretary Jeh Johnson before the designation was made, we consistently asked for what would be different if the designation was made and how we would communicate. Would it be any different——

Chairman BURR. So nothing has negatively happened except that you don't have the guidance to know what to do?

Ms. LAWSON. Nothing has negatively happened to this date, but also nothing positive has happened.

Chairman BURR. Got it. Got it.

Mr. Sandvoss, Illinois is one of the few states that have publicly been identified. I guess that's in part because you took the initiative to do it. You gave a good chronology: 23 June, first sign; 12 July, State IT staff took action; 12 August, the attacks stopped.

At what point was the State of Illinois contacted by any Federal entity about their system having been attacked or was it the State of Illinois that contacted the Federal Government?

Mr. SANDVOSS. We were contacted by the FBI—I don't have the exact date, but it was after we had referred the matter to the Attorney General's office. My guess would be probably a week after.

Chairman BURR. A week after——

Mr. SANDVOSS. After the AG was notified by us of this breach.

Chairman BURR. And the AG was notified approximately when?

Mr. SANDVOSS. On July 19th.

Chairman BURR. July 19th. Okay.

At what point did the State of Illinois know that it was the Russians?

Mr. SANDVOSS. Actually, to this day we don't know with certainty that it was the Russians. We've never been told by any official entity. The only one that we're aware of that was investigating was the FBI and they have not told us definitively that it was the Russians. Our IT staff was able to identify, I think it was, seven IP addresses from a foreign location, I believe it was The Netherlands. But that doesn't mean that the attack originated in the Netherlands. We have no idea where it originated from.

Chairman BURR. Did your IT staff have some initial assessments on their own?

Mr. SANDVOSS. No, because I think any—anything of that nature would have been speculative and we didn't want to do that. I think we wanted to leave that to the professional investigators.

Chairman BURR. You gave an update on what you're currently doing to enhance the security: DHS weekly security checks. Has

82

the Federal—in your estimation, has the Federal Government responded appropriately to date?

Mr. SANDVOSS. I believe they have, yes. I've heard nothing from our IT division and they'd be the persons that would know. I've heard nothing from them that the DHS's work in that matter has been less than satisfactory.

Chairman BURR. Let me ask all of you, except for you, Mr. Sandvoss: Do you believe the extent of cyber threats to election systems should be made public before the next election cycle? Should we identify those states that were targeted, Mr. Haas?

Mr. HAAS. I think as election directors we're certainly sensitive to the balance that Homeland Security and others need to make. I think so far, as far as we've gone, we want to know as the victims or potential victims. And then I think as part of the coordinating council and designation of critical infrastructure, there has to be a conversation amongst the election——

Chairman BURR. Is there a right of the public in your State to know?

Mr. HAAS. Yes, I believe there is. If there was a hack into our system, I think that we would certainly want to consult our statutes and so forth, but we would—we believe in transparency. We would want to let the public know.

Chairman BURR. Dr. Halderman.

Dr. HALDERMAN. I think the public needs details about these attacks and about the vulnerabilities of the system, in order to make informed decisions about how we can make the system better and to provide the resources that election officials need. So, yes.

Chairman BURR. Okay.

Secretary Lawson.

Ms. LAWSON. I lay awake at night worrying about public confidence in our election systems, and so I think we need to be very careful and we need to balance the information, because the worst thing that we can do is make people think that their vote doesn't count or it could be canceled out.

And so if telling the public that, you know, that these attacks are out there and our systems are vulnerable and it doesn't undermine confidence, it makes them know that we are doing everything we possibly can to stop those attacks, I'd be in favor of it.

Chairman BURR. I take for granted none of you at the table have evidence that vote tallies were altered in the 2016 election?

Dr. HALDERMAN. Correct.

Chairman BURR. Dr. Halderman, before I recognize the Vice Chairman real quickly: When you and your colleagues hacked election systems, did you get caught?

Dr. HALDERMAN. We hacked election systems as part of academic research, where we had machines in our facilities——

Chairman BURR. I get that. Did you get caught? Did they see your intrusion into their systems?

Dr. HALDERMAN. The one instance when I was invited to hack a real voting system while people were watching, was in Washington, D.C., in 2010, and in that instance it took less than 48 hours for us to change all the votes and we were not caught.

Chairman BURR. Vice Chairman.

83

Vice Chairman WARNER. I'd like to thank all the witnesses for their testimony. I find a little stunning, Mr. Sandvoss, your answer. I don't know—I think if you saw the preceding panel, you had the DHS and the FBI unambiguously say that it was the Russians who hacked into these 21 systems, and I find it a little strange that they've not relayed that information to you.

What we discovered in the earlier testimony is that we finally got public disclosure that 21 states were attacked, and under questioning from Senator Harris we found that, even though we know those 21 states were attempted to be hacked into, or doors rattled or whatever analogy you want to use, in many cases the State election officials, whether the State directors or the secretaries of state, may not even have been notified.

I find that stunning. And clearly lots of local elected officials, local election officials, where the activities really take place, haven't been notified. So I've got a series of questions and I'd ask for fairly brief responses.

Dr. Halderman, can you just again restate—as Senator King mentioned in the earlier testimony, you don't need to disrupt a whole system. You could disrupt a single jurisdiction in a State, and if you could in effect wipe that ledger clean, you could invalidate potentially not just that local election, but then the results at the State, the Congressional level, the states, and ultimately the Nation, is that not correct?

Dr. HALDERMAN. Yes, that's correct.

Vice Chairman WARNER. So we are not—while it's important and I believe in our decentralized system, we are only as strong as our weakest link. Is that not correct?

Dr. HALDERMAN. That's correct.

Vice Chairman WARNER. Mr. Haas and Secretary Lawson, do you believe that all 21 states that were attacked, that the State election officials are aware?

Ms. LAWSON. I can't answer that question, sir. I'm not certain. I will tell you that Indiana has not been notified. I don't know if we're even on the list.

Mr. HAAS. I don't know for sure, except that DHS did indicate in a teleconference that all the states that were attacked have been notified.

Vice Chairman WARNER. We were told earlier that that's not the case. We were told that they may have been—the vendors may have been notified. So do you know whether Wisconsin was attacked?

Mr. HAAS. We have not been told that we were—that there was an attack on Wisconsin.

Vice Chairman WARNER. Are you comfortable, either one of you, with not having that knowledge?

Ms. LAWSON. We are hypersensitive about our security and I would say that when the FBI sent the notice in September for states to look for certain IP addresses to see if their systems had been penetrated or attempted to be penetrated, we absolutely searched. In fact, we looked at 15,500,000 log-ins that had happened in our system since the 1st of January that year. So we believe that our system has not been hacked.

84

Mr. HAAS. I would also state that both our office and the chief information officer of the State and his office would likely be able to detect if the system was hacked.

Vice Chairman WARNER. Well just, we've got the two leading State election officials not knowing whether their states were one of the 21 that at least the Russians probed—let me finish, please. And you know, I see—I understand the balance. But the notion that State election officials wouldn't know, that local election officials clearly haven't been notified—I appreciate the Chairman's offer. The Chairman and I are going to write a letter to all the states: If you view yourself as victims, I think there is a public obligation to disclose. Again, not to re-litigate 2016, but to make sure that we're prepared for 2017, where I have State elections in my State this year, and 2018. And to do otherwise—because there are some, there are some still in the political process, that believe this whole Russian incursion into our elections is a witch hunt and fake news.

So I could very easily see some local elected officials saying: "This is not a problem, this is not a bother; I don't need to tighten up my security procedures at all." And that would do a huge, huge disservice to the very trust, Secretary Lawson, that you say you want to try to present and provide for our voters.

So I hope when you receive the letter from our—and we'll write this on a confidential basis, but that you would urge your colleagues to come forward, again not to embarrass any State. But I find it totally unacceptable, one, that the public doesn't know, that local elected officials—local election officials don't know, that you as two, as the leaders of the State election officials, don't even know whether your states were part of the 21 that has been testified by the DHS that at least they were, if not looked at, door jiggled, or actually, as the case in Illinois, where actual information from the voter registration efforts were exfiltrated.

So my hope is that you will work with us on a cooperative basis and we want to make sure that the DHS and others are better at sharing information and you get those classified briefings that you deserve.

Chairman BURR. Senator Risch.

Senator RISCH. Thank you very much.

Mr. Sandvoss, July 12th was the date that you first discovered that you had issues, is that right?

Mr. SANDVOSS. Yes, that's correct.

Senator RISCH. And that was a result of a high-volume spike. Is that correct?

Mr. SANDVOSS. Yes, that is correct.

Senator RISCH. Then when you looked at it, you found out that the intrusion attempts actually had started June 23rd, is that correct?

Mr. SANDVOSS. Yes.

Senator RISCH. So—and those were low-volume spikes, starting on June 23rd?

Mr. SANDVOSS. Yes.

Senator RISCH. All right. So if they had never cranked up the volume, is it fair to say you would have never discovered it or probably wouldn't have discovered it?

85

Mr. SANDVOSS. I would say it would probably not have been discovered, certainly not right away. And if it was—the volume was low enough, even an analysis of our server logs might not catch something like that, because it wouldn't stand out. So I think the answer to your question is yes.

Senator RISCH. Then you said 12—or seven days later, the 19th, you notified the Attorney General. Is that right?

Mr. SANDVOSS. Yes, correct.

Senator RISCH. That was the Illinois Attorney General, not the U.S. Attorney General, is that correct?

Mr. SANDVOSS. Yes. State law requires that we notify the Attorney General in these instances.

Senator RISCH. So then the next thing that happened is you were contacted by the FBI. Is that correct?

Mr. SANDVOSS. Yes.

Senator RISCH. All right. So the question I've got—I'm just trying to get an understanding of the facts—are you assuming that the Illinois AG contacted the FBI, or do you know that or not know that, or——

Mr. SANDVOSS. I don't know that for sure, but I would suspect that they probably did, because how else would the FBI know?

Senator RISCH. Right. Well, and that's kind of where I was getting, is that was not the result of some Federal analysis, that there wasn't a Federal analysis of this that turned up what had actually happened. Is that a fair statement?

Mr. SANDVOSS. I believe so, yes.

Senator RISCH. Okay. You then did some things to try to mitigate what had happened. Have you shared this with other states as to what you had done, in order to, I don't know, develop a best practices, if you would?

Mr. SANDVOSS. We didn't have any formal notification to all 50 states, no. I think our focus at that time was trying to repair the damage and assess, you know, what needed to be done, especially with respect to the voters who had their information accessed.

I believe that once the FBI became aware of this, I know they contacted the different states. I don't believe our Attorney General's office did, although I don't know that for certain. But we did not have any formal communication with all 50 states regarding this.

Senator RISCH. And do you believe that you have developed a best-practices action after this attack that you've described for us?

Mr. SANDVOSS. I believe so, yes.

Senator RISCH. Do you think it would be appropriate for you to get that out through the secretary of states organization or other organizations, so that other states could have that?

Mr. SANDVOSS. Certainly. Absolutely.

Senator RISCH. Okay.

Mr. Halderman, Your hacking that you've described for us, would your ability—if you were sitting in Russia right now and wanted to do the same thing that you had done, would that ability be dependent upon the machines or whatever system is used being connected to the Internet?

Dr. HALDERMAN. That ability would depend on whether pieces of election IT equipment, IT offices that are where the election pro-

86

gramming is prepared, are ever connected to Internet. The machines themselves don't have to be directly connected to the Internet for a remote attacker to target them.

Senator RISCH. So would you recommend that the voting system be disconnected from the Internet, that it be a standalone system that can't be accessed from the outside?

Dr. HALDERMAN. It's a best practice, certainly, to isolate vote tabulation equipment as much as possible from the Internet, including isolating the systems that are used to program it.

But other pieces of election infrastructure that are critical, such as electronic poll books or online registration systems, do sometimes need to be connected to Internet—to systems that have Internet access.

Senator RISCH. But that wouldn't necessarily require that it be connected to the Internet for the actual voting process. Is that right?

Dr. HALDERMAN. That's right.

Senator RISCH. And then the extrication of that information off of the voting machine, would that be fair?

Dr. HALDERMAN. I think that's fair to say.

Senator RISCH. Thank you.

Mr. Chairman, I think all of this really needs to be drilled down a little bit further, because it seems to me, with this experience, there's probably some pretty good information where you could put a firewall in place to stop it, or at least minimize it.

Thank you.

Chairman BURR. Senator Wyden.

Senator WYDEN. Thank you, Mr. Chairman. And thank all of you.

I want to start with you, Professor Halderman. What are the dangers of manipulation of voter registration databases, particularly if it isn't apparent until Election Day when people show up at the polls to vote?

Dr. HALDERMAN. I'm concerned that manipulating voter registration databases could be used to try to sabotage the election process on Election Day. If voters are removed from the registration database and then they show up on Election Day, that's going to cause problems. If voters are added to the voter registration database, that could be used to conduct further attacks.

Senator WYDEN. Let me ask—and this can be directed at any of you. I'm trying to get my arms around this role of contractors and subcontractors and vendors who are involved in elections. Any idea, even a ball park number, of how many of these people there are? 10, 70, 200?

Dr. HALDERMAN. Vendors that host the voter registration system?

Vice Chairman WARNER. Yes.

Dr. HALDERMAN. I'm sorry, Senator, I don't have a number.

Ms. LAWSON. Sir, I don't have an exact number either, but I will tell you, in Indiana, for an example, we have six different voting system types. Counties make that decision on their own. But they are all certified by our voting system technical oversight program.

Senator WYDEN. That was my main question. So somebody is doing certification over these contractors and subcontractors and

87

equipment vendors and the like? Does that include voting machines, by the way?

Ms. LAWSON. It does. Most states will have a mechanism to certify the voting machines that they're using, the electronic poll books they're using, the tabulation machines that they're using, making sure that they comply with Federal and State law, and making sure that they have the audit processes in place.

Senator WYDEN. So do you all have a high degree of confidence that these certification processes are not leaving this other world of subcontractors and the like vulnerable?

Dr. HALDERMAN. I have several concerns about the certification processes, including that some states do not require certification to Federal standards; that the Federal standards that we have are unfortunately long overdue for an update and have significant gaps when it comes to security; and that the certification process doesn't necessarily cover all of the actors that are involved in that process, including the day-to-day operations of companies that do pre-election programming.

Senator WYDEN. One last question. We Oregonians and a number of my colleagues are supportive of our efforts to take vote-by-mail national. And we've had it. I was in effect the country's first Senator elected by vote-by-mail in 1996. We've got a paper trail. We've got air gap computers. We've got plenty of time to correct voter registration problems if there are any.

Aren't those the key elements of trying to get on top of this? Because it seems to me, particularly the paper trail—if you want to send a message to the people who are putting at risk the integrity of our electoral institutions, having a paper trail is just fundamental to being able to have the backup we need.

I think you're nodding affirmatively, Professor Halderman, so I'm kind of inclined—or one of you two at the end were nodding affirmatively, and I'll quit while I'm ahead if that was the case. But would either of you like to take that on?

Dr. HALDERMAN. Vote-by-mail has significant cybersecurity benefits. It's a very difficult to hack a vote-by-mail system from an office in Moscow. Whether vote-by-mail is appropriate for every State in every context is in our system of course a matter for the states, but I think it offers positive security benefits.

Senator WYDEN. All right.

Thank you, Mr. Chairman.

Chairman BURR. Senator Blunt.

Senator BLUNT. Dr. Halderman, on that last answer to that last question, how do you count vote-by-mail ballots?

Dr. HALDERMAN. Generally, they would be counted using optical scanners.

Senator BLUNT. Exactly. So you count them the same way you count ballots that aren't vote-by-mail in almost every jurisdiction?

Dr. HALDERMAN. If the optical scan ballots are subsequently audited, you can get high security from that process, but yes.

Senator BLUNT. Well that's a different—that's a different question. Your question there is do you prefer paper ballots and an audit trail, and I do too. But let's not assume that the vote-by-mail ballots are counted any differently. They're counted probably at a more central location, but that doesn't mean that all the manipula-

88

tion you talked about that we need to protect against wouldn't happen in a vote-by-mail election. You've got a way to go back and you've got a paper trail to count.

Dr. HALDERMAN. That's correct. There are three things you need: paper, auditing, and otherwise good security practices.

Senator BLUNT. While I've got you there, on auditing, how would you audit a non-paper system? If it's a touchscreen system—you mentioned Colorado, and New Mexico already did a required sample audit, which I'm certainly not opposed to that if that's what states want to do, or it's the best thing to do. How would you do a non-paper audit?

Dr. HALDERMAN. Senator, I think it would be difficult or impossible to audit non-paper systems with the technology that we use in the United States to a high level of assurance.

Senator BLUNT. So even if you—if you don't have something to audit, it's pretty hard to audit a system that counted—that didn't leave a trail.

Dr. HALDERMAN. It's basically impossible.

Senator BLUNT. So, Mr. Sandvoss, in Illinois do you certify counting systems?

Mr. SANDVOSS. Yes, we do.

Senator BLUNT. And Secretary Lawson, do you certify counting systems?

Ms. LAWSON. Yes, sir.

Senator BLUNT. Mr. Haas, in your, your jurisdiction, somebody is certifying those systems that you use?

Mr. HAAS. We both rely on the EAC certification and then our commission does a testing protocol and then approves the equipment to be used in the State of Wisconsin.

Senator BLUNT. And back in Illinois, do you then monitor in any way that counting system while it's doing the actual counting?

Mr. SANDVOSS. No, the actual counting done on Election Day, Election Night rather, is done locally at the county clerk's offices or board of election commissioner offices. We certify the voting equipment. They have to apply for certification and approval, which we conduct a fairly rigorous test of the voting equipment. But then in actual practice, other than—we do conduct pre-election tests of the voting equipment on a random basis before each election, but there—it's a limited number of jurisdictions.

Senator BLUNT. And do you do that in a way that allows you from your central office to get into the local system? Or do you go to the local jurisdictions or just monitor how they count that—how they, how they check that counting system?

Mr. SANDVOSS. When we do our pre-election tests, we actually visit the jurisdiction.

Senator BLUNT. All right.

Secretary Lawson, similar?

Ms. LAWSON. Similar. However, the State does not go into the counties, but the counties are required to do a public test and, as I mentioned, it's public. And so they're required to do testing on the machines, the tabulation. There's a bipartisan election board that's there——

Senator BLUNT. I guess the point I'd want to drive home there is that not opening that door to the counting system—if you don't

89

have the door, nobody else can get through that door as well. But there's monitoring, there's local testing.

I don't suggest at all that Dr. Halderman's comments aren't important or something we should guard against. I was an election official for 20 years, including the chief election official for 8 of those, and something—as we were transitioning to these systems, something I was always concerned about is what could possibly be done that could be done and undetected.

One of the reasons I always liked the audit trail—that obviously, Dr. Halderman, you do, you do too, is that you do have something to go back, if you have a reason to go back, and really determine what happened on Election Day.

Let's talk for just a moment about the much more open registration system. Secretary Lawson, you said you had 15,500 logins. I believe that was—talk about logging—what are they logging into there? The statewide voter registration system that you maintain a copy of?

Ms. LAWSON. The 92 county clerks in Indiana are connected to the statewide voter registration system, and that 15,500,000 logins reflected the work that they did that year.

Senator BLUNT. 15,500,000?

Ms. LAWSON. 15,500,000.

Senator BLUNT. So obviously that's a system that has lots of people coming in and out of that system all the time. Do local jurisdictions, like if the library does registration, do you have counties where they can also put those registrations directly into the system?

Ms. LAWSON. Other than the counties, no, sir. But we do have Indianavoters.com, where a voter can go on and register themselves. And it's a record that is compared to the DMV record, and then the counties will find that information in their hopper the next day. And then they will—or their computer system, and then the next day they will have the ability to determine whether or not the application is correct.

Senator BLUNT. Do all of your jurisdictions, the three jurisdictions here reflected, have some kind of provisional voting? If you get to the voting place on Election Day and your address is wrong, or your name is wrong, or it doesn't occur—it doesn't appear at all, do you have a way somebody can cast a ballot before they leave?

Ms. LAWSON. Yes, sir.

Senator BLUNT. And in Illinois?

Mr. SANDVOSS. Yes, we do.

Mr. HAAS. We have provisional ballots, but they are very limited. We are not an NVRA State. And we also have Election Day registration, so people can register at the polls.

Senator BLUNT. So, the failure to have your name properly on the—I understand, Chairman, and I also noticed the time on others. But just, the registration system is much more open than the tallying system, that doesn't mean the tallying system doesn't need to be further protected. But the registration system, the idea that somebody gets into the registration system—there are plenty of ways to do that. Unfortunately, we think now other countries and governments may be doing that as well.

Chairman BURR. Senator King.

90

Senator KING. Thank you, Mr. Chairman.

Dr. Halderman, you're pretty good at hacking voting machines, by your testimony. Do you think the Russians are as good as you?

Dr. HALDERMAN. The Russians have the resources of a nation state. I would say their capabilities would significantly exceed mine.

Senator KING. I expected that was going to be your answer, but I wasn't sure whether your modesty would—but I think that's an important point, because you testified here today that you were able to hack into a voting machine in 48 hours, change the results, and nobody knew you had done it. And if you could do it, I think the point is the Russians could do it if they chose.

And we've been talking a lot about registrations lists. My understanding is that quite often a voter registration list at some point in the process is linked up with—the computer that has the voter registration list is linked up with configuring the voting machines, and perhaps even tallying votes. Is that true? Can any of you——

Ms. LAWSON. No, sir.

Senator KING. There's no connection between the registration list and the voting machines?

Ms. LAWSON. No.

Senator KING. Illinois? Is that——

Mr. SANDVOSS. Not in Illinois, no.

Senator KING. Okay.

Mr. HAAS. That's correct.

Senator KING. Then I was mistaken.

Yes, Dr. Halderman?

Dr. HALDERMAN. I believe that depends on the specific equipment involved. There may be some designs of voting systems where the sign-in and the vote counting system are linked.

Senator KING. But of course, if, as you testified I think, if the voting registration list is tampered with in some way on Election Day, it would be chaos if names disappeared, people arrived at the polls and their names weren't on the list. Isn't that correct, Ms. Lawson?

Ms. LAWSON. If a person showed up at the polls to vote and their name wasn't on the list, if they were expecting they would be given a provisional ballot, I think the biggest danger is that the lines at the polls would increase significantly if there was a large number of folks who had to do that in each precinct.

Senator KING. Right, that was what I was referring to.

On August 1 of 2016, press reports have indicated that there was an FBI notification to all of their field offices about the danger of cyber intrusions into voting systems. Supposedly, those were passed on to State election systems. Did you three get something from the FBI around August 1st that gave IP addresses and some warnings about what should be done?

Mr. SANDVOSS. Yes, we did receive an FBI flash. It was in August, and you're saying the 1st. I believe that was it.

Senator KING. That was, yes, I understand that was the date of it. Ms. Lawson, did you receive that?

Ms. LAWSON. Yes, Indiana received a notice from the FBI.

Mr. HAAS. We did as well.

Senator KING. So there is some interconnection. I mean, one of the things that I'm sort of hearing, and I'm frankly appreciative and happy that you all did receive that notice, but there seems to be a lack of information-sharing that goes on that we really need to be sure that—for example, if you learn—if something happens in Illinois, some system whereby you can alert your colleagues across the country to look out for this. And if we learn things here in Washington, if the FBI learns things, that they can alert people around the country, because the best time to deal with this is before the election. After the election or on Election Day is much more difficult.

Dr. Halderman.

Dr. HALDERMAN. Yes, I would support further information sharing.

Senator KING. And then finally, we've talked about what we do about this. Paper trails has come up. Is that the principal defense? Is that—Dr. Halderman, what if—I asked the question to the prior panel. What would you tell my elections clerk in Brunswick, Maine, would be the three things most important that they should do, or my Secretary of State in Maine, to protect themselves against a threat we know is coming?

Dr. HALDERMAN. The most important things are to make sure we have votes recorded on paper, paper ballots, which just cannot be changed in a cyber attack, that we look at enough of that paper in a post-election, risk-limiting audit, to know that they haven't—the electronic records haven't been changed; and then, to make sure we are generally increasing the level of our cyber security practice. Information-sharing is an example of a good and recommended practice, as are firewalling systems and other things that have been suggested.

Senator KING. One final question. Is it possible—and there are some press reports about this—a cyber attack on the vendors of these machines, to somehow tamper with the machines before they go out to the states. Is that a risk?

Dr. HALDERMAN. I would be concerned about that. And in fact the small number of vendors is an example of how our system in practice is not quite as decentralized as it may appear, that attacks spreading via vendors or from vendors to their customers could be a way to reach voting equipment over a very large area.

Senator KING. And there have been press reports that that in fact, was attempted in 2016.

Dr. HALDERMAN. Yes, that's correct.

Senator KING. Thank you, Mr. Chairman. Mr. Chairman, I want to thank you for holding this hearing. This is such important information for the public and for our democracy. I appreciate your work here.

Chairman BURR. Thank you, Senator.

Senator Harris.

Senator HARRIS. Thank you.

So there's a saying that I'm sure many of you have heard, which is the you know the difference between being hacked and not being hacked, is knowing you've been hacked. And so I appreciate, Dr. Halderman, the recommendations that you and your colleagues have made, because it also seems to cover the various elements of

92

what we need to do to protect ourselves as a country in terms of our elections, which is prevention, and then there's the issue of detection and also resilience. Once we—if we discover that we've been manipulated, let's have the ability to stand back up as quickly as possible.

So I have a few questions in that regard. First of all, have each of you—you received for the states, received a notification from the FBI? Is that correct?

Ms. LAWSON. Yes, ma'am.

Mr. HAAS. Yes, yes.

Mr. SANDVOSS. Yes.

Senator HARRIS. And were any of you also notified by DHS? Mr. Sandvoss?

Mr. SANDVOSS. We've had communications with DHS. I don't recall how they were initiated. But I do know that there have been some conference calls with them, and it may have been through the FBI that that occurred.

Senator HARRIS. And I'm speaking of before the 2016 election.

Mr. SANDVOSS. Yes.

Senator HARRIS. Yes.

Mr. SANDVOSS. Yes.

Senator HARRIS. Secretary Lawson.

Ms. LAWSON. Yes, we had—we did have conversations with Department of Homeland Security. However, it was through our national association. It was not a direct contact with the State.

Senator HARRIS. Thank you.

Mr. HAAS. We were one of the states that took up DHS on their offers to do the cyber hygiene scan. We did have a number of communications with, I believe, a point person in their Chicago office. The FBI alert I think was about a specific incident, but our communications with DHS were more about general steps that could be taken to protect our systems.

Senator HARRIS. So as a follow-up to this hearing, if each of you, to the extent that you can recall the nature of those conversations with DHS before the election, if you could share that with the Committee that would be helpful, so we can figure out how notifications might be more helpful to you in the future. Hopefully they're not necessary, but if necessary.

Can you, Ms. Lawson, tell me—Secretary Lawson—what in your opinion are the pros and cons of requiring states to report to the Federal Government if there's been a breach or a hack? What can you imagine would be the pros and cons of a policy that would require that?

Ms. LAWSON. Well, the pro would be that if there—if, for an example, the FBI or the Department of Homeland Security has better ways to counter those attacks, or to make sure that the reconnaissance that's done after such an attack is more sophisticated than the states, then obviously that would be a pro.

Indiana did not take the opportunity to have DHS do our cyber cleaning because we felt that we were in better shape than what they could provide for us, so that would be the con.

Senator HARRIS. Okay.

And can you, Professor Halderman, tell me—you know, before this last election cycle, there had been a lot of talk through the

93

years in various states—Senator Blunt, I'm sure you were part of those discussions—about the efficacy of online voting, because it would bring convenience, speed, efficiency, accuracy. And now we can see that there will be great, potentially, vulnerabilities by doing that. So can you talk with me a little about, just in terms of policy, is the day of discussing the need for online voting, has that day passed because of the vulnerabilities that are associated with that?

Dr. HALDERMAN. I think that online voting, unfortunately, would be painting a bullseye on our election system. Today's technology just does not provide the level of security assurance for an online election that you would need in order for voters to have high confidence.

And I say that having myself done—hacked an online voting system that was about to be used in real elections, having found vulnerabilities in online voting systems that are used in other countries. The technology just isn't ready for use.

Senator HARRIS. And isn't that the irony, that the professor of computer engineering and I, who always believed that we need to do more to adopt technology, that government needs to adopt technology, I think we're advocating the good old days of paper voting are the way to go, or at least an emphasis on that, instead of using technology to vote.

Can you tell me also—any of you, if you know—it's my understanding that some of the election system vendors have required states to sign agreements that prevent or inhibit independent security testing. Are you familiar with that?

Dr. HALDERMAN. That certainly had been something that inhibited attempts by researchers like me to study election systems in the past.

Senator HARRIS. And do you believe that that's a practice that is continuing?

Dr. HALDERMAN. I do not—I don't know the answer to that question.

Senator HARRIS. Have any of you had that experience with any of your vendors?

Mr. SANDVOSS. In Illinois, no, we have not. And I don't think Illinois law would allow such an agreement.

Ms. LAWSON. I don't believe that would happen in Indiana either, Senator, because in order to sell voting equipment in the State of Indiana it has to be certified.

Senator HARRIS. Right, which would require testing.

Ms. LAWSON. Yes, which requires testing.

Senator HARRIS. Thank you.

Thank you, Mr. Chairman. Thank you.

Chairman BURR. Thank you, Senator Harris.

Does any Senators seek additional questions or time?

[No response.]

Seeing none, let me wrap up. I want to thank all of you for your testimony today.

Secretary Lawson, to you. I really encourage you, as the next representative of secretaries of states, to remain engaged with the Federal Government, specifically the Department of Homeland Security. And I think with any transition of an administration there

94

is a handoff and a ramp-up. And I've been extremely impressed with our witness from DHS, who not only was here today, but she has taken the bull by the horns on this issue. And I think you'll see those guidelines very quickly, and I hope that there will be some interaction between secretaries of states, since in 40 states you control the voting process, and you can find a system of Federal guidance and collaboration that works comfortably with every secretary of state in your organization.

I think it is absolutely critical that we have not only a collaboration, but a communication, between the Federal Government and the states as it relates to our voting systems. If not, I fear that there would be an attempt to in some way, shape, or form nationalize that. That is not the answer.

And I'll continue to point, Mr. Sandvoss, to Illinois as a great example of a State that apparently focused on the IT infrastructure and staff, and didn't wait for the Federal Government to knock on the door and say, hey, you got a problem. You identified your problem, you began to remediate it. At some point, the Federal Government came in as a partner. And I think where we see our greatest strength is to work with states and to chase people like you, Dr. Halderman, who like to break into—no, I'm just kidding with you.

Listen, I think what you did is important. And I think the questions that you raised about the fact that you really can target to make the impact of what you're trying to do very, very effective. And that's clearly what campaigns do every day. So we shouldn't be surprised if the Russians actually looked at that or anybody else who wants to intrude into our voting system and our democracy in this country.

I've got to admit that the variation of voting methods, six in Indiana, where I don't know how many counties you've got—I've got 100 counties in North Carolina. It may be that I find out that every county in North Carolina has the power to determine what voting machines, what voting software they have.

This can get extremely complicated. Short of trying to standardize everything, which I don't think is the answer, is how do we create the mechanism for the Federal Government to collaborate directly with those heads of election systems in the states and understand up front what we bring to the table and how we bring it, so that we're all looking at the same thing—the integrity of every vote going to exactly who it was intended to do.

So, yes, we're going to have debates on paper or electronic. We're going to have debates on what should the Federal role be. At the end of the day, if we haven't got cooperation and collaboration and communication, I will assure you we will be here with another Congress, with another makeup of the Committee, asking the same questions, because we won't have fixed it.

But I think that what Dr. Halderman has said to us is, there are some ways that we can collectively approach this to where our certainty of intrusions in the future can go down and the accuracy of the vote totals can be certified.

So I thank all the four of you for being here today in our second panel. This hearing is now adjourned.

[Whereupon, at 12:36 p.m., the hearing was adjourned.]