## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants.

---

# EXHIBIT – 4

---

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3

4   ERIC COOMER, PH.D.,

5                    Plaintiff,

6        vs.              Case No. 1:22-cv-01129-NYW-SKC

7   MICHAEL J. LINDELL, FRANKSPEECH

8   LLC, AND MY PILLOW, INC.,

9                    Defendants.

10   _____

11

12

13        The Videotape Deposition of J. ALEX HALDERMAN, Ph.D.

14        Taken at 2723 South State Street, Suite 150

15        Ann Arbor, Michigan

16        Commencing at 9:02 a.m.

17        Wednesday, August 16, 2023

18        Stenographically reported by:

19        Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

20

21

22

23

24

25   Job No. 6022065

Page 10

1  A.  The legitimacy of our system -- our democracy is
2      founded on the notion of elected government. I would
3      agree with that.
4  Q.  Okay. Would you agree that faith in American democracy
5      rests on the integrity of our elections?
6  A.  I do.
7  Q.  Okay. You also agree that voter fraud is as old as the
8      voting process itself?
9  A.  Indeed it is.
10 Q.  That's why like energy infrastructure, and our
11     financial services infrastructure, election systems are
12     deemed to be critical infrastructure in the United
13     States, correct?
14 A.  Well, I'm not sure if it's solely for that reason, but
15     it's because elections are really the foundation of our
16     democracy. They're truly important to everything that
17     we do as a society.
18 Q.  So no matter what candidate they vote for, every
19     American should be concerned about gaps in the evidence
20     to support the reported outcome?
21 A.  We should be concerned about gaps in the evidence, what
22     do you mean?
23 Q.  I'm actually quoting from you. So your words were no
24     matter what the candidate they vote -- no matter what
25     candidate they vote for, every American should be

Page 11

1      concerned about gaps in the evidence to support the
2      reported outcome. Do you recall saying that in your
3      Barron's article in 2021?
4  A.  Barron's article in 2021? I don't recall saying that,
5      but I believe you if you say that I wrote that.
6  Q.  Do you agree with the proposition that no matter what
7      candidate they vote for, every American should be
8      concerned about gaps in the evidence to support the
9      reported outcome?
10 A.  I agree with that. And the reason that I agree with
11     that --
12 Q.  No. That's all I need. Thank you.
13 A.  The reason that I --
14 Q.  I don't need anything further. I'm just asking if you
15     agree with it. I don't need any --
16 A.  But the reason I don't --
17 Q.  I don't -- I don't need that. Doctor, we're going to be
18     here all day. And so if we could just --
19 A.  But because.
20 Q.  -- respond to my questions rather than trying to
21     advocate for your client --
22 A.  But the reason that I agree with that --
23 Q.  No.
24         MR. CAIN:  He's entitled to --
25         MS. WRIGHT:  No, he's not.

Page 12

1          MR. CAIN:  To explain his answer.
2          MS. WRIGHT:  I'm entitled to conduct my
3  deposition. I'm doing it. If you want to follow up on
4  it at the end, he can -- he can explain. But at this
5  time --
6          MR. CAIN:  If he needs to clarify --
7  counsel, if he needs to explain his answer so that it's
8  not misconstrued, he is entitled to do that. He's
9  entitled to say his justification or reasoning.
10         MS. WRIGHT:  I will listen to it this time
11 to find out if that's what's going on, or if we're just
12 doing advocacy.
13 A.  Can you repeat your question?
14         MS. WRIGHT:  Can you read back the question,
15 please.
16         (Requested portion of the record was read
17         back 9:11 a.m.)
18     "QUESTION:  Do you agree with the proposition
19 that no matter what candidate they vote for, every
20 American should be concerned about gaps in the evidence
21 to support the reported outcome?"
22 A.  Right. So the reason that it's so important that we
23 have evidence to support -- the reason that it's so
24 important that Americans need to be concerned about
25 gaps in the reported outcome is that everyone needs, or

Page 13

1      should be entitled to elections that are both
2      trustworthy and trusted. But the foundation of trust in
3      elections comes from people being able to know that
4      there is affirmative evidence that the results are
5      correct.
6  BY MS. WRIGHT:
7  Q.  Okay. So, in other words, elections also have to be
8      able to prove to a skeptical public that the result was
9      really accurate?
10 A.  Yes. I wrote that, and I agree with that.
11 Q.  Okay. So one of the criteria, or I think you've called
12     it also desirable properties for voting systems is that
13     voters have a means to convince themselves that the
14     outcome's correct without having to blindly trust the
15     technology or election authorities, correct?
16 A.  Sorry. Can you repeat that?
17 Q.  Sure. One of the criteria for voting systems is that
18     voters have a means to convince themselves that the
19     outcome is correct without having to blindly trust the
20     technology or the election authorities?
21 A.  Yes.
22 Q.  Okay. That the way we conduct elections does not
23     routinely produce public evidence that outcomes are
24     correct, wouldn't you agree?
25 A.  Yes, that's true in general. I'm not sure that I follow

4 (Pages 10 - 13)

Page 14

1    the connection to Mr. Lindell's statements about Dr.
2    Coomer, or to Mr. Lindell's -- well, to the hoax that
3    the perpetrated.
4  Q.  Perhaps it will be evident to you later. An evidence,
5    an evidence-based election should have, you know, I'll
6    read a list to you.  First of all, hand marked paper
7    ballots, correct?
8  A.  Yes.
9  Q.  Election officials that protect the paper ballots to
10    ensure that no ballot has been added, removed or
11    altered, correct?
12  A.  Yes.
13  Q.  Election officials that reconcile and verify the number
14    of ballots, and the number of voters, correct?
15  A.  Yes. These are all, all general features that are
16    important in election integrity.
17  Q.  And another would be election officials that check
18    whether the paper trail of ballots is trustworthy using
19    a transparent compliance audit?
20  A.  Yes.  These are all widely accepted criteria. Now, I
21    still fail to see the connection.
22  Q.  And let me -- let's finish and get them all. Let's get
23    them all. Also, election officials that count the
24    votes, correct?
25  A.  Yes. Someone needs to count the votes.

Page 15

1  Q.  And election officials that check the results with a
2    risk-limiting audit that inspects the original hand
3    marked ballots, not images or copies.  You agree with
4    that?
5  A.  Yes, yes. But I still fail to see the relevance to Mr.
6    Lindell's theory.
7  Q.  Okay.
8  A.  Which is completely baseless.
9  Q.  Each of these steps is essential, correct?
10  A.  Yes, I would agree with that.  But, again, I fail to
11    see the relevance.  None of that is connected to
12    whether Eric --
13  Q.  Well, I suspect that you may --
14  A.  -- Coomer personally rigged the presidential election.
15  Q.  I suspect you may miss the relevance of most of today
16    then.
17        MR. CAIN:  Object to sidebar.
18        MS. WRIGHT:  Pardon?
19        MR. CAIN:  Object to the --
20        MS. WRIGHT:  And I object to the
21    volunteering of testimony.
22  BY MS. WRIGHT:
23  Q.  And are you, doctor, are you testifying at trial?  Do
24    you plan to appear at trial and testify?
25  A.  I have offered to be available at trial.

Page 16

1        MS. WRIGHT:  Okay. I'm going to move to
2    strike everything after the response to my question.
3    And I'm going to start moving to strike unless you're
4    going to assure me that this is not going to be his
5    trial testimony.
6        MR. CAIN:  Well, I'm not making an agreement
7    with you. What I will say is Joanne is trying to take
8    down our testimony. You just interrupted me while I was
9    objecting, and you've been interrupting the witness. So
10    if we can slow down, and let him finish, I think,
11    number one, that would be appropriate.
12        MS. WRIGHT:  And if you could instruct your
13    witness to answer my yes or no questions with a yes or
14    no answer, I would appreciate that.
15        MR. CAIN:  Again, he's entitled to explain
16    his answer, especially --
17        MS. WRIGHT:  He wouldn't be entitled in
18    trial, and so he's not entitled here.
19        MR. CAIN:  Especially if he believes that
20    any answer that he would give would be misleading to
21    the jury. That's our position.
22  BY MS. WRIGHT:
23  Q.  Professor Halderman, risk-limiting audits are the most
24    rigorous type of postelection audits, correct?
25  A.  Or the most rigorous type, is that what you said?  I'm

Page 17

1    sorry.
2  Q.  Yes, I did.
3  A.  Yes, risk-limiting audits, although there are another,
4    a number of other criteria that are part of that rigor
5    in addition to meeting a risk limit.
6  Q.  But risk-limiting audits are the most rigorous type of
7    postelection audits, correct?
8  A.  Well, that's a bit of a simplification.
9  Q.  Okay.  But those were your words. You told the U.S.
10    Select Committee on Intelligence in June 2017 that only
11    two states, Colorado and New Mexico, currently conduct
12    audits that are robust enough to reliably detect
13    cyberattacks, correct?
14  A.  That was true in 2016. It's no longer true today.
15  Q.  Because there's a couple more, right?
16  A.  Well, there've been a number of different evolutions in
17    auditing.  There's some states that have added RLAs during
18    the 2020 presidential election in particular.
19  Q.  And we'll get to that.
20  A.  Large number of states --
21  Q.  You'll get a chance to answer that.
22  A.  -- conducted postelection audits of various forms. If
23    you're asking how many states fully meet the criteria
24    that scientists set out, the number was lower.
25  Q.  Four states, correct, as of the 2020 presidential

5 (Pages 14 - 17)

Page 126

1    you're Professor Alex Halderman?
2  A.   I think people are welcomed to examine the evidence for
3     themselves.  But if they're going to claim that there
4     was fraud, if they're going to claim that there was
5     fraud, they should be extremely skeptical of evidence
6     purporting to show that.
7  Q.   So there are people still believe it today?
8  A.   I think a lot of people have been misled, yes.
9  Q.   Yes. That's true, correct, because a lot of people
10    don't have your expertise, correct?
11 A.   I think people can review the evidence that is
12    available out there at this point for themselves and
13    make a determination. But it doesn't alter the fact
14    that it's fundamentally an extraordinary claim to say
15    that the 2020 election was altered by hacking.
16    Especially, I might add, by the kind of hack postulated
17    by Mike Lindell.
18 Q.   But all those people that still believe today that the
19    2020 election was hacked, believe something that is
20    inherently implausible, correct?
21 A.   Yes. It's inherently implausible that the election --
22    well, so it's certainly inherently implausible that the
23    election was hacked in the way that -- the election
24    result was altered in the way that Mike Lindell claims.
25 Q.   How does Mike Lindell claim the election result was

Page 127

1     altered?
2  A.   He has articulated a theory that involves hacking over
3     the internet from China around the time of the 2020
4     election. And his data is -- his data suggests affected
5     results in jurisdictions nationwide, or almost
6     nationwide.
7  Q.   Where have you seen that claim?
8  A.   Well, I've reviewed the data that he purported was
9     definitive proof.
10 Q.   Okay. First of all, where have you seen the claim that
11    you just described that he has made?
12 A.   I've watched his films.
13 Q.   Which, which films have you watched?
14 A.   What are they called Absolute 9-0, Absolute, Absolute
15    Truth; is that correct?
16       MR. CAIN:  Proof.
17 A.   Proof. Thank you. Absolute Proof. Those -- I've watched
18    his films. I've reviewed the data that he provided and
19    purported to be the definitive proof of this -- of his
20    claims. It's all a hoax. I'm sorry.
21 BY MS. WRIGHT:
22 Q.   And Mike knows it's a hoax?
23 A.   He should know it's a hoax.  If he asked anyone to take
24    even -- anyone who understands computer security well
25    to review the purported evidence, they could have told

Page 128

1     him very quickly that this is -- this doesn't hold
2     water. That this is likely to be false, and even more
3     likely to be a hoax.
4  Q.   How do you identify -- what are the criteria for
5     someone being able, someone that understands computer
6     security well, how would the average citizen identify
7     those people?
8  A.   Oh, like you -- like you would almost any other expert,
9     like you would find an expert in any other technical
10    subject. You can look at what someone -- at someone's,
11    someone's CV, past.  You can look at the past -- you
12    can look -- you can look at what they've been -- you
13    can look at their training. You can look at whether
14    they've previously been identified as someone who is
15    credible, or someone who's been engaged in fraud. Those
16    are some examples.  You can look at whether they have
17    performed relevant work at this particular intersection
18    is one way to do it, security and elections.
19 Q.   What constitutes relevant work?
20 A.   Well, for instance, one, one example of relevant work
21    would be peer reviewed scientific publication.  Work
22    for statement government in an election security
23    capacity. And those are just two examples. But those
24    would be good indicators of relevant expertise.
25 Q.   And only those people have the ability to understand

Page 129

1     election cybersecurity?
2  A.   Look, if I am going to -- if I'm presented with this
3     data that is purported to be proof that the election
4     result was stolen, such an extraordinary claim, I'm
5     going to want to get people to vet that who are
6     skeptical of that claim, who are going to be able to
7     identify holes in that claim, and see whether it really
8     truly holds water or not. So I'm going to be able --
9     I'm going to want to look for people who are going to
10    be able to tell me if -- if it holds water, and is
11    likely to withstand scrutiny, because it probably isn't
12    true.
13 Q.   What efforts did you make to contact Mike Lindell to
14    provide him the benefit of your expertise?
15 A.   I don't generally contact people, but I'm easy to find
16    if someone wants to reach out.
17 Q.   If someone's making a mistake, you don't ever take a
18    affirmative action to make sure that inaccurate
19    information isn't being spread?
20 A.   Well, I have my sphere of responsibility, I would
21    suppose, but I didn't contact Mr. Lindell myself.  But
22    I know that after his documentaries appeared, a lot of
23    people wrote publically about what he had -- what he
24    was saying, including fact checkers, including
25    reporters. They quoted experts who are extremely

33 (Pages 126 - 129)

Page 130

1  experienced in this field, who pointed out that factual
2  issues with these claims, right, things that a
3  responsible party would have been -- gone back and
4  inquired about, would have gone and figured out, oh,
5  wait a minute. People are saying this is impossible, or
6  can't possibly hold water for this or that reason.  Is
7  that true?  And then perhaps amended or retracted those
8  theories about a hack of the election on that basis.
9  But I don't -- that is not what Mr. Lindell did. He
10  double downed on it. He claimed to have this absolute
11  proof, right?  He claimed to have these PCAPs that
12  would absolutely prove what happened, and the PCAPs
13  themselves are a hoax.
14  Q.  What do you know about what efforts Mr. Lindell went to
15  verify his evidence of his -- supporting his
16  statements?
17  A.  I've read his deposition testimony. That's the extent
18  of what I know of them.
19  Q.  When did you read that?
20  A.  I read it -- I think I've most recently -- I reviewed
21  it prior to -- prior to this deposition most recently.
22  Q.  Did you review it before you wrote this report?
23  A.  At least portions of it.
24  Q.  When did you write this report?
25  A.  Well, perhaps not. No, I think I did review portions of

Page 131

1  it before the report. I could be wrong about that. If I
2  reviewed it, I cite. And if I didn't, or rather if I
3  cite, I reviewed it.
4  Q.  Your report's dated the 5th day of May 2023. Do you
5  know if you had access to his expert report before you
6  wrote this report?
7  A.  If I cite it in the report, then I did, but I don't
8  recall for sure.
9  Q.  So you were saying that what journalists write, people
10  are supposed to accept as true, especially if they're
11  saying that they're debunking something?
12  A.  I think that it -- I think that if there were experts
13  in the press saying that some theory you have is not
14  true for certain reasons, then if you are at all
15  intellectually honest, you will want to be able to
16  respond to those and investigate those critiques.
17  Q.  So you're saying that the people that are that
18  currently believe that the election was hacked and
19  stolen are not intellectually honest?
20  A.  I think that people need to engage with these kinds of
21  criticisms, of course, I do.
22  Q.  And they're not intellectually honest if they don't?
23  A.  I think there's a difference between -- perhaps there's
24  a difference between the voter on the street who's only
25  paying partial attention to these issues, and someone

Page 132

1  who is dedicating millions of dollars, and a large
2  fraction of his time, as Mr. Lindell did, to promoting
3  claims that others are saying are false. There's no way
4  you can be intellectually honest if you don't agree --
5  if you don't engage with criticism at that point. But
6  that's -- the man on the street, perhaps the situation
7  is different.
8  Q.  And you're saying that the fact that Mr. Lindell has
9  devoted millions of dollars to evaluating this evidence
10  demonstrates that he is out there trying to perpetrate
11  a hoax?
12  A.  That he's dedicated millions of dollars to promoting
13  it, and it is a hoax. The data is a hoax.
14  Q.  What's your evidence that Mr. Lindell has spent
15  millions of dollars promoting what you called a hoax?
16  A.  The data is a hoax. He's testified that he -- he's
17  testified as to the expenditures that he's made in
18  setting up his Lindell TV, and his FrankSpeech website,
19  which are essentially centered around his election
20  related claims.
21  Q.  How much has he spent on that?
22  A.  I don't recall the totals, but the numbers that he
23  talks about in his deposition begin with millions.
24  Q.  How much has he spent to gather evidence of the attack
25  that he discusses.

Page 133

1  A.  I don't recall how much he has claimed to have spent on
2  gathering "evidence." But the evidence he's presenting
3  is fraudulent, and people have told him that credibly
4  for months and months before his cyber symposium.
5  Q.  Name the specific people that have told him that
6  credibly?
7  A.  You'd look at -- look at my, my expert report cites
8  these attempts to -- cites various press reports
9  debunking the claims in his films. Many of those
10  reports are citing established election security
11  experts who were giving reasons. You're not even
12  relying on their expertise. They're saying this is
13  wrong because, or this is impossible because.
14  Q.  And you're saying those are in your expert report?
15  A.  They're cited in my expert report if you can find the
16  footnote. And I'm not sure of the section. And I don't
17  have it in front of me.
18  Q.  Here's a nice clean one for you.
19  A.  Thank you very much.
20       MR. CAIN:  Let's mark it if he's going to
21  review it, or at least testify about it.
22       MS. WRIGHT:  I just want him to -- I'm just
23  letting him refresh his recollection.
24       MR. CAIN:  Okay.  Well, I need to take a
25  break then.

34 (Pages 130 - 133)

Page 146

1 expert to notice certain problems. Other problems
2 should have been obvious to anyone even with a -- with
3 a much lesser degree of expertise. But in terms of the
4 obstacles that I write about here, and I cite a variety
5 of them in these paragraphs that follow that footnote,
6 these are problems that you don't need to be an expert
7 necessarily in order to assess.
8 Q. So anybody that viewed Michael Lindell's videos should
9 have instantly recognized they were unreliable?
10 A. I don't think I would go that far. But I would say that
11 someone who viewed Mike Lindell's videos, and had the
12 benefit of having these problems pointed out to them,
13 would have had immediately a strong basis for
14 skepticism. And if you were promoting the videos, as
15 Lindell himself was, you would now have a strong burden
16 to overcome in order to -- in order to stand by them
17 while maintaining any intellectual integrity.
18 Q. Did Mike Lindell see the references you cite in
19 footnote 16?
20 A. The criticism in debunking of his videos, I recall at
21 the time was all over the news. I know that journalists
22 later confronted him, or confronted him at times with
23 specific critiques. I don't know about the specific
24 articles I cite here if he saw them. But they were
25 representatives of a whole class of very prominent

Page 147

1 critique of Lindell's claims, and they were occurring
2 contemporaneously.
3 Q. How did you choose theses examples and not the others?
4 Were these the best spells of critiques?
5 A. I wouldn't say that they were the best examples, but
6 they were ones that I thought were cogent that appeared
7 when I Googled for critiques of his videos in May of
8 2023.
9 Q. That's when you first Googled for critiques of his
10 videos was May 2023?
11 A. I know I saw critiques of his videos while they were
12 coming out, because it was all over the news. But
13 these are the ones that I found when I was preparing
14 the expert report.
15 Q. When you say it was all over the news, specifically,
16 what news sources were reporting these debunking?
17 A. Well, the Washington Post for one.
18 Q. Okay. That's in footnote 16. What else?
19 A. I don't recall exactly, because this was back in --
20 this was now three years ago. But I do recall very
21 strongly that it was all over the news.
22 Q. And, again, if things are reported in the news, then
23 it's reliable, correct?
24 A. Not necessarily. But it certainly should give someone
25 reason for doubt if one is promoting -- is promoting an

Page 148

1 inherently implausible theory.
2 Q. So they would have to know they're promoting an
3 inherently implausible theory to have doubt?
4 A. The theory is inherently implausible, so that's
5 inherent to the theory.
6 Q. What do you mean when you say inherently implausible?
7 A. I mean it's just unlikely to be true without having
8 even researched any of the specifics about it, just
9 based on the general claim and its nature. And I think
10 it's something that can be seen as implausible to --
11 even to any nonexpert. Because, again, it would be
12 extraordinary. It would be world historical. This has
13 never happened before, right. And claiming an attack on
14 our country, etcetera, etcetera, why was Lindell
15 getting such, such public interest? Because it was an
16 extraordinary claim he was making that was different
17 from the claims that others were making.
18 Q. Was it different from the claims others were making?
19 A. It was different from the claims that officials were
20 making. It was different from the claims that the Trump
21 administration's justice department and DHS were
22 making. That the EOC was making. Then the 59 experts
23 who wrote that letter were making.
24 Q. Was it different from statements Trump was making? And
25 he was president, I believe, at the time, correct, so

Page 149

1 he was a government official?
2 A. Lindell's theories were even more specific than the
3 statements Trump was making. So I think it was
4 even compared to Donald Trump who made certain false
5 claims that were of a general nature.
6 Q. Actually, Donald Trump made a very specific false
7 claim, didn't he? In fact, in your Twitter feed, you
8 posted as not even being true, the one where he said
9 85/25, or whatever the ratio was, of votes that were
10 flipped.
11 A. He made various claims.
12 Q. Early on --
13 A. Excuse me.
14 Q. And you posted that on your Twitter feed, correct, and
15 you said this isn't even true?
16 A. I don't -- I don't recall that specific Tweet, but I
17 know the president made a variety of claims that were
18 untrue. But he didn't have the kind of overarching
19 theory that Mike Lindell came up with that is based on
20 this hoax.
21 Q. How do you know he didn't? Did you talk to President
22 Trump about what his theory was?
23 A. Based on his public claims.
24 Q. In Tweets, on his public Tweets basically?
25 A. In the media, the things that he said publically.

38 (Pages 146 - 149)

Page 150

1  Q.  Okay. And you don't know what kind of briefing he was
2      getting from others in the administration other than
3      the couple that you cite, Bill Barr and Chris Krebs?
4  A.  No.  Of course I don't know what private briefings he
5      may have gotten.
6  Q.  None that was true, correct?
7  A.  None of that bears any relevance on the fact that the
8      evidence that Mike Lindell ended up presenting is a
9      relatively crude hoax. It's just -- it's just fake.
10 Q.  Nevertheless, contrary to what you said before, there
11     were high ranking government officials that came out
12     and said that Dominion has stolen votes that changed
13     the election, correct?
14 A.  Can you give me an example?
15 Q.  Yes. President Trump.
16 A.  Oh, yes.
17 Q.  How about some senators, Louie Gohmert?
18 A.  I don't recall a statement by Louie Gohmert.
19 Q.  Okay. Do you recall any statements by any other
20     senators at the time that were supporting Trump's
21     theories?
22 A.  I don't recall any statement from a high ranking
23     government official supporting Mr. Lindell's theories.
24 Q.  That wasn't my question. Move to strike. Do you recall
25     any other high ranking officials that were supporting

Page 151

1      Mr. Trump's theories?
2  A.  Not that I can point you to as I sit here today.
3  Q.  But you can't also rule out as you sit here today that
4      there were other senators and people that purportedly
5      had greater access to knowledge than the rest of us
6      that made these theories, or made these statements
7      about the election being stolen?
8  A.  There were people who had greater access to knowledge
9      in general than that I cite in this report is
10     authorities who -- who dismissed the claims of fraud.
11 Q.  Who is Maarten Schenk?
12 A.  Could you point me to it, please.
13 Q.  Yes. We were talking now about footnote note 21. That
14     was another paragraph or footnote that you cited that's
15     where you --
16 A.  Oh, I see.
17 Q.  -- set forth all the people that were debunking Mr.
18     Lindell.
19 A.  This is the -- the author of this piece that appeared
20     on Lead Stories on June 3rd, 2021, presumably a fact
21     checker. I don't know who he is.
22 Q.  And, again, what is Lead Stories?
23 A.  It's some kind of journalistic outlet. I don't know
24     sitting here today all that much, or I can't recall.
25 Q.  What did you do to assess whether Lead Stories as a

Page 152

1      journalistic outlet was reliable?
2  A.  Without making a general assessment about their
3      reliability, I'm making an assessment about the
4      reliability of the -- of their criticism of their
5      critique of Lindell's claims that I'm presenting here,
6      which I've read and found to be credible.
7  Q.  If it's not a source that's generally reliable, why
8      would you expect Mike Lindell to find their critique
9      reliable?
10 A.  I'm not saying that I that -- I'm not testifying that
11     they're generally unreliable.
12 Q.  But you can't testify that they are generally reliable
13     either?
14 A.  If they're -- if their critique of his claims that he's
15     promoting is logically cogent, then it's something
16     that's incumbent on him to address. Like if they're
17     citing reliable experts.  If they're citing logical
18     fallacies. If they're citing fundamental obstacles,
19     which all of these collectively do that, then these are
20     huge red flags.
21 Q.  And, again, it's you that identifies who is a reliable
22     expert, correct?
23 A.  No. It's not me. You don't have to ask me who is a
24     reliable expert. There are all sorts of indicators of
25     reliability that people use every day in determining

Page 153

1      whether sources are reliable. This is just, you know,
2      basic civil literacy.
3  Q.  Okay. And so people that have basic civil literacy
4      would have recognized instantly that Mike's statements
5      were not reliable, correct?
6  A.  That these statements -- I think if you read these
7      stories, you can see that they're raising important
8      objections. They're raising objections that demand a
9      response. They're raising objections that should be a
10     red flag about the veracity of Lindell's claims. Now,
11     the man on the street, I don't know if it's going to be
12     enough to change, change their mind, or just confusion.
13     But if I was promoting those claims, I would -- and I
14     was trying to be intellectually honest, I'd know
15     there's stuff here I have to check out. I have to
16     respond to.  And I have to -- and that what I'm
17     promoting is likely to be false.
18 Q.  I want to go back to your report where you identify all
19     the ways that you purportedly alerted Mr. Lindell that
20     his claims were false. In your expert report you
21     identify your appearance on Fox News on November 13th
22     and 14th, 2020 where you stated there's absolutely no
23     evidence, none, that Dominion voting machines changed
24     any votes in this election. And we've already talked
25     about it.  As of that time, you hadn't done any

Page 154

1     forensic analysis, correct, or did we, of a Dominion
2     voting machine involved in the election?
3   A.   I think I've answered this question several times. And,
4     no, did I do any -- I didn't do any original forensic
5     analysis, but the original forensic analysis would not
6     have been relevant to that question. Because what I
7     was saying on Fox News was responding to these
8     absolutely crazy baseless theories, technically
9     inarticulate theories, that people were circulating at
10     the time about election fraud.
11   Q.   What beyond just simply saying there's absolutely no
12     evidence, none that Dominion voting machines changed
13     any votes in this election, what else did you say in
14     that story, in that interview with Fox News?
15   A.   I haven't seen it in a long time. I don't recall.
16   Q.   And you've previously said that simple -- simply --
17     simple denials aren't enough to convince people,
18     correct? And you've said they shouldn't be. We need
19     evidence-based elections, not experts.
20   A.   Oh, absolutely we need evidence-based elections. But at
21     the same time, the need for evidence-based elections
22     doesn't lend credence to every crazy theory and hoax
23     about a past election result. And that's what we have
24     with Mike Lindell's theories. It's a hoax.
25   Q.   In 15, paragraphs 15 to 17 of your report you point to

Page 155

1     your November 16th, 2020 open letter that you and 58
2     other leading election security specialists called
3     further attention to the implausibility of conspiracy
4     theories, such as those promoted by Mike Lindell. Now,
5     as I understand it in that -- in that open letter,
6     where was that open letter published?
7   A.   It was published in the New York -- I don't know if it
8     was published in the New York Times, but the New York
9     Times ran a story about it I believe on the front page
10     and link to it. Link to the open letter.
11   Q.   Any other news outlets that brought attention to the
12     open letter?
13   A.   I don't remember at this point.
14   Q.   Do you know if Mike Lindell subscribes to the New York
15     Times?
16   A.   I don't know.
17   Q.   Do you know how many people in the United States
18     subscribe to the New York Times?
19   A.   Not off the top of my head.
20   Q.   I think you could safely acknowledge that there's
21     probably millions, and millions, and millions of people
22     that do not subscribe to the New York Times, correct?
23   A.   I could acknowledge that at the same time as I point
24     out that millions of people who don't subscribe to it
25     still find out about things that are published in it.

Page 156

1   Q.   But it would be pure speculation for you to say that
2     people did find out about what was published in that?
3   A.   People did.
4   Q.   In the New York Times?
5   A.   People did, in general.
6   Q.   But you don't know. You can't say whether it's 20 or
7     50, or you don't know how many people read it, correct?
8   A.   I can't put a number on it. You'd have to ask the
9     Times.
10   Q.   Okay. Now, in this article that may or may not have
11     been seen by readers of the New York Times, you say, To
12     our collective knowledge, no credible evidence has been
13     put forth that supports a conclusion that the 2020
14     election outcome in any state has been altered through
15     technical compromise. You agree you said that?
16   A.   Yes.
17   Q.   You agree that as of November 16th, 2020 there hadn't
18     been any investigation that had been conducted
19     regarding the vulnerable components of the election
20     system that would justify such reassuring claims?
21   A.   So, once again, this is responding to concrete claims
22     that are being made at the time that the election
23     result had been -- had been hacked.
24   Q.   What claims were being made as of November 16th, 2020
25     that the election had been hacked?

Page 157

1   A.   Oh, my gosh. They were from the former President Trump
2     and others with a lot platforms that made a wide
3     variety of claims. I know at that point -- I believe at
4     that point Oltmann was claiming already that, that Eric
5     Coomer had, had made these statements that Oltmann
6     claims he did. There was a sea of false claims that
7     were emerging at that time.
8   Q.   What were the others?
9   A.   There, there -- the -- I don't think I can enumerate
10     them authoritatively from memory at this point, in
11     large part, because the claims at the time tended to be
12     vague or technically inarticulate.
13   Q.   How do you know, if you can't remember what they were
14     that they were vague or technically inarticulate?
15   A.   You can remember things about other things without
16     remembering all of the details of the specific thing,
17     can't you? That's generally, generally true.
18   Q.   Now, you said Oltmann made statements about Eric Coomer
19     by November 16th of 2020. Had Mike Lindell said
20     anything about Eric Coomer by November 16th, 2020?
21   A.   I don't know.
22   Q.   Did Mike Lindell know who Oltmann was by November 16th
23     of 2020?
24   A.   I don't know.
25   Q.   Do you know if Mike Lindell heard Oltmann say anything

40 (Pages 154 - 157)

Page 158

1    about Eric Coomer as of November 16, 2020?
2  A.  I don't know.
3  Q.  What statements has Mike Lindell made about Eric Coomer
4    specifically?
5  A.  Mike Lindell's called him a criminal. He's called him a
6    traitor. He's broadcast Oltmann's claims. I'm not sure
7    if I can tell you everything that Lindell has said
8    about him, but those are some examples.
9  Q.  Why did Mike Lindell say that Eric Coomer was a
10    criminal?
11         MR. CAIN:  Object to form.
12  A.  Presumably, and I would say the -- not presumably. But
13    the implication to someone who is hearing that
14    statement, who's familiar with Oltmann's claims, for
15    instance, that Mike Lindell agrees or finds credible
16    what Oltmann has claimed.
17  BY MS. WRIGHT:
18  Q.  Is it also possible that he was referring to other ways
19    in which Eric Coomer was a criminal?
20  A.  It's possible, but I don't find that particularly
21    likely or compelling, since Eric Coomer his entire
22    notoriety in this space has come from Oltmann injecting
23    him into this sea of conspiracy theories.
24  Q.  Do you recall when you read Mike Lindell's testimony
25    that he said that he didn't know even who Eric Coomer

Page 159

1    was until he served him with a -- Mike Lindell with a
2    lawsuit?
3  A.  I recall him saying that. I'm not sure if I find that
4    credible.
5  Q.  Okay. So you're calling Mike Lindell a liar on that?
6  A.  With apologies to Mike Lindell, Mike Lindell has been
7    going around the country promoting -- promoting hoaxes
8    about the -- promoting a massive hoax about the
9    presidential election result. I think that injures his
10    credibility.
11  Q.  What other statements, what other people were making
12    statement as of November 16th about Eric Coomer?
13  A.  As of November 16th?
14  Q.  Yep, 2020.
15  A.  I think that's outside the scope of my expert report,
16    so I don't -- I'm not going to be able to recall very
17    much about that.
18  Q.  Okay.
19  A.  At the moment.
20  Q.  What other statements has Mike made about Eric Coomer
21    besides calling him -- well, first of all, the
22    statement that he is a criminal, what date did Mike
23    first make that statement?
24  A.  Is that in my expert report?
25  Q.  I don't know. You're the one that's talking about him

Page 160

1    making all these inherently implausible statements, so
2    I want to know what you know about these statements
3    that you're criticizing?
4  A.  I don't -- I don't think I have the -- I don't think I
5    have the date here.
6  Q.  So you're saying that it's improper. What, what was the
7    context of Mike Lindell calling Eric Coomer a criminal?
8  A.  A criminal, and a traitor he called him at various
9    points. What's the -- what's the --
10  Q.  In the context, what did he say more specifically
11    besides just those two words?
12  A.  In the context of this theory that Dominion has somehow
13    been part and parcel to a Chinese attack that stalled
14    the election result, this preposterous hoax that Mike
15    Lindell is promoting.
16  Q.  So you're saying that even if he doesn't mention Kumar
17    when he's talking about his views of election fraud,
18    that any statements he made about Dominion are
19    inherently about Coomer?
20  A.  No, because he did mention Coomer in the context of
21    Dominion and election fraud.
22  Q.  Okay. What did he say?
23  A.  I don't -- I don't have the date here in front of me.
24    And he went on to promote through his symposium,
25    through his properties, Oltmann making further, further

Page 161

1    baseless claims about Coomer having personally rigged
2    the election.
3  Q.  What evidence do you have that Mike Lindell knew that
4    Oltmann was going to speak at the cyber symposium?
5         MR. CAIN:  Object to form.
6  BY MS. WRIGHT:
7  Q.  Let me restate that.  I may have used names wrong.
8  A.  Yeah.
9  Q.  What evidence do you have that Lindell knew that
10    Oltmann was going to speak at the cyber symposium?
11         MR. CAIN:  Object to the form of the
12    question.
13  A.  That Lindell -- that Lindell knew?  I believe there was
14    some kind of list of speakers.  Some kind of agenda in
15    advance.  Lindell organized the symposium. I would
16    naturally expect that he'd have some, some basic
17    awareness of who was going to participate.
18  BY MS. WRIGHT:
19  Q.  So you're speculating that he knew?
20  A.  It's -- it, it seems beyond -- so Mike Lindell, this
21    event was billed as Mike Lindell's cyber symposium.
22    Like did Mike Lindell not know who the main speakers
23    would be at Mike Lindell's cyber symposium?  I suppose
24    -- I suppose he might claim that, but it would be
25    incredible to me if that were true.

41 (Pages 158 - 161)

Page 162

1 Q. You don't know who else helped put together the cyber
2    symposium, I take it?
3 A. I couldn't tell you sitting here today.
4 Q. Okay. So whether anybody did, you don't know either?
5 A. I couldn't tell you sitting here today.
6 Q. And you couldn't have told me that yesterday, or the
7    day before, or the day before, or the day before that,
8    correct?
9 A. I might have been able to tell you yesterday, or the
10   day before when I reviewed some of the other deposition
11   transcripts.
12 Q. But you can't remember two days later?
13 A. I can't remember today. I'm sorry. I'm just very bad
14   with names, and there's quite a lot of material about
15   the organization of the symposium in Lindell's
16   deposition.
17 Q. What context did Mike call Coomer a traitor?
18 A. In the context of Mike, Mike Lindell talking about his
19   theories of election hacking, and of Dominion somehow
20   being involved in stealing the election.
21 Q. How close were those to -- did Mike make the statement
22   that Coomer was a traitor on the same day that Mike
23   discussed his theories about election hacking?
24 A. Mike Lindell was going around the country discussing
25   these theories of election hacking every day, or

Page 163

1    virtually every day for a period of months.
2 Q. And you're saying that during those months while he was
3    making statements, that's when he said that Coomer was
4    a traitor?
5 A. I'm saying the connection is -- in my mind is
6    undeniable between the notion that like Mike Lindell's
7    entire -- like Mike Lindell's -- Mike Lindell was
8    putting tremendous energy and time into promoting this
9    hoax about the election having been stolen. About
10   having PCAP data that proves it, and so on and so
11   forth. And Mike Lindell -- and Mike Lindell referenced
12   Coomer as a traitor, as a criminal. This is exactly
13   what Oltmann had been -- how Oltmann had been
14   characterizing to that same crowd in the context of the
15   same kind of election hacking theories had been
16   characterizing Coomer. It's just I -- it's --
17 Q. What were the election hacking theories that were being
18   said about Coomer from people other than Mike Lindell?
19 A. Oltmann said that -- Oltmann said that Coomer had
20   participated in an Antifa conference call, and the lead
21   up to the election. That he had assured people that
22   the -- that Trump wasn't going to win. He had made sure
23   of it. That essentially that it was in the bag. And
24   Oltmann connected Coomer, or believed that Coomer had
25   somehow participated in a plot to, to rig the election.

Page 164

1 Q. What was the plot to rig the election that Oltmann
2    talked about?
3 A. So unlike, unlike Lindell who makes very, very specific
4    testable and false claims that are ultimately all part
5    of this hoax, Oltmann, I think his claims were much
6    more vague. They were harder to pin down. But Lindell's
7    claims about the election are -- it does not make
8    Oltmann's claims any less false.
9 Q. So since Lindell makes such specific claims, what did
10   he specifically say about how Coomer was a traitor?
11 A. I don't recall.
12 Q. Did you ever know?
13 A. I'm sure I've read -- I've read in the complaint and
14   elsewhere the specific statements. I'd like to review
15   them before responding to them.
16 Q. Did Mike Lindell ever say that Eric Coomer actually
17   assured that Trump was not going to win?
18 A. I don't recall exactly whether Lindell himself repeated
19   those words, but Lindell did promote through his
20   symposium, and through his FrankSpeech platform and
21   elsewhere Oltmann making those claims.
22 Q. Did Mike Lindell ever say that Oltmann participated in
23   the plot to rig the election?
24 A. Oltmann did?
25 Q. Excuse me. Thank you. Did Mike Lindell ever say that

Page 165

1    Coomer participated in a plot to rig the election?
2 A. I don't -- I don't know sitting here today. But what he
3    did do was platform Oltmann who made those same claims.
4    Who made exactly those claims repeatedly.
5 Q. How did he -- you're saying because he had a website
6    where those claims could be posted that he's
7    responsible for it? Is that your view?
8 A. He -- not only did he have a website, he brought
9    Oltmann on stage during Mike Lindell's cyber symposium
10   when Mike Lindell attracted a national audience, and
11   journalists to come and see this purported, but
12   fraudulent evidence, that the election had been stolen.
13 Q. Was Mike Lindell on the stage with Oltmann came on and
14   spoke?
15 A. It was at his event. It was at Lindell's event. I don't
16   know if Lindell was on stage at the time.
17 Q. Do you know if Mike Lindell even knew Oltmann was going
18   to speak?
19 A. I don't know for sure, but Mike Lindell had control
20   over the event. He had his name on the event. He was
21   paying for the event for a lot of the costs associated
22   with it.
23 Q. And you're saying nobody else had any control over the
24   event besides Mike Lindell?
25 A. I don't know that it absolves him of responsibility if

42 (Pages 162 - 165)

Page 186

1   A.  I think I had read it relatively recently at the time
2       actually, yes.
3   Q.  Okay. Give me another investigation that was done of
4       the 2020 election?
5   A.  I know there were others that I'm forgetting to list
6       today. I think there were -- there was an assessment by
7       the intelligence community that was done at a certain
8       point. Also found no, no evidence. What else?
9   Q.  What was the name of that assessment?
10  A.  I don't recall actually. And I should have cited it in
11      here, but I didn't. I'll have to go and find it for
12      you.
13  Q.  Would you agree that that would probably be one of the
14      more important investigations to have cited?
15  A.  I think the most important ones in my mind actually are
16      the audits that were performed.
17  Q.  Okay. Well, we'll get there. Which intelligence agency
18      did the assessment that you're talking about?
19  A.  I don't remember. The one after -- they do these,
20      these joint agency assessments in various ways. And I
21      am not an intelligence community person, so that's not
22      my world.
23  Q.  Why did they --
24  A.  I can't give you the alphabet soup.
25  Q.  Why did they need to do an assessment?

Page 187

1   A.  Because there's an ongoing threat. But merely because
2       there's an ongoing threat from say foreign governments
3       and cyberattacks doesn't make every theory a credible
4       one, especially a theory like Lindell's that's a thinly
5       veiled hoax.
6   Q.  Well, if they did a joint agency assessment, presumably
7       the theory was credible enough that they were
8       investigating to do an investigation, correct?
9   A.  I'm not saying that they investigated Lindell's
10      specific claims or evidence. They investigated the
11      general question of whether foreign governments had
12      taken actions against the 2020 presidential election.
13  Q.  When were the results of that study?
14  A.  I don't recall. I don't recall. I believe early 2021.
15          VIDEO TECHNICIAN:  Excuse me. In five
16      minutes I have to go off the record to start a new
17      video.
18          MS. WRIGHT:  Okay.  We'll be at a good point
19      to break then.
20  BY MS. WRIGHT:
21  Q.  And what were the ongoing threats that they were
22      investigating, the joint agency assessment that was
23      done?
24  A.  Elections like other critical infrastructure face a
25      threat of cyberattack from foreign nations. And that's

Page 188

1       a fact. And that fact, though, does not make every
2       claim of fraud a plausible one, and certainly doesn't
3       make Lindell's theory which is based on this data
4       that's a thinly veiled hoax true.
5   Q.  What material have you read from the FrankSpeech
6       website?
7   A.  Trying to recall what I've read from the FrankSpeech
8       website. I've watched Lindell's films that were
9       available there.
10  Q.  When did you first watch those?
11  A.  In preparing this declaration.
12  Q.  So before that, you weren't aware of what he had said
13      in the films?
14  A.  I had read quotes from them and summarizations of them
15      in the press prior to that, but I hadn't sat down and
16      watched the entire films.  And plenty of people who
17      were my colleagues or associates had, but I had not.
18  Q.  Anybody report back to you what they saw when they
19      watched those videos on his website?
20  A.  I think it had been brought to my attention that he had
21      been quoting some of my work, and some other experts'
22      work in the context of making statements that were
23      baseless, or were obviously wrong, or were false.
24  Q.  What other material did you read or watch on the
25      FrankSpeech website?

Page 189

1   A.  I don't know what else I watched from the FrankSpeech
2       site. Maybe some of Oltmann's material.
3   Q.  What do you believe you've watched in terms of
4       Oltmann's material?
5   A.  I'm trying to remember. That's probably in the context
6       of a different lawsuit that I watched the Oltmann
7       material. I'm not sure that I reviewed it fresh for
8       this case.
9   Q.  When did you watch the Oltmann material on the
10      FrankSpeech website?
11  A.  It would have been when I was preparing the expert
12      report that I filed in the -- in Eric Coomer's lawsuit
13      against Oltmann.
14  Q.  Did you attend the cyber symposium in August 2021?
15  A.  I did not.
16  Q.  Do you know anybody that did?
17  A.  I do. Three people.
18  Q.  Who?
19  A.  Harri Hursti, Robert Graham, and Doug Jones.
20          MR. CAIN:  He's about done on the tape.
21          MS. WRIGHT:  That's fine.
22          MR. CAIN:  Take a break.
23          MS. WRIGHT:  That's fine.  Yep.
24          MR. CAIN:  Okay.
25          VIDEO TECHNICIAN:  Off the record 2:48.

48 (Pages 186 - 189)

Page 190

1    (Break at 2:48 p.m.)
2    (Back on the record at 2:56 p.m.)
3    VIDEO TECHNICIAN: Back on the record 2:56.
4  BY MS. WRIGHT:
5  Q.  Is it fair to say that you don't agree with all of Mr.
6    Coomer's sworn testimony in the Curling lawsuit
7    regarding the security of Dominion's products?
8  A.  Yes.  I think we had some differences of opinion. The
9    testimony was a long time ago. I'm not sure I recall
10    the specifics. I'm not sure if I recall the specifics.
11    DEPOSITION EXHIBIT 160
12    Security Analysis of Georgia's ImageCast X
13    Ballot of Marking Devices - Curling
14    2:57 p.m.
15    MS. WRIGHT:  We'll mark your expert report
16  in Curling as Exhibit 160.
17    MR. CAIN:  And, Elizabeth, I know, I believe
18  that there's a protective order in Curling, which is
19  why portions of this are redacted.  And so I would just
20  say with respect to that, I don't have the protective
21  order, and I certainly know we don't want to violate
22  the judge's order, so just be mindful of that, Dr.
23  Halderman in your testimony, please.
24  A.  Thank you.
25    MS. WRIGHT:  I am not going to go into the

Page 191

1    specifics of the technology. I don't believe that in
2    any way that would violate the protective order.
3    MR. CAIN:  Well, I don't think you would. I
4    just wanted to make sure.
5  BY MS. WRIGHT:
6  Q.  We've marked as Exhibit 160, which is your July 1st,
7    2021 security analysis of Georgia's ImageCast X ballot
8    marking devices; is that correct?
9  A.  The redacted version of it, yes.
10  Q.  Okay. And this isn't the redacted version that
11    originally was released. This is the most recent
12    redacted version that was released on June 14th, 2023.
13  A.  There's only one version of it that's been released.
14  Q.  Okay. So there's other versions floating around, but
15    they weren't released; is that accurate?
16  A.  No, there are no other versions that are floating
17    around, to my knowledge. There are other versions
18    that -- there is an unredacted version that remains
19    under seal in that case.
20  Q.  Okay. Other than the redactions, is this an accurate --
21    is Exhibit 160 an accurate reproduction of your report?
22  A.  It appears to be.
23  Q.  Are you aware of anything that's in Exhibit 160 that's
24    no longer true?
25  A.  Nothing that would meaningfully change my analysis.

Page 192

1  Q.  Okay. Well, what are you identifying that you no longer
2    believe to be true?
3  A.  I believe that Georgia may have switched, for instance,
4    to configuring its scanners in a different mode that
5    would reject photocopied ballots, but I'm not sure I
6    can point to anything else.
7  Q.  Okay. In section 1.1 of your security analysis, and
8    this is on page four, you identified principal
9    findings, correct?
10  A.  If I may just amend that previous answer, there's been
11    further evidence that's emerged this since report was
12    written that gives me further reason for doubt about
13    the physical security of election equipment in Georgia.
14  Q.  And what is that new evidence that you have?
15  A.  The emergence of the Coffee County intrusion that
16    President Trump was just indicted in connection with
17    this past -- this very week. That's the thing of main
18    relevance to Georgia.
19  Q.  And you're saying that that Coffee County intrusion
20    makes it more likely that the ImageCast X ballot
21    marking devices used in Georgia are now compromised, or
22    were compromised as of 2021?
23  A.  No, may be compromised in the future. I have no
24    evidence that they were ever compromised in the past.
25  Q.  Okay. Because you haven't had an opportunity to

Page 193

1    examine any ImageCast X ballot marking devices that
2    were actually used in a Georgia election, correct?
3  A.  That's one possibility. Another possibility is that
4    they weren't compromised, but those are both components
5    of there being no evidence that I'm aware of.
6  Q.  Okay. Let's talk about your principal findings
7    appearing on page four, and it appears that they
8    continue onto page five under section 1.1. Are those,
9    all those principal findings that you make there, all
10    still accurate today, as far as you know?
11  A.  Yes.
12  Q.  Okay. And --
13  A.  Well, with respect to the version of the ICX that's
14    used in Georgia, there were other versions, and it's
15    used in different states in different configurations.
16  Q.  Okay. But this particular ballot marking device was
17    used in all Georgia elections in the 2020 election,
18    correct?
19  A.  Yes, it was.
20  Q.  In terms of the main conclusions that are found at
21    section 1.2 starting on page six, and going through the
22    top of page eight, are those main conclusions all still
23    accurate today?
24  A.  These conclusions are all still accurate today, at
25    least with respect to Georgia, though I do fail to see

49 (Pages 190 - 193)

Page 194

1    the relevance to Lindell's specific vote rigging
2    theory, which is a hoax, were to the claims that Eric
3    Coomer personally rigged the election.
4  Q.  Objection. Move to strike everything regarding his
5      failure to understand the relevance. It's not
6      responsive.
7          Is it fair to say that in his testimony in
8      the Curling case, Eric Coomer did not identify any of
9      the vulnerabilities that you identify in this report?
10 A.  I would have to review Eric Coomer's testimony in order
11     to say that with certain, but I believe that Dominion
12     was not aware of the vulnerabilities that are described
13     in this report, which are ones that as a result of this
14     work in Georgia, I disclosed to them at a later date.
15 Q.  Who's Andrew Appel?
16 A.  Andrew Appel is the Eugene Higgins professor of
17     computer science at Princeton University.
18 Q.  He was your mentor at one point; is that correct?
19 A.  I did work with him as an undergraduate there as a
20     junior in college years ago.
21 Q.  Would you describe him as a highly regarded
22     cybersecurity expert?
23 A.  Yes, I would.
24 Q.  And that includes cybersecurity as it relates to voting
25     machines?

Page 195

1  A.  Yes.
2  Q.  You're aware that he said of the ImageCast evolution
3      that combining the BMD in scanner is a really bad idea,
4      because it can cast more votes onto your ballot?
5  A.  Oh, yes, and I would agree with that. But, again, that
6      there are in some places voting machines that have
7      particular vulnerabilities doesn't make plausible, let
8      alone possible, let alone true, Mike Lindell's claim
9      that elections across the United States were hacked by
10     the Chinese in 2020.
11 Q.  But you are aware, because you reported it in one of
12     your Tweets, that Eric Coomer on behalf of Dominion in
13     a March 18th, 2019 letter to the cochair of the New
14     York State Board of Elections criticized Professor
15     Appel's opinion by dismissing him as a security
16     maximalist, correct?
17 A.  I don't approve of the name calling.
18 Q.  Okay. And, in fact, in response to his letter, you
19     Tweeted, this is not how responsible companies respond
20     to serious vulnerabilities in their product?
21 A.  So Dr. Coomer and I had differences of opinion. He has
22     different responsibilities than I do, most certainly.
23 Q.  You've also been critical of Dominion because it
24     rebuffed your repeated efforts to meet with them and
25     share your findings regarding the vulnerabilities of

Page 196

1    Dominion's ImageCast X ballot marking system that you
2    looked at, correct?
3  A.  I would say I'm extremely critical of Dominion. There
4      are a lot of vulnerabilities in many of their products,
5      but the same is true of other voting system vendors.
6      None of that is proof that the 2020 election was
7      stalled, nor does it make the theories advanced by
8      Lindell of the specific way in which the election he
9      claims was stolen anything less than the hoax than it
10     is.
11 Q.  Did Dominion oppose you examining the software source
12     code for the ImageCast X machines used in Georgia?
13 A.  I didn't examine the software source code.
14 Q.  Right. It wasn't made available to you, correct?
15 A.  No, it wasn't made available.
16 Q.  And that was because Dominion opposed it, correct?
17 A.  I presumed the state opposed it. Perhaps Dominion
18     opposed it, too. I don't recall.
19 Q.  You found that the ImageCast X used in Georgia is not
20     sufficiently secured against technical compromise to
21     withstand vote altering attacks by bad actors who are
22     likely to attack future elections in Georgia, correct?
23 A.  That's correct. I think there are very serious risks to
24     the way Georgia uses this technology.
25 Q.  You further found that the critical vulnerabilities in

Page 197

1    the ICX, and the wide variety of lesser but still
2    serious security issues, indicate that it was developed
3    without sufficient attention to security during design,
4    software engineering, and testing, correct?
5  A.  That's absolutely correct, and I think the problems in
6      this -- in the ICX are of such a severe nature that
7      Georgia shouldn't use it.
8  Q.  And you noted that previous security testing efforts as
9      part of federal and state certification processes
10     appear not to have uncovered the critical problems that
11     you found. This suggests that either the ICX
12     vulnerabilities run deep, or that the earlier testing
13     was superficial. That's an accurate statement,
14     correct?
15 A.  Yes, not only is that, that -- excuse me. Yes, that is
16     an accurate statement, although the fact that there
17     were vulnerabilities in this equipment, once again,
18     doesn't make Lindell's specific theory plausible, let
19     alone true.
20 Q.  But no grand conspiracies would be necessary to commit
21     large scale fraud, but rather only moderate technical
22     skills of the kind that attackers are likely to target
23     Georgia's elections already possess, correct?
24 A.  Yep. There are very serious problems with this
25     equipment. That doesn't make every crazy theory about

50 (Pages 194 - 197)

Page 198

1   how the 2020 election was stolen plausible or true. And
2   it certainly doesn't -- and it certainly doesn't
3   support Lindell's hoax.
4   Q.   Now, we'll talk about what you've been wanting to talk
5        about all day. Let's talk about the audits that you
6        talk about in your report. You state in your report
7        that the strongest affirmative evidence that the
8        election outcome was not hacked comes from voters'
9        paper ballots which cannot be retroactively changed by
10       computers.
11           MR. CAIN:   Object to form.
12   A.   Could you just point me to it so I can have it open in
13        front of me?  I'm glad it takes you a minute to find
14        it, too.
15   BY MS. WRIGHT:
16   Q.   I probably should have made a note of it.
17   A.   We have paragraph numbers in here and everything, and
18        it's still...
19   Q.   Oh, well, okay.
20   A.   Oh, here, here.
21   Q.   Paragraph 23.
22   A.   Thank you. Thank you.
23   Q.   Under the heading postelection audits provide strong
24        evidence against hacking.
25   A.   I appreciate it.

Page 199

1   Q.   And you see where it says there the strongest
2        affirmative evidence come from voters' paper ballots
3        which cannot be retroactively changed by computers?
4   A.   Yes.
5   Q.   Okay. You go on to say that five of the six states that
6        Donald Trump most narrowly lost used paper ballots
7        statewide.  What did the sixth state use?
8   A.   I'm trying to remember. Which was the sixth state?
9        That must have been --
10  Q.   How about Nevada?
11  A.   Yes, you must be right, Nevada, which in parts of the
12       state in 2020 was still using a DRE with VVPAT system.
13           MR. CAIN:  You want to spell that for her?
14  A.   DRE with V-V-P-A-T, voter verified or verifiable paper
15       audit trail.
16  BY MS. WRIGHT:
17  Q.   What is the significance of Nevada using a DRE VVPAT?
18  A.   That's something other than a system that is a paper
19       ballot with all voters.  Instead of a paper ballot, it
20       maintains a continuous roll cash register tape
21       essentially that is supposed to reflect the voter's
22       choices.
23  Q.   So one of the states that Donald Trump most narrowly
24       lost couldn't even be audited correctly, correct?
25  A.   So it's not the kind of system that -- it's certainly

Page 200

1   not the kind of system that election security experts
2   like me would advocate for. The national academies, for
3   instance, has called for DRE systems, including DRE
4   with VVPAT systems to be phased out.
5   Q.   And that's because it isn't technically possible in the
6        United States to effectively do an audit?
7   A.   Yes, on security grounds, and for reasons of
8        auditability. But, again, the, the strength of the --
9        there are two -- there are two fundamental issues about
10       that. The one, the other five of the six closest states
11       did have paper ballots, or paper ballots, excuse me, of
12       all votes, were primarily paper ballot election
13       systems.
14           And, two, Lindell's theory calls for votes
15       to have been stolen in essentially all jurisdictions.
16       So evidence that comes from these five of the six is
17       itself enough to disprove that theory.
18   Q.   If Mr. Lindell is claiming that votes were stolen in
19        all jurisdictions, and nobody checked the paper in
20        those jurisdictions, then how do we know that votes
21        weren't stolen in the other jurisdictions?
22   A.   Well, the statement that votes were stolen in all
23        jurisdictions, is false, if we know votes weren't stolen
24        in any jurisdictions. That's just prepositional logic.
25   Q.   Okay.  But we cannot rule out, since it wasn't tested,

Page 201

1   that votes weren't stolen, or we can't rule out that
2   votes were stolen in other jurisdictions where, where
3   audits were done or not done, correct?  Let me ask it
4   again.  If an audit wasn't done in another
5   jurisdiction, then we can't rule out that votes were
6   stolen?
7   A.   So the -- a theory that the 2020 election was stolen by
8        hacking, in order for that to happen, in order for that
9        to have any kind of salience, you have to ask where
10       would an attacker have had to steal votes in order to
11       make a difference to the presidential outcome, right?
12       And any plausible attacker who's going to do this is
13       going to focus on the most narrowly contested states.
14       Because any state that is not narrowly contested,
15       right, either is going to have such an implausible
16       outcome as a result of hacking, or the amount of
17       hacking you do isn't going to make any difference to
18       its electoral votes.
19   Q.   Philip Stark didn't agree with you on that, did he?
20   A.   I don't know.
21   Q.   In 2016 when you were trying to decide where to do
22       audits, and request audits, that's exactly what you
23       proposed was the closest states, because that would be
24       where you'd have to flip the fewest votes.  Philip
25       Stark disagreed with you, didn't he?

51 (Pages 198 - 201)

Page 202

1   A.   I don't recall that Philip Stark disagreed with me.
2   Q.   Okay. So the audits that you are referring to are the
3        five -- are five -- from the five, not including the
4        one you didn't do, Nevada, are Georgia, Arizona,
5        Wisconsin, Pennsylvania and Michigan?
6   A.   Yes. Those five of the six closest states conducted
7        some form of audit of their paper trial. They had paper
8        trails, that is, paper ballots, and they conducted some
9        form of audit.
10  Q.   Okay.
11  A.   And in none of those audits did the audit find evidence
12       of fraud.
13  Q.   Well, let's talk about what you mean by some form of
14       audit. First of all, which of the five states did a
15       risk-limiting audit?
16  A.   Yeah, that's going to depend on exactly how you want to
17       define a risk-limiting audit. Of these states, several
18       of them --
19  Q.   I'm talking about the kind of rigorous, and that's your
20       word, risk-limiting audit that you have said are
21       necessary to be assured that a cyberattack did not
22       happen?
23  A.   So as I write in the report, none of these states
24       performed an audit that fully meets the standards that
25       I or other researchers would ask for. That doesn't

Page 203

1        mean that these audits have no evidentiary value,
2        however. Because the question you have to ask is attack
3        that changed the presidential outcome, what is the
4        likelihood that it would evade all of these audits
5        successfully. And the probability, you can do even back
6        of the envelope math, and show that the probability of
7        that is going to be quite low.
8   Q.   But not impossible?
9   A.   Well, of course not impossible, but it's something
10       that, again, you know, speaks to the extraordinary
11       nature of the claim that's being made. And it should be
12       a source of additional assurance to any voter who is
13       assessing this evidence rationally.
14  Q.   Now, let's talk about Pennsylvania first.
15  A.   I should say what is impossible is the theory that
16       Lindell himself posits which involves a national scale
17       attack over the internet affecting votes in every
18       jurisdiction. That is impossible, and his data is a
19       hoax.
20  Q.   Objection. Move to strike all the evidence when he
21       states what is impossible and everything after that.
22            Let's talk about the Pennsylvania audit.
23       First of all, it wasn't a true risk-limiting audit, was
24       it?
25  A.   The major gap in the Pennsylvania audit was the scale

Page 204

1        was too small. That some counties didn't participate.
2   Q.   So it also was not a truly random sample, correct?
3   A.   Well, but let me explain. So in order for that to have
4        been subverted by fraud, it would have to be the case
5        that the fraud was concentrated in those counties that
6        happened not to participate, which is different from
7        Lindell's theory which says that the fraud happened
8        everywhere.
9   Q.   And then the sample size, besides the fact that it
10       wasn't a truly random sample, the sample size that was
11       used was too small, correct?
12  A.   I believe it might have been too small. I don't recall
13       the -- I don't want to say that off the top of my head.
14  Q.   What calculation was done to determine how large the
15       random, or supposedly random, sample should have been?
16  A.   So in Pennsylvania, I'm trying to remember. I think
17       Pennsylvania did the audit in partnership with
18       VotingWorks, which where they used software that is
19       used to determine that sample size. Again, the --
20  Q.   Are you critical of Pennsylvania for farming out the
21       audit to VotingWorks?
22            MR. CAIN:  Did you finish your response?
23       I was -- I was going to say that I think that the
24       sample size was -- I think that the sample size was
25       determined by the Arlo software, excuse me, by using

Page 205

1        the Arlo software. But the main -- the main
2        limitation, again, is the counties that just didn't
3        participate at all, which creates an important gap
4        you'd want to fill in in future public policy to make
5        sure that everything is being appropriately audited.
6        But still even at it's conducted here, this is enough
7        to gain strong evidence against the kind of theory
8        Lindell posits that somehow every single county was
9        hacked.
10  Q.   Was a compliance audit done in Pennsylvania?
11  A.   In Pennsylvania, I don't recall. But, again, we're not
12       talking about an attack that's targeting the physical
13       integrity of those paper ballots. Lindell's theory is
14       about a cyberattack. Someone somehow came in over the
15       internet, right?  And a compliance audit that's going
16       to be doing things like checking the chain of custody
17       is trying to assure the physical integrity of the
18       ballots, not whether the county process was subverted.
19  Q.   Correct. And in terms of the physical integrity of the
20       ballots, Philadelphia, and I believe, what, three, four
21       other counties used ballot marking device machines,
22       correct?
23  A.   Several Pennsylvania counties. I'm not sure. I think it
24       might be more than three or four.
25  Q.   Okay. And including the company that encompasses, or

52 (Pages 202 - 205)

Page 222

1  software, correct?
2  A.  Oh, yes. Now, logic and accuracy testing provides
3  little, if any, benefit against malicious software.
4  What it can do is protect against certain kinds of
5  misconfigurations. They've done well. I have worked now
6  posted very recently about how to do logic and accuracy
7  testing that can detect a broader range of
8  misconfigurations.
9  Q.  How many voting machine jurisdictions are there across
10  or, excuse me, voting jurisdictions are there across
11  the United States?
12  A.  That's a good question, and it really depends how you
13  want to count jurisdictions. The issue there, the
14  reason that it's difficult is that if you're counting
15  on the level of precincts, or ballot styles, if you're
16  counting on polling places. If you're counting just
17  the governments that are administering it, which could
18  be township, could be county, could be city, could be
19  village. And then you have the states and federal
20  jurisdictions. So it's actually a pretty complicated
21  question. But anywhere from if you want to count
22  counties, we're talking in the order of 1,000. If you
23  want to count polling places, order 10,000. If you
24  want to count precincts, order 100,000. It's within a
25  factor of 10.

Page 223

1  Q.  Okay.
2  A.  And, of course, there's 50 states, plus territories in
3  D.C.
4  Q.  When did you first learn about Dennis Montgomery?
5  A.  When did I first learn about Dennis Montgomery? I'm
6  trying to think. I believe that I read about him prior
7  to the 2020 election in connection with some of the
8  past reported fraud that he had been involved in
9  involving the federal government.
10  Q.  Would you agree the federal government has never
11  acknowledged that Dennis Montgomery engaged in any
12  fraud with respect to his work for them?
13  A.  I don't know.
14  Q.  Are you aware of the federal government ever saying
15  that Dennis Montgomery has committed fraud in
16  connection with the work he's done on their behalf?
17  A.  I'm not sure why I would be necessarily aware of that,
18  but not as I sit here today.
19  Q.  Wouldn't that be important for you to know in
20  formulating whether it's true that Dennis Montgomery
21  was someone that participated in high profile hoaxes
22  and fraud?
23  A.  I think he has a reported reputation of doing such,
24  which would be enough to put any -- which would it be
25  enough to put me on notice for sure that I better be

Page 224

1  skeptical about his data if I were going around
2  promoting it.
3  Q.  Do you know what, if any, investigation Mike Lindell
4  did into Dennis Montgomery?
5  A.  I do not as I sit here today. But the question that I
6  would pose would be what investigation did he do into
7  the data, which even a brief inspection by someone who
8  understood computer security or election systems would
9  have been enough to show it's not going to hold water
10  and is likely a hoax. And, in fact, I conclude with no
11  doubt whatsoever that it's a hoax.
12  Q.  Are you aware of Mike -- whether Mike Lindell had
13  security, computer security experts look at this data?
14  A.  If he had computer security experts look at this data,
15  he must have picked people who he knew would tell him
16  what he wanted to hear.
17  Q.  So you're saying that he was seeking to promote the
18  fraud by getting an answer he wanted to hear, rather
19  than somebody telling him something that he believed?
20  A.  I think if he wanted someone who was going to actually
21  examine this data critically, and give him an accurate
22  answer, he could have found some easily just by looking
23  around to almost anybody with computer forensics
24  expertise with election security expertise. It's
25  transparently fraudulent.

Page 225

1  Q.  It's not true that the decentralized nature of the U.S.
2  voting system, and the fact that voting machines are
3  not directly connected to the internet, make changing a
4  state or national election impossible, correct?
5  A.  No, it doesn't make it impossible necessarily. But what
6  it does do it makes it so the bar to committing an
7  attack is higher than it otherwise would be if there
8  was a central point of attack, and it makes it
9  virtually impossible for an attack like the one that
10  Lindell posits to occur, one that's going to affect
11  jurisdictions across every state.
12  Q.  If someone was go to pull it off, it would be someone
13  like China or Russia, correct?
14  A.  Nobody would pull it off. No one would even attempt
15  that. It would be ludicrous, right? It would be
16  tremendously wasteful resources, it would be so likely
17  to get caught. And it probably would be -- and it would
18  be actually impossible to do the way that Lindell
19  posited for all the reasons that I state here. That
20  the machines are not connected to the internet during
21  the relevant time period. For other reasons, too.
22  Q.  The reason that the decentralized nature of the U.S.
23  voting system, and the fact that the machines are not
24  directly connected to the internet, make changing a
25  state or national election possible is because, among

Page 226

1 other things, some election functions are actually
2 quite centralized, correct?
3 A. Some functions are more centralized than others.
4 Preelection programming of machines is quite
5 centralized. But that takes place weeks before, or
6 months before the hack that Lindell purports occurred.
7 What he's proposing is a fraud. It's a hoax.
8 Q. A small number of election technology vendors and
9 support contractors service a system used by many local
10 governments, correct?
11 A. Indeed. Especially ES&S, and some of the other
12 central -- some of the other vendors do programming for
13 a large number of jurisdictions. I think these
14 represent a real risk that needs to be better secured
15 against. That's why we need wider use of risk-limiting
16 audits, handwork, paper ballots and so forth. At the
17 same time, Lindell's theory is not that that was
18 exploited. Lindell's theory is that hackers came in
19 from China, and he's been very clear about this, and
20 directly targeted election jurisdictions across the
21 country. That is not possible to have occurred around
22 election day the way that he maintains. It's a hoax.
23 Q. Objection. Move to strike everything after the
24 acknowledgement that a small number of election
25 technology vendors and support contractors service a

Page 227

1 system used by many local governments.
2 You'd agree also that attackers could target
3 one or few of these companies and spread malicious code
4 to the election equipment that serves millions of
5 voters, correct?
6 A. Such an attack would -- it's certainly a threat, but
7 it's one that would have to occur months or years
8 before an election. And, again, it's not a possibility
9 that lends any credence at all to Lindell's specific
10 theory, which is one that people came in the days
11 surrounding the 2020 election, came in over the
12 internet through China, hacked into individual
13 jurisdictions, and changed votes across the country.
14 That's just not possible. It's a hoax.
15 Q. Objection. Move to strike everything after the word
16 threat.
17 Doesn't matter whether voting machines are
18 connected to the internet, for attackers to infect
19 voting machines with vote stealing malware that can
20 silently alter the election records of every vote,
21 correct?
22 A. Excuse me. Just one second. I'm going to -- could you
23 repeat that for me, please.
24 Q. Sure. It doesn't matter whether voting machines are
25 connected to the internet for attackers to infect

Page 228

1 voting machines with vote stealing malware that can
2 silently alter the electronic records of every vote.
3 A. As I've just explained to you, and as I say in the
4 report, while that is true that there are risks that
5 attackers, especially sophisticated ones, could spread
6 malicious software into a voting system, that would
7 have to take place before the voting machines were
8 programmed for the election which takes place weeks or
9 months in advance. It's not possible for that to be
10 exploited under Lindell's theory that hackers came in
11 over the internet through China in the days surrounding
12 the election, and changed votes all across the country.
13 That's a hoax.
14 Q. Move to strike everything after the words while that is
15 true as being nonresponsive.
16 So the fact that voting machines aren't
17 directly connected to the internet does not make them
18 secure, correct?
19 A. Does not make them secure, could you please --
20 Q. Sure. The fact that voting machines aren't directly
21 connect to the internet doesn't ensure their security,
22 correct?
23 A. Oh, no, that's not enough on its own. It's best
24 practice not to connect them to the internet, but that
25 certainly doesn't make them completely secure. But

Page 229

1 also, the fact that there are other ways of potentially
2 threatening the integrity of elections isn't proof of
3 any specific theory that the 2020 election was hacked.
4 And it's certainly not a basis for Lindell's claims
5 which are a hoax.
6 Q. Objection. Move to strike as nonresponsive everything
7 starting with the words there are other ways.
8 You'd agree that the election system
9 industry has little to no oversight, transparency or
10 regulation, and what little there is is voluntary, lax
11 and woefully outdated. The federal agency tasked with
12 voting system testing and certification has been
13 criticized extensively for its excess dysfunction and
14 lack of security expertise.
15 A. I think things are slowly getting better in terms of
16 regulation of the election security or the election
17 technology industry. But for the most part, I do think
18 the testing is still woefully lacks. That the
19 standards are, are not what they need to be. The
20 standards have very recently been revised in a way that
21 may have some very positive impacts over time. But in
22 general those are, I think, valid criticisms of the way
23 that we produce election technology in this country.
24 And they apply to every major vendor. But none of that,
25 of course, proves that the 2020 election was stolen in

58 (Pages 226 - 229)

Page 234

1  own symposium told him the truth. And Lindell has
2  continued to promote these false claims about the
3  election, and about Dr. Coomer. And I just think it's
4  also just inherently implausible that any of this stuff
5  is true. He's got this data from a person with a
6  history of committing fraud as reported many times in
7  the press.
8  Q.  Many times?
9  A.  Yes. And if you go and look, yes, many times in the
10  press. And if you go and read the -- if you go and
11  examine the data, the data is just transparently
12  fraudulent.
13  Q.  Please identify for me all times that the press has
14  reported that Dennis Montgomery has engaged in fraud in
15  the past prior to Mike Lindell starting to work with
16  Dennis Montgomery?
17  A.  You would have to Google it. I can Google it for you
18  when I get home.
19  Q.  Well, you just said there's many. So give me some of
20  the examples.
21  A.  I know it has now been reported many times.
22  Q.  Okay. But before Mike Lindell started working with him,
23  how many times had it been reported?
24  A.  I don't recall how many times it had been reported.
25  Q.  More than one?

Page 235

1  A.  I believe more than one.
2  Q.  More than two?
3  A.  I believe more than two.
4  Q.  How about three? Can you go that far?
5  A.  I think I can go more than three.
6  Q.  Really? Okay. What's the basis for thinking that it
7  could be three?
8  A.  The basis is that I Googled this at the time I was
9  preparing my expert report, and I looked at the
10  articles about Dennis Montgomery from before the time
11  of Lindell's association with him. But I don't recall
12  today, months later.
13  Q.  Did you look into the federal government asserting
14  State Secrets Act Protection for much of Montgomery's
15  work with the United States?
16  A.  No, I didn't, because I don't think it's relevant. The
17  data that Montgomery produced is obviously fraudulent.
18  It's a hoax. It's a lie. It's a deception. It has
19  nothing to do with the 2020 -- what actually happened
20  during the 2020 election.
21  Q.  What business interests does -- does the kind of
22  supposed lies that you're claiming that Lindell's
23  promoting, what kind of business interest does that
24  help?
25  A.  Well, I understand that he's created a platform called

Page 236

1  FrankSpeech that exists primarily, or is known
2  primarily for promoting conspiracy theories like that
3  that he's been promoting. That Lindell himself has
4  been promoting.
5  Q.  How does that further his business interests?
6  A.  I believe that Mr. Lindell has a financial interest in
7  FrankSpeech.
8  Q.  Is it your understanding FrankSpeech makes money?
9  A.  I don't know if it makes money today. The goal is
10  presumably to make money.
11  Q.  You're just guessing as to that, correct?
12  A.  That's the reason most people start businesses.
13  Q.  Really? Did you start the businesses you started to
14  make money?
15  A.  One of the two businesses that I founded I started to
16  make money. The other is a not for profit.
17  Q.  So people -- some businesses that people start are not
18  for profit?
19  A.  I don't --
20  Q.  Correct?
21  A.  I don't believe that FrankSpeech is a not for profit.
22  Q.  You don't know what his intentions are regarding making
23  a profit from FrankSpeech, do you? You're just
24  speculating, correct?
25  A.  I think one can make a strong inference.

Page 237

1  Q.  From what?
2  A.  From all of these factors that I just -- I've just
3  recited.
4  Q.  You haven't --
5  A.  I'm sorry.
6  Q.  You haven't recited any factors other than you're
7  speculating. What are the specific facts on what you
8  conclude that Mike Lindell is promoting his business
9  interests through FrankSpeech?
10  A.  Is promoting business interests through, through --
11  Q.  FrankSpeech.
12  A.  I think he has a business interest in the success of
13  FrankSpeech as a platform. I think FrankSpeech is --
14  furthermore has engaged in promotions for his other
15  business, MyPillow, and his other -- and his Lindell TV
16  channel. Those I, I think from those facts alone it's
17  apparent to me that Mike Lindell has a business
18  interest in, in promoting this, this, this fraudulent
19  theory he has about the 2020 election. It was the focus
20  of his symposium.
21  Q.  Other than your speculation that he hopes to some day
22  make money from FrankSpeech, what other business
23  interests is Mr. Lindell attempting to promote with
24  what you call his hoax?
25  A.  I understand that he's been using it to promote his

60 (Pages 234 - 237)

Page 238

1  company, MyPillow, and his other company.  That he's at
2  the cyber symposium and elsewhere giving promo codes
3  for MyPillow, while making fraudulent claims about the
4  2020 election.  Those are -- those are additional
5  business interests that he certainly appears to me to
6  have in all of this mess.
7  Q.  And do you have any evidence that Mike Lindell believes
8  that promoting promo codes on FrankSpeech, or anywhere
9  else, has -- well, now let me start over.
10         Do you have any evidence that shows that
11  Mike Lindell believes that promoting MyPillow on
12  FrankSpeech has benefit to MyPillow?
13  A.  No, but why else would he do it?
14  Q.  I don't know. Did you -- have you studied whether Mr.
15  Lindell has actually lost money as a result of his
16  efforts to promote cybersecurity?
17  A.  I haven't. Maybe it's a loss leader for him. He's
18  hoping to make more in the future, but that would be --
19  that would be speculation.
20  Q.  What facts do you have to support your statement in
21  paragraph 10 of your declaration that Mike Lindell
22  portrayed Eric Coomer as someone who manipulated enough
23  votes to deny a victory to Donald Trump in an attempt
24  to promote his own political interests, regardless of
25  the truth?

Page 239

1  A.  Well, again, regardless of the truth, because despite
2  all of the red flags and the people who have debunked
3  the core of his theory, and the fact that even a
4  cursory examination shows his data to be a hoax, the
5  political interests, I think, comes from his apparent
6  desire to promote -- and to promote President Trump,
7  and to promote Trump's theories that he's expressed
8  about the 2020 election result being illegitimate.
9  Q.  How does that benefit Mike's political interests?
10  A.  I know that Mike is, like many people, is a supporter
11  of Donald Trump.
12  Q.  And this --
13  A.  And an associate of his.
14  Q.  How has that promoted his business interests since
15  Trump will not be restored to office, or his clinical
16  interests if Trump can't be restored to office?
17  A.  Well, former President Trump seems to be continuing his
18  claims that the 2020 election was stolen.  And even if
19  he won't be restored to office, it seems to be in
20  his -- he seems to think, anyway, that it's in his
21  political interests to continue portraying the 2020
22  election as a fraud.
23  Q.  And the reason he believes that's in his political
24  interest is because there's so many people that believe
25  it, correct?

Page 240

1  A.  Well, largely as a result of Mike Lindell spreading
2  this hoax.
3  Q.  What's the reach of Mike Lindell's statements?  How
4  many people heard it?
5  A.  Frankly, it was so widely reported, I'd expect that
6  much of the country heard what Mike Lindell was saying
7  around the cyber symposium. It was covered by numerous
8  mainstream media networks. It was covered in print,
9  right?  It was broadcast on Lindell's own services.
10  Q.  And they were all critical of it, correct?  And as you
11  pointed out, they've all debunked it?  So nobody's
12  believing Mike Lindell, according to you?
13  A.  Nobody should believe Mike Lindell, according to me,
14  but I'm afraid a lot of people do believe Mike Lindell
15  because Mike Lindell has told them a lie.
16  Q.  And President Trump has even a bigger follower than --
17  following than Mike Lindell.  And he has been spreading
18  this what you call hoax for much longer to many more
19  people, correct?
20  A.  Well, that would seem to add further credence to it
21  being in Mike Lindell's political interest that he
22  hopes ingratiate himself to former President Trump.
23  Q.  What's the value of that?
24  A.  To join President Trump in promoting this theory.
25  Q.  What's the value of ingratiating himself to President

Page 241

1  Trump?
2  A.  He may well become president again.
3  Q.  Can you --
4         MR. CAIN:  If you don't mind, I'm sorry,
5  ma'am.  Do ya'll mind if take a break?  We've been
6  going about an hour and a half.
7         MS. WRIGHT:  I think we getting fairly close
8  to being done.  Would you rather get done, or you want
9  to take a break?
10         MR. CAIN:  Both.
11  A.  Could I do a quick bio break?
12         MS. WRIGHT: Okay.
13         MR. CAIN:  Let's do -- let's do a quicky.
14         VIDEO TECHNICIAN:  Off the record 4:14.
15         (Break at 4:14 p.m.)
16         (Back on the record at 4:21 p.m.)
17         VIDEO TECHNICIAN:  Back on the record 4:21.
18  BY MS. WRIGHT:
19  Q.  Have you been compensated for the expert report you
20  prepared in Mr. Coomer's case against Mr. Lindell?
21  A.  Yes, I am.
22  Q.  How are you being compensated?
23  A.  I'm being paid my customary hourly rate at $750 an hour
24  for my work in this case.
25  Q.  How many hours do you have into this case?

61 (Pages 238 - 241)

Page 257

1                   CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN  )

3                      ) SS

4    COUNTY OF WAYNE    )

5

6                   I, JOANNE MARIE BUGG, certify that this

7         deposition was taken before me on the date hereinbefore

8         set forth; that the foregoing questions and answers

9         were reported by me stenographically and reduced to

10        computer transcription; that this is a true, full and

11        correct transcript of my stenographic notes so taken;

12        and that I am not related to, nor of counsel to, either

13        party nor interested in the event of this cause.

14

15

16

17

18

19

20

21        JOANNE MARIE BUGG, CSR-2592

22        Notary Public

23        Wayne County, Michigan

24        My Commission expires: 2-26-2025

25