**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants.

---

# EXHIBIT – 3

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PhD.,

     Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

     Defendants

---

## DECLARATION OF J. ALEX HALDERMAN

---

I, J. Alex Halderman, declare and state as follows:

1.    "My name is Dr. J. Alex Halderman. I am Professor of Computer Science and Engineering, Director of the Center for Computer Security and Society, and Director of the Software Systems Laboratory at the University of Michigan in Ann Arbor. I hold a Ph.D. (2009), a master's degree (2005), and a bachelor's degree (2003), *summa cum laude*, in computer science, all from Princeton University. My background,

**CONFIDENTIAL**

qualifications, and professional affiliations are set forth in my curriculum vitae, which is attached as **Exhibit 1**.

2.      "My research focuses on computer security and privacy, with an emphasis on problems that broadly impact society and public policy. Among my areas of research are software security, network security, computer forensics, and election cybersecurity. I have authored more than 90 articles and books, and my work has been cited in more than 15,000 scholarly publications. I have served as a peer reviewer for more than 35 research conferences and workshops. I regularly teach courses in computer security, network security, and election cybersecurity at the graduate and undergraduate levels.

3.      "I founded two companies based on my network security research. One company, ISRG, is a non-profit that helps secure almost 300 million websites, including Wikipedia and Whitehouse.gov. The other company, Censys, is a leading provider of data-driven tools and services to help enterprises secure their network attack surfaces.

**CONFIDENTIAL**

4.    "Much of my research concerns the security of elections. I have published numerous peer-reviewed research papers analyzing security problems in electronic voting systems used in U.S. states and in other countries. I have also investigated methods for improving election security, such as efficient techniques for auditing whether computerized election results match paper ballots. I am the creator of *Securing Digital Democracy*, a massive, open, online course about computer security and elections that has attracted more than 20,000 students.

5.    "I serve as co-chair of the State of Michigan's Election Security Advisory Commission, by appointment of the Michigan Secretary of State. I have also performed security testing of election systems for the Secretary of State of California and computer forensics of election systems for the Michigan Attorney General. I have testified before the U.S. Senate Select Committee on Intelligence and before the U.S. House Appropriations Subcommittee on Financial Service and General Government on the subject of cybersecurity and U.S. elections.

**CONFIDENTIAL**

6.      "I received the John Gideon Award for Election Integrity from the Election Verification Network, the Andrew Carnegie Fellowship, the Alfred P. Sloan Foundation Research Fellowship, the IRTF Applied Networking Research Prize, the Eric Aupperle Innovation Award, the Internet Defense Prize, the University of Michigan College of Engineering 1938E Award for teaching and scholarship, and the University of Michigan President's Award for National and State Leadership.

7.      "I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

8.      "In my 15 years working in the election security field, I encountered Dr. Eric Coomer on only two occasions prior to Election Day 2020. The first time was on February 2, 2019, at the National Association of Secretaries of State winter conference, which I attended. There, Dr. Coomer staffed Dominion's vendor booth and demonstrated the company's equipment. He knew me by reputation and introduced himself; I did not know who he was. Later, on September 15, 2020, Dr.

**CONFIDENTIAL**

Coomer testified about Dominion's equipment at a preliminary injunction hearing in *Curling v. Raffensperger* (1:17-CV-2989-AT, N.D. Ga.), a lawsuit regarding the security of Georgia's election system. I testified as an expert witness for the opposing party in the same hearing. Although Dr. Coomer and I disagreed about certain technical issues, our interactions impressed on me that he was a man of principle who shared my goal of safeguarding election integrity.

**There is No Credible Evidence that the 2020 Election was "Rigged"**

9. "There is not, and has never been, credible evidence that the outcome of the 2020 presidential election was 'rigged' by anyone, let alone by Dr. Coomer. Election security experts and public officials have reiterated this countless times, beginning shortly after the election. Yet Defendants Michael J. Lindell, Frankspeech, and My Pillow have ignored these authorities and instead advanced and continue to advance baseless, outlandish conspiracy theories about the election and Dr. Coomer.

**CONFIDENTIAL**

10.    "In an apparent attempt to promote his own political and business interests regardless of the truth, Lindell has portrayed Dr. Coomer as a criminal who somehow manipulated enough votes to deny victory to Donald Trump. These allegations were and remain implausible, consisting of wild speculation, readily debunked claims, and incoherent technical assertions. In more than two-and-a-half years since the election, Lindell has failed to produce any credible evidence whatsoever to support his election hacking claims. Meanwhile, numerous investigations and audits have not only failed to vindicate his theories but instead added further evidence that the election outcome was correctly decided.

11.    "While I and other scientists have warned for many years that there are security weaknesses in voting systems sold by all major vendors,[1] credible election security experts have never claimed that such vulnerabilities were actually exploited to alter the outcome of an election

---

[1] It is the consensus of the National Academies that "[t]here is no realistic mechanism to fully secure vote casting and tabulation computer systems from cyber threats." National Academies of Science, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy* (2018) at p. 92. Available at https://doi.org/10.17226/25120.

CONFIDENTIAL

in the United States. Technical, physical, and procedural safeguards complicate the task of maliciously exploiting election systems, as does the distributed nature of U.S. elections. Monitoring of likely adversaries by law enforcement and the intelligence community increases the probability that an attempted attack would be discovered and foiled. Merely citing the existence of real technical flaws does not establish that an attack occurred, much less that it altered the presidential election outcome in 2020.

12.   "Starting soon after Election Day, I and other leading election security experts publicly stated that we had seen no credible evidence to support emerging conspiracy theories about the election having been rigged, including those involving Dominion and Dr. Coomer.

13.   "For example, on November 7, 2020, in response to public concerns about errors that had been discovered and corrected in the unofficial election-night results from Antrim County, Michigan (which

**CONFIDENTIAL**

used Dominion equipment), I posted a thread on Twitter[2] that explained why the problem almost certainly resulted from human error rather than 'hacking' or fraud.

14.  "On November 13 and 14, 2020, I appeared on Fox News to debunk claims that the presidential outcome had been hacked. I stated, 'There is absolutely no evidence, none, that Dominion voting machines changed any votes in this election.'[3] I went on to describe the election-rigging accusations as 'extraordinary' and based on 'pure speculation.'

15.  "In an open letter dated November 16, 2020[4] and reported in *The New York Times* that day,[5] I and 58 other leading election security specialists called further attention to the implausibility of conspiracy

---

[2] Available at https://twitter.com/jhalderm/status/1325163291161755649.

[3] "Officials: Dominion machines did not change or delete votes", FOX NEWS (Nov. 14, 2020). Available at https://video.foxnews.com/v/6209855488001. Accessed May 2, 2023.

[4] T. Adams *et al*., "Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence" (Nov. 16, 2020). Available at https://www.mattblaze.org/papers/election2020.pdf. Accessed May 2, 2023.

[5] N. Perlroth, "Election Security Experts Contradict Trump's Voting Claims," THE NEW YORK TIMES (Nov. 16, 2020). Available at https://www.nytimes.com/2020/11/16/business/election-security-letter-trump.html. Accessed May 2, 2023.

**CONFIDENTIAL**

theories such as those promoted by Lindell, Frankspeech, and My Pillow. The letter, which I co-authored, was signed by prominent experts such as Harri Hursti, Matt Blaze, and Andrew Appel, whose work has been repeatedly cited by Defendants in support of such theories, as has my own.

16.   "Our letter distinguished the established science about election security from the wild and unsubstantiated claims that the election outcome had been hacked. We emphasized that such hacking claims were inherently improbable and carried a high burden of proof: 'Anyone asserting that a U.S. election was "rigged" is making an *extraordinary* claim, one that must be supported by persuasive and verifiable evidence' (emphasis in the original).

17.   "Leaving no doubt about our view of the credibility of claims such as those promoted by Defendants, we stated:

> We are aware of alarming assertions being made that the 2020 election was "rigged" by exploiting technical vulnerabilities. However, in every case of which we are aware, these claims either have been unsubstantiated or are technically incoherent. To our collective knowledge, no

**CONFIDENTIAL**

credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise.

18. "During the same period, state and federal authorities also affirmed that they were unaware of any credible evidence that election results had been rigged.

19. "For example, on November 9 and 10, *The New York Times* contacted election officials in every state to ask whether they had seen evidence of fraud or other irregularities during the election. Officials in 49 states reportedly responded that they had not.[6] (The remaining state, Texas, did not respond.) Numerous elected leaders and election officials have repeated as much in their own public statements.

20. "On November 12, 2020, the Cybersecurity and Infrastructure Security Agency (CISA, the Federal agency that oversees election infrastructure security) released a joint statement from the Elections Infrastructure Government Coordinating Council and the Election

---

[6] N. Corasaniti, R. J. Epstein and J. Rutenberg, "The Times Called Officials in Every State: No Evidence of Voter Fraud," THE NEW YORK TIMES (Nov. 10, 2020). Available at https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html. Accessed May 2, 2023.

**CONFIDENTIAL**

Infrastructure Sector Coordinating Executive Committees that stated, 'There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.'[7] The statement was signed by CISA Assistant Director Bob Kolasky, U.S. Election Assistance Commission Chair Benjamin Hovland, National Association of Secretaries of State President Maggie Toulouse Oliver, and National Association of State Election Directors President Lori Augino, as well as by representatives from major election equipment manufacturers.

21.   "On December 1, 2020, Attorney General William Barr reportedly told the Associated Press that U.S. attorneys and FBI agents had been working to investigate specific complaints of alleged irregularities in the election, but 'to date, we have not seen fraud on a scale that could have effected a different outcome in the election.'[8]

---

[7] "Joint Statement from Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees" (Nov. 12, 2020). Available at https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election. Accessed May 2, 2023.

[8] M. Balsamo, "Disputing Trump, Barr says no widespread election fraud," THE ASSOCIATED PRESS (Dec. 1, 2020). Available at https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d. Accessed May 2, 2023.

**CONFIDENTIAL**

22.   "Today, more than two-and-a-half years after the election and following numerous audits and investigations, I am still unaware of any credible evidence whatsoever that the 2020 presidential election outcome was altered by technical manipulation.

**Post-Election Audits Provide Strong Evidence Against Hacking**

23.   "Beyond the lack of credible evidence that the 2020 presidential election *was* 'hacked', there is strong evidence that the election outcome was *not* hacked by Dr. Coomer or anyone else. The strongest affirmative evidence comes from voters' paper ballots, which cannot be retroactively changed by computers. Five of the six states that Donald Trump most narrowly lost used paper ballots state-wide: Georgia, Arizona, Wisconsin, Pennsylvania, and Michigan. All five states were subject to post-election audits that involved people inspecting paper ballots by hand. None found evidence that the election outcome was wrong.

**CONFIDENTIAL**

a)      Georgia conducted a statewide hand-count of the presidential contest that found no significant discrepancy from the reported statewide totals.[9]

b)      The Arizona State Senate commissioned an audit of the presidential result in Maricopa County, home to 62% of the state's population and the only Arizona county that used Dominion equipment. All 2.1 million paper ballots were retallied by hand. Compared to the official results, the hand tally showed 99 more votes for Biden and 261 fewer votes for Trump. The auditors found no evidence of fraud.[10]

c)      Wisconsin hand-counted more than 145,000 ballots, corresponding to 5% of all reporting units statewide, and found 'no evidence that any voting equipment […] changed votes from one candidate to another, incorrectly tabulated votes, or altered vote totals in any way.'[11]

d)      Pennsylvania conducted a risk-limiting audit (RLA) exercise involving 63 of 67 counties, in which workers reviewed a random sample of 45,000 ballots. According to the Secretary of State's office, 'the sample mirrored the reported presidential election results across the

---

[9] Georgia Secretary of State's Office, "2020 General Election Risk-Limiting Audit." Available at https://sos.ga.gov/page/2020-general-election-risk-limiting-audit. Accessed May 2, 2023.

[10] Cyber Ninjas, "Maricopa County Forensic Election Audit Volume III: Result Details" (Sept. 24, 2021). Available at https://www.azsenaterepublicans.com/_files/ugd/2f3470_d36cb5eaca56435d84171b4fe7ee6919.pdf. Accessed May 2, 2023.

[11] Wisconsin Elections Commission, "2020 Post-Election Voting Equipment Audit Final Report" (Feb. 3, 2021). Available at https://elections.wi.gov/sites/default/files/legacy/2021-02/2020%2520Voting%2520Equipment%2520Audit%2520Report.pdf. Accessed May 2, 2023.

<span style="color:red">**CONFIDENTIAL**</span>

participating counties within a fraction of a percentage point, providing strong evidence of the accuracy of the vote count.'[12]

e)   Michigan conducted a similar RLA exercise in which 18,000 randomly selected ballots from more than 1300 local jurisdictions were manually inspected, and the state oversaw a complete hand-count of the presidential contest in one county, Antrim. There was no evidence of fraud or significant error.[13]

24.   "Although these audits do not fully meet the rigorous standard for post-election audits that I and many other election security experts recommend (a jurisdiction-wide risk-limiting audit of hand-marked paper ballots that achieves a high risk-limit), they nevertheless severely constrain the set of possible attacks that could have occurred without detection. It is highly unlikely that an attack that altered enough votes in enough of these states to change the winner of the 2020 presidential election would have evaded detection in every one of these audits.

---

[12] Pennsylvania Secretary of State's Office, "Risk-Limiting Audit Pilot of November 2020 presidential Election Finds Strong Evidence of Accurate Count" (Feb. 5, 2021). Archived from the original at https://web.archive.org/web/20230116051409/https://www.media.pa.gov/pages/state-details.aspx?newsid=453. Accessed May 2, 2023.

[13] Michigan Secretary of State's Office, "Audits of the November 3, 2020 General Election" (Apr. 21, 2021). Available                                                                                                                    at https://www.michigan.gov/documents/sos/BOE_2020_Post_Election_Audit_Report_04_21_21_723005_7.pdf. Accessed May 2, 2023.

**CONFIDENTIAL**

**Defendants Promoted Inherently Improbable Hacking Theories**

25.   "In the aftermath of the 2020 election, virtually every election security expert and election official who weighed in stated that claims that the presidential outcome had been hacked were unsubstantiated or not credible. Nevertheless, Defendants Lindell, Frankspeech, and My Pillow ignored these experts and instead chose to promote incredible conspiracy theories about the election and Dr. Coomer.

26.   "Shortly after the election, Lindell produced, directed, and starred in *Absolute Proof*, a two-hour documentary that aired on One America News (OAN) in February 2021 and was further distributed via the Frankspeech website and other platforms.[14] The film advances the theory that attackers from China and other foreign countries hacked into voting systems across the U.S. and switched votes from Trump to Biden.

27.   "In the climax of the film, Lindell shows what he calls '100% proof of the biggest cyberattack in history'. This 'proof' is purported to

---

[14] *Absolute Proof: Exposing Election Fraud and The Theft of America by Enemies Foreign and Domestic*, Apr. 17, 2021. Available at https://frankspeech.com/tv/video/absolute-proof-exposing-election-fraud-and-theft-america-enemies-foreign-and-domestic. Accessed May 2, 2023.

CONFIDENTIAL

16

be network data that was collected by 'cyber experts' in the days surrounding the election. According to Lindell, the data is a record of how foreign actors surreptitiously connected to computers in 2,995 county election offices, circumvented security, and changed precise numbers of votes to disadvantage Trump. The film depicts the purported hacking data in the form of spreadsheets and of animated maps showing connections from China and other countries to counties across the U.S. The figures below are screenshots from the film that show examples of both forms of the data:



CONFIDENTIAL

EC 22cv01129 001523



28.  "Lindell further elaborated on his hacking theory in two subsequent documentaries, *Absolute Interference* and *Absolutely 9-0*, which were released in April and June 2021, respectively, and again aired on OAN and further distributed by Frankspeech and other platforms.[15] Like *Absolute Proof*, both films starred Lindell.

29.  "Subsequent to the release of these films, Lindell's hacking theories were publicly debunked by numerous experts, journalists, and fact checkers, which should have put Lindell and the other Defendants

---

[15] *Absolute Interference: The Sequel to Absolute Proof with New Evidence Foreign And Domestic Enemies Used Computers to Hack the 2020 Election*, May 3, 2021. Available at https://frankspeech.com/video/absolute-interference-sequel-absolute-proof-new-evidence-foreign-and-domestic-enemies-used. Accessed May 2, 2023. *Mike Lindell Presents: Absolutely 9-0*, July 20, 2021. Available at https://frankspeech.com/video/mike-lindell-presents-absolutely-9-0. Accessed May 2, 2023.

**CONFIDENTIAL**

EC 22cv01129 001524

on notice that their claims were likely to be false.[16] Many of these sources pointed to fundamental obstacles that would make the type of nationwide hack that Lindell proposes practically impossible to conduct, let alone to pull off without detection by authorities.

30.    "One major obstacle is the diversity of U.S. voting systems. Each state administers its own election system, so there is no single computer system that someone could hack to change votes across every state. Election technology and the way it is configured and secured differs from state to state and, in many states, from county to county. In 2020, U.S. jurisdictions used approximately 35 different models of voting

---

[16] *See, for example:* Saranac Hale Spencer and Angelo Fichera, "MyPillow CEO's Video Rehashes Debunked Election Fraud Claims." FactCheck.org (Feb. 5, 2021). Available at https://www.factcheck.org/2021/02/mypillow-ceos-video-rehashes-debunked-election-fraud-claims/. Accessed May 2, 2023. Dana Ford and Alexis Tereszcuk, "Fact Check: Mike Lindell's 'Absolute Proof' Video, Promising To Expose Election Fraud, Relies On False And Unsubstantiated Claims." Lead Stories (Feb. 5, 2021). Available at https://leadstories.com/hoax-alert/2021/02/fact-check-mike-lindell's-absolute-proof-video-promising-to-expose-election-fraud-is-full-of-false-and-unproven-claims.html. Accessed May 3, 2023. Khaya Himmelman, "Fact Checking Mike Lindell's 'Absolute Interference' Video." The Dispatch (May 10, 2021). Available at https://thedispatch.com/article/fact-checking-mike-lindells-absolute/. Accessed May 2, 2023. Philip Bump, "Mike Lindell's 'fraud' allegations are even more ridiculous than you might think." The Washington Post (June 4, 2021). Available at https://www.washingtonpost.com/politics/2021/06/04/mike-lindells-fraud-allegations-are-even-more-ridiculous-than-you-might-think/. Accessed May 2, 2023. Khaya Himmelman, "Fact Checking 'Absolutely 9-0,' the Latest Documentary From Mike Lindell." The Dispatch (June 14, 2021). Available at https://thedispatch.com/article/fact-checking-absolutely-9-0-the/. Accessed May 3, 2023.

**CONFIDENTIAL**

machines, which were deployed in hundreds of different software versions and configurations.[17] Each kind of equipment and style of deployment that was to be hacked would require separate effort on the part of the attackers to discover and exploit vulnerabilities. This means that hacking voting machines in nearly all U.S. jurisdictions simultaneously, as Lindell alleges, would require an incredible expenditure of effort on the part of the attackers.

31.   "Such a nationwide attack would also be extremely likely to be detected. Many states closely monitor the computer systems associated with their election systems, and although the effectiveness of these defenses varies from place to place, an attack that touched on virtually all U.S. jurisdictions would have to avoid detection everywhere, including in the best-monitored localities.

32.   "Lindell claims specifically that the attackers hacked into voting machines over the Internet, and that the attacks occurred in the days

---

[17] Verified Voting, *The Verifier: Election Day Equipment, November 2020*. Available at https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2020. Accessed May 4, 2023.

**CONFIDENTIAL**

surrounding the election. This is not possible, because most voting machines are never connected to the Internet or any other external networks. While it is plausible that attackers might target voting machines by attempting to infect them with malicious software spread from other election-related systems (e.g., the computers used to prepare ballot designs), such an attack would need to take place before officials configured the individual voting machines for the election. This work is typically completed weeks prior to Election Day, long before Lindell purports the hacking took place.

33.    "Attackers might also attempt to hack into computer systems that are used to aggregate and report election results, but a nationwide attack of this nature would be certain to be detected and thwarted. Voting machines are required to print a paper 'poll tape' at the conclusion of voting to document the number of votes received by each candidate. During post-election canvasing and certification processes, officials in many states manually compare the totals on the poll tapes to the reported election results. Any deviation in the results caused by a hack of the

**CONFIDENTIAL**

reporting systems would cause a discrepancy with the poll tapes. As with other election defenses, the rigorousness of this comparison varies by jurisdiction, but an attack that affected nearly all reported results nationwide would certainly be detected in at least some localities.

34.   "During the 2020 election, approximately 68% of votes were recorded on hand-marked paper ballots. Experts consider paper ballots to be a critical security measure, because it is impossible for any kind of cyberattack—including Lindell's—to retroactively change them. The paper ballots from the 2020 presidential election were counted by hand or rigorously audited in many localities and several whole states, without revealing any evidence of widespread fraud. Lindell's theory cannot account for how a hack that affected voting machines or reporting systems across virtually the entire country could have escaped detection in every one of these manual counts.

35.   "Lindell's theory is all the more implausible because no real adversary that sought to affect a presidential outcome without detection would do so by hacking votes in every state. Due to the electoral college,

presidential outcomes tend to hinge on a small number of competitive swing states. Hacking votes in non-swing states, where the change in the results would either be so large as to be implausible or would be too small to affect who won the state's electors, would increase the cost of the attack and the risk of being detected without furthering the attacker's goals. The effort and risk of detection would be much less if the attacker focused hacking attempts on the most closely contested states, rather than attacking virtually all U.S. jurisdictions as Lindell's data implies.

36. "Experts and fact-checkers who publicly debunked Lindell's documentaries also demonstrated errors and inconsistencies in his purported network attack data. These critiques should have raised doubts about the data's veracity in the mind of any reasonable person.

37. "Lindell's purported attack data would have been difficult to collect during the election, but it easily could have been forged after the fact using publicly available Internet address records. For instance, it would be straightforward to select foreign IP addresses at random, and IP addresses associated with U.S. counties can be determined by simply

**CONFIDENTIAL**

looking up the IP address of each country's public website or email server. Patterns in the data shown in Lindell's films suggest that at least certain portions of it were randomly generated.

38.   "If the data Lindell presented had any credibility at all, that credibility would necessarily hinge on who collected it and how, and on whether it was later altered. Lindell initially provided few concrete details about the data's providence, but journalists later identified the likely source as Dennis Montgomery,[18] a man with a history of reported involvement in high profile hoaxes and fraud.[19] Lindell now admits that the data came from Montgomery.[20] This fact alone should have alerted Lindell that the data was likely to be fake.

39.   "Rather than concede that his hacking theories were not credible, Lindell, in his third film, *Absolutely 9-0*, made bold new claims about

---

[18] Maarten Schenk, "Attention Mike Lindell: What You May Want To Know About The 'Data' Used In Your Stolen Election Claims." Lead Stories (Apr. 30, 2021). Available at https://leadstories.com/analysis/2021/04/analysis-finding-the-source-of-the-lindell-evidence-mentioned-on-kimmel.html. Accessed May 2, 2023.

[19] Aram Roston and Peter Eisler, "The man behind Trump World's myth of rigged voting machines." Reuters (Dec. 20, 2022). Available at https://www.reuters.com/investigates/special-report/usa-election-montgomery/. Accessed May 3, 2023.

[20] *Coomer v. Lindell et. al.*, Case No. 1:22-cv-01129 (Dist. Ct. Colo.), Deposition of MyPillow, Inc., March 8, 2023, at 94:13-19.

CONFIDENTIAL

EC 22cv01129 001530

the strength of his evidence. He described having 'pcaps' (a term that is short for 'packet captures') that were 'collected on the night of the election and a couple of days later' that would conclusively prove that the supposed hacking took place. According to Lindell, the purported pcaps provided evidence of hacking that was so compelling, 'irrefutable' and 'not subjective' that it would convince the Supreme Court to vote unanimously to invalidate the results of the presidential election.

40.    "If Lindell really did have pcap data to back up his hacking claims, that would potentially be very significant. The attack data shown in his films consisted of maps and spreadsheets that were essentially a summary of the purported attacks. In contrast, pcaps would be the original source material—a precise technical record of the data sent over the Internet to perpetrate each step of the attacks. Having genuine pcaps of the attacks would be analogous to having a video recording of a crime taking place. If such pcaps existed, they would provide crucial technical data that network security experts could use to investigate or substantiate Lindell's claims.

**CONFIDENTIAL**

41.   "To understand what a pcap is, it is important first to understand that the Internet carries all data in the form of packets, which are small, self-contained units of data, each usually less than about 1500 characters long. Whether you are loading a web page or participating in a Zoom call, the computer sending the data divides it into a stream of such packets, and the computer that receives the packets recombines them into the original transmission. When a computer sends a packet, it labels the packet with its own Internet Protocol (IP) address (the 'source address') and the IP address of the computer that should receive the data (the 'destination address'). Internet service providers coordinate to deliver each packet from the source computer to the addressed destination computer.

42.   "Normally, Internet packets are ephemeral—once they are delivered, the data they contain is not retained by the network. However, technicians will sometimes take steps to record them by using special 'packet capture' software. These create a packet capture ('pcap') file that contains every packet that was visible from the network location where

CONFIDENTIAL

the software was running. A pcap typically stores both the address information and the content of each packet, along with the date and time when the packet was observed. Files that store pcaps typically use one of several standard file formats that are compatible with widely available software tools for creating and analyzing pcap data.

43.   "Lindell claimed in *Absolutely 9-0* to have consulted unnamed 'cyber experts' to 'validate' the purported pcaps. However, once the film became public, fact checkers and established election security experts pointed out that no actual pcap data was shown in the film.[21] Experts also pointed to several factors that made it unlikely that Lindell really had the kind of pcap data he purported to.

44.   "For example, it would be extremely difficult for anyone to capture pcaps of attacks originating from sources around the world destined for nearly three thousand county election offices across the United States.

---

[21] Maarten Schenk, "Fact Check: Mike Lindell's 'Absolutely 9-0' Movie Does NOT Present Credible Evidence of Election Fraud." Lead Stories (June 3, 2021). Available at https://leadstories.com/hoax-alert/2021/06/fact-check-mike-lindells-absolutely-9-0-movie-des-not-present-credible-evidencehttpshomefrankspeechcomtvvideomike-lindell-presents-absolutely-9-0.html. Accessed May 2, 2023.

CONFIDENTIAL

The Internet is a distributed network, so there is no single place from which someone can create a packet capture that has a global view of Internet traffic. The most plausible way for individuals to record the pcaps Lindell claimed to have would be to run packet capture software on the local network of every election jurisdiction. To my knowledge, few, if any, jurisdictions routinely create such packet captures.

45.   "Even if such improbable packet captures existed, it would be implausible for them to show enough information to conclude that attacks occurred, let alone that they successfully changed specific numbers of votes in the manner that Lindell describes. Most Internet traffic is encrypted, and, indeed, the most plausible entry points to a vulnerable county computer system would be over encrypted connections, such as connections to web servers and VPNs. Attacks occurring over encrypted connections would be difficult or impossible to understand using pcap data, because such does not in general allow decryption of encrypted traffic. Even if the packets used to perpetrate the attacks were not encrypted, or if they were somehow decrypted, it would

**CONFIDENTIAL**

likely be difficult or impossible to determine from network data exactly how many votes the attacks had affected.

46.   "These critiques, all of which were raised publicly shortly after the release of Lindell's films, should have raised doubts about the veracity of his claims in the mind of any reasonable person.

**Data Distributed at Lindell's "Cyber Symposium" was Fraudulent**

47.   "Following the release of *Absolutely 9-0*, Lindell announced that he would publicly reveal the purported pcap data at a 'Cyber Symposium' in August 2021. The Frankspeech website advertised that at the event, Lindell would 'reveal the cyber data and the packet captures from the November 2020 election' and offered a $5 million prize to 'any attendee who can prove that this cyber data is not valid data from the November 2020 election.'[22]

---

[22] Frankspeech, "Mike Lindell's Cyber Symposium 2021." Available at https://home.frankspeech.com/content/mike-lindells-cyber-symposium-2021. Accessed May 4, 2023.

**CONFIDENTIAL**

48.   "Shortly before the Symposium, Lindell was interviewed by CNN.[23] Prior to the interview, he provided CNN a sample of the data he planned to unveil at the event. CNN asked nine 'top election security experts', including me, to examine this data. I determined that it was not pcap data at all, but rather the same kind of easily forged spreadsheet data depicted in Lindell's films. During the interview, CNN correspondent Drew Griffin told Lindell that the experts he consulted said the data was 'extremely rudimentary' and 'completely ridiculous.' This should have put Lindell on notice that the data he planned to made public was unlikely to substantiate his hacking claims.

49.   "The symposium was not open to the public, but approximately 20 invited experts attended. These included Harri Hursti, a leading election security expert with whom I have worked several times, and Robert Graham, a well-known network security expert. Although Lindell's team provided these experts with hundreds of gigabytes of data to analyze, at

---

[23] "CNN reporter to Mike Lindell: You have 'proof of nothing.'" CNN (Aug. 6, 2021). Available at https://www.cnn.com/videos/politics/2021/08/06/mypillow-ceo-mike-lindell-election-claims-griffin-dnt-ac360-vpx.cnn.   Accessed May 2, 2023.

CONFIDENTIAL

the conclusion of the symposium, Graham tweeted that the data did not appear to include any packet captures from the 2020 election, nor any other evidence to support Lindell's election hacking theories.[24]

50.   "Following the symposium, Graham published the data that was provided to him, and I obtained a copy.[25] I performed an independent analysis of the data for the purpose of preparing this declaration.

51.   "Several forms of data were provided to the experts at the symposium. None of these was the purported packet captures from the 2020 election that had been Lindell's premise for holding the event.

52.   "The data did include a small number of packet capture files. They use the standard 'pcapng' data format, which is compatible with many widely used software applications for analyzing packet captures. The names of the files suggest they were captured in three locations—Mesa, Colorado, 'Clark County', and 'Lake County'—but I have no means to verify this. Data in the files indicates that they were captured on

---

[24] Robert Graham (Aug. 12, 2021). Available at https://twitter.com/ErrataRob/status/1425913689169928192.

[25] Available via BitTorrent: magnet:?xt=urn:btih:39a9590de21e77687fdf7eacee4dd743f2683d72&dn=cyber-symposium&tr=udp://9.rarbg.me:2780/announce

CONFIDENTIAL

December 1, 2020, May 4, 2021, and May 23, 2021. Since these dates come significantly after the 2020 election, the files could not represent the kind of contemporaneous evidence of an attack that Lindell claimed.

53.   "Three additional files, named 'streams1.csv', 'streams2.csv', and 'stream3.csv', appear to contain packet capture data that has been converted into a text-based representation. The first two files each record a single computer communicating internally with itself, rather than data sent over the Internet. The third file appears to be a portion of one of the packet captures discussed in the preceding paragraph converted into a different data format. None of these files contains any kind of data transmitted over the Internet during the 2020 election, let alone a contemporaneous recording of election hacking.

54.   "Four files with names ending in 'HEX.txt' are document files that inexplicably have been converted into hexadecimal data. After converting these files back into a normal data format, the files do not appear to contain any evidence to support Lindell's theories. The document 'Chinese_SourceIP_HEX.txt' is a table of 1,781 IP addresses,

**CONFIDENTIAL**

each associated with a number between 3 and 7. The other documents, named 'FinalReult_2020_HEX.txt' [sic], 'Target_MachineID_HEX.txt', and 'Targets_HEX.txt' appear to contain meaningless random characters. I can think of no reason why a computer expert would distribute these documents in the form of hexadecimal data, other than to mislead non-experts into thinking the files were more complicated or mysterious than they are.

55.    "The bulk of the data the experts received consists of huge files with names that end in the extension '.bin', which have a total size of approximately 278 gigabytes. These appear to be the supposed 'pcaps' that Lindell referred to in the leadup to the event. However, the files do not contain any kind of packet capture data, and the information they do contain is fraudulent.

56.    "The files are stored in a non-standard data format that is sometimes referred to as 'BLX'. The experts were provided with source code for a software tool called 'cExtract' that extracts data from the

CONFIDENTIAL

BLX files. I inspected the source code to understand the program's operation and the structure of the BLX data format.

57.  "When the cExtract program runs, it accesses Dennis Montgomery's website, blxware.com, to check whether the computer is licensed to use the software. This strongly suggests that Montgomery is the originator of the cExtract program.

58.  "In my opinion, the BLX data and cExtract software appear to be intentionally designed to perpetrate a hoax. They could easily give casual observers the false impression that the BLX files are packet capture files, and that cExtract somehow analyzes the packets to report data about attacks. Users who have only passing familiarity with computer forensics software could be misled into confusing cExtract with genuine network forensics applications that analyzes pcap data.

59.  "When run on the BLX files provided at the symposium, cExtract outputs spreadsheet rows that are substantially similar to the data shown in Lindell's films. However, the software does not perform any kind of meaningful analysis to produce this data. The complete spreadsheet rows

**CONFIDENTIAL**

are all hidden within the BLX file. cExtract simply copies them out. This is a thinly veiled fraud: the rows are concealed essentially by replacing each character with one three positions later in the alphabet. Only about 0.1% of the data in the BLX files is extracted by the tool. The remainder appears to be meaningless random data that is likely intended to make the BLX files seem more substantial than they are while sustaining the ruse that cExtract is performing sophisticated data analysis.

60.   "The cExtract source code is written in an obfuscatory manner that appears to be intended to confuse inexperienced programmers about its behavior. However, I would expect almost any security expert to be able to understand its functionality with only a few hours of work. Indeed, experts in attendance at the symposium reached conclusions about it similar to my own before the conclusion of the event. Shortly after the

**CONFIDENTIAL**

symposium, Robert Graham published a detailed analysis of cExtract and created his own compatible BLX extraction tool.[26]

61.   "Another software tool provided to the experts at the symposium is a web page that reads the spreadsheet data generated by the cExtract program and generates animated maps that are nearly identical to those shown in Lindell's films. This strongly suggests that the BLX files are indeed the data source underlying Lindell's hacking claims.

62.   "I extracted the spreadsheet data from the BLX files provided at the symposium and analyzed it using standard database software. Even a brief analysis of this purported 'evidence' reveals that it is a forgery.

63.   "Of 121,127 rows in the dataset, 4,572 indicate that votes were flipped from Trump to Biden. Each row contains purported vote totals for each candidate both before and after the alleged vote flipping. Adding up the post-flip votes from the allegedly hacked jurisdictions yields 81,116,048 votes for Biden and 74,150,645 votes for Trump—

---

[26] Robert Graham, "blxtract: An extractor that grabs CSV files from BLX files for Mike Lindell's cyber symposium, from code by Dennis Montgomery." GitHub repository. Available at https://github.com/robertdavidgraham/blxtract. Accessed May 2, 2023.

more than 98% of the votes each candidate received nationally. Therefore, if the data were genuine, it would imply that vote flipping affected practically every local election jurisdiction nationwide. This is impossible, for several reasons.

64.   "First, the data shows attacks that would have had to work backwards in time, because they are listed as occurring *after* the supposedly fraudulent vote totals had already been publicly reported. For instance, Lindell's data purports to show that an attack from Sydney, Australia struck the Van Buren County, Michigan clerk's office at IP address 198.61.190.212 and reduced Trump's vote total from 23,205 to 21,591. This attack is listed as occurring on November 6 at 10:08:30. Yet Van Buren County publicly posted its unofficial results approximately two days prior, at 7:36 a.m. on November 4, and Trump's total was already shown as 21,591 votes at that time. Results published on November 4 could not possibly have been altered by an attack on

CONFIDENTIAL

November 6.[27] More broadly, the data show attacks affecting votes in all of Michigan's 83 counties, about half of which were purportedly attacked long after unofficial results had been made public.

65.   "Second, Lindell's data is contradicted by jurisdictions that later confirmed their announced results by hand-counting paper ballots. For instance, the data claims that an attack struck Maricopa County, Arizona, on Election Day and flipped more than 85,000 votes, reducing Trump's total from 1,081,320 to 995,665. However, nearly all votes in Maricopa County were recorded on paper ballots, which a cyberattack cannot later change. The Republican-led Arizona State Senate commissioned a manual recount of all 2.1 million paper ballots and found 995,404 votes for Trump—261 *fewer* than the official total.

66.   "Finally, Lindell's data purports to show that votes were flipped in jurisdictions that did not use voting machines at all. Consider Brookfield, Vermont: Lindell's data purports to show that at 11:26:13 on

---

[27] "Archived November 2020 results – Van Buren County." Election Reporting (Nov. 4, 2020). Available at https://electionreporting.com/4539283c-3f09-4fdf-ad93-0bfd82d32be1/county/7f5af64a-5a9b-4616-a03c-9ce145e683dd. Accessed May 2, 2023.

**CONFIDENTIAL**

EC 22cv01129 001544

November 6, 2020, an attack from IP address 34.82.184.1 infiltrated the Brookfield Town Clerk's office at IP address 45.60.45.214 and shifted 34 votes out of 813 from Biden to Trump. Yet Brookfield, like many small communities across the state, counts votes entirely by hand.[28] Lindell's data shows votes being shift in all 246 cities and towns across Vermont, even though about 20% of these localities use hand counting exclusively, making it impossible for computer hacking to affect vote counting. Similarly, in Montana, Lindell's data purports to show attacks flipping votes in every one of Montana's 56 counties, including 10 counties that count votes exclusively by hand.[29]

67.   "Despite Lindell's hype in the lead-up to the Cyber Symposium, the purported evidence he provided does not include any packet captures from the 2020 election. Instead, it is just another form of the previously debunked spreadsheet data he promoted in his films. Analysis of the data

---

[28] Scott Fleishman, "A look at the voting process in a small Vermont community." WCAX (Nov. 3, 2020). Available at https://www.wcax.com/2020/11/03/a-look-at-the-voting-process-in-a-small-vermont-community/. Accessed May 3, 2023.

[29] Montana Secretary of State, "County Voting Systems." Available at https://sosmt.gov/elections/systems/. Accessed May 3, 2023.

CONFIDENTIAL

shows that it does not represent actual evidence of hacking, but rather is a thinly veiled form of fraud.

**Voting System Data Distributed Lindell's Symposium Harmed Election Security**

68.   "The purported network hacking data was not the only data made public at Lindell's Cyber Symposium. Lindell or his associates also distributed unauthorized copies of genuine election system data and software taken from two jurisdictions—Mesa County, Colorado, and Antrim County, Michigan. Some or all of this data was further distributed online via BitTorrent.

69.   "The Mesa County data consists of two 'forensic images' (that is, copies of the hard drive) from the county's election management system (EMS) server. The EMS is a computer that runs proprietary software that is used to configure ballot scanners before the election and aggregate results after voting is complete. Mesa County Clerk Tiny

**CONFIDENTIAL**

Peters, who participated in the symposium, was subsequently indicted for allegedly helping an authorized person create these images.[30]

70.   "Other data distributed at the symposium originated from the election system in Antrim County, Michigan. This data includes a nearly complete forensic image of the county's EMS and complete forensic images of memory cards used with each of the county's ballot scanners. These images originated as part of a lawsuit that was filed in late 2020 alleging that hacking and election fraud had occurred in Antrim County.[31] The plaintiffs in that lawsuit were authorized to made copies of data from Antrim's election system, subject to a protective order barring dissemination of the data. I served as an expert witness for the State of Michigan in the Antrim County matter and was provided copies of the same data under the protective order. I have confirmed that the

---

[30] Bente Birkeland and Mergan Verlee, "Colorado clerk is indicted for election tampering and misconduct." NPR (Mar. 9, 2022). Available at https://www.npr.org/2022/03/09/1085452644/colorado-clerk-indicted-on-13-counts-of-election-tampering-and-misconduct. Accessed May 3, 2023.

[31] *William Bailey v. Antrim County*, 13th Circuit Court, Michigan, Case No. 2020-9238 CZ.

CONFIDENTIAL

files Robert Graham received at the symposium are identical to Antrim County data I examined for that lawsuit.

71.   "The Antrim and Mesa County materials disseminated at the symposium include security-critical information, such as copies of the proprietary voting system software, the exact system configuration in use (including what security mechanisms were enabled), and sensitive passwords. This information is sufficiently detailed that it would facilitate the planning or development of methods or means to compromise voting systems—not just in Antrim and Mesa County—but anywhere that uses similar systems.

**Joseph Oltmann's Claims About Dr. Coomer Were Not Credible**

72.   "Shortly after Election Day 2020, Joseph Oltmann began to advance wildly speculative theories that Dr. Coomer had personally engaged in a criminal conspiracy to somehow rig the election against Donald Trump. Oltmann voiced these theories on his *Conservative Daily*

**CONFIDENTIAL**

*Podcast* program, in an affidavit dated November 13, 2020,[32] in media appearances, and as a speaker at Lindell's Cyber Symposium event, in which Defendants further promoted and disseminated Oltmann's claims.

73.   "Oltmann has no discernable expertise in election security. According to his affidavit, he is a businessman and political activist, but he indicates no prior experience with election administration or computer security. Without such expertise, he was unqualified to assess whether Dr. Coomer plausibly could have engaged in a plot to rig the election.

74.   "Nevertheless, shortly after the election, Oltmann began claiming that in late September 2020, he attended an 'Antifa' conference call on which a person named 'Eric,' identified by another participant as 'the Dominion guy,' stated, 'Don't worry about the election. Trump is not going to win. I made f—— sure of it. Hahaha.'[33] His affidavit states that he first associated 'Eric' with Dr. Coomer at around the time of the call

---

[32] Affidavit of Joseph T. Oltmann (Nov. 13, 2020). Available at https://voterga.files.wordpress.com/2020/12/joseph-oltmann-affidavit.pdf. Accessed May 2, 2023.

[33] *Id*. at p. 2.

by performing a Google search for the terms 'Eric', 'Dominion', and 'Denver Colorado.'[34]

75.    "Oltmann has never provided credible evidence that such a call really took place, let alone that Dr. Coomer participated or made such statements, and some of the little tangible evidence he has offered is provably false. He produced a screenshot (excerpt shown below) that he purported in sworn testimony showed he had performed such a Google search on September 26, 2020.[35]



---

[34] *Id.* at p. 2.

[35] Deposition of Joe Oltmann, Sep. 8, 2021, Depo. Tr. at 71:10-72:15; *Coomer vs. Donald J. Trump for President, Inc.*; Case No. 2020cv034319; Denver County District Court.

**CONFIDENTIAL**

76.   "Although the screenshot includes a filename of 'Screen Shot 2020-09-26 at 2.03.31 PM,' it could not have been produced on this date.[36] The Google logo in the upper left corner (which I have outlined in red) shows what is known as a Google 'doodle.' Google doodles are artistic variations of the company's logo that the Google website displays to mark certain holidays and other events. Google maintains an archive of past doodles that indicates that the doodle in Oltmann's screenshot was only displayed for Veteran's Day 2020:[37]



Veterans Day 2020
Nov 11, 2020

Therefore, Oltmann could not have created the screenshot significantly before November 11, 2020—two days *after* he began publicly making

---

[36] This discrepancy was first identified by Twitter user @get_innocuous, who described it in a thread dated Dec. 23, 2021 (https://twitter.com/get_innocuous/status/1474201201172307969), but I have verified it independently.

[37] Google, "Doodles Archive: Veterans Day 2020" (Nov. 11, 2020). Available at https://www.google.com/doodles/veterans-day-2020. Accessed May 2, 2023.

CONFIDENTIAL

claims about the call and Dr. Coomer. Oltmann now admits to changing the date on this screenshot, which casts doubt on the entirety of his claims.[38]

77.   "Furthermore, it is implausible on its face that Dr. Coomer ever made the statements that Oltmann attributes to him. Even if someone in Dr. Coomer's position had the ability to manipulate election results, the success of a plot to 'rig' the presidential election would have been far from assured. It would have been impossible to predict several weeks in advance where cheating would have to occur, and by how much, to swing the presidential outcome. (At the time, polls had President Biden winning by an even larger electoral margin than he eventually received.[39]) Such cheating would have required complex manipulation of highly monitored systems across multiple states. The detection and thwarting of the attempt (and subsequent prosecution of the perpetrators)

---

[38] *Coomer v. Lindell et. al.*, Case No. 1:22-cv-01129 (Dist. Ct. Colo.), Deposition of Joseph Oltmann, December 16, 2022, at 294:13-18.

[39] FiveThirtyEight, "2020 Election Forecast" (Nov. 3, 2020). Available at https://projects.fivethirtyeight.com/2020-election-forecast/. Accessed May 2, 2023.

**CONFIDENTIAL**

would have been likely, so keeping the plan a secret would have been a constant concern. It would have been the height of cartoonish buffoonery to claim to a large group that such a scheme was in the works, much less that it was guaranteed to prevail.

78.   "Oltmann further states in his affidavit that he 'started digging into the code irregularities and tying all of the pieces together with the irregularities and the Dominion uses in the disputed states. The correlation was astonishing.'[40] Oltmann offers no explanation for what he means by 'the code irregularities' or for what 'correlation' he found surprising or why. In my experience, claims such as Oltmann's, that assert to have found 'proof' of an improbable event by connecting the dots among widely disparate pieces of evidence in an ill-defined manner, are characteristic of 'crackpot' conspiracy theories. This should have cast doubt on the entirety of Oltmann's allegations in the mind of any responsible party.

---

[40] Oltmann affid. at p. 5-6.

CONFIDENTIAL

79.   "Oltmann's affidavit goes on to say, 'I then found the information related to justifying voting machines being online and his justification that they had "hardware and IP address protection". This statement by itself is FALSE.' It appears here that he is referring to the fact that, in certain jurisdictions, ballot scanners are sometimes connected to the Internet or to a private external network for purposes of returning unofficial election results. This practice is supported by some models of equipment from Dominion and from other vendors. I and many other experts consider this practice to be a security risk, although vendors like Dominion point to technical mitigations they have put in place, such as IP address filtering. While I disagree that these mitigations are sufficient to outweigh remaining security concerns, the practice is obviously motivated by market demand (many jurisdictions find online results transmission convenient) rather than by malicious intent.

80.   "Oltmann has been clear that he is claiming much more than that some election systems have vulnerabilities. Rather, he maintains that Dr. Coomer deliberately created vulnerabilities to facilitate fraud, and that

CONFIDENTIAL

he somehow participated in exploiting those vulnerabilities to rig the presidential election.[41] Yet the existence of security risks, such as those due to electronic vote transmission, is not evidence that those risks were created deliberately, much less that they were exploited by anyone, let alone by Dr. Coomer.

81.   "Oltmann, in his affidavit and elsewhere, implied that he had data analysis expertise and had statistical evidence that the election results were fraudulent. For example, in the November 6, 2020 *Conservative Daily Podcast* program, he asserted that application of Benford's law (a property of the frequency distribution of leading digits in many kinds of natural data) showed election results from precincts in Fulton County, Georgia and elsewhere had been fabricated. Statistical experts debunked this notion at least as early as November 10, 2020.[42] Benford's law does not apply to such data for the simple reason that precincts within a small

---

[41] *See* Joe Oltmann, "Dominion, Big Tech, and How They Stole It," CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) ("It's not admitting it's vulnerable, it's actually creating the vulnerability so that it can actually be manipulated, and that's what's happened here, Max. That's what's happened here.")

[42] W. Mebane, "Inappropriate Applications of Benford's Law Regularities to Some Data from the 2020 presidential Election in the United States" (Nov. 10, 2020). Available at http://websites.umich.edu/~wmebane/inapB.pdf. Accessed May 2, 2023.

**CONFIDENTIAL**

48

jurisdiction, such as an individual county, tend to be approximately equal in size and to have similar vote shares among the candidates. As a result, the leading digits in the results have a different distribution from the one that Benford's law would otherwise predict, even in the absence of fraud. This early debunking should have cast further doubt on the reliability of Oltmann's theories.

82.    "Oltmann's affidavit further claims:

> I used ARIMA analysis to show me trends on data and probability models to prove that they were in fact using code and technology to ghost voters, switch votes or even remove probable ballots completely. Code is random unless it is not. Since we are a data company and understand artificial intelligence and use of neural networks, we understand the capabilities of creating chaos in outcome based on weighted density of probable voters.[43]

Auto-regressive integrated moving average (ARIMA) modeling is a method of using time-series data for forecasting. Oltmann does not explain how he applied it, or to what data. He does not explain how ARIMA analysis could possibly offer 'proof' that the election results

---

[43] Oltmann affid. at p. 6.

CONFIDENTIAL

were fraudulent, much less how it could prove the fraud was perpetrated by 'code and technology' as opposed to some other means. Oltmann's statement is remarkable in that it clothes vague and unsubstantiated reasoning in scientific-sounding terms—such as 'ARIMA analysis,' 'artificial intelligence,' 'neural networks,' chaos theory, and 'weighted density.' In my experience, this is a red flag that indicates claims are likely based on quackery and junk science.

83.   "Credible statisticians have since debunked the most prominently cited claims of statistical and data anomalies during the 2020 election. One peer-reviewed study concludes: 'In each case, we find that the purportedly anomalous fact is either not a fact or not anomalous.'[44]

84.   "The errors, gaps, and indicators of charlatanism in Oltmann's statements, together with his lack of election security expertise, should have rendered his claims about Dr. Coomer non-credible to any

---

[44] A. Eggers, H. Garro, and J. Grimmer, "No evidence for systematic voter fraud: A guide to statistical claims about the 2020 election," (Nov. 2, 2021), *Proceedings of the National Academy of Sciences*, 118(45). The study further concludes: "In short, using the most rigorous specifications we find no evidence that Biden outperformed expectations in counties where Dominion machines were used."

**CONFIDENTIAL**

responsible party, but Lindell, Frankspeech, and My Pillow nonetheless chose to promote them for financial gain.

85.   "Oltmann seems never to have fully articulated any coherent explanation for how Dr. Coomer could have influenced the 2020 presidential election result. Yet his vague vote-rigging theories centered around two main themes, both readily debunked.

86.   "The first is that Dominion voting equipment has the ability to 'weight' votes, in such a way that a fraction of a vote is taken from one candidate and given to another.

87.   "While it is true that some older voting systems had a feature that could be configured to assign different weights to votes from different voters[45] (for use in certain exotic kinds of elections) these systems were not widely used in any of the closely contested states in 2020. The Dominion machines that were in widespread use do not contain this feature and cannot be configured to 'weight' votes.

---

[45] B. Harris, "Fraction Magic," Black Box Voting (May 12, 2016). Available at https://blackboxvoting.org/fraction-magic-2/. Accessed May 2, 2023.

**CONFIDENTIAL**

88.   "In any event, had votes been weighted or otherwise tampered with by a computer algorithm during counting, this would have been detected in jurisdictions that counted ballots by hand during post-election audits and recounts, since then the manual counts would differ significantly from the electronic totals. Georgia announced the results of a complete hand count of the presidential contest without finding evidence of fraud.[46] Later manual audits in Michigan, Wisconsin, Arizona, and Pennsylvania also found no evidence of fraud.

89.   "Other vote-rigging theories promoted by Oltmann and Defendants center around a feature of the Dominion system known as electronic adjudication. 'The adjudication process is the lynchpin of how you can manipulate votes,' Oltmann claimed in a June 5, 2021, appearance on the ThriveTime Show. 'Now obviously you can create phantom votes, or excuse me, phantom ballots, or you can create fraudulent ballots. You can create those things inside of the election system.'

---

[46] Georgia Secretary of State's Office, "Historic First Statewide Audit of Paper Ballots Upholds Results of presidential Race" (Nov. 19, 2020). Available at https://sos.ga.gov/news/historic-first-statewide-audit-paper-ballots-upholds-result-presidential-race. Accessed May 2, 2023.

**CONFIDENTIAL**

90.   "In fact, electronic adjudication is a process designed to *reduce errors,* it is *highly traceable*, and it cannot be used to 'create phantom ballots.' Far from being unique to Dominion (or even invented by Dr. Coomer, as Oltmann has suggested), it is a feature long offered by voting systems from every major vendor.

91.   "Ballot scanners operate by measuring the degree of shading within voting targets, the ovals or rectangles that voters fill in to make their selections. When voters follow the ballot instructions and fill in the targets completely, scanners can process their ballots automatically with very high accuracy. However, some voters do not follow the instructions. For example, they may make exes or check marks for their chosen candidates. In these cases, the scanner may be unable to determine whether a target contains a valid mark. At in-person polling places, scanners can be programmed to return problem ballots to voters for correction, but for ballots that are scanned remotely, such as mail-in ballots, there is no opportunity to let voters fix problems, so ballots with ambiguous marks require human review.

**CONFIDENTIAL**

92.   "This review process is called adjudication. Adjudication procedures vary by jurisdiction, but the process typically is conducted by a vote review panel that involves bipartisan participation or monitoring and public observation.

93.   "Adjudication can be performed manually or electronically, depending on the jurisdiction. In an electronic adjudication system, the vote review panel examines ballot scans on a computer screen rather than the original pieces of paper. This both expedites the process and facilitates the creation of detailed electronic records reflecting every adjudication decision. Dominion's adjudication system preserves the original ballot image file and attaches a log that shows the scanner's interpretation of the votes as well as any subsequent changes made by the vote review panel, a feature that Dominion calls AuditMark.[47] Additional log files record every time a ballot is flagged for adjudication and each adjudication system action.

---

[47] Dominion, "AuditMark Brochure." Available at https://www.votescount.us/Portals/16/New%20voting%20system /AuditMark%20Brochure%20-%20final.pdf. Accessed May 2, 2023.

**CONFIDENTIAL**

94.  "The figure below shows excerpts from a real adjudicated ballot that was cast on a Dominion scanner in Georgia during the 2020 presidential primary. At left is the voter's mark in the presidential contest, which was ambiguous because the oval was not filled in completely. The AuditMark record (portions of which are shown on the right) indicates that the scanner would have interpreted the contest as blank but that, during adjudication at 8:42 PM on the night of the election, it was corrected to a vote for Donald Trump.



95.  "It would not be feasible to use adjudication to introduce 'phantom ballots' without detection, as Oltmann has claimed. Jurisdictions typically use ballot reconciliation procedures to track the number of ballots cast, independently of the electronic adjudication process. They compare the number of ballots that were counted (according to the

**CONFIDENTIAL**

election results) with the number of voters who voted (according to the voter registration system). Introducing additional ballots during adjudication would cause these counts to differ and prompt officials to investigate.

96. "Nor would it be feasible to use adjudication to covertly manipulate large numbers of votes. As I have explained, vote review panels typically involve bipartisan participation or monitoring, and every decision the reviewers make is subject to extensive electronic logging. There is also no 'mass adjudication' feature; the review panel must inspect ballots one at a time and make any necessary corrections to each before saving it and moving on. Even if the entire vote review panel (and any observers) conspired to commit fraud, manually clicking through hundreds of thousands of ballots to alter the presidential votes would likely take days, and it would leave clear traces in multiple sets of data files and logs. Large-scale cheating via adjudication would also be revealed in manual recounts or post-election audits of the original paper

**CONFIDENTIAL**

ballots, which several states have conducted without detecting any evidence of fraud.

97.   "Even a basic understanding of the adjudication process shows the absurdity of Oltmann's characterization that it is the 'lynchpin of how you can manipulate votes', a contention that Defendants have uncritically accepted and promoted. Far from being a sinister vote-stealing tool, adjudication provides voters added assurance that if they make a common mistake, like the one shown in the preceding figure, their votes will still be counted accurately.

98.   "Oltmann has also referred to patents relating to adjudication that list Dr. Coomer as an inventor, seemingly to give the impression that he introduced electronic adjudication capabilities for the purpose of facilitating fraud. In fact, Dr. Coomer did not invent electronic adjudication. The concept has long been applied and is a feature offered by all major election equipment vendors. The only adjudication-related patents I have been able to locate that list Dr. Coomer as an inventor are US8913787B2 and US9202113B2, both entitled 'Ballot adjudication in

**CONFIDENTIAL**

voting systems utilizing ballot images' and having substantially similar claims. A close reading of those claims shows that the patents relate to an *improvement* to electronic adjudication that makes it even more traceable: appending information about the adjudicated result to the image of the ballot, as shown in the preceding figure. Like adjudication generally, there is nothing sinister about this invention. It does not make fraud easier; it makes it *easier to detect*. This should have been obvious to Defendants from the patents alone, and credible experts in election security or election administration could have explained it had Defendants consulted them.

**Events in Antrim Michigan Do Not Support Defendants' Theories**

99.   "Oltmann and Lindell both frequently reference the publication of erroneous election-night results in Antrim County, Michigan as evidence for their conspiracy theories. It is no such thing.

100.  "In Antrim County, there were major errors in the initial, unofficial election-night results. County officials quickly discovered and corrected these problems. County and state officials also quickly explained,

**CONFIDENTIAL**

correctly, that the problems were caused by human error and not by any kind of fraud or security breach.[48]

101. "In response to a lawsuit that alleged that the Antrim County results were fraudulent, the Michigan Secretary of State and the Department of Attorney General tasked me with performing a forensic investigation of the incident to independently confirm what had happened. Using data from the election system, I precisely accounted for the discrepancies and confirmed that they were caused by operator error arising from the county's mishandling of last-minute ballot design changes. I was also able to determine that the discrepancies in the presidential result had been fully corrected. Election officials further confirmed this with a county-wide hand count of the presidential votes. I submitted a detailed expert report in the Antrim matter that explains how the incident occurred and recommends improvements to election technology, training, and procedures to guard against similar problems

---

[48] Michigan Secretary of State's Office, "False claims from Ronna McDaniel have no merit" (Nov. 6, 2020). Available at https://www.michigan.gov/sos/Resources/News/2020/11/06/false-claims-from-ronna-mcdaniel-have-no-merit. Accessed May 2, 2023.

CONFIDENTIAL

in future elections.[49] A condensed version of my expert report underwent scientific peer-review and was published in 2022 at the USENIX Security Symposium, one of the leading international venues for security research, where it was awarded special recognition as a 'Distinguished Paper.'[50]

102. "Michigan's Republican-led Senate Committee on Oversight arrived at similar findings in a June 2021 report. They concluded that 'ideas and speculation that the Antrim County election workers or outside entities manipulated the vote by hand or electronically are indefensible. Further, the Committee is appalled at what can only be deduced as a willful ignorance or avoidance of this proof perpetuated by some leading such speculation.'[51]

---

[49] J. A. Halderman, "Analysis of the Antrim County, Michigan November 2020 Election Incident" (Mar. 26, 2021). Available at https://www.michigan.gov/documents/sos/Antrim_720623_7.pdf. Accessed May 2, 2023.

[50] J. A. Halderman, "The Antrim County 2020 Election Incident: An Independent Forensic Investigation" 31ST USENIX SECURITY SYMPOSIUM (Aug. 2022). Available at https://www.usenix.org/conference/usenixsecurity22/presentation/halderman. Accessed May 2, 2023.

[51] Michigan Senate Committee on Oversight, "Report on the November 2020 Election in Michigan" (June 23, 2021). Available at https://committees.senate.michigan.gov/testimony/2021-2022/Senate%20Committee%20on%20Oversight%20Report%20on%20the%20November%202020%20Election%20in%20Michigan,%20adopted.pdf. Accessed May 2, 2023.

**CONFIDENTIAL**

103. "Oltmann and Lindell have at times pointed to a report about the Antrim County incident by Russell J. Ramsland Jr. as evidence for their conspiracy claims.[52] Ramsland's conclusions are not credible. His report contains an extraordinary number of false, inaccurate, or unsubstantiated statements and conclusions, the most serious of which I refute in my expert report and peer-reviewed research paper referenced above.[53] Many of his errors were also quickly publicly debunked, and his conclusions should have been suspect even to non-experts.

104. "Ramsland's central contention in the report is that 'the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results.' His reasoning is that the system intentionally generates many errors while scanning ballots in order to cause the images of the ballots to be subject to electronic adjudication, during which the votes can be manually

---

[52] R. J. Ramsland Jr., "Antrim Michigan Forensics Report – Revised Preliminary Summary, v2" (Dec. 13, 2020). Available at https://www.depernolaw.com/uploads/2/7/0/2/27029178/antrim_michigan_forensics_report_[121320]_v2_[redacted].pdf. Accessed May 2, 2023.

[53] Halderman analysis at § 5.

**CONFIDENTIAL**

edited. This provides an opportunity, Ramsland claims, for a dishonest operator to change votes without being detected. Citing a forensic examination he conducted, Ramsland claims that a 'staggering number of votes [in Antrim] required adjudication,' and that 'all adjudication log entries for the 2020 election cycle are missing' and must 'have been manually removed.'

105. "In fact, *no* ballots in Antrim County were altered through electronic adjudication. We know this for the simple reason that Antrim County's Dominion system was incapable of performing electronic adjudication. Electronic adjudication is an optional feature of the Dominion system, and Antrim County did not purchase it. The forensic evidence clearly shows that the functionality was not installed on Antrim's systems. There are no adjudication logs because electronic adjudication was not used. In any case, the county's final presidential totals exactly match the results that were printed by each individual scanner before electronic adjudication could have taken place, and the

results were further confirmed by a county-wide hand-count of the paper ballots.

106. "Any competent expert would have recognized that whether Antrim County practiced electronic adjudication was a threshold question for the adjudication vote-rigging claim. Ramsland seems to have been either ignorant about the basic operation of Dominion's technology or to have disregarded the truth in favor of a fictional narrative to support this outlandish theory. Yet Oltmann and Lindell have ignored the fatal flaws in Ramsland's report and continue to cite his work to support their baseless theories.

107. "The U.S. has made important progress in election security since 2016. Although weaknesses remain that need to be better addressed, their existence does not make every assertion of fraud a plausible one, and it certainly does not vindicate the baseless allegations promoted by Defendants that Dr. Coomer 'rigged' the 2020 presidential election. Indeed, the Defendants' allegations regarding Dr. Coomer remain, in my opinion, inherently improbable to this day. Ironically, more than two

CONFIDENTIAL

years after the 2020 election, the only attack on the presidential result for which there is credible evidence is the one perpetrated by Defendants and others like them, who spread lies and distortions to undermine the legitimate winner and advance their own political and financial interests.

108. "I reserve the right to amend this report upon receipt of new information. If called upon, I would be willing to serve as a rebuttal witness.

109. "Pursuant to C.R.S. § 13-27-101, et. seq., I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.

Executed on the 5th day of May 2023, in Ann Arbor, Michigan.

_____

J. Alex Halderman, Declarant

**CONFIDENTIAL**