IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

    Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC,
AND MY PILLOW, INC.,

    Defendants.

# EXHIBIT – 1

```
 1             IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF COLORADO
 3     ------------------------------------------------
 4     Eric Coomer, Ph.D.,
 5              Plaintiff,
 6        vs.              Civil Action No. 1:22-cv-01129-WJM
 7     Michael J. Lindell, Frankspeech LLC,
 8     and My Pillow, Inc.,
 9              Defendants.
10     ------------------------------------------------
11
12         VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL
13         DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.
14                   VOLUME I (Pages 1-370)
15
16
17     DATE:    March 8, 2023
18     TIME:    9:30 a.m. CST
19     PLACE:   PARKER DANIELS KIBORT, LLC
20              Colwell Building, Suite 888, 123 North 3rd St
21              Minneapolis, Minnesota 55401
22
23
24     REPORTED BY: KELLEY E. ZILLES, RPR
25     Job No.: 5761446
```

Page 1

**Page 6**

1    VIDEO TECHNICIAN: We are going on the
2 record at 9:36 a.m. on March 8th, 2023. This is the
3 video recorded deposition of designated representative
4 of My Pillow, Incorporated, Michael J. Lindell, being
5 taken by counsel for the plaintiff in the matter of Eric
6 Coomer, Ph.D. versus Michael J. Lindell, Frankspeech,
7 LLC, and My Pillow, Incorporated, in the United States
8 District Court for the District of Colorado, Civil
9 Action No: 1:22-cv-01129-WJM.
10      This deposition is being held in Minneapolis,
11 Minnesota. My name is Adam Wallin from the firm
12 Veritext and I am the videographer. The court reporter
13 is Kelley Zilles from the firm Veritext.
14      Will counsel please identify themselves for the
15 record.
16      MR. CAIN: Charlie Cain, Brad Kloewer for
17 the plaintiff.
18      MR. MALONE: Ryan Malone for My Pillow,
19 Incorporated.
20      VIDEO TECHNICIAN: Will the court reporter
21 please swear in the witness.
22           MICHAEL J. LINDELL,
23 duly sworn, was examined and testified as follows:
24           EXAMINATION
25 BY MR. CAIN:

**Page 7**

1    Q. Tell us your full name, please.
2    A. Michael James Lindell.
3    Q. Well, good morning, Mr. Lindell. My name is
4 Charlie Cain, we met for the first time --
5    A. Who's paying you?
6    Q. -- about four minutes ago.
7    A. Okay. Go.
8    Q. Is that right?
9    A. What's that?
10   Q. Is that right?
11   A. Is what was the question?
12   Q. We met for the first time --
13   A. Yes, yes.
14   Q. Okay. Here's what we're going to do, we're
15 going to start slow because the court reporter is trying
16 to take down what you're saying, okay?
17   A. Don't sit and scold me already, Mister. I'll
18 do, I'll do whatever I have to do. So you're not,
19 you're just a lawyer, you're an ambulance chasing
20 lawyer, so don't start with me, I got all day, I'll take
21 as much time as you want, so let's go. You're not my
22 boss, you're just a lawyer, frivolous lawyer. So go.
23 Don't start scolding me.
24   Q. Well, I'm asking questions, I'm not going to
25 scold you.

**Page 8**

1    A. Go ahead.
2    Q. All right. So No. 1, ground rules. She's
3 trying to take down what you're saying, so it's
4 important that we don't talk over each other. Do you
5 understand that?
6    A. Yes.
7    Q. Okay. You understand you're here as a corporate
8 rep for My Pillow?
9    A. Yes.
10   Q. Do you understand that we provided a notice of
11 deposition topics for you to look at in order to prepare
12 to give testimony today?
13   A. Yes.
14   Q. Did you look at them?
15   A. Yes.
16   Q. I'm going to be handing you some exhibits
17 throughout the day. We've been marking them, so we're
18 already up to Exhibit 60.
19      (Exhibit 60 marked for identification.)
20   Q. Is that a copy of the deposition notice?
21   A. I need my glasses. Got it.
22   Q. Is that a copy of the notice that you reviewed
23 in order to prepare to give testimony today?
24   A. Yes, it appears to be, yeah.
25   Q. All right. What, if anything, did you do to

**Page 9**

1 prepare yourself today?
2    A. I read the case, I read this frivolous case.
3    Q. Okay. Is that it?
4    A. That's what I did, I read this frivolous case.
5 I answered your question.
6    Q. If there is a question that you don't
7 understand --
8    A. No, I read the, I got it all, I got all these
9 down here, I read this, I read the frivolous case.
10   Q. All right. If there is a question that you
11 don't understand that I ask you during today.
12   A. Mm-hmm.
13   Q. Will you ask me to clarify that for you?
14   A. Yes.
15   Q. Okay. Otherwise I'm going to assume that you
16 understand what I'm asking you.
17   A. Right, got it.
18   Q. You're still quick answering on me.
19   A. Mm-hmm.
20   Q. So let me finish my question, okay?
21   A. Yes.
22   Q. I tend to be a slow talker.
23   A. Good for you.
24   Q. I'm from Texas originally.
25   A. Good for you. I got all day, we'll make a week

3 (Pages 6 - 9)

1  this is relevant.
2        THE WITNESS: Can you object to this stuff.
3        MR. MALONE: Sure, Mike. We'll object,
4  outside the scope. If you know, you can answer.
5     A. I mean, I guess, a half a year, okay. So what's
6  your point. Keep going.
7     Q. There may not be a point, I'm just asking
8  questions.
9     A. Okay.
10    Q. Do you have any expertise, any personal
11 expertise --
12       MR. CAIN: Is that -- pardon me for a
13 second, the TV.
14       MR. MALONE: Let's go off the record for a
15 second.
16       MR. CAIN: Clicked on.
17       VIDEO TECHNICIAN: We are going off the
18 record at 10:12 a.m.
19       (A break was taken at 10:12 a.m.)
20       VIDEO TECHNICIAN: We are back on the
21 record at 10:12 a.m.
22 BY MR. CAIN:
23    Q. If you have to use your phone, sir --
24    A. I don't. I had to see if there were any
25 emergencies. Go ahead.
Page 38

1  not my job.
2     Q. Do you hold yourself out as an expert in
3  elections?
4        MR. MALONE: Object, outside the scope.
5     A. Yeah, I'll object.
6        MR. MALONE: You can still answer, Mike.
7        THE WITNESS: I can answer?
8        MR. MALONE: Yes.
9     A. I would say yes. I'm very, I'm more
10 knowledgeable than I think 99.9 percent of people. What
11 I know not many other people would know because of what
12 I've studied over the past two years every day.
13    Q. Have you performed any work in journalism?
14       MR. MALONE: Object, outside the scope.
15    Q. I assume not.
16    A. Like what?
17    Q. You don't have any training as a journalist, do
18 you?
19       MR. MALONE: Same objection.
20    A. It's, you mean like college?
21    Q. Any training, any, have you ever acted as a
22 journalist, do you have any training or expertise in
23 journalism?
24    A. Define journalism. I mean, I'm a host of my own
25 TV show now.
Page 40

1     Q. All right. Thank you. Part of the reason I
2  asked that question about your educational background is
3  to determine whether or not you had any expertise in
4  things such as computer science or forensics?
5     A. Or what?
6     Q. Forensics, computer science or forensics. Do
7  you have any education, skill or training in that field?
8     A. No.
9        MR. MALONE: Object, outside the scope.
10 Mike, you can still answer.
11    A. No, no.
12    Q. All right. Do you have any expertise or
13 experience in the election industry or election
14 technology?
15       MR. MALONE: Same objection.
16    A. Yes, but I'll say yes.
17    Q. All right. Explain what expertise or education
18 or training you have in that area.
19       MR. MALONE: Same objection.
20    A. Over the last, over the last two years I have
21 learned more than anyone I believe has probably ever
22 learned through other investigations, my own studies and
23 everything else.
24    Q. All right. So on-the-job training basically?
25    A. Call it whatever you want, I don't know, it's
Page 39

1     Q. Different, sir. Do you have any training in
2  journalism?
3     A. I would say no.
4     Q. Okay. Do you, and by -- well, let me, let me
5  switch this up. Does My Pillow employ any individual or
6  consultant that has expertise in election management or
7  election technology?
8     A. No.
9     Q. Okay.
10       THE WITNESS: Why, why does he need to know
11 about that when we're talking about My Pillow, about
12 what I know about elections.
13    Q. Well, you talk about elections pretty much
14 constantly, like you said, in the last two years, right?
15    A. Not on TV, never, I never would mix it with My
16 Pillow ever.
17    Q. You don't mix it?
18    A. No, never. Ever, by the way, ever. The, the
19 media, media wouldn't even let me if I even tried to do
20 that, I can't do it.
21    Q. And in your capacity you are CEO of My Pillow,
22 is that right?
23    A. Mm-hmm, yes.
24    Q. All right. In your capacity as CEO have you
25 reviewed any of the election data that you've
Page 41

11 (Pages 38 - 41)

 1  please stop, they could. But they don't, and because
 2  you if you ask them, and just like The New York Times,
 3  then they say no, we believe in what he's doing, 100
 4  percent.
 5     Q. Aside from --
 6     A. He's always had our back and he always will.
 7  And if we have to lose everything, they're willing to
 8  lose it too because they love our country.
 9     Q. So besides from voicing their opinions, no one
10  in the company has the authority to make you stop,
11  right?
12     A. No, not a legal authority.
13     Q. Okay.
14     A. You know.
15     Q. Let's take a break.
16     A. I guess, I don't know if there's any legal way
17  to do that.
18     Q. You answered my question.
19         MR. CAIN: Let's take a brief break.
20         VIDEO TECHNICIAN: We are going off the
21  record at 11:43 a.m.
22         (A break was taken at 11:43 a.m.)
23         VIDEO TECHNICIAN: We are back on the
24  record at 12:04 p.m.
25  BY MR. CAIN:

Page 118

 1     Q. Before the break we were talking a lot about
 2  your shareholders and your employees. How many people
 3  did My Pillow employ let's say in 2020?
 4     A. No idea. I don't know, 1,500 maybe, I don't
 5  know.
 6     Q. Okay. Is that your best estimate, around 1,500?
 7     A. Mm-hmm.
 8     Q. And you did the stairstep thing with your hands
 9  talking about shareholder price and the profits going
10  down. What, what has happened with your level of
11  employment at My Pillow?
12     A. It's down, it's down. We had to, all the, all
13  the people that did home shows and fairs, they're gone.
14  They had to, which we offered them a job, like I say,
15  over at MyStore and we did everything we could. But
16  yeah, it's down, probably significantly.
17     Q. 50 percent?
18     A. I don't know. I, I couldn't even guess.
19  Probably.
20     Q. Okay. As far as employees themselves, we talked
21  about your, some, somewhat about the executive team. Is
22  there anyone else that is either a C level employee or a
23  member of your executive team that we haven't discussed,
24  just in terms of names?
25     A. No, not that I'm going to give you their names,

Page 119

 1  so.
 2     Q. Well, that matters.
 3     A. Not that I'm going to give you their names.
 4  You're not getting any names, so.
 5     Q. You told me that. I'm not asking you for names,
 6  this, this --
 7     A. There would be no one that could, that would be,
 8  that I haven't told you about, the VP's that were in
 9  charge of the, you know, box store stuff and, you know.
10     Q. Okay. All right. And we talked about you're
11  not sure if the CTO works for My Pillow or for --
12     A. The what?
13     Q. Chief technical officer, Todd.
14     A. I can't check on that right now. I don't
15  believe he works for My Pillow.
16     Q. All right. Does My Pillow employ Kurt Olsen?
17     A. No.
18     Q. So he does not -- Mr. Olsen is an attorney,
19  right?
20     A. Yeah.
21     Q. He does not act as an attorney for My Pillow?
22     A. Absolutely not.
23     Q. All right. Joe Oltmann?
24     A. Yeah.
25     Q. Does he either consult with or is he employed by

Page 120

 1  My Pillow?
 2     A. No.
 3     Q. Has he in the past been?
 4     A. No.
 5     Q. Has he received compensation by virtue of an
 6  association with My Pillow?
 7     A. No. He's got a podcast. If he has a, if he has
 8  a, if he's an affiliate code with a podcast, then he
 9  would, his podcast would have got the sales from My
10  Pillow products.
11     Q. Okay.
12     A. That would be the only, the only thing I can
13  think of.
14     Q. Let's do this, let's, let's break up the
15  monotony a little bit and look at some pieces of paper.
16  I wasn't planning on marking this right now, but let's
17  do it anyway.
18         (Exhibit 61 marked for identification.)
19     Q. This is Exhibit 61, Mr. Lindell.
20     A. Mm-hmm.
21     Q. Have you looked at it?
22     A. I see it, yep.
23     Q. This came off of a spreadsheet that was produced
24  by My Pillow. It shows a company and a vendor, the
25  vendor being CD Solutions, Inc., do you know who that

Page 121

31 (Pages 118 - 121)

```
 1  2014. We started a rev share program where they would
 2  get a percentage of, of everything they sold, so then
 3  they would just ran ads over and over. Sometimes that's
 4  beneficial, sometimes it's not because if they can get
 5  more money for a regular ad, that's what they do.
 6     Q. And thank you for that. Because that's, that
 7  was at least partially my understanding as it relates to
 8  CD Solutions, but this is, this is really a rev share --
 9     A. I, I don't know what he's under, I don't. I
10  don't know if he's under a guarantee or a rev share, I
11  have no idea.
12     Q. All right.
13     A. I don't.
14     Q. Other than those two arrangements, are there any
15  other sort of general --
16     A. Buying ads, you buy, you could buy a straight up
17  ad. But we don't, we don't do that unless we know. We
18  might do a test, you know, if we, because people,
19  they'll lie about their impressions of the people they
20  have watching. We will not buy an ad to lose money.
21        Minnesota Twins, I did that with them, we
22  checked, we did that with them one season, then they
23  gave us a guarantee after that because I told them what
24  each thing was worth. Behind home plate had a different
25  promote code, the announcer did, up in left field and
                                                  Page 126
```

```
 1  right field. I did it for all Major League Baseball. I
 2  was able to tell them where their audience was, where
 3  they were overcharging. And so they, but I don't know
 4  what, what this, what Joe was on this CD Solutions.
 5     Q. But fair to say it's basically three structures
 6  now?
 7     A. Right.
 8     Q. Again, you called it a guarantee --
 9     A. We're not, he's not, he doesn't get to, we're
10  not paying, I can tell you by this. We're definitely
11  not paying him without or we wouldn't be running ads.
12  If we're paying him and he says it's worth this much and
13  it would either have to be making this number. But I
14  think the payments, when you do that structure it's a
15  little more consistent. You give them, you give them
16  let's say 2,000 for their ads and then they got to keep
17  running ads until we get to, until we make our number.
18     Q. Right.
19     A. At least our break-even number or, you know, 1.5
20  I think it is. Here I don't know what he's on. It
21  looks to me this could be rev share or it could be that
22  guarantee, one of the two.
23     Q. And is there a code or something in My Pillow's
24  files that, that denotes what the structure is, if I
25  wanted to know?
                                                  Page 127
```

```
 1     A. I'm sure there is, I just don't know. I'm sure
 2  there is.
 3     Q. Okay.
 4     A. This would probably, you know, looking because
 5  the numbers are, the cents are different, I would say
 6  it's probably a rev share.
 7     Q. That was my assumption.
 8     A. I would assume that because the other ones
 9  you're giving, you're giving, let's say it's, I don't
10  know, I don't know, some podcast, podcast. Or let's
11  say, let's say, I'll give you an example. Let's say
12  it's Sean Hannity radio. We give them X amount and they
13  have to make a certain amount or, you know, it's, or
14  they have to keep giving us more reads until we make,
15  you know, so we don't lose money.
16     Q. That's the guarantee?
17     A. That's kind of the guarantee. Because some of
18  them are even unwritten guarantees because we'll tell
19  them, hey, like we're not making our numbers, so we
20  can't advertise. And they'll say, well, here, we'll
21  offer more. And it's very transparent between the
22  guarantees.
23     Q. Well, transparent in the sense of what you're
24  saying I understand, but is there, is there an actual
25  agreement in place between My Pillow on the one hand and
                                                  Page 128
```

```
 1  in this case Sean Hannity as to what the guarantee is?
 2     A. I don't think so, I don't think so. We have, we
 3  don't have, we don't sign contracts, we haven't signed
 4  contracts since back when I bought, when I first, and it
 5  was Sean Hannity back in 2000, or no, the first ones
 6  were Imus, it was Cumulus, or Cumulus Media, and that
 7  was back in 2010. And are you familiar with Imus, Don
 8  Imus?
 9     Q. I am. Did he pass away?
10     A. Yes, yes, a couple years ago. But anyway, him
11  and others on Cumulus, we would sign a year contract or
12  half a year and we signed that and, and we didn't, we
13  didn't make our number, but we were very transparent
14  showing them here's where we, we can't, we can't brand.
15     Q. Right.
16     A. So then they would say, then we would go in to
17  negotiate and they would say, well, okay, we will give
18  you four more reads so you can make up, you know, so you
19  can be profitable, you know.
20     Q. Right. So you mentioned a number, thousands of
21  podcasts, I don't remember exactly.
22     A. Yeah, we got, I don't know how many. We've had
23  since 2010, 2010 we had every paper in the United
24  States, every one. And that's on the same thing, that's
25  a, that was 100 percent the same thing, promo code.
                                                  Page 129
```

33 (Pages 126 - 129)

**Page 238**

1  was, this was before the election I believe.
2  Q. Okay. But again, there's --
3  A. I think. It's whatever their podcast name is.
4  If their podcast is Fight for Trump, we would give them
5  Fight for Trump. But I don't even know if they were
6  that. You're asking me this. I would have to, and let
7  me tell you something, this is really important too,
8  just because they're, because I've been on the Dominion
9  lawsuit, I don't know about this Eric Coomer guy, but on
10 the Dominion lawsuit they put in promo codes here that
11 said we were using, which in fact were not in use.
12     What you can do on My Pillow's Website, you can
13 type in a promo code and take a screen shot, it doesn't
14 mean it gives you anything off. You could type in your
15 name, you can type in ambulance chasing lawyer and that
16 would, it would make a picture of it, but you can't, it
17 doesn't mean it works, right, you know.
18 Q. I'm just looking at, here, I'll show you what
19 I'm looking at.
20 A. I don't know what you're looking at. If you're
21 looking at a screen shot, what are you looking at?
22 Fight for Trump, I don't know what you're talking about.
23 Q. I'm looking at a spreadsheet that your company
24 produced.
25 A. Okay.

**Page 239**

1  Q. It's Trump, or excuse me, My Pillow 2366. And
2  I'm not going to mark this.
3  A. My Pillow 2366.
4  Q. No, that's, that's just how it's been labeled,
5  okay. And we asked for promo codes used by My Pillow
6  and got what you're looking at.
7  A. Those are not, but those are not, none of them
8  are used. The only promo code where My Pillow is the
9  email blast and stuff. These promo code all associate
10 to some, somebody out there, they have for 15 years.
11    So like I'll give an example, Trump 1, that's
12 Diamond & Silk, that's Diamond & Silk. Trump 24, I
13 don't know whose that is. Trump 2020, these are
14 podcasters out there, they've been doing this stuff.
15 Tucker, that's his own, Tucker, I don't even know who
16 Tucker is because he doesn't have his own code.
17    Truly, truly, these guys get creative in their
18 names. If they're out there, that's their promo code
19 and their, you know.
20 Q. You're answering a question I didn't ask.
21 A. Okay. Well, you're asking about Fight for
22 Trump, you said who owned it. You said, oh, you said
23 these were My Pillow, no, they're not.
24 Q. Okay. And your distinction being that someone
25 else came up with --

**Page 240**

1  A. Someone else came up with the name for their own
2  show and they're marketing and selling our product like
3  other products out there. You realize there's other
4  products out there like relief factor stuff. These guys
5  also use their own promo codes --
6  Q. I understand, I understand.
7  A. -- and they do the same thing.
8  Q. Right.
9  A. It's pretty much a business model now.
10 Q. Of course.
11 A. Yeah.
12 Q. But if, as we talked about earlier, you said,
13 you know, if there was a promo code that had a bad word
14 in it or --
15 A. Right.
16 Q. You know, you would, you would as the CEO would
17 instruct that vendor to not use that --
18 A. Right.
19 Q. -- promo code?
20 A. And there was some that back then that they,
21 that Dawn said, brought to me and said can you use that,
22 I said absolutely not.
23     (Phone ringing in room.)
24 A. This one I have to take, I'm sorry.
25     MR. CAIN: Let's go off the record.

**Page 241**

1      VIDEO TECHNICIAN: We're going off the
2  record at 3:11 p.m.
3      (A break was taken at 3:11 p.m.)
4      VIDEO TECHNICIAN: We are back on the
5  record at 3:20 p.m.
6  BY MR. CAIN:
7  Q. There's a note on Exhibit 62 in November of 2021
8  that, from Dawn that says, "Just an FYI, we owe Sidney
9  Powell $5,587.58." What was Sidney Powell doing?
10 A. She has her own podcast.
11 Q. So it's --
12 A. It's just like anyone else.
13 Q. Okay.
14 A. She had this before, I think. I don't know when
15 she got her promo code.
16 Q. Okay.
17 A. She has a podcast, just like every other person.
18 Q. And how about Giuliani, does he have a promo
19 code?
20 A. He does, he did. I don't know when he got his,
21 but yes. I think it was sometime after '21 or '22, he
22 came on a podcast, I think it was after they maybe
23 disbarred him or whatever they tried to do to him, you
24 know, just has a podcast, that's his livelihood now.
25     (Exhibit 66 marked for identification.)

1  Q. This is related to the financial topics that
2  we've been discussing, this was produced by My Pillow,
3  Bates 723.
4  A. Okay.
5  Q. Most of it is blacked out on the front. And do
6  you know, this appears if you look at the back to have
7  some information concerning a particular promo code, do
8  you see that on the back?
9  A. Am I looking -- yeah, I see the promo codes,
10 yeah.
11  Q. All right.
12  A. I see daily totals, Frank33, right.
13  Q. Yeah. So quickly since we've touched on this
14 already.
15  A. Yeah.
16  Q. This is actually a text string with someone
17 else, not Dawn, someone named Nick Dressen?
18  A. That's right.
19  Q. Who's Nick Dressen?
20  A. He does the emails and the, the emails and the
21 text marketing.
22  Q. All right. So then if we go to the --
23  A. And he does them for My Pillow, he doesn't --
24 this Frank33, I don't know if that's text or emails, I
25 believe it's emails.

Page 242

1  Q. Okay. So as you stated earlier, Dawn doesn't do
2  the emails?
3  A. No.
4  Q. So this is a separate report relating just to
5  daily totals for the Frank33 email code?
6  A. So, yeah, these are all emails. Frank33 is all
7  emails, I believe, because Nick does, that's what he
8  does. It could be text marketing or emails where you
9  buy, where you send out, you pay to send people, you
10 know, text marketing.
11  Q. Okay. And do you have, just looking at the
12 daily totals from it starts August 2nd at 28,000.
13  A. Mm-hmm.
14  Q. And it appears to have a three-day during the
15 symposium spike of 296,261.
16  A. Yeah.
17  Q. And 291, right?
18  A. Right.
19  Q. Would you attribute that as well to the
20 symposium?
21  A. It's whatever he sent out in text or emails.
22 You don't get it unless you send out a text or whatever.
23 And so I don't know if he's paid to send more out or if
24 he, or what, I don't know, I'd have to look into that.
25     But it did, if you look back there's 204 on 8/6.

Page 243

1  It's up, it's up by, you know, on your highest day
2  there, what, 291. It could be they're sending, that he
3  he sent out the same text market or email, but we might
4  have had more, we might have had more.
5      Our audience got bigger, you know, our text --
6  when people sign up for, then they get text marketing,
7  they sign up for text or email marketing. It looks to
8  me like that they, that the audience could have been
9  bigger. There was definitely none sent on 8/2 and 8/3,
10 that would have been hardly any marketing sent out
11 because you got to pay when you send them out.
12  Q. Would Frankspeech have sent out, I'm looking
13 back at this Exhibit 64, which I know is a splash page
14 on the Web, but would Frankspeech have sent out an email
15 that is similar in nature to what we looked at in
16 Exhibit 64?
17  A. I don't know, I don't know.
18  Q. All right.
19  A. That there with me in the background, is that a,
20 is that screen shot taken from my show or is it taken
21 into the screen shot of a -- let me see that again, if
22 you can turn it. That looks like it's a, I don't know.
23 Like I don't know if that's taken from a, like a show
24 where you took a screen shot. Do you know where you got
25 this?

Page 244

1      MR. KLOEWER: It's a screen shot of the
2  Website.
3  A. Oh, so that was on the Website. So that video,
4  that video, that's a video that was on the Website.
5  Okay, I gotcha. Yeah, then that's a video, so it's not
6  an email.
7  Q. Okay. And I have the video, I don't think we're
8  going to watch it.
9  A. That's not, that's not an email. Whatever this
10 is, these are emails.
11  Q. Okay. But and you'll talk about this with
12 Frankspeech a little bit more, but just to help me
13 understand part of that --
14      (Phone ringing in room.)
15  A. Oh, shoot, it's that same lady. Let's take two
16 seconds.
17      VIDEO TECHNICIAN: We are going off the
18 record at 3:26 p.m.
19      (A break was taken at 3:26 p.m.)
20      VIDEO TECHNICIAN: We are back on the
21 record at 3:28 p.m.
22 BY MR. CAIN:
23  Q. So when we broke you were discussing, you told
24 me Exhibit 66 shows email --
25  A. Mm-hmm.

Page 245

62 (Pages 242 - 245)

1  you're talking after lawsuit, there's two different
2  things, after you screwed me and before, you got that,
3  after you screwed my employees and before. This whole
4  thing in the back where I called him, absolutely, that's
5  after you did this to my company.
6      Q. So you think it's okay to defame someone after
7  they sue you?
8          MR. MALONE: Object to form.
9      A. No, it's not defaming him, I'm telling you what
10 you did to my company. And I will sit there and say
11 that's subjective. I can say anything I want. I can
12 call you a criminal because I feel like you are what you
13 did to my company, and you were part of that as much as
14 Coomer, both you two, and, and Chris Ruddy, whatever he
15 had to do with it, but he's the one that told me I can't
16 have you on anymore, Mike. I go who's Eric Coomer, what
17 do I, what do I know about Eric Coomer.
18     You guys wait a year and then you serve me
19 papers on the steps in Colorado. After that, that's
20 when I really went after you, remember that part, after
21 this lawsuit. One, only one thing was ever said about
22 you, about you, and that's after the Newsmax incident in
23 the spring of '21. I never talked about you.
24     After I left, after that it was different news
25 after a week or two after Newsmax, I bad-mouthed him

Page 306

1  every single day for two weeks, and then I probably had
2  more stuff I had to do because, you know, this was the
3  spring of '21. You guys from that point on, any time I
4  bad-mouthed, any time anything came up, it was all that
5  week after you sued me.
6      I bet you can't even find anything in the last
7  year. I don't bring up Eric Coomer. This is what you
8  did to me. I reread this last night and that's why I'm
9  so upset about it. This is the most frivolous thing
10 I've ever seen. And, and I was coming here, I was so
11 mad this morning, I go I didn't do anything, I said one
12 thing after they attacked my company. Everything else
13 in here, bringing up stuff at symposium and all that,
14 you guys, you guys attacked me in the, in the spring of
15 '21. I didn't know anything, anything about Eric Coomer
16 before that.
17     Q. Is that why you were okay with Oltmann coming
18 into the symposium and talking about Coomer?
19     A. I didn't bring Oltmann into the symposium, I had
20 nothing to do with that. I had nothing to do with that.
21 I didn't know who was coming, I didn't invite him, I
22 didn't invite him. There was a vetting of people that
23 had to vet. You got to be invited if you were the
24 media, a cyber person, or, or worked in government,
25 those were the three criteria. So obviously he put in

Page 307

1  an application to get in based on his podcast, I don't
2  know, or a cyber guy, I don't know. I didn't invite him
3  on that stage, I didn't invite him to the thing, period.
4      Q. So you didn't vet the people that were going to
5  be talking --
6      A. No, there was a team, there was a team. No, no,
7  no, Kurt Olsen and other people decided that, I didn't
8  decide. I was going on the stage myself for 72 hours.
9  I didn't have anybody scheduled for that stage. You
10 can, you can ask the guys that put it on. I was the
11 only one scheduled when I got there, it was going to be
12 all me for three days, period.
13     That's a fact, you can ask anybody that was
14 there. And then all of a sudden this red team shows up
15 and Kurt Olsen and Janet Lynn, they're saying, well, we
16 got the schedule, we want these people up there. No
17 idea who they were. All these people I met for the
18 first time. That's the first time I met Joe Oltmann, I
19 didn't even remember who he was. He wasn't, he wasn't
20 on the stage, you know. There's a picture I guess of
21 where he said hello. I never, you know, he said he met
22 me there, I didn't know, I didn't know him from Adam.
23 A lot of people that were at the symposium, I can't tell
24 you if they were there or not. The only reason I say
25 Joe Oltmann was there is because you guys told me in

Page 308

1  this.
2      Q. Pause button. Deep breath. We're going to take
3  a break because the court reporter is getting tired, and
4  frankly, I am too.
5          MR. CAIN: So let's go off the record.
6          VIDEO TECHNICIAN: We are going off the
7  record at 4:38 p.m.
8          (A break was taken at 4:38 p.m.)
9          VIDEO TECHNICIAN: We are back on the
10 record at 4:52 p.m.
11         (Exhibit 72 marked for identification.)
12 BY MR. CAIN:
13     Q. Okay. Let's look at Exhibit 72, Mr. Lindell.
14 I'll just give you a second on this. This is, well,
15 I'll characterize it while you're looking at it.
16 Exhibit 72 is another symposium related email that
17 you're copied on. Do you see you being copied on the
18 front page?
19     A. Mm-hmm.
20     Q. We know that's a yes, but can you answer yes.
21     A. I said yes, yeah.
22     Q. Okay. All right. And this kind of follows from
23 what your testimony was earlier that it was supposed to
24 be Mike Lindell for 72 hours and things changed?
25     A. Yeah. I don't know who James Oaks is.

Page 309

78 (Pages 306 - 309)

1  about, she's probably talking about going after, this is
2  what I'm assuming, going after her recount, but I don't
3  know.
4     Q. Okay. And then proceed to the next page in the
5  middle. In the middle it says, "Mike, sorry I missed
6  your call, was in a meeting. Will call you back this
7  morning. Good stuff on this end too. I am determined
8  to bring down Dominion with Tina's case and we may take
9  a major step in that direction tomorrow." Now it was
10 unclear to me if this is you texting this?
11    A. No, this is Mike, this is the lawyer, they had a
12 lawyer named Mike for Tina Peters. This is a very bad
13 guy, just so the know, be careful, okay. This is the
14 guy that ran away with all the money, this is the guy
15 that I'm very upset with because he, he, he took off and
16 he, he had the evidence and stuff from Tina, he had, he
17 had everything. Everything he got from Tina he took it
18 down to that place in Texas, what's their name, Russ
19 Ramsland, you know, they're all sitting there, got their
20 little cabala going down there.
21    Q. Do you remember Mike's last name?
22    A. No.
23       THE WITNESS: Do you know it, if I say it,
24 McCullough?
25       MR. MALONE: That's right.

Page 366

1     A. Mike McCullough. You can have his name. I'll
2  give you the other corrupt lawyer too.
3        THE WITNESS: It was Karen something?
4        MR. MALONE: That one I don't know offhand.
5     A. Okay. Mike McCullough, that's him. That was
6  before, before I told him off, I don't know what the
7  date on this, yeah, 8/23. So this is probably one of
8  his last texts to me because I told him off. He's a bad
9  guy.
10    Q. Okay.
11    A. He was clinging onto Tina to make money and he's
12 the one that paid all her stuff, by the way, out of a
13 Tina Peters fund.
14    Q. All right. We're getting a little far afield.
15 Let's do this, since you're going to be here tomorrow,
16 what I would propose is let's take, let's take our
17 adjournment now and you all can figure out, that will
18 give you some time to figure out --
19    A. Hey, my show is starting, do you want to come on
20 as a guest, off the record?
21    Q. No, no desire to do that.
22    A. That would blow the country's mind, here we got
23 the lawyer here that did this to My Pillow, Eric Coomer,
24 and he said I called him traitor.
25    Q. I will say this on the record before we break,

Page 367

1  we are under a protective order in our case, some of
2  this is likely to be designated as confidential by
3  either of the parties.
4     A. I haven't heard that yet.
5     Q. Okay. We don't have to do it contemporaneously,
6  meaning we can do it --
7     A. Okay. I'm not agreeing to anything.
8     Q. I'm not asking for your agreement.
9     A. This thing, this thing is public already.
10    Q. Right.
11       MR. MALONE: Mike, just listen to him,
12 we'll object if we need to.
13       THE WITNESS: Okay, okay.
14    Q. Yeah, my point is this, I'm not here to advise
15 you, but if you talk about your deposition, if you talk
16 about what we did here today, it may ultimately end up
17 violating the protective order if that portion is marked
18 confidential.
19    A. You do care about me.
20       THE WITNESS: This guy is bizarre, one
21 minute he's hammering me, the next minute he's trying to
22 get me not to get in trouble. I thought you were
23 supposed to do that.
24       MR. MALONE: That's an issue we agree,
25 nobody wants you in trouble, Mike, so keep listening.

Page 368

1        THE WITNESS: Well, that's great, I got
2  plans, so we're okay.
3        MR. MALONE: He's not done, he's done yet.
4        MR. CAIN: I am, unless there is an
5  objection --
6     A. I do want to put it on the record that I will
7  for sure want that on the record what you put in there
8  today, that one piece on there that I know didn't come
9  from My Pillow. I will have that answer for you
10 tomorrow morning and I want to put it on the record, is
11 that agreeable?
12    Q. Yeah, that's what I'm proposing.
13    A. Okay. Because that is quite a deal you showed
14 me there.
15    Q. All right.
16       MR. CAIN: Let's, let's adjourn then.
17       VIDEO TECHNICIAN: We are going off the
18 record at 6:01 p.m.
19       (Proceedings adjourned for the day at
20       6:01 p.m., 03-08-2023)

Page 369

```
 1              UNITED STATES DISTRICT COURT.
 2             FOR THE DISTRICT OF COLORADO
 3
 4          Civil Action No.: 1:22-cv-01129-WJM
 5    ---------------------------------
      Eric Coomer, Ph.D.,
 6
 7          Plaintiff,
 8       vs.
 9    Michael J. Lindell, Frankspeech LLC, and My
      Pillow, Inc.,
10
11          Defendants.
      ---------------------------------
12
                  VIDEOTAPED DEPOSITION OF
13                      VOLUME II
                   MICHAEL J. LINDELL
14     Designated Representative of My Pillow, Inc.
                  Taken on MARCH 9, 2023
15               Commencing at 9:30 A.M.
16
17
18
19
20
21
22
23
24
25    REPORTED BY:  Mari Skalicky, RMR, CRR
```

Page 371

```
 1         everything I said.  And I stand by what I
 2         said.  You're an ambulance-chasing lawyer,
 3         evil person, you and your Eric Coomer
 4         buddy, so you will be sued.  Don't worry.
 5         And you will be sued big because I won't
 6         back down.
 7              MR. CAIN:  All right.  Anything else?
 8         So with that, Ryan, unless you have a
 9         different take on this, I'd like to
10         conclude this deposition, which means it
11         will be put into a transcript and it will
12         be sent to you for your review and
13         signature.  And then to the extent that we
14         want to address any other issues with the
15         court, we can do that later.
16    A.   I'll sue you later.  Don't worry.
17              MR. MALONE:  We agree to conclude.
18         We'll read and sign and reserve further
19         questions and responses to any motions,
20         and let's move on.
21              THE VIDEO OPERATOR:  We're going off
22         the record at 9:53 a.m.
23              (The right to read and sign the
24         deposition was preserved.)
25
```

Page 393