IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

    Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC,
AND MY PILLOW, INC.,

    Defendants.

# EXHIBIT – 2

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3      Civil Action No.: 1:22-cv-01129-WJM
 4      ----------------------------------
        Eric Coomer, Ph.D.,
 5
 6              Plaintiff,
 7          vs.
 8      Michael J. Lindell, Frankspeech LLC,
        and My Pillow, Inc.,
 9
10              Defendants.
        ----------------------------------
11
                  VIDEOTAPED DEPOSITION OF
12                   MICHAEL J. LINDELL
        Designated Representative of FrankSpeech LLC
13                Taken on MARCH 9, 2023
                  Commencing at 9:59 a.m.
14
15
16
17
18
19
20
21
22
23      REPORTED BY:   Mari Skalicky, RMR, CRR
24
25
```

Page 1

**Page 10**

1  deposition of My Pillow, your preparation
2  for that deposition.
3      You indicated that you had read the
4  complaint in this case. Have you done
5  anything to prepare for this deposition
6  beyond review of the complaint?
7  A. I read -- no. I read the complaint.
8  Q. Okay. I'm going to show you what we'll
9  mark here as -- I believe we're at Exhibit
10  77.
11      (Deposition Exhibit No. 77 was
12  introduced.)
13      THE WITNESS: I'm just turning up my
14  hearing aids.
15      MR. KLOEWER: Sure.
16      (Discussion off the record.)
17  BY MR. KLOEWER:
18  Q. So I've just marked as Exhibit 77 what we
19  have designated as a first amended notice
20  of the intention to take your deposition.
21      Mr. Lindell, if you can flip back a
22  couple pages to -- it's probably page 5 or
23  6 of this document, "Matters Upon Which
24  Examination is Requested."
25      Do you see that page?

**Page 11**

1  A. Yes.
2  Q. Did you review these topics prior to your
3  deposition today?
4  A. What's that?
5  Q. Did you review these topics prior to your
6  deposition today?
7  A. Yeah.
8  Q. Okay. Well, we don't need to go through
9  this right now, but I may refer back to
10  this document as we proceed. I just want
11  to be sure that we have that on the record
12  because I may refer back to it as we go.
13      Before we really get into the
14  documents, I'd like to talk to you about,
15  obviously, FrankSpeech, but I think the
16  easiest way to do this deposition is to
17  start at the beginning.
18      So can you tell me, when did the idea
19  of starting FrankSpeech come to you?
20  A. It came after the movie Absolute Proof.
21  It came sometime after -- in the two weeks
22  following Absolute Proof, because none of
23  the media in the country -- they wouldn't
24  even attack me. It's like I was
25  nonexistent. My voice was completely

**Page 12**

1  silenced.
2  Q. Okay. And Absolute Proof was produced in
3  February of 2021?
4  A. February 5th it aired, 9:00 a.m. February
5  5th.
6  Q. So in the months after Absolute Proof, you
7  began thinking about starting a media
8  outlet.
9      What were -- you just mentioned one
10  of them, that the media wasn't covering
11  Absolute Proof.
12  A. That's not what I said.
13  Q. Okay. Tell me what your rationale was.
14  A. Okay. From January 9th until February
15  4th, I was attacked every day, from
16  morning until night, by every media outlet
17  in the world, everyone, all the way to --
18  and I was on every station, media after
19  media after media, whether My Pillow was
20  losing box stores or losing Twitter or --
21  and as I'm showing evidence, just trying
22  to attack, just trying to attack.
23      And so when I did -- a week before we
24  did the movie, in one week -- and that was
25  the way I was getting the word out was by

**Page 13**

1  being attacked. Because after February
2  4th, when Smartmatic sued Fox News -- when
3  they sued Fox News, everything changed.
4      Absolute Proof launched the next day.
5  Now, no conservative media, Fox News,
6  Salem Media, all these guys, no one would
7  have me on there. And none of the bad
8  media, I call it, are left, but the media
9  that was attacking me quit attacking me.
10      So it was like silence. I couldn't
11  google my own name on Google. I
12  couldn't -- which means you couldn't even
13  buy your own ad words. I was suppressed
14  in Wikipedia. They took me off Wikipedia.
15  It was an all-out assault on me, so I
16  couldn't talk. It was a completely
17  silenced me.
18      And that lasted about 17 days. And
19  somewhere during that time, I said, you
20  know, I better come up with something so I
21  can at least talk, at least talk so people
22  can hear.
23      I had no way to share the evidence I
24  have from the election that I received on
25  January 9th. That was the 100 percent

```
 1     Pillow.  You hurt these 2,000 employees.
 2     You hurt them.  It's disgusting.  I mean,
 3     they -- it's beyond belief.
 4          And everything else I said was after
 5     you sued me publicly on the steps of the
 6     Colorado capitol.
 7          So I will sit and I will stand by it.
 8     I think it's -- I think you guys were very
 9     criminal in what you did.  I think you had
10     an agenda, and it's a money-driven agenda
11     to hurt not only me, but My Pillow
12     employees, FrankSpeech, and to hurt, and,
13     quite frankly, to stop the word from
14     getting out.  Stop my voice.
15          I don't know what your underlying
16     agenda, but it sure looks suspicious when
17     you make a dirty deal with Newsmax, and
18     part of the deal is to suppress Mike
19     Lindell from never being able to go on and
20     sell his product again.  That's
21     disgusting.
22          So call it -- you know, if it's -- if
23     it's within international laws, or
24     whatever, that you can do that to someone,
25     you know, I'm sorry, that's too bad.
```
Page 110

```
 1     Because that is not in the law that you
 2     guys could come after me for defaming when
 3     you did this to My Pillow.
 4          I'll say it again.  It's not defaming
 5     when you did it.  You did it.  You got to
 6     admit you did it.
 7  Q. Are you done?
 8  A. Yeah.
 9  Q. So sounds like you personally made the
10     determination that the content was not
11     defamatory, and that's why it has not been
12     taken down.  Is that correct?
13          MR. MALONE:  Object to form.  Asked
14     and answered.
15          THE WITNESS:  I don't know what he's
16     talking about.
17          MR. KLOEWER:  I think we can take a
18     break here now, and we'll get back into
19     the statements when we get back.
20          THE VIDEO OPERATOR:  We're going off
21     the record at 11:34 a.m.
22          (Break taken.)
23          THE VIDEO OPERATOR:  We are back on
24     the record at 11:49 a.m.
25  BY MR. KLOEWER:
```
Page 111

```
 1  Q. Okay.  Mr. Lindell, when we left off, we
 2     were talking about the FrankSpeech terms
 3     and conditions on the FrankSpeech website.
 4     I want to go back and discuss a little
 5     about how someone is able to upload
 6     content onto FrankSpeech.
 7          We talked about this a little bit as
 8     far as some of the stuff that you've
 9     objected to and don't allow on.
10          Can anyone make a FrankSpeech account
11     and publish material there?
12  A. I believe so.
13  Q. So we joked a little bit yesterday as a
14     misunderstanding about Eric Coomer having
15     a podcast, for example.  But if he wanted
16     to set up a podcast on FrankSpeech, could
17     he do that?
18  A. Yeah.
19  Q. What about -- I know you've had some
20     back-and-forth with journalists at, for
21     example, The Daily Beast.  If they wanted
22     to publish a podcast on FrankSpeech
23     that --
24  A. That bashed me?  Absolutely they could.
25     100 percent.  And they'll tell you that,
```
Page 112

```
 1     too.
 2  Q. So if people are publishing content on
 3     FrankSpeech about topics that you disagree
 4     with, like insisting the election was
 5     legitimate or something like that, would
 6     you have any objection to that?
 7  A. No, that's fine.
 8  Q. Let's see here.  I want to talk about the
 9     FrankSpeech website a little bit.
10          Going to refer you back to what we've
11     marked as Exhibit 80 before.  It's this
12     document that says "Defendant
13     FrankSpeech's Answers to Interrogatories."
14  A. Yep.
15  Q. I'm going to refer you to question No. 11.
16          Now, this question says:
17          "Identify the authors of any content
18     produced by FrankSpeech and published
19     on the FrankSpeech website that
20     references Dr. Coomer."
21          And your attorney has objected to a
22     few things here.
23          If you turn the page to page 11,
24     we've got a supplemental answer here.  It
25     says:
```
Page 113

29 (Pages 110 - 113)

```
 1    and she said I could look online and see
 2    it, she had put it out there online; she's
 3    a journalist.
 4        And -- but what she was saying made
 5    sense with my investigations of two months
 6    that I had done on my own, and where
 7    people voted everywhere that didn't live
 8    in that particular area or state, or they
 9    were old and deceased.
10        And I had got people -- I had got
11    voter rolls and it didn't make sense
12    because people are generally good people,
13    and this is when, whoa, it's like a light
14    bulb when I'm going this is the only way
15    you could explain it would be computers.
16        And so I was wide open, and I said,
17    "Yes, I would love to hear more about it."
18    And that's the only time, that call with
19    Brannon Howse, and then when I met him in
20    Tennessee.
21 Q. You said yesterday that you have not met
22    Mary Fanning in person; is that correct?
23 A. Never.
24 Q. Have you ever seen a photo of her?
25 A. (Shakes head back and forth.)
                                        Page 18
```

```
 1        MR. MALONE: Mike, you have to say
 2    "yes" or "no."
 3 A. No. No.
 4 BY MR. KLOEWER:
 5 Q. That's a "no"?
 6 A. "No."
 7 Q. And so this January 9th call, the
 8    information that Ms. Fanning gave you,
 9    this is what you referred to as the
10    information you got on January 9th, which
11    you referred to --
12 A. This is what I refer to as evidence, yes.
13    (Court reporter interruption.)
14 BY MR. KLOEWER:
15 Q. And that's what you have referred to as
16    the evidence you received --
17 A. Yes.
18 Q. -- on January 9th?
19 A. Correct.
20 Q. Did you -- did Mr. Howse tell you that he
21    was working with Patrick Byrne at the
22    time?
23 A. No. I didn't know who Brannon Howse -- we
24    didn't talk about any of that.
25 Q. Are you aware as you sit here today that
                                        Page 19
```

```
 1    Mr. Howse was working with Patrick Byrne
 2    prior to that time?
 3 A. I didn't know he ever was.
 4 Q. Are you aware that Patrick Byrne has taken
 5    credit for sending people to speak with
 6    you on January 9th?
 7 A. No. That's -- if he is, that's not true,
 8    because Brannon has told me that the
 9    backstory of him and Mary. I don't even
10    know if they know Patrick Byrnes (sic), if
11    Mary even knows him.
12        So that's not true if Patrick Byrnes
13    is out there. I've never heard that,
14    ever.
15 Q. Well, I'm getting a little ahead of my
16    outline here, but we might as well take a
17    look at this now.
18        Charley is going to be playing some
19    clips for you here.
20        This is a clip that has been added to
21    what we've labeled as Exhibit 65.
22        (Deposition Exhibit No. 65 was
23    introduced.)
24 BY MR. KLOEWER:
25 Q. We're going to play clip 14 from that. I
                                        Page 20
```

```
 1    want to show you a brief excerpt.
 2        This is an interview that Patrick
 3    Byrne did with Eric Metaxas in July of
 4    2021, where he explains how he sent folks
 5    to meet with you on January 9th.
 6        MR. KLOEWER: Clip 14, please.
 7        Let's go off the record real quick.
 8        THE VIDEO OPERATOR: We're going off
 9    the record at 10:12 a.m.
10        (Break taken.)
11        THE VIDEO OPERATOR: We are back on
12    the record at 10:13 a.m.
13        (Playing Video Clip:
14        "Mike Lindell, is that what they're
15    saying it should be nine to nothing.
16    We have the proof. I know the proof
17    he has, and it's -- you know, Mike
18    Lindell likes to say that on January
19    9th, some white-hat hackers showed up
20    in his life. They were -- if you
21    read the book, I describe the Bad
22    News -- some hackers I call the Bad
23    News Bears. They were the guys.
24        We had reached the point on January
25    9th, I didn't have any more access to
                                        Page 21
```

6 (Pages 18 - 21)

**Page 142**

There is one thing I said, and that was after Newsmax -- when Chris Ruddy called me -- and you can get him right here and he'll tell you how upset I was.

I bad-mouthed Newsmax for two weeks after that. I bad-mouthed Coomer for one sentence. But after you serve me papers in Colorado, I probably bashed him for a month, because I'm going another lawsuit, another lawsuit.

I threw it. I never even opened the paper. Did you know that? I never even opened it. I just gave to it my attorneys.

I got better things to do with my life. We're trying to save a country here, not that you guys, ambulance-chasing lawyers, trying to get money off people that had nothing to do with it.

My employees, if I sat here and they sat here and looked at you guys, they would say how could people do this? How could anybody do this to anybody? And that's -- you know.

And did I say, and you wonder why I

**Page 143**

said that, and I apologize for calling your friend a scumbag, but I'm so upset what you did, not to me, but to my employees. What you did to my employees. Why would you do that?

You didn't even do your research. You could have came and you said, "Do you even know Eric Coomer?" "No." Instead Chris Ruddy has to call me and tell me I can't go on his show anymore. And that was a big thing to me when I would go on the host and talk about My Pillow, and made in America and everything.

I'm sitting right now my business is probably down -- I don't know -- half, more than half, because of all this stuff. But I can't go on TV to promote it. I can do a commercial, but I can't go on there and say, "Hey, my employees thank you."

They used to come out and show -- Newsmax, you would have one of their hosts go, "Look at this. Look at all the, you know, Made in America," and interviewing me, and my employees would come on his show.

**Page 144**

Q. Okay.
A. That all got thrown away when you guys did this.
Q. Mr. Lindell, your testimony has confused me on this issue for many reasons.

Did Chris Ruddy tell you that a condition of settlement --
A. Straight up. The thing he said, "I can't have you on to even talk about pillows anymore."

It was -- I'll read the complaint. It was the day -- when he told me that was the day you guys made a dirty deal. And I said -- and I said, "What did you do? You've made a public statement saying there is nothing wrong with the machines." We had all kinds of conversation.

And I go, "Who is Eric Coomer?" you know, and he said something about he works for Dominion or something -- I can't remember that part. But I found out he worked for Dominion.

I don't care who he worked for. Eric Coomer did this to me and I don't even know the guy. It's disgusting.

**Page 145**

So when you say when I called him a criminal, when I said "Eric Coomer, if I'm you right now, instead of going over and making deals with Newsmax, I'm turning myself in and turning in your operation; just maybe that you get immunity and you get to do maybe 10, 20 years. You are disgusting, and you are treasonous. You are a traitor to the United States."

And I said that because of what he did. When I was told by Ruddy on my business is just kkk (sound) because of some guy I don't know. That's just bizarre. And you guys -- and then you guys sue me.

I didn't say -- this is the only thing I said about him. A year later you sue My Pillow and FrankSpeech and Mike Lindell. Everything else that was said was after you sued me.

And I still didn't check into all your stuff on your guy. I'm going, "Go ahead and sue me." I threw it on the pile -- you can even ask my lawyer -- never read it.

37 (Pages 142 - 145)

```
 1   here yesterday?  You're right, I should
 2   have read this, but I've got other things
 3   going on in my life that are a lot more
 4   important than these frivolous lawsuits.
 5   And it's the most important thing to our
 6   country ever, to my children, my
 7   grandchildren, everything.
 8       That's where I'm at.  So we can keep
 9   going, you know, and waste an afternoon.
10  Q.  I would like to get into the videos of all
11   the various statements that have come up
12   here, and we can talk a little bit more
13   about the Newsmax settlement.
14       My concern is that that is going to
15   be a bigger issue and is going to take a
16   lot of time.
17       MR. KLOEWER:  So if it makes sense to
18   everybody, I think we can break for lunch
19   now.
20       THE WITNESS:  Have we already ordered
21   lunch?
22       MR. KLOEWER:  And when we come back,
23   we can get into that --
24       THE WITNESS:  That sounds good.
25       MR. KLOEWER:  -- additional material?
                                          Page 150
```

```
 1       THE VIDEO OPERATOR:  We're going off
 2   the record at 12:22 p.m.
 3       (A lunch recess was taken.)
 4       THE VIDEO OPERATOR:  We're back on
 5   the record at 1:17 p.m.
 6  BY MR. KLOEWER:
 7  Q.  Okay, Mr. Lindell.  When we left off, we
 8   were talking about the FrankSpeech website
 9   a little bit.
10       I want to wrap up a few issues
11   related to the sort of back end of the
12   FrankSpeech website as I understand it.
13       So I'll show you what's been marked
14   as Exhibit 85 here.
15       (Deposition Exhibit No. 85 was
16   introduced.)
17  BY MR. KLOEWER:
18  Q.  Have you seen this document before?
19  A.  No.  No.
20  Q.  Okay.  Well, it's been disclosed as
21   FRANKSPEECH-00009.  It's labeled as a
22   "Master Consulting Services Agreement,"
23   and it's dated March 11, 2021.  And it
24   states on the first page that it's made
25   between Brannon Howse, RJ Daniel Johnston,
                                          Page 151
```

```
 1   Johnston Howse, LLC --
 2  A.  Yep.
 3  Q.  -- and Mike Lindell.
 4       Does that refresh your memory a bit
 5   as to what we're looking at here?
 6  A.  Yeah, and I see "Vocl."  This was never
 7   done because Vocl, like I said, that's not
 8   a real entity.  We didn't get it -- this
 9   never came to fruition.
10  Q.  Okay.  You're anticipating my next
11   question then because I was a little
12   confused about that.
13       I see that this document isn't
14   signed --
15  A.  Yep.
16  Q.  -- either.
17  A.  Right.
18  Q.  So --
19  A.  It was -- you want me to explain it?
20  Q.  Yes.  What is Vocl?
21  A.  Vocl was -- like you had to pick a name,
22   like a social media name, and I liked the
23   name Vocl, V-o-c-l.  And when it went out
24   there to -- you have to get the name, I
25   made the mistake of saying something
                                          Page 152
```

```
 1   publicly.  So they went out -- somebody
 2   quick grabbed it and the patent trademark.
 3       And so we went to -- we grabbed it,
 4   and then it came in from everywhere, the
 5   fighting, threatening lawsuits from at
 6   least six different entities out there.
 7   And nobody owned it.
 8       So I said, you know what, let's just
 9   sit there.
10       And then when we went and did
11   Frank -- Frank -- we couldn't have Frank.
12   We ended up doing FrankSpeech.  I don't
13   know how long it was after this.  This was
14   early on.
15       So this was absolutely nothing.
16  Q.  So this -- so was there a second -- was
17   there a follow-up contract to this that
18   was entered into with Johnston Howse for
19   FrankSpeech?
20  A.  Whatever you got.  Whatever you got or
21   subpoenaed, you have.  That's all I have.
22   That's 100 percent.  Whatever you got, I'm
23   fully transparent.
24       I don't even know if we're working
25   under an agreement.
                                          Page 153
```

39 (Pages 150 - 153)

| | |
|---|---|
| 1  I read a little bit about it in here. I<br>2  was just actually trying to find it. I<br>3  know it says "Antifa" in here.<br>4  Q. Do you believe that happened?<br>5  A. What?<br>6  Q. The Antifa call.<br>7  A. I don't know. I haven't checked into it.<br>8  Ask Joe Oltmann.<br>9  What does that have to do with me? I<br>10  don't get this.<br>11  Q. Well, you accused Dr. Coomer of treason.<br>12  A. Because of what he did to My Pillow.<br>13  What's the matter with you?<br>14  Q. Well, you just said --<br>15  A. I don't know what you're trying to mix. I<br>16  told you, I've never heard this in my<br>17  life. I've never read the complaint, and<br>18  that's why I was upset with you guys.<br>19  I've actually apologized for treating<br>20  your other lawyer bad because I'm very<br>21  upset that you would even bring this case.<br>22  I called him a traitor and a<br>23  disgusting person that he would go and<br>24  have one of my biggest outlets and tell<br>25  the guy never to have me on again.<br>Page 194 | 1  attorney has deposed Dr. Coomer, and you<br>2  know that he's getting death threats as a<br>3  result of these claims that he's a<br>4  traitor.<br>5  MR. MALONE: Object to form.<br>6  BY MR. KLOEWER:<br>7  Q. You know that, don't you?<br>8  A. What's that?<br>9  MR. MALONE: I'm just objecting to<br>10  form and foundation, Mike. You can answer<br>11  the question if you know.<br>12  A. Do I know what?<br>13  BY MR. KLOEWER:<br>14  Q. That he is getting death threats because<br>15  of public claims that he is a traitor.<br>16  You know that, don't you?<br>17  A. No, I don't know that.<br>18  Do you know that I got death threats<br>19  because --<br>20  Q. That's not my question.<br>21  A. I get death threats.<br>22  Q. That's not my question.<br>23  A. Is this in here, this death threats?<br>24  Q. Yes.<br>25  A. Okay.<br>Page 196 |
| 1  Now, if you didn't do that, that<br>2  Ruddy said because of that -- because of<br>3  that settlement, that's why I can't go on<br>4  there anymore. That's why I went out --<br>5  and you know what, you can check it out,<br>6  because I bad-mouthed Newsmax and Ruddy<br>7  way more than you guys and Coomer that<br>8  whole two weeks.<br>9  It was like the end of My -- end of<br>10  My Pillow. I'm going so I can't ever go<br>11  on, and I would go on regularly to talk<br>12  about My Pillow. I mean, you know, it's<br>13  just horrible. That's why I called him<br>14  that.<br>15  Is it so bad to call him a traitor?<br>16  I'm sorry, he is a traitor, what he did to<br>17  my company. These are hard-working<br>18  Americans. Don't you care about people?<br>19  Q. Well, tell me this --<br>20  A. Obviously not because you decided to sue<br>21  them and double down.<br>22  MR. MALONE: Mike, wait for his<br>23  question.<br>24  BY MR. KLOEWER:<br>25  Q. You've read the complaint, and your<br>Page 195 | 1  Q. It is. It's in the --<br>2  A. I don't know. Just show us the --<br>3  (Court reporter interruption.)<br>4  BY MR. KLOEWER:<br>5  Q. Your attorney has deposed Dr. Coomer and<br>6  he testified about the death threats he's<br>7  gotten, and the extreme harm that has been<br>8  caused to his life.<br>9  A. From what he did to my employees.<br>10  Q. Because of claims that he is a traitor.<br>11  A. Who said that? Me?<br>12  Q. You did.<br>13  A. Because of my employees.<br>14  Q. Yes.<br>15  A. Maybe he shouldn't have done that.<br>16  You know what my employees feel, they<br>17  feel like they're lost a lot of their<br>18  livelihood because of him.<br>19  Q. Well, he's lost --<br>20  A. And they've had death threats.<br>21  Q. -- his entire livelihood because of these<br>22  --<br>23  A. And they've had death threats --<br>24  Q. -- claims. So --<br>25  A. And they've death threats because of --<br>Page 197 |

```
 1    break for now.
 2         We're going off the record at 2:45
 3    p.m.
 4         (Break taken.)
 5         THE VIDEO OPERATOR:  We are back on
 6    the record at 3:06 p.m.
 7  BY MR. KLOEWER:
 8  Q. Okay.  Mr. Lindell, before we broke we
 9    watched a panel discussion at the Cyber
10    Symposium that included Joe Oltmann, David
11    Clements, Patrick Colbeck, Josh Merritt
12    and Phil Waldron.
13         It sounds like that was the first
14    time you had seen that discussion.  Is
15    that correct?
16  A. That's correct.
17  Q. And did you know that Mr. Olson would be
18    present -- I know you said that you wanted
19    to present the Dennis Montgomery
20    information that you got on January 9th.
21         Did you understand -- did you know
22    that Mr. Olson would be presenting other
23    information such as that that was included
24    here?
25  A. No.  No idea.
```
Page 258

```
 1  Q. Did you think -- was it your understanding
 2    going into the symposium that Mr. Olson's
 3    speakers would also be presenting
 4    information about Dennis Montgomery?
 5  A. No.  They weren't presenting about Dennis.
 6  Q. Okay.
 7  A. They were not presenting about Dennis.  I
 8    had Dennis's stuff.  So that's why --
 9    that's why when he started putting people
10    up, or whatever he did, they had nothing
11    to do with my evidence.  Nothing.
12  Q. But you said before that you were working
13    with him for I think you said a month
14    beforehand, talking about getting --
15  A. No, I worked with him for -- it worked
16    with him since the end of February.
17  Q. Okay.  So for several months beforehand.
18  A. Yeah.
19  Q. And you talked about preparing for this
20    and discussing the symposium for a while
21    beforehand?
22  A. No.  Every day we would talk about
23    different things, and I told him that, "We
24    need to have a symposium, like a three-day
25    event or something, and just -- like I'll
```
Page 259

```
 1    just" --
 2         And I told him my vision of having
 3    cyber guys, just like I've said, cyber
 4    guys, the media and the politicians, and
 5    put them all in a room.  And that is what
 6    we talked about.  We never got into
 7    details of lineups or anything, ever.
 8         MR. KLOEWER:  We are going to go to
 9    Exhibit 4, clip 4.  We'll take a look at
10    this here.  This is one minute and nine
11    seconds.  So we'll watch real quick and
12    then we'll discuss it.
13         (Playing Video Clip:
14         "All right.  So you got a couple of
15    hit men that were pulling triggers.
16         The first gentleman you know is
17    John Poulos, who is the CEO of
18    Dominion.  When he gave those
19    remarks, it was before the
20    legislature under oath.  John Poulos
21    committed perjury time and time
22    again.
23         The other gentleman at the end was
24    a person we've heard about because of
25    Joe Oltmann:  Eric Coomer, who holds
```
Page 260

```
 1    the patent for the feature known as
 2    adjudication, which is one of the
 3    tools in their tool chest to murder
 4    the American people's vote.
 5         And this is one of the statements
 6    he made along with when Joe -- and
 7    talk about being on the call, this is
 8    what he heard.
 9         You heard from Joe and you can
10    assess whether you think he's telling
11    the truth.
12         'Make f-ing sure that Trump is not
13    going to win."  That's a vice
14    president of a company that is
15    running elections in 28 states.
16         You've got your election cartel.
17    You've got your (indiscernible)
18    organizations, and you have the man
19    that pulled the trigger.")
20  BY MR. KLOEWER:
21  Q. "The man that pulled the trigger."  Did
22    you see this presentation --
23  A. I've never seen this, no.
24  Q. -- at the time?
25  A. And, once again, I'm going to say this for
```
Page 261

66 (Pages 258 - 261)

```
 1  Q. Yep.
 2  A. Has that up there -- you'll have to go
 3     check it out -- "inside the machine."
 4  Q. I've checked it, but it doesn't say
 5     anything about what Eric Coomer, an
 6     individual, did.
 7  A. Did you look through it? Did you have a
 8     cyber guy look at it? Did it say "Coomer"
 9     inside the cyber --
10  Q. Doesn't say "Coomer" in those documents.
11     That's why I'm asking.
12  A. How do you read cyber? How do you read
13     cyber? Seriously. How do you read cyber?
14     I'm asking you that.
15        Did you get a cyber guy to decrypt
16     that and see if his name is in there? Did
17     you? Or see if his computer is tied into
18     what happened there? Did you check that
19     out?
20  Q. Did you?
21  A. No. It's up there. That's why I'm not
22     going to discredit. I'm not going to
23     discredit it because it's so vast, and
24     it's up there.
25        I don't want you to discredit that
                                        Page 314
```

```
 1     evidence for our case.
 2  Q. But you don't -- as you sit here today,
 3     you don't know if that evidence says the
 4     word "Coomer" in it.
 5  A. I don't know that.
 6  Q. Okay.
 7  A. And that's why I'm putting -- but I'm
 8     putting "Deny" for that reason. I don't
 9     want you to try and discredit that because
10     I don't know if it says in there, and I
11     know that he was with Dominion.
12        But I do know Dominion is guilty
13     there, and Janet Griswold, because they
14     tried to delete it. They're guilty of at
15     least covering up or deleting, committing
16     a crime, deleting the evidence. That, we
17     know.
18        MR. KLOEWER: Okay. Can we go off
19     the record, take a little break.
20        THE VIDEO OPERATOR: We're going off
21     the record at 3:54 p.m.
22        (Break taken.)
23        THE VIDEO OPERATOR: We are back on
24     the record at 4:03 p.m.
25  BY MR. KLOEWER:
                                        Page 315
```

```
 1  Q. All right. Mr. Lindell, just a couple
 2     more questions here. I want to clarify a
 3     few things.
 4        First of all, before you said that
 5     you thought Lindell-TV was streaming the
 6     symposium, and you checked.
 7        Where did you check?
 8  A. I called Brannon Howse and said, "When was
 9     Lindell-TV formed?" and it was formed in
10     April. I was way off.
11        The reason I thought it was August,
12     because Diamond and Silk joined the lineup
13     in August, and we went to her funeral.
14     That's why I thought in my head, oh, we
15     must have -- it must have been formed in
16     August, that channel. They were just
17     added in August.
18        Brannon clarified, he said, "No."
19     That was -- it was April -- I'm sorry, can
20     I check?
21        MR. MALONE: April 19th.
22  A. April 19th.
23  BY MR. KLOEWER:
24  Q. And you said the symposium was not
25     live-streamed on FrankSpeech; is that
                                        Page 316
```

```
 1     correct?
 2  A. It's on Lindell-TV. And it was -- it sat
 3     on FrankSpeech, amongst other stations,
 4     right.
 5  Q. Is it possible that it was streamed live
 6     on FrankSpeech as well?
 7  A. I believe it was. I mean, there were --
 8     back then there were two things you had.
 9        The website has changed form. I
10     would say it probably was because you
11     had -- when you came in, there was two
12     things back then. I'm not going to say
13     100 percent.
14        There was a drop in here with
15     Lindell-TV with just one screen. And then
16     you had to go over here to go to
17     FrankSpeech.
18        That's what I was saying before when
19     you showed me those analytics. I believe
20     there was two things.
21        There was one website; it's almost a
22     separate website streaming thing here that
23     Lindell-TV was on. And then FrankSpeech
24     was standalone. That I can check if you
25     want before we leave. I can make one call
                                        Page 317
```

80 (Pages 314 - 317)

**Page 318**

1  on that and they would probably know.
2      But I don't know if -- I would say
3  it's almost 100 percent sure on -- 99
4  percent, because I remember Johnston
5  Howse, I said, "Why -- you know, why
6  aren't we having Lindell-TV over here,
7  keep it where it is instead of putting it
8  on FrankSpeech," because we knew we were
9  going to get attacked. I mean, many
10 people going there, which had happened at
11 the Frankathon or whatever.
12     So I think they were separate, but I
13 don't know.
14 Q. Okay.
15 A. When I mean separate, a completely
16 separate website or platform, you know.
17 Q. And just to clarify, we've talked about
18 Eric Coomer and what evidence you have
19 about him a few times today.
20     I just want to be sure. Is there any
21 evidence I haven't asked you about? Is
22 there anything I haven't raised that you
23 think is evidence that Eric Coomer played
24 a role in rigging the election?
25 A. I'm going to be honest is I don't know

**Page 319**

1  what's all piled up. I have so much
2  evidence for every -- for stuff you can't
3  believe. It's probably piled from here
4  over this building.
5      Specifically to Eric Coomer, I'd have
6  to ask my lawyers now. I don't know. I
7  would have to ask my -- my teams that are
8  out there. I don't know.
9      But for me, this thing here is -- I
10 mean, it's so far down my list, and now
11 it's even -- this is bizarre. I will be
12 going to the judge, I'm telling you, and
13 say, "You need to dismiss this."
14     You guys, I'm appalled at this. I
15 don't -- I didn't vet -- I didn't do a big
16 thing on Eric Coomer until he did that.
17 And that's it.
18     So as far as evidence, if you're
19 mixing him with Dominion, which when you
20 guys served me papers, I see that, I
21 see -- you know, he has agenda. I don't
22 know -- if it's not money, then he's in on
23 it. There is -- you know. And we will be
24 diving into that, or that -- I'm sure my
25 guys already have, you know.

**Page 320**

1      But I don't know right now speaking.
2  I don't have it in front of me. I don't
3  know. I didn't even know I was supposed
4  to bring that.
5      And I read -- and if I wouldn't have
6  read this two nights ago, if I would have
7  read it back when it was served, we
8  probably wouldn't be talking here. This
9  would have been -- you know, a judge go,
10 "This is frivolous."
11     I don't know Eric Coomer, and you
12 guys -- and I understand you guys coming
13 this far because you probably thought,
14 "Well, obviously he didn't say anything
15 about this, so he must know something
16 more." And you're probably surprised I
17 don't know any of these guys. You know, I
18 don't know it. And I apologize.
19     That's why I've been so very upset
20 with -- especially with that judge. I
21 mean, the judge should have said this
22 should have been dismissed, or at least
23 ruled on it, you know. I've never heard
24 of such a thing.
25     And I'm going to say this in our

**Page 321**

1  stream here. I'm so upset with the judge
2  when I heard my lawyer -- or the judge
3  said, "I'm not going to rule on the
4  dismissal, but you got to go do
5  discovery."
6      You guys have better things to do, I
7  have better things to do. If -- I would
8  believe if you knew now what you knew
9  then, what I knew, that you probably
10 wouldn't have done this. And then I would
11 have to say, you know -- you know, you
12 guys may be half criminal, you know.
13     Because you did do the thing -- you
14 did do the thing with Ruddy. And you can
15 go -- you know, the thing with Ruddy, I
16 can't deny that was bad what you said,
17 "Don't have Mike Lindell up there."
18     Whether you said it or he said it or
19 how you guys came to that, that's not
20 right.
21 Q. Well, I do want to just briefly address
22 that on the record. And Mr. Cain made
23 similar statements yesterday.
24     But I do want to be clear that you've
25 accused of us of many things over the last

## Page 322

```
 1    two days, and I've not responded to those
 2    accusations --
 3  A. No, you've been very good.
 4  Q. -- in an effort to maintain
 5    professionalism.
 6       But I want to be clear that our lack
 7    of response should not be understood to
 8    mean that we don't deny the accusations
 9    that you have made --
10  A. Right.
11  Q. -- against both ourselves and our client.
12       So please don't infer from my silence
13    on those matters --
14  A. Yeah, I don't.
15  Q. -- that I'm agreeing to what you've said
16    or that that is any form of admission
17    because it's not.
18  A. Right. And I respect that.
19  Q. So that's the only reason I haven't
20    engaged with any of those statements.
21  A. I didn't take it as agreeing.
22       MR. KLOEWER: Okay. That's all we
23    have for today. So that's all we have for
24    questions.
25       MR. MALONE: We'll reserve questions,
```

## Page 323

```
 1  and we'll read and sign.
 2       THE VIDEO OPERATOR: We are going off
 3  the report at 4:09 p.m.
 4       (The right to read and sign the
 5  deposition was preserved.)
 6       (The deposition concluded at 4:09
 7  p.m.)
```

## Page 324

```
 1       I, MICHAEL J. LINDELL, do hereby certify
 2  that I have read the foregoing transcript of
 3  my testimony and that same is true and correct
 4  to the best of my knowledge and belief, except
 5  as follows:
 6
 7  PAGE    & LINE NO.  CORRECTION      REASON

20       _____
         MICHAEL J. LINDELL
         SWORN TO AND
21       SUBSCRIBED BEFORE ME this
         day of       , 2023
22       NOTARY PUBLIC
```

## Page 325

```
STATE OF MINNESOTA )
                   : CERTIFICATE
COUNTY OF HENNEPIN )
    I hereby certify that I reported the
deposition of MICHAEL J. LINDELL on
MARCH 9, 2023 in Minneapolis, Minnesota, and
that the witness was by me first duly sworn to
tell the whole truth;
    That the testimony was transcribed under
my direction and is a true record of witness
testimony;
    That the cost of the original has been
charged to the party who noticed the
deposition, and that all parties who ordered
copies have been charged at the same rate for
such copies;
    That I am not a relative or employee or
attorney or counsel of any of the parties or a
relative or employee of such attorney or
counsel;
    That I am not financially interested in
the action and have no contract with the
parties, attorneys, or persons with an
interest in the action that affects or has a
substantial tendency to affect my
impartiality;
    That the right to read and sign the
deposition was reserved.
    WITNESS MY HAND AND SEAL this
23RD DAY OF MARCH 2023.

       _____
       Registered Merit Reporter
       Certified Realtime Reporter
```

82 (Pages 322 - 325)

Veritext Legal Solutions
800-336-4000