# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

## EXHIBIT 4 to
## PLAINTIFF'S NOTICE OF WITHDRAWAL OR MODIFICATION OF
## CERTAIN CONFIDENTIALITY DESIGNATIONS


## (Replacement Exhibit 1 to Docket 177 filed at Docket 178)

---

# EXHIBIT 1

# CONFIDENTIAL
# FILED UNDER SEAL

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:22-cv-01129-NYW-SJC
 3   _____
 4
     ERIC COOMER, Ph.D.,
 5
             Plaintiff,
 6
     vs.
 7
     MICHAEL J. LINDELL, FRANKSPEECH
 8   LLC, AND MY PILLOW, INC.,
 9           Defendants.
     _____
10
          CONFIDENTIAL DEPOSITION OF ERIC COOMER, PH.D.
11                   February 15, 2023
     _____
12
     APPEARANCES:
13
     ON BEHALF OF THE PLAINTIFF:
14           CHARLES CAIN, ESQ.
             Cain & Skarnulis
15           300 Colorado Street, Suite 2850
             Austin, Texas  78701
16           Phone:  512-477-5000
             Email:  ccain@cstrial.com
17
     ON BEHALF OF THE DEFENDANTS:
18           RYAN P. MALONE, ESQ.
             Parker Daniels Kibort LLC
19           888 Colwell Building
             123 North Third Street
20           Minneapolis, Minnesota  55401
             Phone:  612-355-4100
21           Email:  malone@parkerdk.com
22
23
24
25
```

Page 6

1        (Exhibit 1 was marked.)
2        Q.   (By Mr. Malone)  Okay.  And, Dr. Coomer,
3   what we are looking at is a document entitled Plaintiff's
4   Confidential Objections And Answers to Defendant
5   Michael J. Lindell's First Set of Interrogatories.
6        Have you seen this document before?
7        A.   I have.
8        Q.   Do you recall working with your attorneys
9   to prepare answers to these interrogatories?
10       A.   Yes, I do.
11       Q.   Okay.  Dr. Coomer, if you could turn to
12   page 3 of Exhibit 1, which has the heading Objections and
13   Answers.  And you can see Interrogatories 1 through 4
14   displayed there.  Do you see where I'm looking?
15       A.   Yes, I do.
16       Q.   If you could take a moment to review all of
17   those answers, and let me know if there's anything that is
18   inaccurate, incomplete, or that you would like to change
19   today.
20       A.   This looks complete.
21       Q.   Excellent.  If you could turn to page 4.
22   Looking at Interrogatory Number 5, which asks for your
23   educational background, if you could take a moment to
24   review that answer and let me know if anything needs to be
25   changed or elaborated on.

Page 7

1        A.   Trade school.  So I did attend a one-week
2   vocational trade school for Neapolitan pizza-making,
3   which is not listed.
4        Q.   And when did you attend that trade school?
5        A.   That would have been, to the best of my
6   recollection, I believe it was February of 2021.
7        Q.   So fairly recently?
8        A.   Yes.
9        Q.   And we'll, I believe, talk about that a
10   little bit more later on today.
11        But is it fair to say that you're currently
12   in the restaurant business?
13       A.   Yes, it is.
14       Q.   Okay.  Did you obtain any sort of
15   certificate from that trade school?
16       A.   I did.
17       Q.   And what is the name of the trade school?
18       A.   It's the AVPN, which is the Associazione
19   Pizza Napoletana Verace.
20       Q.   And is the AVPN located physically in
21   Colorado?
22       A.   No.  They -- they are based out of Naples,
23   Italy; but they do have a school in -- based in -- I
24   think it's Burbank, LA.
25       Q.   And is that where you attended?

Page 8

1        A.   I attended in LA.
2        Q.   Well, we might get to that later on today.
3        But backing up a little bit, after you
4   obtained your Ph.D. in nuclear engineering and plasma
5   physics in December of 1997, what did you do for work?
6        A.   Immediately after that -- that time, I
7   started doing essentially consulting for software
8   development.  I did a lot of just database projects,
9   and -- yeah, that was what I did shortly after that.  I
10   did have a couple other jobs here and there post '97.
11       Q.   And as a consultant for software
12   development, were you freelance, or did you have a primary
13   employer at that time?
14       A.   Freelance.
15       Q.   And can you provide an estimate about how
16   long you performed freelance consulting work?
17       A.   Yeah, so it was off and on.  It was in
18   '99 -- late '99 I took a job with a company called Planet
19   Outdoors.  That was a dot-com startup.  That did not last
20   that long, if everybody remembers the dot-com blowup.  So
21   from about, I think, around December '99 to December of
22   2000 was when I worked at Planet Outdoors.
23        So then after that, I went back to sort of
24   contract database work and did that up until 2004.
25       Q.   And this would be from about 2000 to 2004

Page 9

1   doing the contract database work, correct?
2        A.   Correct.
3        Q.   Who were some of the contractors or
4   companies with whom you worked doing that work?
5        A.   I have to be honest, I can't recall at
6   this time.
7        Q.   It was a long time ago?
8        A.   It was.
9        Q.   Do you recall where you were living and
10   working at that time?
11       A.   Yes.  I was in Broomfield, Colorado,
12   working from home doing remote work.
13       Q.   Moving on to Interrogatory Number 6.
14   Dr. Coomer, I understand that during this time
15   period -- and I think you've been open about this -- that
16   you struggled with addiction in your life.  Is that fair
17   to say?
18       A.   That is fair.
19       Q.   And so this -- this interrogatory asks
20   about some instances that I understand may have been a
21   result of or related to those addictions; is that
22   accurate?
23       A.   Yes.  That is my understanding.
24       Q.   Dr. Coomer, are you also aware that there's
25   a protective order in this case, and that if we designate

3 (Pages 6 - 9)

Page 10

1 this deposition confidential, that it cannot be used
2 outside the context of this case.  Are you aware of that?
3      A.  I am aware of that, yes.
4      Q.  Okay.  So with that understanding, I'm
5 going to be asking you a few questions about these
6 instances which you've identified in response to
7 Interrogatory Number 6.
8          So if you could turn to page 5 here.
9 You've identified a case number 2003T00050 with a date of
10 January 24th, 2003, as an instance in which you were
11 charged with careless driving and reckless driving.  Do
12 you see where I'm referring at the top of the page?
13      A.  Yes, I do.
14      Q.  I understand that that's what you were
15 charged with.  Do you recall what the outcome of that
16 instance -- or incident was?
17      A.  I believe I do.  It was a fine and points
18 against my license.
19      Q.  So was that the result of a plea or a trial
20 court conviction or anything like that?
21      A.  I believe it was a plea.  I never went to
22 trial on that.
23      Q.  Okay.  Moving on to the next incident
24 identified with the date of July 1st, 2003, where you
25 identified the charges as driving under

Page 11

1 restraints-alcohol-related speed contest, careless
2 driving, driver's license permit, it looks like unauth,
3 short for unauthorized minor/DR.  Do you see where I'm
4 referring there?
5      A.  Yes, I do.
6      Q.  What was the outcome of those charges?
7      A.  Again, it was points against my license,
8 which I believe led to a suspension of license and a
9 fine.
10      Q.  Do you recall what the fine was?
11      A.  No, I do not.
12      Q.  Okay.  Moving on to the May 18th, 2005,
13 incident, failure to display proof of insurance,
14 headlamps-detective, seat belts not in use.  What was the
15 outcome of that charge?
16      A.  I'll be honest, on that one, I don't know
17 because I don't even recall ever being cited for seat
18 belt not used.  I'm pretty religious about my seat belt.
19 So this one does not -- this one doesn't ring a bell.
20      Q.  Okay.  Moving on to the November 2nd, 2006,
21 incident in which you've identified charges for driving
22 while ability impaired, lane usage violation and reckless
23 driving.  What was the outcome of that charge?
24      A.  To the best of my knowledge, it was a fine
25 and points against license.  I do not recall if I had a

Page 12

1 suspension of license.
2      Q.  And just so that I understand your earlier
3 testimony, in 2003, there was a suspension that was issued
4 against your license -- license; is that correct?
5      A.  That is correct.
6      Q.  Do you recall how long that suspension was?
7      A.  12 months.
8      Q.  Were you unable to drive during those
9 12 months?
10      A.  I think, on that suspension, that is
11 correct.  There may have been a suspension on the '05.
12 And, again, I don't want to speculate because I can't
13 recall all the details.
14      Q.  Understood.  Moving on to the
15 November 17th, 2007, charges for disturbing the peace,
16 unlawful to, I believe, spit public place.  What did you
17 mean when you identified the unlawful to spit public place
18 charge there?
19      A.  That was the actual charge that I was
20 charged with.  It is unlawful in Denver to spit on the
21 sidewalk.
22      Q.  What was the outcome of that charge?
23      A.  A fine.
24      Q.  What was the amount of the fine, if you can
25 recall?

Page 13

1      A.  I don't recall.
2      Q.  Finally, there is a charge identified here
3 dated September 21st, 2021, for failure to yield
4 right-of-way/stop sign, reckless driving, failing to
5 report accident-call police.  Do you see that charge
6 identified?
7      A.  Yes, I do.
8      Q.  What was the outcome of that charge?
9      A.  It was a charge of reckless driving, I
10 believe 8 points on my license, and a fine.
11      Q.  Has that matter been resolved --
12      A.  Yes, it has.
13      Q.  -- that you're aware?
14      A.  Sorry.  Yes, it has.
15      Q.  Dr. Coomer, are you aware that video
16 footage of that incident has circulated on the internet?
17      A.  Yes, I am.
18      Q.  Okay.  Dr. Coomer, did you ever spend any
19 time in any sort of county jail or correctional facility?
20      A.  You mean have I spent the night in jail?
21      Q.  Any amount of time.
22      A.  Yes.
23      Q.  Okay.  Was that in relation to any of the
24 charges that we just went through over the last few
25 minutes here?

4 (Pages 10 - 13)



Page 14

1    A.  Yes.
2    Q.  Which one?
3    A.  The first one, the 2003T00050, Clear Creek
4  County incident.  The second one, 2003T000733.  And the
5  disturbing the peace, 07GS066853.
6    Q.  For each of those incidents, are you saying
7  that you spent just a night in jail per incident, or are
8  you saying something else?
9    A.  To the best of my recollection, it was a
10  single holding night.
11    Q.  For each of those three?
12    A.  Yes.
13    Q.  Did you spend any amount of time in jail
14  for the September 2021 incident?
15    A.  No, I did not.
16    Q.  Doctor, we don't have to go through the
17  video, and I would prefer not to, but is it your testimony
18  that you've seen it?
19    A.  Yes, I have.
20    Q.  Do you recall, in that video, that it
21  appears you were at the -- is it the Fitz Restaurant in
22  Salida?
23    A.  The Fritz.
24    Q.  Excuse me, The Fritz restaurant in Salida.
25  And that's your restaurant, correct?

Page 15

1    A.  Correct.
2    Q.  And I believe that there was at least one
3  cook on duty that day at The Fritz who was in the
4  restaurant with you when the police arrived; is that
5  correct?
6    A.  That is my recollection, yes.
7    Q.  Do you recall the name of that cook?
8    A.  I am drawing a blank because he didn't
9  last very long.  We just always called him the Viking.
10      I can provide that at a later time, but
11  it's escaping me.  I've gone through a lot of employees.
12    Q.  If you could do that, that would be great.
13      MR. CAIN:  We'll leave -- pardon me -- a
14  blank in the deposition for him to answer that question
15  after reviewing his records.
16    Q.  (By Mr. Malone)  When the police arrived
17  then, Dr. Coomer, do you recall telling them that you had
18  done a couple of shots with the gentleman that we'll refer
19  to as the Viking for today's purposes?
20    A.  Yes, I do.
21    Q.  Had you consumed any alcohol before driving
22  your vehicle that day?
23    A.  No, I had not.
24

Page 16

1
20    A.  Yes.
21    Q.  Okay.  Moving on to page 6 of Exhibit 1.
22  If you could take a look at your answer to Interrogatory
23  Number 7, Dr. Coomer.  Do you see that?
24    A.  Yes, I do.
25    Q.  Is that information still accurate with

Page 17

1  respect to your cell phone number?
2    A.  That is correct.
3    Q.  When you worked at Dominion, did you have a
4  company-issued cell phone?
5    A.  That is -- the cell phone -- the Samsung
6  listed there is the company-issued cell phone.  And I
7  have only had one cell number for both personal and
8  business.
9    Q.  So you were able to use the Samsung for
10  official business and the iPhone for your personal
11  communications; is that right?
12    A.  No, that is incorrect.  I used the Samsung
13  for both personal and business; and then, when I
14  separated from the company, I bought the iPhone and I was
15  able to transfer the number.
16    Q.  I see.  And Verizon was the carrier during
17  that entire time period?
18    A.  Yes, it is.
19    Q.  Did you have that same cell phone number
20  when you started at Dominion in -- I believe was it 2010?
21    A.  Yes, I did.
22    Q.  Do you know whether Verizon was the carrier
23  at that time?
24    A.  It was.
25    Q.  Okay.  If you could turn the page to page 7

5 (Pages 14 - 17)



Page 18

1  in Exhibit 1, Dr. Coomer.  Interrogatory 11 asks for all
2  lawsuits, including the venue and case number in which you
3  have either been a party or a witness in the previous
4  10 years.  You've indicated that you were a witness in the
5  Curling v. Raffensperger case in the Northern District of
6  Georgia in 2017; is that right?
7         A.  That is correct.  Well, the -- case
8  was filed in 2017.  I believe my testimony was in 2019.
9         Q.  Understood.  And I believe you may have
10  also provided some additional testimony in 2020?
11         A.  I believe so.  That sounds correct.
12         Q.  Were you considered -- or was it your
13  understanding that you were providing expert testimony in
14  that case?
15         A.  Yes, I was providing expert testimony.
16         Q.  Do you recall what your compensation was
17  for providing that testimony?
18         A.  Yes.  It was zero.
19         Q.  So expert testimony pro bono in the Curling
20  case, correct?
21         A.  That is correct.
22         Q.  How did that come about?
23         A.  I was asked by my company who, as a vendor
24  of Georgia providing election equipment, to provide
25  expert testimony on our equipment.

Page 19

1         Q.  So your employer, Dominion at the time
2  obviously, asked you to provide expert testimony for the
3  defendants in that case, correct?
4         A.  Yes.
5         Q.  And they -- was it Dominion that asked you
6  to do so without additional compensation?
7         A.  The topic never came up.
8         Q.  You were never offered additional
9  compensation to provide testimony in that case?
10         A.  Nope.  No.  Sorry.
11         Q.  I suppose I've been using the term
12  "Dominion" fairly broadly.  Do you recall who the
13  individual was who asked you to provide testimony in that
14  case?
15         A.  Not specifically, no.
16         Q.  Was it your boss, John Poulos, at that
17  time?
18         A.  John Poulos was not my boss at the time.
19         Q.  Who was your boss or director, supervisor,
20  however you would it describe them at the time?
21

Page 20

1

Page 21

1         Q.  At this time your official title was the
2  director of product security; is that correct?
3         A.  It was director of product strategy and
4  security.
5         Q.  Strategy and security?
6         A.  Correct.
7         Q.  Did you, Dr. Coomer, consider that to be a
8  sales-type role?
9         A.  Partially, is the best I can answer that.
10         Q.  In what ways was it a sales-type role?
11         A.  So my duties under the product strategy
12  portion were to meet with existing clients and potential
13  clients and analyze their needs and take that back and to
14  essentially develop new products that would meet their
15  needs.
16             The security part was, once those products
17  were starting to be developed, to make sure that they
18  were developed with robust security elements that matched
19  both the needs of certification and also the emerging
20  threats as designated under the critical infrastructure
21  designation for election infrastructure.
22         Q.  Do you recall the time period where you
23  started in that role as the director of strategy and
24  security?
25         A.  Yes, that was November of 2013.

Veritext Legal Solutions

www.veritext.com                                                888-391-3376

Page 30

1       A.  Various YouTube clips that I've seen with
2  additional interviews with Mr. Lindell where he's
3  mentioned me by name saying that I belong behind bars.
4       Q.  Do you have the dates or links to those
5  clips with you today?
6       A.  I do not.
7       Q.  Let's go to what will be marked as
8  Exhibit 2.
9            (Exhibit 2 was marked.)
10      Q.  Okay.  We are back on the record.  And I'm
11 glad we are.
12          That reminds me, Dr. Coomer, I should have
13 mentioned when we started that if you need a break at any
14 point today, let me know.  My request would be that if
15 there's a question that's pending, that you answer the
16 question before we break.  And we'll try to get through
17 this as expeditiously as possible.  Fair?
18      A.  That is fair.
19      Q.  Okay.  So we were just talking about a
20 number of paragraphs that you identified as your Amended
21 Complaint -- in your Amended Complaint that are
22 defamatory.  And you have just been handed a copy of that
23 Amended Complaint against Mr. Lindell, My Pillow and
24 Frankspeech.  And what I'd like you to do is turn to
25 paragraph 61, which can be found -- you probably have it

Page 31

1  already -- which can be found at page 36 of Exhibit 2.
2           Do you see that, Dr. Coomer?
3       A.  Yes, I do.
4       Q.  What is the false statement of facts that
5  gives rise to your claim of defamation in paragraph 61?
6  Statement or statements, plural.
7       A.  I don't -- I don't feel that I can make
8  that determination as I'm not an attorney.
9       Q.  Understanding that you're not an attorney,
10 my question is a little bit different.  I'm asking you for
11 your understanding of what a false statement of fact is.
12 The attorneys can sort out what defamation is.
13          But you identified a number of statements
14 here.  And so what I want to do is understand what you're
15 claiming is a fact, what you're claiming is an opinion,
16 of the claims that are facts, what's false.  Do you
17 understand?
18      A.  I think I do, and I think the biggest one
19 I can point out is that the quote, You are a traitor to
20 the United States, that is defamation, per se.  I am not
21 a traitor to the United States of America.
22      Q.  And it's your testimony here today that
23 that is -- whether someone can be a traitor or not is a
24 question of fact?
25      A.  Yes, it is, to my understanding.

Page 32

1       Q.  We'll get into it a little bit later today,
2  Dr. Coomer, but you've referred to some folks as traitors
3  and some folks as treasonous publicly, correct?
4       A.  Not to my recollection right now.
5       Q.  Okay.  But if you had, that would be okay?
6       A.  It depends on the context.
7       Q.  Would it be a statement of fact or a
8  statement of opinion?
9           MR. CAIN:  Object to form.
10      A.  It depends on the context.
11      Q.  (By Mr. Malone)  Okay.  Paragraph 61, other
12 than Mr. Lindell saying that you're a traitor, any other
13 false statements of fact in that paragraph?
14      A.  Yeah.  Just saying that he has evidence
15 thereof is false.  There is no evidence that I was
16 treasonous.  There is no evidence that I affected the
17 election.  The context here again is that -- and, you
18 know, there's more to this -- this whole paragraph is
19 about me rigging the election.  And that is patently
20 false.  I did not rig the election.  I did not attempt to
21 rig the election.  And he's saying, these are things that
22 I have evidence of, the evidence there is patently false.
23 There is no evidence.
24      Q.  You say looking at this paragraph is about
25 Mr. Lindell accusing you personally of rigging the

Page 33

1  election.  Is that your testimony just now?
2       A.  Yes.
3       Q.  Where does he say that?
4       A.  It is not explicitly stated.  I'd say it's
5  in context.  If I'm you, I'm turning myself in and
6  turning in the whole operation.  The whole operation
7  being the rigging of the election.  That is the context,
8  as I understand it.
9       Q.  And do you take that context from the block
10 of text that we're looking at now or from other things
11 that he said at that time, May 9th, 2021?
12      A.  Again, I think it's within the context of
13 this discussion, yes.  It's over for Dominion.  It's too
14 late to close the gate.  The cows are out of the barn.
15 So there's -- there's more up top here.  All right.  He's
16 talking about Dominion, to take our country through
17 China.  You did your best.  You corrupt people you.  You
18 tried to suppress our voice.
19          Again, I think the context there is in
20 direct relation to claims of election corruption.  You
21 did it, but you failed.
22          So, yes, I think that sets -- I think that
23 clearly sets this paragraph in connection with supposed
24 rigging of the election.
25      Q.  You mentioned Mr. Lindell's alleged

9 (Pages 30 - 33)

Page 34

1 statements about Dominion.  Is it your testimony that what
2 he says about Dominion is what he's saying about you?
3     A.  Yes, I think there's a direct correlation.
4     Q.  That's not quite my question about whether
5 there's a correlation.  My question is whether it's one
6 and the same as far as your understanding goes.
7     A.  Every time that I've seen him mention
8 Dominion, he mentions me.  So I think it is one and the
9 same.
10     Q.  And that's -- just so I understand your
11 statement just there, Dr. Coomer, every time Mr. Lindell
12 mentions Dominion, he mentions you, as far as you know?
13     A.  As far as I know.
14     Q.  Okay.  So you're not aware of any
15 statements that Mr. Lindell has made about Dominion that
16 don't refer to you by name?
17     A.  I am not.
18     Q.  What about his statements about Brian Kemp
19 and Brad Raffensperger?  Do you see that in the middle of
20 the block of text in paragraph 61?
21     A.  Yes, I do.
22     Q.  Is it your understanding that what he's
23 saying about them -- who I believe were the governor and
24 secretary of state in Georgia at the time -- reflect on
25 you in any way?

Page 35

1     A.  No.  Because he says, I can say that just
2 like I can say that about Brian Kemp.  So I think he's
3 making a separate statement about Brian Kemp and
4 Raffensperger, and saying that the same evidence of their
5 corruption applies to me.
6     Q.  And that's your understanding?
7     A.  That is my understanding.
8     Q.  In paragraph 61, at the top there, --
9 backtracking a bit -- you indicate that this statement or
10 series of statements was on May 9th, 2021, correct?
11     A.  Yes.
12     Q.  Are you aware of any statements that
13 Mr. Lindell made about you before May 9th, 2021?
14     A.  Again, I'd have to look through the entire
15 complaint.  But if this is the first one listed, this may
16 be the first one.  I'd have to speculate on that.
17     Q.  No need to speculate.  Just want to know
18 what you know.  Are you aware of any statements that
19 Mr. Lindell has made about Dominion before May 9th of
20 2021?
21     A.  I do not recall any at this time.
22     Q.  Okay.  Moving on to paragraph 81, which can
23 be found on page 48 of Exhibit 2.  Let me know when you're
24 there, Dr. Coomer.
25     A.  Okay.

Page 36

1     Q.  Okay.  And we are looking at this paragraph
2 because it was identified in your answer to Interrogatory
3 15 referencing defamatory statements, and that's
4 paragraphs 81 through 83, which goes from pages 48 to 52
5 of Exhibit 2.  These are statements that appears you're
6 claiming Joe Oltmann and others made at the Cyber
7 Symposium in Sioux Falls, South Dakota, in August of 2021;
8 is that accurate?
9     A.  That is correct.
10     Q.  You can feel free, Dr. Coomer, to take a
11 moment to review these paragraphs if it will be helpful.
12 But my question to you is whether you're aware of any
13 facts that Mr. Lindell said anything in these paragraphs.
14     A.  Again, I'd defer to my attorneys on this.
15 But I believe the claim is that, as the host and promoter
16 and creator of the Cyber Symposium, he was essentially
17 publishing these remarks and not necessarily stating them
18 himself.
19          Are there any quotes exactly in here from
20 Mr. Lindell?  I do not believe so.  I do remember
21 him -- Mr. Lindell introducing these speakers at the time
22 and giving his endorsement to what they were saying.
23 That is my understanding.
24     Q.  Okay.  So did you just say that Mr. Lindell
25 introduced these speakers?

Page 37

1     A.  That's my recollection that he did, yes.
2     Q.  What do you base that recollection on?
3     A.  The fact that I was watching the symposium
4 when it was happening.
5     Q.  You were watching it live?
6     A.  Yes.
7     Q.  How were you watching it live?
8     A.  I can't remember the exact URL.  There
9 were several.  I was watching on the internet.
10     Q.  Why were you watching it live?
11     A.  Because I knew that it was likely going to
12 involve discussions about me.
13     Q.  Why did you think that it was likely going
14 to involve discussions about you?
15     A.  Because it was hosted by Mr. Lindell, and
16 he was having people like Joe Oltmann on stage.  And they
17 have made a habit of making me a focal point of their
18 conspiracy theories about election fraud.
19     Q.  Are you aware of any facts that show
20 Mr. Lindell knew what Joe Oltmann was going to say at the
21 symposium?
22     A.  Beyond introducing him and having him on
23 and saying, I believe, you know -- again, I don't want to
24 speculate on the exact quote.  But, you know, here's Joe
25 Oltmann to talk about the proof of election fraud from,

10 (Pages 34 - 37)

Page 38

1 you know, Eric Coomer and Dominion, I believe that that
2 was an endorsement; and, yes.
3      Q.  And it's your recollection that Mike
4 Lindell said, Here's Joe Oltmann to talk about Eric Coomer
5 at the symposium?
6      A.  I don't want to go as far as that quote.
7 But I do recall him introducing Joe Oltmann to talk about
8 election fraud and the proof that he had.
9      Q.  Okay.  Anything else?  Any other facts that
10 you're aware of that Mike Lindell knew what Joe Oltmann
11 was going to say at this symposium?
12      A.  Only things that I can infer at this time.
13      Q.  Okay.  Moving on to page 49, paragraph 82.
14 This complaint quotes an exchange between Joe Oltmann and
15 David Clements.  Do you see that?
16      A.  Yes, I do.
17      Q.  Okay.  What are the false statements of
18 fact that you believe are quoted in this exchange here?
19      A.  Okay.  The -- one of the major players is
20 Eric Coomer.  Again, this is in -- you have to put this
21 in context.  The whole exchange is about, quote, unquote,
22 voter fraud.  The panel was about voter fraud and
23 election fraud.
24          So one of the major players -- I am
25 inferring, and I think it's fair to infer that the major

Page 39

1 players in election fraud is Eric Coomer.  That is false.
2          Eric Coomer was a vice president of
3 Dominion Voting Systems.  I guess that's debatable
4 because at one time I had that title.  Oltmann does
5 correct that.
6          I do not hold the adjudication patent.  As
7 far as I know, it was not a sign of HSBC.  It is wholly
8 owned by DVS.  I was one of the people -- I was one of
9 the main contributors to the adjudication patent, but
10 like anybody that works for a company, patents are
11 routinely signed over to the company.  I do not have any
12 ownership of that patent.  I do not get any royalties
13 from that patent.
14      Q.  But you would agree that you're identified
15 as an inventor on that patent?
16      A.  Yes, I am.
17      Q.  Brief side bar on that point, Dr. Coomer.
18 Are you aware of how many patents Dominion holds that you
19 are identified on?
20      A.  It's somewhere between two and four.
21      Q.  Do you recall what those patents are?
22      A.  There's definitely one for adjudication.
23 There's one for, like, secure ballot tracking, I believe.
24 I'd have to go back and look.  That's easily done on a
25 Google patent search.  But I can't recall all of them.

Page 40

1      Q.  And is it your testimony that you don't see
2 any profits or participation in those patents?
3      A.  No profits, no royalties for those
4 patents, correct.
5      Q.  Okay.  Okay.  And getting back to this
6 quote here.  Was HSBC a guarantor on that adjudication
7 patent as far as you know?
8      A.  As far as I know, no.
9      Q.  Okay.  What are the other false statements
10 of fact that you would identify in paragraph 82 here?
11      A.  From Mr. Clements, Were you not also on a
12 phone call with Eric Coomer.  That is false.  I was never
13 on a phone call with Mr. Oltmann regarding any
14 discussions of elections.
15          And I never said -- oh, let's see
16 here -- Don't worry about the election.  Trump's not
17 going to win.  I made F-ing sure of that.  I never made
18 that statement anywhere, either on a phone call or not on
19 a phone call.
20      Q.  All right.  We've talked about Oltmann
21 already.  So same questions with respect to David Clements
22 and Waldron, who I believe is Phil Waldron; is that
23 correct?
24      A.  Yes, that is Phil Waldron.
25      Q.  Are you aware of any facts that Mr. Lindell

Page 41

1 knew what Mr. Clements or Mr. Waldron were going to say at
2 this symposium?
3      A.  Personally, no.
4      Q.  Okay.  Moving on to the next page,
5 paragraph 83.  What false statements of fact do you
6 believe are in this paragraph?
7      A.  The commentary about the corruption of the
8 courts.  We had gone through various court proceedings
9 with an impartial judge who made judgments based on the
10 facts.  Calling that a corrupt judiciary is, I think,
11 wholly false.
12      Q.  But not only do you think it's false, but
13 you're saying that's a false statement of fact that can be
14 proven true or not true; is that right?
15      A.  Yes.
16      Q.  Okay.  What else in paragraph 83?
17      A.  Despite them trying to keep us silent for
18 nine months, I think that that can -- I think that's a
19 statement of fact that can be proven.
20      Q.  Who's "them" in that sentence that you're
21 referring to?
22      A.  From that context I believe that is
23 Patrick Colbeck, and the "them" -- he is thanking
24 Lindell.  So I would infer that he is including Lindell
25 in that plurality.

11 (Pages 38 - 41)

Page 54

1 speaking -- I never talked about Eric Coomer.  Well, I
2 think we already have voluminous quotes in this complaint
3 preceding this date where Mr. Lindell, does, in fact,
4 talk about me.
5     Q.  (By Mr. Malone)  Okay.  Just to back up on
6 that for a minute, Dr. Coomer.  The voluminous quotes
7 you're referring to, what, apart from that May 9th
8 statement that we discussed earlier, are you referring to
9 where he mentioned you by name?
10    A.  I don't know if we have cataloged every
11 single time he mentioned my name.
12    Q.  Okay.  So as you sit here right now, you're
13 just not aware of anything beyond that May 9th quote that
14 we talked about earlier?
15    A.  Not that I can specifically recall right
16 now with specificity.
17    Q.  Okay.  Moving on from that.  What other
18 false statements of fact did you identify?
19    A.  He's the -- apparently he's the president
20 of Dominion.  I was never president of Dominion.  The
21 criminal crime family here in Denver.  Dominion is not a
22 criminal crime family.
23        All right.  That's it for that paragraph.
24        Eric Coomer, you are a criminal.  Again, I
25 guess that depends on the context.  Do I have a criminal

Page 55

1 record?  Yes.
2        My Pillow doesn't even know who you are.
3 As a representative for My Pillow, Mr. Lindell made
4 specific statements about me.  Therefore, I can infer
5 that My Pillow, as Mr. Lindell is a key representative of
6 My Pillow, does know about me.
7        I hear you ran into a building drunk the
8 other day.  There's absolutely no evidence that alcohol
9 was involved in that incident.
10    Q.  Well, I -- is that the incident -- when you
11 say "the incident," Dr. Coomer, are you referring to that
12 September of 2021 incident?
13    A.  Yes, I am.
14    Q.  And we don't need to watch the video.  But
15 you would agree that there is video of you saying that you
16 were drinking with the Viking, correct?
17    A.  After the accident, yes.
18    Q.  Okay.  And do you have any facts that
19 Mr. Lindell did hear that?
20    A.  I'm not -- I'm not sure what that question
21 is.
22    Q.  I will clarify that.
23        So the statement is, I hear you ran into a
24 building drunk the other day, or whatever you were.
25        Do you see where I'm referring?

Page 56

1     A.  Yes.
2     Q.  Or do you have any facts that Mr. Lindell
3 did not hear that?
4     A.  I guess no provable facts, no.
5     Q.  Do you understand, based on the video that
6 you're familiar with, that someone would think that alcohol
7 was involved in that incident?
8     A.  No.
9     Q.  You don't understand that?
10    A.  No.
11    Q.  Okay.  Moving on, what other false
12 statements of facts would you identify in paragraph 95?
13    A.  Shouldn't you have thought about that,
14 Eric Coomer, before you did crimes against the United
15 States and quite frankly, all of humanity?
16        I have not committed crimes against the
17 United States or humanity.  And that is provable.
18    Q.  Okay.  What else?
19    A.  I think that's it for that paragraph.
20    Q.  Paragraph 96, which you've also
21 identified as containing false statements of fact.  If you
22 would take a moment to review that paragraph, Dr. Coomer.
23 And let me know when you've had a chance to do so.  It
24 goes on to the next page, just the top of page 59.
25    A.  Okay.

Page 57

1     Q.  Okay.  You've identified those 19
2 statements as falsehoods.  My question to you is which of
3 those would you identify as being false statements of fact
4 versus just an opinion?
5        MR. CAIN:  Object to form.
6     A.  Number 1, false.
7     Q.  (By Mr. Malone)  And that's a false
8 statement of fact?
9     A.  Yes.
10    Q.  Is that your testimony?  Okay.
11    A.  Number 3, Number 4, Number 5, Number 7.
12 I'd say Number 12, but I guess somebody might disagree.
13 Number 14, Number 15, Number 16, Number 17, Number 18,
14 Number 19.
15    Q.  I'd like to ask you about Number 4 where
16 you've been identified -- at least you claim you've been
17 identified as the president of Dominion.  Do you see that?
18    A.  Yes.
19    Q.  You were never the president of Dominion,
20 were you, Dr. Coomer?
21    A.  No, I was not.
22    Q.  Okay.  What facts do you have that being
23 identified as the president of Dominion was a problem for
24 you?
25    A.  It's continuing a false narrative of who

15 (Pages 54 - 57)

Page 58

1 and what I was and did at Dominion.
2     Q.  Okay.  But how does being the president
3 Tina false narrative, is my question.
4     A.  That I somehow was this all-powerful
5 person within Dominion that then had some inference that
6 I could control everything that happened there.
7     Q.  You don't think Dominion did anything wrong
8 in the 2020 election, do you?
9     A.  No, I do not.
10     Q.  Okay.  Moving on to paragraph 98 on
11 page 59, which quotes an interview with Mr. Lindell with
12 Steve Bannon on April 7th of 2022.  What false statements
13 of fact do you identify in that paragraph?
14     A.  Once again, Mr. Lindell has indicated that
15 I was, the quote, unquote, head of Dominion.  That is
16 false.
17         We already have what they were hiding.
18 I've never seen anything provided that they have anything
19 that Dominion was hiding, and Dominion is not -- was not
20 hiding anything.  And, again, the inference was that I,
21 as the head of Dominion, would have been the one hiding
22 whatever it is they're saying I'm hiding.
23         So that's a statement of -- of -- a false
24 statement.
25     Q.  Okay.  Anything else?

Page 59

1     A.  Because the lawyers are criminals too.
2         MR. CAIN:  I can speak to that.
3         THE DEPONENT:  Yeah.
4         MR. CAIN:  False.
5         THE REPORTER:  I'm sorry.  I --
6         MR. CAIN:  False.
7     A.  It's like a criminal crime family.  It's a
8 big criminal crime family.
9         All our overseas military votes were for
10 Biden.  Completely false.  They're using a national email
11 system.  False.
12     Q.  (By Mr. Malone)  What is your understanding
13 of what "they're using a national email system" refers to
14 there?
15     A.  For the military overseas voters.
16     Q.  And it's your testimony that there's no
17 national military email system for military overseas
18 voters?
19     A.  Correct.
20     Q.  How do you know that?
21     A.  Because I've worked in elections for
22 15 years.  Elections are run at the county level.
23 Military overseas voters have a variety of methods of
24 returning their votes, but they are directly to the
25 county.  They do not go through a national email system.

Page 60

1     Q.  Okay.  Anything else?
2     A.  I think that's it.
3     Q.  Backtracking a bit one paragraph,
4 Dr. Coomer.  Paragraph 57.  This states, to be clear, none
5 of this is hyperbole.  Lindell means every word, and he
6 intends for his audience to know that he means what he is
7 saying.  Do you see that?
8     A.  Yes, I do.
9     Q.  Is that an accurate allegation as far as
10 you're concerned?
11     A.  I believe so, yes.
12     Q.  Do you have any facts that Mr. Lindell
13 doesn't believe what he has said about Dominion or about
14 you?
15     A.  Not that I can -- not that I can recall.
16     Q.  Do you have any facts that Mr. Lindell is
17 just saying all this so that he can sell pillows?
18     A.  Again, do I have a fact, no.  I can make
19 inferences.
20     Q.  Okay.  I'm just asking for facts today.
21     A.  Okay.
22     Q.  Okay.  Paragraph 100 on page 60.
23     A.  Okay.
24     Q.  This refers to an interview that
25 Mr. Lindell gave on the Eric Metaxas show.  And I'm

Page 61

1 looking at a sentence that says, As he frequently does,
2 Lindell confirmed here too that he was appearing on
3 Metaxas's show as an agent of My Pillow and that My Pillow
4 continues to finance his defamation campaign against
5 Dr. Coomer.
6         Do you see that?
7     A.  Yes.
8     Q.  Okay.  What facts do you have to support
9 the allegation that My Pillow finances Mr. Lindell's
10 defamation campaign against you?
11     A.  Again, the inference that every time he
12 discusses me or election fraud he mentions My Pillow and
13 provides My Pillow discount codes.
14     Q.  It's your testimony that he does that every
15 time that he mentions you?
16     A.  To my recollection, yes.
17     Q.  Anything else?
18     A.  No.
19     Q.  Okay.  Paragraph 103 on page --
20     A.  Actually, I'm sorry.  I think actually
21 just in paragraph 101, I think this statement, Well,
22 listen, I say so my audience, if you want to support
23 Mike, and I hope you do, go to MyPillow.com.
24 MyPillow.com and my store and spend money there.  And if
25 you want to support this program, use the code Eric.

16 (Pages 58 - 61)



Veritext Legal Solutions



Page 102

1    Q.   Okay.  So how many calls would you say, and
2  over what time period did this -- did these discussions
3  with John Poulos about Antrim County happen?
4        A.   To the best of my recollection, three to
5  four calls over a week.
6        Q.   Okay.  And that week was, in time?
7        A.   Sometime in November.
8        Q.   After you were placed on leave?
9        A.   Again, to the best of my recollection,
10  yes.  Timelines are a little fuzzy.  It's been a couple
11  of years.
12       Q.   Yeah.  You also, I think, mentioned that
13  there was another troubleshooting project that you worked
14  on at that time.  What do you recall about that?
15       A.   To be honest, I don't recall anything
16  about it.  I recall getting a phone call asking about
17  some additional troubleshooting, and that is -- and I
18  just -- I can't recall any of the details.  And then
19  again that is when I sort of conferred with my attorneys
20  and then responded that this wasn't appropriate
21  considering that I was on leave.
22       Q.   Apart from the conversations with John
23  Poulos that we've talked about, did you interface with
24  anyone else about elections during your leave at Dominion?
25       A.   I mean, that's a pretty broad question.  I

Page 104

1  conveying threats to you; is that right?
2        A.   That is correct.
3        Q.   You're in possession of written threats to
4  you, threats to your safety; is that right?
5        A.   Correct.
6        Q.   And you would be able to provide all of
7  those that you've received?
8        A.   Correct.
9        Q.   Okay.  You also say that you have had to
10  increase personal security to you and to those around you.
11  Can you elaborate as to what you mean by that?
12

Page 103

1

Page 105

1

Veritext Legal Solutions



28 (Pages 106 - 109)



Page 110

Page 112

Page 111

1  case?
2      A.  I don't see any reason why not.
3      Q.  Do you see any reason why you would not be
4  able to, at this point, identify the individuals whose
5  houses you stayed in?
6      A.  Subject to confidentiality, yes.
7      Q.  Okay.  I'd ask that do you that as well.
8          What -- what country did you go to in
9  January of 2021?
10     A.  Tahiti.  French Polynesia.
11     Q.  And stayed there for three weeks?
12     A.  Roughly three, three and a half.
13     Q.  Will you be seeking costs for that trip in
14 this lawsuit?
15     A.  Again, I'm going to leave the final damage
16 and monetary request up to my legal team of what's
17 appropriate.
18     Q.  The CCW permit that you referenced in your
19 answer to this interrogatory on page 10, is that CCW
20 concealed carry weapon?
21     A.  Yes, it is.
22     Q.  When did you obtain that permit?
23     A.  I got an emergency permit in December of
24 2020.
25         Were there costs associated with obtaining

Page 113

1      Q.  Moving on to the next paragraph,
2  Dr. Coomer, you state, with respect to noneconomic
3  damages, plaintiff has undergone substantial therapy since
4  the time of the false claims against him, and he has been
5  diagnosed with various mental conditions arising from the
6  trauma of this still-ongoing ordeal.
7          Do you see that?
8      A.  I do.
9      Q.  When did you first undergo the therapy that
10 you are referring to in your answer here?
11     A.  I believe that started the first or second
12 week of December.
13     Q.  Prior to that time, had you been going to a
14 therapist or anything like that?
15     A.  Not immediately prior.  I have -- I have
16 seen therapists at various times over the years.  But I
17 think it had been quite some time and not specifically
18 for any of the conditions that this current therapy is
19 for.
20     Q.  What are those conditions?
21     A.  I mean, obviously, I saw a lot of
22 therapists dealing with my substance abuse back in the
23 early 2000s.  And then I saw some grief counseling due to
24 a couple close deaths.  But I've never -- I've never had
25 to seek therapy for what essentially has been acute PTSD

29 (Pages 110 - 113)

Page 114

1 anxiety and panic attacks until this time.
2      Q.  And those are all conditions that you've
3 received a diagnosis for?
4      A.  Yes, it is.
5      Q.  Do you recall when you first received a
6 diagnosis for any of those conditions?
7      A.  I don't remember the exact date.  But I
8 did get -- I've requested a specific diagnosis from the
9 therapist I was seeing.  Maybe it was around the first
10 amended filing in the first case.
11          MR. CAIN:  I'm not answering.  You're
12 looking to me.
13          THE WITNESS:  I know.  I'm just -- yeah.
14          MR. CAIN:  Use the best of your
15 recollection.
16          THE WITNESS:  That's my recollection.  It
17 was probably sometime in January of 2021.
18      Q.  (By Mr. Malone)  And to the best of your
19 recollection, Dr. Coomer, this is all before Mr. Lindell
20 made any statement about you that you're aware of?
21      A.  The first round of therapy, yes.  The
22 second round, no.
23      Q.  Tell me about that.  What do you mean by
24 first round versus second round?
25      A.  So I continued my current round of

Page 115

1 therapy -- my first round of therapy in regards to all of
2 this until around -- right around April of '21.  And then
3 when the threats substantially increased right around the
4 time of the Cyber Symposium, and I started receiving more
5 harassment, I reengaged in therapy.
6      Q.  So you discontinued therapy in April of
7 2021?
8      A.  Yes.
9      Q.  What prompted you to stop going at that
10 time?
11      A.  It was a combination of things.  The
12 threats had started to die down.  I didn't feel quite as
13 harassed.  And also, honestly, financial.
14      Q.  Are you able to provide an estimate as to
15 the costs of going to therapy from when you started going
16 in 2020 to today?
17      A.  Yes, I can provide that.
18      Q.  Dr. Coomer, I'm not sure if you're aware,
19 but we've asked you to sign a medical authorization so
20 that we can access your records.  Are you opposed to doing
21 that?
22          MR. CAIN:  I'll handle that.
23          MR. MALONE:  All right.
24      Q.  (By Mr. Malone)  Will you be seeking costs
25 in this lawsuit associated with your treatments?

Page 116

1      A.  Again, I defer to my attorneys on the full
2 cost model and damages model.  I'm not going to speculate
3 on that.
4      Q.  Okay.  As for the costs that you mentioned
5 associated with therapy, was this, from 2020 to today, all
6 out-of-pocket, or was some of it covered by insurance?
7      A.  It's 100 percent out-of-pocket.
8      Q.  That's always been the case?
9      A.  Yes.
10      Q.  Outside of the therapy that you have sought
11 and referred to here, have you needed or sought any other
12 medical treatment that you're claiming is as a result of
13 my client's conduct?
14      A.  Outside of the therapy, no.
15      Q.  Moving on to the following paragraph, you
16 say, Plaintiff has also made what efforts he can to
17 correct the false public narrative that defendants have
18 created.  These efforts have included publication of an
19 op-ed in the Denver Post on December 8th, 2020, denying
20 the false allegations against him.
21          Do you see that?
22      A.  Yes, I do.
23          (Exhibit 6 was marked.)
24          (Discussion off the record.)
25      Q.  (By Mr. Malone)  Okay.  So that we're all

Page 117

1 literally on the same page here, I am referring to
2 Exhibit 6, a document entitled Guest Commentary: I work
3 for Dominion Voting Systems.  I did not commit voter
4 fraud.  The attacks against me need to stop.
5          Do you see that, Dr. Coomer?
6      A.  I do.
7      Q.  And you've previously been asked about this
8 document before in other depositions; is that right?
9      A.  Yes, I have.
10      Q.  Okay.  And is this the article that you
11 were referring to in your answer to the interrogatory we
12 were just discussing?
13      A.  Yes, it is.
14      Q.  Okay.  I have a few questions about that.
15 First of all, that December 8th, 2020, date, that's
16 accurate as far as you know, correct?
17      A.  As far as I recall, yes.
18      Q.  That's the date it was published as far as
19 you know, right?
20      A.  I believe so, yes.
21      Q.  What dates did you write this article, if
22 you know?
23      A.  It was written probably over a week prior,
24 and then a couple of days for editing with the Denver
25 Post.

30 (Pages 114 - 117)

Page 118

1    Q.  So either late November and/or early
2 December of 2020, correct?
3    A.  That is correct.
4    Q.  And that's, as far as you know, before
5 Mr. Lindell said anything about you, right?
6    A.  As far as I know, yes.
7    Q.  Okay.  So in your answer to Interrogatory
8 18, which is Exhibit 1 we were just talking about, it's on
9 page 10, the answer I see is, Plaintiff has also made what
10 efforts he can to correct the false public narrative that
11 defendants have created.
12       Do you see that?
13    A.  Yes, I do.
14    Q.  Okay.  Are you referring to the defendants
15 in this lawsuit?
16    A.  Yes.
17    Q.  Okay.  The next sentence, as we talked
18 about is, These efforts have included publication of an
19 op-ed in the Denver Post on December 8th, 2020, denying
20 the false allegations against him, right?
21    A.  Correct.
22    Q.  So how were you correcting the false
23 narrative that defendants made when they hadn't said
24 anything about you at that time?
25    A.  Because the defendants in this case have

Page 119

1 continued to amplify specific comments, mostly by Joe
2 Oltmann, that this op-ed speaks directly to.
3       So maybe created is a nuance there.
4 Continued to amplify might be a -- might be a slightly
5 better way of putting that.  But he has continued to
6 restate, repost the exact statements that this op-ed
7 spoke to and was in existence before and of which
8 Mr. Lindell should have been aware of.
9    Q.  So you'd agree that the defendants, meaning
10 My Pillow, Frankspeech, and Mr. Lindell didn't create this
11 narrative?
12    A.  I don't -- I wouldn't necessarily say
13 that.  I think that they have -- they have modified the
14 narrative that started with Mr. Oltmann.  So I think that
15 they have added to it, modified, amplified it.
16    Q.  Okay.  Let's break that down one by one.
17 How did they modify it?
18    A.  They've added statements -- misstatements,
19 false statements that they have proof that the election
20 was compromised, and that, again, that I'm a traitor,
21 that I'm treasonous and disgusting and evil.  I think
22 that has added to the narrative.  Yeah.
23    Q.  Are those things that Oltmann has not said
24 about you?
25    A.  No, no.  He said those about me as well.

Page 120

1    Q.  And you would agree that he said them
2 first?
3    A.  Yes.
4    Q.  So when you wrote this article, which is
5 Exhibit 6, the Denver Post article, you would agree that
6 you weren't writing this in response to anything that Mike
7 Lindell said, right?
8    A.  At that time, no.
9    Q.  Okay.  Would you flip to page 2 of this
10 document, Dr. Coomer?
11    A.  I went straight to 3.  Okay.
12    Q.  All right.  There is a sentence that says,
13 Not only have I designed systems and products that
14 directly support the auditing and validation of election
15 results -- I'm going to pause there because I want to
16 understand what systems and products you're referring to
17 in that clause.
18    A.  Specifically -- and there are many -- but
19 specifically the digital adjudication system.  I also
20 developed an export system that was specifically in
21 support of what are called ballot level auditing
22 systems -- or methodologies, such as risk-limiting
23 audits.  I was deeply involved in that.  And enhancements
24 to things specifically in the Dominion system around
25 what's called the audit mark, which is a digital record

Page 121

1 that's attached to every ballot image that's scanned that
2 clearly shows how the tabulator interpreted the vote at
3 the time of scanning.
4       So -- I also developed -- and this is more
5 of a process-oriented system.  It's called a coordinated
6 vulnerability disclosure program.  And that is --
7 essentially provides a semi-legal framework -- well, it's
8 a legal framework, not semi-legal -- provides a legal
9 framework, some Safe Harbor language that allows
10 third-party researchers to provide vulnerabilities based
11 on testing without the fear of being essentially sued for
12 compromising, you know, intellectual property.  And I've
13 worked with other programs, setting up some independent
14 third-party penetration testing with some government
15 groups that are related to programs available from CISA
16 which is the Cybersecurity and Infrastructure Security
17 Agency.
18    Q.  So how would you say that that pertains to
19 auditing and validating election results?  Because my
20 understanding is that's all -- that's all at the front
21 end, and that the auditing and validation would happen
22 after an election.  Is that correct?
23    A.  Yes, it would.  And that's where things
24 like the export that supports ballot level auditing
25 processes comes into play.  The transparency and the

31 (Pages 118 - 121)

Page 130

1          Now, the human-induced error there is that
2 anytime you create new ballots in machines you should run
3 what's called a pre-election logic and accuracy test.
4 They did not conduct that pre-logic and accuracy test on
5 that subset of machines that they put out in the field.
6 If they had done that, they would have noticed
7 immediately the mismatch in the results and could have
8 updated the EMS.
9          So on election night, the
10 tapes -- everything matched, but when they accumulated
11 the results in the EMS there was still a
12 misconfiguration, a mismatch between the official
13 machines' ballots and what the EMS was expecting. So
14 there was essentially a flip-flop in the vote totals when
15 accumulating; it was caught almost immediately. I think
16 it was, you know, by the next morning -- they did this
17 at, like, midnight. By the next morning, somebody
18 finally looked at the results and said, these don't look
19 right. They looked at the tapes and quickly realized
20 that the tapes weren't matching the accumulation
21 reporting.
22      Q.  Are you -- sorry, Dr. Coomer. I didn't
23 mean it interrupt you.
24      A.  No, it's okay.
25      Q.  Are you aware of why that logic and

Page 131

1 accuracy test was not run?
2      A.  You would have to ask the county clerk of
3 Antrim, Michigan.
4      Q.  And it would have been the county clerk's
5 responsibility to run that test?
6      A.  Absolutely.
7      Q.  Are you aware of any other failures, apart
8 from Antrim County, Michigan in November of 2020, of other
9 failures to run a pre-election logic and accuracy test?
10      A.  I can't get specifics, but, yes, I have
11 experienced that issue over my 16 years.
12      Q.  When you say that you can't get specifics,
13 do you mean that you don't remember or that you can't
14 disclose?
15      A.  I can't remember -- again, it's 16 years.
16 It's a lot of customers. I couldn't say exactly. But
17 process failures are not -- I mean, they're not common,
18 but they happen.
19      Q.  Are you aware of any of these process
20 failures that led to results failures?
21      A.  Again, unofficial -- and, again, to be
22 clear, those results from Antrim that were released that
23 had the swap in the candidates are unofficial results.
24 I'm aware of unofficial results having issues. I am not
25 aware of any official certified results having issues.

Page 132

1          There are -- there are follow-on
2 processes. It's not just pre-election logic and accuracy
3 tests which should be done. But there's also post-logic
4 and accuracy tests, which is after the election. And
5 there's also something called canvassing.
6          Again, it didn't need to get to that point
7 in Antrim. They identified it very quickly. But
8 canvassing is when, you know, when you have a machine, it
9 prints out a results tape. You take that results tape,
10 and canvassing is looking at that results tape and then
11 looking at the specific results that correspond to that
12 machine in the reporting system and verifying that all of
13 those numbers are the same. And if they're not, that
14 triggers a full investigation, possible rescan of
15 ballots, reaccumulation.
16          That's why elections' full certified
17 results are not available in one day. It takes time to
18 do that. It takes time to validate those. And there are
19 many processes, again, specifically created and
20 implemented to mitigate against potential human error.
21      Q.  When you say that you're aware of other
22 instances, are you aware of any specific instances -- I'm
23 talking about dates and locations where there -- where
24 these process failures that you were testifying about just
25 now?

Page 133

1      A.  I can't give specific dates. Palm Beach
2 County sometime around 2011. There was a county in New
3 Jersey that didn't perform their, what's called prelat.
4 I couldn't give you a date.
5          But again, you know, we're talking there
6 are, you know, in excess of 3,000 counties in the U.S.
7 that conduct elections on a regular basis. So an
8 occasional, call it breakdown in process, should
9 not -- should not be surprising. But in all of these
10 cases these were eventually identified either in post-lat
11 or in post audits and corrected.
12          THE REPORTER: I have a question. Post
13 what?
14          THE DEPONENT: Lat, l-a-t. Logic and
15 accuracy testing.
16      Q.  (By Mr. Malone) In your time working at
17 Dominion, are you aware of any attempts to manipulate
18 election results, any specific attempts?
19      A.  No.
20      Q.  Moving on to the paragraph that starts
21 with, It is unconscionable, toward the bottom of the page,
22 there's a sentence that says, Additionally, any posts on
23 social media channels purporting to be from me have also
24 been fabricated.
25          That wasn't accurate, was it, Dr. Coomer?

34 (Pages 130 - 133)

Page 134

1    A.  It was accurate in the intent.  So -- and
2 I think I can provide evidence.  As I said, I wrote the
3 op-ed, and then there was a certain amount of editing
4 from the Denver Post.  I agree that this may not be clear
5 but the intent was any current social media purporting to
6 be me is not real.  There were several accounts during
7 this time essentially starting around November 9th up
8 until -- and actually still going on occasionally, where
9 people were creating accounts using pictures of me and
10 making posts.  This is what this sentence is in regards
11 to.
12          I have never -- I've never denied that the
13 various Facebook posts -- the historical ones -- sorry,
14 air quotes don't travel well -- that the historical
15 Facebook posts were not mine.  I've never denied that.
16 It was specifically about current accounts that were
17 impersonating me, because they were making statements
18 like they were me saying, yeah, I threw the election,
19 yada, yada, yada.
20    Q.  Okay.  We'll talk about those Facebook
21 posts in a few moments here.  But you also write, I do not
22 have a Twitter account.
23          Do you see that?
24    A.  I do.
25    Q.  Has that always been accurate?

Page 135

1    A.  That was not accurate.  I had completely
2 forgotten that I had a Twitter account for about a day.
3 I think it was one of those late-night things.  That
4 is -- that is factually incorrect.  I did have a Twitter
5 account for about, I think it was a day or two.  I did
6 forget about that until seeing evidence of it some months
7 later.
8    Q.  Okay.
9          (Exhibit 7 was marked.)
10          (Discussion off the record.)
11    Q.  (By Mr. Malone)  Okay.  Dr. Coomer, you've
12 just been handed what's been identified as Exhibit 7 in
13 this deposition.  It's the New York Times article entitled
14 He Was the 'Perfect Villain' for Voting Conspiracists.
15          This is the article you were referring to
16 in your answer to that interrogatory, Interrogatory 18 we
17 were talking about; is that right?
18    A.  That is correct.
19    Q.  And you've seen this document before,
20 obviously, correct?
21    A.  I have a copy of it at home.
22    Q.  Yeah.  And you've been asked about this
23 document at a deposition before, haven't you?
24    A.  I have.
25    Q.  Okay.  I'd like to know a few things that

Page 136

1 maybe you've talked about before and maybe you haven't.
2 The first general question I have for you is, having
3 testified about this article before, having a copy at home
4 like you do, is there anything that you are aware of in
5 this article that's wrong or that you need to correct here
6 today?
7    A.  Not that I'm aware of.  I mean, obviously
8 it is -- it's about 10,000 words.  I have read it several
9 times.  I am not aware of anything that needs -- well,
10 there's probably a statement in here that I didn't have
11 Twitter.  That's potential.
12    Q.  Okay.
13    A.  That would be the only thing, to my
14 knowledge, that would -- that would be incorrect.
15    Q.  Starting on page 1 of this document, it
16 indicates that on November 9th you left your temporary
17 office in Daley Plaza and headed back to the
18 hotel where he'd been staying for the previous few weeks.
19          Do you see that, Dr. Coomer?
20    A.  I do.
21    Q.  Why were you in Chicago for a few weeks at
22 that time?
23    A.  I was providing election support for the
24 city of Chicago and Cook County.
25    Q.  Was that commonplace for you in your role

Page 137

1 as director to stay in one location around an election for
2 an extended period of time?
3    A.  Occasionally.  Not -- not all the time.
4 Specifically at this time -- let me rephrase.
5          I would normally stay a couple of days for
6 election support.  Obviously this was during COVID, and
7 we were working on small staffs and not trying to expose
8 workers.  And I have a long history with Chicago.  So I
9 was chosen to be the main person on the ground where we
10 would normally have a large staff.
11    Q.  At this time, how many employees did the
12 company have?
13    A.  I would only be able to hazard a guess,
14 and that would be speculation.
15    Q.  Okay.  Let me ask it this way.  When you
16 say there would be a large staff on site, would that staff
17 consist of full-time employees or contractors or both?
18    A.  Both.
19    Q.  Okay.  And would there generally be a
20 standard mix of employees versus contractors?
21    A.  Yes, depending on the role, yeah, it would
22 be a mix.
23    Q.  Okay.  So you mentioned that you were in
24 Chicago because of your history with Chicago, right?
25    A.  Yes.

35 (Pages 134 - 137)

Page 150

1    A.  I mean, vaguely.  They post a lot of
2  articles about me.  I couldn't tell you the actual
3  specific article, but I do recall that first one.
4    Q.  Do you recall the video that is being
5  referred to in this paragraph here?
6    A.  I do not.  I wouldn't tell you -- I
7  couldn't be able to tell you the contents.
8    Q.  It also says that you reposted an open
9  letter about antifa on Facebook.  Do you see the verbiage
10  there?
11    A.  I do.
12    Q.  Do you agree with that?
13    A.  Yes, I do.  Well, hold on.  Yes, I do.
14    Q.  But you wrote that open letter, right?
15    A.  No.
16    Q.  You didn't?
17    A.  I did not.
18    Q.  Who did?
19    A.  I have no idea.  It was anonymous.
20    Q.  Where did you find it?
21    A.  It was reposted by somebody I was
22  following on Facebook.
23    Q.  Do you know who?
24    A.  No, I do not.
25      (Discussion had off the record.)

Page 151

1      (Recess from 1:36 p.m. to 1:48 p.m.)
2    Q.  (By Mr. Malone)  Before the break,
3  Dr. Coomer, we were talking with the New York Times
4  article which you are broadly familiar with.  And I have a
5  couple of final questions about this.
6      If you -- if you could turn to
7  page -- page 8 of this document.  I just want to clarify
8  that what's being reported here is what we have already
9  talked about here today.
10      So there is a highlighted sentence towards
11  the top that said -- excuse me, there's a paragraph at the
12  top of page 8 that says, His arrival had been fraught.
13  When the plane touched down at the airport, Coomer tried
14  to log into his work email with no success.  He texted
15  Poulos to let him know he was having a problem.
16      And that's referring to John Poulos,
17  correct?
18    A.  That's correct.
19    Q.  About what -- what day was this happening?
20  What day in November of 2020?
21    A.  The exact day I'm going to have a problem
22  with.
23    Q.  Okay.
24    A.  It's somewhere around 18th, 19th, or 20th.
25  But I can confirm that because I can look up my flight

Page 152

1  history.
2    Q.  That might be helpful.  It also might be
3  helpful if you go to the previous page, page 7,
4  Dr. Coomer, which has a paragraph beginning with, On
5  November 19th, Poulos, sitting in his office at his home
6  in Toronto.  Do you see that?
7    A.  Yes, I do.
8    Q.  Okay.  So I just want to make sure I
9  understand that this article is accurate that all of this
10  that's being reported here would have been on the 19th.
11  That's when your plane touched down, and you talked to
12  John Poulos?
13    A.  Again, I can't say that for sure.  I could
14  have touched down on the 18th.  I mean, the 19th was
15  definitely when the news conference happened.  I honestly
16  can't remember if I was in Chicago or in my friend's
17  cabin when I watched that.  But it's all within 18th,
18  19th, or 20th.
19    Q.  So you stayed in Chicago for a period of
20  time following the election; is that correct?
21    A.  Yes.
22    Q.  Okay.  And then you returned home in Salida
23  after your Chicago stay?
24    A.  Yes and no.  I made a quick stop to feed
25  my cats and then go hide out in my friend's cabin.

Page 153

1    Q.  So other than stopping to feed your cats
2  you essentially went right from Chicago to hiding at your
3  friend's cabin; is that right?
4    A.  That is correct.
5    Q.  Okay.  And so the way that this article is
6  reporting and I believe that you're describing it today,
7  Dr. Coomer, that around November 18th, 19th, or 20th is
8  when Poulos texted you that it would be a good idea to
9  take a break, is that right?
10    A.  That is correct.
11    Q.  Okay.  And then I think we talked about
12  sometime after that you were brought in to discuss what
13  was happening in Antrim County as well as another area
14  that needed some troubleshooting; is that right?
15    A.  To the best of my recollection, yes.
16    Q.  Okay.  But by that time you had already
17  offered your resignation from the company, correct?
18    A.  Yes.  Again -- well, again, I offered to
19  resign if it was beneficial.  I did not tender my
20  resignation, just to be clear about that.  And I believe
21  that was actually done on November 11th, to the best of
22  my recollection.
23    Q.  To the best of your recollection, did you
24  state a reason why you were writing that resignation,
25  however you want to describe it, tendering or otherwise?

39 (Pages 150 - 153)

Page 154

1       A.  Again, that was a late-night text.  I
2  probably used the phrase, I fucked up.
3       Q.  And that's because of the Facebook posts,
4  right?  That's what you're referring to?
5       A.  No, it's not because of the Facebook
6  posts.  It is because there were people misinterpreting
7  what I said and using that to create a false narrative
8  election fraud.
9            Nothing in my Facebook posts talked about
10  interfering with the election.  I simply am talking to
11  Facebook friends to unfriend me, which has nothing to do
12  with the election.  But I was seeing at that point people
13  spinning false narratives that that somehow meant that I
14  had interfered with the election.
15       Q.  I understand that.  But that's not quite my
16  question.  My question is, did you offer your resignation
17  based on what was made public from your Facebook posts?
18       A.  No.  I offered -- I offered to potentially
19  resign because of the blow back and the false stories
20  that were being created out of that.  I noted that's a
21  nuance, because I -- at the time even, I stood by my
22  right to make those comments, but I never expected them
23  to be used in -- not to overuse a term -- weaponized in
24  false statements.
25            And, you know, that was maybe either a

Page 155

1  miscalculation on my point or naivete that I could have
2  personal beliefs that would impugn my integrity that I
3  had demonstrated over 15 years.
4       Q.  I think you just said that you -- you had
5  the right to make these posts.  Is that accurate?
6       A.  Yes.
7       Q.  Your testimony?  You still believe that,
8  that you have the right to post what you did?
9       A.  Absolutely.
10       Q.  And why do you say that you had the right
11  to do that?
12       A.  Well, one, it's First Amendment.  It's
13  protected speech.
14       Q.  Okay.  And I understand you're not a
15  lawyer, but why -- what is your understanding of what the
16  First Amendment covers in relation to these Facebook
17  posts?
18       A.  Well, I'll make it even simpler.  Colorado
19  statute is pretty clear that employers cannot restrict
20  any social media content from their employees.
21       Q.  When was that statute enacted, as far as
22  you know?
23       A.  I don't know the date, but I know we
24  discussed it in 2019 as a company.  And that came
25  directly from general counsel.

Page 156

1       Q.  You discussed it while you were employed
2  with Dominion?
3       A.  Yes.
4       Q.  Before any of your Facebook posts were made
5  public as far as you know?
6       A.  Correct.
7       Q.  And when I say public, I think we can
8  understand just for today I'm referring to beyond the 300
9  or so friends that you had.
10       A.  That is correct.
11       Q.  Fair?  Okay.  Let's talk about some of
12  these posts, which will be marked as Exhibit 8.
13            (Exhibit 8 was marked.)
14       Q.  Okay.  This is what's been marked as
15  Exhibit 8 with a number of 0001 at the top corner.  And
16  this is a post that you've provided in this case with a
17  link to a YouTube video of a band called Stiff Little
18  Fingers.
19            Do you see that?
20       A.  I do.
21       Q.  And I see it has a "4d" under your name,
22  meaning it was posted four days prior to when this
23  screenshot was taken.  What date are we looking at here,
24  is my question.
25       A.  Yeah, I have no idea.  It would be four

Page 157

1  days before whenever this was captured.  And, again, I'm
2  not the source of these screen captures.
3       Q.  Oh, the screen captures?
4       A.  Yeah.
5       Q.  Okay.  But you did post a link -- oh, no,
6  the screen captures.  Yes.  Understood.
7       A.  All of these are screen captures, right?
8  So they were done by somebody else.  So the time, I
9  couldn't -- I couldn't tell you.
10       Q.  As you've become more familiar with these
11  posts over the last couple of years, do you have a
12  sense or do you know when this post was made?
13       A.  Sometime in 2020.  I could not give you an
14  exact date.
15       Q.  And do you agree that you did make this
16  post, right?
17       A.  Yes.
18       Q.  All right.  And the post reads, Just
19  fucking vote.  And if you voted for a fascist, friend,
20  family or foe, fucking untrumpme, I've got no truck for
21  racists.
22            Do you see that?
23       A.  I do.
24       Q.  Are you referring specifically to -- who in
25  that post?

40 (Pages 154 - 157)

Page 158

1       A.  Any fascist or racist that you voted for.
2       Q.  For example, would that include Donald
3  Trump?
4       A.  Yes, it would.
5       Q.  Okay.  And you would agree, without having
6  to go through all of these pages here, Dr. Coomer, you
7  certainly can if you'd like to, but that you refer to
8  Trump and others as racists and fascists on a number of
9  occasions.  Would you agree with that?
10       A.  I would agree with that.
11       Q.  Okay.  Those are -- those are nasty names,
12  yeah?
13       A.  For most people, yes.
14       Q.  But they're not nasty names for Donald
15  Trump, for example?
16       A.  You'd have to ask him.  But there are
17  certainly people out there that take pride in those
18  names.
19       Q.  Okay.  So do you think that Donald Trump
20  would take pride in being called a fascist or a racist?
21       A.  I can't speculate on that.
22       Q.  Well, you don't, because otherwise you
23  wouldn't have called him that, right?
24       A.  No.
25       Q.  If you thought it was a compliment you

Page 159

1  wouldn't have called somebody --
2       A.  No, that's not -- those are two separate
3  questions.
4       Q.  Okay.
5       A.  Whether I thing he is one and whether he
6  takes pride in it are two separate questions.  I don't
7  know if he takes pride in it.
8       Q.  We've gone through some of the things that
9  you've accused Mr. Lindell of saying about you in this
10  case.  And I'd like to unpack what -- what the difference
11  is.
12          So, for example, if you were to call
13  someone a racist, would you consider that to be a
14  statement of fact?
15       A.  If they have shown racist tendencies, yes.
16       Q.  Okay.  So specifically you're referring to
17  former president Trump here.  Do you think that that's a
18  statement of provable fact with him?
19       A.  I think there's a high likelihood, yes.
20       Q.  Okay.  What -- what facts do you have to
21  support that?
22       A.  I think continually referring to nations
23  that are predominantly black as shit-hole countries is a
24  pretty racist thing to say.
25       Q.  Anything else, sir?

Page 160

1       A.  Nothing that's going -- I'd have to look
2  back.  I'm not going to speak specifically.  But
3  I'll -- that's good one to start with.
4       Q.  Let's say he --
5          THE REPORTER:  I'm sorry.  "Let's say
6  he..."
7          MR. MALONE:  He hadn't said that --
8       Q.  (By Mr. Malone)  -- that reported shit-hole
9  country remark, would you still be able to call him a
10  racist, in your opinion?
11       A.  I think I could.
12       Q.  Why do you say that?
13       A.  I'd also point to his handling of the
14  southern border, again, with people of color trying to
15  flee oppressive regimes and general poverty.
16       Q.  Okay.  So what about the description of him
17  as a fascist just in this post, what are you referring to,
18  or what facts do you have to make that claim?
19       A.  His general policies, not tolerating any
20  dissent, firing anybody that questioned his policies,
21  being capricious.  I think that's -- I mean, I'm not
22  trying to get a Ph.D. in political science, but I think
23  there's good arguments for that.
24       Q.  Let me ask you this, Dr. Coomer.  Do you
25  feel as though you need good arguments for that?

Page 161

1       A.  Sure.
2       Q.  So you feel as though you need to have
3  facts to support calling someone a fascist?
4       A.  To an extent.  Obviously there are carve
5  outs for what you would call public figures.  The bar is
6  a little bit lower.  But, yes, I do thing that there
7  should be facts.
8       Q.  And the difference is whether someone is a
9  public figure or not?
10       A.  Obviously there's political speech, and
11  then there's, you know, targeting an individual.  I think
12  if I started posting pictures of a random person on the
13  street and saying they were a fascist, they might -- they
14  might have -- they might have a case that, if I didn't
15  have any decent arguments or evidence to the fact, that
16  that would be defamation.
17       Q.  Okay.  How about someone like, you know --
18  well, Jonathan Sackler.  He's on page 4 of your post,
19  Exhibit 8.
20       A.  Yeah.  Page 4.  Page 4.  I mean,
21  he's -- he's head of Pharma, Purdue, yep.
22       Q.  So it's your understanding or belief that
23  you can call him a shit bag because he was what?
24       A.  They profited -- and, I mean, the company
25  that he headed was criminally neglect and fined therefor

41 (Pages 158 - 161)

Page 218

1    Q.  Okay.  And this document is dated
2  February 4th, 2021.  I understand that an original version
3  of this complaint was filed previously, correct?
4    A.  Correct.  I believe --
5    Q.  Okay.
6    A.  -- December 21st.
7    Q.  Around that time?
8    A.  2020.
9    Q.  Paragraph 1 is a sentence that says,
10  "Defendants, by their actions, have elevated Dr. Coomer
11  into the national spotlight, invaded his privacy,
12  threatened his security, and fundamentally defamed his
13  reputation across the country."
14      Do you see that?
15    A.  I do.
16    Q.  Do you still believe that to be true with
17  respect to these defendants?
18    A.  I do.
19    Q.  And you believed that to be true in
20  December of 2020 when your original complaint was filed?
21    A.  I do.
22    Q.  And when you made your statement to the
23  Associated Press on December 23rd, or thereabouts?
24    A.  I do.
25    Q.  So whether you liked it or not, you were a

Page 219

1  public figure in the winter of 2020, right, Dr. Coomer?
2      MR. CAIN:  Object to form.
3    A.  Based upon defamatory statements about me,
4  yes.
5    Q.  (By Mr. Malone)  Point you to page 25 -- 25
6  of this complaint, paragraph 52, which say -- says, After
7  the results of the election were called for President Joe
8  Biden, Oltmann co-hosted a Conservative Daily podcast.
9  And the footnote, footnote 55, refers to episode 196,
10  Dominion Voting Systems of the Conservative Daily podcast.
11  Do you see that?
12    A.  I do.
13    Q.  And that's where it all started, wasn't it,
14  Dr. Coomer?  That's where the trouble began?
15    A.  That's where my specific name came into
16  the discussion, yes.
17    Q.  How many times was that podcast downloaded
18  or viewed or listened to?
19    A.  I have no idea.
20    Q.  What platforms was that podcast available
21  on?  What digital platforms?
22    A.  Honestly, I couldn't give an exhaustive
23  list.  I don't know.
24    Q.  Have you reviewed Joel Oltmann's
25  deposition --

Page 220

1    A.  I --
2    Q.  -- transcript in this case?
3    A.  Sorry.  I have.
4    Q.  And would you dispute his testimony insofar
5  as he says his podcast is available on Spotify, Pandora,
6  Apple, Google Podcasts, among various radio stations?
7    A.  I mean, I'll take him at his word.
8    Q.  But what you just don't know is how many
9  times it's been listened to on those platforms; is that
10  right?
11    A.  Correct.  And I know that that's not an
12  exhaustive list of where his podcast is hosted.
13    Q.  Okay.  Moving on to page 28, paragraph 57.
14  We've talked a bit about this article already.  It's The
15  Gateway Pundit article about you on November 13th, 2020.
16  How many people saw that article?
17    A.  I have no idea.
18    Q.  Okay.  Paragraph 58 on the following page.
19  Complaint alleges also on November 13th, 2020, Michelle
20  Malkin hosted an interview with Oltmann who was identified
21  as a representative of FEC United on her personal YouTube
22  channel #malkinlive, which has approximately 100,000
23  subscribers.
24      Do you see that?
25    A.  I do.

Page 221

1    Q.  How many people saw the interview on
2  Michelle Malkin's YouTube channel?
3    A.  I do not know.
4    Q.  Do you know whether it was more or less
5  than the 100,000 subscribers that she had?
6    A.  I do not know.
7    Q.  Okay.  Page 31, paragraph 59.  This refers
8  to an interview that Oltmann did on Eric Metaxas's show on
9  November 24th, 2020.  You allege -- the interview was also
10  published on Metaxas's YouTube channel, the Eric Metaxas
11  radio show, which has approximately 185,000 subscribers.
12      Do you see that?
13    A.  I do.
14    Q.  How many people saw the interview on
15  YouTube?
16    A.  I do not know.
17    Q.  How many people listened to that interview
18  as a podcast?
19    A.  I do not know.
20    Q.  Are you aware of which platforms host Eric
21  Metaxas's pod -- excuse me -- podcast?
22    A.  I do not have an exhaustive list.
23    Q.  Paragraph 60 on page 34.  This refers to
24  more Gateway Pundit articles about you published on
25  November 14th, 2020.  Do you see that?

56 (Pages 218 - 221)

Page 238

1 an individual did use the barcode in that way?
2        A.   Not in the field on commercial units.
3        Q.   What about outside of the field on
4 commercial units?
5        A.   I have read some claims that, in a
6 laboratory setting, they were able to compromise that,
7 yes, on a single device.
8        Q.   Do you know where that lab setting was?
9        A.   I believe it was Dr. Halderman's lab in
10 Michigan, or it was -- it may have been somewhere in
11 Georgia.
12        Q.   Were these tests that Dominion asked
13 Dr. Halderman to perform?
14        A.   They were not.
15        Q.   Do you know why he was doing that?
16        A.   He was doing that as part of his work as
17 an expert for the plaintiffs in Curling.
18        Q.   In the Curling case?
19        A.   Yes.
20        Q.   Okay.  Exhibit 15.
21             (Exhibit 15 was marked.)
22        Q.   This is a declaration that Dr. Halderman
23 presented in the Curling case dated September 29th, 2020.
24 Have you seen this declaration before, Dr. Coomer?
25        A.   It's been a while, but I'm pretty sure

Page 239

1 I've read this one.  I would go with yes.
2        Q.   Okay.  Are you aware of anything in this
3 declaration that's inaccurate?
4        A.   Actually, let me skim this one.  This
5 looks to be a little bit later.
6             There are certainly -- there are certainly
7 comments made by Dr. Halderman in this that I would
8 absolutely disagree with and I think border on incorrect.
9        Q.   Okay.  Which would those be?
10        A.   His characterization that -- this was
11 specifically in regards to a de minimus software change
12 that the EAC had approved.  He compares that de minimis
13 software change to the entire automatic air control
14 system of the Boeing 737 Max aircraft, which was a very
15 complex system involving multiple sensors and millions of
16 lines of software code.
17             Our de minimus change in this was
18 literally on the order of three lines.  And again,
19 we -- Dominion did not deem this de minimis.  It was Pro
20 V&V the, voting systems test laboratory and accredited
21 testing laboratory for the EAC, which the EAC approved.
22 And comparing such a de minimis change to such a complex
23 system I found egregiously -- I find egregious.  And I
24 think he's completely wrong in his conclusions on this.
25        Q.   You were not compensated beyond your salary

Page 240

1 to testify in the Curling case, correct?
2        A.   That is correct.
3        Q.   Do you know if Dr. Halderman was?
4        A.   I do not know for sure.
5        Q.   Okay.  On page 4 of this document,
6 paragraph 17, Dr. Halderman testified -- or he says, quote,
7 As I have already testified, malicious modifications to
8 the BMD's software could undermine the integrity of
9 election results in multiple ways, including by changing
10 either the bar codes alone or both the bar codes and the
11 human readable text with the result that election outcomes
12 could be changed without detection.
13             Do you see that?
14        A.   I do.
15        Q.   Do you agree with that statement?
16        A.   I do not.
17        Q.   Why not?
18        A.   Because of the various processes and
19 audits that are in place and followed.  There are several
20 steps along in this process that I think the statement,
21 change without detection, is incorrect.  I fundamentally
22 disagree with Dr. Halderman on this.
23        Q.   What about his next statement, Replacing
24 the software now on the eve of the election creates a
25 vector by which an attacker could introduce malicious

Page 241

1 changes into BMDs statewide.
2        A.   I fundamentally disagree with that
3 statement as well.
4        Q.   For what reasons?
5        A.   Multiple reasons.  Again, process
6 procedures, chain of custody.  There was a new package
7 of -- of software for the BMD created.  It was created by
8 the lab.  It was delivered securely from the lab to the
9 state.  The state then securely delivered that to all of
10 the machines.  And then all of the machines underwent
11 that pre-logic and accuracy testing that we discussed
12 earlier.
13        Q.   So because of the testing procedures that
14 were or should have been in place, you disagree with
15 Dr. Halderman's assessment here, is that fair?
16        A.   Yes.  And also on a -- post-election there
17 are audits that compare the paper records to the
18 electronic records.  And then there is a way to verify
19 that the software that's installed on the devices is the
20 official software.  It's called a hash value.  It's
21 essentially a unique digital signature.
22             So, you know, doing audits of that which,
23 again, is best practices, you would be able to detect
24 whether or not the installed software was the official
25 software.

61 (Pages 238 - 241)

Page 246

1 order.
2        A. Okay.
3        Q. Okay. This is a paragraph, left column,
4 that begins, "Dr. Coomer testified at the injunction
5 hearing that Dominion did not intend to encrypt the QR
6 barcode."
7            Do you see that?
8        A. I do.
9        Q. Is that how you testified?
10       A. Yes, it is.
11       Q. Why did Dominion not intend to encrypt the
12 QR barcode?
13       A. Because as being part of the official
14 paper record, we felt that that had to be publicly
15 available information. And if you encrypted it, then you
16 would have to provide the security keys, which you could
17 not do publicly.
18       Q. I see.
19           The order goes on to say, "He also
20 testified regarding the use of digital signatures, secure
21 keys in the system 'that are part of the system and the
22 standard SHA-256 hashing algorithm.'"
23           Is that the -- the algorithm that we were
24 just talking about a few minutes ago?
25       A. It's one method of digitally signing

Page 247

1 things. I don't believe SHA-256 is used on the software
2 packages. And while the QR barcode was not encrypted, it
3 was signed with a SHA-256 hash algorithm.
4        Q. Was that a problem?
5        A. No.
6        Q. Okay. Jumping up to the top right corner
7 of the page, there is a sentence that says, "He further
8 acknowledged the potential for compromise of the operating
9 system, by exploiting a vulnerability, that could allow a
10 hacker to take over the voting machine and compromise the
11 security of the voting system software."
12           Do you see that?
13       A. I do.
14       Q. Is that an accurate reflection of your
15 testimony?
16       A. Insofar as I've stated multiple times,
17 given enough time and resources and unfettered access,
18 there's no system that cannot be compromised.
19           Sorry for the double negative.
20       Q. No. That's okay. I think I understand.
21           When you say, "by exploiting a
22 vulnerability," are you referring to a specific
23 vulnerability?
24       A. Sorry.
25       Q. I should clarify. This is Judge

Page 248

1 Totenberg's summary of your testimony. So if it's not
2 accurate, let me know. But were you referring to a
3 specific vulnerability when you testified in
4 September 2020 in this case?
5        A. My recollection, I was speaking of
6 vulnerabilities in general and not a specific one.
7        Q. Okay. So these were theoretical issues
8 that you were discussing at the injunction hearing?
9        A. Again, the best of my recollection, that
10 is correct.
11       Q. Okay.
12           (Exhibit 17 was marked.)
13       Q. Okay. Dr. Coomer, I have -- or you have
14 just been handed Exhibit 17, which is a series of text
15 messages you've produced in this case starting with the
16 Bates number of 001259. Do you see that?
17       A. I do.
18       Q. Okay. These are texts with Bill Coomer.
19 That's your brother William, right?
20       A. Yes, that's my older brother.
21       Q. Okay. Is -- is your older brother a
22 lawyer?
23       A. No.
24       Q. Okay. I don't mean to ask this question
25 indirectly. So I'm just curious why, as far as you know,

Page 249

1 there is a privilege block at the beginning of these text
2 messages.
3        A. I don't personally know.
4        Q. Okay.
5        A. Probably because -- well, I'm not going to
6 speculate.
7        Q. Okay. And it refers -- in your texts with
8 your brother Bill you're referring to absolute proof that
9 Mr. Lindell was in?
10       A. Am I? Can you --
11       Q. Sure. I'm referring to your text on
12 February 5th, 2021, where you say, So they do have
13 segments of me in that stupid absolute proof bullshit.
14 Then Bill responds, Is that a question or a statement?
15       A. Okay. Yes.
16       Q. Okay. So you've watched the film Absolute
17 Proof?
18       A. I did.
19       Q. Are you aware of any statements that
20 Mr. Lindell made about you in that film?
21       A. I do not recall any.
22       Q. Okay. Were you familiar with Mr. Lindell
23 before the 2020 election?
24       A. In general, yes.
25       Q. And you knew him as the -- as what?

63 (Pages 246 - 249)

Page 254

1      Q.  I see.  At 5:53 on June 8th, it looks as
2  though ████████ said, "Give me a call, or Signal me -
3  same number as before.  It'd be good to catch up."
4          Do you see that?
5      A.  I do.
6      Q.  Did you -- or do you often communicate with
7  ████████ through Signal?
8      A.  I do not.
9      Q.  Have you ever communicated with him through
10  Signal?
11      A.  Not that I recall.
12      Q.  Have you ever communicated with anyone
13  through the -- when I say "Signal," I mean the app Signal,
14  correct?
15      A.  I have used Signal, yes.
16      Q.  Have you used Signal to communicate with
17  anyone about your case against Mr. Lindell, My Pillow, and
18  Frankspeech?
19      A.  No.  Not that I recall.
20      Q.  Who is ████████
21      A.  He is a fellow colleague that I met at the
22  University of California Berkeley.  We were both grad
23  students.  He started in -- he was there from 1993 to
24  1994.
25      Q.  And you've kept in touch with him since

Page 255

1  then?
2      A.  Off and on, yes.
3      Q.  And I'm assuming that you've provided this
4  email because on page 1 you refer to pillow-boy Lindell;
5  is that right?
6      A.  That is correct.
7      Q.  Okay.  You say that you have four active
8  lawsuits, soon to be five.  What was the fifth lawsuit
9  that you're referring to there?
10      A.  I don't remember the order.
11      Q.  Okay.  Anyone other than those that we've
12  talked about today or that were identified in your answer
13  to the interrogatories?
14      A.  There's no other cases other than the ones
15  listed.
16      MR. MALONE:  All right.  Dr. Coomer,
17  that's all I have for you today.  Thank you for your
18  time.
19      MR. CAIN:  We'll reserve our questions
20  until trial.
21      THE REPORTER:  Your order for transcript,
22  please.
23      MR. MALONE:  PDF condensed, if possible,
24  electronic condensed.
25      THE REPORTER:  And do you want exhibits

Page 256

1  for your copy?
2      MR. MALONE:  Yeah, that would probably be
3  good.  Mine are all over the place, so the official
4  exhibits would be good.
5      MR. CAIN:  Whatever Scotti Beam says, I
6  do.
7      THE REPORTER:  Do you want to handle
8  signature?
9      MR. CAIN:  Yes, I do.
10          * * * * * * * *
11      WHEREUPON, the foregoing deposition was
12  concluded at the hour of 4:56 p.m.  Total time on the
13  record was 6 hours and 48 minutes.
14
15
16
17
18
19
20
21
22
23
24
25

Page 257

1      REPORTER'S CERTIFICATE
2
3
4      I, Laurel S. Tubbs, a Registered
5  Professional Reporter and Notary Public within the State
6  of Colorado, do hereby certify that previous to the
7  commencement of the examination, the deponent was duly
8  sworn by me to testify to the truth.
9      I further certify that this deposition was
10  taken in shorthand by me at the time and place herein set
11  forth and thereafter reduced to a typewritten form; that
12  the foregoing constitutes a true and correct transcript.
13      I further certify that I am not related
14  to, employed by, nor of counsel for any of the parties or
15  attorneys herein, nor otherwise interested in the result
16  of the within action.
17      My commission expires September 1, 2023.
18
19
20  LAUREL S. TUBBS
    Registered Professional Reporter
    Registered Merit Reporter
21  Certified Realtime Reporter
    and Notary Public
22
23
24
25

65 (Pages 254 - 257)