**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01129-NYW-SKC

ERIC COOMER, PH.D.,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC, and
MY PILLOW, INC.,

      Defendants.

---

## ORDER ON PENDING DISCOVERY MOTIONS

---

This matter is before the Court on the following motions.

(1)     Plaintiff's Motion to Compel Document Production and Deposition Testimony from Third-Party Tina Peters Pursuant to F.R.C.P. 45 and Motion for Sanctions Pursuant to F.R.C.P. 37 ("Motion to Compel Peters") [Doc. 97, filed February 2, 2023];

(2)     Plaintiff's Objection to Third-Party CD Solutions Inc.'s Confidentiality Designations ("Objections to CD Solutions's Designations" or "Objections") [Doc. 113, filed February 24, 2023];[1] and

---

[1] Originally, Plaintiff's Objection to Third-Party CD Solutions, Inc.'s Confidentiality Designations [Doc. 113], Plaintiff's Reply to Third-Party CD Solutions Inc.'s Response to Plaintiff's Objections to Confidentiality Designations [Doc. 121], and their respective exhibits were all filed under Level 1 restriction. By Order dated June 2, 2023, this Court directed Plaintiff to file redacted versions of his Objections and Reply. [Doc. 148 at 5]. The redacted, public versions of the Objections and Reply were filed on June 6, 2023. [Doc. 154; Doc. 155]. That same day, the Court un-restricted a number of exhibits that, under no circumstances, could have been deemed confidential or subject to restriction, and ordered Plaintiff to confer with third-party CD Solutions, Inc. about the remaining exhibits that remained under restriction. [Doc. 156 at 2].

(3)     Non-Party Dominion Voting Systems, Inc.'s Motion to Modify Defendants' Subpoena ("Motion to Modify") [Doc. 125, filed April 4, 2023].

First, with respect to the Motion to Compel Peters, third-party Tina Peters ("Ms. Peters") filed a Response [Doc. 111]; Plaintiff Eric Coomer, Ph.D. ("Plaintiff" or "Dr. Coomer") filed a Reply [Doc. 114]; and Ms. Peters filed a Sur-reply with leave of Court [Doc. 134].[2]  Defendants Michael J. Lindell ("Defendant Lindell" or "Mr. Lindell"); Frankspeech LLC ("Frankspeech"); and My Pillow, Inc. ("MyPillow") (collectively, "Defendants") took no position with respect to Plaintiff's requested relief as to Ms. Peters but objected to certain statements and arguments made by Plaintiff in the Motion to Compel Peters [Doc. 102].  Dr. Coomer filed a Reply to Defendants' Response to Motion to Compel Document Production and Deposition Testimony from Third-Party Tina Peters [Doc. 110].  This Court held a Telephonic Discovery Conference on January 27, 2023 [Doc. 95], which precipitated the filing of the Motion to Compel Peters.

Second, with respect to Plaintiff's Objections to CD Solutions's Designations, third-party CD Solutions, Inc. ("CD Solutions" or "CDS") filed a Response [Doc. 118] and Dr. Coomer filed a Reply [Doc. 121].

Third, with respect to the relief sought by third-party Dominion Voting Systems, Inc. ("Dominion"), Defendants responded to the Motion to Modify [Doc. 131].  This Court held a hearing on the Motion to Modify on April 12, 2023, during which a number of the issues were resolved on the record.  [Doc. 133].

These three discovery motions are now fully briefed, and this Court finds that oral argument would not materially assist in the resolution of any of these motions.  For the reasons set

---

[2] Ms. Peters sought leave to file a sur-reply and the request was unopposed.  [Doc. 115].  The Court granted leave on April 12, 2023.  [Doc. 133].

forth herein, the Motion to Compel Peters is **GRANTED in part** and **DENIED in part**; Plaintiff's Objections to CD Solution's Designations are **SUSTAINED in part** and **OVERRULED in part**; and Non-Party Dominion Voting Systems, Inc.'s Motion to Modify Defendants' Subpoena is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

The Court has discussed the background of this case in detail, *see* [Doc. 119; Doc. 169], and therefore limits this section to the allegations most relevant to the motions before it. Dr. Coomer is the former Director of Product Strategy and Security for Dominion, which provides election support services throughout the United States, including during the 2020 presidential election. [Doc. 170 at ¶ 17]. Joseph R. Biden ("President Biden") won the 2020 presidential election. [*Id.* at ¶ 18]. Nevertheless, a number of individuals and organizations have challenged the legitimacy of the 2020 presidential election, and alleged that the result of such election was tainted by fraud.

Plaintiff alleges that Defendants "have been among the most prolific vectors of baseless conspiracy theories claiming election fraud in the 2020 election," [*id.* at ¶ 1], in that they "began promoting a variety of claims that the November 2020 election had been rigged against former President Trump very shortly after the election was called for President Biden." [*Id.* at ¶ 41]. Dr. Coomer alleges that Defendants based their theories of election fraud upon statements made by non-party Joe Oltmann ("Mr. Oltmann"),[3] who hosts a podcast called "Conservative Daily." [*Id.*

---

[3] This Court takes judicial notice that Plaintiff has filed a separate action against Mr. Oltmann and others based on these allegations in Colorado state court. *See* [Doc. 22; Doc. 194]; *see also St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (observing that, whether requested by the parties or not, "federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

at ¶ 28].  On November 9, 2020, Mr. Oltmann expressly identified Dr. Coomer as someone inside Dominion who was "specifically related to Antifa" and "controlling the elections."  [*Id.* at ¶ 29].  Dr. Coomer avers that, according to Mr. Oltmann, who purportedly infiltrated Antifa, Dr. Coomer participated in a conference call before the election during which Dr. Coomer claimed that he had rigged the election.  [*Id.*].  Mr. Oltmann then posted a photo of Dr. Coomer's house and encouraged his social media followers to "Blow this shit up.  Share, put his name everywhere.  No rest for this shitbag.  Eric Coomer, Eric Coomer, Eric Coomer.  This shitbag and the corrupt asshats in Dominion Voting Systems must not steal our election and our country!  Eric we are watching you . . . ."  [*Id.* at ¶ 35].

Dr. Coomer alleges that starting in late November 2020, Defendants sponsored the "Women for America First" bus tour, which traveled around the country in a bus emblazoned with the MyPillow logo and, during these sponsored events, Mr. Lindell mentioned "crooked Dominion machines," referring to Dr. Coomer's former employer.  [*Id.* at ¶ 41].  Even after Dominion sent cease-and-desist letters dated December 23, 2020, and January 8, 2021, Defendants continued.  [*Id.* at ¶¶ 42, 44].  On March 11, 2021, Mr. Lindell appeared as a guest on Mr. Oltmann's podcast and was introduced as "Mr. Mike Lindell, the CEO of MyPillow, affectionately known as the MyPillow guy."  [*Id.* at ¶ 47].  During the interview, Mr. Lindell informed Conservative Daily's listeners that they could use a unique promotional code for discounts on MyPillow products.  [*Id.*].  Mr. Oltmann concluded the interview by promoting Mr. Lindell's forthcoming social media platform, "Frankspeech," stating: "We will be a tireless advocate for MyPillow.  We'll be a tireless advocate for what we're doing on the election integrity issue, or side, and we will make sure people know about the platform."  [*Id.*].

Frankspeech launched in April 2021.  [*Id.* at ¶¶ 48–49].  Plaintiff alleges that "Defendants utilized Frankspeech to defame Dr. Coomer to an online audience around the world, including Colorado, where their defamatory conduct took a variety of forms, including republication of defamatory articles that had been retracted by other outlets, publication of defamatory interviews conducted by Frankspeech hosts, and publication of defamatory statements by Lindell himself." [*Id.* at ¶ 50].  For example, the Frankspeech website re-published Mr. Oltmann's podcast episodes containing "almost daily publications defaming Dr. Coomer with ongoing allegations that he participated in an Antifa conference call, claimed on that call that he intended to subvert the results of the 2020 election, and then did in fact subvert the presidential election."  [*Id.* at ¶ 51].

On May 3, 2021, Frankspeech anchor Brannon Howse ("Mr. Howse") interviewed Mr. Oltmann.  [*Id.* at ¶ 54].  Mr. Howse began the interview by stating, "[a]gain, I want to remind you before we go to our next guest in Colorado, he's going to tell you about a live conference call with one of the leaders of Dominion voting machines.  Before we go to that guest, don't forget, go to mypillow.com if you would.  Use the promo code FRANK and save up to 66%."  [*Id.*].  During this interview, Mr. Oltmann repeated his claims about the conference call, specifically identifying Dr. Coomer.  [*Id.* at ¶¶ 55–56].  He again explained that he identified Plaintiff as the "Eric" on the conference call using Google, stating he "started doing research" and "it didn't take [him] much to figure out who [Eric] was.  I Googled 'Eric Dominion Denver Colorado' and up pops all this information on Eric Coomer of Dominion Voting Systems and what he did."  [*Id.* at ¶ 57].

On May 7, 2021,[4] Newsmax issued an on-air retraction regarding claims about Dr. Coomer and Dominion, including an admission that "Newsmax has found no evidence that Dr. Coomer

---

[4] Though Paragraph 62 of the Second Amended Complaint and Jury Demand refers to "May 7, 2022," this appears to be a typographical error as it uses the predicate "[d]ays later" to refer to the preceding paragraph, which alleges that Mr. Oltmann's interview was on May 3, 2021.

interfered with the Dominion voting machines or voting software in any way, nor that Dr. Coomer ever claimed to have done so, nor has Newsmax found any evidence that Dr. Coomer ever participated in any conversation with members of Antifa, nor that he was directly involved with any partisan political organization." [*Id.* at ¶ 62]. On May 9, 2021, Mr. Lindell appeared on Frankspeech and stated, with respect to Plaintiff:

> Yeah, Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation so maybe, just maybe, that you get immunity and you only get to do, I don't know, ten, twenty years. I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America. And you know what? I can say that, just like I can about Brian Kemp and Brad Raffensberger. These are things that I have evidence of. The evidence is there. You know, it's sitting there. Well Mike, 'Why don't you turn it all in to the Supreme Court and bring it to the FBI?' Oh, it's getting to the Supreme Court, everybody.

[*Id.* at ¶ 63 (emphasis omitted)]. According to Plaintiff, Mr. Lindell's reference to "deals at Newsmax" refers to Newsmax's on-air retraction of similar claims about—and apology to—Dr. Coomer just days prior. [*Id.* at ¶ 64].

Then, in August 2021, Mr. Lindell hosted a "Cyber Symposium" that was "created, run, and produced by" Mr. Lindell, MyPillow, and Frankspeech. [*Id.* at ¶ 72]. During the Symposium, Ms. Peters, the then-County Clerk and Recorder for Mesa County, Colorado, allegedly claimed that her office had been "invaded" and "raided" by investigators from the Colorado Secretary of State's office, which was conducting an investigation into a potential breach of election security systems. [*Id.* at ¶ 77 (alteration omitted)]. Dr. Coomer further contends that speakers at the Cyber Symposium continued to make statements regarding Dr. Coomer's purported involvement in election fraud and his alleged "deep ties with Antifa," all of which were published by Defendants. [*Id.* at ¶¶ 72–97]. Defendant Lindell's relationships with Mr. Oltmann and Ms. Peters have continued since the Symposium. [*Id.* at ¶ 98].

Defendants were served with this lawsuit just before a "Colorado Election Truth Rally" on April 5, 2022. [*Id.* at ¶¶ 100–01]. Mr. Lindell, Mr. Oltmann, and Ms. Peters participated in the event, which was conducted on the steps of the Colorado State Capitol. [*Id.*]. After receiving service of process, Mr. Lindell gave a speech; referring to supposed election fraud, he stated: "It started with Eric Coomer and Dominion based right here in Colorado. By the way, [Plaintiff] just sued me as I walked up on the stage. Just sued me, I just got papers. Thanks, Eric! Now Eric will be the first one behind bars when we melt down the machines." [*Id.* at ¶ 102]. The next day, Frankspeech published another statement from Mr. Lindell:

> So everybody, if you want to know just how corrupt, the corruption we're up against. Eric Coomer served, had served papers to me before I was going onstage at the Capitol. I've never talked about Eric Coomer. He's the, apparently he's the president of Dominion, the criminal crime family here in Denver. . . .
>
> Eric Coomer, you are a criminal. Eric Coomer, your lawyers better look out. I'm not putting up with this. My Pillow doesn't even know who you are. My employees, I have 2,700 employees. Shame on you Eric Coomer. You did a very, very stupid move, Mr. Coomer. You're going to be the first one, right behind Rafsenberger [sic] and Jena Griswold behind bars. . . . You've been a part of the biggest crime this world has ever seen. Eric Coomer, president of Dominion, you have even said what you did or what you were going to do. You're disgusting. You're disgusting, you're evil, you belong behind bars, and we will not stop until you are behind bars. We're going to melt down your little machines and you're going to hang on to your little prison bars. "Let me out, let me out!" Should have thought about that, Eric Coomer, before you did crimes against the United States and quite frankly all of humanity. It's disgusting what you've done. You and Dominion. And Jena Griswold.

[*Id.* at ¶ 103]. Dr. Coomer alleges that, since that time, Defendants have continued to publish falsehoods about him through Mr. Lindell's guest appearances on various podcasts, [*id.* at ¶¶ 106, 116]; radio shows, [*id.* at ¶ 108]; and interviews, [*id.* at ¶¶ 119–20]. In one such interview, published by Frankspeech, Ms. Peters discussed receiving a subpoena from Dr. Coomer in this action and her reaction to it. [*Id.*].

Plaintiff initiated this lawsuit on April 4, 2022, in the District Court of Denver County, Colorado, [Doc. 4], and Defendants removed the case to federal court on May 5, 2022. [Doc. 1]. Defendants sought to dismiss the action.[5] [Doc. 18; Doc. 19]. On June 17, 2022, Dr. Coomer filed a First Amended Complaint and Jury Demand ("First Amended Complaint") to add additional allegations of conduct arising since the inception of the lawsuit. [Doc. 21]. Defendants moved to dismiss each of the claims asserted in the First Amended Complaint under Rule 12(b)(6). *See generally* [Doc. 38]. After full briefing on the merits, this Court denied Defendants' Motion to Dismiss on March 15, 2023. [Doc. 119]. Then, on April 6, 2023, Plaintiff sought leave to further amend his operative pleading, to include additional facts and to assert a demand for exemplary damages. [Doc. 127]. On July 7, 2023, this Court granted Plaintiff leave, directed him to file his Second Amended Complaint and Jury Demand ("Second Amended Complaint"), and ordered Defendants to file an answer to the Second Amended Complaint no later than July 21, 2023. [Doc. 169]. On July 21, 2023, Defendants answered the Second Amended Complaint. [Doc. 171].

In his Second Amended Complaint, Plaintiff asserts three causes of action against all Defendants: (1) defamation, (2) intentional infliction of emotional distress, and (3) civil conspiracy. [Doc. 170 at ¶¶ 146–59]. The Second Amended Complaint also includes demands for permanent injunctive relief as well as exemplary damages. [*Id* at ¶¶ 160–174].[6] Dr. Coomer

---

[5] These motions were stricken by the Honorable William J. Martínez. [Doc. 30]. The matter was reassigned to the undersigned on August 5, 2022, upon her appointment as a United States District Judge. [Doc. 42].

[6] Injunctive relief and exemplary damages are types of remedies, not standalone claims. *See zvelo, Inc. v. Akamai Techs., Inc.*, No. 19-cv-00097-PAB-SKC, 2019 WL 4751809, at *6 (D. Colo. Sept. 30, 2019) ("Injunctive relief is not a separate cause of action; rather it is one form of the relief for the other legal violations alleged." (alteration and quotation omitted)); *Dean v. Wright Med. Tech., Inc.*, 593 F. Supp. 3d 1086, 1103 (D. Colo. 2022) ("[A] claim for exemplary damages is not a separate and distinct cause of action, but rather is auxiliary to an underlying claim for actual damages." (alteration and quotation omitted)); *see also Jackson v. Johns*, 714 F. Supp. 1126, 1131

alleges that, as a result of Defendants' conduct, he has faced "an onslaught of harassment and credible death threats issued against him; he is at risk in his home or in going to work; his presence puts his family, friends, colleagues, and his community in danger." [*Id.* at ¶ 152]. He further avers that, as a direct and proximate result of Defendants' conduct, he has "suffered significant actual and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss." [*Id.* at ¶¶ 154, 159]; *see also* [*id.* at ¶ 150 ("As a direct and proximate result of Defendants' conduct, Dr. Coomer has suffered significant actual and special damages including, without limitation, harm to his reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.")].

A Scheduling Order entered on July 7, 2022, and pretrial discovery proceeded. [Doc. 32]. The Scheduling Order set a deadline for amendment of pleadings and joinder of parties of August 21, 2022. [*Id.* at 9]. Plaintiff made clear in the Scheduling Order that he anticipated seeking the depositions of various third parties. [*Id.* at 10]. Defendants filed a Motion to Stay Discovery and Pre-Trial Deadlines pending the Court's resolution of their Motion to Dismiss on September 28, 2022. [Doc. 57]. The Honorable S. Kato Crews denied the stay on November 15, 2022, [Doc. 76], and this Court then entered a Protective Order (which had been largely drafted and stipulated to by the Parties in this action) on November 16, 2022, to facilitate discovery—including, but not limited to, subpoenas directed to third parties.[7] [Doc. 77].

---

(D. Colo. 1989) ("A request for punitive damages is not a separate claim for relief but rather, is a prayer for damages.").

[7] The Court amended the Protective Order on June 2, 2023, to address the appropriate procedures and standards applicable to the filing of restricted documents, and in an attempt to give the Parties more guidance regarding its expectations around designations and filing under restriction. [Doc. 149]. In this Order, this Court applies the Protective Order as it existed when these various discovery motions were filed.

Nevertheless, various discovery disputes have arisen and these motions followed.  Given

that the pleadings now appear settled for the first time in this action, and the Parties have filed

other motions that may be impacted by the ruling contained herein, the Court turns to the respective

discovery motions.

## LEGAL STANDARDS

### I.   Discovery Generally

Rule 26(b)(1) of the Federal Rules of Civil Procedure defines the scope of permissible

discovery.  *See* Fed. R. Civ. P. 26(b)(1).  The Rule permits discovery "regarding any nonprivileged

matter that is relevant to any party's claim or defense and proportional to the needs of the case."

*Id.*  Rule 401 of the Federal Rules of Evidence defines relevant evidence as having "any tendency"

to make a fact that "is of consequence in determining the action" either "more or less probable

than it would be without the evidence."  Fed. R. Evid. 401.  In defining the scope of appropriate

discovery, the Parties and the Court are directed to consider "the importance of the issues at stake

in the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden

or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

### II.   Rule 45

Federal Rule of Civil Procedure 45 governs subpoenas.  Rule 45(a)(1)(A)(iii) provides that

a Party may issue a subpoena to produce documents, known as a subpoena duces tecum.  A

subpoena served on a third party pursuant to Rule 45 of the Federal Rules of Civil Procedure is

considered discovery within the meaning of those Rules.  *Rice v. United States*, 164 F.R.D. 556,

557–58 (N.D. Okla. 1995).  Accordingly, a subpoena is bound by the same standards that govern

discovery between the Parties: to be enforceable, a subpoena must seek information that is relevant

to a Party's claims or defenses and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

On a timely motion, the Court must quash or modify a subpoena that (1) "fails to allow a reasonable time to comply"; (2) "requires a person to comply beyond the geographical limits specified in Rule 45(c)"; (3) "requires disclosure of privileged or other protected matter, if no exception or waiver applies"; or (4) "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). The Court *may* quash or modify a subpoena that requires (1) "disclosing a trade secret or other confidential research, development, or commercial information"; or (2) "disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B). Generally, "a party has no standing to quash a subpoena served upon a third party, except as to claims of privilege relating to the documents being sought," or "upon a showing that there is a privacy interest applicable." *Windsor v. Martindale*, 175 F.R.D. 665, 668 (D. Colo. 1997) (citations omitted) ("Absent a specific showing of a privilege or privacy, a court cannot quash a subpoena duces tecum."). "Objections unrelated to a claim of privilege or privacy interests are not proper bases upon which a party may quash a subpoena." *Cobbler Nev., LLC v. Does*, No. 15-cv-02771-WYD-MEH, 2016 WL 300827, at *1 (D. Colo. Jan. 25, 2016) (citations omitted). Ordinarily, the failure to lodge a timely objection under Rule 45(d)(2)(B) will constitute a waiver of any objection to production of the designated documents. *Metro Mart, Inc. v. N. Star Mut. Ins. Co.*, No. CIV-14-1215-W, 2015 WL 13567095, at *2 (W.D. Okla. June 9, 2015) (citing 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2463 at 481 (3d ed. 2008)).

In addition, "[i]n determining whether to grant a motion to compel non-party production under Rule 45, courts 'consider the burden on the nonparty, relevance, the requesting party's need

for the documents, the breadth of the document request, and the time period covered by the request.'" *Al Muderis v. Hernandez*, No. 20-mc-00090-RM, 2021 WL 119348, at *2 (D. Colo. Jan. 13, 2021) (quoting *Premier Election Sols., Inc. v. Systest Labs Inc.*, No. 09-cv-01822-WDM-KMT, 2009 WL 3075597, at *3 (D. Colo. Sept. 22, 2009)).  "While the court has considerable discretion with regard to regulating discovery which is exchanged in a lawsuit, discovery from third-parties in particular must, under most circumstances, be closely regulated." *Premier Election Sols.*, 2009 WL 3075597, at *3.

## III.    Confidentiality and Protective Orders

Rule 26(c) of the Federal Rules of Civil Procedure provides that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).  The Party seeking a protective order bears the burden of establishing its necessity, *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981), but the entry of a protective order is left to the sound discretion of the Court.  *See Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008).  As part of the exercise of its discretion, the Court may specify the terms for disclosure. Fed. R. Civ. P. 26(c)(1)(B).  While a protective order may be appropriate where a trade secret or other confidential information is at issue, the existence of a trade secret is not required.  Instead, the good cause standard is highly flexible, having been designed to accommodate all relevant interests as they arise.  *See Rohrbough*, 549 F.3d at 1321.  Judge Boland has cogently explained that there are at least three kinds of protective orders that courts have utilized to limit discovery or the dissemination of information— (1) particular protective orders, (2) blanket protective orders, and (3) umbrella protective orders. *See Gillard v. Boulder Valley Sch. Dist. RE-2*, 196 F.R.D. 382, 385–86 (D. Colo. 2000).

12

In this action, the Parties filed a Stipulation Regarding Proposed Protective Order, [Doc. 74], with a proposed blanket protective order that places the initial burden of determining what information is entitled to protection upon the producing party. *See Gillard*, 196 F.R.D. at 386. This Court entered a Protective Order, with limited amendments to the Parties' proposal, on November 16, 2022. [Doc. 77]. This Court then amended the Protective Order on June 2, 2023, to clarify issues related to the filing of documents as restricted on the public docket. [Doc. 149].

## ANALYSIS

I.     **Motion to Compel Peters**

By notice[8] and subpoena dated August 29, 2022, Plaintiff gave notice of the deposition of Ms. Peters, to occur on November 7, 2022, in Grand Junction, Colorado. [Doc. 51; Doc. 97-1]. In addition to deposition testimony, Dr. Coomer also subpoenaed the following categories of documents:

1.     All written communications between You and Lindell, FrankSpeech, or My Pillow between January 1, 2020 and the present, including, but not limited to, all written communications relating to Dr. Coomer or Dominion Voting Systems.

2.     All written communications between You and Joseph Oltmann between January 1, 2020 and the present, including, but not limited to, all written communications discussing Dr. Coomer or Dominion Voting Systems.

3.     All documents and communications authored, sent, or received by You relating to concerns about the accuracy, reliability, verifiability, or truthfulness of the information published during the Cyber Symposium.

4.     All documents and communications between You and any other members of the so-called "Red Team" at the Cyber Symposium, including, but not limited to, all documents or communications between You and Phil Waldron, Doug Logan, Conan Hayes, Ron Watkins (aka Code Monkey), Mark Cook, Shawn Smith, Lisa Draza, and/or Oltmann, between October 1, 2020 and the present.

---

[8] The title of the notice references Joseph Oltmann, but its body and the attached subpoena identify Ms. Peters as the person to whom the subpoena is directed. [Doc. 97-1 at 2, 5]. Accordingly, this Court takes the reference to Mr. Oltmann in the title as simply a typographical error.

5.      All documents and communications authored, sent, or received by You specifically linking Dr. Coomer to specific acts of interference, manipulation, or alteration of the 2020 presidential election results.

6.      All documents and communications authored, sent, or received by You describing the credentials, qualifications, or work experience of Conan James Hayes, including, but not limited to, communications with any third parties who claimed to be able to vouch for those credentials, qualifications, or work experience.

7.      All documents and communications authored, sent, or received by You relating to any surveillance of, threats directed towards, or harassment of Dr. Coomer between January 1, 2020 and the present.

8.      All documents or communications authored, sent, or received by You discussing any visits by Conan James Hayes to Mesa County, Colorado, between January 1, 2020 and the present, including, but not limited to, any communications identifying all individuals who interacted with Conan James Hayes during his time in Colorado.

[Doc. 97-1 at 13]. Ms. Peters appeared for her deposition on November 7, 2022, and was represented by Scott E. Gessler ("Mr. Gessler") of Gessler Blue LLC and Stephen F. Prager ("Mr. Prager") of Springer & Steinberg, P.C. She proceeded to invoke the Fifth Amendment based on advice of counsel on every question beyond her name and a few preliminary questions. [Doc. 97-2 at 6:10–25].[9] In addition, according to Dr. Coomer, Ms. Peters did not produce responsive documents. [Doc. 97 at 3]. The Parties appeared before this Court on January 27, 2023, for a Telephonic Discovery Hearing during which Ms. Peters was represented by Mr. Gessler (but not Mr. Prager) and the Court directed Plaintiff to file a motion to compel. [Doc. 95]. The instant Motion to Compel followed. [Doc. 97].

In the Motion to Compel, Dr. Coomer argues that the Fifth Amendment is not a shield that can be invoked by Ms. Peters to escape compliance with the document subpoena, nor as a blanket

---

[9] When citing to a transcript, this Court refers to the docket number assigned by the United States District Court for the District of Colorado's Electronic Case Files ("ECF") system, but the page and line number of the original transcript, for the purpose of consistency.

response to all deposition questions.  [*Id.* at 4].  To that end, Dr. Coomer offers a chart that reflects the categories of topics raised in the November 7 deposition as to which Ms. Peters invoked the Fifth Amendment: (1) her relationship and communications with Defendants and Mr. Oltmann; (2) her relationship and communications with other relevant third parties, including Phil Waldon, Ron Watkins, Patrick Byrne, Dr. Frank, Sherronna Bishop, David Clements, Mike Flynn, Clay Clark and/or the ReAwaken America Tour, Joe Flynn, Steve Lucescu, and The America Project; (3) potential undue influence of Defendants or Mr. Oltmann; (4) Mesa County criminal allegations; (5) documents requested and deposition preparation; (6) her work as County Clerk and experience of administering the 2020 election; (7) questions related to Dr. Coomer; (8) the Cyber Symposium; (9) invocation of the Fifth Amendment; and (10) her beliefs about the 2020 election and subsequent work with election deniers.  [Doc. 97-6].[10]  In addition, Dr. Coomer seeks attorney's fees and costs associated with his attorney's attendance at the November 7 deposition, for the filing of the Motion to Compel, and for the attendance of a subsequent deposition.  [Doc. 97 at 4].

In her Response, Ms. Peters argues that she has been indicted by a state grand jury and faces an upcoming[11] criminal trial on thirteen criminal counts ("Mesa County Indictment") involving her activities with respect to Colorado's elections, particularly the Mesa County 2021 election and the execution of her duties as Mesa County Clerk and Recorder during that time.

---

[10] Ms. Peters contends that [Doc. 97-6] should be stricken, based on exceeding the Court's page limitations.  [Doc. 111 at 10].  While this Court appreciates Ms. Peters's attention to its Civil Practice Standards, this Court finds that the chart is useful in assisting the Court in substantively ruling and, therefore, respectfully declines to strike it.

[11] Originally scheduled for March 2023 and then moved to August 2023, [Doc. 111-1 at ¶ 3], this Court takes judicial notice of the docket from the Mesa County District Court for the State of Colorado indicating that trial in *People v. Peters et al.*, Case No. 2022CR371, is now set to commence on or about February 9, 2024.  *See St. Louis Baptist Temple*, 605 F.2d at 1172.

[Doc. 111-1 at ¶ 4].  Ms. Peters also asserts that she is subject to an investigation by the United States Department of Justice.  [*Id.* at ¶ 5].  Accordingly, Ms. Peters argues that she is entitled to invoke the Fifth Amendment, now and until she no longer faces state criminal charges and potential federal criminal charges, as to any questions about her communications with others, particularly with others involved in election-related matters, or that implicate the conspiracy charges set forth in the Mesa County Indictment, the execution of her official duties, or her interactions with others involving elections.  [Doc. 111 at 5–12; Doc. 111-1 at ¶¶ 9–10].  Ms. Peters further contends that she has no additional documents to produce, because her electronic devices have been seized on two occasions by state and federal authorities, and, even if relevant documents existed, they would be subject to Fifth Amendment protection.  [Doc. 111 at 13].  Finally, Ms. Peters argues that costs and fees are unwarranted because any such expenses are "self-imposed," as Ms. Peters's counsel informed Dr. Coomer's counsel that Ms. Peters would likely invoke her Fifth Amendment privilege as to "nearly every question" posed to her.  [*Id.* at 14].

On Reply, Dr. Coomer concedes that Ms. Peters's invocation of the Fifth Amendment is likely necessary with respect to the Mesa County criminal allegations, but contends that she should otherwise answer questions under the remaining topics.  [Doc. 114 at 7, 10].  In her Sur-reply, Ms. Peters continues to argue that Dr. Coomer bears the burden of establishing that she did not properly invoke the Fifth Amendment with respect to each topic.  [Doc. 134].

### A.     Contours of the Fifth Amendment in Civil Litigation

Rule 501 of the Federal Rules of Evidence provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 501.  This Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332 in this removed

case, [Doc. 1], so the basis for Plaintiff's substantive causes of action is Colorado law.[12]   The Fifth Amendment of the United States Constitution is applicable to the States through the Fourteenth Amendment and provides: "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V; *see People v. Ruch*, 379 P.3d 309, 313 (Colo. 2016).   It is well-settled that "[t]he Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."   *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).   The invocation of the Fifth Amendment, however, is not unfettered, nor may the privilege be invoked simply based on the witness's say-so.   *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

While the invocation of the Fifth Amendment privilege against self-incrimination is accorded liberal application, *In re Lindsey*, 229 B.R. 797, 801 (B.A.P. 10th Cir. 1999) (citing *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1077 (6th Cir. 1990)), blanket assertions of the Fifth Amendment are not proper, *see Valdez v. Motyka*, No. 15-cv-00109-WJM-STV, 2021 WL 1216525, at *3 (D. Colo. Mar. 31, 2021) (citing *United States v. Clark*, 847 F.2d 1467, 1474 (10th Cir. 1988)).   Instead, an individual must invoke the privilege "in response to individual questions upon their reasonable belief that a compulsory response by them to these testimonial matters will pose a substantial and real hazard of subjecting *them* to *criminal* liability."   *Clark*, 847 F.2d at 1474 (emphasis altered and quotation omitted).   The privilege adheres to the person, not to information that may incriminate her. *United States v. Nobles*, 422 U.S. 225, 233 (1975).   It "does

---

[12] Dr. Coomer identified the basis of the state court's jurisdiction as Article VI, section 9 of the Colorado Constitution and Colo. Rev. Stat. § 13-1-124.   [Doc. 4 at ¶ 9].

not permit a witness to remain silent to avoid incriminating a third party." *People v. Knapp*, 505 P.2d 7, 10 (Colo. 1973).

In addition, with respect to documents, the Fifth Amendment protects the person asserting privilege only from *compelled* self-incrimination. *See United States v. Doe*, 465 U.S. 605, 610 (1984). Accordingly, where the preparation of the underlying documentation is voluntary, no compulsion is present and the demand of production of documents alone does not require the individual to restate, repeat, or affirm the truth of their contents. *Id.* at 610–12. Indeed, it is a "settled proposition that a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled.'" *United States v. Hubbell*, 530 U.S. 27, 36 (2000).

## B.       Burden

Ms. Peters contends that Dr. Coomer "bears the burden to argue that the subject matter of his questions is proper." [Doc. 111 at 2]. Ms. Peters is correct that, generally, a party seeking to compel discovery must establish that the discovery sought is relevant and proportional to the needs of the case, and that the discovery responses are incomplete. *See Fresquez v. BNSF Ry. Co.*, No. 17-cv-00844-WYD-SKC, 2018 WL 6249685, at *2 (D. Colo. Sept. 17, 2018). But failing to lodge a timely objection to a Rule 45 subpoena operates as a waiver of any challenge to production absent unusual circumstances or good cause. *See Amica Mut. Ins. Co. v. Whois Privacy Prot. Serv., Inc.*, No. 12-cv-00262-REB-KLM, 2012 WL 1657728, at *3 (D. Colo. May 11, 2012); *see also In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998) ("[I]t is clear that Rule 45 contemplates assertion of all objections to document production within 14 days."); *Voxpath RS, LLC v. LG Elecs. U.S.A., Inc.*, No. MC 13-004-TUC-CKJ, 2013 WL 5744045, at *3 (D. Ariz. Oct. 23, 2013) ("[A] nonparty's failure to timely make objections to a Rule 45 subpoena duces tecum generally requires

the court to find that any objection has been waived."); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2463 (3d ed. April 2023 update) ("A failure to object within the fourteen-day period usually results in waiver of the contested issue.").

Ms. Peters does not dispute that she did not object to the Rule 45 subpoena in writing. *Compare* [Doc. 97], *with* [Doc. 111; Doc. 111-1; Doc. 111-2]. Indeed, Ms. Peters argues that she has fully complied with the subpoena. [Doc. 111 at 11]. Therefore, to the extent that Ms. Peters suggests that Dr. Coomer must establish the relevancy of the topics at issue, [*id.* at 2 ("She responded to the subpoena, despite its overbreadth."); *id.* at 3 ("Coomer bears the burden to argue that the subject matter of his questions is proper."); *id.* at 8 (describing Dr. Coomer's deposition of Ms. Peters as a "fishing expedition")], this Court finds that she has waived such objections. In addition, this Court is puzzled by Ms. Peters's suggestion that Dr. Coomer has not established that her deposition answers are incomplete. [Doc. 111 at 3–4]. There can be no genuine dispute that Ms. Peters did not answer the questions posed by Dr. Coomer's counsel during her deposition. *See* [Doc. 97-2].

Ms. Peters's arguments suggest that Dr. Coomer bears the burden of establishing that she did not properly invoke her Fifth Amendment privilege against self-incrimination. *See* [Doc. 111 at 3–8]. This Court respectfully disagrees. Ms. Peters, as the person invoking the privilege, bears the burden of establishing that she has "reasonable cause to apprehend danger upon giving a responsive answer that would support a conviction, or would furnish a link in the chain of evidence needed to prosecute [her] for a violation of the criminal statutes." *United States v. Schmidt*, 816 F.2d 1477, 1481 (10th Cir. 1987) (quotations omitted). Indeed, this is consistent with the assertion of other privileges in the context of civil litigation. *See Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984) (reaffirming that "the party seeking to assert the attorney-client

privilege or the work product doctrine as a bar to discovery has the burden of establishing that either or both is applicable" (quotation omitted)).  Nevertheless, this Court notes that Ms. Peters's burden is "minimal," *see In re Lindsey*, 229 B.R. at 801, and the United States Supreme Court has long held that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486–87.  To hold otherwise might compel the witness to surrender the very protection which the privilege is designed to guarantee.  *See id.*

### C.  Application

#### 1.  Deposition Testimony

*Generally.*  As an initial matter, this Court addresses Plaintiff's contention, and Ms. Peters's denial, that Ms. Peters improperly invoked the Fifth Amendment privilege in a blanket fashion.  *Compare* [Doc. 97 at 3], *with* [Doc. 111 at 7–8].  While Ms. Peters appeared at her deposition on November 7, 2022, and technically invoked her Fifth Amendment privilege against self-incrimination to nearly every question, it is difficult to conclude that counsel exercised any level of discernment when interposing the objections on behalf of Ms. Peters.  For instance, Mr. Gessler invoked the Fifth Amendment privilege on behalf of his client when she was asked:

- To identify an individual in the room purportedly providing security and a dog, [Doc. 97-2 at 8:23–9:12];

- Whether she had "some time" to prepare for her deposition, [*id.* at 10:18–23];

- Whether she met with her attorney to prepare for the deposition, [*id.* at 10:24–11:3];

- Whether she was taking any medication or substance that would affect her ability to give truthful testimony, [*id.* at 11:15–20];

- Whether she understood all of the questions up to a certain point in the deposition, [*id.* at 13:11–14];

- Whether she had been served a subpoena in this action and whether she remembered being served with such subpoena, [*id.* at 13:20–23, 14:23–15:7];

- Whether she filed with this Court any objections to or motions about the subpoena's request for documents, [*id.* at 15:20–16:5];

- Whether she had reviewed the subpoena or produced documents in response to the subpoena, [*id.* at 16:6–18, 17:2–6];

- Whether she saw a statement on the subpoena itself that stated "Documents Requested," [*id.* at 16:23–17:1];

- Whether she was currently employed, [*id.* at 32:8–10];

- Whether it was her first term as a County Clerk, [*id.* at 32:24–33:2];

- Whether she had a definition of Antifa, [*id.* at 47:1–5]; and

- Whether Mesa County published vote totals on the Mesa County Clerk's website, [*id.* at 69:3–13].

Indeed, the limited questions that Ms. Peters responded to were largely directed to whether she understood that, unless she stated otherwise, counsel for Dr. Coomer would assume that she understood a question, [*id.* at 36:5–16], and whether she intended to follow her attorney's advice with regard to invoking the Fifth Amendment, *see, e.g.*, [*id.* at 44:9–45:1]. While Ms. Peters did not assert the privilege as a "blanket claim" in advance of questions actually being propounded, *see State ex rel. Weiser v. Castle Law Grp., LLC*, 457 P.3d 699, 714 (Colo. App. 2019) (holding that "the case law does not prohibit a witness from invoking her privilege to all the questions that a lawyer asks; it only prevents a witness from invoking the privilege without knowing what she

would be asked"), this Court notes that indiscriminate invocation of the Fifth Amendment, without regard to whether there is reasonable cause to apprehend danger from a direct answer to the question, is also not consistent with the authority in the Colorado state courts, the Tenth Circuit, or this District. *See Rios-Vargas v. People*, 532 P.3d 1206, 1213 (Colo. 2023); *United States v. Jones*, 703 F.2d 473, 475–76 (10th Cir. 1983). In her response, Ms. Peters points to several potential bases for the invocation of her Fifth Amendment privilege against self-incrimination, which the Court discusses in turn.

***Mesa County Indictment.*** Ms. Peters first argues that testimony regarding her communications with others implicates her Fifth Amendment privilege against self-incrimination because of Counts Four and Seven of the Mesa County Indictment. [Doc. 111-1 at ¶ 9]. The Mesa County Indictment arises from the Colorado Secretary of State's trusted build election management software updates that were set to begin in Mesa County on May 25, 2021. [*Id.* at 12–13]. The Mesa County Indictment alleges that on April 16, 2021, Jessi Romero ("Mr. Romero"), the Voting Systems Manager with the Colorado Secretary of State, informed Mesa County's election staff that only required personnel from Dominion, the Secretary of State, and Mesa County would be permitted in the trusted build, but that the build would occur under camera, and members of the public could review the footage afterward. [*Id.* at 12]. The Mesa County Indictment further charges that on April 26, 2021, Mr. Romero informed Ms. Peters and other clerks across Colorado that if unauthorized individuals were onsite during the trusted build, the Secretary of State would "move on to the next county." [*Id.* at 13]. The Mesa County Indictment alleges that by the end of the day on May 17, 2021, the security cameras in the trusted build area had been turned off and remained non-operational through the entire installation process, and that on the day of the trusted build, Ms. Peters introduced a person named "Gerald Wood," who participated in the trusted build

process.  [*Id.* at 14–15].  The actual Gerald Wood later denied accessing the Mesa County Clerk and Recorder's Office, either on the date of the trusted build or on other dates that a key card assigned to him was utilized.  [*Id.* at 15].  In August 2021, Secretary of State employees learned that images of the Mesa County election management systems and related passwords were available on the internet and issued Election Order 2021-01, directing Ms. Peters and the Mesa County Clerk and Recorder's Office to provide certain information, documentation, communications, and images related to the May 2021 trusted build.  [*Id.*].

In Count Six, Ms. Peters is charged with unlawfully, feloniously, and knowingly assuming the false or fictitious identity of Gerald Wood.  [*Id.* at 7].  In both Counts Four and Seven, Ms. Peters is charged with conspiracy to commit criminal impersonation based on acts related to the trusted build that occurred between April 23, 2021, and May 27, 2021. [*Id.* at 7–8].  The conspiracy counts reflect that Ms. Peters conspired with Sandra Brown, co-defendant Belinda Knisley (for Count Four only), "and/or a person or persons to the Grand Jury and District Attorney unknown." [*Id.* at 7].

Harvey Steinberg ("Mr. Steinberg"), one of Ms. Peters's attorneys in that matter, describes the criminal proceeding as focusing on Ms. Peters's conduct during the second half of 2021.  [Doc. 111-1 at ¶ 4].  Dr. Coomer concedes, and this Court concludes, that Ms. Peters's invocations of the Fifth Amendment in response to deposition questions directed at the Mesa County criminal allegations are "likely warranted."  [Doc. 114 at 7].  The fact that answers to such questions may also be "a critical component of Lindell's Cyber Symposium" and "underpin Plaintiff's defamation claims in this case," [*id.*], does not change the Court's analysis that the Fifth Amendment protects a witness from compelled self-incrimination.  Nor does the fact that Ms. Peters may have made public statements about the trusted build affect the analysis; the Fifth Amendment does not bar

statements by Ms. Peters that were voluntary and not compelled.  Thus, to the extent that Plaintiff's questions were directed at the allegations related to Ms. Peters's knowledge of Dominion voting systems used by Mesa County, the placement of such equipment within the Mesa County Clerk's Office, the 2021 trusted build, the involvement of any others with regard to the alleged actions involving "Gerald Wood," or the posting of any images of or information about the Mesa County election management systems and related passwords on the internet, this Court concludes that Ms. Peters properly invoked her Fifth Amendment privilege in declining to respond to such questions.

*Other Investigations.*  In addition, counsel for Ms. Peters submitted a Declaration under the penalty of perjury that states that on September 3, 2021, he met with the Mesa County District Attorney about potential criminal charges against Ms. Peters for her actions between May and August 2021 with respect to Mesa County's election preparation.  [Doc. 111-2 at ¶ 4].  Mr. Gessler further states that the District Attorney informed him that the investigation included Ms. Peters's actions at the Cyber Symposium and that he was "keenly interested in Ms. Peters' relationship and communications with Mike Lindell, Sherronna Bishop, and others involved in election-integrity efforts and concerns about voting equipment."  [*Id.* at ¶ 5].  Mr. Gessler further declares that the District Attorney explained that these efforts were part of a joint task force, including both state and federal investigators, examining Ms. Peters's election-related activities.[13]  [*Id.* at ¶ 6].

This Court takes these representations, made under the penalty of perjury by Mr. Gessler, an officer of the Court, as true.  S*ee People v. Espinoza*, 35 P.3d 552, 559 (Colo. O.P.D.J. 2001) (observing that "[a]n attorney who knowingly makes a false statement of material fact to a court

---

[13] Mr. Steinberg also indicates his "belie[f]" that federal prosecutors were investigating Ms. Peters. [Doc. 111-1 at ¶ 5].  But Mr. Steinberg omits additional details of such an investigation and does not provide any corroborating information, such as a letter from the Department of Justice informing Ms. Peters that she is the target of a grand jury investigation.  Thus, this Court relies on Mr. Gessler's more specific statements regarding any federal investigation.

violates the most fundamental duty of an officer of the court"); *Wallic v. Owens-Corning Fiberglass Corp.*, 40 F. Supp. 2d 1185, 1190 (D. Colo. 1999) ("[A] fundamental premise of our judicial system [is] that '[a]ttorneys are officers of the court, and when they address a judge solemnly upon a matter before the court, their declarations are virtually made under oath.'" (quoting *Selsor v. Kaiser*, 81 F.3d 1492, 1501 (10th Cir. 1996))); D.C.COLO.LAttyR 2 (adopting the Colorado Rules of Professional Conduct as the standards of professional responsibility for the United States District Court for the District of Colorado).   In turn, this Court relies on these statements by Mr. Gessler to conclude that Ms. Peters could invoke the Fifth Amendment in response to Plaintiff's inquiries into (1) her communications between May and August 2021 with Defendants, Mr. Oltmann, and other relevant third parties, including but not limited to Sherronna Bishop; and (2) her work as County Clerk and experience administering the 2020 and 2021 elections.

*Other Civil Actions*.   Mr. Gessler notes that Ms. Peters is a party in other civil and administrative actions, including *Griswold v. Peters*, No. 2022CV30007 in Mesa County District Court, which involves her "official duties" as the Clerk and Recorder of Mesa County, Colorado. [Doc. 111-2 at ¶¶ 3, 11].  But the Fifth Amendment cannot be invoked to shield an individual from civil liability.  *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 296 n.20 (1983) (Stevens, J., dissenting). Therefore, to the extent that Ms. Peters suggests that she may invoke the Fifth Amendment to avoid civil liability, such invocation is misplaced.

*Conclusion.*   Given these boundaries, this Court is not persuaded that Ms. Peters has carried her burden and established that all deposition testimony sought by Plaintiff implicates a reasonable risk of self-incrimination.  For one thing, even as described by her attorneys, Ms. Peters's actions and communications prior to May 2021 do not appear to be subject to criminal

investigation.  Indeed, neither Mr. Steinberg nor Mr. Gessler suggests otherwise.  *See generally* [Doc. 111-1; Doc. 111-2].  Nor does Ms. Peters argue that her communications with anyone, including Mr. Lindell or Mr. Oltmann, regarding her testimony in this action, or the payment of her attorney's fees and costs associated with this action—particularly after Ms. Peters separated from her role as Mesa County Clerk and Recorder—could be subject to criminal (as opposed to administrative) sanctions.  *See generally* [Doc. 111; Doc. 111-1; Doc. 111-2].  Nor does she explain the link between potential criminal exposure and testimony about her knowledge of Dr. Coomer, any phone call in which Dr. Coomer allegedly participated in September 2020, or any investigation Ms. Peters independently engaged in to verify Mr. Oltmann's statements regarding Dr. Coomer's alleged role in Antifa or any type of election-related fraud in 2020.  *See generally* [Doc. 111].  And this Court notes that Ms. Peters has not been named as a defendant in various cases filed against former President Trump and other individuals.

Thus, the Motion to Compel Peters is **GRANTED in part** and **DENID in part**.  This Court **ORDERS** Ms. Peters to appear for a second deposition, for a period of no longer than one day of five hours, subject to the rulings in this Order, to occur no later than **November 13, 2023**.  The Parties shall file a Notice with the Court no later than **October 13, 2023**, informing the Court of the date and time of the deposition.  In addition, this Court expects such deposition to be in person, unless Ms. Peters and the Parties otherwise agree or this Court enters an order consistent with Rule 30(b)(4).

## 2.    Documents

Ms. Peters's Response states, unequivocally, that "additional documents do not exist." [Doc. 111 at 12].  Of course, this Court cannot compel production of documents that do not exist. *See Smith v. Pizza Hut, Inc.*, No. 09-cv-01632-CMA-BNB, 2013 WL 1751850, at *3 (D. Colo.

Apr. 23, 2013).  But the Court notes that this statement is pure attorney argument.  *See* [Doc. 111 at 12–13].  There is no supporting declaration or affidavit by Ms. Peters indicating that she no longer has access to any of her electronic devices.  Nor is there any evidence that Ms. Peters has minimized the use of her electronic communications for any reason.  Indeed, even putting aside whether Ms. Peters was using an electronic device at her November 7 deposition, it appears that Ms. Peters possessed and used an electronic device as of February 2022, after the seizure of electronic equipment on November 15, 2021.  *See People v. Knisley*, 521 P.3d 641, 644 (Colo. 2022); *see also* [Doc. 111 at 6].  And as Ms. Peters avoided, on Fifth Amendment grounds, questions about her review of and response to the subpoena during her November 7 deposition, *see supra*, this Court respectfully declines Ms. Peters's request to permit her to belatedly supply a "sworn written statement affirming that she has produced all responsive documents in her possession."  [Doc. 134 at 5].

This Court further finds that Ms. Peters's secondary reliance on the Fifth Amendment privilege against self-incrimination with respect to document production, [Doc. 111 at 13 ("Lastly, even if Peters did have relevant documents (which she does not), communications with others involving election-related matters goes to the heart of the criminal investigation and would be subject to Fifth Amendment protection.")], may not be justified.  Even if her communications with others involve election-related matters, such communications may not be subject to Fifth Amendment protection if they were voluntary in nature and the act of production does not implicate the Fifth Amendment.  *See Doe*, 465 U.S. at 613–14.  But without further information, this Court cannot make a determination as to whether or not any documents have been withheld, or whether the act of production of such documents would implicate Ms. Peters's Fifth Amendment rights.

Accordingly, this Court **ORDERS** Ms. Peters to review the documents requested by the subpoena and **SUPPLEMENT** her responses no later than **October 31, 2023**. To the extent that there are any responsive documents (electronic or otherwise) to which she is invoking the Fifth Amendment or any other privilege, Ms. Peters shall provide counsel in this action with a privilege log, consistent with the requirements of Rule 26(b)(5)(A).

### D.      Attorney's Fees and Costs

In seeking attorney's fees and costs associated with the November 7 deposition of Ms. Peters, Dr. Coomer invokes Rule 37(c)(1)(A) of the Federal Rules of Civil Procedure. *See* [Doc. 97 at 15]. Ms. Peters argues that Rule 37(c)(1)(A) only applies to the Parties. [Doc. 111 at 14]. This Court agrees that the plain language of Rule 37(c)(1)(A) only applies to parties to an action. There is no express provision in Rule 37 permitting a motion to compel responses to a Rule 45 subpoena, *see* Fed. R. Civ. P. 37(a)(3)(B), and Rule 45 contains no similar fee-shifting provision. *See generally* Fed. R. Civ. P. 45. Absent any authority from Plaintiff demonstrating that he may be entitled to an award of fees pursuant to Rule 37, this Court declines to address the merits of the request at this time.[14]

## II.      Plaintiff's Objections to CD Solutions's Designations

As relevant to Plaintiff's Objections, Plaintiff sought certain discovery by subpoenaing third-party Max McGuire ("Mr. McGuire"), who co-hosted Conservative Daily with Mr. Oltmann for several years before the circumstances giving rise to this action, and for eighteen months thereafter. *See* [Doc. 113 at 2–3]; *see also* [Doc. 113-2]. On November 14, 2022, CD Solutions

---

[14] Dr. Coomer has requested an opportunity to more fully brief the issue of attorney's fees and costs in a separate motion. [Doc. 97 at 15]. To the extent that such a motion is filed, Dr. Coomer shall expressly set forth the authority upon which he relies to argue that cost- and fee-shifting are appropriate.

filed a Motion for Protective Order ("CD Solutions's Motion for Protective Order"), seeking guidance from the Court in light of Mr. McGuire's non-disclosure obligations to PIN Business Network, Inc. d/b/a DoBizLo ("PIN"), a corporation founded by Mr. Oltmann, and to CD Solutions, where Mr. Oltmann had served as Chief Executive Officer. *See* [Doc. 75 at 2]. In the context of CD Solutions's Motion for Protective Order, counsel for CD Solutions did not purport to represent either Mr. McGuire or PIN. *See* [*id.*]. Nor did counsel represent Mr. Oltmann in his personal capacity. *See* [*id.*]. This Court denied CD Solutions's Motion for Protective Order and ordered the Parties to proceed with Mr. McGuire's deposition as scheduled. [Doc. 78]. In doing so, this Court noted that CD Solutions could designate certain information as "Confidential" or "Attorneys' Eyes Only" under the Protective Order. [*Id.* (citing [Doc. 77 at 2])]. It appears that Dr. Coomer and CD Solutions agree that CD Solutions is the entity that currently controls Mr. Oltmann's Conservative Daily podcast. *See* [Doc. 113 at 4; Doc. 118 at 7].

On December 14, 2022, CD Solutions filed a Notice of Confidential Information. [Doc. 91]. Again, counsel for CD Solutions did not represent Mr. McGuire, PIN, or Mr. Oltmann in his individual capacity. [*Id.*]. As part of the Notice of Confidential Information, CD Solutions identified certain documents as "CDS Confidential Documents." [Doc. 91-1]. In addition, CD Solutions designated certain deposition testimony of Mr. McGuire as "CDS Confidential Deposition Testimony." [Doc. 91-2]. Plaintiff's Objections followed. The Court notes that from the record before it, it appears that either Mr. McGuire has not designated any of the documents he produced or his deposition testimony as "Confidential," or that such designations, if they exist, are undisputed or intertwined with the arguments presented by CD Solutions.

## A.     CD Solutions's Standing

Dr. Coomer first argues that CD Solutions does not have standing to designate documents and/or information under the Protective Order in this action because he obtained the documents at issue from Mr. McGuire.  *See* [Doc. 113 at 9–10].  The Protective Order entered in this action specifically contemplates that discovery in this matter would also be provided by non-parties:

> Under Federal Rules of Civil Procedure 5.2 and 26(c), this Order Governing the Production and Exchange of Confidential Information (the "Order") will govern the handling of documents, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, and responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom ("Discovery Material"), by or among any Party or non-Party providing Discovery Material, including written and oral responses to discovery requests and/or subpoenas, (each a "Producing Party") in the above-captioned action (the "Litigation") to the party receiving the Discovery Material ("Receiving Party").

[Doc. 77 at 1–2 (emphasis omitted)].  "Producing Party" is defined as a Party or non-party providing discovery, which includes written and oral responses to subpoenas.  [*Id.* at 2].  The Protective Order then permits the designation of Discovery Material as "Confidential" when a "Producing Party" in good faith believes that such Discovery Material "contains trade secrets, proprietary business information, competitively sensitive information or other information the disclosure of which would, in the good faith judgment of the Party or, as appropriate, non-party designating the material as confidential, be detrimental to the conduct of that Party's or non-party's business or the business of any of that Party's or non-party's customers or clients."  [*Id.*].

Dr. Coomer is correct that CD Solutions does not fit within the definition of "Producing Party," as the documents and testimony at issue came from Mr. McGuire.  However, this Court respectfully disagrees with Dr. Coomer's conclusion that CD Solutions has no standing to assert any confidentiality designations.  *See* [Doc. 113 at 9–10].  In the context of Rule 45, courts in this

District have routinely found that non-parties have standing to challenge a subpoena issued to a third party under Rule 45 to protect their claims of privilege or privacy interests. *See Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua, S.A.B. de C.V.*, No. 15-cv-02120-JLK, 2019 WL 8223561, at *3 (D. Colo. Dec. 31, 2019) (holding that an account holder had a privacy interest that confers standing to challenge a subpoena issued under Rule 45 to its bank); *see also Crocs, Inc. v. Effervescent, Inc.*, No. 06-cv-00605-PAB-KMT, 2016 WL 9584443, at *1 (D. Colo. Dec. 12, 2016) (noting that "[t]he general rule is that a party has no standing to quash a subpoena served upon a third party, except as to claims of privilege relating to the documents being sought . . . [or] upon a showing that there is a privacy interest applicable" (quotation omitted and alterations in original)).  By analogy, this Court finds that CD Solutions has standing to designate documents and testimony under the Protective Order to protect its own privacy interests, as there are no claims of privilege asserted here.  Indeed, the Court specifically contemplated that CD Solutions might do so in its Order denying CD Solutions's Motion for Protective Order.  *See* [Doc. 78].  Though the Protective Order does not specifically contemplate that a non-producing, non-party can make such a designation, it does expressly contemplate confidentiality designations by non-parties.  [Doc. 77 at 2].  It would be incongruent to preclude CD Solutions from protecting information about its business that Mr. McGuire would be permitted to designate as confidential.

But that standing only extends as far as CD Solutions's ability to protect its own privacy interests—not Mr. Oltmann's interests as an individual or PIN's interests as a separate corporate entity, as neither are represented by counsel before the Court on this issue.  Contrary to CD Solutions's suggestion to this Court that its agreements are equally applicable to the work that Mr. McGuire was doing for CD Solutions, PIN, and a third entity known as Shuffling Madness Media,

*see* [Doc. 118 at 4], neither agreement at issue bears out that legal conclusion. Neither CD Solutions nor Mr. Oltmann is a party to the non-disclosure agreement between PIN and Mr. McGuire. *See* [Doc. 118-2]. CD Solutions has not produced evidence of any corporate relationship with any other entity. *See generally* [Doc. 118]. And CD Solutions fails to explain how it may enforce a non-disclosure agreement between PIN and Mr. McGuire to which it is not a party and through which it has not been assigned any rights. *See generally* [*id.*]. Nor has CD Solutions cited any authority that would permit it to ignore its corporate form in this instance. *See generally* [*id.*]. Thus, this Court concludes that CD Solutions lacks standing to assert any confidentiality concerns on the part of either PIN or Mr. Oltmann individually, including but not limited to any interests arising under the 2015 Non-Disclosure Agreement between PIN and Mr. McGuire.

### B.    2021 CDS Non-Disclosure Agreement

The Court turns next to the non-disclosure agreement executed between CD Solutions and Mr. McGuire, effective September 1, 2021 ("2021 CDS Non-Disclosure Agreement"). [Doc. 118-4]. CD Solutions and Mr. McGuire are the only parties to the 2021 CDS Non-Disclosure Agreement. *See* [*id.* at 1]. Mr. McGuire is identified as a "Consultant," and he was not an employee of CD Solutions, but an independent contractor. [*Id.*; Doc. 113-1 at 62:19–21; Doc. 113-18 at 3]. The 2021 CDS Non-Disclosure Agreement defines "Confidential Information" as "all nonpublic, confidential, or proprietary information disclosed . . . on or after the Effective Date,[15] by either Party (a 'Disclosing Party') to the other Party (a 'Recipient') or its affiliates, or

---

[15] Although the face of the 2021 CD Solutions Non-Disclosure Agreement includes the date September 15, 2019, it appears that the agreement seeks to protect nonpublic, confidential, or proprietary information disclosed or on or after the "Effective Date," which is September 1, 2021. [Doc. 118-4 at 1]. CD Solutions states in its Response that, "in 2021, Mr. McGuire was hired as a consultant for CDS." [Doc. 118 at 6]. Other provisions of the 2021 CD Solutions Non-

to any of such Recipient's or its affiliates' employees, officers, directors, partners, shareholders, agents, attorneys, accountants, or advisors (collectively, 'Representatives'), whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as 'confidential.'"  [Doc. 118-4 at ¶ 1].

***Exclusions.***   On its face, the only information that may be properly designated as "Confidential Information" under the 2021 CDS Non-Disclosure Agreement must be "nonpublic, confidential, or proprietary."   [*Id.*].   As such, any publicly disseminated information, such as statements made through publicly accessible social media (*e.g.*, a published podcast), does not fall within the 2021 CDS Non-Disclosure Agreement.   In addition, communications between Mr. McGuire and third parties who are not "affiliates"[16] of CD Solutions—or one of CD Solutions's or its affiliates' employees, officers, directors, partners, shareholders, agents, attorneys, accountants, or advisors—are not encompassed by the 2021 CDS Non-Disclosure Agreement.  *See* [*id.*].   Further, the 2021 CDS Non-Disclosure Agreement has specific carve-outs from "Confidential Information" for information that:

    (a)    at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any violation of this Agreement by the Recipient or any of its Representatives;

    (b)    at the time of disclosure is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information to the Recipient by a legal, fiduciary, or contractual obligation to the Disclosing Party;

---

Disclosure Agreement, like the termination provision, also refer to the Effective Date.  *See* [Doc. 118-4 at ¶ 7].   Furthermore, other information in the record indicates that Mr. McGuire and CD Solutions had not reached an independent contractor agreement before September 1, 2021.  *See generally* [Doc. 113-18].

[16] The 2021 CDS Non-Disclosure Agreement itself does not identify any "affiliate."  *See generally* [Doc. 118-4].  CD Solutions provides no evidence upon which this Court can conclude any other third party is an "affiliate" of CD Solutions.  *See generally* [Doc. 118; Doc. 118-1; Doc. 118-2; Doc. 118-3; Doc. 118-4].

(c)     was known by or in the possession of the Recipient or its Representatives, as established by documentary evidence, before being disclosed by or on behalf of the Disclosing Party under this Agreement; or

(d)     was or is independently developed by the Recipient, as established by documentary evidence, without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information.

[*Id.* at ¶ 2]. The 2021 CDS Non-Disclosure Agreement expires two years from the "Effective Date" of September 1, 2021, and provides that either Party may terminate the agreement upon written notice to the other Party. [*Id.* at ¶ 7]. The contracting parties' respective rights and obligations then may survive for an additional period of two years. *See* [*id.*].

Finally, Mr. McGuire resigned from CD Solutions on or about March 11, 2022. [Doc. 113-1 at 51:21–24]. It is not clear from the record before the Court whether Mr. McGuire terminated the 2021 CDS Non-Disclosure Agreement in writing at that, or any other, time.

## C.    Protective Order

Rule 26(c) of the Federal Rules of Civil Procedure permits a court, for good cause, to issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The Protective Order in this case allows any producing party to

designate any Discovery Material as 'Confidential Discovery Material' under the terms of this [the Protective Order] where such Party in good faith[17] believes that

---

[17] Neither the Protective Order nor the Federal Rules of Civil Procedure defines "good faith." *See generally* [Doc. 77]. But generally, under Rule 26(g), by signing discovery, an attorney or a party certifies that to the best of the person's knowledge, information, and belief formed by reasonable inquiry, a discovery request, response, or objection is (1) "consistent with [the Federal Rules of Civil Procedure] and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law"; (2) "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"; and (3) "neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action." Fed. R. Civ. P. 26(g)(1)(B).

> such Discovery Material contains trade secrets, proprietary business information, competitively sensitive information or other information the disclosure of which would, in the good faith judgment of the party or, as appropriate, non-party designating the material as confidential, be detrimental to the conduct of that Party's or non-party's business or the business of that Party's or non-party's customers or clients."

[Doc. 77 at 2]. Unlike in the 2021 CDS Non-Disclosure Agreement, the definition of "Confidential Discovery Material" under the Protective Order does not include a date restriction.

In addition, the Protective Order specifically provides that the burden of establishing that any Discovery Material was properly designated as confidential lies with the designating party—here, CD Solutions. [*Id.* at 10]. Accordingly, to the extent that CD Solutions suggests that it is Plaintiff's burden to establish why the documents and information at issue should not be designated as "Confidential Discovery Material," [Doc. 118 at 18–19], this Court respectfully concludes that such burden shifting is inappropriate.

### D.   Application

CD Solutions relies upon Mr. McGuire's obligations under the 2021 CDS Non-Disclosure Agreement and the Protective Order as the bases for its designation of certain information as confidential. Because CD Solutions is a non-party challenging a subpoena directed at Mr. McGuire, who is not an employee of CD Solutions but rather was an independent contractor subject to a non-disclosure agreement, this Court focuses upon whether the information designated by CD Solutions implicates its privacy interests as a corporation—as it has made no argument that any privileges are at issue. *See generally* [Doc. 118].[18] In making its rulings, this Court broadly

---

[18] Dr. Coomer's reliance on the statutory definition of and legal authority surrounding trade secrets is misplaced. *See generally* [Doc. 113]. Both the 2021 CDS Non-Disclosure Agreement and the Protective Order to which he agreed incorporate a definition of "Confidential Information" broader than mere trade secrets. *See generally* [Doc. 118-4; Doc. 77]. This Court respectfully declines to rewrite these agreements to focus solely on whether the information at issue constitutes a trade secret—particularly where Dr. Coomer stipulated to the Protective Order. *See* [Doc. 74 at 1].

considers statements made by Mr. McGuire in the course of executing his independent contractor duties for CD Solutions as covered by the 2021 CDS Non-Disclosure Agreement—unless it is clear on the face of the communications and/or documents that the information is personal, rather than business-related, in nature.  To further parse the voluminous testimony and documents before it would require this Court to expend even more of its limited resources—beyond the significant amount it has already devoted to in camera review of these designations and objections—and would not promote judicial economy.  *See United States v. Garcia-Martinez*, 730 F. App'x 665, 673 (10th Cir. 2018) (observing that "*in camera* review is frequently time-consuming and may tax limited judicial resources; therefore, it is not a remedy to be unstintedly granted").  But as discussed further below, the designation of "Confidential Information" is not equivalent to restriction from the public record—particularly where such communications may be central to the claims and defenses of the Parties, and the action in general is of public concern.

### 1.    Deposition Testimony

Upon review of the disputed portions of Mr. McGuire's testimony[19] and application of the definitions set forth above, the Court concludes that the following portions of his deposition are not properly designated as confidential under the 2021 CDS Non-Disclosure Agreement and/or the Court's Protective Order and, accordingly, are respectfully **DE-DESIGNATED**:

| Testimony from [Doc. 113-1] | Rulings |
|---|---|
| 37:1–7, 37:21–22, 38:5–25, 42:6–44:5, 81:19–22 | CD Solutions has failed to carry its burden to show that Mr. McGuire's testimony about the existence of any personal legal defense fund |

---

[19] The Court utilizes [Doc. 113-1] to review Mr. McGuire's testimony, and notes Dr. Coomer's representation that the yellow highlighted sections of that transcript are subject to dispute.  [Doc. 113 at 2 n.2].  CD Solutions does not appear to disagree that the portions in yellow are in dispute with respect to confidentiality designations.  Nevertheless, the Court has reviewed the entirety of [Doc. 113-1] for context.

| Testimony from [Doc. 113-1] | Rulings |
|---|---|
|  | for Mr. Oltmann individually constitutes "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. CD Solutions does not have standing to make arguments on behalf of Mr. Oltmann as an individual. |
| 39:9–22 | Mr. McGuire's independent perspective about whether revenue generated by CD Solutions should go into a corporate account and whether he worked for Mr. Oltmann individually does not constitute "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. CD Solutions does not have standing to make arguments on behalf of Mr. Oltmann as an individual. |
| 40:3–9, 40:13–25 | Mr. McGuire's personal lack of knowledge regarding the ownership of Conservative Daily and any personal concerns harbored as a shareholder do not reasonably qualify as "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 45:13–17, 46:2–21 | Testimony regarding Mr. McGuire's or Mr. Oltmann's personal social media postings do not qualify as "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 62:13–18 | CD Solutions does not have standing to assert arguments on behalf of other third parties, such as Shuffling Madness Media, arising from a subpoena directed at Mr. McGuire. |
| 62:22–64:1 | PIN and Shuffling Madness Media are not before the Court and CD Solutions does not have standing to assert arguments on their behalf arising from a subpoena directed at Mr. McGuire. |
| 73:22–25 | Testimony about messages sent by Mr. Oltmann to Mr. McGuire, including on social media, after Mr. McGuire resigned in March 2022 are not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |

| Testimony from [Doc. 113-1] | Rulings |
|---|---|
| 76:2–15 | Testimony about Mr. McGuire's response to a subpoena topic is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order, although a particular substantive response may be "Confidential Information." |
| 86:14–88:15 (redact out reference to "CD Solutions") | CD Solutions does not have standing to assert arguments on behalf of other third parties arising from a subpoena directed at Mr. McGuire. |
| 98:22–99:1 | Mr. McGuire's independent post-resignation knowledge is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 129:15–131:7 | Mr. McGuire's independent knowledge of Mr. Oltmann's personal practice of recording calls is not "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 131:8–133:23 | Mr. McGuire's independent perspectives about his work or Mr. Oltmann individually, or discussions between Mr. McGuire and his mother, who is not a representative or agent of CD Solutions, are not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 133:24–134:1, 134:8–13, 134:18–21 | Mr. McGuire's independent knowledge or opinion is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 145:17–21 | Mr. McGuire's independent perspective about his work is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 155:10–14 | Mr. McGuire's independent perspective about Dr. Coomer is not "Confidential Information" under either the 2021 Non-Disclosure Agreement or the Protective Order. |
| 156:14–157:8 | Mr. McGuire's independent knowledge about whether there was an attack on voting machines or software in the November 2020 election is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |

| Testimony from [Doc. 113-1] | Rulings |
|---|---|
| 166:13–22, 168:14–169:16 | Mr. McGuire's independent perspective about Mr. Oltmann's affidavit is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 172:3–23[20] | Mr. McGuire's independent perspective or knowledge regarding certain public statements does not constitute "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 208:16–21 | Mr. McGuire's testimony about his recent text messages is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 216:23–217:6 | Mr. McGuire's testimony about the existence of any personal legal defense fund for Mr. Oltmann individually does not constitute "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order.   CD Solutions does not have standing to make arguments on behalf of Mr. Oltmann as an individual. |
| 221:5–24 | Mr. McGuire's opinion of Mr. Oltmann as an individual does not constitute "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 229:12–14 | CD Solutions does not have standing to assert arguments on behalf of other third parties arising from a subpoena directed at Mr. McGuire. |
| 230:14–231:14 | CD Solutions does not have standing to assert arguments on behalf of other third parties, such as PIN, arising from a subpoena directed at Mr. McGuire. |
| 233:3–4, 233:7–10 | Mr. McGuire's testimony about something he created in June 2022, after he was no longer employed by CD Solutions, reflecting his independent perspective, does not constitute |

[20] The highlighting on this page of the transcript covers two additional lines.  *See* [Doc. 113-1 at 172:24–25].  Those lines consist of the beginning of a question.  Neither the balance of the question nor the answer to the question is highlighted on the following page, *see* [*id.* at 173:1–7], so the Court assumes those additional lines are not at issue.

| Testimony from [Doc. 113-1] | Rulings |
|---|---|
| | "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 245:1–9 | Mr. McGuire's testimony about his conversations with a third party is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 257:17–25 | Mr. McGuire's testimony about the existence of any personal legal defense fund for Mr. Oltmann individually does not constitute "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. Similarly, Mr. McGuire's opinion of Mr. Oltmann as an individual does not constitute "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. CD Solutions does not have standing to make arguments on behalf of Mr. Oltmann as an individual. |
| 260:3–8 | Mr. McGuire's testimony about the existence of any personal legal defense fund for Mr. Oltmann individually does not constitute "Confidential Information" of CD Solutions under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| 261:14–262:5 | Mr. McGuire's testimony about a video he was sent after he resigned from CD Solutions and his public comments about it is not "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |

Based on the record currently before the Court, the remainder of the deposition excerpts identified as disputed are properly designated as "Confidential Information" under the 2021 CDS Non-Disclosure Agreement and/or the Protective Order in this case. In so ruling, this Court has been cautious to include testimony that may trigger CD Solutions's privacy interests as a corporation and personal information that might raise concerns about an individual's safety.

2.      **Documents**

The Court now turns to the designation of certain documents as "Confidential Information."  CD Solutions's designations are reflected in [Doc. 91-1],[21] and Dr. Coomer's concession that certain information may remain designated as "Confidential Information" is reflected in [Doc. 113-19 at 13–14].  Therefore, the remaining documents in dispute are as follows:[22]

- Request Folder 2: 191022 Group Conversation with Joe Oltmann.pdf;

- Request Folder 2: 220524 Joe Oltmann Messages to Max McGuire on Max, called Paul Watney [Doc. 113-6];

- Request Folder 2: Aggregate Messenger with Hammerling(1).pdf [Doc. 113-7];

- Request Folder 2: Joe Texts to Max 210 Number.pdf [Doc. 113-8];

- Request Folder 2: Josh Texts 3.pdf[23] [Doc. 113-9];

- Request Folder 3: 22054 Joe Oltmann Messages to Max McGuire on Max, called Paul Watney [Doc. 113-6];

- Request Folder 3: Joe Texts to Maxs 210 Number.pdf [Doc. 113-8];

[21] CD Solutions withdrew its confidentiality designation of an affidavit by Mr. Oltmann contained in Request Folder 9.  *See* [Doc. 113-19 at 2].

[22] It is not entirely clear that the Court has all of the documents at issue.  There does not appear to be an exhibit to the Objections corresponding to "Request Folder 2: 191022 Group Conversation with Joe Oltmann.pdf," but there is also correspondence that indicates that Dr. Coomer was "willing to accept the confidentiality designations for the documents in request folder 2 labeled 211104-211210, as well as 221104.  Everything else we object to."  [Doc. 113-19 at 4].  It also appears, though it is likewise not entirely clear, that there are duplicates of the produced documents in various folders based on substantially identical naming conventions.  Nevertheless, where the naming conventions are substantially identical, this Court assumes that the documents are identical.  To the extent that this is not the case, the Court presumes Dr. Coomer will seek further relief after meeting and conferring with CD Solutions.

[23] "Josh" and "Hammerling" appear to refer to the same individual, Josh Hammerling ("Mr. Hammerling").  *Cf.* [Doc. 113 at 7].

- Request Folder 3: Josh Texts 3.pdf [Doc. 113-9];

- Request Folder 4: All documents [Doc. 113-10];

- Request Folder 5: All documents [Doc. 113-11; Doc. 113-12];

- Request Folder 6: All documents [Doc. 113-13];

- Request Folder 9: Joe Texts to Maxs 210 Number.pdf [Doc. 113-8];

- Request Folder 9: Josh Texts 3.pdf [Doc. 113-9];

- Request Folder 9: Text with Jimmy Sengenberger re_Joe on Antifa Call.docx [Doc. 113-14]; and

- Request Folder 10: All documents [Doc. 113-15].

***2015 PIN Agreement.*** As discussed above, this Court finds that CD Solutions does not have standing to invoke any of the protections under the 2015 PIN Agreement, and thus, any documents designated under that agreement alone should be **DE-DESIGNATED**.

***Exhibits.*** Upon review of the exhibits submitted to the Court and application of the definitions set forth above, the Court concludes that the following exhibits are not properly designated as confidential under the 2021 CDS Non-Disclosure Agreement and/or the Court's Protective Order and, accordingly, are respectfully **DE-DESIGNATED**:

| Exhibit | Ruling |
|---|---|
| Exhibit 6 [Doc. 113-6] | The exchange is personal in nature and does not constitute "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| Exhibit 7 [Doc. 113-7] | Dr. Coomer specifically argues that Mr. Hammerling left CD Solutions prior to Mr. McGuire, so their text messages cannot be designated as "Confidential Information." [Doc. 113 at 12–13]. In response, CD Solutions does not directly address Mr. Hammerling or present any evidence that Mr. Hammerling was employed by CD Solutions at |

| | |
|---|---|
| | the time of these text messages. *See generally* [Doc. 118]. Therefore, CD Solutions has failed to carry its burden to show that this document reflecting personal communication with Mr. Hammerling is properly designated under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| Exhibit 8 [Doc. 113-8] (partial) | Text messages between Mr. McGuire and Mr. Oltmann after Mr. McGuire's resignation on or about March 11, 2022, generally do not constitute "Confidential Information." However, messages after that date which specifically reference work conducted by Mr. McGuire as an independent contractor of and for CD Solutions prior to his resignation may be properly maintained as "Confidential Information." Messages that refer to Mr. McGuire's post-termination relationship with CD Solutions, *e.g.*, communication regarding a New York Times article reflecting Mr. McGuire's lack of response to requests for comment, are not covered by either the 2021 CDS Non-Disclosure Agreement or the Protective Order. The Court does not disturb the confidentiality designation with respect to messages preceding Mr. McGuire's resignation. |
| Exhibit 9 [Doc. 113-9] | This document reflecting personal communications between Mr. McGuire and Mr. Hammerling is not properly designated as "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| Exhibit 10 [Doc. 113-10] (partial) | Screenshots of public statements from social media are not properly designated under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. The Court does not disturb the confidentiality designation with respect to the messages sent and received during Mr. McGuire's employment with CD Solutions. |
| Exhibit 11 [Doc. 113-11; Doc. 113-12] (partial) | Text messages between Mr. McGuire and Mr. Hammerling on or after March 11, 2022, generally do not constitute "Confidential Information." However, messages that reference work conducted by Mr. McGuire as |

| | |
|---|---|
| | an independent contractor of and for CD Solutions prior to his resignation, *e.g.*, discussions regarding advertising sales for CD Solutions, may be properly maintained as "Confidential Information." The Court does not disturb the confidentiality designation with respect to messages preceding Mr. McGuire's resignation. |
| Exhibit 12 [Doc. 113-13] | This document reflecting personal communications between Mr. McGuire and Mr. Hammerling is not properly designated as "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |
| Exhibit 13 [Doc. 113-14] | This document reflecting personal communications between Mr. McGuire and Mr. Sengenberger is not properly designated as "Confidential Information" under either the 2021 CDS Non-Disclosure Agreement or the Protective Order. |

***Consequences of De-Designation.*** The Court notes that the de-designation of certain information does not constitute a ruling that such information is probative or admissible in this action—issues that are not currently before this Court. Conversely, the Court does not discount the potential probative value of Mr. McGuire's testimony that has been designated "Confidential Information." But the ultimate probative value does not preclude the application of the Protective Order, to which Dr. Coomer stipulated, and its broad definition of "Confidential Information." *See* [Doc. 77 at 2].

***Restriction from the Public.*** Finally, the Court reminds the Parties and non-parties before it that the entry of a protective order under Rule 26(c) of the Federal Rules of Civil Procedure, and any designation thereunder, is not equivalent to an order to restrict any designated documents or information from public access. As recognized by Local Rule 7.2 and the Tenth Circuit's case law, designation under a protective order is, in and of itself, insufficient to justify restriction. *See* D.C.COLO.LCivR 7.2(c)(2); *see also Lucero v. Sandia Corp.*, 495 F. App'x 903, 913 (10th Cir.

2012); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-cv-01468-WJM-BNB, 2012 WL 2917116, at *6 (D. Colo. July 16, 2012) (holding that "the mere fact that a party has designated a document as confidential is insufficient to justify restricted access").

Dr. Coomer argues that Mr. McGuire's public statements preclude the designation of certain "Confidential Information" here. *See* [Doc. 113 at 14]. Insofar as CD Solutions may have made the same statements on social media,[24] through its podcast, or by other public means, it is generally true that once the "cat has already been let out of the bag . . . [e]x-post facto sealing should not generally be permitted." *Flohrs v. Eli Lilly & Co.*, No. 12-2439-SAC, 2013 WL 4773515, at *2 (D. Kan. Sept. 4, 2013) (collecting cases). But, depending on the circumstances, Mr. McGuire's or CD Solutions's public statements on the same topics may not preclude designation of other statements—despite their similarity—as "Confidential Information" under the 2021 CDS Non-Disclosure Agreement and/or the Protective Order in this case.

Nevertheless, public disclosure of information is a factor in any request to restrict information from the public docket. And the Tenth Circuit has been clear that parties and courts should not reflexively restrict documents upon which they rely to seek or afford relief. *See Lucero*, 495 F. App'x at 913. Indeed, in only the rarest of circumstances is restricting the public's access to court documents appropriate. *See Rocky Mountain Mortg. Specialists, Inc. v. First Am. Real Est. Info. Servs., Inc.*, No. 07-cv-00815-MSK-MEH, 2008 WL 4293316, at *3 (D. Colo. Sept. 16, 2008). Thus, moving forward, the Parties and non-parties should be cognizant of this standard when seeking any type of restriction of filings from the public record.

---

[24] "Similar to writing a letter to a local newspaper, publicly posting on social media suggests an intent to 'communicate to the public or to advance a political or social point of view beyond the employment context.'" *Liverman v. City of Petersburg*, 844 F.3d 400, 410 (4th Cir. 2016) (citation omitted) (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011)).

In sum, Plaintiff's Objections to CD Solutions's Designations are **SUSTAINED in part** and **OVERRULED in part**, as set forth above.

## III.    Motion to Modify

Defendants served Dominion, a non-party, with a Rule 30(b)(6) subpoena for testimony and documents in March 2023.  *See generally* [Doc. 125-1].  In its Motion to Modify, Dominion seeks to disallow (1) certain topics Defendants sought to discuss at a Rule 30(b)(6) deposition, and (2) certain requests for production of documents.  *See* [Doc. 125 at 5–11].  The Parties and Dominion appeared before this Court on April 12, 2023, for a Telephonic Status Conference, at which time this Court made certain rulings with respect to Dominion's arguments.  [Doc. 133].  The Court reserved ruling on deposition Topic Nos. 12, 22–24, and 27–30[25]; and document Request Nos. 18–28, 30, 32, and 35.  *See* [*id.*].  This Court considers each of these items in turn.

*Topic No. 12 and Request No. 30.*  Through Topic No. 12, Defendants seek testimony regarding "[p]roducts and services Dominion provided relating to the 2020 presidential election." [Doc. 125-1 at 8].  Dominion argues that this topic is "plainly outside the scope of the claims and defenses in the instant litigation."  [Doc. 125 at 5].  In their written Response to Motion to Amend Subpoena, Defendants do not address Topic 12 at length, but argue that, although a non-party, Dominion has a central role in this action given Plaintiff's allegations that he was defamed by Defendants' statements regarding the conduct of the election.  *See* [Doc. 131 at 9].  Defendants further contend that Dominion would not be burdened by the contemplated testimony, given its

---

[25] During the Telephonic Status Conference, Dominion made clear that its objection to providing a Rule 30(b)(6) witness to testify about the produced documents is tied to its objections to the underlying requests for production.  [Doc. 133].  This Court understand that to the extent that it orders Dominion to serve responses to the document requests still in dispute—namely, Request Nos. 18–28, 30, 32, and 35—Dominion will provide a corporate designee to testify as to documents produced in response to those requests.

own defamation litigation against Defendants and others.[26]  *See* [*id.* at 8].  At the Telephonic Status Conference, Defendants argued that testimony about this topic was necessary because truth is an affirmative defense to defamation.  *Cf.* [Doc. 171 at 57 (asserting affirmative defense of substantial truth)].  Similarly, Request No. 30 seeks "[a]ll documents relating to agreements under which Dominion provided products and/or services" in Colorado since 2020.  [Doc. 125-1 at 15].

Substantial truth is an affirmative defense to a defamation claim, and the defense relates to whether "the substance, the gist, the sting, of the matter is true."  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1110 (10th Cir. 2017) (quoting *Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972)).  In the Dominion suit, Dominion alleges that Defendants defamed it by promoting statements that "Trump got so many votes that he 'broke the algorithm' in the Dominion machines that had been programmed to give '1.3 to Biden and 0.7 to the president' for each vote cast," and that the Dominion machines used in the November 2020 presidential election "broke" and should not be used in other elections, among others.  [*US Dominion, Inc. v. My Pillow, Inc.*, Case No. 21-cv-00445-CJN (D.D.C.), ECF No. 1 at ¶¶ 50–51].  Unlike the Dominion suit, however, Dr. Coomer does not seek to hold Defendants liable for these general statements about Dominion or its products or services.  The central allegations in this case are that Defendants adopted and promulgated Mr. Oltmann's statements that Mr. Oltmann purportedly infiltrated Antifa; heard Dr. Coomer participate in a conference call before the election during which Dr. Coomer claimed that he had affirmatively rigged the election; and that Mr. Oltmann had evidence of Dr. Coomer's wrongdoing.  *See, e.g.*, [Doc. 170 at ¶¶ 2, 29–30, 33, 43, 51, 53, 57–58, 61–62, 84].  Thus, general testimony about Dominion's products and services used in the 2020 presidential

---

[26] This Court takes judicial notice of *US Dominion, Inc. et al. v. My Pillow, Inc. et al.*, Case No. 21-cv-00445-CJN (D.D.C.) ("Dominion suit").  When citing to docket entries in the Dominion suit, this Court uses the convention [ECF No. __].

election does not shed light on whether Mr. Oltmann heard Dr. Coomer—during an Antifa conference call before the election—claiming that Dr. Coomer had affirmatively taken action to rig the 2020 presidential election.  Nor does general information regarding Dominion's products and services in the 2020 presidential election go to the truth of whether Dr. Coomer is part of a "criminal crime family" or engaged in "crimes against the United States," including and up to treason.  [*Id.* at ¶¶ 63, 103].  And testimony about products and services Dominion provided, relating to the 2020 presidential election, certainly does not go to whether Mr. Oltmann—and in turn Defendants—had evidence that Dr. Coomer had undertaken any affirmative acts to "rig" the election.

Nor is this Court persuaded that Dr. Coomer's involvement in separate "election security litigation" involving Dominion, [Doc. 131 at 6], pertains to the truth of whether Dr. Coomer was actually on a telephone conference with Mr. Oltmann during which Dr. Coomer suggested that he had rigged the voting machines.  *See* [Doc. 170 at ¶ 29 (alleging that, according to Mr. Oltmann, Dr. Coomer stated on the Antifa call not to "worry about the election," and that "Trump is not gonna win," as he "made f-ing sure of that")].  To the extent that an expert for Plaintiff may opine that allegations that Dr. Coomer could have single-handedly rigged the election are inherently implausible, the expert will have to disclose the information upon which she or he relied.  That will presumably be subject to disclosure pursuant to Rule 26(a)(2)(B).

Thus, in applying Rule 26(b)(1), this Court respectfully concludes that Topic No. 12, as written, is overly broad, and any minimal relevance is not proportional to the needs of this case. Moreover, although this Court respectfully declines to redraft this subpoena topic on behalf of Defendants, *cf. Heim v. BNSF Ry. Co.*, No. 8:13CV369, 2014 WL 6949044, at *9 (D. Neb. Dec. 8, 2014) (observing that "court orders which re-draft and narrow the discovery provide no

incentive to draft targeted discovery at the outset, or to engage i[n] good faith discussions to resolve discovery disputes"), the Court notes that, to the extent that Defendants seek to use discovery yielded through the Dominion suit—pertaining to the truth of the allegations that Dr. Coomer participated in the Antifa teleconference or manipulated Dominion voting machines—the Parties should meet and confer with Dominion about using such evidence in this case, including whether any designations under the Protective Order, as amended, are necessary.  For the same reasons, the Court concludes that Request No. 30 falls outside the scope of relevant discovery.

*Topic Nos. 22–23 and Request Nos. 18–21, 23–24.*  Defendants also seek testimony and documents regarding "[a]ny security vulnerability identified by Coomer to Dominion"; "[a]ny security vulnerability [Dominion] discussed with Coomer"; and "bugs," "weaknesses," "vulnerabilities" in Dominion's products and services identified by Dr. Coomer.  [Doc. 125-1 at 8, 14–15].  Dominion argues that these topics and requests are unduly burdensome, invite a fishing expedition, and are designed to embolden election conspiracy theorists and improperly harass Dominion.  *See* [Doc. 125 at 5–6, 8–9].  Dominion further contends that Defendants' definition of "security vulnerability" lacks "any technical basis and does not provide adequate specificity."  *See* [*id.*].  Defendants respond that, rather than harass Dominion, they "seek to gather facts that may prove critical to their defenses at trial."  [Doc. 131 at 8].  Defendants add that Topic 23 falls within the scope of discovery because Dr. Coomer has alleged defamation in connection with statements about the security vulnerabilities of Dominion products.  *See* [*id.* at 9].  At the Telephonic Status Conference, Defendants further asserted that information regarding security vulnerabilities communicated between Dr. Coomer and Dominion is discoverable because it pertains to whether Defendants acted with "actual malice," or whether their statements were plausible.

As discussed above, the purportedly defamatory statements concerning Dr. Coomer are not based on general statements about the security vulnerabilities of Dominion products. Rather, the defamation claim in this action revolves around statements made specifically about Dr. Coomer, such as that Dr. Coomer is a "traitor to the United States," [Doc. 170 at ¶ 63]; that Dr. Coomer participated in an Antifa teleconference leading up to the 2020 presidential election during which he purportedly assured other participants that he had made sure that President Trump would not win the election, [*id.* at ¶ 29]; that Dr. Coomer had participated in a conspiracy to rig the election against President Trump, [*id.* at ¶ 30]; and that Dr. Coomer did, in fact, subvert the presidential election through intentional, specific tampering with voting machines, [*id.* at ¶¶ 51–52]. But there is no allegation that Dr. Coomer specifically identified the particular Dominion product, service, or election site he "rigged." To prevail on his defamation claim under Colorado law,[27] Dr. Coomer must prove that Defendants made "(1) a defamatory statement concerning [Dr. Coomer]; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Ct.*, 866 P.2d 908, 911 n.4 (Colo. 1993) (citations omitted).

"A statement is published with actual malice if it is published with actual knowledge that it was false or with reckless disregard for whether it was true." *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1288 (Colo. App. 2022) (citation omitted). "Actual malice can be shown if the defendant entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its

---

[27] Neither side engages in a choice-of-law analysis, but both sides proceed as if Colorado law applies. *See, e.g.*, [Doc. 38 at 7–10; Doc. 45 at 3–5]. The Court thus assumes that Colorado law applies. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption."); *see also* [Doc. 119 at 7 n.4].

probable falsity," *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014) (citation omitted), or if the speaker "willfully chose not to learn the truth." *McIntyre v. Jones*, 194 P.3d 519, 530 (Colo. App. 2008).  Furthermore, "[t]he motivation behind a publication is a factor to consider in determining whether the evidence shows a publisher acted with actual malice," but a "publisher's motive in publishing a story cannot, by itself, provide a sufficient basis for finding actual malice."  *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1042–43 (10th Cir. 2013) (citations omitted).

The element of "actual malice" properly focuses upon *Defendants'* knowledge about, and actions to ascertain the truth of, their statements about Dr. Coomer, i.e., that on a national Antifa teleconference, Dr. Coomer assured listeners that he had rigged the election, and that Mr. Oltmann and Defendants had evidence that Dr. Coomer did so.  This inquiry does not focus upon "[a]ny security vulnerability," "bugs," or "weaknesses" with respect to Dominion's products and services that were unknown to Defendants at the time of their statements, but that Dominion and Dr. Coomer may have discussed in the course of business.  [Doc. 125-1 at 8, 14–15].  Thus, to the extent that Defendants seek information about general "security vulnerabilities," "bugs," or "weaknesses" in Dominion's products and services, or Dr. Coomer's statements on those topics, such information is not proportional to the needs of the case.  Indeed, Defendants have not identified any specific factual allegations—let alone made a showing supported by any evidence—that Dr. Coomer exploited any such "security vulnerabilities," "bugs," or "weaknesses" in the context of the 2020 presidential election.

Further, the sheer breadth of these discussion topics and requests for production is staggering, given (1) that the term "security vulnerability" is undefined by the subpoena, [*id.* at 6–7]; (2) that these topics seek information spanning more than three years, from January 2018 to

May 2021,[28] [*id.* at 7]; and (3) the overarching importance of security, and confidentiality regarding such security, in administering fair elections. The Advisory Committee Notes to Rule 26 recognized the dangers of a lack of proportionality as early as 1983 when "Rule 26(b)(1) [was] amended to add a sentence to deal with the problem of over-discovery." Fed. R. Civ. P. 26(b)(1) advisory committee's note to 1983 amendment. This concern came into focus with the 1993 and 2015 amendments, which directed courts to weigh several factors, including the burden and expense of the discovery sought, as well as the importance of the proposed discovery to the resolution of the issues, to reach a case-specific determination of the appropriate scope of discovery. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 1993 and 2015 amendments. The Court also notes that the burden imposed under Rule 26 to show relevance is heightened as applied to non-party discovery. *See Echostar Commc'ns Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 394 (D. Colo. 1998). After weighing the factors set forth by Rule 26(b)(1), this Court respectfully concludes that any marginal relevance of the evidence sought by Defendants through Topic Nos. 22 and 23, and Request Nos. 18, 19, 20, 21, 23, and 24 is outweighed by the burden imposed upon Dominion as a non-party to prepare a witness to testify to a large swath of confidential information that is not proportional to the needs of this case when there has been no showing, in this action or otherwise, that Dominion's products or services were subject to any tampering by Dr. Coomer.

*Topic No. 27 and Request No. 25.* Through Topic No. 27 and Request No. 25, Defendants seek communications between Dominion and Dr. Coomer since his separation from Dominion,

---

[28] Originally, Defendants' subpoena to Dominion sought information from the beginning of Dr. Coomer's employment to the present. *See* [Doc. 125-1 at 7, 13]. At the Telephonic Status Conference, Dominion and Defendants informed the Court that they had agreed to limit the timeframe to at least January 2018 through May 2021, when Dr. Coomer formally separated from Dominion. Dr. Coomer went on leave from Dominion in November 2020.

including but not limited to communications regarding this action.  [Doc. 125-1 at 9, 15].   In general, for the reasons stated above, this Court concludes that communications between Dominion and Dr. Coomer that occurred after his separation from Dominion are not relevant, in this action, to whether Defendants defamed Dr. Coomer, intentionally inflicted emotional distress upon Dr. Coomer, or engaged in a civil conspiracy to defame or intentionally inflict emotional distress upon Dr. Coomer.  *See* [Doc. 170 at ¶¶ 146–59].  Nevertheless, this Court respectfully concludes that communications between Dominion and Dr. Coomer after his separation that are specific to the causes of action presented by this lawsuit, and the underlying alleged facts, are discoverable.

For instance, to the extent that Dominion and Dr. Coomer communicated after his separation from Dominion about Defendants' statements regarding Dr. Coomer's purported participation in an Antifa teleconference prior to the 2020 presidential election, such evidence may be probative and/or admissible with respect to whether the substantive factual allegations underlying the causes of action or defenses in this case are more or less likely, Fed. R. Evid. 401, or such evidence may get at the credibility of potential trial witnesses.  Indeed, Dr. Coomer's arguments regarding Mr. McGuire's post-separation communications with Mr. Oltmann in his Objections to CD Solutions's Designations suggest as much.  *See, e.g.*, [Doc. 113 at 14].  Similarly, if Dr. Coomer attempted to influence Dominion's responses to Defendants' subpoena, such evidence is also discoverable and may be relevant to issues of credibility and impeachment.  Accordingly, this Court **ORDERS** Dominion to respond to Request No. 25 as limited herein no later than **October 31, 2023**, and produce a corporate designee to testify as to Topic No. 27 no later than **November 13, 2023**.

*Topic Nos. 28–29 and Request Nos. 22, 26–27.*  Through Topic Nos. 28 and 29, and Request Nos. 22, 26, and 27, Defendants seek evidence regarding "Dominion's instructions to

Coomer relating to his role as an expert witness" in *Curling et al. v. Raffensperger et al.*, Case No. 1:17-cv-02989-AT (N.D. Ga.); evidence of communications between Dominion and Dr. Coomer regarding Dr. J. Alex Halderman; and evidence of communications "on and around November 10, 2020 relating to Antrim County, Michigan." [Doc. 125-1 at 8–9, 15]. For the reasons stated above, this Court is not persuaded that any such information is probative with respect to the claims for defamation, intentional infliction of emotional distress, and civil conspiracy before this Court. Nor is this Court inclined to invite the distraction of an entirely separate litigation into this one. Accordingly, the Court concludes that Topic Nos. 28 and 29, and Request Nos. 22, 26, and 27, are not proportional to the needs of this case.

*Topic No. 30 and Request No. 28.* Defendants seek documents and testimony from Dominion regarding its communications with Dr. Coomer related to Mr. Oltmann and/or Conservative Daily. [*Id.* at 9, 15]. The temporal scope of this request, i.e., from January 2018 through May 2021, *see supra* n.28, is overly broad. However, to the extent that Dominion and Dr. Coomer communicated about Mr. Oltmann and/or the Conservative Daily podcast, and such communications relate to Mr. Oltmann's statements regarding Dr. Coomer underlying this lawsuit, discovery should be permitted for the same reasons that the Court permits it with respect to Topic No. 27 and Request No. 25 above. Thus, this Court **ORDERS** Dominion to respond to Request No. 28 as limited herein no later than **October 31, 2023**, and produce a corporate designee to testify as to Topic No. 30 no later than **November 13, 2023**.

*Request No. 32.* In Request No. 32, Defendants seek "[a]ll documents referencing or relating to 'Antifa.'" [*Id.* at 16]. "Antifa" is not defined within the subpoena. *See generally* [*id.*]. Dominion argues that this Request is beyond the scope of this proceeding and unduly burdensome. *See* [Doc. 125 at 11]. This Court respectfully agrees that production of any Dominion document

that may refer or relate to "Antifa" is overly broad, as the factual allegations underlying this action do not relate to "Antifa" generally.  *See Am. Friends Serv. Comm. v. City & Cnty. of Denver*, No. 02-cv-00740-EWN-CBS, 2004 WL 7334020, at *4 (D. Colo. Feb. 19, 2004) (citing cases for the proposition that discovery requests that seek all documents that "refer or relate to" a particular subject are facially overbroad and too ambiguous to meet the "reasonable particularity" requirements of the Federal Rules of Civil Procedure).  However, for the reasons set forth above, this Court **ORDERS** Dominion to produce any documents that refer or relate to Dr. Coomer's alleged participation in an Antifa teleconference prior to the 2020 presidential election, no later than **October 31, 2023**.

*Request No. 35.*   Through Request No. 35, Defendants seek all agreements between Dominion and Coomer.  [Doc. 125-1 at 16].  Dominion contends that this Request "is beyond the scope of the instant proceedings, is unduly burdensome, and improperly seeks to harass Dominion." [Doc. 125 at 11].  Dominion further argues that Defendants may seek this information from Dr. Coomer, a party to this action.  *See* [*id.*].  Defendants contended at the Telephonic Status Conference that agreements between Dominion and Dr. Coomer are particularly relevant to Dr. Coomer's damages theories, as Dr. Coomer alleges that Defendants' conduct has resulted in lost earnings.  *See, e.g.*, [Doc. 170 at ¶¶ 150, 154, 159].

Insofar as Dominion contends that this Request is overly burdensome, this Court cannot conclude as such based on the record before it.  Request No. 35—unlike others at issue in this Order—is not overly broad and unduly burdensome on its face.  Generally, when discovery appears to be relevant, the responding party bears the burden of establishing that the requested discovery (1) does not fall within the scope of relevant evidence, or (2) is of such marginal relevance that the potential harm of discovery outweighs any benefit.  *See Simpson v. Univ. of*

*Colo.*, 220 F.R.D. 354, 359 (D. Colo. 2004).  The objecting party cannot "sustain this burden with boilerplate claims that the requested discovery is oppressive, burdensome or harassing."  *Id.* (citation omitted).  Thus, this Court is not persuaded that Dominion's first argument—which lacks any supporting evidence—defeats Request No. 35.

The Court turns to Dominion's second argument, i.e., that the documents sought are in the possession, custody, and control of Dr. Coomer, and may be sought from him. Rule 26 directs this Court to consider the availability of discovery to the respective parties.  *See* Fed. R. Civ. P. 26(b)(1).  In addition, as discussed above, the Court must consider Dominion's non-party status. *See Echostar*, 180 F.R.D. at 394.  Based on these considerations, the Court respectfully agrees with Dominion that the documents at issue in Request No. 35 may be properly sought from Dr. Coomer.  *See Al Muderis v. Hernandez*, No. 20-mc-00090-RM, 2021 WL 119348, at *2 (D. Colo. Jan. 13, 2021) ("[C]ourts may refuse discovery requests aimed at nonparties in cases where the same testimony or documents could instead be obtained from a party to the action, and a few courts even impose a heightened relevancy requirement for nonparty discovery requests." (quotation omitted)).  Request No. 35 will not be enforced.[29]

The Motion to Modify is thus **GRANTED in part** and **DENIED in part** as discussed herein.

---

[29] As discussed at the Telephonic Status Conference, Topic No. 24, which involves the documents received by Defendants in connection with Request Nos. 18–35, [Doc. 125-1 at 8], is resolved by virtue of the Court's resolution of the arguments respecting Request Nos. 18–35.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)     Plaintiff's Motion to Compel Document Production and Deposition Testimony from Third-Party Tina Peters Pursuant to F.R.C.P. 45 and Motion for Sanctions Pursuant to F.R.C.P. 37 [Doc. 97] is **GRANTED in part** and **DENIED in part**;

(2)     Tina Peters **SHALL APPEAR** for a second deposition, for a period of no longer than one day of five hours, subject to the rulings in this Order, to occur no later than **November 13, 2023**, and the Parties **SHALL FILE** a Notice with the Court no later than **October 13, 2023**, informing the Court of the date and time of the deposition;

(3)     Tina Peters **SHALL REVIEW** the documents requested by subpoena and **SUPPLEMENT** her responses, consistent with this Order, no later than **October 31, 2023**, and, to the extent that there are any responsive documents (electronic or otherwise) to which she is invoking the Fifth Amendment or any other privilege, Ms. Peters shall provide counsel in this action with a privilege log, consistent with the requirements of Rule 26(b)(5)(A);

(4)     Plaintiff's Objection to Third-Party CD Solutions Inc.'s Confidentiality Designations [Doc. 113] is **SUSTAINED in part** and **OVERRULED in part** as discussed in this Order;

(5)     Non-Party Dominion Voting Systems, Inc.'s Motion to Modify Defendants' Subpoena [Doc. 125] is **GRANTED in part** and **DENIED in part**; and

(6)     Dominion Voting Systems, Inc. **SHALL RESPOND** to Request Nos. 25, 28, and 32 **as limited herein** no later than **October 31, 2023**, and produce a corporate

designee to testify as to Topic Nos. 24, 27, and 30 **as limited herein** no later than

**November 13, 2023**.  All other modifications requested are **GRANTED**.

DATED:  September 29, 2023

BY THE COURT:

_____
Nina Y. Wang
United States District Judge