IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, Ph.D.,
    Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,
    Defendants

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY OF J. ALEX HALDERMAN**

---

TO THE HONORABLE THE UNITED STATES DISTRICT COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), through counsel, files this Response to Defendants' Motion to Exclude Testimony of J. Alex Halderman [Dkt. 188] (Defendants' Motion), and in support thereto states:

### I.    INTRODUCTION

1.    Defendants do not challenge Dr. Halderman's expertise, nor do they suggest that he is any way unqualified to opine on matters pertaining to election technology and security. In fact, they go out of their way to highlight his long history of well documented critiques of voting machine technology, including systems that were designed, in part, by Dr. Coomer. Instead, Defendants limit their challenge to the relevance of discreet portions of Dr. Halderman's testimony. At times, Defendants assert that Dr. Halderman's testimony is irrelevant by attempting to create distance between Defendants' China-based election rigging theories with their Dominion-based election rigging theories. In reality, these theories are inextricably intertwined, and both are

1

highly relevant. In other instances, Defendants argue that Dr. Halderman's testimony is *too* relevant in that it speaks directly to one or more of the actual malice standards at issue in this dispute. For the reasons stated below, all of Defendants' challenges to Dr. Halderman's testimony are without merit and should be denied.

## II.   BACKGROUND

2.   Dr. J. Alex Halderman is among the most preeminent election security experts in the country. His resume speaks for itself,[1] and Defendants do not make any effort to challenge his expertise. In fact, Defendants themselves have been ardent proponents of Dr. Halderman's work. Until a recent renovation to the FrankSpeech website, Defendant FrankSpeech prominently featured "Professor Halderman's Declaration" at the top of a tab titled "Fix2020First."[2] The tab linked to a declaration that Dr. Halderman produced in a lawsuit filed in Georgia styled *Curling et. al. v. Raffensperger, et. al.*, Case No. 1:17-cv-2989-AT. In that proceeding, Dr. Coomer also served as an expert on behalf of his then employer, Dominion Voting Systems, where he provided rebuttal testimony to some of the critiques lodged by Dr. Halderman.

3.   Lindell and his closest confidantes have endorsed the significance of Dr. Halderman's opinions. For example, Lindell stated the following under oath:

> The whole public hasn't got to see what he's seen. But they let him see it in this court because it was before the 2020 election. After that it was like, ehhh, nobody gets to see nothing. So I believe this Halderman should be put – he should be put on a stand and say, "Hey, what did you find?" Everything should be put out there. What he thought. He's an expert, and it's not – it's not his opinion. What did he actually see that is fact. That's what everybody should see. Whether you believe

---

[1] **Exhibit 1**, Halderman curriculum vitae.

[2] **Exhibit 2**, FrankSpeech homepage dropdown menu.

2

– whether you believe Halderman or not is irrelevant.  It's what are the facts, what did he see that are facts?  He's a guy that can see and tell you if it's fact or not.[3]

4. Lindell's personal attorney, Kurt Olsen,[4] has also gone out of his way to promote Halderman's work and to encourage publication of his opinions on FrankSpeech.  For example, Olsen reached out to Brannon Howse, the primary anchor on FrankSpeech, with proposals for segments that featured Dr. Halderman's work.[5]

5. Defendants' enthusiasm for Dr. Halderman is unsurprising given his frequent criticism of voting technology platforms and his deep personal knowledge of how those platforms operate.  This principled impartiality is precisely what makes his testimony so relevant and helpful to the jury in this case.  For the jury to fully understand the context in which Defendants' false allegations against Dr. Coomer arose, however, this testimony must include discussion of the various overlapping theories that Defendants have espoused.  As discussed below, these theories are and always have been inextricably intertwined, especially with respect to the defamatory publications at issue here.

6. Defendants' Motion attempts to divide Dr. Halderman's opinions into two general topics.  These topics can be broadly characterized as the China Claims, and the Dominion Claims.  Defendants seek to exclude discussion of the China Claims.

---

[3] **Exhibit 3**, Depo Tr. FrankSpeech LLC 30(b)(6) deposition, Mar. 9, 2023, at 121:15-122:8.

[4] Mr. Olsen is the individual authorized by Lindell to identify speakers for the Cyber Symposium event, including Joe Oltmann and David Clements, and put them onstage.  *See* **Exhibit 3**, Depo Tr. FrankSpeech, at 261:25-262:14 (Lindell: "I never booked any speaker to speak on that stage.  Kurt Olsen and Janet Lynn put – and whoever else was with them did all of this.  No idea.  And yes, they had the right to.  They were the ones that put together that part of the symposium.").

[5] **Exhibit 4**, Oct. 5, 2021 text message exchange between Brannon Howse and Kurt Olsen; **Exhibit 5**, Oct. 5, 2021 email exchange between Brannon Howse and Kurt Olsen.

7. The China Claims posit a global conspiracy to rig the 2020 presidential election, wherein China's involvement is supposedly demonstrable through packet captures (PCAPs) that evidence international internet traffic on and around the night of the election. Defendants have adopted this theory on the basis of information provided to Lindell by a notorious conman and fraudster named Dennis Montgomery.[6] This theory turns in large part on an alleged supercomputer that Montgomery claims is called Hammer, which supposedly uses a software platform called Scorecard to rig elections. The China Claims are what Lindell primarily intended to present at the Cyber Symposium. Under this theory, every single county in the country had its election results electronically manipulated on election night. Lindell swears by the truth of this theory.[7]

8. In contrast, the Dominion Claims posit a theory whereby Dr. Coomer's former employer, Dominion Voting Systems, supposedly used some secret feature of its platform to manipulate vote counts across the country. This theory has undergone countless permutations as its proponents have attempted to account for the various impossibilities it implicates. At bottom, however, it holds that Dominion Voting Systems, which only operated in thirty states in the 2020 election, is responsible for rigging the election in favor of President Biden. Lindell also swears by the truth of this theory.[8]

---

[6] Montgomery has been involved in multiple high profile, well-publicized frauds across the country for at least the last twenty years. *See generally*, Adam Roston et. al., *The man behind Trump World's myth of rigged voting machines*, REUTERS, Dec. 20, 2022, https://www.reuters.com/investigates/special-report/usa-election-montgomery/. Montgomery's history of fraud was brought to both Lindell and Mr. Olsen's attention on multiple occasions prior to the Cyber Symposium, and those warnings were deliberately discarded. *See, e.g.*, **Exhibit 6**, July 4, 2021 text message from Brannon Howse to Kurt Olsen; **Exhibit 7**, July 20, 2021 Expanded Summary emailed to Mike Lindell and Kurt Olsen.

[7] **Exhibit 3**, at 50:5-51:1.

[8] **Exhibit 3**, at 279:10-280:9.

4

9. The China Claims and the Dominion Claims would appear to be unnecessarily duplicative, or even mutually incompatible. While neither theory is true nor technically sustainable, each does serve to fill gaps where the other fails. Each relies on the other to present a semblance of plausibility. For this reason, Defendants have regularly invoked both simultaneously while defaming Plaintiff. In his very first public tirade against Dr. Coomer, for example, Lindell expressly tied the two theories, stating:

> *Dominion*, you did your best, and Smartmatic, *to take our country through China*. You did your best, *you corrupt people, you* . . . Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you I'm turning myself in *and turning in the whole operation* so maybe, just maybe, that you get immunity and only get to do, I don't know, ten, twenty years. I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America.[9]

10. The Cyber Symposium itself originally focused on the China Claims through presentation of alleged PCAPs, but those collapsed immediately upon the slightest scrutiny.[10] Defendants had spent months promoting this nationally broadcasted event to politicians, cyber security experts, and media figures from across the country, but when the inescapable fraud of the underlying "evidence" became apparent, they pivoted to the Dominion Claims. This pivot resulted not only in multiple publications of the lies about Dr. Coomer at issue in this dispute,[11] but also

---

[9] Plaintiff's Second Amended Complaint (SAC) at ¶ 63 [Dkt. 170] (emphases added).

[10] **Exhibit 8**, Depo. Tr. Harri Hursti, Mar. 30, 2023, at 112:7-21 (noting that it only took two hours for actual cyber experts to conclusively determine the "evidence" presented at that Cyber Symposium was fraudulent.)

[11] *See* SAC at ¶¶ 72-97.

5

the invitation of Mesa County Clerk Tina Peters onstage to spread lies of her own about the trusted build process.[12]

11. That Defendants claim Dr. Coomer was part of a grand global conspiracy at the intersection of both the China Claims and the Dominion Claims is evident from their own sworn testimony. A few examples readily demonstrate this belief:

- Q: "So it sounds like in your mind it's possible that Hammer and Scorecard is what was used to rig the election?

  A: "Anything is possible, but we do know it was rigged. We know it was broke into, and China was involved. That's what I've been saying since day one . . . I don't know if they used Hammer Scorecard. They broke in. You can break into a computer with Hammer Scorecard.

  Q: "Okay. So you don't actually know what your theory of the case is?"

  A: "I know the election was broke into. One hundred per cent. Broke into and rigged. One hundred per cent."

  Q: "But you don't know how?"

  A: "But I don't know which devices and which – which computer devices, which exact computer devices, no. Do I know it was done with computers? One hundred per cent."[13]

- "[Dr. Coomer is] covering up something. He's covering up something. I have all the . . . evidence from the election. And it was done through Dominion, and other machines. That's a fact. You're not going to take that away from me. Fact, fact, fact."[14]

- Q: "You're putting Coomer in the group with Griswold and Raffensperger because you believe they all played a role in election crime as well?

---

[12] *Id.*

[13] **Exhibit 3**, at 50:5-51:1.

[14] *Id.* at 210:21-211:6.

6

- A: "They've all done something with election crime, but Coomer did something extra to me and my employees. To me and my employees. So did Dominion. Dominion sued my employees, too."[15]

- Q: "So the biggest crime the world has ever seen is rigging the election?"

  A: "He's part of the biggest cover-up of the biggest crime in history."[16]

- Q: "So crimes against the United States and all of the world . . . in that instance, you're referring to rigging the election?"

  A: "Absolutely … Dominion covered it up. Dominion, all the machines in Colorado. And then you just – and then you guys served me with papers, the vice president or president of Dominion. So yes. He's either in on it or he's doing something, because you don't sue MyPillow after you try to destroy him a year earlier."

- "You just told me you're part of it, Eric Coomer. I was nice before when you attacked me over here with Newsmax, and you attacked. I just – right there I just called you a traitor, what did you do to my company. Now you sue me? I never said anything about you. But all of a sudden, oh you're the vice president of Dominion. Now I get it. You're Dominion."[17]

12. As discussed more fully below, the aspects of Dr. Halderman's testimony that touch on these various threads of Defendants' claims are all relevant and necessary for the jury to properly understand the disputed issues in this case.

### III.   LEGAL STANDARD

13. Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and when the fact is of consequence in determining the action. FED. R. EVID. 401. "The threshold for relevance under the Federal Rules of Evidence is not a high

---

[15] *Id.* at 282:8-16.

[16] *Id.* at 283:15-284:2.

[17] *Id.* at 295:2-25.

one," *U.S. v. Medina-Copete*, 757 F.3d 1092, 1105-06 (10th Cir. 2014) (*quoting United States v. Cerno*, 529 F.3d 926, 934 n. 5 (10th Cir. 2008)), requiring sufficient materiality and probative value to "provide a fact-finder with a basis for making some inference, or chain of inferences." *Id*., (*quoting United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007).

14. "Because the alleged defamatory statements [at issue here] relate to a matter of public concern, the 'actual malice' standard applies to Plaintiff's defamation claim." Order on Motion to Dismiss [Dkt. 119], p. 10 (*citing Brokers' Choice of Am., Inc. v. NBC Universal, Inc*., 861 F.3d 1081 (10th Cir. 2017) (applying Colorado law).

15. Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989). To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity." *Lewis v. McGraw-Hill Broad. Co., Inc.,* 832 P.2d 1118, 1122-23 (Colo. App. 1992). Courts have considered numerous circumstantial factors as sufficient to establish that a defendant has acted with actual malice, including, as relevant here, when a defendant relies on anonymous sources,[18] when a defendant had reason to know his source was unreliable,[19] when the

---

[18] *St. Amant v. Thompson*, 390 U.S. 727, 721-32 (1968); *Eramo v. Rolling Stone, LLC*, 209 F.Supp.3d 862, 872 (W.D. Va. 2016).

[19] *St. Amant*, 390 U.S. at 732 (""[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Celle v. Filipino Rep. Enters., Inc*., 209 F.3d 163, 190 (2d Cir. 2000); *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283 (D.D.C. 2017) ("[I]f there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice."); *Jankovic v. Int'l Crisis*

8

allegations made are inherently improbable,[20] when a defendant intentionally avoids the truth,[21] when a defendant's allegations conform to a preconceived storyline,[22] and when a defendant has a financial motive to make the defamatory statements.[23]

## IV. ARGUMENT

### A. *Dr. Halderman's testimony concerning Absolute Proof, Absolute Interference, and Absolute 9-0 should not be excluded.*

16. Lindell's *Absolute* series of films readily demonstrates how Defendants regularly intermingle their various election rigging claims with the claims at issue here. For example, Lindell's first film, *Absolute Proof*, is focused primarily on the China Claims. However, the two-

---

*Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice).

[20] *St. Amant*, 390 U.S. at 732 (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F. Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ("when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" is evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), aff'd., 350 F.3d 1272 (D.C. Cir. 2003) (same).

[21] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 693 (noting that "evidence of an intent to avoid the truth was . . . sufficient to satisfy the more demanding [actual malice standard]" which included the failure to review available evidence and failure to attempt to interview known key witnesses); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth."); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361 (Colo. 1983).

[22] *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often provide to be quite powerful evidence."); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 674-75 (W.D. Va. 2019); *Eramo v. Rolling Stone, LLC,* 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

[23] *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (finding circumstantial evidence of motive can establish actual malice).

9

hour film also includes a 28-minute interview with Matt DePerno[24] that is focused entirely on the Dominion Claims. This interview focuses on the universally debunked Antrim County Report and includes a nearly 2-minute segment of video footage of Dr. Coomer giving a sales presentation for Dominion Voting Systems in Chicago in 2017.[25] Following the segment featuring Dr. Coomer, Lindell summarized by stating, "The purpose of this whole show obviously is to show everyone in the world that these machines, that this was the biggest fraud, the biggest crime I believe against humanity. This is a crime against humanity. If we wouldn't all be talking about this now, and this is all the truth is going to be revealed."[26] While Lindell did not explicitly tie this allegation to Dr. Coomer at the time, this is virtually a verbatim precursor to the allegation that Defendants would go on to level against Dr. Coomer directly. *See* SAC at ¶¶ 3, 103-104.

17. Dr. Halderman's testimony as it relates to the false claims published in the *Absolute* series serves to place Defendants' statements about Dr. Coomer in their proper context. It also speaks directly to many of the elements that Dr. Coomer must demonstrate to prevail on his claims, including, but not limited to, Defendants' reliance on unreliable sources, the inherent implausibility of their claims, their intentional avoidance of the truth, and their conformity to a pre-conceived narrative that the election was rigged. Dr. Halderman's testimony on this issue should not be excluded.

---

[24] **Exhibit 9**, Excerpt for *Absolute Proof*, Feb. 5, 2021, available at https://caincloud.egnyte.com/dl/EKXRcGjkYV/Ex_9_-_20210205_Lindell_DePerno_AP_cut.mp4_

[25] *Id.*, at 17:50.

[26] *Id.*, at 21:15.

### B.     Dr. Halderman's testimony concerning data revealed at the August 2021 Cyber Symposium should not be excluded.

18.     The Cyber Symposium is an event of central significance in this case. Defendants spent months promoting the event, including through direct invitations to politicians, media figures, and cyber security experts across the country. They even offered a $5 million reward to anyone who could prove the information they presented was false.[27] They promised to show everyone proof that the election had been rigged, and millions tuned in for the big reveal. Ultimately, this did not come to pass. Instead, Defendants' obviously fraudulent "evidence" supposedly supporting the China Claims collapsed almost immediately. In their desperation to fill airtime for their massive audience, Defendants fell back on the Dominion Claims. Part of this effort included putting Joe Oltmann on stage to present a supposed link between Dominion and China titled "DOMINION: Serbian Technology with Chinese Characteristics." *See* SAC at ¶¶ 81, 90. Oltmann, who knew the audience believed the China Claims were connected with the Dominion Claims, introduced himself by stating, "I was the one who came forward with the information about Eric Coomer of Dominion Voting Systems." *Id*.

19.     Dr. Halderman's discussion of the data presented at the Symposium, contained in paragraphs 47-71 of his report, is highly relevant to this dispute. It shows that Defendants knew that the data they were presenting was false, or proceeded with reckless disregard for the truth. It further demonstrates the inherent implausibility of the theory presented, and Defendants' willful avoidance of the truth. The rapid collapse of this "evidence" also provides circumstantial evidence

---

[27] Lindell was subsequently ordered to pay this $5 million award in an arbitration proceeding brought by Robert Zeidman, a cyber security expert who attended the Cyber Symposium and proved the "evidence" presented was false.

11

that speaks to Defendants' motive in focusing the remainder of the Symposium on Dr. Coomer and the Dominion Claims. Discussion of the data presented at the Symposium should not be excluded.

C. **Dr. Halderman's testimony about inaccurate election results posted in Antrim County, Michigan should not be excluded.**

20. Dr. Halderman's discussion of the Antrim County report is relevant and helpful to the jury. As noted above, Lindell has historically relied on the Antrim County report to support his false claims of election fraud, and the Antrim County report focuses a substantial amount of discussion on false claims about the adjudication function of Dominion voting machines. Dr. Coomer's involvement with securing patents related to this function has been the one of the primary drivers of false claims against him.

21. Discussion of the Antrim County report first serves to contextualize the preceding discussion of the adjudication function contained in paragraphs 89-98, whose relevance Defendants do not dispute. It also serves to demonstrate how Defendants disregarded reliable sources and willfully avoided the truth, both of which are factors relevant to the jury's actual malice analysis. The Court should not exclude this testimony.

D. **Dr. Halderman's testimony about Oltmann's claims should not be excluded.**

22. Defendants' entire argument with respect to Dr. Halderman's testimony about Oltmann's claims is a misstatement of the law. Defendants assert that actual malice can only be shown by "clear and convincing proof that any publishing Defendant 'in fact entertained serious doubts as to the truth of' Oltmann's statements about Coomer." Motion, at p. 8 (*quoting Miles v. Nat'l Enquirer*, 38 F.Supp.2d 1226, 1228 (D. Colo. 1999). As discussed above, actual malice can

12

also be shown through reckless disregard of the truth and the various factors courts have established to make that assessment.

23. Dr. Halderman's testimony relating to Oltmann's claims is among the most relevant and important contributions his testimony offers. Oltmann is the origin of the lies about Dr. Coomer, as well as a close friend and business associate of Defendants. Dr. Halderman's testimony on this topic speaks directly to the falsification of the lies at issue here, their reliance on anonymous sources, their inherent implausibility, the willful avoidance of the truth necessary to sustain them, and the conformity of the claims to Defendants' pre-conceived narrative. This testimony should not be excluded.

### E. *Dr. Halderman's testimony about Dr. Coomer's character should not be excluded.*

24. Defendants assert that Dr. Halderman's testimony relating to Dr. Coomer's character, a matter on which he has personal experience and knowledge, should be excluded because it violates Fed. R. Evid. 404(a)(1). This is a puzzling assertion given that Defendants apparently do not intend to argue that Dr. Coomer actually did rig the election. In fact, they have made every effort they can to distance themselves from Oltmann and his claims, despite his numerous close ties with Defendants. Nearly a year after this case was filed, Defendants even began pursuing a completely new theory of the case in order to not have to defend the lies about Dr. Coomer, namely by arguing that Defendants' numerous defamatory publications were really just about Lindell being upset about a "dirty deal" between Dr. Coomer and Newsmax that prevented Lindell from promoting MyPillow on that network. This false narrative is readily disproven and will be more thoroughly addressed in response to Defendants' Motion for Summary Judgment. For purposes of this argument, however, Defendants do not attempt to identify which

13

"particular occasion" they suggest Dr. Halderman's testimony on this topic pertains to. The Court should deny the request to exclude this testimony as well.

### F. Dr. Halderman's use of the term "conspiracy theories" should not be excluded.

25. Defendants object to Dr. Halderman's use of the term "conspiracy theory" because they claim the term has a negative connotation. They further argue that this negative connotation effectively renders use of the term to be synonymous with an argument that their claims are inherently implausible. Because inherent implausibility is a factor relevant to a finding of actual malice, Defendants assert that use of the term "conspiracy theory" is, therefore, an impermissible legal conclusion. This circuitous argument, taken to its logical conclusion, would suggest that Dr. Halderman cannot say anything which might suggest a connection to any of the burdens Dr. Coomer must meet to sustain his claims.

26. In reality, Dr. Halderman's opinions on this matter derive from his own deep personal knowledge and experience with the subject matter. Notably, Defendants do not deny that their beliefs are, in fact, conspiracy theories. Nor could they. Defendants must concede that they posit a vast global coordination of historically unprecedented scope wherein thousands of unidentified collaborators have worked together in secret to shift the power dynamics of the entire planet. This is a theory about a conspiracy, or, a conspiracy theory. Referring to things by their names cannot be impermissible simply because some scholars have argued that those names have negative connotations.[28]

---

[28] Defendants rely primarily on recently published journal articles on the topic, but there is no evidence that Dr. Halderman has reviewed these publications, is familiar with the criteria put forward therein, or that he is relying on the definitions proffered in those publications when utilizing the term "conspiracy theory" himself.

14

### G. *Dr. Halderman's testimony regarding the credibility of evidence should not be excluded.*

27. Like Dr. Halderman's testimony with respect to Oltmann's claims about Dr. Coomer, Dr. Halderman's testimony regarding the credibility of evidence is among his most relevant and helpful for the jury. Indeed, Defendants expressly concede his expertise on this matter. If Defendants believed that there was some infirmity in Dr. Halderman's opinions that warranted rebuttal, they could have simply identified an expert witness of their own to dispute Dr. Halderman's position. They have not done so. This testimony is highly relevant and the Court should deny the request to exclude it.

### H. *Dr. Halderman's testimony regarding others' states of mind should not be excluded.*

28. Dr. Halderman's opinions with respect to Mr. Lindell's business interests, his use of cyber security "experts" who have only produced "evidence" that conforms to his desires, and his use of the term "hoax" all derive from Dr. Halderman's personal experience and knowledge arising from his review of Defendants' claims and the bases upon which they rely. His insights on this matter are relevant to multiple actual malice factors such as pre-conceived narrative and financial motive. The Court should, therefore, deny the motion to exclude this testimony as well.

## VI. CONCLUSION

For the reasons stated herein, Eric Coomer, Ph.D. requests that the Court deny Defendants' Motion to Exclude Testimony of J. Alex Halderman and for such other and further relief to which he may be justly entitled to receive.

15

Respectfully submitted this 10th day of October 2023.

      */s/ Bradley A. Kloewer*
Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
David E. Jennings, No. 54643
djennings@cstrial.com
Steve Skarnulis
skarnulis@cstrial.com
Zachary H. Bowman
zbowman@cstrial.com
**Cain & Skarnulis PLLC**
P. O. Box 1064
Salida, Colorado 81201
and
303 Colorado Street, Suite 2850
Austin, Texas 78701
719-530-3011/512-477-5011 (Fax)

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
**RechtKornfeld PC**
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900
**ATTORNEYS FOR PLAINTIFF**