**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

**EXHIBIT 16**

---

```
1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3    ----------------------------------------------------------

4    Eric Coomer, Ph.D.,

5                  Plaintiff,

6       vs.               Civil Action No. 1:22-cv-01129-WJM

7    Michael J. Lindell, Frankspeech LLC,

8    and My Pillow, Inc.,

9                  Defendants.

10   ----------------------------------------------------------

11

12        VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13       DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                  VOLUME I (Pages 1-370)

15

16

17   DATE:   March 8, 2023

18   TIME:   9:30 a.m. CST

19   PLACE:  PARKER DANIELS KIBORT, LLC

20           Colwell Building, Suite 888, 123 North 3rd St

21           Minneapolis, Minnesota 55401

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR

25   Job No.: 5761446
```

Veritext Legal Solutions
800-336-4000

**Page 2**

1                    APPEARANCES
2
3   On Behalf of Plaintiff:
4      CHARLES J. CAIN, ESQ.
5      Ccain@cstrial.com
6      BRADLEY A. KLOEWER, ESQ.
7      Bkloewer@cstrial.com
8      Cain & Skarnulis PLLC
9      P.O. Box 1064/101 N. F Street, Suite 207
10     Salida, Colorado 81201
11
12  On Behalf of Defendant:
13     RYAN MALONE, ESQ.
14     Malone@parkerdk.com
15     Parker Daniels Kibort
16     888 Colwell Building
17     123 North Third Street
18     Minneapolis, Minnesota 55401
19
20  ALSO PRESENT:
21     ▮▮▮▮▮▮▮▮▮▮
22     Adam Wallin, Videographer
23
24  NOTE:  Original deposition transcript will be provided
25  to Charles J. Cain, Esq. as taking party of deposition.

**Page 3**

1                    INDEX
2           (Volume 1 - Pages 1-370)
3
4
5
6   WITNESS:  MICHAEL J. LINDELL            PAGE
7
8
9
10  EXAMINATION BY MR. CAIN............................  6
11  AFTERNOON SESSION................................... 226
12
13
14
15
16  OBJECTIONS... 12, 15, 38, 39, 40, 42, 49, 60, 69, 84,
17  92, 103, 105, 112, 170, 185, 225, 253, 259, 281, 282,
18  286, 294, 295, 306, 323
19
20
21
22
23
24
25

**Page 4**

1   EXHIBITS MARKED AND REFERRED TO:
2
3   Exhibit 60   Plaintiff's First Amended Notice of
4                Intention to Take Oral and Videotaped
5                Deposition of the Authorized
6                Representative(s) of My Pillow, Inc....   8
7
8   Exhibit 61   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮     121
9
10  Exhibit 62   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     152
11
12  Exhibit 63   My Pillow Ads on Fox News Since 2017... 169
13
14  Exhibit 64   My Pillow Flash Sale Ad................ 192
15
16  Exhibit 65   Flash Drive........................... 201
17
18  Exhibit 66   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮     242
19
20  Exhibit 67   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     268
21
22  Exhibit 68   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮  ▮▮▮▮▮▮▮▮▮▮
24  ▮  ▮▮▮▮▮▮▮▮▮▮▮▮     273
25

**Page 5**

1   Exhibit 69   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮
3   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮     275
4
5   Exhibit 70   ▮▮▮▮▮▮▮▮▮▮▮▮▮
6   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮
7   ▮  ▮▮▮▮▮▮▮▮▮▮     290
8
9   Exhibit 71   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10  ▮  ▮▮▮▮▮▮▮▮▮▮▮▮     297
11
12
13  Exhibit 72   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮  ▮▮▮▮▮▮▮▮▮
15  ▮  ▮▮▮▮▮▮▮▮▮▮▮     309
16
17  Exhibit 73   ▮▮▮▮▮▮▮▮▮▮▮     336
18
19  Exhibit 74   ▮▮▮▮▮▮▮▮▮▮▮     355
20
21  Exhibit 75   ▮▮▮▮▮▮▮▮
22  ▮  ▮▮▮▮▮▮▮▮▮▮▮▮     358
23
24  (Original exhibits attached to original transcript.
25  Copies attached to transcript copies.)

Veritext Legal Solutions
800-336-4000

| | |
|---|---|
| 1      VIDEO TECHNICIAN: We are going on the<br>2 record at 9:36 a.m. on March 8th, 2023. This is the<br>3 video recorded deposition of designated representative<br>4 of My Pillow, Incorporated, Michael J. Lindell, being<br>5 taken by counsel for the plaintiff in the matter of Eric<br>6 Coomer, Ph.D. versus Michael J. Lindell, Frankspeech,<br>7 LLC, and My Pillow, Incorporated, in the United States<br>8 District Court for the District of Colorado, Civil<br>9 Action No: 1:22-cv-01129-WJM.<br>10    This deposition is being held in Minneapolis,<br>11 Minnesota. My name is Adam Wallin from the firm<br>12 Veritext and I am the videographer. The court reporter<br>13 is Kelley Zilles from the firm Veritext.<br>14    Will counsel please identify themselves for the<br>15 record.<br>16      MR. CAIN: Charlie Cain, Brad Kloewer for<br>17 the plaintiff.<br>18      MR. MALONE: Ryan Malone for My Pillow,<br>19 Incorporated.<br>20      VIDEO TECHNICIAN: Will the court reporter<br>21 please swear in the witness.<br>22        MICHAEL J. LINDELL,<br>23 duly sworn, was examined and testified as follows:<br>24        EXAMINATION<br>25 BY MR. CAIN:<br><br><div align="right">Page 6</div> | 1   A. Go ahead.<br>2   Q. All right. So No. 1, ground rules. She's<br>3 trying to take down what you're saying, so it's<br>4 important that we don't talk over each other. Do you<br>5 understand that?<br>6   A. Yes.<br>7   Q. Okay. You understand you're here as a corporate<br>8 rep for My Pillow?<br>9   A. Yes.<br>10   Q. Do you understand that we provided a notice of<br>11 deposition topics for you to look at in order to prepare<br>12 to give testimony today?<br>13   A. Yes.<br>14   Q. Did you look at them?<br>15   A. Yes.<br>16   Q. I'm going to be handing you some exhibits<br>17 throughout the day. We've been marking them, so we're<br>18 already up to Exhibit 60.<br>19     (Exhibit 60 marked for identification.)<br>20   Q. Is that a copy of the deposition notice?<br>21   A. I need my glasses. Got it.<br>22   Q. Is that a copy of the notice that you reviewed<br>23 in order to prepare to give testimony today?<br>24   A. Yes, it appears to be, yeah.<br>25   Q. All right. What, if anything, did you do to<br><br><div align="right">Page 8</div> |
| 1   Q. Tell us your full name, please.<br>2   A. Michael James Lindell.<br>3   Q. Well, good morning, Mr. Lindell. My name is<br>4 Charlie Cain, we met for the first time --<br>5   A. Who's paying you?<br>6   Q. -- about four minutes ago.<br>7   A. Okay. Go.<br>8   Q. Is that right?<br>9   A. What's that?<br>10   Q. Is that right?<br>11   A. Is what was the question?<br>12   Q. We met for the first time --<br>13   A. Yes, yes.<br>14   Q. Okay. Here's what we're going to do, we're<br>15 going to start slow because the court reporter is trying<br>16 to take down what you're saying, okay?<br>17   A. Don't sit and scold me already, Mister. I'll<br>18 do, I'll do whatever I have to do. So you're not,<br>19 you're just a lawyer, you're an ambulance chasing<br>20 lawyer, so don't start with me, I got all day, I'll take<br>21 as much time as you want, so let's go. You're not my<br>22 boss, you're just a lawyer, frivolous lawyer. So go.<br>23 Don't start scolding me.<br>24   Q. Well, I'm asking questions, I'm not going to<br>25 scold you.<br><br><div align="right">Page 7</div> | 1 prepare yourself today?<br>2   A. I read the case, I read this frivolous case.<br>3   Q. Okay. Is that it?<br>4   A. That's what I did, I read this frivolous case.<br>5 I answered your question.<br>6   Q. If there is a question that you don't<br>7 understand --<br>8   A. No, I read the, I got it all, I got all these<br>9 down here, I read this, I read the frivolous case.<br>10   Q. All right. If there is a question that you<br>11 don't understand that I ask you during today.<br>12   A. Mm-hmm.<br>13   Q. Will you ask me to clarify that for you?<br>14   A. Yes.<br>15   Q. Okay. Otherwise I'm going to assume that you<br>16 understand what I'm asking you.<br>17   A. Right, got it.<br>18   Q. You're still quick answering on me.<br>19   A. Mm-hmm.<br>20   Q. So let me finish my question, okay?<br>21   A. Yes.<br>22   Q. I tend to be a slow talker.<br>23   A. Good for you.<br>24   Q. I'm from Texas originally.<br>25   A. Good for you. I got all day, we'll make a week<br><br><div align="right">Page 9</div> |

<div align="right">3 (Pages 6 - 9)</div>

1 of this. Go ahead.
2 Q. Probably up to your lawyer, but I'm happy to
3 stay as long as you'd like.
4 A. Just keep going.
5 Q. All right. Why did you call me an ambulance
6 chaser?
7 A. What?
8 Q. Why did you call me an ambulance chaser?
9 A. Because you are. This is a frivolous case and
10 if you're representing this guy and you've read this
11 case, you are a disgusting lawyer, period. There's my,
12 that's my, that's my right to say. You want to sue me
13 too, Mr. Ambulance Chaser. Are you working on
14 contingency or consignment with the guy, what are you --
15 I can't believe anybody would take this. This is
16 absolutely disgusting, it's a disgrace to our country,
17 it's a disgrace to you.
18 Q. Anything else?
19 A. No, that's it. You asked me a question, I
20 answered it.
21 Q. Okay. Now you, it looks to me based on what you
22 told me off the record before we started that you put
23 some notes on the back of that?
24 A. Yeah, I put the notes in here. It says, do you
25 want me to read them?
Page 10

1 Q. Yes, I do, because I looked at them and I
2 couldn't, I couldn't --
3 A. It says Chris Ruddy emails, it says Eric Coomer
4 emails with Newsmax and Ruddy. It says, and then it
5 says Coomer, from when I lost business with Eric Coomer
6 I put a note here. That's the only time I ever, ever
7 said anything before I was filed. I said one paragraph
8 and that was after Eric Coomer made a deal with Chris
9 Ruddy. And that's when I lost business. And then I
10 came out and made the comment that I said.
11 I was just, my notes to tell. That's the only
12 thing that was ever said. Everything else that I said
13 came after I was served papers at the capitol in
14 Colorado, it was just my personal notes here.
15 I made one comment in two years and that was
16 after Eric Coomer hurt me by going to Newsmax and
17 whatever he said to them so I couldn't appear on Newsmax
18 anymore and that's it. And I talked to Ruddy and it was
19 disgusting what he did, Eric Coomer did with Newsmax.
20 So there, that's my, that's what the notes are.
21 Q. Okay. Well, let me follow up then. Who's Chris
22 Ruddy?
23 A. He's the owner of Newsmax.
24 Q. And you said a note, email with Chris Ruddy or
25 something to that effect?
Page 11

1 A. No, it was the note to tell my lawyers to get
2 the emails from Chris Ruddy, which we've already
3 subpoenaed you guys but you don't seem to supply
4 anything. We've already subpoenaed the emails from
5 Ruddy to you, you, Mr. Lawyer, that won't give us those
6 because you don't seem to think you have to give
7 anything because you like your frivolous case. That's
8 what it is, it's a note for me to tell my lawyer. But
9 as long as you bring it up, this is when I went out, I
10 didn't even know who Eric Coomer was until he did this
11 dirty deal with Newsmax and Ruddy and hurt my business.
12         MR. CAIN: Objection, nonresponsive.
13 A. Huh, say it?
14 Q. I said, objection, nonresponsive.
15 A. Well, you don't like that, huh?
16 Q. Let me explain a few things to you.
17 A. What?
18 Q. Let me explain a few more things to you.
19 A. Mm-hmm.
20 Q. Have you given a deposition before like this?
21 A. I've given a ton of depositions.
22 Q. Okay. So you, you understand the process
23 somewhat?
24 A. Mm-hmm, sure do.
25 Q. Okay. When I ask you a question, you need to do
Page 12

1 your best to respond only to my question.
2 A. Are you going to arrest me? I'll say whatever I
3 want and if we have extra, that's too bad. There's no
4 rule that says I can't give a full answer. So, you
5 know, I'm telling you the rules. Have you ever been in
6 a deposition where they can't stand who you are, have
7 you?
8 Q. A lot more than you, sir.
9 A. Okay, good. Keep going. Don't tell me about my
10 depositions, you're not my boss, you're just some
11 frivolous lawyer in here and you're bringing this
12 frivolous case to me, and especially against a company
13 that had nothing to do with anything. You're
14 disgusting. Keep going.
15 Q. I want you to understand another thing.
16 A. What's that?
17 Q. This case is pending in Federal Court.
18 A. I don't care. What does that have to do with
19 anything.
20 Q. Do you understand that?
21 A. Yes.
22 Q. All right. There's a federal judge that's going
23 to likely be reading and watching this deposition.
24 A. I don't care.
25 Q. Do you understand that?
Page 13

4 (Pages 10 - 13)

1    A. I don't care. She should have dismissed this a
2  long time ago. She hasn't ruled on that, there's a
3  problem, I got a problem with her too.
4    Q. Okay. The judge has practice standards on
5  how --
6    A. No, the judge did not dismiss this case. We put
7  in to get it dismissed and she ruled, an unfair ruling
8  saying well, go ahead and do discovery and waste all
9  your time while I'm sitting here not doing nothing.
10  That's what that judge is doing. So don't tell me what
11  the judge is doing. And you just let me worry about the
12  judge reading this, okay.
13    Q. I just want you to understand.
14    A. No, you just don't worry about me. You're not
15  out for my benefit, okay, he's out for my benefit, not
16  you. So you can get, don't worry if I say something
17  that offends the judge, okay. You just let me worry
18  about that, you got that.
19    Q. Yeah, I got it.
20    A. Okay, good. Keep going.
21    Q. The reason I bring that up, sir, is if the judge
22  is not pleased with your conduct in this deposition,
23  there may be penalties.
24    A. Oh, okay, good. You tell, you go ahead. And
25  you think you're worrying about old Mike, you're really,

1  not being responsive or acting in good faith today, we
2  may have to come back and do this some more, and I want
3  you to understand that.
4    A. Oh, I got that.
5    Q. All right. And if that's the case, I will be
6  asking for attorneys fees and costs.
7    A. Oh, you will, huh. I'm already asking for them,
8  I might just come after you guys for the most frivolous
9  case ever when this is done. If there is a way to sue
10  you, believe me I'm doing it.
11    Q. Okay.
12    A. Okay. Just so you know that, beyond anything
13  you've ever seen, so be prepared.
14    Q. I'm committed to being polite and professional
15  today.
16    A. Okay, go ahead. We're getting through that.
17  Now you know where I sit, let's get on with it.
18    Q. Okay.
19    A. All right.
20    Q. Now we talked about the notice, you looked at
21  Exhibit 60.
22    A. Yep.
23    Q. You're the only person here on behalf of My
24  Pillow --
25    A. That's correct.

1  that's great. You're bringing a frivolous case, you're
2  really up my back. Go ahead, keep going.
3    That judge, you put this in the record, that
4  judge is a big problem I got. If someone didn't have
5  the money or time to sit through this garbage when I put
6  in to her a summary judgment last summer and she hasn't
7  ruled on it, either say yeah or nay, it's disgusting.
8  It's disgusting to our country that she couldn't make a
9  ruling. But go ahead and do deposition. If there was
10  some guy that didn't have money you would put them under
11  just in this garbage, wasting my day, wasting my time.
12  But think if it was someone on the street, don't you
13  care about people. This is disgusting.
14    This judge should have ruled a long time ago,
15  either yeah or nay, frivolous or not, but she didn't.
16  She said go ahead and do discovery while I sit and
17  decide what I'm going to do, that's disgusting. I got
18  no problem with you on that, I got a problem with the
19  judge not making a ruling, so there.
20    Now go ahead. Now that the judge has that on
21  record, now you don't have to worry about what me and
22  the judge think about each other, all right.
23    MR. CAIN: Objection, nonresponsive.
24    Q. Here's, here's another thing that I need you to
25  know, Mr. Lindell. If the court determines that you're

1    Q. -- to testify. You need to let me finish my
2  question before you answer, okay?
3    A. Mm-hmm.
4    Q. In my estimation you seem agitated this morning.
5  Are you taking any medication or other drugs that would
6  affect your ability to testify?
7    A. No.
8    Q. Now I prior to the deposition your counsel Mr.
9  Malone indicated that you'd have an assistant in here
10  today.
11    A. Mm-hmm.
12    Q. And that's ▇▇▇▇?
13    A. Yes.
14    MR. CAIN: Hi, ▇▇▇▇.
15    Q. Her last name is what?
16    A. ▇▇▇▇.
17    Q. Does she work for My Pillow?
18    A. Yes. No, she doesn't, she works --
19    THE WITNESS: My Pillow or Lindell
20  Management?
21    ▇▇▇▇ Lindell Management.
22    A. Lindell Management.
23    Q. Lindell Management.
24    A. Yeah. She can go in the other room if you want.
25  It was only because if I get an emergency call she has

5 (Pages 14 - 17)

| | |
|---|---|
| 1 to take it. | 1 don't, I never met the guy. |
| 2    Q. Well, given that she's not an employee -- | 2    Q. Because you wanted to talk about election fraud |
| 3    A. That's fine, she can go out there. | 3 issues on Newsmax? |
| 4      THE WITNESS: Just go. It's no big deal. | 4    A. No, My Pillow, do you get it, My Pillow. I |
| 5    ██████████████ the deposition.) | 5 couldn't go on there to talk about My Pillow. And I |
| 6    A. Okay. | 6 asked him why I couldn't talk about my new platform |
| 7    Q. All right. Now is there anyone, Mr. Lindell, in | 7 Frankspeech or My Pillow. I couldn't have my ads there, |
| 8 your view that's more knowledgeable about your company | 8 he wouldn't let me run Frankspeech ads after that |
| 9 My Pillow than yourself? | 9 either. He let me run plenty of Frankspeech ads, |
| 10    A. No. | 10 wouldn't let me run that. |
| 11    Q. You mentioned Mr. Ruddy and then we kind of got | 11    I couldn't go on to talk, I'm friends with all |
| 12 sidetracked and you talked about lost business as a | 12 the hosts there, we would go on and they would say, hey, |
| 13 result of Eric Coomer, is that correct? | 13 you hired so many people today, hey, Made in America. |
| 14    A. That's correct. | 14 He, he, I could never go on again and talk about My |
| 15    Q. Explain that to me, how did you lose business. | 15 Pillow and it hurt our sales. Sure, we run the ads, but |
| 16    A. Chris Ruddy, apparently Eric Coomer when I found | 16 sales would spike if you could go on and say how many, |
| 17 out the spring of '21 he sued, I guess at some point he | 17 Made in America, talking about your number of employees, |
| 18 must have said Coomer, okay. And when he did, when he | 18 hiring, you know, you're hiring employees, new things |
| 19 made a deal with Newsmax, which I believe was the | 19 that would develop at My Pillow, new products. From |
| 20 spring, it was right before the statement I made here on | 20 that day I've never been able to go back on there |
| 21 Page 36. The only comment I ever made about, I didn't | 21 because of Eric Coomer. And I didn't know who the guy |
| 22 know who Eric Coomer was, and when I made the statement | 22 was, I don't know why he did this to me. |
| 23 it was I believe the day after I heard Chris Ruddy | 23    Q. Would sales spike when you talked about election |
| 24 announce that there was no, they found no evidence of | 24 fraud issues? |
| 25 crime or whatever, blah, blah, blah, and this guy named | 25    A. No, no. You're talking about the Cyber |
| Page 18 | Page 20 |

| | |
|---|---|
| 1 Eric Coomer had, it was a case with Eric Coomer. | 1 Symposium, I lost $4 million over that because of that, |
| 2    From that point I was not allowed, I talked to | 2 at least, maybe more. |
| 3 Ruddy, I was not allowed to go on Newsmax anymore to | 3    Q. All right. We'll get to that. |
| 4 talk about My Pillow and it hurt my business. And then, | 4    A. And when I talked about election, when I talked |
| 5 and I said Eric Coomer is a traitor what he did, and | 5 about election things I lost $100 million in one month |
| 6 that's when I made that comment and I stand by that. | 6 going forward. Right now I probably lost a quarter, at |
| 7 What he did to My Pillow that day and whatever he made a | 7 least 250 million. I've had to borrow money, my company |
| 8 dirty deal with Chris Ruddy, I'm not allowed to go on | 8 is down, it's way down. |
| 9 Newsmax like I was always on to go and talk about my | 9    Q. And you're here on behalf of My Pillow, so I |
| 10 products and talk about anything that's out there in the | 10 want to make the record clear. |
| 11 news. They had me on all the time for ten years. | 11    A. Yep. |
| 12    Q. Is My Pillow not running advertisements on | 12    Q. When you say I lost 4 million. |
| 13 Newsmax? | 13    A. My Pillow has, My Pillow, it's just My Pillow. |
| 14    A. Yeah, we run advertisements, we have since 2011 | 14 You're correct. So you want me to answer My Pillow all |
| 15 on every station, every single station, ABC, CNN, all of | 15 the time? |
| 16 them. But what happened is when I would go on there he | 16    Q. Well, I just don't want -- |
| 17 would have me on to talk about My Pillow, just like on a | 17    A. My Pillow has lost millions and millions, |
| 18 newscast, talk about my employees, talk about, talk | 18 hundreds of millions. |
| 19 about the business, Made in America. | 19    Q. And My Pillow lost $4 million in connection with |
| 20    But I from that point, from the time Eric Coomer | 20 the Cyber Symposium? |
| 21 did this, whatever deal they made, I was shut out of | 21    A. Probably more than that because we made a |
| 22 Newsmax, I never appeared on there since. One time in a | 22 decision when Fox wouldn't run the ads and everybody |
| 23 recording, one time in a recording when they, and that's | 23 else did, ABC, NBC, CBS, CNN, everybody ran the ads, |
| 24 it, it was shut off. And I was very upset with this guy | 24 Newsmax, OAN, they all ran the ads to advertise for this |
| 25 Eric Coomer. I had no idea who this guy was, still | 25 symposium. Fox would not take the ad and then we |
| Page 19 | Page 21 |

1 pulled, we had to pull our ads, My Pillow ads off there.
2 And so we probably lost it could have been upwards of 8
3 million, but for sure 4 million. 4 million minimum, 8
4 million max because we didn't advertise at the Cyber
5 Symposium, it was completely free, a free event, and
6 that cost us to sell probably a million or 2, at least.
7     Q. And do you blame Dr. Coomer for that as well?
8     A. No, he had nothing to do with that, I don't know
9 what he had to do with that. I'm just saying we lost a
10 lot of money there. But that was, it was an event, it
11 was an event that I didn't want, I didn't want to
12 advertise there, it was so serious I didn't advertise My
13 Pillow, we chose not to.
14    Q. Well, we'll look at some clips about that.
15    A. Yeah.
16    Q. Because you did actually.
17    A. No. If they are RSBN, there's other outlets
18 that were there, that's their own deal. You need to
19 understand, for My Pillow we did, we have other
20 advertisers out there. RSBN is another network. We're
21 on over 3,000 stations, we have been for over 15 years,
22 and if they do the news and they're advertising My
23 Pillow, that has nothing to do with the Cyber Symposium.
24    What I'm saying is I think maybe the whole
25 thing, I might have read one, made one read, but we did
Page 22

1 not run. We ran commercial free, commercial free the
2 whole 72 hours, that's a fact. And that, that's not My
3 Pillow, that would be my, my platform, the stream that
4 we were doing Frankspeech.
5     All the other news outlets were there, that's
6 whatever they did, that's their deal, you know, because
7 they, it's like any other platform, they all advertise
8 My Pillow, like whether if CNN was there they ran a My
9 Pillow ad I think, ABC, CBS, NBC, whoever was there,
10 they ran ads, that's their normal programming. Do you
11 follow me?
12    Q. Oh, I'm following you. I'm not sure, her name
13 is Kelley.
14    A. Okay, sorry. I'll go slower.
15    Q. Maybe less coffee, I don't know. We're going to
16 talk about it.
17    A. This is my second cup, thank you. Maybe you
18 should talk faster.
19    Q. No, I think the court reporter appreciates a
20 slower --
21    A. You're getting personal, do you want to go back
22 there. Keep going.
23    Q. All right. We'll talk about the symposium
24 obviously in a minute.
25    A. Okay.
Page 23

1     Q. But you did bring up the fact that you could not
2 run My Pillow advertisements during the symposium?
3     A. No, I chose not to.
4     Q. Okay.
5     A. On Frankspeech. Let me --
6     Q. You, you made that decision.
7     A. No, no, I'm going to make, I got to explain
8 something. At the symposium My Pillow had nothing to do
9 with that except for if any outlets were there, like
10 RSBN, ABC, CNN, Frankspeech, if they chose not to run
11 ads during that, that was their choice.
12    At Frankspeech, which was my stream, I chose not
13 to, I chose commercial free. That's what I did and
14 that's not, now that's not My Pillow, that's my
15 Frankspeech platform. It's like a Rumble, it's like a,
16 it's like a Rumble and a Facebook combined kind of. And
17 I just chose, I said we're not running ad, this is too
18 important, we're not running any ads.
19    Anything else you see in that -- now did I at
20 one point if I said anything from the stage, I might
21 have at one time for 30 seconds or whatever, but, but I
22 don't know, I don't know, we'd have to look back if
23 there was something there, that would have been it. But
24 I don't think I did and there was definitely no ads ran.
25 Not even, I don't even think bottom thirds or anything,
Page 24

1 I think it was just too important to me not to run any
2 ads.
3     Q. You did.
4     A. Well, we'll see if you got Frankspeech, if you
5 have that, if you have, if it's a bottom third or
6 whatever, but you can say what you want. So you're
7 telling me I ran an ad. I don't believe we ran an ad.
8     Q. Well, we'll talk about it.
9     A. Okay, well.
10    Q. Depends on how you define ad.
11    A. We never broke for a commercial, I ran it
12 commercial free, so if you're saying that, I know it's a
13 lie.
14    Q. You promoted My Pillow products during the Cyber
15 Symposium.
16    A. No, I did not promote My Pillow products. My
17 Pillow, let me just tell you something about My Pillow.
18 My Pillow doesn't promote anything. We sell our
19 product, we have ads on 3,000 stations, newspapers,
20 podcasts across the country, we have since 2010. We're
21 the No. 1 advertiser, New York City Times No. 1
22 advertiser, Washington Post, CNN, MSNBC, Fox,
23 Frankspeech now, that was just a new platform, RSBN,
24 Real America's Voice, all of these platforms. They do a
25 daily, they do it every day and that was just another
Page 25

**Page 26**

1  day for them, okay, period.

2        So My Pillow didn't put ads in there, it's their

3  normal programming, do you understand that, that's what

4  you need to know. I chose on Frankspeech where I would

5  normally have ads running, I chose not to run ads

6  because I also control Frankspeech. I just told not to

7  run breaks with ads. I didn't think it was, I didn't

8  want to do that. And you know, did it cost me a lot of

9  money, could I have made a lot of money, probably, but

10  instead I lost $2 million, 4 million overall at least,

11  at least $4 million. If I look back, could I have ran

12  ads, I could have, but I thought the messaging was more

13  important than to run ads.

14        Now if they did anything at the bottom third of

15  Frankspeech, I don't know that, at that time we were

16  brand-new with Lindell TV and Frank -- it was

17  Frankspeech, it wasn't even Lindell TV. I don't know if

18  they ran a bottom third, I don't know, because I'd have

19  to look back and see.

20        MR. MALONE: Mike, just remember the court

21  reporter.

22        THE WITNESS: Okay, yeah.

23    Q. You said now multiple times you lost money, and

24  by you we mean My Pillow, right?

25    A. Yeah, My Pillow lost us money.

**Page 27**

1    Q. Are you having trouble hearing me?

2    A. I have hearing aids, I can hear you.

3    Q. Okay. I'll try to speak up if I need to.

4    A. There's two things, when I say -- I'm sorry, I

5  got to say. I lost money personally, I lost money and

6  Frankspeech lost money, the platform, and My Pillow lost

7  money because we couldn't, we didn't, it hurt us because

8  the ads of Fox when I pulled down the My Pillow ads on

9  Fox because of what, because of what they were saying

10  about the Cyber Symposium and they were the only outlet

11  that did not run the ads just to, for people to watch

12  it.

13        So My Pillow lost, I mean, if I had to break

14  them down, My Pillow probably lost 4 million, 3 million,

15  I personally lost at least 2 million, and then, and

16  Frankspeech, that was new, so you could consider that

17  me, probably another million. So I would say 6 million,

18  3 million My Pillow though just segregated that we would

19  have normally had sales. Had the Cyber Symposium not

20  ran, we would have at least 3 million, it could be as

21  high as 5 million.

22    Q. Now, Mr. Lindell, if I wanted to verify those

23  numbers by looking at any of the financial data from the

24  symposium time period and looking at the My Pillow

25  financial data, what would I look to in your company's

**Page 28**

1  records?

2    A. This is our sales. So you'd have to, you would

3  look at the sales. It's very easy to see. Here's Fox

4  News, let's just use Fox. Fox News sales that are

5  directly related to promo codes that go, are in between

6  the spots on Fox News, so let's just take them. That

7  alone would have been, I think it was four weeks, three

8  or four weeks, so that would be at least a million

9  dollars worth of sales a week from Fox gone, and it

10  could have been more, I'm just saying that's minimum, so

11  that would be.

12        If the Cyber Symposium did not exist we would

13  have gotten, we would have been $4 million higher. And

14  that's, that would be looking at the Fox News promo

15  codes, that would be, you would easily be able to tell.

16  But here, Cyber Symposium, after, that's very easy to

17  show that.

18    Q. Okay.

19    A. And then the other one would be easier, easier

20  to show, and I don't know this, would be what

21  Frankspeech, if there was a promo code there you would

22  have had, and I don't know if there was, I didn't even

23  know if we used them back then, but if there was you

24  would see sales before, on email, on emails, we have

25  emails, you would have seen sales before and then during

**Page 29**

1  and you would see this big drop-off.

2    Q. Okay.

3    A. And those are the two biggest platforms I think

4  that, that were affected.

5    Q. All right.

6    A. Yeah, yeah.

7    Q. I think you answered my question.

8    A. All right.

9    Q. Visually, I'm a visual person.

10    A. Mm-hmm.

11    Q. I certainly have the emails with you and ███████

12  you know someone named ███████ at your company?

13    A. Yeah.

14    Q. What's her last name?

15    A. ██████████████████ now, she's married, I

16  don't know.

17    Q. All right. And you, we'll look at those, but

18  you would email with her daily about how much money was

19  coming in under certain promo codes, right?

20    A. I do, I've done that for 15 years.

21    Q. Okay.

22    A. What I, and what I look at, this is very

23  important you know this, she'll send me, every day I

24  look at a report like a thousand promo codes and I

25  look for deviations. I'll tell you one that happened

1 yesterday, it's called ARK, and yesterday we normally do
2 about $█████ but yesterday we did ███████ So this is
3 what ███████ and I would talk about. I called her and said
4 what happened, what's with this ARK. It's called a
5 deviation and we have to look in to see why did this
6 happen. Well, yesterday we found out the reason was we
7 had launched a new product a month ago called My Pillow
8 2.0 and yesterday the gal on the show did a 15-minute
9 read of how much she liked it, liked it. And so
10 that's, that's the deviation. Otherwise it could have
11 shown up on a promo code site, like RetailMeNot.
12     We always have to find out why the numbers
13 changed from our regular numbers, that's how we do it
14 every day, we've been doing it for 15 years and that's
15 how I run my company. If you see a deviation out there,
16 you know, let's say it's CNN in the middle of the night
17 and it's a promo code directly to a show that cost a
18 thousand dollars, we look at that and if it only took in
19 1,200 or let's say 900, we don't run it again. And
20 that's why we track everything with promo codes. It's
21 like otherwise you have no way, you're just putting ads
22 out there that would be frivolous or they could be great
23 and you wouldn't know, one or the other.
24     Q. Right. I understand that. All I'm talking
25 about right now, Mr. Lindell, is what documents are

Page 30

1 available in your company that track sales. We're
2 talking about promo codes.
3     A. That's it.
4     Q. You discussed deviations and how you analyze
5 that.
6     A. With promo codes. Promo codes and 1-800 numbers
7 that are attached to every single event, every single
8 station, every single news article, I mean, I mean
9 newspaper, every single spot has its own individual code
10 and 1-800 number, everything for 15 years. It doesn't
11 matter what station they're on or what's going on,
12 they're all tracked by that.
13     Q. Okay. On a macro level, that's a micro level,
14 on a macro level financial reporting for your company,
15 okay, do you have monthly profit and loss statements
16 that are generated that you review, in what form do you
17 look at macro financial data?
18     A. Macro, what do you mean macro. When we get our,
19 if we get a, we'll look at our I guess monthly or
20 whatever. But ours changes based on the media buys we
21 do. So I look at, I look at more of, like I say, a
22 daily. The macro I'm looking, you know, to be honest, I
23 don't, I don't even look at the monthly. I'll look at
24 maybe the year, the year-end. But we look, we micro
25 every day. We look at the, you know, you look at at sales

Page 31

1 every day.
2     But the, but the sales can be deceiving. If you
3 have gross sales it could be because you bought a bunch
4 of media for a break-even, you know, just a break-even.
5 Because a lot of times I have to do that to keep our
6 manufacturing level, even though I don't make any money,
7 net money, but I have the volume of, to keep our
8 employees employed because we have, I do my own
9 manufacturing too on a lot of the products. So I'll,
10 sometimes I'll buy media. Let's say, let's say it's --
11     Q. I'm not asking your about buying media.
12     A. Well, this is what, this is what you're asking,
13 this is how I'm tracking stuff. Like you just have the
14 daily gross sales would be another way to look at it,
15 but then you would have to look into that because it
16 could be, it could be different if you're looking at
17 your net or where you're making your money. You could
18 have a $2 million day, but you lost money on it is what
19 I'm saying, where I have to do it to match the
20 manufacturing with the media buys.
21     Ours is different than any other media out
22 there, media company ever. I've been doing it for
23 15 years. Every single thing is like its own business,
24 you have to do it that way or otherwise, imagine a ball
25 team and you want all 300 batters. If one falls below

Page 32

1 that, you don't play them again, and you don't play them
2 again. Or if you did, you better have a reason why you
3 played it.
4     There are times I bought media, like just this
5 week, I bought media on The View, I bought media on
6 General Hospital. I normally don't buy that, but I
7 bought it just to test it and I lost, I lost a lot of
8 money this week testing those, those spots with the new
9 product.
10     Q. Let's focus on my question, okay. I appreciate
11 your answer. What I'm trying to understand is what kind
12 of financial reporting is done within your company?
13     A. You --
14     Q. Outside of --
15     A. Okay. The year-end profit and loss, the
16 year-end, the year-end tax returns.
17     Q. Yeah. So you have P&L statements, you've seen
18 those in your company, right?
19     A. We, when we have a board meeting which we have
20 maybe once a quarter.
21     Q. Okay.
22     A. You know.
23     Q. Is that the kind of information --
24     A. I don't look at them, I don't look at them. I
25 look at the dailies, like I told you, every day.

Page 33

| | |
|---|---|
| 1  Q. That's great. I appreciate your business style, | 1  Q. Where are they? |
| 2  that's fine, but I may need to have some different | 2  A. They're in ███████████ |
| 3  information than perhaps you possess, so. Is it true | 3  Q. How long have they been preparing returns for My |
| 4  that at least on a quarterly basis you would look at | 4  Pillow? |
| 5  profit and loss statements for the company as a whole, | 5  A. Since 2004. |
| 6  yes or no? | 6  Q. Okay. Do they produce, if you know, any audited |
| 7  A. Me personally I just look at year-end. I know | 7  financial statements for the company? |
| 8  where things are at on a daily basis, so the answer is | 8  A. I don't know, that's all done, they're, they're |
| 9  no. | 9  a professional company. I guess. |
| 10  Q. All right. On an annual basis is it your | 10  Q. Okay. Have you ever seen any audited financial |
| 11  practice to, to review P&L statements for the company? | 11  statements for My Pillow? |
| 12  A. I see the tax returns. I already know what | 12  A. Yeah, the year-end, the year-end, whatever is on |
| 13  they're going to end up because I look at it every day. | 13  that tax return, how's that, that's what I look at. |
| 14  That's what I'm trying to tell you, I micromanage is my | 14  Q. And has the corporate tax return for My Pillow |
| 15  macromanage. I know where everything is every single | 15  been filed for the tax year 2020? |
| 16  day. I don't need to look at a monthly report that's | 16  A. Yes. |
| 17  going to show me, I look at the bank account every day, | 17  Q. 2021? |
| 18  I look at the, I know what's going on, everything. | 18  A. Yes. |
| 19  This, I took calculus in 9th grade, I know | 19  Q. I assume not for 2022? |
| 20  what's going on out there, I know every single -- I | 20  A. I believe it's almost done because I know that |
| 21  could tell you if a little station is a, does 200 grand | 21  he said we lost, I don't know, 5 million or something. |
| 22  or $200 less than it's supposed to and then we check | 22  Q. In 2021, or 2022? |
| 23  into it. This is, so I don't know what to tell you. Do | 23  A. In 2022, it was a $5 million loss. I just have |
| 24  I, if I wanted to go out there and say, hey, could you | 24  to sign them, that was the end, it was a loss, which, |
| 25  put together a financial statement, I don't know, they | 25  which explains, you know, we lost a lot of money. |
| Page 34 | Page 36 |
| 1  probably could. | 1  Q. All right. And you mentioned 9th grade |
| 2  MR. MALONE: Mike, let's keep it nice and | 2  calculus. Do you have a high school degree? |
| 3  slow. | 3  A. Yeah. |
| 4  THE WITNESS: Huh? | 4  Q. Or diploma? |
| 5  MR. MALONE: Keep it nice and slow for the | 5  A. Yeah. |
| 6  court reporter. | 6  Q. Where did you go to school? |
| 7  THE WITNESS: Right. But I don't know what | 7  A. Chaska, Minnesota. |
| 8  he's asking here. | 8  Q. Okay. When did you graduate? |
| 9  A. I just, yeah, I don't, I don't look at that | 9  A. 1979. |
| 10  stuff, I look at daily. So I want to know every, I want | 10  Q. Did you go to college? |
| 11  to know in real-time. I'm not like another corporation | 11  A. Yes. |
| 12  where they come in fourth quarter we lost this, by that | 12  Q. Where did you go to college? |
| 13  time it might be too late. | 13  A. University of Minnesota. |
| 14  Q. All right. The object of the exercise here, | 14  Q. Did you graduate? |
| 15  sir, is to figure out what kind of financial documents | 15  A. No. |
| 16  the company would prepare in its normal course, that's | 16  Q. How many years did you go? |
| 17  all I'm asking. | 17  A. Half a year. |
| 18  A. Okay. Year-end sales. | 18  Q. So you don't have any bachelor degrees or |
| 19  Q. Okay. | 19  anything like that? |
| 20  A. Year-end tax returns. | 20  A. No. Is that required for this deposition? |
| 21  Q. And obviously the tax returns are prepared I | 21  Q. No, I'm just trying to figure out. |
| 22  assume by an outside accountant? | 22  A. Well, what business is that of yours, I'm asking |
| 23  A. Yep, absolutely. | 23  you, I don't think it's any of your business. But keep |
| 24  Q. What accounting firm? | 24  going. Now you're getting personal on me again. Do you |
| 25  A. ███████████ | 25  got a bachelors degree? I mean, I don't even know why |
| Page 35 | Page 37 |

**Page 38**

1 this is relevant.
2          THE WITNESS:  Can you object to this stuff.
3          MR. MALONE:  Sure, Mike.  We'll object,
4 outside the scope.  If you know, you can answer.
5      A.  I mean, I guess, a half a year, okay.  So what's
6 your point.  Keep going.
7      Q.  There may not be a point, I'm just asking
8 questions.
9      A.  Okay.
10     Q.  Do you have any expertise, any personal
11 expertise --
12          MR. CAIN:  Is that -- pardon me for a
13 second, the TV.
14          MR. MALONE:  Let's go off the record for a
15 second.
16          MR. CAIN:  Clicked on.
17          VIDEO TECHNICIAN:  We are going off the
18 record at 10:12 a.m.
19          (A break was taken at 10:12 a.m.)
20          VIDEO TECHNICIAN:  We are back on the
21 record at 10:12 a.m.
22 BY MR. CAIN:
23     Q.  If you have to use your phone, sir --
24     A.  I don't.  I had to see if there were any
25 emergencies.  Go ahead.

**Page 39**

1      Q.  All right.  Thank you.  Part of the reason I
2 asked that question about your educational background is
3 to determine whether or not you had any expertise in
4 things such as computer science or forensics?
5      A.  Or what?
6      Q.  Forensics, computer science or forensics.  Do
7 you have any education, skill or training in that field?
8      A.  No.
9          MR. MALONE:  Object, outside the scope.
10 Mike, you can still answer.
11     A.  No, no.
12     Q.  All right.  Do you have any expertise or
13 experience in the election industry or election
14 technology?
15          MR. MALONE:  Same objection.
16     A.  Yes, but I'll say yes.
17     Q.  All right.  Explain what expertise or education
18 or training you have in that area.
19          MR. MALONE:  Same objection.
20     A.  Over the last, over the last two years I have
21 learned more than anyone I believe has probably ever
22 learned through other investigations, my own studies and
23 everything else.
24     Q.  All right.  So on-the-job training basically?
25     A.  Call it whatever you want, I don't know, it's

**Page 40**

1 not my job.
2      Q.  Do you hold yourself out as an expert in
3 elections?
4          MR. MALONE:  Object, outside the scope.
5      A.  Yeah, I'll object.
6          MR. MALONE:  You can still answer, Mike.
7          THE WITNESS:  I can answer?
8          MR. MALONE:  Yes.
9      A.  I would say yes.  I'm very, I'm more
10 knowledgeable than I think 99.9 percent of people.  What
11 I know not many other people would know because of what
12 I've studied over the past two years every day.
13     Q.  Have you performed any work in journalism?
14          MR. MALONE:  Object, outside the scope.
15     Q.  I assume not.
16     A.  Like what?
17     Q.  You don't have any training as a journalist, do
18 you?
19          MR. MALONE:  Same objection.
20     A.  It's, you mean like college?
21     Q.  Any training, any, have you ever acted as a
22 journalist, do you have any training or expertise in
23 journalism?
24     A.  Define journalism.  I mean, I'm a host of my own
25 TV show now.

**Page 41**

1      Q.  Different, sir.  Do you have any training in
2 journalism?
3      A.  I would say no.
4      Q.  Okay.  Do you, and by -- well, let me, let me
5 switch this up.  Does My Pillow employ any individual or
6 consultant that has expertise in election management or
7 election technology?
8      A.  No.
9      Q.  Okay.
10          THE WITNESS:  Why, why does he need to know
11 about that when we're talking about My Pillow, about
12 what I know about elections.
13     Q.  Well, you talk about elections pretty much
14 constantly, like you said, in the last two years, right?
15     A.  Not on TV, never, I never would mix it with My
16 Pillow ever.
17     Q.  You don't mix it?
18     A.  No, never.  Ever, by the way, ever.  The, the
19 media, media wouldn't even let me if I even tried to do
20 that, I can't do it.
21     Q.  And in your capacity you are CEO of My Pillow,
22 is that right?
23     A.  Mm-hmm, yes.
24     Q.  All right.  In your capacity as CEO have you
25 reviewed any of the election data that you've

11 (Pages 38 - 41)

1 accumulated that supports these allegations that the
2 2020 presidential election was procured by fraud?
3 　　　　　MR. MALONE: Object to form.
4 　　A. Have I reviewed, not as CEO of My Pillow, it has
5 nothing to do with it. But have I looked at stuff as
6 Mike Lindell as an individual, absolutely. I've never
7 done anything on behalf of My Pillow for the election.
8 　　Q. Is that right?
9 　　A. That's right.
10 　　Q. As it relates to My Pillow itself, from a
11 corporate standpoint you said 15 years you've been doing
12 things essentially the same way, right?
13 　　A. We started doing promo codes and, and phone
14 numbers, in 2010 I started with newspaper ads, then
15 called remnant ads. It was the most, one of the most
16 successful remnant ads in the United States history. I
17 made them myself, we did it in-house, it was me holding
18 a pillow, but I had to know how each ad worked.
19 　　My whole premise is you treat every, every,
20 every ad or everything like it's your only one. I come
21 from doing home shows and fairs where that's all the
22 money I had. So I want to make this ad the best it can
23 be and you have to track the sales or you don't know if
24 it did good or not. It's direct, direct to consumer,
25 direct marketing. And I started, that was 2010, we did

Page 42

1 every paper in the United States hundreds of times and
2 that was --
3 　　Q. I'm sorry to interrupt you. When you started in
4 2010 was that under the current corporation My Pillow,
5 Inc. that is --
6 　　A. Yes, yes.
7 　　Q. -- it is today?
8 　　A. Yes.
9 　　Q. Okay. And when you started in 2010, how many
10 shareholders were in the company?
11 　　A. A lot.
12 　　Q. In 2010?
13 　　A. Mm-hmm.
14 　　Q. In --
15 　　A. A lot of employees, a lot of people.
16 　　Q. I'm talking about shareholders.
17 　　A. Yes, yes.
18 　　Q. Okay. So and the company itself is as I
19 understand it from looking at the articles is, is a
20 company that was formed here in Minnesota, right?
21 　　A. Mm-hmm, I think so, yeah, yes.
22 　　Q. All right. And it's authorized to do business
23 certainly in Colorado, correct?
24 　　A. Yes, yes.
25 　　Q. All right. And it's fair to say you're the

Page 43

1 founder of the company?
2 　　A. I'm the inventor of My Pillow in 2004, I
3 invented My Pillow. I don't like the word founder, it's
4 I'm the inventor of My Pillow, I got a patent on it.
5 　　Q. And are you a majority shareholder of the
6 company?
7 　　A. Right now. I wasn't back when you asked, but I
8 am now. Now I have 51 or 54 percent. When you asked
9 about 2010, I think I was, I wasn't the majority.
10 　　Q. You had other partners in the company?
11 　　A. It's all kinds of people, yeah, partners and,
12 and employees that got stock. We're an employee owned
13 company.
14 　　Q. Right. But you're the controlling shareholder
15 to this day?
16 　　A. Now, now I am, I wasn't then.
17 　　Q. As of when have you been the controlling
18 shareholder of My Pillow?
19 　　A. I think, I'd have to look, I think 2010 or '11.
20 I can't, I want to say '10, '11, '12. I don't know, I'd
21 have to look, I'm not sure about that. It might have
22 even been 2009. I don't know, to be honest with you, I
23 don't know.
24 　　Q. Okay. But fair to say for the last decade?
25 　　A. Oh, at least, yeah. You know what, I would

Page 44

1 probably say the summer of 2009 maybe when we, I think
2 that's when we went from one corp. to the My Pillow,
3 Inc. So I, I think it was the summer of 2009, that's
4 what I'll say.
5 　　Q. I didn't understand what you said, we went
6 from --
7 　　A. Before, before it was My Pillow, Inc. it was, I
8 think it was Night, I think it was Night Moves
9 Minnesota, LLC and that was in 2004 or '05. And then in
10 2009 in the summer I believe that's when My Pillow, Inc.
11 was formed and that's when I became the majority
12 shareholder.
13 　　Q. Okay.
14 　　A. There were two partners we got that got out.
15 　　Q. Does, does My Pillow have what's called a cap
16 table that identifies the shareholders and their
17 respective interests?
18 　　A. Yeah, yeah.
19 　　Q. You've seen that document?
20 　　A. Yeah. I think there's 50 some people or 40 some
21 at least of shareholders.
22 　　Q. 40 to 50?
23 　　A. 40 to 50, it could be more, but at least 40 to
24 50, yeah, I believe.
25 　　Q. Are there any shareholders of the company that

Page 45

12 (Pages 42 - 45)

1  aren't also employees?
2      A.  There was, I think his shares were bought when
3  you leave, it's an employee owned, so when you leave My
4  Pillow you can't just go sell your shares publicly, you
5  know, I think it has to be -- you'd have to look at our
6  bylaws.  I don't believe so that aren't, that aren't
7  actively, there's probably some that aren't actively
8  working, but I don't know.  The short answer is I don't
9  know.
10     Q.  Okay.  There's a process under the bylaws of My
11 Pillow if a, let's say an employee quits but he has a
12 share of the company.
13     A.  If he, yeah, if he wants to sell there's a
14 process.  You can't just go to sell to an outsider.
15     Q.  Right.
16     A.  We buy back, I believe we buy back, the company
17 has to buy back the shares or something like that, there
18 is a process.
19     Q.  Yeah.
20     A.  You know, and the board has to approve it and
21 all, you know, we had --
22     Q.  It's called treasury stock?
23     A.  What's that?  I don't know, I don't know.
24     Q.  All right.  But there's no group or block of
25 venture capitalists that --

Page 46

1      A.  Yes, yes.
2      Q.  In other words, it's not --
3      A.  Yes.
4      Q.  You know what a nonprofit company is?
5      A.  Yes.  It's for profit, but it lost money because
6  of all this, yes.
7      Q.  All right.  And you mentioned the board several
8  times, so let's talk about the board, okay.
9      A.  The board of what, My Pillow?
10     Q.  Yes, sir.
11     A.  Yeah.
12     Q.  How many board members are there?
13     A.  Probably a dozen maybe, ten to 12.
14     Q.  Okay.  Who, has that changed in the last two
15 years?
16     A.  I don't think in the last two years.  You get
17 people come and go.  One guy got Alzheimer's and there's
18 people, and one guy, one guy left.  In 2020, in 2021
19 there was about three that switched over, one was the
20 ex-mayor of Chaska.  Some of these guys, you know, these
21 guys were just board members, they don't work for My
22 Pillow, they're outside members who keep an eye on and
23 watch everything.
24     Q.  That's, that's --
25     A.  That guy is gone.  Since '20, since the

Page 48

1      A.  No.
2      Q.  -- own shares in the company?
3      A.  No, it's all employee, all people that have
4  helped My Pillow and, yeah, it's not capital.
5      Q.  Okay.  Well, you mentioned early on that the
6  company has gone into debt and --
7      A.  That what?
8      Q.  The company has gone into debt?
9      A.  Yeah, mm-hmm.
10     Q.  Is that bank debt?
11     A.  We had to borrow money from a, from a, I'll call
12 it a bank basically.  It's against your sales, against
13 your inventory, we had to borrow money this year because
14 of the stuff that's hurt us so bad with lawsuits like
15 this.
16     Q.  Is that called factoring, did you factor?
17     A.  No, we didn't buy it, we didn't do it against
18 our daily sales.  I know what you're talking about, we
19 didn't do it against sales.  But it was very high
20 interest loans, very high interest.  And that's
21 partially because the bank, if you remember, they
22 debanked us, they did.  We've been attacked every way,
23 including this lawsuit.
24     Q.  And this goes without saying, but I just need it
25 on the record, My Pillow is a for profit company?

Page 47

1  beginning of 2021 we probably had three.  One guy, like
2  I say, he had Alzheimer's, he's still like an honorary
3  board member I think, but and then you have one, the
4  mayor of Chaska left when we were getting, when we were
5  losing all our box stores and getting cancelled he
6  pulled out, you know, he didn't, he,  he wanted to
7  leave.
8      Q.  Why?
9      A.  Huh?
10     Q.  Why?
11     A.  Because we were getting attacked every day in
12 the media about losing box stores, you remember that.
13 Every day My Pillow loses three more box stores, you
14 know.  We lost 20 some box stores in January alone in
15 2021 and that's when he pulled out.  He didn't, you
16 know, you'd have to ask him, I never asked him why, he
17 just said I want to resign and --
18     Q.  Well, let's, let's do this, sir.  Let's break it
19 down since you told me there's been some switching in
20 2021.
21     A.  Mm-hmm.
22     Q.  In 2020, all right, who was on the board of
23 directors of My Pillow?
24     A.  You'd have to --
25         MR. MALONE:  That's outside the scope.

Page 49

13 (Pages 46 - 49)

**Page 50**

1    A. I don't know, you'd have to look yourself, I
2 don't know the exact. I'm not going to say what I don't
3 know. There was, you know, I could give you names,
4 ████████████████████
5    Q. Hold on, slow down.
6    A. ████████████████
7    Q. How, how do you spell his last name?
8    A. I don't know, that's why you should just get the
9 list. I'll give it to you, I'll gladly give it to you.
10    Q. Thank you.
11    A. I don't, I give you names, I give you some
12 misinformation. Because they might have been, 2020, you
13 know, the only changes I think came with maybe three
14 people, the rest are still on there. We had a corporate
15 attorney that left for another job and he was on there
16 back then. But there was a change, I don't know when
17 they --
18    Q. Okay. But you're, you're fine with giving me a
19 list?
20    A. I'll give you the list, you can have the list,
21 you can have the stockholders, you can have it, I got no
22 problem.
23    Q. Okay. So you have no problem giving me the cap
24 table that I referred to earlier.
25    A. I don't know, what's that, list of stockholders?

Page 50

**Page 51**

1    Q. It's the list of stockholders and their records.
2    A. If my lawyers say it's fine, otherwise I don't,
3 you know, what's your point. So maybe not. I don't
4 want them attacked, I don't want their names out there
5 publicly and I'm sure they don't. So maybe not. We'll
6 have to see, I'll ask my attorneys. Because, you know,
7 we get attacked, employees have been attacked enough by
8 people like you. So maybe not. In fact, I might just
9 say not. The ones I gave you aren't on the board so,
10 you know, get a subpoena because I don't want these
11 people to know they're shareholders and get attacked
12 because stuff gets released to the public and I'm tired
13 of my employees getting attacked by people like you.
14    Q. I'm attacking your employees?
15    A. So I'm going to say no. You better have your,
16 have that judge do that when she's done making her other
17 ruling.
18    Q. I'm sorry, you said I'm attacking your
19 employees?
20    A. No, this, this, this thing attacked and hurt my
21 employees. They're tired of being attacked out there by
22 box stores and frivolous lawsuits. So I'm not putting
23 their names out there. They have enough stuff to worry
24 about, they have families, they have children,
25 grandchildren and they're, so no, I'm not giving you

Page 51

**Page 52**

1 their names.
2    Q. Well, I'll talk to your lawyer about that. But
3 I guess, like I was asking earlier, Mr. Lindell, I need
4 to know what exists --
5    A. I don't care what you need to know, so keep
6 going. I'm not giving you those right now, so that's my
7 answer. You can get the judge to order that.
8    Q. The --
9    A. And I'm doing it to protect their names because
10 it gets out there and they get attacked by people like
11 you or Coomer, whoever this frivolous case is. So
12 that's, you can respect that. I'm not giving you names
13 out there.
14    Q. Don't point your finger at me.
15    A. Okay. Point your finger, what, I went like
16 this, I went like this, I didn't point no finger at you.
17 You're asking me to try and incriminate my employees.
18 What are you going to do, go after them, you already
19 have, just saying.
20    Q. The corporate attorney that left the board, who
21 was that?
22    A. None of your business. You want to attack his
23 name too, I'm not giving you that. So you can get the
24 judge to order that, tell her I wouldn't give you that.
25 I'm not having you put these names out there, so these

Page 52

**Page 53**

1 people are good people, to get attacked by the media or
2 you.
3    Q. I have no interest in publicizing --
4    A. I know, but it doesn't matter.
5      THE WITNESS: This is, is this thing
6 public, will this be public?
7      MR. MALONE: Mike, I'm not here to testify
8 today. This is a confidential proceeding.
9      THE WITNESS: Okay. I'm just asking a
10 question, could this testimony get to the public, yes or
11 no?
12      MR. MALONE: Mike, this is a confidential
13 deposition, all right. I am going to continue to object
14 to this being outside the scope and asked and answered.
15 You've given your answer, we can move on.
16      THE WITNESS: Okay. I just want to ask
17 this question before I move on, can stuff from here be
18 leaked through the media, or to the public, yes or no,
19 is this public information, even though as you say it's
20 confident, that's my question?
21      MR. MALONE: Not right now, Mike, no.
22      THE WITNESS: Okay, okay, all right.
23 BY MR. CAIN:
24    Q. Are you refusing to tell me who is on your board
25 now?

Page 53

1   A.  Right now I am because I'm not going to give
2  you, there's too many, things are too subjective right
3  now, I don't know who is on that and I don't know how to
4  spell their names and I'm not giving you their names for
5  you to go attack them.  And that's just me, I'll consult
6  with my attorney.  You can subpoena that later, go
7  subpoena their names, that's up to you, you know.
8   Q.  You mentioned -- and I will.  You mentioned
9  outside board of directors versus --
10   A.  Yeah, yeah.
11   Q.  -- inside?
12   A.  Yeah, most of them are outside.
13   Q.  Right now most of them are outside?
14   A.  I think so.
15   Q.  Okay.  And by that, let's make sure we're
16  talking apples to apples.  Outside directors are not
17  employed by the company, correct?
18   A.  Correct.
19   Q.  Do the outside directors have shares in the
20  company?
21   A.  I'd have to check, I'll have to check that, I
22  don't know.
23   Q.  Okay.
24   A.  They did, the ones, they did.  Of the two I told
25  you that left, they 100 percent did not have shares.

Page 54

1  But I don't know the other ones that are there right
2  now, I don't know.
3   Q.  All right.
4   A.  I don't believe so.  I think one, two, three, it
5  might be 50/50, you know, but I don't know.
6   Q.  And how often does the My Pillow board meet?
7   A.  As often as required.  We sometimes it will be
8  four times a year, sometimes one time, whatever is
9  required by corporate, you know.  Sometimes it just,
10  that really depends.  It's pretty regularly.
11   Q.  Is there a secretary or someone there that
12  takes --
13   A.  Yep, 100 percent.  It's a legal company, yes.
14   Q.  Okay.
15   A.  The answer is yes.
16   Q.  All right.
17   A.  What do you think we're running.
18   Q.  I'm just asking you questions, I don't know what
19  you're running.
20   A.  Right.
21   Q.  So typically when you have a meeting of the
22  board you'll look at the minutes from the prior meeting
23  and approve those?
24   A.  Correct.
25   Q.  Do you have those minutes in at least the

Page 55

1  company records?
2   A.  Somebody probably has them.  I don't keep them
3  in my drawer.
4   Q.  Okay.
5   A.  But, yeah, I'm sure whoever keeps it, you have
6  to keep them I think.  We would have corporate minutes,
7  yes.
8   Q.  Thank you.  I just want to make sure they exist.
9   ███████████████████████████████████████████
███████████████████████████████████████
██    ██████████████████████████████
██    █████████████████████████████
██    █████████████████████████
██    ████████████
██    ███████████████████
17   A.  I'm not giving you that right now.  I don't need
18  him attacked, I'm not giving you that.  I've answered
19  your question, I'm not giving you names to protect them
20  from being attacked.  I don't trust you as far as I can
21  throw you.  And I'm sorry, that's just my opinion.  I
22  have had stuff leaked to the media and I'm not having
23  these guys get attacked, especially my son, period.
24   Q.  ████████  would have the knowledge of the
25  operations of the company as COO, right?

Page 56

1   A.  Not the stuff that I do with, with this.  If
2  you're asking about the, the ads and stuff, that's not.
3  He's more over the manufacturing and the shipping and
4  stuff, that's his forte.
5   Q.  But he sat through My Pillow board meetings?
6   A.  Mm-hmm.
7   Q.  Is that a yes?
8   A.  Yes.
9   Q.  All right.  So he would have knowledge of what
10  goes on during the board meetings?
11   A.  I'll give you the minutes, I don't care, you can
12  have the minutes.  I'll definitely give you the minutes
13  because I want you to see the minutes because I know
14  what you're getting at.  There ain't nothing in there
15  about anything like this.  So I want you to have the
16  minutes.  So let that be on the record, you can have the
17  board minutes.
18   Q.  And ████████ has sat on the board since 2020?
19   A.  I don't know that, I don't know, that I don't
20  know.
21   Q.  How long has he worked for the company?
22   A.  A long time, but not in that capacity of COO.
23  And you're going to ask me when did he come in, I don't
24  know, I don't know that, I don't know the dates.
25   Q.  Who did he replace?

Page 57

15 (Pages 54 - 57)

**Page 58**

1    A. Nobody, we didn't have a COO I don't think then.
2  I was basically CEO. If somebody was designated that, I
3  don't know, you'd have to look back, no.
4    Q. Does the company have a CFO?
5    A. No. We have a controller.
6    Q. I looked at your -- have you looked at the
7  interrogatory answers that My Pillow gave in this case?
8    A. I don't know, where?
9    Q. It looks like the controller was identified as a
10 person named ██████████
11   A. Yeah, he came on last summer. He wasn't here
12 when, when this all went down.
13   Q. Who was?
14   A. ████ and I don't know his last name, sorry.
15   Q. Is ████ still with the company?
16   A. No, no, no.
17   Q. Do you know where he went?
18   A. I don't know the company he went to, no.
19   Q. Do you know why he left?
20   A. He got, he got an amazing offer. And I guess it
21 was, what do you call it, headhunters that came out, you
22 know, tried to, they hired him away. And it was a, you
23 know, he was a good guy, a good friend of me, he just
24 prayed about it and that's where he went.
25   Q. Is he here locally still?

**Page 59**

1    A. Yeah, I think so. I don't know where he, I
2  don't know where he lives.
3    Q. Is his last name --
4        MR. CAIN: I'm hearing my own voice I think
5  through your ear phones or something. Thank you.
6    Q. Is his last name something you can find for us?
7    A. Yeah, but I'm not, but I'm going to let you get
8  it, I'm not going to give you his name once again to be
9  attacked. I'm not giving you names because I don't want
10 them attacked, especially him. He's not with the
11 company and I'm not going to give you his last name.
12 And I quite frankly I don't remember his last name, I
13 don't have, but I'm not giving that out today.
14   Q. Sir, No. 1, I'm not going to attack anyone.
15   A. It doesn't, I'm not, it's not you, I don't trust
16 these names to leave here. The media grabs them, this
17 is my world now, these guys have been attacked by
18 lawsuits by like this, by media, by box stores
19 cancelling us, by our company, when they cancel to keep
20 people employed, they get shamed by the media. No, I'm
21 not giving you the guy's name. And I don't, to be
22 frank, now I don't remember it anyway. So I'm sorry, if
23 you want names you're going to have to go get them
24 yourself, do your own research, you know.
25   Q. It's a private company.

**Page 60**

1    A. I don't know what to tell you. I'm not, for
2  that reason, and if the judge orders that and she wants
3  to put them at risk, which the judge didn't even order
4  that this case is frivolous, we've been waiting on that
5  for nine months, which I would hope she would make her
6  decision so you don't get to leak all this information
7  out with these names.
8        There's no reason that you should have names
9  other than you want to go attack them and make them,
10 make them feel like crap, you know, or make them, put
11 fear into them, that's what, that's what you guys do, I
12 get it, that's what's been done to my company. And you
13 can't say, that's what this guy does here, Eric Coomer.
14 So that's, that's where I'm at.
15       I'm not giving you names and I can't, and you
16 should understand that. If you've seen us get attacked
17 every single day, I could pull up my name right now
18 every single day, people that work in the call center,
19 they have to listen to garbage every day, you know. We
20 have to listen to attacks or see it out there how
21 another box store goes or another lawsuit that they're
22 getting, that these guys have stock and have to worry
23 about their company which lost millions of dollars
24 because of stuff that your client did.
25       MR. CAIN: Objection, nonresponsive.

**Page 61**

1    Q. I'm going to start doing that, you've been
2  nonresponsive throughout, but this is going to go a lot
3  faster if you answer my question.
4    A. Okay. I'm not giving you the names of anybody
5  that works for me, period.
6    Q. I've already got them.
7    A. Okay, go, then go, go ahead.
8    Q. I just don't have this particular person.
9    A. Well, you're not getting his name.
10   Q. Okay. And this, this would have been, for
11 example, ████████ I know who ████████ is.
12   A. Good for him. He doesn't work for My Pillow, I
13 think he works for Lindell Management, I don't know, but
14 I don't know, I don't know which one he works for.
15   Q. Do you know what he does?
16   A. Yeah, he's an IT guy.
17   Q. All right.
18   A. He works on the back end of Websites.
19   Q. Let's just, let's complete the roster. We know
20 ████████ whoever his last name is, was controller of the
21 company for the period of 2020 and 2021, correct?
22   A. Yes.
23   Q. All right. And, and do you recall roughly, I
24 won't hold you to this, but how long ████ the controller
25 worked for the company prior to that?

1   A. I think three, four years maybe, I don't know.
2   Q. Okay.
3   A. Four years let's say. Probably since '15 or
4 '16, but I don't know that for sure.
5   Q. Okay. And within My Pillow what, what role does
6 the controller perform?
7   A. They just do the, I guess it would be
8 accounting, you know, accounting, more of an accounting.
9 That's why it's not, it's not the role, like a typical
10 CFO, they're not making decisions like projections and
11 what we do here or whatever because the way My Pillow's
12 business model is they couldn't do that anyway. So it's
13 more almost like an accountant.
14   Q. Okay. So ███ would have knowledge at least by
15 virtue of his position in the company and the time
16 period of the, let's say revenue that was being
17 generated by the company in 2020, right?
18   A. I guess, yeah, he would see the dailies and
19 stuff, yeah.
20   Q. Would he be responsible for preparing, you call
21 them the dailies, what do you mean by that?
22   A. No, I get those on my phone, that's automated.
23 I don't know what ███ back then, like I say, it's more
24 of an accounting, you make sure that vendors are paid,
25 you make sure that bills are paid. That's when I say

1 accountant, you know, that's, it's more of an accountant
2 type where you're just paying bills, you're making sure
3 we're not late, making sure that these are, you know,
4 upcoming. Every day he would send me a square, here's
5 the bills due today, here's what I suggest we pay based
6 on the money we have in the account, that's what he
7 would do every day.
8   Q. And then you mentioned or, well, I mentioned the
9 ███ individual and you said you're not sure if
10 he works for Lindell Management or My Pillow?
11   A. Yeah, I don't know if it's Lindell Management or
12 My Pillow, I don't know.
13   Q. I apologize. Where are the corporate offices of
14 your company?
15   A. As far as where it lists corporate or where I
16 physically am at?
17   Q. Yeah, where do you --
18   A. Chaska, Minnesota.
19   Q. Okay. What's the address?
20   A. 1550 Audubon Road.
21   Q. All right. And do you go to work there, is that
22 where your office is?
23   A. Mm-hmm.
24   Q. And is that where ███ office is?
25   A. No, no, he doesn't work in, he's not in

1 Minnesota. He's an IT guy, he's in Texas, he works on
2 the back end of computers. He doesn't do, that's what
3 he does, he works on the back end like servers and stuff
4 or, you know.
5   Q. Gotcha.
6   A. He's IT, not, not like Website, like the back
7 end, you know, servers and --
8   Q. I gotcha.
9   A. I don't know what you'd call it, stuff I don't
10 understand, you know.
11   Q. Okay. That's done remotely is what you're
12 saying?
13   A. Yeah.
14   Q. All right. And, and then in terms of you
15 mentioned --
16   A. He's an employee, not a subcontractor. We have
17 other people that are subcontract for IT, he's an actual
18 employee, I do know that.
19   Q. Okay. Do you know whether he works for a
20 company called PiDOXA?
21   A. No.
22   Q. Have you ever heard of that company?
23   A. PiDOXA. He told me the other day --
24   Q. PiDOXA?
25   A. I don't know.

1   Q. P-I-D-O-X-A.
2   A. I, I know the name and I believe we just got,
3 hired that company about four months ago, but I don't,
4 I'd have to see the spelling. I don't want to say
5 something out of context. We hired a company to do our
6 Website, the back end, because we got rid of another
7 company called, let's see, something Howse, something
8 Howse. It was a company I had when I built Frankspeech,
9 and when I built Frankspeech we switched, I believe we
10 switched now the back end of that, the servers and stuff
11 to, it might be this PiDOXA company you're talking
12 about. I don't know for sure, I'd have to check on a
13 break.
14   Q. Okay. So and you used pronouns, which is fine,
15 you said we. You're referring to My Pillow --
16   A. No, no, no, that's not My Pillow.
17   Q. Okay.
18   A. My Pillow doesn't, this is Frankspeech. My
19 Pillow doesn't have anything to do with PiDOXA. My
20 Pillow has no idea what PiDOXA is.
21   Q. All right.
22   A. I thought you said, I've heard the name and I
23 think it could be the other company we hired on the back
24 end of Frankspeech.
25   Q. Gotcha.

Page 66

1     A. Had nothing to do with My Pillow.
2     Q. All right.
3     A. That's why I believe ████ if he's with
4 that, he works for Lindell Management, not My Pillow.
5 That's what I'm, I'm almost 99 percent sure. I could,
6 you know, ████ would know. No, he doesn't work for
7 My Pillow, I'm almost, like I say, I am 99 percent sure.
8     Q. And, and the Lindell Management company, does
9 that company office out of the My Pillow headquarters?
10     A. Yeah. Well, most of them, a lot of them are
11 remotely, I mean, there's just maybe ten employees
12 remotely I think. I'd have to check that to see how
13 many. It's, I know I think ████ there might be four or
14 five other employees, but they're not in Chaska.
15     Q. Okay.
16     A. It's kind of a, like a management, it's like
17 tech management on the back end and individual projects
18 I guess, I don't know.
19     Q. Are you aware of whether My Pillow has any
20 employee sharing agreements with any of these other
21 companies that you're affiliated with?
22     A. No. As far as My Pillow has a, what are you
23 talking about, can you be more specific.
24     Q. I will. And thank you, that's a good example of
25 asking for a clarification.

Page 67

1     A. Well, thank you, I'm such --
2        THE WITNESS: Maybe I'll get that A plus
3 you said, or did that go out the window.
4        MR. MALONE: You got a ways to go, Mike.
5     Q. I don't think you can claw back into this,
6 respectfully.
7        So affiliated companies, companies that share,
8 have a relationship, you're, you're affiliated with My
9 Pillow, with Lindell Management?
10     A. My Pillow has no affiliation with any company
11 other than we have, when you talk about there's rev
12 shares with about I think 500, I don't know how many
13 podcasts and shows over the last 15 years, radio
14 stations, if you call that a --
15     Q. No, I'm not talking about, we'll talk about
16 revenue share.
17     A. And that's it, there's none, zero.
18     Q. What I'm talking about is, for example, you have
19 someone like ████ who does IT, but he is actually
20 an employee of My Pillow. This is hypothetical, I don't
21 know the answer.
22     A. Yeah, he's not, right.
23     Q. Okay. But that, that employee might be shared
24 with other companies, related companies and then there
25 would be an, an accounting for that person's time.

Page 68

1     A. No, no.
2     Q. You're not aware of any of those types --
3     A. No, no.
4     Q. You got to let me finish.
5     A. No.
6     Q. That's the fourth no.
7     A. Okay.
8     Q. You're not aware of any of those types of
9 agreements, right?
10     A. No, you don't get to work for other companies.
11     Q. Well, it's, it's --
12     A. No.
13     Q. Okay.
14     A. All right. You don't, I think what you're
15 asking is, are you paid by, are you working for multiple
16 companies, you know, and that would be no, a My Pillow
17 employee wouldn't even be allowed to be a subcontractor
18 and work at a, if they have another job that I don't
19 know about, would be like a McDonald's or something,
20 you're not working outside of My Pillow in your same
21 capacity, that answer is no.
22     Q. Okay. Now let's go back to the board because
23 I've neglected to ask you a few questions about your
24 board, whoever they may be.
25     A. Yeah.

Page 69

1     Q. Is there during, let's just frame it from when
2 did you publicly start getting involved in political, in
3 politics or supporting political candidates publicly?
4        MR. MALONE: Object to form, scope.
5     A. Okay. The, I didn't get involved with anything
6 political until I, in, in January, or August 15th of
7 2016 I, Donald Trump had reached out to me in a private
8 meeting asking about stuff made in the USA, about having
9 the manufacturing here, and that was a very, you know,
10 30-minute meeting. Talked to his employees and came
11 back to Minnesota and said, hey, you know, he's going to
12 be a good president and if he -- I didn't, I never
13 voted, I never have been political at all, I'm an
14 ex-crack head, you know, and I thought he would be a
15 great president and that was it.
16        That's, and if you call that involved, I went
17 to, from that point I went to, came back here and I did
18 a press release and said I met Donald Trump and then I
19 was attacked like I've never been attacked. I was the
20 media's darling, and the day I did the press release
21 every news outlet attacked me, called me a racist and
22 everything else. And I never had that happen before in
23 history. I never, I had never, all I said I met him, I
24 didn't even say what we talked about and I was attacked.
25        In fact, when I got back, and this should be,

1 this is probably relevant, I got back from that meeting,
2 and like I say, I didn't ever, I didn't know a liberal
3 from a conservative, a Democrat from a Republican, I
4 knew nothing, it was just, the conversation was about
5 making manufacturing, how is it made in the USA, I want
6 to bring the manufacturing back.  I talked to him about
7 being an ex-crack addict and I had the Lindell Recovery
8 Network for Addicts and he said, well, you know, I'm
9 going to stop drugs being brought in, it was just a
10 conversation.
11        And I got back here and before I did the press
12 release we had a board meeting and I told the board
13 about meeting him.  I said I want to do a press release,
14 I said he's going to be a great president and he's going
15 to help manufacturing here.  Or my board, that one guy
16 that was on the board, that corporate attorney, I can
17 tell you the name, ▇▇▇▇▇ and he said if you do
18 that, if you do that, we're going to lose half our
19 business.  And I walked out of there, of the meeting and
20 the gal, some gal came from the thing and came outside
21 and she goes we didn't get this far by you not listening
22 to God, because I pray about what I do.
23        And I went back in there and I said I'm going to
24 do this, I'm going to do this press release and I don't
25 care what you guys say.  I said I think he'll help our

Page 70

1 recovery, because I was doing evangelizing them, they
2 were Recovery Network for Addiction and what he had
3 talked about I thought would help our country in
4 bringing manufacturing back and it made sense.
5        So when I did the press release I said I met
6 Donald Trump.  Now you got to realize, back then I could
7 say anything and I had a hundred media people going how
8 many employees are, while you're helping people in the,
9 you know, in the inner city and helping this, because I
10 was helping everybody, pouring money out, just pouring
11 money out of my personal pocket to help addiction and
12 everyone across this country including here in
13 Minneapolis.
14        And I did the press release and I was very much
15 taken back going I'm not, I was attacked online by I,
16 find out later most of them were box and trolls, hired
17 hit groups, they called me a racist, they called me
18 everything you could imagine.  And, and I got a taste,
19 you know.  And would I do it again, yeah, I didn't do
20 anything wrong.  I didn't even say I wanted the guy to
21 be president or anything, I didn't put anything, I just
22 said I talked to him.  I figured they would interview me
23 and instead they attacked me and shut me out.  That was
24 the first time ever being shut out by the media and it's
25 pretty much never let up.

Page 71

1    Q.  So ▇▇▇▇▇ to go back to the early part of
2 that.
3    A.  And he's a very much left liberal too, so you
4 could have a great conversation with him.
5    Q.  You should never presume someone's politics.
6    A.  Well, I'm just telling you because you guys
7 attack and you seem to be a little bit on that side, you
8 know.  You presume that I had a lot of coffee this
9 morning, you should never presume that.  So you want to
10 get back personal again, we can go there.
11    Q.  So ▇▇▇▇▇ what I'm hearing from your
12 testimony is one of the My Pillow board members in
13 August, in or about August --
14    A.  August 15th.  It would be August 16th after the
15 first time you said when did I become political.  I
16 didn't even know if that was political, I just met a
17 presidential candidate, which I had never met before, I
18 never met him, didn't know him from Adam.  And I heard
19 about Donald Trump of course, everybody had.  And I came
20 back here and I was totally shocked that this hate that
21 came out of a press release, you know.
22    Q.  I'll try to finish my question now.
23    A.  Mm-hmm.
24    Q.  It was after this meeting with Former President
25 Trump and the issuance of this press release that you

Page 72

1 were advised by at least one member of the board that it
2 would be, at least you'd lose a significant amount of
3 business at My Pillow through public support of that
4 candidate, is that fair?
5    A.  He didn't say anything about the candidate.  His
6 exact quote was I think it will hurt half of our
7 business because, and it will be relevant, he is, was a
8 Democrat and he was voting for Hillary or whatever back
9 then.  So that's the relevance of it.  He was saying
10 don't do this because I believe he didn't want Donald
11 Trump, that's all.
12    Q.  Oh, I think it's relevant.  I didn't --
13    A.  You just said you shouldn't assume the candidate
14 or what his, what his affiliate was.  I know that
15 because that was why he said it.
16    Q.  No, to be clear, I said that about myself.
17    A.  Oh, okay, okay.
18    Q.  Not him.
19    A.  I understand now.  But the relevance is he said
20 it because he didn't want anything good being said about
21 Donald Trump.  And I didn't know politics at all and I'm
22 going, okay, well that, what does that have to do with
23 it, I think he'll help manufacturing and I think he will
24 help addiction in this country.
25        That was my whole point of even doing the press

Page 73

19 (Pages 70 - 73)

**Page 74**

1 release, hey, this guy said, if he didn't lie, if he
2 said the truth, I mean, which I talked to all his
3 employees and they said no, he is who he is, he's a
4 great man, great leader, great person. And I said okay,
5 I've done my due diligence, I'm going to do a press
6 release and tell what I thought he could do, if he said,
7 he said he would manufacturing and help addiction, which
8 those are my wheelhouses, it would help my employees and
9 help people out of addiction and help people to Jesus
10 Christ.
11      That's what I was doing back then, I was doing
12 church speaking, everything when I got saved, that's
13 where I was at. You asked me when this got political.
14 Call that politics, whatever, it was a press release.
15      Q. The discussion with ████████ and the other
16 members of the board about whether to publicly support
17 Donald Trump, did that occur before or after the press
18 release?
19      A. It was before the press release. And it was one
20 statement, I just told you the statement. There wasn't
21 a big discussion, one statement out of him. Because he
22 was, and everybody knew that he was voting for Hillary
23 Clinton.
24      You know, we had had, here's what you got in the
25 background, we had done a big Mike Lindell life story in

**Page 75**

1 Minneapolis here about coming to, coming to Jesus Christ
2 and it's a documentary that's out there and, and it was,
3 we filmed at the Pantages in Minneapolis. And they
4 asked there, and it was kind of a running thing, did
5 anybody here, is anybody voting for Hillary I think it
6 was someone said, and Joe and his wife, his wife stood
7 up.
8      So that's why, I didn't know if he was making
9 that as a, you know, as a statement there or whatever, I
10 mean, it was, just he was, he, you know, I didn't care
11 who he voted for. I just knew this guy could help, you
12 know. And but it was before the press release because I
13 told the board, I said, you know, I just made a comment.
14      I don't even know if the board meeting had
15 started. I think we had got in there, I had just come
16 back from, from, from New York and I said, hey, you
17 guys, before we start, I said I met Donald Trump, I said
18 he's going to, he's going to help manufacturing and he's
19 going to stop, we talked about addiction. That would be
20 a part of the board meeting. And that's when he said,
21 well, I don't know if I'd do that, it could hurt our
22 company. And I, I got mad at him going just because you
23 are, he got political. I, I made a comment about a man,
24 not a politician, you know, and he, and I took offense
25 at him more than anything going just because you want

**Page 76**

1 this person, I'm telling you from the heart that I met
2 this guy, I was excited for these guys to hear, hey, all
3 this stuff you're reading about or hearing about this
4 guy, I think he could really help addiction and, and, or
5 help addiction, which was my platform, they all knew.
6      My Pillow donates, donated a lot because of
7 where I come from, I donate a lot to churches, Salvation
8 Army, Teen Challenge for addiction, that was our
9 wheelhouse, we help, we help everyone, people. We had
10 at that time millions of dollars that we would put into.
11 And that was even, even in our thing at My Pillow that
12 we could give X amount, it's like a tithe to, for Jesus
13 and for people in addiction, Teen Challenge, Salvation
14 Army. So my point was saying, hey, this guy I just met
15 can really help, I think he's going to help people get
16 out of addiction, and which that was a big conversation
17 we had, and manufacturing.
18      Q. Okay.
19      A. You know, he wanted my opinion on making here
20 because back then there weren't a lot of manufacturers
21 where people were making stuff overseas and My Pillow
22 was 100 percent made here and that, that intrigued him,
23 you know.
24      Q. Okay.
25      MR. CAIN: You alright, Kelley, do you want

**Page 77**

1 a break?
2      COURT REPORTER: No, it's fine. Thank you.
3      MR. CAIN: I'll give you a 30-second break.
4 You need a drink?
5      COURT REPORTER: No, I'm okay.
6      MR. CAIN: All right.
7 BY MR. CAIN:
8      Q. Okay. So that one comment in 2016 by a former
9 board member, have there been any other discussions on
10 the board level about you curtailing your political
11 speech?
12      A. We never talked about that ever in board
13 meetings.
14      Q. So you never, there's not been a, an instruction
15 to you by the board of directors of the company to cease
16 talking about either Donald Trump or political issues
17 publicly?
18      A. No, that was never, never. The only time ever
19 was in January when I, when I talked about election
20 crime, when I talked about election, that's when that
21 ████████ left. And why he left, I don't know.
22 That's when we were getting cancelled by box stores.
23 Never was anybody when we would talk about in board
24 meetings that, you know.
25      Most of them are, if you want to talk politics,

20 (Pages 74 - 77)

most of them are Democrat liberal, you know, and
including my own family members. And they, and they,
I'm sure they didn't vote for Donald Trump, but we never
talked about it, we wouldn't talk about it at all.
 Q. So --
 A. But we did when it came to the election where
box stores tanked, we didn't have a board meeting, kept
attacking us, that's when ███ pulled out and that
probably had a lot to do with it, he just thought My
Pillow was going down. That former attorney, that ███
███ he at that time wanted to sell, when these
lawsuits started he wanted to sell, blah, blah, blah,
you know, because he had stock, and then he sits and
sold his stock. But he, you know, he was like we're
done, we're done as a company, you know. They were all
just like, you know, I guess they didn't want to be a
part of something that was getting destroyed because we
were losing millions of dollars and he was very
concerned about his stock at that time, ███████ was
very concerned.
 Q. You kind of anticipated where I was pivoting to.
 A. Okay.
 Q. Because we were talking about did the, did the
board try to curtail your, your public --
 A. No, only in January of '21.

 Q. Okay.
 A. But it was too late for them.
 Q. Okay. What do you mean by that?
 A. Because I already got the evidence on
January 9th.
 Q. Okay.
 A. I got my evidence on January 9th. And when I
got that evidence nobody was going to stop me. This is
100 percent it showed China intrusion in our election.
And no, this wasn't about Donald Trump. Because I even
went on Jimmy Kimmel and, and he said would you be
sounding the alarm if your friend Donald Trump won, and
I said absolutely, and I'd still be sounding the alarm.
 Q. So --
 A. And, and the board, they knew that I was not
going to back down on that once I got that evidence.
And that's when that Joe had that concern over because
we were losing so much money, we just tanked.
 Q. Okay. Let's, as the kids say, unpack that a
little bit. January 9th of 2021 is when you got that
evidence?
 A. Yeah.
 Q. And then you said no one would stop me at that
point?
 A. I was going to get the word out no matter what,

no matter if we lost everything, in which because we
started losing box stores, we started losing millions.
 Q. And the we is My Pillow?
 A. Yes, this is My Pillow.
 Q. Okay. All right. Well, you said we earlier and
so --
 A. When I'm saying My Pillow that you'd have to ask
███████ I believe he left because he would have said
quit doing this and, you know, quit doing this, we're
going to lose our company. But it wouldn't have
mattered for me, I wasn't talking with My Pillow.
 I'm out there on my own and I would think anyone
else that would have that evidence would keep talking
too. They knew that I'm going to be talking. I wasn't
speaking out for My Pillow, I was speaking out for Mike
Lindell and I was given this evidence and it had a
government gag order on it, which I had to get signed to
release this evidence. And that's, you know, you know
the rest of that story.
 Q. Somewhat. Again, let me go back to what I was
trying to ask.
 A. Okay.
 Q. Okay. And I want to break it down.
 A. Yeah.
 Q. All right. You said no one would stop me, and

then you talked about members of, at least one member,
but members of the board --
 A. I didn't talk to them, they left, he left the
board.
 Q. Okay.
 A. He pulled out and said he was resigning. Did I
say good-bye or talk to him, no. Once I got that
evidence, every day was all consuming from morning to
night trying to tell the media, hey, I have this
evidence, you know, but I, I have this evidence, here it
is, here it is. But as you know, everybody was
cancelled on video, YouTube on the 7th and 8th of
January, my evidence came on January 9th.
 Q. All right. So you had one board member that
resigned because of a concern about you going public
with this evidence about election fraud?
 A. It had already happened, I didn't plan it, I
didn't plan it. You understand, I wasn't in Minnesota,
I don't even know where I was when I got it. I guess I
was, I got the phone call. I didn't have a board
meeting to say what Mike Lindell was going to be doing
out there, you know.
 Q. Okay.
 A. So what I did, and now you got to follow this.
 Q. Yes, I do want to follow it.

Page 82

1   A. Okay.
2   Q. But here's what I want you to tell me though.
3   A. Right.
4   Q. How this affected the board and what the board
5   did when you started going public?
6   A. The board didn't have a meeting in January.
7   Q. Okay.
8   A. I'm going to tell you about two board members
9   that I know of.
10   Q. Okay. Thank you.
11   A. One of them was ████████ and he resigned
12   sometime in January, he said I'm done because he seen My
13   Pillow getting destroyed. The other one was Joe
14   ████████ and he actually made a call to ████████ and
15   said we need to sell the stock, we need to get rid of,
16   we need to sell, My Pillow is going to lose everything,
17   we're losing, and every day more box stores would cancel
18   and we would just, our revenue would just, you know.
19   Q. So they were correct at least in that respect
20   that, that you going public about this election fraud
21   issue --
22   A. They didn't tell me, they didn't, they didn't
23   say that, they didn't, you know, I didn't hear that from
24   them. You're trying to -- I'm out there doing it, I
25   never talked to them then. This was after the fact

Page 83

1   where I heard a month later that ████████ had called
2   the controller behind my back and said, hey, we need to
3   do something, you know, Mike keeps out there, you know.
4   Whatever he said, I wasn't there. ████████ I said
5   what is he, you know, what, did he quit, yeah, he said,
6   he's out. I don't know why, you know, you'd have to
7   talk to them.
8       But there was, I'm just assuming because they
9   see us, our business getting destroyed, you know,
10   destroyed, and I'm out here talking about, hey, we got
11   to do something with this, our election because China
12   intruded. That was my narrative, China intruded in our
13   election and I have the evidence, here it is, it was
14   handed to me. But there was one problem, there was a
15   government gag order on it. And Dennis Montgomery, I
16   didn't even say the name back then, but I had to get
17   that signed in order to be able to release it, that was
18   it. And this never let up for four months, five months,
19   you know, you know, it just kept going and going every
20   day. Now did --
21   Q. Has that been --
22   A. Now did my family and stuff, did people from My
23   Pillow --
24   Q. Yep.
25   A. -- did they say, hey, quit talking about this,

Page 84

1   we're losing, we're getting destroyed, we're losing,
2   yes. Conversations, many conversations, they called me.
3   Even family members saying, hey, you can't, we're going
4   to, you're going to lose everything, we're going to lose
5   our business, we keep losing more of our money every
6   day. And it never let up and, you know, this last year
7   we lost millions too, you know, I mean, this doesn't, it
8   didn't let up, but that doesn't mean I'm not going to
9   help save my country.
10   Q. So you kept, you kept doing it irrespective of
11   people within the company that were telling you that you
12   were hurting the company itself financially, right?
13       MR. MALONE: Objection, form.
14   A. They, I don't know the exact conversations. I
15   think they were more about they were all so worried
16   about me getting attacked, you know, they felt, they,
17   you know.
18   Q. But you said, you said tanking the company, it's
19   hurting the --
20   A. No.
21   Q. You said multiple times that concerns were
22   raised about the company tanking.
23   A. They were concerned. Did they sit there and try
24   and help me out of it, no. Did they say stuff to me or
25   say stuff amongst themselves going, hey, you know, we're

Page 85

1   going down. And then they'd ask me, I'd go, you know
2   what, you guys, I have to or we don't have a company
3   anyway, I got to get this money out there, or I mean I
4   got to get this, this evidence out there.
5   Q. Right.
6   A. And they, you know, where they, my, my, some of
7   my guys internally, so we were getting calls by box
8   stores then by all of a sudden their CMO's would call or
9   their CEO's of big companies, your Bed Bath & Beyond,
10   they would call up and my VP's would get on the phone.
11   And it was every day, they go, Mike, they want to talk
12   about the next year. I go they're cancelling us, you
13   know, and they, you know. Were they discouraged, they
14   were discouraged because these, these were guys that
15   were out there, the salespeople.
16       And every day instead of a call saying rejecting
17   the next year, they're going sorry, we're pulling out,
18   we're done. And I would get, you know, I would have to
19   get on those calls and say why, why are you sugarcoating
20   it, I said you're cancelling us, well, we want to take a
21   break. And I go, you know what, why don't you just be
22   honest, you're cancelling us, and then they would cancel
23   us.
24       So my, my, one of my VP's back then, did he, you
25   know, did he have concern, he goes, you know, we're

1 losing all of our, our box stores. And I go, yeah,
2 we're losing them all I said, you know, I agreed with
3 him. I said I don't know what you want me to do, I
4 can't stop, stop spreading that China attacked us and,
5 and that was it.
6      So there was a, that was a VP, I forgot about
7 that, there was at least three that are normal, they
8 deal with all the box stores, those VP's. And there was
9 very much concern for them, they go we just lost another
10 10 million a year, we just lost another 20 million
11 today, we lost another 10 million, it just kept going.
12      And the last one was Costco, that was, they,
13 they kind of waited under the radar and then 90 some
14 people that go around the country that do home shows and
15 fairs at Costco, they got cancelled. That one bothered
16 me the most because we had to try and replace their
17 jobs. But that's what they were used to, traveling. So
18 Costco was horrible what they did. And then last spring
19 was Walmart, you know, a year ago. So they cancelled
20 us, it has hurt us and they, you know, I'm sure that
21 they --
22      Q. But let's just talk about within the company
23 and, and --
24      A. That's what I'm talking about.
25      Q. And I appreciate your response. You said that

1 there were VP's, at least three that were associated
2 with the box store sales that were concerned about this
3 issue?
4      A. They did not, they didn't tell me to not keep
5 talking, okay, they didn't tell me that. And they will
6 probably tell you to this day, those guys have talked
7 about is, hey, they got it. If I don't keep getting the
8 word out, we don't have a company anyway because we
9 don't have a country, that was their attitude too.
10      But it was a, they go is there, you know, they
11 were, I don't know what the word would be. They
12 couldn't believe what the box stores were doing when all
13 I was doing was out there was saying, hey, we got a
14 problem with our election here, China, we have proof
15 that they attacked, that they got inside our elections,
16 and, and that was it.
17      Most of those guys, and I think them, they would
18 say, you know, they were behind what I was doing, they
19 trusted me because they knew. When I took the time to
20 show them here's what I got, you guys, what am I
21 supposed to do, wouldn't you do the same thing. And
22 they all said yes because you don't, we're going to lose
23 everything anyway if we don't, if we lose our country.
24      So a lot of them, if I took the time to sit them
25 down, which those guys I did because they were losing

1 everyone they deal with one after another after another
2 after another, and so I did sit them down. And I go
3 what would you guys do and, you know, you got to do it,
4 we got to save our country, the guy brought me the
5 evidence, you know.
6      Q. After you got the evidence, and I want to, I
7 want to stay on this topic.
8      A. Yep.
9      Q. The topic is when you received what you thought
10 was evidence of interference in our election, just to
11 summarize, you had two board members at some point
12 resigned, ███████ you had some discussions with the
13 VP's about the box stores cancelling, it sounds like you
14 had some concern amongst your family members that were
15 working for My Pillow --
16      A. No, they were worrying about me getting
17 attacked, they were worried about my welfare.
18      Q. All right.
19      A. About my welfare because I was getting, I had to
20 leave Minnesota, I mean, to get physically attacked,
21 that was their concern. Most of it was out of concern
22 for me, it wasn't, you know, most of them was out of
23 concern for me.
24      Q. And then publicly you started talking pretty
25 shortly after January of 2021 about Dominion Voting

1 Systems?
2      A. It was all machines, it was all machines.
3      Q. Right. And they are --
4      A. Voting, electronic voting machines.
5      Q. Dominion being one of them?
6      A. Dominion being one of them. Computers, the
7 computers, when on January 9th -- let me just go back so
8 you know. When I was brought the evidence on
9 January 9th it explained to me, my own research in
10 November and December, those two months, I looked at
11 things all over our country myself.
12      Since I am, I'm very good at math and deviation,
13 so I looked at different counties and stuff that went on
14 in past elections and I did a deep dive. And I said,
15 one of the things I found was all these nonresidents
16 that voted in every state didn't, like in Minnesota, 20
17 some thousand people didn't come across into Wisconsin
18 and vote or vice versa, people are good people, so I
19 couldn't explain that, it was unexplainable to me. So
20 then when I got the evidence on January 9th it showed
21 that it was done with computers. That explained it
22 because you couldn't have that many bad people.
23      Q. Right.
24      A. And from that point on, that's where I said
25 machine, machine, China. And it's 100 percent evidence

1 that China was involved because the IP's came from China
2 and this is in the cyber world.
3    Q. Right. We're going to get into that topic,
4 those topics.
5    A. Okay.
6    Q. Probably a lot more in your individual
7 deposition. I'm really trying to focus on My Pillow --
8    A. Okay.
9    Q. -- here. But I appreciate that, I'm not
10 quibbling with you, I just --
11    A. The short answer in January, just so you know,
12 in January nobody talked to me, I didn't talk to the two
13 board members, I found this out way after the fact, you
14 know. It could have been March when, hey, when I found
15 out did you know back then ███████ came back and
16 said it, did you know ███ probably when we were having
17 our next board meeting we go what do you mean ███
18 resigned, this was three months later.
19    Q. Yeah, that's fine, that's fine.
20    A. But you're putting it in there like I got warned
21 or something, that did not happen.
22    Q. No, no, you've clarified it.
23    A. Okay.
24    Q. So the subsequent board meetings after your
25 discovery and you went public, all right, in any of the

1 subsequent board meetings from then till now has the
2 board ever instructed you to, you got to stop talking
3 about this stuff?
4    A. No, not that I know of.
5    Q. It's hurting the company?
6    A. No. They said it's hurting the company
7 probably, but I don't know we said it in the board
8 minutes.
9    Q. Does the board have the authority to fire you?
10    A. No.
11    Q. Now you own the company, at least the majority
12 of the shares, right?
13    A. The majority, right. They do not have the
14 authority to fire me.
15    Q. So as far as you know, your understanding of the
16 bylaws of the company, any shareholder agreements that
17 may be there, no one within that company has the
18 authority to fire you?
19    A. That's correct. And I'm sure, whatever they
20 said or didn't say, which more things they didn't say,
21 they probably kept it to themselves.
22    Q. Right.
23    A. Because they know. When I got back we probably
24 didn't have a board meeting for five months, I would say
25 maybe even longer because I was, I had to stay out of

1 Minnesota. I had physical threats. By physical I mean
2 threats, I was the No. 1 threat, here's the evidence and
3 they, they the bad guys, whatever, it was pretty bad
4 then, you know.
5    Q. But not to get too legalistic, to the extent
6 that you had the authority as the CEO of the company to
7 make statements publicly on behalf of My Pillow, it was
8 you and you alone?
9    A. I didn't make any statements --
10    Q. No, no, no, let me finish.
11    A. -- on behalf of My Pillow.
12    Q. Let me finish my question. To the extent that
13 you made statements.
14    A. Mm-hmm.
15    Q. On behalf of My Pillow publicly.
16    A. Mm-hmm.
17    Q. It was you and you alone that had the authority
18 to do so, right?
19       MR. MALONE: Object to the form.
20    Q. In other words, no one in the company could say,
21 you know what, Mr. Lindell, you can't say that, you
22 don't have the authority to say that --
23    A. Well, they could say it but, they could say
24 anything they wanted.
25    Q. But it wouldn't matter, it wouldn't matter,

1 right?
2    A. They can't fire me, no. They could, I could,
3 the whole company could be going down and there is
4 nothing they could do if I'm still out as my own
5 individual capacity, that's correct.
6    Q. And you had the discretion to do whatever you
7 wanted to in terms of exercising your authority as CEO?
8    A. Correct.
9    Q. Yes?
10    A. Yeah.
11    Q. Okay. In other words, if Joe VP box guy says,
12 you know what, Mr. Lindell, you shouldn't be out there
13 talking about this and also selling this product at the
14 same time, maybe people could get confused.
15    A. What do you mean selling this product at the
16 same time? I object to that dumb answer. What are you
17 talking about. I didn't go out there, melt down our
18 machines and buy a pillow, I mean, what is wrong with
19 you.
20    Q. So it was a question --
21    A. Nothing changed with My Pillow other than we
22 were destroyed taking pieces off, that stayed the same.
23 The different variables, I'm out here in my own
24 capacity, which trying to get people to see this
25 evidence and sounding the alarm and getting the

1 government to release the gag order on it, that's all,
2 so everybody could see it. It had a government gag
3 order that's why I couldn't even, I couldn't even say,
4 hey, here it all is, I couldn't do that. To this day
5 that gag order is still on the Dennis Montgomery stuff,
6 you know.
7 So all I'm saying is what I'm doing over here we
8 were, it was very separate to over here. It was
9 shameful that they were doing, that box stores were
10 making a decision based on a person over here. That's,
11 you know, that's what I don't, that's what the, you
12 know.
13 Q. You're saying you have information from Dennis
14 Montgomery that's subject to a gag order?
15 A. It's subject to a government gag order, it's
16 been there, yes, it's been there.
17 Q. How did you get it?
18 A. They gave it, on January 9th this was the
19 evidence that was given to me.
20 Q. Right. But if it's subject to a gag order then
21 you shouldn't have possession --
22 A. No, this was pieces, it was like the tip of an
23 iceberg. Then you talk to Dennis Montgomery about that.
24 This evidence I got, whether it was from the, I've been
25 very public with it, okay. And that's a whole another

1 court case where BlitzWare was part of it, a big
2 majority of it.
3 Q. Of what?
4 A. It's called BlitzWare, it's a, it's a whole
5 another thing and it would take, if you want to use up
6 two days of this, we sure can. But that's a whole
7 another deal there. But all I know is the evidence I
8 got, it was very simple. I would hope that if you got
9 that evidence or you got it or you got it or you got it
10 that you would do the same thing if you, with what
11 you've seen. Because it explained everything I had done
12 looking at deviation. I go, this is the only answer and
13 it was handed to me on a silver platter.
14 And I, and I even made it really more real after
15 I validated three other called cameras angles from this
16 election, three other things pointed to this, the same
17 exact thing in the cyber world. Which I didn't know
18 about the cyber world, I didn't know nothing about it,
19 but it explained all the other illegal stuff, which was
20 people voted in states and counties that don't live
21 there. And that's the only thing, and that was the
22 deviation and here was the, here was the evidence.
23 Now the rest of it, if you call it the back end,
24 the source code, all this stuff that would prove it.
25 This was the front end evidence, right, that's got the

1 gag order on it. And it's, and now did I say Dennis
2 Montgomery back then, no, because it was four different
3 sources then. When I went to validate it I got it from
4 three other sources that validated that it was real and
5 then it was 100 percent nonsubjective evidence. It
6 wasn't like I thought that, it was 100 percent real. I
7 didn't just go out there and start talking about machine
8 and stuff unless and until I was 100 percent sure.
9 Q. Since you raised it, three other sources, who
10 were they?
11 A. I'm not, it's not, I can't say that because
12 they're under, they're under that gag order. And I
13 didn't say it back then and I never said Dennis
14 Montgomery back then. That's all part of another deal
15 and you can see that in the news in about two,
16 three weeks.
17 Q. All right. So going back to the beginning of
18 this rabbit trail.
19 A. Mm-hmm.
20 Q. My questions were geared towards the fact that
21 you were and still remain the majority shareholder?
22 A. Yeah, yeah.
23 Q. And you can't be fired by the company?
24 A. That's correct.
25 Q. And the company can't instruct you what you can

1 and cannot say publicly?
2 A. That's right.
3 Q. And I'm assuming you decide what your discretion
4 is as the CEO of the company, what authority you have or
5 what authority you don't have?
6 A. That's correct.
7 Q. Is there anything you can think of you don't
8 have the authority to do on behalf of My Pillow?
9 A. That would, the authority to do everything,
10 unless it would be illegal, I mean, of course, I mean,
11 you know. These, these people that have stock trust
12 it's a private company and I'm the majority shareholder
13 of it, just like any other company.
14 Q. Okay. But you're telling the jury at least, and
15 the jury may end up watching this on the, on the video,
16 that you don't have the authority, or you haven't given
17 yourself the authority to talk about election fraud
18 issues on behalf of My Pillow, is that --
19 A. No, I never talked to it with My Pillow, like
20 putting My, you know, My Pillow, that's, that doesn't
21 make sense. The only thing My Pillow has ever done is
22 ads that when Frankspeech was formed the same as any
23 other, same as any other retail outlet, or I mean
24 podcast show that's been going on for 15 years.
25 Q. Yeah, but --

1    A. It's the same business model.
2    Q. I don't really, you probably gathered this, I
3 don't watch much TV, I don't watch --
4    A. I'm everywhere, I'm on CNN, MSNBC, Fox News,
5 Newsmax.
6    Q. What, what do you call publicly?
7    A. Huh?
8    Q. What, what do you call --
9    A. Here is what I can't, here's what I can't do
10 now, let me tell you this.
11    Q. I didn't ask you what you can't do.
12    A. Okay.
13    Q. I'm asking you what are you, how are you
14 referred to publicly, the My Pillow guy?
15    A. Yeah.
16    Q. Right?
17    A. That, people say that, yeah.
18    Q. Okay.
19    A. Now, now when I'm out there now, people are out
20 there, they're going, you know, it's almost probably
21 more so over here to help fix our country, help save our
22 election. I don't know how people know me.
23    Q. Do you understand how the public might be
24 confused about you talking about election fraud --
25    A. Let me tell you something --

Page 98

1    Q. Hold on, let me --
2    A. No, let me tell you something. This is an
3 anomaly in history. I was on TV 3 million times --
4    Q. I didn't ask you that.
5    A. I'm going to explain your question. I was on TV
6 3 million times up to 2016, so anything I do out there,
7 they're going to associate me with My Pillow.
8    Q. Of course.
9    A. Anything I do, that's the way because I'm so
10 branded. It's like you're branded as a frivolous
11 lawyer, anything you do, well, you'll be branded as that
12 because that's all I know about you right now. So go.
13 I mean, you know, I don't know what you're saying.
14 You're trying to associate that anything I say becomes
15 part of My Pillow, that's not true.
16    Q. Well, that's, but you know that's the perception
17 publicly, don't you?
18    A. No, I don't know that's the perception publicly.
19    Q. Of course. If you're talking about election
20 fraud issues and you're the My Pillow guy, you're saying
21 that the public can separate those two out?
22    A. I would hope they could, why wouldn't they.
23    Q. Have you ever, have you ever issued a press
24 release or a statement to the public that says any, any
25 discussions that I have publicly about election fraud or

Page 99

1 Dominion or Eric Coomer or any of these things --
2    A. I've never, I've never --
3    Q. Let me finish my question.
4    A. Yeah.
5    Q. Are not the positions of My Pillow and that they
6 are not --
7    A. 100 percent I've said that.
8    Q. Okay. Where?
9    A. 100 percent. All the time. I say, you know
10 what, this has nothing to do with My Pillow. I have
11 said that so many times you can't believe it. The
12 difference is now I can't go on stations and talk about
13 My Pillow because of people like Coomer that did this to
14 me, it's the other way.
15    Because people associate me over here with the
16 election, fixing our election, now I can't go and be the
17 My Pillow guy. You're right, I am suppressed from doing
18 that. It's the opposite of what you think. Because of
19 over here they recognize me as trying to fix our
20 election, I can no longer go on on all these, it's cost
21 me millions, I can't go on Salem Media, and that was our
22 No. 1 outlet, Fox News, Newsmax, none of them, no media.
23 I can't go on any station at all and talk about My
24 Pillow anymore. That's why it's cost us so much.
25    I could go on like back in the day go on Imus,

Page 100

1 go on these stations and talk and say, hey, what are we
2 doing with My Pillow, like our new My Pillow 2.0. I
3 can't do that now. When I did that we would let people
4 who know about our company. Now because of this
5 election, trying to save our country, it's crap like
6 this, now I can't go on there and do it because of
7 people like Eric Coomer, that's a fact, that's a fact.
8    All I was trying to do was bring to light that
9 these machine companies and that China intruded in our
10 election, that's reality. So you are exactly right.
11 They don't know me as the My Pillow guy over there,
12 these stations, they know me as trying to fix our
13 election so I can't even go on and advertise My Pillow.
14 That's why we've been hurt, that's why last year we lost
15 $6 million that we had to go borrow money for my
16 employees so I can keep them all employed. They have
17 families and stuff.
18    So don't try and flip it the other way because
19 it's only one way. We keep losing, losing, losing
20 because now I'm branded over here trying to fix our
21 election because media attacks me every day and people
22 like this guy, Eric Coomer, that cost me almost
23 everything when he went and made a deal with Chris Ruddy
24 behind my back and said don't ever have Mike Lindell
25 come on anymore.

Page 101

26 (Pages 98 - 101)

1    I made one comment, there it is circled, that's
2  the only one I ever made about Eric Coomer, the only
3  thing I ever said, until after he sued me, then there's
4  plenty in here. That's the only statement right there
5  that I ever said about this guy I didn't even know,
6  period.
7       Q. What page are you looking at?
8       A. 36. I looked at this last night, it's
9  disgusting. That's the only thing I ever said and that
10 was the day after he made the dirty deal with Chris
11 Ruddy. And I called Chris Ruddy up, I go, what are you
12 doing. I go, what do you mean I can't come on and talk
13 about My Pillow anymore. Well, he's done it with this
14 Eric Coomer. That's when I made that statement. I
15 never had made one statement, didn't even know who he
16 was before that.
17      All that, all this crap about Joe Oltmann who I
18 didn't even know then and all this stuff about,
19 everything after that from this on is after he sued me
20 in Colorado, every statement I made. And I'll continue
21 to make statements about both you and him. This is why
22 this judge should have ruled this as frivolous instead
23 of last summer sitting on it for nine months and making
24 me sit here and waste two days of my life because I
25 could be helping my employees, trying to keep them

1  employed while you people attack. There's my statement.
2       THE WITNESS: Did you get all that?
3       MR. CAIN: Objection, nonresponsive.
4       A. No, but it's disgusting when you sit here --
5       MR. MALONE: Slow down.
6       A. I'm branded as now election, not My Pillow guy,
7  it's the opposite.
8       MR. MALONE: You just got to slow it down.
9       THE WITNESS: I know, but it just pisses me
10 off.
11      MR. MALONE: I understand, they understand.
12      THE WITNESS: So disgusting.
13 BY MR. CAIN:
14      Q. You don't remember my question, do you?
15      A. Yeah, the question is do people know you as the
16 My Pillow guy, blah, blah, blah. I just gave my answer.
17 No, they know me over here as this guy that's trying to
18 save our country. But because of Lawfare and start
19 dirty things that Eric Coomer did on that one day, which
20 that's when I called him out, I can't go on my stand, I
21 can't, my company has been hurt so bad because of people
22 like this Eric Coomer, so bad, tens of millions of
23 dollars, hundreds of millions of dollars.
24      Q. You don't remember my question, do you?
25      A. What's your question, give me a new one. That

1  one struck a chord.
2       Q. No, I just want answers to my questions.
3       A. Okay, what is it?
4       Q. So let's just talk about press releases.
5       A. About what?
6       Q. Press releases, public statements by My Pillow.
7       A. Okay.
8       Q. Okay. Here's the question, has My Pillow issued
9  any press releases or public statements in writing
10 saying that you do not speak on behalf of the company as
11 it relates to election fraud issues?
12      A. I believe so, but I'd have to go back because we
13 may have a PR person back then maybe. I think she did,
14 but I'd have to check on that. I believe so.
15      Q. Okay. So you think as you sit here, I don't
16 want you to guess.
17      A. I don't know, I don't know, but I would really,
18 because I had a, I think we had a PR person back then,
19 this is two years ago now or three years ago.
20      Q. Who, who is that person, are you not going to
21 tell me?
22      A. I don't know, and I'm not giving you her name so
23 you can attack her.
24      Q. Do you have any evidence that I've attacked
25 anybody within your company? Don't show me the, don't

1  show me what you're going to show me.
2       A. Right there, Page 36, Page 36, where you, where
3  I called you lawyers just as bad as him, I called you
4  guys criminals.
5       Q. You did.
6       A. Because what you did to my company back then,
7  that's when I brought up Eric Coomer. I had never, I
8  had never said his name ever in history until he drew
9  first. He went to, he went to Chris Ruddy and made a
10 dirty deal behind my back and then Chris told me I could
11 never come on Newsmax again and talk about My Pillow.
12      Q. Did Mr. Ruddy, since you've raised it now maybe
13 half a dozen times, did Mr. Ruddy tell you the terms of
14 the settlement between Dr. Coomer and Newsmax?
15      MR. MALONE: Object to form.
16      A. No. What he said, he said I couldn't come on
17 Newsmax anymore even if it was to talk about My Pillow.
18      Q. And he, did he say --
19      A. This was public, it went out publicly, I seen it
20 publicly.
21      Q. No, no, no.
22      A. No, this is what I'm telling you, let me tell
23 you the answer. I seen it publicly out there in the
24 public, this guy named Eric Coomer. I go who the heck
25 is that, then I see he's with Dominion and he made a

27 (Pages 102 - 105)

Page 106

1  deal with Ruddy and Ruddy put out a statement saying
2  there's no election crime, we didn't find any election.
3       So I called him up, I go, Chris, what are you
4  doing. I said I have the stuff, the evidence. I said
5  what are you making this. Well, he made, I don't know
6  what he said at that point, but I said, I said well, I
7  want to come on. So I can't come on because I, I go I'm
8  not going to be able to come on your show anymore to
9  talk about My Pillow at all.
10      Because at that point if you remember in
11  February one of his things pulled, pulled their
12  whatever, they pulled their microphone off, they left
13  the thing, and that I guess was because of Eric Coomer,
14  I didn't know it then. But I, but there's a very famous
15  thing when he pulled, my Twitter got cancelled, My
16  Pillow's Twitter got cancelled, it got cancelled. So
17  Newsmax had me on to talk about My Pillow getting, My
18  Pillow's Twitter getting cancelled.
19      Well, I get on there and I start telling him,
20  yes, I said we've been attacked, I said we have
21  electronic voting machines. And the guy took his
22  microphone and threw it, I don't know if you seen it, it
23  went worldwide, No. 1 story in the world. And I was so
24  upset with Ruddy, I go why did the guy. He was, oh,
25  Mike, this guy, he shouldn't have done that, he

Page 107

1  shouldn't have done that.
2       So at that point he came, I came back on the
3  show and he, he actually helped, he put out ads for My
4  Pillow, email blasts and stuff to help My Pillow because
5  we had been, you know, damaged with Twitter and
6  cancellation of the box store. So Ruddy helped putting
7  out ads and said, hey, we'll put out, you know, look I
8  did this. Well, Chris, well, then all of a sudden that
9  spring when this happened, I started, I called Chris and
10  I go, Chris, what are you doing. And he's arguing with
11  me and saying, well, Mike, I can't, I can't get sued,
12  you know, I was getting sued, blah, blah, blah. And I
13  go that's Lawfare. I said, so I can't even come on, I
14  said, to advertise My Pillow.
15      And at that point, because him doing that, there
16  was a deal made or something between, and we've
17  subpoenaed you guys I think for that too you guys won't
18  give us your, your, the conversation between you and
19  Chris Ruddy and Newsmax. So I went very public in the
20  statement and bad-mouthed Newsmax, Eric Coomer and you
21  lawyers. That's all I ever said ever about Eric Coomer,
22  ever, until after you sued me. That's what I said.
23      And that capacity right there, I had every right
24  to say it. When you hurt My Pillow like that, I've
25  never been able to do email blasts with him again, I was

Page 108

1  never able to go on there and talk about my employees,
2  My Pillow because you guys, whatever he was afraid of
3  you guys to deal with, whatever crooked deal you made or
4  whatever you'd be, whatever deal was made that day, that
5  killed My Pillow.
6  Q.  Why don't you step down as CEO if it's, if your
7  activities are hurting the company, your public
8  statements about election fraud, why don't you step
9  down?
10 A.  That's none of your business, is it. What are
11 you trying to give me advice, you care about me, you
12 care about my employees so much.
13 Q.  Well, if you did --
14 A.  No, no, I'm asking you that. Don't sit here,
15 that's subjective, I don't have to answer that question.
16 Q.  Have you ever considered doing it?
17 A.  Was I there? You know what, let me tell
18 you what I did.
19 Q.  No, I said --
20 A.  No, let me tell you what I did do. My company
21 runs off deviations and blocks. As we sit here today,
22 you know what, you know why I have to answer my phone
23 right now, every 500 of my employees have my direct
24 number, if that phone rings it's an emergency, it's a
25 deviation. But when we, when I don't get a call I have

Page 109

1  peace that I know everything is running good back there,
2  do you understand. That's how I run my company.
3       So when I'm sitting out here and I'm doing all
4  this stuff for the country, I'm out here spreading the
5  thing and I hear a call, which I did back then, one
6  after another, we're in an emergency, we're in an
7  emergency, and we would, I have to then over the phone,
8  hey, what can we do because we were getting cancelled so
9  fast. We had to move employees to here to shift them.
10      To give you an example, when Walmart cancelled
11  us last year, we made those pillows, that was, and what
12  did I do then, I put it up right up to Mr. Biden's
13  laptop, we put a statement of their chairman making a
14  deal with Hunter Biden, we played it on my own show, we
15  played that out there. But you know what I had to do
16  with My Pillow, that was a separate thing, at My Pillow
17  then I had all the employees that they lost their job
18  immediately. Instead I started MyStore.com to help
19  them, we're USA entrepreneurs, and moved them over there
20  to shipping so they would keep supporting their family.
21  So that's what I did.
22      I took all my savings, $40 million, kept paying
23  employees, kept to keep the company going, borrowed
24  whatever I had to do because this is separate from this.
25  And so I'm not there on a day-to-day running, I'm, I'm

28 (Pages 106 - 109)

Page 110

1 sitting there, they call me for deviations and blocks.
2    Q. How do you say they're separate when one is
3 affecting the other?
4    A. Well, okay, let me tell you something. What
5 does it have to do with decisions made here. The only
6 thing you're saying, is this one over here affecting My
7 Pillow, yeah, it's catastrophic. But because of things
8 I can't reel back like what you did to Newsmax, so I
9 can't go out there and tell about My Pillow, tell about
10 how great, good My Pillow is doing or if it's doing
11 employees or that we didn't have to lay off my
12 employees, or I can sit there.
13    At one point I could go on Newsmax and say, hey,
14 we're being attacked, we've lost the box store. So
15 Chris did emails to help us. But as soon as you did
16 this I can't do that, I can't talk about, Mike Lindell
17 is not allowed on these platforms because I'm in this
18 space.
19    So but decisions made here have nothing to do,
20 if I say I'm resigning as CEO of My Pillow, then it
21 still, like you say, I'm branded, even though I'm over
22 here doing this, I'm branded at My Pillow. The cancel
23 culture is you think those box stores are going to come
24 back, you think Newsmax and all them are going to go,
25 okay, let's have Mike Lindell on to talk about My

Page 111

1 Pillow, or even if I'm not there or I can talk now, no.
2    It was the damage that was done because of stuff
3 like this has hurt My Pillow irreparable. And you're
4 going to say, well, why haven't we done a lawsuit
5 against you yet. We'll see, you know. The damage that
6 was done, you can't reel it back, you know. Would I
7 make the same, do the same thing now knowing now what I
8 knew then, yes, we're saving our country, we're saving
9 our election. This isn't about Donald Trump or Eric
10 Coomer or anybody, this is about saving our elections,
11 saving our country.
12    Our elections is, the system is broken. You
13 know what I said out there, paper ballots, hand count,
14 paper ballots. I've met with Germany, France, UK,
15 Netherlands, met with them all, they're beautiful what
16 they do there, there's no machines. I'm sorry that you
17 love machines so much or Eric does or whatever he does.
18 I don't even know what he does with Dominion, I don't
19 care. I made one statement about him ever and that's
20 because he attacked me by going after Newsmax and saying
21 don't have Mike Lindell on anymore. Now whether he said
22 that or not, I don't know, but Chris won't let me on
23 anymore.
24    Q. Do you view your --
25       MR. CAIN: Objection, nonresponsive.

Page 112

1    Q. Do you view your role as CEO of My Pillow to
2 maximize the value for the shareholders, to make money
3 for the shareholders?
4    A. To provide them jobs and yes, and make, yes,
5 provide them jobs. We have careers there, people are
6 like a family, we have blacks, white, Hispanics, Asian,
7 liberals, conservatives.
8    Q. Okay.
9    A. We're like a family, this has united us. Would
10 I lose everything to protect them, yes. So if I lose my
11 life savings and everything I had, I've borrowed money
12 to put in there, I will do whatever it takes. Whatever
13 I'm doing here, even though you guys keep attacking, I
14 will do whatever it takes to, you know, down to the last
15 dollar I ever have. I've sold stuff to keep, to keep
16 the company going this last year, I've sold stuff,
17 borrowed the money, sold pieces of land, everything to
18 try and get, to try and save their jobs.
19    Q. Do you view your role though to maximize the
20 value of the shares, I'm not talking about their jobs,
21 value the shares --
22    A. That's what the CEO is, that's what I did, if
23 you've read my book, that's what I've been doing for
24 20 years.
25    Q. Right. Does the company issue shareholder

Page 113

1 dividends?
2    A. What do you mean dividends? Yeah, they, it's,
3 it's, it's a, what do you call a, it's an S corp. or an
4 LLC. All the money filters down, every one of them get
5 money form the stock. It's a direct filtered down, if
6 you know what an LLC is, you don't get dividends, you
7 get direct money. If the company makes money, like this
8 year they lost, these guys all lost money, they have to
9 take, they'll take a loss on their taxes, they lost
10 money, their K-1's will have a minus on there, they lost
11 money.
12    Q. It's not an LLC.
13    A. Or S corp., whatever it is, it's either an LLC
14 or an S corp. My feeling is it's an S corp., same,
15 works the same say, LLC or an S corp. work the same way.
16 The money flows, your K-1's flow right to you, it's not
17 a C corp.
18    Q. Okay.
19    A. So these guys will get hit with that loss, but
20 it will go, that loss will go against their taxes this
21 year, you know.
22    Q. So the shareholders of My Pillow have been
23 losing money since when?
24    A. The last year they lost, they lost money, the
25 last three years since this happened.

1  Q. So you see a direct correlation as the CEO of
2  the company of your public statements about election
3  fraud and the loss of value of the shares that your
4  shareholders own?
5  A. 100 percent, yeah, it's not even a question,
6  it's not even a question. It's in black and white, 24
7  box stores, that's 100 million a year. But it's the
8  daily, it's now the, you had, you know, what we had
9  before where we had way more podcasts and shows out
10  there now and we've lost some of them. And so they had,
11  you know, everything is.
12  Q. And none of the 500 people that can call you
13  directly on your phone have called you and said Mike,
14  you need to, you need to cut it out, you need to stop
15  talking about this publicly because it's hurting the
16  company?
17  A. They, they, yeah, well, they, they haven't
18  called me and said that. They've had, you know, I'll
19  have conversations and they'll go, you know, is there
20  any, you know, you know we lost another one. But they
21  don't say that, hey, stop doing it because they know.
22  If they do that I will educate them and say here, you
23  guys know we have, they all know, we have big meetings,
24  we've had big meetings, I've said you guys, here's what
25  I have, you know, if we lose it all, you know, this is
Page 114

1  it. And all of them, you know, you got to do it, we got
2  to save our country, most of them have that attitude.
3  If you went employee by employee --
4  I'll give you an example. I had The New York
5  Times was there and also on a separate thing Business
6  Insider, they both were doing huge stories on this.
7  They came and spent three days there at different, both
8  ones at different times. They're doing a huge
9  documentary, whatever it is, okay.
10  They were there, they went and had free rein,
11  feel free to talk to the employees. They asked them all
12  those questions. I didn't know what they'd say,
13  everything you're saying. And they said, you know what,
14  we, we now, we now see it, we know Mike is out there and
15  if he, if he doesn't say, most of them know I'm doing
16  it, I wouldn't be doing it to destroy the company. But
17  if that, if that happens, I can't help that. I'm going
18  to do what I have to do because it's so important that
19  we save our election or I won't have a company anyway.
20  And they all, if you went down and talked to all
21  my employees like they did, and believe me, the Business
22  Insider and New York City Times would love to write bad
23  stuff about me, trust me on that. And all of them, they
24  were, they couldn't even believe, they were very
25  impressed after talking to find out who I was. I'll
Page 115

1  give an example here, this is a perfect example.
2  Q. You can finish your answer and then we're going
3  to take a break because she's catching on fire.
4  A. Okay. But I'm going to give you this perfect
5  example. In the state of Minnesota I had a bar for
6  13 years, I fought for pull tabs. Are you familiar what
7  a pull tab is?
8  Q. Pull tab?
9  A. It's a, it's a gambling thing, it's a, it's a
10  gambling cardboard gambling thing, okay. Our gambling
11  laws in Minnesota back when I had this --
12  Q. What does this have to do with --
13  A. Because I'm going to tell you why, this is what
14  my employees, you want to know, this is exactly
15  relevant. I had that bar and I fought for law changes.
16  I basically fought city hall and I fought our state, our
17  state on these laws and I fought. And I was attacked
18  for fighting, I lost everything, everything in 2003, I
19  lost all the value of my bar.
20  Four years later everything I fought for came
21  true, it's in my book. I got calls from, it saved our
22  industry here, our restaurant and bar industry, I got
23  calls from people around the state going Mike, we know
24  you lost everything, but thank you for standing up for
25  what was right and not worrying about the, you know,
Page 116

1  backing down. I lost everything, just like this, and my
2  employees, they all know that.
3  I'm sorry if this the repercussions, but I'm
4  100 percent, I have to do what I have to do because I
5  have the evidence that China intruded in our elections
6  and it was through machines, and that's fact. And
7  you're never going to tell me, I don't care if I lose
8  every dime. And do I care about them, yeah, I borrowed
9  money to help them out, to keep My Pillow going about, I
10  don't know, 10 million in the last year, I borrowed to
11  the max. I keep doing it and I will keep doing that.
12  If they keep destroying us, I have to keep doing that.
13  And that's what I'm saying, my employees will
14  all tell you the same thing. They're not going to tell
15  me don't do this because they know me, so they know that
16  what I'm doing is what I need to do.
17  Q. And no one within the company has the authority
18  to stop you?
19  A. What's that?
20  Q. I said no one in the company has the
21  authority --
22  A. They wouldn't want to.
23  Q. No, no. No one has the authority to stop you,
24  do they?
25  A. They could certainly voice their opinion to say
Page 117

1 please stop, they could. But they don't, and because
2 you if you ask them, and just like The New York Times,
3 then they say no, we believe in what he's doing, 100
4 percent.
5 Q. Aside from --
6 A. He's always had our back and he always will.
7 And if we have to lose everything, they're willing to
8 lose it too because they love our country.
9 Q. So besides from voicing their opinions, no one
10 in the company has the authority to make you stop,
11 right?
12 A. No, not a legal authority.
13 Q. Okay.
14 A. You know.
15 Q. Let's take a break.
16 A. I guess, I don't know if there's any legal way
17 to do that.
18 Q. You answered my question.
19 MR. CAIN: Let's take a brief break.
20 VIDEO TECHNICIAN: We are going off the
21 record at 11:43 a.m.
22 (A break was taken at 11:43 a.m.)
23 VIDEO TECHNICIAN: We are back on the
24 record at 12:04 p.m.
25 BY MR. CAIN:

1 so.
2 Q. Well, that matters.
3 A. Not that I'm going to give you their names.
4 You're not getting any names, so.
5 Q. You told me that. I'm not asking you for names,
6 this, this --
7 A. There would be no one that could, that would be,
8 that I haven't told you about, the VP's that were in
9 charge of the, you know, box store stuff and, you know.
10 Q. Okay. All right. And we talked about you're
11 not sure if the CTO works for My Pillow or for --
12 A. The what?
13 Q. Chief technical officer, ████.
14 A. I can't check on that right now. I don't
15 believe he works for My Pillow.
16 Q. All right. Does My Pillow employ Kurt Olsen?
17 A. No.
18 Q. So he does not -- Mr. Olsen is an attorney,
19 right?
20 A. Yeah.
21 Q. He does not act as an attorney for My Pillow?
22 A. Absolutely not.
23 Q. All right. Joe Oltmann?
24 A. Yeah.
25 Q. Does he either consult with or is he employed by

1 Q. Before the break we were talking a lot about
2 your shareholders and your employees. How many people
3 did My Pillow employ let's say in 2020?
4 A. No idea. I don't know, 1,500 maybe, I don't
5 know.
6 Q. Okay. Is that your best estimate, around 1,500?
7 A. Mm-hmm.
8 Q. And you did the stairstep thing with your hands
9 talking about shareholder price and the profits going
10 down. What, what has happened with your level of
11 employment at My Pillow?
12 A. It's down, it's down. We had to, all the, all
13 the people that did home shows and fairs, they're gone.
14 They had to, which we offered them a job, like I say,
15 over at MyStore and we did everything we could. But
16 yeah, it's down, probably significantly.
17 Q. 50 percent?
18 A. I don't know. I, I couldn't even guess.
19 Probably.
20 Q. Okay. As far as employees themselves, we talked
21 about your, some, somewhat about the executive team. Is
22 there anyone else that is either a C level employee or a
23 member of your executive team that we haven't discussed,
24 just in terms of names?
25 A. No, not that I'm going to give you their names,

1 My Pillow?
2 A. No.
3 Q. Has he in the past been?
4 A. No.
5 Q. Has he received compensation by virtue of an
6 association with My Pillow?
7 A. No. He's got a podcast. If he has a, if he has
8 a, if he's an affiliate code with a podcast, then he
9 would, his podcast would have got the sales from My
10 Pillow products.
11 Q. Okay.
12 A. That would be the only, the only thing I can
13 think of.
14 Q. Let's do this, let's, let's break up the
15 monotony a little bit and look at some pieces of paper.
16 I wasn't planning on marking this right now, but let's
17 do it anyway.
18 (Exhibit 61 marked for identification.)
19 Q. This is Exhibit 61, Mr. Lindell.
20 A. Mm-hmm.
21 Q. Have you looked at it?
22 A. I see it, yep.
23 Q. ████████████████████████████
████████████████████████████████
████████████████████████████████



Veritext Legal Solutions
800-336-4000



Veritext Legal Solutions
800-336-4000



Veritext Legal Solutions
800-336-4000



Page 134

Page 135

Page 136

Page 137



Page 138

Page 139

Page 140

Page 141



Veritext Legal Solutions
800-336-4000



Page 146

Page 147

Page 148

Page 149



**Page 150**

1    (Exhibit 62 marked for identification.)
2    Q.  Okay.  Mr. Lindell, it's a thick document, so.
3    A.  Yep, yep, got it.
4    Q.  Does this jump out at you as something that you
5    recognize?
6    A.  No.
7    Q.  Okay.  I'll give you a minute to look at it
8    then.
9    A.  Oh, yeah, this, yeah, when one of my employees
10   got killed, is that what it is?
11   Q.  I don't know.
12   A.  It says homicide.  Yeah, one of my employees,
13   her, let's see, her boyfriend or whatever at that
14   intersection, he cut her head off.
15   Q.  Oh, boy.  Okay.
16   A.  I don't know why that's relevant.
17   Q.  It's not.  Flip through it just to familiarize
18   yourself with it, because that's not the point of this
19   exhibit.
20   A.  Well, then why would you put that horrific
21   picture on there?
22   Q.  Well, why would it be produced by My Pillow, I
23   don't know.
24        THE WITNESS:  Where did this, what is this,
25   why is this on there?

Page 152

**Page 151**

20   Q.  Along the lines of, we already kind of got on
21   the weeds on promo codes, but I do have some more
22   questions based on some documents that were just
23   produced to us on Monday.
24        MR. CAIN:  So let's mark this, Kelley.
25   This will be Exhibit 62.

Page 151

1        MR. MALONE:  Mike, just take a second to
2    flip through.
3        THE WITNESS:  Okay.
4    A.  Okay.
5    Q.  So I'll tell you what I think this is, and then
6    you can tell me if I'm wrong.
7    A.  Yep.
8    Q.  What I believe this to be, after looking through
9    it, is a copy of the texts between yourself --
10   A.  And
11   Q.  -- and
12   A.  Yep, that's right.
13   Q.  Over time.
14   A.  Every, every morning she sends the same thing,
15   yep.
16   Q.  Okay.  So it's not about the beheading.
17   A.  Right.  I don't know why that, but she probably
18   texted me this showing me one of our employees this
19   happened to, it had to be in her text.
20   Q.  Right.  I think it just is the first one because
21   of the dates range that was produced, that's it.
22   A.  Right.
23   Q.  Nothing special about that.  All right.  And if
24   you, if you look at the first page.
25   A.  Yep.

Page 153

39 (Pages 150 - 153)

1     Q. Back to the beheading page.  It says on the top
2   there's it looks like four boxes, ████ and a 952
3   area code number, do you see that?
4     A. Yeah.
5     Q. And then device owner and then Mike Lindell,
6   that's you, 952 --
7     A. Yep.
8     Q. -- ████
9     A. Yeah.
10    Q. Is that the same number as what goes to that
11  phone?
12    A. That's this one, yeah.
13    Q. Okay.  All right.  And then, and is that a new
14  phone or is that the same one that was seized?
15    A. No, they seized it, it's still there with them.
16    Q. Oh, but you --
17    A. They make new phones.
18    Q. They do, that's true.
19    A. Yeah, ain't that something.  I can't believe
20  people are that, wow, did you get your phone back, how
21  do you make calls.
22    Q. And, and you can even back things up to the
23  Cloud.
24    A. Yeah.  But there was a lot of stuff on there
25  that they took that wasn't backed up, that was the

1   disturbing part.
2     Q. That's actually a question that I had to ask
3   you, which is, is there any My Pillow data that's been
4   lost as a result of that?
5     A. No, not, no, no, that was my pictures of my
6   grandkids and stuff.
7     Q. Personal?
8     A. Yeah.  Everything, everything here that you're
9   showing me is a text I get, like I told you, every
10  morning, there's a snidbit, this little gray thing.
11    Q. Yeah.
12    A. She'll just send a snidbit, and it can be
13  whatever she thinks is, you know, random.  Okay, it will
14  be, like she'll say, hey, I'm checking on this one.
15  She'll show, there's no logic, she'll say a cross
16  section so I can look and see, I'll be able to look.
17  Like I'll look at this one here, Diamond & Silk.
18    Q. Okay.  I'm going to ask you about specific ones.
19    A. Okay.  All right.
20    Q. Just let me do that because I don't know --
21    A. That's what this is, this is all this is.
22    Q. Okay.
23    A. She probably, I text her more than anyone in the
24  company because every morning like clockwork that's what
25  she sends.

1     Q. Okay.  Back to what I was asking.  On the first
2   page there's also a box that says ████████
3   do you see that?
4     A. Yeah.
5     Q. Do you know what device that goes to?
6     A. That's the same device, that's just --
7     Q. Okay.
8     A. There's no, there's other device, that's the
9   same device, that's.
10    Q. All right.  My assumption was it might be an
11  iPad or something or another.
12    A. No, I don't have it.  Everything I do is on
13  here, everything in the world.  I don't have a computer,
14  this is it.
15    Q. Is that a company phone?
16    A. This is a, yeah, this is My Pillow I believe,
17  yeah, yeah.  But everything, it's also my personal,
18  everything is on here.
19    Q. Right.  But is it, it's a, the company pays for
20  your device?
21    A. I don't know, probably.
22    Q. Okay.
23    A. We pay for 20, 30 other employees, so probably
24  mine too I assume.
25    Q. Probably ████ as well?

1     A. Yeah.
2     Q. Okay.
3     A. I don't know, I can't say that for sure because
4   she's got one in her office.  Oh, that's a, that's a
5   cell, this would be her cell.
6     Q. Okay.  So this would be a company issued cell --
7     A. I don't know if ████████ is a company phone or
8   not is what I'm telling you.  I assume it is, but I
9   don't know.
10    Q. Okay.
11    A. ████ the reason it says ████ is because that's
12  her husband's name.
13    Q. Right.
14    A. You know.  She might not have a company phone,
15  that's just I'm texting her on her personal phone
16  because we can't, because we're not texting on a company
17  phone.  She, it's a physical phone with buttons on it,
18  you know, like, you know.
19    Q. Yes, I understand.
20    A. Right.
21    Q. Okay.  Thank you.  And that's how you have her
22  in your phone as ████████ but her actual last name is
23  ████ or her married name may be different, is that
24  right?
25    A. Yeah.

Veritext Legal Solutions
800-336-4000

1  Q. Is that right?
2  A. Yeah, ████████ because her husband ████ this
3  goes back a long time.
4  Q. Does he work for the company as well?
5  A. He works in manufacturing.
6  Q. For the company?
7  A. He's a forklift driver, correct.
8  Q. All right. So let's flip the page to -- and the
9  bottom has some what they call Bates numbering in our
10 profession and it says My Pillow 2135 on the bottom
11 right.
12 A. Yep.
13 Q. Are you with me?
14 A. Yep.
15 Q. Okay. Now you started to talk about this
16 earlier. And, and this is kind of the explain to the
17 jury what we're looking at part of your deposition. It
18 appears to me on the left side is where ████ is texting
19 you revenue numbers, is that right?
20 A. Right, right. You know what I just showed you
21 on this phone?
22 Q. Yes, sir.
23 A. There's, she's texting me like 20, maybe ten to
24 20 of all those you just seen. So I can make in the
25 morning without me having to go through them all, she'll

1  text me what she thinks could be a deviation or at least
2  so I can make a thing that overall all is well before I,
3  because otherwise if I, if they're all down or
4  something, I'm looking at something, I wanted her, I'm
5  the one that told her to do this every morning. If I
6  see something that's out of whack I got to quick get to
7  here because in real-time if there's, if there's
8  something wrong the computer.
9  Q. Mm-hmm.
10 A. This happened because of what happened one time
11 on Thanksgiving. We took in, all the numbers were down
12 and I'm going these are, you know, I caught it on the, I
13 caught it myself, but I said I need to get a snidbit
14 sent every morning so that I can see if there's a
15 deviation overall. Like the Website if it's down 5 or
16 10 percent, I would be able to know.
17     And this also shows me something could have
18 happened the day before. I'll give you a perfect
19 example. Let's say that, I don't know, something huge
20 like, you know, invasion of Ukraine or Afghanistan, that
21 day in Afghanistan when they did that, all our numbers
22 were down. Now I hadn't seen the news that day, but I
23 woke up and she sent me, I'm going what happened
24 because, you know, because it was all the deviation.
25 Q. Right.

1  A. But it was because everybody was, their
2  commercials didn't run because everybody was focused on
3  that. There's always a reason for the changes, you
4  know.
5  Q. Okay. But to this, this page, and we're going
6  to use this as an example.
7  A. Yeah, yeah.
8  Q. I'll have some other questions, but.
9  A. Right.
10 Q. She is, is she deciding what, these are promo
11 codes on the left-hand side, like L66?
12 A. Yeah, yeah.
13 Q. She decides what information to provide you?
14 A. Yeah, it's just, it's just a snidbit. She can
15 send whatever she wants. And she'll for sure send
16 something she thinks looks out of whack.
17 Q. So it's not, for example, one could assume that
18 the bigger accounts that are making more money --
19 A. No, no.
20 Q. -- she might put on there?
21 A. No, no, it's not the bigger accounts, it could
22 be the smallest or the biggest.
23 Q. Okay. So is it fair to say then that we're
24 looking at maybe just deviations that she sent to you?
25 A. No, you're just looking at a cross section, so

1  like a cross section. Here, I'll give you an example.
2  So here she put, she's got some TV on here, she's got
3  some like Hannity on here, he is a, he's definitely on
4  a, kind of a guarantee, but --
5  Q. On the radio?
6  A. It's radio.
7  Q. Yeah.
8  A. So it's a snidbit. Like you might have some
9  podcasts, some radio, some TV. So I can say, well, gee,
10 that number is higher on a podcast. She's got to do
11 some of each group, so to speak. She doesn't do the,
12 the emails and text marketing, that comes from, I look
13 at that, I get the emails on myself. So that's a whole
14 another world there because I don't have a guy, he'll
15 look at that now and he'll see deviations, ████ will,
16 and he would call me up. But usually I catch that
17 myself because it can be --
18 Q. So ████ doesn't do email or text?
19 A. She doesn't look at those promo codes. She only
20 gets, she stays in her lane. She doesn't even do the,
21 the print, any of the print or the, she doesn't do text,
22 emails, mailers or print, she just does podcast, TV and
23 radio.
24 Q. All right. So up at the top left of this, I've
25 seen this L66 code a fair amount. What does that relate

Page 162

1 to?
2    A. L66 is Frankspeech buy, or they're, these are
3 real ads, like they go in between Frankspeech buys for
4 My Pillow. So they, same, it's the same thing as any
5 other platform, like Rumble or a podcast, whatever. But
6 these are, these are real ads, these are like
7 commercials like you see on Fox, the L66 is.
8    Q. And so anything that has an L66 associated with
9 it is --
10    A. That's a 24/7, like all over, it's like, it's a
11 24/7 TV show. This a Lindell TV.
12    Q. Okay.
13    A. So it's in between Pete Santilli, I hired Emma
14 Robinson, War Room, Mike Lindell, I do, I do an hour
15 show there, Hope Report, my Christian hour. So it's
16 just a TV lineup. Diamond & Silk.
17    Q. Okay.
18    A. And the ads go in between like a regular
19 commercial like on Fox.
20    Q. Okay. And so if it says in this example, L66,
21 ▇▇▇▇ and then last Wednesday ▇▇▇▇▇▇▇
22    A. Right.
23    Q. What does that ▇▇▇ number represent, just a
24 number --
25    A. That would be a, that would be gross sales

Page 163

1 before anything is taken off, sales tax, shipping,
2 anything, that's a gross sale number before anything is
3 touched.
4    Q. So all of these, am I correct then she is giving
5 you all the things with the dollar signs are gross sale
6 numbers?
7    A. These were gross sale, yeah. So this would be
8 before any, anything taken out, returns, everything that
9 got taken out. These are your gross sales that, that
10 these, and these are, I don't know if they're, I believe
11 that they are gross even after the discounts, you know
12 what I mean.
13    Q. No, I don't know the last part.
14    A. Well, see, what she's giving me there is like if
15 you have a retail, the thing is $50 and you're selling
16 it for 25, that's that added up here. So it's not
17 gross, when I say gross, it's not the retail what they,
18 you know, this is actual sales that we got credit cards
19 for, you know.
20    Q. Gotcha. Okay. There's a separate promo code
21 below L66 that's just Frank, what does that relate to?
22    A. That, that's an email, or that's an email. I
23 don't know why she has Frank on there. This is, what,
24 what day is this from?
25    Q. So this is in the time period late July of 2021.

Page 164

1    A. Yeah.
2    Q. All right.
3    A. That was, Frank was, I think that one, that one
4 I would have to look into. Or it was for Frankspeech.
5 The short answer is I don't know. It has to, it's
6 probably an email that I did back then and used Frank on
7 that. But I don't know why she, I might have, I might
8 have asked her to give me that Frank code because Frank
9 only gets email blasts. So that would have been email,
10 an email, an email blast. Does that make sense. Email
11 marketing. She shouldn't, if she sent that back then,
12 it's not in her lane.
13    Q. Right.
14    A. But I asked her, I can also ask her if you see
15 any, like I'm saying, if you see any e-codes. Like last
16 night I almost did call her and say send me the, the
17 email blast, that big one we were doing that I just
18 checked myself because I didn't know how much time I
19 would have to check. That would have been to ▇▇▇
20 here, check on this, you know, send me this code too,
21 you know.
22    Q. Right. And I mentioned the time period on this.
23 Part of the reason we're looking at this, this period is
24 because it's in the sort of the weeks leading up to your
25 symposium, okay. Do you remember when your symposium

Page 165

1 was?
2    A. Yeah, in August.
3    Q. Okay. Of 2021, right?
4    A. Yeah.
5    Q. All right. So would the Frank code here have
6 anything to do with ads that were being run in
7 connection with the symposium?
8    A. No, not at all.
9    Q. Okay. I'm sorry.
10    A. 100 percent no.
11    Q. Okay.
12    A. These were, and you realize this is, this is,
13 this is My Pillow, this is another promo code, that's
14 just another promo code Frank.
15    Q. Right. No, I get it.
16    A. No, there was no ads ran with, those would have
17 been My Pillow advertisements, not Cyber Symposium. On
18 Cyber Symposium we didn't sell pillows, a Cyber
19 Symposium ad, you realize that. So like when I bought
20 ads on everywhere in the country like Fox, but Fox
21 wouldn't run them, there was no money to be made, you
22 know what I mean, there was no, it was, it was to watch
23 the Cyber Symposium. It was, it cost me money, it
24 wasn't a revenue generator.
25    Q. Okay. Back to Exhibit 62. War Room we know you

Page 166
1 mentioned is, is Steve Bannon's show, correct, that's
2 the War Room?
3    A.  Yeah.  Well, it says, it doesn't have a, yeah,
4 yeah, yeah, that's War Room, yep.
5    Q.  Okay.  And then the rest are sort of
6 self-explanatory.  There is Dawn in this --
7    A.  Gallagher is on, on Salem Media, he's the host I
8 guess since 2010, Hannity since, or 2012, Hannity since
9 2014, that's radio.
10    Q.  Okay.
11    A.  On GMO, I don't know.  Dinesh D'Souza, that
12 would be his show on both, I think he does radio and
13 podcast, I don't know.  But that's Salem Media, a lot of
14 them are Salem Media.
15    Q.  Okay.  And who's your point of contact at Salem,
16 who do you deal with?
17    A.  We deal with, I don't know who she deals with.
18 Now we do, I use Phil, Phil.  Back in the day before
19 they went public I dealt with this, with Phil.  I
20 haven't dealt with him for a long time, but he's, Phil,
21 oh, my gosh, he's the one that won't let me, he gave the
22 order that I can't come on.
23    Q.  Boyce?
24    A.  Boyce, yep.  Phil Boyce, that's correct.
25    Q.  All right.

Page 167
1    A.  Yeah.  He's the one I can't come on anymore.
2    Q.  So looking again back to this exhibit.  On the
3 right side there's, I'm color blind, but it looks like a
4 yellow-ish color.  This is on a second page.  Actually,
5 you don't have a colored version, so it's probably gray,
6 all gray.  On the right side it says, "Please call me at
7 7:30 your time over, I would like to go over Gallagher
8 and talk about dropping Fox."
9    A.  Talk about what?
10    Q.  "Dropping Fox," do you see that, right there?
11    A.  Is that with Phil Boyce?
12    Q.  This is your text with ███.
13    A.  Oh, no, yeah, yeah, yeah.  Okay, yeah.  What
14 that was is Fox would not take my ads and so I dropped
15 them, I dropped My Pillow.  I was the No. 1 story in the
16 world, everybody was asking me to come on their show,
17 everyone, I mean CBS, everybody wanted, why are you
18 dropping Fox News, why are you dropping your ads, you
19 know.
20    Q.  Right.
21    A.  That's what that question is.
22    Q.  And, and the answer to that question is what,
23 why were you dropping Fox News in late July?
24    A.  Because they wouldn't let me, they wouldn't let
25 me run ads, they wouldn't let me run ads, they would not

Page 168
1 let me run ads, of all the companies in the country, to
2 watch the Cyber Symposium, to watch it.  And it was an
3 ad, hey, we're having this, we're having this event.
4 And that was it, everyone else accepted it, CBS, NBC,
5 CNN, MSNBC, everybody in the whole country except for
6 Fox.
7        And I thought, you know what, I can't have you
8 censoring my ads, I couldn't even believe it.  So I
9 took, I pulled my My Pillow ads from them.  And then
10 that became a big story, everyone is going why would you
11 do that, how much did it cost you.  It cost me over 2
12 million, over $2 million a week, in, in actual net
13 revenue over almost a million a week.  I just completely
14 crushed by doing it, but it was the principle of the
15 thing.  Why are you doing this with censoring people,
16 you know.
17    Q.  Okay.  I actually printed this out.  Let's mark
18 this, I wasn't going to talk about it, but let's do it
19 anyway.  So keep that handy dandy.
20    A.  Yep.
21    Q.  The big one there.
22    A.  Yep.
23    Q.  And I'm going to stop talking so she can mark
24 that exhibit.
25    A.  Yeah, okay.  What am I doing?

Page 169
1        (Exhibit 63 marked for identification.)
2    Q.  Now, Mr. Lindell, I'm going to tell you what
3 just happened.  She can't mark an exhibit and type at
4 the same time, so we have to pause, okay?
5    A.  Mm-hmm.
6    Q.  So you, you brought up the point and you've made
7 it several times already that My Pillow dropped its ads
8 on Fox News and you've explained why now, right?
9    A.  (Nodding head.)
10    Q.  And I'll represent to you, do you know who Media
11 Matters is, what that group does?
12    A.  (Shaking head.)
13    Q.  Okay.  Well, this graph is their analysis of the
14 ad buys by My Pillow on Fox News over a period of time.
15    A.  Right.
16    Q.  Do you see that?
17    A.  Mm-hmm.
18    Q.  And if you look at sort of the period of time
19 that we're talking about, it's kind of on this right
20 side.
21    A.  Yeah, I got it.
22    Q.  And that's the, does that correlate with the,
23 your decision to stop running the ads?
24    A.  Yeah, yeah, absolutely.
25        MR. MALONE:  Objection, foundation.  But

43 (Pages 166 - 169)

Page 170 (top left):

1 yes, you can answer.
2    A. Yes.
3    Q. Okay. And just from, and maybe you know these
4 numbers and maybe you don't, but on the left axis of
5 this graph there's 100, 200, 300, 400, 500, 600, that
6 correlates to the number of ads. And then --
7         MR. MALONE: Same objection.
8    A. I don't know what that means, I don't know what
9 that means.
10    Q. Okay.
11    A. I have no idea what that means.
12    Q. Well, do you know how many ads were run on Fox
13 News last month?
14    A. No, absolutely not, I wouldn't know that.
15    Q. Okay.
16    A. See you, you need to understand, we have another
17 company we go through where they, every ad is rated
18 itself what you pay and what you get back. And then,
19 and once a week I talk to her and say how much can we
20 buy if we bid this much. It's a bidding thing, you
21 know.
22    Q. Right.
23    A. And if I wanted to take a loss, you know, and
24 just brand, I could buy more ads.
25    Q. Right.

Page 170

---

Page 171 (bottom left):

1    A. You know, you know.
2    Q. But in this case you've testified that the Fox
3 News ad relationship was financially lucrative for My
4 Pillow at the time that you made the decision to pull
5 them, right?
6    A. I, I don't know if -- all I know is at least,
7 whatever you see there, that's at least I was breaking
8 even.
9    Q. Right.
10    A. That thing, breaking even or making a little
11 bit. That's my branding, I don't pay for branding.
12 Does that make sense.
13    Q. Yeah.
14    A. Most of the ads will break even or a little
15 better because I'm branding, I'm not paying for my
16 branding.
17    Q. Right, I get it, I get it.
18    A. Yeah.
19    Q. But I'm, what I'm trying to understand is when
20 you pulled the ads from Fox.
21    A. Right.
22    Q. You knew that you were going to end up taking a
23 financial hit, the company at least was?
24    A. Well, if these, depends on how these were going
25 at the time. I didn't check in to see. We were moving

Page 171

---

Page 172 (top right):

1 so fast, I'm trying to save the country and I don't know
2 if these ads were a break even right here or if they
3 were making money.
4    Q. Well, you testified that, as a matter of fact,
5 you ended up losing several million dollars?
6    A. Right, that, when I, when I dropped the ads the
7 revenue there just tanked.
8    Q. Right.
9    A. So now, now was the gross sales the net, that's
10 why I said I left it kind of open, you said I won't hold
11 you to that. It could be 2 million I lost. I know I
12 lost out 4 million in gross sales.
13    Q. Okay.
14    A. But I don't know how much I lost in net because
15 I don't know if these were break even buys or if they
16 were making money buys.
17    Q. All right.
18    A. And very seldom do you have a place where it's
19 really, really good, like right now the My Pillow 2.0
20 because it's a new product and you have the margins, you
21 know.

Page 172

---

Page 173 (bottom right):

22    Q. Right.
23    A. So if I, in order to keep my manufacturing up,
24 there's times I dipped down below that just to keep them
25 busy.

Page 173

44 (Pages 170 - 173)

1    Q. Right.
2    A. But very seldom because we can't afford it,
3 especially now. And when this did this dip here, when I
4 did that, my guess is these, you know, these were
5 probably, they were definitely above a break even. When
6 you see this dip here, that means that the ads were not
7 working, the ads were not working. And you see this dip
8 here, that means you're not, you've got, you know, you
9 have different products. So we had a different product
10 launch here probably. There's a reason this went up
11 here, there's a reason it went up here. The reason it
12 went up here --
13    Q. Mr. Lindell.
14    A. What?
15    Q. Hold on. Thank you again for the explanation,
16 but it's not going to make sense to the jury.
17    A. No, this, this will make sense right now is what
18 I'm telling you.
19    Q. Hear me out, hear me out. When you say you see
20 this, you see the dip, they can't see it, so they don't
21 know what you're pointing to. I can see it. Circle the
22 two areas, the dips that you were talking about when you
23 had --
24    A. I would have to --
25    Q. Take your pen --

Page 174

1 point?
2    A. When you, when you don't have a three-week or
3 four-week history.
4    Q. Right.
5    A. So you don't know, you don't know if it was
6 downturn. You're kind of shooting blanks. So it's kind
7 of like, like when we launched the My Pillow 2.0, this
8 has happened before in history. We launched the My
9 Pillow 2.0, we put it everywhere because we don't have a
10 history, okay. Fox did it one other time where Fox
11 dropped it. And this is when I was attacked by the
12 Better Business Bureau and they took My Pillow from an A
13 plus to an F. When they did that and did a national
14 press release, two things dropped us, Fox and The View.
15 And when that happened we were a whole month without
16 Fox. This is very similar to what happened then. When
17 we went back we had to put everything out there and
18 retest it.
19    Q. But why as the CEO of My Pillow were you willing
20 to risk, you know, the potential losses by pulling those
21 ads?
22    A. Because, I've answered that before, I'm going to
23 say it again, because I didn't want to lose our country,
24 that's it. I had to get this out there and they stymied
25 my voice, they stopped my voice. So you know what, it

Page 176

1    A. I'm just going to tell you something because I
2 can't circle what you're saying. I would, if I were to
3 explain this without, without seeing what was behind it,
4 what happened back then. Back then I probably knew.
5 When we had this right here, I guarantee there was
6 either --
7    Q. You're pointing to the big dip in the middle.
8    A. Yeah, this here, we were either exchanging
9 products or when this went up here we might have
10 launched a new product. Here it's very easy to explain.
11 I didn't run ads for almost a month and everybody, I'm
12 coming back so everybody, everybody either, either I, I
13 didn't know what to buy then because we had no test to
14 go by, so I probably put it out there and a lot of them
15 were probably below market, that would be my guess,
16 because you see they're higher. And it doesn't mean
17 that you made any more money, it means that you ran more
18 ads coming out of this gate. We had nothing to go by
19 what was going to be working or not.
20    Q. So slow down. You're talking about the spikes
21 after you made the decision --
22    A. After, right.
23    Q. -- to start advertising again?
24    A. Right, right.
25    Q. You said you had nothing to, to go on at that

Page 175

1 didn't matter, no matter what the repercussions were, My
2 Pillow, I had to sell them. If you're not going to do
3 this, I'm going to pull my ads. I have to have people
4 see this evidence, that was the whole thing.
5    Q. I know, but you knew, the problem with that
6 potentially is you knew from the My Pillow side of that
7 that that was going to potentially --
8    A. 100 percent I did.
9    Q. Okay.
10    A. I knew it was going to hurt us, but it doesn't
11 matter when you lose your country. I had to make that
12 decision to Fox. How dare you do this, how dare you do
13 this, we have this, you can't tell me -- and I even went
14 to them, CNN ran it, MSNBC ran it, everybody ran it.
15 Even, even if you would think if it was political, they
16 would run it, wouldn't you, I would think so. Fox, you
17 know, and Fox who I advertise on a lot doesn't run my
18 ad.
19    Q. Okay.
20    A. They did it for a reason and, and they didn't
21 want this information out there, that's what I think.
22    Q. Where there other decisions that you made
23 leading up to the Cyber Symposium that ended up hurting
24 the My Pillow finances?
25    A. Of course. In January when I was holding up the

Page 177

1 evidence and every day I'm losing a box store, every
2 single day.
3    Q.  Right, no, no, no.  I'm actually focused more on
4 the late summer --
5    A.  There were other, there were other stations that
6 threatened to cancel me if I didn't stop talking, there
7 were 12 little stations.  And I told them go ahead and
8 cancel me, if you do you're not coming back, I'm not
9 getting cancelled.  I have to, we have to get this
10 evidence out there.
11        So yes, I did make those statements to them.
12 They decided to stay on with us, it was 12 of them.  And
13 they, I got called by our media buyer and she said we
14 have 12 TV stations I think are going to cancel.  I said
15 tell them if they do they're never coming back because
16 I'm not going to, they're not going to bully me into
17 changing my mind and not showing this evidence to the
18 world.
19    Q.  You mentioned Chris Ruddy earlier and Newsmax.
20 Were there, sort of the opposite of what we were talking
21 about with Fox, were there certain media outlets that
22 were actually helping you promote the Cyber Symposium?
23    A.  No, no.  They all, all of them were just the
24 generic ads.
25    Q.  Okay.

Page 178

1    A.  And, and incidentally now that you ask that,
2 everyone was the same, whether it was ABC, Newsmax or
3 whatever.  But on the first day of the Cyber Symposium
4 Dominion decided to sue OAN and Newsmax, not the rest of
5 ABC, NBC, CBS, NBC.  You wonder why I don't like the
6 name Dominion.  They hurt us there too.  They attacked
7 those two and then OAN, what ends up manifesting from
8 that, they take, AT&T takes them off the news, or Direct
9 TV, we lost that for advertising too because their
10 audience went down to nothing.  So I got Eric Coomer
11 destroying Newsmax for me and Dominion and AT&T and them
12 guys destroying OAN.
13    Q.  I noticed, by the way, there was a Dominion
14 promo code.  Why do you have a Dominion promo code?
15    A.  Because I, you know why, because when I went on
16 TV and they're going, oh, Mike, Dominion sued you, which
17 I asked them to sue me because I wanted the discovery,
18 that's how it was.  I asked them to sue me, did you know
19 that, are you familiar with that.
20        I called up, I called up the Daily Beast and I
21 said why would you tell Dominion to sue me, I got the
22 evidence.  And so he walks over and he tells them that,
23 his name is Asawin.  And he goes yep, they're going to
24 sue you.  And I said, okay, do an article about it, he
25 did.  They didn't sue me for three days.  I had to call

Page 179

1 him up and go Asawin, the Daily Beast is very left, I go
2 you better get back over there and tell Dominion chop,
3 chop or you're going to be known as fake news, that was
4 it.
5        So when they first sued me finally, they sued me
6 and it said, and they sued My Pillow, it said something
7 about promo codes.  So I went on Steve Bannon, the first
8 time I had ever met him in my life.  And I go on there
9 and he goes, Mike, Dominion sued My Pillow and not just
10 you.  And I said yeah, they're disgusting.  And I said,
11 he goes, well, you said they're using promo codes, and I
12 said, yeah, use promo code Dominion to save up to
13 66 percent.  And then he dropped his microphone, it was
14 disgusting.  That's where it came from.
15    Q.  Who dropped his microphone?
16    A.  Steve, he just, he couldn't believe I said that.
17 I said use promo code Dominion.  Just like when the FBI
18 took my phone, I said use promo code FBI.
19    Q.  I thought it was Hardee's.
20    A.  No.  Well, Hardee's was one too, they put their
21 thing out there, you know.
22    Q.  All right.  Let's, let's focus back --
23    A.  In other words, you know, take your lawsuit of
24 promo codes and shove it, that was my, that was my
25 statement to them.

Page 180

1    Q.  Yeah, using the company My Pillow to, to make
2 that statement, right?
3    A.  After the lawsuit, Mr. Twister, after I was
4 sued.  Everything in here in your little lawsuit, other
5 than that one little paragraph, everything I said --
6    Q.  We don't, we don't --
7    A.  -- after he sued me.
8    Q.  We don't need --
9    A.  After Coomer served his papers.
10    Q.  We don't need to replow that, okay, I've heard
11 you say that.
12    A.  Well, then I'm just telling you.  So that's what
13 he, you know, using My Pillow, after.
14    Q.  Let's --
15    A.  And it's a, and it's a joke, you know, shoving
16 it back in you guys' face.  Oh, you think My Pillow
17 benefitted from this, give me a break.  Talk to them
18 employees who are trying to support their families.  You
19 guys are disgusting.  What else you got.
20        It's kind of a sad day for you, isn't it, to see
21 how bad My Pillow is sitting and you're trying to make
22 it look like this was some grand thing to make money.
23 It's just sad, it really is, it's sad.  This is probably
24 the most frivolous lawsuit in the history of the United
25 States, and I mean that.  It's shameful that judge did

Page 181

46 (Pages 178 - 181)

1 not dismiss this last summer when she, when it was
2 brought up for dismissal, it's shameful.
3   Q.  Are you through?
4   A.  Okay.  What else do you want to know in here.
5   Q.  All right.  Flip to, if you look at the bottom
6 right, Page 2138.
7   A.  Yep.
8   Q.  By the way, did you read Dr. Coomer's
9 deposition?
10   A.  What's that?
11   Q.  Do you know that Dr. Coomer gave a deposition in
12 this case?
13   A.  Who's Dr. Coomer, is that Eric?
14   Q.  Yeah, he's, he's a Ph.D.
15   A.  I didn't, I wasn't at his deposition.
16   Q.  I said did you read it?
17   A.  No.
18   Q.  Okay.
19   A.  Was that a requirement?  This whole case is
20 frivolous, you guys are already wasting so much of my
21 time that I'm here.  And let's finish, okay.  No, I did
22 not read his deposition.  I don't know the guy.
23   Q.  Okay.  In his deposition he was asked about
24 run-ins with the law, criminal conduct.
25   A.  Okay.

Page 182

1   Q.  Are you aware of that?
2   A.  He was, he was, he was part of criminal conduct,
3 I'm unaware.
4   Q.  Okay.  He was asked about that in his
5 deposition.
6   A.  If he's a criminal?
7   Q.  Yeah.
8   A.  Did he, did he come clean?
9   Q.  You think he's a criminal, don't you?
10   A.  Did he come clean?
11   Q.  You think he's a criminal, don't you?
12   A.  Do I think he's a criminal?
13   Q.  Yeah.
14   A.  I think what he did to me is criminal.  What he
15 did to my company when he did that deal with Chris Ruddy
16 I think is criminal, yes.  I think he's a traitor and
17 criminal by what he did to My Pillow, that's what I
18 think.  There's your answer.  And I stated it very, very
19 fine in here after he, after he attacked me.
20 100 percent, there it is, yeah, Eric Coomer, if I knew
21 right now instead of turning and making deals with
22 Newsmax, why don't you turn yourself in to get less
23 time.  I hope, I hope he does get time for what he did
24 to us.  Oh, you don't, you don't, we haven't pressed
25 charges yet, but let's get rid of this frivolous lawsuit

Page 183

1 and then we'll see what I can, we'll see what kind of a
2 lawyer you are then.  Keep going, what's your point.
3   Q.  Do you hire criminals?
4   A.  What?
5   Q.  Do you hire criminals?
6   A.  Do I hire criminals, ex-criminals, yeah.  I have
7 people that have been, have done all kinds of stuff and
8 I have a company of second chances.  I get them off of
9 addiction, I get them to Jesus, yes.  I have hired
10 people that have been criminals, that have done criminal
11 things.  I have a criminal record, so.  And now you're
12 going to go what is it.  Look it up, read my book.
13   Q.  I actually don't care.
14   A.  Okay.
15   Q.  But the point has been made and I think I even
16 noticed in some of your documents that, some texts where
17 you're talking about Eric Coomer --
18   A.  Only after the fact.
19   Q.  -- being detained by the police?
20   A.  Only after you guys served me these papers.  And
21 whatever you found was after you have sued me.  There's
22 only one statement I ever made about this man was after
23 he did this at Newsmax.
24   Q.  Okay.
25   A.  That's fact, I read this.  Unless you got more

Page 184

1 that you didn't put in there, I read this.  Everything I
2 said was after you served me papers in Colorado.
3   Q.  I'm just asking you --
4   A.  And everything I said I mean it.
5       MR. MALONE:  Mike, just listen to his
6 questions.
7   Q.  Does My Pillow, I'm just asking if there's a
8 double standard at My Pillow.  On the one hand we're
9 looking at some texts about Eric Coomer running in,
10 having a run-in with the law, right, and then on the
11 other hand you've said yourself you have a criminal
12 record.  You know ███ has a criminal record, don't you?
13   A.  Yeah, sure.
14   Q.  
███ ███.
17       MR. MALONE:  Object to the form, outside
18 the scope.  You can answer.
19   A.  I know all the things, yeah, and they got help,
20 and yes, she got help and she's fine.
21   Q.  I just want to make sure that when we try this
22 case My Pillow isn't going to castigate Dr. Coomer
23 because he's had run-ins with the law himself?
24   A.  Listen to me.  I don't know his run-ins with the
25 law.  You're misunderstanding what I said.  What he did

Page 185

Page 186

1  to me I consider it criminal. I don't care what he's
2  done in his past nor do I know what he's done in his
3  past. Do you get that?
4      Q. I do.
5      A. Well, then don't sit here and tell me. He did
6  this directly to me.
7      Q. Right.
8      A. And it's criminal what he's done to me.
9      Q. And, and --
10     A. He's a criminal, that's what he is, and that's
11 my opinion. He did this to me. I don't care if he,
12 what he's done in his past, I could care less. I heard
13 once he, that he's got some DWI's, I don't even know, I
14 don't know, I don't know, I don't know his past, I don't
15 know what he's done, I don't know anything about the
16 guy. But I do know what he did to me. That's why we're
17 here, what he did to me. And I will, just like these
18 other people that you hear me bad-mouth, I don't
19 bad-mouth anybody directly unless they, I have the
20 evidence of what they did to me or what, or that, that
21 I've done my due diligence.
22     Eric Coomer did this directly to me. And I made
23 one statement about him. Didn't say nothing for a whole
24 year, and then you guys come up and serve me papers in
25 Colorado. I'll bet there was statements after that,

Page 187

1  wasn't there. Then everybody knew that what he did to
2  My Pillow and Mike Lindell. How dare he come and sue My
3  Pillow, he's a scumbag for doing that.
4      THE WITNESS: Put that in there, scumbag,
5  S-C-U-M, bag.
6      A. That's what he is for what he did to me.
7      Q. Okay. That's not my question. There were
8  questions to him about his past.
9      A. Not from me.
10     Q. And what I'm hearing you say --
11     A. Not from me.
12     Q. From your lawyer.
13     A. Well, I don't know what my lawyer did, that's
14 between my lawyer and him. You guys, all lawyers do the
15 same stuff, lawyer stuff.
16     MR. MALONE: Just let him ask the question,
17 see what he has to say.
18     Q. Okay. From your perspective as CEO of My
19 Pillow, Eric Coomer's past, whether he had run-ins with
20 the law or, or criminal issues, is of no moment and is
21 irrelevant?
22     A. Is irrelevant, 100 percent irrelevant, as far as
23 I'm concerned, that's his business.
24     Q. Because you believe, you said, you know, ███
25 has --

Page 188

1      A. She had, I have many, many people, their past,
2  but if they've changed, if they've changed or gotten
3  help, absolutely I hire him. This is current, this is
4  real.
5      Q. You struggled with addiction?
6      A. Oh, yeah, I was a crack addict, yeah.
7      Q. And Eric Coomer struggled with addiction.
8      A. I don't know, I don't know. I feel bad for him,
9  but I hope he got changed, hopefully he found the Lord
10 Jesus Christ, you know, so I can pray for him. I have
11 prayed for him, believe it or not, I have prayed for
12 him, you know. I prayed for him, I go why did this
13 person do this to somebody and I prayed for his
14 salvation, for his soul, and for him to get help, you
15 know, as I have lawyers that even back up frivolous
16 cases like this. And I got to meet the lawyer behind
17 the curtain. Go ahead.
18     Q. I'll take whatever I can get. Okay. Let's,
19 let's de-escalate and just talk about some numbers,
20 that's a little easier I think in a sense. Go back to
21 this exhibit, if you would, please, 62. You've already
22 been quite clear at least in your mind that your
23 activities relating to the election, 2020 election have
24 hurt My Pillow's business?
25     A. Absolutely.

Page 189

1      Q. In a, a sort of a shorter area or window, did
2  My Pillow at least around the Cyber Symposium experience
3  an uptick in sales?
4      A. Huh-un, no.
5      Q. Okay.
6      A. And it's hard to tell because, because of drop
7  in the Fox ads, so it's very hard. But we lost, it's a
8  net net definitely loss.
9      Q. Well, if you take Fox out of the scenario,
10 because you made the decision to, to cut Fox out, all
11 right. So put Fox --
12     A. It's all one thing.
13     Q. Hold on, hold on. Put Fox in a box on the side.
14     A. Okay.
15     Q. And just, just talking about the other revenue
16 streams. During the symposium, isn't it true that you
17 had an uptick in revenue from the other sources
18 outside --
19     A. I, I don't know, I would have to, I have no
20 idea.
21     Q. Is there something like, I've looked at, there's
22 week -- here's the question, and correct me if I'm
23 wrong. You both do day, daily reporting where you look
24 at --
25     A. And weekly reporting, yeah.

1    Q. To -- you got ahead of me again.
2    A. What's that?
3    Q. You got ahead of me again.
4    A. Yeah.
5    Q. Daily reporting, hey, what did we do last
6 Wednesday, what are we doing this Wednesday, right?
7    A. Mm-hmm.
8    Q. Week, what did we do last week, what are we
9 doing this week, right?
10   A. Right.
11   Q. Okay. So looking at 2138, this is the back and
12 forth between --
13   A. Where do you see it, 21 what?
14   Q. 38 on the bottom right, the very bottom right.
15   A. Oh, 2138, okay. All right.
16   Q. So and, and you touched on this, so let me just
17 make sure I understand this portion of it.
18   A. Mm-hmm.
19   Q. At the top of this email or text exchange it's
20 July 31, 2021, right?
21   A. Yep.
22   Q. Do you see that in the middle?
23   A. Yep.
24   Q. And then ███ says, "Yesterday sales were really
25 good, these are actual sales"?

Page 190

1    A. Okay.
2    Q. Is it true that she would report sales from the
3 prior day typically, right?
4    A. I had her switch to that. If she backed in, she
5 did, I don't think she did, sometimes, but there she
6 didn't.
7    Q. Okay. Well, I, that's what I'm trying to
8 understand because --
9    A. Okay. There's no thing she has to do. She
10 could do without it if she wanted. I mean, this is just
11 a thing to, like I say, so I could like at deviations or
12 whatever. This one is on 7/31, so the sales were good.
13 I would have checked in to why did that happen on
14 July 31st.
15   Q. Right.
16   A. Because especially, you know, they were all
17 pretty much up, which is, so something happened there.
18 Did we launch a new product, I don't know. This one
19 would have nothing to do with the Cyber Symposium, it
20 was in July. I don't even know if we had announced it
21 yet.
22   Q. Okay.
23   A. In fact, I don't, I don't know, I don't know
24 what day was the ads went out.
25   Q. We're going to do something similar to what we

Page 191

1 did before because I think it helps to speak about this
2 in context. Please keep that in front of you.
3    A. Yeah, yeah.
4    Q. And then I'm going to let her mark this and
5 we're not going to talk while she does that.
6       (Exhibit 64 marked for identification.)
7    A. I can already see the answer right there. It's
8 a flash sale probably that day, that's what it is, yeah,
9 it's a flash sale.
10   Q. Okay. This is Exhibit 64.
11   A. Yep.
12   Q. Right?
13   A. Yeah.
14   Q. Okay. Explain to the jury what we're looking at
15 here.
16   A. Okay. This is --
17   Q. And it's two pages, it's double. Go ahead.
18   A. This is a flash sale. So what we had is
19 products in there that are being, that were on sale at
20 that time, the offer expires 12/21, so this is a flash
21 sale.
22   Q. Okay. And this would have been, if you look at
23 URL on the bottom, it says basically MyPillow.com/.
24   A. Right. This was an ad done at Frankspeech, not
25 My Pillow.

Page 192

1    Q. Okay. So again, this is a flash sale on
2 Frankspeech?
3    A. That's correct, that's their sale.
4    Q. And there's a promo code that's associated with
5 this sale, right?
6    A. Yeah. I don't see the promo code on here, but
7 yes.
8    Q. I don't either. Do you recall what it was?
9    A. What's that?
10   Q. Do you recall what the promo code was?
11   A. No, there's no, there was no promo code on this
12 ad. What this would do, you're going to
13 Frankspeech.com, there was, you'd have to go there. And
14 we had a store on Frankspeech, Frankspeech had its own
15 store back then.
16   Q. Right.
17   A. So there was no promo code.
18   Q. Okay.
19   A. So they would go back there and they would use
20 whatever promo code they had, you know, if they heard it
21 out there, whatever. If they came to Frankspeech, they
22 would use whatever promo code. This was a, this was a
23 store that was owned by Frankspeech, follow me.
24   Q. I do.
25   A. So they're selling My Pillow products.

Page 193

1 Q. Right.
2 A. That's right.
3 Q. But again, if you look at the bottom left.
4 A. Mm-hmm.
5 Q. The URL is actually MyPillow/Frankspeech. So
6 did you actually --
7 A. Right. So, so let me explain that again to you.
8 Just like, pick somebody, pick Sean Hannity, pick The
9 Chicks or whatever, somebody out there, nothing to do
10 with anything. They get their own back page, which is
11 MyPillow.com/ whoever it is, whatever podcast it is,
12 whatever it is. This was /Frankspeech.
13 So in other words, we didn't have a separate
14 merchant server. What you need to understand is the
15 money has to come in there and the tracking has to come
16 in from there. These, all these people out there they,
17 they get paid for their ads after, you know, afterwards.
18 They don't have, it doesn't go to their Website. Are
19 you following me?
20 Q. Yes.
21 A. That's why this is the same as every other ad
22 that would have been out there by anybody else. Just
23 call it Frankspeech, call it, or Frank, call it The
24 Chicks or Sean Hannity or Mike Gallagher. They all have
25 back splash whatever there thing is, it's a drop-in

Page 194

1 page. We used our drop-in page on Frankspeech. Does
2 that make sense?
3 Q. Not, not that part. But let's just dumb it down
4 for the nontechnical members of the jury. If in this
5 period of time, August of 2021, you went to the My
6 Pillow site, would you be able to get to this flash --
7 A. No, 100 percent no, no.
8 Q. Okay.
9 A. You would go to Frankspeech from there. So
10 Frankspeech, this particular podcaster, they did okay
11 that day because they were pretty, you know, if there
12 was, if there was sales. If this correlation is to
13 their on Frank, whatever the, whatever promo code was
14 coming in there, it doesn't, you know, list it here.
15 But they, this one here, and this might not even have a
16 lot of sales because this is pretty generic.
17 Q. Well, this one speaks directly to the Cyber
18 Symposium, does it not?
19 A. Right, down below, yeah. This was an
20 announcement. So I was going -- this would have been,
21 are you sure this wasn't an email, where did you get
22 this?
23 Q. This is off the Website.
24 A. Okay. So this would have been a message that I
25 have something important coming up. Just like, here's

Page 195

1 an example, let me use, let me use like the Gateway
2 Pundit or Epic Times, okay, it's very similar to that.
3 They will put what the news are, what's going on, and
4 then they'll, they'll do an ad. So think of this as two
5 separate things.
6 I'm talking about, just because I own them all,
7 so I'm talking about a thing coming up, an event coming
8 up, and now I'm selling, and now you have an ad in there
9 for My Pillow, you know, just like any other thing. You
10 can go to anybody's page, Epic Times or Gateway Pundit.
11 I don't know, we'd have to, I could name them over and
12 over and over again, different, different magazines,
13 they'll put in there whatever it is and then they have
14 an ad in there.
15 So this is, think of this as my ad telling about
16 a Cyber Symposium coming to you, important commercial
17 that I've ever done. I was actually talking about the
18 commercial that I was going to do on Fox and CNN, that's
19 what I'm talking about here, did you read that?
20 Q. No.
21 A. I'm coming out with the, as the most important
22 commercial I've ever done, My Pillow had gone through in
23 the last five months in my effort to bring the truth
24 forward for all that's come down to this, I'm having
25 Cyber Symposium, there, live stream 24/7.

Page 196

1 These are the ads when I did on TV, when I did
2 the ad on TV, this might have been one of them, you
3 know. When I did an ad on TV and said, hey, you need to
4 come to the Cyber Symposium, this is one of my most
5 important ads, a directional ad to come to you. Are you
6 following me?
7 Q. No, I'm following you. But why would My Pillow
8 in this instance care if people were coming to the
9 symposium one way or the other?
10 A. It says it right there, I'm going to read why,
11 this is just news about My Pillow. I, Mike Lindell, I'm
12 coming to you with the most important commercial that
13 all of you know that My Pillow and myself have gone
14 through. They were attacked. So in other words, the
15 commercial is talking about My Pillow and my employees.
16 The ad that came out on TV was to direct them
17 there. Everyone was going, hey, My Pillow, that's big
18 news when they got attacked like they did, they did
19 nothing wrong. You guys don't care because you sued
20 them, you know, admit that. So that's exactly what it
21 was telling the public. My Pillow has been attacked,
22 they've been sued. Everyone, you guys hadn't sued me at
23 this point, but Dominion had, Smartmatic had, every box
24 store had cancelled us because they were afraid. So we
25 had been attacked.

Page 197

50 (Pages 194 - 197)

1　　So my point being was, hey, you need to watch
2　the Cyber Symposium and you're going to find out
3　evidence of why My Pillow and I have been attacked. It
4　was, it was getting to the point of where I was going to
5　be vindicated. But, hey, guys, don't you care about
6　your country. I've sacrificed everything, including my
7　company and all my money, all I want to do is watch
8　the Cyber Symposium, just come to it and see what we,
9　see what I have, that's all it was. That's, that's the
10　My Pillow relationship. Now I do know, that's why there
11　was no promo code, there was no sales for this.
12　Q. There weren't?
13　A. There was no sales, there was no promo code,
14　there was no sales for this. This was talking about
15　trying to get people to come and watch the Cyber
16　Symposium.
17　Q. All right. I, I understand that part, and I
18　think you've tried to answer the question that I was
19　posing there.
20　A. It was news, you're separating the news. So
21　like when My Pillow lost their Twitter account, remember
22　that, it was worldwide news, we were attacked. The
23　problem is I couldn't go on anybody's station and say
24　why did My Pillow lose their Twitter account, why did My
25　Pillow lose their Facebook, why did Mike Lindell when he
Page 198

1　A. CNN was there, everybody was there. Did they
2　ran ads, I don't know. Everybody was there. I didn't
3　run any ads. If I would have, I would have made a lot
4　of money, wouldn't I, if I would have sat and run ads.
5　But I felt it was so important, I didn't want any ads
6　ran, I said no. This, people can't think that, oh, he's
7　doing this. No, I did it to save our country. I didn't
8　run one ad at that Cyber Symposium, that's a fact.
9　Q. And you didn't promote the company or provide
10　promo codes for My Pillow?
11　A. No. I may have at one time, but I don't even
12　believe I did that. You're looking at the wrong thing.
13　If you're looking at RSBN or War Room or something,
14　whoever was televising that, because I got accused of
15　that. I don't control RSBN, they've been selling my
16　show for ten, 15 years.
17　Q. Well, let's look, you've just said a lot that we
18　could probably deal with.
19　A. Show me something that you're talking about,
20　don't just sit here and be, you know. You know I ran
21　commercial free, so that would be a lie.
22　Q. Well, I think there's a little bit of semantics
23　there.
24　A. I never, I don't even know there is one time I
25　went out there and said one word to buy My Pillow at
Page 200

1　couldn't do ads and he couldn't even have himself in the
2　picture, and it was attack after attack. Because they
3　didn't want China, they didn't want the news out about
4　this, about the evidence, the evidence that is now two
5　years later we all see it, it's everywhere, you know,
6　everything approved it now.
7　Q. But what you're telling us, from what I'm
8　hearing is My Pillow had an interest in advertising the
9　Cyber Symposium --
10　A. No, they didn't, they didn't advertise anything
11　at the Cyber Symposium.
12　Q. What are we looking at?
13　A. They didn't advertise anything at the Cyber
14　Symposium. I told you, we didn't run any ads. Show me
15　an ad we ran. What is wrong with you. All I'm doing is
16　I wanted them to come and see why My Pillow is getting
17　attacked and Mike Lindell. That was the driver, hey,
18　you guys want to see why they're attacking us and trying
19　to kill my employees and myself, watch the Cyber
20　Symposium. Not to watch it to sell pillows. I made it
21　commercial free. If you're talking about RSBN or War
22　Room, they were all there, but they're their own people.
23　I don't control them, they buy ads from me. Do you get
24　that part?
25　Q. Of course I do.
Page 199

1　that time. Show me, because there's not. That would
2　have been the last thing on my mind. It was, it was a,
3　we had more things to worry about then selling a couple
4　of pillows when it was, this was a do or die weekend for
5　our country. And I don't even think I mentioned it, now
6　that I think about it, not at all. You're going to be,
7　it's going to break your heart you can't find anything.
8　Q. Well, there's several.
9　A. There's zero, I ran no ads.
10　Q. Again, we're talking about two different things.
11　If you are streaming a symposium and you're telling
12　people to go to your MyPillow.com --
13　A. I wasn't, I didn't do that, that's not true.
14　Q. Okay, okay.
15　A. That's not true. I did not tell that, the
16　symposium wasn't about MyPillow.com at all.
17　Q. Okay.
18　A. Frankspeech was there televising, we had, they
19　were attacked. RSBN was there, I think they ran it
20　nonstop. I don't know if OAN was there, I don't know.
21　I think War Room was there, RAV, CNN was there.
22　　　　MR. CAIN: What's the next?
23　　　　COURT REPORTER: 65.
24　　　　(Exhibit 65 marked for identification.)
25　A. I hate to rain on your parade, but I didn't run
Page 201

51 (Pages 198 - 201)

Page 202:

1  any ads and I didn't talk about My Pillow while I was
2  there.
3  Q. Okay. Hold that thought. Exhibit 65, we've got
4  some clips that we'll show to you during the course of
5  the day.
6  A. Okay.
7  Q. Exhibit 65, this is 17.
8  A. Mm-hmm, okay.
9  Q. Have you seen that?
10  A. Yep.
11  Q. And what are we looking at here?
12  A. I'm, I'm standing in front of a screen with a
13  square on it.
14  Q. Okay. And this is at the Cyber Symposium?
15  A. Yeah.
16  Q. And that's you?
17  A. Yep.
18  Q. This is about 40 seconds.
19  Playing Video Clip: "For this symposium
20  the media, the bad media said he's only doing this to
21  run My Pillow ads. And then if you remember when
22  Dominion sued me, they said they sued My Pillow and they
23  said he's only doing this to make money giving out promo
24  codes. Well, today you can save up to 66 percent and
25  you can, and, and use, hold it, and use promo code

Page 203:

1  audit."
2  A. Right. So same thing I did with Dominion,
3  that's what you got.
4  Playing Video Clip: "That will be the best
5  savings you can find" --
6  Q. It's one of many.
7  A. You think that was an ad? Are you out of your
8  mind, seriously.
9  Q. You tell me.
10  A. Well, that's not an ad. I don't even know if we
11  used promo code audit. I was making a joke like, hey,
12  you guys, these guys are trying to say I was making
13  money by losing my own company. I didn't even know who
14  Dominion was or for that matter this Eric Coomer guy and
15  you guys sue me out of the blue because you think I'm
16  making money or trying to make money. Are you out of
17  your mind. That's what I was doing, and you don't know
18  sarcasm when you hear it. You do, does anybody else in
19  this room get that. That's the best you got, good luck.
20  Promo code audit because that's what we were doing was
21  an audit.
22  Q. Okay. So you're saying you don't know if you
23  made money using the promo code audit?
24  A. No, we didn't, we lost money at the Cyber
25  Symposium. It cost almost a million dollars to put it

Page 204:

1  on. The sales that day were probably $200,000 if that.
2  We didn't have Fox, we didn't have nothing. The total
3  net net we lost about 4 million. I didn't run ads
4  during there, I didn't run any ads, not one, so you
5  can't get me on it. I was making fun of people like you
6  accusing me. You're accusing me just like I said, the
7  media. Everything I told you, you just proved my point.
8  I even told you about the Dominion code, didn't I. Yes,
9  I did.
10  Q. If you go to --
11  A. So you kind of killed your own little case
12  there, I'm sorry. You got something more.
13  Q. If you go to exhibit, the big Exhibit 62 that
14  we've been looking at.
15  A. 72 hours of tape and you show that thing, that's
16  unbelievable, that's shameful. What else you got.
17  Q. If you go to Page 2149.
18  A. Mm-hmm.
19  Q. Are you there?
20  A. Yep.
21  Q. Okay. This is more of the email chain between
22  you and ████.
23  A. Mm-hmm.
24  Q. Actually, if you look at the, the prior page.
25  A. Mm-hmm.

Page 205:

1  Q. It starts 8/12, August 12th, August 13th,
2  August 14th.
3  A. Right.
4  Q. But on the top of 2149 on the top left, what is
5  ████ telling you there, can you just read that section?
6  A. Yeah, it says, "I guess you track promo code
7  audit," because I mentioned promo code audit. I said
8  yeah, put it in there. Or she says I guess, I guess I
9  didn't, I guess I didn't answer her. "I'm guessing you
10  want me to track promo code audit for Frank as well,
11  yesterday ████ so far
12  Q. So as it relates to the audit promo code that we
13  just looked at you talking about at the symposium.
14  A. Mm-hmm.
15  Q. The day prior had brought in ████ excuse me,
16  $███ is that right?
17  A. Mm-hmm, right.
18  Q. And then at least as of this reporting $██████
19  right?
20  A. There's two things to that. I don't know when
21  the promo code audit was set up and when it was set up;
22  and No. 2, this is not My Pillow, this is Frank, this is
23  Frankspeech, this is the platform Frankspeech. My
24  Pillow has nothing to do with Frankspeech, you do
25  understand that. This is another, this is on the list

1  here like your Diamond & Silk, War Room, Alex Jones,
2  Bartz, it's everybody. This is not My Pillow, they
3  don't get those sales. Anything that came close to
4  Frankspeech, My Pillow doesn't get them. Do you get
5  that?
6      Q.  No, I guess I don't.
7      A.  Talk to my employees. They wouldn't get, they
8  don't get that money. It's another platform like, like
9  War Room, like Fox News. They have to pay. What
10  Frankspeech ends up with with that, My Pillow will get a
11  portion of that for their sales.
12      Q.  Wait, wait, wait. My Pillow --
13      A.  They don't get anything from Frankspeech.
14  Frankspeech, that's their sales. Do you get that. This
15  wasn't a My Pillow, it had nothing to do with My Pillow.
16      Q.  It's the product that was being sold.
17      A.  Right, by using a promo code, right.
18      Q.  Right. When a pillow is sold, My Pillow gets a
19  portion of the sale?
20      A.  From everywhere I have ads in the world. What
21  I'm saying is when I do an email blast --
22      Q.  Wait. You said ten times that My Pillow doesn't
23  get the money.
24      A.  No, you need to understand, that's sold on the
25  Frankspeech platform.

1      Q.  I don't care what the platform is, the money is
2  going in part to the platform --
3      A.  That's right.
4      Q.  -- and in part to My Pillow?
5      A.  Just like any other, that's correct.
6      Q.  You're in the pillow business to sell pillows,
7  right?
8      A.  Mm-hmm.
9      Q.  Yes?
10      A.  Sure.
11      Q.  And that's what we're looking at, the
12  S█████ --
13      A.  But that was sold on the Frankspeech platform.
14      Q.  I don't care if it was sold on the moon. The
15  money is going to My Pillow in part?
16      A.  Not all of it, but some of it, yes.
17      Q.  Okay. And it's going to whomever --
18      A.  Mm-hmm.
19      Q.  -- is advertising that product?
20      A.  Mm-hmm.
21      Q.  Through the promo code, right?
22      A.  Okay.
23      Q.  Are you trying to tell the jury that you're not
24  making money --
25      A.  What jury, what jury are you talking about, why

1  are you --
2      Q.  The ones that are looking at this on the video.
3      A.  I'm trying to tell you that you're trying to say
4  we made money there. We lost $4 million. And that, I
5  don't know when the promo code audit was set up. That's
6  a Frankspeech is a platform just like the man on the
7  moon, Fox News, everyone I've been doing for 15 years.
8          Now did they buy more for promo code audit by me
9  saying that, yeah, I said it as a thing, yeah, they did.
10  It looks like they bought more than the day before. Is
11  that what you want me to say. Yes, by me saying that on
12  that stage, I'm telling you I didn't do any ads, it was
13  not to run ads at all, and I ran ad free. Did I say
14  that because of proving a point, you proved my point.
15          Rotten horrible lawyers like you and the media
16  saying, oh, Mike Lindell is trying to save this country
17  just to make money. I have lost everything I've had so
18  far, you got it. So don't sit here and take your,
19  because I'm not going to take this garbage you're
20  spewing out. This is horrific what you're doing, I've
21  said it from the start of this thing, it's disgusting,
22  I've lost millions of dollars.
23          You'd like to be in my shoes, you just can't put
24  it through your head. Why would anybody hold to his
25  moral compass and say here, I have evidence to save our

1  country so you have a job. And I'm willing to sacrifice
2  every single thing I have, including other people's
3  jobs. If it takes that, I can't help it, I'll try and
4  do everything I can to help save them. But you know
5  what, if it comes to that, I will lose everything I have
6  because that's how important it is to fix our elections.
7  That's it.
8          So you can go ahead and say that to the jury and
9  make it look like I was trying to make money. They
10  heard that statement. I made a joke about it. I can't
11  help that that many people bought, but I still lost
12  $4 million that weekend. That's the bottom line. So
13  you can sit there and go, look at him. If there was an
14  ad coming up every two minutes, you could maybe make
15  that argument, but it didn't. There wasn't even
16  anything on the strips, nothing. So it's disgusting
17  that you're even insinuating that. That's all I'm
18  saying. Go ahead.
19      Q.  You can't bang on the table because you're --
20      A.  That's what I did, I'm sorry, I apologize. Did
21  it break anything? I'm just getting, it's disgusting.
22  I can't believe that you're a lawyer, that you would do
23  something like that. Don't you have a moral compass. I
24  mean, this is bizarre, this whole thing is bizarre.
25  That I did it to make money with promo codes, really.

| | |
|---|---|
| 1      Talk to my employees, talk to -- when you were<br>2 out of the office I sat here, we're overdrawn today,<br>3 that's what I had to do while you were out of the room,<br>4 by a quarter million dollars. I have to borrow more<br>5 money now and more money because you guys keep attacking<br>6 my company and what you did with Eric Coomer to that<br>7 fateful day when he did his deal with Newsmax.<br>8      Q. All right. I'm just asking you questions today.<br>9      A. Yeah, keep going.<br>10      Q. I'm not going to make any speeches. The<br>11 question was, and you've talked about using that promo<br>12 code $███████ in revenue came in to My Pillow, of which<br>13 a portion of it went to Frankspeech, right?<br>14      A. Mm-hmm. One to some, some went the other, some<br>15 went to shipping sales, I don't know what portion.<br>16      Q. And then if you look further down in ██████ in<br>17 your exchange on this day, I needed you to clarify<br>18 something for me. This is 2149. After she tells you we<br>19 did $██████ on that audit promo code, you say, "Audit<br>20 is also Frank." And then you say, "Actually, audit is<br>21 me, not Frank, put that in the memo, Frank - audit."<br>22 And I was confused by that when I read it first as to<br>23 what you're --<br>24      A. I don't know, I don't know what that means.<br>25      Q. -- referring to?<br><div align="right">Page 210</div> | 1      Q. I understand that.<br>2      A. That's what, that's what I assume that meant.<br>3      Q. Well, it could, I mean, and as you pointed<br>4 out --<br>5      A. Because it wasn't an ad, so I wanted to keep it<br>6 separate so I know if my ads are working, that's all it<br>7 was.<br>8      Q. Okay, all right. No, what I was trying to<br>9 figure out, since you own half roughly of My Pillow and<br>10 100 percent of Frankspeech if when, if the code actually<br>11 that you were using audit was driving revenue to a<br>12 company you owned 100 percent of versus if it was --<br>13      A. No, no.<br>14      Q. -- me?<br>15      A. No, my stockholders would not allow that and<br>16 neither would my son, you can't do that. It's a<br>17 completely separate entity. That's accusing me of<br>18 committing a crime.<br>19      Q. No, I'm asking questions --<br>20      A. It is, you can't do it, it's illegal. It would<br>21 be morally wrong and illegal. And no, that's not the<br>22 truth.<br>23      Q. Okay.<br>24      A. It was done to track over here, otherwise I lose<br>25 track of the ads because it's skewed by that audit, and<br><div align="right">Page 212</div> |
| 1      A. They, back then, I don't know, we were, because<br>2 I own 100 percent of Frankspeech so, you know. I don't<br>3 know what that would mean. I guess maybe, maybe<br>4 sorting, because we had, I know what it was. Because we<br>5 had two, we had two things going on, I didn't want it to<br>6 be confused with the bucket. I wanted to know if Frank,<br>7 keep Frank separate because we were doing our regular<br>8 ads so she didn't mix it in, you know what I mean. I<br>9 didn't want it mixed in so I couldn't tell what our<br>10 regular ad did, that's what it was.<br>11      Q. Okay.<br>12      A. Audit wasn't a regular ad, so I wanted her to<br>13 put it under a category of me so that over here I can<br>14 track my ads. Do you follow that?<br>15      Q. Not, not --<br>16      A. It's very simple.<br>17      Q. -- entirely. Well, you live with your business,<br>18 I don't.<br>19      A. No, but it's very simple. At Frankspeech<br>20 there's a bunch of other promo codes there, I got the<br>21 L66 or whatever and where you run ads. In order to give<br>22 them credit over there I wanted, I did not want<br>23 Frankspeech, I had to know what ads were working here<br>24 for that promo code Frank, so I put audit separately.<br>25 Do you understand that?<br><div align="right">Page 211</div> | 1 I said that on stage. I can't skew those numbers over<br>2 here, I have to -- are you following me?<br>3      Q. Yeah, I'm following you.<br>4      A. All right. It's tracking is all it is.<br>5      Q. Okay. So when you say actually audit is me --<br>6      A. What's that?<br>7      Q. Actually --<br>8      A. Just to put --<br>9      Q. -- audit is me?<br>10      A. She probably put it, back then she probably put<br>11 it under, under Mike or another, the Mike code. At that<br>12 time I had a Mike code, I had an ML, so you could track<br>13 different things that, you know, what it was producing.<br>14 But I didn't get, I didn't get a check from that, if<br>15 that's what you're saying, no, I didn't get a personal<br>16 check.<br>17      Q. Well, do you, that raises a question that I<br>18 asked early --<br>19      A. Ever.<br>20      Q. -- to that point. The promo codes, whether it's<br>21 whatever, it doesn't matter, are there any instances<br>22 where you are actually the, the receiver of the revenue<br>23 share --<br>24      A. No.<br>25      Q. -- personally?<br><div align="right">Page 213</div> |

<div align="right">54 (Pages 210 - 213)</div>

1    A.  No, no, no, zero.
2    Q.  Which is what you were saying.  I just wanted to
3  clarify it.
4    A.  Right.  And there's also ones where, you're
5  going to ask the next question, I'll do it for you being
6  the lawyer you are, that Frankspeech isn't treated any
7  different than any other outlet out there, it's all the
8  same.
9    Q.  What is the, what is the deal?
10    A.  It's a rev share, just like every other single
11  person out there, whatever that's at at the time of that
12  product.
13    Q.  Okay.  And I know you, you addressed this, but I
14  didn't ask the follow-up questions.  If, if, is the rev
15  share ever dictated by impressions?
16    A.  No, never.
17    Q.  Okay.
18    A.  Ever, ever.  It doesn't matter if you have, if
19  you have $5 in sales or 500,000, nobody gets more
20  because of volume.
21    Q.  As long as it's the same time period and the
22  same product, then the revenue share should be the same
23  across all your platforms, right?
24    A.  Yeah, it depends what product they had, there's
25  the --

1    Q.  I said the same product at the same time.
2    A.  It could depend on what product, if they wanted
3  to be a specific thing like an overstock sale.  There's
4  a lot of variables, but it's, but it's not -- everybody
5  is treated the same, okay.  It's not based on, hey, you
6  do a million dollars.  I've had people try that, well,
7  we're a big volume thing.  I said well, good for you
8  Special K, you know, it doesn't mean I don't give you
9  the same treatment as the guy that sells 10, has a
10  smaller audience, they're all the same.
11    Q.  All right.  Let's finish up with this page and
12  then give some of us a break.  If you look down on the
13  left after this discussion about audit and me.  It is
14  reported by ▮▮▮▮ "Frank audit $▮▮▮▮▮ and that would
15  relate to this promo code we were just talking about?
16    A.  I don't know, I don't know if that's all of
17  Frank and the code audit, I don't know that.  Because
18  that, I don't know what that means.  I would have to
19  look back and see what that would entail.  It could be
20  all of Frank and including audit.  Because the promo
21  code is audit, I don't know why this says Frank audit,
22  you know what I'm saying.
23    Q.  Well, you, you actually just told her put in the
24  memo Frank audit?
25    A.  Okay.

1    Q.  So --
2    A.  Where does it say that?  It says, "I'm guessing
3  you want me to track promo code audit for Frank as
4  well."  My guess is when it says Frank audit, that's
5  audit and Frank all included in one.  I mean, she's
6  asking to add audit with all the other Frank promo
7  codes, that's what she's asking.
8    Q.  Okay.
9    A.  Do you see that?  "I'm guessing you want me to
10  track audit for Frank as well."  And you look up here
11  and it says ▮▮▮▮▮, but the big number down there
12  would be all of the promo codes.  Do you follow me?
13    Q.  I do follow you.  Mike, I need to know the
14  answer to it though.
15    A.  I don't know the answer.  What's your question?
16    Q.  Do you know whether or not that's all of Frank
17  promo codes or just audit?
18    A.  No, it's all Frank's promo codes, 100 percent.
19  There is no way it's just audit because it wouldn't
20  match the ▮▮▮▮▮ up above.
21    Q.  Is there a way to segregate those out?
22    A.  I don't know, I'd have to look back, that's two
23  years ago.
24    Q.  All right.  Now it looks to me --
25    A.  I doubt, I doubt if there is because that's in a

1  big swimming pool, but I could check.
2    Q.  Okay.  Going down this column, we looked at
3  Frank audit, ▮▮▮▮▮
4    A.  Mm-hmm.
5    Q.  This is, this is after the symposium ramped up,
6  wrapped up, excuse me.
7    A.  Mm-hmm.
8    Q.  All right.  And these have sort of the week
9  prior and then the current week --
10    A.  Right.
11    Q.  -- results.  So this would relate to sales
12  during the symposium, the week of the symposium, true?
13    A.  It says 8/16.
14    Q.  Right.
15    A.  Okay.  Yeah, that's that week.
16    Q.  Okay.  So --
17    A.  8/16, so I don't know, is that, this is the
18  actual week we did the symposium?
19    Q.  This is your exhibit and it says that --
20    A.  Well, I don't know, it says it was 8/16.
21    Q.  Yeah.
22    A.  So yeah, I guess that would be the whole week we
23  had the symposium.
24    Q.  Okay.  So L66, you touched on this earlier, that
25  code is what?

Page 218:

1   A. That is commercials.
2   Q. Okay.
3   A. That was real commercials and that would be on,
4 on Lindell TV, it had nothing to do with the symposium.
5 That's our regular scheduled programming on Frankspeech,
6 like all the podcasts. If you look over there there's
7 like, I don't know, 300 podcasts. It's like a Rumble.
8   Q. Right, right, right.
9   A. So that's where that's from.
10   Q. And then did Lindell TV broadcast the symposium?
11   A. We did on one stream, but we have three streams
12 I believe, or two then, I don't know. But on the one we
13 ran commercial free, so we couldn't, it couldn't have
14 came from that. This L66 did not come from the
15 symposium.
16   Q. At all?
17   A. It can't, 100 percent.
18   Q. Okay. How do you --
19   A. Because those are, because those are paid, those
20 are ads.
21   Q. No, no, I get it.
22   A. Those are ads like you see on Fox, and we didn't
23 run any during the symposium.
24   Q. I know.
25   A. Okay.

Page 219:

1   Q. I understand.
2   A. Okay.
3   Q. Wait for my question.
4   A. Okay.
5   Q. Is this week prior ▮▮▮▮ the week of the
6 symposium ▮▮▮▮ is that a deviation as you --
7   A. Yeah, that's a deviation.
8   Q. Okay. And the same for Frank, ▮▮▮▮ that
9 week --
10   A. Yep, that's a deviation.
11   Q. Okay. And we can go on down.
12   A. Yeah.
13   Q. Well, let's go to --
14   A. The others didn't move much. RSBN, see that big
15 deviation, RSBN, that would be easy, they, they
16 simulcast the symposium and they did run ads.
17   Q. Right.
18   A. There's a guy that did run ads.
19   Q. And they had people there talking about your
20 products on the floor?
21   A. I don't know what they did, that's their own
22 news. And Steve Bannon, you see his was about the same,
23 he was there. He just ran his normal ads, but he didn't
24 run nonstop probably like, and he's only on I think two
25 hours of the day where RSBN was a full 72 hours.

Page 220:

1   Q. Did he tell you, he Steve tell you why he didn't
2 run his ads?
3   A. He ran his regular, I think, I don't even know
4 if he ran regular ads then. They might have ran
5 commercial free too.
6   Q. Okay.
7   A. I think he did, now that I think. I don't know,
8 I don't know. He didn't, he didn't do, his would have
9 changed if he would have been there because he was there
10 the whole three days, but his didn't change. And RSBN
11 is easy because they do, they are specific, they'll do
12 events. And we watch them all the time. If I see a
13 spike like yesterday, it was maybe $500, you know, some
14 days where they're $100,000, but then they do an event.
15 For example, they just did CPAC, you know. They do
16 events, they're very event orientated, so that's their
17 spike.
18   If I, if I had to look on here, the one that
19 would be the weird one is the L66 because we didn't run
20 any ads. So I would have to see what the week prior,
21 did we not run ads there or were we affected by Fox.
22 See Fox TV affects a lot of what you're doing. But so I
23 don't know, that one I would have to affect. I would
24 say a lot of people went through Frankspeech, you know,
25 not to the Cyber Symposium, but they went to Frankspeech

Page 221:

1 to that platform whether they were going there for pick
2 a, pick a podcaster, because there are a lot of
3 podcasters that were also, you know, there.
4   Q. Right.
5   A. So there, there we put ads around them, like on
6 Rumble or YouTube, those are those one-minute ads.
7   Q. Okay.
8   A. I would say the Cyber Symposium that, if I had
9 to guess, they had the traffic going not to watch the
10 symposium, but the traffic going to Frankspeech could
11 have, could have made that difference. Because we
12 didn't run ads at the symposium. So that's the only way
13 I could explain it. And I would really have to dig in
14 to find that out.
15   Q. Well --
16   A. And why didn't I back then, because I was trying
17 to save a country. I didn't even know what we did. I
18 was out there after that for weeks going, hey, can you
19 guys, you know, that's all I was doing every day. I
20 spent 18 hours a day with evidence going around to
21 Attorney Generals and going around this country. I
22 wasn't paying attention to numbers, until I get a call
23 about, hey, we're overdrawn or we need money, you know.
24   Q. Well, the deviation that we're looking at is at
25 least correlated to some increased traffic on these

Page 222

1 various platforms because of the, the Cyber Symposium
2 being that week, right?
3        A.  Well, good for them, they did good I guess for
4 two days.
5        Q.  Okay.  Well, so did My Pillow in the sense
6 that --
7        A.  No, My Pillow lost $4 million.  How many times
8 do I have to tell you that.
9        Q.  Did My Pillow -- yeah, you've told me multiple
10 times.
11        A.  If you take the numbers, if you take the Cyber
12 Symposium out and if you put what we normally do, we're
13 down $4 million.  Now you can say, well, it was your
14 choice to drop Fox.  Yeah, it was, it was your choice to
15 do this.  I didn't charge for the symposium.  Maybe I
16 could have charged, maybe I should have ran ads like
17 RSBN, maybe then I would have maybe broke even, but I
18 lost $4 million.  And I knew I was going to take a hit,
19 I didn't care.
20        You asked me, well, why did you drop Fox, you
21 knew you were going to take a hit.  Because they
22 wouldn't take my ads and advertisements on election
23 crime, that's it.  I don't care about this thing here, I
24 have to save the country here and get the word out.  If
25 you had the evidence I would hope you would do the same

Page 223

1 thing.  This isn't money driven, this isn't, I don't
2 care how much money I've spent.  You can sit out there,
3 I've spent over $40 million of my own money.  I have no
4 money left.  Every dime I've had to save this country to
5 get this out there, and you guys know that, you see me
6 every day.  Do I say, oh, I'm going to back down now,
7 and no, it doesn't matter because I know what I have.
8 And if I don't finish it, you're done, you don't have a
9 job in a couple years, it's over, you will never have an
10 election again.
11        This isn't about a Democrat or a Republican,
12 this is about the evidence that China intruded in our
13 election.  Did your guy do it, I don't know and I don't
14 care, but I know what he did to me, I know what he did
15 to me at Newsmax.  And that's what I went after him with
16 one paragraph calling him a traitor, and I did, and a
17 criminal, because what he did My Pillow was criminal.
18 He didn't have to do that to My Pillow and attack my
19 company and my employees so they lose all the money.
20 It's disgusting.
21        Q.  Is that why he's a traitor too, what he did to
22 your company?
23        A.  Mm-hmm, absolutely.  He did it, he did it there
24 to suppress, to attack Newsmax and suppress what --
25 everybody knew what I was trying to get out there and he

Page 224

1 obviously knew it because he told Newsmax not to have me
2 on anymore, I think.  They didn't have me on, Ruddy says
3 I can't have you on after your boy here, your, your
4 money cash cow, whoever is paying you.  I hope he's
5 paying you, you know, I hope you get paid or you're just
6 doing it on, think you're going to get a big payday
7 here, you know.
8        Q.  Is Chris Ruddy a traitor too for what he did?
9        A.  I told him that, and I go Chris, you're a
10 traitor if you do that.  I called Fox, said why don't
11 you watch.  I said, Chris, here, if you do that, I said
12 you're a traitor.  I bad-mouthed him every day after
13 that for at least a week and he goes Mike, will you quit
14 bad-mouthing me.  I go okay, I will, and I bad-mouthed
15 Newsmax and I have ever since.
16        Newsmax, Salem Media and Fox I bad-mouth almost
17 every day that they won't put the evidence, they won't
18 talk about elections, nobody, because it's called
19 Lawfare.  It's what your guy started, you started, even
20 before Smartmatic started Lawfare.  On February 4, 2021
21 when Smartmatic sued Fox News, it changed our country
22 forever.  Nobody can go on, evidence or not.  Even 2,000
23 meals when they had cameras, they wouldn't even have
24 them on at Newsmax or Salem Media, or I mean or Fox
25 News.

Page 225

1        This is where we're at, this is Lawfare.  It's
2 absolutely insane.  You attack companies so they drop My
3 Pillow.  They tried to put me out and this whole thing,
4 let's just break Mike Lindell, run him out of money, run
5 his company down so he shuts up.  That's the game.
6 Whether you're a part of that game or not, I don't care.
7 Anyone that gets in my way of getting this out, they're
8 a traitor, period, they are a traitor to our country.
9 Because no one, just let me out and let me show this to
10 the world.  It's up on Frankspeech right now, but no
11 reporters report it, instead it's that's what comes out
12 of here, Mike Lindell sued by Dominion for $6.3 billion
13 and at the capitol when I'm trying to get the word out,
14 they got sued by a guy named Eric Coomer, who I didn't
15 know from the man on the moon, you know.
16        Q.  All right.
17        A.  It's just bizarre.
18        MR. CAIN:  I'm going to object as
19 nonresponsive.
20        Q.  Here's what we're going to do.  We're going to
21 give her a break, sir, and I'm going to reiterate what I
22 told you earlier.  As much as I'm enjoying my time with
23 you, I may have to ask for more of it because --
24        A.  What's that now, ask what?
25        Q.  Can you put your phone down, please.

57 (Pages 222 - 225)

1    A.  No, I got an emergency, so no, I'm not putting
2  my phone down, I'm checking this.  I have a text from my
3  IT that I told you we were overdrawn today by a quarter
4  million dollars, so I want to take this text, is that
5  okay?
6    Q.  That's fine.
7    A.  Okay.
8    Q.  But not in the middle of a deposition.
9    A.  Okay.
10      MR. CAIN:  Let's go off the record.
11    A.  All right.  Keep going.
12    Q.  We just went off the record.
13    A.  Okay.
14      VIDEO TECHNICIAN:  We are going off the
15  record at 2:04 p.m.
16      (Lunch break taken from 2:04 p.m. to
17      2:56 p.m.)
18      AFTERNOON SESSION
19      VIDEO TECHNICIAN:  We are back on the
20  record at 2:56 p.m.
21  BY MR. CAIN:
22    Q.  Okay.  Mr. Lindell, I'm going to jump around a
23  little bit just to clean up some stuff.  We talked about
24  a lot this morning and early afternoon, and we don't
25  have enough time to go through a lot of these exhibits.

1  On Exhibit 62 though, which we looked at, I don't
2  necessarily need you to -- well, I may point you to
3  something, but I can obviously read through it later.
4  But there's, beginning in, in August there's a bunch of
5  different audit codes, promo codes --
6    A.  Mm-hmm.
7    Q.  -- that are coming up.  For example, on the
8  report on August 25th, audit 67, audit 68, audit 89,
9  audit 98.  And the audit refers to what?
10      MR. MALONE:  What page are we looking at?
11    A.  I see it.  It's just different commercials.  So
12  I, like I threw that name audit out there, so I just
13  use, because we have to, we have to pick like cool, like
14  for the, you know, it's just a different name to, to --
15  like audit 35 it says sheets, audit 50 says towels.  I'm
16  just looking at this.  So it's just different products.
17    Q.  Well, but a more basic question is, the audit is
18  referring to the idea that to audit certain states
19  elections, counties elections?
20    A.  No, it doesn't say that.
21    Q.  Well, that's my question.
22    A.  No, it's just the name audit.
23    Q.  Yeah, but what does, that doesn't refer to
24  auditing an election?
25    A.  No, it doesn't refer to auditing an election.

1  It's a code, it's a code, audit 30, audit 50, it says
2  towels and sheets.
3    Q.  I get that, but you mentioned it at the
4  symposium.
5    A.  What's that?
6    Q.  You mentioned audit code at the symposium.
7    A.  Yeah.
8    Q.  You are --
9    A.  And by the way, do you know at that symposium,
10  here, I want to put this on the record.  When I said
11  audit in that joke there, if I, what that, what that
12  code took in there, did you notice I didn't mention it
13  after doing that the next three days.  I could have made
14  a lot of money if I was trying to make money, let's let
15  that be on the record.  You know what I'm saying.  If
16  you would have said audit and all of a sudden boom, you
17  had the spike, I'd have mentioned it again.
18    Q.  Are, are you saying --
19    A.  The audit, the reason the audit is on there is
20  just a code.  Audit 30, there's different towels,
21  sheets, that's what it says here, towels, sheets.  These
22  are Frankspeech codes.
23    Q.  All right.  You created that code though, that
24  came from your brain, didn't it?
25    A.  Yeah.

1    Q.  Okay.
2    A.  When I, when I said it, when I said audit, I
3  think that's, I think that came from me.
4    Q.  Okay.
5    A.  Because I said it as a, at the Cyber Symposium
6  as a joke.  Not as a joke, but sarcastically.  Yeah, use
7  promo code audit because the media is saying I make the
8  money off promo codes, Dominion and whatever, so.
9    Q.  But are you telling me under oath that the audit
10  has nothing to do with or does not refer to the idea or
11  concept of auditing an election?
12    A.  When I said it there, yeah, when I said it at
13  the symposium.  These codes here now, no.
14    Q.  Okay.
15    A.  No, we just, the codes were set up to audit
16  codes.  Audit 30, they refer to towels and sheets.  When
17  I said it at the symposium I was making a correlation
18  going, hey, when the media attacked me, I got sued by
19  Dominion and Smartmatic for using promo codes that My
20  Pillow had nothing to do with it.  So I just put it out
21  there, promo code Dominion, I did on Bannon, just like I
22  did audit at the symposium.  That wasn't to make money
23  there, that was not to make money when I said use promo
24  code audit to save up to 60 -- you watched it, I was
25  being very, what would you call the word in your own

Page 230:

1  mind, sarcastic. I'm tired of people thinking that I
2  did this to make money, you know, that was the whole
3  thing.
4      Q. I didn't ask you about money. You know, we got
5  to be on point here.
6      A. Well, then, well, you're asking me. I just told
7  you, it says right here, audit 50 towels, audit 33
8  sheets.
9      Q. All right. You answered part of my question.
10 There is audit --
11     A. It says right there, I'm reading it.
12     Q. Let me finish, please. There's audit 67, audit
13 68, audit 89, audit 98. Which, which vendors were using
14 those audit codes?
15     A. I'll have to check on that, I'll have to check
16 on that. But here it says towels and sheets. I don't
17 know which vendor. So probably, here's my guess, when I
18 said that at the symposium, other vendors out there
19 probably went, hey, can I have an audit code. I don't
20 know, I'd have to check on that, you know, that could
21 be. Or it could be we had to divide them up with the
22 audit code because it was already established. And
23 that's probably it, so people are using an audit code.
24 I had to divide it up to towels and sheets, you know
25 what I mean. We had to put numbers behind it. That's
                                              Page 230

Page 231:

1  probably, that would make more sense. We couldn't use
2  just one code audit or you're not tracking your media.
3      Q. No, you've already talked about --
4      A. Well, that's what it is, that's exactly what it
5  is. It meant nothing as far as auditing somewhere. You
6  had to divide it up between sheets and stuff because I
7  said it at the symposium, so now you have all this,
8  everyone is using promo code audit, I couldn't track a
9  sheet commercial from a towel commercial. Do you follow
10 me?
11     Q. I do follow you.
12     A. That's what we did. So we probably shut off the
13 promo code audit is what, that's my guess. It's like,
14 I'll give you an example. Back when we did originally,
15 what they did way back in the beginning we used promo
16 code My Pillow on all the media in 2012, all, it was
17 just a promo code, My Pillow. And then what happened
18 was we couldn't track it all because it was all going to
19 the same code. So then we had My Pillow 22, My Pillow
20 23, very similar.
21         So when I said that at the symposium, what
22 people had stuck in their head, so when they're seeing
23 commercials on, on Frankspeech, this is probably from
24 Frankspeech, we had to divide them out into numbers,
25 that's all.
                                              Page 231

Page 232:

1      Q. Is there a --
2      A. To get them to quit, to get them to quit using
3  that generic code.
4      Q. Is there a mechanism if let's say ███ is in
5  this room with us and I want to know, ███ how much in
6  revenue was done associated with all of the audit codes,
7  is there, is there a way internally to produce that kind
8  of financial reporting?
9      A. From back then, maybe, I would say yes.
10     Q. Okay.
11     A. But then you asked me why, why the number is
12 behind it.
13     Q. You answered my question.
14     A. It's very simple. If people kept using that
15 code audit. It's kind of like Dominion when I threw
16 that out there.
17     Q. Right.
18     A. I had to, I had to actually, first I just
19 disconnect it because people used it and I couldn't
20 track my media.
21     Q. No, I know the tracking part.
22     A. Well, that's the biggest part of it, you have to
23 be able to track your media.
24     Q. We may be asking these, or talking about this
25 for different reasons, so.
                                              Page 232

Page 233:

1      A. Mm-hmm, right.
2      Q. So if, if, for example, Frank33, if I wanted to
3  know how many sales --
4      A. What?
5      Q. Frank33.
6      A. Frank33, right.
7      Q. If I want to know how many sales are associated
8  with that promo code, can you go back or someone --
9      A. Well, I would assume, I don't think we changed
10 our, I don't think we changed our platform.
11     Q. All right. Have you ever asked someone like
12 ███ or your controller to give you a report like that
13 that just says, hey, I want to see War Room, I want to
14 see everything --
15     A. Of course I have.
16     Q. Okay.
17     A. Or I can do it myself, you know, I can do it
18 myself.
19     Q. Okay.
20     A. I showed you on my phone. What's wrong with
21 you. I just showed you all the promo codes.
22     Q. Let's, let's not get combative about it.
23     A. Well, no, I'm just telling you. You're asking
24 me something, I just showed you how I can do it.
25     Q. No, you, you didn't produce a report. Oh, you
                                              Page 233

1 want to do it, do it?
2   A. What do you want to know?
3   Q. Frank33.
4   A. Frank33.
5   Q. How many sales in the history of that code have
6 been made under Frank33?
7   A. In where, forever?
8   Q. Forever.
9   A. Well, I don't know when forever would be. Let's
10 see. It wouldn't have been before, let's go 2020. The
11 problem is what's going to happen is it will probably
12 take a half hour to come up on the board here, you know
13 what I mean.
14       MR. MALONE: Yeah, I do know what you mean.
15 Let's go back and follow up.
16   A. I can't produce an individual code, it would be
17 forever that I, you know, that's what I'm saying, you
18 would have to produce --
19   Q. Yeah, you just tore into me because I'm just --
20   A. No, I know. What I'm saying is I could do it,
21 but we would wait probably an hour and a half. Because
22 here, here's what happens is --
23       MR. MALONE: So we'll do it later, Mike.
24       THE WITNESS: No, no, but I want give it to
25 him so he understands this.

1 boxes, we had, you know, financial reporting that was
2 paper for the most part, right?
3   A. Yeah. I had a bar for 13 years, yeah, you tally
4 it up by hand.
5   Q. Yeah. This day and age a lot of stuff is on
6 computers?
7   A. Oh, believe me, I know. Our election, I, I get
8 it.
9   Q. So it's easier if it, to the extent the
10 computers have value, it's easier, would you agree, at
11 My Pillow to produce a report because you have a
12 database, a computer database that has that data
13 contained on it, is that a fair statement?
14   A. To produce a report?
15   Q. Yes.
16   A. In that, in that sense, yeah. You would have
17 to, it's like credit card transactions, anything, I get
18 that.
19   Q. Yeah, yeah, and --
20   A. If you're telling me, if you're trying to do
21 anything over here about election machines, you're going
22 down the wrong path.
23   Q. No, no, I'm not. I'm just trying to figure out
24 how --
25   A. Because if it's a mistake here, it doesn't

1   A. I take a date range, like say a date range, and
2 now from, for two years, for two years it has produced
3 every code, everything, and it will take probably five
4 hours, I've never done that big of a date range. And
5 when I do it, if I do a five-day date range for two
6 years it might take ten minutes, but then it lists them
7 all and I go down to the one you're talking about.
8   Q. Right.
9   A. That's what I do.
10   Q. But it's, but it's on a computer?
11   A. Same thing.
12   Q. Right?
13   A. You have to do it the same way.
14   Q. It's like a, but it's information, financial
15 information that My Pillow has on a computer, right?
16   A. No, it's not financial. It's, it's -- well, it
17 says financial, but it's reporting so I can make
18 decisions whether or not to buy media or something to
19 pay media out, to pay vendors, that's their, that's
20 their accounting.
21   Q. But my, I'm asking maybe a slightly different
22 question. In terms of back in the old days. How old
23 are you?
24   A. 61.
25   Q. All right. We used to have boxes, bankers

1 matter, you're losing money, but over here you lose your
2 country. But I know what you're trying to figure out.
3 The answer to your question is yes. I can do a date
4 range, but all of them show up. So I just scoot down
5 and find that particular code. It's easier if it's
6 within a week or two and you're only doing like a week,
7 but when you do a year it takes, it just, it takes time.
8   Q. Okay. But --
9   A. Because you realize it's adding, you know, it's
10 a big process, you need a big server. We have our own
11 servers.
12   Q. Right. But it's, it's, it's a computerized
13 function, in other words, it's not as burdensome as
14 going to pull files off of --
15   A. Right, right.
16   Q. It's not that difficult to do, is it, I mean, is
17 it?
18   A. I wouldn't think so.
19   Q. All right. There are, I have Fight for Trump
20 and Trump related promo codes, what are those used for?
21   A. Those were vendors that were out there. That
22 would have been like some podcaster, I don't even know,
23 I'd have to find out. They were not My Pillow, they
24 were podcasters, or radio hosts, radio hosts out there.
25 Maybe it was a Salem radio host back in the day. This

1 was, this was before the election I believe.
2    Q.  Okay.  But again, there's --
3    A.  I think.  It's whatever their podcast name is.
4 If their podcast is Fight for Trump, we would give them
5 Fight for Trump.  But I don't even know if they were
6 that.  You're asking me this.  I would have to, and let
7 me tell you something, this is really important too,
8 just because they're, because I've been on the Dominion
9 lawsuit, I don't know about this Eric Coomer guy, but on
10 the Dominion lawsuit they put in promo codes here that
11 said we were using, which in fact were not in use.
12    What you can do on My Pillow's Website, you can
13 type in a promo code and take a screen shot, it doesn't
14 mean it gives you anything off.  You could type in your
15 name, you can type in ambulance chasing lawyer and that
16 would, it would make a picture of it, but you can't, it
17 doesn't mean it works, right, you know.
18    Q.  I'm just looking at, here, I'll show you what
19 I'm looking at.
20    A.  I don't know what you're looking at.  If you're
21 looking at a screen shot, what are you looking at?
22 Fight for Trump, I don't know what you're talking about.
23    Q.  I'm looking at a spreadsheet that your company
24 produced.
25    A.  Okay.

Page 238

1    Q.  It's Trump, or excuse me, My Pillow 2366.  And
2 I'm not going to mark this.
3    A.  My Pillow 2366.
4    Q.  No, that's, that's just how it's been labeled,
5 okay.  And we asked for promo codes used by My Pillow
6 and got what you're looking at.
7    A.  Those are not, but those are not, none of them
8 are used.  The only promo code where My Pillow is the
9 email blast and stuff.  These promo code all associate
10 to some, somebody out there, they have for 15 years.
11    So like I'll give an example, Trump 1, that's
12 Diamond & Silk, that's Diamond & Silk.  Trump 24, I
13 don't know whose that is.  Trump 2020, these are
14 podcasters out there, they've been doing this stuff.
15 Tucker, that's his own, Tucker, I don't even know who
16 Tucker is because he doesn't have his own code.
17    Truly, truly, these guys get creative in their
18 names.  If they're out there, that's their promo code
19 and their, you know.
20    Q.  You're answering a question I didn't ask.
21    A.  Okay.  Well, you're asking about Fight for
22 Trump, you said who owned it.  You said, oh, you said
23 these were My Pillow, no, they're not.
24    Q.  Okay.  And your distinction being that someone
25 else came up with --

Page 239

1    A.  Someone else came up with the name for their own
2 show and they're marketing and selling our product like
3 other products out there.  You realize there's other
4 products out there like relief factor stuff.  These guys
5 also use their own promo codes --
6    Q.  I understand, I understand.
7    A.  -- and they do the same thing.
8    Q.  Right.
9    A.  It's pretty much a business model now.
10    Q.  Of course.
11    A.  Yeah.
12    Q.  But if, as we talked about earlier, you said,
13 you know, if there was a promo code that had a bad word
14 in it or --
15    A.  Right.
16    Q.  You know, you would, you would as the CEO would
17 instruct that vendor to not use that --
18    A.  Right.
19    Q.  -- promo code?
20    A.  And there was some that back then that they,
21 that █████ said, brought to me and said can you use that,
22 I said absolutely not.
23    (Phone ringing in room.)
24    A.  This one I have to take, I'm sorry.
25    MR. CAIN:  Let's go off the record.

Page 240

1    VIDEO TECHNICIAN:  We're going off the
2 record at 3:11 p.m.
3    (A break was taken at 3:11 p.m.)
4    VIDEO TECHNICIAN:  We are back on the
5 record at 3:20 p.m.
6 BY MR. CAIN:
7    Q.  There's a note on Exhibit 62 in November of 2021
8 that, from █████ that says, "Just an FYI, we owe Sidney
9 Powell $ ████████  What was Sidney Powell doing?
10    A.  She has her own podcast.
11    Q.  So it's --
12    A.  It's just like anyone else.
13    Q.  Okay.
14    A.  She had this before, I think.  I don't know when
15 she got her promo code.
16    Q.  Okay.
17    A.  She has a podcast, just like every other person.
18    Q.  And how about Giuliani, does he have a promo
19 code?
20    A.  He does, he did.  I don't know when he got his,
21 but yes.  I think it was sometime after '21 or '22, he
22 came on a podcast, I think it was after they maybe
23 disbarred him or whatever they tried to do to him, you
24 know, just has a podcast, that's his livelihood now.
25    (Exhibit 66 marked for identification.)

Page 241

61 (Pages 238 - 241)

Q. This is related to the financial topics that we've been discussing, this was produced by My Pillow, Bates 723.

A. Okay.

Q. Most of it is blacked out on the front. And do you know, this appears if you look at the back to have some information concerning a particular promo code, do you see that on the back?

A. Am I looking -- yeah, I see the promo codes, yeah.

Q. All right.

A. I see daily totals, Frank33, right.

Q. Yeah. So quickly since we've touched on this already.

A. Yeah.

Q. This is actually a text string with someone else, not ███ someone named ███████

A. That's right.

Q. Who's ███████

A. He does the emails and the, the emails and the text marketing.

Q. All right. So then if we go to the --

A. And he does them for My Pillow, he doesn't -- this Frank33, I don't know if that's text or emails, I believe it's emails.

---

Q. Okay. So as you stated earlier, ███ doesn't do the emails?

A. No.

Q. So this is a separate report relating just to daily totals for the Frank33 email code?

A. So, yeah, these are all emails. Frank33 is all emails, I believe, because ███ does, that's what he does. It could be text marketing or emails where you buy, where you send out, you pay to send people, you know, text marketing.

Q. Okay. And do you have, just looking at the daily totals from it starts August 2nd at ███

A. Mm-hmm.

Q. And it appears to have a three-day during the symposium spike of ███

A. Yeah.

Q. And ███ right?

A. Right.

Q. Would you attribute that as well to the symposium?

A. It's whatever he sent out in text or emails. You don't get it unless you send out a text or whatever. And so I don't know if he's paid to send more out or if he, or what, I don't know, I'd have to look into that. But it did, if you look back there's ███ on 8/6.

---

It's up, it's up by, you know, on your highest day there, what, ███ It could be they're sending, that he he sent out the same text market or email, but we might have had more, we might have had more.

Our audience got bigger, you know, our text -- when people sign up for, then they get text marketing, they sign up for text or email marketing. It looks to me like that they, that the audience could have been bigger. There was definitely none sent on 8/2 and 8/3, that would have been hardly any marketing sent out because you got to pay when you send them out.

Q. Would Frankspeech have sent out, I'm looking back at this Exhibit 64, which I know is a splash page on the Web, but would Frankspeech have sent out an email that is similar in nature to what we looked at in Exhibit 64?

A. I don't know, I don't know.

Q. All right.

A. That there with me in the background, is that a, is that screen shot taken from my show or is it taken into the screen shot of a -- let me see that again, if you can turn it. That looks like it's a, I don't know. Like I don't know if that's taken from a, like a show where you took a screen shot. Do you know where you got this?

---

MR. KLOEWER: It's a screen shot of the Website.

A. Oh, so that was on the Website. So that video, that video, that's a video that was on the Website. Okay, I gotcha. Yeah, then that's a video, so it's not an email.

Q. Okay. And I have the video, I don't think we're going to watch it.

A. That's not, that's not an email. Whatever this is, these are emails.

Q. Okay. But and you'll talk about this with Frankspeech a little bit more, but just to help me understand part of that --

(Phone ringing in room.)

A. Oh, shoot, it's that same lady. Let's take two seconds.

VIDEO TECHNICIAN: We are going off the record at 3:26 p.m.

(A break was taken at 3:26 p.m.)

VIDEO TECHNICIAN: We are back on the record at 3:28 p.m.

BY MR. CAIN:

Q. So when we broke you were discussing, you told me Exhibit 66 shows email --

A. Mm-hmm.

1  Q. -- marketing revenue associated with the Frank33
2  code that your understanding is most likely was sent out
3  by Frankspeech during --
4  A. Right.
5  Q. -- around the time of the symposium, correct?
6  A. Right, yep. So if you look at Friday, Saturday
7  and Sunday, by Sunday we probably didn't even send out
8  an email because that's very low, it's a very low
9  number.
10  Q. And you seem to be referring to someone else
11  that would have been doing that marketing?
12  A. Yeah, I have no idea who sent this out. I, I
13  wouldn't have ordered these sent out, that would have
14  been done by, I don't know, we had a company doing our
15  emails back then and our texts, and I don't, I don't --
16  Q. Was that --
17  A. Not, not within My Pillow.
18  Q. So that was outsourced to a third-party?
19  A. I'm sorry?
20  Q. That was outsourced?
21  A. Outsourced to a third-party, they would have
22  done this and used that code. I have, I can have ▉
23  pull that code so it looks like, or you guys did, he
24  pulled, he was able to pull that because he can pull
25  promo codes. He was not in charge of that back then. I

1  think we got rid of that company in November of, of '21,
2  we got rid of this company. Then we got a new company
3  that was -- this is Frankspeech now by the way, this
4  isn't My Pillow.
5  Q. Right.
6  A. We bought Frankspeech, the same company that
7  does My Pillow now is doing Frankspeech as of November
8  of '21.
9  Q. Okay. Thank you.
10  A. Yeah.
11  Q. So that was my next question too.
12  A. Right, right.
13  Q. Who does that for My Pillow?
14  A. It's a company called Liz Trax, it's on their
15  platform, it's on their platform. ▉ in-house does
16  it, but he has to do it on their platform. There's all
17  kinds of rules when it comes to that.
18  Q. Okay.
19  A. So Liz Trax is, I've had them for I want to say
20  ten years, 12 years.
21  Q. Can you spell that.
22  A. Liz, L-I-Z, T-R-A-X maybe, Liz Trax. L-I-Z
23  maybe, I don't know.
24  Q. Do you know where that company is located?
25  A. Huh-un. I think it could be -- I'm not going to

1  guess.
2  Q. Okay.
3  A. It's a national company.
4  Q. Before lunch, a couple of follow-up questions to
5  your testimony. I had asked you, you told us at length
6  how much money My Pillow has lost over the last few
7  years.
8  A. Mm-hmm, yes.
9  Q. You mentioned some loans against inventory I
10  believe?
11  A. No, it's loans, I think they put everything in
12  collateral.
13  Q. And then you, okay. So it's to a financial
14  institution or like who is the lender?
15  A. It's a financial, it's financial, yeah. And
16  you're going to ask who and I don't know, I'd have to
17  get their name. It's a credit company or company, it's
18  not a normal bank.
19  Q. Okay.
20  A. But it's not a, I don't know what you'd call it.
21  They do, Saveign I think is one, it's loan companies.
22  Q. Okay.
23  A. They're not banks.
24  Q. Okay. I think I neglected to ask the follow-up
25  which is, I thought you said, well, I know you said you

1  personally lost money, but have you lent My Pillow money
2  yourself, you personally as a lender to the company,
3  called a shareholder loan?
4  A. Have I, many times.
5  Q. Okay.
6  A. Many times. Are you kidding me, yes.
7  Q. All right. There's a distinction I'm drawing
8  between a capital contribution where, where you're
9  actually --
10  A. I know what you're talking about, a loan where
11  you get paid back, yes, yes.
12  Q. Okay.
13  A. Yes.
14  Q. And that's currently the case that the company
15  is in debt to you?
16  A. To me by these other loans, this is a direct
17  loan from My Pillow had to borrow money to stay in
18  business.
19  Q. Right.
20  A. Because of this stuff. $8 million I believe at
21  the last count. Not Mike Lindell borrowing money, My
22  Pillow borrowing money.
23  Q. Right, I know, I know.
24  A. And Mike Lindell has also had to borrow money.
25  Q. Okay. We're not, you're not wearing that hat

1　right now.
2　　A.　Right.
3　　Q.　My Pillow has borrowed money from Mike Lindell
4　as the lender?
5　　A.　No, My Pillow borrowed money from these other
6　two companies as the lender.
7　　Q.　All right.　I thought you, you said you lent
8　money to --
9　　A.　I said I have lent money to My Pillow.　You said
10　when, I'd have to look back, many times I said.　Even if
11　you go back when My Pillow needed money, I had to take
12　it personally and put it in my bill.　This goes back for
13　a long, long time with different times where I've had
14　to, like, I don't know, when we needed money, we
15　couldn't buy, we didn't have enough money to buy
16　inventory or whatever to buy things to sell.
17　　Q.　Okay.
18　　A.　I take money from Mike Lindell and put it in My
19　Pillow.　This time I ran out of money in Mike Lindell
20　even selling a building and I had, they had to go
21　elsewhere to get money because I didn't have money to
22　give them anymore.　I was, as of today, overdrawn.　My
23　Pillow borrowed $8 million themselves to cover just this
24　last year alone, not even covering back when your guy
25　did this about starting to borrow money.

Page 250

1　　Q.　All right.　When My Pillow was borrowing money
2　from you personally.
3　　A.　To what now, me personally?
4　　Q.　Yes, sir.　Did you have an actual loan document
5　associated with that?
6　　A.　They keep, the accountants do that.　And this
7　might not have been, I don't think that was anything
8　during the last two years.
9　　Q.　Okay.
10　　A.　But you would call it a loan, yes.　If my My
11　Pillow didn't have money to pay Frankspeech, so to
12　speak, for their codes, I'd run that and gave them time
13　because I don't have it.　And so then I, and they
14　probably still owe me money, I don't know, you know, I
15　don't know.　All I know is when I ran out of money to
16　give them money to get them through this last year, they
17　had to go borrow 8 million, 4 million -- actually, it
18　might be three loans, 4 million, 2 million and 4 and a
19　half, I think it's 10 million.
20　　Q.　Okay.
21　　A.　And then we lost for the year about $6 million.
22　　Q.　Who at My Pillow would be in charge of that
23　relationship, making those loans and coordinating with
24　the lenders?
25　　A.　I had to do that.

Page 251

1　　Q.　Okay.　All right.　Now you also talked earlier
2　about this gag order and the election data.　And then I
3　think you said something about two to three weeks?
4　　A.　Mm-hmm.
5　　Q.　Something is going to happen?
6　　A.　Mm-hmm.
7　　Q.　What's going to happen in two to three weeks as
8　it relates to --
9　　A.　Well, the government, the government said about
10　I think it was six months ago or so, said the cases in
11　Nevada, it's Dennis Montgomery, and not to get into the
12　specifics, the government said if Mike Lindell wants to
13　release the 2020 election data, the other stuff will
14　remain under a gag order.　Because he's also got a lot
15　of stuff, he worked with the CIA going back all the way
16　to Brennan, Clapper, the government.　He worked with the
17　CIA for over a decade, over 15 years I believe.　And so
18　the government said that.
19　　　We now have waited, because Dennis Montgomery is
20　still under a gag order, so according, my attorneys
21　said, hey, we have to do this strategically, you know.
22　　　MR. MALONE:　You don't have to tell them
23　what the lawyers said.
24　　　THE WITNESS:　Well, whatever, okay.
25　　　MR. MALONE:　You answered the question,

Page 252

1　that's fine.
2　BY MR. CAIN:
3　　Q.　Who's handling that?
4　　A.　What's that?
5　　Q.　What, what lawyers are handling --
6　　A.　There's different lawyers.
7　　　MR. MALONE:　You don't have to tell them
8　that either.
9　　A.　Yeah, yeah, there's about six firms, I mean.
10　　Q.　That's not privileged.　Is there a proceeding in
11　Nevada that relates to that?
12　　A.　Oh, yeah, just look it up.
13　　　THE WITNESS:　Can I give him the name of
14　the case?
15　　Q.　Well, you can tell me what it is.
16　　　MR. MALONE:　If you know, Mike, but --
17　　A.　I don't know the name of the case, but it's --
18　　　MR. MALONE:　I'd say it's outside of the
19　scope of the questions.
20　　　THE WITNESS:　No, I know, but I'll give him
21　that case, that way they can look it up themselves, I
22　mean, that's a big thing, it's a big thing.
23　　Q.　I've seen reference to it.
24　　A.　But, you know, and this is, in the next few
25　weeks it's going to show something, it's really going to

Page 253

| | |
|---|---|
| 1   be, you know, not your case, but other cases are going | 1   a picture of him, we had a picture of him. And it never |
| 2   to go bye-bye, I mean, it's going to go, hello, it's not | 2   came forward, it was the biggest coverup you ever seen. |
| 3   defamation when this is what I have, what I have on | 3   Q. And the logic is escaping me. Why did that have |
| 4   January 9th. | 4   anything to do as to whether you released the data or |
| 5   Q. Well, that was supposed to be the same data that | 5   not? |
| 6   you promised to produce at the symposium. | 6   A. I just told you. I was physically don't release |
| 7   A. No, no, no, no, no, no, this is, there's two | 7   it. And then also Waldron said they were going to stick |
| 8   different things going on. | 8   in the data, which had already happened with this |
| 9   Q. It's not PCAP data? | 9   crooked guy named Josh Merritt where he had stuck |
| 10   A. Yeah, this will be PCAP. This is PCAP from | 10   something in there and he took something from the |
| 11   China that I couldn't drop the third day. I mean, these | 11   symposium. |
| 12   were certain PCAP's that could not be dropped because I | 12   So this, we already had been sabotaged that day |
| 13   was, on the second day of the Cyber Symposium I was | 13   by a guy named Josh Merritt who had met in Texas on the |
| 14   physically warned and also this, this colonel that was | 14   way there and he got up on the floor and he said, yep, |
| 15   running this team said we are going to have, said we are | 15   I've validated all of Dennis Montgomery's stuff. Now I |
| 16   going to have, we believe we have information that | 16   didn't even, I didn't even put the name out Dennis |
| 17   they're going to put a poison pill into the data, this | 17   Montgomery. And he got up there before we were turning |
| 18   was the last day of the symposium. We were going to | 18   it into the Cyber '15 Act, the 2015, we were turning it |
| 19   release the China part, specifically the China part, and | 19   the bag and I go who is this guy. He's there with this |
| 20   he said we, we can't, they're going to put a poison | 20   Russ Ramsland guy and then Kurt Olsen an attorney, this |
| 21   pill. I was physically attacked and warned and I had to | 21   other attorney that was going to put it in the bag. |
| 22   make the call, okay, we won't put the China stuff down. | 22   And Josh Merritt got up on the board because the |
| 23   Q. Are you talking about Phil Waldron? | 23   guy goes, well, I don't know if Dennis Montgomery's |
| 24   A. Yeah, Phil Waldron, yeah. | 24   stuff has been validated. I have it, I validated it for |
| 25   Q. Okay. Well, you said publicly during the | 25   six months I've been validating. And Josh got up and I |
| Page 254 | Page 256 |
| 1   symposium that you weren't showing the data because you | 1   didn't know who he was, he goes I have totally |
| 2   were saving it for the Supreme Court and the -- | 2   validated. He drew a thing on the board explaining it |
| 3   A. No, that's, you know, this is what I'm telling | 3   to this guy. So the guy is putting it in the bag |
| 4   you -- | 4   instead. I go, well, I want a copy to bring to the |
| 5   Q. But you said that. | 5   Cyber Symposium. |
| 6   A. I don't know, you'd have to show me where I said | 6   They started to download it and it was going to |
| 7   that. What I said on the second day after I was | 7   take too long. And I said no, just bring, bring it |
| 8   attacked the morning of the third day, I said I was | 8   with, we'll bring it back. And Kurt Olsen agreed, okay, |
| 9   physically attacked, that's in a police report. | 9   we'll bring it back, but Mike, it would have to go in |
| 10   Q. Who, who attacked you? | 10   there. I go, I agree, but I have to get going, I had |
| 11   A. Three guys by the elevator. See, do your due | 11   the Cyber Symposium. I had the whole thing to get the |
| 12   diligence. They physically attacked to warn me not to | 12   chairs, everything ready and get the food, everything |
| 13   put this down the next day. Waldron came about shortly | 13   done. |
| 14   after that, police were called and everything, but | 14   And so then Josh Merritt flew on my plane and |
| 15   Waldron came and said, hey, you can't release the China | 15   then he gets there and I find out he's part of some red |
| 16   stuff, we have been, they're going to put a poison pill | 16   team or whatever, I didn't even know what a red team |
| 17   in the data, which means stuff that, I don't know what a | 17   was, I didn't hire him. Apparently Kurt or somebody |
| 18   poison pill is, I wasn't sure what it is, but he said | 18   hired him and he's in this room with about eight other |
| 19   trust me, we can't do it, let's get the gag order lifted | 19   people. And, and then I give him the, he takes the |
| 20   on that part, you know. | 20   thing and he puts it in and he goes, well, we don't have |
| 21   Q. And there's a police report on this? | 21   enough we need here. And I'm going what are you talking |
| 22   A. Yeah, there's a police report, absolutely. | 22   about. And then the other guy is bringing stuff, he's |
| 23   Q. Who were the three people -- | 23   bringing it the next day, he goes you shouldn't have the |
| 24   A. I don't know, they couldn't find the guy. They | 24   Cyber Symposium, you shouldn't have it. I go what are |
| 25   did it, they put it all over the news, a picture of him, | 25   you talking about not to have it. It was like he was |
| Page 255 | Page 257 |

1 already trying to sabotage.
2 And then this Josh Merritt on this, it was his
3 first or second day he went, he was supposed to be part
4 of this, whatever it's called, red team, but he went and
5 said something to them. We had a rumor that he had put
6 stuff in the cyber room and to sabotage. We've got a
7 tape by the way, where him and his wife were out
8 there to sabotage it, we've got a whole recording of him
9 saying that. I couldn't even play it all on the show
10 because he swore so much. And in fact, I had to bleep,
11 bleep, bleep, bleep, it was disgusting. But they had
12 that all planned. I didn't know the guy from Adam.
13 And then he turned it into some newspaper, which
14 one of our guys caught him before it was even, before it
15 was even out, the news article came out, so it was all
16 preconceived. And then we kicked him out, I said you're
17 not coming over here, you're kicked out of the Cyber
18 Symposium. I said what are you doing, I didn't even
19 know who the guy was. And I said he's sabotaging the
20 symposium.
21 I took him to court after that I believe. And I
22 think, I don't know if they ended up dropping the
23 charges or what, but he stole something from there. He
24 took the drive with him and to this day I don't believe
25 we ever got it back. He took the drive and, and he's a

1 A. I don't know the name of the company on there,
2 that I don't.
3 Q. Okay. Is it, is there a lease with that company
4 for the use of the plane?
5 A. I don't know. This was an attorney back in the
6 day lined that up with, it's Minnesota Jet, I don't
7 know. The short answer is I don't know.
8 Q. I'm just --
9 A. And that, and that plane, I don't even know if
10 that was, I had two planes, or used two planes, one was,
11 I don't know if it was the Falcon 50 or the, or the new
12 one. In fact, I think an article came out, Mike had to
13 sell his airplane at the failed Cyber Symposium.
14 Q. Who pays for the plane?
15 A. What?
16 Q. Who pays for the plane?
17 A. Who pays for the plane?
18 Q. Yes.
19 A. I'd have to look up the thing. I don't know if
20 it's Lindell Management or My Pillow, I don't know. I
21 guess it depends who uses, the usage. You have to keep
22 track of everything like that.
23 Q. Okay. Who would be the person --
24 A. Probably Lindell Management, you know, that's
25 probably, you know, which is my, my, it's the management

1 bad guy. So I don't know if that's relevant to your
2 case.
3 Q. It is.
4 A. Very bad guy. He was there, I think he was
5 planted by someone, because first he says Dennis
6 Montgomery is good, then we had a tape of him, horrible
7 tape of him saying how he was going to sabotage it. And
8 it was all, here he, here he rode on my plane. I'm
9 going who found this guy, all these guys, I didn't even
10 know where the red team came from.
11 Q. Yeah, he testified about a plane trip he took
12 with you to the symposium.
13 A. Yeah, and it was because I didn't know who he
14 was. We got there to drop off this thing and the Cyber
15 '15 Act, 2015 Act, to drop the information off so it
16 would go out everywhere.
17 Q. I'm speaking of the plane. You fly around a
18 lot, the plane that you were flying in during the
19 symposium, was that a plane that was leased or owned by
20 you or My Pillow?
21 A. No, it's --
22 MR. MALONE: Form.
23 A. It's in another account, I don't know who, it's
24 like a holding account.
25 Q. Okay.

1 company.
2 Q. Right. By the way, does My Pillow pay Lindell
3 Management for certain management services?
4 A. That I don't know either. You're going to,
5 you'd have to ask the controller, I don't know.
6 Q. Okay.
7 A. I don't know who, when that goes back. If we do
8 work, if Lindell Management does work for My Pillow, I
9 believe we have to get paid, you know, I'm sure there's
10 agreements there. This was set up back with the other
11 attorney I told you that worked in-house, by that
12 ███████ back in the day.
13 Q. ███████
14 A. He's no longer around. He works here for, he
15 works in Minneapolis, he worked for, I can't remember
16 the firm. It's a big firm, you'd probably, I don't know
17 where you live, but it's one of the bigger firms in
18 Minneapolis.
19 Q. Okay.
20 A. ███████ is what, ███████
21 that law firm, if you want to look it up. I think
22 that's where he's at, that's where he came from.
23 Q. My guess is Brad here next to me is looking it
24 up right now.
25 THE WITNESS: Do you know who they are?

**Page 262**

1        MR. KLOEWER: I'm looking them up right
2  now.
3        THE WITNESS: ███████ nice
4  guys.
5  BY MR. CAIN:
6    Q. All right.
7    A. Charge ███ an hour. Do you guys make that
8  much an hour?
9    Q. No comment.
10    A. Or are you making it on this, on frivolous
11  cases, consignment things?
12        MR. MALONE: They won't answer the
13  questions, Mike.
14        THE WITNESS: Well, he's asking me stuff
15  that has been completely irrelevant. I could ask him
16  some questions, that's crazy.
17        MR. MALONE: We'll do that later.
18    A. Who owns your airplane, who owns it, you know,
19  what does Lindell, what does it have to do with anything
20  you're talking about. Josh Merritt, I gave a ride to
21  the guy on my plane, the guy, I didn't know he was a bad
22  guy, but he's there, I don't know where he came from, I
23  didn't hire the guy. He sits up on the thing and says
24  this evidence is all good, and then two days later he
25  tries sabotaging the symposium. And then, and then he

**Page 263**

1  about two days or four days after the symposium we get a
2  tape that was taped two days before the symposium how
3  he's going to take, win the $5 million and sabotage the
4  thing. Just a disgusting person.
5    Q. This data we've been talking about, is it the
6  same data that, that you procured from Patrick Byrne?
7    A. I didn't purchase anything from Patrick Byrne, I
8  never dealt with Patrick Byrne on anything, purchasing
9  any data. What are you talking about and where did this
10  come from. Now you're starting to be stupid, now you're
11  really asking some questions. Where did you even get
12  that I purchased any data from Patrick Byrne. This
13  is the most out left field thing I've ever heard. What
14  do you want me to say, oh, no, I didn't purchase it. I
15  never purchased anything or got anything from Patrick
16  Byrne ever.
17    Q. Thank you.
18    A. My evidence came from Brannon Howse on
19  January 9th, you got that.
20    Q. Who did he get it from?
21    A. I don't know. Mary Fanning I believe, and then
22  they got it from Dennis Montgomery, that's, that's what
23  I've heard.
24    Q. Okay.
25    A. And did I know Brannon Howse and Dennis

**Page 264**

1  Montgomery, or did I know those guys, no. I had been on
2  Brannon Howse's show one time three months prior or
3  something.
4    Q. Did you pay Mr. Howse for access to the --
5    A. No, 100 percent, no. I never paid him a dime.
6    Q. You have not paid any amount of money or My
7  Pillow has not paid any amount of money for this data --
8    A. No.
9    Q. -- that you say is under gag order?
10    A. No, absolutely not, 100 percent no.
11    Q. Has Mary Fanning ever worked for My Pillow?
12    A. No.
13    Q. Have you ever met her?
14    A. No.
15    Q. Do you know if she's a real person?
16    A. Yeah, I've talked to her. She, she helped, she
17  helped in two movies, she's definitely a voice.
18    Q. She's definitely a voice.
19    A. Yeah.
20    Q. But you've never met her in person?
21    A. I've never met her in person. I've never met a
22  lot of these people you're talking about in person. I
23  met, I think I've probably met Joe Oltmann like four
24  times.
25    Q. Dennis Montgomery, does he --

**Page 265**

1    A. I met Dennis many times now because now he does
2  work for me.
3    Q. Okay.
4    A. Mike Lindell.
5    Q. He does not work for My Pillow?
6    A. No, absolutely not, he does not work for My
7  Pillow, never has.
8    Q. Just you personally?
9    A. Mm-hmm.
10    Q. Is that a yes?
11    A. Yes.
12    Q. It's just ambiguous if you say mm-hmm.
13    A. Yes, yes, yes.
14    Q. It's not clear what that means. Where is, if I
15  needed to locate Mr. Montgomery, where would, where
16  would I find him, if you know?
17    A. I think that's his -- once again, I don't want
18  you attacking him.
19    Q. Do you know where he lives?
20    A. Yes, I do.
21    Q. Do you have his contact information?
22    A. Yes, I do.
23    Q. Do you have his phone number?
24    A. Yes, I do.
25    Q. Will you provide that information to us?

1    A.  No, I will not because that's the last person I
2  want you to attack.  He's been attacked enough, you
3  guys, maybe not you, but Dominion makes a really good
4  case of that.  You want him, subpoena him.
5    Q.  I'm sorry, I missed the part about Dominion
6  makes really?
7    A.  Dominion has got his number and everything, you
8  guys call them up, I'm sure -- by the way, do you ever
9  talk to their lawyers, can I subpoena that, your guys'
10  text messages?  We'll have to talk about that afterwards
11  when we're off the record.  When we go out to lunch
12  tonight, let's talk about that, huh.
13    Q.  I already had lunch.
14    A.  Oh, okay, dinner.
15    Q.  Oh, you mentioned, let's stick on the symposium.
16  We talked a little bit about --
17    A.  Do a lot of people call you Perry Mason?
18    Q.  No.
19    MR. MALONE:  Mike, just answer questions,
20  let's keep it moving here.
21    A.  Okay.  Did I mention what?
22    Q.  You had mentioned you had to get back, you had
23  food to order, this is for the symposium.
24    A.  Yeah, because nothing was planned.
25    Q.  Why was that, why was nothing planned?

1    A.  Because I was just going to get up there for
2  72 hours myself and just talk, talk and put evidence
3  out, that's all I was going to do.  It was nothing
4  planned.  I had, the food was all planned, but I
5  micromanage, I wanted to make sure that everyone had a,
6  where their seating was, where the food was, because the
7  continuous food, I didn't want anyone, I wanted everyone
8  to be attentive.  I wanted to, it was a big thing to me,
9  everything was on the line.
10    I wanted to, you know, these guys are sitting
11  there trying to put evidence in a thing or whatever, we
12  had to get there.  And a copy he said could have took up
13  to two, three more hours and I was, you know, wanted to
14  get there and make sure that they, as people come in to
15  set the thing up and make sure everybody, everything was
16  right, you know, from food to seating to everything.
17  You know, this was put on, this was an event put on at
18  the spur of the moment basically, you only had, what,
19  three or four weeks when I decided to do it because, you
20  know.
21    Q.  Okay.  And, and My Pillow produced a spreadsheet
22  with the some of the expenses associated with that.  Let
23  me just show you this real quick.
24    A.  How would My Pillow produce that.  This is
25  Lindell Management you mean.  My Pillow had nothing to

1  do with any expenses at the Cyber Symposium, just let's
2  make that clear in the record.
3    And I had people that had My Pillow emails, they
4  worked for Lindell Management, that's their email, okay.
5  They don't work for My Pillow, that's still their email.
6  They might have worked for My Pillow at some point like
7  my niece.  You probably got this, my niece ███████
8  ███████ works for, she's my chief of staff at Lindell
9  Management.  That's probably where you got those, so
10  don't say you got them from My Pillow.
11    Q.  My Pillow produced them is what I'm saying.
12    THE WITNESS:  Why would My Pillow give it
13  to them, how did they get them?
14    MR. MALONE:  Mike, we'll talk about that,
15  just answer his questions.
16    A.  Okay.  I haven't seen them, I can't see it, I
17  want to see it, where are they.
18    Q.  It's because you haven't stopped talking and so
19  they can't mark it yet, so let her mark it.
20    A.  Okay.
21    (Exhibit 67 marked for identification.)
22    Q.  Okay.  Before she marked this we were talking
23  about expenses.
24    A.  Yeah.
25    Q.  Have you ever seen this --

1    A.  No.
2    Q.  -- spreadsheet before?
3    A.  No.
4    Q.  And it had a column, the second page is I guess
5  the last column, it that just bled over.
6    A.  Mm-hmm.
7    Q.  But in terms of the expenses associated with the
8  Cyber Symposium, you just testified that that would not
9  have been incurred by My Pillow?
10    A.  That's correct.
11    Q.  Okay.  Does, do you know who incurred those
12  expenses?
13    A.  Lindell Management.
14    Q.  Okay.
15    A.  Lindell Management put on the whole thing.
16    Q.  Okay.  Lindell Management.
17    A.  Yep, Mike Lindell, which is I'm 100 percent Mike
18  Lindell.
19    Q.  Okay.  And did Lindell Management get reimbursed
20  for any of these expenses from any third-party?
21    A.  No.  Lindell Management paid these.  And if
22  there wasn't money in the Lindell Management account,
23  Mike Lindell had to personally pay for it in there.
24  It's possible that this was a check written out on Mike
25  Lindell, you know, but it was Lindell Management.  So

1 then, you know what I mean, they're kind of like one in
2 the same, but I would, everything was done through
3 Lindell Management.
4    Q. Gotcha. Is that the same for, for example,
5 rallies, if you're, if you're hosting a rally?
6    A. I don't host rallies. I did one Frank, two
7 Frankspeech, that was Frankspeech.
8    Q. Okay.
9    A. I did a Frank rally in Mitchell, South Dakota
10 and I did Frank one in, a Frank thing in Wisconsin,
11 that's the only two events. The other things were Cyber
12 Symposium, which would have been Lindell Management, and
13 then the Moment of Truth Summit which was Lindell
14 Management.
15    Q. Okay. How is it that Lindell Management is
16 going to be realizing any income from, for example,
17 hosting or producing the Cyber Symposium?
18    A. They wouldn't. We were managing, they wouldn't.
19 They didn't make, zero, what do you mean, we went in the
20 hole.
21    Q. That seems like a bad business decision.
22    A. It is. Lindell Management is a management
23 company, that's all it is, it's a management company, so
24 it's --
25    Q. But there wasn't any mechanism in place for that

1    Q. All right. But my, my question is, you have a
2 Lindell Management email account. When do you use that
3 as opposed to My Pillow?
4    A. I, I never do. I just quick grab whatever
5 email. Originally when those were set up when Lindell,
6 once again that ███████ to keep everything
7 structured he said let's do it Lindell Management. This
8 is when they were going to do work for, when we got
9 people, tech people that were working for other things
10 like My Pillow and when we had the Lindell Foundation
11 and the Lindell Recovery Network, all these things,
12 that's what Lindell Management would do, work for their
13 charitable work.
14    So at that time, I think it was ███████ said
15 let's do separate emails for that, and even on Lindell
16 Foundation when I had that. I just never used it
17 hardly, you know, when it was set up, I just didn't use
18 it, you know, very seldom. If I do, it would go there
19 by default. I bet you could check back the last three
20 months and I probably have one use.
21    Q. Let's, let's try to do question and answer, if
22 we can.
23    A. All right.
24    Q. Because we're getting long in the day.
25    A. Yeah.

1 company --
2    A. To make zero, that's correct.
3    Q. And so when is it that your -- well, let me just
4 show you a couple of emails. Because you mentioned
5 this, so that's why I pulled out this folder. You said
6 something to the effect of just because they're using a
7 My Pillow email address doesn't mean they're working for
8 My Pillow?
9    A. That's correct. I have a My Pillow email
10 address because that's my email. I have many people
11 that have a My Pillow that either don't work for them
12 anymore, but they kept their email, you know, some of
13 them.
14    Q. Okay. I'm not making judgments here.
15    A. Just like MyStore, that would be another one.
16 They might still have a My Pillow email, even though
17 they no longer work for My Pillow, they work for
18 MyStore.
19    Q. All right. But you have a, you have a Lindell
20 Management email?
21    A. I use, 99 percent of the time I use my My Pillow
22 email, 99.9.
23    Q. Okay.
24    A. And very seldom do I ever email, I text, as you
25 know.

1    Q. She's going to mark this next exhibit.
2    (Exhibit 68 marked for identification.)
3    Q. This is Exhibit 68. And this appears to be an
4 email between you and Dr. Shiva, is that right?
5    A. No, this says, "Dear Alan," I don't know who
6 Alan is, I don't know who Alan is. I don't know who
7 this Alan is, I have no idea.
8    Q. Okay.
9    A. And I probably, I never read this email, just so
10 you know that, ever.
11    Q. I didn't ask you if you've read it. If you look
12 at the top, the reason I said it's an email from --
13    A. Oh, Alan Duke, I do know Alan Duke, I'm sorry.
14    Q. And on the top it looks like Dr. Shiva is
15 sending you this at Lindell Management, do you see that
16 up top --
17    A. Yep, yeah.
18    Q. -- Mr. Lindell. Thank you. Okay. So this
19 would be an example of when you, one of the few times
20 that you would get an email --
21    A. No, he, he, this was given to him on a card. I
22 never used Lindell Management. He, I get stuff sent to
23 me because I, obviously he got a business card, some,
24 whatever he got for Dr. Shiva, he probably got a
25 business card from my assistant.

| | |
|---|---|
| 1      Now I'm going to explain this, now I remember. | 1   people call my call center, and these are upset people |

Now I'm going to explain this, now I remember.
So I had an assistant back then, not ▮ another
assistant where we made up cards, Lindell Management
cards, okay, so that I wouldn't, you know, and on that
card had an email. People would ask me all the time for
a card and I didn't want to use My Pillow, I wanted to
use Lindell Management. So I used that email on that
card. So obviously this guy got one of them cards. I
don't ever converse on the Lindell Management, I bet you
I didn't even respond to this, you know.
Q. Okay.
A. This is, other than incoming, give out business
cards that, you know, here, I want a business card,
well, here, use this. And once again, I think the
assistant then could pull them up and segregate them,
like people who wanted my picture and wanted my card.
And obviously Shiva got one. What's the date on this?
Q. February 18, 2021.
A. Yeah. So that would have been the only thing.
He probably got a, he probably got a business card with
that on that. I don't even remember how he ever got
ahold of me.
Q. Did Dr. Shiva perform any work or My Pillow?
A. No, no.
Q. As a consultant?

Page 274

people call my call center, and these are upset people
or anybody, and they bug them enough, because they're on
the phone, they have to, at a certain point I said if
you can't handle the customer and if they're adamant, I
gave them this ▮ email to use. It goes into a generic
box to a team that just covers like customers that are
upset. Deviations, you know, deviations. Like this
guy, he says, so he was probably very upset, you are
very difficult to make contact, I called and waited 20
minutes, I'm not, so he was very upset. Anybody that's
so upset about anything, they give them that ▮ email.
Q. Gotcha. So this particular email relates to, if
you look in the middle, it actually relates to Dr.
Coomer, do you see that?
A. Yep.
Q. Do you remember receiving this?
A. No, I never read this email. I don't read the
▮
Q. Okay. At all?
A. No. They would be, ▮ go to a team and
usually they've been ordered, back then we got thousands
of emails, customers and stuff, so they, so what they do
is they go through and take care of the My Pillow
customers. Everything else they're ordered to, we
consider a junk mail.

Page 276

A. No, nobody did, no, absolutely not.
Q. All right.
A. He's talking about, this is, this is Alan Duke,
he's Lead Stories of the Facebook fact checkers.
Q. You can put that aside.
A. What?
Q. You can put that aside.
A. Okay.
Q. Let's go to 69.
(Exhibit 69 marked for identification.)
Q. This is the email portion of your deposition,
Mr. Lindell, so we'll just look at a few. You should
give one to your counsel.
Okay. Exhibit 69 at least purports to be, and
it's been produced I guess twice in this litigation,
purports to be an email from some person named Mark
Debarbieri?
A. Yep, yep.
Q. To Mike Lindell at ▮, do you see
that?
A. Mm-hmm, yep.
Q. Do you know who this person is?
A. No idea.
Q. Do you know how he got your email address?
A. Yes, I can, that's an easy one to explain. When

Page 275

Q. Okay.
A. This was never read by me, probably looked at,
boom, gone.
Q. Okay. And I'm not asking about the lumpy pillow
calls.
A. No, they're not lumpy pillows, that's not what
they call on, okay. When you say lumpy pillows, now
you're an asshole, you got that, you're an asshole is
what you are.
MR. MALONE: Mike.
THE WITNESS: No, he's an asshole, he's an
ambulance chasing asshole.
A. That's what you are. Lumpy pillows, kiss my
ass. Put that in your book. No, they, they answer
anything, any problem customer that wants to reach Mike
Lindell, those are the ones, I want to talk to Mike
Lindell, I want to talk to Mike Lindell. They send them
to here and they go, and they call about maybe they
didn't get their pillow on time because of the Fed Ex or
whatever, but we'll cover it even though it could be
somebody else's fault. Nobody calls because of a lumpy
pillow. But good, good one though.
Q. Are you done?
A. Yeah, I'm done.
Q. What I'm saying --

Page 277

70 (Pages 274 - 277)

1    A. Obviously you don't have a My Pillow too, you
2   don't, do you.
3    Q. What I'm saying is, Mr. Lindell --
4    A. Asshole. But go ahead.
5      THE WITNESS: No, I'm pissed.
6      MR. MALONE: I understand.
7    A. Yeah, go, when you're saying what.
8    Q. The non-customer product complaint calls.
9    A. Anything that comes in where the customer,
10  there's a, they can't get, they got to get, get to, they
11  can't solve the problem if the customer wants to talk to
12  Mike Lindell or if they want to talk about the weather
13  being bad. They say, they, they go give them ████ and
14  it goes into another team of people.
15   Q. Okay.
16   A. And this team take anything that's unrelated to
17  My Pillow and throw it in the garbage.
18   Q. Okay. That's where I'm going. To the extent
19  that My Pillow is receiving emails from people like Mr.,
20  I'm going to butcher his last name, Debarbieri --
21   A. Nobody, the only ones that know --
22   Q. Let me finish my question, please.
23   A. Well, then, okay. Then make sure you be
24  specific. Because people don't, now you asked me how
25  they got that email address. I don't publish it for

Page 278

1   everybody. I don't, people try and reach me all the
2   time for different things. You don't have that luxury
3   of being, have people, everyone on the street wants your
4   email whether to get a picture or whether to attack you
5   or whatever it is, you know, people like you that
6   probably can the phone. But go ahead.
7      I give, they give them the email, it's a thing,
8   catchall so they don't have to take the wrath or an
9   attack or to say I want to talk to Mike Lindell, come
10  on, come on, come on, it's easy, they give them this
11  email. You asked how they got the email, that's it.
12  It's the only way they can get ████████.
13   Q. Do you need to take a break?
14   A. No, I don't need to take a break.
15   Q. All right.
16   A. Your lumpy pillow question kind of set a nerve.
17  Because obviously, just like your question in here in
18  your little complaint, Mike's frivolous Cyber Symposium.
19  This whole case is frivolous, you should be ashamed of
20  yourself. But go ahead, finish your question on this
21  and try not to talk about, I get personal when you
22  bad-mouth my employees or my pillows or anything like
23  that. Go ahead.
24   Q. I haven't said a single word about your
25  employees and I don't own --

Page 279

1    A. You've attacked them, you attacked them, you're
2   part of this, you're getting paid on consignment, you
3   get paid if they get money from my employees, yes, you
4   have attacked them. You personally did this, the
5   Newsmax, you and I call it right out, the criminal
6   lawyers and Coomer when you guys did this to me.
7    Q. Do you not think that, that Eric Coomer rigged
8   the election?
9    A. What?
10   Q. Do you not think that Eric Coomer rigged the
11  election?
12   A. I said, Eric Coomer didn't, I didn't say that, I
13  didn't say that. I said Dominion, they used Dominion
14  machines and all machines. I'm not specific just to
15  Dominion, ES&S, Hart, all of them, we've got to get rid
16  of the computers in our election. I never said anything
17  about Eric Coomer. I called him a traitor what he did
18  to My Pillow and Newsmax.
19      Chris Ruddy called me up and says, sorry, Mike,
20  you can't come on anymore, this guy, I don't know, let's
21  make a deal. Were you involved in that deal? You hurt
22  a lot of innocent people is what you did because that
23  day we couldn't go on. Like right now when we're
24  overdrawn I can't go on Newsmax and say, hey, we got the
25  new My Pillow 2.0, my employees thank all of you, like I

Page 280

1   used to do, I'm their host. I can't do that anymore
2   because of you and Coomer. That's reality, that's cost
3   us hundreds of millions of dollars.
4      When I'm done with this, you wait, if there's
5   any way to get your wallet it's going to be, that's what
6   we're going to do because you've hurt us so bad, it's
7   disgusting. And then you call it a lumpy pillow. Put
8   that in there too, huh, are you going to put that out
9   there. Did you use a My Pillow, how dare you. Are you
10  reading this stuff, I don't get it, you're worse than
11  the media. So keep going.
12   Q. I think there was a question in there.
13      MR. CAIN: I'm going to object as
14  nonresponsive.
15   A. The question, the question you asked me, how did
16  they get the ML. I've never read this, anything that
17  came across. We get stuff all the time, it goes right
18  in the garbage.
19   Q. So to that point, the emails that come in that
20  get filtered into ██████████.
21   A. That's correct.
22   Q. -- that relate to, let's say it's someone like
23  this gentleman who's calling about or emailing about
24  Coomer or Dominion.
25   A. Garbage.

Page 281

71 (Pages 278 - 281)

Page 282:

1  Q. That gets deleted, trashed?
2      MR. MALONE: Objection, asked and answered.
3  A. Obviously you got it off the server, I don't
4  know what they do with it. They put a thing that it's
5  been looked at. They go down, they're here to take care
6  of our customers. That's what My Pillow is, if it's
7  non-customer related, it goes bing.
8  Q. If I wanted to see --
9  A. This email was never answered, I guarantee it,
10  because you wouldn't answer it because then you're
11  engaging with people that have nothing to do with My
12  Pillow.
13  Q. I didn't ask if it was answered. What I'm
14  trying to find out is how many people are sending emails
15  to My Pillow about things like election security or Dr.
16  Coomer?
17  A. You did, obviously you did a search, a search of
18  our whole company. I don't know, how many did you get.
19  People call us for other things. If somebody calls
20  that's non-related to My Pillow it goes into ▮▮▮▮ and
21  then these guys look at it and they don't answer them.
22  They have orders, don't engage them. It's just gone.
23  Is it deleted, I don't know if it's deleted, but they're
24  able to get them. They're probably in trash, we don't
25  double delete ever.

Page 283:

1  Q. When ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  A. Yeah.
3  Q. Would he be in charge of the IT relating to --
4  A. No, it's a whole another department. Todd is in
5  the back end of Websites and stuff. This is different,
6  this is emails.
7  Q. Okay.
8  A. This is emails. It's a whole, if you did a data
9  search that looks like this is where this is coming on
10  your little discovery, everything that had the word in
11  there that if you got one, that's what you got. I never
12  seen it, I would never see these, ever.
13      Back then if they called, I had to do this
14  because my customers, my, my call centers, they were
15  being either attacked or most people went, hey, I got
16  stuff, I got evidence, I got evidence. You know what, I
17  got my own evidence, I don't want to talk to you guys
18  and waste my time, that's, you know, so we just put a
19  filter in, that's all. We had the same filter in before
20  this stuff. Any problem stuff that with ▮▮▮ related, any
21  deviation, anything they couldn't get rid of the
22  customer where they had to have, here, you can email
23  Mike personally. And the ▮▮▮ go with that, it's a team,
24  I'll give you an email because they all want to be able
25  to contact, here's an email.

Page 284:

1      My team would say, hey, if it was My Pillow
2  related, this would be the extreme where if it was
3  something extreme that, I don't know what it would be.
4  My Pillow, we had one time where we kept getting pillows
5  where they said it was opened up, it turned out it was a
6  scam, they were showing us the same picture. That would
7  go into there, it kept going in there. And then this
8  team is very trained in what, you know, what to do with
9  the customer to make them happy.
10  Q. What's, what's their training as it relates to
11  people calling irate on the 800 number --
12  A. Not just irate.
13  Q. Hold on. Please just let me finish one
14  question.
15  A. Okay.
16  Q. Calling irate about the election fraud issues?
17  A. Nobody called, I don't know back then. All I
18  know is if it's not related to My Pillow or if they have
19  a problem with My Pillow, if they need, if they want to
20  get to Mike Lindell. That's why I set up the ▮▮▮▮
21  I set it up a long time ago, way before this. And when
22  this, when we started getting it, we got calls from
23  people attacking us, like when the box stores were
24  dropping, we got attacked by people, death threats, many
25  death threats and stuff that I got. So these people,

Page 285:

1  they go here's an email. And then some, we turned some
2  into the cops if it was really a death threat.
3      But if they call, and rather than, so we could
4  get them off the phone instead of focusing on My Pillow,
5  send them there. Or if it was some problem that they
6  were, you know, if it was against our parameters. Let's
7  say it was a pillow, I'll give you an example, something
8  that was out of the 60-day money back guarantee and
9  they're a half a year later and they're, so it's either,
10  it's a scam, they're trying to return something that
11  maybe it was a bed or something or, I don't know, you
12  name something. And then they'd have since it's outside
13  the parameters, email ▮▮▮▮ That's what it was
14  originally set up for, then they're outside of the
15  parameters. Every company does it, outside of their
16  lane. So then they say here.
17      And it would always come -- I'll give another
18  one why it was set up originally. We had a thing on TV
19  once, buy one get one free, okay, if you remember,
20  that's a lot of my ads, buy one get one free. These
21  people swore there was a price up there, and there never
22  was, I never had any ad back there with a buy one get
23  one free. So we finally had to send them, we sent them,
24  they would argue, so we sent them to ▮▮▮ And then
25  these guys, we came up with a thing, they would have to

1 interact and say, hey, if you find a screen shot, you
2 will get a reward, you know, you have to take a screen
3 shot, okay. So it solved that problem because people
4 really believed that even though it wasn't true. So
5 that was set up.
6      So anything with the election, whether it was
7 good, even if it was good, hey, I got, like right now if
8 they called up and said, hey, I got a good invention for
9 Mike on MyStore, I need to talk to him, I need to talk
10 to him. My reps instead of saying I can't talk to him,
11 there's no way you can get to him, but does he have an
12 email, you know what, here's his email, that's it,
13 because they don't have time. My Pillow has to
14 function, it doesn't have time to talk about the weather
15 or whatever. So these things go there.
16      And this thing here would have been deleted or
17 at least unchecked and it's sitting there in the server.
18 It was, nothing ever gets double deleted because if they
19 come back to us we have to be able to show the
20 conversation with them. We do that to protect our
21 company.
22      MR. CAIN: Objection, nonresponsive.
23 Q. I'm just trying to get a sense of how many
24 people call your company about the election fraud
25 issues?

Page 286

1 with every keyword you gave. There you go.
2 Q. Thank you.
3 A. Yeah, now you got your answer. You already knew
4 the answer, you just was hoping there was more I think.
5 It sucks that you're not going to win all this money,
6 huh. Don't you feel it slipping away because you're all
7 wrong and you realize you shouldn't have done this.
8 Q. I'm not sure you understand how you're
9 perceived.
10 A. I don't care how you think I'm perceived. Let
11 me tell you how you're perceived. You're perceived as
12 an ambulance chaser, you're the reason what's wrong with
13 this country with lawyers, you're disgraceful is what
14 you are.
15      When I read this thing again last night, I
16 thought, one paragraph after you came after me. I
17 didn't know this, whatever this Oltmann, I didn't know
18 him then and I barely know him now. And you guys, and
19 you guys, all the stuff back then the only thing in here
20 was one statement I made after you attacked Newsmax,
21 after Coomer attacked Newsmax. That's the only
22 statement I made, period, I didn't know who Eric Coomer
23 was.
24 Q. We're recycling old testimony. I didn't ask you
25 about that either. So let's, let's stay focused because

Page 288

1 A. How many to nowadays, probably, I don't know,
2 none, a few. Back then in January of '21, a lot. They
3 were all calling in attacking and then, and then we were
4 losing our box stores, you know.
5 Q. They, they were emailing too?
6 A. Not emailing, no. The only to an email
7 probably, I don't know, maybe one a month. I don't
8 know, whatever you got is what we have. Whatever you
9 got, then you know the number. If you did, if you did,
10 had us do a search, whatever you got. And believe me,
11 these guys did it all on their own, the lawyer said, no,
12 we got this third-party to do the stuff, didn't I, I was
13 very adamant about that. You can kiss my butt I said.
14 He goes no, Mike, we have to get them. I said there's
15 no emails that we have between with any of these things.
16      MR. MALONE: Mike, Mike, you know what I'm
17 going to say?
18      THE WITNESS: What?
19      MR. MALONE: You don't have to tell them
20 about what we talked about.
21      THE WITNESS: Okay.
22 A. No, I'm just saying, every, you have every one.
23 So you have your own answer.
24 Q. Okay.
25 A. You have every single one ever done at My Pillow

Page 287

1 we only have a little bit more time.
2 A. Okay.
3      THE WITNESS: My A plus went out the
4 window.
5      MR. MALONE: Just keep it moving, Mike.
6 Q. By the way, I'm not responding to your name
7 calling and I'm not responding to --
8 A. I know, but I did respond when you said
9 something about my product that about 2,000 employees
10 rely on and they have families. And for you to have,
11 I've sold 80 million My Pillows in 14 years. You don't
12 have one, so you have no right to say that. You took
13 that right off of your corruption that you do. You're
14 probably the one putting out the narrative, it sure
15 seems like it.
16      I read some of the crap in here that you wrote
17 in your brief that's disgusting. The lies in here. One
18 of them says after Mike was with Donald Trump in 2017 at
19 a manufacturers summit, he started doing promo codes on
20 Fox. I was doing it ten years prior. This is a big
21 lie, you're a lying lawyer.
22      MR. MALONE: Mike, you're going to let him
23 finish what he's going to say and I'll object if --
24 A. Go ahead.
25 Q. I'm not going to respond to your personal

Page 289

73 (Pages 286 - 289)

1  attacks.
2    A. That's fine.
3    Q. My reference to a customer complaint relating to
4  a pillow, I'm sure you've had some customer complaints
5  in the past.
6    A. You said lumpy, where did you come up with that?
7    Q. Maybe they didn't like their pillow.
8    A. No, where did you come up with lumpy?
9    Q. That was a hypothetical to separate it from
10  people --
11    A. Where did you come up with that name?
12    Q. To separate it, let me finish, from people who
13  were calling or emailing about the election fraud
14  issues.
15    A. Okay.
16    Q. Okay. So non-customer.
17    A. I'll take your apology. Let's go, keep it
18  moving.
19    Q. Okay. Well, you need to understand the context.
20  And I'm not apologizing.
21        MR. CAIN: Okay. Let's mark the next
22  exhibit.
23        (Exhibit 70 marked for identification.)
24    Q. Okay. Now this is an email, while you're
25  reviewing it to familiarize yourself with it, this is an

Page 290

1  email that was actually produced by Brannon Howse, and
2  you can tell that because it's got his name on top, do
3  you see that?
4    A. Mm-hmm.
5    Q. Is that a yes?
6        MR. MALONE: Mike, you have to respond
7  verbally.
8    A. What was the question?
9    Q. I said this is an email produced by Mr. Howse,
10  you can see that by --
11    A. Yeah, yeah, yeah, RJ Johnston, yes.
12    Q. Okay. All right.
13    A. RJ Johnston, yeah.
14    Q. Yeah. And RJ Johnston is who?
15    A. He, he ran, RJ Johnston ran Johnston Howse, a
16  company called Johnston Howse for Frankspeech, they ran,
17  they built Frankspeech, the back end, the
18  infrastructure, everything.
19    Q. Okay.
20    A. And at that time he ran different things like
21  the emails, he subbed out the email people, he
22  subcontracted everything out, everything.
23    Q. And you can see that this email relates to a
24  rally?
25    A. Yep, the one in, the one in Wisconsin, correct.

Page 291

1    Q. Okay. And then you can also see -- what rally
2  was that, by the way?
3    A. It was a, it was a rally, there was probably
4  16,000 people, I spoke, Diamond & Silk, it was in
5  northern Wisconsin.
6    Q. Okay. About election issues?
7    A. What's that, election issues?
8    Q. Yes, sir.
9    A. Absolutely.
10    Q. Okay.
11    A. And no tickets were sold, that's, are you going
12  to ask me. Keep going.
13    Q. Well, it references that.
14    A. Yeah, I don't know why he put that. We didn't
15  sell any tickets, it was a free event, it cost me, that
16  event cost me a half a million dollars out of my pocket.
17    Q. You personally?
18    A. Yep.
19    Q. All right. You can see on the bottom that ███
20  ███████ is sending an email to Janet Lynn?
21    A. Yep.
22    Q. And others?
23    A. Yep.
24    Q. Copying you?
25    A. Yep.

Page 292

1    Q. At your My Pillow email?
2    A. Yeah, he used it, he's one, he works for Lindell
3  Management. He still has a My Pillow email. At one
4  time he worked for My Pillow, a long time ago.
5    Q. Okay. But this is in June of 2021.
6    A. Right. So he was working for Lindell
7  Management, not My Pillow, he was using his My Pillow
8  email.
9    Q. Well, it indicates that he's ███████
10  ████████████ for My Pillow.
11    A. "Attached is a Web optimized version of the
12  poster if you want to use it for Frankspeech," he was
13  doing work for Frankspeech. This is to RJ Johnston.
14  ███████████ helped, had to, he
15  was my, my eyes over at Frankspeech with all these RJ
16  Johnston and all these stuff. I had to get ████████
17  to watch them constantly because, you know, to this.
18  He's optimizing Frankspeech for this Website, or for
19  this event. And what it says here as of a few minutes
20  ago, whoever wrote that, ███████ didn't realize
21  because he's IT. We didn't sell any tickets, there were
22  no price, it was just, what he's saying, we had this
23  many signed up for the event.
24    Q. Do you have an explanation as to why he's
25  holding himself out as the chief technology officer for

Page 293

Page 294:

```
 1   My Pillow?
 2          MR. MALONE:  Object to form, foundation,
 3   scope.
 4      A.  What's that?
 5      Q.  He's making an objection.
 6      A.  I, I'd have to call him right now, whether he
 7   was, he was working for Lindell Management.  He uses
 8   that, he was the chief technology officer for My Pillow.
 9   I don't know if he's, if it's My Pillow or Lindell
10   Management, but he's obviously using his email.  He used
11   an old template there, that's the only thing I can tell
12   you.
13      Q.  Is he an employee of My Pillow, do you know?
14          MR. MALONE:  Same objection.
15      A.  I, I would have to call and ask him, I would
16   have to call and ask him, I really would, I don't know.
17   He's either My Pillow or Lindell Management.  He was
18   doing, he does most his work or all of it for Lindell
19   Management.
20      Q.  But why would, you said he's either My Pillow or
21   he's Lindell Management.
22      A.  He was My Pillow at one time, here is his title.
23      Q.  I heard your answer to that.
24      A.  Right.
25      Q.  My question is --
```
Page 294

Page 295:

```
 1      A.  At least three years he's been, he was
 2   definitely Lindell Management with this thing on here,
 3   so he hasn't changed his, his header on his thing.
 4      Q.  My question is, why if he's working for My
 5   Pillow in fact is he doing Web optimization for this
 6   event?
 7          MR. MALONE:  Object to form, foundation.
 8      A.  I just told you, he had, My Pillow did not
 9   employ him to do that.  He was working for Lindell
10   Management, for me.  My Pillow had nothing to do with
11   that event.  There wasn't an ad at that event, there was
12   zero at that event, period.  Frankspeech, Frankspeech,
13   if there was no even, we didn't even have ads back then,
14   we had nothing.  They were, the Website he's talking
15   about is a poster that for people to sign up on a, on a
16   sheet how many people were signed up so we knew what to
17   expect, that's all it was.
18      Q.  All right.
19      A.  He was not working for My Pillow.  My Pillow had
20   nothing to do with it, no ad, no nothing.  This, when
21   he's talking about the Website, it's a one-page thing
22   that we sent out from Lindell Management at Frankspeech,
23   hey, sign up for this event, that's it.  We didn't sell
24   tickets, zero tickets.  I can show you the Website he
25   made, it was a poster of the people that were going to
```
Page 295

Page 296:

```
 1   be there, me, Diamond & Silk, it was a collage, Charlie
 2   Kirk, Dinesh D'Souza, his daughter.  It was a collage of
 3   people.  Now Frank, I think we called it the Frank,
 4   Frank, I can't remember, Frank something, and it was to
 5   get Frankspeech to get them to get us noticed that we
 6   had a Website.
 7      Q.  ████████ is also on this email chain.
 8      A.  She works, she's my chief of staff for Lindell
 9   Management.
10      Q.  Okay.  She also has a My Pillow --
11      A.  I told you that earlier in the conversation.
12      Q.  Yes, you did.
13      A.  There's only a few ████████████████████
14   They used to years ago, maybe four years ago they worked
15   for My Pillow.  We kept their email because, their same
16   email because we go back and forth.  That's just their
17   email.  It would be like if you had a gmail.com.
18      Q.  Okay.
19      A.  They, they, they do work, they work for Lindell
20   Management, but they have My Pillow emails.
21      Q.  Okay.  That's why I'm asking you the questions
22   to find out what your answer is.
23      A.  But I already told you about ██████  In fact, I
24   named all the ones.  I told you ████████████████
25   ████████, there's ██████████ would be another one, she
```
Page 296

Page 297:

```
 1   works for MyStore, but she still has a, I think she has
 2   a My Pillow address, she used to work at My Pillow, but
 3   she works for MyStore, but she works under Lindell
 4   Management doing work for MyStore.
 5      Q.  And I think you said you lost, I may be blurring
 6   the rallies, about a half million dollars on this one?
 7      A.  That one cost me half a million.
 8      Q.  This one?
 9      A.  This rally, it was free for the public.  And we
10   had to do a lot there, we brought in a big screen, we
11   brought in stages, we brought in, we bussed people in,
12   we hired a company to bus people in.  The whole purpose
13   of this, we had just come up with Frankspeech, I was
14   afraid of losing my voice because when the media does an
15   attack I still need to get my voice out there, and we
16   were doing this to make, so people would know about
17   Frankspeech, the Website, and that was it.
18      Q.  Okay.  Thank you.
19      A.  I told them at this one, I didn't even tell
20   about election what you said, my story was about
21   redemption, I told my coming to Jesus from out of crack
22   cocaine, that was my speech at that one.
23          (Exhibit 71 marked for identification.)
24          COURT REPORTER:  Can you, the blue ones,
25   can you make sure they stay over here.
```
Page 297

75 (Pages 294 - 297)

1       MR. MALONE: Yes. Mike, we are going to
2  make sure the blue ones stay over here, these are the
3  official exhibits.
4       THE WITNESS: What do you want me to do
5  with this?
6       MR. MALONE: Just look at it and give me
7  one.
8       I'm going to request that we receive the entire
9  Howse production, which appears to be this Exhibit 72 as
10 well as Exhibit 71. We have not received any documents
11 from the Howse production yet.
12      THE WITNESS: Okay, okay.
13      MR. CAIN: Did you ask for them from
14 Aubrey, is it Aubrey? And I'm, I'm not obligated to
15 give them to you, but I'm happy to do so. Do you know
16 who Aubrey Greer is?
17      MR. MALONE: No.
18      MR. CAIN: Okay. I thought maybe he had
19 done some work with you. Okay. But I'm happy to give
20 them to you, that's not the point, but.
21      MR. MALONE: Sure.
22      MR. CAIN: I didn't think I was obligated
23 to do to.
24 BY MR. CAIN:
25   Q. Okay. Mr. Lindell, Exhibit 71 is kind of
                                              Page 298

1  similar in nature to some of the others we looked at.
2    A. Yes.
3    Q. But this one is about the Cyber Symposium, do
4  you see that?
5    A. Yeah.
6    Q. Okay. And I think you testified earlier that
7  you were detail, you got into the details, it sounds
8  like you get into the details of events like the Cyber
9  Symposium, right?
10   A. What it's going to look like to the customers,
11 yes.
12   Q. Yeah. And in this instance, this email appears
13 to be just maybe about a week before the actual
14 symposium itself.
15   A. Okay.
16   Q. Is that right?
17   A. Yep.
18   Q. August 2nd?
19   A. Ten days I guess.
20   Q. Okay. And this is, this woman, Dr. Janet Lynn,
21 do you know who she is?
22   A. Yeah.
23   Q. Who is she?
24   A. She's some gal from Wisconsin and she helped
25 with the, she is an event coordinator is what she is.
                                              Page 299

1  She helped with the Frank rally, that's what it was
2  called, the Frank rally we did in northern Wisconsin.
3  She had, she knew the people at the venue, she does
4  venues, so she did a good job there so we hired her as
5  one of the people helping out here.
6    Q. And it looks like this message was forwarded to
7  you and to Kurt Olsen and to ████ and ████ is the
8  young lady that's here today, right?
9    A. Yep, yep, yep.
10   Q. And to Brannon Howse.
11   A. Right.
12   Q. Do you see that?
13   A. Yep.
14   Q. Now how is it, we talked about Kurt Olsen before
15 and you said he does not work for My Pillow?
16   A. That's correct.
17   Q. How is that he got associated with the
18 symposium?
19   A. Okay. By the way, you notice I use My Pillow, I
20 never use the Lindell Management, it's just always
21 ████████████
22      Kurt Olsen, I met Kurt Olsen on, in February of,
23 late February of '21, and I met him and he had done, I
24 found out he had done the, the case, the Pennsylvania
25 versus Texas case. So he had, he was the lawyer and,
                                              Page 300

1  and he, him and I at that time, I showed him everything
2  I had with the Dennis Montgomery and that's how, how he
3  got involved. We've been pretty much inseparable since
4  then, I was using him for a lawyer, you know.
5    Q. Do you know how he's compensated?
6    A. I didn't pay him. He was working for free to
7  save our country, that's a fact, working for free.
8    Q. A volunteer?
9    A. Yes, he has been doing that for as long as I can
10 remember, since, since back then. He loves his country
11 and all he does is get attacked by people like you too.
12   Q. Are you saying I don't love my country?
13   A. I don't know. Look what you did to, look what
14 you did to Made in America to employees, USA employees.
15 I don't know what you do. It doesn't appear. You're a
16 money hungry lawyer, that's what it appears to be.
17   Q. Are you concerned if you resign from the company
18 you're going to lose this platform you have to talk
19 about these important election issues?
20   A. What, if I resign from what?
21   Q. Your company.
22   A. If I resign from my company, if I die tomorrow
23 My Pillow, My Pillow, whatever it is, maybe, maybe
24 they'd stop attacking them, if that's what you mean. If
25 I, if I, you know, if I resigned and said okay, you
                                              Page 301

76 (Pages 298 - 301)

Veritext Legal Solutions
800-336-4000

1 guys, quit attacking My Pillow, ain't going to happen.
2 They hate, they absolutely hate, they being China,
3 whoever attacked us, they want Mike Lindell gone, they
4 want to bury me, they want to take every, even, they
5 want to take my money, no matter what. I would have to
6 do so, I don't have any money to fight this cause.
7      So over here they would continue the attack
8 because they know that I'm a stockholder and they would
9 continue. They don't care about collateral damage or
10 hurting all them people, they don't care about that.
11 They figure if Mike Lindell can, you know, once he runs
12 out, but I got other things, I just sold one building,
13 I'm selling a house. I will keep getting money to fight
14 this cause forever. You can't say, you can't even say
15 that, that, gee, Mike Lindell, he spent over
16 $40 million, gee, is he drifting, no, it's all my own
17 money.
18 Q. My question was more geared towards being the
19 CEO of this company and, and being on television gives
20 you a platform, a public platform, people listen to you,
21 they know who you are, right?
22 A. No, no, no. My platform over here, I have no
23 platform anymore because of what you guys did. I don't
24 have a platform to speak out anymore, I don't. I can't
25 go on any station in the country other than being

Page 302

1 attacked, you did that. Unless, unless Business Insider
2 or Yahoo, I can pull up today, Mike Lindell, there will
3 be four attacks just today. That's the only way people
4 hear about me, the only way that they hear about this
5 election crime, that's it.
6      I don't get to go on TV and go, hey, guess what,
7 that ship sailed with Smartmatic suit, Fox News. I was
8 on Tucker Carlson one time in three years, three years.
9 I could go on, I could go on and talk about pillows all
10 over with these talk hosts, I can't anymore, I've lost
11 that, I've lost that. The only way the word gets out is
12 because they attack me. I could go right now and
13 they'll say, you know what, Mike Lindell, blah, blah,
14 blah, blah, and it's attack, Yahoo, Business Insider.
15 When they get up to CNN and Washington Post, then they,
16 then it's a big attack, then you're right over target,
17 they attack. But, you know what, the media out there
18 then hears. I didn't have Twitter, they took my
19 Twitter. I didn't have a voice. What do you think, I'm
20 my own voice on Frankspeech, that's why I built it so I
21 have one voice that I could put on my show, that's it.
22 Q. Well, you've talked about these issues on --
23 A. When?
24 Q. You've talked about election fraud issues on
25 some of your vendors --

Page 303

1 A. Who?
2 Q. -- podcasts?
3 A. Who, who?
4 Q. Joe Oltmann.
5 A. No, I didn't, I never talked ever on Joe Oltmann
6 about, about these issues. Joe Oltmann had me on one
7 time, and this is in your thing, it's to sell, to talk
8 about My Pillow. He said something about somebody I
9 didn't even know, Coomer, he told his little thing, I
10 talked about My Pillow, it's when he came onboard. What
11 are you talking about.
12 Q. When you went on his program you didn't know
13 that he would be promoting My Pillow?
14 A. No, I didn't, this is when he wanted to sell My
15 Pillow, so he said can I have you on my show. And when
16 I get a new podcaster I go on their show to talk about
17 My Pillow.
18 Q. Right. So when you went on Oltmann's podcast
19 you knew that you would be talking about My Pillow?
20 A. Yeah, he was a new podcaster, I had never met
21 him before. It's like any other podcaster, of course,
22 of course.
23 Q. Did you ever have any discussions with Joe
24 Oltmann about, you know, this back story about Eric
25 Coomer, how he got on some --

Page 304

1 A. Never --
2 Q. -- Antifa call?
3 A. -- ever in my life did I talk about. I heard
4 about that after this thing and Newsmax, that's when I
5 heard about Eric Coomer. In my life I had never heard
6 that.
7 Q. So you haven't --
8 A. I still don't know the story. Something you put
9 in here about Antifa, I have no idea what you're talking
10 about.
11 Q. So My Pillow never did any sort of independent
12 fact checking about that story, let's send someone to --
13 A. Of course not. I didn't know the story ever
14 went out on the podcast. Joe Oltmann, let me tell, this
15 guy had, and we were looking for Frankspeech, he had
16 some technology, someone said, well, there's a guy named
17 Joe Oltmann that's got technology. I asked about the
18 technology and then we decided to go with Johnston
19 Howse, that was the only thing there. And then this guy
20 wanted to sell My Pillow and I went on there to, like I
21 would any other podcast, and I only went on there one
22 time.
23 Q. Well, you've been on at least four times.
24 A. No. Well, since then, since your lawsuit
25 probably, yeah. No, only, I'm talking pre-lawsuit,

Page 305

77 (Pages 302 - 305)

1 you're talking after lawsuit, there's two different
2 things, after you screwed me and before, you got that,
3 after you screwed my employees and before. This whole
4 thing in the back where I called him, absolutely, that's
5 after you did this to my company.
6    Q. So you think it's okay to defame someone after
7 they sue you?
8       MR. MALONE: Object to form.
9    A. No, it's not defaming him, I'm telling you what
10 you did to my company. And I will sit there and say
11 that's subjective. I can say anything I want. I can
12 call you a criminal because I feel like you are what you
13 did to my company, and you were part of that as much as
14 Coomer, both you two, and, and Chris Ruddy, whatever he
15 had to do with it, but he's the one that told me I can't
16 have you on anymore, Mike. I go who's Eric Coomer, what
17 do I, what do I know about Eric Coomer.
18    You guys wait a year and then you serve me
19 papers on the steps in Colorado. After that, that's
20 when I really went after you, remember that part, after
21 this lawsuit. One, only one thing was ever said about
22 you, about you, and that's after the Newsmax incident in
23 the spring of '21. I never talked about you.
24    After I left, after that it was different news
25 after a week or two after Newsmax, I bad-mouthed him

1 every single day for two weeks, and then I probably had
2 more stuff I had to do because, you know, this was the
3 spring of '21. You guys from that point on, any time I
4 bad-mouthed, any time anything came up, it was all that
5 week after you sued me.
6    I bet you can't even find anything in the last
7 year. I don't bring up Eric Coomer. This is what you
8 did to me. I reread this last night and that's why I'm
9 so upset about it. This is the most frivolous thing
10 I've ever seen. And, and I was coming here, I was so
11 mad this morning, I go I didn't do anything, I said one
12 thing after they attacked my company. Everything else
13 in here, bringing up stuff at symposium and all that,
14 you guys, you guys attacked me in the, in the spring of
15 '21. I didn't know anything, anything about Eric Coomer
16 before that.
17    Q. Is that why you were okay with Oltmann coming
18 into the symposium and talking about Coomer?
19    A. I didn't bring Oltmann into the symposium, I had
20 nothing to do with that. I had nothing to do with that.
21 I didn't know who was coming, I didn't invite him, I
22 didn't invite him. There was a vetting of people that
23 had to vet. You got to be invited if you were the
24 media, a cyber person, or, or worked in government,
25 those were the three criteria. So obviously he put in

1 an application to get in based on his podcast, I don't
2 know, or a cyber guy, I don't know. I didn't invite him
3 on that stage, I didn't invite him to the thing, period.
4    Q. So you didn't vet the people that were going to
5 be talking --
6    A. No, there was a team, there was a team. No, no,
7 no, Kurt Olsen and other people decided that, I didn't
8 decide. I was going on the stage myself for 72 hours.
9 I didn't have anybody scheduled for that stage. You
10 can, you can ask the guys that put it on. I was the
11 only one scheduled when I got there, it was going to be
12 all me for three days, period.
13    That's a fact, you can ask anybody that was
14 there. And then all of a sudden this red team shows up
15 and Kurt Olsen and Janet Lynn, they're saying, well, we
16 got the schedule, we want these people up there. No
17 idea who they were. All these people I met for the
18 first time. That's the first time I met Joe Oltmann, I
19 didn't even remember who he was. He wasn't, he wasn't
20 on the stage, you know. There's a picture I guess of
21 where he said hello. I never, you know, he said he met
22 me there, I didn't know, I didn't know him from Adam.
23 A lot of people that were at the symposium, I can't tell
24 you if they were there or not. The only reason I say
25 Joe Oltmann was there is because you guys told me in

1 this.
2    Q. Pause button. Deep breath. We're going to take
3 a break because the court reporter is getting tired, and
4 frankly, I am too.
5       MR. CAIN: So let's go off the record.
6       VIDEO TECHNICIAN: We are going off the
7 record at 4:38 p.m.
8       (A break was taken at 4:38 p.m.)
9       VIDEO TECHNICIAN: We are back on the
10 record at 4:52 p.m.
11       (Exhibit 72 marked for identification.)
12 BY MR. CAIN:
13    Q. Okay. Let's look at Exhibit 72, Mr. Lindell.
14 I'll just give you a second on this. This is, well,
15 I'll characterize it while you're looking at it.
16 Exhibit 72 is another symposium related email that
17 you're copied on. Do you see you being copied on the
18 front page?
19    A. Mm-hmm.
20    Q. We know that's a yes, but can you answer yes.
21    A. I said yes, yeah.
22    Q. Okay. All right. And this kind of follows from
23 what your testimony was earlier that it was supposed to
24 be Mike Lindell for 72 hours and things changed?
25    A. Yeah. I don't know who James Oaks is.

1  Q.  Okay.
2  A.  And I don't, and Janet, whatever, she wrote
3  this.  We worked off this updated program agenda.  I
4  have no idea what she worked out with him.  I didn't
5  have, I never had any plan going into the Cyber
6  Symposium or scheduled speakers, and Janet will testify
7  to that.  Because when we went there I go, they told me
8  to get off, she goes get off, you need to get off the
9  stage, I'm not getting off the stage.  And then they
10  went to take a break, I go there's no breaks, that's
11  right, take a break from the stage.  She goes well, we
12  have these other people.  I go, good for you, I didn't,
13  I'm speaking.
14  Q.  Well, that's what I'm trying to get to the
15  disconnect because this program agenda --
16  A.  What program agenda?
17  Q.  The one that's attached at the end of this,
18  which is Page 122, okay?
19  A.  Yeah, I never seen this.
20  Q.  Okay.  So that's, there's some, some disconnect
21  here that I --
22  A.  I have never seen this in my life.
23  Q.  Okay.
24  A.  So whatever Janet Lynn did with, with who is she
25  here with, Brannon Howse and Kurt Olsen and Tim Tunes,

1  exhibit Dr. Janet Lynn is saying, "We worked out this
2  updated program agenda with Mike late last night.  Days
3  2 to 3 will be similar, but with new speakers, panel
4  guests and cyber data updates," okay?
5  A.  Yep.
6  Q.  All right.  Do you remember that happening?
7  A.  No, I don't remember.  If we were on the phone
8  talking through what are we going to do, I don't
9  remember -- I remember Doug Frank was going to be there
10  because I wanted him there, he's the one guy I wanted
11  there because he had evidence that he had been in
12  scientific proof, and Phil Waldron because Phil Waldron
13  had also been in there, Phil Waldron had evidence.
14  Those are the only two I see on here.
15  Now they're going, if she says well, I'm going
16  to find other speakers, or Kurt Olsen, I don't know.  So
17  there was no, this thing here, if you watch it, it
18  wasn't, this schedule was not followed.  I don't know
19  where this came from, I never seen it.  Did I talk to
20  them about it, about this first day, she says I did,
21  ongoing, it says right here if you look at it, this Mike
22  Lindell and you got two speakers.  I don't know, it
23  doesn't say, speaker 2 to be announced.  This is all
24  Kurt Olsen, Janet Lynn.  These guys took over the thing,
25  I had no, I didn't schedule one person on this thing, on

1  they certainly didn't work this out with me.
2  Q.  But you were, there's a couple emails here.
3  That email was sent to your My Pillow email on
4  July 30th, "Hi, Mike," it talks about the stage
5  production flow.
6  A.  Did I answer, no, I didn't read this email.
7  Q.  Okay.
8  A.  You need to understand, I don't, I rarely if
9  ever read emails.
10  Q.  Okay.  Well --
11  A.  Ever, and they know that.  So whatever they did
12  here, that's their deal.  And this kind of, this kind of
13  makes more sense now why they argued with me when I got
14  there.  I go, what are you talking about, this isn't,
15  this isn't what we're doing.
16  Q.  Okay.  Well --
17  A.  I guess they got Phil Waldron.  I mean, if you
18  look what happened the first day, it probably doesn't
19  match this.  I guess it does say you have Dr. Frank,
20  Phil Waldron and Mike, the rest is Mike Lindell so, you
21  know, I guess that's, that kind of makes sense.  I do, I
22  think I knew Dr. Frank was going to speak, that's the
23  only one I knew of.
24  Q.  Yeah, maybe this one will refresh your
25  recollection a little bit.  At the beginning of this

1  the Cyber Symposium, not one, other than myself.
2  Q.  All right.  So let's just, from your
3  recollection let's just break down the timeline leading
4  up to the symposium.  And you've told us that you were
5  going to be there for three days talking, that was in
6  your mind originally?
7  A.  Yep, yep.
8  Q.  Right?
9  A.  And actually, there was two things, I forgot to
10  tell you one thing.  In my mind Brannon Howse was going
11  to be in a booth where we would, he'd be like a
12  reporter, let's go back to the booth, and he would be
13  mostly from a booth interviewing people, cyber guests
14  and people in the audience, that was my plan.
15  So he would be interviewing like, like, you
16  know, hey, how is, you know, what do you think about
17  what Mike is saying, and it would be me on stage and it
18  would go back and forth.  That ship sailed when I got
19  there because then we, I got so busy on stage.  And
20  Brannon, he was actually upset, he goes, well, don't I
21  get to talk or whatever.  I go no, there's, right now we
22  got to get to, I have to talk, you know.
23  Q.  That ship sailed when you got there --
24  A.  Because there was, it was all, there was too
25  much that I had to say and we didn't have Brannon

1  going -- here's what I set up. I wanted four things
2  going, I had a cyber room, the evidence would go down to
3  the cyber room, okay, this is what I set up. I don't
4  know about all this stuff for this, for this stage that
5  she said to be announced, to be announced.
6        My setup that I set up the cyber thing was four
7  things, I wanted this is where all the eating is going
8  to be, this is the cyber room, we're going to feed
9  evidence to the cyber guys, this is the election room
10  where you could go in there and do election and watch
11  how they flip it in real-time, any cyber guy, which we
12  did and the guy hacked it right from the table. So you
13  had machines in there, voting machines showing
14  real-time, so show people here's how they did it, here
15  it was easy, okay. And then, and then we had another
16  place where you could go and tune in your county and see
17  what happened in the election, that was that space. And
18  then we had Brannon Howse in a booth for Frankspeech.
19        And as far as, as far as the stage up here, I
20  didn't really care. I know I was going to be up there
21  as much as I could and then I would be doing interviews.
22  And the rest was Janet Lynn and Kurt Olsen, whatever
23  they wanted to put up there. My thing was, the whole
24  purpose of the whole event was here's the evidence,
25  bring your own cyber guy, and you have legislators or
                                                    Page 314

1  any governor, we invited both Democrat and Republicans
2  across the country and the media.
3        So here's the cyber guys, wow, yes, this
4  happened, and then this is from the 2020 election. And
5  then over here these guys would go here, it's right from
6  their own guys, and the media would report it. That's
7  how it was supposed to go. This wasn't a thing of a,
8  other than Dr. Frank, I did want him to show his
9  algorithms because those come right from the voter rolls
10  that we had, it's a different evidence.
11  Q. When did you realize that you were not going to
12  be able to show the entirety of the PCAP data?
13  A. No, we had the whole, we had the PCAP data. It
14  was Saturday night when I was physically attacked and
15  Waldron said don't bring down the China stuff, he said
16  they're going to put that in the data. We were
17  releasing data. The thing was, the data we were
18  releasing, we couldn't release the China, this is what
19  he told me, you can't release stuff, and this was after
20  I was attacked. I mean, there were two separate
21  incidents. And he said we have a report they're going
22  to put a poison pill in the data because they knew that
23  that part of the data would show China intrusion,
24  100 percent it showed China was in the room. It doesn't
25  say they did anything, but they were in the room, they
                                                    Page 315

1  were in our whole election system.
2        That's what you're going to see very shortly.
3  In fact, I might just throw that at you, you can get a
4  copy when we throw out the evidence, that would make it
5  nice and public. That was just that one piece that they
6  seen when I was told by this colonel not to put it out.
7  Q. Okay. Well, it sounds like, I don't want to put
8  words in your mouth, but it sounds like you had one
9  vision for the symposium and Kurt and Janet Lynn --
10  A. No, there was, whoever, this red team that came
11  in there, this red team, I don't know where they came
12  from. Kurt, Janet, Phil Waldron, whoever was, you know,
13  and probably six other people in that room, they had
14  their own little idea what they were going to put up to
15  go out there. All these people that were invited, all
16  of a sudden they get to go up on stage, it was crazy.
17        I'd be up doing an interview with CNN and I'd
18  look down and there's a, what's his name, that Professor
19  Clements I met, who is that guy. All these guys coming
20  I never met before in my life. And I didn't invite
21  them, they were invited as cyber experts. So they must
22  have cleared, cleared, what do you call, the screening
23  team, you had to show you were either someone in
24  government or media or cyber, you had worked in that
25  realm.
                                                    Page 316

1  Q. Was -- well, strike that. I know you, you
2  quibble with the idea of a red team, but you had a room
3  set up for cyber --
4  A. I didn't set that up, that was, no, the red team
5  was at the hotel. There was a room they got that I
6  think Kurt Olsen got. All those fellows, Kurt Olsen was
7  driving the bus on that.
8  Q. Okay. All right.
9  A. That was a, I walked in there, I go who are all
10  these guys. I didn't know anyone that room except for
11  Doug Frank I had met before one time, I think one time,
12  that might have been the first time we met. No, the
13  second time because he was in Absolute Interference, so
14  I met him one other time. And I had not met, or then,
15  I'm trying to think who else, and I met this Todd that
16  was in the room. Other than that, I never met anyone in
17  the room, I go who are these people.
18        And they're telling me how they're going to run
19  the Cyber Symposium. I go, I go, you ain't running it,
20  this is my event, I'm getting the word out. They're
21  trying to tell me, well, we're going to get this speaker
22  and that speaker. I'm going, you know what, I'm doing
23  this. And finally the second day I just went, I had
24  interviews to do, I said, you know what, I'm losing my
25  voice, go ahead, and whatever they did, they did.
                                                    Page 317

Q. Did any independent cyber expert tell you while you were there that the data that they had reviewed was worthless?

A. No, nobody said that other than Josh Merritt to a media outlet. I had, when I just said Alan Duke there, Alan Duke the Facebook fact checker who had covered up all my stuff on Facebook, he was invited, him and a guy named Martin, and a cyber guy from the Facebook fast checker. They called me, they had my cell phone number, they called me and they, and he said Mike, what you're putting out, there was a duplicate of Pennsylvania I believe and Wisconsin. And he said, and I said, well, Martin, I said, it's from the 2020, right. He said, yeah, but you had a duplicate file. That was just a mistake that they were labeled, that was the only one. But it made me feel good, I go it's right, right, and he goes absolutely, it's time stamped from the 2020 election.

And I go, and all I wanted to show, it's like a, all I wanted to show here's a tip of an iceberg. You can't show, it took me six months to have all these people validate this. And then what we wanted to show them is, hey, here it is, is it from there or not, and you show them that and now everybody, the media would say it's from 2020, and here everybody could have it.

We were putting it in that 2015 Cyber Act and it would be everywhere and everybody would like into it and it would be over, I could have went home, went fishing, everything done, beautiful day, everybody take a look at it. And then and everyone said it was time stamped, that's all I thought, oh, this is great, it's perfect. Martin was only one, it was one thing was duplicated. And he is an expert and he is the one that covered stuff up on Facebook. And I'll tell you one more thing we did with Alan Duke.

Q. Martin?

A. Martin is partners. Alan Duke owns Lead Stories, everything you see covered up on Facebook and Twitter that says false information, that was those guys. He has three employees, four, and Martin is his partner, he's over in Belgium, those two would cover everything up. I got in battles with Alan Duke. One time I forwarded my phone number, or I put his number, his Website up and he forwarded all those calls to my phone number and I forwarded them back to his.

But let me tell you what we did with Alan Duke. We took the evidence, I gave him the evidence, signed an NDA, okay, with him. This is after the Cyber Symposium, well after. I gave him guts of it and said here, I'll sign an NDA, and you sign this. We had Kurt, Kurt can

testify to this. We gave him it. I said you could be a hero, instead of a traitor you could be a hero, bring it out. I said just tell the public it's true, they can do everything, he goes okay.

He got it and he found out it's 100 percent true, and you know what he did, he said I'm not, and you can ask Kurt Olsen, I am not going to go public with this. He said we are, we, we are fact checkers to find out if something is true. I said well, you found out it is true. He says yeah, we don't have to put a false thing over it. So he goes you're welcome to put it up on your Website, which we did, it's on Frankspeech right now, but he won't put, he won't say publicly it's fact, but he won't cover it up. Oh, thank you, Alan Duke, you know, that's disgusting. Do you get that, what he said, what he did to us.

I'm so upset with that guy, more than you guys, you know, because this guy could have got it all out in the open. He had the whole enchilada and he won't put it out and say it's all true, everybody, because he's afraid, I think he's in fear. But he sent me little pictures of himself with Raffensperger and all the others, hey, Mike, how's it going. I go Alan, it's not funny anymore.

Q. All right. So he had the whole enchilada, as

you put it.

A. Yeah.

Q. By when he signed an NDA?

A. Mm-hmm.

Q. Is that yes?

A. He got to look at, right, he got to look at it. He got PCAP, he got the whole whatever part of the thing, just part of the thing so he could look deeper. Because all these guys at the symposium, you can't look in three days, some of these guys took six months to validate stuff. We gave him an actual PCAP, or the data from inside the machines, here you go.

Q. The whole, the whole dataset or just the tip, as you said?

A. He got not the whole dataset, he got a big chunk, whatever it was, you know, he got enough to show -- it's on Frankspeech, you can go look at it.

Q. So who's coordinating that aspect of it, like transmitting data to people like him to review?

A. No, no, this was on, this was on, some of it went public from the, from the Cyber Symposium, this was stuff from there.

Q. Okay.

A. So we took it and gave him more of a tip because we, you know, probably some of the SIEM stuff too, I

1 don't know.
2    Q. And the six months of the review that you
3 testified about, was that done by the three people you
4 mentioned early in the day whose names you can't give
5 me?
6    A. No, no, no, those were three that had validated
7 Dennis Montgomery's work.
8    Q. Okay.
9    A. That worked with him back in the day. They
10 validated Dennis Montgomery's work and yes, it's real.
11 I had it validated by people I didn't know, three guys I
12 never met before in my life that were professional cyber
13 guys, one that had worked for the government, he had
14 great credentials.
15    Q. Are these people that you can tell me who they
16 are?
17    A. No, I don't want them attacked because they're
18 out there. And you could, I can tell you this, the guy
19 that, the only one I can tell you, and this is after the
20 Cyber Symposium they had another image that they
21 validated was a guy, have you heard of Jeff O'Donnell?
22    Q. Doesn't strike a chord.
23    A. I can give you his name, he's another cyber guy,
24 because he doesn't care if his name is out there, he
25 gets attacked all the time. The other ones don't want

1 their names out there. These guys are professionals,
2 they work, this is what they do. One of them is top
3 secret, does missions for the government, missions for
4 them, this is what he does.
5    Q. Well, can you understand members, whether they
6 were cyber experts or the media, were expecting to see
7 the entirety of the PCAP data presented at the
8 symposium?
9       MR. MALONE: Objection, foundation.
10    A. You know, I don't know. The challenge was said
11 there, you can't validate it all in, you know, as they
12 were getting fed stuff, you can't, it took six months,
13 there's 40 some terabytes of data, 40 some terabytes of
14 data, that's a lot here. So you have this window.
15      All it was was supposed to be you guys check it
16 out, it's from the 2020 election, and you guys better go
17 out and tell the world that it's real and then go in,
18 and then they could have all validated and done
19 whatever. That's what I wanted to, everybody,
20 everybody, here, take it. Or at least the government
21 release that gag order, you know. It was a catch-22.
22      I wanted the government going, here, you know
23 what, if I get in trouble, you know, so be it. Now the
24 government has said just, what was it, four months ago,
25 yep, Mike Lindell can release it. He said, he said

1 this, that I can do it, but the rest of the stuff Dennis
2 Montgomery has cannot be released. I would have
3 released it then too. Alan Duke has got a chunk, but it
4 wasn't released to the public. I wanted him, maybe he
5 will now that the government said that, but he still
6 won't. That's what I'm upset with him about.
7      As soon as the government said they could
8 release it, I said Alan, now you can go say it's all
9 real, you've seen, you've seen the mountain, he's seen
10 the mountain, it shows the intrusion in our elections
11 through the machines, 100 percent. So now at least
12 we'll be able to put that out now that they've released
13 it, the government said this, you know. We subpoenaed
14 Dennis Montgomery, our lawyers subpoenaed Dennis
15 Montgomery to, you know, here, put this out there. It's
16 evidence in my case too, you know what I mean.
17    Q. Right. So you've said a lot again, I'm not
18 going to go through it all. A couple of things that I
19 understood were, No. 1, to the extent that there was an
20 agenda for the show, or the symposium.
21    A. There was no agenda in my mind.
22    Q. Okay.
23    A. Absolutely not. I was so worried, what are we
24 going to do, I'm just going to get up there and talk.
25 And I was, I was going to keep throwing it back to

1 Brannon Howse to interview people.
2    Q. You said that.
3    A. Yeah. And then they would all talk amongst
4 themselves in rooms and we were going to, you know, it
5 became something a lot different in my mind.
6    Q. Well, it was -- don't get upset.
7    A. Right.
8    Q. It was disorganized, at best.
9    A. Oh, it was terribly disorganized, terribly
10 disorganized.
11    Q. And --
12    A. Because it wasn't what I originally wanted to
13 do.
14    Q. Right.
15    A. Because certain people changed that.
16    Q. So and it got to the point where there were
17 people on stage that you had no idea were going to be
18 there talking?
19    A. No, none of them. The only one I knew was going
20 to be there was Dr. Frank, that was the only one. And I
21 knew, and I didn't really know he was going to be that
22 person until he was in that room.
23    Q. Okay. Why didn't you do more to vet the people
24 that were going to be talking, I mean, this was --
25    A. There wasn't going to be no, in my mind nobody

1 was going to be talking. You need to understand this
2 part. I, I had it set up where the, Brannon Howse was
3 going to be, I wasn't even going to be a host, I was
4 going to tell my evidence, tell my thing, and then dump
5 it to the cyber guys and everybody, it would be an
6 interaction thing where people would be walking around
7 and they would be interviewing. Everyone had their own
8 booth.
9      But what it became, all of a sudden CNN,
10 everybody shows up and all the cameras are in the back.
11 So I'm going okay, we've got to keep going and talk to
12 this these people, in my mind. So I stayed on stage if
13 you know the first day, I think the whole day almost, I
14 don't think I left that stage. I don't know, you know.
15 I know at one time they wanted to take a break and I go
16 no, we can't take a break. And that's why I know it was
17 commercial free because there wasn't one minute of
18 break.
19      And but my mind was this, I would be throwing
20 the camera back to Brannon Howse, he would be
21 interviewing, like let's say governors or legislators or
22 senators and say, hey, what do you think so far, what do
23 you think so far. That's what I wanted it to be. It
24 was just to, imagine, you know, because nobody would
25 listen, no judges would look at the evidence or nothing.
Page 326

1 That's all I wanted.
2      Q. But again, the disconnect in my mind is you had
3 the absolute authority of how to run the symposium,
4 didn't you?
5      A. And I set up -- no, not really.
6      Q. Why?
7      A. If I wanted to sit there and say, I got tired, I
8 mean, I was on that stage, I didn't leave that stage, I
9 said my speak. The hour the cameras didn't work, they
10 attacked them, made the biggest attack on the cameras.
11 I told my whole story of crack addiction at one point,
12 you know, I did almost for an hour. And I'm going, and
13 I kept putting there.
14      And then I go okay, you cyber guys, you can all
15 go, and they started dumping evidence. But I wanted to
16 keep, keep the camera moving, I never put it back to
17 Brannon Howse. At one point Janet Lynn said these guys
18 are going up. I go no, they're not, who said you're
19 running the show. I said I'm going to keep talking.
20 They wanted me, the one guy said get him off the stage.
21 I go no, I'm not leaving, I want to tell, you know,
22 because I wanted to get the word out on this.
23      And then, then by the night, I think it was, I
24 don't know at one point it was, for sure the next day, I
25 said you know what, you guys do what you want, I'm going
Page 327

1 to go interview with CNN. I was losing my voice, I went
2 and did interviews almost all day, CNN because they were
3 there, another outfit. I was two hours interviewing
4 with one outfit, at least an hour and a half with CNN,
5 and I just went to the media, right to the media and got
6 interviewed.
7      I had no idea, at one point I looked down the
8 stage and I had Dr. Doug Frank on the side sitting
9 there, I go, I did call down, I go tell him to get off
10 the side of the stage and get up, you know, because it
11 just looked bad cosmetically.
12      Q. Did you not know, you said at some point or at
13 one point you just turned it over to them, I --
14      A. No, no, it was them kind of from the beginning.
15 But when I went on that stage, I got on the stage, I
16 controlled when I got on that stage, everything else was
17 them.
18      Q. And the them was Janet and Kurt Olsen?
19      A. Kurt Olsen, Janet and whoever they were talking
20 to in that room. And I don't know who else was involved
21 in that planning, I don't, I absolutely don't to this
22 day.
23      Q. Did you want Tina Peters on the stage?
24      A. When Tina Peters, I never met her before in my
25 life.
Page 328

1      Q. That wasn't my question.
2      A. Okay. Well, I'm going to tell you, explain
3 that. When they came to the symposium, the Colorado
4 group, when they got there she said she had just got her
5 door bashed in. I said well, you should take her up and
6 tell her story on the stage. I didn't know who she was
7 or why they bashed her door. She said they had bashed
8 it and broke in her office. I'm going, she should get
9 on the stage. And then she has a couple lawyers go,
10 well, we don't think so. I go why wouldn't she tell
11 that about getting your door bashed in. That's all I
12 knew. And the lawyers finally said okay, Tina, it's up
13 to you, and she went on the stage. No idea who she was.
14 She was up there with I think with three other people, I
15 think there was Mark Cook maybe or Janet, or I mean
16 Shiroma might have been there. There was other people
17 that were, that came on that bus.
18      You got to realize, the planes came in, I had no
19 idea who was on these planes. These were people that
20 vetted that who we could get rides because my plane all
21 over the country brought in as many people as they could
22 whether, we didn't know them, but they were vetted to be
23 there.
24      Q. So you didn't know then that they were going to
25 present the Mesa County data?
Page 329

83 (Pages 326 - 329)

1    A. No idea, absolutely no idea. I'm looking down,
2  I go what's on the, what's on the screen. I was up at
3  CNN being interviewed, I had no idea what they were even
4  talking about.
5    Q. Did you know who Conan Hayes was?
6    A. Who?
7    Q. Conan Hayes?
8    A. Yeah, I knew who Conan Hayes was.
9    Q. Yeah. What was his role at the symposium?
10   A. What was his role at the symposium?
11   Q. If any.
12   A. His role was he was a cyber guy that was there
13 and he is, he is a cyber guy, I knew his name, I knew
14 him, Conan Hayes.
15   Q. All right.
16   A. But I didn't know anything about any Mesa image.
17 Conan Hayes, Conan Hayes did other stuff for me
18 validating Dennis Montgomery. I don't know anything
19 else Conan Hayes did. He was one of the guys that was
20 validating my Dennis Montgomery info.
21   Q. Okay. So who was paying his retainer?
22   A. Who?
23   Q. Who was paying Conan Hayes?
24   A. I don't know who was paying Conan Hayes.
25   Q. Was --

1    A. I pay him now, he works for me now.
2    Q. Okay. Then?
3    A. Then, I don't know if he was even getting paid.
4  I don't know, I'd have to look at the months. If I paid
5  him I believe from the Cyber Symposium on, maybe a month
6  earlier, I don't know. Because it probably was a month
7  earlier because he was another validation I wanted to
8  validate of Montgomery stuff, he is one of the three.
9    Q. Okay.
10   A. So I probably, I met him I suppose June, July
11 and I paid him, I probably gave him some money then to
12 validate because there was about ten cyber guys were
13 validating leading up to the Cyber Symposium and he was
14 one of them.
15   Q. Did you have to take or did you authorize My
16 Pillow to, to make a distribution of funds so that you
17 could pay for the symposium?
18   A. What?
19   Q. That's maybe a little too lawyerly.
20   A. No, My Pillow didn't pay anything for the
21 symposium.
22   Q. No, no, I know that, that's your testimony. My
23 question is a little different. You're a shareholder of
24 the company and you receive distributions when the
25 company makes a profit, right?

1    A. Yes.
2    Q. Okay. And if, you have the unilateral authority
3  to determine when a distribution is made?
4    A. No, that's done by the, that's done by a formula
5  that's in our books. That, you can't say when a
6  distribution is made.
7    Q. Okay.
8    A. We have to every year have to pay, sometime
9  during that year you have to pay up to the highest tax
10 brackets half of their, to cover their taxes.
11   Q. Okay.
12   A. I don't control that, that's -- and the account,
13 normally you can't even do anything if the account gets
14 down to here, you can't, but it's been below that for
15 quite a bit now where we can't, we can't do, there was
16 no distributions I think probably the last year and a
17 half because we had a loss.
18   Q. Okay.
19   A. And you can't distribute when a loss and you
20 can't, you have to distribute to cover taxes.
21   Q. Right, right. And it sounds like that you
22 actually have a formula at My Pillow that tells the
23 controller when a distribution can be made to
24 the shareholders?
25   A. No, you have to by the tax year. That's the

1  only thing, that's the only formula. You don't get to
2  distribute when it reaches a certain point. You, you
3  have to distribute -- like here's the problem, you
4  probably don't understand how it works. If your
5  inventory is so high, this is another thing, a problem
6  we had and why that hurt us, when your inventory, if
7  your inventory, if you have paid for inventory, you got
8  to pay that, that is your income, you got to pay tax on
9  that on your taxes as income even though you might not
10 have got the cash for it. Do you follow me?
11   Q. I do.
12   A. That's, that's the problem we had. We've always
13 been able to balance that. Now that's been out of whack
14 because you have all the inventory that was paid for,
15 but because our sales are so down, then you got
16 inventory so tax, or people had to pay taxes, we had to
17 borrow money just to even do a distribution, I had to
18 get that money too, that was in 2021.
19   Q. So to the extent that My Pillow pays you, it's
20 either, and you've already said you don't receive a cut
21 of a promo code like a revenue share personally?
22   A. No, no.
23   Q. Are you paid a salary?
24   A. Yeah.
25   Q. As the CEO?

1    A. Yeah.
2    Q. So you get money from the company that way?
3    A. Yeah.
4    Q. And then you get money from the company through
5    distributions?
6    A. Mm-hmm.
7    Q. That's a yes?
8    A. Yes.
9    Q. Is there any other mechanism that you're paid
10   compensation at My Pillow besides those three things?
11   A. No, no.
12   Q. Company car?
13   A. No.
14   Q. Company plane?
15   A. No.
16   Q. Okay.
17   A. I guess a pickup, my pickup, I think that's in
18   My Pillow's name.
19   Q. Okay. All right.
20   A. There is a pickup.
21   Q. Okay.
22   A. A Dodge Ram pickup.
23   Q. That's what I drive.
24   A. I don't get to use it for personal stuff though,
25   if that's what you're asking me, if you're talking taxes

1         MR. CAIN: What's the next number?
2         COURT REPORTER: 73.
3         (Exhibit 73 marked for identification.)
4    A. That's so funny. What was your question about
5    him?
6    Q. Just a minute. So Exhibit 73 is, is from My
7    Pillow's production, Bates 730, it's an Excel
8    spreadsheet, so I don't have a printout for you because
9    there's too many cells.
10   A. Okay.
11        MR. CAIN: So we're just going to, if this
12   is agreeable, I think there's been two exhibits that are
13   spreadsheets, or just one. We'll email that to her and
14   to you.
15        MR. MALONE: That's fine.
16        MR. CAIN: Because it's --
17        MR. MALONE: As long as we have the Bates
18   on the record, that's fine.
19        MR. CAIN: Yeah, it's My Pillow 730.
20   BY MR. CAIN:
21   Q. Let me see if, this is, you may have to bring
22   this a little closer because it's hard to see.
23   A. I can see it, I can see it, yep.
24   Q. Okay. So this is multiple tabs on this, which
25   is why I couldn't print it out. So my question to you

1    or whatever.
2    Q. Part of what we had asked you to talk about
3    today is the investigation to the extent that you did
4    through My Pillow any investigation of Eric Coomer?
5    A. Nobody at My Pillow did investigate Eric Coomer.
6    Q. Okay. Well, My Pillow did produce some
7    information on Eric Coomer.
8    A. The only thing, the only thing we would have
9    would be as a podcaster, what the name of his podcast
10   is, we would mail him products so he tries it.
11   Q. Well, he's not, he's not a client or a vendor
12   for you. I'm just asking about --
13   A. No, no, he is a podcaster like every other
14   podcaster, what do you mean.
15   Q. No.
16        MR. MALONE: He's talking about Coomer.
17   A. Oh, Coomer, I'm sorry. No, I have no idea who
18   he is, I've never met him, I don't know who he is, other
19   than when he did this to me.
20   Q. Who, who did you think I was asking you about?
21   A. I thought you were asking about, what's his
22   name, Joe Oltmann.
23   Q. Oh, yeah.
24   A. If Eric Coomer had a promo code he probably
25   wouldn't have done this to me.

1    was, has My Pillow performed an investigation on the
2    background of Eric Coomer at any point?
3    A. No, I haven't even. So, no, My Pillow,
4    absolutely not. I don't even know what this is.
5    Q. Okay. Well, your company produced it. Do you
6    know how your company became in possession of this
7    information?
8    A. I have no idea. I don't know what it is. It
9    looks like Facebook pages.
10   Q. Yeah. If we're looking at the first cell on the
11   left it's, that's A and it goes down through, I'm
12   scrolling through, various people that apparently are
13   Facebook friends with Eric Coomer.
14   A. Yeah, I have no idea, I have no idea, I don't
15   know. I have no idea who would have produced this or
16   where you got it.
17   Q. I got it from you.
18   A. Well, you didn't get it from me because I don't
19   know who this is or what this is.
20   Q. Well, I've asked for --
21   A. I have no idea what this is. I don't even know
22   who these people are. And My Pillow would not be able
23   to produce this, how would they get it. It looks like
24   it came from Facebook.
25   Q. All right. I hear you --

Page 338

1    A. Who, who is the person you got it from?
2    Q. I got it from your counsel, this was produced in
3  your production.
4         MR. MALONE: That's fine, just answer what
5  you know.
6    A. Okay. I don't know what this is.
7    Q. All right. Well --
8    A. I never seen it before in my life.
9    Q. Okay, thank you for that. However, I need to
10 know the source of this investigation, who compiled the
11 information.
12   A. This doesn't look like an investigation, it
13 looks like a list of names.
14   Q. Okay. It looks like a list of names, I agree.
15   A. If you say, My Pillow or who produced this?
16   Q. My Pillow.
17   A. Okay. When you say My Pillow, somebody had to
18 produce it from My Pillow. Why are you saying My
19 Pillow? Did you get it from Frankspeech, did you get it
20 from Mike Lindell, Lindell Management?
21   Q. My Pillow.
22   A. Then you'd have to ask these guys because I have
23 no idea where they got it.
24   Q. Okay.
25   A. I don't know why they would tell you they got it

Page 339

1  from My Pillow because they didn't it from My Pillow. I
2  bet you it's a mistake and they got it from, even
3  Lindell Management wouldn't have this.
4    Q. So you never seen this information --
5    A. 100 percent, no. I don't even know what it is.
6  This is crazy. I have no idea what this is, this would
7  mean nothing to me.
8    Q. So you obviously didn't review it when you were
9  preparing to testify, right?
10   A. No, I never looked at this in my life.
11   Q. All you looked at was --
12   A. This is right now. I looked at this, right
13 here, your wonderful complaint attack on me. I didn't
14 look at this, I'm looking at it for the first time. I
15 have no idea. I disagree you got it from My Pillow.
16 Somebody, whoever did your, or what do you call it,
17 discovery, made a mistake. I don't know where they
18 pulled it from, but it wasn't from me, My Pillow.
19 Unless you have some My Pillow employee on Facebook.
20 have no idea, this is, I have no idea where you got it.
21 It doesn't say it's from My Pillow.
22   Q. It actually is labeled My Pillow 730.
23   A. Where?
24   Q. Up on the top.
25   A. Okay. I don't know who did this. You didn't

Page 340

1  get it from me. I didn't provide this, I don't know
2  where they got this. You'd have to, if I were you I'd
3  ask that guy right there, I'd blame him. Seriously, I
4  don't know where you guys got this, can you say.
5    Q. We can, he can if he wants, otherwise we can
6  work it out.
7    A. No, I, I will tell you where he got it, because
8  I would like, I would want to know where this came from.
9  And it didn't come from My Pillow because I know, I have
10 never done an investigation on Eric Coomer.
11   Q. Well, you may not have personally, but --
12   A. Nobody at My Pillow would have. The only one
13 that would have would have been these guys maybe for
14 this case.
15   Q. Okay.
16   A. I 100 percent know no one at My Pillow did an
17 investigation. They wouldn't even, none of them would
18 even know what they're investigating.
19   Q. That's why I'm asking you the questions.
20   A. Right.
21   Q. I don't know the answer to these questions.
22   A. Okay. I'm, I'm just telling you, I know
23 100 percent that did not come from a My Pillow employee.
24   Q. Okay.
25   A. It didn't even come from Lindell Management.

Page 341

1  This is crazy.
2    Q. Why, why is it crazy?
3    A. Because none of them, there's nobody at My
4  Pillow that worked on anything with me with election
5  crime, period. And I never ordered an investigation on
6  Eric Coomer, ever.
7    Q. Do you know how this information apparently got
8  to My Pillow?
9    A. I don't even know where you got it, I have no
10 idea. I'm going to be asking them a lot of questions
11 because this certainly isn't My Pillow.
12   Q. Okay.
13   A. If they got it from some email or some My Pillow
14 site, I don't know.
15   Q. Does My Pillow have investigators?
16   A. No, zero. The only, you know who has
17 investigators, Mike Lindell, personally, boom, that's
18 it.
19   Q. So did Mike Lindell personally hire an
20 investigator to compile information on --
21   A. No, no.
22   Q. -- Eric Coomer?
23   A. I never hired anything on Eric Coomer, ever.
24 The only thing I ever did on Eric Coomer is one
25 statement. Do you want me to read it to you, you've

1 seen it, after what he did to me at Newsmax. I read,
2 it's one statement, everything else I said came after
3 you guys did this lawsuit.
4 Q. Well, you know he's associated with Dominion,
5 Eric Coomer?
6 A. I did not know it until Newsmax, I did not know
7 it until you guys filed this suit against him. I go
8 what are you doing and he goes, he says this Eric
9 Coomer, when I was talking about him, I said who the
10 heck is Eric Coomer. I knew nothing about Eric Coomer
11 until Newsmax until you guys, or until you did that to
12 Newsmax and My Pillow. Now after you sued me over in
13 Colorado, I probably said a few things about you.
14 Q. All right. I'm going to just scroll through
15 these tabs, maybe that helps.
16 A. Helps what?
17 Q. I don't know, we'll see. The second tab
18 appears, it says EC planning contacts, do you see, I'm
19 going to switch to that. And it has a list of 30 --
20 A. No idea.
21 Q. 30-ish names.
22 A. I have no idea. I don't know anybody on there.
23 Q. Have you ever seen this information before?
24 A. No, never in my life.
25 Q. Eric Coomer, or EC relatives --

1 Q. Before you started talking about --
2 A. I didn't even know, I don't know anything about
3 the guy.
4 Q. Right. Before you started talking about him,
5 you didn't know anything about him, did you?
6 A. No, I didn't know any, I still don't know
7 anything about him. I know one thing about it, what he
8 did to me with Newsmax, that's the only thing. Every
9 comment I made after that was because of that, what he
10 did to Newsmax. I don't know where he lives, I don't
11 know anything about him, zero.
12 Q. It sounds like the Newsmax issue angered you?
13 A. Yeah, it hurt us, it hurt my company, it was
14 horrible. What do you mean did it anger me. I was
15 worried, I get worried about my employees. That's one
16 thing that went right to the heart of My Pillow, you
17 hurt My Pillow, right, you did, you.
18 Q. Okay. Next tab --
19 A. And you did it twice, you doubled down, and then
20 you did a lawsuit a year later. Now when you go after
21 Newsmax and say don't have Mike Lindell on your show
22 ever and talk about My Pillow, you know, and then this
23 stuff. No, I know nothing about this.
24 Q. Next tab is his, purports to be cycling
25 contacts, he used to be a --

1 A. No.
2 Q. -- contacts?
3 A. No.
4 Q. It shows his mother-in-law?
5 A. No. I would say you just got this yourself
6 because I have no idea where this came from, I have
7 never seen it before.
8 Q. I didn't, it's not from me, I'll represent that
9 to you.
10 A. Okay. Well, it ain't from me, it's not from me
11 or My Pillow, that's a fact.
12 Q. Well --
13 A. I don't care your thing says you got it from My
14 Pillow, you got it in My Pillow's discovery. I'll have
15 to find out from the lawyers why they put that in My
16 Pillow's discovery.
17 Q. Can you understand why I might think it's coming
18 from My Pillow?
19 A. I don't know why. Because, because it was in a
20 packet you got in discovery, that they might have
21 grouped Frankspeech, Mike Lindell. But even if it was
22 Mike Lindell grouped in there by mistake, I never
23 ordered any investigation on Eric Coomer, ever.
24 Q. Right.
25 A. Ever.

1 A. I don't have any idea what this is. I never
2 seen this, a spreadsheet like this, I've never seen, I
3 never seen a spreadsheet like this.
4 Q. Well, maybe you've seen this next tab, other
5 contacts?
6 A. No.
7 Q. It says info from Joey Camp?
8 A. Nope, I don't know who that is.
9 Q. Various people with some information on them,
10 you've never seen that?
11 A. No, ever.
12 Q. Jennifer Morrell, bolded there?
13 A. I don't know who they are.
14 Q. Radical friend?
15 A. Nope, don't know who they are.
16 Q. Passwords, this tab says passwords. And I'll
17 just scroll down. Are you following with me?
18 A. Yeah.
19 Q. And it looks like based on the numbers,
20 approximately 197 email addresses?
21 A. Okay, and why is there passwords there?
22 Q. Well, I was hoping you could tell me.
23 A. I have no idea. I don't know, I don't have,
24 this is nothing from me.
25 Q. Okay. So there's Smartmatic employees here?

**Page 346**

1  A. I have no idea, absolutely none.
2  Q. With what appears to be their email?
3  A. I don't know where you got this, you know,
4  you're going to have to ask these lawyers. It looks
5  like you planted this, to be honest with you. I have no
6  idea what this is.
7      THE WITNESS: This is, do you know, did we
8  give them this, I can ask you that.
9      MR. MALONE: Sure, Mike, we did give it to
10  them.
11      THE WITNESS: We did.
12      MR. MALONE: Yeah, they didn't plant it.
13  And you can just tell him what you know about it.
14  A. Okay, zero.
15  Q. ES&S, vogue.com passwords for those employees?
16  A. (Shaking head.)
17  Q. Okay. On the top here it says, and this is
18  starting in cell C, NV?
19  A. Don't know who that is.
20  Q. That was going to be my question. "NV, I have
21  not tried these yet. Search database in first tab and
22  try passwords with other email accounts in case they use
23  the same password," do you see that?
24  A. Yeah.
25  Q. Are you aware of any activity in hacking into

**Page 347**

1  email accounts of election workers?
2  A. No. What are you talking about.
3  Q. I'm talking about --
4  A. I've never seen this before and it didn't come
5  from me or any employee of My Pillow, that's a fact, I
6  would bet my life on it, you got that. I would put
7  everything I had on it, I would put everything on it.
8  It didn't come from an employee of My Pillow and it
9  didn't come from me. I never, and I never investigated
10  Eric Coomer, period.
11  Q. So you don't have an explanation as you sit here
12  today --
13  A. I have one explanation, it never came from a My
14  Pillow employee or me.
15  Q. Well --
16  A. 100 percent it didn't, not 99, because nobody in
17  My Pillow would even know this stuff. How would they
18  even know this, this is crazy. I know all my employees,
19  nobody did, nobody. And I'd bet everything I have on
20  it.
21  Q. All right.
22  A. That I do know. You asked me what I know on
23  this, I know that we didn't do it, Mike Lindell or My
24  Pillow employee.
25  Q. And you can work out how it got in my file --

**Page 348**

1  A. I'm just telling you for the record, I told you
2  what I know about it. 100 percent it did not come from
3  a My Pillow employee or Mike Lindell.
4  Q. Okay. But you're not, you're not disputing the
5  fact that it was in the possession of My Pillow?
6  A. I'm disputing that because I don't know where
7  you got it. You can say you got it from my attorneys
8  and I don't know where they got it. And they're going
9  to have to explaining to do to me because if they did
10  discovery, I think this had to come from somewhere else
11  or somebody planted it because it didn't come from a My
12  Pillow employee. Obviously you should be able to go
13  back and see if it came from a My Pillow employee, but
14  it's not on there.
15  Q. Sir, not to defend anyone, but we did ask for
16  this information.
17  A. Good for you.
18  Q. And this was produced as part of a production.
19  A. I don't care. It's not from a My Pillow
20  employee or Mike Lindell, that's what I'm telling you.
21  So you'll have to work that out and I will with this
22  attorney right here as soon as, believe me, we'll be
23  here all night until I find out where he got this.
24  Q. Well, it may have come to your CTO, it may have
25  come to just someone else.

**Page 349**

1  A. No, nobody at My Pillow did this. If somebody
2  sent us an email, maybe at that ▮▮▮▮thing and we didn't
3  know about it, if that's where it came from, that could
4  be, I don't know. This is a deviation. Believe me,
5  I'll find out where it came from. But it didn't come
6  from a My Pillow employee. So when you did the
7  discovery to My Pillow, maybe it was in like that little
8  email you showed me before.
9      That, it looks like somebody sent us a bunch of
10  evidence to an email address, that's what I would say,
11  or to Facebook. It looks like it might have been, maybe
12  it was on a My Pillow Facebook and somebody popped it up
13  there, that would be My Pillow discovery. That's, you
14  know what I mean, if that's the case. But it never came
15  from a My Pillow employee or Mike Lindell.
16  Q. Well, it sounds like you need to investigate
17  that first before you can swear to that.
18  A. No, I can swear to that now because I know my
19  employees and I know me. Nobody, this would have came
20  before me, nobody would be doing this. They wouldn't
21  even know how to do this. Nobody at My Pillow, no one
22  has even the brains or whatever the heck they're diving
23  into whatever the cyber stuff is.
24      If this came in discovery it came, like I told
25  you, either the ML email and nobody seen this. Anybody

1 that would have seen this at My Pillow would have
2 brought this to me and said what the heck is this,
3 that's a fact. I can tell you that because I know my
4 company. I would put everything I have. It didn't come
5 from a My Pillow employee and it didn't come from Mike
6 Lindell and none of my employees seen this. And if they
7 did see it, they would have brought it to me and said
8 what is this. That's it. I don't have cyber people
9 that work at My Pillow, none of them. So obviously some
10 hero probably sent that in.
11 Q. Why do you call them a hero?
12 A. Because it looks like, isn't it supposed to be
13 you sent it about an investigation into Eric Coomer?
14 Q. Yeah.
15 A. Right, so he tried to be a hero. I never seen
16 this. That's what I would think, some guy that wanted
17 to be a hero, I want to be a hero, here, I got all the
18 information on them, whatever it is.
19 Q. Does it, does it trouble you that My Pillow is
20 in possession of this information?
21 A. I didn't know they were and I don't know if they
22 are. We have emails. You got, what you did, you, a
23 deposition, or you got discovery, which is disgusting,
24 every email, all emails where you're mentioning
25 whatever, the name Smartmatic, blah, blah, blah. So

1 emails that I can't control, outside emails that are
2 sent to My Pillow.
3 You get outside emails. If I sent you an email
4 from, if I sent you an email here and saying what you
5 are and you're Mike Lindell, are you sorry you got an
6 email from me? I can't, we can't control who we get
7 email from and we certainly can't control what's said on
8 Facebook. So if someone put this up on Facebook on a My
9 Pillow site or they sent an email, what am I supposed to
10 do, in possession of it. Did you want us to delete it
11 because we, I told you, we don't delete anything, we
12 don't delete stuff. What do you think, you know, that's
13 crazy. So am I ashamed to have that on there, no.
14 Q. I said does it trouble you?
15 A. Trouble me as far as what?
16 Q. That you have this type of information on
17 election workers in your --
18 A. I don't have this information, we don't have it
19 at My Pillow. We're going to find out it was an email.
20 We're not in possession of this.
21 Q. Well, yeah, you were.
22 A. No, we aren't. It's on an email, it's on an
23 email server. It could have been deleted, I don't know,
24 I have to find out. If it's on Facebook, we're not in
25 possession of it. I thought I seen Facebook on here.

1 I don't know where you got it from, but we're
2 not in possession of that. If they sent, I guess if
3 they sent an email to you, I got a lot of other bad
4 stuff where people send porno stuff to us in emails or
5 hate email, and do I feel bad about having that in my
6 possession, yeah, but I can't help it, it's an email.
7 Q. Well, here's, here's what I propose then, sir,
8 and I can talk offline with your counsel. We're going
9 to be together tomorrow.
10 A. Yeah, I'll find out where this was, you can bet
11 on that. That will be the first thing we can do, how is
12 that.
13 Q. Yeah, and we'll at least, I'm only entitled
14 to --
15 A. Oh, no, I'm going to tell you everything because
16 I want you to know everything. I don't hide my hand
17 because I have nothing to hide. We will find out where
18 that came from, we will find out who sent it, if it was
19 an email, who sent it, where they live, everything. I
20 want to find out because you're not going to sit here
21 and tell me one of my employees did it, because they
22 didn't.
23 Q. I'm just asking you questions. I don't, I'm not
24 telling you anything.
25 A. What's even more if it was me that had it or one

1 of my guys, one of my cyber guys did it for me
2 personally, I think I would know about it, I would want
3 to see it. I've never seen this before in my life. So
4 I know I didn't order an investigation into Eric Coomer.
5 Maybe these lawyers did. I'm going to find out from
6 him. They probably did because you guys did this to
7 him, I'm sure they had to get an investigation going,
8 you know.
9 Q. All right.
10 A. I just pay them, I don't know what they do, you
11 know. If you're trying to incriminate them right now,
12 you should tell him.
13 THE WITNESS: What did you guys do?
14 Q. No, I'm not, and they've been --
15 A. I'll find out.
16 Q. -- they've been thorough and professional.
17 A. I will find out, okay.
18 Q. So I'm not saying anybody did anything wrong, I
19 just want to get the answers to the questions.
20 A. No, but I'm telling you it didn't come from My
21 Pillow or Mike Lindell, so that we do know. And we will
22 find out so that you can say, wow, Mike, you're right.
23 I can say 100 percent because I know all my people and I
24 know me. I would tell you if I did this, I would tell
25 you if one of my employees could even do this. Zero,

1 zero percent.

2 Q. All right.

3 A. It was probably an email from someone in one of

4 those ██ emails.

5 Q. Okay. Thank you. What we'll do then when we

6 start up tomorrow, and this could change when we talk,

7 but I'll propose that we go on the record and finish the

8 My Pillow part of your deposition.

9 A. Right.

10 Q. To conclude with that.

11 A. But you better add that back in, because that

12 didn't come from My Pillow, tomorrow.

13 Q. Okay.

14 A. All right. Go ahead, what's the next thing.

15 Q. Just give me a second.

16 A. All right. Hurry up, this lady wants to go

17 home.

18 Q. The clock runs no matter what I do.

19 A. Okay. If I didn't know you, I'd swear you set

20 me up there, put that in there, but then you tell me my

21 own attorneys gave it, that's disturbing.

22 Q. Similar questions about another Excel

23 spreadsheet that was produced, this, this one by under

24 the Lindell name, meaning it's supposed to have come

25 from you personally, all right. But I think it relates

Page 354

1 to the symposium, so I want to ask you about this one.

2 A. Okay.

3 Q. This is Lindell, it's actually the first thing

4 that was produced, it's document No. 1.

5 A. Okay.

6 (Exhibit 74 marked for identification.)

7 Q. So 74 is Lindell No. 1. And I'll try to get

8 this close to you so you can see this one. In the, in

9 the days leading up to the Cyber Symposium, do you

10 recall circulating a list of potential invitees --

11 A. No.

12 Q. -- to the symposium?

13 A. No, I didn't do any of these invites. I don't

14 know who any of these are. This was, like I say, they

15 were given parameters, invite politicians, every

16 politician in the country was invited, Democrats and

17 Republicans, both at the state levels and the federal

18 levels.

19 Q. Okay.

20 A. Every outlet media was invited, podcasters,

21 everybody, and cyber guys. And they had to prove that

22 they were a cyber, that they had --

23 Q. You mentioned that.

24 A. That's it.

25 Q. Do you know, the reason I'm, I want you to look

Page 355

1 at this --

2 A. Yeah.

3 Q. -- and tell me, do you know how this information

4 was gathered and who gathered it?

5 A. No idea and no idea. There was I know ██

6 ████ I think she worked on it, I think ████████,

7 once again, it was Lindell Management, she's my chief of

8 staff, she would have had a team with her, probably

9 ████████ maybe.

10 They were just getting lists from, from like DC,

11 I know we got a list, you know, that's online there with

12 their emails. We knew all the, we knew most of the

13 media. And cyber guys, that was invite, I think the

14 word got out so they would, they would take an invite

15 and then we would add them to the list. These weren't

16 potential invites, these were people that reached out

17 and we had, they reached out to us and then we said if

18 they were okay to be invited.

19 Q. Did any of the election companies send

20 representatives or were they invited?

21 A. Who?

22 Q. Anyone from any of the election companies,

23 Dominion, ES&S, Smartmatic.

24 A. I don't know, I don't know. If they were cyber

25 guys, then they were invited. Absolutely, if they were

Page 356

1 cyber people that could come in there, they definitely

2 should have been there, and they were invited. Anybody

3 with, you had to have cyber credentials. And I know

4 they were definitely invited when I was on a show once

5 because they said are you inviting all the machine

6 companies, their cyber guys, absolutely.

7 Q. Well, part of the reason I was asking about this

8 list is because we had, we had received some

9 communications between you and Tina Peters --

10 A. No, you didn't, not before the symposium. I

11 didn't know who she was and I never communicated with

12 her ever before that, so you're lying. That's a fact.

13 Q. You didn't let me finish my question.

14 A. Okay. Well, go ahead.

15 Q. You accused me of lying before I finished my

16 question.

17 A. Well, you said I communicated with her and this

18 list was done before the symposium.

19 Q. So my question was, we received some

20 communications between you and Tina Peters recently

21 dated in April of 2022, so that would have been after

22 the symposium.

23 A. A year later, yeah.

24 Q. Okay.

25 MR. CAIN: Well, let me just mark this.

Page 357

90 (Pages 354 - 357)

| | |
|---|---|
| 1     (Exhibit 75 marked for identification.) | 1  through July and the next page you're talking about, or |
| 2  A. I want to make it clear on the thing you just | 2  she's talking about I should say, apparently raising |
| 3  showed me, those were not potential invites, those were | 3  money. |
| 4  people that reached out to be invited, there's a | 4  A. In 2022. |
| 5  difference. Do you follow me? | 5  Q. Yes, sir. |
| 6  Q. Oh, yeah, I do. | 6  A. Mm-hmm. |
| 7  A. As they reached out they got put on here and we, | 7  Q. So fairly recently. Do you remember this |
| 8  or as we, except for the list, the politicians was a | 8  episode where she was talking about raising money for |
| 9  massive list sent out, you know. | 9  her race on a recount? |
| 10  Q. Okay. So that actually is a good point in | 10  A. Yeah. |
| 11  that -- | 11  Q. Okay. And, and were you involved in that? |
| 12  A. What's that? | 12  A. No, no. She was, it looks like she was asking |
| 13  Q. I said that was, that's a good point because I | 13  me could I do a shout out on my media channel. |
| 14  didn't really ask you how the invitations -- | 14  Q. So she is, and that's why, part of why I'm |
| 15  A. You said these were potential invites. Some of | 15  asking this is, she's emailing, or excuse me, texting |
| 16  them were, some weren't, some had reached out and they | 16  you about raising money for this particular race and |
| 17  had to be vetted. | 17  she's sending that to your -- |
| 18  Q. Right, okay. Who actually sent out the | 18  A. It's not, I think this was a, I don't know if it |
| 19  invitations, did My Pillow have anything to do with | 19  was a race, it was through, to do a recount, right? |
| 20  that? | 20  Q. A recount, right, I apologize. |
| 21  A. No, no. | 21  A. Yeah, a recount. I had nothing to do with that. |
| 22  Q. Okay. | 22  Q. Well -- |
| 23  A. No, it was done by Lindell Management, it was | 23  A. She's asking, she's asking me like everyone else |
| 24  done by -- you'd have to check. It was done by a | 24  does, will you help me out and do that and I didn't. |
| 25  Lindell Management server, not by a My Pillow. | 25  Q. Okay. And that's, that's my question. So you |
| <div align="right">Page 358</div> | <div align="right">Page 360</div> |

| | |
|---|---|
| 1  Q. Okay. All right. | 1  say, "Is there something I can send out in email?" |
| 2  A. I think it went to symposium.com or something | 2  A. That's what I said, right. |
| 3  like that, or whatever the event was. Symposium.com, | 3  Q. And she asked you then to put this out to your |
| 4  there was a .com, there was a special email set up for | 4  contacts? |
| 5  that to respond. | 5  A. Right. |
| 6  Q. Gotcha. | 6  Q. Are you with me? |
| 7  A. It was not My Pillow. | 7  A. And I didn't put it out. |
| 8  Q. Okay. | 8  Q. You didn't? |
| 9  A. Absolutely it wouldn't be My Pillow for this. | 9  A. What? |
| 10  Q. Fine. And so we're looking at Exhibit -- | 10  Q. You didn't put it out? |
| 11  COURT REPORTER: 75. | 11  A. No. |
| 12  Q. 75. And this appears to be, it says, "Tina | 12  Q. Why not? |
| 13  new," is that her new cell phone? | 13  A. Well, I didn't use My Pillow email for anything |
| 14  A. What's that? | 14  and I don't know what, for an email I didn't know where |
| 15  Q. It, it says, "Tina new," like the person that | 15  to put it out, I mean, I don't know where to put out |
| 16  you're talking to -- | 16  something like that. |
| 17  A. Mm-hmm. | 17  Q. Okay. |
| 18  Q. -- or texting with in this instance is, by the | 18  A. I did not put my, never, never would I put an |
| 19  context it's Tina Peters' new cell phone? | 19  email out from My Pillow involving anything with |
| 20  A. I guess, yes, Tina new, that would be a new | 20  elections or anything else other than sending pillows, |
| 21  number, I don't know, probably a new number. | 21  period. So when she put an email, I might have said, |
| 22  Q. Okay. And we don't have time, we're about to | 22  you know, to email people around, like other podcasters |
| 23  run out for the day, but since we're going to start up a | 23  maybe, but I didn't do that. That's what I meant by |
| 24  little bit tomorrow, we can maybe shave this a little | 24  that, can I send out an email to other, because she |
| 25  bit. This is an exchange in April and then it goes | 25  asked me, if you read it here, it says, "I am," it says, |
| <div align="right">Page 359</div> | <div align="right">Page 361</div> |

<div align="right">91 (Pages 358 - 361)</div>

"It has to be individual donations, I need a shout out
from every media channel. Is there something I can send
out in an email?" So I wanted her to write something
and I could have sent it out to my podcasters maybe at
Frankspeech, but I didn't do it, no.

I just thought it was, you know, it doesn't make
sense, because it looks like, "Put this out, Mike, Mesa
County clerk can be," I never sent it. In fact, I
probably didn't look at the text. A lot of times people
text me, I don't have time to read it, I never sent that
out.

Q. And did My Pillow pay for her legal defense?

A. Absolutely not.

Q. Did you personally?

A. No. My Pillow never paid a dime and I never
paid a dime. Did she get money, you know, lawyer get
money from the Lindell Legal Offense Fund, yeah, one
lawyer did.

Q. On her behalf for her defense?

A. I don't know what they were doing, I guess they
were. But they set up their own fund and they went
south on it and two lawyers that to this day are sitting
on funds that they collected for her and nobody knew
what the heck they did with it.

Q. Okay.

Page 362

A. I never put in a dime personally.

Q. All right. Well, the --

A. That I know of. And if I, and I could check
before I got here, the Lindell Legal Fund, because
you'll probably ask, we'll see if you put in money to
the Lindell Offense Fund it's called, and I don't
believe I did, but those lawyers got money out of there
for her attorneys I believe.

Q. Okay.

A. That was for one month and then they did their
own thing.

Q. The, the Legal Offense Fund --

A. Right.

Q. -- that you're aware of.

A. It's a C corp.

Q. Yes. And you're, you're obviously, I think you
were actually the incorporator of that entity, do you
understand that?

A. Yeah, there's three people on that board, Kurt
Olsen is one.

Q. And who is the other one?

A. Paul, some Paul, I don't know his last name.

Q. Okay.

A. He's not from Minnesota, he was just a, going to
be just a board member back when set it up and we hadn't

Page 363

really done anything with it because I didn't go out and
solicit it. And Kurt started to and Kurt pretty much
controlled the money coming out of there.

Q. But this other person, not a, not a My Pillow
employee or person?

A. No, no, from Wisconsin. He's not a My Pillow,
his name is Paul, oh, my gosh. He runs a treatment
center, he runs a, he's a veteran that runs, I got to
know him through where I got saved, Operation Restored
Warrior.

Q. Do you know whether Tina Peters' attorney, Mr.
Gessler, was paid out of that Legal Offense Fund?

A. What's his name, I don't know who Gessler is?

Q. Scott Gessler.

A. Don't know him, I don't even know who he is. I
don't know if I've even met him. When I say I don't
know, even if I met him, I might not know him by face.

Q. Okay. If you flip to it's 1422. I was confused
by some, some statements here. At the top it says, you
say, "Tina, are you available this morning? We should
get the employment done or did the movie people hire?"

A. Right.

Q. What are you referring to when, "We should get
the employment done"?

A. She was doing a documentary, it was called --

Page 364

now I got to think.

Q. Selection Code?

A. Election Code, Election Code, that's correct.

Q. Okay. So that's what this is referring to?

A. Yeah, yeah. She was doing it, it's for Election
Code, or Selection Code. Selection Code, I'm sorry,
Selection Code. Yeah, that's what I was asking her. I
wanted to know if she got her employment done with the,
if the movie people hired her or paid her or whatever
she was doing because it was her story.

Q. I see. Did My Pillow produce --

A. No, no.

Q. -- that particular deal?

A. No, My Pillow didn't produce that. It's some
outside company, I don't even know who they were. I can
give you their names. My Pillow did nothing with any of
this, zero, absolutely zero.

Q. All right. And then she goes on in response,
"Yes, I'm available. This lawsuit needs Dershowitz or
Powell. The SOS and Dominion violated statute in the
recount." What lawsuit was she --

A. I have no idea what she's talking about. I
never responded, as you can see.

Q. Okay.

A. No idea, absolutely no idea. If she's talking

Page 365

1 about, she's probably talking about going after, this is
2 what I'm assuming, going after her recount, but I don't
3 know.
4    Q. Okay. And then proceed to the next page in the
5 middle. In the middle it says, "Mike, sorry I missed
6 your call, was in a meeting. Will call you back this
7 morning. Good stuff on this end too. I am determined
8 to bring down Dominion with Tina's case and we may take
9 a major step in that direction tomorrow." Now it was
10 unclear to me if this is you texting this?
11    A. No, this is Mike, this is the lawyer, they had a
12 lawyer named Mike for Tina Peters. This is a very bad
13 guy, just so the know, be careful, okay. This is the
14 guy that ran away with all the money, this is the guy
15 that I'm very upset with because he, he, he took off and
16 he, he had the evidence and stuff from Tina, he had, he
17 had everything. Everything he got from Tina he took it
18 down to that place in Texas, what's their name, Russ
19 Ramsland, you know, they're all sitting there, got their
20 little cabala going down there.
21    Q. Do you remember Mike's last name?
22    A. No.
23       THE WITNESS: Do you know it, if I say it,
24 McCullough?
25       MR. MALONE: That's right.

1    A. Mike McCullough. You can have his name. I'll
2 give you the other corrupt lawyer too.
3       THE WITNESS: It was Karen something?
4       MR. MALONE: That one I don't know offhand.
5    A. Okay. Mike McCullough, that's him. That was
6 before, before I told him off, I don't know what the
7 date on this, yeah, 8/23. So this is probably one of
8 his last texts to me because I told him off. He's a bad
9 guy.
10    Q. Okay.
11    A. He was clinging onto Tina to make money and he's
12 the one that paid all her stuff, by the way, out of a
13 Tina Peters fund.
14    Q. All right. We're getting a little far afield.
15 Let's do this, since you're going to be here tomorrow,
16 what I would propose is let's take, let's take our
17 adjournment now and you all can figure out, that will
18 give you some time to figure out --
19    A. Hey, my show is starting, do you want to come on
20 as a guest, off the record?
21    Q. No, no desire to do that.
22    A. That would blow the country's mind, here we got
23 the lawyer here that did this to My Pillow, Eric Coomer,
24 and he said I called him traitor.
25    Q. I will say this on the record before we break,

1 we are under a protective order in our case, some of
2 this is likely to be designated as confidential by
3 either of the parties.
4    A. I haven't heard that yet.
5    Q. Okay. We don't have to do it contemporaneously,
6 meaning we can do it --
7    A. Okay. I'm not agreeing to anything.
8    Q. I'm not asking for your agreement.
9    A. This thing, this thing is public already.
10    Q. Right.
11       MR. MALONE: Mike, just listen to him,
12 we'll object if we need to.
13       THE WITNESS: Okay, okay.
14    Q. Yeah, my point is this, I'm not here to advise
15 you, but if you talk about your deposition, if you talk
16 about what we did here today, it may ultimately end up
17 violating the protective order if that portion is marked
18 confidential.
19    A. You do care about me.
20       THE WITNESS: This guy is bizarre, one
21 minute he's hammering me, the next minute he's trying to
22 get me not to get in trouble. I thought you were
23 supposed to do that.
24       MR. MALONE: That's an issue we agree,
25 nobody wants you in trouble, Mike, so keep listening.

1       THE WITNESS: Well, that's great, I got
2 plans, so we're okay.
3       MR. MALONE: He's not done, he's done yet.
4       MR. CAIN: I am, unless there is an
5 objection --
6    A. I do want to put it on the record that I will
7 for sure want that on the record what you put in there
8 today, that one piece on there that I know didn't come
9 from My Pillow. I will have that answer for you
10 tomorrow morning and I want to put it on the record, is
11 that agreeable?
12    Q. Yeah, that's what I'm proposing.
13    A. Okay. Because that is quite a deal you showed
14 me there.
15    Q. All right.
16       MR. CAIN: Let's, let's adjourn then.
17       VIDEO TECHNICIAN: We are going to go off the
18 record at 6:01 p.m.
19       (Proceedings adjourned for the day at
20       6:01 p.m., 03-08-2023)
21
22
23
24
25

## Page 370

```
 1          REPORTER'S CERTIFICATE
 2
 3
    STATE OF MINNESOTA  )
 4                      ) ss.
    COUNTY OF WASHINGTON )
 5
 6      I hereby certify that I reported the videotaped
    deposition of Michael J. Lindell, Volume I, on the 8th
 7  day of March 2023, in Minneapolis, Minnesota, and that
    the witness was by me first duly sworn to tell the whole
 8  truth;
 9      That the testimony was transcribed by me and is a
    true record of the testimony of the witness;
10
        That the cost of the original has been charged to
11  the party who noticed the deposition, and that all
    parties who ordered copies have been charged at the same
12  rate for such copies;
13      That I am not a relative or employee or attorney or
    counsel of any of the parties, or a relative or employee
14  of such attorney or counsel;
15      That I am not financially interested in the action
    and have no contract with the parties, attorneys, or
16  persons with an interest in the action that affects or
    has a substantial tendency to affect my impartiality;
17
        That the right to read and sign the deposition by
18  the witness was reserved.
19      WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.
20
21
22
23
            Kelley E. Zilles
24          Kelley E. Zilles, RPR
            Notary Public, Washington County, Minnesota
25          My commission expires 1-31-2025
```

## Page 372

```
 1  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2  Michael J. Lindell (#5761446)
 3          E R R A T A   S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Michael J. Lindell        Date
25
```

## Page 371

```
 1  Ryan Malone
 2  Malone@parkerdk.com
 3          March 22, 2023
 4  RE:  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 5      3/8/2023, Michael J. Lindell (#5761446)
 6      The above-referenced transcript is available for
 7  review.
 8      Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25
```

## Page 373

```
 1  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2  Michael J. Lindell (#5761446)
 3      ACKNOWLEDGEMENT OF DEPONENT
 4      I, Michael J. Lindell, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  Michael J. Lindell        Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25
```

(e) Review by Witness; Changes; Signing. If requested by the deponent or a party before completion of the deposition, the deponent shall be notified by the officer that the transcript or recording is available. Within 35 days of receipt of such notification the deponent shall review the transcript or recording and, if the deponent makes changes in the form or substance of the deposition, shall sign a statement reciting such changes and the deponent's reasons for making them and send such statement to the officer. The officer shall indicate in the certificate prescribed by subsection (f)(1) of this rule whether any review was requested and, if so, shall append any changes made by the deponent.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3   ----------------------------------------------------------

4   Eric Coomer, Ph.D.,

5              Plaintiff,

6      vs.              Civil Action No. 1:22-cv-01129-WJM

7   Michael J. Lindell, Frankspeech LLC,

8   and My Pillow, Inc.,

9              Defendants.

10  ----------------------------------------------------------

11

12       VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13      DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                VOLUME I (Pages 1-370)

15

16

17  DATE:   March 8, 2023

18  TIME:   9:30 a.m. CST

19  PLACE:  PARKER DANIELS KIBORT, LLC

20          Colwell Building, Suite 888, 123 North 3rd St

21          Minneapolis, Minnesota 55401

22

23

24  REPORTED BY: KELLEY E. ZILLES, RPR

25  Job No.: 5761446

                                          Page 1

```
 1                    REPORTER'S CERTIFICATE
 2

 3
      STATE OF MINNESOTA    )
 4                          ) ss.
      COUNTY OF WASHINGTON )

 5

 6        I hereby certify that I reported the videotaped
      deposition of Michael J. Lindell, Volume I, on the 8th
 7    day of March 2023, in Minneapolis, Minnesota, and that
      the witness was by me first duly sworn to tell the whole
 8    truth;

 9        That the testimony was transcribed by me and is a
      true record of the testimony of the witness;

10
          That the cost of the original has been charged to
11    the party who noticed the deposition, and that all
      parties who ordered copies have been charged at the same
12    rate for such copies;

13        That I am not a relative or employee or attorney or
      counsel of any of the parties, or a relative or employee
14    of such attorney or counsel;

15        That I am not financially interested in the action
      and have no contract with the parties, attorneys, or
16    persons with an interest in the action that affects or
      has a substantial tendency to affect my impartiality;

17
          That the right to read and sign the deposition by
18    the witness was reserved.

19        WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.

20

21

22

23

24        Kelley E. Zilles, RPR
          Notary Public, Washington County, Minnesota
25        My commission expires 1-31-2025


                                          Page 370
```

|  |  |
|---|---|
| 1  REPORTER'S CERTIFICATE | 1  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al |
| 2 | 2  Michael J. Lindell (#5761446) |
| 3 | 3  E R R A T A  S H E E T |
| STATE OF MINNESOTA  ) | 4  PAGE_____ LINE_____ CHANGE_____ |
| 4             ) ss. | 5  _____ |
| COUNTY OF WASHINGTON ) | 6  REASON_____ |

REPORTER'S CERTIFICATE

STATE OF MINNESOTA  )
                    ) ss.
COUNTY OF WASHINGTON )

     I hereby certify that I reported the videotaped
deposition of Michael J. Lindell, Volume I, on the 8th
day of March 2023, in Minneapolis, Minnesota, and that
the witness was by me first duly sworn to tell the whole
truth;
     That the testimony was transcribed by me and is a
true record of the testimony of the witness;

     That the cost of the original has been charged to
the party who noticed the deposition, and that all
parties who ordered copies have been charged at the same
rate for such copies;
     That I am not a relative or employee or attorney or
counsel of any of the parties, or a relative or employee
of such attorney or counsel;
     That I am not financially interested in the action
and have no contract with the parties, attorneys, or
persons with an interest in the action that affects or
has a substantial tendency to affect my impartiality;

     That the right to read and sign the deposition by
the witness was reserved.
     WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.

_____
Kelley E. Zilles, RPR
Notary Public, Washington County, Minnesota
My commission expires 1-31-2025

Page 370

---

Ryan Malone
Malone@parkerdk.com
     March 22, 2023
RE:   Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
   3/8/2023, Michael J. Lindell (#5761446)
   The above-referenced transcript is available for
review.
   Within the applicable timeframe, the witness should
read the testimony to verify its accuracy. If there are
any changes, the witness should note those with the
reason, on the attached Errata Sheet.
   The witness should sign the Acknowledgment of
Deponent and Errata and return to the deposing attorney.
   Copies should be sent to all counsel, and to Veritext at
errata-tx@veritext.com.

   Return completed errata within 30 days from
receipt of testimony.
   If the witness fails to do so within the time
allotted, the transcript may be used as if signed.

        Yours,
        Veritext Legal Solutions

Page 371

---

Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
Michael J. Lindell (#5761446)
     E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____    _____
Michael J. Lindell          Date

Page 372

---

Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
Michael J. Lindell (#5761446)
     ACKNOWLEDGEMENT OF DEPONENT
   I, Michael J. Lindell, do hereby declare that I
have read the foregoing transcript, I have made any
corrections, additions, or changes I deemed necessary as
noted above to be appended hereto, and that the same is
a true, correct and complete transcript of the testimony
given by me.

_____ 4/20/23
Michael J. Lindell          Date
*If notary is required
     SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.

_____

     NOTARY PUBLIC

Page 373

94 (Pages 370 - 373)

Veritext Legal Solutions
800-336-4000