**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129-NYW-SKC

ERIC COOMER, Ph.D.,
      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,
      Defendants

---

**PLAINTIFF'S OMNIBUS RESPONSE TO**
**DEFENDANTS' OMNIBUS MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), through counsel, files this Omnibus Response to Defendants' Omnibus Motion for Summary Judgment [Dkt. 177], as follows:

## I.    INTRODUCTION

Defendants' Motion for Summary Judgment (Motion) rehashes the same failed arguments from Defendants' Motion to Dismiss without adding any new undisputed facts that would alter the Court's prior analysis. Defendants' motion to dismiss was properly denied on March 15, 2023. Dkt. 119. The present recycled Motion narrowly challenges only one of the numerous defamatory publications at issue in this case. Thus, even if the Court were inclined to reverse course and revisit its prior ruling, it could not grant the requested relief of dismissing Dr. Coomer's entire case.

The Motion makes several other disjointed arguments that are similarly unavailing, to wit:

- Defendants argue that Defendant MyPillow, Inc. cannot be held liable for the conduct at issue here. This argument fails because Defendant Lindell was acting

as an agent of MyPillow at all times relevant to this dispute.  He had actual and apparent authority to do so, and MyPillow is alsoliable under respondeat superior.

- Defendants also argue that they cannot be found liable for either intentional infliction of emotional distress (IIED) or civil conspiracy, but these arguments are largely derivative of their failed claims against Dr. Coomer's claim for defamation.

Finally, Defendants' Motion makes no effort to defend Defendants' repeated claims that Dr. Coomer engaged in criminal activity with respect to the 2020 presidential election.  After numerous depositions and the exchange of thousands of pages of documents, the obvious lies about Dr. Coomer remain obvious lies.  There is no effort to promote the truth of Lindell's election fraud narrative across this case or even with respect to Dr. Coomer's former employer.  Instead, the Motion is another vehicle to mislead and distract the Court and the public using manufactured narratives that do not survive even cursory scrutiny.

Full disclosure of the facts—both undisputed and disputed—presents a very different picture.  As such, the Motion fails to show there are any undisputed material facts and that Defendants are entitled to judgment as a matter of law.

## II.    RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    This Court's practice standards require summary judgment movants to provide a statement of undisputed material facts.  Defendants' Motion contains both disputed and undisputed facts.

2.      Dr. Coomer acknowledges the following paragraphs in the Motion are undisputed except as noted:  paragraphs 1-6, 8-10,[1] 11-12,[2] 13-21,[3] 22-30,[4] 34, 36-37, 39, 41, 43, and 45-49, 52.[5]

3.      Dr. Coomer denies paragraph 7.   Joe Oltmann (Oltmann) admitted that on November 11, 2020, he "recreated" a screenshot of his Google search of Dr. Coomer.[6]  Previously, Oltmann alleged that he identified Dr. Coomer in September 2020.[7]  This is important because Dr. Coomer contends that Oltmann reverse engineered his fabricated story about being on "Antifa call" with Dr. Coomer.

4.      Dr. Coomer denies paragraph 31 because the "settlement agreement" with Newsmax was not announced in on-air statement on Newsmax.

5.      Dr. Coomer admits that Lindell previously appeared on Newsmax to advertise MyPillow products as stated in paragraph 32.  Dr. Coomer denies that Lindell "could no longer

---

[1] Dr. Coomer admits reposting the so-called "Antifa Manifesto" as alleged in paragraph 10.  It has been alleged that Dr. Coomer created the document.  He did not.

[2] Dr. Coomer admits to making various historical social media posts, as alleged in paragraph 12, and referenced at times by Oltmann.  Dr. Coomer is not aware of all posts attributed to him by Oltmann.

[3] Dr. Coomer admits paragraph 21 but disputes the characterization of "claiming" to be in fear for his safety.  Dr. Coomer was and is, as a matter of fact, in fear for his life.  **Exhibit 11**, Depo. Tr. Dr. Coomer (Feb. 15, 2023), 46:19-47:25.   He is literally threatened to this day despite the passage of three years since the 2020 election.  **Exhibit 15**, X post (Dec. 3, 2023).

[4] Dr. Coomer admits that he received treatment from Dr. Finkell as stated in paragraph 22.  Dr. Coomer denies that he never mentioned Lindell (every citation provided by Defendants confirms Dr. Finkell did not have any specific recollections of any individuals mentioned by Dr. Coomer).

[5] Admitted only as to the fact that the statement was made but not as to motivation or scienter.

[6] Oltmann's fabrication of evidence implicates C.R.S. § 18-8-610.

[7] **Exhibit 8**, Depo. Tr. Oltmann, 275:17-282:7.

make live personal appearances on Newsmax" following his settlement with Newsmax.  Newsmax CEO Chris Ruddy (Ruddy) testified directly contrary to Lindell's claim.[8]

6.      Dr. Coomer denies Lindell's account of his conversation with Ruddy as stated in paragraph 33.  Ruddy has testified to the contrary.[9]

7.      Dr. Coomer denies that Lindell has not accused him of personally "rigging" the election as claimed in paragraph 35 of the Motion.  Lindell's statements about Coomer directly implicate him and, by extension, his employer (Dominion), in rigging the election.[10]  To believe otherwise would be to disregard virtually all of Lindell's public statements about the 2020 election and Dr. Coomer.

8.      Dr. Coomer denies paragraph 38 of the Motion because it falsely implies that the Cyber Symposium's only purpose was to prove that China interfered with the 2020 presidential election.  This was a purpose of the symposium, but there were others, including to promote claims that Dr. Coomer and Dominion played a role in rigging the election, to disseminate illegally obtained election management data from Mesa County, Colorado, to drive web traffic to Lindell's newly-created media platform, Frankspeech, and to promote and sell MyPillow products.

9.      Dr. Coomer denies Lindell's purported ignorance of Oltmann's allegations against Dr. Coomer or Dominion as alleged in paragraph 40.  The fact that Lindell claims he had no "prior knowledge" of these allegations is belied by Lindell's own public statements.  If Lindell is to be

---

[8] **Exhibit 10**, Depo. Tr. Ruddy (Aug. 18, 2023), 52:3-14.

[9] **Exhibit 10**, Depo. Tr. Ruddy, 60:2-23.

[10] *Infra* ¶ 77.

believed that he was wholly ignorant of these allegations, then by definition he acted with reckless disregard of the truth when he allowed Oltmann and Clements to appear on his stage.

10.     Dr. Coomer denies that Lindell was referring to "lawfare" in paragraph 42 of the Motion when he said "It started with Eric Coomer and Dominion based right here in Colorado." Dr. Coomer contends Lindell was referring to his election-rigging narrative in that speech (which was entitled *Colorado Election Truth Rally*).[11]

11.     Dr. Coomer denies that the bolded statements contained in paragraph 43 contain all of the false and defamatory statements Lindell made about him and that they accurately reflect what actually occurred.

12.     Dr. Coomer denies Lindell's narrative beginning in paragraph 50 that his dispute with Dr. Coomer actually relates to Newsmax.  This is belied by his consistent association between Dr. Coomer, Dominion, and election-rigging.  Admitted to the extent that the statements therein were made by Lindell but denied that they are distinct.

13.     Dr. Coomer denies paragraph 51.  Lindell's beliefs regarding Dr. Coomer's role in rigging the election are not "distinct" from his claims about Newsmax.  Dr. Coomer contends the Newsmax claims are meant to deflect from Lindell's actual motive.

14.     Dr. Coomer denies paragraph 53 of the Motion.  A parties' conclusory allegation of "sincere" belief is not competent summary judgment evidence.  Actual malice can be inferred from objective circumstantial evidence, which can override a defendant's protestations of good faith.  *See Brown v. Petrolite Corp.*, 965 F.2d 38, 46-47 (5th Cir. 1992).

---

[11] **Exhibit 16**, Jeremy Jojola Tweet (Apr. 4, 2022).

### III.    ADDITIONAL MATERIAL FACTS

15.    Following former President Trump's defeat in the 2020 presidential election, Defendants Lindell and MyPillow began publishing statements and supporting causes that asserted the 2020 election was fraudulent.[12]

16.    On January 9, 2021, Lindell received a phone call from Brannon Howse (Howse), who is the anchor of a program called Worldview Weekend (WVW).[13]  WVW was the first outlet to interview former General Michael Flynn following his pardon by former President Trump.[14]

17.    Howse was joined on this call by an individual allegedly named Mary Fanning (Fanning),[15] who claimed to have information that demonstrated that the election had been rigged.[16]  Patrick Byrne (Byrne), former CEO of Overstock.com and a defendant in related proceeding *Coomer v. Byrne et. al*., Case No. 22-cv-01575-RM-SKC, has taken credit for sending Howse and Fanning to speak with Lindell,[17] but both Lindell and Howse deny knowledge of Byrne's involvement.[18]  The source of the information proffered to Lindell by Howse and Fanning

---

[12] *See* SAC at ¶ 41 (noting MyPillow's endorsement of the Women For America First bus tour, among other relevant publications.).

[13] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech at 16:19-18:20; 61:13-23.

[14] **Exhibit 5**, Depo. Tr. Howse (May 20, 2023), at 19:8-20:5.

[15] Undersigned counsel is not aware of anyone, including Defendants or their associates, who have ever actually seen the individual(s?) known as "Mary Fanning." *See, e.g*., **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 18:21-19:3; **Exhibit 5**, Depo. Tr. Howse, 22:6-23:15; **Exhibit 6**, Depo. Tr. Olsen (June 15, 2023), 205:14-17; **Exhibit 7**, Depo. Tr. Merritt (Nov. 14, 2022), 68:13-69:8.

[16] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 16:19-18:20.

[17] **Exhibit V-2**, Eric Metaxas Show, Interview with Patrick Byrne, (July 6, 2021).  Exhibits identified with a preceding "V" are a/v files that will be submitted to the Court for traditional filing on an external USB drive.

[18] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 19:20-22:7; **Exhibit 5**, Depo. Tr. Howse, 45:22-49:1.

is Dennis Montgomery (Montgomery),[19] a notorious con artist who has been involved with decades of well-publicized scams on government agencies, entities, and individuals.[20]

18.    Lindell subsequently took this information to the White House, where he attempted to persuade former President Trump of its legitimacy.[21]

19.    Beginning in February 2021, Lindell began working with Howse and Fanning on the production of various "documentaries" purporting to present evidence that the 2020 election had been rigged.  For example, on February 5, 2021, Lindell released "Absolute Proof," a film that presented various theories of election rigging, which included a segment of Dr. Coomer demonstrating the adjudication function of Dominion Voting Machines.[22]

20.    Following negative public pushback for his efforts to spread lies about the 2020 election, Lindell began developing a new website, which he originally intended to be a social media site where users could speak freely about issues such as election fraud.[23]  That effort culminated in the creation of FrankSpeech, LLC.[24]  The FrankSpeech website was run by JohnstonHowse, LLC, an entity owned in part by Howse.[25]  Lindell and FrankSpeech hosted a "Frankathon" to commemorate the launch of the website on April 19, 2021.[26]

---

[19] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 32:10-33:20.

[20] *See* **Exhibit 17**, Aram Roston et. al., *The man behind Trump World's myth of rigged voting machines*, REUTERS (Dec. 20, 2022), available at https://www.reuters.com/investigates/special-report/usa-election-montgomery/

[21] *See* Maggie Haberman, *Photos of Trump ally who visited White House capture notes about martial law*, N.Y. TIMES, (Jan. 15, 2021), https://www.nytimes.com/2021/01/15/us/politics/mike-lindell-notes-west-wing.html

[22] **Exhibit V-3**.

[23] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 82:10-83:18.

[24] *Id*.

[25] *Id*. at 60:18-62:1.

[26] **Exhibit 5**, Depo. Tr. Howse, 117:4-22.

21.     On April 30, 2021, Dr. Coomer filed a Notice of Voluntary Dismissal of Defendant Newsmax, Inc., in related proceeding *Coomer v. Donald J. Trump for President, Inc., et. al.*[27] Newsmax was one of fifteen original defendants in that proceeding, including, as relevant here, Herring Networks, Inc. dba One America News Network (OAN), and OAN's correspondent White House correspondent Chanel Rion.

22.     Within hours of the filing of the notice, the President of OAN Charles Herring emailed Lindell about the settlement.[28]  The email was also directed at Charles Herring's father and brother, Robert and Bobby Herring, respectively.  The subject of the email was "NewsWAX CAVES and ENRICHES Dominion's Eric Coomer."  It mocked Newsmax CEO Ruddy for having "no backbone" and stated that "When it's time to FIGHT, we find out who's a boy and who's a man." (Emphasis in original).[29]

23.     Shortly thereafter, Newsmax published an on-air retraction and apology of the false claims they had published about Dr. Coomer.[30]  They also published a written apology and retraction on their website.[31]

24.     On the first weekday after the settlement with Newsmax was publicly disclosed, May 3, 2021, FrankSpeech anchor Howse invited Oltmann on the air for a lengthy interview wherein Oltmann repeated and expounded upon his false claims that Dr. Coomer partook in an Antifa conference call, that he claimed during that call to have rigged the 2020 presidential

---

[27] **Exhibit 18**, Plaintiff's Notice of Voluntary Dismissal of Defendant Newsmax Media, Inc., *Coomer v. Donald J. Trump for President, Inc. et. al.*, Case No. 2020cv34319, (Denver Dist. Ct. Apr. 30, 2021).

[28] **Exhibit 19**.

[29] *Id.*

[30] **Exhibit V-4**.

[31] **Exhibit 20**.

election, and that he did in fact rig the election.[32]   Howse began the interview by promoting MyPillow products, and stated that Lindell was very impressed with Oltmann at the Frankathon event two weeks prior.[33]  This interview preceded the founding of Lindell TV, and is marked with "frankspeech.com" as its publisher.[34]

25.    Days after Oltmann's interview on FrankSpeech, and shortly after Newsmax published an on-air retraction,[35] Howse conducted an interview of Lindell wherein Lindell accused Dr. Coomer of being "treasonous," and a "traitor to the United States of America."[36]  He directly tied Dr. Coomer to claims of election rigging, falsely stating that "These are things that I have evidence of.  The evidence is there."  Lindell made these statements along with claims that he had "evidence" against Georgia Governor Kemp and Georgia Secretary of State Raffensberger, two other individuals that Lindell believes played a role in rigging the 2020 election.[37]

26.    Claims that Dr. Coomer partook in an "Antifa call," claimed on that call to have rigged the election, or did in fact play any role in rigging the election are unequivocally false.[38]

27.    In the months following these publications, Defendants began to plan for "Mike Lindell's Cyber Symposium" to be held in South Dakota on August 10-12, 2021.   Lindell promoted the event by promising his audience evidence of election fraud, which included the presentation of packet captures (PCAPs), that purported to show that "China" had rigged the 2020

---

[32] **Exhibit V-5; Exhibit V-6**; *see also* SAC at ¶¶ 54-61.

[33] **Exhibit V-7**.

[34] *See, e.g.,* **Exhibit V-7**; *see also* **Exhibit 5**, Depo. Tr. Howse, 118:18-119:6.

[35] **Exhibit V-4**.

[36] **Exhibit V-8**.

[37] *Id*.

[38] *See* **Exhibit 1**, Declaration of Eric Coomer, at ¶¶ 15, 19.

election.[39]   The event was intended to promote FrankSpeech, and would be livestreamed on the

FrankSpeech website.[40]   The event also included in-person attendees made up of elected officials,

cyber security experts, and journalists from across the country.

28.     The MyPillow website also hosted a Cyber Symposium landing page, and Lindell

described the Symposium as arising, in part, from "what MyPillow and myself have gone through."

He went on to state that, "To help support this Cyber Symposium event, I am offering some of the

best prices ever on MyPillow products."[41]

29.     The Symposium featured a "$5,000,000 Challenge."   Promotional materials for the

event indicated that "A $5,000,000 prize will be offered to any attendee who can prove that this

cyber data is not valid data from the November 2020 election."[42]

30.     Lindell also promoted the event by using a unique "promo code" associated with

the Symposium, Frank33.[43]   Utilizing the Frank33 promo code allowed MyPillow customers to

get discounts on MyPillow products.   Between August 2 and August 15, 2021, the Frank33 promo

code generated at least $1,832,500 in revenue for MyPillow.[44]

31.     Lindell worked closely with his counsel Kurt Olsen (Olsen), while planning the

Cyber Symposium.[45]   Olsen previously served as counsel for former President Trump, spoke with

him multiple times on January 6, 2021, and subsequently sued to quash a subpoena issued to him

---

[39] **Exhibit V-9**, at 0:50.

[40] *Id*. at

[41] **Exhibit 21**.

[42] **Exhibit 22**.

[43] **Exhibit 23**.

[44] **Exhibit 24**.

[45] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 251:6-254:8; 255:24-256:21; 261:25-262:14.

by the January 6 Committee.[46]  Olsen worked to establish a lineup of speakers for the Symposium, which would go on to include both Oltmann and David Clements (Clements).[47]  Olsen also worked to build a "red team" comprising individuals with backgrounds in technology and cyber security.[48] The ostensible purpose of the red team was to verify the accuracy of the information that Lindell intended to present at the Symposium.

32.     In the runup to the Symposium, multiple individuals reached out to Lindell, Olsen, and Howse to warn them that the information they intended to present at the Symposium was fraudulent.[49]     These communications contained detailed warnings referencing Dennis Montgomery's long history of fraud.  In the days prior to the Symposium, members of the red team again warned Lindell that the alleged PCAP data from Montgomery was fraudulent and could not be verified.[50]  The red team's internal communications with one another echoed these concerns.[51]

33.     On the eve of the Symposium, one member of the red team, Josh Merritt (Merritt), confronted Lindell about the falsity of the PCAP information provided by Montgomery.[52]  After this confrontation, Lindell provided Merritt with a hard drive that he claimed included further evidence of election fraud.[53]  Merritt examined the hard drive that evening.  Merritt became

---

[46] *See* Erik Larson, *Lawyer Who Talked to Trump on Day of Capitol Riot Sues Over Subpoena*, BLOOMBERG, (Mar. 25, 2022), available at https://www.bloomberg.com/news/articles/2022-03-25/lawyer-who-talked-to-trump-on-day-of-mob-riot-sues-over-subpoena?embedded-checkout=true

[47] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow (Mar. 8, 2023), 307:17-308:12; **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech 251:6-254:8; 255:24-256:21; 261:25-262:14.

[48] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 257:14-258:1.

[49] **Exhibit 25**.

[50] **Exhibit 7**, Depo. Tr. Merritt, 106:11-108:6.

[51] **Exhibit 26**.

[52] **Exhibit 7**, Depo. Tr. Merritt, 106:11-108:6

[53] *Id*. at 108:7-109:17.

convinced that the hard drive contained fabricated "evidence," and feared the potential consequences of being in possession of what he understood to be manipulated data.[54]  Merritt set off the fire alarm in his hotel so that he would be able to identify the moment when he made this realization in what he presumed would be subsequent conversations with law enforcement.[55]

34.     One cyber security expert who attended the Symposium, Harri Hursti, testified that the entire event was a sham, and that the supposed "evidence" presented was easily falsified.[56] This testimony was echoed by Dr. J. Alex Halderman as well.[57]

35.     The Defendants disregarded all of these warnings and proceeded with the Symposium, even though they had no basis whatsoever to claim the information they intended to present was accurate.  Because MyPillow employees had spent weeks inviting elected officials and cyber security experts to the Symposium, there were multiple qualified individuals on site to immediately debunk the falsified "evidence" Lindell presented them on the first day of the Symposium.  One of those experts, Robert Zeidman, produced a report demonstrating the falsity of the "evidence" and made a claim on the $5 million prize offered by Lindell.[58]  Zeidman later sued for the $5 million when Lindell refused to pay, and a 3-member arbitration panel issued an order awarding Zeidman the prize.[59]

---

[54] *Id*. at 99:4-104:15

[55] *Id*. at 104:16-105:15.

[56] **Exhibit 13**, Depo. Tr. Hursti (Mar. 30, 2023), 105:14-112:25

[57] **Exhibit 12**, Halderman Declaration at ¶ 29.

[58] **Exhibit 27**.

[59] **Exhibit 28**.

36.     Following the immediate collapse of the "evidence" purporting to demonstrate the factual basis for claims that China had rigged the election, Lindell and Olsen quickly pivoted to promotion of claims that instead Dominion Voting Systems had rigged the election.  This pivot included putting a largely unknown county clerk from Mesa County Colorado, Tina Peters (Peters), onstage to falsely claim that she had evidence that Dominion Voting Systems had somehow played a role in rigging the 2020 election.[60]  Both Peters and Lindell claim not to have met one another until the Symposium,[61] but Peters flew to the Symposium on Lindell's private jet, accompanied by Conan James Hayes (Hayes).[62]  Hayes had been working with both Lindell and Montgomery for at least several weeks at that point,[63] and he had previously posed as someone named Gerald Wood (Wood) during an update of Dominion software in Mesa County.[64]  That impersonation, and the circumstances surrounding it, gave rise to multiple criminal indictments against Peters and others.[65]  Merritt testified that Peters told him at the time that Lindell would pay off Merritt's mortgage if they continued working together.[66]  Peters asserted the Fifth Amendment literally hundreds of times in response to questioning relating to the Symposium and its attendees.

37.     The pivot to the Dominion claims also resulted in multiple publications attacking Dr. Coomer and explicitly accusing him of rigging the 2020 election.[67]  These publications came

---

[60] **Exhibit V-10**.

[61] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 328:24-329:23; **Exhibit 9**, Depo. Tr. Peters (Nov. 9, 2023), 13:10-16.

[62] **Exhibit 7**, 30(b)(6) Depo. Tr. Merritt, 129:8-130:4.

[63] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech 33:16-20.

[64] *See* **Exhibit 29**, *People v. Peters*, Mesa County Grand Jury Indictment, Case No, 21CR100; *see also* **Exhibit V-11**.
[65] *Id*.

[66] **Exhibit 7**, Depo. Tr. Merritt, 143:10-145:15.

[67] **V-Exhibits 12-14**.

in various forms, but included a panel discussion with Oltmann, Clements, and others, as well as individual PowerPoint presentations by both Oltmann and Clements.

38.    Oltmann had been previously ordered to appear for a deposition in related proceeding *Coomer v. Donald J. Trump for President, Inc.*, on the same day as the Symposium.[68] His then counsel claimed to the Court that Oltmann could not appear on account of his fear of contracting Covid-19, but in reality he was appearing onstage, unmasked, with Lindell in South Dakota.[69]  Oltmann discussed his legal troubles onstage at length, and the fact of Dr. Coomer's defamation lawsuit was known to Defendants.[70]

39.    Lindell stated that he had authorized his counsel, Olsen, to put Oltmann and Clements on stage.[71]  For his part, Olsen claimed ignorance as to how either Oltmann or Clements (and their PowerPoint presentations), repeatedly made it onstage, but he did not deny the possibility that he had put them there.[72]

40.    The Symposium was widely publicized.  FrankSpeech alone recorded at least 1,854,271 unique viewers, by far the most viewers it has ever had, before or since.[73]  This included at least 13,986,053 separate pageviews.[74]

---

[68] *See* **Exhibit 1-10**, *Coomer v. Donald J. Trump for President, Inc. et. al.*, Case No. 20-cv-34319; in the District Court, County of Denver, Colorado; Defendant Oltmann's Motion for Relief from the July 7, 2021 Order Requiring Joseph Oltmann to Appear at the Courthouse for his Deposition on August 11 (Aug. 9, 2021).

[69] *Id.* at p. 2; *see also* **Exhibit V-12**.

[70] **V-Exhibits 12-13**.

[71] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 251:6-254:8; 255:24-256:21; 261:25-262:14.

[72] **Exhibit 6**, Depo. Tr. Olsen, 172:7-13; 173:11-175:17; 198:8-200:16.

[73] **Exhibit 30**.

[74] *Id.*

41.     Dr. Coomer, who was in attendance at the Denver County Courthouse for Oltmann's scheduled deposition, returned to his hotel room that evening to see Oltmann live onstage, where he continued to spread lies alongside Lindell to an audience of millions.[75]

42.     Following the Symposium, Dr. Coomer's mental health took an unfortunate turn, and his therapist noted that his mental health was worse than it had been at any point since he began seeking treatment many months prior.[76]

43.     Dr. Coomer filed suit against Defendants on April 4, 2022, and Lindell was served on the steps of the Colorado Capitol in Denver on April 5, 2022.[77]  Lindell was appearing for an event promoting Peters' failed candidacy for Secretary of State.  Oltmann was visibly present with Lindell at the event, and Lindell went on to repeat his claims that Dr. Coomer was a criminal who would be imprisoned for his alleged role in rigging the 2020 election.[78]

44.     Over the next two weeks, Lindell continued his media blitz against Dr. Coomer, repeatedly publishing false claims that Dr. Coomer was a criminal, would soon be behind bars, and had partaken in a criminal conspiracy to rig the 2020 election.  Notably, at no point in these post-lawsuit publications did Lindell ever claim or suggest that his claims about Dr. Coomer arose from the Newsmax settlement.  Instead, they are all explicitly linked to claims of election fraud.

45.     On April 8, 2022, Lindell received an email from Robert Herring.  Robert Herring had forwarded Lindell an email from his son, Charles.  The subject line of the email was "Re: Eric Coomer information," and attached to the email was a series of documents containing detailed

---

[75] **Exhibit 1**, Coomer Declaration at ¶¶ 26-29.

[76] **Exhibit 14**, Depo. Tr. Finkell (July 6, 2023) 252:23-254:25.

[77] **Exhibit V-15**.

[78] *See* SAC at ¶ 101, *see also* **Exhibit V-1**.

information about Dr. Coomer and his friends and relatives, as well as password information for employees of several voting systems providers.[79]   In response to Herring's request that Lindell let him know if the email and attachments came through, Lindell said "Came through ! [sic]."[80]

46.     During the 30(b)(6) deposition of MyPillow on March 8, 2023, Lindell admitted to never having actually read the complaint filed against him until the night prior.[81]   He also claimed for the first time that his criminal accusations against Dr. Coomer were the product of his belief that Dr. Coomer had insisted as part of his settlement with Newsmax that Lindell not be allowed to appear or sell MyPillow products on Newsmax in the future.[82]   Lindell claimed that he had never heard of Dr. Coomer until Ruddy told him that Lindell was not allowed to promote MyPillow products on Newsmax as a condition of the settlement with Dr. Coomer.[83]

47.     In a subsequent deposition Ruddy, the CEO of Newsmax, confirmed that the settlement agreement contained no such provisions relating to Lindell or MyPillow.[84]   He repeatedly confirmed that Lindell had in fact *contacted him* about the settlement, not the other way around.[85]   He stated that he told Lindell that Newsmax had found no evidence to support the false claims about Dr. Coomer, and that this upset Lindell.[86]   He further asserted that neither Lindell nor

---

[79] Plaintiff is not attaching this document on account of the personal and national security implications already addressed with the Court in the Stipulated Motion for Leave to Disclose Certain Confidential Documents to relevant law enforcement authorities [Dkt. 135].

[80] **Exhibit 31**.

[81] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 140:6-144:3; 205:5-10.

[82] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 18:11-19:11.

[83] *Id*.

[84] **Exhibit 10**, Depo. Tr. Ruddy, 61:12-62:10; 62:20-63:8.

[85] *Id*., 45:5-13; 49:16-51:6.

[86] *Id*., 49:2-15.

MyPillow has ever been forbidden from appearing on Newsmax or selling MyPillow products, and that in fact he has invited Lindell to promote MyPillow, FrankSpeech, and even the Symposium numerous times since then.[87]

48.     In his Answers to Plaintiff's Second Set of Requests for Admission, Lindell made multiple admissions that he relied on Oltmann's allegations against Dr. Coomer.  Lindell also admitted he had no corroborating evidence supporting Oltmann's allegations, and that he neither performed nor commissioned any investigation into Oltmann's allegations about Dr. Coomer.[88]

49.     In his Answer to Plaintiff's Follow-Up Interrogatory, Lindell also relied heavily on Oltmann's allegations against Dr. Coomer.  Specifically, Lindell acknowledged that "Oltmann has claimed through public statements and sworn testimony that Dr. Coomer, in fact, played a role in rigging the 2020 election.   Oltmann bases these claims, at least in part, on his own purported personal knowledge."[89]

## IV.     ADDITIONAL MATERIAL FACTS RELATING TO MYPILLOW, INC.

50.     MyPillow employees spent weeks planning and preparing for the Symposium, including contacting elected representatives across the country to promote the Symposium, both by phone and by email.  They also arranged accommodations for Symposium attendees.  These contacts were made during business hours and from @mypillow.com email addresses.[90]

---

[87] *Id*. at 64:18-66:9; 66:19-25; 69:3-15.

[88] **Exhibit 32**, Defendant Michael J. Lindell's Responses to Plaintiff's Second Set of Requests for Admission (Nov. 17, 2023), p. 3.

[89] **Exhibit 33**, Defendant Michael J. Lindell's Answer to Plaintiff's Follow-Up Interrogatory (Nov. 21, 2023).

[90] **Exhibit 34**.

51.     MyPillow employees reached out to members of the press to promote the Symposium, during business hours and from @mypillow.com email addresses. [91]

52.     Lindell frequently contacted members of the press and others about election related matters during business hours and from his @mypillow.com email address.[92]

53.     Lindell promoted the Symposium internally to MyPillow employees, during business hours from his @mypillow.com email address.[93]

54.     The Chief Technical Officer of MyPillow assisted both Lindell and FrankSpeech with setting up email addresses related to the Symposium.[94]

55.     The MyPillow Controller requested W9s and issued payments to Symposium contributors for the work on the Symposium.[95]  He also issued payments to Symposium vendors.[96]

56.     During the Cyber Symposium, Lindell actively promoted MyPillow onstage.[97]  The MyPillow customer service helpline was inundated with calls from people watching the Symposium and calling to complain about the poor livestream quality.  The Customer Service Store Manager stated, "My phone is ringing pretty constantly with calls reporting issues with the program cutting out.  Are they working on it?"[98]

---

[91] **Exhibit 35**.

[92] **Exhibit 36**.

[93] **Exhibit 37**.

[94] **Exhibit 38**.

[95] **Exhibit 39**.

[96] *Id*.

[97] **Exhibit V-1**.

[98] **Exhibit 40**, p. 2.

57.     MyPillow board members told Lindell that his statements about the election were hurting the company.[99]   Multiple MyPillow board members left the company in early 2021 following Lindell's public statements about the election which they knew were negatively affecting the company.[100]  Lindell testified that by January 2021, "it was too late for them" because "the board, they knew that I was not going to back down on that once I got that evidence."[101]

58.     Lindell is the majority shareholder of shares in MyPillow,[102] and no one with the company has any authority to control his conduct, or to fire him.[103]  Lindell confirmed his absolute control and discretion as CEO, stating:

Q:  My questions were geared towards the fact that you were and still remain the majority shareholder?

Lindell:  Yeah, yeah.

Q:  And you can't be fired by the company?

Lindell:  That's correct.

Q:  And the company can't instruct you what you can and cannot say publicly?

Lindell:  That's right.

Q:  And I'm assuming you decide what your discretion is as the CEO of the company, what authority you have or what authority you don't have?

Lindell: That's correct.

Q:  Is there anything you can think of you don't have the authority to do on behalf of MyPillow?

---

[99] **Exhibit 2**, 30(b)(6) Depo. Tr. My Pillow, 90:24-91:8.

[100] *Id*. at 78:6-79:18.

[101] *Id*.

[102] *Id*. at 90:24-91:21.

[103] *Id*. at 92:20-93:8.

Lindell:  That would, the authority to do everything, unless it would be illegal, I mean, of course, I mean, you know.[104]

59.     Lindell acknowledges that his viewers always associate his public statements about the election with MyPillow, stating,

I was on TV 3 million times up to 2016, so anything I do out there, they're going to associate me with MyPillow . . . Anything I do, that's the way because I'm so branded.[105]

60.     Lindell affirmatively rejected calls from MyPillow employees and his own family members imploring him to stop making public statements about the election because they were hurting MyPillow sales. He stated,

Now did my family and stuff, did people from MyPillow – did they say, hey, quit talking about this, we're losing, we're getting destroyed, we're losing, yes. Conversations, many conversations, they called me.  Even family members saying, hey, you can't, we're going to, you're going to lose everything, we're going to lose our business, we keep losing more of our money every day.  And it never let up and, you know, this last year we lost millions too, you know, I mean, it doesn't, it didn't let up, but that doesn't mean I'm not going to help save my country.[106]

61.     Lindell asserts that his own employees support his public statements about the election, and that they are willing to lose everything to support his public positions on the election.

Lindell:  And that's what I'm saying, my employees will tell you the same thing. They're not going to tell me don't do this because they know me, so they know that what I'm doing is what I need to do.

Q:  And no one within the company has the authority to stop you?

Lindell:  They wouldn't want to.

Q:  No, no.  No one has the authority to stop you, do they?

---

[104] *Id*. at 96:20-97:11.

[105] *Id*. at 99:5-10.

[106] *Id*. at 83:22-84:9.

> Lindell:  They could certainly voice their opinion to say please stop.  They could. But they don't, and because if you ask them, and just like the New York Times, then they say no, we believe in what he's doing, 100 percent.

> Q:  Aside from –

> Lindell:  He's always had our back and always will.  And if we have to lose everything, they're willing to lose it too because they love our country.[107]

62.     Lindell acknowledges making MyPillow a vehicle for his own personal political beliefs, and that those decisions hurt the company.  For example, MyPillow pulled its ads from Fox News because Lindell was upset that they would not run advertisements for the Cyber Symposium. He stated:

> I didn't want to lose our country.  That's it.  I had to get this out there and they stymied my voice, they stopped my voice.  So you know what, it didn't matter, no matter what the repercussions were, MyPillow, I had to sell them.  If you're not going to do this, I'm going to pull my ads.  I have to have people see this evidence, that was the whole thing … I knew it was going to hurt us, but it doesn't matter when you lose your country.  I had to make that decision to Fox.[108]

63.     MyPillow has run multiple promo codes specifically tied to political beliefs about the 2020 election, to promote FrankSpeech, and to promote the Cyber Symposium.  For example, MyPillow has utilized the promo codes "Fight4Trump," "Dominion," "Frank33," and "Audit" to drive MyPillow revenue.  The latter two promo codes, Frank33 and Audit, were specifically associated with the Cyber Symposium, and generated at least $1,832,500[109] and $619,500[110] in

---

[107] *Id.* at 117:13-118:8.

[108] *Id.* at 176:23-177:12.

[109] **Exhibit 24**.

[110] **Exhibit 41**.

revenue for MyPillow, respectively.  Lindell expressly promoted Frank33 while promoting the Symposium,[111] and even promoted promo code Audit while live onstage at the Symposium.[112]

64.     The publications at issue in this dispute were paid for, at least in part, by MyPillow. For example, Howse and various other FrankSpeech contributors are compensated exclusively through MyPillow promo codes, meaning they only get paid if they sell MyPillow products.[113] Oltmann's podcast, Conservative Daily, has also collected tens of thousands of dollars in revenue from promoting MyPillow products.[114]

65.     Multiple publications at issue here were repeatedly punctuated with breaks to promote MyPillow products.  This is part of both MyPillow and Lindell's practice of intermingling election skepticism with sales pitches, including when Lindell explicitly states that purchasing MyPillow products will allow him to continue his campaign to challenge the election results.[115]

## V.     LEGAL STANDARD

66.     A movant is entitled to summary judgment only when it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a).  A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law.  *Wright v. Abbot Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party.  *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir.

---

[111] **Exhibit 23**.

[112] **Exhibit V-16**.

[113] **Exhibit 5**, Depo. Tr. Howse, 315:21-316:1.

[114] **Exhibit 42**.

[115] *See, e.g.*, **Exhibit V-18**; *see also* **Exhibit V-22**.

1997).  In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-movant.  *See id.*  The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.*  At a minimum, the movant must show that the non-movant lacks evidence on an essential element of its claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 663, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Only if the movant meets its initial burden does the burden shift to the non-movant to set forth facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The non-movant must provide "significantly probative evidence"—through affidavits, deposition transcripts, or specific exhibits incorporated therein—that would support a verdict in its favor.  *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012).

67.     This Court has already determined that Defendants' statements about him involved a matter of public concern, and consequently that the "actual malice" standard from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), applies.  More specifically, in Colorado, if the statement does pertain to a matter of public concern or a public official or figure, there are two additional burdens the plaintiff must prove at trial: (1) the statement's falsity by clear and convincing evidence and (2) that the defendant published the statement with actual malice. *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008); *see also Broker's Choice of Am., Inc. v. NBC Universal, Inc.*, 861, F.3d 1081, 1110 (10th Cir. 2017).  At this stage of the proceeding, Dr. Coomer need only establish a reasonable probability that he would be able to produce at trial clear and convincing evidence of falsity and actual malice.  *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 252 (1986); *see also Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 562 (2012); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005).

## ARGUMENT

### I.    *Dr. Coomer Has Established Triable Issues of Fact Regarding His Defamation Claims*

68.    Under Colorado law, the elements for defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*, 866 P.2d 908, 911 n.4 (Colo. 1993).

### A.    Defendants' Statements are Actionable.

69.    As a preliminary matter, the entirety of Defendants' argument with respect to the actionability of Dr. Coomer's claim for defamation focuses on only one of the numerous defamatory publications at issue here.  Specifically, Defendants center their attention exclusively on the interview that Lindell conducted on FrankSpeech on April 6, 2022.[116]  *See* Defendants' Motion at pp. 18-29; *see also* SAC at ¶¶ 103-05.  While it is true that this individual interview contained numerous defamatory statements, this single instance cannot be understood as a stand-in for every other publication at issue.  Instead, it is just one iteration of a now yearslong personal vendetta waged by Defendants against Dr. Coomer.

70.    That campaign comprises multiple publications that Defendants do not meaningfully acknowledge, analyze, or challenge.  Specifically, Defendants do not dispute the actionability of Defendants' defamatory publications on May 3, 2021 (SAC ¶¶ 54-61), May 9,

---

[116] **Exhibit V-23**.

2021 (SAC ¶¶ 63-65), August 10-12, 2021 (SAC ¶¶ 81-92), April 4, 2022 (SAC ¶¶ 100-102), April 7, 2022 (SAC ¶¶ 106-107), April 8, 2022 (SAC ¶¶ 108-109), May 23, 2022 (SAC ¶¶ 116), September 7, 2022 (SAC ¶¶ 119-123), September 15, 2022 (SAC ¶¶ 125-127), or March 10, 2023 (SAC ¶¶ 128-130).

71.     Defendants' silence on these publications is telling.  Defendants seek dismissal of this action without making any meaningful effort, for example, to acknowledge or grapple with the falsehoods they published to millions during the Cyber Symposium.  Nor do they substantively engage with Lindell's public accusation of treason against Dr. Coomer just days after his first real opportunity to reclaim his name and reputation.  To the extent Defendants make any passing reference to these multiple publications, they do so under the falsifiable guise that Lindell's repeated accusations of criminal conduct are just a misunderstanding arising from Dr. Coomer's settlement with Newsmax.  Documentary evidence, as well as the sworn testimony of both Lindell and Newsmax CEO Chris Ruddy, disprove this manufactured narrative.

72.     This failure to engage with the overwhelming majority of the conduct at issue in this dispute is alone sufficient for the Court to deny Defendants' request for "an order dismissing this action entirely."  To the extent the Court is willing to consider an order narrowly tailored to address only the April 6, 2022, publication, that order should also deny the relief requested.

### i.     Defendants' statements are not protected statements of opinion.

73.     For a statement to be actionable as defamatory, it must express or imply a verifiably false fact about the plaintiff.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990).  "An opinion based on undisclosed facts is contrasted with an opinion which is based on circumstances set forth by the publisher and which support the proffered opinion."  *Burns v. McGraw-Hill*

*Broadcasting Co., Inc.*, 659 P.2d 1351, 1359 (Colo. 1983). Opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation. *Id.* at 1360. "If a listener cannot evaluate the alleged defamatory language because no basis for the statement has been disclosed, a defamation action may properly be brought." *Id.*

74.     Defendants first contend that a narrow subset of descriptors employed by Lindell in the April 6 interview are protected opinion, namely that Dr. Coomer is "disgusting," "evil," and made a "stupid move." "Allegedly defamatory language must be examined in the context in which it is uttered." *Id.* There is no wholesale exemption from defamation for statements broadly labeled as "opinion." *Lawson v. Stow*, 327 P.3d 340, 348 (Colo. App. 2014). "To be entitled to full constitutional protection, the statement must not contain a provably false factual connotation or, if it does, it must not be such that it could reasonably be interpreted as stating actual facts." *Id.*; *see also Milkovich*, 497 U.S. at 20.

75.     Courts apply a two-step analysis to determine whether a statement constitutes pure opinion. First, this involves a determination of whether the statement is sufficiently factual to be susceptible of being proved true or false. Second, a court must determine whether reasonable people would conclude that the assertion is one of fact. *Lawson*, 327 P.3d at 348.

76.     Here, the descriptors challenged as opinion all derive from Lindell's overarching and unequivocal message that Dr. Coomer was a criminal who had committed crimes against the United States. A reasonable jury could determine these claims all derive from Lindell's criminal accusations. In any case, these statements were made without disclosing their underlying basis, thus disqualifying the statements from protection as opinions. Lindell makes no reference to any of the claims in the Complaint, any of his prior statements about Dr. Coomer, the underlying basis

for those statements, or the demonstrably false accusations from which they arose.  To the extent Lindell acknowledges the basis for the lawsuit at all, he explicitly lies about it, falsely claiming that he "never talked about Eric Coomer."  In reality, he had publicly accused Dr. Coomer of treason, and published a dayslong widely publicized event to millions across the country that "talked about" Eric Coomer at length.

### ii.   Defendants' statements are not hyperbole.

77.    Defendants next contend that their statements on April 6, 2022, that Dr. Coomer was "treasonous," a "traitor," and a "criminal" are nothing more than unactionable rhetorical hyperbole.  This is demonstrably false.  Lindell's allegations of treasonous conduct were intended literally, and his own sworn testimony confirms this.  On multiple occasions, Lindell asserted under oath his belief that Dr. Coomer engaged in criminal conduct *with respect to the 2020 election*.[117]  For example, Lindell stated the following:

> Lindell: I hope he ends up behind bars, and I stand by my statement.
>
> Q: You're putting Coomer in the group with Griswold and Raffensperger because you believe they all played a role in election crime as well?
>
> Lindell: They've all done something with election crime, but Coomer did something extra to me and my employees.  To me and my employees.  So did Dominion.  Dominion sued my employees too.[118]
>
> * * * * *
>
> Q: So the biggest crime the world has ever seen is rigging the election?

---

[117] *See* **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 208:25-209:13; 210:6-213:4; 282:6-20; 283:25-284:7; 286:3-14; 287:7-288:11; 293:11-294:24; 295:2-25; 319:18-25.

[118] *Id*. at 282:6-20.

Lindell: He's part of the biggest cover-up of the biggest crime in history.[119]

* * * * *

Q: So crimes against the United States and all of the world.  I know –

Lindell: Yes.

Q: I've heard you state your opinion about that, about MyPillow.

Lindell: I stand by that, too.

Q: But in that instance, you're referring to the rigging of the election?

Lindell: Absolutely.[120]

* * * * *

Lindell: Dominion can't deny this.  Neither can Eric Coomer.  Whatever he's sued me for for his big cover-up, you know, sorry guys.  And you guys are just as bad because you're out running around suing people when you know they're guilty.[121]

78.     When Lindell himself confirms under oath that he published statements accusing Dr. Coomer of criminal conduct related to the rigging of a presidential election, he cannot then honestly argue to the Court that he was actually talking about something else. Whether or not Dr. Coomer engaged in the crime of election rigging is a factual claim that is provably false.[122] The publications at issue here are unambiguous as to subject matter and intent, and a reasonable juror could conclude Lindell meant exactly what he said.  Lindell's audience of election deniers certainly takes Lindell at his word, and calls for Dr. Coomer's execution continue to this day.[123]

---

[119] *Id.* at 283:25-284:7.

[120] Id. at 287:7-15.

[121] *Id.* at 294:18-24.

[122] *See generally* **Exhibit 12**, Declaration of Dr. J. Alex Halderman [Dkt. 196-2].

[123] *See, e.g.*, **Exhibit 43** (Nov. 18, 2023 social media post claiming that "Eric Coomer need [sic] to be publicly hung and dragged through the streets of D.C.").

79.     Defendants are correct when they "freely acknowledge that, *in most cases*, these specific statements ("treasonous," "traitor," "criminal," and "did crimes") would survive summary judgment."  Motion, at p. 20 (emphasis in original).  This case is not unique in the manner Defendants attempt to portray it, and the Court should reject arguments that Defendants' publications about Dr. Coomer constitute rhetorical hyperbole.

### iii.     Defendants' statements are not vague.

80.     Defendants contend their statements calling Dr. Coomer "corrupt" and that he "said what [he] did or [he was] going to do" are vague and not actionable.  The context of Defendants' publications is unequivocal.  These statements were made in the context of a lengthy diatribe wherein Lindell explicitly stated, "Eric Coomer, you are a criminal."  The claim that Dr. Coomer is "corrupt" is juxtaposed with allegations about how he conducted his job as Director of Strategy and Security for Dominion Voting Systems.  Similarly, there is no possible alternative interpretation for the statement, "Eric Coomer, president of Dominion, you even said what you did or what you were going to do" other than Oltmann's lies about the alleged "Antifa call."

81.     In any case, in a subsequent publication that Defendants do not acknowledge or challenge, Lindell stated, "Eric Coomer, who are you other than some corrupt person with Dominion, one of the most corrupt people?"  *See* SAC at ¶ 116.  If the jury actually has any doubts about whether Defendants were accusing Dr. Coomer of being corrupt in the administration of his job duties, Lindell's own published statements again confirm his meaning.  A reasonable jury could determine that Lindell meant exactly what he said, and the Court should reject this argument.

### iv.    Prediction of Future Events are not protected statements of opinion.

82.    Defendants assert that Lindell's statement that Dr. Coomer will be "behind bars" is a protected prediction of future opinion.  Motion, p. 25.   ButLindell did not state that Dr. Coomer would be "behind bars" based on speculative future events; he made this statement specifically in reference to the contemporary criminal conduct of which he accused Dr. Coomer. A reasonable jury could conclude that Lindell was stating that Dr. Coomer *had committed* crimes.

### v.    Statements about non-parties are actionable.

83.    Defendants also assert that their statements about various nonparties are not actionable.  Motion, p. 25.  Again, this assertion entirely omits the context in which the statements were made.  Dr. Coomer obviously is not trying to prevail on defamation claims against non-parties.  Rather, Lindell's statements regarding Georgia Secretary of State Raffensperger and Colorado Secretary of State Griswold being "behind bars" add essential context, namely that Lindell accused Dr. Coomer of conspiring with these non-parties.

### vi.    Defendants' statements are not "substantially true."

84.    Defendants are notably unwilling to argue to this Court "the truth" of what they regularly publish to their followers, namely that Dr. Coomer was criminally involved in rigging the 2020 election.  This is unsurprising, given that this claim is and always has been a lie that remains provably false every time Defendants persist in publishing it.  As discussed more below, this duplicitous conduct is just one of many means by which the jury could determine that Defendants have acted with actual malice, that they know their claims about Dr. Coomer are false, or that they have recklessly disregarded the truth.

85.    Instead, Defendants would have this Court believe that Lindell's numerous criminal accusations against Dr. Coomer, all of which were published in the context of the 2020 presidential election and Dr. Coomer's role at Dominion, are "substantially true" because of entirely unrelated conduct that occurred either years before, or months after, many of the publications at issue here. They premise this argument on the fact that Dr. Coomer is, technically, a "criminal" because he, like Lindell, has been forthright about his previous struggles with addiction.  Alternatively, they suggest that Dr. Coomer is a "criminal" because he was cited with reckless driving *after* many of the publications at issue in this dispute.

86.    This cynical effort to mislead both the Court and the jury should be rejected.  By this standard, anyone falsely accused of committing a heinous crime could have a claim for defamation dismissed as long as the defendant could identify some instance at any point in their life when they violated the law, no matter how inconsequential or irrelevant that conduct may be to the publications at issue.  Here, however, there is no evidence that Lindell ever had any awareness of Dr. Coomer's struggles with addiction or traffic violations at the time he made many of the statements at issue, thus rendering the claim even more tenuous.

87.    On this topic as well, Lindell's own sworn testimony undercuts the arguments presented in the Motion.  When asked if Dr. Coomer's past had any bearing on the claims at issue in this dispute, Lindell was unequivocal.

> Q: From your perspective as CEO of MyPillow, Eric Coomer's past, whether he had run-ins with the law or, or criminal issues, is of no moment and is irrelevant?
>
> Lindell: Is irrelevant, 100 percent irrelevant.  As far as I'm concerned, that's his business.[124]

---

[124] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 187:18-23.

88.     Both the Court and the jury should take Lindell at his word on this issue, and Defendants' claim that their statements were "substantially true" should be rejected.

**B.      Defendants Did Cause Damages to Dr. Coomer.**

89.     Defendants' argument with respect to causation can be distilled to an apparent belief that Dr. Coomer became fair game after others had already published lies about him, and that the conduct of others absolves them of accountability for their own actions.  This is not the law, but even if it were, Defendants' conduct here is so egregious and extreme as to put their publications in a category of their own.

**i.      Republication gives rise to new causes of action and new damages.**

90.     It is not and cannot be true that Defendants' do not bear liability for republishing defamatory falsehoods after others have already done so.  "[T]he republication of false defamatory statements is as much a tort as the original publication."  *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7 (citing RESTATEMENT (SECOND) OF TORTS § 578 (1977)) ("Each time that libelous matter is communicated by a new person, a new publication has occurred, which is a separate basis of tort liability . . . It is no defense that the second publisher names the author or original publisher of the libel.").

**ii.      Defendants' publications are uniquely damaging.**

91.     Defendants' yearslong defamation campaign against Dr. Coomer is unique not only in its duration, but also on account of the personal animus that has motivated it.  The recklessness of this campaign is evident from its very origins.  Lindell first attacked Dr. Coomer at what should have been the beginning of the end of his long ordeal, namely the settlement with Newsmax.  After

months of hiding and fearing for his life on a regular basis, Dr. Coomer finally had public vindication in the form of Newsmax's public retraction and apology.

92.     The CEO of OAN, Newsmax's co-defendant, was enraged by this development and immediately contacted Lindell with the news.[125]  Lindell then contacted Newsmax CEO Ruddy to confront him about the settlement.[126]  Ruddy told Lindell that there was no evidence that Dr. Coomer had done anything wrong, and this angered Lindell further.[127]  FrankSpeech then had Oltmann on for a lengthy interview on the very next weekday after news of the settlement, where Oltmann repackaged his lies for the new FrankSpeech audience.[128]  When Newsmax published an on-air retraction, Lindell doubled down with a lengthy, shouting rant about how Dr. Coomer was treasonous, a criminal, and would soon be imprisoned alongside elected officials he believed had also played a role in rigging the election.[129]

93.     Lindell then embarked on preparations for an unparalleled publicity stunt intended to promote FrankSpeech and boost MyPillow sales.  In June of 2021, Lindell began promoting the Cyber Symposium to be held that August.[130]  Lindell assured his audience that he would be presenting evidence of election fraud, and even offered a $5 million reward to anyone who could disprove his "evidence."[131]  He stated "I have all the packet captures of the whole election,"[132] and

---

[125] **Exhibit 19**.

[126] **Exhibit 10**, Depo. Tr. Ruddy, 45:5-13; 49:16-51:6.

[127] *Id*. at 49:2-15; 63:9-64:11.

[128] **Exhibit V-7**; *see also* SAC at ¶¶ 54-61.

[129] **Exhibit V-8**; *see also* SAC at ¶ 63.

[130] **Exhibit V-17**; *see also* **Exhibit V-9**.

[131] *Id*. at 0:18.

[132] *Id*. at 0:50.

that "not one person on the planet can say that this isn't real and that Donald Trump did not win eighty million to sixty-eight million, because he did."[133]   Numerous MyPillow employees began working to invite elected officials from every single state, including every elected official in every state.[134]   This massive undertaking was intended to ensure as many viewers as possible. Lindell stated, "It has to be the most watched show in history because we want everybody to see the evidence.  We want everybody to see what a cyber attack did to our country."[135]

94.    It worked.  Millions tuned in. In fact, FrankSpeech recorded its biggest viewing ever, with 13,986,053 pageviews.[136]  The Symposium's viewers had been promised proof that the 2020 election was rigged, and what they got were multiple presentations by Oltmann and Clements discussing Dr. Coomer, showing pictures of him, and describing him as "the man that pulled the trigger."[137]  That Defendants published these lies on the same day that Oltmann was supposed to be getting deposed in Denver is all the more egregious.  Here again, Defendants had usurped an opportunity for Dr. Coomer to reclaim his name and reputation, and had instead given a massive platform to dangerous lies.  Whether intentionally or not, Defendants' conduct has served to ensure that Dr. Coomer cannot escape these lies, which have completely upended his life.[138]

95.    Defendants' refusal to acknowledge or engage with the effects of their conduct is also unique amongst the defendants Dr. Coomer has named in related lawsuits.  While several of

---

[133] *Id*. at 3:20.

[134] **Exhibit 34**.

[135] **Exhibit V-9** at 7:58.

[136] **Exhibit 30**.

[137] **Exhibit V-8**.

[138] **Exhibit 1**, Declaration of Eric Coomer at ¶ 31.

those defendants have persisted in continuing to publish lies about Dr. Coomer, the majority have not. This is unsurprising given that the claims are demonstrably false,[139] and that Colorado expressly allows for a trebling of exemplary damages when a defendant persists in such conduct after a lawsuit is filed. *See* C.R.S. § 13-21-102. But Defendants do not care about that. This willingness to persist in publishing known falsehoods, long after others have apologized or ceased engaging in the same conduct, is especially damaging for Dr. Coomer. Defendants' conduct gives their audience the false impression that there actually is some reason to suspect Dr. Coomer of wrongdoing and that those who have admitted to these lies were themselves being dishonest.

96.     "False statements of fact harm both the subject of the falsehood *and* the readers of the statement." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984) (noting that "New Hampshire may rightly employ its libel laws to discourage the deception of its citizens,") (emphasis in original). "It is the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." RESTATEMENT (SECOND) OF TORTS § 577A, Comment a (1971). Defendants' efforts to identify and target a new audience for their lies have served to cause Dr. Coomer unique damages not accounted for elsewhere.

### C.     MyPillow is liable for defamation.

97.     Defendants claim that Dr. Coomer's "defamation claim should not proceed against MyPillow for the additional, independently sufficient reason that MyPillow never published, authorized, or ratified any statements about Coomer." Motion at p. 33. Defendants then proceed

---

[139] Even Oltmann's podcast co-host Max McGuire does not believe Oltmann's story, and has testified that Oltmann has a habit of putting himself in other people's stories. *See* **V-Exhibits 20-21** (McGuire Depo. Clips (Nov. 17, 2022).

to assert that no statements at issue were made by a speaker acting as an agent of MyPillow. These claims are demonstrably false.

**Legal Standard**

98. Whether an agency relationship exists is ordinarily a question of fact. *Christoph v. Colo. Commc'ns Corp.*, 946 P.2d 519 (Colo. App. 1997); *see also* RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006) (whether relationship is characterized as agency in agreement between parties or in context of industry or popular usage is not controlling). However, if evidence as to an agent's authority is undisputed, or if only one reasonable and logical inference could be drawn from the evidence, the question of the existence of the agency relationship is one of law to be determined by the trial court. *Kelly v. Cent. Bank & Tr. Co.*, 794 P.2d 1037 (Colo. App. 1989).

99. The common law of agency attributes the legal consequences of one person's action to another person on three distinct bases: actual authority, apparent authority, and respondeat superior. *State Farm Mut. Ins. Co. v. Johnson*, 396 P.3d 651, 655 (Colo. 2017). An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act. *Id.* at 356 (citing RESTATEMENT (THIRD) OF AGENCY § 2.01). An agent has apparent authority to affect a principal's relations with a third party when the third party reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal. *Id.* (citing RESTATEMENT (THIRD) OF AGENCY § 2.03). Under the respondeat superior doctrine, an employer is liable for torts of an employee acting within the scope of employment. The employer is liable if the employee's conduct was motivated by an intent to serve the employer's interests and connected to acts the employee was

authorized to perform.  *Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 693 (Colo. App. 2006).  An agency relationship can exist even where the parties "do not subjectively intend that legal consequences flow from their relation.  The critical determination is whether the parties materially agreed to enter into a particular relation to which the law of agency attached." *W. Fire Truck, Inc., v. Emergency One, Inc.*, 134 P.3d 570, 576 (Colo. App. 2006).

> ### i.      MyPillow's conduct here.

100.    Defendants first argue that MyPillow did not authorize Lindell, Oltmann, or Clements to speak on its behalf.  This argument fails for multiple reasons.  As noted above, Lindell and Lindell alone has absolute discretion to act on MyPillow's behalf in any way he sees fit, and no one is authorized to control his statements or conduct.[140]  He is the majority shareholder with ultimate power, so it is unclear who or what MyPillow could be referring to when it asserts that "MyPillow never directed or authorized Lindell to make statements about Coomer, election interference, or any other political matter."  In fact, Lindell affirmed under oath that MyPillow board members have no ability to control him, and he can and will do whatever he wants with MyPillow, even if that means completely destroying the company.[141]  And, of course, Defendants present the Court with no evidence that MyPillow ever disclaimed Lindell's statements about Coomer or his authority to make them.

101.    The same is true with respect to Oltmann and Clements' statements made at the Symposium.  Lindell authorized his attorney Olsen to identify speakers for the Symposium and to

---

[140] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 96:20-97:11.

[141] *Id*. at 117:13-118:8.

put them onstage.[142]  The Symposium was then organized and promoted by multiple MyPillow employees who spent weeks reaching out to elected representatives across the country during business hours and from their MyPillow email addresses.[143]  MyPillow hosted a landing page for the Symposium on its website,[144] and created promo codes relating to the Symposium to drive revenue to MyPillow, and it advertised those promo codes during the event.[145]  Viewers of the Symposium understood it to be a MyPillow production, and called the MyPillow customer service line to report that the livestream was not working.[146]  Lindell therefore had both actual and apparent authority to act on behalf of MyPillow, and MyPillow is responsible for the conduct of its agent.

102.    Lindell had actual authority because he is the only person empowered to make decisions on behalf of MyPillow, and he believes that public advocacy relating to the 2020 election is necessary *in his role as CEO*,[147] even if it means MyPillow "lose[s] everything."[148]  Lindell knows he is immediately associated with MyPillow in the wider public,[149] that his election related activities have hurt MyPillow,[150] and that board members and others have implored him to stop,[151] but he has knowingly decided not to alter or moderate his conduct in any way.

---

[142] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 251:6-254:8; 255:24-256:21; 261:25-262:14; 263:5-16.

[143] **Exhibit 34**.

[144] **Exhibit 45**.

[145] **Exhibit V-9**.

[146] **Exhibit 40**.

[147] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 176:23-177:12.

[148] *Id*. at. 83:22-84:9.

[149] *Id*. at 99:5-10.

[150] *Id*. at 176:23-177:12.

[151] *Id*. at 78:6-79:18; 83:22-84:9.

103.    Lindell also has apparent authority to act on behalf of MyPillow, and third parties regularly assume that is the capacity in which he is acting with respect to his election related conduct.  Multiple individuals across the country have emailed MyPillow theories and other information related to election fraud, including information related to Dr. Coomer,[152] because they understand MyPillow to be involved with Lindell's efforts.  Third parties are justified in this understanding because Lindell has actual authority to act on behalf of MyPillow, and regularly intermingles his election related claims with sales pitches for MyPillow products.  Indeed, viewers of the Cyber Symposium even called MyPillow to complain about the FrankSpeech livestream because they understood the two entities to be one and the same.[153] Oltmann too has made public statements directly tying support to MyPillow with support for election denial.[154]

104.    Perceptions of apparent authority are further bolstered by the communications from MyPillow employees sent to elected officials and members of the press across the country.[155] Lindell's public appearances as "the MyPillow guy" to promote the Symposium and allege election fraud alongside MyPillow promotions are evidence to support a perception of apparent authority.

105.    With respect to respondeat superior, Lindell's constant promotions of MyPillow products and recitation of election related promo codes falls squarely within his role as CEO of the company.  Lindell acknowledges that his role as CEO is to maximize the value of MyPillow shares,[156] which necessarily requires the sale of MyPillow products.

---

[152] **Exhibit 44**.

[153] **Exhibit 40**.

[154] **Exhibit V-19**; *see also* SAC at ¶ 47.

[155] **Exhibit 34**.

[156] **Exhibit 2**, 30(b)(6) Depo. Tr. MyPillow, 112:19-24.

106.     In denying MyPillow's motion to dismiss the defamation claim filed against it in *U.S. Dominion, Inc. et. al. v. MyPillow, Inc., et. al.*, the United States District Court for the District of Columbia found MyPillow's identical argument in that proceeding unavailing.  Noting Lindell's constant promotion of MyPillow products at election-related events, and MyPillow's provision of promotional codes directly tied to election fraud themes, the Court found that "a corporation may be liable for an executive's conduct when the executive was acting within the scope of his employment and in furtherance of the company's business."  Id. at p. 27, n. 13 (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) (determining that a complaint stated a claim for defamation against The New York Times where it alleged facts giving rise to a plausible inference that the paper's agents recklessly disregarded the truth); *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 202-04 (D.N.J. 2011) (deciding that a complaint stated a claim for defamation against a corporation where CEO made allegedly defamatory statements)).  Given the foregoing, there can be no doubt that here too, MyPillow is both independently liable for the production and publication of defamatory content about Dr. Coomer, and also liable for Lindell's defamation of Dr. Coomer while acting as an agent for MyPillow.  The facts developed in discovery affirm that this question of fact should be put to the jury.

### ii.     MyPillow *did* ratify the statements at issue here.

107.     Defendants' ratification argument fails for the same reasons discussed above. Lindell alone is empowered to ratify statements on behalf of MyPillow.  This authority is evident in his politically motivated decisions to knowingly hurt MyPillow sales for the sake of promoting a narrative that the 2020 election was stolen.  MyPillow has also made other public efforts to associate itself with election denial, for example through its promotion of the "Women for America

First" bus tour across the country challenging the election results.  These efforts are evidence of MyPillow's ratification of statements that the 2020 election was rigged, its incorporation of that belief into its business model, and its utilization of that political belief to turn a profit.

<strong>iii.     The statements by a MyPillow agent are defamatory.</strong>

108.    Defendants acknowledge that Dr. Coomer has alleged that "[a]t all relevant times, Lindell was acting as an agent and representative of MyPillow."  Motion, at p. 34 (citing SAC at ¶ 9).  Just paragraphs later, however, they assert that only four statements are relevant to this analysis.  Motion at pp. 36-37.  The examples Defendants cite are demonstrative of the agency relationship asserted here, but as discussed above, are by no means stand-ins for the entirety of the publications at issue in this dispute.  Dr. Coomer maintains that Lindell was acting as an agent for MyPillow at all times relevant to this dispute.

<strong>D.     Defendants <em>did</em> act with actual malice.</strong>

109.    Defendants are not willing to argue to this Court that their accusations of criminal conduct against Dr. Coomer arising from the 2020 election have any merit, nor have they made any effort to identify evidence supporting those accusations.  Their efforts to distance themselves from Lindell's personal friend and business associate Oltmann are transparent, and Lindell's various excuses are devoid of credibility.  The contrast between their conduct here, where lies have consequences, and publicly, where so far they have not, is striking.  This contradiction alone is compelling evidence that Defendants know their lies about Dr. Coomer are false, or at a minimum that they recognize the recklessness with which they have disregarded the truth in pursuit of their personal vendetta against Dr. Coomer. Beyond this surface level disconnect, there is a substantial body of evidence for the jury to consider when making this subjective, fact-intensive inquiry.

### i.   Defendants' insistence that they believe their own lies is unavailing.

110.   Defendants first argue that Lindell's blind insistence on the validity of his own beliefs somehow insulates him from liability here.  It does not.  Actual malice can be inferred from objective circumstantial evidence, which can override a defendant's protestations of good faith. *See Brown v. Petrolite Corp.*, 965 F.2d 38, 46-47 (5th Cir. 1992).  "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence.  By examining the editors' actions we try to understand their motives."  *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002) (*quoting Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997).

111.   The rationale behind allowing a jury to assess actual malice through the lens of circumstantial evidence is well grounded.  If defendants like Lindell, MyPillow, and FrankSpeech could simply hide behind their willingness to blindly believe anything at all as long as it conforms to their preconceived narratives, then the law would reward willful ignorance and insulate the most reckless publishers from accountability.  Instead, Courts have identified a number of factors that evidence reckless disregard for the truth as being sufficient to satisfy an actual malice inquiry.

### ii.   Actual malice factors.

112.   Courts have considered countless circumstantial factors as sufficient to establish that a defendant has acted with actual malice, including: when a story is fabricated by a defendant or is the product of his imagination[157]; when a defendant relies on anonymous sources[158]; when a

---

[157] *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968).

[158] *Id.*; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

defendant had reason to know his source was unreliable[159]; when the allegations made are inherently improbable[160]; when a defendant intentionally avoids the truth[161]; when a defendant's allegations conform to a preconceived storyline[162]; and when a defendant has a financial incentive to make the defamatory statements.[163] The evidence supports a finding of actual malice on all of these bases.

### iii.    Knowledge of falsity.

113.    Defendants' knowledge of the falsity of their publications about Dr. Coomer is evident from the very beginning.  Even if we take Lindell at his word and give him the benefit of the doubt by assuming that he first heard of Dr. Coomer in connection with the Newsmax

---

[159] *St. Amant*, 390 U.S. at 732 ("'[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000); *Wells v. Liddy*, 186 F.3d 505, 542-43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283 (D.D.C. 2017) ("[I]f there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice."); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice).

[160] *St. Amant*, 390 U.S. at 732 (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F. Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom.  Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ("when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" is evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd.*, 350 F.3d 1272 (D.C. Cir. 2003) (same).

[161] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 693 (noting that "evidence of an intent to avoid the truth was . . . sufficient to satisfy the more demanding [actual malice standard]" which included the failure to review available evidence and failure to attempt to interview known key witnesses); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth."); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361 (Colo. 1983).

[162] *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often provide to be quite powerful evidence."); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 674-75 (W.D. Va. 2019); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

[163] *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (finding circumstantial evidence of motive can establish actual malice).

settlement,[164] this occurrence was teeming with warning signs to alert Lindell of the reckless course he was about to embark upon.  When he called Chris Ruddy to confront him about the settlement, Ruddy told Lindell that Newsmax had no evidence that Dr. Coomer had engaged in any wrongdoing.  Thus, from the very beginning, Lindell knew that there was no basis to believe Dr. Coomer had done anything wrong.  This alone constitutes a "high degree of awareness of probable falsity." *See Diversified Mgmt. v. Denver Post*, 653 P.2d 1103, 1109-10 (Colo. 1982).

114.    It bears repeating that Lindell's story about his conversation with Chris Ruddy being the basis for his attacks on Dr. Coomer is controverted by various pieces of contemporaneous evidence.[165]  A reasonable jury could determine the whole narrative, which Lindell first debuted nearly a year after this case was filed, is a fabrication.  The discrepancies between Lindell's version of that conversation and Ruddy's are significant, and the jury should be given an opportunity to assess Lindell's credibility on this matter.

### a.    Failure to investigate.

115.    Lindell has confirmed that the only "evidence" he has allegedly tying Dr. Coomer to any wrongdoing at all derives from Oltmann.[166]  But, despite his close personal and financial ties to Oltmann, Lindell insists he knows nothing about the alleged "Antifa call" and claims he never made any effort to investigate Oltmann's claims.  In fact, not a single individual who partook in the publication of Oltmann's claims ever made any effort to investigate them at all.  Howse

---

[164] There are many reasons to doubt Lindell's credibility on this claim, not least of which being Dr. Coomer's appearance in *Absolute Proof*, published on February 5, 2021, and Lindell's relationship with Oltmann, which goes back to at least March 11, 2021, when Oltmann stated to Lindell on Conservative Daily, "I got involved in this entire election integrity issue, as you know, based on Eric Coomer."

[165] *See, e.g.*, **Exhibit 19**.

[166] **Exhibit 32**, Lindell Responses to Plaintiff's Second Set of Requests for Admission.

testified that he had never heard of Oltmann,[167] did not think his claims about Dr. Coomer were interesting,[168] did not follow up on them,[169] and believed FrankSpeech should have removed the Oltmann interview from its website.[170]  Olsen stated that Oltmann's claims were "not something [he] ever looked at or even really thought about."[171]  Tina Peters insisted she had never asked Oltmann anything about his claims.[172]  Even Oltmann himself admitted to never making any effort at all to identify any of the other supposed participants on the alleged "Antifa call."[173]  Howse never made an attempt to contact Dr. Coomer or Dominion Voting Systems to try to confirm the claims.[174]  For his part, Lindell insists that he is proud to have made no effort to ever contact Dr. Coomer.  He stated, "Sorry I didn't reach out to Eric Coomer.  And I'm not sorry.  Make sure you put that part in if you say, 'Well, Mike said he was sorry,' because I'm not sorry."[175]

116.    While not sufficient on its own, failure to investigate obvious sources of corroboration is evidence of actual malice.  *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180 (D. Colo. 1999).  This is especially relevant here, where the claims about Dr. Coomer, if true, would likely constitute bombshell evidence of potential election interference.  All of these individuals are deeply embroiled in multiple legal proceedings, some of them criminal,

---

[167] **Exhibit 5**, Depo. Tr. Howse, 86:17-87:2.

[168] *Id.* at 60:22-61:13; 127:20-128:3.

[169] *Id.* at 130:9-17.

[170] *Id.* at 142:10-146:25.

[171] **Exhibit 6**, Depo. Tr. Olsen, 50:15-51:1.

[172] **Exhibit 9**, Depo. Tr. Peters, 133:17-134:5.

[173] **Exhibit 8**, Depo. Tr. Oltmann, 353:7-355:22.

[174] **Exhibit 5**, Depo. Tr. Howse, 140:24-142:2.

[175] **Exhibit 3**, 30(b)(6) Depo. Tr. FrankSpeech, 302:2-6.

surrounding their public efforts to assert the 2020 election was rigged.  The fact that none of them thought claims that Dr. Coomer was involved in rigging the election warranted so much as a single follow up question is compelling evidence that they never believed the claims in the first place.

### b.    Inherent implausibility.

117.    This is the only actual malice standard that Defendants attempt to address, and their arguments here are similarly unavailing.  This argument fails for multiple reasons, but the most important of these is that it is premised on information which they insist elsewhere they never knew anything about.  Specifically, Defendants reference Dr. Coomer's involvement with election technology patents, Dominion's adjudication function, and his expert testimony in *Curling v. Raffensperger*.  They even cite Dr. Coomer's Facebook posts at length.  But if, as Defendants claim, they never knew anything about Dr. Coomer or the basis of Oltmann's claims, then this information cannot have factored into their subjective belief that Dr. Coomer was a criminal who had engaged in the biggest crime in American history.  Defendants cannot claim ignorance as a shield while simultaneously wielding knowledge as a sword.

118.    Even if Defendants were to now abandon the ruse that Lindell has only ever been upset about his mistaken belief about the Newsmax settlement and admit that he has knowingly accused Dr. Coomer of election crime on numerous occasions (as he himself admitted repeatedly under oath), the claims would still be inherently implausible.  The notion that one person could rig the entire election is absurd on its face, and has been from the very beginning.  Dr. Coomer has produced substantial evidence in the form of expert testimony from Dr. J. Alex Halderman that

there is simply no plausible basis for any of the election rigging theories that Lindell has publicly promoted.[176]  This evidence is notably unrebutted.

**c.**      **Willful avoidance of the truth.**

119.     Defendants' willful avoidance of the truth and disregard of reliable sources are also evident.  Lindell admitted to never even reading the Complaint filed against him until almost a year after this lawsuit was filed, and only after making numerous additional public defamatory attacks against Dr. Coomer.  This fact alone is evidence that a reasonable jury could find sufficiently demonstrative of reckless disregard for the truth.

**E.**      **Defendants' political motive and preconceived narrative.**

120.     "Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks*, 491 U.S. at 668 (*citing Herbert v. Lando*, 441 U.S. 153, 160 (1979); *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987).  "[I]t cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."  *Id*. There is substantial evidence in the record of Defendants' political motive to publish the statements at issue, and the jury should be allowed to weigh that evidence.

**II.**      ***Dr. Coomer Has Established Triable Issues of Fact Regarding His IIED Claims***

121.     The facts supporting that claim include and build upon the facts underlying Dr. Coomer's defamation claim.  A claim for intentional infliction of emotional distress requires proof that "(1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe

---

[176] *See* **Exhibit 12**, Declaration of Dr. J. Alex Halderman [Dkt. 196-2].

emotional distress." *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (*citing Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), aff'd, 90 P.3d 228 (Colo. 2004)). Here, the scope of Defendants' challenge to Dr. Coomer's claims is also limited, and relies almost entirely on their arguments with respect to Dr. Coomer's claim for defamation.

122. The remainder of Defendants' argument on this issue appears to turn on the fact that Dr. Coomer stopped seeing his then therapist, Dr. Finkell, several weeks after the Symposium. But Dr. Coomer continued to undergo mental health treatment with other providers after that time, and continues to do so to this day.[177] Even Dr. Finkell noted that Dr. Coomer's mental health was worse after the Symposium than at any point during his prior treatment.[178] As discussed above, and as addressed more thoroughly in Plaintiff's Response to Defendants' Motion to Dismiss [Dkt. 45], Defendants' conduct here is easily extreme enough to meet the threshold established by Colorado law, and the jury should be allowed to hear this claim as well.

### III. Dr. Coomer Has Established Triable Issues of Fact Regarding His Civil Conspiracy Claims

123. There is evidence establishing that Defendants engaged in civil conspiracy. The facts underlying Dr. Coomer's civil conspiracy claim include and build upon the facts that support his defamation and intentional infliction of emotional distress claims. To prevail on a claim for civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on

---

[177] **Exhibit 1**, Coomer Declaration at ¶ 31.

[178] **Exhibit 14**.

the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

124.     Defendants assert that any alleged conspiracy here could have only occurred between Lindell and himself, and that a conspiracy claim involving a single individual is therefore a logical impossibility.  The evidence discussed above readily defeats this argument.  Multiple individuals working on behalf of both MyPillow and FrankSpeech worked together to accomplish, promote, and distribute the publications at issue here.  They did so in order to perform the overt unlawful act of defaming Dr. Coomer.  The Court should deny Defendants effort to dismiss Dr. Coomer's claim for civil conspiracy accordingly.

## IV.     *Dr. Coomer Has Established Triable Issues of Fact Regarding His Permanent Injunction Claims*

125.     Injunctive relief is a remedy Dr. Coomer has sought in the event he prevail on his claims against Defendants.  As such, review of that relief at this stage of the proceeding is premature.  Even were this relief subject to review at this time, Dr. Coomer has made a prima facie showing for permanent injunctive relief, and, as discussed above, has adequately pleaded a basis for relief on his other claims as well.  Defendants' argument for summary judgment on this claim is premised entirely on their assertion that they made no defamatory statements.  Consequently, as Dr. Coomer has demonstrated that Defendants made defamatory statements against him, this Court should deny summary judgment on this claim.

## V.     *Dr. Coomer Has Established Triable Issues of Fact Regarding His Exemplary Damages Claims*

126.     Colorado Revised Statute section 13-21-102(1)(a) provides that exemplary damages may be awarded to a plaintiff against a defendant when "the injury complained of is

attended by circumstances of fraud, malice, or willful and wanton conduct."  Colorado Revised Statute section 102(b) defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."

127.   Defendants summarily conclude that Dr. Coomer cannot prove exemplary damages because "a reasonable jury could not find fraud, malice, or willful and wanton conduct beyond a reasonable doubt."  And in support of this assertion, contend that Lindell's "sincere belief in the truth" of his statements insulates him from culpability.  The problems with Lindell's "sincerity" were discussed at length above.  But even without considering Lindell's "sincerity," as Defendants acknowledge in their Motion, "malice" as used in the statute can include "vindictiveness and retaliatory motives."  Colo. Jury Instr. 5:4 (citing *Bonidy v. Vail Valley Ctr. For Aesthetic Dentistry, P.C.*, 232 P.3d 277 (Colo. App. 2010)).

128.   This motivation, in addition to Defendants' willful repetition of the same conduct that gave rise to this dispute multiple times after being sued, all support a claim for exemplary damages, and the jury should be allowed to hear this claim as well.

## CONCLUSION

For the reasons stated above, Eric Coomer, Ph.D. requests Defendants Michael J. Lindell, My Pillow, Inc., and Frankspeech, LLC's Omnibus Motion for Summary Judgment be denied. Eric Coomer, Ph.D. prays for additional relief, at law or in equity, to which he may be justly entitled to receive.

Respectfully submitted this 11th day of December 2023.

*/s/ Charles J. Cain*

Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
David E. Jennings, No. 54643
djennings@cstrial.com
Steve Skarnulis
skarnulis@cstrial.com
Zachary H. Bowman
zbowman@cstrial.com
**Cain & Skarnulis PLLC**
P. O. Box 1064
Salida, Colorado 81201
and
303 Colorado Street, Suite 2850
Austin, Texas 78701
719-530-3011/512-477-5011 (Fax)

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
**RechtKornfeld PC**
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900
**ATTORNEYS FOR PLAINTIFF**