IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

     Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

     Defendants

---

**EXHIBIT 1**

---

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3    ----------------------------------------------------------

 4    Eric Coomer, Ph.D.,

 5                    Plaintiff,

 6        vs.              Civil Action No. 1:22-cv-01129-WJM

 7    Michael J. Lindell, Frankspeech LLC,

 8    and My Pillow, Inc.,

 9                    Defendants.

10    ----------------------------------------------------------

11

12         VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13       DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                   VOLUME I (Pages 1-370)

15

16

17    DATE:   March 8, 2023

18    TIME:   9:30 a.m. CST

19    PLACE:  PARKER DANIELS KIBORT, LLC

20            Colwell Building, Suite 888, 123 North 3rd St

21            Minneapolis, Minnesota 55401

22

23

24    REPORTED BY: KELLEY E. ZILLES, RPR

25    Job No.: 5761446

                                          Page 1
```

| | | | | |
|---|---|---|---|---|
| 1 | APPEARANCES | | 1 | EXHIBITS MARKED AND REFERRED TO: |
| 2 | | | 2 | |
| 3 | On Behalf of Plaintiff: | | 3 | Exhibit 60  Plaintiff's First Amended Notice of |
| 4 | CHARLES J. CAIN, ESQ. | | 4 | Intention to Take Oral and Videotaped |
| 5 | Ccain@cstrial.com | | 5 | Deposition of the Authorized |
| 6 | BRADLEY A. KLOEWER, ESQ. | | 6 | Representative(s) of My Pillow, Inc.... 8 |
| 7 | Bkloewer@cstrial.com | | 7 | |
| 8 | Cain & Skarnulis PLLC | | 8 | Exhibit 61 ██████████ 121 |
| 9 | P.O. Box 1064/101 N. F Street, Suite 207 | | 9 | |
| 10 | Salida, Colorado 81201 | | 10 | Exhibit 62 ██████████ 152 |
| 11 | | | 11 | |
| 12 | On Behalf of Defendant: | | 12 | Exhibit 63  My Pillow Ads on Fox News Since 2017... 169 |
| 13 | RYAN MALONE, ESQ. | | 13 | |
| 14 | Malone@parkerdk.com | | 14 | Exhibit 64  My Pillow Flash Sale Ad................ 192 |
| 15 | Parker Daniels Kibort | | 15 | |
| 16 | 888 Colwell Building | | 16 | Exhibit 65  Flash Drive............................ 201 |
| 17 | 123 North Third Street | | 17 | |
| 18 | Minneapolis, Minnesota 55401 | | 18 | Exhibit 66 ██████████ 242 |
| 19 | | | 19 | |
| 20 | ALSO PRESENT: | | 20 | Exhibit 67 ██████████ 268 |
| 21 | ████████████████ | | 21 | |
| 22 | Adam Wallin, Videographer | | 22 | Exhibit 68 ██████████ |
| 23 | | | 23 | |
| 24 | NOTE:  Original deposition transcript will be provided | | 24 | ██████████ 273 |
| 25 | to Charles J. Cain, Esq. as taking party of deposition. | | 25 | |
| | Page 2 | | | Page 4 |

| | | | | |
|---|---|---|---|---|
| 1 | INDEX | | 1 | Exhibit 69 ██████████ |
| 2 | (Volume 1 - Pages 1-370) | | 2 | ██████████ 275 |
| 3 | | | 3 | ██████████ 275 |
| 4 | | | 4 | |
| 5 | | | 5 | Exhibit 70 ██████████ |
| 6 | WITNESS:  MICHAEL J. LINDELL                PAGE | | 6 | ██████████ |
| 7 | | | 7 | ██████████ 290 |
| 8 | | | 8 | |
| 9 | | | 9 | Exhibit 71 ██████████ |
| 10 | EXAMINATION BY MR. CAIN............................  6 | | 10 | ██████████ |
| 11 | AFTERNOON SESSION................................. 226 | | 11 | ██████████ 297 |
| 12 | | | 12 | |
| 13 | | | 13 | Exhibit 72 ██████████ |
| 14 | | | 14 | ██████████ |
| 15 | | | 15 | ██████████ 309 |
| 16 | OBJECTIONS... 12, 15, 38, 39, 40, 42, 49, 60, 69, 84, | | 16 | |
| 17 | 92, 103, 105, 112, 170, 185, 225, 253, 259, 281, 282, | | 17 | Exhibit 73 ██████████ 336 |
| 18 | 286, 294, 295, 306, 323 | | 18 | |
| 19 | | | 19 | Exhibit 74 ██████████ 355 |
| 20 | | | 20 | |
| 21 | | | 21 | Exhibit 75 ██████████ |
| 22 | | | 22 | ██████████ 358 |
| 23 | | | 23 | |
| 24 | | | 24 | (Original exhibits attached to original transcript. |
| 25 | | | 25 | Copies attached to transcript copies.) |
| | Page 3 | | | Page 5 |

2 (Pages 2 - 5)

| | |
|---|---|
| 1       VIDEO TECHNICIAN: We are going on the | 1    A. Go ahead. |
| 2 record at 9:36 a.m. on March 8th, 2023. This is the | 2    Q. All right. So No. 1, ground rules. She's |
| 3 video recorded deposition of designated representative | 3 trying to take down what you're saying, so it's |
| 4 of My Pillow, Incorporated, Michael J. Lindell, being | 4 important that we don't talk over each other. Do you |
| 5 taken by counsel for the plaintiff in the matter of Eric | 5 understand that? |
| 6 Coomer, Ph.D. versus Michael J. Lindell, Frankspeech, | 6    A. Yes. |
| 7 LLC, and My Pillow, Incorporated, in the United States | 7    Q. Okay. You understand you're here as a corporate |
| 8 District Court for the District of Colorado, Civil | 8 rep for My Pillow? |
| 9 Action No: 1:22-cv-01129-WJM. | 9    A. Yes. |
| 10    This deposition is being held in Minneapolis, | 10    Q. Do you understand that we provided a notice of |
| 11 Minnesota. My name is Adam Wallin from the firm | 11 deposition topics for you to look at in order to prepare |
| 12 Veritext and I am the videographer. The court reporter | 12 to give testimony today? |
| 13 is Kelley Zilles from the firm Veritext. | 13    A. Yes. |
| 14    Will counsel please identify themselves for the | 14    Q. Did you look at them? |
| 15 record. | 15    A. Yes. |
| 16       MR. CAIN: Charlie Cain, Brad Kloewer for | 16    Q. I'm going to be handing you some exhibits |
| 17 the plaintiff. | 17 throughout the day. We've been marking them, so we're |
| 18       MR. MALONE: Ryan Malone for My Pillow, | 18 already up to Exhibit 60. |
| 19 Incorporated. | 19       (Exhibit 60 marked for identification.) |
| 20       VIDEO TECHNICIAN: Will the court reporter | 20    Q. Is that a copy of the deposition notice? |
| 21 please swear in the witness. | 21    A. I need my glasses. Got it. |
| 22       MICHAEL J. LINDELL, | 22    Q. Is that a copy of the notice that you reviewed |
| 23 duly sworn, was examined and testified as follows: | 23 in order to prepare to give testimony today? |
| 24       EXAMINATION | 24    A. Yes, it appears to be, yeah. |
| 25 BY MR. CAIN: | 25    Q. All right. What, if anything, did you do to |
| Page 6 | Page 8 |
| 1    Q. Tell us your full name, please. | 1 prepare yourself today? |
| 2    A. Michael James Lindell. | 2    A. I read the case, I read this frivolous case. |
| 3    Q. Well, good morning, Mr. Lindell. My name is | 3    Q. Okay. Is that it? |
| 4 Charlie Cain, we met for the first time -- | 4    A. That's what I did, I read this frivolous case. |
| 5    A. Who's paying you? | 5 I answered your question. |
| 6    Q. -- about four minutes ago. | 6    Q. If there is a question that you don't |
| 7    A. Okay. Go. | 7 understand -- |
| 8    Q. Is that right? | 8    A. No, I read the, I got it all, I got all these |
| 9    A. What's that? | 9 down here, I read this, I read the frivolous case. |
| 10    Q. Is that right? | 10    Q. All right. If there is a question that you |
| 11    A. Is what was the question? | 11 don't understand that I ask you during today. |
| 12    Q. We met for the first time -- | 12    A. Mm-hmm. |
| 13    A. Yes, yes. | 13    Q. Will you ask me to clarify that for you? |
| 14    Q. Okay. Here's what we're going to do, we're | 14    A. Yes. |
| 15 going to start slow because the court reporter is trying | 15    Q. Okay. Otherwise I'm going to assume that you |
| 16 to take down what you're saying, okay? | 16 understand what I'm asking you. |
| 17    A. Don't sit and scold me already, Mister. I'll | 17    A. Right, got it. |
| 18 do, I'll do whatever I have to do. So you're not, | 18    Q. You're still quick answering on me. |
| 19 you're just a lawyer, you're an ambulance chasing | 19    A. Mm-hmm. |
| 20 lawyer, so don't start with me, I got all day, I'll take | 20    Q. So let me finish my question, okay? |
| 21 as much time as you want, so let's go. You're not my | 21    A. Yes. |
| 22 boss, you're just a lawyer, frivolous lawyer. So go. | 22    Q. I tend to be a slow talker. |
| 23 Don't start scolding me. | 23    A. Good for you. |
| 24    Q. Well, I'm asking questions, I'm not going to | 24    Q. I'm from Texas originally. |
| 25 scold you. | 25    A. Good for you. I got all day, we'll make a week |
| Page 7 | Page 9 |

Veritext Legal Solutions
800-336-4000

1       VIDEO TECHNICIAN:  We are going on the
2  record at 9:36 a.m. on March 8th, 2023.  This is the
3  video recorded deposition of designated representative
4  of My Pillow, Incorporated, Michael J. Lindell, being
5  taken by counsel for the plaintiff in the matter of Eric
6  Coomer, Ph.D. versus Michael J. Lindell, Frankspeech,
7  LLC, and My Pillow, Incorporated, in the United States
8  District Court for the District of Colorado, Civil
9  Action No:  1:22-cv-01129-WJM.
10      This deposition is being held in Minneapolis,
11  Minnesota.  My name is Adam Wallin from the firm
12  Veritext and I am the videographer.  The court reporter
13  is Kelley Zilles from the firm Veritext.
14      Will counsel please identify themselves for the
15  record.
16      MR. CAIN:  Charlie Cain, Brad Kloewer for
17  the plaintiff.
18      MR. MALONE:  Ryan Malone for My Pillow,
19  Incorporated.
20      VIDEO TECHNICIAN:  Will the court reporter
21  please swear in the witness.
22      MICHAEL J. LINDELL,
23  duly sworn, was examined and testified as follows:
24      EXAMINATION
25  BY MR. CAIN:

Page 6

1  Q. Tell us your full name, please.
2  A. Michael James Lindell.
3  Q. Well, good morning, Mr. Lindell.  My name is
4  Charlie Cain, we met for the first time --
5  A. Who's paying you?
6  Q. -- about four minutes ago.
7  A. Okay. Go.
8  Q. Is that right?
9  A. What's that?
10 Q. Is that right?
11 A. Is what was the question?
12 Q. We met for the first time --
13 A. Yes, yes.
14 Q. Okay. Here's what we're going to do, we're
15 going to start slow because the court reporter is trying
16 to take down what you're saying, okay?
17 A. Don't sit and scold me already, Mister.  I'll
18 do, I'll do whatever I have to do.  So you're not,
19 you're just a lawyer, you're an ambulance chasing
20 lawyer, so don't start with me, I got all day, I'll take
21 as much time as you want, so let's go.  You're not my
22 boss, you're just a lawyer, frivolous lawyer.  So go.
23 Don't start scolding me.
24 Q. Well, I'm asking questions, I'm not going to
25 scold you.

Page 7

1  A. Go ahead.
2  Q. All right.  So No. 1, ground rules.  She's
3  trying to take down what you're saying, so it's
4  important that we don't talk over each other.  Do you
5  understand that?
6  A. Yes.
7  Q. Okay.  You understand you're here as a corporate
8  rep for My Pillow?
9  A. Yes.
10 Q. Do you understand that we provided a notice of
11 deposition topics for you to look at in order to prepare
12 to give testimony today?
13 A. Yes.
14 Q. Did you look at them?
15 A. Yes.
16 Q. I'm going to be handing you some exhibits
17 throughout the day.  We've been marking them, so we're
18 already up to Exhibit 60.
19      (Exhibit 60 marked for identification.)
20 Q. Is that a copy of the deposition notice?
21 A. I need my glasses.  Got it.
22 Q. Is that a copy of the notice that you reviewed
23 in order to prepare to give testimony today?
24 A. Yes, it appears to be, yeah.
25 Q. All right.  What, if anything, did you do to

Page 8

1  prepare yourself today?
2  A. I read the case, I read this frivolous case.
3  Q. Okay.  Is that it?
4  A. That's what I did, I read this frivolous case.
5  I answered your question.
6  Q. If there is a question that you don't
7  understand --
8  A. No, I read the, I got it all, I got all these
9  down here, I read this, I read the frivolous case.
10 Q. All right.  If there is a question that you
11 don't understand that I ask you during today.
12 A. Mm-hmm.
13 Q. Will you ask me to clarify that for you?
14 A. Yes.
15 Q. Okay.  Otherwise I'm going to assume that you
16 understand what I'm asking you.
17 A. Right, got it.
18 Q. You're still quick answering on me.
19 A. Mm-hmm.
20 Q. So let me finish my question, okay?
21 A. Yes.
22 Q. I tend to be a slow talker.
23 A. Good for you.
24 Q. I'm from Texas originally.
25 A. Good for you.  I got all day, we'll make a week

Page 9

3 (Pages 6 - 9)

1 of this. Go ahead.
2    Q. Probably up to your lawyer, but I'm happy to
3 stay as long as you'd like.
4    A. Just keep going.
5    Q. All right. Why did you call me an ambulance
6 chaser?
7    A. What?
8    Q. Why did you call me an ambulance chaser?
9    A. Because you are. This is a frivolous case and
10 if you're representing this guy and you've read this
11 case, you are a disgusting lawyer, period. There's my,
12 that's my, that's my right to sue. You want to sue me
13 too, Mr. Ambulance Chaser. Are you working on
14 contingency or consignment with the guy, what are you --
15 I can't believe anybody would take this. This is
16 absolutely disgusting, it's a disgrace to our country,
17 it's a disgrace to you.
18    Q. Anything else?
19    A. No, that's it. You asked me a question, I
20 answered it.
21    Q. Okay. Now you, it looks to me based on what you
22 told me off the record before we started that you put
23 some notes on the back of that?
24    A. Yeah, I put the notes in here. It says, do you
25 want me to read them?
                                                    Page 10

1    Q. Yes, I do, because I looked at them and I
2 couldn't, I couldn't --
3    A. It says Chris Ruddy emails, it says Eric Coomer
4 emails with Newsmax and Ruddy. It says, and then it
5 says Coomer, from when I lost business with Eric Coomer
6 I put a note here. That's the only time I ever, ever
7 said anything before I was filed. I said one paragraph
8 and that was after Eric Coomer made a deal with Chris
9 Ruddy. And that's when I lost business. And then I
10 came out and made the comment that I said.
11        I was just, my notes to tell. That's the only
12 thing that was ever said. Everything else that I said
13 came after I was served papers at the capitol in
14 Colorado, it was just my personal notes here.
15        I made one comment in two years and that was
16 after Eric Coomer hurt me by going to Newsmax and
17 whatever he said to them so I couldn't appear on Newsmax
18 anymore and that's it. And I talked to Ruddy and it was
19 disgusting what he did, Eric Coomer did with Newsmax.
20 So there, that's my, that's what the notes are.
21    Q. Okay. Well, let me follow up then. Who's Chris
22 Ruddy?
23    A. He's the owner of Newsmax.
24    Q. And you said a note, email with Chris Ruddy or
25 something to that effect?
                                                    Page 11

1    A. No, it was the note to tell my lawyers to get
2 the emails from Chris Ruddy, which we've already
3 subpoenaed you guys but you don't seem to supply
4 anything. We've already subpoenaed the emails from
5 Ruddy to you, you, Mr. Lawyer, that won't give us those
6 because you don't seem to think you have to give
7 anything because you like your frivolous case. That's
8 what it is, it's a note for me to tell my lawyer. But
9 as long as you bring it up, this is when I went out, I
10 didn't even know who Eric Coomer was until he did this
11 dirty deal with Newsmax and Ruddy and hurt my business.
12        MR. CAIN: Objection, nonresponsive.
13    A. Huh, say it?
14    Q. I said, objection, nonresponsive.
15    A. Well, you don't like that, huh?
16    Q. Let me explain a few things to you.
17    A. What?
18    Q. Let me explain a few more things to you.
19    A. Mm-hmm.
20    Q. Have you given a deposition before like this?
21    A. I've given a ton of depositions.
22    Q. Okay. So you, you understand the process
23 somewhat?
24    A. Mm-hmm, sure do.
25    Q. Okay. When I ask you a question, you need to do
                                                    Page 12

1 your best to respond only to my question.
2    A. Are you going to arrest me? I'll say whatever I
3 want and if we have extra, that's too bad. There's no
4 rule that says I can't give a full answer. So, you
5 know, I'm telling you the rules. Have you ever been in
6 a deposition where they can't stand who you are, have
7 you?
8    Q. A lot more than you, sir.
9    A. Okay, good. Keep going. Don't tell me about my
10 depositions, you're not my boss, you're just some
11 frivolous lawyer in here and you're bringing this
12 frivolous case to me, and especially against a company
13 that had nothing to do with anything. You're
14 disgusting. Keep going.
15    Q. I want you to understand another thing.
16    A. What's that?
17    Q. This case is pending in Federal Court.
18    A. I don't care. What does that have to do with
19 anything.
20    Q. Do you understand that?
21    A. Yes.
22    Q. All right. There's a federal judge that's going
23 to likely be reading and watching this deposition.
24    A. I don't care.
25    Q. Do you understand that?
                                                    Page 13

                                        4 (Pages 10 - 13)

1    A. I don't care. She should have dismissed this a
2  long time ago. She hasn't ruled on that, there's a
3  problem, I got a problem with her too.
4    Q. Okay. The judge has practice standards on
5  how --
6    A. No, the judge did not dismiss this case. We put
7  in to get it dismissed and she ruled, an unfair ruling
8  saying well, go ahead and do discovery and waste all
9  your time while I'm sitting here not doing nothing.
10  That's what that judge is doing. So don't tell me what
11  the judge is doing. And you just let me worry about the
12  judge reading this, okay.
13    Q. I just want you to understand.
14    A. No, you just don't worry about me. You're not
15  out for my benefit, okay, he's out for my benefit, not
16  you. So you can get, don't worry if I say something
17  that offends the judge, okay. You just let me worry
18  about that, you got that.
19    Q. Yeah, I got it.
20    A. Okay, good. Keep going.
21    Q. The reason I bring that up, sir, is if the judge
22  is not pleased with your conduct in this deposition,
23  there may be penalties.
24    A. Oh, okay, good. You tell you, go ahead. And
25  you think you're worrying about old Mike, you're really,

Page 14

1  that's great. You're bringing a frivolous case, you're
2  really up my back. Go ahead, keep going.
3    That judge, you put this in the record, that
4  judge is a big problem I got. If someone didn't have
5  the money or time to sit through this garbage when I put
6  in to her a summary judgment last summer and she hasn't
7  ruled on it, either say yeah or nay, it's disgusting.
8  It's disgusting to our country that she couldn't make a
9  ruling. But go ahead and do deposition. If there was
10  some guy that didn't have money you would put them under
11  just in this garbage, wasting my day, wasting my time.
12  But think if it was someone on the street, don't you
13  care about people. This is disgusting.
14    This judge should have ruled a long time ago,
15  either yeah or nay, frivolous or not, but she didn't.
16  She said go ahead and do discovery while I sit and
17  decide what I'm going to do, that's disgusting. I got
18  no problem with you on that, I got a problem with the
19  judge not making a ruling, so there.
20    Now you go ahead. Now that the judge has that on
21  record, now you don't have to worry about what me and
22  the judge think about each other, all right.
23    MR. CAIN: Objection, nonresponsive.
24    Q. Here's, here's another thing that I need you to
25  know, Mr. Lindell. If the court determines that you're

Page 15

1  not being responsive or acting in good faith today, we
2  may have to come back and do this some more, and I want
3  you to understand that.
4    A. Oh, I got that.
5    Q. All right. And if that's the case, I will be
6  asking for attorneys fees and costs.
7    A. Oh, you will, huh. I'm already asking for them,
8  I might just come after you guys for the most frivolous
9  case ever when this is done. If there is a way to sue
10  you, believe me I'm doing it.
11    Q. Okay.
12    A. Okay. Just so you know that, beyond anything
13  you've ever seen, so be prepared.
14    Q. I'm committed to being polite and professional
15  today.
16    A. Okay, go ahead. We're getting through that.
17  Now you know where I sit, let's get on with it.
18    Q. Okay.
19    A. All right.
20    Q. Now we talked about the notice, you looked at
21  Exhibit 60.
22    A. Yep.
23    Q. You're the only person here on behalf of My
24  Pillow --
25    A. That's correct.

Page 16

1    Q. -- to testify. You need to let me finish my
2  question before you answer, okay?
3    A. Mm-hmm.
4    Q. In my estimation you seem agitated this morning.
5  Are you taking any medication or other drugs that would
6  affect your ability to testify?
7    A. No.
8    Q. Now I prior to the deposition your counsel Mr.
9  Malone indicated that you'd have an assistant in here
10  today.
11    A. Mm-hmm.
12    Q. And that's ████████
13    A. Yes.
14    MR. CAIN: Hi ████████
15    Q. Her last name is what?
16    A. ████████
17    Q. Does she work for My Pillow?
18    A. Yes. No, she doesn't, she works --
19    THE WITNESS: My Pillow or Lindell
20  Management?
21    ████████ Lindell Management.
22    A. Lindell Management.
23    Q. Lindell Management.
24    A. Yeah. She can go in the other room if you want.
25  It was only because if I get an emergency call she has

Page 17

5 (Pages 14 - 17)

1  that China was involved because the IP's came from China
2  and this is in the cyber world.
3      Q.  Right.  We're going to get into that topic,
4  those topics.
5      A.  Okay.
6      Q.  Probably a lot more in your individual
7  deposition.  I'm really trying to focus on My Pillow --
8      A.  Okay.
9      Q.  -- here.  But I appreciate that, I'm not
10  quibbling with you, I just --
11      A.  The short answer in January, just so you know,
12  in January nobody talked to me, I didn't talk to the two
13  board members, I found this out way after the fact, you
14  know.  It could have been March when, hey, when I found
15  out did you know back then ████████ came back and
16  said it, did you know ████ probably when we were having
17  our next board meeting we go what do you mean ████
18  resigned, this was three months later.
19      Q.  Yeah, that's fine, that's fine.
20      A.  But you're putting it in there like I got warned
21  or something, that did not happen.
22      Q.  No, no, you've clarified it.
23      A.  Okay.
24      Q.  So the subsequent board meetings after your
25  discovery and you went public, all right, in any of the

Page 90

1  Minnesota.  I had physical threats.  By physical I mean
2  threats, I was the No. 1 threat, here's the evidence and
3  they, they the bad guys, whatever, it was pretty bad
4  then, you know.
5      Q.  But not to get too legalistic, to the extent
6  that you had the authority as the CEO of the company to
7  make statements publicly on behalf of My Pillow, it was
8  you and you alone --
9      A.  I didn't make any statements --
10      Q.  No, no, no, let me finish.
11      A.  -- on behalf of My Pillow.
12      Q.  Let me finish my question.  To the extent that
13  you made statements.
14      A.  Mm-hmm.
15      Q.  On behalf of My Pillow publicly.
16      A.  Mm-hmm.
17      Q.  It was you and you alone that had the authority
18  to do so, right?
19          MR. MALONE:  Object to the form.
20      Q.  In other words, no one in the company could say,
21  you know what, Mr. Lindell, you can't say that, you
22  don't have the authority to say that --
23      A.  Well, they could say it but, they could say
24  anything they wanted.
25      Q.  But it wouldn't matter, it wouldn't matter,

Page 92

1  subsequent board meetings from then till now has the
2  board ever instructed you to, you got to stop talking
3  about this stuff?
4      A.  No, not that I know of.
5      Q.  It's hurting the company?
6      A.  No.  They said it's hurting the company
7  probably, but I don't know we said it in the board
8  minutes.
9      Q.  Does the board have the authority to fire you?
10      A.  No.
11      Q.  Now you own the company, at least the majority
12  of the shares, right?
13      A.  The majority, right.  They do not have the
14  authority to fire me.
15      Q.  So as far as you know, your understanding of the
16  bylaws of the company, any shareholder agreements that
17  may be there, no one within that company has the
18  authority to fire you?
19      A.  That's correct.  And I'm sure, whatever they
20  said or didn't say, which more things they didn't say,
21  they probably kept it to themselves.
22      Q.  Right.
23      A.  Because they know.  When I got back we probably
24  didn't have a board meeting for five months, I would say
25  maybe even longer because I was, I had to stay out of

Page 91

1  right?
2      A.  They can't fire me, no.  They could, I could,
3  the whole company could be going down and there is
4  nothing they could do if I'm still out as my own
5  individual capacity, that's correct.
6      Q.  And you had the discretion to do whatever you
7  wanted to in terms of exercising your authority as CEO?
8      A.  Correct.
9      Q.  Yes?
10      A.  Yeah.
11      Q.  Okay.  In other words, if Joe VP box guy says,
12  you know what, Mr. Lindell, you shouldn't be out there
13  talking about this and also selling this product at the
14  same time, maybe people could get confused.
15      A.  What do you mean selling this product at the
16  same time?  I object to that dumb answer.  What are you
17  talking about.  I didn't go out there, melt down our
18  machines and buy a pillow, I mean, what is wrong with
19  you.
20      Q.  So it was a question --
21      A.  Nothing changed with My Pillow other than we
22  were destroyed taking pieces off, that stayed the same.
23  The different variables, I'm out here in my own
24  capacity, which trying to get people to see this
25  evidence and sounding the alarm and getting the

Page 93

24 (Pages 90 - 93)

| | |
|---|---|
| 1    A. It's the same business model. | 1  Dominion or Eric Coomer or any of these things -- |
| 2    Q. I don't really, you probably gathered this, I | 2    A. I've never, I've never -- |
| 3  don't watch much TV, I don't watch -- | 3    Q. Let me finish my question. |
| 4    A. I'm everywhere, I'm on CNN, MSNBC, Fox News, | 4    A. Yeah. |
| 5  Newsmax. | 5    Q. Are not the positions of My Pillow and that they |
| 6    Q. What, what do you call publicly? | 6  are not -- |
| 7    A. Huh? | 7    A. 100 percent I've said that. |
| 8    Q. What, what do you call -- | 8    Q. Okay. Where? |
| 9    A. Here is what I can't, here's what I can't do | 9    A. 100 percent.  All the time.  I say, you know |
| 10  now, let me tell you this. | 10  what, this has nothing to do with My Pillow.  I have |
| 11    Q. I didn't ask you what you can't do. | 11  said that so many times you can't believe it.  The |
| 12    A. Okay. | 12  difference is now I can't go on stations and talk about |
| 13    Q. I'm asking you what are you, how are you | 13  My Pillow because of people like Coomer that did this to |
| 14  referred to publicly, the My Pillow guy? | 14  me, it's the other way. |
| 15    A. Yeah. | 15       Because people associate me over here with the |
| 16    Q. Right? | 16  election, fixing our election, now I can't go and be the |
| 17    A. That, people say that, yeah. | 17  My Pillow guy.  You're right, I am suppressed from doing |
| 18    Q. Okay. | 18  that.  It's the opposite of what you think.  Because of |
| 19    A. Now, now when I'm out there now, people are out | 19  over here they recognize me as trying to fix our |
| 20  there, they're going, you know, it's almost brought | 20  election, I can no longer go on all these, it's cost |
| 21  more so over here to help fix our country, help save our | 21  me millions, I can't go on Salem Media, and that was our |
| 22  election.  I don't know how people know me. | 22  No. 1 outlet, Fox News, Newsmax, none of them, no media, |
| 23    Q. Do you understand how the public might be | 23  I can't go on any station at all and talk about My |
| 24  confused about you talking about election fraud -- | 24  Pillow anymore.  That's why it's cost us so much. |
| 25    A. Let me tell you something -- | 25       I could go on like back in the day go on Imus, |
| Page 98 | Page 100 |
| 1    Q. Hold on, let me -- | 1  go on these stations and talk and say, hey, what are we |
| 2    A. No, let me tell you something.  This is an | 2  doing with My Pillow, like our new My Pillow 2.0.  I |
| 3  anomaly in history.  I was on TV 3 million times -- | 3  can't do that now.  When I did that we would let people |
| 4    Q. I didn't ask you that. | 4  who know about our company.  Now because of this |
| 5    A. I'm going to explain your question.  I was on TV | 5  election, trying to save our country, it's crap like |
| 6  3 million times up to 2016, so anything I do out there, | 6  this, now I can't go on there and do it because of |
| 7  they're going to associate me with My Pillow. | 7  people like Eric Coomer, that's a fact, that's a fact. |
| 8    Q. Of course. | 8       All I was trying to do was bring to light that |
| 9    A. Anything I do, that's the way because I'm so | 9  these machine companies and that China intruded in our |
| 10  branded.  It's like you're branded as a frivolous | 10  election, that's reality.  So you are exactly right. |
| 11  lawyer, anything you do, well, you'll be branded as that | 11  They don't know me as the My Pillow guy over there, |
| 12  because that's all I know about you right now.  So go. | 12  these stations, they know me as trying to fix our |
| 13  I mean, you know, I don't know what you're saying. | 13  election so I can't even go on and advertise My Pillow. |
| 14  You're trying to associate that anything I say becomes | 14  That's why we've been hurt, that's why last year we lost |
| 15  part of My Pillow, that's not true. | 15  $6 million that we had to go borrow money for my |
| 16    Q. Well, that's, but you know that's the perception | 16  employees so I can keep them all employed.  They have |
| 17  publicly, don't you? | 17  families and stuff. |
| 18    A. No, I don't know that's the perception publicly. | 18       So don't try and flip it the other way because |
| 19    Q. Of course.  If you're talking about election | 19  it's only one way.  We keep losing, losing, losing |
| 20  fraud issues and you're the My Pillow guy, you're saying | 20  because now I'm branded over here trying to fix our |
| 21  that the public can separate those two out? | 21  election because media attacks me every day and people |
| 22    A. I would hope they could, why wouldn't they. | 22  like this guy, Eric Coomer, that cost me almost |
| 23    Q. Have you ever, have you ever issued a press | 23  everything when he went and made a deal with Chris Ruddy |
| 24  release or a statement to the public that says any, any | 24  behind my back and said don't ever have Mike Lindell |
| 25  discussions that I have publicly about election fraud or | 25  come on anymore. |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

1    I made one comment, there it is circled, that's
2  the only one I ever made about Eric Coomer, the only
3  thing I ever said, until after he sued me, then there's
4  plenty in here.  That's the only statement right there
5  that I ever said about this guy I didn't even know,
6  period.
7      Q.  What page are you looking at?
8      A.  36.  I looked at this last night, it's
9  disgusting.  That's the only thing I ever said and that
10  was the day after he made the dirty deal with Chris
11  Ruddy.  And I called Chris Ruddy up, I go, what are you
12  doing.  I go, what do you mean I can't come on and talk
13  about My Pillow anymore.  Well, he's done it with this
14  Eric Coomer.  That's when I made that statement.  I
15  never had made one statement, didn't even know who he
16  was before that.
17      All that, all this crap about Joe Oltmann who I
18  didn't even know then and all this stuff about,
19  everything after that from this on is after he sued me
20  in Colorado, every statement I made.  And I'll continue
21  to make statements about both you and him.  This is why
22  this judge should have ruled this as frivolous instead
23  of last summer sitting on it for nine months and making
24  me sit here and waste two days of my life because I
25  could be helping my employees, trying to keep them

1  one struck a chord.
2      Q.  No, I just want answers to my questions.
3      A.  Okay, what is it?
4      Q.  So let's just talk about press releases.
5      A.  About what?
6      Q.  Press releases, public statements by My Pillow.
7      A.  Okay.
8      Q.  Okay.  Here's the question, has My Pillow issued
9  any press releases or public statements in writing
10  saying that you do not speak on behalf of the company as
11  it relates to election fraud issues?
12      A.  I believe so, but I'd have to go back because we
13  may have a PR person back then maybe.  I think she did,
14  but I'd have to check on that.  I believe so.
15      Q.  Okay.  So you think as you sit here, I don't
16  want you to guess.
17      A.  I don't know, I don't know, but I would really,
18  because I had a, I think we had a PR person back then,
19  this is two years ago now or three years ago.
20      Q.  Who, who is that person, are you not going to
21  tell me?
22      A.  I don't know, and I'm not giving you her name so
23  you can attack her.
24      Q.  Do you have any evidence that I've attacked
25  anybody within your company?  Don't show me the, don't

1  employed while you people attack.  There's my statement.
2          THE WITNESS:  Did you get all that?
3          MR. CAIN:  Objection, nonresponsive.
4      A.  No, but it's disgusting when you sit here --
5          MR. MALONE:  Slow down.
6      A.  I'm branded as now election, not My Pillow guy,
7  it's the opposite.
8          MR. MALONE:  You just got to slow it down.
9          THE WITNESS:  I know, but it just pisses me
10  off.
11          MR. MALONE:  I understand, they understand.
12          THE WITNESS:  So disgusting.
13  BY MR. CAIN:
14      Q.  You don't remember my question, do you?
15      A.  Yeah, the question is do people know you as the
16  My Pillow guy, blah, blah, blah.  I just gave my answer.
17  No, they know me over here as this guy that's trying to
18  save our country.  But because of Lawfare and start
19  dirty things that Eric Coomer did on that one day, which
20  that's when I called him out, I can't go on my stand, I
21  can't, my company has been hurt so bad because of people
22  like this Eric Coomer, so bad, tens of millions of
23  dollars, hundreds of millions of dollars.
24      Q.  You don't remember my question, do you?
25      A.  What's your question, give me a new one.  That

1  show me what you're going to show me.
2      A.  Right there, Page 36, Page 36, where you, where
3  I called you lawyers just as bad as him, I called you
4  guys criminals.
5      Q.  You did.
6      A.  Because what you did to my company back then,
7  that's when I brought up Eric Coomer.  I had never, I
8  had never said his name ever in history until he drew
9  first.  He went to, he went to Chris Ruddy and made a
10  dirty deal behind my back and then Chris told me I could
11  never come on Newsmax again and talk about My Pillow.
12      Q.  Did Mr. Ruddy, since you've raised it now maybe
13  half a dozen times, did Mr. Ruddy tell you the terms of
14  the settlement between Dr. Coomer and Newsmax?
15          MR. MALONE:  Object to form.
16      A.  No.  What he said, he said I couldn't come on
17  Newsmax anymore even if it was to talk about My Pillow.
18      Q.  And he, did he say --
19      A.  This was public, it went out publicly, I seen it
20  publicly.
21      Q.  No, no, no.
22      A.  No, this is what I'm telling you, let me tell
23  you the answer.  I seen it publicly out there in the
24  public, this guy named Eric Coomer.  I go who the heck
25  is that, then I see he's with Dominion and he made a

1 evidence and every day I'm losing a box store, every
2 single day.
3     Q.  Right, no, no, no.  I'm actually focused more on
4 the late summer --
5     A.  There were other, there were other stations that
6 threatened to cancel me if I didn't stop talking, there
7 were 12 little stations.  And I told them go ahead and
8 cancel me, if you do you're not coming back, I'm not
9 getting cancelled.  I have to, we have to get this
10 evidence out there.
11     So yes, I did make those statements to them.
12 They decided to stay on with us, it was 12 of them.  And
13 they, I got called by our media buyer and she said we
14 have 12 TV stations I think are going to cancel.  I said
15 tell them if they do they're never coming back because
16 I'm not going to, they're not going to bully me into
17 changing my mind and not showing this evidence to the
18 world.
19     Q.  You mentioned Chris Ruddy earlier and Newsmax.
20 Were there, sort of the opposite of what we were talking
21 about with Fox, were there certain media outlets that
22 were actually helping you promote the Cyber Symposium?
23     A.  No, no.  They all, all of them were just the
24 generic ads.
25     Q.  Okay.

Page 178

1 him up and go Asawin, the Daily Beast is very left, I go
2 you better get back over there and tell Dominion chop,
3 chop or you're going to be known as fake news, that was
4 it.
5     So when they first sued me finally, they sued me
6 and it said, and they sued My Pillow, it said something
7 about promo codes.  So I went on Steve Bannon, the first
8 time I had ever met him in my life.  And I go on there
9 and he goes, Mike, Dominion sued My Pillow and not just
10 you.  And I said yeah, they're disgusting.  And I said,
11 he goes, well, you said they're using promo codes, and I
12 said, yeah, use promo code Dominion to save up to
13 66 percent.  And then he dropped his microphone, it was
14 disgusting.  That's where it came from.
15     Q.  Who dropped his microphone?
16     A.  Steve, he just, he couldn't believe I said that.
17 I said use promo code Dominion.  Just like when the FBI
18 took my phone, I said use promo code FBI.
19     Q.  I thought it was Hardee's.
20     A.  No.  Well, Hardee's was one too, they put their
21 thing out there, you know.
22     Q.  All right.  Let's, let's focus back --
23     A.  In other words, you know, take your lawsuit of
24 promo codes and shove it, that was my, that was my
25 statement to them.

Page 180

1     A.  And, and incidentally now that you ask that,
2 everyone was the same, whether it was ABC, Newsmax or
3 whatever.  But on the first day of the Cyber Symposium
4 Dominion decided to sue OAN and Newsmax, not the rest of
5 ABC, NBC, CBS, NBC.  You wonder why I don't like the
6 name Dominion.  They hurt us there too.  They attacked
7 those two and then OAN, what ends up manifesting from
8 that, they take, AT&T takes them off the news, or Direct
9 TV, we lost that for advertising too because their
10 audience went down to nothing.  So I got Eric Coomer
11 destroying Newsmax for me and Dominion and AT&T and them
12 guys destroying OAN.
13     Q.  I noticed, by the way, there was a Dominion
14 promo code.  Why do you have a Dominion promo code?
15     A.  Because I, you know why, because when I went on
16 TV and they're going, oh, Mike, Dominion sued you, which
17 I asked them to sue me because I wanted the discovery,
18 that's how it was.  I asked them to sue me, did you know
19 that, are you familiar with that.
20     I called up, I called up the Daily Beast and I
21 said why would you tell Dominion to sue me, I got the
22 evidence.  And so he walks over and he tells them that,
23 his name is Asawin.  And he goes yep, they're going to
24 sue you.  And I said, okay, do an article about it, he
25 did.  They didn't sue me for three days.  I had to call

Page 179

1     Q.  Yeah, using the company My Pillow to, to make
2 that statement, right?
3     A.  After the lawsuit, Mr. Twister, after I was
4 sued.  Everything in here in your little lawsuit, other
5 than that one little paragraph, everything I said --
6     Q.  We don't, we don't --
7     A.  -- after he sued me.
8     Q.  We don't need --
9     A.  After Coomer served his papers.
10     Q.  We don't need to replow that, okay, I've heard
11 you say that.
12     A.  Well, then I'm just telling you.  So that's what
13 he, you know, using My Pillow, after.
14     Q.  Let's --
15     A.  And it's a, and it's a joke, you know, shoving
16 it back in you guys' face.  Oh, you think My Pillow
17 benefitted from this, give me a break.  Talk to them
18 employees who are trying to support their families.  You
19 guys are disgusting.  What else you got.
20     It's kind of a sad day for you, isn't it, to see
21 how bad My Pillow is sitting and you're trying to make
22 it look like this was some grand thing to make money.
23 It's just sad, it really is, it's sad.  This is probably
24 the most frivolous lawsuit in the history of the United
25 States, and I mean that.  It's shameful that judge did

Page 181

46 (Pages 178 - 181)

1  to me I consider it criminal. I don't care what he's
2  done in his past nor do I know what he's done in his
3  past. Do you get that?
4    Q. I do.
5    A. Well, then don't sit here and tell me. He did
6  this directly to me.
7    Q. Right.
8    A. And it's criminal what he's done to me.
9    Q. And, and --
10   A. He's a criminal, that's what he is, and that's
11  my opinion. He did this to me. I don't care if he,
12  what he's done in his past, I could care less. I heard
13  once he, that he's got some DWI, I don't even know, I
14  don't know, I don't know, I don't know his past, I don't
15  know what he's done, I don't know anything about the
16  guy. But I do know what he did to me. That's why we're
17  here, what he did to me. And I will, just like these
18  other people that you hear me bad-mouth, I don't
19  bad-mouth anybody directly unless they, I have the
20  evidence of what they did to me or what, or that, that
21  I've done my due diligence.
22       Eric Coomer did this directly to me. And I made
23  one statement about him. Didn't say nothing for a whole
24  year, and then you guys come up and serve me papers in
25  Colorado. I'll bet there was statements after that,
                                                    Page 186

1    A. She had, I have many, many people, their past,
2  but if they've changed, if they've changed or gotten
3  help, absolutely I hire him. This is current, this is
4  real.
5    Q. You struggled with addiction?
6    A. Oh, yeah, I was a crack addict, yeah.
7    Q. And Eric Coomer struggled with addiction.
8    A. I don't know, I don't know. I feel bad for him,
9  but I hope he got changed, hopefully he found the Lord
10  Jesus Christ, you know, so I can pray for him. I have
11  prayed for him, believe it or not, I have prayed for
12  him, you know. I prayed for him, I go why did this
13  person do this to somebody and I prayed for his
14  salvation, for his soul, and for him to get help, you
15  know, as I have lawyers that even back up frivolous
16  cases like this. And I got to meet the lawyer behind
17  the curtain. Go ahead.
18   Q. I'll take whatever I can get. Okay. Let's,
19  let's de-escalate and just talk about some numbers,
20  that's a little easier I think in a sense. Go back to
21  this exhibit, if you would, please, 62. You've already
22  been quite clear at least in your mind that your
23  activities relating to the election, 2020 election have
24  hurt My Pillow's business?
25   A. Absolutely.
                                                    Page 188

1  wasn't there. Then everybody knew that what he did to
2  My Pillow and Mike Lindell. How dare he come and sue My
3  Pillow, he's a scumbag for doing that.
4       THE WITNESS: Put that in there, scumbag,
5  S-C-U-M, bag.
6    A. That's what he is for what he did to me.
7    Q. Okay. That's not my question. There were
8  questions to him about his past.
9    A. Not from me.
10   Q. And what I'm hearing you say --
11   A. Not from me.
12   Q. From your lawyer.
13   A. Well, I don't know what my lawyer did, that's
14  between my lawyer and him. You guys, all lawyers do the
15  same stuff, lawyer stuff.
16      MR. MALONE: Just let him ask the question,
17  see what he has to say.
18   Q. Okay. From your perspective as CEO of My
19  Pillow, Eric Coomer's past, whether he had run-ins with
20  the law or, or criminal issues, is of no moment and is
21  irrelevant?
22   A. Is irrelevant, 100 percent irrelevant, as far as
23  I'm concerned, that's his business.
24   Q. Because you believe, you said, you know, ███
25  has --
                                                    Page 187

1    Q. In a, in a sort of a shorter area or window, did
2  My Pillow at least around the Cyber Symposium experience
3  an uptick in sales?
4    A. Huh-un, no.
5    Q. Okay.
6    A. And it's hard to tell because, because of drop
7  in the Fox ads, so it's very hard. But we lost, it's a
8  net net definitely loss.
9    Q. Well, if you take Fox out of the scenario,
10  because you made the decision to, to cut Fox out, all
11  right. So put Fox --
12   A. It's all one thing.
13   Q. Hold on, hold on. Put Fox in a box on the side.
14   A. Okay.
15   Q. And just, just talking about the other revenue
16  streams. During the symposium, isn't it true that you
17  had an uptick in revenue from the other sources
18  outside --
19   A. I, I don't know, I would have to, I have no
20  idea.
21   Q. Is there something like, I've looked at, there's
22  week -- here's the question, and correct me if I'm
23  wrong. You both do day, daily reporting where you look
24  at --
25   A. And weekly reporting, yeah.
                                                    Page 189

Veritext Legal Solutions
800-336-4000

1 here like your Diamond & Silk, War Room, Alex Jones,
2 Bartz, it's everybody. This is not My Pillow, they
3 don't get those sales. Anything that came close to
4 Frankspeech, My Pillow doesn't get them. Do you get
5 that?
6    Q. No, I guess I don't.
7    A. Talk to my employees. They wouldn't get, they
8 don't get that money. It's another platform like, like
9 War Room, like Fox News. They have to pay. What
10 Frankspeech ends up with that, My Pillow will get a
11 portion of that for their sales.
12    Q. Wait, wait, wait. My Pillow --
13    A. They don't get anything from Frankspeech.
14 Frankspeech, that's their sales. Do you get that. This
15 wasn't a My Pillow, it had nothing to do with My Pillow.
16    Q. It's the product that was being sold.
17    A. Right, by using a promo code, right.
18    Q. Right. When a pillow is sold, My Pillow gets a
19 portion of the sale?
20    A. From everywhere I have ads in the world. What
21 I'm saying is when I do an email blast --
22    Q. Wait. You said ten times that My Pillow doesn't
23 get the money.
24    A. No, you need to understand, that's sold on the
25 Frankspeech platform.
                                                    Page 206

1 are you --
2    Q. The ones that are looking at this on the video.
3    A. I'm trying to tell you that you're trying to say
4 we made money there. We lost $4 million. And that, I
5 don't know when the promo code audit was set up. That's
6 a Frankspeech is a platform just like the man on the
7 moon, Fox News, everyone I've been doing for 15 years.
8       Now did they buy more for promo code audit by me
9 saying that, yeah, I said it as a thing, yeah, they did.
10 It looks like they bought more than the day before. Is
11 that what you want me to say. Yes, by me saying that on
12 that stage, I'm telling you I didn't do any ads, it was
13 not to run ads at all, and I ran ad free. Did I say
14 that because of proving a point, you proved my point.
15       Rotten horrible lawyers like you and the media
16 saying, oh, Mike Lindell is trying to save this country
17 just to make money. I have lost everything I've had so
18 far, you got it. So don't sit here and take your,
19 because I'm not going to take this garbage you're
20 spewing out. This is horrific what you're doing, I've
21 said it from the start of this thing, it's disgusting,
22 I've lost millions of dollars.
23       You'd like to be in my shoes, you just can't put
24 it through your head. Why would anybody hold to his
25 moral compass and say here, I have evidence to save our
                                                    Page 208

1    Q. I don't care what the platform is, the money is
2 going in part to the platform --
3    A. That's right.
4    Q. -- and in part to My Pillow?
5    A. Just like any other, that's correct.
6    Q. You're in the pillow business to sell pillows,
7 right?
8    A. Mm-hmm.
9    Q. Yes?
10    A. Sure.
11    Q. And that's what we're looking at, the
12 ███████
13    A. But that was sold on the Frankspeech platform.
14    Q. I don't care if it was sold on the moon. The
15 money is going to My Pillow in part?
16    A. Not all of it, but some of it, yes.
17    Q. Okay. And it's going to whomever --
18    A. Mm-hmm.
19    Q. -- is advertising that product?
20    A. Mm-hmm.
21    Q. Through the promo code, right?
22    A. Okay.
23    Q. Are you trying to tell the jury that you're not
24 making money --
25    A. What jury, what jury are you talking about, why
                                                    Page 207

1 country so you have a job. And I'm willing to sacrifice
2 every single thing I have, including other people's
3 jobs. If it takes that, I can't help it, I'll try and
4 do everything I can to help save them. But you know
5 what, if it comes to that, I will lose everything I have
6 because that's how important it is to fix our elections.
7 That's it.
8       So you can go ahead and say that to the jury and
9 make it look like I was trying to make money. They
10 heard that statement. I made a joke about it. I can't
11 help that that many people bought, but I still lost
12 $4 million that weekend. That's the bottom line. So
13 you can sit there and go, look at him. If there was an
14 ad coming up every two minutes, you could maybe make
15 that argument, but it didn't. There wasn't even
16 anything on the strips, nothing. So it's disgusting
17 that you're even insinuating that. That's all I'm
18 saying. Go ahead.
19    Q. You can't bang on the table because you're --
20    A. That's what I did, I'm sorry, I apologize. Did
21 it break anything? I'm just getting, it's disgusting.
22 I can't believe that you're a lawyer, that you would do
23 something like that. Don't you have a moral compass. I
24 mean, this is bizarre, this whole thing is bizarre.
25 That I did it to make money with promo codes, really.
                                                    Page 209

                                      53 (Pages 206 - 209)

1 mind, sarcastic. I'm tired of people thinking that I
2 did this to make money, you know, that was the whole
3 thing.
4     Q. I didn't ask you about money. You know, we got
5 to be on point here.
6     A. Well, then, well, you're asking me. I just told
7 you, it says right here, audit 50 towels, audit 33
8 sheets.
9     Q. All right. You answered part of my question.
10 There is audit --
11     A. It says right there, I'm reading it.
12     Q. Let me finish, please. There's audit 67, audit
13 68, audit 89, audit 98. Which, which vendors were using
14 those audit codes?
15     A. I'll have to check on that, I'll have to check
16 on that. But here it says towels and sheets. I don't
17 know what vendor. So probably, here's my guess, when I
18 said that at the symposium, other vendors out there
19 probably went, hey, can I have an audit code. I don't
20 know, I'd have to check on that, you know, that could
21 be. Or it could be we had to divide them up with the
22 audit code because it was already established. And
23 that's probably it, so people are using an audit code.
24 I had to divide it up to towels and sheets, you know
25 what I mean. We had to put numbers behind it. That's
                                                        Page 230

1     Q. Is there a --
2     A. To get them to quit, to get them to quit using
3 that generic code.
4     Q. Is there a mechanism if let's say ███ s in
5 this room with us and I want to know, ███ how much in
6 revenue was done associated with all of the audit codes,
7 is there, is there a way internally to produce that kind
8 of financial reporting?
9     A. From back then, maybe, I would say yes.
10     Q. Okay.
11     A. But then you asked me why, why the number is
12 behind it.
13     Q. You answered my question.
14     A. It's very simple. If people kept using that
15 code audit. It's kind of like Dominion when I threw
16 that out there.
17     Q. Right.
18     A. I had to, I had to actually, first I just
19 disconnect it because people used it and I couldn't
20 track my media.
21     Q. No, I know the tracking part.
22     A. Well, that's the biggest part of it, you have to
23 be able to track your media.
24     Q. We may be asking these, or talking about this
25 for different reasons, so.
                                                        Page 232

1 probably, that would make more sense. We couldn't use
2 just one code audit or you're not tracking your media.
3     Q. No, you've already talked about --
4     A. Well, that's what it is, that's exactly what it
5 is. It meant nothing as far as auditing somewhere. You
6 had to divide it up between sheets and stuff because I
7 said it at the symposium, so now you have all this,
8 everyone is using promo code audit, I couldn't track a
9 sheet commercial from a towel commercial. Do you follow
10 me?
11     Q. I do follow you.
12     A. That's what we did. So we probably shut off the
13 promo code audit is what, that's my guess. It's like,
14 I'll give you an example. Back what we did originally,
15 what they did way back in the beginning we used promo
16 code My Pillow on all the media in 2012, all, it was
17 just a promo code, My Pillow. And then what happened
18 was we couldn't track it all because it was all going to
19 the same code. So then we had My Pillow 22, My Pillow
20 23, very similar.
21         So when I said that at the symposium, what
22 people had stuck in their head, so when they're seeing
23 commercials on, on Frankspeech, this is probably from
24 Frankspeech, we had to divide them out into numbers,
25 that's all.
                                                        Page 231

1     A. Mm-hmm, right.
2     Q. So if, if, for example, Frank33, if I wanted to
3 know how many sales --
4     A. What?
5     Q. Frank33.
6     A. Frank33, right.
7     Q. If I want to know how many sales are associated
8 with that promo code, can you go back or someone --
9     A. Well, I would assume, I don't think we changed
10 our, I don't think we changed our platform.
11     Q. All right. Have you ever asked someone like
12 ███ or your controller to give you a report like that
13 that just says, hey, I want to see War Room, I want to
14 see everything --
15     A. Of course I have.
16     Q. Okay.
17     A. Or I can do it myself, you know, I can do it
18 myself.
19     Q. Okay.
20     A. I showed you on my phone. What's wrong with
21 you. I just showed you all the promo codes.
22     Q. Let's, let's not get combative about it.
23     A. Well, no, I'm just telling you. You're asking
24 me something, I just showed you how I can do it.
25     Q. No, you, you didn't produce a report. Oh, you
                                                        Page 233

Veritext Legal Solutions
800-336-4000

1    MR. KLOEWER: I'm looking them up right
2  now.
3    THE WITNESS: ███████████nice
4  guys.
5  BY MR. CAIN:
6    Q. All right.
7    A. Charge███ hour. Do you guys make that
8  much an hour?
9    Q. No comment.
10   A. Or are you making it on this, on frivolous
11 cases, consignment things?
12   MR. MALONE: They won't answer the
13 questions, Mike.
14   THE WITNESS: Well, he's asking me stuff
15 that has been completely irrelevant. I could ask him
16 some questions, that's crazy.
17   MR. MALONE: We'll do that later.
18   A. Who owns your airplane, who owns it, you know,
19 what does Lindell, what does it have to do with anything
20 you're talking about. Josh Merritt, I gave a ride to
21 the guy on my plane, the guy, I didn't know he was a bad
22 guy, but he's there, I don't know where he came from, I
23 didn't hire the guy. He sits up on the thing and says
24 this evidence is all good, and then two days later he
25 tries sabotaging the symposium. And then, and then he

Page 262

1  Montgomery, or did I know those guys, no. I had been on
2  Brannon Howse's show one time three months prior or
3  something.
4    Q. Did you pay Mr. Howse for access to the --
5    A. No, 100 percent, no. I never paid him a dime.
6    Q. You have not paid any amount of money or My
7  Pillow has not paid any amount of money for this data --
8    A. No.
9    Q. -- that you say is under gag order?
10   A. No, absolutely not, 100 percent no.
11   Q. Has Mary Fanning ever worked for My Pillow?
12   A. No.
13   Q. Have you ever met her?
14   A. No.
15   Q. Do you know if she's a real person?
16   A. Yeah, I've talked to her. She, she helped, she
17 helped in two movies, she's definitely a voice.
18   Q. She's definitely a voice.
19   A. Yeah.
20   Q. But you've never met her in person?
21   A. I've never met her in person. I've never met a
22 lot of these people you're talking about in person. I
23 met, I think I've probably met Joe Oltmann like four
24 times.
25   Q. Dennis Montgomery, does he --

Page 264

1  about two days or four days after the symposium we get a
2  tape that was taped two days before the symposium how
3  he's going to take, win the $5 million and sabotage the
4  thing. Just a disgusting person.
5    Q. This data we've been talking about, is it the
6  same data that, that you procured from Patrick Byrne?
7    A. I didn't purchase anything from Patrick Byrne, I
8  never dealt with Patrick Byrne on anything, purchasing
9  any data. What are you talking about and where did this
10 come from. Now you're starting to be stupid, now you're
11 really asking some questions. Where did you even get
12 that that I purchased any data from Patrick Byrne. This
13 is the most out left field thing I've ever heard. What
14 do you want me to say, oh, no, I didn't purchase it. I
15 never purchased anything or got anything from Patrick
16 Byrne ever.
17   Q. Thank you.
18   A. My evidence came from Brannon Howse on
19 January 9th, you got that.
20   Q. Who did he get it from?
21   A. I don't know. Mary Fanning I believe, and then
22 they got it from Dennis Montgomery, that's, that's what
23 I've heard.
24   Q. Okay.
25   A. And did I know Brannon Howse and Dennis

Page 263

1    A. I met Dennis many times now because now he does
2  work for me.
3    Q. Okay.
4    A. Mike Lindell.
5    Q. He does not work for My Pillow?
6    A. No, absolutely not, he does not work for My
7  Pillow, never has.
8    Q. Just you personally?
9    A. Mm-hmm.
10   Q. Is that a yes?
11   A. Yes.
12   Q. It's just ambiguous if you say mm-hmm.
13   A. Yes, yes, yes.
14   Q. It's not clear what that means. Where is, if I
15 needed to locate Mr. Montgomery, where would, where
16 would I find him, if you know?
17   A. I think that's his -- once again, I don't want
18 you attacking him.
19   Q. Do you know where he lives?
20   A. Yes, I do.
21   Q. Do you have his contact information?
22   A. Yes, I do.
23   Q. Do you have his phone number?
24   A. Yes, I do.
25   Q. Will you provide that information to us?

Page 265

67 (Pages 262 - 265)

1   Now I'm going to explain this, now I remember.
2   So I had an assistant back then, not ███ another
3   assistant where we made up cards, Lindell Management
4   cards, okay, so that I wouldn't, you know, and on that
5   card had an email.  People would ask me all the time for
6   a card and I didn't want to use My Pillow, I wanted to
7   use Lindell Management.  So I used that email on that
8   card.  So obviously this guy got one of them cards.  I
9   don't ever converse on the Lindell Management, I bet you
10  I didn't even respond to this, you know.
11      Q.  Okay.
12      A.  This is, other than incoming, give out business
13  cards that, you know, here, I want a business card,
14  well, here, use this.  And once again, I think the
15  assistant then could pull them up and segregate them,
16  like people who wanted my picture and wanted my card.
17  And obviously Shiva got one.  What's the date on this?
18  February 18, 2021.
19      A.  Yeah.  So that would have been the only thing.
20  He probably got a, he probably got a business card with
21  that on that.  I don't even remember how he ever got
22  ahold of me.
23      Q.  Did Dr. Shiva perform any work or My Pillow?
24      A.  No, no.
25      Q.  As a consultant?
Page 274

1   people call my call center, and these are upset people
2   or anybody, and they bug them enough, because they're on
3   the phone, they have to, at a certain point I said if
4   you can't handle the customer and if they're adamant, I
5   gave them this ███ mail to use.  It goes into a generic
6   box to a team that just covers like customers that are
7   upset.  Deviations, you know, deviations.  Like this
8   guy, he says, so he was probably very upset, you are
9   very difficult to make contact, I called and waited 20
10  minutes, I'm not, so he was very upset.  Anybody that's
11  so upset about anything, they give them that ███ mail.
12      Q.  Gotcha.  So this particular email relates to, if
13  you look in the middle, it actually relates to Dr.
14  Coomer, do you see that?
15      A.  Yep.
16      Q.  Do you remember receiving this?
17      A.  No, I never read this email.  I don't read the
18  ███
19      Q.  Okay.  At all?
20      A.  No.  They would be, ███ go to a team and
21  usually they've been ordered, back then we got thousands
22  of emails, customers and stuff, so they, so what they do
23  is they go through and take care of the My Pillow
24  customers.  Everything else they're ordered to, we
25  consider a junk mail.
Page 276

1       A.  No, nobody did, no, absolutely not.
2       Q.  All right.
3       A.  He's talking about, this is, this is Alan Duke,
4   he's Lead Stories of the Facebook fact checkers.
5       Q.  You can put that aside.
6       A.  What?
7       Q.  You can put that aside.
8       A.  Okay.
9       Q.  Let's go to 69.
10      (Exhibit 69 marked for identification.)
11      Q.  This is the email portion of your deposition,
12  Mr. Lindell, so we'll just look at a few.  You should
13  give one to your counsel.
14      Okay.  Exhibit 69 at least purports to be, and
15  it's been produced I guess twice in this litigation,
16  purports to be an email from some person named Mark
17  Debarbieri?
18      A.  Yep, yep.
19      Q.  To Mike Lindell at ███ do you see
20  that?
21      A.  Mm-hmm, yep.
22      Q.  Do you know who this person is?
23      A.  No idea.
24      Q.  Do you know how he got your email address?
25      A.  Yes, I can, that's an easy one to explain.  When
Page 275

1       Q.  Okay.
2       A.  This was never read by me, probably looked at,
3   boom, gone.
4       Q.  Okay.  And I'm not asking about the lumpy pillow
5   calls.
6       A.  No, they're not lumpy pillows, that's not what
7   they call on, okay.  When you say lumpy pillows, now
8   you're an asshole, you got that, you're an asshole is
9   what you are.
10      MR. MALONE:  Mike.
11      THE WITNESS:  No, he's an asshole, he's an
12  ambulance chasing asshole.
13      A.  That's what you are.  Lumpy pillows, kiss my
14  ass.  Put that in your book.  No, they, they answer
15  anything, any problem customer that wants to reach Mike
16  Lindell, those are the ones, I want to talk to Mike
17  Lindell, I want to talk to Mike Lindell.  They send them
18  to here and they go, and they call about maybe they
19  didn't get their pillow on time because of the Fed Ex or
20  whatever, but we'll cover it even though it could be
21  somebody else's fault.  Nobody calls because of a lumpy
22  pillow.  But good, good one though.
23      Q.  Are you done?
24      A.  Yeah, I'm done.
25      Q.  What I'm saying --
Page 277

70 (Pages 274 - 277)

1  A. Obviously you don't have a My Pillow too, you
2  don't, do you.
3  Q. What I'm saying is, Mr. Lindell --
4  A. Asshole. But go ahead.
5      THE WITNESS: No, I'm pissed.
6      MR. MALONE: I understand.
7  A. Yeah, go, when you're saying what.
8  Q. The non-customer product complaint calls.
9  A. Anything that comes in where the customer,
10 there's a, they can't get, they got to get, get to, they
11 can't solve the problem if the customer wants to talk to
12 Mike Lindell or if they want to talk about the weather
13 being bad. They say, they, they go give them ████ and
14 it goes into another team of people.
15 Q. Okay.
16 A. And this team take anything that's unrelated to
17 My Pillow and throw it in the garbage.
18 Q. Okay. That's where I'm going. To the extent
19 that My Pillow is receiving emails from people like Mr.,
20 I'm going to butcher his last name, Debarbieri --
21 A. Nobody, the only ones that know --
22 Q. Let me finish my question, please.
23 A. Well, then, okay. Then make sure you be
24 specific. Because people don't, now you asked me how
25 they got that email address. I don't publish it for

Page 278

1  everybody. I don't, people try and reach me all the
2  time for different things. You don't have that luxury
3  of being, have people, everyone on the street wants your
4  email whether to get a picture or whether to attack you
5  or whatever it is, you know, people like you that
6  probably call on the phone. But go ahead.
7      I give, they give them the email, it's a thing,
8  catchall so they don't have to take the wrath or an
9  attack or to say I want to talk to Mike Lindell, come
10 on, come on, come on, it's easy, they give them this
11 email. You asked how they got the email, that's it.
12 It's the only way they can get ████████.
13 Q. Do you need to take a break?
14 A. No, I don't need to take a break.
15 Q. All right.
16 A. Your lumpy pillow question kind of set a nerve.
17 Because obviously, just like your question in here in
18 your little complaint, Mike's frivolous Cyber Symposium.
19 This whole case is frivolous, you should be ashamed of
20 yourself. But go ahead, finish your question on this
21 and try not to talk about, I get personal when you
22 bad-mouth my employees or my pillows or anything like
23 that. Go ahead.
24 Q. I haven't said a single word about your
25 employees and I don't own --

Page 279

1  A. You've attacked them, you attacked them, you're
2  part of this, you're getting paid on consignment, you
3  get paid if they get money from my employees, yes, you
4  have attacked them. You personally did this, the
5  Newsmax, you and I call it right out, the criminal
6  lawyers and Coomer when you guys did this to me.
7  Q. Do you not think that, that Eric Coomer rigged
8  the election?
9  A. What?
10 Q. Do you not think that Eric Coomer rigged the
11 election?
12 A. I said, Eric Coomer didn't, I didn't say that, I
13 didn't say that. I said Dominion, they used Dominion
14 machines and all machines. I'm not specific just to
15 Dominion, ES&S, Hart, all of them, we've got to get rid
16 of the computers in our election. I never said anything
17 about Eric Coomer. I called him a traitor what he did
18 to My Pillow and Newsmax.
19     Chris Ruddy called me up and says, sorry, Mike,
20 you can't come on anymore, this guy, I don't know, let's
21 make a deal. Were you involved in that deal? You hurt
22 a lot of innocent people is what you did because that
23 day we couldn't go on. Like right now when we're
24 overdrawn I can't go on Newsmax and say, hey, we got the
25 new My Pillow 2.0, my employees thank all of you, like I

Page 280

1  used to do, I'm their host. I can't do that anymore
2  because of you and Coomer. That's reality, that's cost
3  us hundreds of millions of dollars.
4      When I'm done with this, you wait, if there's
5  any way to get your wallet it's going to be, that's what
6  we're going to do because you've hurt us so bad, it's
7  disgusting. And then you call it a lumpy pillow. Put
8  that in there too, huh, are you going to put that out
9  there. Did you use a My Pillow, how dare you. Are you
10 reading this stuff, I don't get it, you're worse than
11 the media. So keep going.
12 Q. I think there was a question in there.
13     MR. CAIN: I'm going to object as
14 nonresponsive.
15 A. The question, the question you asked me, how did
16 they get the ML. I've never read this, anything that
17 came across. We get stuff all the time, it goes right
18 in the garbage.
19 Q. So to that point, the emails that come in that
20 get filtered into ████████ --
21 A. That's correct.
22 Q. -- that relate to, let's say it's someone like
23 this gentleman who's calling about or emailing about
24 Coomer or Dominion.
25 A. Garbage.

Page 281

71 (Pages 278 - 281)

1  interact and say, hey, if you find a screen shot, you
2  will get a reward, you know, you have to take a screen
3  shot, okay. So it solved that problem because people
4  really believed that even though it wasn't true. So
5  that was set up.
6      So anything with the election, whether it was
7  good, even if it was good, hey, I got, like right now if
8  they called up and said, hey, I got a good invention for
9  Mike on MyStore, I need to talk to him, I need to talk
10  to him. My reps instead of saying I can't talk to him,
11  there's no way you can get to him, but does he have an
12  email, you know what, here's his email, check it out, it,
13  because they don't have time. My Pillow has to
14  function, it doesn't have time to talk about the weather
15  or whatever. So these things go there.
16      And this thing here would have been deleted or
17  at least unchecked and it's sitting there in the server.
18  It was, nothing ever gets double deleted because if they
19  come back to us we have to be able to show the
20  conversation with them. We do that to protect our
21  company.
22      MR. CAIN: Objection, nonresponsive.
23      Q. I'm just trying to get a sense of how many
24  people call your company about the election fraud
25  issues?

Page 286

1  with every keyword you gave. There you go.
2      Q. Thank you.
3      A. Yeah, now you got your answer. You already knew
4  the answer, you just was hoping there was more I think.
5  It sucks that you're not going to win all this money,
6  huh. Don't you feel it slipping away because you're all
7  wrong and you realize you shouldn't have done this.
8      Q. I'm not sure you understand how you're
9  perceived.
10      A. I don't care how you think I'm perceived. Let
11  me tell you how you're perceived. You're perceived as
12  an ambulance chaser, you're the reason what's wrong with
13  this country with lawyers, you're disgraceful is what
14  you are.
15      When I read this thing again last night, I
16  thought, one paragraph after you came after me. I
17  didn't know this, whatever this Oltmann, I didn't know
18  him then and I barely know him now. And you guys, and
19  you guys, all the stuff back then the only thing in here
20  was one statement I made after you attacked Newsmax,
21  after Coomer attacked Newsmax. That's the only
22  statement I made, period, I didn't know who Eric Coomer
23  was.
24      Q. We're recycling old testimony. I didn't ask you
25  about that either. So let's, let's stay focused because

Page 288

1      A. How many to nowadays, probably, I don't know,
2  none, a few. Back then in January of '21, a lot. They
3  were all calling in attacking and then, and then we were
4  losing our box stores, you know.
5      Q. They, they were emailing too?
6      A. Not emailing, no. The only to an email
7  probably, I don't know, maybe one a month. I don't
8  know, whatever you got is what we have. Whatever you
9  got, then you know the number. If you did, if you did,
10  had us do a search, whatever you got. And believe me,
11  these guys did it all on their own, the lawyer said, no,
12  we got this third-party to do the stuff, didn't I, I was
13  very adamant about that. You can kiss my butt I said.
14  He goes no, Mike, we have to get them. I said there's
15  no emails that we have between with any of these things.
16      MR. MALONE: Mike, Mike, you know what I'm
17  going to say?
18      THE WITNESS: What?
19      MR. MALONE: You don't have to tell them
20  about what we talked about.
21      THE WITNESS: Okay.
22      A. No, I'm just saying, every, you have every one.
23  So you have your own answer.
24      Q. Okay.
25      A. You have every single one ever done at My Pillow

Page 287

1  we only have a little bit more time.
2      A. Okay.
3      THE WITNESS: My A plus went out the
4  window.
5      MR. MALONE: Just keep it moving, Mike.
6      Q. By the way, I'm not responding to your name
7  calling and I'm not responding to --
8      A. I know, but I did respond when you said
9  something about my product that about 2,000 employees
10  rely on and they have families. And for you to have,
11  I've sold 80 million My Pillows in 14 years. You don't
12  have one, so you have no right to say that. You took
13  that right off of your corruption that you do. You're
14  probably the one putting out the narrative, it sure
15  seems like it.
16      I read some of the crap in here that you wrote
17  in your brief that's disgusting. The lies in here. One
18  of them says after Mike was with Donald Trump in 2017 at
19  a manufacturers summit, he started doing promo codes on
20  Fox. I was doing it ten years prior. This is a big
21  lie, you're a lying lawyer.
22      MR. MALONE: Mike, you're going to let him
23  finish what he's going to say and I'll object if --
24      A. Go ahead.
25      Q. I'm not going to respond to your personal

Page 289

73 (Pages 286 - 289)

5761446 -

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLORADO

 3      --------------------------------------------------------

 4      Eric Coomer, Ph.D.,

 5                    Plaintiff,

 6          vs.              Civil Action No. 1:22-cv-01129-WJM

 7      Michael J. Lindell, Frankspeech LLC,

 8      and My Pillow, Inc.,

 9                    Defendants.

10      --------------------------------------------------------

11

12           VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL

13        DESIGNATED REPRESENTATIVE OF MY PILLOW, INC.

14                    VOLUME I (Pages 1-370)

15

16

17      DATE:    March 8, 2023

18      TIME:    9:30 a.m. CST

19      PLACE:   PARKER DANIELS KIBORT, LLC

20               Colwell Building, Suite 888, 123 North 3rd St

21               Minneapolis, Minnesota 55401

22

23

24      REPORTED BY: KELLEY E. ZILLES, RPR

25      Job No.: 5761446
```

Page 1

```
 1                        REPORTER'S CERTIFICATE

 2

 3

     STATE OF MINNESOTA    )
 4                         ) ss.
     COUNTY OF WASHINGTON  )

 5

 6       I hereby certify that I reported the videotaped
     deposition of Michael J. Lindell, Volume I, on the 8th
 7   day of March 2023, in Minneapolis, Minnesota, and that
     the witness was by me first duly sworn to tell the whole
 8   truth;

 9       That the testimony was transcribed by me and is a
     true record of the testimony of the witness;

10

         That the cost of the original has been charged to
11   the party who noticed the deposition, and that all
     parties who ordered copies have been charged at the same
12   rate for such copies;

13       That I am not a relative or employee or attorney or
     counsel of any of the parties, or a relative or employee
14   of such attorney or counsel;

15       That I am not financially interested in the action
     and have no contract with the parties, attorneys, or
16   persons with an interest in the action that affects or
     has a substantial tendency to affect my impartiality;

17

         That the right to read and sign the deposition by
18   the witness was reserved.

19       WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.

20

21

22

23

24       Kelley E. Zilles, RPR
         Notary Public, Washington County, Minnesota
25       My commission expires 1-31-2025


                                               Page 370
```

```
 1        REPORTER'S CERTIFICATE
 2
 3
     STATE OF MINNESOTA   )
 4                        ) ss.
     COUNTY OF WASHINGTON )
 5
 6     I hereby certify that I reported the videotaped
     deposition of Michael J. Lindell, Volume I, on the 8th
 7   day of March 2023, in Minneapolis, Minnesota, and that
     the witness was by me first duly sworn to tell the whole
 8   truth;
 9     That the testimony was transcribed by me and is a
     true record of the testimony of the witness;
10
       That the cost of the original has been charged to
11   the party who noticed the deposition, and that all
     parties who ordered copies have been charged at the same
12   rate for such copies;
13     That I am not a relative or employee or attorney or
     counsel of any of the parties, or a relative or employee
14   of such attorney or counsel;
15     That I am not financially interested in the action
     and have no contract with the parties, attorneys, or
16   persons with an interest in the action that affects or
     has a substantial tendency to affect my impartiality;
17
       That the right to read and sign the deposition by
18   the witness was reserved.
19     WITNESS MY HAND AND SEAL THIS 22nd day of March 2023.
20
21
22
23
              Kelly E. Zilles
24   Kelly E. Zilles, RPR
     Notary Public, Washington County, Minnesota
25   My commission expires 1-31-2025
                                              Page 370
```

```
 1   Ryan Malone
 2   Malone@parkerdk.com
 3           March 22, 2023
 4   RE:   Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 5   3/8/2023, Michael J. Lindell (#5761446)
 6     The above-referenced transcript is available for
 7   review.
 8     Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
                                              Page 371
```

```
 1   Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2   Michael J. Lindell (#5761446)
 3         E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Michael J. Lindell            Date
25
                                              Page 372
```

```
 1   Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
 2   Michael J. Lindell (#5761446)
 3        ACKNOWLEDGEMENT OF DEPONENT
 4     I, Michael J. Lindell, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10       Michael J. Lindell        4/20/23
11
12   Michael J. Lindell            Date
13   *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19   NOTARY PUBLIC
20
21
22
23
24
25
                                              Page 373
```

94 (Pages 370 - 373)