# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

## EXHIBIT 5

---

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2     _____
3     ERIC COOMER, Ph.D.,        )
                                 )
4          Plaintiff,            )
                                 )
5     VS.                        ) NO. 1:22-CV-01129-WJM
                                 )
6     MICHAEL J. LINDELL,        )
      FRANKSPEECH LLC, AND       )
7     MY PILLOW, INC.,           )
                                 )
8                                )
           Defendants.           )
9     _____

10

11

                        VIDEO DEPOSITION
12
                             OF
13
                        BRANNON HOWSE
14
                        MAY 20, 2023
15

16

17

18

19

20

21

22

23      ALPHA REPORTING CORPORATION, A VERITEXT COMPANY
                      236 Adams Avenue
24                    Memphis, TN 38103
                       901-523-8974
25                  www.alphareporting.com


                                              Page 1

1    The video deposition of BRANNON HOWSE is
2  taken on this, the 20th day of May 2023, on behalf
3  of the Plaintiff, pursuant to notice and consent of
4  counsel, beginning at approximately 9:03 a.m. in the
5  offices of Apperson Crump, PLC, 6000 Poplar Avenue,
6  Suite 150, Memphis, Tennessee.
7    This deposition is taken pursuant to the
8  terms and provisions of the Federal Rules of Civil
9  Procedure.
10    All forms and formalities are waived.
11  Objections are reserved, except as to form of the
12  question, to be disposed of at or before the
13  hearing.
14    The signature of the witness is not
15  waived.
16
17
18
19
20
21
22
23
24
25

Page 2

1      I N D E X
2      EXAMINATION INDEX
3  BRANNON HOWSE
   BY MR KLOEWER                7
4
5      EXHIBIT INDEX
6  EXHIBIT NUMBER    DESCRIPTION        PAGE
7  EXHIBIT NO  100  Documents Bates        53
   Labeled  DEFS-572 and 573
8
   EXHIBIT NO  101  State of Delaware Registered  79
9      Agent Information
   Lindell-TV, LLC
10
   EXHIBIT NO  102  State of Delaware Entity    80
11    Details Lindell-TV, LLC
12
   EXHIBIT NO  103  Documents Bates CTRL      94
13  000097 and 98
14  EXHIBIT NO  104  Email Chain Bates        97
   Howse Prod  0685 to 0688
15
   EXHIBIT NO  105  Declaration of J  Alex      103
16    Halderman
17  EXHIBIT NO  106  Page 294 from Mr  Oltmann's  136
   Deposition Transcript
18
   EXHIBIT NO  107  EY Press Release        149
19    October 7, 2020
20  EXHIBIT NO  108  Documents Bates CTRL      176
   000042 and 43
21
   EXHIBIT NO  109  Copy of Text Message      255
22    Bates CTRL 000001
23  EXHIBIT NO  110  Text Message String      260
   Bates CTRL 000059 to 60
24
   EXHIBIT NO  111  Excerpt from Deposition    287
25    of Joe Oltmann Pages 209 to 211

Page 4

1      A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
       BRADLEY A  KLOEWER, ESQ
4      Cain & Skarnulis PLLC
       303 Colorado Street
5      Suite 2850
       Austin, Texas 78701
6      719-530-3011
7
   FOR THE DEFENDANTS:
8      RYAN P  MALONE, ESQ
       Parker Daniels Kibort LLC
9      888 Colwell Building
       123 North Third Street
10     Minneapolis, Minnesota  55401
       612-355-4100
11
12  FOR THE WITNESS:
       AUBREY GREER, ESQ
13     Glankler Brown, PLLC
       6000 Poplar Avenue
14     Suite 400
       Memphis, Tennessee 38119
15     901-525-1322
16
17
18
19  ALSO PRESENT:
       STEVE CUMMINGS, VIDEO SPECIALIST
20
21
22
23
24  COURT REPORTER:
       KORIAN NEAL, RPR, CCR, LCR #402
25     Koriannealreporter@gmail.com

Page 3

1  EXHIBIT NO. 112  Text Message String      291
   Bates DEFS 000224
2
   EXHIBIT NO. 113  Flash Drive Containing    298
3      Clips 1 Through 7
4  EXHIBIT NO. 114  Text Message Chain      310
   Bates 000164
5
   EXHIBIT NO. 115  Text Message Chain      314
6      Bates 000200
7  EXHIBIT NO. 116  Email Chain Bates      318
   Howse Prod. 0520 to 0523
8
   EXHIBIT NO. 117  Plaintiff's Notice of    319
9      Intent to Take Oral and
       Video Deposition of Brannon
10     Howse and Serve Subpoena
11
       PREVIOUSLY MARKED EXHIBITS
12
   EXHIBIT NUMBER    DESCRIPTION      PAGE
13
   EXHIBIT NO. 21  Screen Shot of Eric      131
14    Dominion Denver Colorado
       Taken on 9/26/2020
15
   EXHIBIT NO. 44  Document Bates Labeled    81
16    DEFS-000258
17  EXHIBIT NO. 45  Document Bates Labeled    82
   DEFS-000259
18
   EXHIBIT NO. 79  Document Bates Labeled    83
19    DEFS-000682 and
       FRANKSPEECH 000054
20
   EXHIBIT NO. 81  FrankSpeech Terms of Use  105
21
   EXHIBIT NO. 82  Home Page of FrankSpeech  88
22
   EXHIBIT NO. 85  Master Consulting Services  62
23    Agreement Bates
       FRANKSPEECH 9 to 14
24
25

Page 5

2 (Pages 2 - 5)

1 EXHIBIT NO. 86   PiDoxa Customer Service      286
           Agreement Bates FrankSpeech
2          000001 to 8
3 EXHIBIT NO. 87   Cyber Symposium Program      224
           Agenda Bates Lindell
4          000023 to 25
5 EXHIBIT NO. 88   Cyber Symposium Audience     243
           Overview Bates DEFS 000684

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 COURT REPORTER'S CERTIFICATE . . . . . . . .359
25 ERRATA SHEET . . . . . . . . . . . . . . . .360

Page 6

---

1      VIDEO SPECIALIST: We are now on the
2 record. Today is May the 30th, 2023. The time is
3 9:03 a.m.
4      This is the video recorded deposition of
5 Mr. Brannon Howse, taking place at 6000 Poplar
6 Avenue, Memphis, Tennessee.
7      Today's deposition is in regard to Case
8 Number 1:22-cv-01129-WJM, captioned Eric Coomer,
9 Ph.D., versus Michael J. Lindell, et al., filed in
10 the United States District Court for the District of
11 Colorado.
12      Counsel, will you please introduce
13 yourselves for the record.
14      MR. KLOEWER: Brad Kloewer for the
15 plaintiff.
16      MR. GREER: Aubrey Greer for the deponent.
17      MR. MALONE: Ryan Malone for all
18 defendants.
19      VIDEO SPECIALIST: At this time, the
20 witness may be sworn in by the court reporter.
21           BRANNON HOWSE,
22 having been first duly sworn, was examined and
23 testified as follows:
24           EXAMINATION
25 BY MR. KLOEWER:

Page 7

---

1      Q. All right. Good morning, Mr. Howse. My
2 name is Brad Kloewer. I'm an attorney for Eric
3 Coomer. We just met a moment ago off the record.
4 I'll be taking your deposition today.
5      Have you ever had your deposition taken
6 before?
7      A. You know, I don't recall.
8      Q. Okay. Well, in that case, I'll just
9 establish a couple of few basic ground rules. If I
10 ask a question that you don't understand, please let
11 me know. And I'll rephrase it and try to ask it in
12 a way that makes sense to you.
13      As your counsel just mentioned before we
14 got started or alluded to, the most important in
15 person in this room today is Korian. She's taking
16 down everything you say. So we need to be careful
17 not to speak over each other.
18      I would ask you not to anticipate my
19 question if you can. I know sometimes you probably
20 will guess where I'm going, but it's important that
21 we not speak over each other so she has a chance to
22 get everything down.
23      The other thing is if we could try to
24 speak slowly and clearly. That helps her out, as
25 well?

Page 8

---

1      If you need a break at any time, let me
2 know, and we can take one. The only rule we have is
3 if there is a question on the table at the time, I
4 ask that we resolve that issue before we go to take
5 a break.
6      Same thing goes, obviously, for the
7 videographer and staff. If they need to take a
8 break, we will, as well.
9      Let me see. What else do we have here?
10 Have you taken any medications that may affect your
11 ability to provide testimony today?
12      A. No.
13      Q. No? Are you -- I provided a copy of the
14 protective order that's been issued in this counsel
15 through counsel. Are you aware of that order?
16      A. You'll have to explain that more.
17      Q. Okay. Well, there's been a protective
18 order that's been issued in this case that -- that
19 requires that certain information remain
20 confidential. Certain parties have designated some
21 information as confidential.
22      I'm going to be showing you some exhibits
23 today.
24      A. I believe I've seen that document.
25      Q. Okay.

Page 9

3 (Pages 6 - 9)

1    MR. GREER: Did you want to give us the
2 Exhibit A that we're supposed to sign?
3    MR. KLOEWER: I don't have a printed copy.
4    MR. GREER: I just want to remind you.
5    MR. KLOEWER: Yeah. We can -- we can get
6 that during a break, and I'll get your signature on
7 that. I just wanted to be sure you're aware of it
8 before we start.
9 BY MR. KLOEWER:
10    Q. And on that note, we mentioned this to
11 Mr. Lindell, as well, but subsequent to this
12 deposition, I just want you to be aware that some of
13 the things that we discuss or that you discuss may
14 ultimately be subject to that protective order. So
15 just be aware that if you discuss this after the
16 fact, you may inadvertently be violating provisions
17 of that protective order.
18    So I just want to be sure that you're
19 aware of the terms. Or you can discuss that further
20 with your counsel.
21    All right. Now, I want to start not at
22 the absolute beginning, but I do want to begin by
23 learning a little bit about your credentials and how
24 you got into this position. I don't want to waste
25 too much time on that.

Page 10

1    I don't need to know where you went to
2 kindergarten, but I am curious how you got to be
3 where you are today. So can you tell me a little
4 bit about your education? Did you go to college?
5    A. I think a semester.
6    Q. Okay. And where did you go?
7    A. Lakewood Community College.
8    Q. Okay. Have you -- have you studied
9 journalism at all?
10    A. In school, no.
11    Q. Do you consider yourself a journalist?
12    A. Absolutely.
13    Q. Okay.
14    A. One of the best in the conservative
15 market, actually.
16    Q. Tell me little bit about your program
17 Worldview Weekend. When did that start?
18    A. That's -- Worldview Weekend is not a
19 program. That's an organization.
20    Q. Okay.
21    A. So I've got multiple programs. Which one
22 do you want to know about?
23    Q. Well, I'd like to know when you started
24 doing, as you've described it, journalism. When did
25 you get into this line of work?

Page 11

1    A. Wrote -- my first book came out in 1993.
2 So I was doing interviews likely before that but
3 certainly aggressive interviews full schedule since
4 my first book in 1993 came out.
5    Q. And Worldview Weekend, you describe it as
6 an organization.
7    A. Uh-huh (affirmative response).
8    Q. When did you establish that?
9    A. I believe that was established -- you'll
10 have to ask my corporate attorney for the books.
11 But I think 1993, but I don't remember. I think it
12 was incorporated as American Family Policy Institute
13 dba Worldview Weekend.
14    Q. I see.
15    A. And then we held our first Worldview
16 Weekend in -- I believe it was February of 1993 in
17 Minneapolis, St. Paul.
18    Q. What do you mean by that, your first
19 Worldview Weekend? Sounds like you had a
20 conference?
21    A. Yes. Correct.
22    Q. And what happens at these conferences?
23    A. This would have been, as was traditional
24 for many years, a Friday night, all day Saturday
25 conference. And we bring in speakers, and we

Page 12

1 concentrate on largely the Sixth Dominant world
2 views that ruled the world.
3    Q. And when you say that it's an
4 organization, what else does that entail? You have
5 conferences. How frequently do those occur?
6    A. We've -- I think we've done those in about
7 300 locations, some of them duplicate locations but
8 since 1993. I think the last count was something
9 around 300 Worldview Weekend -- Worldview Weekend
10 rallies that were held all over the country.
11    Q. That's about ten a year?
12    A. It was more than that a lot of years.
13    Q. Okay. And what --
14    A. I mean, we did rallies, Worldview Weekend
15 rallies, sometimes ten rallies in one -- in one --
16 ten rallies ten nights in a row.
17    Q. Okay. So quite possibly more much than
18 300 --
19    A. Yes, sir.
20    Q. -- after 30 years.
21    A. Well, it could be. I don't -- but last
22 figure, you know --
23    Q. That's not --
24    A. Trying to be as accurate for you as
25 possible.

Page 13

4 (Pages 10 - 13)

1   Q.   Sure.  No.  I understand.  I'm not
2   asking --
3       A.   I could provide you with a list of all of
4   them or most of them --
5       Q.   Not --
6       A.   -- or the fliers.
7       Q.   Not necessary.  So you hold these
8   conventions or rallies with --
9       A.   Well, they were -- they were rallies at
10  one point, one-night rallies.  For many years, they
11  were Friday night, all day Saturday.
12          Then after I think it was the 2008 crash,
13  we went to one night, making them free.  So I think
14  prior to that, that most all of them were ticketed.
15  Then we went to free and like an offering because
16  people were having a hard time after 2008.  So we --
17  I think those most -- not that -- we did some
18  that were ticketed, but the majority of these -- so
19  there's Worldview Weekends that were Friday night,
20  all day Saturday.  Then there were Worldview Weekend
21  rallies that would be one night.
22      Q.   I see.  And when you say they were held at
23  different locations, are those different locations
24  across Tennessee, across the country?
25      A.   Across the country with some exception.

Page 14

1   Certain states, I wouldn't go to.
2       Q.   Okay.  What else does Worldview Weekend
3   do?
4       A.   We have a radio show, Worldview Weekend
5   Radio.  We have Worldview Weekend Hour, which is a
6   Sunday night service, Sunday night service I teach.
7          We have Worldview Report, which is a
8   30-minute daily news cast.  We have Brannon Howse
9   Live.  We have Worldview Financial Report.
10      Q.   So these are -- these are all -- it sounds
11  like you have some radio programs and some
12  television programs, as well.
13      A.   Correct.
14      Q.   And we've already discussed the rallies.
15  Anything else that Worldview Weekend does?
16      A.   Well, we produce books, documentaries.  We
17  do -- we've sponsored concerts.
18          I do an annual concert.  Having been
19  classically trained, I do an annual concert, three
20  -- the last few years, it's filmed and produced into
21  a television special.  We've produced CDs, music,
22  Christian music.
23      Q.   Okay.
24      A.   It's all biblical worldview based.
25      Q.   All right.

Page 15

1       A.   So...
2       Q.   And we're sort of getting up to the
3   present here.  I want to sort of understand what
4   your operation looked like in late 2020.
5          So at that time, were you -- did you have
6   five programs as you've just described?
7       A.   I -- up to what date?
8       Q.   Well, I'm trying to understand, get a
9   general idea of what your operation looked like in
10  late 2020, so as we're approaching the presidential
11  election and then the weeks thereafter.
12      A.   Oh, I've had Worldview Radio I've been
13  doing for years on 60 something trust world stations
14  or however many it is as the network grew.
15          Worldview Weekend Hour, that's been going
16  on for several years prior.  You know, I think -- I
17  think the Sunday night Worldview Weekend Hour I was
18  doing since 2015.
19          But I think Worldview -- Worldview
20  Television was going on -- I want to say we started
21  that around 2006, 2007, some 2008, somewhere in
22  there.
23      Q.   And your studios are all based here in
24  Memphis?
25      A.   Correct.  Well, no.  We have studios here,

Page 16

1   and we have a studio at another location.
2       Q.   Where is that other location?
3       A.   We don't disclose for security reasons.
4       Q.   Okay.
5       A.   It's undisclosed for that reason so we
6   have somewhere to go for safety.
7       Q.   All right.  About how much of your time do
8   these broadcasts -- were these broadcasts taking up
9   in late 2020?  Was this like a five day a week
10  thing?  Can you estimate your weekly investment time
11  and producing this content?
12      A.   Well, I pretty much work seven days a
13  week.  So...
14      Q.   Okay.  And that was true a few years ago
15  in 2020, as well?
16      A.   Correct.
17      Q.   Okay.  We'll get into this more
18  specifically in a bit.  But I understand that
19  Mr. Lindell was a guest on one of your programs at
20  some point in 2020?  Is that correct?
21      A.   I believe he was a guest on my TV show and
22  then a guest on my radio show.  But you would have
23  you would have to show me those to verify.
24      Q.   Well, I don't have them with me.  I
25  haven't seen them.  I just have heard him discuss

Page 17

Veritext Legal Solutions
800-336-4000

1 having been a guest on one of your programs at some
2 point prior to your current relationship. So --
3    A.   That would be correct.
4    Q.   Do you recall what the reason for having
5 Mr. Lindell as a guest on your program at that time
6 would have been?
7    A.   I think there were multiple reasons.
8    Q.   Okay. Can you tell me what some of those
9 might have been?
10    A.   He was a successful CEO, self-described
11 Christian, conser -- politically economic
12 conservative, American icon, really, success --
13 success story and was known I think also for being,
14 you know, pro-life, holding to many of the values --
15 the Christian world view values that we hold to.
16    Q.   So did you have him on to discuss any one
17 of those sort of aspects in particular --
18    A.   I don't remember.
19    Q.   -- or just -- okay. But all of them would
20 have been relevant to your audience?
21    A.   Anything Christ -- related to the
22 Christian world view would have been relevant or
23 nonChristian worldview. Because again, we -- we
24 discuss competing world views.
25        So when we discuss the six dominant world

Page 18

1 to this time?
2    A.   November 27th would have been a Friday.
3 So that was on I believe a Sunday night. So that
4 may have been 22nd or the -- whatever Thanks --
5 probably around the 22nd, if I had to guess.
6    Q.   Okay. And were you acquainted with
7 General Flynn prior to this time?
8    A.   Not till that -- not till that interview.
9    Q.   So --
10    A.   Acquainted as in was I aware of who he
11 was?
12    Q.   No. I meant more in the personal sense,
13 had you met him before?
14    A.   I never met him or talked to him prior to
15 the interview.
16    Q.   And how did that interview come to be?
17 Did you reach out to him?
18    A.   No, I did not.
19    Q.   So someone reached out to you?
20    A.   Correct.
21    Q.   And who was that?
22    A.   General -- General McEnver -- McInnerney.
23    Q.   Okay.
24    A.   General McInnerney.
25    Q.   Lieutenant General Thomas McInnerney, just

Page 20

1 views, we're talking biblical Christianity, secular
2 humanism, cosmic humanism, post modernism, Marxism
3 and Islam.
4    Q.   So going into the 2020 election, you were
5 conducting all these shows at different times. I
6 want to focus in on one interview that you conducted
7 around this time frame that jumped out at me.
8        In November of 2020 on the 28th, you
9 interviewed Mike Flynn? Is that correct?
10    A.   You mean General Flynn?
11    Q.   That's correct. Yes.
12    A.   What time frame?
13    Q.   November 28th of 2020?
14    A.   Are you sure it was the 28th?
15    Q.   I believe so. But you can correct me if
16 I'm wrong.
17    A.   I thought it was the 27th.
18    Q.   Okay.
19    A.   What day of the week was the 28th?
20    Q.   Couldn't tell you that off the top of my
21 head either. The date isn't -- isn't particularly
22 necessary. It's possible the clip I watched was
23 posted the following day.
24        I'm just curious how this interview came
25 to be. Were you acquainted with General Flynn prior

Page 19

1 to clear for the record?
2    A.   Correct.
3    Q.   And so I take you were acquainted with
4 General McInnerney prior to this time?
5    A.   Correct.
6    Q.   When did you first meet General
7 McInnerney.
8    A.   I believe it was right after the -- within
9 a day or so after the 2020 election.
10    Q.   Okay. So just a few weeks prior to that
11 time?
12    A.   Correct.
13    Q.   And who introduced you to General
14 McInnerney?
15    A.   I believe it was Mary Fanning.
16    Q.   Okay. And why did she put you in touch
17 with General McInnerney?
18    A.   Because of information he had related
19 to -- she relayed that he had a working knowledge of
20 a piece of government software known as Hammer
21 Scorecard.
22    Q.   I was going to get into Ms. Fanning a bit
23 later. But we can hop in now since you've mentioned
24 her.
25        When did you first meet Mary Fanning?

Page 21

6 (Pages 18 - 21)

1   A.  I don't recall.
2   Q.  What is her background?
3   A.  Hers?
4   Q.  Yes.
5   A.  You would have to ask her.
6   Q.  Well, have you met Ms. Fanning?
7   A.  Not in person.
8   Q.  Not in person.  Have you ever seen her?
9   A.  I have seen what are supposed to be
10 pictures of her, but I don't know.  I've never met
11 her in person.  So I wouldn't know.  But I've been
12 shown what I am told is a picture of her.
13  Q.  As you sit here today, do you believe that
14 Mary Fanning is a real person?
15  A.  I do.
16  Q.  Okay.
17  A.  Is there a belief she's an AI or
18 something?
19  Q.  No.  I've never met anyone who's seen her
20 or met her in person.  We've asked a lot of people.
21 So it's -- it's hard for me to know whether she's
22 real or not.
23      I've heard her voice, but I've never seen
24 her, and I've never met anyone who has.  So I was --
25 so I was asking.  Seems like you've had a long

Page 22

1   Q.  Yes.  Of 2020.
2   A.  I don't recall.
3   Q.  Okay.  Mr. Lindell has described
4 Ms. Fanning as a journalist.  Would you agree with
5 that characterization?
6   A.  I would think that would be accurate
7 description.
8   Q.  Do you know anything else about her
9 background?
10  A.  Other than stories she's told me about her
11 childhood and, you know, personal things.
12  Q.  Okay.  But as far as her work history?
13  A.  She has written -- reportedly written
14 papers for the Center for Security Policy, Frank
15 Gaffney's organization, I believe.
16     That's how I -- I believe that's how I
17 came to know who she was, was reading her white
18 papers that were published on the website of the
19 Center for Security Policy.
20  Q.  Okay.  And center for Security Policy is
21 an organization you just mentioned, Frank Gaffney?
22 Is that correct?
23  A.  Correct.
24  Q.  Okay.
25  A.  Are you not familiar with it?

Page 24

1 relationship with her.
2   A.  I've known her for a while.
3   Q.  Okay.
4   A.  But never met her in person that I'm aware
5 of.  I mean, if she's walked up to me at a
6 conference and shook my hand and introduced herself
7 and talked to me --
8   Q.  Well --
9   A.  I've met tens of thousands of people
10 probably or more.  Who knows, I mean, all these
11 years?  So...
12  Q.  So I know you just said you don't recall
13 when you first met her.  Can you give me a general
14 idea?  Was it prior to 2020?
15  A.  I can't.
16  Q.  Presumably you knew her before you were
17 introduced to General McInnerney?
18  A.  Correct.
19  Q.  And that was just around the time of the
20 election?
21  A.  Correct.
22  Q.  I know Ms. Fanning was reporting on Hammer
23 Scorecard at least in October of that year.  Did you
24 know her at that time?
25  A.  In October?

Page 23

1   Q.  I'm not.  I'm familiar with the name Frank
2 Gaffney.  I was going to ask you about him a bit
3 later.  But we can get into that, as well.
4     We've got a lot to get through here.  But
5 we'll get to Mr. Gaffney.
6     All right.  So getting back on track, I'm
7 sure Ms. Fanning will come up again a few times as
8 we proceed here today.  So you spoke with General
9 Flynn in late --
10  A.  Let me just clarify.  I don't know when I
11 met Ms. Fanning.  Because I had been trying to reach
12 her for some time to interview her because I was
13 reading her white papers.  And she was very hard to
14 reach.
15  Q.  I believe it.  Yes.  All right.  So --
16  A.  And so at some point --
17  Q.  All right.
18  A.  I believe at some point, Claire Lopez, who
19 I -- do you know Claire?
20  Q.  She is in the same line of questioning
21 we're going to get to with Mr. Gaffney later.
22  A.  Okay.
23  Q.  But I'm familiar with her name.
24  A.  I believe Claire Lopez, who reportedly is
25 former Central Intelligence Agency, CIA, worked at

Page 25

7 (Pages 22 - 25)

1 Center for Security Policy, who I think oversaw the
2 editing and publishing of literature by Mary.
3          And I had tried reaching out to Mary
4 through her. And I think I was told Mary was trying
5 to reach me, as well. I don't know why we were
6 having such a hard time connecting.
7          But at some point, and I don't know
8 exactly what year, we finally were able to make
9 connection.
10    Q. I see. And do you consider Ms. Fanning to
11 be a reliable source of information?
12    A. Yes.
13    Q. And that's --
14    A. Well, let me just say that like everything
15 I do, I try to do my due diligence and verify from
16 multiple sources. And I found much of the research
17 that she would present, I was able to validate
18 through other sources.
19    Q. I see.
20    A. Or just go to the footnote she was
21 providing or the documentation she was providing.
22    Q. I see. So getting back into the timeline
23 here, in late November, you know, you conduct this
24 interview With General Flynn. This was the first
25 interview he conducted after being pardoned by

1 speak with Patrick Byrne?
2    A. I don't believe I've ever spoken to
3 Patrick Byrne.
4    Q. Ever?
5    A. I don't believe so.
6    Q. Okay.
7    A. I mean, if he was brought on to a
8 conference or call or something -- but I don't
9 recall ever speaking to Patrick Byrne. I
10 specifically tried to avoid Patrick Byrne.
11    Q. Why is that?
12    A. Just intuition.
13    Q. You're obviously familiar with him.
14    A. Yes.
15    Q. Is there any other reason beyond -- if
16 you've never met him, what are you basing this
17 intuition on?
18    A. Intuition is just, you know, my gut and
19 just -- I don't know. It just -- I do that with
20 several people. That's not uncommon.
21    Q. Okay. What about Lynn Wood? Were you in
22 touch with Mr. Wood at this time?
23    A. What time?
24    Q. Late November of 2020?
25    A. Not that I recall.

1 President Trump. Is that correct?
2    A. That's what we were told.
3    Q. Okay. And at that time, did you speak
4 with Mr. Flynn's counsel Cindy Powell?
5    A. No, I did not.
6    Q. Have you ever been in touch with
7 Ms. Powell.
8    A. Yes.
9    Q. In what capacity?
10    A. To interview.
11    Q. Okay. She's been a guest on your program,
12 as well?
13    A. Correct.
14    Q. Can you estimate about how many times?
15    A. No, I cannot. But it's all in the open
16 record if anyone wants to go look and count.
17    Q. Okay.
18    A. It's not --
19    Q. So ballpark --
20    A. No idea.
21    Q. -- more or less than five times?
22    A. No idea.
23    Q. Okay. Were you in touch with -- now, I
24 know Ms. Powell and General Flynn were working with,
25 for example, Patrick Byrne at the time. Did you

1    Q. Were you aware that General Flynn and
2 Cindy Powell and Patrick Byrne were all working
3 together at Lynn Wood's property in South Carolina
4 at the time?
5    A. I don't think I would have known that.
6    Q. No? You personally -- have you ever been
7 to Lynn Wood's property in South Carolina?
8    A. No, I have not.
9    Q. Okay. What about Jim Penrose? Did you
10 speak with him at the time?
11    A. Who is that?
12    Q. He's another individual who purports to a
13 cyber security expert who was working with those
14 folks at Mr. Wood's property at the time.
15    A. Hum.
16    Q. Russ Ramsland?
17    A. You probably need clarification on that.
18 The name may sound familiar, but I can't tell. I
19 don't -- I can't verify that I even know who that
20 is.
21    Q. Okay.
22    A. I mean, I would have to be shown something
23 that would show that I somehow had contact with him.
24 But best of my knowledge, I'm not sure who that is.
25    Q. Okay. That's fine. It's not a gotcha

1 question. I'm just trying to understand, you know,
2 which members of this group of people who were
3 working together at the time you were in contact
4 with.
5         Russell Ramsland, have you ever met him?
6     A.  I have interviewed him.
7     Q.  Okay.
8     A.  I believe I have interviewed him.
9     Q.  All right.  When would that have occurred?
10    A.  I don't know.  But I think I have
11 interviewed him.
12    Q.  Do you know if that would have been before
13 of after the 2020 presidential election?
14    A.  I believe it would have been after.
15    Q.  And are you familiar with his organization
16 the Allied Security Operations Group?
17    A.  Familiar in what way?
18    Q.  Do you know that they exist?
19    A.  I have heard about it.
20    Q.  Okay.
21    A.  But I don't -- I can't say I know anything
22 in detail about the organization.
23    Q.  Okay.  So you don't know what they do?
24    A.  I suppose they do something related to
25 cyber security, and I know that they were studying

Page 30

1 elections and election results and cyber hacking,
2 I'm told.
3     Q.  Okay.
4     A.  And I believe I have -- I believe --
5 again, you would have to go back through all my
6 shows.  But I believe I have interviewed him, but I
7 don't -- I can't say for certain.  I don't -- it's
8 sometimes hard to distinguish between when someone
9 else interviewed him and I was in the room for a
10 production my private conversations with him and
11 then did I ever interview him myself.
12        And it's kind of like asking you what did
13 you have for lunch and dinner a week ago today.
14    Q.  Right.  That's -- that's fair.  Are you
15 still in touch with Mr. Ramsey?
16    A.  I'm -- I'm not not in touch with him.  If
17 he were to call me, I would take his phone call.
18    Q.  Okay.
19    A.  In other words, we -- there's no falling
20 out.  I mean, if he were to call me, I would take
21 his call.
22    Q.  What about Phil Waldron?  Were you in
23 contact with Mr. Waldron at this time?
24    A.  What time is that?
25    Q.  Late November 2020?

Page 31

1     A.  I don't know.
2     Q.  Conan Hayes, were you in touch with
3 Mr. Hayes in late 2020?
4     A.  I don't think so.
5     Q.  Okay.
6     A.  I don't think I -- is that the Cohen that
7 works with Mike Lindell?
8     Q.  Yes.
9     A.  I don't believe I came to figure out who
10 he was or even know who he was until after working
11 with Mike Lindell in 2021.
12    Q.  Okay.
13    A.  A lot of these people kind of work on the
14 shadows, you know, on the edge.  They're -- they
15 don't run to be interviewed.
16    Q.  Right.  That's why I'm asking about some
17 of these folks.
18        Last one, Josh Merritt?
19    A.  I mean, Russ Ramsland may run to be
20 interviewed.  I'm not saying he doesn't.  But when
21 you're talking about guys like Cohen --
22    Q.  Yeah.  Well, part of the reason I'm asking
23 is the organization I referred to a moment ago,
24 ASOG, the Allied Security Operations Group, it's our
25 understanding that Mr. Waldron, Mr. Hayes,

Page 32

1 Mr. Ramsland and an individual named Josh Merritt,
2 who I'm about to ask you about, all worked for that
3 organization at the time.
4        So I'm just trying to understand if you
5 were in touch with them in this late 2020 time
6 frame.
7     A.  Not that I'm aware of.
8     Q.  Okay.  So I just mentioned Josh Merritt.
9 Did you ever speak with him in late 2020?
10    A.  Not that I'm aware of.  I don't think I
11 knew who he was until the Cyber Symposium came
12 around.
13    Q.  You know who he is now, though?
14    A.  I know who he is.  But I don't know
15 that -- I could not tell you if I have ever talked
16 to him or not.
17    Q.  All right.  So proceeding through this
18 late 2020 time frame -- well, I don't know if this
19 is 2020 or early 2021.  But do you recall when you
20 first met Mike Lindell?
21    A.  In person?
22    Q.  No.  Well, I know -- I know he was -- he
23 was interviewed -- you interviewed him on your show
24 as you already discussed.  And we're not sure
25 exactly when that occurred?

Page 33

9 (Pages 30 - 33)

1   A.   Sometime I believe in November of 2020.
2   Q.   Was when he was on your show?
3   A.   I believe so.
4   Q.   I see.  Okay.
5   A.   Right before the election, I believe.
6   Q.   Just before the election?
7   A.   Well, I may have interviewed him after the
8   election, too.  I may have interviewed him right
9   before the election, and then I may have interviewed
10  him right after the election.
11       But I know all of -- the first two
12  interviews for radio and TV I believe took place in
13  November.  I don't remember the dates.
14  Q.   And --
15  A.   You know the dates.  Right?
16  Q.   I'm not sure about the ones prior to
17  January 9th.
18  A.   Okay.
19  Q.   That's what I'm asking about.
20  A.   Okay.
21  Q.   But I know about January 9th, and that's
22  what I'm going to ask you about next.
23       I understand you spoke with Mr. Lindell on
24  January 9th on the phone.  Correct?
25  A.   Correct.

Page 34

1   Q.   Okay.  What was the --
2   A.   January 9th of 2021.
3   Q.   Yes.  What was the purpose of that call?
4   A.   General -- I believe General McInnerney
5   and Mary Fanning had requested I introduce them.
6   Q.   And why did they come to you for that
7   purpose?
8   A.   Because they knew I had his cell phone
9   number.
10  Q.   And why did they want to speak with
11  Mr. Lindell?
12  A.   They believed they had information related
13  to the election that should be brought to
14  president -- then President Trump.
15  Q.   And what information was that?
16  A.   They believed they had information related
17  to a government program that they claim was a
18  government program in the intelligence community
19  related to Hammer and Scorecard.
20  Q.   And had you seen that information
21  yourself?
22  A.   I had been interviewing Mary Fanning and
23  General McInnerney I believe starting the day after
24  the election on my radio show about that.
25  Q.   As far as the info -- well, do you know

Page 35

1   what the nature of the information was?  Are we
2   talking about video footage, data?
3        What exactly did they want to present to
4   Mr. Lindell?
5   A.   They wanted -- I believe what they wanted
6   to present was the history of this mentioned
7   software program and what it could do and how it had
8   been used and what its function was.
9   Q.   And what is the history of that software
10  and program?  I'll ask that a bit more specifically.
11       Do you know when Hammer -- and just to be
12  clear on the record, what is Hammer, and what is
13  Scorecard, two-part question.
14  A.   As I understand it from General
15  McInnerney, Hammer -- one of them is the program,
16  and one is the operating program.
17  Q.   Okay.  So are they both software programs?
18  A.   That's what I understand.
19  Q.   Okay.  I've heard that Hammer is actually
20  the hardware.
21  A.   There you go.
22  Q.   It's the --
23  A.   Hardware and one's a software.
24  Q.   Okay.  And Scorecard is the program that
25  runs --

Page 36

1   A.   I believe that is true.
2   Q.   And what do -- what does Hammer and
3   Scorecard do as you understand them?
4   A.   As I understand it?
5   Q.   Yeah.
6   A.   As I understand it, it is a piece of
7   software that can do things in the intelligence
8   arena related to elections, related to cyber
9   security, related to hacking, harvesting data,
10  looking at data.  That's what I was told.
11  Q.   Okay.  Well, that's a -- that's a pretty
12  broad spectrum of capabilities.
13       Is Hammer Scorecard, is it your
14  understanding that the program Scorecard is -- was
15  created to rig elections?
16  A.   I have no idea.  Well, let me take that
17  back.  Well, I can tell you what I'm told.
18       I'm told it was used by the intelligence
19  arena overseas to flip elections.
20  Q.   And who told you that?
21  A.   I believe, if you go back and listen to
22  the interviews, that's what's being said in the
23  interviews with Mary Fanning and General Thomas
24  McInnerney.  But I would have to go listen to those
25  interviews.  But I believe that's the case.

Page 37

10 (Pages 34 - 37)

_

1    There was a whole book written about it I
2 think called The Hammer is the Key to the Coup?  Is
3 that the name of the book by Mary Fanning and Allen
4 Jones?
5    Q.  Yeah.
6    A.  That goes into detail on this.
7    Q.  Who is Allen Jones?
8    A.  He's a -- that's a good question.  Who is
9 Allen Jones?
10    Q.  Thank you.  Who is Allen Jones?  Do you
11 know the answer?
12    A.  He's an individual that reports to have
13 written this book with Mary Fanning.  He's an
14 individual that I have interviewed several times.
15 But he's an interview -- he's not an individual that
16 I'm aware of ever seen his picture.  He doesn't like
17 to answer the phone.  He's very...
18    Q.  So similar to Ms. Fanning then.
19    A.  Correct.  Although Mrs. -- Ms. Fanning
20 would answer my calls.  I don't know that -- I know
21 I have called Allen, but I don't always know if he
22 really answered unless it was a scheduled interview.
23 But if I said I just want to call Allen today, I'm
24 not sure he would pick up the phone.
25    Q.  Okay.

Page 38

1    A.  Is that his real name?  I don't know.
2    Q.  Do you know anything about his background,
3 his credentials?
4    A.  I do not.  That I -- and do I know
5 anything about his credentials, his background?  I
6 may have read a bio that was provided to me on the
7 air.  But can I recall that bio?  No.  Does anything
8 about his bio or background stick out to me?  No.
9    Q.  All right.  I'm just trying to
10 understand --
11    A.  My guess is you have about as much
12 information on him as I do.
13    Q.  That -- that sounds accurate.  Yes.  Okay.
14 So Ms. Fanning has written this book with Allen
15 Jones.  And she has reached out to you with Mr. --
16 with General McInnerney to reach out to Mr. Lindell.
17    Sounds like you haven't seen the
18 information that they intended to present to
19 Mr. Lindell?  Is that correct?
20    A.  Have I seen?  I mean, I'm assuming that
21 what they presented to him would have been in her
22 book.
23    Q.  Okay.
24    A.  So I have seen her book.
25    Q.  Okay.  So the purpose of this call

Page 39

1 wasn't -- were you presenting this information
2 yourself, or were you just an intermediary to put
3 Mr. Lindell in touch with them?
4    A.  I was just putting him in touch.
5    Q.  I see.
6    A.  I may have -- I may have clarified a few
7 things here and there she would talk because I would
8 have known about what she was saying from all the
9 interviews with them.  But she was the presenter as
10 I understood the conversation.  I was just the guy
11 making the connection.
12    Q.  So going back to Hammer and Scorecard,
13 you've been told that Hammer was used to manipulate
14 elections in foreign countries?  Did I hear you
15 correctly?
16    A.  That's what I have been told.
17    Q.  And was Hammer and Scorecard used to
18 manipulate the 2020 presidential election?
19    A.  I don't know the answer to that.
20    Q.  Have you seen any evidence that it was?
21    A.  I have seen evidence of what I believe is
22 something going on, but I can't tell you the program
23 that was being used.
24    Q.  Do you know when Hammer and Scorecard was
25 created?

Page 40

1    A.  I do not.
2    Q.  Do you have a ballpark time frame?
3    A.  Again, this may have come up in interviews
4 and been talked about in the years and the time
5 frames.  But I have I to listen to those interviews
6 again.
7    So I may have been told.  It may be in the
8 interviews I've done.  But do I recall the year it
9 was reportedly created and launched?  No.  I don't
10 recall at this time.
11    Q.  Have you heard that it was created during
12 the Obama administration?
13    A.  I believe I have heard -- no.  Well, I
14 don't know.
15    I do know that there was talk that it was
16 being used during the Obama administration.  I don't
17 know that it was created during the Obama
18 administration.
19    Q.  Do you know who built Hammer or Scorecard
20 or developed Scorecard?
21    A.  I don't know if there was any one
22 individual.
23    Q.  Do you know the identities of any of the
24 individuals who were involved in Scorecard?
25    A.  We were told that a gentleman by the name

Page 41

11 (Pages 38 - 41)

1 of Dennis Montgomery was involved with that.
2   Q.  Well, we'll talk about Mr. Montgomery a
3 lot throughout this deposition.  But did you
4 understand at the time of the call on January 9th of
5 2021 that the information being presented to
6 Mr. Lindell came from Mr. Montgomery?
7       I can rephrase that.  That was a long
8 question.
9       Were you aware of the source of the
10 information in January of 2021?
11   A.  Yes.
12   Q.  And that source being Dennis Montgomery?
13   A.  Well, I believe the source that they --
14 was Mary Fanning, General McInnerney.  And I would
15 assume at some point in there, you would have to add
16 the name Dennis Montgomery.
17   Q.  That's what I'm wondering is at which
18 point in your recollection did you become aware that
19 Dennis Montgomery was involved in all of this?
20   A.  Probably at the point I started
21 interviewing Mary and General McInnerney over the
22 radio.
23   Q.  So late 2020?
24   A.  Correct.
25   Q.  Have you ever met Mr. Montgomery?

Page 42

1       So do I know that I have interviewed him
2 on air?  I do not.
3   Q.  So I appreciate that clarification.  And
4 moving forward, if I ask if you have met somebody,
5 I'm not trying to pull a gotcha question with --
6   A.  Right.  I have only talked to him --
7   Q.  -- oh, I saw you talk with him in the
8 hotel lobby.  I just mean, do you recall a specific
9 interaction where you met an individual.  So --
10   A.  I have only talked to him one time.
11   Q.  And what was the contents of that
12 conversation?
13   A.  Someone -- I believe Doug Frank was
14 talking to him, but I don't remember.  I think it
15 was Doug Frank was talking to him on a cell phone
16 and said would you like to say hi to Dennis
17 Montgomery, who I, up to that point, don't believe I
18 had ever talked to before and put him on the phone
19 to say hello.
20   Q.  When did that conversation occur?
21   A.  I believe that occurred in the spring of
22 2021.
23   Q.  So prior to this Cyber Symposium?  Cyber
24 employment symposium occurred in August of 2021 just
25 for reference.

Page 44

1   A.  Not that I'm aware of.  What do you mean?
2 You mean met in person?
3   Q.  Yes.
4   A.  Not that I'm aware of.  Again, if someone
5 comes up to me, shakes my hand, asks me to sign one
6 of my books or take a picture, I don't always know
7 who I'm meeting.
8   Q.  Sure.
9   A.  But has anyone ever walked up to me and
10 said they're Dennis Montgomery and I had a
11 conversation with them knowing it was Dennis
12 Montgomery?  No, I have not.
13   Q.  Have you ever interviewed him on your
14 program?
15   A.  I have not.
16   Q.  Any of your programs?
17   A.  Not that I -- no, not that I'm aware of.
18 Again, if a caller calls into a show --
19   Q.  Yeah.
20   A.  -- they could claim to be Brad, and it's
21 not you.
22   Q.  Sure.
23   A.  So have -- and I can inter -- I could have
24 a conversation with that person, which could be
25 deemed an interviewing the caller.

Page 43

1   A.  I be -- I believe that's probably
2 possible, but I can't -- they were in my studio.
3 They were standing in my television studio.
4   Q.  Dr. Frank was?
5   A.  Correct.
6   Q.  And he was speaking to Mr. Montgomery by
7 phone?
8   A.  I believe that was who was talking to him.
9 I be -- if I -- you know, and my recollection is
10 clear, I believe it was Dr. Frank.  But if someone
11 wanted to correct me and say, no, it was so and so,
12 then I would be open to say, oh, yeah, I'm sorry, I
13 thought it was Doug.
14   Q.  Throughout this deposition, Mr. Howse, I'm
15 going to show you a number of video clips.  I think
16 -- I spoke with Steve before we started.  I think
17 I'm just going to show those to you on my laptop.
18   A.  Okay.
19   Q.  Hopefully, that works out all right.  If
20 not, we can try to come up with a different
21 arrangement during the break.
22       But I want to show you one.  I think
23 you've already addressed this question, but I just
24 want to be sure I have your -- a full understanding
25 of your relationship with Mr. Byrne.

Page 45

12 (Pages 42 - 45)

1        I'm going to show you a clip.  This is
2   what's been previously labeled as Exhibit 65, Clip
3   14.  This is an interview that Patrick Byrne
4   conducted or that, rather, Eric Metaxas conducted
5   with Patrick Byrne on July 6th of 2021, so about a
6   month before the Cyber Symposium.
7        MR. GREER:  I'm sorry, Brad.  What is this
8   an exhibit to?
9        MR. KLOEWER:  We --
10       MR. GREER:  You said it's previously been
11  marked as.  I just --
12       MR. KLOEWER:  Yeah.
13       MR. GREER:  I want to know where I can go
14  and find it.
15       MR. KLOEWER:  In a prior -- I can get you
16  a link to all of the video clips.
17       MR. GREER:  Right.
18       MR. KLOEWER:  This was admitted during the
19  30(b)(6) deposition My Pillow --
20       MR. GREER:  Okay.
21       MR. KLOEWER:  -- that happened on March
22  8th.
23       MR. GREER:  Great.
24       MR. KLOEWER:  I'll have Scott email you
25  links to all the video clips --

Page 46

1        Q.  Do you know if Ms. Fanning was working
2   with Mr. Byrne at that time?
3        A.  I don't know.  I don't recall.  Could have
4   been.
5        Q.  What about Lieutenant General McInnerney?
6        A.  Was he what?
7        Q.  Was he working with Patrick Byrne at the
8   time?
9        A.  I don't know.
10       Q.  So neither --
11       A.  Or I should say, I don't recall.  Because
12  if it was told to me, I don't remember.
13       Q.  But you don't recall either General
14  McInnerney or Ms. Fanning telling you that they were
15  working with Patrick Byrne at the time?
16       A.  At the time being?
17       Q.  When they reached out to you and said
18  please put us in contact with Mr. Lindell?
19       A.  I don't recall that.  It doesn't mean they
20  weren't.  That doesn't mean they didn't tell me that
21  they had visited with Patrick Byrne.  I just don't
22  remember.
23       Q.  And you stated before, you've never had
24  any direct communication with Patrick Byrne?
25       A.  Not that I know of, not that I can

Page 48

1        MR. GREER:  Great.
2        MR. KLOEWER:  -- during the break so you
3   have a copy of those.  But this is Exhibit 65, Clip
4   14.
5   BY MR. KLOEWER:
6        Q.  I'm going to show you this real quick, and
7   then I'll ask you a question about it.  Let me make
8   sure the volume is...
9        (WHEREUPON, THE ABOVE-REFERENCED VIDEO
10  CLIP WAS PLAYED.)
11       A.  Can I see that again?
12  BY MR. KLOEWER:
13       Q.  Sure.
14       A.  I believe this is the first time I've ever
15  seen this.
16       Q.  Sure.  Yeah.  And like I said, I'll get
17  copies of all this to your counsel.
18       (WHEREUPON, THE ABOVE-REFERENCED VIDEO
19  CLIP WAS PLAYED.)
20  BY MR. KLOEWER:
21       Q.  Okay.  That's why I was asking you about
22  Mr. Byrne.  You see here he's taking credit for
23  being the source that sent folks to speak with
24  Mr. Lindell on January 9th.
25       A.  He can have it if he wants it.

Page 47

1   remember.
2        I, again, tried to actually avoid
3   Mr. Byrne as far as being inter -- as far as
4   interviewing him, I try to -- I mean, I will bring
5   people on I don't agree with regularly.  I'll bring
6   people on I do agree with.  And then I'll bring
7   people on I just am interviewing.
8        But I generally try to be careful
9   interviewing certain people.  And he was one of the
10  people I did not want to hook my reputation to.
11       Q.  Are you aware of Mr. Byrne's work in
12  promoting theories of potential election fraud in
13  the 2020 election?
14       A.  That's a really broad question.
15       Q.  Yes.  Are you familiar with his work, for
16  example, in promoting the Maricopa County audit in
17  Arizona?
18       A.  I probably have heard that he had
19  something to do with that.
20       Q.  Have you seen his film The Deep Rig?
21       A.  I may have seen clips of it.  I haven't
22  sat down and watched his video, but someone may have
23  provided clips.  Someone may have called for clips
24  to be played at some point on the air or sent them
25  to me on my email or something.  But I don't recall.

Page 49

13 (Pages 46 - 49)

1    Again, I get a lot of stuff thrown at me.
2  And a lot of it, I try not to remember because it's
3  just garbage.
4    But am I -- do I recall having seen a
5  video of him?  Is it a documentary?  What is it?
6    Q.  It's a -- Deep Rig is film that he
7  created.  It's starred Joe Oltmann and discussed the
8  theory that the election had been rigged in '20.
9    A.  Well, I think this might be the first I
10 remember ever hearing about that unless, again,
11 someone can show evidence otherwise.
12   Q.  That's fine.  If that's your recollection
13 you haven't seen it --
14   A.  So you're telling me that Joe Oltmann was
15 involved in a documentary with Patrick Byrne?
16   Q.  Yes.  It also starred General Flynn.  It
17 starred Phil Waldron.  It starred Doug Logan.  It
18 included commentary from -- oh, what's his name --
19 Jovan Pulitzer, Bobby Piton and a handful of other
20 folks that were involved with   the --
21   A.  And when did this come out?
22   Q.  That film was released in June 24th of
23 2021, I believe.  20 -- yes.  2021.  Yeah.
24   A.  Well, it's possible I have seen clips.
25 Because I get emailed so many clips and things.

Page 50

1    Q.  No problem.  We can move on from that
2  topic.  He was the producer of The Deep Rig is why
3  I'm asking.
4    Okay.  So where are we here?  All right.
5  So after January 9th, did your relationship with
6  Mr. Lindell develop more after that point?
7    A.  Yes.
8    Q.  In what ways?
9    A.  He asked me if I would be willing to work
10 on a documentary for him.
11   Q.  And you said yes, I presume?
12   A.  I did.
13   Q.  Was that documentary Absolute Proof?
14   A.  Yes, it was.
15   Q.  What did your -- now, I know Absolute
16 Proof was released on February 5th of 2021.  Does
17 that sound correct?
18   A.  That sounds correct.
19   Q.  So this was a pretty quick turnaround
20 between January 9th and February 5th.
21   A.  Correct.
22   Q.  Who were you working with to produce
23 Absolute Proof?
24   A.  Mary Fanning and Mike Lindell and whoever
25 else is in it.

Page 52

1    Q.  Okay.  Yeah.
2    A.  But it didn't make an impression to the
3  point that I'm able to really engage you in a
4  conversation about it.
5    Q.  Are you familiar with the America Project?
6    A.  The America Project?
7    Q.  Yes.
8    A.  Well, there's so many organizations have
9  names similar to that.
10   Q.  Sure.  More specifically, the organization
11 that was founded by Patrick Byrne and General Flynn
12 to pursue election integrity project.
13   A.  Was Joe Flynn involved in that?
14   Q.  Yes.  He's the third board member.  That's
15 correct.
16   A.  Okay.  I am aware of that they had some
17 kind of organization.
18   Q.  But you're -- as you sit here today,
19 you -- could you tell me what type of work they do?
20   A.  I could guess based on who the people are.
21   Q.  I won't ask you to do that.  What about a
22 guy by the name of Steve Lucescu?  Have you ever
23 heard of him?
24   A.  I don't recall that name.  I could, but I
25 don't recall that name.

Page 51

1    Q  I'm going to mark an exhibit for you here
2      MR  KLOEWER:  Korian, if I can steal these
3  from you here
4  BY MR  KLOEWER:
5    Q  So just like with the video clips,
6  we're -- we're labeling exhibits consecutively  So
7  we're actually right at Number 100
8    A  Okay
9      MR  KLOEWER:  We left off at 99  So I'm
10 going to mark this as Exhibit 100
11     (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
12 WAS MARKED AS EXHIBIT NO  100 TO THE DEPOSITION, AND
13 IS HERETO ATTACHED )
14     MR  KLOEWER:  I believe this is going to
15 be the official copy for the court reporter  I've
16 got another copy for your counsel here
17     MR  GREER:  Thank you
18     MR  KLOEWER:  Ryan, there's one for you
19 BY MR  KLOEWER:
20   Q  Do you recognize this document, Mr  Howse?
21 And you can take a moment to familiarize yourself
22     (BRIEF PAUSE FOR DOCUMENT REVIEW)
23 BY MR  KLOEWER:

Page 53

14 (Pages 50 - 53)

6    Q.   Okay.  Do you recall viewing this footage
7    of Dr. Coomer?
8    A.   I do not recall.  Is that in Absolute
9    Proof?
10   Q.   Yes, it is.  That's why I'm asking about
11   it, if this was the first you had heard of
12   Dr. Coomer or if you had some prior knowledge about
13   him.
14   A.   I -- I don't recall knowing anything about
15   him prior to footage.
16   Q.   Okay.
17   A.   That was -- so you're telling me that
18   there's video footage of Dr. Coomer in Absolute
19   Proof?
20   Q.   Yes.
21   A.   Okay.
22   Q.   It's --
23   A.   Which means then I would have seen it.
24   Q.   Right.  That --
25   A.   But again, I'm producing an awful lot of

Page 54

1    radio and television, and I produce many
2    documentaries.
3    Q.   Right.
4    A.   And I'm there to produce.  I'm not there
5    to vet the content.
6    Q.   I see.  So your role in that film was just
7    overseeing folks who were vetting the content?
8    A.   They used my -- they -- they -- I was paid
9    for my studio to be used --
10   Q.   Okay.
11   A.   -- and to post edit the production and
12   deliver it on external hard drive to Mr. Lindell.
13   Q.   Who was vetting the content from that
14   film?
15   A.   I would -- for the most part, I believe it
16   was -- the final say was Mike Lindell.  His -- it
17   was his documentary.
18   Q.   So he was --
19   A.   As I understand it.
20   Q.   -- doing the fact checking, was doing the
21   background research to ensure the information was
22   accurate?
23        MR. MALONE:  Object to form.
24        MR. GREER:  You can answer.
25        MR. MALONE:  You can still answer.

Page 55

1    BY MR. KLOEWER:
2    Q.   That's -- I should have highlighted that
3    at the beginning.  I'll tell you now.
4        Throughout this deposition, there -- it's
5    possible that your counsel or Mr. Malone will object
6    to a question I ask.  That doesn't mean you can't
7    answer.
8        It's possible your counsel will instruct
9    you not to answer.  And in that instance, he and I
10   may discuss it or -- but if he doesn't instruct you
11   not to answer, you're still allowed to.
12       So Mr. Malone is just objecting to the
13   form of my question, but --
14   A.   So what is -- what is the question again?
15   Q.   Not we've got to rewind --
16   A.   Right.
17   Q.   -- ten minutes to get back to when I asked
18   it.
19       Is it your understanding that Mr. Lindell
20   was vetting the accuracy of the information in
21   Absolute Proof?
22   A.   I know Mr. Lindell was busy being briefed,
23   looking at information, looking at material.  So if
24   you want to call that vetting, I would assume he
25   was.

Page 56

1    Q.   Was there anyone else?
2    A.   I know he's talking to a lot of people to
3    try to get a handle on what was going on and what --
4    you know, what the big picture was.  So if that's
5    considered vetting...
6    Q.   Do you recall anyone else on that project
7    who was doing that sort of work --
8    A.   I believe Mary Fanning was.
9    Q.   -- to confirm the accuracy?  Okay.  But
10   she was -- it sounds like she was never physically
11   present --
12   A.   Correct.
13   Q.   -- for the production of the film.
14   A.   Correct.
15   Q.   Was she primarily emailing this content
16   then?
17   A.   I believe email would have been the
18   predominant form.  She may have text some stuff.  I
19   don't -- but if she was wanting quality clips in the
20   documentary, she would either Dropbox it or email
21   it.
22   Q.   Anyone else other than Ms. Fanning?
23   A.   For Absolute Proof?
24   Q.   Yeah.
25   A.   Anyone else involved in?

Page 57

15 (Pages 54 - 57)

1    Q.    Fact checking or vetting the accuracy of
2    the information presented?
3    A.    There could have been.
4    Q.    You don't recall anybody as you sit here
5    today?
6    A.    If you said a name, I might be able to
7    say, oh, yeah.  But as far as someone else that was
8    fact checking and doing the research, I can't think
9    of anyone.  But it doesn't mean there wasn't.
10        Again my job was filming, post editing,
11   delivering to the client.
12   Q.    So going back to Eric Coomer, then, if I
13   understand -- when did you first -- when is your
14   first recollection of hearing the name Eric Coomer?
15   A.    Probably during this production.  But if
16   you had asked me was Eric Coomer in Absolute Proof,
17   I would not have been able to answer that question.
18   Q.    Do you recall --
19   A.    I mean, I knew there was someone with a
20   voting machine company or maybe more than one that
21   was in clips, but...
22   Q.    Had you seen any statements about
23   Dr. Coomer from, for example, Joe Oltmann prior to
24   this time?
25   A.    I don't think at that point, I knew who he

Page 58

1    was.  So the answer to that question would be, no, I
2    don't believe so.
3    Q.    Do you recall the presidential press
4    conference in November of 2020 with Sidney Powell
5    and Rudy Giuliani where they laid out some theories
6    of election fraud?
7    A.    Only because I saw reports of it.
8    Q.    Okay.
9    A.    Or actually, I think I saw a deposition
10   related to it.
11   Q.    You don't recall hearing either of them
12   mention Dr. Coomer during that conference?
13   A.    I do not recall that.
14   Q.    Okay.
15   A.    You have to understand how my day works.
16   Q.    I understand that.
17   A.    I don't --
18   Q.    I know you wear lots of hats and you've
19   got a lot going on.  I just --
20   A.    And one of the ways I'm able to achieve
21   what I do is not getting caught up in a lot of
22   drama, rumors, speculation, theories.  I could sit
23   all day long and listen to that.  And I get an email
24   box full of it, right, from all kinds of people
25   around the world.

Page 59

1        So if I'm going to produce the number of
2    live radio shows and TV shows in a given week,
3    month, year, I cannot be distracted by watching
4    every press conference unless it rises to a level
5    that is of interest to me and of importance to my --
6    I believe my audience.
7        Generally, if it doesn't interest me, I
8    don't cover it.  It has to be of interest to me,
9    generally speaking.
10       Sometimes I do cover stuff that doesn't
11   interest me because it's in the public interest to
12   know.  And I cover it, and I'll interview someone,
13   and I really don't want to.  But it's in the public
14   interest.  So I do it.
15       But for the most part, I produce radio and
16   television based on what I find interesting and
17   important.  And if I don't find it interesting and
18   important, I try not to cover it unless I'm asked to
19   or I feel I have an obligation to the audience to
20   present it.
21   Q.    Okay.
22   A.    And Eric Coomer wasn't someone that I
23   found a lot of interest in.  I'm not even sure I
24   knew who he fully was other than what was presented
25   in this video clip.

Page 60

1    Q.    Well, we may be getting a bit ahead of
2    ourselves here, but do you think Eric Coomer is
3    interesting as you sit here today?
4    A.    No.
5    Q.    Why not?
6    A.    I don't -- I mean, what's interesting
7    about him?
8    Q.    Well, do you think he rigged the election?
9    A.    No, I do not.  Do I think he personally
10   did?
11   Q.    Yes.
12   A.    I have no proof that he did or didn't.  I
13   have...
14   Q.    Okay.  We'll get into that when we get to
15   some of the footage here.  I want to get through a
16   couple other thing before we get to the interviews.
17       All right.  So throughout this time frame,
18   you're producing these films.  When did the idea of
19   FrankSpeech first come up?  Do you recall?
20   A.    I don't.  You remember he had another idea
21   to call it VOCL, I think.
22   Q.    Yes, he did.  And I've got a document to
23   show you on that note.  We can just do that now.
24       I'll hand you what's been previously
25   marked as Exhibit 85.

Page 61

16 (Pages 58 - 61)

Page 62

```
 1        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
 2   WAS PREVIOUSLY MARKED AS EXHIBIT NO. 85 TO THE
 3   DEPOSITION, AND IS HERETO ATTACHED.)
 4        THE WITNESS:  Can I take this?
 5        MR. KLOEWER:  Do you need to take a break?
 6        MR. GREER:  Is it important?
 7        THE WITNESS:  Well, it could be related --
 8   no.  I guess not.  It's just an IT guy.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25        Who is -- who's Mr. Johnston?
```

Page 64

```
 1   of the LLC.
 2        Q.  I see.  And do you have experience or
 3   expertise in those fields?
 4        A.  I do not.
 5        Q.  You rely on Mr. Johnston for that?
 6        A.  Correct.  And other people.
 7        Q.  So where do you come in with Johnston
 8   Howse?
 9        A.  I -- the software that we had, I had paid
10   Mr. Johnston, as an IT guy, to develop.
11        Q.  I see.
12        A.  So I had really the ownership, and he
13   believed he, as the creator, had ownership.
14        Q.  And this software is what you were going
15   to be providing to Mr. Lindell or discussing
16   providing in this --
17        A.  To build a social media platform for him.
18   Correct.
19        Q.  I see.  And VOCL, LLC, as we see here,
20   V-O-C-L, LLC, which is identified in this agreement,
21   that entity -- well, does that entity exist?
22        A.  Which entity?
23        Q.  VOCL, LLC.
24        A.  I don't believe it does.
25        Q.  So as I'm sure your counsel has already
```

Page 63

```
 1        A.  He was my IT guy that I contracted with
 2   for many years to build and maintain my broadcast
 3   platform.
 4        Q.  And is he based here in Tennessee, as
 5   well?
 6        A.  No.  I believe he lives in Virginia and
 7   bounces between Virginia and Michigan, I think.
 8        Q.  What is Johnston Howse, LLC?
 9        A.  It was an LLC that was formed by my
10   attorney Jake --
11        MR. GREER:  Jake Kasser.
12        A.  -- Kasser, by which to provide services to
13   Mr. Lindell.
14   BY MR. KLOEWER:
15        Q.  So it was created for this purpose?
16        A.  Created for the purpose of -- of -- help
17   -- well, no.  Yes and no.
18        It was created as an LLC by which to do
19   legal or computer programming --
20        Q.  Okay.
21        A.  -- and maintenance, you know, to help him
22   build and run a website.  He contracted with us.
23        And then we were going to also have other
24   clients.  That was the -- that was the purpose and
25   function.  But he would have been the first client
```

Page 65

```
 1   went straight to and noticed, this document is
 2   unsigned.
 3        We've been told by Mr. Lindell this is the
 4   only document he has relating to the basis for the
 5   foundation of Frankspeech.
 6        So let me back up.  What happened to VOCL,
 7   LLC?  Why didn't -- why didn't that entity come into
 8   being?
 9        A.  I believe that was the name that
10   Mr. Lindell wanted.  And I believe someone else
11   already had the trademark for it or had -- that's
12   Lindell calling me now.  Can we take a quick break?
13        MR. GREER:  Can you answer -- finish
14   answering his question?
15        A.  I believe it was trademarked already or
16   going to be, or there was some infringement he could
17   not use the name VOCL.
18   BY MR. KLOEWER:
19        Q.  I see.
20        MR. KLOEWER:  Do we need to --
21        MR. GREER:  You want to take a break?
22        MR. KLOEWER:  -- go off the record?  Sure.
23        MR. GREER:  Don't discuss your testimony.
24        THE WITNESS:  Okay.
25        VIDEO SPECIALIST:  This ends Media Number
```

17 (Pages 62 - 65)

Page 66

1  1. Going off the record at 10:01 a.m.
2          (SHORT BREAK)
3      VIDEO SPECIALIST:  This begins Media
4  Number 2.  Going back on the record at 10:05 a.m.
5  BY MR. KLOEWER:
6      Q.  All right, Ms. Howse.  Before we broke, we
7  were talking about this master consulting services
8  agreement between you and Mr. Johnston and Johnston
9  Howse and VOCL, LLC.
10      I believe I'd just asked you why VOCL, why
11  that entity didn't come into being.  And you stated
12  that the name was already taken.  Did I have that
13  correctly?
14      A.  I believe that -- I mean, that's what I
15  was told by Mr. Lindell, that his legal team had
16  told him, his attorney told him, it was not a name
17  he was going to be able to use.
18      Q.  So FrankSpeech was the backup, I take it?
19  Or how did you land on FrankSpeech?
20      A.  I came up with the name.
21      Q.  You did?  Okay.  Is there another contract
22  that memorializes your agreement?
23      A.  I came up with the name Frank.  Someone
24  else may have added the term speech.
25      Q.  I see.  Okay.  And as I mentioned, this is

Page 67

1  not signed, and Mr. Lindell has told us there's
2  nothing subsequent.
3          Do you have a subsequent master consulting
4  services agreement --
5      A.  I don't believe --
6      Q.   -- with Mr. Lindell?
7      A.  I believe this is the only one that was
8  created, and I don't believe it was ever enact --
9  you know, signed.
10      And I don't believe -- there may have been
11  another one created for FrankSpeech, but it would be
12  like this one, not signed.
13      Q.  Do you know if the terms of this agreement
14  are what were reflected in any subsequent agreement
15  with FrankSpeech?
16      A.  I don't know.
17      Q.  I want to look at couple of these just
18  real quickly.  And we asked Mr. Lindell about this,
19  as well, but just want to confirm your recollection.

Page 69

9      Q.  Okay.  And is that -- is that the cost
10  that -- is that what it cost to operate FrankSpeech?
11      A.  You would have to ask Mr. Johnston.  He
12  was the one hiring the computer techs and setting up
13  the system.
14      I was in conversations and heard things,
15  but that wasn't my job to -- I'm not a computer guy
16  other than -- about as much as you are probably.



1    Q.   So as you sit here today, you're not aware
2 if you have an ownership interest in FrankSpeech?
3    A.   In FrankSpeech.  I don't believe I do.
4    Q.   Okay.
5    A.   I think there was a discussion of my
6 owning a percentage of stock in VOCL.
7    Q.   Right.  Yeah.
8    A.   And there was discussion of that for
9 Frank.  But nothing was enacted.
10    Q.   Who does own FrankSpeech?
11    A.   Mr. Lindell, from what I understand.  He
12 may have given shares to someone else, but I don't
13 know.  So he's the primary owner from my
14 understanding.
15    Q.   I see.  All right.  Let's sort of zoom out
16 and talk about FrankSpeech in general.  Why was
17 FrankSpeech created?
18        MR. MALONE:  Object to the form,
19 foundation.  Brannon, you can answer.
20 BY MR. KLOEWER:
21    Q.   What's your understanding of why
22 Mr. Lindell wanted to start FrankSpeech?
23    A.   To give him back his voice, to provide an
24 outlet for those affected by the canceled culture.
25 That's what I understood.

Page 70

1 cancelled from Twitter, as you put it?
2    A.   I can't tell you the exact reason why.
3 But I could guess.
4    Q.   Well, do you know what the basis was for
5 Twitter -- and to be clear, when you say cancelled,
6 what do you mean from Twitter?
7    A.   I think his account was frozen, and he
8 couldn't tweet.
9    Q.   Okay.  And you don't know why his account
10 was frozen?
11    A.   Not specifically from Twitter's
12 standpoint.
13    Q.   What about the big box stores?  Do you
14 know why they stopped selling his products?
15    A.   I think it was because he was questioning
16 the election.
17    Q.   Okay.  Because of his statements about the
18 2020 election?
19    A.   I believe so.
20    Q.   So going back to the basis for forming
21 FrankSpeech, to give him back his voice -- and
22 correct me if I'm wrong, but it would it be fair to
23 characterize his decision to create FrankSpeech as
24 he wanted a platform where he could speak about the
25 election?

Page 72

1    Q.   Explain what you mean to give him black
2 his voice?
3    A.   Well as I understood, at some point, he
4 was starting to be deplatformed, whether that was in
5 this time frame or after.  But there was talk of a
6 rising cancel culture.  And this would be an
7 opportunity to be a platform for people to speak and
8 put out conservative content, truthful content
9 without censorship.  That was the initial goal as I
10 understood it.
11    Q.   What are some of the platforms that
12 Mr. Lindell believed he was being canceled from, if
13 you know?
14    A.   At the this time, I don't know.  I don't
15 think some of the more aggressive cancelations came
16 till after -- was this in March?
17    Q.   That's -- that's the date of the agreement
18 we just looked at.
19    A.   So I don't know the time frame.  But he at
20 some point started being canceled by Twitter, and as
21 I understood it, other outlets and, of course, I
22 think box stores canceling his product.
23    Q.   Do you know what the reason was, why those
24 -- I should probably state those one at a time.
25        Do you know why he was not -- why he was

Page 71

1    A.   I think he wanted a platform where he
2 could speak about whatever he wanted.
3    Q.   Okay.  And among those issues being
4 election?
5    A.   If he so chose.
6    Q.   Is FrankSpeech, would you consider it to
7 be a news outlet?
8    A.   Yes.  Well, let me take that back.  I
9 don't know what Frank -- I don't -- FrankSpeech is
10 a -- more of a social media platform.
11        Lindell TV is more of the news outlet.
12 They're two -- as I understand them, they're two
13 separate LLCs.  They're two separate corporations.
14    Q.   And when was -- so we've looked at this
15 agreement for --
16    A.   So --
17    Q.   -- VOCL was March of '21.
18    A.   So to make sure I answer your question, I
19 understand FrankSpeech is more of a social media
20 platform, like the conservative alternative to
21 Facebook or YouTube.
22    Q.   Okay.
23    A.   I know Mr. Lindell wanted also it to have
24 aspects of Twitter, like a Twitter type feeling.
25 But I don't know that that ever came about.  I

Page 73

19 (Pages 70 - 73)

1 don't.
2     But I do know it was to be a social media
3 platform for free thought, free thinking, free
4 speech.
5     Q.  But FrankSpeech came before Lindell TV.
6 Correct?
7     A.  I believe that would be a fair assumption.
8     Q.  So it's -- if I understand correctly, you
9 think Lindell TV, you would consider that to be a
10 news outlet?
11     A.  Lindell TV is a news outlet.
12     Q.  Okay.  How many people work for Lindell
13 TV?
14     A.  I don't know.
15     Q.  Do you work for Lindell TV?
16     A.  I am a -- I am contracted.
17     Q.  Okay.
18     A.  In other words, I'm not an employee.
19     Q.  So you're a 1099 for FrankSpeech?
20     A.  No.
21     Q.  Or for Lindell TV?  Sorry.
22     A.  1099 for Lindell TV.  Correct.
23     Q.  Okay.
24     A.  I may have received a 1099 for
25 FrankSpeech.  Because I think at some point, they

Page 74

1 were running as one deal, and then they were split.
2     Q.  That's what I'm trying to understand is
3 when that occurred.
4     A.  It occurred somewhere -- and maybe
5 Mr. Lindell will tell you.  Maybe he already has
6 told you.
7     I asked for Lindell TV to be a separate
8 entity from FrankSpeech.
9     Q.  Why?
10     A.  Because if I was going -- if I was going
11 to help Mr. Lindell build Lindell TV, I wanted to
12 have a specific team that I could oversee and help
13 him do that.
14     I didn't want -- I did not want -- really
15 didn't want to run FrankSpeech.  I wanted to help
16 him build Lindell TV.
17     Q.  And do you have that team now?
18     A.  Yes.
19     Q.  And who would you consider to be on that
20 team?
21     A.  The Lindell TV team?
22     Q.  Yeah.
23     A.  Mr. Lindell, myself.  And then we have the
24 people that work with us, the contractors that work
25 with us.

Page 75

1     Q.  And who are those contractors?
2     A.  Well, there is my son.  There is Reagan,
3 Van, Caleb, Logan.  They're all technicians in the
4 control room.
5     Q.  Okay.  That's -- your anticipating my next
6 question.  So the contractors that you're referring
7 to are doing --
8     A.  Production.
9     Q.  -- technical work?
10     A.  Production.
11     Q.  Production work?
12     A.  Production work, producing.
13     Q.  Do you have any journalists on staff?
14     A.  I'm on -- I mean, I'm --
15     Q.  Sure.  Other than yourself?
16     A.  -- a journalist.
17     Q.  Yeah.
18     A.  I guess we would have Emerald Robinson.
19     Q.  She is another 1099 for Lindell TV?
20     A.  I don't know if she's 1099 or an employee.
21 I don't know.  You'd have to ask Mike.
22     Q.  Okay.  Anybody else?
23     A.  I would think most of the people that
24 broadcast with us would consider themselves
25 journalists.

Page 76

1     Q.  Well, I'm just trying to determine what
2 the scope of actual people that work for Lindell TV
3 is.  I know you have a lot of folks you interview
4 and stuff like that.  I'm just trying to gauge the
5 scope of the actual Lindell TV team.
6     So it sounds like yourself and
7 Ms. Robinson would be the journalists on the team.
8 You've got technical staff, contractors who produce
9 the show.  Anybody else?
10     A.  Not that I can think of at this point.  I
11 mean, if you want to provide me with a list of
12 names, I'll tell you.
13     Q.  Well, what I'm getting at is, do you have,
14 for example, any fact checking staff to ensure the
15 accuracy of information that's published by Lindell
16 TV?
17     A.  We are constantly reaching out to people
18 for fact checking.
19     Q.  Okay.  Like who?
20     A.  Any of the number of people that we
21 interview in a given moment.  I mean, I would -- I
22 could call a Rolodex full of people to say is there
23 reason to believe this information is true, is this
24 person credible.
25     Q.  Do you do that before airing content?

Page 77

1  A.  Generally I do if I'm involved in it.
2  Q.  And --
3  A.  But again, I can't anticipate what
4  everyone is going to say on air and fact check them
5  on live television.
6  Q.  Sure.  Well, what happens if you interview
7  someone on Lindell TV and you find out after the
8  fact that what they said was -- was false?
9  A.  Sometimes we will correct the record.  Not
10  uncommon that I often invite people that I'm talking
11  about to come on the program, that they're welcome
12  to come on the program live so it can't be edited,
13  and state their side of the story.
14  Q.  Have you ever issued any retractions?
15  A.  I don't -- if I have, I don't remember.
16  Q.  Okay.  Do you have any policies of
17  procedures for issuing retractions?
18  A.  Not any written that I'm aware of.
19  Q.  Do you have any sort of unwritten
20  understandings of when it's appropriate to issue a
21  retraction?
22  A.  I think basic common sense dictates.
23  Q.  So I was going to ask this in a bit but
24  just to button up this issue, we can -- I just want
25  to be sure I understand the timeline here.

Page 78

---

1  MR. KLOEWER:  I'm going to mark this as
2  Exhibit 101
3  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
4  WAS MARKED AS EXHIBIT NO. 101 TO THE DEPOSITION, AND
5  IS HERETO ATTACHED )
6  BY MR. KLOEWER:
7  Q  And I understand you may not have seen
8  this document before  So take a moment to take a
9  look at it  Tell me if you have
10  (BRIEF PAUSE FOR DOCUMENT REVIEW)
11  BY MR. KLOEWER:
12  Q  Have you ever seen this document?
13  A  I don't believe I have
14  Q  Okay  I'll represent on the record it's a
15  document that was pulled from the State of Delaware
16  Secretary of State's office  Identifies entity name
17  as Lindell TV, LLC and indicates a formation date of
18  June 2nd, 2021
19  We had previously looked at your master
20  services agreement with VOCL that was dated March of
21  2021  So this would be about three months later
22  Does that seem right to you?
23  A  It does seem correct.
24  Q  Lindell TV would have been established in
25  June of 2021?

Page 79

---

1  A  That would be fair to say
2  Q  Okay
3  A  As a -- as a corporation  Yes
4  Q  Okay
5  MR. KLOEWER:  And a nearly identical
6  document here I'll mark real quickly as Exhibit 102
7  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
8  WAS MARKED AS EXHIBIT NO. 102 TO THE DEPOSITION, AND
9  IS HERETO ATTACHED )
10  BY MR. KLOEWER:
11  Q  Take a look at that  Have you seen this
12  document before?
13  A  Not that I'm aware of
14  Q  Okay  I'll just represent again this is a
15  separate document also available on the Delaware
16  Secretary of State's office, again indicating an
17  incorporation date of June 2nd, 2021
18  I don't have another question for you on
19  that  Just confirm that that makes sense to you as
20  the date when Lindell TV would have been
21  established
22  Okay  Let me see here  So FrankSpeech,
23  as I understand it, really got going in about April
24  of 2021?  Does that make sense to you?
25  A  I believe it was April 19th would have

Page 80

---

1  been the official launch.  Does that sound about
2  right?
3  Q.  I believe so.  I'm going to show you a
4  couple -- I don't know if I need to show you both of
5  these, April 8th.  Well, sure.
6  This has been previously marked as Exhibit
7  44.
8  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
9  WAS PREVIOUSLY MARKED AS EXHIBIT NO. 44 TO THE
10  DEPOSITION, AND IS HERETO ATTACHED.)
11  BY MR. KLOEWER:



22  you -- were you involved in the process of reaching
23  out to folks to produce content for FrankSpeech?
24  A.  I don't think this is producing content,
25  is it?

Page 81

21 (Pages 78 - 81)



1 contribute?
2    A. I do not remember. I mean, I think,
3 obviously, they wanted to reach out to people like
4 Dinesh D'Souza, you know, people that would have
5 been a known quantity in the conservative America
6 First movement.
7    Q. Okay. So as a corollary to that, do you
8 know if they were reaching out to anybody with
9 opposing viewpoints?
10    A. I don't know.
11    Q. But it sounds like you personally weren't
12 involved in making a list of, for example, we need
13 to call Diamond and Silk, we need to call
14 Mr. D'Souza, or were you?
15    A. I may have been. Because I was the one
16 that was instrumental in helping bring Diamond and
17 Silk on to Lindell TV. So are we talking
18 FrankSpeech, or are we talking Lindell TV?
19    Q. Well, this is from April. So this would
20 have been months prior to the foundation of Lindell
21 TV. So I'm just trying to understand the origins of
22 the platform and how different contributors were
23 brought into the fold.
24    A. Right. I'm sure I would have been
25 involved in some discussions that, you know,

Page 84

19    A. I may have been. I know they were -- what
20 they were trying -- I think what they were trying to
21 do was get people set up to become what they called
22 influencers and to begin to post like you would,
23 say, on YouTube and get their accounts and content
24 going.
25    So they -- teaching them -- teaching them

Page 82

1 how to post their videos.

1 bringing people on like Dinesh D'Souza, Diamond and
2 Silk, their -- they would be good influencers.
3    Q. What about Joe Oltmann? We see him on
4 this list here. If you see the email addresses --
5    A. I would not consider him an influencer in
6 my opinion. I mean, again, I'm talking Dinesh
7 D'Souza, Diamond and Silk, maybe Ted Singer out of
8 Michigan, Nugent, Ted Nugent. I would be thinking
9 those, people that, you know, have name ID.
10    Q. And you don't consider Mr. Oltmann to be
11 one of those --
12    A. Not at this time.
13    Q. Somebody in that category?
14    A. Not at this time. No.
15    Q. Had you ever seen the Conservative Daily
16 podcast?
17    A. Not that I'm aware of.
18    Q. Have you seen or listened to it today or
19 as of now, have you ever watched any?
20    A. I have seen it running when I walked
21 through a room on the screen on Lindell TV, I think
22 Channel 2.
23    Q. Right.
24    A. And I think I have been a guest once or
25 twice in the last few months.

Page 85

12    Do you recall this event? And you can
13 take a quick moment to review some of the names
14 there to see if you recall being involved with this.
15    A. I know they were having a day where they
16 -- different times of the day, different day and
17 different times, of a particular day, where they
18 were trying to get people in -- I think they were
19 maybe doing a screen share or something and trying
20 to walk people through and show them how to load
21 content.
22    Q. Okay.
23    A. I believe -- that's what I recall.
24    Q. Okay. Now, how -- do you know what the
25 process was for identifying folks to reach out to to

Page 83

22 (Pages 82 - 85)

1   Q.   So you do know that Conservative Daily
2 runs twice daily on FrankSpeech?
3   A.   I know it runs.  I -- if you'd asked me
4 how many times, I couldn't have told you a specific
5 answer.  I would have to go look at the schedule.
6 But I believe you if you're telling me it runs twice
7 a day.  I know it runs once a day for sure.
8   Q.   So do you know who would have invited
9 Mr. Oltmann to this conversation?  Sounds like it
10 wasn't you.
11   A.   I don't -- I would -- again, I would have
12 been going for -- I have a long broadcast career.
13 I'd have been going for names that -- from a
14 journalist talk show host, I would have been going
15 for names like, as I said, Diamond and Silk, Dinesh
16 D'Souza, you know, Michael Reagan.
17       I would have been looking for names that
18 would identify with a track record, people that I
19 know or would like to know that I know have
20 credibility and can bring a news persona to the
21 platform, a journalistic news persona.
22   Q.   And Mr. Oltmann didn't meet that criteria?
23   A.   Not in my --
24   Q.   You weren't familiar with any of his prior
25 publications?

Page 86

1 But can you tell me -- this has been previously
2 marked as Exhibit 82.
3       (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
4 WAS PREVIOUSLY MARKED AS EXHIBIT NO. 82 TO THE
5 DEPOSITION, AND IS HERETO ATTACHED.)
6 BY MR. KLOEWER:
7   Q.   Do you recognize what we're looking at
8 here?
9   A.   This looks like the home page of
10 FrankSpeech.
11   Q.   Did you have any involvement in creating
12 the FrankSpeech website?
13   A.   Writing the code?
14   Q.   No.  I mean more in the sense of
15 contributing content.
16       So let me clarify that.  So the image we
17 have here, I've got the mouse hovering over a tab
18 that says fix2020first.  And we see a dropdown menu
19 there that includes a variety of different links to
20 different information.
21       That different information, do you know
22 who compiled those?  So if I were to click, for
23 example, on the top one, Professor Halderman's
24 declaration, it will take me to a declaration.
25   A.   I'm pretty sure most of those were the --

Page 88

1   A.   I only knew of Mr. Oltmann as being a
2 supposed computer guy.  That's all I know him as.
3   Q.   Did you see him speak on Freedom Plaza on
4 January 5th?
5   A.   I did not.  Are you saying he was in D.C.
6 on January 5th?
7   Q.   Yes.  He was the keynote speaker --
8   A.   Huh.
9   Q.   -- prior to the January 6th.
10   A.   I didn't go to that.
11   Q.   No?
12   A.   I was not there.  I tweeted the night
13 before I thought it was a trap.
14   Q.   Well, that's -- that's beyond what I'll be
15 asking you about today.  Concerning other matters.
16 We're already on a timeline here.  So we can --
17 that's not on my outline.  But I was just curious if
18 you had seen him speak at that event.
19       Okay.  Let's see here.  79, I did that
20 already.
21       I want to take a look at the FrankSpeech
22 home page here.  And you can tell me again -- I'm
23 not entirely clear of the scope of your involvement
24 with the creation of the website.  I understand that
25 you said that was more Mr. Johnston's wheelhouse.

Page 87

1 at the request of Mr. Lindell.
2   Q.   Okay.  And who actually responded to that
3 request?
4   A.   I would venture -- I would guess it would
5 be a collection of people who would then reach out
6 to the programmers and ask them to type that in
7 there and make that work.
8   Q.   Who would that collection of people have
9 involved?
10   A.   Probably would have obviously involved RJ.
11 I could have -- I would have been CCed in the
12 emails, I'm sure.  But it would have been RJ.  I'm
13 guessing here.
14   Q.   Sure.
15   A.   It would be RJ and then whoever else
16 Mr. Lindell wanted in the loop or whoever RJ wanted
17 in the loop.  But it would be a -- could be Todd
18 Carter could be in here.  I don't know.  I would
19 have to see the email.
20       But if he were looking to have something
21 done like this, he'd would have to start with the
22 guy that's running the project and hiring the people
23 and overseeing the people to do it, which would be
24 RJ --
25   Q.   Right.

Page 89

23 (Pages 86 - 89)

1  A.  -- as I understand it.
2  Q.  And you mentioned Todd Carter.  Who's
3  that?
4  A.  Todd Carter is Mike Lindell's IT guy,
5  his --
6  Q.  Mike Lindell's IT guy or his personal IT
7  guy?
8  A.  Todd Carter?
9  Q.  Yeah.
10  A.  I believe Todd Carter is the chief IT guy
11  for My Pillow.
12  Q.  Okay.  So he --
13  A.  Although he may wear many hats for many
14  different LLCs run by Mr. Lindell.
15  Q.  So it's possible that the My Pillow CTO
16  was -- was working to help build out the FrankSpeech
17  website?
18  A.  I don't be -- I don't believe -- well, I
19  don't know.  You'd have to ask Mr. -- you'd have to
20  ask that to Todd.
21      I'm sure Todd was in the loop as far as
22  hearing things and knowing what was going on.  But
23  you would have to ask Todd.
24  Q.  All right.  So I don't have links to this
25  now, but -- or I don't have copies.  But if you look

1  And then they were scanned in, if I remember
2  correctly.
3      Someone compiled them and sent them -- in
4  fact, I think I heard that someone had compiled
5  them, sent them to Mr. Lindell in a manilla envelope
6  or an envelope, and then they were later scanned in.
7  Q.  They sent them to him at his home address?
8  A.  I don't know where they would have sent
9  them.  I doubt his home address.  Probably his
10  office.
11  Q.  Would those articles, do you know if they
12  were sent to him by Robert Herring, CEO of OAN?
13  A.  I would not know that.  I don't recall
14  hearing that.
15  Q.  Okay.  Let's look at the top here.  The
16  first line says Profess Halderman's declaration.
17  A.  I mean, I suppose, again, I could have
18  heard that and don't recall.
19  Q.  Yeah.
20  A.  I mean, in your line of work, I doubt you
21  remember everything you've ever said or anyone else
22  has ever said in every deposition you've been in.
23  Q.  Well I try to, but it's hard.
24  A.  Yeah, exactly.  So what I'm saying is
25  unless you can provide me with an email that shows

1  at the exhibit I just showed you, about four or five
2  items down, it says proof from Internet sources.
3      I'll represent to you that if you click on
4  that link, it takes you to another page with
5  probably about a hundred different articles.
6      Tell me, does that sound familiar?  Are
7  you familiar with the FrankSpeech website?
8  A.  Is this -- proof from Internet sources?
9  Q.  Yes.
10  A.  And I believe that would take you to a
11  collection of news stories --
12  Q.  Yes, it does.
13  A.  -- about the election.
14  Q.  Yes.  Do you know who collected and
15  compiled those stories?
16  A.  No, I do not.  I may have known at one
17  time, but I couldn't tell you who did.
18  Q.  It wasn't you?
19  A.  No.
20  Q.  No.  Okay.
21  A.  I didn't -- I'm not aware of I -- of me --
22  I wouldn't -- again, I'm not aware of my collecting
23  those stories.  I believe those came to
24  Mr. Lindell -- if I remember correctly, I believe
25  they came to Mr. Lindell in a -- through the mail.

1  that I -- but even if you showed me an email doesn't
2  mean I read that email.
3  Q.  We've just seen text messages from
4  Mr. Lindell providing his home address to
5  Mr. Herring.
6  A.  Oh, okay.
7  Q.  So when you mentioned a manilla envelope
8  and hard copies, I thought, perhaps, that was the
9  purpose for providing that contact information.
10  A.  I thought, from what I -- what I can
11  recall, it was just some random person providing
12  them.
13  Q.  Okay.  The top line says Professor
14  Halderman's declaration?
15  A.  Correct.
16  Q.  Who's Professor Halderman?
17  A.  As I understand, he is a computer expert
18  that has testified before Congress.
19  Q.  Okay.  Computer expert in -- do you know
20  more about his background that that, or is that the
21  extent?
22  A.  I have watched, and I have played I
23  believe on my show or Mr. Lindell has had played on
24  his show -- and it may be in one of the
25  documentaries that I post edited -- where he is



1  discussing running tests with his team to see if

2  votes can be changed in an election   And I believe

3  he has testified before Congress under oath about

4  this matter

5        And I believe he has a declaration

6  detailing some of this information that has been

7  held by the Court in Georgia   And there is the

8  desire for that document to come out and be public,

9  if I'm recalling everything correctly, Brad

10    Q    Sure   I'm just asking for your

11  recollection   That's fine

Page 94

Page 95

Page 96

Page 97

25 (Pages 94 - 97)



Page 98

Page 100

Page 99

13        Would you agree with that characterization
14  of Dr. Halderman as a renowned cyber security
15  expert?
16        A.   That's what I have had him projected to me
17  as.
18        Q.   Okay.  Have you ever reached out
19  Dr. Halderman --
20        A.   Not that I'm aware.
21        Q.   -- during your program?
22        A.   Not that I'm aware.
23        Q.   Why not?
24        A.   I don't know that he is allowed to talk,
25  is he?  I mean, I don't know.

Page 101

26 (Pages 98 - 101)

1   Q.  I'm just curious if -- it sounds like
2   Mr. Olsen believes him to be a reliable source.
3   A.  Well, I think the U.S. Congress does.
4   They put him there as an expert, didn't they?
5   Q.  Do you consider Dr. Halderman to be a
6   reliable source from what you know?
7   A.  I have no reason to think he's not a
8   reliable source.
9   Q.  Okay.
10  A.  I mean, when he's put before the U.S.
11  Senate Intelligence Committee, I would think that
12  they had vetted him.  And I know he's under oath.
13  So I hope what he's saying is true.
14      Again, I don't -- if this is a TV or radio
15  show, I would like to see that TV or radio show.  I
16  don't know if this was a proposed show.  I don't
17  know if this is a transcript of a show.  I don't
18  know.
19      I would need to see more information to be
20  able to determine what it is.
21  Q.  Okay.
22  A.  I can't say one way or the other without
23  more context.
24  Q.  Okay.  The reason I'm asking -- well,
25  there's a couple of reasons.  Number one, Professor

Page 102

1   produced another report against Clay Clark in the
2   Reawaken American Tour.
3       This is the biggest document I'll hand you
4   today.  This is the declaration of J. Alex Halderman
5   that's been filed in this case.
6       MR. GREER:  Was this part of a 26A AQ
7   disclosure?
8       MR. KLOEWER:  Yes, it was.
9   BY MR. KLOEWER:
10  Q.  We'll refer back to this once we get into
11  discussion of Mr. Oltmann.  But I just want to
12  flag -- well, you know, I don't think it's very fair
13  to question you on this document, this very lengthy
14  document, that you're just seeing for the first
15  time.
16      So I am going to refer back to this when
17  we -- when we talk about Joe Oltmann in a couple
18  minutes.  But -- so keep that one close by.
19      I will represent to you that as you can
20  see you're looking at right now, some of the subject
21  headings do speak to a variety of subject matters
22  that we've already discussed.  So for example, on
23  Page 15 of this report, Dr. Halderman starts a
24  section stating that defendants promoted inherently
25  improbable hacking theories.  He's provided

Page 104

1   Halderman is at the top of the list on FrankSpeech
2   Proof affixed 2020first tab

      And the third reason is because
8   Dr Halderman has produced an expert report in this
9   case
10      There's no reason you would have seen this
11  yet  It's just been disclosed
12      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
13  WAS MARKED AS EXHIBIT NO  105 TO THE DEPOSITION, AND
14  IS HERETO ATTACHED )
15  BY MR KLOEWER:
16  Q   Were you aware that Dr Halderman had
17  produced a number of expert reports for Dr Coomer
18  in his various lawsuits?
19  A   I don't believe I would be
20  Q   Okay
21  A   You said it was just released  Right?
22  Q   This one was  There are a number of other
23  public reports that Dr Halderman has also written,
24  for example, in the first case that Dr Coomer filed
25  against Sidney Powell, Giuliani and those folks  He

Page 103

1   testimony that -- let me see here -- there is no
2   credible evidence that the 2020 election was rigged
3   and a variety of other matters, which I'm going to
4   come back to as I just have indicated a couple times
5   throughout the remainder of this --
6       MR. GREER:  And I'm sorry.  Was there a
7   question?
8       MR. KLOEWER:  No, there's not.  I'm sorry.
9   I'm rambling a bit here.
10      I had a question, but I don't think it's
11  ready yet.  So we'll come back to this.
12  BY MR. KLOEWER:
13  Q.  You know what?  Before we wrap up with
14  FrankSpeech -- this is -- this is the problem, I'm
15  out of order with my exhibits.  I'm going to hand
16  you what's been marked as Exhibit 81.
17      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
18  WAS PREVIOUSLY MARKED AS EXHIBIT NO. 81 TO THE
19  DEPOSITION, AND IS HERETO ATTACHED.)
20  BY MR. KLOEWER:
21  Q.  Do you recognize what we're looking at
22  here?
23  A.  Terms of use for FrankSpeech.
24  Q.  Yes.  Were you involved with drafting
25  these?

Page 105

27 (Pages 102 - 105)

1    A.  I think these came from his legal counsel.
2 I believe I was involved in trying to describe -- I
3 don't know if this is in here.  That may have been
4 under the purpose.  That may have been under the
5 purpose of FrankSpeech, which was -- I know that I
6 was involved in trying to describe why we were not
7 going to allow certain obscenities and how
8 obscenities are not free speech.
9        And I was involved in explaining to Mike
10 Lindell and Kurt Olsen that as a constitutional
11 republic, the leading scholar for the founding
12 fathers was William -- reportedly to be William
13 Blackstone.  And when he was asked what is a
14 constitutional republic, he reportedly said whatever
15 the divine has ruled on, we don't rule against.
16        So the basis or underpinning, as I
17 understand it, of our republic, is the character and
18 nature of God or the laws of God.
19        Therefore, my position was that free
20 speech does not entail coming on there and using GD
21 or the F word.  And someone says, well, you're
22 infringing on my free speech.  My position would be
23 that we are a constitutional republic.  The website
24 is going to be about promoting that which is
25 consistent with the character and nature of God.

Page 106

1 can't go around using obscenities on television with
2 the FCC.
3        And if we're going to be a website based
4 on a Christian world view and our constitutional
5 republic being based on the character and nature of
6 God, we can have standards.
7    Q.  So you would agree that the -- that the
8 First Amendment is not absolute in that context?
9    A.  In what context?
10    Q.  Well, there are limits to free speech, as
11 you've just described.
12    A.  I understand that you cannot shout fire in
13 a crowded building and things like that.  Correct.
14    Q.  Well, that -- that anticipates my next
15 question here.
16        So if you want to turn the page to Page 2
17 under user contributions.  If you look down about
18 two paragraphs -- and I think this is probably what
19 you were just discussing with respect to profanity
20 or part of what you discussing.
21        But it indicates that we have the right to
22 remove or refuse to post any user contributions for
23 any or no reason in our sole discretion.
24        Would you agree that FrankSpeech has the
25 discretion to take down content they don't agree

Page 108

1        I had conversations and provided them with
2 what I believed to be accurate historical
3 documentation on the founding of our republic.  And
4 therefore, we should have certain standards
5 consistent with our republic for speech.
6    Q.  And --
7    A.  I don't know that I would have been
8 involved in the terms of use.  I think these came
9 from an attorney.
10    Q.  You're not an attorney.  Correct?  Okay.
11 Just to establish that beforehand.  I understand --
12    A.  But you -- I hope you understand the
13 lengths at which I'm going --
14    Q.  Sure.
15    A.  -- to try to answer your question --
16    Q.  Yeah.
17    A.  -- and to be forthright.
18    Q.  Sure.
19    A.  So if you consider terms of use was I
20 discussing with them why people should not be able
21 to come on there and use GD or the F word and how we
22 would refute anyone claiming you're therefore
23 undermining your whole purpose of free speech --
24    Q.  Sure.
25    A.  You can't scream fire in a building.  You

Page 107

1 with?
2    A.  Yes.
3    Q.  So if somebody was on FrankSpeech and they
4 were using language like you just described, they
5 had the ability to take that down?
6    A.  We have the -- I would think they -- they
7 had the ability to take it down.
8    Q.  Has that ever happened before?
9    A.  I don't know.
10    Q.  Do you --
11    A.  It could have.  And if you give me an
12 example, I might.
13    Q.  Well, I mean, I know, off the top of my
14 head, that Mr. Oltmann, for example, uses profanity
15 with great frequency.
16    A.  Where?
17    Q.  On his program.
18    A.  Does he?
19    Q.  Yes.  But I don't --
20    A.  What kind of profanity?
21    Q.  Well, I could show you a highlights reel.
22    A.  Is he using the F word?
23    Q.  Yes, he has.  Yes.  I'm just wondering if
24 that's -- if that content has been taken down by
25 FrankSpeech or if it's bleeped out or --

Page 109

28 (Pages 106 - 109)

1    A.  Mr. Lindell could have heard about it and
2  asked for it to be taken down.  I don't recall.
3       But I wasn't aware that he uses the F word
4  on a program.
5    Q.  I don't -- I don't have those clips
6  prepared.  I can tell you, I have dozens of
7  instances of that type of conduct or that type of
8  speech.
9    A.  But actually using the F word on air?
10    Q.  Yes, yeah.
11    A.  I mean, that's -- you're saying the F
12  word.  But actually saying it?
13    Q.  Yes.  Yes.  He very recently used that
14  word multiple times in reference to Clay Clark, for
15  example, which we'll get to a little bit later.
16       But I'm just wondering if there have been
17  instances when content has been taken down by
18  FrankSpeech that you're aware of.
19    A.  Not that I can recall.  Doesn't mean it
20  hasn't happened or that it wasn't requested and I
21  was not in the loop.  I don't -- I don't own
22  FrankSpeech.
23    Q.  Sure.
24    A.  I don't operate FrankSpeech.
25    Q.  What I'm trying to understand is, are

*Page 110*

1  there people --
2    A.  I have been a consultant on a variety of
3  projects because of my media background and my
4  journalistic background.  And because I understand
5  the audience, I get consulted with on certain
6  things.
7    Q.  Okay.  Is --
8    A.  But that doesn't mean -- I don't want to
9  confuse that with I don't run FrankSpeech.
10       MR. GREER:  And Brannon, just make sure
11  let him finish his question before you answer.
12  BY MR. KLOEWER:
13    Q.  What I'm trying to understand, is there
14  somebody that you know of that works there whose job
15  is to take down content?  If somebody calls Mike
16  Lindell and says, hey, this program just had
17  somebody -- it was a live show, and somebody went
18  off and we need to take it down, is there someone
19  whose job is to do that?
20    A.  I don't know.  You'd have to ask Mike.
21    Q.  But as you sit here today, are you aware
22  of any instance when FrankSpeech has taken content
23  down off the --
24       MR. GREER:  Object to the form.  You've
25  asked and answered that three times.

*Page 111*

1    A.  I'll just say, I'm not aware.
2  BY MR. KLOEWER:
3    Q.  Okay.  Let's move on to the next page
4  here.  And this is part of what I'm getting at, as
5  well.
6       And I apologize.  The print job here is a
7  little odd.  We have the FrankSpeech logo covering
8  some of the language at the top of Page 3 of this
9  exhibit.  But I'll read for you as I understand the
10  text reads.  These content standards apply to any
11  and all and -- to any and all user must comply with
12  all applicable federal, state, local and
13  international laws and regulations.  Without
14  limiting the foregoing, user contributions must
15  not -- and the first bullet point here says, contain
16  any material that is defamatory, obscene, indecent,
17  abusive, offensive, harassing, violent, hateful,
18  inflammatory or otherwise objectionable.  Long
19  sentence there.
20       But here your user terms also prohibit --
21    A.  Wait, wait.  Whose user terms?
22    Q.  FrankSpeech.  Sorry.  I said yours.
23    A.  You said mine.
24    Q.  Yes.  Not yours.  Here, Frankspeech's user
25  terms prohibit publication of defamatory content.

*Page 112*

1       What I'm trying to understand is, is there
2  any anyone at FrankSpeech who is making
3  determinations of what is defamatory?
4    A.  You -- you -- you would have to ask
5  Mr. Lindell.
6    Q.  Okay.  Have you ever -- I mean, are you
7  aware, for example, that Dr. Coomer has issued
8  repeated written requests that information about him
9  be retracted and taken down from the FrankSpeech
10  website?
11    A.  I don't believe I'm aware of that.
12    Q.  Okay.
13    A.  Has that happened?
14    Q.  Yes.  And I'm trying to understand who, if
15  anybody, would have gotten those requests and
16  analyzed them to see if they violated the terms and
17  conditions.
18    A.  Yeah.  That would be a question for
19  Mr. Lindell.
20    Q.  Okay.  Okay.  Beyond what you just
21  described as far as, you know, limiting profanity,
22  you've spoken to wanting to adhere to -- and correct
23  me if I'm using incorrect language here, but trying
24  to adhere to a Christian world view.
25       Are there other -- strike that.  I'll move

*Page 113*

29 (Pages 110 - 113)

1 on. I'm trying to understand if there are ethical
2 standards at FrankSpeech beyond what you've
3 described already.
4    MR. GREER: Hold on. Objection. I think
5 we're getting into an area where we're sort of
6 mischaracterizing things. Mr. Howse has testified
7 that he doesn't own FrankSpeech; he doesn't run it.
8    He can't speak to the policies,
9 procedures, employee decisions of FrankSpeech. So
10 to the extent your questions are asking him to
11 answer for FrankSpeech, I object.
12    MR. KLOEWER: Okay.
13    A. I'm happy to answer questions about
14 Lindell TV, of which I have some influence.
15 BY MR. KLOEWER:
16    Q. Okay. I'm just -- the line between your
17 different roles seems a little blurry.
18    I understand you're just -- you were
19 explaining how you advised against the allowance of
20 profanity for the terms of FrankSpeech, and I
21 understand that that's been incorporated into their
22 operating model.
23    So it's not clear to me where your role as
24 advisor shaping the environment at FrankSpeech ends.
25    A. As a -- as a consultant at times on any

Page 114

1 number of things that Mr. Lindell would like to seek
2 my counsel on, I have provided what I believe is
3 advice that would help further the growth of his
4 audience, many of which know he's an avout
5 self-professing conservative Christian. And if he
6 wants to build a platform, be it FrankSpeech or
7 Lindell TV, he needs to be mindful of the fact that
8 that audience does not want to come on a site where
9 that kind of language is being used, and if you do,
10 many of these people will turn it off.
11    Q. All right. Okay. I want to start getting
12 into really the basis for the lawsuit that we're
13 here to discuss today.
14    Obviously, we've been discussing all that
15 background --
16    A. Are we just now getting to that?
17    Q. We're just getting it to. Yes. Well, let
18 me --
19    A. So let's see. It's going on 11:00. We
20 started --
21    Q. Yes.
22    A. So two hours later, we're now getting to
23 the meat of the subject.
24    Q. Yes. Well, I needed a little context
25 before we proceed here.

Page 115

1    I want to first discuss an interview that
2 you conducted on May 3rd of 2021 with Joe Oltmann.
3 And that interview is still up on the FrankSpeech
4 website. If I search for the term Oltmann, I can
5 find an interview labeled Joe Oltmann exposes Eric
6 Coomer of Dominion Voting Systems.
7    Do you recall conducting that interview?
8    A. I don't recall conducting the interview,
9 but I know I did.
10    Q. Okay. I'm going to show you a bunch of
11 clips. So we'll refresh your memory --
12    A. Okay.
13    Q. -- on all of that. But tell you what,
14 I'll show you the first clip. And that will
15 hopefully provide some context to you here. And at
16 that point, I'll have some follow-up questions.
17    So I'm going to show you what's been
18 previously marked as Exhibit 65, Clip 1. And
19 hopefully, the volume is still where it's supposed
20 to be. And you tell me if you need me to replay it
21 or you can't hear or whatever.
22    (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
23 PLAYED.)
24 BY MR. KLOEWER:
25    Q. That's just a short clip. Does that

Page 116

1 refresh your memory at all? Do you remember the
2 Frankathon, for example?
3    A. I remember the Frankathon. Yes.
4    Q. What was the Frankathon?
5    A. That was I believe the April 19th, 2021?
6 Is that correct?
7    Q. I don't know.
8    A. I think that was April 19th. I think it
9 was April 19, 2021, launch of -- the official launch
10 of FrankSpeech.
11    Q. And what -- what was the event? Was it a
12 banquet or party or --
13    A. It was a live streaming event from our
14 studio -- from my studio --
15    Q. Okay.
16    A. -- that I agreed to.
17    Q. So the attendees were remote, I take it?
18    A. Some of them were.
19    Q. Okay.
20    A. But I believe there were some there in
21 person. I think General Flynn might have been there
22 in person.
23    Q. Okay.
24    A. I would have to go back and check.
25    Q. Was Joe Oltmann there in person?

Page 117

30 (Pages 114 - 117)

1    A.   Not at the FrankSpeech. I think he was by
2  Skype from his home.
3    Q.   Okay. So when you say you remembered him
4  at the Frankathon --
5    A.   When I said it in that interview there.
6    Q.   Yeah. You said you were very impressed by
7  him at the Frankathon --
8    A.   Did I say that?
9    Q.   Yeah. Let me replay it, just so we're --
10 we're clear on...
11       (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
12 PLAYED.)
13 BY MR. KLOEWER:
14   Q.   Do you remember this conversation with
15 Mr. Lindell you're describing here where he very
16 complimentary of Mr. Oltmann?
17   A.   I don't remember it.
18   Q.   No? Okay. Now, just a quick question
19 here. This -- we're going to watch a number of
20 different clips today.
21       This one is interesting to me in that it
22 just says FrankSpeech.com across the bottom.
23 There's not a Lindell TV banner. Do you know why
24 that would have been?
25   A.   What was the date of this?

1    A.   And then when I interviewed him at the
2  Frankathon, I thought -- if my memory serves me
3  right, I thought that was the first time I had ever
4  talked to the man. And then I found out later, oh,
5  wait a minute, that's the Joel -- is it Joe or Joel?
6    Q.   Joe.
7    A.   Joe?
8    Q.   J-O-E. Yeah. Joe.
9    A.   That's the Joe that supposedly owned a
10 data center in Colorado that had been on a phone
11 conference with RJ and myself and some others.
12   Q.   Okay.
13   A.   So apparently I was aware of him before,
14 but I didn't -- I don't think I understood that
15 we're talking about the same Joe.
16   Q.   And you'll discuss this in a minute. So
17 I'm not trying to set a trap for you here.
18       But do you recall hearing Mr. Oltmann's
19 story about Eric Coomer?
20   A.   I think the first time I heard it was
21 at --
22   Q.   In the next clip probably. I think -- I'm
23 going to show you. I just want to be sure I'm
24 understanding you correctly.
25       All right. So I'm going to play for you

1    Q.   Well, it was May 3rd of 2021. So --
2    A.   And when was Lindell TV formed?
3    Q.   I believe June 2nd. So I just want to
4  confirm. Is -- would that because at this time,
5  this was a publication of FrankSpeech only?
6    A.   That's -- that's what I understand.
7    Q.   Okay. Fair. All right. What else do we
8  have here? Okay. We've already looked at the
9  Delaware clips.
10       So -- and you just said you didn't know
11 him before the Frankathon. Does that comport with
12 your recollection? And you -- your counsel is about
13 to say asked and answered. I just want to be sure.
14       MR. GREER: That's okay.
15   A.   Well, wait a minute. I don't -- I think I
16 may have known who he was before the Frankathon.
17 BY MR. KLOEWER:
18   Q.   Okay.
19   A.   But I didn't know he was that guy. In
20 other words, I believe I was in a phone conference
21 with him.
22   Q.   Okay.
23   A.   And that he had represented himself as
24 having a data center in Colorado.
25   Q.   Okay.

1  what's been labeled as Exhibit 65, Clip 2. This is
2  from that same interview.
3       (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
4  PLAYED.)
5  BY MR. KLOEWER:
6    Q.   Okay. And I've got this cut up into a
7  bunch of, you know, long segments. We're going to
8  -- they're going to be cut off a few times.
9       Had you heard anything about an Antifa
10 call before this? Not necessarily from Joe Oltmann.
11 I know you just said you hadn't heard his story.
12 But had -- this -- this notion of a Dominion
13 executive partaking in an Antifa phone call, had you
14 ever heard that before?
15   A.   I don't believe I would have unless he
16 expressed that in the interview in April.
17   Q.   Right. Well, I'm just -- this -- these
18 claims were out in the world at this time. And I'm
19 just wondering if you had come across them and then
20 realized that Mr. Oltmann was involved with that or
21 if you had never heard that story before.
22   A.   I don't even recall.
23   Q.   Okay. I want to play Clip 4 now. And
24 I'll have several question for you after that. This
25 is Exhibit 65, Clip 4.

1    (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
2 PLAYED.)
3 BY MR. KLOEWER:
4    Q.   Okay.  So here he was describing the call
5 that he claims to have been on.  I'm wondering -- he
6 describes his notes, that he takes very detailed
7 notes.  Have you ever seen those notes?
8    A.   No.  I don't believe I have.
9    Q.   Did you ever ask for them?
10    A.   I don't believe I did.
11    Q.   Why not?
12    A.   It's not -- I mean, why would I ask for
13 his personal notes?
14    Q.   Well, if Mr. Oltmann's story is true, it
15 strikes me that it would be an incredible piece of
16 evidence to support any theories that the election
17 was rigged.
18        I understand that you and Mr. Lindell both
19 believe that to be the case.  Is that true?
20    A.   Which --
21    Q.   Let me rephrase that question.  That's --
22 strike that one.
23        As you sit here today, do you believe that
24 the 2020 presidential election was rigged?
25    A.   I believe there were problems with the

Page 122

1 2020 election.
2    Q.   That's an answer to a question I didn't
3 exactly ask.  Do you believe that the 2020
4 presidential election was rigged?
5    A.   I don't know what you mean -- what do you
6 mean -- what do you mean by rigged?
7    Q.   Was there an individual or group of
8 individuals who deliberately manipulated the
9 election results in such a way that the incorrect
10 winner was named?
11    A.   How would I know that?
12    Q.   Well, that's -- so you -- is that a no?
13    A.   I don't know -- you're asking me if I
14 believe the -- you're asking me if I believe the
15 election was rigged.
16    Q.   Yes.
17    A.   And I'm telling you I believe there were
18 problems, and I believe there were certain laws that
19 were not followed, state and federal.
20    Q.   Have you seen evidence to convince you
21 that the election was rigged?
22    A.   Well, again, you're using a word that I
23 have already told you is not a word that I am using
24 to describe my concerns with the election.
25    Q.   Okay.

Page 123

1    A.   So if you're asking me have I seen
2 evidence that I believe state laws and federal laws
3 were not followed, I believe I have.
4    Q.   Okay.  When we asked Mr. Lindell this
5 question, he was confident that the election was
6 rigged.  Sounds like you are not as confident.
7    A.   It depends on what you mean by the word
8 "rigged".
9    Q.   Right.  What I mean is, were the results
10 manipulated so that an incorrect victor was named in
11 this case?
12    A.   I believe there is evidence that there
13 were some things going on in the election that
14 looked awfully suspicious when I interviewed people
15 like Dr. Walter Doherty, Dr. Doug Frank, Jeff
16 O'Donnell, General Flynn, Thomas McInnerney.
17    Q.   Have you seen evidence that has convinced
18 you beyond a doubt that Joe Biden was not lawfully
19 elected?
20    A.   I have seen evidence -- well, for example,
21 if it's true that the state of Pennsylvania had more
22 votes than voters, then I believe -- then I
23 understand that's against state law, and they're not
24 to certify.
25    Q.   Have you looked into that claim?

Page 124

1    A.   I have not personally gone and done my own
2 study on that, but I have interviewed several people
3 who claim from the state of Pennsylvania that they
4 have and that there were more votes than voters and
5 that state law in Pennsylvania says such this
6 certain election should not be certified in the
7 state of Pennsylvania.
8        No one has refuted that claim, that I'm
9 aware of, that there were more votes than voters.
10    Q.   Would you characterize your work as a
11 journalist and as -- or have you attempted to seek
12 out evidence showing that the election results were
13 inaccurate?
14    A.   I personally --
15    Q.   Yes.
16    A.   -- am not a computer expert.
17    Q.   Okay.
18    A.   I'm not an election expert.
19    Q.   Okay.
20    A.   I'm a journalist.  So I interview all
21 kinds of people.  And I interview people who believe
22 the election was manipulated electronically.  I
23 believe -- I interview people who believe the
24 election was manipulated by ballots.
25        I believe -- I interview people who will

Page 125

32 (Pages 122 - 125)

1 oftentimes not even speak to the issue of machines.
2 They -- they don't know enough about machines to
3 know, but they do believe there was election fraud
4 through ballots.
5        So I interview a lot of people with a lot
6 of ideas. I interview people that don't believe the
7 election was stolen. I interview people who believe
8 Joe Biden is the rightful winner of the White House,
9 and I interview them.
10       And they don't get -- they don't get
11 deleted as a guest because they don't agree with a
12 certain paradigm. I'm a journalist. I interview
13 all kinds of people. I interview Naomi Wolf, who
14 comes generally from the progressive side, Steve
15 Kirsch, generally from the Progressive side, to
16 people all the way on the right.
17       I interview a wide variety of people who I
18 don't agree with on many issues, who I do agree with
19 on many in some depending on who we're talking
20 about. Some of them maybe are pro-life, others are
21 not. I'm pro-life. Some of the people I interview
22 may not be pro-life, and I would disagree with them.
23 But that doesn't mean I don't interview them about
24 their specific topic.
25       If they bring up the pro-life issue, then

Page 126

1  A.  I try not to waste time on things that I
2 don't think are pertinent to my mission or that I
3 find particularly interesting. I think I did say
4 there are times I have to cover some topics I don't
5 find particularly interesting because the public has
6 a right to know, or the public is interested in
7 those topics.
8        But I generally try to cover topics that
9 are of interest to me or are in my area of
10 expertise.
11  Q.  So in this instance, you have a guest on
12 the show who claims to have overheard a Dominion
13 executive tell a group of Antifa activists that he
14 had rigged the 2020 presidential election. Is that
15 interesting to you?
16  A.  I don't believe I followed up and did more
17 shows on it, did I?
18  Q.  Well, we'll get to those. There are --
19 there have been many publications on FrankSpeech.
20  A.  No, no. Did I?
21  Q.  You conducted an interview with Tina
22 Peters where she raised these issues again. Yeah.
23  A.  But I -- did I bring up -- did I interview
24 multiple times and pursue that topic with Oltmann
25 after that?

Page 128

1 I'm going to discuss that with them from my
2 perspective. And we can have a nice, cordial
3 disagreement.
4        I interview a lot of people on a lot of
5 topics. I don't have to agree with them to
6 interview them.
7  Q.  Okay.
8  A.  I interviewed not too long ago Robert F.
9 Kennedy, Jr. He's a Democrat. I think he just
10 announced to run for president as a Democrat. I'm
11 trying to get him back on my broadcast.
12       I'm happy to interview people of all
13 political persuasions and talk about their issues.
14 And there are issues I agree with Robert F. Kennedy,
15 Jr. on. I'm pretty sure there are issues I don't
16 agree with him on.
17       But as a news guy and a journalist, I try
18 to offer a public service of interviewing a variety
19 of opinions.
20  Q.  So earlier in the deposition, you
21 referenced that you get all kinds of communications,
22 and you don't waste time on things you don't think
23 are interesting. And correct me if I'm
24 mischaracterizing your testimony. Would you say
25 that's fair, you don't like to waste --

Page 127

1  Q.  Not that I'm aware of.
2  A.  Then I probably didn't find it of
3 interest.
4  Q.  Okay. Do you believe that that occurred?
5  A.  I have no idea.
6  Q.  Okay. But you didn't do any follow-up
7 research on this claim. Well, we just said you
8 didn't ask for the notes.
9  A.  It's live television.
10  Q.  Yeah. Well, you know, I asked you before
11 if you'd ever issue a retraction if you found out
12 something was inaccurate.
13  A.  But I never found out that's inaccurate.
14 I think that's what you guys are all fighting in
15 court about, isn't it?
16  Q.  Well, yes and no.
17  A.  Do you know it's inaccurate?
18  Q.  I know it is. Yes.
19  A.  Do you have the evidence it's inaccurate?
20  Q.  I --
21  A.  You have hard evidence --
22  Q.  I'm not the one --
23  A.  -- it's a inaccurate.
24  Q.  I'm not the one -- well, we'll get to some
25 of that. We will. I'm asking the questions today,

Page 129

33 (Pages 126 - 129)

1 but I will present some of that --
2     A.  But you see, you're trying to put me in a
3 position --
4         THE REPORTER:  I'm sorry.  I'm so sorry.
5 One person, please.
6     A.  But you're trying to put me in a position
7 that's very similar to your job.
8 BY MR. KLOEWER:
9     Q.  Sure.  Well, as a -- I'm just wondering if
10 you made any effort to confirm whether these claims
11 were accurate or not.  Did you investigate them
12 beyond speaking to Mr. Oltmann?
13     A.  Not that I'm aware of.
14     Q.  Okay.  Did you ask him who else was on
15 this supposed Antifa call?
16     A.  Not that I'm aware of, I mean, unless it's
17 on the video.
18     Q.  Okay.  Let's -- let's look at Clip 5.  If
19 you're asking for evidence that it's false, we can
20 take a look at Clip 5.  And I have a few follow-up
21 questions on it, as well.  This, I believe, is a
22 short one.
23         (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
24 PLAYED.)
25 BY MR. KLOEWER:

Page 130

1     Q.  I'm going to try to replay that because it
2 was skipping a little bit.  I'll -- before we watch
3 it again, I'll represent to you that he says, I
4 Googled Eric Dominion, Denver, Colorado, and up
5 popped all this information.
6         So I'm going to play that one more time
7 just to see if you can get a better listen to it,
8 and then we'll talk about this.
9         (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
10 PLAYED.)
11 BY MR. KLOEWER:
12     Q.  Did you -- I don't believe he references
13 it in this interview.  But are you aware that
14 Mr. Oltmann claims he has a screen shot of his
15 Goggle search results for Eric Dominion, Denver,
16 Colorado?  Is that something you're --
17     A.  I don't believe I'm aware of that.
18     Q.  Okay.  I'm going to hand you what's been
19 previously marked as Exhibit 21.
20         (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
21 WAS PREVIOUSLY MARKED AS EXHIBIT NO. 21 TO THE
22 DEPOSITION, AND IS HERETO ATTACHED.)
23 BY MR. KLOEWER:
24     Q.  And the exhibit that's in evidence is in
25 color.  I apologize for the quality of this.  I had

Page 131

1 to print this one at the hotel last night, and it's
2 not great.
3         But I'll represent to you that this is the
4 exhibit that Mr. Oltmann has submitted into evidence
5 claiming that this was a Google search he conducted
6 on September 26th of 2020.  Do you see that date at
7 the top?
8     A.  Who -- where it says Eric Coomer, Denver,
9 Colorado, taken on 9/26/20?
10     Q.  Yes.
11     A.  Yes.  I see that.
12     Q.  And then just below that -- this is more
13 difficult to read on this copy.  But it's -- the
14 actual label affixed to the image says screen shot
15 2020-09-26 at 2:03:31 p.m.  Can you read that?
16     A.  Yes.
17     Q.  Okay.  Is this the first time you've seen
18 this?
19     A.  I believe it is.
20     Q.  Okay.  I told you we would refer back to
21 the declaration of Dr. Halderman.  Do you have that
22 large document somewhere?  Do you want to pull that
23 out?  We'll cross reference these two documents
24 together.
25         If you want to flip to -- and I realize

Page 132

1 the confidential labels are over the page numbers on
2 this.  It's Page 43 of Halderman report.  It's
3 Paragraph 75.  If's easier to flip to -- do you see
4 what I'm referring to there?
5     A.  No.
6         MR. GREER:  Brad, why don't you use the
7 Bates page, you know, the last --
8         MR. KLOEWER:  Yeah.  That's --
9         MR. GREER:  Last four of the Bates page
10 might be easier.
11         MR. KLOEWER:  Yeah.  That's going to be
12 easier.
13 BY MR. KLOEWER:
14     Q.  It's going to be 001550 is the page number
15 there.  And Mr. Howse, I would ask you if you could
16 keep your phone away while we're on the record.
17     A.  Okay.
18     Q.  I don't have any reason to believe
19 you're --
20     A.  No.  I've got --
21     Q.  -- seeking the answers to questions --
22     A.  My stream --
23     Q.  -- from someone else, but let's --
24     A.  My stream is down, and I'm trying to get
25 it fixed.

Page 133

34 (Pages 130 - 133)

1 Q. Okay. So do you see this page of the
2 Halderman report?
3 A. Where are we at now?
4 Q. Paragraph 75.
5 MR. GREER: It's Page 50.
6 A. Well, look at that. I just happened to
7 turn to it.
8 BY MR. KLOEWER:
9 Q. Look at that. All right. He says,
10 "Oltmann has never provided credible evidence that
11 such a call really took place, let alone that
12 Dr. Coomer participated or made such statements.
13 And some of the little tangible evidence he has
14 offered is provably false.
15 He produced a screen shot, excerpts shown
16 below, that he purported in sworn testimony showed
17 he had performed a Google search on September 26th."
18 Do you see that red box that Dr. Halderman
19 has added around that?
20 A. Yes.
21 Q. Do you know what that is? Are you
22 familiar with Google Doodles?
23 A. I don't think so.
24 Q. Okay. Well, do you use Google to search
25 for things?

Page 134

1 Veteran's Day 2020   Veterans Day 2020 was November
2 11th of 2020
3 Do you know when -- when Mr Oltmann first
4 published his claims about Eric Coomer?
5 A No
6 Q I'll represent to you it was November 9th,
7 two days prior to this image  Have you watched the
8 original Conservative Daily episode where
9 Mr Oltmann lays out his story about Eric Coomer?
10 A I don't believe I have
11 Q You never have  Okay  I'll show you some
12 clips from that in a little bit
13 Dr Halderman goes on to opine, he says,
14 Oltmann now admits to changing the date of this
15 screen shot which cast doubt on the entirety of his
16 claims
17 I'll hand you this real quick just so you
18 can have reference to that  We'll mark this as
19 Exhibit 106
20 (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
21 WAS MARKED AS EXHIBIT NO  106 TO THE DEPOSITION, AND
22 IS HERETO ATTACHED )
23 BY MR  KLOEWER:
24 Q  This is just a single-page excerpt  We
25 deposed Mr Oltmann in this case on December 16th of

Page 136

1 A. Not generally.
2 Q. Okay. Well, just generally, I'll
3 represent to you that every day -- not every day but
4 often, Google commissions what's called a doodle.
5 It's am image on their home page that is sometimes
6 meant to commemorate an event on that day.
7 A. Like Christmas or something?
8 Q. Exactly. They may have a Christmas
9 tree --
10 A. I think I've seen those.
11 Q. -- image.
12 A. Yes.
13 Q. Something to that effect. The image here
14 is what's -- what's relevant. And we can turn the
15 page here, the Halderman report, Paragraph 76. It
16 says, "Although the screen shot includes a file name
17 of screen 2020-09-26, it could not have been
18 produced on this day. The Google logo in the upper
19 left corner, which I have outlined in red, shows
20 what is known as a doodle. Google doodles are
21 artistic variations of the company's logo." I just
22 read that to you.
23 But he says here, "Google maintains an
24 archive of past doodles that indicate the doodle on
25 Oltmann's screen shot was only displayed on

Page 135

1 last year.
2 We had had him under oath in the case
3 against him, which is where he had previously
4 testified about the screen shot. By this time, we
5 had been made aware of the image of the issue with
6 the doodle.
7 If you want to look down to Line 13 of
8 that Page 294. This is me asking. I said, "So this
9 image, as you just stated, was created on November
10 11th. Who changed it to say 2020-09-26? Did you
11 change that date?" Oltmann responds, "That's the
12 file name." I said, "Yes. Who changed that?" He
13 says, "I changed the file name."
14 So going back to my original question, you
15 didn't ask Mr. Oltmann for any evidence of the
16 search that he conducted at the time?
17 A. Not that I'm aware of.
18 Q. And you haven't since that time?
19 A. Not that I'm aware of.
20 Q. Have you read the lawsuit in this case?
21 A. No. I don't think I have.
22 Q. No? Okay.
23 A. Is it online?
24 Q. Well, yes. You provided your viewers a
25 link to that --

Page 137

35 (Pages 134 - 137)

1  A.  Okay.
2  Q.  -- about a month ago --
3  A.  Okay.
4  Q.  -- of which we'll get to.  But yes, it is.
5 Of course, Mr. Lindell has a copy, as well.
6      But I just -- my question --
7  A.  I provided my viewers to a link to his
8 lawsuit?
9  Q.  Yes.
10  A.  To Oltmann's lawsuit?
11  Q.  Not to Oltmann -- to the lawsuit in this
12 case against Mike Lindell.
13  A.  Oh, okay.  I thought you just asked me
14 about Oltmann.
15  Q.  There are multiple lawsuits.  I was
16 confused.  Yes.  Dr. Coomer has filed five separate
17 lawsuits.  Mr. Lindell --
18  A.  Okay.  I thought you were saying -- asking
19 me if I have read the lawsuit against Oltmann.
20  Q.  No.  And I apologize for the confusion.  I
21 meant the lawsuit in this case.
22      Have you read Dr. Coomer's lawsuit against
23 Mike Lindell?
24  A.  Have I read it?
25  Q.  Yes.

Page 138

1 twice.  But how many times have I interviewed Joe?
2  Q.  To my knowledge, this is the only one that
3 we have.
4  A.  Other than when he appeared on
5 FrankSpeech.
6  Q.  Correct.
7  A.  The FrankSpeech.
8  Q.  Frankathon?
9  A.  Frankathon.  Right.
10  Q.  Yeah.
11  A.  So if I have not interviewed him after
12 that interview --
13  Q.  Yeah.
14  A.  -- what does that tell you?
15  Q.  Well, that you didn't believe him?
16  A.  It's just not of interest to me.
17  Q.  Okay.  Do you believe him, as you sit here
18 today?
19  A.  I have no reason to believe him, not
20 believe him.  I have no opinion.
21  Q.  Okay.
22  A.  I know what he has said.  I know what
23 Mr. Coomer has said.
24  Q.  Did you contact Dr. Coomer after this?
25  A.  I don't -- I don't believe I even have

Page 140

1  A.  I don't know if I have or not.  If I would
2 have, it would have been on the air.  We would have
3 brought it up, as you said, because Mike would have
4 asked for it.
5      It would have been on the Lindell Report.
6 I don't think it would have been on Brannon Howse
7 Live.  Correct?
8  Q.  Well, I haven't seen -- I haven't seen
9 anything about that.  I just -- the reason I ask is
10 because we discussed this fabrication of evidence in
11 the lawsuit.
12      So if you had read it, then you would be
13 familiar with that issue.  It sounds like you
14 haven't.
15  A.  I am -- I'm not familiar with this.  This
16 is all new to me.  From everything I'm hearing, this
17 is all new to me.
18      Again, how many times have I interviewed
19 Mr. Oltmann?  Do you know?
20  Q.  Mr. Oltmann, to my knowledge, this was --
21 this was the first.  But --
22  A.  Well, the FrankSpeech one.  Right?
23  Q.  But you said you've been on his show a
24 couple of times, as well.
25  A.  I think he's had me on his show once or

Page 139

1 Dr. Coomer's contact info.
2  Q.  Did you try to find him?
3  A.  I doubt I did.
4  Q.  Okay.  Did you ever contact Dominion
5 Voting Systems to see if they could verify any of
6 this?
7  A.  I don't believe I did.  But I think I
8 may -- you'd have to go through the record.  I think
9 I may have invited, as I do often on the air, people
10 who are being discussed are open and free to come on
11 the air to give their side.  That's very common for
12 me to do.
13  Q.  Okay.
14  A.  And I may have done that -- would not have
15 been out of characteristic for me to do that on a
16 program.  And so that may be in the file.  You may
17 go back and find where I have done that.
18      You may not either.  I don't know.  But
19 that's not uncommon for me to, one, to be fair to
20 people as a journalist to give other people the
21 opportunity to present their side.
22      So if they had reached out to me, I would
23 have very likely let them come on the air live so it
24 couldn't be edited to present their -- their side.
25  Q.  But you didn't make that effort yourself

Page 141

36 (Pages 138 - 141)

1 to reach out to Dr. Coomer?
2    A.  Not that I'm aware of.
3    Q.  Is it your practice to, if somebody on
4 your program makes an outlandish claim, to
5 investigate that after the fact, or do you -- do
6 your shows end when they end?
7    A.  If someone is making a comment about
8 someone that is false, I would like to know that.
9    Q.  But in this instance --
10    A.  And if someone -- if Mr. Coomer had
11 contacted me or his attorney had sent me a letter,
12 then I would have taken that very seriously.
13    Q.  Okay.
14    A.  And I would have then invited Mr. Coomer
15 on the air to correct the record.
16        So if someone had reached out to me and
17 said, hey, what was said about Mr. Coomer is a
18 complete lie on your show, do you know that to be a
19 lie, I would have said, no, I don't know it to be a
20 lie.  I didn't know what the guy was going to say.
21 I mean, it's a live television show.
22        But if you're telling me that what he has
23 said is not truthful and your client would like to
24 come on the show to offer his side of the story, any
25 reasonable journalist would have said, okay, sure,
Page 142

1        In my mind, if your attorney sent me a
2 letter or Mr. Coomer's attorney sent me a letter --
3    Q.  Yeah.
4    A.  -- saying you interviewed Joe Oltmann and
5 we would like it to be turned -- we would like it to
6 be pulled off the website --
7    Q.  Yeah.
8    A.  -- my first -- next phone call would have
9 been to my legal counsel to say look at this.  And I
10 would have been making sure it was pulled down or
11 certainly done my best.
12    Q.  Okay.
13    A.  Because I'm not interested in being a
14 platform for people to say something that is --
15 could fall into the category of a legal problem.
16    Q.  Okay.
17    A.  And I would have likely given Mr. Coomer
18 the opportunity to state his case.
19        As I've already said in this deposition, I
20 oftentimes interview people with differing opinions.
21        Actually, the best television is when
22 people don't agree.  Oftentimes on my live radio
23 show, when people don't agree with me, you'll notice
24 I keep them on the air longer.  Because it's good --
25 and I don't generally treat them with disrespect.
Page 144

1 come on.
2    Q.  Okay.  So nobody has told you that we have
3 repeatedly demanded a retraction with claims about
4 Eric Coomer --
5    A.  This is -- I believe this is the first I'm
6 ever hearing of it.  But then again, I don't run
7 FrankSpeech.
8    Q.  Sure.  Yeah.
9    A.  So you have asked that of FrankSpeech.
10 Right?
11    Q.  Yes.
12    A.  You've not asked that of Lindell TV?
13    Q.  No.  But as we've established, this is a
14 FrankSpeech publication.
15    A.  Right.
16    Q.  It's on FrankSpeech website.
17    A.  But why would you not reach out to me?
18 Because if you had reached out to me --
19    Q.  Yeah.
20    A.  -- I would have likely -- I would have
21 very likely said, pull the interview.
22        If there -- if they want it down, why not
23 pull it down.  Is it -- this isn't -- you know, this
24 isn't interviewing something that is of great
25 historical purposes.
Page 143

1 Because I want to show people how we can have
2 dialogue or -- I don't want to use that word.
3        How we can have debates with people and
4 yet be respectful.  So I oftentimes give people who
5 disagree with me longer air time on my radio show.
6 Because it makes for good television and radio.
7        And that's what talk radio and talk
8 television is about.  Right?
9    Q.  Sure.
10    A.  That's why we open the phone lines and let
11 all people call in.  And some will agree; some don't
12 agree.
13        And I guess I'm wondering why Mr. Coomer
14 never reached out to me to come on the air, why he
15 never had his attorney send me a letter saying, hey,
16 this was said in an interview with you, can you use
17 any leverage you might have to have this pulled.
18    Q.  Well, you're not a defendant in this
19 lawsuit, Mr. Howse.  FrankSpeech is.
20        And we have communicated that to
21 Frankspeech's counsel.  And I presumed it had been
22 communicated to you, but it seems that's not the
23 case.
24    A.  This -- I'm pretty sure this is the first
25 time I'm hearing about it unless there's an email
Page 145

37 (Pages 142 - 145)

1 that was sent. But then again, that doesn't mean I
2 would have seen the email.
3     Q.   But if that email had been communicated to
4 you directly, it sounds like you would have pulled
5 the interview.
6     A.   I would have certainly inquired with the
7 parties involved and my legal counsel --
8     Q.   Okay.
9     A.   -- to say if there is the risk of harm
10 here or the risk of a legal issue here, then for all
11 reasons, we should just pull it and be done with it.
12 Why would we leave this up here? It's not worth it.
13     But I'm not aware that anyone's ever
14 reached out to me. Certainly, they would have
15 called my cell phone or sent me a certified letter.
16 And I certainly, as I think my legal counsel can
17 tell you, take very seriously letters that come to
18 my attention from anyone in a law firm.
19     And I would have been doing my due
20 diligence to get to the bottom of it and limit my
21 exposure.
22     Q.   Okay.
23     A.   So I would again ask why they didn't
24 contact me.
25     Q.   Okay. I appreciate that. Let's move on.

Page 146

1 Georgia?
2     Q.   I don't believe that's what he's referring
3 to here.
4     A.   Then I'm not sure I know what he is
5 referring to.
6     Q.   That's -- I can't ask you to speculate on
7 that.
8     Let's look real quick at Clip 7, also
9 comes from Exhibit 65, Clip 7.
10     (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
11 PLAYED.)
12 BY MR. KLOEWER:
13     Q.   What about that claim that he was a
14 finalist for entrepreneur of the year? Did you
15 investigate that at all?
16     A.   I do believe I looked to try to figure out
17 what he was talking about. I don't know if it was
18 before that or after that.
19     But I do know that he has made some
20 claims, and I think I looked up online and -- I
21 don't know, Brad. I think I saw a picture of him like
22 with a yellow lab or something and his dogs?
23     And so I -- I wasn't so sure about the
24 claims. And I think I went to see -- and I don't
25 know if it was before this interview or after this

Page 148

1 Just another couple quick ones. And I think, based
2 on your testimony already, I know the answers to a
3 few of these questions. So we'll go through them
4 quickly.
5     But I'm going to show what's been labeled
6 as Exhibit 65, Exhibit -- or Clip 6.
7     (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
8 PLAYED.)
9 BY MR. KLOEWER:
10     Q.   Again, we had some audio issues there.
11 Were you able to hear that clip?
12     A.   I could.
13     Q.   Okay. Just to reiterate, Mr. Oltmann is
14 stating that he was -- he was sent an article that
15 referenced Eric Coomer. And that's when he knew
16 that Dr. Coomer must have been involved in this.
17 Have you seen that article?
18     A.   I'm not aware that I have.
19     Q.   Did you ever request it from Mr. Oltmann?
20     A.   I don't believe I did.
21     Q.   Okay. Do you know what he's talking about
22 about the voting machines going down in Georgia on
23 election day?
24     A.   Is he referring to when they stopped
25 voting due to a supposed water leak or something in

Page 147

1 interview
2     Again, here is my question to you: As far
3 as you and I are both aware, how many times have I
4 interviewed Mr -- Mr Oltmann?
5     Q   Just the once
6     A   Right  Are you aware that I interviewed
7 him after this?
8     Q   No  But --
9     A   Right
10     Q   -- Mr Lindell has made many statements
11 about Dr Coomer on your program since that time
12     A   Not my program
13     Q   Well, we'll show some footage here
14     A   We've got to distinguish between I think
15 Brannon Howse Live and Lindell Report
16     Q   This is what I've just marked as Exhibit
17 107
18     (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
19 WAS MARKED AS EXHIBIT NO  107 TO THE DEPOSITION, AND
20 IS HERETO ATTACHED )
21 BY MR KLOEWER:
22     Q   There's not a need to look at this  I'm
23 just showing it as a follow-up on my previous
24 question
25     Do you see the date here at the top? It's

Page 149

38 (Pages 146 - 149)

1 label --

2    A.    October 7th.

3    Q.    -- October 7, 2020.  And the title here is

4 that Ernst & Young announces winners of the

5 entrepreneur of the year 2020 award at that time.

6        So this would have been a month prior to

7 Mr. Oltmann's claims about Dr. Coomer.  Just

8 confirming you didn't look into his claim about

9 this.  Correct?

10       Let me see here.

11       THE REPORTER:  Did you answer?  I didn't

12 get your answer.

13       MR. GREER:  Was there a question?

14       THE WITNESS:  That's why I stopped.

15 BY MR. KLOEWER:

16    Q.    I may have trailed off myself.  Sorry.  I

17 just -- I think it's asked and answered.  I just

18 want to confirm you hadn't looked into his claim

19 about being nominated as entrepreneur of the year?

20       MR. GREER:  Can you clarify?  Do you mean

21 after this interview?

22       MR. KLOEWER:  Correct.

23       MR. GREER:  Okay.

24       MR. KLOEWER:  Yes.

25 BY MR. KLOEWER:

Page 150

---

1    Q.    So he states that he gave up so much by

2 coming forward with this information, that he lost

3 entrepreneur of the year.  I'm just confirming --

4    A.    I think I just said a while ago, I did --

5 I don't know when, but I think I researched --

6    Q.    Yes.

7    A.    -- to try to find out if all these awards

8 were legit.

9    Q.    Right.

10   A.    And I don't know when I did that.  I don't

11 know if it was before this interview or after this

12 interview.  I would have to think it was after the

13 interview, I started trying to research to see if

14 these claims about awards were true.  I think it was

15 after this Interview.

16       And the point I'm asking again is -- and I

17 don't know the answer fully.  I think I know the

18 answer.  Have I ever interviewed him again?

19   Q.    Right.  So it sounds like you, as you sit

20 here today, you doubt Mr. Oltmann's credibility?

21   A.    I don't have enough information on

22 Mr. Oltmann to make a full judgment.

23   Q.    Okay.

24   A.    But I would want to do more research on

25 claims.

Page 151

---

1    Q.    Okay.  I'm going to show you one more clip

2 from this interview, and then I think we can take a

3 break here before hopping into the next one.

4        I'm going to show you what's been labeled

5 as Exhibit -- or Clip 10 from Exhibit 65.

6        (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS

7 PLAYED.)

8 BY MR. KLOEWER:

9    Q.    All right.  I apologize.  The quality of

10 these clips is not great.

11       Were you able to understand that?

12   A.    I was.  But is that on the original?

13   Q.    Yes.

14   A.    I think it is on the original.

15   Q.    I believe so.  I mean, we've cut it up

16 from --

17   A.    It's not your computer doing that.

18   Q.    Well, I don't know.  It may be a little of

19 both.

20   A.    I think it's the original.

21   Q.    Yeah.  That may be.

22   A.    Which makes it very hard in an

23 interview --

24   Q.    Yeah.  Well --

25   A.    -- to figure out what's really being said.

Page 152

---

1    Q.    Yeah.  The reason I play that -- did you

2 hear where he said his criminal past where he's done

3 some things that frankly are pretty disgusting?  Did

4 you hear him say that?

5    A.    I heard -- I think I heard it here.

6    Q.    Yes.

7    A.    I don't know what I would have heard on

8 the air.

9    Q.    Okay.

10   A.    You have to understand also -- and you'll

11 have to look at -- to see if I'm wearing an ear

12 piece, which is very typical I am.

13   Q.    Okay.

14   A.    I don't always hear everything everyone

15 says if someone's talking in my ear.

16   Q.    Okay.

17   A.    And I have to be honest with you.  I don't

18 always pay attention to everything everyone's saying

19 if I'm being distracting by incoming text, a server

20 is down or the stream is down or -- sometimes when

21 I'm on the air, I'm trying to deal with a crisis.

22 If you watch, you'll see I'm on my phone a lot while

23 I'm on the air.

24       And so that doesn't mean -- so what I'm

25 saying is, it's not uncommon for me to have people

Page 153

---

39 (Pages 150 - 153)

1 on the air, and I'm not fully tuned in to what
2 they're saying or I'm not being distracted or
3 someone's actually talking in my ear. But I did
4 hear it then --
5   Q. Okay.
6   A. -- when you played it.
7   Q. Well, my question was, after this
8 interview, did you look in to see if there was any
9 truth to those claims that Dr. Coomer has a criminal
10 past?
11   A. I did -- I don't know if I looked into
12 them or not.
13   Q. Okay.
14   A. I did look into what was reported to be a
15 DUI or something.
16   Q. Okay. Well, I'll represent to you --
17 well, I don't know which -- as far as criminal
18 charges, that -- in his past prior to this time,
19 have you done any research, or have you been made
20 aware of anything of that nature?
21   A. Not that I'm aware of.
22   Q. Okay.
23   A. Other than I think the reported DUI. It
24 was kind of splashed everywhere. Right?
25   Q. That -- I believe I know the incident

Page 154

1 you're referring to. And that would have occurred
2 in September of 2021, months after this interview.
3   A. Correct.
4   Q. Okay. So --
5   A. That's what I understand, too. You also
6 have to understand that when you're dealing with an
7 adult that age and we're on live television, you
8 have to assume that an adult that age at this point
9 is aware of the legality of things he says. Right?
10   Q. Yes. Well, I mean, to that extent, I
11 mean --
12   A. What I'm saying is, in broadcasting, it's
13 very common for me to say in my opinion or I
14 believe, in my opinion or I believe.
15     So this is why -- this is one reason why
16 when I look for people to interview or broadcasters,
17 I'm looking for people that are seasoned or are
18 teachable, people that can learn how you properly
19 interview people and present information and
20 distinguish between your opinion and known facts.
21     And I would -- I generally like to believe
22 that the people that come on my program,
23 particularly of that age, are aware of the
24 legality -- legality of what they're saying.
25   Q. Yeah.

Page 155

1   A. So once it's said on live television, it's
2 hard to bring it back.
3   Q. Yeah.
4   A. Particularly when I'm not the one saying
5 it. But I would say that once a show goes off the
6 air and it's been broadcast, he's the one
7 accountable for what he said, not me.
8     But if it is brought to my attention that
9 it is not true and I receive communication from the
10 individual in reference or from their attorney, we
11 would take it very seriously.
12   Q. Okay. Well, going back then, I'll play
13 this clip. I'll play Clip 8 from this same
14 interview.
15     (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
16 PLAYED.)
17 BY MR. KLOEWER:
18   Q. Okay. So I showed that because you did
19 know that he had been sued for defamation by Eric
20 Coomer in this interview.
21   A. Did I say that, or did I say, have you
22 been sued?
23   Q. Well, you said have you been sued. But at
24 point, you knew.
25     So I'm wondering why you didn't go back to

Page 156

1 investigate or issue a retraction.
2   A. Let's play that again.
3   Q. Sure.
4     (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
5 PLAYED.)
6 BY MR. KLOEWER:
7   Q. Okay.
8   A. So I think we're talking about two
9 lawsuits here, one from Dominion and one from
10 Dr. Coomer.
11   Q. Right. Oltmann has not been sued by
12 Dominion.
13   A. He has not?
14   Q. No. He has only been sued by Eric Coomer.
15   A. Oh.
16   Q. He's also a defendant in a separate
17 defamation lawsuit brought by a journalist in
18 Ukraine, but that's not relevant here.
19     I only show this to point out that at
20 least as of this date, May 3rd of 2021, you were on
21 notice that Dr. Coomer had filed a defamation
22 lawsuit?
23   A. It -- well, from what it sounds like
24 there, that's -- I learned it on the air.
25   Q. Yeah. I think that's probably true.

Page 157

40 (Pages 154 - 157)

Veritext Legal Solutions
800-336-4000

1    A.  Because you know, I don't even know how to
2  say his name at the beginning of the interview.  I
3  asked who he is, and then I seem shocked he's been
4  sued by the guy he's talking about.
5    Q.  Yeah.
6    A.  Which in my mind, I'm thinking to myself,
7  wouldn't I or wouldn't he be telling you right now to
8  be quiet and not be doing interviews like this?
9        So you kind of see my shock --
10    Q.  Yeah.
11    A.  -- that he'd been sued by Coomer.
12    Q.  Yeah.
13    A.  I thought I had heard something about him
14  being sued by Dominion.  Maybe I hadn't.  I don't
15  know.
16        But I'm pretty sure I'm finding on the air
17  right there that he'd just been sued by the guy he's
18  talking about.
19    Q.  Okay.  All right.
20    A.  Which I mean, how do you sue a guy twice
21  for defamation?
22    Q.  I think we can take a break here.  And
23  then we get into some of the post -- the interviews
24  with Lindell that occurred after this and get into
25  some of that.

Page 158

1    A.  Okay.
2        MR. KLOEWER:  If we want to take five or
3  ten minutes?
4        MR. GREER:  Sure.
5        MR. KLOEWER:  Does that work for
6  everybody?
7        VIDEO SPECIALIST:  This ends Media Number
8  2.  Going off the record at 11:43 a.m.
9        (SHORT BREAK)
10        VIDEO SPECIALIST:  This begins Media
11  Number 3.  Going back on the record at 11:54 a.m.
12  BY MR. KLOEWER:
13    Q.  Mr. Howse, when we just wrapped up, we
14  were finishing a May 3rd interview you conducted
15  with Joe Oltmann.
16        I meant to ask you -- I don't have any
17  clips from this.  But at the end of this interview,
18  Mr. Oltmann described some of his work in the Middle
19  east and North Africa.  Do you recall that
20  conversation at all?
21    A.  I do.
22    Q.  Do you know what Mr. Oltmann was doing in
23  that region --
24    A.  I don't.
25    Q.  -- at that time?

Page 159

1    A.  I don't.  He made a comment something -- I
2  think I had to come on after he got off air, I made
3  a -- I think I made a comment about correcting what
4  he had -- something he had said about interfaith
5  dialogue or something.
6    Q.  Okay.  He did addresses that a bit.  I was
7  just curious if you aware then or if you're aware
8  now that his business partner at the time was
9  convicted of working with a terrorist organization,
10  providing material aid and comfort to the Al-Qaeda
11  terrorist network?
12    A.  You're kidding me.
13    Q.  No, I'm not.  Is this the first you've
14  heard of this?
15        THE WITNESS:  Did you know this?
16        MR. GREER:  News to me.
17  BY MR. KLOEWER:
18    Q.  All right.
19    A.  Does Mike Lindell know this?
20    Q.  I don't know.  Okay.  We'll proceed.
21    A.  Is he in prison?
22    Q.  I believe he was sentenced to a year.  His
23  name is Mark Siljander.
24        MR. GREER:  Do you know how to spell that?
25        MR. KLOEWER:  Sure.  S-I-L-J-A-N-D-E-R.

Page 160

1        MR. GREER:  Interesting.
2  BY MR. KLOEWER:
3    Q.  That's -- I don't know much more beyond
4  what I've seen in public reporting --
5        MR. GREER:  I'll run it down.  It's
6  interesting.
7    A.  That was his business partner?
8  BY MR. KLOEWER:
9    Q.  Yes.  As far as we -- their -- the
10  Canadian Outlet Globe and Mail recently published an
11  article on Mr. Oltmann, and they discussed that a
12  bit.  So you can find that coverage.
13        I was just curious if your conversation on
14  air with Mr. Oltmann had continued afterwards, but
15  it sounds like it didn't.  So...
16    A.  Oh, you haven't seen the full interview?
17    Q.  No.  I have.  I wasn't sure -- if you
18  discuss that aspect of his work --
19    A.  Yeah.
20    Q.  -- in the Middle East at the time.
21    A.  And I don't think I've discussed that with
22  him --
23    Q.  Yeah.
24    A.  -- either off the air.
25    Q.  That was my question.  So you've answered

Page 161

41 (Pages 158 - 161)

1 it.
2     All right. I want to skip forward a
3 bit --
4     A. I did -- just for the record, I did
5 discuss -- I think he text me after I -- he must
6 have kept listening to what I was saying after he
7 left. Because I made it known how I feel about
8 interfaith dialogue.
9     Q. Okay.
10    A. And I think he text me, oh, I do agree
11 with what you're saying now.
12    Q. Okay.
13    A. Because he made some theological comments
14 that I wanted to separate myself from.
15    Q. Okay. And to be clear, I don't know the
16 facts of that -- of that background story at all.
17 It's just something we've seen reported and wondered
18 about.
19       Okay. I want to skip forward six days.
20 So we're going to move forward to May 9th of 2021.
21 So that interview was on May 3rd, and we're moving
22 forward to the 9th.
23       I'm going to play for you what's been
24 previously labeled as Exhibit 43, Clip 3. And this
25 is a bit of a longer video, but I do want to spend a

Page 162

1 Q. Okay.
2 A. So I'm trying to figure out what show he's
3 on.
4 Q. Well, maybe after we watch a clip, you'll
5 have some indications, and you can let me know. I
6 don't know beyond what we're about to see.
7      (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
8 PLAYED.)
9 BY MR. KLOEWER:
10 Q. Okay. So we've already established, you
11 didn't -- you didn't investigate Oltmann's claims
12 after that interview six days prior?
13 A. Not that I'm aware of.
14 Q. About Eric. Okay. Do you know what
15 Mr. Lindell is referring to here when he describes
16 Eric Coomer as being treasonist?
17      MR. MALONE: Object. Foundation.
18 A. No.
19      MR. MALONE: Sorry.
20 BY MR. KLOEWER:
21 Q. When he says, I can say these things
22 because we have the evidence, do you know what
23 evidence he's referring to?
24 A. I do not.
25 Q. Do you know why Mr. Lindell would be

Page 164

1 little time on it. That one started right up. Let
2 me get it --
3      MR. GREER: And I'm sorry, Brad. What was
4 the date on that?
5      MR. KLOEWER: Of this?
6      MR. GREER: That clip you're going to
7 play.
8      MR. KLOEWER: May 9th --
9      MR. GREER: May 9th.
10     MR. KLOEWER: -- 2021.
11     MR. GREER: Okay. Gotcha.
12     MR. KLOEWER: So this is six days later.
13     MR. GREER: Gotcha.
14 A. What broadcast is this?
15 BY MR. KLOEWER:
16 Q. Well, maybe you can tell me that. I
17 believe this was a similar FrankSpeech broadcast.
18 Here again, we don't have the sort of Lindell TV
19 banner. I think this was prior to the time when
20 Lindell TV was founded.
21 A. And the date was again?
22 Q. May 9th.
23 A. So this would have just been a general
24 FrankSpeech broadcast. Because Lindell TV is not
25 formed, and I am doing Brannon Howse live by then.

Page 163

1 referring to Dr. Coomer alongside Brad
2 Raffensperger?
3 A. I do not.
4 Q. Do you know what he's referring to when he
5 says making deals at News Max?
6 A. I do not.
7 Q. Are you aware that Dr. Coomer had sued
8 News Max for -- for publishing claims about him that
9 Mr. Oltmann had raised?
10 A. I don't recall if I knew it or not. I
11 mean, if it was in the news and I read it, it's
12 possible I read it. But I don't recall knowing
13 that.
14 Q. Okay. Let me play for you real quick
15 what's been labeled as Exhibit 65, Clip 11. See if
16 this looks familiar.
17      This is a video from May 8th, 2021. So
18 this was the day before the interview that we just
19 watched. It's about a minute and a half. So a bit
20 longer clip.
21      (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
22 PLAYED.)
23 BY MR. KLOEWER:
24 Q. Have you seen that?
25 A. I don't think I've ever seen that.

Page 165

42 (Pages 162 - 165)

1  Q.  Okay.  Were you aware that News Max had
2  settled a lawsuit with Dr. Coomer?
3      A.  I probably have heard it.  I'm thinking
4  that Mike maybe mentioned it on the air.  I don't
5  remember.
6          But didn't they also settle with Dominion,
7  something separate from this?
8      Q.  I'm not aware that News Max has settled
9  with Dominion.
10     A.  They're being sued by Dominion.  Right?
11     Q.  They are.  Yes.
12     A.  And didn't they put on -- a statement on
13 the air kind of like that about Dominion?
14     Q.  I believe they did.  Yes.
15     A.  That's the one I'm most familiar with.
16 This one, I'm not as familiar with at all.  I may
17 not be -- I think that was the first I've ever seen
18 it.  But it's hard to keep these things straight.
19     Q.  Sure.
20     A.  Because there's you're saying the lawsuit
21 with Coomer and then -- with News Max, and there's a
22 lawsuit with Dominion and News Max.
23     Q.  Yeah.
24     A.  But I'm pretty sure I was aware of that
25 kind of comment being made by -- that kind of

Page 166

1      A.  Were you there for that?
2      Q.  Yes.
3      A.  Was that interesting?
4      Q.  That's one word for it.
5      A.  Were you on the receiving end?
6      Q.  Yes.  I'm going to proceed with this.
7      A.  Right.
8      Q.  Sorry.  I'm going to proceed with the
9  questioning here.
10         So this -- this is sort of leading us up
11 to the Cyber Symposium which took place --
12     A.  Yes.
13     Q.  -- in South Dakota in August of 2021.  So
14 a few months after that, after these couple of
15 interviews.
16         And I want to talk about sort of the lead
17 up to the symposium, first of all.  Do you recall
18 when you first heard that Mr. Lindell was planning
19 to put on a Cyber Symposium?
20     A.  I don't recall.
21     Q.  Were you part of the planning discussions
22 for that event?
23     A.  I was part of the planning discussions for
24 the television side.
25     Q.  Okay.  And what do you mean by the

Page 168

1  comment being made by News Max about Dominion.  I
2  think that was one that we've talked about on the
3  air.
4          But that one -- this one here, I think
5  this may be the first I'm aware of this.
6      Q.  So you didn't investigate afterwards what
7  Mr. Lindell was talking about when he said making
8  deals with News Max?
9      A.  No.
10     Q.  Okay.  What do you think he meant when he
11 said you'll be behind bars -- or you should be
12 turning yourself in to maybe get immunity?
13     A.  I have no idea.  You'll have to ask
14 Mr. Lindell.
15     Q.  Okay.
16     A.  I mean, I'm assuming you probably already
17 have.
18     Q.  Yes.  Yes.
19     A.  What did he say?
20     Q.  I don't have that testimony in front of
21 me.  Let me see here.
22     A.  Can I read it sometimes?  Is it public
23 yet?
24     Q.  It's not.  You can talk to Mr. Malone
25 about that.  I trust it will be eventually.

Page 167

1  television side?
2      A.  Bringing in our camera crew, bringing in
3  our switchers, setting up the news desk.
4      Q.  Okay.  When you say our, what do you mean
5  by that?
6      A.  Well, I get --
7      Q.  FrankSpeech or is that --
8      A.  No, no.
9      Q.  -- Brannon Howse Live or Worldview Week?
10     A.  No.  My equipment, bringing in my
11 equipment, some of which I own, some of which Mike
12 Lindell or Lindell TV owns.
13     Q.  Okay.
14     A.  But bringing my -- my crew, my son and
15 another young man that worked for us at the time
16 there.
17     Q.  Okay.
18     A.  How we would set up cameras, where we
19 would try to position them, type of equipment and
20 cables we would need, if we were going to do
21 something wireless, you know, have our cameras
22 wireless shooting to the switcher, having our news
23 desk.
24         I was supposed to have a news desk off to
25 the side on the floor.  And I would be interviewing

Page 169

43 (Pages 166 - 169)

1 people, state legislators and people that were
2 there.
3    Q.  Well, this is getting a bit ahead of my
4 question, but did that ultimately come to pass?  Did
5 you have that table set up there?
6    A.  I had the table set up.
7    Q.  Okay.  Were you conducting interviews?
8    A.  I think I was able to do my radio show
9 from there.  And for the first day before the
10 conference started, the day before or maybe that day
11 or that night, but maybe it was the day before, I
12 did do a radio show there.
13        I did my TV show there  I think that night
14 I think before I started.  I had Steve Bannon on, I
15 think, for one of them.  Then all the plans got
16 scratched.
17    Q.  Well, yeah.  We'll get into that in a bit
18 once we get to the symposium.  I'm just trying to
19 understand the planning that led up to it.
20        Do you know what the purpose of the
21 symposium was?
22    A.  I think the purpose of the symposium was
23 to try to get as many state legislators there as
24 possible to become educated on how elections work
25 and to go back to their states and work on

*Page 170*

1    Q.  Right.
2    A.  Correct.
3    Q.  Okay.  So beyond just educating
4 legislators, it was also to present proof that the
5 election was rigged.  Correct?
6    A.  There were -- there was a cyber room set
7 up, and then there was a room set up in the back
8 where people who had to have certain computer
9 credentials were trying -- were, I guess, challenged
10 to prove.
11        So I guess there was a dual kind of thing
12 going on.  One was public policy and election
13 integrity, and then another one was cyber security.
14 So it kind of seemed like it was -- because it was
15 at least two rooms going.
16    Q.  Yeah.  Okay.
17    A.  One where the cyber people were.  And I
18 think they were -- I think you had to have a badge
19 and everything to get back there.
20        And then there was where the public --
21 general invited public was.  It wasn't open doors to
22 anybody, I don't think.  I think you had to be
23 invited or get a pass.
24        So there was the area where the
25 legislators and the activists grass roots were, and

*Page 172*

1 legislation to tighten up election laws, how
2 elections are conducted.
3    Q.  Okay.
4    A.  I think it was basically an opportunity
5 for people that run conservative or patriotic or
6 Amer -- pro-America public policy groups to hear and
7 then the state legislators to hear.  So it was like
8 a public service.
9    Q.  But it was more than just an educational
10 format for how elections work.  Right?
11    A.  I don't know what you mean.
12    Q.  Well, are you aware of the five million
13 dollar award --
14    A.  Oh, yes, yes.
15    Q.  -- that Mr. Lindell offered?
16    A.  Yes.
17    Q.  What was the purpose of that award?
18    A.  The purpose of that award, as I understood
19 it, was to be able to prove that the packet captures
20 that he had obtained I think through Dennis
21 Montgomery were in fact for the 2020 election.
22    Q.  Okay.  And you're aware that he has been
23 ordered to pay that five million dollars to the
24 claimant?
25    A.  By an arbitration board.

*Page 171*

1 then there was where the cyber guys were.
2        And I don't think -- I don't think -- I
3 don't think people from one side could just walk
4 over to the other side.  So I think there was also
5 two events going.
6    Q.  Okay.  Could you?  Did you have access
7 to --
8    A.  I -- I -- I did go back there.  But I had
9 to be -- I'm pretty sure I had -- well, I know
10 someone had to escort me back there.
11    Q.  So you were there as a member of the
12 press?
13    A.  I was there as a -- as a -- as a
14 representative of Lindell TV and as a member of the
15 press.  Yes.
16    Q.  And were you involved with planning what
17 sort of material would be presented on stage?
18    A.  Not that I'm aware of.
19    Q.  Do you know who was?
20    A.  Well, Mike and I think a lady named Janet.
21 Do you know Janet?
22    Q.  I've seen her referenced in some emails.
23    A.  And I think Kurt Olsen.  Those would be
24 three names.  And then, of course, that would be
25 what would be presented.

*Page 173*

44 (Pages 170 - 173)

1   Q.  So my question has two parts, really,
2  one --
3   A.  Mary Fanning may have been involved.  I
4  don't know.
5   Q.  Okay.
6   A.  I don't know.
7   Q.  So the one aspect of it is was there
8  material that would be presented?  And the other
9  question is, who was choosing the speakers to
10  present that material?
11       Do you know who was involved with
12  establishing a lineup for the event, meaning the
13  speakers who would be on stage to present?
14   A.  I'm sure Mike was involved in that.  But
15  as I understood it, once they thought the conference
16  was penetrated and there were saboteurs there, as
17  they believed, the schedule went right out the
18  window.
19   Q.  Okay.  That's what -- we'll get into that
20  a bit, as well.
21       Do you know -- did you know that Joe
22  Oltmann would be presenting on stage at the
23  symposium prior to the symposium?
24   A.  I don't think I did.  In fact, I think I
25  was shocked when I saw he was there.

Page 174

1   Q   Okay  And we discussed Montgomery a bit
2  before  And I apologize if I'm repeating a question
3  I already asked
4   A   That's fine
5   Q   But what's -- you were familiar with
6  allegations about -- or concerns about the
7  reliability of Mr  Montgomery prior to the
8  symposium   Is that a fair statement?
9   A   Correct

Page 176

1   Q.  Shocked, why?
2   A.  I just didn't see why he would be there.
3   Q.  You didn't think that his claims about
4  Eric Coomer were relevant?
5   A.  No.  I don't have a -- I didn't have a
6  opinion one way or the other.  I just didn't know
7  why he would be there when I thought it was going to
8  be cyber security cyber experts.
9       I didn't put him in the cyber security
10  cyber expert category.
11   Q.  Had you seen the PCAP data that
12  Mr. Lindell had promoted prior to the event?
13   A.  I think -- I don't know.  I don't know.  I
14  may have.  I may have seen it when he would have
15  a -- show it on the screen.  I don't know.
16       Maybe that's what is even footage in
17  Absolute Proof.  I don't know what all that is.
18       So it's possible I have seen footage
19  that's PCAP, and it -- I either was told that's the
20  beginning of PCAP or that is PCAP, or maybe I wasn't
21  told at all what it was.  So I can't -- I don't
22  really know.
23       Would you know PCAP if you saw it?
24   Q.  No.  So where did those PCAPS come from?
25   A.  I'm told they came from Dennis Montgomery.

Page 175

Page 177

45 (Pages 174 - 177)



13    Q.  Jeff Nyquist.  Who is Jeff Nyquist?
14    A.  Jeff Nyquist portrays himself to be an
15 expert on China.
16    Q.  Yeah.  Is he -- what is his line of work?
17    A.  That's a good question.
18    Q.  Is he a journalist?
19    A.  He would probably portray himself as one,
20 but I don't think so.
21    Q.  Is he an academic?  Is he a professor?
22    A.  He would portray himself as one, but I
23 don't think so.
24    Q.  Okay.  Does he have an employer?  Do you
25 know who that is?

Page 178

1    A.  I don't know whose his employer is.  I
2 think he worked at one time for a state agency.
3    Q.  Okay.
4    A.  Later I thought he was a little more
5 substantive than I thought he was.  And I found out
6 later -- I was told later he actually worked for
7 some state agency.
8    Q.  Okay.  So how do you know Mr. Nyquist?
9    A.  He had produced -- he's written a book,
10 and he had -- was well known for blogging about
11 national security issues like China.
12        And I think he had written some articles
13 for the Center for Security Policy.  And that was
14 how I initially became aware of him.
15    Q.  Okay.
16    A.  And then I started interviewing him.  And
17 I even included him in one of my documentaries.  I
18 think he is in my documentary Siege.
19    Q.  Okay.
20    A.  He was in my studio.
21    Q.  Okay.  So he sounds like somebody you had
22 previously relied upon?
23    A.  Yes.

Page 179

Page 180

7    Q.  Okay.
8    A.  But I found it interesting that people
9 that claim to be worried about my 30 plus year
10 career as a journalist had shown no real interest in
11 my credibility before, all of sudden did and were
12 calling me all about the same time period, the same
13 three calls coming in, I think it was, by three
14 different people, I believe it was, all of which I
15 believe I could tie back to the either being retired
16 CIA or had worked in the Pentagon.
17        And I thought how interesting that all of
18 a sudden, I'm getting all these calls trying to get
19 me to not interview these folks and do my job as a
20 journalist, which is to try to validate the claims.
21 And to me, it feel -- felt like maybe Jeff had been
22 approached and used his leverage as someone I did
23 consider a friend and a regular person I interviewed
24 to do the same thing of trying to put pressure on me
25 to not continue pursuing this.

Page 181

46 (Pages 178 - 181)

1    But I was already in communications with a
2 friend of 15 years, who is a navy officer, who is a
3 literal rocket scientist, who had been a friend for
4 15 years, and as I understood it, had the corner
5 office in a facility known as a skiff and that he
6 had -- I talked to him regularly about these types
7 of software programs and were they -- were they
8 legit. He led me to believe that such types of
9 software programs that are out there could
10 absolutely do these things and would blow your mind.
11    He couldn't really talk to me about this
12 because he had never been read in on Hammer or
13 Scorecard. If he had, he could neither confirm or
14 deny.
15    But because he had not been read in on
16 these particular programs, he could discuss it with
17 me. He said he could not validate those particular
18 programs but was aware of programs like that.
19    So I expressed to him concern I was having
20 pressure put on me by people tied to the
21 intelligence arena, who were then reaching out to
22 other people to try to put pressure on me to not
23 continue my journalistic research into the validity
24 of these claims by Mr. Montgomery or Mary Fanning or
25 General McInnerney.

Page 182

1 15 years or so. And he'd come listen to my show.
2 And he came to Memphis, heard me speak in person.
3 We became friends.
4    And he -- I asked for his counsel, based
5 on his background and occupation at the time. He's
6 now retired, if such programs could be used in this
7 manner.
8    He listened to a lot of the shows I was
9 doing, which he already did anyway. But he found
10 them very intriguing. And he said to me such
11 programs, while I'm not read in on this particular
12 type of program -- those are three initials. I
13 can't remember what they are. There's three
14 initials in the intelligence area for software.
15    Anyway, he said such type of programs do
16 exist that do these kind of things, but I cannot
17 speak to that particular program because I haven't
18 been read on it. But if I had, I couldn't talk to
19 you about them.
20 Q. Well, did you look --
21 A. So I was encouraged to keep doing my
22 research. And I -- I was under the impression that
23 Jeff here was applying some of the same pressure to
24 me through, perhaps, folks that had come to him to
25 apply that kind of pressure.

Page 184

1 Q. So sounds like you did continue your
2 research --
3 A. I did.
4 Q. -- into those claims?
5 A. I did.
6 Q. Were you able to validate that
7 Mr. Montgomery's information was accurate?
8 A. I was not -- I was not able. I don't have
9 the computer skills to validate his information.
10 But I, as I told you, reached out to someone who I
11 turned -- found out later was working, according to
12 what he told me -- and he was a friend of 15 years
13 and still is -- at the National Reconnaissance
14 Organization. Are you familiar with that
15 organization?
16 Q. No.
17 A. So this gentleman's bio is pretty
18 impressive.
19 Q. And who --
20 A. And he --
21 Q. Who are we talking about? Who is this
22 gentleman?
23 A. His name is Jason Pratt.
24 Q. Okay.
25 A. And he'd been a friend for probably around

Page 183

1 Q. Well, did you investigate what he tried to
2 warn you about, for example, Sheriff Joe Arpaio,
3 Mike Zullo?
4 A. I did ask a few questions.
5 Q. Did you look into those?
6 A. I did ask some questions. I did. And I
7 also, though, had been told by Jeff that one of my
8 close friends, broadcast partners, someone that was
9 in my documentary with him, was in the studio at the
10 same time as him, he had implied to me that she
11 shouldn't be trusted and she was of some kind of
12 nefarious background.
13    So I had already -- I had already in my
14 mind had come to believe that Jeff would make
15 assumptions about people that were -- well, let's
16 just say I accused him -- I think I accused him once
17 of his toupee being too tight.
18 Q. Okay. Are you aware, as you sit here
19 today, that Sheriff Joe Arpaio from Arizona sued
20 Dennis Montgomery for fraud?
21 A. I did hear that.
22 Q. Okay. Are you familiar with the facts of
23 that case at all?
24 A. I am not.
25 Q. So you're not aware that Montgomery

Page 185

47 (Pages 182 - 185)

1 claimed to Arpaio that he could prove the Obama
2 administration was tapping his phones, for example?
3    A. That part, I'm not familiar with.
4    Q. Okay.
5    A. I -- now you're bringing all this up, I do
6 think I remember hearing that there was some kind of
7 squabble between the two of them. And I didn't -- I
8 didn't really investigate to see what it was all
9 about.
10    Q. Okay. Well, if Mr. Montgomery had been
11 involved in fraud previously, would that concern
12 you?
13    A. It would. But I questioned some of these
14 accusations to both Mary Fanning as well as to
15 General Thomas McInnerney. And I was aware of the
16 book by Mary called I think the Hammer is the Key to
17 Coup and that General McInnerney on my broadcast had
18 relayed the story of Admiral Ace Lyons. Are you
19 familiar with Admiral Ace Lyons?
20    Q. No.
21    A. Admiral Ace Lyons is a rather, I think,
22 highly decorated naval officer who's since passed
23 away. And I believe he and General McInnerney were
24 very close friends. And I believe it was General
25 McInnerney and Admiral Ace Lyons that were the ones

Page 186

1 first exploring and putting out information about
2 the Hammer and Scorecard on another podcast and
3 program.
4        And that I'm told, as I remember the
5 story, by General McInnerney on the air that when
6 Ace Lyons was dying, he conveyed to General
7 McInnerney, Three Star General McInnerney, retired,
8 that Hammer is the key to the coup.
9        So I questioned General McInnerney Three
10 Stars about this information. And because we had
11 been doing so much radio and television in the month
12 of November about this topic, I was always try to
13 get to the bottom of it, even in the face of people
14 criticizing me for covering it, I believed there was
15 something here worthy of talking about due to the
16 backlash we were receiving. And then to my
17 surprise, retired Three Star General who's also
18 director of National Intelligence -- are you
19 familiar with DNI?
20    Q. In general. Sure.
21    A. Then to my surprise, the director of
22 National Intelligence wants to give me the first
23 interview since he's pardoned.
24    Q. Okay.
25    A. So that began to tell me something. Why

Page 187

1 would the director of National Intelligence be
2 willing to give an interview, what is purportedly
3 his first interview since pardoned from Trump, to a
4 guy that's been on this topic for three weeks
5 already on television unless he sees that there's
6 some validity in what I'm saying and he's willing to
7 lend his voice.
8        And if you -- have you ever listened to
9 the interview between me and General Flynn?
10    Q. I haven't listened to the audio. No.
11    A. It's fascinating.
12    Q. Well, you know that General Flynn works
13 very closely with Patrick Byrne. Right? We
14 discussed that before.
15    A. I knew -- I think he did in the past. I
16 don't think they do now.
17    Q. Well, they're both board members on the
18 American Project.
19    A. Still?
20    Q. As far as I know.
21    A. I thought that relationship was no longer.
22 But I could be wrong.
23    Q. Did General Flynn's proximity to Patrick
24 Byrne give you concerns?
25    A. I personally, like I said, am not

Page 188

1 interested in associating with Patrick Byrne. And I
2 had -- I would have preferred that General Flynn not
3 run in the -- you know, let him around him.
4        But General Flynn is -- he's a wise guy.
5 He knows what's going on. You know, he has -- maybe
6 he has his reason and motives.
7    Q. This text message says, just Google Dennis
8 Montgomery. Did you do that?
9    A. I believe I -- I don't know if I used
10 Google, but I believe I had searched things about
11 him.
12    Q. Are you familiar with the fraud he
13 perpetrated on the U.S. Government related to Al
14 Jazeera and the war on terror?
15    A. I am aware of the claims. Do you trust
16 this federal government? Does the FBI lie? Have
17 they set people up?
18        Have they manufactured evidence? Have
19 they withheld evidence against innocent people? Did
20 they just try to carry out a coup against a sitting
21 president?
22        Did they -- did they try to stop or delay
23 the swearing in of a duly elected president-elect
24 Donald Trump? Did the CIA director John Brennan,
25 who admitted for voting for communist Gus Hall who's

Page 189

48 (Pages 186 - 189)

1 still allowed to become CIA director, was he
2 involved in that?
3        Was James Comey, who said I was a
4 communist, now I don't know what I am, didn't he say
5 that?  Wasn't he also involved?  Because I
6 understand from Colonel John Mills, who was on, I'm
7 told, the National Security Council for two
8 presidents, was in the DOD and asked to be a part of
9 the committee to look into the Russia, Russia,
10 Russia hoax, and he has told me on my radio and TV
11 show, certainly television several times, when he
12 looked into that, there was nothing there.  He was
13 told to stand down.
14        John Brennan and James Comey had hands on
15 keyboard, which would mean that there was, in my
16 opinion and that of Colonel John Mills and others,
17 an attempted coup d'etat by the sitting CIA director
18 and the FBI director.
19        MR. KLOEWER:  Objection, nonresponsive.
20 BY MR. KLOEWER:
21     Q.  My question, Mr. Howse, was, are you
22 familiar with the allegations that Mr. Montgomery
23 was involved in a fraud on the U.S. Government?
24     A.  I am -- I am aware of the allegations,
25 just as I'm aware of the allegations by I believe

Page 190

1 corrupt criminal treasonist CIA and FBI directors
2 for the same thing against Donald Trump.
3        So consider the source, the corrupt
4 federal government.
5     Q.  Those allegations didn't give you any
6 concern --
7     A.  They did give me concern.
8     Q.  -- about Mr. Montgomery's reliability?
9     A.  They did give me concern, which is why I
10 posed several conv -- had several conversations with
11 people, as I've already discussed, one of them being
12 someone who I believe worked for the National
13 Reconnaissance Organization in a skiff, which with
14 what I was told several hundred people under his
15 command, I was told, as well as discussed
16 extensively with General Thomas McInnerney.
17        So yes, I brought my concerns to them, of
18 which they would address my concerns and would then
19 ask if he's such a fraud, why was he given a deal
20 with the FBI through I think FBI Attorney James
21 Baker.
22     Q.  Who's Claire Lopez?
23     A.  Claire Lopez is reportedly a former CIA
24 operations officer who went to work for the Center
25 for Security Policy.

Page 191

1     Q.  Okay.  So it sounds like previously, you
2 had trusted both Nyquist and Lopez?
3     A.  I did.
4     Q.  Okay.  Did you consider the possibility
5 that this communication was sincere, that they were
6 trying to warn you?
7     A.  Yes.  I have no problem with them trying
8 to warn me.  The issue was that it was put up there
9 with other people who I don't know that well, trying
10 to call me, which I thought was putting -- was a
11 coordinated effort by the intelligence arena to
12 get -- to get me to quit giving a platform to
13 investigating what the government seemed very
14 concerned about, which was Hammer and Scorecard.
15        Whether that's what the program's called
16 or whether they gave it a different name, the
17 government seemed to be very concerned about this
18 information being out there.
19     Q.  And as we've already discussed, you're
20 aware that Mr. Lindell has been -- an arbitration
21 panel has found that he is liable for the five
22 million dollar award for claiming that this evidence
23 presented to the Cyber Symposium was related to the
24 2020 election?
25     A.  That's what I understand.  But I also

Page 192

1 understand the man that's making the claim couldn't
2 even open the program to look at this -- look at the
3 cyber packet.  So if he can't even operate the
4 program to open the cyber packet, as I'm told, how
5 the heck would he know what's going on?
6        But that has nothing to do -- what you
7 just conflated and mixed with Hammer and Scorecard,
8 that has nothing to do -- the Mike Lindell symposium
9 and the CPAC -- or the packet capture has nothing to
10 do with Jeff Nyquist or Hammer and Scorecard.  Those
11 are two different topics.
12     Q.  Well, they're all related to Dennis
13 Montgomery.  Right?  The PCAPs were provided by
14 Montgomery.
15     A.  But again, I'm not aware of anyone proving
16 that the data that Mr. Lindell had was not from the
17 2020 election.
18     Q.  Well, Mr. Zeidman apparently has --
19     A.  Not if he -- I don't think he has.  I
20 don't think he's proven that.
21        And again, if it's true, he couldn't even
22 open the wire program or whatever it's called to
23 read this -- the cyber packets.  And that seems
24 awfully odd.
25        I will tell you that I did propose the

Page 193

49 (Pages 190 - 193)

1 idea at my national conference that I do believe --
2 and I was saying -- in the summer of 2020 before I
3 ever met Mike Lindell, I was saying in the summer of
4 2020, I believed there was a color revolution
5 coming, that I believed that our government has been
6 involved in flipping elections and installing
7 puppets in other countries and that I believed the
8 intelligence arena would be involved in doing that
9 again based on several documents that I went over on
10 the air and people that I was interviewing.
11        So I warned of a color revolution having
12 been practiced by the CIA and the intelligence arena
13 for many, many years and that they were now going to
14 bring this home and try it out here on America. I
15 warned of that in 2020.
16        In October, I believe it was, of last year
17 at a national conference, I warned that I was saying
18 that and that I believed to this day, the CIA is
19 heavily involved in much of this activity. And I
20 agree with Congress Bill Posey that the -- in a
21 letter Congressman Bill Posey of Florida wrote to I
22 believe the inspector general of the CIA and CCed to
23 I believe then director of the CIA Gina as well as
24 then director of National Intelligence John Radcliff
25 that there should be an investigation between the

*Page 194*

1 connection between the CIA and the voting machine
2 companies. I believe Congressman Bill Posey was
3 right to pose that.
4        When I talked about this issue from the
5 platform of my conference in October, I believe of
6 last year --
7    Q. Mr. Howse --
8    A. -- an individual -- let me finish this --
9 an individual came to me that I've known for many
10 years, many years, that I have reason to believe is
11 honest and was with the NSA.
12    Q. Okay.
13    A. And the individual told me, you are so
14 over the target, you don't know it, you are so over
15 the target, and you should keep going that
16 direction. That's all I can tell you, but you are
17 so over the target.
18        So what I'm saying to you is, I have done
19 my homework. I have reached out to people who have
20 incredible careers. And I have research
21 organizations and agencies -- no disrespect to you
22 because that's not your line of work --
23 organizations you don't even know exist, I'm sure,
24 like the National Reconnaissance Organization, very
25 much about the director of national intelligence.

*Page 195*

1        So I have done my due diligence. And I'm
2 more than happy to give you the names, and you can
3 put those people under oath.
4        MR. GREER: Can I interject one second?
5 You've got to slow down for Korian. She's having
6 trouble transcribing this stuff. So please, please
7 slow down for her.
8        THE WITNESS: Okay.
9 BY MR. KLOEWER:
10    Q. So why did you forward this message to
11 Mr. Olsen?
12    A. Because I wanted him to be aware that
13 there was apparently a concerted effort by a group
14 of people to -- to get us to stop talking about
15 Hammer and Scorecard and the government's
16 interference in the election or a color revolution
17 by the intelligence arena, which told me if you're
18 taking flak, you're over the target, which was
19 confirmed again by the retired NSA officer who came
20 to me in October at my conference to my face and
21 said, you're over the target, don't stop.
22    Q. Okay. I see Mr. Olsen responded to that
23 text with a thumbs up emoji. Did you discuss this
24 any further with him afterwards?
25    A. Yes. I'm sure we had.

*Page 196*

1    Q. Okay. Did he share any concerns about
2 Mr. Montgomery?
3    A. I don't -- I don't remember. I'm pretty
4 sure -- it would have been characteristic of me to
5 pursue further conversation with Mr. Olsen because
6 of his I think being formally in the Navy Seals.
7 Correct?
8        See, I know more about this stuff than you
9 do, which is not again a criticism of you because
10 this not your area. But I'm dealing with people
11 that have legitimate resume's --
12    Q. Well --
13    A. -- and credentials.
14    Q. -- I understand Mr. Olsen claims to have
15 been a Navy Seal. We haven't deposed him yet.
16    A. So what I'm saying to you is it would have
17 been very characteristic to me reach out to him
18 because of his reported being a navy seal and an
19 attorney who I believe had also been dealing with
20 this Montgomery issue to address my concerns about
21 this.
22        But again, not only were my concerns
23 answered enough to keep pursuing for the truth but
24 knowing that my government at many levels is
25 corrupt.

*Page 197*

50 (Pages 194 - 197)

1    Let's not forget it was May I believe of
2 1984, Washington Times -- Senator Jesse Helms in the
3 Washington Times acknowledging the CIA installed a
4 communist puppet in El Salvador.
5    Q.  I'm going to cut you off there.  I
6 appreciate the commentary, but we're going to be
7 here all day if we're talking about what happened in
8 El Salvador in 1984.  So --
9    A.  But the reason I'm addressing it is not --
10 and my passion is not hostility towards you, Brad.
11 My passion is just that, that I have done my
12 homework, and I am one of the leading experts on
13 understanding world views and national security.
14    And I did go and seek out the people that
15 I knew in my personal and professional life to
16 research and validate certain types of software and
17 do they exist.  And I also am very aware, as a
18 research journalist in the area of national federal,
19 the federal government has a long history of extreme
20 criminal activity and treasonist behavior at the
21 highest levels of the government from the CIA to
22 FBI, and I think that's now all coming out in court
23 and in congressional testimony.
24    Q.  Okay.  Let's get back to the symposium.
25    A.  I mean, why is the FBI Director Comey and

1 the FBI John Mueller giving the top FBI director
2 award to people that are reportedly known ties to
3 Jihadis?  Why are they doing that with people tied
4 Muslim Brotherhood?  Why are we using a group that
5 is known for anti-Semitism, hatred of Jews, dates
6 all the way back to Adolph Hitler, Muslim
7 Brotherhood --
8    Q.  Okay.  Mr. Howse --
9    A.  -- to consult with the FBI?
10    MR. GREER:  You've got -- you've got to
11 slow down for her.  You've got to slow down for her.
12 BY MR. KLOEWER:
13    Q.  We need to get back on topic, as well.
14 I'm trying not to be rude and cut you off, but we're
15 here to talk about radio matters.
16    A.  I just want this in record so when the
17 intelligence arena reads this --
18    Q.  Yeah.
19    A.  -- they know I know what they're up to.
20    Q.  Understood.
21    A.  And by the way, I'm not suicidal.  But
22 this intelligence arena is corrupt.  I'm sure they
23 will read all of this.  So just know, I'm very aware
24 of what the intelligence arena is doing.
25    Q.  Okay.

1    A.  What role the other people involved, I
2 don't know.  But I know what my government's been
3 doing.
4    Q.  Back to the symposium, were you aware that
5 a red team had been assembled?
6    A.  Yes.
7    Q.  Okay.  And do you know what I mean when I
8 say red team?
9    A.  I don't.
10    Q.  Okay.
11    A.  I only came to find out about this during
12 the whole controversy of a supposed red pill being
13 put into -- or being tried to be put into the data.
14    So I came to know about it as the week or
15 the event unfolded.
16    Q.  Do you know who was responsible for
17 assembling the red team?  And by that --
18    A.  I am not.
19    Q.  -- I mean selecting the people who would
20 be on it?
21    A.  I am not.
22    Q.  Okay.  Do you know if that was -- if
23 Mr. Lindell was involved with that process?
24    A.  I don't know.
25    Q.  Do you know if Mr. Olsen was involved in

1 that process?
2    A.  I don't know.
3    Q.  Okay.  Do you know who was on the
4 so-called red team?
5    A.  I think a guy named Josh Merritt was or
6 came to find out after the fact.  This is -- a lot
7 of stuff came out after the fact.
8    Q.  And I believe you testified previously
9 that you hadn't met Mr. Merritt or heard of him
10 until that time?
11    A.  I don't believe I had.
12    Q.  Is that correct?  Okay.  So I won't ask
13 you more about him.
14    As far the other members of -- well, let
15 me ask you, what was the red team's purpose?
16    A.  I don't know.
17    Q.  Okay.  So there are other members on that
18 team, for example, Sean Smith, do you know who that
19 is?
20    A.  Does he go by a nickname?
21    Q.  I only know him as Sean Smith.  It's
22 possible, but --
23    A.  I think I might know who Sean Smith is.
24    Q.  Okay.  But you don't recall as you sit
25 here today?

1    A.  No.
2    Q.  Okay.  What about Ron Watkins?
3    A.  I don't think I know what that is either.
4    Q.  Do you remember Ron Watkins presenting on
5  stage at the Cyber Symposium?
6    A.  I do not.  I was not at the Cyber
7  Symposium for some of it.  I was -- I was out to eat
8  with my wife.  I was -- I was avoiding the facility.
9    Q.  Why?
10    A.  Because there was, in my mind, a lot of
11  feds in the building or people that were federal
12  assets in the building or around the building.  And
13  it was, to me, a very uncomfortable place.
14    Q.  Okay.  Did you know who --
15    A.  We are -- we were later told, and I was
16  told by one of the people that I've already
17  referenced who has a reportedly un -- you know,
18  stellar resume' for national intelligence in his
19  position, that there were planes flying well up
20  above this -- the area, gaining data, and it was
21  likely CIA or NSA.
22       So I even had people who went later who
23  are from the intelligence arena went to investigate
24  what planes were flying over the building, getting
25  data.  So I --

1    Q.  So are you familiar --
2    A.  I was not being --
3    Q.  -- with Mr. Watkins?
4    A.  If I was not being needed, which I wasn't
5  apparently because the whole schedule got changed, I
6  became irrelevant largely.  I didn't -- so I -- and
7  I was very uncomfortable with what was maybe going
8  down there.  So I spent a lot of time off the
9  premises.  So I wasn't always there.
10    Q.  Okay.
11    A.  And my credit card will show where I was
12  eating.
13    Q.  I take your word for it.  Did you know who
14  Mr. Watkins was before the symposium?
15    A.  I don't -- I don't know.  I don't -- I
16  mean, I may have heard his name or, heck, I could
17  have interviewed him.
18    Q.  Does the alias CodeMonkey mean anything to
19  you?
20    A.  Now -- didn't I just ask you if he had a
21  nickname?  Well, that was Sean --
22    Q.  Sean Smith.
23    A.  Okay.  See, I know these guys all go by
24  nicknames.
25    Q.  Yeah.

1    A.  Okay.  CodeMonkey?
2    Q.  Yeah.
3    A.  I'm familiar with the CodeMonkey.
4    Q.  Okay.
5    A.  But I don't -- familiar with it as in
6  hearing it.  If he walked in the room right now, I
7  don't think I could identify CodeMonkey.
8    Q.  Are you familiar with a website 8chan?
9    A.  I've heard it of.  Yes.
10    Q.  What do you know about 8chan?
11    A.  I just -- I don't know anything about
12  other than it's -- I've heard it referenced.
13    Q.  Did you know that Mr. Watkins was the
14  administrator of the website called 8chan?
15    A.  I don't believe I did.
16    Q.  Do you know why 8chan was taken down?
17    A.  I do not.  Is that Q -- QAnon?
18    Q.  Well, that's my next question.  Are you
19  aware that Mr. Watkins has been identified as the
20  individual most likely behind the QAnon conspiracy
21  theory?
22    A.  That's probably why I am familiar with the
23  channel you're talking about, why I immediately
24  asked if it's connected to QAnon.  That's probably
25  how I've already heard all this.

1    Q.  Okay.
2    A.  Which I knew it was a bogus thing from the
3  beginning.  I never bought into QAnon.
4    Q.  Did it concern you, or does it concern you
5  now, that Mr. Watkins was presenting on stage at the
6  Cyber Symposium?
7    A.  If what you're saying was true and he was
8  connected to QAnon, if that's true, I wouldn't have
9  put him up there.
10    Q.  Okay.
11    A.  But do we know that's true?  Because
12  there's a lot of things said about Mr. Coomer that
13  aren't true, you're saying.  That's what you're
14  saying.
15    Q.  Yeah.
16    A.  There are things been said about me in
17  career not true.
18    Q.  Sure.
19    A.  So is what -- is what you're saying true,
20  and has it been proven?
21    Q.  Do you know about the content that 8chan
22  was famous for?  Do you know what sort of website it
23  was?
24    A.  No.
25    Q.  Are you not aware that it hosted, for

1 example, child pornography?
2    A.   Oh my word, no.
3    Q.   Are you aware that it was taken down after
4 live streaming the mass shootings in New Zealand?
5    A.   I don't think I would have known that.  I
6 don't -- I don't -- I'm not a computer guy.
7    Q.   Okay.
8    A.   So I wouldn't even know how you would get
9 -- is that on the dark web?
10    Q.   It used to just be a website you could
11 type in.
12    A.   Anyone could go to?
13    Q.   Yeah.
14    A.   I'm not -- I don't -- I don't think I've
15 visited the website, and I certainly would not be a
16 proponent of any such website.
17    Q.   Okay.  Do you know if anybody looked into
18 Mr. Watkins' background --
19    A.   I don't.
20    Q.   -- before he presented on stage?
21    A.   I don't know that I knew -- is this the
22 one again known as CodeMonkey?
23    Q.   Yes.
24    A.   I don't know that I knew much about him
25 other than just hearing his name.  So you probably

Page 206

have told me more right now about this guy than I
2 have heard in my life.
3    Q.   Okay.  Well, there's an HBO documentary on
4 Mr. Watkins --
5    A.   Is there, really?
6    Q.   -- which I can recommend to you if you'd
7 like to know more.
8    A.   What's it called?
9    Q.   Into the Storm.
10    A.   Huh.  When was that made?
11    Q.   Last year, year and a half --
12        MR. GREER:  A few years ago?
13        MR. KLOEWER:  Yeah.
14        MR. GREER:  Something like that.
15    A.   Before the symposium?
16 BY MR. KLOEWER:
17    Q.   I'm not certain.  I couldn't tell you.
18        MR. GREER:  During COVID, I remember.
19        MR. KLOEWER:  Yeah.
20 BY MR. KLOEWER:
21    Q.   So it would have been prior to this
22 symposium.  Yeah.
23        So years long effort to identify the
24 individual behind QAnon, and it focused largely on
25 Mr. Watkins.

Page 207

1        Okay.  Who else do we have on the red
2 team?
3    A.   But that would go to prove the point that
4 the place was infiltrated in my mind.
5    Q.   Well, these were people put on stage.
6 That's what I'm trying to understand, who put them
7 on stage?
8    A.   Well, at one point, things were so fluid,
9 I'm not sure who was putting people on stage.  There
10 were times that Mike I don't think was even
11 backstage.
12        I don't know if Mike has testified to the
13 fact that there were times where he wasn't even
14 backstage.  He was not there.  Janet was helping.
15 Kurt was helping, I think.  You know, I don't know
16 who all.  But it was very fluid.
17        And I think there were definitely people
18 going on that stage that Mike Lindell did not sign
19 off on.  And I would be shocked if Mr. Lindein
20 didn't testify to that fact.
21    Q.   Well, I'm going to show you an interview
22 in a little bit that he did on your show where he
23 said that Kurt Olsen put people on stage.  Would you
24 disagree with that?
25    A.   That's probably true.

Page 208

1    Q.   Okay.
2    A.   But again, the point I'm making is that I
3 already told you before this conversation, this part
4 of the conversation started that I was -- I was
5 concerned of the place being infiltrated.
6        So it would not shock me that our corrupt
7 government, at the highest levels, that our corrupt
8 federal government -- not that everybody is corrupt.
9 My father's retired government.  I know many
10 wonderful civil servants and many people who served
11 our country and government honorably.
12        But it would not shock me if people -- if
13 the corrupt people inside our government would do
14 their best to penetrate Mr. Lindell's event with
15 such people as you are describing in order to
16 discredit the event and Mr. Lindell and everyone
17 involved.  That would not shock me at all.
18        I mean, our government's known, isn't it,
19 for setting up honey pots and sending prostitutes to
20 people's rooms and getting pictures and leverage?
21    Q.   Are you suggesting that the federal
22 government put Ron Watkins on stage on live
23 television at the Cyber Symposium?
24    A.   I am saying if that came out to be proven
25 true, it wouldn't shock me one bit.

Page 209

53 (Pages 206 - 209)

1 Who were these characters that were
2 outside the symposium, one of them dressed like
3 Jesus walking around with a cross bar? Who was that
4 character, who, by the way, some guy that reportedly
5 assaulted Mr. Lindell, one of the guys was report --
6 that guy reportedly walked across the street, talked
7 to Jesus. Jesus dropped his cross bar, and they
8 walked across the street together.
9 So I'd like to know who some of those
10 protestors were. Were some of those government
11 people or government -- people put there by the
12 government?
13 But I already testified before you started
14 even going down this road of questioning that I
15 stayed away from the venue some because I was very
16 uncomfortable at that event and that it was
17 penetrated. And I told you that before we even went
18 down this road, didn't I?
19 So it would not shock me that the
20 government or people working for the government
21 would try to get people on the platform to discredit
22 the event and Mr. Lindell.
23 Q. What about Mark Cook? Are you familiar
24 with Mr. Cook?
25 A. I'm not sure if I know that name.

Page 210

1 Draza.
2 A. Yes.
3 Q. Lisa Draza.
4 A. Yes. She was there. I think that was my
5 first introduction to her.
6 Q. Okay. What --
7 A. Again, it's possible I interviewed her on
8 a show before the symposium.
9 Q. Okay.
10 A. If that -- if that's the case, so be it.
11 But I believe, my recollection now is, that was the
12 probably the first time I became aware of her when
13 she was on the platform, making a presentation,
14 which I was there for that. I think I was up -- I
15 think I was up in the balcony area that overlooked
16 the floor and stage.
17 Q. And Phil Waldron?
18 A. Correct. I know him, and I think -- I
19 would have interviewed him before that because I
20 think he's in -- is he not in Absolute Proof?
21 Q. I believe so. Yeah.
22 A. Yeah.
23 Q. Yeah. And he also works very closely with
24 Patrick Byrne and has for quite some time. Are you
25 aware of that?

Page 212

1 Q. No? Okay.
2 A. And again, my passion is not directed at
3 you personally, Brad.
4 Q. I understand.
5 A. My passion is I don't appreciate my
6 government trying to interfere with events, free
7 speech, rightful educational purposes, are trying to
8 destroy individuals, whether it be myself of Mike
9 Lindell or anyone else. I don't appreciate my
10 government doing that.
11 Much less do I appreciate my government
12 giving awards to known Jihadis or people tied to
13 Jihadis.
14 Q. The only --
15 A. Which isn't a shocker that some of these
16 same government individuals are flying around with
17 reported pedophile Jeffrey Epstein on his plane.
18 Wow.
19 Q. My only concern is getting through the
20 material that we have to get through so we can all
21 go home. So I'm just trying to keep us on target.
22 A. I hear you.
23 Q. Lisa Draza, do you know who that is?
24 A. Dr. Draza?
25 Q. Yeah. I've heard her referred as Lady

Page 211

1 A. Yes. I think was I aware of that, along
2 with Russ Ramsland?
3 Q. Yes.
4 A. Yeah.
5 Q. Okay.
6 A. Again, I don't -- and I'm not -- I don't
7 have any particular beef with Mr....
8 Q. Byrne.
9 A. Byrne. I just -- it's just a gut feeling.
10 Q. Okay. What about Conan Hayes?
11 A. What about him?
12 Q. Were you aware that he was on the red
13 team?
14 A. I don't think I was aware he was on the
15 red team. I was probably told at some point, he was
16 on the read team.
17 Q. Okay. Had you ever met him before, or
18 have you met him ever?
19 A. Yes.
20 Q. Okay. When did you meet Mr. Hayes?
21 A. I believe -- are you talking about Cohen
22 [sic]?
23 Q. Yeah.
24 A. I believe -- does he have a nickname too?
25 Q. Probably. I'm not aware of it. But I

Page 213

54 (Pages 210 - 213)

1 know he was a professional surfer prior to all this.
2    A.  I think you're exactly right.  Had a
3 clothing line or something and all that?  Yeah,
4 yeah, yeah.
5        He, I think, came to our studio, was in
6 the studio for a few days, in our studio for a few
7 days.  Can't remember what -- whether -- it wouldn't
8 have been for Absolute Proof, I don't think.
9        It could have been for the launch of
10 FrankSpeech and that event and when we were
11 finishing up -- when we were finishing up Absolute
12 Interference.
13        Is he not in one of the documentaries and
14 he's in dark -- in the dark?
15    Q.  He may -- well, I don't know.
16    A.  See now, I'm the director.
17    Q.  There are people who are in the dark on a
18 few of those.  So I'm not sure who they all are.  I
19 presume that he's --
20    A.  Were they in the physical dark, or are
21 they --
22    Q.  Yeah.
23    A.  -- in the dark?  You know what I'm saying?
24 The point I'm making is, here I am producing or
25 directing the film, and I'm asking you who was in

Page 214

1 it.
2    Q.  Yeah.
3    A.  Because it all becomes a blur.
4    Q.  Yeah.  I believe you said before that
5 Mr. Hayes works for Mr. Lindell now?  Is that your
6 understanding?
7    A.  Who are we talking about?
8    Q.  Conan Hayes.
9    A.  See, I don't know him.  I don't even know
10 him as the name Cohen.  Cohen -- Conan?
11    Q.  Yeah.
12    A.  Conan.  Does he work for Mr. Lindell?
13    Q.  That's what I'm asking you.
14    A.  I think he might.
15    Q.  Okay.  What does he do for Mr. --
16    A.  I don't know.
17    Q.  Okay.
18    A.  Obviously, he would probably do, if I can
19 -- if you want me to guess, he probably does
20 something related.
21    Q.  Were you aware of Mr. Conan -- Mr. Hayes's
22 involvement in the -- with Tina Peters in Mesa
23 County?
24    A.  I'm sure I probably heard that somewhere.
25    Q.  Okay.  Are you aware that he was the

Page 215

1 individual who infiltrated Mesa County clerk's
2 office under an alias?
3    A.  I don't know if I was -- am aware of that
4 or not.
5    Q.  Okay.  Do you know that he took the images
6 of the Mesa County election systems utilizing a fake
7 name?
8    A.  I don't think I was aware of that.
9    Q.  Okay.  Do you know that he was FaceTiming
10 with Patrick Byrne while doing that?
11    A.  I don't think I know that.
12    Q.  Okay.
13    A.  You have to understand, again, I run a TV
14 network.  I'm not involved in all of the research of
15 computer code and who's doing -- you realize I'm on
16 television four hours a day.  Do you know how many
17 hours it takes to prepare for four hours of live TV
18 a day and radio?
19    Q.  Sure.  Well, you've had Tina Peters on as
20 a guest many times.
21    A.  Correct.  But that doesn't -- correct.
22 I've had her on many times.  But that doesn't mean
23 I'm privy to all this information or even if I
24 happen to get looped into a conference call where
25 it's being discussed, that I am even seeking to try

Page 216

1 to remember it.
2        Because for the volume of information that
3 I obtain every day, I have to deliberately not try
4 to retain certain information so that I can
5 concentrate on what it is I do need to remember to
6 go on TV that day.
7        So there are some conversations that I get
8 looped into or conference calls.  Things get
9 discussed, and I have zero interest of what's being
10 discussed right now and may not even be paying
11 attention.  I may even actually be reading more
12 articles to get ready for TV.  I may be texting a
13 guest.
14        I can be involved in conversations where
15 things are being talked about, and it can even be on
16 a Zoom call and being recorded.  That doesn't mean
17 that I'm paying attention or even processing what's
18 being said or absorbing or even trying to absorb
19 what's being said.
20        So I have to be careful when I answer your
21 questions because I don't always know who it is I've
22 been looped into a call with.
23    Q.  Okay.  Just a courtesy reminder for Korian
24 here, if you could please speak slowly.  She's --
25 she's doing -- she's doing an incredible job over

Page 217

55 (Pages 214 - 217)

1 here, but try to keep in mind.
2     So did you know that Conan Hayes flew to
3 the symposium on Mr. Lindell's jet --
4     A.  That, I knew.
5     Q.  -- with Tina Peters?
6     A.  I don't know if I knew he flew with Tina.
7 But I -- but I did hear a story about some
8 conversations that took place on the jet.
9     Q.  Okay.  Well, what story did you hear?
10    A.  Just -- I just heard there was some tense
11 conversation.
12    Q.  Tense in what way?
13    A.  I don't -- I can't remember the details.
14 I just know that there -- I heard there was a tense
15 conversation on the plane that involved Cohen.
16    Q.  Was Dennis Montgomery at the symposium?
17    A.  If he was, I wasn't aware.
18    Q.  Do you know why he wasn't?
19    A.  I would think that would be dangerous for
20 him if he had some kind of government what he can
21 and cannot do.
22    Q.  Okay.  Had you heard that Mr. --
23    A.  Have you heard he was there?
24    Q.  Well, I heard that he was supposed to be
25 but that he had a stroke.

Page 218

1     A.  I heard he had a stroke too.
2     Q.  Okay.  Do you know if that's true?
3     A.  I don't.
4     Q.  Okay.  When did you first hear of Tina
5 Peters?
6     A.  I believe I first heard of Tina Peters
7 right before the symposium or at the symposium.  I
8 think that was thrown together very, very quickly.
9 I mean, you would probably know from your research
10 in the investigation how.  But I think that whole
11 Tina Peters thing got thrown together at the event,
12 and he sent his plane to go get her.
13    Q.  Okay.
14    A.  That's how I remember it.
15    Q.  But you -- prior to that time, you weren't
16 involved in any conversations about trying to get
17 the Mesa County data, for example?
18    A.  Me?
19    Q.  Yeah.
20    A.  Not that I'm aware of.  I mean, why would
21 I have a conversation like that?  I don't know how
22 to get data.  I'm doing good to use my phone.
23    Q.  Well --
24    A.  I have to ask my teenagers with help for
25 that sometimes.

Page 219

1     Q.  Yeah.  Do you know if folks on the red
2 team were getting paid to present at the
3 symposium --
4     A.  I don't.
5     Q.  -- or to do their --
6     A.  I don't.
7     Q.  If I told you that Josh Merritt testified
8 that he was offered $30,000 for the three days
9 there, would that surprise you?
10    A.  I don't know if it would surprise me or --
11 I mean, isn't he the one that's accused of betraying
12 Mr. Lindell?
13    Q.  Yes.
14    A.  Then I would take everything he said with
15 a grain of salt.
16    Q.  Do you know -- well, were you paid for
17 being at the symposium?
18    A.  Was I paid for being at the symposium?  I
19 would have to check?  I was paid.  I don't know if I
20 was paid a flat fee or paid by Pillow codes.  I'd
21 have to check.
22    Q.  Okay.  Well, that raises a general
23 question.  How are you paid?  By --
24    A.  Generally in American currency, I prefer.
25    Q.  Sure.  Yeah.  Let me -- let me clarify

Page 220

1 that a bit.  So it's not a wampa?
2     A.  No -- no bitcoin.
3     Q.  Well, you just raised an interesting
4 question whether you're paid directly or by Pillow
5 codes.  Are you paid in Pillow codes, and what does
6 that mean?
7     A.  When I began working with Mr. Lindell, I
8 was paid for doing the documentary as a contractor,
9 Absolute Proof.  I was paid for doing the
10 documentary Scientific Proof and Absolute
11 Interference.
12       And then once I became -- began to help
13 him develop what became Lindell TV, I began to be
14 paid largely and predominantly off of Pillow codes
15 that are used exclusively on Lindell TV so we can
16 track sales.
17    Q.  So your compensation then is -- is
18 directly tied to the pillows that are sold using
19 the -- utilizing promo codes --
20    A.  Correct.
21    Q.  -- from programs?
22    A.  Correct.  They would be considered -- My
23 Pillow would be considered a sponsor and advertiser
24 just the way a gold company that we work with or,
25 you know, some other company we work with.

Page 221

56 (Pages 218 - 221)

1    Q.  But you don't have like a -- you're not a
2  salaried -- I know you're a 1099.  But you don't
3  have like a set rate that you're -- you charge on a
4  monthly basis, for example?
5    A.  Not yet.
6    Q.  Okay.  Okay.  Do you know what My Pillow's
7  involvement was with the Cyber Symposium?
8    A.  I don't.
9       MR. MALONE:  Objection, foundation, form.
10  Sorry, Brannon.
11       THE WITNESS:  Uh-huh (affirmative
12  response).
13  BY MR. KLOEWER:
14    Q.  Who is David Clements?
15    A.  Professor David Clements is supposedly a
16  professor.
17    Q.  Of what?
18    A.  I don't know.  I think mathematics, but
19  I'm just guessing at this point.
20    Q.  Okay.
21    A.  Do you know?
22    Q.  Well, he's claimed to be a law professor.
23    A.  Okay.  That's right.  He claims to be a
24  law professor.  Thank you.
25    Q.  But he was a teacher at the University of

Page 222

1  New Mexico State, which doesn't have a law school or
2  law department.
3    A.  Huh.  That's interesting.
4    Q.  He's no longer employed there.  Were you
5  familiar with his podcast Professor's Record?
6    A.  I might have been.  I don't know.
7    Q.  Okay.  Have you ever met Mr. Clements?
8    A.  Yes.
9    Q.  Okay.
10    A.  I think the first time I met him was at
11  the Cyber Symposium in August.
12    Q.  Did you know him by reputation prior to
13  that time?
14    A.  Not that I'm aware of.
15    Q.  Okay.  Do you -- are you still in contact
16  with Mr. Clements?  Has he ever been on your show,
17  for example?
18    A.  I believe -- yes.  He's been on my show.
19    Q.  Okay.
20    A.  I think I actually saw him in person.
21  Last time I saw him in person was at the event in
22  August in Springfield, Missouri.  He was there at
23  that, I believe.
24    Q.  Is that the Moment of Truth Summit?
25    A.  Yes, sir.

Page 223

1    Q.  And do you know how Mr. Clements found his
2  way on stage at the symposium?
3    A.  No, sir.
4    Q.  Because he and Oltmann ended up presenting
5  a number of times at the symposium.  Are you aware
6  of that?
7    A.  I did -- I didn't know they were -- I'm
8  not sure I knew -- I'm not sure I know they
9  presented numerous times.

Page 224

18    Q.  Okay.  Did he attempt to exercise any
19  control over who was on stage?
20    A.  When he was around.  But there was times
21  he was being dragged for what seemed to be a lot of
22  pressing issues in another room.
23    Q.  Okay.
24    A.  But you will notice I think his voice -- I
25  think he started getting hoarse at the event because

Page 225

57 (Pages 222 - 225)

1 he was on stage talking so much.
2     Q.  Do you know what pressing issues were
3 taking him away?
4     A.  I think -- I think some of them were to
5 Tina Peters coming there.
6     Q.  Do you know -- did you hear any concerns
7 about people demanding the five million dollar
8 award?
9     A.  I heard -- I didn't hear any concerns
10 about them demanding.
11     Q.  Or people claiming it or believing that
12 they were entitled to it?
13     A.  I can't remember.  I can't remember if I
14 heard it at that event then.  Are you talking about
15 at the actual event?
16     Q.  Yeah.
17     A.  I can't remember if anyone claimed they
18 deserved it then.
19     Q.  So let --
20     A.  I think I heard people saying the data
21 wasn't from the 2020 election, but I think they had
22 to prove it wasn't from the 2020 election.

██████  ███████████████████████████████
████████████████████████████████████████
███████████████████

Page 226

███████████████████████████████
██████████████████████████████████
████████████████████████████████████████
████████████████████████

6     Q.  Do you know why he didn't show up
7 ultimately?
8     A.  I do not.  I think this is the first time
9 I'm hearing about it.
10     Q.  Okay.
11     A.  I think I see where I'm listed to sing the
12 National Anthem, but I think I only did it one time.
13 I don't think I did it Day Three.  I think I only
14 did it one time.
15     Q.  Okay.
16     A.  So what I'm trying to say is I don't think
17 this schedule was being followed.
18     Q.  Right.  And that's not -- I'm not trying
19 to tie up in anything there.  Every witness has
20 testified that the scheduled was not followed.  I'm
21 just trying to figure out why.
22     THE WITNESS:  Brad, can I get a Coke?
23     MR. KLOEWER:  Yeah.  We can go off the
24 record.
25     MR. GREER:  Let's take a short one.

Page 227

1     MR. KLOEWER:  Yeah.
2     VIDEO SPECIALIST:  This ends Media Number
3 3.  Going off the record at 1:00 p.m.
4     (SHORT BREAK)
5     VIDEO SPECIALIST:  This begins Media
6 Number 4.  Going back on the record at 1:09 p.m.
7 BY MR. KLOEWER:
8     Q.  Okay.  All right.  Mr. Howse, when we took
9 off last time, we were talking about the Cyber
10 Symposium and many of the events leading up to it.
11     I want to show you some of the footage
12 from that event now and ask you a couple follow-up
13 questions on that, as well.  So we're going to take
14 a look now at what's been previously labeled as
15 Exhibit 3, Clip 8.
16     Now, I know you were in and out of the
17 symposium.  I don't know if you were present for
18 this or not, but I'll -- we'll take a look, and I
19 will ask you -- sorry.  Let me get this prepared
20 before we launch right into.
21     I'll just represent before we start, this
22 is a panel discussion on stage at the Cyber
23 Symposium.  From left to right, it includes Joe
24 Oltmann, Pat Colbeck, David Clements, Phil Waldron,
25 Josh Merritt.  I'll start this here.

Page 228

1     (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
2 PLAYED.)
3 BY MR. KLOEWER:
4     Q.  Okay.  Were you present for that
5 conversation?
6     A.  I -- if I was, I was up in the balcony.
7     Q.  Okay.  So you don recall --
8     A.  I don't recall.
9     Q.  Do you recall --
10     A.  And I may not have been there.  That may
11 have been one of the times I was away.
12     Q.  Okay.  And if I understand your prior
13 testimony correctly, you don't --
14     A.  But I could have also been standing
15 backstage.  I just don't remember what.
16     Q.  Do you know who organized that panel
17 discussion?
18     A.  I do not.
19     Q.  Okay.  Couple questions here.  Were you
20 aware at the time that Mr. Oltmann was skipping a
21 court-ordered deposition in Denver on that same day?
22     A.  No.
23     Q.  Were you aware that he had argued to the
24 Court that he couldn't appear because he was afraid
25 of catching COVID?

Page 229

58 (Pages 226 - 229)

1    A.  No.
2    Q.  Are you aware that Mr. Oltmann has been
3 sanctioned over $50,000 for refusing to provide
4 testimony or evidence to support his claims?
5    A.  I don't think I know that.
6    Q.  Okay.  When he says the Antifa Judge, do
7 you know who he's referring to there?
8    A.  I wondered that myself.
9    Q.  You haven't seen any evidence to
10 support --
11    A.  No, I have not.
12    Q.  Okay.  Have you seen any reporting about
13 the first antislap hearing in Mr. Oltmann's case in
14 October of 2021?
15    A.  Have I seen what?
16    Q.  Yeah.  Did you see any reporting
17 about those --
18       MR. GREER:  I don't think he knows what
19 that is.
20 BY MR. KLOEWER:
21    Q.  Okay.  So --
22       MR. KLOEWER:  Thank you.
23 BY MR. KLOEWER:
24    Q.  Were you ware of the -- how can -- how can
25 I put this?

Page 230

1 I mean, that would be very concerning.  So I'm
2 pretty sure I would remember that.
3    Q.  Okay.  So you --
4    A.  Because I don't talk like that --
5    Q.  Right.
6    A.  -- on my broadcast.
7    Q.  I know you don't.  That's why I'm
8 surprised --
9    A.  How do you know I don't?
10    Q.  I watch your show with some frequency.
11    A.  What do you think?
12    Q.  Well --
13       MR. GREER:  Brad tunes in every night.  He
14 can't say it here, but he tunes in every night.
15    A.  So you do -- you do -- you appreciate the
16 level of professionalism I do?
17 BY MR. KLOEWER:
18    Q.  I appreciate the extent to which you
19 interview sources for your stories.  Yes.
20    A.  And I'm pretty much here in person the way
21 I'm on the air.  Right?
22    Q.  Yes.  Let's see.  Sorry.  I'm trying to
23 stay focused on the question here.
24       Do you follow Joe Oltmann on Telegram or
25 on Twitter?

Page 232

1       MR. GREER:  Why don't you explain
2 antislap.
3       MR. KLOEWER:  Sure, sure.  Yeah.  I don't
4 really need to get into it.
5 BY MR. KLOEWER:
6    Q.  I just want to know if you have done any
7 research on Mr. Oltmann's -- the case against him
8 and specifically if you were aware of the massive
9 security presence that was required at the
10 courthouse for his hearing in October of 2021?
11    A.  No.  I'm not aware of that.  Why would he
12 need massive security?
13    Q.  Well, he had called for patriots to
14 surround the courthouse, for example.
15       Are you familiar with Mr. Oltmann's
16 various publications calling for violence against
17 his political adversaries?
18    A.  No, I'm not.
19    Q.  Have you seen reporting about him calling
20 for the governor of Colorado to be hung?
21    A.  I don't think I've seen that.
22    Q.  Have you seen him on his podcast say that
23 leftists should be dragged behind people's cars
24 until their limbs fall off?
25    A.  No.  I don't think I would have seen that.

Page 231

1    A.  I don't -- I don't think I do.  Now, I
2 don't run my Twitter.
3    Q.  Okay.
4    A.  So and if I have Telegram, and I don't
5 know if I do, I don't run that either.  I mean, you
6 can even look on my phone and tell if I even have
7 Telegram on my phone.  I don't even know if I have
8 Telegram on my phone.
9       MR. GREER:  I'll be honest, I don't know
10 how to use it.
11    A.  So I mean, I could call my gal that
12 handles all that and ask her if I have Telegram and
13 I'm following him.  But again, I have a gal, Annie,
14 who runs a lot of my social media for me.
15 BY MR. KLOEWER:
16    Q.  Are you --
17    A.  I used to run my Twitter.  But since
18 getting so busy the last few years, I turned that
19 over to her.
20    Q.  Are you aware that Mr. Oltmann has
21 repeatedly stated that Dr. Coomer could be put to
22 death for treason?
23    A.  I don't think I am aware that he said
24 that.
25    Q.  Okay.  So if you --

Page 233

59 (Pages 230 - 233)

Page 234

1    A.  I mean, I do know that people make those
2  kind of comments all the time because that's one of
3  the stipulations with treason I guess could be done.
4  But I'm not -- I don't follow Mr. Oltmann, if I
5  could be blunt.
6        When I walk into the control room and see
7  he's on Channel 2 of Lindell TV, I seize up there.
8    Q.  Okay.
9    A.  But...
10    Q.  Are you -- you're aware that his company
11  runs FrankSpeech now, aren't you?
12    A.  I am aware of that now.
13    Q.  Okay.  All right.  So going back to the
14  conversation here, do you have any idea why this --
15  this information would be presented at the
16  symposium?  Because the way you described it before,
17  it doesn't seem like this was -- would have been
18  relevant to what you thought that was supposed to be
19  about.
20    A.  Yeah.  I have no idea why that was
21  presented.
22    Q.  Okay.  Let me show you another clip here
23  real quick.  We're going to look at Clip 7 or
24  Exhibit 3, Clip 7.  It's from the same discussion.
25  This is a shorter clip.

Page 235

1        (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
2  PLAYED.)
3  BY MR. KLOEWER:
4    Q.  So I think you testified before you've
5  never watched the first episode where he accused
6  Dr. Coomer of rigging the election, the first
7  episode of Conservative Daily, November 9th?
8    A.  When -- I don't...
9    Q.  It was November 9th of 2020.
10    A.  No.  I don't think I ever watched that.
11    Q.  You just heard Mr. Oltmann say he would
12  never, ever, ever accuse somebody if he wasn't
13  absolutely sure.  Did you hear him say that?
14    A.  I did.
15    Q.  Okay.  I'm going to show you, just real
16  quick, a couple clips here of Mr. Oltmann from that
17  first episode.  I'm going to show you what's been
18  previously labeled as Exhibit 18, Clip 2.
19        And I'll represent to you this is from
20  that first November 9th episode where he first
21  identified and accused Dr. Coomer of rigging the
22  election.
23    MR. GREER:  I'm sorry, Brad.  What was
24  that?
25    MR. KLOEWER:  This is November 9th.

Page 236

1        (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
2  PLAYED.)
3    MR. KLOEWER:  I apologize.  I'm playing
4  the wrong clip.
5    MR. GREER:  Who's Joe Otto?
6    MR. KLOEWER:  This was an alias that
7  Mr. Oltmann was using --
8    MR. GREER:  Oh, that's right.
9    MR. KLOEWER:  -- until the next day.  Yes.
10  He had been operating under an alias as a co-host of
11  the show until he came forward with his claims.
12    A.  That was my question, who's Joe Otto?
13  BY MR. KLOEWER:
14    Q.  Yes.  My understanding is that he wanted
15  to remain anonymous as a co-host of this show prior
16  to this time.  And after accusing Dr. Coomer, there
17  was so much press coverage that he reveals his
18  actual identity.  I apologize.  I'm --
19    A.  Revealed his what?
20    Q.  His real identity.
21    A.  Oh, I thought you said revealed his sexual
22  identity.  I was like, wow, I should tune on about
23  that.
24    MR. GREER:  What's the exhibit number?
25    THE WITNESS:  I don't want to picture him

Page 237

1  in high heels and all that.
2    MR. KLOEWER:  This is Exhibit 18.  And I
3  was mistakenly playing Clip 3.  What I intend to
4  play is Clip 2 from Exhibit 18.
5    MR. GREER:  Got it.
6    MR. KLOEWER:  And I'll play that right
7  now.  This is a short one.
8        (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
9  PLAYED.)
10  BY MR. KLOEWER:
11    Q.  Okay.  So there we have Mr. Oltmann
12  admitting for the first time that he can't identify
13  Dr. Coomer.
14        I'm just going to ask you this, and I know
15  it's going to be asked and answered.  This is the
16  first time you've seen that.  Correct?
17    A.  I believe this is the first time ever
18  seeing these.
19    Q.  Let's play Clip 5, also Exhibit 18.
20    A.  When did those air?
21    Q.  This was November 9th of 2020.  And --
22    A.  Well, November 9th of 2020, I wasn't even
23  working with Mike Lindell at that point.
24    Q.  Right.  I'm just wondering if you
25  conducted any investigation into Dr. -- into

1 Oltmann's claims about Eric Coomer, if you went back
2 to the source at any point. Let's look at Clip 5.
3      (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
4 PLAYED.)
5 BY MR. KLOEWER:
6    Q.  First time you've seen that clip?
7    A.  I believe it is.
8    Q.  Last one from that. I'm going to play for
9 you Clip 6, Exhibit 18.
10      (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
11 PLAYED.)
12 BY MR. KLOEWER:
13    Q.  Okay. First time you've seen that clip,
14 as well?
15    A.  I believe that is the first time I've seen
16 that.
17    Q.  Okay. Have you ever discussed Joe Oltmann
18 with Mike Lindell?
19    A.  Yes.
20    Q.  And do you know if Mr. Lindell is familiar
21 with these claims --
22    A.  I don't know.
23    Q.  That he discussed, the Antifa calls
24 claims?
25    A.  I don't know.

Page 238

1      But I don't -- I don't have time to check
2 out Twitter unless I'm doing research.
3    Q.  Okay. So you didn't see just a couple
4 days ago, for example, when he asked his followers
5 to buy guns and to buy ammunition and to link up
6 with other people who are also armed?
7    A.  I did not see that.
8    Q.  Okay. You haven't seen him call for
9 firing squads?
10    A.  I have not heard that.
11    Q.  Okay. Let's go back to the symposium.
12 I've got another clip from there Mr. Clements.
13 Let me get my numbers straight here.
14      This is Exhibit 43 and what's been
15 previously labeled as Exhibit 43. And where is -- I
16 apologize for the mix-up here.
17      Exhibit 43, Clip 4. Okay. Similar story
18 before. I don't know if you were present for this
19 presentation, but we'll take a look, and you can let
20 me know afterwards.
21      (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
22 PLAYED.)
23      MR. KLOEWER: Let me expand this because
24 the images on the screen are important for this one.
25      (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS

Page 240

1    Q.  Okay. You haven't -- that's not what you
2 discussed with him? Let me clarify my question.
3      Have you discussed these allegations that
4 Dr. Coomer was on an Antifa call with Mr. Lindell?
5    A.  I don't believe I have discussed that with
6 him. We could have, but I don't recall ever
7 discussing those things with him.
8    Q.  And I asked you a moment ago if you were
9 aware that Mr. Oltmann had -- has repeatedly stated
10 that Dr. Coomer could be put to death for treason.
11      Have you ever discussed Mr. Oltmann's
12 threats in general?
13    A.  I don't think I was aware of any threats
14 till today.
15    Q.  Okay. And we've established you don't
16 follow his social media.
17    A.  I do not.
18    Q.  Okay.
19    A.  I mean, if the gal that runs my social
20 media has chosen to follow him, so be it. If you
21 want to ask the question would I choose to follow
22 him, I don't -- I wouldn't choose to follow him. If
23 I found out later that we had followed him to see
24 what he was up to or someone had on my team, fair
25 enough.

Page 239

1 PLAYED.)
2 BY MR. KLOEWER:
3    Q.  The man that pulled the trigger. Have you
4 seen this presentation before?
5    A.  I don't believe I have. I mean, it's
6 possible I was up in the balcony, but the balcony
7 had -- it was a suite. So it had a kitchenette and
8 a microwave.
9      And so a lot of times, I was back -- you
10 had to go out on to the balcony. So a lot of times,
11 I was back in the suite, working on my computer,
12 talking to my wife.
13      That's if I was there at that time. I
14 could have been backstage by the switchers, talking
15 to my son and my team.
16      I could have been out to a meal at that
17 point. I just don't -- I don't even know what day
18 that was. So I don't recall that presentation.
19    Q.  Had you ever seen that presentation
20 before? And what I mean is the PowerPoint.
21    A.  I think this is the first time I've ever
22 seen the presentation.
23    Q.  All right. So this vote trafficking
24 parable, you weren't involved in any discussions
25 beforehand we're going to put this on stage at the

Page 241

61 (Pages 238 - 241)

Page 242:

1 symposium?
2     A.   No, sir.
3     Q.   Okay.  All right.
4     A.   Remember, I'm very much coming from the
5 standpoint of television production, interviewing
6 people.  I don't -- you know, as we've already
7 discussed, I'm not sure who was putting the schedule
8 together, deciding what went on the stage.
9          My role was really to be just filling
10 time.  When they went from the live stage and they
11 needed to reset, they were going to throw it to me
12 to a news desk that was set up on the floor that I
13 did interview Steve Bannon from I think the night
14 before the conference started or something.
15          And so they would have thrown it to me
16 where I would have interviewed a state
17 representative or somebody there, giving them time
18 -- giving the audience something to watch while they
19 reset the stage and got the next group.
20     Q.   Okay.
21     A.   And that was supposed to be this kind of
22 back and forth.  That got scratched -- scrapped
23 along with the schedule when -- I think it was
24 because again fear they were -- the group event had
25 been penetrated.

Page 244:

12     Q.   Okay.  Were you aware that the event was
13 being promoted as a FrankSpeech affiliated event?
14     A.   Yes.  I think that was the -- yeah.  I
15 think it was exactly what it was.
16     Q.   And why was that?
17     A.   I mean, that was what's on the back --
18 banners and everything.
19     Q.   Right.  Yeah.  So my question is, do you
20 know, was FrankSpeech trying to promote itself by
21 putting on this symposium?
22     A.   I think they were trying to make people
23 aware that they were now up and running and offer
24 this as a public service.
25     Q.   And FrankSpeech live stream --

Page 243:

1     Q.   Was -- was the Cyber Symposium a big event
2 for FrankSpeech?
3          MR. MALONE:  Object to form, foundation.
4          MR. GREER:  You can answer the question.
5          THE WITNESS:  Oh.
6     A.   Was it a big event in what way?
7 BY MR. KLOEWER:
8     Q.   Well, it seems to me that this was the
9 first big event for FrankSpeech.  I'll just show --
10     A.   I think our launch was -- was a big event.



Page 245:

1     A.   Educational.
2     Q.   Right.
3     A.   You know, I think the goal was to try to
4 educate the public, educate legislators.
5     Q.   Did -- FrankSpeech live streamed the
6 entire event, didn't they or did they?
7     A.   I think they did.
8     Q.   Yeah.
9     A.   I mean, that's that we were to there to do
10 was to set up our cameras, run our switchers and
11 stream it.
12     Q.   Okay.
13     A.   I mean, it did go down at times.
14     Q.   Right.  Well, you had millions of viewers.
15     A.   Right.
16     Q.   So perhaps, not surprising.  In your mind,
17 looking back --
18     A.   That's actually a very good point.  In
19 other words, you understood that there was a lot of
20 people hitting things that would cause your -- your
21 CDN, your content delivery network, to have a
22 problem.
23     Q.   Right.  In retrospect, when you think
24 about the Cyber Symposium, do you consider it to be
25 to have been a success in your mind?

1    A.   I believe it was a success in that
2 there -- everyone will define success differently.
3 But I believe it was a success in that it caused a
4 lot of members of the legislators around the country
5 who showed up to go back to their states and begin
6 to introduce legislation.
7        I have had several conversations with
8 people that that for them was the moment they
9 started really getting involved.  Whether they were
10 there in the building or watching, that was when
11 they really started getting involved in studying
12 what was going on in their state, in their precinct,
13 in their county.  And many of the legislators, I'm
14 told, that was when they -- and the citizens
15 activists, that was when they really started
16 organizing to get structure -- tougher laws,
17 stricter laws, more transparency to make sure the
18 elections were secure and audible.
19    Q.   Maybe I asked this before.  But were you
20 involved in plans to invite all those legislators to
21 be there?  Was that something that you proposed or
22 supported?
23    A.   I supported it.
24    Q.   Okay.
25    A.   I mean, I support anybody coming there to

Page 246

1 learn more about how to make elections more secure
2 and more audible and transparent.  So yes, I would
3 definitely -- I don't know that I -- I don't know
4 what you mean by encouraged -- encouraged it.  But
5 would I go on the air and say, yeah, if you're a
6 state legislator, if you'd show up, be there.
7        But again, it wasn't up to the public, I
8 don't think.  I think you had to be invited.
9    Q.   Right.
10    A.   So I think we may have encouraged -- if
11 you're asking me did I go on the air and encourage
12 legislators if they want to come to the event, to
13 follow the process to register, we probably -- I
14 probably was involved in promoting it that way as an
15 educational legislative briefing.
16        Because I think we also had members of the
17 legislature speaking, of various legislators.
18    Q.   Right.  Yeah.  I believe there were.
19 And --
20    A.   You have to understand, Brad, that there's
21 a difference between what the event was supposed to
22 be and what the event became.
23    Q.   Well, yes.  That much has become clear to
24 me, which is part of why I'm asking all these
25 questions --

Page 247

1    A.   Yeah.  I get that.
2    Q.   -- about how all this Eric Coomer content
3 made its way on stage.
4    A.   Uh-huh (affirmative response).
5    Q.   I don't know if we discussed this before
6 with respect to the video of Dr. Coomer that was
7 included in Absolute Proof.  But do you know what
8 Dr. Coomer's job was with Dominion Voting Systems?
9    A.   Other than what I think is in a video clip
10 on -- is he not in a video clip in the documentary
11 Absolute Proof?
12    Q.   He is.  Yeah.
13    A.   So I think that's a Dominion produced
14 clip.  Right?
15    Q.   Well, that's -- my understanding is that
16 video was taken by the Cook County --
17    A.   Okay.
18    Q.   -- in Illinois, and it's just housed on
19 their public server --
20    A.   Okay.
21    Q.   -- as a public hearing.
22    A.   And I think it may have his name and title
23 under there?
24    Q.   Yes.
25    A.   So that would be where I would have

Page 248

1 understood what his name and title were.
2    Q.   Okay.  So what I mean to get at is
3 Mr. Oltmann also discussed something called the
4 adjudication function of the machines.  Do you know
5 what that is?
6    A.   Adjudication is I believe when a ballot
7 cannot be properly read or the intent of the voter
8 cannot be read or deciphered, it goes to what's
9 called adjudication, where I think there's supposed
10 to be a Republican and a Democrat that then examined
11 the ballot and decide what was the intent of the
12 voter.  I think that's what's called adjudication.
13    Q.   Wow.  That's the best answer I've gotten
14 from any deponent on that question.  You know what
15 adjudication is.  Impressive.
16    A.   This is my job.
17    Q.   Yeah.  That's correct.  Are you familiar
18 with Dr. Coomer's involvement in securing patents to
19 improve the adjudication process?
20    A.   I have -- I have heard that he had
21 patents.  I can't say that -- prior to day -- to
22 today, if you would have asked me what kind of
23 patents he had, I'm not sure I could have said what
24 kind of patents he had.
25    Q.   Okay.  Well, that Halderman report I gave

Page 249

63 (Pages 246 - 249)

1 you before has a long section on that. So you
2 can --
3     A. Okay.
4     Q. -- freshen up on that after the
5 deposition.
6     A. I can take it with me?
7     Q. Sure.
8     A. Is that public yet?
9     Q. No. It's still labeled confidential.
10    A. Okay.
11    Q. But you are subject to the protective
12 order.
13        MR. GREER: You just can't share it with
14 anybody.
15        THE WITNESS: Okay.
16        MR. GREER: You can discuss it with me but
17 no one else.
18    A. I'll probably just leave it all with you.
19 BY MR. KLOEWER:
20    Q. What I'm getting at -- what I was getting
21 at with my prior question, you've seen an instance
22 of Dr. Coomer's presenting Dominion voting machines
23 technology to local legislatures in the form of that
24 video from Cook County that was included in --
25    A. I have seen that. Yes.

Page 250

1     Q. Yes. So what I'm saying is that part of
2 his job was to travel the country and to sell
3 Dominion products to state legislators, the same
4 folks who were invited to the Cyber Symposium.
5        Do you know -- I realize you may not have
6 been involved in this part of it. But do you know
7 how many state legislators actually came to the
8 Cyber Symposium?
9     A. I'm sure I heard the figure at one point.
10 But I think every state was represented, was it not?
11    Q. I'm not sure in terms of physical
12 attendance. That's what I'm wondering if you know.
13    A. I'm sure the number was thrown out, but I
14 can't remember how many. But I know a number was
15 thrown out.
16        In fact, at the end of the event, I think
17 they had all the state legislators -- members of
18 the -- members of the legislatures line up at the
19 end of the event and then talk about what they
20 learned and why they were glad they were there.
21        That part, I was there for. I remember
22 that part. Because I did thought -- I thought it
23 was kind of impressive the line was as long as it
24 was.
25    Q. I've seen invitations to representatives

Page 251

1 from every state. I don't know the extent to which
2 these invitations were accepted.
3        As far as -- so my prior question was, do
4 you view this symposium as a success. And you said
5 yes because it got these state legislators --
6     A. Tuned in.
7     Q. Tuned in?
8     A. Tuned in to studying the issues of
9 elections, security of elections, the audit -- the
10 ability to audit an election, the transparency of
11 election, how an election works.
12        You know, I think a lot -- I think one of
13 the things I've learned in this whole process is
14 that a lot of Americans, including elected
15 officials, don't know how the election process
16 really works.
17    Q. I'll have this question again with some
18 future clips. But Mr. Oltmann was on stage talking
19 about how he'd been sued for defamation. And you
20 knew that he had been sued for defamation months
21 before that time.
22        Did it concern you that he was on stage
23 repeating the same allegations?
24    A. I don't know that I knew he was on stage
25 doing that.

Page 252

1     Q. Okay.
2     A. Because remember, I wasn't there a lot of
3 the time. And if I was, I was backstage, and it was
4 hard to hear.
5        Have you ever been backstage of a
6 auditorium and you got that sound going out and
7 bouncing around? It gets very hard to hear what's
8 going on on the stage unless they put in a speaker
9 system or monitor system on the floor back there
10 that's kicking it back to you, which is why a lot of
11 speakers will have a monitor -- you'll see the
12 president sometimes will have a monitor with his own
13 voice coming back at him standing at the podium. So
14 it will ground his speech because he's hearing it
15 hit back wall.
16        So even when -- even if I were there
17 doesn't mean I was hearing what was being said or
18 even paying attention to was being said. But if
19 your question is...
20    Q. Well, if you weren't there in real time, I
21 suppose you've answered my question. I'll ask it
22 with respect to some later publications. We can
23 circle back to that.
24        Did you -- did leave the symposium on
25 Mr. Lindell's plane?

Page 253

64 (Pages 250 - 253)

1    A.  No.
2    Q.  No.  Okay.  Is that -- is there a reason
3  that's funny or --
4    A.  Because I don't fly.
5    Q.  Oh, okay.  So you weren't -- so you didn't
6  travel with Mr. Oltmann and Ms. Peters --
7    A.  No, sir.
8    Q.  -- and those folks?  Okay.
9    A.  Mr. Lindell has offered to let me fly on
10  his jet, but I have told him no.  I don't fly.  I
11  quit flying in February of 2005.
12    Q.  Oh, wow.  Okay.  Well, that -- that
13  answers my questions about the flight.
14    A.  You flew yesterday.  Right?
15    Q.  Yes.
16    A.  Do you like it?  Of course, not.
17    Q.  Okay.  Let's take a look here.  I want to
18  talk a little bit about Kurt Olsen, your
19  relationship with Kurt Olsen.  When did you first
20  meet him?
21    A.  I believe I first met Kurt Olsen when he
22  came to town for -- I think we were -- I think it's
23  when we were going to launch FrankSpeech in April of
24  2021.  I think that might have been the first time I
25  met him.

Page 254

12    Q.  Okay.
13    A.  You know, I'm just guessing at this point.
14    Q.  Sure.
15    A.  But he was here for some event.  We had a
16  meal in the back room at Bonefish.  I was trying to
17  think about the other people that were in that room.
18  It was full.  It was a little room, but it was full.
19      But that -- I just can't remember the date
20  or what the event was he came to town for.  But it
21  was -- I met him person in.  We picked him up at the
22  hotel there across the street and then went to
23  dinner at Bonefish.
24    Q.  What was your understanding of his role in
25  FrankSpeech, if any?

Page 256

1      I met him -- the first time I met him, we
2  went to dinner at Bonefish here over in
3  Collierville  And we had some event going on  I
4  just can't remember -- they all -- the events all
5  run together
6      But my first time to meet him was when we
7  picked him up at his hotel  He was staying at the
8  Fairfield Inn by the Collierville Mall  And then we
9  went to dinner at Bonefish in the back room at
10  Bonefish

Page 255

1    A.  I don't know that he had a role.  I just
2  knew that he was an attorney, and I think his story
3  was he had been at a law firm that he founded.
4    Q.  Okay.
5    A.  And that he was kicked out of his own law
6  firm that he helped found for questioning the
7  election.  Does that sound similar to what you
8  heard?
9    Q.  Sure.  I'll be speaking with him next
10  month.  But I'm just curious as to why he was
11  brought into this mix.  Was it -- he just introduced
12  to you as a nice guy that you should know, or was he
13  in some official capacity?
14    A.  I don't -- I don't think at that point --
15  I'm just telling you my opinion.  I don't think at
16  that point it was in any official capacity.
17    Q.  Okay.
18    A.  He was just there as an attorney who was
19  concerned about elections.  And I think he and Mike
20  were just getting to know each other.  I think the
21  relationship was kind of just developing.
22      I don't -- I don't know when Mike met him.
23  But listening to the conversations, I got the
24  feeling that this was a fairly new -- new
25  friendship.

Page 257

65 (Pages 254 - 257)

1    Q.   What is Mr. Olsen's role as it relates to
2  Mr. Lindell now as you understand it?
3    A.  I don't know.  I know that he is sometimes
4  referred to as one of his attorneys.  And so I think
5  the answer would be he's one of his attorneys.
6    Q.   And one of his attorneys, do you
7  understand it to be his personal capacity?  Does he
8  represent --
9    A.  I don't know if he's representing Mike or
10  My Pillow or FrankSpeech or all of the above.  I
11  don't know.
12    Q.  Has he ever represented you?
13    A.  Not that I'm aware of.  Not in a -- not in
14  an official capacity that I'm aware of.
15    Q.  Has he ever contacted you, for example, as
16  counsel for FrankSpeech to -- and you don't need to
17  tell me the substance of the conversations.  I'm
18  trying --
19    A.  I don't know -- I don't -- I don't know if
20  he's contacted me as counsel to FrankSpeech.
21    Q.  Okay.
22    A.  Because when we were working on, you know,
23  like the mission statement of the website and things
24  like that, I don't know if he was speaking as a
25  friend, as doing pro bono work or being counsel to

Page 258

1      But I don't know what capacity he's doing
2  that, is he doing as the attorney for Mike Lindell
3  personally, for My Pillow, for FrankSpeech, for
4  Lindell TV, is he doing that as the guy that runs
5  the Lindell Legal Offense Fund?  I don't know   You
6  would have to ask him
7    Q   Does he run the Lindell Legal Offense
8  Fund?
9    A   I think he does   I think he kind of
10  oversees that

Page 260

1  Mike Lindell personally, My Pillow or FrankSpeech.
2  I don't know.
3    Q.   What is -- I've seen a lot of text
4  messages with you and Mr. Olsen about your coverage.
5  How would you describe your relationship with
6  Mr. Olsen?
7    A.  Friend.
8    Q.  Just as friends?
9    A.   Friend and someone that whose counsel I
10  would seek on some legal matters, just like I would
11  reach out to Judge Napolitano, or I have interviewed
12  Alan Dershowitz numerous times.  He's just another
13  guy I would reach out to for -- for his thoughts
14  either off the air or can you come on the air and
15  share your perspective as a -- as an attorney.
16    Q.  Does he play any professional role that's
17  relevant to your work with Lindell TV?  For example,
18  was he counsel for Lindell TV?
19    A.  I don't know.  I don't know if he is.  I
20  know we have -- I know that I've called him before
21  to get documents from him, to get court papers,
22  court filings to show on the air and things, you
23  know, that Mike will want certain things shown on
24  the air, and he'll be like get it from -- get it
25  from Kurt.

Page 259

25    Q.   Who is Mr. Santilli?

Page 261

66 (Pages 258 - 261)

1   A.  Well, that's an impressive question.  Who
2  is Pete?  Pete is a -- I think he's retired marine,
3  retired military or former.  I don't think he
4  retired or former.  I think he's former military.  I
5  think he's marine.
6         He is a -- I guess I would call him a
7  journalist, a citizen journalist, investigator,
8  investigative journalist, talk show host is how I
9  describe him.
10        He called me last night, in fact.
11   Q.  How long have you known Mr. Santilli?
12   A.  I think -- I can't remember if
13  Mr. Santilli showed up for the live streaming of
14  FrankSpeech on the April 19, was in the room.
15  Something tells me he was there and broadcasting,
16  kind of live streaming it.
17        But I know Right Side Broadcasting did
18  that.  But for some reason, I thought Pete might
19  have been there for that.
20   Q.   And that was the first time you would
21  have ever met him possibly?
22   A.  If it wasn't there, then it would have
23  been at the Cyber Symposium -- symposium in August.
24  And I'm thinking of another event where he came to
25  the studio and kind of did his thing in the

Page 262

1  the state capital.
2   Q.  Were you present for that?
3   A.  No, I was not.
4   Q.  Okay.  Is that because you don't fly or --
5   A.  That's exactly right.  I wouldn't go to
6  Colorado.
7   Q.  Just in general?
8   A.  The elevation.  I don't -- I don't like to
9  travel.  I only have certain parts of the country I
10  will travel to.  There are other parts of the
11  country I will not travel to.  They're too far.
12        And I don't like -- I've been to Colorado,
13  Denver a few times, and the elevation, altitude
14  sickness.  And I'm certainly not driving that far.
15   Q.  Right.
16   A.  Not unless someone wants to pay me several
17  million dollars to do it.
18   Q.  So I'll just represent that we served
19  Mr. Lindell with a lawsuit on April 5th of 2022.
20  And I'm going to show you a clip that's been labeled
21  as Exhibit 65, Clip 21.
22        This is an interview you conducted with
23  Mr. Lindell the very next day on April 6th.
24   A.  Okay.
25        (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS

Page 264

1  background.  But I don't --
2   Q.  You didn't have a relationship that
3  existed with him prior to any of the events we've
4  discussed today?
5   A.  Not that I remember.  But remember, I
6  interview thousands people over years.  But if I had
7  to make a good stab at it, I would say that Pete and
8  I met some time in the spring or summer of 2021.
9   Q.  Okay.
10   A.  Why?  What's Pete done?
11   Q.  I'm just curious about his role in all of
12  this.  So I'm curious about everybody's role in all
13  of this.
14   A.  Have you guys deposed him yet?
15   Q.  No.
16   A.  Are you going to?
17   Q.  He has not been subpoenaed at this time.
18  Moving forward, I want to touch -- get to a few of
19  these later publications.
20        Do you -- do you remember when Mr. Lindell
21  was served with this lawsuit?
22   A.  With this lawsuit?
23   Q.  Yes.
24   A.  I'm going to guess here, and I think he
25  was sued while he was in Colorado speaking before

Page 263

1  PLAYED.)
2  BY MR. KLOEWER:
3   Q.  I'll start this over again, and we'll make
4  it full screen here.
5   A.  Now, just for the record, that looks like
6  that's on the Lindell Report.
7   Q.  Yes.  What -- what does that mean to you?
8  What -- how does that differ from --
9   A.  That -- there's the Lindell Report, then
10  there's Brannon Howse Live, Worldview Report.
11  They're different shows we have on Lindell TV.
12        So that's specifically on Lindell Report
13  that airs every night, for the most part, from 6:00
14  -- Monday through Friday from 6:00 to 7:00.
15   Q.  And you --
16   A.  Which I co-host with him.
17   Q.  You co-host that with Mr. Lindell?
18   A.  And sit in often when he's out and
19  unavailable.
20   Q.  All right.  This is a bit of a long chip,
21  as well.  I'll have several questions for you
22  afterwards.
23        (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
24  PLAYED.)
25  BY MR. KLOEWER:

Page 265

67 (Pages 262 - 265)

1    Q.   What crimes is Mr. Lindell referring to
2  there?
3    A.   I have no idea.
4    Q.   Well, you have -- you have no idea what
5  crime he is referring to?
6    A.   I mean, I would just be guessing.
7    Q.   What would you guess?
8        MR. MALONE:  Object to foundation, asked
9  and answered, form.
10  BY MR. KLOEWER:
11    Q.   Let me ask you this, Mr. Howse:  Do you
12  believe that Dominion Voting Systems rigged the 2020
13  presidential election?
14    A.   I have no evidence they rigged the
15  election.  What I believe and what I can prove are
16  two different things.
17    Q.   Do you know if Mr. Lindell believes
18  Dominion Voting Systems rigged the election?
19        MR. MALONE:  Objection, foundation.  You
20  can answer.
21    A.   You would have to ask him.
22  BY MR. KLOEWER:
23    Q.   When he says, you even said what you were
24  going to do, do you know what he's referring to
25  there?

Page 266

1  watched the video of him accusing Dr. Coomer by name
2  of treason.
3    A.   Right.  And I'm telling you what I think
4  I've heard him saying on the air.
5    Q.   Okay.
6    A.   Isn't that consistent with what you've
7  heard him say?
8    Q.   I've heard him say that.  Yes.  But the
9  evidence suggests otherwise.
10    A.   What I'm saying is my testimony lines up
11  with what with you've heard.  Is that right?
12    Q.   Okay.  Yes.  After -- after an interview
13  like this, does it concern you, as you sit here
14  today, the effect that this sort of publication
15  could have on Eric Coomer?
16    A.   I don't -- I'm not sure I want to speak
17  specifically to Eric.  But I would say that as a
18  broadcaster and having done this for many, many,
19  many years, I'm very aware that anyone who has a
20  microphone in front of them or is wearing a
21  microphone, whether they're on TV, whether they're
22  on radio, they have a responsibility to be
23  consistent with what it is they have chosen for
24  their profession.
25        If you're Howard Stern, then I guess

Page 268

1        MR.MALONE:  Same objections.
2    A.   I would just be guessing what his -- what
3  he's saying.
4  BY MR. KLOEWER:
5    Q.   So you haven't discussed Mr. Lindell's
6  beliefs about Dr. Coomer with him?
7    A.   I have right on the air.  Because -- on --
8  I didn't -- I don't think I said anything in that
9  whole clip.
10        But in other clips, I think you'll find
11  I'm on the air where he's discussing it.  So
12  technically, yes, I have had conversations with him
13  because I'm sitting there listening to him.
14        And I've heard him say he didn't know who
15  Coomer was.  So he's getting -- his -- I believe his
16  position is I'm being sued by someone for defaming
17  them when I don't even know who they are.
18    Q.   Well, we've already watched clips today
19  from Mr. Lindell accusing Dr. Coomer of treason in
20  May of 2o21.  So --
21    A.   That was before he was sued?
22    Q.   Yes.
23    A.   Yes.
24    Q.   That was the basis of the lawsuit.  So
25  when he says I don't even know who he was, we've

Page 267

1  you're a shock jock and you say things.  Right?  If
2  you're a nighttime host like Jimmy Kimmel, then
3  you'll mock me and mock Mike Lindell, as he has done
4  many, many, many, many times.
5        There are what I call yellow dog
6  journalists out there that write all kinds of stuff
7  about me that's not true.  I have been accused of
8  being even anti-Semitic for putting out a document
9  exposing globalism.  And yet, I have produced
10  documentaries warning about the rise of
11  antiSemitism.
12        I have dedicated my national show to
13  covering Israel and the Jewish state and the Jewish
14  people for a Middle East Friday -- Middle East
15  update every Friday for I think maybe 12, 13, 14
16  years.
17        I have produced two conferences on the
18  rise of antiSemitism called Holocaust Arising and
19  Warning.  And yet, then someone I think with the
20  Huffington Post turns around and accuses me of
21  antiSemitic claptrap.
22        So to answer your question, I have been on
23  the receiving end of having things said about me
24  that are not true.  But in my capacity, I try not to
25  do that.  I try to be a journalist that's fair and

Page 269

68 (Pages 266 - 269)

1 that presents truth and doesn't go after people on a
2 personal level or their character unless I can prove
3 that their character is in question due to their
4 actions.
5        But that being said, I also am a staunch
6 defender of the First Amendment. And I believe that
7 while I don't like having things said about me that
8 are not true that you will find online, that I find
9 very hurtful, have hurt my credibility with certain
10 people because they believed those lies that are
11 presented, have lied about my wife online, lied
12 about other things online that are very hurtful --
13 so I know what it feels like, and I try never to do
14 that to someone else.
15        But I also know that as a staunch defender
16 of the First Amendment, that is a price I'm willing
17 to pay to maintain the First Amendment. And if
18 someone believes that I am what they say I am and
19 they believe it to be true, I will defend the right
20 to say it.
21        And I have not gone after and sued people
22 like Mr. Coomer has done. I have not gone after and
23 sued people for liable or defamation or whatever.
24 And maybe it's because I thought the laws in this
25 country were rather broad, that you -- that you have

Page 270

1 a right to believe what you want to believe and to
2 voice it.
3        But I am willing to tolerate being lied
4 about, smeared, dragged through the mud if that's
5 what it takes to maintain a free society where
6 people can voice their opinions and ideas, even as
7 disgusting as we might think some of them are, I
8 want to defend the right of people to say that. And
9 I will debate them in the pubic arena. I will
10 challenge them. I will even offer them to come on
11 the show and say it to my face.
12        So I believe if we want to maintain a free
13 society, myself, Dr. Coomer and others just got to
14 put up with it, or we're not going to have freedom
15 of speech.
16     Q. And we've established before you haven't
17 actually read the complaint in this case?
18     A. I don't think I have.
19     Q. So are you aware that Dr. Coomer's had
20 death threats directed against him as a result of
21 these allegations?
22     A. I don't think I have -- am aware of that.
23 But I have had a plenty of that in my life.
24        And the corrupt criminal FBI doesn't care.
25 I have a file folder full of people threatening my

Page 271

1 family and I. I get voice mails of people
2 threatening sexual assault on my wife, if I can
3 remember one particular incident if I remember
4 correctly.
5        But I have emails and letters that have
6 been received on our end. And the corrupt FBI
7 doesn't seem to have any interest in that because as
8 I was told by former FBI agents, you're of the wrong
9 political persuasion.
10        So the point I'm making is I'm very aware
11 of what that kind of situation is about. I don't
12 wish that upon anyone. But I do know that when
13 you're in the First Amendment arena and you're a
14 public figure, that goes with the territory.
15        As one president I think said, if you
16 can't handle the heat, get out of the kitchen. This
17 is just what we, as public figures and public
18 people, have to endure if we want to be true to the
19 First Amendment.
20        But once you take away the First
21 Amendment. freedom of speech, freedom of religion,
22 then you start kissing all the other amendments
23 goodbye.
24        So I know what it's like to get threats.
25 I know what it's like to have people believe things

Page 272

1 about you that are not true to come to you with a
2 presupposition that you have to try to overcome.
3 But that's a consequence that I'm willing to live
4 with to be able to live in a free society where we
5 can debate and speak truth and even if that means
6 someone says something we know is not true that they
7 believe to be true.
8        And I do believe there are people that
9 write things about me, and they believe them to be
10 true.
11     Q. You said before that it's important that
12 you be consistent with what your values and beliefs
13 are.
14     A. Uh-huh (affirmative response).
15     Q. And if you know that this type of
16 publication is giving rise to death threats -- and
17 correct me if I'm wrong. Have you seen any evidence
18 to suggest that Eric Coomer rigged the election?
19     A. I have not seen any evidence. But I also
20 haven't spent any time researching this.
21     Q. Okay. So you have no evidence to support
22 a belief that Eric Coomer rigged the election, and
23 yet, we've seen multiple publications of your
24 show --
25     A. Wait a minute. Not my show.

Page 273

69 (Pages 270 - 273)

1    Q.   Lindell TV, FrankSpeech?
2    A.   FrankSpeech.
3    Q.   Where you've been anchor on the show where
4 accusations that Dr. Coomer did these things have
5 been published.  Is that consistent -- do you
6 believe that publishing statements that result in an
7 innocent person getting death threats is consistent
8 with your beliefs and what you're trying to do with
9 your show?
10    MR. GREER:  Objection as to form.  You can
11 answer.
12    A.   I don't want to see anybody have their
13 civil liberties infringed upon regardless of who
14 they are, friend, foe, agree, disagree.  But I also
15 know that I'm not responsible for how other people
16 conduct themselves.
17    I do know that when we live in a free and
18 open society and there's the exchange of ideas and
19 contradicting beliefs, that some people in society
20 are going to act in an inappropriate manner.
21    Again, these are the consequences of
22 living in an open, free society of which there are
23 laws.  So the issue really shouldn't be I interview
24 someone, they say something that I personally don't
25 agree with, they say something that I personally

Page 274

1 publication?
2    A.   I'm not -- I'm not in control of what
3 people say to Mr. Coomer.  I have no control over
4 that any more --
5    Q.   Well, you are in control of what you
6 publish about Dr. Coomer on your program.
7    A.   No, no.  I'm not -- I am not -- I don't
8 control what comes out of someone's mouth on live
9 television.
10    Q.   Have you ever gone back to correct the
11 record about -- did you, for example, after this
12 interview with Mr. Lindell, publish an episode of
13 your show saying that there was no evidence to
14 support any claims that he was --
15    A.   I'm not obligated to go behind
16 Mr. Lindell's broadcast and make disclaimers about
17 what he said on his program.  I'm only responsible
18 for what I say, not what someone else says.
19    Q.   And it doesn't bother you if somebody else
20 lies on your show?
21    A.   Well, first of all, I would have to know
22 did they lie.  And then I would have to -- then if
23 it's a provable lie, then you -- I would probably
24 have a conversation with someone that, hey, this
25 isn't true, you probably don't want to do this or

Page 276

1 wouldn't say, they say something that I personally
2 wish they hadn't said on my show or on a show I'm
3 anchoring.
4    But again, I'm a free form that's live.
5 And if such dissemination of information brings a
6 threat against someone, then the law needs to step
7 up and take action.
8    In other words, in our society, there are
9 structures that deal with that.  You don't shut down
10 free speech because if someone says something we
11 disagree with, it's going to cause somebody who's
12 acting irreasonable or irrational to go make a
13 threat against someone.  If that was the case, no
14 one would get in cars.  Because someone in Memphis
15 today is going to get in a car wreck.
16    So we have to have that balance and say,
17 yeah, it's terrible that someone heard that and went
18 and did X, Y or Z that is illegal.  The authorities
19 should deal with that.  The same way the authorities
20 have refused to deal with threats against me or my
21 family, they should deal with any physical threats
22 against Mr. Coomer or anyone else.
23    Q.   So if I am understanding you correctly,
24 it's -- you don't believe it's your concern whether
25 Eric Coomer gets death threats as a result of your

Page 275

1 say that.
2    But again, we're back to this position of
3 is it a lie or is it something he believes to be
4 true.  And if it's something he believes to be true,
5 then to him, he's not telling a lie.  From his
6 perspective, he believes it to be true.
7    The same people write things about me that
8 are not true, but they believe them to be true.
9 They believe them to be true.  If they believe them
10 to be true, they have the First Amendment right to
11 say it or print it.
12    And I'm willing to live with that because
13 I'm wanting to maintain a free and open society.
14 Sometimes we're going to get our feelings hurt.
15 Sometimes we're going to get threats.  Sometimes
16 we're going to miss out on opportunities or
17 friendships because someone has said something.  But
18 those are all very, very small prices to pay for a
19 free and open society.
20    Our founding fathers were very rich
21 people, most of them very wealthy people.  And they
22 said that they were sacrificing their lives for the
23 sacred honors and their possessions.  And most of
24 them lost everything, including children in our
25 Revolutionary War.

Page 277

70 (Pages 274 - 277)

1    So I think if our founding fathers can
2  lost everything they had, could have stayed rich and
3  fat and happy if they had just kept their mouths
4  shut, I think if they can sacrifice it all,
5  including losing their own health and their own
6  loved ones to form a free society like we have, I
7  think we can tolerate and be big boys and pull our
8  big boy pants up and tolerate someone lying about
9  us.
10    My First Amendment right, your First
11 Amendment right is more important than how I feel.
12 And as I've already said, if Mr. Coomer had reached
13 out to me or his counsel had reached out to me, sent
14 me a certified letter and said this is my concern, I
15 would have immediately brought it to my counsel, who
16 is an expert in defamation and liable. Because
17 we've had conversations about it long before I ever
18 worked with Lindell.
19    I would have brought it to him, and I
20 would have asked him what should we do here.
21   Q. Okay.
22   A. And I would have been prone to saying,
23 Mr. Coomer, would you like to come on my show. That
24 would have been excellent television.
25    I think Mr. Lindell would have been fine

Page 278

1 with that, too. I think Mr. -- I don't think
2 Mr. Lindell would have said, no, you can't have him
3 on your show. Because Mr. Lindell is all about free
4 and exchange of ideas. I think Mr. Lindell would
5 have been fine, have him on.
6    Mr. Lindell has said Brannon, why don't
7 you interview Mr. fact checker, what's his name?
8 Shame on you Allen Duke. That's his name, Allen
9 Duke. I have to add the shame on you, Allen Duke,
10 to remember his name every time. He said, why don't
11 you interview Allen Duke, Brannon?
12    So Mr. Lindell has had people that he
13 believes have been dishonest about him. I mean,
14 Mr. Lindell hasn't sued -- I don't think Mr. Lindell
15 has sued Allen Duke for reportedly putting up a
16 image on the screen on Facebook saying that this
17 contains -- what was it? It said content contains
18 nudity or something. Talk about Absolute Proof. I
19 mean, you're going to run around and sue people for
20 some of this stuff?
21    First of all, I think it's a waste of
22 time. It's a waste of money. And again, you just
23 have to tolerate certain things in a free and open
24 society if we want to maintain our First Amendment.
25    But if his attorneys had sent me a letter,

Page 279

1 I would have sent it to him and said what should we
2 do, let's pull the -- let's pull it and/or let's
3 offer Mr. Coomer a chance to come on my show live
4 unedited and state his position.
5    I am open to hearing from anyone. I would
6 interview Bill Clinton. I would interview Joe
7 Biden. I would -- I'm a news guy.
8   Q. Okay.
9   A. And in fact, controversy makes for great
10 news. If something like that came about, that would
11 be -- to me, that would be a great -- that would be
12 a great ratings show to interview Mr. Coomer to
13 refute Mr. Oltmann.
14    MR. GREER: Let's get back on track.
15    MR. KLOEWER: Yeah. Let's --
16    MR. GREER: Let Mr. Kloewer ask a
17 question, and we can answer it.
18    MR. KLOEWER: Yeah.
19 BY MR. KLOEWER:
20   Q. We've already established that you were
21 never provided with copies of those -- of those
22 demands that we had previously issued. So there's
23 not a lot to follow up on there.
24    Let's skip forward a little bit to
25 September of last year. So moving forward a few

Page 280

1 months from this last publication. I'll show you
2 what's been previously labeled as Exhibit 3, Clip
3 10.
4    Now, this is a longer clip. I need to
5 skip forward because this one is kind of improperly.
6 This was an interview you conducted with Tina
7 Peters. I believe it was immediately after her
8 criminal arraignment in Mesa County. She was served
9 with a subpoena in this case outside the courthouse.
10 I'm going to skip forward here to the relevant
11 portion.
12    (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
13 PLAYED.)
14 BY MR. KLOEWER:
15   Q. It's about two minutes here. There was a
16 technical difficulty with her, and she came out.
17 And now, this is her coming back on to your program.
18    (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
19 PLAYED.)
20 BY Of tape.
21   Q. Change of subject here. So this -- by
22 this point, this is September of 2022, we've had
23 multiple instances when Mr. Oltmann's allegations
24 have been raised on your show.
25    Why didn't you challenge Ms. Peters on

Page 281

71 (Pages 278 - 281)

1 these claims?
2     A. I don't know whether the claims are true
3 or not. Would I chal -- what would I challenge her
4 on?
5     Q. Well, what evidence does she have to
6 support these claims? For example, she said he was
7 responsible for the -- he had the patents for the
8 algorithm that changed votes.
9         Have you seen any evidence to suggest
10 there's an algorithm that changes votes?
11     A. Yes.
12     Q. Okay. Have you seen any evidence that
13 that is somehow tied to work that Eric Coomer has
14 done?
15     A. No.
16     Q. Have you seen any of the patents that
17 Dr. Coomer was involved in securing?
18     A. No, no.
19     Q. Okay.
20     A. What was her reason for coming on the
21 show?
22     Q. Well --
23     A. I mean, she threw that out on live
24 television. I wasn't interviewing her about Coomer,
25 was I?

Page 282

1     Q. No.
2     A. What was the reason I was having her on
3 the show?
4     Q. I -- I don't know.
5     A. Something had happened, I think, and --
6     Q. This is outside the courthouse of her
7 arraignment, I presume.
8     A. No. This is outside of looks like a
9 restaurant where she had been eating. I think she
10 may have been arraigned. So the topic of the
11 interview I think was her being arraigned.
12         I think she's at a restaurant, not outside
13 the courthouse.
14         So the point I'm making is I did not seek
15 to -- I don't think I was seeking to interview her
16 about Eric Coomer because that's just not a topic
17 I'm really interested in. I think what the topic --
18 I'd have to go back and watch. I think the topic
19 was her being arraigned or her legal issues.
20         She brought up Coomer. Again, it's live
21 television. I'm not going to sit there and put her
22 on trial or argue with her, debate with her. I'm
23 just going to let her say what she wants and move
24 on.
25         Again, Mr. Coomer could have reached out

Page 283

1 to me just the way everybody else reaches out to me
2 wanting air time. He could have done the same.
3     Q. You didn't reach out to Mr. Coomer before
4 or after these interviews, have you?
5     A. Nope.
6     Q. Did you ever try to identify anybody in
7 any way to reach out to him?
8     A. I think -- I'd have to go back and check
9 the record. But I don't know if I offered.
10         Again, it would be very consistent with
11 what I've done over the years to stay on the air.
12 If he wants to come on here, refute this, you're
13 welcome.
14         But no, I did not seek him out to
15 interview him. I'm not really interested in the --
16 Mr. Coomer's story. But when people bring it up,
17 they bring its up.
18         That's their freedom of speech. They're
19 responsible for what they're saying. I'm not
20 responsible for what they're saying. I'm not -- I'm
21 not sitting there in that interview to validate her,
22 argue with her, refute her.
23         I'm just interviewing her about what I
24 think was her just being arraigned. But I'd have to
25 go see the context.

Page 284

1         But if you're asking me do I sit around
2 and try to do shows on Eric Coomer, no, that doesn't
3 seem very interesting to me.
4     Q. We discussed this briefly before, but
5 Johnston Howse, LLC is no longer running the
6 FrankSpeech website. Is that correct?
7     A. That's what I understand.
8     Q. Why not?
9     A. I think the cost and the bills of what it
10 took to keep that team going were beyond the budget
11 Mr. Lindell wanted to maintain. And he, I think,
12 was able to find a way to cut costs by going to the
13 company he went with.
14     Q. Do you know --
15     A. I also think there was a point at which at
16 least I wanted Johnston Howse to finish the work up
17 and be done with it. But I didn't want to have my
18 hands in that part.
19     Q. Well, you were deriving income from the
20 arrangement with Johnston Howse --
21     A. Right.
22     Q. -- weren't you?
23     A. Correct. But that doesn't mean that I
24 wanted to see it keep going.
25     Q. Okay.

Page 285

72 (Pages 282 - 285)



Page 286

1    A.  It was becoming more of a hassle and a
2  headache for me than it was worth.
3    Q.  Okay.  Do you know if there was a bidding
4  process for replacement?
5    A.  No idea.

Page 287

14      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
15  WAS MARKED AS EXHIBIT NO  111 TO THE DEPOSITION, AND
16  IS HERETO ATTACHED )
17  BY MR  KLOEWER:
18    Q   These are -- this is an excerpt from the
19  deposition of Joe Oltmann  I showed you a page
20  previously from this with respect to a Google screen
21  shot
22      I want to draw your attention to the
23  bottom of the second page, Page 210  I said,  And
24  they're getting paid what Johnston Howse used to be
25  getting paid?  And he states,  Oh, no, no, no  The

Page 288

1  cost factor for what we are able to do and produce
2  for Mike and what he was paying previously, without
3  divulging dollars, was almost 70 percent less."
4      Does that sound accurate to you?
5    A.  I have no idea.
6    Q.  Okay.  Is it possible that Johnston Howse
7  was charging 70 percent more?
8    A.  I have no idea.
9    Q.  The last page, Oltmann went on to say,
10  their system was poorly engineered, and a lot of
11  that had to do with the fact that they had never
12  done these types of things before, and they didn't
13  have proper things in place that would allow -- it
14  went down a lot, had buffering issue and had a lot
15  of issues.
16      Would you agree with that
17  characterization?
18    A.  No.  I wouldn't agree with all that.  No.
19  Did the system go down?  Yes.
20      So what you're telling me is you're asking
21  me to take the word of a guy you claim is libeling,
22  slandering and this guy apparently is doing this to
23  me, and you want me to take his word?  Is that what
24  we're doing here?
25    Q.  Well, I'm just curious if you're familiar

Page 289

1  with the circumstances under which Mr. Oltmann's
2  company took over management of FrankSpeech.
3    A.  I knew it was about saving money.
4    Q.  Okay.
5    A.  And I also knew it was about the fact that
6  I had been asking Mike to try to wrap this up with
7  Johnston Howse, that I didn't want to be in the
8  middle between him and RJ anymore.  There was -- the
9  two of them kind of would get at it, and I would be
10  in the middle, and I wanted out.
11      I saw my relationship with Mike and
12  Lindell TV long term.  The Johnston Howse thing was
13  a necessary evil to get his system up and running,
14  licensing the software that we had developed.
15      I wanted the project to be limited and,
16  you know, get it done, be done, move on.  It was
17  becoming more of a headache than it was worth to me
18  personally.
19    Q.  And it sounds like you weren't really
20  handling much of the technical aspect of things
21  anyway.
22    A.  I don't have a technical ability to do
23  that kind of stuff.
24    Q.  Okay.  Have you been happy with the new
25  service provided by PiDoxa?  Feel better than the

73 (Pages 286 - 289)

1 previous?
2    A.  No, not better.  No.
3    Q.  Okay.  Is it worse?
4    A.  It's, you know, hard to say.  It's hard to
5 say.  Because it does go down.  There are problems.
6        But again, this is just the nature of
7 software and systems this big and servers that are
8 running this much data and having -- I mean, it's
9 just -- so it's hard to sit here and say is it
10 better, is it worse.
11        You know, we went down.  They go down.
12 It's just the nature of I think computers unless
13 you're a multibillion dollar company.
14    Q.  Okay.  I think I want to get into the
15 subpoena we issued you.  That will probably be a big
16 chunk of time.  So if we want to take a break here
17 and get back into that.
18    A.  Okay.
19        VIDEO SPECIALIST:  All right.  This ends
20 Media Number 4.  Going off the record at 2:19 p.m.
21        (SHORT BREAK)
22        VIDEO SPECIALIST:  This begins Media
23 Number 5.  Going back on the record at 2:32 p.m.
24 BY MR. KLOEWER:
25    Q.  Okay.  I told you before we'd get into the

Page 290

6    Q.  How do you know Clay Clark?
7    A.  From his Thrive Time program and then his
8 Reawaken Tours he does.
9    Q.  Have you ever been a guest on the Thrive
10 Time show?
11    A.  I think I have.
12    Q.  In what capacity?  I mean, why did he
13 invite you on the show?  I know he has a broad
14 spectrum on his --
15    A.  Why wouldn't anyone invite me on their
16 show?  I'm a very good guest.
17    Q.  Well --
18    A.  Full of lots of knowledge, particularly if
19 you want to get me going on the CIA.
20    Q.  Well, that's -- that's kind of my
21 question.  What was the --
22    A.  I don't remember.
23    Q.  -- nature of the commentary that he was
24 looking for?
25    A.  So I've written 14 books.  Have you read

Page 292

1 subpoena, but I want to talk about a couple other
2 items real quickly beforehand
3    A  All righty

Page 291

1 any of them?
2    Q.  I have not.
3    A.  Did you know I wrote 14 books?
4    Q.  I didn't know you've written 14, but --
5    A.  I think it's 14.
6        MR. GREER:  You need to get him an
7 autographed copy.
8    A.  Yeah.  I'll give you -- my last one is
9 Marxianity.  You'd love it.
10 BY MR. KLOEWER:
11    Q.  Great.
12    A.  So it could have been about that book.  I
13 have no idea what he interviewed me about.  You
14 know, you can interview me about so many things.  So
15 I don't know what he interviewed me about.
16    Q.  Do you recall about what time that -- when
17 that was?
18    A.  No, I don't.  It all runs together.
19    Q.  What -- and you mentioned the Reawaken
20 America tour.  Have you ever presented at --
21    A.  Yes, finally.
22    Q.  Okay.  When did --
23    A.  Because they've been trying to get me to
24 go there for a while, but I wouldn't travel out of
25 my way.

Page 293

74 (Pages 290 - 293)

1      So they finally came to Nashville. And
2 that was in January.
3      Q.   Okay. Was --
4      A.   It was either January or February of this
5 year. So I went over there and spoke.
6      Q.   Okay.
7      A.   Uh-huh (affirmative response).
8      Q.   I'm not -- was Mr. Oltmann on the lineup
9 at that time, as well?
10     A.   I don't know.
11     Q.   Okay. Have you heard that the Reawaken
12 America tour will not insure the tour if Mr. Oltmann
13 speaks on it?
14     A.   Say that again.
15     Q.   That the insurance provider for the tour
16 refuses to insure the events if Mr. Oltmann is on
17 stage?
18     A.   Really?
19     Q.   Are you aware of that?
20     A.   No, I'm not.
21     Q.   Okay. Mr. Clark hasn't reached out to you
22 to let you know about that?
23     A.   Not that I'm aware of.
24     Q.   Okay. And Mr. Oltmann --
25     A.   Why would he reach out to me and tell me

Page 294

1 that?
2      Q.   Well, I probably asked that question the
3 wrong way.
4           The better question would be, has
5 Mr. Howse reached out to you or Mr. Lindell about
6 that? I don't think Clay Clark is broadcasting it.
7 But from what I can gather from social media,
8 Mr. Oltmann has called everybody because he's very
9 upset.
10     A.   When did this occur?
11     Q.   Maybe two weeks ago.
12     A.   Oh, wow.
13     Q.   So I was just curious if you were on the
14 call list. Because --
15     A.   I have not received a call from Clark --
16     Q.   -- he was calling everybody and telling
17 everybody.
18     A.   I have not received -- I'm hearing about
19 this for the first time.
20     Q.   Okay.
21     A.   As far as I know. Again, unless someone
22 sent me an email and I haven't read it.
23     Q.   When I mentioned before that Mr. Oltmann
24 is frequently profane on his show, that episode
25 discussing Mr. Clark is one of those examples.

Page 295

1      A.   Was he mad at Clay?
2      Q.   Yes.
3      A.   Oh, wow.
4      Q.   Let me see here. Have you read the
5 lawsuit against Clay Clark and the Reawaken America
6 tour --
7      A.   I don't think I have.
8      Q.   -- filed by Eric Coomer?
9      A.   I don't think I have.
10     Q.   Have you read any of Dr. Coomer's
11 lawsuits?
12     A.   Only thing I looked up was the lawsuit
13 that involved Rudy Giuliani being deposed.
14     Q.   Okay.
15     A.   And that may have been for -- is
16 Dr. Coomer suing Giuliani?
17     Q.   Yes.
18     A.   Okay. And that -- and is that online,
19 that deposition online?
20     Q.   Yes.
21     A.   I think that's what I found. I think
22 that's about the only thing I've read that I
23 remember.
24     Q.   Did you read that transcript?
25     A.   I read a few minutes of it. I skimmed it.

Page 296

1 Let's put it that way.
2      Q.   All right.
3      A.   Then it became so boring, I quit.
4      Q.   As far as the actual complaints, though,
5 you haven't read any of them?
6      A.   Not that I can remember.
7      Q.   Including the lawsuit against Mr. Lindell?
8      A.   Well, I may have read some of that on the
9 air. I don't remember.
10     Q.   But not the whole thing?
11     A.   Have we shown that on the air? Have we
12 brought that up on the air?
13     Q.   I can show you that now. We can take a
14 look at that.
15     A.   I mean, if Mr. Lindell has been sued, you
16 know, he's probably going to show it off on air.
17     Q.   Yes. I am aware of that. Well, we can go
18 ahead and do that now. So I'm sort of doing a
19 lightening around here of a few random loose ends
20 that I've got before we get into the subpoena.
21          But we can take a look at that most recent
22 interview with Mr. Lindell from March 10th since you
23 mentioned it.
24          MR. KLOEWER: Korian, this is what I told
25 you about when we started this morning, that I have

Page 297

75 (Pages 294 - 297)

1 a flash drive with news that have not been admitted
2 as exhibits yet.
3     Now, the way we've been doing this
4 previously is to label this flash drive with the new
5 clips as the next exhibit in line. So I'm going to
6 call this Exhibit 113. And we've got Clips 1
7 through 7 here.
8     We've got copies for Mr. Malone and
9 Mr. Greer --
10     MR. GREER: Thank you.
11     MR. KLOEWER: -- as well. And Aubrey, I'm
12 sorry. I meant to have my paralegal --
13     MR. GREER: That's okay.
14     MR. KLOEWER: -- send you a link to you
15 everything. She'll get it to you so you'll have
16 access to all -- everything that's been filed so
17 far.
18     (WHEREUPON, THE ABOVE-MENTIONED FLASH
19 DRIVE WAS MARKED AS EXHIBIT NO. 113 TO THE
20 DEPOSITION, AND IS HERETO ATTACHED.)
21 BY MR. KLOEWER:
22     Q. So we've got this as Exhibit 113. I don't
23 think I want to talk about -- we've already
24 addressed several these issues. I think Clip 6 is
25 what I want to take a look at here.

Page 298

1 BY MR. KLOEWER:
2     Q. Okay. So I think I teed this up, March
3 10th. This is an interview you conducted with
4 Mr. Lindell. This is just --
5     A. Wait a minute. I want to correct the
6 record on that. This isn't an interview I conducted
7 with Mr. Lindell.
8     This is the Lindell Report. So --
9     Q. Okay.
10     A. -- I don't know that we would say this is
11 an interview I conducted. When you're on the
12 Lindell Report, he's driving the ship.
13     Q. Okay.
14     A. Unless I -- he's not there, then I'm
15 hosting; I'm driving. But if it's -- it's the
16 Lindell Report. It's his show. I don't really
17 describe him as when he's on his show, interviewing
18 him.
19     Q. That's fair. All right. So let's --
20     A. In other words, I don't know what he's
21 going to talk about --
22     Q. Well --
23     A. -- always. I don't always know.
24     Q. All right. Here we go.
25     (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS

Page 300

1     THE WITNESS: That will wake you up.
2     MR. GREER: Yeah. That's going to be my
3 new alarm, Mike Lindell screaming at me.
4     MR. KLOEWER: I think that is Brian's
5 alarm already, isn't it?
6     THE WITNESS: I have woken up many a
7 mornings to that.
8 BY MR. KLOEWER:
9     Q. So I'm going to show you a clip from an
10 episode of the Lindell Report that was recorded on
11 March 10th of this year, just about two months ago.
12     A. Okay.
13     Q. And this was just a couple days after the
14 deposition.
15     THE WITNESS: I do not believe how hot
16 it's getting in here. Holy cow. I think I'm going
17 to have to actually take my jacket off. Well, if
18 you're not taking yours off, I'm not taking mine
19 off.
20     MR. GREER: You're good. If you want to
21 get comfortable, get comfortable.
22     MR. KLOEWER: I am going to take my tie
23 off.
24     MR. GREER: There you go.
25     MR. KLOEWER: Don't let me stop you.

Page 299

1 PLAYED.)
2 BY MR. KLOEWER:
3     Q. Okay. So clearly, you know where to find
4 the pleadings in the case if you'd like to.
5     A. Well, I don't know if I know. I think I
6 just Googled, and it popped up. I don't know that I
7 would have known about that website.
8     I think I just put it into Yahoo what --
9 and that's what popped up.
10     Q. Okay. And I think I know the answer to
11 this already, but just to be certain, did anybody --
12 has anyone provided you a copy of the complaint at
13 issue here?
14     A. Which -- which one?
15     Q. The lawsuit that Dr. Coomer filed against
16 Mike Lindell, My Pillow and FrankSpeech.
17     A. I don't know that anyone has provided it
18 to me.
19     THE WITNESS: Have you provided it to me?
20     MR. GREER: I can't answer that question.
21     A. I don't know if anyone's -- I don't know.
22 I don't know. He probably has. He probably emailed
23 me a link to it or PDF of it or something. I don't
24 know. I don't know. Didn't I show it on the air
25 one night?

Page 301

76 (Pages 298 - 301)

1 BY MR. KLOEWER:
2  Q.  Well, this is the first instance I've seen
3 when you did.  We were surprised when we took
4 Mr. Lindell's deposition to learn that he had never
5 read it.
6      And so I'm a bit surprised --
7  A.  Well, he just admitted that, didn't he?
8  Q.  -- you hadn't either.  Well, your
9 interviews are discussed at length in the complaint.
10 So I'm surprised to hear that.
11  A.  Okay.  So now that you mention my
12 interviews are mentioned at length, that does jog my
13 memory.  I have read something.  Because I read
14 something somewhere -- someone had to have sent me a
15 PDF of this.
16      I think -- I think Mr. Lindell may have
17 sent me a PDF of it or directed  me to or Kurt
18 Olsen.  Someone had to have sent me a PDF of this.
19 Because I think I did Control F, you know, the
20 command Control F and searched my name.  So I think
21 now that we're talking more, it's jogging my memory
22 more.
23  Q.  Have you ever had a conversation with
24 anyone at FrankSpeech or I guess My Pillow or
25 Mr. Lindell, for that matter, suggesting that you

Page 302

1 maybe not publish more content about Eric Coomer?
2  A.  Have I suggested that?
3  Q.  Have you been part of the conversation?
4  A.  Not that I'm aware of.
5  Q.  Okay.  Has anybody encouraged you to
6 investigate the claims about Eric Coomer?
7  A.  Not that I'm aware of.  But then again, I
8 don't run FrankSpeech.
9  Q.  Right.  I'm wondering if anybody from
10 FrankSpeech has raised this concern with you.
11  A.  Not that I'm aware of.
12  Q.  Okay.  So we looked at your terms and
13 conditions before --
14  A.  Right.
15  Q.  -- that, you know, prohibit defamatory
16 content.
17  A.  Right.
18  Q.  You said you would take it down if you had
19 been told.
20  A.  Yes.  If I had gotten a letter from his
21 attorney, I would have brought it to my attorney.
22 And I would have said -- since I'm the one on there
23 interviewing Mr. Oltmann, I would have said I think
24 it's better to just take this thing down.
25      And if Mr. Coomer said I want equal time,

Page 303

1 I think we would been, you know, open to that, say,
2 sure, come on, say your side of the story.
3  Q.  Okay.
4  A.  This is not again a topic I have a lot of
5 interest in or passion about one way or the other,
6 as you can probably tell.  Right?
7  Q.  And that's because you don't believe that
8 Eric Coomer rigged the election, do you?
9  A.  I don't have any evidence that Eric Coomer
10 rigged the election.  I don't -- I just don't have
11 any evidence of that.  Again --
12  Q.  And you don't have --
13  A.  -- I think you already --
14  Q.  -- any evidence Dominion Voting Systems
15 rigged the election, neither, do you?
16  A.  Say that again.
17  Q.  You don't have any evidence that Dominion
18 Voting Systems rigged the election, either, do you?
19  A.  I don't have any evidence that Dominion
20 Voting Systems rigged the election.  I do have my
21 concerns about all the machine companies and their
22 security largely based on the information that I was
23 given by General McInnerney, Mary Fanning, the
24 interview I did with General Michael Flynn on
25 November of 20...

Page 304

1  Q.  27th of 2021?
2  A.  Correct.  2021, November 2021, where as
3 the former director of national intelligence, he
4 talks about all the machine companies.  Have you
5 not -- have you seen that interview?
6  Q.  I don't believe I have.  No.
7  A.  He mentions -- you can find them on my
8 website.  He mentions all of -- I think he
9 mentions -- I know he mentions Dominion, ES&S, Hart.
10 I think he mentions a couple of them, and he talks
11 about those machines and China and China
12 interference.
13      So what I'm saying to you is if you're
14 asking me do I have evidence of Dominion, I'm not a
15 computer guy.  What evidence would I look at and
16 understand what I'm seeing?
17      But do I have testimony from people I
18 trust, like General Flynn, General McInnerney,
19 others, Jeff O'Donnell, Dr. Walter Doherty, that
20 show great concerns to me about the voting machines,
21 all of the voting machines?  Yes.
22      But then again, I also got my information
23 from Kamala Harris.  I got my information from
24 Senator Amy Klobuchar.  I mean, I've watched the
25 clips from Hacking Democracy.  I've watched the

Page 305

77 (Pages 302 - 305)

1 clips from -- what's the other one -- Kill Chain.
2 Right?
3      So the Democrats were screaming all of
4 this in 2016. I've watched the testimony of
5 Professor Halderman talking about his -- what his
6 team could do.
7      So what I'm saying to you is based on the
8 public record by elected officials or national
9 security people, like General Flynn or the testimony
10 of Mr. Halderman or the testimony of Vice President
11 then U.S. Senator Kamala Harris on the, you know,
12 committees, sitting, talking about -- I just watched
13 -- my team just watched them flip votes or whatever.
14      I'm saying I have concerns based on what
15 my -- what government officials are telling me or
16 former government officials are telling me.
17   Q.  I guess my question ultimately is, we've
18 all heard Mr. Lindell confidently assert that he
19 knows the election was rigged. And I don't know
20 what his theory is.
21      I don't know if China rigged the election.
22 I don't know if the voting machines rigged the
23 election. I don't know if all the companies worked
24 together.
25      And I'm curious if you have a theory as to

*Page 306*

1 what -- how the election was rigged. I know I asked
2 you before, and you said you didn't have -- you
3 couldn't say one way or the other. Is that correct?
4   A.  Yeah. I don't know -- I don't know how it
5 was done. I think it was done multiple ways. I
6 think there was ballot harvesting going on. I think
7 there was using dead people to vote in certain
8 states.
9      I am -- I am very curious to know -- to
10 see and have more information on as Professor
11 Halderman, Kamala Harris, General Flynn, Amy
12 Klobuchar have said, more information about these
13 machines and can votes be changed. I'm just telling
14 you what these government officials are telling us,
15 some of them under oath.
16      And General Flynn in my interview with
17 him, you know, the first interview since he was
18 pardoned, spoke about the voting machines and
19 intrusion by China. So --
20   Q.  As you sit here today, do you have any
21 working theory as to how Eric Coomer individually
22 could have rigged the election?
23   A.  No. I've never claimed he did.
24   Q.  And you haven't -- you don't -- my point
25 is you don't have any idea how he possibly could

*Page 307*

1 have, or you haven't worked out a theory to that
2 effect?
3   A.  He's not even on my radar. My radar would
4 be on the CIA, and it would be on overseas and other
5 things, just like Congressman Bill Posey is writing
6 a letter to the inspector general of the CIA, I
7 believe it was, on his congressional letterhead
8 there should be investigation between the connection
9 between the CIA and the voting machine companies.
10      So my picture or my thoughts or my opinion
11 again is largely based on reading the reports by
12 government officials or listening to the testimony
13 of government officials or former or current
14 national intelligence people.
15      I don't -- Eric Coomer isn't on my radar.
16   Q.  Moving back to the video --
17   A.  I mean, have you ever heard me do a show
18 about Eric Coomer when someone else wasn't the one
19 bringing it up?
20   Q.  Well, no. Which leads me to believe that
21 you don't believe the claims about him.
22   A.  I don't have a -- I don't have a way to
23 disprove the claims. You know, I think there's a
24 verse in the Bible in Proverbs that says that one
25 side of a report sounds good until you hear the

*Page 308*

1 other side. Right?
2   Q.  Right.
3   A.  So I would want to hear both sides. I
4 mean, if -- if they walked in here with all kinds of
5 evidence and court cases and screen shots and stuff,
6 then I would say, wow, isn't that interesting. I
7 haven't heard both sides. I can hear what one side
8 is saying. I can hear what the other side is
9 saying. But I haven't heard it from both sides in a
10 concrete presentation, which is why, again, this
11 isn't -- this isn't of interest to me.
12      That's why whenever it seems to get
13 brought up, it's brought up by somebody else.
14   Q.  Going back to the video we just watched,
15 do you know if your viewers did reach out to the
16 Court in response to this?
17   A.  I don't know if they did. I wouldn't be
18 shocked.
19   Q.  Is that -- I know Mr. Lindell's involved
20 in a lot of litigation. Does he commonly call for
21 folks to contact the judge of those cases directly?
22   A.  I don't know if he has done that before.
23 But that would not be out of character for him to
24 urge the public to respectfully contact appointed or
25 elected people to voice their concerns.

*Page 309*

78 (Pages 306 - 309)



**Page 310 (left top)**

1  Q  As I said, I'm going to bounce around a
2  little bit here with a few different items  Oh,
3  here we go on the topic of other defendants
4     THE WITNESS:  It's started to cool down in
5  here all of sudden  The air kicked on
6     MR  GREER:  It came back on
7  BY MR  KLOEWER:

Page 310

**Page 312 (right top)**

1  told my name was taken off of that.
2     Q.  I see.  Does the name Randy Corporon ring
3  a bell?
4     A.  I don't know.
5     Q.  Okay.  I did see another text which I just
6  mentioned I don't have with me but that expressly
7  referenced Randy Corporon, C-O-R-P-O-R-O-N.
8        He's the RNC committee man for the state
9  of Colorado.  Sound familiar?  Okay?
10     A.  You keep talking, it might.
11     Q.  Okay.  He's the attorney for the Gateway
12  Pundit.
13     A.  Okay.
14     Q.  We've sued Gateway Pundit for publishing
15  stories about Dr. Coomer.
16     A.  I don't -- I don't think the attorney I
17  was talking about was from Colorado.  I think he was
18  from Missouri.
19     Q.  Burns?  Does that name sound familiar?
20     A.  That's starting to sound familiar.

Page 312

**Page 311 (left bottom)**

6     Q.  Okay.
7     A.  And at one point, I think I was named.
8     Q.  Okay.
9     A.  And then once I explained to Jim Hoft --
10  oh, I think I called him.  I said, what's -- what is
11  this all about?  And he said, you interviewed Allen
12  Jones or Mary Fanning or both of them.  Had to be
13  both of them.  And one -- Allen Jones I think said
14  something about someone.  And so they were looking
15  for an apology or retraction or something.
16        And I went back and listened to it.  And
17  my response to what he said was something to the
18  effect of, oh, okay, and I changed the topic.
19        So I said, you're going to name me in a
20  filing of someone that spouted something off on live
21  radio, and my response was, oh, okay and moved on.
22  And I think I asked, have you heard the recording?
23  And he said no.  And I said, well, you should go
24  listen to.
25        And within -- within a few days, I was

Page 311

**Page 313 (right bottom)**

22     Q.  He's the RNC committee man for the state
23  of Colorado.  He's also counsel for the Gateway
24  Pundit in our lawsuit against them.
25     A.  Okay.

Page 313

79 (Pages 310 - 313)

1    Q    And he is a defendant in a separate
2    lawsuit that we've also filed against Salem Media
3    Group  He's a -- he's a top radio host in Colorado,
4    and he's been involved with this process throughout
5        He was counsel for another third party
6    He's been criminal defense counsel for Tina Peters,
7    and he's -- well, he's just a very relevant
8    character --
9    A    Why was I getting ahold of him or wanting
10   to, or was I wanting to?  Do you know?
11   Q    That's what I'm asking you
12   A    Oh
13   Q    So if you don't remember, I will presume
14   it was inconsequential  But that's on me because I
15   didn't bring the exhibit
16   A    That's all right
17   Q    Okay  Anything else related on here?
18   Here we'll go  I'll mark this as Exhibit 115
19       (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
20   WAS MARKED AS EXHIBIT NO  115 TO THE DEPOSITION, AND
21   IS HERETO ATTACHED )
22   BY MR  KLOEWER:
23   Q    Just a quick question here  I started at
24   the beginning of this deposition by asking you if
25   you'd ever been deposed before  You said you didn't

Page 314

1    recall.
2        You mentioned here, I'm being subpoenaed
3    for a bunch of documents related to a class action
4    lawsuit against My Pillow.  Have you been deposed in
5    that lawsuit?
6    A    This is my first deposition.
7    Q    Okay.  It is.  All right.  What is this
8    lawsuit?  What was the class action against My
9    Pillow that you're referring to here?
10   A    This is a class action lawsuit related to
11   a text alert system, I believe.  I think this is
12   related to a text alert.
13   Q    Okay.  What -- do you recall what the name
14   of that case is?
15   A    No, I do not.  But it's -- I think it
16   settled.
17   Q    Okay.  Do you know why you were being
18   called in a lawsuit against My Pillow?
19   A    Because Johnston Howse was involved in
20   helping set up the texting system.
21   Q    And you mentioned before that your work
22   for Lindell TV, you're paid exclusively in My Pillow
23   promo codes?  Is that correct?
24   A    That has been the case except for the
25   documentaries, which was before -- I mean, that was

Page 315

1    our first endeavors together.  So he just paid me
2    whatever he wanted.
3    Q    Do you know if that's a common arrangement
4    for other programs hosted on FrankSpeech, like, for
5    example, Tamara Scott?
6    A    She works -- she works based on Pillow
7    codes.
8    Q    Okay.
9    A    She can go and get other sponsors if she
10   wants them.
11   Q    Okay.
12   A    And mention them in the broadcast.  And
13   she does.  She has some product that she also
14   advertises or promotes or pitches.
15   Q    Diamond and Silk, for example, do you know
16   if they have a similar arrangement?
17   A    They do.  They're -- I was one of the
18   first ones to reach out to them and get them on.
19   And their whole -- their whole thing has been based
20   on My Pillow codes and then their ability to go get
21   other sponsors, which they do as a -- they've gone
22   and got other sponsors, as well.
23       Most or all of them are supplementing
24   their My Pillow code with other sponsors.  I think
25   the only one that's being paid a guaranteed fee is

Page 316

1    Emerald Robinson.
2    Q    I see.
3    A    I don't know of any other hosts that are
4    guaranteed a monthly fee.
5    Q    And in your case, at least -- I know you
6    probably don't know for other folks.  But is -- do
7    the My Pillow codes constitute the majority of your
8    income from your work for Lindell TV?
9    A    No.
10   Q    No.  You have separate advertisers that --
11   A    Do better.
12   Q    Do better?
13   A    At times.
14   Q    Okay.
15   A    Yeah.  It's kind of like up and down.  One
16   will do good -- depends on what's going on in the
17   country and the trends.  So sometimes the My -- the
18   My Pillow codes are doing -- do very, very, well.
19       Other times, they don't do as well.  But
20   another sponsor that's offering something more
21   relevant to what's going on in the country and the
22   people like a gold company will just do really,
23   really well.
24   Q    On that note, we'll take a quick look at
25   this.  We discussed this individual briefly several

Page 317

80 (Pages 314 - 317)



1 hours ago

2      MR KLOEWER: Marking this as Exhibit 116

3      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

4 WAS MARKED AS EXHIBIT NO 116 TO THE DEPOSITION, AND

5 IS HERETO ATTACHED )

6   A   Oh, yeah Todd

16   A   Todd is an IT guy that can help get

17 certain things done on the website

18   Q   And that's him TC@mypillow com?

19   A   TC@mypillow com, I think that's Todd

20 Carter

Page 318

2      He would do some stuff that would

3 obviously come in the realm of Lindell TV  So I

4 think he -- you would have to ask him, but I think

5 he wears a lot of hats

6   Q   And I may need to ask him for this

7 question, as well  But do you know if he's paid

8 directly by FrankSpeech for his work with

9 FrankSpeech, or is that part of his work with --

10   A   I don't know

11   Q   Okay  I'm going to hand you an exhibit

12 now, which I have not stapled  So these are loose

13 pages  And I apologize for that  But it's a large

14 document  So it's a little easier that way

Page 319

2   A.  Okay.

3   Q.  Those are the documents requested.  Do you

4 see what I'm referring to?

5   A.  The last two pages?

6   Q.  Yes.

7   A.  Yes.

8   Q.  The rest, you don't need to get into.  Did

9 you -- did you work on providing a responses to

10 these through counsel?

11   A.  I did.

Page 320

22   Q.  Have you ever talked to Ms. Powell about

23 Eric Coomer?

24   A.  I don't remember.  On air or off air?

25   Q.  Either.

Page 321



**Page 322**

```
1    A.   Yeah.  I don't remember.
2    Q.   Have you discussed Dominion Voting Systems
3 with her?
4    A.   Oh, I'm sure.
```

**Page 324**

```
18   Q.   And would you -- do you have like a
19 standard pillow code that you use for your show all
20 the time?
21   A.   Come on.  You watch my show.  You should
22 know.
23   Q.   Is it B66?  Is that your code?
24   A.   Well, let's see.  You think it's B66.
25 Like the lapel BB?
```

**Page 323**

**Page 325**

```
1    Q.   Well, what I'm getting at is --
2    A.   Even on my mug sometimes, Brad, on the
3 desk, it says B66 on the mug.
4    Q.   Is that the only promo code that you
5 utilize?
6    A.   No, it is not.
7    Q.   Okay.  What other promo codes do you use?
8    A.   WVW.
9    Q.   Okay.  Anything else?
10   A.   We have used delta for my yellow lab.
11   Q.   Okay.  Do you ever have like events
12 related code --
13   A.   Yes.
14   Q.   -- or something like that?
15   A.   Yes.
16   Q.   Did you utilize one of those for the Cyber
17 Symposium, for example?
18   A.   I believe we did.  It was L66.
19   Q.   L66.  That was your code for that?
20   A.   No.  That was -- that was the code of
21 Lindell TV.
22   Q.   Okay.  And were other codes associated
23 with the -- with the Cyber Symposium, for example,
24 Frank 33 and audit.  You're saying L66 was another
25 one of those?
```

Veritext Legal Solutions
800-336-4000

Page 326:

1    A. I don't know what those other codes were
2 per se. I don't.
3    Q. Okay.
4    A. I would -- I would -- that's interesting
5 you mention it. I probably knew at the time. But
6 you know, if I'm going to show up over there and
7 provide my film crew and my cameras and switchers
8 and do that and get paid on a commission of whatever
9 he sells, then I would have thought it would have
10 been L66.
11    Q. Okay.
12    A. And maybe he -- I don't know who -- how
13 often those other codes you're mentioning were used,
14 and I don't know if I got paid a percentage of those
15 or not. I mean, someone who tracks that could look.
16 Dawn, who tracks that, would know.
17    Q. All right. That's Dawn Curtis?
18    A. I believe that's her last name.
19    Q. Okay. Well, that raises an interesting
20 question. Do you keep your own independent records
21 of revenue generated by your promo codes?
22    A. I wouldn't have my own independent
23 records. Because it all goes through his company.
24 They just tell me what the sales are and here's what
25 we're sending you.

Page 328:

1 It is what it is.
2    Q. Does she provide you like a spreadsheet or
3 something to demonstrate all the sales associated
4 with your promo code?
5    A. Yeah. She does provide a spreadsheet.
6    Q. So if you request sales related to your
7 promo code, that is a document that My Pillow can
8 produce?
9    A. She pro -- she provides me for -- with a
10 spreadsheet for WVW about every two weeks. And that
11 money gets paid pretty consistently.
12    Q. What does that spreadsheet include? Is
13 that a list of all the -- you know, each individual
14 towel or pair of slippers, or is it just line item
15 that says --
16    A. I think it's just a line. But I want to
17 be clear. The spreadsheet I get every two weeks for
18 WVW, that's, you know, really small. That's not --
19 that's not a real big number.
20        And so it's very easy to do. And it's not
21 a -- it's not apparently a problem with cash flow.
22 So I get that report pretty much every two weeks and
23 get paid on it pretty much every two weeks.
24        B66 is a -- is a bigger number. And so
25 sometimes it -- I think there's a cash flow issue.

Page 327:

1    Q. And is that like a monthly thing? They
2 just issue you a check for the sales that came in
3 that month?
4    A. It depends on the code we're talking
5 about. If it's B66, then I might get it once a
6 month. I might get it once every few months.
7 Depends on what's going on with the cash flow as I
8 understand.
9        So sometimes I'm asking can I get my check
10 for B -- can I get my money from B66.
11    Q. Are you able to track those sales in real
12 time? Like do you know what you're owed on any --
13 do you have access to a portal that will say --
14    A. No.
15    Q. -- X number of -- okay.
16    A. No.
17    Q. It's your reliance on My Pillow to provide
18 you the information?
19    A. I have to call Dawn. I could call Dawn
20 and say, hey, Dawn, did my code do last night. And
21 she would say, oh, you're great or whatever.
22        But she's so busy. You know, unless it's
23 a big, big, big event, I don't usually bother like
24 that. I just --- it is what it is. I'm not going
25 to really change what I'm doing, you know, per se.

Page 329:

1 And so they're waiting for, you know, something to
2 happen, sales to go up or a new special.
3        And I've been very, you know, patient
4 because, you know, I'm trying to be a team layer.
5 So sometimes I could -- I get paid every two weeks.
6 Sometimes I might not get paid once a month.
7 Sometimes it'll be a couple months.
8        I think I got paid for my March finally in
9 April or early May or whatever. And I -- I think I
10 was last week told, oh, you'll be getting April this
11 next week or this past week.
12        So in other words, it's just -- I'm not
13 pressuring them. I know he's got bills and he's --
14 you know, so I'm trying to be sensitive.
15    Q. I think you've already answered the
16 question I was trying to get at is, is there
17 recordkeeping specific to each individual?
18    A. Dawn would have all that.
[redacted]
[redacted]
22        Phil Waldron, are you in contact with him?
23 Has he -- I know you said he's been a guest on your
24 show. How frequently would you say you're in touch
25 with Mr. Waldron?



Page 330

1    A.   I mean, they're all available online.
2  It's not that often.  I don't know when I last had
3  him on.  But whatever I've done with him would be
4  on -- on the website, I think.  I don't think
5  anything's been hidden or pulled.
6        But it's been a few months easily I think
7  since I've had him on.

11        Doug Logan, are you in touch with Doug
12 Logan?  Do you know him?
13    A.   Doug Logan, is he the one with Cyber
14 Ninjas?
15    Q.   Cyber Ninjas?
16    A.   Yes.  I have interviewed him.
17    Q.   Okay.
18    A.   But am I in touch with him as in do I --
19 it's probably been months since I talked to him.
20    Q.   Do you remember talking to him about the
21 time of Cyber Symposium?
22    A.   I can check my texts if you want me to.
23        MR. GREER:  Don't do it now.
24 BY MR. KLOEWER:
25    Q.   Yeah.  We can -- we can circle back on

Page 332

13 BY MR. KLOEWER:
14    Q.   Mr. Lindell, for example.
15    A.   Mr. Lindell and I don't really communicate
16 much except through -- mostly through text, some
17 email a little bit.  But you have all that from my
18 understanding.
19    Q.   Mr. Olsen, did you talk to him about --
20    A.   You have all those texts.  So I don't -- I
21 mean, I -- I just went through every individual one.
22 I don't know what was said.  But you have all that.
23    Q.   Do you ever utilize other platforms to
24 communicate with folks like Signal, for example?
25    A.   Yes.  Signal.  But I hate it.

Page 331

1  that.  Conan Hayes, we talked about, Ron Watkins,
2  Mark Cook, Lisa Draza.

Page 333

1    Q.   Okay.  When do you use Signal?
2    A.   When someone -- usually when someone sends
3  me a message on it, which I usually ask them don't
4  use that.  You're kidding yourself if you think it's
5  safe.  I don't think is.  Maybe they think it is.  I
6  don't know.
7        It seems to me be a really cheesy app.  It
8  doesn't work well.  I don't know like it.  And I
9  don't want to have to go trying to search out five
10 different platforms and communicate with people.
11 Communicate with me through text or forget it.
12        But they'll -- occasionally someone will
13 send me a thing on Signal like they're so worried
14 about their communications.
15    Q.   Do you ever communicate with Mr. Lindell
16 on Signal?
17    A.   Not that I'm aware of.
18    Q.   Has he ever tried to communicate with you?
19    A.   Not that I'm aware of.  Does Mr. Lindell
20 impress you as someone who isn't already saying it
21 all out on the public?
22    Q.   Well, I know that he communicates with
23 Mr. Oltmann on Signal from time to time.
24    A.   Really?  Okay.
25    Q.   So I'm just curious.

84 (Pages 330 - 333)

1    A.   Well, I can check my Signal.  But I don't
2 think so.
3    Q.   Do you recall having conversations after
4 the symposium about what happened and why the
5 information didn't pan out the way --
6    A.   Yes.  We talked about it on the air, I
7 think.
8    Q.   Yeah.  And what's your -- what's your
9 assessment of that at this time?
10    A.   Well, based on what I was told, the event
11 was sabotaged.  You know, they -- it was
12 penetrated.
13    Q.   By who?
14    A.   Well, if you believe certain people, Josh
15 Merritt and maybe even the government or government
16 assets or actors.



Page 334

11    Q.   Okay.  Just to confirm -- and I apologize
12 if you answered this -- that VOCL contract we saw,
13 Mr. Lindell said he's not aware of a separate
14 contract related to FrankSpeech.  Is that -- is that
15 correct?
16    A.   Correct.
17    Q.   Is that your understanding, as well?
18    A.   I mean --
19    Q.   There's no such --
20    A.   -- I think that was the only contract that
21 was written.  It was never finalized.  It was never
22 signed and enacted.  And it was pretty all much done
23 over just a verbal agreement.
24    Q.   And I saw Mr. Lindell say about a week or
25 two ago that they were going to be selling shares of

Page 336

Page 335

1 FrankSpeech?  Have you heard about this?
2    A.   Yes.
3    Q.   Okay.  Were you involved in discussions to
4 do that?
5    A.   No.  I found out about it like pretty much
6 everybody else, in real time.
7    Q.   Okay.  Are you -- have you discussed
8 getting shares of FrankSpeech from Mr. Lindell
9 yourself?
10    A.   He has -- he said to me the other day, you
11 should have some shares in FrankSpeech.  He's
12 offered them to me.
13    Q.   And he suggested in his deposition that
14 there were other owners of FrankSpeech, but he
15 wouldn't tell us who they are.
16    A.   Yeah.  You would have to ask him.
17    Q.   You don't know who the ownership structure
18 is now?
19    A.   I have not seen a list -- I've not seen a
20 list of who the ownership structure are.
21        I heard talk about certain people getting
22 stock when it first started.  But I don't know what
23 finally ended up being done.

Page 337

85 (Pages 334 - 337)



14    Q.   Hursti?
15         A.   Hursti was there.  So I think Hursti said
16    something to me about it.  I went back there when I
17    was, you know, directed to go back there, see what
18    was going on.  And I saw Hursti there.  I met him
19    and got my picture with him.

Page 338

4         A.   It was verbally, I think.
5         Q.   Okay.
6         A.   Mike, are you going to have to pay
7    anybody?  No.  Nobody proved it was not from the
8    2020 election.
9              I mean, I think we talked about it on the
10   air.
11        Q.   Okay.  But you don't have any
12   communications --
13        A.   Not that I'm aware of.  Because I would
14   have no reason to.  I'm not -- I didn't make the
15   offer.  I wasn't -- I wasn't -- wasn't there like,
16   Brad, a three-panel group that was overseeing
17   everything?
18        Q.   I believe there was.  You weren't involved
19   with that process at all?
20        A.   No.  What -- who was?  Kurt Olsen and who
21   else?
22        Q.   I believe Dr. Frank was the second judge
23   and Todd Sanders was the third.
24        A.   Okay.  So again, if I'm in any emails that
25   went to my inbox, I don't know that anything came

Page 340

1    up.  But again, I would have no reason to be
2    involved in those communications.
3         Q.   That was something outside of your
4    purview, it sounds.
5         A.   And if I get -- sometimes they try to drag
6    me into stuff.  One reason why I'm able to
7    accomplish what I am in a day is I don't get dragged
8    into other people's  projects and drama.
9              So someone may ask you to be involved in
10   something or look at this and give your thoughts.
11   It's going to have to be pretty darn important
12   before I set aside what I'm doing.
13             Because every day I have, you know, four
14   hours of TV I've got to get ready for, and I've got
15   other things to do.  So I don't -- I'm not looking
16   to get involved in other people's events.
17             My days are very structured.  I pretty
18   much live the same routine day in, day out.  You can
19   set your clock by a lot of my routines.
20             I get off the air.  I make hot tea.  I
21   bring it to the bedroom.  I work for a few hours.
22   You know, my schedule is very structured in a lot of
23   regards.
24             I mean, some days, I lose control of it.
25   Something comes up, and I can't -- but I like to

Page 341

Page 339

86 (Pages 338 - 341)

1 keep a very scheduled routine. I like to -- this is
2 when I get off the air at 2:00, I start doing show
3 prep for the night and call Mike, what he's going to
4 do in his show.
5      So what I'm trying to say to you is if I
6 see emails or emails come in and it's not in my
7 interest or my purview, I try not to get caught up
8 in it. But that doesn't mean if I didn't search
9 through emails, I wouldn't find some communication
10 about this. But I doubt it.
11      And again, I don't read every email I get.
12 Q. Okay.
13 A. I'll routinely tell people if you really
14 need to get ahold of me, text me.
15 Q. Moving on to Number 11. We discussed this
16 a little bit, but I'm just curious. You know, we've
17 seen a couple interviews that you conducted, the May
18 3rd one with Joe Oltmann, September interview with
19 Tina Peters.
20      With respect to the Oltmann interview, the
21 first one we looked at, did he provide you any
22 information prior to that interview?
23 A. Not that I'm aware of.
24 Q. Okay. So you did -- is it your typical
25 practice when you conduct an interview with somebody

Page 342

1 do that.
2 A. But you see what I was doing there, didn't
3 you?
4 Q. Yes. I mean, I can see you on screen.
5 When you refer --
6 A. No. But you realize what I was doing with
7 that line of questioning to him. Right?
8 Q. What were you doing?
9 A. I was trying to -- I was asking him if he
10 has done his due diligence and verified that this --
11 these are accurate statements that he is making and
12 he has verified them with his attorney. Didn't I
13 ask him that?
14 Q. Yes.
15 A. So there you go.
16 Q. But you didn't verify that information
17 yourself.
18 A. That's not my job.
19 Q. Let me see. Where are we? And so --
20 A. That would have been -- that right there
21 would have been when -- when his attorney should
22 have reached out to me and said, you were asking
23 about this, here, let us give you more information.
24 And then I would have responded, interesting.
25      And that's when they could have requested

Page 344

1 new to request information from them beforehand?
2 A. Not -- not generally. Depends on what the
3 topic is and who person is.
4 Q. Well, sorry. I'm going to circle back
5 here because it's occurring to me now I want to
6 watch one clip real quick with respect to that May
7 3rd, 2021 interview. It's going to be 65.
8      I'm going to show you what's been labeled
9 as Exhibit 65, Clip 9.
10 MR. GREER: Have we already watched this
11 one?
12 MR. KLOEWER: I don't believe we have.
13 And I --
14 MR. GREER: I'm sorry. Give me the
15 exhibit one more time. 65, Clip 9?
16 MR. KLOEWER: Yes.
17 MR. GREER: Okay. Thank you.
18 (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
19 PLAYED.)
20 BY MR. KLOEWER:
21 Q. So we can see the stacks of paper that you
22 said were provided to you by Mr. Oltmann. Do you
23 still have those?
24 A. I have no idea. We'll have to search.
25 Q. All right. Well, I would request that you

Page 343

1 either it be taken down by me and get me to help
2 them do that, or they could have said, we'd like to
3 have equal time.
4 Q. So in this instance, we have some evidence
5 of communications prior to the interview that you
6 conducted. Did you have -- and I realize that it's
7 a live show with Mr. Lindell.
8      But for example, the May 9th interview we
9 watched a few days after that where Mr. Lindell
10 accused Dr. Coomer of treason, did you have any
11 communications prior to that time discussing what
12 you would discuss on the show or --
13 A. Not that I'm aware. Generally, we don't
14 talk about everything we're going to discuss on the
15 show.
16      Mike will have a certain thing. He wants
17 to have a guest come on, play a clip. Sometimes he
18 will say, I've been busy all day, I have no clue
19 what I'm going to talk about, let's just take calls,
20 I'm going to come on and update them on a few
21 things, and we'll take calls. I have no clue what
22 we're going to talk about.
23      You know, I'd like to play that again.
24 Because I'd like to hear I said there again, that
25 clip right there.

Page 345

87 (Pages 342 - 345)

1    (WHEREUPON, THE ABOVE-REFERENCED CLIP WAS
2 PLAYED.)
3 BY MR. KLOEWER:
4    Q.  Was there any reason why this interview
5 had to happen on this day?
6    A.  No idea.  I don't know if I -- I can't
7 remember how he came to be interviewed.
8    Q.  What I mean is, could you have waited an
9 extra day to review what he had sent over and
10 validated it yourself?
11    A.  I could have.  But I'm not really
12 interested in this topic.  So I may have been asked
13 to interview him.  It's not uncommon I'm sometimes
14 asked to interview people.
15    Q.  Do you know if you were or who would
16 have --
17    A.  I can't remember.
18    Q.  -- asked you that?
19    A.  I can't remember why I was interviewing
20 him.  It would not be something, oh, let's go get
21 Joe, it's going to be a great interview.
22       If I had to guess, someone probably either
23 asked or he reached out to me.  I don't know how it
24 came about.
25       But if you watch my shows, you will see

Page 346

1 you were going to discuss?
2    A.  She would have probably texted me or asked
3 me -- called me and asked me to interview her, which
4 is generally again how it happens.  She'll reach out
5 to me, or Mike will say, we should get Tina.
6       But in this instance, she probably reached
7 out to me, which is not uncommon, hey, I could come
8 and tell my side of the story on this, you know,
9 this is what's going on, will you have me on.  And I
10 will do that for her.
11       I think she's a cancer survivor.  I think
12 her son was a Navy Seal too who had passed away.
13 And so I've kind of had a soft spot for her.
14       So generally, if she asked me can I come
15 on, I generally try to help her out and let her come
16 on just to be kind to her.
17       But as far as do I know what she was going
18 to say that day about Mr. Coomer?  Probably didn't.
19       Again, she comes on for a specific reason
20 and then says something else, talked about something
21 else.  I highly doubt that I knew that was coming.
22    Q.  And for your more recent March 10th
23 interview that we just watched a small clip from
24 following the depositions of Mr. Lindell, did you
25 have any planning prior to that?

Page 348

1 that generally, again, I talk about things that I
2 find of interest or really important.  This wasn't a
3 real thing of interest to me.
4       And I had not even had time to print
5 everything out.  I don't know what time day he sent
6 it over versus the interview, time of interview.
7    Q.  Okay.
8    A.  But we didn't put -- as you can see, I
9 think, we didn't put any of it on the air.  We
10 didn't show any of it.
11    Q.  Okay.  And with respect to the other
12 interviews we looked at --
13    A.  I don't even know that we actually went
14 through a lot of what he sent me.  Did we?
15    Q.  I -- I don't believe so.
16    A.  So to the point of your question is, I
17 didn't have time to vet it.  I didn't have time to
18 look at it.  And a lot of it, therefore, we didn't
19 even apparently discuss.
20       So I think actually I was doing my job by
21 not showing it on the screen and not going into it.
22    Q.  With respect to the interview you
23 conducted with Tina Peters, I think we touched on
24 this previously, did you have any communications
25 with her before or after that interview about what

Page 347

1    A.  Which one?
2    Q.  We watched a brief clip where you put up
3 the Judge Wong's contact -- or the Court's
4 information there.
5    A.  Uh-huh (affirmative response).
6    Q.  Did you have any discussions with
7 Mr. Lindell preparing for that --
8    A.  Probably.
9    Q.  -- conversation?
10    A.  For that one, he probably would have said,
11 hey, I want to talk about this Coomer lawsuit.
12    Q.  And would that -- would those
13 communications have been in writing or --
14    A.  Most likely phone.  I would call him at
15 like 2:00, 3:00, what are you going to do on your
16 show tonight?  Are you going to do your show
17 tonight?  Am I going to sit in for you?  Do you want
18 me to book you a guest?  What do you want to do?



Page 349



14    Q.   I see?  Are you --
15    A.   But if you're asking have I ever received
16  any of Montgomery's work, I think that video was
17  his.
18    Q.   So any information you have from Dennis
19  Montgomery would have come to you via Mary Fanning?
20    A.   Correct.  I don't believe I have -- I
21  don't believe I even have his email address.
22    Q.   Does Mary Fanning work with Dennis
23  Montgomery?  What is her role serving as that
24  intermediary?
25    A.   If you figure it out, let me know.  It's

Page 352

24    Q.   Does Mr. Johnston have any role at
25  FrankSpeech today?

Page 350

1    A.   Not that I'm aware of.
2    Q.   Okay.  It's been -- is he still managing
3  your show?  You said before that he had --
4    A.   He had built some of my --
5    Q.   -- Worldview Weekend.
6    A.   He had built some of my stuff.  Yes.  He's
7  still working and helping as an IT guy.  We're
8  transitioning away from him, as well, for that.
9    Q.   Okay.
10    A.   So my goal is eventually to close down
11  Johnston Howse, move away from him.  I worked with
12  him for nine years.  And I think he's kind of in a
13  new place in life.  I don't think he really wants to
14  maintain my site.  I think he wants to go do
15  something else.
16        I do.  I've worked with him for I think
17  eight or nine years, however many years.  And I'm
18  looking for a new team to put around me.
19    Q.   Okay.
20    A.   That's a little more compatible with my
21  personality.

Page 351

1  an interesting relationship.  I don't know what she
2  is to him.
3    Q.   All right.  I've asked everyone I possibly
4  know to ask.
5    A.   Does everybody have the same response?
6    Q.   Yes.  Okay.  So you personally have never
7  received, for example, the PCAPS.
8    A.   I am not aware that I've received PCAPS.
9  And if I did, I wouldn't -- I don't think I would
10  know what I was looking at or how to open them
11  unless it was just click and file and it opened up.
12  But I'm not aware that I've received any PCAPS.
13    Q.   Okay.
14    A.   We were -- we were later told that if
15  someone had opened those PCAPS at that Cyber
16  Symposium, we were going to be raided by the
17  government, that they were there and they were ready
18  to raid and they were ready to arrest.
19    Q.   Who told you that?
20    A.   I believe I heard that from Mike Lindell.
21    Q.   Do you know who told him that?
22    A.   No, I don't.  Probably his attorney, Kurt
23  Olsen.  But I don't know.
24    Q.   Okay.
25        MR. KLOEWER:  I think that's -- I'd like a

Page 353

89 (Pages 350 - 353)

1 quick break to just make sure if I've missed
2 anything.
3      MR. GREER:  No problem.  Take your time.
4      MR. KLOEWER:  I think we're probably
5 getting pretty close.
6   A.  One -- one -- one thing I do want to
7 clarify, make sure I'm being fully transparent.
8 Mr. Montgomery would reportedly come on to my Sunday
9 night class or service that I teach.  And there --
10 at the time, we were using something called -- I
11 think it was live stream.  And there is a public
12 comment section in there.  And he would come in and
13 make comments.
14      MR. GREER:  I think I produced those.
15      MR. KLOEWER:  You did.
16 BY MR. KLOEWER:
17   Q.  Now that you mention that --
18      MR. GREER:  I forgot about that.
19   A.  So I don't want -- I want to be
20 transparent in saying that if I've ever received
21 information -- I don't know what your definition of
22 receiving information is, but --
23 BY MR. KLOEWER:
24   Q.  Sure.
25   A.  -- that would be one that he was putting

Page 354

1   A.  I don't -- I discussed that I was coming
2 here.
3   Q.  Okay.
4   A.  I discussed that we were going to be
5 talking about it.
6   Q.  Okay.  And that --
7   A.  But now, if you want to ask me did we
8 discuss with any particular thing --
9   Q.  That -- did you discuss any specific topic
10 that you anticipated would come up in the deposition
11 today?
12   A.  I don't know if there was any particular
13 topic that we discussed other than he just kind of
14 said, have you ever been through these kind of
15 things before, here's how it will go down and here's
16 the kind of general gist of probably what they're
17 looking for.
18   Q.  Okay.  But nothing substantive beyond
19 that?
20   A.  No.
21   Q.  Okay.  Other than that, have I been
22 respectful to you today?
23   A.  Absolutely.
24   Q.  Great.
25   A.  Have I?

Page 356

1 out information, and we were receiving it in our
2 account.  But --
3   Q.  Yeah.  I believe you produced those.
4      MR. KLOEWER:  Okay.  Let's take a minute,
5 just five minutes to make sure I need to wrap up any
6 last lose ends.
7      VIDEO SPECIALIST:  This ends Media Number
8 5.  Going off the record at 3:38 p.m.
9      (SHORT BREAK)
10      VIDEO SPECIALIST:  This begins Media
11 Number 6.  Going back on the record at 3:48 p.m.
12 BY MR. KLOEWER:
13   Q.  Just a couple last questions, Mr. Howse.
14 Have you discussed your testimony with Mr. Lindell
15 today?
16   A.  Other than he called me because his site
17 was down, and I just told him it was kind of funny,
18 we were just discussing you, and then I told them I
19 had to take your call.  And he said okay.
20      And he immed -- his whole concern was
21 getting ahold of my son to get their stream back up.
22   Q.  And prior to your deposition today, did
23 you discuss your testimony with Mr. Lindell?
24   A.  Did I discuss my testimony?
25   Q.  Yes.

Page 355

1   Q.  Yes.  I don't have any further questions
2 here.
3   Q.  Okay.  So you come away liking me more?
4   Q.  If it's even possible, yes.
5   A.  Good answer, Brad.
6   Q.  Yeah.
7      VIDEO SPECIALIST:  Are we ready to
8 conclude the deposition?
9      MR. GREER:  Hold on.  Do you want to ask
10 any?
11      MR. MALONE:  No questions for defendants
12 at this time.  Thanks for your time, Mr. Howse.
13      MR. KLOEWER:  I'll pass the witness.
14 Yeah.
15      THE WITNESS:  So we have the ability to
16 amend and correct?
17      MR. GREER:  You're going to -- you're
18 going to read and sign it.  Pursuant to the
19 protective order, 15 days after we receive the
20 transcript, we have the opportunity to designate
21 certain materials as confidential if we want.
22      You'll read the deposition.  You'll sign
23 and attest that everything you said is true and
24 correct.  If there are any errors, we can fill out
25 what's called an errata, and we can correct it.

Page 357

90 (Pages 354 - 357)

| | |
|---|---|
| 1     THE WITNESS:  Right. | 1     ERRATA SHEET FOR THE TRANSCRIPT OF: |
| 2     MR. GREER:  Usually it's for minor things. | 2         BRANNON HOWSE |
| 3     THE WITNESS:  Right. | 3         CORRECTIONS |
| 4     MR. GREER:  You can't change the substance | 4  Page Line Now Reads  Should Read   Reasons |
| 5  of your testimony. | 5  ____ ____ _____ _____ _____ |
| 6         VIDEO SPECIALIST:  This concludes today's | 6  ____ ____ _____ _____ _____ |
| 7  deposition.  Going off the record at 3:50 p.m. | 7  ____ ____ _____ _____ _____ |
| 8 | 8  ____ ____ _____ _____ _____ |
| 9 | 9  ____ ____ _____ _____ _____ |
| 10 | 10  ____ ____ _____ _____ _____ |
| 11 | 11  ____ ____ _____ _____ _____ |
| 12 | 12  ____ ____ _____ _____ _____ |
| 13 | 13  ____ ____ _____ _____ _____ |
| 14 | 14  ____ ____ _____ _____ _____ |
| 15 | 15  ____ ____ _____ _____ _____ |
| 16 | 16  ____ ____ _____ _____ _____ |
| 17 | 17  ____ ____ _____ _____ _____ |
| 18 | 18 |
| 19 | 19  (Date)         Signature of Witness |
| 20 | 20  Sworn to and Subscribed before me, _____, |
| 21 |     this ____ day of _____, 20__. |
| 22 | 21 |
| 23 | 22  _____   _____ |
| 24 | 23 |
| 25 | 24 |
|                          Page 358 | 25 |
| |                          Page 360 |

1         C E R T I F I C A T E
2  STATE OF TENNESSEE   )
3  COUNTY OF SHELBY    )
4
      I, Korian Neal, LCR #402, RPR, CCR, Licensed
5  Court Reporter and Notary Public, in and for the
   State of Tennessee, do hereby certify that the above
6  was reported by me, and the transcript is a true
   and accurate record to the best of my knowledge,
7  skills, and ability
8      I further certify that I am not related to
   nor an employee of counsel or any of the parties to
9  the action, nor am I in any way financially
   interested in the outcome of this case
10
      I further certify that I am duly licensed by
11 the Tennessee Board of Court Reporting as a Licensed
   Court Reporter as evidenced by the LCR number and
12 expiration date following my name below
13     I further certify that this transcript is
   the work product of this court reporting agency and
14 any unauthorized reproduction and/or transfer of it
   will be in violation of Tennessee Code Annotated
15 39-14-104, Theft of Services
16   IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my notarial seal this 12th day of
17 June 2023
18
19
20
21     Korian Neal, RPR, CCR, LCR #402
       Expiration Date 06-30-2024
       Notary Public Commission Expires
22     04-29-2026
23
24
25
                          Page 359

| |
|---|
| 1  agreer@glankler.com |
| 2         June 12, 2023 |
| 3  RE: Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al |
| 4  DEPOSITION OF: Brannon Howse (# 5909772) |
| 5     The above-referenced witness transcript is |
| 6  available for read and sign. |
| 7     Within the applicable timeframe, the witness |
| 8  should read the testimony to verify its accuracy. If |
| 9  there are any changes, the witness should note those |
| 10  on the attached Errata Sheet. |
| 11     The witness should sign and notarize the |
| 12  attached Errata pages and return to Veritext at |
| 13  errata-tx@veritext.com. |
| 14     According to applicable rules or agreements, if |
| 15  the witness fails to do so within the time allotted, |
| 16  a certified copy of the transcript may be used as if |
| 17  signed. |
| 18         Yours, |
| 19         Veritext Legal Solutions |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
|                          Page 361 |

Veritext Legal Solutions
800-336-4000

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2    _____

 3    ERIC COOMER, Ph.D.,          )
                                   )
 4          Plaintiff,             )
                                   )
 5    VS.                          ) NO. 1:22-CV-01129-WJM
                                   )
 6    MICHAEL J. LINDELL,          )
      FRANKSPEECH LLC, AND         )
 7    MY PILLOW, INC.,             )
                                   )
 8                                 )
            Defendants.            )
 9    _____

10

11

                      VIDEO DEPOSITION
12
                           OF
13
                      BRANNON HOWSE
14
                      MAY 20, 2023
15

16

17

18

19

20

21

22

23      ALPHA REPORTING CORPORATION, A VERITEXT COMPANY
                      236 Adams Avenue
24                    Memphis, TN 38103
                      901-523-8974
25                  www.alphareporting.com


                                              Page 1
```

```
 1                   C E R T I F I C A T E
 2    STATE OF TENNESSEE      )
                              )
 3    COUNTY OF SHELBY        )
 4
              I, Korian Neal, LCR #402, RPR, CCR, Licensed
 5    Court Reporter and Notary Public, in and for the
      State of Tennessee, do hereby certify that the above
 6    1 was reported by me, and the transcript is a true
      and accurate record to the best of my knowledge,
 7    skills, and ability.
 8            I further certify that I am not related to
      nor an employee of counsel or any of the parties to
 9    the action, nor am I in any way financially
      interested in the outcome of this case.
10
              I further certify that I am duly licensed by
11    the Tennessee Board of Court Reporting as a Licensed
      Court Reporter as evidenced by the LCR number and
12    expiration date following my name below.
13            I further certify that this transcript is
      the work product of this court reporting agency and
14    any unauthorized reproduction and/or transfer of it
      will be in violation of Tennessee Code Annotated
15    39-14-104, Theft of Services.
16            IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my notarial seal this 12th day of
17    June 2023.
18
19
20            Korian Neal, RPR, CCR, LCR #402
21            Expiration Date 06-30-2024
              Notary Public Commission Expires
22            04-29-2026
23
24
25
```

Page 359

```
 1        ***NOTIFICATION BY REPORTING FIRM RE RETURN OF
 2                          ORIGINAL***
 3     -------------------------------------------------------
              DEPOSITION OF BRANNON HOWSE
 4
                         MAY 20, 2023
 5     -------------------------------------------------------
 6        The original deposition XXXX/was not returned to
 7    the deposition officer on _ _ _ _  July 17th 2023  _ _;
 8        If returned, the attached Changes and Signature
 9    page contains any changes and the reasons therefor;
10        If returned, the original deposition was sent to
11    Bradley A. Kloewer, Custodial Attorney;
12        That $ N/A      is the deposition officer's charges
13    to the PLAINTIFF for preparing the original
14    deposition transcript and any copies of exhibits.
15        That a copy of this notification was sent to all
16    parties shown herein this   16th    day of   Aug.      ,
17    2023.
18
19                         BY: Kim Cao
                             _____
20                         FOR:
                           VERITEXT LEGAL SOLUTIONS
21                         Veritext Registration No. 571
                           300 Throckmorton Street
22                         Suite 1600
                           Fort Worth, Texas  76102
23                         (817) 336-3042 (800) 336-4000
24    Job No. 5909772
25


                                              Page 1
```

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.