IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

**EXHIBIT 6**

---

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2     - - - - - - - - - - - - - - - :
                                     :
 3     ERIC COOMER, PHD,             :
                                     :
 4            Plaintiff,             :  CASE NO.
                                     :
 5            vs.                    :  1:22-cv-01129
                                     :
 6     MICHAEL J. LINDELL,           :
       FRANKSPEECH LLC and MY PILLOW,:
 7     INC.,                         :
                                     :
 8            Defendants.            :
                                     :
 9     - - - - - - - - - - - - - - - :
10
11               DEPOSITION OF KURT B. OLSEN
12
13     DATE:            June 15, 2023
14     TIME:            9:32 a.m.
15     LOCATION:        Veritext Legal Solutions
                        1250 I Street, NW
16                      Suite 901
                        Washington, DC 20005
17
18     REPORTED BY:     Constance H. Rhodes
                        Reporter, Notary
19
20
21               Veritext Legal Solutions
                1250 Eye Street, Northwest
22                 Washington, DC 20005

                                              Page 1
```

1  A P P E A R A N C E
2  On behalf of Plaintiff:
3    BRADLEY A. KLOEWER, ESQUIRE
     Cain & Skarnulis, PLLC
4    101 North F Street
     Suite 207
5    Salida, Colorado 81201
     Bkloewer@cstrial.com
6
7  On behalf of Defendants:
8    ANDREW PARKER, ESQUIRE
     Parker Daniels Kibert
9    800 Colwell Building
     123 North Third Street
10   Minneapolis, Minnesota 55401
     Parker@parkerdk.com
11
12 On behalf of the Witness:
13   CHRISTOPHER KACHOUROFF, ESQUIRE
     McSweeney Cynkar & Kachouroff
14   13649 Office Place
     Suite 101
15   Woodbridge, Virginia 22192
     (703) 621-3300
16   Chris@mck-lawyers.com
17 ALSO PRESENT:
18   Ellen Hebert, Videographer
19          * * * * *
20
21
22
Page 2

1  OLSEN EXHIBITS CONTINUED:
2  Exh 135 Plaintiff's Notice of Intent to Take
         Deposition of Kurt Olsen          233
3  Exh 136 Atty. Kachouroff 6/8/23 letter to Atty
         Cain re: Olsen Subpoena Production   234
4  Exh 137 July 2021 email re: Cyber Symposium   258
   Exh 138 Olsen 2/28/22 email re: Halderman clip  260
5  Exh 139 Fanning 4/22/22 email re: lawsuit    261
6  EXHIBITS PREVIOUSLY MARKED:
7  Exh 5   Messages between P and Z
   Exh 21  Screenshot -- Eric Coomer
8  Exh 24  Parley message Joe Oltmann
   Exh 25  Parler - Oltmann on Coomer
9  Exh 53  Oltmann messages
   Exh 72  Oaks email re Symposium agenda
10 Exh 87  Symposium Program Agenda
   Exh 103 Olsen message Halderman clips
11 Exh 105 Declaration of Halderman
   Exh 104 Olsen 10/5/21 TPs for Halderman Rpt.
12 Exh 108 7/4/21 Olsen text re: credibility of
         Fanning and Montgomery
13 Exh 116 Todd Carter 5/20/22 email to Olsen re
         notice of complaint filing
14
15
16
17
18
19
20
21
22 (*Exhibits attached to transcript.)
Page 4

1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiff         6
4    Counsel for Defendants        268
5
6          E X H I B I T S
7  Exh 118 4 10 December 29th Meeting - Just Call
        It Corrupt and Leave the Rest to me   22
8  Exh 119 7 12 President Trump Still Sought to
        Delay Joint Session          27
9  Exh 120 Olsen 2/25/21 Engagement letter to
        Mike Lindell               32
10 Exh 121 Mary Fanning 2/20/22 email re Demo
        of Scorecard               72
11 Exh 122 Mary Fanning 3/11/21 email re: Dominion
        letter to American Report       86
12 Exh 123 Clare Locke 2/4/21 letter to Fanning
        re: False Statement about Dominion   88
13 Exh 124 Cover email for Burns Law letter to
        Fanning  3/22/21            94
14 Exh 125 Burns Law letter to Fanning re
        Defamatory Comments to individuals
15      and demand for retraction      100
   Exh 126 Mary Fanning 3/27/21 email to Olsen 105
16 Exh 127 Olsen 4/6/21 email to Fanning re:
        Dominion/Smartmatic/Coomer threats   116
17 Exh 128 Expanded Summary to Arpaio from Zullo
        re: Subject infiltration of Mike
18      Lindell - Threat to DJT 7/20/21   148
   Exh 129 USB Flash Drive           159
19 Exh 130 Waldren 8/2/21 email re: NDA Agmt   159
   Exh 131 Excerpt of Lindell Depo Transcript  191
20 Exh 132 Fanning 8/6/21 email re: Lindell Opening
        remarks                 203
21 Exh 133 Olsen 6/29/21 email Fanning re: Byrne 207
   Exh 134 Kirk Weibe 8/17/21 email to Olsen re
22      Symposium fallout           215
Page 3

1       P R O C E E D I N G S
2  WHEREUPON,
3          KURT B. OLSEN
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6          EXAMINATION BY COUNSEL FOR PLAINTIFF
7          VIDEOGRAPHER:  Good morning.  We are going
8  on the record at 9:31 a.m. -- correction 9:32 a.m.
9  Today's date is June 15th, 2023.  Please note that
10 the microphones are sensitive and may pick up
11 whispering and private conversations.  Please mute
12 your phones at this time.  Audio and video recording
13 will continue to take place unless all parties agree
14 to go off the record.
15         This is Media Unit Number One of the
16 video-recorded deposition of Kurt B. Olsen, taken
17 by counsel for the plaintiff in the matter of Eric
18 Coomer, Ph.D versus Michael J. Lindell, et al., in
19 the United States District Court for the District
20 of Colorado, Case Number 1:22-CV-01129-NYW-SKC.
21         The location of the deposition is
22 Veritext at 1250 I Street, Northwest, Suite 901,
Page 5

2 (Pages 2 - 5)

1  Washington, D.C.
2      My name is Ellen Hebert from Veritext.
3  I am the Videographer.  The Court Reporter is
4  Connie Rhodes from Veritext.
5      If there are any objections to
6  proceeding, please state them at the time of your
7  appearance.  Counsel, and all present will now
8  state their appearances and affiliations for the
9  record, beginning with the noticing the attorney.
10     MR. KLOEWER:  On behalf of Plaintiff Eric
11 Coomer, my name is Brad Kloewer.
12     MR. PARKER:  On behalf of Defendants
13 Michael J. Lindell, FrankSpeech LLC, and My Pillow,
14 Inc., Andrew Parker.
15     MR. KACHOUROFF:  My name is Chris
16 Kachouroff, and I represent Kurt Olsen.
17     VIDEOGRAPHER:  Thank you.  Will the court
18 reporter please swear in the witness.
19 WHEREUPON,
20         KURT B. OLSEN
21 called as a witness, and having been first duly
22 sworn, was examined and testified as follows:
                                          Page 6

1    A    Sure.
2    Q    All right.
3        MR. PARKER:  Counsel, make I make a short
4  statement?
5        MR. KLOEWER:  Certainly.
6        MR. PARKER:  I just wanted to indicate for
7  the record that the defendants are not intending to,
8  nor are they otherwise, waiving any attorney-client
9  privilege, work product privilege, or other
10 privilege as it relates to this matter.  Thank you.
11       MR. KACHOUROFF:  And I also have a quick
12 statement.
13       MR. KLOEWER:  Sure.
14       MR. KACHOUROFF:  Mr. Olsen is designating
15 only nonpublic documents such as his emails that
16 he's turned over and marking them as confidential
17 pursuant to paragraph five of the protective order.
18       MR. KLOEWER:  Understood.
19 BY MR. KLOEWER:
20   Q    Okay.  Let's get started here.  We'll
21 obviously get into the substance of this
22 particular lawsuit here in a minute, but I do want
                                          Page 8

1      EXAMINATION BY COUNSEL FOR PLAINTIFF
2  BY MR. KLOEWER:
3    Q    Okay.  Good morning, Mr. Olsen.
4    A    Good morning.
5    Q    My name is Brad Kloewer.  I represent
6  the plaintiff in this matter, Eric Coomer.  We met
7  just a few minutes ago off the record.  I'll be
8  taking your deposition today.
9        I know you are an attorney, so I won't
10 belabor the ground rules.  I think you probably know
11 those pretty well. I do have a couple boxes to check
12 before we start, though.
13       Have you taken any medications, any drugs,
14 or alcohol that may affect your ability to provide
15 testimony here today?
16   A    No.
17   Q    And as you know, we can take a break at
18 any time.  Let me know if you need one.  I do ask,
19 though, if there's a question on the table that we
20 answer that question first before we go off the
21 record and take a break.
22       Is that okay?
                                          Page 7

1  to understand, Mr. Olsen, a little bit about your
2  background and about how it is you came to be
3  here.
4      You are an attorney, correct?
5    A    Correct.
6    Q    And where are you licensed to practice?
7    A    D.C. and Maryland.
8    Q    And how long have you been practicing
9  law?
10   A    Thirty-one years.
11   Q    Thirty-one years.
12       And are you a solo practitioner now, or do
13 you have a firm?
14   A    I'm a solo practitioner.
15   Q    Okay.  And have you always been a solo
16 practitioner?
17   A    No.
18   Q    Where did you work before you started
19 your own firm?
20   A    I started off as Kirkland and Ellis here
21 in D.C.
22   Q    Okay.
                                          Page 9

3 (Pages 6 - 9)

1    A    And then I went to Texas and worked at
2  Barger and Moss, and then after that I started my
3  own firm that became a partnership, and then I'm
4  back being a solo.
5    Q    And when did you leave the partnership
6  that you were with prior to your solo
7  practitioner?
8    A    2021.
9    Q    2021. And why did you leave that
10 practice?
11   A    Moved on to different endeavors.
12   Q    Would you say that you have any area of
13 focus, any specialty, in your practice?
14   A    General litigation.
15   Q    And I understand you do work in election
16 law now? Is that a fair characterization?
17   A    I had been involved in election
18 contests, yes.
19   Q    How long have you been doing
20 election-related work?
21   A    Two and a half years.
22   Q    Okay. So since early 2021?

Page 10

1  but not on behalf of the firm.
2    Q    Okay. And when did you first get
3  involved in handling election-related litigation?
4  Do you recall the first, for example?
5    A    Yeah. I was one of the primary drafters
6  of the complaint that Texas signed onto in the
7  Supreme Court that was filed on December 7th,
8  2020.
9    Q    The case that was filed by Attorney
10 General Paxton?
11   A    Correct.
12   Q    And were you an attorney of record in
13 that case?
14   A    I did not -- yes. Actually I did appear
15 on the record; not on the complaint itself but on
16 subsequent filings.
17   Q    Okay. I didn't see your signature on
18 the filing so I was -- appreciate --
19   A    Well, I was listed as counsel so I did
20 not sign it. Texas signed it.
21   Q    So in that instance you were
22 representing the State of Texas?

Page 12

1    A    Before that.
2    Q    Before that? So late 2020?
3    A    Correct.
4    Q    Prior to that time, did you have any
5  experience in election law?
6    A    No.
7    Q    I think you said you left your prior
8  firm in early 2021; is that right?
9    A    Yes.
10   Q    So in late 2020 were you doing
11 election-related work with that firm?
12   A    No.
13   Q    No. You were --
14   A    Wait. When you -- you mean when I was
15 at the firm?
16   Q    Yeah. I'm sorry. Just -- just to be
17 clear, what was the name of that firm?
18   A    Klafter, Olsen and Lesser.
19   Q    Klafter, Olsen and Lesser.
20        When you were with Klafter, Olsen and
21 Lesser, were you doing election-related work?
22   A    I was -- yes. I did some election work,

Page 11

1    A    Correct. I was retained as Special
2  Counsel to Texas.
3    Q    And was that an hourly retrainer
4  agreement? What was the -- what was the nature of
5  your compensation for that work?
6    A    There was no compensation.
7    Q    No compensation.
8        Are you licensed to practice in Texas?
9    A    No.
10   Q    Were you pro hac'd in for that? Did you
11 file a motion pro hac?
12   A    The case was filed in the Supreme Court.
13   Q    It was filed directly in the Supreme
14 Court?
15   A    Correct.
16   Q    Okay. And are you admitted to practice
17 in the Supreme Court?
18   A    No.
19   Q    How did you get involved with the
20 Attorney General of Texas?
21        It seems like a -- let me clarify my
22 question.

Page 13

4 (Pages 10 - 13)

1    Your first election-related case was a
2 petition filed directly to the Supreme Court?
3    A   Yeah.  Under original jurisdiction,
4 state to state.
5    Q   Who introduced you to the team in
6 General Paxton's office?
7    A   I don't recall.
8    Q   Was there anybody at your old firm that
9 you were working with that -- that got you plugged
10 into that litigation?
11    A   No.
12    Q   Did you reach out to them and say, hey,
13 I'm an attorney in D.C. I think I can help you
14 guys out?
15    A   I don't recall, but if I did that would
16 probably be privileged since I represent them.
17    Q   Okay.  Well, I'm just trying to
18 understand how it is that you come to the -- a
19 firm in Washington, D.C., and your first election
20 case goes straight to Supreme Court on behalf of
21 the Attorney General of Texas?  So...
22    A   Well, it goes straight --

Page 14

1 that time, I mean December of 2020?
2    A   Well, in December of 2020, I was
3 involved in the Texas case and any kind of related
4 litigation that would be related to that case,
5 yeah.
6    Q   Were you involved in any other election
7 challenges in any other states?
8    A   At that time?
9    Q   Yes.
10    A   What do you mean involved?
11    Q   Well, did you represent any clients that
12 were challenging the results of the 2020 election?
13    A   Challenging in court?
14    Q   Yes.
15    A   I did not pursue any other cases in
16 court at that time for -- that were filed.
17    Q   Were you working on potential cases at
18 that time?
19    A   Yes.
20    Q   And which cases were those?
21    A   It would be another case to be filed in
22 the Supreme Court.

Page 16

1    MR. PARKER:  Objection as to form.
2    THE WITNESS:  It goes straight to the
3 Supreme Court because it's an original action with
4 exclusive jurisdiction because it was a state versus
5 a state.
6 BY MR. KLOEWER:
7    Q   I understand.  I -- I appreciate the
8 legal principle.  It just -- I'm confused as to
9 how you -- you found yourself working with the
10 Attorney General of Texas so quickly as began on
11 election work.
12    It sounds like you may have reached out to
13 them, but you don't recall?
14    A   Again, any communications that I would
15 have with a client would be privileged, so I don't
16 recall the specifics, but I wouldn't be disclosing
17 that anyway.
18    Q   So that was the Texas v. Pennsylvania
19 case; is that correct?
20    A   Correct.
21    Q   And were you involved in any other
22 election-related litigation at that time?  And at

Page 15

1    Q   And was that the US v. Pennsylvania
2 case?
3    A   That was -- if -- if that's what you're
4 referring to -- and this is public record so I can
5 state what is on the record -- there was a draft
6 complaint that listed the United States as a
7 plaintiff.
8    Q   And did you draft that complaint on your
9 own?  Were you working with others at that time?
10    A   I don't recall specifically, but I would
11 say that I did -- it was something that I did.
12    Q   And who was your client in that
13 instance?
14    A   Well, in that particular instance it was
15 an idea that I had.
16    Q   So you hadn't been retained by any
17 client to -- to draft that complaint?
18    A   Correct.
19    Q   Okay.  Did you ever represent the Trump
20 campaign at any point?
21    A   Yes.
22    Q   In what capacity?

Page 17

5 (Pages 14 - 17)

1    A    I was retained by the President as his
2    lawyer.
3    Q    And when -- when did that relationship
4    start?
5    A    What do you mean relationship?
6    Q    The -- the attorney-client relationship.
7        When did -- when did the Trump campaign
8    retain you as its counsel?
9    A    I have a retention letter.  I believe
10   it's dated January 5th.  I don't recall
11   specifically, but it's somewhere around that time.
12   Q    January 5th, 2021?
13   A    Is when the retention letter was
14   actually signed, yeah.
15   Q    And were you representing him prior to
16   that time?
17   A    I would say there was an attorney-client
18   relationship, yes.
19   Q    What's the basis for your understanding
20   there was an attorney-client relationship prior to
21   the retention letter?
22   A    I'm a lawyer, and we're talking about

Page 18

1    know her?
2    A    I do know her.
3    Q    When did you meet Ms. Powell?
4    A    Sometime long after that point.  I don't
5    recall exactly when, but it was not at all during
6    that time period.
7    Q    So you weren't involved in any of the
8    lawsuits that Ms. Powell filed in December of
9    2020, in Arizona, Michigan, Wisconsin, or Georgia?
10   A    I did not participate in any of those
11   cases, no.
12   Q    Do you recall the circumstances
13   surrounding when you met Ms. Powell for the first
14   time?
15   A    I have a very vague recollection, but
16   that's -- that's about it.
17   Q    Okay.  What is -- what is your vague
18   recollection when you met her?
19   A    I just met her.
20   Q    Where?
21   A    It was in Texas.
22   Q    In person?

Page 20

1    litigation.
2    Q    And that was -- those were
3    communications with President Trump or with
4    members of the Trump campaign?
5    A    Probably both.
6    Q    Were you working with Rudy Giuliani at
7    this time?
8    A    No.
9    Q    Do you know Rudy Giuliani?
10   A    I mean I know of him, yes.  I mean...
11   Q    Have you met him?
12   A    I've never met him in person, no.
13   Q    So you weren't involved in any of -- any
14   of the work that he was doing in December 2020,
15   for example?
16   A    No.
17   Q    The different state challenges, that
18   sort of stuff?
19   A    It depends on what you mean by involved,
20   so I did never -- I never worked with Rudy on any
21   of these matters.
22   Q    And what about Sidney Powell?  Do you

Page 19

1    A    I believe so.
2    Q    Was it an event?  Was it a meet her in
3    her office?
4    A    No, it was a meeting.
5    Q    Okay.  To discuss litigation or just a
6    friendly chat?
7    A    I would say, you know, this would be
8    pursuant to my retention as -- by Mike Lindell to
9    investigate election-related matters.
10   Q    Okay.  Did Mr. Lindell introduce you to
11   Ms. Powell?
12   A    I don't recall.
13   Q    Do you remember if you met her prior to
14   the time of the Cyber Symposium, which I'll
15   represent to you was August of 2021?
16   A    I don't have a specific recollection if
17   it was before or after.
18       MR. KLOEWER:  Let's take a look at a
19   couple of documents here just to wrap up the -- the
20   early phases prior to your time working with
21   Mr. Lindell.
22       If you would mark this as Exhibit 118.

Page 21

6 (Pages 18 - 21)

1    THE WITNESS:  Thank you.
2    (OLSEN Exhibit Number 118 was marked for
3    identification.)
4    BY MR. KLOEWER:
5    Q    This is an excerpt from January 6 report
6    that was produced by the U.S. Congress in
7    Chapter 4, Section 10.
8    I want to draw your attention to the lower
9    half of page 393 here.  First of a meeting on
10   December 29th, states, the next day Rosen, Donoghue,
11   and Engel had a meeting with Mark Meadows, Pat
12   Cipollone, and Cipollone's deputy --
13   A    I'm sorry.  Where -- where are you?
14   Q    Sorry.  I'm right down here on the
15   bottom of 393, last paragraph.
16   A    Okay.
17   Q    Right under the paragraph heading it's
18   4.10, December, 29th.
19   A    Yup.
20   Q    See that.  Okay.
21   And it goes to state, while the meeting
22   dealt primarily with the presidential transition,
Page 22

1    Q    Rosen, Engel, possibly Pat Cipollone,
2    possibly Pat Philbin although I realize they may
3    not fall under that specific umbrella.
4    A    So I didn't meet with Pat, who I used to
5    work with at Kirkland and Ellis, and Jeff Rosen I
6    did meet, and I used to work with him at Kirkland
7    and Ellis.  Yeah.
8    Q    Okay.  For purposes of discussing this
9    lawsuit?
10   A    I met with Jeff, yes.  We had a couple
11   of phone conversations.
12   Q    Okay.  And does this -- this
13   characterization comport with your memory of that
14   call that -- that they from Mr. Rosen expressed
15   some skepticism about the lawsuit?
16   A    No.
17   Q    Did -- did he believe the lawsuit should
18   be filed?
19   A    I didn't say that either.
20   Q    Okay.  What was his position on the
21   lawsuit whether it should be filed?
22   A    Our first conversation was he wanted
Page 24

1    the group discussed a draft civil complaint modeled
2    after Texas v. Pennsylvania that the President
3    wanted the Department of Justice to file challenging
4    the results of the presidential election.
5    And it says it was tentatively called
6    United States v. Pennsylvania.
7    Is that the case that you were working on,
8    Mr. Olsen?
9    A    Yes.
10   Q    Okay.  And this goes on to state, the
11   DOJ officials said that they had not had time to
12   thoroughly review the proposed suit, but initially
13   indicated that it appeared to be flawed, and did
14   not see viable for DOJ to file.
15   Last sentence here, Meadow suggested that
16   the DOJ leadership meet with William Olson and Kurt
17   Olsen, the two attorneys affiliated with the Trump
18   campaign that had been working on the proposed suit.
19   Did you ultimately meet with those
20   officials at the Department of Justice to discuss
21   this lawsuit?
22   A    Those officials being Donoghue and --
Page 23

1    some legal research, which I provided him, and
2    this is public record.  It's in the congressional
3    record.  It was a case, South Carolina v.
4    Katzenbach, which shows under the parens patriae
5    doctrine, the United States would have standing to
6    pursue such an action.
7    And, he, you know, the first conversation
8    we had was I would characterize as very collegial,
9    and that was that.
10   Q    And how many conversations did you have
11   with Mr. Rosen ultimately?
12   A    Two.
13   Q    Two?
14   A    Yeah.
15   Q    And the second conversation, would you
16   characterize that as collegial as well?
17   A    A different tone than the first
18   conversation, yeah.
19   Q    And did he express concerns about filing
20   that US v. Pennsylvania lawsuit in that
21   conversation?
22   A    No.  They said that they were not there
Page 25

7 (Pages 22 - 25)

1 to talk with me. They just wanted to listen, and
2 they, Donog -- Deputy Agent Donoghue was on the
3 call too.
4     Q   Okay. And, of course, that -- that
5 lawsuit ultimately was not filed, correct?
6     A   That's correct.
7     Q   Who made the decision whether to file
8 that or not?
9     A   I don't know.
10     Q   Would the client in that instance be the
11 United States Department of Justice?
12     A   That was who the main plaintiff was,
13 correct.
14     Q   Okay. So presumably -- and I'm
15 speculating here -- but officials at the DOJ would
16 have ultimately had ultimately the discretion to
17 file that or not?
18     A   I believe it's the Attorney General who
19 represents the United States in those
20 circumstances.
21     Q   And you said your formal retention
22 was -- well, formally established on January 5th,

Page 26

1 so that would have been about a week later.
2         Does that sound about right?
3     A   Well, I would say that the retention
4 letter that's the date of the retention letter.
5     Q   And are you still retained by the Trump
6 campaign?
7     A   I have not been dis-retained, if you
8 will.
9     Q   So that retainer letter was on behalf of
10 the Trump campaign?
11     A   I believe that's correct.
12     Q   Donald J. Trump for President,
13 Incorporated?
14     A   I believe that's correct, yeah.
15     Q   Not on behalf of Donald J. Trump in his
16 personal capacity?
17     A   I don't know.
18     Q   Okay. Moving forward through the week,
19 I want to show you what we'll mark as Exhibit 119.
20         (OLSEN Exhibit Number 119 was marked for
21         identification.)
22

Page 27

1 BY MR. KLOEWER:
2     Q   This is another excerpt from the
3 January 6th report. This is from Chapter 7 of
4 pages 608 to 609 of that document. Excuse me. I
5 want to direct your attention to the second page
6 of this.
7         MR. KACHOUROFF: Just for clarification --
8 I'm sorry to interrupt you.
9         MR. KLOEWER: Sure.
10         MR. KACHOUROFF: This is the congressional
11 report from the J6 committee?
12         MR. KLOEWER: That's correct, yes.
13         MR. KACHOUROFF: Okay.
14 BY MR. KLOEWER:
15     Q   The second paragraph on page 2 at 609
16 begins, of the 13.
17         Do you see what I'm referring to?
18     A   I do.
19     Q   This is referring to calls that
20 President Trump made on the night of January 6th
21 following the attack on the Capitol, and it states
22 about three, four lines down -- well, five or six

Page 28

1 lines down, he spoke with the Kurt Olsen and Mark
2 Meadows -- Mark Martin rather, lawyers who had
3 advised him on the vice president's role of joint
4 session.
5         He spoke with Martin for nine minutes at
6 7:30 p.m., and Olsen twice for 11 minutes at
7 p.m., and another 10 very minutes at 7:40 p.m.
8         I'm not going to ask for the substance of
9 that conversation, obviously, but does this seem
10 accurate to you, the -- the -- the duration of those
11 calls?
12     A   I don't have any basis to dispute it.
13     Q   Okay. Were you with Rudy Giuliani when
14 you were making these calls to President Trump?
15     A   I don't recall.
16     Q   Were you in the Willard Hotel that
17 night?
18     A   No.
19     Q   Were you in the room with Joe Oltmann?
20     A   No.
21     Q   Were you with Patrick Burn?
22     A   No.

Page 29

8 (Pages 26 - 29)

**Page 30**

1  Q  Have you reviewed any of the testimony
2  of Joe Oltmann in this case regarding his
3  whereabouts on January 6?
4  A  No.
5  Q  Are you aware that Mr. Oltmann has
6  testified that he was in the room with Rudy
7  Giuliani that night when Patrick Burn came in to
8  ask for a pardon?
9  A  No.
10  Q  So you weren't present for any of those
11  conversations?
12  A  No.
13  Q  Were you with Sidney Powell that night?
14  A  No.  I hadn't -- as I testified earlier,
15  I had not, to my recollection, never met any of
16  those folks.
17  Q  You hadn't met Joe Oltmann at this
18  point?
19  A  No.
20  Q  Okay.  We'll -- we'll have a lot more to
21  discuss about Mr. Oltmann as we proceed.  I'll
22  leave it there for now.

**Page 31**

1  Moving forward through time, how did you
2  first meet Mr. Lindell?
3  A  I received a call from the President.
4  Q  Okay.  President Trump?
5  A  Correct.
6  Q  And he introduced you to Mr. Lindell?
7  A  I would say that's accurate, yeah.
8  Q  Okay.  Was Mr. Lindell on the call?
9  A  Yes.
10  Q  He was.  Okay.  And do you recall about
11  when that call occurred?
12  A  February of 2021.
13  Q  February of 2021.
14  And when did you first meet Mr. Lindell in
15  person?
16  A  Shortly thereafter.  I don't remember
17  specifically, but, I mean, shortly thereafter.
18  Q  Do you know why Mr. Trump felt that he
19  should introduce you to Mr. Lindell?  Was
20  Mr. Lindell seeking counsel at the time?
21  A  I don't know.
22  Q  What was your understanding of why you

**Page 32**

1  were being put in touch with Mr. Lindell?
2  A  Well, that's attorney-client privileged.
3  Q  Which client are you referring to?
4  A  Well, both of my clients now.
5  Q  Let's take a look here at the retainer
6  agreement you signed with Mr. Lindell just to get
7  that established.

**Page 33**



1   for-profit enterprise?

2       A   I do not.

3       Q   Does it produce any products that you're

4   aware of --

5       A   Not that I'm aware of.

6       Q   -- or services?

7       A   Not that I'm aware of.

8       Q   You mentioned it's involvement with

9   Lindell Recovery Network.

10          Do you know what services it provides in

11  that context?

12      A   I don't.  I just know that Mike is

13  involved in a lot -- a lot of good things, and the

14  Lindell Recovery Network would be one of them.

15          And I don't know if that's under the

16  umbrella of Lindell Management or not.

17      Q   What I'm trying to understand is how do

18  you know when Mr. Lindell is speaking to you or

19  asking you a question for some legal guidance

20  related to him personally versus when he's asking

21  for guidance on behalf of Lindell Management LLC?

22      A   So Mike would be the owner of the

Page 36

15      Q   Do you represent any of Mr. Lindell's

16  other entities?  For example FrankSpeech LLC?

17      A   No.

18      Q   Have you ever represented FrankSpeech

19  LLC?

20      A   As an attorney?

21      Q   Yes.

22      A   No.

Page 34

1       Q   Do you represent Lindell Management LLC?

2       A   To the extent that Lindell Management is

3   under the control of Mike Lindell, I would say

4   yes.

5       Q   But you don't have a separate agreement

6   with Lindell Management, for example?

7       A   There is not a distinct retention

8   agreement with Lindell Management, correct.

9       Q   What does Lindell Management do?

10          MR. PARKER:  Objection as to form.

11          THE WITNESS:  I don't know specifically.

12  It's Lindell Management LLC.  I think it does, you

13  know, a number of things on behalf of Mike Lindell.

14  BY MR. KLOEWER:

15      Q   Personally?

16      A   I don't know if it's personally.  I just

17  know that it's the LLC that he set up to handle

18  activities related to a lot of work that he does

19  is my understanding.  Like the Lindell Recovery

20  Network.  I'm -- I'm not sure, but there's a lot

21  that goes on is what I think.

22      Q   Do you know if Lindell Management is a

Page 35

1   privilege, and that would be best directed to him.

2   My understanding is I represent Mike Lindell.

3           In what capacity he is seeking legal

4   advice from me is something that would be, you know,

5   better answered by him.

6       Q   I understand that.  I'm just trying to

7   understand if -- if you have a sort of an

8   indication in your mind of when, if there's any

9   lines in your -- for example, if he asked you to

10  review a contract with a supply distributor for My

11  Pillow, you would recognize that as being on

12  behalf of My Pillow as a hypothetical; would you

13  agree with that?

14      A   Correct.

15      Q   Okay.  So do you have any similar sort

16  of markers in your mind that say, okay, this is a

17  question on behalf of Lindell Management as

18  opposed this is a question from Mike Lindell?

19      A   I don't know what you mean by similar

20  markers?

21      Q   Any sort of -- in your mind, is there

22  any delineation between Mike Lindell and Lindell

Page 37

10 (Pages 34 - 37)

1 Management LLC?

2 A No.

3 Q So you view them as being the same

4 entity?

5 A Well, I don't know what you mean by as

6 at same entity, but when I -- I view, when I

7 represent Mike Lindell that that would include

8 Lindell Management.

9 Q You don't have anything in writing to

10 memorialize that understanding; is that correct?

11 A The retention letter is -- speaks for

12 itself.

13 Q Did you know about Lindell Management as

14 an entity when you embarked on this agreement with

15 Mr. Lindell in February 2021?

16 A I don't recall.

17 Q Do you recall when you first engaged in

18 any work on behalf of Lindell Management LLC?

19 A Well, as I said, I met with Mike

20 Lindell, and I assume that they are -- that when

21 I'm doing work with respect to Mike Lindell that

22 that would include Lindell Management.

Page 38

1 Q That's not exactly the question I was

2 asking.

3 The first instance when you became aware

4 that Lindell Management as an entity existed, do you

5 recall when that was? Was it prior to the Cyber

6 Symposium, for example, in August of 2021?

7 A Probably. I mean I had heard about

8 Lindell Management before.

9 Q So I know you've done a lot of work for

10 Mr. Lindell since engaging or since executing this

11 agreement.

12 Can you tell me which cases that you've

13 been involved in do you understand to fall under the

14 umbrella of this agreement?

15 A Which filed cases?

16 Q Yeah. Let's start there.

17 A Well, you notice that it says to defend,

18 investigate, or bring potential claims for

19 election law violations.

20 So I am involved with Mr. Lindell's

21 defense in every action that has been asserted

22 against him.

Page 39

1 Q Are you his counsel in this proceeding?

2 A I am his counsel, and since these are

3 defamation actions, in truth, is a defense to

4 defamation actions, and so I represent him in

5 connection with those actions, that's correct.

6 Q Do you intend to enter an appearance in

7 this case?

8 A Possibly.

9 Q Are you Mr. Lindell's counsel of record

10 in his lawsuit against Dominion Voting Systems?

11 A I did not appear on the pleadings, no.

12 Q Well, that's, again, not exactly my

13 question.

14 Are you his counsel? Do you consider

15 yourself to be his counsel with respect to that

16 proceeding?

17 A I am Mike Lindell's counsel with any

18 matter that involves defending, investigating, or

19 bringing potential claims with respect to election

20 law violations.

21 Q Okay. So we've got this case brought by

22 Dr. Coomer. We've got the lawsuit filed by

Page 40

1 Dominion Voting Systems.

2 What about the lawsuit filed by

3 Smartmatic? And I -- I apologize for being

4 redundant. I anticipate your counsel telling me

5 asked and answered.

6 I just want to confirm if you understand

7 that case to fall under the same umbrella?

8 A Yes.

9 Q Are there any other lawsuits that have

10 been filed against Mr. Lindell where you have

11 represented him in a defense capacity?

12 A Well, there is the arbitration in the

13 Zeidman matter.

14 Q And you were called as a witness in that

15 matter; is that correct?

16 A Correct.

17 Q Okay. Were you Mr. Lindell's counsel of

18 record as well?

19 MR. PARKER: Objection. Counsel, you're

20 using the word counsel as if he's representing him

21 as a lawyer, and then you throw in occasionally

22 counsel of record.

Page 41

11 (Pages 38 - 41)

1      Those are two different things, and we
2  should have clarity on the record. I don't think
3  you are intending to create some confusion, but it
4  does.
5          MR. KLOEWER: Sure. I apologize, and
6  that's a fair objection. When I say counsel of
7  record, what I mean is you've entered an appearance
8  and that you've acted on behalf of Mr. Lindell in
9  engaging with opposing counsel.
10         THE WITNESS: I -- I did not enter an
11  appearance in that proceeding.
12  BY MR. KLOEWER:
13    Q   And I'll just -- moving forward,
14  that's -- that's a distinction I'm drawing in my
15  mind, at least, as having entered an appearance
16  and engaging directly with opposing counsel.
17         MR. KACHOUROFF: And I think the record
18  shows that he hasn't entered an appearance in any of
19  the cases that you've mentioned.
20         MR. KLOEWER: That's correct. I just
21  don't know if he's actually engaging behind the
22  scenes in a way that I wasn't aware of.

Page 42

1  BY MR. KLOEWER:
2    Q   Okay. Any other matters that you would
3  consider to fall under the defense prong of this
4  agreement?
5    A   When you say matters, what do you mean?
6    Q   Well, any other lawsuits that have been
7  filed against Lindell. I'm speaking specifically
8  to matters where a claim has been filed and an
9  opposing party is seeking some form of relief.
10        So the four cases we've discussed so far
11  are this one, Dominion, Smartmatic, and Zeidman. I
12  don't know if there are any others that -- that you
13  represented Mr. Lindell on that you would consider
14  to fall under the same umbrella?
15    A   I -- I don't believe so.
16    Q   Okay. Let's talk about cases that you
17  have affirmatively filed that you worked -- that
18  this agreement you understand to -- to encompass.
19        Which lawsuits have you filed pursuant to
20  this agreement?
21    A   I don't believe I've filed any cases
22  pursuant to this agreement. I haven't.

Page 43

1    Q   So, for example, your work representing
2  Kari Lake in Arizona, you're not compensated under
3  this agreement --
4    A   No.
5    Q   -- for that work? Okay.
6        And who's -- who's your client in that
7  instance?
8    A   Kari Lake.
9    Q   Okay. And is Mr. Lindell paying for
10  that representation or is she paying you directly?
11    A   I'm -- I'm not compensated by
12  Mr. Lindell for that representation.
13    Q   Have you represented Tina Peters as
14  well?
15    A   I am not her counsel of record, no.
16    Q   Have you served as her counsel? So here
17  we get back to the distinction.
18        I understand you haven't entered an
19  appearance. You haven't engaged with opposing
20  counsel, but have you provided her legal counsel?
21    A   No.
22    Q   Mr. Lindell hasn't compensated you for

Page 44

1  any representation of Ms. Peters?
2    A   No.
3    Q   Is there any representation outside the
4  scope of this agreement that Mr. Lindell has paid
5  you for?
6    A   I don't know what you mean by any
7  representation?
8    Q   Any other lawsuits that you filed on
9  behalf of any other parties where your
10  compensation was paid by Mr. Lindell?
11    A   No.
12    Q   So just to clarify -- and -- and I
13  apologize if it's asked and answered -- under the
14  terms of this agreement you have not filed any
15  lawsuit affirmatively seeking relief that in your
16  understanding arises from this agreement?
17    A   Correct.
18    Q   Now the third prong, investigating.
19        Which cases would you consider to fall --
20  to fall under this prong?
21    A   Everything. Everything that's election
22  related.

Page 45

12 (Pages 42 - 45)

1    Q   What does election related mean in your
2    mind?
3    A   Dealing with claims that would relate to
4    or impact an election.
5    Q   Have you filed any lawsuits in the last
6    two and a half years alleging that Dominion Voting
7    Systems somehow manipulated election results?
8    A   No, I don't believe so.
9    Q   Have you filed any lawsuits alleging
10   that Dr. Eric Coomer was involved in somehow
11   manipulating election results?
12   A   No.
13   Q   Why not?
14       MR. PARKER:  Objection as to form.
15       MR. KACHOUROFF:  Also goes to mental
16   impressions and work product.
17   BY MR. KLOEWER:
18   Q   Well, as you sit here today, do you
19   believe that Dominion Voting Systems rigged the
20   2020 vote -- presidential election?
21       MR. KACHOUROFF:  Same thing.  Work
22   product.

Page 46

1    Q   Have you read the complaint in this
2    case?
3    A   No.
4    Q   You said before you represent
5    Mr. Lindell in this matter, and you served as
6    counsel, but you haven't read the complaint?
7    A   Correct.
8    Q   Are you familiar with Joe Oltmann's
9    claim that he participated in an Antifa conference
10   call?
11   A   I had heard that generally.
12   Q   Are you familiar with his claim that he
13   overheard Dr. Coomer on that call claim that he
14   had rigged the 2020 election?
15   A   My hesitation is that because there's so
16   much in the media about everything I have no
17   specific recollection about that claim, but it's
18   been around.
19       I mean this is what is talked about
20   generally, so I don't have a specific recollection
21   as to that.  But I -- no.  I think the answer is no
22   on that question.

Page 48

1       THE WITNESS:  This goes into my
2    investigation and my mental impressions somehow.
3    I'm not going to -- that's work product.
4    BY MR. KLOEWER:
5    Q   It's your position that stating whether
6    you believe Dominion Voting Systems rigged the
7    election is work product?
8    A   Yes.
9    Q   Do you believe that Eric Coomer rigged
10   the election?
11   A   I don't -- I think as I stated in my
12   responses to your discovery requests, other than
13   looking at patents by Mr. Coomer, that's the only
14   thing I've looked at with respect to him, so I
15   don't have any opinion.
16   Q   Are you familiar with the allegations
17   against him?
18   A   No, but wait a second.
19       What allegations are you referring to?
20   Q   The allegations made primarily by Joe
21   Oltmann.
22   A   Only in the most general sense.

Page 47

1    Q   Do you know who Eric Coomer is?  Like do
2    you know what his role was at Dominion Voting
3    Systems?
4    A   I know that he was an officer.  I don't
5    remember his specific title at Dominion, and I
6    know that has patents related to his -- well, I
7    don't even know if it was when he was at Dominion,
8    or where he was before.
9       So I don't have a specific recollection.
10   I just know that he was involved with Dominion in
11   terms of election software or the products that
12   Dominion sold.
13   Q   Well, I'll represent to you that he was
14   the director of strategy and security --
15   A   Okay.
16   Q   -- for Dominion Voting Systems.  He was
17   one of the top executives at that company.
18       And I'm trying to understand if
19   Mr. Oltmann's claims are true that that would be a
20   fairly sensational piece of evidence, and you've
21   been engaged in litigation challenging the election
22   results for years.

Page 49

13 (Pages 46 - 49)

Veritext Legal Solutions
800-336-4000

1    I understand you are personally acquainted
2 with Mr. Oltmann, and I'm trying to understand why
3 you haven't investigated this claim?
4    A    When you say "this claim," what are you
5 referring to?
6    Q    That Dr. Coomer was on an Antifa
7 conference call where he claimed that he had
8 rigged the 2020 election.
9    A    Well, again, I think you're -- you're
10 getting into my mental impressions why I would
11 investigate or not.  So I think that's work
12 product.  But as I stated in my responses, the
13 only thing that I have looked at with respect to
14 Mr. Coomer are the patents.
15    Q    You don't believe this story, do you,
16 Mr. Olsen?
17    A    I don't know what you mean "this story."
18    Q    That Eric Coomer was on an Antifa
19 conference call where he claimed he rigged the
20 election.
21    A    I don't have a belief one way or the
22 other.  It's not something I've ever looked at or

Page 50

1 even really thought about.
2    Q    I know you haven't read the complaint,
3 but have you seen any of the video footage of
4 Mr. Lindell making repeated statements about
5 Dr. Coomer over multiple years?
6        MR. PARKER:  Objection as to form.
7        THE WITNESS:  I have to say I don't recall
8 seeing any video statements that Mike made about
9 Dr. Coomer.  That's not to say that he didn't say
10 something or that I was -- I just don't recall him
11 making any statements publicly about Dr. Coomer or
12 Mr. Coomer.
13 BY MR. KLOEWER:
14    Q    Are you aware that he has accused
15 Dr. Coomer of treason?
16    A    I don't know.  I mean there's a lot
17 that's been said, so you're asking for one
18 thing -- I -- I don't know what specific things
19 Mike said about Mr. Coomer.
20    Q    Do you recall seeing any of his
21 statements claiming that he's going to melt down
22 voting machines so that Dr. Coomer will be -- that

Page 51

1 he'll be the first behind bars when he does that?
2    A    Well, I certainly --
3        MR. KACHOUROFF:  Object as to form.
4        THE WITNESS:  I certainly recall
5 Mr. Lindell talking about melting down voting
6 machines and turning them into prison bars.  I -- I
7 don't recall any statements made in connection with
8 Mr. Coomer.
9 BY MR. KLOEWER:
10    Q    We'll take a look at a few of those
11 statements here a little later.
12        One of the overarching questions that I
13 have that I still don't understand -- and this will
14 be sort of a theme in this deposition is I'm trying
15 to understand what is the theory of how the election
16 was rigged.
17        I don't know if Mr. Lindell's position is
18 that China did it or that Dominion Voting Systems
19 did it, or that Eric Coomer did it; and I'm trying
20 to get at a -- an idea if you have any idea, but it
21 sounds like that you've been counsel for Mr. Lindell
22 for more than two years and you don't know -- it

Page 52

1 sounds like you know virtually nothing about these
2 allegations against Dr. Coomer.
3        MR. KACHOUROFF:  I'm going to object to
4 that.  I let it go on a little bit.
5        MR. KLOEWER:  Yeah.
6        MR. KACHOUROFF:  But really this is kind
7 of far afield, and everything you're asking him
8 really devolves on his representation of
9 Mr. Lindell.  And so when you ask these questions I
10 can appreciate your misunderstanding and your
11 confusion about the theory, but you're asking an
12 attorney for his mental impressions on a theory.
13        Really?
14        MR. KLOEWER:  Well, he's also a fact
15 witness in this case, and we'll get to that.
16        MR. KACHOUROFF:  You can ask him facts,
17 but I mean I'm going to object to the extent you're
18 asking for mental impressions.
19        MR. KLOEWER:  Well, Joe Oltmann found his
20 way on stage at the Cyber Symposium.
21        MR. KACHOUROFF:  Well, you can ask him
22 about that.

Page 53

14 (Pages 50 - 53)

1      MR. KLOEWER: Well, we're getting there.
2 I'm trying to understand how he got there, and why.
3 And there's a lot of history prior to that time.
4 Multiple lawsuits that have been filed, but I'm
5 trying to understand if --
6      MR. KACHOUROFF: Well, you can ask him
7 factual questions, and he'll be happy to answer
8 anything that's in his personal knowledge.
9      MR. KLOEWER: Let's proceed then.
10 BY MR. KLOEWER:
11    Q   Moving back just quickly to the other
12 cases that you filed on behalf of Ms. Lake, for
13 example.
14      Have you been sanctioned in any of your
15 representation of election work cases, Mr. Olsen?
16    A   Yes.
17    Q   In which cases?
18    A   There was an injunction action filed in
19 Arizona that Judge Tuchi sanctioned the attorneys,
20 including Alan Dershowitz and Parker Daniels.
21    Q   And who is the client in that case?
22    A   Kari Lake and Mark Finchem.

Page 54

1 Maryland Bar Association?
2    A   Yeah. So the project -- or no. The 65
3 Project -- Project 65 or whatever -- the one
4 that's a George-Soros-supported organization,
5 filed a -- a baseless complaint against me.
6 Actually, I'm looking at a defamation action
7 against them for accusing me of basically
8 committing a crime, like Steve Bannon, when I
9 filed an action against the January 6th committee
10 seeking a declaratory judgment that there was
11 substantial evidence of outcome determined of
12 election fraud.
13      Do you guys take defamation cases?
14    Q   We're a little booked up right now.
15      What's the status of that bar complaint?
16 Has it been addressed, or is it pending?
17    A   So I filed my response back in September
18 of 2022. The 65 Project tried to add something
19 related to Judge Tuchi's order, and the Maryland
20 Grievance Committee declined to do anything
21 because that -- that whole matter is up on appeal.
22    Q   And I believe you stated at the

Page 56

1    Q   And Mr. Lindell was not paying for your
2 time in that, correct?
3    A   No.
4    Q   Were you compensated for your work on
5 that case?
6    A   No.
7    Q   All right. So we have an injunction
8 case.
9      Anything else? Any other case?
10    A   Yeah. I was sanctioned by the Arizona
11 Supreme Court in connection with the Lake case,
12 the appeal.
13    Q   Anything else?
14    A   No. Nope. Until I've gotten involved
15 in election cases, I've never been sanctioned in
16 30 years of practice. Never had a complaint from
17 any client, never had a complaint from any court.
18    Q   Sounds like since you got involved in
19 this work, you've had a couple of those instances.
20    A   Yeah. Two.
21    Q   What about bar complaints? Have there
22 been any complaints filed against you at the

Page 55

1 beginning of this deposition you are also admitted
2 to practice here in Washington, D.C., correct?
3    A   That's correct.
4    Q   Have there been any bar complaints filed
5 against you with the D.C. bar?
6    A   No.
7    Q   Any other complaints other than the
8 Project 65 complaint?
9    A   Well, there is -- I mean, there's a
10 complaint in Arizona about them -- I mean,
11 that's -- that's been filed -- related to the
12 injunction. So that's -- we're looking at that.
13      And then there's a complaint related to
14 the Arizona Supreme Court sanctions.
15    Q   I see. And you're not admitted to
16 practice in Arizona, correct? You just had a --
17 you were admitted for purposes of that litigation?
18    A   Correct.
19      MR. PARKER: It's two different
20 litigations, Brad.
21      MR. KLOEWER: Two -- two different -- so
22 there's the injunction, and then there's the

Page 57

15 (Pages 54 - 57)

1  separate --
2      MR. PARKER:  Election contest.
3      MR. KLOEWER:  -- election contest.  Okay.
4  All right.
5      MR. PARKER:  Correct.
6  BY MR. KLOEWER:
7      Q   Since the time you entered into this
8  agreement with Mr. Lindell, how much have you
9  billed him?
10     A   I have not billed him -- submitted --
11 well, I mean, I will say that I've been
12 compensated, but I have -- but that's all I'll
13 say.
14     Q   Do you have a general idea of how much
15 you've billed him over the last two and a half
16 years?
17     A   So I -- I think I've submitted one bill
18 to him.  I view this more as an effort to save the
19 country, so I haven't really looked at this from a
20 standpoint of seeking profit from my
21 representation.
22     Q   Well, how much have you made off of that
                                          Page 58

1  representation?
2      A   I don't know what you mean by "that
3  representation"?
4      Q   Under -- under this agreement where you
5  establish a $500 hourly rate, how much have you
6  billed Mr. Lindell for work arising from that
7  agreement?
8      A   I just don't think that's any of --
9  relevant to this case, so I'm not going to talk
10 about that.
11     Q   Well, when did you submit the one bill
12 that you say you submitted?
13     A   I submitted a bill in -- sometime around
14 April, May, or June of 2022.  Around that time
15 frame.
16     Q   How much of your time would you say, as
17 a percentage basis of your legal work, is spent
18 representing Mr. Lindell?
19     A   Well, that varies.  I mean you're saying
20 how much of my time.  A lot of time.  I mean, I
21 worked with him, but I also represent others.
22     Q   Over the last two years could you guess
                                          Page 59

1  at an average how many hours a week you put in
2  representing Mr. Lindell under this agreement?
3      A   A lot.  I couldn't give you a figure.
4      Q   Well, presumably the bill you submitted
5  would -- would have a figure attached?
6      A   For that particular time period it
7  would, yeah.
8      Q   And that one bill was to encompass a
9  time frame between February 2021 and April of
10 2022?
11     A   No.  I just never bothered to submit a
12 bill before that.
13     Q   Do you have other clients who are paying
14 you for your work right now?
15     A   Yes.
16     Q   Kari Lake being one of them presumably?
17     A   Correct.
18     Q   Let's move forward in time here a bit.
19         How did you meet Brannon Howse?
20     A   Through Mike.
21     Q   Mike introduced you to him?
22     A   Yeah, it had to be.
                                          Page 60

1      Q   Did you know who Mr. Howse was prior to
2  that introduction?
3      A   Uh-uh.
4      Q   You didn't know him by reputation?
5      A   Didn't know him at all.
6      Q   Were you familiar with Worldview
7  Weekend?
8      A   Not a thing.
9      Q   Who did you understand him -- understand
10 him to be in -- in Mike's life at the time?
11 And -- and I understand a form objection is
12 coming.
13         Why was Mr. Lindell introducing you to
14 Brannon Howse as you understood it?
15         MR. PARKER:  Objection as to form.
16         THE WITNESS:  I think it was in connection
17 with one of the Absolute movie -- Absolute Proof
18 movies.
19 BY MR. KLOEWER:
20     Q   What was your role in the Absolute Proof
21 movie, if any?
22     A   I -- I think that came out in early
                                          Page 61

16 (Pages 58 - 61)

1 February. I did not have a role at that time.
2    Q    You watched the film, though?
3    A    Yeah. I watched some of it.
4    Q    But you weren't involved with the
5 production?
6    A    Correct.
7    Q    And Mr. Lindell retained you after the
8 time when it was already released; is that
9 correct?
10    A    Correct.
11    Q    What about the subsequent Absolute
12 movies? Were you involved with those? And to be
13 clear, I'm referring to Absolute Interference,
14 Absolute 9-0. Oh, the third -- the fourth one was
15 Scientific Proof.
16         Did you play any role in -- in the
17 creation of those films?
18    A    I don't know what you mean by
19 "creation," but I was -- so I don't know what you
20 mean by creation.
21    Q    Well, did you have any role as far as
22 did you advise the producers of the film for

Page 62

1 example on the contents of the film?
2    A    I mean I was there during filming.
3    Q    Okay. Did you review any content before
4 it was entered into -- like, for example, did you
5 say at any point maybe don't put this in there?
6         Were you consulted as to the legitimacy of
7 any of the information presented in those films?
8    A    Well, some of that would get into --
9 certainly some, of if not all, would get into
10 attorney-client privileged communications, which I
11 won't disclose.
12         The one thing that I was involved in is
13 I -- maybe Dr. Frank coming into whatever movie he
14 was in.
15    Q    And what was your involvement there?
16    A    I had met with Dr. Frank before.
17    Q    Who is Dr. Frank?
18    A    He is a PhD who has done incredible work
19 analyzing election-related issues specifically as
20 it relates to the registration voter roles.
21    Q    How did you meet Dr. Frank?
22    A    I don't recall exactly. I just don't

Page 63

1 recall exactly how I met him.
2    Q    Did you meet him prior to the Cyber
3 Symposium?
4    A    Yes.
5    Q    So it would have been sometime in early
6 2021? Does that comport with your recollection?
7    A    Early to mid or so I would say.
8 Sometime in 2021.
9    Q    Did you attend one of his -- I know at
10 the time he was traveling the country giving
11 presentations -- did you attend one of those
12 presentations?
13    A    No.
14    Q    What was the context in which you met
15 him? Was it -- did someone introduce you?
16    A    Yes. Somebody introduced me, and it was
17 in the context of some work that he had done in
18 Pennsylvania in analyzing the voter registration
19 roles there.
20         And I think it was Kathy Barnette. He had
21 done some work on behalf of her campaign.
22    Q    And you consider Dr. Frank to be a

Page 64

1 reliable source?
2    A    Reliable source for what?
3    Q    For analyzing election data?
4         MR. KACHOUROFF: I'm going to object.
5 Again, this is going back to mental impressions and
6 work product, and we're going to be here all day
7 with this objection if you don't -- you can ask him
8 facts, but you're asking about what he's doing in
9 the cases and what he's doing with experts. I think
10 that's objectionable.
11         MR. KLOEWER: I'm trying to get to the
12 reliability of the -- of the individuals that have
13 been relied upon by the defendants in this case, and
14 what --
15         MR. KACHOUROFF: Precisely. And his view
16 of what's reliable and what's not reliable is work
17 product.
18 BY MR. KLOEWER:
19    Q    Let's get back to Mr. Howse.
20         Since you first started working with him
21 with respect to -- to -- did you introduce Dr. Frank
22 to him?

Page 65

17 (Pages 62 - 65)

1    A    I don't recall.

2    Q    What's your relationship with Mr. Howse

3    today?

4    A    I mean I know him.  I've talked with

5    him.  He does FrankSpeech, has a great news show.

6    Q    Do you consider him a friend?

7    A    Sure.

8    Q    Have you ever represented Mr. Howse?

9    A    No.

10    Q    We'll get into FrankSpeech in a little

11    bit.  I'll hold off on that line of questioning.

12        Do you know about Mr. Howse's background

13    as far as any education or training that he has?

14    A    Not really.

15    Q    I know you stated before you weren't

16    familiar with his prior work with Worldview

17    Weekend.

18        Since you've gotten to know him have you

19    made any effort to understand his -- his background

20    as far as experience, work experience, things of

21    that nature?

22    A    Well, I don't know what you mean by, you

*Page 66*

1    know, made any effort.  So I've learned some

2    things.  I know that he's done documentaries

3    before.  I've met him.  He has been, I think,

4    sounding the alarm about an effort to subvert

5    officials in this country and things like that

6    generally.

7        Same thing like, you know, Yuri Bezmenov,

8    a former KGB defector, talked about how the former

9    Soviet Union was going to subvert the United States.

10    I mean, along those lines.  I mean, you have that --

11    that kind of analysis.

12    Q    Have you read any of his books?

13    A    Of Brannon's, no.

14    Q    Yeah.  What about Mary Fanning?  When

15    did you meet her?

16    A    Sometime in 2021.  I would -- I think

17    in, you know, first, second quarter of 2021, but

18    that's the recollection.

19    Q    Who is Mary Fanning?

20    A    Well, she's -- she writes for -- I think

21    it's called The American Report.  And who she is,

22    I think, is a mystery to -- to many people.  But

*Page 67*

1    she has some interesting articles that she writes.

2    Q    Have you ever met Ms. Fanning in person?

3    A    No.

4    Q    You ever seen her?

5    A    No.

6    Q    Do you know her husband?

7    A    I know of him, yeah.

8    Q    Did you work with him at Kirkland Ellis?

9    A    No.

10    Q    You're aware that she's married to Greg

11    Kirchhoefer at Kirkland Ellis, correct?

12    A    Yes.

13    Q    And did you ever -- I know Kirkland

14    Ellis is a very big firm.  What do you mean when

15    you say you are aware of him?

16    A    Well, I mean, you know, I know that

17    that's her husband.

18    Q    Okay.  But you never worked on any cases

19    with him, for example, when you worked together?

20    A    No.

21    Q    Were you ever in the same office with

22    him?

*Page 68*

1    A    No.  Never knew him before I had met

2    Mary.  And when I said met, talked with her.

3    Q    So is Mary a journalist?

4    A    I would consider her.  I mean, she

5    writes for a publication, so I would think that's

6    a journalist.  Yeah.

7    Q    What other work experience does Mary

8    Fanning have?

9    A    I don't know.

10    Q    Do you know anything about her work

11    history?

12    A    No.

13    Q    Have you attempted to find out anything

14    about her work history?

15    A    No.

16    Q    Why not?

17    MR. KACHOUROFF:  Objection.  Goes back to

18    mental impressions and work product.

19    MR. KLOEWER:  Are you instructing him not

20    to answer?

21    MR. KACHOUROFF:  I'm instructing him not

22    to answer on that basis, yes.

*Page 69*

18 (Pages 66 - 69)

1  BY MR. KLOEWER:
2      Q   Do you know if Ms. Fanning has ever
3  worked for any government agency?
4      A   I do not know.
5      Q   Have you ever seen any evidence to
6  suggest that she has?
7      A   I mean I've seen it talked about.  You
8  know open in the media, you know, speculation, if
9  you will, but I've not seen any direct evidence,
10 no.
11     Q   Have you ever asked her?
12     A   I don't -- I don't recall.
13     Q   And she's never offered you any
14 information to substantiate any credentials?
15     A   I don't recall.
16     Q   We'll get into some of the
17 communications, but she's provided a lot of
18 information on a variety of topics to you and --
19 but she's never provided you any information
20 about -- well, we've already established.
21         You don't have any information about
22 her -- her work history or her credentials, and

Page 70

1  programs with intelligence agencies including
2  based out of Fort Washington, Virginia.
3      Q   Have you met Mr. Montgomery?
4      A   I mean I've talked to him.  I've never
5  met him in person, no.
6      Q   Do you know where Mr. Montgomery lives?
7      A   Yes.
8      Q   Did you ever -- have you ever attempted
9  to meet with him in person?
10     A   No.

Page 72

1  you've never requested that information?
2      A   To the best of my recollection, that's
3  correct.
4      Q   Do you represent Mary Fanning?
5      A   No.
6      Q   Have you ever?
7      A   No.
8      Q   Do you know anyone who has met Mary
9  Fanning in person?
10     A   I've never discussed that with anybody,
11 so I wouldn't have any specific facts.
12     Q   I'll take that as a no.
13     A   I don't have any facts, or at least I'm
14 not aware of any facts of somebody saying they met
15 with Mary Fanning, that's correct.
16     Q   But you do understand her to be a real
17 person?
18     A   Oh, yeah.  No, I've talked to her.
19     Q   What about Dennis Montgomery?  Who is
20 he?
21     A   Dennis Montgomery is a former
22 contractor, worked at eTreppid and -- on various

Page 71

Page 73

19 (Pages 70 - 73)

6    Q   What is Scorecard?

7    A   So my understanding of Hammer Scorecard
8  is it is a packing program generally, or a program
9  that can access information, you know, on any
10  system, any computer system. And the Scorecard
11  can manipulate voting results.

12    Q   So I think we're -- it seems we're
13  talking about potentially two separate things.
14  Are Hammer and Scorecard the same thing in your
15  mind?

16    A   I believe that they have been publicly
17  represented as related but distinct.

18    Q   In what way?

19    A   That Hammer is what is used to access
20  and the Scorecard is what's used to manipulate the
21  voting results.

22    Q   Are they both software programs?

Page 74

1  Q   Well, I've heard conflicting
2  representations about this program. I'm trying to
3  understand if you have a better answer than the
4  ones I've gotten.

5    Do you -- is it your understanding that a
6  government computer is required to run Scorecard?

7    A   I don't think it has to be a government
8  computer. I think it has to be a computer.

9    Q   Okay. Do you understand Hammer to be a
10  piece of hardware or a piece of software?

11    A   I believe it's a program.

12    Q   Okay. What -- so what does Hammer do as
13  opposed to what does Scorecard do?

14    A   My understanding is the Hammer program
15  is used to access any type of computer system.
16  The Scorecard is what can manipulate results.
17  That's my general understanding.

18    Q   And when was Hammer created?

19    A   My understanding is -- I think it was
20  like in 2004. I think. You know. But a long
21  time ago, that being a long time.

22    Q   And does Hammer, which was created in

Page 76

1    A   I -- I'm not a tech person, so I
2  don't -- I can't give a specific answer. I would
3  think that it's software but you obviously --
4  software has to operate on something so there
5  would be that.

6    Q   Well, is it your understanding that I
7  could, for example, upload the Scorecard program
8  onto this laptop here and run it?

9    A   I have no idea. I don't know what the
10  capacity or whether that would be technologically
11  feasible.

12    Q   Do you know if there's a hardware
13  component that is necessary to run Scorecard?

14    A   I think there's always a hardware
15  component necessary to run any software.

16    Q   Well, that's -- that's fair. I mean a
17  unique hardware component. Something that would
18  not be on a commercial computer device, for
19  example.

20    A   I don't know what you mean by "unique."
21  I mean software is software. Whether a computer
22  has a capacity within it to operate.

Page 75

1  2004, still have the capacity to access any
2  computer system in 2023?

3    MR. PARKER: Objection as to form.

4    THE WITNESS: I don't think anything would
5  have changed.

6  BY MR. KLOEWER:

7    Q   Well, you're aware that technology has
8  progressed substantially since 2004, correct?

9    A   Well, not with respect to hacking.
10  Everything is being hacked every single day.

11    Q   Well, I mean encryption methods have
12  grown much more sophisticated. We have smart
13  phones, for example, with far greater storage
14  capacity, increased security measures coming out
15  all the time.

16    A   Well, I -- pardon me.

17    Q   Well, is it your understanding that
18  Hammer is capable of -- this 2004 program is
19  capable of bypassing all the developments that
20  would have occurred between then and now?

21    MR. PARKER: Objection as to form.

22    THE WITNESS: Yeah. I mean, I -- I mean

Page 77

20 (Pages 74 - 77)

1  just in the general question, I mean, even
2  Mr. Coomer has testified that given enough time and
3  access, any computer can be hacked.
4       I would have no reason to think that it
5  wouldn't function just as -- it would.  I mean, it
6  isn't -- hacking isn't something new.  It's been
7  around for a long time.  There's many ways to hack
8  computers.
9  BY MR. KLOEWER:
10      Q    Well, let me ask the question this way,
11  what is Mr. Montgomery's involvement with Hammer
12  and Scorecard as you understand it?
13      A    My understanding is he is the creator.
14      Q    Okay.  And does he still have access to
15  those programs?
16      A    I believe he does.  I don't know,
17  though.  Depends what you mean by access to the
18  programs.
19      Q    Can he hop on his computer today and
20  start running Scorecard?
21      A    I don't know.  I don't have any
22  firsthand knowledge.

Page 78

6  BY MR. KLOEWER:
7       Q    What is your understanding of Mary
8  Fanning's relationship with Dennis Montgomery?
9       A    My understanding is that she knows him.
10      Q    How?
11      A    That, I don't know.
12      Q    Have you ever asked her what is the
13  basis for her relationship with Mr. Montgomery?
14      A    No.
15      Q    Have you ever asked him how he knows
16  Ms. Fanning?
17           MR. PARKER:  I'm going to object.  It
18  seems to me that this is all going to a lawyer's
19  investigation of these individuals, but I may be
20  wrong about that.
21           But without waiving our privilege on the
22  work product investigative work that Mr. Olsen has

Page 80

1  BY MR. KLOEWER:
2       Q    So you've never seen Scorecard operate?
3       A    That's correct.
4       Q    You've never seen Hammer operate?
5       A    That's correct.

Page 79

1  done, if this is part that of work.
2           THE WITNESS:  Well, I would say I just
3  know that she knows him.  I don't know for how long.
4  I just know that they know each other.
5  BY MR. KLOEWER:
6       Q    But you haven't made any effort to
7  develop a better understanding of that
8  relationship?
9       A    I don't know what you mean by "develop a
10  better understanding," but I haven't pursued it.
11      Q    Look at the second -- or sorry -- third
12  paragraph of this email from Ms. Fanning.  She
13  says:  Some of those IP addresses --
14      A    I'm sorry.  What page and where?
15      Q    On the first page it's marked Olsen 218.
16  I'm looking three paragraphs down.  It begins with
17  "some of those IP addresses."
18      A    Okay.
19      Q    -- "the voting machines themselves.
20  Montgomery's demonstration would reveal how
21  Scorecard was used, as well as the watermark that
22  he inserted into the source code proving someone

Page 81

21 (Pages 78 - 81)

1 gave the technology to China.
2        Do you know what she's referring to here?
3 What is a watermark that he inserted?  What's your
4 understanding of that phrase?
5    A   I don't know specifically.  I mean, I
6 know what a watermark is.
7    Q   Do you know when Mr. Montgomery stopped
8 doing government work?
9    A   No.  Not -- I know that there is a
10 publicly filed declaration by Mr. Montgomery in
11 the District of Nevada that lists the contracts he
12 has with the government, or some of them at least.
13        And I know that he turned over something
14 like 47 hard drives to the FBI in connection with
15 his whistle -- whistleblower activities about
16 unlawful government surveillance.
17        I don't know how you would characterize it
18 as work with the government, and I don't know when
19 the last time he was compensated by the government
20 pursuant to any of these programs.
21    Q   And are you -- when you refer to this
22 litigation in Nevada, you're referring to the 2006

Page 82

1 case?
2    A   There is a case pending in eTreppid,
3 correct.
4    Q   Are you aware of him doing any
5 government work in the last 17 years?
6    A   I don't know one way or the other.  I
7 mean, other than the contracts that are listed.
8 So 17 years, that would go back to 2006, right?
9    Q   Right.
10    A   I think that there are -- obviously, I
11 did not know Mr. Montgomery, you know, until
12 recently, and I do believe that there are
13 contracts in his declaration that are dated after
14 2006, but I -- you have to look at the document.
15    Q   And when you're requesting a
16 demonstration, you say:  If we're given access to
17 voting machines by a friendly AG, do you think
18 Dennis would do a demonstration.
19        You're asking for a demonstration of what
20 specifically?  I know we said Scorecard, but what
21 are you -- what's your understanding of what
22 Scorecard would show?

Page 83

1    A   Well, just that -- that you could access
2 and manipulate votes.
3    Q   Any votes on any machine?
4    A   As opposed to what?
5    Q   Well, can Scorecard, in your
6 understanding, manipulate votes from a tabulator
7 produced by Hart InterCivic, for example?
8    A   I don't think that there's a distinction
9 in terms of the manufacturer of the hard -- soft
10 -- hardware, the tabulator.  So...
11    Q   So you understand Scorecard to have the
12 capacity to manipulate results from any voting
13 machine?
14    A   That would be my understanding, yes.
15    Q   Not just Dominion?
16    A   Correct.
17    Q   Do you believe there's anything unique
18 about Dominion machines that makes them uniquely
19 susceptible to Scorecard?
20        MR. PARKER:  Objection.
21        MR. KACHOUROFF:  Objection.
22        Go ahead.

Page 84

1        THE WITNESS:  That's going to get into
2 work product.
3 BY MR. KLOEWER:
4    Q   Is there any publicly available evidence
5 you could point me to to suggest that Dominion
6 Voting machines are uniquely susceptible to
7 Scorecard?
8        MR. KACHOUROFF:  Same objection.
9        THE WITNESS:  Well, yeah.  There is
10 publicly available --
11        MR. KACHOUROFF:  It doesn't matter that
12 it's publicly available.  I mean, the fact that he's
13 investigated and selected publicly available
14 information, that itself is work product.
15        I mean you have the same opportunity to
16 go look at these publicly available sources as
17 well.
18        MR. KLOEWER:  Well, I haven't found any.
19 So that's why I'm asking.
20        MR. KACHOUROFF:  Okay.  Well...
21        MR. KLOEWER:  I'm just trying to
22 understand that the -- the intersection between

Page 85

22 (Pages 82 - 85)



**Page 86**

1 Dominion Voting Systems and Hammer Scorecard.  It's
2 not clear to me that -- that there's anything unique
3 about Dominion, and it sounds like there's nothing
4 you can point me to suggest that there is.
5        MR. PARKER:  Objection.  Asks for mental
6 impressions.  It's all about his legal
7 investigation.  He doesn't have to answer that.
8 We're not waiving the objection as the defendants in
9 this case.  And your assumptions aren't evidence.
10 BY MR. KLOEWER:
11    Q   Well, this is -- so this was
12 February 20th of 2021.  This communication
13 preceded your retention by Mr. Lindell, correct?
14    A   It precedes the date of the retention
15 letter; but as you know, retention can begin prior
16 to a letter being signed.
17    Q   And did your retention by Mr. Lindell
18 precede this communication?
19    A   Yeah.  Because that's the only way I
20 would have met Mary Fanning or talking about any
21 of this stuff.

**Page 87**

**Page 88**

**Page 89**

19    A   Not that I recall.  I mean we had
20 subsequent conversations so I -- but I don't -- I
21 don't recall.
22    Q   So there is a pretty lengthy letter

1 that -- that goes through a number of factual
2 claims made by The American Report.
3       I'll direct your attention to the bottom
4 of page 3 of this document labeled Olsen 224.  The
5 letter states:  Turning back to the "raw data
6 analytics," the spreadsheet in the article does not
7 support your claims of the election being stolen.
8 The PDF identifies a total of 56,395 votes that were
9 supposedly stolen from Donald Trump.  Even if the
10 PDF were accurate -- it isn't -- the number of votes
11 at issue would not have changed the outcome of the
12 election.  Other obvious problems in the PDF
13 include --
14       And it goes through several bullet points
15 that speak to specific, factual allegations made by
16 Mary Fanning and Alan Jones in the reporting with
17 The American Report.
18       Have you looked into any of these factual
19 allegations to determine their factual accuracy?
20       MR. KACHOUROFF:  Objection.  Goes back to
21 the work product and mental impressions.
22       THE WITNESS:  Yeah.  As I said, I don't
Page 90

1 for pulling off one of the most elaborate and
2 dangerous hoaxes in American history after he
3 tricked the Federal Government into paying
4 millions of dollars for bogus terrorist-detection
5 software.
6       Are you familiar with -- with these
7 allegations against Mr. Montgomery?
8       MR. KACHOUROFF:  I'm going to object to
9 the form.  These aren't allegations.  These are
10 quotes from news articles or online sources.  So...
11 BY MR. KLOEWER:
12   Q   Are you familiar with the -- these
13 quotes from online sources?
14   A   I mean I've -- I've seen allegations --
15 you know, quotes.  I mean, I'm not saying these
16 specific.  Again, I don't recall looking at this
17 document.  But I've seen people make allegations
18 against Dennis Montgomery.  Sure.  Unproven ones.
19 And I assume that if he defrauded the government
20 they would --
21       MR. KACHOUROFF:  Hold on.  I'm going to
22 object again because you're, again, going to mental
Page 92

1 recall reviewing this document.
2 BY MR. KLOEWER:
3   Q   In that third bullet point down it says:
4 Almost 20 percent of the counties listed in the
5 PDF did not even use Dominion machines in the 2020
6 election.
7       Do you recall ever looking into this
8 allegation?
9   A   Again, I don't recall looking at this
10 document.
11   Q   Okay.  Just real quickly, and I know --
12 I just want to confirm that this is all accurate
13 throughout the remainder of this.
14       Now, on page 4 of that document they list
15 many of the -- or several, at least, of the prior
16 fraud allegations, fraud complaints, fraud
17 convictions, against Dennis Montgomery.
18   A   I'm not sure where you're referring to.
19 What --
20   Q   On page 4, the second full paragraph
21 down begins with "Similarly."  It states:
22 Similarly, Dennis Montgomery is a fraudster known
Page 91

1 impressions about witnesses that he has.  And it's
2 -- it's attorney work product clearly.  So he
3 doesn't have to answer these questions.
4       If you want to know about these people,
5 you should depose them yourself.
6       MR. KLOEWER:  Well, we've tried.
7 Mr. Montgomery is claiming that he cannot appear for
8 a deposition.  So...
9       MR. PARKER:  We're still working on that,
10 though.
11       MR. KLOEWER:  We're -- we're counting down
12 the days.
13       MR. KACHOUROFF:  Working together.
14       MR. KLOEWER:  Yeah.  I'll believe it when
15 I see it.
16 BY MR. KLOEWER:
17   Q   Do the allegations, the multiple
18 allegations, of fraud against Mr. Montgomery over
19 several years give you any cause for concern about
20 his reliability?
21       MR. KACHOUROFF:  Same objection.
22 Attorney-client privilege, mental impressions, and
Page 93

24 (Pages 90 - 93)



1  work product.

2       MR. KLOEWER:  Let's take a look at 177.

3       THE WITNESS:  What are we looking at?

Page 94

1       Q    Are you familiar with The Gateway

2  Pundit?

3       A    Oh, yeah.

4       Q    What is The Gateway Pundit?

5       A    It's a publication, news -- news

6  publication.

7       Q    Do you read The Gateway Pundit yourself?

8       A    I have read it, yes.

9       Q    Do you consider it to a reliable source?

10       A    Yes.

11       Q    Do you know Jim Hoft?

12       A    I do.

13       Q    Do you know Joe Hoft?

14       A    I do.

15       Q    How did you meet Jim Hoft?

16       A    I don't recall.

17       Q    Do you know when you met him?

18       A    Not exactly.

19       Q    Was it after the 2020 election?

20       A    Yes.

21       Q    Okay.  Was it after January 6?

22       A    Yes.

Page 95

1       Q    Okay.  Did you meet him in person or was

2  it a phone call?

3       A    Phone call.

4       Q    Okay.  Was he seeking legal counsel from

5  you?

6       A    No.

7       Q    Have you ever represented Jim Hoft?

8       A    No.

9       Q    Have you ever represented The Gateway

10  Pundit?

11       A    No.

17       Q    Were you -- do you recall when you

18  became aware that The Gateway Pundit had sued Mary

19  Fanning and Brannon Howse for defamation?

20       A    Not exactly.  I mean, I'm aware of the

21  lawsuit, but I don't know when I became aware of

22  it.

Page 96

1       Q    Have you read the lawsuit?

2       A    No.  Well, I may have, but I don't have

3  a specific recollection about it.

Page 97

25 (Pages 94 - 97)

Veritext Legal Solutions
800-336-4000



1    MR. KLOEWER:  Okay.

2    MR. KACHOUROFF:  We'll be here for a
3  while.

4    MR. KLOEWER:  Let's take a look at this
5  next one.

6    THE WITNESS:  And I'm not trying to break
7  your flow, but we've been going almost two hours, so
8  at some point, when you have a good time to take a
9  break.

10    MR. KLOEWER:  We can break now if you
11  want.

12    THE WITNESS:  We can keep going for a
13  little bit, but I'm just -- just saying, you know,
14  I'd like to take a break within ten minutes or so.

15    MR. KLOEWER:  Sure.  I've got two more --

16    THE WITNESS:  The court reporter is
17  nodding.

18    MR. KLOEWER:  Are we good for ten minutes?
19  I've just got two quick ones to get through here.
20  Well, maybe quick.  We'll see.  And then we'll wrap
21  up the Fanning correspondence.

22    We'll mark this one as 126.

Page 100

1    (OLSEN Exhibit Number 126 was marked for
2    identification.)

7    MR. KACHOUROFF:  I'm -- again, I'm going
8  to go back to the same objection of attorney-client
9  work product.  Any time you ask questions, I've
10  given a lot of latitude because I don't want to
11  break your flow.

12    MR. KLOEWER:  Sure.

13    MR. KACHOUROFF:  But I do want to -- we're
14  going to be here all day on this topic making
15  objections to whatever he thinks about a certain
16  witness or some allegation because he's intimately
17  in Mike Lindell's defense.

18    MR. KLOEWER:  Yeah.  Well, I've got all
19  day worked out.  We've got a lot to get through, so
20  I'm going to keep asking --

21    MR. KACHOUROFF:  And I'll keep objecting
22  then.

Page 99

Page 101

Page 98

Veritext Legal Solutions
800-336-4000





11    Q   She does.  Do you know that this claim
12  about Chobani yogurt factory was made by Alex
13  Jones in 2017 on InfoWars?
14    A  No.
15    Q   Did you know that the Chobani yogurt
16  factor sued Alex Jones?
17    A  I have no idea.
18    Q   Do you know that Alex Jones issued a
19  retraction and settled the lawsuit one month
20  later?
21    A  I have no idea.
22    Q   So if I understand you correctly you

Page 102

Page 104

7      You know this is nonsense, right,
8  Mr. Olsen?
9      MR. KACHOUROFF:  Objection.  Objection to
10  form.  And moreover, whether he believes she's
11  credible and decides not to address her in emails
12  and responses goes back to the mental impressions
13  and attorney work product.
14  BY MR. KLOEWER:
15    Q   As you sit here today, Mr. Olsen, do you
16  believe that the Chobani yogurt factory is sending
17  terrorists --
18      MR. KACHOUROFF:  Same objection.
19  BY MR. KLOEWER:
20    Q  Did you look into this claim at all?
21    A  So as I said, I don't recall receiving
22  this email.

Page 103

1  made no effort to investigate the legitimacy of
2  this claim for Ms. Fanning?
3    A   First of all, I didn't work for
4  Ms. Fanning, so I wouldn't investigate for her.
5    Q   You didn't call law enforcement to let
6  them know about a terrorist pipeline into the
7  United States?
8    A  As I said, I don't recall seeing this,
9  but I assume law enforcement follows terrorists in
10  the United States and doesn't need help from me.
11      MR. PARKER:  Objection regarding this
12  document as to form.
13      MR. KLOEWER:  The last one here, and we'll
14  take a break.  This one will hopefully be quick.
15  This is Exhibit 127.
16      (OLSEN Exhibit Number 127 was marked for
17      identification.)



Page 105

27 (Pages 102 - 105)

1   February, March, and April of 2021.

10   Q   It appears that you were familiar with
11   Dr. Coomer's lawsuits at least as early as April
12   of 2021.
13       Is that a fair characterization?
14   A   I think -- I have no recollection of
15   Coomer's lawsuit, but this email states what it
16   says.
17   Q   Did you ever read the lawsuit that -- at
18   this time, I'll represent -- right -- right now
19   Dr. Coomer has five lawsuits pending.  At this
20   time, he had one pending against the Trump
21   campaign and various others.
22       Did you read that lawsuit?

Page 106

Page 108

1   A   I don't recall reading any lawsuit by
2   Eric Coomer.  At this time, Mike had been sued by
3   Dominion and I think Smartmatic.
4   Q   I'm just wondering why you're asking for
5   information about Eric Coomer if you hadn't read
6   his lawsuit and didn't know anything about him.
7   A   Well, as I said, I think, before, I knew
8   there was general stuff and that they are all kind
9   of just floating around.
10       MR. KLOEWER:  Let's -- we can take a break
11   there.  We can get into some more specific stuff
12   once we get into (inaudible) --
13       Go off the record.
14       VIDEOGRAPHER:  Going off the record.  The
15   time is 11:21 a.m.
16       (Whereupon, a brief recess was taken.)
17       VIDEOGRAPHER:  Going back on the record.
18   The time is 11:36 a.m.
19   BY MR. KLOEWER:
20   Q   When we left off, Mr. Olsen, we were
21   talking about sort of the time frame in the months
22   leading up to Cyber Symposium, primarily in

Page 107

8   Q   Who is Jeff Nyquist?
9   A   I know he's an author and some type of
10   journalist, or he writes.  I mean, there's a blog
11   that I -- that I am aware of that he writes.
12   Q   Does he have a particular focus area
13   or...
14   A   I think foreign policy and -- yeah,
15   foreign policy I -- I would say, particularly with
16   China and others I think.
17   Q   Do you read his work?
18   A   I have, yes.
19   Q   Is he associated with any particular
20   publication or just his own blog?
21   A   Not that I'm aware of.
22   Q   Do you consider Mr. Nyquist to be a

Page 109

28 (Pages 106 - 109)



1 reliable source?
2    A   I don't know what you mean by reliable.
3 So I read a lot of people and -- and just like,
4 you know, most people you judge what you see. I
5 don't think he's, you know, a crackpot or anything
6 like that.
7       He's -- I mean I think he is entitled to
8 his opinions. I think he does -- some of his work I
9 find very intriguing.

20       Do you know who Mike Zullo is?
21    A   I don't know him personally, but I know
22 of him.

Page 110

1    Q   Okay. How do you know of Mr. Zullo?
2    A   Well, I know he's written about Dennis
3 Montgomery, and I know that he was involved with
4 Sheriff Arpaio. And so that's, I mean, I've
5 never -- I don't recall ever speaking with him.
6       I talk to a lot of people, so it's -- you
7 know, there's a lot of going on. I don't recall
8 speaking with him, but I know of him. I read some
9 of his stuff.
10    Q   Do you know what he does for a living?
11 How is he involved with Mr. Arpaio, for example?
12    A   I -- maybe as an investigator or
13 something like that. I -- I don't know
14 specifically.

Page 111

6    Q   Do you know her? Have you met her?
7    A   No.
8    Q   Do you know if that's accurate if she's
9 CIA or not?
10    A   No. I mean I don't have any personal
11 knowledge of her being at the CIA.

17       What about Frank Gaffney? Do you know who
18 that is?
19    A   I mean, I've heard the name Frank
20 Gaffney. I've seen him on TV. I've never met him
21 or spoken with him.

Page 112

Page 113

29 (Pages 110 - 113)



1      You don't recall any others?

5      MR. KLOEWER:  Let's take a look at this
6   document.  We'll mark this as 128.
7      (OLSEN Exhibit Number 128 was marked for
8      identification.)

Page 114

Page 116

4      Do you recall if anyone else during this
5   time tried to alert you about Mr. Montgomery?
6      MR. KACHOUROFF:  Objection.  I'm going to
7   go back to the work product and mental impressions.
8   Whether somebody contacted him or not is -- is
9   entirely a function of his investigation perhaps.
10  So you're asking him -- you're getting into that
11  part -- like I said earlier today, I really tried to
12  let you --
13     MR. KLOEWER:  Yeah.
14     MR. KACHOUROFF:  -- go, but right now
15  it's -- it's not -- I'm not going to let you get
16  into his mental impressions and work product.
17  BY MR. KLOEWER:
18     Q   Okay.  I'm just wondering to the extent
19  people are affirmatively reaching out and -- and
20  trying to warn you.  Not -- not the steps that you
21  took, but communications that you received that
22  were directed you by third parties.

Page 115

Page 117

Veritext Legal Solutions
800-336-4000



Page 118

Page 120

Page 119

5        Maybe good to back up here and understand,
6   you know, why I'm asking these questions.
7        You're aware that Mr. Lindell at this time
8   -- well, when did you first hear about the Cyber
9   Symposium?
10      A   Probably around June 2021.
11      Q   And do you recall how you first heard
12   about it?
13      A   Yes.
14      Q   Describe the circumstances of that.
15      A   Well, that would get into
16   attorney-client privilege communications.
17      Q   In this case your client being
18   Mr. Lindell?
19      A   Correct.
20      Q   You were aware at this time Mr. Lindell
21   was publicly promoting the Cyber Symposium; is
22   that fair?  This being July of 2021 which is what

Page 121

31 (Pages 118 - 121)

1  it's dated.
2     A  Yes.  Yes.
3     Q  What do you understand to have been the
4  purpose of the Cyber Symposium?
5     A  I think to raise awareness generally
6  speaking.
7     Q  Awareness about what?
8     A  Election fraud, how machines are
9  being -- are being or can be used to manipulate
10  elections.
11     Q  Do you recall hearing Mr. Lindell
12  publicly claim that he would be presenting PCAP
13  information at the Symposium?
14     A  I have a general recollection about
15  that, yes.
16     Q  What are PCAPs?
17     A  Well, they are -- my understanding --
18  and again, I'm not a cyber expert -- okay?  So the
19  PCAPs are packet capture data.  It's the packet
20  that is transmitted across the internet that has a
21  certain identifier that allows that information to
22  be, you know, it's organized, so that the

Page 122

1  information will eventually marry up into a, you
2  know, cogent, cohesive bit of information.
3  They're like little discrete packets of
4  information that need to be brought together.
5     Q  I see.  And why was Mr. Lindell going to
6  present PCAP information at the Symposium?
7     A  Well, again, I think that gets into
8  attorney-client privilege.
9     Q  Well, he publicly stated that the PCAPs
10  would demonstrate evidence of election fraud,
11  correct?
12     A  I don't know that he said it that way,
13  but if he said it, he said it.
14     Q  Do you know where this PCAP information
15  came from?
16     A  When you say this PCAP information, what
17  are you referring to?
18     Q  The information that Mr. Lindell
19  intended to present at the Cyber Symposium.
20     A  Again, that gets into attorney-client
21  privilege.
22     Q  Well, Mr. Lindell has publicly stated

Page 123

1  that the source of the PCAP information was Dennis
2  Montgomery.
3       Would you disagree with that, what he
4  stated publicly?
5     A  You'd have to show me something where he
6  said that.  I don't know specifically, so I don't
7  want to speak for him.  If he said it, he said it.
8     Q  He's testified --
9     A  Yeah.  Okay.
10     Q  -- under oath that in this case, and
11  he's been very clear that he got his information
12  from Mr. Montgomery.
13       Were you aware that this information was
14  coming from Mr. Montgomery?
15     A  Again, that gets into attorney-client
16  communications and work product.

Page 124

7       Did you -- we've established that you've
8  never seen Hammer or Scorecard operate, correct?
9     A  Correct.

Page 125

32 (Pages 122 - 125)



17        Do you know who Don Berlin is?
18    A   I do.
19    Q   Do you know -- well, how do you know
20  Mr. Berlin?
21    A   He's an investigator.
22    Q   How long have you known him?

Page 126

Page 128

9    Q   All right.  Are you familiar with this
10  entity, XRVision?  It says he's the CEO of
11  XRVision.
12    A   No.

Page 127

1    A   Two years maybe.
2    Q   Okay.  You didn't know him prior to your
3  work with Mr. Lindell?
4    A   Correct.
5    Q   How did you meet Mr. Berlin?
6    A   I don't recall exactly.

Page 129

33 (Pages 126 - 129)



22

1 to talk a little bit about Joe Oltmann.
2      Do you know who Joe Oltmann is, Mr. Olsen?
3   A   I do.
4   Q   How do you know Joe Oltmann?
5   A   I'm not sure I understand.  What do you
6 mean how do I know him?
7   Q   When did you meet Joe Oltmann?
8   A   I think the first time I met him was at
9 the Cyber Symposium.
10  Q   Okay.  Did you know him by reputation?
11  A   I don't know what you mean by
12 reputation, but, I mean, I had -- there's, like, a
13 lot of people around, so I don't have a specific
14 recollection.
15      He was, like, one of many people that, you
16 know, was around that time.
17  Q   Do you watch the Conservative Daily
18 Podcast?
19  A   No.
20  Q   Have you ever?
21  A   I might have, but it's -- not that I
22 recall, I mean.

1 BY MR. KLOEWER:
2   Q   Well, Mr. Lindell has -- has been held
3 -- the arbitration panel has found that the
4 information presented at the Symposium was not
5 related to the election, correct?
6      MR. PARKER:  Objection as to form.
7 Misstates.
8      THE WITNESS:  Yeah.  I'm not sure of what
9 the exact holding was.
10 BY MR. KLOEWER:
11  Q   You're aware that Mr. Lindell has been
12 ordered to the pay $5 million to Mr. Zeidman,
13 correct?
14  A   I am aware.
15  Q   I guess we can -- we can talk about the
16 results in the aftermath of the Symposium when we
17 get into that a little more.  I'm probably getting
18 ahead of my schedule here.
19      Let's -- let's get into the Symposium, and
20 then I'll revisit that -- that question.
21  A   Okay.
22  Q   Before we get to the Symposium, I want

1   Q   Do you know that Joe Oltmann is the host
2 of the Conservative Daily Podcast?
3   A   I've heard that, yeah.
4   Q   And we've talked a little bit about
5 Mr. Oltmann's allegations against Dr. Coomer.
6      Were you aware of those claims when you
7 met Mr. Oltmann in August of 2021?
8   A   I don't have a specific recollection.  I
9 think, as I said before, I had a general idea of,
10 you know, mean things were said, but I don't --
11 it's not something that I focused on.
12  Q   Have you ever made any effort to -- to
13 investigate Mr. Oltmann's background?
14  A   No.  Not -- no.
15  Q   I can -- can infer the answer to this
16 question, but have you ever watched the first
17 November 9th, 2020, Conservative Daily Podcast
18 where Mr. Oltmann first accused Eric Coomer of
19 rigging the 2020 presidential election?
20  A   Never.
21  Q   I'll show you a couple documents here,
22 and then we'll start looking at some clips.  I'll

34 (Pages 130 - 133)

1 show you what's been previously marked as
2 Exhibit 24.
3        Do you follow Mr. Oltmann on social
4 media, Mr. Olsen?
5    A   No.
6    Q   Are you on social media?
7    A   I am.
8    Q   Which platform are you active on?
9    A   Truth.
10    Q   Anything else?
11    A   No.  I don't post on anything other than
12 Truth.
13    Q   Are you on Telegram?
14    A   I mean, I'm not on it.  I look at it.
15    Q   Gab Social?
16    A   Not really.
17    Q   Twitter?
18    A   I look at it, sure, yeah.
19    Q   Do you follow Mr. Oltmann on any of
20 these platforms?
21    A   Uh-uh.
22    Q   And we're -- we're looking at right now

1 a platform that is now defunct.  This was a post
2 from Mr. Oltmann on December 8th, 2020.
3        I understand you -- you haven't read the
4 complaint in this case; is that correct?
5    A   That's correct.  I have no recollection
6 of reading the complaint.
7    Q   I want to draw your attention to the --
8 the third paragraph of this -- of this post from
9 Mr. Oltmann.  And it's right above a photograph of
10 a house, and I'll represent to you that this is
11 Mr. -- this is Dr. Coomer's home.
12        Mr. Oltmann says: So it is up to you.
13 Blow this shit up.  Share, put his name everywhere.
14 No rest for this shitbag.  Eric Coomer, Eric Coomer,
15 Eric Coomer.  This shitbag and the corrupt asshats
16 in Dominion Voting Systems must not steal our
17 election and our country.  Eric, we are watching
18 you.
19        Is this the first time you've seen this
20 post?
21    A   It is.
22    Q   Do you know that Dr. Coomer is still a

1 frequent feature of Mr. Oltmann's podcast on a
2 nearly daily basis?
3        MR. PARKER:  Objection as to form.  I'm
4 sorry I interrupted you.
5        THE WITNESS:  I don't watch, so I don't
6 know anything.
7 BY MR. KLOEWER:
8    Q   Let's take a look at the next one.  This
9 has been previously marked as Exhibit 25.
10        I take your prior testimony to suggest
11 that -- have you -- I know you produced to us a
12 transcript of Dr. Coomer's first deposition in the
13 main case.
14    A   Correct.
15    Q   Did you read that deposition transcript?
16    A   I did not.
17    Q   Did you watch the video?
18    A   I don't -- let me put it this way, I
19 don't recall reading it.
20    Q   Okay.
21    A   I may have.  I see lots.  I get a lot of
22 documents.

1    Q   Well, we'll get into -- do you recall
2 any allegations regarding Dr. Coomer being in his
3 home with a shotgun?
4    A   No.
5    Q   Do you remember him discussing it?
6    A   No.
7    Q   And you haven't read any of Dr. Coomer's
8 sworn declarations?
9    A   I did read one, yes.
10    Q   Okay.
11    A   At least one in the Curling litigation.
12    Q   In the -- okay.  So -- so prior to all
13 of this litigation.  The work he was doing while
14 he was still with Dominion presumably.
15    A   I'm not sure if it was post or before.
16    Q   I'll represent to you that the Curling
17 -- his work in Curling preceded any of the
18 allegations at issue in this dispute.
19        So before we get to this document, the
20 reason I'm asking you is if you're familiar with
21 Dr. Coomer's sworn testimony that there was an
22 instance where he had returned to his home after

1 being in hiding for several weeks to feed his cats,
2 and as soon as he was in his house, somebody started
3 shouting at him from outside the house.
4      And he told them to leave his property;
5 that he had a shotgun; and that they were
6 trespassing.
7      Do you recall?
8   A  I don't recall anything like that.
9   Q   All right.  Back to the exhibit.  This
10 is from December 8, 2020, which is the same day
11 that that instance occurred.
12      Here's Mr. Oltmann stating:  Eric Coomer,
13 I want to chat with you, but you are too scared.
14 How about you put that shotgun down and come out.
15 Everyone is watching you, Eric.  Everyone.
16      Is this the first time you seen this
17 document as well?
18   A  Yes.
19   Q   And I take from your prior testimony
20 that you are not aware of or familiar with
21 Mr. Oltmann's campaign of stalking and harassing
22 Dr. Coomer?

Page 138

1   A  I'm aware that there is some work done,
2 but the specifics of it I'm not.
3   Q   You weren't involved with any
4 negotiations for that contract, for example.
5   A  No.
6   Q   Okay.  Do you know that Johnston Howse
7 is no longer running the FrankSpeech website?
8   A  I don't even know -- well, the short
9 answer is no.
10   Q   Well, I'll represent to you that in this
11 case we've been produced -- we've received
12 documentation showing that FrankSpeech is paying
13 Mr. Oltmann's company, Pidoxa, $1.9 million a year
14 to keep the FrankSpeech website essentially up and
15 running, as I understand Mr. Oltmann's testimony
16 on the matter.
17   A  Okay.
18   Q   Have you ever watched of any of
19 Mr. Oltmann's interviews with Mr. Lindell?
20   A  I don't believe so.
21   Q   Do you know that Mr. Lindell has been a
22 frequent guest on the Conservative Daily Podcast?

Page 140

1   A   So as I said, I was -- I have a general
2 awareness that some -- what I said, you know, mean
3 things.  I don't know specifically what was said,
4 but it's not something that I have -- the short
5 answer is no.
6   Q   Just real quick, do you know about
7 Mr. Oltmann's relationship with Mr. Lindell today?
8   A  I think that would be attorney-client
9 privilege.
10   Q   Well, do you know that Mr. Oltmann runs
11 FrankSpeech website, for example?
12      MR. PARKER:  What was --
13      THE WITNESS:  I don't know what you mean
14 by run.
15      MR. PARKER:  Wait, wait, wait.  Please.
16 BY MR. KLOEWER:
17   Q   Let me -- let me clarify.  I said do you
18 know that Mr. Oltmann runs the FrankSpeech
19 website?  Are you aware that a company that is
20 owned by Joe Oltmann called Pidoxa has been
21 retained by FrankSpeech to run the back end of
22 their website?

Page 139

1   A  No.
2   Q   Do you know that Mr. Oltmann has been
3 interviewed on FrankSpeech?
4   A  I think I'm generally aware that he has
5 appeared on there.  I mean not because I watch,
6 but just because.  You know...
7   Q   Did you see the Brannon Howse interview
8 with Joe Oltmann from May of 2021?
9   A  No.  At least not that I recall.
10      MR. KLOEWER:  Okay.  I can probably
11 anticipate your responses to some of these
12 questions, but I do need to confirm whether you've
13 some of this -- some of these clips before.
14      So we're going to try this.
15      Ellen, I'll trust you to yell at me if
16 it's not working.  Hopefully, the volume is loud
17 enough, but I'm going to turn my screen here and
18 show a clip to Mr. Olsen.
19 BY MR. KLOEWER:
20   Q   Let's start with -- well, I want to
21 start with that -- that November 9th episode
22 first.  And I know you haven't watched that

Page 141

36 (Pages 138 - 141)

1 episode, but I know some of these clips are
2 floating around in general, so I want to see if
3 you've come across any of these specific clips
4 just in your --
5     A   So I can maybe -- I haven't seen any
6 clips of Joe Oltmann saying anything.
7     Q   Okay.  Well, let's --
8     A   And you can show me, but I'm going to
9 tell you I -- I don't pay attention to that.
10     Q   All right.  Let's take a look at what's
11 been previously marked as Exhibit 18, clip two.
12         MR. KLOEWER:  One moment.  Let me get this
13 in a better position.
14         Can you see the screen okay, Mr. Olsen?
15     A   I can.
16     Q   Okay.  And just to avoid any confusion
17 here, Mr. Oltmann is identified in this image as
18 Joe Otto.  I'll represent to you that that was a
19 pseudonym that he was using prior to this time and
20 after he came forward with his claims about Eric
21 Coomer, he has since that time revealed his
22 identity as Joe Oltmann.

Page 142

1     This is the episode first identifying
2 Dr. Coomer.
3         (Clip played.)
4 BY MR. KLOEWER:
5     Q   So you have seen Mr. Oltmann admitting
6 on the first episode that he couldn't identify
7 Eric Coomer?
8     A   No.
9     Q   Are you familiar with claims that Joe
10 Oltmann is the origin of the Dominion Voting
11 System's theory?
12     A   I don't know what theory, but I'm not
13 familiar with him being the origin of anything.
14 So --
15     Q   That Dominion Voting Systems was
16 responsible for rigging the 2020 election.
17     A   I'm not familiar with that.
18     Q   Okay.  Just -- just so you're familiar
19 with the context of what I'm getting at, this --
20 this was published on November 9th.
21         Mr. Oltmann sent an email to OAM on
22 November 10th where he raised these claims, OAM ran

Page 143

1 a story on November 11th, and President Trump
2 Tweeted about Dominion Voting Systems for the first
3 time on November 12th.
4     A   Okay.
5     Q   So the timeline -- and he cited to the
6 OAM report.  So that's why I'm asking if you -- if
7 you're familiar with the purported origin of
8 claims that Dominion Voting Systems was
9 responsible for rigging the 2020 election?
10     A   Not from Joe Oltmann or anything.  I
11 mean -- so does that answer your question?
12     Q   Sure.
13     A   I didn't know of Joe Oltmann back then.
14     Q   We'll get through these next quick.
15 These are short clips, so I won't waste too much
16 of your time here.  Clip five.
17         (Clip played.)
18 BY MR. KLOEWER:
19     Q   You haven't seen that one either?
20     A   No.
21     Q   Last one here, Exhibit 18, clip six.
22         (Clip played.)

Page 144

1 BY MR. KLOEWER:
2     Q   You haven't seen that one either?
3     A   No.
4     Q   Okay.  And just real quick, we'll show
5 clip seven from that same Exhibit 18.  This is
6 from a later episode.  This is about two days
7 later, just one example of sort of the conduct
8 that I described before.
9         (Clip played.)
10 BY MR. KLOEWER:
11     Q   You've never seen this clip before?
12     A   No.
13     Q   Did you ever see the Oltmann interview
14 with Michelle Malkin around the same time frame?
15     A   No.
16     Q   So you're not familiar with him saying
17 that Dr. Coomer had committed treason that was
18 punishable by death at that time?
19     A   No.
20     Q   Moving forward through time.
21         Do you know who Clay Clark is?
22     A   Yes.

Page 145

37 (Pages 142 - 145)

1    Q    Who is Clay Clark?
2    A    So I don't know exactly how to describe
3    -- like an evangelist promoter, some type of
4    public speaker figure.
5    Q    Do you know him personally?  Have you
6    met him?
7    A    Talked to him one time.
8    Q    What was the context of that
9    conversation?
10   A    I think he had been sued and was looking
11   for representation.
12   Q    Well, did -- do you recall what the
13   lawsuit was?
14   A    Not exactly.  I mean I knew it was about
15   this.  Something to do with the election.  Whether
16   it was by any particular defendant, whether it was
17   Dominion or Smartmatic or Eric Coomer or anybody
18   I don't have any recollection.
19   Q    Okay.  Did you read the complaint that
20   had been filed against him at the time?
21   A    Not that I recall.
22   Q    You declined representation I presume?

Page 146

1    A    Yes.  Well, I -- well, let me see.  I
2    don't know that he asked me per se.  I think he
3    was looking for.
4    Q    But you didn't review the allegations at
5    the time?
6    A    I have no recollection of looking at
7    that.
8    Q    Well, Dr. Coomer sued Clay Clark and the
9    Reawaken America Tour.  And have you ever attended
10   a Reawaken America Tour event?
11   A    No.
12   Q    You never went with -- well, that was an
13   answer -- that was the answer.
14       You are familiar with the tour, though?
15   A    I am.
16   Q    Do you know -- are you aware that the
17   tour is no longer allowing Joe Oltmann to speak?
18   A    No.
19   Q    Okay.  Let me play this clip for you
20   here.  And the reason I'm showing you this is
21   because I know that Joe Oltmann has been reaching
22   out to a lot of people about this.  He's very

Page 147

1    upset about it, or at least that's what he claims.
2        He's been calling and talking to a lot of
3    people, and I don't know if you're one of them or
4    not, so I'm going to play this clip here.
5        This is the time when I'm going to label a
6    flash drive the new exhibit because this clip has
7    not been entered yet.
8        MR. KLOEWER:  Connie, I'm going to label
9    this flash drive as Exhibit 129.  And when I refer
10   to future exhibits off of this, it'll be those three
11   -- three videos on there.
12       (OLSEN Exhibit Number 129 was marked for
13       identification.)
14       MR. PARKER:  Will you be providing us a
15   link as well?
16       MR. KLOEWER:  Yes, I can.  I'll -- I'll
17   have Scotty circulate that at the break here.
18       So this is from just a couple months
19   ago.  This is April of 2023.
20       (Clip played.)
21       MR. PARKER:  I object to this as to form.
22

Page 148

1    BY MR. KLOEWER:
2    Q    Did Mr. Oltmann ever reach out to you
3    regarding this -- this matter?
4    A    No.
5    Q    Have you ever discussed that with
6    Mr. Lindell?
7    A    No.
8    Q    Nevermind.
9    A    Yeah.
10   Q    Sorry.
11       MR. PARKER:  It's privileged.
12   BY MR. KLOEWER:
13   Q    That one -- I take that question back.
14   That's fair.  All right.
15       Are you aware that Mr. Oltmann has been
16   sued for defamation by a journalist working in
17   Ukraine right now?
18   A    No.
19   Q    So do you know who Sarah Ashton-Cirillo
20   is?
21   A    No.
22       MR. KLOEWER:  Just real quick.  I'll play

Page 149

38 (Pages 146 - 149)

1 this one. It's about a minute and a half. This is
2 from April of last year, 2022. This would have been
3 a few months before Pidoxa got the contract to run
4 FrankSpeech.
5     MR. PARKER: Object to this as to form as
6 well.
7         (Clip played.)
8 BY MR. KLOEWER:
9     Q   So he says "Let's bring on Joey Kim."
10 I'll ask you about it in a minute.
11         Does that refresh your recollection if
12 you're familiar with the lawsuit from Ms. Cirillo?
13     A   No.
14     Q   Have you ever seen Ms. Cirillo appear on
15 RT, the Russian TV channel?
16     A   No.
17     Q   Do you know somebody named L. Todd Wood?
18     A   I may have heard the name, but I'm not
19 sure if it's because you're saying it, but the
20 short answer is nothing specific.
21     Q   All right. We -- we can move on from
22 that. So just to put a bow on this one, it sounds

Page 150

1 like you're -- you're not familiar with
2 Mr. Oltmann's background and have not made any
3 efforts to investigate his background; is that
4 correct?
5     A   Yeah. That would be correct.
6     Q   He says in his -- that he was on a call
7 with various members of Antifa and that he took
8 notes.
9         Did you ever request those notes from
10 Mr. Oltmann?
11     A   No.
12     Q   Did you ever ask him who else was on the
13 call?
14         MR. PARKER: Objection as to form.
15 There's no indication he even knows. You say he
16 said this assuming he knows.
17         MR. KLOEWER: That's fair. We -- we can
18 move on from that. I think that box is checked.
19 BY MR. KLOEWER:
20     Q   Okay. Let's get into the Symposium a
21 little bit.
22         Did you attend -- well, I know you

Page 151

1 attended the Symposium yourself, right?
2     A   Yes. Yes.
3     Q   Were you there for the entire event?
4     A   Yes.
5     Q   What was your role at the Symposium?
6     A   Well, I was Mike's counselor. It was a
7 very, kind of, loosely run event. So it -- I
8 don't know that there are defined roles, so to
9 speak, to give you a definitive answer.
10         I mean, I had a role in, you know, being
11 there, and, you know, helping out.
12     Q   Were you involved in planning the event
13 as far as creating a schedule of speakers, events,
14 things of that nature?
15     A   So there's distinctions there with your
16 question. There's planning and schedule and
17 things like that. So was I involved in planning?
18 Yes.
19         I may have had something with scheduling,
20 but that was not my -- that was not what I was
21 doing. I wasn't scheduling speakers.
22     Q   Who is Janet Lynn?

Page 152

1     A   So Janet Lynn was brought in to
2 basically manage the Symposium, that -- that was
3 her role as I understood it.
4     Q   And -- and what does that mean? What --
5 what does management encompass?
6     A   Well, I think that would be, I mean,
7 everything from security to, you know, the
8 catering to maybe speakers and things like that as
9 time went on. I mean I did know Janet.
10     Q   So was -- was she responsible for
11 identifying speakers and putting them on stage?
12     A   I don't know that I would say that.
13 Like I said, it was a very kind of loosely run
14 event.



Page 153

39 (Pages 150 - 153)



Page 154

4        Who is James Oaks?
5    A   I have no -- I have no recollection.
6    Q   Okay.  What about Tim Unes?
7    A   Tim -- Tim runs a -- like a production
8  company, for lack of a better word, that puts on
9  events like that.  So I think they handle the
10  security like the stage management and technical,
11  like the audiovisual.  Things like that.
12    Q   What about Christopher Ambrosini?
13    A   I don't recall that name.

Page 155

Page 156

Page 157

7        Do you recall something called the red
8  team associated with the Symposium?
9    A   Yes.
10    Q   And what was the red team?
11    A   It was a team of cyber experts to
12  analyze a slice of data provided by Dennis
13  Montgomery.
14    Q   And why was the red team necessary?
15    A   Well, I think it was --
16        MR. KACHOUROFF:  I think that goes back to
17  work product again and -- and mental impressions why
18  he thought it was necessary.
19  BY MR. KLOEWER:
20    Q   Well, there were cyber experts that were
21  invited to the Symposium publicly, correct?
22    A   Yes.

40 (Pages 154 - 157)

```
1    Q   And they were there to validate the
2  data, correct?  That's why they were invited?
3    A   I don't know if it was to validate the
4  data or just to see it.  But, you know...
5    Q   And the -- was it your understanding
6  that this data had not been validated prior to the
7  Symposium?
8    A   I don't know --
9       MR. PARKER:  Objection.  That may be work
10 product.  I don't know if -- you need to consider we
11 are not waiving that privilege.
12      THE WITNESS:  Okay.
13 BY MR. KLOEWER:
14   Q   Who was on the red team?
15      Well, look, before I ask that question,
16 were you involved in getting the red team together,
17 sort of, retaining folks to play that role?
18   A   That was more Phil Waldron.  So but --
19 was I involved, yes.  I mean, but that wasn't me.
20   Q   So Phil Waldron was responsible for
21 identifying folks that would be part of that
22 group?
                                      Page 158
```

```
8       Who is Phil Waldron?
9    A   He is a former Army officer,
10 intelligence branch, I believe, who has been
11 involved in some of the election stuff and human
12 trafficking and other things that are going on in
13 the country and elsewhere now.
14   Q   Human trafficking.  What do you mean by
15 that?
16   A   So he's involved in, you know, for
17 example, the border issues and the human
18 trafficking that is being done by the cartels
19 currently and before.  Women, children being
20 transported across the border.  It's been well
21 publicized.
22   Q   What do you understand his role in that
                                      Page 160
```

```
1    A   Correct.
2    Q   Who delegated that authority to Phil
3  Waldron?
4       MR. PARKER:  Objection as to form.
5       THE WITNESS:  I don't recall specifically.
6  BY MR. KLOEWER:
7    Q   Did you ask Phil Waldron to do that?
8    A   I may have.
9       MR. KLOEWER:  Let's take a look at an
10 exhibit here.
11      Let's take a break.  Let's go off the
12 record.
13      VIDEOGRAPHER:  Going off the record.  The
14 time is 12:35 p.m.
15      (Whereupon, a brief recess was taken.)
16      VIDEOGRAPHER:  Going back on the record.
17 The time is 12:41 p.m.
                                      Page 159
```

```
1  to be?  You say he's involved.
2    A   I think that's one of the -- I mean, I
3  don't have a specific of his role, just that he --
4  my understanding is that he is assisting on
5  bringing information like that to light and -- and
6  helping out, so to speak.
7    Q   When did you meet Mr. Waldron?
8    A   Well, it was before the Symposium.  I'm
9  not sure how long before, but it was after he had
10 done all of the presentations that he was involved
11 in, in, like, Arizona and other -- if he did other
12 states.  But it was after all that stuff.
13   Q   You didn't have any interactions with
14 Mr. Waldron as far back as, say, November of 2020?
15   A   No.
16   Q   December 2020?
17   A   No.
18   Q   And you already said you weren't -- you
19 weren't working with Mr. Giuliani at that time?
20   A   Correct.
21   Q   Did you know that Mr. Waldron was
22 working closely with Mr. Giuliani?
                                      Page 161
```

41 (Pages 158 - 161)

1    A   I mean, I may have seen it on TV.

2    Q   So this email that we're looking at

3    states:  The purpose of this email is to begin

4    communications to establish an expert working

5    group to validate or invalidate a unique dataset.

6         The recipient of this email -- and -- and

7    you produced to us probably a half dozen of these,

8    identical, from the same date that were to different

9    recipients.  Do you recognize this email address

10   baroqueoyster@protonmail.com?

11   A   I -- I don't.  I mean, obviously, I

12   think it did come from my production, but I don't

13   recognize the email address.

14   Q   Do you know why you were cc'd on this

15   email?

16   A   Well, like I said, I was involved in

17   part of that.

18        MR. PARKER:  Objection as to form.

19   BY MR. KLOEWER:

20   Q   Did you assist -- so if I understand

21   correctly, Mr. Waldron was the one coming up with

22   a list of names of people for the red team; is

Page 162

1    that right?

2    A   Yeah.

3    Q   Did you recommend anybody to Mr. Waldron

4    for that purpose?

5    A   I think this is starting to get into the

6    work product protection issues.

7    Q   Okay.  Well, let's talk about who we

8    know who was ultimately on the red team.  Sean

9    Smith.  Do you know Mr. Smith?

10   A   I do.

11   Q   Okay.  Who is he?

12   A   He's a retired Air Force colonel who --

13   whose job in the -- in the military was to assess

14   cybersecurity threats through, I think, pretty

15   much the vast majority of weapons systems employed

16   by the Department of Defense.

17   Q   When did you meet Mr. Smith?

18   A   Probably sometime in July 2020.

19   Q   Are you still in contact with him?

20   A   I am.

21   Q   What's the nature of your relationship

22   now?

Page 163

1    A   He's -- well, his name is out there, but

2    he is a consulting expert.

3         MR. PARKER:  You said you met him

4    July 2020 before the --

5         THE WITNESS:  No, no.  Not -- forgive me.

6    Before the Symposium.  The lead-up to the Symposium,

7    not in 2020 --

8    BY MR. KLOEWER:

9    Q   What about Mark Cook?

10   A   Same.

11   Q   Okay.  You met him in the lead-up to the

12   Symposium?

13   A   Correct.

14   Q   What does he do?

15   A   He's another cybersecurity expert.

16   Q   Is he ex-military as well?

17   A   I don't know.

18   Q   Draza Smith?

19   A   Same.  I mean I met her.

20   Q   Did you know her prior to this time?

21   A   That time frame, no.

22   Q   Josh Merritt?

Page 164

1    A   No.

2    Q   You didn't know him previously?

3    A   No.

4    Q   Were you familiar with his work with the

5    Allied Security Operations Group?

6    A   No.  Not at this time.

7    Q   Okay.  Did you know that Mr. Merritt

8    used they alias Spider in his -- the declarations

9    he provided to Sidney Powell?

10   A   I mean, I know that now.

11   Q   Okay.  You didn't see that reporting at

12   the time?

13   A   No.  At least not that I recall.

14   Q   All right.  What about Ron Watkins?

15   A   What about him?

16   Q   Do you know him?

17   A   I mean yes.

18   Q   When did you first meet Mr. Watkins?

19   A   Around the same time.

20   Q   Did you know him by reputation prior to

21   this time?

22   A   I think so.

Page 165

42 (Pages 162 - 165)

1    Q   Okay.  Do you know that -- are you aware
2    that Mr. Watkins has utilized the pseudonym Code
3    Monkey?
4    A   I've heard that, yes.
5    Q   Code Monkey Z?
6    A   I know Code Monkey; I don't know -- I'm
7    not recollecting Code Monkey Z.  But...
8    Q   And you've seen Mr. Watkins appear on
9    AOM wearing a cowboy hat?
10   A   Not that I recall.
11   Q   No?  There was piece called
12   Dominion-izing the Vote.  It was viewed millions
13   of times.  You don't recall that?
14   A   I don't recall seeing that.
15   Q   Are you aware of Mr. Watkins' alleged
16   involvement with QAnon conspiracy theory?
17   A   I may have heard it, but it's not
18   something -- I mean, like, there's a lot of
19   general stuff, so I can't say -- it would only be
20   a general, like I've heard it.
21   Q   But you are aware that he has been
22   identified as the most likely source, the origin

Page 166

1    A   Not really a lot.  I don't look at that,
2    so, I mean, I hear of 8chan.  I know it's a
3    message board like Reddit, I think, and others
4    that are out there.
5    Q   Are you aware that 8chan was taken down
6    following mass shootings in New Zealand?
7    A   Not at all.
8    Q   You're not familiar with reporting about
9    8chan hosting mass shooter manifestos?
10   A   No.
11   Q   You're not familiar with reporting about
12   8chan hosting child pornography?
13   A   No.
14   Q   And you're not aware that Mr. Watkins
15   was the administrator of 8chan while he lived in
16   the Philippines?
17   A   No.
18   Q   So I take it you didn't conduct any
19   investigation of him prior to the Cyber Symposium?
20   A   Correct.
21   Q   Do you know if Mr. Waldron conducted any
22   investigation into Mr. Watkins' background?

Page 168

1    of the QAnon conspiracy theory?
2    A   I'm not aware of that.
3    Q   You're not aware of that.  You haven't
4    seen the HBO documentary series Into the Storm,
5    all about Mr. Watkins?
6    A   No.
7    Q   You haven't seen the reporting from The
8    New York Times identifying him as a likely source?
9    A   No.
10   MR. KACHOUROFF:  Objection to the
11   assumption that The New York Times is credible.
12   BY MR. KLOEWER:
13   Q   Well, it's not the only outlet.
14   Mr. Watkins essentially admits himself in the
15   documentary it was him.
16   Do you know where Mr. Watkins is today?
17   A   I do not.
18   Q   Are you familiar with his involvement
19   with a message board 8chan?
20   A   I mean I've heard of 8chan.  I've heard
21   of 4chan.
22   Q   What do you know about 8chan?

Page 167

1    A   Again, the short answer is you'd have to
2    ask him.
3    Q   But it sounds like you personally did --
4    took no steps to vet members of the red team?
5    A   I didn't say that.
6    Q   Okay.  Well --
7    A   I said that -- I'm saying that that
8    would encroach on the work product privilege.
9    Q   Okay.  What about Joe Oltmann?  Was he a
10   member of the red team?
11   A   No.
12   Q   Why not?
13   A   I don't recall even knowing, so I
14   don't -- I don't even know how to answer that.
15   Q   He wasn't a candidate?  For example, you
16   didn't consider him as somebody to reach out to?
17   A   So the short answer is no.
18   Q   You're aware that Mr. Oltmann purports
19   to be a subject matter expert on election
20   technology?
21   A   I'm not.
22   Q   Let's see.  If we're starting to depart

Page 169

43 (Pages 166 - 169)

1 from the red team a bit, who is David Clements?
2    A   I mean I know what he's done, so he's a
3 -- I believe he lives in New Mexico, and there are
4 public reports of, you know, his involvement in
5 election-related activities.
6    Q   Do you know him?
7    A   I've met him, yes.
8    Q   What was -- how did you meet him?
9    A   He was at the Cyber Symposium.
10    Q   Was that the first time you met him?
11    A   Yes.
12    Q   And if I recall correctly you said the
13 Cyber Symposium was the first time you met Joe
14 Oltmann as well?
15    A   Yes, I believe so.
16    Q   How did you come across these two
17 individuals?  Were they backstage?  Were they out
18 in the crowd?
19    A   I don't know.  I mean, it may have
20 been -- so, look, I was walking around a lot.  So
21 I don't know if I met somebody backstage or out on
22 the side or whatever.  But people knew that I

Page 170

1 represented Mike, and people would come up to me.
2 So...
3    Q   You don't recall specifically somebody
4 saying, hey, here's Joe Oltmann, you need to meet
5 this guy?
6    A   No.
7    Q   Oltmann testified that he was carrying a
8 firearm during the entire Symposium, and that he
9 was allowed through security.
10    Did you have a say in that?
11    A   No.  At least not that I recall.
12    Q   Do you know how Joe Oltmann got on stage
13 at the Symposium, who put him up there?
14    A   No, I do not.
15    Q   Was it you?
16    A   Not that I recall.
17    Q   Well, let's take a look real quick here.
18 This is going to be -- what did I label this -
19 129, so I'm going to show you what is Exhibit 129,
20 clip one.
21    One second.  This is from a March 10th,
22 2023, interview that Mike Lindell did on

Page 171

1 FrankSpeech.  So just a few months ago.  This was in
2 the days immediately following our 30(b)(6)
3 depositions of My Pillow and FrankSpeech.
4    I'll play this clip for you, and I'll have
5 some questions for after that.
6    (Clip played.)
7    So you disagree with Mr. Lindell when he
8 says that you put him on stage?
9    A   What I said is I have no recollection of
10 putting him on stage.
11    Q   Do you deny putting him on stage?
12    A   If I don't have a recollection, I can't
13 deny or say I did.
14    Q   Who would know?
15    A   Well, Janet Lynn might.
16    Q   What is -- who does Janet Lynn work for?
17    A   I don't know.
18    Q   Well, is she -- does she work for -- I
19 haven't seen her referenced anywhere outside of
20 the Symposium, so I'm trying to understand if
21 she's somebody based in South Dakota who works at
22 the venue, or if she's a staffer at My Pillow, or

Page 172

1 if she's Mike Lindell's niece.  I don't know.
2    Do you know any -- any --
3    A   None of those three.
4    Q   -- insight as to who she is?
5    That would be fairly remarkable
6 (unintelligible).
7    A   She organizes events.
8    Q   So was she hired for that purpose for
9 assisting with the organization of this event?
10    A   I believe so.
11    Q   Do you know who put David Clements on
12 stage?
13    A   I do not.
14    Q   Now we can go back to looking at
15 Exhibit 87.  That's the schedule --
16    A   Well, let me put it this way.  I don't
17 recollect that.
18    Q   Let's take a look at a couple of the --
19 the instances when Mr. Oltmann was presenting on
20 stage at the Symposium.
21    I'm going to show you what's been
22 previously marked as Exhibit 3, clip 8.  This is a

Page 173

44 (Pages 170 - 173)

1 panel discussion. And I'll represent the
2 participants on this panel, as I understand them,
3 from left to right, Joe Oltmann, Pat Colbeck, David
4 Clements, Phil Waldron, Josh Merritt.
5      Before I start, do you recall this
6 presentation at the Symposium?
7      A   Not specifically.
8      Q   Let's go ahead and play the video here.
9      A   I mean, I know there were presentations,
10 but I don't recall.
11           (Clip played.)
12 BY MR. KLOEWER:
13      Q   Does watching that refresh your memory
14 as to whether you saw that at the time?
15      A   No.
16      Q   Were you -- where were you during these
17 presentations?
18      A   I was all around. It was a bit chaotic
19 around that time.



1      Testify if you know.
2 BY MR. KLOEWER:
3      Q   Would you agree that people attended
4 this Symposium to take up Mr. Lindell's $5 million
5 challenge, the "Prove Mike Wrong" challenge?
6      MR. PARKER: Objection as to form.
7      THE WITNESS: You'd have to ask them. I
8 mean there were cyber experts that were there.
9 BY MR. KLOEWER:
10      Q   Do you recall what the reception was to
11 the data that was presented? Were -- were people
12 convinced?
13      Let me rephrase that.
14      Do you recall anyone making a claim on the
15 $5 million prize on the first day of the Symposium?
16      A   No.
17      Q   Do you recall any criticism that the
18 information presented was not PCAP data from
19 China?
20      A   I think at the end of the Symposium, you
21 know, we did get two challenges. None of the
22 other experts did except for Zeidman and then one

18      Q   There were cyber experts present at the
19 Symposium that were trying to claim the $5 million
20 award, correct?
21      A   Well, I don't know --
22      MR. PARKER: Objection as to form.

1 other individual.
2      So that -- I mean the answer would be,
3 yes, because they challenged.
4      Q   Do you know who Harri Hursti is?
5      A   I do.
6      Q   Who is Harri Hursti?
7      A   So he's a -- I'll call him a
8 self-described cyber expert. I don't have any
9 specific knowledge, but he's appeared in -- I
10 think it was Kill Chain was the movie. And yeah.
11 So...
12      Q   Have you heard Mr. Hursti state publicly
13 that the information presented to the experts at
14 the Symposium was identifiable as being fraudulent
15 almost immediately?
16      A   No. And I assume he would have put in
17 for the $5 million challenge if he felt that way.
18      Q   Do you recall press coverage at the time
19 of attendees of the event complaining that the
20 information was not accurate?
21      A   When you -- so there was an article at
22 the end I think, so at the time -- if you mean

Veritext Legal Solutions
800-336-4000

1 that, yes, I recall that Washington Times article
2 and that whole thing, yeah.
3    Q   Isn't it true that the Symposium went
4 off schedule almost immediately because the
5 information that Mr. Lindell intended to present
6 was known to be fraudulent almost immediately?
7    A   No.
8    Q   Did concerns about the accuracy of the
9 information affect the scheduling of the event
10 moving forward?
11    A   Yes.
12    Q   In what way?
13    A   Well, I think as what was publicly
14 disclosed, a sliver of the data, which was given
15 to the red team.  The red team was unable to
16 access it to either confirm or deny its -- you
17 know, what it purported to be.
18    Q   Why wasn't the red team able to access
19 that information?
20    A   I don't know.  I'm not a cyber person.
21 But for whatever reason they were not able to
22 access it.

*Page 178*

1    Q   Who would know why they weren't able to
2 access it?
3    A   Well, I guess you could ask members of
4 the red team.  I wasn't the one doing the work.
5    Q   Well, let's take a look at what some of
6 the members was red team had to say.
7       I'll give you what's previously been
8 marked as Exhibit 5.
9    A   Thank you.
10    Q   This was produced to us by Josh Merritt.
11 Have you seen this document before?
12    A   Not that I recall.
13    Q   Were you involved in this group chat
14 amongst the members of the red team at the time?
15 And I'll represent to you that Mr. Merritt has
16 provided testimony to us that these are messages
17 exchanged between members of the red team
18 attempting to verify the data.  And I don't know
19 if you were on it because the names have been
20 blacked out and it's not clear who is speaking in
21 every instance.
22    A   I think this is going to get into my --

*Page 179*

1 potentially, I don't see the names -- I don't
2 recall seeing this, but I would say this is going
3 to get into my work product area.
4       MR. PARKER:  I'm going to object to this
5 document as to form as well.
6       MR. KLOEWER:  Well, this is a public
7 document that was shared with many people --
8       MR. PARKER:  We don't even know who the
9 people are.
10       MR. KLOEWER:  -- outside the scope of your
11 representation.
12 BY MR. KLOEWER:
13    Q   Well, I just want to know if you -- if
14 you were on this -- on this communication.
15    A   Like I said, I don't recall seeing this
16 document; but again, my work in connection with
17 this would be pursuant to work product in my
18 investigation.
19    Q   Were you retained to represent any of
20 the members of the red team?
21    A   Well, I didn't represent them.  I
22 represented Mike Lindell.

*Page 180*

1    Q   Sure.  I'm just saying these are --
2 these are -- this is a conversation between many
3 people that you don't represent that was shared
4 with third parties --
5       MR. KACHOUROFF:  Conversation with
6 experts.
7       THE WITNESS:  With experts.
8       MR. KLOEWER:  Well --
9       MR. KACHOUROFF:  And we don't know who
10 they are.
11 BY MR. KLOEWER:
12    Q   I just want -- so are you refusing to
13 answer whether you were involved in this
14 conversation or not?
15    A   I'm saying I don't know because I've
16 never seen this document before.
17    Q   Okay.  You can put that aside then.
18       Did you speak to any members of the red
19 team on the first day or the second day that were
20 raising concerns about the legitimacy of the
21 information?
22    A   I think that gets into my work product

*Page 181*

1 protection.

2    Q    You're suggesting that a conversation
3 you may have had with Josh Merritt, for example,
4 in the presence of multiple third parties, is
5 protected as work product?

6    A    I'm saying conversations involving
7 experts, a group of experts, whether it's one or,
8 you know, seven, whatever it is, that's pursuant
9 to my investigation.

10        My conversations and investigation with
11 those experts is work product.  Yes.

12    Q    Who -- who all was in the room with the
13 red team -- do you recall -- when they were all
14 meeting to go through this information?

15    A    Well, that was a separate room,
16 conference room.  It was the members of the red
17 team.

18    Q    But people who were not members of the
19 red team were coming and going, correct?

20    A    I don't know what you mean "people who
21 are not members of red team are coming and going."

22    Q    Joe Oltmann, for example.

Page 182

1    A    I don't ever recall him being there.

2    Q    When Josh Merritt had an argument with
3 Mike Lindell insisting that the information was
4 inaccurate and telling you -- this is according to
5 his sworn testimony -- that in the presence of
6 multiple members of the red team, he confronted
7 Mr. Lindell with allegations that the information
8 was not accurate.

9        Were you present at that conversation?

10        MR. PARKER:  Objection as to form.

11        THE WITNESS:  I may have been.

12 BY MR. KLOEWER:

13    Q    Did you tell Mr. Lindell -- well, who's
14 Conan Hayes?

15    A    Conan is another cyber expert.

16    Q    What are his credentials that -- that
17 lead you to describe him as a cyber expert?

18    A    I believe he has CSSIP.  I forget the
19 exact acronym for what it stands for, but --

20    Q    Have you seen that certification
21 yourself?

22    A    The certificate?

Page 183

1    Q    Yeah.

2    A    I'm not sure, but I...

3    Q    Are you aware that -- well, how is
4 Mr. Hayes involved in all of this?  Is he a member
5 of the red team?

6    A    I don't know the answer if he's
7 specifically a member of the red team because that
8 was a specific group.  He is a consulting expert.

9    Q    For who?

10    A    I would say Mike.

11    Q    Has he produced any expert reports that
12 Mr. Lindell has utilized?

13    A    Well, he's a consulting expert, so I
14 don't know.

15        MR. KACHOUROFF:  I'm going to object again
16 on the basis of work product.

17        MR. PARKER:  We'll add to that objection.

18 BY MR. KLOEWER:

19    Q    Are you aware that Mr. Hayes prior to
20 this was a professional surfer?

21    A    I am.

22    Q    Do you know that he went from being a

Page 184

1 professional surfer to a clothing designer?

2    A    I knew he had a company that dealt with
3 surf wear.

4    Q    What sort of computer forensic work has
5 Mr. Hayes ever done that you're aware of?

6    A    That I have personal knowledge, none.
7 Because I wasn't -- well, say the question again.

8    Q    What computer forensic experience does
9 Mr. Hayes have that you are aware of beyond -- I
10 know you said you believe he has a certificate,
11 but you haven't seen it?  What else?

12    A    Well, I believe he was involved with the
13 ASOG Report on Antrim County.

14    Q    Okay.  Prior to that time are you aware
15 of him ever having been involved in any sort of
16 computer forensic work?

17    A    I believe Patrick Byrne hired him.

18    Q    What makes you believe that Patrick
19 Byrne hired Conan Hayes?

20    A    I just have general statements.  Maybe
21 hired's not the right word.  I believe he worked
22 with Patrick Byrne.  So I don't know.  Hired, that

Page 185

1  has a connotation.
2      Q   When did he start working with Patrick
3  Byrne as you understand it?
4      A   My understanding would be before the
5  election.
6      Q   How far before the election?  As far as
7  back as 2019?
8      A   Not sure.
9      Q   I do want to talk about Patrick Byrne
10  for a while, but I have a number of questions
11  about him and his relationship with Conan Hayes.
12          MR. KLOEWER:  I think it might make sense
13  to take a lunch break now, if that works for
14  everybody.  When we get back we can get into
15  Mr. Byrne and wrap up the Symposium.
16          Does that work?
17          THE WITNESS:  Sure.
18          (Discussion off the record.)
19          VIDEOGRAPHER:  Going off the record.  The
20  time is 13:15 p.m.
21          (Whereupon, a luncheon recess was
22          taken.)

Page 186

1              * * * * *
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 187

1          A F T E R N O O N   S E S S I O N
2                  (1:53 p.m.)
3  WHEREUPON,
4              KURT OLSEN
5  was called for continued examination, and having
6  been previously duly sworn, was examined and
7  testified further as follows:
8          EXAMINATION BY COUNSEL FOR PLAINTIFF
9          CONTINUED
10          VIDEOGRAPHER:  Going back on the record.
11  The time is 13:53 p.m.
12  BY MR. KLOEWER:
13      Q   Okay.  Mr. Olsen, when we left off we
14  were talking about Conan Hayes and Patrick Byrne.
15  I'm going to circle back to that topic later
16  because I'd like to get through the Symposium
17  itself.
18          But I just want to confirm -- well, maybe
19  the best way to do this is to start a clip --
20  another clip from the Symposium.  And then we'll
21  talk about who was -- who was putting these
22  presenters on.

Page 188

1          So I'm going to show you what's been
2  previously marked as Exhibit 43, clip four.
3          One moment.  Sorry.
4          Okay.  So we have David Clements on
5  stage here.  We talked about him a bit before.
6  Let me get this back from the beginning.
7              (Clip played.)
8  BY MR. KLOEWER:
9      Q   All right.  "The man that pulled the
10  trigger."
11          Have you seen this presentation before,
12  Mr. Olsen?
13      A   I don't recall.
14      Q   Do you recall seeing that during the
15  Symposium?
16      A   No.
17      Q   We were provided a copy, and it appears
18  that Mr. Clements was giving a PowerPoint
19  presentation.
20          Had you seen that prior to the Symposium?
21      A   I don't recall.
22      Q   Do you know who would have seen that

Page 189

48 (Pages 186 - 189)

1 before the Symposium?
2    A  I don't know.
3    Q  Could anybody at all walk on stage and
4 present?
5    A  It's an interesting question.  As I
6 said, it was a bit chaotic.  I don't think there
7 was -- things kind of got to the point where, for
8 lack of a better phrase, a little bit of a
9 free-for-all.  So to answer your question, I don't
10 think anybody could just come up and get up, but I
11 don't think there was a lot of organization around
12 it.
13    Q  Was there anybody who would have -- I'm
14 trying to ask this question the correct way.
15        Who would have been responsible for
16 stopping a speaker who was not welcome?
17        MR. KACHOUROFF:  Objection as to form.
18        You can answer if you know that.
19        THE WITNESS:  I -- I don't know that there
20 is an answer for that.
21 BY MR. KLOEWER:
22    Q  So if Harri Hursti wanted to get on

Page 190

1 command.  It was more kind of done by the seat of
2 the pants.
3        And so Harri Hursti, to use your example,
4 I mean he's a cyber guy.
5        Do I think he could have gotten up there
6 and -- I think probably yes.  If he said, hey, I
7 want to talk about something, I think that could
8 have happened.
9    Q  Well, who would he have said, hey, I
10 want to talk about something to?
11    A  Well --
12        MR. PARKER:  Objection as to form.
13        THE WITNESS:  I don't know exact -- it
14 could have been Janet Lynn.  It could have been Tim
15 Unes; it could have been, you know, anybody around
16 that, you know, was part of the planning for this
17 Symposium.
18 BY MR. KLOEWER:
19    Q  If I understand your prior testimony,
20 though, Janet Lynn was just an event planner?
21    A  Uh-huh.
22    Q  Was she -- was she vetting the

Page 192

1 stage and get to the microphone and say this is
2 all fraud, you're all being duped, would anyone
3 have stopped him?
4    A  Well --
5        MR. PARKER:  Objection as to form.
6        THE WITNESS:  I think if Harri Hursti
7 wanted to get up on stage and talk, I think it very
8 well could have happened.
9 BY MR. KLOEWER:
10    Q  Okay.  If there was a mentally ill
11 person from off the street, who wanted to get on
12 stage and scream gibberish, who would have stopped
13 that person?
14    A  Well, there was security there for that.
15    Q  Okay.  But as far as management content
16 of what speakers were presenting, it sounds like
17 there was -- there was nobody that was doing that.
18    A  Well, see, it's a little bit of both.  I
19 mean there was -- obviously, some people were.
20 There was some structure, loose.  But it wasn't,
21 for lack of a better phrase -- you know, like
22 following a set line and this is a chain of

Page 191

1 background of these speakers?  Was that part of
2 her purview?
3    A  I don't --
4        MR. KACHOUROFF:  Objection as to form.
5        THE WITNESS:  I don't know.  As I said,
6 this was a lot of, you know, it's kind of seat of
7 the pants.

Page 193

49 (Pages 190 - 193)



Page 194

Page 196

Page 195

15    Do you recall telling Mr. Lindell to get
16  off stage in order to put other people on stage?
17    A    I don't recall that, telling him to get
18  off stage.  What I --
19        MR. KACHOUROFF:  Objection as to form.
20  That's not what the document says.
21        THE WITNESS:  Yeah.  So I don't recall
22  that, no.

Page 197

5    Q    Okay.  So same question.
6        Do you recall Mr. Lindell telling you to
7  go ahead and put people up?

18    Q    Well, take a minute, and let me know
19  when you read through it.
20    A    So I think, as I testified before
21  generally, I do recall generally sometimes being
22  involved with Janet to put things up, a couple

50 (Pages 194 - 197)

1  things -- people up.  But I have no specific
2  recollection of any particular speakers or
3  anything like that.  It really was seat of the
4  pants, and it wasn't -- I was not the organizer of
5  saying, okay, this person goes up on stage; that
6  person goes up on stage.  You know, one, two,
7  three.
8      Q    Other than Janet Lynn is there anyone
9  who would be able to confirm or deny who was in
10  charge of putting people on stage?  Specifically,
11  Joe Oltmann?
12     A    I don't know.
         ████ █████████████
         ██████████████████████████
         ██████████████████████
         ████████████████████
         ██████████████████████████████
         ████████████████████████
         ██████████████
21     A    Yeah.
22     Q    Did you care who was on stage,

1  Mr. Olsen?
2      A    So I don't know how to answer that
3  because as I said before, I have no specific
4  recollection as to putting people on stage or not.
5          I mean I think it -- obviously, you would
6  care.  Like you said, you wouldn't some bum off the
7  street to be on.
8      Q    Well, were you aware that Joe Oltmann
9  was skipping a court-ordered deposition in Denver
10  on this very day to appear on stage here?
11     A    No.
12     Q    Are you aware that Mr. Oltmann has been
13  sanctioned over $53,000, multiple orders from
14  state courts, in the Colorado Court of Appeals for
15  refusing to provide evidence in the case that
16  Dr. Coomer has filed against him?
17     A    No.
18     Q    This goes back to my prior question.
19  Wouldn't you -- does it concern you that Joe
20  Oltmann on stage now that you know these
21  things about him?
22         MR. KACHOUROFF:  Objection.  Work product.

1          THE WITNESS:  I -- I didn't know he was
2  even speaking.  I have no recollection of that.  And
3  so you're putting your -- saying some things, and
4  I'm not disputing what you say, but I just -- to say
5  that I have a concern, I don't -- I mean, you don't
6  want -- I just don't recall him going up on -- I
7  mean, I honestly just don't recall him going up on
8  stage.  Never saw him.  Don't have any recollection
9  of it.
10 BY MR. KLOEWER:
11     Q    Do you recall him doing a subsequent
12  presentation called Dominion Technology or
13  Dominion Voting Systems, Serbian Technology with
14  Chinese Characteristics.  It's a big purple
15  screen.
16     A    No.
17     Q    Well, we've seen some of the footage of
18  Mr. Oltmann.  I know you haven't read the
19  complaint, but are you aware that Dr. Coomer has
20  gotten death threats as a result of the claims
21  against him?
22     A    No.

1          MR. PARKER:  Objection as to form.
2  BY MR. KLOEWER:
3      Q    Are you aware that Dr. Coomer has had to
4  go into hiding on multiple occasions as a result
5  of death threats directed against him?
6          MR. KACHOUROFF:  Objection as to form.
7          THE WITNESS:  No.  Other than what you
8  have said.
9  BY MR. KLOEWER:
10     Q    Do you know how many people watched the
11  Cyber Symposium?
12     A    No.
13     Q    Would it surprise you if it were over a
14  million people?
15         MR. KACHOUROFF:  Objection as to form.
16         THE WITNESS:  No.
17 BY MR. KLOEWER:
18     Q    Did you expect that there would be a
19  substantial audience for this event?
20         MR. PARKER:  Objection as to form.
21         THE WITNESS:  I don't know what my
22  expectations were at the time.  I mean, you know,



1   obviously if you're putting on an event, you want it
2   to be successful.
3   BY MR. KLOEWER:
4       Q   You know that Mr. Lindell was reaching
5   out to legislators across the country inviting
6   them to this event, correct?
7       A   Yes.
8       Q   Including county level -- excuse me,
9   county-level elections officials?
10      A   I -- I would assume so.
11      Q   Do you know what Dr. Coomer's job
12  responsibilities were with Dominion Voting
13  Systems?
14      A   At the time, no.  I mean I -- I think as
15  I've testified before, it was not a focus.
16      Q   So you weren't aware that his job
17  involved traveling the country to interact with
18  election officials for the purpose of promoting
19  the Dominion product line?
20      A   No.

Page 202

7       Did Mr. Oltmann request that you put him
8   on stage?
9       A   Not to my recollection.  Certainly, I
10  don't recall him saying anything to me about that.
11      Q   Did Mr. Clements request that you put
12  him on stage?
13      A   Not to my recollection.

Page 203

11      Q   Well, do you know if she was involved in
12  selecting speakers for the event?
13      A   Not that I'm aware of.
14      Q   Was she present at the event?
15      A   You know what?  I've never met her so I
16  can't say.  If -- I wouldn't recognize her if I
17  saw her.
18      Q   Was her husband there?
19      A   Not that I know of.
20      Q   Was Dennis Montgomery at the Symposium?
21      A   I don't believe so.
22      Q   Did he have a stroke the night before?

Page 205

52 (Pages 202 - 205)

1    A   He had a stroke as I understand it.  I
2  don't know if it was the night before, but
3  sometime in that period.
4    Q   Are you aware of that -- of allegations
5  of Mr. Montgomery has had strokes on the eve of
6  important events in the past?
7    A   No.
8    Q   Do you know if Mr. Montgomery was
9  invited?
10   A   I don't have any recollection of that.
11   Q   Did you expect to see him there?
12   A   I don't have any recollection of it, an
13  expectation of that.
14   Q   Okay. I guess we can -- we can address
15  this one now.  I don't have anywhere else to put
16  it.
17       You mentioned that you understood Conan
18  Hayes was working with Patrick Byrne.
19       Who is Patrick Byrne?
20   A   He's the -- I believe the founder and
21  CEO of Overstock.com.
22   Q   All right.  Have you met Mr. Byrne

Page 206

1    Q   For which -- which investigation?
2    A   Investigation as part of my engagement
3  with Mike in terms of election fraud.
4       (OLSEN Exhibit Number 133 was marked for
5       identification.)

Page 208

1  personally?
2    A   I have.
3    Q   In what context?
4    A   What do you mean in what context?
5    Q   Well, what were the circumstances
6  surrounding your meeting with him?  Was he -- were
7  you introduced to him by someone else?
8    A   I don't recall.
9    Q   When did you meet him?
10   A   I want to say sometime in the April-ish
11  2021 time frame.
12   Q   Did you meet him in person?  With a
13  phone call?
14   A   I met him in person.
15   Q   Where?
16   A   Florida.
17   Q   Was he living there at the time?
18   A   I don't know.
19   Q   What was the context of your
20  conversation?
21   A   So this is going to get into work
22  product and my investigation again.

Page 207

Page 209

Veritext Legal Solutions
800-336-4000

1    Q    Let me show you a clip here, and you can
2 tell me if this -- what it means to you.
3         MR. KLOEWER: Exhibit 3, clip 11.  Okay.
4 So this one has been previously marked as Exhibit 3,
5 clip 11.
6         Let me restart.  So this is Patrick
7 Byrne.  He's referring to a conversation he had
8 with Conan Hayes.  That will be clear from the
9 context as we proceed.
10         (Clip 11 played.)
11 BY MR. KLOEWER:
12    Q    Do you know what he's referring to?  The
13 event he's describing?
14    A    No.
15    Q    This is part -- part a much larger
16 interview, or -- or, I guess, monologue that
17 Mr. Byrne delivered.
18         What he's describing is the -- the copying
19 of the Mesa County servers and that Mr. Hayes was
20 FaceTiming him in real time while he was copying
21 those servers.
22         Were you aware of Mr. Hayes's involvement

Page 210

1 in that event?
2         MR. KACHOUROFF: Objection as to form.
3         THE WITNESS: Yeah.  Again, I think you're
4 getting into investigations and work product.
5 BY MR. KLOEWER:
6    Q    Did you know that Mr. Byrne was working
7 with Mr. Hayes at the time?
8    A    I think, again, this is all
9 investigations and work product.
10    Q    And I asked you before, do you represent
11 Tina Peters?
12    A    No.
13    Q    Have you ever?
14    A    No.
15    Q    Do you know how she came to be on stage
16 at the Symposium?
17         Let me -- I'll rephrase that.
18         Do you know how she arrived to the
19 Symposium?
20    A    No.
21    Q    Do you know who -- who put her on stage?
22    A    I'm not sure when you say who put her on

Page 211

1 stage.
2    Q    You're aware she was on stage --
3    A    I'm -- correct.  I -- I'm aware that she
4 went on stage.
5    Q    Okay.  And were -- were you part of the
6 conversations preceding her appearance on stage?
7 Mr. Oltmann said there was some disagreement as to
8 whether she should be allowed up there or not.
9         I'm wondering if that comports with your
10 recollection?
11         MR. PARKER: Objection as to form.
12         THE WITNESS: I remember that there was
13 some debate whether she should, yes.
14 BY MR. KLOEWER:
15    Q    And were you on the camp that believed
16 that she should or in the camp that believed she
17 shouldn't?
18    A    I don't know exactly recall, but I would
19 say, given what happened, which is my
20 recollection, her house had been raided or
21 something like, that she -- that that news should
22 get out.  Yeah.

Page 212

1    Q    I'm going to show you one more Patrick
2 Byrne clip here.  This has been previously marked
3 as Exhibit 65, clip 14.  I'm going to turn the
4 volume down a little bit here.
5         This is a July 6th, 2021, interview that
6 Patrick Byrne did with Eric Metaxas.
7         Do you know who Eric Metaxas is?
8    A    I've met him, yes.
9    Q    Okay.  When did you first meet
10 Mr. Metaxas?
11    A    I don't remember.
12    Q    Okay.  Have you ever discussed
13 Dr. Coomer with Eric Metaxas?
14    A    No.
15    Q    Did you ever discuss Eric Coomer with
16 Patrick Byrne?
17    A    No.
18    Q    All right.  So is just about a month
19 prior to the Symposium.
20         (Clip played.)
21 BY MR. KLOEWER:
22    Q    Now, what Mr. Lindell and Mr. Howse have

Page 213

54 (Pages 210 - 213)

1 testified that their relationship started on this
2 January 9th conversation, where Mr. Howse
3 introduced Mr. Lindell to Mary Fanning.
4        Have you heard that story before?
5        MR. KACHOUROFF: Objection as to form.
6        THE WITNESS: Yeah. I think that would
7 also would get into attorney-client privilege.
8 BY MR. KLOEWER:
9     Q   Well, this is -- Mr. Lindell's made
10 these statements publicly as had Mr. Howse.
11        Are you aware that Mr. Howse met
12 Mr. Lindell on January 9th?
13        MR. PARKER: Objection as to form.
14        THE WITNESS: No.
15 BY MR. KLOEWER:
16     Q   Did you know that Patrick Byrne had sent
17 Mr. Howse and Ms. Fanning to Mr. Lindell?
18        MR. KLOEWER: Objection as to form.
19        THE WITNESS: I don't have any
20 recollection of that.
21 BY MR. KLOEWER:
22     Q   Mr. Lindell denied that this was true.

Page 214

1 Symposium that I wasn't even following, but I think
2 the Symposium was very good at bringing about a
3 general awareness of election issues and bringing
4 people together to focus on them.
5        MR. KLOEWER: Okay. I'm going to mark
6 this as Exhibit 134.
7        (OLSEN Exhibit Number 134 was marked for
8        identification.)
9 BY MR. KLOEWER:
10     Q   Before we look at this, can you tell me
11 who's Kurt Weibe, W-E-I-B-E -- or well, sorry --
12 he spells it W-I-E-B-E, so perhaps Wiebe?
13        Do you know who I'm referring to?
14     A   I know who he is.
15     Q   Who is he?
16     A   He's a former NSA -- I'm not sure what
17 his position at the NSA was, but he was a
18 whistle-blower at the NSA some years ago.
19     Q   Okay. Do you know what his background
20 is, what his credentials are?
21     A   Not exactly. I mean, I just know he was
22 at the NSA and not as a paper pusher is my

Page 216

1        Do you have any insight into whether
2 Mr. Byrne was involved in any way --
3        MR. PARKER: Objection as to form.
4        MR. KLOEWER: -- with sending people to
5 speak with Mr. Lindell?
6        MR. PARKER: Same objection.
7        THE WITNESS: I don't have any
8 recollection of that. I've never seen that clip
9 before.
10 BY MR. KLOEWER:
11     Q   Let's see if we can wrap up the
12 Symposium here. In your mind do you consider the
13 Cyber Symposium a success?
14     A   What do you mean by a success?
15     Q   Well, I'm kind of wondering how you
16 would define that. Do you believe that the
17 Symposium presented evidence to the American
18 public that the 2020 election was rigged?
19     A   Again --
20        MR. KACHOUROFF: Objection as to form.
21 Mental impression and work product.
22        THE WITNESS: So there was a lot in the

Page 215

1 understanding.



Page 217



1 with the creation of FrankSpeech website in any
2 way?
3    A   What do you mean the creation of the
4 website?
5    Q   Well, specifically, I'm asking -- I'm
6 not trying to hide the ball here.  There's a tab
7 on the FrankSpeech website, and it says
8 Fix2020First.  We've entered that previously as an
9 exhibit.  I don't have a copy today.
10       But there's a drop-down menu that says
11 Dr. Halderman's declaration.  It's right up top.
12    A   Okay.
13    Q   And I'm wondering if you had any input
14 into promoting Dr. Halderman's opinions on the
15 FrankSpeech website?
16    A   I may have, sure.  I mean in terms of
17 that declaration.
18    Q   Okay.
19    A   And I'm not sure which declaration
20 you're talking about, but --
21    Q   It from Curling v. Raffensperger.
22    A   Okay.

Page 220

1    Q   Does the name J. Alex Halderman mean
2 anything to you --
3    A   Yes.
4    Q   -- Mr. Olsen?
5       Who is Dr. Halderman?
6    A   He is a -- I believe he's a professor of
7 computer science but -- at the University of
8 Michigan.  He was an -- a retained expert in
9 Curling -- the Raffensperger case in Georgia.
10 He's also given testimony in other places, the
11 Senate Intelligence Committee in June of 2017; and
12 I believe he's been involved in election --
13 looking at machines and their vulnerabilities for
14 about 13 years or so.
15    Q   Do you know Dr. Halderman?
16    A   No.
17    Q   Have you never met him?
18    A   No.
19    Q   Do you consider him to be a reliable
20 source?
21    A   I consider him to be a source.
22    Q   Well, I'm asking -- were you involved

Page 219

1    Q   That's -- that's --
2    A   It's the December 21st, 2021, I believe?
3    Q   Couldn't tell you, but I believe that's
4 the one we're referring to.
5       MR. PARKER:  There are several
6 declarations --
7       MR. KLOEWER:  There are.  Yes, there are.
8       MR. PARKER:  -- from that case.
9 BY MR. KLOEWER:
10    Q   There are.  Are you aware who the
11 opposing experts on that case are or were?
12    A   The opposing experts?
13    Q   Yes.
14    A   Not by name.  I know of other experts
15 like Professor Stark, and he's probably the one
16 that I'm most familiar with.  Harri Hursti, I
17 believe, is an expert there.  Those are the only
18 names that come to mind.
19    Q   Were you aware that Dr. Coomer was the
20 expert that was designated by Dominion Voting
21 Systems?
22       MR. PARKER:  There were two experts.

Page 221

56 (Pages 218 - 221)

1    MR. KLOEWER:  One of two, yes.

2    THE WITNESS:  So I didn't know that he was

3  an expert designated because -- in terms of that of

4  designation.

5    I remember seeing a declaration by him

6  which is the one that I mentioned before where he

7  said any computer can be hacked given enough time

8  and access.

9  BY MR. KLOEWER:

Page 222

---

1    Q    Okay.  Why did you want to pull these

2  clips?

3    A    We -- I was talking on FrankSpeech about

4  the Halderman declaration at issue, and as part of

5  that I had pulled excerpts of his testimony to the

6  Senate intel committee.

7    Q    And -- and what did those excerpts

8  address?

9    A    What did Professor Halderman address?

10    Q    Yeah.  What was he discussing?

11    A    Yeah.  He was discussing how the

12  machines could be used to steal elections by a

13  nefarious actor on a national scale, and how easy

14  it was to do.

15    Q    So is it -- is it fair to say that --

16  that you think Dr. Halderman's concerns are

17  credible?

18    A    Well, I think Dr. Halderman expressed

19  what many cyber experts have been, which is that

20  these machines are completely wide open to

21  manipulation and can be used to steal elections on

22  a national scale.

Page 223

---

Page 224

---

10    Q    Do you propose topics for FrankSpeech

11  content?

12    A    Well, I did here.

13    Q    Okay.  Is that something you do

14  regularly?

15    A    No.

16    Q    How often would you say you -- you

17  propose topics for FrankSpeech?

18    A    It's more haphazard, but not -- not that

19  often, you know.  More than one, less than

20  probably 20.

21    Q    You've been a guest on Mr. Howse's

22  program before --

Page 225

---

57 (Pages 222 - 225)

1    A    Yes.
2    Q    -- correct?
3        How often would you say you've appeared on
4    that show?
5    A    I'm just guessing.  Five, six, seven
6    times.  Something like that.
7    Q    And do you typically present a sort of
8    script prior to your appearances?
9    A    No.
10    Q    Okay.  Were you aware that Dr. Halderman
11    has produced an expert report in this case?
12    A    Which case?
13    Q    This one, Coomer v. Lindell?
14    A    No.
15    Q    I hand you what's been previously marked
16    as Exhibit 105.  Take a moment to flip through
17    this.  It's a very long document.  I don't -- I
18    don't mean for you to flip all the way through it.
19    It's a 64-page report.
20        Have you ever heard Dr. Halderman claim
21    that the election in 2020 was rigged?
22    A    No.  I've -- I've -- I've heard him

Page 226

1    specifically disclaim it, which doesn't make any
2    sense since he said it could be rigged in 2021,
3    with the same vulnerabilities that it had not
4    changed in 2020.
5        So he talks about in June of 2017 that the
6    elections can be rigged, and somehow in 2020, they
7    can't be; but they can in the '16 election, and the
8    '22 election, and the '21 election.  But we're going
9    to carve out 2020 because something's different.
10        And I think that the most intellectually
11    dishonest thing I've ever heard because the same
12    vulnerabilities he identifies, it didn't change in
13    2020.
14    Q    Well, you're familiar with the
15    distinction between a vulnerability and an
16    instance when a vulnerability is actually
17    exploited, right?
18    A    Correct.  And you have to look for
19    exploitations, and if you don't look, how can you
20    say it didn't occur?
21    Q    Well, are -- are you aware that
22    Dr. Halderman -- did you read the answer to

Page 227

1    Counter Report produced by ASOG?
2    A    I did, yeah.
3    Q    Did you read Dr. Halderman's rebuttal
4    report?
5    A    I did.
6    Q    Okay.  So you know then that he did look
7    for exploits and determined the none occurred?
8    A    He did not.  He actually danced around
9    some of the issues.  I don't remember
10    specifically, but he did not do a direct rebuttal.
11        But I'll say this, he issued his report in
12    the Curling matter that was the subject of the
13    previous exhibit where he talked about the
14    vulnerabilities existing in 16 states that -- that
15    used Dominion.
16        And that will -- ultimately resulted in
17    the cease and advisory on June 7, 2022, in which
18    they listed about 13 vulnerabilities.  This is
19    public.  I think it was 13.  Maybe it was nine
20    vulnerabilities and 13 fixes, and they had a
21    statement there, is that, we have no evidence of any
22    exploitation.

Page 228

1        And I think, as I publicly said in
2    commenting on that report -- so it's public --
3    nobody looked.  Nobody looked in these machines or
4    there's no evidence that anybody looked to see if
5    there had been any exploitation.  And the same thing
6    happened in Williamson County, Tennessee, where the
7    EAC did a report on the Dominion machine where they
8    found, quote, erroneous code that somehow got on
9    there.
10        There was no determination on how that --
11    at least not in public, not that I've seen -- on how
12    erroneous code got on there, how it got past
13    certification or if any other machines had that
14    erroneous code.
15    Q    Just so I understand you correctly,
16    you're saying that you read Halderman rebuttal
17    report, the ASOG report, but you're maintaining
18    that he didn't actually look?
19    A    I'm -- I'm saying he didn't look at any
20    other machines, and I don't believe he examined
21    the systems that ASOG did; that's my recollection,
22    yeah.  It's been a long time.

Page 229

58 (Pages 226 - 229)

1    But I believe that there -- I believe
2    there was a rebuttal report to his report.
3        MR. KLOEWER: Well, this is a 64-page
4    report. That's your copy. You can keep it. Take a
5    look at it.
6        REPORTER: It goes to me, does it not?
7        MR. KLOEWER: Well, yes, it does. Your
8    counsel's got a copy.
9        Watch out there, Chris. You're spilling
10   a drink there.
11   BY MR. KLOEWER:
12   Q    I do want to just briefly direct your
13   attention to something. This is going back to
14   Oltmann a little bit.
15   A    Where are we?
16   Q    I'm going to find -- I know it's
17   paragraph 75 in here. The stamps on here
18   unfortunately are -- obscure the page numbers.
19       And, again, I know we've discussed your
20   investigation into Mr. Oltmann or a lack thereof.
21       I do have to just check some boxes here.
22   A    Sure.

Page 230

1    Q    Had you ever heard Mr. Oltmann claim
2    that he Googled, you know, that following this
3    Antifa call that he claims he was one that he
4    Googled Eric Dominion, Denver, Colorado?
5        Have you heard that claim?
6    A    No.
7    Q    He claims that's how he identified
8    Dr. Eric Coomer as being the person on this call.
9        So in your interactions with Mr. Oltmann
10   did he ever -- he never showed you the screenshot he
11   claims to have taken of that search?
12   A    Never heard it; never seen it.
13   Q    Well, let me hand you the screenshot to
14   see a little context. We can get through this one
15   quickly if you're not familiar with the
16   allegation.
17       This is what Mr. Oltmann has presented as
18   evidence that he was -- that he identified Eric
19   Coomer before the election.
20       Do you see the top there? It says
21   screenshot of Eric, Dominion, Denver, Colorado,
22   taken on 9/26/20?

Page 231

1    A    Okay.
2    Q    And then -- just below that, it's a
3    little smaller, you may need to squint a bit, it
4    says screenshot 2020-09-26 at 2:03:31 P.M.
5        Do you see that?
6    A    No. Oh, wait a second. In the black
7    box?
8    Q    Yes.
9    A    Okay.
10   Q    Mr. Oltmann has provided sworn testimony
11   that this is proof that he was looking into Eric
12   Coomer in September. The reason I mention it
13   here, number one, is to see if you're familiar
14   with this allegation; number two, to see if you're
15   familiar with the evidence that this -- that this
16   is a fabrication.
17   A    No --
18       MR. PARKER: Objection as to form.
19       MR. KLOEWER: Okay.
20       THE WITNESS: No to both.
21   BY MR. KLOEWER:
22   Q    Okay. Just real quickly I'll --

Page 232

1    paragraph 75 there, Dr. Halderman's speaks to this
2    image.
3        Are you familiar with Google Doodle? What
4    Google Doodles are? Do you use Google?
5    A    I've used Google, but I've never heard
6    of Google Doodle.
7    Q    Okay. So let me explain it. When you
8    open Google sometimes it's -- oftentimes it's just
9    the standard Google Home page with the -- with the
10   multicolored G-O-O-G-L-E.
11   A    Okay. Yeah.
12   Q    Sometimes it will be an image, a
13   specific image to commemorate a holiday or
14   someone's birthday.
15   A    Right. Right. Right.
16   Q    Something to that effect. Do you know
17   what I mean?
18   A    Yeah.
19   Q    They call these Doodles, and Google
20   keeps an archive of the Doodles that they create.
21       And do you see the image in the top left
22   corner here of this -- of Exhibit 21 as red, white,

Page 233

59 (Pages 230 - 233)



1  blue, the second O in Google is a star?

2      A   Oh, yeah.  Yep.

3      Q   And if you flip back to the Halderman

4  report and turn to page 44, paragraph 76, he

5  points out that this Doodle is from November 11th

6  of 2020, and it was commissioned by Google to

7  commemorate Veteran's Day that year.

8      A   Okay.

9      Q   Which would be two days after Oltmann

10  first made his claim against Dr. Coomer.

11          MR. KACHOUROFF:  Objection as to form.

12  This witness has disqualified himself from answering

13  anything about this.

14          MR. KLOEWER:  That's fine.  I just want to

15  confirm if he's familiar with that.

16          You can set that aside for now.

17          We'll mark this as Exhibit 135.

18          (OLSEN Exhibit Number 135 was marked for

19          identification.)

Page 234

Page 236

8      We'll mark this as Exhibit 136.

9      (OLSEN Exhibit Number 136 was marked for

10     identification.)

22

Page 235

Page 237

Veritext Legal Solutions
800-336-4000



Page 238

Page 239

22

Page 240

Page 241

Veritext Legal Solutions
800-336-4000



Page 242

Page 243

Page 244

Page 245

62 (Pages 242 - 245)

Veritext Legal Solutions
800-336-4000



Page 246

Page 248

```
1    Q   Do you often communicate via signal?
2    A   I sometimes do just as I said, yeah.
3    Q   Is there a reason why you would
4  communicate via signal as opposed to a standard
5  text messaging app?
6    A   Other than -- anybody can intercept a
7  regular text message.
8    Q   Do you use a text messaging app for
9  communications with others?
10   A   What's a text messaging app?  You mean
11 like Signal?
12   Q   Well, not Signal.  The standard app that
13 comes on a -- on a phone that you buy from a
14 store.
15   A   Text messaging?
16   Q   Yeah.
17   A   Yes.
18   Q   Okay.  So do you text message with
19 Mr. Lindell, for example?
20   A   Yes.
21   Q   And we've already seen text messages
22 with you and Brannon Howse.
```
Page 247

Page 249

63 (Pages 246 - 249)

2      A   I don't know if -- so there were

3   probably some scheduling like -- there may have

4   been some scheduling like who was invited to

5   come -- like the -- there was a vetting process

6   for the -- who could come there as a cyber expert.

7      Q   And those would have been with My Pillow

8   employees?

9      A   I don't recall.

10     Q   Why would My Pillow have been involved

11  in those discussions?

12     A   I don't know that they were

13  specifically.  I'm just -- I'm not sure if it's

14  Lindell acting on behalf of Lindell Management or

15  My Pillow.

16     Q   Okay.  What about FrankSpeech?  Did you

17  communicate with anybody at FrankSpeech regarding

18  the Cyber Symposium?

19     A   I mean the only person would have been

20  Brannon Howse.

21     Q   So that raises an interesting point.

22  What's your understand -- how many people work for

Page 250

1   regarding Cyber Symposium that you're aware of?

2      A   I mean his son may have been on it,

3   Logan.  But that would have been it.

Page 252

1   FrankSpeech as you understand?  If you had to

2   guess.

3      A   Well, do you mean like the VAC?  What do

4   you mean work for FrankSpeech?

5      Q   Are employed by FrankSpeech?  How many

6   employees --

7      A   For like tech and everybody?

8      Q   Yeah.

9      A   I mean there's Brannon, who does a lot

10  of the front.  In terms of the back office, I'm

11  not sure how many people are employed, you know,

12  to do all the technical support.

13     Q   Do you know is there's anybody at

14  FrankSpeech that does content moderation?

15     A   I mean, maybe Brannon.

16     Q   Okay.

17     A   I don't know.

18     Q   Were you involved in drafting the terms

19  of use for FrankSpeech?

20     A   I believe so.

21     Q   Okay.  Okay.  So other than Brannon, you

22  haven't communicated with anybody at FrankSpeech

Page 251

22     Just to confirm, you don't have any other

Page 253

64 (Pages 250 - 253)

**Page 254**

1  contracts with Mike Lindell, with My Pillow,
2  Incorporated, or FrankSpeech LLC; is that correct?
3      A   Well, I have a -- yeah -- there's no
4  other contract or agreement.  I have an equity
5  stake in FrankSpeech.
6      Q   You do?
7      A   Yeah.
8      Q   When did you get that?
9      A   I think September.
10     Q   September of last year?
11     A   I'm guessing.  Maybe -- I'm not exactly
12 sure, but fairly recently.
13     Q   Okay.  Who else has an equity stake in
14 FrankSpeech?
15     A   I don't know exactly.  I know Mike
16 Lindell is the, I mean -- I mean, he's the primary
17 owner.
18     Q   Okay.  And what is your stake in
19 FrankSpeech?  Is it a percentage share?
20     A   Five percent.
21     Q   Did you purchase that?
22     A   No.

**Page 255**

1      Q   How did you come into possession of that
2  stake?
3      A   Mike just gave it to me.
4      Q   As a gift?
5      A   I don't know.
6      Q   Did he --
7      A   You have to ask him?
8      Q   Was it in compensation for labor?
9      A   I think that gets into attorney-client
10 privileged communications.
11     Q   Is Mr. Lindell trying to sell shares of
12 FrankSpeech to the public now as you understand
13 it?
14     MR. KACHOUROFF:  Objection as to form.  It
15 could be privileged.
16     THE WITNESS:  Yeah.  I'm not -- I would
17 only know that anything about the privileged
18 communications.
19 BY MR. KLOEWER:
20     Q   Who else would know who owns stakes of
21 FrankSpeech other than Mr. Lindell?
22     MR. KACHOUROFF:  Objection as to form.

**Page 256**

1      THE WITNESS:  Mike would.
2  BY MR. KLOEWER:
3      Q   Anybody else?
4      A   The other owners.
5      Q   Well, sure.  Okay.
6      But you don't know anybody other than Mike
7  who would be able to identify those other owners?
8      MR. PARKER:  Objection as to form.
9      THE WITNESS:  I believe that -- I believe
10 Conan and Dennis may have stakes in it.
11 BY MR. KLOEWER:
12     Q   Why do you think that?
13     MR. KACHOUROFF:  Objection as to form.
14     THE WITNESS:  I believe I may have seen
15 agreements to that effect.
16 BY MR. KLOEWER:
17     Q   And -- and your 5 percent stake is that
18 memorialized in a written agreement?
19     A   Yes.
20     Q   Okay.  What about My Pillow?  Do you own
21 any shares of My Pillow?
22     A   No.

**Page 257**

1      Q   Have you ever served on the board of My
2  Pillow?
3      A   No.
4      MR. PARKER:  Objection as to form.
5      MR. KLOEWER:  Okay.  You can set aside the
6  subpoena.
7  BY MR. KLOEWER:
8      Q   We can get into a sort of lightning
9  around here.  I have a bunch of random questions
10 that are not necessarily consecutive.
11     Tell me, who is Todd Carter?
12     A   I believe he's the chief technology
13 officer of My Pillow.

Veritext Legal Solutions
800-336-4000



Page 258

Page 260

2        Do you often communicate with Mr. Carter
3    involving items for the FrankSpeech website?
4        A    No.
5        Q    How often would you say Mr. Carter is
6    involved in working on the FrankSpeech website?
7        A    I have no idea.
8        Q    Do you know if he's employed by
9    FrankSpeech?
10       A    I don't know that either.

Page 259

2        Q    Was she involved in planning the
3    Symposium?
4        A    I don't believe so.

Page 261

66 (Pages 258 - 261)



1   FrankSpeech?

2       MR. KACHOUROFF:  Objection as to form.

3   There's no evidence that he plays that role.

4   BY MR. KLOEWER:

11  BY MR. KLOEWER:

12    Q   Is there anyone else you know of at

13  FrankSpeech if you want a video uploaded that you

14  would contact?

15    A   Well, I usually go to Brannon.

16       (OLSEN Exhibit Number 139 was marked for

17       identification.)

Page 262

Page 264

Page 263

8     Q   Oh, I just -- you had previously stated

9   that you haven't spoken with him and don't know

10  him.  So if that was --

11    A   No, no, no.  I never said I didn't know

12  Kirchhoefer.  I think you that I had met -- I've

13  never met him.

14    Q   Okay.

15    A   I've talked to him.  I've never met him

16  in person.

17    Q   When have you talked to him?

18    A   It's been many months ago, like, at

19  least probably six months.  He, you know...

20    Q   In relation to the lawsuit from Gateway

21  Pundit?

22    A   I think it was.

Page 265

67 (Pages 262 - 265)

1    Q   Was he seeking legal counsel from you?
2    A   No.
3    Q   What was the purpose of the call?
4    A   I think to vent.
5    Q   Okay. Was that your first conversation
6 with Mr. Kirchhoefer?
7    A   My recollection is I had never spoken to
8 him before this lawsuit was filed. That's my
9 recollection.
10       MR. PARKER: Before what lawsuit?
11       THE WITNESS: The lawsuit against -- by
12 the Hofts against Fanning.

Page 266

15       MR. KLOEWER: Okay. Can you take, like, a
16 five -- well, maybe ten-minute break? I need to
17 make a quick call and then probably wrap up here.
18       VIDEOGRAPHER: Going off the record. The
19 time is 15:17 p.m.
20       (Whereupon, a brief recess was taken.)
21       VIDEOGRAPHER: Going back on the record.
22 The time is 15:20 p.m.

Page 267

BY MR. KLOEWER:
2    Q   Mr. Olsen, I know you've stated that you
3 don't represent My Pillow and haven't before.
4        Do you know Chris Ruddy?
5    A   I know of Chris Ruddy, yes.
6    Q   Have you ever met him?
7    A   Yes.
8    Q   In what context?
9    A   Just at a -- like a dinner party. I
10 mean, I wasn't -- it wasn't a set-up meeting. It
11 was -- he was at a group.
12   Q   And has -- have you ever been engaged to
13 pursue legal action against Newsmax on behalf of
14 Mr. Lindell?
15   A   No. What? No, no.
16   Q   And, Mr. Olsen, did you speak with
17 Mr. Lindell about your testimony today?
18   A   Only that I was -- I'm being deposed,
19 yes.
20   Q   Did you discuss the substance with him
21 at all?
22   A   No.

Page 268

1    Q   Did he have any input as far as your
2 testimony?
3    A   No.
4    Q   Mr. Olsen, have I been respectful to you
5 today?
6    A   Well, I would say generally, yes.
7        MR. KLOEWER: All right. We'll leave it
8 at that. I don't have any further questions.
9        CROSS EXAMINATION
10 BY MR. PARKER:
11   Q   I've got a couple -- a few questions.
12       Do you have any facts that you are aware
13 of to indicate, imply, and infer that Mike Lindell
14 put Joe Oltmann on the stage at the Symposium?
15   A   No.
16   Q   Do you have any facts that imply or
17 infer or indicate that Mike Lindell had knowledge
18 that Joe Oltmann was going to go up on the stage?
19   A   No.
20   Q   Do you have any facts about whether Mike
21 Lindell knew anything that Joe Oltmann might say
22 up on the stage?

Page 269

68 (Pages 266 - 269)

1    A    No.

2    Q    Do you have any facts to indicate that

3  My Pillow had anything to do with the Cyber

4  Symposium or the planning of the Cyber Symposium?

5    A    The only thing is that there were

6  certain people that were there at the Cyber

7  Symposium doing -- like taking tickets and things

8  like that.  So they may have been employed by

9  Lindell Management or Mike.  I don't know.

10    Q    Do you have any facts to indicate that

11  any of those people were paid by My Pillow for

12  that service?

13    A    No.

14    Q    Would it surprise you to learn that none

15  of them were paid by My Pillow?

16    A    No.

17    Q    No, it would not surprise you?

18    A    It would surprise me that if anybody was

19  paid by My Pillow.  Correct.

20        MR. PARKER:  I have nothing further.

21        You're not going to ask any questions?

22        MR. KLOEWER:  Negative.  Nothing further.

Page 270

---

1        VIDEOGRAPHER:  We are off the record at

2  15:24 p.m.  This concludes today's testimony given

3  by Kurt Olsen.  The total number of Media Units used

4  is six and will be retained by Veritext.

5        (Whereupon, at 3:24 p.m., the deposition

6        of KURT B. OLSEN was concluded.)

7

8            * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 271

---

1        CERTIFICATE OF NOTARY PUBLIC

2        I, CONSTANCE HUNT RHODES, the officer

3  before whom the foregoing deposition was taken, do

4  hereby certify that the witness whose testimony

5  appears in the foregoing deposition was duly sworn

6  by me; that the testimony of said witness was

7  taken by me in stenotypy and thereafter reduced to

8  typewriting under my direction; that said

9  deposition is a true record of the testimony given

10  by said witness; that I am neither counsel for,

11  related to, nor employed by any of the parties to

12  the action in which this deposition was taken; and

13  further, that I am not a relative or employee of

14  any attorney or counsel employed by the parties

15  thereto, nor financially or otherwise interested

16  in the outcome of the action.

17

18        *Constance Hunt Rhodes*
          CONSTANCE HUNT RHODES

19        Notary Public in and for the
          District of Columbia

20

    My commission expires:

21  January 31, 2028

22

Page 272

---

1  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al

2  Kurt B. Olsen Job No. 5914157

3        E R R A T A  S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Kurt B. Olsen              Date

25

Page 273

69 (Pages 270 - 273)

1 Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al

2 Kurt B. Olsen 5914157

3          ACKNOWLEDGEMENT OF DEPONENT

4    I, Kurt B. Olsen, do hereby declare that I

5 have read the foregoing transcript, I have made any

6 corrections, additions, or changes I deemed necessary as

7 noted above to be appended hereto, and that the same is

8 a true, correct and complete transcript of the testimony

9 given by me.

10

11 _____  _____

12 Kurt B. Olsen              Date

13 *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

                                        Page 274

1 Chris@mck-lawyers.com

2          June 30, 2023

3 Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al

4 DEPOSITION OF: Kurt B. Olsen 5914157

5    The above-referenced witness transcript is

6 available for read and sign.

7    Within the applicable timeframe, the witness

8 should read the testimony to verify its accuracy. If

9 there are any changes, the witness should note those

10 on the attached Errata Sheet.

11    The witness should sign and notarize the

12 attached Errata pages and return to Veritext at

13 errata-tx@veritext.com.

14    According to applicable rules or agreements, if

15 the witness fails to do so within the time allotted,

16 a certified copy of the transcript may be used as if

17 signed.

18          Yours,

19          Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 275

70 (Pages 274 - 275)

5914157 -ENR

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2      - - - - - - - - - - - - - - - - - :
                                         :
3      ERIC COOMER, PHD,                 :
                                         :
4              Plaintiff,                :   CASE NO.
                                         :
5              vs.                       :   1:22-cv-01129
                                         :
6      MICHAEL J. LINDELL,               :
       FRANKSPEECH LLC and MY PILLOW,    :
7      INC.,                             :
                                         :
8              Defendants.               :
                                         :
9      - - - - - - - - - - - - - - - - - :
10
11              DEPOSITION OF KURT B. OLSEN
12
13     DATE:              June 15, 2023
14     TIME:              9:32 a.m.
15     LOCATION:          Veritext Legal Solutions
                          1250 I Street, NW
16                        Suite 901
                          Washington, DC 20005
17
18     REPORTED BY:       Constance H. Rhodes
                          Reporter, Notary
19
20
21              Veritext Legal Solutions
                1250 Eye Street, Northwest
22                Washington, DC 20005
```

Page 1

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2              I, CONSTANCE HUNT RHODES, the officer

 3     before whom the foregoing deposition was taken, do

 4     hereby certify that the witness whose testimony

 5     appears in the foregoing deposition was duly sworn

 6     by me; that the testimony of said witness was

 7     taken by me in stenotypy and thereafter reduced to

 8     typewriting under my direction; that said

 9     deposition is a true record of the testimony given

10     by said witness; that I am neither counsel for,

11     related to, nor employed by any of the parties to

12     the action in which this deposition was taken; and

13     further, that I am not a relative or employee of

14     any attorney or counsel employed by the parties

15     thereto, nor financially or otherwise interested

16     in the outcome of the action.

17
18                        CONSTANCE HUNT RHODES

                          Notary Public in and for the
19
                          District of Columbia

20
       My commission expires:
21     January 31, 2028

22

                                              Page 272
```

```
 1        ***NOTIFICATION BY REPORTING FIRM RE RETURN OF
 2                         ORIGINAL***
 3    ------------------------------------------------------
               DEPOSITION OF KURT B. OLSEN
 4
                       JUNE 15, 2023
 5    ------------------------------------------------------
 6        The original deposition xxxx/was not returned to
 7    the deposition officer on _ _ _ _ Aug. 2nd 2023 _ _ _;
 8        If returned, the attached Changes and Signature
 9    page contains any changes and the reasons therefor;
10        If returned, the original deposition was sent to
11    Bradley A. Kloewer, Custodial Attorney;
12        That $ N/A     is the deposition officer's charges
13    to the PLAINTIFF for preparing the original
14    deposition transcript and any copies of exhibits.
15        That a copy of this notification was sent to all
16    parties shown herein this  17th    day of   Aug.      ,
17    2023.
18
19                        BY: Kim Cao

20                        FOR:
                          VERITEXT LEGAL SOLUTIONS
21                        Veritext Registration No. 571
                          300 Throckmorton Street
22                        Suite 1600
                          Fort Worth, Texas  76102
23                        (817) 336-3042 (800) 336-4000
      Job No. 5914157
24
25

                                             Page 1
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.