# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

     Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

     Defendants

---

## EXHIBIT 8

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


CIVIL ACTION NUMBER: 1:22-CV-01129-NYW-SKC


ERIC COOMER, PH.D.,

Plaintiff


V.


MICHAEL J. LINDELL, FRANKSPEECH LLC,

AND MY PILLOW, INC.,

Defendants


**CERTIFIED TRANSCRIPT**


DEPONENT:  JOSEPH OLTMANN

DATE:      DECEMBER 16, 2022

REPORTER:  DARIANA CABRERA ALVAREZ



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 2..5
JOSEPH OLTMANN, 12/16/2022

---

Page 2

1                          APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, ERIC COOMER, PH.D.:

4    Brad Kloewr, Esquire

5    Charlie Cain, Esquire

6    Cain and Skarnulis, PPLC

7    P.O. Box 1064

8    Salida, Colorado 81201

9    Telephone No.: (719) 530-3011

10   E-mail: bkloewer@cstrial.com

11   ccain@cstrial.com

12

13   ON BEHALF OF THE DEFENDANTS, MICHAEL J. LINDELL,

14   FRANKSPEECH LLC, AND MY

15   PILLOW, INC.:

16   Ryan P. Malone, Esquire

17   Parker, Daniels, Kibort, LLC

18   123 North Third Street

19   888 Colwell Building

20   Minneapolis, Minnesota 55401

21   Telephone No.: (612) 355-4100

22   E-mail: malone@parkerdk.com

23

24   AND

25

---

Page 3

1                     APPEARANCES (CONTINUED)

2

3    Ingrid DeFranco, Esquire

4    Law Office of Ingrid J. DeFranco

5    P.O. Box 128

6    Brighton, Colorado 80601

7    Telephone No.: (303) 443-1749

8    E-mail: ingrid.defranco@gmail.com

9    ALSO PRESENT:

10   Nicholas Teti III - Advanced Legal Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

1                            INDEX

2                                                  Page

3    PROCEEDINGS                                       7

4    DIRECT EXAMINATION BY MR. KLOEWR                  8

5

6                          EXHIBITS

7    Exhibit                                        Page

8    36 - Motion for Relief                          14

9    37 - Objection to Plaintiff's Motion            17

10   38 - Re: Objection, etc. Email

11        November 21, 2022                           18

12   39 - Vehicle Registration                       21

13   40 - February 22, 2021 Text Message             25

14   41 - February 28, 2021 Text Message             25

15   42 - Conservative Daily Podcast Revenue

16        Email March 10, 2021                        28

17   43 - Flash Drive Clips                          34

18   44 - Frank Influencer Demo Email

19        April 8, 2021                               37

20   45 - Frank Influencer Demo Follow Up Email

21        April 8, 2021                               42

22   46 - May 26, 2021 Text Message                  65

23   47 - Deposition Transcript Excerpt             151

24   48 - August 14, 2021 Text Message             172

25   49 - August 26, 2021 Text Message             189

---

Page 5

1                     EXHIBITS (CONTINUED)

2    Exhibit                                        Page

3    50 - May 20, 2021 Text Message                 200

4    51 - July 12, 2022 Text Message                202

5    52 - Subpoena to Joseph Oltmann                212

6    53 - August 31, 2022 Text Message              213

7    54 - Dr. Coomer Google Search Screenshot       276

8    55 - Dominion - Colorado Secretary of State

9         Google Screenshot                         286

10   56 - Text Messages from Unsaved Number         314

11   57 - Deposition Excerpt of Max McGuire         322

12   58 - RE: Voter Fraud Follow Up Email

13        November 10, 2020                          350

14   59 - Screenshot of Video                       357

15

16

17

18

19

20

21

22

23

24

25



(866) 715-7770
advancedONE.com

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 6..9
JOSEPH OLTMANN, 12/16/2022

Page 6

                    STIPULATION

1
2
3   The VIDEO deposition of JOSEPH OLTMANN was taken at
4   UNITED STATES COURTHOUSE, 901 NINETEENTH STREET, ROOM
5   A502, DENVER, COLORADO 80294 on FRIDAY the 16TH day of
6   DECEMBER 2022 at approximately 9:00 a.m.; said
7   deposition was taken pursuant to the FEDERAL Rules of
8   Civil Procedure.
9
10  It is agreed that DARIANA CABRERA ALVAREZ, being a
11  Notary Public and Court Reporter for the State of
12  COLORADO, may swear the witness and that the reading and
13  signing of the completed transcript by the witness is
14  not waived.
15
16
17
18
19
20
21
22
23
24
25

Page 7

                    PROCEEDINGS

1
2
3       VIDEOGRAPHER:  We're here, the date is
4   12-16-2022 for the deposition of Joseph Oltmann.
5   Case is 1:22-CV-01129-WJM.  We're -- the location is
6   901 Nineteenth Street, Denver, Colorado.  Let's see
7   here.  Okay, so -- and -- my name is Nicholas,
8   T-E-T-I III.  9534 Castle Ridge Circle, Highlands
9   Ranch, 80129.  If everybody can introduce themselves
10  and then we can proceed.
11      MR. KLOEWR:  All right.  Good morning, this is
12  Brad Kloewr here on behalf of the Plaintiff,
13  Dr. Eric Coomer.  I'm joined by Charlie Cain.
14      MR. MALONE:  This is Ryan Malone on behalf of
15  Defendants, MyPillow, Frank Speech, Michael Lindell.
16      MS. DEFRANCO:  Ingrid DeFranco on behalf of
17  Joseph Oltmann, who appears to my right.
18      MR. KLOEWR:  You want to swear in the witness?
19      VIDEOGRAPHER:  We are going to swear in the
20  witness.
21      COURT REPORTER:  Raise your right hand.  Do you
22  solemnly swear or affirm the testimony you're about
23  to give will be the truth, the whole truth, and
24  nothing but the truth?
25      THE WITNESS:  I do.

Page 8

1       COURT REPORTER:  Thank you.
2               DIRECT EXAMINATION
3   BY MR. KLOEWR:
4       Q   All right.  Let's get started.  Mr. Oltmann,
5   we have a lot to discuss regarding this particular case,
6   but I would like to address just a few housekeeping
7   matters before we get started, to confirm a few
8   questions we have.  We're going to need to send you
9   another subpoena as a witness in this case, we'll going
10  to go to trial next year.  And I believe you've
11  represented to the Court and to us that you are a
12  resident of Texas now; is that correct?
13      A   I am.
14      Q   Okay.  And how long have you been a Texas
15  resident?
16      A   Officially, February this year, but August of
17  2021 is when I --
18      Q   August of 2021.  And you -- you own residential
19  property in Texas?
20      A   I don't.
21      Q   You don't, but you live there full-time?
22      A   I do.
23      Q   That's -- and are you renting?
24      A   What difference does it make?
25      Q   I'm just trying to --

Page 9

1       A   It's none of your business.  I'm going to tell
2   you right now, anything that you're going to do that
3   causes security issues for me and my family, because
4   you've already done it, I'm not going to answer.
5       Q   Okay.  We'll get to that in a bit.
6   Mr. Oltmann.  I just need to confirm your residence
7   because we are --
8       A   I just confirmed my residence.  I'm a resident
9   of Texas.
10      Q   Okay.  What county do you live in?
11      A   Bexar County.
12      Q   Bexar County, around San Antonio.  And are you
13  paying property taxes in Texas?
14      A   I'm not going to answer any questions related
15  to my living.  I'm not going to do it.
16      Q   Mr. Oltmann, has your counsel provided you a
17  copy -- I know we provide you a copy directly of the
18  protective order has been in this case.  Did you have a
19  chance to --
20      A   That's done really well to this point.
21      Q   Mr. Oltmann, I'm going to ask you to -- let me
22  just -- let's establish some ground rules before we get
23  started here.
24      MS. DEFRANCO:  Excuse me, Mr. Kloewr, I -- I
25  don't have access to the filings in this case, so I

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 10

1    have not seen a protective order.
2        MR. KLOEWR:  Okay.  I believe we e-mailed that
3    to you directly a couple days ago.  We can confirm
4    that.  I'll represent to you; Mr. Malone is here as
5    well.  Can you confirm that a protective order has
6    been issued in this case.
7        MS. DEFRANCO:  Do have a copy?
8    BY MR. KLOEWR:
9        Q    I can e-mail it to you again.  Perhaps we
10   should establish some ground rules here before we get
11   started.  I know you've been deposed before Mr. Oltmann,
12   but I'll just remind you that you need to ask -- answer
13   the questions that are asked.  If I ask you a question,
14   that's a question that I need an answer to, not any
15   other question, not a question you would like to answer.
16   I'd ask you also too, to please speak slowly, not talk
17   over me. That's a courtesy to Dariana here, who needs to
18   get down all of our answers as clearly as possible.
19   Mr. Oltmann, are you on any medications this morning
20   that may affect your ability to provide testimony?
21       A    I've never been on medication.
22       Q    Okay.  And have you discussed your testimony
23   with Mr. Lindell?
24       A    No.
25       Q    Did you discuss the subpoena you received with

Page 11

1    him?
2        A    No.
3        Q    Did you discuss that subpoena with
4    Mr. Lindell's counsel?
5        A    No.
6        Q    Did you inform Mr. Lindell --
7        VIDEOGRAPHER:  Sorry to interrupt you.  I'm
8    going to adjust the sensitivity on your microphone -
9    -
10       THE WITNESS:  All right.
11       VIDEOGRAPHER:  -- a little.  Okay.  All right.
12   Thank you.
13   BY MR. KLOEWR:
14       Q    Did you inform Mr. Lindell when you received
15   the subpoena in this case?
16       A    I did not.
17       Q    Okay.  And -- and how did you become aware of
18   the subpoena that was issued?
19       A    From Tina Peters?
20       Q    Tina Peters informed you that we were trying
21   to serve you with the subpoena?
22       A    Tina Peters said that she was served, and she
23   saw my name on it.
24       Q    Okay.  So that would've been in September?
25       A    October.

Page 12

1        Q    October.  Okay, so your counsel did not inform
2    you that we had reached out to her to try to serve a
3    subpoena?
4        A    Maybe, but I mean, I -- I wasn't really paying
5    attention to any of it, I mean, so it's -- no.
6        Q    You'd been informed that there was a subpoena
7    that we had issued to the Federal Court, and you were
8    paying attention to that?
9        A    I think what Andrea said is that you were
10   trying to serve -- serve her or something.  Serve her or
11   something.
12       Q    Okay.
13       A    I mean, Andrea's been under the weather to --
14   for the last four, five, six months.
15       Q    Okay.  But she did inform you of that?
16       A    I'm sure, eventually, she did.
17       Q    Okay.  We'll get back to that in a bit.  Just
18   want to be sure we're on the same page here.
19       VIDEOGRAPHER:  Can we go off the record for a
20   second?  I want to adjust the microphone.
21       MR. KLOEWR:  Sure.
22       (OFF THE RECORD)
23       VIDEOGRAPHER:  Okay, back on the record at
24   9:22 a.m. for the deposition of Joseph Oltmann case,
25   1:22-CV-01129-WJM.

Page 13

1    BY MR. KLOEWR:
2        Q    Okay, Mr. 1:22-CV-01129-WJM, before we -- when
3    we went off the record, we were confirming that your
4    counsel, Mr. DeFranco, had received a copy of the
5    protective order that's been issued in this case.  We
6    were asking you to confirm your Texas residency, and
7    I'll state now, on the record, as I just said to
8    Mr. DeFranco, that we are willing to stipulate on the
9    front end that we will redact any information regarding
10   your current residence, where you reside in the state of
11   Texas, but we will need that information to subpoena you
12   for this trial, which is why I'm asking for it.  So can
13   you please state your address for the record?
14       MS. DEFRANCO:  Just to clarify this, will be
15   attorney eyes only?
16       MR. CAIN:  That's correct.
17       MS. DEFRANCO:  Okay.  Thank you.
18       A    Okay, do you want the address?
19   BY MR. KLOEWR:
20       Q    Yes.
21       A    And no one else sees this except for you guys?
22       That's correct.
23       A    ████████████████████████████████████
24   ███████████████
25       Q    Okay.  And that has been your address since



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 14..17
JOSEPH OLTMANN, 12/16/2022

Page 14

1  August of 2021, I believe you said?
2      A   No, I've been in Texas since August of 2021.
3      Q   Okay.  And that's when you -- when you moved
4  there as a permanent resident?
5      A   No, I moved there as a permanent residence,
6  probably, February of this year.
7      Q   Okay.  Well let's do this, I want to just
8  confirm the accuracy of a few documents that have been
9  filed.  I'm going to mark this first exhibit as Exhibit
10  36.  Thank you, Dariana.  You can have a copy there.
11  Take a minute to familiarize yourself with that
12  document.  Mr. Oltmann.  I don't expect you to recall
13  every pleading that's been filed on your behalf, but if
14  you take a look at the date on that, do you recognize
15  what I've just handed you?
16          (EXHIBIT 36 MARKED FOR IDENTIFICATION)
17      A   Uh-huh.
18      Q   Okay, so this, I'll represent for the record,
19  is a pleading that was filed in Coomer B.,
20  Donald J.  Trump for President in the Denver District
21  Court, titled, Defendant Joseph Oltmann's Motion for
22  Relief from the July 7, 2021, order requiring Joseph
23  Oltmann to appear at the courthouse for his deposition
24  on August 11, 2021.  We don't need to get much into the
25  substance of this, but if I can direct your attention to

Page 15

1  page 2, the last sentence before the conclusion there.
2  That states, "Mr. Oltmann is not a resident of the state
3  of Colorado and will have to travel to appear."  Do you
4  see that?
5      A   Yeah.
6      Q   And this is dated 6th of August 2021?
7      A   Yep.
8      Q   So at that time, you had established residency
9  in Texas?
10      A   You don't established residency to do a bunch
11  of things.  So being able to have your business inside
12  of Texas, there's a bunch of things you have to do.  So
13  was I in Texas in August, yes.  Did I establish
14  residency in Texas?  No.  By their standards or by -- by
15  the standards that they have, and -- and, legally, I
16  can't even vote in Texas yet, until they finish the
17  process of making my driver's license, which is a
18  process that takes three to six months.
19      Q   Okay.  So what are the steps, as you
20  understand them, to establish residency in Texas?
21      A   You have to have -- you have to do business
22  down in Texas.  You have to full-time do business down
23  in Texas, which I do.  You have to have a -- well, I
24  mean, in order to vote, you have to have a driver's
25  license.  You have to have a place of resident.  And all

Page 16

1  that happened in 2022, not in 2021.  All of that, in
2  order to legally be able to file taxes as a Texas
3  resident.
4      Q   Okay, so you had --
5      A   But, being in Texas in August, which I did
6  tell you, we're -- being in Texas started in August of
7  2021.
8      Q   Okay.  And if I understood you correctly
9  before, you said by February of this -- you can keep
10  that.
11          MS. DEFRANCO:  Is this an exhibit number?
12          MR. KLOEWR:  36.
13          MS. DEFRANCO:  Got it.
14  BY MR. KLOEWR:
15      Q   If I understood you correctly, you -- you said
16  that you had completed all those steps for establishing
17  residency by February of 2022?
18      A   No, I still haven't completed all those --
19  those, but by February I had a business inside of Texas.
20      Q   Okay.
21      A   I was doing business inside of Texas,
22  therefore I can -- I can establish that I can pay taxes
23  in Texas.
24      Q   Okay.  So I guess I'm not clear.  So you're
25  not a resident in Texas yet, then?

Page 17

1      A   I can't vote in Texas yet, but I'm a resident
2  of Texas.  You can't just say you're a Texas resident by
3  picking up and having a lease in Texas.  That's not how
4  it works.
5      Q   Okay.  Let's take a look at what I'll label as
6  Exhibit 37.  Let me snag this from you here.  Sorry, Mr.
7  Oltmann, I'll give you the marked copy.  These are going
8  to be the official ones for the court reporter, if you
9  want to pass that to your counsel.  This is -- do you
10  recognize this document?
11          (EXHIBIT 37 MARKED FOR IDENTIFICATION)
12      A   No, I don't.
13      Q   Okay.  Well this is what's been labeled as
14  Document 55, filed into this proceeding, Coomer B.,
15  Michael Lindell.  Cover page says Joseph Oltmann's
16  Objection to Plaintiff's Motion for Substituted Service
17  on Colorado Counsel.
18      A   This wasn't provided to us, and the
19  information sent over, was it?
20      Q   Well, this is signed by your counsel, Andrea
21  Hall.
22      A   Okay.
23      Q   And if I recall your -- what you stated to
24  Ms. -- Judge Wang on Tuesday, you had approved this
25  filing; is that correct?

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 18..21
JOSEPH OLTMANN, 12/16/2022

Page 18

1      A    Yeah, I've never read this.
2      Q    Okay, well I'll direct your attention to
3  Paragraph 6, which is on page 2 of that filing.  State's
4  Filing, "In August 2021, Mr. Oltmann moved his residence
5  from Colorado and ceased to be a resident of this state.
6  While he conducts business in the state of Colorado,
7  Mr. Oltmann does not reside here."
8      A    Correct.
9      Q    And she's referring to the same move that you
10 made, that you just described, is that right?
11     A    Correct.
12     Q    Okay.
13     A    So what -- what did I say that was different
14 than that?
15     Q    I'm just confirming that these -- these
16 statements are all referring to the same series of
17 events.  We'll mark this as Exhibit 38.  This is an
18 e-mail you sent to us on November 21st.  Do you
19 recognize this document, Mr. Oltmann?
20         (EXHIBIT 38 MARKED FOR IDENTIFICATION)
21     A    Yes.  I think it started with, "Cain, you are
22 a liar.  It's who you are.  Own it."  Right?  So it
23 dates back to the 11th?
24     Q    Yeah.  The document I'm referring to begins
25 with, "Ingrid sent an e-mail -- "

Page 19

1      A    Oh, the document actually begins if you go
2  back in time from the 4th, Charlie Cain, et al, and goes
3  all the way up.  But it starts with -- I mean, if you
4  want I can read it.
5      Q    I'm familiar with the document, Mr. Oltmann,
6  I'm referring to the first page that I just handed you,
7  specifically in the first Paragraph --
8      A    But it doesn't start on that, it starts on
9  11-4, correct?
10     Q    That is correct, Mr. Oltmann.
11     A    Okay, so that's --
12     Q    But the first page of this document is what
13 I'm referring to.
14     A    Okay.
15     Q    And it says, "I do business and I'm paid out
16 of San Antonio, Texas.  I paid taxes in Texas."  Now, I
17 just asked you if you paid property taxes in Texas and
18 you said, no.
19     A    That's not what I said.  I said, "What
20 difference does it make what I do?"  I'm not going to
21 divulge my -- I didn't say that.  But you want to -- can
22 you read that back, whether or not I said that I paid
23 property taxes in Texas?
24     Q    We can clarify right now, Mr. Oltmann, do you
25 pay property taxes in Texas?

Page 20

1      A    No.  You just said that I -- I said -- paid
2  property tax in Texas.  Do I -- did I say that?  Did I -
3  - did I actually say that I paid property taxes in Texas
4  or just another line from the Coomer attorney?
5      Q    Mr. Oltmann, please.  Dariana's trying to take
6  down everything you say.
7      A    Right.
8      And I need you to speak slowly and ask the
9  question I asked.  I'm giving you an opportunity to
10 clarify.  If I got it wrong, then please tell me.
11     A    No, I don't pay property taxes in Texas.
12     Q    You don't pay property taxes in Texas?
13     A    No.
14     Q    So when you say, "I pay taxes in Texas," what
15 are you referring to?
16     A    I have to file taxes in Texas.
17     Q    Okay.  So you filed your federal income taxes
18 in Texas?
19     A    As a Texas resident.
20     Q    Okay.  That's all I needed to know.
21     Is that it?
22     Q    For that exhibit, yes, it is.
23     A    All right.
24     Q    We'll mark this as Exhibit 39.  Do you have
25 any vehicles in Texas, Mr. Oltmann?

Page 21

1         (EXHIBIT 39 MARKED FOR IDENTIFICATION)
2      A    Yes.
3      Q    And those are registered in Texas?
4      A    Yes.
5      Q    Trying to understand -- what I'm wondering,
6  Mr. Oltmann, is why you've been voting in a state where
7  you're not a resident.  You voted in person here in
8  Colorado; is that correct?
9      A    You know what?  Do me a favor.  If you're
10 trying to do something where you want to backdoor
11 everything in order to -- to go after my life, go -- go
12 pound sand, run up a river.  Okay.  I voted in Texas
13 after talking to the Secretary of State of Colorado.
14     Q    Mr. Oltmann.  Mr. Oltmann.
15     A    No, I'm not going to do this.  I'm not going
16 to do this where you try to tear apart my life.
17     Q    We're not trying to --
18     A    Yes, I am.  You're not going to tear apart my
19 life and say that I did something wrong.  I called the
20 Colorado Secretary of State.  I said, "I cannot vote in
21 Texas.  I am still have a driver's license in Colorado.
22 I still have a residence in Colorado, although I don't
23 live there, can I vote there?"  And their comment to me
24 was, "Yes, you can."
25     Q    Okay, I just want to ask you --

Page 22

```
1      A   So this stuff that you're trying to do to --
2  this has nothing to do with Mike Lindell.  Nothing.  And
3  just like the -- the deposition you did against Max, it
4  had nothing to do with Mike Lindell.  You didn't even
5  ask him a question about Mike Lindell.
6      Q   Mr. Oltmann, you weren't present for that
7  deposition.  I'll represent to you that we did ask
8  Mr. --
9      A   I was not present during that deposition.
10     Q   I know.  I'm not going to -- we're not
11  going to have a shouting match and go back and forth,
12  okay?
13     A   You lie.  That's the problem.  You lie.
14     Q   Mr. Oltmann, please.
15     A   This doesn't have to do with Mike Lindell's
16  case.
17     Q   Here's what's going to happen.  You're here to
18  sit for a deposition.
19     A   And I'm here answer questions --
20     Q   Despite that --      --
21     A   And I'm here to answer questions and also tell
22  you what I think about the things that you're putting in
23  front of me.
24     Q   That's not what we're here to do, Mr. Oltmann.
25     A   I can -- I absolutely have a right to do that.
```

Page 23

```
1      Q   You're here to answer questions.  If you're
2  going to be argumentative and you're going to refuse to
3  answer those questions, I'm going to take the transcript
4  to Judge Wang and we're going to sit and do this all
5  over again.  And I'm going to request our costs and our
6  fees for doing that.
7      A   Yeah, of course you would.
8      Q   So if you want to sit down and this again --
9      A   It's called Weaponization of Law Fair.  You
10  guys are really good at it.
11     Q   Mr. Oltmann, let's stick to the content here.
12  I'm just trying to confirm the facts here.
13     A   Are you?  How about the fact that you showed
14  up on the side of the street by accident when Eric
15  Coomer was getting arrested for running into a building?
16     Q   I'll be asking the questions.  We're going to
17  proceed.  That is not what we're discussing here today.
18  You want to talk about Mr. Lindell?  Now, you just threw
19  the exhibit back at me, for the record.  Can you confirm
20  that this is your signature?
21     A   It is my signature.
22     Q   Okay.  And you did vote in person at Douglas
23  County Parks and Trails on November 8th here in
24  Colorado; is that correct?
25     A   I did.
```

Page 24

```
1      Q   Okay.  All right.  Let's talk about
2  Mr. Lindell.  How did you first meet?
3      A   I don't recall.
4      Q   Do you recall when you met Mr. Lindell?
5      A   I -- I met him several times.  He appeared on
6  my podcast; I think before I met him in person.
7      Q   Okay.  Do you recall the circumstances of when
8  you first met him?
9      A   I don't.
10     Q   He's a pretty famous guy.  You don't recall
11  meeting the My Pillow guy, Mike Lindell?
12     A   I've -- I've met a lot of really famous
13  people.
14     Q   Okay.  Well, let's take a look at what I will
15  mark as Exhibit 40.  This has been produced by
16  Mr. Lindell.  I know you haven't seen it, or I -- I
17  suspect you haven't because you're not a party to this
18  communication.  But take a look.  This is what's been
```

Page 25







**Page 26**

```
 7     A   I -- I don't.
 8     Q   Okay.  Skip over this one.  All right.  Do you
 9  remember when Mr. Lindell was first on the Conservative
10  Daily podcast?
11     A   I don't recall.
```

**Page 27**

```
 4     Q   Okay.  Can you tell me how you got a promo
 5  code?  I'm trying to understand.  You know, not everyone
 6  Mike Lindell speaks to gets a promo code, obviously.
 7  Why did you guys get one?  Did you negotiate it?
 8     A   I did not.
 9     Q   Did he offer it to you himself?
10     A   He did not.
11     Q   Did --
12     A   He didn't offer it to me, no.
13     Q   Okay.  And you didn't request one?
14     A   I did not.
15     Q   Well, I'm just curious as to how the
16  promo code came to exist then.  Did Mr. McGuire request
17  it?
18     A   I -- it's too long ago.  I mean, I -- I don't
19  know, and I don't actually read a lot of these e-mails
20  that come in.
21     Q   Okay.  So is it possible that you requested
22  different promo codes from him?
23     A   Once I knew we were having a promo code, we
24  would establish a promo code.  Max and I would probably
25  have talked about it and said, "What promo code do we
```

**Page 28**

```
 1  want?"  Someone offered us the promo code.
 2     Q   Okay.  I'll see if this will refresh your
 3  memory.  Marking this as Exhibit 42.
```

**Page 29**

```
15     Q   Okay.  Do you remember the date when
16  Mr. Lindell was first a guest on your podcast?
17     A   I don't.
18     Q   Okay.  If I were to represent to you that the
19  first interview was on March 11, 2021, would you
20  disagree with that?
21     A   I would've no knowledge one way or another.
22     Q   Okay.
23     A   When did you say that was?
24     Q   March 11, 2021.  The e-mails we've been
25  looking at are from March 10th and this interview
```


AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 30..33
JOSEPH OLTMANN, 12/16/2022

Page 30

1  would've happened the following day, on the 11th. Does
2  that comport with your memory?
3      A   I got a lot going on, so I would not say that
4  a whole lot comports as far as me being able to figure
5  out if that is accurate.
6      Q   Okay.  So going back to the promo code, it
7  sounds like there was -- we've just seen a bit of
8  negotiation, or maybe not negotiation, but at least
9  requests from you for a specific promo code.  What were
10 the -- what are the terms of your promo code with My
11 Pillow?
12     A   I have no idea.
13     Q   Do you derive any income if people purchase
14 products from My Pillow using CD21?
15     A   Yeah, but to be honest, I haven't looked at
16 any income coming from him in -- since the beginning.
17     Q   So you've never checked to see what your
18 income stream looks like from that?
19     A   And I've never been paid by Conservative
20 Daily.
21     Q   Do you have any idea how much revenue
22 Conservative Daily derives from its sales of My Pillow
23 products?
24     A   No.
25     Q   Do you know how much revenue Conservative

Page 31

1  Daily derives from any of its advertisers?
2      A   No.
3      Q   Well, so you don't -- you don't track any of -
4  - any revenue that --
5      A   I track revenue.
6      Q   Okay.  Which revenue do you track?
7      A   Collected revenue.  Bottom line.
8      Q   I agree.  Okay.  So if I understand correctly,
9  you've never looked at how much money you've made from
10 My Pillow, and that's a number that doesn't particularly
11 concern you?
12     A   No.  I think there's an e-mail somewhere,
13 where he tried to offer us 40 percent and I sent him an
14 e-mail back saying, "We don't need that much money,
15 please don't pay us 40 percent."
16     Q   Meaning, you would get 40 percent of the
17 revenue that comes from sales using your promo code?
18     A   Right.  And we said, we don't -- we don't
19 really want that.  Why don't you just give it back to
20 Mike and --
21     Q   Okay.  So --
22     A   I know that e-mail exists because I -- I did
23 not write that one either, but I did ask Lynn to write
24 that one.
25     Q   Okay.  But you didn't disclose that in

Page 32

1  response to the subpoena.
2      A   I -- I don't think it was relevant to what you
3  said I needed in relation to Eric Coomer.  Did you say
4  in relation to Eric Coomer or -- it was very specific,
5  the subpoena.
6      Q   We'll -- we'll get into the subpoena later.  I
7  just want to confirm you didn't provide that
8  communication to us.
9      A   I did not.
10     Q   Okay.  So you said 40 percent was too high.
11 What is your -- your percentage cut of revenue from
12 product sold using the CD21?
13     A   I have no idea from.
14     Q   Okay.  You don't -- you just thought 40 was
15 too high?
16     A   I -- I think that 40 is too high.  Yeah, I do.
17 I think if -- I mean, I'm -- yeah, that's a lot of money
18 to pay someone just to stand up there and say CD21.
19     Q   But you don't know what you're making right
20 now?
21     A   No.
22     Q   So it could be 39 for all you know?
23     A   Yeah, I don't know.  I mean, I can check.  You
24 want me to check?  I can check.
25     Q   It's just -- I'm just confirming that you're

Page 33

1  not familiar with the details of your relationship with
2  Mr. Lindell.
3      A   Mike's my friend.
4      Q   I understand that.  I'm just trying to get a
5  better understanding of your business relationship.  And
6  it sounds like that's how your relationship began; is
7  that correct?
8      A   I mean --
9      Q   So first, you know, within days of meeting
10 him, you had a promo code for your podcast, and you've
11 been using that promo code ever since, correct?
12     A   Yeah.  I think that there's tens of thousands
13 of people that are out there that have promo codes from
14 Mike Lindell.  I'm pretty sure that's the case.  I mean,
15 he's got a lot of people across the country that support
16 him in the fight against the election fraud.
17     Q   So you understand the -- the -- the promo
18 codes to be related to that fight against election
19 fraud?
20     A   No.  I think that supporting Mike Lindell when
21 he is being attacked viciously by this radical ideology
22 that's trying to steal the voice of American people to
23 keep us in a perpetual state of slavery, is something
24 that I want to support.
25     Q   Okay.  So you understand your support from My

Page 34

1  Pillow to support your beliefs about election fraud, as
2  well?
3      A   No, my support for My Pillow is to support
4  Mike Lindell as a person so that he can be blessed
5  financially.  How he handles his -- his finances and
6  resources are up to him.  And I have no knowledge of
7  that one way or another.
8      Q   Okay.  Let's take a look at clip one.  We're
9  going to be showing you a -- a series of video clips and
10 audio clips.  Have you already seen these or no?
11     A   This is the first time.
12     MR. MALONE:  I'm not going to answer questions.
13     MR. KLOEWR:  Okay.
14     MR. MALONE:  And I also -- I don't know what
15     we're going to see.
16     MR. KLOEWR:  We will be -- so, let -- let me do
17     this, and let me clarify.  This may help to answer
18     that question.  We have a flash drive with new clips
19     that have not been entered as evidence yet.  I will
20     label that flash drive as Exhibit 43.
21         (EXHIBIT 43 MARKED FOR IDENTIFICATION)
22     MR. MALONE:  Okay.
23 BY MR. KLOEWR:
24     Q   So what we're going to be watching now is
25 going to be Exhibit 43, Clip 1.  Now, as we proceed, I

Page 35

1  am going to show some clips, which we have seen before.
2  Some of those may be referred to as Exhibit 3 clips.
3      A   Okay.
4      Q   Those were shown in the deposition of Tina
5  Peters.  And at other times, I will refer to Exhibit 18
6  clips.  These were showed during the Deposition of
7  Mr. McGuire.  This will be Exhibit 43, Clip 1.  43.
8      A   Of that?
9      Q   It's going to be on the screen that --
10     MR. CAIN:  No, I don't have access that.
11     MR. KLOEWR:  You don't have access yet.
12     MR. CAIN:  I'll just -- I'll play it for you,
13     Mr. Oltmann, on this iPad.
14 BY MR. KLOEWR:
15     Q   And before we start, I'll represent that this
16 is the conclusion of your first interview with
17 Mr. Lindell on March 11, 2021.
18     A   This is my first interview with him?
19     Q   Yes.
20         (VIDEO PLAYED)
21     Q   Okay.  So we just discussed this a bit, but
22 when you say you'll be a tireless advocate for My
23 Pillow, I believe you said, that's to ensure Mr. Lindell
24 enjoys financial success; is that correct?
25     MR. MALONE:  Object to foundation on that

Page 36

1  question.
2      Q   You can correct me if I'm wrong in -- in that
3  characterization.
4      A   I don't -- I don't know -- I don't know what -
5  - I don't know how to answer that question.  So by
6  supporting My Pillow, it's a -- it's supporting Mike?
7      Q   Well, let me put it this way.  I -- I have a
8  lot of pillows in my house that I like.  I don't know
9  the brand names for them.
10     A   Are they MyPillows?
11     Q   They're not.
12     A   You should try them, they're really good.
13     Q   Well, I -- I -- with this language that you
14 would be a tireless advocate for My Pillow, I'm -- I'm
15 wondering why it is you say you would -- you would do
16 that?
17     A   Because I want to support My Pillow.  I have
18 My Pillow -- I've had MyPillows for longer before I
19 actually met Mike.  I didn't know you could put them
20 back in the washer and dryer and wash them and make them
21 re-fluff themselves either.  That was a new one.  So
22 when I found that out, it saved me a lot of money.
23     Q   All right.  And we also -- you also said in
24 there, "We'll be moving to the platform ourselves, and
25 we'll make sure to support you 100 percent."  Now, I

Page 37

1  understand this was March of 2021.  What platform were
2  you referring to at the time?
3      A   Frank Speech.
4      Q   Okay.  And do you recall when Frank Speech
5  launched?
6      A   I don't.
7      Q   Okay.  Let's take a look at 258.
8      A   Do you my MyPillows?  I'll send you some for
9  Christmas.
10     Q   Okay.  I'm going to hand you what's been
11 marked as Exhibit 44. Oh, I'm sorry.  I just -- he's got
12 three copies of 44.  I apologize.  Mr. Oltmann, if you
13 could remove the paper clip and give your counsel one of
14 those copies there.  And if you could pass that down to
15 Mr. Malone.  This is what's been previously marked as
16 Defendant's 258.  Do you recognize this document,
17 Mr. Oltmann?
18
19
20
21
22
23
24
25



```
10     Q    Okay.  Is there ever a time when someone else
11 would be using your phone to send e-mails?
12     A    No, but there's a time that they would use
13 their phone and -- if I'm -- there are times that I've
14 said, "Hey, just send it," you know, they're not --
15 she's not there, so she'll send it from her phone.
16     Q    Okay.
17     A    But I think you can tell, because sometimes
18 this will show up as well.    .
```



```
19     Q    Okay.  So is it -- is it safe to say that --
20 that you were involved with the Frank Speech platform
21 from the beginning?  Before it launched, you were
22 anticipating publishing Conservative Daily on Frank
23 Speech?
24     A    That's kind of a tricky question, because the
25 short answer is no and then turned into yes.  So I was -
```

```
1 - I was involved in the conversations up front on how to
2 set up the architecture of the system, and then it was
3 found that I was -- I don't know.  A lot of people take
4 advantage of Mike, and I was doing things to try and
5 save him, financially, money and leveraging
6 relationships I had all over the country in order to
7 make sure that he didn't spend too much on the
8 infrastructure he was trying to create.  And once it was
9 found out that I wasn't interested in taking advantage
10 of Mike, I was not privy to a lot of those conversations
11 anymore.
12     Q    Well, let's unpack that a little bit.  Are you
13 saying that Mr. Lindell would've preferred that you were
14 trying to take advantage of him?  I don't -- I don't
15 understand what you're saying.
16     A    No, that's not what I said at all.
17     Q    Okay.
18     A    That -- we came up with a -- a plan for the
19 system that he was building, and there was other people
20 involved in it and we were trying to provide them
21 assistance in that.  And once I started talking about
22 how you could cut out a lot of these expenses and -- and
23 kind of shoreline or -- or streamline the process for
24 implementation of these systems, that it would -- it
25 would reduce cost for them, it did not seem that -- that
```

```
1 that was their goal.
2     Q    When you say their, are you talking about Mike
3 Lindell --
4     A    No.
5     Q    -- did you present these --
6     A    I'm talking about other people that were --
7 that were already brought into the -- the -- the mix to
8 -- to do work for Mike.
9     Q    And did --
10     A    And I didn't feel good about it at that point,
11 I just -- I didn't want to be -- I didn't want to be
12 associated with -- with it.  And they didn't really want
13 me involved because I was fighting back on spending more
14 when you could spend less and get something more stable.
15     Q    Okay.  So did Mr. Lindell request a -- a bid
16 from you or a proposal to run the website?
17     A    And I -- and I didn't -- I didn't ask to be a
18 part of it, other than just helping him set up
19 infrastructure because I do know the system architecture
20 very well when it comes to VOD and -- and system
21 deployment.
22     Q    So you --
23     A    Technology system deployment.
24     Q    Okay.  So you volunteered your expertise in
25 this field to help him establish the website?
```



Page 42

```
1    A   For free.
2    Q   And it sounds like there were some
3    intermediaries that didn't appreciate your input?
4    A   Yeah.
5    Q   Is that correct?  Okay.
6    A   Yeah.
7    Q   And who were those intermediaries?
8    A   This RJ guy.
9    Q   Okay.  Well, let's --
10   A   He -- he didn't really appreciate it.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 43



```
7    Q   Okay.  That's -- you're anticipating my next
8    question.  So you made a proposal to Johnston Howse to
9    run the website and they rejected that proposal; did I
10   understand that correctly?
11        A   I did not.  I did not create a -- I was -- I -
12   - the only thing that I did was use our expertise to get
13   him access to lower bids.  I leveraged relationships
14   that I had with companies, like Dell and others, and
15   said, "Here's what I would do if I were you.  I'm not
16   you.  But if I were you, this is the architecture that I
17   would -- I would create."
18   Q   Okay.
19        A   So I did not have any -- I did not have any
20   dog in the hunt, I was not making any money, I was not
21   getting paid.  I was giving them advice based upon my
22   many years of experience in dealing in this -- in this
23   arena.
24   Q   Okay.  Do you often give professional advice
25   of this nature free of charge?
```

Page 44

```
1    A   Yes, I do actually.  Yeah.
2    Q   Okay.
3    A   I mostly do it for non-profits and that was a
4    large concentration of what I did prior to getting
5    involved, or -- or being forced to get involved, in --
6    in this whole circus.
7    Q   Okay.  So if I understand correctly, against
8    your recommendation -- or -- or -- or not, I don't know
9    if you conveyed this to Mr. Lindell.  But it sounds like
10   he chose to go with Johnston Howse, and you thought
11   there would be better options for --
12   A   No.
13   Q   -- creating the --
14        A   The advice that I gave was to Johnston Howse
15   in order to help Mike Lindell.
16   Q   Okay.
17        A   I did not -- I at no point had a conversation
18   with Mike Lindell about it, I didn't -- nor did I think
19   it was proper.  The people that he hired to do that work
20   was Johnston Howse.  I respected that relationship.  I
21   didn't necessarily agree with the direction that they
22   went in, and I didn't understand why they would not heed
23   the advice, given the amount of expertise that we had in
24   this arena, but that wasn't -- it wasn't for me to have
25   a conversation with Mike or to interfere with that
```

Page 45

```
1    relationship, and so I didn't.  So there was never a
2    conversation that I had with Mike about that.  I had my
3    conversation using the chain of -- of command for this,
4    which is, "This is his representative on that side," and
5    I stuck -- I stuck to that.
6    Q   Okay.  So is it safe to say you weren't very
7    close with Mr. Lindell at -- at this time, in April of -
8    - of 2021, a month after your first interview?
9        A   No, I would tell you that I feel an immense
10   loyalty to someone that has such an unselfish desire to
11   serve what is right in our country.  And, you know, for
12   someone that's willing to give up so much and follow his
13   faith, I think that that's the type of person that I
14   would walk shoulder to shoulder with any day of the
15   week, twice on Sunday.  And so as a result, I -- I will
16   do things and help people that I feel are -- are good
17   people.  And he is a very, very good man.
18   Q   Okay.  So at the time Frank Speech was
19   launched then, in late April of '21, do you recall
20   Conservative Daily was utilizing the platform?
21   A   I don't recall.
22   Q   Okay.
23        A   If that had been a question you had posed
24   before this, I could have given you dates on when our
25   first episode was.
```



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 46..49
JOSEPH OLTMANN, 12/16/2022

Page 46

1    Q    Tell me about that relationship a little bit.
2  Do you derive any revenue from having the Conservative
3  Daily Podcast hosted on Frank Speech?
4    A    I do not.
5    Q    Okay.  So there's -- there's no ad revenue
6  relationship there?
7    A    No.
8    Q    And are you able to collect any metrics or
9  observe sort of what -- what sort of viewer engagement
10 you get through the Frank Speech website for
11 Conservative Daily?
12   A    I was told that -- that we're a popular show,
13 but the short and long answer is no.
14   Q    Okay.  So if you were --
15   A    That's one of my concerns.  Like, everywhere
16 else you have a counter on it so you could see, all
17 right, this many people actually watched it and -- or
18 you have some analytics that are tied to a backend, and
19 that's just not a capability of that system to date.
20   Q    All right.  Well, that was -- that was my next
21 question.  So you couldn't get that information if you
22 wanted to?
23   A    I -- I think I could, now.
24   Q    Okay.
25   A    But I don't -- I haven't.

Page 47

1    Q    And you've never requested that information?
2    A    So we use links.  When we put out links, so
3  I'll tell you how I track our engagement from our side
4  using SimpleMath, and that is how many people clicked on
5  the link and went to that place, and that gives me a
6  better idea who watched it, and then you just got to get
7  average watch time.  We -- we have a method by which we
8  use to see how many people engage with Conservative
9  Daily or my content specifically, and that's just so
10 that we can create an ad structure.  I'm not very good
11 at ad structure and I'm not very good at looking at this
12 from a revenue standpoint.  So up to this point I
13 haven't been very good at it.  But -- so it's not a --
14 but in the future, that'll allow for us to grow that ad
15 revenue if we decide to go in a different direction and
16 -- and expand what Conservative Daily does.
17   Q    Okay.  And Conservative Daily is on many
18 different platforms; is that correct?
19   A    Yeah.  So a hundred and -- we open syndicated
20 for radio stations, which is 147, I think, radio
21 stations that can pick it up for free.  And they don't
22 pay us either, so --
23   Q    Are those a.m. stations, are those satellite
24 stations --
25   A    No idea.  It's --

Page 48

1    Q    -- streaming?
2    A    It's a remnant deal where you -- that you just
3  sign up to give them access to it, and then we're on
4  stuff like Pandora, Apple Podcast, Google Podcast,
5  Spotify, Rumble.  I -- I don't -- it's a lot.  It's a
6  lot of stations.
7    Q    So in the spectrum of platforms, do you have
8  any way to gauge how -- how much of your personal
9  traffic at -- at Conservative Daily is being driven by
10 Frank Speech?  It sounds like maybe not, you said you
11 can't get those specific metrics, but --
12   A    Well, if we weren't on so many other channels
13 and if I was interested in tracking the code, the CD21
14 code, I could give you a better idea for revenue side.
15 But, you know, there's a lot of people out there using
16 the code.  So even if you do have an influence for them
17 to use it, it doesn't necessarily mean that they're
18 going to use CD21.  They could use Charlie Kirk's deal
19 or, you know, DC Draino's deal, or News Leak, or any of
20 the number of people that are out there.  So I mean, I
21 think that's a way that he measures effectiveness of the
22 platform because that's the only -- only way you can
23 measure whether or not the platform's working.  I'm just
24 not sure, in my case, it works very well.
25   Q    Okay.  Okay, let's see here.  Do you have any

Page 49

1  other contributions to Frank Speech website, other than
2  the Conservative Daily podcast being hosted there?  Do
3  you ever, you know, write articles or anything of that
4  nature to provide content to Frank Speech?
5    A    No.  I don't write articles for them, no.  I
6  didn't even know that that was a thing on his site.
7    Q    Well, they -- they have some -- they have some
8  posted.  I'm just curious if -- if the -- if there's
9  anything beyond Conservative Daily that -- that you
10 directly contribute to that's hosted on the Frank Speech
11 website?
12   A    No.  That I contribute to hosting on the
13 website?
14   Q    Yes.  Any content that you create or produce,
15 is -- is Frank Speech also promoting or publishing that
16 information?
17   A    I don't -- I don't think so, no.  I mean, I'd
18 have to check with the guys to see if they do anything,
19 but it's -- we have a lot of relationships with a lot of
20 different people, but I don't write articles, I don't
21 write content for them.  I do write papers quite often
22 related to some of the information that's given to me in
23 different states on the system.
24   Q    Okay, we might get into that a bit later, but
25 you've been a guest on Frank Speech a number of times,

Page 50

1  correct?
2      A    I -- I have a show on Frank Speech.
3      Q    You have a show on -- other than Conservative
4  Daily, or just --
5      A    On Conservative Daily, but it's on Frank
6  Speech.
7      Q    Okay.
8      A    Is that what you're talking about?
9      Q    Well, I'm talking more about, you know, Frank
10  Speech also hosts live, you know, Lindell TV Program for
11  example.
12      A    Uh-huh.
13      Q    And you've been a -- guest on interviews
14  conducted by Brannon Howse, for example, is that
15  correct?
16      A    I think I've done that a couple times.
17      Q    Okay.  Do you have an idea about how many
18  times you've appeared in that capacity?
19      A    A couple times, probably.
20      Q    Okay.  I'm going to play you an audio clip
21  from what we understand to be your first interview on
22  Frank Speech, and you can correct me if I'm wrong, this
23  is from May 3rd of 2021, it's just a brief clip with
24  Brannon Howse.  I'm going to play this portion where he
25  sort of describes meeting you and how that relationship

Page 51

1  started.  Going to play Clip 2.
2          (AUDIO PLAYED)
3      A    When was this?
4          (AUDIO PLAYED)
5      Q    May 3, 2021.
6          (AUDIO PLAYED)
7      THE WITNESS:  I can't see it.
8      MR. CAIN:  It's just audio.
9      THE WITNESS:  Oh, okay.  Sorry.
10      MR. CAIN:  Let's start it over.
11      THE WITNESS:  Yeah, let's restart that.
12          (AUDIO PLAYED)
13  BY MR. KLOEWR:
14      Q    Okay.  So you recall that FrankAthon event --
15      A    I don't.
16      Q    -- that Mr. Howse is referring to?
17      A    I don't.
18      Q    Do you remember meeting Mr.    Howse at that
19  event?
20      A    I don't even remember a FrankAthon at all, so
21  I don't --
22      Q    It was a promotional event that coincided with
23  the launch of Frank Speech in late April 2021?
24      A    Was it an event people attended?
25      Q    Well, that's what I'm asking you.  I -- I

Page 52

1  wasn't there.  I don't know.
2      A    No.  I mean, I -- I would probably have
3  remembered if there was a launch party.
4      Q    Okay, but you don't recall meeting Brannon
5  Howse for the first time?
6      A    I think I met him for the first time in -- at
7  the symposium, I think.
8      Q    Okay.  Well, the -- the interview that I just
9  played you a clip from was from May of 2021, which
10  would've proceeded the symposium by about three months.
11      A    It preceded the symposium?
12      Q    That's correct, yes.
13      A    When was the symposium?
14      Q    It was in August of 2021.
15      A    Well, so I had never met him before then, I
16  don't think.
17      Q    Well, the interview I just played you a clip
18  from was from months prior.  That was very shortly after
19  the Newsmax settlement in this case; do you recall that?
20  Or in -- in the other case.
21      A    You mean -- what settlement?
22
23
24
25

Page 53

11      Q    -- through the prior case.  I'm just asking
12  you if you recall the timeline, which would've been late
13  April?
14      A    I -- I don't actually, but --
15      Q    Okay.  So this meeting -- I'm curious how you
16  came to be a guest on Frank Speech in this capacity?
17      A    I don't recall.
18      Q    Did Mr. Howse e-mail you?
19      A    I don't recall.
20      Q    Well, this was an interview that lasted about
21  an hour.  Do you remember receiving any communications
22  about what sort of information you would present on that
23  interview?
24      A    I don't recall.
25      Q    In any of the times you've been on Frank



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 54..57
JOSEPH OLTMANN, 12/16/2022

Page 54

1  Speech, has anyone from Frank Speech tried to discuss
2  the -- the nature of your -- the interview prior to the
3  time of airing?
4      A    No, I don't think so.
5      Q    So in your experience, whenever you've gone on
6  Frank Speech there's no preparation for the interviews?
7      A    No, I don't actually prepare for interviews,
8  typically.
9      Q    Okay, but has anyone from Frank Speech ever
10 attempted to prepare for an interview before having you
11 on?
12     A    No, I don't think so.
13     Q    So in those instances when you've appeared
14 there, it's just sort of a -- a general free for all of
15 -- of discussion topics?
16     A    Honestly, yeah.
17     Q    Okay.
18     A    I mean, mostly.  I mean, I think that you'd
19 probably asked me a bunch of questions.
20     Q    Okay.
21     A    I'm not a -- I mean, it -- it -- it is a
22 interview type of format, so they just ask you questions
23 and you kind of just talk.
24     Q    Okay.  And have they ever asked you to provide
25 any -- any evidence for any of the things you've stated

Page 55

1  on Frank Speech?
2      A    Like what things that I stated on Frank
3  Speech?
4      Q    Well, for example, in this interview you
5  discussed your claims about Dr. Coomer at length --
6      A    Oh --
7      Q    -- and I'm wondering if Frank Speech requested
8  any evidence to support those claims prior to having you
9  on the air?
10     A    I don't know.  I'm probably -- I -- I probably
11 -- if they did, I probably sent them all the information
12 that I had, that you have in the other case.
13     Q    But you don't know that they ever requested
14 that information?
15     A    I don't recall.
16     Q    And you don't recall having sent them that
17 information on your own?
18     A    I've sent that information to a lot of people,
19 so I could have, but I don't know.
20     Q    And -- and following your interviews, have you
21 ever gotten any requests for clarification or
22 documentation to support claims that you made on the air
23 on Frank Speech?
24     A    They weren't claims.  I want to just -- I want
25 to really clarify that and -- they're not claims.  I

Page 56

1  didn't just wake up one day and say, "I'm going to turn
2  my life upside down."
3      Q    Any --
4      A    Just get involved in something --
5      Q    I'll rephrase the question.
6      A    -- advertising clicks.  It's just not
7  something that I'm -- I find myself doing just for fun.
8      Q    Okay.  I'm not looking to get into a semantics
9  dispute with you.
10     A    It's not semantics, it's the truth.  So the
11 truth is not actually semantics.  The truth is the
12 truth.  You can't make up a different truth.  It either
13 is a truth or it isn't a truth.
14     Q    Mr. Oltmann, I'll ask the questions here.  The
15 -- have you ever received a request from anyone at Frank
16 Speech, following an interview you conducted there where
17 they requested any evidence to support statements you
18 made --
19     A    I don't recall.
20     Q    -- during that?  Okay.  Has anyone at Frank
21 Speech ever asked you for information or sources for the
22 statements you have made?
23     A    I think that they understand that that
24 information is -- is the timeline and the information
25 provided is pretty concrete.  It's pretty solid.  From

Page 57

1  beginning to end, it's solid.
2      Q    When you say you think they understand that,
3  what do you mean?  Who -- who is they?
4      A    I think that anyone that would ask me for
5  information knows that I'm an open book and that
6  information has been readily available.  Everything from
7  the -- the affidavits from people that were with me on
8  the six affidavits from John Tig -- Tiegen, who by the
9  way is an American hero, guy spent all of his time on --
10 13 hours on top of a roof actually --
11     Q    I'm -- I'm familiar with Mr. Tiegen.
12     A    Well, I -- I'm not finished talking.  I -- I'm
13 going to finish the entire -- it'll answer your
14 question.  John Tiegen, who was supposed to be on that
15 call with me to the October 16th article that was
16 written where I had been investigating journalists
17 because they were running bad things about me --
18     Q    Okay.
19     A    -- related to it, and then if you go further -
20 -
21     Q    But you haven't identified any of the other
22 participants on that call, for example, have you?
23     A    What do you mean I haven't identified?  I
24 provided notes --
25     Q    Well, we've asked you for the identities of

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                         Pages 58..61
JOSEPH OLTMANN, 12/16/2022

Page 58

1 the other individuals on that call and you've never
2 provided that information, have you?
3       A    You mean the person that got me on that call?
4       Q    Among others, but yes, you've also testified
5 that there were as many as 19 people on that call.  And
6 we've requested that information, and you've not
7 provided it; is that correct?
8       A    That's not true.  I gave you the notes related
9 to that call specifically.
10      Q    Yes, but we asked you for the identities of
11 the other people on the call and you said you couldn't
12 identify anyone on that call.
13      A    That's not what I said.  That's -- we can go
14 back to the transcript.  That's not what I said at all.
15      Q    Well --
16      A    Where I said these are the people that I
17 thought were on the call.
18      Q    Okay.  Well --
19      A    I did -- I did not say that.  I did not say
20 that.  That is not -- and if you want to bring up the
21 deposition from before that I took for four hours, seven
22 hours actually, we can definitely walk through that.  If
23 you want to bring that into this -- this equation, we
24 can do that.  But that's not what I said.  And you're --
25 you're recalling something from recollection, not from

Page 59

1 something you're putting in front of me.  So if you'd
2 like to put it in front of me, I definitely will go back
3 and -- and look at that.
4       Q    Okay.  What about the -- you've claimed on
5 repeated occasions that you have identified 13 Antifa
6 journalists?
7       A    I have.
8       Q    And who are those 13 journalists?
9       A    I don't have my notes with me right now.
10      Q    Can you name one of them?
11      A    Yeah.
12      Q    Who?
13      A    Heidi     Beedle.
14      Q    Okay.  Can you name a second --
15      A    Sean Heidi    Beedle.  Yeah, Mackenbach, the
16 guy that writes for the Colorado -- times reporter.  Do
17 you know who he is?  You guys sent information to him,
18 apparently --
19      Q    Are you referring to Eric Malba      ch?
20      A    Oh, you do?  Yeah, that guy.
21      Q    You claimed he was on the Antifa call at one
22 point; is that correct?
23      A    I don't recall if I said that or not.
24      Q    Okay.  Was he on the Antifa call?
25      A    I'll have to go back and look at my notes.  I

Page 60

1 know that the school board member was on that call.
2       Q    Which school board member?
3       A    The -- the one that was accused of raping 31
4 children and that the --
5       Q    You're referring to Mr. Anderson?
6       A    Oh, you know that story too, huh?
7       Q    I do.  He provided a deposition -- or a -- a
8 declaration in this case.
9       A    A declaration in this case that says that it
10 wasn't an Antifa call, it's a BLM call.  That one?
11      Q    That's correct, yes.
12      A    Oh, yeah.
13      Q    But you -- you -- you provided sworn testimony
14 from Mr. Tiegen that that was not the call that you're
15 referring to, right?
16      A    It wasn't the call.  We -- it wasn't a BLM
17 call.  This was definitely an Antifa call.  And I also
18 remember inside the testimony that you guys said that
19 Antifa didn't exist.  You did that in a court of law.
20 You said that Antifa was just a thought, it wasn't
21 actually a organization, and that turned out to be false
22 as well.
23      Q    Okay.  We're getting a little sidetracked
24 here.  My original question, Mr. Oltmann, was just, no
25 one at Frank Speech has ever requested evidence to

Page 61

1 support statements that you made on their show after any
2 appearances on that show; is that correct?
3       A    I don't recall.
4       Q    Okay.  Now, I just play you the clip from the
5 May 3, 2021, interview.  Just a few days later on May
6 9th, Mr. Lindell spoke about Dr. Coomer on Frank Speech
7 at length.  And we're going to play that clip for you
8 now, that's what's been labeled as Clip 3.
9           (AUDIO PLAYED)
10      Q    Okay.  So this is Mr. Lindell in early May.
11 Again, shortly after the -- the Newsmax public
12 retraction apology was issued to Dr. Coomer.  And we
13 just heard Mr. Howse say that you had spoken with
14 Mr. Lindell at the Frankathon a couple weeks prior, and
15 you had just appeared on Frank Speech a few days before
16 that, so were you -- were you talking to Mr. Lindell
17 during this time frame about Dr. Coomer?
18      A    I don't recall.
19      Q    Do you know why he would be talking about
20 Dr. Coomer in that context?
21      A    I think everyone was talking about Dr. Coomer.
22      Q    Well, not everyone.
23      A    No?
24      Q    He says, "The evidence is there."  Do you know
25 what evidence Mr. Lindell's referring to?

Page 62

```
 1     A    Do you want me to walk you through all the
 2  evidence?
 3     Q    Well --
 4     A    I mean, I -- I don't really -- what's your
 5  question --
 6     Q    Let -- let -- let me ask it this way, has
 7  Mr. Lindell ever provided you any evidence about
 8  Dr. Coomer that you did not have already?
 9     A    I don't recall.  I've gotten a lot of
10  information related to Dr. Coomer that people have shown
11  me that it's not related.
12     Q    Okay, but you didn't disclose any
13  communications from Mr. Lindell about Dr. Coomer, so.
14     A    I didn't say that.  I said I don't recall.
15  You've been handing over information, so.
16     Q    Did you conduct a search for those
17  communications?
18     A    I did.
19     Q    And you didn't find anything?
20     A    Nope.
21     Q    So is it safe to say that Mr. Lindell has
22  never provided you any information about Dr. Coomer?
23     MS. DEFRANCO:  Object to the form.
24     A    No.  Because I put stuff on a Dropbox and then
25  I can just share the link on the Dropbox, so it's stuff
```

Page 63

```
 1  that is readily available for the case that is openly
 2  and publicly available.  I'll share that link with
 3  people, say, "Here's the link for Dropbox if you want
 4  access to it."  I mean, I was just -- Cain said
 5  yesterday that it was all publicly available and
 6  debunked information.  But, I mean, I guess you could --
 7     Q    I'm just -- I'm just trying to understand if
 8  Mr. Lindell has any information about Dr. Coomer that
 9  you were not aware of before he provided it to you?
10     MS. DEFRANCO:  Object to the form.
11     A    I don't know.  I don't know if that's the case
12  or not.
13     Q    Okay.  Do you know if -- do you know if
14  Mr. Lindell is relying on anyone else for his claims
15  about Dr. Coomer?  Other than you.
16     A    There -- there's a lot of information out
17  there.  Now, there's information out there for, I don't
18  know, Marco Polo.  There's information out there for
19  other -- there's other sources that have put information
20  out readily available that are directly related to Eric
21  Coomer, so it would not be shocking that he gathered
22  information from other sources.
23     Q    Okay, but you're not aware of any of those as
24  you sit here today?
25     A    I'm aware of a lot of sources of information
```

Page 64

```
 1  for Eric Coomer.  I've even told people to hold onto that
 2  information and we'll get back to it, that people have
 3  brought forward against -- about Eric Coomer.  But
 4  there's also a bunch of information about Eric Coomer
 5  that's been scrubbed from the internet, taken off of
 6  Twitter.  So there's -- there's -- there's a ton of
 7  stuff out there about Eric Coomer.  It does not hold him
 8  in a very good light.
 9     Q    All right.  So I'll take that to mean that --
10  that you don't recall any specific information that
11  Mr. Lindell has provided you about Dr. Coomer that you
12  didn't have before, correct?  Is that correct, you don't
13  recall any specific information --
14     A    I don't recall.
15     Q    -- that you learned from Mr. Lindell?  Okay.
16  Let's take a look at 242, we'll label this -- I've lost
17  the exhibit stickers page.  Do you have that over there?
18     THE WITNESS:  Is there a way to tell who's in
19  Dropbox?  Is there a way to tell in Dropbox if
20  you've shared -- who you've shared it with?
21     MS. DEFRANCO:  No --
22     THE WITNESS:  Or they just copy the link and
23  send it to them?  I don't think there is.
24     MS. DEFRANCO:  No, you can tell.  You can tell.
25  It shows who you share it with.
```

Page 65

```
 1     MR. KLOEWR:  Thanks.  I'm not sure where we
 2  left off.  Are we at number 40 --
 3     MR. CAIN:  Six.
 4     MR. KLOEWR:  Six, so should I start at 47?
 5     MR. CAIN:  No, this should be 46.
 6     MR. KLOEWR:  Forty-six, okay.
 7     MS. DEFRANCO:  Not that I know.  Maybe you
 8  share it.
 9     THE WITNESS:  Okay.  You want some more water?
10     MS. DEFRANCO:  No, not yet.  Thanks.
11  BY MR. KLOEWR:
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



13    Q    -- early-summer time frame.  How frequently
14  would you say you were in contact with Mr. Lindell at
15  that time?
16    A    Not very often.
17    Q    Okay.  Did you ever, you know, were you
18  calling him to chat or was it this sort of, you know,
19  sporadic messaging from time to time?
20    A    I mean, I would call to chat -- to chat with
21  him, just to say hello, but not -- not very often.
22    Q    Okay.
23    A    I don't think I call anybody very often.
24    Q    Okay.  Well, what I'm trying to understand is
25  that we're -- we're getting up closer to the time of the

1   Cyber Symposium.  Which, as we've discussed before,
2   occurred in August of 2021.
3     A    Okay.
4     Q    So I'm trying to understand your relationship
5   with Mr. Lindell throughout that time period, because
6   you obviously presented at the Cyber Symposium on a
7   number of occasions.  We'll look at some of that video.
8   I'm just trying to understand how you found yourself
9   there.  So did Mr. Lindell invite you to the symposium?
10    A    I don't recall who invited me.  Somebody
11  invited me.  I think it was Sherrona Bishop.
12    Q    Okay.  Did she send you an invite, did she
13  call you?
14    A    Uh-uh.
15    Q    Was that the first you heard of the Cyber
16  Symposium, when Ms. Bishop invited you to it?
17    A    Well, I had been given and been invited to be
18  a part of conference calls.
19    Q    Okay.
20    A    Where they would discuss the information to be
21  discussed at the symposium.
22    Q    Okay.
23    A    And I would bring up things that -- that they
24  were just questions about what they were suggesting or
25  theorizing on.

1     Q    Okay.  And you said you were on conference
2   calls.  Were -- how -- how many conference calls do you
3   recall being on to discuss the content --
4     A    I've probably been on --
5     Q    -- of the symposium?
6     A    -- 400 to 500 calls --
7     Q    Well --
8     A    -- with people over the last two years.
9     Q    I'm just referring specifically to the Cyber
10  Symposium?
11    A    Yeah, so I don't remember.  I don't recall.
12    Q    Okay.  Who else would've been on those calls
13  other than Sherrona Bishop?
14    A    Other people related to -- to election
15  integrity.
16    Q    So would Mike Lindell have partaken in those
17  calls about the information that would be presented at
18  the symposium?
19    A    No.  They had a group of people that I wasn't
20  associated with, that I wasn't a part of.
21    Q    Okay.
22    A    Core group, and then I would -- you know, I
23  didn't -- I don't really -- I don't ask to be involved
24  in it.  If somebody asks me to, I will get involved in
25  it.  But I don't try to get involved in all

1   conversations, I -- I take a more humble approach to
2   service.  So if they want me and they need me, I'll --
3   I'll help them.  But I'm not necessarily going to just,
4   you know, go out there and be the brightest bulb in the
5   room, which is typically not the case.
6     Q    So did Mr. Lindell, was he aware that these
7   calls that you were on were taking place?
8     A    I -- I have no -- I don't have any idea if he
9   did or didn't it.
10    Q    Well, it -- it sounds like you were discussing
11  the information that would be presented at the
12  symposium.  And I'm trying to understand, were you
13  presenting ideas of what should be presented there?
14    A    No.  So in -- when you're dealing with
15  technology and things moving very fast, you find
16  yourself -- there's a lot of people, you can't tell if
17  they're good people or bad people, that are -- you know,
18  that want to influence the direction of the conversation
19  or what's happening.  It's opportunity in chaos.  And so
20  I would be brought in, and they'd say, "Well, what's the
21  likelihood of this being the reality from a systematic
22  standpoint, that this is how the system operated?"  And
23  since I'm a -- kind of a bookworm when it comes to
24  reading about Dominion, ES&S, Smartmatic, got access to
25  those things and I was able to study the -- the process.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 70..73
JOSEPH OLTMANN, 12/16/2022

Page 70

1  They would ask me questions on whether or not they
2  thought that this was a feasible explanation.  And
3  anytime they brought a -- a theory forward with data, I
4  would always say that the likelihood of 1,000 people
5  being involved in the fraud are slim to none, that this
6  is -- this is directly related to the codebase inside
7  these systems, and then I would point out the whys,
8  related to how that would be effectively the way that
9  they were able to cheat in the system.  And so I -- that
10 -- I tried to create some sort of sensibility to make
11 an overarching desire for people that don't understand
12 technology, don't understand system architecture, or
13 don't understand code to try and synthesize or theorize
14 on what was really happening with the voting machines in
15 2020 and 2022.
16      Q    So the folks who were trying to put together
17 the information that would be presented at the symposium
18 --
19      A    Uh-huh.
20      Q    -- they were looking to you as a -- as a
21 source to confirm the validity of the information that
22 was presented?
23           MR. MALONE:  Object to form, foundation.
24      A    You know, I don't even think that that's the
25 case.  They just invited me to -- to have a seat at the

Page 71

1  table, given how I got involved in it and the system
2  architecture model that I built back in December of 2020
3  after a very short -- a very short study of the systems
4  related to Dominion and all the affidavits and
5  everything else.
6      Q    So is Sherrona Bishop who invited you to be a
7  member of these sort of talking groups to go through
8  this information?
9      A    Sometimes.  I mean, I -- I do know that she's
10 invited me to several meetings.
11     Q    And did you understand that she was inviting
12 you on Mr. Lindell's behalf?  Was she working with him
13 to formulate a presentation for the symposium?
14     A    I can't -- I can't speak for Sherrona Bishop.
15 I have no idea what their relationship is even today.
16     Q    I'm just asking about your understanding at
17 the time.  Like, did you know that -- that Mr. Lindell
18 was trying to put together a schedule for the symposium
19 --
20     A    So --
21     Q    -- and that's why you're having these talks?
22     A    So look, some people get involved in stuff
23 because they have motives, right?  I'm -- I'm a hundred
24 percent driven by my faith, which got me involved in
25 this to begin with.

Page 72

1      Q    I -- I understand.  That's not the question
2  I'm asking.
3      A    Well, I'm -- I'm answering the question.  You
4  want me to answer the question, I'll answer the
5  question.  I got involved in this directly related to my
6  faith.  That's how I got involved in this from day one.
7  I didn't want to be involved in it, I didn't try to be
8  involved in it, and I didn't try to get involved in any
9  of the subsequent conversations.  I came out and talked
10 about what I knew, and as a result of talking about what
11 I knew, I am now living in a house with bulletproof
12 glass and security cameras.
13     Q    That's not what I'm -- that is not what I'm
14 asking at all, Mr. Oltmann.
15     A    Well, I'm -- I'm not -- I'm just answering the
16 question.
17     Q    Do you understand that you were partaking in
18 conversations --
19     A    You have to let me finish answering the
20 question.  You have to let me finish answering the
21 question.  I'm not done answering it, right?  And you
22 have to let me answer it.  You want me to answer it, I'm
23 going to answer the question.
24     Q    Okay.  Please answer the question.  Did you
25 understand at the time that you were partaking in

Page 73

1  discussions to prepare the information that would be
2  presented at the cyber symposium?  Yes or no?
3      A    No.
4      Q    Okay.
5      A    No, I would not say that that was the direct -
6  - the characterization of those conversations.  Those
7  conversations were to gather information on whether or
8  not these theories that had come up out of nowhere were
9  -- or out of different places.  I don't want to say
10 nowhere, but come out of different places, whether they
11 had validity, whether they had any sort of substance to
12 the reality of what was really happening in the 2020
13 election.
14     Q    Okay.  And one of those theories involved the
15 PCAPs that Mr. Lindell eventually presented at the
16 symposium; is that correct?
17     A    Yes.
18     Q    And did you have a chance to review that
19 information prior to the symposium?
20     A    I did not.
21     Q    Do you know who did?
22     A    I do not.  I do not.
23     Q    Did you have any discussions with anybody
24 about this particular theory about PCAPs providing
25 evidence of that the Chinese had interfered in the

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 74..77
JOSEPH OLTMANN, 12/16/2022

Page 74

1  election?
2      A    So this is a very, very tricky conversation
3  because packet captures is something that in order to
4  validate that, you have to have the end-to-end
5  encryption, you have to have the ability to untangle
6  what it was that was transferred.  But the system, if
7  you look at the architecture of -- of Dominion
8  specifically, if you look at that system, you would
9  never need that in order to operate, you would just need
10 a single set of -- a single code, a -- a root kit, a
11 single piece of code that would be able to activate
12 inside that system, that would cause that system to do
13 the things that it did, namely in Arizona.  So the
14 problem with focusing in on China coming in and, you
15 know, doing these things is that if you look at
16 probability and just look at simple math, like the
17 probability of things happening based upon a probability
18 matrix, it's -- it didn't seem to me that it would
19 correlate, unless it was activating a piece of code
20 inside those machines, that that could be possible.
21     Q    And did you convey that skepticism about this
22 theory to Mr. Lindell prior to the symposium?
23     A    I always -- I always -- I don't volunteer my
24 information; I just give my thoughts and I tell people I
25 would check this out.  You know, since --

Page 75

1      Q    Did you do that with Mr. Lindell?
2      A    I did not.
3      Q    Okay.
4      A    I did not.
5      Q    Do you know where the information about the
6  PCAPs came from?
7      A    I believe it came from -- and if I'm talking
8  out of hand, I might be, but I think it came from Dennis
9  Montgomery and Mary Fanning, I think, one of the two.
10     Q    Do you know Dennis Montgomery?
11     A    I do not.
12     Q    Have you ever attempted to reach out to him or
13 meet him?
14     A    I have not.
15     Q    What about Mary Fanning?  Have you met her?
16     A    I have not.
17     Q    You've never spoken with her on the phone or
18 anything of that nature?
19     A    I have not.
20     Q    Okay.  And you didn't speak with either of
21 them prior to the symposium?
22     A    I did not.
23     Q    When did you become aware that Mr. Lindell was
24 getting his information from Dennis Montgomery?
25     A    I -- actually, Mr. Lindell's never told me

Page 76

1  that directly, I've just heard that as subscript from
2  other people.
3      Q    Okay.  What other people suggested that
4  Mr. Lindell was getting his information from Dennis
5  Montgomery?
6      A    I don't think he gets all of his information
7  from Dennis Montgomery.  Let me characterize that.  I
8  think he got some information from Dennis Montgomery.
9      Q    Okay.  So in these discussions leading up to
10 the symposium, you know, there were many people who were
11 involved with this symposium, obviously.  We'll talk
12 about the red team a little bit, the folks behind the
13 scenes.  You were one of the few individuals that
14 presented on stage.
15     A    Uh-huh.
16     Q    And you did that on several instances.  When
17 did you know that you would be making on-stage
18 presentations at the symposium?
19     A    I never knew.  I didn't know about Tina Peters
20 until I got there.  I hadn't had a conversation with Tina
21 Peters until I got there.  That's not true.  I had a
22 conversation with Tina Peters when I was headed there.
23 And, you know, the only thing that I said when all this
24 was happening was, "We have to make sure that there's a
25 certain business maturity to how information is

Page 77

1  collected and presented to the American people."  And I
2  made a suggestion that you -- that we not place
3  information out in the general public that is not
4  vetted, validated, and solidified, like that, you know,
5  those things.  And then so somebody said, "Well, we have
6  a -- somebody has to go on stage.  All right, you go on
7  stage."  And I was like, "Okay."
8      Q    Were you surprised that there was no --
9      A    So --
10     Q    -- schedule for this three-day event, that
11 there was no planned presentations?
12     A    Mike is -- has a lot of people around him, and
13 Mike is guided by his faith.  He is a man of immense
14 faith.  His belief in God is unwavering.  And the reason
15 why he gets involved with things is not necessarily
16 based on what is -- you know, what is the most popular,
17 it's what is right.  He -- he's -- he unrelentlessly
18 will pursue truth.  And so as a result, you -- you're --
19 you cannot stop Mike from speaking about that truth.
20     Q    Well, that -- I was asking if you were
21 surprised there was no schedule to the event.  And
22 you're aware that Mr. Lindell had offered a $5 million
23 award prior to the event, correct?
24     A    I did hear about that when I got there.
25     Q    Okay.  What did you understand that reward to

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 78..81
JOSEPH OLTMANN, 12/16/2022

Page 78

1    be offered for?
2         A    If they could, I think, approve or disprove
3    the PCAPs.
4
5         Q    Okay.  What do you mean disprove the PCAPs?
6         A    I don't -- again, I didn't even -- I didn't
7    even look at the -- even to this day, I have not looked
8    at that.  I heard about it.  I -- I thought it was, you
9    know, that I walked in and talked to all the coders that
10   were in the room, the -- the guys that really smart,
11   white hats, having conversations with them about the --
12   you know, what they were seeing when they were, you
13   know, kind of trying to break down the -- what small
14   parts of the PCAPs they were provided.
15        Q    Okay.  There's -- there's a lot to unpack in
16   all this.
17        A    Okay.
18        Q    Now, the -- the promotional material for the
19   symposium preceded the symposium by a couple months, and
20   this $5 million award was --
21        A    Uh-huh.
22        Q    -- was widely broadcast.  Do you recall that?
23        A    Yeah, it was.
24        Q    Okay.  And did you -- I just want to clarify
25   if you knew that the centerpiece of the symposium prior

Page 79

1    to that time was going to be this PCAP information,
2    that's what the $5 million award centered on.
3         A    Yeah, no, no.  I -- and again, I believe that
4    there is a crapload of white noise out there, and so
5    there's a lot of people that want to be validated and
6    want that time that maybe necessarily weren't looking
7    out for Mike's best interest.  I'm not saying that
8    that's the case with Mary Fanning or with Dennis
9    Montgomery or anyone else that's in front of him, but
10   some of the information, some of the people, in my
11   opinion, were not leading Mike in a place that was in
12   the best interest of what he was trying to -- they were
13   basically leading him away from truth.  Now, he
14   eventually came back and figured it out, and I believe
15   he did figure it out, but in real time, there's -- it --
16   it's like a fire hose of information and people are
17   constantly firing at you, what's true, what's not true.
18   And -- and because there's so many different theories
19   out there that are not related to, for instance, what
20   Clay Parikh was putting out and the information he had
21   coming out of Arizona related to his --
22        Q    Okay, well, that's -- I -- we're getting a bit
23   far field here.  Basically, what I'm trying to get at is
24   it -- it surprises me that Mike Lindell would promote a
25   $5 million award for months on end prior to the cyber

Page 80

1    symposium promising verifiable evidence of election
2    fraud.
3         A    Yeah.
4         Q    And it sounds like he didn't have any idea
5    what he was going to present at that event even until --
6         A    Well I'm sure --
7         Q    -- moments before that event.  Is that -- am I
8    correct in that?
9         A    I know -- I know that -- yeah, so I know that
10   he had access to information that I don't have access
11   to, to this day.  I know that he'd seen stuff that I
12   don't have access to, so -- so I don't want to
13   question --
14        Q    Could you have the access if you wanted it?
15        A    I've never asked for it.  It's not my
16   expertise, so it'd be -- it'd like be -- be asking to --
17   to read something in Chinese, right, or Bidenese.  You
18   just can't --
19        Q    What --
20        A    You can't understand what you can't.  I stay
21   in my lane.  Like, these are the things that I
22   understand.  System architecture, I understand.  I
23   understand why you would build the things you would
24   build.  I understand the mathematical way of working
25   around the probabilities of failure or success.  I

Page 81

1    understand that stuff.  But if you ask me to read PCAPs
2    and understand formulas or derivatives of where they
3    came from or -- or how it was created, that's -- that's
4    not in my wheelhouse.  That would -- I -- I would be
5    able to validate that about as much as you could
6    validate the -- the computer code in a -- in a new
7    Tesla.
8         Q    So you've been working for years to assemble
9    and present evidence to the public of election fraud,
10   and you're telling me that Mike Lindell has evidence
11   that he assured the country was evidence of that and you
12   never asked for it?
13        A    That's not true.  I didn't ask for information
14   related to PCAPs.  Those are two separate conversations.
15        Q    Why not?  If -- if it's true that the PCAPs
16   are evidence the election was rigged, isn't that what
17   you've been seeking for two years?
18        A    Yeah, so I'm not -- I -- I already have the
19   evidence.  The evidence is overwhelming that the
20   Dominion system was designed to defraud the American
21   people.  It's even more overwhelming if you look at the
22   information that came out of 2022 in -- in Arizona.  If
23   you look at the -- Are we stopping here for a second or
24   are we good?
25             MR. MALONE:  No, just keep going.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                          Pages 82..85
JOSEPH OLTMANN, 12/16/2022

Page 82

1    THE WITNESS: Okay.
2        Q    Well, if it's true that the evidence that you
3    have proves the election was rigged, then it seems like
4    that would contradict evidence that Mr. Lindell claims,
5    because you're        presenting a theory of --
6        A    Why would it?
7        Q    Well, China and Dominion are two separate
8    things, correct?
9        A    Do you know who the private equity firms are
10   that own Dominion, ES&S, and Smartmatic?
11       Q    That's --
12       A    Are you familiar with that?
13       Q    That's not my question, Mr. Oltmann.  Just
14   answer the --
15       A    No, no, no, hold on.  And the same private
16   equity firms also own interest in Stella -- stellar
17   Printing, Runbeck, and Cathedral Corporation, and that
18   they're all the same players.
19       Q    So --
20       A    You also know that the -- the -- the system
21   going down 48 percent, it actually turns out to be
22   almost 70 percent when those systems stopped working in
23   Arizona.  The probability of that happening is next to
24   zero unless you actually interfered with the computers
25   themselves.

Page 83

1        Q    Objection, nonresponsive.
2        A    That's --
3        Q    Are you --
4        A    You asked me about my expertise.  That wasn't
5    nonresponsive, I was answering on the expertise.  I'm
6    also answering on the --
7        Q    No, I asked you if the theories about China
8    conflicted with the theories about Dominion, and you're
9    telling me about Runbeck in Arizona.  I'm just, let's --
10       A    All right, so let's look at the architecture
11   standpoint from --
12       Q    That's not what we're here to discuss.
13       A    But it is, because --
14       Q    I'm trying to understand something else.
15       A    -- Mike Lindell looked at the overall system
16   architecture of fraud across the country.  Now, this is
17   not something that just appeared itself in 2020.  They
18   just knew that there was such a high regard for
19   President Trump.  Now, they have been stealing elections
20   at local bases all the way up to the presidential for
21   decades.
22       Q    Mr. Oltmann, we're going to get back on topic
23   here.  You said that you had never met Tina Peters
24   before coming to the symposium; is that correct?
25       A    Correct.

Page 84

1        Q    You said you spoke with her on the way out?
2        A    I did.
3        Q    That was the first conversation you had?  Was
4    it --
5        A    Yes.
6        Q    Were you on the flight with her out on Mike
7    Lindell's flight?
8        A    I was not.
9        Q    What do you mean you had a conversation with
10   her on your way out, then?
11       A    On the phone.  I had a conversation with her
12   on the phone.  That was the first time somebody gave her
13   my phone number and we connected.
14       Q    Who gave her your phone number?
15       A    I don't recall.  I don't recall.
16       Q    And who did you think was calling you when you
17   received that call?
18       A    Well, I know it happened through Signal, and
19   Signal has this deal where they -- it deletes the
20   messages, and so somebody said, "This person's going to
21   call you," and they hit a thing and Tina hit a thing to
22   -- you know, a -- a message request.  And from there,
23   called her --
24       Q    So -- so someone connected you through Signal
25   and you don't know who that person was?

Page 85

1        A    I don't recall.
2        Q    Okay.  Was it Con    an Hayes?
3        A    No, because I didn't -- the first time I ever
4    met Co    nan Hay s was at the symposium.
5        Q    Okay.  Was it Ron Watkins?
6        A    I, to this day -- actually, that's not true.
7    I have met Ron Watkins.  I met him in -- in Arizona.
8    No, I don't believe it was Ron Watkins.
9        Q    Was it Phil Waldron?
10       A    I -- I could not -- I had had lots of
11   conversations with Phil Waldron, but I don't believe
12   that Phil Waldron was the person that was making
13   connections.
14       Q    Patrick Byrne?
15       A    Absolutely not.  I don't remember.  I just
16   know that it wasn't those people.
17       Q    Seems a little surprising you wouldn't recall
18   who introduced you to Tina Peters.
19       A    Let me explain to you what was happening to me
20   at that time.  I had people coming to my house with
21   guns.  I had somebody send powder to my home in order to
22   terrorize my wife and my daughter.  I sat in the -- in
23   the -- cul-de-sac while hazmat --
24       Q    Okay.
25       A    -- went and cleared my home.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                Pages 86..89
JOSEPH OLTMANN, 12/16/2022

Page 86

1    Q    Mr. Oltmann --
2    A    I have personal security 24 hours a day, seven
3    days a week and had to move them into my home.
4    Q    We'll -- we'll go down this road because
5    you've -- you've tried to change the subject many times,
6    so let's just do it.  Let's get it out there.
7    A    You want to know why I can't actually remember
8    everything that happened at that time when I've got
9    fires that are coming at me from every direction.  I've
10   got to protect my family and I've got to --
11   Q    Let's talk about these threats.
12   A    Yeah.
13   Q    You told Judge Wang on Tuesday that Dr. Coomer
14   had directed these threats at you; do you recall that?
15   A    I believe he did.  I didn't come out at
16   Dominion when I first came out.
17   Q    What is the basis for your opinion?
18   A    I came out the information on Eric Coomer.
19   Q    Yeah.
20   A    And the next day, I -- I literally start with
21   death threats, the next day.  Two days later, I'm in a
22   grocery store --
23   Q    What basis do you have --
24   A    -- when a man walks up to me wearing a mask,
25   walks up to me wearing a mask and threatens me and my

Page 87

1    family, two days afterwards.  By the - - by the end of
2    the week, I now have personal security that's having to
3    watch over my daughter and my son.  I got a guy with
4    binoculars that's over across the street, across my
5    office.  I would say that it was like opening up hell on
6    me, yet I didn't say anything about Dominion.  I said,
7    "This is the guy that said he did what he did."  And at
8    that point, it's either Dominion covering for him or him
9    directing people to come after me.  So that is how I
10   correlated those threats to Dr. Coomer, which by the
11   way, he has a -- he has a habit of doing this.
12   Q    So I'm trying to distinguish between
13   circumstantial evidence --
14   A    Okay.
15   Q    -- and direct evidence, okay?
16   A    Okay.
17   Q    So you would agree that you made the claims
18   about Dr. Coomer publicly, yes?
19   A    I did.
20   Q    And it was a big national news story, correct?
21   A    It was.
22   Q    And a lot of people were paying attention to
23   those claims, weren't they?
24   A    Yes.
25   Q    So --

Page 88

1    A    You think that somebody out of nowhere came
2    out and decided to go -- go find me at my house?  He has
3    full access to all this stuff.  He's connected to
4    Antifa, who by the way had been attacking me for months
5    prior.
6    Q    Mr. Oltmann, I'm asking you for specific
7    evidence you have that these individuals who you claim
8    came to your house and I'm -- I'll take your word at
9    that.  I was there last summer when Mr. Papas gave that
10   sworn testimony.
11   A    You were at my house?
12   Q    No, I was in the courthouse in July of 2021,
13   when Greg Papas took the stand and provided testimony
14   people had came to your house.  I take him at his word,
15   and I take you at your word that these things occurred.
16   What I want to understand is how, what specific evidence
17   other than the fact that you talked about Eric Coomer
18   publicly, I'm asking for specific evidence that ties
19   Eric Coomer to those events.  What evidence do you have
20   that he is in any way directly personally involved with
21   these events that you have experienced?
22   A    Did I come out against Eric Coomer or did I
23   come out against Dominion when I --
24   Q    Objection, nonresponsive.  What specific
25   evidence do you have tying Eric Coomer to the threats

Page 89

1    that have been directed against you personally?
2    A    So you're telling me that all of this stuff
3    coming after me a day after I did that was just happened
4    to be some crazy people?
5    Q    Objection, nonresponsive.  What specific
6    evidence do you have --
7    A    The evidence is the threats and how they came
8    at me over not just the days but the weeks and the
9    months and almost years that have followed.
10   Q    Okay.  So you don't have any direct evidence
11   tying Eric Coomer's threats to --
12   A    I would not say -- I would not say that.  I
13   would not say that.  I would not say that -- no, but
14   direct evidence is kind of a term that you guys like to
15   use in order to say that you have circumstantial
16   evidence.  People have been convicted of murder on
17   circumstantial evidence, and people came after my
18   family.
19   Q    Well, what --
20   A    I lived in a -- I lived in an RV literally
21   with a metal box around me and my wife so we could sleep
22   at night so that nobody shot into the RV while my house
23   was being done.
24   Q    But you don't --
25   A    I had to redo my house to make sure that my

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 90..93
JOSEPH OLTMANN, 12/16/2022

Page 90

1  wife and my family were safe.  I had to put personal
2  security detail on my son at the university.
3      Q    I'm -- I'm aware of all this, Mr. Oltmann.
4      A    No, you're not.
5      Q    Yes, I am.
6      A    You're not aware of it.
7      Q    You've said it many times.  I'm aware of these
8  issues.  You discuss them frequently.
9      A    Yeah.
10     Q    And you've raised them many times in this
11 case.
12     A    Yeah.
13     Q    What I'm trying to understand is how and why
14 you're tying those to Mr. Coomer.  And the reason I'm
15 asking that is because you have many enemies, don't you,
16 Mr. Oltmann?
17     A    No, I don't.
18     Q    Well, I believe you just recently said that
19 the entire Republican party of the state of Colorado is
20 against you; is that your belief?
21     A    That's not true.  I said the establishment
22 hates me.
23     Q    Okay.  So they're --
24     A    You can -- you can actually rephrase it and
25 say, "The establishments that hate you," and the -- the

Page 91

1  answer to the question is yes, because it's a part of
2  the Uni-party that aligns with this radical left
3  ideology.
4      Q    Okay.  How many people are in the
5  establishment?
6      A    I don't know.  No idea.
7      Q    A lot, right?
8      A    I -- I would -- I would venture to say no.  I
9  would venture to say that the talking heads are all put
10 there for a reason.
11     Q    Okay.  And you've also said many times that
12 there are many journalists who are out to get you, and
13 I'm paraphrasing that.
14     A    Show -- show me -- show me where I said that.
15     Q    Well, you've said yourself that Antifa
16 journalists are --
17     A    Show me where I said that.
18     Q    You have referred us to the October 15th --
19     A    You said many times, I said this --
20     Q    Yeah.
21     A    -- so please show me where I've said that.
22     Q    One instance is on October 15th when you made
23 a speech at the Bandimere Speedway saying that you were
24 -- that Antifa journalists were trying to take you down
25 and you were trying to identify      --

Page 92

1      A    That's not what I said either.  That's not
2  what happened and it's not a good characterization of.
3  But you have a computer over there.  You could actually
4  play that video of what I actually said.
5      Q    I don't have all these specific exhibits ready
6  to go,
7           Mr. Oltmann, but answer me this way: do you
8  believe that there are any journalists that have
9  animosity towards you?
10     A    Antifa journalists have animosity toward me?
11 Absolutely.
12     Q    Okay.
13     A    You provide them information regularly on the
14 cases provided for the Coomer versus either Lindell or
15 Coomer versus me.
16     Q    And do you believe that there are individual
17 members of Antifa other than Dr. Coomer, as by your
18 characterization, that also bear animosity towards you?
19     A    I think that this little cabal-ish, little
20 group, fraternity that they've developed in Colorado and
21 across the country called Our Revolution and -- and
22 other groups tied to Antifa, I do believe that they have
23 animosity towards me because I'm tearing down the
24 constructs of their ability to do critical race theory
25 and grooming of our children and -- and stealing our

Page 93

1  elections and our voice.  Yeah, I would say that there's
2  a lot of people that don't want that to happen.  They
3  would love to usher in this Marxist, communist ideology.
4      Q    Okay.  What -- what about Patrick Byrne?  You
5  would agree that he bears a substantial amount of
6  animosity towards you, correct?
7      A    No, I don't think he does anymore.  I think he
8  said a bunch of things because he was mad at me.
9      Q    Okay.
10     A    I don't believe that he's mad at me anymore.
11     Q    What about Jovan Pulitzer?  You would agree
12 that you have a -- a
13 --
14     A    Treasure hunter?
15     Q    -- contentious relationship with Mr. Pulitzer,
16 right?
17     A    Yeah, absolutely.
18     Q    Okay.  What about Lin Wood?  You used to be a
19 member of the FightBack board and he removed you from
20 that board, correct?
21     A    No, I resigned from that board.
22     Q    Okay.  Do you still -- are you still in
23 contact with Mr. Wood?
24     A    I just sent him a text message yesterday.
25     Q    Okay.  What about Doug Logan?  He was

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                           Pages 94..97
JOSEPH OLTMANN, 12/16/2022

Page 94

1  interviewed on your show, and he stated that throughout
2  the Maricopa process, he had gotten a lot of threats and
3  they mostly came from the right, not the left.  Do you
4  recall that?
5      A    No, I don't.  You want to show me where it is
6  said?  Do you have that interview?
7      Q    I don't have that clip with me, I'm just
8  asking you if you recall it.  What about Max McGuire?
9      A    Well, how do -- wait, if you -- if you're
10 saying that I -- that I recall it, let's play it so that
11 I can recall it the same way you do.
12     Q    I can find that clip and provide it for you --
13     A    Okay.
14     Q    -- at a later time.
15     A    Well, I can't answer the question at a later
16 time.  We can answer it here, though, if you want to
17 find it really quick.
18     Q    I will strike the question.  We'll proceed.
19 What about Max McGuire, Mr. Oltmann?
20     A    Max McGuire's been my friend for a long time.
21     Q    Is he still your friend?
22     A    I don't know.  We'll see.
23     Q    What about Madison Marquette?
24     A    Madison Marquette?  Never been my friend.
25     Q    Okay.  What about --

Page 95

1      A    You mean Madison Marquette, the ex-porn star
2  that literally is raising money for child trafficking,
3  but that money never goes to child trafficking, the one
4  that there's an entire video on that basically shows
5  that she's defrauded people all over the country?  That
6  one?
7      Q    That's the one.  That's who I'm referring to.
8  What about, let's see here.  I mean, there are 24 other
9  defendants who have all been sued as a result of
10 publishing your claims about Eric Coomer.  Many of them
11 have faced substantial financial consequences for being
12 involved in this litigation. Did it ever occur to you
13 that some of them might bear animosity towards you?
14     A    That they would bear animosity towards me?
15     Q    Yeah.
16     A    For speaking the truth?
17     Q    No, for getting them sued.
18     A    The truth is the hard roads.  You can sue
19 anyone for anyone -- anything across the entire country.
20 And when you got a judge that literally marches in an
21 Antifa rally and holds up a sign that says she'll burn
22 down the world, and that person overrules a 20-year
23 Judge, which is what happened in the case --
24     Q    Objection, nonresponsive.  I'm just asking if
25 it's occurred to you --

Page 96

1      A    No, this is actually an answer to the
2  question.
3      Q    -- that many of the other defendants may bear
4  animosity towards you.  I'm just trying to understand.
5  There -- we've just gone through a long list of people
6  that you have had a contentious relationship with.  Some
7  of them you've described as hating you.
8      A    And none of those people actually got on a
9  call and said, "Don't worry about Trump.  He's not going
10 to win.  I made fucking sure of it."  None of them
11 except for Eric Coomer.
12     Q    Well, he did not make those statements, but --
13     A    Are you saying he didn't make those
14 statements?  Are you also saying he didn't make the
15 statements that I fabricated all of the posts that were
16 on Facebook and then he subsequently erased those
17 Facebook posts --
18     Q    Mr. Oltmann --
19     A    -- and then told the world they didn't exist?
20     Q    Mr. Oltmann, Dr. Coomer has provided --
21     A    That one?  Or how about the one that ran
22 into --
23     Q    -- sworn testimony regarding this issue.  This
24 is not --
25     A    And I've provided sworn testimony to the -- to

Page 97

1  the affirmative.
2      Q    I'm not going to --
3      A    That everything that I said was accurate and
4  true.
5      Q    We'll move on, Mr. Oltmann.  I'm just trying
6  to establish that you have no direct evidence that
7  Dr. Coomer has been involved in any of the threats
8  against you, and it seems like you've not considered the
9  possibility of many other entities that could have been
10 involved in any of that.  I'm not saying --
11     A    They were -- so do you think they were
12 involved in it on November 7th?  Do you think they were
13 -- or excuse me, November 10th, and then on November
14 11th, November 12th.  They weren't sued at that time.
15 Or how about the fact when they sent powder to my house?
16 How about the fact the FBI never came back to talk to me
17 or the fact that the FBI has now been involved and
18 embroiled in more scandals than they have in the
19 previous 50 years?
20     Q    Mr. Oltmann, you're aware that you and Andrea
21 Hall appeared on an interview on May 5th of last year
22 where you stated that the package that was sent to your
23 house was sent by a window company that was doing work
24 on your property.
25     A    That's not true.



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 98..101
JOSEPH OLTMANN, 12/16/2022

Page 98

1     Q   You know that's on video, right?

2     A   That's not true.  That's not true.  It came
3 from a window company that was doing work in my house --
4 but it didn't come from the window company.  It came
5 from a envelope that had the window company on it that
6 was their old logo from almost a decade ago.

7     Q   Okay.  I'm going to take Mr. Cain up on his
8 suggestion that we take a break.  Let's take five
9 minutes.

10    VIDEOGRAPHER:  Okay.  All right.  Going off the
11 record at 10:53 a.m.

12        (OFF THE RECORD)

13    VIDEOGRAPHER:  On record at 11:05 a.m. and this
14 is still 12-16-2022.  Our witness still is Joseph
15 Oltmann.  Case is still 1:22-CV-0111 -- or
16 01129-WJM.

17 BY MR. KLOEWR:

18    Q   All right, Mr. Oltmann, before we went off the
19 record, we had gotten a little distracted.  I want to
20 get back into the discussion of the symposium, but real
21 quick, if we could go back and just have a couple
22 clarifying questions about a few things we discussed
23 before.  You mentioned at one point that you have a
24 Dropbox that you provide to people with all the
25 information about Dr. Coomer; is that correct?

Page 99

1     A   Yeah.

2     Q   And is there a reason why we haven't been
3 provided a link to that Dropbox yet?

4     A   You actually have.

5     Q   When?

6     A   It's discovery information, so it's all been
7 provided to you in discovery.

8     Q   Okay, so everything that's in that folder is
9 what you provided to us over the last few days?

10    A   I provided more information because as I start
11 collecting more information from other sources, I
12 finally decided after I saw your argument with Judge
13 Wang that maybe I should start creating a depository of
14 information.  So I'm actually in the process right now
15 of pulling down information from every known source,
16 including every bit of information from every different
17 state.

18    Q   So the Dropbox you referred to before, have
19 you provided us all the information that's contained in
20 that Dropbox?

21    A   I have.

22    Q   Okay.  And that's -- those are the e-mails
23 you've sent over the last couple days, including various
24 reports, things of that nature?

25    A   Yeah.

Page 100

1     Q   Okay.

2     THE WITNESS:  You got that too, right?

3     MR. MALONE:  Yeah.

4     A   I also sent back a file to you guys showing
5 that you didn't receive those and then resent them minus
6 the one document.

7     Q   Okay.  And -- and that -- that's the extent of
8 the information that you have on Dr. Coomer in your
9 possession right now?

10    A   In my possession.

11    Q   Okay.

12    A   There's people that have come forward, but
13 those people have not yet signed affidavits, nor have
14 they written any information to me.

15    Q   Which people are you referring to?

16    A   Just people that have come forward to say, "I
17 have information about Eric Coomer," and I was like,
18 "Okay, let's put a -- put a pin in it.  I don't want to
19 hear it right now."

20    Q   Who -- who are those people?

21    A   Just people that other people have brought to
22 me.  I purposely have kept myself away from those
23 particular individuals so that I don't create any sort
24 of connective tissue.

25    Q   You're trying to stay away from people who

Page 101

1 have offered you information on Eric Coomer?

2     A   Yep, I am.

3     Q   Which people are you trying to stay away from?

4     A   Friends of his that he's had in the past,
5 people that he's had relationships with, girlfriends --

6     Q   Like -- like --

7     A   -- ex-wives.

8     Q   Who?  Who are these people?

9     A   I don't know.  I can't recall their name from
10 -- from memory.

11    Q   Okay.  So you don't remember anybody who's
12 come to you with information about Eric Coomer?

13    A   Not with their -- not their names, no.

14    Q   Okay.

15    A   But there's a lot of it out there.

16    Q   You had also mentioned before that you'd be --
17 you could provide us the information from the CD21 promo
18 code if we requested it.

19    A   What information do you want?

20    Q   The revenue that's been derived from the CD21
21 promo code.  And I'm also wondering if you could clarify
22 just which entity it -- it is that's collecting that
23 revenue.  Is that going to CD Solutions?

24    A   It is.

25    Q   Okay.  And then just the last cleanup

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 102..105
JOSEPH OLTMANN, 12/16/2022

Page 102

1  question, you had mentioned at the beginning that you
2  called the Secretary of State to confirm your voter
3  status.
4      A   Yep.
5      Q   Are -- are you referring -- I'm assuming
6  you're not referring to Jena Griswold.  Who did you
7  speak with at Secretary of State's office?
8      A   How relevant is that to this?  Why is it
9  relevant?
10     Q   That's a question --
11     A   Are you doing the dirty work for somebody else
12 that called me?  Because by the way, the -- the Nine News
13 called me too in order to suppress my vote.  I did not
14 vote in Texas.  I still own a house here in Colorado.
15 As a result, I voted here because I did not have full
16 status in Texas.  So if what you're asking me is whether
17 or not you want to deprive me of the ability to vote or
18 to investigate my ability to vote in one state over
19 another --
20     Q   Mr. Oltmann, objection, nonresponsive.
21     A   -- that's irrelevant to this case.  This is
22 about Mike Lindell, this is about My Pillow, and this is
23 about Frank Speech.  That --
24     Q   No --
25     A   That is not directly related --

Page 103

1      Q   Objection --
2      A   -- to any of those three.
3      Q   -- nonresponsive.  Mr. Oltmann, the judge is
4  going to make determinations of what's relevant in this
5  case.  I'm just asking, you stated under oath that you
6  spoke to the Secretary of State about your voter status.
7  I'm asking who you spoke with.
8      A   I said I called the Secretary of State's
9  office.
10     Q   Okay.  And did you -- who did you speak with
11 there?
12     A   I -- I don't -- I don't recall.
13     Q   Okay.  When did you call them?
14     A   Two days before the election when I flew in.
15     Q   And you spoke to a customer service
16 representative or someone of that nature?
17     A   You actually go -- you get on hold first,
18 somebody answers the phone, then it goes through.  You
19 can ask for different sources and resources and then
20 they transfer you to those resources.
21     Q   Okay.  All right.  Let's get back into the
22 timeline here.  We left off, I believe, around the time
23 when you were arriving at the cyber symposium.  We
24 talked a little bit about your call with Ms. Peters.
25 Somebody wanted her to call you.  You don't recall who

Page 104

1  put you in touch.  Why did -- why was someone putting
2  Tina Peters in touch with you?
3          MS. DEFRANCO:  Object to the form.
4      Q   Do you know?
5      A   Can I answer it?  I don't know.
6      Q   What did you discuss with Ms. Peters?
7      A   The 2021 municipal election and the fact that
8  there was huge irregularities and that there was an
9  investigation that she had underway because there was a
10 whole lot of really just uneasy feelings she was getting
11 from dealing with the Secretary of State's office and
12 the fact that they were coming in to cover up those
13 crimes that were committed by Dominion and the Secretary
14 of State's office when they were colluding to build in
15 this trusted bill.  And then she discussed the other
16 information related to other pieces and parts as they
17 did imaging on the system that would lead to uncovering
18 more of an understanding of how they committed the
19 fraud, not just in Mesa County but across the country,
20 and that she felt before that as if the elections were
21 safe and secure, and now she feels as if she's been
22 betrayed and she's betraying the people in -- in her
23 community as a result of that betrayal.
24     Q   Okay, so -- and so you had never spoken with
25 her beforehand?

Page 105

1      A   I had not.
2      Q   Did you know that she had engaged Conan Haye
3  s to help her copy the Mesa County information?
4      A   I did not.
5      Q   Okay.  Did you know that Patrick Byrne was
6  involved with that process?
7      A   You never discussed it with him while you were
8      --
9      A   I did not.
10     Q   -- filming with him in Arizona?
11     A   I did not.
12     Q   He didn't mention to you that -- his contact
13 with Mr. Hayes?
14     A   I did not.
15     Q   Okay.  And I believe you said before that you
16 had not met Mr. Haye    s until the symposium; is that
17 correct?
18     A   I had not.
19     Q   Okay.  You didn't have any communications with
20 him prior to that time regarding the intracounty data,
21 for example?
22     A   I may have been on a call with him.  Symposium
23 was in 2021.
24     Q   It was in August, yes.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                          Pages 106..109
JOSEPH OLTMANN, 12/16/2022

Page 106

1    A    Okay.  So I had not met him until 2021.  I had
2    been involved in several conversations in early 2021 or
3    late 2020 if I recall.  No, early 2021 I think.
4    Q    Okay.  So you never spoke to him at the time
5    when he was involved with the (inaudible)
6    ?
7    A    So I want to clarify, I did not know his name
8    was Con    an Haye s, so --
9    Q    Okay, but you --
10   A    -- I want to be really clear.  He went by a --
11   a deal called CH, so I would -- I was in a Signal group
12   with what was called CH and I didn't know that -- know
13   that was Con    an, nor did anyone ever use his name.
14   Q    Okay.
15   A    And the only time that I had heard his name
16   was from Matt DePerno, and it wasn't in a shining light.
17   Q    And when did this -- when were these
18   communications on the CH Signal channel happening?
19   A    Late 2020 or early 2021.
20   Q    And in addition to Mr. DePerno, who else was
21   involved in that Signal thread, CH?
22   A    Jim Penrose.  I want to say Stephanie Lambert,
23   but I might be putting different conversations together.
24   Q    Doug Logan?
25   A    I had never talked to Doug Logan until I want

Page 107

1    to say mid-2021.
2    Q    Okay.  Do you know if he was involved in the
3    Signal communications on the CH channel?
4    A    Not that I'm aware of, no.
5    Q    Phil Waldron?
6    A    I'm pretty sure Phil Waldron was, yes.
7    Q    Mark Cook?
8    A    I've had conversations with Mark Cook, but I
9    would not say that I had conversations with Mark Cook on
10   those.  But it's -- it would not be -- Mark Cook shows
11   up everywhere.  He's literally everywhere.  Every
12   conversation, every group that I have a conversation
13   with at some point is talking to Mark Cook.
14   Q    Ron Watkins?
15   A    He disappeared, so I don't -- I don't remember
16   when he came into the picture and left the picture.  But
17   --
18   Q    You don't recall if he was part of those
19   conversations in late 2020 on the CH Signal channel?
20   A    No, I don't think he was.  No.
21   Q    You said Mr. DePerno got you involved
22   on that channel. When did you first meet Matt DePerno?
23   A    On January 5, 2021.
24   Q    You met him on the 5th?
25   A    I was being -- I wrote this model for the ways

Page 108

1    that you could -- I call them the big cons, the small
2    cons.  It's a diagram.  And the diagram shows how you
3    can actually inject or manipulate the voting system with
4    Dominion.
5    Q    And this is the flow chart you presented on
6    January 5th at Freedom Plaza?
7    A    Yeah.
8    Q    So you met Mr. DePerno for the first time on
9    the 5th.
10   A    Yeah.  So --
11   Q    In Washington DC?
12   A    When I got to Washington DC, I was asked to go
13   to a hotel. Before I'd gotten there, I had people that
14   were old -- the ex-DNI people, DHS people, people that
15   were actively in DHS.  I had people that were working
16   inside of intelligence community that remained unnamed
17   to this day.  Ex-CIA guys that were -- I don't know if
18   you're ever ex when you're CIA, but they came and
19   started grilling me.  They were grilling me on the
20   information on this model, because I sent the model in
21   late December.  I got involved in that after I was sued.
22   And I'm like, all right, well let's dig in and see if
23   this is even possible.
24   Q    Are you describing the -- the conversations
25   you had at the State Department?

Page 109

1    A    No, that's afterwards.
2         MR. KLOEWR: This was prior to this?
3         THE WITNESS: These are people that came and
4    wanted to validate that -- that I -- I wasn't just
5    coming out of the woodwork saying, I know, I
6    understand the system architecture.
7    Q    And you were having these meetings with these
8    people, with Matt DePerno at the Trump Hotel?
9    A    No.  No.  So I had the meetings with them.
10   One person would come in and another person would come
11   in.  Yeah.  They just sat me down and start asking me a
12   bunch of questions.
13   Q    Who was sending these people to you?
14   A    No idea.  He was wondering, well, is someone
15   else going to come talk to you?
16   Q    Who told you somebody's -- how did you find
17   yourself in a room where ex-security officials were
18   presenting themselves one by one?
19   A    You ever seen Forrest Gump?
20   Q    Yes.
21   A    All right.  So I mean, look, I -- I didn't ask
22   for it.  They just asked me -- I sent the model to a
23   bunch of people, including John -- John Easton.
24   Q    Eastman?
25   A    Eastman, sorry.  And a guy named Terry.  And

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                         Pages 110..113
JOSEPH OLTMANN, 12/16/2022

Page 110

1   then I was having conversations with them about what the
2   system would have to look like in order to create the
3   fraud and to syndicate it.  Then I read all the 5,000
4   affidavits.
5       Q    So why did you send this information to John
6   Eastman?
7       A    I sent him the model.  He said, here's the
8   model --
9       Q    How did you know John Eastman?  I mean, how
10  did you -- what made you think that that Mr. Eastman would
11  appreciate that communication?
12      A    I think -- I don't know who came first, but it
13  was either Phil Waldre    n or it was the ex-CIA guy.
14      Q    Faddis?
15      A    Faddis.  That was Charles Faddis who flew in.
16  It was the weirdest meeting I've ever met with anyone in
17  my life.  Sat down, had dinner with me, and then
18  disappeared, literally disappeared.
19      Q    Was the investigator hired by Sidney Powell to
20  investigate your claims?
21      A    He said he was, but then Sidney Powell said he
22  wasn't.  So then I eventually reached out to Sidney
23  Powell and said, you know, what gives?  Who is this guy?
24  Does he worked with you?  And I actually didn't directly
25  talk to Sidney Powell.  I talked to somebody that worked

Page 111

1   for Sidney Powell.  And that guy said, I'll check with
2   Sidney.  Checked with Sidney.  He says, well, he doesn't
3   work with us, right?  And so then I was a little
4   confused, like, why is this guy flying all the way out
5   here saying he works with her when he doesn't?  And
6   that's when the -- you know, I mean obviously, and --
7   and Greg Papas was there the whole time.  And there's
8   not a time in the -- that 16 months that he wasn't right
9   next to me.
10      Q    So in those meetings you're having on the 5th,
11  if I understand correctly, Charles Faddis or Phil
12  Waldron referred you to John Eastman?
13      A    I think so.
14      Q    You provided a flow chart to John Eastman.
15  John Eastman, then scheduled meetings with you and
16  former security officials who came to speak with you?
17      A    No.  No, I think it -- I think that one --
18  Faddis or Eastman came first.  Eastman might have heard
19  about it through some of these other people, because I
20  was also -- I sent all that information over to
21  Congressman Johnson's office.  I had a conversation with
22  his staff.  I had a conversation with staff at the
23  Congressman in Pennsylvania's office.  There's four or
24  five different congressional offices that were -- that I
25  was providing information to them because they contacted

Page 112

1   me first because they said, well, all these posts for
2   Coomer were all made up based on a December, I think,
3   9th op-ed written by Eric Coomer.
4       Q    So you said Congressman Johnson.  Which
5   Johnson are you referring to?
6       A    Ron Johnson.  Ron Johnson.
7       Q    The senator from Wisconsin, Ron Johnson?
8       A    Let me check real quick.
9       Q    Sure.
10      A    Yeah.  So I can't -- I can get that
11  information back to you if you want me to.  I can tell
12  you who that person is for clarification.
13      Q    Sure.  Yeah.  You mentioned a congressman from
14  Pennsylvania.  Are you referring to Scott Perry?
15      A    I think so, yeah.
16      Q    Any other Congresspeople you met with?
17      A    I didn't meet with them.  I met with their
18  teams.
19      Q    Their staff.  Okay.
20      A    So as I started, because the -- it started to
21  get a little frosty with them because with the people
22  that we're talking, because they said, well, you
23  fabricated all these Facebook posts.  And I think that
24  started around the 10th of -- of December.  It got
25  really, really dicey.  It got really dicey for me from a

Page 113

1   safety standpoint.  So -- so I had to provide all of
2   those posts.  And then I -- somebody asked me to -- to
3   provide another affidavit.  I ended up never -- to not
4   do the affidavit because people just kept then lining up
5   and calling me and e-mailing me.  And one person led to
6   another person.  And so then they said -- I said,
7   listen, I'm going to put this informed for you.  I'm
8   going to show you how the election fraud occurred.  Now
9   again, I wasn't ever dealing with Dr. Shiva.  I didn't
10  deal with the team that was put together.  That was in
11  the other hotel in December.  I did it all based on
12  information that was sent to me.  Manuals, RFPs, RFQs,
13  documents, schematics, videos.  I would take all that
14  information, put it together.  I build out this huge
15  board.  And then from that board, I am able to tell you
16  how the fraud occurred from the machines.  The only thing
17  that was I unsure of was you had this information coming
18  in saying that there was all these signals that were
19  coming in from different countries around the world, and
20  it's how it influenced.  But if you look through the
21  schematics of Dominion and ESMS specifically, that's
22  impossible.  You don't need that because of the up flow
23  from Dominion and ESMS recital --
24      Q    And what you produced, and you shared that
25  with these people?

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                     Pages 114..117
JOSEPH OLTMANN, 12/16/2022

Page 114

1    A    Yeah.  And so I tried to simplify it so that
2    the American people could understand it, and the people
3    that -- that don't understand technology can understand
4    it.
5    Q    So you met Mr. DePerno at that time?
6    A    I sat down on the couch after being grilled
7    for -- yeah, for about six hours, seven hours.  I sat
8    down on the couch and there was a guy sitting down next
9    to me and I look over at him and I go, what are you here
10   for?  And then I just reached out my hand --
11   Q    So it was by chance that you sat next to Matt
12   DePerno --
13   A    I had --
14   Q    -- after meeting with security officials on
15   January 5th, right?  You found yourself on a couch next
16   to Matt DePerno?
17   A    Yes.
18   Q    Okay.  Did he know who you were?
19   A    Nope.
20   Q    Did you know who he was?
21   A    Nope.
22   Q    You weren't -- you hadn't ever reached out to
23   him following the Antrim County report?
24   A    No.  No, but I did shake his hand and I did --
25   I was aware of the Antrim report because the Antrim

Page 115

1    report gave me a -- a deep dive into the imaging, you
2    know, from a very high level.  And so then that was able
3    to validate some of the things that I got from the
4    information from the -- the logs, information I got from
5    the -- the systems chromatics that were -- that were
6    readily available.
7    Q    So how did you find yourself at the Secretary
8    of State's office with Mr. DePerno the next day?  Did
9    somebody refer you there?
10   A    Okay, so that night on the 5th, I went on the
11   stage.  And before that, I had to -- had a meeting with
12   a couple of people.  I think one of them was John
13   Eastman.  Sorry.  I always say that wrong.
14        VIDEOGRAPHER:  Sorry to interrupt.  Does
15   anybody have their cell phone by their -- by their
16   wireless?
17        THE WITNESS:  No.
18        VIDEOGRAPHER:  Sometimes it's -- it's -- could
19   you kind of see if you could space it out.  I'm
20   hearing some kind of buzz from them.
21        Sarah Wells, the FBI, you're on my phone.
22   I'll move it over.  Okay.  So I sat down with them, and I
23   said, let me just tell you what's going to happen
24   tonight with the election with Georgia, the Georgia
25   election, the runoff election.  And they said, all

Page 116

1    right.  I said, the system's going to go down, it's
2    going to come back up.  It's going to start out with the
3    Democrats losing, and it's going to end up with the
4    Democrats winning.  And here's some of the indicators
5    that you're going to have.
6    BY MR. KLOEWR:
7    Q    When you say with them, you're talking about
8    John Eastman?  Who else?  Who's there?
9    A    I don't -- I don't remember the somebody else.
10   And they -- they laughed at me.
11   Q    So was this Mr. Giuliani?
12   A    No, I -- I only sat -- that's a totally
13   different conversation that occurred.  And that was on
14   the 7th.  Excuse me.  No, that was on the 6th.  Jan 6th.
15   That was on January 6th that night.  It was the first
16   time that I had conversations with Giuliani.  And that
17   by itself is -- I -- I -- that'd be a great topic to go
18   through in deposition.  But -- so then I went to -- I
19   was asked to go out on the stage.  When I went out on
20   the stage, as soon as I started talking and we put the
21   model up on the screen, all of the media went dark.  So
22   all the media was up there talking and letting people
23   talk and there were freely disseminating it.  And
24   literally the second that I put that up there, and you
25   can check this from every YouTube video to even direct

Page 117

1    markets, they all went dark.  All of them went down.
2    Q    So that's the information that you went with
3    Mr. DePerno to present at the State Department the next
4    day?
5    A    No, that's actually not even how I ended up at
6    the State Department.  Ended up at the State Department
7    because at 2:00 in the morning I get a phone call from,
8    I think it was either Waldron or, or Eastman or there
9    were several of them.  There's another guy that -- I
10   still can't remember his name that was there.  What was
11   his name?  They called me and said, how'd you know?  You
12   need to come over here to the -- the hotel.
13   Q    With Robert Patrick Lewis?
14   A    Robert Patrick Lewis?
15   Q    First Amendment Victorians?
16   A    I did meet him there, but he wasn't involved
17   in any of this.  He was just security, I think.  He
18   said, how did you know?
19   Q    Dennis Waldman (phonetic)?  Is that who called
20   you?
21   A    No, I only met him once.  I shook his hand and
22   walked away.  And I said, I'm clairvoyant.  I laughed
23   because I was like, this is stupid.  I mean, I could
24   have built this election system in my basement.
25   Q    So Mr. Eastman then put you in touch with

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                     Pages 118..121
JOSEPH OLTMANN, 12/16/2022

Page 118

1   officials at the State Department and said that you need
2   to hear from this guy?
3        A    No.  So then somebody else reached out to
4   somebody in the State Department and they said, you're
5   going to the State Department today.  And that was -- I
6   mean, I just got here.  I don't remember.  I mean, look,
7   it -- it was a blur.  I mean, I'm going to -- I'm going
8   to place and I'm unfamiliar with.  Everyone is talking
9   about power and money, and you have people that are
10  walking up to me saying, oh, you know, there's some
11  great opportunities.  And they're -- they're trying to --
12  it -- it's the craziest environment ever, because I
13  didn't feel like all of these people really cared about
14  whether or not we were looking at what was true and not
15  true in the election.  I think some of them did.  I
16  think John Eastman did.  But there was a lot of people
17  there that were just kind of hanging on and looking for
18  opportunities.  And, you know, I wanted nothing to do
19  with it.  I just -- I wanted to get in, talk about the
20  things that were -- were true.  The stuff that I
21  uncovered inside the system because I got sued, because
22  I doubled down.  As soon as you come after me, right?
23  I'm going to double down.  I'm going to go, okay, well
24  let's -- let's validate it.
25       Q    So why were you sent to the State Department?

Page 119

1   I -- I've never understood what -- what did the State
2   Department -- what interested did they have in this
3   information?
4        A    Because everything that I said was going to
5   happen on the -- on the 5th in the runoff election
6   happened.  Because they -- what happened with Dominion
7   and ESMS and more -- like, I put on Dominion because of
8   the bombacaceous nature of Eric Coomer.  Now, whether or
9   not he is the one that did it all, or he just was knew
10  about it.  Those are the two things that -- that I -- I
11  -- I question.  Like whether or not he is the mastermind
12  or he is just directly correlated to a system they knew
13  was fundamentally flawed.  I don't know.
14       Q    Well, I can understand why, for example, the
15  Department of Homeland Security Department of Justice
16  would want that information.  I don't understand why the
17  Department of State would.
18       A    Why the -- why wouldn't they?
19       Q    Well, they're involved in foreign diplomacy,
20  matters outside the borders of the United States.  I
21  don't understand what role they would play in -- in --
22  in --
23       A    Well, I think it's directly related to
24  national security.  Wouldn't -- isn't it?
25       Q    That's what I'm asking you.

Page 120

1        A    Well, keep in mind that as all this stuff was
2   -- and I don't understand the government apparatus
3   either.  I -- I've never been involved in politics.  I
4   don't particularly like it.  I think it's trash, right?
5   Both sides of the party.  But if you start looking at
6   everyone's duties and responsibilities, everyone was
7   putting their hand in the cookie jar.  I mean, there was
8   no one that wasn't trying to get a piece of what's
9   happening in the country.  It was pandemonium.
10       Q    Okay.  So through these contacts, you and Mr.
11  DePerno were referred to the State Department and that's
12  where you met with Bob Destro and Mike Pompeo?
13       A    I did not meet with Mike Pompeo.  I met with
14  counsel for Mike Pompeo.
15       Q    Okay.  And Bob Destro?
16       A    Bob Destro I do believe was involved in some
17  of the conversations, yes.  I don't know if he was there
18  at the time that we were talking to them.  No.
19       Q    And he presented you the flowchart and
20  explained to him?
21       A    And then -- and then somebody said -- I can't
22  -- I still can't remember that one guy's name.  And I
23  never wrote it down.  He's like a ghost.  And I keep
24  asking everybody what his name is.  I even asked Phil
25  Waldron what his name is.  He's like, well, what's this

Page 121

1   guy look like?  Clean shaven?  Mid-fifties?  So as we --
2   as we sat there, I think it was, here's the diagram and
3   here's the -- here's what happened on January 5th.  Now,
4   either I'm just a really good guesser or I understand
5   that architecture of the system.  I understand that they
6   were basically doing QA in real time.  They were -- the
7   Dominion system was not cooked to do what it did in
8   2020.
9            And in 2022, if you look at the math
10  derivatives, you'll see, if you look at the math and
11  science, you'll see that the charts show that they were
12  able to either use fixed point outcome or PID function,
13  or it's an algorithm that actually created the output on
14  what the -- the election results would be.  Not just at
15  one level, but at every level.  So they were over the
16  last couple years to be able to smooth those edges.  And
17  you can see what happened in Maricopa County,
18  specifically with the 300,000 ballots that were -- that
19  had no chain of custody.  The system is not -- it's not
20  fair, it's not free and it's not transparent.  And I
21  think that when I met with them, I was showing them a
22  transparent look into what is going on inside the
23  system.  So that was --
24       Q    So what was the purpose?  What were they going
25  to do with this information?



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 122..125
JOSEPH OLTMANN, 12/16/2022

Page 122

1    A   I think --
2    Q   What do you expect the State Department to do
3  with that?
4    A   I think it's above my pay grade.  I -- I think
5  that -- I think that we probably should have hit the
6  pause button.  I don't think we'd be here today if we
7  would've hit the pause button and really looked into the
8  -- what really happened across the country in the
9  elections from a state by state basis.  And the fact
10 that we act like elections have autonomy to their state
11 and the states are -- are freely able to have their own
12 system deployment.  But they -- they really, really
13 don't because they're all tied to this system called
14 Eric.  And then Eric has the ability to then freely
15 input --
16   Q   So these concerns, that's why John Eastman
17 helped to arrange in a meeting with you at the State
18 department, with the State Department officials, to
19 raise these concerns?
20   A   Yeah.  So then they asked me to -- present
21 it to the president and I said, I think that's probably
22 not my place.
23   Q   They asked you to, meaning Bob Destro asked
24 you to present this information?
25   A   I don't know if it   was Bob Destro.  I

Page 123

1  mean, I think that's why on January 6th, I'm -- I was
2  going down to meet with Mayor Giuliani.  So when I got
3  down there --
4    Q   So you admit that you spoke to him that
5  evening, what was the nature of that conversation?
6    A   I walked in, I sat down, got asked a bunch of
7  questions, I answered the questions related to the
8  charts and the things that --
9    Q   Were you invited to be there?
10   A   I was, yeah.  Somebody asked.
11   Q   I imagine Mr. Giuliani had a lot to do that
12 night.  And so who -- who referred you to Mr. Giuliani?
13 I guess, how'd you get through the door?
14   A   I don't remember.  One of the talking heads.
15 I mean, one of the people.
16   Q   Okay.
17   A   I don't -- I don't remember who it was.
18   Q   Did somebody tell you Mr. Giuliani wants to
19 speak with you?
20   A   Yes.
21   Q   Go to this room?
22   A   Yes.
23   Q   And that was in the Willard Hotel?
24   A   Yes.
25   Q   And what did you discuss with him?

Page 124

1    A   The stuff that I knew related to the Dominion
2  system and the -- the conversation had quickly shifted
3  from Eric Coomer to system architecture.  And -- and
4  because there was other people working on this, too.
5  You had Dr. Shiva working on it from a different
6  standpoint at this group.  Excuse me.  That was run by
7  the -- this data analyst team that was tied into --
8  these are analysts for the federal government.  Some of
9  them literally I wasn't even allowed to know their name.
10 They sat in an office and was able to break down the --
11 the system handoff, the -- the -- the software handoff,
12 excuse me, the data handoff from Dominion to Citedal
13 and then Citedal          to Edison.  And
14 then I was able to sit with them.  They go, how did you
15 know all the stuff that you know if you didn't have
16 intimate access to all the data?  And I was like, well,
17 I just read, and I understand system architecture.  And
18 so by reading this, they tell you enough and the manual
19 that you put it together and then if you go state by
20 state, those manuals aren't the same.  They aren't the -
21 - the system architecture is not the same.
22   Q   So your discussion with Mr. Giuliani that
23 evening was just about system architecture for Dominion?
24   A   Well, I -- I would love to speak to -- I would
25 love to tell you that more people -- so two other people

Page 125

1  came in and said, Hey, you need to listen to this guy.
2  And I was like -- and he asked me who I was and I'm
3  like, I'm really not anybody.  I'm just a guy that -- I
4  was a tech CEO; I understand this stuff.  I found myself
5  in the middle of this because I stood up in March of
6  2020.  So then I told him about the fact that I got
7  involved during COVID and I just wanted to protect
8  businesses because my friend committed suicide and --
9  and March of 2020, and that's the fire that was lit in
10 me.  And I had my head in the sand for most of the time.
11 So then he kept taking phone calls.  People kept walking
12 in.  Patrick Burn walks in barefoot, sits down, I -- I
13 scoot over and now I have a seat at the table for what
14 can only be described as --
15   Q   Is that the first time you met Patrick Byrne?
16   A   Yes.
17   Q   And that's when he requested Mr. Giuliani --
18   A   No, it's not the first time I met Patrick
19 Byrne.  That's not true.  No, it's not true.  Pause.  On
20 January 5th I met Patrick by, because somebody asked me
21 to go meet them.  They came in to question me that used
22 to work for DNI.  I didn't know who Patrick Byrne was.
23 I googled on my phone and said he was an ex-CEO of
24 Overstock.  I didn't know the correlation between him
25 and President Trump.  Matter of fact, I think the

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                      Pages 126..129
JOSEPH OLTMANN, 12/16/2022

Page 126

1  article that I saw online was that he wasn't that fond
2  of President Trump.  So I was trying to figure out why I
3  was meeting with Patrick Burn at the Trump Hotel, and
4  then somebody took me from the Trump Hotel in the -- the
5  lobby on the 5th.  I think it's the 4th.  I think it's
6  the 4th.  It might have been the 4th.  4th, 5th, 6th all
7  blend together for me.
8          So let's just say the 4th.  So the 4th, I'm up
9  in -- it's 4th or 5th.  I need to have -- it's one of
10  those two days.  I'm up at the hotel, at the Trump
11  Hotel, and he said he wants to meet with me.  They take
12  me up to his room, I sit down, I show him the diagram.
13  I said, listen, this is how the election was -- was
14  influenced.  Here's how you would do it.  Here's the --
15  here's the question we need to ask.  Is it an outside
16  internet access that caused them to be able to then
17  correlate to ballots that were fraudulent or made in the
18  system?  And because the system actually uses --
19      Q    So this is a similar presentation that you've
20  been giving the whole weekend, you gave that to Patrick
21  Burn when you met him as well?
22      A    Yeah.  And he says, well, that's a nice
23  theory.  And I said, sir, that's not a theory.  That's
24  how it happened.
25      Q    And so a couple nights later he walks into

Page 127

1  Giuliani's hotel room barefoot, sits down next to you
2  and asks Mr. Giuliani to arrange a pardon for him; is
3  that correct?
4      A    Yes.  That was the craziest thing ever.
5      Q    What did he say he needed a pardon for?
6      A    That's the 5 billion -- I mean, that's the
7  part where -- that's not just the only time that you get
8  in this circle where there's just, pardon my language,
9  there's just shit happening all around you and you're
10  just wondering why -- like what -- why is that person
11  here?  What are they doing?
12      Q    Yeah.  How did Mr. Giuliani respond?
13      A    He said no, I didn't have a talk with him.  I
14  -- I didn't have any conversation with him.
15      Q    Well, I mean how did he respond to Mr. Burn
16  when he said, I need you to organize it or arrange a
17  pardon for me?  Did he say, okay, I'll see what I can
18  do?  Or did he say get out of my --
19      A    I haven't had a conversation with him.  And
20  then Mayor Giuliani was distracted by a text message
21  that came in from one of his ex-law partners who said
22  something to the effect of, you're a disgrace.  And they
23  started talking about that in front of Patrick.  And
24  then the person behind me -- and then I'm sitting at a
25  table with Christina Bobbs on the other side, and I

Page 128

1  think she's just as bewildered as I am.  Like the
2  conversation is like going off the rails.  It's just not
3  even -- there's no plan.  Like you can -- you can -- you
4  can see that it does not appear in all of this -- this
5  is right after this stuff happened at the Capitol, that
6  nobody had a plan.  Nobody understood what was
7  happening.  It was just -- it was absolute chaos.
8      Q    So you -- it sounds like you don't know why
9  Patrick Byrne was requesting a pardon from Mr. Giuliani?
10      A    Well that's actually why he got pissed off at
11  me.  And that's -- and went after me, because I went
12  public and said, you know -- months later I was like,
13  look, I can't -- I got to ask the question why -- what
14  would you have to do where you'd need a Presidential
15  pardon the day of a -- why would that be the first thing
16  on your mind?  You think the President's actually
17  thinking about that when all this stuff is going on in
18  Washington?
19      Q    So did he keep asking for one?  It sounds like
20  Mr. Giuliani was distracted.  Did he just -- did he
21  stay --
22      A    Yeah, he asked a couple times.  I wasn't the
23  only one there to think to myself, this is crazy, this
24  is nuts.
25      Q    So Giuliani never responded to him?

Page 129

1      A    He said, I'll see what I can do.  I'll talk to
2  him.  I think that's what he said.  Again, I that part's
3  a fog.  The part about asking for a pardon is 100
4  percent, absolutely, that is exactly what happened.
5      Q    And he had a film crew with him at the time,
6  is that right?
7      A    No.
8      Q    Videotaping this?  I thought you had said that
9  he had somebody behind him that was videotaping the
10  whole thing?
11      A    No, there -- I only found out about the video
12  thing -- the video thing because somebody else took a
13  picture of it or something and they said they had a
14  video.  I found out about that later.
15      Q    Okay.  So you didn't see somebody that was
16  videotaping this exchange where Mr. Burn --
17      A    A heavyset guy sitting on the couch that was
18  on his phone like this.  Turns out later he was taking
19  pictures or videos.  And I still to this day have not
20  seen that video.  But I've -- I've asked publicly for
21  that video because I'd like to -- because that's the
22  first thing that came out.  Somebody came out and said,
23  nah, Patrick didn't ask for a pardon.  I'm like,
24  bullshit, and then I even texted some of the other
25  people that were there and said, Hey guys, listen.  Did



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                          Pages 130..133
JOSEPH OLTMANN, 12/16/2022

Page 130

1   -- was I the only one in the room that heard that?  I
2   mean, how do you -- how do you walk away from that?
3        Q    So was Mr. Lindell present for any of these
4   meetings --
5        A    No.
6        Q    Did you ever have any interactions with
7   Mr. Lindell in Washington while you were there?
8        A    No.
9        Q    And we discussed before, you didn't meet him
10  until February, is that right?
11       A    March.
12       Q    Early March of 2021?
13       A    I -- I don't -- yeah, whatever this is.
14       Q    Yeah.  So were you aware that Mr. Lindell was
15  in Washington at the time?  Did you hear about any
16  conversations with them?  Any -- let's -- we -- we've
17  gotten sidetracked here.  Let's get back into this once
18  again, into the symposium.  So you arrived at the
19  symposium, you spoke with Tina Peters on the phone that
20  night?
21       A    Yeah, that day.
22       Q    Okay.  And did you fly in on Lindell's plane
23  to get there?
24       A    No.
25       Q    Did you fly commercial?

Page 131

1        A    I did.
2        Q    Okay.  And --
3        A    Can you tell me what question you asked me to
4   go get information on though?
5        Q    Yeah, I had requests -- well, previously I had
6   -- you got it, Ingrid?  Thank you.  Okay.  So Tina
7   Peters arrived that first night.  Did you speak with her
8   in person once she got off the plane and was there?
9        A    No.  No, no.  I -- and -- and I was given a
10  badge.  I was told that -- so they had metal detectors
11  that when he came in, and said nobody with a weapon come
12  in.  I -- I guess I'm not calling in because I'm not
13  going anywhere without a gun.  And so I went to walk
14  outside.  Somebody came up and said, oh, that's Joe.  He
15  can get through no problem.  He can have a gun on him.
16  So they walked me around the metal detectors, and I was
17  inside with a -- with a weapon.
18       Q    Okay.  So Mr. Lindell was expecting you, it
19  sounds like?  You said he had invited you?
20       A    I don't think he directly invited me.  I think
21  I was invited -- I think it was Sharon Bishop that
22  invited me.
23       Q    So I'm just wondering who made an exception to
24  get you around that, the metal detector?  It seems like
25  they would've been concerned about security.

Page 132

1        A    Yeah, I don't think I was considered a concern
2   or security threat.
3        Q    I'm just wondering.
4        A    I was Perfectly okay leaving.  Like I got
5   there.  I was perfectly okay leaving, but I was not
6   going to walk into a place that I knew nothing about
7   with a bunch of people that could be CIA.  I just was --
8   I -- I do not respect nor do I trust the government
9   apparatus.
10       Q    Yeah, that's fine.  I -- I understand all
11  that.  I'm just asking who -- who, you know, went over
12  management's head to say, Joe Oltmann is a good guy, let
13  him through.  Was it -- did Lindell say, I don't care,
14  he can bring a gun?
15       A    No, he was not -- he was not a part of any of
16  that conversation.
17       Q    But presumably somebody from his team said,
18  this is not a security risk that we're concerned about?
19       A    Yes.
20       Q    Was that Kurt Olson?
21       A    No.
22       Q    No?
23       A    The first time I met Kurt Olson was behind the
24  stage.  We started talking.  He asked me a bunch of
25  questions.  I told him that I would not put Tina Peters

Page 133

1   on the stage, so I became really unpopular to another
2   team that Mike has.
3        Q    They wanted to put her on stage, and you
4   thought that was --
5        A    I think that's the dumbest thing ever.  I
6   think that they should have -- I mean, I -- I'll just
7   tell you, I mean, I don't think that was a good move,
8   right?  Because the -- the people in the audience are
9   going to clap and then she's going to get, you know,
10  more emboldened in what -- where she is.  And then she's
11  going to get anxiety and then that's going to lead to
12  her being more fresh.  It is human nature to do what she
13  -- what -- what happened when she got on the stage.
14       Q    So was Kurt Olsen kind of calling the shots
15  for the symposium then?  Who was on stage and when?  Is
16  that his role?
17       A    No, no, he's -- he's -- he's a really good
18  lawyer.  He's a really, really good lawyer.  And he --
19  he even made the comment that maybe we should, you know,
20  hit the pause button.  But there was just other people
21  that were in that -- that were running it.  And then
22  when she got up there, she actually started doing really
23  well.  I just said, I'm not sure that I would've done it
24  without a little more.
25       Q    So Mr. Mr. Olsen said maybe we should hit the

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 134..137
JOSEPH OLTMANN, 12/16/2022

Page 134

1  pause button?  He said that to you?
2      A    No, he didn't say it to me, but I was allowed
3  to go anywhere I wanted.  So you could -- he was having
4  conversations with people about -- all right, let's --
5  let's -- I mean, lawyers have a tendency to say, when
6  chaos, let's calm it down so you can see all the chips
7  on the board.  And I think that's what he was doing.  He
8  was just trying to -- which is what probably led to
9  there being a pause on the stage and people not going up
10 at certain times, is because he was just trying to --
11 you know, to maybe be a -- a -- a voice of reason and
12 everything that was happening.
13     Q    So he suggested that maybe pausing the
14 symposium would be a good idea?
15     A    I think not pausing the symposium.  Pausing
16 the idea of putting Tina Peters up on the stage.
17     Q    Okay.  And was Mr. Lindell present for that
18 conversation; do you recall?
19     A    No.  I didn't see him during that
20 conversation.
21     Q    Okay.  So who was sort of doing stage
22 management then?  Deciding who was on and who was off?
23     A    You know, Phil -- Phil Waldron was a big part
24 of that deal.  Mark Cook was a big part of the
25 conversations that happened.  I think it was by

Page 135

1  committee.  And you're asking me this question and I'm
2  telling you based on my perception, maybe not how it
3  actually happened, because there are things that -- that
4  I understood about the connection between Dominion and
5  when I was on the stage at symposium that I talked about
6  related to this company called -- man, what's it called?
7  There's so much in my head.  It's -- they built the --
8  the data center for Dominion over in Serbia.  And then
9  how that was connected to the Chinese company and how I
10 was able to go -- I flew to Chicago, and I went to go
11 visit the place at this -- roaming Networks.
12     Roaming Networks said that they had an office
13 just outside of Chicago.  So I flew to Chicago and
14 rented a car and was able to check the fact that Roaming
15 Networks doesn't actually exist and there -- it was a
16 front company, and that even though they said that they
17 were operating out of that office, much like what
18 Dominion does now, where they create these small pop-up
19 offices everywhere, Roaming Networks was never a US
20 based company.  And they had no -- they had no activity
21 at all at that location.  And when I asked a few people
22 that came out of there, Hey, is this the office for
23 Roaming Networks?  Both of those people said that they
24 had no knowledge of what Roaming Networks was, yet that
25 was the address for them.  That's the company that built

Page 136

1  the -- the data center for Dominion offshore.
2      Q    So you were asking -- I'm sorry, I'm not sure
3  where -- I forgot my own question here.  I was asking
4  about stage management, who was putting people on there,
5  and you said Phil Waldre      n had a lot to do with
6  that.
7      A    No, but I said that this is why I got put on
8  stage.  So I got put on stage because I said, Hey, you
9  guys might want this information because they were --
10 they were not going through the PCAP information because
11 -- and I wasn't involved in any of these conversations,
12 so these conversations were absent me.  They were
13 talking about the viability of putting up the PCAP
14 information based on information that they had related
15 to anything that might have been inserted.  I don't -- I
16 don't really -- national security.  I didn't really want
17 anything to do with that conversation, because again,
18 it's not my expertise.
19     Q    So this is the presentation you gave about; I
20 believe the title was Dominion: Serbian Technology with
21 Chinese Characteristics?  This is -- they wanted you to
22 go on stage to present that information?
23     A    Yeah.
24     Q    Okay.  And did you create that slideshow that
25 you presented?

Page 137

1      A    No.  No.
2      Q    Who did?
3      A    Well, a -- a team of people.
4      Q    Okay.  Who are those people?
5      A    So -- so they're my black box.  They're my
6  researchers that do a bunch of work for me and I do a
7  bunch of work for them.
8      Q    Okay.  And who are they?
9      A    Ex-government guys.  They're my sources for
10 what I do on the press side.
11     Q    Ex-government guys, meaning, I mean, like
12 Charles Faddis?  Is he --
13     A    No.
14     Q    -- somebody you're referring to here?  Phil
15 Waldron?
16     A    Nope.
17     Q    Who are you referring to?  I don't understand.
18 These black boxes.  These are people that work for you?
19     A    They don't work for me.  We -- we all
20 volunteer our time and we all put together the
21 information and we all make sure that information -- we
22 -- we -- that's why I told you that there's these
23 documents that are built that -- that allow us to gather
24 information.  We had sources over in -- in the Balkans.
25     Q    Was Josh Merritt a member of that group?

COOMER, PH.D. vs MICHAEL J. LINDELL, et al          Pages 138..141
JOSEPH OLTMANN, 12/16/2022

Page 138

1    A    Josh Merritt is -- is a part of the -- he --
2  he's a guy that, in my opinion, is just working for the
3  government apparatus.
4    Q    All right.  So was he a member of that group
5  that put together slideshow --
6    A    No.
7    Q    -- information for?  Okay.  And so what did
8  you do to verify the information in that slideshow
9  before presenting it on stage?  Had you seen the
10  slideshow before you went on stage to present it?
11   A    Yes.
12   Q    Okay.  When had you seen that before?
13   A    We had been discussing that for several weeks.
14   Q    Okay.  And had Mike Lindell seen that before
15  you went on stage to present it?
16       MR. MALONE:  Object to foundation.
17   A    No, I didn't ask Mike permission for anything.
18  I just said this is some information you probably need
19  to be aware of.
20   Q    So it sounds like Mr. Lindell wasn't aware of
21  what information would be presented at the symposium?
22       MR. MALONE:  Same objection.
23   A    I -- I think he did.  He had a -- but I was
24  not on the schedule to be presenting, so I just was
25  presenting because it was information related that was

Page 139

1  relevant to Dominion and the fraud perpetrated on the
2  people in
3  2020.
4    Q    Is there a reason why the schedule -- you said
5  you weren't on the schedule.  Was there a schedule that
6  -- that was not in effect or what happened there?
7    A    Well, I don't think it was a schedule that was
8  not in effect.  I think that it was a -- it was a thing
9  in motion that kept changing.  And the reason why it
10  kept changing is because the -- more information kept
11  coming in.  I mean, keep in mind, in 2021 we were pretty
12  new.  We were pretty immature as it relates to
13  understanding the system architecture collectively,
14  other than what we've been able to collect from the
15  outside.  But as you got more information on the inside,
16  including the audit, that information led to a better
17  understanding of things that should not have been
18  present, like the SQL Database in Mesa that would --
19  that had election files and election data that was not
20  certified.
21   Q    So some of the things that we've heard that
22  were sort of going on backstage with the schedule
23  changing was concerns about the accuracy of the PCAP
24  data.  Did you hear any concerns about that while you
25  were there?

Page 140

1    A    Yeah.  So I was one of the people that said,
2  "If you're not sure, don't get up there and say you're
3  sure."  So I would say that --
4    Q    Did you say that to Mike Lindell?
5    A    I did.
6    Q    And how did he respond?
7    A    That I didn't get access to the information,
8  and so then I got in the back room and started asking
9  Connan about it.
10   Q    And what did Connan say about it?
11   A    "Yeah, no, no.  It's real.  I have it."  I go,
12  "Show it to me."  It's not like I could have done
13  anything with it.  I just wanted to see it, right?
14   Q    And did he show you?
15   A    No.
16   Q    Why not?
17   A    I don't know.  He said, "Well, you know, I
18  don't -- it's -- there -- there's -- " and I think this
19  is the same time that all the other information was
20  coming forward that there might be something in the
21  PCAPs, that if they divulged it could be -- it could
22  create a -- national incident.  And I think that was
23  said on stage.  So I don't -- but then I just gave up
24  that conversation and gave up the fight of whether to or
25  to not, and then I went into the room with all the

Page 141

1  coders and just started having conversation with them
2  about what they were seeing.  I was trying to protect
3  Mike.  So the whole -- the whole thing that I cared
4  about was making sure someone wasn't trying to walk Mike
5  off a cliff in order to create chaos so that they could
6  discredit all the good information that had come across
7  that showed the fraud in 2020.  It was directly related
8  to Dominion Voting Systems, ES&S and Smart Medic.  And I
9  felt we had enough information --
10   Q    And were you concerned that Con    an Hay
11  s might be walking Mike Lindell off a cliff, as you --
12  as you stated it?
13   A    I don't -- I don't think -- I don't know if
14  Conan Hays was the one calling the shots.  And I don't -
15  -
16   Q    Who was calling the shots?
17   A    Oh, man.
18   Q    Was it Kurt Olsen?
19   A    And Kurt is the attorney --
20   Q    Yeah.
21   A    -- that works for Mike.  I think Kurt is a
22  very honorable man. So again --
23   Q    So was he calling the shots as far as putting
24  the PCAPs on stage?
25   A    I don't think so.  And again, this is where --

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                     Pages 142..145
JOSEPH OLTMANN, 12/16/2022

Page 142

1  this is where my -- there's certain things that you cut
2  off, you do your best you can to gather as much
3  information as possible.  Mike had not permissioned me
4  to give him advice.  Mike had not permissioned me to --
5  to be involved or to try to protect his interest.  So
6  what I was doing was just trying to make sure that what
7  information was provided, that they weren't walking him
8  off a cliff.
9      Q    So was there somebody above both Kurt Olson
10  and Mike Lindell that was calling the shots?
11     A    I don't think so, no.
12     Q    So it sounds like nobody was really calling
13  the shots, or maybe many people were?
14     A    Well, I think Mike -- Mike's in charge.
15     Q    Yeah.
16     A    I mean, it's -- it's -- it's -- mike is the --
17  is the -- is the leader of being able to present this
18  information.  But I think there's a lot of people -- you
19  know, I learned as a CEO, there's a lot of people that
20  give you advice.  Some people give you advice for the
21  right reasons, and some people give you advice because
22  they truly want to walk you to your death.
23     Q    Yeah.
24     A    And so I think that Mike is taking it -- he is
25  such a pure person and who he is that he just, he -- he

Page 143

1  takes people for who they are until they show who they
2  aren't.  And so I think that this is just a case of a
3  lot of people wanting to help Mike, but I think that
4  some people, like Josh Merritt, may not have had the
5  best of intentions.  I don't think Josh Merritt had good
6  intentions.
7      Q    Was Dennis Montgomery present for the
8  symposium?
9      A    No.
10     Q    Where was he?
11     A    In the hospital.
12     Q    What -- was he -- was he supposed to be at the
13  symposium?
14     A    I was told he was, yeah.  But I was -- again,
15  I wasn't privy to those conversations.
16     Q    Okay.  Why was he in the hospital?  Do you
17  know?
18     A    Was he in the hospital?  Was he not in the
19  hospital?  I mean, I don't know.  I don't -- I don't --
20  I -- I think he told everyone he was in the hospital.
21     Q    Do you consider Dennis Montgomery to be a
22  reliable source of information?
23     A    Well, there's two ways to look at Dennis
24  Montgomery as a reliable source.  One, the government is
25  saying a lot of bad things about him, and the government

Page 144

1  says bad things about people that are telling the truth.
2  Now, whether or not he's telling 100 percent of the
3  truth, whether or not his system did or has done what he
4  said, I have never had access to it.  I've never looked
5  at the systems schematics.  I've never had a chance to
6  look at -- under the hood and Documentum, anything like
7  that.  So if you -- if I was given access to that and I
8  had the ability to validate it, I could sit here and
9  tell you 100 percent yes, he's good, or no, he is bad.
10  You know, I know that he has his -- his foibles, he has
11  his -- his things that -- that they say are -- are
12  problematic.  But I think, you know, he had a gambling
13  addiction.  People face other addictions.  And so I
14  don't -- I don't know.
15     Q    Did Mr. Lindell ever ask you to verify
16  Mr. Montgomery's information?
17     A    No.
18     Q    Have you ever offered?
19     A    Recently.
20     Q    And how did he respond?
21     A    Yeah.  Yeah.  I mean, he -- so --
22     Q    Have you begun that process?
23     A    I have not.
24     Q    Do you know when you will?
25     A    Hopefully soon.

Page 145

1      Q    Okay.
2      A    I would really like to put the bed once and
3  for all whether or not this is a -- a viable thing that
4  happened with Dominion, ES&S and Smartmatic.
5      Q    So did you hear concerns that there were
6  people in the crowd who were demanding $5 million award?
7      A    I did not ever hear that, no.
8      Q    No.  Are you aware that Mr. Lindell had been
9  sued for that to --
10     A    No.
11     Q    -- collect that 5 million award?
12     A    I have not.
13     Q    No.  Did you hear any conversations with Mr.
14  Olson discussing that reward and whether it could be
15  given?
16     A    No.
17     Q    Okay.  And you mentioned a couple times --
18     A    You said there's a lawsuit pending?
19     Q    It's my understanding, yes.
20     A    Who -- who's the plaintiff?
21     Q    I am not sure I could say with certainty off
22  the top of my head.  I believe the plaintiff's name may
23  be Alderson, but I'm not certain.
24     A    Alderson?
25     Q    So you mentioned a couple conversations you

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 146..149
JOSEPH OLTMANN, 12/16/2022

Page 146

1  overheard or partook in with Kurt Olson. I'm just
2  trying to understand his role a little better. I know he
3  is the attorney, but it sounds like he was doing a bit
4  of stage management, trying to decide who was going to
5  go on and when.
6       A   Yeah. I don't think he was the one stage
7  managing. I think he was the one just trying to make
8  sure that from a -- from a legal standpoint, that they
9  were -- they were covered.
10      Q   Okay.
11      A   I -- I don't actually understand the full
12 elements behind all of that because I was late to the
13 party.
14      Q   Okay. But it sounds like you overheard some
15 conversations with him at least about whether Tina
16 Peters should go on stage?
17      A   Well, and he's a very smart lawyer, so he --
18 what he said is, "Let's -- let's have a conversation
19 about it and let's not just rush and do that. Let's --
20 maybe not now, right?" And so I think people heed his
21 advice because he's -- he's a good lawyer.
22      Q   So who decided to rush then? Because Tina
23 Peters obviously found her way on stage.
24      A   I -- I wasn't a part of that conversation.
25      Q   Okay.

Page 147

1       A   So I wasn't -- and -- and nor was I asked to -
2  - my -- nobody asked my opinion. And until somebody
3  asked my opinion, I -- I'm not going to just volunteer
4  it.
5       Q   And Mr. Hay     s was sort of behind the
6  scenes the whole time. Was he there throughout the whole
7  symposium; do you recall?
8       A   He was there for part of it. He was there the
9  part when I asked the simple question, "Show it to me."
10      Q   Yeah. And he -- and he refused to do that?
11      A   He said that, "You know, I -- I can show you
12 some parts. Let me show you this." And I said, like,
13 "Well, that's not enough data to -- that's not a lot of
14 data. That -- that data does not tell me anything,
15 right?"
16      Q   So we talked a bit about Mr. Merritt. He had
17 described in his deposition being given a black hard
18 drive by Mr. Lindell that had been given to him he
19 understood by Mr. Hay     s with some information on it.
20 Did you ever see that hard drive?
21      A   If it's the hard drive that was in the room,
22 yeah, I saw it. But I don't know that it came from that
23 -- that line.
24      Q   Okay.
25      A   Nor do I even think -- I mean, look, I didn't

Page 148

1  have direct contact with Mike Lindell other than to
2  shake his hand. Matter of fact, the first picture I
3  ever took with Mike Lindell was a couple weeks ago,
4  right? Or actually, that's not true. About a month and
5  a half ago. So I -- I'm -- I'm not a, you know, take a
6  picture with people. I'm not a, you know, ooh, look at
7  me. I'm a -- I'm actually off that I'm still involved
8  in this. Honestly, I'm just pissed. I'm pissed that we
9  can't seem to get a freaking election right after 22
10 years of talking about the same damn problems. That's
11 what I'm pissed off at.
12      Q   So I bring up Merritt because he described a
13 number of conversations he had had with Mr. Lindell
14 telling him that the information was not accurate. And
15 we've seen some -- some communications between members
16 of the Red Team that were all concerned about the
17 legitimacy of PCAPs, too. Some -- some writings from Ron
18 Watkins, from Phil Waldron discussing the accuracy of
19 those -- that information prior to the symposium. And
20 those exhibits have been, -- have been entered in this
21 case.
22      A   Yeah, but Josh Merritt also -- Josh Merritt is
23 also the guy that got on a podcast and said that he
24 grabbed a hose off of his car and did a tracheotomy on
25 the side of the road for a guy that was in a car

Page 149

1  accident. I mean, which is not only improbable but
2  impossible. So and the fact that he was involved in the
3  Bundy Ranch deal back in 2014, that he was one of the
4  few people not to be indicted in that area as well. I
5  mean, so there's this big cloud over Josh Merritt, over
6  the -- the fact that whether or not he got that -- that
7  -- that hard drive from -- from Mike Lindell, whether or
8  not. I mean, he -- he was a weird guy throughout the
9  entire thing. He was -- he was pretty shady the entire
10 time. Every conversation I had with him was a moving
11 target. The guy was literally, you couldn't pin him
12 down. He was like squishy.
13      Q   So were you present for the conversations that
14 he had with Mike Lindell or that he described?
15      A   I was not, so I can't say those conversations
16 didn't happen. I'm just telling you that the
17 conversations where I would ask him simple questions
18 about the PCAPs or I would ask conversations about,
19 "Hey, didn't you guys have a conversation before this
20 ever happened? And didn't you -- didn't you show up --
21 before the symposium started, did you guys sit in a room
22 and say, 'Hey, we have it, or we don't have it. We're
23 about to go live with a -- deal where you win $5
24 million. If it's not right, you probably want to know
25 that that's right.' Did you have that conversation?" He

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                          Pages 150..153
JOSEPH OLTMANN, 12/16/2022

Page 150

1  wouldn't answer the question. So why would you not
2  answer that question? I'm asking a simple question. I
3  just want to know whether or not I'm getting egg on my
4  face in a place where it is or not real. And he
5  would not answer the question and you would say, "Oh,
6  yeah. I've seen it. I've seen it. I've seen it." So
7  he's telling you that he didn't believe that they were
8  there, but he was telling me that he had seen it, and
9  everything is good.
10      Q    Okay. Let's take a look. Got an excerpt from
11  his deposition testimony.
12      A    Okay.
13      Q    I want to -- this is -- we'll mark this as
14  Exhibit, what are we up to here? 4 -- 47? Okay. This
15  is just one page from that deposition. He didn't recall
16  many interactions with you, but he did describe this
17  one. So at the top here he says, "And then after we
18  left the room, that night was when, what's his name? I
19  can't remember his name right now. Joe -- Joe Oltmann.
20  That was when he handed me a box with a white hard drive
21  in it and I asked, 'What's this box?' And he said, 'It's
22  the Antrim forensic analysis.' And I said, 'Well, what
23  am I supposed to do with it?' And he said, 'Well, I know
24  you've been asking for it.' Because I had previously
25  been asked -- I had previously been asked for the

Page 151

1  legitimate one, but it was under lock by the judge in
2  Antrim. It was never supposed to be public." Do you
3  recall this interaction?
4          (EXHIBIT 47 MARKED FOR IDENTIFICATION)
5      A    No.
6      Q    You don't recall giving him a copy of the hard
7  drive with Antrim information on it?
8      A    I gave him a hard drive.
9      Q    Okay.
10      A    But I never talked about it being locked by
11  the judge. I never talked about any of that stuff. I
12  talked about the fact that this is the drive that was
13  given to me, and I gave the drive to him.
14      Q    So what does that mean, with Antrim
15  information? What -- what information was on this hard
16  drive?
17      A    That was the imaging information that was
18  available on the -- that was sent to me by the lawyers
19  in -- in Michigan.
20      Q    The lawyers in Michigan being Matt DePerno?
21      A    The law firm that represents -- represented or
22  represented with Matt. I think -- I think that was
23  connected to Jim Penrose.
24      Q    Okay. And did you -- did you sign any
25  documents to receive that -- that information? Like did

Page 152

1  you agree --
2      A    I think I --
3      Q    -- to a protective order or anything of that
4  nature?
5      A    I was never given a protective order. Never
6  told him it was under a protective order. I never said
7  anything about it being under a protective order. It
8  was sent to me publicly and freely. I didn't -- they
9  said, "Check this out. It came in an e-mail with those
10  lawyers -- from lawyers."
11      Q    And when did you get that?
12      A    In January of 2021.
13      Q    Is that when you met Mr. DePerno in
14  Washington? Did he give it to you then?
15      A    He did not give it to me.
16      Q    No? Okay.
17      A    He connected me with a law firm that -- that -
18  - that sent that file over to me.
19      Q    After the fact? After you returned to
20  Colorado from Washington, or did you get it at the time
21  when you were there?
22      A    I don't recall. One of the two. But this
23  particular hard drive was -- you know, people asked me
24  for the information. It's the copy that I had of that
25  information. They -- he had asked for it. So Josh

Page 153

1  Merritt had asked for this, so had someone else. And I
2  was like, "Look, you want to see what's real or not
3  real. Validate this."
4      Q    Okay. So -- so who told him -- who told you
5  to give it to him? Who said, "Josh Merritt is looking
6  for this"?
7      A    Josh Merritt is the one that asked me for it.
8      Q    He asked you directly?
9      A    He asked me in a -- in a group for it.
10      Q    Oh.
11      A    A chat for it. And -- and so did Phil
12  Waldron. And I guess they were getting access to, or --
13  and -- and by the way, this is before I even knew
14  anything about the Mesa stuff. So I have no access to
15  the Mesa stuff. Never seen the Mesa stuff. Never
16  looked at the Mesa stuff. Never -- I was asked three
17  questions about the Mesa stuff a month and a half
18  earlier by -- on a chat. Like, "Hey, do you know
19  there's this forensic thing happening in Colorado? I
20  heard it's happening." I said, "I have no idea." I knew
21  there was stuff happening in -- in Wyoming. Knew there
22  was stuff happening in Nebraska. Knew that stuff was
23  happening in Texas, Nevada, Arizona. There's states all
24  over the country where there are county clerks and
25  recorders that were cooperating with this group, but I

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                          Pages 154..157
JOSEPH OLTMANN, 12/16/2022

1  didn't know anything about the one in the Mesa until I
2  got that call from Tina Peters the day that I was flying
3  to the -- the symposium.
4      Q   Okay.  And just to wrap this exhibit up, the
5  next paragraph there he says is, "The firefighters turn
6  off the smoke detector.  I look up on my computer."  Do
7  you recall a fire alarm going off that night?  Were you
8  staying at the hotel where the symposium was held?  I
9  guess is the --
10     A   No.
11     Q   -- first question to ask.  You --
12     A   No.
13     Q   You didn't stay at that hotel?
14     A   No.
15     Q   Okay.
16     A   No, I did not.  I didn't -- yeah, I didn't.  I
17 did not stay in the hotel that they stayed in.
18     Q   Okay.
19     A   I stayed in a hotel that kept me away from all
20 the -- look, after the stuff happened in January, I
21 really didn't want to be in the room with a bunch of
22 people that I didn't know.  And I didn't want to be in a
23 hotel room with people who -- that I had no idea who
24 they were either.  So I stayed at a separate hotel
25 across town.  And it's not that I didn't trust Mike,

1  because I trust Mike implicitly.  It's that I didn't
2  trust them.  I didn't trust what was happening.  I --
3  because I didn't trust it.
4      Q   Okay.  And was Mike Lindell staying at that
5  hotel, do you know?
6      A   I have no idea.
7      Q   Or was he staying where you -- he wasn't
8  staying where you were though?
9      A   No, no.  I think I was the one staying where I
10 was.  I was the only one.  I -- I -- I'm not kidding.  I
11 was 10 miles away.
12     Q   So what sorts of interactions were you having
13 with --
14     A   Do you want that --
15     Q   -- Lindell?  This is -- will be for her.
16 She's says that she wants it.  I mean, did you get
17 dinner with Mr. Lindell during this time?
18     A   No.
19     Q   Were you having any sort of like casual
20 conversations or was it all business throughout this
21 time frame?
22     A   No.  I -- I never went to dinner with him.  I
23 never had any conversations with him other than just a
24 couple of, "Hey, this is what I think.  I think that,
25 you know, Tina should not be -- " so I did say that Tina

1  shouldn't be so public.  It was my opinion that Tina
2  shouldn't have been so public.  That this should have
3  been a - that this was the nail in the coffin, that I
4  felt based on the information they had preliminary had
5  told me, that if they had that information, it aligned
6  with all the stuff that I knew about the system, that
7  this is the thing that nobody's going to be able to walk
8  away from.  And it turns out that they hired Dominion
9  for Rob Rubinstein to tell them there's nothing to see
10 here and it's time drift, which is absolute bullshit.
11 Anyone who knows anything about technology knows that's
12 bullshit, but that's how they explained it away.  And
13 they never talked about the -- the components of the
14 system that were -- that were -- legitimately shouldn't
15 have been there.  Like --
16     Q   So you didn't discuss, for example, the
17 information you were going to put on stage in the panel
18 discussion?  We already talked about the - - the Serbian
19 technology presentation.  Sounds like you didn't provide
20 Mr. Lindell a copy of that before you went on stage?
21     A   I gave it to Phil Waldron.
22     Q   Did you give a copy to Kurt Olsen?
23     A   I did not.
24     Q   Do you know if anybody did?  I know you said
25 you didn't make that slideshow yourself.  Do you know if

1  Mr. Olson had seen a copy beforehand?
2      A   No.  And the first time I ever saw the -- and
3  heard that CoNan did the -- the image was by -- I didn't
4  even know that he was involved in the image, by the way.
5  Nobody told me any of that stuff either, up to this
6  point.  They didn't tell me anything until, is it Ron
7  Watkins started talking about it and Conan's initials or
8  something appeared on the image as they're showing it on
9  -- on the screen, which I was adamantly opposed to doing
10 any of that because now you're -- you're not allowing
11 yourself the -- the ability to cook the cake.  Like you
12 can't cook the cake if you -- if you're letting
13 everybody else see what's -- what -- while it's cooking.
14 There's no ability for you to --
15     Q   Were you in contact with Ron Watkins at the
16 time?  Could you -- like, could you text him and say,
17 "Ron, what are you doing," for example?
18     A   I didn't.  So it doesn't mean --
19     Q   But could you have?  I mean, did you have his
20 number?  Had you met him before?
21     A   On a -- I was on a -- chat deal on Telegram.
22     Q   Okay.
23     A   But I didn't -- I mean there was no -- I'm not
24 a willing participant.  I'm not a guy that got involved
25 in this because I wanted to wake up one day and say, "I

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 158..161
JOSEPH OLTMANN, 12/16/2022

Page 158

1  think it'd be a great idea to fuck my life up."
2      Q   Well, I mean, in this instance you were a
3  willing participant. You flew there, you went on stage,
4  you gave --
5      A   Yeah, because somebody called me a liar and
6  I'm not a liar.
7      Q   Well, let's take a look at another one of --
8  since we've already addressed the Serbian one, let's
9  take a look at what's been labeled as -- previously
10 labeled as Exhibit 3, Clip 8. This is a bit of a long
11 clip, but I want to -- I have a few questions for you
12 about it afterwards. So this is a panel discussion that
13 you partook in with David Clements, Mr. Merritt, who
14 we've discussed, Pat Colbeck and Phil Waldron.
15     A   Yes. I hadn't gotten a haircut in a long time
16 in that picture. I gained 20 pounds in that picture,
17 too. They spelled my name wrong.
18     Q   Geez.
19     A   Yeah.
20         MR. MALONE: You looked a little rough.
21         THE WITNESS: I was rough. It was a rough time
22 for me.
23         (AUDIO PLAYED)
24     A   Pat Colbeck. Is that Pat Colbeck?
25 BY MR. KLOEWR:

Page 159

1      Q   Yeah, from Michigan.
2      A   Is that the end of it naturally or did it just
3  stop?
4      Q   That's -- that's the end of it.
5      A   So Pat -- Pat Colbeck was one of the other
6  people that was behind the stage.
7      Q   And was he doing sort of stage direction,
8  putting folks on?
9      A   He was having conversations with Phil Waldron
10 and them about direction.
11     Q   Okay. How did this discussion come to be?
12 Was that planned beforehand? How much advance notice
13 did you have that you were going to be on stage for this
14 discussion?
15     A   15 minutes.
16     Q   Okay. So I mean, it sounds like there was
17 just no plan for what was going to go on?
18     A   I think they had a plan. I just think that
19 the -- the PCAPs and not having Dennis Montgomery there
20 and not having a full picture interfered with that. I
21 don't -- I don't -- and again, that's -- that's --
22 that's me guessing.
23     Q   Okay. And did you -- I mean, you've sort of
24 alluded to this yourself. It sounds like you were
25 there, and you're involved in all of this because of

Page 160

1  your claims about Dr. Coomer, right?
2      A   Actually, I was told to come there to talk
3  about the system architecture and the things I'd learned
4  about Dominion previously. Coomer just kept coming up
5  and they said, "Hey. Well, let's talk about the
6  connection to Dominion with this Eric Coomer guy. And
7  this is what was said and -- and these -- these are the
8  -- the steps that I took. This is what Eric Coomer
9  said. Here's what information I was able to collect
10 after the fact. Here I am at the -- am hunting. Here's
11 the information that validated what he was saying.
12 Here's what I said happen and here's what we saw happen
13 in the election. And here's where we find out that they
14 own 50 percent of the voting systems across the United
15 States, and that happened in all of them." It was --
16     Q   And it's your belief as you sit here today,
17 that -- that Dr. Coomer played some role in rigging the
18 election; is that correct?
19     A   Yes. You don't brag about fixing the election
20 and then tell me that you're not involved in fixing the
21 election. Now whether or not he has knowledge about the
22 people inside of his company doing it and he just said,
23 "Hey, don't worry about it," and he took credit for it.
24 Eric loves a little Eric. And I've done an immense
25 amount of research on Eric, all the way back. You know,

Page 161

1  if I had to do it all over again, the anger that I feel
2  from someone coming after my family, I'm -- I'm not sure
3  that -- I'm -- I -- I think that I probably would've
4  just shown up at his front door and said, "What gives?"
5  I probably would've done it differently.
6      Q   Well, we'll get into that a little bit when we
7  get -- later this afternoon. I want to try to keep
8  proceeding through the symposium here, but what -- I ask
9  you that question because that's the -- that's the
10 information you were providing to the crowd here at this
11 time. This is what you understand to be evidence of --
12 of Dr. Coomer partaking in some way in rigging the
13 election. That's what you were presenting to the crowd
14 here; is that fair?
15     A   The answer, yeah. He did take a part. And --
16 and I mean, he owns the adjudication process. And if
17 you actually look at all the data related to what
18 happened in Antrim County, what happened in Maricopa
19 County, what happened in Maricopa County the second
20 time, look at the information that came out of Colorado,
21 you can come up with no alternative than that the system
22 of adjudication would have to play a part in that, of
23 which he owns that adjudication process. He is the --
24 the patent holder in it. So he owns the adjudication
25 process, he helped the -- to develop and design the

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                          Pages 162..165
JOSEPH OLTMANN, 12/16/2022

Page 162

1  system by his own admission, he said it. And then all
2  of a sudden now he's -- he's got hands off and never
3  wrote an ounce of code. That's not what he wrote.
4      Q   So when Mr. Clements says he's been accused of
5  something pretty salacious, what he was referring to is
6  the accusation that he partook in rigging the election?
7      A   Yes.
8      Q   And that's -- that's what you understood that
9  you and Mr. Clements in this instance we're -- we're
10 presenting to the audience was evidence of election
11 rigging?
12     A   I don't think there was election rigging. I
13 know there's election rigging. I know that the
14 elections in 2020 and 2022 were stolen up and down the
15 ballot. And it's been -- been done for decades. It
16 started, you know, pretty blatantly in 2018. The fact
17 nobody brought up in 2018 is -- is a -- a little bit of
18 -- beyond me. But I think there's so much chaos that
19 was created that the chaos favors the op not the -- the
20 people. And that's a perfect indication of what
21 happened in 20 -- 2018.
22     Q   Let's take a look at one more clip here. I
23 think this is going to be the last one from the
24 symposium itself. This is going to be Clip 4 from
25 whatever it is, Exhibit 42 or whatever we're on today.

Page 163

1  The new -- new exhibits, new clips. And this is a --
2  this is a presentation that was put on just by
3  Mr. Clements. And I believe it -- it followed
4  immediately after your presentation on Serbian
5  technology. So we'll just show a clip here and then
6  I'll have some questions for you about it.
7          (AUDIO PLAYED)
8      Q   Okay. The man that pulled the trigger. I --
9  did you help Mr. Clements prepare this presentation?
10     A   No.
11     Q   Had you seen it before?
12     A   No.
13     Q   It's a -- it's a lengthy slideshow. Looks
14 like he prepared it and showed it before. I believe he
15 refers to it as the boat trafficking parable. I
16 understand if you don't know the answer to this, but do
17 you know if that was provided to Mr. Lindell prior to
18 the symposium? A copy of this slideshow?
19     A   No idea.
20     Q   Okay. So similar to the Serbian technology
21 one, it was just out there, and somebody asked to
22 present it? Do you know the circumstances of how and
23 why Mr. Clements found himself on stage to present this?
24     A   No. I wasn't involved in that.
25     Q   Okay. So you weren't there when they said,

Page 164

1  "Let's get David up there to do this slide show?"
2      A   Right.
3      Q   Okay. Do you know where Mr. Clements is
4  getting his information about Eric Coomer?
5      A   I didn't see the whole interview, so I don't
6  know what other things he presented. I -- I don't have
7  enough information to say.
8      Q   Has Mr. Clements ever given you information
9  about Dr. Coomer that you didn't have before?
10     A   I don't know. I don't -- I don't know. I
11 mean, he gets information from a lot of different
12 places.
13     Q   Okay.
14     A   And I mean, I got information from other
15 people about Eric Coomer dating all the way back to
16 2008, 2007.
17     Q   But as you sit here today, you don't recall
18 any specific information provided to you by Mr. Clements
19 that was something new that you didn't know about Eric
20 Coomer before?
21     A   I don't know. I don't know if I did or not.
22 I mean, at that point there's a lot of information
23 coming at me from different sources.
24     Q   And you had known Mr. Clements for a while
25 prior to this time, correct?

Page 165

1      A   No. I mean, I think I did for six months
2  prior to that, five months prior to that. But not a
3  whole lot of interaction, no.
4      Q   How did you --
5      A   I would say we're pretty close now.
6      Q   How did you guys first meet?
7      A   On one of his podcasts, I believe.
8      Q   Is that The Professor's Record?
9      A   Yeah.
10     Q   Did you reach out to him saying, "Hey, put me
11 on your podcast. I've got information"? Did he reach
12 out to you and say --
13     A   Yeah. I've never -- I've never reached out to
14 anyone to be on anybody's podcast.
15     Q   So it was him reaching out to you, presumably?
16     A   Yes.
17     Q   To invite you on? And you met through Dennis
18 Hough; is that correct?
19     A   Dennis Hough? Yes. I think so, yes.
20     Q   Yes. And you had worked with Mr. Hough
21 previously with respect to the Hunter Biden laptop, is
22 that right?
23     A   Yes. I met with JP as a result of Dennis.
24     Q   JP being John Penrose?
25     A   John -- John Paul.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 166..169
JOSEPH OLTMANN, 12/16/2022

Page 166

1    Q    Oh, John Paul is the -- the computer store
2    owner that was in receipt of the laptop?
3    A    Yes.
4    Q    And so Mr. Haugh put you in touch with him and
5    then he subsequently put you in touch with David
6    Clements?
7    A    Yes.
8    Q    Okay.  How do you know Dennis Hough?
9    A    Dennis is the computer guy.  He is a Air Force
10   guy, I think.  And I think I met him through Phil --
11   Phil Waldron or Sherrona Bishop.  No, Sean -- Sean
12   Smith.  Through Sean Smith.
13   Q    So you -- well I can get to -- to one of my
14   coming-up questions about Sean Smith.  We're sort of
15   going through all the members of the Red Team here.
16   A    Is that what they call them is the Red Team?
17   Q    Well, that's how we've understood them to be
18   referred to.  With respect to the symposium, there are
19   these -- that's how Mr. Merritt described it.  I believe
20   Mr. Lindell may have as well, but I may be incorrect on
21   that.  I'm just referring to the individuals who were
22   sort of behind the scenes attempting to verify the
23   information prior to that time.  So --
24   A    Yeah.
25   Q    -- we've got Sean Smith, Mark Cook, Ron

Page 167

1    Watkins, Phil Waldron, Mr. Merritt, Lisa Draza as I
2    understand it.  So it sounds like you had met Sean Smith
3    early in 2021 as well and he put you in touch with Mr.
4    Haugh?
5    A    I think I met Sean Smith, yeah, in early 2021.
6    Q    Now before that, and correct me if I'm wrong,
7    you -- weren't you involved in some investigations of
8    the Hunter Biden laptop before the election or shortly
9    afterwards?  I thought you had said that in an interview
10   with Peter Boyles?
11   A    Sure.  I only -- I only got involved in the
12   Hunter Biden laptop deal because they gave me
13   information related to whether or not it was authentic
14   or not.
15   Q    They gave you being Dennis Hough?
16   A    I don't think it was Dennis Hough that gave me
17   access to that originally.  I know that Dennis Haugh
18   introduced me to JP.
19   Q    Okay.
20   A    Because he knew family members of JP and JP
21   was staying in Colorado.
22   Q    Okay.
23   A    And he called me and said, "Will you meet with
24   JP?"  And I was like, "Sure, I'll meet with him."  So --
25   Q    Did he fly out to meet you?

Page 168

1    A    Who?
2    Q    JP?
3    A    No.  He was living there.  He was in hiding in
4    Colorado.
5    Q    Because I believe you described to Peter
6    Boyles in mid-November of 2020 that someone had flown
7    out to meet you to discuss the -- the Hunter Biden
8    laptop.  Do you recall that?
9    A    No.
10   Q    No?  Okay.
11   A    That might have happened, but this was -- no.
12   Q    Okay.  Back to Mr. Clements.  You -- you guys
13   are still -- you just said, I believe, that you guys are
14   pretty close now?
15   A    Who?  I'm sorry.
16   Q    You and David Clements?
17   A    We are.
18   Q    And how frequently would you say you're in --
19   you're in contact with Mr. Clements?
20   A    Once a week, maybe twice a week at times.
21   Q    And mostly calls, e-mails, text messages?
22   A    Go hang out with him.  You know, I -- he --
23   he's a -- I've hung out with him at different places.
24   Q    Okay.  And it sounds like you probably, I -- I
25   know because I've seen the interview you did on The

Page 169

1    Professor's Record, you provided him information about
2    Eric Coomer, right?
3    A    I did.
4    Q    And presumably that's -- that's what he's
5    incorporating into his presentation here is some of the
6    things that you told him?
7    A    Yeah, but you'd have to -- you'd have to show
8    me the entire interview.  So if you show me the entire
9    deal, I could tell you what party he got it from me and
10   what party he got on his own.
11   Q    Okay.  It's a -- it's a 45-minute
12   presentation.  We don't have time for that today.  I'm
13   just trying to sort of understand the nature of your
14   relationship with Mr. Clements.
15   A    He's a good man.
16   Q    Let me see here.  So that -- that brings us
17   pretty close to the end of the symposium.  Do you recall
18   how you got home from the symposium?
19   A    I flew home on a plane with -- on Mike's
20   plane.
21   Q    On Mike's plane.  And who else was on that
22   plane home?
23   A    Sherrona Bishop.  I -- what's the guy's name
24   that -- what's the computer expert?  He was on the
25   plane.  There was five other people on the plane.

Page 170

1    Q    Was that the first time you'd ridden on
2  Mr. Lindell's plane?
3    A    Yes.
4    Q    And what was the mood like on the plane?  Was
5  it people celebrating, or do you recall?
6    A    So after enduring a couple days of just not --
7  trying to figure out what was happening, I listened to
8  the guy who ended up turning on Tina Peters.  He -- this
9  is the most fascinating part about all of this, is that
10  he -- he's the one that said, you know, "We're going to
11  win this," and that - - he started describing all the
12  things that he did in order to assist in getting the
13  image, even though later he said that he was an
14  unwilling participant and -- I forget what that guy's
15  name is.  Robert --
16    Q    Gerald Wood.
17    A    Gerald Wood.  I'm referring to Gerald Wood.
18  The complete opposite of what he wrote is what he said
19  on the -- on the plane.  And then you know, I guess they
20  had raided his house while he was in -- at the
21  symposium.
22    Q    And I believe you described flying home from
23  that, that you stopped in Denver, they dropped you off
24  before continuing on to Grand Junction?
25    A    I think the opposite happened, I think.  I

Page 171

1  think they dropped him off in Grand Junction then
2  dropped me off in Centennial.
3    Q    So was it all Colorado folks then, sounds
4  like?  I mean there's, you mentioned Sherrona Bishop --
5    A    Yeah.
6    Q    -- Gerald Wood.  You said there were several -
7  - a few others, though.
8    A    Yeah, I don't remember who they were.
9    Q    Polly Casen, was she on the flight?
10    A    Polly Casen?  Polly Casen?
11    Q    Ash App, maybe?
12    A    I don't think Ash was.
13    Q    Sean Smith?
14    A    I wish I could remember.  I can ask those
15  people, but I don't --
16    Q    Okay.
17    A    I don't remember.  I do know that I fell
18  asleep as soon as they took off, so I don't think of
19  anyone else on the plane, I crashed out.
20    Q    But you did have conversations with Gerald
21  Wood at least, sounds like?
22    A    Oh yeah.  I wanted to know what was going on
23  with -- like how did it happen.  Want to know -- you
24  know, you're a part of it, you're a part of this team
25  that -- that, you know, did this investigation, tell me

Page 172

1  -- tell me what part you played.  Which is the opposite
2  of what he said he played, so I don't -- I don't know.
3  I don't know what to believe at this point.
4    Q    And was Tina Peters on that flight back?
5    A    I don't believe so, no.
6    Q    Why not, if everybody's going back to
7  Colorado, do you know?
8    A    I think that there was a fear for her safety.
9  So she went into -- and again, I'm -- I'm -- again,
10  you're asking what I think.  I -- I don't know.  I
11  should probably answer I don't know, because I don't
12  know.
13    Q    Okay.  I'm going to show you what we'll mark
14  as Exhibit 48 here.  Got just a couple more and then
15  we'll break for lunch.  I know everybody's getting
16  hungry, I'm just going to wrap up this section real
17  quick.
18        (EXHIBIT 48 MARKED FOR IDENTIFICATION)
19    A    So Counsel has a flight at 6:00, too.  I have
20  a flight at 5:45, so I'd forgo lunch to make sure we
21  can --
22        MR. CAIN:  There's more than just you, in
23  particular the court reporter.  We have to break for
24  lunch, but the sandwiches brought in for
25  folks that need something.  We'll take a short

Page 173

1  break.
2        THE WITNESS:  You going to take a bite of mine
3  first?
4        MR. CAIN:  No.  I'll let you pick which one.
5        THE WITNESS:  Have you ever heard the -- the
6  jellybean story?  Put 100 jelly beans in, one's a bad
7  one.  You still got to just stick your hand in and
8  bite -- eat a jelly bean.
9  BY MR. KLOEWR:







(866) 715-7770
advancedONE.com

Page 178



Page 180

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20    Q    Okay.  So that kind of anticipates the
21 question I was going to ask in a bit, but we can discuss
22 it now.  Do you communicate with Mr. Lindell on Signal?
23    A    I just call him.
24    Q    I mean, we can see many text messages
25 obviously that Mr. Lindell has disclosed between you

Page 179

Page 181

two.  I'm -- I'm wondering if you also utilize Signal
for your communications?
   A    I'm not saying that I haven't before, but it's
not normal, no. It's not normal.
   Q    What are the circumstances when you would use
Signal instead of texting or calling him?
   A    If I did, it would have to be because of
something, you know, that was super security to be
spoken about.  But -- but I mean, I'm -- I'm not sure I
had those conversations with Mike specifically.



Page 182

6      Q      And -- and you're -- when you saying doing it
7  and what makes him a bad guy is that he spoke to the
8  press and said the P-cap information did not add up; is
9  that correct?
10     A      No.  I mean, violating trust is one thing,
11 doing it with and being involved in the problem itself
12 or creating the problem is another.  So Josh Merritt was
13 actively there trying to sabotage and interfere with
14 things that I could see from the outside while he's
15 sitting there saying that -- that there's nothing to
16 these P-caps.  He was the one that said to me that there
17 was validation that happened prior to the symposium, but
18 then was like, "Well, you know -- " and I said, "Well,
19 did you get a chance to see it?"  And he would -- he
20 just was squishy; he wouldn't answer the question.  So
21 he's over here talking to the press, yet he's the one
22 that's in the middle that's supposed to be an expert
23 validating the thing before the symposium ever started.
24 So it feel -- it feels like self-sabotage.  It feels
25 like, again, Mike is being run off a cliff by just some

Page 183

1  really bad people.
2      Q      Mr. Merritt had -- we'll get into -- I guess
3  we can address this now.  Mr. Merritt provided testimony
4  that he was offered $30,000 to come to the symposium to
5  validate this information.  And then when he saw it he -
6  - he had serious concerns about its validity and
7  possible criminal implications being in possession of
8  that information.  So -- well let me ask you this, were
9  you offered any money to -- to be at the symposium?
10     A      Nobody has ever offered me money for -- I
11 don't want anybody's money.  Nobody's offered me money
12 at all, not under any circumstances anybody offered me
13 money to -- I -- I've been offered jobs by people that
14 say, "Hey look, I -- maybe we get you this high paying
15 job," right?  And I'm like, "I don't want a job, I'm
16 good."  So I -- but I've -- and -- and Mike's never
17 offered me anything.  I've never asked for anything.
18 Nobody has ever given me a dollar, not $1 to be in the
19 middle of this.  Not one.  Not -- not people that you
20 don't know, do know, no cash, no nothing.  Nothing.
21     Q      Well you're aware that other people there at
22 the symposium were paid for their time and for being
23 there, right?
24     A      I'm sure.  I'm sure that there were people
25 there that were paid for their time.

Page 184

1      Q      So Phil Waldron never offered you compensation
2  for being there?
3      A      Nope.
4      Q      Never heard a phone conversation or a Signal
5  message from Mr. Waldre    n.
6      A      If he offered me money, I said, "I don't want
7  your money."  And people have offered me money and I was
8  like, "I don't want your money.  I'm sorry, I don't want
9  your money.  I'm going to -- I'm going to do this for
10 the right reasons and I'm going to do it because it's
11 the truth, not because somebody gives me money and then
12 I can be tainted by that money."
13     Q      So who's offered you money that you turned
14 down?
15     A      So Jovan Pulitzer offered me a thing saying
16 that he had some magic system that could do all sorts of
17 crazy stuff and he needed a CEO to run it.  I was
18 offered to be a part of what was happening at the
19 Arizona audit the first time in 2020.  I forget who the
20 person was behind that, but they were working closely
21 with Phil Waldron, or not, excuse me, Phil Waldron.  But
22 Patrick Byrne.  I was offered by people at Tap to get --
23     Q      Just to clarify, these are separate instances
24 the CEO position offered you by --
25     A      Yeah, these are people --

Page 185

1      Q      -- Jovan Pulitzer, it's not related to the
2  Maricopa audit offer?
3      A      Yeah.
4      Q      So it was Patrick Byrne.
5      A      Literally it was a phone call that said, "You
6  know, you're really smart and you could run this.  I got
7  this great opportunity, come run this company.  We'll
8  pay you a bunch of money to do it."  I'm like, "This is
9  silly.  I don't -- I don't -- "
10     Q      So Patrick Byrne offered you a paid position
11 working on the Maricopa audit?
12     A      No.  Someone that was working with Patrick
13 Byrne.
14     Q      Doug Logan?
15     A      Doug Logan.  And I said, "I don't -- " it was
16 a circus.  I mean there was already like 50 cooks in the
17 kitchen.  It was never going to get anywhere with that
18 many people.  And there were people that are doing their
19 - - there for the right reason, people that weren't.  So
20 I flew out there, had a conversation with four or five
21 people and I was like, "I'm out."  Because they -- they
22 had lost credibility when they started leaking stuff.
23 Again, if you -- if you want to know how the cake's
24 built, you build the cake, right?  You don't build the
25 cake while you're telling people that there's poison in

1  the cake and everything else.  You just -- and the more
2  you do that, the less public trust on both sides get
3  developed, and now we're talking about, it's just -- it
4  turns into a hot mess.
5      Q    So how much were you offered to take a role in
6  Maricopa audit?
7      A    I don't know.  I don't remember.  150, 200
8  grand, something like that.
9      Q    For a limited amount of time or just for
10 purposes of the audit?
11     A    To come in and be a consultant.  I don't even
12 know -- there wasn't ever any money that was discussed
13 per se, just, "Hey, we have this X dollars available,
14 it's going to cost us six, seven, eight million dollars
15 to do this deal.  We can cut out a little piece for you
16 to come -- come and consult and talk about what you
17 think you can see."  And I was like, "Yeah, I'm -- I'm
18 not interested in your money, but what I am interested
19 in is helping you.  So if I can help, I'm interested in
20 doing that."
21     Q    So you said you flew to Arizona, had a
22 conversation with four or five people about that --
23     A    Yeah.
24     Q    -- central offer?  And did that include Doug
25 Logan in that group of people?

1      A    No, it didn't.  I didn't meet Doug Logan until
2  -- where did I meet him?  I met him in Arizona.  Oh, the
3  Deep Rig deal is the first time I met him.
4      Q    At the premiere of the film or in the process
5  of filming?
6      A    In the process.  He wasn't at the premier.
7      Q    And you don't recall any of the other
8  individuals who were there?
9      A    There was a guy that I met with that was --
10 that was working on the audit, I did meet him.  He ended
11 up dying a couple months later.  I guess he was one of
12 the auditors.  Remember that guy's name?
13     Q    Not off the top of my head.
14     A    You know what I'm talking about?
15     Q    Is this the guy who died after the Reawaken
16 America event?
17     A    No, this is the guy had COVID, he was in the
18 audit.
19     Q    Is this who Ron Watkins claimed had been
20 murdered?
21     A    Yeah, that guy.  You know what I'm talking
22 about?
23     Q    Yeah.  Was he murdered in your opinion?
24     A    I don't know.  I mean, again, it -- it is -- I
25 don't know.

1          VIDEOGRAPHER:  Can we just pause for a second?
2      Can we move this -- I think your cell phone is
3      interfering --              .
4          THE WITNESS:  Oh, it is.  I'm sorry.
5          VIDEOGRAPHER:  -- nearby.  Okay.
6          THE WITNESS:  Is that better?
7          VIDEOGRAPHER:  Yeah.  Thank you.
8          THE WITNESS:  All right.
9          VIDEOGRAPHER:  Okay, done.
10         MR. KLOEWR:  All right, let's move on here.
11         THE WITNESS:  Hey Charlie, you lied to me, it's
12     got my name on it.  Couldn't eat it.
13 BY MR. KLOEWR:
14     Q    I'll take a bite in the break for you if
15 you're hungry over there.  I can help you out there.
16
17
18
19
20
21
22
23
24
25



Page 190

1     A    This is where I was -- you know, again, I -- I
2  care about Mike, I care about Mike greatly.  I mean --
3  and I would do anything for Mike.  And I think that --
4  that that loyalty is because he has -- he has shown his
5  loyalty to the American people.  He has shown his
6  loyalty to people that would probably step over his dead
7  body if -- if given the opportunity.  And so I didn't
8  feel like Mike had enough people around him that were
9  willing to -- to do things because they just wanted to
10  protect the integrity of what was happening.  And so
11  this was me stepping in saying, "I'm going to help you,
12  Mike."  And, you know -- and by the way, it took -- it
13  took a while for me because I -- I wasn't -- I was
14  telling him that I didn't like everybody on his team, I
15  was questioning maybe some of the people that were on
16  his team, that he hadn't come to the same conclusion.
17  And -- but I didn't want to do so in such a way that I
18  was not allowing him to go through that process.  And he
19  didn't -- he didn't know me.  So I had -- I had work to
20  do to make sure that I did the things that I said I
21  would do and -- and, you know, let him experience what
22  he was going to experience and not feel like I was
23  telling Mike Lindell what to do.  So this was me just
24  taking a humble approach of, "Here's -- here's what I --
25  I'll -- I'm willing to do."  And yeah -- and when he

Page 191

1  didn't answer me, didn't answer me, I finally said, "All
2  right, let's have a phone call."
3     Q    So did you start getting involved in -- you
4  know, you said you need to just conduct the
5  investigation of the Mesa County stuff.  Did you start
6  playing an active role in investigating that
7  information?
8     A    Uh-uh.
9     Q    Did you ever see the scans of the hard drives
10  that were taken by Connan Hays?
11     A    I did not.
12     Q    Have you seen those as you sit here today?
13     A    Have I seen the scans?
14     Q    Yeah.
15     A    The -- the images?
16     Q    Yeah.
17     A    Yeah.  But not in my possession, just as other
18  people were doing the work.
19     Q    Where did you see those and when?
20     A    I was on a presentation on a call, and they
21  were walking through some of the schematics.  I forget
22  who was on the call, but I think it was -- and again, I
23  -- I don't know if this is the person that was on it,
24  but I get invited to these all the time by the way,
25  where someone says, "Hey, I have these cast vote

Page 192

1  records.  Here's what it comes out to, here's how we put
2  it in the system, how it came out."  Or I get sent sub-
3  stacks, I'll read the sub-stack and then I'll try to
4  reach out to that person to see if I can get some
5  information related to whether or not -- where did they
6  get it?  How do I validate the authenticity of the data?
7  You know, do you have a chain of custody on that data?
8  Did you get it from the Secretary of State?  So I'll ask
9  those questions, understanding what the -- the -- the --
10  the chain of custody is.  And then -- so I was on one of
11  those things.  We were doing a presentation and talking
12  about the data.  I think Jeff O'Donnell was involved in
13  it.
14     Q    So you haven't personally analyzed the data
15  that was taken from the Mesa County hard drives?
16     A    No.  No.

Page 193

12     Q    So do you have your communications on Signal
13  set to delete?
14     A    Not for him I don't.
15     Q    Okay.  But you just said you don't have any
16  record of any communications with him through that app?
17     A    Yeah, well it shows up when you set it to
18  delete, it'll -- it'll show up on your phone as set to
19  delete.
20     Q    Okay.
21     A    It'll show you that separately.  So I set most
22  of my stuff up to delete.
23     Q    Okay.  Well talk about that in a little bit, I
24  just want to be sure.  So you said you contact -- you
25  communicated with him sometimes on Signal, but you just

Page 194

1  showed me your app and you have no communications there.
2      A    Yeah, because you can make a phone call
3  through Signal.
4      Q    Okay.  And so there's no records there.  You
5  don't have --
6      A    If you just make a phone call through Signal
7  it doesn't go through the same channels as if it's a --
8  it's a Wi-Fi call, so it's like doing it on -- it -- it
9  doesn't have the same carrier characteristics of calls
10 that, you know, somebody can be listening in on or have
11 access to it.
12     Q    So if you're ever texting with Mike Lindell
13 it's through this standard texting app that we're
14 looking at right here?
15     A    Most often.  I don't have it on this one, so.
16     Q    Okay.  So this takes us sort of away from the
17 symposium time frame.  I want to talk a little bit about
18 your relationship with Mr. Lindell now.  It seems like
19 since the symposium your relationship with Mr. Lindell
20 has grown fairly significantly.  Would you agree with
21 that?
22     A    Yes.
23     Q    And how frequently would you say you're in
24 contact with Mr. Lindell now?
25     A    I don't know, three times a week.

Page 195

1      Q    And are those mostly calls, text messages, e-
2  mails?  How are you communicating there?
3      A    Calls, or I'll fly up and see him.
4      Q    And he's a fairly frequent guest on
5  Conservative Daily?
6      A    I wouldn't say he is frequent, no.  He's been
7  on it several times over the last two years, but no.  I
8  have a lot of guests.
9      Q    When you have Mr. Lindell on the show, do you
10 prepare topics beforehand or is it sort of a
11 freewheeling conversation as we discussed before?
12     A    Mike is a free spirit, so I let Mike speak.
13 Mike speaks about what's happening and he -- you know,
14 he's pretty articulate and he -- he just kind of talks,
15 we let him speak, let him kind of tell everyone what
16 he's thinking.
17     Q    So you don't send over, you know, a list of
18 topics for example, "Here's what we're going to discuss
19 in the interview," it's just, "Come on the show and
20 we'll discuss whatever comes up?"
21     A    Yeah.  And if he finds something he wants to
22 discuss, he -- he may say, "Hey, I want to talk about
23 this."  But again, it's not -- he's not -- I wouldn't
24 say he is on the show as a regular contributor.
25     Q    What about public speaking engagements, have

Page 196

1  you ever engaged in any of those with Mr. Lindell?
2  We've seen some -- some invitations that include both
3
4
5          .  How frequently would you say you -- you do
6  events with Mr. Lindell?
7      A    Infrequently.  So I get invited to stuff all
8  the time and they put me on these things, and I wouldn't
9  say I go to all of them because it's not really
10 something I enjoy.  I'll do it because I think we have
11 to talk about what the state of the nation is, but it's
12 -- I -- I don't -- I mean, I've been at events where
13 he's spoken, I've spoken, but, you know, I don't think
14 it's a normal thing.
15     Q    How many events do you -- do you think you've
16 done with him if you had to guess?
17     A    I don't know.  I've done the Reawaken Tour and
18 he's done different days than I've spoken, so I guess
19 you could call it the same event.
20     Q    Do you recall what the last event is you did
21 with Mr. Lindell?
22     A    No.  I think it was in Grand Junction, I
23 think.  Maybe I'm conflating dates.
24     Q    And your -- your business involvements with
25 Mr. Lindell, your professional involvements are -- have

Page 197

1  grown substantially in the last year too, correct?
2      A    Meaning?
3      Q    Meaning your -- your business related
4  ventures.  So for example, Mr. Lindell is hosting some
5  different information through -- through PIN Business
6  Network; is that correct?
7      A    No.
8      Q    Do you know what COS America is?
9      A    Yes.
10     Q    What is COS America?
11     A    It's an organization that works across the
12 country in order to uncover voter fraud in different
13 states.  So it's a way that they can all communicate
14 information collectively and together.
15     Q    And have you helped him set up his website for
16 that organization?
17     A    No.  No.  I -- no, the answer to that question
18 is no.  I -- I haven't.
19     Q    Has anybody at PIN Business Network helped
20 them with that?
21     A    No.
22     Q    Let's take a look here.  Well, your
23 relationship with My Pillow has grown a bit as well,
24 right?  Are you working more proactively to distribute
25 My Pillow products today than you were a year ago, for

Page 198

```
 1  example?
 2      A   What do you mean am I --
 3      Q   Let's take a look.  We can look at clip six,
 4  that might give a little context to what I'm getting at
 5  here.
 6      A   Okay.  You said don't volunteer information.
 7  See, that is so much a better picture of me, I got a
 8  haircut --
 9          (AUDIO PLAYED)
10      Q   Right, so --
11      A   He has to enjoy my -- my humor, though.  It is
12  kind of funny.
13      Q   So are you selling MyPillows to DCF Guns,
14  then?
15      A   Not yet.  We -- we -- we're going to get a
16  distribution contract for it, but not yet.  We're
17  working on it.
18      Q   What do you mean when you say actively trying
19  to get MyPillows in 23,000 stores across the country?
20      A   So there's companies that have the ability to
21  plug into and sell products.  And what I've told Mike is
22  that, you need to be able to track all of them, but they
23  need to be able to sell it on their website.  So let's
24  say a company wants to sell an e-commerce sell MyPillow,
25  we just have to connect it into -- via API, into his
```

Page 199

```
 1  system.  And then every time they buy a MyPillow, even
 2  if they buy it from -- from Sally's, you know, Truck
 3  Shop, that -- that pillow automatically goes to
 4  distribution at the MyPillow factory.  It's shipped out,
 5  and then that person -- that money that's collected
 6  there, a certain portion of that shoots to MyPillow to
 7  pay for it, and then the money that they keep as their
 8  margin stays with them.  They never have to keep the --
 9  they never have to stock the pillow.  And the pillow is
10  shipped directly from MyPillow, but the transaction
11  happened on that website.
12      Q   And is that sort of service what you do
13  through PIN Business Network for --
14      A   No.
15      Q   -- other clients?
16      A   No.
17      Q   So this is just a -- a -- are you doing this
18  as a favor to Mr. Lindell?
19      A   This part?  Yes.
20      Q   You're not receiving any compensation for --
21      A   For this?
22      Q   -- working to distribute MyPillow across the
23  country?
24      A   I'm not receiving one dollar in compensation
25  for distributing MyPillow across the United States.
```

Page 200

```
 1      Q   No revenue sharing?
 2      A   No.  It's like, you're like, "Why are you
 3  doing this then?"
 4      Q   That -- that is my question.  I'm -- I'm --
 5  I'm skeptical of the claims that this is --
 6      A   Do you read the Bible?
 7      Q   -- out of the goodness of your heart, but --
 8      A   Do you read the Bible?
 9      Q   I do not.
10      A   Okay, sorry.
```



Page 201







Page 206

16    Q    Okay.  Let's take a look at clip seven.
17         (AUDIO PLAYED)
18    A    I don't get to listen to Jovan?  That's not
19  fair.
20    Q    Well, I think you're playing him at triple
21  speed in that episode, so --
22    A    Oh, was I really?
23    Q    -- I don't think anybody's -- needs to listen
24  to that, but that's correct, that's the episode where
25  you're discussing Mr. Pulitzer.

Page 207

1     A    Okay.
2     Q    So tell me, you said "We took over," who's we?
3     A    Our company, PiDoxa.
4     Q    PiDoxa, okay.  So PiDoxa is running the Frank
5  Speech website now or -- or --
6     A    PiDoxa Tech Solutions.
7     Q    Okay.  And what is PiDoxa's role at Frank
8  Speech?  What services do you provide there?
9     A    The backbone behind Frank Speech.
10    Q    What does that mean?  Explain it to me like
11  I'm a dumb lawyer who doesn't understand that.
12    A    Are you a dumb lawyer?
13    Q    In this context, I will accept that
14  designation, yes.  So what does it mean to provide the
15  backbone for a --
16    A    In other words, make sure we do the -- the
17  system management, the stack management, server
18  management for him.  Make sure we have proper pipelines.
19  Make sure we have proper VOD and -- and data
20  infrastructure so that the system is able to operate in
21  a -- -- with multicom complexity, in other words, you
22  can have multiple streams going on at the same time that
23  are live that people can enter or exit.  So the entire
24  infrastructure of what runs, the backbone behind the
25  website, all the equipment, will we run that.

Page 208

1     Q    So you're -- so PiDoxa keeps -- is -- if I go
2  to Frank Speech.com right now, the reason it's going to
3  pull up a live stream and the website is because of what
4  PiDoxa is doing; is that correct?
5     A    Yeah, we -- we manage the -- the
6  infrastructure behind it that makes that possible.
7     Q    And how many people does it take to do a job
8  like that?
9     A    7 to 10 people depending on the day.
10    Q    And those are all PiDoxa employees that are --
11    A    PiDoxa Tech Solutions --
12    Q    -- are doing the work?
13    A    -- yeah.
14    Q    And is that a -- full-time job?  Like -- I -
15  - I presume it would be, but I don't know, you know, if
16  the website goes down, they're going to call you and
17  you're going to be able to resolve that problem in real
18  time?
19    A    Yeah, so I don't resolve the problem.
20    Q    Okay.
21    A    I -- I went through the Documentum and created
22  all the suggestions for how we were going to do the
23  rollover.  And the -- there's two things that we were
24  after, one is a higher degree of stabilization, and two
25  was to make sure that we maximized the effectiveness of

Page 209

1  the site and what it's able to do against making it also
2  cost effective.
3     Q    And I presume -- it sounds like this is a big
4  job that's full- time, as you've just described?
5     A    Uh-huh.
6     Q    I presume Frank Speech is paying for that
7  service?
8     A    They -- they are.
9     Q    Okay.  And have you sort of supplanted
10  Johnston Howse, LLC, or are you working alongside them
11  in that role?  We discussed them before as being the --
12  the original entity that sort of set up the website, and
13  it sounds like you may be doing some of the work that
14  they're -- they were doing.  Is that correct or --
15    A    Correct.
16    Q    Okay.  And are they still involved in that
17  process, or have you taken over?
18    A    We've taken over 99 percent of it so far.
19    Q    Okay.
20    A    So it's a handoffs, there's -- there's still a
21  knowledge transfer that has to happen when you hand over
22  systems.  So that knowledge transfer includes making
23  sure you have the right credentials, that you have right
24  system authorizations and ownership.  So that's the
25  process that that team goes through in order to make



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1 sure that that is able to be accomplished.

2     Q  So have these business relationships cause any

3 personal friction with you and the Frank Speech team?

4     A  No, they're -- the -- the whole team is our

5 team.

6     Q  So Mr. Howse for example, is he working for

7 PiDoxa now or --

8     A  No, he's his own -- that's Lindell TV, that

9 has nothing to do with the Frank Speech platform.

10     Q  Okay.  I'm just trying to understand, if -- it

11 seems like, you know, if -- if you've taken this

12 contract from him, that it -- it seems likely that there

13 could be some -- some tension there.  But it sounds like

14 you're saying there's not?

15     A  No, because I'm not getting paid and --

16     Q  PiDoxa is getting paid, right?

17     A  Yeah.

18     Q  And they're getting paid what Johnston

19 Howse --

20     A  Or even --

21     Q  -- used to be getting paid?

22     A  Oh, no.  No, no, no.  Oh, no.  The -- the cost

23 factor for what we were able to do and produce for Mike

24 and what he was paying previously, without divulging

25 dollars, is almost 70 percent less.

1     Q  Okay.  But your company, PiDoxa, is getting

2 paid?

3     A  They're getting paid --

4     Q  Yeah.

5     A  -- what's called a cost plus contract in order

6 to get the work done.

7     Q  So it's 70 percent less is what Johnson Howse

8 was charging previously, and they're not getting that

9 income now?

10     A  Correct.

11     Q  Okay.

12     A  And their system was -- was -- was poorly

13 engineered, and a lot of that had to do with the fact

14 that they had never done these types of things before,

15 and they didn't have the proper things in place that

16 would allow -- it -- it went down a lot and it had

17 buffering issue -- it had a lot of issues, and so we

18 were able to eliminate those issues in less than three

19 weeks, and then put some -- some stop caps in place that

20 allowed for those systems not to have any -- to have

21 failovers.

22     Q  And PiDoxa's your company that you based out

23 of Texas as you described before, did I understand that

24 correctly?

25     A  Have I based that out of -- no, it has -- so I

1 have an office in Texas, and PiDoxa is based out of

2 Colorado.

3     Q  Okay.  So you work remotely for that entity

4 from Texas?

5     A  Well, I mostly work remotely for the entity of

6 CD Solutions, because most of my time and effort goes

7 into making sure that we have proper structure.  I'm

8 trying to figure out how to be profitable and be a

9 talking head.

10     Q  Okay.  I think that wraps up most of my

11 questions about Mr. Lindell and your relationship with

12 his entities.  I want to shift gears here to discuss the

13 subpoena we issued you and the responses you've provided

14 to that for a little while.

15     A  Okay.

16     Q  This is Exhibit 52.  Okay.  Do you recognize

17 this document, Mr. Oltmann?

18     (EXHIBIT 52 MARKED FOR IDENTIFICATION)

19     A  Sorry, hold on a second.  What is this?

20     Q  Well, this is the subpoena that was issued to

21 you.  I'm asking you if you recognize it.

22     A  I do.

23     Q  Okay.  I'm going to refer you back -- well,

24 let's see --

25     A  I did not receive all these pieces, though.

1     Q  So we discussed that a little bit before.  It

2 sounds like Ms. Hall did inform you that we were

3 attempting to serve a subpoena on you; is that correct?

4     A  Yes.

5     Q  And if I recall correctly, you don't -- you

6 don't remember when you had those communications with

7 her?

8     A  I don't.

Page 214



```
15        Q    Did you speak with anybody on Mr. Lindell's
16   legal team about the subpoena issued in this case?
17        A    I did not.  I think -- I think Andrea did, but
18   I mean, I -- I don't -- I didn't.
19        Q    Did you discuss the documents that you would
20   produce in response to the subpoena with anybody on
21   Mr. Lindell's team?
22        A    All right, can you answer that -- ask that
23   question again please?
24        Q    Yeah.  Did you discuss the information or the
25   documents you had produced in response to the subpoena
```

Page 215

```
1    with Mr. Lindell's team?
2         A    No.  I didn't even know what was in the
3    subpoena, I just knew that there was a request for a
4    subpoena.
5         Q    So when we provided Ms. Hall with a copy of
6    the subpoena, afterwards she didn't give you that?
7         A    When?  When you said that she was substitute to
8    counsel or when --
9         Q    Well, we filed that motion, we got an order
10   from the Court, I believe on September 28th, that
11   allowed us to serve her by e-mail or by certified mail.
12   We sent her that e-mail and that certified mail.  And
13   that's what I'm asking you --
14        A    Yeah, but I'm not -- I'm not --
15        Q    -- did she provide you with that document at
16   that time
17   ?
18        A    I'm not her, so I don't know what you did or
19   didn't give to her.  She did give it to me, she passed on
20   the subpoena to me when she was ordered by the Court to
21   pass on the subpoena to me.
22        Q    Okay, that would've been late September?
23        A    I -- I don't recall the time.
24        Q    Okay.
25            MR. MALONE:  And I just want to clarify that I
```

Page 216

```
1    -- I believe your statement about what the Court
2    order permitted is not accurate.  I don't believe
3    the Court ordered gave you permission to violate the
4    rules of service in Colorado, so I just don't want
5    that to be out there.
6            VIDEOGRAPHER:  Could you move your phone to the
7    other side, please?  Thanks.
8    BY MR. KLOEWR:
9         Q    Well, we'll -- we'll note the clarification.
10   In the e-mail to Ms. Hall, we did specifically quote the
11   language from the order, which expressly allowed service
12   by e-mail or service by certified mail in these
13   circumstances, which we did.  We also served Ms. Hall
14   personally with that subpoena thereafter, when she
15   refused to accept service pursuant to the Court's
16   expressed language.
17        A    She's never -- she never got it served to her;
18   she only got it via e-mail.
19        Q    She did get it via e-mail though, correct?
20        A    I have no idea.  I know that I got it.
21        Q    All right.  Let's take a look at the second to
22   last page of that document.  It's a long document
23   because it provides a lot of instructions for you.
24   There's a supplement that was amended to change the
25   date.  So there's a lot of information there that we
```

Page 217

```
1    don't necessarily need to take a look at, but I'm
2    interested primarily in the documents requested, which
3    is on page 16 of 17 of that document.  And we'll start
4    at the top.  And you provided some responses to these
5    requests yourself acting in, what appears to be a pro se
6    capacity as you represented to the Court and as you
7    represented to us, so I'll hand these out.  I understand
8    this was before your current counsel, Ms. DeFranco, was
9    retained for purposes of this deposition.  So we can
10   kind of compare these side by side here as we proceed.
11   I want to look at what --
12           VIDEOGRAPHER:  Hold on.  Does anyone have their
13   cell phone next to the wire on their lapel?
14           MR. KLOEWR:  It could be me.
15           VIDEOGRAPHER:  Okay.
16           MR. KLOEWR:  Better?
17           VIDEOGRAPHER:  Would you have your cell phone
18   near the wire?
19           MR. MALONE:  No.  It's --
20           VIDEOGRAPHER:  Okay.  All right just must be
21   some interference then.  Okay.
22   BY MR. KLOEWR:
23        Q    Okay.  Now, on Tuesday we had a conference
24   call with the Court, and you told Judge Wang that you
25   had produced everything that exists in response to these
```



Page 218

1  documents. Do you recall saying that?
2      A   Yep, that I have.
3      Q   Okay.
4      A   I did send over more information as it related
5  to the -- the one part about -- related to election
6  fraud.
7      Q   So let's look at the first request here. We
8  requested all written communications with Lindell, Frank
9  Speech, or MyPillow between January 1, 2020, and the
10 present, including but not limited to all communications
11 discussing Dr. Coomer or Dominion Voting Systems. In
12 your written response to us, you stated, "There are
13 none," do you recall doing that?
14     A   Yep.
15     Q   And was that an accurate statement when you
16 made it?
17     A   Yes.
18     Q   Well, Ms. Oltmann, we've just spent the last
19 several hours going through many written communications,
20 e-mails, text messages, between you, Mr. Lindell, Frank
21 Speech, and MyPillow between January 2020, and the
22 present.
23     A   Yes.
24     Q   How do you explain how Mr. Lindell is able to
25 produce all these documents and you're not?

Page 219

1      A   Because he keeps communication, and I don't.
2      Q   You don't keep any communications? You delete
3  all of your text messages?
4      A   I delete every bit of my text messages as it
5  relates to any of this. And -- and if I don't -- if --
6  if it -- if I don't see it as important, if I -- I don't
7  see it as -- as personal, I delete it. If I'm having a
8  conversation with anyone, I delete it. I have the
9  conversation, then I delete it.
10     Q   You're aware that, in the lawsuit filed
11 against you, you have an ongoing duty to preserve
12 evidence in that case, correct?
13     A   None of that is evidence that has anything to
14 do with any of these cases or Coomer?
15     Q   Well, we've seen many communications with you
16 and Mr. Lindell discussing Eric Coomer, haven't we?
17     A   None of -- no. You had someone that says I'm
18 going to talk to Coomer's lawyer in the Coomer v.
19 Lindell lawsuit. That is not related to -- to Coomer,
20 that is related to this suit itself. I -- I don't keep
21 communications -- and -- and by the way, this is before
22 I even saw the subpoena for this specifically, and so I
23 didn't -- I don't keep those communications. I could
24 talk -- I -- I've talked to Mike about, you know, how
25 he's doing personally, I've talked about praying for

Page 220

1  him. I'm sure you have those communications, as well.
2  Those are personal communications, and those are
3  personal things that -- that friends speak about. So I
4  don't keep those communications. I have those
5  conversations with him as if I'm sitting in front of
6  them, and then I get rid of them.
7      Q   So do you have your cell phone set to delete
8  every text message you send automatically? Or do you go
9  through and proactively do that yourself?
10     A   What do you mean proactively do it myself?
11     Q   Well, is your phone deleting your messages for
12 you or are you deleting your messages yourself?
13     A   I delete my message.
14     Q   Okay, how frequently do you do that?
15     A   If I have a conversation with someone and I'm
16 talking about something personal to them, I delete it.
17 I delete that on my personal side, having conversations
18 with people related to conversation I'm having about,
19 they're having a bad day, I delete it.
20     Q   Well, we've looked at some of your business
21 communications as well that are included in here. Is it
22 also your practice to delete business communications?
23     A   What do you mean -- like what? What are you
24 talking about?
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 221

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5      A   -- when -- when I went through e-mails,
6  because Mike does everything over text message, when I
7  went through e-mails, I just put in there MyPillow,
8  Frank Speech, or Lindell, and there was nothing that
9  came up that was even discussing anything other than
10 MyPillow. I had 500, "Here, do you want to buy a
11 MyPillow" in there. I mean I could have produced I
12 guess a MyPillow ad, but that was the extent of it.
13     Q   So you don't -- if -- if you're communicating
14 with Mr. Lindell's on strictly business topics, you
15 delete those as well, even if it happens in a text
16 message?
17     A   I don't do business through text messaging. I
18 don't -- that's not how I do business.
19     Q   Okay.
20     A   I do business by having contracts written,
21 developing plans, make sure you stick to the project
22 plan. That has nothing to do with text messages. I
23 don't do business through text messages.
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 222

Page 224

Page 223

Page 225



```
21      Q    And I believe I heard you say in a podcast one
22  time that you were -- you recorded all your calls with
23  Patrick Burn, for example, is that true?
24      A    Not all my calls, but I record some of the
25  calls.  Have recorded.
```



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 226..229
JOSEPH OLTMANN, 12/16/2022

Page 226

1    Q    And you -- and you still have copies of those?
2    A    No.
3    Q    You've deleted all the calls that you have
4  with Patrick Burn?
5    A    I'm pretty sure, yeah.  I mean, there was
6  nothing substantive about those calls.
7    Q    Have you recorded calls with any of the other
8  defendants in the various lawsuits filed by Dr. Coomer?
9    A    Such as who?
10   Q    Sidney Powell, for example?
11   A    Never had a call with her.
12   Q    Rudy Giuliani?
13   A    Never had a call with him.
14   Q    Anybody working for the Trump campaign?
15   A    Never had a conversation with anybody there.
16   Q    Michelle Malkin?
17   A    Never -- never -- well, that's not true.  I
18  did record a call the first time I had a conversation
19  with her, and then I deleted it.
20   Q    Eric Metaxas?
21   A    Never.
22   Q    We've already said you don't record calls of
23  Mr. Lindell.  Have you record any of your calls related
24  to Frank Speech and the work you're doing with them
25  through the dockets?

Page 227

1    A    No.  No.
2    Q    Clay Clark?
3    A    No.
4    Q    What about Randy Corporon?
5    A    No, he was an attorney for me.  I would not
6  record those calls.  I -- he's a good dude.
7    Q    What about any other hosts at Salem Media?
8  Peter Boyles?
9    A    No.
10   Q    George Brauchler?
11   A    George Brauchler?  I did keep a couple text
12  messages from George Brauchler.
13   Q    No recorded calls?
14   A    No.
15   Q    Deb Flora?
16   A    Never had a conversation with her.
17   Q    Let's see.  How about, like, Steve Lucescu?
18  Any of the folks involved with The Deep Rig --
19   A    No.
20   Q    -- for example?
21   A    Again, my limit to recording a phone call is
22  someone that's going to be an adverse character, like
23  Lin Wood.  I recorded calls with Lin Wood, because Lin
24  would say one thing in public, and he'd do something
25  completely different, and he became very, very

Page 228

1  irrational.  So I would record his calls.
2    Q    Jovan Pulitzer may fall into that category as
3  well?
4    A    Oh, absolutely.
5    Q    So you don't back up your phone in any way?
6  You don't --
7    A    I do not.
8    Q    You're not worried about losing text messages
9  that may be valuable to you by inadvertently deleting
10  it?
11   A    What -- what text messages are valuable?
12   Q    I don't know.  There's all kinds of reasons
13  why people may want to preserve their text messages.
14   A    Why -- why would I want to preserve text
15  messages?
16   Q    Well, that's a good question.  Let's take a
17  look at Exhibit 10.  Now, this is a bit of a long
18  segment, but I'm primarily interested in the last few
19  sentences of this clip.  Now, this is right after Mr.
20  Lindell's devices were seized by the FBI.  This is a
21  Conservative Daily episode from September 14th of this
22  year.  Let's listen to Clip 10.
23        (AUDIO PLAYED)
24   Q    Okay, so you just -- I just asked you if you
25  kept your text messages for any reason.  You said, "Why

Page 229

1  would I do that?"  Here we have a recording of you
2  stating that you back up your phone in the event that
3  you have your devices seized by the FBI so that you can
4  ensure the information that's on there is accurate.
5    A    Yeah.  So here's what you do, and you can go
6  in here and check real quick, so you understand.  There
7  is -- your phone cannot be backed up cause there's no
8  backup.  The only backup that I have is your phone
9  numbers and the contacts.  That's it, and I set it up
10  that way because I don't -- I don't trust government
11  apparatus at all.  I don't trust anything about what
12  they do.  I see what they did to Roger Stone.  I see
13  what they've done to everyone else through January 6th,
14  the lies that they've told.  I've seen all the crimes
15  that they've committed against American people and the
16  fact that they've used the weight of the government in
17  order to enslave and -- and treat people poorly.  So no,
18  I don't trust the government.  I don't trust the
19  apparatus of government.  I think it's here to -- to
20  hurt us and to take -- to treat us like slaves, take 54
21  percent of our money and send it overseas and give it to
22  other people.  I have zero interest in doing what they
23  just did to Jeremy, which is plant grenades on him and
24  say that the guy actually has grenades in his house with
25  no DNA, no fingerprints, and nothing that would have any



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 230..233
JOSEPH OLTMANN, 12/16/2022

1   sort of connective tissue to Jeremy Brown.  Yet they
2   convict him of having access to these -- these grenades.
3   So no.
4        Q    So what you stated here on your podcast was
5   not true?
6        A    No, it's absolutely true, because if anything
7   was on my phone other than the information that I back
8   up, which is only going to be your -- my contacts, then
9   they would have no ability to put anything else on my
10  phone.  So I back it up in such a way that I know -- I
11  know exactly what information would be contained on my
12  phone.  That's the only information on it.
13       Q    And when you go through this process of
14  deleting your text messages and removing everything from
15  your phone, I take it you're taking care to ensure that
16  you're not deleting any evidence that's relevant to the
17  lawsuit against you that's still pending in the Court of
18  appeals?
19       A    I don't have any information.  I've turned
20  everything over to you.  I've turned everything over to
21  you.
22       Q    Well, I understand that, but we discussed
23  before that you have an ongoing duty to preserve
24  evidence in that case.
25       A    What evidence?  I've given you the evidence,

1   and the more evidence that comes out -- the only
2   evidence that's come out is actually damning for your --
3   for your client, not for me.  So I don't have any
4   information related to anything that has happened, and I
5   don't have conversations about things with people, and
6   every time I get on there, it is recorded on -- on
7   Rumble.  I've never deleted a Rumble video.  I've never
8   gone back on anything that I've said.  I've never done
9   anything.  I've made sure that we maintain a record
10  there, and anything else, I make sure I have access to
11  the depositories, and the depositories change.  I call
12  people and say, "Hey, do you still have that information
13  on Ed Solomon?  Do you still have this information on
14  this?"  I make sure they have their information, but
15  I've got to keep my life very simple, and my
16  conversations with my wife are none of your business or
17  none of anybody else's business.  My conversation with
18  my friends are none of your business, and they're none
19  of anybody else's business, and the fact that you guys
20  have leaked stuff to the press to try and make me held
21  out to -- to -- in a harsh light, I'm going to do things
22  ethically.  I'm not going to delete anything that would
23  -- would ever be subjected to or you could grab from
24  somebody else, and I would never say anything that I
25  would not 100 percent say, "Yes.  I said that."

1        Q    So your communications with the Gateway
2   Pundit, for example, you've maintained those, the
3   co-defendant in the first case, your ongoing
4   communications with him.
5        A    What ongoing communications?
6        Q    Well, they've published a number of articles
7   about Dr. Coomer, including many after that lawsuit was
8   filed.
9        A    And you're saying they got all the information
10  from me?
11       Q    Well, I don't know.  I'm just -- I'm just
12  asking.  You -- are you telling me that you have not
13  communicated --
14       A    No, Jim and -- Jim and Joe Hall do not have
15  conversations with me.
16       Q    Okay.
17       A    And in my conversation with them, I gave him -
18  - I gave Joe a hug when he was at the -- the Truth
19  Summit.  It -- I was like, "I probably shouldn't talk to
20  you.  Just wanted to say thank you for the work that
21  you're doing," and I walked away.
22       Q    Okay.  All right.  So you haven't had any
23  communications with any other defendants in that case?
24       A    Since when?
25       Q    Since the -- since the case was filed.

1        A    No, I saw Eric Metaxas at an event in
2   Nebraska.
3        Q    He was recently on your podcast as well,
4   wasn't he?
5        A    Eric Metaxas, talking about his book.
6        Q    Yeah.
7        A    That was the -- that was the limit that we
8   would talk about, and I did say beforehand, "We're not
9   talking about anything other than your book.  This is
10  your book, book, book."  I told everyone there, "I'm not
11  having a conversation with him about anything other than
12  the book," and that's what we did.
13       Q    So the e-mails inviting him on your show, for
14  example, did you delete those?
15       A    No, they actually e-mailed in asking if he
16  could be on the show, and it was a PR firm that I think
17  did it, and I didn't handle it.  None of that
18  information came to me.  It came to someone on the CD
19  team, and their e- mails are preserved, and their
20  e-mails are -- I mean, they're -- they're doing work for
21  the company, and, you know, theirs is -- it's a
22  function.  "Are you going to be on or are you not going
23  to be on?  Send us the files that you want to actually
24  discuss on the podcast," and that's the end of the
25  story.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al          Pages 234..237
JOSEPH OLTMANN, 12/16/2022

Page 234

1    Q    So if the Court of Appeals rules in Dr.
2  Coomer's favor and we go back to the district court and
3  we engage general discovery in that case, we're not
4  going to find -- none of the other defendants are going
5  to have any communications with you.  Is that what
6  you're telling me?
7    A    I think it'd be limited.
8    Q    Okay.  I -- what I -- what I'm asking is --
9    A    So ask me who.  I mean, I don't have any
10 communications with Gateway.  I don't have any
11 communications with the Trump deal.  I don't have any
12 conversations with Giuliani.  I don't have any
13 information with Metaxas. I don't have any with Metaxas.
14 I don't have any information with anyone, any
15 communication.  So yes, to the best of my knowledge, you
16 would have high. That's my -- you might get a high out
17 of this deal.
18   Q    And you understand that you are a witness in
19 at least four other lawsuits involving all these
20 different individuals, including Mr. Lindell?
21   A    No, I'm not.
22   Q    You're here today as a witness in this case.
23   A    You said four other cases.  What four other
24 cases?
25   Q    The lawsuit against Mike Lindell, MyPillow,

Page 235

1  and Frank Speech is one of them.  The case against Randy
2  Corporon and Salem Media of Colorado is another.
3    A    I was never notified that I was a witness in
4  that.
5    Q    Well, you are.
6    A    All right.
7    Q    I would suspect your former counsel,
8  Mr. Corporon, would've advised you of that.
9    A    I think he's waiting for my lawyers to say
10 that we can have a communication of some sort.
11   Q    You're also witnessing the case against
12 Patrick Byrne, the America Project, and Steve Lucescu?
13   A    Oh, you mean that this is all over -- over
14 Eric Coomer?
15   Q    That's correct.  He has five pending lawsuits.
16   A    So it's -- okay.  So you're talking about your
17 lawsuits that you just ran around and frivolously sued
18 everybody.
19   Q    They weren't filed frivolously, but those are
20 the lawsuits that I'm referring to, and the fifth
21 lawsuit being Mr. Clark (phonetic).
22   A    Who -- who pays your bills?
23   Q    Mr. Oltmann, I'm curious.  I'll ask the
24 question here.  We've discussed our -- our Dominion
25 agreement previously.  We did not have a relationship

Page 236

1  with Dominion, Mr. Oltmann.  Let's see.  Let's proceed.
2  So with respect to those other proceedings, are you
3  deleting all your communications with all those
4  defendants as well?
5    A    I don't have any communications with those
6  defendants.
7    Q    That's -- that's not in response to my
8  question.  If you have communications with them, are you
9  deleting those as well?
10   A    No.  Anything that has to do with the lawsuit,
11 I would not delete.  No.  No, anything that would be
12 even remotely.
13   Q    Let's move on to Question Number 2.  "All
14 written communications with David Clements between
15 January 1, 2020, and the present, including but not
16 limited to all written communications regarding --
17 discussing Dr. Coomer or Dominion Voting Systems."  Is
18 it your testimony here today that you delete all
19 communications with Mr. Clements as well?
20   A    Yes.
21   Q    So there is not a single e-mail, text message,
22 or any -- any other form of communication that exists
23 with Mr. Clements?
24   A    Yeah, I think I actually messed up on this,
25 because I missed the word including.  I thought it was

Page 237

1  related to Eric Coomer, because I have a couple of
2  e-mails from him that are not -- that are not related to
3  Eric Coomer or Dominion.
4    Q    Okay.  Well, in that case, we'll be looking
5  for supplemental disclosure, including those
6  communications, because we are seeking all
7  communications from Mr. Clements.
8    A    All right.  So I -- I do have some
9  communications with David Clements.  I missed the "But
10 not limited to all written communication discussing
11 Dr. Coomer or Dominion Voting Systems."
12   Q    All right.  Let's take a look at Number 3.
13   A    Yeah.
14   Q    "All documents and communications authored,
15 sent, and received by you concerning any compensation
16 for your employment, time, expertise, labor, or training
17 of others related to the Cyber Symposium."  We discussed
18 this a bit before.  As I -- it's my understanding you
19 were not offered any compensation for your time at the
20 symposium?
21   A    I was not.  I mean, someone probably offered
22 something at some point, but I did not, because I've
23 been offered several times in different areas, but I
24 declined.
25   Q    What does that mean?  Who -- who would've



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 238..241
JOSEPH OLTMANN, 12/16/2022

Page 238

1  offered you?
2      A   I don't know. I just declined. I just don't
3  -- I don't take money from people.
4      Q   So Phil Waldron told you that he would -- that
5  you would be paid $30,000 to speak at the Cyber
6  Symposium?
7      A   He never said that. No. No, nobody ever said
8  that to me. I mean, people -- and -- and how you relate
9  it to the Cyber Symposium, I don't think at that time
10 anybody -- I think at that time, everyone already knew
11 that I was not interested in taking money from someone.
12     Q   And you appeared at the symposium and skipped
13 your deposition in your case?
14     A   I skipped my deposition because you wanted me
15 to have it in the courthouse, because you wanted me to
16 disclose something so you could weaponize the Court
17 system in order to have me thrown in jail for not
18 disclosing what any normal person with any sort of
19 ethics would not disclose.
20     Q   You were sanctioned roughly $32,000 for that
21 in conjunction with other discovery violations. Is that
22 right?
23     A   Work discovery --
24         MS. DEFRANCO: Objection. Relevance.
25     Q   I'm -- I'm just trying to understand, you

Page 239

1  know, the -- the finances here. I -- I appreciate your
2  statements regarding the kindness with which you're
3  doing all these things for Mr. Lindell, but to accept no
4  compensation to appear onstage at an event that's
5  promising $5 million if the information can be falsified
6  and to on the flip side be sanctioned more than $30,000
7  for that event strikes me as unlikely. So I'm just
8  trying to understand to confirm that that's actually
9  what occurred.
10        MS. DEFRANCO: And that's asked and answered.
11     A   Wait a minute. You -- you think that -- you
12 don't read the Bible, either, so there's that. That's
13 kind of shocking to me.
14     Q   That is neither here nor there, Mr. Oltmann.
15 Let's proceed to Number 4. All documents and
16 communications between you and any other members of the
17 so-called red team at the Cyber Symposium, including but
18 not limited to all documents and communications between
19 you and Phil Waldron, Doug Logan, Conan Hays, Ron
20 Watkins, AKA CodeMonkey, Mark Cook, Sean Smith, Josh
21 Merritt, and/or Lisa Draza. Now, this one, you provided
22 a slightly different answer. In this case, you
23 objected. You objected on First Amendment grounds, but
24 you concluded your objection by saying, "Notwithstanding
25 these objections, without waiving and subject to the

Page 240

1  foregoing, deponent will conduct a reasonable search of
2  his records or kept in a normal course of business for
3  responsive documents." Have you conducted that search?
4      A   No.
5      Q   And you have no communications whatsoever with
6  any of these individuals?
7      A   I don't. I think I -- I think I missed this,
8  though. I did not run the -- I ran it. So Lisa is not
9  listed under Draza. So some of these people have e-mail
10 addresses that they could have sent me something, but
11 during that time I looked for Cyber Symposium -- so just
12 to be clear, they would send me something. They would
13 send it from ProtonMail, so their name doesn't show up
14 during that time. So I would have no way of looking up
15 some of these people, like Draza has a ProtonMail e-
16 mail, and Mark has a ProtonMail e-mail. So they don't -
17 - they don't operate with an e-mail that goes back to
18 them. So in looking through, I didn't have any
19 information related to that.
20     Q   So it sounds like you are e-mailing folks with
21 some frequency, and we've seen a lot of e-mails that you
22 send in this case and other cases. Are you also deleting
23 all of your e-mails?
24     A   No, and I don't e-mail people with -- with --
25 I like to talk to people on the phone.

Page 241

1      Q   Well, it sounds like you've compiled a lot of
2  documents and done a lot of research. It's -- you're
3  telling me you do none of that with the benefit of e-
4  mail?
5      A   I don't do the benefit of e-mail, because I
6  want to make sure that whatever information I'm getting,
7  I can be able to validate, and I don't -- I don't -- so
8  no, I don't. I don't do a lot of communication related
9  to this via e-mail.
10     Q   Let's talk a little bit about a few of these
11 characters. Mr. Waldron. When did you first meet Phil
12 Waldron?
13     A   In Washington, DC, I think.
14     Q   When you were out there on January 5th?
15     A   Yes.
16     Q   You never spoke to Mr. Waldron before that
17 time?
18     A   I did talk to him before that time. I talked
19 to him in December as well, but I didn't meet him until
20 January of 2021.
21     Q   I don't know if you heard Mr. Giuliani's
22 deposition testimony, but he stated that all the
23 information he had about Dr. Coomer came to him through
24 Phil Waldron. Do you recall that?
25     A   Can you say that again, please?

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 242..245
JOSEPH OLTMANN, 12/16/2022

Page 242

1    Q    Mr. Giuliani has told us that his information
2  about Dr. Coomer came from Phil Waldron.
3    A    That's what he said?
4    Q    Yes.
5    A    Okay.
6    Q    You don't -- you didn't hear that testimony at
7  the time, or you haven't reviewed that?
8    A    No.
9    Q    Do you --
10   A    I -- I can't tell you if that's accurate or
11 not, because I don't have it in front of me.
12   Q    Did you discuss -- were you aware that
13 Mr. Waldron was getting your information to Mr. Giuliani
14 at the time?
15   A    I was not.
16   Q    And in The Deep Rig, Mr. Waldron says that
17 your claims about Eric Coomer are why the Allied
18 Security Operations Group first began looking into
19 Dominion. Do you recall that portion of the film?
20   A    I don't.
21   Q    Would that comport with your understanding of
22 --
23   A    I don't think that that's what he said in the
24 -- in the movie.
25   Q    I don't have a clip here, but --

Page 243

1    A    I don't think that -- I mean, you're -- you're
2  asking me to say that -- something that I don't believe
3  that's in the movie. I don't believe he said that.
4    Q    Okay. Is it your understanding that your
5  claims about Dr. Coomer are what gave rise to claims
6  about Dominion Voting Systems? I believe you've said
7  that before, and you can correct me if I'm wrong, taken
8  responsibility for being the genesis of the claims
9  against the voting systems?
10   A    I don't think anyone was looking at the
11 machines. I think they were looking at a bunch of bad
12 actors walking around and doing things until we started
13 talking about Eric Coomer. Yes. I think that was the
14 genesis behind people looking into, "Well wait a minute.
15 Let's look at the machines."
16   Q    Now, one of Phil Waldon's Associates is a guy
17 by the name of Russ Ramsland. Do you know Mr. Ramsland?
18   A    I've talked to him several times.
19   Q    When did you first meet Russ Ramsland?
20   A    I'm not sure I did, but I think that he was in
21 the room in DC.
22   Q    In the hotel room, in the Trump --
23   A    Yeah.
24   Q    -- hotel room with Mr. Giuliani and
25 Mr. Eastman?

Page 244

1    A    Well, I don't believe that he was in the same
2  room with -- with Giuliani, but he might have been.
3    Q    And that was the first time you'd met
4  Mr. Ramsland in person?
5    A    I believe so.
6    Q    Had you ever spoken to him before?
7    A    Just asked me to send information to him.
8    Q    When did he do that?
9    A    In May or June of 2021.
10   Q    Of 2021?
11   A    Uh-huh.
12   Q    So you weren't in contact with Mr. Ramsland
13 any time prior to your claims about Dr. Coomer?
14   A    Prior to my claim about -- no. I wasn't in
15 contact with anyone. I was in contact with no one. On -
16 - on November 6th, I was hunting elk.
17   Q    When you say anyone, I know we haven't
18 discussed this person yet, but were you in contact with
19 L. Todd Wood prior to your claims about Dr. Coomer?
20   A    No.
21   Q    Let's talk about next down on the list. Doug
22 Logan?
23   A    No.
24   Q    When did you first meet Doug? And forgive me
25 if I asked that before.

Page 245

1    A    At the -- I met him at the -- I believe the
2  first time I met him was at the taping of The -- the
3  Deep Rig.
4    Q    That's right. You did say that. Yeah. So
5  you never met him at Tamale, for example?
6    A    Never, nor was I invited to Tamale.
7    Q    When was the first time you went to Tamale?
8    A    When I got a phone call at 11:00 at night and
9  I talked to Lin Wood for three and a half hours on the
10 phone about Jesus.
11   Q    Okay. And that would've been sometime in --
12   A    Before he fell off the wagon and everybody
13 became the demon.
14   Q    Okay.
15   A    So I don't know when that time was, but it
16 happened.
17   Q    So you weren't part of any of the meetings
18 taking place at Tamale in November 2020 with Patrick
19 Byrne, General Flynn?
20   A    No. No seat at the table, no wanting a seat
21 at the table? Not involved in that at any -- any way,
22 shape or form.
23   Q    When's the last time you spoke with Doug
24 Logan?
25   A    I had him on the -- when did the -- when did

1  the -- when did it end?  When did the audit end?  Is
2  that September of 2021?
3      Q    The audit would've ended in -- I believe in
4  August, but I -- I'm not certain on that.
5      A    So I did an interview with him, and then I
6  talked to him on the phone three weeks after that, and I
7  probably had a conversation with him once since then.
8      Q    And you didn't have any communications with
9  him during the Cyber Symposium?
10     A    I'm not even sure he was there.  Was he there?
11     Q    My understanding he was -- is that he was a
12  member of the red team, that he was working with
13  Watkins, Merritt, Waldron, Hay      es, some of these
14  other folks to try to verify the B caps, but --
15     A    Yeah, I don't think so.
16     Q    What about Ron Watkins?  When did you first
17  meet Mr. Watkins.
18     A    At the symposium.  Was he at the symposium?  I
19  think he was at the --
20     Q    He appeared remotely.  I don't know where he
21  was physically at the time, but he appeared onscreen.
22     A    I think that's the first when I started
23  talking to him, and it didn't last long.  Then he ran
24  for office, I think.  Did he run for office in 2021 or
25  2020?  2021?

1      Q    2022 is when he would've been running for the
2  primary in the Arizona House.
3      A    Yeah.  Then he just disappeared.
4      Q    Did you ever reach out to him under his
5  pseudonym CodeMonkey?
6      A    Yes.
7      Q    And how soon were you reaching out to him?
8      A    I mean, I think I -- I was connected to him
9  through, again, this Telegram group, and they said,
10  "Hey, you've got to talk to this guy, Watkins."
11     Q    Because he also appeared on the OEN special,
12  Dominionizing the Vote.  Did you speak to him in that
13  context?  He had one segment, and you had the next.
14     A    Do you have that video?
15     Q    I do.  I don't have it with me immediately.
16  But you may recall from the first proceeding, we showed
17  a number of those clips in the anti- SLAPP hearing,
18  which involved Mr. Watkins wearing a cowboy hat, making
19  claims about the Dominion user manual.  Does that sound
20  familiar?
21     A    Well, the Dominion user manual does kind of
22  tell you how to steal an election.
23     Q    Well, that's not my question.  I'm asking if
24  you spoke with Mr. Watkins at the time in the context of
25  that OEN piece?

1      A    I don't recall.
2      Q    And you said he was part of that signal group.
3  Is that the CH group you mentioned before that you were
4  part of?
5      A    No, they were part of the Telegram group.
6      Q    Part of the Telegram group.  Okay.  When did
7  you get involved with that?
8      A    Sometime in 2021.
9      Q    And you never shared any information about
10  Dr. Coomer with Mr. Watkins?
11     A    I'm sure I shared with him the same thing I
12  shared with everybody else.
13     Q    Well, I'm just asking about direct
14  communications.  Did you speak with him personally about
15  this stuff, send him an e-mail, for example?
16     A    I don't think so.
17     Q    Have you ever looked into Mr. Watkins'
18  background?
19     A    Oh, yes.
20     Q    Are you familiar with his work on the website
21  8chan?
22     A    Yes.
23     Q    Have you ever been to 8chan?
24     A    I have not.
25     Q    You never went there before it was taken down?

1      A    I never went to 8chan.
2      Q    What about 8kun, 8-K-U-N?
3      A    I was never involved in any of it, no QAnon,
4  no Q, not -- any of that.  I didn't even know that crap
5  even existed.
6      Q    Okay.  Well, that -- that wasn't my question.
7  It's my next question, but were you familiar with the
8  type of content that was posted on 8kun, for example?
9      A    It's not content that I would want going
10  through my mind.
11     Q    And you knew that Mr. Watkins was the
12  administrator of that website?
13     A    I found out later.
14     Q    When did you find out about 8kun and his work
15  there?
16     A    When I just started looking into who Ron is
17  and started having conversations with him on, "Hey, who
18  is this?" on the -- I was in the channel, like, "Hey,
19  what is this?"
20     Q    And Mr. Watkins was a guest on Conservative
21  Daily, wasn't he?
22     A    Yeah.
23
24
25

Page 250

1  ▮▮▮▮▮▮

2       Q    And you helped with the fundraising for

3  Mr. Watkins' congressional campaign, correct?

4       A    I did.

5       Q    What was your role in -- in that?

6       A    I just let him talk about it on the -- on the

7  radio and helped him get set up to where he could get

8  credit card processing --

9       Q    But you --

10      A    -- I connected him with somebody else.

11      Q    Okay.  Well, that --

12      A    And then I -- then I- --

13      Q    When you say you got him connected, I -- my

14 understanding was that through perhaps Bedoxer (sic)

15 or some other of your entities, you were managing the

16 donations that were made to Ron Watkins' congressional

17 campaign?  Do I have that wrong?

18      A    No, I -- I connected him to Cornerstone.

19      Q    Cornerstone.

20      A    -- which does credit card processing, because

21 I didn't have the proper infrastructure in place to --

22 to be able to make sure that we do proper reporting on

23 the -- on the --

24      Q    So before having Mr. Watkins on your show to

25 promote his congressional campaign, you didn't do any

Page 251

1  background research on him?

2       A    Sadly, no.

3       Q    If you had known that he was the administrator

4  of 8kun, would you have promoted his congressional

5  candidacy?

6            MS. DEFRANCO:  Object to the form.

7       A    Probably not.

8       Q    Now, you said before you didn't know anything

9  about QAnon, any of that stuff.  It sounds like you do

10 now.  Are you aware that Mr. Watkins has been identified

11 as the most likely individual as being behind the QAnon

12 conspiracy theory?

13      A    No.

14      Q    You're not aware of those reports?

15      A    I'm not.

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17

18

19

20

21

22

23

24

25      Q    Well, you're aware that there is an individual

Page 252

1  that posts what are known as Q Drops or did on the

2  website 8kun, right?

3       A    No, I didn't.  I knew about Q Drops, but, I

4  mean, that's like in the -- in the Matrix stuff, talking

5  to me, too, because I -- I said it's just a bunch of

6  nonsense, and they didn't like the fact that I said it

7  was nonsense.

8       Q    Okay.  Well, you -- I mean, so you're familiar

9  with the fact of an individual who's posted Q Drops and

10 has been identified by his followers as this entity

11 known as QAnon, correct?

12      A    I don't -- so I think that you're

13 mischaracterizing it, because I will tell you the Q and

14 QAnon doesn't -- doesn't exist.  So as I started digging

15 into this, because I used the same vernacular, saying

16 QAnon, just like I talk about adjudication, adjudication

17 process one, adjudication process two, and I was told,

18 "See, you doesn't know anything about it," because the

19 first adjudication is actually a signature match, which

20 is -- in essence is adjudication.  But that's not the

21 term that they use.  Well, same thing could be said for

22 QAnon.  There's an Anon, which is a part of the Q, and

23 then there's Q.  So those are two different things.  So

24 QAnon was actually developed by the media to kind of,

25 you know, conflate those things together.  But they're

Page 253

1  not the same thing.  There is -- it's not a QAnon.

2       Q    Okay.  So in any case, you became aware of

3  Mr. Watkins' potential involvement with this world

4  sometime after you promoted his congressional candidacy;

5  is that correct?

6       A    It -- it wasn't the QAnon part that bothered

7  me.  It was the -- the other stuff that related to

8  things that I don't want to be anywhere near, which is

9  pornography and things like that that do not --

10 you know, I don't want to fill my head with it.

11      Q    All right.  And last one on Watkins.  You said

12 he disappeared.  Do you have any idea where he is today?

13      A    No, but I -- I just mean disappeared, mean you

14 don't hear anything from him.  There's no -- there's no

15 footprint.

16      Q    When was the last time you were in contact

17 with him?

18      A    A year ago.  Again, I'm -- this is a guess.

19 It's probably a year ago.  I'm not even on the same chat

20 with him.

21      Q    Okay.  Moving down through the red team, Mark

22 Cook.  You stated before that he's just everywhere.

23 Does seem to be the case.  Who is Mark Cook?

24      A    I don't know.  I mean, he's a good guy.  Super

25 nice guy.



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 254..257
JOSEPH OLTMANN, 12/16/2022

Page 254

1    Q   Do you know anything about his background?
2  What does he -- what does he do?  How is he involved in
3  this group?
4    A   You know, I spoke at a conference -- not a
5  conference, but an event with Mark.  Mark preceded me,
6  speaking about election integrity and what -- what steps
7  we need to take in order to, you know, solidify free,
8  fair, and transparent elections, and, you know, he was -
9  - he was very articulate, understood what he was saying.
10 He -- he talked about the same things that we need to
11 continue to talk about, which is paper ballots, day of
12 voting, getting rid of mail-in ballots, completely going
13 to an ID, all normal things that you'd want., Even --
14 even the -- the -- the prospect of creating a national
15 holiday for voting days to make sure that everyone has
16 an opportunity to vote who wants to vote, so --
17     Q   Did you -- did you speak with Mr. Cook at the
18 symposium?
19     A   I did.
20     Q   And do you recall the nature of those
21 conversations?
22     A   He worked on a Dominion voting machine, that
23 they were able to -- to let hackers hack the voting
24 machine, and that -- I think that the -- the shortest
25 amount of time someone was able to hack a Dominion

Page 255

1  voting machine was, like, four minutes.
2      Q   When did he -- when was he involved with that?
3      A   They set it up at the symposium.  That was --
4      Q   They had a Dominion voting machine at the
5  symposium?
6      A   I think it was a Dominion machine.  I'm pretty
7  sure it was.
8      Q   And you said they let him do that.  Who's
9  they?
10     A   They -- they were trying to show people how
11 easy it was to manipulate the voting machine, change
12 what the voting machine does.  So they set up this
13 station, and he was involved in that.
14     Q   Do you know who at the symposium had acquired
15 voting machines for this demonstration?
16     A   No idea.  I mean, I'm not -- I just remember
17 that's the conversation that I had with him there.
18     Q   Did you partake in any of these --    in
19 this demonstration of showing voting machines, hacking
20 them?
21     A   No.
22     Q   You don't know if there were other examples
23 from ES&S, for example, or - or Hart Inter
24 Civic, any other companies?
25     A   No, but the backbone of the technology, the --

Page 256

1  the source code is all pretty similar between all those
2  machines.
3      Q   What about Sean Smith?
4      A   He's a really good man.
5      Q   When did you meet Mr. Smith?
6      A   In -- I believe the first time I actually got
7  in front of him was in 2021.  I can't put a date on it,
8  though.
9      Q   And what does he do?  What's his background?
10     A   His background is cybersecurity and
11 technology.  He's a lieutenant colonel, or I think he's
12 a full bird colonel, a full bird colonel or lieutenant
13 colonel, you know, served our country for over 20 years.
14     Q   Did you speak with him at the Cyber Symposium?
15     A   Yes.
16     Q   What did you discuss with Mr. Smith at the
17 Cyber --    ?
18     A   I -- I don't remember.
19     Q   We had heard -- well, I'll get through the
20 last one here.  What about Lisa Draza?
21     A   She's also another amazing person.
22     Q   When did you first meet her?
23     A   In 2021.
24     Q   And I should have asked this for -- for both
25 Mr. Cook and Mr. Smith, but do you have any ongoing

Page 257

1  relationship with these folks?  Do you work with them
2  today in any capacity?
3      A   I just -- Draza, and there's a thing that Jeff
4  O'Donnell built that's called the Draza.  It's -- it's
5  based on the ability to in real time take the Edison
6  data and turn it into charting for election data, and I
7  believe it's called Draza Report.  It's on
8  magaraccoon.com/drazareport, and so I encourage her.
9  You know, she's another person that got involved in this
10 because of -- she lost her brother-in-law in Afghanistan
11 or Iraq, one of the two.
12     Q   Okay.  And did you speak with her at the
13 symposium?
14     A   I did.
15     Q   And what -- what did you talk to Ms. Draza
16 about?
17     A   Just hello, goodbye.  Again, I can't recall
18 what we talked about.
19     Q   And was she or Mr. Smith or Mr. Cook, were
20 they involved in helping you prepare any of the
21 presentations that you put on?
22     A   No.
23     Q   Did any of them share concerns with you about
24 the accuracy of the information that was presented at
25 the symposium?



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 258..261
JOSEPH OLTMANN, 12/16/2022

Page 258

1     A    Which part of the accuracy?  What -- what --
2  what is in question on the accuracy of the symposium?
3     Q    Well, Mr. Mayer provided testimony that he was
4  in a room with one or more of these individuals on
5  multiple occasions when they spoke with Mr. Lindell and
6  informed him that the P-Caps were not what they
7  purported to be, and --
8     A    I wasn't in those meetings, so I can't talk to
9  what they would or would not have been said -- would've
10  happened in those meetings.
11     Q    Well, I think we established that.  I'm just
12  wondering if in your conversations with Mr. Cook or
13  Mr. Smith or Ms. Draza, they informed you that there
14  were concerns about this information?
15     A    I think everyone raised -- that is, I think
16  there's a lot of people that raised the specter of
17  whether or not it was legitimate information, because
18  the fact that he never showed up.  Dennis Montgomery
19  wasn't at the symposium, so there was no ability to see
20  that -- that what he was talking about was real.
21     Q    Well, that's my impression.  It sounds like
22  there was a lot of discussion and concern about the
23  information that was presented.  I'm just wondering if
24  you recall conversations about, you know, discussing,
25  sharing those concerns?  Were you worried that the

Page 259

1  information that was presented was not accurate?
2     A    You know, I think that if you are going to run
3  an op, I've seen this before, if you want to run an op,
4  you run an op in such a way that you create as much
5  white noise so that the truth gets so convoluted that
6  you can't see the true pathway of what's wrong in the
7  system.  And so there's a lot of people that were
8  throwing grenades in about what's happening in Italy,
9  and then in Germany we have servers that are being taken
10  over and, you know, you have ballot trucks -- here's
11  stuff I do know -- you had a -- you had a -- you had a
12  shredder truck full of ballots that Chad Wolf, the head
13  of DHS, went down and inspect, and it sure as hell, it
14  was a ballot truck, or excuse me, a shredder truck full
15  of ballots.  Down in Georgia, I know for a fact that we
16  had pictures that -- that they were ballots from the
17  ballot company that were supposed to be put through the
18  Dominion system, and nobody got access to the ballots,
19  and they shredded those ballots.  So there are things
20  that we know are true, and then there are things that
21  other people would bring in that are working with that
22  resistance, working with the outside in order to create
23  as much chaos as possible so that you cannot see the
24  truth.  And I think that's the case here.  I think it's a
25  government op.  I think that they did this in a coup

Page 260

1  d'etat against the American people.  I think Dominion
2  was right in the middle of it.  And -- and by the way,
3  there's - there's a lot of connective tissue between
4  Eric Coomer and what happened in Mongolia in 2004.  I
5  mean, I could go down the line.  I mean, so, there is a
6  lot of evidence to show that Dominion Voting Systems is
7  -- is the nexus of the fraud in 2020 --
8     Q    Okay.
9     A    -- 2021 and 2022.
10     Q    I -- I understand.  I've heard this all
11  before, Mr. Oltmann.  My question was just if you recall
12  any conversations with these people        --
13     A    Well, you also said you're a dumb lawyer and
14  the dumb -- I mean, that really is the case is that you
15  guys don't understand technology, because if you did,
16  you certainly would see this differently.
17     Q    All right, Mr. Oltmann, let's proceed to
18  number six.
19     A    All right.
20     Q    Looking at number five, actually, before we
21  move on, I don't -- think we may have skipped over this
22  one.  And this is very related to what we just
23  discussed.  I just want to confirm as we proceed,
24  because your answer here is not responsive to the
25  question.  We asked for all communications concerning

Page 261

1  the accuracy, reliability, verifiability, or
2  truthfulness of the information presented at the cyber
3  symposium.  And you responded, said, "I was there to
4  consult on what they had.  I was there to inspect their
5  work, not the other way around."  So I -- I understand
6  your prior testimony, meaning you don't have any
7  communications speaking to those concerns; is that
8  correct?
9     A    I'm sorry, I don't understand that question.
10  What was the question?
11     Q    Well, we've seen a lot of messages between
12  members of the Red Team saying that this is not
13  accurate, this is incorrect.  We can't proceed with
14  this.
15     A    Where is that?  I haven't seen this.
16     Q    Well, they're admitted into evidence.  They
17  were one of the exhibits during the merit deposition.
18  They include messages from Ron Watkins, Phil Walter --
19     A    I haven't seen -- I haven't seen any of those.
20     Q    Well, they're in the case file.  It's not
21  really relevant here.  I'm just asking if you have any of
22  those communications yourself with any of these -- these
23  folks saying that this is -- this information's
24  problematic.
25     A    I -- I don't have enough information.  I think



Page 262

1  I've said this before.  I don't have enough information
2  on it.  I've never been given access to it.  I haven't
3  seen the system that it -- these P-Caps are running
4  through to even verify if it is risen true.  I think
5  that Mike Lindell says it -- it does exist, and it is
6  true, and I think that he has other people that he's had
7  validated.  But I to this point have not been given
8  access to that, so I can't really -- I can't give you an
9  answer.  I can't -- I can't speculate.
10      Q      Okay.  Now, we move on to number six, and I
11  want to spend some time on this one because it involves
12  a category of evidence which to this day we still have
13  not seen from you in various requests.  We requested all
14  documents or communications relating to specific acts
15  that Dr. Coomer specifically undertook which resulted in
16  provable manipulation, alteration, or misreporting of
17  the 2020 election results.  Now, I've heard all the
18  claims you've raised today, I've watched a lot of
19  Conservative Daily, I've seen the documents you
20  produced.
21      A      Have I converted you yet?  You stay for the
22  prayer, or you leave before the prayer?
23      Q      I stay for the whole episode, Mr. Oltmann.
24      A      That's awesome.
25      Q      And I have never to this day seen you describe

Page 263

1  a specific act that Dr. Coomer specifically took himself
2  that altered election results.  I understand you have a
3  broad overarching theory about the machines, but I
4  haven't seen any evidence --
5      A      Not a theory.
6      Q      Regarding -- well, tied -- tied --
7      A      It's supported by evidence.
8      Q      Well, what specific evidence ties Dr. Coomer
9  to any act in all this beyond what you claimed to have
10  overheard on a phone call?
11      A      What was -- what -- what was his job?  I know
12  you're trying to -- to pinpoint the fact that, look, he
13  -- if he would've just stayed off that call, he would've
14  done himself a huge service, because then I wouldn't be
15  here.  And then you guys would've been looking for
16  everything else.
17      Q      Well, he --
18      A      If -- if he wasn't -- well, his own friend,
19  Matt, whatever his name is, it's the head of the --
20  Matt --
21      Q      Crane.
22      A      Crane.  Oh, you knew who he was.  Met with me
23  for breakfast.  His exact comment is, "Eric loves a
24  little Eric."  The guy is literally an egomaniac.
25      Q      And he told you Eric didn't do this as well,

Page 264

1  correct?
2      A      He told me Eric didn't do it.  That's not what
3  he said.  That's actually not what he said.  What he
4  said is, "I have a hard time believing that he would --
5  he would be able to act alone.  I have a hard time
6  believing that -- that he would do this."  And I said,
7  "Round the corners for me."
8      Q      So again, back to my question, what -- what
9  specifically, what did Eric Coomer do?
10      A      Eric Coomer himself said not to worry about
11  the election, that he made sure it got taken care of.
12      Q      I'm -- I'm aware of that.  I'm asking --
13      A      All right, so --
14      Q      -- what he did to rig the election.  Please --
15  yeah.
16      A      So let's start there, and then let's move
17  forward on that.  So he did that.  I didn't think twice
18  about him.  I thought he was just a Jedi that thought he
19  could just adversely affect the election.  Didn't know
20  anything about Dominion.  Nothing.  I knew nothing about
21  Dominion.  I'm not even looking for Eric Coomer.  You
22  fast forward, I literally talk about the fact of
23  infiltrating Antifa.  That's long before knowing about
24  Eric Coomer.  I know about Eric Coomer, but I don't know
25  about Eric Coomer.

Page 265

1      Q      I -- I've heard all this.  What did he do to
2  rig the election --
3      A      Hold on.
4      Q      -- Mr. Oltmann?
5      A      You go forward to November 3rd; we all saw
6  what happened on November 3rd.  Despite the fact that
7  you want to whitewash the fact that that's not
8  important, we saw the deviations that happened on
9  November 3rd --
10      Q      Mr. Oltmann.  What did Eric Coomer --
11      A      Okay, you're not letting me finish.
12      Q      You're not answering the question.
13      A      I get to finish.  I am answering the question.
14  Eric Coomer, director of strategy and security for
15  Dominion Voting Systems, who holds the adjudication
16  process patent that is implemented into the system,
17  makes the comment that, "Don't worry about Trump.  I
18  made sure of it.  He's not going to win."  Right?  He
19  said that, not me.  I didn't say it.
20      Q      What did Eric Coomer do to rig the election?
21      A      What --
22      Q      Please, Mr. Oltmann, answer that question.
23      A      I think that comes down to getting access to
24  the source code, doesn't it?  He also said he didn't
25  write the source code, yet he never wrote announce of

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 266..269
JOSEPH OLTMANN, 12/16/2022

Page 266

1  the -- of the code, but he did.
2       Q    So you have no --
3       A    Then --
4       Q    You have no idea.  You have no theory about
5  what Eric Coomer specifically did, do you?
6       A    What do you mean I have no --
7       Q    What did he do?
8       A    I'm not in a court, first of all.
9       Q    Well --
10      A    I'm sitting here in a deposition.
11      Q    You're telling me he was on a call and --
12      A    Why get on a call?
13      Q    That he wrote some code -- well, he wasn't on
14  the call, Mr. Oltmann.
15      A    Oh my gosh.
16      Q    We'll get to that.
17      A    You don't believe that either.  You don't
18  believe it.
19      Q    Mr. Oltmann.
20      A    You don't believe it.
21      Q    I very much believe that.
22      A    No, you don't.
23      Q    That is --
24      A    Do you believe that he ran into a building?
25      Q    -- that is --

Page 267

1       A    Do you believe that he ran into his --
2       Q    -- entirely irrelevant.
3       A    -- do you believe he ran into his restaurant
4  and started drinking?
5       Q    I'm not going to argue with you, Mr. Oltmann.
6       A    No, I mean, it's -- it's important.
7       Q    Nope.
8       A    I mean, he stood up there --
9       Q    It's important --
10      A    -- on the side of the road and lied four
11  times, and it didn't bother him.  There was not one bit
12  of it that bothered him.  It didn't bother him.
13      Q    Mr. Oltmann --
14      A    And if you look at --
15      Q    -- I've asked you several times --
16      A    -- that's not even the only thing.  He said he
17  didn't have a Twitter account, but he does have a
18  Twitter account.  And then you guys went and scrubbed it
19  for Twitter.  But here's the problem scrubbing it for
20  Twitter.  Even when you did it in the Wayback Machine,
21  we have the ability to provide that evidence as well.
22  He lies.  "I never even went in and -- and logged into
23  it."  But he didn't do that.  He also lied and said that
24  he --
25      Q    Objection, non-responsive.  Mr. Oltmann --

Page 268

1       A    He also lied and said that the Facebook posts
2  don't exist, that he didn't have them.
3       Q    You're obviously evading this question.
4       A    No, I'm not evading it.
5       Q    You have no evidence that Eric Coomer did
6  anything, do you?  He didn't -- what did he do?  How did
7  he rate the election?  What did he do, Mr.--
8       A    What are you talking about?
9       Q    I'm talking --
10      A    The entire Dominion system is under scrutiny
11  right now --
12      Q    How?
13      A    -- and it points directly to the machines.
14  Are -- are you kidding me?  300,000 ballots.  300,000.
15  Did you not read what happened with Kari Lake and the --
16  and the suit in -- in Arizona?  You can't run away from
17  it.  No matter how many you guys give to the Daily Beast
18  and everyone else, you can't run away from the fact that
19  you stole an election.  You stole --
20      Q    Mr. Oltmann --
21      A    And it's not even the election that was stolen
22  by Dominion and by Eric Coomer and by his entire system
23  in this entourage --
24      Q    I've asked you the same question many times.
25      A    It's not even that that got stolen.

Page 269

1       Q    I haven't heard anything here --
2       A    It's the voice of the American people that got
3  stolen.  They didn't ask for this.
4       Q    Okay.  Thank you, Mr. Oltmann.
5       A    All right.
6            MR. KLOEWR:  I understand.  I've gotten your
7       answer.  I think we should take a quick break.
8            VIDEOGRAPHER:  Okay.  The time is --
9            THE WITNESS:  All right.
10           VIDEOGRAPHER:  14:41 Mountain Time.  Going off
11      the record.
12           (OFF THE RECORD)
13           VIDEOGRAPHER:  The time is 14:55 Mountain Time.
14      Back on the record for the case of Joseph Oltmann.
15      Date is still 12-16-2022.  Case remains the same.
16      1:22-CV-01129-WJM.
17  BY MR. KLOEWR:
18      Q    All right.  Mr. Oltmann, when we left off, we
19  were talking about number six.  I think we've addressed
20  that request.  I want to confirm that we've addressed
21  your objection thoroughly here, and I think we've
22  discussed it before, but you tell me if I'm wrong.  You
23  say, "I do not keep that information.  It is held in a
24  depository that when I need information or to review
25  information, I get access to it."  What are you

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 270..273
JOSEPH OLTMANN, 12/16/2022

Page 270

1    referring to when you say that?  What is the depository?
2        A    All the information related to the election
3    fraud evidence of Dominion Voting Systems.
4        Q    So what -- is that the Dropbox that you
5    described before?
6        A    No.
7        Q    Okay.
8        A    No, it's just where you -- I sent a couple of
9    links and then Kane responded that that's publicly
10   debunked information, which is not true, but --
11       Q    So those documents that you sent us are -- are
12   all of the documents that are in this depository that
13   you've described here?
14       A    Just one of them.
15       Q    Okay, is there a reason why you haven't
16   produced the rest?
17       A    Well, because there's thousands and thousands.
18   There's -- there's probably two terabytes of
19   information.
20       Q    Okay.  Does any of it deal with Dr. Coomer
21   specifically?
22       A    I'm sure some of it does, yeah.  It has to do
23   with the -- the work that he's done, the things that
24   he's said.  There's some videos in there.
25       Q    And have you -- have you disclosed all of

Page 271

1    that?
2        A    I've disclosed everything, yes.
3        Q    Okay.
4        A    I mean, there's more information out there.  I
5    just didn't go digging for it because it wasn't in my --
6    it wasn't in my -- I'm actually right now working on a
7    depository that I have that information myself.  That
8    way, when something like this comes up again, I can just
9    drop all two terabytes of information.
10       Q    Okay.  Who else has access to this depository
11   that you're describing?
12       A    Well, it depends on which one you're talking
13   about.
14       Q    How many depositories are there?
15       A    Probably a couple dozen.
16       Q    You have a couple dozen depositories that all
17   include different information pertaining to --
18       A    Yeah, so like Mark Cook --
19       Q    -- specific acts of Dr. Coomer?
20       A    So Mark Cook has information that he collects
21   on data on Dominion Voting Systems and the fraud that
22   was perpetrated in certain areas in different states
23   across the country.
24       Q    So Mark Cook has evidence describing specific
25   acts that Dr. Coomer took?

Page 272

1        A    What is --
2            MR. DEFRANCO:  I object to --
3        A    You know, the idea that you can say that Eric
4    Coomer is not responsible for it when he is responsible
5    for it and that's what he does, and you say that all of
6    this evidence doesn't --
7        Q    That's not my --
8        A    -- he doesn't have a gun in his hands.
9        Q    I'm just trying to --
10       A    It's leftist bullshit.
11       Q    Mr. Oltmann --
12       A    It doesn't --
13       Q    I'm just --
14       A    -- it doesn't negate the fact that we have
15   massive amounts of evidence that the system was designed
16   to defraud the American voter.
17       Q    So there may or may not be dozens of
18   depositories that you have access to --
19       A    Yes, sir.
20       Q    -- and you may or may not have provided the
21   information relevant to Dr. Coomer, which may or may not
22   be in those dozens of depositories?  Did I understand
23   that correctly?
24       A    That's not what I said at all.
25       Q    Well, there's information out there that you

Page 273

1    haven't disclosed; is that correct?  That is in --
2        A    That's not true.  This says the information
3    that I sent or received related to me specifically.
4    Then in the conversation with -- with -- with Judge
5    Wang, he said if you have access to it, any information
6    you have access to, and then it came back that, fine,
7    I'll give you access to all that information.  I'll
8    start gathering all that information.  I'm doing you a
9    favor.  You say it's publicly available, but obviously
10   it's not publicly available because some of that
11   information, I've never seen any bit of the evidence
12   that -- or information that you've disclosed or talked
13   about.
14       Q    Okay.  Let's move on.  Number seven.  I think
15   we've discussed this as well already.  Just want to
16   confirm.  You don't seem to recall specifically the
17   circumstances of your invitation to the cyber symposium?
18   Maybe that Ms. Bishop invited you?  Is that -- am I
19   recalling that correctly?
20       A    She might have, yes.
21       Q    And you don't have a written invitation that
22   sort of lays out, you know, where you're going to stay
23   at a hotel, here's your flight number, Mr. Oltmann,
24   anything of that nature?
25       A    No.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                      Pages 274..277
JOSEPH OLTMANN, 12/16/2022

Page 274

1    Q    Did you pay for all that stuff yourself?
2    A    I did.
3    Q    And we've already established that you did not
4  provide a copy of the presentation that you presented to
5  Mr. Oltmann beforehand?
6    A    Okay, where is that?
7    Q    Any communications relating to the material
8  you intended to present at the cyber symposium?
9    A    I didn't intend to present anything.
10   Q    Okay.
11   A    I presented -- I mean, that wasn't what I was
12 there for.
13   Q    All right.  Let's take a look at number eight.
14   A    Know why they only do seven hours now.
15 Deposition time.
16       MS. DEFRANCO:  Do we have a copy of the entire
17   thing?
18   Q    Well, that's a good question.  Mr. Oltmann, do
19 you have a copy of the presentation that you put on?
20 The Serbian technology with Chinese characteristics?
21   A    I'm sure I can find it.
22   Q    Okay.
23   A    I don't have -- I did not have one that I
24 could find related to it in an e-mail or anything else.
25 But I can -- I can call the -- guys that helped put

Page 275

1  it together and see if they can get it for me.
2    Q    All right.  And that was the only presentation
3  that was -- that you partook in that was prepared in
4  advance; is that correct?
5    A    Yes.
6    Q    You didn't have any notes or topic ideas or
7  anything for the panel discussions that you partook in
8  where you described your claims against Dr. Coomer?
9  That was all improv?
10   A    I don't -- improv would -- would --
11   Q    It wasn't scripted is what I mean.  You didn't
12 have a schedule of or talking points when you sat down
13 at that table, say, we need to talk about this and then
14 we need to talk about that then we need to talk about
15 this?  Nothing of that nature?
16   A    No.
17   Q    Let's take a look at number eight.  I do want
18 to talk about this one for a little while because we've
19 -- we're still -- I've never gotten an answer on this
20 either.  All documents or communications sent or
21 received by you relating to the photo screenshot of the Google
22 Search results you can -- you created on November 11,
23 2020, purporting the show Google Search results from
24 September 26th.  I'm going to refer you to what's been
25 previously marked as Exhibit 21.  It's in your binder.

Page 276

1  Let's take a look at that.  You've seen this document
2  before, correct, Mr. Oltmann?
3       (EXHIBIT 54 MARKED FOR IDENTIFICATION)
4    A    I have.
5    Q    What are we looking at here?
6    A    Screenshot of Eric Coomer, Denver, Colorado on
7  09-26-2020.
8    Q    Okay.  And we -- we can see that in two
9  locations on this document.  One is written at the top
10 as if it had been just typed out above the screenshot.
11 And then we also have a smaller version that appears to
12 be part of the screenshot itself, and it says screenshot
13 2020-09 --
14   A    Yeah.
15   Q    -- dash 26 at 2:03:31 p.m.?
16   A    Yeah.
17   Q    So this document, as you disclosed it to us,
18 appears to be a screenshot of the screenshot, because
19 this was a PDF that we received from you.
20   A    No, that's not the case at all.  This -- this
21 particular piece was taken out of a document that was
22 put in there, but there was a screenshot was also
23 provided.  This -- this file was also provided.
24   Q    We have never received the native file of this
25 screenshot, Mr. Oltmann.  We requested it many times.

Page 277

1    A    How is that possible?
2       MS. DEFRANCO:  I don't know what he means by
3    native file.
4    A    Because when they said the stuff about when
5  the Wayback Machine that's on this, we wrote an entire
6  explanation of this that was sent to Andrea and sent
7  back over to you.
8    Q    Yes, but you'd never provided the native --
9  the image, the -- the screenshot itself, a copy of that.
10 We only have this PDF --
11   A    How is that possible?
12   Q    -- which appears to be a screenshot of the
13 screenshot.
14       MS. DEFRANCO:  I don't think it is.
15       THE WITNESS:  That's not possible.
16       MS. DEFRANCO:  I -- I -- I -- I don't think
17   that's accurate.
18   A    I know for a fact we provided it.
19 BY MR. KLOEWR:
20   Q    Well, we've not received it.  The actual
21 image, the photo screenshot.  We do not have that.
22 We've never gotten it.  We filed a motion seeking to --
23 an order compelling preservation of this document.  You
24 didn't respond to that.  Now Ms. Hall did send us an
25 e-mail on December 29th of last year responding to

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 278..281
JOSEPH OLTMANN, 12/16/2022

Page 278

1  questions about it.  She did not attach anything to that
2  document.
3         A    Well that doesn't make any sense, because I
4  personally went through, and I even had a conversation
5  with Randy Corporon about this when he was the one that
6  said, "Hey, show me what you were looking at," and that
7  was on November 10, 2020, or November 11, 2020.  So we
8  sat and walked through this entire process and figured
9  out, based on one computer and the other computer, how
10  this information was collected.  So that -- and his
11  recollection is the same as my recollection, and I
12  didn't remember anything about this.  I didn't even know
13  I had it in my possession until afterwards.  But I had
14  denoted it as 09-26-2020 because that's what I did.  And
15  if you see where it says view all, it scrolled down
16  because above it had information related to the -- the
17  screen share.  And then there was another one related to
18  this that was on November 10th or November 11th, I can't
19  remember.  But both of those were provided.
20         Q    But you --
21         A    And the explanation of this was provided to
22  Andrea, who then sent it on to you.
23         Q    Yes, and that explanation conflicted with
24  prior representations you've made.  I'm trying to
25  understand this.  Who changed -- who changed the -- the

Page 279

1  title of this document to screenshot 2020-09-26?  Who
2  did that?
3         A    What -- what do you mean?  The screenshot at
4  the very top?
5         Q    Yes, where it says 20331?
6         A    That was in the document.
7         Q    No, Mr. Oltmann, it wasn't, because the Google
8  Doodle in this image is from November 11th.  So this
9  photo was not taken on September 26th.
10         A    No.
11         Q    It wasn't.
12         A    But -- but I knew that the dates on -- when I
13  actually did the research on it was the 26th because we
14  had the other computer.
15         Q    So you changed the date of the screenshot to
16  reflect a prior date?
17         A    No, to reflect the date that I actually took
18  the information from.  Because inside of Google, if you
19  go to try and reproduce this, which is slightly changed
20  now, but if you use the old Chrome, and you put in the
21  information related to the dates, this is the
22  information that showed up on that date.  Now if you go
23  back and put this information on today, none of this
24  information going back to 2020 would be there, because
25  it's all been scrubbed from the internet.  Every bit of

Page 280

1  information related to Eric Coomer has been scrub from
2  the internet completely.
3         Q    So when you take a screenshot, it
4  automatically creates a time --
5         A    Right.
6         Q    -- and date stamp at the top.  This screenshot
7  was not taken on September 26th, because it includes a
8  Google Doodle from November 11th.
9         A    Okay.
10         Q    It could not have been taken that day.  So who
11  changed the date at the top?  Who changed it?
12         A    When we create the file, we created it based
13  on this file being produced using the Wayback Machine on
14  09-26-2020.
15         Q    Okay, well --
16         A    Based on those two computers we had side by
17  side.
18         Q    Well you're providing some conflicting
19  representations right now. You've said Wayback Machine
20  and you've said you'd go inside and Google, so what's
21  your --
22         A    Well, okay, so inside of Google they have the
23  ability to change the date range, if you were to go into
24  your computer right now, the date range by which you can
25  look for and search the internet.  If you were to do

Page 281

1  that right now.  Now you can't do it on Eric Coomer
2  right now because he's scrubbed everything from the
3  internet.  But if you were to do it on a different
4  topic, you would see that above this view all, there is
5  these three boxes and a box to the right, okay?  Of the
6  information that would show up.  This is a scroll up of
7  the information that showed up for Eric Coomer on that
8  date.  Make sense?  So if you were to go -- you've never
9  used -- if you go into Google, and you ask for to change
10  the date under tools --
11         Q    Yep.
12         A    -- you can change the date.  So when we change
13  the date, that's the information that would've showed up
14  on the 20th that I got my information, excuse me, the
15  26th that I got my information on in doing research on
16  Eric Coomer.
17         Q    So if what you're saying is true, then today,
18  I should be able to use those same tools and input this
19  data and get these same results.
20         A    Okay, try it.
21         Q    Correct?  That -- I've -- I've asked you to
22  produce that.  Send me a URL to do that.  Show me these
23  results again through Google.
24         A    You can't.
25         Q    Exactly.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 282..285
JOSEPH OLTMANN, 12/16/2022

Page 282

1     A     You know why you can't?
2     Q     Because you can't recreate the search results
3  that existed on a prior date, and your counsel has told
4  us this photo was taken on --
5     A     That's not a -- that's a lie.
6     Q     -- November 12th.
7     A     That's a lie.
8     Q     I can show you the e-mail from Ms. Hall,
9  Mr. Oltmann.
10    A     No, you can produce that information --
11    Q     So          --
12    A     -- but when you scrub the information from the
13 internet, you can then not produce that information.  So
14 if we were talking about the same information that
15 existed on the 26th of September in 2020.  If you were
16 talking about that same information, that information
17 would've populated had it not been scrubbed from the
18 internet.  None of these files exist.  If you go to
19 Secretary of State and Dominion on September 9, 2016,
20 that does not exist.  It doesn't exist.
21    Q     Well, if that's true today, it would've been
22 true on November 11th when you took this photo to
23 recreate it, wouldn't it have been?
24    A     What do you mean?
25    Q     This photo was taken on November 11th.

Page 283

1     A     All right, but the other photo -- it -- it
2  might have been.
3     Q     And -- and you said at the time --
4     A     On the 10th, not the 11th.
5     Q     -- that he had already scrubbed the internet
6  from all of his -- all of his information.  So if that's
7  true, this information shouldn't have been there.
8     A     That's not true.  The nine --
9     Q     It it's true today it would've been true then.
10    A     It was true then.  And you said that he
11 scrubbed -- scrubbed it on the 10th of -- of November?
12 Is that what you're -- you're telling me?
13    Q     I'm telling you; you made representations at
14 this time --
15    A     You just lied.  You just actually said that he
16 scrubbed the internet on the 10th of November.
17    Q     No.
18    A     He hadn't even heard about --
19    Q     Mr. Oltmann, I did not say the word scrubbed
20 and I didn't say he scrubbed the internet.
21    A     You said had he scrubbed the internet, this
22 would not have shown up on -- on the 10th of November or
23 11th of November, correct?
24    Q     Let's -- let's do this, Mr. Oltmann.  Are --
25 are you familiar with -- does the name J. Alex

Page 284

1  Holderman mean anything to you?
2     A     You mean the guy that said that the mini
3  machines are -- are what, compromised?
4     Q     The professor from Michigan?
5     A     Yeah.
6     Q     Do you know who I'm referring to?
7     A     Oh yeah.
8     Q     I believe you produced some documents from
9  Dr. Holderman to us, correct?
10    A     Okay.  I did.
11    Q     And you're aware that Dr. Holderman was the
12 opposing expert against Dr. Coomer in the
13 Curling v. Raffensperger --
14    A     Yes.
15    Q     -- case in Georgia?
16    A     Yes.
17    Q     Okay.  And you may recall that Mr. Holderman
18 is briefly featured in the OAN clip that we discussed
19 briefly before the Dominionizing the Vote that you were
20 in last -- in November of 2020.
21    A     Is that the Newsmax one?  Or OAN?
22    Q     OAN.
23    A     Okay.
24    Q     So it sounds like you're familiar with
25 Dr. Holderman by reputation.  Is it your opinion that

Page 285

1  he's a reliable source?
2     A     Today?  No.  I think that he changed his tune
3  and said that there's nothing wrong with the Dominion
4  machines and that they can be -- they can be fixed.
5     Q     Are you familiar with his credentials in
6  general?
7     A     I am.
8     Q     And you believe that the -- what he produced
9  as far as the Curling v. Raffensperger case, for
10 example, is reliable, I presume, since you've provided
11 it to us as an exhibit?
12    A     I provided it as an exhibit today?
13    Q     It's one of the things that you put in the
14 drop or that you e-mailed us over the last 72 hours.  It
15 says something about your report
16 --
17    A     I think that was just the information that we
18 actually pulled in to validate some of the stuff against
19 Coomer, yeah.
20    Q     -- okay.  So do you believe those reports that
21 he produced in that context are reliable?
22    A     I didn't review that report specifically.  You
23 want to show it to me?
24    Q     Well, I'm going to show you another document
25 here.  Mark this as Exhibit 55.  Are you aware that



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 286..289
JOSEPH OLTMANN, 12/16/2022

Page 286

1  Dr. Holderman has produced a number of expert reports,
2  including in your case, the Denver District Court?  Do
3  you remember that?
4              (EXHIBIT 55 MARKED FOR IDENTIFICATION)
5        A    No, I don't remember this.
6        Q    Well, the one I've just handed you is an
7  excerpt from the report he produced in our lawsuit in
8  this court against Clay Clarke and the Reawaken America
9  tour --
10       A    Okay.
11       Q    -- which is more updated to reflect this
12  Google screenshot issue.  But he also produced a lengthy
13  report in your case where he went through your claims
14  against Dr. Coomer and explained how and why the
15  allegations were not feasible.  I have to remove this
16  excerpt from the Clay Clark report, because at that
17  time, he had the benefit of being able to review this
18  information. Now if you look at paragraph 25,
19  Dr. Halderman states, "Oltmann has never provided
20  credible evidence that such a call took place, let alone
21  that Dr. Coomer participated or made such statements,
22  and some of the little tangible evidence he has offered
23  is provably false.  He produced a screenshot excerpt
24  shown below that he purported in sworn testimony showed
25  he had performed a Google search on September 26th."

Page 287

1  You see that?
2        A    Yep.
3        Q    We can turn the page here.  Dr. Halderman
4  continues, "Although the screenshot includes a file
5  name," and that was the 2020-09-26 --
6        A    Yeah, but we've already been through this.
7        Q    Yes.
8        A    We've already been through this.  We went
9  through this in December of 2021.  I know you wanted to
10  make a whole year go by before you discussed it again,
11  but you didn't even discuss the information that was
12  provided to you when I went back and said, all right,
13  the file, after talking to Randy, who was there that day
14  and said, "Okay Randy, what happened?"  And he's like,
15  "Hey, I told you to do this research."  And then I went
16  back and looked at the files and remember doing the
17  side-by-side comparison.
18       Q    So why doesn't this image include a reference
19  to the date the photo was taken?
20       A    What do you mean why doesn't it have an image?
21  I didn't even find this --
22       Q    Why did we --
23       A    -- this file didn't even come up until -- what
24  was it, November? October?  I didn't even know I had a -
25  - I even had this picture.

Page 288

1        Q    Mr. Oltmann, we just had a hearing with Salem
2  two weeks ago where you discussed this screenshot with
3  Mr. Corporon on November 14th on the radio as evidence
4  that you had taken this image in September.  So -- and
5  we have -- and you also presented it on Conservative
6  Daily as evidence --
7        A    No, listen --
8        Q    -- to prove your claims.
9        A    He is the one that told me --
10       Q    You did not forget about this.
11       A    He is the one that told me to show me the
12  information that you would've gone back to in September.
13  So I went back and showed him exactly what I did.  I
14  walked in and said -- I looked at -- he told me on
15  November 12th, "Show me what you would've seen when you
16  went through this."  That's when I went back and put the
17  information in on November 11th, put the information --
18  or 10th, I think it was the 10th, not the 11th, on the -
19  - it would've been the 11th, it was Veterans Day.  I put
20  that information in.  You can actually change the date,
21  change the search -- search criteria.  It'll still show
22  up in the church criteria, but it takes it from that
23  date.  Tig actually was the one that said he was gone
24  from I think the 21st to the 23rd or 24th, and that --
25  that this would've been the information a few days later

Page 289

1  that I actually collected.  It is the information that
2  Tig had, the information that I had with Randy, and the
3  information I had for the search to bring me to the
4  conclusion that was the same Eric Coomer.
5        Q    Well, that's a lot you just said there.  Tig
6  presented us with an affidavit stating that the call
7  happened the weekend prior, between September 17th and
8  September 21st here                    --
9        A    Okay, then that'll be it.  Okay.
10       Q    -- so you didn't input in information from Tig
11  because this says September 26th.
12       A    Because I didn't do it on the day that I had
13  the call.  I took the information based on me searching
14  for it, and I took a date range, and so the -- the date
15  range that was on this was the end date of the date
16  range that I had run on that Wayback Machine -- no,
17  excuse me, the Google -- ability to go back and look at
18  -- you -- you guys aren't even using the system or
19  understanding the tool.
20       Q    Well --
21       A    The fact is, at the time --
22       Q    We did consult with an expert who produced a
23  report for us and said that your conflicting
24  representations don't make sense and that what you've
25  claimed you did is not actually technically possible.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 290..293
JOSEPH OLTMANN, 12/16/2022

Page 290

1     A    That's bullshit.  You could do it right now.
2     Q    Well --
3     A    You could literally do it right now on your
4  computer.
5     Q    Why don't you do that for us and produce it?
6  I would like the native file of this screenshot.
7     A    Perfect.
8     Q    And I would like a URL that allows me to
9  recreate these search results from this date as you
10 claim you were able to do on November 11th.
11    A    No, what I will do, because you can't, because
12 those files don't exist, because you scrubbed all of
13 those files from the internet.  You can't have it both
14 ways.  You can't walk through the internet and delete
15 every ounce of that file ever existing or those websites
16 ever existing and then expect to produce the same thing.
17 Google goes off of information that is still publicly
18 available.  Still.
19    Q    We'll -- we'll move on here; I just want to --
20    A    But I will run this same scenario on Charlie
21 Kane on the 21st of -- I will go back the same eight
22 weeks with Charlie Kane and see if the same search
23 results show up for Charlie Kane as they show up for --
24 that they do eight weeks later.
25    Q    Okay, so just to confirm, when you -- when you

Page 291

1  first found out this claim was circulating, you
2  originally posted statements that said that you had
3  gotten a new computer in November compared to the one
4  you had in September.  Do you recall those statements?
5     A    I had two computers, yes.
6     Q    Okay.  So your testimony today is that this
7  image is not different because you changed your
8  computer?
9     A    What are you talking about?  You're trying to
10 conflate and -- and
11 --
12    Q    You said that you moved documents from a
13 September --
14    A    No, you're trying to confuse all the
15 information related to this event on purpose.
16    Q    I -- I'm trying to figure out what --
17    A    I went back and tried to figure out why the
18 date on that would have something that would have
19 something for Veterans Day.  I made the phone calls; I
20 had counsel help me go through this entire process.  I
21 went back and looked at all the notes that I had related
22 to Randy Corporon and the fact that Randy was helping me
23 on the 10th of November.  And he said, "Look, I also
24 have an affidavit that was torn to pieces."  That's
25 another piece of this, that they took out a ton of stuff

Page 292

1  and just, "Hey, let's just keep it simple," and making
2  it look stupid.  Still -- still factually accurate but
3  missing a ton of information.  And so this -- this
4  particular thing that was done on Google was done using
5  those same tools to be able to go back into September
6  and say, "Okay, these are the times that it would've
7  been.  This is the end date.  Take the screenshot of
8  that, and then take it the same day with Eric Coomer and
9  show the difference between the two."  If you were not
10 using the tool to go back in time, those would've been
11 identical.  The search results in one would've been
12 identical to the search results in the other.  They would
13 not have changed at all.  But we know based on the one
14 that shows on September -- or on -- on November 11th
15 that that's not the case.  Because they're completely
16 different.  So if you weren't using the tool, if I was
17 not using the tool to go back to September of 2020, it
18 would've had the same results that on the 11th,
19 regardless of which search you ran.  There's -- there
20 would be no difference at all.  And this is the thing,
21 that thing does not address.  It doesn't address it at
22 all.  And yet a year later you want to make it subject
23 to, it doesn't exist.  That's not right.  That's not true.
24    Q    So was it Google Advanced Criteria that
25 allowed you to create this image, or was it the Wayback

Page 293

1  Machine?
2     A    I used the Advanced Criteria and I talked to
3  it in the vernacular of the Wayback Machine, because it
4  does the same thing.
5     Q    Okay.  So you didn't act, it's not a Wayback
6  Machine image, it's Google Advanced Criteria?
7     A    Yeah.  So you knew that.  So why didn't you
8  bring that up before?
9     Q    No.  Well, you've said both things.  The
10 Wayback Machine is not Google Advanced Criteria.  Those
11 are two separate platforms.  So I'm just trying to
12 clarify which was it that allowed you to create this
13 image.  I think we've gotten as much of an answer as
14 we're going to get on this issue.  So just to clarify,
15 now, you've explained different means by which you
16 recreated this --
17    A    Yes.
18    Q    -- on November 11th.  But you did recreate
19 this on the 11th, correct?  This is an image that you
20 took on November 11th, whether by going through the
21 Google advanced search criteria way back machine, any
22 other means.  This is an image from November 11,
23 correct?
24    A    Correct.
25    Q    And you don't have the original screenshot

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 294..297
JOSEPH OLTMANN, 12/16/2022

Page 294

1  that you took on September 26th?
2      A   I wasn't looking for Eric Coomer.
3      Q   That's not my question.  No, you don't have
4  the image that you took on September 26th?
5      A   I just had the URL of me doing the search for
6  Eric Coomer on one computer over another.
7      Q   Okay.
8      A   And so when -- when Randy met with me, he's
9  like, "I need the information back then."  Now, if I
10  wouldn't have gone back through my notes, I didn't even
11  provide this initially, as the initial information on
12  this case, because I didn't have it.
13     Q   So this image, as you just stated, was created
14  on November 11th. Who changed it to say 2020-09-26?  Did
15  you change that date?
16     A   That's the file name.
17     Q   Yes.  Who changed that?
18     A   I changed the file name.
19     Q   You changed file name?  Thank you.  All right.
20     A   You still want me to send you the Advanced
21  Search Criteria and do a video of it?  You still want
22  that?
23     Q   Yes, I do.
24     A   Okay.  I drank way too much coffee.
25     Q   Let's take a look at Exhibit number 9 or

Page 295

1  question number 9.  I apologize.  We requested all text
2  messages allegedly sent to you at any point between
3  November 3rd and the 9th, wherein you were supposedly
4  alerted of an article claiming that Georgia voting
5  machines went down on Election Day, as well as a copy of
6  the article linked to in those text messages.  In
7  response to that, you said, "It's been wiped from the
8  internet, much like everything else that is linked to
9  Eric Coomer, but my attorney from the District Court is
10  searching for it in hard copy form."  Has your attorney
11  from District Court, are you referring to Ms. DeFranco
12  when you say that?
13     A   Yes.
14     Q   And has she been able to locate an article
15  that references Dr. Coomer with respect to election day
16  in Georgia?
17         MS. DEFRANCO:  Object to the form.
18     A   Not yet.
19     Q   Not yet?  And who sent you the text message?
20  Who sent you the message with the article?  Lieutenant.
21     A   I'm not answering that question.
22     Q   Is it because there was no text message,
23  Mr. Oltmann?
24     A   You know what?  Your client's a liar, not me.
25     Q   Here's your chance to tell the truth and to,

Page 296

1  if I'm wrong, tell me.  Who sent the text message?
2      A   I'm not going to tell you.
3      Q   And you're aware that voting machines in
4  Georgia didn't go down on Election Day, aren't you,
5  Mr. Oltmann?  Dominion Voting Machines didn't go down on
6  Election Day?
7      A   Oh, they didn't?  They didn't have four day --
8  four hours that, four precincts that the machines didn't
9  work?
10     Q   You may be referring to a Poll Pad that was
11  manufactured by the company called KNOWiNK
12  K-N-O-W-i-N-K.  Is that what you're referring to?
13     A   No.
14     Q   Okay.
15     A   You're saying that the election machines in
16  those four counties did not go down?
17     A   I'm saying that Dominion Voting Machines did not go
18  down.
19     A   Yes, they did.  And there was an update
20  performed on the machines.
21     Q   But you don't have any evidence to support
22  that occurring or you haven't produced it.  Have
23  you?
24     A   Are you -- are you kidding me?
25     Q   No.

Page 297

1      A   It's -- it's actually in a, in a Georgia deal
2  that happened three months or later.  They had a -- a
3  whole hearing on this.
4      Q   Well, we haven't seen it.  We haven't seen it
5  produced.  And Dominion did not issue an update on
6  Election Day.  And I would like to see any evidence
7  suggesting that Dr. Coomer was involved in something
8  like that, because we've never seen it.  It's been two
9  years.  We've been requesting it.  It's a central part of
10  your story, and I'm just wondering if you have any
11  evidence to support this.
12     A   When did you request this before?
13     Q   We've requested all evidence of your
14  communications.
15     A   You -- you've requested this?
16     Q   In the prior case, we asked --
17     A   You never requested this.
18     Q   We asked for evidence involving your
19  investigation --
20     A   No, you never requested it.
21     Q   Well, we asked for it at this time and you
22  don't have it.
23     A   But you never requested it.  So two years
24  later you requested, after you got done wiping and
25  exploit, you know, getting rid of information about Eric

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 298..301
JOSEPH OLTMANN, 12/16/2022

Page 298

1  Coomer from the internet.  How about the YouTube videos
2  or the articles that were written about Eric Coomer
3  testifying to Congress?  Those are all gone, too.
4      Q    So you're refusing to even identify who sent
5  you this article. So we'll take that as another evasive
6  response from you and --
7          MS. DEFRANCO:  Object to the form.  And I'm
8  going to instruct Mr. Oltmann not to answer that
9  question on grounds of newsperson's privilege.
10         MR. KLOEWR:  On newsperson's privilege?
11         MS. DEFRANCO:  He was pursuing a story.
12         MR. KLOEWR:  He was --
13         MS. DEFRANCO:  Sued him for it.
14         MR. KLOEWR:  He was -- he's stated that he was
15  not.  That somebody sent this to him randomly as a
16  friend.  This was not a journalistic endeavor.
17         MS. DEFRANCO:  That's not what he said.  He did
18  not say that.
19         MR. KLOEWR:  That's --
20         MS. DEFRANCO:  You put words in his mouth.  We
21  can have it read back.
22  BY MR. KLOEWR:
23      Q    So you refuse to tell us who sent you an
24  article on November 6th on the newsperson's privilege,
25  am I understanding that correctly?

Page 299

1      A    Yep.
2      Q    Okay.
3      A    I'm, I -- I don't want the damage done to that
4  person the same way you've done the damage to everybody
5  else.
6      Q    Well, if -- if what you say is true, they
7  should be able to provide us with a text message and
8  confirm it and that would confirm your story, Mr.
9  Oltmann, I'm trying to help you out by establishing
10  facts that we have not been able to identify in two
11  years.  But, and then we'll --
12     A    You haven't been able to identify the facts in
13  two years?
14     Q    Nope.
15     A    Then -- then why did Eric Coomer file a
16  lawsuit and then delete everything from Facebook, or
17  delete everything from Facebook, then file a lawsuit?
18     Q    Let's move to number 10.
19     A    Why did he say he doesn't have a Twitter
20  account, but he actually had a Twitter account?
21     Q    Mr. Oltmann --
22     A    Why'd he go through this entire --
23     Q    I'm asking the questions here today.
24     A    -- story about running into a building and
25  then running into it?  I'm not the one that's lied, but

Page 300

1  he continually lies over and over and over again.  How
2  about the story put out there where he talks about his
3  wife being raped or raping his wife and then peeing out
4  her, making her bark like a dog? How about that?
5      Q    Mr. Oltmann?
6      A    It's over and over and over again.  You want
7  to call someone that tells the truth a liar, but your
8  client is nothing, but a liar and he has done nothing
9  but lie his entire life.
10     Q    We can do this again if you like Mr. Oltmann.
11  I'd like to proceed.  Number 10, all notes you took
12  during the alleged Antifa call, including, but not
13  limited to the notes you read from during the November
14  9, 2020, Conservative Daily podcast where you quoted in
15  your notes claiming that Dr. Coomer had stated, "We have
16  prepared for the new future where we put down these
17  fascist F's" is how you said it on the show.  Now,
18  before we answer this question, I'm going to refer you
19  to what's been previously marked as Exhibit 19.  So
20  let's take a look at that.  You should have reference to
21  those notes as we go through this.
22     A    Okay?
23     Q    Are these the notes that you took during what
24  you have described as the Antifa call?
25     A    Yes.

Page 301

1      Q    Do you have any other notes that you took
2  during the Antifa call that you have not disclosed?
3      A    Isn't there five pages in this?
4      Q    We received four, Mr. Oltmann.
5          COURT REPORTER:  I'm sorry, what did you say?
6          MR. KLOEWR:  I said we received four.
7      A    And they were in this order?
8      Q    This is how we received them.  Yes.  I believe
9  they are out of order, but this is how we received them
10  then.
11     A    That's not all the notes.
12     Q    Do you still have this notebook, Mr. Oltmann?
13     A    I do.
14     Q    Were you using this notebook to keep notes on
15  other matters at the time?  Or was this --
16     A    Yeah, there's other stuff in it as well, but
17  not on those pages.
18     Q    Do you ever date your notes?
19     A    No, I typically just put titles on them.  I
20  think it says what I'm doing.  That's why this doesn't
21  make any sense.  So this must be page 1? Antifa call?
22  Is that page 1?  Yeah, that's page 1.
23     Q    Are you looking at your notes right now,
24  Mr. Oltmann?
25     A    I'm going to the Dropbox to see if this is all

Page 302

1  the notes you were given.  Can you check your notes, or
2  no?  Same thing.  Are you looking at the Dropbox?
3            MS. DEFRANCO:  I know it what we produced.
4       A   I should have brought my computer.
5       Q   So if you still have this notebook, presumably
6  you would have some notes you took both before and after
7  this event --
8       A   Yeah.
9       Q   -- in that same notebook?  And it's possible
10  those notes could serve to place these notes within a
11  time range, correct?
12      A   Yeah, actually they could.  I think that we
13  actually talked about that.
14      Q   Is this -- is this the first time it's
15  occurring to you, Mr. Oltmann, that these notes could
16  serve to establish a date for the Antifa call?
17      A   We know what the date was for the Antifa call.
18  We know what date range for the Antifa call.  We already
19  know, because Tig was supposed to be on that call.
20      Q   Okay.  Well, Mr. Oltmann, we requested these
21  before.  We requested them again today.  If we need to
22  go off the record and take a break for you to find those
23  and produce them, we can do that.
24            MS. DEFRANCO:  Let's do that.
25            MR. KLOEWR:  Let's do that.  We'll go off the

Page 303

1  record.
2            VIDEOGRAPHER:  Okay.  Time is 15:34.
3            (OFF THE RECORD)
4            VIDEOGRAPHER:  Okay.  Time is 15:37 p.m.  Back
5  on the record with Joseph Oltmann.
6  BY MR. KLOEWR:
7       Q   Okay.  Before we went off the record, you were
8  going to try to find your notes.  Were you able to
9  confirm whether these four pages that were previously
10  disclosed are the entirety of the notes you took?
11      A   They are.
12      Q   They are?  There's no fifth page?
13      A   No, there is not a fifth page, but there is
14  notes related to what Randy asked me to write down on
15  what happened in that call.  So that's information that,
16  when he asked me to go through all the information that
17  I had, I had information that I had written down that
18  was between me and Randy.
19      Q   So you had a separate set of notes that you
20  created for Mr. Corporon describing your recollection of
21  the call?  What do you mean?  I -- I'm not sure I
22  understand you.
23      A   Yeah.  So Randy asked me what information you
24  collected on that call.  I walked through that
25  information and recalling what happened on the call with

Page 304

1  -- with Coomer.  So I had these notes and then I had the
2  notes that I wrote out to talk to Randy about when I was
3  going through the information related to gathering the
4  information about Randy or Eric Coomer.
5       Q   Okay.  But what we're looking at now are the
6  ones you took in real time, on the call?
7       A   Correct.
8       Q   Okay.  Let's take a look at what has been
9  previously marked as Exhibit 18, Clip 3.
10            MS. DEFRANCO:  It's a video.
11            THE WITNESS:  Oh, all right.
12            MR. KLOEWR:    18, Clip 3.  Yes.
13            (VIDEO PLAYED)
14  BY MR. KLOEWR:
15      Q   All right, Mr. Oltmann, can you take a minute
16  to review your notes and show me where the phrase, "We
17  have prepared for the new future where we put down these
18  fascist F's," is included in your notes?
19      A   No, because these were show notes.  These are
20  the notes that I wrote out of my recollection on what
21  happened in the event.
22      Q   So that statement, well now, wait just a
23  minute.  You said, "Let me read through my notes.  I
24  took detailed notes."  So you were not reading from your
25  notes from the Antifa call in this episode?

Page 305

1       A   No, we sat down.  So Max probably had the
2  conversation with you where we sat down and talked
3  about, "All right, tell me what happened on the call?"
4  So Max and I walked through, this is the stuff that
5  happened on the call.
6       Q   You're telling me you had a conversation with
7  Max McGuire prior to this episode where you walked
8  through the claims you were going to make?
9       A   No, I talked to him about the things that I
10  was going to talk about on the show.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 306



15    Q    So when you're reading -- when you say I took
16  detailed notes, I'm reading from my notes, you're not
17  referring to these notes?  Am I understanding that
18  correctly?
19    A    Correct.
20    Q    You were referring to a different set of notes
21  that you prepared before the episode.  Do you still have
22  those notes?
23    A    I'm sure I do.  Those are the stuff that I've
24  shared with Randy Corporon.
25    Q    Would Mr. Corporon be in possession of a

Page 307

1  separate set of notes describing the Antifa call?
2    A    No.  These are the information that I was
3  supposed to write down to make sure that I had accurate
4  information.  This is on, this is the information that I
5  wrote up on this show specifically to talk about what
6  happened with the call with Eric Coomer.
7    Q    Okay.  So let me be sure I understand what
8  you're telling me.  You had a conversation with Randy
9  Corporon sometime before this episode on November 9th
10  where he asked you --
11    A    No, I had a conversation with him on the 10th,
12  but the notes that I used contemporar -- with the -- the
13  show that I had there, I wrote down those in the notes
14  that I had with Randy Corporon.
15    Q    Okay.  But you were in contact with
16  Mr. Corporon before this episode aired, discussing your
17  claims about Dr. Coomer, correct?
18    A    I don't think so, no.
19    Q    Okay.  Well, he said on his radio show on
20  November 14th that you texted him at 11:00 in the night,
21  on November 6th, telling him that you had just had a
22  realization about Eric Coomer.  Would you dispute that
23  now?
24    A    No.  Did I say that on the show?
25    Q    No.  I'm just trying to understand where

Page 308

1  Mr. Corporon comes in to play on all this, because it
2  sounds like we're talking about two separate sets of
3  notes.  We have these ones that you actually took during
4  the call, and we have a separate set that you prepared
5  before the episode, apparently in a situation with Mr.
6  McGuire.
7    A    I wrote down with down the stuff that I needed
8  to talk about based on that call, and I had notes and I
9  had notes on what happened on the call that I used for
10  the show.  But those notes were in conjunction with the
11  conversations that I was having with Randy.  I'm pretty
12  sure that those are in the Privilege Log.
13    Q    So do you have a copy of those notes, and can
14  we have them?
15    MS. DEFRANCO:  No, of course not.  They're
16  privileged and you know it.
17    Q    So when you say you took note, that you
18  prepared these notes for the show, based on your
19  recollection, where does this phrase, "We have prepared
20  for the new future where we put down these fascist F's,"
21  come from?
22    A    From the recollection of what happened on the
23  call in September.
24    Q    You remember that specific phrase being used?
25    A    Yes.  I mean, again, I paraphrased even the

Page 309

1  last part of it. This is all from a recollection of Eric
2  from Dominion.
3    Q    Well, which part of the last part did you
4  paraphrase?  The part where he says Trump's not going to
5  win.  I made effing sure of it.  You paraphrase that?
6    A    Well, I had some of those on the notes.  Okay,
7  let me, let me explain to you what happens when you're
8  stepping out in the middle of nowhere
9  --
10    Q    No, I --
11    A    No, no.
12    Q    I want you to tell me which part you
13  paraphrased.  That's the question.  What did you
14  paraphrase?
15    A    Well, I said that I paraphrased.  I went back
16  and listened to this.
17    Q    Yes.  So which part is paraphrased?  "Trump's
18  not going to win." Is that a paraphrase?
19    A    I don't know.  I didn't check the notes out.
20  I don't have the notes sitting in front of me.
21    Q    What about, "I made effing sure of it."  Is
22  that a paraphrase?
23    A    That is not a paraphrase.
24    Q    Well, how would we know?  Because it sounds
25  like you're not even sure which part's paraphrased as



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 310..313
JOSEPH OLTMANN, 12/16/2022

Page 310

1  you sit here today?
2     A    That's two years ago.  That's two years ago,
3  and that's sitting on talking about something that I
4  didn't even want to talk about and the amount of
5  pressure that was on me to talk about what I had
6  discovered, knowing what the outcome was going to be in
7  my life.  That's what that is.  That's trying to figure
8  it all out in real time.  This is the information that I
9  have.
10    Q    Well, this particular phrase, Mr. Oltmann has
11 upended Dr. Coomer's life.  If I understand you
12 correctly today, you're not sure which part of it is
13 paraphrase and which is not.
14    A    Well, I know that those notes right there that
15 I was reading from are inside the Privilege Log, that I
16 do know.
17    Q    Inside which Privilege Log?
18    A    The conversations that I had with Randy
19 Corporon.  But you want talk about upending lives?
20    Q    No, I don't.  I want to understand which part
21 you paraphrased.
22    A    No, you don't.  You want to talk about, you
23 want to talk about Coomer.  But you don't want to talk
24 about the adverse effect it had on my family or stepping
25 out on election fraud and having give up, give up his

Page 311

1  career, give up his company.  What else did I give up?
2  I took no money from it.  But you want to protect the
3  demon, a guy that literally has done nothing.
4     Q    Number 11, we asked for all communications you
5  have with Joseph Camp.
6     A    Yep.
7     Q    Or anyone acting on his behalf between January
8  2020 and the present.  Now, in response to that request,
9  you again issued your Reporter's Privilege Objection.
10 Let's talk a little bit about Joey Camp.  When did you
11 meet Mr. Camp?
12    A    I don't remember.
13    Q    Did you meet him in the summer of 2020?
14    A    I did not.
15    Q    Were you aware that he was spending time with
16 Tig Tiegen at the time during the BLM protest?
17    A    I don't believe that that's accurate.
18    Q    Was Mr. Camp a member of FEC United?
19    A    I don't believe he was.
20    Q    Did you ever speak to him before this episode
21 about Dr. Coomer, November 9th?
22    A    No.
23    Q    You never had any communications with Joey
24 Camp any time prior to your claims about Dr. Coomer?
25    A    I don't believe I did.  No.

Page 312

1     Q    Mr. Camp is not the conduit that got you onto
2  what you have described as being the Antifa call?
3     A    He is not.
4     Q    Do you know anything about Mr. Camp's
5  background?
6     A    I know he has been doing undercover stuff for
7  many years.
8     Q    What do you mean by undercover stuff?
9     A    He's been uncovering stuff in Denver and
10 around the country for many years.
11    Q    Have you ever looked into his background or
12 asked your attorneys to look into his background?
13    A    Such as?
14    Q    Criminal background?
15    A    What criminal background?
16    Q    Are you aware that Mr. Camp is a convicted
17 felon?
18    A    I know that he had a -- a charge and yeah, but
19 I didn't, I didn't see anything that was concerning when
20 I looked back on his history.  Are you aware that Eric
21 Coomer is a drug addict, that he has Satan tattooed on
22 his arm?
23    Q    Did you ever conduct a search of Mr. Camp's
24 criminal history in the state of Colorado, for example?
25    A    No.  He -- he was very -- he was very open

Page 313

1  about it.
2     Q    Would it surprise you if I told you that we've
3  identified more than a dozen restraining orders have
4  been issued against Mr. Camp in various states?
5     A    That would surprise me, yes.
6     Q    Would it surprise you that Mr. Camp had a
7  restraining order issued against him by a 15 year old
8  when he was 32 in Jefferson County, in July of 2016?
9     A    No, I didn't know that.
10    Q    Now, in your -- our prior case, we showed you
11 a gab post for Mr. Camp where he took responsibility for
12 having identified Dr. Coomer himself.  Have you ever
13 discussed that claim with him?
14    A    I've never seen that.
15    Q    Well, we showed it to you in your prior
16 deposition.  Have you ever discussed Dr. Coomer with
17 Mr. Camp?
18    A    No, he never showed that to me.
19    Q    We did Mr. Oltmann, it's Exhibit PX 117, I
20 believe.  I can get a copy for you, but we certainly
21 showed you that.  It included an image that was a,
22 appeared to be an affidavit he had drafted for purposes
23 in that case. It included a case caption.  You don't
24 recall that?  We showed you in your deposition.  You
25 stood up, you said you needed to go to the restroom

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 314..317
JOSEPH OLTMANN, 12/16/2022

Page 314

1   immediately afterwards.  You recall that?
2        A   No, that's not true.  That's not true.  That's
3   a lie.  That's not true.  That's a lie.  That's a lie.
4        Q   We can take a break and pull the transcripts
5   for that, and I can pull up that gab post for you.  What
6   I want to show you right now is what we've -- we'll mark
7   as, if I can find the Exhibit title, 56.  Now, you're
8   aware that Mr. Camp is the individual who posted the
9   videos of Dr. Coomer that you've referenced several
10  times today involving the traffic accident, correct?  He
11  has a big Joey Camp logo on the videos that you've
12  showed on Conservative Daily.  You're aware of that?
13       (EXHIBIT 56 MARKED FOR IDENTIFICATION)
14       A   All right.  Say that again?
15       Q   You're aware that Mr. Camp is the individual
16  who has gotten the police body cam footage of Dr.
17  Coomer, that he has posted to the internet, correct?
18       A   These are terrible.
19       Q   Is that a yes or no, Mr. Oltmann, you're aware
20  that Mr. Camp --
21       A   I'm reading this.  This is an Exhibit, right?
22       Q   Yes.
23       A   Okay.  So let me read this real quick.  So is
24  this Joey Camp?
25       Q   Yeah.  Claims to be.  And he describes many

Page 315

1   actions that Mr. Camp had taken, and the phone number
2   indicated here is a number that Mr. Camp had used to
3   contact various other individuals across the country at
4   the same time, including where he provided photos of
5   himself in text messages, other individuals.  I want to
6   direct your attention to the very end of this text
7   message where Mr. Camp states to Dr. Coomer, "You know I
8   have the Zoom recorded, don't you?"  You see that part?
9        A   Oh, wow.  So does he have the Zoom recorded?
10       Q   Well, that's my question to you, Mr. Oltmann,
11  have you asked him?
12       A   No, I've never seen this before.  I've never
13  seen this before.
14       Q   No, you wouldn't have --
15       A   Where would I've ever --
16       Q   -- this was a text message that was sent to
17  Mr. Coomer.
18       A   So how would I know that?  I didn't, I've
19  never seen this before in my life.
20       Q   Well, he's been a guest on your show.  He has
21  a fundraising page where he prominently features his
22  involvement with Dr. Coomer.
23       A   I've had hundreds of people on my Facebook, on
24  my show.
25       Q   Well, you had him on your show to discuss the

Page 316

1   Eric Coomer footage, correct?
2        A   I did.
3        Q   And he didn't tell you at the time that he had
4   a recording of the Zoom call?
5        A   No.
6        Q   Do you know how Mr. Camp would have a
7   recording of the Zoom call?
8        A   No idea.
9        Q   You told me he was not your conduit to that
10  call, correct?
11       A   He was not my conduit for that call.
12       Q   Okay.  You said --
13       A   And I had never had a conversation with this
14  guy prior to coming out with this ever.  I'm just
15  surprised that --
16       Q   Mr. Oltmann, real quick, I'm going to show you
17  what was previously, and -- and, Ryan, I apologize, we
18  don't have a hard copy of this.  I hadn't anticipated
19  needing to refresh Mr. Oltmann on this.  This is what
20  was admitted as Exhibit PX 131 during your deposition on
21  September 8, 2021.  This is a -- gab post from Joey
22  Camp.  I'll read it for you and then I'll show it to
23  you.
24       A   Okay.
25       Q   Because I want to get this on the record, and

Page 317

1   I'd like you to focus on listening while I read through
2   this.  Here's Mr. Camp speaking.  "When my team preserved
3   material from Eric Coomer, we did so because of his
4   connection to Antifa, not because of his connection to
5   Dominion, which we didn't even know existed before.  The
6   Antifa Manifesto published here by Eric Coomer's address
7   as a would be press release that's acting as a public
8   relations officer for Antifa.  There is no other example
9   of this manifesto anywhere on the internet."  I believe
10  you've described it as a repost.  You know that's not
11  accurate.  "While the election is certainly an issue, I
12  was/am determined to document and tell the truth about
13  Antifa and their actions.  Eric Coomer is a member of
14  Antifa.  During the phone call with an Eric Coomer on
15  the line with other members of Antifa nationwide, one of
16  the Antifa members spoke about finding and killing me.
17  That was the end of last year.  April 2021, Karma 161,
18  and this apparent threat occurred by whatever name his
19  account number was at the time, posted a bounty for my
20  life.  The FBI called me to warn me.  Local police in
21  Denver spoke to me about a vacation."  So here we have
22  Mr. Camp in two instances saying, number one, when my
23  team preserved material from Eric Coomer, is he the one
24  that gave you the Facebook posts?
25       A   No.

1  Q  Do you know what he's referring to when he
2  says, "When my team preserved information?"
3  A  Nope.
4  Q  Okay.  And here he's describing the contents
5  of the call.  He says, "During the phone call with Eric
6  Coomer on the line, with other members of Antifa, one of
7  the members spoke about finding and killing me.  You
8  haven't discussed that with him?
9  A  I did not.
10  Q  Does it surprise you that you've been in
11  contact with Mr. Camp and he's providing you
12  information, he's been a guest on your show, and he has
13  been claiming to have been the one to discover Eric
14  Coomer and to have preserved information --
15  A  Where did he say that in there, that he
16  discovered Eric Coomer?
17  Q  When my team preserved material from Eric
18  Coomer, we did so because of his connection to Antifa,
19  not because of his connection to Dominion.  Meaning his
20  investigation would've proceeded yours, because you knew
21  he was Dominion from the start, by your allegations,
22  correct?
23  A  So then, yeah, but that doesn't say that he's
24  -- he wasn't involved in any of this.
25  Q  Well --

1  A  He's not the one that gave me access to the
2  Facebook post.  He's not the one that gave me -- none of
3  that -- none of that is true.
4  Q  Okay.  So when we go to the trial in this
5  matter, you don't intend to -- to provide any evidence
6  that's been provided to you by Joey Camp?
7  A  What?  I don't understand the question.  Why
8  would that be a -- a real question?
9  Q  I -- I'm trying to understand, Mister --
10  A  You've spent the last 45 minutes literally
11  attacking me with stuff that isn't -- this isn't me.
12  Q  Here's this.
13  A  I didn't do this.
14  Q  Here's the second page of this Gab post, which
15  was admitted as an Exhibit PX131.  You can go back --
16  A  Okay.  Let me see it.
17  Q  -- through the case file and it's an image of
18  our case caption in Denver District Court,
19  Coomer v. Donald J. Trump, et al, with the correct case
20  number there says Declaration of Joseph Camp.  This was
21  included in his Gab post.  We showed you-all this in
22  your declaration.
23  A  Where is this declaration?
24  Q  Well, that's a good question.  I wonder how he
25  -- I would like to know.  Was he going to provide you a

1  declaration in that case?
2  A  He -- he wouldn't have talked to me.  He
3  would've not had a conversation with me about it.  I
4  don't know anything about a declaration. Do you know
5  about a declaration?  Is it -- okay.  You can't answer
6  the question.
7  Q  Mr. Kemp is also represented by Andrea Hall,
8  correct?  Mr. Oltmann, are you aware of that?
9  A  I'm not.  Where's the declaration?
10  Q  Second page.  Scroll down.
11  A  Where is the declaration?
12  Q  I don't know.  This is -- this is all he
13  included on that Gab post and that's what we asked you
14  about in your deposition.
15  A  I've never seen this.
16  Q  I haven't seen the declaration.
17  A  I've never seen this.  And I've never seen the
18  declaration.  I've never seen a declaration.  I've never
19  seen this.
20  Q  Okay.
21  A  You're saying that you asked me questions
22  about this related to the fact that he took credit for
23  it.  I don't see that in here.
24  Q  Okay.  Well, it's entered as an exhibit, as a
25  PX exhibit, meaning we answered it during your

1  deposition.
2  A  And I'd like to know how I responded to that.
3  Do you have that as well?
4  Q  You're -- I don't have your entire transcript
5  with me right now. I'm just asking you about -- I
6  assumed you would recall this because we did discuss it.
7  But we'll put this aside for now.  Can somebody tell me,
8  I apologize.  What exhibit are we up to?
9  MR. CAIN:  Fifty-six.
10  MR. KLOEWR:  Fifty-six.
11  MR. MALONE:  Seven.
12  BY MR. KLOEWR:



Page 322

Page 324

Page 323

Page 325

```
11                              .  Going back to my prior
12  questions, has Mr. Lindell ever asked you how you got on
13  the Antifa call?
14      A   I'm sure he has.
15      Q   And what did you tell him?
16      A   That it -- it was the same thing that did
17  happen.  That the Antifa kids showed up at one of our
18  meetings.
19      Q   Well, I'm -- I want --
20      A   And that had nothing to -- those meetings had
21  nothing to do with the election integrity, had nothing
22  to do with November 3rd.
23      Q   I want to be sure I understand this clearly.
24  You said, I'm sure he did.  But do you recall
25  specifically Mr. Lindell ever asking you how you got on
```

 AdvancedONE LEGAL  (866) 715-7770  advancedONE.com



Page 326

1  the Antifa call?  And I mean specifically the individual
2  who provided you that access?
3       A   No.  I'm sure -- no, I don't.  No.
4       Q   He's never asked you?
5       A   I don't know if he has or not.  I don't
6  recall.
7       Q   Did he ever ask you about the other people who
8  were on that call?
9       A   I -- I don't recall.
10      Q   Has he ever asked you for the identities of
11 the allegedly 13 Antifa journalists you claim to have
12 identified?
13      A   I don't think so, no.
14      Q   Has he ever asked you when you got access to
15 Dr. Coomer's Facebook accounts?
16      A   I don't think so.  I think he just is -- he's
17 read the things that we've put out there.
18      Q   Has he ever asked you how you got access to
19 Dr. Coomer's Facebook accounts?
20      A   I don't recall.
21      Q   Did he ever ask you to clarify for him the
22 nature of the screenshot we discussed before?
23      A   No, because I already did in December of 2021.
24      Q   But he didn't ask you to explain that because
25 we did describe it in the complaint.  It seems like

Page 328

Page 327

1  something that he may ask about, but he never did, ask
2  you directly to explain that screenshot?
3       A   Say that again.
4       Q   Did Mr. Lindell ever ask you to explain the
5  screenshot?  We discussed it for a while.  I don't need
6  to get back into it.  I just want to know if Mr. Lindell
7  has asked you to explain the issue to him?
8       A   No, but -- but it's not uncommon for Mike not
9  to do that.

Page 329

3       Q   Okay.  Let's play Clip 9.  This is from
4  Conservative Daily podcast.  This was on September 13th
5  of this year.  Just over three months ago.  You had Clay
6  Clark on as a guest.  Let's play just a quick clip from
7  that.
8       A   I know you're getting sued by Eric Coomer.
9  Your lawyer's probably telling you not to talk about
10 that at all.  I got -- I got served with a subpoena to
11 do a deposition, by the way.  By -- by -- Lindell
12 matter.
13      Q   This was on September 13th.  You just told
14 Mr. Clark that you got served at the subpoena to do a
15 deposition in the Lindell matter.  Were you served as a
16 subpoena?
17      A   No.  It was -- I think that I was talking
18 about the fact that they -- you were looking to subpoena
19 me.
20      Q   Well, you said you were served as a subpoena?
21      A   Okay.  Well, I mean, for -- for your all's
22 deal, you were looking to do a subpoena.  I was doing it
23 under the fact that you were looking to do a subpoena.
24 So how is that creating a story that doesn't exist?
25      Q   Well, you weren't served with a subpoena, were

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 330..333
JOSEPH OLTMANN, 12/16/2022

Page 330

1  you?
2      A    What do you mean, I wasn't served with a
3  subpoena?
4      Q    Well, we -- we saw this clip and we're
5  confused.  Because our process server was trying to
6  serve you at that time.  And that's what I'm trying to
7  understand.  Why you would claim that you were served
8  with a subpoena when you weren't?  It sounds like you're
9  -- you're referring to the e-mail that was received by
10 Ms. Hall?
11     A    Probably.  But how is that -- how is that
12 putting myself in someone else's shoes?
13     Q    Well, it's putting yourself in a story that
14 did not occur.
15     A    That's not true.
16     Q    But you weren't served with a subpoena.
17     A    You mean, technically.  Because you're going
18 to use words the same way that you leftist use words to
19 manipulate situations like what happened in the
20 election, right?  This -- this is a simple deal where
21 you talk about the fact that you were trying to subpoena
22 me for this Lindell matter.
23     Q    Do you recall when you told Judge Wang you
24 became aware of the subpoena in this case?
25     A    No.  I knew there was a subpoena on -- in

Page 331

1  August.  I had not seen the subpoena until later.
2      Q    Let's move on to number 12.  We requested all
3  documents or communications authored, sent, or received
4  by you relating to any attempts to monitor, surveil,
5  locate, track, follow, investigate, harass, or threaten
6  Dr. Coomer or any member of his family.  You didn't
7  engage with many of those terms you just said, I have
8  never threatened Mr. Coomer or his family, nor have I
9  ever made an attempt to threaten him, or anyone
10 connected to him. Have you ever made an attempt to
11 monitor with Dr. Coomer?
12     A    No.
13     Q    Have you ever made an attempt to surveil Dr.
14 Coomer?
15     A    No.
16     Q    Have you ever made an attempt to locate Dr.
17 Coomer?
18     A    No.
19     Q    Have you ever made efforts to track Dr.
20 Coomer?
21     A    No.
22     Q    To follow him?
23     A    No.
24     Q    To intimidate him?
25     A    Nope.

Page 332

1      Q    To harass him?
2      A    Nope.
3      Q    Sorry, I lost my page here.  One moment.  Or
4  to threaten him.  We already discussed that.  Okay.  And
5  when we had a call with Judge Wang on Tuesday, do you
6  recall telling Judge Wang that you had never sent anyone
7  to Dr. Coomer's house?
8      A    Yep.
9      Q    Let me just refer to that portion of the
10 transcript here to be sure I -- I'm recalling your
11 statement correctly.  This is on page 31, lines 14 to 17
12 of the transcript from that hearing.  Page -- lines 15
13 to 17 rather.  You told the judge, "I have never sent
14 someone to his home.  That is a lie. I have never done
15 anything to push anything out on Mr. Coomer."  Was that
16 an accurate statement you made to Judge Wang?
17     A    It was.  It was.
18     Q    Let's play Clip 8.  Mr. Oltmann, this is an
19 audio clip from an interview you conducted with Peter
20 Boyles on November 17, 2020.  Let's take a quick listen.
21         (AUDIO PLAYED)
22         He's a ghost.  I had somebody go to his house
23 in Salida.  He's a ghost.  So was that an accurate
24 statement you made to Peter Boyles on November 17th?
25     A    Yeah.  So it wasn't actually me sending

Page 333

1  someone.  Someone had said they were going to go by that
2  lived in Salida.
3      Q    Well, you said I had somebody go by.  You said
4  he's a ghost.  I had somebody go to his house.  What do
5  you mean somebody in Salida said they were going to go
6  by?
7      A    Somebody in Salida that contacted me said they
8  were going to go by.
9      Q    Who was that?
10     A    A guy that did work for him as a contractor
11 and he stiffed.
12     Q    Who -- who is this person?
13     A    I don't remember.  It's been two years.
14     Q    Okay.
15     A    Keep in mind, by November 17th, I was in
16 complete lockdown, had personal security, and was under
17 massive threats of people coming to my house with guns.
18     Q    Let's play Exhibit -- what's been previously
19 marked as Exhibit 18, Clip 9.
20         (AUDIO PLAYED)
21     Q    So I just asked you a couple minutes ago if
22 you had made any attempts to monitor, surveil, locate,
23 track, follow, investigate, harass, or threaten
24 Dr. Coomer.
25     A    Right.

**AdvancedONE**
LEGAL

**(866) 715-7770**
advancedONE.com

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 334..337
JOSEPH OLTMANN, 12/16/2022

Page 334

1    Q    And in every instance you've said no. Do you
2  want to correct those statements that you made under
3  oath?
4    A    No, because I didn't threaten him.
5    Q    Well, you were clearly tracking him, correct?
6    A    No, I wasn't.
7    Q    You had people telling you where his truck
8  was?
9    A    Yeah.
10   Q    And following him around?
11   A    But I didn't --
12   Q    You don't think that's surveilling Dr. Coomer?
13   A    I didn't ask anybody to do anything.
14   Q    You don't think going on a podcast and telling
15 him that you've got people following him everywhere is
16 an attempt to harass him or threaten him?
17   A    Again, do you want to turn this around?
18   Q    No, I want to --
19   A    And look at what they did to my family.
20   Q    No, I don't.  That's not what I'm asking at
21 all --
22   A    No.  You don't want to.
23   Q    No, because that's not the issue here.  I'm
24 asking --
25   A    No, the issue is --

Page 335

1    Q    It's not the issue at all.
2    A    It is the issue.  It's clear the issue.  You
3  have people threatening my kids.  You have people
4  threatening my wife.
5    Q    So you didn't --
6    A    And people showing up to my house with guns.
7  Who showed up to his house with a gun, anyone.  And the
8  fact that they had forensic people and people in DHS and
9  DNI and those people were coming out of the woodwork
10 saying, we're going to check into this.  Those are
11 people that contacted me, giving me that -- that
12 information, not me giving it to them.
13   Q    Let's flip to what's been previously marked as
14 Exhibit 24.  Do you recognize this post, Mr. Oltmann?
15   A    I don't actually.  And I've actually tried to
16 get this post on Parler.  I've even asked Parler if I
17 could have this post that you said was put on Parler.
18   Q    Do you recognize the image that's included on
19 a post from @JoeOltmann?  Have you seen that image
20 before?
21   A    You brought this up in the last -- the
22 deposition that I did with you, correct?
23   Q    Yeah.  So what are we looking at here?
24   A    So this is the one where you said that I
25 posted this on Parler, but it doesn't exist on Parler.

Page 336

1    Q    Well, Parler didn't exist at the time.  It had
2  been taken down following the events at the Capitol.
3    A    But Parler came back up.
4    Q    Yes.  And --
5    A    So why did this post disappear from the time
6  that it went down at the time that it went back up?
7    Q    I'm not on Parler, Mr. Oltmann, I don't know
8  what they've done as far as document retention.  We
9  pulled this at the time and let's read it here.  "I've
10 been busy doing 15 interviews in the last two days."
11 Sounds like what you were up to at the time.  "Was told
12 today, after questioning by the MSM has not picked up
13 Eric Coomer that I was 'breaking something they are
14 running away from.'  What the living hell is that
15 supposed to mean?  Antifa in the middle of 28 states by
16 proxy of one of the largest shareholders in Dominion
17 voting systems.  So it is up to you.  Blow this shit up.
18 Share his name everywhere.  No rest for this shitbag.
19 Eric Coomer.  Eric Coomer.  Eric Coomer.  Eric Coomer.
20 This shitbag and the corrupt asshats in Dominion Voting
21 Systems must not steal our election and our country.
22 Eric, we are watching you."  When has Eric Coomer ever
23 posted a photo of your house, Mr. Oltmann?
24   A    I didn't post this.  You -- you can't even
25 tell me the date that this is posted.

Page 337

1    Q    December 5, 2020.
2    A    So then where's that date?  And how come they
3  don't have this on Parler?
4    Q    Not on this document.
5    A    I said the same thing before.
6    Q    I just told you; I don't know how Parler
7  works.  I'm asking why -- when has Eric Coomer ever
8  posted a photo of your house?
9    A    Where is this post where I posted it on
10 Parler?
11        MR. CAIN:  Objection, nonresponsive.
12   A    Where is the post?  You're putting a post in
13 front of me and saying, Joe, you did this.  I went
14 through it.  Did we find anything on that?  We couldn't
15 find anything related to me even posting this at all.
16   Q    We pulled -- you can see that we pulled this
17 when it was posted four hours ago.  We were watching
18 your statements very closely at the time because our
19 client's life was in danger.  My question to you, and
20 this is the question I want an answer to not anything
21 else.  When has Eric Coomer ever posted a photo of your
22 house on social media?
23   A    No.  He sent people to my house with guns.
24 That's what he did.
25   Q    No, we already established you have no



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                         Pages 338..341
JOSEPH OLTMANN, 12/16/2022

Page 338

1  evidence to do -- find any involvement with Dr. Coomer.
2      A    I don't have any evidence.  I -- I have 16
3  months of having to hire personal security and
4  bulletproof glass at my house.
5      Q    Direct evidence.
6      A    And thermal cameras.  I don't have police
7  reports that show that people sent powder to my house
8  and actually came there with guns.
9      Q    Objection, non-responsive.  I understand your
10 refusal to answer to me that you know that Dr. Coomer
11 has never posted a photo of your house on social media,
12 correct?
13     A    I also know that that's not me taking a
14 picture of his house, and I don't even think that post
15 exists.
16     Q    Who did take that picture, Mr. Oltmann?
17     A    No idea.
18     Q    Was it Scott Wheeler?
19     A    Who's Scott Wheeler?  Who's Scott Wheeler?
20     Q    Let's take a look at what's been previously
21 marked as Exhibit 25.  This is a post from that same day.
22 Now, Ms. Oltmann, have you reviewed the declaration of
23 Eric Coomer that was filed in response to your
24 Anti-SLAPP motion to dismiss?  It's about 30 pages.
25     A    Say that again.

Page 339

1      Q    Dr. Coomer produced an affidavit that he
2  attaches an exhibit to his response to your Anti-Slapp
3  motion to dismiss.  Did you read that document?
4      A    I -- I might have.
5      Q    Okay.  It's a long document where Dr. Coomer
6  gives his side of the story, describes his background
7  with Dominion, things that had happened to him.  At one
8  point in that declaration, he describes an episode where
9  he went to his house to feed his pets and he wasn't
10 going at home very often at the time.  And when he was
11 in there, someone started shouting at him through the
12 wall and he said, "Please leave.  I have a shotgun.
13 You're trespassing.  I need you to leave the property."
14 Do you recall that?
15     A    No.
16     Q    Okay.  Let's look at -- let's look at what's
17 been marked as Exhibit 25.  It's from the same Parler
18 account.  "Eric Coomer" --
19     A    So again, where is this and why was this not
20 produced before and why is it not on Parler?
21     Q    I've given you-all the information I have,
22 Mr. Oltmann, I don't know anything about Parler's
23 document retention policies.  We were monitoring your
24 statements very closely at the time and we saved this --
25     A    But I can't -- I -- I don't remember posting

Page 340

1  this, but I posted this.
2      Q    This is from the -- there's -- we've already
3  established that you don't remember various things
4  relevant to this case, Mr. Oltmann, let's read the
5  statement.  "Eric Coomer want to chat with you, but you
6  are too scared.  How about you put that shotgun down and
7  come out?  Everyone is watching you, Eric.  Everyone."
8  You don't recall making this statement?
9      A    No, I don't.
10     Q    You don't find it odd that this coincided
11 specifically on the same date in real time with an
12 instance where Dr. Coomer was behind his locked door of
13 his house yelling at Scott Wheeler to leave his
14 property?
15     A    And who's Scott Wheeler?
16     Q    You're telling me you don't know who Scott
17 Wheeler is?
18     A    Who is Scott Wheeler?
19     Q    Okay.
20     A    Who is Scott Wheeler?
21     Q    I think you know the answer to that,
22 Mr. Oltmann, but it's not my job to answer questions
23 today.  Let's take --
24     A    So you're saying that Scott Wheeler is the one
25 that -- that he put a shotgun out on.  That's -- that's

Page 341

1  what you're saying.
2      Q    Let's take a look at what has been previously
3  marked as Exhibit 18, Clip 10.  And before we do this, I
4  just want to confirm you didn't -- it sounds like the
5  way you've described your -- your monitoring of
6  Dr. Coomer's movements based on the video statements
7  we've just watched, that people were reaching out to
8  you of their own accord to tell him things.  Is that
9  right?
10     A    I'm sorry, say that again.
11         MR. MALONE:  I'm going to object to the
12 characterization as monitoring.
13     Q    So you stated that some people in Salida had
14 just let you know that they were going to Dr. Coomer's
15 house.  And I'm paraphrasing, is that an accurate
16 description of?
17     A    People were reaching out to me, yes.  That he
18 has had run-ins with apparently in Salida, which is
19 quite a few people, I guess.
20     Q    And did you ask anybody to keep track of him
21 for you?
22     A    No.
23     Q    You didn't ask anyone to follow him?
24     A    No.
25     Q    Okay.  Let's play Clip 10.



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 342..345
JOSEPH OLTMANN, 12/16/2022

Page 342

1    A    And -- and frankly, I -- I have to tell you
2  the fact that we're not having a conversation about Eric
3  Coomer every day.  He should be a household name.  He
4  should never be able to leave this house at all without
5  everybody knowing who he is, where he is.  I have people
6  in Salida that literally are following him around and
7  saying, all right Joe, here's where he is at next,
8  here's where he is at next.  I found him.  I found him.
9  He's staying in this basement up here.  Oh, oh, he's at
10 his house now.  You want to know why?  Because people in
11 his own town, people in his own town think the guy is an
12 absolute terrible human being.  I -- all right, listen,
13 the stories that I was told about how he terrorized
14 someone that has been a lifetime member of the community
15 in Salida, it's third generation, and how he terrorized
16 that person is unbelievable.  And I was like, will you
17 go on the record?  He's like, yes.  I was like, great,
18 let's go on the record.  So I may have him on here.  So
19 you can see what kind of a terrible human being Eric is.
20 He's terrible.  This Eric Coomer is terrible.  I think
21 he's a terrible human being.  Terrible.
22    Q    What do you mean when you say you have people
23 in Salida telling you, Hey Joe, he's in this house.  Hey
24 Joe, he's in this basement?
25    A    This guy is talking about is the contractor

Page 343

1  that he went after.
2    Q    Okay.  So that was your person that you had
3  watching Eric Coomer?
4    A    No, that's the person that kept calling me
5  saying, this guy has done terrible things to a lot of
6  people.
7    Q    But you don't remember that person's name?
8    A    He doesn't exist.
9    Q    I'm asking you?  Who's the contractor?
10   A    He's -- he should know.  Eric knows.
11   Q    No, we don't know.  I'm asking you.
12   A    How does he not know?  I haven't talked to the
13 guy in nearly two years.
14   Q    What's his name, Mr. Oltmann?
15   A    I don't -- I have no idea, but I will get it
16 for you.
17   Q    It's convenient.  A lot of names you don't
18 recall.  So I just want to confirm, just going back real
19 quick, when you said to Judge Wang on Tuesday, "I have
20 never sent someone to his home.  That is a lie."  Were
21 you telling the truth to the judge --
22   A    Yes, I was.
23   Q    -- at that point.  Okay.  Let's take a look at
24 number 13.  We asked you for all documents or
25 communications relating to any alleged breach of

Page 344

1  election software hardware in Mesa County, including
2  documents and communications from Tina Peters, Sherrona
3  Bishop, Conan Hayes, Patrick Vernon, Gerald Wood, you
4  said you would conduct a search for those documents.
5  Have you done that?
6    A    This is number 13?
7    Q    Yes.
8    A    Where it says, "The deponent objects to this
9  request on the grounds it violates First Amendment of
10 the United States Constitution."
11   Q    Yes.  The last couple sentences, you said,
12 "Subject to the foregoing, deponent will produce the
13 non-privileged documents in his custody, possession, or
14 control.  And that you would conduct a reasonable search
15 of your records where kept in the normal course of
16 business."  Have you conducted that search?
17   A    Yeah, I don't -- there was -- there was no --
18 well, that's not true.  Because I don't think I answered
19 or that I saw it that way when I was looking at it
20 before.  Let see this real quick.
21   Q    I'll take it.  If you have responsive
22 documents, you'll supplement this disclosure.  Am I
23 correct in assuming that?
24   A    Yeah.  Yeah, I will.  I have a few more notes
25 from Sherronna Bishop.

Page 345

1    Q    Let's take a look at number 14.  We asked for
2  all communications relating to the individual who gave
3  you access to Dr. Coomer's private Facebook account.
4  You said you would conduct a search and provide those
5  documents.  Have you conducted that search?
6    A    I already -- yeah, I put that -- I did conduct
7  that and send it to you, Facebook post.  I did put that
8  back in the deal.  I sent you the Facebook posts and the
9  relevant posts.
10   Q    About -- about the individual who provided you
11 those posts, have you given us information about that?
12   A    I'm not going to give the information on him.
13   Q    Okay.  Was it Ryan McBride?
14   A    No.
15   Q    Okay.  Why won't you provide that information?
16   A    Look at what I've had to endure.  Why would I
17 give up information related to --
18        MR. MALONE:  I'm -- I'm going to instruct
19 Mr. Oltmann not to answer this question on the
20 grounds of privilege.
21        MR. KLOEWR:  Okay.  And which privilege are you
22 speaking to --
23        MR. MALONE:  News person.
24 BY MR. KLOEWR:
25   Q    News person privilege.  Okay.  Mr. Oltmann,

Page 346

1  how do you know when the individual who provided you
2  those Facebook posts accessed Dr. Coomer's Facebook
3  account?
4      A   How do I know -- say it again?
5      Q   When he accessed the account?
6      A   How do I know when?
7      Q   Yeah.
8      A   I'm -- I'm not sure I understand.
9      Q   Well, were you on the phone with this person
10 and were they accessing Dr. Coomer's account in real
11 time or were these screenshots that have been taken for
12 example, weeks prior?
13     A   No, they all happened on the 6th of November.
14     Q   They all happened on the 6th of November.
15 Okay.  How --
16     A   I believe.
17     Q   How do you know that?
18     A   How do I know it happened on the 6th of
19 November?
20     Q   Yes.
21     A   Because that's when I had the aha pit in my
22 stomach over everything that I was looking at.
23     Q   So this is a person who was already known to
24 you, presumably?
25     A   How I got access to the Facebook post was

Page 347

1  legal.  How I got access to the other posts related to
2  his Twitter was legal.
3      Q   Objection, nonresponsive.  This was a person
4  who was known to you prior to that time; is that
5  correct?  Yes or no; is that correct?  You knew this
6  person before they provided you the Facebook posts?
7      A   I got access to those posts legally.
8      Q   Objection, nonresponsive.  I will take your
9  evasiveness to mean that yes, this individual was known
10 to you.  Is that an accurate statement, Mr. Oltmann?
11     A   I got those posts legally and I got them when
12 I was developing a story for what happened in the
13 election in 2020.
14     Q   Okay.  And how do you know that the posts that
15 were provided to you -- well, do you know, are those the
16 entirety of the posts on Dr. Coomer's Facebook page?
17     A   You mean are they the posts -- is there other
18 posts that he did not scrub when he was getting rid of
19 evidence before he filed a lawsuit?
20     Q   That's not my question at all.  The person who
21 provided you these posts, did they provide you every
22 single post on Dr. Coomer's Facebook page as it existed
23 at the time, yes or no?
24     A   I believe that there were other posts.
25     Q   Okay.  How do you know that?

Page 348

1      A   I just said I believe it.
2      Q   Why?
3      A   Just hopefully there'd be something that
4  wasn't that ugly of a person all the time.
5      Q   So it's your belief there may be other posts
6  that Dr. Coomer had on his Facebook page that you've not
7  disclosed or shared?
8          MR. MALONE:  Object to the form.
9      A   Not sure I understand.
10     Q   Well, I'm trying -- you presented these posts
11 as though they created a complete picture of Dr. Coomer,
12 and I'm wondering if they do
13         MS. DEFRANCO:  Object to the form.
14     A   What do you mean?  The -- the accurate story
15 of the --
16     Q   Well, how do I know that Dr. Coomer didn't
17 also post something on his Facebook account saying that,
18 I don't know, "The -- the elections are free and fair,
19 and I would never interfere with an election"?
20     A   Well, I mean, you guys had the opportunity to
21 disclose that.  You didn't disclose it.  So I guess
22 those posts don't exist.
23     Q   Well, that's -- I'm saying at the time you got
24 access to these posts --
25     A   Look, I -- I just -- I just heard -- I just

Page 349

1  heard myself --
2      Q   -- we don't know if there's -- if there's
3  evidence in that Facebook page that was --
4      A   -- on these videos.
5      Q   Yep.
6      A   Just now.  Having to deal with what I've had
7  to deal with for the last two years.
8      Q   No, Mr. Oltmann.  Nonresponsive.  We heard --
9  I just heard you directing harassment at Dr. Coomer.
10     A   Where?  Where?
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 350

15    MS. DEFRANCO:  In person in Colorado.
16    Q    What are we have to, 58?  I'll hand you what's
17  been marked as Exhibit 58.  This was an e-mail that was
18  disclosed to us by OAN in the first case where it was
19  designated as OAN00005.  I'm going to draw your
20  attention specifically to, well, about the middle of the
21  first page there.  Subject, Eric Coomer three to Avon
22  Lyons.  That's avon@cutandpen.com and Andrew Lyons,
23  alyons@transwest.com.  This was an e-mail you sent on
24  November 8th at 8:23 p.m.  Who is Avon Lyons?
25         (EXHIBIT 58 MARKED FOR IDENTIFICATION)

Page 351

1     A    This is a mistake.  It was never supposed to
2  go to them.
3     Q    Who is Avon Lyons?
4     A    It's -- it's Andrew's son.
5     Q    Okay.  Who's Andrew Lyons?
6     A    He's a -- he was a client of Pen's.  He was
7  working on two e-mails at the same time, it sounds like.
8     Q    So this was sent to Mr. Lyons in error?
9     A    Yep, I do believe so.
10    Q    Is Mr. Lyons a member of FEC United?
11    A    No.  No.  Just a cattle guy.

Page 352

13    Q    Let's look at request number 15.  Here we ask
14  for all documents related to the Antifa call, any
15  discussion of the identities of those individuals, any
16  attempts to identify them, or any communications with
17  any of these alleged individuals.
18    A    Number 16, you said?
19    Q    Number 15.  Have you been able to identify any
20  of the other participants on the Antifa call
21  conclusively?  Last time we spoke, you hadn't been able
22  to.  Have you been able to do that since then?
23    A    Well, I think in my notes, I'm not sure, I had
24  a few people that I thought that I identified in that --
25  that call.

Page 353

1     Q    Okay.  So have you identified them and have --
2     A    I haven't spent any time at all on any of this
3  for a while.  It's been a while.
4     Q    You haven't spent any time trying to identify
5  the other members of the Antifa call?
6     A    No.
7     Q    You previously testified there were as many as
8  19 people on the call.  Do you recall that?
9     A    I think that was in the notes, too, right?
10    Q    And any one of those individuals would be able
11  to corroborate your claims about Dr. Coomer presumably,
12  right?
13    A    I'm a little confused about the fact that Joey
14  Camp has a recording of that.
15    Q    Oh, I'm confused, as well.  I'm asking you if
16  you have made any effort to identify anyone who could
17  corroborate your story.  It sounds like there's 18
18  potential individuals out there.  Have you done that?
19    A    No, I have not.
20    Q    So in two years of dealing with this
21  litigation, which you have described as destroying your
22  life and costing you hundreds of thousands of dollars, I
23  believe is representations you've made --
24    A    Hundreds of thousands?  Oh.
25    Q    Is that correct?  Is that an accurate



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 354..357
JOSEPH OLTMANN, 12/16/2022

Page 354

1   assessment?
2        A    No.  How about millions of dollars?
3        Q    Okay.  So in two years of litigating costs --
4   a case, it's cost you millions of dollars by your
5   representation and gotten 24 other defendants sued, and
6   by your repeated statements today, subjected you and
7   your family to bodily harm.  At no point in that that
8   time have you ever tried to identify any of the other 18
9   people who could corroborate your story?
10       A    Have you?
11       Q    Yes.
12       A    And?
13       Q    The call didn't occur, so we don't -- we're
14  not able to do that.  The only way we can get there is
15  through you, Mr. Oltmann.  The only way anybody in the
16  world can get facts about this story is through you, and
17  it's surprising to me that you haven't made any effort
18  in two years and all the turmoil that you've described
19  to identify a single other individual who could
20  corroborate that story and if true, presumably, work
21  to --
22           MS. DEFRANCO:  Excuse me.  I know -- I know
23       it's late, but you're here to ask questions, not
24       make speeches.
25  BY MR. KLOEWR:

Page 355

1        Q    Okay, that's fair.  I understood your
2   testimony to say you've not made any effort to identify
3   the --
4        A    No, you've spent the last two hours literally
5   just badgering me and pushing conjecture.  That's what
6   you've spent the last two hours doing.
7        Q    So you haven't been able to identify them,
8   correct?  Is that a yes?  You haven't identified any
9   other members of the call?
10       A    I have spent all of my time not doing that.
11  I've been spending my time on Dominion Voting Systems,
12  ESMS, Smartmatic, making sure that we have enough
13  information to get rid of the voting machines and the
14  mail-in ballots.  That's what I spent my time on.
15       Q    So that's why you haven't produced any
16  documents, they just don't exist for number 15, just to
17  confirm, you don't have those documents in your
18  possession?
19       A    What -- what documents?
20       Q    About the other individuals.  You just --
21  there's no other documents that we haven't seen?
22       A    I have produced the documents.
23       Q    All right.  We've only got a little time left.
24  I want to just wrap up a few loose ends in general.  If
25  you could flip open to Exhibit 22, what's been

Page 356

1   previously marked as Exhibit 22.  Do you recognize this
2   document, Mr. Oltmann?
3        A    I do.
4        Q    What are we looking at here?
5        A    The affidavit from November.
6        Q    Okay.  And this was the affidavit that you --
7   that Mr. Corporon helped you to draft?
8        A    Yep.
9        Q    And I'm going to refer your attention to the
10  bottom of page 1, on top of page 2.  And I'll read this
11  portion for you.  It says, "Then I honed in among other
12  conversations key actors in the organization who work
13  for local and state news publications.  One person of
14  interest was Hydee Beedle, identified leader of Our
15  Revolution in El Paso, Southern -- El Paso County,
16  Southern Colorado, an Antifa leader of the same area."
17  What do you mean when you say, "identified leader of Our
18  Revolution"?
19       A    Our -- our revolution is a Antifa group that
20  infiltrated the Democrats across the country.  They have
21  these little groups of Our Revolution.
22       Q    Okay.  So I haven't seen anything linking
23  Ms. Beedle to Our Revolution and --
24       A    That's a lie.  There's a video, and it's
25  actually a one of my podcasts.  You have it on there

Page 357

1   because I played the actual video.
2        Q    So describe what you mean by that.
3        A    Dating back to November of 2020.  Excuse me?
4        Q    What do you mean?  What does the video do to
5   identify Ms. Beedle?
6        A    I'm sorry?
7        Q    Does Ms. Beedle make an appearance in the
8   video and say, "Hi, my name is Hydee        Beedle, I'm
9   the leader of Our Revolution here," or -- or what?  How
10  does --
11       A    No, she was at an Our Revolution deal standing
12  on the stage.
13       Q    Standing on the stage next to Chris Jacks is I
14  believe is how you've described her position previously?
15       A    Yep.  Yep.
16       Q    I'm going to hand you what we're going to mark
17  as Exhibit 58.
18           VIDEOGRAPHER:  I thought we a 58.
19           MR. KLOEWR:  Did we have 58?  Are we at 59?
20           VIDEOGRAPHER:  Yeah, we do.
21  BY MR. KLOEWR:
22       Q    I apologize.  We'll call that 59.
23  Mr. Oltmann, do you see Ms. Beedle in this image?
24           (EXHIBIT 59 MARKED FOR IDENTIFICATION)
25       A    I do.

COOMER, PH.D. vs MICHAEL J. LINDELL, et al                              Pages 358..361
JOSEPH OLTMANN, 12/16/2022

Page 358

1     Q    And can you identify Ms. Beedle?
2     A    The woman on the right of the, excuse me, the
3  man on the right of the thing dressed like a woman for
4  the --
5     Q    Okay, let me just clarify here.  We need to be
6  clear for the record.  So on the one that you've marked,
7  can you please circle the individual that you've
8  identified as Hydee     Beedle?  Okay, thank you.  And
9  did you make that identification yourself or did someone
10 else?
11    A    I actually talked about this with Hydee      -
12 - Hydee Beedle.
13    Q    You did?
14         VIDEOGRAPHER:  Can I get my pen back?
15    Q    And Ms. Beedle told you that this individual
16 is her?
17    A    No, she said that she was a part of -- that
18 she's no longer a part of those organization.
19    Q    Do you have any other basis for claiming that
20 Ms. Beedle is a member of Our Revolution other than this
21 image?
22    A    How is that even relevant to all this?
23    Q    Well, you provided this.  This is your
24 affidavit where you identified Dr. Coomer as being on a
25 call, and you've also identified Ms. Beedle as being a

Page 359

1  member -- as -- as a specific individual.  And I'm
2  trying to determine whether your identifications in this
3  case have been accurate.  So I'm just wondering if you
4  have any other information that would suggest that this
5  individual is Hydee      Beedle.
6     A    Well, I think that in my notes, I -- I had
7  done an interview with Beedle.
8     Q    And you said she denied that she was a member
9  of Our Revolution in that interview?  Did I hear you
10 correctly?
11    A    No, I didn't say that.
12    Q    Oh, okay.  Sorry.  Well, what did she say in
13 your interview with her?
14    A    I said inside of my notes here that I thought
15 that Hydee Beedle was actually on this call.
16    Q    Okay.  I -- I think I misheard you before
17 then.  Did you say you spoke to this -- to Hydee
18 Beedle about this being here in this picture?
19    A    When I sat and talked to her about when she
20 wanted information related to this, I'm the one that
21 sent her that video and sent her the information that
22 was sent on to me, along with pictures of her sitting
23 there with communist stuff behind her.
24    Q    Okay.  And have you seen any other evidence
25 other than this photo that ties Ms. Beedle to Our

Page 360

1  Revolution?
2     A    I -- I don't recall.
3     Q    All right.  As we scroll down through this
4  document, we see the screenshot, we've already discussed
5  that for a while.  I want to look at sort of the end of
6  your declaration here.  The last paragraph before you
7  sign there, the paragraph that begins with, "I began to
8  research the connection to Diane Feinstein," it's on
9  page 6 of your affidavit, you state, "I used ARIMA
10 analysis to show me trends on data and probability
11 models to prove that they were in fact using code and
12 technology to ghost votes, switch votes, or even remove
13 probable ballots completely."  What is ARIMA analysis?
14    A    It's analysis that's used in financial system
15 so that -- the problem with this affidavit is that it
16 was nearly six pages long and now it's only three or
17 four because I was told to limit all the information in
18 it.  So all the stuff that I just wrote out as far as
19 notes and sent over to Randy, he's like, "Just sign it.
20 We can amend it later."  So this didn't even have --
21 this was just me -- there's a much bigger piece to this
22 that I sent over to Randy that Randy did not include.
23 And I was told that, "Hey Joe, don't worry about it.
24 Just get an affidavit in and we can amend this affidavit
25 later."  And I was like, "Okay."

Page 361

1     Q    Randy Corporon told you to not worry about the
2  accuracy of your affidavit, to just get it in?
3     A    Well, no.  I sent the affidavit over to him,
4  and this is a condensed version of that affidavit.  Some
5  of this stuff had made no difference whatsoever.  I
6  don't understand why the notes turned into an affidavit.
7     Q    Well, anyways, back to ARIMA analysis, did you
8  conducted this analysis yourself?  I see you say, "I
9  used ARIMA analysis to show me trends."  What ARIMA
10 analysis are you referring to?
11    A    So we have a program and some guys that work
12 inside of Pen and -- here, I'll pull this up.
13    Q    While you're looking for that, do you still
14 have access to this analysis you're referring to in this
15 affidavit?
16    A    Yeah, I don't have access to anything at the
17 Pen -- Pen level.
18    Q    You don't have access to anything at Pen?
19    A    The guy -- the guy that worked on this with
20 me?
21    Q    Yep.
22    A    Hold on a second.
23    Q    Yeah, what -- what's his name?
24    A    Hold on.
25         MR. CAIN:  While he's looking, I'm sorry to

Page 362

1    interrupt you, the Court has said we have a hard
2    stop at 5:00 because we have to exit the building.
3        MS. DEFRANCO:  So you're going to get cheated
4    out of five minutes.  You'll probably look to them
5    with that.
6        A    One second.  Pulling the stuff out of the
7    e-mail I think that -- got all the stuff in it that went
8    over to Randy.
9    BY MR. KLOEWR:
10       Q    Can you just tell me the name of the person
11   who you worked with on this ARIMA analysis?  My
12   understanding of ARIMA is that it's a fairly
13   sophisticated application.
14       A    No, not really.
15       Q    Well, are there many people at Pen who know
16   how to conduct this sort of analysis?
17       A    Only a few.  See if I have access to it.
18       MS. DEFRANCO:  Joe, what are you trying to
19   find?
20       MR. CAIN:  We need to wrap-up Q & A here.
21       MR. KLOEWR:  Yeah, yeah.  Let's --
22       VIDEOGRAPHER:  Who -- who is the person?
23       THE WITNESS:  Andrew Lerner.
24       MR. KLOEWR:  Andrew Lerner.
25       VIDEOGRAPHER:  Thank you.

Page 363

1    BY MR. KLOEWR:
2        Q    And do you still believe that that ARIMA
3    analysis proves that they were using code to ghost
4    votes, switch votes, and remove probable ballots
5    completely?
6        A    Sorry, I'm trying to find this e-mail.
7        Q    Well, it's -- my question is just do you stand
8    by this statement that the ARIMA analysis that you did
9    with Mr. Lerner showed you that they were able to use
10   technology to ghost votes, switch votes, or even remove
11   probable ballots completely?
12       A    I think it showed an anomaly in -- I did have
13   an e-mail that inside the log that had that information
14   in it.
15       Q    So at this time when you provided this, did
16   you consider yourself an expert in election technology?
17       A    No.
18       Q    Do you consider yourself an expert in election
19   technology today?
20       A    No.  I don't think -- I don't think any of us
21   are experts in electronic technology.  I think election
22   technology is supposed to do one thing and that's count
23   the vote of the people, but it's not doing it very well.
24   So all the election experts out there have created a
25   system that creates chaos.

Page 364

1        MR. KLOEWR:  Okay.  Do we want to take a quick
2    break before we wrap up or?
3        MR. MALONE:  We can.
4        MR. KLOEWR:  Just one minute real quick.  If we
5    got anything else, we'll wrap up.
6        VIDEOGRAPHER:  Stay recording or cut?  Off
7    record.
8        MR. KLOEWR:  Off record.
9        VIDEOGRAPHER:  Off the record.  Okay.  Going
10   off the record at
11   16:54.
12       (OFF THE RECORD)
13       VIDEOGRAPHER:  4:58 p.m. time.
14   BY MR. KLOEWR:
15       Q    Okay.  We do have, as we indicated, I'm not
16   sure if it was on the record or not a moment ago, but
17   the Court has given us a hard stop at 5:00 p.m. so we've
18   got to hop off here momentarily.  Just wanted to clear
19   up a few matters or confirm a few matters.
20
21
22
23
24
25

Page 365

12       Q    And we've discussed Mr. Corporon a bit various
13   times throughout this.  I understand he was your counsel
14   at some point of time, including with respect to
15   creating this affidavit, some other things.  Can you
16   clarify when Mr. Corporon began representing you and
17   when he stopped?
18       A    I don't know.
19       Q    Well, did you -- did you hire him?  Did you
20   pay him to represent you for a specific purpose?
21       A    You know, when everything happened, it
22   happened really fast. When you're in the middle of
23   something where people are attacking you relentlessly,
24   everything kind of just --
25       Q    Well, this was prior to all that.  We've



COOMER, PH.D. vs MICHAEL J. LINDELL, et al                    Pages 366..369
JOSEPH OLTMANN, 12/16/2022

Page 366

1  already established that you were talking to
2  Mr. Corporon on November 6th before any of these claims
3  occurred.
4       A    No, you established that I was talking to him
5  on November 6th. He said that, right?  I haven't seen
6  that.
7       Q    Yes, that was what --
8       A    Maybe we did on his radio program.
9       Q    He said he got a -- a text message from you at
10  11:00 p.m. on the sixth describing your claim.
11      A    Well, so then I would definitely go -- by the
12  way, no one was talking about Dominion on November 6th.
13  No one.  It wasn't even a thing.
14      Q    Which is -- it speaks exactly to my point,
15  which is why you -- you were working with Mr. Corporon
16  prior to anyone began attacking you as I understand it,
17  correct?
18      A    Yeah.  But the breakdown of -- of how you --
19  when you've never been attacked like this, the breakdown
20  of just going to fight, fight, fight, fight happens when
21  people start attacking your family and start attacking
22  you.
23      Q    So was there --
24          VIDEOGRAPHER:  For the record I have 5:00.
25      Sorry.

Page 367

1          MR. KLOEWR:  All right.  Well, we'll call in at
2  that then.
3          VIDEOGRAPHER:  Okay.  The time is 5:01 p.m.
4  Let's see, the 17th. Let me --
5          THE WITNESS:  I have some stuff that I have to
6  provide?
7          VIDEOGRAPHER:  Yeah, so doesn't include what we
8  asked for today.
9          MR. MALONE:  For today.
10         VIDEOGRAPHER:  For today of 12-16 -- at -- at
11  12-16-2022.  This is the conclusion of this
12  particular deposition on this day, case
13  1:22-CV-0129-WJF.
14         COURT REPORTER:  Okay.  And then before I go
15  off the record, Mr. Kloewr, how did you want a copy
16  of the transcript?
17         MR. KLOEWR:  Our usual arrangement if you've
18  got that on file.  Otherwise, I want it expedited
19  e-transcript.
20         MR. MALONE:  Yeah.
21         MR. KLOEWR:  Yeah.
22         COURT REPORTER:  Okay.  And then did you want a
23  copy of the video?
24         MR. KLOEWR:  Yes.
25         MR. MALONE:  We'll take electronic condensed

Page 368

1  with video, as well.
2          COURT REPORTER:  Okay.  And then Ms. DeFranco?
3          MS. DEFRANCO:  He's reading, please.  Reading
4  and signing.
5          (DEPOSITION CONCLUDED AT 5:02 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 369

1                    CERTIFICATE OF REPORTER
2                    STATE OF COLORADO
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof by me
7  after first being duly sworn to testify the truth, the
8  whole truth, and nothing but the truth; and that the
9  said matter was recorded digitally by me and then
10  reduced to typewritten form under my direction, and
11  constitutes a true record of the transcript as taken,
12  all to the best of my skills and ability. I certify
13  that I am not a relative or employee of either counsel,
14  and that I am in no way interested financially,
15  directly or indirectly, in this action.
16
17
18
19
20
21
22  DARIANA CABRERA ALVAREZ,
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 10/22/2025
25  SUBMITTED ON:  12/29/2022



February 3, 2023

**<u>Via Electronic Mail</u>**
Brad Kloewr
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, TX 78701

RE: 1:22-cv-01129-WJM (CO)

Deposition of: **Joseph Oltmann**
Taken:  December 16, 2022
Case: Eric Coomer, Ph. D vs. Michael J. Lindell, Frankspeech LLC, and My Pillow, Inc
Signature:  Reserved

YOU ARE HEREBY NOTIFIED that the following items listed below have been served upon
you for filing, as you deem necessary:

____  Exhibits (Copy/Original)

____  Deponent Errata and/or Signature Page (Copy/Original)

____  Reporter Certification

**X**  Correspondence Letters

**X**  Other:  <u>As of today's date our office has not received the witnesses errata or signature page.</u>

Feel free to contact our office should you have any questions.

                                    Respectfully,


                                    Production
                                    Group
                                    AdvancedONE
                                    Legal


AO/pg
enclosure
cc: <u>via electronic mail</u>
     all counsel in appearance



December 30, 2022

**Via Electronic**
Ingrid DeFranco
Law Office of Ingrid J DeFranco
P.O. Box 128
Brighton, CO 80601

Re:     Deposition of Joseph Oltmann
        Deposition Date: December 16, 2022
        Eric Coomer, Ph. D vs. Michael J. Lindell, Frankspeech LLC, and My Pillow, Inc
        Cause No.: 1:22-cv-01129-WJM (CO)


Dear Ingrid DeFranco:

Please have your client read and sign the attached Oral Deposition, making any necessary changes on the errata sheet that is provided.  Please see below for the amount of time that has been given for witness review and signature:

\_\_\_\_\_ 20 Days on or before _____

\_\_\_\_\_ 28 Days on or before _____

 _X_\_\_ 30 Days on or before  January 29, 2023

\_\_\_\_\_ 60 days on or before _____

\_\_\_\_\_ Other _____


Errata and Signature page should be returned to the address below:

> **Attn: Production**
> **productioncentral@advancedone.com**
> **2777 N. Stemmons Freeway**
> **Suite 1025**
> **Dallas, Texas 75207**



AO/pg
enclosure
cc: via electronic mail
       all counsel in appearance