# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

## EXHIBIT 9

---

1          IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLORADO

2

    Civil Action No. 1:22-CV-01129-NYW-SKC

3   _____

4   ERIC COOMER, Ph.D.,

5            Plaintiff,

6   v.

7   MICHAEL J. LINDELL, FRANKSPEECH, LLC,

    and MY PILLOW, INC.,

8

             Defendants.

9   _____

10        VIDEO DEPOSITION OF TINA MARIE PETERS

11              November 9, 2023

12  _____

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 1

Page 2

```
 1  APPEARANCES:
 2  ON BEHALF OF THE DEPONENT:
        GEOFFREY N. BLUE, ESQ.
 3      Gessler Blue
        7350 E. Progress Place, Suite 100
 4      Greenwood Village, Colorado  80111
        Phone: 303-906-1050
 5      Email: gblue@gesslerblue.com
        and
 6
 7      DOUGLAS I. RICHARDS, ESQ.
        Richards Carrington
 8      1444 Blake Street
        Denver, Colorado  80202
 9      Phone: 303-962-2690
        Email: doug@richardscarrington.com
10
11  ON BEHALF OF THE PLAINTIFF:
        BRADLEY A. KLOEWER, ESQ.
12      Cain & Skarnulis, PLLC
        101 N. F Street, Suite 207
13      Salida, Colorado  81201
        Phone:  719-530-3011
14      Email: bkloewer@cstrial.com
15
    ON BEHALF OF THE DEFENDANTS:
16      RYAN MALONE, ESQ. (Via Zoom)
        Parker Daniels Kibort, LLC
17      123 N. 3rd Street, Suite 888
        Colwell Building
18      Minneapolis, Minnesota 55401
        Phone: 612-355-4100
19      Email: malone@parkerdk.com
20
    Also Present: Dustin Brown, videographer
21
22
23
24
25
```

Page 3

```
 1      PURSUANT TO WRITTEN NOTICE and the appropriate
 2  rules of civil procedure, the video deposition of
 3  TINA MARIE PETERS, called for examination by the Plaintiff,
 4  was taken at Richards Carrington, 1444 Blake Street, Denver,
 5  Colorado, commencing at 10:07 a.m. on November 9, 2023,
 6  before Deanna Baysinger, a Notary Public and Registered
 7  Professional Reporter in and for the State of Colorado.
 8
 9
10                      I N D E X
11
    EXAMINATION:                          PAGE
12  By Mr. Kloewer                          5
13
14  EXHIBITS:                             PAGE
15
    Exhibit 190   Order on Pending Discovery Motions    7
16
17
18
    PREVIOUSLY MARKED EXHIBITS:            PAGE
19
20  Exhibit 1     Subpoena To Testify At A Deposition In   10
                  A Civil Action
21
    Exhibit 2     Excerpt from Twitter between Senator    81
22                Pat Toome and Tina Marie Peters
23  Exhibit 3     Thumb drive with videos               105
24
25
```

Page 4

```
 1            P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  Good morning.  We are
 3  on record at 10:07 a.m. November 9, 2023.
 4          This is the video recorded deposition of
 5  Tina Peters.
 6          My name is Dustin Brown here with our
 7  court reporter, Deanna Baysinger.
 8          This deposition is being held at 1444
 9  Blake Street in Denver, Colorado.
10          Caption of the case is Coomer versus
11  Lindell, et al.
12          Please note that audio and video recording
13  will take place unless all parties agree to go off the
14  record.
15          If there are any objections to proceeding,
16  please state them at the time of your appearance
17  beginning with the noticing attorney.
18          Appearances please.
19          MR. KLOEWER:  Here on behalf of the
20  Plaintiff, Dr. Eric Coomer.  My name is a Brad Kloewer.
21          MR. BLUE:  Sorry, yeah, me next.
22          Geoff Blue on behalf of the deponent Tina
23  Peters.
24          MR. RICHARDS:  My name is Doug Richards.
25  I represent Ms. Peters in People versus Peters pending in
```

Page 5

```
 1  Mesa County District Court, Case Number 22CR371.
 2          MR. MALONE:  And Brad Malone on behalf of
 3  all the Defendants.
 4          TINA MARIE PETERS,
 5  called as a witness, having been first duly sworn, was
 6  examined and testified as follows:
 7              EXAMINATION
 8  BY MR. KLOEWER:
 9      Q.  All right.  Good morning, Ms. Peters.
10      A.  Good morning.
11      Q.  My name is Brad Kloewer.  I represent the
12  Plaintiff in this action, Dr. Eric Coomer.
13      A.  Okay.
14      Q.  We met about a year ago and just again
15  briefly before going on the record here this morning.
16          I know you've been deposed before so I
17  don't want to belabor the rules.  I know you know the
18  ground rules but I do want to just briefly reiterate a
19  few basic rules to help us get through this deposition
20  today.
21      A.  Okay.
22      Q.  If -- if I ask any question that doesn't
23  make sense to you or isn't clear, please let me know, and
24  I will rephrase that question and try to ask it in a way
25  that makes sense.
```

2 (Pages 2 - 5)

1        The other thing is, this is not a marathon.
2  You are welcome to take a break at any time, if you need
3  to use the restroom or get something to eat or whatever,
4  that's fine.  The only thing I ask with that is that if
5  there's a question pending on the table, that we respond
6  to that question before taking a break.  Is that fair?
7        A.  Yeah.  That's fair.  Yeah.
8        Q.  Okay.  And the third main rule that I want
9  to highlight is the most important person in the room here
10  today is sitting to your right.  That's Deanna.  She's
11  taking down every word you say and that I say, so it's
12  important that you and I not speak over each other.
13        I'm going to do my best to speak slowly
14  and clearly to help her get everything written down, but
15  I ask if you could please do the same as well, that will
16  help us all get through this.
17        (Interruption.)
18        THE DEPONENT:  Thank you so much.  I
19  appreciate that.
20        Q.  (By Mr. Kloewer)  I don't think there's any
21  other big major rules before we proceed, so we can get
22  into the questioning now.
23        Ms. Peters, can you state your full name
24  for the record.
25        A.  Tina Marie Peters.

Page 6

1        Q.  And, Ms. Peters, are you on any medications
2  today that may affect your ability to give testimony?
3        A.  No.
4        Q.  And, Ms. Peters, as you are aware, we took
5  your deposition almost exactly one year ago today, and the
6  Court has ordered that deposition to reoccur today.  Are
7  you aware of that?
8        A.  I am.
9        Q.  Okay.  And have you reviewed the order that
10  was issued by the Court in this matter regarding this
11  deposition?
12        A.  Briefly.  I may need to refer to it some
13  more to understand it.
14        Q.  Sure.  Well, let me give you a copy of
15  that.  We're going to mark this as --
16        A.  Thank you.
17        Q.  -- Exhibit 190.  If we can continue with
18  that consecutively.  Sorry.  Deanna has the labels there.
19  I've got a copy for your counsel here as well.  A second
20  one here.
21        (Exhibit Number 190 was marked.)
22        MR. RICHARDS:  That's okay.
23        MR. KLOEWER:  You're all set.
24        THE COURT REPORTER:  If you want to hand
25  that to me, I will put a sticker on that.

Page 7

1        THE DEPONENT:  On this one?
2        THE COURT REPORTER:  Yes.
3        MR. BLUE:  I'm sorry.  This is what
4  number?
5        MR. KLOEWER:  190.  We're just going to
6  continue consecutively from where we left off.
7        Q.  (By Mr. Kloewer)  Is this the order that
8  you reviewed, Ms. Peters?  Does this look ?
9        A.  I just saw it for the first time this
10  morning so --
11        Q.  Okay.
12        A.  But I'm sure my attorneys have reviewed
13  it.
14        Q.  Okay.  I want to draw your attention
15  specifically to Page 28 of this order.  It's printed on
16  both sides.  If you can flip through to there.
17        MR. BLUE:  I'm sorry.  What page?
18        MR. KLOEWER:  28.
19        Q.  (By Mr. Kloewer)  All right.  So I'm going
20  to read from the top here, and you can tell me if you see
21  what I'm referring to.
22        The Court says, Accordingly, this Court
23  orders Ms. Peters to review the documents requested by
24  the subpoena and supplement her responses no later than
25  October 31, 2023.

Page 8

1        Now, I heard you say you just saw this
2  order for the first time this morning; is that correct?
3        A.  So I believe this -- I believe this -- I
4  mean, it looks familiar but I think my attorneys are the
5  ones that -- yeah, I have so many -- I have so many
6  papers so I can't be certain.
7        Q.  Okay.  Well, my question is -- I mainly
8  want to know, did you conduct that review of the documents
9  requested in the subpoena upon receipt of this --
10        THE DEPONENT:  Have we gone over this?
11        THE COURT REPORTER:  I'm sorry.  I --
12        MR. BLUE:  You can't --
13        THE DEPONENT:  I'm sorry.  Have we gone
14  over this because I know we've gone over a lot.
15        MR. BLUE:  I -- I -- I don't know the
16  answer to that --
17        THE DEPONENT:  Okay.  It's not --
18        MR. BLUE:  -- because you would have done
19  it with Scott.
20        THE DEPONENT:  Oh, okay.
21        A.  I'm not -- I'm not for certain.  We've
22  gone over a lot.  I mean, possibly when I see it, you
23  know, it -- I've just gone over a lot of documents, so I
24  will have to see if my memory --
25        Q.  (By Mr. Kloewer)  Okay.

Page 9

3 (Pages 6 - 9)

1    A. -- serves me right.
2    Q. You don't recall producing any documents in
3 the last 30 days, for example.
4    A. Oh, I've produced a lot of documents in
5 the last 30 days. I just can't be certain which ones --
6    Q. Okay.
7    A. -- to help you with that.
8    Q. Well, I will represent that we've never
9 received any supplemental disclosure in this case and
10 that's why I'm asking if --
11    A. Oh.
12    Q. -- if you conducted this search and if you
13 supplemented your records accordingly.
14    A. Oh, okay. Yeah, not to my knowledge.
15    Q. Okay.
16    A. Yeah. Thank you.
17    Q. Well, I do want to take a look at the
18 subpoena, and we will go through and see which documents
19 we requested and I just want to confirm for the record
20 whether any documents responsive to that subpoena exist.
21       So I'm going to show you here what has
22 been previously labeled as Exhibit 1, and Deanna doesn't
23 have to label this one because it already has a sticker
24 on it from the prior deposition.
25    A. Okay.
Page 10

1    Q. Do you recognize the document I've just
2 handed you, Ms. Peters?
3    A. I don't recognize this document, but I
4 recognize that we were at the Hotel Maverick on that date
5 it has on here.
6    Q. Okay. And I know -- as you've just
7 indicated, I know you've gone through a lot of similar
8 documents over the last couple of years --
9    A. That's right.
10    Q. -- so I don't expect you to recall
11 everything.
12       I will represent that this was the
13 subpoena that was previously issued to you.
14    A. Uh-hmm.
15    Q. I just want to draw your attention to the
16 very last page of this document, so you can just flip to
17 the end there?
18    A. Okay.
19    Q. It's a page with a -- it's labeled
20 Documents Requested --
21    A. Okay.
22    Q. -- at the very top.
23       All right. We're just going to go through
24 these one by one here, and the first category of
25 documents we requested was, All written communications
Page 11

1 between you and Lindell, FrankSpeech, or My Pillow
2 between January 1, 2020, and the present, including, but
3 not limited to, all written communications relating to
4 Dr. Coomer or Dominion Voting Systems. Do you see that?
5    A. Uh-hmm. I do.
6    Q. Okay.
7    A. So -- so -- oh, go ahead.
8    Q. What I was going to ask, since this order
9 was issued, do you -- have you reviewed your
10 communications to see if any documents responsive to this
11 request are in your possession?
12    A. You know what? I -- I don't think I have
13 but I don't -- I can't be certain. I just know that
14 Dominion Voting Systems, we used that when I was clerk
15 so...
16       MR. BLUE: Just answer the questions that
17 he's asking you, though. He's asking you about --
18       THE DEPONENT: So -- uh-hmm. Uh-hmm.
19       MR. BLUE: -- whether you reviewed
20 documents.
21       THE DEPONENT: Yeah.
22    A. No. This -- this is probably accurate
23 right here.
24    Q. (By Mr. Kloewer) Okay. And over the last
25 few years and -- and I'm sure your counsel will jump in
Page 12

1 and I want to be clear, I'm not seeking responses between
2 the time frame of May 2021 --
3    A. Uh-hmm.
4    Q. -- and August 2021. The Court's order is
5 explicit in limiting the questioning here to that, so
6 that's not what I'm looking for.
7       But I -- I do want to get a general idea
8 of how exactly you have communicated with the Defendants
9 in this case over the years.
10       For example, Mr. Lindell, how have you
11 typically communicated with Mr. Lindell?
12    A. You know, I -- I don't -- I mean, I don't
13 communicate often with Mr. Lindell but he is -- I mean, I
14 hadn't even met him until the symposium. So -- so are
15 you asking me -- say that again. Are you asking me how I
16 communicate with him or...
17    Q. Yeah, let me clarify a bit. So, what I'm
18 looking for is if you are talking to Mr. Lindell, is that
19 over text message? Do you email him? Are they phone
20 calls? That's what I'm trying to understand.
21    A. Oh, I see. I get a lot of emails from his
22 company, you know, things like that. So yeah. But
23 specifically I don't -- I don't recall.
24    Q. Okay. And I'm not referring to promotional
25 materials from My Pillow for example.
Page 13

4 (Pages 10 - 13)

1    A.  Oh.

2    Q.  I just mean if --

3    A.  Uh-hmm.

4    Q.  -- if -- if you were to communicate with
5 Mr. Lindell or try to -- would you reach out to him on a
6 phone call?  Would you send him an email and say let's
7 talk?  Would you set up a Zoom meeting --

8    A.  Sure.

9    Q.  -- something of that nature?

10    A.  Sure.

11    Q.  What's the typical means by which you
12 communicate with Mr. Lindell?

13    A.  You know, he has admin assistant that
14 handles that.  I know with Cause of America, that would
15 be like the people that are over that.  There are --
16 there are, like, Monday night calls sometimes that he's
17 on with Cause of America.  You know, he's a very public
18 figure so -- with -- I mean, he's not readily available
19 for just anybody to talk to.

20    Q.  So if you wanted to speak with Mr. Lindell
21 about some matter, would you reach out to him directly or
22 would you go through his assistant that you mentioned?

23        MR. BLUE:  Let me just stop for a second.
24        I'm kind of curious as -- isn't this
25 deposition about the things that occurred before May

Page 14

1 of '21?  Is that right?  Or --

2        MR. KLOEWER:  To some extent.  There are
3 also a number of publications that occurred after August
4 of 2021.

5        MR. BLUE:  By Mr. Lindell?

6        MR. KLOEWER:  And by Ms. Peters
7 on FrankSpeech.

8        MR. BLUE:  She's not -- she's not a party
9 in the case; right?

10        MR. KLOEWER:  No, she's not, but the
11 publications involving her interviews on FrankSpeech are
12 subject to liability in this proceeding.  So that's --

13        MR. BLUE:  To her?

14        MR. KLOEWER:  We will get into that.  No,
15 but to the Defendants.  I mean, those are -- those are
16 publications of which we will get into that occurred in
17 September of 2022, so well after the time frame limited
18 by the Court.

19    Q.  (By Mr. Kloewer)  And, Ms. Peters, when you
20 refer to Mr. Lindell's assistant, are you referring to
21 Katelyn Gamlin --

22        MR. BLUE:  And I apologize.  One last
23 question.

24        MR. KLOEWER:  Sure.

25        MR. BLUE:  And the September 2022 is the

Page 15

1 last statement you have by her?  Is that what I'm
2 hearing?

3        MR. KLOEWER:  That's the last -- yeah,
4 that's correct.  Yes.

5    A.  What was that statement?

6    Q.  (By Mr. Kloewer)  We will get into that in
7 a bit.  So it's an interview that you conducted on
8 FrankSpeech with Brannon Howse?

9        MR. BLUE:  Is that the video you showed me
10 earlier?

11        MR. KLOEWER:  Yeah, that's --

12        MR. BLUE:  So you found the date for that?

13        MR. KLOEWER:  September 7th of 2022.  And
14 that's just -- to make a clear record, that's referenced
15 in paragraphs 118, 119, 120, 121 of Plaintiff's second
16 amended complaint in this case.

17    Q.  (By Mr. Kloewer)  Just going back to my
18 question.  If you are trying to reach out to Mr. Lindell,
19 would you go through his personal assistant to set up some
20 sort of call or communication or what's the process there
21 typically?

22    A.  You know, so to be -- you know, to be
23 when -- to be on the show or something like that, I would
24 go through probably Brannon Howse or -- I'm trying to
25 think.  I mean, there would be different circumstances

Page 16

1 for different things, I think.  Cause of America would be
2 probably Michelle and, you know, those people there.  So
3 I'm just --

4    Q.  Michelle who?  What's the last name?

5    A.  There's a woman -- I don't, I think that's
6 with Cause of America on there.  There's -- I mean, you
7 can always email.  It depends on who, I think, would get
8 that -- I don't know, you know, those types of
9 communications.

10        So I don't know.  I don't communicate with
11 him very often.  He's a very busy man, obviously, you
12 know.  But I -- that's probably how I would do that is
13 through other channels if possible, you know.

14    Q.  Okay.  You mentioned for FrankSpeech you
15 would go through Brannon Howse?

16    A.  Uh-hmm.

17    Q.  And how would you do that?  Is that
18 typically through calls?  Text messages?

19    A.  He has a producer, his son, Logan, which
20 I've been on Skype before, I think.  Skype or Zoom, one
21 of those.

22    Q.  And you've been a -- you've been
23 interviewed on FrankSpeech multiple times; correct?

24    A.  Uh-hmm.  That's correct.

25    Q.  And are those interviews typically

Page 17

5 (Pages 14 - 17)

1  scheduled beforehand?
2      A.  I'm trying to think back of -- of -- I
3  mean, it's been a long time since I've been on there so
4  I'm trying to think of what the circumstance was.
5          I know that when I was at the Capitol and
6  I was opposing the Senate Bill 22153 because of the
7  outreach or the usurping the clerk's authorities and
8  consolidating it with the Secretary of State.
9          I know Mr. Lindell was there then.  Yeah.
10 So that was -- that's when I -- I think I was on -- I
11 think I was on Brannon then.  I -- I don't remember
12 exactly.  I would have to look back.  I have been on a
13 lot of shows --
14     Q.  Sure.
15     A.  -- so.
16     Q.  But just to confirm, if you were to be
17 interviewed on FrankSpeech, would they interview -- would
18 they email you beforehand requesting to set a time for
19 that?
20     A.  No, not necessarily.  I think sometimes --
21 like if something was happening, you know, I could
22 probably text Brannon or he would -- I'm trying to think
23 of how I -- I think Brannon would text me.  I'm trying
24 to -- I'm trying to remember.  Like I said, it's been a
25 long time since I've been on there.

Page 18

1      Q.  Sure.
2      A.  So I don't know.  Yeah.
3      Q.  And on these various interviews you've
4  given on FrankSpeech, is the topic matter -- do you ever
5  establish that before the interviews or how do you know
6  what you are going on the show to discuss?
7      A.  Well, usually it would be current events,
8  what's going on, you know, what my opinion is on
9  something, you know.  You know, I know that there's a lot
10 of -- people have different opinions on different
11 subjects and -- yeah.
12     Q.  Do you recall ever receiving an email from
13 someone at FrankSpeech proposing an interview or topic for
14 an interview?
15     A.  No.  No.  I don't think they've ever
16 basically told me what to say.  I think -- I think with
17 Mr. Lindell and -- and FrankSpeech, it's pretty much an
18 open platform for people to be able to -- I don't
19 think -- I can't ever think of them directing me
20 personally to say anything or to -- yeah.  I can't -- I
21 can't recall that.  I mean, it's pretty much an open
22 platform for people to voice their opinions, would be
23 my -- would be my impression.
24     Q.  Okay.
25     A.  Yeah.

Page 19

1      Q.  And when you say sometimes you've emailed
2  or there may have been emails, what email account would
3  those emails have been sent to?
4      A.  Probably -- I mean, I'm trying to think.
5  There's a My Pillow email that I would probably think
6  would go to those.
7      Q.  So, sorry, just to confirm.
8      A.  Maybe --
9      Q.  We will circle back to that.  My question
10 is which -- which of your emailing addresses --
11     A.  Oh.
12     Q.  -- would you be communicating with
13 FrankSpeech?
14     MR. BLUE:  And this is --
15     A.  Probably --
16     MR. BLUE:  Sorry.  Go ahead.
17     THE DEPONENT:  Go ahead.
18     MR. BLUE:  No.  No.  Go ahead.  There's
19 not an objection so...
20     THE DEPONENT:  Okay.
21     MR. BLUE:  And, actually, can you give a
22 time frame?
23     THE DEPONENT:  Yeah.
24     Q.  (By Mr. Kloewer)  Sure.  Well, I'm
25 referring generally to the time frame established by the

Page 20

1  subpoena, January 1, 2020, through the present, excluding,
2  as I mentioned before, the timeframe outlined in the
3  order.  So January 1st of 2020 through the present minus
4  May through August of 2021.
5      A.  Let me write that down.  Okay.
6      Q.  Yeah, sorry.  I realize it's a bit
7  confusing --
8      A.  January -- yes, it is confusing because
9  there's a lot that's happening --
10     MR. BLUE:  I need that because --
11     A.  Yeah, January.  I will get a pen out.
12     MR. RICHARDS:  Do you need a notepad?
13     THE DEPONENT:  Yeah.  Yeah.
14     A.  It is kind of confusing because there's a
15 lot of -- a lot of time that's gone by and a lot of
16 things have happened so it's not -- it's not real clear
17 what you're saying.
18     THE DEPONENT:  Oh, thank you.
19     MR. BLUE:  Here you go.
20     A.  So, yeah, if you can be a little bit more
21 specific because I'm kind of -- you know, I'm kind of
22 reaching to give you an answer, and I want to be
23 accurate, you know.
24     Q.  (By Mr. Kloewer)  Sure.  Yeah.  So I'm
25 talking about January 1 of 2020 --

Page 21

6 (Pages 18 - 21)

1    A. January -- wait a minute. Hang on.
2 Uh-oh.
3    Q. -- through the present, so November 9th of
4 2023.
5        MR. BLUE: I will get you another one.
6        THE DEPONENT: Hang on. I'm sorry. I
7 could not -- I could not get that.
8    Q. (By Mr. Kloewer) Through the present,
9 November 9, 2023.
10        THE DEPONENT: I probably can find one
11 too. Thank you. This one looks good. All right.
12    A. All right. January -- say that again.
13    Q. (By Mr. Kloewer) January 1 of 2020.
14    A. Of 2020.
15    Q. 2020.
16    A. Through --
17    Q. Through today, November 9, 2023.
18    A. -- today. Okay. And then -- and then you
19 are excluding.
20    Q. Excluding the time frame of May 2021
21 through August of 2021, so May 1st of --
22    A. May.
23    Q. -- 2021 through August 30th.
24    A. May. August 30 of 2021.
25    Q. Yes.

Page 22

1        THE DEPONENT: I don't know how many email
2 addresses I have.
3    A. Like you want a number of email
4 addresses --
5    Q. (By Mr. Kloewer) Yes.
6    A. -- or -- I don't know. I don't know. I
7 just -- you know, I have made email addresses for -- for
8 my -- for my business, for -- so -- be a little bit more
9 specific --
10    Q. Sure.
11    A. -- what you are asking me.
12    Q. Which email addresses have you communicated
13 with any of the Defendants with?
14    A. Okay.
15    Q. And I'm referring to Mike Lindell,
16 FrankSpeech or My Pillow. So if you -- if you have a
17 separate business email address --
18    A. Right. Right.
19    Q. -- something else, I don't need to know
20 about that.
21    A. Oh, okay.
22    Q. I just want to establish --
23    A. Okay.
24        THE COURT REPORTER: I'm sorry. We need
25 to do one at a time. So every time you say, "Uh-hmm"

Page 24

1    A. Okay. All right. Okay. Let me think
2 about this for a minute.
3        So January -- so I didn't even know him
4 until August when I met him for the first time at the
5 symposium.
6    Q. Okay.
7    A. So that would take out all of 2020 and
8 20 -- almost all of 2021.
9    Q. Okay.
10    A. August, then there would be September,
11 October, November, that kind of -- so -- so you are
12 saying -- so I would be September the 1st through --
13 through today.
14    Q. Yep.
15    A. Okay.
16    Q. So I guess maybe an easier way to frame
17 this might be --
18    A. 2021.
19    Q. -- how many email addresses do you have?
20    A. Oh, my gosh. Let me think for a minute.
21 So I have my clerk's email address --
22    Q. When you say clerk's email address, you
23 mean your Mesa County government email address?
24    A. Uh-hmm. Yeah. Yeah. Uh-hmm. Yeah.
25 Yeah. You know, and --

Page 23

1 "Yeah", I'm writing that so I'm trying to get two people
2 at the same time.
3        So if you could just wait for his entire
4 question to be asked, and that way it's a nice clean
5 transcript and I can get everything you say and
6 everything he says.
7        THE DEPONENT: I apologize for that.
8 Thank you.
9        THE COURT REPORTER: That's okay.
10        MR. KLOEWER: I'm as bad an offender as
11 you are right now. I am breaking my own rule right out
12 of the gate.
13        MR. BLUE: We were doing a hearing last
14 week and I did it numerous times on cross-examination, so
15 I get it.
16    Q. (By Mr. Kloewer) Okay. So back to the
17 question.
18        I just want to know about the email
19 addresses that you've used to communicate with these
20 Defendants.
21    A. You know, I would have to check. I would
22 have to check that. Because I know that I provided the
23 email addresses, and I don't remember which ones those
24 were. So I would have to check for that.
25    Q. Okay. But it sounds like you have several

Page 25

7 (Pages 22 - 25)

Veritext Legal Solutions
800-336-4000

Page 26

1 email addresses.
2     A. I do. I have a business email, I have my
3 clerk's email, I have, you know, personal with my family,
4 you know. Yeah, so...
5     Q. And -- and just to confirm, you didn't --
6 you didn't review any of those email accounts for
7 communications that might be responsive to this request.
8     A. Back when -- yeah. Yeah, I have. Back
9 when I was asked for this information, and I supplied
10 everything that I had, so yeah.
11     I mean, I went through here to -- to, you
12 know, kind of bullet point -- Scott went over with me,
13 you know, kind of what --
14     MR. BLUE: Hold on a second.
15     THE DEPONENT: Oh.
16     MR. BLUE: Be careful about what you say
17 about what you talked with Scott with because that's
18 attorney-client privilege.
19     THE DEPONENT: Okay. All right.
20     MR. BLUE: All right. So just make sure
21 you are answering the questions that he asks.
22     THE DEPONENT: Okay. Perfect.
23     A. Yeah. I just wanted to be as complete as
24 I could, you know, with my memory and the length of time
25 it's been.

Page 27

1     Q. (By Mr. Kloewer) So in 2022, you starred
2 in a film produced by Mike -- by Mike Lindell called
3 Selection Code? Is that correct?
4     A. Yes, that is correct.
5     Q. And were you in contact with Mr. Lindell
6 during the production of that film?
7     A. No, I was not.
8     Q. Who -- so was he involved in the production
9 of that film?
10     A. From what I understand, yes, but -- but it
11 was a separate group that was doing that.
12     Q. And what was that group?
13     A. You can look on the -- you can look on the
14 Selection Code movie and it gives who the producer is,
15 who the, you know, director is and all of that.
16     Q. So at no point were you in direct contact
17 with Mr. Lindell during the production of that film?
18     A. No.
19     Q. Do I understand that correctly?
20     A. No. No. No. No. We didn't talk about
21 the -- the -- about Selection Code so...
22     Q. And last one here, My Pillow, I know you
23 previously produced some promotional emails you had
24 received from My Pillow for various products.
25     A. Uh-hmm.

Page 28

1     Q. Have you ever been in contact with anyone
2 else at My Pillow?
3     A. Katelyn because I've seen her at, you
4 know, events. No. You know, that -- I mean, not to my
5 recollection. Yeah.
6     Q. And what is your understanding of Katlyn's
7 role at My Pillow?
8     A. I think she's probably, you know, his --
9 his admin like, you know, like I had, you know, admins in
10 business and things like that. Yeah, that's...
11     Q. But you understand her to be employed by My
12 Pillow?
13     A. Well, I don't know if it's My Pillow,
14 FrankSpeech. I'm not sure who -- yeah, what her official
15 employment is. I don't --
16     Q. Have you ever emailed --
17     MR. BLUE: Hold on. I just want to stop.
18 Not you. Are you done with your answer?
19     THE DEPONENT: Yes.
20     MR. BLUE: Okay. Ryan, were you trying to
21 make a statement?
22     MR. MALONE: Yes. I objected to the
23 foundation of that question. I don't know if it got on
24 the record or not.
25     MR. BLUE: It probably wasn't because we

Page 29

1 didn't hear it.
2     MR. MALONE: Okay. Thank you.
3     MR. BLUE: Sure.
4     THE DEPONENT: Okay. What does that mean,
5 the foundation?
6     MR. BLUE: So, do you want to take this
7 one since it's your deposition?
8     Q. (By Mr. Kloewer) Sure. And I will just
9 note that, and you've done it a few times and it's not --
10     A. Okay.
11     Q. -- been a problem yet but you can't ask
12 your attorney questions during the deposition.
13     A. Oh, okay.
14     Q. I'm trying to understand what your
15 knowledge --
16     A. Okay.
17     Q. -- of the various matters is.
18     A. Oh, gotcha. Okay.
19     Q. He can object to certain questions but he
20 can't provide you with any answers. So you are welcome
21 to -- to circle back and review those matters with him
22 when we go off the record, but during the deposition, you
23 can't refer to your attorney for --
24     A. Oh, I apologize for that. Yeah.
25     Q. I couldn't --

**Page 30**

1     (Cross talk.)
2     A.  I'm trying to -- I think I'm trying --
3  because he is my counsel, I'm trying to understand what
4  you are saying so I just should ask you what you mean by
5  this.  Is that what I'm understanding?
6     Q.  That's correct.
7     A.  Okay.
8     Q.  During the deposition, Mr. Blue can't
9  assist you with providing any answers to any questions.
10     MR. BLUE:  The only time that you can --
11  that we can talk during the deposition while a question
12  is pending is if there's a potential privilege that we
13  have -- that I have to clarify with you.
14     THE DEPONENT:  Okay.
15     MR. BLUE:  Okay.
16     THE DEPONENT:  And you will just let me
17  know that.
18     MR. BLUE:  Yeah --
19     THE DEPONENT:  Okay.
20     MR. BLUE:  -- I will step in.  Otherwise,
21  you just need to answer the questions that he asks you.
22     MR. RICHARDS:  Can I ask a question?
23     Are you -- the glare is going to just be
24  probably another just 15 minutes or so.
25     THE DEPONENT:  Oh, yeah, no, I'm good.

**Page 31**

1  Yeah, I moved a little bit.
2     MR. RICHARDS:  Are you okay?  Okay.
3     THE DEPONENT:  Did I -- did I move out of
4  your --
5     MR. RICHARDS:  I can see that you are
6  still in the frame --
7     THE DEPONENT:  Oh, uh-hmm.
8     MR. RICHARDS:  -- but I just want to make
9  sure you're comfortable.
10     THE DEPONENT:  Yeah, thank you.  I
11  appreciate that.  I can move in and out.  Uh-hmm.
12     Q.  (By Mr. Kloewer)  Just to button up
13  Number 1 before we move on, do you recall ever texting or
14  emailing with Ms. Gamlin for any reason?
15     A.  Ms. Who?
16     Q.  Ms. Gamlin, Katelyn Gamlin.
17     A.  Oh, that's her last name?  Oh.  I don't
18  know.  I can't recall.  I can't recall.
19     Q.  Okay.
20     A.  I -- I email a lot of people and text a
21  lot of people so...
22     Q.  And on that note, I saw before we got
23  started today, you have a cell phone; correct?
24     A.  I do.
25     Q.  And how long have you had that cell phone?

**Page 32**

1     A.  Well, the FBI took, as you are aware, all
2  of my devices so those were -- those were taken
3  November 16, 2021.  So those -- yeah.
4     Q.  And -- and the cell phone you have now, you
5  purchased after the FBI took your prior devices; is that
6  correct?
7     A.  Yes.
8     Q.  And you've had that same device since that
9  time?
10     A.  I had some temporary devices, you know,
11  that I just -- I don't use anymore.  I think -- I
12  think -- no, I think the FBI took those too.  I don't
13  know.  Yeah.  I mean, I have -- yeah.  I mean, now I have
14  to have a cell phone, yes.
15     Q.  And is that -- so do you still possess any
16  of those other temporary devices you just referenced?
17     A.  No.  No.  They -- no, the FBI took all of
18  those.
19     Q.  And so if I understand correctly, the cell
20  phone you have now you purchased presumably late
21  November 2021?  I'm speculating.  Correct me if I'm wrong.
22     A.  No.  Let's see.  I -- I would have to look
23  at records to see when I purchased that, yeah.
24     Q.  And how do you typically communicate on
25  that?  Is it through the normal text messaging app that's

**Page 33**

1  sort of a standard default app on the phone?
2     A.  Usually like a -- I have a Signal app that
3  just -- because I get -- I have so many -- you know, I
4  mean, I've got supporters that contact me, different
5  people that contact me.  It's set to burn ones, you know,
6  that I don't need.  So there's a -- there's a set on
7  there on Signal that you can put so that it -- so you
8  don't accumulate a volume and use up all your cell --
9     Q.  Do you do all of your text messaging
10  through Signal?
11     A.  For the most part.  My mom, you know,
12  we -- we go back and forth.  We use both.  Yeah.
13     Q.  And you said --
14     A.  Sometimes.
15     Q.  -- you have it set to -- to delete text
16  messages you don't need; is that correct?
17     A.  Yeah.  I mean, you know, it's just a --
18  it's a function that it has to -- so you can just stay
19  focused on your present texts, you know.  Because
20  usually, I mean, having been a prior business owner,
21  usually when you are done with something, you are, you
22  know, done.
23     Q.  And so do you -- how do you determine which
24  ones you might need and which ones are set to delete?
25     A.  Oh, my goodness.  I guess the relevancy of

9 (Pages 30 - 33)

1 what the subject matter is about. I mean, if it's
2 something like a -- a meeting or whatever that's already
3 passed or -- you know, I mean, I don't know that I have
4 any set, prescribed reason for -- for one way or the
5 other. Yeah.
6        Q. And you make that determination on a sort
7 of message-by-message basis whether to delete or to keep
8 it?
9        A. I don't know that I have any prescribed --
10 yeah. And let me ask you, why are you asking that?
11 Because I think that maybe if I understand the context --
12        Q. Sure. Yeah.
13        A. -- of it, I can -- I can answer you a
14 little bit more direct.
15        Q. So on Signal, for example, if you have an
16 ongoing conversation with someone, you can set those
17 particular messages to delete after a certain time frame.
18        A. Yeah, you can have all of your messages to
19 do that. Uh-hmm.
20        Q. So what I'm trying to understand is, are
21 there individuals that you have set your Signal to delete
22 automatically as opposed to other individuals that do not
23 delete automatically?
24        A. Geez. I don't know. I don't know that
25 I've paid that much attention to it, you know. I mean, I
Page 34

1 would have to go back and look and see who I have what.
2 I mean, yeah, so...
3        Q. Do you ever text with Mike Lindell on
4 Signal?
5        A. No. Uh-uh.
6        Q. No. Have you ever?
7        A. Uh-uh.
8        Q. All right. Moving on to Number 2, and I'm
9 sorry to belabor the specifics. My hope and intent is
10 that this will streamline the remainder of the questions.
11 I just want to sort of get a lay of the land --
12        A. Sure.
13        Q. -- by the means on which you communicate
14 with folks on the front end.
15        Moving to Number 2, All written
16 communications between you and Joseph Oltmann between --
17 again, we established the same time frame so I will apply
18 that as we've previously discussed, between January 1,
19 2020, and the present, excluding that -- that window in
20 2021.
21        A. Uh-hmm.
22        Q. Did you conduct a review of your different
23 accounts to see if you had any communications responsive
24 to this request?
25        A. I did, and I don't even think I knew him
Page 35

1 until -- I -- I'm trying to think when I first met him.
2 Yeah. Yeah, I can't remember but it was -- I think -- I
3 don't know if I met him before or after the symposium. I
4 think it was definitely after and -- yeah. So I can't be
5 real clear on that.
6        Q. You still in contact with Mr. Oltmann?
7        A. You know, he is doing some of -- some
8 work, I think, for -- for Conservative Daily, so I've
9 been on that show before. Uh-hmm. Yeah.
10        Q. Do you have a general idea of how many
11 times you've been a guest on Conservative Daily?
12        A. Oh, my gosh. No. Uh-uh. I don't keep
13 track of all of that. Yeah.
14        Q. Would you say more than ten?
15        A. I -- like I said, I wouldn't -- I don't
16 know. I can't give you a number.
17        Q. Same question I had before about
18 FrankSpeech.
19        How are those interviews scheduled? Does
20 Mr. Oltmann reach out to you beforehand to set a time?
21        A. No. No. Like I said before, that was
22 mainly with -- with Brannon and Logan. Logan is his --
23 his producer, I think.
24        Q. And with respect to Conservative Daily, are
25 you communicating with Mr. Oltmann directly to establish
Page 36

1 those and to set up those interviews?
2        A. No. No. That's usually someone else that
3 runs his -- I'm not -- I don't -- I'm not that familiar
4 with how his operation runs, I guess.
5        Q. Okay.
6        A. So --
7        Q. Do you know who someone else might be?
8        A. I don't at the moment.
9        Q. Greg Pappas for example, goes by the alias
10 Apollo?
11        A. Greg. He's on his show.
12        Q. Yeah.
13        A. Yeah, he's on his show.
14        Q. Is that who you schedule interviews with?
15        A. I'm trying to think of when I've had
16 interviews and how that goes. I don't -- I don't pay
17 that much attention to, you know -- I mean, I talk to
18 people all day long.
19        You know, I guess -- I'm trying to be
20 helpful with you but I -- but I talk to so many people
21 that those people are not my focus, if that makes sense.
22 There -- that's not what I -- I focus on on a day-to-day
23 basis to remember. Plus I've been in a couple of
24 rear-end collisions in my life where, you know -- so
25 things like that that are not important, I may not even
Page 37

10 (Pages 34 - 37)

1 remember --
2       Q.  Okay.
3       A.  -- so...
4       Q.  And just to clarify, you've been in a
5 couple of rear-end collisions in your life did you say?
6       A.  I have.
7       Q.  And why do you mention that?
8       A.  Well, because, you know, sometimes -- and
9 I'm almost 70.  Sometimes, you know, things that happened
10 that aren't relevant to my day-to-day life that may be
11 more important to you but that aren't important to me,
12 I'm not going to be easily -- easy to recall them for --
13 you know, for you.
14       Q.  And if I understand correctly, you did
15 review your email accounts to -- to see if you had any
16 emails or communications from Mr. Oltmann for -- for any
17 reason?
18       A.  I don't know if I've ever emailed
19 Mr. Oltmann.
20       Q.  What's a typical means by which you
21 communicate with him?
22       A.  Let me think.  Probably -- I think he's on
23 Signal.
24       Q.  And you had those messages set to delete as
25 well?

Page 38

1       A.  Yeah.
2       Q.  How frequently would you estimate you are
3 in contact with Mr. Oltmann today?
4       A.  Well, let me think.  You know, we know
5 kind of the same people.  Occasionally.
6           MR. BLUE:  And when you say contact you
7 mean --
8       A.  Like about...
9           MR. BLUE:  -- in writing or do you mean
10 seeing him in person?  Like what do you mean by contact?
11           MR. KLOEWER:  That's a good question.
12       Q.  (By Mr. Kloewer)  I'm trying to just
13 understand the nature of your relationship now.
14       A.  Yeah.
15       Q.  So, you know, if you guys are texting every
16 day, that's one thing.
17       A.  No.
18       Q.  If you see him at an event every three
19 months, that's another.
20       A.  Uh-uh.
21       Q.  I'm just trying to get a ballpark idea of
22 the frequency of which you are in contact with
23 Mr. Oltmann.
24       A.  Yeah.  I would say that he's an
25 acquaintance just like hundreds and thousands of

Page 39

1 acquaintances that I have.  You know, I don't -- do we go
2 have lunch and dinner and -- no.  And do things like that
3 all the time -- are we best buddies?  No.
4       Q.  When was the last time you spoke to
5 Mr. Oltmann?
6       A.  I would have to -- I would have to check.
7       Q.  Did you discuss this deposition with him?
8       A.  No.
9       Q.  Did you tell him that you were being
10 deposed in this case?
11       A.  The first one I may have.  I can't -- I
12 can't recall.
13       Q.  Okay.  But as far as this deposition
14 occurring today, have you discussed this deposition with
15 Mr. Oltmann?
16       A.  No.
17       Q.  And the first one I think you just said,
18 you may have discussed that with him as well?
19       A.  You know that was -- I mean, I -- I can't
20 remember.  I was on somebody's show about that
21 deposition, I think, that it was coming up, but I don't
22 remember -- I don't recall what show that was.  It may
23 have been CD.  I'm not sure.
24       Q.  Did you discuss the testimony you expected
25 to provide in this case?

Page 40

1       A.  You know, the thing of it is, is there's
2 so many -- there's so many -- there's so much around
3 this -- let me just put it this way.  There's so much
4 around the elections, around all this, that I don't --
5 tell me your question again because I'm trying to -- I'm
6 reaching, trying to figure out how to answer you but it's
7 very general to me.
8       Q.  I'm trying to understand if you discussed
9 your testimony in this case with Mr. Oltmann.
10       A.  Oh, no.  I think I did mention -- and I
11 don't know if it was on his show or where.  I did mention
12 that -- I am concerned because I have other cases going
13 on, that this is not really my focus.
14           You know, Mike Lindell is a great man, I
15 think he's a great patriot, I've seen his -- his
16 sacrifice, his -- you know, what he's -- what he's done
17 to try to make a platform so that people can tell the
18 truth.
19           And so I don't have any opinion on -- I
20 don't know.  I'm not sure I understand your question,
21 really, or what you are driving at with this.
22       Q.  I'm not trying to hide the ball, just to be
23 clear.  I just want to understand if Mr. Oltmann discussed
24 your testimony in this case --
25       A.  Oh, what to say you mean?

Page 41

11 (Pages 38 - 41)

1    Q.  -- prior to your deposition?  For
2 example --
3        A.  Like what I should say?
4        THE COURT REPORTER:  I'm sorry.  I cannot
5 get two people talking at the same time, so I'm not
6 getting your answer and I'm not getting your question.
7        THE DEPONENT:  Okay.
8    Q.  (By Mr. Kloewer)  Yes, that's what I would
9 like to know.  If prior to your deposition, Mr. Oltmann
10 discussed what you were going to say with you.
11       A.  Oh, no.  No.  I mean, pretty much -- yeah.
12 Nobody tells me what I'm going to say or -- I mean, what
13 I say are my opinions so...
14       Q.  And -- and to clarify, is -- is that with
15 respect to this deposition and the deposition you took
16 last year?
17       A.  Yeah.  I -- I believe that I didn't have
18 counsel on -- from anybody on what I could -- or could
19 not say except for my -- my counsel, you know.
20       Q.  And I should have asked this before, but
21 same question with respect to Mr. Lindell.
22           Did Mr. Lindell discuss your testimony,
23 and by that I mean, what you were going to say in your
24 deposition?
25       A.  No.  No.  I would have no reason to

Page 42

1 discuss with Mr. Lindell.
2    Q.  And have you discussed this deposition with
3 Mr. Lindell --
4        A.  No.
5        Q.  -- since it was set?
6        A.  No.
7        Q.  Do you ever have written communications
8 with Mr. Oltmann outside of Signal?
9        A.  Not that I recall.
10       Q.  Let's take a look at Number 3 here.  All
11 documents and communications authored, sent or received by
12 you relating to concerns about the accuracy, reliability,
13 verifiability, or truthfulness of the information
14 published during the Cyber Symposium.
15          I'm anticipating your counsel's objection
16 to this line of questioning given the Court's order.
17          All I want to know for Number 3 is did you
18 review your email or text communications to determine if
19 any communications responsive to this request exist.
20       MR. BLUE:  So just answer the question he
21 just asked.  Only that question.
22       A.  Can you say the question again?
23       Q.  (By Mr. Kloewer)  I'm wondering if you
24 conducted a review of your email or text message accounts
25 to determine if any documents responsive to this request

Page 43

1 exist.
2        A.  Yes.
3        Q.  And when did you conduct that review?
4        A.  When I was asked to do so.
5        Q.  When you were asked to do so last year or
6 following the Court's order this year?
7        A.  Well, the Court ordered this year, it has
8 a period of time; right?  So, I mean, it would be the
9 same.
10       Q.  Well, let me clarify my question a little
11 bit.
12       A.  All right.
13       Q.  So we went through this process a year ago
14 prior to your first deposition.
15       A.  Okay.
16       Q.  And -- and you didn't produce any documents
17 responsive to this.
18       A.  I did produce documents.
19       Q.  Yes, but not responsive to this particular
20 request, Number 3.  All you -- all you produced at your
21 last deposition was about 20 pages of My Pillow
22 promotional materials --
23       A.  Oh.
24       Q.  -- is the only documents we received from
25 you, and that remains true to this date.

Page 44

1        A.  Are you sure?
2        Q.  Yes.
3        MR. BLUE:  Go ahead.  Sorry.
4        A.  Well, I mean, I -- I would have gone
5 through and done a search and produced what I had.
6        Q.  (By Mr. Kloewer)  Okay.
7        A.  So, I mean, if -- if there was, prior to
8 that time, anything deleted or anything -- I mean, I
9 wouldn't have had access to that.  But I went through and
10 did a search because you had asked me to do a search --
11 or do a -- you know, if I had documents and
12 communications, so I did a search.  And to the best of my
13 ability, I produced what I had.
14       Q.  Okay.  And did you perform that search
15 again after the Court issued this order in this case?
16       A.  I think that I felt that what I produced
17 was sufficient --
18       Q.  Okay.
19       A.  -- with what I had.
20       Q.  Okay.  So since September 29th of this
21 year, you haven't gone through to review those
22 communications --
23       A.  September 29th.
24       Q.  -- when this order was issued from the
25 Court.

Page 45

12 (Pages 42 - 45)

1    A.   September 29th --
2    Q.   Of this year.
3    A.   -- of this year?
4    Q.   Yeah.
5    A.   Oh, I wouldn't have had documents to --
6  related to those -- to those communications --
7    Q.   Okay.
8    A.   -- that I'm aware of.
9    Q.   And just to clarify another matter briefly,
10  I know your devices were taken in November of '21.
11    A.   Right.
12    Q.   Is it your position that you lost access to
13  your email accounts by losing those devices?
14    A.   Yeah, I had a Proton account that was
15  totally obliterated and encrypted and that's where --
16  that -- at that time, that's where most of my stuff was,
17  and I still am unable to recover that --
18    Q.   So you weren't --
19    A.   -- to this date.
20    Q.   -- you are not able, for example, to get on
21  a laptop and try to access your -- your email account?
22    A.   From -- from that -- no.  From that device
23  that was taken, no.
24    Q.   And explain to me how that works because --
25    A.   It's --
Page 46

1    Q.   -- maybe I'm ignorant about how Proton
2  email works but...
3    A.   Yeah.  If you -- if you lose your -- your
4  email -- your password or whatever, it encrypts it.  You
5  have to -- you know, it automatically -- that's one of
6  the things about that email that makes it secure so that
7  no one can hack you and that sort of thing.
8    Q.   So did you lose your -- your password to
9  that account?
10    A.   Yep, and my ability to access it.  So if I
11  was to go in and try to do that, it would just be all
12  encrypted.  Yeah.
13    Q.   And are there any other accounts that you
14  lost access to when your devices were seized?
15    A.   Yeah.  I don't remember exactly which
16  ones.  I mean, I had to -- yeah.  I mean, that was --
17  that was a big deal.  You know, that was everything.
18  That was my children's pictures, my -- you know, the
19  history.  I mean, they took every electronic device I've
20  ever owned.  All of my backups of my computers over my
21  lifetime.
22    Q.   And have those devices been returned to
23  you?
24    A.   They have not.
25    Q.   All right.  Let's look at Number 4.  All
Page 47

1  documents --
2    THE DEPONENT:  Do I need to change?
3    THE VIDEOGRAPHER:  It's all right.
4    Q.   (By Mr. Kloewer)  All documents and
5  communications between you and any other members of the
6  so-called Red Team at the Cyber Symposium, and that
7  includes Phil Waldron, Doug Logan, Conan Hayes, Ron
8  Watkins, Mark Cook, Shawn Smith, and Lisa Draza.
9    Again, same time limitation.  I'm not
10  looking for communications between May and August
11  of 2021 --
12    A.   Uh-hmm.
13    Q.   -- but have you reviewed your different
14  accounts to see if you have any communications with these
15  individuals?
16    A.   I don't know a lot of these people.  I
17  didn't even know about this Rod -- Ron Watkins until the
18  Cyber Symposium so...
19    Q.   Are you still in contact with Mr. Watkins?
20    A.   No, I've never been in contact with
21  Mr. Watkins.
22    Q.   When was the last time you've spoken with
23  him?
24    A.   I've never spoken with him.
25    Q.   Okay.
Page 48

1    A.   Yeah.
2    Q.   What about Phil Waldron?
3    A.   No.
4    Q.   When did you first meet Mr. Waldron?
5    A.   I have never met Phil Waldron, and I don't
6  know who Doug Logan is.  Who is Doug Logan?
7    Q.   You never met Doug Logan?
8    A.   No.  Who is that?
9    Q.   He's the CEO of an organization called
10  Cyber Ninjas.
11    A.   Oh, no, I've never met him.  I didn't know
12  that.
13    Q.   From Maricopa County.
14    A.   Oh, no, I've never met him.  I've seen
15  work by Draza, and that's about it so...
16    Q.   What about Conan Hayes?  Are you still in
17  contact with Mr. Hayes?
18    A.   No, I'm not.
19    Q.   When is the last time you spoke with him?
20    A.   When he did a -- an image from my
21  computer.  That's it.
22    Q.   And when did he do that image?
23    THE DEPONENT:  Well, that's during the
24  time I can't talk about, isn't it?
25    MR. BLUE:  I don't know when it is.  You
Page 49

13 (Pages 46 - 49)

1 will have to --
2    A. It's during that time when we -- you
3 know...
4        MR. BLUE: Are you saying that it's
5 between May and August of 2021?
6        THE DEPONENT: Uh-hmm.
7        MR. BLUE: So you can answer the question
8 because the question is just about when you --
9        THE DEPONENT: Uh-hmm.
10        MR. BLUE: -- talked to him.
11    A. It was during that period of time, yeah.
12    Q. (By Mr. Kloewer) And you never -- you
13 never contacted -- you haven't been in contact with
14 Mr. Hayes since August of 2021.
15    A. That's right. Correct.
16    Q. He never came back to Mesa County, for
17 example, after that --
18    A. Nope.
19    Q. -- date? Did you ever --
20    A. Uh-uh. Not to my knowledge.
21    Q. Did you have dinner with Mr. Hayes and
22 Lauren Boebert at some point?
23        MR. BLUE: Are we talking about documents
24 here as opposed to meeting with them and talking to them?
25        MR. KLOEWER: Yes.

Page 50

1    Q. (By Mr. Kloewer) And the point of that
2 question was, was there any communications to establish a
3 time to meet up afterwards to --
4    A. Okay. Isn't that during this -- this
5 exclusion that the Court has given you?
6    Q. If it is, you can tell me. I don't know.
7    A. Well, that would be during that time. If
8 something like that was to occur, that would be during
9 that time.
10    Q. Okay.
11        MR. RICHARDS: Can we just take one
12 moment?
13        MR. KLOEWER: Yeah. Sure.
14        Do you want to go off the record or?
15        MR. BLUE: Yeah. I just -- this might be
16 easier.
17        THE VIDEOGRAPHER: Going off record at
18 10:58.
19        (Recess from 10:58 a.m. to 11:01 a.m.)
20        THE VIDEOGRAPHER: Back on record at
21 11:01 a.m.
22    Q. (By Mr. Kloewer) Okay. We've been
23 bouncing around some of the names on Number 4 here.
24        I believe you mentioned Lisa Draza. Who
25 is that?

Page 51

1    A. I've seen -- I've seen her -- I think she
2 did a -- I'm trying to think. At one of the events, I
3 think she had something -- she's a Ph.D. in something. I
4 don't know what it is, and she had some -- I'm trying to
5 remember -- some grafts or something that she had put --
6 put out there. But I've never met her in person, that
7 I'm aware of, anyway.
8    Q. And going back briefly to Ron Watkins, did
9 you know who he was prior to the symposium?
10    A. I had no idea.
11    Q. Prior to May of 2021?
12    A. I had no idea.
13    Q. Are you familiar with the alias Code
14 Monkey?
15    A. I am now but I had --
16    Q. At the time?
17    A. -- no idea -- no.
18    Q. No. Okay.
19    A. No.
20    Q. So you weren't familiar with his work on
21 8Chan, for example?
22    A. No. I didn't know what that was.
23    Q. What about Mark Cook, who is that?
24    A. Mark Cook travels around and he talks
25 about the Mesa report. Have you read the Mesa report 1,

Page 52

1 2, and 3?
2    Q. I -- I have, yes.
3    A. Yeah. Yeah, he talks about the anomalies
4 in the system that he's seen and verified. So he goes
5 around talking about that. I think last time I heard, he
6 was in -- I think he was in Texas.
7    Q. And how frequently are you in contact with
8 Mr. Cook?
9    A. Oh, probably about as frequently as Ron
10 Watkins. No, I'm just kidding. Not -- not frequently.
11 I don't -- you know, I wouldn't even use that word
12 "frequently."
13    Q. Have you ever texted or emailed with
14 Mr. Cook?
15    A. Um, I don't know if I've -- no. Texted?
16 No. Emailed? I don't know if I've gotten -- or if he
17 sent out some information about the reports.
18        I know he was at the Capitol the day I was
19 at the Capitol to ask the legislature to remove the
20 wireless devices that are in the voting machines that are
21 not supposed to be in the voting machines. And so he was
22 there that day. But there were a whole lot of other
23 people there as well.
24        I remember there was a lady from -- whose
25 family lives in Brazil, and she was warning the

Page 53

14 (Pages 50 - 53)

1 legislature, crying and mopping up her tears and crying
2 and saying, please, please don't let it happen here that
3 happened there, and she was begging the legislatures.
4         There were a lot of people there that day.
5 And I remember Mark was there. I was there. I can't
6 remember anybody else that was there. Oh, I think Kevin
7 Lenberg, representative, he might have been there. There
8 was a lot going on that day. Yeah. Because they were
9 introducing some other bills there at the Capitol.
10        Q.  And were you in contact with Mr. Cook
11 during his preparation of the Mesa County reports?
12        MR. BLUE: I'm sorry. I missed that
13 question. Sorry.
14        Q.  (By Mr. Kloewer) I said were you in
15 contact with Mr. Cook during his preparation of the Mesa
16 County reports?
17        MR. BLUE: And when was the Mesa County
18 report issued?
19        THE DEPONENT: That was -- those -- the
20 preparation for that were in that time frame here, May to
21 August.
22        MR. BLUE: Okay. So you are just asking
23 if she was in communication?
24        Q.  (By Mr. Kloewer) I don't need to know the
25 substance of those communications. I just want to know if

Page 54

1 they exist, if you were in contact with him at the time.
2        A.  If I was in contact with him. Let me
3 think when I first met him.
4         I think my familiarity with -- with him is
5 more of his analysis of him speaking -- going around and
6 speaking about the need for transparency, the need for
7 election reform, things like that. Yeah.
8        Q.  Well, that's a slightly different answer
9 than my question.
10        I just want to know if he was contacting
11 you while preparing the -- for purposes of preparing the
12 Mesa reports.
13        A.  Oh, no. Uh-uh. No. I mean, you know the
14 cyber experts are --
15        MR. BLUE: Sorry. I'm just listening to
16 make sure that we don't do any substance. Because the
17 question is --
18        THE DEPONENT: Oh.
19        MR. BLUE: -- did you talk to him before.
20        THE DEPONENT: Okay.
21        MR. BLUE: We just need to be careful
22 about the Court's order.
23        THE DEPONENT: Oh, sorry. Okay.
24        A.  So did I -- repeat that again, please.
25        Q.  (By Mr. Kloewer) I just want to know if

Page 55

1 you were in contact with Mr. Cook about the substance of
2 the Mesa County reports. You don't need to tell me what
3 that substance was, but if he was --
4        A.  Oh.
5        Q.  -- reaching out to you, for example, to --
6 to -- to understand the base -- the facts surrounding his
7 reports. And that's just a yes-or-no question.
8        A.  I would have to say -- I would have to say
9 yes. I would have to say yes. Uh-hmm.
10        Q.  Last one, Shawn Smith. Who is Mr. Smith?
11        A.  He is in, actually, Selection Code. They
12 interviewed him for Selection Code. I believe he was a
13 colonel before in intelligence. I'm not sure which
14 branch of the military he was in, but he was -- he --
15 from what I understand, he was someone who determined
16 threats in the military as far as -- I'm trying to phrase
17 this right. Threats in the military in maybe the cyber
18 space or in -- I'm not sure exactly but he's very -- he
19 seems very, very smart. He -- they interviewed him for
20 Selection Code and -- I mean, that's really all I can
21 think of to articulate.
22        Q.  When did you first meet Mr. Smith?
23        MR. RICHARDS: I'm going to object. This
24 does get into -- this -- this would require an answer
25 that would violate the Court's order.

Page 56

1        THE DEPONENT: Okay.
2        Q.  (By Mr. Kloewer) Are you in contact with
3 Mr. Smith today?
4        A.  I know -- I know of him. I have no reason
5 to really communicate with him. I mean, everything is
6 pretty much out, the cyber reports -- I mean, yeah.
7        Q.  Have you ever communicated with him?
8        A.  Yeah. I mean, you know, he was -- he was
9 part of Selection Code, of the movie, but as far as
10 hanging out with him and things like that, no.
11        Q.  Did you ever exchange any text messages or
12 emails with Mr. Smith?
13        A.  I can't -- I can't remember anything that
14 I would have wanted to talk to him about.
15        Q.  So just so I understand, because I asked if
16 you had been in contact with him and you said, well, yeah,
17 he was in Selection Code, is that just you saw him on set
18 or --
19        A.  He -- no. I can't remember specifically.
20 Like I said, these are people that have their own lives
21 and do their own thing and, you know, we don't hang out
22 together. So I'm -- I'm -- the reason I'm pausing is I'm
23 trying to think back and see if I can give you any
24 relative dates or information and I can't -- nothing
25 comes to my mind.

Page 57

15 (Pages 54 - 57)

1    Q.  Okay.  Moving on to Number 5, this requests
2  all documents and communications authored, sent or
3  received by you specifically linking Dr. Coomer to
4  specific acts of interference, manipulation, or alteration
5  of the 2020 Presidential election results.
6    A.  Uh-hmm.
7    Q.  Did you review your communications to see
8  if you had anything responsive to this request?
9    A.  There -- I mean, I have -- I have given my
10  opinion on -- on -- I mean, I've never -- to my
11  knowledge, never met Dr. Coomer or spoke with him, but, I
12  mean, I have opinions on what I have seen either on
13  Facebook or, you know, things that have been said about
14  elections that, in my opinion, aren't true, things like
15  that so...
16    Q.  We will get into that a little more a bit
17  later on discussion of Dr. Coomer specifically --
18    A.  Okay.
19    Q.  -- and your beliefs about --
20    A.  But I've never met him.  I don't have
21  anything against him.  He's, you know -- I don't -- I
22  don't know the man.
23    I know that he was drunk and he ran
24  through a building and then lied about it.  I saw that on
25  tape.  I don't know him.  It's just a video that I saw.

Page 58

1    Q.  As far as any documents you've received,
2  have you seen any -- have you ever received any
3  documentation that purports to link Dr. Coomer to any act
4  of election interference?
5    A.  Oh.  I saw on Facebook at one time that --
6  a post that he had put out on Facebook where he said that
7  he had -- something to the effect, I won't get it exactly
8  right because it was a long time ago, and I didn't -- I
9  didn't know the specifics but he -- there was a -- a
10  Facebook post on his account, that appeared to be his
11  account, where he had said that Trump wasn't going to win
12  and he made -- he said -- he used the word, I will just
13  say it, F'ing sure -- I won't say the word -- that Trump
14  wasn't going to win or something like that, that he had
15  fixed that.
16    And then I remember going to the Secretary
17  of State's website and looking and she had him listed as
18  the CEO or something of Dominion.  And then I remember
19  after all that came out, that was deleted off the
20  website.
21    And so I remember those -- I remember
22  those pictures, I remember the posts, I remember the
23  Secretary of State Jena Griswold, having it on her --
24  having him prominently on her website or the Secretary of
25  State website.  And then after that all came out, it was

Page 59

1  scrubbed.
2    And I think -- I -- I don't know if I
3  still have anything like that, but I remember seeing it,
4  and I thought it was odd that all of a sudden all that
5  would be gone, you know.
6    Q.  I have a couple of follow-up questions to
7  that.
8    So if I understand correctly, it's -- it's
9  your belief that Dr. Coomer himself posted on Facebook
10  that he had made sure Trump would not win the election?
11    A.  That was -- that was what it appeared to
12  be, and that was my opinion from what I saw, and that's
13  what it led me to believe, yeah.
14    Q.  Did someone send that to you?
15    A.  No.
16    Q.  You just came across it?
17    A.  No.  I'm trying to think how I saw that.
18    It's -- like I said, that's been a long
19  time ago.  That was -- that was -- I don't even remember
20  when it was.  And it was kind of -- I think it was kind
21  of going around out there.  And since I'm involved -- or
22  I was involved in elections, that was a concern to me,
23  you know.  Yes.
24    Q.  So I just want to clarify a distinction
25  here because there are many -- and I think I am familiar

Page 60

1  with the, sort of, image you are referring to that
2  includes a picture of Dr. Coomer's face next to the
3  statement that you just referenced in quotation marks --
4    A.  Okay.
5    Q.  -- attributing that statement to him.
6    A.  Right.
7    Q.  There's a difference between that and
8  actually seeing Dr. Coomer himself post a statement to
9  that effect.  I'm trying to understand what -- what you
10  believe you saw.
11    A.  Well, that's what I -- that's what I saw.
12  There was -- there was some videos too that --
13    Q.  Which is what you saw?
14    A.  Okay.  Go ahead.  Say that again.
15    Q.  An image attributing that account to
16  Dr. Coomer or Dr. Coomer making that comment himself?
17    A.  It was a Facebook post on his Facebook
18  account.
19    Q.  Okay.
20    A.  It was an interchange between other people
21  that hated Trump, and they were talking about how much
22  they hated Trump, and he was reassuring them -- this was
23  my impression of it.
24    Q.  Okay.
25    A.  That he was reassuring them that you don't

Page 61

16 (Pages 58 - 61)

**Page 62**

1  have to worry about him, he won't -- he's not going to
2  make it or whatever.  He's not going to become president.
3  He made F'ing sure of it.
4         And then when I saw -- when I saw that he
5  was on the Secretary of State's website and as the top
6  guy with Dominion Voting Systems and in my county we used
7  Dominion Voting Systems.
8         So that was -- that was a concern, and I
9  think it was just -- it was put out there.  So it caught
10  my attention, let me put it that way.  It caught my
11  attention.  Um...
12     Q.  Who did -- who put that out there --
13     A.  I have no idea.
14     Q.  -- to your understanding?
15     A.  I have no idea.  I didn't know -- who was
16  who in the zoo.  I didn't know anybody from -- I mean,
17  I -- I had always believed that we -- our elections were
18  secure and, you know, that I had done good elections and
19  I had always believed that -- always what the Secretary
20  of State told me, Colorado County Clerk's Association had
21  told me.
22         So this was shocking to me to see these
23  things.  So I didn't know quite what to make of it, but
24  it concerned me.
25         And then -- you know, so as things

**Page 63**

1  progressed, you know, and different things came out,
2  it -- you know, it formed opinions that are just my
3  opinion -- you know, everybody is entitled to one -- but
4  yeah, it was -- I remember that.  I remember that was --
5  that was concerning, that someone would be -- someone in
6  that position would be so vehemently opposed to a
7  candidate.  When you think about a vendor should be a
8  vendor and not have that kind of power and control.
9     Q.  I'm getting a bit ahead of myself here in
10  the questioning, but since you raise it, I'm curious, what
11  evidence have you seen to confirm whether or not
12  Dr. Coomer ever actually made that statement?
13     A.  I don't know.  It -- it's my -- it was just
14  my opinion.  It was something I saw but it wasn't just
15  one thing.  There were other things that seemed to
16  surround that controversy, that -- you know, that was
17  troubling I think.
18     Q.  Is that a no?
19         MR. BLUE:  Is she a target here today?
20         MR. KLOEWER:  She's not a defendant but
21  the --
22         MR. BLUE:  Because I'm kind of curious, I
23  mean, how what she did is relevant to the case against
24  the Defendants here today.
25         MR. KLOEWER:  Well, I can provide you a

**Page 64**

1  copy of the complaint if you'd like.  The -- the
2  publications made by FrankSpeech repeat the claims that
3  Dr. Coomer participated in an Antifa conference call.
4         THE DEPONENT:  He did.
5         MR. KLOEWER:  Claimed on that call that he
6  rigged the election.
7         THE DEPONENT:  Is that what this --
8         MR. KLOEWER:  That he did, in fact, rig
9  the election.
10         MR. BLUE:  This is -- you are not supposed
11  to be answering this.  This is between --
12         MR. KLOEWER:  The reliability of the
13  source for those claims is a factor that is relevant to
14  the actual malice inquiry, as is the plausibility of the
15  claims themselves.
16         So the people making those claims and the
17  publications, the basis on which they base those
18  statements, is a relevant fact for the Court's analysis
19  under the actual malice standard.
20         So I'm trying to understand the basis by
21  which Ms. Peters, as well as CMC, made those statements
22  on Frankspeech, whether they were grounded in reasonable
23  investigation or what facts she based those opinions upon
24  so...
25         THE DEPONENT:  Okay.

**Page 65**

1     Q.  (By Mr. Kloewer)  We can move on here.
2     A.  So that -- so I didn't know --
3         MR. BLUE:  Let him -- let him ask you
4  questions.
5         THE DEPONENT:  Okay.  All right.
6     Q.  (By Mr. Kloewer)  We will get into the
7  specific statements here in a bit --
8     A.  All right.
9     Q.  -- and that line of questioning will be
10  placed in a bit more appropriate context.
11         All right.  I do want to get through the
12  subpoena here so that we can move to the next topic.
13         But just to button up Number 5 real
14  quickly, it's -- it's my understanding that you don't --
15  you have not seen any documents or communications that
16  tie him to a specific act of election interference; is
17  that correct?
18     A.  I've seen videos.  You know, I have to be
19  honest with you, I don't spend my days thinking about
20  Eric Coomer.  I don't -- he's not someone that I am
21  interested in pursuing or taking up my time with what he
22  does or doesn't do.
23         So -- so I think that -- I mean, I know
24  this is -- the importance of this deposition is basically
25  about him, but he doesn't take up a big portion of my

**Page 66**

1 life or hasn't in the past taken up a big portion of my
2 life or my interest. You know, all I know is what I've
3 seen out there and that -- that's the extent of my
4 interest in Dr. Coomer.
5     Q. Well, as you sit here today, do you believe
6 that Eric Coomer played a role in rigging the 2020
7 Presidential election?
8     A. My -- my opinion?
9     Q. Yes.
10    A. Since it's my opinion, and -- you know,
11 and he has his own opinion, and I would -- I think it's
12 questionable. I do. I think that there's -- you know,
13 there's people out there that did not want to see Trump
14 elected.
15        I feel -- it's my opinion that with his
16 position, that if anybody had a -- the opportunity, the
17 access and the opportunity to do something, that it would
18 be him.
19        Do I want to -- do I take my time, zero in
20 on trying to attack him and punish him for that or -- or
21 try to prove it right or wrong, it's not -- it's not my
22 interest to do so.
23        So, my opinion is just like anybody else's
24 opinion. It's just an opinion. We still have our First
25 Amendment right to say what we want to say without being

**Page 67**

1 hopefully prosecuted for it still in this country so...
2     Q. So have you seen any evidence that makes
3 you confident that Eric Coomer did rig the 2020 election?
4     A. Have I seen any evidence?
5        Like I said, I don't spend my day seeking
6 out evidence or anything else pertaining to Eric Coomer.
7 He's not -- he's -- so I'm answering your question this
8 way, is that I'm not interested in Eric Coomer. I don't
9 care what he does or did or whatever. That's up for him
10 and God to sort out.
11        If he did, shame on him. If he didn't,
12 well, then good for him. But everybody has their own
13 accountability and that's not my place to -- or my
14 interest.
15    Q. Was -- I'm trying to ask you a yes-or-no
16 question --
17    A. Well, I mean --
18    Q. If your answer is no, then that's fine.
19    A. No, I don't --
20    Q. Have you seen anything -- any evidence that
21 makes you confident that Eric Coomer rigged the 2020
22 Presidential election?
23    A. I haven't sought out any evidence, let me
24 put it that way.
25    Q. That's not -- that's not my question.

**Page 68**

1        Have you seen any?
2     A. I haven't seen any, no. No.
3     Q. Let's look at Number 6. And, again, I'm,
4 once again, anticipating your counsel's objection on this
5 question.
6        I just want to know if these documents
7 exist. I presume from your prior testimony that they
8 fall within the date range we've already excluded from
9 discussion today.
10        This refers to all documents and
11 communications, sent or received by you
12 describing the credentials, qualifications or work
13 experience of Conan James Hayes, including, but not
14 limited to, communications with any third parties who
15 claim to be able to vouch for those credentials.
16        Did you ever receive any documents of this
17 nature, and that's just a yes-or-no question.
18        MR. BLUE: Remember, this -- this is most
19 likely in the time period that you're -- that they can't
20 ask you substance.
21        THE DEPONENT: Okay.
22        MR. RICHARDS: I'm just going to object
23 and assert the Fifth Amendment on behalf of my client and
24 advise her not to answer that question.
25        THE DEPONENT: Okay. I accept that.

**Page 69**

1     Q. (By Mr. Kloewer) Yeah. Moving on, we will
2 take a look at Number 7.
3        All documents and communications authored,
4 sent or received by you relating to any surveillance of,
5 threats directed towards or harassment of Dr. Coomer
6 between January 1, 2020, and the present.
7     A. Go ahead.
8     Q. Well, first of all, did you review your
9 communications to see if anything responsive to this
10 request exists?
11    A. Yes. And I don't understand the question
12 really. If you can -- if you can elaborate on that.
13    Q. Well, are you aware now of any threats or
14 harassment that have been directed at Dr. Coomer?
15    A. No.
16    Q. Have you ever discussed any surveillance of
17 Dr. Coomer? And I'm referring specifically to any
18 communications with Mr. Oltmann about that.
19    A. No.
20    Q. Has Mr. Oltmann ever told you that he had
21 or has people in Salida surveying Dr. Coomer?
22    A. Nope. News to me.
23    Q. Let's look at Number 8.
24        All documents or communications authored,
25 sent or received by you discussing any visits by Conan

18 (Pages 66 - 69)

1 James Hayes to Mesa County -- I believe we've already
2 addressed this, actually. It arose in a prior
3 question -- including but not limited to any
4 communications identifying all individuals who interacted
5 with Mr. Hayes during his time in Colorado.
6           MR. RICHARDS: I --
7           MR. KLOEWER: Counsel.
8           MR. RICHARDS: If you are going to go into
9 this, I will be objecting based on the Court's order.
10          MR. KLOEWER: Understood.
11     Q. (By Mr. Kloewer) Okay. We can set this
12 document aside.
13          MR. BLUE: Because you know the players
14 and --
15          THE DEPONENT: Yes. Do you want this?
16     Q. (By Mr. Kloewer) Okay. Ms. Peters, you
17 have two attorneys here with you today, Mr. Blue with
18 Gessler Blue and Doug --
19          MR. RICHARDS: Richards.
20     Q. (By Mr. Kloewer) And Doug Richards.
21          MR. KLOEWER: I apologize. I did remember
22 Doug when we met this morning. I -- I had spoke with
23 prior -- Ms. Peters' prior counsel.
24     Q. (By Mr. Kloewer) But the point of my
25 question, Ms. Peters, who is paying for your counsel here

Page 70

1 today?
2     A. I have a fund set up for that where people
3 can donate on my website.
4     Q. And -- and both these attorneys are being
5 paid out of -- exclusively out of the proceeds from that
6 fund?
7     A. That's my intent, yes.
8     Q. And where is that fund located?
9     A. It's on my website.
10    Q. It's directly through your website?
11    A. Uh-hmm.
12    Q. What website is that?
13    A. My name, tinapeters.us.
14    Q. And when was that website set up?
15    A. Oh, I have no idea. I don't know.
16 Probably -- I don't know. I can't give you a date. Even
17 a date range. I don't know.
18          I have people that do that for me,
19 volunteers that would do -- you know, different
20 volunteers kind of -- it's kind of a hodgepodge of
21 supporters and volunteers that do that for me.
22    Q. Do you have any other fundraisers set up
23 for that purpose, for example, on GoFundMe or GiveSendGo,
24 anything of that nature?
25    A. I have personal -- I have a personal one

Page 71

1 on GiveSendGo.
2     Q. And those funds are not for -- for legal
3 defense?
4     A. I mean, I guess I could use them for that.
5     Q. Okay.
6     A. It's -- you know, I just leave it up to
7 the people if they want to contribute, that's what they
8 do. Yeah.
9     Q. How much has Mr. Lindell contributed to
10 your legal defense?
11    A. I have no idea.
12    Q. Mr. Lindell stated on -- during a 9 News
13 interview at that Colorado Capitol interview, that he had
14 contributed $800,000 to your legal defense. Is that
15 accurate?
16    A. I have no way to know that. And -- and
17 afterwards, I think he retracted that, so I -- I have no
18 idea. I don't know his personal finances, and I have no
19 reason to know.
20    Q. You've never discussed the funding of your
21 legal defense with him?
22    A. Nope, I have not.
23    Q. Has he ever told you how much money he's
24 contributed to it?
25    A. Nope.

Page 72

1     Q. How much money have you raised through your
2 legal defense fund?
3     A. I would have to look. I have no idea.
4 I -- that's in a trust. I don't -- I don't have any -- I
5 don't have any, what do you call it, control over that.
6     Q. Are you able to review the donors to
7 that -- to that account?
8     A. I think that would go through the trust --
9 I'm not sure. I -- that's not something that I -- that
10 I -- I mean, I'm a busy person. That's not something
11 that I really focused on.
12    Q. Well, explain how this works to me.
13          So you set up a trust account and there's
14 a trustee that oversees that account presumably?
15    A. Right. Right. So I don't have any --
16 any -- I wanted to keep things separate so there was
17 no -- not ever any impropriety, any -- that sort of
18 thing. So I don't -- I don't control that.
19    Q. Who is the trustee of that account?
20    A. I would have to check and see for you.
21 Get back with you.
22    Q. Do you have a ballpark estimate of how
23 much that account --
24    A. I have no idea. No idea.
25          It's what the people want to donate. I

Page 73

19 (Pages 70 - 73)

1  don't -- I don't get into the financial aspect of that.
2          And -- and let me ask you something,
3  because these -- these seem to be personal questions.
4          What does this have to do with Mr. Lindell
5  and Coomer?  It seems to be totally focused on me and my
6  affairs.
7      Q.  Well, Ms. Peters, just as a general rule, I
8  will be asking the questions here today.  The relevance of
9  those matters will be determined by the Court.
10          Does that legal defense fund, are -- are
11 those funds utilized for your civil defense in other
12 related matters as well?
13     A.  I -- I'm not aware of what -- where they
14 go.  They are just -- they are disbursed and -- I don't
15 see the -- you know, I -- I don't know.  You know, I
16 don't know that it's -- that it's that important for me
17 to know.
18     Q.  You don't believe it's important to know
19 where the money is coming from for your legal defense?
20     A.  You know, I'm very grateful -- I'm very
21 grateful for my legal defense.  I think they're doing a
22 great job.  And if there are donors that would like to
23 give -- there's a lot of patriots out there, Brad, you
24 know, that -- that care about this country, that -- that
25 see the persecution of me, for one, for trying to stand

Page 74

1  up and do my job as a travesty.
2          And so it's moved people to be able to do
3  what they can to support, you know, our country and
4  that's -- that's the way they feel.
5          So I'm very grateful, I don't question
6  their motives or, you know, their beliefs, but I'm very
7  grateful.
8      Q.  Did Mr. Lindell assist you or advise you in
9  establishing that trust?
10     A.  Nope.
11     Q.  Are you aware of any contributions to that
12 trust from My Pillow, Incorporated?
13     A.  I don't know what My Pillow, Incorporated,
14 does with -- I don't know their financial structure.  I
15 have no way to know that, nor should I even assume to ask
16 that.
17     Q.  Have you received any payments to your
18 legal defense fund from FrankSpeech, LLC?
19     A.  I have no idea.
20     Q.  Have you ever reviewed the list of donors?
21 And I apologize if I've asked that already --
22     A.  Nope, I have never --
23     Q.  -- but just to clarify.
24     A.  -- reviewed the list of donors from --
25 from FrankSpeech or Lindell's organization.

Page 75

1      Q.  Would you have access to that list of
2  donors if you requested it from the trustee?
3      A.  From -- from Lindell's trust that --
4      Q.  No.  The trustee of your -- your legal
5  defense trust, could you have access to that list of
6  donors if you requested it?
7      A.  I don't know that.
8      Q.  You've never requested it?
9      A.  I've never requested it.
10     Q.  Are you currently represented in any matter
11 by Randy Corporon?
12     A.  No.
13     Q.  Have you ever been represented by Randy
14 Corporon?
15     A.  Yes.
16     Q.  In what matter?
17     A.  I don't know.  He was -- he was involved
18 early -- I'm not exactly sure which ones he was involved
19 with.  You'd have to ask my counsel.  You would have to
20 ask these guys.
21     Q.  Do you recall who paid Mr. Corporon for
22 representing you?
23     A.  I would imagine -- I -- I don't know.  I
24 never saw the invoices, so I don't know.  I mean, it
25 could have come out of the legal -- the Lindell legal

Page 76

1  defense fund.  I don't -- I don't -- I never saw his
2  invoices, so I can't give you -- you're asking the wrong
3  person for this kind of thing -- this kind of
4  questioning.
5      Q.  Okay.  Where are invoices for your legal
6  defense sent?
7      A.  This is not my expertise.  I don't -- I --
8  I do not handle those matters, so you will have to ask
9  someone that does.  That would be questions for probably
10 the Lindell legal fund or Lindell or somebody that
11 handles his...
12     Q.  So who paid Randy Corporon would be a
13 question for the Lindell legal defense fund?
14     A.  I would -- I would ask -- maybe ask Randy
15 Corporon.  I never saw his -- his invoices.  I don't
16 know.
17     Q.  Okay.
18     A.  But, you know, I can't give you what you
19 are asking because I don't -- that's not my -- that's
20 not -- that's not in my -- my knowledge.  So I know you
21 keep asking me the same thing, but you are going to have
22 to ask people that are involved that -- that do finances.
23     Q.  Sure.  And I don't mean to -- to badger you
24 on this point.  I am a bit skeptical --
25     A.  Well --

Page 77

20 (Pages 74 - 77)

**Page 78**

1     Q.  -- that you don't know how much money your
2  legal defense fund has raised, you don't know how much
3  you've paid for legal defense, you don't know who has
4  contributed to that fund, and you don't know how much
5  money is in that fund today; is that correct?
6     A.  That's correct.  I don't know.
7     Q.  And you've never received an invoice.
8     A.  I don't -- okay.  I'm going to tell you
9  this one more time.  You're going to have to ask people
10  that do that.
11    Q.  Okay.
12    A.  I don't -- you know, there's a lot of
13  patriots out there that support me, that want to -- that
14  want to help.  So, you know, you're -- you're asking the
15  wrong person.  I don't deal with the finances of my legal
16  defense.
17    Q.  Okay.
18    A.  Is that clear?
19    Q.  Who is the right person to ask that
20  question?
21    A.  I have no idea.
22    Q.  You don't know who would know how much is
23  in your legal defense fund?
24    A.  I've answered that question.
25       MR. BLUE:  Objection.  Objection.  This

**Page 79**

1  has been asked and answered.
2       MR. KLOEWER:  It's not answered.
3       MR. BLUE:  You just -- you just -- you
4  asked her, and she just gave you an answer.  She said she
5  doesn't know.  And so now you are asking her again.  You
6  are starting to badger her on this issue, and it's
7  getting frustrating.
8       MR. KLOEWER:  She told me I would need to
9  ask somebody who would know and she doesn't know who
10  would know.
11       MR. BLUE:  Exactly.  So, therefore, you've
12  gotten your answer; right?  You just repeated her answer
13  back to me.
14       MR. KLOEWER:  Yes, but --
15       MR. BLUE:  But you don't believe it.
16  That's fine.  You don't have to believe it.  You've got
17  an answer.  Can we move on, please?
18    Q.  (By Mr. Kloewer)  Can you estimate when
19  Mr. Rick (sic) Corporon stopped representing you?
20    A.  No.
21    Q.  Has he ever entered an appearance on your
22  behalf in any of your various legal matters?
23    A.  Yes.  I don't know which one.  I don't
24  recall.
25    Q.  Are you in contact with Mr. Corporon?

**Page 80**

1     A.  No.
2     Q.  When was the last time you spoke with him?
3     A.  I don't -- I don't recall.
4        MR. KLOEWER:  All right.  I want to get
5  into the next line of questioning here.  I wonder if --
6  are we wanting to take a break or --
7        THE DEPONENT:  I'm good.
8        MR. KLOEWER:  -- plow through for about
9  another hour here?
10       THE DEPONENT:  I can keep going.
11       THE COURT REPORTER:  I don't want to go
12  for another hour.  That would be two and a half hours on
13  the record so...
14       MR. KLOEWER:  Okay.
15       THE COURT REPORTER:  So now is fine or in
16  another half an hour.  Two hours is my max.
17       MR. KLOEWER:  I might be able to squeeze
18  it in in a half an hour.  Let's give it a shot.
19       THE COURT REPORTER:  Okay.
20       MR. KLOEWER:  You tell me, though, if
21  we're reaching your limit.
22       THE COURT REPORTER:  Okay.  Awesome.
23       MR. KLOEWER:  We can stop any time.
24       THE COURT REPORTER:  Thank you.
25       MR. BLUE:  How dare you have a timeframe.

**Page 81**

1  Your comfort matters here?
2        MR. KLOEWER:  More than anybody else's in
3  the room, so you let me know.  All right?  We will -- I
4  am happy to take a break whenever.
5        THE DEPONENT:  Do you get cramps in your
6  fingers from doing that?
7        THE COURT REPORTER:  Not my fingers, no.
8     Q.  (By Mr. Kloewer)  Ms. Peters, I will show
9  you what's been previously marked as Exhibit 2.  I want to
10  talk about this a little bit.
11    A.  Okay.
12    Q.  Well, before we do that, do you have any
13  social media accounts?
14    A.  Yeah, I have Facebook, I don't hardly ever
15  get on there, and Twitter.  I'm on Twitter.
16    Q.  And what's your Twitter handle or your
17  account name?
18    A.  @realtinapeters.
19    Q.  Okay.  Have you ever had any other Twitter
20  accounts?
21    A.  No, not -- not that I know of.  Not -- I
22  mean, maybe -- I don't know.  Let me think -- let me
23  think about that for a minute.  I'm not a real social
24  media person, so let's see.  Yeah, I might have one -- I
25  don't know.  You will have to look.  I'm sure it would be

1 easy to check out.
2     Q. Well, let's take a look at --
3     A. I might have a personal one from a long
4 time ago.
5     Q. -- what's been marked as Exhibit 2.
6     A. Oh, yeah, I remember this one. Uh-hmm.
7     Q. Okay. Well, that answers my first
8 question.
9         So this account at @bhealthynow, that was
10 an account -- that was your account?
11     A. Oh, yeah. Uh-hmm. That's on old one, a
12 really old one.
13     Q. Okay.
14     A. Uh-hmm.
15     Q. So we're looking at a Tweet from you here
16 that is dated January 3rd of 2021.
17     A. Uh-hmm. Right.
18     Q. And this appears to be a response to a
19 series of tweets from Senator Pat Toome.
20     A. Uh-hmm.
21     Q. It's the former senator from Pennsylvania,
22 I believe. And we don't need to read every statement that
23 Mr. Toome made -- makes here.
24     A. Uh-hmm.
25     Q. He's basically signaling his intent to vote

Page 82

1 to certify the election results on January 6th, which is
2 three days subsequent to this Tweet.
3     A. Uh-hmm.
4     Q. We see your response here, it says, Shame
5 on you. As one that administers elections in my county,
6 you apparently have no idea how it is possible to 1)
7 tabulate more than once ballots favoring a candidate; 2)
8 change algorithm in a voting machine, and then in
9 parenthesis it says, see Eric Coomer from Dominion's
10 Facebook rants.
11     A. Uh-hmm. Yeah, I remember this.
12     Q. So you -- you doubted the election results
13 as early as January of 2021; correct?
14     A. Not in my county.
15     Q. Well, why not?
16     A. Because I was running the election, I
17 believed that we had -- that we had processes in place in
18 my county to -- and we did everything that -- that we
19 could to, you know, have bipartisan judges, having -- so
20 on and so forth. And I've said all along that I felt
21 like I ran a good election. That we -- there was nothing
22 to see in Mesa County. But I did know that there were
23 things going on across the country.
24         So when Pat Toome was saying these things,
25 it was -- it was obvious to me, in my opinion, that he

Page 83

1 was what I said, either ignorant or dirty because of his
2 comments.
3     Q. What is an algorithm, as you understand it?
4     A. It's a program in a computer.
5     Q. What does an algorithm do?
6     A. It tells the computer what to do, in my
7 opinion.
8     Q. Why are you referencing an algorithm here
9 with reference to Eric Coomer's Facebook rant?
10     A. Because it -- I guess after seeing his
11 Facebook that was attributed to him, and I think they
12 proved that was his Facebook account, that he was the
13 one, as I mentioned before, that was one of the
14 principals, one of the CEOs or -- what was his position
15 with Dominion?
16     Q. What did you understand his position to be?
17     A. Well, I understood his position to be
18 someone that was high ranking, that traveled and -- and
19 set up the computers in the different states. Is that
20 not correct?
21     Q. As I mentioned before, I -- I'm -- this is
22 not an opportunity for you to ask questions.
23         He was the director of strategy and
24 security for Dominion Voting Systems, so there's --
25     A. So security --

Page 84

1     Q. -- no reason -- I'm not playing any games
2 by withholding that information, but I just want to be --
3     A. Okay. So --
4     Q. -- clear.
5     A. So security -- so someone that is in
6 charge of security and what was the other thing?
7     Q. Director of strategy and security.
8     A. Strategy and security.
9         So he went into the different states and
10 he -- from what I understand, he taught on the machines,
11 right, he would have teaching on how the machines worked,
12 and he would actually program the machines.
13     Q. Did you ever see Eric Coomer mention an
14 algorithm?
15     A. I saw some videos of him, and I would have
16 to see if I can find them, you probably are aware of
17 them, of him stating that you can change the -- the
18 results in an election electronically. There is -- there
19 are some training videos out there still that you can
20 find where he specifically talks about that.
21         And so when this happened -- I will just
22 give you some reference here about this.
23         So I'm reading Pat Toome's -- and we know
24 what's happened with Bill Barr, you know, after all this.
25         It says, We have not seen fraud on a scale

Page 85

22 (Pages 82 - 85)

1 that could have affected different outcome in the
2 election.
3         And it's interesting just before that --
4 and I don't believe this is Democrat or Republican. I
5 mean, you have to understand. If you've ever heard me
6 speak, I don't blame one or the other.
7         But if you will look at -- the Democrats
8 were saying that, in front of the Senate Judiciary
9 Committee and in front of Congress, that, yes, the
10 machine -- the voting machines, the votes can be flipped.
11         And if you just look at -- there's --
12 there's reference to that in Selection Code where Kamala
13 Harris, you know, all the Democrats, you know, that are
14 in Congress are talking about how these machines can
15 change the votes. Right?
16         And then -- and, I mean, they had seen
17 votes flipping, they had seen all this stuff. And then
18 you turn around -- and then after they've said that, you
19 turn around after the other -- the other election,
20 Trump's election, they go no, no, it couldn't do that.
21         So here he's saying that we have not seen
22 fraud on a scale that could affect a different outcome in
23 the election, and then you have the Democrats talking
24 about, yes, these machines can flip the votes. We've
25 seen them do it. And I will just reference Selection

Page 86

1 Code because they -- they put those clips out there.
2         Okay. And then it says -- Senator Toome
3 says, I acknowledge that this past election, like all
4 elections, had irregularities. So he's already saying
5 they had irregularities. But the evidence is
6 overwhelming that Joe Biden won this election. Well,
7 that's his opinion.
8         And then he goes on and talks about the
9 narrow victory in Pennsylvania is easily explained by the
10 decline in suburban support for President Trump and the
11 president's slightly smaller victory margins in most
12 rural counties.
13         So he says, I voted for President Trump
14 and endorsed him for re-election, but on Wednesday, I
15 intend to vigorously defend our form of government by
16 opposing this effort to disenfranchise millions of voters
17 in my state and others.
18         I was so -- I -- when I read that, I
19 was -- that's what prompted my reply. Shame on you. As
20 one that administers election in my county, you
21 apparently have no idea how it is possible to, and then I
22 said 1 and 2.
23         Okay. Something you may not know is that
24 the director of the Colorado County Clerk's
25 Association --

Page 87

1         MR. BLUE: We -- you need to answer the
2 questions he's giving you.
3         THE DEPONENT: Okay. All right.
4         MR. BLUE: Sorry. I'm surprised you
5 didn't stop it but...
6         MR. KLOEWER: Sometimes it's -- I want to
7 hear what she has to say.
8         THE DEPONENT: Well, here is --
9         MR. BLUE: Tina, just answer his question.
10         THE DEPONENT: All right. Okay.
11    Q. (By Mr. Kloewer) You stated before you
12 never met Eric Coomer; correct?
13    A. I've never met -- to my knowledge, I've
14 never met Eric Coomer.
15    Q. Did you ever attend any of the county --
16    A. I did.
17    Q. -- media --
18    A. Association? Yeah.
19         MR. BLUE: Let him answer his -- finish
20 his answer.
21         THE DEPONENT: Okay.
22         MR. BLUE: I mean his -- let him finish
23 his question.
24         THE DEPONENT: Okay. All right.
25         MR. BLUE: He needs to let you finish your

Page 88

1 answer.
2    Q. (By Mr. Kloewer) Did you attend any of the
3 events which -- where Dr. Coomer was present?
4    A. Not to my knowledge.
5    Q. Okay. So what -- when was the first time
6 you heard the name Eric Coomer?
7    A. I think it was that Facebook post.
8    Q. And I should have asked you this before,
9 but do you watch Conservative Daily podcast or did you
10 before?
11    A. No. No. I didn't know Conservative
12 Daily.
13    Q. Did you know of Joe Oltmann? I know you
14 stated you didn't meet him until later, but were you
15 familiar with him --
16    A. No. No. No. Uh-uh.
17    Q. -- as a -- so you first became aware of
18 Eric Coomer on the basis of Facebook posts that said what?
19 Is this what you --
20    A. I didn't know --
21    Q. -- we discussed before?
22    A. I didn't know that --
23         MR. BLUE: Again, you've got to let him
24 finish his question.
25         THE DEPONENT: Oh, sorry. Okay. All

Page 89

23 (Pages 86 - 89)

1 right.
2     Q.  (By Mr. Kloewer)  Is this the post you
3 discussed before and you believed you saw?
4     A.  I don't know who posted that post.
5     Q.  Okay.
6     A.  I didn't -- but I didn't know who Joe
7 Oltmann was or who posted the post.
8     Q.  And did seeing those posts, did that give
9 you concern about Dominion Voting Systems?
10     A.  When I saw that that was the same person
11 that is -- was our sheriff, yeah.  Yeah.  That -- that
12 concerns me.  I mean, that should concern anyone.
13     Q.  Did seeing those claims about Dr. Coomer
14 make you concerned about the security of elections in Mesa
15 County?
16     A.  No.
17     Q.  Why not?
18     A.  Like I said, I -- I believed that -- back
19 then, I believed that our voting systems were secure in
20 Mesa County.
21     Q.  Does your familiarity with those claims
22 about Dr. Coomer give you concerns about the security of
23 elections in Mesa County today?
24     A.  Say that again.
25     Q.  Does what you have heard about Eric Coomer

Page 90

1 different today.  Yes, I am concerned about our
2 elections, and I think I've been very vocal about that.
3     Q.  And does that concern arise in part from
4 what you believe about Eric Coomer?
5     A.  No.  Well, no.  I think there's a lot of
6 things that play into it.  I really -- I -- I was really
7 disappointed and -- what's the word to use?  Disenchanted
8 I think would be a good word.
9     Everything that I believed about the
10 sanctity of our vote, about people being able to choose
11 their elected officials, about the transparency of our
12 elections, that we had put every process in place, having
13 bipartisan judges, Democrat and Republican working
14 together, all of that to secure the people's vote, that
15 I -- that was my job to do --
16     Q.  And would you say that these --
17     A.  Let me finish.
18     Q.  Oh, sorry.
19     A.  -- cut at the core with me on how it was
20 even possible to have a black box that had the
21 possibility to do what it appears from expert reports
22 that these black boxes are able to do, this was to me --
23 and I'm being persecuted for it.  All I did was do my
24 job.
25     That, to me, is -- if Eric Coomer had

Page 92

1 make you concerned about the security of elections in Mesa
2 County today?
3     MR. BLUE:  Hold on just a second.  Sorry.
4     THE DEPONENT:  Where are you guys going
5 for lunch?
6     MR. BLUE:  Go ahead and answer.  You can
7 answer the question.
8     THE DEPONENT:  Oh.
9     MR. BLUE:  We were just making sure this
10 wasn't covered by the order.
11     MR. KLOEWER:  Sure.
12     THE DEPONENT:  Okay.  All right.
13     A.  Ask me again, please.
14     Q.  (By Mr. Kloewer)  Does what you've heard
15 about Eric Coomer, does it make you concerned about the
16 security of elections in Mesa County today?
17     A.  I would say it's not necessarily about
18 Eric Coomer because I had seen that a long time before
19 and had kind of -- I didn't affect me so I didn't -- I
20 didn't -- it didn't think it affected me, so I didn't
21 have any opinion one way or the other.  I was just
22 focused on doing my job.  I -- I took that office to fix
23 three and a half hour wait times.  I did not set out
24 to -- to expose election irregularities.
25     What I know now after what we've seen is

Page 91

1 something to do with this, then shame on him.  If Eric
2 Coomer was part of a company that has something to do
3 with this, shame on him.  I don't hate Eric Coomer.  I
4 love my country.
5     Q.  So would you say that your -- these claims
6 about Eric Coomer -- or what you believe about him hasn't
7 contributed to your disenchantment, as you described it,
8 and your distrust for the voting systems?
9     A.  There's many things that have contributed
10 to that.
11     Q.  Are there other clerks that you've
12 discussed this with that share that disenchantment?
13     MR. BLUE:  Again --
14     A.  You know -- oh.
15     THE DEPONENT:  During the time frame?
16     MR. BLUE:  -- as long as it's after August
17 of '21.
18     A.  I think it's important to note that the
19 director of the Colorado County Clerk's Association, his
20 wife has worked for the company -- same company that Eric
21 Coomer works for.  I think that's important to note.
22     And so having that influence as the
23 director of the Colorado County Clerk's Association and
24 seeing the persecution that has happened to me, has had
25 an ill-fated effect of intimidating and silencing the

Page 93

24 (Pages 90 - 93)

1　voice of the county clerks in Colorado.  That's my belief
2　and my opinion.
3　　　Q.  (By Mr. Kloewer)  Well, I am anticipating
4　your concern on the next question, so I don't need you to
5　give any specific names, but have you ever discussed Eric
6　Coomer with other clerks?
7　　　A.  No.  Not to my knowledge.  This was the --
8　this -- the Facebook post was the only one that I -- that
9　I even remember and maybe an interview saying anything
10　about Eric Coomer.
11　　　Q.  Okay.  What interview might that have been?
12　　　A.  I'm not sure.  I'd have to -- I'd have to
13　recall.  I've given a lot of interviews.  But, you know,
14　like I said, this is my opinion.  This is not -- you
15　know, I'm allowed to have my opinion.  I know what I know
16　about elections -- or I thought I knew about elections
17　back then.
18　　　Q.  And since this time, obviously, and
19　especially since after the Cyber Symposium, we've already
20　established that you've gotten closer with Joe Oltmann,
21　you've been a guest on his show many times, have you
22　discussed Eric Coomer with Joe Oltmann?
23　　　A.  Not to my knowledge.
24　　　Q.  You ever ask him about his claims about
25　Eric Coomer?

Page 94

1　　　A.  You know, I didn't even know back then,
2　like I mentioned before, who Joe Oltmann was.  I don't
3　remember who put that Facebook post up.
4　　　　　You know, that -- it was -- I mean, you
5　can tell from my -- my picture here that that's me.  You
6　know, it has my name.  You knew that was me by my name
7　right there.  Even though it says @bhealthynow, you knew
8　that was me.
9　　　　　So when I see a post by someone that says
10　Eric Coomer and they're saying all these things, I mean,
11　I don't know how strict Facebook is about having accounts
12　that aren't yours.  I think you have to give your name.
13　I don't know.
14　　　　　But, I mean, that's what -- that's the
15　information that I had to go on to draw my own opinion.
16　　　Q.  Okay.  It sounds like you didn't take any
17　steps to verify whether those posts you had seen were
18　accurate at the time.
19　　　A.  Well, if you saw this post made by me,
20　would you be certain that was made by me?  No.
21　　　Q.  That's why I've asked you about it today.
22　　　A.  Right.  Right.
23　　　Q.  That's why I'm asking you what steps you
24　took to verify --
25　　　A.  So --

Page 95

1　　　Q.  -- that the posts attributed to Eric Coomer
2　were from him?
3　　　A.  Did Eric Coomer put out that post?
4　　　Q.  Well, you stated before that you believed
5　you had seen a post where Eric Coomer stated in writing
6　that he had made sure Donald Trump would not win the
7　election; is that correct?
8　　　A.  Right.  Did he put out that post?
9　　　Q.  No, there's no evidence to that effect.
10　Not even Joe Oltmann has claimed that.  That's why I'm
11　trying to understand the basis for your beliefs.
12　　　A.  So -- so -- well, I just would like to
13　know because that will help me with my opinions.  You
14　know, people's opinions can change about people.
15　　　　　Did he put that post out?  Was that his
16　account?
17　　　Q.  Eric Coomer -- again --
18　　　A.  No, I just want to know.  I just want to
19　know.  Because if I'm wrong, I'm willing to admit I'm
20　wrong, but was that his account?
21　　　Q.  I will represent to you that Eric Coomer
22　never stated in writing that Donald Trump would not win
23　the election and that he'd make sure of that.
24　　　A.  But was that -- was that his -- was that
25　his account?

Page 96

1　　　Q.  His Facebook account did post content
2　critical of President Trump but he never stated that --
3　this -- again, I'm getting into the weeds.
4　　　A.  Well, no, no, no.  It helps me --
5　　　Q.  Okay.
6　　　A.  It helps me to understand --
7　　　Q.  Yeah.  Yeah.
8　　　A.  -- because if you're saying that -- that I
9　said these things, was that his account that I read?  Was
10　that his account that said that -- that he would make
11　sure that President Trump didn't win?
12　　　Q.  If that's what you --
13　　　A.  He'd make fucking sure of that.
14　　　Q.  -- read, there's no publication to that
15　effect in the record I've seen.
16　　　　　THE COURT REPORTER:  I'm sorry.  You need
17　to repeat that.
18　　　　　Please one at a time.
19　　　　　THE DEPONENT:  Okay.
20　　　Q.  (By Mr. Kloewer)  If your statement -- if
21　your belief is that you saw a post where Eric
22　Coomer stated in writing that he made sure Trump would not win,
23　there's no evidence in the record to suggest that.  That's
24　never been produced.
25　　　　　The reason I'm asking you about your

Page 97

25 (Pages 94 - 97)

1 conversations with Joe Oltmann is the entirety of the
2 claim that Eric Coomer made these statements is that Joe
3 Oltmann claims he infiltrated an Antifa conference call
4 where he overheard someone named Eric make that
5 statement, and I want to know if you discussed those
6 claims with Joe Oltmann to understand the basis of your
7 belief that Eric Coomer made those statements.
8        A.  No.  No, I haven't, but what I'm trying to
9 understand, though, is --
10        MR. BLUE:  Tina, just answer the question,
11 please.
12        A.  Okay.  No.  No.
13        MR. BLUE:  Can I just stop for a second
14 here?  It's 12:01.  I don't know where you are and -- and
15 I've taken depositions so you may want to continue with
16 some questions, but I just want to point out where we are
17 timewise.
18        MR. KLOEWER:  Sure.  And -- and we can
19 take a break if we need to.
20        Given the limitations from the order, I
21 just -- I'm sure you guys are wondering, I don't
22 anticipate using up the full five hours.  I think I've
23 probably got maybe -- maybe an hour, hour and a half
24 left.
25        So if we want to take a lunch break, we

Page 98

1 can.  If we want to power through, we can.  I think
2 Deanna wants a break so we should do at least that much,
3 but how much time we take is --
4        MR. BLUE:  I -- we ordered lunch for us --
5        MR. KLOEWER:  Okay.
6        MR. BLUE:  -- so I don't know when that's
7 coming.
8        MR. RICHARDS:  It might be here.
9        THE DEPONENT:  It's here.  I saw it here.
10        MR. BLUE:  It's here.  So we actually have
11 lunch here so...
12        MR. KLOEWER:  Let's do this.  Let's take a
13 break now.  We will take 30, 40 minutes.
14        MR. BLUE:  Sure.
15        MR. KLOEWER:  I will walk down the street
16 and grab a sandwich somewhere and we'll come back --
17 let's say 45 just to be safe.  12:45.
18        MR. RICHARDS:  12:45 right here.
19        MR. BLUE:  Great.  Thank you very much.
20        THE VIDEOGRAPHER:  Off record 12:03 p.m.
21        (Recess from 12:03 p.m. to 12:54 p.m.)
22        THE VIDEOGRAPHER:  We're back on the
23 record, 12:54 p.m.
24        MR. BLUE:  And before we start, we -- we
25 just went through her email --

Page 99

1        MR. KLOEWER:  Okay.
2        MR. BLUE:  -- to look for additional
3 communications in response to the subpoena and found
4 nothing.
5        If you want to ask her about -- about
6 that, you can do so, but I can represent to you that we
7 went through and did keyword searches on all these
8 questions.
9        MR. KLOEWER:  Okay.  And which email
10 account?
11        MR. BLUE:  It was through her main Proton
12 account that she uses, the one that is encrypted from
13 prior to November 16th of 2021.
14        The way Proton works, is if you do a
15 password reset, it encrypts everything prior to the date
16 you do the password reset.
17        MR. KLOEWER:  Okay.
18        MR. BLUE:  So we were able to go back to
19 November 16th of 2021 and do a search on all her emails
20 prior to November 16, 2021 -- post-November 16 --
21        MR. KLOEWER:  Okay.  Post.
22        MR. BLUE:  -- 2021, and we did keyword
23 searches on all of these questions and found nothing.
24        Q.  (By Mr. Kloewer)  Okay.  Okay.  And is that
25 the only email account that you use?

Page 100

1        A.  The other one is -- there's just one from
2 my business, one for my clerk -- you know, my work one,
3 and that was pretty much it.
4        Q.  And you don't have access to the clerk one,
5 I presume, or do you?
6        A.  We do.
7        Q.  You do?
8        A.  You do?
9        Q.  No, I'm asking if you do.
10        A.  Oh.  Oh.
11        Q.  I certainly don't.
12        A.  I'm sure Mesa County does.
13        MR. BLUE:  Probably not actually at this
14 point.
15        Q.  Okay.
16        MR. BLUE:  Oh, actually, considering
17 what's been happening, they probably do.
18        MR. KLOEWER:  Yeah.
19        MR. BLUE:  They probably would have saved
20 it.
21        A.  So, anyway, that was further --
22        Q.  (By Mr. Kloewer)  You don't have access to
23 that account yourself.
24        THE COURT REPORTER:  I'm sorry.  You don't
25 have access to that account yourself?

Page 101

26 (Pages 98 - 101)

| | |
|---|---|
| 1       MR. KLOEWER: Correct. | 1   you, I can't provide you any factual information. |
| 2      Q. (By Mr. Kloewer) Do you have access to | 2      The purpose of the deposition is for me to |
| 3   that account? | 3   understand what you know and the basis for what you know. |
| 4      A. I -- I think I can get some emails that | 4      So if you ask me any questions, I don't |
| 5   were forwarded and -- yeah. I mean, like -- | 5   mean to rude or dismissive or -- and I don't want a |
| 6       MR. BLUE: Wait. The question is, can you | 6   nonresponsiveness on my part to suggest that I'm dodging |
| 7   access that account? Can you log into that account? | 7   or refusing to acknowledge you. I just -- I'm not able |
| 8      A. I can't log into Mesa County -- | 8   to do that. |
| 9       MR. BLUE: That's the question -- | 9      And so if you ask me questions about facts |
| 10      A. -- not Mesa County anymore. | 10   in the case or things of that nature, I'm not going to |
| 11       MR. BLUE: That's the question he asked. | 11   respond and I mean no offense by that but I just want to |
| 12      A. Oh, okay. Yeah. Yeah. No. No. No. | 12   be sure that you understand, the sort of, parameters of |
| 13   They cut off my access to Mesa County back then. Yeah. | 13   what we're able to do here today and -- and why I'm not |
| 14       MR. KLOEWER: Okay. And I presume you -- | 14   responding. |
| 15   unless you have access to technology that our firm | 15      A. Okay. And I -- I appreciate that. I was |
| 16   certainly doesn't, were you able to review the text | 16   just trying to get a better understanding about what I |
| 17   messages, the messages -- | 17   believe. |
| 18       MR. BLUE: No, we didn't. | 18      Q. So I think what makes the most sense here |
| 19      Q. (By Mr. Kloewer) Okay. All right. And | 19   next is to take a look at an interview you conducted on |
| 20   sorry if I just asked this. That's the only email account | 20   FrankSpeech on September 7, 2022, and I want to discuss |
| 21   you would -- would have used for these -- | 21   some of the statements in that. |
| 22      A. For -- | 22      A. Okay. |
| 23      Q. -- for these communications? | 23      Q. Now what I'm going to do, is I'm going to |
| 24      A. Uh-hmm. Yes. | 24   play this on my laptop for you and hopefully the sound is |
| 25       THE COURT REPORTER: This what? | 25   okay. |
| <div align="right">Page 102</div> | <div align="right">Page 104</div> |

| | |
|---|---|
| 1       MR. KLOEWER: I said for these | 1       MR. KLOEWER: Brian, you're the only one |
| 2   communications. | 2   in the room I'm a bit concerned about having access to |
| 3      A. Yes. | 3   this. I know you've seen the video before. It's what's |
| 4       MR. BLUE: Okay. Can I just -- please | 4   been previously labeled as Exhibit 3, Clip 10. We |
| 5   remember two things. Answer only the question, and wait | 5   described it in the complaint. I cited those paragraphs |
| 6   for him to finish his questions before you answer. | 6   previously. |
| 7       THE DEPONENT: Okay. | 7      But that's what we're looking at. |
| 8       MR. BLUE: It's really hard because in | 8   Hopefully you can follow along just fine but let me know. |
| 9   normal day-to-day life, we talk over each other all the | 9       MR. MALONE: I understand. That's fine. |
| 10   time. | 10       MR. KLOEWER: Okay. |
| 11       THE DEPONENT: Okay. | 11       MR. BLUE: And, Brad, are you going to |
| 12       MR. BLUE: Right. So it's -- we can hear | 12   play -- pay -- excuse me -- play the entire clip? |
| 13   but nobody is transcribing us on a day-to-day basis. | 13       MR. KLOEWER: No, I'm not. And that's a |
| 14       THE DEPONENT: Okay. | 14   good question to clarify on the front end, especially for |
| 15       THE COURT REPORTER: Thank you. | 15   Deanna here. |
| 16       MR. BLUE: You're welcome. | 16      Q. (By Mr. Kloewer) The clip that we've |
| 17      Q. (By Mr. Kloewer) Ms. Peters, before we | 17   produced is six minutes and that -- only a couple of |
| 18   took a break, we were discussing your knowledge of the | 18   minutes of that are actually relevant. There's a break |
| 19   claims about Eric Coomer -- | 19   where there's a communication error. |
| 20      A. Uh-hmm. | 20      So I'm going to skip ahead to a couple |
| 21      Q. -- allegedly partaking in an Antifa | 21   different points, and I will note on the record the |
| 22   conference call. | 22   timestamp for that clip that I'm referring to. But we're |
| 23      And I want to clarify before we proceed | 23   not going to watch this whole six-minute clip now. I'm |
| 24   that -- and I mentioned this before but I can't provide | 24   probably going to show you 30 seconds at a time and we |
| 25   you any information, I can't answer any questions for | 25   will just do that three or four times until we get |
| <div align="right">Page 103</div> | <div align="right">Page 105</div> |

<div align="right">27 (Pages 102 - 105)</div>

1 through it.
2        A. Can I ask a question? Is that -- did you
3  say that's on FrankSpeech?
4        Q. It's my understanding. It's labeled as a
5  Lindell TV Production.
6        A. Okay.
7        Q. So but it was published on FrankSpeech.
8        MR. BLUE: Which exhibit -- what exhibit
9  is this again?
10       MR. KLOEWER: It's been previously labeled
11 as Exhibit 3, Clip 10.
12       MR. BLUE: Exhibit 3, Clip -- never had an
13 exhibit with a clip as a name but that's fine.
14       MR. KLOEWER: Yeah. Well, we've had
15 several of these where we introduce 10 or 15 clips per
16 deposition and the flash drive is what serves as the
17 exhibit, so that's kind of why that naming convention
18 develops.
19       MR. BLUE: Got it. It works. Yes.
20       Q. (By Mr. Kloewer) Okay. I'm just to trying
21 to get this started here and make sure the picture is right
22 and then I will turn it to face you so you can view this.
23       A. Oh, okay. I thought you were playing it
24 up there.
25       MR. BLUE: No, he's doing it and he's

Page 106

1  going to show it to you.
2        THE DEPONENT: Okay.
3        MR. BLUE: Do you want the text -- the
4  words transcribed? I assume you do.
5        MR. KLOEWER: I did speak with Deanna
6  about that. If you can, that would be great just because
7  the questions are going to relate to that portion. But I
8  got you a copy of the video and let me know if we need to
9  rewind it and play it again to be sure we get all of
10 this.
11       Q. (By Mr. Kloewer) Okay. So I'm going to
12 skip ahead in this clip to about the 1 minute 50 second
13 mark, and we're going to play just about -- probably
14 30 seconds here.
15       (Video played.)
16       MS. TINA PETERS: And before I walked out,
17 I was served with a -- a subpoena that, get this,
18 Brannon, it's from Eric Coomer. Everybody knows who Eric
19 Coomer is; right? And --
20       MR. BRANNON HOWSE: Well, for those who
21 don't -- for those who don't, tell us who he is.
22       MS. TINA PETERS: So Eric Coomer is the --
23 I won't even call him a gentleman. I would call him
24 Antifa, I will call him Dominion, the one that did the
25 software that he bragged about.

Page 107

1        Q. (By Mr. Kloewer) Okay. I will pause right
2  here.
3        In the clip you can see there's a break
4  where there's a communication error and you call back in
5  about two minutes later.
6        A. Okay.
7        Q. But I wanted to just discuss a few of the
8  statements you made there.
9        A. Okay.
10       Q. First off you started by -- what -- where
11 were you when this video was taken?
12       A. Let me -- let me see -- I can't -- after
13 it plays, I can -- I can get an idea.
14       Q. I don't necessarily need the physical
15 location.
16       A. Oh, that in Grand Junction. That's in
17 Grand Junction. Yeah.
18       Q. Okay. And were you conducting this on your
19 cell phone? It appears that way but I don't know how this
20 interview was --
21       A. Probably.
22       Q. Okay. And did you contact Mr. -- did
23 Mr. Howse invite you on this interview prior to this time
24 or how -- how was this arranged?
25       A. I have no idea. I have no idea --

Page 108

1        Q. Okay.
2        A. -- if he invited me on or somebody
3  contacted -- yeah, I don't know. I don't know how I got
4  there. But he's -- you know, I've dealt with his
5  producer -- his -- his producer before, Logan, so I have
6  no idea.
7        Q. Do you recall if you had a conversation
8  with Mr. Howse prior to this interview but before you went
9  live on air or did it just --
10       A. I don't know what I did, no.
11       Q. You started by saying everyone knows Eric
12 Coomer. What's -- is it your opinion, as you sit here
13 today, that everyone knows who Eric Coomer is?
14       A. Well -- and I appreciate you saying that.
15       I think on this show, his audience, that
16 people would know who that is.
17       Q. Okay.
18       A. That's just my opinion.
19       Q. Why do you think the FrankSpeech audience
20 know who Dr. Coomer is?
21       A. Well, I don't know. I would assume that a
22 lot of people that are -- I wouldn't say in the
23 mainstream media they would necessarily know, but I think
24 in alternative media, they would because of all the -- I
25 mean, that's how I was able to see that -- that post,

Page 109

28 (Pages 106 - 109)

1 that Facebook post. So -- and I was not even looking at
2 things like that.
3        So I would assume that people do know
4 that, do know about him because of all the hoopla about
5 elections and especially the vendor that you guys
6 represent so...
7        Q. And when you say you would describe him as
8 Antifa, what is Antifa, first of all?
9        A. It is what many have described as a --
10 kind like a revolutionary group that goes in -- they
11 don't like Donald Trump, they don't -- you know, they
12 seem to be very disruptive, a lot of hate-type things,
13 especially towards Donald Trump and people who are -- are
14 supporters of Donald Trump or Grass Roots or MAGA.
15 That's just my impression, yeah.
16        Q. And what is the basis for saying that --
17 why would you describe Eric Coomer as Antifa?
18        A. Well, because that was what was portrayed
19 in -- I'm referring back to that Facebook post again and
20 evidently those -- it was pretty much -- and I don't know
21 who actually put it out exactly but it was pretty much
22 common knowledge, in my opinion, that people that spoke
23 like that, you know, threatened -- I mean, there were
24 some putting out, like, his -- him being -- Donald Trump
25 being beheaded and, you know, just things like that.

Page 110

1        Q. Do you have any evidence that Dr. Coomer
2 has ever been violent?
3        A. Well, I was talking to you before about
4 him running into -- I mean, that was pretty wildly
5 broadcast news about him being drunk, allegedly, and
6 running into a building and then walking away into a bar
7 and drinking a couple of shots. And then when the police
8 questioned him, he lied about doing that when there were
9 eyewitnesss that saw him do that.
10        So, I mean, the character of a person
11 is -- you know, I don't know. That just...
12        Q. But as far as engaging in political
13 violence, do you have any evidence that Dr. Coomer has
14 ever done anything like that?
15        A. Oh. Well, let's just say it this way.
16        If that Facebook post -- and I will do
17 some more checking, and I may be wrong, but I will do
18 some more checking to see if I can find out anything more
19 about -- or find that Facebook post again. Like I said,
20 I haven't seen that Facebook post since, gosh, a long
21 time ago. I -- I don't even know -- remember when it was
22 but it was --
23        MR. BLUE: Tina, just answer the question,
24 please.
25        A. Yeah, no.

Page 112

1 People that put that kind of hate speech out there as
2 representatives of Antifa, that sort of thing so...
3        Q. Have you ever seen Dr. Coomer publish any
4 suggestion of Donald Trump being beheaded?
5        A. I don't think that came from him.
6        I'm just saying that's the type of
7 rhetoric that you see that hate Trump. You know, I'm
8 going to make sure he doesn't get elected. That
9 opposition to Trump coming from that, the riots, you
10 know, with the burning down Seattle and all of that as --
11 and then just disrupting.
12        Q. So is it your position that anybody who
13 opposed the candidacy of Donald Trump is Antifa?
14        A. Not necessarily. I think that there --
15 that Antifa is probably part of that organized group but
16 I wouldn't limit it to just Antifa. I mean, you know,
17 there's other -- other groups that have been very vocal
18 and very disruptive and things like that.
19        Q. As you understand Antifa, is it an
20 organization with members?
21        A. I don't know -- the way I understand it
22 and, you know, this may or may not be accurate, is that
23 it's a group that -- that is very vocal, very violent in
24 some of their -- their protests, destructive, things like
25 that. So, that's just the way it's portrayed. Uh-hmm.

Page 111

1        Q. (By Mr. Kloewer) And just to clarify, you
2 are referring to a Facebook post where you believe you saw
3 Dr. Coomer state that he had rigged the election and that
4 Donald Trump would not win and he had made sure of it.
5        A. That was the inference that I remember.
6        Q. Okay.
7        A. Yeah. I would have to see it again.
8        Q. Okay. Skip ahead here a little bit in the
9 video. I'm going to skip to the 4-minute 20-second mark.
10 This is after you come back from a connection issue.
11 Sorry. The 4-minute 10-second mark rather.
12        We will play this for just another minute
13 here.
14        (Video played.)
15        MR. BRANNON HOWSE: The man that you were
16 subpoenaed by, he worked at one time for Dominion; is
17 that correct?
18        MS. TINA PETERS: That's correct. He was
19 the one that was in charge of the patents for the
20 algorithm that is inside the Dominion voting machine and
21 actually bragged on an Antifa call, that is -- was a
22 member of, that he would make sure that the Trump
23 wouldn't get in; that he made F'ing sure of it.
24        And that's what got Joe Oltmann -- Joe
25 Oltmann was on that call and that's what got him involved

Page 113

29 (Pages 110 - 113)

1  in the fight a few years ago.
2        Well, Eric Coomer is now subpoenaing me
3  against our beloved patriot Mike Lindell, and this is
4  going to happen November 7th right here in Grand Junction
5  where they're going to subpoena me and interrogate me to
6  try to gen up some kind of information about our patriot
7  Mike Lindell.  Not going to happen.  You know, it's
8  just -- you know, it's, like, throw another one on the
9  pile, like Mike says.
10       But nevertheless, their assault is coming.
11       And what happened today with the --
12    Q.  (By Mr. Kloewer)  Okay.  Couple things
13  there.
14    A.  Okay.
15    Q.  You started by stating that Eric Coomer is
16  the one who is "in charge of the patents for the
17  algorithm."
18    A.  Uh-hmm.
19    Q.  What's the basis for that statement?
20    A.  I believe his doctorate -- I mean, when
21  he -- when it was on the Secretary of State's website
22  when I went and looked at it -- I believe that's where I
23  saw it.  I could be mistaken.
24       But there was -- there was -- it seems
25  like there was a record of several patents with his name

Page 114

1  on them with Dominion.
2    Q.  Have you ever looked into which patents, if
3  any, that Dr. Coomer is associated with?
4    A.  No.  But I -- it's -- it's pretty easy to
5  surmise that they were -- I mean, he's -- there's some
6  reason that he's so highly up and goes in and programs
7  the machines in other states.  So that would just seem
8  logical.  I mean, this is just my opinion so...
9    Q.  Well, yes.  I'm --
10    A.  You know, yeah.
11    Q.  -- just trying to understand the basis of
12  that opinion.
13    A.  Yeah.  Right.
14    Q.  So you haven't -- when you say "the patents
15  for the algorithm," which algorithm are you referring to?
16    A.  I would have to look back and see if I
17  made notes or anything about that.
18       And when was this one, this one here?  Oh,
19  September 7th --
20    Q.  September 7th of 2022.
21    A.  Okay.
22    Q.  So last September.
23    A.  Oh.  A year ago.  Okay.  There's a lot
24  that happened.
25    Q.  And -- and just to -- to confirm this

Page 115

1  before moving on, you haven't looked at any of the
2  specific patents or ever tried to conduct an investigation
3  into what --
4    A.  No, I --
5    Q.  -- patents he was involved with.
6    A.  -- would like to, though.  Yeah.
7    Q.  You go on to say that he's the one that
8  says that he bragged on the Antifa call that Trump
9  wouldn't win.
10    A.  No.  I believe that was on the Facebook.
11    Q.  Well --
12    A.  Wasn't it?
13    Q.  -- let's replay the clip here so that --
14    A.  Okay.  I may have said that and been --
15  and been -- yeah.  If I said call, I'm sure I meant the
16  Facebook post.
17    Q.  Let's play it here.  I'm starting from the
18  4-minute 25-second mark.  Let's go back to 4:20, just to
19  be certain I'm not overstepping here too far.
20       (Video played.)
21       MS. TINA PETERS:  That is inside the
22  Dominion voting machine and actually bragged on an Antifa
23  call that is -- was a member of, that he would make sure
24  that Trump wouldn't get in; that he made F'ing sure of
25  it.

Page 116

1    A.  No, that's referring to --
2       MS. TINA PETERS:  And that's what got
3  me --
4       MR. BLUE:  Shh.
5    Q.  (By Mr. Kloewer)  Okay.  So you said he
6  bragged on an Antifa call that he was a member of, that
7  Trump wouldn't get in; that he made sure of it.
8       What's the basis for that statement?
9    A.  Okay.  So I could have been mistaken on
10  that because it sounds like to me -- and of course this
11  is a year ago.  It sounds like to me that I was referring
12  to the Facebook post because I wasn't on an Antifa call.
13    Q.  Well, you -- you -- that's what you said,
14  though.
15    A.  Okay.  Fine.
16    Q.  So I'm wondering --
17    A.  Well, so maybe I was mistaken.
18    Q.  What -- where did you hear that Eric Coomer
19  was on an Antifa call?
20    A.  I think that was probably common
21  knowledge.  I don't know.  I don't know exactly the who,
22  date and time.  If you are asking me from Joel Oltmann,
23  no.
24    Q.  Okay.  Did you ever conduct any
25  investigation to determine if that was true?

Page 117

30 (Pages 114 - 117)

1    A.  No, but I'm curious now.  I think I -- I
2  think I want to do some...
3    Q.  You never asked Joe Oltmann about this
4  claim that Eric Coomer was on an Antifa call?
5    A.  No, not to my recollection.
6    Q.  Why not?
7    A.  We're not that close.  I mean, we
8  haven't -- we weren't that close then.  I mean,
9  obviously, you know.
10    Q.  Well, here is why I'm asking.
11    If it were true that Eric Coomer were on
12  an Antifa call or he claimed that he had rigged the
13  election, you would agree that would be very significant
14  evidence --
15    A.  Yeah.
16    Q.  -- regarding the security of Dominion
17  voting machines; correct?
18    A.  Oh, yeah, for sure.
19    Q.  But it -- but you never thought to ask if
20  that story was true?
21    A.  You know, that's a good question.  I mean,
22  we hear a lot of things out there, you know, both sides,
23  everybody, and I think it -- you know, different people
24  believe different things.  Fair enough?
25    Q.  Are you aware that Oltmann has claimed that

*Page 118*

1  he took notes during that Antifa call?
2    A.  Uh-uh.  No, I'm not.
3    Q.  So I know the answer -- I think I know the
4  answer to this question already, but you haven't ever
5  asked to see Joe Oltmann's notes?
6    A.  Uh-uh.
7    Q.  Do you know who else was on that call?
8    MR. BLUE:  Verbal answers.
9    A.  Oh, no.  No.  Sorry.
10    Q.  (By Mr. Kloewer)  Are you aware that
11  Oltmann has claimed that more than a dozen other people
12  were on the call?
13    A.  I'm not -- I'm not familiar with what his
14  claims are.
15    Q.  Have you ever asked Joe Oltmann to identify
16  any of the other members of the call?
17    A.  I have not.
18    Q.  Why would you make a claim like this when
19  you know you are on television if you haven't asked those
20  questions?
21    MR. BLUE:  Objection.  What's the
22  relevance about why she does something to your case?
23    MR. KLOEWER:  Motive.
24    MR. BLUE:  I understand that you are
25  saying --

*Page 119*

1    MR. KLOEWER:  Yeah.
2    MR. BLUE:  I understand your theory --
3    MR. KLOEWER:  Yeah.
4    MR. BLUE:  -- but her motivation is
5  irrelevant.
6    MR. KLOEWER:  There are multiple motive
7  factors which speak to circumstantial evidence, which can
8  motivate -- or which can speak to the actual malice
9  standard.
10    Some of those are profit motives, some are
11  political motives, some are conformity to a preconceived
12  narrative.  We've cited all these cases in the briefing,
13  but circumstantial evidence of motive is a factor that is
14  relevant to the Court's determination of actual malice
15  so...
16    MR. BLUE:  By her.  Not by somebody else.
17    MR. KLOEWER:  Well, the motive behind the
18  publication is a relevant consideration, which is why
19  we're asking so...
20    MR. BLUE:  Are you -- are you going to be
21  suing her for defamation after this?
22    MR. KLOEWER:  I don't think the speaking
23  objections are really relevant or appropriate right now.
24    The Court can determine if this testimony
25  is relevant or not.

*Page 120*

1    I've explained for you the basis for the
2  reason -- for the questioning.  Circumstantial
3  evidence -- circumstantial factors relevant to motive are
4  a factor that the Court considers when determining actual
5  malice and defamatory publication.
6    She doesn't need to be a defendant to have
7  contributed to the publication of this material.
8    THE DEPONENT:  Can you explain all that?
9    Q.  (By Mr. Kloewer)  So -- so you don't
10  have -- so you don't have any further -- well, let me ask
11  it this way.  Do you have any other evidence to
12  corroborate this claim that Eric Coomer was on an Antifa
13  call?
14    A.  No.
15    Q.  You went on in this clip to state that it
16  was Dr. Coomer's intent to interrogate you to get
17  information on Mr. Lindell.  I'm probably paraphrasing.
18  We can watch the clip again, if you'd like, and then you
19  say "not going to happen."
20    Do you know what you meant when you said
21  "not going to happen"?
22    A.  I do.  I do.  I --
23    Q.  What were you referring to there?
24    A.  I felt like -- to be honest with you, I
25  felt like this was a witch hunt, just like has been

*Page 121*

31 (Pages 118 - 121)

1 leveled at me, and there's nothing that I can tell you,
2 now or then, that would put Mr. Lindell in a bad light.
3 I think he's a great patriot. I think he's served this
4 country, he's -- at great cost to him and his
5 organization, and I have nothing bad to say about him.
6          So, you know, my impression of your
7 deposition, then and even now, is to try to malign him in
8 some way that I have no knowledge of; that I don't feel
9 exists.
10     Q. So when you said "not going to happen," you
11 were speaking with reference to the type of testimony you
12 anticipated providing?
13     A. It's not going to happen. I don't have
14 anything to give you that is going to support your
15 defamation of Mr. Lindell. It's just not there. And --
16 in my knowledge. In my experience.
17     Q. Okay. I'm going to put this aside for now.
18          All right. We discussed this event
19 briefly before, but you spoke on the steps of the
20 Colorado Capitol on April 4th of 2022 with Mr. Lindell.
21 Do you recall that event?
22     A. April 4th of 2022. I do. I do.
23     Q. And what was the purpose of that event, if
24 you recall?
25     A. I believe -- well, I don't know because

Page 122

1     Q. As you sit here today, it's -- and I think
2 I know answer to this question, but is it your belief that
3 the 2020 Presidential election was rigged?
4          THE DEPONENT: Do you want me to answer
5 that?
6          MR. BLUE: I'm not objecting.
7          THE DEPONENT: Huh?
8          MR. BLUE: I'm not objecting.
9          THE DEPONENT: All right.
10          MR. BLUE: I mean, I think it's irrelevant
11 but...
12     A. If you had asked me after 2020, I would
13 have said not in my county. I did know that there were
14 irregularities across the country, which I did not -- I
15 can't speak to. But I did not feel that it was rigged in
16 my county and that's what my -- I tried to stay within my
17 rails, you know, in regard to my -- my job as clerk. And
18 I don't think I'm supposed to talk about my job as a
19 clerk.
20          MR. BLUE: No, you are not supposed to
21 talk about your job as a clerk.
22          THE DEPONENT: Okay.
23     A. And I was clerk then.
24          THE COURT REPORTER: I was what?
25          THE DEPONENT: I was clerk then.

Page 124

1 I've spoken a couple of times on the steps of the Capitol
2 so I can't recall that exact -- I can't recall that exact
3 time.
4     Q. Were you aware that Mr. Lindell had been
5 served with this lawsuit by Dr. Coomer at that event?
6     A. I think -- I think it -- yeah, I think
7 somebody walked up to him because there was press
8 everywhere, people were following me, the -- my security
9 was trying to protect me and I -- so a lot of people were
10 around him separate from me. So, I think I heard later
11 that he was. Yeah.
12     Q. Do you recall Mr. Oltmann being present at
13 that event?
14     A. I don't.
15     Q. Okay. You don't remember speaking with him
16 on the steps there?
17     A. I don't -- I don't remember it. If I did,
18 that could have been. It was a very busy day.
19     Q. Did you discuss the lawsuit that
20 Mr. Lindell had been served with at any point after or
21 during that event?
22     A. I may have. I have no recollection of it.
23     Q. Okay. Do you recall Mr. Lindell's response
24 of being served with the lawsuit?
25     A. No.

Page 123

1     Q. (By Mr. Blue) But today, as you sit here,
2 you do believe the election was rigged; correct?
3     A. Explain to me what you mean by "rigged."
4     Q. The votes cast -- the counted votes cast
5 was manipulated in such a way as to reflect an inaccurate
6 result.
7     A. That's a fair definition. Yes.
8     Q. And who rigged it?
9     A. I think that there's -- this is bigger
10 than any of us ever realized, to be honest with you. I
11 can't give you one name of one person.
12     Q. Well, let's start with one name of one
13 person.
14     A. Okay. Go for it.
15     Q. Sorry?
16     A. Go for it.
17     Q. No. Can you name one person?
18     A. No, I am not going to get into
19 naming people that will sue me if I say that they rigged
20 the election. That's -- so that would be a fool's error.
21 Why would I do that? To become a target?
22     Q. How many people do you believe were
23 involved in this effort?
24          MR. BLUE: Objection. Relevance. But you
25 can answer.

Page 125

32 (Pages 122 - 125)

| | Page 126 |
|---|---|
| 1 | Q. (By Mr. Kloewer) You can answer. |
| 2 | MR. BLUE: You can answer. |
| 3 | A. I have no idea. |
| 4 | Q. (By Mr. Kloewer) Can you ballpark it? |
| 5 | A. Nope. No ballpark. |
| 6 | Q. Are you talking one to ten people or more |
| 7 | than a thousand? |
| 8 | A. I can't speak for other people. |
| 9 | Q. Do you share Mr. Lindell's belief that the |
| 10 | Chinese government was involved in rigging the 2020 |
| 11 | election? |
| 12 | A. Hmm. That's interesting subject. |
| 13 | I don't know that my belief and my opinion |
| 14 | really matters. |
| 15 | MR. KLOEWER: Objection. Nonresponsive. |
| 16 | Q. (By Mr. Kloewer) Do you share his belief |
| 17 | that the Chinese government was involved in rigging the |
| 18 | 2020 election? |
| 19 | A. I think it was more than just one single |
| 20 | person, one single entity, and that's just my belief. |
| 21 | I don't know if the Chinese government -- |
| 22 | you -- then -- then your next question is going to be, |
| 23 | well, do you have proof of that? |
| 24 | I -- this is not my interest. What -- |
| 25 | what Mr. Lindell, what Coomer does, what other people do |

Page 126

| | Page 127 |
|---|---|
| 1 | are not my -- that is not where my interest lies. |
| 2 | Q. Well, you are facing criminal charges for |
| 3 | this, and it's not your interest in -- in whether the |
| 4 | election was rigged or by who or how? |
| 5 | A. I'm not facing criminal charges for the |
| 6 | election -- rigging the election. That's not accurate. |
| 7 | Q. And I didn't mean to suggest that you are, |
| 8 | but the criminal charges you are facing arise out of your |
| 9 | beliefs about the election, and it sounds like you're not |
| 10 | able to articulate any individual or entity who you |
| 11 | believe was actually involved in rigging the results. |
| 12 | A. So are you familiar with what my charges |
| 13 | are? |
| 14 | Q. Yes. |
| 15 | A. Okay. Is there anything in my charges |
| 16 | that -- that attribute truth to what you just said? |
| 17 | Q. Again -- |
| 18 | A. They don't. I will answer for you. They |
| 19 | don't. |
| 20 | So, let's -- let's talk about relevance to |
| 21 | what my belief about the 2020 election matters here. |
| 22 | Because otherwise, I have nothing more to tell you. |
| 23 | Q. Well, do you believe -- |
| 24 | A. It just doesn't matter. |
| 25 | Q. Do you believe Dominion Voting Systems |

Page 127

| | Page 128 |
|---|---|
| 1 | rigged the election? |
| 2 | A. Oh, my goodness. |
| 3 | MR. BLUE: You've got to answer the |
| 4 | questions. |
| 5 | THE DEPONENT: Okay. All right. |
| 6 | A. Do I believe that -- |
| 7 | MR. BLUE: But object -- |
| 8 | A. -- Dominion Voting Systems rigged the |
| 9 | election. |
| 10 | Q. (By Mr. Kloewer) Yes. |
| 11 | A. Do I believe that Dominion Voting Systems |
| 12 | rigged the elections. |
| 13 | My opinion is stated in the expert reports |
| 14 | of Mesa County Report Number 1, Mesa County Report |
| 15 | Number 2, and Mesa County Report Number 3 that were done |
| 16 | by very qualified cyber experts with years and years of |
| 17 | experience in computers, cyber security, and other |
| 18 | matters that relate to education far beyond mine. |
| 19 | Q. And is it the conclusion of those reports |
| 20 | that Dominion Voting Systems rigged the election? |
| 21 | A. Well, I would suggest that everybody read |
| 22 | it for themselves and draw their own conclusion. Yes, |
| 23 | there were anomalies that were presented in those three |
| 24 | reports that are very concerning. |
| 25 | Q. But is it the conclusion of those reports |

Page 128

| | Page 129 |
|---|---|
| 1 | that Dominion Voting Systems rigged the election? |
| 2 | A. You would have to ask them. |
| 3 | MR. MALONE: Excuse me, Ms. Peters, I'm |
| 4 | sorry. |
| 5 | THE COURT REPORTER: I'm sorry. |
| 6 | MR. MALONE: Objection to form, |
| 7 | foundation, and asked and answered. And you can answer. |
| 8 | Q. (By Mr. Kloewer) Have you publicly claimed |
| 9 | that the 2020 Presidential election was rigged by Dominion |
| 10 | Voting Systems? |
| 11 | A. I'm not sure. Do you have evidence that I |
| 12 | have? |
| 13 | Q. Do you believe that the Chinese government |
| 14 | coordinated with Dominion Voting Systems to rig the 2020 |
| 15 | election? |
| 16 | MR. BLUE: Objection. Foundation. |
| 17 | A. I don't know. |
| 18 | MR. BLUE: You -- when I make an |
| 19 | objection, you can go ahead and answer. |
| 20 | THE DEPONENT: I can? |
| 21 | MR. BLUE: Unless -- unless somebody tells |
| 22 | you don't answer -- |
| 23 | THE DEPONENT: Okay. |
| 24 | MR. BLUE: -- don't worry about the |
| 25 | objections. |

Page 129

33 (Pages 126 - 129)

1      THE DEPONENT: Oh, okay.
2      MR. BLUE: We're just putting them in for
3  the record, and then you can answer the question.
4      A. Can you repeat the question?
5      Q. (By Mr. Kloewer) Do you believe that the
6  Chinese government coordinated with Dominion Voting
7  Systems to rig the 2020 election?
8      MR. BLUE: Same objection.
9      A. Okay. Who do you mean by the Chinese
10  government? It's like a big --
11     MR. BLUE: Not me.
12     A. That's a big -- are you talking about the
13  Communist Chinese party or are you talking about the
14  people of the Republic of China?
15     Q. (By Mr. Kloewer) Are you familiar with --
16     A. Who are you talking about?
17     Q. Are you familiar with Mr. Lindell's
18  allegations that China rigged the election, just China?
19     A. You know, Mr. Lindell has said a lot of
20  things. I don't keep up with what Mr. Lindell says. So,
21  you know, his opinion, he's entitled to his own opinion,
22  I can't speak for him.
23     Q. Do you believe that there are elements of
24  the Chinese government who worked in coordination with
25  Dominion Voting Systems to rig --

Page 130

1      A. I don't --
2      Q. -- the 2020 election?
3      A. I don't know.
4      Q. Have you seen any evidence to suggest that
5  they did?
6      A. All I know is what my -- from my purview
7  is Mesa County Report 1, 2, and 3, and I will just let
8  the experts speak for themselves. You probably should
9  talk with them about the specifics.
10     Q. So can you say with certainty that Dominion
11  Voting Systems rigged the 2020 election?
12     MR. BLUE: Objection. Asked and answered.
13  Form and foundation.
14     A. I've answered that.
15     MR. BLUE: You can answer.
16     Q. (By Mr. Kloewer) And your answer is, is it
17  you rely on the Mesa County reports; is that correct?
18     A. That's correct.
19     Q. And the conclusions that they've drawn?
20     A. Uh-hmm.
21     Q. When you stated that Dr. Coomer bragged on
22  the Antifa call that Trump wouldn't win, did you care if
23  that was true or not?
24     A. I care about my country, yes. I do care
25  about my country.

Page 131

1      Q. That not my question.
2      A. That's my answer.
3      Q. Well, that's nonresponsive.
4      Did you care if it was true or not whether
5  Eric Coomer claimed on an Antifa call that he rigged the
6  election as you stated?
7      A. Did I care? Did I care that he -- that
8  that's what I read? Did I care -- yeah, I care about
9  this country. Yes, I do care if someone is -- is
10  accused or it appears that they've done something to
11  threaten our country. It does concern me.
12     Q. Do you care if Dr. Coomer receives death
13  threats as a result of these claims?
14     A. No one should receive death threats. I
15  have received death threats. Okay? So, no one should
16  receive death threats. This is -- we still live,
17  hopefully, in a free country where our opinion is honored
18  and we're not persecuted for thinking a different way
19  than someone else.
20     Q. You would agree that receiving death
21  threats as a result of a false claim is deeply harmful.
22     MR. BLUE: Objection. Form. Foundation.
23     A. Yes.
24     MR. BLUE: Go ahead.
25     THE DEPONENT: Do I answer still it?

Page 132

1      MR. BLUE: Yes.
2      A. Yes, because I have done -- I have
3  received that as well.
4      Q. (By Mr. Kloewer) And you would agree
5  that -- that people who have made false claims about you
6  that resulted in death threats to you, had harmed you by
7  making those claims.
8      A. Yes, absolutely.
9      MR. BLUE: Objection. Form, foundation,
10  relevance.
11     A. But I don't -- I don't know -- I don't
12  know his heart. I know my heart, and I care about this
13  country. I don't know him. I shouldn't -- I mean, all I
14  can tell you is, yes, the threats have been made about me
15  are unfounded, and I know that because I know what I have
16  and haven't done.
17     I don't know what Eric Coomer has and has
18  not done, so I can't speak -- we're -- we're not alike,
19  let me put it that way.
20     Q. And the reason you don't know what Eric
21  Coomer has and hasn't done is because you haven't
22  conducted any investigation; is that correct?
23     A. Why would I? He's not a big part of my
24  life. He's not -- he doesn't take up any space in my
25  head from what -- the things -- the two things that

Page 133

34 (Pages 130 - 133)

1 you've brought out here today.

2     Q. So Eric Coomer was not important enough for

3 you to investigate whether the claims that you made about

4 him were unfounded.

5     MR. BLUE: Objection. Asked and answered.

6     THE DEPONENT: Do you want an aspirin? I

7 have one.

8     MR. BLUE: No, I'm fine.

9     MR. KLOEWER: I think if we want to take

10 about a five-minute break here, make a quick call and I

11 think I'm just about done, but let me -- do you want to

12 go off the record for five minutes and hop back in?

13     MR. BLUE: Sure.

14     MR. KLOEWER: Okay.

15     THE VIDEOGRAPHER: Going off the record

16 1:34 p.m.

17     (Recess from 1:34 p.m. to 1:40 p.m.)

18     THE VIDEOGRAPHER: Back on the record,

19 1:40 p.m.

20     Q. (By Mr. Kloewer) Ms. Peters, just one last

21 question.

22     Earlier today we were discussing your

23 legal defense fund and the entities who would have

24 information about that fund.

25     I understand you don't know who those

Page 134

---

1 entities are. Would you have any objection to us

2 submitting that request on your counsel to provide

3 information about that account?

4     MR. BLUE: Objection. That's a legal

5 question. We would have to -- she and I would have to

6 have a conversation about it before we objected or not

7 objected to that.

8     MR. KLOEWER: Okay. All right. I have

9 nothing further for you today, Ms. Peters.

10     THE DEPONENT: Okay.

11     MR. KLOEWER: We can -- I will pass the

12 witness if you have any questions on your end.

13     MR. BLUE: I have no follow-up.

14     Ryan?

15     MR. MALONE: No questions. Thank you for

16 your time today, Ms. Peters.

17     THE DEPONENT: Thank you. I appreciate

18 you, Ryan.

19     THE VIDEOGRAPHER: All right. Going off

20 record 1:41 p.m.

21     This concludes today's testimony given by

22 Tina Peters.

23     Thanks, everybody.

24     THE DEPONENT: Thank you. I appreciate

25 it.

Page 135

---

1     THE COURT REPORTER: So, Counsel, can you

2 put your orders on the record, please.

3     Mr. Kloewer, would you please put your

4 order on the record.

5     MR. KLOEWER: I believe we have a standing

6 order, and that's what I want again.

7     MR. BLUE: I'm -- we're just going to --

8 reading and signing.

9     THE COURT REPORTER: Okay.

10     MR. BLUE: So that will be enough for us,

11 I think. If we decide to order, we will call.

12     THE COURT REPORTER: Mr. Malone?

13     MR. MALONE: We will take an electronic

14 transcript. We do not need a video.

15     THE COURT REPORTER: Thank you.

16     * * * * * * * *

17     WHEREUPON, the foregoing deposition was

18 concluded at the hour of 1:42 p.m. Total time on the

19 record was 2 hours and 34 minutes.

20

21

22

23

24

25

Page 136

---

1     I, TINA MARIE PETERS, the deponent in the

2 above deposition, do acknowledge that I have read the

3 foregoing transcript of my testimony, and state under

4 oath that it, together with any attached Statement of

5 Changes pages, constitutes my sworn testimony.

6

7

8 _____ I have made changes to my deposition

9

10 _____ I have NOT made any changes to my deposition

11

12

    _____

13     TINA MARIE PETERS

14

15 Subscribed and sworn to before me this _____ day

16 of _____, 2023.

17     My commission expires:_____.

18

19

20     _____

    Notary Public

21

22

23

24

25   Job No. TX6304305

Page 137

35 (Pages 134 - 137)

```
1        CERTIFICATE OF COURT REPORTER
2        I, DEANNA BAYSINGER, a Registered Professional
3  Reporter and Notary Public within and for the State of
4  Colorado, commissioned to administer oaths, do hereby
5  certify that previous to the commencement of the
6  examination, the witness was duly sworn by me to testify
7  the truth in relation to matters in controversy between
8  the said parties; that the said deposition was taken in
9  stenotype by me at the time and place aforesaid and was
10 thereafter reduced to typewritten form by me; and that
11 the foregoing is a true and correct transcript of my
12 stenotype notes thereof.
13        That I am not an attorney nor counsel nor in
14 any way connected with any attorney or counsel for any of
15 the parties to said action nor otherwise interested in the
16 outcome of this action.
17        My commission expires:  November 8, 2026.
18
19
20    DEANNA BAYSINGER
      Registered Professional Reporter
21    Notary Public, State of Colorado
22
23
24
25
                                              Page 138
```

```
1  gblue@gesslerblue.com
2              November 14, 2023
3  RE: Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
4  DEPOSITION OF: Tina Marie Peters 6304305
5     The above-referenced witness transcript is
6  available for read and sign.
7     Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11    The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
                                              Page 140
```

```
1  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
2  Tina Marie Peters Job No. 6304305
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Tina Marie Peters              Date
25
                                              Page 139
```

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.