# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

## EXHIBIT 10

---

Page 1

1

2  UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

3  ----------------------------------------X

ERIC COOMER, Ph.D.,

4

PLAINTIFF,

5

6      -against-    Civil Action No.:

1:22-cv-01127-NYW-SKC

7

8  MICHAEL J. LINDELL, MYPILLOW, INC., and

FRANKSPEECH, LLC,

9

DEFENDANTS.

10  ----------------------------------------X

11                 DATE: August 18, 2023

12                 TIME: 9:00 A.M.

13

14        DEPOSITION of the

15  Witness, CHRISTOPHER RUDDY, taken by the

16  Defendant, pursuant to a Subpoena and to

17  the Federal Rules of Civil Procedure, held

18  at the offices of Duane Morris, LLP, 230

19  Park Avenue, Suite 1130, New York, New York

20  10169, before Karyn Chiusano, a Notary

21  Public of the State of New York.

22

23

24

25

Page 2

1
2  A P P E A R A N C E S :
3
4  CAIN & SKARNULIS, PLLC
    Attorneys for the Plaintiff
5    ERIC COOMER, Ph D
     303 Colorado Street
6    Austin, Texas 78701
     BY: CHARLIE CAIN, ESQ
7      BRAD KLOEWER, ESQ
     ccain@cstrial com
8    bkloewer@cstrial com
9
10  PARKER, DANIELS, KIBORT, LLC
    Attorneys for the Defendants
11   MICHAEL J  LINDELL, MYPILLOW, INC ,
     and FRANKSPEECH, LLC
12   Colwell Building, 888
     123 N 3rd Street
13   Minneapolis, Minnesota 55401
     BY: RYAN MALONE, ESQ
14
15
    DUANE MORRIS, LLP
16   Attorneys for the Witness
     CHRISTOPHER RUDDY
17   230 Park Avenue ~ Suite 1130
     New York, New York 10169
18   BY: ANDREW FISH, ESQ
     ALFish@duanemorris com
19
20
    ALSO PRESENT:
21   PHIL GLAUBERSON, Videographer
     ERIC COOMER, Ph D , via Zoom
22   MICHAEL OLNEY, Newsmax
23
24
25      *   *   *

Page 3

1
2  F E D E R A L   S T I P U L A T I O N S
3
4
5    IT IS HEREBY STIPULATED AND AGREED by and
6  between the counsel for the respective
7  parties herein that the sealing, filing and
8  certification of the within deposition be
9  waived; that the original of the deposition
10  may be signed and sworn to by the witness
11  before anyone authorized to administer an
12  oath, with the same effect as if signed
13  before a Judge of the Court; that an
14  unsigned copy of the deposition may be used
15  with the same force and effect as if signed
16  by the witness, 30 days after service of
17  the original & 1 copy of same upon counsel
18  for the witness.
19
20    IT IS FURTHER STIPULATED AND AGREED that
21  all objections except as to form, are
22  reserved to the time of trial.
23
24      *   *   *   *
25

Page 4

1        OPENING STATEMENTS
2        THE VIDEOGRAPHER:  Good
3  morning.
4        We are going on the record at
5  9:12 A.M., 8/18/23.  Please note that
6  microphones are sensitive and may
7  pick up whispering and private
8  conversations.
9        Please mute your phones at this
10  time and place them away from the
11  microphones as they can interfere
12  with the audio.
13        The audio and video recording
14  will continue to take place unless
15  all parties agree to go off the
16  record.  This is Media Unit one of
17  the video-recorded deposition of
18  Christopher Ruddy in the matter of
19  Eric Coomer, Ph.D. versus Michael J.
20  Lindell, et al, filed in the United
21  States District Court for the
22  District of Colorado,
23  122CV01129NYWSKC.
24        The location of this deposition
25  is Duane Morris, LLP, 230 Park

Page 5

1        OPENING STATEMENTS
2  Avenue, New York, New York.
3        My name is Phil Glauberson
4  representing Veritext and I am the
5  videographer.  The Court Reporter is
6  Karyn Chiusano from Veritext.
7        I am not authorized to
8  administer an oath, I am not related
9  to any party in this action, nor am I
10  financially interested in the
11  outcome.
12        If there are any objections to
13  proceeding, please state them at the
14  time of your appearance.  All
15  appearances will be noted on the
16  stenographic record.
17        Will the Court Reporter please
18  swear in the witness?
19        THE COURT REPORTER:  Sir, can
20  you raise your right hand?
21        (Witness complies.)
22        THE COURT REPORTER:  Do you
23  swear that the testimony you are
24  about to give will be the truth, the
25  whole truth and nothing but the

2 (Pages 2 - 5)

Page 6

1          CHRISTOPHER RUDDY
2     truth, so help you, God?
3          THE WITNESS:  I do.
4   C H R I S T O P H E R     R U D D Y,
5   called as a witness, having been first duly
6   sworn by a Notary Public of the State of
7   New York, was examined and testified as
8   follows:
9          THE COURT REPORTER:  Wonderful,
10  sir.
11       Can I kindly have your name,
12  spelling, please?
13       THE WITNESS:  Christopher
14  Ruddy.  C-H-R-I-S-T-O-P-H-E-R, Ruddy,
15  R-U-D-D-Y.
16       THE COURT REPORTER:  Can I
17  kindly have your address, sir?
18       THE WITNESS:  1120 Bear Island
19  Drive, West Palm Beach, Florida
20  33479.
21       THE COURT REPORTER:  Any time
22  you're ready, Mr. Malone, I'm ready
23  for you, sir.
24       MR. FISH:  Pardon me.  Before
25  the questioning begins, let me make a

Page 7

1          CHRISTOPHER RUDDY
2     note for the record, that the
3     parties -- both counsel are appearing
4     remotely which is probably obvious.
5          But we are stipulating to the
6     means and methods of this deposition
7     being remote and neither party
8     intends and shall raise any objection
9     to the admissibility of any testimony
10    or evidence based solely on the means
11    and methods of taking this
12    deposition.
13         Is that our agreement?
14         MR. MALONE:  The rebuttal is so
15    stipulated.
16         MR. FISH:  Pardon me.
17         Thank you.
18  EXAMINATION BY
19  MR. MALONE:
20    Q.   Mr. Ruddy, would you please
21  state your job title?
22    A.   Chief Executive Officer.
23    Q.   And you're the Chief Executive
24  Officer of Newsmax?
25    A.   Correct.

Page 8

1          CHRISTOPHER RUDDY
2     Q.   How long have you held that
3   title?
4     A.   Approximately twenty-five
5   years.
6     Q.   Staring in, roughly, 1998?
7     A.   Correct.
8     Q.   What jobs did you hold before
9   you held your current position?
10    A.   I was a national correspondent
11  at the Pittsburgh-Tribune-Review.  I was a
12  reporter at the New York Post.  I was a
13  school teacher in the City of New York
14  after college.
15    Q.   And Newsmax begin its operation
16  in 1998?
17    A.   It did.
18    Q.   At that time, how would you
19  characterize Newsmax's business model?
20    A.   I would say that it was a mixed
21  revenue model to -- we offered content and
22  sold advising, and we also sold
23  subscriptions to a -- a newsletter.
24    Q.   And that content was
25  distributed through cable television; is

Page 9

1          CHRISTOPHER RUDDY
2   that accurate?
3     A.   No.
4          It was digital website means.
5   We also had a print product, the newsletter
6   that later became the magazine.
7     Q.   I see.
8          So Newsmax started as an online
9   and a print operation; is that accurate?
10    A.   Correct.
11    Q.   Thank you.
12         And at some point, I understand
13  that that business model changed, that
14  Newsmax offered content through cable
15  television; is that accurate?
16    A.   Correct.
17    Q.   And when did that start?
18    A.   We did not go on cable until --
19  until 2014.
20    Q.   Okay.  And when Newsmax went on
21  cable, did it continue to offer online
22  content?
23    A.   Yes.
24    Q.   And it offers online content
25  and content through cable television

3 (Pages 6 - 9)

CHRISTOPHER RUDDY

1
2 distributors; is that accurate?
3    A.   Correct.
4    Q.   How many homes is Newsmax --
5 I'll refer to it as Newsmax TV available
6 on?
7    A.   Probably over $100 million --
8 $110 million.
9    Q.   And that's through cable and
10 satellite TV distributors; is that
11 accurate?
12    A.   And a -- yes, and streaming.
13    Q.   And streaming through digital
14 platforms?
15    A.   Yes, like, Roku.
16    Q.   I see.
17       So, that hundred million is
18 just through cable, satellite and
19 streaming; is that accurate?
20    A.   Yes.  That's an estimate.
21    Q.   Okay.  And is there a similar
22 estimate available as to how many
23 individuals access Newsmax's content
24 online?
25    A.   We get data from -- we have

CHRISTOPHER RUDDY

1
2 internal Google data, and we have data from
3 Comscore, and we average anywhere from -- I
4 think -- I haven't looked at the recent
5 numbers, maybe four to eight million people
6 a month.
7    Q.   Four to eight million online?
8    A.   Four to eight million online.
9    Q.   Okay.  We'll look at a few
10 numbers from Comscore in a bit.
11       First, I'd like to ask you, Mr.
12 Ruddy, what did you do to prepare for your
13 deposition today?
14    A.   I just had a meeting with my --
15 my lawyer and my in-house counsel a couple
16 of days ago, and we just discussed what
17 issues we might be -- you guys might be
18 raising and that was it.
19    Q.   Understood.
20       I am going to try share my
21 screen, and we will identify this document.
22       I believe we left off at 161.
23       MR. MALONE:  Brad or Charlie,
24   is that accurate from --
25       MR. FISH:  Yeah, that's the

CHRISTOPHER RUDDY

1
2 next one, 161.
3       MR. MALONE:  Okay.
4       It appears, though, I'm not
5 permitted to do a screen share.  Is
6 there any way we can change that?
7       THE COURT REPORTER:  Hold,
8 please.
9       THE VIDEOGRAPHER:  We are going
10 off the record at 9:20.
11       (Whereupon, an off-the-record
12 discussion was held.)
13       THE VIDEOGRAPHER:  We are back
14 on the record at 9:22.
15    Q.   Okay.  Mr. Ruddy, what is being
16 displayed on the screen is a subpoena which
17 will be identified as Exhibit 161, which
18 I'll represent to you is a subpoena to
19 Newsmax Media Incorporated and it is dated
20 February 13, 2023.
21       (Whereupon, Subpoena was marked
22       as Exhibit 161 for identification as
23       of this date by the Reporter.)
24    Q.   Have you seen this document
25 before?

CHRISTOPHER RUDDY

1
2    A.   No.
3    Q.   Do you understand that Newsmax
4 has produced documents in this litigation?
5    A.   I am -- I don't know what
6 documents have been produced.
7    Q.   Okay.  One of the documents
8 that has been produced has been identified
9 as NMXLIND1, and we will identify that
10 document as Exhibit 162, and I will share
11 that on the screen.
12       (Whereupon, Nielsen Ratings
13       was marked as Exhibit 162 for
14       identification as of this date by the
15       Reporter.)
16    Q.   Can you see that document, Mr.
17 Ruddy?
18    A.   Yeah.  It's Nielsen ratings.
19    Q.   And have you seen this
20 particular document before?
21    A.   That specific one, I'm not
22 aware.
23    Q.   Understood.
24       I do have some questions about
25 the data that we are looking at that I

4 (Pages 10 - 13)

Page 14

CHRISTOPHER RUDDY

1
2    would like to ask you.
3        What I first see in the
4    upper-left-hand corner of this document,
5    which I'm indicating with my cursor here --
6        THE COURT REPORTER:  I'm sorry.
7     I can't hear you.  I'm sorry, sir.  I
8     can't hear you.
9        MR. MALONE:  Okay.  I will do
10     my best to address that.
11     Q.    What I am indicating with my
12    curser in the upper-left-hand corner of the
13    screen, it says
14    Nielsen-NewsmaxTV-liveSD(000).
15        Do you see that, sir?
16     A.    Yes.
17     Q.    Okay.  Can you explain what
18    that means?
19     A.    I think it's the live number of
20    people watching at any given moment in
21    thousands on Newsmax.  They call it
22    impressions.
23     Q.    And what does the SD stand for,
24    right here?
25     A.    I -- I -- I -- I always -- SD

Page 15

CHRISTOPHER RUDDY

1
2    usually means Standard Definition, but
3    most -- most TVs now are HD, so I don't
4    know why they use SD.  I don't know what
5    that represents there, but I believe it
6    means all TVs.
7     Q.    And Nielsen is a third-party
8    service; correct?
9     A.    Correct.
10     Q.    And they're the industry
11    standard in television ratings; is that
12    fair?
13     A.    Probably, yeah.
14     Q.    So, is it accurate that --
15    well, let me ask you it this way:  Is this
16    a document that Newsmax or that Nielsen
17    would have created?
18     A.    It looks like we created it
19    from Nielsen data because we have it lined
20    up on our programs, but it's from Nielsen
21    data.
22     Q.    Understood.
23        Newsmax document based on
24    Nielsen data; fair?
25     A.    Um-hum.

Page 16

CHRISTOPHER RUDDY

1
2        THE COURT REPORTER:  I didn't
3     get a response.
4     Q.    Can you explain what it is that
5    the demos column here, specifically refers
6    to, the -- the first row under "demos," is
7    "P2+."
8        Do you see that?
9        (Witness reviews document.)
10     A.    Yep.
11     Q.    What does that mean?
12     A.    Persons aged two years or
13    older.
14     Q.    And I -- well, I won't assume I
15    will just ask, what does the W2+ row refer
16    to?
17     A.    Women two years and older.
18     Q.    And the M2+?
19     A.    Men two plus and older.
20     Q.    Okay.  And the A in the
21    succeeding rows refers to age; is that
22    fair?
23     A.    Yeah.  Adults, yeah.
24     Q.    So, if we were to refer to, for
25    example, Row 30, which appears to refer --

Page 17

CHRISTOPHER RUDDY

1
2    Rows 30 through 37 --
3        MR. MALONE:  Excuse me.
4     Q.    -- refers to "American Agenda."
5        Do you see that?
6        (Witness reviews document.)
7     A.    Yeah.
8     Q.    And this would be data
9    reflecting the number of thousands of
10    viewers for each week indicated in these
11    columns here.
12        Do you see that?
13        (Witness reviews document.)
14     A.    Yeah.
15     Q.    All right.  So, for example,
16    the week of 11/16, meaning November 16th,
17    there would have been, according to this
18    chart, 474,000 persons, age 2+ that saw an
19    American Agenda; is that right?
20     A.    I think it's the number of
21    impressions, so, it was at any given
22    moment, the average number of viewers was
23    435,000.
24     Q.    I see.
25        And those would be unique

5 (Pages 14 - 17)

CHRISTOPHER RUDDY

1
2 viewers?
3    A.   Correct.
4    Q.   And that's data that's
5 aggregated over the course of eight weeks.
6       So, the average is based on the
7 16th through the 22nd; is that what we're
8 looking at in Column M here?
9    A.   Yeah.
10       I'm assuming that's how they
11 define a week, yeah.
12    Q.   Okay.  And the -- the
13 difference here -- well, let me ask it this
14 way:  What does the November, 2020 actuals
15 refer to in your understanding?
16    A.   Well, I would -- how many
17 actually came in.  How many average viewers
18 they had in the month of November.
19    Q.   Is that just based on -- the
20 average of Columns K through N here?  I'm
21 indicating.
22    A.   I'm -- I'm guessing.
23       Yeah.  I'm not -- I'm guessing,
24 I have no, you know --
25       MR. FISH:  Don't guess, Chris.

CHRISTOPHER RUDDY

1
2    Okay.
3       THE WITNESS:  Yeah.
4    Q.   Okay.  The difference indicated
5 in Column Q here, on Exhibit 161, do you
6 see that?
7       (Witness reviews document.)
8    A.   Well, Q is blocked by all of
9 the images on the screen of you guys.
10    Q.   Let's see what we can do about
11 that, sir.
12       Can you see it better now?
13    A.   Slightly, but not really, no.
14 Now I can see it.
15    Q.   Let's go forward, for example,
16 taking American Agenda in Rows 30 through
17 37 again.
18       You see that, for example, the
19 increase in viewership of American Agenda
20 was 935 percent month over month in 2020.
21       Is that what this column is
22 indicating?
23    A.   Yes.
24    Q.   Okay.  It's fair to say that
25 Newmax's viewership was robust in November

CHRISTOPHER RUDDY

1
2 of 2020 following the election; is that
3 right?
4    A.   Correct.
5    Q.   Do you recall -- giving an
6 interview about Newmax's viewership at that
7 time?
8    A.   I gave many.  I don't know
9 which one you're referring to.
10    Q.   In particular, I'm referring to
11 what will be identified as Exhibit 163.
12       (Whereupon, Interview was
13       marked as Exhibit 163 for
14       identification as of this date by the
15       Reporter.)
16    Q.   Do you see that document
17 displayed on your screen?
18    A.   Yes.
19    Q.   So, this is an interview with
20 the New Yorkers', Isaac Chotiner, dated
21 November 24th, 2020.  It's an interview
22 with you.
23       I'm scrolling down to Page 10
24 of this document which quotes you as
25 saying, "The news cycle is red hot and

CHRISTOPHER RUDDY

1
2 Newsmax is getting $1 million people per
3 minute according to Nielsen tuning into
4 Newsmax TV.  I think that's good?" End
5 quote.
6       Do you see that?
7       (Witness reviews document.)
8    A.   Yes.
9    Q.   And that was accurate at that
10 time, November 24th, 2020?
11    A.   I -- I believe it is.  I don't
12 have the tape recording of it.
13    Q.   Understood.
14       So, the quote is accurate as
15 far as you know; correct?
16    A.   Yeah.  I mean, I have no reason
17 to dispute it.
18    Q.   And then, follow-up question
19 is:  Is that number accurate, as far as you
20 know, the $1 million per minute as of
21 November 24th?
22    A.   Yeah.
23       I -- I -- I -- I don't know.  I
24 don't remember all of the data at that
25 time.  But, based on the data you just

6 (Pages 18 - 21)

Page 22

1    CHRISTOPHER RUDDY
2 showed me, it looks pretty close to
3 accurate.
4    Q.   Okay.  Just a few more
5 questions about that, sir.  One moment.
6        What I'm sharing on -- or going
7 to be sharing on my screen is a document
8 that will be identified as Exhibit 164.
9        It was previously produced in
10 this case as NMXLIND9.
11        Can you see that document
12 displayed on your screen, Mr. Ruddy?
13    A.   Correct.
14    Q.   The tab that we're looking at
15 is identified as "Newsmax, Monday through
16 Sunday total day, data through December
17 6th, 2020."
18        Do you see that?
19        (Witness reviews document.)
20    A.   Correct.
21    Q.   Above that title, you wrote one
22 here is a reference to Comscore TV
23 Essentials.
24        Do you see that?
25        (Witness reviews document.)

Page 23

1    CHRISTOPHER RUDDY
2    A.   Um-hum.
3    Q.   What is Comscore TV Essentials?
4    A.   It's another rating service,
5 like Nielsen.
6    Q.   It's a competitor with Nielsen?
7    A.   Correct.
8    Q.   Is there any reason to believe
9 that the data would be different between
10 Nielsen and Comscore?
11    A.   I have no idea if it's
12 different or not.
13    Q.   Okay.  Some of the Rows here --
14 we talked about SB, referring to Standard
15 Definition in the context of the Nielsen
16 document that we looked at.
17        What does HH live refer to?
18    A.   House -- HH is household, so
19 it's live households.
20    Q.   Okay.  And is there any reason
21 why the numbers are slightly different in
22 this Row here between HH live and HH live
23 SE as far as you know?
24    A.   I don't know the difference.
25    Q.   Okay.  Going down to Row 41,

Page 24

1    CHRISTOPHER RUDDY
2 which refers to, "A one-minute reach
3 monthly trend."
4        Do you see that, sir?
5    A.   Um-hum.
6    Q.   What is your understanding of
7 what one-minute reach refers to besides
8 being here?
9    A.   The total number of -- the
10 reach is -- the reach usually means the
11 total number of -- of people cumulatively
12 over, like, an hour or whatever.
13        That's usually what reach
14 means, at least in the Nielsen world.  So,
15 it's a -- it's a cumulative number.  It's
16 not a per-minute number, a reach.
17    Q.   Okay.  When you refer to "the
18 Nielsen world," would that also include the
19 -- the Comscore world?
20    A.   I think they use similar
21 terminology.  So, those numbers look like
22 the monthly reach of households that tuned
23 in at least once for whatever period of
24 time Comscore delineates for them to be
25 included, five minutes or 15 minutes, I

Page 25

1    CHRISTOPHER RUDDY
2 don't know what the number is, and that's
3 the total number of households that clicked
4 in at least once.
5    Q.   And so, would I be reading this
6 data accurately, Mr. Ruddy, as of November
7 of 2020, that approximately 1.6 million
8 households would be viewing Newsmax's
9 content at least once on TV?
10    A.   I think that indicated 16
11 million households.
12    Q.   16 million.
13        I guess, I missed my count
14 somewhere.  I wouldn't put it passed me?
15    A.   Well, if it's in thousands that
16 would be 16 million.
17    Q.   Oh, it is.  Oh, thank you.
18 Okay.  I'm displaying a tab identified as
19 "Programming Trends" in the bottom of the
20 same document, Exhibit 162.
21        Do you see that on your screen,
22 Mr. Ruddy?
23    A.   Yes.
24    Q.   Okay.  This is still from
25 Comscore TV Essentials, and my question to

7 (Pages 22 - 25)

Page 26

CHRISTOPHER RUDDY

1
2 you is: Whether this refers to the total
3 number of viewers for each of the programs
4 identified here?
5        So, for example, John Bachman
6 Now --
7        THE COURT REPORTER: I can't
8 hear you, sir.
9    Q.   John Bachman Now, Column D.
10        Do you see that?
11        (Witness reviews document.)
12   A.   Yeah.
13   Q.   Okay. What does the "W/0"
14 under the "John Bachman Now column" refer
15 to?
16   A.   Week of, I'm guessing. I don't
17 know. I'm assuming that's week of.
18   Q.   So, for the week of, for
19 example, 11 -- November 16th, the total
20 viewers would be, on average, 518,241?
21   A.   I don't know if that's total
22 viewers. I don't know. I don't know --
23 I'd have to ask.
24   Q.   When you say you'd have to ask,
25 do you know who you would have to ask to

Page 27

CHRISTOPHER RUDDY

1
2 get that information confirmed?
3    A.   Well, Jason Villar does my
4 Nielsen rating compilations in the office.
5        I would ask him what that
6 specifically referred to.
7    Q.   What is Jason's last name?
8    A.   V-I-L-L-A-R.
9    Q.   The Exhibit 123, which has been
10 previously identified in this case as
11 NMXLIND12. It is the November 23rd, 2020
12 through November 29th, 2020, Comscore
13 program in DX.
14        (Whereupon, Comscore Program
15        in DX was marked as Exhibit 123
16        identification as of this date by the
17        Reporter.)
18        Do you see that, Mr. Ruddy?
19   A.   Correct.
20   Q.   In Row 29, Column G, there is a
21 reference to Michelle Malkin's program that
22 identifies HH, which I understand is
23 households; correct?
24   A.   Um-hum.
25   Q.   181,455.

Page 28

CHRISTOPHER RUDDY

1
2        Do you see that?
3        (Witness reviews document.)
4    A.   Um-hum.
5    Q.   And is it your understanding
6 that that is an average number of
7 households viewing her program for that
8 week?
9    A.   I haven't looked at what the --
10 what the -- what the metric are, if that's
11 reach or average. I don't know what he was
12 using there, reach or average, but I'm -- I
13 would guess that it's -- I don't know.
14   Q.   And that's -- and that's fine,
15 sir, you certainly don't need to guess
16 if -- if we would try and obtain that
17 information, would Mr. Villar be the person
18 who would have it?
19   A.   Correct.
20   Q.   Okay. And would that generally
21 be true with all ratings information?
22   A.   He would -- he would know most
23 answers.
24   Q.   One more question about the
25 ratings for this time period, sir.

Page 29

CHRISTOPHER RUDDY

1
2        MR. MALONE: I'll stop my
3        share.
4    Q.   Okay. This will be Exhibit
5 164. This is a document that's previously
6 been produced in this litigation as
7 NMXLIND10.
8        (Whereupon, Document was marked
9        as Exhibit 165 for identification as
10        of this date by the Reporter.)
11   Q.   Do you see that on your screen,
12 there, Mr. Ruddy?
13   A.   I do.
14   Q.   Okay. My question is about the
15 column --
16        MR. MALONE: -- or excuse me.
17   Q.   In Row 2 of this document,
18 there's a reference to P2+PROJ in italics.
19        Do you see that?
20        (Witness reviews document.)
21   A.   Yep.
22        MR. FISH: Before you go on,
23        Ryan, I'm going to interject that I
24        may have tuned out, but did you say
25        Exhibit 164 for this or Exhibit 165

8 (Pages 26 - 29)

Page 30

CHRISTOPHER RUDDY

1
2  because you -- you had marked 164.
3      MR. MALONE:  Oh, I -- I
4  apologize.  This will be 165.
5      Thank you.
6      Q.  My question about this document
7  165, Mr. Ruddy, is what the P2+PROJ refers
8  to, if you know?
9      A.  I don't.
10     Q.  Mr. Ruddy, you understand that
11 I represent Mike Lindell and two of
12 companies in this litigation; correct?
13     A.  I now know, based on what you
14 said, yeah.
15     Q.  How long have you known Mr.
16 Lindell?
17     A.  Several years.
18     Q.  When you say "several," would
19 you be able to provide any sort of
20 estimate?
21     A.  I think I met him in the last
22 two years in the Trump administration.  So,
23 it would be '19 to '20.
24     Q.  Do you recall the circumstances
25 under which you met Mr. Lindell?

Page 31

CHRISTOPHER RUDDY

1
2      A.  Um, I -- I -- actually, I'm --
3  I'm not exactly sure which time I met him.
4  I met -- I know I was at an airport -- a
5  private airport facility in Orlando, and
6  either I was leaving and he was coming or
7  he -- he was -- we were both arriving, and
8  I met him there, and I don't know if that
9  predated meeting him at the Trump Golf Club
10 in West Palm Beach.
11     I was having lunch with a group
12 of people, and he was sitting alone, I
13 believe, and one of the people at my table
14 invited him to a lunch, and there were
15 several people there.
16     Q.  At that time, did you know who
17 he was?
18     A.  Yes.
19     Q.  What did you think of him when
20 you met him?
21     A.  I thought he was a very
22 successful businessman and had been a great
23 sales guy.  And I thought he was a guy with
24 a lot of energy and seemed very -- in the
25 conversation, very hyped up.

Page 32

CHRISTOPHER RUDDY

1
2      Q.  And at -- at some point, would
3  it be fair to say that Newsmax established
4  a business relationship with Mr. Lindell?
5      A.  It did.
6      Q.  How would you describe that
7  relationship?
8      A.  Advertiser and news provider or
9  content provider.  We're a business and he
10 would advertise.
11     Q.  So when you say "content
12 provider," that's referring to Newsmax;
13 correct?
14     A.  Yes.
15     And then I would also add not
16 only that, because, occasionally, he would
17 come on the air to talk about some issue or
18 thing and that I think predated -- predated
19 the election of 2020.
20     Q.  And do you recall when he would
21 come on the air to -- to talk?
22     A.  I don't remember any specific
23 incident before the '20 election, but I
24 think during that election, he might have
25 come on to talk about Trump and his support

Page 33

CHRISTOPHER RUDDY

1
2  of Trump.  And also, Mike was very big and
3  has been on rehab issues and addiction, and
4  I think he'd come on to talk about that
5  before the '20 election.
6      Q.  Sir, I'd like to try and play a
7  video.  I hope this works through screen
8  share.
9      MR. MALONE:  This will be
10     Exhibit 166.
11     (Whereupon, video was marked as
12     Exhibit 166 for identification as of
13     this date by the Reporter.)
14     MR. MALONE:  Okay.  I'm going
15     to play this clip, and it will be
16     about two and a half minutes and then
17     I'd like to ask you some questions
18     about it.
19     (Video plays in background.)
20     Q.  Okay.  That's the end of that
21 clip, which I'll represent to you, sir, was
22 a clip from Sean Spicer's program, Spicer &
23 Co, dated March 31, 2020.
24     A.  Okay.
25     Q.  Had you seen that clip before?

9 (Pages 30 - 33)

CHRISTOPHER RUDDY

1
2    A.    No.
3    Q.    Would it be accurate to say
4  that Mr. Lindell would sometimes come on
5  the air and talk about issues like that,
6  like --
7    A.    Well, now, that you refreshed
8  my memory, yeah. I guess -- yeah.  I -- I
9  don't know all the issues that he came to
10  talk on.
11    Q.    Understood.
12        Do you know how he would be
13  invited on the air if he was going to do a
14  segment like that?
15    A.    Well, there's two ways people
16  are inviting on air, either producers reach
17  out and say we'd like to have you on or we
18  -- we -- or we -- or if he calls us and
19  asks to go on.
20    Q.    And when you say "he calls us,"
21  sir, do you mean you personally?
22    A.    It could be that or it could
23  have been his company or book or contacting
24  our producers.  I don't know how he sets up
25  interviews, frankly, other than -- in the

CHRISTOPHER RUDDY

1
2  past, we have talked, where he's talked
3  about some subject, and I said you should
4  come on about it over several years.
5    Q.    Do you recall any specific
6  incident in which that happened would where
7  he called --
8    A.    I can't tell you which one.
9    Q.    Okay.
10    A.    I talk to a lot of people.
11    Q.    Understood.
12        The clip that we watched was in
13  March of 2020.
14        You referenced a few minutes
15  ago some instances where Mr. Lindell would
16  come on the air to talk about election
17  issues, in the winter election of 2020?
18        Do you recall that?
19    A.    Correct.
20    Q.    And do you recall an incident
21  in February where I -- I believe it was Bob
22  Sellers walked off the air while Mr.
23  Lindell was talking about those issues?
24    A.    Correct.
25    Q.    Did Mr. Lindell ever personally

CHRISTOPHER RUDDY

1
2  talk to you about that incident?
3    A.    Yes.
4    Q.    When did he do that?
5    A.    Before or after you're talking
6  about?
7    Q.    After.
8    A.    We spoke, I believe the day
9  that happened, and Mike was apologetic
10  because I reminded him that we had agreed
11  beforehand that he would not talk about the
12  election.
13        He said he wanted to talk about
14  something else, I can't remember what it
15  was, and that he was fine coming on, and
16  then I said, Mike you had agreed that we
17  wouldn't talk about the election, and he --
18  he made no issue that we had asked him not
19  to talk about it on the -- on the show and
20  that he -- he was apologetic because then
21  he remembered that he had agreed, but he
22  forgot, he said and I said, fine.
23        We had our disclaimer, Bob had
24  our disclaimer.  We weren't particularly
25  happy about the episode, but we -- we, you

CHRISTOPHER RUDDY

1
2  know, it was -- it was his opinion that he
3  offered, but we -- we just would have
4  preferred it not be an issue.
5    Q.    So, that was the conversation
6  that took place after his segment on Bob
7  Sellers' program; right?
8    A.    Yep.
9    Q.    Okay.  What do you recall about
10  the conversation before he went on?
11        It was that same day?
12    A.    I don't believe so.  But I --
13  -- there was a conversation before about
14  him coming -- he want -- I -- maybe he said
15  he wasn't being invited on, that was a
16  theme in some of his calls.
17        I said, Mike we're happy to
18  have you on just -- we just are not talking
19  about the election and the stolen election
20  theories right now, we already covered
21  that.
22        And he said, fine, fine, fine,
23  he would come on and he would talk about X,
24  Y, and Z and he broke that agreement.
25    Q.    And just so that I'm

Page 38

CHRISTOPHER RUDDY

1
2 understanding, Mr. Ruddy, was that a
3 conversation or series of conversations
4 that happened over the phone?
5    A.   Yes.
6    Q.   Through a -- phone call or
7 through text messages or how did it --
8    A.   I believe it was phone calls.
9    Q.   Would you say that you speak to
10 Mr. Lindell through phone calls often?
11    A.   I would not describe it as
12 often.  I would say sporadically.
13    Q.   Of the --
14        MR. MALONE:  Strike that.
15    Q.   You mentioned that before he
16 went on the air, you indicated to him that
17 the election issues were, I believe your
18 word was covered --
19    A.   Correct.
20    Q.   -- is that right?
21        What do you mean by that, sir?
22    A.   After the election of -- in
23 November, Joe Biden was elected.  There was
24 an election contest with President Trump
25 contesting the election.  We covered the

Page 39

CHRISTOPHER RUDDY

1
2 issues related to that, the statements from
3 both sides, all of the press reports and
4 then, the December 14th, Joe Biden was
5 elected by the Electoral College.  He
6 became President elect.  We reported that.
7        And then he became -- Congress
8 certified that in January and he then he
9 became the President on January 20th.
10        So, we -- our position was that
11 those results were legal and final, and
12 there wasn't a single court in the United
13 States that disputed them.  And, so,
14 therefore, while we had covered it very
15 significantly during that period, we
16 weren't continuing to cover it in any
17 significant way unless there was some major
18 news report that we felt we should cover
19 something.
20        And, so, we were not bringing
21 guests on to come on and dispute the
22 election that had already been confirmed.
23    Q.   And those were all reports that
24 had aired on Newsmax's TV program; correct?
25        MR. FISH:  Objection to form.

Page 40

CHRISTOPHER RUDDY

1
2    A.   All reports?  I don't know what
3 you mean.
4    Q.   Well, your -- I suppose what I
5 mean, sir, is you just referred to -- my
6 question was what had been covered on
7 Newsmax, and your answer was, "A series of
8 events that happened between November and
9 January of 2021"?
10    A.   Correct.
11    Q.   So, my question to you is
12 whether those events were reported on
13 Newsmax's airwaves?  That's all.
14        MR. FISH:  Objection to form.
15        THE WITNESS:  What does that
16      mean, objection?
17        MR. FISH:  You can answer.
18    A.   I -- I -- we covered both sides
19 of the election dispute.  We did not take a
20 position editorially that the election was
21 stolen or not.
22        We felt our job was to report
23 on what major news makers were saying, and
24 what the government was saying and what the
25 court rulings were saying, and if anyone

Page 41

CHRISTOPHER RUDDY

1
2 looks at that record very carefully, would
3 see that we were balanced in that
4 reporting.
5    Q.   When you were having this
6 conversation with Mr. Lindell before he
7 went on the air in February of 2021, do you
8 recall what his reaction was?
9    A.   He seemed very agreeable that
10 he would go on and he would not talk, and I
11 said, "We're just not going to make an
12 issue of it."
13        He seemed agreeable and there
14 didn't seem any problems, so, and I --
15 either I -- I probably had one of my
16 bookers reach out to him and set up the
17 interview.
18    Q.   So, he was agreeable about what
19 he would discuss?
20    A.   Correct.
21    Q.   And did he, at any point, agree
22 with the notion that the election wasn't
23 stolen?
24    A.   No.
25    Q.   As far as you know, has he

11 (Pages 38 - 41)

Page 42

CHRISTOPHER RUDDY

1
2 every expressed any doubt about that belief
3 of his?
4    A.   Not that I'm aware of.
5    Q.   Is it accurate, sir, that after
6 Mr. Sellers walked off the program that you
7 and Mike had a conversation; right?
8    A.   Correct.
9    Q.   And Mr. Lindell returned to the
10 Newsmax airwaves later that same day?
11    A.   I believe that's true.
12       MR. MALONE:  One moment.
13       I'm going to pull up that.
14    Q.   Okay.  This will be Exhibit, I
15 believe, 166 -- 167.
16       MR. MALONE:  167, as I was
17    saying.
18       (Whereupon, Video was marked
19    as Exhibit 167 for identification as
20    of this date by the Reporter.)
21    Q.   Okay.  And it appears from the
22 Newsmax website, sir, that that segment
23 would have aired on February 2nd of 2021.
24       Do you have any reason to doubt
25 that?

Page 43

CHRISTOPHER RUDDY

1
2    A.   No.
3    Q.   Do I understand correctly that
4 Mr. Lindell spoke to you between the
5 segment where Mr. Sellers walked of the air
6 and the segment that each of us watched?
7    A.   Correct.
8    Q.   And was it your decision to, I
9 guess, put him back on the air?
10    A.   Well, certainly, to let him go
11 back on.  He may have been booked.  A lot
12 of times we'll book a guest for daytime and
13 prime time, so, he may have been previously
14 booked for that, so -- but -- but there was
15 a discussion about him.
16       I know when we chatted on the
17 phone about coming on in the future, and I
18 said I had no issue with that as long as he
19 didn't talk about the election, and he
20 insured me that he wouldn't do that again.
21       MR. FISH:  Brian, if there's a
22    convenient time, can we take a break?
23    I don't want to interrupt your
24    questioning, but could we get a
25    break.

Page 44

CHRISTOPHER RUDDY

1
2       MR. MALONE:  Sorry, Andrew, you
3 cut out there.
4       MR. FISH:  Sorry.  At a
5 convenient time, can we take a break?
6       MR. MALONE:  Absolutely.  Let's
7 take one right now.
8       THE VIDEOGRAPHER:  This will
9 end Media Unit Number One.
10       Going off the record at 10:05.
11       (Whereupon, a short recess was
12 taken.)
13       THE VIDEOGRAPHER:  We're back
14 on the record at 10:17.
15       This will begin Media Unit Two.
16    Q.   Mr. Ruddy, I'd like to return
17 to something we were talking about just
18 before the break which is your conversation
19 with Mr. Lindell before he went on the air
20 on February 2, 2021.
21       And I believe you had mentioned
22 that Newsmax had covered a lot of issues
23 related to the 2020 election; fair?
24    A.   Yes.
25    Q.   Do you recall talking to Mr.

Page 45

CHRISTOPHER RUDDY

1
2 Lindell about Eric Coomer at all during
3 that conversation?
4    A.   I don't remember.
5    Q.   Do you recall ever talking to
6 Mr. Lindell about Eric Coomer?
7    A.   Yes.
8    Q.   When did that conversation
9 happen?
10    A.   After we had settled the
11 agreement, at some point, Michael -- Mike
12 Lindell reached out to me to talk to me
13 about the settlement.
14    Q.   Okay.  I think I know what
15 you're referring to, Mr. Ruddy.  I want to
16 make sure, though.
17       So, what I'll do is display on
18 my screen what be Exhibit 168.

12 (Pages 42 - 45)

Page 46

```
1          CHRISTOPHER RUDDY
2     Q.   Okay.  This is Dr. Coomer's
3  complaint against a number of Defendant's,
4  including Donald J. Trump for President and
5  Newsmax Media Incorporated.
6     A.   Yes.
7     Q.   Do you see that on your screen,
8  sir?
9     A.   That's correct.
10    Q.   And this has a file stamp of
11 December 22, 2020.
12         Do you see that?
13         (Witness reviews document.)
14    A.   Yes.
15    Q.   That is the action that you
16 were referring to just moments ago that
17 Newsmax settled?
18    A.   Yes.
19    Q.   Okay.  And is this -- what will
20 be marked as Exhibit 169 --
```

Page 47

```
1          CHRISTOPHER RUDDY
```

Page 48

```
1          CHRISTOPHER RUDDY
2     Q.   The clip we just watched, sir,
3  is dated May 8th, 2021.
4          Do you have any reason to doubt
5  that's when it aired?
6     A.   I don't know the date -- I
7  don't know that that aired.  It aired after
8  the settlement.
9     Q.   Right.
10         And -- and that's my next
11 question:  Do you know why it aired
12 approximately a month after you and Dr.
13 Coomer signed the Settlement Agreement?
14    A.   I don't recall what the
15 circumstances relating to that were.
16    Q.   But I believe you mentioned
17 that you recall talking to Mr. Lindell
18 about it; is that right?
19    A.   Correct.
20    Q.   And did you talk to him after
21 that clip that we just watched aired?
22    A.   I don't remember when I talked
23 to him.
24    Q.   What do you recall about what
25 he said when you talked to him about it?
```

Page 49

```
1          CHRISTOPHER RUDDY
2     A.   I remember there was a
3  conversation where he had expressed anger,
4  and -- and that I had settled and he -- he
5  was negative about it.
6          And I told him that we had no
7  evidence that Mr. Coomer had done any of
8  these things that various people had --
9  had -- had stated about him.
10    Q.   How did he respond when you
11 told him that?
12    A.   I don't recall exactly what he
13 said, but I do remember that he -- he was
14 not -- not happy about our settlement
15 agreement and that was that.
16    Q.   Did you mention to Dr. Coomer,
17 specifically, during that conversation?
18    A.   Did I mention what
19 specifically?
20    Q.   Yeah.
21         Did you mention Dr. Coomer's
22 name specifically during that conversation?
23    A.   Michael raised the name, the
24 Coomer lawsuit.  We had settled it.
25    Q.   Had you told him that Newsmax
```

13 (Pages 46 - 49)

CHRISTOPHER RUDDY

1 CHRISTOPHER RUDDY
2 and Dr. Coomer had settled the lawsuit?
3    A.   He was aware of it that this --
4 that there was a settlement and he raised
5 the issue.
6    Q.   Do you recall --
7       MR. MALONE:  Sorry.
8    Q.   I did not mean to interrupt,
9 sir.
10       What was the last part of your
11 answer?
12    A.   He was aware of it that we had
13 settled from -- from public notice.
14    Q.   When you say "public notice,"
15 can you elaborate on what you mean by that?
16    A.   He was aware of it.  We had
17 publicized the -- the clarification, both
18 on TV and on our website, and I don't know
19 where else.
20       But I know that we had made it
21 public, and there were press reports about
22 it, there were numerous press reports about
23 it.
24    Q.   I see.
25       So, as -- as far as you know,

CHRISTOPHER RUDDY

1 CHRISTOPHER RUDDY
2 that's how he became aware of that
3 settlement?
4    A.   I'm not exactly aware of how he
5 became aware.  I don't know.  He didn't
6 tell me.
7    Q.   Okay.  Did Mr. Lindell, during
8 that conversation, indicate that he wanted
9 to go on to Newsmax's airwaves?
10    A.   He may have.  I'm not -- I
11 don't recall.
12    Q.   And just for clarity, sir, this
13 conversation that we're talking about now,
14 this would have taken place over the phone?
15    A.   Yes.
16       Let me just answer your
17 question, though, your initial question,
18 again, which is Mike always has -- has
19 frequently asked me to go on TV.
20       And, so, I don't recall when
21 specifically, but I always tell him the
22 same thing, you're welcome to come on
23 Newsmax, but we don't want to talk about
24 the stolen 2020 election.
25       So, that has been a refrain of

CHRISTOPHER RUDDY

1 CHRISTOPHER RUDDY
2 ours in a -- in several conversations.
3    Q.   Do you recall ever telling him
4 that he couldn't go on the air to talk
5 about MyPillow's products?
6    A.   Never.
7    Q.   Did Mr. Lindell ever ask you to
8 go on the air to discuss his website
9 FrankSpeech.com?
10    A.   Yes.
11    Q.   And how did you respond when he
12 asked you to talk about FrankSpeech?
13    A.   I believe we invited him on to
14 speak about it.
15    Q.   Okay.  And when would that
16 invitation have been extent to him?
17    A.   I don't remember.
18    Q.   I'm sorry?
19    A.   I don't remember the date.
20    Q.   Okay.  Would it be fair to say
21 that you and Mike have disagreed over the
22 years that you've known him?
23    A.   Yeah.
24    Q.   And when you disagree with Mr.
25 Lindell, he's not shy about letting you

CHRISTOPHER RUDDY

1 CHRISTOPHER RUDDY
2 know; is that also fair?
3    A.   Yes.  I would say.  Yeah.  I'm
4 not shy about letting him know.
5    Q.   Understood.
6       For example, let's do this.
7 This will be, I believe, Exhibit 170.
8       (Whereupon, Text Messages were
9    marked as Exhibit 170 for
10    identification as of this date by the
11    Reporter.)
12    Q.   These are documents that have
13 been previously produced in this case, as
14 Lindell-011000 through Lindell-011023.
15       MR. FISH:  Is -- is it possible
16    for you to make it any bigger?  Just
17    on the screen.
18    A.   I think so.
19       MR. MALONE:  I think so.
20       MR. FISH:  There.  That's
21    better.
22    Q.   Okay.  Can you see that on your
23 screen okay, Mr. Ruddy?
24    A.   Yes.
25    Q.   Is it accurate that what is

14 (Pages 50 - 53)

Page 54

CHRISTOPHER RUDDY

1         CHRISTOPHER RUDDY
2 being displayed on the screen are text
3 messages between you and Mr. Lindell?
4    A.   They appear to be.
5    Q.   Okay.  And so, just for
6 example, on February 22nd of 2021, Mr.
7 Lindell texts you, quote, "They sued me,
8 Chris.  Will Newmax have me in to talk
9 about it?"
10     And your response is, "Of
11 course, Mike, we're also doing a story."
12     Do you see that?
13     (Witness reviews document.)
14    A.   Right.
15    Q.   When you say "We are also doing
16 a story," was that referring to Newsmax
17 doing a story about Gideon's lawsuit
18 against Mr. Lindell and MyPillow?
19    A.   I don't recall.
20    Q.   Okay.  Scrolling down through
21 this document, it appears that Mr. Lindell
22 texted you on May 2nd with a link to what
23 appears to be Absolute Interference, his
24 movie.
25     Do you see that?

Page 55

1         CHRISTOPHER RUDDY
2     (Witness reviews document.)
3    A.   Yes.
4    Q.   Do you recall ever watching
5 that film?
6    A.   I don't remember.  I might have
7 seen parts of it.
8    Q.   Okay.  Then it appears as
9 though, there's an another text from you,
10 Mr. Lindell, dated May 29th, 2021.
11     Do you see that?
12     (Witness reviews document.)
13    A.   Yes.
14    Q.   And as far you know, there were
15 no other text messages between you and Mr.
16 Lindell between May 2nd and May 29th?
17    A.   I wouldn't know.  I wouldn't
18 know.  I don't know the whole history of
19 it, but from what your records shows, there
20 wasn't.
21    Q.   Okay.  I just wanted to make
22 sure we have the right records.
23     So, any conversation that you
24 would have had with Mr. Lindell during that
25 time would have been either over the phone

Page 56

1         CHRISTOPHER RUDDY
2 or in-person?
3    A.   I think I had only spoken to
4 him after -- on the phone.  I don't think
5 we had in-persons during -- after -- in
6 2021.  I don't recall any in-persons.
7    Q.   Okay.  So, conversations in May
8 of 2021 are over the phone?  That's what I
9 want to understand.
10    A.   If there were any that month,
11 yes.
12    Q.   Very good.  Okay.
13     Mr. Ruddy, thank you very much
14 for your time this morning.  I don't have
15 any further questions for you at this time,
16 and I will pass you to Mr. Cain.
17 EXAMINATION BY
18 MR. CAIN:
19    Q.   Thank you.
20     Good morning, Mr. Ruddy.
21     Let's talk a little bit about
22 what counsel's covered and fill in a few
23 gaps.
24     After the timeline, you were
25 shown Exhibit 168, which was the Original

Page 57

1         CHRISTOPHER RUDDY
2 Complaint, it's dated December 22nd, 2020
3 that Dr. Coomer filed against Newsmax.
4     And then in your testimony, you
5 referenced the date that President Biden
6 was inaugurated, January 20th of 2021,
7 roughly a month after the complaint was
8 filed.  And then, subsequently, you were
9 shown some video on February 2nd of Mr.
10 Lindell's appearance.
11     So all of that occurred within
12 about a two month -- two- to three-month
13 time period.
14     When did Newsmax make the
15 decision that it was going to stop covering
16 news about -- or claims about the election
17 being stolen?
18    A.   I don't believe we've ever
19 stopped covering it, but we were not going
20 to bring on guests to just make claims that
21 the election was stolen, if that was their
22 purpose.
23     The news cycle is a 24-7 wheel,
24 and we can't control what every guests says
25 or does, but at late December, we issued a

15 (Pages 54 - 57)

CHRISTOPHER RUDDY

1    CHRISTOPHER RUDDY
2  clarification- -- a very sweeping --
3  sweeping clarification about Dominion's
4  Smartmatic, where we said, as a network, we
5  had not been provided with any evidence,
6  and at -- around that time, we began using
7  the terms that we believe the election was
8  legal and final, but we made very serious
9  things, but we never stopped covering it.
10    Q.   I -- I probably was
11  inarticulate.
12       What you're saying is that in
13  late December of 2020, Newsmax made a
14  decision to make that public that -- that
15  simply you'd found no evidence that the
16  election had been stolen -- credible
17  evidence, and that you weren't going to be
18  bringing guests on to make those
19  unsubstantiated claims; is that fair?
20    A.   That's fair to say.
21    Q.   Okay.  And then, we saw --
22  there was some discussion about the host of
23  Mr. Sellers and his interaction with Mike
24  Lindell.
25       Let's -- let's actually take a

1    CHRISTOPHER RUDDY
2  quick look at that.
3       Do you remember when that
4  occurred, Mr. -- Mr. Ruddy?
5    A.   I -- I -- other than I think it
6  was in February, I don't have the exact
7  date.
8    Q.   Less -- less so much about the
9  about the specific date, which I believe is
10  February 2nd, but the incident occurring.
11       How was that brought to your
12  attention?
13    A.   I think one of my -- my staff
14  probably called it to my attention.  I
15  wasn't watching.
16    Q.   Okay.  Did you -- did you
17  review the clip of the incident?
18    A.   I did.
19    Q.   Okay.  Let's pull that up.
20  Ryan, I think your last exhibit were the
21  texts, Exhibit 170; is that right?
22       MR. MALONE:  Yes.
23       MR. CAIN:  All right.
24       So we will identify this as
25  Exhibit 177.

1    CHRISTOPHER RUDDY
2       (Whereupon, Video was marked as
3   Exhibit 177 for identification as of
4   this date by the Reporter.)
5    Q.   Do you see that, Mr. Ruddy?
6       (Witness reviews document.)
7    A.   I do.
8       (Video plays in background.)
9    Q.   Okay.  So, that is -- that was
10  part of the segment that he was on before
11  Mr. Sellers left.
12       Is it your testimony that
13  before that segment aired, you had had a
14  discussion with Mr. Lindell to the effect
15  of he could -- he could come on Newsmax, so
16  long as he didn't talk about election fraud
17  or stolen election issues?
18    A.   That's correct.
19    Q.   And then, he breached that
20  agreement, and, in your view, at least, by
21  going on and saying what he said during
22  that segment; is that fair?
23    A.   That's correct.
24    Q.   Subsequent to that segment, you
25  had a conversation with him where; Number

1    CHRISTOPHER RUDDY
2  One, Mr. Lindell apologized to you for
3  raising those issues; and, Number 2, agreed
4  to -- to not race them in future
5  appearances on Newsmax; is that also fair?
6    A.   Yes.
7    Q.   At any point during your
8  discussions on the phone or on text, did
9  you make an agreement with --
10       MR. CAIN: Well, strike that.
11       Let me -- let me start over.
12    Q.   Was there an agreement that you
13  you were involved with Eric Coomer or his
14  representatives to keep Mike Lindell off of
15  Newsmax?
16    A.   No.
17    Q.   Is that a no?
18    A.   No.
19    Q.   I heard some rustling, and I
20  want to make sure that's clear on the
21  record?
22    A.   No.  No.  Did you hear that?
23  No.
24    Q.   Was there ever an agreement
25  between Newsmax and Eric Coomer that would

Page 62

CHRISTOPHER RUDDY

1
2 have prevented Mike Lindell from coming on
3 Newsmax to promote MyPillow?
4     A.   No.
5     Q.   Was there ever an Agreement
6 between Newsmax, to your knowledge, and
7 Eric Coomer that would have prevented Mike
8 Lindell from -- from coming on Newsmax to
9 promote FrankSpeech?
10     A.   No.
11     Q.   The Settlement Agreement that
12 you were shown, I believe --
13         MR. CAIN: Well, I don't have
14     the exhibit number in front of me.
15     Q.   But you recall looking briefly
16 at the Settlement Agreement?
17     A.   I just saw it on the screen.  I
18 haven't reread it for purposes of this
19 meeting.



Page 63

CHRISTOPHER RUDDY

1

9     Q.   In any of these discussions
10 with Mr. Lindell that we've been talking
11 about, did -- did you ever explain to him
12 that the election fraud narrative that he
13 was promoting didn't hold water in your
14 view?
15     A.   I made comments to the effect
16 of our position and why we believed our
17 position.
18     Q.   Can you expound on that
19 specifically, what did you explain to him
20 your position was and why you were taking
21 it?
22     A.   I would have said what I've
23 said countless times is that every state
24 certified the election.  And there --
25 there's no court overturned any one of

Page 64

CHRISTOPHER RUDDY

1
2 those certifications.  The election is
3 final, and -- and to say that it's stolen
4 is a legal claim, and that Newsmax can't
5 make a legal claim if there's no basis for
6 it.
7     Q.   And that decision and -- and
8 the statement that you just made was made
9 independently of anything relating to Dr.
10 Coomer or his settlement; is that fair?
11     A.   Correct.
12     Q.   And Mr. Lindell is allowed and
13 has been allowed to appear on Newsmax since
14 the election.  So long as, again, he wasn't
15 going to raise these election fraud claims;
16 fair?
17     A.   That's correct.
18     Q.   In fact, Mr. Lindell has pretty
19 constantly made advise on Newsmax since the
20 ████████████ settlement with Dr. Coomer
21 on Newsmax; is that fair?
22     A.   That's correct.  That's
23 correct.
24     Q.   And, in fact, -- well, there's
25 some -- I'm not going to look at the texts,

Page 65

CHRISTOPHER RUDDY

1
2 but there -- there were some texts between
3 you and Mr. Lindell regarding his cyber
4 symposium in August of 2021.
5         Do you recall having any
6 discussions with Mr. Lindell about that
7 symposium?
8     A.   Yes.
9     Q.   And what do you recall?
10     A.   He called me and said he was
11 doing a symposium about election security,
12 and he said that he had an advertisement
13 that he would like to run on Newsmax, maybe
14 our head department had pushed back, I
15 don't recall -- on running it, but I -- he
16 said that Fox was not running the ad, but
17 that, he claims CNN and I believe NBC were
18 running the ad, and would I take a look at
19 it, and I did, and I said as long as it
20 wasn't about the '20 election, I -- I -- we
21 could -- we could run the ad.  We also
22 believed that.
23     Q.   And -- I'm sorry.
24     A.   People have -- people have a
25 right to -- to buy ads, and political ads

17 (Pages 62 - 65)

CHRISTOPHER RUDDY

1
2 on -- on issues that we would disagree
3 with.
4      Q.   Okay.  So to your knowledge,
5 did Newsmax run ads regarding the
6 symposium?
7      A.   Yes.
8      Q.   Political ads?
9      A.   Yes.
10      Q.   And does that fall -- do
11 political ads fall into a separate category
12 then commercials for consumer products, for
13 example, in terms of pricing and -- and
14 things of that nature?
15      A.   They do.
16          But I -- I'm not sure we'd
17 characterize that ad for a symposium as a
18 political ad.
19      Q.   But be that as it may, the --
20 Newsmax was still agreeable to running
21 whether it was a political ad or not,
22 advertisements for the -- for the Lindell
23 cyber symposium after it settled the
24 lawsuit with Eric Coomer?
25      A.   That is true.  That's correct.

CHRISTOPHER RUDDY

1
2      Q.   By the way, in any of these
3 discussions that you had with Mr. Lindell
4 during this period of time, did -- did he
5 ever call you a trader or words to that
6 effect for not allowing him to appear on
7 Newsmax?
8      A.   He made, I believe, that
9 comment outside of -- at some event, but I
10 don't believe that he said that to me
11 directly.
12      Q.   Okay.  Did you have any
13 discussions with him after he made that
14 comment about you?
15      A.   I don't recall, but I -- I
16 might have complained to him, but I don't
17 recall that particular comment.
18      Q.   All right.  Does Newsmax -- I'm
19 going to shift gears, and I'll -- I'll be
20 done, you will be thankful to know quickly
21 or soon.
22          But does Newsmax receive
23 revenue from Mike Lindell based on the use
24 of promo codes for MyPillow products?
25      A.   No.

CHRISTOPHER RUDDY

1
2      Q.   There's, I think, some evidence
3 in the record that there was a Newsmax
4 promo code that was used on MyPillow.
5          It's your testimony that to the
6 extent that those promo codes were tracked
7 in revenue calculated from their use, none
8 of that would have gone or would have been
9 paid to Newsmax; fair?
10      A.   That is my belief.  We have
11 never done a revenue share of any sort
12 using a promo code.  And the promo code
13 comes from the advertiser, not Newsmax to
14 track where they got the orders.
15      Q.   Right.
16          So, for -- for purposes of
17 any -- any kind of ad revenue from Mr.
18 Lindell or MyPillow, that's just a paper ad
19 arrangement; is that correct?
20      A.   Oh, yep.  He always paid for
21 his ads.  That's correct.
22      Q.   And -- and is that arrangement
23 in writing?
24      A.   He would have written
25 agreements with our advertising department

CHRISTOPHER RUDDY

1
2 on ads that he had buys and rates.
3      Q.   And is there a written
4 agreement in effect to this day with
5 MyPillow with respect to ad buys and rates?
6      A.   Well, I believe so because
7 they're currently advertising, and we
8 wouldn't have somebody on without an
9 treatment.
10      Q.   And is your condition with
11 respect to Mr. Lindell as far as him not
12 discussing the -- the alleged election
13 fraud with respect to the 2020 election; is
14 that condition still in place to this day?
15      A.   Yes.
16          MR. CAIN:  Thank you, Mr.
17 Ruddy.
18          That's all I have for you.
19          THE WITNESS:  Thank you, Mr.
20 Cain.
21          Thank you, Mr. Malone and our
22 other guests.
23          THE VIDEOGRAPHER:  This will
24 end media Unit 2 and conclude the
25 deposition of Christopher Ruddy.

18 (Pages 66 - 69)

Page 70

1          CHRISTOPHER RUDDY
2          We are going off the record at
3   10:52, 8/18/23.
4          THE COURT REPORTER:  Mr. Cain,
5   would you like a copy of the
6   transcript?
7          MR. CAIN:  Yes, I would.
8   Condensed.
9          (Whereupon, at 10:52 A.M., the
10  Examination of this witness was
11  concluded.)
12
13       o     o     o     o
14
15
16
17
18
19
20
21
22
23
24
25

Page 71

1          CHRISTOPHER RUDDY
2          E X H I B I T S
3
4   PLAINTIFF'S EXHIBITS
5
6   EXHIBIT   EXHIBIT              PAGE
7   NUMBER   DESCRIPTION
8   161     Subpoena          12
9   162     Nielsen Ratings      13
10  163     Interview         20
11  164     Comscore Program in DX   27
12  165     Document          29
13  166     Video             33
14  167     Video             42
15  168     Complaint         45
16  169     Settlement Agreement    46
17  170     Text Messages        53
18  171     Video             60
19
20
21
22  (Exhibits retained by Court Reporter.)
23
24
25

Page 73

1          CHRISTOPHER RUDDY
2          C E R T I F I C A T E
3
4   STATE OF NEW YORK      )
                   : SS.:
5   COUNTY OF NEW YORK     )
6
7          I, KARYN CHIUSANO, a Notary Public
8   for and within the State of New York, do
9   hereby certify:
10         That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14         I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19         IN WITNESS WHEREOF, I have hereunto
20  set my hand this 22nd day of August, 2023.
21
22
23          *Karyn Chiusano*
            KARYN CHIUSANO
24
25

19 (Pages 70, 71, 73)



# CERTIFICATE

## UNITED STATES DISTRICT COURT

CASE: Coomer, Eric, Ph.D. v. Lindell, Michael J., et al.
CASE NO: 1:22CV01129WJM
WITNESS: Christopher Ruddy
DATE REPORTED: August 18, 2023

I, Karyn Chiusano, the undersigned court reporter in and for the State of New York, do hereby certify that signature for review was not requested for the above-named witness.

IN WITNESS WHEREOF, I have hereunto set my and affixed my signature this 2nd day of October, 2023.

Colorado Rules of Civil Procedure

Chapter 4, Disclosure and Discovery

Rule 30

(e) Review by Witness; Changes; Signing. If
requested by the deponent or a party before
completion of the deposition, the deponent shall be
notified by the officer that the transcript or
recording is available. Within 35 days of receipt
of such notification the deponent shall review the
transcript or recording and, if the deponent makes
changes in the form or substance of the deposition,
shall sign a statement reciting such changes and
the deponent's reasons for making them and send
such statement to the officer. The officer shall
indicate in the certificate prescribed by
subsection (f)(1) of this rule whether any review
was requested and, if so, shall append any changes
made by the deponent.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF
CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.