**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

      Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

      Defendants

---

**EXHIBIT 11**

---

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 1:22-cv-01129-NYW-SJC
3   _____
4
    ERIC COOMER, Ph.D.,
5
            Plaintiff,
6
    vs.
7
    MICHAEL J. LINDELL, FRANKSPEECH
8   LLC, AND MY PILLOW, INC.,
9           Defendants.
    _____
10
         CONFIDENTIAL DEPOSITION OF ERIC COOMER, PH.D.
11                  February 15, 2023
    _____
12
    APPEARANCES:
13
    ON BEHALF OF THE PLAINTIFF:
14          CHARLES CAIN, ESQ.
            Cain & Skarnulis
15          300 Colorado Street, Suite 2850
            Austin, Texas  78701
16          Phone:  512-477-5000
            Email:  ccain@cstrial.com
17
    ON BEHALF OF THE DEFENDANTS:
18          RYAN P. MALONE, ESQ.
            Parker Daniels Kibort LLC
19          888 Colwell Building
            123 North Third Street
20          Minneapolis, Minnesota  55401
            Phone:  612-355-4100
21          Email:  malone@parkerdk.com
22
23
24
25

Page 2

1          PURSUANT TO WRITTEN NOTICE and the
2    appropriate rules of civil procedure, the confidential
3    deposition of ERIC COOMER, PH.D., called for examination
4    by the Plaintiffs, was taken at Westin Denver
5    International Airport, 8300 Peña Boulevard, Denver,
6    Colorado, commencing at 9:00 a.m. on February 15, 2023,
7    before Laurel S. Tubbs, a Registered Professional
8    Reporter, Registered Merit Reporter, Certified Realtime
9    Reporter and Notary Public in and for the State of
10   Colorado.
11                    INDEX
12   EXAMINATION:                        PAGE
13   By Mr. Malone                         4
14   EXHIBITS:                           PAGE

15   Exhibit 1  Plaintiff's Confidential Objections      6
              and Answers to Defendant Michael J.
16            Lindell's First Set of
              Interrogatories
17
     Exhibit 2  Plaintiff's First Amended Complaint     30
18            and Jury Demand
19   Exhibit 3  1040 U.S. Individual Income Tax          79
              Return for 2020
20
     Exhibit 4  2022 Form 1040-ES Payment Voucher,      85
21            1040 U.S. Individual Income Tax
              Return 2021, 2021 Colorado Individual
22            Income Tax Return
23   Exhibit 5  Confidential Separation Agreement &      86
              Release
24
25

Page 3

1    EXHIBITS (Cont'd):                   PAGE

2    Exhibit 6  Article Titled Guest Commentary:  I     116
              work for Dominion Voting Systems.  I
3            did not commit voter fraud.  The
              attacks against me need to stop.
4
     Exhibit 7  Article Titled He Was the 'Perfect      135
5            Villain' for Voting Conspiracists
6    Exhibit 8  Facebook Posts                          156
7    Exhibit 9  Article Titled Dominion worker Eric     211
              Coomer sues Trump campaign and
8            conservative media
9    Exhibit 10  Exhibit A-1 Coomer v. Donald J. Trump  212
              for President, et al. Defamatory
10            Statement Spreadsheet
11   Exhibit 11  Plaintiff's First Amended Complaint    217
12   Exhibit 12  Original Complaint                      227
13   Exhibit 13  Democracy Suite® EMS Results Tally &   229
              Reporting User Guide
14
     Exhibit 14  Declaration of Dr. Eric D. Coomer      236
15
     Exhibit 15  Exhibit 1 Declaration of J. Alex       238
16            Halderman
17   Exhibit 16  LexisNexis Curling v. Raffensperger    245
18   Exhibit 17  Text Messages                          248
19   Exhibit 18  Text Messages                          250
20   Exhibit 19  Text Messages                          251
21   Exhibit 20  Email Chain                            253
22
23
24
25

Page 4

1           P R O C E E D I N G S
2           ERIC COOMER, PH.D.,
3    having been first duly sworn/affirmed, was examined and
4    testified as follows:
5             EXAMINATION
6    BY MR. MALONE:
7        Q.  Good morning, Dr. Coomer.
8        A.  Good morning.
9        Q.  You've had your deposition taken before,
10   correct?
11       A.  I have.
12       Q.  Approximately how many times?
13       A.  Twice.
14       Q.  So you're reasonably familiar with the
15   ground rules.  And I'll go over them quickly here.  You
16   can see that we have a court reporter with us today.
17   She's taking down everything that we say.  And for that
18   reason, it's very important that we speak clearly,
19   reasonably slowly, and that we don't talk over each other.
20   Make sure that, when I'm done speaking, you can speak, and
21   vice versa.  Does that sound fair?
22       A.  That's fair.
23       Q.  And obviously, in normal everyday
24   interactions, we tend to nod, say "mm-hmm," things like
25   that.  It's also very important that we respond audibly

Page 5

1    and clearly to every question.  Fair?
2        A.  That is fair.
3        Q.  All right.  From what I understand, you are
4    recovering from a bought of laryngitis; is that correct?
5        A.  I am, but it's gotten better, so I think I
6    should be okay today as long as I keep the volume down.
7        Q.  Understood.
8            Is there any other reason why you would not
9    be able to testify today?
10       A.  No, there is not.
11       Q.  Okay.  What did you do to prepare for
12   today's deposition, Dr. Coomer?
13       A.  I reread both the Amended Complaint that
14   we filed against Lindell, My Pillow, Frankspeech, and
15   then I reviewed my separation agreement from DVS.
16       Q.  Did you bring any documents with you today?
17       A.  I did not.
18       Q.  And obviously I don't want to hear about
19   any conversations you had with your attorneys.  But did
20   you speak to anyone other than your attorneys in
21   preparation for today's deposition?
22       A.  I did not.
23       Q.  Okay.  I'm going to hand you what we will
24   mark as Exhibit 1.
25           (Discussion off the record.)

2 (Pages 2 - 5)

Page 6

1       (Exhibit 1 was marked.)
2       Q. (By Mr. Malone) Okay. And, Dr. Coomer,
3  what we are looking at is a document entitled Plaintiff's
4  Confidential Objections And Answers to Defendant
5  Michael J. Lindell's First Set of Interrogatories.
6       Have you seen this document before?
7       A. I have.
8       Q. Do you recall working with your attorneys
9  to prepare answers to these interrogatories?
10      A. Yes, I do.
11      Q. Okay. Dr. Coomer, if you could turn to
12  page 3 of Exhibit 1, which has the heading Objections and
13  Answers. And you can see Interrogatories 1 through 4
14  displayed there. Do you see where I'm looking?
15      A. Yes, I do.
16      Q. If you could take a moment to review all of
17  those answers, and let me know if there's anything that is
18  inaccurate, incomplete, or that you would like to change
19  today.
20      A. This looks complete.
21      Q. Excellent. If you could turn to page 4.
22  Looking at Interrogatory Number 5, which asks for your
23  educational background, if you could take a moment to
24  review that answer and let me know if anything needs to be
25  changed or elaborated on.

Page 7

1       A. Trade school. So I did attend a one-week
2  vocational trade school for Neapolitan pizza-making,
3  which is not listed.
4       Q. And when did you attend that trade school?
5       A. That would have been, to the best of my
6  recollection, I believe it was February of 2021.
7       Q. So fairly recently?
8       A. Yes.
9       Q. And we'll, I believe, talk about that a
10  little bit more later on today.
11      But is it fair to say that you're currently
12  in the restaurant business?
13      A. Yes, it is.
14      Q. Okay. Did you obtain any sort of
15  certificate from that trade school?
16      A. I did.
17      Q. And what is the name of the trade school?
18      A. It's the AVPN, which is the Associazione
19  Pizza Napoletana Verace.
20      Q. And is the AVPN located physically in
21  Colorado?
22      A. No. They -- they are based out of Naples,
23  Italy; but they do have a school in -- based in -- I
24  think it's Burbank, LA.
25      Q. And is that where you attended?

Page 8

1       A. I attended in LA.
2       Q. Well, we might get to that later on today.
3       But backing up a little bit, after you
4  obtained your Ph.D. in nuclear engineering and plasma
5  physics in December of 1997, what did you do for work?
6       A. Immediately after that -- that time, I
7  started doing essentially consulting for software
8  development. I did a lot of just database projects,
9  and -- yeah, that was what I did shortly after that. I
10  did have a couple other jobs here and there post '97.
11      Q. And as a consultant for software
12  development, were you freelance, or did you have a primary
13  employer at that time?
14      A. Freelance.
15      Q. And can you provide an estimate about how
16  long you performed freelance consulting work?
17      A. Yeah, so it was off and on. It was in
18  '99 -- late '99 I took a job with a company called Planet
19  Outdoors. That was a dot-com startup. That did not last
20  that long, if everybody remembers the dot-com blowup. So
21  from about, I think, around December '99 to December of
22  2000 was when I worked at Planet Outdoors.
23      So then after that, I went back to sort of
24  contract database work and did that up until 2004.
25      Q. And this would be from about 2000 to 2004

Page 9

1  doing the contract database work, correct?
2       A. Correct.
3       Q. Who were some of the contractors or
4  companies with whom you worked doing that work?
5       A. I have to be honest, I can't recall at
6  this time.
7       Q. It was a long time ago?
8       A. It was.
9       Q. Do you recall where you were living and
10  working at that time?
11      A. Yes. I was in Broomfield, Colorado,
12  working from home doing remote work.
13      Q. Moving on to Interrogatory Number 6.
14  Dr. Coomer, I understand that during this time
15  period -- and I think you've been open about this -- that
16  you struggled with addiction in your life. Is that fair
17  to say?
18      A. That is fair.
19      Q. And so this -- this interrogatory asks
20  about some instances that I understand may have been a
21  result of or related to those addictions; is that
22  accurate?
23      A. Yes. That is my understanding.
24      Q. Dr. Coomer, are you also aware that there's
25  a protective order in this case, and that if we designate

1 this deposition confidential, that it cannot be used
2 outside the context of this case. Are you aware of that?
3      A. I am aware of that, yes.
4      Q. Okay. So with that understanding, I'm
5 going to be asking you a few questions about these
6 instances which you've identified in response to
7 Interrogatory Number 6.
8           So if you could turn to page 5 here.
9 You've identified a case number 2003T00050 with a date of
10 January 24th, 2003, as an instance in which you were
11 charged with careless driving and reckless driving. Do
12 you see where I'm referring at the top of the page?
13      A. Yes, I do.
14      Q. I understand that that's what you were
15 charged with. Do you recall what the outcome of that
16 instance -- or incident was?
17      A. I believe I do. It was a fine and points
18 against my license.
19      Q. So was that the result of a plea or a trial
20 court conviction or anything like that?
21      A. I believe it was a plea. I never went to
22 trial on that.
23      Q. Okay. Moving on to the next incident
24 identified with the date of July 1st, 2003, where you
25 identified the charges as driving under

1 restraints-alcohol-related speed contest, careless
2 driving, driver's license permit, it looks like unauth,
3 short for unauthorized minor/DR. Do you see where I'm
4 referring there?
5      A. Yes, I do.
6      Q. What was the outcome of those charges?
7      A. Again, it was points against my license,
8 which I believe led to a suspension of license and a
9 fine.
10      Q. Do you recall what the fine was?
11      A. No, I do not.
12      Q. Okay. Moving on to the May 18th, 2005,
13 incident, failure to display proof of insurance,
14 headlamps-detective, seat belts not in use. What was the
15 outcome of that charge?
16      A. I'll be honest, on that one, I don't know
17 because I don't even recall ever being cited for seat
18 belt not used. I'm pretty religious about my seat belt.
19 So this one does not -- this one doesn't ring a bell.
20      Q. Okay. Moving on to the November 2nd, 2006,
21 incident in which you've identified charges for driving
22 while ability impaired, lane usage violation and reckless
23 driving. What was the outcome of that charge?
24      A. To the best of my knowledge, it was a fine
25 and points against license. I do not recall if I had a

1 suspension of license.
2      Q. And just so that I understand your earlier
3 testimony, in 2003, there was a suspension that was issued
4 against your license -- license; is that correct?
5      A. That is correct.
6      Q. Do you recall how long that suspension was?
7      A. 12 months.
8      Q. Were you unable to drive during those
9 12 months?
10      A. I think, on that suspension, that is
11 correct. There may have been a suspension on the '05.
12 And, again, I don't want to speculate because I can't
13 recall all the details.
14      Q. Understood. Moving on to the
15 November 17th, 2007, charges for disturbing the peace,
16 unlawful to, I believe, spit public place. What did you
17 mean when you identified the unlawful to spit public place
18 charge there?
19      A. That was the actual charge that I was
20 charged with. It is unlawful in Denver to spit on the
21 sidewalk.
22      Q. What was the outcome of that charge?
23      A. A fine.
24      Q. What was the amount of the fine, if you can
25 recall?

1      A. I don't recall.
2      Q. Finally, there is a charge identified here
3 dated September 21st, 2021, for failure to yield
4 right-of-way/stop sign, reckless driving, failing to
5 report accident-call police. Do you see that charge
6 identified?
7      A. Yes, I do.
8      Q. What was the outcome of that charge?
9      A. It was a charge of reckless driving, I
10 believe 8 points on my license, and a fine.
11      Q. Has that matter been resolved --
12      A. Yes, it has.
13      Q. -- that you're aware?
14      A. Sorry. Yes, it has.
15      Q. Dr. Coomer, are you aware that video
16 footage of that incident has circulated on the internet?
17      A. Yes, I am.
18      Q. Okay. Dr. Coomer, did you ever spend any
19 time in any sort of county jail or correctional facility?
20      A. You mean have I spent the night in jail?
21      Q. Any amount of time.
22      A. Yes.
23      Q. Okay. Was that in relation to any of the
24 charges that we just went through over the last few
25 minutes here?

4 (Pages 10 - 13)

Page 14

1      A.  Yes.
2      Q.  Which one?
3      A.  The first one, the 2003T00050, Clear Creek
4  County incident.  The second one, 2003T000733.  And the
5  disturbing the peace, 07GS066853.
6      Q.  For each of those incidents, are you saying
7  that you spent just a night in jail per incident, or are
8  you saying something else?
9      A.  To the best of my recollection, it was a
10 single holding night.
11     Q.  For each of those three?
12     A.  Yes.
13     Q.  Did you spend any amount of time in jail
14 for the September 2021 incident?
15     A.  No, I did not.
16     Q.  Doctor, we don't have to go through the
17 video, and I would prefer not to, but is it your testimony
18 that you've seen it?
19     A.  Yes, I have.
20     Q.  Do you recall, in that video, that it
21 appears you were at the -- is it the Fitz Restaurant in
22 Salida?
23     A.  The Fritz.
24     Q.  Excuse me, The Fritz restaurant in Salida.
25 And that's your restaurant, correct?

Page 15

1      A.  Correct.
2      Q.  And I believe that there was at least one
3  cook on duty that day at The Fritz who was in the
4  restaurant with you when the police arrived; is that
5  correct?
6      A.  That is my recollection, yes.
7      Q.  Do you recall the name of that cook?
8      A.  I am drawing a blank because he didn't
9  last very long.  We just always called him the Viking.
10        I can provide that at a later time, but
11 it's escaping me.  I've gone through a lot of employees.
12     Q.  If you could do that, that would be great.
13        MR. CAIN:  We'll leave -- pardon me -- a
14 blank in the deposition for him to answer that question
15 after reviewing his records.
16     Q.  (By Mr. Malone)  When the police arrived
17 then, Dr. Coomer, do you recall telling them that you had
18 done a couple of shots with the gentleman that we'll refer
19 to as the Viking for today's purposes?
20     A.  Yes, I do.
21     Q.  Had you consumed any alcohol before driving
22 your vehicle that day?
23     A.  No, I had not.
24     Q.  The last incident that you've identified
25 here is a 2015 incident which you pleaded guilty to a

Page 16

1  misdemeanor assault charge in Denver County Court, and
2  that incident is expunged from your record.  Do you see
3  where I'm referring to?
4      A.  Yes, I do.
5      Q.  Who was involved in that charge, or who was
6  the other party --
7         THE REPORTER:  I'm sorry.  I didn't hear.
8  "Other party..."
9         MR. MALONE:  Involved.
10     A.  Again, I'd have to look back.  I believe
11 his name was Jason.  I do not have a last name.
12     Q.  (By Mr. Malone)  It's not a person that you
13 currently have any sort of relationship with?
14     A.  No, it is not.
15     Q.  Did you spend any time in jail for that
16 incident?
17     A.  Yes, I believe that happened on a Friday.
18 So I did not get bonded out until Monday.
19     Q.  So a weekend?
20     A.  Yes.
21     Q.  Okay.  Moving on to page 6 of Exhibit 1.
22 If you could take a look at your answer to Interrogatory
23 Number 7, Dr. Coomer.  Do you see that?
24     A.  Yes, I do.
25     Q.  Is that information still accurate with

Page 17

1  respect to your cell phone number?
2      A.  That is correct.
3      Q.  When you worked at Dominion, did you have a
4  company-issued cell phone?
5      A.  That is -- the cell phone -- the Samsung
6  listed there is the company-issued cell phone.  And I
7  have only had one cell number for both personal and
8  business.
9      Q.  So you were able to use the Samsung for
10 official business and the iPhone for your personal
11 communications; is that right?
12     A.  No, that is incorrect.  I used the Samsung
13 for both personal and business; and then, when I
14 separated from the company, I bought the iPhone and I was
15 able to transfer the number.
16     Q.  I see.  And Verizon was the carrier during
17 that entire time period?
18     A.  Yes, it is.
19     Q.  Did you have that same cell phone number
20 when you started at Dominion in -- I believe was it 2010?
21     A.  Yes, I did.
22     Q.  Do you know whether Verizon was the carrier
23 at that time?
24     A.  It was.
25     Q.  Okay.  If you could turn the page to page 7

5 (Pages 14 - 17)

1 in Exhibit 1, Dr. Coomer. Interrogatory 11 asks for all
2 lawsuits, including the venue and case number in which you
3 have either been a party or a witness in the previous
4 10 years. You've indicated that you were a witness in the
5 Curling v. Raffensperger case in the Northern District of
6 Georgia in 2017; is that right?
7     A. That is correct. Well, the -- the case
8 was filed in 2017. I believe my testimony was in 2019.
9     Q. Understood. And I believe you may have
10 also provided some additional testimony in 2020?
11    A. I believe so. That sounds correct.
12    Q. Were you considered -- or was it your
13 understanding that you were providing expert testimony in
14 that case?
15    A. Yes, I was providing expert testimony.
16    Q. Do you recall what your compensation was
17 for providing that testimony?
18    A. Yes. It was zero.
19    Q. So expert testimony pro bono in the Curling
20 case, correct?
21    A. That is correct.
22    Q. How did that come about?
23    A. I was asked by my company who, as a vendor
24 of Georgia providing election equipment, to provide
25 expert testimony on our equipment.

1     Q. So your employer, Dominion at the time
2 obviously, asked you to provide expert testimony for the
3 defendants in that case, correct?
4     A. Yes.
5     Q. And they -- was it Dominion that asked you
6 to do so without additional compensation?
7     A. The topic never came up.
8     Q. You were never offered additional
9 compensation to provide testimony in that case?
10    A. Nope. No. Sorry.
11    Q. I suppose I've been using the term
12 "Dominion" fairly broadly. Do you recall who the
13 individual was who asked you to provide testimony in that
14 case?
15    A. Not specifically, no.
16    Q. Was it your boss, John Poulos, at that
17 time?
18    A. John Poulos was not my boss at the time.
19    Q. Who was your boss or director, supervisor,
20 however you would it describe them at the time?
21    A. At the time that I testified in Curling v.
22 Raffensperger, it would be Sheree Noel.
23    Q. Okay. Sheree Noel?
24    A. Yes.
25    Q. Okay. What was Ms. Noel's title then at

1 Dominion?
2     A. I'll be honest, I do not recall.
3     Q. But you understood that she was your
4 supervisor or boss?
5     A. She was my direct report, yes.
6     Q. Was Ms. Noel then a direct report to John
7 Poulos?
8     A. No, she was a direct report to Waldeep
9 Singh.
10        THE REPORTER: I'm sorry. The name?
11        THE DEPONENT: Waldeep. So W-a-l-d-e-e-p,
12 Singh, S-i-n-g-h.
13        THE REPORTER: Thank you.
14        THE DEPONENT: Yeah.
15    Q. (By Mr. Malone) And just so I understand
16 the chronology here, this is in the 2019 to 2020 time
17 frame, correct?
18    A. Correct.
19    Q. During that time period, what was
20 Mr. Singh's title at Dominion, if you know?
21    A. To the best of my recollection, it was
22 executive vice president of sales.
23    Q. So Mr. Singh was two levels above you at
24 that time, correct?
25    A. Yes.

1     Q. At this time your official title was the
2 director of product security; is that correct?
3     A. It was director of product strategy and
4 security.
5     Q. Strategy and security?
6     A. Correct.
7     Q. Did you, Dr. Coomer, consider that to be a
8 sales-type role?
9     A. Partially, is the best I can answer that.
10    Q. In what ways was it a sales-type role?
11    A. So my duties under the product strategy
12 portion were to meet with existing clients and potential
13 clients and analyze their needs and take that back and to
14 essentially develop new products that would meet their
15 needs.
16        The security part was, once those products
17 were starting to be developed, to make sure that they
18 were developed with robust security elements that matched
19 both the needs of certification and also the emerging
20 threats as designated under the critical infrastructure
21 designation for election infrastructure.
22    Q. Do you recall the time period where you
23 started in that role as the director of strategy and
24 security?
25    A. Yes, that was November of 2013.

6 (Pages 18 - 21)

Page 22

1    Q.   And at that time you had been employed by
2  Dominion for a number of years; is that correct?
3    A.   Yes, with a short seven-month hiatus where
4  I took a consulting job and then returned to Dominion.
5    Q.   Okay.  What time period -- the month is
6  fine -- did you start your employment with Dominion?
7    A.   That was July of 2010.
8    Q.   And what was your title with the company at
9  that time?
10    A.   Vice president of U.S. engineering.
11    Q.   Where were you based?
12    A.   Denver, Colorado.
13    Q.   As of July of 2010, did you have any
14  experience in the elections space at all?
15    A.   Yes, I had five years' experience at that
16  point.
17    Q.   Okay.  Where had you worked the five years
18  before July of 2010 in elections?
19    A.   Sequoia Voting Systems.
20    Q.   Were those the immediately preceding five
21  years?
22    A.   Yes.
23    Q.   So 2005-2010 you were with Sequoia,
24  correct?
25    A.   That is correct.

Page 23

1    Q.   What was your title at Sequoia?
2    A.   So I was initially hired as a database
3  engineer.  Within six months I was the senior software
4  developer.  And then I believe in 2009 I was the
5  executive vice president of engineering.
6    Q.   And you stayed in that role as the
7  executive vice president of engineering until July of
8  2010?
9    A.   June of 2010.
10    Q.   Okay.  What prompted the move from Sequoia
11  to Dominion?
12    A.   Dominion acquired the assets of Sequoia,
13  and as part of that asset agreement they offered me an
14  employment contract.
15    Q.   When you say that Dominion acquired the
16  assets of Sequoia, does that include all of Sequoia's
17  existing technology at that time?
18    A.   I'll be honest, I can't answer that
19  because I never saw the full acquisition agreement.
20    Q.   Is it your recollection that most Sequoia
21  employees moved on to work for Dominion?
22    A.   No.  We had a substantial reduction in
23  force.  There were several employees that were offered
24  full-time contracts, employment contracts with Dominion.
25  And then there were several that were offered essentially

Page 24

1  temporary contracts to get us through the 2010 election
2  cycle.  "We" being Dominion.  I couldn't give you exact
3  numbers.
4    Q.   That's fine.  And when you were at Sequoia
5  from 2005 to 2010, were you also based in Denver?
6    A.   Yes.
7    Q.   Okay.  We will possibly talk a little bit
8  more about the Curling case.  As you sit here today, have
9  you ever offered expert testimony, whether as a Sequoia
10  employee or a Dominion employee or as a consultant, in any
11  other case that you're aware of?
12    A.   In any other case, no.
13    Q.   And I probably should clarify.  You
14  mentioned that you took a seven-month hiatus from
15  Dominion; is that correct?
16    A.   That is correct.
17    Q.   What seven-month period was that in time?
18    A.   I believe it was March 2013 through
19  November 2013.
20    Q.   And what did you do during that hiatus?
21    A.   I took a consulting job with Sogeti,
22  S-o-g-e-t-i, as a large data analyst.
23    Q.   What prompted the move to Sogeti at that
24  time?
25    A.   I just felt like I needed a change at the

Page 25

1  time, try something new.  I had been doing elections work
2  for, at that point, eight years.  Just wanted to see what
3  else was out there.
4    Q.   And is it that caused you to go back
5  from Sogeti to Dominion?
6    A.   I realized that my place in life and
7  career should be in elections.
8    Q.   Moving back to Exhibit 1, page 7, your
9  answer to Interrogatory Number 11, you identified a number
10  of cases where you are a party, including Coomer v.
11  Donald J. Trump, Coomer v. Salem Media of Colorado, Coomer
12  v. Make Your Life Epic, Coomer v. Lindell, this matter,
13  Coomer v. Byrne.  Are there any other cases in which you
14  are a party for the past 10 years?  I should clarify.
15    A.   No.  I believe this is a complete list.
16    Q.   You've also indicated that you are a
17  witness in the U.S. Dominion v. Fox News case currently in
18  Delaware.  That's accurate?
19    A.   I was deposed in that case, yes.
20    Q.   Did you produce documents in that case?
21    A.   I did not -- I did not produce any
22  documents because I did not have any responsive
23  documents.
24    Q.   As you sit here today, Dr. Coomer, do you
25  anticipate testifying at the trial in that case?

7 (Pages 22 - 25)

Page 26

1    A.  I couldn't answer that.
2    Q.  Do you know the rough time period in which
3 you were deposed in that case?
4    A.  It was sometime last year.
5    Q.  Sometime in 2022?
6    A.  Yes.
7    Q.  Okay.  Moving on -- actually, I should
8 clar- -- ask, were you compensated for providing your
9 deposition testimony in the Dominion v. Fox News case?
10    A.  I was not.
11    Q.  Okay.  Your answer to Interrogatory 12,
12 which asks for all persons with whom you communicated by
13 text or SMS messaging, videoconferencing, Signal, or any
14 other electronic means on November 3rd.  After some
15 objections, you've identified John Poulos, Kay Stimson,
16 Nicole Nollette, Alex Soto-Vasquez, Mark McKinney, and
17 possible other employees of DVS, as well as individuals
18 working for Fulton County.  Do you see that?
19    A.  Yes, I do.
20    Q.  Is that accurate?
21    A.  That is accurate, to the best of my
22 recollection.
23    Q.  Am I reading that answer correctly,
24 Dr. Coomer, that all of those individuals were Dominion
25 employees at that time?

Page 27

1    A.  Yes, except for the individuals working
2 for the county or city.
3    Q.  Understood.
4         Do you still have access to any of those
5 texts, SMS messages, Signal messages, anything else that
6 the interrogatory asks for?
7    A.  I do not.  Those were all property of the
8 company, and they retained that when I was separated.
9    Q.  And it's your understanding that they're
10 still in possession of those messages?
11    A.  I couldn't answer that.
12    Q.  Do you have access to any emails from the
13 time that you were employed by Dominion?
14    A.  I do not.  All access was removed.
15    Q.  Moving onto your answer to Interrogatory 13
16 on page 8 of Exhibit 1.  The interrogatory asks for
17 Oltmann's well-publicized calls for violence.  And, of
18 course, you understood that interrogatory to be asking
19 about Joe Oltmann; is that correct?
20    A.  Correct.
21    Q.  And Mr. Oltmann is a defendant in one of
22 the lawsuits that you have brought and identified in your
23 answer to the interrogatory we just talked about, right?
24    A.  That is correct.
25    Q.  And you understand that Mr. Oltmann has

Page 28

1 offered deposition testimony in this case?
2    A.  Yes, he has.
3    Q.  Of those well-publicized calls to violence
4 that you are referring to in your answer, do you have any
5 facts that Mr. Lindell was aware of those calls to
6 violence?
7    A.  I believe that is covered in our First
8 Amended Complaint.
9    Q.  So any facts that you are aware of would be
10 identified in the First Amended Complaint?
11    A.  Correct.
12    Q.  Dr. Coomer, are you aware of any
13 well-publicized calls to violence that Mr. Lindell has
14 made?
15    A.  It depends on your definition of "calls to
16 violence."
17    Q.  Understood.  Well, you're testifying today.
18 So what's your definition of "calls to violence"?
19    A.  Calling me disgusting, treasonous, and a
20 traitor that should be rounded up and put behind bars, I
21 find to be a call to violence, as there is no evidence
22 that I'm guilty of any of those charges.
23    Q.  I believe you refer to that incident in
24 your Complaint, and we'll talk about that.
25         Any others that you claim -- any other

Page 29

1 calls to violence you're claiming Mr. Lindell has made
2 against you?
3    A.  Specifically, I would have to refer to the
4 Amended Complaint.  But those are the -- that's a pretty
5 good example of at least one.
6    Q.  Okay.  In your answer to Interrogatory 15,
7 at the bottom of page 8, you were asked to identify every
8 defamatory statement you alleged was made by Lindell in
9 this case, including the date.  Do you see that?
10    A.  Yes, I do.
11    Q.  And after some objections that your
12 attorney made, you refer to Plaintiff's First Amended
13 Complaint, paragraphs 61, 81 through 88, 94 through 96,
14 98, 100, and 103.
15         Do you see that?
16    A.  Yes, I do.
17    Q.  And as you sit here today, is that still
18 accurate?
19    A.  I believe it is, with the caveat that that
20 Amended Complaint is several months old, and I believe
21 that there have been more defamatory statements made
22 since then.
23    Q.  When you say that you believe that there
24 have been more defamatory statements made since then, what
25 are you basing that belief on?

8 (Pages 26 - 29)

Page 30

1  A.  Various YouTube clips that I've seen with
2  additional interviews with Mr. Lindell where he's
3  mentioned me by name saying that I belong behind bars.
4  Q.  Do you have the dates or links to those
5  clips with you today?
6  A.  I do not.
7  Q.  Let's go to what will be marked as
8  Exhibit 2.
9  (Exhibit 2 was marked.)
10  Q.  Okay.  We are back on the record.  And I'm
11  glad we are.
12  That reminds me, Dr. Coomer, I should have
13  mentioned when we started that if you need a break at any
14  point today, let me know.  My request would be that if
15  there's a question that's pending, that you answer the
16  question before we break.  And we'll try to get through
17  this as expeditiously as possible.  Fair?
18  A.  That is fair.
19  Q.  Okay.  So we were just talking about a
20  number of paragraphs that you identified as your Amended
21  Complaint -- in your Amended Complaint that are
22  defamatory.  And you have just been handed a copy of that
23  Amended Complaint against Mr. Lindell, My Pillow and
24  Frankspeech.  And what I'd like you to do is turn to
25  paragraph 61, which can be found -- you probably have it

Page 31

1  already -- which can be found at page 36 of Exhibit 2.
2  Do you see that, Dr. Coomer?
3  A.  Yes, I do.
4  Q.  What is the false statement of facts that
5  gives rise to your claim of defamation in paragraph 61?
6  Statement or statements, plural.
7  A.  I don't -- I don't feel that I can make
8  that determination as I'm not an attorney.
9  Q.  Understanding that you're not an attorney,
10  my question is a little bit different.  I'm asking you for
11  your understanding of what a false statement of fact is.
12  The attorneys can sort out what defamation is.
13  But you identified a number of statements
14  here.  And so what I want to do is understand what you're
15  claiming is a fact, what you're claiming is an opinion,
16  of the claims that are facts, what's false.  Do you
17  understand?
18  A.  I think I do, and I think the biggest one
19  I can point out is that the quote, You are a traitor to
20  the United States, that is defamation, per se.  I am not
21  a traitor to the United States of America.
22  Q.  And it's your testimony here today that
23  that is -- whether someone can be a traitor or not is a
24  question of fact?
25  A.  Yes, it is, to my understanding.

Page 32

1  Q.  We'll get into it a little bit later today,
2  Dr. Coomer, but you've referred to some folks as traitors
3  and some folks as treasonous publicly, correct?
4  A.  Not to my recollection right now.
5  Q.  Okay.  But if you had, that would be okay?
6  A.  It depends on the context.
7  Q.  Would it be a statement of fact or a
8  statement of opinion?
9  MR. CAIN:  Object to form.
10  A.  It depends on the context.
11  Q.  (By Mr. Malone)  Okay.  Paragraph 61, other
12  than Mr. Lindell saying that you're a traitor, any other
13  false statements of fact in that paragraph?
14  A.  Yeah.  Just saying that he has evidence
15  thereof is false.  There is no evidence that I was
16  treasonous.  There is no evidence that I affected the
17  election.  The context here again is that -- and, you
18  know, there's more to this -- this whole paragraph is
19  about me rigging the election.  And that is patently
20  false.  I did not rig the election.  I did not attempt to
21  rig the election.  And he's saying, these are things that
22  I have evidence of, the evidence is patently false.
23  There is no evidence.
24  Q.  You say looking at this paragraph is about
25  Mr. Lindell accusing you personally of rigging the

Page 33

1  election.  Is that your testimony just now?
2  A.  Yes.
3  Q.  Where does he say that?
4  A.  It is not explicitly stated.  I'd say it's
5  in context.  If you're me, I'm turning myself in and
6  turning in the whole operation.  The whole operation
7  being the rigging of the election.  That is the context,
8  as I understand it.
9  Q.  And do you take that context from the block
10  of text that we're looking at now or from other things
11  that he said at that time, May 9th, 2021?
12  A.  Again, I think it's within the context of
13  this discussion, yes.  It's over for Dominion.  It's too
14  late to close the gate.  The cows are out of the barn.
15  So there's -- there's more up top here.  All right.  He's
16  talking about Dominion, to take our country through
17  China.  You did your best.  You corrupt people you.  You
18  tried to suppress our voice.
19  Again, I think the context there is in
20  direct relation to claims of election corruption.  You
21  did it, but you failed.
22  So, yes, I think that sets -- I think that
23  clearly sets this paragraph in connection with supposed
24  rigging of the election.
25  Q.  You mentioned Mr. Lindell's alleged

9 (Pages 30 - 33)

Page 34

1 statements about Dominion. Is it your testimony that what
2 he says about Dominion is what he's saying about you?
3     A. Yes, I think there's a direct correlation.
4     Q. That's not quite my question about whether
5 there's a correlation. My question is whether it's one
6 and the same as far as your understanding goes.
7     A. Every time that I've seen him mention
8 Dominion, he mentions me. So I think it is one and the
9 same.
10     Q. And that's -- just so I understand your
11 statement just there, Dr. Coomer, every time Mr. Lindell
12 mentions Dominion, he mentions you, as far as you know?
13     A. As far as I know.
14     Q. Okay. So you're not aware of any
15 statements that Mr. Lindell has made about Dominion that
16 don't refer to you by name?
17     A. I am not.
18     Q. What about his statements about Brian Kemp
19 and Brad Raffensperger? Do you see that in the middle of
20 the block of text in paragraph 61?
21     A. Yes, I do.
22     Q. Is it your understanding that what he's
23 saying about them -- who I believe were the governor and
24 secretary of state in Georgia at the time -- reflect on
25 you in any way?

Page 35

1     A. No. Because he says, I can say that just
2 like I can say that about Brian Kemp. So I think he's
3 making a separate statement about Brian Kemp and
4 Raffensperger, and saying that the same evidence of their
5 corruption applies to me.
6     Q. And that's your understanding?
7     A. That is my understanding.
8     Q. In paragraph 61, at the top there, --
9 backtracking a bit -- you indicate that this statement or
10 series of statements was on May 9th, 2021, correct?
11     A. Yes.
12     Q. Are you aware of any statements that
13 Mr. Lindell made about you before May 9th, 2021?
14     A. Again, I'd have to look through the entire
15 complaint. But if this is the first one listed, this may
16 be the first one. I'd have to speculate on that.
17     Q. No need to speculate. Just want to know
18 what you know. Are you aware of any statements that
19 Mr. Lindell has made about Dominion before May 9th of
20 2021?
21     A. I do not recall any at this time.
22     Q. Okay. Moving on to paragraph 81, which can
23 be found on page 48 of Exhibit 2. Let me know when you're
24 there, Dr. Coomer.
25     A. Okay.

Page 36

1     Q. Okay. And we are looking at this paragraph
2 because it was identified in your answer to Interrogatory
3 15 referencing defamatory statements, and that's
4 paragraphs 81 through 83, which goes from pages 48 to 52
5 of Exhibit 2. These are statements that appears you're
6 claiming Joe Oltmann and others made at the Cyber
7 Symposium in Sioux Falls, South Dakota, in August of 2021;
8 is that accurate?
9     A. That is correct.
10     Q. You can feel free, Dr. Coomer, to take a
11 moment to review these paragraphs if it will be helpful.
12 But my question to you is whether you're aware of any
13 facts that Mr. Lindell said anything in these paragraphs.
14     A. Again, I'd defer to my attorneys on this.
15 But I believe the claim is that, as the host and promoter
16 and creator of the Cyber Symposium, he was essentially
17 publishing these remarks and not necessarily stating them
18 himself.
19     Are there any quotes exactly in here from
20 Mr. Lindell? I do not believe so. I do remember
21 him -- Mr. Lindell introducing these speakers at the time
22 and giving his endorsement to what they were saying.
23 That is my understanding.
24     Q. Okay. So did you just say that Mr. Lindell
25 introduced these speakers?

Page 37

1     A. That's my recollection that he did, yes.
2     Q. What do you base that recollection on?
3     A. The fact that I was watching the symposium
4 when it was happening.
5     Q. You were watching it live?
6     A. Yes.
7     Q. How were you watching it live?
8     A. I can't remember the exact URL. There
9 were several. I was watching on the internet.
10     Q. Why were you watching it live?
11     A. Because I knew that it was likely going to
12 involve discussions about me.
13     Q. Why did you think that it was likely going
14 to involve discussions about you?
15     A. Because it was hosted by Mr. Lindell, and
16 he was having people like Joe Oltmann on stage. And they
17 have made a habit of making me a focal point of their
18 conspiracy theories about election fraud.
19     Q. Are you aware of any facts that show
20 Mr. Lindell knew what Joe Oltmann was going to say at the
21 symposium?
22     A. Beyond introducing him and having him on
23 and saying, I believe, you know -- again, I don't want to
24 speculate on the exact quote. But, you know, here's Joe
25 Oltmann to talk about the proof of election fraud from,

10 (Pages 34 - 37)

Page 38

1 you know, Eric Coomer and Dominion, I believe that that
2 was an endorsement; and, yes.
3      Q.   And it's your recollection that Mike
4 Lindell said, Here's Joe Oltmann to talk about Eric Coomer
5 at the symposium?
6      A.   I don't want to go as far as that quote.
7 But I do recall him introducing Joe Oltmann to talk about
8 election fraud and the proof that he had.
9      Q.   Okay.  Anything else?  Any other facts that
10 you're aware of that Mike Lindell knew what Joe Oltmann
11 was going to say at this symposium?
12      A.   Only things that I can infer at this time.
13      Q.   Okay.  Moving on to page 49, paragraph 82.
14 This complaint quotes an exchange between Joe Oltmann and
15 David Clements.  Do you see that?
16      A.   Yes, I do.
17      Q.   Okay.  What are the false statements of
18 fact that you believe are quoted in this exchange here?
19      A.   Okay.  The -- one of the major players is
20 Eric Coomer.  Again, this is in -- you have to put this
21 in context.  The whole exchange is about, quote, unquote,
22 voter fraud.  The panel was about voter fraud and
23 election fraud.
24          So one of the major players -- I am
25 inferring, and I think it's fair to infer that the major

Page 39

1 players in election fraud is Eric Coomer.  That is false.
2          Eric Coomer was a vice president of
3 Dominion Voting Systems.  I guess that's debatable
4 because at one time I had that title.  Oltmann does
5 correct that.
6          I do not hold the adjudication patent.  As
7 far as I know, it was not a sign of HSBC.  It is wholly
8 owned by DVS.  I was one of the people -- I was one of
9 the main contributors to the adjudication patent, but
10 like anybody that works for a company, patents are
11 routinely signed over to the company.  I do not have any
12 ownership of that patent.  I do not get any royalties
13 from that patent.
14      Q.   But you would agree that you're identified
15 as an inventor on that patent?
16      A.   Yes, I am.
17      Q.   Brief side bar on that point, Dr. Coomer.
18 Are you aware of how many patents Dominion holds that you
19 are identified on?
20      A.   It's somewhere between two and four.
21      Q.   Do you recall what those patents are?
22      A.   There's definitely one for adjudication.
23 There's one for, like, secure ballot tracking, I believe.
24 I'd have to go back and look.  That's easily done on a
25 Google patent search.  But I can't recall all of them.

Page 40

1      Q.   And is it your testimony that you don't see
2 any profits or participation in those patents?
3      A.   No profits, no royalties for those
4 patents, correct.
5      Q.   Okay.  Okay.  And getting back to this
6 quote here.  Was HSBC a guarantor on that adjudication
7 patent as far as you know?
8      A.   As far as I know, no.
9      Q.   Okay.  What are the other false statements
10 of fact that you would identify in paragraph 82 here?
11      A.   From Mr. Clements, Were you not also on a
12 phone call with Eric Coomer.  That is false.  I was never
13 on a phone call with Mr. Oltmann regarding any
14 discussions of elections.
15          And I never said -- oh, let's see
16 here -- Don't worry about the election.  Trump's not
17 going to win.  I made F-ing sure of that.  I never made
18 that statement anywhere, either on a phone call or not on
19 a phone call.
20      Q.   All right.  We've talked about Oltmann
21 already.  So same questions with respect to David Clements
22 and Waldron, who I believe is Phil Waldron; is that
23 correct?
24      A.   Yes, that is Phil Waldron.
25      Q.   Are you aware of any facts that Mr. Lindell

Page 41

1 knew what Mr. Clements or Mr. Waldron were going to say at
2 this symposium?
3      A.   Personally, no.
4      Q.   Okay.  Moving on to the next page,
5 paragraph 83.  What false statements of fact do you
6 believe are in this paragraph?
7      A.   The commentary about the corruption of the
8 courts.  We had gone through various court proceedings
9 with an impartial judge who made judgments based on the
10 facts.  Calling that a corrupt judiciary is, I think,
11 wholly false.
12      Q.   But not only do you think it's false, but
13 you're saying that's a false statement of fact that can be
14 proven true or not true; is that right?
15      A.   Yes.
16      Q.   Okay.  What else in paragraph 83?
17      A.   Despite them trying to keep us silent for
18 nine months, I think that that can -- I think that's a
19 statement of fact that can be proven.
20      Q.   Who's "them" in that sentence that you're
21 referring to?
22      A.   From that context I believe that is
23 Patrick Colbeck, and the "them" -- he is thanking
24 Lindell.  So I would infer that he is including Lindell
25 in that plurality.

11 (Pages 38 - 41)

Page 42

1    Q.  I don't think that was quite my question.
2  Let me clarify.
3        You're saying despite them trying to keep
4  us silent for nine months, that that's a false statement
5  of fact.  That was my understanding.  Is that not what
6  your testimony is?
7    A.  Yeah, that's fair.  Yep.
8    Q.  Okay.  So my question is who is "them" in
9  that clause there?
10    A.  That would include me.  Again, in the
11  context of this -- it's my recollection, they are, again,
12  Clements and Oltmann were joining on the whole discussion
13  they had with me being the architect of the election
14  fraud, and the "them" would include me trying to keep
15  them silent.
16    Q.  "Them" would include you.  Who else would
17  it include?
18    A.  I'm going to go with the cabal, the deep
19  state, as they like to refer to it.
20    Q.  Okay.  Who's -- who's "they"?  You just
21  said "as they like to refer to it."  Who's "they"?
22    A.  The panel speakers.
23    Q.  So this is Clements, Oltmann, and Colbeck,
24  correct?
25    A.  Correct.

Page 43

1    Q.  And you're saying that they like to refer
2  to the deep state?
3    A.  Yes.
4    Q.  Where do they do that?
5    A.  It's not particularly in this, but I've
6  watched enough of Oltmann's podcast that I've heard him
7  refer to the demons of the deep state and the cabal.
8    Q.  What is the deep state, or what's your
9  understanding of what the deep state is?
10    A.  That's a good question.  You're going to
11  have to ask Oltmann.
12    Q.  Okay.  What is your understanding of
13  Oltmann's understanding of what the deep state is?
14    A.  Some magical group of people that control
15  all the levers of power and somehow control everything
16  that goes on.
17    Q.  Who do you think is included -- or what's
18  your understanding of what -- of who Oltmann thinks is
19  included in this?
20    A.  I know he thinks I'm included.  Sorry.  I
21  didn't mean to interrupt.
22    Q.  That's okay.  Who else besides you?
23    A.  Anybody that's a Democrat.
24    Q.  What about the cabal?  How is that
25  different than the deep state?

Page 44

1    A.  That also, my understanding and things
2  that I've heard, includes demons such as Hollywood
3  elites.
4    Q.  And that's -- that's different than the
5  deep state as far as your understanding of what Joe
6  Oltmann is talking about there?
7    A.  Honestly, I think those terms are somewhat
8  interchangeable within this group.
9    Q.  Within which group?
10    A.  The same group that we were just talking
11  about, the panel, people like Oltmann, Clements.  I've
12  seen them use those terms interchangeably.
13    Q.  Talking about you?
14    A.  Including me.
15    Q.  Okay.  We've talked about Clements.  You
16  mentioned Pat Colbeck in this paragraph 83.  Are you aware
17  of any facts that Mr. Lindell knew what Patrick Colbeck
18  was going to say at this symposium?
19    A.  Not directly, no.
20    Q.  Paragraphs 84 through 86 broadly referred
21  to this parable presented by David Clements.  Do you see
22  where I'm referring there, Dr. Coomer?
23    A.  Yes, I do.
24    Q.  Are you aware of any facts that Mr. Lindell
25  knew this parable was going to be presented?

Page 45

1    A.  Beyond knowing that he scheduled Clements
2  to present this presentation, I believe that there's a
3  strong likelihood that he knew exactly what was going to
4  be said.
5    Q.  How do you know that Mr. Lindell scheduled
6  Clements to make this presentation?
7    A.  I believe I recall Mr. Lindell saying that
8  he had scheduled the speakers and this symposium.  It was
9  his symposium.
10    Q.  And he said that at the symposium, is your
11  testimony?
12    A.  I believe so.  And he may have said
13  that -- I have some recollection of a statement,
14  something like that, leading up to the symposium on
15  Mr. Oltmann's podcast.
16    Q.  Okay.  Other than that, are you aware of
17  any facts that Mr. Lindell was involved in this
18  presentation that Clements made, that he prepared it in
19  any way?
20    A.  Not directly.
21    Q.  Do you see this -- I'm referring to
22  page 51, right above paragraph 85.  Do you see this image
23  of Mr. Clements making this presentation?
24    A.  Yes.
25    Q.  And obviously, the bottom row, second from

12 (Pages 42 - 45)

1 the right, that's -- that's your photograph, correct,
2 Dr. Coomer?
3      A.  Yes, it is.
4      Q.  Can you identify any of the other people
5 who are -- have their photographs displayed on that
6 screen?
7      A.  I believe that's John Poulos to the left
8 of me.  I believe that's Adrian Fontes to the right of
9 me.  The resolution is a little -- a little rough for me
10 to --
11      Q.  Understood.
12      A.  -- identify anybody else.  But I believe
13 that -- I'm pretty sure on those two.  Adrian Fontes is
14 now the SOS of Arizona, and obviously John Poulos is the
15 CEO of Dominion.
16      Q.  So from this image, those are the only two
17 folks that you can identify?
18      A.  Easily, yes.
19      Q.  Okay.  Moving on to paragraph 86 where you
20 refer to apparent threat directed to Dr. Coomer and
21 others, Clements went on to state, quote, So my message
22 for some of you out there in the vote-trafficking world,
23 it's not too late for you to get --
24      THE REPORTER:  I'm sorry.  "It's not too
25 late..."

1      Q.  (By Mr. Malone)  -- for you to get some
2 lenience because we're going to get you one way or the
3 other, end quote.  Do you see that, Dr. Coomer?
4      A.  Yes, I do.
5      Q.  Are there any false statements of fact in
6 paragraph 86?
7      A.  Yes.  Again, I'm going to infer from the
8 image that includes me and the fact that he mentioned me
9 by name that he considers me part of the vote -- quote,
10 unquote, vote-trafficking world.  I'm not part of a
11 vote-trafficking world.
12      I do believe a statement of fact is that
13 they're going to come get me one way or another.  And
14 that is why I'm afraid for my life.
15      Q.  So it's your testimony that's a true
16 statement of fact then, correct?
17      A.  That they're going to come get me one way
18 or another?
19      Q.  Right.  I just want to understand, when
20 someone like Clements talks about something that will
21 happen in the future, in his view, is it your testimony
22 that that's something that can be proven true or false?
23      A.  I know that I've had people show up at my
24 house and have sent me death threats.  So, yeah, I think
25 I could call that a statement of fact.

1      Q.  Let's talk about that now, Dr. Coomer.
2 When was the first time that someone showed up at your
3 house?
4      A.  I don't know the exact time for the first
5 one because there were several photos of my house posted
6 online somewhere around the end of November.  I believe
7 it was the first or second week.  I was actually staying
8 in a cabin because it was not safe to go home.  But I had
9 to go home and feed my cats.
10      And while I was there feeding my cats, I
11 believe it was somewhere around the second week of
12 December, two gentlemen came directly to my door yelling
13 through the door when the DOJ was going to arrest me.
14      Q.  And when you refer to November and
15 December, just for clarity, that's 2020?
16      A.  2020.  Sorry about that.
17      Q.  No problem.
18      I think we've talked about this a little
19 bit earlier today, Dr. Coomer.  But you're not aware of
20 any statement that Mr. Lindell made before May of 2021; is
21 that right?
22      A.  I can't recall right now, no.
23      Q.  Okay.  So the first time that people showed
24 up to your home was in the winter of 2020, November or
25 December, right?

1      A.  Correct.
2      Q.  What about the written threats that you
3 received?  When did you first start to receive those?
4      A.  In November.
5      Q.  Of 2020?
6      A.  Of 2020.
7      Q.  When was the most recent time that someone
8 showed up at your house uninvited?
9      A.  There -- I believe there were recent
10 pictures of my house about four months ago, posted.
11      Q.  Where were they posted?
12      A.  Telegram, I believe.
13      Q.  And who posted them?
14      A.  Some anonymous person.  I also had two
15 gentlemen show up at my restaurant and made obvious
16 comments that -- do we have that -- do we have that
17 photo?
18      MR. CAIN:  Just answer his question.  I
19 don't know.
20      A.  Okay.  I'm just trying to give the exact
21 quote, but essentially they sat down at the bar at my
22 restaurant and said, Oh, you're that Eric Coomer guy.  No
23 fucking way we're going to eat here.  Somebody should put
24 you down.
25      Q.  (By Mr. Malone)  And this was at The Fritz?

13 (Pages 46 - 49)

Page 50

1      A.   Yes, it was.
2      Q.   If you have that already, Dr. Coomer, I
3  would ask that you provide those Telegram photos posted by
4  the anonymous person.  Would you be able to do that if you
5  can?
6      A.   I'm sure we have a catalog, yes.
7      Q.   Okay.  Are you aware of Mr. Lindell posting
8  any photos of your home?
9      A.   No, I'm not.
10      Q.   Are you aware of Mr. Lindell sending any
11  threats to you at any time?
12      A.   The statements that he made that I'm a
13  traitor and should be put behind bars I consider a
14  threat.
15      Q.   Anything else?
16      A.   Several of those sorts of statements, but
17  along those lines.
18      Q.   Are you aware of anyone who's come to your
19  home or sent you a threatening message because of
20  Mr. Lindell?
21      A.   I think that there's an inference.  For
22  example, the threats -- I have continued to receive sort
23  of a constant stream of threats and things like that.
24  But during and shortly after the symposium, the amount of
25  threats significantly increased.  And I think it's fair

Page 51

1  to infer that that is directly a result of Mr. Lindell's
2  symposium.
3      Q.   Okay.  I want to understand that.  The
4  number of threats significantly increased.  What do you
5  mean by that?
6      A.   So, you know, I would get maybe one
7  voicemail a month.  And during the symposium and shortly
8  after, I was getting several a day.  The amount of posts
9  on various social media platforms also spiked.  I believe
10  we can provide metrics of that.  And I'd say it's a fair
11  inference that there's a correlation between those two.
12      Q.   Okay.  Well, I would certainly ask that you
13  provide those metrics if you're able to do so.
14           What about the voicemails that you just
15  referred to?
16      A.   I've saved all of those, yes.
17      Q.   And you would be able to provide those?
18      A.   Yes.
19      Q.   And would you be able to provide the
20  voicemails starting -- I believe your testimony was you'd
21  get them about once a month; is that correct?
22      A.   It is correct.  I can fairly state that
23  every voicemail threat I have forwarded to my legal team,
24  and there should be a repository of such.
25      Q.   And I don't know if you said this, but did

Page 52

1  those voicemails start in November of 2020?
2      A.   Yes, they did.
3      Q.   And as far as you know, you or your team
4  still has access to all of them?
5      A.   Correct.
6      Q.   Okay.  We'd ask for those as well.
7           Okay.  Moving on to paragraph 94 on
8  page 56 of Exhibit 2, the Amended Complaint.  You're
9  referring to a speech that Mr. Lindell gave, which I
10  believe was in April of 2022, based on a footnote, 136.
11  Do you see that, Dr. Coomer?
12      A.   Yes, I do.
13      Q.   Okay.  What false statements of fact would
14  you identify in paragraph 94?
15      A.   So, again, in context, the statement, It
16  started with Eric Coomer and Dominion based right here in
17  Colorado.  The "it" in context is election fraud.
18      Q.   Okay.  What -- what are you basing that
19  context on?  Is it beyond this quote here?
20      A.   Yes, the entire rally was about election
21  fraud.
22      Q.   Which rally would that be?
23      A.   The rally that Mr. Lindell was giving on
24  this day.
25      Q.   Okay.  So the context is your testimony is

Page 53

1  that "it" refers to election fraud, correct?
2      A.   That is correct.
3      Q.   All right.  What other false statements of
4  fact are you identifying in paragraph 94?
5      A.   I think that's the only one of fact.
6      Q.   Okay.  Paragraph 95, which you've also
7  identified as containing false statements of -- or
8  containing defamatory statements, excuse me.  So my
9  question to you is, what false statements of fact would
10  you identify in paragraph 95?
11      A.   Well, again, in context, he starts with,
12  If you want to know just how corrupt the corruption we're
13  up against --
14           THE REPORTER:  I'm sorry.  When you read,
15  if you could just slow down.
16           THE DEPONENT:  Sorry.
17      A.   Sorry.
18           THE REPORTER:  And I have, it starts
19  with -- or "He starts with, if you want to know just..."
20      A.   -- how corrupt the corruption we're up
21  against, Eric Coomer served -- had served papers to me
22  before I was going on stage at the capitol.  Again, I
23  would say the inference there is that I am corrupt and
24  part of the corruption.
25           I never -- again, this is Mr. Lindell

14 (Pages 50 - 53)

Page 54

1  speaking -- I never talked about Eric Coomer.  Well, I
2  think we already have voluminous quotes in this complaint
3  preceding this date where Mr. Lindell, does, in fact,
4  talk about me.
5      Q.  (By Mr. Malone)  Okay.  Just to back up on
6  that for a minute, Dr. Coomer.  The voluminous quotes
7  you're referring to, what, apart from that May 9th
8  statement that we discussed earlier, are you referring to
9  where he mentioned you by name?
10     A.  I don't know if we have cataloged every
11 single time he mentioned my name.
12     Q.  Okay.  So as you sit here right now, you're
13 just not aware of anything beyond that May 9th quote that
14 we talked about earlier?
15     A.  Not that I can specifically recall right
16 now with specificity.
17     Q.  Okay.  Moving on from that.  What other
18 false statements of fact did you identify?
19     A.  He's the -- apparently he's the president
20 of Dominion.  I was never president of Dominion.  The
21 criminal crime family here in Denver.  Dominion is not a
22 criminal crime family.
23         All right.  That's it for that paragraph.
24         Eric Coomer, you are a criminal.  Again, I
25 guess that depends on the context.  Do I have a criminal

Page 55

1  record?  Yes.
2         My Pillow doesn't even know who you are.
3  As a representative for My Pillow, Mr. Lindell made
4  specific statements about me.  Therefore, I can infer
5  that My Pillow, as Mr. Lindell is a key representative of
6  My Pillow, does know about me.
7         I hear you ran into a building drunk the
8  other day.  There's absolutely no evidence that alcohol
9  was involved in that incident.
10     Q.  Well, I -- is that the incident -- when you
11 say "the incident," Dr. Coomer, are you referring to that
12 September of 2021 incident?
13     A.  Yes, I am.
14     Q.  And we don't need to watch the video.  But
15 you would agree that there is video of you saying that you
16 were drinking with the Viking, correct?
17     A.  After the accident, yes.
18     Q.  Okay.  And do you have any facts that
19 Mr. Lindell did hear that?
20     A.  I'm not -- I'm not sure what that question
21 is.
22     Q.  I will clarify that.
23         So the statement is, I hear you ran into a
24 building drunk the other day, or whatever you were.
25         Do you see where I'm referring?

Page 56

1      A.  Yes.
2      Q.  Or do you have any facts that Mr. Lindell
3  did not hear that?
4      A.  I guess no provable facts, no.
5      Q.  Do you understand, based on the video that
6  you're familiar with, why someone would think that alcohol
7  was involved in that incident?
8      A.  No.
9      Q.  You don't understand that?
10     A.  No.
11     Q.  Okay.  Moving on, what other false
12 statements of facts would you identify in paragraph 95?
13     A.  Shouldn't you have thought about that,
14 Eric Coomer, before you did crimes against the United
15 States and quite frankly, all of humanity?
16         I have not committed crimes against the
17 United States or humanity.  And that is provable.
18     Q.  Okay.  What else?
19     A.  I think that's it for that paragraph.
20     Q.  Okay.  Paragraph 96, which you've also
21 identified as containing false statements of fact.  If you
22 would take a moment to review that paragraph, Dr. Coomer.
23 And let me know when you've had a chance to do so.  It
24 goes on to the next page, just the top of page 59.
25     A.  Okay.

Page 57

1      Q.  Okay.  You've identified those 19
2  statements as falsehoods.  My question to you is which of
3  those would you identify as being false statements of fact
4  versus just an opinion?
5          MR. CAIN:  Object to form.
6      A.  Number 1, false.
7      Q.  (By Mr. Malone)  And that's a false
8  statement of fact?
9      A.  Yes.
10     Q.  Is that your testimony?  Okay.
11     A.  Number 3, Number 4, Number 5, Number 7.
12 I'd say Number 12, but I guess somebody might disagree.
13 Number 14, Number 15, Number 16, Number 17, Number 18,
14 Number 19.
15     Q.  I'd like to ask you about Number 4 where
16 you've been identified -- at least you claim you've been
17 identified as the president of Dominion.  Do you see that?
18     A.  Yes.
19     Q.  You were never the president of Dominion,
20 were you, Dr. Coomer?
21     A.  No, I was not.
22     Q.  Okay.  What facts do you have that being
23 identified as the president of Dominion was a problem for
24 you?
25     A.  It's continuing a false narrative of who

15 (Pages 54 - 57)

Page 58

1 and what I was and did at Dominion.
2      Q.  Okay.  But how does being the president
3 Tina false narrative, is my question.
4      A.  That I somehow was this all-powerful
5 person within Dominion that then had some inference that
6 I could control everything that happened there.
7      Q.  You don't think Dominion did anything wrong
8 in the 2020 election, do you?
9      A.  No, I do not.
10      Q.  Okay.  Moving on to paragraph 98 on
11 page 59, which quotes an interview with Mr. Lindell with
12 Steve Bannon on April 7th of 2022.  What false statements
13 of fact do you identify in that paragraph?
14      A.  Once again, Mr. Lindell has indicated that
15 I was the, quote, unquote, head of Dominion.  That is
16 false.
17          We already have what they were hiding.
18 I've never seen anything provided that they have anything
19 that Dominion was hiding, and Dominion is not -- was not
20 hiding anything.  And, again, the inference was that I,
21 as the head of Dominion, would have been the one hiding
22 whatever it is they're saying I'm hiding.
23          So that's a statement of -- of -- a false
24 statement.
25      Q.  Okay.  Anything else?

Page 59

1      A.  Because the lawyers are criminals too.
2          MR. CAIN:  I can speak to that.
3          THE DEPONENT:  Yeah.
4          MR. CAIN:  False.
5          THE REPORTER:  I'm sorry.  I --
6          MR. CAIN:  False.
7      A.  It's like a criminal crime family.  It's a
8 big criminal crime family.
9          All our overseas military votes were for
10 Biden.  Completely false.  They're using a national email
11 system.  False.
12      Q.  (By Mr. Malone)  What is your understanding
13 of what "they're using a national email system" refers to
14 there?
15      A.  For the military overseas voters.
16      Q.  And it's your testimony that there's no
17 national military email system for military overseas
18 voters?
19      A.  Correct.
20      Q.  How do you know that?
21      A.  Because I've worked in elections for
22 15 years.  Elections are run at the county level.
23 Military overseas voters have a variety of methods of
24 returning their votes, but they are directly to the
25 county.  They do not go through a national email system.

Page 60

1      Q.  Okay.  Anything else?
2      A.  I think that's it.
3      Q.  Backtracking a bit one paragraph,
4 Dr. Coomer.  Paragraph 57.  This states, to be clear, none
5 of this is hyperbole.  Lindell means every word, and he
6 intends for his audience to know that he means what he is
7 saying.  Do you see that?
8      A.  Yes, I do.
9      Q.  Is that an accurate allegation as far as
10 you're concerned?
11      A.  I believe so, yes.
12      Q.  Do you have any facts that Mr. Lindell
13 doesn't believe what he has said about Dominion or about
14 you?
15      A.  Not that I can -- not that I can recall.
16      Q.  Do you have any facts that Mr. Lindell is
17 just saying all this so that he can sell pillows?
18      A.  Again, do I have a fact, no.  I can make
19 inferences.
20      Q.  Okay.  I'm just asking for facts today.
21      A.  Okay.
22      Q.  Okay.  Paragraph 100 on page 60.
23      A.  Okay.
24      Q.  This refers to an interview that
25 Mr. Lindell gave on the Eric Metaxas show.  And I'm

Page 61

1 looking at a sentence that says, As he frequently does,
2 Lindell confirmed here too that he was appearing on
3 Metaxas's show as an agent of My Pillow and that My Pillow
4 continues to finance his defamation campaign against
5 Dr. Coomer.
6          Do you see that?
7      A.  Yes.
8      Q.  Okay.  What facts do you have to support
9 the allegation that My Pillow finances Mr. Lindell's
10 defamation campaign against you?
11      A.  Again, the inference that every time he
12 discusses me or election fraud he mentions My Pillow and
13 provides My Pillow discount codes.
14      Q.  It's your testimony that he does that every
15 time that he mentions you?
16      A.  To my recollection, yes.
17      Q.  Anything else?
18      A.  No.
19      Q.  Okay.  Paragraph 103 on page --
20      A.  Actually, I'm sorry.  I think actually
21 just in paragraph 101, I think this statement, Well,
22 listen, I say so my audience, if you want to support
23 Mike, and I hope you do, go to MyPillow.com.
24 MyPillow.com and my store and spend money there.  And if
25 you want to support this program, use the code Eric.

16 (Pages 58 - 61)

Page 62

1     I'm sorry. I think that sums it up pretty
2  well.
3        Q. It's my understanding of paragraph 101,
4  Dr. Coomer that this is a quote that you attribute to Eric
5  Metaxas, correct?
6        A. Yes.
7        Q. So that's not something that Mr. Lindell
8  said?
9        A. That is not something Mr. Lindell said,
10  no.
11       Q. Okay.
12       A. But Mr. Lindell did provide the code. The
13  My Pillow code.
14       Q. Mr. Lindell provided that code?
15       A. Yes.
16       Q. How do you know that?
17       A. He provides all the codes, from my
18  understanding.
19       Q. What are you basing that understanding on?
20       A. Just for the fact that every time he's on
21  a podcast there is a specific code for the podcast that
22  he is on.
23       Q. That's every podcast?
24       A. That I'm aware of, yes.
25       Q. Okay. What podcasts are you aware of?

Page 63

1        A. Well, the Eric Metaxas show, Conservative
2  Daily, those are the two that come right to mind. I
3  believe there are others.
4        Q. Okay. One of those podcasts is
5  Conservative Daily, so if you'd turn to page 61, paragraph
6  103. Same questions. What false statements of fact are
7  you identifying in this paragraph?
8        A. 103. Let me read that.
9           Well, I think we've proven that it's not a
10  frivolous lawsuit. I have to remember all the lawsuits
11  and where we are with everything. But I think we have
12  withstood any challenges to dismiss on frivolity.
13          Eric Coomer, who are you other than some
14  corrupt person who is with Dominion, one of the most
15  corrupt people. Again, that's a factual statement. I'm
16  not corrupt. I've never been accused of corruption.
17       Q. Okay. I have a question about your
18  testimony about this being a frivolous lawsuit,
19  Dr. Coomer. You don't believe it is, correct?
20       A. Correct.
21       Q. But I believe your testimony was it had
22  been proven not to be; is that right?
23       A. Again, I said it's hard for me to remember
24  all the lawsuits. I know we've prevailed in 12(b)(6)
25  motions for dismissal. We did prevail on anti-SLAPP.

Page 64

1  That wasn't specifically the Lindell matter. I'm not
2  sure if we've had 12(b)(6) motions in the Lindell matter.
3        Q. In this case?
4        A. Yes.
5        Q. Okay. Dr. Coomer, are you good to go for
6  another 25 minutes without a break, or would you like to
7  take one now?
8        A. No, let's keep going. Do you need to take
9  a break?
10       Q. Off the record.
11          (Recess from 10:36 a.m. to 10:45 a.m.)
12          (By Mr. Malone) Back on the record.
13  Dr. Coomer, if you could hold Exhibit 1 back in front of
14  you, which are your answers to Lindell's interrogatories.
15  And turn to page 9 of Exhibit 1.
16       A. Okay.
17       Q. Okay. Referring to Interrogatory 17 which
18  asks for you to describe the damages that you are seeking
19  in this lawsuit. Do you see that?
20       A. Yes, I do.
21       Q. And your answer is that you're going to be
22  seeking noneconomic damages including pain and suffering
23  damages to your reputation to the fullest extent allowed.
24  And my question to you is, how much money are you seeking
25  in noneconomic damages and pain and suffering damages?

Page 65

1        A. I cannot provide that number. My team is
2  still working with a damages expert on what that figure
3  will be.
4        Q. So it's your testimony that you cannot
5  provide that number today, correct?
6        A. That is correct.
7        Q. Have you provided a number at any point for
8  your damages in this case?
9        A. In this case, I do not believe so.
10       Q. Okay. Same question with respect to
11  punitive damages. Do you have a computation for the
12  punitive damages that you are going to be seeking in this
13  case against the defendants?
14       A. Similar answer. Not at this time. That's
15  something that my team is still developing.
16       Q. And that's something that you have not
17  provided at any point in this case so far?
18       A. As far as I know, that is correct.
19       Q. Okay. Moving on to Interrogatory 18, still
20  on page 9. The question asks you to describe in detail
21  any and all efforts that you have made to mitigate the
22  damages that you have described in your answer to
23  Interrogatory 17. Do you see that?
24       A. Yes, I do.
25       Q. Okay. The second sentence says, With

17 (Pages 62 - 65)

Page 66

1  respect to economic damages, plaintiff is no longer able
2  to work in the elections industry as a result of the
3  constant threats leveled against him and his employer.
4         The first question is, when you say "his
5  employer," are you referring to Dominion?
6      A.  In this -- in this context, yes, Dominion.
7      Q.  Okay.  So don't need to be -- I just want
8  to clarify that you mean your former employer Dominion?
9      A.  Correct.
10     Q.  How do you know that you are no longer able
11 to work in the elections industry, Dr. Coomer?
12     A.  I've had various conversations with
13 colleagues throughout the elections industry, and the
14 overwhelming response is, It's too bad, we could never
15 hire you after all of this because you were really good
16 at your job, but we could never take that risk of having
17 you work for us.
18     Q.  Who said that to you?
19     A.  Various clerks, county clerks, various
20 individuals that run sort of election consulting firms.
21     Q.  Okay.  Do you have the names of the -- any
22 of the various clerks that you've just referred to?
23     A.  I could provide those names.  I want to
24 make sure that these are privileged, just again, because
25 their concern is the potential negative impacts and

Page 67

1  additional threats that they could be -- that they could
2  get based on having any contact with me.  I don't know
3  how we want to --
4      Q.  That's understood, Dr. Coomer.  So what I
5  will request from you and from your lawyers that you
6  provide those names subject to the protective order in
7  this case.
8      A.  Okay.
9      Q.  And that you would provide any written
10 correspondence, whether it's texts or emails, Signal,
11 whatever it might be, with those individuals.
12     A.  I will state that I believe all of these
13 conversations were oral.  There's a clerks' conference.
14 It happened to be in Salida, and a lot of clerks came and
15 ate at my restaurant.  So these were a lot of just
16 discussions that we had, you know, essentially over
17 dinner.
18         I do not recall any written
19 communications, but I will certainly verify that.  And I
20 will -- I will provide the names that I can.
21     Q.  Thank you.  I would have the same request
22 with respect to the individuals that run election
23 consulting firms who you just mentioned.  Do you know of
24 the names of any of those individuals as you sit here
25 today?

Page 68

1      A.  Again, yes, I do; and I'd like to provide
2  that and -- under the subject of the protective order
3  again because they would potentially face harassment.
4  But I can provide that list.
5      Q.  Okay.  Do you know the names of the firms
6  that they work for?
7      A.  Honestly, I'll have to verify the names
8  because they've changed a few times.  So I can provide
9  those as well.
10     Q.  That clerks' conference in Salida that you
11 just mentioned, when did that happen?
12     A.  It was the summer conference 2022.  I
13 believe it was the second week of August -- second or
14 third week of August, '22.
15     Q.  Okay.  Do you have any other facts or
16 conversations that you would base the statement that you
17 are no longer able to work in the elections industry on?
18     A.  Again, I will have to go back.  I may have
19 had some early correspondence.  I'm thinking specifically
20 of one vendor, but I don't want to state that without
21 verifying it.
22     Q.  Would it surprise you or would you dispute
23 that you reached this conclusion in 2020 -- or 2021?
24     A.  I would not dispute that.
25     Q.  Okay.  I think what I'm trying to

Page 69

1  understand, Dr. Coomer, is -- is why.  As you sit here
2  today, are you aware of any clerk who believes what
3  Mr. Lindell said about the 2020 election?
4      A.  Yes.
5      Q.  Can you identify that individual?
6      A.  Tina Peters.
7      Q.  Okay.  Was Ms. Peters ever in a position to
8  hire you -- forgive me if I get the jargon wrong, but
9  is -- was she the person who decided to use Dominion when
10 you worked there?
11     A.  I do not believe so.  I believe it was the
12 prior clerk.  But she did -- I believe Tina Peters did
13 attempt to cancel the Dominion contract before she was
14 relieved of her election oversight duties.
15     Q.  Okay.
16     A.  Sorry.
17     Q.  No, I apologize.  Continue your answer.
18     A.  There's another clerk, I'm blanking on his
19 name.  Maybe the Douglas County clerk.  I'd have
20 to -- I'd have to follow up on that.  He also, based on
21 statements I've seen, appears to believe in Mr. Lindell's
22 false statements.
23     Q.  Okay.  Anyone else as far as clerks are
24 concerned?
25     A.  I'm speaking specifically on Colorado

18 (Pages 66 - 69)

1 clerks which, because I'm not in the industry anymore, is
2 who I have, you know, the most familiarity with. I do
3 know that there are other counties across the U.S. that
4 have been, I guess, contesting their contracts with
5 Dominion, and some have been canceled. And I do believe
6 that it is related to Mr. Lindell's continued promotion
7 of false election fraud claims.
8      Q.   Okay. What about your employment status?
9 Do you have any facts that those contracts were canceled
10 because you used to work for Dominion?
11      A.   I do not have any direct evidence of that
12 because my employment was severed before those contracts
13 started to be canceled.
14      Q.   Do you have any facts that, if you went
15 back to work in the elections industry, that the contracts
16 would be affected in any way?
17      A.   Based on various statements from both
18 inside the company and from clerks that I'm involved
19 with, I could say that there's a high likelihood that, if
20 I was working there, that would be used to cancel
21 contracts, yes, I do believe that.
22      Q.   And when you say "inside the company," are
23 you referring to Dominion?
24      A.   Yes, I am. Sorry.
25      Q.   And were those representations made to you

1 in writing?
2      A.   To be honest, I am not sure simply
3 because, you know, once I was put on leave I had no
4 access to my email. So I haven't been able to go back
5 and verify that. I do know that I had several oral
6 conversations, you know, with essentially higher-ups in
7 Dominion, specifically John Poulos, CEO, Mike Frontera,
8 who was general counsel. And the sentiment was, you
9 know, they were getting feedback from various customers
10 that if I remained I would be problematic. Actually the
11 word was radioactive.
12      Q.   Why would you be radioactive?
13      A.   Because of all of the attention that was
14 being focused on me with false claims that I made
15 statements about rigging the election.
16      Q.   What about these election consulting firms
17 that you just referenced? Tell me a little bit about
18 that. What -- what is an election consulting firm, if we
19 can start there?
20      A.   So these are various firms that provide
21 essentially consulting services about best practices for
22 election offices, things about how to better comply with
23 the requirements of being designated critical
24 infrastructure, how to better handle chain of custody of
25 ballots, how to run better signature verification

1 processes, how to create better guides for election
2 workers, how to do better poll worker training, how to
3 provide more comprehensive and uniform guides for things
4 like how to apply adjudication processes to ballots that
5 have voter intent issues.
6           So they really -- they run the gamut of,
7 you know, broadly best practices on how to run secure,
8 transparent, and honorable elections.
9      Q.   Of all of the services that you just
10 identified, Dr. Coomer, doesn't Dominion do all of those
11 things as well?
12      A.   No, not necessarily.
13      Q.   Okay. What are the services that a
14 consulting firm would perform that Dominion would not?
15      A.   Well, I mean, shortly, all of it.
16 Dominion provides election hardware, training on how to
17 use it, and then some limited services, whether it's
18 ballot printing or basic training on how to use the
19 system. Dominion, while there may be some references to
20 best practices, things like backing up the system, things
21 like that, Dominion is not a company that's involved in
22 the actual administration of elections.
23           MR. CAIN: Let's go off the record.
24           (Discussion off the record.)
25      Q.   (By Mr. Malone) All right. Dr. Coomer,

1 have you applied to any of these election consulting firms
2 that we were just talking about, applied for employment,
3 specifically?
4      A.   I've had discussions about potential
5 employment.
6      Q.   And again, you don't recall today who
7 you've had those discussions with, or do you?
8      A.   No, I do. I couldn't name the actual
9 company that she runs. I just wanted to provide a
10 complete list.
11      Q.   Sure. So I want to also understand who --
12 the type of work that these firms do. So for a consulting
13 firm that you just described, who would be the client?
14 Would it be a county? Would it be a state?
15      A.   It's generally a county, but it can be a
16 state as well.
17      Q.   Would it be whoever has a contract, for
18 example?
19      A.   Whoever is in charge of running elections.
20      Q.   Okay.
21      A.   So -- yeah.
22      Q.   And it is your belief that you can never
23 work for one of these consulting firms?
24      A.   Yes, that is what I've been told.
25      Q.   Okay. Again, we'd ask for the identity of

19 (Pages 70 - 73)

Page 74

1 whoever told you that, subject to a protective order.
2 We'd like to know when they would have told you that.
3        A.   Okay.
4        Q.   I understand from this answer, Dr. Coomer,
5 that you are now working in a different industry.  And
6 looking toward the center of that answer there, it says
7 plaintiff has, therefore, some new work in a different
8 industry.  Do you see that?
9        A.   Yes, I do.
10       Q.   What is the industry that you're referring
11 to there?
12       A.   Restaurant and hospitality.
13       Q.   Okay.  So that is related to the two local
14 restaurants that you've invested in?
15       A.   That is correct.  And to clarify at this
16 point, we have split those two restaurants, so I have
17 interest in only one of the restaurants currently.  That
18 just happened.
19       Q.   Okay.  So I want to understand the timing
20 there, Dr. Coomer, because the final sentence in this
21 answer says, Due in part to unwarranted threats and
22 concerns about business disruption, plaintiff has divested
23 himself from one of the two Salida-based restaurants.  Do
24 you see that?
25       A.   Yes, I do.

Page 75

1        Q.   Is that related to the answer you just
2 gave, or is that a separate transaction?
3        A.   That is related to the answer I just gave.
4 We split the business because my business partner that
5 predominantly runs the second restaurant was tired of the
6 threats that he was receiving by being associated with
7 me.
8        Q.   Who is that business partner?
9        A.   Brett Ziemkhe, Z-i-e-m-k-h-e.
10       Q.   And what is the name of the restaurant that
11 you divested from?
12       A.   That would be Benson's Tavern.
13       Q.   Is Benson's located in Salida?
14       A.   Yes, it is.
15       Q.   And were Benson's and The Fritz -- I assume
16 that was the other restaurant?
17       A.   That is correct.
18       Q.   Were they under the same ownership group,
19 or how was their business relationship structured before
20 this divestment?
21       A.   Yes, it was under a single LLC.
22       Q.   What's the name of that LLC?
23       A.   Spotted Dog.
24       Q.   And Spotted Dog is in Salida as well?
25       A.   That is correct.

Page 76

1        Q.   Is -- now that there's been this
2 divestment, is Spotted Dog still a going concern?
3        A.   Yes.  And Mr. Ziemkhe has retained
4 100 percent ownership of Spotted Dog and essentially
5 d/b/a Benson's Tavern.  I've created a new LLC to run The
6 Fritz.
7        Q.   What's the name of that LLC?
8        A.   T&L Concepts.
9        Q.   Does T&L Concepts have any other ownership
10 interests besides The Fritz?
11       A.   No, it does not.
12       Q.   Does T&L Concepts own 100 percent of The
13 Fritz?
14       A.   Yes, it does.
15       Q.   Okay.  I believe earlier this morning,
16 Dr. Coomer, you mentioned that there were some customers
17 that showed up at your restaurant and said that they
18 weren't going to eat there because you were there; is that
19 correct?
20       A.   That is correct.
21       Q.   And that was at The Fritz?
22       A.   Correct.
23       Q.   Forgive me if you've already said, but what
24 time period did that happen in?
25       A.   The best of my recollection, it was

Page 77

1 roughly -- time goes so fast -- probably four to five
2 months ago.
3        Q.   Okay.  So in this answer you're referring
4 to unwarranted threats and concerns about business
5 disruption.  Were there any threats or disruptions at
6 Benson's?
7        A.   Again, my recollection, yes, there were.
8 I was not there to specifically witness them because I
9 tend to run The Fritz.  Brett runs Benson's.  But Brett
10 has intimated that he has gotten, you know, various
11 comments from customers that are unhappy that he has
12 business dealings with me.
13       Q.   And when were those complaints received by
14 Brett, as far as you know?
15       A.   I believe they were.
16       Q.   I'm asking when.
17       A.   Oh, when?
18       Q.   Yeah.
19       A.   At various times over the last year and a
20 half.
21       Q.   So was it Brett's request that you divest
22 your ownership interest from Benson's?
23       A.   It was a mutual decision that the, I
24 guess, the scrutiny that we were being put under, that it
25 was probably best that we go our separate ways.

20 (Pages 74 - 77)

Page 78

1    Q.  How did you know Brett?  How did you get in
2 business with him, I should ask?
3    A.  I've known Brett since 2000.  We worked
4 together at a dot com that I mentioned earlier, I
5 believe.
6    Q.  You mentioned a dot com.  I'm not sure if
7 you mentioned the specific one.  What was the name of that
8 company?
9    A.  It was PlanetOutdoors.com.
10    Q.  And so you've known and kept in touch with
11 Brett since that time?
12    A.  I have.
13    Q.  Would you say you're still on amicable
14 terms with Brett?
15    A.  We are on decent terms.
16    Q.  Okay.  Why do you say decent instead of
17 amicable?
18    A.  We don't -- we don't talk much these days.
19    Q.  Do you know why that is?
20    A.  It's related to the business split.
21    Q.  So it was a mutual decision, but
22 it's -- has not been good since the decision was made just
23 personally between you and him?
24    A.  I think there's just a certain tension
25 with, you know, splitting.  We just have not been as

Page 79

1 friendly as we have for the last 22 years.
2    Q.  Are you aware of any threats or disruptions
3 at Benson's since you've divested?
4    A.  No, I am not.
5    Q.  How did you get into the restaurant
6 business in the first place?
7    A.  It was basically through Brett.  I knew my
8 job was ending.  His current partner at the time was
9 looking to get out.  I've always been a -- you know, my
10 very first job when I was 14 was cooking.  And he thought
11 it was an opportunity.  It was local.  There was a need.
12 We were friends.  So that's what provided the
13 opportunity.
14    Q.  And around what time period did you
15 officially get into business with Brett through this
16 Spotted Dog LLC or otherwise?
17    A.  The agreement was signed on July 1st of
18 2021.
19    Q.  Do you still have a copy of that agreement?
20    A.  Somewhere.
21    Q.  Would you be able to produce it?
22    A.  Yes, I would.
23    Q.  Okay.  Let's go to what will be marked as
24 Exhibit 3.
25    (Exhibit 3 was marked.)

21 (Pages 78 - 81)

Page 82

Page 83

Page 84

Page 85

(Discussion off the record.)

Page 86

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 88

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 87

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 89

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

23 (Pages 86 - 89)

Page 90

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 91

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
www.veritext.com                                                                888-391-3376



Page 94

Page 96

19     Q. Okay. We talked about you being provided
20 with a copy of this separation agreement in April of 2021,
21 correct?
22     A. Correct.
23     Q. But you had been on leave from the company
24 for some time before then, yes?
25     A. Yes, I believe that was -- I think the

Page 95

Page 97

1 official -- the official date I was on leave was
2 somewhere around November 20th.
3     Q. Why do you say November 20th?
4     A. That's the best of my recollection.
5     Q. Okay. Would you dispute an earlier date
6 that you were on leave?
7     A. No. Again, that's the best of my
8 recollection. I know it's the day that I returned from
9 election support, which I think is somewhere between the
10 18th and the 20th.
11     Q. And that's -- so that I'm clear on your
12 testimony, that's the day that your leave started?
13     A. Yes, when I left the customer site all of
14 my access to email and company resources was locked down.
15     Q. Prior to your leave beginning, Dr. Coomer,
16 had you tendered your resignation at Dominion?
17     A. I made -- I did write an email offering
18 that if it would be best for the company I would consider
19 resigning. But I did not offer a complete letter of
20 resignation, no.
21     Q. To whom did you write that email?
22     A. I believe it was John Poulos.
23     Q. Did you receive a response to that email
24 from John Poulos?
25     A. My recollection is that he called me and

25 (Pages 94 - 97)

Page 98

1 said don't be stupid, we'll figure this out.
2      Q.  Do you recall the date that that call
3 happened?
4      A.  I believe it was November 11th.
5      Q.  Okay.  So you speak to Mr. Poulos on the
6 11th, and a week later or so, the 18th, in that range,
7 you're placed on leave from the company; is that right?
8      A.  Again, based on the exact date that I
9 can't quite recall, somewhere around the 18th, 19th, or
10 20th, yes.
11      Q.  Are you aware of any contracts or other
12 writings that set the terms of your leave with the
13 company?
14      A.  No.  There was -- as far as I know, there
15 was nothing -- there was nothing formal.  Actually, the
16 conversation I had was, You're under a lot of stress, you
17 need to take some time off.  It's best if we just lock
18 you out of everything so that you can put this out of
19 your mind and, you know, take care of your mental health.
20      Q.  And all that is what John Poulos told to
21 you?
22      A.  Yes, it is.
23      Q.  Was anyone else at Dominion involved in the
24 decision to place you on leave as far as you know?
25      A.  Not that I know.  I don't know what the

Page 99

1 internal conversations were.
2      Q.  Between your leave starting in November and
3 your termination or separation with Dominion a few months
4 later, what did you do for -- what work did you do for the
5 company?
6      A.  For the first couple weeks I was still
7 being contacted -- since I didn't have access to company
8 resources, I was still being contacted occasionally by
9 phone to help provide troubleshooting for technical
10 issues.  I believe I was contacted specifically for input
11 on the issues -
12      THE REPORTER:  I'm sorry.  "The issues..."
13      THE DEPONENT:  In Antrim County.
14      A.  I believe that was post, you know, being
15 put on leave.  I was contacted potentially -- well, I'm
16 not going to again speculate.  I was contacted on another
17 couple technical issues that I can't recall; at which
18 point, again after conferring with my attorneys, I stated
19 that if I was going to be on leave I needed to be on
20 leave, and I didn't want to blur the lines of still
21 providing, I guess, employment services to Dominion.  And
22 at that point all work ceased.
23      Q.  (By Mr. Malone)  Understood.  So for the
24 instances that you do recall and that were before your
25 attorneys got involved, who was it that contacted you

Page 100

1 about those issues, the troubleshooting issues and the
2 issues in Antrim County?
3      A.  I believe that was only John Poulos.
4      Q.  And what did Mr. Poulos ask you to do
5 specifically that you recall?
6      A.  After describing the issues that were
7 happening, my technical evaluation of what might be the
8 root cause.
9      Q.  The root cause of what happened in Antrim
10 County?
11      A.  Yes, I believe that was one of them.
12      Q.  Okay.  And what was your response to that
13 request from Mr. Poulos?
14      A.  That it was clearly a post-election
15 configuration issue that was not properly implemented by
16 the county and not -- and not gone through the proper
17 logging and accuracy testing because all of the machines
18 themselves properly tabulated the ballots.  It was only
19 the accumulation back at the EMS that we know they had
20 made changes to that caused the misreporting.  And once
21 those changes were corrected, the reports matched the
22 actual tapes from the machines.
23      Q.  What -- what data were you provided with to
24 reach that conclusion?
25      A.  I wasn't provided specific data other than

Page 101

1 a clear timeline of the sorts of changes they made.  And
2 I'm familiar enough with the system to know how that
3 would affect those results.
4      Q.  What was the form of this correspondence
5 with John Poulos?  Was this through email or through
6 calls?
7      A.  Phone calls.
8      Q.  So at some point in the winter of 2020,
9 correct?
10      A.  Correct.
11      Q.  You get a call from John Poulos, and he
12 asks you to opine on what happened in Antrim County,
13 Michigan.  Do I have that right?
14      A.  Yes.
15      Q.  Okay.  And you're not provided with any
16 data -- with any written data at that time, right?
17      A.  Correct.
18      Q.  Okay.  Were you aware of anyone at that
19 time who was?
20      A.  No.
21      Q.  So do you recall reviewing any reports or
22 opinions by Dr. Halderman at that time?
23      A.  No.  The Halderman report came out much
24 later.  And I did review Halderman's report when it came
25 out.

26 (Pages 98 - 101)

1    Q.  Okay.  So how many calls would you say, and
2  over what time period did this -- did these discussions
3  with John Poulos about Antrim County happen?
4    A.  To the best of my recollection, three to
5  four calls over a week.
6    Q.  Okay.  And that week was, in time?
7    A.  Sometime in November.
8    Q.  After you were placed on leave?
9    A.  Again, to the best of my recollection,
10  yes.  Timelines are a little fuzzy.  It's been a couple
11  of years.
12    Q.  Yeah.  You also, I think, mentioned that
13  there was another troubleshooting project that you worked
14  on at that time.  What do you recall about that?
15    A.  To be honest, I don't recall anything
16  about it.  I recall getting a phone call asking about
17  some additional troubleshooting, and that is -- and I
18  just -- I can't recall any of the details.  And then
19  again that is when I sort of conferred with my attorneys
20  and then responded that this wasn't appropriate
21  considering that I was on leave.
22    Q.  Apart from the conversations with John
23  Poulos that we've talked about, did you interface with
24  anyone else about elections during your leave at Dominion?
25    A.  I mean, that's a pretty broad question.  I

1  can certainly recall at least a phone call with a
2  colleague outside of Dominion where we discussed in
3  general what was, you know, the false allegations of
4  election fraud.
5    Q.  That's good clarification, Dr. Coomer.  Not
6  talking about what was being said about you at that time;
7  I'm talking about any -- any work that you were asked to
8  do or discussed.
9    A.  No.
10    Q.  Okay.  Okay.  I think we're going to go
11  back to Exhibit 1.  And we are still on your answer to
12  Interrogatory Number 18.  But we are on page 10, the last
13  page of that document.
14    A.  Okay.
15    Q.  Okay.  To refresh your memory, Dr. Coomer,
16  this is a question about your efforts to mitigate the
17  damages that you're alleging in this lawsuit.  And you
18  respond, Given the still consistent stream of death
19  threats that plaintiff regularly endures, plaintiff has
20  also had to take various measures to increase his own
21  personal security and that of those around him.
22        Do you see that?
23    A.  Yes, I do.
24    Q.  Okay.  I believe we talked a little bit
25  about that, that you are in possession of voicemails

1  conveying threats to you; is that right?
2    A.  That is correct.
3    Q.  You're in possession of written threats to
4  you, threats to your safety; is that right?
5    A.  Correct.
6    Q.  And you would be able to provide all of
7  those that you've received?
8    A.  Correct.
9    Q.  Okay.  You also say that you have had to
10  increase personal security to you and to those around you.
11  Can you elaborate as to what you mean by that?
12    A.  Yeah.  So I've had to increase the
13  security at the restaurant, and both of my brothers have
14  also.
15    Q.  And your brothers' names, Dr. Coomer?  I
16  think I have them, but I want to make sure I have them.
17    A.  William and Michael.
18    Q.  Okay.  And if I saw some texts to a Bill
19  Coomer, that's William?
20    A.  Yeah.
21    Q.  Okay.  When you say that you have to
22  increase the security at the restaurant, have you had to
23  hire an outside security guard or firm; or what have you
24  had to do at the restaurant to increase security?
25    A.  Cameras.

1        THE REPORTER:  I'm sorry.  Cameras?
2        THE DEPONENT:  Cameras.
3    A.  Can't afford a security guard.  That was
4  discussed very early on.
5    Q.  (By Mr. Malone)  What is, if you know, the
6  amount of money that it cost to install those cameras?
7    A.  I think it was roughly $1,200.
8        MR. MALONE:  Let's go off the record.
9        (Recess from 11:55 a.m. to 12:24 p.m.)
10    Q.  (By Mr. Malone)  Back on the record.  So
11  before the break we were discussing security cameras that
12  you installed at your restaurant, which I believe you
13  testified was about $1,200; is that correct, Dr. Coomer?
14    A.  Yes, that's correct.
15    Q.  And is that $1,200 something that you paid
16  for out-of-pocket personally or from the -- the LLC that
17  owns The Fritz?
18    A.  That was from the LLC.
19    Q.  Okay.  Is that a cost that you are going to
20  be seeking to recover in this lawsuit?
21    A.  Yes.
22    Q.  Okay.  What other security-related costs
23  are you going to be seeking to recover in this lawsuit?
24    A.  So I have a full security system installed
25  in my house as well.  And that's with active monitoring.

27 (Pages 102 - 105)

Page 106

1 So, you know, I think it was maybe even 5-, 600 bucks
2 plus $25 every month. Yeah.
3    Q. When did you install that security system?
4    A. Around December -- mid to late December of
5 2020.
6    Q. And that 5- to $600, is that something that
7 you paid for personally?
8    A. I paid a portion of that. I believe that
9 I was able to expense a portion of it back to Dominion as
10 well.
11    Q. And is Dominion continuing to pay for any
12 of the monthly fees associated with that security system?
13    A. No, they are not.
14    Q. And those are, what, $25 or so, you said?
15    A. About 25 to 30. I forget the exact
16 number.
17    Q. What's the name of the security company or
18 provider that installed the system for you?
19    A. I installed it myself. And it's
20 monitored -- it's either Lifelink or Life something.
21    Q. And you installed it back in December of
22 2020, right?
23    A. Around that time, yes.
24    Q. And that's before that Mr. Lindell made any
25 statement about you or Dominion that you're aware of; is

Page 107

1 that correct?
2    A. That is correct.
3    Q. So is that installation cost something that
4 you are seeking to recover in this lawsuit against
5 Mr. Lindell?
6    A. I'd leave that to my attorneys and their
7 damage model to figure out specifics.
8    Q. Moving on to firearms and weapons training
9 that you identified in your answer to this interrogatory.
10 When did you purchase the firearms that you're referring
11 to here?
12    A. That would have been mid December.
13    Q. Of 2020?
14    A. I'm sorry. 2020. I always forget to have
15 the year.
16    Q. That's fine.
17       What firearms did you purchase?
18    A. A pistol.
19    Q. What kind?
20    A. Sig Sauer P --
21       THE REPORTER: I'm sorry. One more time.
22       THE DEPONENT: Sorry. Sig Sauer, so S-i-g
23 S-a-u-e-r, P365.
24    Q. (By Mr. Malone) How much did you pay for
25 that pistol?

Page 108

1    A. I believe it was roughly $700.
2    Q. Any other firearms that you've purchased?
3    A. Since then, no.
4    Q. Have you used any of those firearms since
5 you purchased them in December of 2020?
6    A. Can you be specific on "used"?
7    Q. Sure. Have you had to -- first, have you
8 had to discharge any firearms?
9    A. I've discharged firearms in practice.
10    Q. Okay. Have you had to discharge firearms
11 in response to any threat that you perceived?
12    A. I have not had to discharge to a specific
13 threat.
14    Q. Have you been in a situation where you felt
15 as though you needed to go retrieve your guns?
16    A. Yes.
17    Q. Okay. Tell me about that situation or
18 situations.
19    A. I had two strange men show up at my
20 door -- I think I mentioned this altercation earlier --
21 sometime in December when I was feeding my cats. And at
22 that time I had been borrowing a shotgun from my friend's
23 place that I was hiding out in to use specifically when I
24 went to my house to feed my cats. And I did feel my
25 safety was in jeopardy. So I did have the shotgun in my

Page 109

1 hand.
2    Q. And the shotgun -- that was your friend's
3 shotgun?
4    A. Yes.
5    Q. Okay. This incident where you were going
6 to feed your cats, that was at your home, correct?
7    A. Correct.
8    Q. That was in Salida at the time?
9    A. Yes, it was.
10    Q. Is it the same home that you identified in
11 your answer to Interrogatory Number 3 on page 3 of this
12 exhibit?
13    A. It's 111 Crestone Mesa Drive, yes.
14    Q. And how long have you lived at that
15 residence?
16    A. Five and a half years. So I have to do
17 the math. I think I moved in there in August of 2017.
18    Q. Okay. Your friend's house that you were
19 hiding in, also in Salida?
20    A. No.
21    Q. Okay. Was it in Colorado?
22    A. Yes.
23    Q. How long did you stay at this person's
24 house?
25    A. That particular house, about four weeks.

28 (Pages 106 - 109)

Page 110

1    Q.   Okay.
2    A.   There were other houses as well.  So I
3  moved around a lot in those -- in those months, sort of
4  November, December, January.
5    Q.   Are these houses that you have felt as
6  though you need to hide in since 2021?
7    A.   Yes, occasionally.
8    Q.   Occasionally?
9    A.   Yes.
10    Q.   I understand that at some point in 2020
11  that you left the country, Dr. Coomer.  Is that accurate?
12    A.   Yes, it is.  2020.  No.  2021.  Sorry.
13    Q.   No problem.
14        What period of time?
15    A.   Mid January of 2021.
16    Q.   How long were you out of the country?
17    A.   Three and a half weeks.
18    Q.   So doing my quick math here, that would get
19  you back in the States in February of 2021?
20    A.   Correct.
21    Q.   Okay.  Are you able to provide an estimate
22  about how much it cost for you to leave the country and
23  stay abroad?
24    A.   Yes, I have all of those receipts.
25    Q.   Would you be able to produce those in this

Page 111

1  case?
2    A.   I don't see any reason why not.
3    Q.   Do you see any reason why you would not be
4  able to, at this point, identify the individuals whose
5  houses you stayed in?
6    A.   Subject to confidentiality, yes.
7    Q.   Okay.  I'd ask that do you that as well.
8        What -- what country did you go to in
9  January of 2021?
10    A.   Tahiti.  French Polynesia.
11    Q.   And stayed there for three weeks?
12    A.   Roughly three, three and a half.
13    Q.   Will you be seeking costs for that trip in
14  this lawsuit?
15    A.   Again, I'm going to leave the final damage
16  and monetary request up to my legal team of what's
17  appropriate.
18    Q.   The CCW permit that you referenced in your
19  answer to this interrogatory on page 10, is that CCW
20  concealed carry weapon?
21    A.   Yes, it is.
22    Q.   When did you obtain that permit?
23    A.   I got an emergency permit in December of
24  2020.
25    Q.   Were there costs associated with obtaining

Page 112

1  that permit?
2    A.   Yes, there were.
3    Q.   Do you know what those costs were?
4    A.   Not off the top of my head.
5    Q.   We've talked about your leaving the country
6  in January of 2021 for Tahiti.  You also identified times
7  when you had to leave the state for extended periods of
8  time.  Do you see where I'm referring to, Dr. Coomer?
9    A.   No, I do not.
10    Q.   So after the sentence that says -- that
11  includes and got a CCW permit, the sentence says, Waves of
12  threats became especially pronounced or when particular
13  threats have arisen, plaintiff has also had to leave the
14  state and/or country for extended periods of time or go
15  into hiding.
16        Do you see that?
17    A.   Yes, I do.
18    Q.   Okay.  So my question is, other than the
19  three-week period we just discussed in the winter of 2021,
20  what periods did you leave the state or country?
21    A.   That full list is something I'm still
22  compiling.
23    Q.   Once that list is compiled, will you be
24  able to produce that in this case?
25    A.   Yes, I will.

Page 113

1    Q.   Moving on to the next paragraph,
2  Dr. Coomer, you state, with respect to noneconomic
3  damages, plaintiff has undergone substantial therapy since
4  the time of the false claims against him, and he has been
5  diagnosed with various mental conditions arising from the
6  trauma of this still-ongoing ordeal.
7        Do you see that?
8    A.   I do.
9    Q.   When did you first undergo the therapy that
10  you are referring to in your answer here?
11    A.   I believe that started the first or second
12  week of December.
13    Q.   Prior to that time, had you been going to a
14  therapist or anything like that?
15    A.   Not immediately prior.  I have -- I have
16  seen therapists at various times over the years.  But I
17  think it had been quite some time and not specifically
18  for any of the conditions that this current therapy is
19  for.
20    Q.   What are those conditions?
21    A.   I mean, obviously, I saw a lot of
22  therapists dealing with my substance abuse back in the
23  early 2000s.  And then I saw some grief counseling due to
24  a couple close deaths.  But I've never -- I've never had
25  to seek therapy for what essentially has been acute PTSD

29 (Pages 110 - 113)

Page 114

1 anxiety and panic attacks until this time.
2      Q.   And those are all conditions that you've
3 received a diagnosis for?
4      A.   Yes, it is.
5      Q.   Do you recall when you first received a
6 diagnosis for any of those conditions?
7      A.   I don't remember the exact date.  But I
8 did get -- I've requested a specific diagnosis from the
9 therapist I was seeing.  Maybe it was around the first
10 amended filing in the first case.
11          MR. CAIN:  I'm not answering.  You're
12 looking to me.
13          THE WITNESS:  I know.  I'm just -- yeah.
14          MR. CAIN:  Use the best of your
15 recollection.
16          THE WITNESS:  That's my recollection.  It
17 was probably sometime in January of 2021.
18      Q.   (By Mr. Malone)  And to the best of your
19 recollection, Dr. Coomer, this is all before Mr. Lindell
20 made any statement about you that you're aware of?
21      A.   The first round of therapy, yes.  The
22 second round, no.
23      Q.   Tell me about that.  What do you mean by
24 first round versus second round?
25      A.   So I continued my current round of

Page 115

1 therapy -- my first round of therapy in regards to all of
2 this until around -- right around April of '21.  And then
3 when the threats substantially increased right around the
4 time of the Cyber Symposium, and I started receiving more
5 harassment, I reengaged in therapy.
6      Q.   So you discontinued therapy in April of
7 2021?
8      A.   Yes.
9      Q.   What prompted you to stop going at that
10 time?
11      A.   It was a combination of things.  The
12 threats had started to die down.  I didn't feel quite as
13 harassed.  And also, honestly, financial.
14      Q.   Are you able to provide an estimate as to
15 the costs of going to therapy from when you started going
16 in 2020 to today?
17      A.   Yes, I can provide that.
18      Q.   Dr. Coomer, I'm not sure if you're aware,
19 but we've asked you to sign a medical authorization so
20 that we can access your records.  Are you opposed to doing
21 that?
22          MR. CAIN:  I'll handle that.
23          MR. MALONE:  All right.
24      Q.   (By Mr. Malone)  Will you be seeking costs
25 in this lawsuit associated with your treatments?

Page 116

1      A.   Again, I defer to my attorneys on the full
2 cost model and damages model.  I'm not going to speculate
3 on that.
4      Q.   Okay.  As for the costs that you mentioned
5 associated with therapy, was this, from 2020 to today, all
6 out-of-pocket, or was some of it covered by insurance?
7      A.   It's 100 percent out-of-pocket.
8      Q.   That's always been the case?
9      A.   Yes.
10      Q.   Outside of the therapy that you have sought
11 and referred to here, have you needed or sought any other
12 medical treatment that you're claiming is as a result of
13 my client's conduct?
14      A.   Outside of the therapy, no.
15      Q.   Moving on to the following paragraph, you
16 say, Plaintiff has also made what efforts he can to
17 correct the false public narrative that defendants have
18 created.  These efforts have included publication of an
19 op-ed in the Denver Post on December 8th, 2020, denying
20 the false allegations against him.
21          Do you see that?
22      A.   Yes, I do.
23          (Exhibit 6 was marked.)
24          (Discussion off the record.)
25      Q.   (By Mr. Malone)  Okay.  So that we're all

Page 117

1 literally on the same page here, I am referring to
2 Exhibit 6, a document entitled Guest Commentary:  I work
3 for Dominion Voting Systems.  I did not commit voter
4 fraud.  The attacks against me need to stop.
5          Do you see that, Dr. Coomer?
6      A.   I do.
7      Q.   And you've previously been asked about this
8 document before in other depositions; is that right?
9      A.   Yes, I have.
10      Q.   Okay.  And is this the article that you
11 were referring to in your answer to the interrogatory we
12 were just discussing?
13      A.   Yes, it is.
14      Q.   Okay.  I have a few questions about that.
15 First of all, that December 8th, 2020, date, that's
16 accurate as far as you know, correct?
17      A.   As far as I recall, yes.
18      Q.   That's the date it was published as far as
19 you know, right?
20      A.   I believe so, yes.
21      Q.   What dates did you write this article, if
22 you know?
23      A.   It was written probably over a week prior,
24 and then a couple of days for editing with the Denver
25 Post.

30 (Pages 114 - 117)

1    Q.   So either late November and/or early
2   December of 2020, correct?
3    A.   That is correct.
4    Q.   And that's, as far as you know, before
5   Mr. Lindell said anything about you, right?
6    A.   As far as I know, yes.
7    Q.   Okay.  So in your answer to Interrogatory
8   18, which is Exhibit 1 we were just talking about, it's on
9   page 10, the answer I see is, Plaintiff has also made what
10  efforts he can to correct the false public narrative that
11  defendants have created.
12       Do you see that?
13   A.   Yes, I do.
14   Q.   Okay.  Are you referring to the defendants
15  in this lawsuit?
16   A.   Yes.
17   Q.   Okay.  The next sentence, as we talked
18  about is, These efforts have included publication of an
19  op-ed in the Denver Post on December 8th, 2020, denying
20  the false allegations against him, right?
21   A.   Correct.
22   Q.   So how were you correcting the false
23  narrative that defendants made when they hadn't said
24  anything about you at that time?
25   A.   Because the defendants in this case have

1   continued to amplify specific comments, mostly by Joe
2   Oltmann, that this op-ed speaks directly to.
3        So maybe created is a nuance there.
4   Continued to amplify might be a -- might be a slightly
5   better way of putting that.  But he has continued to
6   restate, repost the exact statements that this op-ed
7   spoke to and was in existence before and of which
8   Mr. Lindell should have been aware of.
9    Q.   So you'd agree that the defendants, meaning
10  My Pillow, Frankspeech, and Mr. Lindell didn't create this
11  narrative?
12   A.   I don't -- I wouldn't necessarily say
13  that.  I think that they have -- they have modified the
14  narrative that started with Mr. Oltmann.  So I think that
15  they have added to it, modified, amplified it.
16   Q.   Okay.  Let's break that down one by one.
17  How did they modify it?
18   A.   They've added statements -- misstatements,
19  false statements that they have proof that the election
20  was compromised, and that, again, that I'm a traitor,
21  that I'm treasonous and disgusting and evil.  I think
22  that has added to the narrative.  Yeah.
23   Q.   Are those things that Oltmann has not said
24  about you?
25   A.   No, no.  He said those about me as well.

1    Q.   And you would agree that he said them
2   first?
3    A.   Yes.
4    Q.   So when you wrote this article, which is
5   Exhibit 6, the Denver Post article, you would agree that
6   you weren't writing this in response to anything that Mike
7   Lindell said, right?
8    A.   At that time, no.
9    Q.   Okay.  Would you flip to page 2 of this
10  document, Dr. Coomer?
11   A.   I went straight to 3.  Okay.
12   Q.   All right.  There is a sentence that says,
13  Not only have I designed systems and products that
14  directly support the auditing and validation of election
15  results -- I'm going to pause there because I want to
16  understand what systems and products you're referring to
17  in that clause.
18   A.   Specifically -- and there are many -- but
19  specifically the digital adjudication system.  I also
20  developed an export system that was specifically in
21  support of what are called ballot level auditing
22  systems -- or methodologies, such as risk-limiting
23  audits.  I was deeply involved in that.  And enhancements
24  to things specifically in the Dominion system around
25  what's called the audit mark, which is a digital record

1   that's attached to every ballot image that's scanned that
2   clearly shows how the tabulator interpreted the vote at
3   the time of scanning.
4        So -- I also developed -- and this is more
5   of a process-oriented system.  It's called a coordinated
6   vulnerability disclosure program.  And that is --
7   essentially provides a semi-legal framework -- well, it's
8   a legal framework, not semi-legal -- provides a legal
9   framework, some Safe Harbor language that allows
10  third-party researchers to provide vulnerabilities based
11  on testing without the fear of being essentially sued for
12  compromising, you know, intellectual property.  And I've
13  worked with other programs, setting up some independent
14  third-party penetration testing with some government
15  groups that are related to programs available from CISA
16  which is the Cybersecurity and Infrastructure Security
17  Agency.
18   Q.   So how would you say that that pertains to
19  auditing and validating election results?  Because my
20  understanding is that's all -- that's all at the front
21  end, and that the auditing and validation would happen
22  after an election.  Is that correct?
23   A.   Yes, it would.  And that's where things
24  like the export that supports ballot level auditing
25  processes comes into play.  The transparency and the

31 (Pages 118 - 121)

1 validation is more up-front. Again, that comes into
2 things like the audit mark, the logging and --
3 essentially the logging and security around the
4 adjudication process allows the validation post-election
5 that things were done properly.
6　　Q.  When you refer to the adjudication process,
7 are you able to explain generally what that means as you
8 understand it?  As the patent -- as the inventor on the
9 patent, what does the adjudication process entail, is my
10 question.
11　　A.  So adjudication in a broad sense is a way
12 of ensuring voter -- what's called voter intent.  So
13 various states have laws.  People are fallible.  People
14 fill out paper ballots, and they make mistakes.  They
15 make notes.  They may cross out something without getting
16 a new ballot.  And many states -- most states have laws
17 that say, regardless of how the machine may interpret
18 that vote, it is incumbent on the election officials to
19 apply what the voter intended.
20　　　So Dominion's digital adjudication system
21 applies a very streamlined, auditable, transparent way of
22 doing that.  Before this system existed, these were
23 done -- these voter intent issues were handled by hand.
24 So you would get a bunch of people around a table, they'd
25 get a paper ballot, then they'd have to get another blank

1 paper ballot, and then they'd have to transfer all of the
2 votes and then transfer how, you know -- whatever the
3 voter intent issue was onto that new ballot, and then
4 they'd have to rescan it.
5　　　Dominion's system allows that to be done
6 digitally which provides, one, enhanced security because
7 each team needs a secure login to do that.  There's a
8 full traceable digital log that -- that captures every
9 change that was made.
10　　　The changes that were made are also
11 applied to the audit mark which is attached to every
12 digital image of the ballot which, in a lot of states, is
13 publicly available.  So the public can actually go in and
14 see how these adjudications were applied.  And then it
15 preserves the original ballot image because nothing has
16 changed on the image itself.  Just the updated record,
17 and then that can be retabulated without having to handle
18 another physical ballot, which can introduce errors.
19　　Q.  Understanding that the adjudication process
20 can be done digitally, isn't there still a human element
21 that someone has to determine whether a ballot needs to be
22 adjudicated?  Is that right?
23　　A.  No, it's not a human.  It is part of the
24 system.  So there are various criteria that determine
25 whether a ballot is sent to adjudication.  Those are

1 configurable.  Those are driven by the state.  So some of
2 the -- some of the options that would send -- or flag a
3 ballot for adjudication is if there's a contest that's --
4 what's called overvoted, which means a voter has made
5 more selections than they're allowed to make on a
6 particular contest, that's a standard condition for
7 adjudicating a ballot.
8　　　Another one is write-ins because ICR,
9 image character recognition, is not good enough for most
10 people's handwritings, so those are typically something
11 that are sent to adjudication.
12　　　There's also something called an ambiguous
13 mark.  So that's, when you're dealing with mail-in
14 ballots, you know, people fill out a ballot, and they
15 mail it in, and it goes through the system.  And if that
16 voter has made very light marks, check marks that don't
17 fill in the ballot, even though they're directed to, it
18 may flag that ballot as having ambiguous marks which
19 would then send it to adjudication.
20　　　Again, these are all configurable options,
21 and they are set by state statute.  Dominion does not set
22 these.  We just offer these, and it's up to the state to
23 determine what the conditions are that send a ballot to
24 adjudication.
25　　Q.  Is -- as far as you know, is every system

1 that a state uses relying on digital adjudication, is my
2 question?
3　　A.  No.  There are some -- there are some
4 counties and jurisdictions that still do it by hand.
5　　Q.  And so that I'm clear, those counties and
6 jurisdictions may also use Dominion machines and software
7 but do adjudication by hand?
8　　A.  That is correct.
9　　Q.  Moving on to the rest of that sentence on
10 page 2, but I have championed and helped --
11　　THE REPORTER:  I'm sorry.  One more time.
12　　Q.  (By Mr. Malone)  I have championed and
13 helped develop a vulnerability disclosure program to
14 support more collaboration between election vendors and
15 independent third-party security researchers in
16 identifying and mitigating potential security
17 vulnerabilities in election infrastructure.
18　　　That's the end of the quote.
19　　　What is the vulnerability disclosure
20 program you're referring to there?
21　　A.  I briefly mentioned that a few minutes
22 ago.  So again, that is essentially a process along with
23 essential safe harbor language that, one, lets
24 researchers do certain penetration testing without the
25 threat of legal action for essentially compromising

32 (Pages 122 - 125)

Page 126

1 intellectual property. It provides -- in practice, it
2 provides essential email for researchers to submit any
3 potential vulnerabilities. It also has specific language
4 on what the company is responsible to do in -- in
5 response to those vulnerability disclosures. Essentially
6 it gives a time frame where the company can investigate;
7 the potential vulnerability, work with the researcher to
8 discuss any mitigations or whatever, in a certain amount
9 of time frame before the researcher would publicly
10 disclose those vulnerabilities in hopes that the
11 mitigations could be in place before those
12 vulnerabilities are disclosed.
13    Q. Did that program that you developed have a
14 name?
15    A. It was just Dominion's CVDP.
16    Q. CVDP?
17    A. Yeah, Coordinated Vulnerability Disclosure
18 Program. I think -- there might have been a marketing
19 term. Maybe it was under the Dominion Security umbrella.
20 But I believe there was -- I'm not sure, I haven't went
21 to the website in a while -- but there was a
22 page specifically for the CVDP that listed all of the, I
23 guess, the parameters and the legal language around that.
24    Q. Are you aware of any patents that Dominion
25 holds related to CVDP?

Page 127

1    A. No, it's not a patentable process.
2    Q. Are you aware of any of Dominion's
3 competitors that use something similar to the CVDP?
4    A. I know several competitors have discussed
5 it. I was even on a panel with several vendors where we
6 discussed CVDP specifically. ES&S was looking into a
7 CVDP program. Hart --
8       THE REPORTER: I'm sorry. "Hart..."
9       THE DEPONENT: Hart InterCivic.
10    A. -- was considering a CVDP program. This
11 is a concept that exists in lots of information
12 technology spaces and, you know, groups like IT-ISAC,
13 which is the Information Technology Information Sharing
14 and Analysis Center, these are all groups that are
15 centered around the designation of election
16 infrastructure being critical infrastructure. And
17 there's a lot of discussion internally that many -- there
18 are many other sectors of critical infrastructure, and a
19 lot of the vendors in those spaces have CVDP programs
20 specifically to engage with third-party researchers to
21 enhance the security of the products.
22    Q. (By Mr. Malone) So that program, and
23 really your job as the director of product security at
24 Dominion assumes that there are vulnerabilities, correct?
25    A. Correct.

Page 128

1    Q. And you view your job as one that set out
2 to eliminate those vulnerabilities, correct?
3    A. Correct.
4    Q. We've talked a bit about it before, but I
5 just want to have some additional clarity here,
6 Dr. Coomer. If you'd go to page 3.
7    A. Yes.
8    Q. All right. And I think, you know, we just
9 talked about this a little bit. But there's a sentence
10 toward the top third of the page that says, While no
11 system is 100 percent defensible against dedicated
12 threats, the multiple layers of testing, auditing, and
13 process controls assure the security of U.S. elections.
14       Do you see that?
15    A. I do.
16    Q. Do you still agree with that statement?
17    A. Absolutely.
18    Q. Has that statement, in your view, always
19 been true?
20    A. Yes, I believe it has.
21    Q. The following paragraph says, The software
22 glitch that some claimed switched votes between particular
23 candidates was an easily detected human error. And that
24 was in reference to the incident in Antrim County,
25 Michigan; is that right?

Page 129

1    A. That is correct.
2    Q. Okay. And I know you've talked a little
3 bit about what happened there. But I just want to
4 understand exactly what it is that was the human-induced
5 error involved in that incident.
6    A. To keep it brief, a set of ballots for the
7 election were defined and printed. And then the
8 corresponding machines -- because each machine is in a
9 different precinct, may have a different ballot type, a
10 different collection of contests that it reads were
11 created.
12       Then they realized the -- the clerk
13 realized that she left a contest off on one of the ballot
14 types, or several of the ballot types. It was one
15 contest. It wasn't across the whole election. So they
16 went into -- the election management system is where you
17 define the ballots. They made changes, created a subset
18 of new ballots and machines, but they didn't fully make
19 the change in the election management system for reading
20 the results of the machines.
21       So the ballots matched the machines. The
22 machines read the ballots just fine. But when the memory
23 elements from the machines came back to the election
24 management system there was a mismatch in the
25 configuration.

33 (Pages 126 - 129)

Page 130

1    Now, the human-induced error there is that
2  anytime you create new ballots in machines you should run
3  what's called a pre-election logic and accuracy test.
4  They did not conduct that pre-logic and accuracy test on
5  that subset of machines that they put out in the field.
6  If they had done that, they would have noticed
7  immediately the mismatch in the results and could have
8  updated the EMS.
9    So on election night, the
10 tapes -- everything matched, but when they accumulated
11 the results in the EMS there was still a
12 misconfiguration, a mismatch between the official
13 machines' ballots and what the EMS was expecting.  So
14 there was essentially a flip-flop in the vote totals when
15 accumulating; it was caught almost immediately.  I think
16 it was, you know, by the next morning -- they did this
17 at, like, midnight.  By the next morning, somebody
18 finally looked at the results and said, these don't look
19 right.  They looked at the tapes and quickly realized
20 that the tapes weren't matching the accumulation
21 reporting.
22    Q.  Are you -- sorry, Dr. Coomer.  I didn't
23 mean it interrupt you.
24    A.  No, it's okay.
25    Q.  Are you aware of why that logic and

Page 131

1  accuracy test was not run?
2    A.  You would have to ask the county clerk of
3  Antrim, Michigan.
4    Q.  And it would have been the county clerk's
5  responsibility to run that test?
6    A.  Absolutely.
7    Q.  Are you aware of any other failures, apart
8  from Antrim County, Michigan in November of 2020, of other
9  failures to run a pre-election logic and accuracy test?
10    A.  I can't get specifics, but, yes, I have
11 experienced that issue over my 16 years.
12    Q.  When you say that you can't get specifics,
13 do you mean that you don't remember or that you can't
14 disclose?
15    A.  I can't remember -- again, it's 16 years.
16 It's a lot of customers.  I couldn't say exactly.  But
17 process failures are not -- I mean, they're not common,
18 but they happen.
19    Q.  Are you aware of any of these process
20 failures that led to results failures?
21    A.  Again, unofficial -- and, again, to be
22 clear, those results from Antrim that were released that
23 had the swap in the candidates are unofficial results.
24 I'm aware of unofficial results having issues.  I am not
25 aware of any official certified results having issues.

Page 132

1    There are -- there are follow-on
2  processes.  It's not just pre-election logic and accuracy
3  tests which should be done.  But there's also post-logic
4  and accuracy tests, which is after the election.  And
5  there's also something called canvassing.
6    Again, it didn't need to get to that point
7  in Antrim.  They identified it very quickly.  But
8  canvassing is when, you know, when you have a machine, it
9  prints out a results tape.  You take that results tape,
10 and canvassing is looking at that results tape and then
11 looking at the specific results that correspond to that
12 machine in the reporting system and verifying that all of
13 those numbers are the same.  And if they're not, that
14 triggers a full investigation, possible rescan of
15 ballots, reaccumulation.
16    That's why elections' full certified
17 results are not available in one day.  It takes time to
18 do that.  It takes time to validate those.  And there are
19 many processes, again, specifically created and
20 implemented to mitigate against potential human error.
21    Q.  When you say that you're aware of other
22 instances, are you aware of any specific instances -- I'm
23 talking about dates and locations where there -- where
24 these process failures that you were testifying about just
25 now?

Page 133

1    A.  I can't give specific dates.  Palm Beach
2  County sometime around 2011.  There was a county in New
3  Jersey that didn't perform their, what's called prelat.
4  I couldn't give you a date.
5    But again, you know, we're talking there
6  are, you know, in excess of 3,000 counties in the U.S.
7  that conduct elections on a regular basis.  So an
8  occasional, call it breakdown in process, should
9  not -- should not be surprising.  But in all of these
10 cases these were eventually identified either in post-lat
11 or in post audits and corrected.
12    THE REPORTER:  I have a question.  Post
13 what?
14    THE DEPONENT:  Lat, l-a-t.  Logic and
15 accuracy testing.
16    Q.  (By Mr. Malone) In your time working at
17 Dominion, are you aware of any attempts to manipulate
18 election results, any specific attempts?
19    A.  No.
20    Q.  Moving on to the paragraph that starts
21 with, It is unconscionable, toward the bottom of the page,
22 there's a sentence that says, Additionally, any posts on
23 social media channels purporting to be from me have also
24 been fabricated.
25    That wasn't accurate, was it, Dr. Coomer?

34 (Pages 130 - 133)

Page 134

1    A.  It was accurate in the intent.  So -- and
2  I think I can provide evidence.  As I said, I wrote the
3  op-ed, and then there was a certain amount of editing
4  from the Denver Post.  I agree that this may not be clear
5  but the intent was any current social media purporting to
6  be me is not real.  There were several accounts during
7  this time essentially starting around November 9th up
8  until -- and actually still going on occasionally, where
9  people were creating accounts using pictures of me and
10  making posts.  This is what this sentence is in regards
11  to.
12      I have never -- I've never denied that the
13  various Facebook posts -- the historical ones -- sorry,
14  air quotes don't travel well -- that the historical
15  Facebook posts were not mine.  I've never denied that.
16  It was specifically about current accounts that were
17  impersonating me, because they were making statements
18  like they were me saying, yeah, I threw the election,
19  yada, yada, yada.
20    Q.  Okay.  We'll talk about those Facebook
21  posts in a few moments here.  But you also write, I do not
22  have a Twitter account.
23      Do you see that?
24    A.  I do.
25    Q.  Has that always been accurate?

Page 135

1    A.  That was not accurate.  I had completely
2  forgotten that I had a Twitter account for about a day.
3  I think it was one of those late-night things.  That
4  is -- that is factually incorrect.  I did have a Twitter
5  account for about, I think it was a day or two.  I did
6  forget about that until seeing evidence of it some months
7  later.
8    Q.  Okay.
9      (Exhibit 7 was marked.)
10      (Discussion off the record.)
11    Q.  (By Mr. Malone)  Okay.  Dr. Coomer, you've
12  just been handed what's been identified as Exhibit 7 in
13  this deposition.  It's the New York Times article entitled
14  He Was the 'Perfect Villain' for Voting Conspiracists.
15      This is the article you were referring to
16  in your answer to that interrogatory, Interrogatory 18 we
17  were talking about; is that right?
18    A.  That is correct.
19    Q.  And you've seen this document before,
20  obviously, correct?
21    A.  I have a copy of it at home.
22    Q.  Yeah.  And you've been asked about this
23  document at a deposition before, haven't you?
24    A.  I have.
25    Q.  Okay.  I'd like to know a few things that

Page 136

1  maybe you've talked about before and maybe you haven't.
2  The first general question I have for you is, having
3  testified about this article before, having a copy at home
4  like you do, is there anything that you are aware of in
5  this article that's wrong or that you need to correct here
6  today?
7    A.  Not that I'm aware of.  I mean, obviously
8  it is -- it's about 10,000 words.  I have read it several
9  times.  I am not aware of anything that needs -- well,
10  there's probably a statement in here that I didn't have
11  Twitter.  That's potential.
12    Q.  Okay.
13    A.  That would be the only thing, to my
14  knowledge, that would -- that would be incorrect.
15    Q.  Starting on page 1 of this document, it
16  indicates that on November 9th you left your temporary
17  office in Daley Plaza in Chicago and headed back to the
18  hotel where he'd been staying for the previous few weeks.
19      Do you see that, Dr. Coomer?
20    A.  I do.
21    Q.  Why were you in Chicago for a few weeks at
22  that time?
23    A.  I was providing election support for the
24  city of Chicago and Cook County.
25    Q.  Was that commonplace for you in your role

Page 137

1  as director to stay in one location around an election for
2  an extended period of time?
3    A.  Occasionally.  Not -- not all the time.
4  Specifically at this time -- let me rephrase.
5      I would normally stay a couple of days for
6  election support.  Obviously this was during COVID, and
7  we were working on small staffs and not trying to expose
8  workers.  And I have a long history with Chicago.  So I
9  was chosen to be the main person on the ground where we
10  would normally have a large staff.
11    Q.  At this time, how many employees did the
12  company have?
13    A.  I would only be able to hazard a guess,
14  and that would be speculation.
15    Q.  Okay.  Let me ask it this way.  When you
16  say there would be a large staff on site, would that staff
17  consist of full-time employees or contractors or both?
18    A.  Both.
19    Q.  Okay.  And would there generally be a
20  standard mix of employees versus contractors?
21    A.  Yes, depending on the role, yeah, it would
22  be a mix.
23    Q.  Okay.  So you mentioned that you were in
24  Chicago because of your history with Chicago, right?
25    A.  Yes.

35 (Pages 134 - 137)

Page 138

1    Q.   What do you mean by that?
2    A.   They were the first election that I
3  supported back in 2006 for their March election.  So I
4  was very familiar with their election rules and also the
5  various election directors, poll workers, clerks.  I just
6  had a very large, long history providing support to
7  Chicago and Cook County.  And I did a lot of -- we did a
8  lot of specific development to meet their needs, which I
9  was directly involved with.
10   Q.   And is this the sort of situation where
11 they request you specifically to be there on site?
12   A.   Yes.
13   Q.   And when I say "they," I should clarify,
14 when the city asks that you be there on site?
15   A.   Yes.  They would make that routinely.
16   Q.   And would that be the case for every
17 election that you would work on, that you would be working
18 on site in some other place than Denver where you lived at
19 the time?
20   A.   I mean, that depends.  Smaller elections I
21 would provide technical support from basically a command
22 center in Denver.  Major midterms and -- general
23 elections, I don't think I was -- well, that's not true.
24 There were a couple of times I supported Denver County
25 directly.  But, yeah, major elections, I was generally on

Page 139

1  site at some client.
2    Q.   And while you were on site, would you also
3  be doing other work for other jurisdictions?
4    A.   Potentially.
5    Q.   What about in this few-week stretch in the
6  fall of 2020?
7    A.   Yes.  I provided various technical support
8  for several other counties.
9    Q.   Do you recall which ones?
10   A.   The only one I can specifically recall was
11 Gwinnett County, Georgia.  There may have been others.
12   Q.   Others in Georgia?
13   A.   Potentially.  Again, not to be -- not to
14 quibble, but election weeks are pretty hectic, and it's
15 hard to remember everything that goes on.  But I do
16 specifically remember Gwinnett, and potentially others.
17   Q.   Moving on to the next paragraph which
18 starts, Earlier that evening -- and that's referring to
19 November 9th -- a colleague sent him a link to a video of
20 Coomer speaking at a conference with a menacing comment
21 below it.
22        Do you see that?
23   A.   Yes, I do.
24   Q.   Who was the colleague?
25   A.   Again, it's been a long time.  I'd have to

Page 140

1  look up his name.  But he is the director of the IT-ISAC
2  which I mentioned earlier which is the Information
3  Technology Information Sharing and Analysis Center.
4    Q.   So that was not a Dominion --
5    A.   Not a Dominion employee, no.
6    Q.   Do you recall how that individual got this
7  video?
8    A.   It was his video.  So IT-ISAC would do
9  what they call fireside chats, I believe was the name.
10 And it's on various things related to information
11 technology and critical infrastructure.  I had been on a
12 panel, again, harkening back to a previous discussion
13 that focused on CVDP, Coordinated Vulnerability
14 Disclosure Programs.
15        I can't remember all the participants.  I
16 do know that -- I believe Jack Cable was on there.
17 He's -- he was out of Stanford at the time.  He was sort
18 of one of the leading proponents of CVDPs.  He actually
19 provided input into the creation of our Dominion's
20 process.
21        So this was a panel discussion about
22 election integrity and security, focusing on CVDP.  So it
23 was a whole video of that.  So -- and, again, I can't
24 believe I've blanked on his name.  It's his video.
25   Q.   Okay.

Page 141

1    A.   It's his program.
2    Q.   We'll ask that you follow up with that
3  individual's name when you can pull it.
4        And let's move on to the next page.
5  Obviously you're aware that the rest of this portion of
6  the article talks about Oltmann's statements about you in
7  November of 2020.  You're familiar with all of those,
8  correct?
9    A.   Unfortunately, yes.
10   Q.   So let's move on to page 3.  There is a
11 highlighted portion towards the top of this article that
12 says, Coomer, expressing a common assurance among election
13 specialists, has pointed out that because every Dominion
14 system creates a durable, voter-verifiable, paper record
15 of the cast votes, which is the official record, voters
16 had concrete evidence of how the vote went in the face of
17 any allegations of electronic vote-switching or other
18 fraud.
19        Do you see that?
20   A.   I do.
21   Q.   Do you believe that's an accurate
22 statement?
23   A.   I do.
24   Q.   Is it the case that every Dominion system
25 commercially available creates a paper record of cast

36 (Pages 138 - 141)

Page 142

1 votes?
2      A.  Yes.
3      Q.  Okay.
4      A.  At least up until the time that I left the
5 company.
6      Q.  Do you have reason to believe that that's
7 changed since you've left the company?
8      A.  I just don't know.  I can't say for fact,
9 so I'm just clarifying.
10      Q.  Are you aware of any jurisdictions that use
11 direct recording -- or I guess DREs is how they're
12 commonly referred to -- devices that Dominion offers?
13      A.  Not without a paper record attached.
14      Q.  How does the paper record work with a DRE,
15 to your understanding?
16      A.  So technically there are no DRE systems in
17 use.  There are touch screens that have a -- essentially
18 a reel-to-reel paper printer.  That paper printer also
19 has a scanner in it.
20         So it's not that the machines are directly
21 recording the selections that are made on the touch
22 screen, the selections are used to print on the
23 reel-to-reel, and as it's being printed, there's a
24 scanner that's verifying what's printed matches what the
25 selections were, and that is the official record.

Page 143

1      Q.  In that instance, would the voter see that
2 printed record?
3      A.  Yes.  And they have to verify each page.
4 So if there's multiple pages, it pauses, asks the voter
5 to verify before moving on.  If there are any issues, the
6 voter can cancel and adjust their votes.
7      Q.  Moving on to page 4, the next page.  Okay.
8 This -- the top paragraph there is referring to the 300 or
9 so Facebook friends who saw your post.  And I think
10 you know what I'm referring to there; is that
11 correct, Dr. Coomer?
12      A.  I will stipulate that, yes.
13      Q.  Of those 300 or so friends, were any of
14 them Dominion employees.
15      A.  I believe so, but I couldn't tell you for
16 sure.
17      Q.  Okay.  I believe elsewhere in discovery
18 you've identified all the names that you could.  Would it
19 be helpful for you to review that list and identify which
20 of them was a Dominion employee?
21      A.  Yeah.  And, sorry, it's time dependent,
22 too.
23      Q.  Sure.
24      A.  Because some posts early on in 2016, some
25 of those people would have been Dominion employees.  But

Page 144

1 in 2020, they were not.
2      Q.  Understood.  What about in -- well, I
3 suppose we could go through that when we get to it.
4         But do you know any names definitively who
5 were Dominion employees as part of your Facebook friends
6 in 2020?
7      A.  In 2020, I do not.
8      Q.  Okay.  What about 2019?
9      A.  No, I'd have to go -- because again, I
10 wasn't posting in 2019.  So I'd have to go back to 2016.
11 I know that there were current DVS employees.  I can name
12 a couple.
13      Q.  Okay.  So understanding that there is
14 turnover in employment for that time period, 2016 to 2020,
15 did the number of your Facebook friends change in that
16 time?
17      A.  Oh, I'm sure it did.
18      Q.  So that 300 number, was that -- is that an
19 estimate, or is that based on something that you know?
20      A.  That's an estimate.
21      Q.  Is that an estimate for 2020?
22      A.  I believe that's an estimate based on
23 2020.
24      Q.  Okay.  What would that number have been in
25 the proceeding years, 2016 to 2019?

Page 145

1      A.  Very close.  Again, I can't account for
2 anybody that unfriended me.  But I never had -- I never
3 had a number that was much different than 300.  So maybe
4 310.
5      Q.  Is it your understanding that it was one of
6 those 300 or so people that provided your Facebook posts
7 to Joe Oltmann?
8      A.  That would be speculation on my part.
9      Q.  Okay.  And I believe later on in this
10 article you speculate that that could have been someone
11 that you met at Bandimere; is that right?
12      A.  We did not meet at Bandimere; but again,
13 that is speculation.
14      Q.  Okay.  And, you know, just so we're on the
15 same page here, if you could turn to page 6 of this
16 exhibit.
17      A.  Yeah.
18      Q.  And I'm referring to the highlighted
19 paragraph above Oltmann's photo in the center of the page,
20 that says --
21      Where are we?  Oh, page 6.  I'm on page 5.
22 Sorry.
23      Q.  The sentence reads, Coomer, a
24 self-described motorhead with an interest in vintage cars,
25 started to think the source might have been a Facebook

37 (Pages 142 - 145)

Page 146

1 friend he made at Bandimere Speedway, a race track he
2 sometimes visited.
3           Do you see that?
4     A.  No, I don't.  Hold on.  Page 6.  And you
5 said the paragraph above -- okay.  Hold on.  Here we go.
6           Okay.  Yeah.  So that's -- that's
7 incorrect.  That's just one of those things I'd never
8 really noticed.  I didn't meet him at Bandimere, but he
9 raced at Bandimere.
10    Q.  Okay.  When you say "him," it sounds like
11 you have an individual in mind; is that right?
12    A.  I do.
13    Q.  Who is that?
14    A.  His name is Ryan McBride.
15    Q.  Okay.  And why do you think it is that
16 Mr. McBride leaked your posts?
17    A.  Because he, I believe, is a member of FEC
18 United.  I can't verify that because they don't have
19 public records.  But he posts -- he posted a lot of -- he
20 reposted a lot of FEC United contents and a lot of
21 content from Joe Oltmann.
22    Q.  When did he do that?  Like, what time
23 period are you referring to?
24    A.  Prior to November 9th.
25    Q.  When did you become Facebook friends with

Page 147

1 Mr. McBride?
2     A.  I think I met him back in 2005 or '06.
3     Q.  So you met him in 2005 or '06?
4     A.  Yes.
5     Q.  And did you become Facebook friends with
6 him at that time?
7     A.  Yeah, I was actually close friends with
8 him.  I helped build his garage, paint his house.
9     Q.  And you stayed friendly with him for all
10 the way up until when?
11    A.  Close friends, probably till about 2010.
12    Q.  Okay.  So you were Facebook friends in
13 2005, 2006, correct?
14    A.  Best of my recollection, yeah.
15    Q.  Facebook was pretty new then, right?
16    A.  Yeah.  So it was probably -- it was
17 probably later because I don't -- I think in 2005 they
18 still limited it to university students.  So let's say
19 late aughts.
20    Q.  And you're Facebook friends with him from
21 late aughts, and real-life friends with him until 2010 or
22 so, correct?
23    A.  To the best of my recollection.
24    Q.  And you stayed Facebook friends with him
25 until when?

Page 148

1     A.  Probably November 11th of 2020.
2     Q.  And at that point, did you unfriend him, so
3 to speak?
4     A.  Yes.
5     Q.  Did you unfriend anyone else at that time?
6     A.  Yes.  I couldn't give a definitive list.
7 And it was mostly, let's say not close -- not close
8 friends.  Don't know if that detail is necessary.  But I
9 race mountain bikes, and I meet a lot of people mountain
10 biking; and then you get a friend request and then you
11 realize you met him at a mountain bike race once, why are
12 they on here, so...
13    Q.  Understood.  And so I suppose my question
14 then is, did you unfriend anyone because you thought that
15 they leaked your post to Oltmann?
16    A.  No.
17    Q.  Besides Ryan McBride?
18    A.  Ryan McBride is the only one that I
19 specifically removed because I was -- I speculated that
20 he may be the source of that.
21    Q.  If Mr. McBride was not the source of that,
22 do you have an idea of who else it might be?
23    A.  No.  My -- no.
24    Q.  Have you ever spoken to Mr. McBride about
25 this ordeal?

Page 149

1     A.  I have not.
2     Q.  Why not?
3     A.  No contact is better than contact in
4 situations like this.
5     Q.  When was the last time you spoke to him
6 about anything?
7     A.  I wouldn't be able to recall.
8     Q.  Sometime between 2010 and 2020?
9     A.  Sure.
10    Q.  Okay.  Moving on to page 5.
11    A.  You mean moving back?
12    Q.  Yeah.  So we're in the middle of page 5.
13    A.  Okay.
14    Q.  We are -- I'm looking at the paragraph in
15 the middle of the page that says, On Friday,
16 November 13th, the right-wing news outlet the Gateway
17 Pundit, picking up on Oltmann's podcast, ran a story that
18 mentioned Coomer by name in the headline, included links
19 to videos in which Coomer was talking about election
20 security, and ran a full reprint of the open letter about
21 antifa that he had reposted on Facebook.
22          Do you see that?
23    A.  I do.
24    Q.  Do you know the article that -- or that is
25 being described in this paragraph?

38 (Pages 146 - 149)

Page 150

1    A.  I mean, vaguely.  They post a lot of
2  articles about me.  I couldn't tell you the actual
3  specific article, but I do recall that first one.
4    Q.  Do you recall the video that is being
5  referred to in this paragraph here?
6    A.  I do not.  I wouldn't tell you -- I
7  couldn't be able to tell you the contents.
8    Q.  It also says that you reposted an open
9  letter about antifa on Facebook.  Do you see the verbiage
10  there?
11    A.  I do.
12    Q.  Do you agree with that?
13    A.  Yes, I do.  Well, hold on.  Yes, I do.
14    Q.  But you wrote that open letter, right?
15    A.  No.
16    Q.  You didn't?
17    A.  I did not.
18    Q.  Who did?
19    A.  I have no idea.  It was anonymous.
20    Q.  Where did you find it?
21    A.  It was reposted by somebody I was
22  following on Facebook.
23    Q.  Do you know who?
24    A.  No, I do not.
25    (Discussion had off the record.)

Page 151

1    (Recess from 1:36 p.m. to 1:48 p.m.)
2    Q.  (By Mr. Malone)  Before the break,
3  Dr. Coomer, we were talking with the New York Times
4  article which you are broadly familiar with.  And I have a
5  couple of final questions about this.
6    If you -- if you could turn to
7  page -- page 8 of this document.  I just want to clarify
8  that what's being reported here is what we have already
9  talked about here today.
10    So there is a highlighted sentence towards
11  the top that said -- excuse me, there's a paragraph at the
12  top of page 8 that says, His arrival had been fraught.
13  When the plane touched down at the airport, Coomer tried
14  to log into his work email with no success.  He texted
15  Poulos to let him know he was having a problem.
16    And that's referring to John Poulos,
17  correct?
18    A.  That's correct.
19    Q.  About what -- what day was this happening?
20  What day in November of 2020?
21    A.  The exact day I'm going to have a problem
22  with.
23    Q.  Okay.
24    A.  It's somewhere around 18th, 19th, or 20th.
25  But I can confirm that because I can look up my flight

Page 152

1  history.
2    Q.  That might be helpful.  It also might be
3  helpful if you go to the previous page, page 7,
4  Dr. Coomer, which has a paragraph beginning with, On
5  November 19th, Poulos, sitting in his office at his home
6  in Toronto.  Do you see that?
7    A.  Yes, I do.
8    Q.  Okay.  So I just want to make sure I
9  understand that this article is accurate that all of this
10  that's being reported here would have been on the 19th.
11  That's when your plane touched down, and you talked to
12  John Poulos?
13    A.  Again, I can't say that for sure.  I could
14  have touched down on the 18th.  I mean, the 19th was
15  definitely when the news conference happened.  I honestly
16  can't remember if I was in Chicago or in my friend's
17  cabin when I watched that.  But it's all within 18th,
18  19th, or 20th.
19    Q.  So you stayed in Chicago for a period of
20  time following the election; is that correct?
21    A.  Yes.
22    Q.  Okay.  And then you returned home in Salida
23  after your Chicago stay?
24    A.  Yes and no.  I made a quick stop to feed
25  my cats and then go hide out in my friend's cabin.

Page 153

1    Q.  So other than stopping to feed your cats
2  you essentially went right from Chicago to hiding at your
3  friend's cabin; is that right?
4    A.  That is correct.
5    Q.  Okay.  And so the way that this article is
6  reporting and I believe that you're describing it today,
7  Dr. Coomer, that around November 18th, 19th, or 20th is
8  when Poulos texted you that it would be a good idea to
9  take a break, is that right?
10    A.  That is correct.
11    Q.  Okay.  And then I think we talked about
12  sometime after that you were brought in to discuss what
13  was happening in Antrim County as well as another area
14  that needed some troubleshooting; is that right?
15    A.  To the best of my recollection, yes.
16    Q.  Okay.  But by that time you had already
17  offered your resignation from the company, correct?
18    A.  Yes.  Again -- well, again, I offered to
19  resign if it was beneficial.  I did not tender my
20  resignation, just to be clear about that.  And I believe
21  that was actually done on November 11th, to the best of
22  my recollection.
23    Q.  To the best of your recollection, did you
24  state a reason why you were writing that resignation,
25  however you want to describe it, tendering or otherwise?

39 (Pages 150 - 153)

Page 154

1    A.   Again, that was a late-night text.  I
2 probably used the phrase, I fucked up.
3    Q.   And that's because of the Facebook posts,
4 right?  That's what you're referring to?
5    A.   No, it's not because of the Facebook
6 posts.  It is because there were people misinterpreting
7 what I said and using that to create a false narrative
8 election fraud.
9         Nothing in my Facebook posts talked about
10 interfering with the election.  I simply am talking to
11 Facebook friends to unfriend me, which has nothing to do
12 with the election.  But I was seeing at that point people
13 spinning false narratives that that somehow meant that I
14 had interfered with the election.
15    Q.   I understand that.  But that's not quite my
16 question.  My question is, did you offer your resignation
17 based on what was made public from your Facebook posts?
18    A.   No.  I offered -- I offered to potentially
19 resign because of the blow back and the false stories
20 that were being created out of that.  I noted that's a
21 nuance, because I -- at the time even, I stood by my
22 right to make those comments, but I never expected them
23 to be used in -- not to overuse a term -- weaponized in
24 false statements.
25         And, you know, that was maybe either a

Page 155

1 miscalculation on my point or naivete that I could have
2 personal beliefs that would impugn my integrity that I
3 had demonstrated over 15 years.
4    Q.   I think you just said that you -- you had
5 the right to make these posts.  Is that accurate?
6    A.   Yes.
7    Q.   Your testimony?  You still believe that,
8 that you have the right to post what you did?
9    A.   Absolutely.
10    Q.   And why do you say that you had the right
11 to do that?
12    A.   Well, one, it's First Amendment.  It's
13 protected speech.
14    Q.   Okay.  And I understand you're not a
15 lawyer, but why -- what is your understanding of what the
16 First Amendment covers in relation to these Facebook
17 posts?
18    A.   Well, I'll make it even simpler.  Colorado
19 statute is pretty clear that employers cannot restrict
20 any social media content from their employees.
21    Q.   When was that statute enacted, as far as
22 you know?
23    A.   I don't know the date, but I know we
24 discussed it in 2019 as a company.  And that came
25 directly from general counsel.

Page 156

1    Q.   You discussed it while you were employed
2 with Dominion?
3    A.   Yes.
4    Q.   Before any of your Facebook posts were made
5 public as far as you know?
6    A.   Correct.
7    Q.   And when I say public, I think we can
8 understand just for today I'm referring to beyond the 300
9 or so friends that you had.
10    A.   That is correct.
11    Q.   Fair?  Okay.  Let's talk about some of
12 these posts, which will be marked as Exhibit 8.
13         (Exhibit 8 was marked.)
14    Q.   Okay.  This is what's been marked as
15 Exhibit 8 with a number of 0001 at the top corner.  And
16 this is a post that you've provided in this case with a
17 link to a YouTube video of a band called Stiff Little
18 Fingers.
19         Do you see that?
20    A.   I do.
21    Q.   And I see it has a "4d" under your name,
22 meaning it was posted four days prior to when this
23 screenshot was taken.  What date are we looking at here,
24 is my question.
25    A.   Yeah, I have no idea.  It would be four

Page 157

1 days before whenever this was captured.  And, again, I'm
2 not the source of these screen captures.
3    Q.   Oh, the screen captures?
4    A.   Yeah.
5    Q.   Okay.  But you did post a link -- oh, no,
6 the screen captures.  Yes.  Understood.
7    A.   All of these are screen captures, right?
8 So they were done by somebody else.  So the time, I
9 couldn't -- I couldn't tell you.
10    Q.   As you've become more familiar with these
11 posts over the last couple of years, do you have a
12 sense or do you know when this post was made?
13    A.   Sometime in 2020.  I could not give you an
14 exact date.
15    Q.   And do you agree that you did make this
16 post, right?
17    A.   Yes.
18    Q.   All right.  And the post reads, Just
19 fucking vote.  And if you voted for a fascist, friend,
20 family or foe, fucking untrumpme, I've got no truck for
21 racists.
22         Do you see that?
23    A.   I do.
24    Q.   Are you referring specifically to -- who in
25 that post?

40 (Pages 154 - 157)

Page 158

1    A.  Any fascist or racist that you voted for.
2    Q.  For example, would that include Donald
3 Trump?
4    A.  Yes, it would.
5    Q.  Okay.  And you would agree, without having
6 to go through all of these pages here, Dr. Coomer, you
7 certainly can if you'd like to, but that you refer to
8 Trump and others as racists and fascists on a number of
9 occasions.  Would you agree with that?
10    A.  I would agree with that.
11    Q.  Okay.  Those are -- those are nasty names,
12 yeah?
13    A.  For most people, yes.
14    Q.  But they're not nasty names for Donald
15 Trump, for example?
16    A.  You'd have to ask him.  But there are
17 certainly people out there that take pride in those
18 names.
19    Q.  Okay.  So do you think that Donald Trump
20 would take pride in being called a fascist or a racist?
21    A.  I can't speculate on that.
22    Q.  Well, you don't, because otherwise you
23 wouldn't have called him that, right?
24    A.  No.
25    Q.  If you thought it was a compliment you

Page 159

1 wouldn't have called somebody --
2    A.  No, that's not -- those are two separate
3 questions.
4    Q.  Okay.
5    A.  Whether I thing he is one and whether he
6 takes pride in it are two separate questions.  I don't
7 know if he takes pride in it.
8    Q.  We've gone through some of the things that
9 you've accused Mr. Lindell of saying about you in this
10 case.  And I'd like to unpack what -- what the difference
11 is.
12         So, for example, if you were to call
13 someone a racist, would you consider that to be a
14 statement of fact?
15    A.  If they have shown racist tendencies, yes.
16    Q.  Okay.  So specifically you're referring to
17 former president Trump here.  Do you think that that's a
18 statement of provable fact with him?
19    A.  I think there's a high likelihood, yes.
20    Q.  Okay.  What -- what facts do you have to
21 support that?
22    A.  I think continually referring to nations
23 that are predominantly black as shit-hole countries is a
24 pretty racist thing to say.
25    Q.  Anything else, sir?

Page 160

1    A.  Nothing that's going -- I'd have to look
2 back.  I'm not going to speak specifically.  But
3 I'll -- that's good one to start with.
4    Q.  Let's say he --
5         THE REPORTER:  I'm sorry.  "Let's say
6 he..."
7         MR. MALONE:  He hadn't said that --
8    Q.  (By Mr. Malone)  -- that reported shit-hole
9 country remark, would you still be able to call him a
10 racist, in your opinion?
11    A.  I think I could.
12    Q.  Why do you say that?
13    A.  I'd also point to his handling of the
14 southern border, again, with people of color trying to
15 flee oppressive regimes and general poverty.
16    Q.  Okay.  So what about the description of him
17 as a fascist just in this post, what are you referring to,
18 or what facts do you have to make that claim?
19    A.  His general policies, not tolerating any
20 dissent, firing anybody that questioned his policies,
21 being capricious.  I think that's -- I mean, I'm not
22 trying to get a Ph.D. in political science, but I think
23 there's good arguments for that.
24    Q.  Let me ask you this, Dr. Coomer.  Do you
25 feel as though you need good arguments for that?

Page 161

1    A.  Sure.
2    Q.  So you feel as though you need to have
3 facts to support calling someone a fascist?
4    A.  To an extent.  Obviously there are carve
5 outs for what you would call public figures.  The bar is
6 a little bit lower.  But, yes, I do thing that there
7 should be facts.
8    Q.  And the difference is whether someone is a
9 public figure or not?
10    A.  Obviously there's political speech, and
11 then there's, you know, targeting an individual.  I think
12 if I started posting pictures of a random person on the
13 street and saying they were a fascist, they might -- they
14 might have -- they might have a case that, if I didn't
15 have any decent arguments or evidence to the fact, that
16 that would be defamation.
17    Q.  Okay.  How about someone like, you know --
18 well, Jonathan Sackler.  He's on page 4 of your post,
19 Exhibit 8.
20    A.  Yeah.  Page 4.  Page 4.  I mean,
21 he's -- he's head of Pharma, Purdue, yep.
22    Q.  So it's your understanding or belief that
23 you can call him a shit bag because he was what?
24    A.  They profited -- and, I mean, the company
25 that he headed was criminally neglect and fined therefor

Page 162

1 in essentially creating the opioid epidemic by pushing
2 OxyContin. Yeah.
3     Q. When was that finding of criminal
4 negligence made?
5     A. I couldn't give you the exact date on
6 that.
7     Q. Do you know whether there were findings of
8 criminal negligence made against Sackler?
9     A. Specifically on him, not sure. I believe
10 it was just on Purdue Pharma. But I think it did include
11 the family members too, but -- because it was operating
12 officers of the company.
13     Q. Okay. And was that before or after he
14 died?
15     A. I could not tell you that.
16     Q. Okay. So this image here, I understand you
17 didn't take the screen cap, but it's dated July 6.
18     A. Okay.
19     Q. So do you have a sense of what year that
20 was, or do we have to look it up?
21     A. I believe that was 2020.
22     Q. Okay. Is it your belief that he was a
23 public figure like you were talking about before?
24     A. As the head of Purdue Pharma, yes.
25     Q. What about his family members, his -- the

Page 163

1 other Sacklers? Are they public figures?
2          MR. CAIN: Objection. Form.
3     A. Potentially. It depends on what their
4 roles were in the company and how much they profited off
5 of the illegal activity that they were found guilty of.
6     Q. (By Mr. Malone) Are you aware of any
7 folks, just taking this as an example, who profited off of
8 Purdue Pharma outside of the Sacklers?
9     A. I don't.
10     Q. Okay. If you were -- if you were aware of
11 those people, would you be able to call them shit bags
12 too?
13     A. I'm not going to speculate because I don't
14 know any of them.
15     Q. Okay. I don't think we have to go through
16 all of these posts referring to Trump. We've talked about
17 him. But I think I do need some clarity on this antifa
18 statement that I know you've talked about before. So if
19 you could turn to page 9, Dr. Coomer.
20     A. I anticipated that. I'm there.
21     Q. June 2nd. Same question. Do you
22 know the year that this was reposted?
23     A. I believe it was 2020.
24     Q. Okay. And I said reposted just now. But I
25 want to make sure that I was right to do that. So that

Page 164

1 text at the top says, In case you didn't know, colon. Do
2 you see that?
3     A. I do.
4     Q. Okay. Did you write that part?
5     A. I did not.
6     Q. So is it your testimony that this entire
7 post from page 9 to 12 is something that somebody else
8 drafted?
9     A. That is my assertion, yes.
10     Q. Okay. And just mechanically, how did that
11 work? Did you copy and paste it, or did you hit a share
12 button? How did this come to be posted under your name?
13     A. I believe I hit a share button. So a post
14 came up. I can't recall from which account, right,
15 because you can follow accounts that you're not friends
16 with, and I simply hit, I think it's either share or
17 repost. And there is no commentary here, I believe, that
18 is from me. I think this was a straight -- a straight
19 repost.
20     Q. Well, I certainly could be wrong,
21 Dr. Coomer. But my understanding of that share or repost
22 feature is that you would still see the original author or
23 poster on something like that.
24     A. Then it's possible I cut and pasted. To
25 be honest, I -- I can't recall exactly how. But it seems

Page 165

1 odd that I would cut and paste. But I certainly did not
2 type this, quote, unquote, manifesto.
3     Q. And there is no dispute that this post did
4 appear under your name. That's correct?
5     A. Correct. There's also no dispute that
6 this post originated, I believe, three days before I
7 reposted it. And I believe we have evidence of that.
8     Q. If so, we would request that evidence. I
9 don't believe I've seen it. I would like to.
10     A. Yeah.
11          MR. CAIN: Hold on. I've got a list.
12     A. It's for Brad.
13          MR. CAIN: So this would be the --
14          THE DEPONENT: The antifa manifesto, the
15 original post.
16          And actually, now that I look at this, let
17 me clarify. The two first lines, in case you didn't
18 know, antifa, in quotes, has made a statement, that is
19 potentially something that I typed.
20     Q. (By Mr. Malone) And if that was something
21 that you typed, then the, I guess, pasted content would
22 begin To: All media?
23     A. Correct. And I'm just saying it's
24 potential. I don't -- I can't say for certain. But now
25 that I look at this, that is -- that is potentially

42 (Pages 162 - 165)

Page 166

1 correct.
2      Q.  I suppose my question is, why wouldn't you
3 have just identified the original author at the time?
4      A.  I don't know.  You're on Facebook.  You do
5 quick things.
6      Q.  Do you know the name of the person who
7 wrote this?
8      A.  I don't.  But, again, I do believe that we
9 have -- I do believe we have, and we'll certainly supply
10 evidence of one of the original postings of this that's
11 from several days before this appeared on my timeline.
12      Q.  Okay.  You've previously described this
13 post both in your other deposition and I believe to the
14 Times as satire; is that right?
15      A.  That is correct.
16      Q.  You've been asked about that.  I'd like to
17 ask it in a slightly different way.  Because it seems to
18 me that these are all statements, this manifesto, can call
19 it that, that you would agree with, right?
20      A.  No.
21      Q.  Okay.  What -- what don't you agree with?
22      A.  Well, I mean -- and again, I don't know if
23 we want to go through line by line.  But it contradicts
24 itself several times.  All right?  The author says that
25 there is no organization but that he is speaking for the

Page 167

1 organization.  I mean, that's clearly a contradiction.
2 All right?  There is no membership, no meetings, no
3 leaders.  I would agree with that.
4      Q.  Right.
5      A.  You know, the satire part, you know,
6 is -- antifa thing is really -- I guess, lack of a word,
7 an ethos.  And the reason I posted on this is because it
8 was on or around the day that the current president was
9 trying to declare the antifa organization as a terrorist
10 organization.  And if you have no organization, how can
11 it be declared a terrorist organization?  I mean, that is
12 fundamentally the satire and one of the reasons that I
13 posted it.
14           And again, I'm going to say that those
15 first two lines are probably what I wrote before I
16 reposted this and why I put antifa in quotes, because
17 there is no antifa organization to rerelease a statement.
18 So...
19      Q.  Going down to, I guess, the bottom third of
20 page 9 here, there's a paragraph that says, "It will
21 likely be no problem for LEO to identify the author of
22 this document, who has also maintained the AntiFa page on
23 Facebook since founding it in 2017."
24           Do you see that?
25      A.  I do.

Page 168

1      Q.  I assume that LEO refers to law enforcement
2 officer or officers there?
3      A.  I would assume so.
4      Q.  Okay.  What do you know about this antifa
5 page on Facebook?
6      A.  I do not know anything about that.
7      Q.  Do you know whether it exists at all?
8      A.  I do not.
9      Q.  Going to the -- I guess the list of demands
10 on page 11, which I'm sure you've seen before.  The
11 paragraph in the center of the page says, "Traditionally,
12 this type of document is accompanied by a list of
13 'demands.'  "Here are our demands:"
14           Do you see that?
15      A.  I do.
16      Q.  Do you disagree with any of these demands?
17      A.  I would have to read through them.  If you
18 give me a minute.
19      Q.  Sure.
20      A.  There are some that I probably disagree
21 with.
22      Q.  Which ones?
23      A.  And again, I mean, much like everything in
24 policy, some of these aren't a black-and-white answer.
25 But abolition of right-to-work laws, I have a problem

Page 169

1 with that as a small business owner.  Universal basic
2 income with a federal job guaranty, involuntary
3 unemployment, you know -- again, I don't think it's cut
4 and dry there.  A requirement that functional proficiency
5 and --
6           THE REPORTER:  I'm sorry.
7           THE DEPONENT:  Sorry, I know -- I realize
8 that.  I realize that.
9           THE REPORTER:  Requirement that --
10      A.  -- a requirement that functional
11 proficiency in media, political and economic literacy be
12 demonstrate to graduate high school, debatable.
13           The creation of a publicly funded
14 nonpartisan media source, I quibble with that.
15      Q.  (By Mr. Malone)  What about the federal
16 charges of treason?
17      A.  Yeah, I would definitely disagree with
18 that.
19      Q.  Okay.  So that seems to be most of these
20 policy demands that this letter purports to make.  And so
21 my question, Dr. Coomer, is did you understand these
22 demands to be satirical?
23      A.  I think some of them are may not be.  That
24 was not -- that was not the key goal in my reposting
25 this.

43 (Pages 166 - 169)

Page 170

1  Q.  What would you say was the key goal in
2  reposting?
3      A.  Again, pointing out that -- and again, I
4  think back and forth throughout this whole, quote,
5  unquote, manifesto there's a tongue-in-cheek that there
6  is no such thing as an antifa organization.  I would say
7  that the -- the writer, the creator of this, those
8  demands are likely his own, and he thinks that those are
9  fair.  But the -- the fallacy that this is speaking for
10 some global terrorist organization I think was, by the
11 face of it, laughable.
12          I'd have to find in here where he
13 even -- the original author even states, I have no
14 authority to write this on behalf of antifa.
15          So again -- well, I think it speaks for
16 itself.  I think -- I think it's a piece of satire on the
17 order of Thomas Swift's A Modest Proposal.  I think that
18 there are -- there are kernels of truth in there much
19 like A Modest Proposal.  But I think on the whole of it,
20 anybody that took this seriously missed the point.
21     Q.  Page 12, when this posts includes, says,
22 Currently media and other actors wishing to contact this
23 author may do so through the page.  Should Mr. Zuckerberg
24 who has displayed plenty of authoritarian and fascist
25 tendencies himself, decide not to post the page or that

Page 171

1  page any longer, this document will be updated.
2          Do you see that?
3      A.  I do.
4      Q.  Okay.  So obviously this was written by
5  someone else who was not you?
6      A.  Correct.
7      Q.  Do you view this paragraph as satire as
8  well?
9      A.  I do.
10     Q.  So you -- well, let me ask it this way.
11          You believe that Mark Zuckerberg has
12 displayed plenty of authoritarian and fascist tendencies
13 like this author says?
14     A.  I would agree with authoritarian.
15     Q.  What's -- what authoritarian tendencies
16 would you identify?
17     A.  I mean, just the -- the basic way he's run
18 his organization over the years.
19     Q.  Do you have any examples?
20     A.  I mean, we can go back to, you know -- I
21 forget the movie, Social Media, whatever it was called.
22     Q.  Social Network?
23     A.  Social Network.  Yeah, the way he formed
24 his company, the way he ousted many of his early
25 investors and friends I think is pretty authoritarian.  I

Page 172

1  think the way he is -- you know, directed sort of the
2  echo chamber of algorithms all in service of pushing ad
3  revenue is pretty authoritarian.
4      Q.  So it's your belief that the way that this
5  guy was portrayed in a movie 13 years ago allows someone
6  to label him as authoritarian?
7      A.  No, it's not just based on the movie.
8      Q.  Okay.  What else is it based on?  Based
9  on --
10     A.  I think his continued behavior as a
11 business owner and a CEO.  I think there's arguments to
12 be made.  I'm not prepared to make those arguments right
13 now, but I think it's fair.
14     Q.  And you don't feel as though you have to
15 make those arguments, do you?
16     A.  I mean, yeah, I think I can if I have
17 enough time to collate things, but...
18     Q.  What about calling him a fascist?  Do you
19 agree with that?
20     A.  I haven't seen fascist tendencies
21 personally.
22     Q.  Do you view this person describing
23 Zuckerberg as fascist as satirical?
24     A.  Potentially.  Again, I didn't write the
25 piece, so I can't tell you the entire thought process of

Page 173

1  the original author.
2      Q.  And do you have any problem with this
3  author calling him a fascist?
4      A.  Problem?  I don't know.  I think it's a
5  little heavy-handed.  I think he made better points
6  earlier.
7      Q.  Heavy-handed, but do you -- let me get
8  this -- would you agree that this person would have the
9  right to do it, to call him a fascist?
10         MR. CAIN:  Objection.  Form.
11     A.  Again, Mr. Zuckerberg runs one of the
12 largest companies and has direct -- has direct things on
13 freedom of speech that, yeah, I think it's potentially
14 appropriate.
15     Q.  (By Mr. Malone)  So because he's famous,
16 he's a public figure, right?
17     A.  A public figure that controls a company
18 that it deals directly with speech, yes.
19     Q.  Okay.  What if he didn't deal directly with
20 speech?  What if he was just a famous guy?
21         MR. CAIN:  Objection.  Form.
22     A.  Again, it depends on context.  And again,
23 I do contend that I believe that entire piece is a satire
24 piece, so I see it no different than, you know, a
25 comedian speaking on a public figure.

44 (Pages 170 - 173)

Page 174

1    Q. (By Mr. Malone) You posted a number of
2 videos on the following pages linking to songs
3 about -- about the police. You talked about that before.
4 And is it fair to say you're no fan of law enforcement?
5    A. That is not a fair -- that is not a fair
6 assessment.
7    Q. Okay. What would be fair?
8    A. These songs are specifically about police
9 brutality, and I'm not a fan of police brutality. I
10 can -- I can be critical of police brutality and still
11 support law enforcement.
12    Q. Well, Dr. Coomer, I don't think we want to
13 spend a whole bunch of time on this, but I believe one of
14 the songs by The 4 Skins is "A.C.A.B."
15       Do you see that? That's on page 23.
16    A. Yes.
17    Q. So you know what "A.C.A.B." stands for,
18 don't you?
19    A. I do.
20    Q. So that's not about police brutality, is
21 it?
22    A. It is, actually. If you listen to the
23 song, also if you listen to the intro -- actually I think
24 it's the extro. They explicitly state, not all coppers
25 are bastards just like not all teenagers are criminals.

Page 175

1       This is about police brutality. This was
2 a specific time in England when there was a lot of police
3 brutality, and that's -- that's the genesis of this song,
4 as I understand it.
5    Q. Okay. And so for clarity on the record
6 here, I don't think I made that clear, but that's
7 "A.C.A.B.," which stands for All Cops Are Bastards,
8 correct?
9    A. Correct.
10    Q. And it's your testimony that that's an okay
11 statement to make as long as it's in the context of police
12 brutality?
13    A. Yes.
14    Q. Okay. What if it was beyond the context of
15 police brutality? Would that be a fair statement to make?
16    A. I don't know. It depends on the context.
17    Q. Okay. Let's hypothetically provide some
18 context. What if someone comes up to you unprompted and
19 says, all cops are bastards. That's it. That's the
20 content.
21    A. That's a hypothetical -- I don't think I
22 can answer that because I'm not experiencing it.
23    Q. You've never seen someone say that?
24    A. No.
25    Q. Okay. Would it be fair to say that you

Page 176

1 understand why other people did not appreciate the nuance
2 that you're talking about here today?
3       MR. CAIN: Objection. Form.
4    A. I can't control other people's
5 perceptions. I can just make my position clear.
6    Q. (By Mr. Malone) Well, one position I'd
7 like to ask about is on page 38.
8       THE REPORTER: 38?
9       MR. MALONE: 38, yes.
10    Q. (By Mr. Malone) All right. This is a post
11 that appears to be dated July 9th, 2017. Is that
12 accurate?
13    A. Yeah.
14    Q. And this post, you know what it says. I
15 don't think we need to read it.
16       Who are you referring to in that post
17 specifically?
18    A. I was sitting, I believe, in the Dallas
19 airport. And these were two gentlemen sitting at the bar
20 harassing the bartender. These are direct quotes.
21    Q. That's -- that's it, just direct quotes
22 from two guys you heard talking at a bar?
23    A. Yep. Sorry. Yes.
24    Q. Okay. At this time, 2017, did Dominion
25 have any contracts in Texas that you are aware of?

Page 177

1    A. No, not that I'm aware of.
2    Q. Is that still the case?
3    A. As far as I'm aware, yes.
4    Q. And is one of the reasons because Texas
5 declined to certify the Democracy Suite System?
6    A. Correct.
7    Q. Do you know offhand when that decision was
8 made by Texas?
9    A. I believe it was 2019. It could have been
10 early 2020. Best of my recollection. My guess is 2019.
11    Q. So after this post here in 2017?
12    A. Yes.
13    Q. Okay. So based on this conversation -- or
14 incident that you overheard involving these two guys --
15 and they're not famous guys, right?
16    A. No, not that I know of.
17    Q. No guys you recognized, you write, Ah,
18 Texas, the land of racists, idiots and misogynists,
19 correct?
20    A. Correct.
21    Q. Were you basing that on anything other than
22 that incident in the airport?
23    A. No. That was based specifically on the
24 conversation I overheard from these two gentlemen.
25    Q. You're not saying that it's only the public

45 (Pages 174 - 177)

Page 178

1  figures in Texas that are racist, idiots, and misogynists,
2  right?
3      A.  Well, I didn't identify these gentlemen by
4  name specifically, so...
5      Q.  No, you didn't.  But you do say that Texas
6  is the land of racists, idiots, and misogynists, right?
7      A.  Based on the conversation that I was
8  overhearing at the time, yes.  I was in Texas.
9      Q.  And that's a fair statement to make in your
10 opinion, right?
11     A.  Yes.
12     Q.  Why?
13     A.  Because that was the -- it was clear they
14 were from Texas, and that was the conversation that I
15 overheard.
16     Q.  Okay.  I just want to understand.  It's
17 fair to make that statement about the state based on the
18 conversation you overheard with two guys?
19     A.  I didn't say the whole state was racist.
20 I just said it was a land of racists based on these two
21 people, of conversation I overheard.
22     Q.  And do you still feel that way today?
23     A.  Unfortunately I think that there are
24 racists in every state, unfortunately.  But this
25 conversation happened in Texas.

Page 179

1      Q.  Curious about a post you made on the
2  following page, page 39, where you're endorsing someone
3  for mayor of Salida.  Do you see that?
4      A.  I see the post you're talking about.
5      Q.  I believe it's P.T. Wood?
6      A.  Yes.  I don't believe I've specifically
7  endorsed him.  Make sure you are currently registered to
8  vote.
9      Q.  I see.  Is there a reason for that wording
10 in that post?
11     A.  So my job -- I always described my job
12 when I was at Dominion to make it as easy for as many
13 people to vote.  And a lot of my posts, I think, express
14 that.  We had a post earlier that you showed, I think
15 it's actually the very first one.  It says, Just fucking
16 vote.  I don't say who to vote for.  Just vote.
17 Participate in the process.
18         Salida peeps, make sure you are currently
19 registered to vote.  It's easy.  This is about voting.
20     Q.  Is that because Dominion had policies about
21 saying who someone should vote for?
22     A.  No.  Again, my understanding is Colorado
23 statute says you can't do that.  I never wanted to appear
24 to tell people how to vote, just to vote.  I made
25 that -- I think I've made that very clear.  And the only

Page 180

1  other statement I made was, if you're going to vote a
2  certain way, maybe we shouldn't be Facebook friends.
3         But I've always contended that my job was
4  to provide easy solutions, secure solutions for as many
5  people to participate in the electoral process as
6  possible.
7      Q.  So it's your understanding of the Colorado
8  statute that it would be okay to say who not to vote for?
9      A.  Yeah, I don't think the Colorado
10 statute -- and it's not just Colorado -- who to vote for
11 or who not to vote for is not something that a company
12 can dictate or limit.
13     Q.  So do you have a problem with saying, vote
14 for P.T. Wood?  I still don't think I'm clear on that
15 point, and maybe I'm just not understanding.  But you're
16 saying, make sure you're currently registered to vote with
17 a link to the announcement for candidacy of his mayorship,
18 right?
19     A.  Yeah.
20     Q.  So any reasonable person would view that as
21 an endorsement of this candidate?
22     A.  I disagree with that.
23     Q.  Okay.  You would disagree with that?
24     A.  I would.
25     Q.  And would you also -- would you say that,

Page 181

1  if you had said, Vote for P.T. Wood, for example, that
2  that would be improper?
3      A.  No, I don't think that would be a problem.
4         THE REPORTER:  I'm sorry.  You --
5      A.  I'm sorry.  No, I don't think that would
6  be a problem.
7      Q.  (By Mr. Malone)  Is your view of that
8  affected in any way by the fact that this is a private
9  message among your -- or post among your Facebook friends?
10 Does that matter at all?
11     A.  No, I don't think that matters.
12     Q.  Okay.  I have a quick question about
13 page 42, posts on November 8th of 2016 about Donald Trump
14 where you refer to him as an insane orange narcissist
15 racist xenophobic clown.
16         Do you see that?
17     A.  I do.
18     Q.  And you believe all those things to be
19 true?
20     A.  I do.
21     Q.  And you believe that you have the right to
22 say all of those things about him?
23     A.  I do.
24     Q.  Okay.  And that right is based on the First
25 Amendment?

46 (Pages 178 - 181)

Page 182

1    A.  Yes.
2    Q.  And because he's a public figure?
3    A.  Yes.
4    Q.  And then you post UST, UST, UST.
5        What are you referring to there?
6    A.  That's probably a typo.  I think it's
7  supposed to say USA, USA, USA.
8    Q.  Okay.
9    A.  Also, I mean, I will clarify one thing.
10  These statements were to a limited number of private
11  people.  I think that matters too.
12    Q.  Well, I think it does as well.  And I'm
13  curious about your understanding of that.  So when you
14  say, "a limited number of private people," we're still
15  talking about 300 or so, right?
16    A.  Yes, with settings on Facebook that those
17  posts are only available to them.  They can't be
18  forwarded.  They can't be shared.  Yeah.
19    Q.  Okay.  So at what point would it not have
20  been private to you?
21    A.  If it was a public post.
22    Q.  So that's the difference, the settings on
23  Facebook is what differentiates from a public post versus
24  a private post?
25    A.  In that context, I believe so, yeah.

Page 183

1    Q.  You mentioned that the number between 2016
2  and 2020 was always in the ballpark of 300 people as your
3  friends seeing these posts, right?
4    A.  Ballpark, yes.
5    Q.  Was that -- was there a reason for that?
6  Did you want it to stay in that range?
7    A.  Yeah.  I didn't -- I was never one of
8  these people that just started randomly, you know,
9  friending people trying to get a bigger audience.  That
10  wasn't my goal.  That's also why I didn't have my posts
11  be public because I just -- that wasn't -- that wasn't my
12  end -- my end goal.
13    Q.  In your opinion, was there anything
14  significant about the number 300?
15    A.  No.
16    Q.  Okay.  So, for example, to put the question
17  a little better, if you had 1,000 friends, would you have
18  looked at these posts any differently?
19    A.  That's a bit arbitrary.  It's not the
20  number -- as I said, the vast majority of those 300 were
21  either close friends or people -- only people that I had
22  direct interaction with.  These were not strangers.
23  These were not random, let's say, internet connections.
24  These were all people that I personally knew.  I think
25  that's the key.

Page 184

1    Q.  But you testified today that some of these
2  people were folks that you maybe met on a bike ride one
3  time, right?
4    A.  Yes, but they were people that I had
5  interactions with.
6    Q.  So every Facebook friend you had during
7  that time period is someone you had met in real life at
8  least one time; is that what you're saying?
9    A.  Yes.
10    Q.  Okay.  And that's what -- well, strike
11  that.  I'll ask it a different way.
12        Ryan McBride was one of these people,
13  right?
14    A.  That is correct.
15    Q.  And he saw all of these posts that we've
16  talked about today and that we'll -- that we'll spare the
17  time between 2016 and 2020 as far as you know, right?
18    A.  As far as -- as far as -- sorry -- as far
19  as I know, correct.
20    Q.  Okay.  It appears as though most of these
21  commenters are blacked out in the documents that you have
22  produced.  Are you aware of any comments that he
23  specifically ever made on any of your posts?
24    A.  I am not aware, no.
25    Q.  Did he ever send you any messages on

Page 185

1  Facebook about the content you were posting?
2    A.  No, did he not.  As far as I remember.
3    Q.  Did he ever have a conversation with you in
4  person about what you were posting on Facebook?
5    A.  No, not specifically about what I was
6  posting on Facebook.  We did have several conversations
7  that we clearly had, let's call it opposite political
8  views over the years.
9    Q.  And it's because he disagreed with
10  you -- your opinion, that's why he took it upon himself to
11  provide these posts to Joe Oltmann?
12        MR. CAIN:  Objection.  Form.
13    A.  I can't -- again, one, I can't speculate
14  that Ryan is the person that provided this.  And I
15  certainly can't speculate on what his motivations were.
16    Q.  (By Mr. Malone)  Moving on to page 44.  A
17  post on election day, 2016, November 8th, you post, T
18  minus 15 minutes to showtime, folks.  And hash tags, 2016
19  results, wide margins, no recounts.
20        A commenter responds, "#wide margins
21  ha-ha."  And then you respond, "From a professional
22  standpoint, it's my one and only hope for tonight."
23        Do you see that?
24    A.  I do.
25    Q.  What did you mean by, "From a professional

47 (Pages 182 - 185)

Page 186

1 standpoint"?
2      A.   Elections can be messy.  And the closer
3 elections are, the more time it takes to resolve them,
4 the more questions that can arise.  This is a shortened
5 version of what a lot of -- many people in the industry
6 call the election day prayer.  Lord, I don't care who
7 wins, just let them win by a lot.  Because we're dealing
8 with, you know, hand -- hand-marked ballots.  We're
9 dealing with voter intent issues.  The closer they are,
10 the more time it takes to get to, you know, a certified
11 result.  And the more time it takes, the more distrust
12 can be sown into the system.
13           Again, as you noticed, there's no
14 indication of who I say should win, what party I say
15 should win; just that I hope whatever contest happens,
16 they win by a margin that is enough to show that it is
17 what the people expected.
18      Q.   I understand that.  But you didn't actually
19 feel that way, did you, Dr. Coomer?
20      A.   I absolutely did.
21      Q.   So you would have preferred Donald Trump to
22 win in a landslide than Hillary Clinton to win by a razor
23 thin margin?
24      A.   As I clearly stated, I don't -- I have my
25 own personal feelings.

Page 187

1      Q.   Right.
2      A.   But from a professional standpoint and an
3 election worker, I want whoever wins to win by a
4 landslide, absolutely.
5      Q.   Page 53.
6      A.   We're not going to talk about the red
7 panda?  Page 50.
8      Q.   Maybe if there's actually time we'll come
9 back to that.  We'll save that for last.
10      A.   All right.  53.  Okay.
11      Q.   Actually, let's go to 52 quickly.  This is
12 a post about -- about -- Hillary made on November 7th,
13 2016.  You can take a moment to review it if you'd like.
14 But I believe your testimony is that you would never
15 encourage anyone to vote for a particular candidate --
16      A.   Okay.
17      Q.   -- on social media.  Is that -- is that
18 accurate?
19      A.   I think that's -- I think that is
20 accurate, yes.
21      Q.   Okay.  And do you view this post as
22 consistent with that?
23      A.   I do.
24      Q.   Okay.  Now, let's go to 53, a link to a
25 Huffington Post article from November 4th, 2016.

Page 188

1      A.   Okay.
2      Q.   It's a post, "Where's the uproar?
3 Hypocrites.  Charlatans.  Morally bankrupt.  Welcome to
4 the new normal."
5           Do you see that?
6      A.   I do.
7      Q.   Do you recall who you were referring to as
8 hypocrites, charlatans and morally bankrupt?
9      A.   I'm going to assume, based on what I'm
10 reading here, that it's Rudy Giuliani.
11      Q.   It's that referring to the FBI?
12      A.   No.  It's Rudy Giuliani.
13      Q.   Okay.  Just Rudy?
14      A.   In this contest, based on what I'm
15 reading, I mean, again, I can't transport myself back to
16 2016, but, yes.  Giuliani.
17      Q.   Okay.  Well, in this context I see
18 hypocrites plural, charlatans plural.  So my question is
19 who, other than Giuliani, are you referring to?
20      A.   Well, he was acting on behalf of Trump.
21 So I'd probably throw in him there too.
22      Q.   And Giuliani and Trump?
23      A.   I'm going to just read a couple of
24 comments here.
25           Yeah.  Again, based on the context that

Page 189

1 I'm reading here, and not being able to fully recall, you
2 know, November 4, 2016, I think I'm specifically speaking
3 of Trump and Giuliani.
4      Q.   Page 55, there's a post from a Penelope
5 Chester in Toronto on November 2nd, 2016.  And she writes,
6 "Lol...Dominion friends, this is for you."  Creating the
7 post.
8           Do you see that?
9      A.   I do.
10      Q.   Did Penelope Chester work at Dominion?
11      A.   She did.  I do not believe she was still
12 working there in 2016.
13      Q.   She was still a Facebook friend with you in
14 2016?
15      A.   Yes.
16      Q.   Okay.
17      A.   I might have left her off the list.  And
18 that was just an oversight.
19      Q.   Page 57, there's a post from you dated
20 October 29th, 2016, including a link to what appears to be
21 a couple of articles, one on MSN, one on Google.  And
22 there's a quote saying, We don't do that stuff, end quote.
23 Oh, but, quote, you, end quote, do.
24           What were you referring to in that context?
25      A.   I'd have to go back and read the original

48 (Pages 186 - 189)

1 articles. But the -- clearly the quote is from --
2 my best guess it's from Trump since both of these are
3 about Donald Trump questioning the veracity of ballot
4 accounting. The you would be Trump as well, but the full
5 context of what the "do" is, I can't answer without
6 reading the original articles.
7     Q.  Okay. So this is you accusing Trump of
8 election fraud, right?
9     A.  No, again, I'd have to read the original
10 articles to find out what the exact context is.
11     Q.  Are you aware of any time where you've
12 accused Trump of election fraud?
13     A.  I don't believe I've ever accused anybody
14 of election fraud. I've certainly questioned issues of
15 disenfranchisement, which is different.
16     Q.  Different but equally serious. Can we
17 agree?
18     A.  Actually, you can't go to jail for
19 disenfranchisement. You can go to jail for election
20 fraud.
21     Q.  In some ways, Dr. Coomer, doesn't that make
22 it worse?
23     A.  That's a semantic question.
24     Q.  Maybe, but I'm asking for your opinion.
25     A.  I think there are serious problems with

1 legal disenfranchisement, yes.
2     Q.  And you've accused folks of
3 disenfranchising voters and potential voters in the past,
4 yes?
5     A.  Yes, I have.
6     Q.  And will you continue to do that if you
7 feel that that's happening?
8     A.  Honestly, these days, not -- not beyond
9 friends and family due to the harassment I would get.
10     Q.  Looking back, are you aware of any
11 individuals you've accused of disenfranchising voters?
12     A.  I can't say that I've ever accused a
13 specific individual of voter disenfranchisement. It's
14 more systemic issues, voter laws, things like that.
15     Q.  So that article about Trump that we were
16 talking about a few minutes ago, that wasn't accusing
17 Trump of disenfranchisement?
18     A.  As I said, I'd have to reread the article
19 to know the full context of what that comment was.
20         MR. MALONE:  We are a four full minutes
21 past 2:47. I apologize. Let's take a break.
22         (Recess from 2:51 p.m. to 3:00 p.m.)
23     Q.  (By Mr. Malone) Okay. Dr. Coomer,
24 continuing with the Facebook posts that we were
25 discussing. I'd like you to turn to page 66, which is a

1 post from October 11th, 2016. And the second paragraph of
2 that post says, "Gas up the trains folks...trumpet is
3 going to load them up -- are you on the list 'to go?' I
4 figure I'm at least in the top 10 groups who are 'enemies
5 of the fatherland.'
6         Do you see that?
7     A.  I do.
8     Q.  Would you say "trumpet," you're referring
9 to Donald Trump, right?
10     A.  I am.
11     Q.  Why did you say that you were in the top 10
12 groups who are enemies of the fatherland?
13     A.  Being a relative progressive.
14     Q.  So just being politically left of center,
15 that's among the top 10 groups?
16     A.  Yes, in this post.
17     Q.  Did you view this post as satirical?
18     A.  I would actually characterize it as
19 hyperbolic.
20     Q.  So when you characterize it as hyperbolic,
21 does that mean that you didn't truly believe you were
22 going to be rounded up and put on trains?
23     A.  Not that day.
24     Q.  At a later time, before Mr. Oltmann said
25 anything about you, did you have that feeling?

1     A.  I'm sorry. Could you rephrase that?
2     Q.  Yes.
3         Between October 11th in 2016, did you --
4 and November, let's say 9th of 2020, did you have the
5 feeling that you were going to be rounded up and taken
6 somewhere against your will for your political beliefs?
7     A.  No, not me personally. But I think
8 there's evidence that, again, there was similar behavior
9 going on in the country driven by Trump's policies.
10     Q.  So to say that you were is hyperbolic, and
11 that's something that you can say, right?
12     A.  Sorry. Can you rephrase that again?
13     Q.  Yes. To say that you felt you were going
14 to be, you know, rounded up and put on a train with other
15 political enemies of Donald Trump, that's something that
16 you view as a hyperbolic statement, right?
17     A.  I would actually say a hyperbolic warning.
18     Q.  Who were you warning?
19     A.  Warning that -- I can say that I could see
20 a time where this could happen under Trump's policies.
21 I'm not saying it would happen today. But I can -- I can
22 see it as in the realm of possibility.
23     Q.  And I understand, Dr. Coomer, that you
24 will -- you agree that you've been through a lot over the
25 last couple years, fair? You would agree with that?

49 (Pages 190 - 193)

Page 194

1    A.  More than fair.
2    Q.  Okay.  But this hasn't happened.  You
3 haven't been put on a political enemies list and rounded
4 up by the government, right?
5    A.  The second half of that is true.  I do not
6 know if I've been put on an enemies list.
7         Actually, I would speculate that I have
8 been.
9    Q.  Do you have any problems speculating about
10 that?
11    A.  Do I have any problem speculating about
12 that?  Again, I'll strike that.  I don't want to
13 speculate.  But I can say that I have not been rounded
14 up.
15    Q.  But that's a statement that you made in the
16 past, right, about a future event, fair?
17    A.  Fair.
18    Q.  Do you have any regrets about making that
19 statement?
20    A.  I do not.
21    Q.  Even though it didn't come true?
22    A.  Yet.
23    Q.  Exactly, yet.  Even though it didn't come
24 true yet?
25    A.  That's correct.

Page 195

1    Q.  Okay.  Moving on to page -- well, actually,
2 one more question about the post on page 66.  If you
3 weren't referring to Donald Trump as Trumpet in that post,
4 would you have any problem making a similarly hyperbolic
5 statement?
6         MR. CAIN:  Objection.  Form.
7    A.  I made that -- I made that statement
8 specifically in regards to Trump, so I don't see the
9 point in making it about anybody else.
10    Q.  (By Mr. Malone)  Have you ever made a
11 statement like that about, for example, George W. Bush
12 when he was president?
13    A.  Not to my recollection, no.
14    Q.  Okay.  Page 70, a post of yours on Facebook
15 from September 7th, 2016.  I do read this correctly that
16 you were excited about going to Pennsylvania at the time?
17    A.  No.  That's not -- that's not about a
18 particular excitement.  That was a thing that I was doing
19 at the time wherever I was heading.  It would be
20 "destination" --
21         THE REPORTER:  I'm sorry.
22 "Destination..."
23         THE DEPONENT:  Bound -- sorry -- bitches.
24    Q.  (By Mr. Malone)  So that would be a common
25 format of post at this -- during this time?

Page 196

1    A.  Yeah.
2    Q.  Are there any others that you're aware of?
3    A.  Yeah.  I used to -- I used to do that all
4 the time.  And again, I used to travel all the time.  So
5 wherever I was heading, I would post something similar to
6 that, until I realized that I was telling people where I
7 was and stopped.
8    Q.  And did you stop around this time,
9 September of 2016?
10    A.  That is likely.
11    Q.  Is that where you were based or stationed
12 for the 2016 election, Pennsylvania?
13    A.  No.  I do not think I've ever supported
14 on-site support in Pennsylvania.
15    Q.  So what brought you to Pennsylvania at that
16 time?
17    A.  I do not recall.  But it was -- again,
18 I've never provided election day support, from my
19 recollection, in Pennsylvania.  At any time.
20    Q.  That same day, on the same page,
21 September 7th, 2016, it appears that you're posting a link
22 to an EAC.gov blog by Vice Chair Masterson; is that right?
23    A.  Yes.  And that's Matt Masterson.
24    Q.  Matt Masterson.  And you write your post,
25 "Lots of good info here.  Regardless of the blowhard's

Page 197

1 specious assertions (all of them), our electoral process
2 is pretty damn robust/secure."
3         Do you see that?
4    A.  I do.
5    Q.  Why did you call Matt Masterson a blowhard?
6    A.  That's out of context.  I'm referring to
7 Trump here.  I have nothing but the utmost respect for
8 Matt Masterson.
9    Q.  I see.  So this is an article by Matt
10 Masterson about Donald Trump?
11    A.  No.  It's an article about our electoral
12 process of which, in September 2016, Trump was calling
13 into question.  So, again, it's the unfortunate of -- the
14 nature of Facebook that I was not as specific as I should
15 have been.
16         But the blowhard specious assertions
17 refers to Trump's assertions of potential voter issues,
18 which is why I posted this excellent article from Matt
19 Masterson that describes how robust and secure the
20 election system is.
21    Q.  And one of your Facebook friends, who is
22 crossed off -- and actually, I should ask a couple of
23 questions about that.
24         Were these individuals crossed off by
25 whoever leaked the -- leaked the post to Joe Oltmann?

50 (Pages 194 - 197)

1    A.  I don't know who did the redactions.

2    Q.  You just don't know?

3    A.  I don't know.

4    Q.  Okay.  Based on your understanding of
5  Facebook and how the privacy settings work, is it fair to
6  conclude that anyone who commented under one of your
7  articles -- or one of your posts, excuse me, is a Facebook
8  friend of yours?

9    A.  Based on the settings that I had applied,
10  that should be correct.

11    Q.  Okay.  So a Facebook friend who is -- had
12  their name crossed off, comments on your September 7th
13  post and writes, Hillary seems worried about the Russkies
14  helping Trump or at least raising doubt about our outcome.
15        Do you see that?

16    A.  I do.

17    Q.  Just as a side bar, do you think that that
18  happened?

19    A.  What happened?

20    Q.  That Russia somehow helped Trump or raised
21  doubt about the outcome?

22    A.  I think that there's ample evidence that
23  Russia did interfere in multiple elections, mostly in
24  disinformation campaigns.

25    Q.  That Russia did interfere?  I just want to

1  make sure I heard that.

2    A.  Yes.  Yes.

3    Q.  What sorts of disinformation campaigns are
4  you referring to?

5    A.  Mostly Twitter bots, targeted articles on
6  Facebook, et cetera.

7    Q.  Twitter bots, targeted articles object
8  Facebook.  Anything else?

9    A.  I think that there is evidence that some
10  of the attempted penetrations of voter registration
11  systems, namely in Florida, Arizona, and Illinois,
12  originated from -- from my understanding, from the
13  information I have, from Russian sources.

14    Q.  All right.  When you say from your
15  understanding the information you have, what information
16  are you referring to?

17    A.  Basically just reports coming out of the
18  states, some of the testimony that I heard.

19    Q.  Testimony from whom?

20    A.  I'm trying to remember at the time.  And
21  maybe I shouldn't say testimony, because I'm not sure it
22  was an official proceeding.  But I think I was in some
23  election board hearings where they discussed specifically
24  in Illinois, Arizona, and Florida.

25    Q.  Is it your opinion that these campaigns

1  affected the outcome of the 2016 election?

2    A.  I can't say for sure, but it's my personal
3  belief that it did, yes.

4    Q.  That's your personal belief?

5    A.  Yes.

6    Q.  Have you ever expressed that personal
7  belief to anyone, whether on Facebook or elsewhere?

8    A.  I have not.

9    Q.  You respond to this comment from your
10  friend, and you say, I did not say there were not threats,
11  especially to internet connected systems.

12        Do you see that?

13    A.  Yes.

14    Q.  What internet connected systems are you
15  referring to?

16    A.  Just in general.

17    Q.  Okay.  Are you referring in general to
18  internet connected voting systems?

19    A.  No.  I mean, the voting ecosystem.  So
20  reporting systems, online voter registration systems,
21  electronic poll books.  That is what I'm referring to.
22  So outside -- not necessarily the actual tabulation
23  systems, but the entire ecosystem.

24    Q.  At any point are you aware of tabulation
25  systems --

1        THE REPORTER:  I'm sorry.  "Tabulation
2  systems..."

3        MR. MALONE:  Being connected to the
4  internet.

5    A.  Tabulation systems -- central tabulation
6  systems, no.

7    Q.  (By Mr. Malone)  Okay.  I noticed that you
8  clarified central tabulation systems.  I'm trying to
9  understand why you did that.  What other types of
10  tabulation systems might there be?

11    A.  In certain jurisdictions, the increasing
12  voting machines, after the polls are closed, may have a
13  temporary internet connection for transmitting unofficial
14  results.

15    Q.  In your experience and professional
16  opinion, is that a potential security vulnerability?

17    A.  All connections are a potential
18  vulnerability, and that is why you put process,
19  procedures and mitigations to mitigate against those
20  vulnerabilities.

21    Q.  Page 72, July 21st, 2016, this is a rant
22  that you posted.  And this is -- I think you referred to
23  it earlier this afternoon, Dr. Coomer.  This is the
24  Unfriend Me rant.  You're familiar with it?

25    A.  I am.

51 (Pages 198 - 201)

1    Q.   And you refer to -- my understanding
2 is -- well, first, you refer to the Christian jihadist VP
3 pick.  That's Mike Pence, right?
4    A.   Yes, it is.
5    Q.   It's your belief that Mike Pence is or was
6 a Christian jihadist?
7    A.   I would call him a Christian nationalist.
8    Q.   What's the difference?
9    A.   He hasn't outright called for jihad
10 against non-Christians.
11    Q.   So why did you call him a jihadist?
12    A.   Again, I would characterize this as being
13 hyperbolic.
14    Q.   Would you characterize your description of
15 someone who would vote for Trump and Pence as a
16 fucking -- fucking idiot hyperbolic?
17    A.   Debatable.
18    Q.   Well, I'm not here to debate today,
19 Dr. Coomer.  I'm just here to know what you feel.
20    A.   I feel there's a detect of character.
21    Q.   Okay.  And is that defect of character such
22 that makes that person a fucking idiot?
23    A.   Again, I'd probably put that into the
24 hyperbolic bucket.
25    Q.   Then it appears that you go on to refer to

1 Trump specifically as a wind bag, fucktard, fascist,
2 racist fuck.  Would you consider any or all of those
3 descriptions as hyperbolic?
4    A.   I would not.
5    Q.   So those are all true, in your opinion?
6    A.   Those are my opinions, yes.
7    Q.   What makes someone a fucktard?
8        MR. CAIN:  Oh, gosh, object to form.
9    A.   That's a nice adjective for describing
10 somebody that behaves in the way that Trump does.
11    Q.   (By Mr. Malone)  Okay.  I'm not sure quite
12 how to ask this, Dr. Coomer, but you don't view that as an
13 offensive statement?
14    A.   Offensive?  I mean, I --
15    Q.   We've talked about neologism a little bit,
16 or at least in passing, talking about Antifa right, as a
17 combination of two words?
18    A.   Yep.  Sorry.  Yes.
19    Q.   Okay.  That's what this is, right?  That's
20 what -- that's what fucktard is?
21    A.   Yes.
22    Q.   Okay.  So what -- what makes someone a
23 fucktard?
24    A.   Again, the best I can describe it is
25 somebody that behaves as Trump does.  An idiot

1 that -- that just has no empathy and understanding for
2 other people.  I guess that's the best I could use.
3    Q.   That's the best you could do to describe
4 that?
5    A.   Yeah.  Yes.  Sorry.
6    Q.   Okay.  I know you don't want to be talking
7 about these posts.  I don't necessarily want to be asking
8 you about them.  They have become public, as you know.
9 And you've been pretty consistent, Dr. Coomer, that these
10 were never intended to be shared beyond your 300 or so
11 Facebook friends, right?
12    A.   That is correct.
13    Q.   Okay.  So then why is it that you put a
14 hash tag that says "untrumpe," and below that you say, "I
15 think that hash tag might go viral"?
16    A.   Because I did have friends that I hoped
17 would start using that hash tag as well.
18    Q.   Okay.  Now, I don't quite understand how
19 these -- the Facebook privacy settings work.  But if that
20 hash tag went viral, wouldn't your post be made viral?
21    A.   My understanding is no.
22    Q.   That was your understanding?
23    A.   That is my understanding, yes.
24    Q.   Okay.  So when you say on the following
25 page in your reply to a post by Carolyn Hegge or Hedge --

1    A.   Corene Henage.
2    Q.   I wasn't even close.
3        In your response to -- to Ms. Gardella, she
4 writes, "Yag, what Coomer said.  #untrumpme."  And then
5 you respond, "Let's go viral with this."
6        Yes?
7    A.   Correct.
8    Q.   So you wanted -- you wanted this post to be
9 public, didn't you?
10    A.   No.  I wanted -- I wanted the #untrumpme
11 to become a thing.
12    Q.   Just -- just the hash tag?
13    A.   Yes.
14    Q.   This whole post?
15    A.   Yup.  Sorry.  Yes.
16    Q.   Okay.  Well, turning back to the previous
17 page, 72, you respond, Second edit, "These opinions are
18 rational and completely my own."
19        Do you see that?
20    A.   I do.
21    Q.   And they're based in reason and highly
22 credible.  Do you still believe all that?
23    A.   I do.
24    Q.   So you still believe that Mike Pence is a
25 Christian jihadist, Christian nationalist?

52 (Pages 202 - 205)

Page 206

1      A.  I think the sentiment is -- is correct.
2      Q.  So it's the overall sentiment that you're
3  talking about as being rational, completely your own,
4  based in reason, and highly credible?
5      A.  I do.
6      Q.  You then continue, though they are not
7  necessarily the thoughts of my employer, though if not, I
8  should probably find another job.  Who wants to work for
9  complete morons.
10          Do you see that?
11      A.  I do.
12      Q.  Why did you feel as though you needed to
13  add this second edit?
14      A.  It was trying to be a bit of comedy.
15      Q.  Probably a bad question.  What I'm trying
16  to get at is, did someone come to you and say, What are
17  you doing, why are you posting this, you work for
18  Dominion?
19      A.  No.
20      Q.  So you just realized that you needed to add
21  this clarification?
22      A.  Correct.  And -- and to be clear, these
23  are not -- these are in-line edits.  It's not like I went
24  back to the post.  This is -- this is just sort of my
25  writing style.  I've got a rant.  I end the rant.  And

Page 207

1  then I make some -- some statements.  So this wasn't
2  something that I posted and then went back and edited.
3      Q.  Right.  No, that was my understanding too.
4  But I do appreciate the clarification.
5          So when you say second edit, you're just
6  saying you added this text after the phrase second edit at
7  the bottom of the page, right?
8      A.  Post post script.
9      Q.  Okay.  And I think I talked over you, but
10  you, I believe, said that you wanted to make this addition
11  because the original post was comedy?
12      A.  No, no, no, no.  The second edit, that
13  section is sort of just banter.
14      Q.  Okay.  So the second edit is the comedic
15  banter?
16      A.  Yes.
17      Q.  All right.  What part of that is comedic to
18  you?
19      A.  Honestly, the whole thing.  It's kind of
20  like, hey, oh, by the way, everything I say here is
21  highly credible; like, that's in the eye of the beholder.
22  I believe it.  Certainly not everybody that worked for
23  Dominion held these same beliefs.
24          The next part is not comedic.  None of my
25  personal opinions affect my professional conduct or

Page 208

1  attitudes.  I am nonpartisan.  Those are all correct:
2      Q.  Okay.  So that part is serious.  What about
3  I am not, however, willing to stand by and watch this
4  great country be taken over by fascists without saying
5  something, anything.
6      A.  That's serious.  That's saying something,
7  which this post -- that's what this refers to is the
8  statements that I made above.  Saying something.  Never
9  in here did I say I would do anything to affect the
10  election.
11      Q.  At page 78 there's a fairly lengthy thread
12  of comments here.  And I'm referring to the one that's
13  toward the bottom where you say, "Let's not call it
14  fighting for my country, though I think it does hang in
15  the balance.  Let's call it I won't 'brunch' fascists and
16  racists, or religious jihadists.  #out."
17          Do you see that?
18      A.  I do.
19      Q.  What does that mean?
20      A.  I think that's a typo.  I think that
21  should have been "truck."
22      Q.  Okay.  Did you mean to put it in quotes?
23      A.  Yeah, probably.  Yeah, I don't -- I don't
24  understand what brunch means either.  But based on other
25  posts I've made, I think that word was supposed to be

Page 209

1  "truck."
2      Q.  Okay.  And you're referring to who when
3  you're talking about fascists and racists or religious
4  jihadists?
5      A.  Anybody that has fascist, racist, or
6  again, I would call it Christian nationalist beliefs.
7      Q.  And in this context you referred
8  specifically to two guys, right?  To Donald Trump and Mike
9  Pence?
10      A.  In this context, I'm not sure I could say
11  that.  I think this is a general thread.  Or maybe this
12  continues from all of it.  Yeah.  Maybe.
13          So, no, I would not say that it's just
14  those two specific people.  This post goes a little -- or
15  this thread goes a little far afield.  Again, it's hard
16  to say specifically, but if you look up two comments
17  above, Danny Schneider, I'm not sure that posting on
18  Facebook -- I'm sorry.
19          I'm not really sure that posting on
20  Facebook is really fighting for this country, is it?  If
21  nothing else, you should unfriend the people you don't
22  like, don't expect them to unfriend you.  That's silly.
23          I said, Let's not call it fighting for my
24  country, though I think it does hang in the balance.
25  Let's call it I won't -- again, I think the idea here is

1 truck, fascist and racist or religious jihadists. I
2 think that's the context.
3      Q.  Do you understand how someone could have
4 misinterpreted that, Dr. Coomer, as we sit here today?
5      A.  Not in this context, no.
6      Q.  You don't -- you don't understand that?
7      A.  No, I -- again, it's Facebook. You're
8 commenting in a thread. I think at the time the context
9 was pretty clear.
10      Q.  Well, I'm not sure that -- how about this?
11 Let's move on. Because I do have -- if you have your copy
12 of Exhibit 1 handy. Page 10. Your answers to --
13      A.  I'm sorry. Exhibit 1 is the
14 interrogatory?
15      Q.  Yes. Your answers to Lindell's
16 interrogatories.
17      A.  Yes.
18      Q.  Okay.
19      A.  Which page?
20      Q.  10. The last page.
21      A.  Okay.
22      Q.  This is in your answer to your
23 Interrogatory 18 which asks about your efforts to mitigate
24 your damages in this case. And you respond by saying that
25 you have also filed five separate lawsuits against a total

1 of 25 defendants wherein he has -- he being you -- has
2 laid out the objective falsehood of the allegations
3 against him and has demanded retraction from those seeking
4 to profit off the lies that have upended his life.
5      Do you see that?
6      A.  I do.
7      Q.  The first question, is that 25 defendants
8 number still accurate?
9      A.  As far as my recollection, yes.
10      Q.  Okay. You refer to the demand for
11 retraction from those seeking to profit off the lies that
12 have upended your life. Are you aware of when or if that
13 demand was made on the defendants in this case?
14      A.  I do not have that information.
15      Q.  This should be Exhibit 9.
16      (Exhibit 9 was marked.)
17      Q.  Okay. We are looking at an Associated
18 Press article dated December 23rd, 2020, which is titled
19 Dominion worker Eric Coomer sues Trump campaign and
20 conservative media.
21      Have you seen this article before,
22 Dr. Coomer?
23      A.  I believe I have.
24      Q.  And on page 2 of this document there's a
25 brief paragraph above the photo that says, quote, I have

1 been thrust into the public spotlight by people with
2 political and financial agendas. But at Hart, I am a
3 private person, end quote, Coomer said in his statement.
4      Do you see that?
5      A.  I do.
6      Q.  Do you remember making that statement?
7      A.  I do.
8      Q.  Do you agree that this statement would have
9 been on or before December 23rd, 2020, when this article
10 was published?
11      A.  That is correct.
12      (Exhibit 10 was marked.)
13      Q.  Okay. Exhibit 10, Dr. Coomer, is a
14 document that has the caption of Eric Coomer, Ph.D. v.
15 Donald J. Trump for President, Inc., et al., in the
16 Colorado state court case.
17      Have you seen this document before?
18      A.  I believe I have.
19      Q.  Okay. It's been produced --
20      A.  Let me just double-check. I mean, I try
21 to look at all of the docs.
22      Yes, it does look familiar.
23      Q.  Okay. It's been produced in our case as
24 well, the Mike Lindell, My Pillow, and Frankspeech with
25 the Bates number starting 00356. If you could turn to

1 page -- it's page 3 of the document, Bates number 00358,
2 Dr. Coomer.
3      A.  Okay.
4      Q.  My understanding is that this is a chart of
5 defamatory statements that you claim have been made
6 against you by various defendants that you've sued; is
7 that right?
8      A.  That is what it appears to be, yes.
9      Q.  Okay. And I see that the first statement,
10 the publication number one in the top row is November 9,
11 2020. Do you see that?
12      A.  I do.
13      Q.  Your statements Joe Oltmann made on
14 November 9th of that year. And it appears that they go on
15 to the next page, right?
16      A.  Yes, I believe these are all statements
17 from the November 9th podcast.
18      Q.  Until toward the bottom of the following
19 page which identifies some statements made by Joe Oltmann
20 on November 10th, 2020?
21      A.  Correct.
22      Q.  Following page, November 11th, 2020?
23      A.  Correct.
24      Q.  Following page, November 13th?
25      A.  Bottom of the last page, November 12th.

54 (Pages 210 - 213)

Page 214

1    Q.   Good correction.  Thank you.
2  November 12th, 2020?
3         Now, on page 00361, November 13th, 2020?
4    A.   Correct.
5    Q.   Page 362, statements from Michelle Malkin
6  on Twitter on November 13th, 2020, in addition to
7  statements Oltmann made on the same day as well as James
8  Hoft at the Gateway Pundit.
9         Do you see all of that?
10   A.   I do.
11   Q.   Okay.  I believe you're familiar with this
12  document based on your testimony just now.  But if you
13  need some time to review it, that's fine.  Let me know.
14        My question is, are you aware of any
15  additional statements or statements that need to be
16  corrected in this chart that you've provided here?
17        MR. CAIN:  Object to form.
18   A.   Not that I'm aware of.  Obviously, there
19  are a lot of statements.  I have reviewed them at some
20  time.  So, no, I'm not aware of anything that needs to be
21  amended.
22   Q.   (By Mr. Malone)  You're right.  There are a
23  lot of statements.  I believe this chart identifies 200
24  statements, is that right, that could be found --
25   A.   I'll take your --

Page 215

1    Q.   I'm referring to page 2 of the document,
2  Bates number 00357.  There's a -- bold publication numbers
3  on the left.  It says the word publication numbers, that
4  there are 76 distinct publications which encompass nearly
5  200 defamatory statements.  Do you see that?
6    A.   I do see that.
7    Q.   As far as you know, that's accurate?
8    A.   As far as I know, yes.
9    Q.   And as we've discussed at some length
10  today, those statements started on November 9th with Joe
11  Oltmann's video?
12   A.   That is correct.
13   Q.   Are you aware of any statements before
14  November 9th that you made publicly?
15   A.   About me, specifically, no, I am not
16  aware.
17   Q.   Okay.  Turning to page -- it's a bit
18  confusing.  It would technically be, I guess, page 27 of
19  this document, Bates number 00382.  And I'm referring to
20  publication 64.
21   A.   Okay.
22   Q.   All right.  A series of statements
23  identified on Frank TV with Brannon Howse and Joe Oltmann.
24  Do you see those?
25   A.   I do.

Page 216

1    Q.   Are you aware of any statements made on
2  Frank TV about you prior to that time?
3    A.   Not that I'm aware of.
4    Q.   Are you aware of any statements made on the
5  My Pillow website prior to that time?
6    A.   No.
7    Q.   And I think we've covered it, but are you
8  aware of any statements made by Mr. Lindell about you
9  prior to that time?
10   A.   Not that I'm aware of.
11   Q.   It appears the last time that Frank TV is
12  identified here is the following page, the top row,
13  referring to the same interview with Brannon Howse and Joe
14  Oltmann, implicating Oltmann.  Do you see that?
15   A.   I do.
16   Q.   Are you aware of any other instance where
17  Lindell or Frankspeech or My Pillow is identified here on
18  this chart?
19   A.   On this chart, let me double-check.  Just
20  want to make sure how many pages.
21        Yes.
22   Q.   Okay.
23   A.   Oh, no, that's Joe Oltmann.  It's at the
24  symposium.  Sorry.
25        Not specifically with Lindell or

Page 217

1  Frankspeech as a source within this document.
2    Q.   Moving on to Exhibit 11.
3        (Exhibit 11 was marked.)
4    Q.   This is your first Amended Complaint
5  against Donald J. Trump for President, et al.
6        Do you see that, Dr. Coomer?
7    A.   I do.
8    Q.   And this is plaintiff's first amended
9  complaint, which is dated February 4th, 2021, correct?
10   A.   Correct.
11   Q.   As far as you know, is everything in this
12  Amended Complaint still accurate?
13   A.   As far as I know, yes.
14   Q.   Okay.  Turning to page 2 of Exhibit 11, you
15  identify all the defendants which you are suing in this
16  action here.  And those include Joe Oltmann, Rudy
17  Giuliani, and Sidney Powell among others that we've talked
18  about today.  Do you see all that?
19   A.   I do.  So the one thing is that Newsmax is
20  no longer a party to this lawsuit.  They're listed near
21  the bottom.
22   Q.   And beyond Newsmax, as far as you know, are
23  all of the defendants identified on page 2 here still
24  parties in this lawsuit?
25   A.   Yes, they are.

55 (Pages 214 - 217)

Page 218

1    Q.  Okay.  And this document is dated
2  February 4th, 2021.  I understand that an original version
3  of this complaint was filed previously, correct?
4    A.  Correct.  I believe --
5    Q.  Okay.
6    A.  -- December 21st.
7    Q.  Around that time?
8    A.  2020.
9    Q.  Paragraph 1 is a sentence that says,
10  "Defendants, by their actions, have elevated Dr. Coomer
11  into the national spotlight, invaded his privacy,
12  threatened his security, and fundamentally defamed his
13  reputation across the country."
14    Do you see that?
15    A.  I do.
16    Q.  Do you still believe that to be true with
17  respect to these defendants?
18    A.  I do.
19    Q.  And you believed that to be true in
20  December of 2020 when your original complaint was filed?
21    A.  I do.
22    Q.  And when you made your statement to the
23  Associated Press on December 23rd, or thereabouts?
24    A.  I do.
25    Q.  So whether you liked it or not, you were a

Page 219

1  public figure in the winter of 2020, right, Dr. Coomer?
2    MR. CAIN:  Object to form.
3    A.  Based upon defamatory statements about me,
4  yes.
5    Q.  (By Mr. Malone)  Point you to page 25 -- 25
6  of this complaint, paragraph 52, which say -- says, After
7  the results of the election were called for President Joe
8  Biden, Oltmann co-hosted a Conservative Daily podcast.
9  And the footnote, footnote 55, refers to episode 196,
10  Dominion Voting Systems of the Conservative Daily podcast.
11  Do you see that?
12    A.  I do.
13    Q.  And that's where it all started, wasn't it,
14  Dr. Coomer?  That's where the trouble began?
15    A.  That's where my specific name came into
16  the discussion, yes.
17    Q.  How many times was that podcast downloaded
18  or viewed or listened to?
19    A.  I have no idea.
20    Q.  What platforms was that podcast available
21  on?  What digital platforms?
22    A.  Honestly, I couldn't give an exhaustive
23  list.  I don't know.
24    Q.  Have you reviewed Joel Oltmann's
25  deposition --

Page 220

1    A.  I --
2    Q.  -- transcript in this case?
3    A.  Sorry.  I have.
4    Q.  And would you dispute his testimony insofar
5  as he says his podcast is available on Spotify, Pandora,
6  Apple, Google Podcasts, among various radio stations?
7    A.  I mean, I'll take him at his word.
8    Q.  But what you just don't know is how many
9  times it's been listened to on those platforms; is that
10  right?
11    A.  Correct.  And I know that that's not an
12  exhaustive list of where his podcast is hosted.
13    Q.  Okay.  Moving on to page 28, paragraph 57.
14  We've talked a bit about this article already.  It's The
15  Gateway Pundit article about you on November 13th, 2020.
16  How many people saw that article?
17    A.  I have no idea.
18    Q.  Okay.  Paragraph 58 on the following page.
19  Complaint alleges also on November 13th, 2020, Michelle
20  Malkin hosted an interview with Oltmann who was identified
21  as a representative of FEC United on her personal YouTube
22  channel #malkinlive, which has approximately 100,000
23  subscribers.
24    Do you see that?
25    A.  I do.

Page 221

1    Q.  How many people saw the interview on
2  Michelle Malkin's YouTube channel?
3    A.  I do not know.
4    Q.  Do you know whether it was more or less
5  than the 100,000 subscribers that she had?
6    A.  I do not know.
7    Q.  Okay.  Page 31, paragraph 59.  This refers
8  to an interview that Oltmann did on Eric Metaxas's show on
9  November 24th, 2020.  You allege -- the interview was also
10  published on Metaxas's YouTube channel, the Eric Metaxas
11  radio show, which has approximately 185,000 subscribers.
12    Do you see that?
13    A.  I do.
14    Q.  How many people saw the interview on
15  YouTube?
16    A.  I do not know.
17    Q.  How many people listened to that interview
18  as a podcast?
19    A.  I do not know.
20    Q.  Are you aware of which platforms host Eric
21  Metaxas's pod -- excuse me -- podcast?
22    A.  I do not have an exhaustive list.
23    Q.  Paragraph 60 on page 34.  This refers to
24  more Gateway Pundit articles about you published on
25  November 14th, 2020.  Do you see that?

56 (Pages 218 - 221)

Page 222

1     A.  I do.
2     Q.  Okay.  How many people read those articles
3  on The Gateway Pundit?
4     A.  I do not know.
5     Q.  Paragraph 63, which -- actually, let's talk
6  about paragraph 62.  Now, I understand Newsmax has -- is
7  no longer a defendant in that case.  And that is the
8  result of a confidential settlement agreement, accurate?
9        MR. CAIN:  That part is, yes.
10     Q.  (By Mr. Malone)  Okay.  So I don't need to
11  note terms of that settlement agreement, Dr. Coomer.  What
12  I'd like to know is how many people saw the interviews
13  that you refer to in this complaint -- or in this
14  paragraph, excuse me, on November 20th and December 5th?
15     A.  I don't have those numbers.
16     Q.  Would you have the numbers as to how many
17  people heard the Howie Carr Show as a podcast on the
18  podcast providers?
19     A.  No, I would not.
20     Q.  Same question with respect to the episode
21  of American Agenda you referred to in this paragraph on
22  December 15th, 2020.  How many people saw that episode?
23     A.  I do not have those numbers.
24     Q.  Okay.  Now on to page 63, which is talking
25  about Eric Trump's Tweet.

Page 223

1     A.  Paragraph 63?
2     Q.  Paragraph 63, page 43.
3     A.  Okay.  Page 42?
4     Q.  Yeah.  It starts on page 42.  I'd like to
5  ask about what's on page 43.
6     A.  Okay.
7     Q.  There's an allegation that says, on
8  November 17th, 2020, Eric Trump, a representative and
9  surrogate of President Trump's campaign, Tweeted the
10  following.  This appears to be a link to The Gateway
11  Pundit article that we've talked about.
12        The allegation continues, With his
13  relationship to the president and the Trump campaign, Eric
14  Trump has a Twitter following of roughly 4.5 million
15  people.
16        Do you see that?
17     A.  I do.
18     Q.  How many people saw Eric Trump's Tweet on
19  November 7th of 2020?
20     A.  I do not know.
21     Q.  Paragraph 64, Furthering these
22  allegations -- and this is on page 45.  Furthering the
23  false allegations, on November 19th, 2020, the Trump
24  campaign provided an update on its legal challenges to the
25  election from the Republican National Committee in

Page 224

1  Washington, D.C.
2        Do you see that?
3     A.  I do.
4     Q.  And you refer to specific individuals,
5  including Powell, Giuliani, and Jenna Ellis.  Do you see
6  that?
7     A.  I do.
8     Q.  And in footnote 105, you allege that the
9  event was broadcast on C-SPAN.  It has also been
10  substantially reported across various media outlets,
11  including CNN, Fox, New York Times, as well as defendants
12  OANN and Newsmax, and there is a reference to Trump
13  tweeting about the conference.  Yes?
14     A.  Yes, I see that.
15     Q.  How many people saw footage of that press
16  conference about you or partially about you on
17  November 19th, 2020?
18     A.  I do not know.
19     Q.  And it was around that time that you had
20  agreed to go on leave from Dominion; is that right?
21     A.  Technically I was forced to go on leave.
22     Q.  Understood.  But my question is,
23  November 19th is in the range of three dates that I
24  believe you provided today of November 18th, 19th, or
25  20th, that you, sure, your words were forced to go on

Page 225

1  leave?
2     A.  I was placed on leave, correct.
3     Q.  The following page, page 46, toward the
4  bottom of that page, the allegation reads, As noted above,
5  Dr. Coomer's social media was private, and of course,
6  under the First Amendment to the Constitution, he is
7  entitled to his political opinion.
8        Do you see that?
9     A.  I do.
10     Q.  You still believe that, don't you?
11     A.  I do.
12     Q.  Would you agree that Mr. Lindell is
13  entitled to his political opinion?
14     A.  I would.
15     Q.  Okay.  If we go to paragraph 72 under the
16  heading, the letter D, The harm defendants caused
17  Dr. Coomer.  It's page 53, paragraph 72, says, social
18  media exploded with threats and attacks as the lies
19  spread.  For example, on November 21st, 2020, anonymous
20  Reddit user Fair 001 posted an article to the Subreddit
21  R/Donald Trump titled, Eric Coomer needs to be arrested
22  before he tries to run or fly away.  The post contained
23  the following image.
24        Do you see that?
25     A.  I do.

57 (Pages 222 - 225)

Page 226

1    Q.  Okay.  Are you aware of any threats and
2  attacks on social media before that time?
3    A.  Oh, yeah.
4    Q.  So this -- November 21st, 2020, is not the
5  first one?
6    A.  Absolutely not.
7    Q.  Just an example?
8    A.  Just an example.
9    Q.  Paragraph 77, page 56.  You refer to a
10  threatening text message from unknown out-of-state numbers
11  sent directly to your phone in Colorado.
12       Do you see that?
13    A.  I do.
14    Q.  When was the first threatening text that
15  you received?
16    A.  I can't state with any specificity.  I do
17  not believe these were the first ones.
18    Q.  Was the first one in November of 2020?
19    A.  To the best of my recollection, yes.
20    Q.  Okay.  Paragraph 78, same page, refers to a
21  post made by Joe Oltmann on the social media platform
22  Parler.  Do you know how many people saw that post that's
23  quoted in paragraph 78?
24    A.  I do not.
25    Q.  All right.  Paragraph 80, page 57,

Page 227

1  referring to an Oltmann post on his Facebook, January
2  26th, 2021.  How many people saw that post?
3    A.  I do not know.
4    Q.  Okay.  You would agree that we've talked
5  about statements in a two-and-a-half-month span from
6  November 2020 to January of 2021, correct?
7    A.  Correct.
8    Q.  And those are still four months or so
9  before any of the defendants in this case said anything
10  about you that you're aware of?
11    A.  That I'm aware of, yes.
12       MR. MALONE:  Okay.  How about one more
13  short break?
14       (Recess from 3:58 p.m. to 4:07 p.m.)
15       (Exhibit 12 was marked.)
16    Q.  (By Mr. Malone)  Okay.  Dr. Coomer, you've
17  just been handed what's been marked as Exhibit 12.  And
18  this is your original complaint against Patrick Byrne and
19  Steve Lucescu -- I think I'm pronouncing that correctly --
20  and The America Project.  Do you see that?
21    A.  I do.
22    Q.  You're familiar with this document?
23    A.  I read it a while ago.  I haven't --
24    Q.  As far as you know everything in here is
25  accurate to your understanding?

Page 228

1    A.  As far as I know, yes.
2    Q.  Okay.  If we go to paragraph 57, which is
3  on page --
4    A.  36.
5    Q.  -- page 36.  All right.  This refers to the
6  premier of "The Deep Rig" film that you're claiming
7  Patrick Byrne produced and published; is that correct?
8    A.  That is correct.
9    Q.  How many people have seen that film?
10    A.  I do not know.
11    Q.  Paragraph 59, page 37, referred to a panel
12  where Mr. Byrne was involved.  And you allege, "As the
13  panel proceeded, Byrne took an opportunity to mislead his
14  audience with outright falsehoods, and to impliedly defame
15  Dr. Coomer, who helped secure the patents for Dominion's
16  adjudication [sic] feature, in the process.
17       Do you see that?
18    A.  I do.
19    Q.  What do you mean by "impliedly defame"?
20       MR. CAIN:  Object to form.
21    A.  My recollection is he was talking
22  specifically about the adjudication process and patents
23  which I was the principal inventor, but did not name me
24  specifically.
25    Q.  (By Mr. Malone)  Okay.  Looking at the

Page 229

1  block of text, that you're quoting Byrne as saying in
2  paragraph 59, what in that block of text there is
3  inaccurate, in your opinion?
4    A.  The final two sentences.  "It's right
5  there in the operator's manual" -- sorry.  "It's right
6  there in the operator's manual, the precinct
7  administrator can come by with a mouse click, drag 'em
8  over and give them to Joe Biden or whoever" -- it should
9  be whomever -- "whoever they want.  It's so obviously a
10  design flaw that I was horrified."
11       Those are outright falsehoods.
12    Q.  Do I understand correctly that the
13  operator's manual doesn't refer to Joe Biden?
14    A.  That is correct.
15    Q.  Does the operator's manual refer to the
16  adjudication process?
17    A.  I would assume so, yes.
18    Q.  Did you take any role in drafting a
19  Dominion operator's manual, Dr. Coomer?
20    A.  I mean, over the 10-plus years I was
21  there, I'm sure I created some copy.  That was not my
22  main job.  But I'm sure I provided some input here and
23  there over the years.  But I can't say specifically.
24    Q.  Okay.  This will be Exhibit 13 then.
25       (Exhibit 13 was marked.)

58 (Pages 226 - 229)

Page 230

1    MR. CAIN: Is this 13?
2    MR. MALONE: This is 13.
3    Q. (By Mr. Malone) So, Dr. Coomer, you've
4 just been handed the Democracy Suite, DS, results, tally
5 and reporting user guide. Do you see this document?
6    A. I do.
7    Q. Have you seen it before?
8    A. I have.
9    Q. Okay. Did you take any role in drafting
10 any part of this user guide?
11    A. As I said before, I've provided various
12 input. I can't say specifically that I'm responsible for
13 anything in this particular guide.
14    Q. Not responsible for anything?
15    A. I can't say one way or the other.
16    Q. Okay. If you could turn to page 65 of this
17 document, which has the heading 11.2.2 settings.
18    A. Yes.
19    Q. Okay. Do you see toward the bottom center
20 of this page, the STV in bold letters, referring to single
21 transferable voting, more specifically, the weighted
22 inclusive Gregory method which implements fractional
23 surplus transfer of elected candidates?
24    Do you see that?
25    A. I do.

Page 231

1    Q. Do you know what that refers to?
2    A. That is a particular mode of what is
3 referred to as ranked choice voting, which is not used in
4 any jurisdiction in the United States. And that is not
5 the same as fractional voting.
6    Q. Okay. So what's the difference between
7 ranked choice voting and fractional voting?
8    A. Fractional voting is when you can give a
9 certain fraction of votes to candidates. Ranked choice
10 voting is when you rank your choices numerically, and
11 then there is a specific algorithm for trying to get to a
12 50 percent plus 1 vote majority.
13    Q. That's ranked choice voting?
14    A. Yes.
15    Q. Okay. Is that not what they use in, for
16 example, the New York City mayor's race?
17    A. I honestly don't know if New York City is
18 doing ranked choice.
19    Q. So your testimony that no jurisdiction uses
20 ranked choice voting is that you're just not aware of any?
21    A. No, I didn't state that. I said no
22 jurisdiction uses STV.
23    Q. I see. Okay. So the STV incorporates
24 elements of both ranked choice and fractional voting?
25    A. No, it does not.

Page 232

1    Q. Okay.
2    A. Okay. STV is a particular implementation
3 of ranked choice voting when you have more than vote for
4 one. So if you have a contest where you can vote for
5 two, like school boards, okay, there is a particular
6 element -- algorithm called STV, single transferable
7 vote, that is an extension of ranked choice voting for
8 contests that have more than one voteable candidate.
9    Q. Now, how does that interact with the
10 fractional voting that you just mentioned and that's
11 included in STV?
12    A. Fractional voting is not included in STV.
13 There is a fractional weighting -- I know -- terminology
14 matters. Fractional voting is a particular style of
15 voting that, again, deals with a single-candidate race
16 where you can essentially apply, as a voter, I want
17 60 percent of my vote to go to one candidate and
18 40 percent to go to another.
19    That is not the same as the fractional
20 algorithm in STV for applying the ranked choice
21 algorithm.
22    Q. In what context would just fractional
23 voting by itself be used?
24    A. There is no jurisdiction in the U.S., or
25 as far as I know in the world, that uses fractional

Page 233

1 voting. It is an academic concept for voting.
2    Q. If it's not used anywhere in the world, why
3 is it referenced in the context of STV in this manual?
4    A. It is -- fractional voting is not
5 referenced in STV. STV -- fractional surplus transfer is
6 what is referenced, and that is specific to the STV
7 algorithm. That is not the same as fractional voting.
8    Q. Okay. Would you be able to describe how
9 that STV algorithm that you've just mentioned works?
10    A. Personally, no, I can't, because it's not
11 used anywhere. It's -- again, it's an academic way of
12 dealing with ranked choice voting with multiple
13 candidates.
14    I never was involved in
15 the -- essentially, the application of that algorithm.
16 It was created within the system specifically because
17 there were jurisdictions that were looking to use it, but
18 it's never been -- it's never been used.
19    Q. Do you know which jurisdictions were
20 looking to use it?
21    A. I believe they were in Minnesota.
22    Q. Do you know why these jurisdictions were
23 exploring an STV?
24    A. I can only speculate, so, no.
25    Q. So no one has indicated to you why they

59 (Pages 230 - 233)

Page 234

1 were looking to use single transferable voting?
2    A. RCV in general has been looked at because
3 there are academic claims that it provides certain
4 benefits. Most of the implementations I've seen, it
5 comes down to a cost-effective model that removes
6 the -- removes the requirement of doing runoffs.
7    Q. I see. And you mentioned a few times that
8 to employ this technology you would need to rely on some
9 sort of algorithm; is that correct?
10    A. Yes. By definition, RCV uses an
11 algorithm.
12    Q. By definition RCV uses one; and by
13 definition STV would also use one, right?
14    A. STV is just an extension of the base RCV
15 algorithm.
16    Q. Do I understand correctly that any
17 jurisdiction that uses ranked choice voting, if they did,
18 would rely on some sort of algorithm?
19    A. Only for the contests that are designated
20 as ranked choice voting contest.
21    Q. Okay. And you're not aware of any of those
22 as you sit here today?
23    A. Oh, yes. Alameda County in California
24 uses RCV. San Francisco uses RCV. The state of Maine, I
25 think currently -- sorry. Let me back up.

Page 235

1       Alameda and San Francisco use RCV for
2 several local races. Maine, I believe, is the only state
3 that uses ranked choice voting for federal congressional
4 offices. I think there's somebody else, but those are
5 who I know for sure.
6    Q. Okay. I'd like to briefly jump back to
7 Exhibit 12, which is the complaint against Patrick Byrne,
8 among others. And if you could, Dr. Coomer, turn to
9 page 46.
10       All right. We've talked earlier -- this
11 is paragraph 78 at the bottom of the page. We've talked
12 earlier about Dr. Halderman's interim report, which
13 you've read, correct?
14    A. I have.
15    Q. And this report was published on March 26,
16 2021, correct?
17    A. Yes. That is correct.
18    Q. Okay. You -- you knew Dr. Halderman at
19 that time, did you not?
20    A. I've had interactions with Dr. Halderman.
21 I wouldn't necessarily characterize us as knowing one
22 another.
23    Q. Okay. But your paths have crossed?
24    A. Yes.
25    Q. And that was through your work in the

Page 236

1 Curling case, correct?
2    A. That's one of the areas that our paths
3 crossed, yes.
4    Q. What were the other areas?
5    A. I've seen him at various -- essentially
6 election conferences.
7    Q. Dating back to when? You can provide a
8 rough estimate.
9    A. I mean, the first time that I ever met
10 Halderman personally, roughly -- let me think about that.
11 Personally. Because I took one of his online classes
12 around 2009, and I think I personally met him on or
13 around 2015.
14    Q. 2015? Okay.
15       MR. MALONE: This will be Exhibit 14.
16       (Discussion off the record.)
17       (Exhibit 14 was marked.)
18    Q. (By Mr. Malone) This is Exhibit 14.
19 Dr. Coomer, this is your declaration in the Curling case
20 which was filed on November 13th, 2019. Do you remember
21 preparing this document?
22    A. I do.
23    Q. If you could turn to page 2, paragraph 3.
24 And the second sentence says, "Specifically, Georgia has
25 purchased Dominion Democracy Suite for use in its

Page 237

1 elections. Democracy Suite includes ImageCast X
2 Ballot-Marking Devices, (BMD's) [sic], which operate with
3 a printer to produce a paper ballot, and ImageCast
4 Precinct Polling Place Scanners, which are optical
5 scanners which allow ballots to be scanned and tabulated."
6       That was all accurate at that time,
7 correct?
8    A. That is accurate.
9    Q. Does Georgia still use the ImageCast
10 ballot -- ImageCast X ballot marking devices?
11    A. As far as I know, they do, yes.
12    Q. Moving on to page 7, paragraph 13. You
13 write, While all computers can be hacked with enough time
14 and access -- do you still agree with that?
15    A. I do.
16    Q. Dominion is not aware of any situation
17 where an individual used the barcode on one of its units
18 to launch software or to affect the operation of the unit.
19       Do you see that?
20    A. I do.
21    Q. That was accurate at that time,
22 November 13th, 2019?
23    A. Yes, it was.
24    Q. Since that time, since you signed this
25 declaration, have you come to learn of any situation where

60 (Pages 234 - 237)

Page 238

1 an individual did use the barcode in that way?
2     A.  Not in the field on commercial units.
3     Q.  What about outside of the field on
4 commercial units?
5     A.  I have read some claims that, in a
6 laboratory setting, they were able to compromise that,
7 yes, on a single device.
8     Q.  Do you know where that lab setting was?
9     A.  I believe it was Dr. Halderman's lab in
10 Michigan, or it was -- it may have been somewhere in
11 Georgia.
12     Q.  Were these tests that Dominion asked
13 Dr. Halderman to perform?
14     A.  They were not.
15     Q.  Do you know why he was doing that?
16     A.  He was doing that as part of his work as
17 an expert for the plaintiffs in Curling.
18     Q.  In the Curling case?
19     A.  Yes.
20     Q.  Okay.  Exhibit 15.
21         (Exhibit 15 was marked.)
22     Q.  This is a declaration that Dr. Halderman
23 presented in the Curling case dated September 29th, 2020.
24 Have you seen this declaration before, Dr. Coomer?
25     A.  It's been a while, but I'm pretty sure

Page 239

1 I've read this one.  I would go with yes.
2     Q.  Okay.  Are you aware of anything in this
3 declaration that's inaccurate?
4     A.  Actually, let me skim this one.  This
5 looks to be a little bit later.
6         There are certainly -- there are certainly
7 comments made by Dr. Halderman in this that I would
8 absolutely disagree with and I think border on incorrect.
9     Q.  Okay.  Which would those be?
10     A.  His characterization that -- this was
11 specifically in regards to a de minimus software change
12 that the EAC had approved.  He compares that de minimis
13 software change to the entire automatic air control
14 system of the Boeing 737 Max aircraft, which was a very
15 complex system involving multiple sensors and millions of
16 lines of software code.
17         Our de minimus change in this was
18 literally on the order of three lines.  And again,
19 we -- Dominion did not deem this de minimis.  It was Pro
20 V&V the, voting systems test laboratory and accredited
21 testing laboratory for the EAC, which the EAC approved.
22 And comparing such a de minimis change to such a complex
23 system I found egregiously -- I find egregious.  And I
24 think he's completely wrong in his conclusions on this.
25     Q.  You were not compensated beyond your salary

Page 240

1 to testify in the Curling case, correct?
2     A.  That is correct.
3     Q.  Do you know if Dr. Halderman was?
4     A.  I do not know for sure.
5     Q.  Okay.  On page 4 of this document,
6 paragraph 7, Dr. Halderman testified -- or he says, quote,
7 As I have already testified, malicious modifications to
8 the BMD's software could undermine the integrity of
9 election results in multiple ways, including by changing
10 either the bar codes alone or both the bar codes and the
11 human readable text with the result that election outcomes
12 could be changed without detection.
13         Do you see that?
14     A.  I do.
15     Q.  Do you agree with that statement?
16     A.  I do not.
17     Q.  Why not?
18     A.  Because of the various processes and
19 audits that are in place and followed.  There are several
20 steps along in this process that I think the statement,
21 change without detection, is incorrect.  I fundamentally
22 disagree with Dr. Halderman on this.
23     Q.  What about his next statement, Replacing
24 the software now on the eve of the election creates a
25 vector by which an attacker could introduce malicious

Page 241

1 changes into BMDs statewide.
2     A.  I fundamentally disagree with that
3 statement as well.
4     Q.  For what reasons?
5     A.  Multiple reasons.  Again, process
6 procedures, chain of custody.  There was a new package
7 of -- of software for the BMD created.  It was created by
8 the lab.  It was delivered securely from the lab to the
9 state.  The state then securely delivered that to all of
10 the machines.  And then all of the machines underwent
11 that pre-logic and accuracy testing that we discussed
12 earlier.
13     Q.  So because of the testing procedures that
14 were or should have been in place, you disagree with
15 Dr. Halderman's assessment here, is that fair?
16     A.  Yes.  And also on a -- post-election there
17 are audits that compare the paper records to the
18 electronic records.  And then there is a way to verify
19 that the software that's installed on the devices is the
20 official software.  It's called a hash value.  It's
21 essentially a unique digital signature.
22         So, you know, doing audits of that which,
23 again, is best practices, you would be able to detect
24 whether or not the installed software was the official
25 software.

61 (Pages 238 - 241)

Page 242

1      Q.  Do I understand correctly that that hash
2  value you just referred to also relies on an algorithm?
3      A.  Yeah.  Yes.
4      Q.  Okay.  Getting back to Dr. Halderman's
5  statement, Malicious code could be introduced by what the
6  defendants and their election experts often refer to as an
7  insider at Pro V&V or by attackers who compromise the
8  company's systems.  It could also be introduced by
9  modifying the software update package as it is being
10  distributed to the state and onward to counties, or as the
11  counties are copying it to machines across the state.
12      Do you disagree with those statements?
13      A.  Are these theoretically possible vectors?
14  Yes.  That is why there are policies and procedures
15  involved to mitigate these.
16      So, again, I think we have to -- I think
17  we have to segregate what is an academic theoretical
18  threat model and what is something that would go
19  undetected and be something that could be carried out
20  in -- what's the word I'm looking for -- in a -- you
21  know, again, an undetected manner.  So I'm sorry to be so
22  nuanced on that, but that's the reality of it.
23      Q.  Paragraph 8 on the next-to-last page is
24  Dr. Halderman's statement, I am especially perplexed that
25  the state has decided to accept these risks because it

Page 243

1  would appear, based on today's testimony, that simple
2  procedural changes could correct the asserted problem
3  without any changes to the software.
4      Did you testify on September 29th, 2020?
5      A.  I honestly can't remember.  I might have
6  testified the day before.  But it was -- it was around
7  this time.
8      Q.  So it's your understanding that
9  Dr. Halderman is referring to your testimony by that
10  sentence statement?
11      A.  Yes, he is.
12      Q.  All right.  He goes on to say, Dr. Coomer
13  characterized the user interface problem as occurring only
14  once each time a BMD is powered on and operated.  If this
15  is the case, the state should be able to simply instruct
16  poll workers after turning on each BMD to print a test
17  ballot and trigger the aberrant behavior before voters
18  begin using the machine?
19      Are those statements accurate?
20      A.  They're factually accurate.  They are
21  impractical to implement on election day.
22      Q.  What makes them impractical?
23      A.  You have human poll workers.  You have
24  long lines.  You may have to restart the BMD during a day
25  for a variety of reasons.  And relying on poll workers

Page 244

1  that are stressed and dealing with these long lines, to
2  follow this -- and it was somewhat a convoluted procedure
3  to trigger this behavior and fix it, as opposed to
4  making, again, what the EAC agreed was a de minimis
5  change, which means a change that does not -- that is not
6  at risk of, you know, affecting anything else.  When
7  you're dealing with an entire state of 33,000 machines
8  it's the better way to go, in my opinion.  And I
9  completely disagree with Dr. Halderman on this.
10      Q.  When you say a de minimis change is not at
11  risk of affecting anything else, what is it that you mean
12  by that statement?
13      A.  So de minimis change is an actual
14  technical term.  And it means that it's a change that's
15  so innocuous that it can be -- it can be made without
16  fear of having any additional effects on the rest of
17  system.
18      Q.  We're talking about the Curling case.  Are
19  you aware with how that case was decided as far as the
20  2020 election is concerned?
21      A.  I do not recall at this time, and I have
22  since purged all following of that case.
23      Q.  Why do you say that?
24      A.  Because it's not my job anymore, and
25  again, I -- I try to keep my sanity where I can.

Page 245

1      Q.  And by following the Curling case, it's
2  your testimony that that would not be good for your
3  sanity?
4      A.  It's frustrating.
5      Q.  What specifically makes that case
6  frustrating?
7      A.  Again, because I think that there are
8  multiple statements by Halderman that I fundamentally
9  disagree with, that I think he embellished, and I'm not
10  in a position anymore where I could provide expert
11  rebuttal to such arguments.
12      Q.  As far as you know, Dr. Coomer, do you
13  intend to identify Dr. Halderman as an expert witness in
14  this case?
15      A.  In this case specifically, I'm not sure.
16  I believe so.
17      Q.  I think this will be Exhibit 16.
18      (Exhibit 16 was marked.)
19      Q.  Okay.  Dr. Coomer, you've just been handed
20  the LexisNexis reported version of the order issued in the
21  Curling case.  It's at 493 F.Supp. 3d 1264.  Have you seen
22  this order before?
23      A.  I believe I skimmed this order when it
24  came out, but I do not think I have fully digested it.
25      Q.  Okay.  If you could turn to page 22 of that

62 (Pages 242 - 245)

Page 246

1 order.
2       A.  Okay.
3       Q.  Okay.  This is a paragraph, left column,
4 that begins, "Dr. Coomer testified at the injunction
5 hearing that Dominion did not intend to encrypt the QR
6 barcode."
7           Do you see that?
8       A.  I do.
9       Q.  Is that how you testified?
10      A.  Yes, it is.
11      Q.  Why did Dominion not intend to encrypt the
12 QR barcode?
13      A.  Because as being part of the official
14 paper record, we felt that that had to be publicly
15 available information.  And if you encrypted it, then you
16 would have to provide the security keys, which you could
17 not do publicly.
18      Q.  I see.
19          The order goes on to say, "He also
20 testified regarding the use of digital signatures, secure
21 keys in the system 'that are part of the system and the
22 standard SHA-256 hashing algorithm.'"
23          Is that the -- the algorithm that we were
24 just talking about a few minutes ago?
25      A.  It's one method of digitally signing

Page 247

1 things.  I don't believe SHA-256 is used on the software
2 packages.  And while the QR barcode was not encrypted, it
3 was signed with a SHA-256 hash algorithm.
4       Q.  Was that a problem?
5       A.  No.
6       Q.  Okay.  Jumping up to the top right corner
7 of the page, there is a sentence that says, "He further
8 acknowledged the potential for compromise of the operating
9 system, by exploiting a vulnerability, that could allow a
10 hacker to take over the voting machine and compromise the
11 security of the voting system software."
12          Do you see that?
13      A.  I do.
14      Q.  Is that an accurate reflection of your
15 testimony?
16      A.  Insofar as I've stated multiple times,
17 given enough time and resources and unfetterred access,
18 there's no system that cannot be compromised.
19          Sorry for the double negative.
20      Q.  No.  That's okay.  I think I understand.
21          When you say, "by exploiting a
22 vulnerability," are you referring to a specific
23 vulnerability?
24      A.  Sorry.
25      Q.  I should clarify.  This is Judge

Page 248

1 Totenberg's summary of your testimony.  So if it's not
2 accurate, let me know.  But were you referring to a
3 specific vulnerability when you testified in
4 September 2020 in this case?
5       A.  My recollection, I was speaking of
6 vulnerabilities in general and not a specific one.
7       Q.  Okay.  So these were theoretical issues
8 that you were discussing at the injunction hearing?
9       A.  Again, the best of my recollection, that
10 is correct.
11      Q.  Okay.
12          (Exhibit 17 was marked.)
13      Q.  Okay.  Dr. Coomer, I have -- or you have
14 just been handed Exhibit 17, which is a series of text
15 messages you've produced in this case starting with the
16 Bates number of 001259.  Do you see that?
17      A.  I do.
18      Q.  Okay.  These are texts with Bill Coomer.
19 That's your brother William, right?
20      A.  Yes, that's my older brother.
21      Q.  Okay.  Is -- is your older brother a
22 lawyer?
23      A.  No.
24      Q.  Okay.  I don't mean to ask this question
25 indirectly.  So I'm just curious why, as far as you know,

Page 249

1 there is a privilege block at the beginning of these text
2 messages.
3       A.  I don't personally know.
4       Q.  Okay.
5       A.  Probably because -- well, I'm not going to
6 speculate.
7       Q.  Okay.  And it refers -- in your texts with
8 your brother Bill you're referring to absolute proof that
9 Mr. Lindell was in?
10      A.  Am I?  Can you --
11      Q.  Sure.  I'm referring to your text on
12 February 5th, 2021, where you say, So they do have
13 segments of me in that stupid absolute proof bullshit.
14 Then Bill responds, Is that a question or a statement?
15      A.  Okay.  Yes.
16      Q.  Okay.  So you've watched the film Absolute
17 Proof?
18      A.  I did.
19      Q.  Are you aware of any statements that
20 Mr. Lindell made about you in that film?
21      A.  I do not recall any.
22      Q.  Okay.  Were you familiar with Mr. Lindell
23 before the 2020 election?
24      A.  In general, yes.
25      Q.  And you knew him as the -- as what?

63 (Pages 246 - 249)

Page 250

1    A.   The My Pillow guy.
2        Q.   Did you know anything else about him before
3  20 -- the 2020 election other than being the My Pillow
4  guy?
5        A.   That he seemed to support conservative
6  political agendas.
7        Q.   What do you base that belief on?
8        A.   Just some random stuff that I read about
9  causes that he supported, et cetera.
10       Q.   This is before 2020?
11       A.   Before November 2020, yes.
12       Q.   What causes did you read that he had
13  supported?
14       A.   I can't recall the specifics.
15       Q.   Did you personally have a strong opinion
16  about him one way or the other before the 2020 -- well, I
17  should say before May of 2021?
18       A.   No, I did not.
19       Q.   Do you recall ever expressing an opinion
20  about him one way or the other before these texts that we
21  just looked at with your brother?
22       A.   No, I do not.
23       Q.   Okay.  Okay.  Exhibit 18.
24           (Exhibit 18 was marked.)
25       Q.   Okay.  You're looking at some texts that

Page 251

1  you've produced in this case with Vic Babbitt.  Do you see
2  those, Dr. Coomer?
3        A.   I do.
4        Q.   And Vic writes, I used to work at Hart
5  InterCivic.  Do you see that?
6        A.   I do.
7        Q.   As far as you know, does he still work at
8  Hart?
9        A.   No, he has not worked at Hart for quite
10  some time, probably 15 years.
11       Q.   Did you ever follow up on this text
12  exchange with Mr. Babbitt?
13       A.   Not beyond what is here.
14       Q.   You never met him in person after March of
15  2021?
16       A.   No.
17       Q.   Did you ever ask him for a job?
18       A.   No.  He works in a field that I am not
19  competent in.  He does not work in elections anymore.
20       Q.   Okay.  Exhibit 19.
21           (Exhibit 19 was marked.)
22       Q.   These are text messages you've provided in
23  this case with Ryan Macias on January 17th, 2021.  Do you
24  see those, Dr. Coomer?
25       A.   I do.

Page 252

1        Q.   Who is Ryan Macias?
2        A.   He's a colleague that I've worked with
3  probably over the last -- I think I first met him in
4  2007.  He's had a variety of positions within the
5  elections base.
6        Q.   Who is Mr. Macias's employer?
7        A.   Currently, I do not know.  Yeah.
8  Currently I don't know his employer.
9        Q.   So he texted you on January 17th asking to
10  see how things are going, right?
11       A.   Yes.
12       Q.   And in your response, you say, "That Jovan
13  pullitzer clown and the My Pillow guy are keeping it
14  alive."
15           Do you see that?
16       A.   I do.
17       Q.   What are you referring to about -- what is
18  the "it" that they're keeping alive?
19       A.   The false narrative of election fraud.  So
20  I will have to amend my answer because this is dated
21  January 17th of 2021.  So clearly, I was aware of
22  Mr. Lindell being involved in the conspiracy theories
23  about election fraud before May.  What those specific
24  statements are, I cannot recall.  But this is pretty
25  clear evidence that I was aware of him before that.

Page 253

1        Q.   Are you aware of anything that he had said
2  about you as of January 17th, 2021?
3        A.   Again, I can't recall the specifics.  I'm
4  just -- I'm basing it --obviously, there's clear evidence
5  that I knew that he was involved in the election fraud
6  conspiracies.  I can't say one way or another whether he
7  had mentioned me specifically by name at this point or
8  not.
9        Q.   This will be Exhibit 20.
10           (Exhibit 20 was marked.)
11       Q.   Okay.  You're looking at Exhibit 20, which
12  are emails between you and Patrick Bolan June 8th, 2022.
13  Do you see that?
14       A.   Yes, I do.
15       Q.   Okay.  If you turn to the second page, it
16  looks like you sent the email to Mr. Bolan that just says
17  "Checking in"; is that right?
18       A.   That appears so, yes.
19       Q.   Was that the subject of the email; was that
20  the text?
21       A.   That was the text of the email.
22       Q.   Nothing beyond that?
23       A.   Yeah.  So the subject is -- because this
24  is just a continuous chain.  So the subject was "Hi."
25  And then "Checking in."

64 (Pages 250 - 253)

Page 254

1     Q. I see. At 5:53 on June 8th, it looks as
2 though Mr. Bolan said, "Give me a call, or Signal me -
3 same number as before. It'd be good to catch up."
4     Do you see that?
5     A. I do.
6     Q. Did you -- or do you often communicate with
7 Mr. Bolan through Signal?
8     A. I do not.
9     Q. Have you ever communicated with him through
10 Signal?
11     A. Not that I recall.
12     Q. Have you ever communicated with anyone
13 through the -- when I say "Signal," I mean the app Signal,
14 correct?
15     A. I have used Signal, yes.
16     Q. Have you used Signal to communicate with
17 anyone about your case against Mr. Lindell, My Pillow, and
18 Frankspeech?
19     A. No. Not that I recall.
20     Q. Who is Patrick Bolan?
21     A. He is a fellow colleague that I met at the
22 University of California Berkeley. We were both grad
23 students. He started in -- he was there from 1993 to
24 1994.
25     Q. And you've kept in touch with him since

Page 255

1 then?
2     A. Off and on, yes.
3     Q. And I'm assuming that you've provided this
4 email because on page 1 you refer to pillow-boy Lindell;
5 is that right?
6     A. That is correct.
7     Q. Okay. You say that you have four active
8 lawsuits, soon to be five. What was the fifth lawsuit
9 that you're referring to there?
10     A. I don't remember the order.
11     Q. Okay. Anyone other than those that we've
12 talked about today or that were identified in your answer
13 to the interrogatories?
14     A. There's no other cases other than the ones
15 listed.
16     MR. MALONE: All right. Dr. Coomer,
17 that's all I have for you today. Thank you for your
18 time.
19     MR. CAIN: We'll reserve our questions
20 until trial.
21     THE REPORTER: Your order for transcript,
22 please.
23     MR. MALONE: PDF condensed, if possible,
24 electronic condensed.
25     THE REPORTER: And do you want exhibits

Page 256

1 for your copy?
2     MR. MALONE: Yeah, that would probably be
3 good. Mine are all over the place, so the official
4 exhibits would be good.
5     MR. CAIN: Whatever Scotti Beam says, I
6 do.
7     THE REPORTER: Do you want to handle
8 signature?
9     MR. CAIN: Yes, I do.
10     * * * * * * *
11     WHEREUPON, the foregoing deposition was
12 concluded at the hour of 4:56 p.m. Total time on the
13 record was 6 hours and 48 minutes.
14
15
16
17
18
19
20
21
22
23
24
25

Page 257

1     REPORTER'S CERTIFICATE
2
3
4     I, Laurel S. Tubbs, a Registered
5 Professional Reporter and Notary Public within the State
6 of Colorado, do hereby certify that previous to the
7 commencement of the examination, the deponent was duly
8 sworn by me to testify to the truth.
9     I further certify that this deposition was
10 taken in shorthand by me at the time and place herein set
11 forth and thereafter reduced to a typewritten form; that
12 the foregoing constitutes a true and correct transcript.
13     I further certify that I am not related
14 to, employed by, nor of counsel for any of the parties or
15 attorneys herein, nor otherwise interested in the result
16 of the within action.
17     My commission expires September 1, 2023.
18
19
20     LAUREL S. TUBBS
    Registered Professional Reporter
    Registered Merit Reporter
21     Certified Realtime Reporter
    and Notary Public
22
23
24
25

65 (Pages 254 - 257)

Page 260

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2

          ASSIGNMENT REFERENCE NO: 5691228
 3        CASE NAME: Coomer, Ph.D., Eric v. Lindell, Michael J., et al.
          DATE OF DEPOSITION: 2/15/2023
 4        WITNESS' NAME: Eric Coomer, Ph.D.
 5        In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7        I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9        I request that these changes be entered
      as part of the record of my testimony.
10

          I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    3/30/23
      Date                 Eric Coomer, Ph.D.

14

          Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22    this 30  day of March        , 20 23 .
23
          Notary Public
24                                       TRACEY A MELIA
                                    NOTARY PUBLIC - STATE OF COLORADO
                                       NOTARY ID 20154008930
          10/7/2023                 MY COMMISSION EXPIRES OCT 7, 2023
25
          Commission Expiration Date
```

Page 261

1                          ERRATA SHEET

          VERITEXT LEGAL SOLUTIONS MIDWEST

2                    ASSIGNMENT NO: 5691228

3    PAGE/LINE(S) /          CHANGE          /REASON

4    15/9 The Cook's name is Grayson McKee /recollection

5    19/23 "Noel" should be "Noell" throughout/spelling

6    66/23 Jennifer Morrell CEO The Elections Group,

7    Matthew Crane Executive Director of the Colorado

8    County Clerks Association, Kay Stimson VP Governmental

9    Relations, DVS

10   72/8 honorable/auditable / mis-transcribed

11   100/17 logging/logic  / mis-translation

12   140/1 Scott Algeier Exec Director IT-ISAC

13   151/24 11/18/2020 flight ORD-DEN clarification

14   202/21 detect/defect mis-transcribed

15   235/12 Interim/Antrim mis-transcribed

16   245/9 strike "that I think he embellished,"

17   speculative and not what I intended

18   _____

19

     _3/30/23_                  _____
20   Date                       Eric Coomer, Ph.D.

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS  30

22   DAY OF ___March_____ , 20 23

23                   _____
                     Notary Public

24
                              10/7/2023
25   _____
     Commission Expiration Date

TRACEY A MELIA
NOTARY PUBLIC - STATE OF COLORADO
NOTARY ID 20154008930
MY COMMISSION EXPIRES OCT 7, 2023