# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129

ERIC COOMER, PhD.,

     Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,

     Defendants

---

## EXHIBIT 13

---

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3          CIVIL ACTION NO: 1:22-CV-01129-WJM
    -------------------------------------------x
 4    ERIC COOMER, Ph.D.,                      :
 5                         Plaintiff,          :
 6                                             :
              -versus-
 7                                             :
 8    MICHAEL J. LINDELL, FRANKSPEECH LLC,     :
      and MY PILLOW, INC.,
 9                                             :
                         Defendants.
10    -------------------------------------------x
11
12
13
14            Videotaped Deposition of HARRI HURSTI,
15       taken pursuant to Subpoena, Notice, and the Federal
16       Rules of Civil Procedure, at Regus, 500 West Putnam
17       Avenue, Greenwich, Connecticut, before June Keefer,
18       RMR, RPR, a Notary Public in and for the State of
19       Connecticut, on March 30, 2023, at 10:10 a.m.
20
21
22
23
24
25
                                              Page 1
```

1  A P P E A R A N C E S :
2
3
    For the Plaintiff:
4
    CAIN & SKARNULIS PLLC
5   P.O. Box 1064/101 N. F Street
    Suite 207
6   Salida, Colorado 81201
    -and-
7   303 Colorado Street
    Suite 2850
8   Austin, Texas 78701
    Tel: (719)530-3011
9   By:  CHARLES J. CAIN, ESQ.
10
11
    For the Defendants:
12
    PARKER DANIELS KIBORT LLC
13  888 Colwell Building
    123 North Third Street
14  Minneapolis, Minnesota 55401
    Tel: (612)355-4100
15  By:  RYAN P. MALONE, ESQ.
16
17
18  A L S O   P R E S E N T :
19    DEBBIE O'TOOLE, Videographer
20
21
22
23
24
25

*Page 2*

---

1        THE VIDEOGRAPHER:  Good morning.  We're
2  going on the record at 10:10 a.m. on March 30th, 2023.
3  Please note that the microphones are sensitive and may
4  pick up whispering and private conversations.  Please
5  mute your phones at this time.  Audio and video recording
6  will continue to take place unless all parties agree to
7  go off the record.
8        This is Media Unit 1 of the
9  video-recorded deposition of Harri Hursti taken by
10  counsel for the Plaintiff in the matter of Eric Coomer,
11  Ph.D. versus Michael J. Linden, et al., filed in the
12  United States District Court of Colorado, case number
13  1:22-CV-00 -- I mean 01129-WJM.  The location of the
14  deposition is Regus, 500 Putnam Avenue, Suite 400,
15  Greenwich, Connecticut 06830.
16        My name is Debbie O'Toole representing
17  Veritext and I'm the videographer.  The Court Reporter is
18  June Keefer from the firm Veritext.  I'm not related to
19  any party in this action nor am I financially interested
20  in the outcome.  If there are any objections to
21  proceeding please state them at the time of your
22  appearance.  Counsel will now state their appearances for
23  the record beginning with the noticing attorney.
24        MR. CAIN:  Charlie Cain on behalf of the
25  Plaintiff.  And it's Lindell, not Linden.

*Page 3*

---

1        MR. MALONE:  Ryan Malone on behalf of all
2  Defendants.
3        THE VIDEOGRAPHER:  Will the Court
4  Reporter please swear in the witness and we may proceed.
5           *    *    *
6  H A R R I   H U R S T I ,
7  274 Valley Road, Cos Cob, Connecticut 06807,
8    called as a witness, having been first duly sworn by
9    June Keefer, a Notary Public in and for the State of
10   Connecticut, was examined and testified as follows:
11       THE REPORTER:  Any stipulations?
12       MR. CAIN:  By the rules.
13       MR. MALONE:  That's right.
14  DIRECT EXAMINATION
15  BY MR. CAIN:
16  Q.  Can you tell us your full name please.
17  A.  Harri Hursti, H-a-r-r-i, H-u-r-s-t-i.
18  Q.  And, Mr. Hursti, from the sound of your voice I
19  take it you're from Lubbock, Texas originally?
20  A.  I'm from Finland, Helsinki originally.  I'm a
21  dual citizen of Finland and the United States.
22       THE REPORTER:  Finland?
23       THE WITNESS:  Finland.
24       THE REPORTER:  What else did you say?
25       THE WITNESS:  I'm a dual citizen of the

*Page 4*

---

1  United States and Finland, but Helsinki, Finland, the
2  capital city of the country.
3  Q.  And I'm going to do my best to clarify if
4  there's -- you speak -- your English is very good of
5  course, but sometimes it's difficult to understand some
6  of the words, so I'll do my best to clarify that when I
7  can.
8  A.  Unfortunately English is my third language.
9  Q.  There you go.  Mr. Hursti, you and I have met
10  in person for the first time about eight minutes ago or
11  so; right?
12  A.  Correct.
13  Q.  You are here in a case that I filed on behalf
14  of Dr. Eric Coomer, who is formerly of Dominion Voting
15  Systems; do you understand that?
16  A.  I understand that.
17  Q.  Have you ever met Dr. Coomer?
18  A.  To the best of my knowledge never.
19  Q.  Okay.  And I have served a subpoena on you to
20  appear here; is that right?
21  A.  Correct.
22  Q.  You received that?
23  A.  Correct.
24  Q.  And you're -- other than the nominal witness
25  fee that you received, you're not being compensated to be

*Page 5*

2 (Pages 2 - 5)

1 here, are you?
2     A.  Correct; I'm not compensated.
3     Q.  All right.  And part of that subpoena, which
4 should be here, if my documents had arrived I'd show it
5 to you, but that subpoena had a request for documents for
6 you to produce?
7     A.  Correct.
8     Q.  And you've done that, have you not?
9     A.  Correct; about half gigabyte of documents.
10     Q.  Okay.
11         THE REPORTER:  I'm sorry, about?
12         THE WITNESS:  Half gigabyte of documents
13 compressed.  A little less, but approximate.
14     Q.  And we took the liberty of converting those to
15 PDF and putting control numbers on those documents, and
16 also where you have indicated we have marked those
17 documents as Confidential or Attorneys' Eyes Only, okay?
18     A.  Wonderful.
19     Q.  All right.  And the reason we've done that is
20 there is a protective order in this case; right?
21     A.  Yes.
22     Q.  Okay.  And you've seen that protective order?
23     A.  Yes, and I have returned signed that I have
24 seen it.
25         THE REPORTER:  I'm sorry, have what?

Page 6

1         THE WITNESS:  Returned signed page.
2     Q.  Okay.  So I provided -- my office provided you
3 with a copy of the protective order; correct?
4     A.  Correct.
5     Q.  And as you indicated on the record, you've seen
6 it, you've read it, and you've signed it?
7     A.  Correct.
8     Q.  All right.  As part of that protective order, I
9 don't have it in front of me, but you'll have
10 approximately two weeks, maybe 15 days after you receive
11 this transcript to designate any portion of the
12 transcript as Confidential or Attorneys' Eyes Only.
13     A.  Uh-huh.
14     Q.  Okay.  You have that right, okay?
15     A.  Wonderful.  Thank you.
16     Q.  And, likewise, either Mr. Malone or myself have
17 that right to designate under our protective order, okay?
18     A.  Yes.
19     Q.  You told us where you were born.  Can you give
20 me some biographical information in starting with your
21 educational background.
22     A.  Actually, interestingly enough, my highest
23 degree is a high school degree, so I have been
24 self-educated.  Regardless of that, I have been visiting
25 and lecturing at a number of universities both in the

Page 7

1 United States and in Europe.  My background is in
2 originally software development --
3         THE REPORTER:  I'm sorry, in?
4         THE WITNESS:  Software development.
5     A.  -- governmental databases, database systems,
6 ray tracing graphics, encryption algorithms, secure
7 communication protocols, etc.
8         THE REPORTER:  After encryption
9 algorithms.
10         THE WITNESS:  Encryption algorithms,
11 secure communication protocols.
12         THE REPORTER:  Secular?
13         THE WITNESS:  Secure communication
14 protocols.
15     A.  I was co-founder of EUnet, the first European
16 internet service --
17         THE REPORTER:  I'm sorry, I'm not getting
18 it.
19         THE WITNESS:  EUnet.
20     Q.  Let's stop for a second.  She can't obviously
21 take down what I'm saying and you're saying at the same
22 time.  You're a fast talker --
23     A.  Okay.
24     Q.  -- which is fine, but it's making it a little
25 more difficult.

Page 8

1     A.  I will slow down.
2     Q.  Just if you can just channel me.  I speak very
3 slowly.
4     A.  Okay.
5     Q.  It's very boring.  So just slow down.
6     A.  All right.  So I was co-founder of EUnet, the
7 first Pan-European internet service provider.  I was
8 co-founder of ROMmon, the first real-time full packet
9 inspection system capable of doing 2 gigabits per second.
10 That's relevant because that is absolutely the same
11 technology which is kind of PCAP technology.
12         THE REPORTER:  Which is?
13         THE WITNESS:  PCAP.
14         THE REPORTER:  PCAP?
15         THE WITNESS:  Packet Capture.
16     Q.  Yeah.  And I'll help spell some of these things
17 to the extent that I can.  PCAP is P-C-A-P, usually all
18 capitals, and that's short for Packet Capture; correct?
19     A.  Correct.  Yeah, and I'm only jumping here
20 relevant parts of my past, so --
21     Q.  Sure.
22     A.  -- which are relevant to this testimony.
23         So that's a -- that's a -- my quick past.
24 Currently I'm head of security for an open source
25 zero-trust company --

Page 9

3 (Pages 6 - 9)

**Page 10**

1    THE REPORTER: I'm sorry. Head of
2  security --
3    THE WITNESS: Open source.
4    THE REPORTER: Open --
5    THE WITNESS: Source zero-trust.
6    MR. CAIN: Like they didn't trust anyone.
7    THE WITNESS: Yeah.
8    MR. CAIN: They have zero trust.
9    THE WITNESS: Correct.
10   A.  -- identity management company called Ory,
11  O-r-y.
12   THE REPORTER: I'm sorry. Start that
13  over again. Something management company.
14   A.  Open source identity management company called
15  Ory, O-r-y. So I'm head of security for them currently.
16   MR. CAIN: You're recording this, June?
17   THE REPORTER: Yeah, but I'm still not
18  going to understand it if I don't understand it now.
19   MR. CAIN: I'll help you and I think
20  Harri will as well.
21   THE WITNESS: I will be slowing down.
22   Q.  Okay. All right. So she interrupted you a
23  little bit. Is there anything further you want to talk
24  about --
25   A.  No.

**Page 11**

1   Q.  -- in terms of your background?
2   A.  That's it.
3   Q.  Okay. So then let me break that down. You
4  went to high school, I assume in Finland?
5   A.  That's correct.
6   Q.  When did you graduate?
7   A.  '87.
8   Q.  And since then you have been working as -- in
9  the cyber business?
10   A.  I was in a university school, so I started
11  working when I was in school way before I even went to
12  high school.
13   Q.  Okay.
14   A.  So I have a long past in this area.
15   Q.  All right.
16   A.  Cyber was not the word used back in those days,
17  so.
18   Q.  Computer industry?
19   A.  Well, computer security, yeah.
20   Q.  Okay. Computer security. And you've been in
21  computer security since 1987 at least?
22   A.  Correct.
23   Q.  All right. And you mentioned a couple of
24  companies. One I want to ask you about in a little more
25  detail. It's called ROMmon?

**Page 12**

1   A.  Correct; ROMmon.
2   Q.  And that is not like the soup, it is spelled
3  R-o-m-m-o-n?
4   A.  Correct. ROM monitor is exactly where it comes
5  from.
6   Q.  Okay. And then you told us as relating to that
7  business that you developed -- I assume you had a team
8  that worked with you; is that right?
9   A.  It was -- yeah, we had a software development
10  team, but the whole concept was between me and my
11  co-founder Patri Halanius. So we were the two people who
12  had the idea, built the architecture, built the whole
13  technology.
14   Q.  Okay. And June is going to need you to spell
15  your co-founder's name.
16   A.  P-a-t-r-i, H-a-l-a-n-i-u-s.
17   Q.  Okay. And the technology you developed
18  analyzed traffic data over the internet; is that right?
19   A.  Correct. It's the -- normally when you do
20  traffic analysis you -- back in the day like firewall
21  it's on a packet forward chain, so all the packages go
22  through it, which means that the device can slow down the
23  traffic if it needs more time to process. We were unique
24  because instead of being in a packet forward chain we
25  were in the router's or switch's mirror port, which is a

**Page 13**

1  fire hose. Mirror port.
2   Q.  Like a mirror you look in?
3   A.  Yeah. So that's why we were in a fire hose we
4  couldn't control and we had to real-time analyze
5  everything because we couldn't slow the traffic down,
6  which is very good because then we don't add latency.
7    THE REPORTER: Because then we --
8    THE WITNESS: Don't add latency.
9   Q.  Like latency?
10   A.  Latency. So it was a unique approach, but that
11  was really -- in essence it's real-time capturing the
12  traffic PCAP and real-time analyzes. Back in those days
13  2 gigabits per second was unbelievably fast.
14   Q.  So tell me if my analogy makes sense. It'd be
15  like standing outside looking at the freeway as the cars
16  go by at 70 miles an hour and you were able to analyze
17  those vehicles at 70 miles an hour, they didn't have to
18  slow down to 35 miles an hour for you to be able to
19  analyze the data?
20   A.  Correct, and in that analogy instead of looking
21  what the car looks like and what's the license plate, we
22  also look who was inside of car and what is in the trunk.
23   Q.  Okay.
24   A.  That's the secret what we did.
25   Q.  All right. And a lot of companies that develop

4 (Pages 10 - 13)

1 that type of valuable software end up selling that to
2 another party. Did you package that product up and sell
3 it?
4     A. We sold the whole company to publicly-traded
5 antivirus company called F-Secure. It's listed in
6 Nasdaq.
7     Q. And that's F, hyphen, S-e-c-u-r-e?
8     A. Correct.
9     Q. Okay. I'm aware of a product called Wireshark.
10 Do you know what that is?
11     A. I do know what it is. It's an open source
12 software free of charge enabling you to both capture and
13 analyze traffic and create PCAP files and also analyze
14 existing PCAP files.
15     Q. Okay. And is -- the technology that you
16 developed, is that similar to Wireshark?
17     A. In broad strokes, yes. Wireshark is a tool for
18 human to analyze it. What we did was we automatically
19 analyzed it and also we were able to use that data to
20 dynamically reconfigure the whole network; for example,
21 ban undesirable traffic or whatnot.
22     THE REPORTER: Ban?
23     THE WITNESS: Ban undesirable traffic.
24     Q. Ban as in --
25     A. Stop.

Page 14

1     Q. -- stop.
2     A. So we basically made a rule-based AI version of
3 what Wireshark is for humans.
4     Q. Okay. I'll pretend like I understood that last
5 part. And then you mentioned another company that you're
6 involved with currently; right?
7     A. Correct.
8     Q. And the name of that company is what?
9     A. Ory, O-r-y.
10     Q. Okay. And what does Ory do?
11     A. Ory is developing an open source zero-trust
12 architecture software, everything starting from identity
13 management to authorization, authentication, provisioning
14 permissions.
15     THE REPORTER: Pro?
16     THE WITNESS: Provisioning permissions.
17 Permissions.
18     THE REPORTER: What's the first word?
19     THE WITNESS: Provisioning.
20     Q. Provisioning?
21     A. Yeah.
22     MR. CAIN: Like provisioning.
23     A. Basically eliminating traditional credentials
24 and tokenizing the security.
25     Q. And that company is based out of Munich?

Page 15

1     A. Munich, yeah. The whole headquarter is Munich,
2 Germany. We're an American company, but basically I'm
3 the only one -- as of yesterday I was the only one in the
4 U.S., now there's two of us because we hired a new person
5 yesterday.
6     Q. And you mentioned early on you have dual
7 citizenship?
8     A. Correct.
9     Q. You're a U.S. citizen?
10     A. U.S. citizen and Finland-European Union
11 citizen.
12     Q. And in terms of your expertise have you served
13 as an expert witness?
14     A. I have served in multiple lawsuits as expert
15 witness both sides of the board.
16     Q. Okay. I don't need you to go into detail on
17 each of these cases, we don't have time, but I do want a
18 general overview of the types of cases you've served as
19 an expert witness and the jurisdictions that you served.
20     A. In -- maybe the most publicity is Curling case
21 which is in the Federal Court of Georgia in Atlanta, and
22 that is about election equipment, how the election
23 equipment should be treated, how to change the settings
24 of the system to make it more secure. So it's all about
25 election technology.

Page 16

1     When I look the other things where I've been
2 either testifying, providing declarations or depositions,
3 most of them on the United States side are relating to
4 elections, and I'm never in those lawsuits for a
5 candidate, it's always about the technology or if it's
6 a -- if it's for a specific race I have been then doing
7 mainly for races which are not relating an actual human
8 candidate, so races which are for bond issues or whatnot.
9     THE REPORTER: For bond?
10     THE WITNESS: Bond, financial bond.
11     Q. Like James Bond?
12     A. Yeah, yeah.
13     And then on the Europe side most of my work has
14 been related to insider trading, telecommunication
15 contracts and stuff like that, so back to my telecom
16 background.
17     Q. Mr. Hursti, about how many election-related
18 lawsuits have you acted as an expert witness in?
19     A. That's an excellent question. On top of my
20 head I can remember immediately five, but I'm not certain
21 if that is exhaustive list, and also if I have been
22 providing a research paper I don't count those, like when
23 I have been working for Penn State University to create
24 the EVEREST Report or for Princeton University to create
25 the analysis of Sequoia equipment, I didn't count those

Page 17

5 (Pages 14 - 17)

1 to that five. So my answer is almost certainly
2 inaccurate because I don't know what is the definition.
3 I was counting only when I have been either testifying or
4 providing a -- declarations. Actually now I remember one
5 more, so six.
6    Q. So let's back up because you mentioned
7 something that I want to ask you about. You said
8 EVEREST, you used that term, and that's spelled like the
9 mountain?
10    A. Correct.
11    Q. All right. And I believe, I looked it up, that
12 stands for Evaluation and Validation of Election-Related
13 Equipment, Standards and Testing?
14    A. Correct.
15    Q. All right. And so correct me if I'm wrong, but
16 that was actually part of two studies, one was done by --
17 commissioned by Penn State University; is that right?
18    A. So the study was commissioned by the Secretary
19 of State of Ohio, Jennifer Brunner.
20    Q. Can you spell her last name?
21    A. No. I don't remember how it's spelled.
22    Q. Okay.
23    A. But she was the Secretary of State of Ohio.
24 She commissioned I believe three different studies to
25 have apparently different people doing the same work over

Page 18

1 all the backup systems for the election definition,
2 election management, and the central tabulation. So
3 that's the scope of the study.
4    Q. And DRE is?
5    A. Direct-recording electronic. That's the touch
6 screen.
7    Q. And that -- as I read that 300-page report --
8 I'm kidding, I didn't read it all, but I looked at it --
9 it looked to me like at the time you all were looking at
10 various threat models and vulnerabilities of the ES&S
11 System, Premier, and Hart InterCivic; is that right?
12    A. Correct. It's a sad state of affairs that that
13 study even when it's old it's still relevant, because
14 those same systems unfortunately are still in use across
15 the U.S. in multiple places.
16    Q. And I believe that study was completed in 2007?
17    A. Correct.
18    Q. Okay. And to be clear, you were hired by the
19 Secretary of State to serve as an independent expert to
20 contribute to the study?
21    A. Not fully. I was hired by the Penn State
22 University. The principal investigator Patrick McDaniel
23 did make it as a condition that I have to be joining --
24 they have to organize me to join the team so that Penn
25 State will accept this commission.

Page 20

1 and over again. I was part of the team in -- which did
2 the EVEREST study. We were -- the head was Penn State
3 University and we also used certain subsections, the
4 University of Pennsylvania and the University of
5 California, both Davis and Santa Barbara.
6    Q. Okay. And the purpose of that study was what?
7    A. The purpose of the study was to look into every
8 election system used in the State of Ohio, evaluate. Now
9 we talk about a -- even when we did look also to one
10 electronic pollbook system we are only --
11         THE REPORTER: Elec --
12         THE WITNESS: Electronic pollbook system.
13         THE REPORTER: Electronic?
14         THE WITNESS: Pollbook.
15         MR. CAIN: Poll, like p-o-l-l --
16         THE WITNESS: Book, yeah.
17         MR. CAIN: -- book. So it's related to
18 elections.
19    A. But the main focus was the voting terminals,
20 and terminal here meaning both the terminal where the
21 voter votes at DRE, direct-recording --
22         THE REPORTER: The voter votes --
23    A. Voter terminals meaning both the DRE,
24 direct-recording electronic voting, so touch screen
25 voting, and paper scanners for paper ballots, and then

Page 19

1    Q. Okay. And then the other study you referred to
2 I wasn't actually sure if it was part of this EVEREST,
3 but it was with -- related to Sequoia?
4    A. Correct. Yeah, that's not part of EVEREST.
5 It's a separate lawsuit, separate everything.
6    Q. Okay. And Sequoia is a voting system company?
7    A. That is a now-defunct voting system company,
8 yes, and that was a study which we did for -- in
9 Princeton University for a lawsuit in New Jersey.
10    Q. Okay. And describe just in general what that
11 study was about.
12    A. There was an impossible results in primary
13 which the impossible results meant that the number of
14 Republicans and Democrats who voted were not matching the
15 results, so the results had to have -- there was a one
16 vote flaw -- one -- at least one voter had to have
17 switched it from Republican to Democrat, and that
18 triggered the study. So we studied that system
19 identifying the vulnerabilities and also tried to
20 identify how this one vote discrepancy could have
21 happened.
22    Q. Okay. And what did you conclude?
23    A. We concluded a number of problems in the system
24 as vulnerabilities and how you can compromise it, but we
25 also found a feature in that system where a dishonest

Page 21

6 (Pages 18 - 21)

Page 22

1  poll worker can cancel a voter's vote, the current one
2  vote, and then presumably vote instead of that voter,
3  see. So the X condition was a dishonest poll worker. It
4  is human against the system.
5      Q.  And I've seen the term used a white hat hacker.
6  Have you heard that term?
7      A.  I have heard that term.
8      Q.  What does that term mean to you?
9      A.  Generally speaking it means an ethical hacker
10  who is commissioned to do work for unidentified
11  vulnerabilities so they can be fixed. I personally I'm
12  characterizing myself as a black hat -- non-practicing
13  black hat, and the reason for that distinction is that
14  white hat hackers are nowadays often trained to be white
15  hat, which means they are trying to be smarter and they
16  don't have criminal minds, they don't think like a
17  criminal, and, hence, because the mindset is so
18  important, white hat hackers who have been trained to be
19  white hat are very often incomplete in their work because
20  they don't think like a criminal would think.
21      Q.  And you do?
22      A.  That is one of the things I've been credited to
23  be able to do, yeah.
24      Q.  All right. And so this -- your deposition is
25  obviously being videotaped and --

Page 23

1      A.  Yep.
2      Q.  -- may be shown to the jury, and I think one of
3  the things that you might add value to is to describe
4  sort of the friction between the election industry, the
5  people that are making the machines and the election
6  management software, and the people with good intentions
7  that are trying to poke vulnerabilities or look for
8  vulnerabilities in that software; right?
9      A.  Correct.
10      Q.  And is it fair to say that that dynamic is in
11  place in order to help improve ultimately the security of
12  our elections?
13          MR. MALONE:  Object to form and
14  foundation.
15          THE WITNESS:  What?
16      Q.  He just objected for the record, but you can
17  answer.
18          MR. MALONE:  You can answer it.
19      A.  Okay. So there has been a lot of friction
20  between the voting technology vendors and the security
21  community, and it is generally accepted that voting
22  technology area is 30 years behind in development to
23  other industries, from Microsofts of the world to medical
24  equipment to cars. Traditionally voting system vendors
25  have been very litigious and attacking the security

Page 24

1  community using --
2          THE REPORTER:  And what the --
3          THE WITNESS:  Attacking security
4  community. Attacking. Attacking.
5          MR. CAIN:  The security --
6          THE REPORTER:  No. Before that.
7          MR. CAIN:  Attacking, like attacking.
8      A.  They are -- they have been using things like
9  Digital Millennium Copyright Act. Digital Millennium
10  Copyright Act, DMCA. Right now the situation a few years
11  ago changed because in the triennial review, every third
12  year, triennial review of Copyright Act we got a exempt
13  for security research of voting machines as one of the
14  exempt areas from the DMCA, which took a lot of the blunt
15  weapons used by the voting system vendors against
16  security community away. But we have had a very uneasy
17  relationship between the security community and the
18  vendors.
19      Q.  And part of that is you've been trying to --
20  well, let me back up. As I understood it, you're one of
21  the few people that have actually had access to source
22  code relating to election management software; is that
23  right?
24      A.  That is correct.
25      Q.  Okay.

Page 25

1      A.  At one point of time before Dominion was even
2  in this market with their own name, at one point of time
3  I had seen source code of basically every major system
4  used in the United States, so, and there is less than a
5  dozen people in security community who have had that
6  access.
7      Q.  So less than a dozen people in the entire
8  community have had access to the actual source code?
9      A.  Yes. There are of course people who are in
10  certification side, but in the security community that
11  was unfortunate that it was so small a group of people
12  who have ever had that access, that's unfortunate.
13      Q.  I was asking, you called yourself half black
14  hat?
15      A.  No. I said I'm non-practicing black hat.
16      Q.  Non-practicing black hat. But you have -- I
17  noticed there was a hack that was even named after you.
18  I think it was of the Diebold scanning.
19      A.  There's multiple of those, but, yeah. Both big
20  ones, Hursti Hack and Hursti Hack 2, are against Diebold.
21      Q.  Diebold is D-i-e-b-o-l-d. Okay. And that's an
22  election company?
23      A.  A now-defunct election company; correct.
24      Q.  Can you explain sort of the distinction, if
25  there is one, between the concept of there being a

7 (Pages 22 - 25)

1  vulnerability in an election security system and an
2  actual exploit of that vulnerability?
3      A.  There's a humongous distinction.  There are a
4  lot of vulnerabilities which might not be exploitable.
5  Again, there are vulnerabilities which are deeply
6  exploitable in multiple different ways.
7          The most important thing to understand about
8  the voting technology used today in United States is that
9  it's extremely old.  These systems were designed back in
10 the day when cyber war was bad science fiction.  These
11 systems were designed during the time when security was
12 not part of consideration in the sense we understand
13 cyber security today, it just didn't exist.  Of course
14 the vendors have later tried to implement some of the
15 security as a Band-Aid over the problem, but the reality
16 if security is not part of the DNA, if the security is
17 not part of the original architecture and design, all of
18 these afterthought security additions are inadequate.  So
19 they have been doing some work but not sufficiently.
20     Q.  Despite that fact, at least in your view, are
21 you aware of these potential exploitable vulnerabilities
22 actually being exploited?
23     A.  In a demonstration setting, yes.  In a real
24 election, no.
25     Q.  And that's -- that would include the 2020

Page 26

1  election and then the past primary election in 2022?
2      A.  Correct.
3      Q.  Okay.  Oh, I mentioned, you were also part of a
4  movie called Kill Chain; is that right?
5      A.  I have been in two HBO Emmy-nominee
6  documentaries, Hacking Democracy and Kill Chain: The
7  Cyber War on America's Elections.
8      Q.  Okay.  And have you acted as an expert for news
9  organizations such as CNN?
10     A.  Absolutely.
11     Q.  All right.  I'll tell you what I'm going to do.
12 I noticed my exhibits came in.  That's nice to see.  I'm
13 not going to take a break, though.  I'm just going to do
14 something.  I want to talk to you just briefly about
15 DEF CON.  Do you know what that is?
16     A.  I know what that is.
17     Q.  Okay.  What is DEF CON?
18     A.  DEF CON is one of the oldest and one of the
19 largest hacker conferences in the world.
20     Q.  And you've attended DEF CONs in the past?
21     A.  I have been attending that many, many times,
22 and I'm also a co-founder and co-organizer of Voting
23 Village, previously called as Voting Machine Hacking
24 Village in DEF CON, and since we started we have been one
25 of the major attractions, major villages of DEF CON.

Page 27

1      Q.  And that DEF CON conference seems to take place
2  in Las Vegas quite a bit?
3      A.  It always takes place in Las Vegas either last
4  week of July or first week of August, thereabouts, yeah.
5      Q.  And I don't want to put words in your mouth
6  but -- well, let's do this.  Actually last night I saw a
7  news story I think on the last DEF CON that Anderson
8  Cooper did.
9      A.  Donie O'Sullivan did that for Anderson Cooper.
10         THE REPORTER:  I'm sorry, who?
11     A.  Donie O'Sullivan.  He's a journalist with CNN.
12     Q.  The diminutive Irishman.  I want to play you
13 just a little bit of that report because I want you to
14 react to some of the things that were said to it.  This
15 is from -- the title of it is called Hackers Tore Apart
16 Voting Machines, Here's What They Found.  It was
17 published seven months ago and it's a report by Donie
18 O'Sullivan.  So I'm just going to mirror my screen for
19 you, Mr. Hursti, and it's a five-minute clip.  We're not
20 going to watch all of it.  You want to see it?  See if
21 you can get that.
22         THE REPORTER:  Am I taking this down?
23         MR. CAIN:  No.
24         THE REPORTER:  Okay.
25         MR. CAIN:  You're welcome.  The reason

Page 28

1  you're not going to take this down is you're not going to
2  be able to identify all the different speakers and --
3  because there's more than one.  So I'm going to have him
4  look at it and then ask him some questions, okay?
5          You can take a break, June.
6          (Video played)
7      Q.  I think you're wearing the same shirt.
8      A.  A similar shirt.
9          (Video play resumed)
10         MR. CAIN:  All right.  I'm going to pause
11 it there.  There's -- I think the rest of it is some
12 discussion with Anderson Cooper.  Just a second on this.
13     Q.  So obviously you were interviewed for this
14 particular piece and it's from I guess the last DEF CON;
15 is that right?
16     A.  Correct.
17     Q.  And how did these hacking seminars, for lack of
18 a better term, actually work?  The piece showed that they
19 actually had election -- at least election voting
20 machines available to be hacked; is that right?
21     A.  Correct.  If I rewind, the Voting Village is
22 possible because we received the exempt from Digital
23 Millennium Copyright Act, DMCA.  Without that exempt we
24 could have never started this without being under a
25 Damocles sword of legal threats, but that exempt allowed

Page 29

8 (Pages 26 - 29)

1 us to have Voting Village.
2        Voting machines which we have here have been
3 bought from eBay, bought from government surplus,
4 auctions. Every single machine has to be bought. We
5 have been carefully documenting where it came from, how
6 we acquired it. Hilariously, funny, we bought certain
7 voting machines for zero dollars from government surplus
8 but we had to pay to get the receipt because it was zero
9 dollars, because we really wanted to have the receipt to
10 prove --
11    Q.  The source?
12    A.  -- the source. So that's why we have
13 documented everything.
14        So this is -- all of these voting machines have
15 a story of how we acquired those, and now because of
16 Digital Millennium Copyright Act we can allow people to
17 tear them apart, study them, and we have
18 single-handedly -- I'm very proud about this --
19 single-handedly hundred-folded the number, at least
20 hundred-folded, multiplied by a hundred, the number of
21 people in the United States who have firsthand experience
22 on voting machines, and what make me every year so happy
23 was to have an election -- local election officials who
24 can come to Village their first time tear apart the
25 voting machines they have been using to conduct their
Page 30

1 elections, because there are a lot of good election
2 officials who because of contractual legal reasons
3 haven't been able to do that.
4        So that's the premise. And when we started --
5 our mission is educational. Our -- every voting machine
6 can be hacked; that's a fact. That we are not there to
7 prove, if find new vulnerabilities. The fact that we
8 find new vulnerabilities is accidental and it's not the
9 main thing. The main thing is educational, showing
10 people can prove to themselves what is true. And when we
11 started the belief was that -- general belief was that
12 these machines are infallible, they are impenetrable. We
13 started by showing, yes, there's a lot of work which
14 needs to be done to secure the system.
15        Over the years now our second educational
16 mission has been to fight the misinformation,
17 disinformation, the mal-information, to tell, yes, there
18 are vulnerabilities but that doesn't mean that those have
19 been exploited, and we are tirelessly -- every single
20 time when there's any claim that an actual hack has
21 happened we are ready to jump to investigate, we want to
22 investigate. So that's our mission. It's all education.
23    Q.  Well, as part of that mission -- just a second.
24    A.  And just to add, the foundation, the nonprofit
25 behind -- our mission is international, it's not U.S.
Page 31

1 centric. So we are helping other governments with their
2 voting systems. Some of these voting systems come from
3 the United States.
4        When we started Village we were criticized that
5 we are irresponsible because we are allowing potentially
6 foreign hackers to access voting machines, and my
7 response to that was, yes, those foreign hackers are
8 Americans because almost all of these systems' origin
9 outside of the U.S.
10    Q.  And so, for example, some of these voting
11 machines that may have been at the DEF CON could have
12 been acquired overseas and then brought back?
13    A.  Correct. Actually, for example, the white
14 machine which was just on the table, that was commonly
15 used in local elections in Canada and actually part of
16 the software was written in Canada.
17    Q.  Okay. And going back to the term
18 misinformation, have you lectured on that topic as it
19 relates to election?
20    A.  Both related to election and generally. So
21 unfortunately one of the things I have been needing to
22 take as part of what I educate and teach and lecture
23 about is misinformation, disinformation, and
24 mal-information.
25    Q.  Okay. And can you explain the difference
Page 32

1 between those three terms, misinformation,
2 disinformation, and mal-information?
3    A.  So if we start from mal-information, that's a
4 deliberately, with an evil intent, created information to
5 deceive. When we have misinformation, that is a -- that
6 can be -- it's information which is not true but it is
7 not necessarily purposefully created. And disinformation
8 is purposefully created false information with not
9 necessarily malicious intent, a specific malicious
10 intent, it can be just generally sowing distrust.
11    Q.  Okay. And as it relates to this piece that was
12 done you were asked by that CNN reporter whether you had
13 ever found a vulnerability that was actually used to
14 change votes in an election and you said that you had
15 not. Is that your testimony under oath?
16    A.  Correct. So we have been -- as I said, we have
17 been investigating a number of things, most recently in
18 last year audited the election and the equipment used in
19 Windham County, which is Rockingham District 3,
20 New Hampshire.
21    Q.  Which -- what's the name of the county again?
22    A.  Rockingham. I don't know how to spell it.
23 Rockingham. So there -- this was a hard objective for
24 symposium, the controversy.
25        What happened there was that in New Hampshire
Page 33

9 (Pages 30 - 33)

**Page 34**

1  any candidate can ask for a recount and it's always
2  granted.  There was a local race, eight candidates, vote
3  for four.  Four Republicans won.  One Democrat, Kristi
4  St. Laurent, was very close, so she asked for a recount.
5  When recount was done something -- so, first of all, in
6  New Hampshire when a hand recount is done everybody gets
7  more votes every time.  That's the rule, everybody gets
8  more votes when you do a recount, and that's because
9  voters are not following the instructions, and so there
10  are votes which the voting machine is not registering but
11  the human looking into the ballot will see that there's a
12  vote.  So that's why rule is every single time you get
13  more votes.
14      Now something very unusual happened in this
15  recount.  All four Republicans got about 300 votes more,
16  three of the Democrats got 30 votes more, give or take,
17  and the woman who asked for a recount lost 99 votes.  So,
18  first of all, losing votes in a hand count is almost
19  never heard of.  In the history of in New Hampshire
20  recount this is the biggest numerical difference,
21  300 votes, which they have ever recorded.  So the
22  expectation was everybody gets about 30, 40 votes more,
23  not 300.  So something was obviously wrong.
24      The conspiracy theorists were screaming, oh, we
25  finally found the algorithm, this is how the votes have

**Page 35**

1  been stolen.  We investigated.  We found what was the
2  problem, what caused both the unusual undercount of
3  Republican votes but also why there was this surplus
4  votes which were eliminated in hand count from the Kristi
5  votes, and we published a report and after that started
6  having a nice flow of death threats, as you do.
7      But this was a good example how we -- every
8  single time we want to -- if there's a discrepancy, if
9  there's a result which is obviously wrong or suspected to
10  be wrong, we want to investigate and find out what caused
11  it, and not a single time we have found evidence that
12  this has been a -- something was deliberately --
13  vulnerability was deliberately exploited.  We sometimes
14  don't find the answer, but usually you find the answer
15  and it is just these machines are bad or they are used in
16  the wrong way, and in this New Hampshire case it was a
17  human problem.
18      Q.  And that's happened in the past; for example,
19  in Antrim County was that a human error that caused the
20  issue in Michigan?
21      A.  It's a human problem and it's a fascinating
22  human problem because it is underlining not only how bad
23  the design is but it's also underlining another group of
24  vulnerability --
25      THE REPORTER:  A what?

**Page 36**

1      THE WITNESS:  Another group of
2  vulnerability.
3      THE REPORTER:  I'm not getting it.
4      THE WITNESS:  Group.
5      THE REPORTER:  Not a group?
6      THE WITNESS:  Another group, another
7  source.
8      MR. CAIN:  Another group.
9      A.  -- and that is election management companies,
10  middleman companies which are outsourcing partners for
11  the local jurisdictions to program around the elections.
12  So this was a human error but the human error had an
13  element where there was a bad communication between the
14  outsourcing party and the jurisdiction.
15      Q.  Okay.  And since you mentioned it, what you're
16  referring to are companies that now exist that are hired
17  by let's say a county official --
18      A.  Often county, yes.
19      Q.  -- often a county official to help administer
20  their elections?
21      A.  Accurate, yes, and there is -- it's unknown how
22  many companies there are in this nature because they
23  don't -- there's no reporting requirement, and sometimes
24  the Secretary of State is not even if you -- there's two
25  kind of states basically, well, there's three, but the

**Page 37**

1  main two things is top down and bottom up.  Bottom up
2  means that the county election officials are very
3  independent and the Secretary of State has limited
4  control over them.  So in this kind of bottom-up state
5  the Secretary of State might not be even knowing the
6  extent of the outsourcing has happened by the counties.
7      I have been helping Secretary of State of
8  Kentucky, Secretary Grimes, to do an audit of Kentucky,
9  and in that place she was aware that there are two
10  election management companies operating in that state but
11  she had no idea that all except two counties were
12  basically run by these two companies.  So she didn't have
13  an idea.  She didn't know the extent of the control these
14  companies had.
15      Q.  Okay.  So --
16      A.  And neither of these companies is software --
17  is election machine vendor.  They are all local companies
18  who are middlemen.
19      Q.  Okay.  So I'll miss some, but at this point in
20  your deposition we've talked about potential
21  vulnerabilities that you look into; one is you've
22  identified the fact that the election machines and
23  technology in your view is old, for lack of a better
24  term?
25      A.  Outdated.

1    Q.  Outdated.  Thank you.  There's also concerns
2  that you just pointed out about human I want to say
3  either errors or even bad actors that could potentially
4  affect the election results; right?
5    A.  I want to point out one thing.  Just because
6  something is old doesn't mean -- and outdated doesn't
7  mean it's insecure.  The first voting machine I hacked in
8  Leon County, the Diebold paper ballot scanner, I did say
9  at that time that when the dust settles I wouldn't be
10  surprised if this machine is one of the best ones.  I can
11  today say it's one of the best ones.  It's so old that it
12  doesn't have the horsepower to understand wireless or
13  internet or anything.  It is actually hardened by
14  accident.  It's so old that modern attacks cannot be
15  deployed against it because it's so old.
16    Q.  It's like I can't plug my Mac into a dot matrix
17  printer.
18    A.  This is exactly a good analogy.  So just
19  because something is old doesn't mean it's bad, but you
20  have to treat it differently and you have to put
21  processes in place.  And this voting machine which is the
22  first one, that's actually the one which is used in
23  New Hampshire, and I'm saying it's -- because it's old it
24  has vulnerabilities but the vulnerabilities are mainly by
25  nature insider risks, and, hence, you have to protect the

Page 38

1  system against the humans who are operating it.
2    Q.  For example, a rogue county clerk could be a
3  good example of that risk?
4    A.  A rogue county clerk, the outsourcing partner,
5  even in some cases a rogue volunteer poll worker.
6    Q.  Got you.
7    A.  But county supervisor is a -- they are a very
8  powerful party in this mix, and if they go rogue they can
9  cause irreparable damage and very hard to detect that.
10  So this system is really relying on the honesty and
11  integrity of the election officials.
12    Q.  Integrity.
13    A.  Yeah.
14    Q.  And then going back to that report from -- by
15  the way, actually I meant to ask you, you mentioned the
16  nonprofit and the Voting Village; is the DEF CON seminar
17  put on by this nonprofit?
18    A.  No.  DEF CON is a host organization.
19    Q.  I see.
20    A.  And we are a guest of -- the villages are
21  guests of the host organization.  When we started Voting
22  Village we didn't have the nonprofit.  We incorporated
23  that later.  It's called Election Integrity Foundation.
24  It's incorporated in New York.  So, that we actually
25  created only afterwards.  Some villages still today are

Page 39

1  not incorporated, it's just a group of people doing their
2  stuff, and almost all of the villages started just by no
3  legal structure whatsoever.
4    Q.  And then just to quote you from that piece we
5  saw, you said something to the effect of the hacking of
6  an election would be an extraordinary claim that would
7  require extraordinary proof.  What did you mean by that?
8    A.  Well, it's actually not related only to the
9  election.  If you are making an extraordinary claim the
10  more extraordinary the claim there's more you have to
11  have evidence to back your claim and prove that your
12  claim is right.  Just because something is vulnerable
13  doesn't mean it's exploited.  Just because something is
14  exploited doesn't mean that it changes the outcome.  And
15  I want to point out for example that when I used the
16  New Hampshire, even when the result was wrong it never
17  changed the outcome, those four Republicans were always
18  going to be elected.  So just because the result was
19  inaccurate didn't change the outcome of the election in
20  that case.
21    Q.  And then a couple more questions on that piece,
22  and then I'm going to take a break to get that package
23  that arrived.  You said something to the effect that you
24  were more concerned about misinformation than the actual
25  potential vulnerabilities in the systems themselves, and

Page 40

1  I think Chris Krebs called -- his term was perception
2  hack.  Can you explain what you meant by those
3  statements?
4    A.  So there's two elements in this.  The first
5  element is just a made-up, baseless claims with no
6  whatsoever even made-up attempt to have a illusion of
7  proof, just -- typically -- United States had a wrong
8  threat model for elections because the threat model was
9  dishonest candidate tries to win and tries to cheat to
10  win.  The threat model was not including a nation state
11  type of attacker whose primary motivation is ideological
12  sowing the distrust.
13        If you think Cold War, that was an ideological
14  war between communism and capitalism.  If you think about
15  that ideological war and translate that to today, it's
16  war against democracy and war against rule of law.  So
17  there's a group of attackers and adversaries who don't --
18  they might have a favorite candidate, but the primary
19  motivation is to sow distrust to your society, so society
20  falsely thinks that the system is not working.  That's
21  the first group of problem, first element.
22        Second element is something which directly ties
23  to symposium.  When in symposium these --
24    Q.  And just to be clear, you're referring to the
25  Cyber Symposium that --

Page 41

11 (Pages 38 - 41)

1    A.  Correct.
2    Q.  -- Michael Lindell put on?
3    A.  Absolutely correct.
4    Q.  Okay.
5    A.  So in the Cyber Symposium when these -- I'm not
6  a lawyer but I would say illegally obtained copies of
7  Mesa County, Colorado --
8    Q.  Mesa is M-e-s-a.
9    A.  -- images were distributed, in cyber war and
10  cyber security you always assume that your adversary has
11  your software.  The fact that the software is distributed
12  doesn't change -- doesn't create a new threat.  It might
13  amplify the threat by allowing less sophisticated actors
14  to -- it lowers the barrier but it doesn't create
15  something new.
16        When I looked in Mesa County images I got a
17  strong mental image that the second image was an attempt
18  or preparation of to create a rogue election server,
19  something which can be used to mimic a real election
20  server.  Why that is dangerous is that if you take a
21  software and you install it to clean computer and you try
22  to create false evidence, made-up evidence to back a
23  claim of a hack which never happened, because it's a
24  clean server there are things which will be a little
25  bit -- the bread crumbles are not in a place where you
Page 42

1  expect them to be, it's too clean, so experts will have a
2  relatively easy time to say this is false, this is not
3  true.  If you have a real election server image like what
4  was distributed in Cyber Symposium, now it changes the
5  threat because those servers, those images had all the
6  bread crumbles in the places they're supposed to be, and
7  if you use that kind of image to create a false evidence,
8  now you have a false evidence which is more compelling
9  and harder for experts to have a firm opinion if this is
10  true or not.
11        So I did call it right after that what I'm
12  afraid of is I'm seeing a factory of false evidence
13  creation.
14        THE REPORTER:  A factory?
15    A.  A factory for false information creation in
16  those images.
17        So that's -- again, when I say -- when I was
18  asked what keeps you up at night, after symposium those
19  images kept me up at night, but not for the reason people
20  thought, it was because I can see these how they've been
21  created to make more compelling mal-information.
22    Q.  Okay.  That was pretty complicated even for
23  Ryan Malone.  So let's talk about that just a bit more.
24  The first thing you said I think is that you had access
25  to two forensic -- well, you didn't say forensic, you
Page 43

1  said two images of -- from election servers in Mesa
2  County; is that right?
3    A.  So it's correct, and let me be very clear here.
4  The organizers of Cyber Symposium claim those to be
5  forensic images.  That is a claim which is
6  demonstratively false because there's no chain of
7  custody, there's no proof of authenticity or verbatim of
8  those images.  They are --
9        THE REPORTER:  Authenticity or --
10        THE WITNESS:  Or that the images are
11  verbatim.  Verbatim?
12        THE REPORTER:  Verbatim?
13    Q.  Verbatim.  Yeah, the actual same image.
14    A.  Yes.
15        THE REPORTER:  The actual --
16        MR. CAIN:  Same image, exact copies.
17    A.  So, and even further if you look after the
18  symposium when Lindell-TV website started distributing
19  the images, not a one of these images has a -- on the
20  page a different hash number, so it means that is
21  definitely not verbatim.  So you cannot -- these are not
22  forensic images.  They are images, but you -- it will be
23  false to assert any trust to those images.
24    Q.  And I -- that's why I -- I said forensic image
25  and then I corrected myself.
Page 44

1    A.  No.
2    Q.  And you've explained why you don't believe
3  those are forensic images?
4    A.  They are not forensic images, and I don't -- I
5  cannot assert any trust on those.  Curiously, it's
6  curious to look at those, but you cannot one way or
7  another use those as evidence of anything.
8    Q.  And is it -- am I correct that the potential
9  rogue election server image one of the ways that -- or
10  one of the things that potentially evidenced that it
11  wasn't the real image was the fact that the disk was
12  partitioned differently?
13    A.  No.  That is -- so the partitioning change
14  means that the story told about installation of a witness
15  built or --
16        THE REPORTER:  A what?
17        THE WITNESS:  Witness built, witness,
18  eyewitness.
19    A.  -- witness built or a secure image, that story
20  is disputable, there's something missing from that story.
21        What I'm referring, why I'm saying the
22  possibility of rogue server is that the second image has
23  a hardware profiles -- additional hardware profiles and
24  one of those hardware profiles or two, I don't remember
25  if it was one or two, is a type of machine which to the
Page 45

12 (Pages 42 - 45)

1 best of my knowledge is never used in Colorado and never
2 used by Dominion, so it's something else, and I leave it
3 there. I don't have explanation. I just see this
4 shouldn't be.
5    Q. When you say type of machine do you mean --
6    A. Brand name and model.
7    Q. Okay. Like a Dell --
8    A. Versus IBM kind of thing, yes.
9        MR. CAIN: Okay. Let's go off the record
10 please.
11       THE VIDEOGRAPHER: We're off the record.
12 The time is 11:20.
13       (Recess: 11:20 to 11:31 a.m.)
14       THE VIDEOGRAPHER: We're back on the
15 record. The time is 11:31.
16 BY MR. CAIN:
17    Q. Okay. So this is the second session of your
18 deposition. I want to talk to you about some
19 communications, a few communications before the Lindell
20 symposium, some e-mail exchanges that you had, and then
21 we're going to talk about the symposium, okay?
22    A. Sounds good.
23       MR. CAIN: One lesson I've learned is I
24 can't talk and have her mark this at the same time. It's
25 hard to multi-task. So I'm going to set this down and

Page 46

1 exception of maybe a video, if they have this HH in the
2 control number that means it came from the stuff that you
3 gave me, okay?
4    A. Yep.
5    Q. So quickly on these, we're not going to do deep
6 dives in any of this stuff, this appears to be some
7 discussion between you and a gentleman named Alex
8 Halderman and some others, both, as I mentioned, before
9 and after the symposium; is that right?
10    A. Yes.
11    Q. Okay. And Alex Halderman is who?
12    A. Alex Halderman is an old friend of mine, a
13 partner in preventing crime. He -- I met him originally
14 when he was a grad student in Princeton while I was --
15 while they were re-creating one election-related
16 vulnerability demonstration and then later a couple of
17 other things. So I met him when he was starting in
18 Princeton.
19    Q. Okay. And his work, as far as you know,
20 academic work to the present has been focused on election
21 security issues?
22    A. He is -- actually his call to fame was a work
23 called cold boot, which is not related to election. So
24 he actually, like myself, our -- we didn't start with the
25 election, but then later he has been doing a lot of work

Page 48

1 June is going to mark this as Exhibit 90, nine zero.
2 We've been running our exhibits.
3       (Exhibit 90: HH 000199-207 - marked for
4 identification.)
5    A. For the record, now when we're starting to talk
6 about symposium I will be almost certainly contradicting
7 myself and that is because the -- everything about
8 symposium was changing all the time, what the organizers
9 were telling and whatnot, so when I'm contradicting
10 myself it's just because we move in a timeline and what
11 was the crown truth on the first day was not the crown
12 truth on the second day. So the contradiction is not --
13 it's because of the timeline, we were given contradicting
14 information all the time.
15    Q. And we'll get to that. This is actually
16 Exhibit 90, which is an e-mail chain that I think
17 straddles the symposium, because if you look at the very
18 back, as with most of these e-mail chains, the back
19 sections are the older e-mails in the chain and then on
20 the top of the document it ends on September 8th. So
21 these e-mails actually are both before and after the
22 symposium; is that right?
23    A. It seems to be that, yes.
24    Q. Okay. And this is, Mr. Hursti, if it has --
25 all of the exhibits I think that we'll look at with the

Page 47

1 around the election but not solely in election. So his
2 practice is more security, a wider -- a way wider range
3 than elections only.
4    Q. And he -- in fact, he testified as an expert in
5 Curling as well; right?
6    A. Correct. He was in the other -- expert for the
7 other plaintiffs in that, because there's two plaintiffs.
8    Q. Okay. And Curling is C-u-r-l-i-n-g; that's how
9 the litigation is referred to in Georgia, right?
10    A. Yeah.
11    Q. Okay. And then there's another fellow here
12 named David Dill on this e-mail chain. Who is Mr. Dill?
13    A. David Dill is a professor emeritus from
14 Stanford University. He has been doing election security
15 related work, but again his main study is a lot of other
16 things in security space and in things like simulating
17 DNA for cancer and stuff like that. He's the grand old
18 man in election space. A lot of the early people in
19 election security movement and research credit David Dill
20 as the person who recruited everybody to come to the
21 space.
22    Q. And so I'll focus you on page 204. And just as
23 you sit here, Mr. Hursti, do you remember why it was you
24 and Mr. Dill and Mr. Halderman were discussing the Mike
25 Lindell documentary and topics at this time?

Page 49

13 (Pages 46 - 49)

Page 50

1  A.  There is a mailing list where a lot of election
2  security experts both from the universities and from the
3  Secretary of State Office and whatnot have a discussion
4  about how to verify election results, how to address the
5  vulnerabilities and whatnot, and so when the symposium
6  with the extraordinary impossible claims came this was --
7  obviously it became a topic we were discussing.  This EVN
8  list is referring to the mailing list where this is the
9  spin of conversation.  So I don't specifically remember
10 why this e-mail, but I tell the general background why
11 this conversation happened.
12  Q.  Okay.  So at this point, this is your e-mail of
13 July 29, you knew there was going to be a Cyber Symposium
14 that Mr. Lindell was going to put on; right?
15  A.  Yeah, we were aware of that and none of us got
16 invited, which is natural.
17  Q.  So this list that you referred to is actually
18 in the subject line, it is EVN, the letter E, the letter
19 V, the letter N, list; do you know what that stands for?
20  A.  Election Verification Network.
21  Q.  Okay.  And so that's a group.  About how many
22 people are on the EVN list?
23  A.  I don't know the current number.  Off the top
24 of my head, and I might be way off, it's about 200.
25  Q.  Okay.  And just looking at page 204 here, the

Page 51

1  sign-off on the e-mail, I've seen enough of your e-mails,
2  is that S-c-o, is that your -- essentially your
3  signature?
4  A.  Yeah.  I'm commonly called Scofield or Scof, so
5  that's my handle.
6  Q.  What does -- where did Scofield come from?
7  A.  A long time ago when I was a young man I was
8  for a while working for United Nations UNESCO and we
9  had -- during Cold War we had a lot of conferences behind
10 the Iron Curtain in places like Bulgaria and whatnot
11 about computer-aided education, and there was an incident
12 where someone was making a run from East Berlin to West
13 Berlin.  I was odd one out.  I was -- I think I was
14 sixteen and the average age of the group was fifty, so I
15 was a little bit sticking out, and there was a novel by
16 Robert Ludlum and there was a fictional character
17 Scofield, and basically people started calling me that.
18      It's the same as in aviation, you never get to
19 choose your call sign.  If somebody says I'm Maverick,
20 you're lying.  If somebody says you're Wanker that's
21 probably true.  That's actually a real call sign very
22 notable U.S. Air Force pilot.  So all the call signs are
23 always awful because other people choose it for you.
24  Q.  It's funny you should say that.  My law
25 partner, Steve Skarnulis, his nickname is Goose and I'm

Page 52

1  Maverick.  So I'm going to direct him to this portion of
2  the transcript when I get back into town.
3      But back to 204, again I'm not going to go into
4  too much detail, but it appears that you were looking at
5  both the rules of -- the potential rules to challenge the
6  data that was going to be presented at the Cyber
7  Symposium.  Can you tell me what you understood sort of
8  the challenge to be?
9  A.  So Lindell published this flyer that there will
10 be a $5 million reward, and then there was no specific
11 rules, but what he was saying was that you have to be in
12 the symposium in order to be eligible to claim it, and
13 the original claim was that he will share his PCAP files
14 and if someone can prove that those PCAP files are not
15 from election, then that's the challenge, and then the
16 challenge kept on changing all the time, and as I say
17 here, no rules of the challenge are published, because
18 that was basically what he was saying in the television
19 and whatnot, and he kept on modifying and changing what
20 he was saying.
21  Q.  Okay.  So let's -- you refer to a flyer that
22 had been published.  Let me give June a document and see
23 if we can make sense of it.
24      (Exhibit 91: Flyer - marked for
25 identification.)

Page 53

1  Q.  June has handed you Exhibit 91.  Is that the
2  flyer that you just referred to that you had received?
3  A.  Yes.
4  Q.  Okay.  So you must have received this flyer
5  sometime prior to the e-mail that we were looking at on
6  July 29?
7  A.  This was not specifically sent to me.  This was
8  everywhere, posted in Twitter.
9  Q.  I see.
10 A.  So I never received that as a sent to me.  It
11 was publicly available everywhere.
12 Q.  Because you weren't invited?
13 A.  What?
14 Q.  I mean you weren't -- you said you weren't
15 invited to the symposium?
16 A.  I was never invited.
17 Q.  Okay.  And so obviously in your e-mail you're
18 talking about there aren't any rules at that point in
19 time, but then you refer, down it looks like in 4 and 5,
20 about the kiosks of data that are going to be available,
21 and then you say, quote, "additional evidence," close
22 quote, he shares are just more hex dumps of meaningless
23 CSVs.  So let me stop you before you answer that.  Hex is
24 h-e-x.  CSVs is the letter C, the letter S, and the
25 letter V, which I believe stands for comma-separated

14 (Pages 50 - 53)

1 values?
2     A.  Correct.
3     Q.  Okay.  So what do you mean by that statement in
4 5, additional evidence he shares are just more hex dumps
5 of meaningless CSVs?
6     A.  This refers to something which is in the other
7 documents I produced.  So when Lindell started the
8 announcements he first announced that all this data, all
9 these PCAP files will be released to public gradually in
10 a month prior to the symposium.  Basically he was
11 promising daily dumps of that data.  Well --
12     Q.  You said -- I'm sorry to interrupt you --
13 gradually?
14     A.  Gradually, yeah.  Not in one go, but he was
15 promising gradual release of that data prior to the
16 symposium.  I believe he first said that he will start a
17 month before the symposium and then he walked back to be
18 within a two weeks time to two weeks daily before the
19 symposium.  Ultimately he never released any of that.
20 However, what he did do was he was trying to convince
21 media to come and in order to convince media he was
22 sharing to media something which he claimed to be the
23 PCAP files or taster PCAP files.
24          THE REPORTER:  Or?
25          THE WITNESS:  Or taster.
                                          Page 54

1     Q.  Like an appetizer?
2     A.  Yeah.  Now, these CSV file, this so-called
3 claimed PCAPs were actually in hex dumps, and media who
4 wanted to validate is there any meat on this bone
5 communicated with a lot of experts, and in this mailing
6 list there's more than me, who different media outlets
7 shared what they have been given by Lindell prior to --
8 prior to the symposium.  So also media didn't treat these
9 so-called supposedly PCAP files, which they were not, as
10 a exclusive or confidential, which allowed us experts to
11 exchange information between us, did you get the same
12 thing that I did kind of thing.
13      So, for example, in my case I was primarily
14 doing the analysis for CNN, but you see some other
15 outlets, like I believe it was NBC, for example, who also
16 were communicating prior to the symposium with me.  So we
17 analyzed those and came to quickly the conclusion these
18 are not PCAPs, these are actually excerpts from the
19 visualization, and it's just baseless, meaningless files.
20 So I think that's -- it's not evidence of anything, but
21 that was also the reason why some media then decided this
22 is not worth their time, because if the taster is, for
23 lack of a better word, bullshit, what would be the
24 expectation that something real would be in the
25 symposium.
                                          Page 55

1     I personally expected that in symposium we
2 would be given a made-up synthetic PCAPs, but we were not
3 given anything, so that was a surprise that there was a
4 big fat nothing.  But, anyway, that was just leading,
5 this is before symposium when we were trying to figure
6 out what to expect.
7     Q.  Okay.  So again I'm sorry to kind of break that
8 down, but you were working with CNN at the time of this
9 e-mail that we're looking at, Exhibit 91, in late July;
10 is that correct?
11     A.  Yes.  I am currently talking with CNN, as it
12 says in the first line.
13     Q.  Okay.  And as part of that conversation did CNN
14 want you to look at the appetizer --
15     A.  Yes.
16     Q.  -- of data?
17     A.  CNN was sending me the appetizers as they claim
18 and I was analyzing what the appetizers mean and part of
19 that conversation is part of the stack of documents I
20 have been sharing.
21     Q.  Yeah.  And I was looking for that because I
22 have some questions about it, but I just got this packet,
23 so I'm not quite as organized as Ryan knows I typically
24 am.
25     A.  I have to add that these appetizers, so to
                                          Page 56

1 speak, were so small that only when we got -- there was a
2 possible thing to think that this is a cut off from
3 inside of PCAP file, which would be meaningless anyway,
4 but then when we started to have more appetizers that
5 whole thing collapsed and there's no other explanation
6 than this is all just smoke and mirrors and meaningless.
7     Q.  Okay.  Bear with me for just a second,
8 Mr. Hursti.  I'm going to see if --
9     A.  And when we were doing this prior to symposium
10 analysis we gave every possible benefit of doubt for
11 Cyber Symposium, so we were exhaustively coming up any
12 far-fetched idea which will be beneficial for symposium
13 organizers and just knocked them down one by one.  So we
14 really -- I would say that we were not only having an
15 open mind but we were really trying to figure out what
16 would be any kind of beneficial explanation for Lindell
17 and Cyber Symposium, didn't find any possible way of
18 seeing anything else than nothing.
19     Q.  Well, if you weren't impressed by the data that
20 you saw before the symposium, why did you end up going?
21     A.  So as I communicated with CNN my prediction,
22 which was false, my prediction is that they will be
23 presenting man-made, you know, smoke-and-mirror synthetic
24 PCAPs, so CNN wanted me there, and we had a discussion
25 that's probably something which will happen and it
                                          Page 57

15 (Pages 54 - 57)

1 needs to be debunked if that happens, but I'm a curious
2 person, I like to go places, especially places where I'm
3 being hated.
4    Q.  And it was in South Dakota.  You like to go to
5 South Dakota?
6    A.  I flew directly from Las Vegas DEF CON to Sioux
7 Falls and then from there got home.  So it's just, you
8 know, not -- wouldn't have been my favorite place.  I
9 actually didn't even have time to go to see the falls.
10    Q.  Do you know why it was in South Dakota?
11    A.  I have no idea.
12    Q.  Okay.  I'm going to -- in football they call
13 it --
14    A.  As you see in the poster, it actually was very
15 late when the venue was announced.  It was not known when
16 this whole thing started and the announcement started
17 where this is going to be.
18    Q.  Well, part of the reason I asked you, you know,
19 why did you end up going anyway was to find out if you
20 were looking to possibly win $5 million by being there.
21    A.  I -- definitely that was the thing where -- CNN
22 didn't reimburse all of my costs, I needed to cover, you
23 know, meals and drinks and taxes and whatnot, and I knew
24 based on everything I see that there is no possible way
25 of this money not to be on the table for me to take.  So

Page 58

1 obviously that was part of the motivation is it's an easy
2 5 million.
3         MR. CAIN:  So what I'm going to do since
4 I've been struggling with getting exhibits here and
5 apparently not getting all the exhibits here, with --
6 hold on, Mr. Hursti -- with your permission, Ryan, I want
7 to just have a placeholder for an exhibit from your file.
8 So we've marked Exhibit 90 and Exhibit 91.  Exhibit 90 is
9 the e-mail chain that we'll probably talk a little bit
10 more about.  Exhibit 91 is the $5 million challenge.
11    A.  I actually now realize why you have the
12 Attorneys' Eyes Only.  This is from an e-mail from me to
13 my attorney, but obviously this is not -- this is public,
14 yeah.
15    Q.  Actually that's a point I was going to make.
16 That's -- there's a larger e-mail that that comes from
17 with I think Mr. Cross, David --
18    A.  That's another e-mail, yes.
19         THE REPORTER:  Mr.?
20         MR. CAIN:  Cross.
21         THE WITNESS:  David Cross, attorney for
22 MoFo.
23    Q.  Okay.  So that document --
24         THE REPORTER:  Attorney for?
25         THE WITNESS:  MoFo.  It's short for --

Page 59

1         MR. MALONE:  Morrison & Foerster.
2         THE WITNESS:  Yeah.
3         MR. MALONE:  Morrison & Foerster, but
4 they go by MoFo.
5    A.  And the other person there is Jody Westby,
6 she's an attorney, my personal attorney, so she's an
7 attorney too.
8    Q.  Okay.  Well, I think we can all agree amongst
9 this triangle that that particular document itself --
10    A.  Is public.
11    Q.  -- is public and is not subject to
12 confidentiality?
13    A.  Correct.
14         MR. MALONE:  Agreed.
15         MR. CAIN:  Okay.  So what I'm going to
16 ask you, Ryan, is we have a document that has been -- and
17 you were given the documents a few days ago from our
18 office?
19         MR. MALONE:  Correct.  We received them
20 from Scotty.
21         MR. CAIN:  And so Bates 906 through 916
22 is an e-mail chain between Mr. Hursti and appears to be a
23 CNN producer.
24    Q.  Do you know Audrey Ash?
25    A.  I exchanged e-mails with her, but she's with

Page 60

1 the organizer, assistant producer.  I don't know if I've
2 ever met her in person.
3    Q.  Okay.  And I'm not going to mark a 92.  I'm
4 going to substitute this document in for Exhibit 92 when
5 we can get a printed-out copy.  Maybe at a break they'll
6 print it out for me.  But I want you to take a look at
7 this sort of e-mail thread.  I'll mirror my screen so you
8 can see it.
9         And so this is -- going down to 916 there's --
10 this e-mail ends from Miss Ash, it says, Do you have any
11 idea what this data might be referring to?  Would an
12 actual PCAP file look anything like this data?  And then
13 she goes on to say more, and then there's a series of
14 numbers and columns that she's attached here, and it
15 appears that you spoke to her.  So is this consistent
16 with your recollection that this is what CNN was
17 providing to you to --
18    A.  Yes.
19    Q.  -- comment on?
20    A.  Yes.  And this is what I refer hex dump, that's
21 the column in the e-mail.
22    Q.  So in Exhibit 90 we looked at you're talking
23 about hex dumps, what you were referring to is what we're
24 seeing in part on document 915, which is those letters
25 and numbers; is that right?

Page 61

16 (Pages 58 - 61)

1    A.   Correct.
2    Q.   And then on -- just scrolling up there appears
3 to be more hex dumps, as you've identified them, and then
4 what is this, this is a colored chart that has it looks
5 like perhaps IP addresses or something on it?
6    A.   I don't see that.
7    Q.   Oh, God.  That's why I'm asking.  What are we
8 looking at here, if you know, this is called, page 914?
9    A.   914.  That's not 914 here.  This is still the
10 hex dump.  I don't see what you see.
11    Q.   Okay.  Oh, okay.
12    A.   Yeah.  That's why I say -- since I don't --
13 once you scroll it there I can tell what it is.
14    Q.   All right.  Well, let's slow down because it
15 appears my iPad has now locked up.  So this is going to
16 be really riveting testimony.  Hold on.
17       All right.  I'm going to show you what I'm
18 looking at.
19    A.   All righty.
20    Q.   So this is more of the hex dump on 9 -- this is
21 page 914?
22    A.   That's Wireshark.
23       THE REPORTER:  That's?
24       THE WITNESS:  That's Wireshark.
25       THE REPORTER:  Shark?
Page 62

1       THE WITNESS:  Wireshark.  Wire and the
2 fish.
3    Q.   Okay.  So page 914 you say shows Wireshark.  So
4 explain that.  I know we discussed what Wireshark is
5 earlier, but what are we seeing here?
6    A.   If you have a real PCAP file and you import
7 that PCAP file into Wireshark it translates those -- that
8 data flow into the packages and the contents of the
9 packages.  So this is a more human readable one-to-one
10 translation of what the PCAP file looks like when
11 Wireshark translates this to human.
12    Q.   I see.  So is this a non-PCAP file that has
13 been run through Wireshark?
14    A.   No.  This is a -- I think this is an example I
15 have been -- it probably says there -- I did show to CNN,
16 if -- which never happened, but if they would have given
17 us any kind of PCAP files what will be the visuals
18 looking like if I analyze it.
19    Q.   Okay.  So you were trying to help the producer
20 understand what a real PCAP would look like once it went
21 through Wireshark?
22    A.   Yes, so that they understand when -- there's
23 BruteShark, which is giving you another kind of visual,
24 just example visuals, like what -- they were trying to
25 understand if something happens in the symposium what I
Page 63

1 could be able to show them and the audience of CNN, what
2 it would look like.  So this was purely an example of
3 what if, if they give something what it will look like.
4    Q.   Okay.  And so I'll just read from this e-mail a
5 few other things.  You're not going to be able to read
6 along with me, but for the record it is stamped at 911,
7 page 911 on the stuff that you produced to us.  So we
8 just looked at the example that you sent.  You responded
9 back to the CNN producer and you said, That is not a PCAP
10 file, that is CVS file.  I think you mis --
11    A.   Yeah, probably.  I'm dyslexic.
12    Q.   Okay.  So you meant CSV file?
13    A.   Correct.
14    Q.   From some service which enriches IP address
15 data.  What do you mean by enriches IP address data?
16    A.   So IP address is simply four numbers separated
17 by a period mark and it doesn't tell where on the planet
18 it is or anything like that.  What the teaser data and
19 so-called -- and the data which was in these wonderful
20 pieces of fiction called absolute proof and those movies
21 produced by Lindell, they had additional data on the
22 certified IP address, that means enriching, you are
23 finding the geo -- first of all finding the geolocation
24 of an address and claiming this address is in that
25 physical location.  That's one example of enriching the
Page 64

1 data, adding information which is derived, simply derived
2 from the address.
3    Q.   Okay.  And you say that some of these programs
4 that Mr. Lindell had produced has a stream of what looks
5 like hex data?
6    A.   That is correct.
7    Q.   Is that what you were talking about that you
8 were reviewing?
9    A.   Yeah.  That -- the actual funny part is that if
10 you looked at teaser given to CNN, which is at the end of
11 the mail, that actually is the similar data which is
12 scrolling on those movies, and it also -- the content of
13 that is not PCAP, but it's the data used for creating the
14 visualization of attacks like missiles flying, like the
15 traffic flying across --
16       THE REPORTER:  I'm sorry.  The
17 visualization of?
18    A.   Attacks over the map coming from China and
19 attacking the U.S., like the missile coming with any type
20 of visualization.
21       So actually this hex dump is excerpt from that
22 visualization queue, the visualization data.  It's not
23 real data from any --
24    Q.   So -- I'm sorry to interrupt you.
25    A.   -- from any PCAP.
Page 65

17 (Pages 62 - 65)

1    Q.   So there is a point in one of the movies where
2  you see a map of a globe and you see, like you called it,
3  missiles, it looks like the old nuclear bomb maps where
4  things are flying from one country in an arc to another
5  country; is that what you're referring to?
6    A.   Absolutely.
7    Q.   And it shows in this instance in Mr. Lindell's
8  documentary essentially data, it looks like data is being
9  transmitted from the United States to areas like China?
10   A.   That is allegation there, yes, but there's no
11  proof of anything.
12   Q.   And the data you -- sort of the preview or
13  appetizer data was data that related to that
14  visualization?
15   A.   Correct.  That's our belief and I don't have
16  proof but it seems to be that.
17   Q.   And is that -- I don't mind looking like I
18  don't know what I'm talking about, which happens all the
19  time, but is that ANSI data, A-N-S-I data, or is that a
20  program, was that done in ANSI?
21   A.   No.  So A-N-S-I, American number information --
22  numbers information -- that's a registration data,
23  that's a -- there are a couple of organizations around
24  the world who are governing IP address ranges in their
25  region and assigning those addresses to companies and

Page 66

1  governments needing the addresses.  So that's one of the
2  organizations.
3    Q.   Okay.  So I completely whiffed on that one.
4    A.   RIPE would be the equivalent for Europe.
5         THE REPORTER:  I'm sorry, RIPE?
6    A.   RIPE, R-I-P-E, that would be the equivalent
7  organization for European Union.  That comes from French
8  words and I'm not even trying to say that.
9    Q.   Okay.  And then again going back to what you
10  were talking to with the CNN producer, on July 26th after
11  I just read that part about enriching the IP address, a
12  little further down you say, I have set up servers which
13  are doing nothing.  Those are just honeypots to see who
14  are scanning and attacking around.  I was checking real
15  time.  One of my honeypots in New Jersey.  In address
16  where there was -- has never been anything.  Right now I
17  am receiving 84 to 94 packets per second probing around.
18  As most attempts are just one to three packets, but some
19  are larger, I see every second about 15 new IP addresses
20  attacking, and taking a few minutes sample about 22
21  percent of these addresses are from China, which means 3
22  to 5 new IP addresses from China were sniffing my box
23  every second.  Most of those are actually not humans,
24  those are malware and automated scanners trying to find
25  new victims, and then you go on.

Page 67

1         So why are you explaining this idea of a
2  honeypot that you've set up and looking at internet
3  traffic?
4    A.   So, first of all, there's a wonderful company
5  doing this now called GreyNoise.
6         THE REPORTER:  Grey?
7         THE WITNESS:  GreyNoise.  Grey.  Called
8  GreyNoise.
9         THE REPORTER:  GreyNoise?
10         THE WITNESS:  That's the name.
11   A.   Anyway, what I'm explaining here is I run these
12  honeypots because I want to know what is the background
13  noise of internet.  So these are honeypots which allows
14  me, myself, to see who is doing what, who is trying to
15  find victims, and my point was that when a claim is
16  saying this is extraordinary they were attacking this
17  election, blah, blah, blah, this many times, I'm just
18  explaining that's business as usual.  My box which has
19  nothing, my honeypots which have nothing, have never had
20  anything of value to attack, you still get this amount of
21  attacks every single second, and for instance is why this
22  amount of these attacks comes from China.  I'm just
23  explaining what is the background noise of internet.
24   Q.   I see.
25   A.   And so saying I -- saying that this place was

Page 68

1  attacked 30 times a second by China is business as usual,
2  a quiet evening.
3    Q.   So that's essentially the baseline of
4  background noise on the internet?
5    A.   Yeah.  That's what I'm explaining.  Being
6  attacked multiple times a second is every single day when
7  there's nothing interesting there at all.
8    Q.   And that would include potentially a server
9  that hosts poll data in Pennsylvania, you know, being --
10  if it's hooked up to the internet being pinged by China?
11   A.   Everything in the internet, including if
12  there's poll data, it doesn't matter, everything gets
13  attacked all the time and probed indiscriminately.
14   Q.   And one of the things that -- and correct me if
15  I'm wrong.  One of the things that is done in security
16  for elections is to air gap election systems, like
17  election management software?
18   A.   Uh-huh.
19   Q.   And what is -- is that correct?
20   A.   Yes.
21   Q.   Okay.  And so explain what air gapping means.
22   A.   Air gapping means that the system is not
23  connected to internet at all, there's no way of that
24  system to be in internet, because there is no wire,
25  there's no wireless, there's no connection.

Page 69

18 (Pages 66 - 69)

1          THE REPORTER: There's no wire, there's
2    no --
3          THE WITNESS: Wireless.
4          THE REPORTER: I didn't hear the word.
5          THE WITNESS: Wireless.
6    A.  Some people are mistaking that air gapping
7    would allow wireless. No. It means you have absolutely
8    no connection from this system to any other network.
9    Q.  So I'll dumb it down for me. You talked about
10   DEF CON and hacking machines and we just talked about
11   wireless connections and air gapping. In order to hack a
12   machine, an election machine, is it fair to say you have
13   to have some form of access to that machine?
14   A.  Yes. So, and the some form of machine access
15   can be then memory cards or whatnot, the physical media,
16   but you have to have a either physical access to the
17   network or you have to have a, for example, a physical
18   media, physical media like a USB stick which is
19   traveling. We call it sneakernet because the network all
20   are humans carrying stuff around.
21   Q.  So one of the layers of protection that is
22   utilized in the United States is to either air gap
23   systems or to control access to systems in order to
24   ensure that they haven't been hacked or there isn't an
25   unauthorized access; is that fair?

Page 70

1    Q.  But can you -- is my answer --
2    A.  One thing -- yes. One thing what I found
3    hilarious in Cyber Symposium when they were telling they
4    have every county what was their real results and been
5    hacked and hacked, one of those places is New Hampshire.
6    New Hampshire has 320 voting jurisdictions, and out of
7    those jurisdictions 197 has some kind of voting
8    technology, the rest, 123, have no whatsoever computers,
9    it's all human, manual, and yet he claimed to have PCAP
10   files how it was hacked. It's impossible because they
11   don't have that computer or voting machine. So there are
12   small jurisdictions in the United States and New
13   Hampshire is one of the premier examples where absolutely
14   there's zero technology, all human, all manual, no
15   computers involved.
16   Q.  But in addition to that, you know, going back
17   again to that visualization, if the Chinese were going to
18   actually hack a United States election remotely, there
19   would have to be some connectivity in order for them to
20   talk to the data; right?
21   A.  Yes.
22   Q.  And presumably that would be over the internet;
23   right?
24   A.  That's a very good assumption.
25   Q.  Okay.

Page 72

1    A.  That's fair. Best practice is air gapping.
2    Q.  Okay. All right.
3    A.  And, by the way, if you have air gap system and
4    you look at that system with Wireshark, you see there
5    packet Cs which look like going to internet because
6    Windows operating system is trying to call home and
7    whatnot. So the fact is over air gap doesn't mean that
8    if you look at traffic you don't see something which
9    looks like internet traffic, it just cannot go anywhere
10   because there is no connection.
11   Q.  Okay. You might see that it's searching for a
12   connection?
13   A.  Correct.
14   Q.  But not getting one?
15   A.  Exactly.
16   Q.  Okay. And so going back to this visualization
17   that we talked about where, you know, data is going
18   between countries and that sort of thing, in order for
19   data to come between the United States, let's say some
20   county that -- it doesn't matter what county, but that
21   has election software; in other words, it's not just a
22   hand election -- by the way, there are counties still in
23   the United States that don't have voting machines, they
24   do everything by hand, including counting; right?
25   A.  One thing which I found --

Page 71

1    A.  It's not the only possibility, but it's a very
2    good assumption because China doesn't have basically any
3    other kind of connectivity.
4    Q.  Is that -- was that affirmatively represented
5    to you or the other experts at the symposium that the
6    data that was being -- that was going to be presented was
7    data that was collected over the internet?
8          MR. MALONE: Object to form. You can
9    answer it.
10   A.  The story of these traffic captures changed
11   over the time. Before, originally it was claimed that a
12   group of military intelligence experts saw something
13   happening and started capturing this data. That was the
14   original story.
15   Q.  Where did that -- let me interrupt you. I'm
16   sorry. Where did you hear that as a potential source?
17   A.  So the original story came from -- I don't know
18   if it's original, but the first time I heard that came
19   from Russ Ramsland and ASOG, Allied Security Operations
20   Group, a private outfit out of Texas, but I just don't
21   remember which airport the office was, but it's a private
22   company. So that was the first story. And then the
23   story changed over the time to how these traffic captures
24   became to be and where they were captured and how they
25   were captured.

Page 73

19 (Pages 70 - 73)

1    So before Lindell's time, I believe it was
2 before his time, this was the story, it was the military
3 experts.  Then, to the best of my recollection, Lindell
4 started that story and then it changed to be the
5 super secret military program Hammer and Scorecard.  It's
6 a made-up super-secrecy program.  Anyway, the story, how
7 they even got these files, it changed all the time; that
8 was my point.  None of that was possible.
9    Q.  Okay.  So you said A-S-O-G, which is this
10 Allied Security Operations Group; correct?
11    A.  Yep.
12    Q.  And that Mr. Ramsland is affiliated with that
13 group?
14    A.  That's the leader of that group.
15    Q.  Oh, okay.  So the --
16    A.  And one of the employees of that group was Josh
17 Merritt.
18    Q.  Okay.  And you've met Mr. Merritt at the
19 symposium?
20    A.  Correct; first time in my life.
21    Q.  Okay.  And you believe that was the origin of
22 the idea that some U.S. military patriot was able to
23 procure that data?
24        MR. MALONE:  Objection to the foundation.
25    A.  First time I heard was this, because I was not

Page 74

1 ASOG.
2    Q.  Okay.  So you held up Exhibit 90, which is your
3 e-mail, and page 204, and so let me just kind of circle
4 to that then.  There you say, I know identities of three
5 of, quote, "experts," close quote, he has.  The he is
6 referring to who?
7    A.  Lindell.
8    Q.  Okay.  Number 1, Cloud guy, no security
9 expertise and completely clueless how networks work, used
10 to work for Russ Ramsland.  Who are you referring to
11 there?
12    A.  Peter Sherard (phonetic).
13    Q.  Can you spell his last name?
14    A.  No, but it's in one of the e-mails.
15    Q.  Did he work for ASOG as you understood it?
16    A.  Let me explain this because I think this is
17 valid.
18    Q.  Okay.
19    A.  So after 2020 election there was a CPAC
20 meeting.
21        THE REPORTER:  A what?
22    A.  Republican Party CPAC.
23    Q.  C-P-A-C.
24    A.  Yeah.  And they had formed a election integrity
25 working group.

Page 76

1 aware at that time the earlier story which was with
2 Dennis Montgomery and Mary Fanning, so I didn't know that
3 background story.  I'm telling from my perspective.  My
4 first introduction to this was this ASOG and military
5 experts capturing the data, taking it, putting it aside,
6 and then starting to disseminate to different groups.
7    Q.  And when did -- in relation to the
8 symposium, which if you look at the flyer it says it was
9 August 10 through 12 of 2021, when do you recall kind of
10 first hearing the ASOG Russ Ramsland origin story?
11    A.  Something between June and July of 2020.
12    Q.  So the year prior?
13    A.  Correct.
14    Q.  Okay.  Had you at any point been to the hangar
15 in Texas?
16    A.  No.
17    Q.  Okay.  All right.  So you said first ASOG is a
18 potential source for the --
19    A.  And these are the three known -- I'm saying in
20 this page 204, I know identities of three of the,
21 quotation marks, "experts."  These are actually the three
22 people I knew from the ASOG, and they all showed up then
23 in one way or another to support Lindell.  So these
24 are -- these people I -- before I ever heard about
25 Lindell's Cyber Symposium these were associated with

Page 75

1    Q.  Integrity?
2    A.  Yeah.  They called me up and said they want to
3 speak with me, and I speak with everyone.  So I told --
4 well, I asked where they are.  They said Virginia.  I
5 said, well, I happen to have --
6        THE REPORTER:  I'm sorry.
7        THE WITNESS:  Virginia.
8        THE REPORTER:  Virginia?
9        THE WITNESS:  Yeah, Virginia.
10    A.  So I found they are from the D.C. area, and at
11 that time I had an office in Quantico, Virginia.  So I
12 said, well, let me invite you all to Quantico, I have
13 off-the-wire building so you don't need to have
14 clearance, I can host you guys.  What happened was
15 instead of the few people who I thought were coming,
16 there was 20 people coming, plus they sent a video link,
17 and the meeting started by David Eviden (phonetic) and --
18        THE REPORTER:  David?
19        THE WITNESS:  Eviden.  The name is there.
20 He's the ex-NSA guy.
21        MR. CAIN:  He's an ex-NSA guy.  I'll get
22 you his last name.  David we'll call him.
23    A.  David, yeah, and then Peter.  And they had a
24 flyer of a -- telling how all of these attacks were
25 carried out over the network attacking U.S. elections.

Page 77

20 (Pages 74 - 77)

1    THE REPORTER:  Over the?
2    THE WITNESS:  Over the network attacking
3 U.S. Elections.
4    THE REPORTER:  At the?
5    THE WITNESS:  Attacking.
6    MR. CAIN:  The network.
7    THE REPORTER:  Over the, what, elections?
8    CAIN:  U.S.
9    THE WITNESS:  Yeah, U.S. elections.
10    MR. CAIN:  United States.
11    A.  In order for me to save time because we had
12 only six hours, when they had this flyer I said just to
13 save time this is a piece of pure fiction, there's no
14 truth or connection to reality at all this paper.
15    Q.  The paper you were holding up?
16    A.  The paper which were given and distributed by
17 these two guys of ASOG.
18    Q.  I see.
19    A.  The room went quiet because of course this was
20 kind of an explosive statement for them, and to my great
21 surprise these two guys who work for ASOG, yes, we have
22 been telling Russ all along that we shouldn't be
23 distributing this, this is Russ Ramsland's idea of what
24 could have happened, we are not saying this actually
25 happened.  This is just a theory and fantasy what could

Page 78

1 have happened.  I was shocked because I was expecting a
2 clash and controversy and all of a sudden the people
3 who -- the very people who distributed the paper said
4 this is bullshit, we agree.  This is how I know these two
5 people, I invited them and the group came with a huge
6 group to Quantico to visit me after the Republican Party
7 CPAC meeting.
8    Q.  Okay.
9    A.  So that's why I know who they are, I know they
10 introduced themselves and they self-identified their role
11 in ASOG and their role in the Antrim County report.
12    Q.  Antrim County, A-n-t-r-i-m.
13    A.  Yeah.  So this is not hearsay.  This is
14 firsthand.  I have personally been in the room with these
15 guys hearing them to tell the story.
16    Q.  Okay.  So the number one then is Peter, and
17 your personal knowledge of their expertise came from --
18    A.  Talking with them.
19    Q.  -- this meeting?
20    A.  Yes.
21    Q.  And the number two, is that the David person?
22    A.  Yes.
23    Q.  Okay.  So the David person is the ex-NSA, was
24 their work-level manager of a small malware detection
25 group for a short while, non-technical and used to work

Page 79

1 for Russ Ramsland; was asked to leave NSA because he was
2 on -- or in the wrong side of bad arguments more than
3 once.  And so what did you mean by that last statement,
4 was in the --
5    A.  I have friends in agencies, so of course when I
6 meet new people I want to know who I'm talking with.  So
7 I got the background story, which I haven't confirmed
8 true, I just heard what are these guys' background,
9 because I -- you usually -- a lot of people around,
10 Sidney Powell, Russ Ramsland, they give fake credentials,
11 they are not who they say to be.  If somebody says I'm
12 from NSA, I will figure out who you are, because it's an
13 unusual background for these groups.  Of course and when
14 you have a conversation over beer you hear a little bit
15 more background story.  That's what I'm putting here.
16    Q.  And do you have security clearance in the
17 United States?
18    A.  No, I don't.
19    Q.  Then number 3 kind of speaks for itself, that's
20 Josh Merritt, and we'll talk about him.  That's the third
21 expert that you identified that were associated with
22 Mr. Lindell?
23    A.  Originally associated with Russ Ramsland but
24 then inherited to Mr. Lindell's group either by person or
25 by their work products.

Page 80

1    Q.  Okay.
2    A.  I'm actually not knowing if Peter Sherard ever
3 directly worked for Lindell's group.  I know that his
4 work product has been represented by -- and shared by
5 Lindell to the public.
6    Q.  In what form?
7    A.  Lindell-TV, public speeches.
8    Q.  Okay.  All right.  As usual, as Ryan is now
9 learning in my depositions, we go down different trails
10 that I wasn't expecting to hop down.  Let me do this --
11    A.  I'm going to be, by the way, marking this part
12 confidential when I'm mentioning these names in this
13 context.
14    Q.  Absolutely.  Understood.  Okay.  So going back
15 to a few more statements I want to read to you from the
16 provisionally marked Exhibit 92, which is that e-mail
17 chain with the CNN producer.  You know, we talked about
18 the data and what that data represented to you, and you
19 told the CNN producer your view of the data pre-symposium
20 and then you kind of summarized it appears to me, on
21 Wednesday, July 28th, you sent a long e-mail talking
22 about these NetFlow data, CSV files, all of the -- some
23 of the stuff that we've been talking about, and then you
24 said, Basically, until there is more data available it is
25 impossible to tell, and then you list three things.

Page 81

21 (Pages 78 - 81)

1 Number 1, Is this real at all, now when it is clear that
2 the, quote, "target," close quote, explanation text are
3 deliberate fabrications and cannot come from honest
4 third-party source. This can just -- can be just an easy
5 hoax. Collect names of county websites, find IP
6 addresses for those, name those with, quote, "alternative
7 election -- permutation -- excuse me -- alternative
8 related names," close quote. Take a bunch of IP
9 addresses from any firewall. Reverse map those with
10 third-party source to get their names. Then run
11 permutation software for a day and, bang, you have 37
12 Terabytes of fake IP pair logs.
13          MR. CAIN: Pair, p-a-i-r.
14     Q. Now, you and I as computer experts know what
15 that means, but if you could explain just in general in
16 layman's terms what you're talking about there.
17     A. I'm talking about two things. First of all,
18 the part where I'm talking about the IP addresses are not
19 being the county. So when I looked for this hex dump on
20 all the material and they say county clerk, county
21 something in state X, when I look at those IP addresses
22 they were predominantly -- first of all, I didn't find
23 any real election office at all, even when the text says
24 whatever, but they were predominantly a third-party
25 webhotels, and it was hilarious sometimes that webhotel

Page 82

1 the same IP address had the county's public website, a
2 porn site and realtors' listings of real estate sales.
3 So they were not exclusively used by the county.
4          At this time when I wrote this I was still
5 theorizing that we will be presented fake synthetic PCAPs
6 to fool us. I was -- I didn't ever believe or theorize
7 that we are not given nothing. I was thinking what kind
8 of fake data and how to create fake data. Actually one
9 of the persons as an expert, Professor Doug Jones from
10 State of Iowa, who was not allowed to be an expert, he
11 was in symposium, and he is expert in creating synthetic
12 data. So that was kind of funny that if we would have
13 been presented this kind of synthetic data I'm
14 theorizing, we actually had a person in Sioux Falls
15 visiting who was not allowed to be in as an expert, but
16 he was only a professor, you know.
17     Q. So Sioux Falls, Doug Jones, Associate Professor
18 Emeritus at the University of Iowa?
19     A. Correct.
20     Q. All right.
21     A. Well, he would -- if we would have been
22 presented this kind of fake data, which they didn't, he
23 would have been my on-the-spot go-to guy to say help me
24 with this, we need to analyze it.
25     Q. Because you actually were e-mailing -- or on

Page 83

1 the list that you talked about earlier, he was on that
2 list?
3     A. He is on the list and we knew before -- we
4 coordinated that we will meet. He knew that he probably
5 will be rejected as an expert because he didn't have
6 media to -- I don't remember who was taking him there, he
7 was not on his own, he was also brought in, but they
8 rejected the idea that he would be expert. I mean just
9 40 years of expertise, nothing.
10     Q. He's I think a Ph.D. in computer science?
11     A. Yes. And he also has been, for example, the
12 certifier of voting machines in Miami-Dade County,
13 Florida. So he has been working for a number of states
14 to certify the critical infrastructure of elections, a
15 true expert.
16     Q. Did you gain an understanding as to why he was
17 not allowed to attend as an expert, a cyber expert?
18     A. The -- at one point of time Mike Lindell
19 announced that the experts have to have a CISSP
20 certificate, which is a commercial certificate. Because
21 it's commercial this was the first time ever in my life
22 when somebody asked me if I have a CISSP.
23     Q. C-I-S-S-P.
24     A. It's a commercial security certificate. It's
25 just a money-crapping thing. None of the professors or

Page 84

1 academics of top experts have it. So my belief and my
2 recollection, there might be other reasons too, was that
3 because he doesn't have CISSP, I didn't either, but they
4 were rejecting him because he doesn't have this bullshit
5 commercial certificate.
6     Q. So, and you were able to get in because you had
7 a press pass; is that right?
8     A. Actually the -- so Mike Lindell was inviting
9 publicly that if public local state legislators or media
10 comes that they can bring their experts. So they were
11 trying to reject me too, but CNN was persisting and
12 saying this is our expert and we will be -- we will be
13 protesting that you're rejecting our expert. So, and in
14 the back rooms nobody from press was allowed to the back
15 room, so that was another fiction created, that I had
16 both expert pass and press pass. They didn't like that
17 at all.
18     Q. I see. So your understanding was CNN took the
19 position that they would only attend and, you know,
20 potentially broadcast from that location if you were part
21 of their team?
22     A. I don't know what argument they used, but there
23 was a controversy and I needed to wait for a long time
24 when they were doing their thing, and after that they
25 handed me an okay, they approved you, but it was not I

Page 85

22 (Pages 82 - 85)

1 walk in and -- no.
2    Q. Okay. Well, I mean you were expecting -- let
3 me ask it in a non-leading way. Hold on.
4    A. When I wrote this mail to CNN I expected that
5 they don't -- they are not going to be wanting to come
6 there. When we were having prior we were absolutely
7 counting fifty-fifty chance that I will be rejected and
8 never allowed to be an expert.
9        We with the CNN expected that there was a
10 fifty-fifty chance that they will bounce me and not allow
11 me to be expert. That was assumption.
12    Q. Because when you actually ultimately got there
13 how many people were there like yourself that you
14 consider to be sort of true independent qualified cyber
15 security experts?
16        MR. MALONE: Object to form.
17    A. I would say in addition to myself one and a
18 half as an expert.
19    Q. Is the other one Robert Graham?
20    A. Correct.
21    Q. And who's that, who's the half?
22    A. That is actually a person I didn't know before,
23 Robert -- Eddie Rob was the chat name. I didn't know him
24 before. And he himself knows he doesn't know enough, but
25 he knew actually more than most of the people, so we

Page 86

1 became friends.
2    Q. Where is he from, do you remember?
3    A. He is from Minnesota. I actually went to visit
4 him when I was stranded out in Minnesota accidentally, so
5 I had drinks. I have met him once after the symposium by
6 being stranded in Minnesota. I called him immediately do
7 you have time for a beer, and of course he had.
8    Q. Okay. So back to what we were discussing. We
9 got off target again. So we were talking about the sort
10 of three things that you concluded before the symposium
11 that you were telling CNN, and we talked about, you know,
12 the IP address, pairs, and you gave the example of one IP
13 address had multiple, you know, businesses, a porn site
14 and real estate site and --
15    A. And whatever.
16    Q. And whatever. Because multiple web addresses
17 can exist on the same IP address; right?
18    A. Correct. If it's a low-cost webhotel that's a
19 very common practice to save cost for the service
20 provider, and I underline low cost.
21    Q. And then you say, as part of this number 1,
22 then you run the permutation software for a day and,
23 bang, you get 37 Terabytes of fake IP pair logs. So
24 there's three things there. So permutation software,
25 37 Terabytes, and then fake IP pair logs. Can you

Page 87

1 explain what you mean there?
2    A. So originally the claim Mike Lindell made is
3 that he is traveling from hotel to hotel with the disk
4 where he has 37 Terabytes of this packet capture. So
5 that's where the 37 comes from. He actually has changed
6 it now to 32 lately. I don't know why 5 Terabytes,
7 but originally he had used.
8        The rest is I'm explaining a simple method of
9 creating completely synthetic data which will be 37
10 Terabytes and look --
11        THE REPORTER: I'm sorry. The rest --
12    A. Is I'm explaining a simple method how to
13 generate a synthetic data blob which will be something he
14 could present. So I'm just explaining to CNN that making
15 a false evidence of the size he claims which will have
16 IP addresses which would need an expert to say this is
17 not true is not dark magic, this is simple and easy and
18 every high school student or at least undergrad knows how
19 to do this. I'm just explaining how simple and easy this
20 method is.
21    Q. So the permutations -- so basically, if I can
22 restate, it would have been easy to simply create a
23 program that could generate fake IP pairs, permutations
24 of that data, and write it over and over and over and
25 over and over and over again to where suddenly you have,

Page 88

1 as you described it, a data blob?
2    A. Yeah.
3        MR. MALONE: Object to form.
4    Q. Is that basically what you were saying?
5    A. I'm just explaining one method of creating a
6 fake 37 Terabyte, which is the target size, data from
7 simple sources, which will be creating data which for a
8 casual observer would be looking like the real thing but
9 wouldn't survive any real analysis.
10        I also want to point out, it's in some of the
11 mail, that especially in Twitter where I point out that
12 the 37 Terabytes, which sounds enormous amount of data,
13 is actually tiny comparing to what the data size of what
14 Lindell claimed to have would be, and if that data would
15 have been collected the actual data would be -- 37
16 Terabytes would be less than zero-point-five percent of
17 that. So actually one reason why --
18        THE REPORTER: Would be thirty --
19    A. 37 Terabytes would be less than zero-point-five
20 percent of what the real data of what he claimed to have
21 would be in size.
22    Q. Okay. So let's break that down. So 37
23 Terabytes, that sounds like a lot of data.
24    A. But it's not compared to what he claims that he
25 has.

Page 89

23 (Pages 86 - 89)

1  Q.  Okay.  So how did you -- you said
2  point-zero-five percent.  So I can't do the math, so if
3  you --
4  A.  It's listed that when you look at network,
5  statewide network and you look at data, current election
6  data, and if you look non-election week how much traffic
7  goes through that kind of network, that would be 1,500 --
8  and you extrapolate that to be the whole United States
9  and all the states, my estimation what that will be 1,500
10  to 2,000 Terabytes of data instead of 37.  It's a
11  guesstimate and it's based on my work in places like
12  Kentucky where I looked at real network and I know what
13  happens there.  So it is -- it's not an absolute fact,
14  it's just directionally how much bigger that kind of data
15  would be actually.
16  Q.  So that's sort of your best estimate of what
17  the actual dataset size would be if the claims that
18  Mr. Lindell were making about trying to hack the election
19  would have been?
20  A.  If he would have been able to capture the data
21  he claimed to have, that data would have been so
22  enormously larger than 37 Terabytes.
23      They, by the way, in symposium tried to address
24  that by claiming that the super secret software running
25  in China, this Hammer and Scorecard, was such a hot fire

Page 90

1  hose that they couldn't send all the data with that super
2  secret program to U.S. and for that reason they only had
3  a sample of the data.  I don't remember what percentage
4  it was.  It's probably in some of the e-mails.  At that
5  point both me and Robert say, well, then we can go home,
6  this is useless, because if you don't have the full
7  dataset you cannot do the analysis you claim and we
8  cannot do analysis what we want to do.  That kind of
9  example renders the whole data useless and almost
10  meaningless.
11  Q.  Okay.  So let's again break that down.  You
12  said there was a representation made that the data was
13  coming essentially out of a fire hose.  Hold on.  I
14  thought you created a product that was able to -- this
15  2-gigabyte product that would have been able to capture
16  that volume of data; is that not true?
17  A.  That product was created almost 20 years ago,
18  and I'm not attesting that that product would have been
19  powerful enough to even take that.  So the data amount
20  would be so enormous.  The fire hose would be too big I
21  would say for even ROMmon, but a couple of ROMmon boxes
22  would be able to do it.
23      THE REPORTER:  But what?
24      THE WITNESS:  But a couple of ROMmon
25  boxes could have been doing that.

Page 91

1      MR. CAIN:  That's his company that we
2  talked about earlier.
3  Q.  Okay.  But where did you hear this explanation
4  about the fire hose?
5  A.  Okay.  This is going to be a little bit
6  lengthier, but I think just in order to have a -- some
7  kind of coherence in this story.
8      THE REPORTER:  Some kind of what?
9      THE WITNESS:  Coherence.
10      MR. CAIN:  Coherence.
11  A.  When we finally got to the back rooms as
12  experts we were originally divided to four rooms, and
13  Phil Waldron was the lead man to brief people.  So they
14  were originally --
15  Q.  Phil Waldron.
16  A.  Yeah.
17  Q.  W-a-l-d-r-o-n.
18  A.  So he was the guy who was doing the briefing,
19  so he went first to the first room.  I don't know what he
20  said there.  Then supposedly he went to the second room.
21  I don't know what he said there.  At the time when I was
22  in room four, so they actually said wait a minute, this
23  is taking too long a time, we will brief room three and
24  four at the same time.  So that was when I heard --
25  Q.  Is this day one of the --

Page 92

1  A.  This is day one, the start of this whole thing.
2  So then Mr. Waldron first explained that this data is
3  coming from a military source, blah, blah, blah.  Then he
4  changed the story while he was still talking and all of a
5  sudden he introduced this idea that this actually is from
6  the CIA super secret program called Hammer and Scorecard.
7  He originally denied that Dennis Montgomery had anything
8  to do with that, but he changed the story in midstream
9  because this Hammer and Scorecard is associated with
10  Mr. Montgomery, so he changed the story midstream, which
11  was we were, whoa, that's interesting.
12      So then he was -- we were having these
13  questions, like why 37, and that was when he was
14  explaining that this Hammer and Scorecard, which is
15  running and capturing data in China, was having such a
16  fire hose in China that they couldn't call home all the
17  data.  He also immediately at that time admitted, told us
18  we don't have 37 Terabytes right now because this Dennis
19  guy has had a stroke and he's fighting for his life.  He
20  was making allegation that this was assassination attempt
21  probably by the U.S. Government.  But he was saying,
22  well, we don't have the 37 Terabytes because he got the
23  stroke before he was able to send everything to us, so we
24  only have a slice of the 37 Terabytes and we are going to
25  give you a slice of that slice.

Page 93

24 (Pages 90 - 93)

| | |
|---|---|
| 1  Q.  Okay. | 1  was eventually given to us. |
| 2  A.  Which they never did.  But I'm just telling | 2  Q.  Okay. |
| 3  you.  This is why I say that I'm going to contradict | 3  A.  We were first given a couple of very small PCAP |
| 4  myself, because the story told to us can change within | 4  files which were named with Lake County and whatnot. |
| 5  one hour. | 5  It -- we very quickly identified that this data -- me and |
| 6  MR. CAIN:  I'm giving June a break. | 6  Robert is we, it's primarily me and Robert, but we were |
| 7  Do you need to take a break? | 7  actually spending time -- me and Robert were in the same |
| 8  THE REPORTER:  Yes, I do. | 8  room.  We were using this time to teach the other people |
| 9  MR. CAIN:  All right.  Let's go off the | 9  the trap.  So we were -- we used this opportunity to try |
| 10  record. | 10  to make more experts. |
| 11  THE VIDEOGRAPHER:  We're off the record. | 11  Q.  Okay.  Let's break that down.  You're in |
| 12  The time is 12:48. | 12  room 4? |
| 13  (Recess:  12:48 to 1:10 p.m.) | 13  A.  I was in originally room 4, but after the |
| 14  (Exhibit 92:  Series of E-mails - marked | 14  briefing they realized that there were not enough |
| 15  for identification.) | 15  experts, so room 3 and 4 were combined, there were only |
| 16  THE VIDEOGRAPHER:  We're back on the | 16  three.  Then day two there was -- so many people left, |
| 17  record.  The time is 1:10. | 17  there was only two rooms, and last day there was only one |
| 18  BY MR. CAIN: | 18  room, because people kept leaving. |
| 19  Q.  So, Mr. Hursti, in the second session we were | 19  Q.  So you were in combined room 3 and 4 looking at |
| 20  talking at length about this e-mail exchange, series of | 20  what was said to be PCAP data from Lake County and you -- |
| 21  e-mails between you and CNN pre-symposium, and I think I | 21  is that right? |
| 22  left off kind of reading from that.  During the break I | 22  A.  Lake County, a couple of other places.  They |
| 23  had them copy what I had been talking about.  It's now | 23  were very small files. |
| 24  labeled Exhibit 92.  It is Bates 906 through 916, and I'm | 24  Q.  Okay.  And you and Robert, referring to Robert |
| 25  going to hand you that.  Just confirm that that's the | 25  Graham, took it upon yourselves to help train the other |
| Page 94 | Page 96 |
| 1  e-mail chain that you produced between yourself and CNN | 1  people in the room as to what they should be looking for? |
| 2  prior to the symposium. | 2  A.  And what tools to use.  Like they didn't know |
| 3  A.  Yep, it looks like. | 3  about BruteShark, so we were showing these other tools |
| 4  Q.  Okay.  And on the first page of Exhibit 92 is | 4  and also training them with the new tools they were not |
| 5  where I was reading from those three items that you | 5  familiar with. |
| 6  listed.  It's at the bottom.  We talked about the topics | 6  Q.  Okay.  And you said -- did you say BruteShark? |
| 7  in item number 1, the sort of how to fake 37 Terabytes of | 7  A.  Yes. |
| 8  data, and then you indicated you actually ended up at the | 8  Q.  Okay.  That's different from Wireshark? |
| 9  symposium with them saying it was 32 Terabytes? | 9  A.  It's a related -- it's different, and |
| 10  A.  No.  After the symposium, recently, this year | 10  BruteShark is a further development, it's a better tool |
| 11  or like last year, for reasons unknown Mr. Lindell his | 11  for visualizing a PCAP file. |
| 12  public statements have changed it from 37 to 32. | 12  Q.  And the other people in the room, about how |
| 13  Q.  I see.  The second item on Exhibit 92 in the | 13  many people would you say? |
| 14  e-mail you say, If this is real, what could be the data | 14  A.  Ten. |
| 15  source.  Having a small sample, say 100 megabytes, would | 15  Q.  Okay.  Do you -- |
| 16  already start to give an idea what could be the data | 16  A.  More than ten, but definitely that. |
| 17  source or collection of data sources and even maybe | 17  Q.  Other than yourself and Mr. Graham and the half |
| 18  collection method, and if there is a public data source | 18  expert you referred to, your friend from Minnesota, do |
| 19  for that.  So we talked about what was said the source of | 19  you know any -- did you know any of the other people in |
| 20  the data was in the earlier segment.  Have you ever been | 20  the room? |
| 21  able to determine, at least what you looked at at the | 21  A.  I didn't know anyone else than Robert Graham in |
| 22  symposium, what the actual source of that data was? | 22  the room, and in the audience I knew Doug Jones, but that |
| 23  A.  Well, none of the data which was promised were | 23  was the full extent of people. |
| 24  ever given, so, hence, no, because you cannot -- it was | 24  THE REPORTER:  I knew -- |
| 25  never given.  So let me -- let me -- let me quantify what | 25  THE WITNESS:  Doug Jones, Professor |
| Page 95 | Page 97 |

25 (Pages 94 - 97)

1 Jones.
2    Q.   Doug Jones.
3    A.   Yeah.
4    Q.   So Doug Jones, who you mentioned earlier,
5 the --
6    A.   He was in the audience because he was not
7 allowed to be expert.
8    Q.   Okay.  But they did allow him to come into the
9 main conference area?
10    A.   Yes, he was in the main conference area, and
11 that's why in the e-mails he's writing what happened in
12 them, because I didn't see what happened in the main
13 area, so he was writing, and that's why I learned some of
14 the things what happened in the main area, because he was
15 telling what happened there because I couldn't be there.
16    Q.   Okay.  So, again, during the entire three days
17 is it fair to say that you didn't spend time in the main
18 area listening to the speakers?
19    A.   Very little, because they were trying to --
20 well, actually inaccurate.  The first day we were in the
21 beginning for a little while there.  The second day
22 they -- the second day when we arrived we were told that
23 the back rooms are closed for us and they will open it
24 later.  They made this dog and pony show about --
25    Q.   Dog and pony show.

Page 98

1    A.   -- about we together examining these Mesa
2 images.
3         THE REPORTER:  What kind of images?
4         THE WITNESS:  Mesa.
5    Q.   Mesa County, Colorado.
6    A.   Mesa County.  So that day we spent two hours
7 maybe in the main room.
8    Q.   Day two?
9    A.   Day two.  And then day three I don't think I
10 spent more than the time when I went to upstairs the
11 media area and there was a bar to have beer with Robert.
12 I think that was the only time when I was in the main
13 room.  The first day we also went with Robert to the
14 military bar upstairs, so, again, it was a separate area,
15 so it was -- I couldn't hear what is happening.  It's
16 glass walls and stuff.
17    Q.   Okay.  Let me repeat, and tell me if this is
18 accurate.  Day one pretty much in the combined room, 3
19 and 4, day two you had a couple of hours in the main room
20 when the Mesa County data --
21    A.   In the start, yes.
22    Q.   -- was being presented.
23         Did you see Mr. Watkins, his presentation?
24    A.   I saw part of that.  I don't think I saw all of
25 that, but I'm not certain because I don't know what I

Page 99

1 don't know.
2    Q.   Okay.  And then day three you were in the bar
3 part of the time but not in the main room?
4    A.   Day one and day four we were in the bar, but
5 day three -- basically the only time when I was
6 continuously for two hours seeing the main thing was the
7 start of day two.
8    Q.   Okay.  All right.
9    A.   And they didn't like us to go to the main area.
10 They tried to prevent us to go there.  So they wanted to
11 try to keep us separated from each other and definitely
12 separated from the main crowd.
13    Q.   Okay.  So you used the pronoun they.  When you
14 refer to they wanted you to stay in your room, what --
15 who's the they?
16    A.   They are -- so I don't know who hired them, but
17 they is referring to security guards who were biker-type
18 guys who were the security.  So we were by the security
19 put in place by organizers.  I think they were trying to
20 make this intimidating.
21    Q.   I see.  But did -- you had mentioned off the
22 record that you had security there with you; is that
23 true?
24    A.   Correct.  CNN had hired from New York two
25 ex-law-enforcement SWAT guys, I believe they were SWAT

Page 100

1 guys, both as our personal security detail.  So they were
2 from New York coming to Sioux Falls.
3    Q.   And did they stay with you in the room?
4    A.   They were not allowed to the back rooms, so
5 while I was in the back room they were waiting for me in
6 the main area.
7    Q.   Okay.
8    A.   And I was always driven by them from the venue
9 to hotel and everything.  So I basically -- unless I was
10 in the back room I was never alone, I was always having
11 one of those two guys with me.
12    Q.   Were you staying at the same hotel as
13 Mr. Lindell?
14    A.   Correct.  It's across the street, but still
15 even when we arrived to the -- there was people who
16 were -- we were first time tried to be harassed before we
17 even first time got in.  There was a group of people who
18 were welcoming fact-checkers.  They have -- I don't have
19 picture, but they have cars, they have signs, and we were
20 already at that time being harassed before we even got
21 into the venue.  So that kind of set the tone for us.
22    Q.   So there were people outside the venue with
23 cars and signs that were harassing some of the people
24 that were coming in?
25    A.   They -- basically the war cry of Mr. Lindell

Page 101

26 (Pages 98 - 101)

1 the first day is stop reporting, stop fact-checking or
2 vice versa, stop fact-checking, start reporting. So they
3 were -- the whole idea was they're not against media,
4 sir, they were against fact-checking, that was the point.
5 And then media, like the lead stories where Mr. Graham
6 was representing, they were against -- very much against
7 that because what they do is fact-checking, fact-checking
8 bad.
9    Q.  Okay. So circling back, you were describing
10 teaching the other -- sort of tutorial with the other
11 people in your room with Robert Graham. I'm going to
12 read from a section of deposition from Josh Merritt at
13 this point and this relates I think to day one. But
14 before I do that, you know Josh Merritt; right?
15    A.  I first met him in symposium. Before that I
16 had heard his voice, both voice altered and as it is
17 in -- when he was with ASOG.
18        THE REPORTER:  I'm sorry?
19    A.  Both voice altered and with natural voice in
20 conference call where he was the expert, the military
21 expert for ASOG.
22    Q.  Okay. So you had heard I guess an interview or
23 something on --
24    A.  Conference call.
25    Q.  Conference call. You said voice altered. What

Page 102

1 was the circumstance where you heard his voice being
2 altered?
3    A.  This was very early when ASOG was claiming --
4 Sidney Powell was claiming that they have a military
5 intelligence specialist whose identity has to be
6 concealed even in the court filings, and then I was
7 invited to a call with ASOG where this super secret
8 military intelligence guy with no name, he was called at
9 the time Jackal.
10    Q.  J-a-c-k-a-l?
11    A.  Yeah. So he was on the call explaining this
12 German server and Scytl and --
13    Q.  Scytl is S-i-e-d-e-l; right?
14    A.  Yes.
15        MR. CAIN:  Is that right?
16        MR. MALONE:  I thought it was S-c-y-t-l.
17    A.  S-c-y-t-l.
18    Q.  Oh, Scytl. I'm sorry.
19    A.  So this was the -- this was the time when the
20 claim was that all votes are sent from United States to
21 Germany, where they are altered in Germany and then they
22 are dialed back to the counties using the QSnatch
23 vulnerability, which that's bullshit, but at that time
24 Spyder was explaining in this call this theory.
25    Q.  Okay. So let me stop you there, because now

Page 103

1 you're saying Spyder. You're referring to --
2    A.  Jackal. The same guy, just married, but
3 different names. He changed his name.
4    Q.  His nickname.
5    A.  Yeah.
6    Q.  So Spyder he actually -- it's spelled with a
7 "y," not an "i"?
8    A.  Both, depending.
9    Q.  Okay. All right. So that was your first, like
10 you heard his name or his voice being altered because he
11 was associated with Sidney Powell as her military expert?
12    A.  Yeah, and it was presented that he's in life
13 danger if his true identity will ever be revealed.
14    Q.  But in fact his identity was revealed because
15 they produced a declaration briefly that had his name on
16 it?
17    A.  I don't know that back story whole thing. I
18 just find it hilarious.
19    Q.  Okay.
20    A.  I find a lot of things hilarious.
21    Q.  Okay. So this is the Josh Merritt, the same
22 guy you've been talking about that you met at the
23 symposium?
24    A.  Correct.
25    Q.  And did he represent to you who he was working

Page 104

1 for while he was there?
2    A.  After the introductions by Phil Waldron was
3 over, after that Josh Merritt became the primary point of
4 contact for us and Lindell's people, and it was -- Josh
5 Merritt claimed that he had been hired to support
6 Lindell's Red Team or whatnot a week before or so of the
7 symposium.
8    Q.  Okay. So when we took Josh Merritt's
9 deposition there was some discussion about when he came
10 into the room first and you were there, and this is at
11 page 122, line 7, through page 123, line 18. I'm going
12 to read to you what he said and then get your response or
13 reaction.
14        So the question was:  What was the response to
15 the information that was provided to the experts?
16        And his answer was:  About an hour into the
17 symposium Colonel Waldron and Kurt Olsen pulled me aside
18 and asked me to go talk to the people in the cyber expert
19 room. So I went into the cyber expert room not knowing
20 what was going on. I walked in and the first person who
21 talked to me was Harri Hursti, and Harri immediately
22 started complaining. He said I don't know what this data
23 is but this is nowhere near what was claimed it should
24 be, and as we call it in the military, I sort of had my
25 moment-of-truth moment at that moment. I don't know why

Page 105

27 (Pages 102 - 105)

1 Waldron and Olsen sent me in, but when I'm being
2 confronted by a bunch of guys who, right, left, I didn't
3 care what their political ideas were, but they knew tech,
4 I was going to be respectful because it's the field we
5 all work in, and considering I hold certs, c-e-r-t-s,
6 short for certifications, that if I have an integrity
7 issue I could lose and that's, you know, how I feed my
8 kids. I couldn't lie. So I looked at all of them and I
9 say, look, I came to the same conclusion you guys did and
10 so did the whole Red Team, that this data is not good,
11 that it's BS, and I said we're going to work through and
12 deal with all of this, and I started saying what
13 questions do you all have, how can we work through this,
14 and I started talking to them. I can't answer a lot of
15 their questions, so my brain tells me don't let them be
16 limited with data. So I went and I grabbed the drives.
17 I grabbed both drives. They were in my computer bag,
18 which was in the presentation room for the database
19 vulnerability. So I grabbed the black drive and the
20 white drive. I walked both drives into the cyber expert
21 room and I handed them to Harri Hursti and I said you all
22 can look through these. Now, the first day it was just
23 Antrim information and the supposed PCAP information.
24      That's the end of his answer there.
25      Do you remember any of that happening?

Page 106

1      A.  It's when we were in the back room we were told
2 that there is a network where we can fetch the data. The
3 network was so slow and riddled with configuration errors
4 when we started --
5      THE REPORTER:  Riddled with?
6      THE WITNESS:  Configuration errors.
7      A.  It took forever to get even small -- things
8 what should have been downloaded in one minute took one
9 hour. So once we started to get the first things down we
10 realized this data is not from election, not from
11 November, that was when I talk about the PCAP files the
12 first ones we got down, and then when Josh came we say
13 this is not from November, this is not from election,
14 this might be a public network in election office, but we
15 can tell you exactly only one of the files was from
16 December 2020, the rest were from early 2021, nowhere
17 near election, and that was -- and we complete the
18 network, so then he did bring those two drives. I
19 made -- started making a copy of the data to everybody
20 else. So I was the copying point of getting everybody
21 else up to the speed. So that is true, he provided those
22 drives, I started copying, off we go.
23      Q.  Okay. So you said there was some data that
24 was -- may have been in a public network --
25      A.  Not public. An internal network of the venue.

Page 107

1      Q.  Oh, okay. I'm sorry. What I was referring to
2 is, the data you were looking at, some I thought you said
3 could have been from an election office but just like the
4 public network of the election office; is that --
5      A.  So we -- they were labeled as they would be a
6 county.
7      Q.  Right.
8      A.  The first thing we checked was the time, and we
9 figured out immediately that this is nowhere near
10 election time. We couldn't confirm the locations, but
11 there's some data believing that the data would be from
12 that location, but then you find radio control packages,
13 which are meaning that these are from wireless network,
14 which also when you map the data you get very quickly an
15 idea that this is the public wireless network maybe in
16 their county office but there's nothing confidential in
17 this network.
18      Q.  Right. I mean anybody can sort of access that
19 data?
20      A.  Correct. And we found from the -- also the
21 type of computer used to capture there was a gaming
22 laptop PC, a computer gaming laptop PC and a Mac, and we
23 found the name -- the initials CHA, and we figured out
24 then later this is Conan Hayes, so there was the name of
25 the person. Also these captures were amateurish, so they

Page 108

1 were polluted because he didn't -- whoever captured it
2 didn't know what he's doing.
3      Q.  Okay. I missed one of those words. Also
4 the --
5      A.  They were contaminated by the --
6      Q.  Contaminated.
7      A.  Polluted. Basically they were not clean
8 captures. The capturing computer itself had a VPN and
9 the VPN made these -- if you would be saying this is any
10 value as evidence, no, because the guy who was doing
11 these captures didn't know what he was doing.
12      Q.  Okay. And you mentioned the name Conan Hayes.
13      A.  We later figured out that the initials are
14 Conan Hayes. We didn't know it at the time.
15      Q.  Okay. And who do you understand Conan Hayes to
16 be?
17      A.  I understand that he is some kind of sports
18 where -- entrepreneur who had been being some kind of
19 expert for this group. I don't really know. His name
20 started popping up during the next day. I believe this
21 was the first time I ever heard his name. So I had no
22 idea and actually very little interest.
23      Q.  Okay. So basically is that the data that you
24 were able to get from the wireless source or is the data
25 you were describing from the hard drives that you were

Page 109

28 (Pages 106 - 109)

1 given?
2    A.  So the data on the hard drives were all the
3 same data which was in the wireless plus then some extra.
4 And then the extra files which we were trying to download
5 but we were not able to were the files which they claim
6 to be PCAP files from the super secret Hammer and
7 Scorecard.  When we finally got it I confronted again
8 Josh Merritt, saying this is not PCAP file, and he would
9 say, well, how you can know, you have looked into it only
10 for two minutes, and I think it was Robert who said
11 that's because we checked it three times just to be
12 certain, otherwise we would have said that in 15 seconds
13 because it's so blatantly obvious.  And then --
14    Q.  Robert Graham said that?
15    A.  Yeah.  Robert actually is -- even I rank his
16 skills higher than mine in this area, so he's even better
17 than I am.  Anyway, it's wonderful to work with him.
18        So, anyway, then when we started looking for
19 what is inside of that super secret program we found out
20 that the whole file is a random garbage with the markers
21 and between the markers we were the same visualization files
22 and they have a program and the visualization was used --
23 basically you know what is a ROT13, so Caesar --
24        THE REPORTER:  ROT?
25        THE WITNESS:  ROT, R-O-T 13.

Page 110

1    A.  It's the Caesar 2000-year cipher used by Julius
2 Caesar.  They had a variation of that; instead of 13 it
3 was 3, so even easier.
4        So the software which was supposed to be
5 analyzing PCAP files were actually making itself slow, it
6 was reading the file three times over, just to create an
7 illusion that it's doing something.  It was only looking
8 at these markers and whatever is behind the markers it
9 was using ROT3 to make it clear text and out comes the
10 visualization files the same things which were in the hex
11 dumps.
12    Q.  So the same visualized data going back and
13 forth like missiles, that same data was what you were
14 looking at?
15    A.  Yeah.  And Mr. Graham published all of this to
16 Git, so you can probably still download all of that from
17 his Git.
18    Q.  Git is G-i-t.
19    A.  Yeah, G-i-t.
20    Q.  So he was able to capture and publish the data
21 that we're talking about on Git?
22    A.  He published it, and then they actually tried
23 to throw me out and rough me up because they thought I
24 published it.  So that's why I was tried to be roughed up
25 and pushed around in the first day and thrown out and all

Page 111

1 of that fun stuff.  A little bit of physical exercise
2 always is good.
3    Q.  Okay.  So you looked at the wireless data that
4 you could get and Josh Merritt brought you the data that
5 he had on the hard drives?
6    A.  On the removable drives, yes.
7    Q.  Okay.  And so how long did this whole process
8 take you to get to the conclusion that you just
9 described?
10    A.  Two hours maybe because we were very careful in
11 giving all benefits of doubt, and then once we confronted
12 again Josh, then he was saying, eventually at the end of
13 last day he said, well, we have been feeding you shit
14 because we wanted to vet if you are trustworthy, we as a
15 group, and that's why we were deliberately feeding you
16 shit, just to vet your trustworthiness, and this was
17 after I got re-invited back after being kicked out after
18 I was accused to do the publication, which actually
19 Robert did, and, hence, in one e-mail Robert is
20 apologizing for me being kicked around because of what he
21 did.
22    Q.  So the explanation that Josh Merritt gave you
23 at the end of day one was we were in essence testing you
24 by feeding you shit data?
25    A.  Not me, but the whole room, yeah.

Page 112

1    Q.  The whole group in your room.  And did your
2 room have a name, were you guys --
3    A.  3, room number 3.
4    Q.  Oh, it just had a number.
5    A.  And it has color, but I don't remember what the
6 color was, maybe green or blue.  There were colors for
7 the rooms.
8    Q.  I guess what I'm trying to figure out is the
9 people that were in that room, were they supposed to be
10 the independent experts verifying the data?
11    A.  Yes.
12    Q.  Okay.  So you get the data, it's bad, but then
13 Josh Merritt comes in and says it was deliberately bad
14 because we were trying to vet you guys to see if you knew
15 what you were talking about?
16    A.  So --
17        MR. MALONE:  Object to form.
18    Q.  Is that basically correct?
19    A.  Yeah.  So let me -- let me -- when -- after
20 this drama when they tried to kick me out and all of this
21 drama and then they said, well, I can come back, then the
22 explanation became from Josh that they were deliberately
23 giving us this data which they knew is not what we came
24 for, because tomorrow they will be giving us something
25 better, even better.  That was the Mesa images.  So this

Page 113

29 (Pages 110 - 113)

1  all was just vetting our trustworthiness.
2      Q.  But you -- well, hold on.  You weren't going to
3  the symposium for the Mesa images?
4      A.  No, we didn't.  No.  This was -- first of all,
5  when they told that no PCAPs are coming, it's going to be
6  image, that's why so many people left from that, the next
7  day we had only two rooms, because the skill set needed
8  and the tools needed for analyzing these images it's a
9  totally different skill set and tool set.  I was able to
10  build myself a software package to analyze it overnight
11  in my hotel room, but a lot of other people say I came
12  for the PCAPs, if they are not here I go home, I have no
13  skills to analyze disk images.
14      Q.  But to be clear, when you arrived at the
15  symposium did you know or not that you were going to be
16  given access to Mesa County's --
17      A.  No.  That was a complete surprise.  In the end
18  of -- the name of Mesa County was not mentioned in the
19  end of day one, but only in the end of day one we were
20  told that tomorrow they will be giving us disk images.
21  We didn't know if it's Mesa County or whatnot.  We didn't
22  know what images those are.  It was a total surprise, and
23  as I say there was people who were, you know, lack of a
24  better term, seriously pissed off because they only came
25  to see the PCAP files as promised and now you're giving

*Page 114*

1  something else.
2      Also in the end of day one they came, multiple
3  people came to tell us that this 5 million is no off the
4  table, this is no longer promised, this offer has been
5  withdrawn.
6      Q.  So who -- you anticipated where I was going.
7  Exhibit 91 says Mike will reveal the cyber data and the
8  packet captures from the November 2020 election.  That's
9  false?
10      A.  We got zero packet captures or cyber data from
11  November 2020 election.  Cyber data is traffic data.
12      Q.  And after day one under this $5 million
13  Challenge it says, 5 million will be offered to any
14  attendee who can prove that this cyber data is not valid
15  data from the November 2020 election.  You could prove
16  that at the end of day one, couldn't you?
17      A.  Correct.  That's why we were told there was a
18  number of -- I don't remember, it was from other room
19  there was already a person who had written a draft of
20  saying we didn't get anything and only the small files
21  given to us are not from -- are not election data and are
22  not from November 2020, and we were -- at the end of day
23  one that was also I was saying that's an easy 5 million,
24  and that's when they came to say, no, this offer is no
25  longer on the table, it's gone, nobody gets paid.

*Page 115*

1      Q.  And do you remember who told you that?
2      A.  Multiple persons.  I think Josh was one of the
3  people mentioned, but there was also a receptionist woman
4  who were checking us in.  There were a number of people.
5  I think Kurt Olsen also came to our room.
6      Q.  O-l-s-o-n.
7      A.  So this came from many sources, and then to our
8  surprise on day two Lindell was saying, no, it's not
9  withdrawn, and then we were again told, no, it is
10  withdrawn, this is no longer offered.
11      Q.  So it kind of went back and forth on day two?
12      A.  Day two everybody else except Lindell.  Lindell
13  had said that -- I didn't see that, but Lindell -- and I
14  saw it later on the video, on Lindell-TV, that he said on
15  stage that some people are saying that this offer is
16  withdrawn; no, it's not withdrawn.  He also -- when I
17  afterwards looked at the videos he was telling how we are
18  working and nobody has been able to -- all kind of
19  complete lies what happened there.
20      The other thing which happened in the day one
21  was that they were sending state legislators to the back
22  room.  Some of them came with this, I don't know, Brannon
23  Howse.
24      THE REPORTER:  I'm sorry?
25      MR. CAIN:  Brandon Howse.

*Page 116*

1      MR. MALONE:  Brannon.  Brannon,
2  B-r-a-n-n-o-n.
3      A.  So there were people --
4      Q.  Hold on, Mr. Hursti.  So Brannon Howse is
5  H-o-w-s-e and it is two n's, not an n.
6      So I apologize for the interruption.  So you
7  were saying Brannon Howse was?
8      A.  So he came to the back room.  So he came with
9  the state reps.  There were state reps coming to say I
10  want to see what you have for my state.  I said we don't
11  have anything for any state, we have nothing here.  And
12  they were shocked because they have been told in the main
13  room that we are working on the data, and I don't know
14  how they got to the back rooms.  I remember some came
15  with this Howse because he came to the back room only
16  once, but there were multiple times when the state reps
17  came to see, I want to see what you have on my state.  I
18  said we have nothing, we have absolutely nothing.
19      It was chaotic, if that's not clear from the
20  description.  And, no, I don't have the names of the
21  state reps.
22      Q.  No, but you met Kurt Olsen; right?
23      A.  Yeah, he came to the room.  I spoke with Howse.
24  I don't remember I would have had more than one or two
25  sentences with Kurt Olsen.  We spoke with the state reps

*Page 117*

Veritext Legal Solutions
800-336-4000

1 a little bit more because they were in disbelief when we
2 told them we have no data whatsoever. They were
3 disbelieving it. They were trying to say, well, you can
4 tell us, I'm from that state. I said, no, we
5 literally -- we're all in the room saying we don't have
6 anything, they have given us nothing, we have been
7 spinning our wheels doing very basic things (indicating)
8 because we have nothing to do here, we're wasting our
9 time.
10     Q. But in terms of who you interacted with, did
11 you ever get a sense of who appeared to be sort of
12 organizing and running the symposium?
13     A. Phil Waldron.
14         MR. MALONE: Object to form. I'm sorry.
15 Go ahead.
16     A. My best -- as I said, to ask my mental image
17 how it presented, number one is Phil Waldron. We never
18 had Lindell to come to the back rooms. We never spoke
19 with Lindell. Phil Waldron was the main organizer to our
20 view, and the point of contact --
21         THE REPORTER: Phil --
22         THE WITNESS: Main organizer.
23         THE REPORTER: Phil --
24         THE WITNESS: Waldron.
25     A. And then Josh Merritt was the point of contact

Page 118

1 until mid second day. Mid second day he went public in
2 Washington Times telling this all is lie and after that
3 he was persona non grata and he was -- I spoke --
4         THE REPORTER: He was --
5         THE WITNESS: Persona non grata.
6         MR. CAIN: Persona non grata.
7     A. Yeah. So he actually reached out in the end of
8 second day because he was worried about his personal
9 safety, and he knew I had body guards, so when I was in
10 the bar he'd reach out and say do you mind if I sit next
11 to you. So all of a sudden he was very much a friend.
12 Well, he was in need of friend, and he told that he's
13 worried that will he get in one piece out of Sioux Falls.
14 He was not -- I could tell he was really afraid, and he
15 was saying that he's afraid but I also believed he was
16 genuinely afraid.
17     Q. This him saying he was concerned about his
18 safety, that was after this --
19     A. After he had went public in The New York Times.
20     Q. You have to let me finish.
21     A. The Washington Times. Sorry.
22     Q. You have to let me finish my question.
23     A. Sorry.
24     Q. And try not to talk over me.
25         Okay. So I think I have a good sense of day

Page 119

1 one. It's fair to say then that the conclusions that you
2 drew from the data presented on day one was essentially
3 there was no data of any relevance; is that fair?
4     A. That is absolutely true.
5     Q. All right. And in terms of the source of the
6 data, we've talked about Hammer and Scorecard, and, you
7 know, you talked about the fire hose analogy that you
8 were given. Could you at any point ever really determine
9 the source of what it was that you were provided?
10     A. So we were provided these small PCAPs which we
11 identified were coming from two different computers. I
12 believe all of these files had the initial of Conan Hayes
13 as the author, and we determined none of these files are
14 from election or -- not from election time or from
15 election network.
16         Then we had these BLX files which were supposed
17 to be this Hammer and Scorecard super secret software,
18 and BLX happens to be publicly known company -- publicly
19 associated company with Dennis Montgomery, and, hence,
20 this was the thing -- as I said, we determined that these
21 files are purely meant to be confusing someone who is not
22 expert and while nothing else is there than their word
23 and the name BLX.
24         THE REPORTER: I'm sorry. While nothing
25 else is --

Page 120

1         THE WITNESS: Than their word and the
2 extension BLX.
3     A. Also in that disk there was a small visual
4 C program which we're told to be the analyzing software,
5 and that was where we found out how the obfuscation and
6 the visualization obfuscation inside the BLX --
7         THE REPORTER: How we found out --
8     A. Visualization obfuscation was done in the --
9 inside of the BLX file, and that's how we found that the
10 software is not doing any analyzing at all, it is only
11 finding these predetermined markers, vomiting out what is
12 between those and making an appearance that it would be
13 doing the real work, which it's not.
14     Q. So what is -- is this BLX format, is that a
15 proprietary format? In other words, what would you need
16 in order to review a BLX file?
17     A. It's a -- as I say, the best we can say it's
18 random garbage, generated random garbage, and inside of
19 random garbage there are these markers and the
20 visualization line obfuscated between those markers.
21 They were trying to claim us that those are the super
22 secret spy program files and the PCAP files are inside of
23 those files. That is absolutely a hundred percent not
24 true.
25     Q. You mentioned Professor Jones, and I'm going to

Page 121

31 (Pages 118 - 121)

1 mark -- try to get through the documents I want to mark.
2 　　　MR. CAIN: Let me have June mark this
3 next exhibit.
4 　　　(Exhibit 93: E-mail - marked for
5 identification.)
6 Q. Mr. Hursti, just to move this along, I'm
7 showing you this is from your files, you had marked a
8 confidential e-mail, this is Exhibit 93. Do you
9 recognize this document?
10 A. I do.
11 Q. This appears to be from that EVN list you were
12 talking about?
13 A. Correct.
14 Q. And this appears to be from Professor Jones?
15 A. Correct.
16 Q. And this is the computer scientist from Iowa?
17 A. Correct.
18 Q. All right. And you mentioned he was out in the
19 main room. Were you getting sort of these types of
20 e-mail updates from him during the symposium?
21 A. After the day was over and I was able to check
22 my mails I got them after the day, but during symposium,
23 yes, not real time while we are there but after the day.
24 Q. Okay. During the symposium were you on a chat
25 app of any type where you were getting information from
Page 122

1 reference to myself. So I provided those photos. Some
2 of those photos actually might be taken in my hotel room.
3 I didn't check. You can see it from time stamp if it's
4 in hotel room or whether it's actually in the back room.
5 So I took a little bit of risk.
6 Q. Well -- and we'll authenticate those as well,
7 but there were, yes, pictures of your computer screen?
8 A. Uh-huh.
9 Q. Yes?
10 A. Correct; yes. I had a burner laptop with me.
11 I came back from DEF CON, so everything was --
12 　　　THE REPORTER: I'm sorry?
13 A. I came back from DEF CON, D-E-F-C-O-N, so my
14 computers both which I had were burners, so wiped clean.
15 Q. Okay. A computer -- a burner computer is one
16 that has been either reformatted or is a fresh new
17 computer with nothing on it essentially?
18 A. Yeah. A computer which I wipe after going in a
19 hacker conference, whatnot, so everything gone after the
20 fact.
21 　　　MR. CAIN: Okay. And let's mark this.
22 　　　(Exhibit 94: Chat.txt - marked for
23 identification.)
24 Q. Okay. So hold on for just a second. She has
25 provided you with a document marked Exhibit 94. Earlier
Page 124

1 outside your room?
2 A. Yes. We were having a group of basically CNN
3 lead stories group where we were exchanging what is
4 happening around, and I have provided that said group to
5 the evidence.
6 Q. Is that the Pcapalooza?
7 A. Yes, that is. I don't know who named it.
8 Q. Not you?
9 A. Not me.
10 Q. And so just -- well, let me just mark that so
11 you can authenticate it. Give me a second.
12 A. I want to remind that, as I wrote, there was
13 this biker guy with a sledgehammer claiming that if they
14 see us taking pictures from the back rooms they will take
15 the phone and smash it and we will talk later who is
16 owing money for that. So we were not using phones just
17 in case that they will be good for the threat. So that's
18 why I was checking this when I went to toilet or whatnot,
19 I was not chatting.
20 Q. But you did produce some photos and some -- a
21 little bit of video from the symposium.
22 A. That video is from the main room where the hex
23 dumps are going, and those pictures from computer that's
24 my computer when I quickly, in order to work efficiently,
25 took pictures when nobody see, so that I can quickly
Page 123

1 you were talking about the chatting that you were doing
2 and you mentioned -- well, I mentioned the name
3 Pcapalooza. Is Exhibit 94 the chat, at least a copy that
4 you made of the chat that was ongoing during the
5 symposium between you and Mr. Graham and a few others?
6 A. This is the copy of that. I don't know who
7 started this group. I got invited to this group when it
8 was already going on, and CNN was aware that this group
9 is there so CNN got me invited to this group.
10 Q. Okay. So, because the only names I
11 recognize -- there's some numbers. The only names I see
12 are you and Mr. Graham, which would make sense if they
13 were in your contacts or whatnot.
14 A. Uh-huh.
15 Q. Do you know who else -- like there's -- for
16 example, there's an area code 360 number here of a person
17 who's in the chat. Do you know who that is?
18 A. I have to check. I don't -- I'm not certain I
19 know all of these people, but they are -- for example,
20 one of the people here is a expert for NATO from Europe
21 and -- military -- real military cyber expert from NATO.
22 I believe that's the 32. So this was a group who
23 somebody else put together, not me.
24 Q. Okay. All right. So because of the time we're
25 not going to go through much on this. The reason I
Page 125

32 (Pages 122 - 125)

1 marked 94 is because -- and 93 is because we were talking
2 about sort of video and photos and communications during
3 the symposium. One set of communications you were
4 getting, appears to be from Exhibit 93, an example, and
5 that would be from Professor Jones; right?
6    A. What? Yeah, this is from Professor Jones.
7    Q. Okay. And then you were communicating via
8 WhatsApp I think --
9    A. Yep.
10    Q. -- with Mr. Graham, getting information out.
11       If you look at the back of Exhibit 94, I
12 believe this came as copies of some of the JPEG images or
13 video that was attached in the WhatsApp group; is that
14 correct?
15    A. Yeah, these are the images which were in the
16 WhatsApp group. I don't remember who has been taking. I
17 don't believe I took any of these pictures.
18    Q. That was my question. There seems to be a
19 picture of a glass of scotch or something. I don't know
20 who took that. Not you I take it?
21    A. I don't recall. I didn't check, but I don't
22 recall posting any pictures here. There are a couple of
23 comments I posted.
24    Q. Okay. And --
25    A. Well, here's the car and the harassing people

Page 126

1 happened and these numbers he's producing are the real
2 numbers.
3    Q. And you didn't find any evidence of that?
4    A. They were not giving any proof whatsoever to
5 back their claims because the PCAP files were supposed to
6 be that proof.
7    Q. I got you. And the next page seems to be a
8 little more comprehensive. This is page 1384, which
9 appears to show on a state-by-state basis the vote totals
10 and then something called Lindell's totals, and then you
11 can see the columns there. Have you seen that document
12 before?
13    A. I have seen it in this chat. They were
14 producing for every state the same thing --
15       THE REPORTER: For every --
16    A. They were producing county by county lists for
17 every state. I didn't verify if they had every state,
18 but they announced it multiple times, and I took a look
19 for New Hampshire because I know it so well. They had
20 every one of the 320 counties, even the ones which are
21 not having computers, and they were having claims that
22 from PCAPs they were able to construct the real results.
23    Q. Okay. So that's -- you talked about that, that
24 what they were saying about New Hampshire at the
25 symposium was impossible because not all of their

Page 128

1 waiting across.
2       THE REPORTER: Here's the what? I'm
3 sorry.
4    A. This is one of the cars which were outside when
5 we arrived the first day. I don't know who took this
6 picture. Oh, actually from CNN, yeah.
7    Q. Okay. But aside from the cars with I guess
8 anti-media stuff on them, if you look at Exhibit 94 at
9 page 1383 and 1384, there's a couple of what appear to be
10 slides from the symposium.
11    A. (Indicating)
12    Q. Yes, sir. So the first one says 2020 Election,
13 and it appears to show the vote totals for Mississippi
14 and then the actual -- what they claim to be the actual
15 vote totals; do you see that?
16    A. Yes, I do.
17    Q. Do you know what this refers to?
18    A. Before symposium the announcement was that
19 Mr. Lindell has been getting irrefutable evidence in the
20 form of these PCAP files how the vote totals were altered
21 and he will present the real results and the proof at the
22 PCAP files how he derived to these truthful numbers. So
23 that's why the PCAPs were the cornerstone of this whole
24 thing, because they were supposed to be providing
25 absolute and irrefutable proof that this manipulation

Page 127

1 precincts had voting machines?
2    A. 123 of the precincts -- of the jurisdictions
3 didn't have any kind of computerized equipment to count
4 votes.
5    Q. Now, on page 1384 there's a column that says
6 true and false -- well, there's actually three that
7 contain that information. Based on your experience at
8 the symposium are you able to ascertain what it means
9 when the highlighted columns say false?
10    A. I don't know. I don't know what the Cook total
11 is. I don't know what MIT total. I don't know what
12 these -- I don't know the data source. I saw this. I
13 don't know what it is.
14    Q. Okay. And the rest of these appear to be
15 pictures taken sort of in the main room at the symposium;
16 is that right?
17    A. That appears to be so, yes.
18    Q. Okay. But they're not pictures that you took
19 yourself?
20    A. You'll have to verify there, but I don't recall
21 posting any pictures.
22    Q. Okay.
23    A. The chat log will show if I posted something,
24 but I don't recall.
25       THE REPORTER: The what?

Page 129

33 (Pages 126 - 129)

1    A.   The chat log, this will show if I posted
2  anything, but I don't recall doing so.
3    Q.   Okay.  But as you sit here today was it -- is
4  it your understanding, at least when you were joined in
5  on this group, that you've produced to us a true and
6  correct copy of all of the chats that occurred during the
7  time period represented?
8    A.   Correct.  This is direct export from the
9  workshop software, so I believe that's everything as long
10 as the WhatsApp worked.
11       THE REPORTER:  Everything --
12   A.   As long as WhatsApp -- I believe it works I
13 think and so.
14       THE REPORTER:  I'm sorry, I believe what?
15   A.   WhatsApp.  I have not modified.  This is what
16 the text stored, so I believe this is everything.
17   Q.   All right.  And then going back to -- I'm sorry
18 to jump around, but I'm just trying to get through this
19 as quickly as possible.  Going back to Exhibit 93, which
20 was the Doug Jones e-mail, he talks about what was going
21 on in the main room, which, you know, he can characterize
22 if he's called as a witness, but on the second page he
23 does say, beginning at the top of page 116, Lindell
24 continues to show scrolling hex data as proof.  No one
25 has talked about the provenance of their data.  Floods of

Page 130

1  gigabytes of hex data do not convince me.  Even if the
2  data shows evil content, without proof that the data
3  existed in 2020 it means nothing.  And then he goes on to
4  talk about whether the data is authentic.  So is this
5  consistent with the testimony you've been giving us about
6  the hex data that was being provided?
7    A.   This is consistent, and I want to also point
8  out from the video you find that the hex scrolling was
9  such a bad quality that you cannot actually even read
10 the -- reliably what the hex dump is.  So he had no way
11 of knowing what he's seeing.
12   Q.   And you took video of the scrolling hex data;
13 right?
14   A.   Yes, to show how it's impossible to read that.
15   Q.   And if the jury gets to see that or a version
16 of that, it essentially kind of looks like The Matrix, in
17 The Matrix where they're scrolling kind of data like
18 that?
19   A.   Yeah.
20   Q.   It looks like hex data.  Do you know what I'm
21 talking about?
22   A.   I know.
23   Q.   Okay.
24   A.   And that was taken from the main room from the
25 display on the left-hand side of the stage.  So that hex

Page 131

1  dump was visible for all audience.
2    Q.   Okay.  All right.
3    A.   And there was no gigabytes of that, but it's
4  impossible to tell when you are just having garble, you
5  don't know how -- when it's wrapping over.  It's
6  wrapping -- it was actually not even megabyte of data.
7        THE REPORTER:  I'm sorry, it's --
8    A.   It's not even megabyte of data.  It was
9  wrapping over, so it was really a loop.
10   Q.   It was looped?
11   A.   Yeah.
12   Q.   Okay.  Now I don't want to get into Mesa County
13 too much, but day two was the Mesa County day; right?
14   A.   Correct.
15   Q.   And you said you spent a couple of hours out in
16 the main room during day two?
17   A.   We all -- as you can see here, they first told
18 that the back rooms are opening second day only 3:30
19 p.m., but they actually opened the back rooms I recall
20 11:00.  So when -- we had no interest of being back
21 there.  I mean Lindell gave a microphone to a woman
22 called Marilyn Todd who was offing me, walking -- bashing
23 me, calling me with names, calling me traitor, trying to
24 rally the people to be harassing me; not the most
25 pleasant way of spending your morning.

Page 132

1    Q.   And that was day two?
2    A.   Early day two, yes.  And there is -- actually
3  Lindell-TV published clips showing part of that, so don't
4  take my word what's over there.
5    Q.   Okay.  But you stuck around despite that;
6  right?
7    A.   What?
8    Q.   You stayed despite that?
9    A.   I -- I -- I made a point to be there the moment
10 the doors opened and the last one to leave so that
11 nothing -- nobody can say something happened just when I
12 was not there.  I stuck it out.  I came there every
13 morning the first thing, stayed when everybody else is
14 leaving, literally seeing that everybody else is leaving
15 before me and being one of the last ones out of the door
16 so that I can personally say nothing happened there.  You
17 know, I wasn't taking a lunch break and something miracle
18 was to happen during the lunch break.
19   Q.   Got you.  Now, in terms of the Mesa County data
20 that was presented, that data was shown up on the board
21 or the screen in the main room; correct?
22   A.   The second day started by I think it was this
23 Seth guy, that he was the dumbest thing I have seen in a
24 long time, but the idea was that we have this image which
25 is now shown on the screen and we will be singing along,

Page 133

34 (Pages 130 - 133)

1 we will be together theorizing what we see and he will be
2 leading the conversation to a direction he wants, but it
3 was all about we all are starting to believe the same
4 thing.
5        Obviously it's impossible to anyone to have any
6 real opinion on something you see on the screen first
7 time and so on. It was all -- it was just to make people
8 feel whatever they wanted to feel. It was more about
9 emotions than any facts.
10 Q. Was it the Mesa County --
11 A. That was Mesa County, yes.
12 Q. Okay. And is it Seth Keshel?
13        MR. MALONE: Keshel.
14 A. I believe that was -- yeah.
15 Q. Does that sound right?
16 A. Yeah, yeah.
17 Q. Okay.
18        MR. MALONE: K-e-s-h-e-l.
19 A. You can find that in video if I'm wrong about
20 the name. Again this is one of the videos published by
21 Lindell-TV or FrankSpeech.
22 Q. Okay. And so but how did you -- if you did,
23 how did you actually analyze any of the Mesa County data
24 that was imaged?
25 A. There is a free open source software called

Page 134

1 what conclusions did you draw from looking at the data
2 that was provided?
3 A. Mesa County. So, first of all, we were given
4 before and after images, but the hard drive also had a
5 third directory.
6 Q. Okay. But let me stop you there. Before and
7 after what for?
8 A. Before and after the trusted build was
9 installed.
10 Q. So trusted, so there's a process, correct me if
11 I'm wrong, where the election company, such as Dominion,
12 will come in and assist the county official with what's
13 called a trusted build, as in I trust you, and then
14 build, b-u-i-l-d, and so is what you're saying that the
15 before and after -- what's sandwiching that is the images
16 before and after the trusted build?
17 A. So --
18 Q. Is that right?
19 A. Yes. So, first of all, some states like
20 California require trusted build to be installed before
21 every election. So state by state it's a different
22 procedure, and using trusted build this way is very good
23 security practice.
24 Q. Why?
25 A. Because it wipes it clean, that whatever bad

Page 136

1 Autopsy.
2 Q. Autopsy?
3 A. Yeah, Autopsy. So once I got the actual files
4 from Josh I fired up Autopsy and started dissecting the
5 file.
6 Q. So Josh Merritt gave you like a hard drive --
7 A. That's again a hard drive, yes.
8 Q. Okay. You interrupted me, so let's -- I know
9 it's exciting, I'm excited too, but about when did Josh
10 Merritt give you the hard drive with the Mesa County
11 images?
12 A. I would say between 11:00 and noon on the
13 second day.
14 Q. And were you the only one that got them on a
15 hard drive or do you know?
16 A. I don't know what happened in the second room,
17 but in my room I got the hard drive and I started making
18 copies to everybody else.
19 Q. Okay.
20 A. Josh was using me day one and day two as the
21 glorified copying machine because I had the fastest
22 computer to do so, so I was the natural choice to speed
23 up things that I used my computer to provide copies to
24 everybody else.
25 Q. Okay. And just kind of on a high-level basis

Page 135

1 things might have happened is now gone and you have a
2 clean field, fresh, known to be trustworthy system to
3 start with, start a new election.
4        The story told in symposium was that
5 installation of trusted build destroyed, deleted the
6 prior election files which they claim are required to be
7 preserved by law. First of all, when you see the before
8 and after, those are two completely different images, so
9 to speak. It didn't delete anything selectively; it's
10 just a completely different system. And we don't even
11 know if those were actually from the same computer. They
12 claim they are, but we cannot prove it.
13        Now, in that drive there was a third --
14 Q. Drive.
15 A. The removable drive.
16        -- there was a third directory and that was
17 having election files. My belief is that some of the
18 files they claim to have been deleted were on that third
19 directory, and as State of Colorado procedure they are
20 required to back those files up before installing trusted
21 build. So while I cannot say this is an absolute fact,
22 it's my belief that they have I believe some of the files
23 they claim to have been deleted in their possession in
24 that drive.
25 Q. Didn't you have access to that third directory?

Page 137

35 (Pages 134 - 137)

1    A.  Yes.
2    Q.  Okay.
3    A.  It's just a lack of time to go through
4  everything and verify.  I don't have anything to compare
5  it with, so, hence, I cannot say those are -- you know
6  that if I say a fact it has to be a fact I know a hundred
7  percent true; that's why I'm saying this is my belief but
8  I have not been able to -- I didn't even try to verify
9  it.  It's just that's -- it was beside the point for
10  anything else done, it was funny that they never
11  mentioned that they have a full directory full of
12  election files.
13    Q.  Okay.  So you were able to do all of this, at
14  least what you've described, during -- after you got the
15  hard drive from Josh Merritt and you spent day two kind
16  of analyzing what you got from Mesa County; right?
17    A.  So the timeline is very compressed.  As I said,
18  I believe we got to the back room about 11:00.  Before
19  noon we had the Mesa images.  I would say, my
20  guesstimate, about 1:00 o'clock me and Robert and the
21  other Rob from Minnesota we -- and, by the way, we
22  brought everybody same page, we were showing what we have
23  found and say I believe this is not the same system and
24  there are these discrepancies.  So when Josh came in it
25  was not me and Rob, it was the whole room piling on Josh

Page 138

1  Merritt saying you are again feeding us shit, and that
2  was the discussion after -- he came a couple of times
3  back and forth tried to find explanation, then he
4  disappeared, and the next thing what happened was
5  Washington Times is running the story what Josh is
6  telling everything is a lie.  And so he didn't tell he's
7  going away.  He just never came back and all of a sudden
8  (indicating) this came out of the press.
9    Q.  So you produced a declaration shortly after the
10  symposium that I want to get you to authenticate.  I
11  believe we're on -- and then once we do that I think
12  probably we need a break.  So let's quickly get through
13  this.  Let her mark it first.
14        (Exhibit 95: Declaration - marked for
15  identification.)
16    Q.  Okay.  The Court Reporter has marked 96 or 95?
17    A.  95.
18    Q.  Exhibit 95.  Have you seen this document
19  before?
20    A.  I produced this document.  Yes, I have seen it.
21    Q.  What is it?
22    A.  Day after when the symposium was over I
23  received a call from Attorney David Cross.  He wanted to
24  verify from me that these images are out in the wild in
25  global internet downloadable, and this I don't know -- I

Page 139

1  don't remember which lawsuit this was for, this was not
2  for Curling, it was some other lawsuit he wanted this
3  for.  I know later it was filed also in Curling, but that
4  was not the reason.  So he wanted me, to ask a
5  first-person witness of this, to tell that these
6  images -- identify these images and also tell that how
7  they were available in the global internet.
8    Q.  Okay.  So to back up or refresh at least my
9  memory, David Cross is an attorney?
10    A.  With MoFo.
11    Q.  With MoFo.  He is the lead attorney for the
12  plaintiffs in Curling?
13    A.  Another one of the plaintiffs, yes.
14    Q.  Okay.  And you mentioned you're an expert in
15  the Curling case?
16    A.  For the other plaintiff, not for David Cross.
17    Q.  Okay.
18    A.  Alex Halderman is the expert for David Cross.
19    Q.  And so Mr. Cross calls you up and says I need
20  this declaration relating to the Mesa County images and
21  that's the genesis of Exhibit 95?
22    A.  Well, he first of course wanted to hear from me
23  what I have seen, and once I explained then he asked if
24  it would be possible for me to make this declaration, and
25  I was in the hotel waiting to rush to the airport, I say

Page 140

1  I have just the time to type this up.  So this was the
2  last thing I did before checking out of the hotel.
3    Q.  After -- this was after day three?
4    A.  After day three.  The symposium was no longer
5  going that day when this was written.
6    Q.  Okay.  And you've talked really I think
7  about -- these are numbered paragraphs in your
8  declaration.  You talked pretty much about 1 through 5,
9  and then in paragraph 7, this is where I want you to
10  focus on, you say The forensic image headers from the
11  Antrim County image are shown in Exhibit 1.  So we were
12  talking about Mesa, so not to confuse the issue, but what
13  is Exhibit 1 purporting to show?
14    A.  To -- because of the claims that Antrim County
15  had been hacked, the Court ordered a real forensic image
16  to be produced as evidence, and I didn't have that image
17  because I never signed a protective order and I didn't
18  want to sign.  When I saw this, this is basically for
19  David Cross prove that someone has violated the
20  protective order and leaked this file.  Only later I
21  found out that one of the people who had access to this
22  image was no one else than Conan Hayes.  I don't know if
23  Conan was the actual leaker, but someone had violated
24  protective order and got this file out.
25    Q.  So during -- so Conan Hayes, who we've talked

Page 141

1 about, was he the person that you understood produced the
2 information that we're seeing in Exhibit 1 from Antrim
3 County or at least the data from Antrim County?
4    A.   So the Antrim County image was done by this
5 Greg Freemyer.  Someone violated the court order and put
6 this out, and later, coincidentally, I was told that
7 Conan Hayes was one of the people who had got this file.
8 I don't know who actually put it out.  I'm just saying
9 that I have been told that he's one of the possible
10 candidates who violated the court order.
11    Q.   But you haven't drawn your own conclusions?
12    A.   I'm just telling you that I cannot one way or
13 another, I don't have evidence, I can just tell what the
14 circumstances told to me.
15    Q.   But was the Antrim County data produced during
16 the symposium?
17    A.   On the day three of symposium all of a sudden
18 this whole -- actually I don't remember if it was day two
19 or three, but this was started to be downloaded.  So this
20 guy Ron Watkins published a link in his Telegram and
21 people started downloading this file.
22    Q.   From Antrim County?
23    A.   From internet and which is the Antrim County
24 image.
25    Q.   Okay.  So let's slow down.  Ron Watkins was

Page 142

1 part of the presentation on day two of the symposium;
2 correct?
3    A.   Day two and I believe also day three, but day
4 two definitely, yes.
5    Q.   And while he was presenting did he explain that
6 he had put a link on Telegram to the Antrim County data?
7    A.   I don't remember if he specifically said that,
8 but it became known, and I don't know if I have seen all
9 of what Ron Watkins said in a video, but at least I saw
10 part of that.  So what happened was this link became and
11 this -- the people in room 1 on day two, those were the
12 people who were getting the link and started downloading
13 it before we in room 2 even knew this happened.
14    Q.   I see.  And the data, just to be clear, from
15 Antrim County was of the election management system?
16    A.   Correct.
17    Q.   Okay.  And then Exhibit 2 and 3 you reference
18 as Mesa County images in your declaration?
19    A.   Correct.
20    Q.   Can you explain the significant portions.  It's
21 a little hard to read, but this appears to be a
22 screenshot from --
23    A.   Autopsy.
24    Q.   From what?
25    A.   Autopsy.

Page 143

1    Q.   Autopsy?
2    A.   Yeah.
3    Q.   So this is a screenshot you made --
4    A.   Correct.
5    Q.   -- out of the program you called Autopsy that
6 you used to review the Mesa County data?
7    A.   Correct.
8    Q.   Okay.  And is there anything of significance
9 from -- like why did you make the screenshot and what's
10 its import?
11    A.   Well, the one important thing is it has the
12 hash values, so it identifies what file I have seen, and
13 if somebody else has the same file we can verify this is
14 the same file.  So this locks that what the file was what
15 we saw.
16    Q.   Can you circle the hash values and just write
17 hash or something by it, because I have no idea what
18 you're talking about.
19    A.   (Witness complies)
20    Q.   Okay.  So that's on the -- sort of the
21 bottom -- well, in the middle of the page?
22    A.   Yeah.  And another important thing is here
23 (indicating), the examiner name, and you have again the
24 initials of Conan Hayes there.
25    Q.   All right.  And that's -- that was one piece of

Page 144

1 evidence that suggested who was involved in imaging the
2 Mesa County data?
3    A.   Whoever did it used his initials.
4    Q.   All right.  And, forgive me, I got a little
5 confused about the significance of the hash values in the
6 middle.  Can you just restate that for me.
7    A.   If someone else shows up a file with the same
8 name, with the hash value we can identify it's absolutely
9 a hundred percent certainly the same file, non-altered.
10    Q.   I see.  Okay.  And then Exhibit 3, what are we
11 looking at with Exhibit 3?
12    A.   Just the same for another Mesa image.
13    Q.   Okay.  So you mentioned the before and after?
14    A.   That's what they say they were, yes.
15    Q.   I got you.  And then, lastly, I'll skip 9, it
16 sort of speaks for itself, but then you say at 10, In my
17 professional opinion, global public release of the server
18 images lowers the barrier to planning an attack against
19 any election management system running this Dominion
20 software, and therefore makes future attacks against such
21 systems more likely.  Can you expand upon that, and
22 specifically earlier you were talking about transparency
23 and having access to voting machines and things of that
24 nature, but here, at least my reading, you seem to
25 suggest that this is problematic that these images have

Page 145

37 (Pages 142 - 145)

1 been released?

2      MR. MALONE: Object to form.

3   A. So, first of all, this -- the significance here

4 is that, because you have these images, not necessarily

5 all grass-root level, want-to-be attackers would have the

6 skills to conduct a blind attack which will be

7 successful --

8   Q. A planned successful attack.

9   A. Blind. Blind.

10      -- now this gives you a practicing target, you

11 can try out if your attack is going to work. So, hence,

12 it lowers the barrier because instead of you have to

13 figure out how the attack works the first time blindly,

14 now you can test it out and fine-tune and refine.

15      When in Hacking Democracy, the video of my

16 attack, that was never tested, I did it blindly with no

17 access to the voting machine. It was a blind attack. I

18 didn't know if it's going to work.

19   Q. Blind attack.

20   A. It was completely blind. That's why I'm

21 nervous in the video. It was never tried out. I didn't

22 know if it was going to work.

23   Q. So this release of the election management

24 purported images, the concern you have is now they don't

25 have to plan blind attacks, they have the potential to

Page 146

1 test it with the images that were provided?

2   A. Correct.

3   Q. Okay. Now --

4   A. Skill level trumps orders of magnitude easier.

5   Q. To be clear, you would still need access to the

6 system either through internet or through direct access

7 or through a malicious actor, an insider --

8   A. Yeah.

9   Q. -- as well; right?

10   A. Yeah. Some sort of access is required, but now

11 you can plan and figure out -- we call it evil maid, that

12 when you leave your computer in your hotel room and the

13 evil cleaning lady uses the USB stick. The same thing is

14 evil cleaning lady of election office can be provided a

15 USB stick, say I pay you $500, you stick this stick in

16 for 30 seconds and put it back to your pocket. This

17 allows you to make that stick to give it to the evil

18 cleaning lady.

19   Q. I see.

20      MR. CAIN: All right. Let's take a

21 break.

22      THE VIDEOGRAPHER: Okay. We're off the

23 record. The time is 2:38.

24      (Recess: 2:38 to 2:45 p.m.)

25      THE VIDEOGRAPHER: Back on the record.

Page 147

1 The time is 2:45.

2 BY MR. CAIN:

3   Q. All right. When we last broke we were talking

4 about vulnerability issues relating to the production of

5 images out of Mesa County. I want to direct you back to

6 Exhibit 90, which was that e-mail exchange that you were

7 having on the EVN list, and after -- and specifically to

8 page 200. So this would have been after the symposium

9 because it's dated September 2nd. There's a new person

10 in this group, a woman by the name of Barbara Simons.

11 Who is Barbara Simons?

12   A. Barbara Simons is longtime president emeritus

13 of ACM, American Computer Machinery, which is the primary

14 professional association. She's also a receiver of

15 presidential medal of whatever for her scientific work

16 and scientific advantages of the computers in general.

17      THE REPORTER: And what of the --

18      THE WITNESS: Scientific advantages for

19 creating modern computers.

20      THE REPORTER: Say it again.

21   Q. Scientific advantages?

22   A. Yeah. Scientific achievements to create the

23 modern computer. She's a very well-known scientist, one

24 of the only women scientists from that era, globally

25 recognized.

Page 148

1   Q. And is she associated with a university?

2   A. Not anymore. She is long time retired, but

3 she's still active, as I said very respected individual.

4   Q. Okay. So when we -- again, when we broke we

5 were talking about the hypothetical of the evil cleaning

6 lady with the data stick, you know, now armed with the

7 knowledge of having seen the images from the election

8 management software. During the break you mentioned that

9 you have produced training videos associated with this

10 type of risk for I believe the Department of Homeland

11 Security. Can you explain to the jury what you've done

12 in that regard.

13   A. So years 2019 and 2020 I was commissioned

14 through my company to create trainings both for CISA, The

15 Cyber and Infrastructure Security Agency, which is

16 sub-agency of Department of Homeland Security, and for

17 FEMA, Federal Emergency Management Agency, a subdivision

18 of the Department of Homeland Security also, and I have

19 created mini cyber range for practicing attacks and

20 defending attacks in critical infrastructure and election

21 infrastructure in specific, and also I have created five

22 training videos either for election security or a

23 critical infrastructure security in specific. Two of

24 these videos are focusing on USB attacks, and one of the

25 things in the video --

Page 149

38 (Pages 146 - 149)

1 Q. USB?
2 A. USB, yes, USB device, Universal Serial Bus. A
3 memory stick, that's a USB.
4      So one of the demonstration attacks in one of
5 the videos is using a real election machine not anymore
6 in use and demonstrate how an evil pre-programmed USB
7 stick takes that voting machine over, and part of the
8 demonstration how also you can use that to change the
9 outcome of the election. So that's a demonstration to
10 raise the awareness of election officials how dangerous
11 it is that someone gets to the voting machine vicinity
12 with USB sticks even for --
13      THE REPORTER: I'm sorry, gets to the
14 voting machine --
15      THE WITNESS: Vicinity, closeness, close.
16 A. -- even for tens of seconds.
17 Q. Okay. And were those training videos, at least
18 at one time were they classified?
19 A. So, first of all, I cannot speak for that, but
20 my belief is that they were at least restricted for a
21 time being. As I said, these videos were probably
22 used '19, 2019, 2020. I don't know what is the current
23 status, how restricted access to those is. I personally
24 don't think they should be restricted, but I cannot speak
25 on behalf of Department of Homeland Security; you have to

Page 150

1 ask them.
2 Q. But suffice it to say that the U.S. Government
3 has retained your company, is that the, forgive me,
4 O-R-Y?
5 A. No. That is Nordic Innovation Labs is my
6 company which have been doing --
7      THE REPORTER: Nordic?
8      THE WITNESS: Nordic Innovation Labs.
9 A. We were commissioned by Department of Homeland
10 Security through Northrop Grumman to produce these
11 trainings for United States Government.
12 Q. So you were a sub?
13 A. For Northrop.
14 Q. For Northrop. Okay. All right. Now back to
15 page 200 on Exhibit 90.
16 A. And just to complete that first of all, I don't
17 know the classification status, but because we worked
18 through Northrop things are usually over-classified and
19 it's stupid. So I cannot really -- I don't know. I
20 honestly don't know.
21 Q. I want to kind of complete the circle on the
22 Mesa County day two. With the benefit of hindsight, you
23 appear to be talking to Dr. Halderman and Dill and
24 Barbara Simons about the symposium here where you say,
25 The elephant in the room is that Tina Peters is the tip

Page 151

1 of the iceberg. First of all, Tina Peters is the county
2 clerk for Mesa County?
3 A. Correct.
4 Q. And then you go on to say, We are currently
5 aware of almost a dozen elected election supervisors who
6 have taken actions to actively sabotage their own
7 election security, quote, "for the cause," close quote.
8 Explain what you mean by that.
9 A. So more places has become now public, most
10 recently Coffee County, Georgia, where the local election
11 official has allowed in unauthorized access for activists
12 to do the same, make a copy of the machines. They have
13 made announcements, both Mr. Lindell and Mr. -- a person
14 working for Mr. Lindell, this Dr. Frank whatever. They
15 have been saying that they have dozens of images, so the
16 dozens of images is their own claim. So that's what this
17 is about.
18      I was aware, without proof, I was told during
19 2020 that Coffee County was imaged for people near ASOG.
20 I had no proof, and it took until basically last few
21 months that what I believe to be true is actual fact.
22 This long time it took before the actual image surfaced,
23 so, and videos of people getting -- being let into during
24 weekend to the office and all of that.
25      THE REPORTER: Into?

Page 152

1      THE WITNESS: Allowed to go to the
2 office, you know.
3 A. So, again, now -- this is now easier to prove
4 than at the time when it was written.
5 Q. I got you. And you say at the end of the page,
6 on page 200, the last sentence, This is not anymore
7 insider risk in the classical threat sense -- threat
8 model sense. What do you mean when you say that? I
9 didn't quite understand that sentence.
10 A. Well, what I'm meaning with that is that this
11 is a more organized, more structural than an insider risk
12 where a rogue single operator does something under
13 persuasion of a threat actor. What I'm meaning is this
14 is bigger than traditional. When you are modeling
15 security risk and when you're making -- building a threat
16 model, this is beyond what you traditionally think this
17 inside risk is. This is more serious because there's
18 more structural.
19 Q. Okay. And you --
20 A. This is a systemic risk now.
21      THE REPORTER: I'm sorry.
22 A. I have to figure out how to say it. Instead of
23 traditional insider risk, this is now systemic risk.
24 Q. Systemic?
25 A. Yeah.

Page 153

39 (Pages 150 - 153)

1   Q.  Okay.  And what I'm struck by, you go to the
2   Cyber Symposium to look at potential risk from in this
3   case China attacking the election, and one of the things
4   you come out from that is a risk that actually was
5   created in part during the symposium by the release of
6   the Mesa County images; is that a fair statement?
7       MR. MALONE:  Object to form.
8       A.  The statement is that the risk was created as
9   you see in May, it was revealed in symposium, and then it
10  was amplified by the fact that they did the irresponsible
11  thing of starting to distribute this.
12      Q.  So in your view did the events that occurred
13  during the symposium ultimately end up making our
14  election system more vulnerable?
15      A.  Absolutely.
16      MR. MALONE:  Object to form and
17  foundation.
18      Q.  Let me say it again.  In your view did the
19  risks associated with potential election vulnerabilities
20  actually end up increasing as a result of the events
21  during the symposium?
22      A.  Absolutely, in two different ways.  One is
23  actually distributing these images.  The second part was
24  the active recruitment happening all the time when people
25  on the stage were trying to call to action to get more

Page 154

1   mind when you say that as it relates to the symposium?
2       MR. MALONE:  Object to foundation.
3       A.  For example, making the false claim that the
4   purpose of trusted build was to delete these election
5   files.  That's never a intention of trusted build, and
6   also that probably almost certainly never even happened.
7   So that is one piece of information where you are using
8   mal-information to prevent the best practices to secure
9   elections to happen.
10      THE REPORTER:  What kind of elections,
11  to, something, elections to happen?
12      THE WITNESS:  You're trying to prevent
13  best practices to secure elections to happen.  You're
14  trying to --
15      THE REPORTER:  To what?
16      THE WITNESS:  Prevent.
17      MR. CAIN:  Prevent.
18      THE REPORTER:  To prevent.
19      THE WITNESS:  Best practices to secure
20  elections to take place.
21      MR. CAIN:  To secure.
22      THE WITNESS:  Yeah.
23      THE REPORTER:  Oh, to secure.
24      Q.  Okay.  So day two was in the books with the
25  Mesa County reveal.  Day three -- well, I think did

Page 156

1   people allowing this unauthorized access.  So this was
2   a --
3       THE REPORTER:  I'm sorry.  Were trying to
4   call to action to get more people --
5       THE WITNESS:  Recruited to allow this
6   kind of unauthorized access to the voting system.
7       A.  So this was an active recruitment event for
8   future crime to be happening.
9       Q.  And then as it relates to the -- sort of the
10  data, let's just focus on day one.  The data that we saw
11  that was going to be presented was supposedly PCAP data
12  from the 2020 election, and as you've already testified
13  that turned out not to be the case, but just the overall
14  information that was provided during the symposium, can
15  you classify that in those three columns that we talked
16  about at the beginning, whether it was disinformation in
17  your view, misinformation in your view or mal-information
18  or some combination?
19      A.  All of the --
20      MR. MALONE:  Object to the form.
21      A.  All of the above.  It's a combination of
22  unintended, intended, and deliberately crafted, so all of
23  the above.
24      Q.  Okay.  And can you give me, the deliberately
25  crafted part, that's the mal-information, what comes to

Page 155

1   something happen, it may have been the night of day two,
2   when Mike Lindell was supposedly attacked; was that the
3   night of day two?
4       A.  I think it was day -- it was actually night of
5   day one.
6       Q.  Day one?
7       A.  That's my recollection.
8       Q.  Okay.  Do you have any information about
9   whether or not that was true, that that actually
10  occurred?
11      A.  So I love beer and I make friends in bars.  So
12  first night I made friends with the bar immediately.  The
13  second day when we got back, that's why I think the
14  second day, when I went -- came to the bar the bartender
15  was asking can you explain, I heard that Mr. Lindell made
16  a claim that he had been attacked with, you know, a knife
17  on the side of his body or something like that.  I say,
18  yeah, that's what I heard he was claiming.
19      Now, the hotel has elevators which are glass
20  elevators and everybody in the bar can see everybody
21  coming in and out of the elevator.  So the bartender said
22  we are so confused here in the hotel -- this is the
23  bartender telling me -- we are so confused, we have no
24  report of anything happening in the hotel, but also he
25  said himself he saw Mr. Lindell and Mr. Lindell's lady

Page 157

40 (Pages 154 - 157)

1 friend to come in, step to the elevator, go upstairs and
2 they never came back and nothing happened. So that's --
3 he was just trying to figure out because -- on behalf of
4 the hotel staff what was the story which they're hearing
5 now about.
6     Q. So, and that was the observation I guess of
7 someone else, the bartender said he saw Mr. Lindell go up
8 but he never saw him come down that evening?
9     A. That's what he told me, and also he said that
10 there was no -- that he was telling me that Mr. Lindell
11 and lady friend came in, they went straight to the
12 elevator, went up, and you can see them, and then never
13 came back. He was just so confused because he didn't
14 know what this fuss is about.
15     Q. And did Mr. Lindell appear the next day at the
16 symposium; I mean was he able to continue on?
17     A. He was telling the story on the stage that --
18 anyway, it's a -- I'm just telling the hearsay of the
19 bartender here. I don't have -- I'm not a witness of
20 this, other than I can tell what I heard.
21     Q. Well, it is hearsay. We'll see if an exception
22 applies if it's relevant, if it becomes relevant.
23         So day three, you mentioned you were going to
24 stay there until the doors closed, can you describe sort
25 of the events that unfolded on day three?

Page 158

1     A. Day three was bizarre beyond anything. Again
2 when we arrived day three we were all gathered to one
3 room as expert, and this room was too small for us, so we
4 were really crowded in there, and then there was a new
5 person who I believe I hadn't seen before, I don't know
6 his name, he was the spokesperson, and this -- to tell in
7 a nutshell what happened was he was saying we are
8 building this Slack server so that we can remain in
9 contact --
10         THE REPORTER: Building --
11     A. -- a Slack server that we can be in contact,
12 but it's of paramount importance that what we talk
13 amongst each other will never be communicated to public,
14 we have to agree on story which we all tell the same
15 story to the public, we have to keep the narrative alive,
16 we have to give Mike Lindell more time, more time to
17 produce whatever, so we have to agree on story, and I'm
18 recommending -- he is saying -- I'm recommending we say
19 we didn't have enough time to analyze this, it's such a
20 complex amount of data, we just need more time.
21         One person in the room, I think his name was
22 Gold, volunteered to be a spokesperson on behalf of
23 everybody else.
24     Q. His name again?
25     A. Gold.

Page 159

1     Q. Like G-o-l-d?
2     A. Yeah, Gold. He was volunteering that he will
3 be the spokesperson telling exactly that story, we didn't
4 have enough time, it's such a complex thing we cannot
5 draw a conclusion, we need more time.
6         Robert Graham and me we told, no, we are not
7 playing a game, we are not going to lie, I'm sorry, this
8 whole idea that we agree on one story is not going to --
9 with us, no, we are going to tell the truth, and of
10 course we kind of didn't gain popularity points with
11 that, but that's what happened. It was all about us
12 being locked in a room try to be intimidated to agree on
13 one story to keep -- and this is an actual quote -- keep
14 the narrative alive.
15     Q. So can you describe -- you said you hadn't seen
16 this person before this event?
17     A. I -- he was -- I didn't know who he is.
18     Q. Was he young, was he old, did he have facial
19 hair?
20     A. So, no, to the best of my recollection no
21 facial hair, in his probably early forties, late
22 thirties, and a very good communicator, probably chosen
23 with his persuasion skills, clearly saying I'm not
24 technical, I'm here just, you know, we need to agree on a
25 story.

Page 160

1     Q. So it wasn't -- you know Phil Waldron. So it
2 wasn't Phil Waldron?
3     A. No. As I said, I didn't see him before.
4     Q. You knew Kurt Olsen. It wasn't Kurt Olsen?
5     A. No.
6     Q. You knew Josh Merritt. It wasn't Josh Merritt?
7     A. Not the NSA guy who -- there was one guy who
8 claimed to be a retired NSA, not that guy. It was just
9 someone.
10     Q. Have you seen -- do you know Shawn Smith?
11     A. Not that guy.
12     Q. It was not Shawn Smith?
13     A. No. Not Seth Keshel. None of the above.
14     Q. Have you seen a picture of Conan Hayes? Do you
15 know if it was --
16     A. I have seen picture. No, it's not that guy.
17 I've seen later a picture, but, yeah, it's not the hippie
18 type at all.
19     Q. Well, he had short hair at times too.
20     A. Okay.
21     Q. So --
22     A. I don't believe he is, but I --
23     Q. All right.
24     A. I have to say one thing. I'm so angry I
25 didn't -- to myself that I didn't catch his name. So

Page 161

41 (Pages 158 - 161)

1  that's my fault.
2      Q.  Well, you mentioned Brannon Howse.  It wasn't
3  him?
4      A.  No.
5      Q.  Okay.  Mark Cook was on the stage?
6      A.  I don't know who he is.
7      Q.  I've got a picture of him, from the internet --
8  actually from the symposium.
9      A.  This is a younger guy.  The guy in the room was
10  older than him.
11      Q.  Okay.
12      A.  I have no idea who he is.  I can try to ask --
13  I haven't asked him, you just gave me a good idea to ask
14  Robert because he might have catched the name.
15      Q.  Okay.  Let's do this.  I'm going to leave -- or
16  June will leave a blank -- all right, let's do it this
17  way.  You'll have a chance to -- you've given depositions
18  before obviously.  You'll have -- you know what an errata
19  sheet is?
20      A.  I don't actually know what it is.
21      Q.  Okay.  It's a -- you get it with your
22  transcript and you use it to correct.
23      A.  Okay.
24      Q.  I suspect there will be a few things, they'll
25  be accurate but --

Page 162

1  telling to anyone outside.
2      Q.  Had anybody, to your knowledge, in that room
3  signed a non-disclosure agreement?
4      A.  I have no idea.
5      Q.  You didn't?
6      A.  I didn't and Robert didn't.
7      Q.  Okay.  All right.  Other than this --
8      A.  Let me --
9      Q.  I'm sorry.
10      A.  There's actually something, which thank you, so
11  let me rewind to day one.  When I was first time walking
12  to the back room they were saying I have to sign this
13  agreement.  I said, no, I'm not interested.  Then when we
14  were in the room waiting for Waldron to present, some
15  woman from the reception came with the agreement, which I
16  have provided a copy, saying everybody has to sign this
17  or otherwise you are not eligible for the 5 million, and
18  I don't -- I didn't see anyone signing it, but there were
19  people who say I'm not interested about 5 million and
20  there were people like me who say this is a
21  bait-and-switch, there was never a discussion about
22  agreement, I'm not going to sign any document without
23  consulting my attorney, and since you are preventing me
24  to use phone I cannot contact my attorney, so please go
25  away.

Page 164

1      A.  I know.
2      Q.  -- but there's been a few difficult passages.
3          So you'll get a chance to read and sign it and
4  correct it, and in the errata sheet if you can talk to or
5  consult Mr. Graham or the internet, try to see if you can
6  figure out if you can identify this person.
7      A.  I will ask from both Robs if they happen to,
8  because we were all in the same room, so we were sharing
9  this experience.
10      Q.  Okay.  Well, that meeting probably only lasted
11  a few minutes?
12      A.  No.  No, no, no, no, no, no, no, no.  This was
13  well over an hour.  We were locked in.  This was literally
14  as hell because we were in a small room sweating, and as
15  I say this was an intimidation and brainwashing effort.
16  No.  This -- if I would have to say top of my head an
17  hour-and-a-half, maybe even two.
18      Q.  Wow.
19      A.  This was a pure -- this was trying to
20  intimidate us to have a single story.
21      Q.  Did you go over any of the data during that
22  discussion?
23      A.  No.  This was a purely telling we have to have
24  a single story, we have to agree everybody what is the
25  story and that's the only story we are going to be

Page 163

1          Then when we were already having the data,
2  first set of data, they came back saying you cannot have
3  any of the data unless you sign this.  I said we already
4  have started, so go away.  So there was three -- I call
5  three distinct times when they were trying to get us to
6  sign this agreement, and the best of my recollection I
7  didn't see anyone signing, but it's possible that people
8  were signing it in the reception before even coming to
9  the room, so don't -- I'm not saying nobody signed.  I
10  just say I didn't see anyone sign it.
11      Q.  Since you brought the topic up or maybe I did
12  but you've explained it, let's mark this next exhibit.
13          (Exhibit 96: E-mail - marked for
14  identification.)
15      A.  Now when you mentioned this I vividly remember
16  that when we were presented in the room this agreement I
17  was next to this Robert who I became then friends later
18  with, and he was one of the guys to say I'm not here for
19  the 5 million, I'm here to see the PCAPs.
20      Q.  This is the guy from Minnesota?
21      A.  Yeah.
22      Q.  Okay.  I've given you Exhibit 96.  You produced
23  this as Attorneys' Eyes Only document.  The front appears
24  to be an e-mail from you to David Cross who we've
25  discussed, and this is August 24th, so shortly after the

Page 165

42 (Pages 162 - 165)

1 symposium?
2   A.  Uh-huh.
3   Q.  Is that correct?
4   A.  That is correct.
5   Q.  All right.  And I'm not as interested in the
6 e-mail itself as the attachment.  If you'll go to the
7 item beginning at page 25 and then 26, 27, 28 and then
8 29, what are -- there's obviously it appears to be photos
9 of a document, what are we looking at?
10   A.  This is the agreement which they tried to get
11 me and the others individually and as a group to sign in
12 order to participate in event.  So this is the agreement
13 I mentioned.  This is the -- I don't -- I've never
14 been -- I was never presented a NDA separately, but in
15 the speak they are actually -- they were claiming that
16 this is an NDA, and I'm not a lawyer, I'm not capable of
17 analyzing it.
18   Q.  Okay.  So when were you first presented with
19 this document?
20   A.  As I say, to the best of my recollection three
21 times.  The first time this was tried to be signed before
22 I even entered first time the back rooms.  Second time
23 this was presented to me before the introductory speech
24 by Phil Waldron.  And the third time this was presented
25 to me when we were already starting with the first

Page 166

1 nuggets of data analyzing.  First it was presented to me
2 as a condition to even get to the back room, second time
3 it was presented as a condition to be eligible for the 5
4 million, and the third time it's presented as a condition
5 to even to be able to see any of the data.  So three
6 different ways of trying to persuade.
7   Q.  Okay.  And you've already testified, but just
8 to be clear, you never signed this document?
9   A.  I very vocally refused to sign it.  Very
10 vocally means that everybody else in the room hears and
11 can testify that I refused to sign it.
12   Q.  Okay.  So now --
13   A.  But let me just clarify.  This is the -- there
14 was an active attempt, so this was not I ignored it like
15 in the first time when on a desk.  When this happened in
16 the back room this was an active refusal where they were
17 trying to pressurize everybody to sign, and I made a
18 little bit as a ringleader, but I wanted to make sure
19 that nobody can give testimony that I signed it, I made
20 it very vocal on refusing.
21   Q.  Got you.  Anything -- after this meeting, this
22 hour-and-a-half to two-hour meeting on day three was
23 there anything else to do at the symposium at that point?
24   A.  After that meeting we went to the two rooms
25 waiting to see if something is given to us, when it

Page 167

1 became clear that nothing is happening me and Rob, not
2 Robert Graham but the Rob, we violated the rules and we
3 wandered to upstairs where the media area and where the
4 bar was to have beer, because there was literally nothing
5 to do, but neither of us wanted to leave because we were
6 afraid that the story will be, oh, the last two hours the
7 parts were produced.  No.
8        THE REPORTER:  The last two hours --
9        THE WITNESS:  The last two hours the
10 miraculous parts were produced.
11        THE REPORTER:  The miracle --
12   A.  We didn't want to be not there, so the claim
13 would be say to people it was actually given, and then we
14 stick to the end.
15   Q.  Miraculously in the last two hours something
16 would happen?
17   A.  Yeah.  So that's why we stick there, had a
18 beer, had more beer, but didn't leave the venue, we
19 stayed there until the bitter end.
20   Q.  All right.  And as I mentioned at the beginning
21 or maybe it was before we got started, you know that I
22 represent -- well, I asked you about Dr. Coomer and you
23 indicated you don't know him, haven't met him; is that
24 right?
25   A.  To the best of my knowledge I have only once

Page 168

1 been in a conference call, which was his testimony to the
2 federal court case.  To the best of my knowledge I have
3 never met the guy.  To the best of my knowledge I have
4 never spoken with the guy because I was only listening to
5 his testimony, I wasn't communicating with him.
6   Q.  And were there any -- during the symposium did
7 you become aware of any what you would consider
8 conspiracy theories regarding people associated with
9 Antifa either hijacking the symposium --
10   A.  Oh my God.
11        MR. MALONE:  Object to form and
12 foundation.
13   A.  Yes.  So multiple times and all the time.  In
14 the first day -- now I have to -- all of this, what I'm
15 going to say, happened I don't necessarily remember which
16 order, but the first day the claim was that there are
17 Antifa people who have been -- the press has left -- has
18 borrowed the press passes to Antifa, and so the people --
19 some of the people with the press passes are Antifa
20 infiltrators.
21   Q.  Okay.
22   A.  And they were -- that was -- they were really
23 rallying people to harass the press.  That was what it
24 was about.  So that was one thing.
25        Then there was a number of stories about this

Page 169

43 (Pages 166 - 169)

| | |
|---|---|
| 1 kind of conspiracy about you know -- | 1 starting from the claim of Smartmatic code being |
| 2    Q.  Wait.  Slow down. | 2 common -- |
| 3    A.  This kind of conspiracy.  I mean the Hammer and | 3       THE REPORTER:  Smart -- |
| 4 Scorecard and all the other conspiracies aside, just | 4       THE WITNESS:  Smartmatic. |
| 5 talking about infiltration.  So there were so many | 5       MR. CAIN:  So Smartmatic is -- |
| 6 different stories how malicious actors are in the room | 6 Smartmatic.  It is an election company. |
| 7 and malicious actors have infiltrated this and have | 7    A.  So this kind of -- the whole family of this |
| 8 sabotaged the network, has sabotaged the event, has | 8 kind of a infiltration software, that was in different |
| 9 prevented the files to be released and whatnot.  So this | 9 forms all around and in so many different forms that it |
| 10 was a -- there was so many different these type of | 10 would be very hard for me to go to anything else than |
| 11 claims.  Most often I would say it was Phil Waldron who | 11 paraphrasing that this Smartmatic, Dominion, linking |
| 12 was saying that, but also others, like Lindell. | 12 Sequoia to this mess, that was all around the place. |
| 13      The interesting thing other was day three -- | 13    Q.  Okay.  But sort of sowing distrust in people |
| 14    Q.  Otherwise? | 14 that are either election workers themselves or people |
| 15    A.  What? | 15 that work for companies like Smartmatic and Dominion, do |
| 16    Q.  You said the interesting thing -- | 16 you find that to be problematic as it relates to our |
| 17    A.  On day three was that the story which had been | 17 trust in our election system in the United States? |
| 18 a little bit around from the beginning, the story was | 18       MR. MALONE:  Object to the form. |
| 19 that we are going to be arrested by United States | 19    A.  It is problematic, but I also want to point out |
| 20 Government and Lindell and the people are protecting us | 20 that this talk about fact-checkers, experts like myself, |
| 21 from being arrested and our devices taken by not giving | 21 poll workers, there was an active attempt to create |
| 22 us the PCAP files, because anyone who has the PCAP files | 22 violence or physical harm.  So that's one thing which I |
| 23 will be arrested, there was all the time -- and some | 23 find so appalling, and nobody should be afraid of their |
| 24 people were believing of the so-called expert group that | 24 safety when they're doing their work, and this -- during |
| 25 we are at risk of being hijacked from a hotel by | 25 the event it was really -- the air was sometimes very |
| Page 170 | Page 172 |

| | |
|---|---|
| 1 government, arrested when we are leaving, our devices | 1 thick with threat and intimidation. |
| 2 taken, maybe arrested when we try to leave to airport at | 2    Q.  And it sounds like you yourself have |
| 3 the airport, but this whole story the government is -- | 3 experienced threats, death threats, you know, associated |
| 4 our arrest is probably imminent if we are not protected | 4 with your election security work; is that true? |
| 5 by Lindell.  This story was all around, and that was | 5    A.  That is very true.  And over the years this |
| 6 another part of the infiltration they were talking about, | 6 is -- I have had less threats before, but I have had |
| 7 this U.S. Government has infiltrated this event to | 7 threats basically every four years before the election, |
| 8 sabotage it.  So the government boogeyman story was all | 8 but I would want to also point out that before symposium |
| 9 around alongside with the Antifa boogeyman. | 9 I was doing the New Hampshire audit and that was in I |
| 10    Q.  Now, so you haven't heard personally the -- any | 10 would say mid July I got a call, I spoke with the |
| 11 statements about Dr. Coomer allegedly rigging the | 11 Assistant Attorney General of New Hampshire about the |
| 12 election or boasting that he rigged the election? | 12 fact that my name, my home, myself doxxed in a -- |
| 13    A.  I have only heard about claims from -- who -- | 13       THE REPORTER:  Myself -- |
| 14 people who claim that they have been, like one was this | 14       THE WITNESS:  Doxxed. |
| 15 Joe Oltmann.  Personally I haven't heard it from | 15    Q.  Let me stop you there.  So dox is d-o-x. |
| 16 firsthand. | 16 Doxxed, past tense, is d-o-x-x-e-d.  Can you explain what |
| 17    Q.  Now, the idea that there's a malicious insider, | 17 being doxxed means? |
| 18 someone at Dominion who has -- who's the head of their | 18    A.  That means that your personal details are |
| 19 security who's actually a malicious actor who's put in | 19 published, like where you live, what are your habits, are |
| 20 let's say malware into the source code, that sort of | 20 published in order for someone who wants to cause a |
| 21 story, if that story is false, would you consider that | 21 physical harm to you can pick up that intel and plan |
| 22 the type of mal-information that you described earlier | 22 their harm. |
| 23 that you were hearing at the symposium? | 23      Anyway, I had this conversation with the |
| 24       MR. MALONE:  Object to form. | 24 Assistant Attorney General and I had a couple of other |
| 25    A.  This is the whole family of mal-information | 25 people with the government, and I was informed that my |
| Page 171 | Page 173 |

44 (Pages 170 - 173)

1 name is in the websites with seriously bad people and I
2 was specifically instructed to contact the local FBI
3 field office.
4    Q. All right. So, again, trying to get done, I'm
5 getting close I swear, what I'd like to do I want you to
6 authenticate to the extent that you can some of the
7 pictures and movies that you produced, and I think that
8 maybe the easiest way to do that is for me to mark a data
9 stick that has those on it as an exhibit, I'll provide
10 one of those to counsel, and for you, Mr. Hursti, I'll
11 see if I can mirror my screen if it won't lock up like
12 last time, and just scroll, have you kind of scroll
13 through these together. So I'll stop talking while she
14 marks this stick, data stick, as the next exhibit.
15        (Exhibit 97: Data stick - marked for
16 identification.)
17    A. I also would like to point out that in the
18 New Hampshire audit my fellow auditor, Professor Philip
19 Stark, got also death threats and to the extent it
20 prompted him to start looking for bulletproof clothing.
21 So this is no fun.
22    Q. Give me just a second and I'll see if I can --
23 I found that air display going back is --
24    A. Flaky.
25    Q. Flaky.

Page 174

1        THE REPORTER: I'm sorry. Say it again.
2        MR. CAIN: Air display is flaky.
3    A. Not reliable.
4    Q. It's unreliable.
5        MR. CAIN: What exhibit number is the
6 data stick?
7        THE REPORTER: 97.
8    Q. Okay. I'm going to do this blind. Mr. Hursti,
9 I'm going to show you -- I'm just going to give you my
10 computer. Don't hack it. And it's a little slow right
11 now, but what I'm going to ask you to do is just there's
12 35 pages of pictures, so if you can just hit the down
13 arrow, and it starts at 1295, and I don't need you to go
14 into detail, I think the main thing I want to know if
15 these are pictures or screenshots that you personally
16 took, all of them, and if they are what they purport to
17 represent; in other words, they're not modified, they're
18 not Photoshopped, you actually yourself took these
19 pictures, just to make sure that they're authentic. Do
20 you understand that?
21    A. I understand that.
22    Q. Okay. And you don't have to -- if there's
23 nothing in particular that's interesting to you, you
24 don't have to say anything about it --
25    A. Uh-huh.

Page 175

1    Q. -- but just --
2    A. Oh, yeah. All right. The first page, yes.
3 Yes.
4    Q. And those are -- first pages are images
5 from your computer?
6    A. Yep.
7    Q. And can you tell us why you were taking images
8 from your computer?
9    A. So while you're looking at two different image
10 files you want to compare them, and since I didn't have
11 two screens, in order for me to instead of writing down
12 what I need to check if another image has the same
13 content, it was easier for me to take a picture, open the
14 next file, flip between those files to verify whether
15 they are the same or different.
16        And so these images from my screen I'll see --
17 I'll tell you if there's something which is for other
18 purpose than that --
19        THE REPORTER: I'm sorry.
20    A. -- if there's something which is for other
21 purpose than this verification. These were never meant
22 to be kept or shared. This is just my internal working
23 when I'm going through two different files and -- or
24 giving myself something to memorize when I communicate
25 with the other people in the room.

Page 176

1    Q. Basically your notes?
2    A. These are my notes.
3    Q. Or some of your notes I suppose?
4    A. Yeah.
5    Q. Okay. And then after the commuter images,
6 unless there's something that -- of the images that's
7 striking to you, then you can just fast-forward past
8 those and then just describe generally the pictures that
9 appear to be from the symposium.
10    A. Yeah. Actually the image on number -- slide
11 number 9, this is actually an image which is relating to
12 having more than one computer hardware image on the --
13    Q. Mesa?
14    A. Mesa.
15        And the same. So there are slides which have
16 computer IDs or hardware config. These are signified
17 because --
18        THE REPORTER: Or hardware?
19        THE WITNESS: Config.
20        MR. CAIN: Config, like configuration.
21    A. Yeah. So like if you looked at page 10, you
22 see different models of computers, and then I took a
23 picture of that because the next point was I will verify
24 if all of these are used either by Dominion or State of
25 Colorado. So this is the nature of these notes.

Page 177

45 (Pages 174 - 177)

1　　　　And image number 19 is the screenshot of the
2　software I mentioned before, BruteShark, the advanced
3　version of Wireshark.  So it's very -- it's not wildly
4　known so far, so.
5　　　　All right.  Now I'm through all of those
6　screenshots taken by me, unedited, as they were.
7　　　　Now I'm in the first page of symposium, so this
8　is the page -- this is the entrance to the venue.
9　　Q.  When you describe the entrance, I don't need to
10　see it, just say the number that you're looking at.
11　　A.  I'm looking at page 20, and this is the main
12　entrance.  I don't know if there was other entrance.  So
13　this is the entrance we used to enter in the venue.
14　　Q.  Not to quibble with your pagination, but it's
15　page 20 of the PDF, but if you can read the control
16　number on the bottom.
17　　A.  Yeah.  That is 001314.
18　　Q.  Okay.  Let's refer to that.
19　　A.  The 1315 is -- this appears to be before we
20　start the day and prayers, people just getting in and
21　settling, that's what I think.  When you check the
22　metadata you find the actual time to see if that's what
23　it is.  The same, this appears to me being before the
24　event really, before the day starting.  The same on page
25　23.

Page 178

1　　Q.  And maybe put your hand down off your mouth or
2　away from, because she's having -- it will help her a
3　little bit.
4　　A.  1318 this is just a panorama giving the idea of
5　the size of the room and the level of the crowd there.
6　　　　1319, I don't recall which day this is, but
7　this is one of the many panels, which we were able to
8　sneak out of the back room just to take a little bit of
9　understanding what's going on.  I used the toilet breaks
10　very literally to go places where I shouldn't.  It's very
11　much -- this is funny, hacker room, I was not allowed to
12　do.  I don't know what happened in the hacker room.
13　　Q.  What number are you looking at?
14　　A.  This is page 26.  So I don't know what was in
15　the hacker room, I was not allowed to go in, and this is
16　not -- the hacker room has nothing to do with us experts.
17　So hacker room was one of the places which was on the
18　main venue side and there was this -- they were claiming
19　a demonstration of voting system being hacked.  That was
20　not a voting system, and they were just doing stupid
21　things there.  There was -- I didn't go to all places.  I
22　don't know -- there's probably rooms I didn't even know
23　exist.  So that's how limited my capability of still was
24　to see.  I just took a picture of this from the main, the
25　hacker room, because I found it hilarious that none of us

Page 179

1　actually in the back room know what was in the hacker
2　room.
3　　　　The picture of 27 is a -- this is the area
4　where the special media were allowed to have their
5　studios, and the bar I'm mentioning is far on my right
6　side all the way, so this was the mezzan layer.  The
7　studio in the center was I believe where most of the
8　time --
9　　　　THE REPORTER:  The studio --
10　　A.  The studio in the middle visible in the
11　picture, that's I believe where Steve Bannon's War Room
12　recordings were done.
13　　　　THE REPORTER:  Wait.  Steve?
14　　　　THE WITNESS:  Bannon.
15　　　　THE REPORTER:  Bannon's what?
16　　　　THE WITNESS:  War Room.  Nickname of show
17　he's doing.
18　　A.  But this upper stage was really CNN was only
19　allowed to do one interview with Mike Lindell there.
20　Even with this was media space it was not for all media,
21　if you get the drift.  But, yeah, since there was a bar
22　there, there's nothing between me and bar, and Rob was
23　like-minded, we don't stop for security trying to stop on
24　our way to have a beer.
25　　　　And then page 28 to 31 is the agreement they

Page 180

1　tried to get us to sign.
2　　　　Yeah, there was a long list -- page 32, there
3　was a long list of prohibited items, and they were
4　checking people to you know -- they were not checking all
5　the people, but they were selectively checking people
6　what do you have in your bags and whatnot.  So there was
7　a long list of prohibited items.
8　　　　I had three passes.  This is page 33.  So this
9　is two of my three passes, so I don't -- whatever reason
10　I don't have the third pass here, but I had the attendee
11　pass, the cyber expert pass --
12　　　　THE REPORTER:  The what?
13　　A.  Attendee, general attendee pass --
14　　　　THE REPORTER:  Identity?
15　　　　THE WITNESS:  Attendee.
16　　　　MR. CAIN:  Attendee.
17　　A.  -- expert pass and press pass, so I was
18　flipping these around especially when I was wandering
19　around, so, and as an expert I was not supposed to be
20　anywhere else than in the expert back rooms.
21　　　　Yeah, I did an interview.  This is page 34.  I
22　just signed for New American.  I don't know what kind of
23　media it is.  It's just a release.  I don't think they
24　ever aired it because I didn't say the things they liked.
25　　　　Yeah, this page 35, I don't know who made this

Page 181

1  slide.  Oh, the whiteboard.  I just wandered by it.
2       THE REPORTER:  White?
3       MR. CAIN:  It's a picture of a
4  whiteboard.
5    A.  So I didn't know who did it and what was the
6  purpose, but it was there and I decided to take a picture
7  to take a look at that later.  So I just used the
8  opportunity to capture something.  I don't know who did
9  it and why.
10    Q.  I think that's all of those pictures.
11    A.  Yeah, that's all.
12    Q.  If you want to hand that back to me.
13    A.  Yep.
14    Q.  So all of those are pictures you took and
15  then --
16    A.  I took and unedited, authentic.
17    Q.  Okay.  And this data stick, Exhibit 97, has a
18  couple of video clips.  One is very short that I don't
19  really care too much about.  The other one is -- it looks
20  like it's about a minute and 15 seconds, and let me see
21  if I can pull that up, and this is labeled 1346, which is
22  the Bates on it.  I'll just show you that from here
23  maybe.
24    A.  Yeah.
25    Q.  Here we are.  So it appears to be a scrolling

Page 182

1    A.  Not altered, and this was from the public area
2  where all the attendees were roaming.
3    Q.  All right.  Getting close.  So I counted
4  multiple reasons that Mr. Lindell gave for not producing
5  the data during the symposium that was expected, and part
6  of those I think Mr. Lindell himself identified in his
7  interview with CNN.  So I'm going to briefly play a clip
8  from Exhibit 65.  This was a previously marked exhibit I
9  think in Mr. Lindell's deposition, maybe another.  It's
10  clip 16 from Exhibit 65.  It's -- the title is CNN
11  election -- from CNN, Election Fraud Proof Implodes.  Do
12  you remember seeing that reporting from the symposium?
13    A.  Yes.
14    Q.  Okay.  And I'm going to start this video at the
15  2 minute and 20 second mark, and I'll show you just a bit
16  of it, and then we'll talk about it, and just because of
17  my inability to use this mirroring I'm going to just play
18  it from this and you can follow along with us if you
19  don't mind.  Here we go.
20       (Video played)
21    Q.  I'm actually going to stop that.  So he says
22  we're showing it here on the screen now, and then it cut
23  to the screen view of what looked to be something from a
24  computer.  What was being shown there, if you know?
25    A.  It seemed to be those missile images, but since

Page 184

1  of the video -- or, excuse me, of the hex numbers; is
2  that right?
3    A.  This is in the left-hand side of the --
4  left-hand side of the main stage.  This was the scrolling
5  of the hex dump.  I took it for two reasons.  The first
6  reason is it shows that the video is so poor quality that
7  you really have a hard time of figuring out reliably the
8  hex numbers, but second part it shows that it loops over,
9  because the address, the offset address on the left, the
10  left side is offset, so it returns back to top.  So this
11  was -- the main purpose was to show this was not
12  continuously going forward, it was looping.
13    Q.  But is this similar to do you remember way
14  back, it seems like yesterday now, we were talking about
15  the hex data that the CNN producer was showing you at the
16  beginning before the symposium, is this the similar or
17  the same data that was in like the Lindell documentary?
18    A.  It's very similar and maybe just maybe the
19  thing which was given to me is actually inside there,
20  it's a small clip.  So this is what all the so-called
21  what they claim to be PCAPs.  This is not PCAP.
22    Q.  Okay.  And the video of the scrolling hex data,
23  that's video you took yourself?
24    A.  Correct.
25    Q.  And that hasn't been altered in any way?

Page 183

1  I was not in the room I don't know what they were shown.
2       Let me also point out that on the weeks leading
3  into the Cyber Symposium Michael Lindell himself and
4  people speaking for him repeatedly claimed that the files
5  he had are irrefutable because they are cryptographically
6  protected and if you change anything it will be visible.
7  So the whole argument he's saying that they will be
8  changing it is already defeating his own argumentation he
9  repeated a month before claiming -- and, by the way, it's
10  something where me and the other expert we had no idea
11  what he is thinking, why he's claiming that these are
12  cryptographically frozen in time, impossible to be
13  modified and whatnot, but that was his claim, these files
14  are absolute proof because they are cryptographically
15  validated and they are frozen in time and you cannot
16  change them.
17    Q.  So is that a term of art, cryptographically?
18    A.  Cryptographically.
19    Q.  Craft?
20    A.  Graphic, cryptographic.
21    Q.  Okay.  So what does that term mean?
22    A.  It means using mathematics encryption
23  technologies to, for example, sign a hash or provide a
24  fingerprint of the data like hash which proves that this
25  data cannot be altered without the hash changing.  So he

Page 185

47 (Pages 182 - 185)

1 never specified how -- what kind of proof he has which he
2 will present us. We were hilariously waiting for that to
3 be, but also that would -- you can do that many ways and
4 you should do that. We just didn't know what he was
5 talking about because he was never specific. The whole
6 idea that he's presenting something which is proof and he
7 has to worry that it can be changed means that everything
8 he said before is false obviously, but second thing is
9 that's what -- there should be a hash code.
10        THE REPORTER: Hash?
11        THE WITNESS: Hash values, codes.
12 Q. So it is possible technically to freeze data in
13 the manner that it can't be altered; is that true?
14     A. There -- alteration will be -- it will be
15 tamper evident. If you change it you will not get away
16 with that change, it will automatically be patently
17 obvious that the data has been tampered with. You don't
18 know how it's tampered with; you know it's tampered with.
19 Q. Let's finish this.
20        (Video played)
21        MR. CAIN: At around the 3 minute and 15
22 second, which is where I stopped it, just before that
23 there was an image from the screen at the symposium and
24 the witness I believe said that's a Mesa image.
25     A. Yeah. That's a visualization of the Mesa

Page 186

1 image.
2        (Video played)
3 Q. So that was your view today obviously, you've
4 testified at length, but that was also your view at
5 the -- contemporaneously at the symposium; is that right?
6     A. I was expecting made-up data, a pile of
7 something which we can argue if it's real or not. I
8 didn't expect in my wildest dream there's nothing.
9 Q. Let's summarize a few things about, you know,
10 excuses for not producing the data. You heard Michael
11 Lindell say I've been told that they could go out there
12 and corrupt it and make fake stuff up and put fake news
13 out, and that's the discussion I think we've already had
14 about whether the data could be, you know, changed or
15 whatnot?
16     A. He himself claimed that the data is protected
17 and cannot be altered. He repeatedly said that in the
18 leading weeks multiple times.
19 Q. And the other thing we saw in that clip is he
20 said, well, he's going to take that proof directly to the
21 United States Supreme Court, the data that he didn't show
22 during the symposium. Has he done that to your knowledge
23 since the symposium --
24        MR. MALONE: Object to form and
25 foundation.

Page 187

1 Q. -- through today, which is March 30, 2023?
2     A. I don't know for certain, but I believe I would
3 have heard if he would have done that. He would be on
4 the news, but I haven't heard that kind of news.
5 Q. There was -- not in the clip that we just
6 looked at, but in the testimony that I received from Mike
7 Lindell during his deposition he testified that he was
8 concerned someone would place a poison -- what's called a
9 poison pill in the data and that -- and because of that
10 he wasn't going to, quote, drop the last part of the
11 data; in other words, there was data that he didn't drop
12 during the symposium because of this concern about a
13 poison pill. Did you hear about a poison pill during the
14 symposium?
15     A. I heard poison pill and a logic bomb and I
16 heard Phil Waldron citing some law claiming that if they
17 would give the data which they now believe contains a
18 logic bomb that would be a violation of yada-yada-yada
19 law and people who get that will be arrested and whatnot
20 and it would put us in harm's way. It's just laughable
21 because -- and also on the last day they were saying we
22 are concerned that your computers will be destroyed and
23 your identity theft and whatnot if this logic bomb gets
24 to your computer; not only that you will be arrested and
25 your computer taken by the federal government but you

Page 188

1 will be, you know, in harm's way. And basically I would
2 say, I'm sorry, every expert in the world knows to use
3 burner computers when you are dealing with potentially
4 hostile data and all data always is potentially hostile,
5 so for that reason it just makes no sense whatsoever.
6 Please give your logic bomb to me.
7 Q. So, again, I think Ryan Malone understands all
8 of that, I don't necessarily, but let me just ask you a
9 couple of follow-ups. Poison pill, can you just define
10 that for the jury as to what does that mean in the cyber
11 security area?
12     A. Nothing.
13 Q. Okay.
14     A. Let me explain. Poison pill or logic bomb --
15 poison pill is not a term. Logic bomb is sometimes used
16 and it refers to a hidden code in a program which will
17 activate under certain conditions or certain time and
18 destroy or alter data. PCAP files are benign data, they
19 don't self-execute, they cannot self-execute, and they
20 are not in executable form, even by accident. Say there
21 is a logic bomb; even by accident you cannot get it to go
22 off because PCAP data is benign data.
23 Q. Okay. Lastly, when we took Mr. Lindell's
24 deposition he appeared on behalf of FrankSpeech, which we
25 don't need to go into FrankSpeech necessarily, but during

Page 189

48 (Pages 186 - 189)

1  his deposition at page 37 he said, in explaining why the
2  data wasn't produced during the symposium, that it is
3  subject to a court, quote, "gag order," close quote, and
4  that he testified that, quote, "If this would get signed
5  by the President I can release this, I have video of
6  all -- the whole election, of all the election,
7  everything that happened," close quote.
8        So, first of all, have you heard of the
9  existence of a gag order that would prevent the release
10  of the data that was promised?
11        MR. MALONE:  Object to form.
12     A.  A claim was made that there is a lawsuit
13  somewhere raised by United States Government forcing a
14  gag order on Dennis Montgomery to not talk or share any
15  of the data created by the super secret CIA Hammer and
16  Scorecard, yada yada.  So this -- in different forms this
17  story, which was not in the beginning of day one but
18  started procreating, this story in different forms with
19  small variations were repeated multiple times.
20     Q.  Is there anything that stood out to you about
21  the symposium that we haven't covered, I know we've
22  talked quite some time, specifically about, you know, the
23  issues surrounding the data that you were promised and
24  didn't receive?
25     A.  There were -- on the day one when we have this

Page 190

1  Coomer specific information, and then there's a tab that
2  contains -- what purports to contain passwords.  So I'm
3  going to show you that.  I'm going to actually give you
4  my computer again, let you familiarize yourself with this
5  document, and then I'll have a few questions for you.
6        I guess the first one is going to be have you
7  seen a spreadsheet like this --
8     A.  No.
9     Q.  -- before, and then go ahead and familiarize
10  yourself.
11     A.  I definitely have not seen this or anything
12  similar.  What is E-C standing for?
13     Q.  E-C stands for, as I understand it, Eric
14  Coomer.
15     A.  Oh, okay.
16     Q.  What's amusing about it?
17     A.  Name Jennifer Morrell and it says radical
18  friend.  I didn't see what is there.  Jennifer Morrell is
19  a known person who has been an election official, I
20  believe an election official in Colorado of all the
21  places.
22     Q.  Can you spell her last name?
23     A.  M-o-r-r-e-l-l.
24        All right.  Still something more here.  Oh,
25  that's the last one.

Page 192

1  dysfunctional network there were a couple of small text
2  files which were the first ones you could get down and
3  they were claiming that this is Chinese text and whatnot,
4  who knows what they were, but there were a couple of
5  these small snippets which were never claimed to be PCAP
6  or never claimed to be anything, just text files which
7  can be interpreted many ways and one of the ways will
8  probably use Chinese letters; meaningless.  So there were
9  a couple of these small snippets.  I just wanted for the
10  sake of completeness report that there are a few
11  meaningless files which we haven't covered, but the point
12  is they're meaningless.
13     Q.  So I'm going to show you one more exhibit.
14  Then I'm going to -- I'll let Mr. Malone ask you
15  questions, I think he has a few for you as well, and then
16  I'm going to take that time to see if I have anything
17  else, but I just want to kind of get done.
18        In discovery in this case we received a
19  spreadsheet, an Excel spreadsheet, it's Exhibit 73, it
20  was produced.  I'll represent to you it was transmitted
21  from Robert Herring, who is one of the owners of One
22  America News, to an e-mail address at My Pillow Mike
23  Lindell, I think it was m-l, I can confirm which e-mail
24  address, but it contained information regarding both
25  election workers at various election companies, Eric

Page 191

1     Q.  When you get on the password page let me know.
2     A.  Yeah.  I already passed it.  Okay, that's
3  password page.
4     Q.  And then on the top right of that there's a
5  statement, it says something like NB, the letter N as in
6  Nancy, B as in boy.
7     A.  I don't see it, but let me find it.
8     Q.  It's at the top of the --
9     A.  Yeah.  I'm -- this open from line 60 being on
10  top, so.
11        Yeah, for the record, I have never seen this
12  kind of collection of passwords and e-mail addresses, so
13  I'm not familiar with this at all.
14        NB, I have not tried these yet.  Search
15  database in first tab and try password -- I'm reading
16  from here -- in first tab and try password with other
17  e-mail account in case they use same password.  Okay.
18  Who is NB?
19     Q.  Good question.  I was going to ask you if you
20  know anybody by those initials in this sphere, this
21  space.
22        MR. MALONE:  Object to form and
23  foundation.
24     A.  There's a couple of things where I actually
25  remember either first name or last name, I'm just

Page 193

49 (Pages 190 - 193)

1  wondering, but the top of my head NB doesn't -- all of
2  the things which -- from this space which might have been
3  NB, none of them really would make any sense to me, so
4  I'm drawing completely blank with this.
5      Q.  How -- I know you're in the cyber security
6  realm.  Have you seen information accumulated like this
7  as it relates to what purports to be election workers and
8  their passwords?
9          MR. MALONE:  Object to form.
10     A.  The answer is weirdly yes.  Now -- I'm just
11  trying to put the time.  So I communicated with certain
12  Attorney Generals of State and Department of Homeland
13  Security, a couple of other parties and officials.  There
14  was a -- I'm just trying to remember why.  But part of
15  one study I accidentally found an open database in public
16  cloud, and one of the things in that was California -- I
17  believe it was California -- California poll workers and
18  their salaries as one of the cross reference.  There was
19  a lot of other things.  So there was a -- it was a weird
20  database because it had so many little bit
21  election-related tables and I didn't know -- I had no
22  idea who put it together, what it's for.  It was one of
23  those things where I wasn't trying to find it, I was
24  trying to find something else, and I accidentally
25  stumbled across that and a couple of other things, best

Page 194

1  of my recollection about a dozen things which triggered
2  then me to start if I knew in that state the Attorney
3  General's Office someone, I called them; otherwise
4  everything else I tossed to the Department of Homeland
5  Security, like deal with this.  But this is not a -- I'm
6  just -- this is not unique or curious, but that's the top
7  of my head coming to my memory.  That's the only time
8  when I have like this kind of weirdness.  You don't have
9  salaries there and I actually found out that in
10  California those salaries are public record, so it was
11  not -- somebody had went through an effort for whatever
12  reason to harvest a lot of election human data into this
13  weird database and table which was then without password
14  globally readable from this Amazon -- I think it was
15  Amazon instance.
16     Q.  Without going into specifics, if you know what
17  would -- how would one go about getting passwords that
18  purport to be from election software company employees,
19  getting -- harvesting the actual passwords?
20         MR. MALONE:  Object to form and
21  foundation.
22     A.  It's actually scaringly trivially easy.  There
23  are so many usernames, slash, e-mail and password lists
24  which are either available for free of charge or for sale
25  in dark web and you can just get those and start

Page 195

1  filtering out your interesting addresses.  So putting
2  this kind of list together is not difficult at all and
3  might be even possible to do it free, but at least with,
4  you know, a hundred dollars in your pocket you can put
5  quite a list together from --
6      Q.  Can you think of a reason why one would want to
7  put a list together like the one that you're looking at
8  in Exhibit 73?
9      A.  Oh, there's --
10         MR. MALONE:  Object to form.
11     A.  There's no good reason.  There's a lot of bad
12  reasons.  I mean this is a, as they say, try these.  I
13  mean it can be anything.  I mean this is clearly someone
14  is, whether you're going after e-mails, whether you're
15  going after logging into the systems, this is a target
16  list for criminal activity being planned.  That's my
17  first mental image of this.  And I -- we -- I and we, we
18  have been a number of times warning that putting this
19  kind of list together is trivially easy.  I have never
20  seen someone actually putting this list together, but
21  this is something which has been flagged as a risk for
22  quite a while.
23         MR. CAIN:  Okay.  All right.  That's all
24  I have for you now, and I'll pass the witness, and I may
25  have a few follow-ups.

Page 196

1          THE WITNESS:  All right.
2  CROSS EXAMINATION
3  BY MR. MALONE:
4      Q.  Dr. Hursti, if you --
5      A.  I'm not a doctor.
6      Q.  Oh, I'm sorry.  Mr. Hursti, if you could refer
7  to what has been marked as Exhibit 96, which I believe is
8  your e-mail to David Cross.
9      A.  Yeah.  Okay.  Which one was 96?  Is this --
10  this is 96, yes.
11     Q.  Yes.  The August 24th, 2021 e-mail.
12     A.  All righty.
13     Q.  Okay.  So looking at the first page of that,
14  HH 23, I see a sentence in the paragraph in the center of
15  the page that says, While in the symposium, the liaisons
16  to us experts admitted that the 37TB of data they have
17  claimed to have does not exist; do you see that sentence?
18     A.  Yes.
19     Q.  And I take it TB stands for --
20     A.  Terabyte.
21     Q.  Okay.  Is that an accurate statement?
22     A.  Yes.
23     Q.  When was that claim by the liaisons made to
24  you?
25     A.  That was Phil Waldron first day before we even

Page 197

50 (Pages 194 - 197)

1 started.
2    Q.   Okay.  So I think I may have misunderstood your
3 testimony earlier and I want to get some clarity on that.
4    A.   Wonderful.
5    Q.   My recollection of your testimony is that Phil
6 Waldron said that they don't have the data at the
7 symposium; is that a fair summary of what he told you?
8    A.   Let me say off the top of my head what I said.
9 He told us that they don't have that 37 Terabyte because
10 the stroke happened and the person who was supposed to
11 give them, which later was identified as Dennis
12 Montgomery, has had a stroke, he's fighting for his life,
13 that's why they didn't get all the data.  They claimed
14 that they have some data, a slice, I don't remember
15 exactly how much the slice was supposed to be, and they
16 were claiming that they will give a slice of that slice
17 they have to us which they maybe thought is that BLX
18 file, I don't know what it meant, but they said that 37
19 Terabytes they don't have it.
20    Q.   Okay.  So that makes me feel a little bit
21 better because that's what I remember you saying.  Now,
22 my understanding of that is that's different than it
23 doesn't exist; correct?  To say that it doesn't exist and
24 they don't have it, that's two different ideas?
25    A.   They later said they don't -- it doesn't exist,

Page 198

1 but I'm just telling you what they first say.
2    Q.   Okay.
3    A.   First they say they don't have it and they have
4 a slice of it and they will give a slice of the slice to
5 us, and then when we say where is this slice, then it
6 was -- I'm just trying to remember if Phil Waldron also
7 said it, but at least Josh Merritt said, no, we don't
8 have it.  So, as I say, I'm contradicting myself because
9 the story was not fixed, it evolved during the event.
10    Q.   Well, I'm not sure you are contradicting
11 yourself, Mr. Hursti, because I've heard you go through
12 with Mr. Cain what he described as excuses for not
13 presenting the data; you went through those at some
14 length, correct?
15    A.   Uh-huh.
16    Q.   And so all I want to understand is where it was
17 said to you and where it was -- or when it was said to
18 you that the data doesn't exist, not that they don't have
19 it.  That's all I want to understand.
20    A.   Now you are asking an excellent question from
21 timing.  I would put first time that to be said about
22 somewhere between maybe 3:00 and 4:00 the day first,
23 3:00 and 4:00 p.m. the first day.
24    Q.   Okay.
25    A.   And there was -- just in clarity's sake, that

Page 199

1 statement was walked back and then stated again.  So
2 there was -- when Josh Merritt was saying things he
3 sometimes walked back and then said I need to go to check
4 from the back room, whatnot, then he comes up with an
5 explanation.  So absolutely true first thing when they
6 were saying they don't have it but they didn't say it
7 doesn't exist, and then later when the story continues
8 then it became that doesn't exist.  And the fact it
9 doesn't exist is also -- as I said before, the problem of
10 that data is that by the size of the data, the collection
11 method, et cetera, it really cannot exist, but putting
12 that aside, I'm explaining to you that the story was --
13 the story changed over time.
14    Q.   Okay.  But let's talk about the specific time,
15 the 3:00 to 4:00 p.m. on day one; that's what you said,
16 right?
17    A.   That was I think was the first time when they
18 say it doesn't exist, and then -- and I believe, I'm
19 actually pretty certain, that after that it was again
20 said, no, we are producing the slice later, the slice of
21 the data which we're promising.  So there was back and
22 forth it was.  It was never it doesn't really exist.
23 It's just like...
24    Q.   Okay.  Well, let's take it step by step.
25    A.   Yeah.

Page 200

1    Q.   So focusing on that first instance that you
2 just referred to, the 3:00 to 4:00 p.m. on day one.  I'm
3 not holding you to that in stone, but that's the general
4 time frame 3:00 to 4:00 p.m.?
5    A.   Yeah, that's what I was thinking like all the
6 evidence which order it happened.  Best of my
7 guesstimate, yeah, that's really about that time frame,
8 yes.
9    Q.   Okay.  So this e-mail to Mr. Cross refers to a
10 liaison to us experts; do you see that?
11    A.   Uh-huh.
12    Q.   And it's a liaison or liaisons who admitted
13 that the data doesn't exist?
14    A.   I would say that the liaison here is primarily
15 Phil Waldron and Josh Merritt.
16        THE VIDEOGRAPHER:  Excuse me.
17        THE WITNESS:  Oh, sorry.
18    A.   Those are the primary, because they were the
19 primary contacts, and there is this third person whose
20 name is somewhere, who was this retired -- claimed to be
21 retired NSA, I'm not going to say whistleblower, and he
22 was the only guy who at the end of the day maintained a
23 statement that he knows Dennis Montgomery personally and
24 he personally believes that if Dennis is doing that he's
25 doing it to protect everybody else.

Page 201

51 (Pages 198 - 201)

1  Q.  Okay.
2  A.  And he was the only one who never walked down
3  the path the data doesn't exist.  He was always saying
4  the data has to exist and if Dennis is playing these
5  games it is only because he's trying to protect Mike
6  Lindell and protect us experts, but he was not part of
7  Lindell's organization to the best of my knowledge.  I
8  think he was just a guest who was friends with the
9  organization.
10  Q.  Okay.  So we'll put that gentleman to the side
11  for now.  Let's focus on Colonel Waldron and Spyder,
12  slash, Jackal, slash, Josh.
13  A.  Whatever, yes.
14  Q.  Okay.  So is it your testimony that those two
15  guys at various points admitted to you that the
16  37 Terabytes of data does not exist at all?
17  A.  So my testimony is that that came at least from
18  Josh and Waldron was saying they don't have it at least
19  in the beginning, and also none of these discussions
20  happened one-to-one in some private settings, all of
21  these were in a public setting, and whoever was in the
22  room was -- who cared to listen could listen.  So these
23  are not something where we had a one-to-one conversation.
24  Q.  Now, my memory of your testimony with respect
25  to Mr. Merritt earlier was that it was you who convinced

Page 202

1  files, the BLX files, and the BLX files are encrypted and
2  the PCAP files are inside of these BLX files and we have
3  to find a way to extract the PCAP files out of this.
4      Now, when we realized that there is no PCAPs
5  inside of the BLX files, and we had a few of these BLX
6  files, then we confronted and say what do you have, do
7  you have anything else than these BLX files, because
8  these BLX files don't have PCAPs inside, and that's when
9  it became they said this is -- we don't have anything
10  else.  So then you don't have the PCAPs.  And that's
11  where the -- the logic became from the fact that they
12  said the only thing we have is these files, and once it's
13  clear these files don't have PCAPs inside; hence, PCAPs
14  don't exist.  You understand the -- you understand the
15  evolution?  Because I personally believe that Josh
16  Merritt was honestly believing that there is PCAPs inside
17  of those BLX files.  He might have a doubt in his head,
18  but I don't think he was lying about that because I think
19  that's what Josh Merritt was maybe referring, that there
20  was this revelation moment when he realized.
21  Q.  Just a quick question about Mr. Merritt.  If
22  you could pull Exhibit 90 and turn to Bates page 204.
23  A.  90.  Page what?
24  Q.  204.
25  A.  Yep.  Yep.

Page 204

1  him that there were problems with the data; correct?
2  A.  Correct.
3  Q.  So are you saying that he admitted to you the
4  data doesn't exist based on what you told him?
5  A.  My -- so let's -- this is very important.  So
6  we were there for PCAP files.  The claim was that the
7  PCAP files are inside of these Hammer and Scorecard
8  files, the BLX files.
9  Q.  Okay.  And when specifically was that claim
10  made, just so that we understand the timing?
11  A.  Very -- as I say to you, Phil Waldron changed
12  his story in the introduction from Dennis Montgomery
13  doesn't exist to bringing Dennis Montgomery into the
14  talk.  Then the whole story --
15  Q.  I'm sorry to interrupt, but I just want to make
16  sure I understood what you just said is Dennis Montgomery
17  doesn't exist?
18  A.  No.  Dennis Montgomery was first denied, that
19  he has nothing to do with this data.
20  Q.  I see.
21  A.  And then while everybody is still in the room
22  Dennis Montgomery became the source of the data, and that
23  was when Dennis Montgomery and the Hammer and Scorecard
24  and all of that came to focus.  The story then became
25  that they have these super secret Hammer and Scorecard

Page 203

1  Q.  Okay.  We've talked a bit about this e-mail
2  from you to Alex Halderman and David Dill a little bit
3  earlier today, but my questions are about the paragraph
4  at the bottom of the page number 3.  The guy -- I'm
5  reading from your paragraph.
6  A.  Yep.
7  Q.  The guy in this video is Joshua Merritt, Sydney
8  Powell's start -- I assume that means --
9  A.  Star, yeah.
10  Q.  -- star expert Spyder who worked for Russ
11  Ramsland.
12  A.  Uh-huh.
13  Q.  Army intelligence training washout, who was
14  admitted to their cyber defense training but washed out
15  after failing 3 early training tests in less than a year.
16  I'll stop there.  Where did you get that information
17  about Mr. Merritt's training in defense?
18  A.  Part of that is in the New York article which
19  you can -- which link is there.
20  Q.  Okay.
21  A.  So that was -- so the -- once it became clear
22  who Spyder -- remember at this point in time I'm
23  saying Joshua because I had no -- I'm referring to him
24  here as Joshua Merritt because I didn't know who this guy
25  is, but all of a sudden a lot of information became

Page 205

52 (Pages 202 - 205)

1 public because people started investigating who Joshua
2 Merritt is, and, hence, I'm saying Joshua because that
3 was the name. I didn't know he's called Josh. I read
4 all the articles, I heard a lot of people who are
5 investigating, and there was -- actually his training
6 records were, for example, published. So I don't know if
7 they were doctored, but there was -- you know, if you
8 Google that's where this comes from.
9 Q. And is that New Yorker article also the source
10 of the statement that you write at the bottom of page
11 204, The -- I think you might mean he -- also is the
12 architect of QSnatch, slash, Scytl Staging falsehood?
13 A. No, that is not from the article.
14 Q. Okay. Where is that from?
15 A. That is from Joshua Merritt himself. This
16 is -- remember when I told that when my first ever I
17 didn't know the name Joshua Merritt, I was in this call
18 organized by pro-Trump people trying to convey the idea
19 that all the votes are uploaded to Germany and there was
20 this guy who was military intelligence expert whose voice
21 is altered, he was telling this whole story, and there
22 was a -- there was even a -- and I probably have it -- a
23 PDF file which was his explanation, his explanation and
24 so-called evidence that this QSnatch/Scytl thing is
25 happening.

Page 206

1 So he was represented to me in this -- before
2 this call and during call as the guy --
3 THE REPORTER: Wait. He was what?
4 THE WITNESS: Represented.
5 A. He was represented as the guy who is the author
6 of all of this, and this was my first time when I heard
7 about this QSnatch thing and it was in that call which I
8 later found it's Josh Merritt, he was the voice. So this
9 one statement is not related to that, and the
10 architect -- as I said, he was represented as the guy who
11 discovered this QSnatch thing with his team, it would say
12 with his team, but he was the guy in the call
13 representing this.
14 Q. And if you know, Mr. Hursti, who was it that
15 made that representation about Mr. Merritt?
16 A. Who are the people? I think the number one guy
17 was a guy called Keith Lewis, and then there was another
18 person -- so there was a group of people from Texas who
19 were working around Russ Ramsland and these were the
20 people who were organizing these calls because they
21 thought that I can be convinced this is real, and my
22 managing partner unfortunately he died in Christmas --
23 two days before Christmas '21, he was a devoted
24 Republican and he was the guy who was getting me into
25 these calls. I didn't want to, but I ended up because I

Page 207

1 wanted to do a favor to a guy who I have hired to be a
2 CEO of my company Nordic Innovation Labs. So his name
3 was Dan Webber, the guy who is now deceased. But this is
4 the story they I ended up to these calls through who,
5 let me put it that way that was unusual for me, I was not in my
6 peer group so to speak.
7 Q. One of the calls that you mentioned you were on
8 involved Dr. Coomer, correct, and that was in the Curling
9 case?
10 A. That was when I was listening to Dr. Coomer's
11 testimony in the Curling case in the Federal Court of
12 Georgia, Atlanta.
13 Q. And do you know why Dr. Coomer was testifying
14 in that case?
15 A. I believe he was on -- the case doesn't involve
16 directly Dominion, but he was testifying on behalf of the
17 Secretary of State's Office as the vendor chosen by
18 Secretary of State Georgia to provide election equipment
19 for Georgia. So he was testifying about Dominion
20 equipment and how Dominion equipment worked and
21 et cetera, and also he was making statements about
22 risk-limiting audits.
23 Q. I see.
24 A. If you go to Curling case I believe there's a
25 rebuttal written by Professor Phil Stark about part of

Page 208

1 his testimony.
2 Q. A rebuttal to Dr. Coomer?
3 A. Yeah.
4 Q. Okay. Well, Mr. Hursti, let's go to the
5 Curling case.
6 A. All righty.
7 MR. MALONE: 98.
8 (Exhibit 98: Exhibit 107, Curling case -
9 marked for identification.)
10 (Discussion off the record.)
11 A. All righty. What is this?
12 Q. Well, I was hoping you could tell me,
13 Mr. Hursti, if you could take just a moment to review
14 this document. Have you seen it before?
15 A. I believe some of this is written by me.
16 Q. Okay. And you're aware that this was a
17 declaration that you submitted in the Curling case?
18 A. I believe so, yes.
19 Q. Okay. And this document -- give me one second
20 here. If you'll turn to page 34.
21 A. 34. Yes.
22 Q. Okay. It's dated August 24th, 2020; correct?
23 A. Yep.
24 Q. As you sit here today, Mr. Hursti, have you
25 come to learn anything in the intervening couple of years

Page 209

53 (Pages 206 - 209)

1 that would make you change anything?
2     A.  I don't recall what all has been here, but we
3 have learned as a community a lot of things about ballot
4 marking devices, BMDs.  So, for example, there have been
5 a number of problems found later.  So maybe if I go
6 through there's new knowledge which was not available at
7 the time of writing, but I cannot always memorize 34
8 pages what all there is, but if I would have to guess I
9 would definitely add more things to this if I'd be
10 writing it today.
11     Q.  Understood.  If you could flip back to
12 page 3 --
13     A.  Okay.
14     Q.  -- of this document, Mr. Hursti.
15         And in subparagraph (b) -- so paragraph 5,
16 subparagraph (b) on top of page 3, the statement, The
17 voting system is being operated in Fulton County in a
18 manner that escalates the security risk to an extreme
19 level; do you see that?
20     A.  Yes, I do see it.
21     Q.  And that statement was accurate at that time?
22     A.  I believe it's still accurate at this point in
23 time.  I'm not aware of any procedures which would be
24 addressing the core issues what caused this statement.  I
25 actually would say that late -- things we have later

Page 210

1 learned about unsuccessful mitigation strategies would
2 underline that at the time of the writing this is a true
3 and honest statement.
4     Q.  And what types of things are you referring to,
5 Mr. Hursti, that you later learned?
6     A.  For example, that the method Georgia performed,
7 the thing which they first called to be a risk-limiting
8 audit and then in midstream changed to be a recount and
9 whatnot, it was not performed in an effective way and
10 because the State of Georgia was not protecting the
11 physical paper ballot population, the fundamental problem
12 becomes that you don't have a trustworthy trail to audit
13 for.  So it doesn't tell it's wrong.  It's just saying
14 that it is increasing a risk that if something happens
15 you don't detect it reliably.
16     Q.  And that risk is present today for voters in
17 Georgia in your opinion?
18     A.  I haven't heard that they would have a -- done
19 corrective measures to address properly that risk, and I
20 believe Professor Philip Stark, who is the inventor of
21 risk-limiting audits, have written declarations to that
22 order later.
23     Q.  Thank you.
24         MR. MALONE:  99.
25         MR. CAIN:  Do you -- I didn't object to

Page 211

1 this but, nor do I have one, these are Plaintiff's
2 Exhibits and we've been kind of going, you know --
3         MR. MALONE:  Yeah.
4         MR. CAIN:  -- back and forth.  I'm fine
5 with us just running them all as Exhibit exhibits, but if
6 you want to just do it that way.
7         MR. MALONE:  That seems to make more
8 sense to me.
9         MR. CAIN:  That's how I typically do it.
10         (Exhibit 99: Affidavit of Harri Hursti -
11 marked for identification.)
12         (Discussion off the record.)
13     Q.  Mr. Hursti, you've just been handed a document
14 marked as Exhibit 99.  Have you seen this document
15 before?
16     A.  I believe so.  I think this is one of the
17 declarations.  I don't know if this is Pennsylvania --
18 no, Wisconsin.  Okay.  Yeah.  I wrote that the same time
19 as statements for Wisconsin, Pennsylvania, and maybe it
20 was Michigan; I don't remember.
21     Q.  And when you say the same time, if you could
22 turn to the last page of Exhibit 99, you're referring to
23 November 28th, 2016?
24     A.  Yep.  Yep, November 2016.
25     Q.  Now, this document, unlike the one you were

Page 212

1 just looking at, doesn't have a case caption on it.  So
2 my question to you is do you recall who the litigants,
3 who the parties were in this case?
4     A.  No.  I don't know.  I don't recall.  So, no.
5     Q.  Okay.
6     A.  I believe under general umbrella that these are
7 related to the recount requests originating from Jill
8 Stein campaign, but I don't know who are the actual
9 persons, and I'm not absolutely certain this is related,
10 but most of the things at that time were -- stemmed from
11 Jill Stein's effort to start a recount in those three
12 states.
13     Q.  And do you recall whether you were paid to
14 prepare this declaration?
15     A.  No, I was not paid.
16     Q.  Do you recall who asked you to prepare this
17 declaration?
18     A.  That is I would -- I -- if I have to guess I
19 would say a name Attorney and ex Deputy Secretary of
20 State of California Lowell Finley.  He was an attorney
21 who was involved and his law office was involved in some
22 of these things.
23         THE REPORTER:  I'm sorry.  He was an
24 attorney that was involved --
25     A.  His law firm was involved in some of these

Page 213

54 (Pages 210 - 213)

1 election litigations. But I cannot say for certain that
2 it was him, but that's my guess.
3     Q. Okay. A few statements I'd like to ask you
4 about. The first one on page 2 of this document,
5 referring to paragraph 4, and referring to the sentence
6 that says, Optical scan machines can be hacked in a
7 manner that changes election results, and such an attack
8 would likely go undetected during normal pre- and
9 post-election testing. Do you see that?
10    A. Which part is that?
11    Q. The first sentence of paragraph 4.
12    A. Paragraph 4.
13    Q. On page 2.
14    A. I'm on the wrong page. That's why I couldn't
15 find it. Paragraph 4. All righty. Yes.
16    Q. Okay. So just referring to that first sentence
17 paragraph 4, my question is whether that's an accurate
18 statement as you sit here today.
19    A. The systems which were used in Wisconsin at the
20 time are still used somewhere in the United States, and
21 if you have that system then it's true, because no one
22 has been writing a new software version for that
23 particular device.
24    Q. Moving on to paragraph 6, the same page.
25    A. May I add one thing, because there is a --

Page 214

1 there's something important here. When I'm talking about
2 pre- and post-election testing, especially pre-election
3 testing, that is usually a legal requirement called Logic
4 and Accuracy Testing of the voting system, and due to the
5 fact how these voting systems are operating, by design,
6 not by flaw, there is a gap which allows you to -- by
7 design uses a different logic during the Logic and
8 Accuracy Test different than --
9         THE REPORTER: Logic and --
10        THE WITNESS: And Accuracy Test, during
11 the --
12        MR. CAIN: Slow down, sir, and just take
13 a breath.
14    A. Okay. All right. So Logic and Accuracy
15 Testing is a legal requirement in a lot of states, and
16 some of the systems, most of the systems I would say
17 unfortunately were designed so that they are using
18 separate logic -- partially separate logic during the
19 Logic and Accuracy Test procedure than what is used on
20 the election day. To address that problem and feature
21 some states changed the regulation saying you cannot test
22 this machine using the vendor-provided logic and accuracy
23 testing operational procedure, instead you have to do the
24 testing as a real election, and that cures the problem I
25 have here described. So this is a -- the mitigation is a

Page 215

1 change in your state procedures and laws, and that takes
2 a lot of this problem away. So the mitigation is known
3 and it's up to the state whether they implement it or
4 not.
5     Q. And, to your knowledge, which states have
6 implemented those mitigation procedures?
7     A. My knowledge at that time a lot of people in
8 Florida counties which using that, a lot of counties
9 using that in New England, so Maine, Vermont,
10 Connecticut, New Hampshire, northern part of
11 Massachusetts, California. This became -- this was so
12 widely published that it was known for the Secretary of
13 State, and so there were a lot of places didn't implement
14 it immediately but step by step.
15        And we, by the way, published the
16 recommendation to change the procedure I believe 2006 or
17 2007, so maybe a decade before this paper. So I'm just
18 telling how slowly the wheels of legal system and
19 regulations are turning.
20    Q. And speaking of the slow-turning wheels, I'd
21 like to ask about the -- I believe you called it the
22 accidentally hardened Diebold machine in New Hampshire.
23    A. Yes.
24    Q. Explain, if you could, how it is that that
25 machine operates differently than most machines in use

Page 216

1 today in the United States.
2     A. So first the obvious one, that it is a paper
3 ballot system with hand-marked paper ballots. Great
4 because now you have the voter's intent recorded by the
5 voter himself, no ballot marking device to permanent
6 media, paper.
7         Now, if we look at technology, there are two
8 systems which are anciently old in their hardware. That
9 is the -- Diebold, so it was originally AccuVote,
10 A-c-c --
11        THE REPORTER: Did you say originally?
12    A. Originally marketed as AccuVote, A-c-c-u Vote.
13 That was by Global Election Systems. They were later
14 acquired by Dominion -- no -- later acquired by Diebold,
15 changed its name to be Premier, and later these systems
16 were maintained simultaneously by ES&S and Dominion after
17 the acquisition. So if you have this system you don't
18 know who is the maintenance party today.
19        So now this system is 1980s technology. It
20 uses a manufacturer called NEC, a Japanese company, their
21 knockoff copy of Intel CPU 80186, and they marketed it
22 with 9V20. They actually went to lawsuit and NEC had to
23 pay royalties to Intel because they copied it.
24        MR. CAIN: Can you spell NEC.
25        THE WITNESS: N-E-C, Nippon Electronics

Page 217

55 (Pages 214 - 217)

| | |
|---|---|
| 1 Corporation. | 1 you aware of any deletion of that memory card, of a |
| 2    A. This CPU predates internet. It predates just | 2 memory card? |
| 3 about everything. This machine was purpose built to be a | 3    A. There is a claim which has been repeated over |
| 4 voting machine. It's not like today most systems are | 4 and over claiming that I was deleting the memory cards. |
| 5 general purpose computers purposed to be a voting | 5 There's a repeated claim that I deleted the memory cards, |
| 6 machine. This was designed to be a voting machine. It | 6 and I refer to what's the actual recording because it |
| 7 doesn't have the horsepower to run TCP/IP stack. That's | 7 shows two things. First, it was not deleted, because |
| 8 control protocol/internet protocol. It doesn't have the | 8 otherwise we couldn't have run the election which we did |
| 9 horsepower, so. Also it doesn't have rewritable | 9 because the programming would have been gone. The second |
| 10 permanent media. The software itself lives on ROM, | 10 part is that we make a point that none of us are to |
| 11 read-only memory. So the voting machine cannot alter its | 11 physically touch anything, it was all done by sworn-in |
| 12 own programming because the program is on a microchip | 12 election officials who were volunteering to do this. So |
| 13 which requires an ultraviolet light first to erase it | 13 I wasn't even physically capable because I was not next |
| 14 and, second, it requires a voltage which is not present | 14 to the machine. But I know this false claim is coming up |
| 15 on the motherboard to reprogram it. So, hence, even if | 15 over and over and over again. |
| 16 you have a theoretical virus for that machine, the virus | 16    MR. CAIN: Okay. I'm sorry. You're |
| 17 cannot jump to the permanent programming. So then the | 17 probably close, but she needs a break. |
| 18 only vulnerability factor in that machine is the memory | 18    MR. MALONE: Okay. |
| 19 card. | 19    THE VIDEOGRAPHER: We're off the record. |
| 20    Q. Now -- | 20 The time is 4:46. |
| 21    A. And, furthermore -- I'm just completing this | 21    (Recess: 4:46 to 4:51 p.m.) |
| 22 whole thing. Furthermore, that device has two external | 22    THE VIDEOGRAPHER: We're back on the |
| 23 ports, a serial port and a modem port, and places like | 23 record. The time is 4:51. |
| 24 New Hampshire, based on my recommendation, physically | 24 BY MR. MALONE: |
| 25 severed the cables and erased -- take this motherboard | 25    Q. Okay. We are back on the record. Mr. Hursti, |
| Page 218 | Page 220 |
| 1 away, so they physically removed the components which | 1 we were discussing your November 28th, 2016 affidavit in |
| 2 could be used for theoretical vulnerabilities. | 2 Wisconsin. I believe you had more you'd like to say |
| 3    THE REPORTER: Could be used for? | 3 about that. |
| 4    THE WITNESS: To exploit theoretical | 4    A. If I complete the thing about allegations that |
| 5 vulnerabilities. | 5 memory card was deleted -- |
| 6    A. So there's multiple factors why that machine, | 6    THE REPORTER: That what? |
| 7 to my surprise, I honestly can say it's one of the best | 7    THE WITNESS: The memory card was |
| 8 right now, if not the best, and it was still the first | 8 deleted. |
| 9 one ever hacked. That is the first to hack. This is the | 9    THE REPORTER: About allocations? |
| 10 first demonstration of hack which can change the outcome | 10    THE WITNESS: Allegations. |
| 11 to the election in a real machine used in elections, and | 11    THE REPORTER: Of memory -- |
| 12 that is the same machine we're talking about. | 12    THE WITNESS: Card being deleted. |
| 13    Q. And that machine was in use in Windham, | 13    A. So, first of all, the procedure which we did |
| 14 New Hampshire in 2020; correct? | 14 was explained, it's in the audio and video recording. |
| 15    A. Correct. And it was used in Georgia before it | 15 Also you can FOIA that from an e-mail. FOIA, Freedom of |
| 16 was replaced by the current Dominion system. | 16 Information Act. It's in an e-mail from me to Deputy |
| 17    Q. And it's your testimony that the only | 17 Attorney General Anna Edwards that explains the |
| 18 vulnerability factor -- or I should say the primary | 18 procedure. And the procedure was done in the very |
| 19 vulnerability factor is the memory card; is that fair? | 19 beginning. The memory card contains the ballot |
| 20    A. Yes. You cannot prove a negative, but over the | 20 definition, it tells where the candidates, their names |
| 21 long time we haven't found an alternative way. If the | 21 are. If the memory card is deleted you cannot run the |
| 22 modem and the serial port are severed physically, then | 22 election. And we ran each machine I believe 38 elections |
| 23 the memory card seems to be the only way to alter the | 23 after that alleged point that it was deleted. If it |
| 24 functionality of the machine. | 24 would have been deleted or erased none of that would have |
| 25    Q. And in Windham, New Hampshire specifically are | 25 happened. So the video which we have provided in this in |
| Page 219 | Page 221 |

56 (Pages 218 - 221)

1 Attorney General's or Secretary's website, that already
2 proves that the claim is wrong.
3    Q.  You talked a bit about the $5 million prove
4 Mike wrong challenge at the Cyber Symposium, and I want
5 to make sure that I understand your testimony from
6 earlier today on that. Did you end up making a claim for
7 that $5 million?
8    A.  I have been making a claim for that and I have
9 been -- and I'm still considering my legal options
10 because of the continuing defamation of Mr. Lindell --
11       THE REPORTER: Because of the what?
12       THE WITNESS: Defamation. Continuing
13 defamation.
14    A.  -- of myself as recent as within the last month
15 using my name and making false claims. So I have not
16 ruled out a legal action in this matter, so. And when I
17 made the claim they -- that was at the end of the first
18 day and they say we don't accept your claim because it's
19 off the table, we don't accept your claim.
20    Q.  Okay. And who said that to you?
21    A.  I -- I -- so that was the woman who I think who
22 was with this -- trying to get this agreement, and she
23 was the person treating us and checking who was
24 registered. She was the woman who was -- this agreement
25 was supposed to be returned to. So the final person I

1 Q.  Okay. So the criticism that you're -- well, I
2 won't call it a criticism. Your observation in this
3 section relates to how the county officials were
4 operating the voting system; correct?
5    A.  Correct. Let me be more specific. I traveled
6 extensively until I lived in Georgia for six months in a
7 hotel during 2020 elections, so I went to different
8 counties. My expectation was that all counties will
9 operate the system the same way. I was proven wrong. I
10 found big variations how different counties are operating
11 the system and that's why I'm specifically saying here
12 Fulton County. Some other counties might operate in a
13 more secure way. This is a commentary specifically how
14 Fulton County is operating, how the human process is, how
15 their physical world thinks how they do it is working.
16 That's -- the risks which they have in the system could
17 be -- their system could be operating way more securely
18 and safely than what Fulton County is doing.
19    Q.  And is it fair to say that part of your role in
20 all of what we've been talking about in election security
21 is to help guide county officials into performing what's
22 called best practices in how they manage their elections;
23 is that fair?
24    A.  That is fair, and the other part a number of
25 Secretaries of State have been actually asking me to

1 tried to give my quickly written note was her, and she
2 refused to take it, saying the offer is no longer valid,
3 it's no longer -- she used the phrase no longer on the
4 table.
5    Q.  But you don't know that person's name as you
6 sit here?
7    A.  I might have been able to find it, but she was
8 just you know -- no, I don't have the name right now, and
9 I don't know if for certain if I have that name anywhere.
10       MR. MALONE: Okay. That's all the
11 questions I have at this time, Mr. Hursti. Thank you.
12       THE WITNESS: No problem.
13 REDIRECT EXAMINATION
14 BY MR. CAIN:
15    Q.  A quick follow-up. On Exhibit -- you don't
16 have to turn to it, it's Exhibit 98, it's the Curling
17 declaration that counsel for Mr. Lindell talked to you
18 about. He pointed you to subsection (b) on page 3 of
19 that document. The line item was, in your declaration,
20 The voting system is being operated in Fulton County in a
21 manner that escalates the security risk to an extreme
22 level. The reference to "is being operated," who is --
23 who are you referring to, who are the people that are
24 operating the voting system?
25    A.  The county.

1 draft legislation how to make it more secure and those
2 things have been passed, and I have to proudly say that
3 one of the last pieces which I drafted was Senate Bill 43
4 in New Hampshire and it passed 24 to zero, both
5 Republicans and Democrats unanimously voted for it.
6       MR. CAIN: Thank you for bringing our
7 political parties together. That's all I have for you.
8       THE VIDEOGRAPHER: This concludes today's
9 deposition. We're off the record at 4:58.
10       (Deposition concluded: 4:58 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| | |
|---|---|
| 1    I, HARRI HURSTI, have read the foregoing | 1      C E R T I F I C A T E |
| 2  transcript of the testimony given at my deposition on | 2      I hereby certify that I am a Notary Public, in |
| 3  March 30, 2023 and it is true and accurate to the best of | 3  and for the State of Connecticut, duly commissioned and |
| 4  my knowledge and belief as originally transcribed and/or | 4  qualified to administer oaths. |
| 5  with the changes as noted on the attached Correction | 5      I further certify that the deponent named in |
| 6  Sheet. | 6  the foregoing deposition was by me duly sworn and |
| 7 | 7  thereupon testified as appears in the foregoing |
| 8 | 8  deposition; that said deposition was taken by me |
| 9      _____ | 9  stenographically in the presence of counsel and reduced |
| 10      HARRI HURSTI | 10  to print under my direction, and the foregoing is a true |
| 11 | 11  and accurate transcript of the testimony. |
| 12 | 12      I further certify that I am neither of counsel |
| 13      SUBSCRIBED AND SWORN TO BEFORE ME, the | 13  nor related to either of the parties to said suit, nor am |
| 14  undersigned authority, on this the _____ day | 14  I interested in the outcome of said cause. |
| 15  of_____, 2023. | 15      Witness my hand and seal as Notary Public this |
| 16 | 16  20th day of April, 2023. |
| 17      _____ | 17 |
| 18      Notary Public | 18      _____ |
| 19 | 19      Notary Public |
| 20 | 20      June Keefer |
| 21 | 21 |
| 22  My commission Expires: _____ | 22  My commission expires: 7/31/2025 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 226 | Page 228 |

| | |
|---|---|
| 1      WITNESS INDEX | 1  Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al |
| 2          PAGE | 2  Harri Hursti Job No. 5768454 |
| 3  Direct Examination by Mr. Cain        4 | 3      E R R A T A   S H E E T |
| 4  Cross Examination by Mr. Malone      197 | 4  PAGE_____ LINE_____ CHANGE_____ |
| 5  Redirect Examination by Mr. Cain      223 | 5  _____ |
| 6 | 6  REASON_____ |
| 7 | 7  PAGE_____ LINE_____ CHANGE_____ |
| 8 | 8  _____ |
| 9      EXHIBIT INDEX | 9  REASON_____ |
| 10  EXHIBIT    DESCRIPTION        PAGE | 10  PAGE_____ LINE_____ CHANGE_____ |
| 11 | 11  _____ |
| Exhibit 90    HH 000199-207        47 | 12  REASON_____ |
| 12 | 13  PAGE_____ LINE_____ CHANGE_____ |
| Exhibit 91    HR 000024        52 | 14  _____ |
| 13 | 15  REASON_____ |
| Exhibit 92    HR 000906-916        94 | 16  PAGE_____ LINE_____ CHANGE_____ |
| 14 | 17  _____ |
| Exhibit 93    HR 000115-116        122 | 18  REASON_____ |
| 15 | 19  PAGE_____ LINE_____ CHANGE_____ |
| Exhibit 94    HH 001368-1390        124 | 20  _____ |
| 16 | 21  REASON_____ |
| Exhibit 95    HH 001175-1179        139 | 22 |
| 17 | 23  _____  _____ |
| Exhibit 96    HH 000023-30        165 | 24  Harri Hursti        Date |
| 18 | 25 |
| Exhibit 97    Data stick        174 | Page 229 |
| 19 | |
| Exhibit 98    Exhibit 107, Curling case    209 | |
| 20 | |
| Exhibit 99    Affidavit of Harri Hursti, 11/28/16  212 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| Page 227 | |

58 (Pages 226 - 229)

1  malone@parkerdk.com
2                    April 20, 2023
3  RE: Coomer, Eric, Ph.D. v. Lindell, Michael J., Et Al
4  DEPOSITION OF: Harri Hursti 5768454
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11      The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18                    Yours,
19                    Veritext Legal Solutions
20
21
22
23
24
25
                                            Page 230

Veritext Legal Solutions
800-336-4000

1              C E R T I F I C A T E

2              I hereby certify that I am a Notary Public, in

3    and for the State of Connecticut, duly commissioned and

4    qualified to administer oaths.

5              I further certify that the deponent named in

6    the foregoing deposition was by me duly sworn and

7    thereupon testified as appears in the foregoing

8    deposition; that said deposition was taken by me

9    stenographically in the presence of counsel and reduced

10   to print under my direction, and the foregoing is a true

11   and accurate transcript of the testimony.

12             I further certify that I am neither of counsel

13   nor related to either of the parties to said suit, nor am

14   I interested in the outcome of said cause.

15             Witness my hand and seal as Notary Public this

16   20th day of April, 2023.

17

18   _____

19             Notary Public

20             June Keefer

21

22   My commission expires: 7/31/2025

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3          CIVIL ACTION NO: 1:22-CV-01129-WJM

-------------------------------------------x

4     ERIC COOMER, Ph.D.,                        :

5                         Plaintiff,             :

6                                                :

                  -versus-

7                                                :

8     MICHAEL J. LINDELL, FRANKSPEECH LLC,       :

      and MY PILLOW, INC.,

9                                                :

                        Defendants.

10    -------------------------------------------x

11

12

13

14            Videotaped Deposition of HARRI HURSTI,

15       taken pursuant to Subpoena, Notice, and the Federal

16       Rules of Civil Procedure, at Regus, 500 West Putnam

17       Avenue, Greenwich, Connecticut, before June Keefer,

18       RMR, RPR, a Notary Public in and for the State of

19       Connecticut, on March 30, 2023, at 10:10 a.m.

20

21

22

23

24

25

                                              Page 1

1              C E R T I F I C A T E

2              I hereby certify that I am a Notary Public, in

3    and for the State of Connecticut, duly commissioned and

4    qualified to administer oaths.

5              I further certify that the deponent named in

6    the foregoing deposition was by me duly sworn and

7    thereupon testified as appears in the foregoing

8    deposition; that said deposition was taken by me

9    stenographically in the presence of counsel and reduced

10   to print under my direction, and the foregoing is a true

11   and accurate transcript of the testimony.

12             I further certify that I am neither of counsel

13   nor related to either of the parties to said suit, nor am

14   I interested in the outcome of said cause.

15             Witness my hand and seal as Notary Public this

16   20th day of April, 2023.

17

18   _____

19                   Notary Public

20                   June Keefer

21

22   My commission expires: 7/31/2025

23

24                                          Page 228

25

DocuSign Envelope ID: 568B02C2-F1A7-4F63-AEB1-D8A9D7F5F055

1          I, HARRI HURSTI, have read the foregoing

2     transcript of the testimony given at my deposition on

3     March 30, 2023 and it is true and accurate to the best of

4     my knowledge and belief as originally transcribed and/or

5     with the changes as noted on the attached Correction

6     Sheet.

7

8                              DocuSigned by:

9                         _Harri Hursti_____
                               0FF987E804544AD...

10                              HARRI HURSTI

11

12

13          SUBSCRIBED AND SWORN TO BEFORE ME, the

14     undersigned authority, on this the _____ day

15     of_____, 2023.

16

17                         _____

18                              Notary Public

19

20

21

22     My commission Expires: _____

23

24

25

                                             Page 226

DocuSign Envelope ID: 568B02C2-F1A7-4F63-AEB1-D8A9D7F5F055

**Coomer, Eric, Ph.D. v. Lindell, Michael J., et al**
**Harri Hursti Job No. 5768454**

## ERRATA

Page 12
Line 11
Change Helenius
Reason Correct spelling of the name

Page 12
Line 16
Change Helenius
Reason Correct spelling of the name

Page 19
Line 2
Change Subcontractors
Reason mishearing

Page 20
Line 1
Change backoffice
Reason mishearing

Page 25
Line 4
Change there is -> there were
Reason past tense

Page 33
Line 19
Change Windham county -> Windham Town
Reason Windham is a Town in Rockingham County

Page 65
Line 22
Change queue -> clue
Reason mishearing

Page 66
Line 21
Change ANSI = American National Standards Institute, but I ment ARIN = American
Registry for Internet Numbers
Reason misunderstanding

DocuSign Envelope ID: 568B02C2-F1A7-4F63-AEB1-D8A9D7F5F055

Page 71
Line 5
Change CAPs
Reason mishearing

Page 79 / 80 Characterization of David and Peter as confidential lines 79/23 - 80/15

Page 85
Line 15
Change Friction
Reason mishearing

Page 86
Line 23
Change "Eddie Rob" -> edirob
Reason mishearing

Page 91
Line 7
Change dataset -> datastream
Reason mishearing

Page 96
Line 9
Change trap -> trade
Reason mishearing

Page 100
Line 4
Change four -> three
Reason mishearing

Page 103
Line 9
Change Jackal -> Jackyl
Reason mishearing

Page 104
Line 2
Change married ->
Reason no idea what the word I said would be

Page 108
Line 23
Change CHA -> CJH
Reason misspelling

DocuSign Envelope ID: 568B02C2-F1A7-4F63-AEB1-D8A9D7F5F055

Page 109
Line 18
Change where -> wear
Reason misheard


Page 130
Line 9
Change workshop -> whatsapp
Reason misheard


Page 137
Line 2
Change clean -> green
Reason misheard


Page 148
Line 13
Change American Computer Machinery - Association for Computing Machinery
Reason misheard


Page 159
Line 22
Change Gold -> Gould
Reason misheard


Page 178
Line 3
Change Wildly -> widely
Reason misheard


Page 185
Line 20
Change Graphy, cryptography
Reason misheard


Page 205 Characterization of Josh/Spyder as confidential, lines 13-15


Page 207
Line 17
Change Keith -> J. Keet
Reason misheard / misspelled

DocuSign Envelope ID: 568B02C2-F1A7-4F63-AEB1-D8A9D7F5F055

Page 219
Line 22
Change 9V20 -> V25
Reason misheard / misspelled

Page 218
Line 8
Change add word "Transmission" before word control

Page 221
Line 17
Change Anne