1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

ERIC COOMER, Ph.D.,                     Case Number
                                        22-CV-1129-NYW-SPB
        Plaintiff,

        vs.                             Denver, Colorado

MICHAEL J. LINDELL, FRANKSPEECH
LLC, and MY PILLOW, INC.,               April 21, 2025
                                        1:32 p.m.
        Defendants.

---

TRANSCRIPT OF FINAL PRETRIAL CONFERENCE PROCEEDINGS

BEFORE THE HONORABLE NINA Y. WANG
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:      ASHLEY N. MORGAN
                        Cain & Skarnulis PLLC
                        303 Colorado Street
                        Suite 2850
                        Austin, TX 78701

                        BRADLEY A. KLOEWER
                        CHARLES J. CAIN
                        Cain & Skarnulis PLLC
                        PO Box 1064
                        Salida, CO 81201

                        DAVID M. BELLER
                        Recht & Kornfeld, P.C.
                        1600 Stout Street
                        Suite 1400
                        Denver, CO 80202

22-CV-1129

2

APPEARANCES:   (Cont.)


For the Defendants:       CHRISTOPHER I. KACHOUROFF
                          Dominion Law Center PC
                          13649 Office Place
                          Suite 101
                          Woodbridge, VA 22192



            *MEGAN E. STRAWN, RPR, CRR (via video)*
            *111 S. Wolcott Street, Casper, WY 82601*
          *307.232.2626 * strawnreporting@gmail.com*

        *Proceedings reported with realtime stenography;*
     *transcript produced with computer-aided transcription.*

22-CV-1129

3

(Proceedings commenced at 1:32 p.m., April 21, 2025.)

THE COURT:  Good afternoon.  We are on the record in 22-CV-1129-NYW-SPB, Coomer versus Lindell, et al.

Could I have appearances of counsel, please.

MR. CAIN:  Good afternoon, Your Honor.  My name is Charlie Cain for the Plaintiff, and with me is Ashley Morgan, Brad Kloewer, and David Beller.

THE COURT:  Good afternoon, Counsel.

MR. KACHOUROFF:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. KACHOUROFF:  Chris Kachouroff appearing for Mike Lindell, My Pillow, and Frankspeech.

THE COURT:  Good afternoon.

And let me just make sure I'm pronouncing your last name correctly.  Is it "Kachouroff"?

MR. KACHOUROFF:  That's perfect, Your Honor.

THE COURT:  Okay.  Thank you.

All right.  We are here for a final pretrial conference in this case.  I've been through your proposed final pretrial order.  We have a number of issues to discuss today, and then I will answer whatever questions that you may have to get us ready for trial.

Let me just pull up the final pretrial order here.

All right.  Unless you-all have a different order that you want to go through, I typically go through the final

22-CV-1129

4

pretrial order, and then we'll talk about questions that you-all had or raised with respect to each phase of the trial. And what I mean by that is, we'll talk about the final pretrial order.  Then we'll talk about the voir dire process, the preliminary jury instructions.  And then we'll talk about the allotments for time, and then we'll take any argument at the end with respect to the motion in limine.

How does that sound to everyone?

MR. KACHOUROFF:  I didn't hear the last part.  I'm sorry.  You said motions in limine?

THE COURT:  Yes.

MR. CAIN:  Sounds great, Your Honor.

THE COURT:  All right.  So moving through the proposed final pretrial order, the first thing that I get to is the Defendants' claims -- I'm sorry -- the Defendants' statement of defenses.  And then, Mr. Kachouroff, I had some questions about these defenses that are reflected on page 5 -- I'm sorry -- page 6 of the proposed final pretrial order.

So it says that:  *Lindell and Frankspeech assert that their statements were expressions of opinions rather than factual claims.*  I've stricken that because unless you have other authority, my understanding is that whether or not the statements are opinions rather than factual claims is a question of law that the Court resolved at the motion-to-dismiss phase.

22-CV-1129

5

So I wanted to raise that to you and see if you had any authority that you wanted to point me to.

MR. KACHOUROFF:  As the Court knows, the standard on the motions-to-dismiss phase is a little bit different.  I still contend, and I'm preserving the record for our client if we were to appeal this case -- and I'm not presuming that we would -- but the idea that calling somebody a traitor, there's plenty of Supreme Court cases -- I believe we cited some -- that talk about that alone does not constitute a statement of fact.  It's an opinion.

THE COURT:  I understand that position, and I understand you preserving that question of law for the appellate court, if necessary.

What I don't -- maybe I'm misunderstanding this statement.  I don't believe that you can re-raise that before the jury because it's a question of law that's already been resolved by the Court at this stage of the motion to dismiss. It's not a question of fact to be resolved by the jury.

So unless you have authority -- which, again, if you do, I welcome it -- that won't be a defense that is presented and argued to the jury.

MR. KACHOUROFF:  That the word "traitor" is a factual statement?  Is that what the Court is saying?

THE COURT:  Correct.  The Court has already made a determination that the statement is a statement of fact --

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

22-CV-1129

6

MR. KACHOUROFF:  Correct.

THE COURT:  -- that is actual -- pursuant to a defamation action.

MR. KACHOUROFF:  Right.

THE COURT:  So you won't be arguing to the jury that it is not a question -- a statement of fact, but it is an issue of opinion.

MR. KACHOUROFF:  I understand that, Your Honor.

THE COURT:  Okay.

MR. KACHOUROFF:  Again, it's done for preservation only.

THE COURT:  All right.  Thank you.

And then the -- I also have a question for the next sentence.  The next sentence says:  *Frankspeech invokes immunity under Section 230 of the Communications Decency Act, claiming it is not liable for third-party content.*

So again, I'm looking for authority with respect to a private party's invocation of immunity under Section 230 of the Communications Decency Act in the context of a defamation action.

MR. KACHOUROFF:  I do not have authority as I stand here today.  I can supplement my filings later.  I did not know that was going to be an issue, Your Honor.

THE COURT:  Okay.

MR. KACHOUROFF:  Other than the section itself.

22-CV-1129

7

THE COURT:  So what I would be looking for, Mr. Kachouroff, is authority that is specific to -- to, obviously, what we have in front of us, which is a defamation -- a private right of action of defamation and then the invocation of Section 230 of the Communications Decency Act.  So -- as a defense to what I understand, as stated here, to the defamatory remarks.  Okay?

MR. KACHOUROFF:  Yes, Your Honor.

THE COURT:  All right.

MR. KACHOUROFF:  Your Honor, may I -- I can pop up and down as much as you want me to --

THE COURT:  You can remain seated as long as you're speaking into the microphone so that we can record and that our court reporter can hear.

MR. KACHOUROFF:  Yes, Your Honor.  Thank you.

THE COURT:  So I think you might have the same answer for me for the -- some of the remainder of the defenses.  So I'll just raise these, and then I'm going to set a deadline for supplementation of authority for these defenses.

So again, I'm unclear how contributory negligence or unclean hands can be a defense to any of the causes of action that we have in this case.  As I understand it, there is the defamation cause of action, the intentional infliction of emotional distress, and the civil conspiracy.

So what I'm looking for, unless you have it today, is

22-CV-1129

8

contributory negligence, unclean hands, prior settlements by other parties being a bar to his claims or that damages should be offset by the statements or actions by third parties.  And then also, as I understand it, if the statements are found to be defamatory or not otherwise protected by the First Amendment, Defendants maintain that they are substantially true.

So as I understand it, "substantially true" could be a defense to defamation; but once a jury finds that statements are defamatory, I'm not sure how they could be otherwise protected under the First Amendment.

MR. KACHOUROFF:  All of the case law -- so it's a two-step.  You have to find that it was done maliciously.

THE COURT:  Correct.

MR. KACHOUROFF:  Because if it's defamatory, that doesn't escape the First Amendment restrictions.  You still have to show that it was made with malice.  That's the key.

THE COURT:  All right.  So I understand that, and so maybe I'm just misunderstanding this statement.  So what you're saying is not that there has been a finding of defamation and somehow the First Amendment is still a defense; is that correct?  Because once they satisfy the two elements and there's a finding of liability for defamation, my understanding is there's not a separate First Amendment defense once that occurs.

22-CV-1129

9

MR. KACHOUROFF: If they find that the statements are defamatory and made maliciously, that would take it out of the First Amendment defense.

THE COURT: Okay. Great.

All right. So again, since we're coming upon this pretty quickly and I want to make sure that the final pretrial order is in place, I'm going to set a deadline for you to submit any authority that you want me to consider with respect to these defenses.

Can you get that submitted no later than May 2nd so that we can make any adjustments that we need to?

MR. KACHOUROFF: Can we make it the 5th?

THE COURT: Okay.

MR. KACHOUROFF: I have a summary judgment brief due in another case on the 2nd.

THE COURT: All right. So we will set that deadline for authority with respect to these defenses for May 5th.

All right. So then moving on down through the final pretrial order, the next thing I get to is stipulations. So you-all don't have any factual stipulations. And then it's -- I'm not entirely certain if this Defendants' proposed stipulated applicability of statutes, law, evidence, and facts just means that you-all are stipulating to the admissibility of all exhibits unless an objection is noted.

This section of the final pretrial order really goes

22-CV-1129                                                          10

to stipulations of facts and potentially law that go to the jury as part of their fact-finding mission, so not really with respect to admissibility.

So let me push you-all on this.  I know this is a case that is hard-fought, but it seems like there should be some factual stipulations that you-all can make.

So have you met and conferred about that?  For instance, is it really disputed that Dr. Coomer was employed by Dominion Voting Systems?

MR. CAIN:  We have met and conferred and, obviously, to little effect.  But there's no -- there is a number, I think, of stipulations that we can agree to, and I think we need to work harder on it.

MR. KACHOUROFF:  I'll just note, Your Honor, de minimis objections at trial like does he work for Dominion, those aren't things that are material to me.  I'm not going to sit there -- I don't see how that's material to the case.  But regardless, those aren't things that we would be disputing.

THE COURT:  Right.  So I'm going to make you-all go back and work a little bit harder on these factual stipulations.  I do think that, in my experience as a trial court judge, it's helpful for the jury to have factual stipulations.  It helps guide them.  It also helps guide the preliminary jury instructions in terms of what they're -- putting their framework together of what they're trying to

22-CV-1129

11

understand as the evidence comes in.

And so I'm going to set a deadline of, again, May 5th for you-all to meet and confer and propose additional factual statements that can be stipulated to.

All right.  The next thing we have on our list are pending motions.  There was a pending motion for substituted service of the trial subpoena on Mr. Joseph Oltmann that was unopposed.  That was Docket Entry 306.  That was granted by the Court at Docket Entry Number -- I'm sorry.  The motion was Docket Entry Number 302; it was granted by the Court at Docket Entry Number 306.

Mr. Cain, any updates with respect to the service of Mr. Oltmann?

MR. CAIN:  Mr. Corporon acknowledged receipt of the subpoena via email.  We also sent a certified copy.  We have not received a return receipt.  Mr. Corporon stated that he has not been engaged by Mr. Oltmann in this case.  So he's saying he's not his lawyer at least with respect to this matter.

And that's been the sum total of our communications.

MR. KLOEWER:  Sorry, Your Honor.  I can supplement that a bit.

(Reporter interruption.)

MR. KLOEWER:  So we sent the subpoena to Mr. Corporon last week.  He confirmed receipt on Wednesday.  We asked -- at

22-CV-1129

12

which point he indicated that he was going to speak with Mr. Oltmann and would get back to us.

On Friday I reached back out to him to confirm whether he had had that conversation and whether Mr. Oltmann intended to comply and honor the subpoena. We've gotten no response to that communication as of this hearing.

So it's still unclear whether Mr. Oltmann himself has been provided a copy of that subpoena, but it is our understanding that Mr. Corporon is aware of it and has a copy of the order, as well.

THE COURT: Okay.

MR. KACHOUROFF: May I ask a silly question? Have we tried to serve him personally?

MR. KLOEWER: Yes. On a related note, Your Honor, we have made multiple efforts to serve Mr. Oltmann in this case. I believe -- we can submit a supplemental affidavit from our process server -- at least four additional occasions where we've attempted to do that, and that's been in conjunction with subpoenas in related cases.

But we have made numerous efforts both through the Douglas County Sheriff's Department and through private process servers both at his home and his place of business in Greenwood Village. All of those attempts have been unsuccessful.

THE COURT: All right. So my understanding from your

22-CV-1129                                                        13

submissions is that there's some argument on May 14, 2025, before the -- oh.  It's not an argument.  So the issue with respect to Mr. Oltmann's sanctions in a different case is before the Tenth Circuit without oral argument on May 14th, 2025; is that right?

MR. KLOEWER:  That's correct, Your Honor.  There's a lot of moving pieces with respect to Mr. Oltmann, which I'm sure we'll be discussing throughout the day.

He has been held in contempt by Judge Martinez.  He fled a deposition in this courthouse last June without answering questions that he had been ordered to answer by Judge Starnella.  He was subsequently held in contempt.  He has appealed that contempt order to the Tenth Circuit.

That's fully briefed.  The Court has denied his request for oral argument and indicated that it will rule just on the briefs, as you noted, on May 14th, I believe, at which point we'll see if it gets kicked back to the district court in the related case against Make Your Life Epic, LLC, and Clay Clark.  So that issue is still pending.

THE COURT:  All right.  All right.  The next thing that I have made an edit to with respect to the final pretrial order is the Plaintiff's motion in limine that's pending.  That's Docket Entry 279.  I believe it was filed on February 10th, 2025.  So that's also going to be reflected in the final pretrial order.

Megan E. Strawn, RPR, CRR                          (307) 232-2626

22-CV-1129

14

Now, I do have some questions with respect to the witness lists. First of all, it looks like Brannon Howse is listed both as a live witness who will be present on behalf of Defense, but then he is also listed as a deponent witness where testimony is expected to be presented by means of deposition by Plaintiff.

So I'm just trying to get some clarity as to whether or not we believe Mr. Howse is actually testifying. He's also listed, I believe, as a witness for the deposition for Defense, too.

So do we know whether or not Mr. Howse is going to be here live or be presented by deposition?

MR. CAIN: So we deposed him. He lives in Tennessee.

THE COURT: Okay.

MR. CAIN: So we don't have control when he's obviously out of subpoena range. That's why we have him listed as such. He obviously worked with Frankspeech before during the incidents that we're here about. But it would be up to the Defendants to bring him here live if he's going to agree to it.

THE COURT: All right. Mr. Kachouroff?

MR. KACHOUROFF: Judge, we are trying to get these people live. So if you see a live witness there and also a designation on the transcript, that's just a fallback position. My intent is that these people will be made

22-CV-1129

15

available.

THE COURT: All right. Okay. So I think it's clear to you-all, consistent with regular practice, he'll either only be presented by deposition or he'll only be live.

MR. KACHOUROFF: Correct, Your Honor.

THE COURT: And just so you-all know, and we'll talk a little bit more about trial practice as we get to those phases of this proceeding, but I do require the parties to exchange 24 -- at least 24 hours in advance who should be anticipated on the next day so that no one is surprised by that.

We'll also talk about this when we talk about the trial practice, but witnesses generally only appear once. So that means if a witness is on both sides' witness list, that person will be presented for Plaintiff, cross-examined by Defense. You're going to get a little bit more leeway with respect to a cross-examination if that person is also on your witness list or affirmative witness list. Then there will be reply, I guess cross combined. And then if that person is on the Defense witness list, then there will be the last cross-examination.

But unless there is some extraordinary reason to recall a witness, witnesses go up and down in one setting.

Does that make sense to everybody?

Okay. All right. Then -- and this is just a matter

22-CV-1129

16

of practice, Mr. Kachouroff, but on the witness list that is not reflected within the final pretrial order, there is a catchall.  Let's see.  It says:  *Any witness identified by Plaintiff and not objected by Defendants.*  I don't permit those kinds of catchalls.  I don't see one on Plaintiff's list.  So just so you know, just as a matter of practice, I always strike those.

All right.  The next issue or sets of issues that I want to talk to you about with respect to witnesses do relate to Mr. Oltmann.  So -- and this is partly reflected in the Plaintiff's questions to the Court.

And so the Plaintiff states:  *If Oltmann is served but does not appear, Plaintiff intends to request, one, a jury instruction with a negative inference due to his non-compliance and, two, the ability to designate and present prior deposition testimony.*

I don't think there's an issue with respect to the ability to designate and present prior deposition testimony.

Have you-all made those designations and exchanged them with each other?

MR. KLOEWER:  Your Honor, I have prepared those designations.  We have not exchanged them with counsel for the Defendants yet.  I can do that today if it would assist.  But we were waiting to see if that would be an option the Court would be willing to consider.

22-CV-1129                                                                17

THE COURT:  All right.  And then, Mr. Kachouroff, I assume that you'll have counterdesignations or objections, so I'll leave that up to you-all.  I do think that because we don't know whether or not Mr. Oltmann is going to appear or not, it makes sense to start exchanging those so that you're ready for those and, for my purposes, if you-all have objections, that I have an opportunity to rule on those.

Was he taken by video, or will he be read by someone sitting on the stand?

MR. KLOEWER:  He was taken by video, Your Honor. We've taken multiple depositions of Mr. Oltmann in related proceedings.  The designations we have prepared are for this case.  But to the extent the Court would be willing to consider deposition testimony from other cases, we'd like to designate that at this point, as well.

THE COURT:  So, Mr. Kloewer, unless you have authority that allows -- because he's not a party to this case.  So generally speaking, I don't think the Federal Rules of Civil Procedure or Evidence allow you to designate his testimony from a different action in this case.

Again, if you have authority that you want me to review on that issue, I'm happy to do so.  But I think you would have to establish that he's somehow in privity or -- because he's not a party.  So we would have to have some sort of other mechanism to allow those depositions to come in.

22-CV-1129

18

MR. KLOEWER:  That may be correct, Your Honor.  It may depend on, you know, his availability and how that shakes out with respect to the service of his subpoena.

So for the time being, we'll go with his testimony in this case.

THE COURT:  All right.  So I'm going to set that same deadline of May 5th -- May 5th is going to be a big day for you-all -- for you-all to exchange those designations, and then also alert the Court if there are objections that I need to rule on.

MR. KACHOUROFF:  Just to be clear --

THE COURT:  Yes.

MR. KACHOUROFF:  -- my designations are -- a lot of them will be responding to their designations, as well.  So I will work with them to try to get their designations ahead of time and get back to them.

THE COURT:  All right.  But if you have your own designations, you also need to identify those.

MR. KACHOUROFF:  Okay.

THE COURT:  So I don't know if you will, but if there are -- if there's testimony from Mr. Oltmann that the Defense is intending to rely upon that might not be proffered by the Plaintiff, you need to separately designate those.

MR. KACHOUROFF:  Like I said, Judge, I won't know until I see their designations.  They have the burden going

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

22-CV-1129                                                                    19

forward.  So I don't know what they intend to designate or not designate.  If they didn't designate anything, I probably wouldn't designate.  So . . .

THE COURT:  All right.  The other thing, Mr. Kloewer, for you-all to identify for the Court is authority.  Again, this might be premature at this point, so I'm not going to make it due before May 5th, 2025.  But something that you-all should think about is to the extent that Mr. Oltmann does not appear, I don't know of any authority, sitting here today, that allows me to give -- draw an adverse inference and instruct the jury on an adverse inference based on Mr. Oltmann's non-appearance.

Again, he's not a party to this lawsuit.  We have granted alternative service.  And to the extent that he is evading service, I'm not sure what authority you have, but I'll need any authority that you have to the extent that you want some sort of adverse inference instruction.  And Defendants will have an opportunity to respond to that.

But sitting here today, that is not something that I know of right now, and so I will need to know the legal basis for that.  Okay?

Finally, there is this issue with respect to if Mr. Oltmann does appear, Plaintiff anticipates he will once again claim that he is shielded by the reporter's privilege, and the Court will likely need to address any renewed

22-CV-1129

20

assertions of the privilege.

Again, that seems to me that we have to wait to see whether or not Mr. Oltmann will, in fact, appear.  And if he does, in fact, appear and invokes the reporter's privilege, or even before that, if we know he is going to appear in court, that seems like the type of thing that I would take either at the beginning of the day before we bring the jury in, over the lunch period, or after we excuse the jury.

So we won't obviously hear it within the purview of the jury, but we'll need to figure out if he's going to show up.  And then, timing-wise, we use those mornings, the breaks, the lunch breaks, and after we excuse the jury to deal with those legal issues.  And hopefully, we can do that the day before Mr. Oltmann appears.  But if we're not sure if he's going to appear or not, we may have to do that contemporaneously.

Okay?

MR. CAIN:  Will the Court accept trial briefing on that issue at that time during the hearing?  Because we have a fair amount of it.  If we need to go and have a separate hearing, I'd like to present that to you.

THE COURT:  I'm certainly willing to accept trial briefing.  Again, it seems a little bit premature right now because we just don't know if he's going to show up.  And so if he doesn't show up and you're designating deposition

22-CV-1129

21

testimony and I'm ruling on objections with respect to deposition testimony, that's one thing.

If he does show up and he invokes the privilege, or even before he invokes the privilege, then at that point, if we think he's going to show up, then I will take whatever briefing we need to.

Okay?

MR. CAIN:  Thank you.

THE COURT:  All right.  Let's see.

All right.  Any issues with respect to the parties' witness lists that arise from Rule 26?

MR. CAIN:  Not on our end.

THE COURT:  For Defendants?

MR. KACHOUROFF:  I apologize for my ignorance, Your Honor, but when you say with respect to Rule 26, do you mean that haven't been disclosed?

THE COURT:  Right.  Anything that might be subject to 26 or 37.

MR. KACHOUROFF:  I have -- well, it just depends on if Mr. Oltmann appears or not.  I'm still -- I may be asking the Court to expand the witness list, but I don't know at this time.  So it doesn't matter.

THE COURT:  All right.  Well, you should know that once I enter this final pretrial order at the end of today, then any amendments will just be governed by Rule 16 before,

22-CV-1129

22

which is the manifest injustice standard.  Okay?

In addition, looking at the Defendants' witness list, it looks like the subject matter of the testimony for the proposed witnesses has not been identified, which is required by the final pretrial order.  So I'm going to set a deadline for supplementation of the witnesses that do appear with respect to the summary and description of their testimony.

That is not leave to add additional witnesses that are not yet identified, but we do need a description of the testimony as contemplated by the local rules and the form.

So if Defense could submit that also by May 5th, 2025, and that can just be in the form of a supplemental witness list with those descriptions.

MR. KACHOUROFF:  Okay, Your Honor.  I want to just go back, if I may.  I know you're making forward progress on the pretrial order, but there is one witness, John Tiegan (phonetic), who was identified in Mr. Oltmann's affidavit, I would like to add him in the witness list.  I don't know if he's going to be there or not, but out of an abundance of caution, he would be a corroborating witness for Mr. Oltmann if Mr. Oltmann appears and if John Tiegan appears.

THE COURT:  Has Mr. Tiegan been disclosed under 26(a)(1) or --

MR. KACHOUROFF:  He was closed in a deposition of Mr. Oltmann that I read, and that was their deposition of

22-CV-1129                                                                          23

Mr. Oltmann.

So --

THE COURT:  Okay.  Was he disclosed on any 26(a) disclosures?

MR. KACHOUROFF:  He wasn't, but I'll get one in today before the Court's order, if that's possible, if the Court would allow that.

THE COURT:  I think you need to meet and confer with Plaintiff's counsel about that.  Simply because someone has been disclosed during the course of a deposition doesn't mean that they've been disclosed as a potential witness in this case under the federal rules.

MR. KACHOUROFF:  Understood, Your Honor.

THE COURT:  Okay.  All right.  Then moving on to the expert witness issues:  *Plaintiff anticipates one or more of its experts will need to be present to hear trial testimony. When and how does the Court wish to address the request?*

So do you -- who do you anticipate the experts or experts needing to hear testimony from?

MR. CAIN:  Just one, Your Honor.  Professor Alex Halderman, our elections security expert, I want him to be present for Mr. Lindell's testimony.

THE COURT:  All right.  And, Mr. Kachouroff, what is Defense's position?

MR. KACHOUROFF:  As long as I get to cross-examine

22-CV-1129

24

Mr. Halderman on the stand, that would be great.

THE COURT:  Okay.  So it doesn't sound like there is an objection, because to the extent that Mr. Halderman testifies, then you'll obviously have an opportunity to cross-examine him.

MR. KACHOUROFF:  Right, Your Honor.

THE COURT:  All right.  I think that that takes care of that issue.

Any other questions, Mr. Cain, with respect to that?

MR. CAIN:  No, Your Honor.

THE COURT:  Okay.  Then it says:  *Plaintiff assumes the Court does not want parties to tender expert witnesses for ruling on qualifications but will instead address any objections when and if they are raised; is that correct?*

I mean, typically what happens is you lay the foundation for their expertise.  You offer them.  If Defense has some limited voir dire, they do that limited voir dire. Any objections are then taken at sidebar out of the purview of the Defense -- I'm sorry -- out of the purview of the jury, and then the Court makes a determination with respect to qualifications.  That's generally how we do it.

Just so you-all know, we just finished a long civil trial a couple weeks ago.  I disfavor sidebars.  They're really hard for our court reporter.  And the jury, even though we try very hard, can often see what we're doing or

22-CV-1129

25

potentially hear what we're doing or whispering.

So to the extent that we can keep those limited, that would be helpful. And if there's going to be some sort of longer argument with respect to qualifications, which I would assume there would not be since we have gone through the 702 motions phase, but if there is, we'll have to take a quick break to do that. Okay?

All right. Any questions with respect to experts?

MR. CAIN: No.

THE COURT: Mr. Kachouroff?

MR. KACHOUROFF: No, Your Honor.

THE COURT: Okay. So then next we go to the timing of witness testimony. Each side has approximately 27.5 hours, including opening and closings as reflected in the trial preparation order, for a total of 55 hours of trial time.

That is the minimum amount of time I believe that we have, assuming that we start testimony at 9:00 a.m. and we conclude at 3:30.

The reason why I do that is I want to make sure that we are being mindful of whatever other obligations that the jurors might have. Now, the way that trials typically run in our courtroom is that towards the middle to the early afternoon, to the extent that we get the feeling that we could cover additional testimony or we want to finish witness testimony so that that witness can be fully released from

22-CV-1129

26

their subpoena, we will ask the jurors whether or not they can stay beyond 3:30.  So don't make any plans for happy hour at 4:00 o'clock.  We may be here until 5:00 or 5:30.

Our courtroom security officers would like us to be out of the courtrooms by 5:00 o'clock for security purposes. Sometimes we run a little bit later.  Particularly given some of the concerns with respect to this case, we probably won't run later given some of the issues that you-all have raised.

But just so you-all know, closing time is taken out of that time.  What I mean by that is you need to manage your time effectively during trial, and what you have left over goes to what you have left for closing.

So for instance, I had a jury trial earlier this year where Defense counsel literally had eight minutes left for closing.  So you just -- you're going to want to manage your time and make sure that you have set aside enough time for that closing.

MR. KACHOUROFF:  I was going to say I can close this case in eight minutes, Judge.

THE COURT:  All right.  So you'll just want to be mindful of that.

Closings/openings are 30 minutes long.  I would anticipate 30 minutes per side for opening given the alignment of the Defendants in this case.  And then closings, again, will be no more than an hour for each side.  Okay?

22-CV-1129

27

All right.  With respect to the introduction of exhibits, I appreciate that many of these exhibits have been stipulated to.  So you-all know, even if an exhibit is stipulated to, I do not mass-admit exhibits.  So if you want an exhibit to be in evidence and before the jury, you need to introduce it through a witness.  That doesn't mean that there's going to be argument about whether or not the exhibit is stipulated or that I'll entertain any objections at that point, but it does need to come in through a witness.  Okay?

All right.  And then: *What is the Court's position on supplementation of exhibits beyond that which are on the current joint list?*

As I indicated before, with respect to the witnesses, once I enter this final pretrial order at the end of today, any amendments to that final pretrial order will need to be done either through a consent process between the parties, or I'll simply apply Rule 16(b)(4), the manifest injustice standard as set forth in the Federal Rules of Civil Procedure.

Okay.  Any questions about that?

MR. CAIN:  Clarification, one step back.  Openings. If the exhibit has been stipulated to, can we show it to the jury during openings, or is it just demonstratives?  What's your preference?

THE COURT:  So if you-all agree that an exhibit, again, is going to come in, you can show it to the jury.  If

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

you can't agree to that, then only demonstratives.  So it's just an extension of the fact that just because an exhibit is stipulated to does not mean it's going to be admitted.  It still needs to be admitted through a witness.  All right?

All right.  Any questions with respect to witness or exhibit practice?

MR. CAIN:  I don't think so, Your Honor.

THE COURT:  Okay.

MR. KACHOUROFF:  I just want to understand, so if I, with my opposing counsel, come up with a list that says we both stipulate and we move to admit this entire list, we can't do that?  You don't want --

THE COURT:  Cannot do that.

MR. KACHOUROFF:  Okay.

MR. CAIN:  And this may be -- pardon the interjection.  I've had Courts that let the exhibits go back; I've had Courts that don't.

THE COURT:  All admitted exhibits go back.  So at the end of trial, you'll work with my courtroom deputy to make sure that a set of exhibits that has been admitted goes back.  We have electronic technology if there are any electronic exhibits to be on a flash drive and to play on a secure device in the back.  But again, you-all are going to have to work with my courtroom deputy to make sure what goes back to the jury is actually supposed to go back and has been admitted,

22-CV-1129

29

not just stipulated.  Okay?

All right.  Any other questions about exhibits?

MR. CAIN:  No, Your Honor.

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  Okay.  Now I'm in the section that says "Special Issues."  So:  *Plaintiff believes that the Court will need to determine the sufficiency of proof necessary to hold each of the Defendants liable for publishing the relevant defamatory statements.  This issue is sufficiently unique to warrant further examination, and the Plaintiff requests leave to brief the Court more fully on this issue*.

So this sounds to me -- Defendants then argue: *Plaintiff misunderstands the standard that District Judge Barber applied in Coomer versus Byrne*, *et al.  There, Judge Barber denied the defendants' motion to dismiss because each of the defendants was alleged to have been involved in producing the alleged defamatory film at issue, interacted with knowledge of the falsity or with reckless disregard of the falsity of the statements at issue in this film.*

This seems like an issue that is appropriately briefed for the Court before trial begins so that I can make a well-reasoned determination.

So, Mr. Cain, can you all be prepared to file an opening brief on this issue by May 5th?

MR. CAIN:  We can.

22-CV-1129

30

THE COURT:  Okay.  And then given the timing of this issue and the fact that it seems fairly well developed at this stage already, Mr. Kachouroff, your response will be due no later than May 16th.

MR. KACHOUROFF:  Thank you, Your Honor.

THE COURT:  And then there will be no replies absent leave of Court.  Any questions about that?

MR. CAIN:  Page limits?

THE COURT:  Well, as short as possible, Mr. Cain, but no longer than 15 pages for the opening brief and then 15 pages for the response.

All right.  You-all have indicated that there is no possibility of settlement.

We go through the offer of judgment.  Section 12 talks about the effect of the final pretrial order.  I think I've spoken about that enough.

Do you have any questions with respect to the effect of the final pretrial order?

MR. CAIN:  We do not.

THE COURT:  Okay.

MR. KACHOUROFF:  I do not.

THE COURT:  Okay.  All right.  Trial will be to a jury, it's estimated, for ten days to start before this Court in this courtroom.  And then that takes me to the end of the final pretrial order.

22-CV-1129

31

Any issues with respect to the final pretrial order before we move on?

MR. CAIN:  None from us, Your Honor.

MR. KACHOUROFF:  How are you going to keep count on the hours and the time?  I've never had that issue before in any court I've practiced in.  Just curious.  How do you --

THE COURT:  Our courtroom deputy keeps track of the time.  Any sidebars that we need to do or any -- any conferences outside the jury is divided in half and assigned to each of the parties.  At the end of each day, if you want, my courtroom deputy will give you a count of how much time you've used and how much time you have left.

MR. KACHOUROFF:  Okay.  Thank you, Your Honor.

THE COURT:  Uh-huh.

MR. CAIN:  Actually, a quick question on that.

THE COURT:  Yes.

MR. CAIN:  Are there adjustments for witness responsiveness or lack thereof?

THE COURT:  There may be, Mr. Cain.  I mean, I am not one of the judges -- as when I practiced before this court, there was a judge who was well known for using her chess clock.  I am not a chess-clock judge, so I will be as reasonable as possible.  That's why I tell you that even though we say that there's 55 hours for the jury trial, I'm always using my discretion as to seeing how things are

22-CV-1129

32

progressing.

And we may have more time than that, depending on whether or not the jury sits longer than 3:30 each day. And I think I said this before: It is my strong preference to have witnesses finish up and not have to carry over to the next day. So if we are in that position, then we will go longer.

We have ten days set out for this trial. I haven't -- I don't have anything else for those ten days. And so you have that time, but I expect you-all to be professional and use your time efficiently. Okay?

And to the extent that either side has issues with respect to certain witnesses or responsiveness or any other issues with respect to trial conduct, civility, witness responsiveness, if they're late to court, again, those are types of issues that you should raise outside the province of the jury as we're going along. Okay?

All right. So we will enter the final pretrial order this afternoon subject to some of the supplementation that I anticipate you-all doing with respect to, again, the stipulations, supplemental witness list descriptions.

You have an issue with respect to -- was it Mr. Tiegan, Mr. Kachouroff?

MR. KACHOUROFF: Correct, Your Honor. John Tiegan.

THE COURT: So with the additional witness, but we'll get that entered with also the schedule for the briefing on

22-CV-1129

33

the special issue identified in the final pretrial order. Okay?

All right. So unless there are any objections, I'm going to move on to voir dire. Okay? All right.

Unless otherwise noted, each side is permitted voir dire examination for 15 minutes after the Court has completed its voir dire examination. *Given the nature of the case and past publicity, will the Court grant additional time for the parties?*

So, Mr. Cain, let me hear from you because this is your question with respect to how much more additional time you anticipate that you will need. And potentially, that will dovetail -- let me just mix in -- jury questionnaires. So the Court is disinclined to issue juror questionnaires in advance. Logistically, the jury pool that we are using, because we are starting this case at the beginning of a month, we will have an entirely new jury pool.

So it will be unlikely that we can get jury questionnaires back from those jurors in advance, which means that we would be giving out jury questionnaires when they arrive. And they would be filling them out. They would have to be copied, brought back up to the attorneys, and then we would have to go through some additional process, it sounds like, to determine for-cause challenges.

So I'm disinclined to use jury questionnaires. I

22-CV-1129

34

think most of the judges in this District are disinclined to use jury questionnaires.  I would be much more inclined to give some additional time for party voir dire if necessary.

So with that, you can tell me what you think.

MR. CAIN:  How long do you think you would use?  That may -- that may govern--

THE COURT:  How much time do I think I use for --

MR. CAIN:  Yes.

THE COURT:  -- voir dire?  Yeah.  So typically, the entire jury selection process, typically, including the 15 minutes for each side and what the Court does and seating the jury, generally takes us until about lunchtime.

The last couple trials that we've had that were longer than five days, it has taken longer.  It's taken until 2:00 o'clock.  We've gotten some feedback that potential jurors don't like it when I just continue on through lunch to seat them.  That makes them frustrated, hungry, and angry. And so I have started giving them lunch and then having them come back even though we're not done with selection.

But it is always my anticipation and hope that we at least get through selection and get to openings before the close of the first day of trial.

MR. CAIN:  Okay.  Second question --

THE COURT:  Okay.

MR. CAIN:  -- are you going to bring 16 up here

Megan E. Strawn, RPR, CRR                              (307) 232-2626

22-CV-1129

35

randomly, or how are you going to do it?

THE COURT:  So they're always random.  Given the publicity associated with these kinds of cases, we will call more than the average number of jurors than we generally do. So there will probably be 50 to 60 venire members instead of the 38 that we typically use for a jury trial -- a civil jury trial.

So the practice is the first 14 sit in the box, but everyone in the gallery who is here as a potential juror is answering the questions, at least in their head.  So they're taking notes.

Then when we go through various phases of questions -- so for instance, the first set of questions will be about undue hardship.  And some people will tell us, you know, I have a disability.  I can't sit for more than 45 minutes at a time.  I can't sit on this jury.  Sometimes I've had people who say, I'm not facile with the English language, so I don't feel like I can sit on this jury.

So there may be points during that process that we take motions to strike jurors for cause before we're done. You-all will come up to sidebar.  We'll discuss whether or not there's any objections with respect to the excusal for cause. And if we do strike someone before we get through the entire Court voir dire process, that person will be excused, and someone from the gallery will be put in their position.

22-CV-1129

36

You will always have 14 people to focus on within the jury box as your potential jurors.  I seat eight.  And so again, you're directing most of those questions to the people sitting in the box.

Your own voir dire, you can ask individual jurors questions if you want to follow up with them, or you can ask the entire panel.  And then the people sitting in the gallery, again, they'll all be taking notes.  So if someone gets struck for cause, someone else comes up from the gallery, the first question I ask them is, Do you have anything written down on your card from the previous questions that you need to tell us?  Okay?

And then we make sure that there's no issue for cause with that person we've just substituted in.  If there is, we go through that whole process again.  You come up, we talk about it, I make a ruling.  And if they're excused, we get someone else.

Does that make sense?

MR. CAIN:  It does.

THE COURT:  All right.  So with that, Mr. Cain, how much time are you asking for with respect to a party's voir dire?

MR. CAIN:  No more than 40 minutes.

THE COURT:  Okay.  Mr. Kachouroff?

MR. KACHOUROFF:  I'm sorry --

22-CV-1129

37

THE COURT:  What's your position --

MR. KACHOUROFF:  -- asking for party voir dire?

THE COURT:  Yes.

MR. KACHOUROFF:  40 minutes?  I object to that.  I don't think we need 40 minutes.  20 minutes would be sufficient for each side.

THE COURT:  So I'll take that under advisement, and we'll issue an order with the minutes of this proceeding.  Okay?

All right.  I think I answered the question about the procedure for strikes for cause.  And then the peremptory strikes, each side is permitted three strikes.  *Will the Court consider granting additional strikes?*  No.  The number of peremptory strikes is set by statute, 28 U.S.C. Section 1870.

In civil cases, each party is entitled to three peremptory challenges.  Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the Court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

In this case, each side will have three strikes because the Defendants are aligned.  I haven't heard anything yet with respect to why we would want additional strikes beyond three, so we'll be using three per side in this case.  Okay?

22-CV-1129

38

All right.  I think I've just -- opening and closing time allotments.  Any additional questions with respect to that?

MR. CAIN:  Oh.  Thank you.

Different courts do things differently.  The first time I had this method, I had no idea that we were going to do our peremptory strikes in open court back and forth.  In that instance, it seemed unusual to me, but -- and a little awkward.

Is that how we're going to do it here?  Which is fine, obviously, but --

THE COURT:  I don't know exactly what you do -- what you mean, "open court."  We have a sheet with the 14 people's names on it, and my courtroom deputy passes them back and forth.

So then there are two columns, Plaintiff/Defendant --

MR. KACHOUROFF:  They're not going to know, Charlie.

MR. CAIN:  I'd hate to say, "Mrs. Smith, I'm sorry, I love you, but you're out."

THE COURT:  Oh, no, no, no.  No.  So how it works is you have this sheet.  Plaintiff's start.  They strike.  We take it to Defense.  They strike.  It goes back and forth until everyone exercises their three.

I come and look at it.  I call you up to the bench. I make sure there aren't any issues.  And then if you confirm

Megan E. Strawn, RPR, CRR                                (307) 232-2626

22-CV-1129

39

to me that there are no issues, I just tell the jury who is on and who is off, and they never know who struck whom.  Okay?

MR. CAIN:  Mr. Beller had another question.  You said eight.  Is one going to be an alternate, and will we know who that is?

THE COURT:  We don't carry alternates in the federal system.  So all eight deliberate and all eight vote.  So it has to be unanimous with respect to all eight.  I carry eight.  Honestly, I used to carry seven in civil cases, but then COVID happened, and then it just seemed a little bit vulnerable to only carry seven and only be able to lose one.

So if they all make it to deliberations, which, knock on wood, most of the time they do, all of them will vote, and all of them will deliberate.  And there will be no one who is left out or excused before deliberations happen, and there is no one who is designated as an alternate.  You'll just have a jury of eight.

All right.  Anything else with respect to selection?

MS. MORGAN:  Related to voir dire, and those were listed as our proposed jury instructions, Number 2 --

(Reporter interruption.)

MS. MORGAN:  The parties had made proposed instructions related to informing the panel about the process of voir dire.  That would be Numbers 2 and 3 on the proposed jury instructions, and so we were wondering if the Court would

22-CV-1129

40

be providing those to the panel.

THE COURT:  So what we will do in terms of voir dire is before selection starts and well before, probably within the next few weeks, after I receive your filings on May 5th, we will be sending counsel a set -- a working set of voir dire that we intend to use, so the Court's voir dire.

I have my own preliminary instructions explaining the voir dire process to them.  I will take a look at what you-all have proposed.  And then you will have that set, and you will have an opportunity to tell me if you have any objections before I actually give those instructions and explain voir dire.

So you'll have an ability to make a record with respect to voir dire before I actually give it.

With respect to the attorney's voir dire process, I require you-all to ask the questions as neutrally as possible. I strongly disfavor hypotheticals and will generally not allow them.  So I don't want you-all asking jurors, If X and Y happens, then what will you do with respect to those issues? Okay?

And so that's a long way of saying that you'll have an opportunity to see how I explain voir dire to them; and if you have any concerns, then you'll have an opportunity to raise that to the Court before I actually give it.  Okay?

MS. MORGAN:  Thank you.

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

22-CV-1129

41

THE COURT:  All right.  Any questions on behalf of Defense?

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  Mr. Cain?

MR. CAIN:  So we submitted a list of questions.

THE COURT:  Yes.

MR. CAIN:  Are we confined within that parameter?

THE COURT:  No.  So what I do with your submitted lists of proposed questions is I go through them.  I often take questions from each side.  I articulate them maybe differently than you articulate them.  And then you will have an opportunity to see, again, in that draft what I'm intending to ask.

And then once I ask those questions, you'll have an opportunity to follow up, because sometimes a juror will say something that you couldn't have anticipated, and you want to follow up with that particular juror.

Sometimes I leave something off of my own voir dire because I don't think it's appropriate for the Court to ask it, but that doesn't necessarily mean that you-all can't ask it.  And if there is a question that I do not think is appropriate for anyone to ask that is on your proposed voir dire, then I will inform you of that, because I'm not here to have you-all be objected to in the middle of voir dire, nor do I feel like it's my role to interrupt your voir dire process.

22-CV-1129

42

I try to let that play out as organically as possible.

Okay.  All right.  Any other questions before we move on to preliminary instructions?

MR. CAIN:  No, Your Honor.

THE COURT:  Okay.

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  Okay.  So with respect to preliminary instructions, we provided you a set of preliminary instructions.  And let me hear from anyone who might have concerns or objections with respect to the proposed preliminary instructions from the Court.

MS. MORGAN:  We appreciate the Court providing the preliminary instructions.  We believe them to be quite thorough.  I did want to raise an issue with respect to Preliminary Instruction Number 8 --

THE COURT:  Okay.

MS. MORGAN:  -- that being the evidence in the case, specifically the paragraph about deposition testimony.  Our proposed instruction regarding depositions as evidence, which is Number 24 of the proposed jury instructions, had somewhat different phrasing.

And so we were wondering if it would be possible to edit the Preliminary Instruction Number 8 to use the phrasing from our proposed instruction, which indicates to the jury:  *You are to consider that testimony as if it had been given by*

22-CV-1129

43

*the witness from the witness stand.*

We believe that language to be stronger and more clear to the jury.  The language in the Court's proposed preliminary instruction says:  *Deposition testimony may be accepted by you.*  So we're requesting that the jury be informed that they must accept deposition testimony as if it were given live, Your Honor.

THE COURT:  All right.  So that's Proposed Instruction Number 24.  Was that stipulated to?

MS. MORGAN:  Let me just double-check.

Yes, that's -- it was not disputed, Your Honor.

THE COURT:  Okay. All right.  Mr. Kachouroff, anything on behalf of Defendants with respect to Preliminary Instruction Number 8?

MR. KACHOUROFF:  I just -- I mean, obviously, we stipulated to it, but I -- to me, it's a distinction without a difference.  The jury can reject any testimony it doesn't find to be credible.  Doesn't have to take it.

So from my perspective, "may" or "shall," it's irrelevant.

THE COURT:  So I'll take a look at that.  Anything else on behalf of Plaintiff?

MS. MORGAN:  Yes, Your Honor.  We had a proposed instruction that was stipulated to regarding juror notebooks, forecasting for the jury what they were allowed to do with

22-CV-1129

44

those notebooks.  I believe such an instruction would be pretty consistent with the Court's Proposed Preliminary Instruction Number 7 with respect to note-taking.  So we'd ask that they be instructed about notebooks.

THE COURT:  What are you anticipating with respect to jury notebooks?  Because we typically don't have jury notebooks.

MS. MORGAN:  Oh, okay.  Well, that answers my question.

THE COURT:  Okay.  All right.

MS. MORGAN:  The next issue that we thought the Court may want to take up as a preliminary issue of instructions would be with respect to Number 10 --

THE COURT:  Okay.

MS. MORGAN:  -- of the parties' proposed instructions.  We had a dispute about what the oath would be that the jurors would give with respect to whether the "ever-living God" language would be included.

THE COURT:  Yeah.  We will simply use the oath that this Court always uses that doesn't contain that language.  So we'll just use the standard oath.

MS. MORGAN:  Thank you, Your Honor.  I think that answers my next question, which related to the oath or affirmation of witnesses.  It was a similar issue.

And then the next matter would be -- and I understand

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

22-CV-1129

45

if the Court doesn't want to take this up as a preliminary matter, but we had asked for an instruction to the jury whereby they could make an inference from the invocation of the Fifth Amendment privilege.

So I thought I would raise that issue now, but I understand if the Court would prefer to address that in the final charge conference.

THE COURT:  So I won't address that in the initial preliminary instructions because I don't know whether or not anyone will invoke the Fifth Amendment.  And so to the extent that the Fifth Amendment is not invoked, I think it's confusing to bring the Fifth Amendment into a case where it's not a criminal case and it may never be invoked.

To the extent that the Fifth Amendment is invoked either by someone testifying live on the stand or admitted deposition testimony, then I'll take that back up, and that may be an appropriate instruction in closing instructions.

But there's no reason to forecast something that may or may not happen in preliminary instructions, particularly, again, because this is a civil case and not a criminal case.

MS. MORGAN:  Understood, Your Honor.  There's one witness in particular we had anticipated, based on the deposition page and line designations, that she would be invoking the Fifth quite frequently, and that's Tina Peters. So that was the reason we asked for that specific instruction

22-CV-1129                                                                46

in advance, Your Honor.

THE COURT:  Sure.  All right.  Anything else with respect to the preliminary instructions?

MS. MORGAN:  I think that's it, Your Honor, because the Court's Proposed Jury Instruction Number 14 has a blank for stipulations.

THE COURT:  In the Court's Proposed Instruction Number 1, we took the proposed instruction by the jury -- I'm sorry -- by the parties and added in some language with respect to the other two causes of action, which is, again, intentional infliction of emotional distress and the civil conspiracy.  And I'm assuming, given your position, there's no objection to that language?

MS. MORGAN:  No, Your Honor.

THE COURT:  All right.

All right.  For Defendants, any objections to be raised with respect to the preliminary instructions?

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  All right.  So the Court will note for the record that Defendants have passed on any objections with respect to the preliminary instructions.  The Court will take under advisement the concerns raised with respect to the Proposed Preliminary Instruction Number 8.

And then we've resolved the oath issue and then the fact that the jury will not have notebooks, and then reserve

22-CV-1129

47

the inference with respect to the Fifth Amendment to final instructions.

So anything else with respect to the preliminary jury instructions?

MS. MORGAN:  No, Your Honor.

THE COURT:  Okay.  All right.

MR. CAIN:  Your Honor, I apologize.

THE COURT:  Yes, Mr. Cain.

MR. CAIN:  And I should have raised this when we were talking about the jurors.

THE COURT:  Yes.

MR. CAIN:  So juror anonymity --

THE COURT:  Yes.

MR. CAIN:  -- we have a concern that to the extent that there's reporting about this case -- and we've seen this in other cases -- that the jurors may be subject to undue publicity.

THE COURT:  Uh-huh.

MR. CAIN:  And I would -- I don't know if the Court's had that issue before, and if so, how we should deal with that.

For example, during the voir dire process, are there going to be people outside of this trial, including media, that are going to be allowed to be in the courtroom?

THE COURT:  I mean, generally speaking, Mr. Cain, all

22-CV-1129

48

proceedings before this Court are open unless they're sealed for some particular reason. The public is allowed to participate in the voir dire process and observe that. If there are particular concerns with respect to juror anonymity, once the jury is seated, we could put in place -- we're going to talk about security next in general about how to escort those people in and out of the courthouse.

That may be appropriate, but I've never sealed the courtroom for jury selection. You-all do not get the proposed venire members until the morning of trial. So there will be no opportunity to look up those individuals before trial begins.

And so again, if there is a particular concern that you want to make a proposal about, I would suggest that you meet and confer with opposing counsel, and then you alert the Court of that by May 5th so that, again, I can make a considered evaluation of it.

I'm not -- I'm not minimizing the concern. I'm not -- but I don't have any experience with sealing the courtroom during the voir dire process.

MR. CAIN: Okay.

THE COURT: Okay?

All right. Okay. So security, secure areas for witnesses. Additional security for parties and counsel and procedures for entrance into the courthouse.

Megan E. Strawn, RPR, CRR                                      (307) 232-2626

22-CV-1129

49

So, Mr. Cain, why don't you let me know what you are thinking about those issues.  I'll have Mr. Kachouroff also raise any issues that -- and concerns that he may have for Defendants or Defense witnesses, and then I can meet with our United States Marshals and see what mechanisms we can put in place.

I mean, this courthouse, obviously, has had high-profile trials before.  This isn't exactly Taylor Swift, but we were able to get her in and out of this courthouse without any significant issues despite the publicity surrounding her cases.

So again, why don't you tell me what you're thinking about, and then I'll confer with our Marshals Service and see what we can do.

MR. CAIN:  Yeah.  Well, the Swifties may not be as acrimonious as some of the folks that are involved in this case.  The issue has come up primarily with Mr. Oltmann. Mr. Oltmann's affiliated with some folks that are -- well, depends on your perspective, but we've had concerns.  We, as lawyers, have been harassed.

And in the past, what has been done -- I know with Mr. Oltmann, he expressed his own security concerns, and the Marshals brought him up through the parking garage and that area.  I think that's helpful.  I know my client's very concerned about secure access.

22-CV-1129

50

So if that could be considered, that would be helpful.

Witnesses, kind of the same issue.  We have some witnesses -- and really this comes down to Mr. Oltmann and the folks that are associated with him.  We've got, for example, Heidi Beedle, who is a reporter here in Colorado.  I'm concerned about witnesses being out front and mixing, potentially, with other witnesses or being harassed.

I'd like to be able to have an area for them to go where they'll -- if the Court has that option, so that they can sit in a secure place while they're waiting to testify.

That was the second issue.

And as far as additional security, I mean, the U.S. Marshals, they'll be fine.  I'm not worried about that.  We have our own security consultant, too.  He'll be here.  I thought he was going to be here today just to introduce the Court to him so you'll know who we have.  But the main thing is getting in and getting out.

THE COURT:  Okay.  All right.  Mr. Kachouroff?

MR. KACHOUROFF:  I don't think there's any such issues, Your Honor.  I think that's way overblown.  I haven't seen anything in that regard, so I'll leave it at that.

You've handled these cases before.  This is certainly not Donald Trump.  It's certainly not Taylor Swift.  It's not any of those cases.  In terms of profile, I would mark this on

22-CV-1129

51

the lower side of the spectrum.

THE COURT:  All right.  So then what I'm understanding you saying is that Mr. Lindell does not believe that he needs to be escorted in and out of the courthouse?

MR. KACHOUROFF:  That would be correct.

THE COURT:  Okay.  All right.  So I'll take that under advisement.

And then, again, if you have any specific proposals, Mr. Cain, that you want me to raise with our security team here in the courthouse, I'm happy to do so.  We do have two attorney rooms in the back of the courtroom off to each side that will be available to you-all.  Sometimes witnesses stay there while they're sequestered before they testify.  That is an option for you, as well.

Mr. Cain, if there are, again, particular witnesses on your list that you're concerned about, I would encourage you to contact our chambers and potentially our courtroom deputy, who is not here today -- we have a lovely substitute -- and inform her of that so I can understand what the complexion of it is when I'm talking to the United States Marshals.

Okay?

MR. CAIN:  Okay.

THE COURT:  All right.  Next, technology.  *Can the trial technician set up and test the courtroom --* oh.  How

22-CV-1129

52

many people, Mr. Cain, do you believe you'll be requesting secure entry for?

MR. CAIN:  Certainly my client and the lawyers.

THE COURT:  Okay.

MR. CAIN:  As far as witnesses go, I don't know that we need that.  I'm more concerned about when they get here them not interacting with other folks that may be waiting to testify, in particular Mr. Oltmann.

THE COURT:  So you think you'll need something beyond the witness rooms?

MR. CAIN:  No.  I actually hadn't thought about that, and I think that's going to work fine.

THE COURT:  All right.  So as I understand it, right now it's the client, lawyers.  If you think of anyone else on that list with respect to entry and exit, let us know. Ms. Buchanan is our courtroom deputy.  Let her know so that I can understand sort of the scope that you are thinking about when I'm talking to the Marshals Service.

Okay?

MR. CAIN:  Okay.  And I'm not here to speechify about it, but I will say, for my client's sake, it will make him much more secure in coming in through, you know, a different route.

THE COURT:  I don't think there's going to be an issue with respect to any clients.  Again, if Mr. Lindell

22-CV-1129

53

needed the same courtesy, I don't think that's an issue.  We just logistically need to understand how many people so that we can work with the Marshals and who those people are.

Okay?

MR. CAIN:  Thank you.

THE COURT:  All right.  Anything else with respect to that?

Okay.  All right.  The next issue is:  *Can we set up the day before -- Can the trial technician set up and test the courtroom technology the Friday before the trial begins?*

So the Friday before the trial begins, assuming that we don't have the criminal trial that is currently set for that day, I think that should be feasible in the afternoon.

In the morning, we have a 9:00 o'clock hearing.  It's difficult to determine how long that 9:00 o'clock hearing will last -- it's on a civil case -- but I can't imagine it's going to last beyond lunch.

So you-all would have -- and I'll ask my courtroom staff to block it that afternoon -- either side, both sides -- to have your technology people come in and set up.  Once that's done, we'll lock the courtroom, and then it will be in place for you-all starting Monday morning.  Okay?

I think you see where you'll be sitting at trial, and then that back table is typically used for paralegals, court tech -- not court -- IT specialists, anyone that you

22-CV-1129

54

need to be running your electronic evidence.  Okay?

All right.  Any other questions with respect to technology?

MR. CAIN:  I think that's it.

THE COURT:  Okay.  All right.  Anything else before we move on to the motions in limine?

MR. CAIN:  No, Your Honor.

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  All right.  Any argument on behalf of Plaintiff with respect to the motions in limine?

MR. KLOEWER:  Yes, Your Honor.

With respect to the motion in limine, Your Honor, we filed, that motion requested various categories of evidence not be admitted.  The Defendants filed a response; and we were permitted to submit a limited reply with respect to a few specific issues, but we were limited in pages and subject matter pursuant to that for-cause standard.

So if I could just briefly expand on some of those issues that were raised.  The motion in limine is fairly limited.  We've sought few categories of information be excluded.  The first pertains to a motor vehicle accident that Dr. Coomer was involved in in September of 2021 -- the timing of that is relevant and significant and meaningful for purposes of the motion -- where he was cited for reckless driving.

22-CV-1129

55

There's sort of two aspects of that:  number one is just discussion of the fact of the incident itself, and the bigger issue is the police body cam footage relating to that incident.

The second issue we raised is any references to Dr. Coomer's sex life or any sort of commentary he's ever made with respect to those -- to that part of his life.

A third deals with drug and alcohol use.

The fourth pertains to his religious beliefs.

And we also have arguments with respect to law enforcement and Black Lives Matter, his Facebook posts about President Trump and other Facebook posts.  So those two categories I sort of lump together.

The Defendants have submitted a single exhibit as their Exhibit 9, which includes 80 pages of Dr. Coomer's various Facebook posts, and those cover a wide variety of different subject matter.  So that request sort of pertains to all those together.

And the last item is -- we refer to it as "the dossier."  I don't know what you'd really call this document. It's a 118-page document.  The Court has just granted a motion to keep that item restricted recently.  It's an unauthored document that was produced in this case that just contains a wide variety of information about Dr. Coomer, his past, his family members, his acquaintances, their contact information,

a lot of speculation about personal aspects of his life.  Very little information that's relevant to the allegations -- the defamatory allegations in this case, which are namely that he rigged the 2020 election.

So I can just sort of start at the top there.  One issue that has gotten a lot of attention, both from us and from the Defendants, is this motor vehicle accident, which occurred in September -- late September of 2021.  Dr. Coomer was driving his vehicle and ran into a building and was subsequently cited with reckless driving.

There was an individual by the name of Joey Camp who subsequently filed a request for the police body cam footage. His watermark is included on that footage.  It indicates "Your Daddy Joey."  That footage has been edited, cut down, and presents a pretty selective picture of what occurred.

The law enforcement officers inquire of Dr. Coomer what happened.  He indicates that he didn't know.  And subsequently, he -- within the space of probably about an hour, he admitted that he had run into the building, and he was released and cited with reckless driving.

Our concerns about this are -- this video has been shared widely among -- on sort of right-wing media to try and tarnish Dr. Coomer's reputation, make him look as bad as possible through that editing of the footage.

The reason I led by mentioning the date is that this

22-CV-1129

57

event occurred many months after most of the significant publications at issue here.  The first publication that we will be discussing happened in early May of 2021.

The Cyber Symposium is another significant event in this case which we'll be discussing at trial that happened in August of 2021.  So this event with Dr. Coomer, this traffic accident, occurred well after many of the allegations had already happened.

So to the extent the Defendants have argued that this is admissible for purposes of, you know, demonstrating their subjective state of mind when they made these publications, why they made these allegations about him, that doesn't hold up just given the timeline.

THE COURT:  All right.  But, Mr. Kloewer, what about the issue of Dr. Coomer's credibility?  So the fact that he initially denied knowing about this incident and then conceded, shouldn't Defendants be permitted to cross-examine Dr. Coomer about this specific incident of truthfulness?

MR. KLOEWER:  Well, yes, Your Honor.  And -- well, let me -- the issue really is what's at issue in this dispute, what aspect of his character is on trial.

THE COURT:  Well, isn't truthfulness always and credibility always an issue for every single witness?  You're asking the jury to make determinations about the credibility of not just Dr. Coomer but every witness that comes before the

22-CV-1129

58

Court and the jury.

MR. KLOEWER:  Yes, Your Honor.  To the extent that that issue is relevant to his testimony, some questioning on what occurred may be -- may be admissible, depending on the testimony that's elicited at trial.

As I indicated at the beginning, the distinction between the police body cam footage and discussing this matter with Dr. Coomer is a meaningful distinction.

THE COURT:  I understand that.

MR. KLOEWER:  So with respect to questioning him about that -- and we indicated this in our supplemental briefing and the replies, focusing the aspects of the consideration of Dr. Coomer's character as it pertains to his work in the election industry and what actually impacted his ability to continue working in the election industry.  And this incident is after the fact, and it's outside the purview of that.

THE COURT:  I understand that, too, Mr. Kloewer.  But I'm really focused on the fact that he made a statement that turned out to not be true to the police.  That is different than showing the body cam footage, and it's certainly different than showing an edited version of the body cam footage.  I'm just focused on the questioning with respect to what happened.  To the extent that he testifies, Yes, I misstated this, then it seems like there isn't any impeachment

22-CV-1129                                                                          59

issue.

But shouldn't the defendant be allowed to question about this specific incident of truthfulness?

MR. KLOEWER:  With respect just to the statements that he made?

THE COURT:  Yes.  Just to the statements, not to the speculation as to why he did it or if he was under the influence of any substance.  Just whether or not he was truthful to the police about this incident initially.

MR. KLOEWER:  Yeah.  I think that -- if the questioning were limited and -- you anticipated my next concern is with respect to the speculation that he was intoxicated or these other matters, with respect to whether he made the statement to the police officers in that instance, I think questioning on that limited issue would be permissible.

It's really the world of speculation that surrounds this incident that we're concerned about.  And the way it has been presented publicly by those who are proponents of this footage is -- I don't think it has a place in this trial, and it could be unduly prejudicial just given those potential misreadings of what occurred.

THE COURT:  All right.  Thank you, Mr. Kloewer.

The next issue you raised?

MR. KLOEWER:  The next issue we raised pertained to Dr. Coomer's sex life and potential speculation --

22-CV-1129

60

THE COURT:  So let me stop you there.

Mr. Kachouroff, I don't see any objection to leaving that out that's raised in the Defendants' response.

MR. KACHOUROFF:  I don't know what they're talking about.  If they're talking about when Mr. Coomer talks about raping his wife, I don't consider that his sex life.  I mean, that's something completely different.  That's a disgusting act that he would put up.  And if he's claiming to be this angelic character who is -- it's Dr. Coomer.  He always goes by "doctor" in a non-academic setting.  There's all these things in his history that he wants to try to get rid of and whitewash.  That, he can't do.  His character for truthfulness is here.  It's on the stand.

THE COURT:  Well, that --

MR. KACHOUROFF:  I'm not -- I'm not going to go into his sex life.  How's that?  I have no intention of doing that.

THE COURT:  But are you going to try to cross-examine him about that statement you just made about raping his wife?

MR. KACHOUROFF:  It doesn't go to his credibility.  If he had denied it somehow in the public sphere, I would.  Not because of the statement itself but because it goes to his truthfulness.  So the answer is no.

THE COURT:  Okay.  So I don't actually see anything within the response that suggests that that information is going to be introduced, and so I would consider that point

22-CV-1129                                                                            61

conceded with respect to those types of statements -- or testimony.

MR. KLOEWER:  I appreciate that, Your Honor, and I appreciate the admission that that won't be elicited by Defendants' counsel.

Our concern with this is primarily with respect to third-party witnesses, namely Joe Oltmann.  We would like an order that reflects that this sort of testimony is improper and won't be coming in.

Mr. Oltmann frequently makes baseless claims about Dr. Coomer on a wide variety of subject matter, and it's our concern that he's going to raise these issues on his own or, you know, in a manner that's non-responsive to a question or something like that.

So to the extent we can have an order from the Court reflecting the impermissibility of that type of testimony, that's all we're requesting with respect to the second subject.

THE COURT:  All right.  I understand.

MR. KLOEWER:  The third issue pertains to Dr. Coomer's drug and alcohol use.  Dr. Coomer has been open in his life about his past struggles with addiction.  He has not had any interaction or use of heroin since 2005.  So this is a -- an issue that is very remote in time.  The Defendants have raised -- suggested that this could be relevant to his

22-CV-1129

62

claim for intentional infliction of emotional distress.  But there's no -- Dr. Coomer didn't receive treatment for this previously.  He doesn't have any -- his own therapist in this case testified that he had no history that was relevant to him that seemed that it impacted his treatment of him, arising from the distress and reason he was seeking treatment following these allegations.

So this matter just is -- it's really remote and doesn't need to be brought up.  I think the risk of undue prejudice to the jury is high with this, and its probative value is very low given that, you know, this is 19 years ago when this issue stopped being an aspect of his life.

So we would request that that not be admitted, either.

THE COURT:  Okay.

MR. KLOEWER:  With respect to his religious beliefs -- and this next -- so this law enforcement and Black Lives Matter and his Facebook posts about President Trump and a further subcategory of assorted Facebook posts, these are sort of all lumped in together about his social media postings.

As I indicated, the Defendants have designated a single exhibit that's about 80 pages long and encompasses a variety of subject matter, you know, some as random as commentary on the death of one of the members of the Sackler

22-CV-1129                                                            63

family who was involved with the Purdue Pharmaceutical scandal and the opioid epidemic.  We just have a lot of subject matter that's covered by this exhibit.

One of those -- there are a few comments that Dr. Coomer makes with respect to his religious beliefs.  This, again, I don't think, has any bearing on whether he took any steps to alter the 2020 election results or whether he did, in fact, rig the election.  And he worked in the election industry, of course, for many years, and these opinions hadn't impacted his ability to stay in that industry.

There's just a few comments in there.  The Defendants have indicated that this is evidence of his preexisting public persona.  I'm not sure exactly what that means.  We can hear from them on that.  But I would just remind the Court that these were comments on his private Facebook page that included about 300 people, whereas the allegations in this case are that the defendants -- you know, they published these statements to a national audience; that they specifically targeted legislators from across the country; that they sent invitations to governors' offices and senators and county clerks and made, really, a direct attack on Dr. Coomer's reputation and credibility with those -- with this wide swath of the public.

So when you're talking about Facebook comments that were made to this limited, narrow group of Facebook friends,

22-CV-1129

64

that's not the reputational harm that's at issue here and what Dr. Coomer is seeking liability for.

So -- and they also speak to that as another cause for his reputational harm. But again, there's no evidence or allegation that Dr. Coomer can no longer work in the election industry as a result of a few of his, you know, Facebook opinions that he raised. So we would request the Court preclude admission of that evidence, as well.

That leads into the next category of Facebook posts. These pertain to law enforcement and the Black Lives Matter movement, summer of 2020. We similarly -- these opinions are also not relevant to this dispute, which turns on Dr. Coomer's conduct with respect to the election.

These posts also include a variety of music videos that Dr. Coomer posted. His musical tastes, I don't think, are relevant in any way. But they were posted throughout this period of the summer of 2020 when the protest movement was very active following various instances of police brutality and things of that nature.

So these two, they just have no bearing on the actual issues that are before the Court. The defendants rely primarily for this body of evidence on this case *World Wide Association of Specialty Programs v. Pure, Incorporated*. That's a Tenth Circuit case from 2006. And it does include some language in there about how character is always relevant.

22-CV-1129

65

But even in that case, the character evidence at issue was specific to the defamatory allegations that were at play there.

In *World Wide Association*, there was an entity that funneled or that referred at-risk youth --

THE COURT:  Correct.

MR. KLOEWER:  -- to specific care providers.

THE COURT:  So the statements were made by another third party other than just the defendant, as I understand it, about the impropriety that was going on at these various youth camps.

MR. KLOEWER:  Sure.  And the Court allowed some publications in from *48 Hours* and other things that had reported on the plaintiff's conduct, which reported their program had sent children to some places where they were abused and things of that nature.

Again, this is specific to the subject matter that's at issue.  So Dr. Coomer's reputation in the election industry, if that were the subject matter of these comments, that would be one thing.  But when he's talking about these things that are -- you know, his reputation, different realms, is not what he's seeking damages for in this case, and it's certainly not the substance or subject of the publications made by the Defendants, which we've narrowed those down to the ten specific statements that we've identified in our proposed

Jury Instruction Number 33; and those all pertain to rigging the election, working with China to rig the election, corruption.

If you review those ten statements, there's no statement by the defendants specifically accusing Dr. Coomer of dishonesty or anything of that nature. And that is -- that harkens back to the prior discussion about the police video.

And as we indicated in our supplemental briefing, there's no indication that Defendants had any awareness of these Facebook posts in the first instance when they made these publications when they accused him of this conduct.

So to the extent they want to argue that it provides some support for their subjective state of mind or cuts against the actual malice evidence, that can't be the case if they have repeatedly insisted up and down that they didn't know about this, had no knowledge of these, never read them, and weren't aware of them. So -- and that's true with respect to the entire body of Facebook posts.

The next category is Facebook posts specifically about President Trump. Again, there's only a few of those in that 80-page document. To the extent there are multiples, I think it would be cumulative to run through all of them with the jury. But again, Defendants had no knowledge of these statements when they made these publications.

So it's an after-the-fact attempt to justify why they

22-CV-1129

67

published what they did when Lindell himself has repeatedly said that he never even read the complaints in this case.  He said all he knew was that Dr. Coomer worked for Dominion; and when he heard that, he just threw it on the pile and didn't even consider it.

So for Mr. Lindell, knowledge that Dr. Coomer worked for Dominion was all he needed to proceed on this campaign that he embarked on for -- well, the entire scope of time relevant to this dispute, well over a year and a half.

So to suggest that these Facebook posts colored his understanding or gave him a good-faith basis for those beliefs cannot be a basis for admission of those documents.

And as I already alluded to, there's also just a variety of entirely relevant Facebook posts.  You know, for example, with respect to Mr. Sackler, there's a number of instances wherein Dr. Coomer just simply posted a URL to a news story; for example, the appointment of an official to USAID.  These things have no bearing on this dispute.

So it's difficult to really engage with the Facebook posts without any sort of effort to cull those down and focus them on topics that are relevant here.  We're dealing with a single exhibit that includes this vast body of different opinion evidence that has no bearing on allegations that Dr. Coomer rigged the election.

So that's that issue.

22-CV-1129

68

And the last issue is what we refer to as "the dossier."  As I indicated -- well, the Court has already indicated it would keep that document under seal.  This is an unauthored document.  The vast body of that information is very deeply personal information about Dr. Coomer that is even further remote in time than many of the things we've already discussed.

There's commentary in there about the death of his younger sister and how that affected him as a young man in the early '90s, his work getting his Ph.D. in Berkeley studying nuclear engineering.  We have no idea where this document came from.  We've asked Mr. Oltmann multiple times the origin of this document.  He refuses to say.  All we've been able to determine about it is that somebody who goes by the name "The Researcher" at index.com compiled this document.

I mentioned an individual by the name of Joey Camp previously.  His watermark is on that police body cam footage. Mr. Camp is the most likely source of this document, but we're not able to question him or subpoena him.  He fled the country years ago.  He was just recently arrested in Belize on a criminal charge of spreading false news in connection with the murder of a Coast Guard officer.

It's our belief and understanding that Mr. Camp is the actual origin of these false claims about Dr. Coomer, and he sold those to Mr. Oltmann.

22-CV-1129                                                                    69

But in any case, all of which is to say this document, like the footage, was compiled by an anonymous individual with a nefarious purpose in presenting this information in this specific way.  At no point in that document is there any evidence that Dr. Coomer partook in an Antifa conference call, confessed to rigging the election on that call, or that he actually undertook any activity whatsoever to manipulate or otherwise alter the election results.

And as I've said before, and I apologize if I'm repeating myself, this is another instance wherein Defendants have insisted they have no knowledge of this document, so it could not have colored their subjective perceptions.

So that's an overview of the various arguments that are raised in the motion in limine.  We would ask that all that information be precluded from admission to the jury.

And if the Court has any questions, I'm happy to answer them.  Otherwise, I will let Mr. Kachouroff respond.

THE COURT:  All right.  Thank you, Mr. Kloewer.

Mr. Kachouroff?

MR. KACHOUROFF:  First, let me address, Your Honor, as a former police officer myself, looking at the body cam footage, it's not a motor vehicle accident; it's a DUI hit-and-run where Mr. Coomer commits a felony on this video cam.

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

22-CV-1129

70

THE COURT:  All right.  So, Mr. Kachouroff --

MR. KACHOUROFF:  Yeah.

THE COURT:  -- I'm going to stop you there because I don't understand how the body cam video could be admissible as extrinsic evidence under Rule 608.

Could you address that?

MR. KACHOUROFF:  Sure, because it goes to his truthfulness and his propensity for truth-telling.

THE COURT:  Okay.  But it's extrinsic evidence of that.  So you may be able to question him about that.

MR. KACHOUROFF:  Correct.

THE COURT:  How is the body cam footage as extrinsic evidence admissible?

MR. KACHOUROFF:  Because if he denies that he lied to the police -- first of all, understand, if you see the context -- I would urge the Court to look at the video first.  And if you see the video, the context of the video speaks volumes to why it should be admitted.

THE COURT:  All right.  Well, let me stop you there.  If he doesn't deny that he was untruthful to the police in this incident, then there's nothing to impeach.

Would you agree with that?

MR. KACHOUROFF:  I'm not -- under 608, I'm not necessarily impeaching him, but it also goes to his reputational evidence, as well.

22-CV-1129

71

THE COURT:  But it's still extrinsic evidence under Rule 608.  So again, I'm focused on the body cam video as extrinsic evidence.

MR. KACHOUROFF:  Right.  Under Rule 4- -- I think it's -- one second, Your Honor.

It's going to be admissible, Your Honor, if Mr. -- if they were to insist, for instance, that it's a motor vehicle accident because it serves to give context to what his -- in other words, if he filches one iota on the stand and doesn't tell the truth about that incident, then because it's a lie, we're allowed to bring evidence of his reputation for lies. And if he denies that --

THE COURT:  Rule 608 says:  *Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.*

MR. KACHOUROFF:  Correct.

THE COURT:  So how is the body cam video, which is extrinsic evidence -- I'm not asking you about cross-examination in court with Dr. Coomer on the stand.  I'm asking you about the extrinsic evidence of the body cam video.

Do you have authority that you're going to cite to me that says that that extrinsic evidence of the body cam video -- and assuming that is the authentic, unedited

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

22-CV-1129

72

version -- is admissible under Rule 608?

MR. KACHOUROFF:  No, not at this time.  And just so we're clear, Your Honor, I was not anticipating us arguing -- I'm prepared to argue the motions in limine, but to the extent that I have the opportunity to supplement with --

THE COURT:  You're not going to have an opportunity to supplement.

MR. KACHOUROFF:  Okay.  I didn't realize we were going to do the motions in limine today.

THE COURT:  All right.  Well, you should be prepared at a final pretrial conference to argue the motions in limine. We indicated in the final trial preparation order that we would address all issues leading up to trial, one of which is the motion in limine.

MR. KACHOUROFF:  My experience, Your Honor, has been most judges will defer that ruling until trial.  I respect your Court's ruling.  I understand where you're going to go with this, but it's . . .

So if we're going to get into this issue of extrinsic evidence, the same is true for them, as well.  They've told you numerous times -- you yourself, Your Honor, are even repeating the words "Dr. Coomer."  That's an academic degree. And yes, I don't deny that Mr. Coomer has a nuclear engineering degree.

But they're doing that for one reason --

22-CV-1129

73

(Reporter interruption.)

MR. KACHOUROFF:  Mr. Coomer does have a nuclear engineering degree, a Ph.D., that was done many, many years ago.  I don't deny that at all.  But they intend to bolster his credibility by calling him and referring to him as "Dr. Coomer."

And that title is something that if you're going to try to increase his reputational and character evidence by calling him "Dr. Coomer" and giving him that standing that we would give to an academic that is an erudite person that we should all look up to, then all of these other matters all of a sudden become extrinsic evidence.  I have a right to respond in kind.

THE COURT:  I don't agree with that.  I'm looking at the plain language of Rule 608(b).  There has been no motion in limine with respect to how to address Dr. Coomer.  If he has a Ph.D. and he's referred to as a doctor, then we'll refer to him as a doctor.  If Mr. Lindell had a Ph.D., I would also refer to him as a doctor.

So I cannot see any connection between the reference of the Plaintiff in this case as Dr. Coomer and evidence that appears to be barred by Rule 608(b).

MR. KACHOUROFF:  I respectfully disagree, Your Honor. They're supporting his character with that.  That violates Rule 608.  608 has an absolute --

22-CV-1129

74

THE COURT:  Do you have any authority that you can cite to me --

MR. KACHOUROFF:  Yes, Your Honor.  The committee notes say it's a strict prohibition.  And so --

THE COURT:  To refer to someone as "doctor" to bolster -- to allow extrinsic evidence of a motor vehicle incident -- I'll call it an "incident" instead of an "accident" -- to undermine the reference to him as "Dr. Coomer" when he has earned a Ph.D.?

Is that what you're telling me, Counsel?

MR. KACHOUROFF:  No, Your Honor.  That's not what I'm telling you.  What I'm telling you is that they're using the Ph.D. language to bolster his character, to support his character.  Because without it, they have nothing.

And so if they're going to try to support his character by referring to him as "Dr. Coomer" -- they're going to elicit testimony today -- sorry, ma'am.  They're going to elicit testimony not today, but during trial, I presume, where they will say that Dr. Coomer has earned his Ph.D. from Berkeley University in 2003, or whenever he earned it.

And if he does such a thing, what's the purpose of that testimony?  It's to support his character that this is not the kind of person that would lie to you on the stand.

THE COURT:  Again, I'm looking at Rule 608(b) --

MR. KACHOUROFF:  Correct.

Megan E. Strawn, RPR, CRR                              (307) 232-2626

22-CV-1129

75

THE COURT:  -- and extrinsic evidence.  You've told me that you do not have authority to cite to me.

MR. KACHOUROFF:  I do.  I said if you look at the committee notes, the 2003 amended, it's been amended to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness's character for truthfulness.

So that's the whole reason for referring to him as Dr. Coomer, Dr. Coomer, Dr. Coomer.  I have a doctorate, Your Honor.  You have a doctorate.  We don't refer to each other as doctors in the courtroom.  It's "counsel," "counselor."

THE COURT:  All right.

MR. KACHOUROFF:  And I want to clarify, this was no motor vehicle accident.  It wasn't an incident.  It was a felony committed in the presence of an officer.  The reason why they don't want the video shown is because it shows Mr. Coomer showing up at the very end talking the police officer out of arresting him.  Oh, that we should all have such abilities to do such a thing.  We don't.

He also misstates.  He said law enforcement inquired, and Mr. Coomer said he didn't know.  That's not what happened in the video.  Clearly --

THE COURT:  But we're -- Mr. Kachouroff, we're not going to trial on the motor vehicle accident.  This is not a

22-CV-1129

76

negligence case --

MR. KACHOUROFF:  Correct.

THE COURT:  -- about the motor vehicle accident.

So I'm focused again on 608(b) and extrinsic evidence of truthfulness or untruthfulness.  That has nothing to do with his denomination as a doctor or not a doctor.

So again, do you have authority, or do you not?  And if you do not, at this point I need you to move on to your next argument.

MR. KACHOUROFF:  Okay.  I don't have authority for the proposition that using your doctorate to bolster or support your credibility in this case, I don't have authority for that.

THE COURT:  All right.  Let's move on, then.

MR. KACHOUROFF:  I'm not bringing anything up about Mr. Coomer's sex life, his drug life, or his religious beliefs.

THE COURT:  Okay.

MR. KACHOUROFF:  To the extent that he brought these Facebook posts himself and they were made public, there's two components with that.  First of all -- and he doesn't deny this.  He's testified under oath in prior testimony.  I expect him to also admit it.

I'm sorry, ma'am.  I'll try to talk slower.

He's also admitted that he lied to the newspaper.  He

22-CV-1129                                                                77

originally said he didn't create these posts when, in fact, he

did.  But it goes to his reputation, his reputational harm.

In other words, he did it to himself.

THE COURT:  But did he publish these?

MR. KACHOUROFF:  Yes, he did.

THE COURT:  He published these in the public domain

himself?

MR. KACHOUROFF:  On Facebook in front of 300 people.

THE COURT:  Okay.  But those are private posts.  So

are you saying that the private posts on Facebook are

publications for the purposes of defamation?

MR. KACHOUROFF:  No.  It's for the purposes of his

reputation.

THE COURT:  Okay.  So again, you're saying that

things he said privately to his Facebook friends -- none of

whom, as I understand, are the Defendants in this case --

would be considered publications, that he did it to himself?

MR. KACHOUROFF:  It goes to his reputational harm,

his reputational injury.

THE COURT:  So his reputational harm with respect to

those 300 people?

MR. KACHOUROFF:  Because obviously, Judge, it wasn't

private if it got out into the public space.

THE COURT:  How would I know that?  Who is going to

testify to that?

22-CV-1129

78

MR. KACHOUROFF:  There may be a witness at trial who will testify that he received -- that he was part of the 300 and that --

THE COURT:  Who is that witness?

MR. KACHOUROFF:  I don't have it in my notes with me at this time.  I can supplement that later if you'd like me to.

THE COURT:  Well, I mean, you only have a limited number of people on your witness list.  So can you take a look at your witness list?

MR. KACHOUROFF:  I cannot, Your Honor.  I don't have it with me.

THE COURT:  Well, we can get you a copy of the witness list.

MR. KACHOUROFF:  You can show me the witness list.  I said I don't have my notes with me, Your Honor.

THE COURT:  All right.  So someone on the current Defense witness list is going to testify that that person is within the 300 of the Facebook friends; is that right?

MR. KACHOUROFF:  Or was contacted by one of the 300 who -- I don't have -- this is something I looked up about two weeks ago.  I don't have it in front of me.

THE COURT:  Okay.  So that seems like it would be dependent on that person coming to trial, testifying, and then you seeking to admit the Facebook post associated with that

22-CV-1129

79

person at trial; is that right?

MR. KACHOUROFF:  I don't think that's right.  I think you should reserve until we're at trial, and we can lay a foundation for -- I mean, Mr. Coomer's not going to deny that these are his posts.  If your only issue is how did this get out in the public domain, well, that would be conditional admissibility.  I get that.

THE COURT:  Right.  That's what I'm asking you.  So I can't decide that issue until that person shows up --

MR. KACHOUROFF:  Correct.

THE COURT:  -- testifies --

MR. KACHOUROFF:  Correct.

THE COURT:  -- about a particular Facebook post, that they received it from one of the 300 people within the private group; is that correct?

MR. KACHOUROFF:  That would be correct.

THE COURT:  All right.

MR. KACHOUROFF:  May I continue, Your Honor?

THE COURT:  Yes, you may.

MR. KACHOUROFF:  Because this information gets out into the public domain, it matters not whether Mr. Lindell had knowledge of it at the time he encountered Mr. Coomer.  This all goes to Mr. Coomer's reputation in the community and how he was perceived.  It's an unsavory one, in my opinion.

The 118-page document, let me say for the record, I

Megan E. Strawn, RPR, CRR                          (307) 232-2626

22-CV-1129

80

will not be outdone by anyone seeking to protect Mr. Coomer's family, his contacts.  I absolutely agree that stuff should be redacted.  That won't be in front of the jury at all

THE COURT:  How are you going to authenticate that document?

MR. KACHOUROFF:  That's going to be my partner, Ms. DeMaster, who just recently entered this case with me. She would have those answers.  I didn't have her here today because, quite frankly, Your Honor -- I can't talk on the record about this.  I'd like to go off the record, if we could, meaning I don't want this for public --

THE COURT:  Well, we can restrict this portion of the proceedings, but we're not going to go off the record.

MR. KACHOUROFF:  That's what I mean.  I mean restrict.

THE COURT:  Okay.

(Sealed proceedings contained in Vol. Ia, pages 81 through 84.)

* * * * *

22-CV-1129-NYW-SPB                                               Vol. I - 85

THE COURT:  All right.  Are you going to be lead counsel in this case?

MR. KACHOUROFF:  I am, Your Honor.

THE COURT:  Okay.  And you understood that you were coming here -- I don't think this portion needs to be restricted.

You're coming here today to talk about getting ready for trial, correct?

MR. KACHOUROFF:  Right.

THE COURT:  And so at this point, you're still representing Mr. Lindell.  You haven't sought to withdraw; is that right?

MR. KACHOUROFF:  There is no way that this Court would allow me to withdraw or entertain this point given -- because the trial has been set.  If the Court would entertain such a motion, I will file it.  But I didn't even raise it because I didn't believe that you would even entertain it.

THE COURT:  Okay.

All right.  Well, what I will say is I don't entertain motions that are not formally filed in front of me.  So I don't know that I am here to give any sort of advice with respect to that issue.

Okay.  All right.

MR. KACHOUROFF:  So I just want to point out that these -- that the establishment of his bias against President

Trump, for instance, it's going to come out.  He's not going to deny that.  That goes to whether he would have or may not have made that phone call.  And the jury can sort that out.  The jury will sort that out.  It's a factual question.  You know, is this the kind of guy that would make such a phone call to begin with to Antifa -- or an Antifa call?

THE COURT:  So are you planning to raise a defense that this call actually occurred?

MR. KACHOUROFF:  Truth?

THE COURT:  Yes.

MR. KACHOUROFF:  I may, Your Honor, yes.  I'm trying to get in touch with -- that's why I -- just in full disclosure, I've not talked with this John Tiegan guy.  He is one of a number of people that were mentioned.  But he has apparently done an affidavit in favor of Joe Oltmann.

John Tiegan is a former Navy Seal who was one of the Seals that was defending the secretary -- one of the ambassadors in Benghazi.  So his reputation, in my opinion, I want to be able to explore that.  I have not talked to him yet.  You may say, Well, why haven't you?  Well, I've given you the answer.

THE COURT:  Okay.  Anything else about this 118-page exhibit?

MR. KACHOUROFF:  Let me voluntarily say this:  I will withdraw that as an exhibit --

22-CV-1129-NYW-SPB                                                Vol. I - 87

THE COURT:  Okay.

MR. KACHOUROFF:  -- but I will ask questions about it, and pages of it may become admissible during the trial.

THE COURT:  How can you withdraw it as an exhibit but then pages become admissible or it becomes an exhibit at trial?

MR. KACHOUROFF:  If it were used for impeachment purposes.  I mean, as you know, I don't have to disclose impeachment materials.  So that's the only way it would become admissible, in my opinion.

THE COURT:  Okay.

MR. KACHOUROFF:  Or pages of it.

I wouldn't -- and still with the proviso that I would not allow any of his personal information for his family, things that he did when he was in the third grade, I don't care about that stuff.

THE COURT:  All right.  So to be clear, you would not be seeking the admissibility of the entirety of the exhibit under any circumstance; is that right?

MR. KACHOUROFF:  That would be correct.

THE COURT:  Okay.  All right.

MR. KACHOUROFF:  One of Mr. -- my colleague's objections to the Facebook posts were that they were cumulative, but it's also vitriolic from Mr. Coomer who, you know, basically put this out there for all to see.  And he'll

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

say, Well, it was only 300 people.  We all know 300 people could then republish.

THE COURT:  Do you have a witness that is -- other than the one that may have been one of the 300 that's going to testify that he received it, any other witness that's going to testify about republication?

MR. KACHOUROFF:  I believe if Mr. Oltmann comes, he will testify -- and he may be the witness I was thinking of. I haven't had the opportunity to talk to him yet.  My colleagues have deposed him; I haven't.  And there is a deposition.  I've read it, but there's some unanswered questions in it.

I think -- and I also -- for the Court's knowledge, I'm also counsel of record in the DC case with Mr. Lindell and the Minnesota case with Mr. Lindell.  So there's a lot of depositions between the three cases, so I'm trying to keep them all straight as to where I heard what.

THE COURT:  Okay.

MR. KACHOUROFF:  It was either Mr. Oltmann or someone else talked about receiving those Facebook posts.  But at the end of the day, he doesn't deny that they're his Facebook posts.  But again, it goes to whether he's the kind of person that would lie about a phone call being on Antifa, claiming that in his line of work he was able to rig the election.

So the -- what I see before the Court is not this

massive trial on whether the 2020 election was rigged. You know, there's basically two statements that are at issue, really. The first statement is Mr. Oltmann saying that he was on this phone call with Mr. Coomer, and Mr. Coomer says, No, I wasn't. And the second one is Mr. Lindell's statement that he made some deal with Newsmax and that Coomer's part of this, and he goes off on this one rant. That's really this whole case, those statements.

And so, you know, we're going to have issues of whether the 2020 election was rigged. I mean, I don't know how that's necessarily relevant, but maybe that's their case. Mr. Cain indicated that that was circumstantial.

So I'm not sure -- if that becomes part of their case, then the fact that Mr. Coomer is vitriolic -- you know, has vitriol dripping from his lips every time he turns around about President Trump, and it's out in public and he testifies about it, it's not hidden now. A jury could reasonably infer that he's the kind of person that would actually have done this type of phone call on the Antifa call. They could disbelieve him.

So the standard isn't whether it's unduly prejudicial; it's whether it's unfairly prejudicial. And everything I do I attempt to prejudice Mr. Coomer.

The question is whether it's unfair to do so. So for that I would say, Judge, it's completely fair for these things

to come in.  Whether we have knowledge of Mr. Coomer's Facebook posts at the time is not the standard for admissibility in this case.

THE COURT:  Right.  But with respect to whether or not the evidence can be used to address actual malice, my understanding is that Mr. Lindell has testified that he didn't know of anything about Dr. Coomer except for the fact that he had settled with Newsmax.

And so evidence with respect to these posts, whatever is in this 118-page exhibit, Dr. Coomer's various statements on Facebook, those, you would agree, can't go to Mr. Lindell's state of mind.

MR. KACHOUROFF:  Correct.  It would be offered for that purpose.

THE COURT:  All right.  Anything else?

MR. KACHOUROFF:  I don't think -- is there anything else the Court would like me to address?

THE COURT:  I actually have several questions about your response, and I'm going to walk through them.  And my understanding is that you signed the response consistent with Rule 11; is that right?

MR. KACHOUROFF:  Yes, Your Honor.

THE COURT:  All right.  So starting with page 3, you cite to *Mata versus City of Farmington*, 798 F. Supp. 2d 1215, 1227, and, quote:  *The prejudice must be unfair in the sense*

22-CV-1129-NYW-SPB                                          Vol. I - 91

*that it would affect the jury's ability to weigh the evidence rationally*, unquote.

So my understanding is that that quote, you say, is from that case; is that right?

MR. KACHOUROFF:  Your Honor, may I look at the case, please, or -- I don't have -- hold on one second.

Excuse me, Your Honor.

THE COURT:  Do you have the brief in front of you?

MR. KACHOUROFF:  I do not.  I do not.  I'm sorry, Your Honor.  I told you that I was not prepared.  I did not realize we were going to do a hearing on the motions in limine.

THE COURT:  Well, what I will tell you is that the actual quote is:  *[The prejudice] must be unfair in the sense that it would be misleading and not aid and assist the jury in making a material determination in this case.*

So that quote that you cite on page 3 does not appear in the actual case.  And I'm going to have my law clerk print a copy of your response for you.

MR. McCLAIN:  Judge, I'm going to send this to the chambers printer.

THE COURT:  All right.

MR. KACHOUROFF:  Your Honor, what was the cite to that that you have?

THE COURT:  *Mata versus City of Farmington*,

22-CV-1129-NYW-SPB                                                    Vol. I - 92

798 F. Supp. 2d 1215, 1227 (D.N.M. 2011).

MR. KACHOUROFF:  Was the quote in parentheses?

THE COURT:  Correct.

MR. KACHOUROFF:  Your Honor, I may have made a mistake, and I may have paraphrased and put quotes by mistake. I wasn't intending to mislead the Court.  I don't think the quote is far off from what you read to me.  I think it --

THE COURT:  All right.  My law clerk's going to bring you the brief.

(Pause in the proceedings.)

THE COURT:  All right.  We'll move on from *Mata* because I've stated my concern about the quote.  It looks like it's in a parenthetical as a quote.

MR. KACHOUROFF:  It is, Your Honor, as a quote.  That was not intended to be a quote.  I may -- let me say this:  I would not knowingly quote something -- or quote something falsely.  I was not trying to mislead the Court.

THE COURT:  I understand that.  So let's keep moving.

MR. KACHOUROFF:  All right.

THE COURT:  The next issue is on that same page.  You state:  *In defamation actions particularly, courts routinely admit evidence probative of truthfulness given that a plaintiff's reputation and credibility are directly at issue.*

You cite *Perrin versus Anderson*, 784 F.2d 1040, 1045 (10th Cir. 1986).

Megan E. Strawn, RPR, CRR                                      (307) 232-2626

Is it your suggestion that *Perrin versus Anderson* is a defamation case?

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  Okay.  So *Perrin versus Anderson* is, in fact, not a defamation case.  It's a Section 1983 case where the decedent was shot and killed by --

MR. KACHOUROFF:  Troopers, yeah.

THE COURT:  -- sheriff deputies.  So there are no general statements regarding defamation in that case.

There is a quote saying:  *In a defamation action, for example, the plaintiff's reputation for honesty is directly at issue when the defendant has called the plaintiff dishonest.*  That's at 784 F.2d 1045.

But the statement that *In defamation actions particularly, courts routinely admit evidence probative of truthfulness given that a plaintiff's reputation and credibility are directly at issue* is, in fact, not supported by *Perrin*.

The next issue comes on page 4.  And on page 4, you state:  *The District of Colorado has specifically addressed the admissibility of evidence showing untruthful context and similar context.*  In *Ginter versus Northwestern Mutual Life*, 756 F. Supp. 627, 630 (D. Colo. 1984), the Court held that:  *Where the focal issue in the case is plaintiff's character, evidence of specific instances of conduct becomes admissible.*

22-CV-1129-NYW-SPB                                              Vol. I - 94

Do you see that?

MR. KACHOUROFF:  I do.

THE COURT:  *Ginter* is not, in fact, a District of Colorado case, and it's not a defamation case.  It's an Eastern District of Kentucky case about a suit regarding insurance benefits.  Plaintiff sued for the breach of contract.  Defendants argued that there was a material misrepresentation in the application.

And so I'm -- I don't quite understand how *Ginter* -- and I would like to understand how *Ginter* became attributed to the District of Colorado.

MR. KACHOUROFF:  Your Honor, my name is on the pleading, and so I take responsibility for this.  I gave cite-checking to another person, but I'm ultimately responsible because my name is on it.  Period.

THE COURT:  Who did you give cite-checking to?

MR. KACHOUROFF:  My colleague, Ms. DeMaster.

THE COURT:  Okay.

MR. KACHOUROFF:  I don't think she intentionally --

THE COURT:  We're going to go through all of these, Mr. Kachouroff --

MR. KACHOUROFF:  Understood, Your Honor.

THE COURT:  -- because there is -- the Court is significantly troubled by this response.

MR. KACHOUROFF:  I understand, Your Honor, and I

Megan E. Strawn, RPR, CRR                                (307) 232-2626

should have --

THE COURT:  All right.  Let's move on.  Also on page 4:  *Further, the body cam footage should be admissible on cross-examination because it concerns Mr. Coomer's mental state and preexisting conditions affecting his psychological well-being, both of which the Plaintiff here has put at issue.*  See *Cerca versus Thomas*, 30 F.App'x 931, 933 (10th Cir. 2002).

That also -- you characterize it as:  *admitting evidence appropriate where multiple levels of relevance for competency, truthfulness, and preexisting conditions to rebut a party's exclusion request.*  That's in the parenthetical.

*Cerca* affirmed a district court's decision to permit testimony about whether the decedent exposed his children to illegal drug activities because the psychological harm related to the children's emotional distress damages for the loss of their father.  That's at page 933.

There was no mention of competency, truthfulness, or preexisting conditions.  I don't see it in the case at all.  I don't even see those words.

Do you have any explanation for that?

MR. KACHOUROFF:  I don't at this time, Your Honor.

THE COURT:  All right.  So then you next say:  *Mr. Coomer seeks to exclude evidence of his social media posts and statements expressing animosity towards President Trump, law enforcement, and related political issues.  This evidence*

22-CV-1129-NYW-SPB                                                    Vol. I - 96

*is directly relevant to rebutting Mr. Coomer's claims that Defendants acted with actual malice.*

But as I understand your argument here today, you will not be presenting that evidence with respect to rebutting any issue of actual malice because you concede that Mr. Lindell had no access to any of those statements about President Trump, law enforcement, Black Lives Matter, or those social media posts or statements or the 118-page exhibit when he made his statements with respect to Dr. Coomer.

Is that correct that you've made that representation to the Court today?

MR. KACHOUROFF:  I did, Your Honor, but I also clarified for the Court that we intend to introduce evidence of Mr. Coomer's social media posts because it goes to his -- is he the kind of person, if he denies these things.

THE COURT:  I understand that.  But my question to you is, you are abandoning this argument that that evidence would be sought to be admitted to rebut Mr. Coomer's claims --

MR. KACHOUROFF:  Yes, Your Honor.

THE COURT:  -- that Defendants acted with actual malice; is that right?

MR. KACHOUROFF:  That's right.

THE COURT:  All right.  So let's move on to page 6. On page 6, you state:  *The Tenth Circuit has repeatedly held that defendants must be permitted to present evidence of*

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

*alternative causes for claim emotional injuries.*  See *Perkins versus Federal Fruit and Produce Company*, 946 F.3d 1242, 1251 (10th Cir. 2019), *admitting evidence of prior emotional difficulties to challenge damages claims.*

In *Jones versus Denver Post Corporation*, 203 F.3d 748, 756 (10th Cir. 2000), *evidence of prior mental health treatment relevant to emotional distress damages.*

Would it surprise you, Mr. Kachouroff, to find out that the case *Perkins versus Federal Fruit and Produce Company* does not, in fact, exist?  There is no case at 945 F.3d 1242 (10th Cir. 2019).

MR. KACHOUROFF:  Would I be surprised?

THE COURT:  Would you be surprised?

MR. KACHOUROFF:  Yes, I would be.

THE COURT:  Okay.  So that citation relates to *United States versus ex rel. Alexander Volkhoff, LLC, versus Janssen Pharmaceutica N.V.*, 945 F.3d 1237, not 1242, (9th Cir. 2020). There is a District of Colorado case by the same name that ended in 2014, *Perkins versus Federal Fruit and Produce Company,* 945 F. Supp. 2d 1225 (D. Colo. 2013).  The appeal was dismissed, No. 13-1250 (10th Cir. July 29, 2013).  It does not deal with evidence regarding prior emotional difficulties, and evidence would not have been admitted regarding prior arrests.

So it does not even talk about the federal -- the District of Colorado case.  It does not talk about the

proposition that -- about admitting any evidence about prior emotional difficulties to challenge damages.

The case citation is associated, as I indicated, with a False Claims Act case.  And the opinion at 945 F.3d 1237 deals with an appeal on a ruling on a motion to dismiss based on lack of subject-matter jurisdiction.

Now moving to *Jones versus Denver Post Corporation,* 203 F.3d 748, 756 (10th Cir. 2000), we found no mention of prior mental health treatment or diagnoses or non-economic damages with respect to that case.  It doesn't seem to relate to permitting evidence to prior mental health treatment relevant to emotional distress damages.  So it is not at that pinpoint citation.  That pinpoint citation seems to pertain to evincing evidence of pretext.

So again, any explanation as to how these citations are and these characterizations of these cases are inaccurate?

MR. KACHOUROFF:  Not at this time, Your Honor.

THE COURT:  Okay.  We've talked about *Mata versus City of Farmington*, 798 F. Supp. 2d 1215, 1227 (D.N.M. 2011). It says:  *In Mata versus City of Farmington, the Court allowed evidence of prior substance abuse issues relevant to emotional distress damages.*

There is no mention of Mr. Mata's prior substance abuse issues relating to emotional distress damages, although the Court does cite some cases permitting substance abuse

22-CV-1129-NYW-SPB                                          Vol. I - 99

evidence with respect to damages purposes.

It cited to *Gates versus Rivera* which allowed evidence of decedent's prior drug use to go to damages about the estate because one issue was what kind of son she lost when defendants killed the plaintiff's son in the case.

So again, any explanation as to the description of this case on page 6?

MR. KACHOUROFF:  Which case are you referring to, *Mata* or *Sanchez v. Duffy*?

THE COURT:  *Mata*.

MR. KACHOUROFF:  And you were speaking quickly, Your Honor.  Can you repeat what you said about this particular case?

THE COURT:  I just don't see it.  I mean, both with *Mata* and with *Sanchez*, I don't see how the propositions that they're cited for are accurate.

In fact, with respect to *Sanchez versus Duffy*, I didn't find any specific discussion with respect to prior mental health treatment to challenge causation with respect to emotional distress damages.

There's no pinpoint citations.  So if there is a pinpoint citation, I would appreciate that so I can make sure that that is an accurate statement of law.

Moving on to *Boeser versus Sharp* --

MR. KACHOUROFF:  I can't -- I'm sorry, Your Honor.  I

Megan E. Strawn, RPR, CRR                              (307) 232-2626

22-CV-1129-NYW-SPB                                              Vol. I - 100

can't move on.  I'm trying to look at these cases while you're talking about them and write something down so that I can -- I hear what you're saying is we have to go back and cite-check this, but --

THE COURT:  You're not --

MR. KACHOUROFF:  -- obviously --

THE COURT:  You were supposed to cite-check this before --

MR. KACHOUROFF:  That's correct.

THE COURT:  -- it was submitted consistent to Rule 11.  So I'm going to go through these.  I don't have time for you to be looking up these cases now.  We'll be issuing an order to show cause.  I'm going to go through these to see if you have responses right now.  If you do not, you will have an opportunity to respond to these within a response to an order to show cause.

So the next one is page 6, *Boeser versus Sharp,* Case Number 03-CV-31-WDM-MEH, 2007 Westlaw 143010 at star 7 (D. Colo.  May 14, 2007).

Quote:  *When a plaintiff places mental state at issue, evidence of preexisting conditions becomes highly relevant to assessing damages.*

It does not seem that that statement is supported by the *Boeser* case, either.

Any response to that right now?

MR. KACHOUROFF:  I'm starting to think this is a draft pleading because I never would do a pin cite, first of all, as you see there after *Boeser v. Sharp*, CIVA 03-CV-00031-WDM-MEH.  I just wouldn't cite that way.

THE COURT:  Well, whether or not it's a draft pleading, you would agree that it was submitted to the Court --

MR. KACHOUROFF:  It was, Your Honor.  My name appears on it.

THE COURT:  -- and your name appears on it.

So moving on, page 7, *Cerca versus Thomas*, 30 F.App'x 931, 933.

MR. KACHOUROFF:  That case was quoted earlier.

THE COURT:  *The Tenth Circuit notes that Rule 608 permits exclusion only if the defendant's introduction is done for the sole purpose of attacking the witness's character for truthfulness,* with the *Cerca* citation.

*Cerca* does not seem to mention either Rule 608 or truthfulness or character evidence.  So it doesn't seem to be supported by *Cerca*.

The next page, next case is *United States versus Morales*, 108 F.3d 1213, 1222 (10th Cir. 1997).  That appears on both pages 8 and 14.  The parenthetical on page 8 is *applying curative admissibility doctrine where the party opens the door to otherwise inadmissible evidence.*

Megan E. Strawn, RPR, CRR                              (307) 232-2626

It's difficult to see how *Morales* supports this proposition at all because the case does not even deal with evidentiary issues, and I could not find the term "curative admissibility" or any other door-opening principles in *Morales*.

Moving on to page 9, *Roberts versus McAfee, Inc.*, 660 F.3d 1156, 1167 to 68 (9th Cir. 2011), describing as *holding public social media posts relevant to damages analyses.* *Roberts* does not address social media posts or how they figure into reputational damages.  Instead, *Roberts* deals with the California Single Publication Doctrine, a rule that limits discovery -- or recovery in a defamatory internet statement for the first time under California law the statement -- the first time a statement is posted to the public.  That's at 660 F.3d 1166 to 67.

It's also unclear to the Court how California law would be applied to a defamation action arising under Colorado law.

Page 9 also cites *Lohrenz versus Donnelly*, 350 F.3d 1272, 1282 to 83 (D.C. Cir. 2003).  It's described as *admitting evidence of Plaintiff's social media posts to assess preexisting reputation*.

This is not accurate.  There's no mention of social media posts.  I note that the case is from 2003 before the proliferation of social media.  In *Lohrenz,* the Ninth Circuit

22-CV-1129-NYW-SPB                                            Vol. I - 103

found that a female Navy pilot became a voluntarily limited-public figure when she chose to become a fighter pilot despite the preexisting public controversy surrounding female fighter pilots.  That's 350 F.3d at 1281 to 1283.

Any explanation for any of these?

MR. KACHOUROFF:  Well, I know the *Lohrenz v. Donnelly* case dealt with a female pilot that had been campaigning.  It was a First Amendment case.  I'd have to go back and look at that, Your Honor.

THE COURT:  Okay.

MR. KACHOUROFF:  But the other one, the *Roberts* -- you said the *Roberts v. McAfee* was not clear to you how that was --

THE COURT:  It doesn't address social media posts or how they figure into reputational damages.  It's also arising under California's Single Publication Doctrine.  So I don't know how the California Single Publication Doctrine is relevant in this particular defamation case.

Moving on to pages 9 and 13:  *The Tenth Circuit has specifically addressed authentication and admitting of social media evidence in United States versus Hassan, holding that social media posts are admissible when adequately authenticated and relevant to material issues.*

Would you agree with me that the citation is incorrect and the statement is incorrect because *Hassan* is a

Megan E. Strawn, RPR, CRR                                (307) 232-2626

22-CV-1129-NYW-SPB                                          Vol. I - 104

Fourth Circuit case and not a Tenth Circuit case?

MR. KACHOUROFF:  Yeah, that should be Fourth Circuit, Your Honor.

THE COURT:  Okay.

I think we've talked about *Sanchez*.  Now let's move on to *Estate of Martinelli versus City and County of Denver*, Case Number 19-CV-2737 --

MR. KACHOUROFF:  Which page are you on, Your Honor? I'm sorry.

THE COURT:  I'm sorry?

MR. KACHOUROFF:  Which page are you on?

THE COURT:  10 and 12.

MR. KACHOUROFF:  10 and 12.

THE COURT:  This case is cited on both pages.

MR. KACHOUROFF:  Okay.

THE COURT:  Case Number 19-CV-2737, 2021 Westlaw 4133804 at star 6 to 7.  It's described as *admitting social media evidence as relevant to damages claim.*  It's supposedly a District of Colorado case dated September 10th, 2021.

Would it surprise you that this case does not exist?

MR. KACHOUROFF:  It does.

THE COURT:  Okay.  It does not exist.  2021 Westlaw 4133804 relates to an Army Merit Systems Protection Board decision, *Lee versus Department of the Army.*

There is a case called *Martinelli versus District*

Megan E. Strawn, RPR, CRR                                    (307) 232-2626

*Court*, but it's from -- it's 612 P.2d 1083, 19 -- Colorado Supreme Court 1980.  You can imagine that in 1980, no one was admitting social media evidence as relevant to any of the damages actions, and that case does not even relate to the admission of evidence at all.

The case number that is associated with *Martinelli*, Case Number 19-CV-2737, is related to an entirely different case that was closed in 2019, *Baccega versus Media Group, Inc.*, Case Number 19-CV-2737-RM-KLM.

Now we'll move on to *Peterson versus Nelnet Diversified Solutions, LLC,* 400 F. Supp. 3d 1122, 1131 (D. Colo. 2019).  That's actually one of my cases.  It's also characterized as:  *permitting discovery and use of social media posts in an emotional distress case.*

That's actually not accurate at all because it doesn't involve any social media or any online statement, emotional distress, or even discovery issues.  That case pertained to the FLSA, the Fair Labor Standards Act, and whether or not particular individuals should or could be compensated for a violation of the Fair Labor Act for what this Court determined to be de minimis time.

I will be honest, I was reversed on appeal, but that has nothing to do with social media, online statements, emotional distress, or even discovery issues.

Any explanation as to how *Peterson* became part of

22-CV-1129-NYW-SPB                                      Vol. I - 106

this briefing with respect to social media posts?

MR. KACHOUROFF:  I do not, Your Honor.

THE COURT:  Then *United States versus Hoffman* on page 10, 806 F.3d 1288, 1295 (10th Cir. 2015), it's described as: *distinguishing between prohibited credibility attacks and permissible non-credibility purposes.*

Would it surprise you that *United States* --

MR. KACHOUROFF:  There's no such case.  It's a -- I recognize the citation to *U.S. v. Hoffman*.

THE COURT:  It doesn't exist.

MR. KACHOUROFF:  It's an old case.

THE COURT:  Okay.  806 F.3d 1288 corresponds to an 11th Circuit case from 2015, *Villareal versus R.J. Reynolds Tobacco Company*.

So do you have a citation to *United States versus Hoffman* that is actually correct?

MR. KACHOUROFF:  I'll have to look for it.  I don't have the exact citation, but I'm not even sure if that case is applicable now that you've pointed all this out, Your Honor.

THE COURT:  Okay.  So then moving on, also on page 10: *Courts have regularly admitted evidence touching on religious beliefs when relevant to factual issues that do not involve credibility.*

My understanding from your representation today is that you will not be seeking to admit any evidence with

Megan E. Strawn, RPR, CRR                              (307) 232-2626

respect to any posts or statements made by Dr. Coomer with respect to his religion or lack thereof.

MR. KACHOUROFF:  Correct, Your Honor.

THE COURT:  Okay.  So I will tell you that that citation is also not accurate.  It was a summary judgment ruling that involved no evidentiary basis, no evidentiary or damages issues, nor did it involve religious statements because the plaintiffs were bringing a race-based disparate impact claim.  It's 238 -- I'm sorry -- 236 F. Supp. 2d at 318.

Now let's move on to page 11, *United States versus Cesareo-Ayala*, 576 F.3d 1120, 1127 to 28 (10th Cir. 2009).  It's described as:  *admitting documents for non-hearsay purposes of showing the effect on the reader's state of mind.*

So again, I understand that you are not seeking to admit the 118-page background document for the purposes to show notice or state of mind; is that right?

MR. KACHOUROFF:  That's correct, Your Honor.

THE COURT:  And so I'm going to let you know that the case does not support that proposition.  The case is actually dealing with statements that took place in conversations, telephone conversations, not written documents.

And the non-hearsay purpose was to show evidence of the participants' business relationship, not either listener's

state of mind.  That's 576 F.3d at 1127 to 1130.

Page 11 also cites to *Brown versus Petrolite Corporation*, 965 F.3d 38, 46 (5th Cir. 1992) as:  *admitting background information to assess reasonableness of defamation defendant's action.*

The case did not address the reasonableness of the defendant's actions.  It appears that *Brown* merely noticed that actual malice can be inferred from circumstantial evidence.  965 F.2d at 47.

So not quite sure how that citation is used for the purpose of establishing -- for the proposition that it can be used to establish the reasonableness of defendant's conduct.

But again, my understanding is that you will not be trying to use that background document to establish the reasonableness of any of the defendants' conduct in this case; is that right?

MR. KACHOUROFF:  That's correct.

THE COURT:  All right.  Now moving on to *United States versus Caraway*, page 11, 534 F.3d 1290 (10th Cir. 2008), quote:  *Courts in the Tenth Circuit lend careful consideration to Rule 403 balancing in defamation or intentional infliction cases because, unlike other legal claims, evidence that is central to reputation or reputational damages or emotional damages is far more probative to these claims regardless of the purported prejudice to a plaintiff,*

22-CV-1129-NYW-SPB                                               Vol. I - 109

citing *United States versus Caraway*, 534 F.3d 1290 (10th Cir. 2008).

So, Mr. Kachouroff, you would agree with me, wouldn't you, that that statement seems to suggest that *United States versus Caraway* would relate to defamation or an intentional-infliction-of-emotional-distress case?  That's what it seems like it suggests; is that right?

MR. KACHOUROFF:  It seems to suggest that, but it's --

THE COURT:  Citing to a criminal case.

MR. KACHOUROFF:  Correct.

THE COURT:  All right.

And then, again, we've talked about *Peterson versus Nelnet* once before.  It's cited again on page 13 as: *discussing the effective limiting instructions for multiple-purpose evidence.*

So again, would it surprise you that *Peterson versus Nelnet* never made it to trial?

MR. KACHOUROFF:  Your Honor, you keep asking me would it surprise me whether they made it to trial.  I don't know. I mean, I can short-circuit all of this right now.

THE COURT:  So you don't have any explanation for *Peterson versus Nelnet* being cited on page 13 for this proposition?

MR. KACHOUROFF:  Not at this time, I do not, Your

Honor.

THE COURT:  All right.  And then the last one, *Jefferson County School District versus Moody Investor Services*, 175 F.3d 848, 857 to 56 (10th Cir. 1999).  After noting the constitutional limitations on defamation law, you cite this case for the proposition that:  *The Tenth Circuit requires 'breathing space' for the defamation defendants to present their defense.*

Again, would you agree with me that the quotation around the words "breathing space" suggests that that language comes directly from the case law?

MR. KACHOUROFF:  Okay.  You're on page 15?  I'm sorry.  I didn't -- I wasn't sure where you were.

I don't know that that would be coming right from the case itself.

THE COURT:  Why would you put it in quotations, then?

MR. KACHOUROFF:  If I was highlighting a phrase, but I -- again, I'm going to take your word for it, Your Honor, that doesn't appear in *Jefferson County School District*.

THE COURT:  All right.  So --

MR. KACHOUROFF:  It's obvious to me it's --

THE COURT:  -- I'm going to ask you a direct question, and as an officer of the court, I need you to give me a direct answer.

MR. KACHOUROFF:  Yes, ma'am.

THE COURT:  Was this motion generated by generative artificial intelligence?

MR. KACHOUROFF:  Not initially.  Initially, I did an outline for myself, and I drafted a motion, and then we ran it through AI.  And I --

THE COURT:  And did you double-check any of these citations once it was run through artificial intelligence?

MR. KACHOUROFF:  Your Honor, I personally did not check it.  I am responsible for it not being checked.

THE COURT:  And you understood, as an officer of the court, pursuant to Rule 11 --

MR. KACHOUROFF:  I did, Your Honor.

THE COURT:  -- if you're going to use generative artificial intelligence that that did not excuse you from the obligations of Rule 11?

MR. KACHOUROFF:  Absolutely not.  Absolutely not.

THE COURT:  You understood that, correct?

MR. KACHOUROFF:  Yes, I did, Your Honor.

THE COURT:  And that doesn't seem to have happened here, does it?

MR. KACHOUROFF:  No, Your Honor.

THE COURT:  All right.  So we will be issuing an order to show cause with respect to this brief and this conduct, because it's unacceptable.  It would be unacceptable regardless of who performed it.  And the fact that

22-CV-1129-NYW-SPB                                           Vol. I - 112

Ms. DeMaster is not here does not excuse Defendants from double-checking that the citations that are generated and used to represent legal authority to this Court, upon which the Court would like to be able to rely to fashion its determinations, would be accurate and correct as a matter of law.

MR. KACHOUROFF:  Your Honor, I would submit to the Court that I don't know of any possible excuse that we could have that would -- all I can tell you is, number one, I have always cite-checked my pleadings.  I did not cite-check this one.  I have been under the gun with the other two cases that I've been involved in and trying to meet deadlines here.

I had not anticipated being the only attorney on these cases, essentially.  Ms. DeMaster came in to help me.

So at the end of the day, I have a responsibility for it.  I've never been in a position where a court, in my 25 years of practice, has ever put me -- thought of my conduct as falling below the standard, and I apologize.

So to the extent that the Court wants to dispose of this matter now, I would submit, Your Honor, I don't have -- I would just --

THE COURT:  We'll go through the formal procedures.

Anything further today on behalf of Plaintiff?

MR. CAIN:  No, Your Honor.

THE COURT:  Anything further on behalf of the

22-CV-1129-NYW-SPB                                              Vol. I - 113

Defendants?

          MR. KACHOUROFF:  No, Your Honor.

          THE COURT:  We will be in recess.

     (Proceedings concluded at 4:16 p.m., April 21, 2025.)

                              *  *  *  *  *

22-CV-1129-NYW-SPB

Vol. I - 114

C E R T I F I C A T E

I, MEGAN E. STRAWN, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Professional Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 109 pages constitute a full, true, and correct transcript.

Dated this 29th day of April 2025.

_____/s/ Megan E. Strawn_____

MEGAN E. STRAWN
Registered Professional Reporter
Certified Realtime Reporter