IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01129-NYW-SBP

ERIC COOMER, Ph.D.,
    Plaintiff

v.

MICHAEL J. LINDELL, FRANKSPEECH LLC,
AND MY PILLOW, INC.,
    Defendants

---

**PLAINTIFF'S RESPONSE TO MICHAEL J. LINDELL AND FRANKSPEECH LLC'S RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

---

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), through counsel, submits this Response to Michael J. Lindell and Frankspeech LLC's Rule 50(b) Renewed Motion for Judgment as a Matter of Law, [Doc. 386], and in support thereof, respectfully shows the following:

### I.     Introduction

1. Defendants' first Motion for Judgment as a Matter of Law was denied by the Court on June 13, 2025, [Doc. 368, p. 2].

2. In this Renewed Motion, Defendants raise the same arguments that the Court has already rejected. The only difference now is that the jury has returned a multi-million dollar verdict for defamation, intentional infliction of emotional distress, and for exemplary damages. Notably, Defendants persist in their refusal to acknowledge evidence that supports the jury's verdict, as well as the legal standards applicable under the actual malice standard. The Court should deny the Renewed Motion accordingly.

1

## II.     Background

3. On June 13, 2025, Defendants moved for a directed verdict. The Court denied that Motion and the case was submitted to the jury.

4. The jury subsequently returned a verdict finding in favor of Dr. Coomer and against Defendant Lindell for defamation arising from statements he published on May 9, 2021, and on April 6, 2022, [Doc. 375]. The jury found Defendant Frankspeech liable for defamation, intentional infliction of emotional distress, and for exemplary damages arising from statements it published on May 9, 2021, August 12, 2021, and on April 6, 2022, [Doc. 377].

5. The Court entered a Final Judgment in this matter on June 24, 2025, [Doc. 381].

## II.     Legal Standard

6. A district court may enter judgment as a matter of law if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). Judgment as a matter of law is appropriate "only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *Wilson v. Schlumberger Technology Corporation*, 80 F.4th 1170, 1180 (10th Cir. 2023) (citing *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir. 1988)). If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed. *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, (1986).

7. Under Rule 50(b), "the Court examines all evidence admitted at trial, construes that evidence and the inferences from it in the light most favorable to the non-moving party, and refrains from making its own credibility determinations, re-weighing the evidence, or substituting

2

its conclusions for those of the jury." *Live Face On Web, LLC v. Integrity Solutions Group, Inc.*, 421 F.Supp. 105, 1060 (D. Colo. 2019) (*citing Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000).

8. Under this analysis, the Court has the narrow task of determining only whether the jury verdict is supported by substantial evidence when the record is viewed most favorably to the prevailing party. *Id*. (*citing Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002)). Substantial evidence is "something less than the weight of the evidence, and is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Id*. Judgment as a matter of law is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Finley v. United States*, 82 F.3d 966, 968 (10th Cir. 1996). "[S]ince the grant of such a motion deprives the nonmoving party of a determination of the facts by a jury, judgment notwithstanding the verdict should be cautiously and sparingly granted." *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 680 (10th Cir. 1982) (*citing Cleverly v. Western Electric Co.*, 594 F.2d 638 (8th Cir. 1979)).

### III.   ARGUMENT

**A.   Frankspeech is not entitled to immunity under 47 U.S.C. § 230.**

9. Anyone who causes or participates in the publication of defamatory matter or who aids or abets another in publishing the matter can be liable. *Coomer v. Salem Media of Colorado, Inc. et. al.*, 565 P.3d 1133, 1149-50 (Colo. App. 2025). *See also Coomer v. Byrne, et. al.*, Case No. 8:24-cv-000008-TPB-SPF, Order Granting in Part and Denying in Part Defendants' Motions to Dismiss (Jan. 14, 2025) (*citing US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002,

3

1040 (Del. Super. Ct. 2023) ("[A]ll who take part in the procurement, composition and publication of a libel are responsible in law and equally so.") (applying New York law and quoting *Treppel v. Biovail Corp.*, No. 03 CIV. 3002(PKL), 2005 WL 2086339, at *3 (S.D.N.Y. Aug. 30, 2005)); *Van Horne v. Muller*, 691 N.E.2d 74, 77 (Ill. App. Ct. 1998) ("[O]ne who requests, procures, or aids or abets, another to publish defamatory matter is liable as well as the publisher."), aff'd in part, rev'd in part on other grounds, 705 N.E.2d 898 (Ill. 1998) (holding that "[a]ll persons who cause or participate in the publication of libelous or slanderous matters are responsible for such publication") (quotation omitted); *Di Giorgio Corp. v. Valley Labor Citizen*, 67 Cal. Rptr. 82, 87 (Ct. App. 1968) ("[I]n the absence of a privilege, anyone who actively participates in the publication of a false and libelous statement is liable for special, general and even punitive damages."); *see also* RESTATEMENT (SECOND) OF TORTS § 581, comment c ("The rule does not relieve from liability the publisher who prints and puts upon the market a libelous newspaper, book or magazine even though its contents are prepared by a third person . . . .").

10.  Section 230 of the Communications Decency Act (CDA) creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). Specifically, § 230(c)(1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(f)(2) defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access

4

by multiple users to a computer service, including specifically a service or system that provides access to the Internet . . . ."  47 U.S.C. § 230(f)(2).

11. Section 230(f)(3) defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  "This is a broad definition, covering even those who are responsible for the development of content only 'in part.'"  *Universal Commc'n Sys., Inc. v. Lycos*, 478 F.3d 413, 419 (10th Cir. 2007); *see also F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009).  Accordingly, there may be several information content providers with respect to a single item of information (each being "responsible," at least "in part," for its "creation or development").

12. An interactive computer service that is also an "information content provider" of certain content is not immune from liability arising from publication of that content.  *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) ((citing *Fair Housing Counsel v. Roommates.com,* 521 F.3d 1157, 1162 (9th Cir. 2009); *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.,* 206 F.3d 980, 985 n. 4 (10th Cir. 2000)).  A service provider is "responsible" for the development of offensive content if it in some way specifically encourages development of what is offensive about the content.  *Id*. at 1199.

13. Frankspeech's argument for immunity is premised on the conclusory statement that "There is no evidence that Frankspeech generated its own content."  Motion, p. 3.  This is false.  In reality, the testimony at trial readily supports a finding that Frankspeech actively partook in creation and publication of the content at issue.  For example, with respect to the May 9, 2021 interview, Brannon Howse testified that, "[T]his would have just been a general Frankspeech

5

broadcast. Because Lindell TV is not formed, and I am doing Brannon Howse live by then."[1] Defendants even cite to this specific portion of the Howse testimony, despite the fact that it directly contradicts the argument they are attempting to make. Defendants also cite to the Howse testimony at 143:2-21, but here again, Howse confirms that the publication at issue was a Frankspeech publication. He repeated that understanding in other testimony as well.[2] Defendants do not actually identify any evidence that would contradict this finding, but even if they did, that would not alter the Court's analysis. As noted above, the relief requested by Defendants would be appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Finley,* 82 F.3d at 968.

14. With respect to the August 12, 2021 statements made by David Clements at the Cyber Symposium, Howse testified to the following:

> Q: Were you aware that this event was being promoted as a Frankspeech affiliated event?
>
> A: Yes. I think that was the – yeah. I think it was exactly what it was.
>
> Q: And why was that?
>
> A: I mean, that was what's on the back, banners and everything.
>
> Q: Right. Yeah. So my question is, do you know, was Frankspeech trying to promote itself by putting on this symposium?
>
> A: I think they were trying to make people aware that they were now up and running and offer this as a public service.
>
> Q: And Frankspeech livestreamed –
>
> A: Educational.

---

[1] **Exhibit 1**, Howse Depo. Tr. at 163:16-25.
[2] *Id*. at 118:21-119:6.

> Q: Right.
>
> A: You know, I think the goal was to try to educate the public. Educate legislators.
>
> Q: Did – Frankspeech livestreamed the entire event, didn't they? Or did they?
>
> A: I think they did.
>
> Q: Yeah.
>
> A: I mean, that was what we were there to do was to set up our cameras, run our switchers, and stream it.[3]

15. There was also substantial additional evidence presented to the jury that indicated the Cyber Symposium was a Frankspeech publication. For example, Defendants repeatedly promoted Frankspeech in conjunction with promotional materials for the Symposium. (*See, e.g.*, Exhibit 93[4] (advertisement for "Mike Lindell's Cyber Symposium" that prominently states, "LIVESTREAMED NON-STOP 72 HOURS ON FRANKSPEECH.COM"); Exhibit 96[5] (showing "FRANKSPEECH.COM" emblazoned on Symposium backdrop; Exhibit 97[6] (advertisement stating "This historical event will be livestreamed 72 hours straight on my new platform Frankspeech.com. You can help by getting everyone you know to go to Frankspeech.com now. To help with this Cyber Symposium event, I am offering some of the best prices ever on MyPillow products, but they're only offered on Frankspeech.com. Go to Frankspeech.com now to receive these exclusive MyPillow offers!")).

---

[3] *Id.* at 244:12-245:11.

[4] Attached hereto as **Exhibit 2**.

[5] Attached hereto as **Exhibit 3**.

[6] Attached hereto as **Exhibit 4**.

7

16. Similarly, there can be no dispute that Frankspeech is also responsible, at least in part, for the creation and development of the April 6, 2022 statement. In fact, after referring to himself, MyPillow, and Frankspeech, Lindell asserted that "***We*** will not stop until you are behind bars."[7] (Emphasis added). And, Frankspeech stipulated to airing this interview as well.[8]

17. Defendants claim that "Mr. Howse, also through his show owned by his own separate company, Worldview Weekend or AFPI, developed, edited, and created the show containing the second statement on April 6, 2022." But there is no evidence whatsoever to support this proposition. The publication in question is emblazoned with logos for both Lindell TV[9] and the Lindell Report, but there is no reference anywhere to Worldview Weekend. Nor did Howse testify that either Worldview Weekend or AFPI was responsible for the interview. Even if he had, that would not be dispositive. As noted above, there may be several information content providers with respect to any given publication. And Frankspeech concedes that it aired all of the interviews in question.[10] Notably, at no point do Defendants identify or even attempt to identify any outlet *other than Frankspeech* where the public would have been able to hear or view the April 6 statement. For example, they do not argue, nor is there any evidence to support, a claim that Brannon Howse *also* aired the interview on a separate platform. Information content providers—even those who may also be considered internet service providers—may be held liable under § 230 when they "knowingly [seek] to transform virtually unknown information into a publicly available

---

[7] *See* Final Jury Instructions, Stipulated Facts, pp. 15-16 [Doc. 371], ¶ 40.

[8] *Id*.

[9] The jury did hear testimony that Frankspeech had recently changed its name to Lindell TV. Counsel for Frankspeech used the name change to undermine the basis for Plaintiff's expert Doug Bania's damages model which utilized the search term "Frankspeech."

[10] *See* Final Jury Instructions, Stipulated Facts, pp. 12-15 [Doc. 371], ¶¶ 28, 34, 40.

8

commodity." *Accusearch*, 570 F.3d at 1199. In every instance, Frankspeech sought to, and did in fact transform this information into a publicly available commodity.

**B.     Dr. Coomer presented evidence of economic damages.**

18.     Defendants' claim that Dr. Coomer did not produce evidence of economic damages is premised on two claims, neither of which are supported by either the law or the facts. First, Defendants assert that Dr. Coomer claimed his reputation was "destroyed" by others before the statements at issue here. This is simply a cherry picking of two entire days of Dr. Coomer's testimony that deliberately omits reference to countervailing evidence.

19.     For example, Dr. Coomer also testified that he believed the settlement with Newsmax was an opportunity to repair his reputation and re-enter the elections industry, but that Defendants' conduct had foreclosed that possibility. He testified that he had received threats and harassment as a result of Defendants' publications. Dr. Coomer further testified that Defendants' ongoing conduct made it impossible for him to escape this cycle. The jury also heard from witnesses including Matt Crane, who testified that Defendants' conduct had so thoroughly poisoned Dr. Coomer's reputation that he was no longer employable in the election industry, despite an otherwise unquestioned professional reputation. And, the jury saw evidence that Defendants went out of their way to target elected officials across the country, many of whom would not have been exposed to the defamatory statements otherwise. *See, e.g.,* Exhibit 15[11] (spreadsheet produced by Defendants indicating efforts to reach out to elected officials from multiple states.). As a result, this is not an instance where "the proof is all one way or so

---

[11] Attached hereto as **Exhibit 5**.

9

overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *Wilson,* 80 F.4th at 1180.

20. This evidence was further supported by the testimony of Doug Bania, Dr. Coomer's expert witness, whose qualifications and testimony Defendants never challenged or even attempted to challenge prior to trial. Mr. Bania testified to the specific costs needed for a reputational repair program. Defendants do not dispute that reputational repair falls under the umbrella of economic damages,[12] but instead insist that Mr. Bania's analysis was "comical" and "irrelevant." While Defendants unsurprisingly disagreed with Mr. Bania's analysis, it still constitutes the type of evidence on which a reasonable jury could, and this instance did, rely. The Court should reject this argument accordingly.

**C.    Lindell is liable for defamation.**

21. Defendants' argument with respect to Lindell's liability for defamation appears to confuse legal standards, specifically the standard for reckless disregard for the truth under the actual malice standard, and the standard for willful and wanton conduct under Colorado's exemplary damages statute. These are nuanced terms that both derive from different bodies of precedent which provide guidance on their application. Contrary to Defendants' claim, there is nothing incongruent about a finding of recklessness under the actual malice standard, while not simultaneously making a finding for exemplary damages. If there were, then no plaintiff could ever recover on a claim for defamation unless and until he also recovered exemplary damages. This is not, and logically cannot be, the law.

---

[12] Defendants did not object to the portion of Jury Instruction No. 45 [Doc. 371, p. 57], which defined economic losses to include costs associated with reputational repair.

10

22. The standard for "reckless disregard for the truth" under an actual malice analysis derives from various factors established over the last several decades of defamation jurisprudence. Throughout the entirety of this case, up to and including during closing arguments, Defendants have simply refused to acknowledge not only that this substantial body of caselaw exists, but also that it applies to the claims at issue here. The Colorado Court of Appeals recently highlighted some of these factors in *Coomer v. Donald J. Trump for President, Inc. et. al*. In relevant part, it stated the following:

> [W]hile inadequate investigation by a layperson is generally not alone sufficient to show actual malice, grossly inadequate investigation might be. Similarly, while the failure to corroborate information received from an otherwise reliable source does not establish actual malice, "a reporter's failure to pursue the most obvious sources of possible corroboration or refutation" may do so. Other circumstantial evidence of actual malice may include (1) the speaker's hostility toward the plaintiff, (2) inconsistencies in the source's account; (3) reasons to doubt the veracity or reliability of the source; (4) the inherent improbability of the claim; and (5) other credible information contradicting the claim.

*Coomer v. Donald J. Trump for President, Inc*., 552 P.3d 562, 592 (Colo. App. 2024) (internal citations omitted).

23. Jury Instruction 31 accurately reflects this standard, and the jury was properly instructed on its application. *See* [Doc. 371, p. 43]. Defendants do not argue that the instruction is improper, nor could they. Nor do they argue that the jury misapplied the law. Instead, they persist in making an argument that both they and the Court know to be misleading.

24. In any case, the jury heard evidence to support *all* of these factors. The entire two weeks of testimony is too substantial to recount here, but the jury heard Defendant Lindell's testimony that he made no effort to investigate the claims about Dr. Coomer, either from Joe Oltmann or from anyone else (in fact, he never even read Dr. Coomer's Complaint until nearly a

11

year after he was served); Lindell's testimony about his personal hostility toward Dr. Coomer arising from Lindell's false claims about the Newsmax settlement; inconsistencies in Lindell's own claims about Dr. Coomer (claiming on the one hand that he only ever accused Dr. Coomer of "blocking" while simultaneously accusing Dr. Coomer of a "coverup" of election crime); numerous inconsistencies in the testimony of Joe Oltmann about the supposed "antifa call"; multiple reasons to doubt the veracity or reliability of Lindell's sources, including both Joe Oltmann and Dennis Montgomery; the inherent implausibility of Lindell's claims, as testified to at length by both Matt Crane and Dr. J. Alex Halderman; and a wide variety of credible information contradicting Lindell's claims, as similarly testified to by both Mr. Crane and Dr. Halderman, as well as the testimony of Dr. Coomer, Josh Merritt, Harri Hursti, Max McGuire, and Heidi Beedle. The jury could have reasonably relied on any or all of this evidence in finding that Lindell had defamed Dr. Coomer.

25. The Court in *Coomer v. Donald J. Trump for President, Inc.* also expressly rejected the argument that "a defendant can defeat a defamation claim simply by 'testifying that he published with a belief that the statements were true." *Id*. at 591 (*citing St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). But that is precisely what Defendants attempt to do here.

26. The standard for finding "reckless disregard for the truth" under an actual malice rubric is not the same standard for finding "willful and wanton conduct" under Colorado's exemplary damages statute, which defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. §13-21-102(1)(b). This is markedly distinct from the actual malice standard, yet

Defendants assert that because the jury did not find Lindell personally liable for the latter, they *could not* have found him liable for the former. This proposition puts the cart before the horse and would radically transform defamation law in Colorado. It must be rejected.

27.     A plaintiff in Colorado cannot plead a claim for exemplary damages in his initial complaint. *See* C.R.S. §13-21-102(1.5)(1). "may not be included in any initial claim for relief." It may only be added "after the exchange of initial disclosures." *Id*. This would necessarily follow the Court's disposition of any Rule 12 motions, including a motion to dismiss for failure to state a claim. The inescapable conclusion from this statutory framework is that the threshold for a finding of recklessness under the actual malice standard is necessarily lower than that for a claim for exemplary damages, which require a heightened evidentiary showing before a party can even plead them.

28.     More broadly, if the Court were to agree with Defendants' logic, namely that a failure to find recklessness under the exemplary damages statute *is the same thing* as failure to find reckless disregard for the truth under actual malice analysis, then the inverse would also necessarily be true. As a result, all defamation judgments deriving from a finding of actual malice would warrant exemplary damages, by default. Indeed, no additional evidentiary showing would be necessary, and the exemplary damages statute would be superfluous.

**D.     Frankspeech acted with actual malice.**

29.     Defendants' argument with respect to a finding of actual malice against Frankspeech suffers from the same flawed reasoning as the argument with respect to Lindell,

13

namely the willful refusal to acknowledge or grapple with any of the actual malice factors relevant to a finding of reckless disregard for the truth.

30. "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives." *Solano v. Playgirl, Inc*., 292 F.3d 1078, 1087 (9th Cir. 2002) (*quoting Eastwood v. National Enquirer, Inc*., 123 F.3d 1249, 1253 (9th Cir. 1997).

31. The jury was presented with an enormous body of evidence that would allow them to conclude that Defendant Frankspeech published the statements at issue with a reckless disregard for the truth. Defendants insist they cannot be liable because—they claim—they actually believed the lies they repeatedly published. To accept Defendants' argument would be to radically change the law in a way that would have dangerous consequences. If a Defendant could defeat a claim for defamation by simply insisting he believed whatever falsehood he published, no matter how absurd or easily refuted, then the law would incentivize willful ignorance. And, it would effectively nullify defamation as a cause of action, as all any defendant would ever have to do is simply submit an affidavit claiming his belief was sincere. The Court should reject this invitation, and deny the Renewed Motion in its entirety accordingly.

## Conclusion

For the reasons stated herein, Eric Coomer, Ph.D. requests this Court deny Defendants Michael J. Lindell and Frankspeech LLC's Rule 50(b) Renewed Motion for Judgment as a Matter of Law. Eric Coomer, Ph.D. requests such other and further relief to which he may be entitled to receive.

14

Respectfully submitted this 28th day of July 2025.

/s/ Charles J. Cain
Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
**CAIN & SKARNULIS PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011/512-477-5011 (Fax)

Ashley N. Morgan
amorgan@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000/512-477-5011 (Fax)

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
David M. Beller, No. 35767
david@rklawpc.com
**RECHTKORNFELD PC**
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900
**ATTORNEYS FOR PLAINTIFF**