UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER,

Plaintiff,

v.

MICHAEL J. LINDELL;
FRANKSPEECH, LLC; and
MY PILLOW, INC.,

Defendants.

_____

REPORTER'S TRANSCRIPT
(JURY TRIAL - DAY 2)
_____

Proceedings before the HONORABLE NINA Y. WANG,
Judge, United States District Court, for the District of
Colorado, commencing at 8:37 a.m. on the 3rd day of June,
2025, Alfred A. Arraj United States Courthouse, Denver,
Colorado.

A P P E A R A N C E S

FOR THE PLAINTIFF:
DAVID MATTHEW BELLER, Recht & Kornfeld, P.C., 1600 Stout
Street, Suite 1400, Denver, CO 80202
CHARLES JOSEPH CAIN, BRADLEY ADAM KLOEWER, Cain &
Skarnulis PLLC, P. O. Box 1064, Salida, CO 81201
ASHLEY N. MORGAN, Cain & Skarnulis PLLC, 303 Colorado
Street, Suite 2850, Austin, TX 78701

FOR THE DEFENDANTS:
JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite
610, Grafton, WI 53024
JAMES JOSEPH DUANE, Regent University School of Law, 1000
Regent University Drive, Robertson Hall Room 353B,
Virginia Beach, VA 23464
CHRISTOPHER I. KACHOUROFF, Dominion Law Center PC, 13649
Office Place, Suite 101, Woodbridge, VA 2219

<u>**I N D E X**</u>

<u>**WITNESSES:**</u>                                                    <u>**PAGE**</u>

**DR. ERIC COOMER**
DIRECT EXAMINATION BY MR. CAIN                          49
CROSS-EXAMINATION BY MR. KACHOUROFF                    199

<u>**E X H I B I T S**</u>

<u>**NO.**</u>                                                  <u>**ADMITTED**</u>

      34    .........................................    181
      36    .........................................    121
      38    .........................................    179
      73    .........................................    143
      93    .........................................    146
     112    .........................................    157
     174    .........................................    126
     178    .........................................    103
     184    .........................................    133
     185    .........................................    135
     187    .........................................    145
     192    .........................................    150
     193    .........................................    152
     200    .........................................    158
     202    .........................................    160
     203    .........................................    163
     208    .........................................    164
     212    .........................................    173
     224    .........................................    164
     235    .........................................    183
     236    .........................................    184
     237    .........................................    185
     262    .........................................    176

1                        **JUNE 3, 2025**

2            (Outside the presence of the jury.)

3            THE COURT:  Thank you.  Please be seated.

4            On the record in 22-cv-1129-NYW-SBP, Coomer v.

5    Lindell, et al.

6            Could I have appearances of counsel, please.

7            MR. CAIN:  Good morning, Your Honor, Charlie Cain

8    for the plaintiff.  If I may announce for everyone, Brad

9    Kloewer, Dr. Coomer, David Beller, and Ashley Morgan.

10   Good morning.

11           THE COURT:  Good morning.

12           MR. KACHOUROFF:  Good morning, Your Honor,

13   Christopher Kachouroff for Mike Lindell, My Pillow, and

14   Frankspeech.  With me is Jennifer DeMaster.  And Mr. Duane

15   will be a little late.  His wife is going to the airport,

16   and he is seeing her off.

17           THE COURT:  Good morning.

18           All right.  Counsel, what do we have to deal with

19   this morning before we see our jury?

20           MR. BELLER:  Good morning, Your Honor, thank you.

21   Briefly, and I raised this with defense counsel, Document

22   344 and Rule 615, the orders under both (a) and (b)

23   yesterday, prohibited the attorneys and the parties from

24   reporting, live Tweeting, blogging from the courtroom.

25           Yesterday afternoon, Your Honor, a reporter, Will

1    Sommer, S-O-M-M-E-R, published an article in which the

2    headline is "Mike Lindell is Texting Me From His

3    Defamation Trial Live."  The reporter goes on to indicate

4    that he engaged in a conversation with Mr. Lindell while

5    Mr. Lindell was in the courtroom.

6         DEFENDANT LINDELL:  That is not true.

7         MR. BELLER:  Your Honor, I hear Mr. Lindell out of

8    my right side state "that isn't true."  For my purposes,

9    obviously I haven't spoken with Mr. Sommer, I cannot

10   testify or I cannot report to the Court whether this

11   reporting is accurate or inaccurate.

12        So at this time I am simply asking the Court to

13   verbally notice the parties of Document 345, as well as

14   remind the parties of the Court's order.  And should this

15   type of reporting continue, certainly the plaintiff will

16   take additional investigatory action in order to be able

17   to confirm the reporting of Mr. Sommer or any other

18   reporter who simply states similar sort of behavior from

19   the parties.  Thank you.

20        THE COURT:  Mr. Kachouroff.

21        MR. KACHOUROFF:  Your Honor, Mr. Lindell disputes

22   that he did this --

23        DEFENDANT LINDELL:  That didn't happen.

24        MR. KACHOUROFF:  -- and you are free to question

25   Mr. Lindell if you want to, Your Honor.

1          THE COURT:  Well, I don't think that is appropriate

2     right now.  I will say that -- and let me be very clear,

3     that any sort of reporting, texting, live blogging, live

4     communication from this courtroom is strictly prohibited.

5          The Court has a local rule that indicates that

6     there is no audio recording, there is no video recording,

7     and there is no live transmission from the courtroom; that

8     is why we are not on TV.  And I want to make sure that

9     there is no interference in the smooth and efficient

10    conduct in this trial, and no distraction.

11         And so that is why I issued Docket Entry No. 344.

12    That is why it is posted on the doors of both this

13    courtroom and the overflow courtroom.  That is why I

14    reminded the gallery yesterday, and that includes texting,

15    any sort of live communications, any sort of live Facebook

16    feed.  It is just a consistent practice of this Court for

17    the administration of a smooth trial that is fair and

18    impartial to all parties before us.

19         To the extent this is violated, the Court, in its

20    discretion, can order sanctions, and will order them.  And

21    so you should advise your colleagues, your loved ones,

22    anyone who might be tempted to violate both the

23    sequestration order, which was entered pursuant to both

24    sections of Rule 615 of the Federal Rules of Evidence

25    yesterday, as well as Docket Entry 344, which was this

1    Court's minute order on pretrial issues.

2        I would hate to take time away from the parties'

3    presentation of this case to conduct an in-camera hearing

4    on this issue, but I will if I have to.

5        Is that clear to everybody?

6    MR. KACHOUROFF:  Yes, Your Honor.

7    THE COURT:  All right.  Thank you.

8        What other pretrial issues do we have -- I guess I

9    should say pre-jury issues?

10    MR. KLOEWER:  Good morning, Your Honor.  A couple

11    issues with respect to redaction of some exhibits, and

12    then also a proposed limiting instruction.  That limiting

13    instruction pertains to a document that was disclosed by a

14    third party and labeled as "attorney eyes only."  So

15    before getting into the substance of that, we would

16    request the Court clear the courtroom so we can comply

17    with the protective order and the associated document

18    produced with that designation.

19    THE COURT:  So could I actually see the document

20    first?

21    MR. KLOEWER:  You can, Your Honor.  It has been

22    designated as Exhibit 70.

23    THE COURT:  Madam deputy, could you bring the

24    notebook.

25        All right.  Is this something you are going to use

1    this morning, Mr. Kloewer?

2        MR. KLOEWER:  We don't intend to use the exhibit

3    for any purpose.  The defendants have suggested a limited

4    proffer may be appropriate for the opening statement,

5    which may incorporate a reference to this document.  We

6    don't think a limiting instruction is necessary and

7    certainly not within the scope they proposed.

8        I don't know if they still intend to raise that

9    issue and would like to get it entered, but to the extent

10   they do, it may be necessary to characterize the document

11   or refer to some aspects of its provisions that would be

12   relevant to the limiting instruction proposed by

13   defendants.

14       So if we need to, if a limiting -- the Court

15   determines a limiting instruction is proper or necessary,

16   we would need to address a provision of that document,

17   which is as I have indicated.

18       THE COURT:  I understand, Mr. Kloewer.

19       Let's actually address the fundamental issue as to

20   whether or not a limiting instruction is appropriate

21   before the opening statement, which is unusual, at best.

22       And so I want to hear from defense counsel and any

23   authority you have with respect to a limiting instruction

24   for an opening statement that is not evidence, and for a

25   document that doesn't sound like it is going to be

1    proffered as an admissible piece of evidence.

2              Ms. DeMaster, are you handling that issue?

3              MS. DEMASTER:  I will handle that issue, Your

4    Honor.  We don't believe Rule 408 requires a limiting

5    instruction right now.  We don't plan to enter that

6    particular exhibit in the opening statements and, frankly,

7    not at all at this time.  But it was just the reference --

8    and this is the issue we raised yesterday regarding the

9    limiting instruction, was just a reference to the fact

10   that there had been a settlement in that matter and

11   wanting a limiting instruction around what that would

12   mean.

13              We have provided that.  We conferred with

14   plaintiff's counsel.  They have a different idea.  We

15   didn't feel that that kind of comported with the

16   provisions of Rule 408.  So we still maybe would like some

17   time to confer, but Rule 408 doesn't require that that

18   limiting instruction happen now.  This will not be

19   introduced today, that particular exhibit, nor in the

20   opening, just the fact of the settlement.

21              THE COURT:  So I don't think that the fact of the

22   settlement is in dispute, and it is in the public realm,

23   so I don't think that there needs to be a limiting

24   instruction, and I am not hearing you say that there

25   should be some sort of limiting instruction either before

1    opening statement or after opening statement, by the

2    Court; is that correct?

3         MS. DEMASTER:  No, it is to -- if there are any

4    details, any testimony, whether or not it comes out

5    regarding the details of that particular settlement, which

6    there will be because there are facts of the case that are

7    relevant to that, if those details come out, we would ask

8    for a limiting instruction just to make sure that that is

9    preserved.

10        THE COURT:  Right.  But the limiting instruction in

11   that context if it relates to testimony, would be given at

12   the time that the testimony is given or at the time of

13   final jury instructions; correct?

14        MS. DEMASTER:  Correct, Your Honor.

15        THE COURT:  So I am not going to hear you all

16   object at all and ask for a limiting instruction during

17   opening statements by the plaintiff; is that right?

18        MS. DEMASTER:  That is correct, Your Honor.

19        THE COURT:  Even if they reference, as we discussed

20   yesterday, in reply, with respect to the fact of the

21   settlement; is that right?

22        MS. DEMASTER:  That is correct.

23        THE COURT:  Okay.  So it doesn't sound to me,

24   Mr. Kloewer, like there is a live issue here.  To the

25   extent that there is testimony that is elicited and

1    admitted at trial that might trigger the need for a

2    limiting instruction, let me be very clear, we need to

3    know what the proposals are with respect to the limiting

4    instruction.  We need to know the authority by which we

5    would evaluate whether or not a limiting instruction is

6    appropriate or not appropriate from each side, not just

7    Rule 408, but the actual case law and authority, and then

8    we will determine whether or not that limiting instruction

9    is appropriate and, if appropriate, when to give that

10   limiting instruction, because I am not inclined to give it

11   every time there is testimony.

12          It seems most appropriate, sitting here today, to

13   give it in the context of a final jury instruction, if we

14   give it at all, and that would be taken up ordinarily in a

15   charging conference with respect to the final jury

16   instructions.  All right.

17          MS. DEMASTER:  Thank you, Your Honor.

18          MR. KLOEWER:  One last thing, if I can just add,

19   and it may streamline the process.  As we proceed through

20   trial, we are prepared to file a motion to preserve the

21   confidentiality of various documents.  We will be filing

22   that momentarily, if we haven't already.  But that should

23   fork out the issues for the Court that may arise and

24   streamline the process.

25          THE COURT:  Thank you, Mr. Kloewer.

1          Anything else?

2          MS. DEMASTER:  Yes, Your Honor.  We had one more

3     issue regarding Exhibit 9.  This regards one facet of the

4     motion in limine.  And in Exhibit 9 there were a couple of

5     disputes.  Last week the plaintiff had asked whether we

6     were taking some of those out.  Old Exhibit 9, before the

7     Court's order on the motion in limine -- on plaintiff's

8     motion in limine, was very clear on certain things

9     regarding social media posts, posts about certain

10    subjects.

11         In the plaintiff's motion in limine, they did not

12    provide those particular Facebook posts as an attachment.

13    And when we provided what we thought was compliant under

14    the Court's order as Exhibit 9A, there was an objection,

15    just yesterday for the first time, where we found out

16    there are four pages from within there that the plaintiff

17    objects to.

18         However, we have conferred with the plaintiff, they

19    are willing to print out -- we only have a front-and-back

20    copy.  We've agreed to two, but there are only two pages

21    from that exhibit that the parties are still disputing.

22    We do plan to introduce that exhibit today.  So we would

23    only need to either work together -- I don't think we will

24    be able to come to agreement on these two pages, so we

25    would need to have the Court review these, and it

1    shouldn't take very long to see whether this complies with

2    the Court's order.

3        THE COURT:  Sure.  So can you all get me a copy of

4    these two pages that are in dispute so I can make that

5    ruling?

6        MS. DEMASTER:  Yes, Your Honor.

7        THE COURT:  You can do it in paper copy, if that is

8    easier, or electronically.  The bigger issue is that I

9    don't have the notebook up in front of me, the notebook

10   starts with Exhibit 11.  But whatever we decide, we need

11   to make sure that it gets into the exhibit notebook in its

12   proper form.

13       MS. DEMASTER:  We have copies, front and back, of

14   Exhibit 9, but this was before we knew about the dispute.

15   So plaintiff's counsel has offered generously to provide a

16   single-sided copy.  It would take me a little later.  But

17   we do have copies right now, front and back.  And if the

18   Court could review those, then we can perhaps go make

19   copies for the notebooks.

20       THE COURT:  That is fine.  So why don't you hand

21   those to my courtroom deputy.

22       MS. DEMASTER:  I will do that right now.

23       THE COURT:  I will take a look at it and make sure

24   it is clear to me what is in dispute and what I am

25   deciding.

1        MR. CAIN:  While they are shuffling papers, may I

2   make one statement, Your Honor?

3        THE COURT:  You may, Mr. Cain.

4        MR. CAIN:  As of 8:49, we've checked the hallway

5   outside for Mr. Oltmann, and he was not present.  We will

6   keep you updated.

7        MR. KACHOUROFF:  As of 8:49 I asked him, and he is

8   trying to find parking.  I said, "Are you coming up?"  He

9   said "Yes."  And I said "The ninth floor."

10        THE COURT:  So he is going to be sequestered.  He

11   can't be in the courtroom until he testifies.

12        MR. KACHOUROFF:  I think you need to execute the

13   return.

14        THE COURT:  He can come in, we can swear him in, he

15   can sit in one of the preparation rooms on the side or in

16   the hall or wherever he wants to be, but pursuant to 615,

17   he is not allowed in the courtroom while Dr. Coomer is

18   testifying, who I assume you are still proceeding with

19   first; is that right?

20        MR. CAIN:  Yes, Your Honor.

21        THE COURT:  All right.  So if I am understanding

22   this correctly, the pages you all want me to consider are

23   0052 and 0014; is that right?

24        MS. DEMASTER:  I am sorry, 0021.

25        THE COURT:  0052 and 0021?

1          MS. DEMASTER:  Yes.  Those are the only two.  The

2     other two they raised, we agreed to remove, so we will do

3     that in the new printing.

4          THE COURT:  All right.

5          MS. DEMASTER:  Just those two.

6          THE COURT:  Anything else, counsel?

7          MR. KACHOUROFF:  Nothing at this time, Your Honor

8     for us.

9          MR. KLOEWER:  I don't believe there is anything

10    else from plaintiff.

11         THE COURT:  All right.  So obviously we will wait

12    to see if Mr. Oltmann shows up.  We are prepared to issue

13    rulings on the deposition designations if necessary, but

14    it won't be necessary if he gets here.

15         We will be in recess until our jury is ready to go.

16         (A break is taken from 8:54 a.m. to 9:06 a.m.)

17         THE COURT:  Thank you.  Please be seated.

18         All right.  Counsel, I understand that Mr. Oltmann

19    is here.

20         Good morning, Mr. Oltmann.  If you can come

21    forward.

22         Good morning, sir.  Could you state your name for

23    the record.

24         THE WITNESS:  Joseph Oltmann.

25         THE COURT:  Did you receive a subpoena to appear

1    here yesterday morning for trial?

2              THE WITNESS:  Yes.

3              THE COURT:  You are here today; is that right?

4              THE WITNESS:  Yes.

5              THE COURT:  You understand that I am going to have

6    my courtroom deputy just swear you in.  You are not going

7    to give your testimony now, but you will need to wait

8    outside.  You can be here for opening statements,

9    obviously, but then during any testimony, before you give

10   your testimony, you will be sequestered, which means you

11   will be outside of the courtroom.  Do you understand that?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Okay.  Then the last thing, I just want

14   to remind you, because you weren't here earlier today, but

15   you might have seen the signs on the door, that we do have

16   an order in place that there is no live transmission from

17   the courtroom or within the courthouse.

18             So if you want to text, Tweet, blog, stream,

19   anything about the trial, you need to do so outside the

20   courthouse.  Do you understand that?

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  So, madam deputy, could you swear him,

23   then we will have him return.  The lawyers will be in

24   touch with you when they are ready for your testimony

25   today.

1           THE WITNESS:  Is there any way I can get an idea of

2      when I will be testifying?  I do have a business to run,

3      and I have a family, kids.

4           THE COURT:  My understanding is that there will be

5      opening statements, that will last about an hour, both

6      sides, then Dr. Coomer is going to testify, so my best

7      estimate, unless these gentlemen tell me something

8      different, is that there will be -- you will not be ready

9      to testify until this afternoon, after lunch.

10          THE WITNESS:  Is it possible I can come back this

11     afternoon?  You can give me a couple hours notice, and I

12     can come back, that way I can still get my work done.

13          THE COURT:  Certainly.  If you are coordinating

14     with either of the attorneys, that is fine.

15          Mr. Cain?

16          MR. CAIN:  Looking at our list, we almost certainly

17     won't be calling Mr. Oltmann until tomorrow.

18          THE COURT:  All right.  So it seems like if

19     Mr. Oltmann is not needed until tomorrow, then we can

20     swear him, he can go home and run his business, and then

21     he can return in the morning.  All right?

22          THE WITNESS:  Yes.

23          THE COURT:  Could you just swear Mr. Oltmann

24     please.

25          (Joseph Oltmann is sworn.)

1              THE COURT:  All right.  So, Mr. Oltmann, I am going

2      to release you from being present in the courthouse for

3      today.  You need to return tomorrow morning.  We start at

4      9 o'clock.  So please be ready to return by 9 o'clock.

5              I assume the attorneys, one side or the other or

6      both will be in touch with you if the schedule changes.

7      You are now under oath, and you are sequestered, which

8      means you cannot speak to anybody about your testimony or

9      the testimony of anyone else in this courtroom as it is

10     given.  Do you understand that?

11             THE WITNESS:  Yes, ma'am.

12             THE COURT:  All right.  Thank you.  We will see you

13     tomorrow.

14             THE WITNESS:  Thank you.

15             THE COURT:  All right.  Counsel, anything else

16     before we bring in the jury?

17             MR. CAIN:  No, Your Honor.

18             THE COURT:  Mr. Kachouroff, anything else?

19             MR. KACHOUROFF:  Not at this time, Your Honor.

20             THE COURT:  All right.  Thank you.

21             MR. KACHOUROFF:  Is there a way to push the mic

22     off?

23             THE COURT:  There is a little button.  I can't have

24     you unplug it.  I need to be able to hear you, the court

25     reporter needs to be able to hear you for the record.

1              (In the presence of the jury.)

2              THE COURT:  Thank you.  Please be seated.

3              Good morning, ladies and gentlemen of the jury.

4              All right.  Mr. Cain, are you ready to proceed?

5              MR. CAIN:  Yes, Your Honor.  And may it please the

6    Court.

7                         **OPENING STATEMENT**

8    BY MR. CAIN:

9              "You are disgusting."  "You are a treasonist."

10   "You are a traitor to the United States of America."

11   "These are things that I have evidence of."  "The evidence

12   is there."  Now, those were the words of Mike Lindell, and

13   he was speaking about the plaintiff, Dr. Eric Coomer, and

14   this was on May 9, 2021, six months after the 2020

15   election had been decided.  To be clear, you better bring

16   the receipts if you are publicly saying that you have

17   evidence of treason and for being part of the biggest

18   crime that we have ever seen.

19             Now, this case is about Dr. Eric Coomer, and ladies

20   and gentlemen, on behalf of our trial team and Dr. Coomer,

21   thank you for being here and hearing this important case.

22             Now let's start with a little bit of background

23   about Eric Coomer.  Eric Coomer grew up in a middle-class

24   military family, with his father ultimately retiring as a

25   full Colonel in the United States Army.  Eric excelled at

1    academics, and he ultimately studied and got his Ph.D.

2    from U.C. Berkley in 1997.

3          Eric moved to Colorado in 1998.  And like many

4    Coloradans here, he is an avid rock climber, he is a

5    mountain biker, a skier, and a kayaker.

6          Now, as for his professional life, much of Eric's

7    career has already been stipulated to.  Dr. Coomer will be

8    the first witness that you hear from today, and he will go

9    through some of his professional career.  But as for his

10   role at Dominion, Dr. Coomer was a top-level election

11   system designer and technical support professional.

12         So that's a lot of words.  What it means is that

13   his clients were election workers, county clerks, and

14   secretaries of state across the country.  Those are the

15   people that actually run our elections.  Dr. Coomer did

16   not run our elections.

17         Now, one of the things that Dr. Coomer is

18   especially proud of was this process called digital

19   adjudication.  You will hear about that when he testifies.

20   The adjudication function in elections is used in

21   circumstances of what you are seeing on this screen.  So

22   this particular example shows that the voter checked a box

23   for Donald Trump.  That should have been an oval.  Now,

24   this ballot would be flagged by the voting system and

25   placed into a separate adjudication bucket, right here

1     (indicating).

2          Now, the original ballot is always preserved.  This

3     ballot then would be reviewed by a bipartisan team for

4     voter intent issues.  That process is mandated by state

5     law, depending on which state is involved in it.  And in

6     the 2020 elections, Dominion was involved as a provider in

7     about 30 of our states.

8          Now, the process that Dr. Coomer helped invent

9     while at Dominion created a trail for the ballot that

10    could be easily audited.  So ultimately the evidence will

11    show that Dr. Coomer believed in transparency in

12    elections, and auditability in elections.  There was

13    always a trail.  And those were the keys to his work.

14         Now, who are the defendants?  You see them on the

15    screen.  The first is My Pillow, Inc.  Now, the evidence

16    will show that My Pillow gave Mike Lindell the megaphone

17    that he needed to spread his election alleged fraud claims

18    across the country for years.  These claims included

19    defamatory statements about Dr. Coomer that you will hear

20    about in this case.

21         Now, Mr. Lindell is the controlling shareholder of

22    My Pillow.  He owns the majority of the company.  And when

23    members of his own board of directors began to protest

24    about his political activities, the evidence will show

25    that Mike Lindell failed to heed their concerns.

1          Now, My Pillow sells products, obviously, through

2    either promo codes or a 1-800 number.  If you have seen

3    the commercials, you would see those.  In this case, you

4    will see many of the defamatory statements went hand in

5    hand with the My Pillow promotions.  And you will see

6    evidence that My Pillow employees and their assets

7    assisted Mike Lindell in coordinating his election fraud,

8    the employees and their assets, including the claims that

9    he was making about Dr. Coomer.

10          Now, as it relates to Mr. Lindell, himself, it is

11    self-evident that he is an exuberant and very well-known

12    marketer.  But the evidence will show that Mike Lindell

13    started to blur the lines between his role at My Pillow

14    and his political activism beginning around 2016, until

15    ultimately those roles became inseparable.  And after the

16    2020 election was called for Joe Biden, Mike Lindell

17    placed Dr. Coomer in his crosshairs.

18          The third defendant is Frankspeech, LLC.  Now, the

19    evidence will show that after the 2020 election, Mike

20    Lindell lost his ability to appear on mainstream TV to

21    discuss his debunked claims of election fraud.  So what

22    did he do?  Well, to get around it, in 2021 he started his

23    own media companies.  Frankspeech, LLC a defendant in this

24    case, is one of those media companies.  And the evidence

25    will show that Frankspeech was one of the primary

1    "publishers," -- and that is a term of art, "publishers"

2    of the false claims about Eric Coomer.

3          You will hear evidence in this case that all of the

4    defendants ignored multiple credible sources that

5    contradicted their election fraud narratives.  Initially

6    there was an entity called CISA, which was an agency

7    within President Trump's own administration that issued a

8    statement confirming that the 2020 election was not

9    compromised, but as you will see, that was not all.

10          Shortly thereafter, numerous election experts

11    across the country, just after the 2020 election,

12    including one of the witnesses in this case, one of our

13    experts, Dr. Alex Halderman, issued their own statements

14    that mirrored the findings you see on your screen from

15    CISA.  Defendants ignored this, as well.

16          So who are the key instigators in this case?  Well,

17    you will hear testimony or see video from each of these

18    witnesses.  Now, Mr. Oltmann you will hear from, he is on

19    the top left, he is a conservative activist here in

20    Colorado, and Mr. Oltmann you will see was the first

21    person to start the false claims about Dr. Coomer.  This

22    was done on his podcast that he has in Colorado called

23    Conservative Daily.

24          Another witness in this case who will be appearing

25    by videotape -- and we have witnesses from around the

1    country, some will be by videotape.  With respect to

2    Ms. Peters, the evidence will show she was a close

3    political ally to Mike Lindell.  She is the former County

4    Clerk of Mesa County Colorado, which is Grand Junction,

5    that way (indicating.)  Ms. Peters published false claims

6    about Eric Coomer on the media platform Frankspeech before

7    her felony convictions for her breach of public trust.

8         On the top right is a gentleman named Brannon

9    Howse -- and it is not Brandon.  Mr. Howse was an anchor

10   at Frankspeech and participated in the first defamatory

11   publication on that platform with Mr. Oltmann.

12        And on the bottom right is David Clements.

13   Mr. Clements is a political activist that made defamatory

14   statements at an event we will be talking about called

15   Mike Lindell's Cyber Symposium.

16        Now, as for Mr. Oltmann -- and let's focus on him

17   first.  As you will see, Mr. Oltmann and Mr. Lindell

18   formed various business alliances together starting in

19   2021.  They, you will see, are allies.  The evidence will

20   show that Mr. Oltmann's obsession with Dr. Coomer and his

21   political rhetoric, some of which you will hear and see,

22   are key to many of the threats that ultimately began to be

23   directed at Dr. Coomer.  And the evidence will show that

24   the defendants gave Mr. Oltmann the vehicle to further

25   disseminate those lies about Dr. Coomer.

1          One of the pieces of evidence that you will hear

2     about is this conference call.  And as you can see, the

3     Court read this to you.  And I know it is hard -- I am a

4     visual person, so I need to see a lot of these things.

5     But this particular call occurred on November 9, 2020.

6          And there are multiple layers of what we would call

7     "hearsay" in this, but the gist of the call is that

8     Oltmann was trying to infiltrate what he called an Antifa

9     conference call, and that was in September of 2020.  So

10    that would have been before the election that this call

11    took place.

12         One of the anonymous people on this call that

13    Oltmann was supposedly monitoring, participated and

14    referred to another anonymous person as "Eric" and "the

15    Dominion guy," implying that Eric Coomer was on this call,

16    himself.

17         This anonymous "Eric Coomer" said "don't worry

18    about the election, Trump is not going to win, I made

19    fucking sure of it."  Now, it says "F'ing," but the

20    testimony will be the expletive was used.

21         So what did Mr. Oltmann do?  Shortly after the

22    call, he decided to track down this information about this

23    Eric Coomer on the call by doing a Google search.  And he

24    searched "Eric," "Dominion," "Denver, Colorado."  You see

25    that at the bottom of the screen.

1          Only there was a problem, there will be a key piece

2     of evidence in this case that shows Mr. Oltmann took steps

3     to fabricate this whole narrative.  Mr. Oltmann will

4     likely testify sometime in the middle of this week.  So

5     what is the key piece of evidence?

6          Well, this purports to be the search that was

7     referenced, that I just referenced to where it says

8     "Eric," "Dominion" and "Denver, Colorado."  And you can

9     see from this search result two things came up first.

10    "Dominion," and Eric Coomer's email and phone.  And for

11    those of you that are tech savvy, when you make a screen

12    shot, there is a date and timestamp up here.  This one

13    shows September 26th of 2020, that is when this screen

14    shot was purportedly taken, only there was a problem.

15         Mr. Oltmann didn't realize that Google has

16    something called a Google Doodle.  And this particular

17    Google Doodle showed that the screen shot that he says was

18    made on September 26th, was actually made on Veteran's Day

19    of 2020.  Does anyone know when that was?  I will tell

20    you, November 11, 2020.  So about a week after the

21    election is when Mr. Oltmann actually performed this

22    search.  Mr. Oltmann, himself, will admit from the stand

23    that he did this, that he backdated his search instead of

24    when the search actually occurred.

25         Now, for his part, Dr. Coomer was already being

 1    harassed, and he will talk about that in his testimony.

 2    He had filed -- he wasn't able to go back to his home

 3    after the election, and ultimately a month later, filed a

 4    lawsuit against parties that are not in this case.  You

 5    heard about a Newsmax component to this, that is a

 6    different lawsuit.  Mr. Oltmann was sued and Newsmax was

 7    sued.  But its relevance, I think, will become apparent in

 8    a minute.

 9        So Dr. Coomer filed suit December 22nd of 2020.

10    And part of the reasoning behind that suit, and part of --

11    ultimately, I would say the thrust of the evidence is

12    going to be about how since that time until today,

13    Dr. Coomer has been pursued, traumatized, in fear for his

14    life for literally 4-and-a-half years.

15        Now, as it relates to these threats, you will hear

16    evidence that Mr. Oltmann, who again was publishing

17    material later on for the defendants, sent this via

18    Parler, and that is Dr. Coomer's house.  "So it is up to

19    you," he said, "blow this shit up.  Share.  Put his name

20    everywhere.  No rest for this shit bag.  Eric Coomer.

21    Eric Coomer.  Eric Coomer."  And then he goes on.

22        On December 12th of 2020, recognizing that people

23    were coming to Dr. Coomer's house, this post was made,

24    "Eric Coomer... want to chat with you but you are too

25    scared.  How about you put down that shotgun and come out.

1    Everybody is watching you Eric... everyone."  Now,

2    Dr. Coomer happened to be home feeding his cats when this

3    occurred.  And the fact that he came to the door with a

4    shotgun, he will talk to you about during his testimony.

5         Meanwhile, the defendants were busy.  Mr. Lindell

6    was busy publishing claims that the 2020 election had been

7    rigged and stolen, but he kept on and he produced, as you

8    see on the top, this film called *Absolute Proof*, exposing

9    "election fraud" and "theft of America by enemies foreign

10   and domestic."

11        This movie, importantly -- and we will provide a

12   clip of this movie involving Dr. Coomer.  So Dr. Coomer

13   was placed into the *Absolute Proof* film for the purpose of

14   showing that the 2020 election had been "rigged."

15        Now, the lawsuit that I mentioned to you in

16   December, that was settled with Newsmax on April 30, 2021.

17   On May 3rd of 2021, the first publications by the

18   defendants about Dr. Coomer began; so approximately four

19   days after the Newsmax settlement.

20        And if you see here -- and we have stipulated to

21   what was said, and we will go through it during testimony,

22   so I will not bother to read most of these, but the first

23   defamatory statement related to his recitation of this

24   false conference call that Oltmann claims that he was on,

25   and this was done on Frankspeech, one of their early

 1    publications.  The gentleman on the left of the screen is

 2    Brannon Howse, that I mentioned to you earlier.

 3          Well, it didn't take long after this was published

 4    for Newsmax to go on air with this correspondent and issue

 5    a public retraction of their stories about Dr. Coomer and

 6    an apology to him.  That ran on Newsmax, I believe, three

 7    separate days.  That was May 7th.

 8          May 9th, having seen the Newsmax retraction, the

 9    evidence will show that Mike Lindell went on Frankspeech

10    and absolutely unloaded on Dr. Coomer.  In this

11    publication, Mr. Lindell associated Dr. Coomer with the

12    false election conspiracy that China had hacked into

13    Dominion machines and had flipped votes.

14          Mr. Lindell accused Dr. Coomer of committing

15    treason, and Mr. Lindell accused Dr. Coomer of being a

16    traitor to the United States of America.  Now, why did he

17    do this?  Well, the evidence will show that he was not

18    upset about Dr. Coomer actually "rigging" the election, he

19    was angry because he blamed Dr. Coomer for making what he

20    called a "dirty deal" with Newsmax that prevented

21    Mr. Lindell from going onto the Newsmax station so that he

22    could promote his pillows.  This, too, was false.

23          To be clear, the parties have stipulated that Mike

24    Lindell and My Pillow were never mentioned in the

25    Dr. Coomer/Newsmax settlement.  So Dr. Coomer didn't make

1    a deal for Mike Lindell not to appear on Newsmax.

2         But to tie a bow on this evidence because this is

3    key, we will present testimony from Chris Ruddy.  Chris

4    Ruddy is the CEO of Newsmax.  Chris Ruddy will flatly deny

5    any such deal, whether an informal handshake or otherwise,

6    existed to keep Mike Lindell off that network.  And you

7    will see another reason why he was kept off.

8         Now, on June 30th of 2021, Mike Lindell hatched

9    plans to do a Cyber Symposium.  So undeterred by all of

10   the evidence to the contrary about the 2020 election, this

11   symposium was held with a large invite list for

12   politicians, medias, and experts throughout the country.

13   The event was livestreamed on Frankspeech and was promoted

14   by My Pillow.

15        The promotion on the My Pillow piece of this was on

16   July 4th.  Now, the Cyber Symposium, as you can see, was

17   August 10th through the 12th.  And the Symposium, in the

18   middle of this, promised to reveal cyber data and the

19   cyber captures from the November 2020 election, and I will

20   try to distill what that means.

21        The gist of what Mike Lindell was claiming is that

22   he had electronic evidence showing China had infiltrated

23   voting machines during the 2020 election.  And if you

24   recall, we will look at the first publication he made,

25   where he said "Dominion, you did your best to take the

1    election through China."  We believe that is what he was

2    referring to through this challenge.

3         Now, the Cyber Symposium, itself, was promoted by a

4    $5 million challenge.  That was offered to any attendee

5    who could prove that the cyberdata was not valid from the

6    2020 election.  Remember that.  That announcement, by the

7    way, I will go back to it, was July 17th of 2021.

8         Now, the problem with the Cyber Symposium, as the

9    evidence will show, is that the cyberdata he was

10   presenting wasn't real.  The evidence will show that the

11   Cyber Symposium was a complete and unmitigated disaster.

12   Lindell, himself, will testify that he planned to be on

13   stage all three days demonstrating how China "stole the

14   election" with this data.  But that plan evaporated almost

15   immediately, and so they were scrambling.

16        And what ended up happening is that numerous space

17   fillers; people that were put on the stage, including Tina

18   Peters, Joe Oltmann, and a gentleman named David Clements,

19   got on stage to talk about whatever they wanted to.  Now,

20   Mike Lindell, himself, will say, it's my Cyber Symposium,

21   but I had no idea who was going on stage and what they

22   were saying.  But he should have known that.

23        Now, there will be three key witnesses here that

24   you will hear from that reviewed this data if there is any

25   confusion about this issue.  These are cyber experts that

1    were there, some perhaps more pursuant to the challenge

2    than others.

3         Those experts that you will hear from are a

4    gentleman named Harri Hursti, who was there for CNN as

5    their cyber expert; a gentleman named Josh Merritt, who

6    was actually part of Mr. Lindell's own team; and Dr. Alex

7    Halderman.  All three of those experts will talk to you

8    about the fact that this data was not real, it was a hoax.

9         COURTROOM DEPUTY:  Mr. Cain, 5 minutes.

10        MR. CAIN:  You are not going to hear all that I

11   have to say because I have got a lot.

12        Now, on August 12th of 2021, the first gentleman

13   that I mentioned, Mr. Clements, talked about this issue of

14   adjudication.  If you recall from that slide, adjudication

15   involved Dr. Coomer, and he said that adjudication was

16   designed to "murder the American people's vote" and that

17   the man that "pulled the trigger" was Dr. Coomer.

18        Mr. Oltmann then appeared on stage, talking about

19   Dr. Coomer's deep ties with Antifa, and also obviously

20   promoting promo code L66 at the time.  Mr. Oltmann will

21   convey to you the source -- or, not the source, but the

22   story relating to this call that we have discussed.

23        We will present evidence to you about the financial

24   impact that this symposium had on My Pillow.  Sales were

25   incredible during the three-day period of time, week over

1    week.  You will hear evidence about the 14 million page

2    views that were driven to Frankspeech, that was a

3    fledgling company at the time, that is the spike on this

4    screen.

5         But while the defendants were watching their bottom

6    line here, Dr. Coomer was watching his back.  Throughout

7    this entire period of time, Dr. Coomer was continuing to

8    get threat after threat after threat, leaving his home,

9    hiding for fear of his life.  He experienced mental

10   distress, fear, and depression severe enough for him to go

11   on medication.  And the evidence will show that Dr. Coomer

12   ended up taking steps to protect himself from the threats

13   of violence he was receiving.

14        I am going to talk to you about one more

15   publication, and I won't have time to talk to you about

16   the remaining ones, but this is a key one.  Fast forward

17   to April 5th of 2020.  This was from the Capitol steps

18   here in Colorado.  This was after Lindell was being served

19   with this very lawsuit, and he launched into three

20   consecutive days of defaming Dr. Coomer.

21        This one is before an election fraud crowd, saying

22   "Eric will be the first one behind bars when we melt down

23   the machines."  In total, we will be talking to you about

24   ten defamatory statements in this case.  We will kind of

25   use this as a guidepost for you.

1         And then we will ultimately, at the end, be talking

2    to you about the civil claims that Dr. Coomer is bringing

3    for the damage done due to the loss and destruction of his

4    professional reputation.  He has brought a claim for

5    intentional infliction of emotional distress for the

6    extreme and outrageous conduct that you will hear about.

7    This is more than a mere insult to him, but this was,

8    rather, severe distress and fearing for his life for the

9    last 4 years.

10        And, finally, we will be asserting a conspiracy

11   claim against the defendants for their collective role in

12   agreement in coordinating these attacks against

13   Dr. Coomer.

14        You will hear evidence of Dr. Coomer's damages

15   through a damage expert, Doug Bania, that relates to his

16   economic damages for what it is going to cost to repair

17   his reputation online.  You will hear evidence about

18   noneconomic damages, including emotional harm, terror,

19   fear, that Dr. Coomer has undergone.  This situation is

20   literally going on to this day through the publicity

21   campaign that Mr. Lindell is waging for this very trial.

22        And we will be seeking exemplary damages.  The

23   Court will instruct you on that, but it relates to willful

24   and wanton conduct committed against Dr. Coomer and

25   others.

1          So I wanted to talk to you about more of this.

2     Ultimately it is the evidence from that witness stand that

3     matters.  It is going to be a lot to digest, but we will

4     do our best to break it down into bite-sized pieces for

5     you.

6          I want to thank you for your time.  I want to thank

7     you for being with us.  I know you surely don't have a

8     choice, I get that.  But at the end of the day, Dr. Coomer

9     is looking forward to presenting his evidence to each and

10    every one of you, and our trial team is committed to being

11    as efficient as we can, but we have got a lot to get

12    through.  Thank you.

13          THE COURT:  Mr. Kachouroff.

14          MR. KACHOUROFF:  Good morning, Your Honor, please

15    the Court, ladies and gentlemen of the jury.

16          Pardon me, one moment while we get set up.

17                    **OPENING STATEMENT**

18    BY MR. KACHOUROFF:

19          Good morning, ladies and gentlemen of the jury.  My

20    name is Chris Kachouroff, and I have the distinct

21    privilege to represent My Pillow, Mike Lindell, and

22    Frankspeech.

23          I am surprised that I didn't hear a lot of things

24    that were going to come out, that should have come out, in

25    the opening statement from my colleague here.  But I want

1    to start with the first slide, and one of the first slides

2    that came to my mind when I watched this are the key

3    instigators.  He has five slides here, and he says these

4    are "the key instigators."

5        But there is one person he left out, it is the

6    person who is responsible for all of us being here today

7    and for all of us being here for the next nine days, they

8    left out the chief instigator, and I will show you who he

9    is right now.  Him, that guy right there (indicating).

10       I am going to prove to you that long before Mike

11   Lindell even knew who Eric Coomer was, long before he said

12   one word about Eric Coomer, before the plaintiff even had

13   a reason to sue Eric Coomer, Eric texted his brother and

14   said "Mike Lindell is a clown."  And he texted the

15   following words to his brother:  "I would love to sue that

16   clown, too."

17       And when he wrote that text, Coomer had absolutely

18   no reason to sue Mike Lindell, My Pillow, or Frankspeech.

19   That text was in February of 2021.  At that point he and

20   his attorney had already sued 25 people with the exact

21   same claim; conspiracy, intentional infliction of

22   emotional distress, and defamation, and they alleged

23   basically the same things they allege here.

24       The evidence will be that Dr. Coomer is a serial

25   litigator.  He was determined to make Lindell number 26,

1    and to do that he set in motion a chain of events all

2    designed and calculated to enable him to sue Mr. Lindell.

3    But to do that, he had to bait him, lure him, he had to

4    trigger Mr. Lindell to react.  As he said in his opening,

5    Mr. Lindell has a vivacious personality.

6         And to start a lawsuit, you need to start -- you

7    have to serve the papers, we call it the Complaint, the

8    actual lawsuit itself.  Typically that takes place at

9    somebody's home or office.  But that is not what they did.

10   They didn't want to do that.  They knew that that would

11   not trigger Mr. Lindell to react the way that he did.  So

12   what they did is they waited until Mike Lindell was on the

13   steps of the Capitol -- it was one of their slides --

14   getting ready to give a live press conference.

15        Mike Lindell will tell you, there were a lot of

16   microphones there, more than he had ever seen.  And he was

17   eager to tell his belief and his story about why the

18   election was so screwed up in 2020.  And without warning,

19   without notice, to make the greatest impact, Mr. Coomer

20   and his lawyers decided to serve him in the most

21   humiliating and embarrassing way possible, right on the

22   steps of the Capitol, right in front of everybody.

23        Now, you can know this, the plaintiff knew that

24   Mr. Lindell would never have mentioned his name in public

25   that way, and they had to trigger him.  And, yes, Mike

1    reacted.  He reacted the way a person would naturally

2    react if they felt they were being attacked or their

3    employee-owned company was being attacked.

4         And so on that Capitol step he made a statement

5    about Mr. Coomer being a criminal and his attorney being a

6    criminal because he felt it was a criminal thing to do to

7    him.  And he did another one the next day and another one

8    the next day and another one a couple days later.

9         Let's take a quick look at what they call our

10   defamatory statements, and this will help you clean up

11   what seems to be one big morass or one big conglomeration

12   of statements here.  We are going to come back to this

13   statement right here, the May 9th one, because that is an

14   important one, as my colleague pointed out.

15        But he is served on April 5th.  He is served on

16   April 5th, that is the day on the Capitol steps, and April

17   6, 7, through May 23, are part of that, I am mad that you

18   served me.  So all of that is related to the way they

19   triggered him on the Capitol steps.  And so is his

20   statement on March the 10th calling them -- he said, "I

21   called them criminals, and I stand by that."  So that is

22   the same event.

23        So what is left over?  Well, he has the platform

24   called Frankspeech, which is like YouTube, it is like X,

25   and you can't sue them under federal law.  We will prove

1    to you, you can't.  Those are online platforms designed to

2    foster free speech, it is the part of the Communications

3    Decency Act.

4         You will hear testimony today from Brannon Howse,

5    one of the other alleged instigators, and Mr. Lindell,

6    that he knew nothing about this interview.  Mr. Lindell

7    had no idea.  You will learn that he had no idea.  And, in

8    fact, I think my counsel admitted it -- my colleague

9    admitted it, that he had no idea in the Cyber Symposium

10   that David Clements, somebody they have not sued, said

11   something about Mr. Lindell.

12        And, finally, Tina Peters.  They all have no

13   evidence that Mr. Lindell knew she was going to say

14   anything in that forum.  He wasn't even part of it.  He

15   didn't even have control over the content.  So they are

16   trying to do something called guilt by association.

17        So what is left?  This May 9th speech.  Now,

18   rightly or wrongly, Mr. Lindell reacted when Newsmax told

19   him, you can't come on anymore.  And he ascribed it, he

20   believed that that was related to the settlement.  He will

21   tell you, Chris Ruddy has told me over and over, no it is

22   not in writing, it is not in the lawsuit, not in the

23   settlement itself, but you can't come on because of the

24   lawsuit.  It is that simple, and we can prove it.

25        You will hear testimony from Mr. Lindell that to

1    this day he can't get on, and he's called Chris Ruddy, the

2    owner of Newsmax, 50, 60 times.  It has literally cost his

3    business a million dollars a month.  He went from 2,700

4    employees, now he is down today to about 300.

5         Oh, by the way, this nonsense that he is using all

6    of this to market My Pillow, he knows how to market My

7    Pillow.  But he believes in what he is doing so much that

8    he doesn't care about the economics of it.  And he is

9    either the world's worst marketer or he really believes

10   what he is saying is true.  That is going to be a key

11   element for us to talk about.

12        I want to talk about the plaintiff's injuries for a

13   moment.  I will prove to you that Eric Coomer is not and

14   was not ever damaged by any of Mike's statements.  He is

15   not injured or hurt at all by Mike Lindell, far from it.

16   He wanted these statements that we just talked about.  He

17   absolutely wanted Mr. Lindell to react because he doesn't

18   have enough on him.

19        Once he got what he wanted out of Mr. Lindell from

20   this humiliating spectacle, we will prove he told a friend

21   in an email, hey, it is time to "shake the money tree,"

22   including My Pillow and Lindell, because his desire was to

23   sue Mr. Lindell all along.

24        There is no claim that he lost any earnings.  There

25   is no claim he lost income from work.  He is not claiming

40

1    he lost money, so you won't see evidence of that.  So

2    there are just two things left, pain and suffering and

3    damage to reputation.

4            For the pain and suffering, I heard my colleague

5    say that he was -- I wrote the words down, "traumatized

6    and in fear for his life."  You will get to see his

7    therapist's, his doctor's treatment notes.  He was getting

8    treated by an online virtual Zoom business.  When you see

9    those records, you can flip through, and they almost look

10   like they are the same thing over and over.  It looked

11   like they were cut and pasted.

12           You know what is missing from those records?  Any

13   mention that he was in fear for his life, that he was

14   traumatized.  None of these records mention anything about

15   Mike Lindell.  Many of them pre-existed Mike Lindell, way

16   back.  In fact, the doctor will state that he didn't

17   know -- he had heard of Mike Lindell, knew this suit was

18   something about Mike Lindell, but didn't know of any of

19   the allegations.  You would expect somebody who was being

20   treated and was very severely traumatized, like he said by

21   the claims, for those words to be in the doctor's notes.

22           There will be no evidence about outrageous and

23   extreme conduct.  It is just words.  All Mike Lindell did

24   was talk.  There was no conduct like doxing somebody;

25   putting that address on the web for people to find it.

1    There was no death threats by Mr. Lindell, he is not that

2    kind of a person.

3          Now, for the claim of damage to reputation, I am

4    very surprised he didn't tell you about the key piece of

5    evidence, Dr. Coomer's own Facebook posts, his social

6    media posts, and we have a lot of them.  You see, he

7    destroyed his own reputation long before he sued

8    Mr. Lindell.

9          The plaintiff had no public reputation by the time

10   Mr. Lindell comes around.  He had no public reputation of

11   a man of dignity, as a stalwart pillar of the community.

12   We will prove that his own social media statements

13   destroyed his reputation, his professional reputation.  He

14   publicly destroyed the ability of anyone to think that he

15   was a man of dignity.

16         And they made a big deal that one of the witnesses

17   was a felon.  Well, we will present evidence today, or

18   when he testifies, that will show that Dr. Coomer,

19   himself, committed a felony, although he was not convicted

20   of it, and he can't deny it, he will admit it.  The police

21   were investigating him for a serious hit-and-run accident.

22   They have several witnesses and photographs.

23         MR. CAIN:  Objection, Your Honor.

24         THE COURT:  Sustained.

25         MR. KACHOUROFF:  Regardless, this was picked up on

```
 1    social media over a hundred thousand times.  This fact
 2    became well known and highly public and did further damage
 3    to Coomer's supposed stellar reputation.
 4         MR. CAIN:  Still argument.
 5         THE COURT:  Sustained.  Move on.
 6         MR. KACHOUROFF:  So the only claim they have is
 7    guilt by association; to take a man named Joe Oltmann and
 8    say that because these two knew each other at one point
 9    and they were together, they are both guilty.  They sued
10    Joe Oltmann in state court.  They claim Joe Oltmann is
11    lying.  The plaintiff says they have some new evidence
12    that there was no Antifa call, but apparently there was a
13    call.  We have no idea whether Coomer was on some call or
14    not, but it has nothing to do with Mike Lindell.  As I
15    showed you in these pictures, Mike Lindell didn't even
16    know these things were happening.  All of the black Xs.
17         Now, plaintiff didn't lose his job at Dominion
18    Voting Systems because of anything that Mike Lindell said,
19    he lost his job and reputation because of his own Facebook
20    posts, his own social media posts, and we will prove that
21    to you.
22         I want to talk about two things real quick; his
23    Facebook posts and how it impacted his job.  He will claim
24    his Facebook posts were supposed to be private to 300 of
25    his friends.  But in his Facebook posts, he takes the
```

1    opportunity to call Trump things like "fascist," "racist,"

2    "f-tard," and "clemency backing."  He posted an Antifa

3    manifesto.  He uses vulgar and obnoxious words against

4    people he disagrees with, even for his own friends.

5         In fact, he said in one of his posts, "friends,

6    family, or foe, if you vote for that f-tard, racist" --

7    blah blah blah -- "un-Trump me now" -- and "unfriend me."

8    Apparently one of them did, and the posts were made

9    public.  But his post, his Facebook posts had extreme

10   political views that impacted him and his company.

11        And I want to stop here for just a moment.  The

12   plaintiff and Mr. Lindell and all of us enjoy First

13   Amendment protections, but the plaintiff worked in a

14   high-level position with government contractors, that

15   involved the crucial function of counting the votes.  He

16   was, by extension, working to support the government.  His

17   extremist views, once they became public, affected public

18   officials, and we will prove that Dr. Coomer knew this.

19        On November 10th, for instance, 2020, Dr. Coomer

20   saw a guy who said to the plaintiff that he was on an

21   Antifa call.  The next day he tendered his voluntary

22   resignation once he watched the video that Joe Oltmann

23   made.

24        You know what is not in that resignation email?

25   There is one thing he never says, he never tells his

1    employer that what Joe Oltmann said was false and that he

2    was never on an Antifa call.  He waited several weeks,

3    actually, before denying such a call in public.  Now

4    Dr. Coomer says he has new evidence to show that he wasn't

5    on the call.

6         But as I said, that is a fight between him and Joe

7    Oltmann, not us.  We don't care about that.  What is

8    important about the Facebook post is that we will prove

9    that Dr. Coomer apologized to his employer for what he

10   says is a "glaring lack of judgment."  And we will prove

11   why he had to apologize.

12        His employer tried to let it blow over, but the

13   comments were so filled with venom that they couldn't take

14   that chance because they would lose business.  You see,

15   after the plaintiff put up the Antifa posts and vulgar

16   political posts and veiled calls for violence that would

17   upset half the voters in this country, his employer was in

18   full damage control, and we will prove that Dr. Coomer

19   knew it.

20        Dr. Coomer's employer got on a call with the Chief

21   Operating Officer for the Secretary of State of Georgia,

22   that man's name is Gabe Sterling.  And you will hear about

23   Gabe Sterling.  The State of Georgia was Dominion's -- was

24   his employer's biggest client; they had just purchased an

25   election system of over a hundred million dollars, but the

1    Georgia official was very concerned because a member of

2    the public sent his venomous posts to Gabe Sterling, and

3    Sterling knew he had a problem.

4         He believed Dr. Coomer was one of the best in the

5    industry, to be sure, and he asked if Dr. Coomer had

6    posted the Antifa posts.  And when Dr. Coomer admitted it,

7    the chief operating officer said, "that was a dumbass

8    thing to do," and he felt bad about it because he felt he

9    affected Gabe Sterling's reputation.  He knew that he was

10   in a special position of trust at a high-level position at

11   the Dominion System company.

12        Let's be clear, we will prove that public election

13   officials are in a very difficult position, especially in

14   a hotly contested election.  The public's eyes are on

15   them.  They are heavily scrutinized, not just in their

16   work, not just what they say, not just what they do, but

17   by extension of who they hire as a vendor.

18        When this happens, they have to be -- well, let me

19   back up.  They have to be impartial, they have to be

20   neutral, they can't take sides for the left, the middle,

21   or the right.  They have to be seen as fair.  And if a

22   vendor, like his former employer, is seen as cheering for

23   one team, voters will get suspicious and blame the

24   government official and Dominion, and it becomes a

25   problem.

1           You see, they are like umpires, and if an umpire

2     cheers for one team during the game, the whole game looks

3     rigged, it looks corrupt, even though it may not be.  And

4     that is why the plaintiff had to apologize to Gabriel

5     Sterling, and that is why he had to resign.

6           I am sure Dr. Coomer is brilliant, in fact, I know

7     he is, but he has a caustic side to him, as well, that got

8     out.  And let me be clear, yes, he destroyed his

9     professional reputation, but he does have First Amendment

10    rights.  We have all had moments where we make statements

11    and comments that were not appropriate.  And, yes,

12    Dr. Coomer has the same First Amendment rights as all of

13    us, but the plaintiff chose to work exclusively for the

14    government counting ballots.  He chose exclusively to

15    count our votes.  He chose to be in a position of an

16    umpire or referee in a game.  He chose to let loose with

17    venomous words, and there are consequences for that in

18    that position.

19          So during voir dire yesterday, you were called upon

20    to hear your views about whether the First Amendment

21    protects violent rhetoric.  Mr. Lindell never called for

22    violence, much less, as the plaintiff's lawyer called it,

23    "an armed rebellion on the nation's Capitol."  They are

24    trying to get you inflamed to make leaps of logic that

25    don't exist.

1          You will see that Mike Lindell believes he is

2     protecting all of us and our American values of fair play

3     and transparency.  He has gone about it financially

4     because he wants the machines gone.  Some may like it, a

5     lot may not.  But that is what the First Amendment is for.

6     The best disinfectant for offensive speech, ladies and

7     gentlemen of the jury, is not less speech, it is more

8     speech.

9          We will prove that Eric Coomer doesn't really

10    believe this.  Remember that email where I told you that

11    you would see "I am shaking the money tree," in that email

12    he brags to his friend that his case will set precedent

13    for years.  You see if he gets his way, no one on the left

14    or the right will be able to talk about voting machines

15    again.

16         I want to be very clear, this debate about election

17    fraud has happened in 2016 with Democrats, 2020, 2024 with

18    Elon Musk, you have heard about all of that stuff.  That

19    is really not what this case is about.  Your verdict will

20    not be a referendum on the 2020 election.  This case is

21    not about the 2020 election.  You won't hear any

22    substantial evidence how badly the machines operated or

23    whose fault it is, it is about whether -- it is not about

24    whether voting machines are good or bad, although that may

25    be his view.  If it were, this trial would take 10 months,

1    not 10 days.  As it is, this really should be a four-day

2    trial.

3         This trial is about whether Mike Lindell believed

4    his statements were true at the time he made them in the

5    context of the national controversy that was brewing.  It

6    doesn't have to be true, but he has to believe it at the

7    time he made them that they were substantially true.

8         Now, giving a verdict for My Pillow or Mike Lindell

9    will not be a validation one way or the another.  The

10   debate on the 2020 election will never end.  Plenty of us

11   have already made up our minds, and that is not what you

12   will decide.

13        All you have to decide is this:  The plaintiff has

14   to prove by clear and convincing evidence, he has to get

15   over this very high bar that the First Amendment imposes,

16   that Mike Lindell believed the statements he made about

17   the election were false.

18        MR. CAIN:  Judge, this has been an argument

19   throughout.  Objection.

20        THE COURT:  Sustained.

21        MR. KACHOUROFF:  We will prove that the plaintiff

22   has a very high bar.  We will prove to you that the

23   plaintiff has to prove that Mr. Lindell made false

24   statements and didn't believe them at the time he made

25   them.  They don't have any such evidence, you won't see

1    that today.

2        We submit that the evidence that you see will show

3    you that Mike believed that he was telling the truth, that

4    he believed they were truthful at the time he made them,

5    and that the First Amendment protects these statements.

6        When you find for Mr. Lindell and the companies, we

7    submit the evidence that will come up and your verdict,

8    will protect people from being targeted from those like

9    the plaintiff, who not only disagree with them, but want

10    to do harm to them.  Thank you.

11        THE COURT:  All right.  Mr. Cain, are you ready to

12    call your first witness?

13        MR. CAIN:  Yes, Your Honor.  We call Dr. Eric

14    Coomer.

15        THE COURT:  Dr. Coomer, if you can step up.

16                    **DR. ERIC COOMER**

17    having been first duly sworn, testified as follows:

18        THE WITNESS:  I do.

19        COURTROOM DEPUTY:  Please be seated.

20        Please state your name, and spell your first and

21    last name for the record.

22        THE WITNESS:  My name is Eric Coomer.  E-R-I-C

23    C-O-O-M-E-R.

24                    **DIRECT EXAMINATION**

25    **BY MR. CAIN:**

1   Q.   Good morning, Dr. Coomer.

2   A.   Good morning.

3   Q.   All right.  Let's begin the evidence.  Now, you just

4   heard an opening argument from defense counsel, so let's

5   start here.  Prior to 2020, had you ever filed a lawsuit?

6   A.   Never.

7   Q.   Have you ever sued anyone, other than these

8   defendants, for anything other than the 2020 election

9   claims against you?

10  A.   I am sorry, there are other cases besides these

11  defendants.

12  Q.   And are all of these related to the allegations in

13  the 2020 election?

14  A.   Specifically that I "rigged" the election, yes.

15  Q.   Is this a "shakedown," as was claimed, of Mike

16  Lindell?

17  A.   Absolutely not.

18  Q.   Okay.  We have got a lot to cover, let's start first,

19  after we clear that, with a little bit of biographical

20  information.

21  A.   Okay.

22  Q.   Now, where are you from originally?

23  A.   Well, I was born in Arizona, but I was in a military

24  family, so I have lived all over the country; New York,

25  Kansas, Texas, Virginia, Colorado, California.

1    Q.    You have parents that are living?

2    A.    Yeah, they are still with us.

3    Q.    And your dad was in the military, you said.

4    A.    For about 33 years.  He was a West Point grad.

5    Q.    And your mother is still living.

6    A.    She is.

7    Q.    Do you get to see them much nowadays?

8    A.    I see them when I can.  You know, they live on the

9    other side of the country, in Virginia, so -- I think last

10   time was Thanksgiving of '24.

11   Q.    Do you have siblings?

12   A.    I do.

13   Q.    How many?

14   A.    I have five.  Two are deceased, and I have two

15   brothers.

16   Q.    I am not going to point them out, but is your

17   brother, Bill, here today?

18   A.    He is.

19   Q.    I noticed yesterday that there were folks protesting

20   outside, and I noticed Mr. Lindell was in front of the

21   camera.  Are you able to go outside in front of this

22   courthouse, or are your movements restricted?

23   A.    I do not use the front entrance of the courthouse.

24   Q.    Did you see the protesters outside?

25   A.    I did see them.

1    Q.    Did you see the "Free Tina Peters" signs?

2    A.    I did.  I saw one "Free Tina Peters" sign.

3    Q.    Where is she needing to be freed from?

4    A.    She is in prison.

5    Q.    Do you feel like you can freely move around this

6    town, Dr. Coomer?

7    A.    I do not.

8    Q.    Now, you said your folks and you moved around a lot

9    as a kid.  Did you end up going to college and to

10   postgraduate school?

11   A.    Yes.  I did my undergraduate at Rensselaer

12   Polytechnic Institute in Troy, New York.  And then I got

13   my masters and Ph.D. at the University of California, in

14   Berkley.

15   Q.    Did you do okay?

16   A.    I excelled.

17   Q.    And you said you went to the University of Berkley

18   for your Ph.D.; is that correct?

19   A.    That is correct.

20   Q.    All right.  And your field of study was what?

21   A.    Nuclear physics.

22   Q.    Did you get a fellowship as part of that?

23   A.    Yes, my -- I attended grad school on the magnetic

24   fusion energy technology fellowship.  And that is from the

25   U.S. Department of Engineering -- or Energy, sorry.

1    Q.   With all of that, did you end up going into nuclear

2    engineering as a career?

3    A.   Postgrad school, no, I left the field.

4    Q.   Why did you leave?

5    A.   Over that 9-year period of undergrad and grad school,

6    my goal had always been to go into academia.  And at the

7    end of that 9-year period, I decided it really wasn't the

8    career for me, so I left to pursue other opportunities.

9    Q.   What were those opportunities?

10   A.   Mostly in database development, software engineering.

11   Q.   Were you active outside of your database development

12   and software engineering career?

13   A.   Yes.  I actually also, you know, was a rock climbing

14   guide.  I wrote articles for the climbing magazines.  I

15   had an avid outdoor pursuit.

16   Q.   Mountain biker, skier, kayaker.

17   A.   Skiing from a very young age, about 6.  Kayaking and

18   mountain biking later in life.

19   Q.   Did you feel like you had a healthy and full life up

20   to that point?

21   A.   Absolutely.  I mean, I raced in international

22   mountain bike stage races that could take, you know, eight

23   days.  I was a pretty proficient kayaker, excellent back

24   country skier.

25   Q.   Now, ultimately did you turn to working in the

1    election industry?

2    A.    Yes, in July of 2005.

3    Q.    Why did you decide to go into elections?

4    A.    It was an opportunity.  I had just left the previous

5    job, and I had, you know, posted my resume on multiple

6    sites; Dice.com, Monster.com.  The kids probably don't

7    know what I am referring to at this point.

8         But based on that, a recruiter called me and said

9    we have this job, we think it fits your skill set, you

10   know, would you be interested in interviewing?  I

11   interviewed with the vice president of engineering, and we

12   hit it off, and it sounded like a really unique job, and I

13   was excited to take that.

14   Q.    I know we have stipulated to a lot of the timeline

15   here, so I won't belabor it.  But Sequoia was the first

16   voting company you went to work for.

17   A.    Yes.  It was Sequoia Voting System.

18   Q.    And I think you were -- I wrote it down.  Defense

19   counsel said something about you "counting the votes."

20   A.    I have never counted votes.

21   Q.    Did that make sense to you?

22   A.    No, it does not.

23   Q.    We will explore that in a bit.  So what did you do

24   for Sequoia?

25   A.    I started, again, as a database analyst, database

1     engineer.  I was what is called re-factoring some of their

2     code base.  I really meshed with the job of developing

3     voting systems.  You know, within a year I was promoted to

4     the director of software development.  And within 3 years,

5     I was the vice president of engineering for Sequoia Voting

6     System.

7     Q.   Just at a 10,000-foot view, what does a voting system

8     do?

9     A.   They create equipment and software to allow clerks,

10    counties, state officials, to administer elections and

11    tabulate votes.

12    Q.   And do you actually, as a voting system professional,

13    do you actually go on ground during the elections?

14    A.   At certain times during, you know, large elections

15    or, you know, complex elections, big sort of large

16    clients, I may visit them and be on site to provide

17    technical customer service.

18    Q.   When you say "technical customer service," what kind

19    of work were you doing to support the election?

20    A.   Again, just providing that customer service if they

21    had questions about how some of the software was working.

22    If they had questions or potential issues, you know, they

23    could consult with me on the best mitigations or solutions

24    and how to fix that.  I did not actually physically go in

25    and touch the equipment.

1    Q.    About how long did you actually work on the ground in

2    that kind of support role you just described?

3    A.    Up through November of 2020.  So 15 years.

4    Q.    Did you end up in a managerial role while at Sequoia?

5    A.    Yes.  Like I said, I was the vice president of

6    engineering.  I had 90 employees at the time.

7    Q.    Where were you based out of at the time?

8    A.    We were based out of right here in Denver, Colorado.

9    Q.    Okay.  And then at some point Dominion came into the

10   picture.  Tell us how that happened?

11   A.    Yes.  Early in 2010, Sequoia Voting System was having

12   financial difficulties, and Dominion Voting Systems

13   approached Sequoia, and eventually there was an asset

14   acquisition.  So Dominion acquired all of the assets,

15   including the IP.

16   Q.    Is that intellectual property?

17   A.    Intellectual property, thank you Mr. Cain.  But they

18   also acquired, you know, physical assets; people, and I

19   was hired on as part of that asset acquisition as the Vice

20   President of U.S. Engineering for Dominion Voting Systems.

21   Q.    Was Dominion also in Denver, Colorado, at the time?

22   A.    During acquisition, no.  Part of the acquisition was

23   they acquired the physical office space, and then

24   essentially migrated some of their operations here in

25   Denver.

1    Q.    Okay.  And then you worked for Dominion for how long?

2    A.    For 10 years.

3    Q.    All right.  Well, just sort of explain to the jury,

4    if you could, your role at Dominion and how it evolved.

5    You started in 2010 as what, VP of engineering, I think we

6    stipulated to.

7    A.    Yes, VP of U.S. engineering.

8    Q.    Okay.  And was that role at Dominion when you went

9    there any different than what you were doing at Sequoia?

10   A.    Initially it wasn't much different.  Again, Dominion

11   acquired a lot of the assets of Sequoia.  A lot of the

12   developers from Sequoia that had been, you know,

13   previously reporting to me, they continued to report to

14   me.  There was still development on some of the Sequoia

15   products because they were existing in the field, they

16   needed support, they needed development.

17        But then there was also some development that

18   involved, you know, interfacing the, what we call the

19   legacy Sequoia products with the new products that we were

20   Dominion specific.  So I oversaw some of that development,

21   as well.

22   Q.    You used the term "interfacing."  Can you dumb some

23   of these terms down for me.  What does that mean?

24   A.    Sure.  It really comes down to exchanging data.  So

25   being able to, for the system, the Sequoia system, to

1    export data, whether it is valid definition data that

2    describes how a ballot is laid out, or the accumulated

3    tabulated results, and being able to import those into the

4    Dominion system for final reporting and other things like

5    that.

6    Q.    Now, by the 2020 election, had all of that migration

7    taken place and you were just working on Dominion systems?

8    A.    Yes.  And that was always the goal was to migrate the

9    legacy customers to a Dominion-specific system.  And by

10   2020, that had happened, and that is where my development

11   was focused.  My role did change over the years where I

12   was not doing the day-to-day management of developers, but

13   I was more concentrated on the development and the ideas

14   of new systems and modifications to the existing system

15   that could better serve the needs of our customers, which

16   are, again, state and county election officials.

17   Q.    Now, did you do work, in addition to domestically

18   here, did you also do work overseas to help other

19   countries improve their elections?

20   A.    Yes.  One of the main countries that I worked closely

21   with was Mongolia.  I also did some work for Puerto Rico.

22   Yeah, those are the main two.

23   Q.    And I know you had a brief period, it is reflected in

24   Stipulation 3, and we don't need to look at it right now,

25   where you did leave Dominion for a brief period, I believe

1    in 2013; is that right?

2    A.    Yes.  It was about seven months.

3    Q.    Okay.  And why did you leave Dominion?

4    A.    At the time I just felt like I was sort of stuck in a

5    role.  That was when I was, you know, working with -- I

6    had a lot of employees, I was more management, and I

7    really wanted to be more creative and really, you know

8    sort of push the envelope of election management systems

9    and voting systems in general.  We couldn't really come to

10   an agreement, so I left the company and I did some

11   consulting for about seven months.

12        I will be honest, three months into that, I

13   realized that I had missed my calling, which is working in

14   voting systems, and I went back to the Dominion

15   management, and we worked out a deal that I could come

16   back in a more -- in a role that more fit my strengths and

17   what I wanted to do as a career.

18   Q.    Now, voting obviously is the cornerstone of our

19   democracy.  Did you feel like you were making a real

20   difference with your role at Dominion, and was that part

21   of the reason why you went back?

22   A.    I mean, that was the whole reason.  You know, even in

23   my graduate school days, you know, I was working on, you

24   know, systems that could provide, you know, clean

25   limitless energy, and that was because I really wanted to

1    give back, you know, to society.

2        And I viewed working in voting systems in that same

3    light; it was fulfilling during elections knowing that

4    people were able to cast a secure, transparent, auditable

5    vote on equipment that I worked on, that I helped design.

6    That was really why I did the whole job.

7        You know, when I started in the business, one of

8    the reasons I took the job was the passion that I could

9    feel from, you know, the people that interviewed me.  And

10   people in the industry, in the voting industry, whether

11   you are a clerk or you work for the vendor, you know, they

12   refer to voting as it either gets in your blood or you

13   leave within a week.  And that is why, you know, you see

14   clerks that have been there for 20 or 30 years.  You see

15   people, my colleagues in other voting system companies,

16   you know, 20, 30 years in.  These are careers, because the

17   people that tend to fit well in that industry really

18   believe in the democratic process and providing solutions

19   on how to best meet that.

20   Q.   Now, Matt Crane, do you know who he is?

21   A.   I do.

22   Q.   He will be testifying during this trial.  Is he one

23   of the people that you consider to fit well within this

24   group you described.

25   A.   Yeah.  He is sort of the poster child for it.  You

1    know, he has been in the voting space for at least 20

2    years.  He was the County Clerk for Arapahoe County, and

3    he is now the Executive Director of the Colorado County

4    Clerks Association.

5    Q.    And in Colorado, the county clerks, are they

6    responsible for running elections in their own counties?

7    A.    Yes.  It falls under the county clerk's purview to

8    administer elections, and the Secretary of State is the

9    ultimate election official.

10   Q.    And who is that in Colorado now?

11   A.    Currently it is Jena Griswold.

12   Q.    How much interaction did you have with the Executive

13   Director of the Clerks Association, Mr. Crane?

14   A.    I actually had more interaction with Mr. Crane when

15   he was the Clerk of Arapahoe County.  I had a little bit

16   of interaction once he took on the executive director

17   position.

18   Q.    Does Mr. Crane have your respect?

19   A.    Absolutely.

20   Q.    Did you two guys occasionally butt heads over

21   politics?

22   A.    I would say he is on the exact opposite end of the

23   spectrum of my political beliefs.

24   Q.    Did that somehow get in the way of being able to work

25   together?

1   A.   Never.  We actually worked really well together, and

2   we stay in touch to this day.

3   Q.   I guess explain to the jury, if you can, this

4   dichotomy with having strong political beliefs and yet

5   being able to work in an industry that involves voting.

6   A.   One word; professionalism.  Almost all secretaries of

7   state and county clerks are partisan positions.  They are

8   elected, they run under a party.  But the expectation and

9   the commitment is when you are running an election and

10  administrating an election, you do that in a nonpartisan

11  way.  You are serving all voters, regardless of their

12  party affiliation.  Politics are left at the door.

13  Q.   And is it fair to say with respect to politics that

14  people within the company you were working at, Dominion,

15  also had different political views?

16  A.   Yes.  I mean, like any company or office, especially

17  in Colorado, you get a pretty broad spectrum of political

18  beliefs.

19  Q.   Did your politics ever get in the way of your work?

20  A.   Not once.

21  Q.   Now, going back to your Dominion days, at one point

22  you were the director of product strategy, then they added

23  the security component to it; is that correct?

24  A.   That is correct.

25  Q.   Okay.  Why did they add that security component to

1    your work?

2    A.    Specifically that was driven by the fact that in

3    2016, voting systems were designated as what is called

4    critical infrastructure, and that is basically a

5    governmental designation.  Other industries include, you

6    know, like, aviation, power grids, things like that.  They

7    are considered critical industries that can have national

8    security implications.

9    Q.    And so what did you start doing once this designation

10   of critical infrastructure came about?

11   A.    So there were a variety of things.  So right around

12   that time, CISA, which is a department under the

13   Department of Homeland Security, was created.  That was

14   not just for voting systems, that was for all critical

15   infrastructure industries.  It stands for Cybersecurity

16   and Infrastructure Security Agency.

17        They had various groups, they are called

18   information sharing centers.  It is a way for sharing

19   information about potential threats or what is happening

20   in the security space.  So I would attend those meetings

21   as a vendor representative.

22        There was specifically an IT-ISAC, which is

23   Information Technology Information Sharing and Analysis

24   Center.  But then there was another one that was more

25   directly related to elections, the EI-ISAC.  So I would

1    attend meetings and I would get briefings from those

2    various groups.

3         I was also a vendor representative to the Colorado

4    National Association of Secretaries -- well, not Colorado,

5    but the National Association of Secretaries of States.

6    They had a cybersecurity working group.  I was part of

7    that.

8         Colorado had a working group on implementing what

9    is called risk-limiting audits.  I was instrumental in

10   that working group, as well.  So there was a variety of

11   things that I did in that security role.  You know, we can

12   also get into what is called a coordinated vulnerability

13   disclosure program.

14   Q.   Let's break it down.  It sounds like you are excited,

15   but you mentioned risk-limiting audits, so I will stop you

16   there.  Does Colorado have risk-limiting audits?

17   A.   Yes, they do.  They were actually the first state to

18   adopt that as an audit process.

19   Q.   Okay.  And is this process part of ensuring that the

20   vote totals are accurate?

21   A.   It is actually more than that.  It ensures that the

22   physical paper ballot, the record on there matches the

23   electronic record in the voting system reporting module.

24   So it is a one-to-one, it is called a ballot audit

25   comparison.  So that physical paper, it is somebody

1    looking at that physical paper and looking at the

2    corresponding electronic record.

3    Q.   And you say Colorado implemented that.  I'll call it

4    an RLA.

5    A.   Yes.  They implemented that, I believe around the

6    2015, 2016 timeframe.

7    Q.   And were you in favor of that?

8    A.   Yes.  I think it's an excellent audit technique.  It

9    is not the only one, but, yes.

10   Q.   Have other states adopted Colorado's model for RLAs?

11   A.   I honestly am not sure if they have copied it

12   directly.  I know that there is a lot of effort to migrate

13   to what are called RLAs.  All states do some form of

14   audit.  But, again, RLA is just one of them.  There are

15   other ballot comparison methodologies.  But that is where

16   the industry is going.

17   Q.   If you wanted to rig up an election, would a

18   risk-limiting audit be a hindrance to your activities?

19   A.   Yes.  Anything that involves modifying the actual

20   paper records, which are the official records in, I

21   believe, every single state, that, in itself, is a

22   hindrance.  So any audit that goes back to the physical

23   ballots and compares them to the electronic records

24   presents serious, serious hurdles for malfeasance.

25   Q.   Now, I am assuming that election systems don't always

1    operate at a hundred percent, that there are problems.

2    A.    Absolutely.  It's like any computer-based system, you

3    know, at home.  Sometimes your Microsoft Word just shuts

4    down or your computer goes to a blue screen of death.

5    Yeah, systems have faults, and the goal is to provide a

6    system that has, you know, recovering mechanisms and a way

7    to recover from any of those kinds of issues.

8    Q.    Can you give the jury an example or two of some of

9    these types of problems that you personally helped

10   address?

11   A.    Yes.  So specifically in the presidential 2020

12   election, there was a county in Georgia that was having

13   issues with their adjudication system, which we have

14   mentioned but we haven't really described.  But it is a

15   separate system, and they were having trouble getting it

16   to start.  I was able to assist them in identifying the

17   issue.  It was basically a configuration issue, and once

18   that was addressed, the system came back up and they were

19   able to move forward.

20   Q.    Did you also observe, while you were working at

21   Dominion, sort of what I would call human problems or

22   errors by the county officials that were performing their

23   functions?

24   A.    Absolutely.  So the most obvious situation that

25   people in this room may be familiar with is what happened

1    in Antrim County, Michigan.  Again, that was in the 2020

2    election.  So to put it briefly, there is an election

3    management system, it is computer based, it is a database,

4    and it has the information about the election, including

5    what every single ballot looks like, right.  Because

6    within a county, depending on where you live, you may not

7    have the same contest; you may be in a different

8    congressional district, you may have a local municipal

9    race.  So you have to keep track of all of that.

10           And at the end of the day, what happens is physical

11   ballots get printed that match that definition.  What

12   happened, what can happen, and what does happen in almost

13   every election in some county, is there is a late change

14   to the ballot.  This can be due to just human error of

15   accidentally leaving a contest off.  And when you go to

16   proof the ballots, you are like, where is this contest?

17   So you have to go back to the election management system,

18   you already have these ballots printed, the machines may

19   be configured for these ballots, and you go back to the

20   election management system, you add that contest, and have

21   to regenerate those ballots and reprint them, and you have

22   to throw away the ones that don't have that contest on

23   them.

24           That was all done in Antrim County, but they did

25   not sync up the tabulators that counted the ballot and the

1    reporting system that received those results.  So while

2    the tabulator was able to process all of those ballots

3    correctly, and we know it was correct because at the end

4    of the election day, what is called the polls are closed,

5    and the tabulators actually print out a report of every

6    contest and candidate.

7         And it is the poll workers, they sign those, and

8    they verify that the total number matches the total number

9    of paper ballots that are in the box, and they wrap all

10   that information up, and they remove what is a removable

11   memory element, which is securely transported down to the

12   central office.

13        The central office takes that removable media,

14   compact flash card, the SD card, and they put that into

15   the reporting system.  Well, the reporting system still

16   had the old election definition, and that was human error.

17   So when those ballots were tabulated, there was a mismatch

18   that led to incorrect unofficial results being reported.

19   Q.   You said "unofficial results."  What you do mean?

20   A.   So --

21   Q.   Actually, before you start that, I have got a

22   Democracy Suite block diagram.  Would that be helpful for

23   you to explain some of this to the jury?

24   A.   I think it would be.

25        MR. CAIN:  Okay.  Someone needs a break, it is not

 1    me, but I am happy to take one if the Court is so

 2    inclined.

 3           THE COURT:  Ladies and gentlemen of the jury, we

 4    need to take a break.  Let's break for 15 minutes.  Be

 5    back here in 15 minutes.

 6           I remind you, you should not be discussing the case

 7    with each other or anyone else.  Enjoy your break.

 8           (Outside the presence of the jury.)

 9           THE COURT:  Thank you.  Please be seated.

10           All right.  There are a few things I want to

11    address with you all outside the province of the jury

12    because it looks like we are getting to exhibits in the

13    examination.

14           First of all, I want you all to be mindful of the

15    motions in limine rulings, that is at Docket Entry No.

16    328, at pages 6 through 8, with respect to something that

17    came up in opening statements.  I am not going to

18    reiterate it here, I just need you all to be mindful both

19    in your questioning and cross-examination of witnesses and

20    any closing argument as to what the Court has already

21    decided with respect to the scope of permissible testimony

22    in the context of the motion in limine.

23           The second issue I wanted to raise to you all was

24    the redactions of Exhibit 9.  And I thought it might be

25    appropriate for -- it sounds like it is plaintiff's

1    objections to address with me the bases for the objections

2    based on the motion in limine for Bates No. Pages 62 and

3    21.  We can do that at side bar if you find that to be

4    appropriate, but I don't quite understand what those

5    objections are.

6         MR. KLOEWER:  Sure, Your Honor.  I believe those

7    were -- yes, we objected to them and maintain an objection

8    to a couple exhibits to their 9A.  I believe the Court has

9    already expressly ruled on those in the motion in limine,

10   so I am not going to discuss it.  If you give me a moment

11   to pull up the corresponding documents.

12        THE COURT:  Dr. Coomer, you may step down and go to

13   the restroom, too.

14        THE WITNESS:  Thank you.

15        MR. KLOEWER:  So in Exhibit 9A, the defendants have

16   included some documents the Court expressly excluded from

17   the Facebook post in the order on the motion in limine.

18   Specifically they have included Bates page 0002; that is

19   page 2 of their Exhibit 9.

20        THE COURT:  2 instead of 21?  Because I was told it

21   is 21.

22        MR. KLOEWER:  That's right, my mistake.  I have

23   four that we discussed, but only two are at issue.  So

24   page 21, which they have included as page 10 of their

25   Exhibit 9.  The Court expressly ruled on those, and it is

1    ordered.

2        THE COURT:  Sorry, let me just see the actual pages

3    because I want to make sure I am tracking.

4        MR. KLOEWER:  This is part of the plaintiff's

5    motion in limine with respect to statements about police

6    and law enforcement, this was included in Bates range 13

7    to 26.  We included -- we expressly identified these Bates

8    labels in our motion in limine as falling under the "law

9    enforcement" and "police" and "Black Lives Matters" and

10   the Court granted that request, that is Docket Entry 28,

11   at page 11.  The Court granted that request with respect

12   to those specific Bates numbers.

13       And the other one is this document, page 52, which

14   we also included expressly in our motion under the

15   "religious beliefs" heading.  The defendants have included

16   this document as page 16 of their Exhibit 9.  Here, again,

17   the Court's order expressly granted the motion in limine

18   with respect to "religious beliefs," both on page 11

19   and --

20       THE COURT:  I don't see any "religious."

21       MR. KLOEWER:  We get down here "didn't need a

22   magical non-existent being."  Again, we identified this as

23   part of those arguments.

24       THE COURT:  Page 7 of the motion in limine?

25       MR. KLOEWER:  That is in our motion in limine on --

1           THE COURT:  I meant the order.

2           MR. KLOEWER:  In the order, on page 11.

3           I don't believe the Court -- well, the Court does

4    reference our paragraph numbers where we raise those in

5    our motion.  With respect to the "religious beliefs," We

6    raise this -- we identify this in paragraph 30.  And with

7    respect to the "police," that was addressed in paragraphs

8    31 to 33.

9           THE COURT:  So, Ms. DeMaster, what is defendants'

10   response?

11          MS. DEMASTER:  Defendants' response, Your Honor, is

12   that Mr. Kachouroff came on this case when prior

13   counsel -- I know we've expressed this to the Court and

14   opposing counsel, that we were not given a lot of things

15   in discovery.  There was a long time that it took to get

16   some of these together.

17          So we did not have -- we did not know, nor have,

18   exactly what they were referring to, this wasn't until

19   later.  But we had many copies of this.  And they have all

20   been public, they have been posted.  This is from another

21   case.  And so we were able to -- we were able to see what

22   they were talking about.

23          But the problem with their motion in limine, the

24   plaintiff's motion in limine never attached these.  These

25   also weren't specifically referenced.  None of the Bates

1   labels were actually referenced in the Court's order on

2   its motion in limine, they were just general information

3   within the Court's discretion.

4        So there was general information that there were

5   two attachments to the plaintiff's motion in limine, one

6   of them was pages of Mr. Lindell's deposition testimony,

7   the other one was the 118-page document, which this Court

8   excluded.  So these were never attached, they were never

9   produced or provided.

10       And so when we were talking about "religious

11  beliefs," there are some other statements out there, not

12  in this exhibit, that talks about "church of satan" or a

13  tattoo or there are other things there, that has all been

14  excluded, we haven't introduced that.

15       We don't see how this is a religious -- this isn't

16  religious, this is a political type of statement here.

17       THE COURT:  Isn't this statement, "the world didn't

18  need a magical non-existent being, just an ignorant

19  populace and a suitable demagogue to bring the

20  apocalypse," isn't "non-existent being" a reference to God

21  and his nonbelief?

22       MS. DEMASTER:  Well, a lot of this is hyperbolic,

23  and it is referring to Donald Trump and to Hilary Clinton.

24       THE COURT:  I don't think this refers to Donald

25  Trump, at all.

1          MS. DEMASTER:  "Suitable demagogue to bring the

2     apocalypse."

3          THE COURT:  We should focus on the motion in limine

4     ruling.  I have ruled that statements about Donald Trump

5     would be admissible to demonstrate his credibility with

6     respect to these various allegations of statements that he

7     made.

8          So, I mean, Mr. Kloewer let me ask you this.  In

9     the motion in limine that you all filed, where are these

10    "suitable demagogue to bring the apocalypse" pages

11    specifically referenced?

12         MR. KLOEWER:  In our motion in limine, Your Honor,

13    with respect to this Exhibit 52 that we are discussing, we

14    addressed that in paragraph 30 of our motion.

15         THE COURT:  What docket entry?

16         MR. CAIN:  Document 279, paragraph 30, we raised

17    that.  I believe the Court, while not expressly citing the

18    Bates number, did incorporate the paragraphs of our motion

19    by reference in granting that.

20         THE COURT:  And what about paragraph 21?

21         MR. KLOEWER:  21 was raised in paragraphs 31 to 33.

22    This was part of a block of documents we identified as

23    Bates label 13 to 26.  This is just right in the middle of

24    those, 21.  These are a series of posts all on the same

25    date, plus or minus a day or two, surrounding the George

1    Floyd protests.

2         I would note on this one, there is no reference to

3    Donald Trump here, this is an ambiguous political position

4    that was asserted in conjunction with police.

5         MS. DEMASTER:  And to Brad's position, just

6    quickly, that was in a part of the Court's order, it was

7    denied without prejudice, of course, but was denied as to

8    "other unidentified statements."  So my colleague here is

9    stating that this is an "other unidentified statement."  I

10   don't see anything about the police, but it is certainly

11   very relevant in this case when talking about "traitor" or

12   "treason" or "reputation" and other kinds of injuries, I

13   would think that this derogatory USA term is quite

14   relevant being posted by somebody in 2020.

15        THE COURT:  Is this a song?

16        MR. KLOEWER:  Yes, it is a music video.  It is a

17   link to music video by another group.  This is not Eric

18   Coomer type of words, it is just a link.

19        THE COURT:  I just wanted to make sure I understood

20   what I was talking about.

21        MR. KLOEWER:  You can check it out on your drive

22   home.

23        THE COURT:  You can see I also am not doing Google

24   searches with reference to this case.

25        MS. DEMASTER:  We would not be opposed to

1    redaction, to redacting the YouTube link, even redacting

2    the picture, if that is more comfortable, so if the song,

3    itself, is about the police and you are afraid people

4    could look that up, we are not opposed to that.  We object

5    to "the magical non-existent being" being redacted.

6         MR. KLOEWER:  I would say there are a lot of Trump

7    posts in there.  We are going to be objecting to

8    cumulative anyway, but this one is more specific to the

9    Court's order.

10         THE COURT:  Well, let me just take a look at what

11    the ruling is, the specific rulings on the motion in

12    limine that we revisited.  I don't know if that will be

13    appropriate, but let me take a look at what I have done to

14    date, and then I will consider these two.

15         MS. DEMASTER:  Thank you, Your Honor.

16         (A break is taken from 10:48 a.m. to 11:00 a.m.)

17         THE COURT:  Thank you.  Please be seated.

18         All right.  With respect to Exhibit 9A, the Court

19    has the following ruling:  With respect to page 0021, the

20    Court will exclude it consistent with its prior ruling on

21    the motion in limine and also pursuant to Rule 403, as any

22    probative value is outweighed by the prejudicial impact.

23         With respect to page 0052, however, the Court will

24    allow that exhibit, but for a redaction that is necessary

25    to be consistent with the Court's prior motion in limine

1    ruling.  I actually don't have the exhibit in front of me.

2    I think it is the second-to-the-last sentence that starts

3    by talking about "a pox" on your house.  And then that

4    last statement that ends with the statement regarding the

5    "non-existent magical being" and the "demagogue."  Does

6    that make sense to everybody?

7             MR. CAIN:  Yes, Your Honor.

8             MS. DEMASTER:  The entire last sentence is out, or

9    just the "non-existent"?

10            THE COURT:  The last two sentences are out.  I

11   believe it starts like "a pox" on your house, that

12   statement.

13            MR. KLOEWER:  Yes, Your Honor.

14            THE COURT:  Then the last statement.  Okay.  So

15   those two sentences will be redacted.  So if you can pull

16   together that exhibit.  And then I am not ruling on

17   admissibility per se, I am just ruling on the redactions,

18   okay.

19            All right.  Anything else before we bring the jury

20   back in?

21            Oh, I did want one reminder, pursuant to Rule 611

22   of the Federal Rules of Evidence, make sure when you are

23   examining or cross-examining that you are not

24   incorporating characterization of the law in those

25   questions.  It is the province of the Court, not the

1    attorneys, to explain the law to the jury.

2         I don't want them to get confused about what the

3    law is.  And so, again, I will sustain any objection as to

4    characterizations of what the standards or the burdens of

5    proof or the legal applications to that testimony would

6    be, okay.

7         MR. CAIN:  I am 97 percent sure I didn't do that,

8    but if I did, I apologize.

9         THE COURT:  All right.  Mr. Cain.

10        Are we ready for the jury?

11        MS. DEMASTER:  Your Honor, may I ask for a point of

12   clarification?

13        THE COURT:  No, because the jury is about to come

14   in.  You can ask at side bar or at a break.

15        MS. DEMASTER:  Thank you.

16        (In the presence of the jury.)

17        THE COURT:  Thank you.  Please be seated.

18        MR. CAIN:  May I proceed?

19        THE COURT:  You may.

20        MR. CAIN:  Thank you.

21   Q.   (BY MR. CAIN)  When we broke, Dr. Coomer, we were

22   starting to look at a demonstrative exhibit that was a

23   Democracy Suite block diagram.  Just generally, what does

24   this diagram represent?

25   A.   This is a high-level overview, with some detail of

1    basically the core election system.

2    Q.   Okay.  With the caveat that you were accused of

3    "rigging" the election, as opposed to being a core

4    employee or not knowing what you are doing, I want to

5    focus more on the redundancies that this diagram would

6    show that would prevent some malicious actor from getting

7    involved in trying to rig an election.  Are you with me?

8    A.   I am.

9    Q.   Okay.  So does this demonstrative explain or

10   demonstrate some of the redundancies that protect our

11   elections?

12   A.   Yes.  Not always explicitly, but I can talk about

13   specifics and what redundancies are included there.

14   Q.   Okay.  What redundancies are included there?

15   A.   Let's start here.  Just imagine in your mind, so what

16   I circled in red here is really the sort of in-person

17   election day voting paradigm.  It has, you know, voters

18   come in, they are verified in the voter registration

19   system, which is, again, outside of the election

20   tabulation system, they get a paper ballot, they fill out

21   that ballot with their choices, and it gets input into the

22   tabulator here.  The tabulator makes an image of the front

23   and back of the ballot, and it tabulates the votes

24   depending on the voter marks.

25          That ballot then goes into a secure ballot box.

1    The corresponding, what is called a cast-vote record,

2    which is an electronic representation of how the votes

3    were counted, the CVR, cast-vote record, the images of the

4    ballot are written to removable -- redundant removable

5    memory elements; again, a compact flash card or an SD

6    card, so like a usb drive, but not, and there are two of

7    those in each tabulator.

8         Those are behind locked and sealed doors, and they

9    are only accessible by poll workers.  So on the day

10   ballots --

11   Q.   Dr. Coomer, I am sorry, we have to keep it a little

12   bit to a question and answer, so I want you to give the

13   explanation, but you just mentioned that those are kept

14   behind lock and key.  So you, as the election service

15   provider, are not involved in this process.

16   A.   Not at all.

17   Q.   Who is?

18   A.   The election officials that are from the county or

19   the state.

20   Q.   Okay.  So from that ImageCast, you put the two marks

21   for the electronic storage.  What is the next step in the

22   process?

23   A.   So throughout the day, ballots are tabulated, and

24   they all end up in the box.  It is a secure box with its

25   own locks and seals.  When the polls are closed -- and,

1    again, that is the election judge or election official --

2    they have to have a secure key, and there is a little key

3    reader in that area (indicating).  They have to have that

4    key and they also have to have a passcode, and that allows

5    them to then close the polls.

6           When polls are closed, the machine, the tabulator,

7    this is a little thermal printer, prints out at least one,

8    but generally five copies of what is called the results

9    report for the tabulator.  And that is the accumulation of

10   all of the ballots that were scanned by that tabulator on

11   election day.

12   Q.   Okay.  And then there is this -- on the bottom of

13   this diagram, it says "Democracy Suite EMS results tallied

14   and reporting."  What is that?

15   A.   Down around this area, this point?

16   Q.   Yes.

17   A.   So let me briefly go back to the polls are closed,

18   the results reports are printed, those are signed by the

19   election judges.  They make various checks; the total

20   number of ballots, does that match the total number in the

21   ballot box, does it match the total number of people that

22   came in to request a ballot?  So they do all of those

23   preliminary checks to make sure that things make sense.

24          They take one of the memory elements out, because

25   they are behind two different doors, they take the memory

1    element out, they take the ballots, and they take a

2    certain number of the reports, and they put them into a

3    secure bag.  Some of the reports are left behind because

4    they are posted at the precinct so individual voters can

5    go to their precinct and check their results for their

6    precinct at any time.  That data in that bag is sent sort

7    of to this area (indicating).

8         The ballots are in the bag, one of the removable

9    elements are in the bag, one of the reports is in the bag,

10   and it goes to the central office where they take the

11   media element, and they read those results into the

12   reporting system.  It is called accumulation.

13   Q.   Is that in the county office?

14   A.   It is in the county office.  It also may be in a

15   remote office that is directly connected to the county

16   office.  So it may be, you know, next door.

17   Q.   There is a lightning bolt kind of in between what you

18   were first talking about and what you have circled.  It

19   says "optional mode of transmission."  What does that

20   refer to?

21   A.   So it is sort of like it sounds.  In certain states,

22   again, states set election law.  States define election

23   law.  Some states have completely different rules on how

24   they operate and administer their elections.  In a couple

25   of states they allow transmitting results, unofficial

1    results from the tabulator at the end of election night

2    when the polls are closed.

3         That is an optional piece of hardware.  It is not

4    included in the tabulators, and it is not usable, operable

5    in states that do not allow it and certify for it.

6    Q.    I am sorry to interrupt you.  Is it firewalled or air

7    gapped from the voting system?

8    A.    It is air gapped from the main voting system, which

9    is here (indicating).  This transmission is not over what

10    you would normally refer to as the internet, it is over a

11    secure cellular network.  It is VPN'd.  All of the devices

12    are what are called "white listed."  So you know, this

13    requires coordination with, you know, the cellular

14    company, whether that is Verizon or Sprint or AT&T.

15         The voting vendor assists the, you know, the end

16    customer working with their cell provider to help

17    configure this, but we do -- the voting machine company

18    does not manage that in any way.  It does not define how

19    it is set up, but we help configure that.

20         So the cell company will create a very isolated

21    protected network with all white listed devices to

22    transmit.  Again, these are unofficial results.  In all

23    jurisdictions that allow the transmission at the end of

24    the night, eventually the media comes down to the central

25    office, and those unofficial results are replaced with

1    these official results from the polling place.

2    Q.   So the unofficial results are the things that you see

3    on TV, sort of early after the ballot is closed.

4    A.   Correct.  And if you look at the jurisdictions,

5    states that allow transmission, they tend to be states

6    with large geographical areas; Alaska, where if you waited

7    for the physical media to arrive, it could take days.  In

8    Alaska they use bush planes.  There could be weather.  So

9    there are lots of things.  And the goal is to get results

10   as quickly as possible, even if they are unofficial.

11   There is a variety of reasons, and states base their laws

12   on that.

13   Q.   So if -- and I don't want to give anybody a roadmap,

14   so just generically, if a bad actor from China or

15   somewhere wanted, and actually got access to this optional

16   mode of transmission, would that access be limited to

17   unofficial results, or could it access official results?

18   A.   It could only access unofficial results.  At the end

19   of the day, it is the physical pieces of paper in the

20   ballot box, those are the records.

21   Q.   When you were working -- well, throughout your entire

22   career, including as a security consultant, did you ever

23   see any evidence of this piece, the optional modem

24   transmission, being accessed by any third parties?

25   A.   No evidence whatsoever.

1    Q.    So not even the unofficial results have been tampered

2    with, to your knowledge?

3    A.    That is correct.

4    Q.    Okay.  All right.  Are there any other redundancies

5    that might prevent a bad actor from getting into this

6    system?

7    A.    Well, again there is also the images of the ballot

8    when they were tabulated; right.  So you have got the

9    electronic records, you have got the physical piece of

10   paper, you can actually go back during audits and look at

11   the image of the ballot that was captured on the

12   tabulator.  Part of the Dominion system -- and it is not

13   on this diagram -- is what is called the AuditMark.  So

14   that is a --

15   Q.    Well, hold on.  I think we have a demonstrative that

16   we can briefly go to for the AuditMark.  Counsel has a

17   copy.  Would that be helpful to you?

18   A.    It would be.

19   Q.    Okay.  You just said "the AuditMark."  Briefly

20   describe how this assists in election security in your

21   viewpoint?

22   A.    It is actually transparency, auditability, and

23   security.  So if you see here, this is the scan of an

24   actual ballot, and you can see, you know, various voter

25   marks here.  The system creates an image of that ballot.

1    Down here is what is called the AuditMark, and it is blown

2    up over here.  This is a text, a human readable text

3    representation of how the tabulator interpreted that

4    ballot at scan time, and that AuditMark is appended to the

5    image of the ballot.  So it is a one-to-one record, and

6    that exists throughout the voting process.

7         That can be referred to if there were questions on,

8    you know, the validity of the vote, whether the tabulator

9    was operating correctly, you could come right to this

10   AuditMark, see this image, and say, hey, does that match?

11   Is it really an oval filled in for Evan Thurston in that

12   contest?

13        I am sure we will jump ahead, but there is another

14   piece of traceability, auditability, and transparency, in

15   what is called an adjudicated AuditMark, but I don't want

16   to get ahead.

17   Q.   Is that the one I put up too soon?

18   A.   Yes, it is.

19   Q.   Would that be helpful for your explanation to the

20   jury?

21   A.   Yes, it would.

22   Q.   Okay.  All right.  Now, in opening I talked about

23   some statements at the Cyber Symposium about adjudication

24   being used to "murder our votes," or something to that

25   effect.  Is this -- I guess just generally describe to the

1    jury what adjudication is and what this represents that

2    they are looking at.

3    A.    So adjudication is not a term that I or Dominion made

4    up, it comes from state law.  When you have ballots that a

5    voter marks, their intent is not always clear, voters make

6    mistakes.  And states have various laws, and they may not

7    be consistent across states.  Again, states are in control

8    of their laws around elections.

9         But most states have what are called voter intent

10   laws, which require adjudicating a ballot.  So in this

11   instance, you can see that the vote for president, instead

12   of filling in the oval like instructed, they put a

13   checkmark through.  The tabulator may not be able to fully

14   determine, is that really a vote or is that a hesitation

15   mark.  Or another example is, somebody voting at home on a

16   vote-by-mail ballot may fill in an oval and say, I changed

17   my mind, they will fill in another oval and put an X

18   through it.  And state law requires that that clear voter

19   intent be adjudicated and that vote properly applied to

20   the candidate the voter intended.  That is called

21   adjudication, and that is a physical process done for

22   many, many decades.

23   Q.    What do you mean by "physical"?

24   A.    So during what is called canvassing, which is

25   post-election night, there are ballots that are what are

1    called out-stacked, and they are essentially ballots that

2    the system is unsure how to count.  Those physical ballots

3    show up to an adjudication board.  Again, I am describing

4    the manual process from decades ago.

5           They would take one ballot, you would have anywhere

6    from two to five people sitting around a table, and they

7    would look at that ballot and say, what is the voter's

8    intent?  We saw this in the 2000 election in Florida with

9    "hanging chads."  These were the old punch cards, the chad

10   may not have completely been punched through on the card,

11   those had to be adjudicated, and that was all over the

12   news.  You saw people holding them up to the light

13   debating on what the voter intent was.

14          So that process has existed for a very long time.

15   And ballots have always been adjudicated for every

16   election, and that also includes when you have write-ins.

17   Systems are not very good at, you know, reading people's

18   handwriting.

19   Q.   Let's go back to that AuditMark example.

20   A.   So part of the transparency of the system is if a

21   ballot ends up in our digital adjudication system, which

22   does not require taking the physical ballot and remaking

23   it, you can do it right on a screen, again, bipartisan

24   county officials or volunteers, they make the adjudication

25   that reflects the voter's intent, and then there is a new

1    adjudicated AuditMark that is appended to the image, and

2    it is time, date stamped, and by user.  You can't really

3    see that.

4            But then it clearly shows, like you see here, here

5    is the adjudicated contest.  And if you go back here, you

6    can see that they wrote in "Jane Austen," and that vote

7    was adjudicated in the system, the write-in was

8    adjudicated, and it was for Jane Austen, which reflects

9    the voter's intent.

10           That action updates the cast-vote record and it

11   updates the AuditMark on the image.  So, again, you have

12   that full transparency in audit from the time the ballot

13   was scanned through adjudication, until it was accumulated

14   and reported on.

15   Q.   How are the counties that you worked with calibrating

16   this adjudication process for which ballots are going to

17   be adjudicated or not?  Is there a spectrum there?

18   A.   Yes.  So, again, the adjudication rules vary from

19   state to state.  So the system was developed to have

20   essentially a configuration.  Some of the things I

21   mentioned; overvotes, that is when you mark too many ovals

22   for a given contest.  So that tends to be one of the

23   flags.

24           Ambiguous marks.  That was that checkmark, where

25   the system can't quite say whether that should be counted

1    as a vote or not, because people will do -- like they will

2    rest their pen on an oval and then fill in a different

3    one.  The system can detect there is a mark there but

4    doesn't know what to do with it.  It is called an

5    ambiguous mark.

6            Write-ins.  Those can be configured as flags to go

7    to adjudication.

8            Blank ballots can also be flagged to go to

9    adjudication.  That happens because regardless of the

10   instructions on the ballot -- and I have seen all sorts of

11   things in the field, even though you are instructed to

12   fill in an oval, people will literally just circle the

13   candidates.  Now, the system can't detect that.  It is a

14   blank ballot because there are no ovals filled in.  And

15   that happens enough in certain states that the state has

16   said, we should flag that, send it through adjudication

17   just to make sure that a voter didn't do something like

18   this, and if they did, we can apply their vote as

19   intended.  Again, that is the jurisdiction that does all

20   of this.

21   Q.   And you mentioned the old way decades ago of five

22   folks around a table.  In the current system, let's just

23   take Colorado, if a ballot is flagged for adjudication, do

24   actual eyeballs get laid on that ballot?

25   A.   Not the physical ballot, the image and the record of

1    the ballot.

2    Q.   Then you have that audit trail that you mentioned

3    earlier.

4    A.   Correct.  That is this here (indicating).

5    Q.   But do you have -- when that happens, do you have

6    someone from the left and someone from the right or

7    someone in between making those decisions, or do you make

8    that decision?  Who makes the decision?

9    A.   I do not make that decision, the system does not make

10   that decision.  And, again, it is by state law.  In

11   Colorado it requires at least two parties, two individuals

12   from at least two different parties, or unaffiliated.  So

13   a dem and a rep.  A dem and an unaffiliated.  An

14   unaffiliated and a rep -- a Republican, sorry I am using

15   truncated terms.  Those can be election officials; so

16   people employed by the county, or they can be, and

17   generally are, volunteers; so election workers.  And they

18   are trained.  And, again, in Colorado, next to the

19   adjudication systems, because it is basically a screen --

20   touch screen and has a mouse, there is also a laminated

21   instruction sheet on how to apply the state voter intent

22   laws.

23        So these people are not just winging it, so to

24   speak, they are following this guideline, and it is a very

25   specific guideline.  And in Colorado, when that team --

1    Q.   Hold on, I can tell you are passionate here.

2    A.   I am.

3    Q.   But we will not have time to talk about all of

4    Colorado and all of these systems.  I think we want to

5    give the jury just an overview of the redundancies I was

6    talking about, but I did raise an issue in the first slide

7    that I showed you that I neglected to mention.  So let's

8    go back to that block diagram.

9         You were talking about Alaska and how far it is and

10   bush planes in connection with that modem transmission.

11   And I neglected to ask you whether Colorado utilizes --

12   there is a lot of space out east.  Do they utilize that in

13   Colorado, at least while you were working in elections?

14   A.   Colorado does not support transmission of unofficial

15   results.

16   Q.   That is just determined by what the state legislature

17   wants to do?

18   A.   That is correct.

19   Q.   Okay.  We may get back into some of this, to the

20   extent there are questions from defense counsel about

21   voting systems, but I guess just at a high-level view, is

22   it fair to say that there is a robust and ongoing debate

23   between people who work at Dominion and academics and

24   others about how to improve all of this and make it more

25   secure?

1    A.    Yes, there is.  And it has gotten better over time.

2    Like that collaboration has become a stronger

3    relationship.  I, again, if I can briefly --

4    Q.    Well --

5    A.    I will let you ask the questions.

6    Q.    I just don't want to get objections, so that it goes

7    quicker.

8          You mentioned a "coordinated vulnerability

9    disclosure program."

10   A.    I did.

11   Q.    Were you part of that?

12   A.    I was.  I wrote the policy for Dominion.

13   Q.    Okay.  So what coordination were you talking about

14   when you wrote the policy for Dominion?

15   A.    So the coordinated vulnerability disclosure program,

16   the CVD program, that was not invented for the elections

17   industry, that has existed for some time in other

18   industries, other critical infrastructure industries like

19   medical devices.

20         What it is, is it sets up a conduit of

21   collaboration between the vendors and developers of these

22   systems and independent third-party security researchers.

23   So it provides things like safe harbor language, a legal

24   term which essentially says we are not going to sue you.

25   The company is not going to sue you for essentially

     1    playing with the devices and trying to identify

     2    vulnerabilities.

     3         I will be honest, 15 years ago, 20 years ago now,

     4    the relationship between voting vendors and independent

     5    researchers was not always, let's say, collegial, it was

     6    adversarial, and that is not good for anybody.

     7         And I strongly believe that in my role, going back

     8    even to my Sequoia days, I tried to increase that

     9    collaboration, and that culminated in a couple of things,

    10    and one was the CVD program.  What that does is allows --

    11    if a researcher identifies a vulnerability in the system,

    12    they can communicate that directly with the vendor, and it

    13    allows the vendor to have time to study the vulnerability

    14    and provide any updates or mitigation to deal with that

    15    vulnerability.  And there are agreements that the

    16    researcher will not release the findings of that

    17    vulnerability -- it is time limited, but they won't

    18    release that until the vendor has a chance of looking at

    19    it, mitigating, or providing updates or even to address

    20    it.

    21         So, again, it just sort of -- it opens that

    22    communication and collaboration potential for outside

    23    researchers.  And I think that that is only going to make

    24    -- and it has already had impacts, where it only makes the

    25    systems better ongoing.  Every system, no matter what it

1    is, has vulnerabilities, nobody is denying that.

2    Q.   Well, pursuant to this concept -- is this kind of

3    debate in our democracy, this kind of healthy and robust

4    debate, good in your view?

5    A.   Absolutely.

6    Q.   Okay.  And you said "outside reachers."

7    Dr. Halderman is an expert that is going to testify in our

8    case.  Is he example of one of those outside researchers?

9    A.   Yes, he is.

10   Q.   Do you know him?

11   A.   I do know him.

12   Q.   In fact, I think you guys both testified in Georgia

13   in the *Curling* litigation.

14   A.   *Curling v. Raffensperger*, yes.

15   Q.   Now, let's kind of turn a little bit more towards the

16   defendants in this case now that we have kind of set the

17   table.  You mentioned you go out and talk to county

18   officials, et cetera.  Did you give presentations to

19   county officials, including some of which ended up in

20   Mr. Lindell's movie, *Absolute Proof*?

21   A.   Yes.  That was one of my core functions in my role at

22   Dominion, again, director of product strategy.  That's the

23   strategy of how we develop products as a company, what

24   products we develop.

25        That, again, my paradigm is, you need to talk to

1   customers.  So I gave a lot of technical presentations on

2   the equipment that was available from Dominion.  And,

3   again, that was a way to elicit feedback.  It was also a

4   way to educate the jurisdictions on the capabilities of

5   the system, and that was generally in conjunction with

6   requests for proposals for providing equipment.

7          I did not do, necessarily, training, but I gave

8   more high-level overviews of the technical system, the

9   capabilities, both in a sales role, but also there are --

10  like California has sort of a vendor meeting that lasts a

11  couple days that allows direct connection between all of

12  the counties and the vendors to talk about, hey, we would

13  love if the system did this.  So I was involved in those,

14  as well, again, to inform future products and updates to

15  the current system.

16  Q.   All right.  Well, let's turn to -- actually, in

17  opening argument defense counsel raised Gabe Sterling,

18  some example related to that.  Do you know Gabe Sterling?

19  A.   I do know Gabe Sterling.

20  Q.   Okay.  When you were at Dominion, did you work with

21  both -- this is Georgia, Gabe Sterling?

22  A.   Yes, this is in Georgia.

23  Q.   In Georgia in the 2020 election, who was their

24  Governor?

25  A.   Brian Kemp.

1    Q.    Who was their Secretary of State?

2    A.    Brad Raffensperger.

3    Q.    What was Gabe Sterling's role?

4    A.    I don't recall his exact title, but he was

5    essentially Brad Raffensperger, like, COO, chief of

6    operations.

7    Q.    And did you ever work with any of those gentlemen I

8    just described?

9    A.    I worked with Gabe Sterling and Brad Raffensperger

10   directly.  I never worked directly with Brian Kemp.

11   Q.    There was a discussion about Facebook posts, and we

12   will talk about that a little bit in a little bit.  But

13   there was a suggestion that your posts, your Facebook

14   posts, had something to do with Gabe Sterling, and you

15   losing your job at Dominion.  Is any of that true?

16   A.    No.  I did not lose my job at Dominion because of

17   Facebook posts.

18   Q.    Why did you lose your job or have to leave?

19   A.    Because I was being falsely accused of rigging the

20   election and being a traitor and committing the biggest

21   crime in history.

22   Q.    All right.  You worked with both Republicans and

23   Democrats.  I mentioned Mr. Crane, but Wayne Williams was

24   the Republican Secretary of State.  Did you have a good

25   relationship with him?

1    A.    He was Secretary of State of Colorado, and I had an

2    excellent relationship with him.

3    Q.    And Jena Griswold is the current Secretary of State.

4    You worked with her.

5    A.    Yes.  She is a Democrat.  I did not have as much

6    direct interaction with Ms. Griswold.

7    Q.    All right.  So I promised we would start getting into

8    the defendants' role in this.  So when, leading up to the

9    first publication about you on Frankspeech, when did

10   things, after the 2020 election, start to come to your

11   attention that information was being circulated about you

12   or accusations?

13   A.    Pretty much November 9, 2021.

14   Q.    Okay.  What happened on that day?

15   A.    There was a podcast by Joe Oltmann -- at the time he

16   was referring to himself as Joe Otto -- and that is where

17   the first claims that I rigged the election were

18   discussed, stated.

19   Q.    And I didn't get through all of what I wanted to

20   cover in opening, but there was a slide that had a phone

21   on it, and it was "Eric from Dominion" and all of that.

22   Was that part of the initial presentation?

23   A.    It was.  It is what most people refer to as "the

24   Antifa call."

25   Q.    Were you on that call?

1    A.    I was not.

2    Q.    How did you find out that this call, this podcast was

3    floating around?

4    A.    The easy answer is my brother contacted me.  I think

5    it was my brother.  No, sorry, a man named Scott Algeier

6    contacted me.  He was the director of the -- I mentioned

7    this earlier, EI-ISAC, that is Election Infrastructure

8    Information Sharing and Analysis Center.  I had done --

9    Q.    I don't need -- I am sorry, I thought you were going

10   to go into what he said to you, and I don't really care

11   about that.

12   A.    No.

13   Q.    This body with all of the letters you just said, were

14   you part of that, as well?

15   A.    I contributed to it.  I wasn't a member of it.

16   Q.    Okay.  But he alerted you to something online.

17   A.    Yes, a threat.

18   Q.    Okay.  And that was what day?

19   A.    I believe it was November 9th.

20   Q.    Okay.  And how long did it take you to sort of

21   backtrack into what was causing that initial threat to

22   you?

23   A.    A couple hours.  And, again, I didn't do the

24   backtracking, my brother did.

25   Q.    Okay.  The one that is here?

1   A.   Yes, Bill.

2   Q.   All right.  And when did you actually watch this

3   initial podcast?

4   A.   I believe it was late on November 9th.  It may have

5   been early November 10th.

6   Q.   And did -- we will talk about sort of what you had

7   gone through, but did you start receiving threats then --

8   I know you mentioned the one -- but sort of initially

9   before Mr. Lindell got involved in this?

10  A.   Yes.  And actually there were threats, general

11  threats to Dominion employees before this podcast.  After

12  this podcast, the threats were directly to me, Eric

13  Coomer.

14  Q.   And did the defendants in this case, or at least with

15  respect to Frankspeech, specifically post a version of

16  what Mr. Oltmann had claimed in that original podcast?

17  A.   Yes.  That was during an interview.

18  Q.   And how long after you sort of initially got -- this

19  story broke, if you want to call it this, how long after

20  that did Mr. Oltmann appear, I think with Brannon Howse?

21  A.   I believe that was May 5th of 2021, so I believe

22  about 6 months.

23  Q.   And between November 9th and May 5th, where were you?

24  I don't mean specifically, but were you in hiding, were

25  you sunbathing, what were you doing?

1    A.    I moved around a lot.  So for the first couple of

2    weeks I was still supporting election work, so I was on

3    the ground.  Towards late November, I returned to

4    Colorado.  I did not return home.  I was explicitly

5    advised that it was too dangerous for me to return to my

6    residence.  So I stayed in various places with some

7    friends.  One friend had a cabin that is really remote,

8    but would be connected.  So I spent several weeks there.

9    I spent several weeks at other friends.  I spent some

10   weeks in an Airbnb.

11          In January, again, due to safety concerns, I

12   actually left the country for several weeks, about

13   three-and-a-half, four weeks.  And then upon return, again

14   I sort of moved around.  As I mentioned earlier, I had

15   cats, and for a variety of reasons it was very difficult

16   for me to move my cats out of my house.  So I would

17   occasionally check on them and spend some time at my

18   house, make sure things were okay.  And then I eventually

19   returned home.

20   Q.    Did you take any actions at that point?  Presumably

21   you were concerned.  Did you take any actions to protect

22   yourself?

23   A.    Multiple actions.

24   Q.    Okay.  What were those?

25   A.    So the first thing -- one of the first things I did

102

1    was I got a security system for my house.  You know, I had

2    a Ring doorbell, but now I got actual cameras that

3    recorded, that were monitored.  A panic button inside the

4    house.  If any of the sensors were tripped -- so at night

5    you can set it up, and I had sensors that could detect the

6    windows being broken that would actually go directly to

7    the police.  I also petitioned the sheriff of my county

8    for an emergency conceal carry permit.

9    Q.    And your county was what?

10   A.    Sorry, it is very difficult to talk about.  Chaffee

11   County.

12   Q.    All right.  You had one incident where some folks

13   came to your house.

14   A.    I did.

15   Q.    And did you have people outside telling you to "run"

16   or posting things?

17   A.    Yes.  One night, probably one of the scariest moments

18   I had, I was sitting on my couch, probably 10:00 p.m., and

19   I got a text that said "run."  And a couple minutes later

20   it said "we're coming right now."

21   Q.    Was that before Mr. Oltmann went on this first

22   interview with Brannon Howse or after?

23   A.    That specific threat?

24   Q.    Yes, sir.

25   A.    I've got to be honest, I am not sure what date that

1    was.

2    Q.   All right.  Now, stipulation of the parties No. 26

3    says that on May 3rd, Oltmann was a guest for an interview

4    that aired on Frankspeech.  Then it goes into the

5    interview, and there is a corresponding video that has

6    that stipulation embedded in it.  Have you brought a copy

7    of that video for the jury to see in this case?

8    A.   I have provided that to my team, so, yes, it should

9    be there.

10         MR. CAIN:  All right.  And that is Exhibit 178.  We

11   offer that.

12         THE COURT:  Any objection?

13         MR. KACHOUROFF:  Without objection, Your Honor.

14         THE COURT:  So admitted.

15         (Exhibit No. 178 is admitted.)

16         MR. CAIN:  I am sorry, Your Honor?

17         THE COURT:  So admitted.

18   Q.   (BY MR. CAIN)  Let's play the video, and then just

19   break it down a bit.

20         (Exhibit 178 played in open court.)

21   Q.   (BY MR. CAIN)  So to put it in context, if you are

22   working for a voting system company and you are confessing

23   that you made sure that Trump was not going to win -- by

24   the way, this relates to the 2020 election; right?

25   A.   That is correct.

1    Q.   All right.  Would that be problematic, at least with

2    respect to your reputation in your business?

3    A.   If I were such a person, I certainly wouldn't brag

4    about it on an anonymous call.

5    Q.   Well, counsel mentioned Gabe Sterling and the

6    Facebook pages, but this information was what was coming

7    out -- and we will see more of it -- that you bragged

8    about rigging the election, making sure that Trump was

9    winning.  Which was more harmful to you?

10   A.   Oh, that I rigged the election, if I understand your

11   question.

12   Q.   Yeah, I probably ought to take it out shoot it and

13   ask it again, but I think you got the gist.

14        Now, this was May 2021.  Had anybody associated

15   with Frankspeech -- we saw Mr. Howse.  Had any of those

16   folks called you to either get your side of this event or

17   otherwise?

18   A.   To this day I have never been contacted by anybody

19   from Frankspeech, Mr. Lindell, or My Pillow to get my side

20   of the story.

21   Q.   So, Mr. Howse, who did this interview, he never

22   called you.

23   A.   No, he did not.

24   Q.   Do you know -- just looking at this, you have got

25   multiple people talking.  Do you know whether there was a

1    recording that Mr. Oltmann made of this call?

2    A.    It is my understanding there is no recording.

3    Q.    It is not one that he has produced to this point.

4    A.    No.  I think he has stated that he did not record the

5    call.

6    Q.    So it is an unrecorded call relating to various

7    anonymous people that subsequently were identified as you

8    from Dominion; that fair?

9    A.    That is the allegation.

10   Q.    Okay.  And that's false?

11   A.    That is absolutely false.

12   Q.    Now, this had already been circulating on the

13   internet, the story about you being on this call, prior to

14   Mr. Lindell's company, Frankspeech, publishing it.  Was

15   this just another drop in the bucket, or was this

16   publication a big deal for you?

17   A.    It was a huge deal.  Just in terms of the reach of

18   the platform, the exposure.  Mr. Lindell is very famous,

19   and this was his media company.  This was not just a

20   random podcaster sitting in his basement, this was

21   nationally broadcast.

22   Q.    Now, opposing counsel, in his argument in opening,

23   said somehow this is a "shakedown" of Mike Lindell, or

24   words to that effect, and that you were looking for a

25   lawsuit against him.  Is any of that true?

1    A.    No, it is not.

2    Q.    And he said you were a "serial litigator."  And I

3    think we covered the fact you haven't filed a lawsuit

4    prior to these allegations starting to surface.

5    A.    That is correct.

6    Q.    Did you know at the time in May when this came out

7    that Lindell was asserting other claims of election fraud?

8    A.    Yes, I was aware of his involvement in the greater

9    elections denialism.

10    Q.    Did you find that movement, if you want to call it

11    that, problematic in terms of either disinformation or

12    misinformation that was being put out to the public?

13    A.    Absolutely.  Without these claims, these false

14    claims, you know, I don't think we would be in the

15    position that we are in today, and I think it led to a lot

16    of the real divisiveness that we are experiencing in U.S.

17    politics.

18    Q.    Now, I am not asking for your legal opinion, but just

19    what is your understanding if someone rigs an election, is

20    that a bad crime or a misdemeanor or a slap on the wrist?

21          MR. KACHOUROFF:  Objection, Your Honor.

22          THE COURT:  Okay.  What is the basis of your

23    objection, shortly?

24          MR. KACHOUROFF:  He is asking for a legal opinion,

25    and also relevance to his understanding of that issue.

 1          THE COURT:  Mr. Cain and Mr. Kachouroff, why don't

 2   you approach.

 3          (A bench conference is had.)

 4          THE COURT:  Mr. Cain, how do you want to respond?

 5          MR. CAIN:  It goes to the impact on the listener

 6   and his damages, the severity of the accusation.

 7          THE COURT:  You need to reframe the question with

 8   respect to the personal observation of the impact on

 9   Dr. Coomer.

10          MR. CAIN:  It was probably too long.

11          THE COURT:  The question of whether it is a bad

12   crime or not --

13          COURT REPORTER:  I'm not hearing.

14          THE COURT:  His opinion as to whether it is a bad

15   crime or not is not relevant.  He can testify with respect

16   to its impact on him, I don't think that will be

17   challenged.

18          (In the hearing of the jury.)

19   Q.   (BY MR. CAIN)  Dr. Coomer, this accusation about

20   being involved or confessing to rigging the election, what

21   was the impact on you?

22   A.   I'm going to put it shortly; it completely upended my

23   entire life, my career to this day, 4-and-a-half years

24   later.

25   Q.   And you mentioned the fact it was on Frankspeech.

1    Was that a new audience for this material?

2    A.    It was a new audience.

3        MR. KACHOUROFF:  Objection, Your Honor, lacks

4    foundation, lacks personal knowledge.

5        THE COURT:  Sustained.

6    Q.    (BY MR. CAIN)  Now, Mr. Oltmann said that the call in

7    question occurred in the middle or sometime at the end of

8    September 2020, before the election.

9    A.    That is correct.

10    Q.    I think that's part of one of our stipulations.  But

11    Oltmann had been making claims initially.  The version

12    that we just saw on Frankspeech, did it differ in any way

13    from the initial recitation of these claims?

14    A.    Yes.  If you compare his initial description of the

15    call, the call on November 9th to, you know, May 3rd,

16    details have changed and morphed along the way.

17    Q.    Okay.  We will ask Mr. Oltmann about those.

18        Now, other than -- you saw Mr. Oltmann on Exhibit

19    179 talking about being on that call.  Did he ever

20    identify anybody else that was allegedly on this call with

21    whomever these people are?

22    A.    Yes.  He's made other statements identifying other

23    participants, one of them he said was a person named Heidi

24    Beedle.

25        MR. KACHOUROFF:  Objection, Judge, hearsay.  We

1    will have Mr. Oltmann here to testify.

2              THE COURT:  Counsel, approach.

3              (A bench conference is had.)

4              THE COURT:  How is the identification of the

5    individual hearsay, he can testify to what was said out of

6    court.

7              MR. KACHOUROFF:  My memory of his response was

8    going to be "Mr. Oltmann said," and so I took that as a

9    direct quote.  So my point is that we are going to have

10   Mr. Oltmann testify.  And I have been doing my best not to

11   object to hearsay and leading questions at times because I

12   am trying to help move it along, but --

13             THE COURT:  Mr. Cain.

14             MR. CAIN:  I just am asking for an identification.

15             THE COURT:  All right.  Overruled.

16             (In the hearing of the jury.)

17   Q.   (BY MR. CAIN)  Who else, Dr. Coomer, did Joe Oltmann

18   ID as being on this call?

19   A.   Heidi Beedle.

20   Q.   Who is Heidi Beedle?

21   A.   She is a journalist.  I think she currently works for

22   The Colorado Times, a reporter, but I am not sure.

23   Q.   Okay.  Anybody else?

24   A.   I know he has identified somebody else.  The name is

25   not coming to me right now.

1    Q.   All right.  Well, Heidi Beedle should be here to talk

2    about it, so we will leave it at that for now.

3         All right.  Actually I want to talk to you, let's

4    segue into these Facebook posts that counsel talked about

5    earlier, so we will put a bookmark on that first video

6    that we just reviewed and then look at or at least talk

7    about the Facebook posts.

8         So going back to the initiation of these

9    allegations, did you become aware that Joe Oltmann had

10   obtained some of your personal Facebook posts?

11   A.   Yes, I became aware of that.

12   Q.   Okay.  Was that a public account or a private

13   account?

14   A.   It was private.

15   Q.   When did you open that account, if you remember?

16   A.   I think it was somewhere around maybe 2010.

17   Q.   Okay.  And had you been posting since 2010?

18   A.   Off and on.  I took a several year break from

19   Facebook probably around early 2017, and I didn't post

20   anything until somewhere around maybe late 2019 or 2020.

21   Q.   How about around the 2016 time period?

22   A.   Yes, I was posting to Facebook around that time.

23   Q.   Was Mr. Oltmann one of your Facebook friends?

24   A.   He was not.

25   Q.   About how many Facebook friends did you have?

1   A.   Roughly 300.

2   Q.   Would you say you were active on the account?

3   A.   I wouldn't say "active."  It wasn't a daily thing,

4   no.

5   Q.   And did you post political commentary on your

6   Facebook page?

7   A.   Occasionally, yes.

8   Q.   Was that for public consumption or for your private

9   group?

10  A.   They were private.  They were private posts for my

11  private group.

12  Q.   Why did you feel comfortable posting privately

13  political commentary or opinions given that you were in

14  the election business?

15  A.   I look at -- you know, Facebook at that time was kind

16  of like a group of friends sitting around a campfire or,

17  you know, discussions that you would have maybe over a

18  beer, and occasionally a rant you might have done in your

19  mirror and shower and all that.

20  Q.   You ranted some, didn't you?

21  A.   I think I even called them rants at the time.

22  Q.   Well, other than your Facebook rants, as you call

23  them sometimes, did you ever personally get involved in

24  any of the political parties in terms of your public

25  facing?

1   A.   Not at all.

2   Q.   Were you attending political rallies, let's say from

3   2016 through the 2020 election, or even before?

4   A.   The only rally that you maybe could construe as

5   political was the March for Women in 2016.  I attended no

6   other rallies or political activism in any way.

7   Q.   Do you regret some of the posts that you made on

8   Facebook?

9   A.   Certainly.

10  Q.   Why?

11  A.   I should have been aware of my audience and the fact

12  that, you know, this was hyperbolic speech.  I made

13  comments about "Trump lovers."  I had friends, and I do

14  have friends to this day, that did vote for Trump.  Again,

15  some of this was classic ranting; getting something off my

16  chest.  Yeah, in hindsight, shouldn't have been on

17  Facebook, even though I thought it was private, I should

18  have known better.  Yeah, I do have regrets on that.

19  Q.   Well, let's say it was colorful, at a minimum.

20  A.   As we have established, I grew up in a military

21  household, so there was lot of colorful language growing

22  up.

23  Q.   But you said "fuck."

24  A.   Yes.

25  Q.   You said "fuck-tard"?

1  A.   I read those, yes.

2  Q.   Fair point.  You called Trump the "Cheeto-in-chief."

3  A.   I did.

4  Q.   And other things.

5  A.   Yes.

6  Q.   And you were doing that 2016, 2017, up through 2020.

7  A.   Well, like I said, I took a break from 2017 to about

8  2020.  But, yes, most of those posts are from the 2016

9  timeframe, I believe.

10  Q.   Was there anything at Dominion at the time, any

11  policy about having a private Facebook page?

12  A.   No.

13  Q.   Do you know why not?

14  A.   In Colorado, companies cannot infringe on employees'

15  social media.

16  Q.   Well, since you are going to be potentially asked a

17  direct question about it, did President Trump's conduct at

18  the time offend you?

19  A.   Yes.

20  Q.   Why did it offend you?

21  A.   I mean, the first example is the Access Hollywood

22  tape where he is literally on tape basically degrading

23  women.  I found that deeply offensive, unconscionable.

24  Q.   Did you think some of what President Trump had done

25  when you were writing these posts was racist?

```
 1    A.    I do believe that.

 2    Q.    And you posted about it.

 3    A.    I did.

 4    Q.    Now, you said you were known for some rants.  There

 5    is this Antifa component that has been raised.  Do you

 6    know what Antifa is?

 7    A.    Antifa as a phrase.  Yes, I do.  It refers to a group

 8    of activists.

 9    Q.    Okay.  Liberal activists.

10    A.    Yes.

11    Q.    Are you Antifa?

12    A.    I am not.

13    Q.    Is there a membership card or group that you are

14    aware of for that organization, if you want to call it

15    that?

16    A.    No, there isn't.

17    Q.    Do you agree, to the extent that you know their

18    beliefs, with at least some of them?

19    A.    Their core belief is of being against fascism, which

20    I definitely wholeheartedly support.  Beyond that, no.

21    Q.    Did you post something called the "Antifa manifesto"?

22    A.    I did.

23    Q.    Was that an original Coomer posting?

24    A.    It was not.

25    Q.    What was it?
```

1     A.    It was a satirical post by an anonymous user.

2     Q.    What was the satire part of it?

3     A.    It starts out by saying that Antifa is not an

4     organization, and this person cannot speak on behalf of

5     Antifa, and then goes on to make several statements

6     proclaiming to be a spokesperson.  It is just a

7     contradiction in every sentence.

8     Q.    Why did you post it?  Did you think it was satirical,

9     funny?

10    A.    It corresponded to a specific point in time.

11    Q.    What point in time?

12    A.    It was right around the time that I believe then

13    President Trump was saying that he was going to designate

14    Antifa as a "domestic terrorist organization."  And on

15    either that same day or the following day, his, President

16    Trump's Justice Department released statements, I believe

17    it was both the Department of Justice and the FBI,

18    released statements saying there was no evidence that

19    Antifa was an organization, let alone a "domestic

20    terrorist organization."

21    Q.    Suffice it to say, this private Facebook group was

22    not something that you are proud about being made public?

23    A.    No, I'm not proud of it.

24    Q.    Did you make it public?

25    A.    I did not.

1    Q.   Who made it public?

2    A.   I don't know the original person, but I know that Joe

3    Oltmann was one of the first people.  That is where I

4    first saw it.

5    Q.   So he was the one that was posting them on his

6    podcast?

7    A.   Yes.

8    Q.   Do you know how he got access to your Facebook

9    account?

10   A.   I do not.

11   Q.   You never learned that?

12   A.   Not to this day.

13   Q.   Okay.  We will see if we can ask Mr. Oltmann.

14        Well, just kind of on a high level, you are a

15   voting systems professional.  Did you ever discourage any

16   of your private Facebook friends from voting for a

17   particular candidate or another candidate?

18   A.   No.  I actually did the opposite.  I have always been

19   a huge proponent of voting.  Vote for who you want to vote

20   for, that is important.  I think it is important to be an

21   active participant in the democratic process.

22   Q.   Well, after Mr. Oltmann first published the Facebook

23   pages, do you know whether Dominion did a sweep of the

24   public-facing internet to see if there were social media

25   posts?

1    A.    Dominion actually hired a third-party company to do

2    an internet sweep of employees' social media prior to

3    Mr. Oltmann's claims, so early to mid-2020.

4    Q.    Did it hit on you?

5    A.    There were no results returned for me.

6    Q.    Now, did your views, colorful views about President

7    Trump's conduct, ever affect your ability to do your job?

8    A.    Not in any way.

9    Q.    Irrespective of how you may have felt about him, did

10   you do anything, let's say in 2016 -- he won that

11   election; right?

12   A.    He did win.

13   Q.    Did you take any steps in 2016, prior to the

14   election, to try to prevent the vote for Trump?

15   A.    Never.

16   Q.    In 2020, same question, did you take any steps to try

17   to alter, modify, or flip votes that were going to Trump

18   to Biden?

19   A.    No.

20   Q.    Is it fair to say, then, that there is not a single

21   election that you have been involved with that you have

22   taken any actions to interfere with?

23   A.    I have never interfered with any election.

24   Q.    Would it make sense, based on your technical

25   knowledge, for you to be even in a position to do that?

1    A.    No.  I don't have the access to even contemplate

2    doing something like that, nor the desire.

3    Q.    We will see in a minute in one of the Cyber Symposium

4    videos, a claim that you have deep ties to Antifa.  Do you

5    have deep ties to Antifa?

6    A.    I have no ties to Antifa.

7    Q.    Now, our voting systems -- and you talked about that

8    at the beginning when we went through some of the

9    diagrams -- are they fully transparent?  Do you know what

10    I mean by that?

11    A.    I think I do, and I think I can answer that.

12    Q.    What is your answer?

13    A.    No, they are not fully transparent.

14    Q.    Is there a reason they aren't?

15    A.    It is one of the layers of security to an extent.

16    So, for instance, the actual source code is not publicly

17    posted, publicly available.

18    Q.    Why not?

19    A.    Again, that is in the security space.  It is what is

20    called, or what is known as a potential threat vector.  If

21    a malicious actor has unfettered access to the source

22    code, they may be able to identify vulnerabilities.  It

23    doesn't mean, necessarily, that they would be able to

24    exploit them, but it is a risk.  So one of the mitigations

25    is to keep that source code private.

1    Q.    Now, when you transitioned, let's say you

2    transitioned from 2018 to 2020, does the state get

3    involved in something called a "trusted build"?

4    A.    Well, a trusted build existed for longer than that.

5    Q.    No, I gather that, but I am just setting an example

6    for you.

7    A.    Okay.

8    Q.    How long has it existed?

9    A.    I mean, as long as I have been in the elections

10   industry.

11   Q.    What is a trusted build?

12   A.    So, again, as brief as possible, voting vendors do

13   not supply the voting system to the end user, that is gone

14   through a third party.  So the source code is provided to

15   the third party, and they analyze that code line by line,

16   they do the required testing to get "certified."

17         At the end of that testing, they create what is

18   called a trusted build.  It is also called a golden image.

19   It is that third-party testing authority that is in full

20   control of that.  The voting vendor does not have control

21   over those images.  Those images are what is provided to

22   the end user, states, counties, and then the states and

23   counties install and configure that system -- the system,

24   based on those trusted builds or golden images.

25   Q.    So if there was malicious code at the beginning of

1    the process that you just described, in that source code,

2    it then goes to an independent test lab.

3    A.   Yes.  These days it is called a VSTL, a voting system

4    test laboratory.

5    Q.   So if you wanted to hack that initial source code or

6    put in malware, it still goes out the door to the third

7    party before this golden image is made?

8    A.   That is correct.

9    Q.   So I am assuming you didn't try to do that either.

10   A.   No.

11   Q.   All right.  I am going to transition to some of your

12   public denials, but I looked at my watch, and now I am

13   looking at Judge Wang.

14        THE COURT:  How long do you think this section will

15   last?

16        MR. CAIN:  Seventeen minutes.

17        THE COURT:  I will give you 17 minutes.

18   Q.   (BY MR. CAIN)  All right.  Now, after the original

19   allegations by Mr. Oltmann came out in November of 2020,

20   did you publicly deny them?

21   A.   I did.

22   Q.   In what format?

23   A.   I wrote an op-ed for the Denver Post.

24        MR. CAIN:  And pull up for the witness Exhibit 36,

25   witness only.

121

1    Q.    (BY MR. CAIN)  Is Exhibit 36 a true and correct copy

2    of the op-ed you published, or that the Denver Post, I

3    should say, published?

4    A.    Yes.

5          MR. CAIN:  Offer 36.

6          THE COURT:  Looks like it is stipulated to.  So

7    admitted.

8          MR. KACHOUROFF:  Without objection.

9          (Exhibit No. 36 is admitted.)

10   Q.    (BY MR. CAIN)  All right.  Let's read it line by

11   line -- no, we are not going to do that.  This was posted,

12   by the looks of it, on December 8th of 2020.

13   A.    Yes.

14   Q.    Okay.  And why did you post this?

15   A.    It was my attempt to try to set the record straight,

16   considering that people making these claims had never

17   reached out or tried to contact me.

18   Q.    And this obviously went out in the post here.  I will

19   have a line of questions, hopefully they are not too

20   redundant.  But did any of Mr. Lindell's team or Brannon

21   Howse or any of these folks ever contact you about this

22   guest commentary?

23         MR. KACHOUROFF:  Objection, asked and answered.

24         THE COURT:  Overruled.

25         THE WITNESS:  No, they did not.

1    Q.    (BY MR. CAIN)    Now let's look at just a few key

2    statements that you made, then we will take our break for

3    lunch.    Can you focus on page 3, maybe six paragraphs in

4    here.    The jury can obviously see it, and they will have

5    it back in the jury room, but what is the gist of what you

6    were trying to convey to the general public at this point,

7    sir?

8    A.    I was refuting several claims of voter interference,

9    election interference.    I discuss the issues that I

10   described earlier in Antrim County.    I mention the 59

11   election experts that put out a statement saying that the

12   technology was secure.    And I explicitly state that I have

13   no connection to Antifa, the Antifa movement, and that I

14   did not rig or influence the election, nor have I

15   participated in any calls, demonstrations, or other

16   demonstrable activity related to any political party or

17   social justice action.

18   Q.    All right.    Now, at the time -- this was December

19   2020 -- were there people out in the public sort of

20   spoofing you, pretending to be you?

21   A.    Yes, there were.

22   Q.    Were they posting as you.

23   A.    They were posting under my name and were using an

24   avatar that was a picture of me.

25   Q.    Because there was a line in here that caught my

1    attention, and I think down below it has highlighting on

2    it.  "Any post on social media channels purporting to be

3    from me have also been fabricated."  Is that what you were

4    referring to on the spoofing?

5    A.   Yes.  I was specifically referencing any recent posts

6    after these allegations.

7    Q.   Because I think shortly -- how long after this did

8    you file a lawsuit against Mr. Oltmann?

9    A.   I believe that lawsuit was on December 22nd.

10   Q.   So about two weeks later.

11   A.   Yes.

12   Q.   And to the extent that this part of the entire op-ed

13   could have been unclear, did you, in your first lawsuit

14   against Mr. Oltmann and others, acknowledge the Facebook

15   posts that you made?

16   A.   Yes.  I have never said they weren't mine.

17        MR. CAIN:  I stated 17 minutes, but that was all I

18   had on that one.

19        THE COURT:  So why don't we go ahead and take our

20   lunch break.

21        Ladies and gentlemen of the jury, you will be

22   released for 45 minutes, so just be back a little after 1

23   o'clock so we can resume.  I remind you not to talk about

24   this case.  Talk about anything else, and we will see you

25   in a little bit.

124

1              (Outside the presence of the jury.)

2              THE COURT:  All right.  Thank you.  Please be

3     seated.

4              Before we adjourn, Ms. DeMaster, you had a question

5     you wanted to address.

6              MS. DEMASTER:  I had a question, really a point of

7     clarification about your ruling on the post for Exhibit

8     9A, the one -- I believe it was 21.

9              THE COURT:  21 is out --

10             MS. DEMASTER:  Yes.

11             THE COURT:  -- entirely.

12             MS. DEMASTER:  Was it because of the video?

13             THE COURT:  Well, the basis is the motion in

14    limine, but also upon further consideration, I don't think

15    it is probative, and any probative value is outweighed by

16    the prejudicial impact with the confusion of the jury.

17             MS. DEMASTER:  That includes the words at the

18    bottom?

19             THE COURT:  Yes.

20             MS. DEMASTER:  Thank you, Your Honor.

21             THE COURT:  Anything else before we adjourn for

22    lunch?  All right.  We will see you in a little bit.

23             (Lunch is taken from 12:20 p.m. to 1:13 p.m.)

24             THE COURT:  Thank you.  Please be seated.

25             All right.  Counsel, are you ready for the jury?

```
 1            MR. CAIN:  Yes, Your Honor.

 2            THE COURT:  All right.  Madam deputy.

 3            MR. KACHOUROFF:  Yes, Your Honor.

 4            (In the presence of the jury.)

 5            THE COURT:  Thank you.  Please be seated.

 6            Dr. Coomer, I remind you, you are still under oath.

 7            Mr. Cain.

 8            MR. CAIN:  Thank you, Your Honor.

 9    Q.   (BY MR. CAIN)  Let's frame where we are at.  We left

10    off with the Denver Post op-ed, that was December of 2020.

11    Before that we had looked at Exhibit 179, which was the

12    first publication that we talked about with Mr. Oltmann.

13    I am not going to go completely sequential, but we need to

14    get through some of these videos.  So let's talk about

15    Absolute Proof.  What is Absolute Proof, Dr. Coomer?

16    A.   It is essentially a video or a movie that, my

17    understanding, was produced by Mr. Lindell that made

18    claims about election interference.

19    Q.   All right.  Have you brought a clip of Absolute Proof

20    that features you, in part, and Mr. Lindell, in part?

21    A.   I have.

22    Q.   And was that published on or about February 5, 2021.

23    A.   That's the date, yes.

24    Q.   All right.  And that's the clip in question.  I don't

25    recall how many minutes it is, but that is Exhibit 174.
```

1          MR. CAIN:  We offer 174.

2          MR. KACHOUROFF:  No objection.

3          THE COURT:  So admitted.

4          (Exhibit No. 174 is admitted.)

5     Q.   (BY MR. CAIN)  Okay.  So I may stop this a few times

6     when Mr. Lindell is talking and you are talking, just for

7     some explanation, but go ahead and let's play 174.  But

8     before we start that, do you know who we are looking at

9     here?

10    A.   That is Mr. Lindell on the right, and I believe

11    Patrick Colbeck on the left.

12    Q.   Who is Patrick Colbeck?

13    A.   I don't know his exact credentials.  I do know that

14    he is part of this sort of group of election analysts.

15         MR. CAIN:  All right.  Go ahead and play it.

16         (Exhibit 174 played in open court.)

17    Q.   (BY MR. CAIN)  Let's stop there.  And do you know

18    what Mr. Lindell was referring to?  We had looked at that

19    block diagram before.

20    A.   Yes.  It is a portion of the Dominion system.

21    Q.   Does that relate to the reporting function that you

22    had talked about before?

23    A.   Yes.  Well, there are two slides there, so the one on

24    the left is essentially related to the transmission of

25    unofficial results.

1    Q.   Let's go back to the two slides.  Okay.  So the one

2    on the left shows the firewall and the external access; is

3    that what you are referring to?

4    A.   Yes.  You can see that here it is a dotted line.  So

5    it is not a direct connection and it is not to the

6    internet.

7    Q.   Okay.  What is it connected to?

8    A.   Again, in states that allow it, it would be that

9    private cellular network that is used to transmit the

10   unofficial results.

11   Q.   All right.  So we talked about that.  The one on the

12   right, do you recognize that?

13   A.   Yes.  So to be clear, the election management system

14   that sits in the central office is a local private

15   network; it's multiple computers connected to each other.

16   That does not mean they are connected to the internet,

17   they are air gapped.

18   Q.   Is that called a LAN?

19   A.   It can be referred to as a LAN, a local area network,

20   yes.

21   Q.   If we were walled off in this courtroom, and my

22   computer was talking to yours, but they weren't

23   transmitting out, would that be a mini version of a LAN?

24   A.   Yes, it would.

25   Q.   Okay.

```
 1              (Exhibit 174 played in open court.)

 2   Q.   (BY MR. CAIN)  Stop right there.  Is that right?

 3   A.   No.

 4   Q.   What is wrong about it?

 5   A.   An Ethernet cable and a local network doesn't get you

 6   to the internet.

 7   Q.   It would be a hard cable between --

 8   A.   Devices.

 9   Q.   -- yes, and the LAN that you referenced?

10   A.   And to be explicit, it says a "cable" because we

11   don't use wireless technology.

12   Q.   Okay.  So this is flat wrong?

13   A.   This is flat wrong.  The conclusion is flat wrong.

14              MR. CAIN:  All right.  Keep going.

15              (Exhibit 174 played in open court.)

16   Q.   (BY MR. CAIN)  And my co-counsel handed me a note

17   that you may have misspoke on the person.  Do you know for

18   sure who that is?  I don't want you to guess.

19   A.   No, I do not know for sure.

20   Q.   All right.  Let's go back to two things, first the

21   transition between the first segment of Mr. Lindell

22   talking, and then it went black, and there was some

23   language on it.  Okay.  That is you.

24   A.   That is me.

25   Q.   And you were in his film.
```

1    A.    I was.

2    Q.    And if Mr. Lindell denies knowing about you, at least

3    as of February 5th of 2021, that wouldn't be a true

4    statement, would it?

5    A.    I don't believe so.

6    Q.    Go a couple of seconds into this.  All right.  Let's

7    stop there.  I don't want to spend a lot of time on this,

8    but I want the jury to understand what they are looking

9    at.  If you can take the pen, there are some screens and

10   devices on that table.  By the way, what does that table

11   say?

12   A.    "Dominion Voting."

13   Q.    And just explain -- it looks like there may be --

14   well, you tell me.  Just identify what we are looking at

15   in terms of the devices on the table.

16   A.    There are about five different types of tabulators

17   and ballot-marking devices.

18   Q.    Okay.

19   A.    I can go from left to right.  So this is a technical

20   sales demonstration.  So the county has requirements, but

21   they hadn't decided on the individual device that they

22   were interested in.  So we set up all of the devices that

23   we can support and configure.  And I gave in-depth

24   descriptions of their capability and functionality.  And

25   it was the county and the selection committee that decided

1    what individual devices to use.

2          So we can go all of the way down on the left, this

3    is what is called an all-in-one tabulator, it is called

4    the ImageCast Evolution.  So it provides tabulation

5    abilities for hand-marked ballots, but you can also, if

6    you are a voter with ADA needs, you can actually feed in a

7    blank ballot, make your selections on a touch screen, and

8    then the unit will actually fill out your ballot as you

9    made selections on the screen and cast it at the same

10   time.

11         This device in here (indicating), this is the

12   ImageCast Precinct, and that is really the workhorse

13   tabulator that Dominion provides.  That is just a

14   tabulator.  So it requires a ballot to be marked, you feed

15   it in, and it tabulates the ballot, puts it in the secure

16   ballot box.

17         These two devices here (indicating), they make up

18   what is called the ImageCast X, and this is a

19   ballot-marking device.  Again, it provides functionality

20   for voters that may need accessible access to casting

21   their vote.  So it has an audio tactile interface.  It

22   supports a variety of ADA-compliant inputs.  And at the

23   end, what happens is based on the selections made on the

24   screen, it prints a ballot that reflects those voter

25   selections.

1          Finally here (indicating), this is the ImageCast

2     X/DRE with VVPAT.  And that is a lot of acronyms.  So it

3     is the same voter terminal, again to provide accessibility

4     options for marking a ballot.  Instead of printing out a

5     ballot that a voter would take by hand and input into a

6     tabulator, it prints out the selections on this

7     reel-to-reel printer, and then once the voter verifies

8     that the selections that are printed are the selections

9     that they intended, that paper -- it is on a reel-to-reel,

10    and it basically just gets stored in this area

11    (indicating), and then allows the next voter to come up

12    without seeing the prior voter's ballot.

13         And then this (indicating) is just a laptop that I

14    was using during the presentation to go through some

15    slides.

16    Q.   Now, do you remember on February 5th of 2021, when

17    you watched this, texting with your brother after seeing

18    this?

19    A.   Yes, I was, specifically my older brother Bill.

20    Q.   I think in the opening argument from counsel, he said

21    something to the effect of, "I'd love to sue this clown."

22    Have you texted that, referring to Mr. Lindell?

23    A.   I did text that, and I was referring to Mr. Lindell.

24    Q.   Were you upset by this movie?

25    A.   I was very upset by this movie.

1    Q.   Why were you upset by the movie?

2    A.   Because this was a new attack and a new

3    representation that I had something to do with rigging the

4    election.

5    Q.   Okay.  Now, like I said, I may skip around, but I am

6    going to stick to May of 2021 for a few minutes.  Let's

7    visit real quick -- and I didn't do a good job of getting

8    through my timeline, but I think I touched on the Newsmax

9    retraction.  And just to save time, there was a lawsuit

10   that was filed, and we have stipulated on the timing on

11   that.

12        But on May 7th of 2021, do you recall watching

13   Newsmax issue a retraction?

14   A.   Yes, I do.

15   Q.   And I think we have -- this may help, Stipulations

16   19, 23, and 24.  So that is the first one, the lawsuit was

17   filed on December 22, 2020.  April 30th --

18   A.   I thought you were asking me a question.

19   Q.   No, I am just trying to get through this to expedite

20   our trial.

21        On April 30, 2021, you settled that lawsuit, which

22   we have stipulated.  And then the 24th, Dr. Coomer's

23   settlement with Newsmax did not include any provision

24   relating to Mike Lindell or My Pillow.

25        All right.  And going to Exhibit 184, have you

```
 1    brought a copy of the Newsmax retraction that you viewed

 2    in May of 2021?

 3    A.   I have.

 4         MR. CAIN:  Offer 184.

 5         THE COURT:  Any objection?

 6         MR. KACHOUROFF:  I am sorry, Your Honor, I have no

 7    objection to that.

 8         THE COURT:  So admitted.

 9         (Exhibit No. 184 is admitted.)

10         (Exhibit 184 played in open court.)

11         MR. KACHOUROFF:  Your Honor, may I approach?

12         THE COURT:  Yes.

13         (A bench conference is had.)

14         MR. KACHOUROFF:  We would just like the limiting

15    instruction, that it is not being offered for its truth,

16    that's all.

17         THE COURT:  So I am going to read the instructions,

18    but I don't think it is appropriate right now.  We will

19    take that up in the context of the instructions.

20         (In the hearing of the jury.)

21    Q.   (BY MR. CAIN)  Okay.  So you saw that.  Do you

22    remember how many times that aired on Newsmax?

23    A.   I don't.

24    Q.   Do you consider Newsmax to have a partisan bend one

25    way or another?
```

1    A.    Yes, I do.

2    Q.    How do they lean?

3    A.    I would call them far to the right.

4    Q.    When you saw this, did you feel some sense of relief?

5    A.    I felt a lot of relief initially, yes.

6    Q.    You say "initially."  What happened?

7    A.    It didn't stop the threats and it didn't prevent new

8    claims.  It didn't make -- it didn't make the situation go

9    away, that's for sure.

10   Q.    Well, let's just jump ahead two days, May 9th of

11   2021, that is Stipulation 28, and we have a video

12   associated.  Before we look at that, let's briefly visit

13   about Michael Lindell.

14         Now, did you know Mr. Lindell prior to the video we

15   are about to see?

16   A.    No.  I knew who he was, but I did not know him

17   personally.

18   Q.    Had you ever spoken to him?

19   A.    No.

20   Q.    You did have some sense he was involved -- obviously

21   we looked at the movie -- in what you called "election

22   denialism" earlier.

23   A.    Yes.  I was aware he was part of that effort.

24   Q.    Had you -- we are talking in this case about the

25   publications by the defendants.  Had you made any

           1    publications publicly about either Mike Lindell or My

           2    Pillow or Frankspeech, to your knowledge?

           3    A.   Never made any public statements about any of those.

           4    Q.   Didn't bad-mouth them, didn't do anything like that.

           5    A.   Not publicly, no.

           6    Q.   Okay.  All right.  Exhibit 185 corresponds to 28.

           7         MR. CAIN:  Offer Exhibit 185.

           8         That is your cue, counsel.

           9         MR. KACHOUROFF:  Stipulated.  Sorry.

          10         THE COURT:  So admitted.

          11         (Exhibit No. 185 is admitted.)

          12         (Exhibit 185 played in open court.)

          13    Q.   (BY MR. CAIN)  Were you still working at Dominion

          14    when this video was aired?

          15    A.   I was no longer employed with them, no.

          16    Q.   And to be clear, were you terminated, separated,

          17    fired?

          18    A.   It was a mutual agreement of separation.

          19    Q.   Had you decided to leave?  You had had enough and you

          20    were going to leave the election industry.

          21    A.   No.  No, that is not a fair characterization.

          22    Q.   When did you ultimately make that decision?

          23    A.   Well, I made the decision to separate from Dominion

          24    in late April of 2021.  I still had hope at that point of

          25    potentially still working in the elections industry in

        1    some capacity.  I have colleagues, they have consulting

        2    groups that, you know, participate in the electoral

        3    process.

        4           And while I agreed that it was no longer tenable

        5    for me to remain employed at Dominion, although I

        6    wholeheartedly wanted to, I still had a hope that I would

        7    one day be able to return in some capacity.  That will

        8    never happen.

        9    Q.   Now, in the opening argument there was some

       10    discussion about -- and I don't want to mischaracterize

       11    it, but something about a "money grab," I think.  Now, you

       12    are not seeking in this case -- or correct me if I am

       13    wrong, but you are not seeking the lost income that you

       14    have sustained as a result of not being in the election

       15    industry anymore.

       16    A.   I am not.

       17    Q.   In other words, you are not doing the job that you

       18    were doing 16, 15 years, and now -- are you employed?

       19    A.   Currently, no.

       20    Q.   Okay.  You had a restaurant at some point.

       21    A.   For about 4 years.  I was a chef/owner of a

       22    restaurant.

       23    Q.   Okay.  Now, in this instance, the video that you just

       24    saw, do you remember what went through your mind?

       25    A.   Sorry, refresh my memory on the clip we just played.

1    Q.    Yeah, you have just had lunch.

2    A.    I know, and my apologies.

3          Okay.  This was one of the worst moments in the

4    whole saga, to be honest.

5    Q.    Why?

6    A.    There is a lot of statements about Dominion, Brian

7    Kemp, Brad Raffensperger.  I am the only one that Mike

8    Lindell calls a traitor, and that is the only crime that

9    is defined in the U.S. Constitution.  It is the highest

10   crime.

11   Q.    Now, was Mr. Lindell making any claims in this

12   Exhibit 185 that were different than the other claims that

13   had been made about you in the past?

14   A.    Yes.  Specifically his reference of, I think there

15   is, you know, "taking the vote through China," I think.

16   Q.    Yes, sir.

17   A.    Yeah.  Also making deals at Newsmax.  You know, I

18   don't know what his intent was with that.

19   Q.    Well, let me ask you, we stipulated that the Newsmax

20   settlement was about 10 days prior to this.  And if I get

21   my timeline right, the statement was something to the

22   effect of "making deals with Newsmax."  Did you have any

23   agreement with Newsmax that related to keeping Mike

24   Lindell or My Pillow off the air?

25   A.    Absolutely not.

1    Q.    A side deal, an informal, anything?

2    A.    Mr. Lindell's name never came up during any

3    discussion I had with Newsmax.

4    Q.    And just looking at this, I know they mentioned

5    "Frank," and that is Brannon Howse with the big pocket

6    square.  Again, this is Mike Lindell, this is not Joe

7    Oltmann.  Is there anything in terms of Mike Lindell's

8    notoriety at the time that concerned you about this going

9    out public?

10    A.    Absolutely.  You know, we can go back, and I am not

11    sure it has been introduced yet, but in January of 2021,

12    Mr. Lindell showed up on the steps of the White House with

13    some papers that referenced martial law.  And it was

14    reported that he and the president met regarding claims of

15    election interference.

16        And we fast forward several months and I am being

17    singled out by Mr. Lindell specifically as a traitor and

18    at the center of all of this.

19    Q.    You got the retraction.  Was this a sign to you that

20    perhaps the story hadn't ended?

21    A.    That is the exact takeaway when I viewed this, was

22    that regardless of the retraction, and it was just

23    released days before this, not only have the claims not

24    stopped, but they are adding new claims; again, this

25    reference to "taking the vote through China," whatever

1    that means.

2    Q.    Well, let's maybe see if we can sort that out.  You

3    worked the 2020 election.  Was there any indication that

4    you received during the election that there was foreign

5    interference?

6    A.    No, there was not.

7    Q.    To the extent you can talk about it, are there ways

8    for states and counties to monitor the potential for

9    intrusion into their networks?

10   A.    There is, and that is not part of Dominion or the

11   voting system, that is separate.  States and counties are

12   responsible for their own IT infrastructure.  And, again,

13   all of that was designated as critical infrastructure.  So

14   the U.S. government, through CISA and DHS, the Department

15   of Homeland Security, provided resources to the states and

16   counties to help secure and monitor their public-facing

17   internal, you know, public-facing IT networks, because

18   they have websites, you know, for reporting.  There is

19   even an SOS, security of state, website for applying for a

20   marriage license.

21        So the government provided resources for securing

22   and monitoring those systems before, during, and after the

23   election, and that is not a function of Dominion.

24   Q.    And I take it that you didn't personally grant the

25   Chinese access to Dominion voting machines during the

1    election.

2    A.    No.

3    Q.    Now, we talked about -- and I will ask you to

4    refresh, at least my memory, on the concept of air

5    gapping.   What is that?

6    A.    So it describes having a system, and it may be an

7    isolated local area network, so it may have a server, a

8    database storage, and a terminal for interfacing.   It may

9    have printers.   Those are all isolated and not accessible

10   from outside that secure network.

11        The concept of air gapping is you may need to get

12   data from that central system to some other location or

13   system that is outside of that network, and the air gap is

14   that physical disconnection from those two statements.   So

15   in the context of voting, results have to get to, you

16   know, potentially the county website and national

17   organization media feeds; so The New York Times, Newsweek,

18   et cetera.

19        So the system provides an export of data.   That is

20   usually put on a piece of removable media, and then it is

21   called the "sneaker net," because you walk it over to a

22   different system that is not connected, and you upload

23   that data, and then it can be viewed publicly.

24   Q.    All right.   Now, in this video, Mr. Lindell

25   referenced both you and Dominion and Brian Kemp and Brad

1    Raffensperger.  We talked about those two gentlemen

2    before, and the jury saw the rest of it, but do you know

3    whether or not any of those individuals -- and I will

4    include you in it -- have been charged with any

5    election-related crime for the 2020 election?

6    A.   No.  No convictions.  And for me personally, I have

7    never been investigated.

8    Q.   Now, Mr. Lindell referenced the "Supreme Court," and

9    I won't try to parrot what he said.  But are you aware

10   that Mr. Lindell tried to go to the Supreme Court?

11   A.   I am aware of that, yes.

12   Q.   Did Mr. Lindell get his case heard by the Supreme

13   Court?

14   A.   The Supreme Court declined to hear his arguments.

15   Q.   In the video, he said something to the effect that,

16   "we're going to dump the evidence on Frank."  Did you know

17   what he was referring to?

18   A.   It's my understanding he was referring to his

19   platform, Frankspeech.

20   Q.   And did you go to that website after seeing this

21   video to try to get a sense of what was being dumped?

22   A.   Yes, I did.

23   Q.   And just generally characterize what you saw.

24   A.   In a single word, gibberish.

25   Q.   Now, obviously -- well, not obviously, let me ask an

1   open-ended.  Have you heard Mr. Lindell claim that the

2   reason that he was making these statements that we just

3   saw is that you prevented him from appearing on Newsmax?

4   A.   I have heard him make that claim.

5   Q.   Was Mr. Lindell really even on your radar, other than

6   what we saw on February 5th, during this period of time?

7   A.   I was aware of him, again, going back to January,

8   February.  So, on my radar, no.  Was I aware that he was

9   part of the elections denial movement?  Yes.  You know, I

10  was at least keeping an ear out if there were any

11  potential more statements from Mr. Lindell or his

12  associated entities.

13  Q.   Well, the suggestion is that is because you wanted to

14  sue him.

15  A.   I kept my ear out because he had already made

16  inferences.  Again, in *Absolute Proof* he is making some

17  claims that I'm involved.  And he may not have stated it

18  explicitly by name, but I was, you know, keenly aware that

19  it may come to that, and he may make statements

20  specifically about me, and he did.

21  Q.   Did you have any control over that?

22  A.   I had zero control over that.

23  Q.   Now, after this May 9th video, did the media, the

24  mainstream media, or whatever you want to call it, run

25  articles about his comments that we just saw?

1    A.    Yes, I believe so.  I believe we have that evidence.

2    Q.    Let's look at one example, I think it's Exhibit 73.

3    I apologize for the formatting of this, the jury can read

4    it, but for the sake of brevity, Exhibit 73 is posted on

5    the same date as that video.  Is that the Newsweek article

6    that we talked about?

7    A.    It is.

8          MR. CAIN:  Okay.  Offer Exhibit 73.

9          THE COURT:  So admitted.

10         (Exhibit No. 73 is admitted.)

11   Q.    (BY MR. CAIN)  Okay.  So is it fair to say that

12   nationwide -- you mentioned Newsmax and Newsweek.  You

13   mentioned Newsweek in terms of reporting on elections.

14   Did you understand Newsweek to have a nationwide audience?

15   A.    Absolutely.

16   Q.    And did stories like this start appearing -- well,

17   have they been appearing pretty much consistently since

18   this time?

19   A.    Yes, frequently.  There is still news coverage about,

20   you know, the claims against me to this day, local and

21   nationally.

22   Q.    Repeating some of these allegations that have been

23   made?

24   A.    Repeating some of the lies, yes.

25   Q.    All right.  Next block, Cyber Symposium.  So we

144

1    watched the May 9th video.  Did you subsequently learn

2    that Mr. Lindell would be holding a Cyber Symposium?

3    A.    Yes, I was aware of that.

4    Q.    And this, obviously, timeline, this was after the

5    Cyber Symposium was -- after that retraction from Newsmax;

6    correct?

7    A.    That is correct.

8    Q.    Did Mr. Lindell appear on TV to promote the Cyber

9    Symposium?

10   A.    Yes, he did.

11   Q.    Did you watch those promotions?

12   A.    I have seen those promotions.  I don't know if I

13   watched them live, but I have seen videos of them.

14   Q.    One of the promotions by Michael Lindell of the Cyber

15   Symposium, was one published on OAN --

16   A.    Yes.

17   Q.    -- where Mr. Lindell made statements --

18   A.    Yes.

19   Q.    -- about the symposium?

20   A.    Yes.

21          MR. CAIN:  All right.  Pull up 187.

22   Q.    (BY MR. CAIN)  Is this the promotion Mr. Lindell made

23   about the Cyber Symposium, at least one of them?

24   A.    It is one of them, yes.

25          MR. CAIN:  Offer 187.

1          MR. KACHOUROFF:  No objection.

2          THE COURT:  So admitted.

3          (Exhibit No. 187 is admitted.)

4          (Exhibit 187 played in open court.)

5    Q.   (BY MR. CAIN)  Dr. Coomer, do you define a "packet

6    capture" in similar terms to Mike Lindell's

7    representations?

8    A.   I do not.

9    Q.   What is a packet capture to you?

10   A.   Again, this is network level, and I am not an expert

11   in that.  But when data is shared between systems over a

12   network, that data is communicated in packets.  So a

13   capture of a packet would be essentially a record of it, a

14   copy of it.  Beyond that, the rest of the statements and

15   things regarding packet captures and what they are, to me

16   is unintelligible and does not match reality.

17   Q.   All right.  So this was aired, I believe June 30th.

18   Stipulations 29 and 30, bring those up, please.  So there

19   was the announcement on July 4th, and I will look at that

20   with Mr. Lindell when he testifies.  And then Stipulation

21   30, there was a reward offered, and you can read the rest.

22          But we actually have, I think, a copy of that

23   publication relating to the award.  So if we take that

24   down, let's look at, with Mr. Coomer, excuse me,

25   Dr. Coomer, Exhibit 93.

```
 1        Now, did you see this announcement sort of related

 2   to the OAN video we just saw and leading up to the Cyber

 3   Symposium?

 4   A.   Yes, I did.

 5   Q.   And does this relate back to what we just saw in the

 6   stipulation?

 7   A.   Yes, it does.

 8   Q.   All right.

 9        MR. CAIN:  Offer 93.

10        THE COURT:  So admitted.

11        (Exhibit No. 93 is admitted.)

12        MR. KACHOUROFF:  I was going to object.

13        THE COURT:  It is stipulated to on the exhibit

14   list.

15        MR. KACHOUROFF:  Okay.  Fine.  Thank you, Your

16   Honor.

17   Q.   (BY MR. CAIN)  Okay.  So I showed this in opening.

18   This is how the Cyber Symposium was advertised by

19   Mr. Lindell.

20   A.   It is one of the ways.

21   Q.   Okay.  Were there others?

22   A.   Yes.

23   Q.   What other ways?

24   A.   I saw, I believe, posts on Twitter/X that referenced

25   the Cyber Symposium.  I saw it referenced, I believe on
```

1    the Conservative Daily podcast.

2    Q.    Mr. Oltmann's?

3    A.    Yes.

4    Q.    By the way, did you enter the $5 million challenge?

5    A.    I did not.

6    Q.    Now, with respect to the Cyber Symposium, itself, did

7    you watch it?

8    A.    I did not watch all of it, but I watched significant

9    portions of it live, and then I went back and watched

10   recordings of certain time frames.

11   Q.    Ones that related to you?

12   A.    Ones that related directly to me, yes.

13   Q.    The parts that you watched, did you see any

14   presentation of packet captures from the 2020 election?

15   A.    There were no examples provided.

16   Q.    Now, were you concerned going into this August,

17   mid-August time period, that your name may come up in this

18   Cyber Symposium?

19   A.    I fully expected my name to be discussed, yes.

20   Q.    Why?

21   A.    Well, based on Mr. Lindell's statements leading up to

22   this, based on his statement that he was going to finally

23   provide the data that proved that the election was stolen,

24   and he has already stated that I am the traitor that did

25   it.

1    Q.   Was this covered by other news media?  I know it

2    streamed on Frankspeech, but did you see coverage by other

3    media?

4    A.   I know there was other coverage, I could not give you

5    a specific outlet.

6    Q.   All right.  A quick roster.  Did you know that --

7    well, strike that.

8         Did Joe Oltmann end up speaking at the Cyber

9    Symposium?

10   A.   Yes.  He spoke several times.

11   Q.   Did David Clements end up speaking at the Cyber

12   Symposium?

13   A.   Several times.

14   Q.   And just to be clear, this was advertised as Mike

15   Lindell's Cyber Symposium.

16   A.   It was.

17   Q.   Do you know who Phil Waldron is?

18   A.   I do.

19   Q.   Did he end up appearing at the event?

20   A.   I am aware of at least one appearance from

21   Mr. Waldron, yes.

22   Q.   Who do you understand him to be?

23   A.   He's an ex-military intelligence officer.  Again, he

24   is a key part of the elections denialist movement.  He has

25   made claims that he has direct evidence of election

1    rigging and election interference.  His claims go back

2    several years, even before 2020, and I believe his

3    specialty in military intelligence was psychological

4    operations.

5    Q.   Did you see Tina Peters appear at the event?

6    A.   I don't know -- I don't think I watched Tina Peters

7    live, but I did go back and watch her segment, yes, at

8    least one.  I don't know if she was on there multiple

9    times.

10   Q.   I know I mentioned her in the opening, but just for

11   the jurors' sake, who did you understand her to be?

12   A.   She was the county clerk and recorder for Mesa County

13   in Colorado.  So that is generally the Grand Junction

14   area.

15   Q.   Did your all paths cross?

16   A.   No.

17   Q.   So you were out of the industry before she was

18   elected.

19   A.   No.  I think she was elected while I was still

20   employed, but I never had any interactions with either

21   Ms. Peters or the Mesa County Clerk's Office.

22   Q.   So we mentioned Mr. Clements.  Just a brief

23   understanding of what you know about him leading up to the

24   symposium.

25   A.   He's a political activist, again, heavily involved in

1    the elections denialist movement.

2    Q.   All right.  Let's go to Exhibit 192, I think it

3    corresponds -- it does correspond with Stipulation 35.

4            MR. CAIN:  Offer 192, Your Honor.

5            THE COURT:  Any objection?

6            MR. KACHOUROFF:  No objection.

7            THE COURT:  So admitted.

8            (Exhibit No. 192 is admitted.)

9    Q.   (BY MR. CAIN)  Part of the reason you are here is to

10   confront your accusers.

11   A.   That's the main reason I am here, yes.

12   Q.   I am going to go over -- you've already answered,

13   were you on a call, do you have deep ties, all of that

14   stuff, but one thing did stick out to me.  There was a

15   reference that Mr. Oltmann made that you "hold the

16   adjudication patent."  And we looked at what adjudication

17   was.  Was that correct?

18   A.   That is not correct.

19   Q.   Did you have a role in Dominion obtaining that

20   patent?

21   A.   I am one of the listed inventors of that patent.

22   Q.   I don't want to dive into patent law, but do you

23   understand there is an owner of a patent and people who

24   are listed as inventors?

25   A.   I do understand the difference.  And Dominion is the

1    owner of the patent.  I signed an agreement to assign

2    ownership of any work that I did at Dominion that resulted

3    in the patent.  So I do not have any ownership, I am a

4    listed inventor.

5    Q.    Is that a typical arrangement when you are dealing

6    with high-tech, that the company will hire individuals,

7    those individuals will perform work that is patentable,

8    but they don't get to own it?

9    A.    About 90 to 95 percent, that is how it works, yes.

10   Q.    Okay.  And I will repeat the question, but I am going

11   to update it to the symposium.  Before people started

12   getting on the stage, did anybody from Frankspeech or Mike

13   Lindell or My Pillow reach out to you to either inform you

14   that you were going to be discussed or to ask for your

15   comment?

16   A.    No, they did not.

17   Q.    You didn't get a personal invitation either, I

18   suppose.

19   A.    I was not invited, no.

20   Q.    Let's go to the next statement by David Clements,

21   that is Exhibit 193, I believe it corresponds to

22   Stipulation 36.

23            MR. CAIN:  Offer 193.

24            THE COURT:  Any objection?

25            MR. KACHOUROFF:  No objection.

152

1            THE COURT:  So admitted.

2            (Exhibit No. 193 is admitted.)

3            (Exhibit 193 played in open court.)

4    Q.   (BY MR. CAIN)  What really bothered you about that?

5    A.   I don't know where to start.  He is saying I

6    "murdered the American vote."  "Murdered."  "Pulled the

7    trigger."  That I'm the one responsible personally.  I

8    don't know if it gets much worse than that.

9    Q.   And in terms of the adjudication, the jury I think

10   has been educated some on that, but just to be clear, did

11   you perform a single act of adjudication in the 2020

12   election?

13   A.   I have never performed a single act of adjudication

14   in any election.

15   Q.   Now, around this time, did you hear about claims of

16   bulk adjudication.  Have you heard that term?

17   A.   Yes, I have heard the term.

18   Q.   What do you understand that to be?

19   A.   It was represented that the adjudication system,

20   specifically the one from Dominion, could allow

21   essentially adjudicating a thousand ballots at a single

22   time, a bulk adjudication, and that functionality does not

23   exist.

24   Q.   Like putting a thousand ballots in and having it

25   adjudicate it from one candidate to another?

1    A.    That is correct, yes.

2    Q.    That is not possible?

3    A.    That is not possible.  The system is only a single

4    ballot at a time for an adjudication team.

5    Q.    All right.  Anymore fallout in your personal life

6    after this Cyber Symposium, additional threats?

7    A.    Yeah.  I mean, it was almost immediate leading up

8    to -- the days leading up to the Cyber Symposium, I saw an

9    increase in threats, and those only further increased

10   after the Cyber Symposium, to an extent that I reengaged

11   with a therapist.

12         So I had been in therapy shortly after the original

13   claims in November.  I think my last session was somewhere

14   in the February timeline.  As I mentioned earlier, you

15   know, those therapy sessions, I never felt the need to go

16   on any type of medication.  The level of attention and

17   threats that are directly correlated with the Cyber

18   Symposium, I reengaged with my therapist, I was in such a

19   state that we had discussions about going on medication,

20   and I am on that to this day.

21   Q.    All right.  So in opening argument, counsel indicated

22   that you did some sort of Zoom therapy, something to that

23   effect.  Do you remember that statement?

24   A.    Yes.  It was over Zoom.  It is during COVID.

25   Q.    Okay.  So it was during COVID.  Where was Dr. Finkell

1    located?

2    A.    He is located in New York City.

3    Q.    Did that make it any less important to you?

4    A.    No.

5    Q.    Now, you mentioned things got worse for you

6    emotionally.  Were you starting to experience things like

7    panic attacks or depression?

8    A.    All -- sorry, I didn't mean to interrupt you.  But,

9    yes, all of the above.  To the extent that around this

10    timeframe, you know, there were instances where the

11    anxiety attacks, panic attacks were such that I had to

12    leave my job and I had to go home.  I was unable to

13    function.

14    Q.    What were you prescribed?

15    A.    It is a medication called Lexapro.  That is for

16    general depression and anxiety, and Clonazepam, which is

17    for acute panic and anxiety attacks.

18    Q.    Were you experiencing all of those, depression,

19    anxiety, and panic attacks?

20    A.    I was, and I continue to this day.

21    Q.    Do you fear for your life?

22    A.    Yes, I do.

23    Q.    But you were -- we haven't really talked about what

24    you were trying to do during this period, and this is

25    August of 2021.  Were you trying to find some normalcy?

1    A.    Yeah, absolutely.  As I said, you know, for the first

2    few months, I was in hiding, I left the country.  But at

3    some point I had to try to get back to some semblance of,

4    call it a normal life.

5    Q.    So what did you do?

6    A.    Like I said, I moved back home -- had to move back

7    home.  I hadn't opened my shades since all of this

8    started.  I did join a restaurant venture, I was the owner

9    and chef.

10   Q.    Do you like to cook?

11   A.    My first job at 14 was in a kitchen.

12   Q.    You said you had to go back home.  Where is home?

13   A.    A town called Salida, in Colorado.

14   Q.    And as of this time, had you still been looking for

15   work in the industry and experiencing barriers, had you

16   given up, or something in between?

17   A.    Something in between.  I, once I separated from

18   Dominion, I did reach out.  As I said, I have several

19   colleagues that I have met over the years that have sort

20   of consulting businesses for election-related stuff.

21   Q.    I am sorry I didn't mean to interrupt.

22   A.    I actually reached out to several of those

23   colleagues, you know, over the several months, but

24   certainly once Mr. Lindell really started popularizing and

25   republishing and sort of cracking the can back open and

1    accusing me of election rigging, it was clear that I was

2    unlikely to ever be able to work in anything related to

3    elections again.

4    Q.   Now let's do this, let's fast forward a little bit.

5    We were looking at the symposium statements, and we will

6    dive into the meat and potatoes with some other witnesses.

7    But there was a period of time in April of 2022 when you

8    had this lawsuit served.

9    A.   Yes.

10   Q.   I believe that was April 5th of 2022, at least when

11   it was served.  Now, there was a suggestion in opening

12   argument that you had timed that to trigger Mike Lindell.

13   Do you remember hearing that?

14   A.   I did hear that.

15   Q.   Now, to be fair, you understood he was going to be in

16   Colorado.

17   A.   Yes, he had promoted the fact that he would be having

18   a rally on the Capitol steps.

19   Q.   And you saw that public announcement.

20   A.   I did.

21   Q.   All right.  Take a look at Exhibit 112.  Is this the

22   announcement that you saw for the public rally to be at

23   the Capitol steps on April 5th?

24   A.   It is one of them, yes.

25        MR. CAIN:  Offer 112.

157

```
1              MR. KACHOUROFF:  No objection.

2              THE COURT:  So admitted.

3              (Exhibit No. 112 is admitted.)

4    Q.   (BY MR. CAIN)  Now, again the lawsuit was served just

5    before this.  Did you have any expectation one way or

6    another whether that was going to trigger Mr. Lindell?

7    A.   I had no conception of what his mental state would

8    be, no.

9    Q.   You can't predict his actions?

10   A.   I am not him, so, no.

11   Q.   All right.  So this frames -- is it fair to say it

12   frames this as an "Election Truth Rally"?

13   A.   That is the title.

14   Q.   And, again, Ms. Peters was associated with this.  Did

15   you see some video of her there?

16   A.   Yes, I did.

17   Q.   And someone named Sherronna Bishop and Representative

18   Hanks.  Now, I am assuming you didn't personally attend.

19   A.   I did not personally attend, no.

20   Q.   But you watched video of the event.

21   A.   After the event I watched video of it, yes.

22   Q.   Did you see Mr. Lindell discuss you at the rally?

23   A.   Yes, I did.

24   Q.   And do you recall when the lawsuit was served on

25   Mr. Lindell if it contained a demand that he start -- stop
```

1    talking about you or, in other words, retract?

2    A.    Yes.

3    Q.    And did it?

4    A.    He did not retract, no.

5    Q.    All right.  So instead of retracting -- let's look at

6    Exhibit 200, which relates to Stipulation 39.

7          MR. CAIN:  And before we play it, I will offer it,

8    Your Honor.

9          MR. KACHOUROFF:  No objection.

10          THE COURT:  So admitted.

11          (Exhibit No. 200 is admitted.)

12          (Exhibit 200 played in open court.)

13    Q.    (BY MR. CAIN)  Now, this was a rally to talk about

14    election fraud issues.  And Mr. Lindell says "it started

15    with Eric Coomer and Dominion, based right here in

16    Colorado."  What did you understand that to mean?

17    A.    The interference and rigging of the elections.

18    Q.    And we have heard those before, but besides, I guess,

19    just the allegations, was there anything in particular

20    that troubled you about this statement?

21    A.    I mean, again, he is singling me out.  There are

22    thousands of election officials, and he is singling me out

23    to be the first one to go to jail for this.

24    Q.    And where did this -- most people sitting around here

25    know where the Capitol is.

1           MR. KACHOUROFF:  Objection, you ask questions.

2    Counsel is testifying.  You ask questions.

3           THE COURT:  Okay.  So, counsel, approach.

4           (A bench conference is had.)

5           THE COURT:  So I am going to sustain the objection

6    as to the form of the question.

7           Mr. Kachouroff, you can't make speaking objections.

8    So just say objection as to form.  And then Mr. Cain can

9    respond and reframe the question, but I don't want you

10   arguing in front of the jury.

11          MR. KACHOUROFF:  I am sorry, I got to a point, and

12   I was letting it go because I wanted to get through the

13   testimony.

14          MR. CAIN:  I am being a little leading, and I

15   apologize.

16          THE COURT:  Understand.  Both of you, I am just

17   trying to get through this, the 611 objections.  And to

18   the extent that the objection has been made, it is a

19   proper objection, so reframe the question.

20          MR. CAIN:  Absolutely.

21          (In the hearing of the jury.)

22   Q.   (BY MR. CAIN)  Anyhow, about how far from here are

23   the Capitol steps?

24   A.   Probably about nine blocks.

25   Q.   Now, the next day -- so we saw day one just a second

1    ago.  The next day, April 6th of 2022, Mr. Lindell stated

2    the following during an interview on the Lindell report --

3    actually, I apologize.  I forgot to ask you one thing

4    about the prior exhibit.

5         MR. CAIN:  Can you pull that back up.

6    Q.   (BY MR. CAIN)  The banner on the bottom, had you seen

7    in some of these publications, promotions for My Pillow?

8    A.   It is my recollection that in every instance a My

9    Pillow promo code was associated with statements by

10   Mr. Lindell.

11   Q.   That would have been placed at the concurrent time

12   the statement was made.

13   A.   That is correct.

14   Q.   Okay.  Let's go to the next day, April 6th.  This

15   relates to Stipulation 40, and the associated video

16   exhibit is Exhibit 202.

17        MR. CAIN:  Offer 202.

18        MR. KACHOUROFF:  Without objection.

19        THE COURT:  So admitted.

20        (Exhibit No. 202 is admitted.)

21        (Exhibit 202 played in open court.)

22   Q.   (BY MR. CAIN)  Let's just focus on some of the

23   falsity in the statement.  He called you "corrupt."  Have

24   you ever been charged with an election crime?

25   A.   No, I have not.

1    Q.    He said he never talked about you.  Was that true?

2    A.    Based on the evidence we have provided, no.

3    Q.    He said you are the president of Dominion.  Is that

4    true?

5    A.    No, it is not, nor was it ever.

6    Q.    Who was president?

7    A.    John Poulos.

8    Q.    He called you "part of a criminal crime family."

9    Have you ever been involved in organized crime?

10   A.    I have not.

11   Q.    He says "My Pillow doesn't even know who you are."

12   What was his title, as you understood it, at the time he

13   made that statement?

14   A.    CEO of My Pillow, Inc.

15   Q.    He said "you will be the first one, right behind

16   Raffensperger and Jena Griswold, behind bars."  And I

17   touched on this earlier, but neither of those individuals

18   are behind bars.

19   A.    No, they are not.

20   Q.    Who is?

21   A.    Tina Peters.

22   Q.    Then he says, seven -- I think we are on seven, that

23   you were part of the "biggest crime this world has ever

24   seen."  What did you understand him to be referring to?

25   A.    That I rigged the election.

1    Q.    And the last comment I will reference is he said

2    "you're number one on my list."  Now, at the time he was

3    making these statements, had he made public statements

4    about how much money he had spent pursuing these election

5    fraud claims?

6    A.    Yes, he had.

7    Q.    What public statements by Mr. Lindell did you hear?

8    A.    To the best of my recollection, he has claimed

9    several numbers, but the one I am most familiar with is up

10   to $40 million of his own money on this, in Denver.

11   Q.    Given your status on the list and the money that was

12   being spent, was that comment of particular concern to

13   you?

14   A.    Absolutely, for a variety of reasons.  I am on a

15   list.  A list of what?  Assassination, threats, with a $40

16   million war chest behind it.

17   Q.    And you were working at a restaurant.

18   A.    At that time, yes.

19   Q.    All right.  Let's go to the next day, April 7, 2022.

20   This is an audio clip from a podcast, so apparently we

21   don't have video of that.  I believe this relates to

22   Stipulation 41.

23            MR. KACHOUROFF:  Without objection.

24            THE COURT:  What exhibit number is this?

25            MR. CAIN:  I am sorry, Your Honor, it is 203.

1              THE COURT:  So admitted.

2              (Exhibit No. 203 is admitted.)

3              (Exhibit 203 played in open court.)

4    Q.  (BY MR. CAIN)  All right.  I will start at, I guess,

5    the back tail end of that.  "Military votes."  "Overseas

6    votes."  Did you understand what he was referring to?

7    A.   Yes.  And, again, acronyms are ubiquitous.  It is

8    called UOCAVA, and it is for uniformed and overseas

9    voters.  Basically residents, generally in the military,

10   but some of them that work for an embassy, that live

11   overseas, they still have the right to vote.  There are a

12   lot of laws around that.  Generally they are only allowed

13   to vote for sort of presidential or congress/senate while

14   they are overseas.

15              So there is a whole series of processes around how

16   you provide voting services to overseas residents that

17   have a right to vote.

18   Q.  All right.  And then he talked about something to the

19   effect that "we already have what they are hiding."  Did

20   you understand what he was referring to there?

21   A.   I mean, I can make a guess.  But, no, I don't

22   specifically.

23   Q.  Don't guess.  All right.  Well, were you hiding

24   anything?

25   A.   No, except myself.

1    Q.   All right.  Let's go to May 23rd of 2022.  So we just

2    looked at April, and we are going to skip to May.  And

3    that is Stipulation 42.  So this would be roughly a month

4    later from what we just saw.

5          MR. CAIN:  And, Your Honor, this is Exhibit 208.

6          THE COURT:  Any objection?

7          MR. KACHOUROFF:  No objection at all.

8          THE COURT:  So admitted.

9          (Exhibit No. 208 is admitted.)

10         (Exhibit 208 played in open court.)

11         MR. CAIN:  Finally, Exhibit 224.  I believe that is

12   Stipulation 43, this is a year later.  And you can see the

13   stipulation there for the jurors.

14         THE COURT:  Mr. Cain, if you are asking for the

15   stipulations to be published, you need to say that so my

16   courtroom deputy knows to turn on the monitor.

17         So are you asking for it to be published?

18         MR. CAIN:  Yes, Your Honor.  I apologize.

19         THE COURT:  All right.  Go ahead.

20         MR. CAIN:  And the associated clip is Exhibit 224.

21   Offer 224.

22         THE COURT:  Any objection?

23         MR. KACHOUROFF:  None whatsoever.

24         THE COURT:  So admitted.

25         (Exhibit No. 224 is admitted.)

1          (Exhibit 224 played in open court.)

2          MR. KACHOUROFF:  Judge, can I object?  Can we

3    approach?

4          THE COURT:  Yes.

5          (A bench conference is had.)

6          MR. KACHOUROFF:  I thought we specifically talked

7    about not having anything to do with the Court being

8    played, and it is clearly referring to Your Honor at the

9    end of that clip.

10         MR. CAIN:  It is not.

11         MR. KACHOUROFF:  "That judge that didn't rule,"

12   that is what I heard.

13         THE COURT:  What I didn't -- what my ruling was

14   pretrial was that there would be no characterization of

15   the Court's orders.  So to the extent he is talking about

16   a court case, he can do that, and this is something the

17   parties have stipulated to, but what I don't want is an

18   argument in closing for you all to be characterizing what

19   I had done.

20         MR. KACHOUROFF:  Correct, agreed.

21         (In the hearing of the jury.)

22         (Exhibit 224 played in open court.)

23   Q.   (BY MR. CAIN)  All right.  Now, this is, as I

24   mentioned, almost a year later, and he was still standing

25   by his words.  At this point in time, to your knowledge,

1    had Mike Lindell made any public statements or issued any

2    press releases retracting any of these statements?

3    A.    No, he hasn't, to this day.

4    Q.    Now, he had mentioned, or we discussed this --

5          MR. CAIN:  And, Your Honor, I have like one or two

6    more questions in this segment, I don't know when you take

7    a break.

8          THE COURT:  Why don't you finish the one or two

9    questions and then we will break for our afternoon break.

10          MR. CAIN:  Thank you, Your Honor.

11    Q.    (BY MR. CAIN)  There will be testimony from

12    Mr. Lindell about this certainly, but the issue that we

13    had talked about was Newsmax and the deal to keep My

14    Pillow on or off, that sort of thing.  And there will be

15    questions about the loss Mr. Lindell claimed as a result

16    of not being on Newsmax.

17          Have you ever been sued by Mike Lindell or My

18    Pillow for interfering in the relationship between My

19    Pillow and Newsmax and the damage that was supposedly

20    caused?

21    A.    No, I have not.

22          MR. CAIN:  All right.

23          THE COURT:  All right.  So, ladies and gentlemen of

24    the jury, we are going to take our afternoon break.  We

25    will break for 15 minutes.  We will be back here around

```
1    2:50.  Have a good break.  Don't talk to each other about

2    this case.  Thank you.

3              (A break is taken from 2:40 p.m. to 3:00 p.m.)

4              (Outside the presence of the jury.)

5              THE COURT:  Thank you.  Please be seated.

6              All right.  Ready for the jury?

7              MR. CAIN:  Your Honor, Mr. Kloewer has one quick

8    issue, is that all right?

9              MR. KLOEWER:  Two, sorry.

10              Your Honor, an issue has just come to our attention

11   that I think we need to address before we proceed and

12   potentially get into the cross-examination of Dr. Coomer.

13              Mr. Lindell's media network, Lindell TV, is posting

14   pretty regularly about what sorts of evidence they intend

15   to introduce in cross-examination.  One of the anchors,

16   Emerald Robinson, has indicated an intent to discuss some

17   emails or other communications from Dr. Coomer and others

18   that we believe to be communications that were disclosed

19   in the *Dominion v. Lindell* case.

20              Our concern with these is they have been disclosed

21   in this case, number one, and number two --

22              THE COURT:  They have or have not?

23              MR. KLOEWER:  They have not.

24              THE COURT:  Okay.

25              MR. KLOEWER:  And number two, also those documents
```

 1    were leaked in violation of the protective order by one of

 2    the counsel in the case, who was disqualified as counsel,

 3    she has been removed as counsel for one of the parties

 4    there.  She is actually currently trying to enter a pro

 5    hoc motion in another one of Dr. Coomer's cases, and we

 6    are dealing with that issue there with respect to the

 7    discovery violation.

 8         It has just kind of come up, we are not sure what

 9    the best approach is to deal with this.  It is our

10    understanding that those documents would be subject to the

11    protective order in the other case and haven't been

12    produced to us.  So, at a minimum, I think they should be

13    produced and we should at least know what to anticipate.

14         But as we have indicated, they've signaled an

15    intent to use the documents that aren't in our possession.

16         THE COURT:  All right.  Mr. Kachouroff.

17         MR. KACHOUROFF:  I have yet to consult my lay

18    opinions on this.  I didn't realize that my

19    cross-examination was already set out for me.

20         THE COURT:  Well, I am not privy, and I am not

21    paying attention, obviously, to what is happening outside

22    and what is being broadcast.

23         MR. KACHOUROFF:  Judge, neither am I.  So what I

24    will do, Judge, is we can meet and confer before the

25    cross-examination, and I think that might be the

1    appropriate way to handle this.

2         THE COURT:  Well, I mean, as a matter of course, if

3    something hasn't been produced in the course of discovery,

4    what would be the basis for using it in cross-examination?

5         MR. KACHOUROFF:  Obviously impeachment.

6         THE COURT:  Right.  But it would need to have been

7    produced in discovery.

8         MR. KACHOUROFF:  Not necessarily.

9         THE COURT:  Okay.  Do you want to cite me some

10   authority for that?

11        MR. KACHOUROFF:  If you will give me a few moments

12   I will come up with it.

13        THE COURT:  All right.  So that would be the first

14   issue.  The second issue is to the extent that there is

15   someone outside talking about what is going on in this

16   case in terms of testimony, which can be accessed by other

17   witnesses outside the courtroom, that seems like that

18   might be a violation of the sequestration order, that

19   other witnesses out in the world not be hearing what is

20   going on in the courtroom before they testify.

21        MR. KACHOUROFF:  I think part of the problem is

22   that you have this leak of documents from the Dominion

23   case that went to a Sheriff Dar Leaf in Michigan, and it

24   is out in the public domain.  It is out there.  It is out

25   there for anyone to see.  So at that point, you know, they

1    are using those documents.

2         THE COURT:  Well, it is one thing if "they" are

3    using documents, whoever the unnamed "they" would be.  It

4    would be another, and a different concern for this Court,

5    if entities associated with the parties in this case are

6    using the documents, particularly in a way that could be

7    seen by our jurors coming in and out of the courthouse.

8         MR. KACHOUROFF:  I would appreciate the opportunity

9    to address this with my colleagues instead of being

10   sandbagged last minute in front of Your Honor and dumped

11   on, so that I would have the opportunity to at least look

12   at this, instead of bumble in front of you and give you a

13   nonanswer.

14        THE COURT:  Okay.  Well, let me just be clear, I am

15   not making a ruling now, Mr. Kachouroff, I am giving you

16   some contours to think about in terms of whatever may be

17   coming in terms of the cross-examination.

18        MR. KACHOUROFF:  I guess I will meet and confer

19   with my colleagues and handle it the way it should be

20   handled under the local rules.  I will find out what it is

21   and handle it.

22        THE COURT:  All right.  I would assume how this

23   would arise, Mr. Kloewer, is if defense counsel seeks to

24   introduce an exhibit which has not been produced, you'll

25   have to object, we will go to side bar, I will hear

1    argument, and then figure it out from there.

2        MR. KLOEWER:  Thank you, Your Honor.  And just to

3    clarify, Your Honor, 54 minutes ago Lindell TV posted an

4    interview with Mr. Lindell describing Dr. Coomer's

5    testimony from an hour ago.  So that is happening right

6    now.

7        THE DEFENDANT:  That's not true.

8        MR. KACHOUROFF:  He says that is not true.  Why

9    don't we have a discussion and handle it not in front of

10    the Judge.

11        THE COURT:  So to the extent that these things are

12    happening, of course I cannot make determinations based on

13    just arguments by counsel, we would need to see what is

14    happening.  If it is on TV and it is a clip, I would

15    assume that it could be submitted to the Court for the

16    Court's consideration.

17        MR. KLOEWER:  Sure.

18        THE COURT:  Thank you.

19        All right.  Are you ready for the jury?

20        MR. CAIN:  Yes, Your Honor.

21        THE COURT:  Madam deputy.

22        (In the presence of the jury.)

23        THE COURT:  Thank you.  Please be seated.

24        Dr. Coomer, I remind you, you are still under oath.

25        THE WITNESS:  Understood.

1          MR. CAIN:  May I proceed?

2          THE COURT:  Yes.

3    Q.   (BY MR. CAIN)  Okay.  It has been a long day, so this

4    is the home stretch.

5          Let's visit a little bit about Tina Peters and the

6    statements she made against you not too long ago.  First

7    off, you already established you know who she is.

8    A.   Yes.

9    Q.   And you have established that she did appear at the

10   Cyber Symposium.

11   A.   That is correct.

12   Q.   All right.  And that she was the Mesa County Clerk.

13   A.   Yes.

14   Q.   All right.  And after the symposium, did Tina Peters

15   discuss you directly when being interviewed by Brannon

16   Howse?

17   A.   Yes, that is my recollection.

18   Q.   Mr. Howse was also the person interviewing Joe

19   Oltmann, that we saw earlier.

20   A.   That is correct.

21   Q.   Did you watch this interview?

22   A.   Yes, I did.

23   Q.   And this is Exhibit 212.  Take a look at, I guess,

24   the front part of that.  Do you see that, Dr. Coomer?

25   A.   Yes, I do.

1    Q.    Is this the video clip of the interview by Brannon

2    Howse of Tina Peters?

3    A.    Yes, it is.

4          MR. CAIN:  Offer 212.

5          THE COURT:  Any objection?

6          MR. KACHOUROFF:  No objection.

7          THE COURT:  So admitted.

8          (Exhibit No. 212 is admitted.)

9          MR. CAIN:  And I will just represent to the Court

10   they dropped her line on this.  She is on a cellphone, I

11   think, so there will be a brief interlude before this

12   comes through.  We will just play it through, but there

13   will be an interruption.

14         THE COURT:  All right.

15         (Exhibit 212 played in open court.)

16   Q.    (BY MR. CAIN)  All right.  She said a lot, but I just

17   want to focus on a couple of things.  First, do you

18   remember the promo code associated with this?

19   A.    I don't remember the exact code, but I saw the code

20   below it.

21   Q.    Second, one aspect that she said was something to the

22   effect of, "he was the one in charge of the patents for

23   the algorithm that is inside of the Dominion Voting

24   Machine."  Does Tina Peters' statement make any sense to

25   you?

1    A.    No, it does not.

2    Q.    Is it true?

3    A.    It is not true.

4    Q.    Why doesn't it make sense to you?

5    A.    One, I have a couple patents -- or I am an inventor

6    on a couple of patents, none of which are related to a

7    "algorithm."  And, again, I am not sure what she means by

8    "algorithm in the machines."

9    Q.    Finally -- well, I may come back to that one, but I

10   want to skip forward to sort of a block relating to some

11   threats that you have received, including one that was

12   pretty recent.

13           Now, are you aware that Mike Lindell has started

14   the Mike Lindell Legal Defense Fund in connection with

15   this case.

16   A.    I am.

17   Q.    And what have you seen from Mike Lindell in that

18   regard?

19           MR. KACHOUROFF:  Judge, objection, relevance.

20           THE COURT:  Mr. Cain.

21           MR. CAIN:  I will approach, Your Honor, if that is

22   all right.

23           THE COURT:  Okay.

24           (A bench conference is had.)

25           MR. CAIN:  This is the motion-for-leave exhibit you

1    may recall that was generated -- this publication was

2    generated on the 30th, and this threat was the first one

3    associated with that.  And so we believe it's obviously a

4    statement by an opposing party and it also goes to

5    damages.

6              THE COURT:  Okay.

7              MR. KACHOUROFF:  That is not a legal threat.  The

8    definition of a threat is not placing somebody on death

9    row.  I know the intimation being made, but placing

10   somebody on death row is a legal process, that is not a

11   threat.  This is highly prejudicial at this time and there

12   is no -- the probative value is outweighed by the

13   prejudicial effect.

14             THE COURT:  Okay.  Overruled.

15             (In the hearing of the jury.)

16   Q.   (BY MR. CAIN)  Now, to your knowledge, was Michael

17   Lindell recently talking about this case and specifically

18   fund raising?

19   A.   Yes.

20   Q.   And he also recorded videos that directed his

21   supporters to mikelindelllegaldefensefund.com.

22   A.   Yes, and one other fund raising site.

23   Q.   A GoFundMe site?

24   A.   GiveSendGo.

25             COURT REPORTER:  I'm sorry, repeat, please.

1          THE WITNESS:  GiveSendGo.

2    Q.   (BY MR. CAIN)  And if you will look at Exhibit 262,

3    Dr. Coomer, do you recognize 262?

4    A.   Yes, I do.

5    Q.   And is this a true and correct copy of what we have

6    just been talking about with respect to fund raising?  You

7    mentioned GiveSendGo and Mike Lindell.

8    A.   Yes, it is.

9          MR. CAIN:  Offer 262.

10          MR. KACHOUROFF:  Over our objection, of course,

11    Judge.

12          THE COURT:  So admitted.

13          (Exhibit No. 262 is admitted.)

14          THE COURT:  Mr. Cain.

15          MR. CAIN:  Yes, Your Honor.

16          THE COURT:  Do you have a question?

17          MR. CAIN:  Oh, I thought you were considering.

18          THE COURT:  I said "so admitted."

19          MR. CAIN:  My apologies.  That must have seemed

20    dramatic.  I apologize, I didn't hear you.  I really

21    didn't.  Okay.  262.  All right.  The exhibit speaks for

22    itself.

23    Q.   (BY MR. CAIN)  You mentioned GiveSendGo and

24    statements about this lawsuit.  When was this published?

25    A.   Looks like last Friday.  Last Friday.

177

1   Q.   And with respect to the -- well, let me ask it this

2   way.  Is this a good example of the types of responses

3   that you were seeing when things were being published

4   about you?

5   A.   Yes.  You are talking about the response to this

6   post?

7   Q.   Yes, sir.

8   A.   It is par for the course.

9   Q.   Typical.

10  A.   Typical.

11       MR. CAIN:  And can you blow that bottom section up.

12  Q.   (BY MR. CAIN)  So with respect to this "typical"

13  response, are you continuing to fear for your life during

14  this trial?

15  A.   Yes.

16  Q.   Now, just to quantify sort of the large aspect of

17  this so that the jury can kind of distill this down to the

18  defendants, throughout the four years, four-and-a-half

19  years or so, daily posts about you, weekly posts about

20  you, monthly posts about you, et cetera.

21  A.   At times it's daily, multiple per days.  Sometimes

22  it's weekly.  I don't think there has ever been a time

23  where it went more than a few weeks, at best.

24  Q.   Were you getting direct messaging to your phone?

25  A.   Yes, I was.

1    Q.   Were you getting direct phone calls?

2    A.   I was getting phone calls, yes.

3    Q.   Were you getting direct mail?

4    A.   I did receive mail, yes.

5    Q.   How about your family?

6    A.   My family received mail.

7    Q.   And I had mentioned in opening, I don't know if we

8    really talked about it, but you got an in-person visit to

9    your home.

10   A.   By two individuals, yes.

11   Q.   All right.  And that's the one that was subsequently

12   discussed by Joe Oltmann on Parler.

13   A.   That is correct.

14   Q.   All right.  And take a look at Exhibit 38.  What is

15   this exhibit?

16   A.   This is the comment we just alluded to from

17   Mr. Oltmann regarding the -- I wouldn't call it an

18   altercation, but interaction I had with two gentlemen that

19   showed up at my front door.

20   Q.   And is it your understanding that Mr. Oltmann has at

21   least been involved in some financial deals with Mike

22   Lindell since this period of time?

23   A.   Yes.

24   Q.   Does he own a company called PiDoxa, to your

25   knowledge?

1    A.    Yes, he does.

2    Q.    What do you understand that company to be doing for

3    Mr. Lindell?

4    A.    I don't know the exact relationship.

5    Q.    Okay.  We will talk about it.

6          MR. KACHOUROFF:  Objection, Your Honor, move to

7    strike, lacks personal knowledge.

8          MR. CAIN:  He didn't answer the question.

9          THE COURT:  Sustained.  There is actually not a

10   question.

11   Q.    (BY MR. CAIN)  Now, this particular post, you

12   remember receiving this?

13   A.    I didn't receive it, I saw it.

14   Q.    Okay.  And this was before or after the Cyber

15   Symposium?

16   A.    This is before.

17   Q.    And this is indicative of one of the threats you

18   received.

19   A.    Yes, it is.

20         MR. CAIN:  Offer Exhibit 38.

21         MR. KACHOUROFF:  I object on foundation.  I don't

22   know -- never mind, we stipulated.

23         THE COURT:  So admitted.

24         (Exhibit No. 38 is admitted.)

25   Q.    (BY MR. CAIN)  We will try to get the exact date.  It

1    was December of 2020.

2    A.    Yes.  It was sometime in the middle of December 2020.

3    Q.    Okay.  Now, let's just visit for a moment about

4    Mr. Oltmann.  Now, is Mr. Oltmann -- are you aware of his

5    affiliation with any militia groups in Colorado?

6    A.    Yes, I am.

7    Q.    What militia groups is Mr. Oltmann affiliated with?

8    A.    Well, he runs something called FEC United, which is

9    Faith, Education, and Commerce.  And they, to my

10   understanding, and from what I have read online, they have

11   a "militia" arm, referred to as UADF, United Air Defense

12   Force, I believe.

13   Q.    And have you seen that militia group active in

14   Chaffee County, Colorado?

15   A.    No.  I have seen other militia groups active.

16   Q.    And the reference that you can see, "Eric Coomer...

17   want to chat with you but you are too scared.  How about

18   you put that shotgun down and come out?  Everyone is

19   watching you Eric... everyone."  Is that the incident that

20   you discussed earlier where they came to your home?

21   A.    That is exactly the incident referred to here.

22   Q.    Why were you at home if it's right after the

23   election?

24   A.    I explained this earlier.  I was in hiding, but I had

25   cats.  I had stopped by my house to feed my cats.

1    Q.   And did you refer to these posts in the lawsuit, the

2    one that we discussed earlier that was served on

3    Mr. Lindell at the Capitol?

4    A.   Yes.

5    Q.   Similar to this, Mr. Oltmann also posted a photo of

6    your home at the same time.

7    A.   Yes, he did.

8    Q.   And those stand approximately how long between the

9    two posts?

10   A.   A couple days, I think.  Maybe not even.

11   Q.   All right.  Let's look at Exhibit 34.  Is Exhibit 34

12   a true and correct copy of the post that -- the Parler

13   post you just referred to?

14   A.   It is.

15   Q.   And you saw it?

16   A.   I saw it.

17        MR. CAIN:  Offer Exhibit 34.

18        MR. KACHOUROFF:  Just with the stipulation as 12/5

19   of 2020.

20        MR. CAIN:  Thank you, counselor.

21        THE COURT:  So admitted.

22        (Exhibit No. 34 is admitted.)

23   Q.   (BY MR. CAIN)  So that is your home.

24   A.   That is my home, yes.

25   Q.   And obviously it speaks for itself, but at this point

```
 1   in time, do you know whether or not Joe Oltmann was in

 2   contact with Mike Lindell?

 3   A.   Contemporaneous with this?

 4   Q.   Yes.

 5   A.   I don't have any knowledge if he was in contact with

 6   Mr. Lindell.

 7   Q.   And had you publicized this in your lawsuit against

 8   Mr. Lindell when you filed it in this case?

 9   A.   Yes.

10   Q.   To your knowledge, is he aware of this?

11   A.   He should be.

12   Q.   Now let's bracket the May to August 2021 time period

13   and look at Exhibit 235.  What is Exhibit 235?

14   A.   It's a post on Twitter/X regarding me.

15   Q.   You received this on or -- you viewed this on or

16   about May 7th of 2021.

17   A.   That's correct.

18   Q.   This would have been four days or so after

19   Mr. Oltmann went on and talked to Brannon Howse, the first

20   video we saw of them.

21   A.   That's correct.

22   Q.   Have you seen this sort of, I would say, caricature

23   of you published online multiple times?

24   A.   Probably close to thousands of times, this particular

25   sort of screen shot meme.  The quote --
```

1    Q.   Let's not get into it.

2         MR. CAIN:  I am going to offer 235.

3         THE COURT:  Any objection?

4         MR. KACHOUROFF:  Yes, Your Honor.

5         THE COURT:  Approach.

6         (A bench conference is had.)

7         MR. KACHOUROFF:  It is of conditional relevance

8    because the post was made before Mike Lindell ever said a

9    word about Mr. Coomer.

10        MR. CAIN:  It was published on Frankspeech.

11        MR. KACHOUROFF:  It is of conditional relevance.

12   Brannon Howse will testify -- and, by the way, he is

13   supposed to be coming.  Brannon Howse will testify that

14   Mike Lindell knew nothing of the broadcast and he never

15   told him about the broadcast.

16        MR. CAIN:  Well, that is the problem.

17        THE COURT:  Okay.  I sense there are going to be

18   some disputed facts in this trial.  Overruled.

19        (In the hearing of the jury.)

20        THE COURT:  So admitted.

21        (Exhibit No. 235 is admitted.)

22   Q.   (BY MR. CAIN)  So this was posted on what platform,

23   if you know?

24   A.   Twitter/X.

25   Q.   Either My Pillow or Mr. Lindell, do you know whether

1    they had Twitter handles?

2    A.   Yes, they do.

3    Q.   I know there is a lot of stuff floating around the

4    internet, but this type of document was posted, you are

5    saying, thousands of times on X or Twitter.

6    A.   It's more than several hundred.  I don't have an

7    exact count, but it is a common post.

8    Q.   Let's look at Exhibit 236.  Is Exhibit 236 a true and

9    correct copy of the Twitter post from May 8th of 2021?

10   A.   I believe it is May 9th.

11   Q.   Excuse me, May 9th.

12   A.   Yes, it is.

13   Q.   All right.  And does this reflect Mike Lindell and a

14   response to a posting about Mike Lindell?

15   A.   Yes, it does.

16        MR. CAIN:  Offer 236.

17        THE COURT:  Any objection?

18        MR. KACHOUROFF:  I am sorry, Judge, I can't see, my

19   eyes are bad.

20        No objection, Your Honor.

21        THE COURT:  So admitted.

22        (Exhibit No. 236 is admitted.)

23   Q.   (BY MR. CAIN)  Were you scared, hiding in your house,

24   on May 9th, or where were you?

25   A.   Do I know my exact whereabouts?  No.  Was I scared on

1    May 9th, certainly, after seeing this post, yes.

2    Q.   And does this correspond with the publication we saw

3    earlier of Mike Lindell where he was talking about you

4    specifically?

5    A.   Yes, it is.

6    Q.   All right.  237.  Were you also getting -- I think

7    you mentioned this -- direct messages to your phone?

8    A.   Yes, I was.

9    Q.   Now, is this a direct message to your phone on August

10   24, 2021, about 10 days after -- 12 days after the Cyber

11   Symposium?

12   A.   Yes, it is.

13        MR. CAIN:  Offer 237.

14        MR. KACHOUROFF:  Judge, I do have a conditional

15   relevance objection on this, as well.

16        THE COURT:  Overruled.  So admitted.

17        (Exhibit No. 237 is admitted.)

18   Q.   (BY MR. CAIN)  And in terms of this reference to the

19   "U.S. general posted your number on telegram lol," do you

20   see that?

21   A.   I do see that.

22   Q.   You were getting these type of direct messages after

23   the Cyber Symposium.

24   A.   I was.

25   Q.   That kind of brings me to a block about sort of why

1    we are here.  We know that you brought suit against Mike

2    Lindell and his companies, My Pillow and Frankspeech.  But

3    ultimately, just in your own words, why are you here in

4    court before this jury?

5    A.    Ultimately it's trying to regain some semblance of my

6    life.  I didn't just lose my livelihood, I lost my life as

7    a direct result of statements from Mr. Lindell accusing me

8    of being a traitor.  His comments I think directly led to

9    threats like you see on the screen, threats to my life

10   that continue to this day, Saturday, that I should be

11   "hanged."

12          This is the only avenue that I have to regain and

13   help hold accountable people that have defamed me and

14   caused me to live in fear on an almost daily basis.  Our

15   system of justice, this is one of the only avenues

16   provided.  And what it comes down to at the end of the day

17   is money.  It's one of the only recourses I have is to

18   hold Mr. Lindell financially liable for the suffering that

19   I have gone through and continue to go through and will

20   continue to go through after today.

21          And to set the record straight, there is a large

22   portion that went into the decision, it was a very hard

23   decision to make, to sue these individuals.  And you've

24   heard that I have got multiple cases.  There is a large

25   portion of that that is beyond the scope of just me

1    personally, it is about helping to protect the democratic

2    process.

3            These lies have continued.  They have gone largely

4    unchecked.  And, you know, when we present all of our

5    evidence and prove that these statements have no basis in

6    fact, maybe it will start a larger discussion and help

7    restore some confidence in the voting systems that we have

8    in the U.S.  That is a significant portion, as well.

9    Q.   Are you concerned that Mr. Lindell isn't going to

10   stop?

11   A.   I wouldn't expect him to.

12   Q.   Are you aware that Mr. Lindell has posted 23 hours

13   ago, 7 hours ago, 6 hours ago, 5 hours ago about this very

14   case and you?

15   A.   I am -- I know for a fact he has over the last 24

16   hours.  I haven't looked at my phone since I started

17   testifying today.

18   Q.   But you saw him outside with cameras on the first

19   day.

20   A.   Yes.

21   Q.   Do you want him to stop?

22   A.   I would like nothing more than for him to stop.

23   Q.   Tell me about the impact on your family and your

24   friends.

25   A.   It has been extensive.  My parents have received, you

1    know, threatening letters.  My brothers have received

2    threats.  Yeah.  You know, my friends -- none of my

3    friends as far as I am aware, received threats from

4    knowing me, but, you know, it has made our friendships

5    difficult.

6            You know, and again, these effects have continued.

7    Some days are worse than others.  I guarantee that

8    unfortunately, just participating in this trial and having

9    this trial, I know that I am going to get increased

10   threats.  I know this.  But I have to do this.  I have to.

11           MR. CAIN:  Thank you.  Pass the witness.

12           THE COURT:  Mr. Kachouroff.

13           MR. KACHOUROFF:  Your Honor, I need to have a quick

14   discussion with the Court on the exhibits.

15           THE COURT:  All right.  Let's take a break.

16           Madam deputy, if you can escort the jury to the

17   jury room so we can discuss these exhibits.

18           COURTROOM DEPUTY:  Yes, Your Honor.

19           (Outside the presence of the jury.)

20           THE COURT:  All right.  Before you proceed, let me

21   get a sense, I know there has been a motion to protect the

22   confidentiality of certain trial exhibits.  I don't know,

23   does this discussion implicate any of those, or any other

24   exhibits that I need to be sensitive about?

25           I am just trying to be conscious about if I need to

1    clear the courtroom for this discussion, or we can have it

2    at side bar.  What is the situation?

3        MR. KACHOUROFF:  Exhibit 9, I just need to get

4    clarification on what is in, what is out.

5        THE COURT:  So the two of you can do that.

6        MR. KLOEWER:  Your Honor has already addressed that

7    with respect to the motion to preserve confidentiality of

8    certain exhibits.  I believe that is a separate

9    conversation from what I raised previously about the other

10   matters regarding potential failure to disclose.  So we

11   can set that aside.  We just want to make sure the

12   confidentiality of those is protected.

13       MR. KACHOUROFF:  Your Honor, I am not able to look

14   for cases on my phone in this courtroom because of the

15   cell service, it is not there.  But Rule 26(a) does say

16   "unless for impeachment."

17       THE COURT:  "Unless used only for impeachment

18   purposes."  However, Rule 26 is also governed by any

19   production requirement by the defendant.  So to the extent

20   that the documents would have been subject to requests for

21   production, they should have been produced.  So if they

22   haven't been produced and they were asked for pursuant to

23   discovery requests, even if you were only going to use

24   them for impeachment purposes, 26(a)(1) only governs

25   self-production.

1        MR. KACHOUROFF:  Okay.  I will need to look at the

2    discovery requests and see if they requested these.  I

3    don't believe they did.

4        MR. KLOEWER:  Your Honor, I believe we would have

5    requested all information that is involving an

6    investigation of Dr. Coomer.  As previously indicated, it

7    is possible these documents are subject to a protective

8    order in a related proceeding.  And there has been a

9    change in counsel here, I don't know if that may have

10   implicated the decision or not.  It hasn't been raised to

11   us in that context.

12        But we requested any information they have about

13   Dr. Coomer, any investigation they conducted with respect

14   to him.  So I can check our discovery requests and confirm

15   when those were issued on the date, and the manner in

16   which those documents were requested.  But certainly

17   throughout this process we have endeavored to understand

18   what information they have about Dr. Coomer, where they

19   collected it, and what the basis for their opinions is.

20   So my assumption is those must be encompassed.

21        MR. KACHOUROFF:  With 25 other defendants, I am

22   quite confident they have far more information than we do.

23        THE COURT:  Well, that is not helpful in this

24   scenario.  What would be helpful for the Court is to

25   understand whether or not these documents are somehow

1    subject to any sort of production.  So I understand that

2    under Rule 26(a)(1), if you are going to use a document

3    solely for impeachment purposes, you do not have to

4    produce that affirmatively.

5         But that is a different question as to whether or

6    not the documents should have been produced in response to

7    discovery requests in this case --

8         MR. KACHOUROFF:  Understood, Your Honor.

9         THE COURT:  -- which then would invoke Rule 37 if

10   they haven't been produced.

11        So I think that -- can you avoid using those for

12   this evening, for this portion, and then allow me to at

13   least do an in-camera review of them?

14        MR. KACHOUROFF:  Pardon me one moment, Your Honor.

15        We still have other exhibits to go through.  There

16   are different redaction things going back and forth.  I

17   think we are close, but we need some more time.  I don't

18   want to be giving cross haphazardly.

19        THE COURT:  I am sorry, I thought all of the

20   redactions had been resolved.  Have they not been?

21        MR. KACHOUROFF:  No, Your Honor.

22        MR. KLOEWER:  I believe the redactions have been

23   resolved, Your Honor.

24        MR. KACHOUROFF:  I haven't gotten copies of the

25   redacted document.  If I put a document up, I don't want

1    to get dinged for putting up a document that is not the

2    same as what they understood the redaction to be.

3         THE COURT:  Let's take a brief recess.  Again, I am

4    not typically involved in these exhibit issues.  Let's see

5    if you all can work it out.

6         And then, Mr. Kachouroff, I would like to

7    understand what the universe of the documents are that you

8    want to use for impeachment purposes on cross that have

9    not been produced in this case.  So it would be helpful

10   for me to know if I am talking about three documents, 30

11   documents, 50 documents, in terms of an analysis of

12   whether or not they are subject to some sort of objection

13   based on discovery.

14        And, again, I understand that under Rule 26(a)(1),

15   if you are only using them for impeachment purposes, you

16   may use them for impeachment.  There may be other

17   preclusions to you admitting them, but it would be helpful

18   for me to understand, not in theoretical terms, what we

19   are talking about.

20        MR. KACHOUROFF:  Understood, Your Honor.

21        THE COURT:  All right.  We will take a break.

22        (A break is taken from 3:52 p.m. to 4:10 p.m.)

23        THE COURT:  All right.  Counsel, what is the status

24   of the issues?

25        MR. KACHOUROFF:  I think the easiest one is Exhibit

1    262.  That is an exhibit that the plaintiff offered and

2    was admitted for evidence which contains what they contend

3    are problematic Dominion documents.  So they already

4    entered an exhibit with the document, so I will use that,

5    the exact document that that clip was referring to, in

6    262.  I don't think Dr. Coomer would deny that.  If that

7    happened, I would bring the full document in for him.

8         The other issue, we checked the discovery requests,

9    and nothing they requested from us in discovery addresses

10   the evidence I intend to bring forward.  For example, the

11   interrogatories ask "who provided?"  Well, I am providing

12   those, this is the stuff I found.

13        They ask for documents in our possession that

14   establish claims of voter fraud.  This has nothing to do

15   with voter fraud.  Zero.  It is just impeachment, Your

16   Honor.

17        THE COURT:  Okay.  Mr. Kloewer.

18        MR. KLOEWER:  Well, Your Honor, this is a layered

19   problem of various questions here.  With respect to the

20   written discovery requests that we previously issued, on

21   August 19th of 2022, we asked the defendants to "identify

22   all individuals who ever provided you any information

23   related to Dr. Coomer and state the nature of the

24   information, the date of the receipt, and the means by

25   which it was provided to you."

1            I think anything would fall within the scope of

2      that request.  Again, without having seen the documents, I

3      don't know if there would have been responses that should

4      have been produced.  We also on our request for production

5      requested "all documents and communication relating to any

6      investigation you made regarding the allegations about

7      Dr. Coomer made by Oltmann."  We also requested "all

8      documents and communications specifically linking

9      Dr. Coomer to specific actual interference, manipulation,

10     or alteration of the 2020 presidential election results."

11     And we requested "all communications describing any theory

12     by which Dr. Coomer could have personally interfered with,

13     manipulated, or altered the 2020 presidential election

14     results."

15            So our general, sort of 30,000-foot understanding

16     of what these documents may be from what has been posted

17     suggest that they would fall under the umbrella of at

18     least some of those requests.

19            The further problem we have, again, just goes back

20     to the -- we have issues on authentication.  Not having

21     seen it, we don't know if they are accurate or not.

22            THE COURT:  I would assume they are not being

23     admitted in evidence.  I mean, they are impeachment

24     documents.

25            MR. KLOEWER:  Well, that's correct.  And that leads

1    into the larger issue of these documents, we believe -- we

2    know that Dominion produced a lot of documents in their

3    case against Mike Lindell and various other defendants.

4    One of the counsel in that case released those documents.

5    She was disqualified from the case and is subject to

6    ongoing proceedings as a result of that.

7         We know that the motion that supports a protective

8    order in that case happened in July of 2024.  I don't know

9    the date Dominion produced the documents, when they would

10   have been in the defendants' possession as a result of

11   that production, but it had to have been sometime prior to

12   July of 2024, from what we can gather from the pleadings

13   that are in our possession.

14        So that information, to the extent that they had

15   it, would have been -- they would have been under a duty

16   to disclose under Rule 26(e), supplement their production

17   if they thought it was relevant to this case in any way,

18   and specifically with respect to those written discovery

19   requests, we have already identified.

20        So we don't know -- we just don't know what we are

21   dealing with, and we have concerns about the nature of the

22   information that is out there.  These -- and I don't know

23   where Mr. Kachouroff may have found them.  Once it tends

24   to get in the wild, it often can be the subject of further

25   manipulation or misuse or whatever, I don't know.

1    But that is our concern.  We just don't know what

2    we are dealing with.  And what we do know about the

3    potential subject matter gives cause for concern.

4    THE COURT:  So, Mr. Kachouroff, are you planning to

5    seek to admit these in evidence?

6    MR. KACHOUROFF:  What I propose is this, Judge.

7    When I use such documents, I will let the clerk know so

8    that the witness, the attorneys, and the Court can look at

9    it in-camera only, and so that you can make a

10   determination right then and there that I have laid the

11   foundation properly, et cetera, and whether it can then be

12   published to the jury.

13   THE COURT:  How would it ever get to the jury under

14   608(b)?  I mean, you are impeaching for truthfulness or

15   not truthfulness.

16   MR. KACHOUROFF:  Right.  I have to ask the witness

17   questions about it.

18   THE COURT:  So it would be extrinsic evidence;

19   correct?  It is not his own testimony, it is extrinsic

20   evidence.

21   MR. KACHOUROFF:  Yes, it will be his own words.

22   THE COURT:  No, the document.

23   MR. KACHOUROFF:  The document, yes.

24   THE COURT:  It is extrinsic evidence.  So how do

25   you get around 608(b)?

1           MR. DUANE:  May I be heard on this?

2           THE COURT:  No.  It is one attorney.

3           MR. DUANE:  May I confer with counsel?

4           THE COURT:  You may confer.

5           MR. DUANE:  I appreciate that.

6           MR. KACHOUROFF:  Judge, it would be under 613(b).

7     It is coming in under a prior inconsistent statement, I am

8     going to impeach him.  Under 608(b).  It is character --

9     not character, prior inconsistent statement, sorry.

10          THE COURT:  All right.  Well, I mean, I think it is

11    incredibly inefficient to go document by document.  I am

12    really not certain why I can't see these in-camera, at

13    least overnight.  Is there any way, given the fact we have

14    45 more minutes of testimony, that we can avoid this,

15    because it will slow down the procedure, and for me to

16    take a look at these overnight?

17          MR. KACHOUROFF:  Yes, Your Honor.

18          THE COURT:  All right.  So let's do that.  I will

19    look at them in-camera.  I would also like a submission of

20    what the discovery requests have been to date, and then I

21    can make a determination with respect to 237.

22          I will tell you that if these documents have been

23    inappropriately leaked from another case, I am disinclined

24    to continue to use them in a public forum.

25          MR. KACHOUROFF:  Your Honor, I didn't make it

1    clear, I am not using these -- there are two things going

2    on at the same time.  Those are not impeachment documents.

3              THE COURT:  Okay.

4              MR. KACHOUROFF:  They have already admitted into

5    evidence, Exhibit 262, which refers to what they call the

6    "leaked" documents that are now currently pending on the

7    web and in the public domain.

8              THE COURT:  All right.

9              MR. KACHOUROFF:  So I am going to use Exhibit 262,

10   which they have already admitted.

11             THE COURT:  Okay.  All right.  So are we ready for

12   the jury?

13             MR. KACHOUROFF:  Yes, ma'am.

14             THE COURT:  You can submit the documents in-camera.

15   You all can submit the discovery requests, and then I can

16   take a look at them overnight.

17             MR. KACHOUROFF:  Your Honor, can we make that for

18   "attorney eyes only" for the in-camera designation?

19             THE COURT:  Yes.

20             MR. KACHOUROFF:  Thank you.

21             (In the presence of the jury.)

22             THE COURT:  Thank you.  Please be seated.

23             All right.  Dr. Coomer, I remind you that you are

24   still under oath.

25             Mr. Kachouroff.

1           MR. KACHOUROFF:  Your Honor, I just need one

2     minute.

3           THE COURT:  All right.

4                        **CROSS-EXAMINATION**

5     **BY MR. KACHOUROFF:**

6     Q.   Good evening, Dr. Coomer.  My name is Chris

7     Kachouroff, and I represent Mr. Lindell, My Pillow, and

8     Frankspeech.

9     A.   Good afternoon.

10    Q.   Do you prefer I call you Dr. Coomer, Mr. Coomer,

11    Eric?

12    A.   I have no preference.

13    Q.   Okay.  I will try to say doctor, but if I mess up, it

14    is not intentional.

15    A.   I won't take it personally.

16    Q.   You admit you were given to hyperbolic rants; no?

17    A.   Yes.

18    Q.   And when we say "hyperbolic rants," political speech

19    can downright be a series of F bombs; correct?

20    A.   That's correct.

21    Q.   I am going to read one from 2016.

22          MR. CAIN:  Is he reading from a document not in

23    evidence?

24          THE COURT:  Mr. Kachouroff, there is an objection.

25          MR. KACHOUROFF:  I am going to hand the witness --

1          THE COURT:  Is it an admitted exhibit?

2          MR. KACHOUROFF:  No.  I am going to hand the

3    witness an exhibit to authenticate it.

4          THE COURT:  All right.  Is there an exhibit number?

5          MR. KACHOUROFF:  It should be Exhibit 9A.

6          THE COURT:  Counsel, can we approach, please.

7          (A bench conference is had.)

8          MR. CAIN:  They have been handing me redactions, so

9    Mr. Kloewer is going to figure this out.  This is a mess.

10          MR. KLOEWER:  We removed the document that Your

11    Honor had instructed us to.  The redaction is still

12    somewhat transparent.  I don't know if it is going to be

13    published to the jury in that state.  I just want to be

14    sure --

15          MS. DEMASTER:  Everything was withdrawn from it

16    this morning.  As far as the redaction, all I had on me

17    was a black Sharpie, and I did it with knowledge of

18    counsel.

19          MR. CAIN:  I can still read it right there.

20          MS. DEMASTER:  That is the best I could get.  I

21    tried.

22          THE COURT:  Well, I mean it is still legible.

23          MS. DEMASTER:  I tried to do it, Your Honor.

24          THE COURT:  We are going to figure out -- if you

25    can avoid page 52, we will figure out what to do about the

1    exhibit.

2            MR. CAIN:  Do we have another copy?

3            MS. DEMASTER:  I need to make a copy.  I did go

4    over with counsel, and I took those out of everything, but

5    I had not yet made a copy.  If I can do that.

6            THE COURT:  All right.  We need a copy of the

7    exhibit as it is.  So let's take a quick break, I will

8    have my courtroom deputy make a copy, and then we will

9    resume.

10           (In the hearing of the jury.)

11           THE COURT:  All right.  Ladies and gentlemen of the

12   jury, we need to take a quick break to take care of

13   something logistically.  Madam deputy.

14           (A break is taken from 4:22 p.m. to 4:43 p.m.)

15           (Outside the presence of the jury.)

16           THE COURT:  Thank you.  Please be seated.

17           All right.  Counsel, we released the jury due to

18   the time.

19           Have you all resolved the issue with respect to

20   Exhibit 9A?

21           MR. KLOEWER:  I believe so, Your Honor.  I spoke

22   with your clerk, who indicated the image was being

23   redacted that was consistent with the order.

24           THE COURT:  So there is an Exhibit 9, but it has

25   not been replaced by Exhibit 9A, or is there an Exhibit 9

1     and 9A?

2           MR. KLOEWER:  Currently a 9, as well.  But you tell

3     me if I am wrong.

4           MS. DEMASTER:  The way I believe it was done, Your

5     Honor, when we conferred last week, opposing counsel asked

6     whether we could have exhibit -- the original Exhibit 9

7     comply with the Court's order.  We believe we did that

8     with Exhibit 9A.  We found out last night there were some

9     concerns from opposing counsel, that is what we addressed

10    with the Court this morning.

11          So when opposing counsel -- when the parties

12    provided the Court a flash drive, we maintained the normal

13    Exhibit 9 and Exhibit 9A in case there were any other

14    rulings on that.  So the next version will be what the

15    clerk is doing right now -- what the Court's clerk is

16    doing right now, is to make sure the version we approve

17    was -- I believe it was three or four pages that are

18    excluded from Exhibit 9A with redactions.

19          THE COURT:  It will remain as Exhibit 9A?

20          MS. DEMASTER:  Yes.

21          THE COURT:  All right.  So I will make that

22    adjustment on my exhibit list.  And then do we have

23    copies, or are you providing us electronic copies of the

24    documents that defendants intend to use with Dr. Coomer

25    that may not have been produced?

1           And, Mr. Kloewer, you are going to provide us

2     copies of the requests for production and interrogatories?

3           MR. KLOEWER:  That's correct, Your Honor.  And if

4     it would be helpful, we can provide context for the

5     concern surrounding the Dominion litigation, but I don't

6     know if that is too much.

7           THE COURT:  Whatever you want me to consider by

8     tomorrow morning you should provide to me.

9           MR. KLOEWER:  Will do.

10          THE COURT:  All right.  Then let me ask the

11    defendants, are you planning to file a written opposition

12    to plaintiff's motion to protect confidentiality, Docket

13    Entry No. 350?

14          MR. KACHOUROFF:  I haven't looked at it, Your

15    Honor.  I don't have seven attorneys on my side, I would

16    need a little bit of time to look at that document.

17          THE COURT:  Okay.  So can you look at it and then

18    let me know by tomorrow morning whether or not you think

19    that you need a written response.

20          MR. KACHOUROFF:  I will.

21          THE COURT:  It appears to me that there are only

22    two documents at issue, Exhibit 30, and Exhibits 74 and 75

23    are the same; is that correct?

24          MS. MORGAN:  That's correct, Your Honor.  I will

25    take the motion to preserve confidentiality, and this

1    motion was sent, and we have conferred about it.  So that

2    is what we believe to be the remaining issue.

3         MR. KACHOUROFF:  I would have an objection on

4    Exhibit 30, the resignation email.

5         THE COURT:  Right.  I know you have an objection to

6    30 and 74 and 75, that is what is reflected in the motion.

7    So I just need to know whether or not you want to make an

8    oral opposition to it, or do you feel like you need a

9    written opposition so that I can make a ruling in time for

10   you all in terms of using these exhibits in the context of

11   examination.

12        You look like you want to say something.

13        MR. DUANE:  I wanted a moment to confer with

14   Mr. Kachouroff before we recess.

15        THE COURT:  Okay.  You will have that opportunity.

16        MR. DUANE:  Thank you for inquiring, Your Honor.

17        THE COURT:  So then these are the things on my list

18   to cover with you all.  And then, of course, I will ask

19   you if there is anything else we need to address.

20        There was some concern with respect to whatever

21   might be being contemporaneously published or reported.

22   To the extent that you all need me to consider that issue,

23   I actually need to understand what is going on.  Not

24   surprisingly, I have not left the courthouse since 7:30

25   a.m., so I don't know what is going on, and am not

1    obviously on the internet looking for it.  So to the

2    extent you need me to address that, I need to see

3    something about that.

4         Mr. Kachouroff, I think you mentioned during one of

5    the side bars that you thought that Brannon Howse was

6    appearing live later this week; is that right?

7         MR. KACHOUROFF:  Your Honor, it will likely be

8    Monday.  I need to talk with my colleagues about the

9    schedule.

10        THE COURT:  But he is going to be live.

11        MR. KACHOUROFF:  That is the goal, yes.

12        THE COURT:  Because I am not going to rule or issue

13   rulings with respect to his deposition designations until

14   I hear that he is not going to be live.

15        MR. KACHOUROFF:  Okay.  Your Honor.

16        THE COURT:  All right.

17        MR. KACHOUROFF:  I will know in short order.

18        THE COURT:  That would be great, and if you can let

19   us know.

20        The last thing that I have on my list is that based

21   on the lineup that I just saw with respect to witnesses

22   tomorrow and the order, whomever is in touch with

23   Mr. Oltmann, I think it would just be professional

24   courtesy to let him know that we don't think we are going

25   to get to him until the afternoon.

1          And so I just wanted to be considerate of his time

2     and not have him appear at 9:00 a.m., to sit around all

3     day before his testimony is required, okay.

4          MR. KACHOUROFF:  I will be glad to call him.

5          THE COURT:  All right.  Thank you.

6          Am I correct, unless Mr. Oltmann appears with his

7     attorney, whom I believe withdrew from this case, that he

8     is not represented by defense counsel?

9          MR. KACHOUROFF:  He indicated that -- I don't want

10    to obligate this attorney because I haven't talked to her

11    about coming here, but he indicated he was going to get

12    Andrea Hall.

13         THE COURT:  Okay.  So I am not sure Ms. Hall has

14    entered an appearance in this case.  So if she is

15    intending to appear on his behalf during his testimony,

16    she needs to enter an appearance.

17         MR. KACHOUROFF:  Understood, Judge.

18         THE COURT:  Okay.  So she appears as an objector on

19    our docket right now, if she is the same Andrea Marie Hall

20    of Eaton, Colorado.  So we need to know whether or not she

21    is representing Mr. Oltmann, because right now Mr. Oltmann

22    was represented by Ingrid DeFranco, and Ms. Hall appears

23    as an objector, but not counsel to Mr. Oltmann.

24         MR. KACHOUROFF:  I could be wrong.  I have talked

25    to a lot of attorneys.

1            THE COURT:  All right.  Anything else, counsel?

2            Mr. Duane, you wanted to confer with co-counsel?

3            MR. DUANE:  Thank you, for 30 seconds.

4            MR. CAIN:  On 9, the redacted exhibit, is it B or A

5     now?

6            MS. DEMASTER:  Only A.

7            MR. CAIN:  I didn't want to waste the jury's time

8     tomorrow, so very quickly I wanted to make a couple of

9     objections to the exhibit for the record so that you can

10    consider those, is that appropriate?

11           THE COURT:  All right.

12           MR. CAIN:  So we are going to object to the exhibit

13    under Federal Rule of Evidence 401.  In our view, the

14    relevance turns on what the purpose of the proffer is at

15    this juncture.  Defendants didn't review these posts prior

16    to making statements about Dr. Coomer, and thus it did not

17    inform their state of mind at the time that they made the

18    publications about Dr. Coomer.

19           So to the extent that the purpose is related to

20    actual malice, we don't think it gets there.  Actual

21    malice with respect to the publication of third-party

22    statements, their publications of Mr. Oltmann's statements

23    from Mr. Clements, turns on whether or not they

24    investigated or corroborated these statements and postings

25    about Dr. Coomer.  We don't believe that they did.  So if

1    they didn't know about them, it doesn't at least affect

2    that element of the claim.

3         As it relates to Rule 403, I know you have

4    considered the balance.  Dr. Coomer obviously testified

5    about the substance of the exhibits.  He has admitted to

6    posting anti-Trump and vulgar posts.  So at this point,

7    given our relevance concerns, we would suggest that the

8    balance shifts on the probative value of these documents

9    versus the risk of undue prejudice, and would be

10   unnecessarily cumulative.

11        THE COURT:  All right.  Mr. Kachouroff.

12        MR. KACHOUROFF:  Your Honor, the jury hasn't even

13   seen the posts yet, and I don't blame counsel for trying

14   to keep them out.

15        THE COURT:  I have to make that determination

16   before we can show them to the jury; right, I have to do

17   the 403 analysis in order to determine admissibility?

18        MR. KACHOUROFF:  First of all, they opened the door

19   wide open.  They have entered in evidence all of the way

20   back from November 9th and said -- and blamed everyone

21   else for his destruction of his reputation, his

22   professional reputation.  In fact, he put it in issue when

23   he said it had nothing to do with what I said in my

24   opening statement, which was his Facebook posts.

25        The jury is entitled to weigh that evidence and

1    make a determination for themselves factually whether his

2    Facebook posts substantially contributed to the

3    "obliteration," as he put it, of his professional

4    reputation.  That is the theory of our case, and it should

5    be admissible under -- it is highly relevant.  And, yes,

6    it is prejudicial, but it is not unfairly prejudicial, it

7    comes from him.

8           THE COURT:  All right.  Thank you.

9           Counsel, anything else you want me to consider

10   overnight?

11          MR. KACHOUROFF:  No, Your Honor.

12          MS. DEMASTER:  A point of clarification, Your

13   Honor.  Did you say that you want to know tonight in

14   writing whether or not the defendants will want to respond

15   orally or in writing to the plaintiff's --

16          THE COURT:  By tomorrow morning.  I need to make a

17   ruling so that we can determine how to treat these

18   documents.  It seems like based on what they are, your

19   co-counsel may want to use them tomorrow.  So I need to

20   make a determination sooner rather than later.

21          MS. DEMASTER:  Yes, Your Honor.

22          THE COURT:  Okay.  Mr. Cain, anything else for

23   plaintiff?

24          MR. CAIN:  I think we have worn out our welcome.

25          THE COURT:  All right.  I won't comment on that.

1          We will see you all tomorrow morning at 8:30

2     outside the province of the jury to take up these issues.

3     Have a good evening.  We will be in recess.

4          (Proceedings conclude at 4:55 p.m.)

5

6

7              **R E P O R T E R ' S   C E R T I F I C A T E**

8

9          I, Darlene M. Martinez, Official Certified

10    Shorthand Reporter for the United States District Court,

11    District of Colorado, do hereby certify that the foregoing

12    is a true and accurate transcript of the proceedings had

13    as taken stenographically by me at the time and place

14    aforementioned.

15

16         Dated this 3rd day of August, 2025.

17

18    _____

19    s/Darlene M. Martinez

20    RMR, CRR

21

22

23

24

25