**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01129-NYW-SBP

**ERIC COOMER,**

**Plaintiff,**

**v.**

**MICHAEL J. LINDELL;
FRANKSPEECH, LLC; and
MY PILLOW, INC.,**

**Defendants.**

_____

**REPORTER'S TRANSCRIPT
(JURY TRIAL - DAY 3)**

_____

        Proceedings before the HONORABLE NINA Y. WANG,
Judge, United States District Court, for the District of
Colorado, commencing at 8:47 a.m. on the 4th day of June,
2025, Alfred A. Arraj United States Courthouse, Denver,
Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
DAVID MATTHEW BELLER, Recht & Kornfeld, P.C., 1600 Stout
Street, Suite 1400, Denver, CO 80202
CHARLES JOSEPH CAIN, BRADLEY ADAM KLOEWER, Cain &
Skarnulis PLLC, P. O. Box 1064, Salida, CO 81201
ASHLEY N. MORGAN, Cain & Skarnulis PLLC, 303 Colorado
Street, Suite 2850, Austin, TX 78701

**FOR THE DEFENDANTS:**
JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite
610, Grafton, WI 53024
JAMES JOSEPH DUANE, Regent University School of Law, 1000
Regent University Drive, Robertson Hall Room 353B,
Virginia Beach, VA 23464
CHRISTOPHER I. KACHOUROFF, Dominion Law Center PC, 13649
Office Place, Suite 101, Woodbridge, VA 2219

## I N D E X

**WITNESSES:**                                                        **PAGE**

### DR. ERIC COOMER
CROSS-EXAMINATION (Cont'd) BY MR. KACHOUROFF              247
REDIRECT EXAMINATION BY MR. CAIN                         335

### MATT CRANE
DIRECT EXAMINATION BY MS. MORGAN                         367
CROSS-EXAMINATION BY MR. DUANE                           407
REDIRECT EXAMINATION BY MS. MORGAN                       460
SUSAN KLOPMAN - Video Deposition                         482

## E X H I B I T S

**NO.**                                                              **ADMITTED**

    9A    ..........................................    315
    30    ..........................................    277
    37    ..........................................    284
   263    ..........................................    326
   264    ..........................................    327

1                        **JUNE 4, 2025**

2              (Proceedings commence at 8:47 a.m.)

3              (Outside the presence of the jury.)

4              THE COURT:  Thank you.  Please be seated.

5              Good morning.  On the record in 22-cv-1129-NYW-SBP,

6        Coomer versus Lindell, et al.

7              Could I have appearances of counsel, and introduce

8        anyone who is at the table with you.

9              MR. CAIN:  Good morning, Your Honor, on behalf of

10       the plaintiff, my name is Charlie Cain.  We have Brad

11       Kloewer, Dr. Coomer, David Beller, and Ashley Morgan.

12             MR. KACHOUROFF:  Good morning, Your Honor,

13       Christopher Kachouroff for My Pillow, Frankspeech, and

14       Mike Lindell.  With me today is Mr. Lindell, our client;

15       James Duane; and Jennifer DeMaster.

16             THE COURT:  Good morning.

17             All right.  So we have one outstanding issue from

18       last night with respect to these documents that were

19       provided to the Court for in-camera review.

20             We recently also received a copy of defendant

21       Michael J. Lindell's Answers to the Plaintiff's first set

22       of Interrogatories, and I think also a copy of defendant

23       Frankspeech's Answer to Plaintiff's First Set of

24       Interrogatories.

25             I will allow a little bit of argument on this

1    issue, but it seems to the Court, upon review, that

2    Interrogatory No. 2 requested the defendant to "Identify

3    all individuals who have ever provided any information

4    related to Dr. Coomer, and state the nature of the

5    information, the date of the receipt, and the means by

6    which it was provided to you."

7         The duty to supplement under Rule 26(e) continues

8    up to and through trial.  So I want to hear from you all

9    with respect to why the documents that were provided to

10   the Court for review last night would not be captured by

11   at least Interrogatory No. 2, and if there is any reason

12   that the supplementation didn't happen.  And if you can

13   also address the *Woodworker*'s factors, I would appreciate

14   that.

15        Mr. Kachouroff.

16        MR. KACHOUROFF:  Your Honor, it will be Mr. Duane

17   arguing this.

18        THE COURT:  All right.  Mr. Duane.

19        MR. DUANE:  Good morning, Your Honor.  You

20   mentioned that you had only recently received a copy of

21   the interrogatories from plaintiff's counsel.  I would

22   like to mention that we also received a copy very

23   recently, but not until 8:31 this morning.

24        THE COURT:  You have a copy of your own discovery

25   responses, Mr. Duane.

1           MR. DUANE:  Yes, of course.  But, Your Honor, the

2     directed point is counsel last night could have furnished

3     the Court with any discovery requests that may be

4     pertinent to this motion.  So we were surprised that we

5     didn't get anything from them until 8:31 this morning.

6           THE COURT:  But your side has access to your own

7     discovery responses.

8           MR. DUANE:  Absolutely, yes.

9           THE COURT:  And you agree that Rule 26 has a

10    self-effectuating continuing obligation to supplement,

11    regardless of whether or not the Court gets involved.

12          MR. DUANE:  Of course, that's correct.  But only

13    with respect to materials within our possession that are

14    within the ambit of a discovery request.  The

15    interrogatory you have, that they have alluded to a moment

16    ago, asks for the defense to furnish to the plaintiff

17    information about any individuals and the identity and the

18    description of any individuals who supplied any

19    information to us.

20          THE COURT:  And state the nature of the

21    information.

22          MR. DUANE:  And state the nature of the information

23    that was supplied to us by those individuals.  That

24    description has literally nothing to do with the two

25    exhibits that were furnished to the Court in-camera last

1    night, neither of which were supplied to us by anyone.

2    These were materials that Mr. Kachouroff found.

3         THE COURT:  So you are suggesting that because

4    counsel found it, you would be under no obligation under

5    the Federal Rules of Civil Procedures to identify and

6    respond to Interrogatory No. 2 so long as counsel found

7    it?  So they could find anything and that would fall under

8    the ambit of your argument?

9         MR. DUANE:  Absolutely, Your Honor.  If this

10   interrogatory were effectively interpreted, it would

11   require us to hand over everything in our possession,

12   regardless of how it came into our possession, and then

13   there would be no need to serve any other interrogatories

14   at all.  That would essentially be construing a single

15   interrogatory as a request that we hand over everything we

16   have acquired in preparation.

17        THE COURT:  No, it wouldn't.  I mean, you would

18   still have a privilege; correct, a work-product privilege?

19        MR. DUANE:  Yes, that is true.

20        THE COURT:  And isn't the crux of this issue that

21   you are planning to use it in open court to impeach the

22   individual?

23        MR. DUANE:  Yes, that's correct.

24        THE COURT:  All right.  So would you agree that in

25   response to Interrogatory No. 2, you all didn't identify

 1    document by document, instead you said, "Subject to these

 2    objections, and as set forth in documents produced herein,

 3    Lindell received information relating to Dr. Coomer from

 4    individuals, including Joseph Oltmann, Robert Herring,

 5    Mark Cook, Alyssa Lemke, Jerry Raski, Paul Catherine, Mary

 6    Fanning, and Patty McMurray."

 7         MR. DUANE:  Yes, and the language you just quoted,

 8    Your Honor, I think is confirmation of the extent to which

 9    we have in good faith complied with their request by

10    detailing exactly what information we've received from

11    other individuals, what it was, and when we received it.

12         Again, the only two documents that are under

13    discussion at the moment are the two that we supplied last

14    night to the Court for its in-camera reviews, are

15    materials that we did not receive from any of those

16    individuals or any other individual with whom we would be

17    in a position to name, because they were quite literally

18    and unequivocally not given to us by anyone else.

19         They were information Mr. Kachouroff, a member of

20    the defense team, found through his own in-camera

21    investigation, only within the last few days.

22         THE COURT:  All right.  Let me hear from

23    Ms. Morgan.

24         MS. MORGAN:  Yes, Your Honor, good morning.  I

25    think what we are kind of dancing around is the manner by

 1    which these documents were obtained.  Really, our main

 2    problem, Your Honor, is not with the Tweets that

 3    Mr. Kachouroff says that he just found, it is with the

 4    documents that were obtained from Stefanie Lambert's

 5    criminal case in Michigan, and you heard some preview of

 6    that from Mr. Kloewer yesterday.

 7         But Stefanie Lambert was involved as counsel in the

 8    *Dominion v. Byrne* case that is pending in the U.S.

 9    District Court for the District Court of Columbia.  In

10    that case, Stefanie Lambert was found to have disseminated

11    documents that were protected under the Court's protective

12    order.

13         In that case, the discovery protective order was

14    very broad and included all documents that were being

15    circulated in discovery in that case, regardless of

16    whether or not they were marked "confidential."

17         And the document that they wish to use -- I won't

18    go into it since we marked it as "attorneys eyes only,"

19    but if the Court looks at the side of that document that

20    is attached to Mr. Kachouroff's email, it is stamped

21    saying that that document was submitted in the Oakland

22    County Court in Michigan.  And that is where Stefanie

23    Lambert's criminal case is pending related to her efforts

24    to overturn the 2020 election and get access to sensitive

25    voting machines.

1         In the *Dominion v. Byrne* case, we provided a copy

2    of the memorandum order for that case, and I have

3    highlighted it because I understand the timing on this,

4    but on page 2 of that quite lengthy memorandum order, the

5    Court references that Lambert's actions have resulted in

6    confidential discovery documents being disseminated in the

7    public.

8         On page 6 of that Order, the Court explains what

9    the breadth of the protective order was, as I just said,

10   and the Court goes into the fact that Lambert filed

11   Dominion's litigation documents, which were confidential

12   in that litigation, in publicly available filings in her

13   Michigan criminal case.  That is on page 16 of the Court's

14   memorandum.

15        The Court further notes -- and, again, as I

16   highlighted on pages 33 and 35 of that memorandum order --

17   that Lambert made no effort to remove these documents from

18   those public filings in her criminal case despite being

19   reminded by the Court of her obligations under the

20   protective order.  And that she didn't -- in fact, she

21   didn't notify the Court of who she had disseminated these

22   documents to, although she was supposed to do so.

23        In that case, the Court took, what we all know is

24   an extreme measure, and decided that her actions justified

25   disqualifying her as counsel.  That is a high bar to get

1    that done.  And the Court also enforced Dominion's motion

2    to enforce the protective order, and they granted that

3    part of it.

4         So we don't believe this document should be used in

5    this litigation.  I know there is not a civil "fruit of

6    the poisonous tree," but that is the best metaphor I can

7    think of for this.  They should not be able to benefit

8    from these documents that were surreptitiously circulated

9    in a public forum.  And the only way they could have

10   gotten access to this is by virtue of Lambert's behavior.

11        And I don't think that it's that important, but I

12   do want to note that we already provided those

13   interrogatories yesterday when we were conferring about

14   this issue, and they have had them since 2022.  So I don't

15   think that there is any surprise there.

16        But I want to address the *Woodworker's* factors

17   because the Court specifically asked for us to do that.

18   So in *Woodworker's Supply, Inc., v. Principal Mutual Life*

19   *Insurance*, a Tenth Circuit case from 1999, the Court -- it

20   states, "A district court may not make explicit findings

21   concerning the existence of a substantial justification or

22   the harmlessness of a failure to disclose, but that the

23   court should consider certain factors in exercising its

24   discretion."

25        And we believe those factors weigh in favor of the

1    Court keeping this evidence out and finding that there

2    would be -- it would be hard to allow the documents to be

3    used.  The first factor is the prejudice or surprise to

4    the party against whom the testimony is offered.  There is

5    substantial prejudice and surprise here; we are just

6    getting a copy of this document in the middle of trial.

7         The second factor is the ability of the party to

8    cure the prejudice.  I have not heard anything from the

9    defendants as to how that prejudice would be cured, but we

10   don't think that is possible, especially in this context,

11   where this document was obtained in litigation where it

12   was supposed to be confidential and then circulated

13   somehow to Mr. Lindell and his team.

14        THE COURT:  Ms. Morgan, are you suggesting only the

15   email correspondence was subject to the protective order

16   in Michigan and not the other documents?

17        MS. MORGAN:  Yes, Your Honor, only because it is my

18   understanding -- I just don't have proof to show that it

19   is connected to the Michigan case, Your Honor.  I trust

20   Mr. Kachouroff when he says he found it on Twitter

21   recently.

22        THE COURT:  All right.

23        MR. KACHOUROFF:  Your Honor, may I be heard on the

24   other objection, which was different than what Mr. Duane

25   was addressing?

222

1          THE COURT:  One attorney on the issue.

2          MR. KACHOUROFF:  Okay.

3          MR. DUANE:  Your Honor, returning to the initial

4    objection with respect to the factors that were mentioned

5    a moment ago, the factors that she mentions are of no

6    conceivable significance.  The Court must first determine

7    that there is a failure to comply with the discovery

8    requests.  And opposing counsel has made no response just

9    now to my representation to the Court, the self-evident

10   fact that the information that is under the discussion

11   here today is not even arguably within the ambit of that

12   interrogatory.

13          And it is simply unreasonable to interpret a

14   request of this nature as tantamount to a request that we

15   turn over to them everything we have, everything that

16   comes into our possession that may be relevant in any way

17   to the case.  If that is the way this interrogatory were

18   to be construed, all of the other interrogatories and all

19   of the other discovery requests that they sent us, all the

20   requests for production of documents, would be

21   superfluous.

22          The interrogatory was very carefully and skillfully

23   crafted by opposing counsel specifically asking us to

24   identify those individuals who furnished information to

25   us, ostensibly for the purpose to enable them to follow up

1    with those individuals and perhaps take those depositions.

2        That request has nothing to do with this

3    information that was not given to us by anybody else.  And

4    to the best of our knowledge, Your Honor, was never in the

5    possession of any third parties before it came into our

6    possession, information which we found on the internet,

7    where it was publicly available.

8        And so for those reasons, I do respectfully submit

9    again that there is no reasonable construction of this

10   interrogatory that can bring these particular documents

11   within the scope of its request.  And I haven't heard

12   opposing counsel give any serious argument to the

13   contrary, either today, or much less anything yesterday.

14       THE COURT:  All right.  Thank you, Mr. Duane.

15       MR. DUANE:  And as to the other objection, if you

16   allow me briefly to say, I don't see how opposing counsel

17   has standing to assert or insist upon the exclusion of

18   evidence, even if everything she said were true, I don't

19   conceive it was, we don't see how it is that this Court

20   has the authority, much less the need to exclude

21   documents, that were not issued -- that were not obtained

22   or procured in violation of any order that was issued for

23   the protection or the defense of their client.

24       THE COURT:  All right.  Thank you.

25       Pending before the Court is the use of three

1     documents that were submitted to the Court for review

2     overnight.

3          In terms of the interrogatories and requests for --

4     interrogatories in front of the Court, Interrogatory No. 2

5     indicates, "Identify all individuals who have ever

6     provided any information relating to Dr. Coomer, and state

7     the nature of the information, the date of receipt, and

8     the means by which it was provided to you."

9          The answer was, "Lindell or Frankspeech objects to

10    this interrogatory as overly broad and not limited in time

11    and scope as to the allegations in the plaintiff's Amended

12    Complaint.  Lindell further objects to this interrogatory

13    to the extent it seeks privileged information.

14         Subject to these objections, as set forth in the

15    documents produced herein, Lindell received information

16    relating to Dr. Coomer from individuals, including Joseph

17    Oltmann, Robert Herring, Mark Cook, Alyssa Lemke, Jerry

18    Raski, Paul Catherine, Mary Fanning, and Patty McMurray."

19         Rule 26(e) of the Federal Rules of Civil Procedure

20    indicate that "there is a duty to supplement in a timely

21    fashion up to and including the time of trial."

22    Specifically, Rule 26(e) indicates that "a party who has

23    made a disclosure under Rule 26(a) and who has responded

24    to an interrogatory request for production or request for

25    admission must supplement or correct its disclosure or

1    response in a timely manner if the party learns that in

2    some material respect the disclosure or response is

3    incomplete or incorrect, and if additional or corrective

4    information has not otherwise been made known to the other

5    person/parties during the discovery process or in writing

6    or as ordered by the Court."

7        To the extent that the interrogatory is at issue,

8    this Court finds that the interrogatory captures the

9    documents at issue.  And the fact that the information was

10   obtained by counsel as opposed to Mr. Lindell or

11   Frankspeech, I think is of no merit.  There is no

12   objection to stating that Mr. Lindell is not going to

13   identify the nature of information about Dr. Coomer that

14   his agents or representatives find themselves.  And then

15   the objection as is, is frankly, under the circuit law,

16   boilerplate and not specific.

17       Now I turn to, for the purposes of Rule 26, Rule

18   36(c)(1), which provides that "a party's failure to

19   disclose is substantially justified where the nonmoving

20   party has a reasonable basis in law and fact and where

21   there is a genuine dispute concerning compliance."  That

22   is *Smith v. Aurora Public Schools*, 318 F.3d 429, 432,

23   District of Colorado, 2016.

24       "Failure to comply with this mandate of Rule 26(a)

25   and (e) is harmless where there is no prejudice to the

1    party entitled to the disclosure."  That is *Poitra v.*

2    *School District No. 1*, 311 F.R.D. 659, District of

3    Colorado, 2015.

4         Whether a Rule 26 violation is harmless is within

5    the district court's discretion.  And the *Woodworker's*

6    factors that guide this District Court's exercise of

7    discretion is, "One, the prejudice or surprise to the

8    party against whom the testimony is offered.  The ability

9    of the party to cure the prejudice.  The extent to which

10   introducing such testimony would disrupt the trial.  And

11   the moving party's bad faith or willfulness."  That is

12   *Woodworker's*, 178 F.3d, at 993.

13        With respect to Rule 37, Rule 37(c) provides that

14   once a violation of discovery is found, there are

15   particular sanctions or consequences that the Court can

16   impose.  Rule 37(c) provides that "if a party fails to

17   provide the information or identify a witness as required

18   by Rule 26(a) or (e), the party is not allowed to use that

19   information or witness to supply evidence on a motion at

20   hearing or at trial unless the failure was substantially

21   justified or is harmless."

22        In addition, or instead of the sanction, the Court,

23   on motion, after giving opportunity to be heard, may order

24   payment of reasonable expenses, including attorney fees

25   caused by failure, may inform the jury of the party's

1    failure, and may impose other appropriate sanctions,

2    including any orders listed in Rule 37(b)(2)(A)(i) through

3    (vi).

4        In application of these standards, the Court finds

5    the following:  The Court finds that the email that has

6    been submitted will be precluded; that the surprise to the

7    party and the prejudice and the potential that this

8    document was inappropriately leaked to the public in

9    another forum, whether or not it now exists on the

10   internet, we were unable to actually get to the bottom of

11   this because there was a lack of disclosure that has

12   prejudiced not only the plaintiff's ability to address it,

13   but also the Court's ability to address it in a wholesome

14   and appropriate manner.

15       With respect to the posts that were on Twitter, the

16   Court finds by applying the *Woodworker's* factors that

17   there has not been sufficient prejudice that has been

18   identified.  Those documents may be used as appropriate

19   subject to the other Rules of Evidence.

20       Again, to the extent that the testimony does not

21   allow for the admission of those documents, we will take

22   that up at that time, but I am not going to preclude that

23   under Rule 37(c).

24       Anything further, counsel, on this issues?

25       MR. DUANE:  No, Your Honor.

228

1           THE COURT:  All right.  So any other issues that

2    you all want to address, because I want to address the

3    notice to the Court with respect to the communications

4    that are occurring and the sequestration order.

5           MR. BELLER:  Your Honor, that is the only other

6    issue for the plaintiff.

7           THE COURT:  Mr. Kachouroff, anything else from the

8    defendant?

9           MR. DUANE:  Yes, Your Honor.  One moment.

10           Your Honor, this motion was filed last night at

11    approximately 11 o'clock, and with all due respect, we

12    submit was overwrought.  And it is not without consequence

13    or significance that it was filed in violation of this

14    Court's local rules that obligate counsel to meet and

15    confer with opposing counsel and to certify that they have

16    done so before filing any motion.

17           If they had contacted us at some point before they

18    filed this at 11 o'clock last night, they would have

19    learned that the interview that they described in this

20    report had already been taken down several hours earlier

21    at our request.

22           As an effort to be proactive, Your Honor, we are

23    doing our level best to try to make sure there is full

24    compliance by our client and every other individual under

25    our control with this Court's sequestration order.

 1          Hours before this motion was filed with the Court,

 2     as we would have been glad to tell them if they had

 3     contacted us, we learned from our own independent

 4     investigation about this interview, although we did not

 5     have the words we now have, the transcript of the entire

 6     interview, we were satisfied, and in an excess of caution,

 7     that this had to be brought down to be on the safe side,

 8     and that is exactly what we arranged.  That is the first

 9     thing I want to advise the Court.

10          The second thing I want to confirm to the Court,

11     again, even if only in an excess of caution, we have had

12     numerous discussions with our client, Mr. Lindell, about

13     the urgency and the very importance of ensuring that we

14     don't even come close to potentially violating this

15     Court's sequestration order.

16          When the order was entered by this Court in advance

17     of the trial, he was advised, and as I've explained to him

18     later, he was utterly forbidden from Tweeting or

19     communicating with anyone under any circumstances about

20     the testimony that was being given by witnesses in this

21     case.

22          And he understood, as I confirmed with him, he

23     would be allowed, without violating this Court's order, to

24     make comments about the general nature of the trial or the

25     nature of the case, as long as they did not amount to a

```
 1    disclosure as long as it wasn't going into the testimony

 2    of the witnesses.

 3           With all due respect, Your Honor, I think it is

 4    quite arguably correct that there are portions of this

 5    interview that suggest that he may have done a poor job of

 6    navigating that line.  But we don't believe, quite

 7    clearly, that the best interest of the parties and the

 8    jury would be well served by launching into a full-blown

 9    hearing to determine whether the defendant is or should be

10    held in civil contempt.

11           So, again, to be proactive, and even if only in an

12    excess of caution, I have confirmed in person with

13    Mr. Lindell, as he is also prepared to confirm, in person,

14    if you wish him to, Your Honor, this morning, that from

15    now until the end of the trial, he will not do any further

16    interviews with anyone about any aspect of this case.

17           He has given me that assurance, even though that

18    would go beyond the terms of your original sequestration

19    order, which only forbid him from disclosing the testimony

20    of witnesses.  He will not Tweet or issue any public

21    statements or answer questions from the press or any

22    reporters about any aspect of this trial until after all

23    of the evidence has been submitted.

24           THE COURT:  And does that extend to the other two

25    defendants?
```

1              MR. DUANE:  Yes, it also extends to both of the

2      other defendants; correct.

3              And finally, one more point, I want this Court to

4      understand, as an officer of the court, I want to

5      represent to you that I am personally satisfied, based

6      upon several conversations with Mr. Lindell, that his

7      alleged violation of this Court's order, if there was one,

8      was not intentional, and that he fully believed that

9      everything he was disclosing here in this interview that

10     he gave to this reporter, was in compliance with this

11     Court's order.

12             So there was no intent on his part to engage in a

13     defiant act of contempt with respect to this Court's

14     order.  And with all due respect, there is no reason to

15     doubt that representation that he made to me and that I am

16     now communicating to you.

17             He is well aware that his every move in this case

18     is being very closely monitored by a very highly

19     disciplined and organized team of excellent professionals

20     on other side.  And this was not something done in

21     darkness and secret, it was in public, in front of the

22     courthouse, so there is no reason to doubt.  And he

23     assures you, Your Honor, respectfully, that he had no

24     intention of showing any disrespect to the Court.

25             Finally, to the extent that there is, or was,

1    arguably a violation of the Court's order, we remind the

2    Court and opposing counsel that they are fully able to

3    pursue the time-honored remedy for such alleged violations

4    of interrogating each witness in the trial about the

5    extent, if any, to which they have been exposed to or read

6    about or heard anything that was said or disclosed during

7    the course of these trial proceedings.

8         And I submit that what has to be remembered and

9    understood is that we are dealing with a situation, as

10   this Court is well aware, where the defendant, by

11   plaintiff's own description, has been exuberant in his

12   embrace of his First Amendment rights and highly involved

13   in social media.

14        He has given incessant statements of all sorts on

15   all various public and semi-public platforms for literally

16   years about this case.  So with all due respect, I do

17   again insist that opposing counsels' concerns are

18   overwrought to suggest that what we are dealing with is a

19   serious risk that the testimony of any of the witnesses in

20   this case will be poisoned by having heard what very

21   little he may have said yesterday to the reporter about

22   his attitude toward this case, when every witness

23   connected with this case has been intimately acquainted

24   for years with countless proclamations by this same

25   individual on this subject.

 1          That can be fully explored on the cross-examination

 2     of any witnesses or the direct examination, who may be

 3     called to testify by either side.  I remind the Court,

 4     only one witness is going to be called at this trial by

 5     us, the remainder will be called by the plaintiff for the

 6     plaintiff, many of them testifying --

 7          THE COURT:  That is not accurate, Mr. Duane.  There

 8     are other witnesses on the defendants' witness list.

 9          MR. DUANE:  If I misspoke, I apologize.  If I

10     misspoke, I apologize about that, Your Honor.

11          THE COURT:  And I am concerned not only about the

12     sequestration order, I am also concerned about tainting

13     the jury, because all of them admitted during voir dire

14     that they have social media.  I have not sequestered the

15     jury.  I cannot monitor what comes on their feeds in

16     Instagram or any social media platform that they have.

17          So I do not want to have to issue any sort of

18     additional order, but I am concerned, not only about the

19     tainting of potential witnesses under Rule 615, but I am

20     concerned about preserving a fair and unbiased jury.

21          MR. DUANE:  Of course.

22          THE COURT:  So I don't see this as a motion, it is

23     not filed as a motion, it is a notice.  There is no

24     request for contempt at this time.  The last sentence of

25     the motion indicates that the Court can consider these for

1    contempt.  I don't read this notice as the plaintiff

2    putting the Court -- I read the notice as the plaintiff

3    putting the Court on notice, as I asked them to do

4    yesterday, about what was going on, because I am not out

5    there, and I don't intend to look on the internet about

6    what is going on.

7         So I don't see this as a motion for contempt.  They

8    are certainly not waiving their right for a motion for

9    contempt, but I don't see this as requesting contempt at

10   this time.

11        So any obligation to meet and confer with respect

12   to a motion, you are absolutely right, would be required

13   under our local rules.  But, again, I don't see this as a

14   motion.

15        MR. DUANE:  All right, Your Honor.  I apologize.

16        THE COURT:  So, Mr. Lindell, let me be very clear

17   to you.  I do not wish to put you under oath and

18   cross-examine you myself, that is not my intent here.  I

19   would like a verbal agreement if you do agree with the

20   representations that your attorney has made as an officer

21   of the Court.  Do you agree with what he has said?

22        THE DEFENDANT:  Yes.  I will not be putting on

23   anything personally.  I've turned my phone off in court,

24   too.

25        THE COURT:  That would be great.

1          Would the plaintiff like to be heard on the matter?

2          MR. BELLER:  I will be very brief, Your Honor.

3          THE COURT:  Thank you, Mr. Beller.

4          MR. BELLER:  Your Honor, if I may just point out

5    two brief things.  Number one, for purposes of the Court's

6    understanding, this is, in fact, a notice, that is all it

7    is, number one.  Number two, there was mention of the

8    First Amendment.  I did not hear anything from the Court,

9    nor is the plaintiff asking for the Court to issue any

10   orders that would relate to the First Amendment.

11         What the defendants choose to do regarding Lindell

12   TV, Frankspeech, and also My Pillow, is purely between the

13   defendants, and we are not asking, nor is the Court

14   ordering, Mr. Lindell or any of those platforms to refrain

15   from speech.  Instead, we are simply asking that they

16   follow the Court's order, as I have no doubt defense

17   counsel is able to articulate.

18         The one piece that is related, and that is, Your

19   Honor, Exhibit 9A, which we have discussed at length, the

20   Court is doing a determination at this point, a balancing

21   test under 403.  How this extends into this issue is I

22   would note that yesterday, after Dr. Coomer's testimony,

23   or during Dr. Coomer's testimony, Mr. Lindell, Frankspeech

24   broadcast, My Pillow advertised in response to Facebook

25   postings, Mr. Lindell's speech was "I don't really care.

1    All this stuff that they are bringing up.  I didn't know

2    the guy.  This is what my thing is everybody, I didn't

3    know the guy."

4         That was in response to a specific statement

5    regarding Facebook.  To that end, Your Honor, I would

6    simply ask the Court to take that into consideration in

7    determining the 403 analysis, recognizing that the

8    defendants have, in fact, conceded that Exhibit 9A is

9    being offered for its prejudicial effect, and given the

10   concessions made by the defense yesterday, excuse me, that

11   that is not in fact being offered for its probative value.

12        So I would ask the Court to simply take that into

13   consideration.  Again, the Court is on notice, and I take

14   the words of the defendant at face value, noting, of

15   course, yesterday Mr. Lindell twice, when confronted with

16   Tweeting, when confronted with giving an interview, in

17   which he was specifically accused of commenting on

18   Dr. Coomer's direct testimony, he shouted out, without

19   prompting or without questioning "That isn't true.  That

20   did not happen."

21        And so recognizing the promises he's made today, I

22   would simply call the Court's attention to that statement

23   that was made unrequested and unprompted yesterday.  Thank

24   you.

25        THE COURT:  All right.  Anything else, counsel?

1          MR. BELLER:  No, thank you, not for the plaintiff.

2          MR. DUANE:  One moment, Your Honor.

3          Your Honor, thank you.  I just want to respond

4    briefly to one point that was made a moment ago.

5    Plaintiff's counsel, if I understand, seems to be

6    suggesting that this Court should exclude evidence on

7    cross-examination of Facebook posts that were publicly

8    disseminated by the plaintiff in this case because they

9    say that my client, out of court, made a statement to the

10   effect that he didn't know the plaintiff.

11         And with all due respect, I think the objection

12   lacks course.  So we are not suggesting that -- we have

13   never suggested, and I am not now suggesting, that this

14   evidence is being offered by us primarily or solely for

15   its supposed effect on the listener or its effect on the

16   defendant.

17         This evidence, as Mr. Kachouroff explained

18   yesterday, is highly probative in this case because it

19   goes directly, among other things, to impeachment of the

20   witness, impeachment by contradiction, by showing that

21   much of the testimony that he gave on direct examination

22   was false, and also, as some of the substantive evidence

23   on the extent to which his reputation, his professional

24   reputation was damaged by his own public proclamations of

25   a highly partisan nature, many of them vituperative,

1    disrespectful, vulgar.

2         And on direct examination, as Your Honor recalls,

3    and also I submit in opening statement, plaintiff's

4    counsel have most unambiguously strived to give the jury

5    the impression that he is something of a delicate -- a

6    shrinking violet who has lead a quiet, peaceful life of

7    relative anonymity before his life was overturned by

8    public dissemination of vile statements being made by the

9    defendant.

10        The jury cannot sensibly evaluate the probative

11   value of that evidence if they are not given an

12   opportunity to understand the extraordinary extent to

13   which this plaintiff has also made a number of, as I say,

14   vile proclamations, which he will confirm on

15   cross-examination, led him to, among other things, having

16   to apologize to his employer for his poor judgment.

17        And we submit it goes directly to the issue of

18   damages.  Even if the jury were to determine that there is

19   defamation, the jury must make an informed assessment of

20   the extent, again, if any, to which the defendants'

21   statements in this case may have had an adverse impact on

22   what little remained of this gentleman's public reputation

23   as an individual with integrity or as a pillar of the

24   community, after the self-inflicted damage that he had

25   already caused to that reputation through these outrageous

1    statements that he made in a number of public and

2    semi-public settings.

3        So it is highly probative on the crafting of

4    damages.  And I remind the Court, now that they have

5    withdrawn their request at the last minute for lost

6    income, there is very little left of this case but the

7    central issue of whether his reputation was damaged, and

8    that requires an informed assessment on the part of the

9    jury as to what sort of reputation he enjoyed before any

10   of these statements were made by the defendant.

11       If this evidence were to be excluded altogether,

12   Your Honor, the jury would be left with a highly

13   distorted, incomplete, and inaccurate impression and

14   picture of what kind of professional reputation this

15   individual enjoyed.

16       Late in his direct examination yesterday, he also

17   testified that he has tried, without success, to procure

18   professional employment, and that he is now unemployed as,

19   further evidence, indirectly, of the damage to his

20   reputation, which he and his attorney intentionally gave

21   the jury to believe, were problems that have been caused

22   entirely, if not primarily, by the adverse impact on his

23   reputation of the statements made by the defendant.

24       Again, this evidence directly contradicts that, to

25   the extent that it goes to show, or at least supports a

1    very logical inference that the jury should be entitled to

2    draw for themselves as to whether his difficulty in

3    securing employment may well have been caused by the

4    extent to which his own professional reputation was so

5    savagely devastated by his own persistent and ongoing and

6    repeated demonstrations of poor judgment.

7         And just by way of authority, Your Honor, I would

8    like to cite the Court the case of *Burke v. Regalado*, a

9    Tenth Circuit, 2019 case.  The cite is 935 F.3d 960, and

10   on page 1024 of that opinion, the Tenth Circuit reminds us

11   that "it is perfectly permissible to accomplish

12   impeachment" -- and I am quoting here from the opinion.

13   And I brought it, by the way, for the Court's benefit, the

14   relevant page if you would like to see it.

15        THE COURT:  I think I can pull it up.

16        MR. DUANE:  I have a copy for opposing counsel,

17   Your Honor.  Give me a moment while I hand it to them, as

18   well.

19        On page 1024, the Tenth Circuit Court of Appeals,

20   wrote the following:  "Any party, including the party that

21   called the witness, may attack the witness' credibility."

22   Citing to 607.  And the Tenth Circuit continues, and I am

23   quoting here, "Impeachment can be accomplished in a number

24   of ways, including contradiction, which occurs when an

25   opposing party endeavors to show a fact to which the

1    witness has testified is not true."  And the citation is

2    omitted.

3         "Evidence is relevant for this purpose when the

4    jury infers that the witness' statement was false, but

5    contradiction may be indirect."  And so, again, Your

6    Honor, I believe this evidence has a high level of

7    probative value.  I absolutely, without regard to whether

8    these various statements by Mr. Coomer were ever known or

9    disclosed to the defendant, that is not the point for

10   which we are offering this evidence.

11        THE COURT:  All right.  Thank you.

12        MR. DUANE:  Thank you, Your Honor.

13        THE COURT:  All right.  There is one more issue

14   that we need to take care of, which is the motion for

15   protective order regarding the confidentiality

16   designation.

17        Did you all further meet and confer, or are we just

18   moving from the papers?

19        MR. DUANE:  As the plaintiff's counsel correctly

20   reports in that motion, it is unopposed.  We waived our

21   right to file a memorandum of law in opposition, and we

22   don't have any strenuous opposition to this motion.

23        However, Your Honor, I will submit to the Court

24   that I am not personally persuaded they satisfied the

25   daunting burden required under the law and under this

1    Court's local rules to demonstrate that the juristic

2    remedy of closing the courtroom is necessary for the

3    discussion of these particular topics.

4         If that is what the Court wishes to do, we have no

5    strenuous objection to that.  However, I remind the Court

6    that closing the courtroom every time these issues are

7    disclosed, may require substantial delays.  And we are

8    anxious to keep this trial moving along as quickly as

9    possible, as we know Your Honor is, as well.

10        Our understanding is that this Court has the

11   ability to keep those monitors turned off, so that when we

12   get to that portion of the cross-examination where those

13   documents are brought into discussion, we have no

14   objection, if the Court prefers, in keeping with the

15   spirit of the motion by the plaintiff, to make those

16   documents available on monitors only to be seen by jurors

17   and the witnesses, and not by members of the general

18   gallery.  Thus, there would be no need to exclude the

19   public from the courtroom, and I suppose bringing them

20   back in again after these matters have been discussed.

21        As to the other portion of the motion asking this

22   Court to order the parties to refrain from citing to

23   these -- and the other part of the motion asks this Court

24   to order us to refrain on any post-trial motions from

25   filing any portions of the trial transcript involving

1    those documents unless it is filed under seal, and we have

2    no opposition to that request.

3        THE COURT:  All right.  Let me hear from

4    plaintiff's counsel.

5        MS. MORGAN:  To be frank, Your Honor, we don't

6    believe that the majority of these exhibits that are

7    subject to this protective order should be admitted into

8    evidence anyway.  For example, the Newsmax settlement

9    demand and the settlement agreement, that would be

10   Exhibits 46 and 70.

11       However, we do anticipate that with respect to

12   Dr. Finkell's testimony, that there will be some medical

13   records that are utilized.  There will also be references

14   to Dr. Coomer's employment file from Dominion, all of

15   those were designated as "confidential," and they contain

16   his protected health information, as well as information

17   relating to his personal identifying information that has

18   not already been publicly disclosed.

19       Given the issues involved in this case, we believe

20   we have satisfied our requirement to show that there would

21   be harm to Mr. Coomer -- or to Dr. Coomer if these

22   documents were made publicly available.  And we have cited

23   multiple cases in our motion where the Tenth Circuit and

24   other district courts within the Tenth Circuit have

25   permitted the remedies that we are seeking.

1          It is not unduly burdensome for them to have to

2     seal those exhibits if they are attached to a post-trial

3     motion.  And we don't believe it would be arduous to

4     exclude public viewing of those exhibits during the course

5     of the trial.

6          THE COURT:  What about the closing of the

7     courtroom?  The compromise that Mr. Duane has proposed

8     that the monitors, except for the jury, would be off to

9     those individuals in the gallery, but it would be on for

10    the jurors.

11         MS. MORGAN:  We believe that would be a suitable

12    compromise, Your Honor.  I don't expect anybody is going

13    to be reading Dr. Coomer's personal identifying

14    information out loud during the course of any of the

15    examination.  However, to the extent that they do

16    anticipate going into some of those items, we would ask

17    that the Court reconsider that issue of closing the

18    courtroom.

19         THE COURT:  All right.  So, Mr. Duane, let me ask

20    you this.  With respect to these documents, would you be

21    amenable to the Court simply turning off the monitors, not

22    clearing the courtroom, because that would -- well, my

23    courtroom deputy is telling me that the monitors for the

24    gallery are connected to the juror monitors.  So when we

25    turn off the monitors for the gallery, we would blank the

 1    jury, so that is actually not logistically possible.

 2         MR. DUANE:  I thought it was such a great idea.  I

 3    am sorry, I wasn't aware it was impossible.

 4         THE COURT:  Madam deputy, could we physically just

 5    turn them off?

 6         COURTROOM DEPUTY:  I don't think so.  I could ask

 7    our IT department, but I don't think we can.

 8         MS. MORGAN:  Given they are on wheels, could we

 9    turn them away from the gallery?

10         THE COURT:  We can certainly turn them away from

11    the gallery.  It will take a little bit of coordination.

12    So we need a little bit of notice that we will be flipping

13    them backwards and forwards, and we need to be careful

14    about the wiring connection.

15         What about the overflow room?

16         COURTROOM DEPUTY:  The overflow room has not been

17    set up.

18         THE COURT:  For monitors.  Okay.  So it seems to me

19    that with this compromise, is everyone stipulating I can

20    grant the plaintiff's motion to protect confidentiality as

21    to all of these documents, and will simply turn the

22    monitors?

23         MR. DUANE:  We have no objection to that at all.

24         THE COURT:  Plaintiff?

25         MS. MORGAN:  No objection.

         1        MR. DUANE:  So I am clear, I am understanding there

         2   is no aspect of this particular motion or objection that

         3   is going to limit our ability to use those exhibits, we

         4   are only talking about the extent to which the --

         5        THE COURT:  Right.  You can use them, they are

         6   subject to admissibility just as anything else.  So I am

         7   not making a ruling they are admissible in evidence, nor

         8   am I making a ruling that they are going to be in the

         9   public record.  I think once they are confidential, that

        10   is the granting part, then you all need to take

        11   appropriate precautions about filing any of these

        12   documents in the public record on appeal, and then also

        13   with respect to the transcript.

        14        MR. DUANE:  Yes.  Your Honor, I am happy to confirm

        15   that opposing counsel, plaintiff's counsel, was correct a

        16   moment ago when she expressed her reasonable and

        17   optimistic assumption that our examination of the

        18   witnesses while we are referring to those documents, we

        19   will not be reading aloud, much less asking the witness to

        20   read aloud, any portion of these documents that would

        21   involve, as she says, such as personal identifying

        22   information like Social Security.

        23        THE COURT:  I would assume you would not generally

        24   be reading hearsay into the record.

        25        MR. DUANE:  That is absolutely correct.  I am sure

1    Your Honor will see to it.

2         THE COURT:  All right.  Anything else?

3         So Document No. 350 will be granted in part and

4    denied in part, as discussed by the parties and the Court,

5    as stipulated by the parties with respect to the monitors.

6         Can we bring the jury in?

7         MR. DUANE:  Yes.  Nothing further from the defense.

8         THE COURT:  We will take a brief recess and then

9    bring the jury in.

10        (A break is taken from 9:33 a.m. to 9:45 a.m.)

11        THE COURT:  Thank you, please be seated.

12        Counsel, are you ready for the jury?

13        MR. CAIN:  Yes, Your Honor.

14        MR. KACHOUROFF:  Yes, Your Honor.

15        (In the presence of the jury.)

16        THE COURT:  Thank you.  Please be seated.

17        Good morning, ladies and gentlemen of the jury.

18        Dr. Coomer, I remind you, you are still under oath.

19        Mr. Kachouroff, whenever you are ready.

20                    **DR. ERIC COOMER**

21    having been previously duly sworn, testified as follows:

22                **CROSS-EXAMINATION (Cont'd)**

23    **BY MR. KACHOUROFF:**

24    Q.   Good morning, Dr. Coomer.

25    A.   Good morning.

1    Q.   I want to talk about a few things we discussed

2    yesterday.  Yesterday, I believe you stated your 2020

3    Facebook post played no role in damaging your reputation;

4    is that a fair statement?

5    A.   Yes.

6    Q.   You said the posts absolutely did not affect your

7    reputation.

8    A.   I don't believe they did.

9    Q.   You were under oath yesterday, were you not?

10   A.   Yes, I was.

11   Q.   You recall you gave testimony in the Dominion case in

12   August of 2024; correct?

13   A.   I believe I gave a deposition.

14   Q.   A deposition, correct, thank you for correcting me.

15   Your attorney, Charlie Cain, was there.

16   A.   Yes.

17   Q.   I was there.

18   A.   Yes, you were.

19   Q.   That was sworn testimony; correct?

20   A.   Correct.

21   Q.   Tell me if you remember the following questions and

22   answers from that deposition:  "Did Mr. Poulos ever tell

23   you he thought your reputation was just untenable?

24        "Answer:  I recall something to that effect.  He

25   was worried that a continuing relationship, and me being

1    employed, may be untenable.  I don't think he said

2    declaratively.

3        "Question:  Did you ever say something similar to

4    that to him?

5        "Answer:  That I was worried it would be

6    problematic?  Yes.

7        "And your reputation was in part triggered by those

8    Facebook posts; right?"

9        And your answer was, "They were definitely.  Yes,

10   it was affected by that, yes, but only in a way those

11   Facebook posts were used as 'evidence' that I rigged the

12   election.  What has killed my reputation is that people

13   think I rigged the election, not my Facebook posts."

14   A.    Yes, that sounds like the answer I gave.

15   Q.    So you initially admitted that your reputation was

16   definitely affected by your posts; correct?

17   A.    That is the statement, yes.

18   Q.    Then you testified, "What killed my reputation is

19   that people think I rigged the election, not my Facebook

20   posts."

21   A.    That is correct.

22   Q.    But yesterday you said your Facebook posts played no

23   role at all in damaging your reputation.

24   A.    I did say that, yes.

25   Q.    So it's not exactly the same as what you testified to

1    in August, would that be fair to say?

2    A.   I wouldn't characterize it that way, no.

3    Q.   In your deposition, you also talked about John

4    Poulos, the CEO of Dominion.

5    A.   I did.

6    Q.   And you know he believes that your Facebook comments

7    damaged Dominion Voting Systems; correct?

8    A.   I don't know that as a fact, no.  I don't know what

9    he believes.

10   Q.   You would disagree with that; right?

11   A.   I would, yes.

12   Q.   And yesterday your attorney asked you something about

13   the use of crude and vulgar language.  He said you were

14   being "hyperbolic."  Do you recall that?

15   A.   He did mention I was "hyperbolic."  He did mention

16   that I tend to use profanity.

17   Q.   You agreed with that; correct?

18   A.   I do.

19   Q.   What is the definition of hyperbolic, Dr. Coomer?

20   A.   Somewhat exaggeration, but not exaggerating in a

21   false way.  So, you know, making a true statement but

22   embellishing on it, and that may lend more significance to

23   it than there may be.

24   Q.   So by calling it "hyperbolic," you were hoping to

25   take the edge off those Facebook posts; correct?

```
 1    A.    I was just being honest.  I spoke in hyperbolic

 2    language.

 3    Q.    You want to minimize the comments by characterizing

 4    them as hyperbole, fair to say?

 5    A.    I am just saying I speak in hyperbolic language.

 6    Q.    The point you were trying to make is the impression

 7    that we should be more tolerant and understanding of your

 8    propensity to be hyperbolic?

 9    A.    No.

10    Q.    You want this jury to be understanding of the fact

11    that you were being hyperbolic; right?

12    A.    Yes.

13    Q.    Fair to say that you want this jury not to be

14    understanding if Mr. Lindell is hyperbolic?

15    A.    I have no opinion on that.

16    Q.    And what he said was less than some of the posts that

17    you said -- what you discuss or describe about President

18    Trump; correct?

19    A.    I think our statements are not the same.

20    Q.    We will get into that.

21    A.    Okay.

22    Q.    But you would say it is okay for Mr. Lindell to be

23    hyperbolic, would you not?

24    A.    Sure.  Sure.

25    Q.    You also talked yesterday, you said your only avenue
```

```
 1    was to come here, and your only avenue for redress was

 2    money.

 3    A.    That is one, yes.  That is one of the big ones.

 4    Q.    Well, let's talk about some other avenues you could

 5    pursue.  You could have called the police; right?

 6    A.    I have called the police.

 7    Q.    You have.  You have called the police for

 8    Mr. Oltmann, what you described, those two posts; correct?

 9    A.    Yes.

10    Q.    In fact, you talked to several FBI agents; right?

11    A.    I have, or my attorneys have on my behalf.

12    Q.    You also talked to the Denver Police.

13    A.    Yes, I have.

14    Q.    Do you remember that the FBI sent Special Agent Jason

15    Myszkiewicz and FBI Agent William Novak to talk to

16    Mr. Oltmann?

17    A.    I am not aware of that.

18    Q.    Okay.  Do you remember Denver Police Detective Brian

19    Marshall and Denver Police Lieutenant Chavez being sent

20    out to talk to Mr. Oltmann?

21    A.    I have no knowledge of that.

22    Q.    You know they investigated Mr. Oltmann's post, do you

23    not?

24    A.    Again, those individuals, I don't have any direct

25    knowledge of that, no.
```

```
 1    Q.   You know they didn't press charges against

 2    Mr. Oltmann; correct?

 3    A.   Again, I have no knowledge of the situation you are

 4    discussing.

 5    Q.   You know nobody has pressed criminal charges against

 6    Mr. Oltmann for the threats you claim he made against you.

 7    A.   Not that I am aware of.

 8    Q.   That is because those posts were not an illegal

 9    threat, were they?

10         MR. CAIN:  Objection.

11         THE COURT:  Sustained.

12    Q.   (BY MR. KACHOUROFF)  Another thing, before you filed

13    a lawsuit, you could have written or called Mike Lindell

14    to tell him you did not make a deal with Newsmax; is that

15    fair to say?

16    A.   I believe I sued him before he made those statements,

17    so that timeline I don't follow.

18    Q.   Well, you know that you settled the Newsmax case in

19    April or early May of 2021; correct?

20    A.   Yes, yes.

21    Q.   The first statement he made about you was May 9,

22    2021, after the Newsmax settlement; correct?

23    A.   That is correct.

24    Q.   You didn't sue him for an entire year after he made

25    that May 9, 2021, statement.
```

254

1    A.    Okay.  Yes.

2    Q.    Sometime in April, 2022.

3    A.    Yes.

4    Q.    Before you filed suit, you could have written, called

5    him and said to Mr. Lindell, I did not do a dirty deal

6    with Newsmax to cause My Pillow to stop being advertised.

7    A.    I could have, but that wasn't the actionable

8    statement.

9    Q.    So that statement didn't bother you on May 9, 2021.

10   A.    That particular one, no.

11   Q.    Yesterday, I believe your testimony was that was a

12   huge deal for you, his Newsmax May 2021 statement.

13   A.    Yes, the other portions of that statement.

14   Q.    So that statement was impactful to you, then.

15   A.    Yes.

16   Q.    And you could have called or written Mr. Lindell and

17   said to him, hey, what you said to me was not right.

18   A.    Potentially.

19   Q.    Before you filed this lawsuit against Mike and served

20   him on the Capitol steps, you could've called him to ask

21   him to let you tell your side of the story; right?

22   A.    I could have.

23   Q.    You could have said, I want to appear on some of your

24   TV shows.

25   A.    I could have.  I could have asked that, yes.

```
 1    Q.   Before you filed this suit, you could have offered to

 2    explain to Mike why he was wrong about how machines work.

 3    A.   I could have, yes.

 4    Q.   And before you filed this suit, you could have told

 5    Mike that what Joe Oltmann was saying about you was false.

 6    A.   Those statements were -- my statement that those were

 7    false were already in the public domain.

 8    Q.   You never reached out to him personally.

 9    A.   No, I did not.

10    Q.   You didn't want to do that.

11    A.   No, I did not.

12    Q.   Because if you had done that and given him the

13    opportunity to listen to your side, he may have done

14    something that you didn't expect; correct?

15    A.   No, that's not why.

16    Q.   You wanted to get rich, that is why.

17    A.   No.

18    Q.   You said on direct that no one tried to get your side

19    of the story in this case.

20    A.   That is correct.

21    Q.   But you were deposed in this case over a year ago;

22    right?

23    A.   Yes, I was.

24    Q.   Mr. Lindell's attorneys reached out to your

25    attorneys.
```

1   A.   I think so.

2   Q.   They set up a deposition of you and asked you

3   questions for several hours; fair to say?

4   A.   Yes.

5   Q.   They got your side of the story; correct?

6   A.   Yes.

7   Q.   But you instead gave an op-ed to a local paper.  You

8   claimed that this was sufficient notice to the world;

9   correct?

10   A.   I did give an op-ed, as we discussed.

11   Q.   To the Denver Post, I believe it was.

12   A.   Yes, in December of 2020.

13   Q.   You know Mr. Lindell doesn't live in Colorado;

14   correct?

15   A.   I am aware of that.

16   Q.   You never emailed Frankspeech to tell them to take

17   the video down.

18   A.   No, I did not.

19   Q.   You never emailed My Pillow to say, hey, can you get

20   ahold of Mike Lindell, take that video down.

21   A.   No, I did not.

22   Q.   But you saw Mike's documentary.

23   A.   Which documentary?  Sorry.

24   Q.   Well, which ones have you seen?

25   A.   *Absolute Proof*.  *Selection Code*.

1   Q.   So you saw *Absolute Proof*.  That was February 5,

2   2021; correct?

3   A.   That's correct.

4   Q.   And you appeared in a video of *Absolute Proof*;

5   correct?

6   A.   There is a video of me, yes.

7   Q.   That video was posted on YouTube; right?

8   A.   I am not sure where all it is posted, but it is

9   publicly available because it was a public demonstration

10  for the City of Chicago.

11  Q.   So nothing in that video was defamatory towards you.

12  A.   Nothing in that video, no.

13  Q.   And nothing about that video was defamatory towards

14  you.

15  A.   The video, itself, is not defamatory towards me.

16  Q.   And *Absolute Proof* wasn't defamatory towards you.

17  A.   I think it is right at the edge.

18  Q.   But that is not one of your allegations here today;

19  is it?

20  A.   It is not.

21  Q.   I want to talk about the security system you

22  installed in your home.  That was a Ring system.

23  A.   No, SimpliSafe.

24  Q.   SimpliSafe.  And that was something that was

25  installed somewhere around the 9th or 10th of December,

 1    2020.

 2    A.   I honestly can't remember the exact date.  It was

 3    sometime in late November to middle December.

 4    Q.   And that had cameras on it.

 5    A.   Yes, several cameras.  It also has door sensors.  It

 6    has sensors to detect broken glass, and motion detectors.

 7    Q.   Your former employer paid for that system for you.

 8    A.   I believe they paid for the initial equipment.  I

 9    have been paying the monthly fee for monitoring.

10    Q.   So the initial equipment was $720 approximately.

11    A.   That sounds about right.

12    Q.   And your monthly monitoring was how much?

13    A.   Initially I think it was $29.  Recently it has gone

14    up to, I think it is 39.98 per month.

15    Q.   Is that still in the same home?

16    A.   It is.

17    Q.   You still live in the same home.

18    A.   That is my residence, yes.

19    Q.   Okay.  There was some discussion about adjudication

20    of ballots yesterday.  Your lawyer asked you if what I

21    said during opening about adjudication being a part of

22    counting ballots was accurate, and you said "no," I

23    believe.

24    A.   I would say it is not part of tabulating ballots, it

25    is a post-tabulation process.

1    Q.    But is still part of the counting of ballots.

2    A.    It still goes into the end record, yes.

3    Q.    Okay.  And yesterday you explained that Dominion

4    block diagram chart.  Do you recall that?

5    A.    I do.

6    Q.    It was a pretty detailed chart that you described as

7    "having a lot of redundancies to protect the system."

8    A.    Yeah.  I used that to describe some of the testimony,

9    yes.

10   Q.    Is it fair to say that it is pretty detailed for a

11   block diagram chart of your system?

12   A.    No, it doesn't have all of the details.

13   Q.    So there are more details than what that block

14   diagram shows.

15   A.    I believe so, yes.

16   Q.    So it is pretty intricate in terms of being a system.

17   A.    Yeah.  The system is pretty intricate, pretty

18   complex.  There are lots of parts to it.

19   Q.    You were pointing out the system has all these

20   redundancies and complexities because Lindell was claiming

21   it couldn't happen.

22   A.    Those redundancies are there as safeguards and layers

23   of security, yes.

24   Q.    Let's take a few examples of it, since you brought it

25   up yesterday, about the 2020 election, like Georgia, for

```
 1    instance.  In the November 2020 election, that county had

 2    problems, didn't they?

 3    A.    They did.  I think I discussed part of that

 4    yesterday, Antrim.

 5    Q.    They were having problems with adjudication systems

 6    that were not properly loading batches.

 7    A.    That is correct.

 8    Q.    And the adjudication system is one you invented.

 9    A.    I was part of the inventor.

10    Q.    Part of the inventor.  You were part of that.

11    A.    Yeah, I helped design that portion.

12    Q.    So they needed help, and they requested help from

13    Dominion.

14    A.    Yes.

15    Q.    And you were providing assistance by Zoom call;

16    correct --

17    A.    No.

18    Q.    -- with Ms. Sheree Nollette.

19    A.    I was providing assistance over the phone.

20    Q.    Okay.  Was Ms. Sheree Nollette on the phone with you?

21    A.    I don't know who Sheree Nollette is.

22    Q.    Do you know who I am talking about?

23    A.    You may -- you may be referring to one of two people.

24    Q.    I am sorry, Nicole Noell -- or Sheree Noel, I am

25    getting confused.
```

1    A.    Okay, there are two people.  I will just let you

2    know, there is Sheree Noell and there is Nicole Nollette,

3    so I need to know which one.

4    Q.    You and Nicole were on a Zoom -- you were questioned

5    in your deposition about you and Nicole were on a Zoom

6    call with the Gwinnett County people; correct?

7    A.    I don't recall being on a Zoom call.  I know I was on

8    a phone call.

9    Q.    Fair enough.  Your answer was, "it does seem like we

10   were both on a call."

11   A.    "A call."

12   Q.    And tell me if you recall, you said to Nicole --

13          MR. CAIN:  Objection.

14          THE COURT:  Counsel, approach.

15          (A bench conference is had.)

16          THE COURT:  All right.  What is your objection?

17          MR. CAIN:  This is subject to your prior order.  I

18   believe he's talking about the email that we were

19   discussing earlier, otherwise, you are testifying from a

20   document that is not in evidence.  I don't understand the

21   purpose of the proffer here.  You were just testifying

22   from --

23          MR. KACHOUROFF:  Respectfully, Your Honor, under

24   the rules I have a right to impeach by prior inconsistent

25   statements or to impeach by contradiction.

1          THE COURT:  That doesn't establish the prior

2     inconsistent statement.  First, you cannot just simply

3     read in portions of the deposition in order to get him to

4     say he said this.  So you need to set out the fact that he

5     doesn't recall, then you have to give him the opportunity

6     to look at the deposition, or if he denies what he says in

7     his deposition, you can include the colloquy of, did you

8     give this deposition under oath, and call out to page X,

9     and did you give this answer.

10          MR. KACHOUROFF:  I understand.

11          MR. CAIN:  Which you've already done, you were just

12     reading from the document.

13          MR. KACHOUROFF:  I understand.  I should have

14     pointed out the line and page number.  But what I am also

15     trying to do is two things at once.  I am trying to

16     impeach him by contradiction or impeachment by prior

17     inconsistent statement.

18          THE COURT:  First you need to establish --

19          MR. KACHOUROFF:  The contradiction doesn't require

20     that.  All I am asking him is whether he remembers making

21     these statements from the deposition.  That is all I care

22     about.  If he says he doesn't, then I will establish the

23     prior inconsistent statement.

24          MR. CAIN:  It is not inconsistent if he doesn't

25     remember.

1        MR. KACHOUROFF:  But that is not impeachment by

2    contradiction.  What I am contradicting is the fact that

3    on direct examination yesterday, he indicated Gwinnett was

4    just a simple problem and he could take care of, it was

5    done, he minimized it.  And I am showing here with this

6    testimony, he is contradicting himself with this testimony

7    to what he said yesterday.

8        MR. CAIN:  Then lay the foundation.  That is not

9    what you are doing, you are just reading from a

10   deposition.

11       THE COURT:  So, again, Mr. Kachouroff --

12       COURT REPORTER:  Judge, I am not hearing you.

13       THE COURT:  -- you can use his deposition

14   testimony, he is a party.  But, again, it is the form of

15   the question.

16       MR. KACHOUROFF:  I understand.  I just want to

17   point out, Judge, that impeachment by contradiction is not

18   something that is necessarily spelled out in the federal

19   rules.  That is the *Burke* case that Mr. Duane cited.

20       MR. CAIN:  I apologize, I mistook that from Antrim,

21   and it is a different issue.

22       (In the hearing of the jury.)

23   Q.   (BY MR. KACHOUROFF)  Do you recall during that phone

24   call telling Nicole, "F'ing hell.  Can we please stop

25   punching ourselves right in our own face"?

1    A.    I don't recall that specifically, but it sounds like

2    something I would say.

3    Q.    (BY MR. KACHOUROFF)   Because you were brought in to

4    troubleshoot a problem in Gwinnett with the adjudication

5    system.

6    A.    Yes.

7    Q.    And you acknowledge that part of the reason the

8    adjudication system was not working was that Dominion had

9    not installed it properly.

10   A.    It was not configured correctly.   It was installed

11   properly, it wasn't configured correctly.

12   Q.    But Dominion was ultimately responsible for

13   configuring it correctly.

14   A.    I am not sure who actually did the initial

15   configuration.   In some cases it was county staff, in some

16   cases Dominion technicians assisted with that.   I don't

17   have direct knowledge of who was involved in that

18   installation and configuration.

19   Q.    You texted Nicole, "We are going to have to eat some

20   poo on this one."   That is one of your less hyperbolic

21   statements; correct?

22   A.    That's fair, yes.

23   Q.    And 60,000 ballots were in limbo after the election

24   in Gwinnett County; correct?

25   A.    Initially, yes.

1    Q.   So they couldn't provide their count certification

2    right away.

3    A.   Certification was weeks away, but they could not

4    provide a final unofficial account for election night and

5    a couple days after.

6    Q.   And let me just point out, four days before the

7    November 2020 election, you described the Dominion system

8    as "our shit is riddled with bugs," right?

9    A.   Sounds like a statement I may have made, but I don't

10   recall actually saying that.

11   Q.   Do you recall saying that "bugs are no good"?

12   A.   Bugs are no good, absolutely agree with that.

13   Q.   And "riddled with bugs" is really not good.

14   A.   It is not ideal, no.

15   Q.   When asked to confirm that you made these statements,

16   you said, "I tend to speak in hyperbole," correct?

17   A.   That's correct.

18   Q.   You also talked about risk-limiting audits, do you

19   recall that?

20   A.   Yes, I do.

21   Q.   Tell us what a risk-limiting audit is, just to

22   refresh our recollection.

23   A.   I don't want to get too far in the weeds, but it is

24   an audit methodology that allows for the processes -- you

25   are taking the physical ballot and you are comparing it

1    directly to the electronic record that is in the reporting

2    system.  That's the basis of it.  There are some

3    statistics behind on how many ballots you look at, but I

4    won't get into those details.

5    Q.   You know about the *Curling v. Raffensperger* case;

6    correct?

7    A.   I am familiar with it, yes.

8    Q.   You gave an affidavit in that case.

9    A.   As a technical witness, yes.

10   Q.   You were also deposed in that case.

11   A.   I don't think I was.  Was I deposed?  It was a long

12   time ago.

13   Q.   It was a long time ago.

14   A.   I know I gave testimony on several days.  I know that

15   I submitted an affidavit.  I don't think I was actually

16   deposed.

17   Q.   Well, the point is, you know Professor Philip Stark.

18   A.   Yes, I do.

19   Q.   He was also an expert in the *Curling* case, on the

20   other side.

21   A.   I wasn't aware of that, no.

22   Q.   You were appearing on behalf of Georgia as a

23   technical expert; right?

24   A.   Yes, I was.

25   Q.   And Philip Stark, the inventor of the risk-limiting

1    audit, was appearing on the other.

2    A.   Again, I didn't know that he actually appeared.   I

3    know some of the other people that appeared, but I wasn't

4    aware Philip Stark appeared.

5    Q.   Dr. Halderman, your expert who is going to appear and

6    testify here, appeared in that case, too.

7    A.   Yes, he did.

8    Q.   On the other side.

9    A.   For the plaintiffs, yes.

10   Q.   Your expert.

11        Going back to Philip Stark, were you aware that he

12   said that the risk-limiting audit in Georgia had problems.

13   A.   I am not aware of that, no.

14   Q.   Let's move on to Fulton County, Georgia.   Were you

15   aware that the Election Management Server crashed?

16   A.   I did not have direct interaction with Fulton County.

17   Q.   What is the Election Management Server?

18   A.   That is that sort of back end, sort of brains part of

19   the system.

20   Q.   Fulton County is the largest county in the State of

21   Georgia; correct?

22   A.   I don't know.

23   Q.   You didn't manage anything to do with Georgia other

24   than Gwinnett County?

25   A.   No, I didn't have any direct interaction with

        1    installing, maintaining, servicing.  I was brought on for

        2    a couple, you know, escalated issues, the only one of

        3    which I can remember is Gwinnett.

        4    Q.  So you are not aware of all of the many issues that

        5    may have occurred, because you weren't focused on that at

        6    Dominion.

        7    A.  That is correct.

        8    Q.  Antrim County, Michigan, you said that the cause of

        9    the switch to votes was human error.  Do you remember

       10    that?

       11    A.  Yes, I do.

       12    Q.  Your expert, Dr. Halderman, that is going to appear

       13    here, disagrees with that, doesn't he?

       14    A.  No, not necessarily.

       15    Q.  He said it should have been a software defect;

       16    correct?

       17    A.  I think he says both.

       18    Q.  He says the software should have accounted for the

       19    human error; correct?

       20    A.  He does say that.

       21    Q.  And you disagree with that vehemently.

       22    A.  No.

       23    Q.  Back then you did.

       24    A.  No, I don't think so.  No.

       25    Q.  You don't remember saying, "F' Halderman"?

```
1            MR. CAIN:  Objection, Your Honor, subject to prior
2    order.
3            THE COURT:  Sustained.
4            MR. KACHOUROFF:  Your Honor, may we approach?
5            THE COURT:  Yes.
6            (A bench conference is had.)
7            MR. KACHOUROFF:  At this time I would ask the Court
8    to reconsider its prior ruling for two reasons.  Number
9    one, I was just made aware of the fact that in Michigan,
10   Dominion declassified, if you will, or made -- removed the
11   confidentiality provisions from that email with Halderman
12   this past October of 2024.
13           It is in a federal court case where Halderman was
14   fighting a deposition by OAN.  The Court can take judicial
15   notice of that.  I can get a copy of the order to the
16   Court.  And I would ask the Court to allow me to question
17   him on that, subject to tying it up after.
18           THE COURT:  Well, I am overruling based on a
19   discovery issue, and there also is the supplemental issue
20   of whether or not it has been properly disclosed.
21           MR. KACHOUROFF:  And I would just note for the
22   record, Judge, that Mr. Cain was at the October 2024 --
23   August 2024 deposition when this document was discussed,
24   so he was well aware of it.
25           MR. CAIN:  I tend to agree with Your Honor.  And my
```

```
 1    concern is that he searched and obtained this document

 2    after the fact, after he's testified and --

 3         MR. KACHOUROFF:  I have no document in my

 4    possession.  I was going to ask him if he remembers saying

 5    those words.  If he says he doesn't, I'm stuck with it.

 6         THE COURT:  Overruled.  The documents need to be

 7    produced so I can evaluate and give an evidentiary ruling

 8    if the evidence comes in, with respect to this witness or

 9    any other.

10         MR. KACHOUROFF:  Thank you, Your Honor.

11         (In the hearing of the jury.)

12    Q.   (BY MR. KACHOUROFF)  In the Georgia case, you said

13    that Texas didn't certify the Dominion system because it

14    was too complex; correct?

15    A.   I think I was just repeating what the Texas report

16    said.

17         MR. KACHOUROFF:  Your Honor, can I show the witness

18    a document, but his eyes only?

19         THE COURT:  You may show him something.  Is it an

20    exhibit?

21         MR. KACHOUROFF:  No, it is not, Your Honor.

22         THE COURT:  Counsel, approach.

23         (A bench conference is had.)

24         MR. KACHOUROFF:  I just want to show him the

25    document and see if he changes his mind.  It is a two-page
```

1      document, it is available online, a publicly available

2      document, and I will have him review this paragraph.

3              THE COURT:  How does he have any foundation with

4      respect to this report?

5              MR. KACHOUROFF:  Because he gave a sworn

6      declaration.  I can enter the sworn declaration if you

7      want me to.

8              THE COURT:  About this report?

9              MR. KACHOUROFF:  Correct.

10             MR. CAIN:  He has seen this report?

11             MR. KACHOUROFF:  I was going to try to establish

12     that.  That is why I wanted to show it to him.

13             MR. CAIN:  Okay.  But you haven't laid the

14     foundation for him having any knowledge.

15             MR. KACHOUROFF:  I didn't get a chance.  I was

16     going to show it to him first.

17             THE COURT:  Has this been produced in discovery?

18             MR. KACHOUROFF:  No, Your Honor.  I am not going to

19     enter it as a piece of evidence.

20             THE COURT:  All right.  You can try to lay the

21     foundation, Mr. Kachouroff.

22             (In the hearing of the jury.)

23             MR. KACHOUROFF:  Your Honor, may I approach the

24     witness and hand a physical copy?

25             THE COURT:  You may.  You can give it to my deputy.

272

1    Q.   (BY MR. KACHOUROFF)   Do you recognize that report?

2    A.   Yes, I do.

3    Q.   And that report concludes that Dominion's Democracy

4    Suite --

5         MR. CAIN:   Objection.   He is testifying from a

6    document not in evidence.

7         THE COURT:   Sustained as to form.

8    Q.   (BY MR. KACHOUROFF)   Do you recall what the document

9    concludes?

10   A.   I mean, this is a document regarding an attempt to

11   certify the Democracy Suite system in Texas.

12   Q.   Texas would not certify the Democracy Suite system.

13   A.   They declined to certify, yes.

14   Q.   Not just because the system was complex; correct?

15   A.   No.   They had other reasons, yes.

16   Q.   They raised concerns about the ability of the system

17   to operate efficiently; correct?

18   A.   Yes.

19   Q.   And they were concerned that it was not safe from

20   fraudulent or unauthorized manipulation; correct?

21   A.   That is one of their findings in this, yes.

22   Q.   You disagree with that; correct?

23   A.   Again, I don't necessarily disagree, but this is a

24   Texas system under Texas certification rules, so they have

25   some very specific rules that at the time that system did

1    not meet that rule in Texas.

2    Q.   I want to return back to *Absolute Proof* for just a

3    moment.  Lindell never mentioned you by name in that

4    video, did he?

5    A.   Mr. Lindell did not specifically speak my name, no.

6    Q.   And so you don't know whether he actually knew who

7    the person was -- you -- in that video.

8    A.   I don't know what his state of mind was, no.

9    Q.   And nowhere in the video does Mr. Lindell say you

10   were rigging elections.

11   A.   Not by name, no.

12   Q.   Or manipulating Dominion machines.

13   A.   Not by name, no.

14   Q.   Or interfering with the operation of machines.

15   A.   Not by name, no.

16   Q.   When you viewed the video, you texted with your

17   brother; correct?

18   A.   I did.

19   Q.   And you were mocking his experts in that video.

20   A.   I was.

21   Q.   You thought they were morons.

22   A.   I do.

23   Q.   You never reached out to Mike to tell him you didn't

24   like his experts.

25   A.   I did not.

1    Q.    Or that you disagreed with them then.

2    A.    No, I did not.

3    Q.    You know Mike's video was not limited simply to

4    Dominion Voting Systems; correct?

5    A.    Correct.

6    Q.    He bashed Hart InterCivic; right?

7    A.    Yes.

8    Q.    Smartmatic.

9    A.    Yes.

10   Q.    Do you recall who else he bashed?

11   A.    Not off the top of my head, but I would guess ES&S.

12   Q.    ES&S.  Fair to say he is an equal opportunity machine

13   basher?

14   A.    I wouldn't actually.  No, I wouldn't say it is equal.

15   Q.    He wants them all gone, doesn't he?

16   A.    He has stated that, yes.

17   Q.    Give me one moment.  I want to try to get a timeline

18   for us so we can understand things a little bit better.

19   All right.  We have the November 2020 election; right, in

20   November of 2020.  Can you tell me, was it November 9th

21   when Mr. Oltmann published his podcast?

22   A.    His first one, yes, that mentioned me.

23   Q.    So you contend that hurt you on November 9th;

24   correct?

25   A.    I am sorry, what was the question?

1    Q.    That was something that hurt you on November 9th.

2    A.    Yes, absolutely.

3    Q.    And you continued to watch it on November 10th, as

4    well, that was probably when you first saw it; fair to

5    say?

6    A.    Somewhere around the evening of the 9th or 10th, yes.

7    Q.    It went viral.

8    A.    Eventually, yes.

9    Q.    But at first it wasn't.

10    A.    I mean, it gained traction pretty quickly.   I

11    couldn't tell you how fast.

12    Q.    I will put another line here for -- we will call this

13    the February 5th video of *Absolute Proof*.   We are going to

14    talk about the May 9th statement where Mike was upset with

15    you about Newsweek [sic].

16    A.    Max.

17    Q.    So after November 10th, several famous people, high

18    profile people picked up these claims; correct?

19    A.    That is correct.

20    Q.    You had people like the President Donald Trump;

21    right?

22    A.    Claims about me, President Trump did not make

23    specific statements, his campaign did.

24    Q.    So his campaign did.   He didn't mention you

25    specifically.

1   A.   Mr. Trump did not.

2   Q.   Sidney Powell mentioned you by name.

3   A.   Sidney Powell did, yes.

4   Q.   Eric Trump.

5   A.   He posted on Twitter, yes.

6   Q.   Rudy Giuliani.

7   A.   Yes.

8   Q.   Eric Metaxas.

9   A.   Yep.

10   Q.   Everybody was talking about it, and it started to

11   gain steam; fair to say?

12   A.   Yeah, definitely.

13   Q.   Just a few days after November 10, actually November

14   11, you entered a -- you sent an email to John Poulos, did

15   you not?

16   A.   I believe so.

17        MR. KACHOUROFF:  Sorry, has this been admitted?  I

18   don't see an -- sorry, has this been admitted?  I don't

19   see an exhibit.

20        THE COURT:  I don't think it is being published to

21   the jury yet.  It is not published automatically.  You can

22   use the ELMO.  It is not being published to the jury.  So

23   if you are laying foundation, that is fine.

24   Q.   (BY MR. KACHOUROFF)  Showing you what is marked as

25   Exhibit 30, do you recognize this exhibit?

1    A.    Yes, I do.

2    Q.    This is an exhibit that has an email from you to John

3    Poulos, the CEO of Dominion; correct?

4    A.    That is correct.

5    Q.    It is an email where you are tendering -- you are

6    volunteering to resign from Dominion Voting Systems;

7    correct?

8    A.    It is.

9          MR. KACHOUROFF:  Your Honor, I move to admit 30.

10         THE COURT:  So I think it is subject to our

11   confidential order, so we need to turn the monitors.  And

12   perhaps, Mr. Kachouroff, just for efficiency sake, one of

13   your colleagues at the table could help you so you don't

14   have to go back and forth and do the work.

15         MR. KACHOUROFF:  Thank you, Your Honor.

16         THE COURT:  Any objection?

17         MR. CAIN:  No, Your Honor.

18         THE COURT:  So admitted.

19         (Exhibit No. 30 is admitted.)

20         MR. KACHOUROFF:  Move to publish.

21         THE COURT:  Go ahead.

22   Q.    (BY MR. KACHOUROFF)  You say, "While there are some

23   wild accusations in the referenced video, the fact is, I

24   posted multiple personal political opinions."  Correct?

25   A.    Correct.

1   Q.   "I should have been more cognizant of how these

2   comments would reflect on our company as a whole."  Right?

3   A.   Correct.

4   Q.   So at that point you are admitting that these things

5   were a reflection on Dominion Voting Systems.

6   A.   In regards to the claims that I rigged the election.

7   Q.   You say, "I failed to exercise proper judgment,"

8   right?

9   A.   Yes.  And I admitted that yesterday.

10  Q.   In fact, you said, "I apologize for this glaring

11  lapse of judgment."

12  A.   I do regret those posts, yes.

13  Q.   It wasn't just about rigging the election, it was

14  that you had multiple personal political opinions;

15  correct?

16  A.   In relation to rigging the election, yes.

17  Q.   Let's go to the last paragraph.  "This has been a

18  very difficult email to write, but at the end of the day,

19  I made poor decisions to express my personal viewpoints."

20  Right?

21  A.   Yes.

22  Q.   "However, I will stress my personal views have never

23  once affected my professional conduct, and I will continue

24  to testify to that effect."  Fair to say?

25  A.   That is exactly what I wrote.

279

1    Q.    That is exactly what you wrote.  So your Facebook

2    posts do impact your personal reputation.

3    A.    Again, in regards to being accused of rigging the

4    election.

5    Q.    So that was on November 11th, right?

6    A.    Yes, at 8:00 a.m.

7    Q.    So Mr. Lindell had nothing to do with any of these

8    red slashes here that I have got on the screen:  The open

9    post, time you found the post, viral post.  Rudy Giuliani

10   is looking at the post, Trump campaign looking at the

11   post, social media looking at the post; correct?

12   A.    Correct.

13   Q.    In your deposition, you also noted that there was a

14   Giuliani press conference on November 19th.  There were

15   countless podcasts about you at that time.

16   A.    That sounded like two questions.

17   Q.    It was, I am sorry.  We can just say, it is fair to

18   say that the Rudy Giuliani press conference took place on

19   November 19.

20   A.    Yes, I recall that press conference.

21   Q.    There were numerous podcasts at that time.

22   A.    There were a few that I was aware of.  I am not sure

23   if it is "numerous."

24   Q.    Mr. Lindell had nothing to do with that stuff.

25   A.    No, he did not.

 1    Q.    On November 24th -- I will try to squeeze this in

 2    here -- November 24th, you texted a friend, Jeremy Wolfe,

 3    and said to him that you were frozen out of Dominion.

 4    A.    I don't recall that exact text, but it sounds

 5    reasonable.

 6            MR. KACHOUROFF:  Your Honor, may I approach the

 7    witness?

 8            THE COURT:  You may.

 9            Mr. Kachouroff, do we have official transcripts of

10    the deposition?

11            MR. KACHOUROFF:  Say it again?

12            THE COURT:  Do we have official transcripts of the

13    depositions for the witnesses to use?

14            MR. KACHOUROFF:  Yes, Your Honor.

15            THE COURT:  So perhaps we should use those, the

16    official ones.

17            MR. KACHOUROFF:  I don't have the -- I am sorry?

18            THE COURT:  A certified sealed one.

19            MR. KACHOUROFF:  I don't have the certified sealed

20    ones with me.

21            THE COURT:  Do we have them somewhere?

22            MR. KACHOUROFF:  I don't have them with me.

23            THE COURT:  I am sorry, let's take this at side

24    bar.

25            (A bench conference is had.)

1              MR. KACHOUROFF:  I am just trying to refresh

2     recollection, not trying to impeach him on this one.  I am

3     just trying to establish a date and hopefully it jogs his

4     memory about what was said.

5              THE COURT:  Do we have official transcripts for

6     him?

7              MR. KACHOUROFF:  In my office back in Florida, but

8     that doesn't help me out here, as I wasn't planning on

9     this being an issue.

10             THE COURT:  I am sorry, Mr. Kachouroff, how would

11    it -- how would it not be an issue?  Typically you have to

12    rely on the certified transcript.

13             MR. KACHOUROFF:  I am not entering it into

14    evidence, I am just asking if he recalls the testimony.

15             MR. CAIN:  For impeachment.

16             MR. KACHOUROFF:  It is not impeaching.  I am just

17    trying to establish a date.  If it is helpful to him, he

18    can say.  If it is not helpful, I will move on.

19             THE COURT:  All right.  So I would suggest that

20    your office ship the official transcripts that you are

21    intending to use, because that is just typically the

22    procedure, that you use the certified transcripts.

23             MR. KACHOUROFF:  Understood, Your Honor.

24             COURT REPORTER:  Closer to the mic.

25             THE COURT:  Okay.  Also, my standing order about

1    trial prohibits people from creating demonstrative

2    exhibits during trial, use of an easel, or anything else.

3    I will let this go because you already did it.  But you

4    should be mindful of that.

5          MR. KACHOUROFF:  Do you consider this a violation

6    of that rule?

7          THE COURT:  Yes.

8          MR. KACHOUROFF:  I did not know, Judge, I am sorry.

9          THE COURT:  That's fine.

10         MR. KACHOUROFF:  I knew we couldn't use an easel.

11         THE COURT:  That is why I didn't stop you, but

12   demonstratives have to be created before you get to

13   court --

14         MR. KACHOUROFF:  Understood.

15         THE COURT:  -- not created during the proceeding.

16   I do that because I don't have any control of what you are

17   writing on the easel.  But you are not writing anything

18   out of line.

19         MR. KACHOUROFF:  I won't, I promise you that.

20         THE COURT:  But I have had incidents where words

21   appear on easels on demonstratives that then become --

22         MR. KACHOUROFF:  I promise you, I won't.

23         THE COURT:  Thank you.

24         (In the hearing of the jury.)

25   Q.   (BY MR. KACHOUROFF)  Does that refresh your

1     recollection?

2     A.   Yes, it does.

3     Q.   Fair to say you told him, "I am pretty much frozen

4     out of work.  I am not clear if I still have a job."

5     A.   That was correct at the time, yes.

6     Q.   Mr. Lindell had nothing to do with that either.

7     A.   No, he didn't.

8     Q.   We talked earlier about an op-ed you wrote for the

9     Denver Post.  That was December 8; correct?

10    A.   That is correct.

11    Q.   Mr. Lindell did not have anything to do with that

12    op-ed, did he?

13    A.   No, he did not.

14    Q.   You don't know if he even saw the op-ed.

15    A.   No, I do not.

16    Q.   You wrote in that op-ed that "the software glitch

17    that claims switched votes between particular candidates

18    was an easily detected, human-induced error."

19    A.   Yes, it was.

20    Q.   The software did not account for that easily

21    detected, human-induced error, did it?

22    A.   The software did not, no.

23    Q.   May 9, you said this was a huge deal for you, that

24    really upset you on May 9th, what was said.

25    A.   Yes, absolutely.

1   Q.   You said it was "the worst moment in the whole saga."

2   A.   It was one of the worst, yes.

3   Q.   Worse than what happened on November 20th to the time

4   you saw his video on February 5?

5   A.   Yes.

6   Q.   Let's take a look at your therapist.  I will bring

7   your therapy records up.  Dr. Coomer, do you recognize

8   Exhibit 37?

9   A.   Yes, I do.

10  Q.   These are copies of your therapist's notes.

11  A.   Yes, they are.

12          MR. KACHOUROFF:  Your Honor, I move to admit 37.

13          THE COURT:  It is stipulated to, so admitted.

14          (Exhibit No. 37 is admitted.)

15          MR. KACHOUROFF:  Your Honor, move to publish to the

16  jury.

17          THE COURT:  I think it is already published.

18          MR. KACHOUROFF:  Is it?  Okay.

19  Q.   (BY MR. KACHOUROFF)  We are looking at April 14,

20  2021, do you see that?

21  A.   Yes, I do.

22  Q.   It says, "Patient describes continued mild to

23  moderate mood anxiety symptoms interfering with social

24  activity, as well as physical activity.  Discuss

25  interpersonal occupational stressors," et cetera.  That

1    was April 14, 2021; right?

2    A.    Correct.

3    Q.    That was before Mike Lindell's May 9th statement.

4    A.    Yes, it was.

5    Q.    The next record, dated 5/26/2021.  That is after Mike

6    Lindell's statement; correct?

7    A.    Yes, it is.

8    Q.    You see down about the middle of the page, you see

9    "mood."

10   A.    Yes, I do.

11   Q.    Tell us what that says right there.

12   A.    "His assessment was pretty good."

13   Q.    There is nowhere in this record -- you say "pretty

14   good," right?

15   A.    Yes.

16   Q.    There is nowhere in this record that it says, Mike

17   Lindell caused me any problems just two weeks earlier.

18   A.    Yeah.  And I don't know why that is not mentioned.

19   Q.    And you discussed your recent trip to the Grand

20   Canyon with friends; right?

21   A.    I did go to the Grand Canyon in April, yeah.

22   Q.    We would expect that your mood would not be pretty

23   good if you had been discussing Mike Lindell; correct?

24   A.    The Grand Canyon was before Mike Lindell's

25   statements, so --

1   Q.   This record is 5-26-2021; correct?

2   A.   Correct.

3   Q.   After Michael Lindell's statement.

4   A.   Yes.

5   Q.   Yesterday you claimed you left the country because of

6   Mr. Lindell's statement; is that fair to say?

7   A.   No, I don't believe I said that.

8   Q.   You actually had started the Fritz, your restaurant,

9   on May 1st.

10   A.   May 14th.

11   Q.   May 14th.  Okay.  Just five days after Mr. Lindell's

12   statement.

13   A.   That is correct.

14   Q.   Truth is, Mr. Lindell's statement didn't bother you,

15   did it?

16   A.   That is not true.

17   Q.   And you don't know whether Mike Lindell saw the

18   Newsmax retraction, do you?

19   A.   I don't know for certain, no.

20   Q.   You do know that he blames you for the Newsmax deal.

21   A.   I have heard statements to that effect.

22   Q.   When you served him on the Capitol steps, as you said

23   yesterday, you knew he would be there; right?

24   A.   I was aware of the rally, yes, and that he would be

25   attending.

1    Q.   Yesterday you testified that you said Mr. Lindell had

2    a Twitter account, referring to Exhibit 235.  Do you

3    recall that?

4    A.   I believe so, yes.

5    Q.   You have no personal knowledge of whether Mr. Lindell

6    had a Twitter account on that date, do you?

7    A.   On that day, I can't say for certain, no.

8    Q.   In fact, Mr. Lindell did not have a Twitter account

9    on that day.

10   A.   Okay.

11   Q.   You don't dispute that you wrote to your brother that

12   you would "love to sue that clown, too," referring to

13   Mr. Lindell.

14   A.   Yes, I admitted that yesterday.

15   Q.   And at the time you sent that message, Mr. Lindell

16   had not said anything about you publicly, had he?

17   A.   No, he had not.

18   Q.   He had not mentioned your name in any broadcast;

19   right?

20   A.   At that point, no.

21   Q.   You have no evidence that Mr. Lindell mentioned you

22   by name before February 5, 2021.

23   A.   Correct.

24   Q.   That is because there are none; right?

25   A.   I am not aware of any.

1    Q.   You reviewed the record of Mr. Lindell's media

2    appearances; correct?

3    A.   I can't say every single one, but --

4    Q.   You can't point to any appearance in which

5    Mr. Lindell accused you of anything before that text.

6    A.   Correct.

7    Q.   In June of 2022, you sent a friend an email referring

8    to Mr. Lindell as "the pillow boy," correct?

9    A.   That sounds familiar.

10        MR. KACHOUROFF:  Excuse me, Your Honor, one moment.

11   Q.   (BY MR. KACHOUROFF)  You described the decision to

12   sue Mr. Lindell as "shaking the money tree."

13   A.   Yes, I did.

14   Q.   You know that Mr. Lindell had never personally

15   accused you of rigging the election.

16   A.   I disagree with that.

17   Q.   What statement did Mr. Lindell make about you where

18   he said Coomer is rigging the election?  It is an

19   open-ended question.  Where did he make that statement?

20   A.   I think we played an exhibit yesterday.

21   Q.   Mr. Lindell never said that you rigged the election,

22   did he?

23   A.   That explicit quote, that quote?  He has accused me

24   of rigging the election, yes, he has.

25   Q.   He personally has said that Dr. Eric Coomer has

1    rigged the election.

2    A.    Dominion, along with Coomer, sent the data through

3    China and stole our voice.  He is a traitor.  Yeah, I

4    think that is a direct statement from Mr. Lindell that I

5    rigged the election.

6    Q.    That is not hyperbole?

7    A.    I wouldn't call it such, no.

8    Q.    Dominion uses programmers in Serbia.

9    A.    Yes, they do.

10   Q.    So things get routed through Serbia and other

11   countries with Dominion.

12   A.    Not election data.

13   Q.    The software is developed overseas; correct?

14   A.    Portions of it are.

15   Q.    But nowhere in that statement did he ever say that

16   you rigged the election, did he?

17   A.    I think that is the inference, yes.

18   Q.    I will show you Exhibit 119.  Do you recognize this

19   exhibit?

20   A.    Give me a moment, please.

21   Q.    I will move it down so you can see it better.

22        THE COURT:  I don't have 119 on my exhibit list.

23   It has been removed for duplication.

24        MR. KACHOUROFF:  Yes, Your Honor.  We did a

25   redaction.

1          THE COURT:  So -- but I don't have 119.

2     Q.  (BY MR. KACHOUROFF)  While waiting for the correct

3     exhibit number, in that email you tell your friend that

4     you are looking to set up precedent in this case --

5     A.   Yes.

6     Q.   -- for years to come.

7     A.   I hope so.

8     Q.   You don't want him talking about machines ever again.

9     A.   No.  The precedent is nobody should be able to get

10    away with the defamation that I have been subjected to.

11    Q.   But you don't want him talking about machines ever

12    again.

13    A.   I don't want him defaming me.

14    Q.   You don't want him to talk about machines.  And I am

15    not talking about you, I am talking about the machines.

16    A.   Mr. Lindell can continue to make statements about the

17    machines, that is not what is at issue here.  The issue

18    here are the statements he made directly about me.

19    Q.   And he wasn't using hyperbole in your opinion?

20    A.   He called me a traitor.

21    Q.   You called President Trump far worse things than a

22    traitor, didn't you?

23    A.   No.

24    Q.   A "Nazi fascist racist fuck-tard."

25    A.   Those aren't crimes in the constitution.

1    Q.    You said he was "going to round people up on trains."

2    A.    Yes.

3    Q.    Nazis do that; right?  And you are referring to Nazis

4    rounding up Jews.

5    A.    Yes.

6    Q.    Who were going to commit murder of Jews.

7    A.    Yes.

8    Q.    You are accusing President Trump to wanting to kill

9    U.S. citizens.

10   A.    I don't think I claimed that, no.

11   Q.    Well, that is what it sounds like, or is that

12   hyperbole?

13   A.    I don't think it is hyperbole.

14   Q.    Donald Trump hasn't round anybody up on trains, has

15   he?

16   A.    Planes.

17   Q.    You are referring to immigration; correct?

18   A.    I am.

19   Q.    But he hasn't rounded up anybody on trains, has he?

20   A.    Not to my knowledge.

21   Q.    He hasn't gassed anybody, has he?

22   A.    Not to my knowledge.

23   Q.    Hyperbole; right?

24   A.    Sure.

25   Q.    When you sued Mr. Lindell by serving him on the

```
 1    Capitol steps here in Denver, you knew that he would be
 2    provoked, didn't you?
 3    A.   No.  I have no knowledge of his state of mind.
 4    Q.   You knew it was going to be on the Capitol steps, did
 5    you not?
 6    A.   To be clear, my firm has a process server, I am not
 7    involved in that.
 8    Q.   So you weren't aware your attorneys were trying to
 9    set him up on the Capitol steps?
10    A.   I was aware we engaged a process server to serve Mike
11    Lindell per the requirements of the suit.
12    Q.   You know there are about 25 other people you served
13    up to that point; correct?
14    A.   I don't know them personally but, yes, I served -- or
15    I had served many other people up to that point.
16    Q.   Did you serve those people at home?
17    A.   Again, I have a process server through the firm.  I
18    don't know where individuals are served or not.
19    Q.   But you obviously knew Mr. Lindell was going to be
20    appearing in Denver, on the Capitol steps, to give a live
21    press conference.
22    A.   Yes.  As I stated, I was aware he would be in town.
23    Q.   And that would maximize the public's attention given
24    to the supposedly defamatory statements that you are
25    telling this jury upset you so much.
```

1    A.    No.

2    Q.    The public attention didn't really upset you all that

3    much in that context, did it?

4    A.    I am sorry, you are going to have to rephrase that, I

5    don't understand the question.

6    Q.    Sure.  The public attention to serve Mr. Lindell on

7    the steps of the Capitol, that didn't upset you.

8    A.    Again, I had no -- I had no decisionmaking in that

9    process.  We have a process server, he serves the papers

10   in the most efficient way he chooses.  I don't make those

11   decisions.

12   Q.    You knew it was a fact that the more people who knew

13   about this lawsuit, the more people who would hear about

14   the statements that Lindell had allegedly made about you;

15   correct?

16   A.    No.

17   Q.    Well, the press coverage would have maximized that at

18   the Capitol; right?

19   A.    I can't speak to that.  I have no idea.

20   Q.    When Mr. Lindell reacted to the service of that

21   lawsuit, he made several other comments, didn't he?

22   A.    He did.

23   Q.    And you added those new comments to your suit.

24   A.    We did.

25   Q.    And those comments were made just after you served

1   him, not before; right?

2   A.   That is correct.

3   Q.   So you've sued -- how many entities have you sued?

4   How many parties have you sued so far, 25, 26, 27?

5   A.   Somewhere in that range.  I know that there are five

6   distinct cases.

7   Q.   You sued about 25 people long before you ever sued

8   Mr. Lindell; correct?

9   A.   That is correct.

10  Q.   Several of the defendants have appeared on television

11  or social media discussing election issues; correct?

12  A.   Yes, they have.

13  Q.   You didn't file any lawsuits against, for instance,

14  David Clements, the guy we showed yesterday with the wild

15  hair.

16  A.   I have not sued David Clements.

17  Q.   You claim he defamed you.

18  A.   He made defamatory statements about me, yes.

19  Q.   But you didn't sue him because he wasn't rich enough.

20  A.   No.  The decisions on who and who not to sue are

21  discussions between my attorneys and myself.

22  Q.   Ultimately you are the one who decides whether to

23  pull the trigger to sue; right?

24  A.   Yes, it is.

25  Q.   You didn't file any lawsuits against anonymous

1    internet users, did you?

2    A.   I don't think that is possible.

3    Q.   You didn't file against people on the internet, the

4    posters that would repeat or re-Tweet the posts by Joe

5    Oltmann.  You didn't file any lawsuits against them, did

6    you?

7    A.   No, I did not.

8    Q.   But in all these cases, you basically allege the same

9    thing; defamation as a result of Mr. Oltmann's statement;

10   right?

11   A.   Not solely Mr. Oltmann's statements, no.  Yes, this

12   case is about defamation.

13   Q.   And you claim reputational harm in every one of those

14   lawsuits, not including Mr. Lindell's, but you claimed

15   reputational harm in every one of those lawsuits; right?

16   A.   I believe so, yes.

17   Q.   And emotional distress, too.

18   A.   Absolutely.

19   Q.   Your legal team in the Trump lawsuit, the Trump

20   campaign lawsuit, is the same legal team you have here

21   today.

22   A.   I have one legal team, and they are here today.

23   Q.   You claimed that your safety was jeopardized by those

24   other 25 defendants; correct?

25   A.   My safety has been jeopardized because of defamatory

1    statements made.

2    Q.    In both cases you used similar language to describe

3    the defendant's alleged misconduct; correct?

4    A.    Yes.

5    Q.    In all those cases, you sought punitive damages, too,

6    right?

7    A.    Yes.

8    Q.    You wanted to hold the media platforms accountable;

9    correct?

10   A.    Publishers of the defamatory statements, yes.

11   Q.    You know that Frankspeech was intended to be an

12   independent platform; correct?

13   A.    I don't have knowledge of what -- why Frankspeech was

14   started, no.

15   Q.    You don't know whether Frankspeech agreed with My

16   Pillow or agreed with Mr. Lindell to do anything to you,

17   do you?

18   A.    I would disagree with that.

19   Q.    You have no evidence here today that an agreement

20   exists between Mr. Lindell and My Pillow to defame you.

21   A.    Not a written agreement, no.

22   Q.    You have no evidence of a written agreement between

23   Mr. Lindell and Frankspeech to defame you.

24   A.    Not a written agreement, no.

25   Q.    You have no evidence of an oral agreement between

1    Mr. Lindell and My Pillow to defame you.

2    A.    No, I do not.

3    Q.    You have no written evidence of an oral agreement for

4    Mr. Lindell and My Pillow and Frankspeech together to

5    defame you.

6    A.    I do not.

7    Q.    Every defendant you have sued so far has a platform,

8    a social media platform, a public figure, or somebody with

9    significant financial assets; correct?

10   A.    No.

11   Q.    All the other people that you sued republished Joe

12   Oltmann's statements hundreds of times before Mr. Lindell

13   interviewed Mr. Oltmann.

14   A.    That is a fair statement, yes.

15   Q.    And your reputation was destroyed before January the

16   1, 2021; correct?

17   A.    Yes.

18   Q.    Mr. Lindell didn't cause that.

19   A.    At that time, no.

20   Q.    All the other people that you sued had more followers

21   than Mr. Lindell ever did, the 25 defendants that you

22   sued.

23   A.    I don't know that as a fact, no.

24   Q.    Well, the Trump for President Campaign entity you

25   sued has more followers than Mr. Lindell; correct?

1    A.    I don't know that as a fact.

2    Q.    You think Mr. Lindell is more popular than President

3    Trump?

4    A.    I am telling you I don't have numbers to look at, so

5    I can't factually answer that question.

6    Q.    Your reputation was shattered long before Mr. Lindell

7    said a word about you; isn't that correct?

8    A.    Yes.

9    Q.    And you have no evidence that your reputation was

10   tarnished or damaged by Michael Lindell any worse or any

11   more than the statements by these other people that you

12   have sued.

13   A.    I disagree.

14   Q.    You have no evidence that your anxiety was made worse

15   by Michael Lindell, or any worse than you have already

16   claimed by these other defendants.

17   A.    Yes, I do.

18   Q.    Well, May 26, your treatment records show that you

19   were in a good mood; correct?

20   A.    It does.

21   Q.    That is just after the May 9th huge deal that you

22   said -- right after Mr. Lindell's May 9 statement that you

23   classified as a "huge deal, a monumental event" in your

24   mind; right?

25   A.    Yes.

1    Q.    You have no evidence whether Mr. Lindell made a

2    single threat to you in this case.

3    A.    I disagree.

4    Q.    Mr. Lindell has never made a threat to you, has he?

5    A.    I think accusing me of being a traitor is a threat.

6    Yes, I do.

7    Q.    No one in this case, or any of the other 25 cases,

8    has been arrested for calling someone a traitor; right?

9    A.    No, but they have been sued, and that is why we are

10   in court.

11   Q.    You recall President Trump calling Hilary Clinton a

12   traitor; correct?

13   A.    Yes, I do.

14   Q.    And that would be hyperbole.

15   A.    Again, I am not going to speak to Mr. Trump's state

16   of mind.

17   Q.    You recall Joe Biden saying he was going to beat up

18   President Trump.

19   A.    I do recall that.

20   Q.    That would be hyperbole.

21   A.    Again, I am not going to speak to Mr. Biden's state

22   of mind.

23   Q.    I want to turn now to public election officials

24   generally.

25            THE COURT:  Mr. Kachouroff, I don't mean to

1    interrupt, but since you are shifting gears I will give

2    the jury the morning break.

3          Ladies and gentlemen of the jury, we will take a

4    break for about 15 minutes, and then just be back here

5    then.  Do not discuss the case, enjoy your 15 minutes off,

6    we will see you in a little bit.

7          (Outside the presence of the jury.)

8          THE COURT:  Thank you, counsel.  Before we take a

9    break, I may be working from an old exhibit list, so make

10   sure I get the updated one.

11         I need you all, and since it is your examination

12   right now, Mr. Kachouroff, to be mindful of the screens

13   when you want them turned back and forth, so just make

14   sure that you are managing that so we are not having to

15   manage that.  We will remind you if it is supposed to be

16   turned and it is not, but you need to be mindful if you

17   want them turned back around, okay.

18         MR. KACHOUROFF:  Yes, ma'am.

19         THE COURT:  All right.  We will be in recess.

20         (A break is taken from 11:00 a.m. to 11:26 a.m.)

21         THE COURT:  Thank you, please be seated.  All

22   right.  Are we ready to proceed?

23         MR. KACHOUROFF:  Your Honor, briefly, Exhibits 119

24   and 120, you are correct, you have the right Exhibit 120,

25   it wasn't redacted.  119 got redacted by mistake, that was

1    the reason for the mix-up.

2        THE COURT:  I am working from the third amended

3    joint trial exhibit list.  It does not appear this has

4    been docketed, so let's make sure it gets docketed, but

5    that is the one I am working from.

6        MR. KACHOUROFF:  In the meantime, should I use, for

7    sake of efficiency and expediency, 119?

8        THE COURT:  Can you just put a sticker over 119 and

9    change it to 120?

10        Madam deputy, do you have a sticker?

11        COURTROOM DEPUTY:  I do.

12        THE COURT:  All right.  Are we ready for the jury?

13        MR. KACHOUROFF:  We are ready, Your Honor.

14        THE COURT:  Madam deputy.

15        (In the presence of the jury.)

16        THE COURT:  Thank you.  Please be seated.

17        Dr. Coomer, I remind you, you are still under oath.

18        Mr. Kachouroff.

19        MR. KACHOUROFF:  Thank you, Your Honor.

20    Q.   (BY MR. KACHOUROFF)  We were going to talk about the

21    public duty of election officials generally from your

22    knowledge.  You would agree they are -- the election

23    officials are the stewards of American democracy at its

24    most granular level; right?

25    A.   I would.

1    Q.   And their role is to ensure that every eligible vote

2    is counted accurately; correct?

3    A.   That's correct.

4    Q.   And securely.

5    A.   Correct.

6    Q.   It is because they are counting ballots; right?

7    A.   Yes, they are.

8    Q.   So this duty includes hiring poll workers; right?

9    A.   Yes.

10   Q.   Managing tabulation processes.

11   A.   Yes.

12   Q.   Making realtime decisions during elections.

13   A.   Yes.

14   Q.   Often under public scrutiny; right?

15   A.   Yes.

16   Q.   The public expects them to act independently.

17   A.   Yes.

18   Q.   They also expect them to act not just competently,

19   but with neutrality; right?

20   A.   Yes.

21   Q.   Restraint.   Integrity.

22   A.   Yes.

23   Q.   They want to be seen as nonpartisans; is that fair to

24   say.

25   A.   In that role.

1    Q.   In that role, correct.  They are not supposed to

2    cheer for either side.

3    A.   That is not correct.

4    Q.   So during an election, an election official can start

5    advocating for one party or the other?

6    A.   During an election counting process, no.

7    Q.   That is because they have to be politically neutral;

8    correct?

9    A.   They should appear neutral, yes.

10   Q.   And they have to be worried about how the public

11   perceives them.

12   A.   I mean, public perception is all about trust, yes.

13   Q.   You would agree that the appearance of bias through

14   personal conduct, public statements, or affiliations can

15   undermine the public's confidence in the results they

16   certify; correct?

17   A.   Well, almost every county clerk, secretary of state,

18   is, by definition, part of a partisan party, so --

19   Q.   But they don't go advocating that during the election

20   process; right -- the election counting, I should say?

21   A.   That is not true.  You have had secretaries of state

22   that are on the ballot.

23   Q.   Secretaries of state, correct.  But the people,

24   actually the workers at the local level that are doing the

25   ballot counting and collecting, they don't go out and

1    start cheering for one team; correct?

2    A.    That is not true.  You have county clerks that may be

3    on the ballot that they are counting, and secretaries of

4    state.

5    Q.    I didn't ask if they are on the ballot.  They are not

6    supposed to be going out and advocating for one side or

7    the other.

8    A.    They would be advocating for themselves as part of a

9    party.  So there is partisanship there.

10   Q.    Not in counting of ballots.

11   A.    In the count of the ballots, no.

12   Q.    They are like umpires; correct?

13   A.    In the election process of counting ballots, yes.

14   Q.    If the umpire cheers for one team the whole game, it

15   looks rigged; right?

16   A.    No.

17   Q.    You know election officials don't operate in a

18   vacuum.  I mean, they have to rely upon vendors like

19   Dominion --

20   A.    Yes.

21   Q.    -- to provide their voting equipment; right?

22   A.    Correct.

23   Q.    Their ballot design software.

24   A.    Correct.

25   Q.    The adjudication systems, like you co-invented.

1    A.    If they purchased them, yes.

2    Q.    And cybersecurity tools.

3    A.    In regard to the election system, itself, but not in

4    regards to their IT systems.

5    Q.    You would agree, would you not, that these vendors

6    become extensions of the public trust when their

7    technology is used to count the votes and report results?

8    A.    Again, I think that authority lies with the counties,

9    themselves.

10   Q.    Right.  But when the public scrutinizes the public

11   official, they look to all of the decisions that the

12   public official has made; correct?

13   A.    Okay.

14   Q.    Including vendor selection; right?

15   A.    Sure.  I mean, but that is the equipment.

16   Q.    If word got out that one of the election officials

17   was hyperpartisan and engaged in hyperbole, it could upset

18   members of the public who might perceive them as being

19   biased.

20         MR. CAIN:  Objection, calls for speculation.

21         THE COURT:  Sustained.

22   Q.    (BY MR. KACHOUROFF)  When a vendor's employee's

23   social media post expresses overt political bias --

24   A.    Excuse me?

25   Q.    I said when a vendor's employee's social media posts

```
 1    expresses overt political bias, threatens to unfriend

 2    co-workers with different political views, or insults half

 3    the electors online, it puts election officials in a

 4    defensive position, no?

 5    A.   I am not sure I would agree with that.

 6    Q.   Okay.  You would agree that at least half of the

 7    voting populous who disagreed with that person's decision,

 8    might call their judgment into question.

 9    A.   Essentially.

10    Q.   And so the integrity of our elections depends not

11    just on what happens in the voting booths, but on the

12    professionalism of those behind the scenes.

13    A.   I mean, yes.  The people involved in this process

14    should be professional, yes.

15    Q.   That includes public servants and private

16    contractors.

17    A.   Yeah.  Anybody working should be working

18    professionally, yes.

19    Q.   So election officials are really judged by the

20    company that they keep, would you agree with that?

21    A.   No.

22    Q.   Well, trusting the vendor is a reputational risk, is

23    it not?

24    A.   Yes.  I think they have to trust the vendor, yes, to

25    act professionally.
```

1    Q.   And so that risk must be managed with extreme care

2    and an uncompromising demand for nonpartisan conduct.

3    A.   During the election process, yes.

4    Q.   And your position at Dominion was very important to

5    election security; correct?

6    A.   Yes.  That was one of my main focuses.

7    Q.   What other focuses do you consider important about

8    the position that you held at Dominion concerning the

9    election process?

10   A.   Providing the services necessary to support the

11   customers during elections, designing products that meet

12   the needs of the customer.

13   Q.   And your responsibilities were ensuring that the

14   machines worked accurately before going to the customer.

15   A.   That was not my specific role, no.

16   Q.   Your adjudication invention went to the heart of

17   voter intent; right?

18   A.   That's correct.

19   Q.   So you would agree your position with Dominion was

20   pretty sensitive.

21   A.   "Sensitive?"  Can you elaborate on that?

22   Q.   Sure.  It is sensitive in the sense that the

23   adjudication process is handling a ballot that may or may

24   not be counted.

25   A.   It provides an interface.  Again, I didn't code that

1    system.  I don't install that system.  I designed that

2    system.  I can tell people how it works.

3    Q.   You also fix it; correct, like Gwinnett County?

4    A.   I can provide input on how to fix it.  I don't go in

5    and touch anything.

6    Q.   But Gwinnett County, you fixed that; right?

7    A.   I provided customer service and technical support

8    that allowed the county to fix their issue.

9    Q.   So you gave them the solution to fix their issue.

10   A.   Yes.  That's sort of standard technical support.

11   Q.   But in the Gwinnett County case, you admitted it was

12   Dominion's fault for not setting the machines up properly.

13   A.   And the county for not testing it beforehand.

14   Q.   So it is important for election officials to know

15   about your reputation so they can depend on you; is that

16   fair to say?

17   A.   I think that's being in direct interaction with me.

18   You build relationships by interacting with people.

19   Q.   They need to be able to trust you.

20   A.   And I think that it is my actions that allow them to

21   trust me, yes.

22   Q.   And they want to know that you are not biased for any

23   one particular candidate or another.  They want to know

24   you are professional and that you want that transparency

25   in the work that you do for them.

 1    A.    Those are two different questions.

 2    Q.    Okay.  Would you like me to re-ask the question for

 3    you?

 4    A.    I would.

 5    Q.    Okay.  They want to know that you don't have bias

 6    towards one candidate or another in your work.

 7    A.    No.  In my work with them?

 8    Q.    Yes.

 9    A.    Yes, I would agree with that.

10    Q.    Now, we talked about your departure from Dominion.

11    You actually voluntarily tendered a resignation back in

12    the November 2020 time period.

13    A.    Yes.

14    Q.    You were officially put on leave on or about the 14th

15    of December, I believe.

16    A.    No.  I was actually put on leave late November.

17    Q.    Late November.  But as of December 14th, you were not

18    interacting at all with any problems that Dominion may

19    have had.

20    A.    That is correct.

21    Q.    We talked about your "glaring lapse of judgment."  Do

22    you recall that?

23    A.    I admitted that, yes.

24    Q.    And that is because you knew that election officials

25    could be considering your political posts as too extreme.

1    A.    Only in relation to false accusations that I rigged

2    the election.

3    Q.    Well, you know who Gabe Sterling is; right?

4    A.    I do know who Gabe Sterling is.

5    Q.    Gabe Sterling is a Republican.

6    A.    He is.

7    Q.    Fair to say you are a Democrat, or on the left of

8    things?

9          MR. CAIN:  Objection, party affiliation.

10          THE COURT:  Sustained.

11    Q.    (BY MR. KACHOUROFF)  You don't see eye to eye on

12    political views; correct?

13    A.    Whose political views?

14    Q.    Yours and Gabe Sterling.

15    A.    Some yes, some no.

16    Q.    Okay.  Well, tell the jury, what is Gabe Sterling's

17    position?

18    A.    I don't know his exact job title, but he is

19    essentially like a chief operations guy for the State of

20    Georgia under the Secretary of State's Office.

21    Q.    He is in a high-up position.

22    A.    Yeah.  He was Brad Raffensperger's right-hand man for

23    managing the election system across the state.

24    Q.    Brad Raffensperger is the Secretary of State for the

25    State of Georgia.

1    A.    Currently, yes.  At the time they were talking about,

2    he was the Secretary of State.  He is now Governor.

3    Q.    John Poulos, the CEO of Dominion, asked you to get on

4    a phone call with Gabe Sterling back in the November 2020

5    timeframe; correct?

6    A.    He did.

7    Q.    And when you were on that phone call, he asked you

8    about Joe Oltmann's statements about you; correct?

9    A.    He did.

10    Q.    And you told him, I did not do what Joe Oltmann said.

11    A.    I did tell him that, yes.

12    Q.    And he asked you about posting Antifa posts on your

13    Facebook page.

14    A.    The Antifa manifesto we have discussed, yes.

15    Q.    You also have Antifa -- other Antifa symbols on your

16    Facebook page, too.

17    A.    I don't believe so.

18    Q.    We will go over those in a few moments.

19    A.    Not that I recall.

20    Q.    I am not trying to trap you.

21    A.    Yeah.

22    Q.    You would agree that Gabe Sterling thought you were

23    among the best in the industry.

24    A.    I think he still thinks that.

25    Q.    But he told you that "posting Antifa stuff was a

312

```
 1    dumbass thing to do."  Those were his words; right?

 2    A.   Yes.

 3    Q.   You apologized to him; correct?

 4    A.   I agreed with him that it was a "dumbass" thing to

 5    do.

 6    Q.   You actually apologized to him.

 7    A.   I don't have the exact -- I can't remember the exact

 8    call.  It certainly wasn't recorded, and at this point --

 9    Q.   You remember The New York Times article that you

10    helped -- you were interviewed for which was entitled He

11    Was the 'Perfect Villain' for Voting Conspiracy Theorists.

12    A.   Yes.  Yes.

13    Q.   Sterling said, "My gut told me it was crap to begin

14    with, but I had to ask you the question."

15    A.   Correct.

16    Q.   You were upset because you thought you might have

17    damaged his reputation; correct?

18    A.   Yes.

19    Q.   But you never mentioned him in your Facebook posts,

20    did you?

21    A.   I did not.

22    Q.   That is why John Poulos was worried that you might

23    have damaged Dominion's reputation; as well?

24    A.   We -- at that point we did not have -- I did not have

25    a conversation with John Poulos specifically about that.
```

1    Q.    Well, with you on board it could undermine Gabe

2    Sterling's reputation in the eyes of the public; correct?

3    A.    Because there were statements out there that I rigged

4    the election.

5    Q.    He said that "posting Antifa stuff was a dumbass

6    thing to do," correct?

7    A.    The release of those documents, those Facebook posts

8    were from the people that were accusing me of rigging the

9    election, so it is a chicken-and-egg sort of thing.

10   Without this defamation, that information doesn't come

11   out.

12   Q.    So you said you had a private Facebook account.

13   A.    Correct.

14   Q.    With 300 of your closest friends.

15   A.    Correct.

16   Q.    And in one of your posts you say, "friend, family, or

17   foe," -- if you voted for President Trump -- "un-trump me

18   now.  I've got no truck for racists."

19   A.    I did say that.

20   Q.    One of them took you up on that offer.

21   A.    I can't say for a fact that that is true.

22   Q.    Well, your Facebook post got out; right?

23   A.    The question you asked is not what you just stated.

24   Q.    One of your friends must have unfriended you at some

25   point because of what you said; right?

```
 1    A.    Perhaps.

 2    Q.    And perhaps copied all of your inflammatory posts;

 3    right?

 4    A.    Perhaps.

 5    Q.    And then disseminated it to the public.

 6    A.    Okay.  But that is not what you asked me.

 7    Q.    I am just -- we are -- you understand what I just

 8    asked you.

 9    A.    Sure.

10    Q.    Okay.  I am showing you what has been marked as

11    Exhibit 9A.  Do you recognize this?

12    A.    I do.

13    Q.    There is a series of other ones behind it, and I will

14    just flip through them slowly so you can see.

15    A.    Okay.

16    Q.    Does that look like your Facebook posts?

17    A.    Yes, they are.

18    Q.    Okay.  Let's start at 72.

19          MR. KACHOUROFF:  Your Honor, I move to admit 9.

20          MR. CAIN:  May we approach?

21          THE COURT:  Yes.

22          (A bench conference is had.)

23          MR. CAIN:  I don't want to waive any of the prior

24    arguments and objections that we made, so I am just

25    reasserting those.
```

1          THE COURT:  I understand.  Overruled.

2          (In the hearing of the jury.)

3          THE COURT:  So admitted.

4          (Exhibit No. 9A is admitted.)

5    Q.  (BY MR. KACHOUROFF)  Dr. Coomer, you testified about

6    Antifa being a word that was -- I think it was called a

7    neologism.  What is a neologism?

8    A.   It is a contraction of two common words to make a new

9    word.

10   Q.   Like Antifa, for instance.

11   A.   Correct.

12   Q.   And Antifa means antifascist.

13   A.   Correct.

14   Q.   So that is a neologism.

15   A.   Yes.

16   Q.   Antifa, that is the end product.

17   A.   Correct.

18   Q.   Okay.  Would you mind reading this rant for me as you

19   intended.

20   A.   It starts with "rant/  Facebook friend land- open

21   call...  If you are planning to vote for that autocratic,

22   narcissistic, fascist ass-hat blowhard and his christian

23   jihadist VP pic, UNFRIEND ME NOW!  No, I'm not joking.

24   I'm all for reasoned political discourse and healthy

25   debate -- I'm looking at you" -- do I have to say the

1    names?

2    Q.   You can say, "these three people."

3    A.   Three people listed by name -- "I disagree with you

4    three on many philosophical grounds but respect your

5    opinions.  Only an absolute FUCKING IDIOT could ever vote

6    for that wind-bag fuck-tard FASCIST RACIST FUCK!  No

7    bullshit, I don't give a damn if you're friend, family, or

8    random acquaintance, pull the lever, mark an oval, touch a

9    screen for that carnival barker... UNFRIEND ME NOW.  I

10   have no desire whatsoever to ever interact with you.  You

11   are beyond hope, beyond reason.  You are controlled by

12   fear, reaction, and bullshit.  Get your shit together.

13        Oh, if that doesn't persuade you, FUCK YOU!

14   Seriously, this fucking ass-clown stands against

15   everything that makes this country awesome.  You want in

16   on that?  You deserve nothing but contempt.  #untrumpme.

17   I think that hashtag might go viral.  #takingastand."  End

18   rant. "/rant" means end rant.

19        "No really, unfriend me!  #untrumpme

20   #youarebeyondhope /rant."

21   Q.   And to be fair, there are a couple edits you made, so

22   I will slide it up.

23   A.   "*edit, I put the end-tag in the wrong spot...  *2nd

24   edit, these opinions are rational and completely my own.

25   They are based in reason and highly credible.  Though they

```
 1    are not necessarily the thoughts of my employer, though if

 2    not, I should probably find another job... Who wants to

 3    work for complete morons?  None of my personal opinions

 4    affect my professional conduct or attitudes.  I am

 5    non-partisan.  I am not, however, willing to stand by and

 6    watch this great country be" -- and I can't read the rest.

 7    Q.   Because of the date stamp, I can't either.

 8    A.   Yeah.  There are a couple other words, "saying

 9    something, anything."

10    Q.   You didn't get consent of these three individuals to

11    name them in this post, did you?

12    A.   No, but they were part of my private Facebook group.

13    Q.   I will highlight a word here.  Is that a neologism?

14    A.   Yes, it is.

15    Q.   And what are the words that make up that word?

16    A.   It would be "fuck" and "retard."

17    Q.   "Retard" is not a nice word, is it?

18    A.   It is not.

19    Q.   In response to one of your -- and I will cover your

20    friend up.  So I will cover your friend up.  You say in

21    response to your friend, you say, "I think my country is

22    worth 'fighting' for.  I'm not advocating building a Wall

23    to huck the trumpets over, but I don't have to interact on

24    a social media site with them.  Nope... don't have to do

25    it.  Call me hypocrite, I'll call it something else.  You
```

1    want to 'break bread' with racist fascists.  Sweet, have

2    at it.  I won't.  And yeah, I'll double down and call

3    racist fascists fuck-tarded morons."  Those are your

4    words, aren't they?

5    A.    They are.

6    Q.    Other thing I wanted to point out here, you called

7    President Trump a "carnival barker."

8    A.    I did.

9    Q.    It is something that you used in reference to him.

10   A.    I'm sorry.

11   Q.    You used that in reference to him.

12   A.    Yes.

13   Q.    Like a "Cheeto man," or I forgot what you called him.

14   Do you remember that?

15   A.    "Cheeto-in-chief," I believe.

16   Q.    "Cheeto-in-chief."

17         Showing you another post from 2016.  "This coward

18   (McCain) won't; clinging to his endorsement of an

19   abomination."  You are referring to Trump.

20   A.    Yes, I am.

21   Q.    "A reprehensible simulacrum of a 'human being'

22   cobbled together from defective spare parts lacking all

23   empathy, humility, humanity."  Correct?

24   A.    Correct.

25   Q.    You are calling John McCain a coward.

1    A.    For supporting Trump, yes.

2    Q.    You know Donald Trump called McCain a coward, too.

3    A.    He did a lot worse.

4    Q.    I will not go through all of these, just a couple of

5    them.  This post is blacked out, but it appears that a

6    Trump supporter was charged, I am guessing it was with

7    election fraud.  Do you see that?

8    A.    Yes, I do.

9    Q.    And you have the quote there, "we don't do that

10   stuff."  And your response was "oh, oh, but you do."

11   Right?

12   A.    Correct.

13   Q.    You were accusing Republicans of election fraud.

14   A.    I was accusing this Republican of election fraud,

15   yes.

16   Q.    Okay.  In your support for former Senator Hilary

17   Clinton, you re-posted, and said if she "had a penis...

18   you fuck head, chuckle fuck's wouldn't have boo to say."

19   Right?

20   A.    Yes.

21   Q.    Another post referring to Britain, you said "fuck

22   you, Britain, we beat your ass again.  We rule!  We will

23   see your silly brexit and raise you an insane orange

24   narcissistic racist xenophobic clown!  UST UST UST!"  That

25   is a satire from you.

320

 1    A.    Yes.

 2    Q.    Hyperbolic satire.

 3    A.    I am not sure that is hyperbolic, but it is satire.

 4    Q.    This is from 2017, "there be some serious fuckery

 5    going on right here fueled by Cheeto-in-chief stocking lie

 6    after lie on flame of Kobach."  What is "the flame of

 7    Kobach"?

 8    A.    So, again, this is referencing a Washington Post

 9    article.  Chris Kobach was -- I forget what his position

10    in Kansas was, he was an elected official.  He became, I

11    guess, one of the staunch members of the election denial

12    group.  He was convinced that there was -- mostly related

13    to "illegal voters."

14          So he was leading essentially a voter fraud

15    investigation group that President Trump put together

16    early on in 2017.  And as the Post article says, "the

17    voting commission is a fraud, itself, shut it down."

18    Q.    You disagree with that political opinion about

19    shutting down the voting commission.

20    A.    No, no, I fully support it.

21    Q.    You fully support that?

22    A.    Yes.

23    Q.    So he was something serious to worry about.

24    A.    Yes, because that commission was basing their

25    statements on lies.

321

1    Q.   And you didn't believe President Trump in 2017 was

2    making the right decision on that.

3    A.   I do not.

4    Q.   In 2017, he had just been elected for about a year

5    and a half now.  Looks like this is on September 14, 2017.

6    A.   So he had been there for a few months.  He was

7    elected in late --

8    Q.   So you are correct, 8 months.  He won the election

9    with Senator Hilary Clinton.

10   A.   Against Hilary Clinton, yes.

11   Q.   You are aware that candidate Hilary Clinton, after

12   the election, stated that the election was stolen from

13   her.

14   A.   I do recall that, yes.

15   Q.   You felt it was stolen from her, too.

16   A.   No, I don't.  I think the results were correct.

17   Q.   Did you try to reach out to candidate Hilary Clinton

18   and let her know she was wrong about saying the election

19   was stolen?

20   A.   No, I did not.

21   Q.   Did you know that Senator Kamala Harris said the

22   election was rigged in 2016?

23   A.   I don't recall her saying that.

24   Q.   Do you recall Senator Amy Klobuchar -- do you know

25   who Amy Klobuchar is?

1    A.    I do know who Amy Klobuchar is.

2    Q.    She is a Minnesota senator; am I correct?

3    A.    Correct.

4    Q.    And she said machines can't be trusted; right?

5    A.    She did.

6    Q.    Okay.  In that timeframe, Dr. Halderman, your expert

7    that is going to testify here, and Harri Hursti, released

8    a video called *Kill Chain*; correct?

9    A.    I can't say who was -- who produced that film.

10   Q.    Fair enough.  But they were in the video.

11   A.    Yes, they were.

12   Q.    And that video -- do you agree with that video?

13   A.    I found it laughable.

14   Q.    Okay.

15   A.    No, I don't agree with it.

16   Q.    And you know a lot of people watched that video;

17   correct?

18   A.    Yeah.  I believe it was carried on HBO.

19   Q.    And broadcast to millions of people.

20   A.    Correct.

21   Q.    And *Kill Chain* says that we can't trust the machines;

22   right?

23   A.    It does.

24   Q.    This is the -- the Antifa people have called it the

25   "Antifa manifesto."  I know you posted it.  You didn't

1    write it; correct?

2    A.    That is correct.

3    Q.    And Antifa is making a statement with this posting;

4    correct?

5    A.    No.

6    Q.    Well, you didn't write it.

7    A.    I did not write it.

8    Q.    You believe it is satirical.

9    A.    I do.

10   Q.    You know Antifa does not necessarily -- they do

11   advocate violence, the Antifa mindset?

12   A.    No, I do not know that.

13   Q.    You don't know that?

14   A.    No.

15   Q.    You are going to have Heidi Beedle testify here,

16   maybe not today, but sometime.

17   A.    Yes.  Heidi Beedle is one of our witnesses, yes.

18   Q.    They advocate "mass civil disobedience," correct?

19   A.    That is what is written here, yes.

20   Q.    And in this Antifa, what you call satirical rant, if

21   you will, if you call it a rant, it says "you can't arrest

22   100 million of us, sir, you would be well-advised not to

23   try."  Isn't that a veiled threat?

24   A.    I don't take it as such.

25   Q.    It says -- it calls out President Trump and says

324

 1    "you, sir and yours" -- referring to his supporters --

 2    "are terrorists, and your victims are done putting up with

 3    it."  Isn't that what it says?

 4    A.   That is what that person wrote, yes.

 5    Q.   Do you agree with that?

 6    A.   No, I do not believe that Donald Trump is a

 7    terrorist, no.

 8    Q.   You would agree, would you not, that nothing in your

 9    post here says you don't agree with that?

10    A.   No.

11    Q.   September 16th, this is about 2020.  You say, "we are

12    well and truly fucked."  And it is William Barr advocating

13    "hitting more protesters with federal charges."  Do you

14    see that?

15    A.   I do.

16    Q.   You didn't agree with arresting the protesters?

17    A.   No, and certainly not charging them with "sedition"

18    for simply peacefully protesting.  This photo was

19    specifically a peaceful protest.

20    Q.   Well, they weren't peaceful protests in Portland,

21    Oregon, were there?

22    A.   This hasn't nothing to do with Portland, Oregon.

23    Q.   Antifa protested in Portland, Oregon, did they not?

24    A.   I don't know that as a fact.

25    Q.   There were violent protests here in Colorado in 2020

1    with Antifa; correct?

2    A.    I don't know the facts of that.

3    Q.    In other post that you have here is --

4          MR. CAIN:  Your Honor, this is getting cumulative.

5          MR. KACHOUROFF:  This is the last post.

6          THE COURT:  All right.

7    Q.    (BY MR. KACHOUROFF)  "If you voted for a fascist -

8    friend, family, or foe, fucking un-trump me.  I've got no

9    truck for racists."  Do you see that?

10   A.    I do.  It comes right after "Just fucking vote!"

11         MR. KACHOUROFF:  At this time I would like to

12   introduce the two exhibits.  Can I just have the monitors

13   with just him and myself and counsel.

14         THE COURT:  I think that is how it is set up right

15   now.

16   Q.    (BY MR. KACHOUROFF)  Have you seen this before?

17   A.    Yes.

18   Q.    You called President Trump a "carnival barker," did

19   you not?

20   A.    Yes.

21   Q.    This is your Twitter post, Eric D. Coomer.

22   A.    It is.

23   Q.    And the date of that post approximately, does that

24   sound right?

25   A.    It does.

1          MR. CAIN:  Your Honor, it hasn't been admitted.

2    He's going into the substance, it is not authenticating.

3          MR. KACHOUROFF:  I was just authenticating.

4          THE COURT:  Overruled.

5          MR. KACHOUROFF:  Move to admit.

6          THE COURT:  So admitted.

7          (Exhibit No. 263 is admitted.)

8          COURTROOM DEPUTY:  Counsel, exhibit number, please.

9          MR. KACHOUROFF:  263.

10   Q.   (BY MR. KACHOUROFF)  In your direct yesterday, you

11   mentioned that President Trump upset you.  It was the

12   Access Hollywood.  Am I saying the incident right.  It was

13   talking about women.

14   A.   The Access Hollywood tape was one of them, yes.

15   Q.   And that upset you.

16   A.   It did.

17   Q.   Why was that?

18   A.   I found it reprehensible.  I found it misogynistic.

19   He was admitting to breaking in and trying to see

20   underaged women naked.

21   Q.   Putting another post up for you to look at.  Do you

22   recognize that?

23   A.   Yes, I do.

24   Q.   That is your Tweet that you did.

25   A.   It is.

1    Q.    March 27, 2020.

2    A.    Yes.  Two minutes after the previous one.

3    Q.    Two minutes after.  Okay.

4          MR. KACHOUROFF:  Your Honor, we move to admit this

5    as 264.

6          MR. CAIN:  No objection.

7          THE COURT:  So admitted.

8          (Exhibit No. 264 is admitted.)

9    Q.    (BY MR. KACHOUROFF)  This is a post from Melania

10   Trump, where she says, "While most children are home

11   during this challenging time, they tend to be on social

12   media throughout the days.  Parents, please be sure to

13   check on them regularly to be sure their practices online

14   are safe."  There is nothing wrong with that statement, is

15   there?

16   A.    No.

17   Q.    And you say, "If you mean not reading anything your

18   PO(TU)S husband twats out, good advice."  Right?

19   A.    Yes.

20   Q.    You put the "TU" in parentheses there; right?

21   A.    Yes, I do.

22   Q.    And tell us why you did that.

23   A.    I mean, again, I am going back several years, but my

24   best guess is that that leaves "POS."

25   Q.    Which stands for "piece of shit."

1   A.   It does.

2   Q.   And you say her "husband twats out."

3   A.   Yes.

4   Q.   What does the word "twat" mean?

5   A.   It is a play on Twitter, so instead of Tweet, you

6   twat.

7   Q.   The Urban Dictionary says that the word "twat" refers

8   to female genitalia.

9        MR. CAIN:  Objection, cumulative.

10       THE COURT:  Overruled.

11       THE WITNESS:  That is one definition, yes.

12  Q.   (BY MR. KACHOUROFF)  And you knew that definition

13  when you put that in there.

14  A.   That is not the definition that I was using.

15  Q.   How would somebody know that that wasn't the

16  definition that you were using?

17  A.   Context.

18  Q.   The context is to the First Lady of the United

19  States.

20  A.   No, the context was to her husband.

21  Q.   You were Tweeting to her; right?

22  A.   About his Tweets that I referred to as "twats."

23  Q.   Just to be clear, these Tweets were not private, were

24  they?

25  A.   They were not.

1    Q.   Lastly, I want to just go quickly through your

2    medical records, this won't take long, and we will be

3    done.

4    A.   Okay.

5    Q.   This is an exhibit already admitted.  This is

6    12/9/2020, right?

7    A.   Correct.

8    Q.   And the "mood" was "alright," right?

9    A.   Correct.

10   Q.   The doctor was quoting your words.

11   A.   I believe so.

12   Q.   "Mildly anxious.  Reactive.  Full range."  There is

13   no mention of Mike Lindell in these posts or in this

14   medical record is there?

15   A.   No.

16   Q.   12/11/2020, "Patient described mild to moderate mood

17   anxiety symptoms."  "Mood," your words "okay," right?

18   A.   Yes.

19   Q.   Going to December, same thing with December 21, "Mild

20   to moderate mood symptoms."  23rd, "mild to moderate mood

21   symptoms."  Do you see those two?

22   A.   You are going fast.

23   Q.   I can slow down if you'd like.

24   A.   You are not giving me time to see.

25   Q.   I will give you time, don't let me rush you.

1    A.    Okay.

2    Q.    12/28/2020, "patient describes continued mild to

3    moderate mood and anxiety symptoms."

4    A.    Okay.

5    Q.    And no mention of Mike Lindell.

6    A.    No, Michael Lindell wasn't part of this at this time.

7    Q.    Okay.  12/30/2020 same thing, "Patient describes

8    continued mild to moderate mood and anxiety symptoms,"

9    right?

10    A.    Yes.

11    Q.    1/4, January 4, 2021, same thing.

12    A.    Yes.

13    Q.    January 6, 2021, same thing.

14    A.    Yes.

15    Q.    January 11, 2021, the same thing.

16    A.    Yes.

17    Q.    January 13, same thing.

18    A.    Yes.

19    Q.    19th of January, 2021, same thing.

20    A.    Yes.

21    Q.    No mention of Mike Lindell at this time.

22    A.    No.

23    Q.    February 8, 2021, three days after *Absolute Proof*,

24    "Patient describes continued mild to moderate mood and

25    anxiety symptoms."  Same thing; right?

1    A.    Yes.

2    Q.    No mention of Mike Lindell.

3    A.    There are no specifics that we discussed during

4    therapy.

5    Q.    Okay.

6    A.    So just because Lindell is not listed here, doesn't

7    mean we didn't discuss him in therapy.  We discussed a lot

8    of things in therapy, and I would hope that that would be

9    private.  I was there for treating my anxiety and my

10   depression.

11   Q.    I want to be clear, I am not mocking your anxiety or

12   depression, it is a real thing.

13   A.    Yeah.

14   Q.    Not at all.  I just want to be clear what is in this

15   record or not, okay?

16   A.    This record does not reflect the topics that we

17   discussed in therapy.

18   Q.    Understood.  But the mood level here is "continued

19   mild to moderate mood and anxiety symptoms," right?

20   A.    Yes.

21   Q.    February 10, same thing, no mention of Mr. Lindell.

22   A.    Again, yes, there is no mention of Michael Lindell

23   because the details of my therapy are not reflected here.

24   Q.    Let's move on.  You talked about, as we move forward

25   here, all of the way through 2021, you talked about at

```
 1    5/26/21 -- do you remember that one?

 2    A.    Yes.

 3    Q.    -- where you said to the doc, you were "pretty good."

 4    A.    Yes.

 5    Q.    August 25, 2021, that is after the Cyber Symposium,

 6    two weeks later; right, approximately?

 7    A.    Yes.

 8    Q.    You say, 'ehh, not great."

 9    A.    You are adding inflection, and that doesn't represent

10    that appropriately.

11    Q.    I am sorry, I am not trying to mock, you said "ehh."

12    A.    I think that is unfair.

13    Q.    I apologize, I wasn't trying to be unfair to you.

14          8/31/2021, "mood" was "okay."   Do you see that?

15    A.    Yes.

16    Q.    Here is your doctor letter dated April 21, 2023.  It

17    says here, "The treatment was suspended in May of 2021

18    when Mr. Coomer's recent employer stated they would no

19    longer pay for treatment sessions.  Mr. Coomer was overall

20    stable and wished to pause sessions at that time as well,"

21    correct?

22    A.    Yes.

23    Q.    You were doing fine.

24    A.    I was doing well enough, and I couldn't afford

25    Dr. Finkell's rates.
```

1    Q.    You'd made some settlements with some of these folks,

2    hadn't you?

3    A.    At that time, yeah.  I am sorry, do we need my

4    financial statements?  I am not rich by any means, and I

5    could not afford a thousand-dollar-an-hour therapist.

6    Q.    You had a separation from Dominion where you were

7    paid a decent amount.

8         MR. CAIN:  Your Honor --

9         THE COURT:  Approach, please.

10        MR. CAIN:  So he is about to go into the separation

11   agreement.  We would object to any testimony or evidence

12   related to that.  We are not seeking to recover in this

13   case for his lost income related to his employment at

14   Dominion.  So he's about to get into the details related

15   to that, and that is confidential.

16        MR. KACHOUROFF:  He said he couldn't afford it, and

17   I am just showing the jury that he received a separation

18   agreement where he was paid a severance package.

19        THE COURT:  I don't see how this is relevant to

20   impeachment relevant to the issues in this case.

21   Sustained.

22        (In the hearing of the jury.)

23   Q.    (BY MR. KACHOUROFF)  Finally, Dr. Coomer, you were

24   involved in an altercation, or I should say -- strike

25   that, I'll rephrase.

```
 1              You were involved in a motor vehicle accident in

 2    2022; correct?

 3    A.    A single motor vehicle accident, yes.

 4    Q.    And it was a hit-and-run accident; correct?

 5    A.    No, it was not.

 6    Q.    The police were investigating your truck hitting a

 7    building and then taking off down the street.

 8    A.    Yes, they were.

 9    Q.    And there were eyewitnesss who saw the truck leaving.

10          MR. CAIN:  Objection, beyond the scope of the

11    order.

12          THE COURT:  Sustained.

13    Q.    (BY MR. KACHOUROFF)  You initially told the police

14    that you did not do that; correct?

15    A.    I did initially, yes.

16    Q.    Several times you told them you did not do that.

17    A.    Yes, I did.

18    Q.    They had to threaten you with a felony, that they

19    were going to --

20          MR. CAIN:  Objection, Your Honor.

21          THE COURT:  Sustained.

22    Q.    (BY MR. KACHOUROFF)  The point is, you lied to the

23    police, didn't you?

24    A.    Yes, initially.  Then I corrected it and told the

25    truth in under 90 minutes.
```

1    Q.    Under 90 minutes, right.  Because they told you if

2    they had to bring witnesses around, you would be arrested;

3    correct?

4            MR. CAIN:  Objection.

5            THE COURT:  Sustained.

6            MR. KACHOUROFF:  I have nothing further.

7            THE COURT: All right.  Mr. Cain, you have about 15

8    minutes until our lunch break.

9                       **REDIRECT EXAMINATION**

10   **BY MR. CAIN:**

11   Q.    All right.  Let's just go through Dr. Finkell, with

12   the understanding that your personal discussions with him

13   are privileged, so I don't want to get into those.

14           Exhibit 37 was what we were looking at, I believe,

15   is that right?  And we can pull that up.  Okay.  And

16   counsel asked you about various entries within the

17   records.  Do you believe that these records adequately

18   capture what you were going through at the time?

19   A.    No, I don't.

20   Q.    Why not?

21   A.    This is a high-level sort of clinical aspect.  It

22   does not capture the depth of what I was going through and

23   trying to process during therapy.

24   Q.    But on, I believe it is page 31 of this exhibit, what

25   is the date on the top right?

1    A.    August 25th of 2021.

2    Q.    Okay.  And what does that date correspond to as it

3    relates to when the Cyber Symposium was going on?

4    A.    It is within two weeks after, roughly.

5    Q.    And on the "assessment" part, where it says that you

6    have "a history of intermittent mood and anxiety symptoms,

7    as well as" -- I will skip through that part.  "Mood and

8    anxiety symptoms in setting of occupational and

9    interpersonal stressors."

10         Below that, it states what the plan is, and is this

11   the point in time, if you look at the second part, that

12   you first started taking drugs for anxiety, depression,

13   and panic attacks?

14   A.    Yes, I mentioned that yesterday.  This corresponds

15   with that, which was directly following the Cyber

16   Symposium.

17   Q.    Okay.  Maybe the suggestion is that you weren't

18   suffering at this time.  Were you suffering?

19   A.    I was suffering enough that I started medication,

20   which I had not been on prior.

21   Q.    All right.  Counsel talked to you a bit about whether

22   Mike Lindell knew anything about you in February of 2021.

23   Do you remember that line of questioning?

24   A.    Yes, I do.

25   Q.    All right.  And I think the extent of it was, "You

337

1    don't know whether Mike Lindell knew anything about you."

2    Do you remember that?

3    A.    That's correct.

4    Q.    All right.  We will pull up 174, which has been

5    admitted.  And this is the piece that we watched from

6    *Absolute Proof*.  Do you remember that?

7    A.    Yes, I do.

8    Q.    Okay.  And do you know who produced that film?

9    A.    It was Mr. Lindell.

10           MR. KACHOUROFF:  Objection, Your Honor, lacks

11   personal knowledge.  There is no evidence that he produced

12   the film.

13           THE COURT:  Can you lay some additional foundation.

14   Q.    (BY MR. CAIN)  Have you watched the film?

15   A.    I have watched the film.

16   Q.    Did you -- have you seen posts where three producers

17   are listed?

18   A.    I have.

19   Q.    And do you know if Mr. Lindell is one of those

20   producers listed?

21   A.    He is one of those producers.

22   Q.    As publicly posted prior to this video getting out.

23           MR. KACHOUROFF:  Objection, leading.

24           THE COURT:  Sustained.

25           MR. CAIN:  And my co-counsel -- I don't have the

1    stipulation, I didn't think it was in dispute, but I

2    believe we have stipulated that he was a producer.

3        MR. KACHOUROFF:  We have stipulated, Judge.  I

4    withdraw my objection.

5    Q.  (BY MR. CAIN)  So now the jury has already seen this

6    film, and they saw a piece that involved you; right?

7    A.  Correct.

8    Q.  And there is a segment where it transitions to you.

9        MR. CAIN:  Can you go to that?

10       (Videotaped recording played in open court.)

11       MR. CAIN:  And just for the record, Your Honor,

12   that is Stipulation 25.  We don't need to look at it.

13   Q.  (BY MR. CAIN)  So the movie that we watched, that was

14   published on February 5th of 2021.  Do you recall seeing

15   that it contained this portion?

16   A.  Yes.

17   Q.  And did you draw the conclusion based on that, that

18   Mr. Lindell was aware of who you were?

19   A.  Again, I can't say that for certain.

20   Q.  You just know it was in his movie.

21   A.  It was in his movie.

22       MR. CAIN:  All right.  You can take that down.

23   Q.  (BY MR. CAIN)  You were asked a series of questions

24   about other cases where you have complained about being

25   defamed.  Do you remember that?

339

1    A.    Yes.

2    Q.    Rudy Giuliani, Sidney Powell, the Trump Campaign, et

3    cetera; right?

4    A.    Correct.

5    Q.    Are you complaining about those instances of

6    defamation by others in this case?

7    A.    No, I'm not.

8    Q.    And we have talked about Newsmax as being one of the

9    parties that you were complaining about.

10   A.    Correct.

11   Q.    Now, Newsmax, the jury saw, issued a retraction

12   publicly to you.

13   A.    And an apology, as well.

14   Q.    Okay.  Is that one of the things you are hoping to

15   accomplish in this case?

16   A.    Absolutely.

17   Q.    You were asked a series of questions about, well, you

18   never sent a letter and you didn't do this with respect to

19   retractions.  But when you filed -- you are familiar with

20   your petition in this case, your lawsuit.

21   A.    Yes, I am.

22   Q.    Okay.  And when you filed that, what did you do?

23   A.    Well, part of that filing was a demand of a

24   retraction from Mr. Lindell and his companies.

25   Q.    And has that happened?

340

1    A.    It has not.

2    Q.    And a corollary to the filing of a lawsuit is

3    something called "serving process."  You touched on that.

4    A.    I did.

5    Q.    And I think you are clear, but I want to give you an

6    opportunity to address the questions, is that something

7    the lawyers do through a process server, or do you have

8    any part of that?

9    A.    That is why I pay my attorneys, they handle those

10   kinds of things.

11   Q.    Now, you were asked questions about your Exhibit 30,

12   I believe it is, and we can pull that up.  What is Exhibit

13   30?

14   A.    That was essentially a tender of resignation sent

15   early in the morning on November 11th of 2020.

16   Q.    Was it heartfelt?

17   A.    It was.

18   Q.    You said it was a difficult email for you to write.

19   A.    Yes.

20   Q.    Okay.  What did Dominion do in response to your offer

21   to just resign?

22   A.    They immediately rejected that offer.

23   Q.    So they didn't accept it.

24   A.    They did not accept it.

25   Q.    All right.  Counsel asked you a series of questions

```
 1    about various counties throughout the United States and

 2    election issues that you addressed.  I think you raised

 3    Gwinnett County, Fulton County, which I think you said you

 4    weren't directly involved with.  But just to give the jury

 5    the scope of elections in the United States and your role

 6    in that, how many counties count ballots on election day?

 7    A.   Counties, municipalities, again, it depends on the

 8    state, it's well in excess of likely 4,000 election

 9    jurisdictions.  Hundreds of thousands of machines,

10    servers, computers.

11    Q.   And Dominion, to be accurate, didn't provide election

12    services in all of those counties.

13    A.   That's correct.  I believe it was somewhere around 35

14    percent.

15    Q.   Okay.  And it's your job when there are issues -- and

16    they cited a couple of examples -- to go in and try to put

17    out whatever fire is happening at the time.

18    A.   That is correct.

19    Q.   And you used your typical colorful --

20         MR. KACHOUROFF:  Objection, Your Honor, leading.

21    Q.   (BY MR. CAIN)  You used language at the time --

22         MR. KACHOUROFF:  Leading.

23         THE COURT:  I will allow a little leading just so

24    we can get through this.

25         MR. KACHOUROFF:  Okay.
```

1    Q.   (BY MR. CAIN)   You used colorful language at the

2    time.

3    A.   Yes, that's my communication style.

4    Q.   Are you familiar with Chicken Little?

5    A.   I am.

6    Q.   What was Chicken Little's stop-phrase?

7    A.   "The sky is falling."

8    Q.   Is that sort of how you addressed issues when they

9    came up?

10   A.   Yes.  That is sort of my MO.  My job was to really

11   advocate for the system, that was my role.

12   Q.   You weren't asked any questions about whether you

13   were involved in rigging the election results in any of

14   those counties.  But is it fair to say that you didn't

15   interfere in any of that?

16   A.   I have never interfered in any election in any county

17   in any country.

18   Q.   Counsel asked you some questions to the effect of,

19   you don't have any evidence that Mr. Lindell agreed to do

20   this with another company that he had to defame you, words

21   to that effect.  Do you remember that?

22   A.   Yes, I do.

23   Q.   All right.  Do you expect -- and you wouldn't have

24   had a seat at the table for anything Mr. Lindell was

25   doing.

1    A.    No, I was not an employee of his company.

2    Q.    You weren't part of his inner circle.

3    A.    No, I was not.

4    Q.    Do you expect that there might be other witnesses in

5    the case that will speak to that?

6    A.    I think there are.

7    Q.    All right.

8    A.    I believe that there are.  It is not that I think, I

9    believe.

10   Q.    And counsel raised something called a "money tree,"

11   and some communication that you were involved with.  Do

12   you remember that?

13   A.    I do recall that.

14   Q.    What do you want from this case?

15   A.    I think we covered this at the end of yesterday.

16   There are several things that I want.  I would like

17   ultimately to have a chance at rehabilitating the public

18   image, my public image as somebody that rigged the

19   election.  I would like an apology for the lies that have

20   been told about me by Mr. Lindell and his companies.  And

21   I would like some compensation for the life that I have

22   lost due to these statements.  It is not just that I lost

23   my job, I lost my life.

24        THE COURT:  Mr. Cain, it is 12:30.  How much longer

25   do you have on redirect?

1          MR. CAIN:  I would like to break, if that is okay.

2     I think I only have about 10 or 15 minutes.

3          THE COURT:  Why don't we go ahead and break.

4          Ladies and gentlemen of the jury, if you can be

5     back by 1:15 to resume.  I just admonish you, as I always

6     have, to not talk about the case to each other or anyone

7     else.  Have a good lunch, and we will be back with you in

8     45 minutes.

9          (Outside the presence of the jury.)

10         THE COURT:  All right.  Counsel, anything else we

11    need to address right now?

12         MR. CAIN:  Not from us.

13         MR. KACHOUROFF:  No, Your Honor.

14         THE COURT:  So I think I saw Mr. Oltmann somewhere

15    out in the hall.  If that is the case, you may want to

16    meet and confer.  This testimony has gone a little longer

17    than expected, I know there are a couple of other

18    witnesses that are going to be presented by deposition,

19    and I am just trying to be mindful and considerate of our

20    live witnesses and making sure that we are trying to

21    adhere to a schedule that doesn't require them to come

22    back repeatedly.

23         MR. CAIN:  Our intent was to call, similar to the

24    issue you just raised, Matt Crane, who is executive

25    director of the association.  We had asked him to be here

345

     1    at 1:00, I believe.  So we are trying to balance those

     2    competing interests.

     3         THE COURT:  Well, again, for the purposes of the

     4    logistics of the trial, I would ask you all to meet and

     5    confer and try to be as accommodating as we can to the

     6    live witnesses, with the knowledge that we can play

     7    depositions at a different time where we are not impeding

     8    on other people's schedule.

     9         All right.  Anything else before we break for

    10    lunch?

    11         All right.  We will see you shortly.  We will break

    12    for lunch.

    13         (Lunch is taken from 12:32 p.m. to 1:23 p.m.)

    14         THE COURT:  Thank you.  Please be seated.

    15         All right.  Counsel, anything before we bring the

    16    jury in?

    17         MR. CAIN:  Not from plaintiff.

    18         MR. DUANE:  No, Your Honor.

    19         (A bench conference is had.)

    20         MR. CAIN:  I wanted to give you a heads up, I am

    21    about done with Dr. Coomer, so we did turn the monitors

    22    around, as there is not going to be anymore confidential

    23    stuff.

    24         MR. DUANE:  If I may, I would like to remind the

    25    Court, as we mentioned briefly yesterday, the next witness

```
 1    is Mr. Crane, and we will have a substantial objection to

 2    his testimony that we would like to be heard on briefly

 3    out of the hearing of the jury.  It shouldn't take long.

 4            THE COURT:  Okay.

 5            (In the presence of the jury.)

 6            THE COURT:  Thank you.  Please be seated.

 7            Dr. Coomer, I remind you, you are still under oath.

 8    Q.   (BY MR. CAIN)  I have three more topics we are

 9    covering on cross-examination that I want to discuss with

10    you.  The first is, you mentioned the name Heidi Beedle.

11    A.   Yes.

12    Q.   Do you know Heidi Beedle?

13    A.   I do not know her personally, no.

14    Q.   Have you ever met Heidi Beedle?

15    A.   I have not.

16    Q.   Have you ever spoken to Heidi Beedle?

17    A.   I have not.

18    Q.   Number two, you were asked questions about sort of

19    the differences between your nonpartisan role at your job

20    versus holding political beliefs outside of your work, and

21    I think that was framed with some questions about Hilary

22    Clinton and Senator Klobuchar.

23            Were you, after the 2016 elections, actually

24    involved in congressional hearings in Washington, D.C. on

25    voter security issues?
```

1    A.   I was not -- I did not testify in front of Congress,

2    but John Poulos, the CEO of Dominion, testified.  I was

3    there in support.  I provided him, you know, sort of

4    technical input on his presentation, that was to the House

5    Oversight Committee.  And I also had -- I had individual

6    meetings with some of the legislative aides for some of

7    the house members.

8    Q.   All right.  Did you end up meeting on voter security

9    issues with aides for Congressional Republicans?

10   A.   Yes, both Democrats and Republicans.

11   Q.   And what was the purpose of -- general purpose of

12   those meetings?

13   A.   Again, they wanted sort of a, you know, a one-on-one

14   discussion about the technicalities, the potential

15   vulnerabilities, and how the system worked so that they

16   could inform their questions during the Congressional

17   testimony.

18   Q.   And you gave that information to both parties.

19   A.   Yes, I did.

20   Q.   All right.  And then with respect to Exhibit 9A, the

21   Facebook posts, we went through those, and I am not going

22   to belabor your political views, but when you were posting

23   on Facebook back in the day, what were your "privacy"

24   settings on?

25   A.   They were fully private.  The only people that could

348

 1    access any of that content were direct friends.  Not

 2    friends of friends, not the general public, it was fully

 3    private.

 4    Q.   And then you looked at the Antifa-related post, and I

 5    think that was on page 5 of the exhibit.  Is this the

 6    Antifa-related post?

 7    A.   It is.

 8    Q.   Okay.  And just blow up maybe down through the first

 9    full paragraph of it.  We are not going to have you go

10    through it all.  Now, this was a repost.

11    A.   Yes, it was.

12    Q.   You mentioned that you felt like it was satirical.

13    A.   I do, and I did.

14    Q.   Okay.  Can you explain to the jury why you felt like

15    this was a repost of satire.

16    A.   If you look at the first full paragraph, it starts

17    with "Antifa isn't an organization, it's literally an

18    idea, nothing more.  Even the claims of this author to

19    represent Antifa is one made unilaterally for the purposes

20    of this communication."  So on the one hand, this author

21    is saying I represent Antifa, an organization that doesn't

22    exist, and it doesn't exist, and then goes on to describe

23    some of the beliefs of Antifa.

24    Q.   Okay.  And then you were asked, as I mentioned, about

25    your political posts, but let's just talk about a couple

```
 1    of posts that relate directly to voting and voting

 2    security.  And I think the very first page we can look at.

 3    So the first sentence with the exclamation mark, do you

 4    see that?

 5    A.    I do.

 6    Q.    Is that your view?

 7    A.    It is.

 8    Q.    Why?

 9    A.    I think it is important for people to -- citizens to

10    participate actively in our democratic process.  I think

11    everybody should vote.  Regardless of who they vote for, I

12    think they should vote.  I full-heartedly believe that.

13    Q.    Then later in the Facebook posts you didn't look at,

14    but in this exhibit, I think it is page 24 of the exhibit,

15    do you remember posting this on September 7th of 2016?

16    That would have been before the November election.

17    A.    Yes, I do.

18    Q.    Okay.  And why did you post this?

19    A.    So I'm posting lots of good info here.  And this is a

20    piece from eac.gov which is Election Assistance

21    Commission.  That is the federal authority that has

22    authorization over our federal elections.  Vice Chair of

23    the EAC, Matt Masterson, wrote a really good piece

24    describing all of the safeguards and the redundancies in

25    the election system as a whole, because there were already
```

1    rumblings in the 2016 election that it was going to be

2    "rigged."  And Trump said at that time, I will accept the

3    results if I win, implying that if he lost it was because

4    it was rigged.

5           So I was posting this as educational material to,

6    you know, to try to reinforce confidence in the voting

7    system.

8    Q.   And you end this statement with "Our electoral

9    process is pretty damn robust and secure."  Do you believe

10   that to this day?

11   A.   I do.

12          MR. CAIN:  All right.  Thank you.

13          THE COURT:  Dr. Coomer, you may step down.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  Counsel, are you ready to call your

16   next witness?

17          MS. MORGAN:  Yes, we are.  Plaintiff calls Matt

18   Crane.

19          THE COURT:  Ladies and gentlemen of the jury, I

20   know you just got back here, but I have been alerted there

21   is an issue we need to take up outside the province of the

22   jury with this witness before we can proceed.

23          So madam deputy is going to take you back to the

24   jury room, and then we will have you back as soon as we

25   can.

1          (Outside the presence of the jury.)

2          THE COURT:  Thank you.  Please be seated.

3          MR. DUANE:  Your Honor, I apologize to the Court, I

4     should have -- I should have articulated this objection

5     earlier, as we don't need to bring them in and out, and I

6     apologize.

7          I did want to make this objection because I believe

8     that it could save us a good deal of time.  My

9     understanding is that this next witness, based upon my

10    brief conversation with them, is planning to testify in

11    general terms about some of the severe and devastating

12    emotional impact that is generally experienced by workers

13    in the voting industry, by various statements by

14    individuals like Mr. Lindell.

15         And I am not sure how much of his testimony would

16    consist of that sort of testimony, but we would

17    strenuously object, of course, under Rule 403, on the

18    grounds that the probative value is ridiculously low with

19    respect to the damages that may have been caused to other

20    individuals who are not the plaintiff to this case,

21    particularly when his testimony cannot be reasonably

22    confined to damages that were caused specifically by the

23    defendant.

24         I have been litigating personal injury cases all my

25    life, and I know, as well as Your Honor does, that it is

1    virtually unheard of for the plaintiff in a drunk driving

2    case, in a tort case, to bring an expert to testify how

3    the lives of other individuals around the country have

4    been devastated by other similar accidents.

5         The probative value is, of course, extremely low,

6    it is virtually zero.  And the risk of unfair prejudice

7    and a needless presentation of unnecessary evidence is

8    practically off the charts.  If the jury is allowed to

9    hear this witness go on at some length about, as I said,

10    about the way in which similar statements by individuals

11    like Mr. Lindell, and others, have hurt other individuals

12    and upset others, besides the plaintiff in this case, it

13    invites the jury to at least subconsciously contemplate

14    the possibility of punishing the defendant with a verdict

15    that would somehow vindicate the rights of others who are

16    not before this Court.

17         My other objection, more generally, it is not yet

18    clear to us, again because we have not received any

19    detailed information about his anticipated testimony, but

20    it appears from what little we have been told, unless I am

21    corrected in a moment, that substantial parts of his

22    testimony may well constitute the functional equivalent of

23    expert testimony.

24         And if that is the case, then we would object to

25    all of his testimony on the grounds that we have not been

1    furnished with a report and a summary of his anticipated

2    testimony, as would be required under Federal Rule of

3    Civil Procedure 26.

4        THE COURT:  Ms. Morgan.

5        MS. MORGAN:  Thank you, Your Honor.  I will address

6    the first thing first.  And I would like to point out to

7    the Court, as everyone knows, that Dr. Coomer is seeking

8    exemplary damages in this case.  Under Colorado Revised

9    Statute 13-21-102, which sets out what has to be shown to

10   be -- for someone to get exemplary damages, it

11   specifically says that "willful and wanton conduct means

12   conduct purposely committed which the actor must have

13   realized is dangerous, done heedlessly and recklessly,

14   without regard to consequences or the rights and safety of

15   others," -- of others -- "particularly the plaintiff."

16       It matters in this case whether or not Mr. Lindell,

17   the defendant's conduct, caused harm to others, whether he

18   did those actions with heedless and reckless disregard to

19   the consequences to the other folks that have been injured

20   by these election fraud allegations.

21       There is another section of this statute that I

22   also want to draw the Court's attention to, which is under

23   Subsection 3(a), and it indicates that one of the things

24   that can be considered is whether the defendant "had

25   continued the behavior or repeated the actions which is

354

 1    the subject of the claim against the defendant in a

 2    willful and wanton manner, either against the plaintiff or

 3    another person or persons, during the pendency of this

 4    case."

 5          It is highly relevant if Mr. Lindell and the other

 6    defendants' actions have harmed other folks within the

 7    election industry.  And so in weighing the probative

 8    value, it is not substantially outweighed by the risk of

 9    unfair prejudice or misleading the jury, because this is

10    squarely at issue in this case.

11          This isn't like a car accident; that is not apples

12    to apples or apples to oranges, it is more like horse to

13    book.  These things are not equivalent.  These other

14    individuals that Matt Crane has worked with and

15    encountered in his role as the Executive Director of the

16    County Clerks Association, has been directly impacted by

17    the lies about Dr. Coomer and the lies about election

18    workers, both in Colorado and across this great nation.

19    And so it is highly relevant, Your Honor.

20          And I also point out that it is relevant to the

21    issue -- his testimony will be relevant to the issue of

22    actual malice because he will describe the various

23    education raised in campaigns, things that have happened

24    that should have put the defendants on notice that these

25    election fraud theories were not true, that there is no

1    substantial truth to it, either.

2         And Mr. Crane will also be testifying with respect

3    to his personal knowledge of Dr. Coomer and his personal

4    -- I am switching, just a second.  I am sorry, Your Honor.

5         This is within the ambit of a lay person's

6    testimony, not an expert's testimony, because he has

7    personal knowledge of Dr. Coomer, he worked with him,

8    insofar as he was the County Clerk for Arapahoe County.

9    So he is well familiar with Dr. Coomer's work and with his

10   reputation in the community of people that work in

11   elections.

12        He will also be testifying about his personal

13   knowledge as someone who has been working in elections for

14   over 20 years.  And I would point the Court specifically

15   to a case out of the District of Colorado, a 2023 case, it

16   is *Vyanet Operating Group, Inc. v. Maurice*.  It is at 672

17   F.Supp 3d 1129.

18        And in this case the Court permitted the defendants

19   to testify as lay people when it came to issues relating

20   to industry, customs, and practices and their personal

21   knowledge working within the industry for a substantial

22   amount of time.  And the Court found it would not be

23   expert testimony for them to testify to that personal

24   experience.

25        And in that case, the Court cited not only to Rules

1    701 and 702 and the advisory notes -- and I do want to

2    pause on the advisory notes real quick -- indicating that

3    "particularized knowledge that a witness has by virtue of

4    his or her position in the business is still within the

5    ambit of lay person testimony."

6         But the Court also cited another District of

7    Colorado case from July 24th of 2019, styled *Anzora v.*

8    *Lezama*, and that is 2019 WL 3334685, at headnote 7, as

9    another case supporting that this type of -- this type of

10   testimony based off of someone's experience and time

11   working in a certain field can still be within the realm

12   of lay testimony.  So I just wanted to draw that authority

13   to the Court's attention.

14        But the point is that Mr. Crane is going to be

15   testifying as a lay expert.  We are not attempting to

16   proffer him as an expert witness, and his testimony is

17   highly relevant.

18        THE COURT:  When you say "lay expert," you mean lay

19   person who is going to be testifying to his percipient

20   knowledge with respect to what he observed as to

21   Dr. Coomer; is that right?

22        MS. MORGAN:  Yes, both as to Dr. Coomer and in his

23   interactions with other election officials, because he

24   works with all of the county clerks within Colorado, Your

25   Honor.  He is the head -- or the Executive Director of the

1    Colorado County Clerks Association.

2         THE COURT:  So tell me how it would be relevant --

3    how his testimony would be relevant as to statements not

4    made by Dr. Coomer.  It is one thing to say that his

5    testimony as to the impact of what Mr. Lindell,

6    Frankspeech, or My Pillow might have been publishing might

7    be relevant and probative and not outweighed by potential

8    undue prejudice to the jury with respect to exemplary

9    damages.  But how would just general testimony about any

10   other statements related to election fraud be relevant to

11   exemplary damages here?

12        MS. MORGAN:  Yes, Your Honor.  I believe that it

13   would be relevant with respect to the circumstances in

14   which -- in which this speech occurred.  So I would point

15   the Court to -- for example, the parties have agreed on a

16   jury instruction that refers to the fact that the context,

17   the circumstances surrounding the speech is necessary to

18   determine the meaning of the statement and whether it

19   defamed the plaintiff and what the meaning would be to

20   those who were hearing that statement.  Specifically that

21   is uncontested Jury Instruction 45.

22        And the Colorado Jury Instructions note that it

23   references two different cases from the Colorado Supreme

24   Court, where the Supreme Court is emphasizing the

25   importance of looking to the context in which speech

1    occurs.  That would be *Keohane v. Stewart*, and that is a

2    1994 case, cited at 882 P.2d 1293, at 1299.

3          And then the second case that is cited there is *NBC*

4    *Subsidiary (KCNC-TV), Inc. V. Living Will Center*, and that

5    is a 1994 case, at 879 P.2d 6.  And the specific pincite

6    is 10 through 11.  So the circumstances matter, Your

7    Honor.

8          The statement by Mr. Lindell and the defendants

9    don't live in a vacuum, it exists within the context of

10   the other election rigging statements that were being

11   made.  And so to understand the damage, not only for

12   Dr. Coomer, but other folks similarly situated and other

13   people working within the election industry, it is

14   necessary to understand how these statements lived --

15        THE COURT:  Isn't that a defamation per quod

16   instruction, and hasn't the Court already ruled as a

17   matter of law that this is defamation per se?

18        MS. MORGAN:  There has been testimony, Your

19   Honor -- and it seems like the defendants are advancing a

20   theory that these statements were not defamatory, even

21   though I understand the Court's ruling on that issue,

22   there seems to be an insinuation that he didn't really say

23   that Dr. Coomer did anything, that it would be -- that it

24   would fall within the ambit of defamation per se.

25        They are still making a defense that this isn't

1    defamation; the statements made by the defendant are not

2    defamatory.

3         THE COURT:  Does it matter what they are saying,

4    when the Court has determined as a matter of law that the

5    statements are defamatory per se?  I mean, I am still not

6    going to give the defamatory per quod instruction.  That

7    is my understanding of the Colorado case law; that it is

8    one or the other.  It is a question of law.  I have made

9    that determination.  So I'm not going to give -- and it is

10   not proper for me to give both sets of instructions.

11        MS. MORGAN:  Understood, Your Honor.  But we think

12   the circumstances are helpful to understanding and

13   evaluating whether exemplary damages are appropriate in

14   this case.

15        THE COURT:  All right.  Anything further?

16        MR. DUANE:  Yes, Your Honor, briefly three points.

17   Number one, respectfully, I must confess that I am

18   altogether unpersuaded by what counsel has just said.

19        The reference that she gave us to those earlier

20   cases and the Colorado Statute, when they talk about the

21   propriety of admitting evidence in a case for punitive

22   damages of other injuries caused by the defendant, as Your

23   Honor is well aware, involves situation where, for

24   example, a drunk driver knows full well that he injured

25   other people in the past, but he continues to go out on

1    the road, or a medical doctor continues to kill patients

2    on the operating table, but oblivious to the danger of

3    which he has already become familiar, he continues to

4    perpetrate his malicious mischief upon future victims.

5        THE COURT:  Would you concede, then, under that

6    theory, that Mr. Crane could testify, or evidence from

7    Mr. Crane could be elicited about Mr. Lindell,

8    Frankspeech, and My Pillow's specific continued

9    statements?

10        MR. DUANE:  Well, no, not necessarily, Your Honor.

11    Then we have a problem of conditional relevance under Rule

12    104(b), unless they can establish that the information

13    that Mr. Crane wants to share with us today was somehow

14    directly brought to the attention of the defendant, then,

15    no, I can't conceive that this highly prejudicial

16    evidence, with very little probative value, would shed any

17    light on whether the defendant is richly deserving of

18    additional punitive measures because of his intentional

19    disregard of dangers that were directly and explicitly

20    brought to his attention.

21        They had the opportunity during extensive pretrial

22    depositions of the defendant to elicit evidence from him

23    that could establish the basis for such a foundation and

24    they have not done so.

25        The second point I would like to make is that when

361

1    I listened to counsel respond to my objection a moment

2    ago, I was alarmed to hear that the problem is worse than

3    I feared, when she specifically admitted that one of the

4    things her witness evidently plans to testify to, as she

5    said, was his knowledge of the defendants' reputation,

6    those were her words, which is an explicit admission of an

7    attempt to violate the unambiguous provisions of Rules 404

8    and 405.

9         In a defamation case, as Your Honor knows, the

10   reputation of the plaintiff is an essential element of the

11   case because of its close connection to damages.  And,

12   therefore --

13        THE COURT:  Isn't it a question of fact that the

14   jury has to determine?

15        MR. DUANE:  Your Honor --

16        THE COURT:  With respect to your argument about

17   conditional relevance, doesn't the jury have to determine

18   as a matter of fact whether or not the actions were

19   willful and wanton by the defendants?

20        MR. DUANE:  Yes, I think that's correct, Your

21   Honor, but that is a question the jury can decide entirely

22   without the assistance of this particular testimony based

23   upon their examination of all --

24        THE COURT:  Because they could decide it without

25   the testimony of this particular witness doesn't

362

1    necessarily mean that the testimony of this particular

2    witness is not relevant or probative.

3         MR. DUANE:  I'm not objecting that it is literally

4    irrelevant, but my point remains that the probative value

5    is almost unimaginably small, especially in light of the

6    obvious risk of unfair prejudice.  Again, it is almost as

7    if we are dealing with a case where a defendant charged

8    with drunk driving and inflicts injury on a --

9         THE COURT:  Well, it is a 403 objection.

10        MR. DUANE:  Absolutely.  And 404, to the extent

11   they want to ask any questions about what this witness

12   claims to know about the reputation of the defendant, his

13   character.

14        THE COURT:  Well, isn't that an issue or an

15   objection that I have to take up once the question is

16   asked?

17        MR. DUANE:  Yes.  Yes.

18        THE COURT:  Anything else?

19        MR. DUANE:  Yes.  Finally, to smooth things along,

20   in light of counsel's representation that this witness

21   would be giving at least some evidence that is not expert

22   testimony, I will withdraw my request for a ruling now on

23   whether any of this evidence ought to be excluded on the

24   grounds that it was expert testimony as to which we were

25   given no pretrial notice.

 1          We can take that up on a question-by-question

 2     basis.  It appears that if counsel is getting into the

 3     functional equivalent of expert testimony with this

 4     witness, then the Court can make a ruling within the

 5     context of each particular question that might pose such a

 6     problem.

 7          THE COURT:  All right.  We will take a brief

 8     recess.

 9          MR. DUANE:  Thank you, Your Honor.

10          (A break is taken from 1:50 p.m. to 1:59 p.m.)

11          THE COURT:  Thank you.  Please be seated.

12          All right.  Pending before the Court is the

13     defendants' objection to the scope of anticipated

14     testimony by Mr. Matt Crane.  To the extent that I

15     understand the objection, the objection as to Mr. Crane's

16     testimony is that he should not be permitted to testify as

17     to injury caused by statements with respect to election

18     fraud and the general environment of election fraud to

19     others, other than Dr. Coomer.

20          The exemplary damages statute in Colorado is

21     codified in Colorado Revised Statute 13-21-102.  In

22     Section 1(b), as used in this section, "willful and wanton

23     conduct means conduct purposely committed which the actor

24     must have realized as dangerous, done heedlessly and

25     recklessly, without regard to consequences or to the

1    rights and safety of others, particularly the plaintiff."

2            The plain language of Section 13-21-102

3    contemplates that the damage -- in assessing exemplary

4    damages could extend beyond the particular plaintiff.

5            However, I agree with defendants that Mr. Crane

6    should not be permitted to just generally testify as to

7    general harm of election fraud claims and general harm to

8    others.

9            I do believe it is within the scope and

10   sufficiently probative, and the probative value outweighs

11   any potential prejudicial effect or confusion by the jury,

12   for Mr. Crane to be able to testify as to what is

13   generally experienced by others, by statements made by any

14   of the defendants or the defendant platforms; Mr. Lindell,

15   Frankspeech, or My Pillow, Inc. and, therefore, I will

16   allow that.

17           I will also allow Mr. Crane to give some limited

18   testimony to give context as to the environment in 2020,

19   and how election officials, but particularly -- election

20   officials are experiencing these kinds of statements by

21   the defendants.  And I expect that, as discussed, any of

22   Mr. Crane's testimony about Dr. Coomer will be cabined by

23   his percipient knowledge and his observations of the

24   impact of statements by Mr. Lindell, Frankspeech, or My

25   Pillow, Inc., on Dr. Coomer, or others, as contemplated in

1     Section 13-21-102 of the Colorado Revised Statute.

2          Any questions?

3          MR. DUANE:  Yes.  I apologize, Your Honor, if I

4     may, just to be clear, and I hesitate to ask you to

5     repeat, but can I ask you to repeat what it is you are

6     ruling they will not be able to do?

7          THE COURT:  They will be able to elicit some

8     general limited testimony about the environment or culture

9     around 2020 to orient the jury as to his testimony.  But

10    other testimony needs to be limited to statements made by

11    these defendants; Mr. Lindell, Frankspeech TV or My

12    Pillow, and published by them.

13         MR. DUANE:  I understand.

14         THE COURT:  Ms. Morgan, anything before we bring in

15    the jury?

16         MS. MORGAN:  I don't think so.

17         MR. DUANE:  You Honor, I have just been reminded

18    that this witness, if I am not mistaken, was not an

19    election official in 2020; that he left office in 2019, if

20    that is correct.

21         THE COURT:  I think he could still observe what

22    he's seeing as the Executive Director of the County

23    Clerk's Organization.

24         MR. DUANE:  But I thought Your Honor indicated --

25    and I apologize if I am incorrect -- that you were

1    indicating that you didn't want the witness to talk in

2    general terms about the effect of speech of other

3    individuals, and this witness was no longer in office long

4    before any of the allegedly defamatory statements in this

5    case were made by any of the defendants.

6          THE COURT:  But he could still observe those.

7          MR. DUANE:  After he's left office?

8          THE COURT:  I think so.  I think he is just a

9    member of the public and an Executive Director of the

10    Clerks Association; is that right?

11          MS. MORGAN:  That's correct, Your Honor.  And in

12    his role as Executor Director of the Colorado Clerks

13    Association, he works with all of the Colorado County

14    Clerks across the state.

15          THE COURT:  All right.  So your objection is noted

16    and overruled.

17          MR. DUANE:  Thank you.

18          THE COURT:  Are you ready for the jury?

19          MS. MORGAN:  Yes, Your Honor.

20          MR. DUANE:  Yes.

21          (In the presence of the jury.)

22          THE COURT:  Thank you.  Please be seated.

23          Ms. Morgan.

24          MS. MORGAN:  Yes, Your Honor.  We are grabbing the

25    witness now.

1           COURTROOM DEPUTY:  If you can stand up there, I

2     will swear you in.

3                           **MATT CRANE**

4     having been first duly sworn, testified as follows:

5           THE WITNESS:  I do.

6           COURTROOM DEPUTY:  Please be seated.

7           Please state your name, and spell your first and

8     last name for the record.

9           THE WITNESS:  My name is Matt Crane.  M-A-T-T

10    C-R-A-N-E.

11                     **DIRECT EXAMINATION**

12    **BY MS. MORGAN:**

13    Q.   Good afternoon, Mr. Crane.  Tell the jury what your

14    current occupation is.

15    A.   Yes.  I am the Executive Director of the Colorado

16    County Clerks Association.

17    Q.   What is the Colorado County Clerks Association?

18    A.   The Colorado County Clerks Association is an

19    association that represents 63 elected county clerks and

20    one appointed county clerk and their staff.  We focus on

21    education and training of our --

22          THE COURT:  Mr. Crane, I am going to just intervene

23    for my own court reporter.  You need to slow down a little

24    bit because she is taking down every word, and you are

25    going too fast.

1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  Thank you.

3      Q.   (BY MS. MORGAN)  I am sorry, finish what you were

4      saying.

5      A.   Yes, ma'am.  So the Colorado County Clerks

6      Association, we are an organization that represents 64

7      county clerks that we have here in Colorado, 63 are

8      elected, one is appointed.  The mission of our association

9      is to focus on the education and training of our members.

10     Q.   How long have you served as the executive director?

11     A.   I started in January of 2021.

12     Q.   Can you help us understand, is the Colorado County

13     Clerks Association a partisan or nonpartisan organization?

14     A.   We are a nonpartisan organization.  Our clerks make

15     up -- we are a mostly Republican organization.  I think we

16     have 40 Republican clerks, 15 or 16 Democratic clerks, and

17     6 or 7 unaffiliated clerks, as well.

18     Q.   I would like to get some more background on you.  How

19     did you get interested in elections?

20     A.   Well, it started actually for me when I was in

21     college, I was on the election commission at Metro State

22     University here in downtown Denver.  And then I started my

23     work in elections administration in 2000 at -- I started

24     at Denver Elections.

25              I never thought that election administration was

1    something I would want to get into, I always wanted to go

2    into some other part of politics, something more

3    interesting.  So I figured I would take the job in Denver,

4    get my foot in the door, meet some other people, and go on

5    to different policy areas.  And, you know, here we are 25

6    years later, it is very much a passion for me, it is a

7    calling for me.  I very much believe in what we do; trying

8    to conduct free, fair, and secure elections for the

9    citizens of Colorado.

10           So I started in Denver, and then I went to the

11    Secretary of State's Office.  So I have both state and

12    county experience.  I went to Arapahoe County in 2007.  I

13    became the Clerk and Recorder of Arapahoe County in 2013,

14    when the previous clerk, Nancy Doty, she had won a County

15    Commissioner race, so there was a vacancy.

16           The County Commissioner appointed me to fill the

17    vacancy.  I stood for election in '14 and won.  I lost in

18    '18 in a Blue wave here in Colorado.  And then after my

19    time in Arapahoe County, I started work with CISA, as an

20    election security expert consultant.  CISA is a department

21    under Homeland Security.

22           After President Obama designated elections as

23    critical infrastructure in early 2017, they needed more

24    election subject matter experts to talk to their technical

25    folks so that they could better serve the sector.  And I

1    also started consulting in other states on election

2    processes and, as well.

3    Q.   And can you tell us whether your wife also works in

4    elections.

5    A.   She does.  I met my wife when we were working both

6    together at the Secretary of State's Office back in 2001,

7    May of 2001.  And after that, she left the Secretary of

8    State's Office in 2002 and went to work for Sequoia Voting

9    Systems on their voter registration side.

10        And then when Dominion took over Sequoia, she was

11   brought over during that merger, and worked with Dominion

12   until September 2019.  She still does some contract work

13   for Dominion on ballot layouts, or taking the ballot

14   content and laying it out in their system so that it is in

15   the right order, and then the ballots are built from

16   there.

17   Q.   And I think we are still talking a little fast, so I

18   will remind you, please slow down just a little bit.

19        So I would like to dig into some of your personal

20   knowledge about how elections are administered in

21   Colorado.  Before the election even happens, before anyone

22   starts voting, can you tell us what the State of Colorado

23   does to make sure that its voter rolls are accurate?

24   A.   Sure.  So when it comes to maintaining our voter

25   rolls, this is an activity that happens every day in every

371

1    county across Colorado.  There are multiple -- we will get

2    registration forms from people over the counter.  We have

3    online voter registration here in Colorado, so we are

4    constantly getting those in.  To make sure our lists are

5    clean, we get information from the DMV through automatic

6    voter registration.  All of that work has to be done.

7         Now, when our employees, when our clerks are doing

8    this work, our voter registration is set up to look for

9    duplicates; to make sure people have the requisite kind of

10   ID necessary here in Colorado to be able to vote.

11        We also focus -- we also bring in information about

12   people from the Department of Corrections.  If somebody

13   has been convicted of a felony and they're serving time in

14   prison, then they are not allowed to be registered to

15   vote, so we have to take those folks off the list.

16        We get some information, you know, from different

17   sources, from the Social Security Administration, you

18   know, and verifying information there.  We get it from,

19   you know, Health and Human Services.  If people have

20   passed away, we get those reports so we can take those

21   people off the voter registration list.

22        So maintaining our voter registration list is a

23   daily activity here in Colorado.

24   Q.   I think you hit most of the subsets I was going to

25   ask you follow-up questions about, but we may need to

1    break it up more into a question and answer.

2            Have you personally participated in pre-election

3    sort of test runs to make sure the voting systems are

4    working?

5    A.    Yes.

6    Q.    And before you get into that, what is your

7    experience, what kind of tests are run on voting systems

8    before an election?

9    A.    Sure.  Do you want me to start at the certification

10   process, all of the way, or just before a specific

11   election?

12   Q.    Just before a specific -- before any given election,

13   what is done?

14   A.    There is maintenance that goes on on the voting

15   system components year around; making sure things like

16   batteries are still functional, making sure that the

17   equipment is still working.  And then when it comes time

18   for an election, once the ballots have been built through

19   the Election Management System, then we get the ballots

20   and we do extensive testing, it is called logic and

21   accuracy testing.

22            Every county goes through that.  In my case, in

23   Arapahoe County, every election we would run tens of

24   thousands of ballots through, making sure that we marked

25   every single position on the ballot.  We would test for

1    under-votes, which means nobody voted in that contest.  We

2    would test for over-votes, which means people voted for

3    more than one person when they weren't supposed to.  We

4    would test different handwriting tools.  We would then run

5    that to make sure that the system was reading the ballot

6    properly, making sure that it is coded properly to the

7    proper precinct, and that the results are coming out

8    correct.

9         So there is also a public aspect to that, a public

10   logic and accuracy test, where we have the political

11   parties and opponent test board members to come in, mark a

12   certain number of ballots, we will scan those ballots on

13   our voting systems, they will then do a hand count of

14   those ballots, and then we will compare the two.

15        I will say the only time there has been error in

16   that process is in the hand count part of it, so we have

17   to go back and hand count and then do the comparison.

18   Q.   Can I pause you real quick.  Can you tell us a little

19   bit about how that test board is created.

20   A.   Sure.  How the test board is created?

21   Q.   Yes, how are they chosen?

22   A.   Here in Colorado it is state statute, the logic and

23   accuracy test is mandated under state law.  And what we do

24   is for the two major parties, Republicans and Democrats,

25   the party chairs get to designate a test board member to

1    participate in this test.  And so they will come down to

2    the election facility, and as I said they will get a set

3    of ballots, and they have to go through the same drill

4    where they have to mark every position on the ballot, make

5    sure every position is accounted for, account for those

6    over-votes, account for those under-votes.

7         They also have to test the equipment that is there

8    for people with disabilities so that the audio is working

9    properly and the attached keypad for people that need that

10   are working properly.

11        And then they will do a hand count -- they,

12   themselves, will do the hand count of the ballots they

13   mark, and then those two, the hand count tally is compared

14   to the voting system tally to make sure that it is working

15   properly.

16   Q.   I would like to ask you about some of the other

17   people who are involved in election administration.  The

18   jury has heard a little bit about poll workers.  Have you

19   personally been involved with hiring poll workers for

20   elections?

21   A.   Yes, I have.  I have actually served as a poll

22   worker, and then I have been involved in hiring and

23   training of poll workers, as well.

24   Q.   What kind of training do poll workers receive before

25   an election?

1  A.    Poll workers -- it depends on the job that they have.

2  So we have some poll workers who their duty is just to

3  open mail ballot envelopes and separate the envelope from

4  the ballot.    There are other more extensive trainings for

5  people who do things like signature verification or who

6  work in the tabulation room.

7        I think it is important for people to understand, a

8  lot of times when an election comes up and they look at

9  the clerk, the elected clerk and they say, oh, that person

10  is fixing it, the clerk is actually not the one doing the

11  work in most cases, it is citizen election judges; people

12  like you who give their time -- they get paid, but they

13  give their time, they see it as a civic duty, and they are

14  the ones who actually come in and verify voter eligibility

15  when people come in to vote centers.

16        They are the ones who do signature verifications to

17  make sure the signature matches what is on the envelope.

18  They are the ones who tabulate the ballots, who run the

19  ballots through voting systems and do the adjudication

20  process and other parts.

21        So our elections, while county clerks are charged

22  with setting them and overseeing them and conducting them,

23  it is actually our citizen poll workers who do the work,

24  who run the election.

25  Q.    And with respect to election judges, who determines

1    who can serve as an election judge in Colorado?

2    A.   Sure.  So state statute here mandates that election

3    judges -- the first judges that the counties have to

4    choose from are judges that come from the two major

5    political parties, Republican and Democrat, and those

6    people that go through caucus process.

7         At the caucus process, which is a process mostly to

8    designate people for higher assembly, so you can vote on

9    candidates for that political party coming out and getting

10   onto the primary election ballot.  But part of that also

11   is a list where people can sign up to be poll workers.

12        State law mandates that we have to work from that

13   list first, hire those people who are interested in being

14   poll workers first.  Then after that, if other people

15   contact us, if they didn't go to caucus but still would

16   like to be poll workers, they contact the office.  It is

17   very difficult to find poll workers, so counties will have

18   job fairs to bring in poll workers.

19        So there are multiple ways, but we have to go

20   through that political party list first.

21   Q.   I am going to fast forward a little bit to early

22   voting and election day, but do you have personal

23   knowledge of the types of security in place to protect

24   ballot boxes and ballot drop boxes?

25   A.   Sure.

1    Q.    And before you say what it is -- so I take it that's

2    a yes.  What kind of security measures are in place for

3    ballot boxes in Colorado?

4    A.    Sure.  There is a lot of different security measures

5    in place.  First, it starts in our election facilities

6    before the ballot box are even taken out to vote centers,

7    we check to make sure those are empty.  We use tamper

8    evidence proof seals to make sure that nobody can get

9    inside.  We create a strict chain of custody so that we

10   know this ballot is leaving, say the Arapahoe County

11   warehouse on October 3rd at 10:00 a.m., it is being taken

12   by a bipartisan team of judges to wherever it is going.

13         When it is in the vote center, that tamper evidence

14   proof seal is there, and there will be a lock on that, as

15   well, either a combination or key lock on the ballot box,

16   as well.

17         MR. DUANE:  Objection, Your Honor.

18         THE COURT:  Approach.

19         (A bench conference is had.)

20         MR. DUANE:  His testimony -- this answer is

21   entirely about ballot boxes, and I submit that is entirely

22   irrelevant to this case.  None of the alleged defamation

23   in this case involves a statement by the defendants or

24   anyone else about ballot boxes, it was the voting machine,

25   that is what this case is about.  So this is irrelevant.

```
 1              THE COURT:  All right.

 2              MS. MORGAN:  The issues of the safeguards for

 3    elections are directly relevant, and it goes to the issue

 4    of actual malice and to substantial truth.  We are setting

 5    that up to show because of the security processes in

 6    place, it is just not believable that Dr. Coomer could

 7    have rigged the election.

 8              MR. DUANE:  That is why I didn't object to the

 9    earlier testimony, but this is getting pretty far afield.

10              THE COURT:  So, Ms. Morgan, I will let him answer

11    this question, and I think you are trying to get this

12    witness to listen to your question and answer your

13    question --

14              MS. MORGAN:  I am.

15              THE COURT:  -- but you are going to need to do a

16    little better job at that.  So I will let a little bit

17    more of this, but not much.

18              MR. DUANE:  Can I ask that she be instructed to ask

19    another question instead of letting him pick up from where

20    he left off?

21              THE COURT:  Why don't you go ahead and ask another

22    question.

23              MS. MORGAN:  Okay.  Thank you.

24              (In the hearing of the jury.)

25    Q.   (BY MS. MORGAN)  All right.  I am going to have us
```

```
 1    fast forward a little bit to what happens after the
 2    election.  Can you please describe to us in Colorado
 3    whether or not there are cameras where the ballots are
 4    being processed?
 5    A.   Yes.  In every election facility where ballots are
 6    being processed, it is state law that every area is under
 7    camera coverage 24/7, and now it is 365.  That recently
 8    was changed, I think back in 2022.  So every part of the
 9    election facility where the voting system components are
10    and where we have live ballots during an election, have to
11    be under camera code.
12    Q.   Were you involved in the creation or implementation
13    of the risk-limiting audit process in Colorado?
14    A.   Yes, ma'am.
15    Q.   Okay.  We have heard a little bit about that already,
16    but we haven't gone through the step by step, and I would
17    like to break it down piece by piece.  Do you believe it
18    would be helpful for the jury's understanding of the
19    risk-limiting audit process if they had an illustration or
20    illustrative aid?
21    A.   Yes.
22    Q.   Okay.  What is the first step in the risk-limiting
23    audit process?
24    A.   Well, the risk-limiting audit process actually starts
25    well before the risk-limiting audit, where counties have
```

```
 1   to keep a ballot manifest so that they know every ballot

 2   that comes in that is tabulated, that they know where it

 3   is at, in terms of where it is being stored at after it

 4   has been tabulated, because part of the risk-limiting

 5   audit is you have to go and find very specific ballots

 6   that have been chosen randomly to be included in the

 7   audit.  So counties have to keep track of that ballot

 8   manifest.

 9          After that, that gets sent to the Secretary of

10   State's Office, along with the cast-vote records, which

11   the cast-vote record is the report from the voting system

12   that details how the system interpreted every single vote

13   on every single ballot.  And so that information goes up

14   to the Secretary of State's office, where they will have

15   a -- they will have a dice throw to figure out --

16   Q.   Before we get to the dice throw, how do you determine

17   what races and issues are being looked at?

18   A.   The Secretary of State's Office chooses the races to

19   be audited.

20   Q.   Okay.  Getting to the dice, what happens with the

21   dice throw?

22   A.   The dice throw, that is something that is open to the

23   public.  We have some people that are really election

24   geeks that love to come in and watch that every time.  And

25   that helps provide randomization to the ballots that are
```

1    chosen.

2         And so the Secretary of State's Office will take

3    all of that information and they will choose the contests

4    that are to be audited, and then based on the cast-vote

5    records, the rolling of the dice, and the ballot, they

6    will choose the ballots that are to be audited.

7    Q.   I want to break that down a little bit, I am sorry.

8    So how do dice come into this, can you explain that?

9    A.   The dice provides randomization to it to be able

10   to -- it is a further step to randomize which ballots are

11   chosen to be able to be audited.

12   Q.   So what are the numbers from the dice used for?

13   A.   They go into the state system, depending on what it

14   is, and I am not familiar with the code, I haven't seen

15   that particular part of it, but they put those numbers in,

16   and it determines what ballots are to be audited.

17   Q.   Okay.  So the numbers from the dice determine what

18   ballots are audited.

19   A.   It is part of that process.

20   Q.   After we have determined the amount of ballots and

21   picked the random ballot based on dice throws, what

22   happens next?

23   A.   Then the counties are given a list of which ballots

24   they have to go and pull to be included into the audit.

25   So political parties, also as a part of appointments they

1    get in the election process, they get to choose what is

2    called an audit board.  They each get to choose one person

3    who represents their party to go in and be -- actually

4    take part in the audit.

5          So like in large counties like Arapahoe, we would

6    also have staff and election judges, it could be 4 or 500

7    ballots that you have to audit.  The number of ballots is

8    also determined by the margin in that contest.  So if a

9    race is chosen that has a wider margin, there are going to

10   be fewer ballots -- there are going to be fewer ballots to

11   audit.  If there is a closer margin, there are going to be

12   more ballots to audits.

13         And so we will have teams go out and get those

14   ballots out of the ballot boxes, again working by

15   bipartisan teams, and then the audit team will work with a

16   member of the staff, then, to enter the votes -- all of

17   the votes on the ballot, not just the audited races --

18   into the tool that the Secretary of State's Office has

19   built to help facilitate the audits.

20   Q.   So what do they do once they put the ballots into

21   that?

22   A.   So once they put the ballots in there, they will get

23   a message that they finished that portion of the audit.

24   The tool that the Secretary of State's office built is

25   then taking those choices and comparing it to the

1    cast-vote record that the county set up before the audit.

2         If there is a discrepancy, even if there is a

3    discrepancy in just one county, it may trigger all

4    counties having to continue to add, continue to audit

5    additional ballots.

6    Q.   Before we get to that point, what is a passing grade?

7    What are we looking to find from this first limiting

8    auditing process?

9    A.   So before the audit, the Secretary will set the risk

10   limit, usually I think it is around 96 or 97 percent;

11   meaning the outcome of the audit, if you pass it, you can

12   have 97 percent certainty that the outcomes are correct on

13   an audited contest.  So that number may vary by election,

14   but usually it is around 96, 97 percent.

15   Q.   So then what happens if there is a discrepancy or we

16   don't hit that 96, 97 percent number?

17   A.   Right.  If there is a discrepancy, then counties will

18   have to go and continue auditing ballots until they hit

19   that risk limit.  And there is a possibility if there were

20   an error, if the tabulation system did not perform

21   properly, then the outcome is you would have to go through

22   and audit every single ballot, essentially doing a hand

23   count of the entire election.

24   Q.   Could a risk-limiting audit ever result in a recount

25   of every single ballot?

1    A.    Could it result in a recount of every single ballot?

2    No, what would happen is the audit -- you would have to

3    ultimately get to, if you couldn't reach that risk limit,

4    you would have to pull every single ballot and notate

5    that.

6    Q.    Can you tell us whether or not the public is able to

7    access the results of that risk-limiting audit?

8    A.    Yes.  The risk-limiting audit results are on the

9    Secretary of State's website, in their audit center.

10   There is a lot of information both about how the audit

11   works, the processes involved, and then the results after

12   each election.

13   Q.    We heard a little bit in the testimony before you got

14   here about "unofficial" results.  Can you explain to the

15   jury whether the preliminary results posted on election

16   night are the final vote counts.

17   A.    No.  Yes, I can explain it.  No, they are not the

18   final vote counts.  The votes that get presented beginning

19   after 7 o'clock on election night, we call those

20   "unofficial" results because we haven't counted all of the

21   ballots yet, and there is a lot that goes into that

22   process here in Colorado, specifically, where the ballots

23   that come in all throughout the early voting period in the

24   mail ballot period.  And then after election day, for

25   military and overseas voters, Colorado provides an

 1    additional eight days to receive a mail ballot for

 2    military and overseas voters, so long as it has been

 3    postmarked by election day.

 4        Also here in Colorado we have what is called a

 5    "cure" process, so a signature verification process.  If

 6    through -- there are many layers to signature

 7    verification.  If a signature has been found not to match

 8    by a bipartisan team of judges, we will send that voter a

 9    letter saying your signature doesn't match, you have until

10    eight days after the election to cure that ballot.  So

11    they can come in and they can say either, yes, I did sign

12    it or, no, I did not.

13        We also have until eight days after to verify

14    provisional ballots, which Colorado has very few

15    provisional ballots now, but that is something that came

16    into play with HAVA, the Help America Vote Act, in 2002,

17    to provide somebody who shows up to vote in person but

18    they don't have the necessary documents to prove

19    eligibility, they can then -- or if the system shows they

20    voted already, they can vote a provisional ballot, and we

21    have eight days to be able to investigate that and see

22    whether that ballot should count or not.

23        The only time a result is considered "official" is

24    after a canvas process.  So that is where the political

25    parties get to appoint, again, one, two people, depending

1    on the county, to come in and look at certain aspects from

2    the election, certain data from the election.  If they are

3    good with the data they see and everything looks above

4    board, they will do what is called "canvas," and certify

5    the election.  And it is only after that certification

6    process that the results are official.

7    Q.   I just want to -- because we are on limited time --

8    switch gears a little bit.  Sorry to interrupt you.

9         During your roughly 25 years of experience in

10   elections at this point, have you had an opportunity to

11   interact with folks who work at the companies providing

12   election technology?

13   A.   Yes, ma'am.

14   Q.   Okay.  What kind of encounters have you had

15   with folks?  If you can just generally describe how it is

16   you have come to know people working for those types of

17   companies.

18   A.   Sure, multiple ways.  One, any election technology

19   vendor or other vendor that provided a service to Arapahoe

20   County, you get to know those folks, both through contract

21   negotiations, you know, and meetings.

22        You know, also through our clerks' conferences.  We

23   have an association that has two conferences every year,

24   where we invite election technology vendors and recording

25   technology vendors and motor vehicle vendors to come in,

1    and it is essentially a trade show where they can show

2    their latest and greatest, and you build relationships

3    with people from the different vendors through the course

4    of activities like that.

5    Q.    Is part of your role as the Executive Director of the

6    Colorado County Clerks Association, organizing those

7    conferences?

8    A.    Yes, ma'am.

9    Q.    Okay.  I want to get to Dr. Coomer.  Did you have the

10   opportunity to meet Dr. Coomer through the course of your

11   career in elections?

12   A.    Yes, ma'am.

13   Q.    Where did you meet Dr. Coomer?

14   A.    We met here, I think 2013 or 2014.  We, in Arapahoe

15   County, we did some work, a pilot program through the EAC,

16   which is the Election Assistance Commission, in

17   Washington, D.C., to move forward on risk-limiting audits,

18   because I knew as a clerk, having worked in elections, we

19   needed a better auditing process to validate that

20   tabulation systems were working properly.

21        So I had Arapahoe County do that pilot project.

22   And then we did the next year on our own with some

23   researchers, and through the course of those -- what we

24   learned about our voting system at the time, we knew we

25   needed to see enhancements in how the voting system

388

```
 1   operated to be able to get to where we can do a successful
 2   risk-limiting audit.  And it is at that point in time when
 3   I first got to know Dr. Coomer.
 4   Q.   In terms of your personal assessment of Dr. Coomer as
 5   another professional working in elections, what did you
 6   think of him?
 7   A.   I thought he was incredibly engaging, a brilliant
 8   guy, and very dedicated to the election process, in making
 9   sure counties had the resources and the tools they needed
10   to be able to facilitate free and secure elections.
11   Q.   Did you two see eye to eye in terms of your political
12   views?
13   A.   No.  No.
14   Q.   You kind of smirked there.  Can you tell us why you
15   are making that face?
16        MR. DUANE:  Objection.  Objection.
17        THE COURT:  Approach.
18        (A bench conference is had.)
19        MR. DUANE:  It seems that the question was intended
20   to elicit a response from the witness about his political
21   affiliation.
22        MS. MORGAN:  There have been insinuations through
23   the cross-examination of Dr. Coomer that because he has
24   political views, that somehow that ruined his professional
25   reputation, and that people working in elections cannot
```

```
 1    have strong political views and still be respected by

 2    their peers.

 3          We believe this testimony is relevant because

 4    Mr. Crane personally knows Dr. Coomer and has knowledge of

 5    how he had political views, but still was a respected

 6    elections professional within the industry.

 7          THE COURT:  So you are not asking party

 8    affiliation?

 9          MS. MORGAN:  No, Your Honor, I am not.

10          THE COURT:  So could you reframe your question to

11    make sure he doesn't answer with respect to party

12    affiliation, but that you are talking about political

13    perspective.

14          MS. MORGAN:  Yes, Your Honor.

15          (In the hearing of the jury.)

16    Q.    (BY MS. MORGAN)  Without telling me, you know, what

17    your party affiliation is, or what Dr. Coomer's is, or who

18    any of you voted for, can you give us some explanation, or

19    meat on that bone, to tell us what you meant with your

20    testimony that you didn't see eye to eye?

21    A.    Sure.  Eric and I are on different sides of the

22    political aisle, and we are both very passionate and very

23    stringent in our views on politics.  We also share that

24    commonality that we aren't afraid to talk about it with

25    people.
```

1    And so whether it was at conferences, you know, if

2    we see each other at the bar or something, people would

3    have it on a stopwatch for how quickly he and I would

4    start getting into politics, and getting animated at

5    times, too, but never at any point feeling like he wasn't

6    a good partner or a friend.  It was always a robust, fun

7    discussion, that I usually won, I would say.

8    Q.   For the next few questions, I want to make sure and

9    focus the scope of this inquiry on the community of people

10   working in elections.

11       Can you please tell the jury whether or not

12   Dr. Coomer was respected within his professional peer

13   group before he was accused of rigging the 2020 election.

14   A.   Yes, without question.

15   Q.   And I want to be specific, before he was accused by

16   Mr. Lindell.

17   A.   Yes, without question, Eric was respected, both by

18   people at Dominion, as well as by people who knew him, who

19   got a chance to know him in the counties where he

20   interacted.  Again, he was considered brilliant and very

21   passionate about the work of elections, very dedicated to

22   the work of elections, and people appreciated that he was

23   willing to do anything he could to help counties be

24   successful.

25   Q.   I want to show you an exhibit now which has already

391

1    been admitted as Exhibit 200.  It will show up on that

2    screen next to you, and I will ask you some questions

3    after you have had a chance to watch this video.

4           (Videotape played in open court.)

5    Q.   (BY MS. MORGAN)  What is your reaction to seeing that

6    statement by Mr. Lindell?

7           MR. DUANE:  Objection, relevance.

8           THE COURT:  Overruled.

9           THE WITNESS:  My reaction is that it is absurd and

10   based on lies and something that election officials have

11   been pushing back on since 2020, that had a dramatic

12   effect, not just on Mr. Coomer, but election officials

13   here in Colorado and all across the country.

14          MR. DUANE:  Your Honor, I object on grounds of Rule

15   702, move to strike.

16          THE COURT:  Overruled.

17   Q.   (BY MS. MORGAN)  Do you think that Mr. Coomer rigged

18   the 2020 election?

19   A.   No.

20   Q.   Why not?

21   A.   It's a laughable -- it would be laughable if it

22   wasn't such a serious claim.  Number one, knowing Eric as

23   I have in our professional meetings, and knowing his high

24   standard of ethics and his work in elections and his

25   passion for this work, as soon as I heard the rumor back

1   in 2020, I just -- I knew that it was BS.

2        The other thing, too, is why I know it is BS is

3   because of the extensive security that we have around our

4   voting systems.  There are multiple -- we have lots of

5   defense in-depth to protect our voting systems that we get

6   better at every single year.

7        And so the notion that one man could fix an entire

8   national election was laughable on its face, and to us --

9   I mean, everybody in the election community was caught

10  completely off-guard, both that anybody thought Eric would

11  do this, and then the fact that the voting systems would

12  be --

13       MR. DUANE:  Your Honor, objection, hearsay.

14       MS. MORGAN:  There is an exception.  Sorry, should

15  we approach, Your Honor?

16       THE COURT:  Yes.

17       (A bench conference is had.)

18       MS. MORGAN:  Your Honor, I would point to the

19  exception in 803 for statements regarding a person's

20  reputation.

21       MR. DUANE:  That exception is limited to reputation

22  of the character in general.  This witness actually did

23  start to give what he thought he knew about the reputation

24  among other people in the industry about a specific event.

25       MS. MORGAN:  This does relate to his character and

```
 1    whether or not he is the type of person that would rig --
 2              THE COURT:  I can't hear you.
 3              MS. MORGAN:  Specifically, this is sub 21 of 803,
 4    that indicates that reputation among a person's associates
 5    or in the community, so the elections' community,
 6    concerning the person's character.
 7              MR. DUANE:  But the question and answer involved
 8    that he was starting to tell us about, is what everybody
 9    in the community believes about whether the allegations in
10    this case are true or false.  That is not reputation as to
11    character.
12              THE COURT:  All right.  Rephrase.  Sustained.
13              MR. DUANE:  Can we strike that last answer, where
14    he alluded to what everybody else believes.  I move to
15    strike.
16              THE COURT:  Overruled.
17              (In the hearing of the jury.)
18    Q.   (BY MS. MORGAN)  With respect to the other
19    individuals in the elections' community, to the extent you
20    have personal knowledge, can you tell us whether or not
21    other people believed that Dr. Coomer is of the type of
22    character of a person who would rig the 2020 election?
23    A.   Yes, and the answer is nobody that I talked to or
24    that came to me believed it.
25    Q.   How would you characterize the impact of the
```

 1    defendant's statements connecting Dr. Coomer to election

 2    fraud or treason on Dr. Coomer's reputation within the

 3    elections community?

 4    A.   Within the elections community, I think that for the

 5    people that knew Eric, it didn't affect his reputation

 6    because we actually know Eric and know what his values are

 7    and what his ethics are and his approach to elections.  So

 8    nobody had any doubt that Eric would not do something like

 9    that.

10         And then, again, with all of the other processes

11    and steps we have in place, again, the whole claim was

12    laughable on its face.

13    Q.   You have had the opportunity to work as a consultant

14    in your field; is that right?

15    A.   Yes, ma'am.

16    Q.   And you've have had the opportunity to hire folks,

17    you have been in a managerial position within elections.

18    A.   Yes, ma'am.

19    Q.   Based on your personal experience, do you think that

20    Dr. Coomer would be hirable in the elections' industry at

21    this point in time given what the defendants have said

22    about him?

23    A.   Based on his skills and qualifications, a hundred

24    percent.  But based on the way his reputation has been

25    tarnished the way that it has, I think that, you know,

1    most voting system vendors -- and I've talked to some of

2    them -- consider him nuclear and would never hire him.

3    Q.    So even though, as you said, people like yourself who

4    know how the systems work wouldn't believe what the

5    defendants are saying, are you saying that he is nuclear

6    or toxic at this point?

7    A.    Yes, ma'am, because he would hurt their bottom line

8    because of all of the lies that continue to be perpetrated

9    against him.  They think that they would lose customers.

10   It would hurt their bottom line, and then they would have

11   the lies and disinformation that have impacted Eric and

12   Dominion, coming to their company.

13        While they respect Eric and they appreciate the

14   work that he did, and they believe he never would have

15   done any such thing, they don't want to have that kind of

16   impact to their bottom line.

17   Q.    Does it make it difficult for people within your

18   sphere and in that community to associate with Dr. Coomer?

19   A.    I think there are some people that are nervous about

20   it.  You know, for those of us who have known Eric a long

21   time, it is not.  You know, there is something to this,

22   where if you run from it, then you are letting the bad

23   guys win; right.

24        So I am not going to do that.  I am not going to

25   bail on somebody, that I know his ethical standards when

1    conducting elections, is so high and who has been a friend

2    for a long time.

3    Q.    Based on your personal knowledge, how have the

4    statements about Dr. Coomer by the defendants impacted

5    elections in Colorado?

6    A.    Well, it has made it exponentially more harder,

7    because the more that the defendant continues to talk

8    about Coomer and elections, it makes it hard for clerks

9    because they continue to hear about this from people in

10   their community who will listen to Frankspeech or who will

11   listen to interviews or follow on social media.

12         And these people, they are very well-meaning

13   people, the people that put pressure on clerks, but they

14   are being lied to, and they don't know enough about what

15   happens in elections to be able to push back on that.  And

16   even though we will say, nothing was shown at the

17   symposium in 2021, or next one he did, I think, the

18   following year or the year after that, or it seems like

19   every other month for a while, oh, the proof is coming.

20   Well, the proof never came.  But that didn't stop people

21   from putting pressure on county clerks to do things.

22         And then we have the most obvious example, you

23   know, where we had a low-information clerk who didn't know

24   her job and her system, she bought into this, showed up at

25   the symposium in 2021, and now is in jail for her criminal

1    actions.

2         So to say that the defendants' actions have not had

3    a catastrophic effect on election officials and the

4    election community in Colorado is just not true.  You

5    can't overstate the impact of -- the impact of what he has

6    done, essentially to some of the most famous election

7    deniers from across the country, are right here in

8    Colorado.  He employed them, both with Cause of America --

9         MR. DUANE:  Objection, this turned into a narrative

10   quite some time ago.

11        THE COURT:  All right.  Mr. Crane, this is a very

12   unnatural back and forth, but if you can listen to the

13   question that Ms. Morgan is asking, and stick to that

14   answer, that would be terrific.

15        THE WITNESS:  Yes, Your Honor.

16   Q.   (BY MS. MORGAN)  Give us one or two examples of how

17   Mr. Lindell and the defendants, Frankspeech and My Pillow,

18   how the statements they have published have impacted

19   elections in Colorado beyond what you have already said.

20   A.   Well, I mean the two biggest ones are Tina Peters,

21   and her being in jail now because of her actions.  And I

22   think also, when you talk about -- he continues to talk

23   about these things.  He has brought in people from

24   Colorado who have gone after clerks and threatened clerks

25   and election staff to work at Frankspeech, to be a part of

1    Frankspeech, to be part of Cause of America, which is

2    something I understand he has funded.

3          So without question, the actions of the defendant

4    have had a large impact, a negative impact on the

5    elections' community and election workers here in

6    Colorado.

7    Q.   And I don't want to go too far into this, but I would

8    like you to give the jury a little bit more context about

9    how the environment and safety concerns changed for

10   election officials after the 2020 election, just so they

11   can understand your testimony.

12   A.   Yes, ma'am.  Certainly after the 2020 election, when

13   election officials started, you know, stepping up to say,

14   no, the election wasn't stolen, we know this, we can prove

15   this, there was a tremendous amount of pressure.  And for

16   those of us who really stepped up and kind of led the way

17   pushing back on it, it has led to death threats,

18   intimidation.

19         One clerk, who has been really strong on this, was

20   pregnant over the last couple of years, and she received

21   threats threatening her and her unborn baby.  We had

22   another clerk in the county -- in the county where Eric

23   lives or lived, who received threats all the time;

24   somebody saying, I am staying outside of your building

25   until you turn over Coomer, as if she was hiding Eric in

1    her office.

2           You know, for Eric, himself, we know people have

3    been outside his house filming it, waiting for him to come

4    home.  You know, myself, my wife, my children have been

5    threatened as a result for standing up and telling the

6    truth.

7           So it has had a huge impact.  County clerks, when

8    they work late at night, if they see a car in the parking

9    lot that they don't recognize, they are afraid to go

10   outside.  This is something that has happened since 2020,

11   and it is all because clerks -- and I want to say this is

12   impacting more Republican clerks than Democrat clerks,

13   because it is Republican clerks who are standing up and

14   pushing back on the lies that so infested our party, to

15   say, no, that is not true.  And that has turned them into

16   getting threats and intimidation and being doxed, those

17   kinds of things.

18   Q.   I am sorry, I don't mean to interrupt you.

19   A.   Not at all.

20   Q.   I want to move to another topic and ask you about

21   Mr. Joe Oltmann's claims, because we will be hearing from

22   him later today.

23          So to set the stage, did you go on Randy Corporon's

24   show, Wake up! with Randy Corporon, on November 28, 2020?

25   A.   Yes, ma'am.

1    Q.   At that point in time, can you tell us whether or not

2    you had heard Joe Oltmann's claim about Dr. Coomer, where

3    he alleges that Dr. Coomer was on an Antifa conference

4    call?

5    A.   I had heard the claims, yes, ma'am.

6    Q.   Had you met Joe Oltmann before?

7    A.   No.

8    Q.   Have you met Joe Oltmann since November 28th of 2020?

9    A.   Yes, ma'am.

10   Q.   Why did you meet with Joe Oltmann?

11   A.   I met with him, I think it was in March of 2021,

12   there were some folks in the Republican party who were

13   friends of Joe, or acquaintances of Joe, and they heard

14   the claims, and they were -- they thought there could be

15   some truth to it.  And then when I was on Randy's show,

16   and then after that, at different speaking engagements,

17   pushing back on it strongly, they said --

18        MR. DUANE:  Objection, he's answered the question

19   fully.

20        THE COURT:  Sustained.

21   Q.   (BY MS. MORGAN)  Okay.  What kind of discussions did

22   you have with Mr. Oltmann about his claims concerning

23   Dr. Coomer?

24        MR. DUANE:  Objection, hearsay.

25        THE COURT:  Approach.

1              (A bench conference is had.)

2              THE COURT:  What is your response to hearsay?

3              MS. MORGAN:  It is not offered for the truth of the

4    matter asserted, Your Honor, and it is partially also for

5    the jury to evaluate the relevance and for the jury to

6    evaluate the bias of Mr. Oltmann and evaluate whether or

7    not they assessed his claims to be truthful.

8              THE COURT:  All right.  Overruled.

9              (In the hearing of the jury.)

10   Q.   (BY MS. MORGAN)  You can go ahead and answer,

11   Mr. Crane.

12   A.   So Mr. Oltmann and I met for breakfast in, I think

13   late March of 2021, and he talked about -- I believe he

14   talked about the Antifa call.  And I said, you know, I

15   don't believe this stuff from Eric, right away, and he

16   started talking about some other things about, well, you

17   know, Eric -- something about Eric being an arrogant guy.

18        And I remember saying, well, yeah, Eric loves some

19   Eric, but I love some me.  And, sure, when you are a

20   confident guy and when you are successful, it is hard not

21   to be confident, it doesn't mean you overturned an

22   election.  And then he started talking about other

23   theories about elections and election data and reports,

24   like flipping overnight, and all that sort of thing.

25        And then I said, well, I would love to see more

402

1    proof, nothing that you have here is convincing, and there

2    are explanations for all of it.  He said, well, I will

3    have you over to my house and show you more, but the

4    invitation never came.

5    Q.   I want to move topics to another witness that the

6    jury will hear from who you referenced earlier, Tina

7    Peters.  Very briefly, in like two sentences, can you

8    explain to the jury what happened with the Mesa County

9    security breach involving Tina Peters?

10   A.   Yes, in May of 2022, I believe it was -- 2021, there

11   was going to be a trusted build, so a new version of the

12   Dominion software loaded on all voting systems across the

13   state, not just Mesa County.  Tina, believing these lies,

14   because she didn't know her system and how they worked or

15   how it is defended, she sneaked somebody in using false

16   credentials for that person, allowed that person to create

17   an image of their voting system, both before the trusted

18   build, and then brought them back after the trusted build.

19        As a result of that, she was convicted in October

20   of last year for multiple felonies and misdemeanors and is

21   serving 9 years in prison.

22   Q.   Subsequent to the Mesa County security breach, what

23   changed with respect to the training requirements for

24   county clerks?

25   A.   Well, we wanted to --

1          MR. DUANE:  Objection, relevance and Rule 407.

2          THE COURT:  All right, approach.

3          (A bench conference is had.)

4          MS. MORGAN:  The relevance, Your Honor, is the

5    showing that there has been a response to these types of

6    statements by Mr. Lindell, and basically that it also has

7    bearing on Tina Peters' credibility in front of the jury.

8          THE COURT:  How is Rule 407 even applicable in this

9    case based on issues we discussed earlier?

10         COURT REPORTER:  Judge, I'm not hearing.

11         THE COURT:  It is not general statements made to

12   officials to elections.

13         MR. DUANE:  Yes, in light of what counsel has just

14   represented, it might be unlikely to say there is a

15   problem with the spirit, if not the letter, of 407, which

16   it would be a 403 objection then, on the grounds of

17   changes that have been made just recently have little, if

18   any, relevance to this case, very little probative value.

19         THE COURT:  Overruled.

20         (In the hearing of the jury.)

21   Q.   (BY MS. MORGAN)  You can go ahead and answer the

22   question, Mr. Crane.

23   A.   Can you repeat the question?

24   Q.   Sure.  Subsequent to the Mesa County security brief,

25   what has changed with respect to the training requirements

1    for county clerks?

2    A.    Right.    Well, our association felt after the security

3    breach in Mesa County where Tina violated her oath of

4    office and all of the ethics that our election

5    administrators believe in, we felt it was important that

6    the citizens in Colorado heard from county clerks that

7    that was not acceptable, and we were going to do what we

8    can to make sure something like that doesn't happen again.

9         So we ran regulation through the Colorado General

10   Assembly that changed a lot of things, and we partnered

11   with the Secretary of State's Office on it, where we

12   changed the laws around cameras and camera coverage, and

13   making sure they are on 365, 24/7, because Tina turned

14   hers off before this breach.

15        We did other things, making sure there were

16   additional access controls around election offices, better

17   chain of custody, those type of things.    But then the one

18   component we felt very strongly about was the training

19   component.

20        There used to be in Colorado an election rule here

21   that an election official had to get certified through the

22   Secretary of State's certification course, which has been

23   around for a long time, within 2 years of taking office or

24   working in elections.    We changed the law so it had to be

25   6 months, rather than 2 years, and we put it in the

1    statute rather than the rule, because we felt it was

2    important that people knew their jobs and had to get

3    educated about what these jobs entail before they did

4    their job.

5    Q.   Just to clarify, was Ms. Peters certified?

6    A.   She was not certified.  Never got certified.

7    Q.   Okay.  Sorry, we are limited and have to do question

8    and answer format.

9         I want to address the question people may have,

10   which is anyone paying you to be here to testify today?

11   A.   No, ma'am.

12   Q.   Are you under a subpoena today?

13   A.   I am under subpoena.

14   Q.   Okay.  I can tell from some of your answers that you

15   seem to be passionate.  Why is it that you are so

16   passionate about educating people and investigating, you

17   know, claims like Mr. Lindell's about Dr. Coomer?

18   A.   Sure.  For two reasons that I can think of that come

19   to mind.  The first is that for election officials that

20   have been in this for a long time and that have made a

21   career out of this, there is an ethos to the work that we

22   do.

23        We know the role that we play in the American

24   fabric in conducting elections.  People have fought and

25   died for this right.  People have marched, been beaten,

1    been killed for the right to vote.  We understand how

2    important our job is in helping people facilitate their

3    most -- one of their most cherished rights as Americans.

4         You know, we know our elections, and perfection is

5    unattainable, but we work hard every single year to get

6    better in terms of access and integrity.  And so when

7    somebody uses elections and makes up lies and

8    disinformation about them for political or financial

9    purpose, you are damn right that infuriates me and all

10   people who have done this for a long time.

11        The other thing that it has led to, aside from

12   undercutting what is our most cherished right as

13   Americans, is the threats that it has done, not just to --

14   not just to Dr. Coomer, but election workers all across

15   the country.

16        So when I see a lie driving threats, intimidation,

17   doxing, and undermining one of our most cherished rights

18   as Americans and using it for financial purposes -- oh,

19   you know, keep donating money and we keep showing you the

20   fraud -- that they never show us.  You are damn right, not

21   just I am mad, but our entire community is mad.

22        MS. MORGAN:  I pass the witness.

23        THE COURT:  All right.  So it is 3 o'clock, let's

24   take our afternoon break, Mr. Duane, before you start.

25        Ladies and gentlemen of the jury, we will take our

1    afternoon break.  We will be back at 3:15.

2            (A break is taken from 2:59 p.m. to 3:17 p.m.)

3            THE COURT:  Thank you.  Please be seated.

4            Counsel, are you ready for the jury?

5            MR. DUANE:  Yes, Your Honor.

6            THE COURT:  Madam deputy.

7            COURTROOM DEPUTY:  Yes, Your Honor.

8            (In the presence of the jury.)

9            THE COURT:  Thank you.  Please be seated.

10           Mr. Crane, I remind you that you are still under

11   oath.

12           Mr. Duane.

13           MR. DUANE:  Your Honor, one moment.

14                       **CROSS-EXAMINATION**

15   **BY MR. DUANE:**

16   Q.   Mr. Crane, good afternoon.

17   A.   Good afternoon, sir.

18   Q.   Thank you for your time and your help here today.

19           I would like to begin by asking you a few questions

20   about the risk-limiting audits that you talked to us about

21   on direct examination.  Do you remember that testimony?

22   A.   Yes, sir.

23   Q.   And you told the jurors that risk-limiting audits are

24   a critical part of protecting election results from

25   irregularities and frauds, didn't you?

1    A.    Yes, sir.

2    Q.    And you said that they've been widely adopted in many

3    of the states.

4    A.    I don't recall saying that.

5    Q.    Well, allow me to ask, isn't it true -- you

6    understand that this case is primarily about allegations

7    and statements that have been made by the defendant,

8    Mr. Lindell?

9    A.    Affirmative.

10    Q.    And you understand the plaintiff in this case, your

11    friend, Mr. Coomer, alleges those statements were false

12    and defamatory.

13    A.    Yes.

14    Q.    And you understand that what the jury's attention is

15    focused primarily on is the November 2020 election.

16    A.    Yes, sir.

17    Q.    Isn't it true that in the November 2020 election,

18    which is the primary focus of this trial, fewer than four

19    states had actually completed a risk-limiting audit?

20    A.    I would have to go back and double check.  But

21    states -- there are other types of audit besides RLAs, or

22    risk-limiting audits.

23    Q.    I understand that, I just want to ask first about

24    risk-limiting audits.  You don't know, as you sit here

25    today, whether fewer or more than four states performed

1    those particular security measures in the 2020 election.

2    A.    Correct, I am not certain.

3    Q.    So you don't know, from your own personal knowledge,

4    whether the devices that you described for us, the

5    risk-limiting audits, on direct examination, had any

6    significant impact on a national basis, in terms of

7    protecting the results of the election from fraud and

8    irregularity?

9    A.    That's correct.

10    Q.    In fact, it is true, isn't it, that the majority of

11    the states in November 2020 did not require an RLA to be

12    conducted; isn't that true?

13    A.    Yes, that is true.

14    Q.    And you also can verify for us, can you not, sir,

15    that an RLA assumes that the ballot pool is not corrupted;

16    right?

17    A.    That's correct.

18    Q.    Because if the ballot pool is somehow corrupted, the

19    RLA essentially ceases to perform its intended function of

20    protecting the election from irregularities and fraud.

21    A.    Yes, sir.

22    Q.    You are not claiming here today -- and we thank you

23    for your vivid and detailed testimony about many of the

24    security measures that were put into place.  But you are

25    not making a claim that these measures are literally

410

1     foolproof.

2     A.    No.

3     Q.    Of course not.  You are not claiming that election

4     fraud or tampering is unheard of or that it never takes

5     place.

6     A.    No.

7     Q.    In fact, you have publicly taken the position that it

8     does sometimes take place.

9     A.    It certainly has throughout history, yes.

10    Q.    Sure.  And recent history, as well, right?  You say

11    throughout history, but even 2020.

12    A.    I would ask you to define "fraud" more.  Do we have

13    people each election try to submit a mail ballot that is

14    not theirs?  That is fraud, yes, that happens.

15    Q.    Well, let me be more specific.  Let's talk about --

16    you mentioned a woman named Tina Peters on direct

17    examination.

18    A.    Yes, sir.

19    Q.    Do you remember that testimony?

20    A.    I do.

21    Q.    And you told us that she received a very, very harsh

22    sentence for her alleged or her apparent participation in

23    some sort of -- was it voter fraud?

24    A.    It wasn't voter fraud, and I didn't say it was a

25    harsh sentence.

411

1   Q.   Well, fair enough.  But it was a 9-year sentence that

2   was imposed upon her.

3   A.   Correct.

4   Q.   And you understand that she was at the time of

5   failing health.

6   A.   I did not know that.  I spoke to her often, she

7   didn't tell me that.

8   Q.   That is not widely known among your associates?

9   A.   Not that I know of.

10  Q.   You knew that she was a Gold Star mother and a mother

11  of a son who died in service.

12  A.   I did.

13  Q.   Yet you personally appeared at her sentencing and

14  personally urged the judge to impose the maximum possible

15  sentence.

16  A.   Yes.

17  Q.   And when the judge agreed to do so, you publicly

18  celebrated that decision.

19  A.   I did.

20  Q.   Because you felt so passionately about the fact that

21  this Golden Star mother ought to be put behind bars for

22  her role in what she did in connection with the election;

23  isn't that true?

24  A.   No.  I felt passionately that if somebody tries to

25  undermine our elections and violates their oath and their

```
 1   ethos that we believe in as election officials, get held
 2   to account for that, which is what happened.
 3   Q.   And you believe that as a result of what she did and
 4   the crimes for which she was convicted, you believe, and
 5   you have publicly stated, that "she has undermined our
 6   election systems," hasn't she?
 7   A.   I did say that.
 8   Q.   Those were your exact words in late 2024 when you
 9   were interviewed by Colorado Public Radio.
10   A.   Yes.
11   Q.   And you told them that what she had done in this case
12   in connection with her conviction was something that had
13   "undermined our election system."
14   A.   Yes, sir.
15   Q.   Because you understand that our election system,
16   despite your best efforts and the best efforts of other
17   people like you, it is not foolproof?
18   A.   No, it is not foolproof, but what she did was put an
19   image out in the wild where any bad actor could go through
20   that, and if they got physical access to these components,
21   they could do nefarious things.  She made our systems more
22   vulnerable to tampering, no question.
23   Q.   Because the system is vulnerable to tampering, isn't
24   it?
25   A.   Like every computer, there are vulnerabilities, and
```

 1   then there are mitigations to make sure that you can

 2   mitigate those vulnerabilities.  We have extensive

 3   mitigation.

 4   Q.    So if Mr. Lindell were to testify in this case that

 5   his considered conviction is that the system is vulnerable

 6   to tampering, you would be the first to agree that he is

 7   right about that, wouldn't you?

 8   A.    As any computer, yes.

 9   Q.    He would be telling the truth if he said that,

10   wouldn't he?

11   A.    Yes.

12   Q.    You understand, sir, that you've given us a great

13   deal of testimony about whether, in fact, these systems

14   are vulnerable to tampering, as you just admitted, or

15   whether they are foolproof.  You also know that the

16   central issue the jury needs to decide in this case is not

17   whether that is the case, but whether the defendant,

18   Mr. Lindell, could have reasonably believed those things

19   were true.  You understand that, don't you?

20   A.    I do.

21   Q.    And you would be the first to admit that even if

22   everything you told us on direct examination were true,

23   that there is widespread disagreement across the country,

24   reaching to the highest levels of our government, on

25   whether voter fraud is, in fact, a real problem.

1    A.    Yes.

2    Q.    President Trump, for example, and his Vice President,

3    have both publicly stated, in reference to the 2024

4    election, that they thought that we probably should not

5    trust these results.  When he was asked whether we should

6    trust the result, he said, well, let's wait until the

7    votes are counted.

8    A.    I think he trusts them now.

9    Q.    I bet he does.  But you complained publically about

10   the fact that you thought President Trump's comments on

11   that subject undermined voter confidence in the integrity

12   of the process.

13   A.    Multiple times.

14   Q.    A process to which you devoted your entire life.

15   A.    Multiple times.

16   Q.    And that wasn't the first time, because it was also

17   true, wasn't it, back in 2016, when Senator Hilary Clinton

18   lost to President Trump during his first presidential

19   campaign, she also claimed that she had been robbed,

20   didn't she?

21   A.    Yes.

22   Q.    She claimed that the election had been stolen from

23   her.

24   A.    Yes.

25   Q.    She claimed that results had been contaminated by

 1   some sort of irregular -- impropriety perpetrated by the

 2   Russians.

 3   A.    That's right.

 4   Q.    And that went a long way, didn't it, to cause a

 5   consternation to you and others in the field, of course.

 6   A.    Not like this.

 7   Q.    But it did give you considerable consternation.

 8   A.    Her claims didn't lead to death threats against

 9   election officials.

10   Q.    I am not asking what effect her claims had on death

11   threats, I am just asking you to confirm, if you can, the

12   fact that Hilary Clinton, the Democratic nominee for

13   president, when she publicly stated that the results had

14   been contaminated and that she was robbed and that the

15   results were stolen, that went some considerable way

16   towards undermining the public process, didn't it?

17   A.    No, respectfully, sir, I think that is incorrect,

18   because I believe Hilary Clinton was complaining about

19   James Comey and factors outside the administration of

20   elections.  So I didn't like -- you know, there is

21   something I call the "loser's lament," and it happens

22   quite often, where if you lose, it can't be because you

23   are a bad candidate or you ran a terrible campaign or

24   there is a wave, there has to be something else that is

25   going on.

```
 1          As I recall, Hilary Clinton was complaining about
 2     Jim Comey and other things going on, not the way that
 3     ballots were counted or the way the election was
 4     conducted.  So it is apples to oranges.
 5     Q.   I understand that, sir.  I am not suggesting
 6     otherwise.  But the point is, she did claim publicly after
 7     she had been defeated that she thought the results of the
 8     process had been undermined by some sort of improper
 9     irregularities, you would agree with that?
10     A.   No, not in terms of the administration of elections.
11     She was -- there were things outside of our world that she
12     was complaining about.
13     Q.   Well, let's put it this way, then.  We can agree,
14     can't we, that then Senator Clinton had public misgivings
15     about whether the rules, for whatever reason, accurately
16     reflected the will of the people.  You would admit, at
17     least, to that one.
18     A.   No, I would not.  The way you are framing it is
19     inappropriate, sir.  The results reflected the votes as
20     they were counted.  That was the will of the people.  She
21     never said that the ballots were fraudulent or the
22     machines didn't tabulate right.  She never said that the
23     results don't reflect the will of the people.
24          She said it got stolen for these other reasons that
25     made her look bad and made people not want to vote for
```

417

```
 1    her.  Two totally different things.
 2    Q.   All right.  We will let the jury decide that.  But
 3    let me put it to you this way, and let's shift gears for a
 4    moment.  Senator Clinton is not the only one; Senator
 5    Kamala Harris, from California, and Amy Klobuchar, also a
 6    senator at the time, among others, publicly complained
 7    after the 2016 election that there was a definite
 8    possibility that some votes had not been properly counted;
 9    isn't that true?
10    A.   I would have to go back and look.  I remember Senator
11    Clinton.  I don't remember Kamala Harris or Senator
12    Klobuchar.
13    Q.   You don't recall what statements may have been made
14    at that time by Kamala Harris.
15    A.   I don't.
16    Q.   And yet you came here today and presumed to tell us
17    what you thought Mr. Lindell's statements, what effect
18    they had on people in the industry.
19    A.   Because I remember Mr. Lindell's statements very
20    clearly and the dramatic impact they had on our election
21    process of the people here in Colorado.
22    Q.   But you can't give us an opinion on the statements --
23    on the effect of similar statements, if any, that were
24    made by Kamala Harris and Amy Klobuchar.
25    A.   No, because it wasn't on anybody's radar here in
```

1   Colorado.  What Hilary Clinton did was, but what others

2   said, no.  The same as Stacey Abrams, when she claimed it

3   was stolen in '18, we knew about it, but it didn't change

4   any behaviors here in Colorado from people coming into the

5   office about it.

6           Again, it is apples to oranges.  You cannot

7   compare -- the "loser's lament" has always been there.

8   You can't compare what happened in 2020 to what happened

9   before that.

10  Q.   And what you call "loser's lament," was also, as you

11  said, exhibited by Stacey Abrams.

12  A.   Yes.

13  Q.   And that was in Georgia --

14  A.   Yes.

15  Q.   -- when she ran for governor.

16  A.   Uh-huh.

17  Q.   Is that a yes?

18  A.   Yes.

19  Q.   And she claimed that there were severe irregularities

20  in that vote.

21  A.   I think she claimed voter suppression, I don't think

22  she -- as I recall, I think it was voter suppression, it

23  wasn't so much that the ballots were counted improperly.

24  Q.   But you would agree that Stacey Abrams' public

25  statements on that subject also contributed to the problem

         1    you complained about concerning undermining public

         2    confidence in the freedom and fairness of the process.

         3    A.    Some people became more concerned about voter

         4    suppression at that time.

         5    Q.    Certainly.  And in the most recent presidential

         6    election, I am sure you have heard many conspiracy

         7    theorists suggesting that Elon Musk may have contributed

         8    to a contamination of the result by shutting down certain

         9    internet sites.  You have heard about those murmurs,

        10    haven't you?

        11    A.    Yes, sir.

        12    Q.    And you are not making any claim that those rumors

        13    can be contributed to Mr. Lindell.

        14    A.    No.  I haven't seen that, no.

        15    Q.    But you will concede, though, that in each -- not

        16    once, but in each of the last three presidential

        17    elections, we have seen vivid and powerful demonstrations

        18    of what you call "loser's lament."

        19    A.    Yes.

        20    Q.    Public complaints by presidential candidates and

        21    their supporters complaining that the result had not been

        22    fair.

        23    A.    Yes.

        24    Q.    Complaining that the result had been rigged.

        25    A.    I don't know that "rigged" -- I am not saying it

1    wasn't, but I don't recall "rigged" coming in until 2020,

2    that specific term, itself, but saying that, you know, the

3    election was unfair or something happened to keep them

4    from winning, it wasn't just they're a bad candidate or

5    something along those lines.

6    Q.   You know that Mr. Coomer, the plaintiff in this case,

7    has made similar allegations.  In this case he has sued

8    Mr. Lindell for defamation.  And you know that he has made

9    similar allegations at least against more than two dozen

10   other individuals.

11   A.   I didn't know that.

12   Q.   Well, fair enough.  But you knew that he filed claims

13   against a number of other individuals.

14   A.   Oh, excuse me, I am sorry, Mr. Coomer.  I am sorry.

15   Claims of defamation against other individuals besides

16   Mr. Lindell, yes, I am aware of that.

17   Q.   Yes.  More than two dozen of them.

18   A.   I don't know the number.

19   Q.   But you don't know the number?

20   A.   I don't know.

21   Q.   But you will agree with me, then, that Mr. Coomer has

22   alleged in this case, and in similar cases, that he has

23   been caused a number of problems because of a number of

24   statements made about the outcome of the election, the

25   2020 election, some of which were made by Mr. Lindell,

1    yes?

2    A.    Yes.

3    Q.    But the large majority of them were allegedly made by

4    other individuals.

5    A.    Yes.

6    Q.    So you are not suggesting by any means that

7    Mr. Lindell is the sole source of any alleged problems

8    that have been caused with respect to Mr. Coomer's

9    reputation.

10   A.    No, just that he had the largest platform and

11   amplified it as much as anybody else did.

12   Q.    But he doesn't have a larger platform, surely, than

13   President Trump and Vice President Vance.

14   A.    No.  I don't recall President Trump speaking about

15   Dr. Coomer specifically.

16   Q.    No, I understand, I will concede that you are right.

17   But President Trump, you, yourself, complained recently,

18   and in public, that President Trump and Vice President

19   Vance, among others, have made statements that are

20   derogatory with respect to the integrity of the electoral

21   process.

22   A.    Yes.

23   Q.    You would be first to admit this is also a source of

24   frustration for the people in your field --

25   A.    Yes.

422

1    Q.    -- who devoted their lives to this sort of thing.

2    A.    Yes.

3          MR. DUANE:  Excuse me, Your Honor.  One moment.

4    Q.    (BY MR. DUANE)  I would like to direct your attention

5    to a problem that came up here in Arizona [sic], is it

6    Air-a-pay-yo County?  Am I pronouncing that right?

7    A.    I don't know.

8    Q.    Air-a-pay-yo County.

9    A.    Oh, you said "here in Arizona."  Here in Colorado,

10   Arapahoe County, yes, sir.

11   Q.    I apologize for my pronunciation, I am from out of

12   town.

13          You are familiar with certain problems that arose,

14   alleged problems, in late 2024.

15   A.    Yes.

16   Q.    And you are aware that those problems concerned some

17   suspicion that some individuals harbored with respect

18   specifically to the 2020 election.

19   A.    Yes.

20   Q.    The presidential election.

21   A.    Yes.

22   Q.    Which you know is at the center of this entire trial.

23   A.    Yes.

24   Q.    In fact, are those suspicions that were brought to

25   the attention of the Air-a-pay-yo County Clerk and

1   Recorders --

2   A.   It is Arapahoe.

3   Q.   Thank you.   -- Office?   They were brought

4   specifically by Mr. Shiro Kuriwaki.

5   A.   Yes.

6   Q.   You have heard that name.

7   A.   I have.

8   Q.   He was an assistant professor at Yale University.

9   A.   Yes.

10  Q.   And he notified the clerk and recorders office in

11  writing that he suspected there were errors in the

12  published results in the 2020 general election; isn't that

13  true?

14  A.   In the redacted cast-vote record, which is an

15  unofficial record, yes.

16  Q.   Yes.  But he publically raised the complaint that

17  this professor, from Yale University, shared Mr. Lindell's

18  suspicion; that there was something wrong with that

19  election, didn't he?

20  A.   That is correct -- no, no, he did not say that there

21  was something wrong with the election.  He said there

22  appears to be an error in an unofficial redacted report.

23  Big difference.

24  Q.   All right.  I will settle for that.  The jury can

25  decide whether that is a big difference.

424

1          And he suggested, did he not, that based upon his

2     investigation, that these errors were likely due to

3     mistakes that were done during the redaction process.

4     A.    Yes.

5     Q.    And as a result of those reports and those complaints

6     that were brought to that office by this Yale University

7     professor, the staff of that county conducted a review.

8     A.    Yes.

9     Q.    And their review confirmed his hypothesis, did it

10    not?

11    A.    That is what they said.

12    Q.    Yes.  The county clerk's office did an independent

13    investigation, which actually independently confirmed that

14    Professor Kuriwaki was correct about his suspicions.

15    A.    Yes.

16    Q.    And as a result, they were required to perform a new

17    redaction of the original unredacted cast-vote record.

18    A.    Correct.

19    Q.    And all of this had to be reported on the clerk's

20    website.  It was reported.

21    A.    It was reported on the clerk's website.

22    Q.    Because these were serious allegations.

23    A.    Yes, sir.

24    Q.    And of considerable concern to your office.

25    A.    Of considerable concern.

425

1    Q.    Of considerable concern to you personally, I am sure.

2    A.    Well, sure.  I mean, anytime something like that

3    happens, we want to dive down into it, and that is exactly

4    what I have done over the last week.  And just like

5    everything else from 2020, it's what we call

6    malinformation; right.

7          So you have somebody who takes a shred of truth, in

8    this case, the report -- data got scrambled inside the

9    report.  What people haven't focused on is that -- or

10   after that, they take that shred of truth, and then they

11   build out lies based on that truth.

12         So there was a press conference at the Capitol with

13   the author of the report and some other people, and they

14   were saying ballots were changed.  That is a lie, no

15   ballot was changed.  They are saying the election was

16   impacted by this.  That is a lie, the election wasn't

17   impacted by this, that report wasn't issued until December

18   10th.

19   Q.    Let me interrupt for a moment, perhaps I wasn't

20   clear, but I appreciate your answer.

21         The experience at the Air-a-pay-yo County Office

22   does confirm mistakes do happen from time to time.

23   A.    Arapahoe, yes.

24   Q.    That the system is not foolproof.

25   A.    The entire election system, it relies on people, and

1    people are not perfect.

2    Q.   Well, you told us on direct examination that you

3    thought that it was impossible that Mr. Coomer, the

4    plaintiff, could have single-handedly changed the outcome

5    of the entire election.

6    A.   Yes.

7    Q.   You find that implausible.

8    A.   Yes.

9    Q.   But you understand that -- you understand that -- let

10   me just rephrase that.

11        You agree, of course, though, that there are

12   occasional problems that crop up.

13   A.   Yes.

14   Q.   And some of them fairly significant.

15   A.   Yes.

16   Q.   Like the ones that were brought to the attention of

17   that office by Professor Kuriwaki.

18   A.   No, I would not say that is a significant error.  It

19   appears to be a sorting error on an unofficial report that

20   had no impact on the actual election, itself.  And, of

21   course, because there are bad actors who like political

22   and financial gain out of these types of things, they have

23   blown it up into a larger lie.  The only basis in truth is

24   that the report -- there was an issue with that

25   "unofficial" report that wasn't created until December

1    10th, after the election was certified.

2          But, once again, like with everything, like with

3    the Symposium, we have all this evidence, and there is

4    nothing there, there is nothing there with this, it is not

5    a significant issue.

6    Q.   You said a moment ago, sir, that in your experience

7    and in your judgment, many of the troublemakers who were

8    affecting the most people in your profession, are taking a

9    little bit of truth and they are ramping it up with

10   falsity and disinformation.

11   A.   Yes.

12   Q.   But in your own words, there was at least a core of

13   truth in many of these misleading claims that have caused

14   you such difficulty.

15   A.   Uh-huh.

16   Q.   So you are certainly not claiming that these

17   statements are entirely false many of the times.

18   A.   Not all of them.  Some of them are.

19   Q.   Some.  But many of the statements that have caused a

20   great deal of difficulty for people in your work have been

21   statements that did include at least a core element of

22   truthfulness.

23   A.   I will have to go back and look at them.  There are

24   some statements that include a core of truth, and then

25   they blow it out -- or people blow it off into these other

1    things that aren't true that didn't happen.  You know, I

2    also find it funny that a lot of these groups don't

3    include or talk to election experts; right.  And they

4    don't take the steps necessary to actually validate what

5    happened.

6         And I can give you four instances.  Lots of

7    concerns about the voting system.  Did Mr. Lindell or

8    anybody ever go to CORA -- and CORA is our open records

9    act.  Did they ever go get the voter marks?  Of course

10   not, the actual paper ballot which would show how the

11   public counted it?  No.

12   Q.   We can have Mr. Lindell answer those questions, I am

13   not allowed to answer your questions here.  But if you can

14   just answer mine, we will get this over with as quickly as

15   we can.

16   A.   Sure.

17   Q.   For clarity sake, I want to make sure the jury is

18   clear on this, all of the testimony that you gave today,

19   and all of the claims that you have made about the harm

20   that you say was caused in part by Mr. Lindell, all of it,

21   100 percent involved nothing more than speech; isn't that

22   true; words that he spoke and words that he wrote?

23   A.   "Involved nothing more than speech?"  No.  No, that

24   is not true.

25        MS. MORGAN:  I object.  May we approach?

1          THE COURT:  Yes.

2          (A bench conference is had.)

3          MS. MORGAN:  This line of questioning calls for a

4    legal conclusion -- I said it calls for a legal

5    conclusion.

6          MR. DUANE:  I am not asking about free speech or

7    First Amendment protection, it is just to clarify that all

8    of his testimony is based on harms caused by nothing more

9    than speech, so the jury is not misled into suspecting

10   that they are in possession of any reason to think that he

11   may have engaged in physical violence.

12         THE COURT:  Sustained as to form.  You can re-ask

13   the question.

14         (In the hearing of the jury.)

15   Q.   (BY MR. DUANE)  Mr. Crane, all of the problems that

16   you have described on direct examination concerning

17   emotional distress and problems and fear and anxiety on

18   the part of workers in your field, so the record is clear,

19   you are not claiming that any of those problems were ever

20   caused entirely or solely by Mr. Lindell and his

21   statements, because you concede that many other

22   individuals across the country have been making similar

23   claims for years.

24   A.   No, again, but he had the large platform and kept

25   perpetuating the lies over and over again.

1    Q.    Understand.  But you will agree that he was not the

2    only one by any means who is making these kinds of

3    statements.

4    A.    He wasn't the only one, no.

5    Q.    And you would also confirm that you have never been

6    in possession of any evidence, and are not making any

7    claim, that you have reason to believe that Mr. Lindell,

8    himself, ever went out to someone's house in a threatening

9    way; right?

10   A.    No, no.

11   Q.    And you are not in possession of any evidence or

12   reason to believe that he, himself, ever threatened anyone

13   with fisticuffs or violence, himself.

14   A.    Well, no.  But when he calls people a traitor and

15   those type of things in a charged environment, it may not

16   be him, but that kind of rhetoric charges up people to do

17   stupid things.

18   Q.    But regardless of whether that might be the case, you

19   admit that Mr. Lindell, as far as you are aware, never --

20   A.    As far as I am aware, no, he has never.

21   Q.    -- threatened anyone with physical violence.

22   A.    As far as I am aware, no.

23   Q.    And you are aware that -- as far as you are aware,

24   Mr. Lindell never published any information himself about

25   the address or phone number or the contact information of

1    any individual that he thought was deserving of public

2    contempt.

3    A.   As far as I am aware, no.

4    Q.   No.  He never did anything himself to directly make

5    it easier for someone to find any of the subjects of his

6    rant; right?

7    A.   As far as I am aware, no.

8    Q.   You said, sir, and I want to clarify if I understand

9    correctly, and I don't mean any disrespect, of course, but

10   I think you confirmed on direct examination that you are

11   anything but an impartial witness in this case; right?

12   A.   That's correct.

13   Q.   You have a keen interest in the outcome of this case,

14   don't you?

15   A.   Correct.

16   Q.   And we appreciate your candor.  And that is true,

17   actually, for a number of reasons, if I might list a few

18   of them.  You and Mr. Coomer are close personal friends,

19   are you not?

20   A.   Yeah, we are good friends.

21   Q.   Close good friends.

22   A.   We are not hanging out at each other's house every

23   weekend.  We connect over texts, you know, every few weeks

24   to check in and how is it going.

25   Q.   You are friends on Facebook.

432

```
 1    A.    Yeah.

 2    Q.    And you have been for at least 8 years.

 3    A.    That sounds about right.

 4    Q.    So for at least 8 years you have had the ability to

 5    read everything he has put on Facebook.

 6    A.    No.

 7    Q.    Much of it, anyway.

 8    A.    I have thousands of friends on Facebook.  I don't

 9    read all of their posts.

10    Q.    Well, you have had the chance to read a lot of his

11    posts.

12    A.    No.  I don't know -- like, I don't think I have ever

13    gone to Eric's page since, like, we first became friends

14    and looked.  If it pops up in the feed, okay.  Like, you

15    guys know what I am talking about, you are friends with a

16    lot of people on Facebook, it doesn't mean that you know

17    every single post that people have.

18    Q.    But you have gotten together with him on social

19    occasions a number of times.

20    A.    Yes.

21    Q.    And his wife.

22    A.    I don't know that I have ever met his wife.

23    Q.    But you are aware that is what you told us -- I am

24    sorry, actually forgive me, I misspoke.  I don't even know

25    if he has a wife.  I meant to refer to your wife, and I
```

1    apologize.

2         Let me ask you questions about your wife.  She also

3    knows Mr. Coomer.

4    A.   She does.

5    Q.   And she has also spent time with him socially in your

6    presence.

7    A.   No, I don't think my wife and Eric and I have ever

8    hung out together.

9    Q.   Your wife, you said, worked for Dominion.

10   A.   Yes.

11   Q.   And can you tell us the full name --

12   A.   Maybe at a Christmas party once, a Dominion Christmas

13   party, but that is the whole -- well, maybe not the whole

14   company.

15   Q.   Can you tell us the full name of the company you

16   called Dominion?

17   A.   Dominion Voting Systems.

18   Q.   Dominion Voting Systems.  You understand that

19   Mr. Coomer was employed by Dominion Voting Systems.

20   A.   Yes.

21   Q.   And he was employed by them during some of the time

22   involving the central allegation in this case.

23   A.   Yes, sir.

24   Q.   And she was employed by Dominion Voting Systems, you

25   said until 2019.

1    A.    Correct.

2    Q.    And you said she still does contract work for them on

3    a reasonably regular basis.

4    A.    Yeah.  Certainly with every big election that comes

5    up, she does.

6    Q.    So you know that Dominion Voting Systems, the company

7    itself, is not a party --

8    A.    Yes.

9    Q.    To this case.

10   A.    Yes.

11        THE COURT:  All right.  Again, this is very

12   difficult for my reporter.  Let him finish the question,

13   and let the witness answer before you ask your next

14   question.

15        MR. DUANE:  Yes, apologies.

16   Q.    (BY MR. DUANE)  But you know that they have also

17   filed lawsuits against Mr. Lindell.

18   A.    Yes.

19   Q.    And so you know that they have a keen interest in the

20   outcome of this case.

21   A.    Yes.

22   Q.    You know that Mr. Coomer, your friend, has publicly

23   expressed his hope that the outcome of this case will

24   serve as a valuable and a vital precedent.

25   A.    Yeah.

```
 1    Q.    One that will transform, on a nationwide basis, our

 2    understanding of the problems that you described on direct

 3    examination.

 4    A.    Yes.

 5    Q.    And you know that this case is being very closely

 6    watched and monitored by the national press.

 7    A.    Yes, sir.

 8    Q.    And you know, therefore, it is quite likely that the

 9    outcome of this case will become widely known around the

10    country.

11    A.    Yes, sir.

12    Q.    And if this jury were to return a verdict in favor of

13    your friend, Dr. Coomer, that would be great news for

14    Dominion, wouldn't it?

15    A.    Well, I suppose so.

16    Q.    Dominion, for whom your wife worked until 2019 on a

17    regular basis --

18    A.    Yes.

19    Q.    -- full time.

20    A.    Yes.

21    Q.    And in addition to the interest that Dominion has in

22    this case -- so you understand, the testimony that you are

23    giving here today, if the jury were to accept it, would be

24    extremely welcome news for the plaintiff and his

25    attorneys --
```

1    A.    Yes.

2    Q.    -- and you know that.  You are here -- you know that

3    you are appearing -- you are a witness for the plaintiff

4    in this case; is that not right?

5    A.    Yes.

6    Q.    During the break, just before the cross-examination,

7    when most of the courtroom went out into the hall, you

8    went instead into a private room to sit with him and with

9    his attorneys, didn't you?

10   A.    I actually didn't know they were going to go in

11   there.  I went in there to sit down and get another bottle

12   of water for a second.

13   Q.    And when they came in, you didn't leave.

14   A.    I didn't leave.

15   Q.    You sat there with them.

16   A.    They gave the instruction that I am not to talk about

17   any of my testimony today, and we didn't.

18   Q.    Please be assured I am not accusing you or them of

19   anything improper.  But I am just saying, it felt natural

20   for you to sit down and spend that 15 minutes conversing

21   or socializing with Mr. Coomer and his attorneys.

22   A.    Yeah.  But if you had come in, I would have hung out

23   with you, too.

24   Q.    I'm looking forward to that opportunity.

25   A.    I would be, too.

```
 1    Q.   Let me ask you this, sir.  In your testimony on

 2    direct exam, you told us near the end that one of your

 3    greatest current passions is education.

 4    A.   Of election officials and the public about what

 5    really happens in our election, yes, sir.

 6    Q.   Because there is a vital need, even today in 2025,

 7    there is still a vital need for widespread public

 8    education about how this process works.

 9    A.   There is, because of so much lies and false

10    information about what really happens, that people turn

11    into political or financial gain.  So do I want to help

12    protect people from predators like that, yes, sir, I do.

13    Q.   Of course.  And there is more than just

14    "misinformation," as you have put it, from a number of

15    sources; right?

16    A.   Uh-huh.

17    Q.   A great number of sources.

18    A.   Yes.

19    Q.   There is also, in addition to misinformation, just a

20    great deal of ignorance on the part of a great number of

21    individuals in the country about how the process works.

22    A.   Yes.

23    Q.   In fact, most of what you told us on direct

24    examination involves matters about which too many

25    Americans are still woefully ignorant.
```

1    A.    Yes.

2    Q.    And that would be even more true 4 years ago, at the

3    time Mr. Lindell made his statements.

4    A.    Yes.

5    Q.    He was operating at a time and in the context where a

6    great deal of misinformation and misunderstanding was

7    prevalent across the country.

8    A.    Yes.

9    Q.    So if Mr. Lindell, or somebody else like him -- let's

10   not talk about him specifically, but if an individual in

11   2020 were of the view that perhaps the results of the

12   election couldn't be trusted, the presidential election,

13   you would not have been surprised.

14   A.    Can you repeat the question?

15   Q.    I will do better, I will rephrase the question.

16          You believe -- you believe that if somebody

17   believed today that we can't trust the electoral process,

18   that would not surprise you because a great number of

19   people to this day seem to harbor that idea --

20   A.    Uh-huh.

21   Q.    -- which you call a mistake.

22   A.    Well, not here in Colorado.  In Colorado, something

23   like 80, almost 90 percent of people who were in a recent

24   poll say that they trust our election processes here.

25   Q.    That is excellent news.

1    A.    That is really good news.

2    Q.    But 90 percent saying that they trust the process,

3    means that 10 percent don't.

4    A.    Yes.

5    Q.    One out of ten; right?

6    A.    Yes.

7    Q.    Even here in Colorado.

8    A.    Correct.

9    Q.    Despite all of your ongoing and dedicated and

10   concerted efforts to get the word out and educate the

11   public.

12   A.    Yes.

13   Q.    So it would be fair to assume that before those

14   education efforts, the extent of popular confusion on the

15   subject was probably worse 4 years ago --

16   A.    I think that is fair.

17   Q.    -- at the time Mr. Lindell made the statements for

18   which he is now on trial here today.

19   A.    Uh-huh.

20   Q.    Is that a yes?

21   A.    Yes.

22   Q.    Thank you, sir.

23         All right.  Perhaps the last topic I want to

24   discuss with you, sir -- Mr. Crane, if you can give me

25   just a moment.

440

1    A.    Sure, take your time.

2    Q.    Two more topics.  I asked you to confirm for us that

3    you have a definite interest in the outcome of this case,

4    and you acknowledged that you do.

5    A.    Yes, sir.

6    Q.    You, quite frankly, to put it bluntly, you'd love to

7    see the plaintiff win this case.

8    A.    Yes, sir.

9    Q.    Because he is your friend, among other reasons.  That

10   is not saying that is the only reason, but he is your good

11   friend.

12   A.    It is not even a major reason.

13   Q.    All right.  But you would like to see the jury return

14   a verdict against Mr. Lindell.

15   A.    Yes.

16   Q.    And you know that they are asking the jury in this

17   case to punish him --

18   A.    Yes.

19   Q.    -- with what is called punitive damages.

20   A.    Uh-huh.

21   Q.    Is that a yes, sir?

22   A.    Yes, sir.  Sorry, I don't mean to --

23   Q.    We have to get a "yes" for the record for the court

24   reporter, for whom I am perpetually trying to go slow.

25         You told us that you -- you said on direct

```
 1   examination that you and your wife have also been

 2   threatened, you said.

 3   A.   Yes.

 4   Q.   The subject of threats.

 5   A.   Yes.

 6   Q.   By various individuals.

 7   A.   Yes.

 8   Q.   You are not claiming that Mr. Lindell made those

 9   threats, just to be clear.

10   A.   Correct.  I am not claiming that.

11   Q.   You don't even know who made those threats.

12   A.   No.  A lot online, received voicemails, you know,

13   those types of things.

14   Q.   And you are not claiming or have any reason to think

15   that Mr. Lindell was one of the ones who made it possible

16   for others to reach you online --

17   A.   No.

18   Q.   -- or that he disseminated information.

19   A.   Not that I know of.  Not that I know of.

20   Q.   Let me finish my question.  You have no reason to

21   believe that he ever intentionally disseminated any

22   information to anyone to make it easier for anybody to

23   target you or threaten you online.

24   A.   Correct.

25   Q.   You don't have any idea who is doing that or how it
```

442

1    happened.

2    A.    No.   I mean, we do know there are some people who

3    push these narratives and say, you know, trouble is

4    coming, you know.

5    Q.    Obviously I am not asking you about background cause

6    and effect, but the actual people who sent you the

7    threats, you don't know their name.

8    A.    Well, that is not true.   I mean, you can look at some

9    of the things that one person in particular has posted

10   online as at least veiled threats.

11   Q.    How far back in time did you and your wife start

12   receiving these threats?   How far back does it go?

13   A.    We -- I would say threats started after -- you know,

14   people started to assassinate my character after I called

15   Joe Oltmann a liar in 2021.   And then when Tina Peters led

16   the security breach and the Secretary of State did a press

17   conference announcing what she was going to do, she asked

18   for representation from the association to be there, so I

19   stood there.   And I let Tina have it pretty good, and that

20   is when stuff started picking up.

21   Q.    Thank you.   I didn't hear that on direct exam, but

22   you are clarifying for us now that you know that at least

23   some of these threats, in your opinion, were based upon

24   things that were said by Mr. Oltmann and by Ms. Peters;

25   that they were instigators that contributed some of the

443

1    threats that came against you --

2    A.    Yes, sir.

3    Q.    -- and your family.

4    A.    Yes, sir.

5    Q.    And you are not making any claims that those

6    individuals worked for Mr. Lindell or that they are under

7    his control, of course --

8    A.    Well --

9    Q.    -- because you know that they are not.

10   A.    I think that they were both on -- well, I think Tina

11   had a show on his platform; right, at one time?  And I

12   think Joe Oltmann maybe would be involved in Frankspeech,

13   as well?

14   Q.    Again, I apologize, I can't answer your questions, I

15   am just trying to find out what you know.

16         To your knowledge, though, is your opinion that

17   Mr. Oltmann and Ms. Peters were part of the problem you

18   have told us all about on direct exam?

19   A.    Yes.

20   Q.    The problem that contributed to the threats that were

21   made against you and your family.

22   A.    Correct.

23   Q.    And you understand, do you not, that those

24   individuals don't work for Mr. Lindell, and they never

25   have?

1    A.    I don't think that is true, sir.  I think, you know,

2    there was some business relationship between Oltmann and

3    Frankspeech, I think.  I think I have seen that.  And

4    certainly Sean Bishop was a part of that, was a part of

5    Frankspeech, as well.

6    Q.    When you received these threats, you and your family

7    members, did you notify the police or the FBI?

8    A.    Yes.

9    Q.    And were investigation pursued?

10    A.    Unfortunately the Littleton Police did not, which was

11    frustrating.  The FBI, you know, they keep a list, and

12    they can't comment on investigations.  So, you know, they

13    were fantastic but, you know, I don't know the status of

14    where any of that is at.

15    Q.    You brought it to the attention of those individuals

16    because you know, based upon your professional experience

17    and training, that threats like those, death threats, are

18    subject of criminal investigation.

19    A.    Yes.

20    Q.    All right.  Do you know when Mr. Lindell made his

21    statements about Dr. Coomer?

22    A.    I think there have been multiple.  I mean, I don't

23    know the exact date.  I could go back and look at the

24    video --

25    Q.    Oh, no, I am not asking -- I apologize, sir, no need.

1    A.    -- and tell.

2    Q.    I am not asking you to go back and look.  But you

3    know that Mr. Lindell is on trial here today for claims of

4    defamation --

5    A.    Yes, sir.

6    Q.    -- for injuries that were supposedly caused by

7    statements that he made.

8    A.    Yes, sir.

9    Q.    And without going back and, as you say, looking at

10   the video, as you sit here today, are you saying you

11   cannot tell me of your own personal knowledge the dates on

12   when he made those statements?

13   A.    No, sir.

14   Q.    No idea?

15   A.    I don't have the list in front of me of the dates

16   when he did it.  I just know there is ample things online

17   to look and see that he's talked about Dr. Coomer quite a

18   bit.

19   Q.    But you can't even tell me what month or what year

20   these statements were made.

21   A.    Well, I don't think you can narrow it down to a year.

22   I think it has been multiple years since 2020.  Certainly

23   on the steps of the Capitol, when he did that press

24   conference when Dr. Coomer's team gave him the subpoena or

25   gave him the notice that he was being sued, certainly that

1    date.

2    Q.   Do you recall the date of that conference?

3    A.   No.

4    Q.   Do you recall what month that conference was held?

5    A.   No.

6    Q.   And yet, when you were asked on direct examination

7    whether -- your opinion about how Mr. Coomer's reputation

8    was changed before and after the making of those

9    statements, you were bold enough to tell us you did have

10   an opinion about that, weren't you?

11   A.   Yes.

12   Q.   Even though you don't even recall the dates.

13   A.   No, but when you talk to people about what has

14   happened and the ramifications -- I didn't write down the

15   dates, but when we talk about, like, when that happened at

16   the Capitol that day, and then I talked to other election

17   officials about that, and we talk about the impact that it

18   is having on Eric and on the community at large, where it

19   is going to get people riled up and start coming after

20   clerks more and putting more pressure on clerks to do what

21   Tina did, to pull a Tina, those type of things, no, I

22   don't know the date, but I am quite certain of the impact.

23   Q.   You said that you are -- wouldn't it be fair to

24   say -- one moment, I want to just check my notes here.

25        It would be fair to say that everything you've told

1     us on direct examination about various individuals who

2     worked for Dominion, and in the -- the individuals who

3     worked for these companies that make these voting

4     machines, you are acquainted with a great number of them.

5     A.     I am what?  Can you repeat?

6     Q.     You are acquainted with a great number of people in

7     that industry.

8     A.     Affirmative.

9     Q.     And are personally acquainted with a great number of

10    them.

11    A.     I mean, we see each other at conferences, if that is

12    what you mean, yes.

13    Q.     And Mr. Coomer in this case has testified that those

14    individuals, and folks like you who work in the

15    government, are sort of like a club.  Would you agree with

16    that clarification?

17    A.     Well, just one point of clarification, I don't "work

18    in the government."

19    Q.     But are like a form of a club.

20    A.     I mean, you know, the election community, we are a

21    community of people who come together and believe in this

22    mission and what we do.

23    Q.     Sure.  But you are the head of an organization that

24    acknowledges individuals who work for the government in

25    the vote collection --

 1   A.   I am sorry, what did you state the purpose was again?

 2   Q.   I am just asking you if you would agree with

 3   Dr. Coomer's characterization that folks involved -- who

 4   work in the government with members of your organization

 5   involved in the counting of votes, and the individuals

 6   like Mr. Coomer and your wife, who work for companies like

 7   Dominion, you are part of a club of sorts.

 8   A.   Yeah, a club, a community.  I would phrase it more as

 9   a community, but, yes.

10   Q.   A close community with vital close professional and

11   personal ties.

12   A.   That's true.

13   Q.   You've said that -- when you heard some of the

14   restatements that were purportedly made about Mr. Coomer,

15   you knew immediately -- I think you called them "BS"?

16   A.   Yes.

17   Q.   That is the phrase you used.  And you said in your

18   experience, many of the others in your field also knew

19   immediately that they were not true.

20   A.   That's correct.

21   Q.   And then later in your direct examination, you

22   testified that in your opinion, Mr. Coomer is probably

23   going to have great difficulty finding work.

24   A.   Yes.

25   Q.   And has been having difficulty finding work.

1    A.    Uh-huh.

2    Q.    You know that personally --

3    A.    Yes.

4    Q.    -- from your own communications and conversations

5    with your friend.

6    A.    Yes.

7    Q.    And you told us that in your opinion, his inability

8    or difficulty finding work could be fairly placed at the

9    feet of Mr. Lindell specifically.

10   A.    Uh-huh, yes.

11   Q.    That is your opinion.

12   A.    That is my opinion.

13   Q.    If he was held, as you say, in very high regard to

14   this day by other members in the field, and if they all

15   knew, as you claim you did, that the allegations against

16   him were simply false, how could it be that he -- that

17   they wouldn't be willing to give him another chance and

18   that they wouldn't hire him?

19   A.    That is a great question, actually.  The reason is

20   because these lies have so permeated across the country,

21   both in terms of elections and outside of it.  As I

22   mentioned before, voting system companies, if they were to

23   hire Eric, would be under intense scrutiny from bad actors

24   and other people who don't care about the truth and who

25   just want to make sure that Eric isn't working anywhere

1    because he "fixed" 2020.

2          So that is a great question.  Yes, they believe in

3    Eric.  Yes, they know Eric, they respect Eric.  But the

4    public arena has been so poisoned with these lies, no

5    election company in their right mind would jeopardize

6    their bottom line by bringing Eric on.

7    Q.   So based upon all of the information that has been

8    available to you so far, you are of the view that the

9    problems caused for Mr. Coomer in finding professional

10   employment can be fairly placed at the feet of

11   Mr. Lindell --

12   A.   Yes.

13   Q.   -- at least to some significant extent.

14   A.   That is affirmative.

15   Q.   I would like to ask you to take a look at a couple of

16   things that the jury has seen already, if I could, and ask

17   you if you have seen these before today.  I would like to

18   start with Exhibit 263, which has already been admitted.

19         MR. DUANE:  Can we have that shown to the witness?

20   Q.   (BY MR. DUANE)  Mr. Crane, I am showing you something

21   that Mr. Coomer has confirmed in this case as a Tweet he

22   sent out back in March of 2020.  Do you see that?

23   A.   Yes.

24   Q.   Have you seen this document before today?

25   A.   No.

1    Q.   You see how it was written as a response to a Tweet

2    by Donald J. Trump?

3    A.   Yes, sir.

4    Q.   And you see that Mr. Coomer wrote the following

5    response.  "You ought to know" -- and now he is referring

6    to President Trump -- "you ought to know a third-rate

7    grandstander, you fourth-rate carnival barker."  You have

8    not seen this before today.

9    A.   I have not.

10   Q.   Would you agree with me that if this sort of

11   statement were made in public by somebody like Mr. Coomer,

12   who works in the voting industry, that it is something

13   that could potentially cause some embarrassment for him

14   and for his employer?

15   A.   Yes.

16   Q.   Because obviously people who work in his field, and

17   the companies like Dominion for whom he works, it is

18   absolutely critical that they maintain -- that they

19   preserve the appearance of absolute impartiality.

20   A.   I would agree with that.

21   Q.   And you would agree with me that this report, if

22   disseminated on a widespread basis, would go a long way

23   toward undermining that public confidence.

24   A.   I think so.

25   Q.   Let me ask your opinion, too, about another Tweet, if

452

```
 1    I might.  This is Exhibit 264.  This is a Tweet that

 2    Mr. Coomer, earlier day, confirmed was written by him back

 3    in 2020, which I can represent to you, if you don't know,

 4    was before any of the statements that were allegedly made

 5    by Mr. Lindell in this case.  Can you see that, sir?

 6    A.    Yes, sir.

 7    Q.    You see where Melania Trump, the First Lady of the

 8    United States wrote, "While most children are at home

 9    during this challenging time, they tend to be on social

10    media throughout the day."

11    A.    Yes, sir.

12    Q.    And she wrote "Parents, please be sure to check on

13    them regularly to be sure they are practicing online

14    safety."

15    A.    Yes.

16    Q.    Sounds like Ms. Trump, or First Lady Trump was

17    expressing many of the same concerns that you share.

18    A.    Sure, absolutely.

19    Q.    Online safety is closely related to concerns you are

20    here about today.

21    A.    Correct.

22    Q.    You wouldn't disagree with her message.

23    A.    No.

24    Q.    And you don't think it was delivered by her in a way

25    that is deserving of a disrespectful response, would you?
```

1    A.    No, sir.

2    Q.    At the bottom there, you will see the response that

3    Mr. Coomer -- Dr. Coomer disseminated to everybody in the

4    public who wanted to see it.  This was, again, March 27th,

5    he wrote, "If you mean not read anything your PO(TU)S

6    husband twats out."  Mr. Coomer told us the "POS" there

7    was written that way to stand for piece of shit?

8    A.    Yeah, I got it.

9    Q.    I am sure.  And he also admitted earlier today that

10   this word there "twat," was one that could be easily

11   interpreted by many members of the public as a

12   particularly despicable and vulgar reference to female

13   genitalia.

14   A.    Yes, sir.

15   Q.    Do you think, Mr. Crane, that it is perfectly

16   consistent with the ethos and the standards of your

17   profession for somebody like Mr. Coomer to be

18   disseminating expressions like this on a widespread public

19   basis?

20   A.    We do generally tell anybody who works in elections

21   to stay off social media with political opinions.  Not

22   everybody does, but we do try to do that for exactly the

23   reason that it may predispose somebody to thinking that

24   you might be up to nefarious activities.

25   Q.    Sure.  That is the advice you generally give to

454

1    people in your field.

2    A.   Yes, sir.

3    Q.   That they should avoid engaging in exactly this kind

4    of speech.

5    A.   Yeah, any political speech.

6    Q.   Because of the way comments like this can so directly

7    and so easily and predictably undermine public confidence

8    in the entire electoral process.

9    A.   Yes.

10   Q.   With which Mr. Coomer was intimately associated at

11   the time he made the statement.

12   A.   Yes.

13   Q.   And if you were a prospective employer thinking about

14   hiring Mr. Coomer back to work and it was brought to your

15   attention that he had written this despicable message

16   about the First Lady's genitalia, would you not, sir, hold

17   it against him?

18        MS. MORGAN:  Objection, Your Honor.

19        THE COURT:  Sustained.

20   Q.   (BY MR. DUANE)  Do you believe that this -- have you

21   seen this Exhibit 264 before today?

22   A.   I have not.

23   Q.   But now that you have seen it, does it change your

24   assessment of this individual's character and reputation?

25   A.   No.  I mean, Eric and I, as I have said, he and I

1    have talked politics for a long time.  I know he feels

2    very passionately about things.  So, you know, in terms of

3    his professional ability to conduct an election in a

4    secure and accurate way, it hasn't changed my mind, or

5    anybody else that I know who works in elections.

6    Q.   I understand that, but let me rephrase, maybe I

7    wasn't clear.  I am not asking about your opinion about

8    how this might affect his ability --

9         THE COURT:  You need to slow down a little bit.

10   Your rapid fire is making it really difficult for the

11   court reporter to follow you.

12        MR. DUANE:  I understand, Your Honor.

13        THE COURT:  Thank you.

14        MR. DUANE:  I apologize to you, I get a little

15   quick sometimes when I get a little passionate, and I

16   engage in hyperbolic methods of communication.  I will

17   slow down.  I am almost done.

18   Q.   (BY MR. DUANE)  Mr. Crane, I am not asking you about

19   your opinion about how this post could affect his

20   abilities to perform the job, I am only asking about his

21   reputation.  This Exhibit 264, which you concede you have

22   not seen before today, would you agree that if this sort

23   of information -- if this sort of Tweet were publicly made

24   and disseminated on a widespread basis by Mr. Coomer, or

25   anybody else working in the voting machine business, it is

1    one that would tend to bring some considerable -- it would

2    tend to discredit him and his employers because of the way

3    it would undermine the public's perception of

4    impartiality?

5    A.    True.  I think it would impact -- could impact the

6    idea of impartiality, yes.

7    Q.    Yes.  Let me ask your opinion, sir, about one more.

8    This is Exhibit 9.  I am going to cover up some of the

9    names on here because the public can see this.  But this

10   is something Mr. Coomer wrote on Facebook in July 2016,

11   that is approximately 5 years before any of the troubles

12   supposedly caused to him by Mr. Lindell's statement, you

13   understand that.

14   A.    Yes.

15   Q.    And let me direct your attention to this.  Can you

16   read it to yourself, sir, quickly, that one sentence

17   there, can you read that to yourself.

18   A.    I have read it.

19   Q.    Yeah.  Now that you have read it, sir, would you be

20   willing to read it out loud or would you be uncomfortable

21   doing so.

22   A.    I can read it:  "Facebook friend land- open call...

23   If you are planning to vote for that autocratic,

24   narcissistic, fascist ass-hat blowhard and his christian

25   jihadist VP pic, UNFRIEND ME NOW!  No, I'm not joking.

 1    I'm all for reasoned political discourse and healthy" --

 2    Q.   I have to ask you to stop there because of the names

 3    I covered up.  Let me cover up those names again.  And a

 4    little later in that same Facebook post, your friend,

 5    Mr. Coomer, wrote the following.  And can you read that

 6    for us, too, or would you be uncomfortable doing so in

 7    public?

 8    A.   Like, the whole thing?  "Grounds but respect your

 9    opinions.  Only an absolute FUCKING IDIOT could ever vote

10    for that wind-bag fuck-tard FASCIST RACIST FUCK!  No

11    bullshit, I don't give a damn if you're friend, family, or

12    random acquaintance, pull the lever, mark an oval, touch a

13    screen for that carnival barker...  UNFRIEND ME NOW.  I

14    have no desire" --

15    Q.   If you can skip down and just read that last

16    sentence.

17    A.   "Oh, if that doesn't persuade you, FUCK YOU!

18    Seriously, this fucking ass-clown stands against

19    everything that makes this country awesome.  You want in

20    on that?  You deserve nothing but contempt."

21    Q.   Does the language of this missive sound much like the

22    language that you use, yourself, personally when

23    communicating with the public about your political views?

24    A.   Well, I would just note one thing, I mean, I don't

25    think -- this was Facebook, I think a closed account, not

1    meant for public views.  But would I put something like

2    that out on Facebook?  I would not.

3    Q.    In fact, would it not be fair to say, sir, that there

4    is no way you would publish something like this yourself

5    on Facebook?

6    A.    Correct.

7    Q.    Not even in a so-called "private" exchange with even

8    300 of your closest friends.

9    A.    No.

10    Q.    Because you know that the widespread dissemination of

11    views like this, from someone playing a pivotal role in

12    the voting industry, is one that could absolutely cause a

13    great deal of difficulty to the reputation of both that

14    individual and his employer.

15    A.    It could cause problems, yes.

16    Q.    And, in turn, it could also cause significant

17    problems for the general public's entire perception of the

18    whole process; isn't that true?

19    A.    Probably.  I mean, "general public" is broad.

20    Whoever sees it, yes.

21    Q.    And now that you have seen these, some of these

22    statements that Mr. Coomer admits that he's made, would

23    you confess you have seen that?

24    A.    I think I have seen that.  I think I saw that when it

25    was posted.

```
1    Q.   The other two you say you have not seen.

2    A.   Right.

3    Q.   Would you be willing to concede that now that you

4    know about these statements, that there is at least a

5    serious possibility that these unfortunate and regrettable

6    Tweets could have had a very serious impact on his

7    professional reputation?

8    A.   Maybe from the public, but the people who know him

9    know that, you know, he is upstanding, and he walks the

10   line and doesn't bring that into meetings, doesn't bring

11   that into his work with Dominion.  So from an office

12   perspective, yes.  From an operational and practical

13   perspective inside the community, no.

14   Q.   I just want to -- probably my last question, I just

15   want to zero in on something you said.  I think you began

16   your answer by agreeing with me and confirmed that at

17   least as far as the general public is concerned, the

18   making of statements like these by Mr. Coomer, or someone

19   like him in his position, could most definitely do severe

20   damage to his perception and his reputation, at least in

21   the general community.

22   A.   Yes.

23   Q.   Last question.  Earlier today Mr. Coomer testified

24   under oath that his reputation had been destroyed by

25   statements like these, even before Mr. Lindell made any
```

1    statements about him.

2            MS. MORGAN:  Objection, Your Honor.

3            THE COURT:  Sustained.

4            MR. DUANE:  No further questions, Your Honor.

5                    **REDIRECT EXAMINATION**

6    **BY MS. MORGAN:**

7    Q.   Mr. Crane, I want to start where Mr. Duane left off.

8    Is it your understanding that Dr. Coomer's Facebook posts

9    did, in fact, ruin his reputation?

10   A.   Inside the election community, no, certainly not.

11   Q.   And I think you said this, but was it your

12   understanding that his Facebook was private?

13   A.   I mean, I can't say for certain, but that was my

14   understanding.

15   Q.   Okay.  I want to circle back to Tina Peters, because

16   you were asked several questions by Mr. Duane about Tina

17   Peters specifically.  You were talking about the risks of

18   sharing the images that she shared at Mr. Lindell's Cyber

19   Symposium.  Can you explain to the jury why that action of

20   displaying those images would actually endanger election

21   security, as you testified?

22   A.   Yes, ma'am.  So having those images online where

23   anybody can see them and anybody can access them, allows

24   them to be studied.  And maybe there are some good actors

25   that want to see it, but there are bad actors looking for

1    ways that they can undermine elections or cheat an

2    election.

3         So by putting the image out online for anybody to

4    see it, it allows people to create a roadmap to how they

5    could do nefarious things if they came in physical contact

6    with the different voting system components.

7    Q.   There was some discussion of some recent inquiries

8    into what happened in Arapahoe County.  Can you tell the

9    jury why it is that you hold that opinion that the

10   redacted cast-vote record issues doesn't have any impact

11   on whether or not the results of the 2020 election in

12   Arapahoe County were valid?

13   A.   Sure.  So what happened was after the election in

14   2020, Arapahoe County put -- after the election was

15   certified and everything was done, Arapahoe County put a

16   redacted version of their cast-vote record -- now, it has

17   to be redacted because here in Colorado, and many other

18   states, there are requirements to protect ballot

19   anonymity, voter secrecy, so nobody can tell how you

20   voted.

21        So in this case, let's say you live in a rural area

22   and there are, like, three or four people in your

23   precinct.  It wouldn't be hard for people, if they were

24   able to look at your ballot or your ballot image of the

25   cast-vote record, to see how you voted.  So we, in

1    Colorado, we value that ballot secrecy and we try to

2    protect that.

3          So before putting that report out after the

4    election, Arapahoe County staff had to go through and look

5    for those small precincts and redact those out, so

6    protecting that voter and their votes.

7          It was during that process that a mistake was made

8    in that report where -- it is a big Excel file, and

9    hopefully everybody is familiar with Excel.  The rows got

10   moved up and down, the precincts got shuffled, but the

11   bottom line vote totals for the candidates didn't change,

12   it was what was published and certified.

13         And so Arapahoe County didn't know this when they

14   posted the file.  Then in October, as you said, there was

15   a researcher who was looking at their cast-vote records

16   and says, hey, I think something looks wrong here, they

17   contact the county, and they are in the middle of an

18   election, a presidential general election, so they look at

19   it after the fact -- oh, I want to say, too, I think I

20   mentioned this before, but that redacted file was created

21   in December, after the election.  It had no official

22   bearing in how the election was conducted.  It is

23   transparency record, it is not an official election

24   record; right.

25         It is trying to -- we put it out there so people

1    can look at it and have most trust in what we do, not less

2    trust in what we do.  So then Arapahoe County fixed it,

3    they reposted a new file, I think it was April 2nd of this

4    year, because that didn't stop some of these bad actors

5    from taking that shred of truth and blowing up a lie about

6    it.

7          They start questioning, well, you are not allowed

8    to redact.  And federal law says you can't redact official

9    records, state law says you can't redact official records.

10   Of course, the citations they used are incorrect, they are

11   not applicable.  Redaction actually is, for certain

12   records, is required under federal law; the Help America

13   Vote Act.  But don't let facts get in the way of a good

14   narrative when you want to use this for political and

15   financial purposes.

16         So Arapahoe County fixed it, they have the new

17   report out there.  There are other things about that that

18   are not true, you know what people have said about this,

19   as well.  But, again, this is just another impact of 2020,

20   and the lies that have so permeated.  And people see that

21   you can get political advantage or financial advantage by

22   spreading lies, that they just continue to push this

23   garbage out.

24         And then we, as election officials --

25         MR. DUANE:  Objection, narrative.

1          THE COURT:  Sustained.

2     Q.   (BY MS. MORGAN)  Does any of that, about the issue

3     with the unofficial results in Arapahoe County, move the

4     needle one way or the other as to whether it would be

5     reasonable to believe that Dr. Coomer rigged the 2020

6     election?

7     A.   Absolutely not.

8     Q.   All right.  And I want to break down some of the

9     terms that you used during your cross-examination, and

10    just now, because I think they sound similar, and I want

11    to make sure the jury understands.  Do you think that it

12    would be -- and that I understand, for that matter.

13         Do you think it would be helpful for us if we were

14    to put up an illustration or diagram breaking down that

15    misinformation, malinformation, disinformation?

16    A.   Sure, I think it is important.

17         MR. DUANE:  Objection, beyond the scope of

18    cross-examination.

19         THE COURT:  Overruled.

20    Q.   (BY MS. MORGAN)  And we will take these one at a

21    time, avoiding a narrative.  Can you describe for us what

22    misinformation is?

23    A.   Sure.  Misinformation is something that is false, but

24    it not knowingly created or shared to cause harm.

25    Q.   Can you give an example of what would fall under the

1   bucket of misinformation?

2   A.   Oh, boy.  Misinformation, somebody -- man, I don't

3   know.  I try to think about it like my kids at school,

4   they see something at school and say, oh, this kid did

5   this, and it is not true, but it has not created harm, it

6   is just information that is out there.  Somebody

7   unknowingly shares something on social media, they don't

8   know it is not true, and they just unwittingly share it.

9   Q.   Then what is disinformation?

10  A.   Now, disinformation is information that is created

11  with the express intent to harm, to hurt, to undermine

12  society, governments, those types of things.

13  Q.   Then finally what is malinformation?

14  A.   Malinformation is that term I referenced earlier.

15  This is the very dangerous one of these three, although

16  disinfo and misinfo are both certainly bad.

17       Malinformation is where they take that shred of

18  truth; right, so, for example, Dr. Coomer works for

19  Dominion and he's put some stuff that are politically

20  charged and inappropriate on social media, and then it

21  blows up into a whole lie after that that the election was

22  fixed, he fixed the election, it was stolen.

23       So taking a shred of truth and blowing up a huge

24  lie based on that truth, which the other reason why that

25  one is so dangerous is because, you know, as election

1    officials, you have to say, okay, is this true?  Then you

2    say, well, yeah, that is true.  Then they say, see.

3         So we have knowledge in malinformation, like,

4    something is true, it doesn't mean this, but all you have

5    to do is admit that one part is true, and then bad actors

6    will take that and blow up other narratives on that.

7    Q.   I think that is a good segue.  You were asked about

8    some questions that led you to testify that some groups

9    don't take steps to validate their claims, and you tried

10   to say something about voter-marked affidavits.  Can you

11   explain to the jury why it is you think that Mr. Lindell

12   should have requested voter-marked affidavits?

13   A.   Well, of course.  The simplest way to prove or

14   disprove that the voting systems had an issue and didn't

15   count ballots accurately was to go to a county, and here

16   in Colorado, ballots are open records.  You can't touch

17   them, but you can see them and pay to have a recount done,

18   whatever.  You just go, you get the ballots, and you do

19   the recount.

20        Nothing shows that Mr. Lindell, that I have seen,

21   has done that.  That is the easiest way you could've

22   answered this question, and it still doesn't happen now,

23   by the way.  The same people making these claims still

24   don't go back to original voter-marked artifacts, which is

25   the paper ballot, which counties have to keep for 25

1    months.

2         We have had counties that have -- we have one

3    county, Elbert County, that recounted, hand counted the

4    presidential race months after, and it matched within

5    three votes.  We have had other counties do other things

6    to validate that the systems worked right.  The easiest

7    way to validate is the paper ballots, and they have never

8    done it.

9    Q.   Have you ever met Mr. Lindell before today?

10   A.   No, ma'am.

11   Q.   Okay.  And as Mr. Duane asked you, and you testified,

12   you have spoken on various occasions in favor of the

13   security of the elections system as it stands; correct?

14   A.   Yes.

15   Q.   Okay.  Has Frankspeech or My Pillow or Mr. Lindell

16   ever reached out to you to ask for some information about

17   how voting systems work?

18   A.   No.

19   Q.   Have they ever asked you to appear on their

20   platforms?

21   A.   No.

22   Q.   Have they ever asked you about your knowledge of

23   Dr. Coomer --

24   A.   No.

25   Q.   -- or about Dominion?

1    A.    Mr. Lindell?

2    Q.    Yes.

3    A.    No.

4    Q.    Prior to the production and airing of *Absolute Proof*,

5    did anyone ever reach out to you to ask for your opinion

6    about the claims that were made in that film?

7    A.    No.

8    Q.    Were you asked to speak at the Cyber Symposium?

9    A.    No.

10   Q.    You were asked some questions about what people back

11   in 2020 may have believed.  Do you think that Mr. Lindell

12   was reasonable in reaching the conclusion and airing the

13   statements that he made about Dr. Coomer?

14         MR. DUANE:  Objection.

15         THE COURT:  Sustained.

16   Q.    (BY MS. MORGAN)  You were asked about the connection

17   between Mr. Lindell and the threats that you have received

18   and that other individuals, other clerks and folks working

19   elections that you know, have received.  I believe you

20   testified that Tina Peters and Joe Oltmann, that their

21   statements helped facilitate those threats; is that

22   accurate?

23   A.    Yes, affirmative.

24   Q.    Is it your understanding that Mr. Lindell and

25   Frankspeech gave a platform to Tina Peters and Joe

1    Oltmann?

2    A.    And others.

3    Q.    And I think that I heard you testify that the

4    platform that Mr. Lindell had was the largest platform,

5    and that he amplified these statements.

6    A.    Yes.  Other than, as I think the attorney pointed

7    out, President Trump obviously has a larger platform than

8    Mr. Lindell.  But for all of the folks who go about it

9    like this, I believe Mr. Lindell has the largest platform,

10   yes.

11   Q.    Sorry, I am checking my notes, I want to make sure I

12   am not covering ground we have already covered so that we

13   are respectful of everyone's time.

14         You were asked questions about your potential

15   interest in this case and why it is that you hope that the

16   jury returns a verdict in favor of Dr. Coomer.  Can you

17   explain to us what the major reasons are, because I think

18   you got cut off in your testimony.

19   A.    The major reason is what I said earlier in the day;

20   when you look at what our elections mean to the foundation

21   of this country, and the way that Mr. Lindell and others

22   have undermined public confidence, with no proof, with no

23   silver bullet, because there is not one, and they continue

24   to do so, I think it is disgraceful, again, when people

25   have fought and died for this right.  And people using it

1    for political or maybe financial gain, whatever that looks

2    like, you know, that is the biggest reason here.

3           Yes, Eric is a friend of mine.  Yes, his life has

4    been turned upside down because of this.  But there is

5    something greater than Eric in this, there is something

6    greater than me in this, and that is the American ethos;

7    we have to rely on our elections for the peaceful transfer

8    of power.  And when people undermine that for political

9    gain, I find it disgusting.  There is no honor in that,

10   and I think, quite frankly, it is anti-American.

11   Q.   Why are the defendants' statements about Dr. Coomer

12   different than the "loser's lament" that you have heard

13   maybe in the past or from other people?

14   A.   I mean, specifically as we talked about with Hilary

15   Clinton, she was talking about the James Comey thing and,

16   you know, that the government -- some people in the

17   government didn't want her to be president, so they came

18   out with that information right before the election.

19          But in this case, when people so viciously went

20   after Dr. Coomer and said that he fixed -- said that he

21   fixed the election, most of -- a lot of these people never

22   talked to or brought in election officials on these teams,

23   along with these other conspiracy theorists, to say, hey,

24   is this true, is this not true?

25          You know, certainly Tina Peters wasn't that person,

471

1  she didn't finish her certification and training.  And if

2  she had, and if she took the time to learn, she wouldn't

3  be in jail right now because she never would have gone

4  along with that half-baked scheme.

5      But, yeah -- yeah, I lost my train of thought

6  there, I apologize.

7  Q.   And just lastly, I want to touch on, there was some

8  discussion of, oh, you went into the plaintiff's room

9  earlier, you know.  Are there witnesses in the hallway and

10  gallery potentially that you would like to avoid during

11  this trial?

12  A.   I mean, there are folks that, you know, make me

13  uncomfortable that have said things about my wife and I

14  and, you know, called us traitors and threatened us.  So,

15  you know, to the extent that we can avoid those people,

16  that is okay.

17      MS. MORGAN:  I will pass the witness.

18      THE COURT:  Well, there is no passing.

19      MS. MORGAN:  Okay, I am concluding.

20      THE COURT:  There is no redirect of redirect, so

21  this witness is going to be released.

22      Mr. Crane, you may step down and be released from

23  your subpoena.

24      THE WITNESS:  Thank you, Your Honor.

25      THE COURT:  Are you all ready to call your next

1     witness?

2          MR. KLOEWER:  Yes, Your Honor, we can.

3          THE COURT:  All right.

4          MR. KLOEWER:  Plaintiff calls Joe Oltmann.

5          MS. HALL:  Your Honor, may we approach?

6          THE COURT:  Yes.

7          (A bench conference is had.)

8          MS. HALL:  Your Honor, it is my understanding that

9     a motion was filed by Charlie Cain on June 2nd.

10          THE COURT:  Could you identify yourself for the

11     record.

12          MS. HALL:  Yes, I apologize, Your Honor.  My name

13     is Andrea Hall, Bar No. 036410.  I am here on behalf of

14     Joe Oltmann.

15          THE COURT:  I think we talked about this yesterday.

16     Have you entered a formal appearance on behalf of

17     Mr. Oltmann?  You appear on our docket as an "objector."

18          MS. HALL:  No, I have not formally entered.  I got

19     a phone call last night at 6:30 about his testifying in

20     this trial.  So I don't know everything that is going on.

21     I did see the motion come across on the filing.

22          The reason I am involved in this case is because

23     you allowed plaintiff's counsel to serve me for a

24     deposition that was conducted on Mr. Oltmann at the very

25     beginning of this case.  Ingrid DeFranco appeared at that

1    deposition, I did not appear at the deposition.  We filed

2    objections to that, however, this Court allowed service

3    through me.  That is why I have been involved in this

4    case.

5            THE COURT:  Are you appearing on behalf of

6    Mr. Oltmann now?

7            MS. HALL:  Correct, yes.

8            THE COURT:  So you will be filing a formal notice

9    of appearance on behalf of Oltmann?

10           MS. HALL:  Correct.  But the issue is the motion

11   that was filed by Mr. Cain on June 2nd, and I believe this

12   should have been resolved way before the trial.

13           THE COURT:  Is this the brief on the newspaper

14   privilege?

15           MS. HALL:  Correct.

16           THE COURT:  So it seems to me that if your client

17   is going to invoke the privilege with respect to certain

18   questions, then I need to hold a separate hearing to make

19   a determination as to whether or not that privilege

20   applies.

21           MS. HALL:  Correct.

22           THE COURT:  So are you all ready to proceed with

23   that today?

24           MR. KLOEWER:  I don't think we are going to get to

25   that portion of the questioning today, we have a lot to

1    get through.

2        THE COURT:  All right.  So it seems like that will

3    not be ripe until he invokes the privilege.  But it sounds

4    like Ms. Hall is representing him.

5        MS. HALL:  Yes.

6        THE COURT:  And if he is intending to invoke the

7    privilege, we should have that hearing tomorrow morning

8    before we have the jury come in.

9        MS. HALL:  And what I can tell the Court, I

10   apologize, is I have a doctor's appointment scheduled at

11   8:30 that was already previously scheduled like 8 weeks

12   out.  I cannot be here at court at 8:30 in the morning.

13       THE COURT:  When do you think you can be here?

14       MS. HALL:  I probably am not going to be able to

15   get here until closer to 11:00.  I am an hour and 30

16   minutes out.

17       THE COURT:  All right.  So is your client willing,

18   then, to just -- maybe we can play one of the depositions,

19   and then start his testimony.

20       MR. KLOEWER:  If that is the case, if Ms. Hall

21   won't be available until later in the morning, I think

22   that makes more sense.  It would be difficult to start

23   right now, but, I mean, we can do it.

24       THE COURT:  I am just trying to be considerate of

25   Mr. Oltmann.

 1          MR. KLOEWER:  If we would have to split up his

 2     testimony to accommodate his attorney, we would be fine

 3     having him start at 11:00, 12 o'clock and doing

 4     depositions in the morning.

 5          THE COURT:  I think he wants to be represented, and

 6     she is saying she is going to enter her appearance on his

 7     behalf, otherwise he would be pro se, which isn't, for

 8     lack of a better word, awesome, for any witness.  So it

 9     sounds like he is going to be invoking the privilege.

10          Ms. Hall, it sounds like you are going to be ready

11     to address that tomorrow.

12          MS. HALL:  Yes.  I started going through the

13     documents, but there is an exorbitant amount.  I killed a

14     tree already this morning with what I could print.  And

15     there are lots of transcripts.  So I am trying to go

16     through --

17          THE COURT:  Be mindful of what he has already

18     testified to in his deposition, and it seems like with

19     respect to at least the deposition designations, he is

20     only invoking the privilege with respect to one or two

21     questions.

22          MR. KLOEWER:  That's correct, Your Honor.  And he

23     has answered most topics.  We would prefer to get through

24     as much testimony as possible before addressing that

25     issue, if we need to, if it comes up.  So I am perfectly

```
 1    happy to give Ms. Hall time to enter an appearance, and we

 2    can do other testimony in the morning and then call

 3    Mr. Oltmann at a time when Ms. Hall is available to

 4    represent him, in the event her representation is

 5    necessary for that issue.

 6         THE COURT:  All right.  So let's just talk

 7    logistics.  Do you have a deposition that we can play now

 8    that will take about 30 minutes?

 9         MR. KLOEWER:  Dominion representative, Susan

10    Klopman, is about 20 minutes.

11         THE COURT:  Then a deposition in the morning

12    before.

13         MR. KLOEWER:  We can do Josh Merritt or Harri

14    Hursti, or both.  They are about an hour each.

15         MR. KACHOUROFF:  I think we have to read a portion

16    of Susan Klopman's into the record.  We did not do a video

17    for that.

18         THE COURT:  So who do you have set up to read,

19    because we don't generally allow attorneys to read, only

20    because attorneys can use inflection.  Do you have someone

21    available who can read?

22         MR. KACHOUROFF:  I can find somebody.

23         THE COURT:  So then, Ms. Hall, you will be here

24    at --

25         MS. HALL:  My appointment is at 8:30.  I am
```

1    assuming I should be done by 9:30 with the appointment, so

2    11:30 I could be here.

3              THE COURT:  You think it will take two hours?

4              MS. HALL:  Well, it takes at least an

5    hour-and-a-half, and then by the time I park and get in

6    through security or whatever, I mean, I just want to be

7    safe.  If I can get here earlier, I mean, I will, but I

8    want to say that I can definitely be here by 11:30.

9              THE COURT:  All right.  So if you are here by

10   11:30, counsel, I think you would be inclined to go

11   through the testimony, insofar as he is not going to

12   trigger the privilege through much of these questions;

13   correct?

14             MR. KLOEWER:  That would be my expectation, Your

15   Honor.  As we've indicated, he has only invoked it with

16   respect to those two pieces of information.  So unless he

17   invokes it more broadly than he has previously, I think we

18   can focus on those aspects of his testimony that don't

19   implicate it.

20             THE COURT:  All right.  But if he invokes it more

21   broadly, then we would be dealing with issues of waiting.

22             MR. KLOEWER:  Yes.

23             THE COURT:  All right.  So that would mean that we

24   would try to get through as much testimony as possible,

25   and then is there a question that you are going to ask --

1     those questions that are going to trigger him to invoke

2     the privilege as he has done?  I am just trying to figure

3     out logistically how we do this most efficiently, so we

4     are not wasting the jury's time.

5          MR. KLOEWER:  I agree, Your Honor, I have already

6     drafted the outline so as to save those issues to the end,

7     if it becomes necessary to address those issues.  But I

8     think we have plenty of questions before disrupting the

9     testimony.

10          MR. DUANE:  May I ask one question --

11          THE COURT:  Yes.

12          MR. DUANE:  This is James Duane.  -- of counsel?

13     Is it reasonable to imagine that this privilege issue

14     could possibly be resolved in a one half hour hearing that

15     we can conduct now while you are here, and excuse the jury

16     for the day, and possibly resolve this now while you are

17     still here, instead of waiting until noon tomorrow?

18          MS. HALL:  I haven't looked at all of the

19     transcripts that were previously filed.  I have looked at

20     what I could print and bring with me and go through here.

21     So I know that there is at least three or four that were

22     60 to 100 pages long.

23          THE COURT:  He has only invoked the privilege as to

24     the identity of the person who told him about the Antifa

25     call.

1          MS. HALL:  Yes, I understand there are only two

2    specific questions, but I don't know what they were

3    referring to in all of those transcripts, and I just want

4    to make sure I have my bases covered in case something

5    else comes up in the argument.

6          THE COURT:  All right.  So it seems to me that the

7    answer to your question, Mr. Duane, although efficient, is

8    no.

9          MR. DUANE:  Just trying to help.

10         THE COURT:  I appreciate that.

11         So I think what we would do, counsel, is we would

12   get through as much of the examination as possible, with

13   the caveat that we might have to release the jury early

14   tomorrow or give them a longer break at lunch to resolve

15   this issue.

16         MR. KLOEWER:  Sure.

17         MS. HALL:  And would it be easier to have the

18   motions hearing about those two specific things before he

19   even starts his testimony?

20         THE COURT:  Frankly, I think, if you know you are

21   going to ask those questions, it would be easier to have

22   the jury take a longer break and resolve those two issues

23   before the examination even starts.  But if you are making

24   an on-the-fly call as to whether or not you are going to

25   ask those questions and it might not be necessary, then we

1   can just do it as objections.

2       MR. KLOEWER:  I think that makes more sense, Your

3   Honor.  And it also -- part of the Court's analysis may be

4   addressed through the testimony that we are able to elicit

5   before addressing the privilege, because some of the

6   factors the Court needs to addressed, we will get evidence

7   on those through Mr. Oltmann's testimony, and that may

8   streamline the process.

9       THE COURT:  I think that might streamline the

10  process so that we don't have to do a separate examination

11  of Mr. Oltmann in a hearing outside the province of the

12  jury, if that is all you think will come out and be

13  elicited during his examination.

14      All right.  So, again, do we have something that

15  can fill this time for the next 20 minutes?

16      MR. KLOEWER:  Yes, Your Honor, we can put on Susan

17  Klopman.  And we will be prepared with one or two hours

18  fillers for the morning until Mr. Oltmann is available, or

19  until his counsel is available.

20      THE COURT: All right.  So, Ms. Hall, I would just

21  ask that you get here as quickly as possible so we can get

22  this resolved before we start his testimony.

23      MS. HALL:  I apologize with respect to the timing.

24      THE COURT:  I know he has been waiting.

25      MS. HALL:  And I thought he was going on today.

481

1    Like I said, we have been here since noon, but I

2    understand how trials go, as well.

3        THE COURT:  While I have counsel here, let me

4    remind you all, I know you did not intend this, Mr. Duane,

5    but to the extent that you know we are going to have an

6    issue about a witness that we need to resolve, it would

7    have been helpful to be able to do that over the lunch

8    break so that we did not have to recess the jury again.

9    It is just a reminder.

10       MR. DUANE:  Thank you, I won't need another

11   reminder.

12       MR. KLOEWER:  Your Honor, since you raised the

13   issue, and to the extent it may be helpful to streamline

14   the process tomorrow, we understand that Mr. Oltmann has

15   been provided with the Court's order on the motion in

16   limine.  He did a whole podcast on it where he read

17   through it, but it may be helpful to remind him that

18   implications of leaked information about that could be

19   subject to admonishment from the Court if he were to try

20   to embark on that testimony.  So we may request that you

21   do that prior to his testimony.

22       THE COURT:  I assume that you can provide Ms. Hall

23   with a copy of the Court's order on the motion in limine,

24   and she can appropriately advise her client.

25       MR. KLOEWER:  Thank you, Your Honor.

1          MS. HALL:  Thank you, Your Honor.

2          MR. DUANE:  I didn't realize this morning the

3    redirect of the plaintiff was going to be so brief and

4    that my objection would, therefore, require excusing the

5    jury so shortly after they returned, but I understand your

6    point.

7          THE COURT:  I appreciate that, Mr. Duane.  I am

8    trying, again, to move the process along efficiently for

9    the jury.

10          MR. KACHOUROFF:  So we are going until 5:00 today?

11          THE COURT:  Yes.

12          (In the hearing of the jury.)

13          THE COURT:  Ladies and gentlemen of the jury,

14    because of scheduling issues, we are actually going to go

15    to a different witness.

16          Is plaintiff ready to call its next witness?

17          MR. KLOEWER:  Your Honor, plaintiff calls Susan

18    Klopman by video deposition.

19          THE COURT:  All right.  Please proceed.

20          (Videotaped deposition of Susan Klopman played in

21    open court, but not reported per agreement of counsel.)

22          MR. CAIN:  Your Honor, we may need to flip the

23    monitors for this testimony.

24          THE COURT:  All right.  Yes.

25          (Videotape deposition of Susan Klopman resumed in

1    open court, but not reported per agreement of counsel.)

2        THE COURT:  Ladies and gentlemen of the jury, we

3    have exceeded your expectations here today by 2 minutes,

4    so I apologize for that.  We are going to recess for the

5    evening.

6        I give you the normal admonition, you should not

7    talk to anyone or amongst yourselves about what you have

8    been hearing in this courtroom until we are ready for you

9    to deliberate.

10        Hope you have a very great evening.  We will see

11    you back here -- again, be back here around 8:45 to be

12    ready to go at 9:00, and I will try to get you all in as

13    soon or as close to that.  I appreciate it.

14        (Outside the presence of the jury.)

15        THE COURT:  Thank you.  Please be seated.

16        Anything the parties want to address outside the

17    province of the jury, either now or tomorrow morning?

18        MR. CAIN:  Not that we are aware of.

19        MR. KACHOUROFF:  No, Your Honor.

20        THE COURT:  So let me -- you can all sit down.

21        And so I did want to talk to you briefly about just

22    the scheduling of the charging conference, because there

23    are still some outstanding issues about the jury

24    instructions.  I don't have a sense of how quickly you are

25    moving through this trial because there are depositions

1    being played, then we have had to move some witnesses

2    around.

3          So my intention is that my law clerk will provide

4    you a copy of the working jury instructions as we have

5    done, probably by the end of tomorrow, if we are on our

6    game.  I assume we would want to get to a charging

7    conference early next week sometime, so you all have

8    resolution well before you are putting together closing

9    arguments.

10          So that is the timeline that I am expecting, and I

11    just wanted to alert you to that.

12          Anything else?

13          MR. CAIN:  No, Your Honor.

14          MR. KACHOUROFF:  No, Your Honor.

15          THE COURT:  All right.  We will see you back here

16    at 8:30 tomorrow morning.

17          (Proceedings conclude at 5:05 p.m.)

18

19

20

21

22

23

24

25

# R E P O R T E R ' S   C E R T I F I C A T E

I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.


Dated this <u>3rd</u> day of <u>August</u>, 2025.


_____
s/Darlene M. Martinez
RMR, CRR