**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER,

Plaintiff,

v.

MICHAEL J. LINDELL;
FRANKSPEECH, LLC; and
MY PILLOW, INC.,

Defendants.

_____

**REPORTER'S TRANSCRIPT**
**(JURY TRIAL - DAY 4)**
_____

        Proceedings before the HONORABLE NINA Y. WANG,
Judge, United States District Court, for the District of
Colorado, commencing at 8:51 a.m. on the 5th day of June,
2025, Alfred A. Arraj United States Courthouse, Denver,
Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
DAVID MATTHEW BELLER, Recht & Kornfeld, P.C., 1600 Stout
Street, Suite 1400, Denver, CO 80202
CHARLES JOSEPH CAIN, BRADLEY ADAM KLOEWER, Cain &
Skarnulis PLLC, P. O. Box 1064, Salida, CO 81201
ASHLEY N. MORGAN, Cain & Skarnulis PLLC, 303 Colorado
Street, Suite 2850, Austin, TX 78701

**FOR THE DEFENDANTS:**
JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite
610, Grafton, WI 53024
JAMES JOSEPH DUANE, Regent University School of Law, 1000
Regent University Drive, Robertson Hall Room 353B,
Virginia Beach, VA 23464
CHRISTOPHER I. KACHOUROFF, Dominion Law Center PC, 13649
Office Place, Suite 101, Woodbridge, VA 2219

<u>I N D E X</u>

| <u>WITNESSES:</u> | <u>PAGE</u> |
|---|---|
| **HARRI HURST** - Video Deposition | 491 |
| **TINA PETERS** - Video Deposition | 496 |

**JOE OLTMANN**

| | |
|---|---|
| DIRECT EXAMINATION BY MR. KLOEWER | 500 |
| CROSS-EXAMINATION BY MR. KACHOUROFF | 634 |

<u>E X H I B I T S</u>

| <u>NO.</u> | | <u>ADMITTED</u> |
|---|---|---|
| 22 | ......................................... | 623 |
| 25 | ......................................... | 565 |
| 26 | ......................................... | 614 |
| 29 | ......................................... | 553 |
| 32 | ......................................... | 599 |
| 59 | ......................................... | 533 |
| 60 | ......................................... | 535 |
| 71 | ......................................... | 538 |
| 116 | ......................................... | 499 |
| 265 | | |
| 126 | ......................................... | 506 |
| 134 | ......................................... | 537 |
| 160 | ......................................... | 530 |
| 161 | ......................................... | 550 |
| 162 | ......................................... | 563 |
| 164 | ......................................... | 551 |
| 165 | ......................................... | 551 |
| 167 | ......................................... | 613 |
| 169 | ......................................... | 521 |
| 170 | ......................................... | 527 |
| 171 | ......................................... | 528 |
| 191 | ......................................... | 548 |

1                          **JUNE 5, 2025**

2              (Proceedings commence at 8:51 a.m.)

3              (Outside the presence of the jury.)

4              THE COURT:  Thank you.  Please be seated.

5              All right.  On the record in 22-cv-1129-NYW-SBP,

6    Coomer v. Lindell et, al.

7              Could I have appearances of counsel, please.

8              MR. CAIN:  Good morning, Your Honor, Charlie Cain,

9    Brad Kloewer, David Beller, and Ashley Morgan for the

10   plaintiff, Dr. Eric Coomer.

11             THE COURT:  Thank you.

12             MR. KACHOUROFF:  Good morning, Your Honor,

13   Christopher Kachouroff, Mike Lindell, James Duane, and

14   Jennifer DeMaster for the defense.

15             THE COURT:  Good morning.

16             I understand there is an issue with respect to

17   Mr. Dennis Montgomery, I believe.  I don't necessarily

18   expect you to argue it this morning if you are not

19   prepared, but I would like to understand and get a preview

20   of what the issue is.

21             MS. DEMASTER:  Thank you, Your Honor.  It will just

22   be -- we just had a slight issue, and thanks for giving us

23   some time, we don't need much, it is regarding some of the

24   designations.  And we know that this Court struck some of

25   our counter-designations under Rule 106, but there are two

1    days of the deposition transcript, and we do feel that

2    some of what was counter-designated by the defendants is

3    relevant and applies to the completeness of some of the

4    testimony from day two, even though it was designated from

5    day one.  Some of the topics switch back and forth.

6         Now, that being said, Your Honor, we don't intend

7    to argue or seek partial reconsideration over every

8    counter-designation objection that was sustained, it would

9    just be a few lines that we do believe provides more

10   context, clarity under Rule 106 for parts of deposition

11   transcript from day two.

12        THE COURT:  All right.  Okay.  So have you started

13   to meet and confer, or is that process over?

14        MS. DEMASTER:  Yes, we did meet and confer this

15   morning with plaintiff's counsel, Ms. Morgan, and she

16   stated that we need to bring this motion for

17   reconsideration.

18        THE COURT:  All right.  So, Ms. Morgan, is that an

19   accurate statement of where you all are?

20        MS. MORGAN:  It is, with the caveat that I don't

21   know what specific designations they are asking to have

22   you reconsider for us to confer about.  We may be able to

23   get closer to that.  Our issue is that -- and I won't

24   belabor the point, but there were counter-designations

25   that were up to 11 to 20 pages.

 1          And I don't -- respectfully, I don't believe that

 2    that is pursuant to Rule 106, that seems to be reopening

 3    topics not part of our designations.  And I won't go into

 4    the whole history, but they didn't timely designate and

 5    then over-designated on the counter-designations, to the

 6    point where they designated the entire deposition

 7    transcript.

 8          And then given a third bite at the apple, went well

 9    beyond the scope of the Court's ruling.  So that is the

10    reason for the opposition, Your Honor, but we may be able

11    to reach some agreements if I know what pages and lines we

12    are talking about.

13          THE COURT:  So it sounds like, again, the conferral

14    process isn't over, and then we can take it up for

15    argument tomorrow before the jury comes in.

16          MS. DEMASTER:  That sounds good, thank you.

17          THE COURT:  All right.  Counsel, anything else this

18    morning?  Do you know if our jury is here?  Are they ready

19    to go?

20          COURTROOM DEPUTY:  I have not seen all of them yet.

21          THE COURT:  So we will take a recess, then we will

22    be back.

23          (A break is taken from 8:54 a.m. to 9:02 a.m.)

24          THE COURT:  Thank you.  Please be seated.

25          Madam deputy, could you bring in our jury, please.

         1          COURTROOM DEPUTY:  Yes, Your Honor.

         2          (In the presence of the jury.)

         3          THE COURT:  Thank you.  Please be seated.

         4          Are we ready for the next witness?

         5          MS. MORGAN:  Yes, Your Honor, Harri Hursti, and

         6    this will be by video deposition.

         7          (Videotaped deposition of Harri Hurst played in

         8    open court but not reported.)

         9          THE COURT:  All right.  Thank you.

        10          Mr. Cain, are you all ready to call your next

        11    witness?

        12          MR. CAIN:  May we approach?

        13          THE COURT:  Yes.

        14          (A bench conference is had.)

        15          MR. CAIN:  We have Tina Peters to fill before

        16    Mr. Oltmann, so we can do that.  Would you like to take

        17    our morning break?

        18          THE COURT:  Do you know how long Ms. Peters is?

        19          MS. MORGAN:  She is 52 minutes.

        20          THE COURT:  We should take our break to give the

        21    jury some stretching time.

        22          MS. DEMASTER:  We had -- we wanted to show one line

        23    from his deposition, just one line, and we were not --

        24    this is more of impeachment and goes to motive and bias,

        25    from 22, line 8 through 19, and it wasn't a

1    counter-designation, it doesn't go to Rule 106.  But also

2    we didn't know at the time that -- because according to

3    the Court's Docket 265 and the standing -- the pretrial

4    order, we were not -- the parties had to provide their

5    affirmative designations on the same date.  And so we

6    weren't aware how much -- if they would be bringing

7    Mr. Hursti at all or how much they were going to be

8    designating of his testimony.

9         And we are just looking at, again, lines 8 through

10   19.  It just goes to motive and bias, nothing more than

11   that.  We just wanted to introduce that.

12        THE COURT:  It is overruled.  All deposition

13   designations have been due.  And if you needed any

14   verification with respect to that, you should have filed a

15   motion seeking clarification.  So overruled.

16        (In the hearing of the jury.)

17        THE COURT:  All right.  Ladies and gentlemen of the

18   jury, we will take our morning break because our next

19   witness is also by deposition, and I think it might be

20   helpful for you to be able to stand up and stretch your

21   legs before we embark on that.

22        So we will take 15 minutes.  I give you the normal

23   admonition, do not discuss the case among yourselves or

24   with anyone else, and we will see you back here in 15

25   minutes.

1              (Outside the presence of the jury.)

2              THE COURT:  All right.  We will be in recess.

3              (A break is taken from 10:39 a.m. to 10:55 a.m.)

4              THE COURT:  Thank you.  Please be seated.

5              All right.  Back on the record.  I hear from my

6      courtroom deputy we have some sort of evidentiary issue

7      with respect to the next deposition.

8              MS. MORGAN:  Yes, Your Honor, that's correct.

9      There are two matters to bring up before the jury comes

10     in.  The first is that there is an exhibit in her

11     deposition that we wish to show side by side, that is

12     Exhibit No. 116.

13             THE COURT:  Do I have a copy of that?

14             MS. MORGAN:  You do, Your Honor.  It is the

15     District Attorney's Report for Mesa County, it is 116 on

16     our exhibit list.

17             THE COURT:  Madam deputy, could you bring me the

18     exhibit.  All right.

19             MS. MORGAN:  We wanted to move to admit that before

20     the video starts.

21             THE COURT:  Any objection?

22             MR. DUANE:  I am not clear of the relevance, why it

23     wouldn't be hearsay.  I could be mistaken, I am just

24     inquiring.

25             MS. MORGAN:  As to relevance, Your Honor, this is

1    the District Attorney's report indicating that there was

2    no malfeasance with respect to the events in Mesa County.

3    So the district attorney did an investigation, and in her

4    deposition, Ms. Peters is asked about that investigation

5    and why it is that she was still spreading lies about

6    Dr. Coomer when she had the awareness that this

7    investigation had taken place and that there was no

8    evidence of election fraud.

9         So this is relevant to the issues of actual malice,

10   as well as exemplary damages and Mr. Lindell's -- well,

11   the defendants' affirmative defense of substantial truth.

12        THE COURT:  Wasn't this an exhibit while Ms. Peters

13   was testifying?  She testified to it.

14        MS. MORGAN:  Yes, Your Honor, that's correct.  For

15   housekeeping, we wanted to make sure it is admitted before

16   she is asked about it and it is shown to the jury.

17        THE COURT:  Mr. Duane.

18        MR. DUANE:  My understanding is plaintiff's counsel

19   wishes to offer into evidence a copy of the Certified

20   Judgment of Conviction establishing that she was convicted

21   of those same charges.

22        THE COURT:  Can we just stick with the DA's report,

23   first?

24        MR. DUANE:  Yes, of course.  I mentioned that first

25   because I want the Court to know we have no objection to

1    the other exhibit, which is why I said the DA's report is

2    cumulative and unnecessary hearsay.  The jury is allowed

3    to learn without objection that she was convicted.

4         I think it is not necessary and not helpful to

5    allow the jury to see the details of the conclusions that

6    were reached by the district attorney with respect to

7    their investigation of the same charges.  All that matters

8    is the bottom line; she was convicted.  That, we don't

9    object to.

10        THE COURT:  Ms. Morgan, can you tell me what rule

11   you are proceeding under in Rule 803?

12        MS. MORGAN:  Yes, we are proceeding under 803(8),

13   as well as 803(22).  Well, 803(22) is with respect to the

14   proof of conviction.  803(8) is the public record.  This

15   is a record of a public office.  And these are -- the

16   exhibits relate to two different things, Your Honor.

17        In the district attorney's report, he is not

18   clearing Ms. Peters.  And the Judgment of Conviction is

19   for impeachment of the witness.  And as a fallback, I

20   would ask the Court to take judicial notice of that

21   conviction.

22        THE COURT:  Well, I think the DA's report, which is

23   Exhibit 115, is admissible under 803(8)(a)(III).  I also

24   believe the conviction is stipulated to at this point.  So

25   that will also be admitted.

1          All right.  Anything else before we bring the jury

2     in?

3          MR. DUANE:  No, Your Honor, not for the defense.

4          MS. MORGAN:  No, Your Honor.

5          THE COURT:  Madam deputy.

6          Oh, I am sorry, just to clarify, which exhibit

7     number is the conviction so that we can make sure the

8     exhibit list is appropriately updated.

9          MS. MORGAN:  I believe this will be 265, Your

10    Honor.  It is not marked, if I may trouble your deputy for

11    a sticker.

12         THE COURT:  All right.

13         MS. MORGAN:  We had to overnight it, so I only have

14    the one certified copy.

15         (In the presence of the jury.)

16         THE COURT:  Thank you.  Please be seated.

17         Mr. Cain, your next witness, or Ms. Morgan.

18         MS. MORGAN:  Plaintiff will be calling Tina Peters,

19    who will be testifying by two depositions.

20         THE COURT:  All right.  Thank you.

21         (Videotaped depositions of Tina Peters played in

22    open court but not reported.)

23         THE COURT:  All right.  Are you all ready for your

24    next witness?

25         MR. KLOEWER:  We could be.  Our next witness is

1    Joseph Oltmann.  Given the timing, we can start, but it

2    may be more efficient to take our lunch break now and take

3    him when we come back.

4         THE COURT:  Ladies and gentlemen, we will now take

5    our lunch break and resume live witnesses after the lunch

6    break.  So we will take 45 minutes.  If you can just make

7    sure that you are back here a little bit before 1:00 so we

8    can start promptly at 1:00, I would appreciate it.

9         I would remind you not to talk to anyone inside or

10   outside of the courthouse about what you are hearing in

11   this case.  I appreciate your attention.  We will be in

12   recess.

13        (Outside the presence of the jury.)

14        THE COURT:  All right.  Thank you, counsel.  Please

15   be seated.

16        All right.  Do you have anything to address or any

17   supplements to what we discussed yesterday with respect to

18   the procedure for the upcoming witness?

19        MR. KLOEWER:  I don't believe so, Your Honor, I

20   think where we left off yesterday is where we remain

21   today.

22        THE COURT:  Any other issues?

23        MR. DUANE:  One quick question.  We received from

24   your clerk this morning a copy of the proposed jury

25   charge, and we wanted to find out what Your Honor's

1    preference would be, what your plan is as to when you

2    expect we would have the opportunity to discuss this.  Has

3    that been decided yet?

4         THE COURT:  I think the issue would be up to when

5    we think an appropriate break would be for the attorneys.

6    My hope was to get to that early next week.  So you might

7    want to meet and confer, we will get the witness list, and

8    see when we can either carve out a morning to do it so

9    that the jury can come in later, or we release the jury

10   earlier in the day and we do it at the end of the day

11   sometime.  But it makes the most sense that we try to get

12   through the live witnesses that we can.

13        MR. DUANE:  Good.  Thank you.

14        THE COURT:  Anything else?

15        MR. KACHOUROFF:  Nothing, Your Honor.

16        THE COURT:  All right.  We will take our lunch

17   break.

18        (Lunch is taken from 12:07 p.m. to 1:07 p.m.)

19        THE COURT:  Thank you.  Please be seated.

20        All right.  Are you all ready for the jury?

21        MR. KACHOUROFF:  I believe so, Your Honor.

22        MS. MORGAN:  There is one thing we wanted to --

23        THE COURT:  You want to admit the exhibits?  I will

24   do so in front of the jury when they come in.

25        MS. MORGAN:  Thank you.

1          THE COURT:  All right.  Anything else?

2          Madam deputy.

3          (In the presence of the jury.)

4          THE COURT:  Thank you.  Please be seated.

5          Before we call our next witness, I just want to

6    formally admit Exhibits 116 and 265 that were shown in

7    conjunction with the last deposition of Ms. Peters.

8          (Exhibit Nos. 116, 265 are admitted.)

9          THE COURT:  Are you all ready to call your next

10   witness?

11         MR. KLOEWER:  Yes, Your Honor.  The plaintiff calls

12   Joe Oltmann.

13         THE COURT:  Ms. Hall, if you would like to come

14   forward and sit at counsel table, it is okay.

15         MS. HALL:  Is it okay that I sit here?  I already

16   have all my stuff here.

17         THE COURT:  That is fine, as long as you speak into

18   the microphone.

19         MS. HALL:  No problem, Your Honor.

20                        **JOE OLTMANN**

21   having been first duly sworn, testified as follows:

22         THE WITNESS:  Yes, ma'am.

23         COURTROOM DEPUTY:  Please be seated.

24         Please state your name, and spell your first and

25   last name for the record.

1          THE WITNESS:  Joe Oltmann.  What else?

2          COURTROOM DEPUTY:  Spell your first and last name

3     for the record.

4          THE WITNESS:  J-O-E.  Last name is O-L-T-M-A-N-N.

5                        **DIRECT EXAMINATION**

6     **BY MR. KLOEWER:**

7     Q.   All right.  Mr. Oltmann, you are here pursuant to a

8     subpoena; correct?

9     A.   Yeah.  I didn't get served a subpoena but, yes, that

10    is why I am here.

11    Q.   That subpoena was issued by Eric Coomer; correct?

12    A.   I think so.

13    Q.   Not by Mike Lindell.

14    A.   I think so.  I think they did serve one, I am not

15    sure.

16    Q.   Okay.  So Eric Coomer, he is the one who has demanded

17    you appear in this courthouse today to answer questions

18    under oath; correct?

19    A.   I think I cooperated with both sides.

20    Q.   Eric Coomer is the one who demanded you be here

21    today; correct?

22    A.   I wasn't demanded by anyone.  You reached out to an

23    attorney that does not represent me in this case, and so I

24    said I would not miss it.

25    Q.   All right.  Let's get started.  We have a lot to get

1    through today, and I have a lot of questions on a number

2    of different topics.  But I think it would be helpful,

3    before we get into the specific facts and your

4    relationship with these defendants at the time, to

5    understand a little bit more about your relationship with

6    these defendants as it exists right now.

7         So as of today, June 5, 2025, your title is the

8    director of the Mike Lindell Media Corporation; correct?

9    A.   It is not.

10   Q.   That is not your title with the entity?

11   A.   I don't work for the entity.

12   Q.   I am referring to the corporation that is registered

13   in the State of Wyoming.

14   A.   I do not work for that entity.

15   Q.   You are not listed as a director of that entity,

16   along with Mr. Lindell, himself?

17   A.   I am not.

18        MR. KLOEWER:  Approach the witness, Your Honor.

19        THE COURT:  You may.

20   Q.   (BY MR. KLOEWER)  See that document, Mr. Oltmann?

21   A.   Yes, sir.

22   Q.   It identifies Mike Lindell Media Corporation at the

23   top.

24   A.   Yes.

25   Q.   And indicates its principal office is at 6200 S.

1    Syracuse Way, Suite 125.  Do you see that?

2    A.    I do.

3    Q.    In Greenwood Village, Colorado.

4    A.    Yes.

5    Q.    You are familiar with that office, aren't you,

6    Mr. Oltmann?

7    A.    Yes, I am.

8    Q.    Why are you familiar with that address?

9    A.    That was my office address for 5 years.

10   Q.    Okay.  That is the address of your company, PIN

11   Business Network.

12   A.    Yes.

13   Q.    And if we look down here lower on this document, it

14   indicates a name change.  Just to be clear, this document

15   was pulled from the Wyoming Secretary of State's website.

16   Do you see that indication at the top?

17   A.    Yes.

18   Q.    And in the history of the documents filed with

19   respect to this entity, if you see that yellow bar towards

20   the bottom, it says "name change."

21   A.    Yes.

22   Q.    It indicates that on January 27th of this year, less

23   than five months ago, that the entity Frankspeech Network,

24   Inc., changed its name to the Mike Lindell Media

25   Corporation.  Do you see that?

1    A.    I do.

2    Q.    Let's turn the page here.  Look at the bottom of page

3    2.

4    A.    Okay.

5    Q.    It identifies the parties.  Do you see that section?

6    A.    I do.

7    Q.    It says "Joseph Oltmann, Director."  Do you see that?

8    A.    I do.

9    Q.    And about four lines down it says, "Mike Lindell,

10   Secretary/Director."  Do you see that?

11   A.    Yes.

12   Q.    So it is your sworn testimony here today that you are

13   not the director of the Mike Lindell Media Corporation

14   registered in the State of Wyoming.

15   A.    I am not.

16   Q.    Did your status change?

17   A.    It changed last year.

18   Q.    Well, we just looked at the document reflecting this

19   was up to date as of May 8th of this year; correct?

20   A.    Yes.

21   Q.    Okay.  So is it your testimony that the State of

22   Wyoming is mistaken in the relationship of these parties?

23   A.    I am not a --

24         MR. KACHOUROFF:  Objection, Your Honor, form.

25         THE COURT:  Overruled.

1          THE WITNESS:  I am not a director for Mike Lindell.

2     I do not work with Mike Lindell.  I do not have a job with

3     Mike Lindell.  I do not work with the entity at all in any

4     capacity.

5     Q.   (BY MR. KLOEWER)  Okay.  We talked a little bit about

6     PIN Business Network.  You own a number of companies,

7     don't you, Mr. Oltmann?

8     A.   I am a shareholder in a number of companies, yes.

9     Q.   In addition to PIN Business Network, there is another

10    one, PiDOXA Tech Solution.  Do you recognize that name?

11    A.   I do.

12    Q.   You are the CEO of PiDOXA; is that correct?

13    A.   I am not.

14    Q.   What is your role at PiDOXA?

15    A.   I am a shareholder of PiDOXA.

16    Q.   Am I pronouncing that right?

17    A.   PiDOXA.

18    Q.   PiDOXA.  Okay.  PiDOXA had a contract to run the

19    Frankspeech website, didn't it?

20    A.   At one point, yes.

21    Q.   Can you pull up what has been marked as Exhibit 126

22    for Mr. Oltmann to see there.  Do you recognize this

23    document, Mr. Oltmann?

24    A.   I do.

25    Q.   That is the PiDOXA logo at the top right-hand corner

1    there.

2    A.    It is.

3    Q.    And we see that address of 6200 S. Syracuse Avenue,

4    No. 125, Greenwood Village, Colorado; correct?

5    A.    Yes, sir.

6    Q.    And I would like to draw your attention to the third

7    page of this document if I could.  So if we scroll down

8    there to page 3, and right up at the top there under that

9    first black bar right there, you see that portion,

10   Mr. Oltmann, and it says "document created by Joe

11   Oltmann."  And then it has an email address of

12   "joe@pidoxa.com."

13   A.    Yes.

14   Q.    Did you create this document, Mr. Oltmann?

15   A.    I don't remember, but the account that this comes off

16   of is owned by joe@pidoxa.com.

17   Q.    Okay.  Is this the sort of document that PiDOXA keeps

18   in its normal course of business?

19   A.    It is.

20   Q.    And you typically, in your role with that company,

21   you create this type of document for the records of

22   PiDOXA; correct?

23   A.    I typically do not.

24   Q.    Okay.  But in this instance, did you?

25   A.    I do not recall.  I don't typically do any of the

1    contracts, I just go through what the necessities are.  So

2    I will write up the reports.

3    Q.   And the bottom right-hand corner of that document,

4    you see it says "Frankspeech-0003."

5    A.   Yes.

6    Q.   Indicating that it was produced to us by Frankspeech

7    in this lawsuit.

8    A.   Okay.

9         MR. KLOEWER:  Your Honor, move to admit Exhibit

10   126.

11        MR. KACHOUROFF:  Relevance.

12        THE COURT:  Overruled.  So admitted.

13        (Exhibit No. 126 is admitted.)

14   Q.   (BY MR. KLOEWER)  Mr. Oltmann, let's look at the top

15   of that, go back to page 1 of that document, and I want to

16   focus on a few details here.  Number one up top, it says

17   "Customer and Order Information.  Frankspeech, LLC."  Do

18   you see that?

19   A.   I do.

20   Q.   And the order date indicates September 5th of 2022.

21   Do you see that?

22   A.   I do.

23   Q.   And let's take a look down in the bottom right-hand

24   corner of this document.  Year one and year two totals.

25   The year one total indicates $1,892,646.  Did I read that

1    correctly?

2    A.    Yes.

3    Q.    Year two says, $1,935,528.  Did I read that

4    correctly?

5    A.    Yes.

6    Q.    This was a contract that you entered into on behalf

7    of PiDOXA with Frankspeech to run their website; is that

8    right?

9    A.    No.  I mean, I was involved in it, yes.  I mean,

10   technically you could say I was responsible for the

11   contract, yes.

12   Q.    All right.  So your company had a roughly $1.9

13   million a year contract with Frankspeech to run their

14   website for at least 2 years; correct?

15   A.    It was not to run their website, no.

16   Q.    It was for purposes of sort of putting up a back-end

17   to the website to make sure that it ran smoothly,

18   something to that effect; correct?

19   A.    No, sir, it is not true.  Would you like to know what

20   it is?

21   Q.    You can briefly describe what that contract served.

22   A.    So Frankspeech had about four server stacks, 740s,

23   750s, Palo Altos, sophisticated equipment, infrastructure

24   equipment that is used to run a network.  And so this

25   contract specifically was for the network, itself; in

1    other words, making sure the network was kept up and that

2    we did all firmware updates and made sure that the

3    hardware and software necessary in order to run the

4    network was safe, secure, and had all of the, you know,

5    cybersecurity measures in place to make sure we could

6    protect it.

7    Q.    All right.  Thanks.  Now let's scroll down to page 2.

8    I want to focus on this box on the left-hand side, about

9    halfway down, the "delivery contact."

10          MR. KLOEWER:  If you would zoom in on that, please.

11    A little bit higher.  Just above that.  Perfect.  Thank

12    you.

13    Q.    (BY MR. KLOEWER)  "Delivery Contact."  Do you see

14    that, Mr. Oltmann?

15    A.    I do.

16    Q.    It says "Todd Carter, CTO."

17    A.    Yes.

18    Q.    And the email address is tc@mypillow.com.

19    A.    Yes.

20    Q.    Do you see that?

21    A.    Yes.

22    Q.    Who is Todd Carter?

23    A.    He is the CTO of My Pillow.

24    Q.    And he was the one that was coordinating your

25    contract with Frankspeech -- or PiDOXA's contract with

1    Frankspeech; correct?

2    A.    Yes.  And I just want to correct the record if I can.

3    Q.    Go ahead.

4    A.    He was the CTO for Frankspeech and for My Pillow.  He

5    worked in both capacities.

6    Q.    And I believe you indicated a few moments ago that

7    PiDOXA no longer runs the Frankspeech website; is that

8    correct?

9    A.    It does not.

10    Q.    And is that -- that is following a lawsuit that

11    Frankspeech filed against you, PiDOXA and PIN Business

12    Network earlier this year, is it not?

13    A.    It is not.

14    Q.    You are aware of that lawsuit.

15    A.    It's actually not -- it is not a lawsuit.

16    Q.    Okay.  But you are aware the lawsuit was filed

17    against you.

18    A.    It was not filed against me.  Do you want to know the

19    circumstances of that?

20    Q.    No, I don't.

21         Let me ask you this, Mr. Oltmann.  Mike Lindell

22    owes you money, doesn't he?

23    A.    Quite a bit.

24    Q.    How much money does Mike Lindell owe you?

25    A.    Mike Lindell personally owes me $3 million, and

```
 1    Frankspeech owes us, with subrogation, approximately
 2    $900,000, plus the remainder of the contract that went
 3    unfulfilled.
 4    Q.   So fair to say that if the jury were to enter a
 5    verdict against Mike Lindell and Frankspeech, that would
 6    impact their ability to pay you back, wouldn't it?
 7    A.   No, I don't think so.  I don't.
 8    Q.   All right.  We are going to get into some questions
 9    about the facts of this case a little more.  I want to
10    talk a bit more about your credentials and background
11    before we do that.  There is a certification in the
12    cybersecurity field called CISSP.  Are you familiar with
13    that credential?
14    A.   I am.
15    Q.   It stands for a Certified Information Systems
16    Security Professional.  You don't have that certification,
17    do you?
18    A.   I do not.
19    Q.   And as far as experience in the election world
20    specifically, you've never held a senior role in the
21    elections security field, have you?
22    A.   I have not.
23    Q.   You never worked in elections as an election official
24    at the state level.
25    A.   No.  It's just a calculator.  You are supposed to
```

1    count ballots.

2    Q.    You never worked as an elections official at the

3    local level, either, have you?

4    A.    I was an observer.

5    Q.    You've never done any work for the Cybersecurity and

6    Infrastructure Security Agency.

7    A.    No.

8    Q.    You have never done any work for the Department of

9    Homeland Security.

10   A.    Have not.

11   Q.    You haven't done any work for the U.S. Election

12   Assistance Commission, or the EAC.

13   A.    No.

14   Q.    You never served as a technical assistant for any

15   election official, have you?

16   A.    Well, yes, I have.

17   Q.    Which election official is that?

18   A.    Am I forced to break confidentiality?

19        THE COURT:  Mr. Oltmann, you need to answer the

20   question.

21   Q.    (BY MR. KLOEWER)  Which election official did you

22   work as a technical assistant for?

23   A.    I actually don't know if you'd call it "technical

24   assistant," but I advised a county clerk.

25   Q.    Which county clerk?

1    A.    The one in Elbert County.

2    Q.    Okay.  You never had any security roles with any

3    election technology companies, have you?

4    A.    No.

5    Q.    You've never published any peer-reviewed articles

6    relating to election security.

7    A.    I did publish a white paper for what to do in 2025 to

8    get rid of machines and mail-in ballots for the upcoming

9    cycle for 2026.

10    Q.    You know what I mean -- you understand what I mean

11    when I say "peer-reviewed," correct?

12    A.    I mean, if Walter Daugherity and David Clements and

13    others are peers, then they reviewed it.

14    Q.    All right.  But as far as like a professional

15    journal, you have never published anything related to

16    elections security in any journal directed towards an

17    audience of elections security experts, have you?

18    A.    I've worked extensively with election integrity and

19    election systems experts over the last 5 years.

20    Q.    All right.  But that is not my question.  You haven't

21    published any peer-reviewed work in any elections security

22    expert journals, have you?

23    A.    I didn't know there was a journal for election

24    integrity.

25    Q.    You've never been invited to speak at a professional

513

```
 1   conference for people working in the elections industry,

 2   have you?

 3   A.   No.

 4   Q.   You've never served as an expert witness in any

 5   election-related litigation, have you?

 6   A.   Say that one more time, I am sorry?

 7   Q.   You've never served as an expert in any

 8   election-related litigation, have you?

 9   A.   I was not -- well, I was asked to speak in John

10   Eastman's trial in California.

11   Q.   And you didn't ultimately speak at that trial,

12   though, did you?

13   A.   No.

14   Q.   Let's talk a little bit about your podcast.  You are

15   the host of a podcast; correct?

16   A.   I am.

17   Q.   The podcast is called Untamed.

18   A.   Yes.

19   Q.   And previously the podcast went by the name of

20   Conservative Daily.

21   A.   It did, yes.

22   Q.   And you just recently changed the name of the

23   podcast.

24   A.   I did.

25   Q.   Throughout this discussion today, I am going just to
```

1    refer to it as "the podcast," whether Untamed or

2    Conservative Daily, just to be clear.

3    A.    That works.

4    Q.    You record that podcast every day.

5    A.    Mostly, yes.

6    Q.    You've got advertisers on the podcast; correct?

7    A.    Sometimes, yes.

8    Q.    You derive revenue from those advertisements.

9    A.    Sometimes, yes.

10   Q.    So the podcast is a business venture for you;

11   correct?

12   A.    No, I would not call it a business venture.

13   Q.    You do derive revenue from it; correct?

14   A.    It has never made money.

15   Q.    I understand that.  But my question is, you do derive

16   revenue from your podcast, don't you?

17   A.    Yes.

18   Q.    And uploading the episodes of that podcast to

19   different platforms is something you regularly do in the

20   course of that business; right?

21   A.    I don't personally, no.

22   Q.    You have people that do that for you.

23   A.    I do.

24   Q.    And they publish that on a variety of different

25   platforms; correct?

1    A.    Yes.

2    Q.    And you would agree, wouldn't you, that old episodes

3    of your podcast would give us insight to what you knew at

4    the time those podcasts were published; right?

5    A.    I would assume, yes.

6    Q.    As well as any insight into what you were thinking

7    about at the time.

8    A.    I can't speak to my -- I would assume so, yes.

9    Q.    I want to get into the specific facts of this case.

10   From a 30,000-foot level, zooming out a little bit, you've

11   stated that your claims about Eric Coomer are the genesis

12   of the theories that Dominion Voting Systems played a role

13   in rigging the 2020 election; correct?

14   A.    No, that is not what I state.

15   Q.    You never stated that your claims about Eric Coomer

16   gave rise to discussions about voting machines?

17   A.    No.  Eric Coomer was on a conference call.  That

18   conference called led me to do research on Eric Coomer.

19   That wasn't actually what I was looking at, I was looking

20   for Antifa journalists, which led to me speaking at

21   Bandimere two-and-a-half weeks before the election, and

22   that's --

23   Q.    Mr. Oltmann, that is not my question.

24   A.    I am trying to get to -- this is the answer in full

25   to your question.  Which led me to the election, which led

516

1    me to three days after the election, while I was up elk

2    hunting, which led me back to Eric Coomer being on the

3    call.

4           The fact that I looked into the election fraud of

5    2020 was a direct correlation of the circumstances of

6    being on that call.  But the reality of it is --

7    Q.   Mr. Oltmann, we are going to get into all those

8    details.

9    A.   But you asked the question about how it led to

10   Dominion being a fraudulent system, which it is.

11   Q.   I didn't ask that.  I asked if you had stated that

12   your claims about Eric Coomer are what gave rise to

13   questions about Dominion Voting Systems after the 2020

14   election.  That was my question.

15          Let me do this, Mr. Oltmann --

16   A.   Can you show me the transcript?

17   Q.   That is exactly what I would like to do.  You recall

18   that I have taken your deposition a couple times now,

19   haven't I?

20   A.   Yes.

21   Q.   And one of those depositions was for purposes of this

22   case; right?

23   A.   I think so, yes.

24   Q.   And, in fact, you appeared for a deposition here in

25   this courthouse to provide that sworn testimony; right?

1   A.   I don't think it was here.  I think that was for the

2   Clark deal.  I don't think I was here for the deposition

3   for Lindell.  I could be wrong.

4   Q.   I will represent to you, Mr. Oltmann, that deposition

5   did occur here.  I have a certified transcript of that

6   deposition.  I want to hand that to you and take a look at

7   some of the things you stated then.

8          MR. KLOEWER:  May I approach the witness, Your

9   Honor?

10         THE COURT:  Yes.

11         MR. KACHOUROFF:  May I also have a copy of the

12   transcript?

13         THE COURT:  Do you have it?

14         MR. KACHOUROFF:  I don't have that transcript that

15   he handed him.

16         MS. HALL:  Neither do I, Your Honor.

17         THE COURT:  It is a copy of his deposition?

18         MR. KLOEWER:  Yes, Your Honor, the certified

19   deposition transcript of the deposition taken on December

20   16, 2022.

21         MR. KACHOUROFF:  I want him to show me what he was

22   handing up.

23         MS. HALL:  I don't have a copy, Your Honor.

24         MR. KACHOUROFF:  I will give her mine.

25         THE COURT:  All right.  Thank you.

518

1    Q.   (BY MR. KLOEWER)  You appeared for that deposition,

2    Mr. Oltmann, and you took an oath before providing that

3    testimony; correct?

4    A.   I did.

5    Q.   Just like you did here today.

6    A.   Yes, sir.

7    Q.   To provide the whole truth and nothing but the truth;

8    right?

9    A.   Absolutely.

10   Q.   I want to direct your attention to page 243 of that

11   document.  Now, the version I have given you has four

12   pages to a page, so the script is a bit small.  But I am

13   looking to the document that is labeled page 243.  You can

14   see the page number in the top right-hand corner.  Let me

15   know when you have reached that page.

16   A.   I have that, yes.

17   Q.   Okay.  Let me get there myself.

18        MR. KLOEWER:  Can you pull that up, and zoom in on

19   lines 4 through 15, please.

20   Q.   (BY MR. KLOEWER)  All right.  We see here I asked you

21   a question.  I said, "Okay.  Is it your understanding that

22   your claims about Dr. Coomer are what gave rise to claims

23   about Dominion Voting Systems?  I believe you've said that

24   before, and you can correct me if I am wrong, taking

25   responsibility for being the genesis of the claims against

1    the voting systems."

2          Did I read that correctly?

3    A.    Yes.

4    Q.    And your response is, "I don't think anyone was

5    looking at the machines.  I think they were looking at a

6    bunch of bad actors walking around and doing things, until

7    we started talking about Eric Coomer.  Yes, I think that

8    was the genesis behind looking into -- well, wait a

9    minute, let's look at the machines."

10          So you have taken credit for being the genesis of

11   the scrutiny of the voting machines following the 2020

12   election; correct?

13   A.    No.  That is actually not the question you just asked

14   me.  You asked me if the genesis behind Dominion Voting

15   Systems being a fraudulent system was Eric Coomer.  Eric

16   Coomer is the one that gave me the ability to look into

17   Dominion Voting Systems to be able to uncover the fraud

18   within Dominion Voting Systems.

19   Q.    Mr. Oltmann, my question is if you took credit, but I

20   think the testimony speaks to that.

21   A.    I did not take credit.

22          MR. KACHOUROFF:  Objection to counsel's commentary.

23          THE COURT:  Sustained.

24   Q.    (BY MR. KLOEWER)  Let's start talking about your

25   claims about Eric Coomer.  And I have a lot of questions

520

1    myself about this Antifa call, and I know the jury does,

2    too.

3        MR. KACHOUROFF:  Can you ask counsel to ask a

4    question instead of adding commentary.

5        MR. KLOEWER:  I am happy to do that, Your Honor.  I

6    am just trying to signpost the testimony so we are all

7    clear what I am addressing here.

8        THE COURT:  Let's just be a little more efficient

9    about it.

10   Q.   (BY MR. KLOEWER)  I want to talk briefly about some

11   of the other things that you published about Eric Coomer

12   over the years.  And you've published many episodes of

13   your podcast about Eric Coomer, haven't you?

14   A.   Yes.

15   Q.   You've discussed a variety of claims about Eric

16   Coomer in those podcasts, haven't you?

17   A.   I have.

18       MR. KLOEWER:  Can you pull up what has been marked

19   as Exhibit 169.

20   Q.   (BY MR. KLOEWER)  Do you see the image on the screen

21   there, Mr. Oltmann?

22   A.   I do.

23   Q.   Is that your Conservative Daily banner across the

24   top?

25   A.   It is.

521

1    Q.    Is that you on the right-hand side of the screen?

2    A.    It is.

3    Q.    That individual on the left, who are we looking at

4    there?

5    A.    Max McGuire.

6    Q.    Who is Max McGuire?

7    A.    My co-host.

8    Q.    He is no longer your co-host, is he?

9    A.    He is not.

10   Q.    At the bottom here we see the phrase, "Georgia Trying

11   to Wipe Dominion Voting Machines."  Do you see that?

12   A.    Yes.

13   Q.    Was this your podcast from November 30, 2020,

14   Mr. Oltmann?

15   A.    I do not recall.

16   Q.    Okay.  You would agree this is an accurate

17   representation of what your podcast looked like; right?

18   A.    Yeah.  It is definitely from an episode.

19         MR. KLOEWER:  Okay.  Move to admit Exhibit 169.

20         MR. KACHOUROFF:  No objection.

21         THE COURT:  So admitted.

22         (Exhibit No. 169 is admitted.)

23         MR. KLOEWER:  Let's go ahead and play that clip.

24         (Exhibit 169 is played in open court.)

25   Q.    (BY MR. KLOEWER)  You said he was a major shareholder

 1    of Dominion Voting Systems; right?

 2    A.    Yes.

 3    Q.    You said he had shell companies.

 4    A.    Yes.

 5    Q.    You said he had foreign bank accounts.

 6    A.    Is that what that said?

 7    Q.    We just watched a clip.  You said shell companies and

 8    foreign entities.

 9    A.    Yes.

10    Q.    And we just indicated you have been deposed several

11    times, both by myself and Mr. Cain.

12    A.    Yes.

13    Q.    And in all those depositions, you have never produced

14    the source of those claims that Mr. Coomer was a

15    shareholder in Dominion Voting Systems or that he had

16    shell companies, have you?

17    A.    That is not true.

18    Q.    You have identified the source of the claim that Eric

19    Coomer was a major shareholder of Dominion Voting Systems?

20    A.    Absolutely.  It was the researcher, and we just had

21    this in the Clay Clark deposition.  If you give me that

22    deposition and a little bit of time, I can find it in the

23    deposition.

24    Q.    Who is the researcher?

25    A.    He is a guy that reached out to me literally three or

1    four days after the first podcast.

2    Q.   His name, Mr. Oltmann.

3    A.   He never gave me his name.  I gave you the email

4    address for him, which is on the documents.  You asked me

5    this question several times, and I cooperated and gave you

6    all of the evidence related to the researcher.

7    Q.   So you don't know the name of the person.

8    A.   I believe it is actually also a part of the in limine

9    that we are not allowed to talk about the researcher.

10   Q.   That is not my question.

11        THE COURT:  Mr. Oltmann -- counsel, approach.

12        (A bench conference is had.)

13        THE COURT:  Ms. Hall, did you advise your client

14   what he is not supposed to be discussing during his

15   testimony, what has been excluded?

16        MS. HALL:  Yes, I did, Your Honor.

17        MR. KACHOUROFF:  I don't think he is talking about

18   the Court's order.  What he is talking about has nothing

19   to do with the Court's order.

20        THE COURT:  He just referenced the motion in

21   limine.

22        MR. KACHOUROFF:  In this case.  The topic he was

23   talking about was a source researcher, and that wasn't

24   even a part of our motion in limine.

25        MR. KLOEWER:  He supposedly wrote the dossier.

524

```
 1         MR. KACHOUROFF:  What's that?

 2         MR. KLOEWER:  He supposedly wrote the dossier that

 3   has been --

 4         THE COURT:  Let me be very clear for the record.

 5   We discussed yesterday evening what he can testify to, and

 6   that's not what he has been testifying to, and so I will

 7   interrupt him.

 8         MS. HALL:  I can appreciate you being upset, but

 9   you have no right to be upset at me.  I didn't do

10   anything.  I followed the Court's instructions.  And I

11   wasn't part of this case.  So when I received the order

12   this morning, and I was told by Mr. Kloewer that

13   apparently this order was issued when he had Randy

14   Corporon and that my client had seen it.  I also gave him

15   a copy of it.  I can only do so much.  But I don't know

16   why the Court is glaring at me like I did something wrong.

17         THE COURT:  I am not suggesting that you did,

18   Ms. Hall.

19         MS. HALL:  Thank you.

20         THE COURT:  I am suggesting to all attorneys that

21   this witness needs to answer the questions so that we can

22   get through his testimony.

23         MR. KACHOUROFF:  Judge, if she could have a moment

24   with him to remind him of that duty.  In the meantime, I

25   would offer that the question -- he has been very amiable
```

1    so far answering questions, and he is trying, but my

2    colleague is trying to amp it up a little bit.  I think if

3    he just asks him questions, he is going to answer it.  But

4    the more antagonistic he gets with him, the more

5    antagonistic he will get.

6          THE COURT:  He is an adverse witness.

7          MR. KACHOUROFF:  I am not saying he is not an

8    adverse witness, I got it, I am just saying.

9          THE COURT:  So ask the question, and he can answer,

10   and Ms. Hall will have advised him.

11         (In the hearing of the jury.)

12   Q.   (BY MR. KLOEWER)  Mr. Oltmann, you never provided the

13   name of the individual that you have identified as the

14   researcher, have you?

15   A.   No.

16   Q.   You don't even know that name yourself, do you?

17   A.   I do not.

18   Q.   And that is the only source for your claims that Eric

19   Coomer was a major shareholder of Dominion Voting Systems;

20   correct?

21   A.   Yes.

22   Q.   It is the only source for the claims that he had

23   shell companies; correct?

24   A.   Yes.

25   Q.   And he is the only source for the claim that Eric

1    Coomer had foreign bank accounts; correct?

2    A.   Yes.  But it fit all of the other stuff that matched

3    up to Eric Coomer prior to that, going all of the way back

4    to the original call.

5    Q.   And around about the same time when you were still

6    claiming that Eric Coomer was a major shareholder of

7    Dominion Voting Systems, with shell companies and foreign

8    bank accounts, you actually had people stalking Dr. Coomer

9    around.

10   A.   I did not.

11   Q.   You didn't have people monitoring his movements for

12   you?

13   A.   No.  There were people in this town that he had

14   previously had issues with that would send me information

15   about Mr. Coomer.

16   Q.   You had people watching his house, didn't you?

17   A.   I did not.

18        MR. KLOEWER:  And can you pull up Exhibit 170,

19   please.

20   Q.   (BY MR. KLOEWER)  Do you see the image on the screen

21   there, Mr. Oltmann?

22   A.   Yes.

23   Q.   The bottom caption there is "Shameful Dems Attacking

24   Election Fraud Witnesses."  Do you see that?

25   A.   Yes.

1    Q.   This is an image from your podcast on December 3,

2    2020.

3    A.   I am sure it was.

4         MR. KLOEWER:  Your Honor, move to admit Exhibit

5    170.

6         MR. KACHOUROFF:  Without objection.

7         THE COURT:  So admitted.

8         (Exhibit No. 170 is admitted.)

9         MR. KLOEWER:  Let's take a look at this clip from

10   December 3.

11        (Exhibit 170 played in open court.)

12        THE WITNESS:  It's true.

13   Q.   (BY MR. KLOEWER)  You said, "I know his truck is

14   parked at his house."  Did I hear that correctly?

15   A.   Yeah.

16   Q.   You said, "We know where he is," right?

17   A.   Yeah.

18   Q.   You said, "He has dummy accounts."

19   A.   Yeah.  I think what I was referring to was Dominion

20   at that point, not Eric Coomer, but Eric Coomer being head

21   of Dominion.

22   Q.   You said, "He has dummy organizations all over the

23   world."

24   A.   And they do.

25   Q.   Eric Coomer has dummy organizations all over the

1   world?

2   A.   Dominion Voting Systems has dummy corporations all

3   over the world.

4   Q.   You said "he" though, didn't you?

5   A.   Yeah.  I probably misspoke.

6   Q.   You said "People in the government are doing that

7   investigation right now."

8   A.   Yes.

9   Q.   You also boasted about how you knew when Eric

10  Coomer -- where he was all of the time, "moving all over

11  across Salida," didn't you?

12  A.   Yeah.  So he has lots of enemies in Salida that don't

13  care much for Eric Coomer, and so we would get updates

14  about Eric Coomer pretty regularly.

15  Q.   Let's take a look at some of the statements you made

16  about that.

17       MR. KLOEWER:  Can you pull up Exhibit 171.

18       MR. KACHOUROFF:  Without objection.

19       THE COURT:  So admitted.

20       (Exhibit No. 171 is admitted.)

21       MR. KLOEWER:  Let's take a look at this video.

22       (Exhibit 171 played in open court.)

23  Q.   (BY MR. KLOEWER)  You said "he should never be able

24  to leave his house at all," right?

25  A.   I did.

1    Q.    You said, "I have people in Salida that are literally

2    following him around," didn't you?

3    A.    Yeah, but it wasn't at my behest, it is just they

4    were following him around.

5    Q.    You said, "Same where he is at.  Joe, here is where

6    he is at next."

7    A.    Yes.

8    Q.    You ever met Eric Coomer?

9    A.    Several times.

10   Q.    You ever met him before all this started?

11   A.    I didn't know him from the man on the moon.

12   Q.    You never even spoke to him once, did you?

13   A.    I did not.

14   Q.    You didn't know a single thing about him.

15   A.    No.

16   Q.    Your first podcast about Eric Coomer was on November

17   9th of 2020; correct?

18   A.    It was.

19   Q.    But even before that, you were certain the election

20   had been rigged, weren't you?

21   A.    We were talking about Biden's statements related to

22   an election fraud network.

23   Q.    You were publishing your podcast every day after the

24   2020 election; right?

25   A.    Most days, yes.

1    Q.   And you were still using the pseudonym Joe Otto at

2    that time; right?

3    A.   I was.

4    Q.   And just one example -- so November 9th was a Monday.

5    And on November 6th, the Friday before that November 9th

6    podcast, you discuss other ways you were certain the

7    election had been rigged; right?

8    A.   I don't recall.  I know I came out on November 6th,

9    because that is the day that I was elk hunting.  That is

10   when I put all of the pieces together.

11   Q.   Yeah, we will get into all of that.

12        (BY MR. KLOEWER)  Let's take a look at Exhibit 160.

13   If you will pull that up now.

14   Q.   (BY MR. KLOEWER)  See the image there, Mr. Oltmann.

15   You are still identified as Joe Otto in this podcast, do

16   you see that?

17   A.   Yes.

18   Q.   Okay.  Does this appear to be an image of your

19   podcast?

20   A.   Yes.

21        MR. KACHOUROFF:  Stipulated, Judge, without

22   objection.

23        THE COURT:  So admitted.

24        (Exhibit No. 160 is admitted.)

25        MR. KLOEWER:  Let's take a look at Exhibit 160.

 1                (Exhibit 160 played in open court.)

 2    Q.   (BY MR. KLOEWER)  So before the words "Eric Coomer"

 3    ever came out of your mouth, you were certain that Biden

 4    would never be president; right?

 5    A.   What date is that?

 6    Q.   That was November 6, 2020.

 7    A.   Yeah.  I didn't say anything about Eric Coomer.

 8    Q.   Exactly.  Because you didn't start talking about Eric

 9    Coomer until November 9th, did you?

10    A.   I didn't even know Dominion Voting Systems ran 50

11    percent of the vote of the American people.

12    Q.   You had decided that Biden would not be president

13    before you did that.

14    A.   Pretty much the same way that President Obama said

15    President Trump would never be president.

16    Q.   That is not my question, Mr. Oltmann.  You stated

17    there is no way Biden will be president days before you

18    ever started discussing Eric Coomer, didn't you?

19    A.   I did say that, yes.

20    Q.   Once you started talking about Eric Coomer through

21    your podcast, ratings started to skyrocket, didn't they?

22    A.   Yeah.  So did the death threats.

23    Q.   You were a relatively unknown podcast prior to that

24    time; right?

25    A.   I wouldn't say that, no.

532

```
 1    Q.   But you certainly started to get a lot more viewers

 2    after you started talking about Eric Coomer, didn't you?

 3    A.   We had quite a big following.  We have been around

 4    since 2012.

 5    Q.   That following grew substantially after you started

 6    talking about Eric Coomer, didn't it?

 7    A.   We had more listeners, yes.

 8    Q.   Let's get into your relationship with Mr. Lindell.

 9    So Eric Coomer sued you on December 20, 2020; correct?

10    A.   Yes.

11    Q.   And we already established you had never even met

12    Eric Coomer before that.

13    A.   No.

14    Q.   You'd never even spoken to him before that, had you?

15    A.   I had not.

16    Q.   And you haven't really spoken to him until today,

17    have you?

18    A.   A couple coarse words, but, no.

19    Q.   You first met Mr. Lindell in February of 2021; right?

20    A.   I don't recall when I first met him.

21    Q.   Okay.  Well, he was a guest on your podcast for the

22    first time on March 9th of 2021.  Does that sound correct?

23    A.   It could be.

24    Q.   Okay.  So that's more than 4 years ago at this point,

25    March of 2021.
```

1   A.   Yes.

2   Q.   Okay.  So just to be clear here, if Mr. Lindell were

3   to assert in this case that he doesn't even know Joe

4   Oltmann, that wouldn't be true, would it, Mr. Oltmann?

5   A.   Mike knows me very well.

6   Q.   He has known you very well for a very long time,

7   hasn't he?

8   A.   Yes.  I have been friends with Mike for a long time.

9        MR. KLOEWER:  I want to show you what has been

10   marked as Exhibit 59.  Can you pull that up, please, just

11   for Mr. Oltmann.

12   Q.   (BY MR. KLOEWER)  All right.  See this document,

13   Mr. Oltmann, it has an address of joe@pinbn.com.  Is that

14   your email address?

15   A.   Yes, it was.

16   Q.   Dated March 10, 2021.

17   A.   Yes.

18   Q.   And it is to dawn@mypillow.com.  Do you see that?

19   A.   Yes.

20        MR. KLOEWER:  Your Honor, move to admit Exhibit 59.

21        MR. KACHOUROFF:  Objection, relevance.

22        THE COURT:  Overruled.  So admitted.

23        (Exhibit No. 59 is admitted.)

24        MR. KLOEWER:  Thank you, Your Honor.

25   Q.   (BY MR. KLOEWER)  Let's take a look at this here.

534

```
1    You state at the top, "Hi, Dawn.  Thank you for your time
2    today.  Items we discussed are below.  Promo code:  1st
3    choice:  Trump.  2nd choice:  CD2021.  3rd choice:
4    freedom."  Do you remember sending this email,
5    Mr. Oltmann?
6    A.   No, but I am sure I did.  I think we produced it at
7    some point.
8    Q.   And this was to get a promo code for you to start
9    selling My Pillow products on your podcast; right?
10   A.   Yes.
11   Q.   And by utilizing a promo code, that gave you the
12   ability to generate revenue for the podcast while also
13   selling Mr. Lindell's products; right?
14   A.   Yes.
15   Q.   And the way that worked is you would collect a
16   portion of the sale price, and the remainder would go to
17   My Pillow; right?
18   A.   Yes.
19        MR. KLOEWER:  All right.  Let's take a look at the
20   next exhibit, which has been marked as Exhibit 60, just
21   for the witness, please.
22   Q.   (BY MR. KLOEWER)  All right.  This document is from
23   Dawn Curtis, dcurtis@mypillow.com.  Do you see that at the
24   top?
25   A.   Yes.
```

1   Q.   And it is to joe@pinbn, which we just established is

2   your email address.

3   A.   Yes.

4   Q.   Do you recognize this email?

5   A.   No, but it looks legitimate.  Yes.

6        MR. KLOEWER:  I move to admit Exhibit 60.

7        MR. KACHOUROFF:  Same objection, relevance.

8        THE COURT:  Overruled.  So admitted.

9        (Exhibit No. 60 is admitted.)

10   Q.   (BY MR. KLOEWER)  All right.  Okay.  So at the top,

11   Dawn, who is identified at the bottom of this email as the

12   marketing director for My Pillow, she says, "I have set up

13   promo code-CD21 also your 800 number is," and she lists

14   the phone number.  You started utilizing that CD21 promo

15   code from this March 10th day forward; right?

16   A.   I believe so, yeah.

17   Q.   And this goes on to provide a sort of script to sell

18   My Pillow products on your podcast.  Would you agree with

19   that characterization?

20   A.   Yes.

21   Q.   It gives you some pointers to try to encourage people

22   to purchase the product.

23   A.   Yes.

24   Q.   It tells you about promo prices and different

25   specials available at that time.

1    A.   Yes.

2         MR. KLOEWER:  Okay.  And I want to look next at

3    what has been previously marked as Exhibit 134.  Can you

4    pull that up just for the witness, please.

5    Q.   (BY MR. KLOEWER)  Okay.  Do you see this document,

6    Mr. Oltmann?

7    A.   Yes.

8    Q.   I believe this was produced to us by My Pillow.  Do

9    you recognize what we are looking at here?

10   A.   I think it is a transaction report.

11   Q.   Okay.  It says, "Bill Payments for CD Solutions Inc."

12   Do you see that?

13   A.   Yes.

14   Q.   CD Solutions Inc., is the name of the entity that the

15   Conservative Daily podcast operated under; is that fair?

16   A.   Yes.

17   Q.   And it indicates the total amounts of revenue

18   generated by that CD21 promo code.  Do you agree with

19   that?

20   A.   Yes.

21        MR. KLOEWER:  Your Honor, move to admit Exhibit

22   134.

23        THE COURT:  Any objection?

24        MR. KACHOUROFF:  Same objection, which is

25   relevance.

1           THE COURT:  Overruled.  So admitted.

2           (Exhibit No. 134 is admitted.)

3    Q.   (BY MR. KLOEWER)  So we can see here from this

4    document, which begins about May 28th of 2021, and

5    continues through December of '22, so about a year and a

6    half, it generated about $35,294 in revenue for your

7    podcast.  Do you agree with that?

8    A.   Probably.  I would assume it is correct.

9    Q.   Okay.  You don't have a promo code anymore, do you,

10   Mr. Oltmann?

11   A.   No.  I haven't for quite some time.

12   Q.   You don't sell My Pillow products on the podcast

13   anymore.

14   A.   No.

15   Q.   Of that $35,000 we are looking at in Exhibit 134, how

16   much, if you can estimate, was directed towards My Pillow,

17   or was this just your revenue you derived?

18   A.   I don't understand the question.

19   Q.   Does this number reflect the revenue that you

20   collected, or is it a total amount of sales of products?

21   A.   That, I am not sure, it says "ACH," so I assume this

22   is what we would receive.

23   Q.   Okay.  Tell me this, what was the split between you

24   and My Pillow when you sold My Pillow through that promo

25   code?

```
 1    A.   I don't recall.

 2    Q.   Do you have an estimate as to what percentage you

 3    collected from those sales?

 4    A.   No, nor did I even keep track of the money that came

 5    in from My Pillow.

 6    Q.   And your podcast was invited to be one of the first

 7    on Mr. Lindell's new Frankspeech network before it

 8    launched; right?

 9    A.   I was not.

10         MR. KLOEWER:  Let's pull up what has been marked as

11    Exhibit 71.

12    Q.   (BY MR. KLOEWER)  All right.  Mr. Oltmann, do you see

13    this document?

14    A.   I do.

15    Q.   It has been marked "Frankspeech-00054" in bottom

16    right-hand corner.

17    A.   Yes.

18    Q.   And it is an email dated April 9, 2021.  Do you see

19    that up top?

20         MR. KACHOUROFF:  Stipulated without objection.

21         THE WITNESS:  Yes.

22         THE COURT:  Are you offering it?

23         MR. KLOEWER:  Yes, Your Honor.

24         THE COURT:  So admitted.

25         (Exhibit No. 71 is admitted.)
```

1    Q.    (BY MR. KLOEWER)   The title of this email is "Frank

2    Influencer Demo."   The attendees, we have several here.

3    Mike Lindell is first, then we have

4    "brannon@worldviewweekend."   Several -- I will not read

5    them all, but if we get down to about the fifth line, on

6    the far right side, it says "Joe Oltmann."   And coming

7    into the next line, "joe@pinbn."

8    A.    Yes.

9    Q.    We have "Diamond Silk" there, and a handful of

10   others.   Do you recall when the Frankspeech website

11   initially launched?

12   A.    I do not.

13   Q.    Do you recall attending this Frank Influencer Demo?

14   A.    No, I don't believe I attended it.

15   Q.    Safe to say, though, your podcast was -- you started

16   publishing it on the Frankspeech website shortly after

17   that website launched; is that fair?

18   A.    I don't think that is what happened, no.

19   Q.    Well, you did publish the Conservative Daily podcast

20   on Frankspeech for quite some time; right?

21   A.    I did.

22   Q.    And your podcast ran on Frankspeech virtually every

23   day that it aired; correct?

24   A.    No, it is not true.   It was quite some time before we

25   were actually put on the network.

540

1   Q.   Do you have a recollection of when you were put on

2   the network?

3   A.   I do not.

4   Q.   When you were put on the network, though, your

5   podcast became part of the daily schedule, didn't it?

6   A.   Yes.

7   Q.   So that allowed you and your podcast to reach a much

8   broader audience than before; right?

9   A.   I was not on the main channel, so I didn't get a

10  majority of that, no.  It didn't create a whole lot of

11  opportunity for us, no.

12  Q.   It created some amount of additional opportunity

13  though right?

14  A.   Yes, it did.

15  Q.   Okay.  And you appeared for an interview with Brannon

16  Howse shortly after that Frankspeech Influencer Demo.  Do

17  you remember that?

18  A.   I don't recall it, but it probably -- I did have an

19  interview with Brannon Howse, yes.

20  Q.   Was that in May of 2021, if you recall?

21  A.   Yes.

22  Q.   And a few months after that first interview, you went

23  on to appear at Mike Lindell's Cyber Symposium; right?

24  A.   Can you repeat that question again, please?

25  Q.   A few months after you first appeared on Frankspeech,

541

```
 1   you went out to Mike Lindell's Cyber Symposium in South
 2   Dakota, didn't you?
 3   A.   I was invited out, yes.
 4   Q.   You were invited.
 5   A.   Yes.
 6   Q.   And that Cyber Symposium occurred from August 10th to
 7   12, 2021.  Does that sound accurate to you?
 8   A.   I will assume for the record you are accurate, yes.
 9   Q.   Okay.  And you were actually ordered to appear for a
10   deposition in the Denver County Courthouse on the same day
11   when you ultimately appeared on screen, on stage at the
12   Cyber Symposium; right?
13   A.   I don't recall.
14   Q.   You don't recall missing your deposition here in
15   Denver to appear on stage at the Cyber Symposium in South
16   Dakota?
17   A.   No, I don't.
18   Q.   Do you recall filing a motion with the Court claiming
19   that you were afraid of catching COVID so you couldn't
20   appear for your deposition in the Denver County Courthouse
21   on August 11, 2021?
22   A.   I don't recall.  But if you want to give me the
23   motion, I would look at it.
24        MR. KLOEWER:  May I approach the witness, Your
25   Honor?
```

1           THE COURT:  You may.

2    Q.   (BY MR. KLOEWER)  All right.  Mr. Oltmann, you see

3    the top right-hand corner says, "Date Filed:  August 9,

4    2021."  Do you see that?

5    A.   Yes.

6    Q.   And just below that it says "Case No. 20-cv-34319."

7    A.   Yes.

8    Q.   The case is styled Eric Coomer v. Donald J. Trump for

9    President, Inc., et al, meaning other parties.  Do you see

10   that?

11   A.   Yes.

12   Q.   That is a case where you are still a defendant to

13   this day; right?

14   A.   Yes.

15   Q.   And the first page indicates the nature of the

16   motion.  It says, "Defendant Joseph Oltmann, Motion for

17   Relief From the July 7, 2021 Order Requiring Joseph

18   Oltmann to Appear at the Courthouse for His Deposition on

19   August 11, 2021."  Do you see that?

20   A.   Yes.

21   Q.   Let's turn to page 2 of this document.  The last

22   sentence of that first paragraph says, "Mr. Oltmann's

23   physician has provided his medical opinion that due to

24   Mr. Oltmann's immune status, a personal appearance poses

25   an unwarranted medical risk."  Do you see that?

1   A.   Yes.

2   Q.   And down at the bottom of that page it is signed by

3   "Andrea M. Hall, Attorney for Defendant Oltmann."  Do you

4   see that?

5   A.   Yes.

6   Q.   Andrea Hall is the attorney joining you here today;

7   correct?

8   A.   Yes.

9   Q.   You weren't actually afraid of catching COVID, were

10  you, Mr. Oltmann?

11  A.   I had COVID prior to that.

12  Q.   But you weren't afraid of catching COVID in the

13  courthouse, were you?

14  A.   No, I wasn't.

15  Q.   But you didn't appear for that deposition anyway, did

16  you?

17  A.   I did not.

18  Q.   You traveled to South Dakota to appear on stage at

19  Mike Lindell's Cyber Symposium.

20  A.   I actually did not travel to appear on --

21  Q.   You said you were invited; right?

22  A.   Yes.

23  Q.   Who invited you?

24  A.   Sherronna Bishop.

25  Q.   Did she invite you on behalf of Mr. Lindell?

1    A.    I think she invited people on behalf of herself,

2    frankly.

3    Q.    All right.  But she was working closely with

4    Mr. Lindell around this time; correct?

5    A.    I didn't know the personal relationship between them

6    at the time, no.

7    Q.    When you got to that event, you spoke with

8    Mr. Lindell multiple times at the symposium, didn't you?

9    A.    I am sure I had a conversation or two with him, yes.

10    Q.    And you were backstage at that event interacting with

11    various folks who were sort of behind the scenes.  Would

12    you agree with that characterization?

13    A.    I had conversations with people behind the scenes,

14    yes.

15    Q.    Including Mr. Lindell's attorney, Kurt Olsen.

16    A.    I did.

17    Q.    You spoke with him several times.

18    A.    I did.

19    Q.    And they both knew that you were there, obviously;

20    right?

21    A.    Yes.

22    Q.    And this will seem like a silly question given the

23    video we are about to watch, but you were obviously

24    permitted to go on stage at that event; right?

25    A.    I would not say that I was a willing participant.  It

1    was -- look, 2020 and 2021 represented some of the two

2    worst years I could possibly say from a frenzy standpoint,

3    and I can't explain it.  Yeah, so during that time they

4    needed someone on stage.  I was standing right there,

5    somebody looked at me and says, why don't you go on stage.

6    Q.   Nobody forced you to go, though, did they?

7    A.   They did not.

8    Q.   You chose to attend that event.

9    A.   I did.

10   Q.   And nobody was -- nobody tried to stop you from going

11   on stage, did they?

12   A.   No.

13   Q.   Nobody raised any concerns about you being on stage

14   in front of the cameras, did they?

15   A.   I don't think so, no.

16   Q.   After that event, you flew back to Colorado on Mike

17   Lindell's private jet, didn't you?

18   A.   I did.

19   Q.   With Tina Peters.

20   A.   Yes.

21   Q.   And he dropped you off at the airport in Arapahoe

22   County; right?

23   A.   Yes.  Mike Lindell was not on the plane.

24   Q.   I want to get into this Antifa call.

25   A.   And I spent about 15 minutes total talking to Mike

546

1    Lindell at the symposium.

2    Q.   Backstage at the event; right?

3    A.   Yeah.  Yes.

4    Q.   So, again, if he were to suggest that he didn't even

5    know you were there, that wouldn't be true, would it,

6    Mr. Oltmann?

7    A.   Knowing what I know about Mike, it could be true,

8    yes.

9    Q.   Okay.  Even though you spoke with him at the event.

10   A.   That has no bearing on the fact of whether he

11   recognizes you or even acknowledges you.  He could have

12   had a conversation with me for two hours, and somebody

13   could ask him four hours later whether or not he had a

14   conversation with me, and he would be, like, what are you

15   talking about?  I have no idea what you are talking about.

16        So, no, it is not a fair assessment to say he would

17   have recognized or remembered having any conversation with

18   me at that time, because there was -- between the

19   operators and the grifters and all of the other people

20   around him, he was surrounded by people who were pariahs.

21   Q.   You would agree Mr. Lindell sometimes doesn't recall

22   things that he's said or done.

23   A.   I would say that is a fair assessment.

24   Q.   Let's take a look at some of those videos from the

25   Cyber Symposium.  I want to sort of set the stage because

```
 1    I have a lot of questions about the Antifa call.  So let's

 2    see how you presented information about that Antifa call

 3    and Dr. Coomer on stage.

 4         MR. KLOEWER:  Can you pull up Exhibit 192, please.

 5    This has been stipulated.  The jury already watched this

 6    video yesterday.  Let's give it one quick replay to

 7    refresh our memories of what the content of the

 8    publication was.

 9         (Exhibit 192 played in open court.)

10         THE WITNESS:  They spelled my name wrong.

11    Q.   (BY MR. KLOEWER)  All right.  Do you remember

12    appearing at that event, Mr. Oltmann?

13    A.   I do.

14    Q.   You saw that promo code L66 scrolling across the

15    bottom for discounts of My Pillow.

16    A.   Yes.

17    Q.   You see "Frankspeech" in the corner of that video.

18    A.   Yes.

19    Q.   Obviously we will not play the entire video of that

20    discussion, but I do want to play one other part briefly

21    to sort of --

22    A.   Did you play the full amount for the jury previously,

23    or is this just a part of it?

24    Q.   Mr. Oltmann, I am asking the questions here.  We need

25    to stay on schedule here to keep moving, but I am going to
```

1    show more of that video right now.

2        MR. KLOEWER:  So if you can pull up what has been

3    marked as Exhibit 191.

4        Okay.  This is another portion of that same event,

5    Your Honor.  I move to admit 191.

6        MR. KACHOUROFF:  I am sorry, Your Honor, I thought

7    it was the same clip.  Give me one moment.

8        THE COURT:  Just a clip from the same proceeding.

9        MR. KACHOUROFF:  Without objection.

10       THE COURT:  So admitted.

11       (Exhibit No. 191 is admitted.)

12       MR. KLOEWER:  All right.  Let's take a look at that

13   clip.

14       (Exhibit 191 played in open court.)

15   Q.   (BY MR. KLOEWER)  "I would never ever ever put

16   somebody's name out there if I was not 100 percent sure

17   that he was the one on that call with Antifa."  Did I hear

18   you correctly when you said that, Mr. Oltmann?

19   A.   Yes.

20   Q.   And that is your position here, that is your sworn

21   testimony today; right?  You "would never ever ever put

22   somebody's name out there."

23   A.   Yes.

24   Q.   And you're sure, as you sit here today under oath,

25   that this guy right here, Eric Coomer, was on that Antifa

1    call; right?

2    A.    Yes.

3    Q.    Not a doubt in your mind.

4    A.    I think that I went through the care necessary to

5    assure that Eric Coomer was the one on that call.  And

6    when I had the first video on the 9th that I put out

7    there, I wasn't thinking about advertising clips, I was

8    thinking about how my life was going to change.  And two

9    days later, I got approached in a grocery store by someone

10   that threatens to take my life.

11   Q.    That is not my question, Mr. Oltmann.  My question

12   is, there is not a doubt in your mind --

13   A.    I am answering that question, and that question is

14   not answered yes or no.  It cannot be answered yes or no.

15   Soon after that, I had people come to my house and try to

16   kill my wife, and my --

17   Q.    You can't say yes to the question that there is not a

18   doubt in your mind, as you sit here today, that Eric

19   Coomer --

20   A.    No, as I sit here today --

21   Q.    -- was on that call?

22   A.    -- there is not a doubt he was on that call.

23   Q.    All right.  We talked a little bit about that

24   November 9th podcast.  Let's pull up a couple clips from

25   that podcast.

```
 1            MR. KLOEWER:  Can you pull up Exhibit 161.  This is
 2    from the original episode, titled Dominion, Big Tech and
 3    How They Stole It.  Do you recognize the image on the
 4    screen?
 5    A.   I do.
 6            MR. KLOEWER:  Move to admit 161.
 7            THE COURT:  Any objection?
 8            MR. KACHOUROFF:  No objection.
 9            THE COURT:  So admitted.
10            (Exhibit No. 161 is admitted.)
11            (Exhibit 161 played in open court.)
12    Q.   (BY MR. KLOEWER)  "I can't tell you if it is the same
13    Eric."  Did I hear that correctly?
14    A.   I was walking through in my mind the whole process of
15    getting to Eric Coomer, connecting to the other parts of
16    the other information that led me back to say, okay, I put
17    all this stuff together.  In other words, I was going
18    through the process mentally while I am on the podcast to
19    talk about how I correlate Eric Coomer to the information
20    I was able to derive.
21    Q.   Well, let's take a look at some more of that mental
22    process playing out on the podcast.
23            MR. KLOEWER:  Can we pull up Exhibit 164?  I move
24    to admit Exhibit 164.
25            MR. KACHOUROFF:  No objection, Your Honor.
```

1               THE COURT:  So admitted.

2               (Exhibit No. 164 is admitted.)

3               (Exhibit 164 played in open court.)

4    Q.   (BY MR. KLOEWER)  "Compared to what I remember

5    hearing in his other videos, I think it is a match, but I

6    can't be sure."  Did I hear that correctly?

7    A.   Yes.

8    Q.   And this is your mental process playing out on the

9    podcast; is that fair?

10   A.   Yes.

11              MR. KLOEWER:  Let's take a look at another one.

12   Can you pull up Exhibit 165.  Another clip from the same

13   episode.

14              Move to admit Exhibit 165.

15              THE COURT:  Any objection?

16              MR. KACHOUROFF:  Without objection.

17              THE COURT:  So admitted.

18              (Exhibit No. 165 is admitted.)

19              (Exhibit 165 played in open court.)

20   Q.   (BY MR. KLOEWER)  "Maybe it is a different guy."  I

21   heard that correctly, too, didn't I?

22   A.   Yes.

23   Q.   So in your first podcast on November 9th we have

24   three separate admissions that you were not sure that the

25   Eric you claim to have heard on an Antifa call was this

552

 1    guy right here, Eric Coomer; right?

 2    A.   Yeah.  But you have to understand when you are going

 3    through the process you literally are mentally going

 4    through the process.

 5    Q.   We will go through the process.  I have a lot of

 6    questions about your process, that is what we are getting

 7    into next.

 8         I want to ask you about an email you sent to OAN

 9    the next day, on November 10th.  Do you remember doing

10    that?

11    A.   I do not.

12    Q.   OAN Network is One American News Network.  Does that

13    sound familiar?

14    A.   Yes.

15    Q.   Do you recall you appeared on One American News in

16    late November 2020.

17    A.   I believe so, yes.

18    Q.   But before that happened, you reached out to them to

19    tell them about your story about Eric Coomer, didn't you?

20    A.   Actually somebody called me and told me to reach out

21    to them.

22    Q.   Okay.  Was that Taylor Scott?

23    A.   I don't know who Taylor Scott is.

24         MR. KLOEWER:  Let's pull up what has been marked as

25    Exhibit 29.

1    Q.   (BY MR. KLOEWER)  Do you recognize this document,

2    Mr. Oltmann?  I will give you a chance to look at it.  It

3    says "From:  Joe Oltmann."  This is a different email

4    address.  We have lots of email addresses for you

5    throughout this correspondence.  This one indicates

6    joe@fecunited.  Do you see that?

7    A.   Yes.

8    Q.   The date is Tuesday, November 10, 2020, at 3:28 p.m.

9    Do you see that?

10   A.   Yes.

11   Q.   And the subject is "Voter Fraud Follow Up."

12   A.   Yes.

13   Q.   Do you remember sending this email now as you look at

14   it?

15   A.   No, but I did send it.

16        MR. KLOEWER:  Okay.  Your Honor, move to admit

17   Exhibit 29.

18        THE COURT:  It is stipulated.  It is so admitted.

19        (Exhibit No. 29 is admitted.)

20   Q.   (BY MR. KLOEWER)  Okay.

21   A.   Do you want me to read this?

22   Q.   No.  We will focus on a few parts.  We don't have

23   time to read the entire thing, but I want to focus your

24   attention on a few aspects of this document.

25        First let's look towards the bottom of this first

 1    page.  It is the paragraph that ends at the blue link,

 2    starting with, "here is the beginning."  And you state,

 3    "Here is the beginning notes for the podcast.  It could be

 4    the biggest tie to the validity of the voting system and

 5    turn the tide of things, IMHO."  That acronym stands for,

 6    in my humble opinion; correct?

 7    A.   Yes.

 8    Q.   You go on to say, "But obviously I relent and give

 9    you the opportunity to decide if it is important.  Here is

10    the link to the CD podcast as well."  So you were

11    providing OAN with the link to the podcast you published

12    the day before; right?

13    A.   Yes.

14    Q.   And the purpose of this email was to tell them about

15    your story about Eric Coomer.

16        MR. KLOEWER:  Let's just scroll up and look at that

17    first paragraph to sort of set the tone.

18    Q.   (BY MR. KLOEWER)  You say, "Yes I do.  What I have we

19    did in the podcast at Conservative Daily yesterday.  We

20    have 80 screen shots of Eric Coomer's Facebook page that

21    is private.  I was also on an Antifa call where Eric

22    Coomer stated that 'Trump cannot win, he made sure of

23    it.'"  Then we have the word "(paraphrased)."  Do you see

24    that?

25    A.   I do.

1   Q.   Which part of that statement is paraphrased?

2   A.   I was doing it from my recollection and the notes

3   that I had.

4   Q.   Which part of the phrase -- of the sentence is

5   paraphrased?

6   A.   I didn't add in, I just -- most of it is from

7   recollection, right.  So it is not -- it is not exact

8   words.

9   Q.   And we will get more into the timing, but the call

10  you claim you were on was supposedly sometime in late

11  September; right?

12  A.   Yes.

13  Q.   So you are paraphrasing your recollection from

14  something that occurred about 6 weeks prior.

15  A.   Yes.

16  Q.   This sentence, "Trump is not going to win, he made

17  sure of it," what were the actual words that were spoken?

18  A.   Well, I think that the notes reflect it.  And how I

19  remember it best is how I described it on the podcast.

20  Somebody asked if the -- "what happens if Trump wins?"

21  And their statement was, "Don't worry about it, Trump is

22  not going to win, I made F'ing sure of it."

23  Q.   But at the time you wrote this email, you were unsure

24  of those words, that is why you wrote "paraphrase," right?

25  A.   I wrote "paraphrase" because I had written down very

1    quickly that "Trump cannot win."  He didn't say, "Trump

2    cannot win," he said "Trump is not going to win," so I

3    paraphrased it.

4    Q.   But you don't recall the exact words as you sit here

5    today, do you?

6    A.   You know, 5 years is a long time.  You remember more

7    5 years ago than you do today.

8    Q.   Five years is a very long time, you are right about

9    that, Mr. Oltmann.

10        Let's look at the bottom of this first page.  The

11   text changes, it becomes bold.  Do you see that?

12   A.   Yeah.

13   Q.   And I want to scroll down to page 2.  There is a

14   paragraph that begins, "So let me back up after this short

15   bit and tell you about a call I was able to listen in on.

16   And why this is important.  Ok, So I was on a call

17   discussing the "fascists" it was fascinating honestly how

18   they thought and spoke.  It was downright scary.  As the

19   call carried on a person who called themself Eric was on

20   the call.  Now I want to start that I cannot verify on

21   this call that it is the same Eric but let me tell you as

22   I jotted down notes what I discovered."  Those are your

23   words; right, Mr. Oltmann?

24   A.   They are, yes.

25   Q.   This is you putting in writing to OAN the day after

1  your podcast that you could not be sure that the Eric you

2  claimed to have heard on this call was this Eric sitting

3  right here; right?

4  A.   I don't know what I was thinking when I wrote it.

5  No, I don't remember what I was thinking when I wrote it,

6  other than the fact that I had it smashed in my ears, use

7  "allegedly," "allegedly."  I would have an attorney call

8  me and say, you have to say that you are not sure.

9  Everyone in the world was telling me that I needed to, you

10  know, say it could be someone else.

11  Q.   You stopped saying that very shortly after this

12  email, didn't you?

13  A.   I stopped saying that when they came to my house to

14  kill my family.  You don't cut the tongue out of the guy

15  that is lying, you cut the tongue out of the guy that is

16  telling the truth.  They came to my house with guns to

17  kill my family.

18  Q.   Mr. Oltmann, that has nothing to do --

19  A.    Twenty times they came to my house to kill my family.

20       THE COURT:  Mr. Oltmann, counsel will have an

21  opportunity to redirect you or cross-examine you, so if

22  you can listen to the question that Mr. Kloewer is asking

23  and answer that question, I would appreciate it.  Thank

24  you.

25  Q.   (BY MR. KLOEWER)  You stopped saying "allegedly."  As

1    you just indicated, people told you that you should be

2    saying "allegedly," right?

3    A.    Yes.

4    Q.    And you stopped doing that.

5    A.    I did.

6    Q.    You certainly didn't say "allegedly" when you were on

7    stage at the Cyber Symposium, did you?

8    A.    I did not.

9    Q.    You said you would never ever ever name somebody if

10   you weren't 100 percent sure they were on that call.  That

11   is what you said on stage; right?

12   A.    Yes.  And if you want to follow that up with the fact

13   that the further I got down the road, Eric Coomer wrote an

14   op-ed that said that I had manufactured all his Facebook

15   posts, and --

16   Q.    Mr. Oltmann, we are going to stop --

17   A.    -- then destroyed all of the evidence.  Then he said

18   that he not only was not on the call, but he wasn't --

19   Q.    That is not my question, Mr. Oltmann.

20   A.    -- associated with them.

21   Q.    Hey --

22   A.    So the further I got down the line, the more

23   information --

24   Q.    Mr. Oltmann --

25         THE COURT:  Mr. Oltmann --

1          THE WITNESS:  -- I got.

2    Q.   (BY MR. KLOEWER)  -- we have got a lot of information

3    to get through and --

4          THE COURT:  Mr. Oltmann, I hate to interrupt you --

5    Q.   (BY MR. KLOEWER)  -- I am the one asking the

6    questions.

7          THE COURT:  -- but you need to listen to the

8    question that Mr. Kloewer is asking and answer the

9    question.

10         THE WITNESS:  Okay.

11         THE COURT:  Thank you.  And I am going to strike

12   that last portion starting with "And if you follow that."

13   Q.   (BY MR. KLOEWER)  Did you ever have a conversation

14   with Mr. Lindell about how uncertain you were on November

15   9th and 10th about identifying Eric Coomer?

16   A.   Never.

17   Q.   Did Mr. Lindell ever ask you if you had doubts about

18   your identification of Eric Coomer being on that call?

19   A.   I do not have any doubts.

20   Q.   You did then, didn't you?

21   A.   When you are a good person, you go through a process

22   where you are introspective; you look at whether or not,

23   could I be wrong, could I be wrong, could I be wrong.

24   Q.   And you had doubts at the time; right?

25   A.   I didn't want to be right.

560

1    Q.    That is not my question.  You had doubts at the time.

2    A.    Any person that is a good person would have doubts

3    because of the fact you are putting out information about

4    another person.

5    Q.    And you had doubts, didn't you?

6    A.    I would not say it was a lot of doubt but, yes, I had

7    a doubt.

8    Q.    You mentioned your notes here that -- and we will

9    talk about those notes, but I just want to get a clear

10   answer.  Did Mr. Lindell ever ask you how certain you were

11   about your identification of Eric Coomer?

12   A.    You know, Mike is a brilliant marketer, but his

13   passion for the country did not lead him to look at

14   details.

15   Q.    That is not my question.  Did Mr. Lindell ever ask

16   you if you were certain that you had identified Eric

17   Coomer correctly?

18        MR. KACHOUROFF:  Objection, foundation, assuming

19   they spoke about this issue.

20        THE COURT:  He just testified that they spoke, so

21   overruled.

22        THE WITNESS:  It was never a question that was

23   asked.  My credibility was not in question.

24   Q.    (BY MR. KLOEWER)  Has he ever asked you about Eric

25   Coomer?

1    A.   On a podcast, I think.  I don't recall the

2    conversations related to Eric.

3    Q.   All right.  Let's talk about these notes you claim to

4    have taken during this call.  Exhibit 29 sort of runs

5    through some of those, so let's stay on the same page we

6    are at here.

7         MR. KLOEWER:  Right about where you are at there,

8    but one line from the paragraph above, it says, "this is

9    from my notes."  Can we pull the top portion up a bit so

10   the last line of that paragraph starting with "notes that

11   I discovered."  And then pull it down to just below, "but

12   not sure."

13   Q.   (BY MR. KLOEWER)  In your email to OAN you say "this

14   is from my notes."  What notes are you referring to here?

15   A.   There were notes that I jot -- so I write in this

16   book, and then I had other notes that I wrote on a piece

17   of paper that were on my desk.  It is a nervous habit I

18   have to write down notes.

19   Q.   You are talking about a specific set of notes here

20   though; right?

21   A.   Yes.

22   Q.   You are talking about the notes that you claim you

23   took during the supposed Antifa conference call; right?

24   A.   In the Antifa conference call, yes.

25   Q.   Okay.  Let's read through a couple of those.  "I have

562

1    a bunch to add.  We have to be prepared for the new future

2    where we put down these fascist fucks."  Did I read that

3    correctly?

4    A.   Yes.

5    Q.   "Someone interrupts.  Who is Eric?  Someone answers,

6    Eric is the Dominion guy.  Go ahead Eric.  Someone

7    interrupts.  What are we going to do if fucking Trump

8    wins."  Did I read all that correctly?

9    A.   Yeah.

10   Q.   "Eric responds, (paraphrased) Don't worry about the

11   election Trump is not going to win.  I made fucking sure

12   of that.. hahaha."  Did I read that correctly?

13   A.   Yes.

14   Q.   Last part here.  "Someone responds fucking right.

15   Eric continues with fortifying the groups and recruiting.

16   He was eccentric and boisterous.  I compared what I

17   remembered hearing with his videos I was able to find...

18   and I think it is a match but not sure."  Did I read that

19   part correctly?

20   A.   You did.

21   Q.   Okay.  We are going to come back to this a couple

22   times here because I want to look at the handwritten notes

23   you took, as well.  And you did produce those notes in the

24   lawsuit that Dr. Coomer filed against you; right?

25   A.   I did.

1    Q.    And you remember reading from those notes in your

2    original November 9th podcast.

3    A.    Yes.

4    Q.    Let's look at a clip of that.

5          MR. KLOEWER:  Can you pull up Exhibit 162, another

6    clip from the same podcast.

7          Move to admit Exhibit 162.

8          THE COURT:  Any objection?

9          MR. KACHOUROFF:  No, Your Honor.

10         THE COURT:  So admitted.

11         (Exhibit No. 162 is admitted.)

12         (Exhibit 162 played in open court.)

13   Q.    (BY MR. KLOEWER)  All right.  So that is you saying

14   again on your podcast that it was a paraphrase, that quote

15   you attributed to Eric Coomer.

16   A.    Yes.

17   Q.    Now let's compare these things that you have said to

18   the notes you claim you took.

19         MR. KLOEWER:  Let's pull up what has been marked as

20   Exhibit 25.

21   Q.    (BY MR. KLOEWER)  You would agree, Mr. Oltmann, in

22   that last clip we were looking at, you were reading from

23   your notes in realtime; right?

24   A.    No, I did not.  We prepare stuff for each show, and

25   so I was reading from what I prepared from what I worked

564

1    on on Saturday and Sunday.

2    Q.    So you were reading from a separate set of notes?

3    A.    I was reading -- I wrote down stuff out of my notes

4    that we had for the show.

5    Q.    But not from the notes you took during the Antifa

6    call.

7    A.    No.  This is just me going through the notes and then

8    writing out what I would go through on the show.

9    Q.    But in the email you wrote to OAN where you said

10   "this is from my notes."  In that email you were quoting

11   from the actual notes you took during the Antifa call;

12   right?

13   A.    Well, I was quoting from the actual notes in both.

14   But when I was on the show, my written notes -- I can't

15   read through my written notes when I am on the -- you will

16   see from my notes that I don't have the greatest

17   handwriting.

18   Q.    Okay.  But in your email to OAN, you said you were

19   reading from your notes you took on the Antifa call;

20   right?

21   A.    That I was reading from my notes -- when I was on

22   there, I went through my notes.  But when you do a

23   podcast, you basically go through the bullet points and

24   the things you want to get from the things you recall and

25   the things you have in your note.  The notes are just an

 1    indication of giving you the ability to go back and recall

 2    things that happened in realtime.

 3    Q.   Let's take a look at the notes you produced.  Those

 4    have previously been marked as Exhibit 25.  Do you see

 5    those, Mr. Oltmann?

 6    A.   I do.

 7    Q.   This is a four-page document that you produced to us.

 8    Does this look like the notes that you took during that

 9    Antifa call?

10    A.   Yes.

11         MR. KLOEWER:  Move to admit Exhibit 25.

12         THE COURT:  Stipulated.  So admitted.

13         (Exhibit No. 25 is admitted.)

14    Q.   (BY MR. KLOEWER)  We are not going to read every line

15    here, but I do want to sort of scroll through each of

16    those four pages and ask several questions about this.

17    A.   That is the first page?

18    Q.   Well, that is the first thing I want to address.

19    This is the order they were produced to us, but we have

20    discussed these before, and I understand they may be out

21    of order; is that correct?

22    A.   I don't recall that being the first page.

23    Q.   Well, we will look through the four pages as they

24    were disclosed in that order, and at the conclusion of

25    that, you can try to reorder them if necessary.

1        So this is the first page here.  It says, "Who is

2   Eric Dominion guy?"  And under that we have "Denver?

3   Colorado Springs?"  Was Eric -- well, let me ask you this.

4   Somebody referred to someone else as "Eric," right?

5   A.   Yes.

6   Q.   Who referred to someone else as "Eric"?

7   A.   No idea.

8   Q.   You don't know who said that person is "Eric"?

9   A.   No, I don't recall.

10  Q.   And who referred to Eric as the "Dominion guy"?

11  A.   I don't recall.

12  Q.   Was it a different person than the person who

13  identified Eric?

14  A.   It could have been, yeah.

15  Q.   So you don't know if the people who said he is "Eric"

16  and who said he is the "Dominion guy" are the same person.

17  You don't know.

18  A.   Correct.

19  Q.   And nobody ever said "Eric Coomer" on this call, did

20  they?

21  A.   They did not.

22  Q.   You never heard the word "Coomer."

23  A.   No.

24  Q.   And nobody ever said "Dominion Voting Systems," did

25  they?

1    A.    No.

2    Q.    Just "Dominion."  So all you had was "Eric" and

3    "Dominion," right?

4    A.    Yes.

5    Q.    Now, this "Denver?  Colorado Springs?"  Where was

6    Eric from, was it Denver or Colorado Springs?

7    A.    I put "Colorado Springs" probably in relation to

8    other questions about people that were on the call.

9    Q.    Well, that is not my question, was Eric from Denver

10   or from Colorado Springs?

11   A.    Well, based on who I thought was on the call, I put

12   Colorado Springs because it was a specific Antifa member

13   in Colorado Springs.

14   Q.    But was Eric from Denver or from Colorado Springs?

15   A.    I just told you what my intent was based on the fact

16   that one of the people that was on this call -- that I

17   thought was on this call was in Colorado Springs.

18   Q.    I understand that.  That is not the question I am

19   asking.  Was Eric from Denver or from Colorado Springs?

20   A.    The thing that was said was that it was Denver --

21   "the guy from Dominion."  It didn't say "Denver" it just

22   said the "Dominion guy."  So I put "Denver" and "Colorado

23   Springs" so I could run a report or run a check on who

24   this person is.

25   Q.    So you don't know if the "Eric the Dominion guy" was

1    from Denver or Colorado Springs, do you?

2    A.   It was an Antifa call in the Denver -- I assume in

3    the Denver area, so --

4    Q.   So you don't know if "Eric the Dominion guy," was

5    from Denver or from Colorado Springs, do you?

6    A.   On the call?  No.

7    Q.   We look down here, we see "Brian CRT-media?  Bev.

8    Sam?"  Where are these names coming from?

9    A.   I need to see all of the notes.  If you have a copy

10   of all four pages I can take a look at them and give you

11   an idea.

12   Q.   Sure.  We will keep scrolling through them.  Just off

13   the basis of this page, you don't know what these

14   references are to "Bev."  "Sam."  We have "Yan-ni - RD

15   knows."  You don't know what the basis for those names

16   are, do you?

17   A.   Yan-ni is another name somebody said, I believe on

18   the call.

19   Q.   So somebody said "Yan-ni."  Did somebody say "Bev"?

20   A.   I don't recall.

21   Q.   Did somebody say "Sam"?

22   A.   Again, it has been 5 years, I don't recall.  If I see

23   all of the notes I can give you a better idea who said

24   what and what part it plays.

25   Q.   This was a Zoom call, wasn't it?

    1    A.    It was.

    2    Q.    You were on a laptop.

    3    A.    I was.

    4    Q.    Were these names written on the screen?

    5    A.    No.

    6    Q.    This was a Zoom call where there were no names

    7    visible for the speakers.

    8    A.    Yes.  So people did use names or use, you know,

    9    partial phone numbers or just digits.  You can change the

    10   Zoom call to whatever you want, I assume.

    11   Q.    Did Bev and Sam use their name on the Zoom call?

    12   A.    I don't recall.

    13   Q.    Well, do you recall what they looked like?

    14   A.    What do you mean?  Do I recall what they looked like?

    15   Q.    Well, it is a Zoom call, a videoconferencing app;

    16   right?  What did Bev look like?

    17   A.    There were no people on there showing their faces.

    18   Q.    There were no people showing their faces on the Zoom

    19   conference call?

    20   A.    Well, that is not true, you had one person that came

    21   on and came off.

    22   Q.    Who was that?

    23   A.    I have no idea.

    24   Q.    Was it Bev?

    25   A.    I have no idea.

1   Q.   What did that person look like?

2   A.   I don't recall.

3   Q.   You recall seeing a person, but you don't know what

4   they look like?

5   A.   Correct.

6   Q.   So just one person on this whole videoconferencing

7   call was briefly visible for a moment, that is your

8   testimony.

9   A.   You know, if they had other people that came in and

10  out, at the time I was looking for Antifa journalists, and

11  I wasn't even concerned with Eric at all.  I was only

12  concerned with Antifa journalists, that's it.

13  Q.   So there was no one visible on this videoconference

14  call except one person, who was briefly visible for a

15  moment.  That is your testimony.

16  A.   There could have been other people that were visible

17  on the call.

18  Q.   There could have been, why do you say that?

19  A.   Because I wasn't staring at the screen the entire

20  time.

21  Q.   You weren't watching the screen on the Antifa call?

22  A.   I was literally sitting there laughing about the fact

23  that they could even think that what they are saying is

24  legitimate.

25  Q.   Okay.  So you were sitting laughing and not watching

```
 1    the videoconference call.
 2    A.   No.  I wasn't staring at the monitor, itself.
 3    Q.   All right.  Let's look at the next line down.  "Woman
 4    on call?  Is that Heidi?"  Who is Heidi?
 5    A.   Sean Beedle.
 6    Q.   Heidi is -- well, you referred to somebody as Heidi
 7    here.  Who is Heidi?
 8    A.   That person's name is Sean Beedle, an Antifa
 9    journalist out of Colorado Springs.
10    Q.   But your notes say "Heidi," right?
11    A.   Yeah.
12    Q.   Why were you asking "Is that Heidi?"  Do you know
13    Heidi?"
14    A.   I asked questions that I can go back and just
15    validate later.
16    Q.   Why were you asking "Is that Heidi?"  Do you know
17    Heidi?
18    A.   Sean Beedle interviewed me previously.
19    Q.   Okay.  Why were you asking "Is that Heidi?"  Do you
20    know Heidi?
21    A.   Because Sean Beedle interviewed me on a call and
22    that's the person I thought was on the call, so I was
23    going back to get notes so I could go back and validate it
24    later.
25    Q.   To be clear, it is your position that Heidi Beedle's
```

1    name is Sean.

2    A.    Heidi Beedle's name is Sean.

3    Q.    We don't see the name "Sean" here in your notes, do

4    we?

5    A.    No, because he goes by Heidi Beedle, but his name is

6    Sean Beedle.

7    Q.    "Jojo Joey Camp?"  Who is Joey Camp?

8    A.    He is a guy that they didn't like very much.

9    Q.    He was on your podcast, wasn't he?

10    A.    I think so, yes.

11    Q.    You know Joey Camp.

12    A.    I do.

13    Q.    Do you know where Joey Camp is today?

14    A.    I have no idea.

15    Q.    When is the last time you spoke to Joey Camp?

16    A.    It has been a long time.

17    Q.    When is the last time, if you recall?

18    A.    I don't recall.

19    Q.    Years ago?

20    A.    It has been a long time.

21    Q.    It says "hit this guy."  Why does it say "hit this

22    guy"?

23    A.    I think what I was referring to is the fact they

24    wanted to -- it was pretty bad what they wanted to do to

25    Joey Camp.

1    Q.    Did they want to "hit this guy" or did you want to

2    "hit this guy"?

3    A.    I think what I was referring to there is I needed to

4    figure out who he was.

5    Q.    Why?

6    A.    Because they had an interest in him.

7    Q.    All right.  Let's scroll down to page 2.  Okay.  Now

8    we see "Antifa Call."  And it says "*RD*"  Who is RD?

9    A.    He is the person who gave me access to the call.

10    Q.    Okay.  But what is his name?  What is his name,

11    Mr. Oltmann?  What is RD's name?

12          MR. KACHOUROFF:  Your Honor, may we approach?

13          THE COURT:  You may.

14          (A bench conference is had.)

15          MR. KACHOUROFF:  I suppose this is the dramatic

16    event that now Mr. Kloewer wanted to produce by asking

17    him --

18          MR. KLOEWER:  This is not, Your Honor.  I will

19    circle back if I need to.  I am just going to get through

20    the notes.

21          THE COURT:  Mr. Kloewer, you need to let

22    Mr. Kachouroff finish his statement so that the record is

23    clear.  You will have an opportunity to respond.

24          Ms. Hall, you will have an opportunity to respond.

25          Mr. Kachouroff.

1           MR. KACHOUROFF:  If Mr. Kloewer is getting to the

2   event where he invokes a journalist privilege or some

3   other privilege, I would ask that we have this hearing

4   outside the hearing of the jury.  That is all.

5           MR. KLOEWER:  I can move on, Your Honor.  I won't

6   try to break the privilege unless we need to, and I will

7   alert the Court if and when that moment comes.  But I will

8   move on through the questioning now.

9           THE COURT:  Just to be clear, if he invokes the

10  privilege, Ms. Hall, are you just going to object?

11          COURT REPORTER:  I am not hearing you.  Into the

12  mic, please.

13          MS. HALL:  I apologize.

14          I didn't know how the Court wanted me to proceed

15  with this issue.  It was my understanding that we weren't

16  going to get into this until we had a hearing.  So I

17  guess --

18          THE COURT:  Just go ahead and object so we can

19  preserve it on the record and so it is clear to me or

20  anybody else that wants to read this record in the future.

21  So I just want to make sure the record is clean.

22          MS. HALL:  That is fine.  I also want to get

23  clarification, is the Court allowing me to object, because

24  I think some of these questions are not relevant.  I mean

25  obviously --

575

1          THE COURT:  He is not on trial as a party, so if it

2    is a relevance objection, a hearsay objection, that is not

3    permitted.  However, if you have an objection that is

4    personal as to Mr. Oltmann, the reporter's privilege, then

5    you can make an objection.

6          MS. HALL:  Understood, I just wanted to be clear.

7    Thank you, Your Honor.

8          THE COURT:  Thank you, Ms. Hall.

9          (In the hearing of the jury.)

10   Q.   (BY MR. KLOEWER)  Mr. Oltmann, we may come back to

11   that question, but I will move on right now, and we might

12   circle back to discuss that in a bit.

13         Let's keep reading through these notes.  Here we

14   see next is "Who is woman?  Heidi??  Beedle.  Not sure.

15   Maybe."  So there we see a note to Heidi Beedle again.

16         A few lines down we see "Eric??  Dominion Guy?  Guy

17   is a Jedi."  What do you mean by that?

18   A.   We named all of our offices -- conference rooms in

19   the office about Star Wars.  We have a lot of people that

20   like Star Wars.  And so when you say something like "Trump

21   is not going to win," you make sure it doesn't feel real,

22   doesn't feel like it is even possible that you could steal

23   an election or you could take something away from Trump.

24   So it was like a way of thinking that they just weren't

25   thinking clearly in their head.

1    Q.    So it didn't seem like that was a possible thing to

2    you.

3    A.    It did not.

4    Q.    Didn't seem real.

5    A.    No.

6    Q.    And you say, "Who the fuck is this guy??"  Then

7    beneath it says "Angry!!!"  Do you see that?

8    A.    Yes.

9    Q.    Was the "Eric" angry?

10   A.    It was into the -- so it was a culmination of how the

11   call was going.  People were pretty upset over a woman

12   that was killed, and it was a pretty emotional call.

13   Q.    So was the "Eric" angry?

14   A.    I think the whole call was angry.

15   Q.    But Eric specifically, was he angry?

16   A.    Well, he wasn't being very nice.

17   Q.    Okay.  Where do we see in your notes that he wasn't

18   being very nice?

19   A.    Well, the notes are for me to recall things.  It is

20   not -- I didn't write out everything that was said.

21   Q.    All right.  Let's keep moving through here.  In the

22   bottom right-hand corner, it is underlined.  It says "19

23   on call.  Do you see that?

24   A.    Yeah.

25   Q.    Is that an indication of how many people were on this

```
 1   conference call?

 2   A.   Yes.

 3   Q.   So there were 19 of them.  And if I understand your

 4   prior testimony correctly, you didn't see any of their

 5   faces.

 6   A.   Well, I think for a brief moment I did.  But, no.

 7   Q.   You think you did or you did?

 8   A.   For a brief moment somebody went on screen.

 9   Q.   Just the one person.

10   A.   I believe so, yes.

11   Q.   Okay.  And of those 19, how many had their names

12   written on the screen?

13   A.   Well, they all had different things.  And I probably

14   picked up some of the names that were on the other thing

15   based on what was on the screen.

16   Q.   Where would we be able to see which of the names you

17   wrote down as the names reflected on the screen?

18   A.   Well, I didn't write names on the screen and hear the

19   name.  But based upon the notes, I wrote down the people

20   or the names that either came up from somebody speaking it

21   or came up from me being able to see it.

22   Q.   Didn't you just say you were on the call trying to

23   identify Antifa journalists?

24   A.   Yes.

25   Q.   And you didn't write down the names that were on
```

578

1    screen?

2    A.    Well, I did.  I either wrote down the names on the

3    screen or the names that were stated, but I can't tell you

4    which ones were which.

5    Q.    All right.  Let's move on here to the third page.

6    "Contact this Joey!!  'Rat.'  Tay-I?  This guy is

7    Antifa??"  Is that Joey the same Joey Camp we talked about

8    before?

9    A.    Yeah.

10    Q.    Okay.

11    A.    Yes.

12    Q.    Who called him a "rat"?

13    A.    Several people.

14    Q.    Which ones call him a "rat"?

15    A.    I don't remember.  I don't think I knew exactly who

16    called who what.

17    Q.    Okay.  If we go down we see "organizing for event.

18    BLM.  Breonna Taylor."

19    A.    Yes.

20    Q.    "Last protest a success."  Kind of scrolling through

21    here.

22    A.    They talk about vandalizing something and blaming it

23    on the Proud Boys.

24    Q.    "Yanni fighter."  What does that mean?

25    A.    I think Yanni is one of the people that somebody said

579

```
 1    his name.  He is just an Antifa fighter.  He is like a
 2    fighter on a hockey team.  They didn't say anything about
 3    hockey, but like an enforcer.  He likes to fight.
 4    Q.   Who said that Yanni likes to fight?
 5    A.   Somebody on the call.  Yanni did.
 6    Q.   Yanni said he likes to fight?
 7    A.   Yeah.  I mean, the comments made during the course of
 8    the meeting were I believe him talking about fighting.
 9    Q.   Okay.  If we look down we see "October protests.
10    *food water* organizer says 'unknown.'" The last line says
11    "Keep Pressure," then "teachers professors."  What does
12    that mean?
13    A.   I believe that somebody was talking about a teacher
14    being on there, professors being a part of this movement
15    to get water and food.
16    Q.   Okay.  Let's look at the last page.  It says
17    "'fortify' training."  What does the word "fortify" mean?
18    A.   Yes.  So I think that is page 2.  Page 1 was the
19    second page.  And page -- or page 2 was the -- the second
20    page you talked about was the first page.  This is the
21    second page.  Then you have the third page, which is the
22    one about Joey at the very top.  And then the fourth page
23    was where I go through and just kind of recap any names or
24    other questions I may have.
25    Q.   We will try to make sense of that in a minute, but
```

1    let's get through the substance, then try to reorder these

2    pages in a way that is more helpful for the jury.  This

3    word "fortify," what does it mean?

4    A.   That was one of the comments that was made on the

5    call.  And, again, it has been 5 years.  I don't remember

6    exactly the context.

7    Q.   Who made that "fortify" comment?

8    A.   Eric.

9    Q.   Eric said "fortify."  Where do we see that reflected

10   in your notes here?

11   A.   Well, so there was -- Eric has a pretty distinctive

12   voice, and he was the one that was talking originally.

13   And as I was writing stuff down, on page 1, if we go back

14   to the previous page, page 2, the second page you showed,

15   this one, he was involved in talking during this period.

16   Can I put my finger on this?

17   Q.   Sure.

18   A.   Right here (indicating), and then moved into here

19   (indicating).  Then if you pull up the next page we were

20   just on -- no, the second one.  This one, he continues

21   speaking right here (indicating) with the "'fortify'

22   training."  I had another page of stuff written down on a

23   piece of paper I had on my desk, but I was unable to

24   locate that in January of 2021.

25   Q.   Well, we are going to talk about that in a minute

581

1    because we did discuss whether you had any additional

2    pages to this previously, but let's get through these

3    here.

4          So Eric says "'fortify' training."  Next it says

5    "PSL - comrades" what does that mean?

6    A.    PSL, I believe that is an organization in Denver.

7    Q.    Okay.  Is that something that Eric said?

8    A.    No.  I was talking notes of an organization they were

9    talking about.

10   Q.    I thought "fortify" was a continuation of things that

11   Eric said.

12   A.    Yeah, but I am just writing down notes as I -- key

13   words and things that I actually can remember so I can

14   remember the key parts.

15   Q.    How do you know when Eric stopped talking?

16   A.    It becomes pretty obvious.  There was a few people on

17   there that were kind of running the meeting.

18   Q.    How would I know looking at these notes where Eric

19   stops talking?

20   A.    You wouldn't, because the notes were meant for me.

21   Q.    Okay.

22   A.    And, again, Eric is just a byproduct of what happened

23   a few days after the election, not that I was looking for

24   Eric Coomer or even Dominion, because even up until this

25   time I had no idea that Dominion was the election system

1    for half of America.

2    Q.    Eric is a byproduct of what happened after the

3    election?

4    A.    After the election, yes.

5    Q.    Okay.  But these are notes you took 6 weeks before

6    the election; right?

7    A.    In September, yes.  You don't understand the

8    significance of it because there is no book or nobody out

9    there talking about the fact that Dominion runs 50 percent

10   of the vote of the American people.  I mean, Eric is one

11   of 2,500 people, right, that works for Dominion,

12   approximately 2,000, 2,500.  How did I pick Eric out of a

13   hat?  He happened to be the Antifa guy.

14   Q.    Now, wait just a minute there, Mr. Oltmann.  You

15   raise an important point, and this is something that I may

16   come back to later again, but I do have a couple questions

17   on this topic right now.

18         You said, did you just "pick Eric out of a hat."

19   And I do wonder when you first identified Eric Coomer.  So

20   who gave you access to Eric Coomer's Facebook account?

21         MS. HALL:  Your Honor, I object, reporter's

22   privilege.

23         THE COURT:  All right.  Counsel, do you want to

24   preserve it?

25         MR. KLOEWER:  Yes, I do.  I will preserve it.  We

1    may circle back.

2    Q.   (BY MR. KLOEWER)  But I just want to confirm, you

3    won't answer that question, will you, Mr. Oltmann?

4    A.   I will not.  I will not subject anybody to what I

5    have gone through over the last 5 years.

6    Q.   We've asked you that question many times under oath;

7    right?

8              MS. HALL:  Your Honor, I am going to object.

9              THE COURT:  Approach.

10             (A bench conference is had.)

11             MS. HALL:  Your Honor, we discussed this, and it

12   was my understanding that the Court was going to have a

13   hearing on this, and he knows that the Court instructed us

14   to have a hearing on this, and he keeps pressuring him

15   about this question.

16             So if he is going to continue to go into this line

17   of questioning, I think we need to have the hearing on

18   this outside the presence of the jury.

19             THE COURT:  Your client can continue --

20             COURT REPORTER:  Judge, I am not hearing you.

21             THE COURT:  Your client can continue to refuse to

22   answer and the jury can evaluate that, and then we will

23   have this hearing before he is compelled to waive the

24   privilege or if he is going to continue to waive the

25   privilege.

 1          MR. KLOEWER:  Your Honor, I won't ask any further

 2    questions about the person's identity.  I would like to

 3    ask a few questions about the refusal to answer, then I

 4    will move on to another topic.

 5          THE COURT:  You can do so.  But, Ms. Hall, I

 6    assume that you are -- you can continue to object to

 7    questions you think are appropriate.

 8          MR. KLOEWER:  And I won't be requesting that the

 9    Court compel an answer at this time, so there won't be a

10    need for a hearing.

11          THE COURT:  All right.

12          (In the hearing of the jury.)

13    Q.   (BY MR. KLOEWER)  Okay.  Real quickly, Mr. Oltmann, I

14    know you are not going to answer that question, and I am

15    not going to ask you to identify that person right now.

16    But we have asked you to identify him multiple times in

17    the past; right?

18    A.   Yes.

19          MS. HALL:  Your Honor, I renew my objection to the

20    reporter's privilege.

21          THE COURT:  All right.  It is preserved.

22    Q.   (BY MR. KLOEWER)  So you are the only person who

23    knows the identity of the person who gave you access to

24    Eric Coomer's Facebook account; right?

25          MS. HALL:  Renewing my objection to the reporter's

585

1    privilege.

2             THE COURT:  All right.

3             THE WITNESS:  Do you want me to answer that

4    question?

5    Q.   (BY MR. KLOEWER)  Yes.

6    A.   So there are several affidavits that were supplied in

7    the state case that have been supplied to you that you

8    have of John Tiegen, who was supposed to be on that call,

9    who had a conversation with me before that call and after

10   that call --

11   Q.   Well, if we don't know who got you on that

12   Facebook --

13   A.   -- but you never deposed him.  You had an opportunity

14   to depose John Tiegen --

15   Q.   That is not my questions.

16   A.   -- but you never deposed him.  And you had an

17   affidavit from him stating he could verify there was a

18   call that occurred.

19   Q.   That is not my question.  My question is, if you

20   won't identify who got you access to Eric Coomer's

21   Facebook account, then we have to take you at your word

22   that you got that access when you tell us you did, don't

23   we?

24   A.   Okay.  Can you rephrase that question?

25   Q.   If you will not identify who gave you access to Eric

586

```
1   Coomer's Facebook account, then we have to rely on your

2   word alone for when you got access to that Facebook

3   account, don't we?

4   A.    No, because there is another affidavit that came in

5   from Gordon Beckstead -- let me finish stating this

6   because you just asked the question -- that stated very

7   clearly that I was at his house elk hunting on November

8   6th when I reviewed all of this with him.

9   Q.    Gordon Beckstead didn't get you access to Eric

10  Coomer's Facebook account, did he?

11  A.    No, but you just asked when I got access to it, and

12  that you have to rely on the fact that it just came from

13  me.  But there is an affidavit that shows that that was

14  the day that I got access to the Facebook page, and it

15  wasn't just Facebook, he had Twitter posts, as well.

16  Q.    We have to take your word that the person who gave

17  you that access didn't give you that access until after

18  the election, don't we?

19  A.    That is why you have an affidavit of someone when it

20  happened.  Like, I'm up there elk hunting.  I don't

21  understand, what more do you want other than the pound of

22  flesh that you take from giving that name so someone can

23  go and do harm to those people.

24  Q.    We have to believe that the person who gave you

25  access to Eric Coomer's Facebook account didn't give you
```

1    that access before the election, don't we?

2    A.    That's the truth.

3    Q.    And we have to take you at your word that you didn't

4    identify Eric Coomer long before the election, don't we?

5    A.    So I don't understand what you are asking.  Are you

6    saying that I actually knew about Eric Coomer prior to the

7    election?

8    Q.    If we can't confirm with the person who gave you

9    access to that Facebook account, if you won't tell us who

10    that is, then we can only rely on you to establish the

11    timing of when that person first told you about Eric

12    Coomer, don't we?

13         MS. HALL:  Your Honor, I am going to renew my

14    objection to the reporter's --

15         THE COURT:  Counsel, approach.

16         (A bench conference is had.)

17         THE COURT:  Counsel.

18         MS. HALL:  Your Honor, he keeps using the language

19    of "you are refusing to answer."  At this point in time I

20    think it has gone beyond the scope of what the Court was

21    going to allow the latitude for.  And if he keeps

22    insinuating that, I think the Court needs to move into the

23    hearing with regard to whether or not the privilege

24    applies.

25         THE COURT:  Sustained.  Move on.

 1              MS. HALL:  I'm sorry?

 2              THE COURT:  I told Mr. Kloewer he needed to move

 3      on.

 4              MS. HALL:  Thank you.

 5              (In the hearing of the jury.)

 6              MR. KLOEWER:  I will move on to a new line of

 7      questioning but, Your Honor, it strikes me this has been a

 8      fairly dense line of questioning, would it be a good time

 9      to take a break?

10              THE COURT:  Are you transitioning to a new topic?

11              MR. KLOEWER:  Well, within the context of the

12      Antifa call, but still have more aspects of it to address.

13      It is as good a time to take a break as any.

14              THE COURT:  All right.  Ladies and gentlemen of the

15      jury, we are going to take our afternoon break for about

16      15 minutes.  We will resume a little after 3:30.

17              (Outside the presence of the jury.)

18              THE COURT:  All right.  Thank you.  Please be

19      seated.

20              I just wanted to check with counsel about the

21      timing.  Mr. Kloewer, how much longer do you think you

22      have with Mr. Oltmann?

23              MR. KLOEWER:  Thirty minutes maybe.

24              THE COURT:  All right.  And then do you have a

25      sense of any cross?

589

1          MR. KACHOUROFF:  No, Your Honor.  I think I will go

2     into a lot of topics.  Probably an hour and a half, 2

3     hours.

4          THE COURT:  Okay.  All right.  So I am just

5     thinking about the timing.  So let's take our break, then

6     we will see how far we can get today.

7          (A break is taken from 3:03 p.m. to 3:22 p.m.)

8          THE COURT:  Thank you.  Please be seated.

9          Mr. Kloewer, are you ready for the jury?

10          MR. CAIN:  Yes, Your Honor.

11          THE COURT:  Mr. Oltmann, could you take the stand

12     again, please.

13          MR. KACHOUROFF:  I am not ready, I have one -- just

14     may we approach?

15          THE COURT:  Okay.

16          (A bench conference is had.)

17          MR. KACHOUROFF:  As I thought about my time

18     estimate, and then I started thinking about the interview

19     I had of Mr. Oltmann a few days ago, I am going to need

20     some time with him to navigate the Court's order because

21     this story weaves into documents that the motion in limine

22     covers, and I have to figure out how to ask questions

23     instead of me saying to him, you can't say this.  But at

24     the same time, it is going to be difficult because I have

25     to create a story that is consistent, because otherwise

590

 1   the motion in limine takes chunks of it out by virtue of

 2   what it excludes.

 3        And I am not asking you to reconsider your

 4   opinions, but I can get through some preliminary things,

 5   but at some point, when I start to go back to the call and

 6   to get him to, well, how did you get there, how did this

 7   happen, it is going to invariably go into things that may

 8   touch on the motion in limine.

 9        So I am not saying I want to revisit the motion in

10   limine, I will just need time to navigate this with this

11   witness.

12        THE COURT:  Well, I assume that Ms. Hall will be

13   here and that Mr. Kloewer will be here to object to the

14   extent that they think you are straying into --

15        MR. KACHOUROFF:  That he will be straying, the

16   witness.  As long as you understand, I don't want you to

17   take it out on me when I ask a question and he says

18   something, and then you look at me.

19        THE COURT:  In general, we will just take it as it

20   comes.  And to the extent -- I try not to interrupt

21   witnesses.  I have tried to redirect Mr. Oltmann to the

22   question at times today, not because I want to provoke

23   him, but because you are going to have an opportunity to

24   examine him, and I am just trying to do this as

25   efficiently as possible to keep him moving.

591

          1          MR. KACHOUROFF:  I just wanted to apprise the Court

          2     so you didn't look at me and think I was up to

          3     skullduggery of some sort.

          4          MS. HALL:  Just to further add -- just to further

          5     add to that, I have explained the order to my client, but

          6     as I have explained to counsel, it is very difficult.  We

          7     weren't here for the ruling.  And how he got to the

          8     ultimate conclusion that it was Eric on the call is some

          9     of the stuff that the Court precluded.

         10          So it is going to be very difficult for him to

         11     testify and connect the dots from A to Z based on the

         12     Court's ruling.  And so he is attempting to navigate and

         13     not violate the Court's order and get in trouble with the

         14     Court, but yet explain to the jury how he got from A to Z.

         15          THE COURT:  All right.  Well, I understand your

         16     characterization.  I mean, obviously the motion in limine

         17     speaks for itself.  I expect all parties will follow the

         18     ruling in the motion in limine, and to the extent we have

         19     trouble with that, we will take it up as it comes.

         20          COURTROOM DEPUTY:  Your Honor, should I get the

         21     jury?

         22          THE COURT:  Yes.

         23          Counsel, for timing purposes, the jury can go until

         24     5:00.  I have been alerted they need a hard stop by 4:30

         25     tomorrow.

1          MR. KLOEWER:  Sure.

2          (In the presence of the jury.)

3          THE COURT:  Thank you.  Please be seated.

4          Mr. Kloewer.

5     Q.   (BY MR. KLOEWER)  Okay.  Mr. Oltmann, we have spent a

6     while going through those notes you claim to have taken

7     during the Antifa call.  I want to wrap this section up,

8     and I think the easiest way to do it is if we can pull

9     back up Exhibit 25.  And I can see from previously you

10    already used the sort of pen function of the screen there.

11         Mr. Oltmann, can you scroll through those notes,

12    and I would like you to circle for the jury the portion

13    that says "I have a bunch to add.  We have to be prepared

14    for the new future where we put down these fascist fucks."

15    Can you scroll through and circle that section when you

16    are ready.

17    A.   We went through this in one of the depositions that

18    you had before about notes that we had related to when I

19    was speaking to Randy Corporon.  So you are aware that

20    there was another page or two pages of notes that are not

21    included in this because it was in that deposition.

22    Q.   Well, not notes that you took at the time of the

23    call, though; right?

24    A.   What do you mean notes that were not at the time of

25    the call?

593

1    Q.    You created a second set of notes just before your

2    podcast.

3    A.    For the podcast, yeah.

4    Q.    Okay.  But the call notes you took during the call,

5    though, don't include that phrase anywhere, do they?

6    A.    No, so you are absolutely wrong.  So the note that

7    had -- if you were to walk into my office you would see I

8    have papers all over my desk.  I operate out of these

9    books, and I write down my notes in these books.  But I

10   will also just grab a piece of paper and just start

11   writing on that piece of paper.  It is a nervous habit

12   that I have, that when I am doing -- well, I will write

13   down some stuff.

14         When I first met with Randy Corporon, one of the

15   things I did is I had a note here and I had notes here.

16   Q.    So you had additional notes just before you published

17   your November 9th podcast, but you lost those notes and

18   you don't have them anymore?

19   A.    I wouldn't -- I actually thought I gave them to Randy

20   Corporon when he was representing me back in November.

21   Q.    But you don't have them, do you?

22   A.    I do not.

23   Q.    So that phrase -- just to be clear, Randy Corporon he

24   is a Republican National Committeeman for the State of

25   Colorado?

594

1    A.   He is a lawyer.  I believe he was.

2    Q.   Republican National Committeeman for the State of

3    Colorado; right?

4    A.   Is he that now?

5    Q.   He was at the time, wasn't he?

6    A.   Yes.  Yes, he was.

7    Q.   He is also a top radio host on 710 KNUS.

8    A.   I don't believe he is -- yes.

9    Q.   He was at the time.

10   A.   He was at the time.

11   Q.   And the founder of the Arapahoe County Tea Party

12   Movement.

13   A.   That, I am not aware of.

14   Q.   So you lost the notes that you had.  It is your

15   testimony there were extra pages, but you don't have them.

16   A.   Yeah.  So I have looked for those notes extensively.

17   Q.   So we are not ever going to find that phrase "we have

18   to be prepared for the new future where we put down these

19   fascist fucks."  That is not in the notes we have, and we

20   are not ever going to see that, are we?

21   A.   I mean, I don't have those notes.  But, again, I have

22   gone to Randy to ask him if he could search for that

23   stuff.  I did that at the last meeting that we had.

24   Q.   Well, let's do this.  Why don't you look through

25   those notes and circle for me the portion that says

1    "Someone interrupts.  What are we going to do if fucking

2    Trump wins."  Why don't we scroll through those and find

3    that portion.

4    A.    You don't write notes for that, you write notes to

5    recall what actually happened on the call.  Nobody writes

6    notes and says, "okay interrupt."  You go through the set

7    of notes and then you recall what happened on that

8    particular call or meeting.

9    Q.    Well, okay, just circle the part for me that says

10   "what are we going to do if fucking Trump wins?"

11   A.    Well, that is why I put in "what Eric Coomer said."

12   Q.    So the question, "What are we going to do if fucking

13   Trump wins," that is not in your notes, is it?

14   A.    I don't know.  Can you let me have access to where I

15   can scroll pages?  It sounds like I can't give you that

16   access, but --

17           THE COURT:  What paper exhibit number is it,

18   Mr. Kloewer?

19           MR. KLOEWER:  It is Exhibit 25, I believe.  25.

20           THE WITNESS:  Thank you.  Okay.  What are you

21   asking me to do?

22   Q.    (BY MR. KLOEWER)  Find the phrase, "What are we going

23   to do if Trump fucking wins?"

24   A.    I wrote, "Trump is not going to win.  I made F'ing

25   sure of it."

1    Q.    But the question that preceded that quotation, that

2    is not in your notes, is it?

3    A.    Yes.  And that is why I wrote "guy is a Jedi."  That

4    is why I wrote down what was said in response to it.

5    Q.    Okay.  So this question, "What are we going to do if

6    Trump fucking wins," that is something you wrote down 6

7    weeks after you took your notes to prepare for your

8    podcast?

9    A.    No.  These are the notes I actually wrote down while

10   I was on the call.  The notes from the podcast are

11   completely different.

12   Q.    Okay.  So where in the notes from the call is the

13   phrase, "What are we going to do if fucking Trump wins?"

14   A.    That is not how you write notes.  You write notes to

15   remember what happened in the conversation, not to write

16   down the question.  You write down -- as I am going

17   through, I am listening to them, and I write down what he

18   said.

19   Q.    But when you wrote your email to OAN, you said, "this

20   is from my notes," didn't you, and you relayed this

21   dialog.

22   A.    This is in my notes.

23   Q.    Well, it is not in the ones we've seen, is it?

24   A.    That is not how you write notes, Brad.  You don't

25   write notes that way.  You write notes to remember and

597

1    recall the entire course of events that are going on in

2    the phone call.  You don't write notes to say, okay, here

3    is verbatim, or even here is what was said every minute of

4    every part of the conversation.

5    Q.   All right.  So the words that you wrote in your email

6    are not reflected in the notes written.

7          MR. KACHOUROFF:  Objection, asked and answered.

8          THE WITNESS:  Oh, my gosh.

9    Q.   (BY MR. KLOEWER)  Let's move on.  Why don't you

10   circle the part that says, "hahaha," after the statement,

11   "Trump is not going to win.  I made fucking sure of it,"

12   which you already confirmed was a paraphrase.  Why don't

13   you circle the part of your notes that indicates there was

14   laughter after that statement.

15   A.   Well, I remember that there was laughter after the

16   statement.

17   Q.   Okay.  Well, why don't you scroll down to page 2 of

18   that Exhibit 25.  And we looked at this, because after

19   that statement, "Trump is not going to win.  I made

20   fucking sure of it," it says "Angry!!!" Doesn't it?

21   A.   Yeah.

22   Q.   Okay.  So are they angry or are they laughing?

23   A.   Well, you have to go to the next page if you would,

24   because it will kind of go through what they are

25   talking -- no, I am sorry, number -- the page is 206.

598

```
 1    Yeah, there you go, so that is a continuation of the
 2    previous one.
 3    Q.   Okay.  Where is the "hahaha"?
 4    A.   That was just them laughing on the call.
 5    Q.   Where does it say "laughing on the call"?
 6    A.   It is what I recall about the call.
 7    Q.   Okay.  Even though you wrote the word "Angry!!!" with
 8    three exclamation marks, what you recall 6 weeks later is
 9    that they were laughing?
10    A.   Yeah, but "Angry!!!" wasn't related to one specific
11    event, it is related to how the call was going
12    specifically.
13    Q.   Okay.  So they were all angry, but they were all also
14    laughing?
15    A.   Have you watched any Antifa calls online that have
16    been recorded?
17    Q.   I am asking the questions today, but we will leave
18    that one alone.
19         Let's move through this because I want to
20    understand a little more about the timing of this call.  I
21    think we belabored the notes, and I may revisit them a
22    couple of times, but the timing of this call is something
23    that is -- I think would be very helpful for the jury to
24    understand.  So you provided a sworn affidavit relating to
25    this call, didn't you?
```

 1    A.    Yes.

 2    Q.    You provided that to Sidney Powell and the Trump

 3   legal team.

 4    A.    No, I did not.  I provided it to Randy Corporon.

 5    Q.    The Randy Corporon we just discussed; right?

 6    A.    Yes.

 7    Q.    And he provided it to Sidney Powell.

 8    A.    Yes.

 9          MR. KLOEWER:  All right.  Let's look at what has

10   been marked as Exhibit 32, just for the witness please.

11    Q.    (BY MR. KLOEWER)  Is this that affidavit we are

12   talking about, Mr. Oltmann?

13    A.    I believe so, yes.

14    Q.    Okay.  And let's look at the last page of that real

15   quick.  That is your signature there; correct?

16    A.    Yes.

17    Q.    Dated the 13th day of November 2020.

18    A.    Yes.

19          MR. KLOEWER:  Move to admit Exhibit 32, Your Honor.

20          THE COURT:  Any objection?

21          MR. KACHOUROFF:  Without objection.

22          THE COURT:  So admitted.

23          (Exhibit No. 32 is admitted.)

24          MR. KLOEWER:  If we can scroll back up to the first

25   page.  And I want to zoom in on second-to-the-last

 1    paragraph, it begins, "on or about the week of September

 2    27th."

 3    Q.   (BY MR. KLOEWER)  So this is -- just to be clear,

 4    this is your sworn statement; correct?

 5    A.   Yes.

 6    Q.   And you read this, you've reviewed it before you

 7    handed it over to Mr. Corporon.

 8    A.   Yeah.  Yes.

 9    Q.   And you ensured that everything in this document was

10    accurate before you signed it.

11    A.   Well, they cut out a ton of stuff they said wasn't

12    relevant, but kind of condensed it, and said we would get

13    to it later.  So it was kind of a, hey, here is what I

14    wrote, and they said, we are going to cut all these parts

15    because it is not relevant, and we will put -- then pushed

16    it together and said "sign it."

17    Q.   And you reviewed the final version to ensure it was

18    accurate before you signed; correct?

19    A.   Yes.

20    Q.   And you would never provide sworn testimony that

21    isn't true, would you, Mr. Oltmann?

22    A.   I would not.

23    Q.   Okay.  So we see this line here that says "On or

24    about the week of September 27, 2020, I was able to attend

25    an Antifa meeting which appeared to be between Antifa

1    members in Colorado Springs and Denver, Colorado."  That

2    is your sworn testimony; right?

3    A.   Yes.

4    Q.   All right.  You have testified before that shortly

5    after this call you tried to identify this anonymous "Eric

6    from Dominion," right?

7    A.   Yes.

8    Q.   You did that by Googling "Eric Dominion Denver

9    Colorado," right?

10   A.   Yes.

11   Q.   And you didn't Google "Eric Coomer," because as we

12   have already established, no one on that call said

13   "Coomer," did they?

14   A.   They did not.

15   Q.   You didn't Google "Eric Dominion Voting System"

16   because nobody on that call said "Dominion Voting

17   Systems."

18   A.   Correct.

19   Q.   They just said "Eric from Dominion."

20   A.   Yes.

21   Q.   That is why you Googled "Eric Dominion Colorado."

22   A.   Yes.

23   Q.   You didn't Google "Eric Dominion Colorado Springs."

24   A.   I did not.

25   Q.   We looked at your notes a minute ago, and if I recall

1    your testimony correctly, you weren't sure if Eric was

2    from Denver or Colorado Springs, were you?

3    A.    At the time I put "Denver" and "Colorado Springs"

4    because of the context of the call being a metro area

5    Antifa call.

6    Q.    But you didn't Google "Eric Dominion Colorado

7    Springs" to confirm the accuracy of your search results,

8    did you?

9    A.    No.  I went to the search results, which were pretty

10   evident, and Eric Coomer was all over it.  And then I went

11   and watched some videos, and it was the same voice that

12   was on the -- it was matching who was on the actual call.

13   Q.    Well, we heard your sworn testimony before.  You

14   weren't able to confirm it was the same voice, were you?

15   A.    No, I said -- you asked me if I had doubts, and the

16   answer is yes, I had doubts.  But it matched Eric Coomer

17   from the multiple videos that were on YouTube, many of

18   which, by the way, have been taken down.  So all of the

19   videos on the internet, from everything Eric Coomer five

20   days after the election, were gone, which can only happen

21   if you have some sort of government agency that can climb

22   in and literally make someone disappear.

23   Q.    Compared to what I remember hearing in the other

24   video, "I think it is a match but I can't be sure," that

25   is what you stated in your video; right?

603

1    A.    Correct.

2    Q.    Let's keep moving through the timeline here.  So as

3    you sit here today, you don't know the specific date of

4    the call; right?

5    A.    I don't, because I really wasn't looking for Eric,

6    and had very little, if any, desire to look at anything

7    related to an election.

8    Q.    And your claim is you forgot about this call until

9    sometime after the election; right?

10   A.    What do you mean I forgot about the call?  I didn't

11   forget about the call at all.  Eric Coomer was not my

12   target.  He wasn't the person I was looking at.  I was

13   looking for Antifa journalists.  I was looking for actual

14   journalists that were on the call.  The context of the

15   call was very simple, I have access to this Antifa call.

16   Q.    Sure.  But what happened is at sometime after the

17   election, somebody sent you a message, according to you,

18   that made you remember this call; right?

19   A.    No, not remember the call, but when I read the

20   article, Eric Coomer was actually the spokesperson for

21   Dominion Voting Systems down in Georgia.  Look, everyone

22   saw what happened on November 3rd --

23   Q.    That is not my question.

24   A.    Everyone saw what happened on November 3rd, November

25   4th, what happened on November 5th.

1   Q.   That is not my question.  Let's set the stage here

2   for the jury because they need to get the facts straight

3   on this, it is important.

4         Your claim is that somebody sent you a text message

5   while you were elk hunting on November 7th, somebody sent

6   you a text message that included a link to an article;

7   right.

8   A.   I think it was a Signal message, but I don't recall.

9   They sent me an article, and I read the article, and Eric

10  Coomer was talking about how four precincts in Georgia,

11  right before election, while in the middle of election,

12  had to get an update, and he was talking about that update

13  as the person that was responsible for those updates in

14  Georgia.

15  Q.   So you received an article that named Eric Coomer by

16  name discussing the election -- an issue in Georgia.  That

17  is your testimony; right?

18  A.   Yes.

19  Q.   And you never provided that article that identifies

20  Eric Coomer by name, have you?

21  A.   Actually, I was able to find it going through the

22  Wayback Machine, so I actually do have it now.

23  Q.   Now you do?

24  A.   Yeah, because I literally have fervently gone

25  through.  But Eric Coomer and/or people that worked with

605

1    him walked place by place, went to Google, had people take

2    down articles all over the country, and replaced people in

3    those articles with different people other than Eric

4    Coomer as a spokesperson.  So how would that happen --

5    Q.    We requested --

6    A.    -- how do you remove someone like Eric Coomer?

7    Q.    -- you produce the article that named Eric Coomer by

8    name, and you never did that, did you?

9    A.    No.  It was removed.

10   Q.    And you didn't produce the text message that was sent

11   to you with the link to that article either, did you?

12   A.    Because I don't have the text message.

13   Q.    You deleted it?

14   A.    No, the Signal just -- yeah, it isn't there.

15   Q.    You didn't take a screen shot?

16   A.    I didn't take a screen shot?  A screen shot of what?

17   Q.    The text message that sent you a link to an article.

18   A.    Why would I take a screen shot of a text message?

19   Q.    Well, because --

20   A.    Why would I do that?

21   Q.    Well, didn't you -- haven't you said that when you

22   read that article and saw the name "Eric Coomer," your

23   stomach sank, right?  That is what you said.

24   A.    Yeah.

25   Q.    And your stomach sank because suddenly you remembered

606

 1    the Antifa call that you were on 6 weeks before; right?

 2    A.    I didn't remember the Antifa call that I was on 6

 3    weeks before, I knew about the Antifa call.  But the

 4    significance of Eric at Dominion then became significant.

 5    And so I started digging in further into Eric Coomer and

 6    who is Eric Coomer.  At that point you just start digging

 7    in.  Who is Eric Coomer?

 8    Q.    So you would agree that receiving that message

 9    changed the trajectory of your life, didn't it?

10    A.    In ways that I can't ever even describe.

11    Q.    But you didn't save it.

12    A.    Why would I save it?

13    Q.    Well, who sent you that message, Mr. Oltmann?  Let's

14    ask that question.

15    A.    I actually -- if I had that, it would make everything

16    much easier for me.

17    Q.    You don't know who sent you that message.

18    A.    I don't.

19    Q.    So you got an anonymous message --

20    A.    Not true.  I ran an organization called FEC United,

21    it stands for Faith, Education, and Commerce.  I have over

22    a hundred thousand people that were involved in that

23    organization all over the country.  People send me stuff

24    today, and I have no idea who they are, I have no idea

25    where the messages came from, but things are often sent to

1    me pretty regularly.

2    Q.   Well, you knew who that person was before, didn't

3    you, who sent you that message?

4    A.   I might have, yes.

5    Q.   Who was it?

6    A.   I don't recall.

7    Q.   Let's take a look at that deposition transcript that

8    we looked at a little bit before from when I deposed you

9    in this courthouse a couple years ago.  Do you have that

10   copy in front of you, Mr. Oltmann?

11   A.   I do.

12   Q.   Why don't you open that up to page 294.

13   A.   Okay.

14   Q.   The last line of that, I am going to read through

15   here --

16        MR. KLOEWER:  And if we can you pull that up, 294,

17   line 25, and I am going to read through all of page 295,

18   as well.

19        MR. KACHOUROFF:  If I can have just one moment.

20        MR. KLOEWER:  Sure.

21        THE COURT:  Counsel, for clarification, is that the

22   actual page in the four square, 294, that you are

23   referring to?

24        MR. KLOEWER:  I don't know the page.  I gave him a

25   condensed version, which has four pages on each, so I

1    would assume that is somewhere near page 75, 74 probably.

2    But it is identified as page 294 on the top of the

3    transcript.

4    Q.   (BY MR. KLOEWER)   And line 25, my question starts,

5    "Let's take a look at Exhibit 9."   And scrolling down to

6    page 295, I said "We requested all text messages allegedly

7    sent to you at any point between November 3rd and the 9th

8    wherein you were supposedly alerted of an article claiming

9    that Georgia voting systems went down on election day, as

10   well as a copy of the article linked to in those text

11   messages."

12        In response you said, "It has been wiped from the

13   internet, much like everything else that is linked to Eric

14   Coomer.  But my attorney from the district court is

15   searching for a hard copy form."

16        I then asked if your attorney -- I said, "Is that

17   Ms. DeFranco?"

18        You said, "Yes."

19        I asked, "And has she been able to locate an

20   article that references Dr. Coomer with respect to

21   election day in Georgia?"

22        You answered, "Not yet."

23        I said, "Not yet.  And who sent you the text

24   message?  Who sent you the message in that article?"

25        You answered, "I am not answering that question."

 1          I said, "Is it because there was no text message,

 2    Mr. Oltmann?"

 3          You responded, "You know what, your client is a

 4    liar, not me."

 5          I asked, "Here is your chance to tell the truth and

 6    to -- if I am wrong, tell me, who sent the text message?"

 7          Your response, "I am not going to tell you."

 8          So you know who sent you that message, don't you?

 9    A.    I actually don't.

10    Q.    You don't.  Did you forget since the time of this

11    deposition?

12    A.    No.  I think that we just had a very tense

13    deposition, and at that point I was just done with you.

14    Q.    Well, you didn't tell me you didn't know who that

15    person was, did you?

16    A.    This is the third deposition, right, or is this the

17    second of the four depositions or three depositions that I

18    took?

19    Q.    You didn't tell me --

20    A.    It was almost 24 hours of depositions that I took

21    with you --

22    Q.    You didn't tell me --

23    A.    -- where you growled at me for 24 hours, so I --

24          THE COURT:  Gentlemen.  Gentlemen.  Gentlemen.

25          Mr. Oltmann, so for the court reporter, you need to

let Mr. Kloewer finish his question, and then you can answer. And then just answer the question that Mr. Kloewer is asking. It will make this proceeding go a little bit more efficiently and it will be helpful for our court reporter because she cannot transcribe when both of you are speaking over each other.

THE WITNESS: I apologize.

MR. KLOEWER: I will move on, Your Honor.

Q. (BY MR. KLOEWER) The point is, we have to take you at your word that you received an article that identified Eric Coomer by name, don't we?

A. Well, if you would like to see that article, I think I have it on my computer, I can actually pull it up for you right now.

Q. We have to take you at your word that someone sent that to you and that is what made you start looking into Eric Coomer.

A. Yeah. You don't, though --

Q. And you didn't want --

A. -- and if you want, I can give you the article.

Q. All right. Let's talk about the search you did to identify the anonymous Eric as Eric Coomer. Because that Google search is how you got from point A to point B; right? "Eric Dominion" to "Eric Coomer Dominion Voting Systems," because you Googled him; right?

1    A.    Yes.

2    Q.    And you did that shortly after the call.

3    A.    Yes.

4    Q.    And you took a screen shot of those search results at

5    the time, didn't you?

6    A.    I did not.

7    Q.    You didn't take a screen shot at the time?

8    A.    No.  So this is the -- when we were going through it,

9    I took a screen shot when I was sitting with Randy, and I

10   don't remember what day it was, I took two of them.  And

11   you are in possession of both of those screen shots.  I

12   believe it was the 12th or 13th.

13        And whatever the day was, he said, "You need to

14   replicate how you got the information from Eric Coomer,"

15   so I did.  And as a matter of fact, it is a part of the

16   affidavit.  So if you look in the affidavit, you can

17   actually see a part of a screen shot that was taken from

18   that inside of Google.  Randy says, you have to be able to

19   show me how you came to that information.  How do you draw

20   a line from Eric Coomer, Eric Dominion Colorado, and

21   Dominion Voting Systems.  And so I went in and did what is

22   called a Wayback.

23        And I can actually perform it right now for the

24   Court if you would like me to so the jury can see it.

25   Q.    Well, let's do this --

612

1    A.   Let me finish, because you asked me to respond to

2    this.  So you can go into Google, there is a tool inside

3    of Google that lets you actually put specific dates.  I

4    modified that several times over the last 4 years, but in

5    that modification you would be able to go back.  And one

6    of the things that happened when we went through this with

7    Randy is that we were able to put side by side two screen

8    shots --

9    Q.   Mr. Oltmann --

10   A.   -- and what it did is I took the screen shot, the

11   first I took, and I changed it to an approximate date of

12   when the Antifa call was, only changing the actual date,

13   not changing anything else, because when you hit a screen

14   shot on Google -- or, excuse me, on Apple, it records this

15   entire line of events over on the deal.  So I just wanted

16   to make sure I could remember it.  Now, that

17   information was --

18   Q.   Mr. Oltmann, I am going to get into details, but we

19   are getting into a bit of narrative here.

20        MR. KLOEWER:  Let's pull up what has been marked as

21   Exhibit 167.

22   Q.   (BY MR. KLOEWER)  And this is from an episode of your

23   podcast on November 12th of 2020, so three days after you

24   made these claims about Eric Coomer.

25   A.   I am sorry what day?

613

1    Q.    November 12, 2020.  The title of the episode is "They

2    are Destroying Envelopes in Philly."

3    A.    Okay.

4          MR. KLOEWER:  Move to admit 167.

5          MR. KACHOUROFF:  Not sure what the relevance of

6    this is.

7          THE COURT:  Overruled.

8          (Exhibit No. 167 is admitted.)

9          (Exhibit 167 played in open court.)

10          BY MR. KLOEWER:  So let's pull up what has been

11    marked as Exhibit 26.

12    Q.    (BY MR. KLOEWER)  I want to spend time looking at

13    this screen shot we just saw the video of.  Do you

14    recognize that document, Mr. Oltmann?

15    A.    Yes.

16    Q.    And at the bottom right-hand corner, it says

17    "20-cv-34319."  Do you see that?

18    A.    Yes.

19    Q.    "JO-disclosures-0199."  Do you see that?

20    A.    Yeah.

21    Q.    And that means that is a document that you produced

22    in evidence in the lawsuit filed against you by Eric

23    Coomer; right?

24    A.    Yes.

25    Q.    This is how you produced it to us.

1   A.   Yes.

2        MR. KLOEWER:  Okay.  Move to admit Exhibit 26?

3        MR. KACHOUROFF:  No objection.

4        THE COURT:  So admitted.

5        (Exhibit No. 26 is admitted.)

6   Q.   (BY MR. KLOEWER)  All right.  There are a couple

7   things to note on this.  So at the top we see in capital

8   letters "SCREEN SHOT of 'Eric Dominion Colorado' taken on

9   9/24/2020."  So that indicates the screen shot was taken

10  on that date; correct?

11  A.   Yeah.  But that is not the case.  It is the date by

12  which -- it is the date by which I went back on the

13  timeframe for what would have shown up on the 26th of

14  September.

15  Q.   Okay.  So that's not when you actually took the

16  screen shot, is it?

17  A.   Correct.

18  Q.   And underneath that, in smaller font it says, "Screen

19  Shot 2020-09-26 at 2:03:31 p.m."  Do you see that?

20  A.   Yes.

21  Q.   That is not correct either, is it?

22  A.   No, the only thing that changed was the "2020-09-26."

23  Q.   And we know that wasn't taken on September 26th

24  because of this little image over here on the left, don't

25  we?

615

1    A.    What image on the left?

2    Q.    The Google little rectangle right there that is being

3    highlighted (indicating).  Do you see that?

4    A.    Yes.

5    Q.    And you know what a Google Doodle is; right,

6    Mr. Oltmann?

7    A.    I do.  I am very familiar with Google.

8    Q.    And this particular Google Doodle was only in effect

9    for a single day; right?

10   A.    All Google Doodles are in effect for a single day.

11   Q.    And the day that Google Doodle was in effect was

12   November 11, 2020, wasn't it?

13   A.    I will take your word for it, yes.

14   Q.    Two days after you first made claims about Eric

15   Coomer.

16   A.    Yes.

17   Q.    Let's zoom out here and take a look at the actual

18   links here.

19          For my colorblind co-counsel here and any others in

20   the courtroom who may have this distinction lost on them,

21   we can see from this screen shot that a number of these

22   links are purple and a number are blue.  Do you see that,

23   Mr. Oltmann?

24   A.    Yes.

25   Q.    So the first one that says "Dominion -- Colorado

616

```
1    Secretary of State," that is purple.

2    A.   Yes.

3    Q.   The second one, "Eric Coomer's email & phone," that

4    is purple.

5    A.   Yes.

6    Q.   The third one, "Eric Schussler -- Old Dominion

7    University," that is blue; correct?

8    A.   Yes.

9    Q.   "Eric E. Johnson, Attorney," that is blue too, right?

10   A.   Correct.

11   Q.   Then we have "Dominion Voting Systems," that is

12   purple.

13   A.   Yes.

14   Q.   And then the last one, "Dominion Voting Systems,"

15   that is blue.

16   A.   Yes.

17   Q.   And a link turns purple to indicate you have clicked

18   on it; right?

19   A.   Yes.

20   Q.   So you didn't click on "Eric Schussler -- Old

21   Dominion University" to determine if he is "Eric the

22   Dominion guy," did you?

23   A.   No.  And actually if you go back to the video that

24   you just showed, it will reinforce how this actually

25   happened.
```

1    Q.   That is not my question.  You didn't click on "Eric

2    Schussler -- Old Dominion University" to confirm whether

3    he was "Eric the Dominion guy," right?

4    A.   Yeah, but I was basically doing this for Randy to --

5    Q.   But --

6    A.   Hold on a second, you just asked a question.  -- for

7    Randy, who said I need you to show me what you were

8    looking at when you looked up Eric Coomer at Dominion

9    Voting Systems, so I did.  And when I took the screen shot

10   of this on November 11th, that is how I knew that all of

11   the stuff online was disappearing about Eric Coomer, and

12   that is why I had the thing on the 13th that showed that

13   "Eric Coomer Dominion Voting Systems" was getting scrubbed

14   from the internet.

15        So if you look at the click, when I was actually

16   making this on November 11th --

17   Q.   Yeah.

18   A.   -- I clicked on these to see what information would

19   show up, and there was no information that showed up.

20   They had literally gone through and deleted everything on

21   the internet about Eric Coomer within five days or three

22   days --

23   Q.   Okay.  But you didn't click on "Eric Schussler -- Old

24   Dominion University" to see if he was "Eric the Dominion

25   guy," did you?

618

1   A.   No, but that was the whole point --

2   Q.   Okay.

3   A.   -- is that when I was on Google on November 11th --

4   Q.   And you didn't --

5   A.   -- I used a feature that is inside of Google.  You

6   can go onto it, you can go in and change.  The tool that

7   you can change, the dates by which --

8        THE COURT:  Mr. Oltmann.  Mr. Oltmann.  I need you

9   to listen to Mr. Kloewer's question and answer his

10  question, and --

11       THE WITNESS:  Ma'am, I am answering that question,

12  and this is relevant.

13       THE COURT:  -- the defendants will have an

14  opportunity to present a cross, so I just need you to

15  listen --

16       THE WITNESS:  Okay.

17       THE COURT:  -- and answer the question --

18       THE WITNESS:  Apologies.

19       THE COURT:  -- asked.

20       THE WITNESS:  Apologies.  Yes.

21       THE COURT:  Thank you.

22  Q.   (BY MR. KLOEWER)  More broadly, Mr. Oltmann, are you

23  familiar with -- that about four block away from here

24  there is a building called the Dominion Tower; do you know

25  about that?

1     A.    I do not.

2     Q.    Did you make any effort to make a catalog of all of

3     the Erics that might work at the Dominion Tower to see if

4     they were the "Dominion guy" you heard on the call?

5     A.    Yeah.  I am just not -- I am not following you,

6     because when I originally did the check into Eric Coomer,

7     the thing that I looked at was, does his voice match, and

8     it did.  But I didn't care about the fact that Eric Coomer

9     matched the voice on the videos about election machines,

10    that had no bearing on me --

11    Q.    Well, Mr. Oltmann --

12    A.    -- because at that time I was looking for Antifa

13    journalists, and the whole idea of this call was for

14    Antifa journalists.  It was not to look at the guy that

15    worked for Dominion Voting Systems that would be stealing

16    elections, because I never even thought it was possible.

17    Q.    "I think it is a match but I can't be sure."  Did you

18    try to find any videos of Eric Schussler to see if maybe

19    his voice was a match?

20    A.    No, I wouldn't have done that.  Because why would --

21    the whole thing, it is confirmation bias at the time, and

22    then you go and you then take all of the information you

23    are able to collect and say, does it align with Eric

24    Coomer being on this call with Antifa?  Is he Antifa?  Is

25    he a bad guy?  Is he a good guy?  I mean, what kind of guy

620

1     is this guy?

2          I mean, he runs 50 percent of the vote of the

3     American people --

4     Q.    Okay.

5     A.    -- does he even have the capability of stealing an

6     election?

7     Q.    Mr. Oltmann, we are getting a bit far afield again

8     here.

9     A.    Okay.  I apologize.

10    Q.    Suffice it to say, you didn't make an effort to make

11    any sort of comparison between different potential Erics

12    and "Eric the Dominion guy," did you?

13    A.    I identified who I thought it was, I walked through

14    the process, and at that point I went back to doing what I

15    was doing, which was identifying Antifa journalists.  On

16    October 15, 2020, I literally was on the stage --

17    Q.    That is not the question, Mr. Oltmann.

18    A.    Again, you have to ask the question, how did I end

19    up --

20    Q.    Mr. Oltmann.

21    A.    -- how did I end up on this call?

22    Q.    I am asking --

23         THE COURT:  Gentlemen.  Our court reporter cannot

24    record you all when you are speaking over each other --

25         THE WITNESS:  Sorry.

621

1          THE COURT:  -- so I am going to remind both of you

2     again.  Listen to the question, answer the question,

3     Mr. Oltmann, and it will make things go much smoother.

4     Q.   (BY MR. KLOEWER)  Let's wrap this one up here.  And

5     you have already acknowledged this, I believe, but just to

6     put -- just to wrap this one up, you changed the date on

7     that screen shot, didn't you?

8     A.   I did.

9     Q.   And you submitted it into evidence.

10    A.   I gave it to my attorney, yes.

11    Q.   Okay.  You didn't disclose that you changed the date

12    on that until we asked you about it, did you?

13    A.   Actually, I think that the attorneys and I talked

14    about it about two weeks before the deposition.

15    Q.   You didn't disclose that you had changed the date of

16    that document you submitted into evidence until we asked

17    you about it, did you?

18    A.   I actually don't think that is true.  I am fairly

19    sure -- actually, I know that I am sure that I did talk to

20    counsel about that previous to that.  And there is a lot

21    going on at the time, because during all of this I was

22    literally having to hire personal security detail to

23    protect my family --

24    Q.   Let's go on to talk about --

25    A.   -- 24 hours a day.

1    Q.    -- another topic here.  We've heard a little bit

2    about somebody by the name of Heidi Beedle.  I want to ask

3    you just a couple questions about Ms. Beedle.

4         MR. KLOEWER:  Can we pull up Exhibit 29, please.

5    And if we could scroll down to the second page of this

6    document, second paragraph there beginning with the

7    phrase, "You have all seen the video of Kris Jacks."

8    Q.    (BY MR. KLOEWER)  We are looking back at the email

9    you sent to OAN on November 10th.  And I am going to read

10   this for you here.  It says, "You all have seen the video

11   of Kris Jacks, the Our Revolution Leader in Northern

12   Colorado who called for the beheading of Americans.  If

13   you check out the video from Project Veritas, you will see

14   that he stated they hold a majority of the seats in the

15   democratic party across Colorado.  In a subsequent video,

16   I observed a journalist who has been known for being a

17   rhetoric junkie and Antifa member.  She is a journalist

18   and she is also a Our Revolution leader in Southern

19   Colorado.  She used the systems in the Business Journal

20   and Colorado Springs Independent to gather and dox people

21   in the community.  And this use of gathering intel,

22   infiltrating calls, groups, and collecting information on

23   individuals, we uncovered 13 Antifa journalists across

24   Colorado."

25         You are talking about Heidi Beedle here, aren't

1   you.

2   A.   The "13" or the "Antifa member and rhetoric junkie"?

3   Q.   The "Our Revolution junkie," who is that?

4   A.   I believe I am talking about Heidi Beedle, yes.

5   Q.   Okay.  And I asked you about Ms. Beedle once before.

6        MR. KLOEWER:  Can we pull up Exhibit 22, please.

7   Q.   (BY MR. KLOEWER)  Do you remember this image?

8   A.   I do.

9   Q.   Does this reflect the Project Veritas video you were

10  writing about in that video to OAN?

11  A.   I think so.

12       MR. KLOEWER:  Okay.  Move to admit Exhibit 22.

13       THE COURT:  Any objection?

14       MR. KACHOUROFF:  I have no objection.

15       THE COURT:  So admitted.

16       (Exhibit No. 22 is admitted.)

17       MR. KLOEWER:  All right.  Let's pull that up.

18  Q.   (BY MR. KLOEWER)  You remember I asked you in your

19  deposition to take a look at this image and circle for me

20  Heidi Beedle.  Do you remember that?

21  A.   Yes.

22  Q.   And we see a circle around someone on the screen

23  there.  Do you see that on the right?

24  A.   Yes.

25  Q.   That is who you identified as Heidi Beedle; right?

1    A.    Well, yes.

2    Q.    And it is still your sworn testimony today that that

3    is Heidi Beedle; right?

4    A.    I believed at the time that was Heidi Beedle, yes.

5    Q.    Is it your testimony today that that is Heidi Beedle?

6    A.    I was told that that is not Heidi Beedle.

7    Q.    You were told that is not Heidi Beedle.  But you

8    claim that she was an identified leader of Our Revolution

9    based on this image alone; correct?

10    A.    She actually is the Southern Colorado leader of Our

11    Revolution, and she was, and still is, to the best of my

12    knowledge, the head of Antifa and started Antifa in

13    Colorado Springs.

14    Q.    Your sworn testimony today is that Heidi Beedle is

15    the leader of Our Revolution, a political movement aligned

16    with Bernie Sanders.

17    A.    It is not a political movement aligned with Bernie

18    Sanders.  That is not --

19    Q.    But your testimony is she is a leader of that

20    organization; correct?

21    A.    No.  She was the leader of that organization, and she

22    was the founder of Antifa in Colorado Springs --

23    Q.    And you concluded --

24    A.    -- and she denied that she was the leader of Antifa,

25    and that she didn't start it until she was uncovered by

1    Andy Ngo --

2    Q.    Mr. Oltmann --

3    A.    -- in late 2023.

4    Q.    I am asking the questions here --

5    A.    All right.

6    Q.    -- and we need to get through this.

7    A.    All right.

8    Q.    You identified her as being associated with Our

9    Revolution on the basis of this video; correct?

10   A.    There was more basis than that.

11        MR. KLOEWER:  Let's pull up Exhibit 32 real quick.

12   Q.    (BY MR. KLOEWER)  This is that sworn affidavit we

13   looked at before.  Do you remember that?

14   A.    Yes.

15   Q.    Let's take look at the last paragraph on that first

16   page.  And this is after you are describing the Antifa

17   call.

18   A.    Yes.

19   Q.    You state, "Then I honed in among other conversations

20   key actors in the organization who worked for local and

21   state news publications.  One such person of interest was

22   Heidi Beedle, identified leader of Our Revolution in El

23   Paso County, Colorado."  Do you see that?

24   A.    Yes.

25   Q.    That was your sworn testimony in your sworn

1    affidavit; right?

2    A.    Yes.

3    Q.    You didn't take any steps to confirm that Ms. Beedle

4    was associated with Our Revolution beyond believing that

5    you saw her in that video; isn't that right?

6    A.    Actually, we did.  We did quite a bit.  But getting

7    the information, that wasn't as important for us as the

8    Antifa connection.

9    Q.    Getting that information wasn't more important than

10   providing sworn testimony?

11   A.    No.  We had a very firm belief in understanding that

12   she was a part of that organization, he/she.

13   Q.    While we are on this exhibit, I do have another quick

14   question for you.  If you want to look down at the second

15   page of that document, this is where -- we have been over

16   this dialog a couple of times.  You describe it again

17   here.

18        MR. KLOEWER:  Can you zoom in on the portion that

19   begins with "The conversation went like this."  And

20   ends -- yep, that will do.

21   Q.    (BY MR. KLOEWER)  "The conversation went like this:

22   Someone identified as 'Eric' began to speak.  Someone

23   asked who Eric was, and someone else replied, 'he is the

24   Dominion guy' (paraphrased)."  So this, the identification

25   of "Eric the Dominion guy," that was also a paraphrase;

627

1    right?

2    A.   Yeah.  I don't know who told me to say everything was

3    paraphrased, but somebody stated when we were walking

4    through this to say "paraphrase," because is that his

5    exact words, and I said, I think so.

6    Q.   But you don't know if the anonymous third party who

7    identified the anonymous speaker as "Eric" actually said

8    these words, do you?

9         MR. KACHOUROFF:  Objection, Your Honor.

10        THE WITNESS:  That is not true.

11   Q.   (BY MR. KLOEWER)  But your sworn testimony here is it

12   is a paraphrase --

13        THE COURT:  Wait, wait, there is an objection.

14        MR. KLOEWER:  Sorry.

15        THE COURT:  Counsel, can you approach because I am

16   not quite sure what the objection was.

17        (A bench conference is had.)

18        MR. KACHOUROFF:  He is walking afoul of the Court's

19   last ruling.  He starts to say, "you can't identify."  He

20   never said he can't identify, but then that means he has

21   to assert the privilege again.

22        MR. KLOEWER:  I am talking about the anonymous

23   person who identified him as "Eric," that's not who got

24   him on the call.

25        MR. KACHOUROFF:  The anonymous person who what?

```
 1          MR. KLOEWER:  Who identified him as "Eric," that's
 2    not who got him on the call.
 3          THE COURT:  It is the person, as I understand it,
 4    the person who was on the call who said that.
 5          MR. KACHOUROFF:  I am sorry, my fault, I
 6    misunderstood it.
 7          THE COURT:  Overruled.
 8          (In the hearing of the jury.)
 9    Q.   (BY MR. KLOEWER)  So what were the actual words
10    spoken, Mr. Oltmann?
11    A.   That is pretty close to what was spoken.
12    Q.   What were the actual words?
13    A.   It has been 5 years.
14    Q.   You don't know the words that were spoken, do you?
15    A.   I have a pretty good idea of the words that were
16    spoken.  But, I mean, if you are asking me if this is the
17    exact words, I would probably say no, I don't know if it
18    is the exact words.  But I do know that somebody asked,
19    "Who's Eric?"  And somebody else said, "he is the Dominion
20    guy."
21    Q.   So we don't know -- so by your testimony today, we
22    have two paraphrases.  Number one is the quote that has
23    been attributed to Eric Coomer saying "Trump is not going
24    to win.  I made fucking sure of it."  And number two is
25    the third party identifying the anonymous Eric as the
```

1    Dominion guy?

2    A.    So I know for a fact he used the F word, for a fact,

3    right, and that is why I wrote it down.  So what I wrote

4    down was a little shocking to me that anybody thought that

5    they could adversely affect or push the election one way

6    or another.  I didn't think that was possible, right.  It

7    seemed out of the realm of possibilities that that could

8    even remotely be something that could happen.

9    Q.    That is not my question.  Let's move on, I want to

10   talk about the other participants on this call.  We looked

11   at your notes, and you said before that there were 19

12   people on that call; right?

13   A.    Yes.

14   Q.    And --

15   A.    I don't think all 19 stayed on the entire time, I

16   just think at one point it had 19, so I wrote it down.

17   Q.    But any one of those could conceivably corroborate

18   your claims, couldn't they?

19   A.    A hundred percent.

20   Q.    And so presumably you have made extensive efforts to

21   identify every single member of that call, haven't you?

22   A.    I have.  I actually called Zoom, which we have a Zoom

23   account, and I asked them if they could pull records.  We

24   have a group right now that is directly tied to a

25   government program that is doing an extensive search based

1    on dates, IP addresses.  I am still to this day, 5 years

2    later, looking under every hood to get information about

3    that particular call, yes, a hundred percent.

4    Q.   So it is your testimony today that you have spent a

5    lot of time trying to identify those people.

6    A.   I wanted to get the call, because if you get the

7    call, you get IP address for others.  And there is -- I

8    guess there is a program -- I mean, again, this is above

9    my pay grade, but there are people that are in the

10   government that have the ability, based on our IP, to

11   cross-correlate that IP address with other IP's and other

12   people that were on during that time period.

13   Q.   Let's pull up that deposition transcript that we

14   looked at a couple times.  And do you want to open that up

15   to page 353 for me, Mr. Oltmann.

16   A.   Yes.

17   Q.   We are going to start at line 15.  All right.  This

18   is me asking you a question.  I said, "Oh, I am confused,

19   as well.  I am asking you if you have made any effort to

20   identify anyone who could corroborate your story.  It

21   sounds like there are 18 potential individuals out there.

22   Have you done that?"

23        Your response, "No, I have not."

24        The question, "So in 2 years of dealing with this

25   litigation, which you have described as destroying your

1     life and costing you hundreds of thousands of dollars -- I

2     believe this is representations you have made."

3            You say, "Hundreds of thousands?"

4            I say, "Is that correct?  Is that an accurate

5     assessment?"

6            You respond, "No.  How about millions of dollars."

7            Then question, "So in the 2 years of litigating

8     costs, it has cost you millions of dollars, by your

9     representation, and gotten 24 other defendants sued, and

10    by your repeated statement today, subjected you and your

11    family to bodily harm.  At no point in that time have you

12    ever tried to identify any of the other 18 people who

13    could corroborate your story."

14           You responded, "Have you?"

15           I said, "Yes."

16           The answer is "And?"

17           My question is, "The call did occur, so we don't --

18    we are not able to do that.  The only way we can get there

19    is through you, Mr. Oltmann.  The only way anybody in the

20    world can get facts about this story is through you, and

21    it is surprising to me that you haven't made any effort in

22    two years and all of the turmoil you have described to

23    identify a single other individual who could corroborate

24    that story and, if true, presumably work to" --

25           Here is your counsel, Ms. DeFranco objecting to my

632

1    question.

2    A.    Actually, she didn't object, she said "You are not

3    here to make speeches," because you were indicting my

4    character at that point, so that is not what it says.

5    Q.    (BY MR. KLOEWER)    Sure.    Page 355, first line, "Okay.

6    That's fair.    I understand your testimony to say you've

7    not made any effort to identify the" --

8         And you say, "No.    You've spent the last 2 hours

9    literally just badgering me and pushing conjecture.

10   That's what you spent the last two hours doing."

11        And then my question, "So you haven't been able to

12   identify them; correct?    Is that a yes?    You haven't

13   identified any other members of the call"?

14        And your answer, "I have spent all of my time not

15   doing that.    I have been spending my time on Dominion

16   Voting Systems, ESMS, Smartmatic, making sure that we have

17   enough information to get rid of the voting machines and

18   the mail-in ballots.    That's what I spent my time on."

19        So at least as of December 22nd, you hadn't made

20   any effort to identify those people; right?

21   A.    Well, that is not what you said.    You said, have you

22   made any efforts, so I called Zoom prior to, or as soon as

23   I got sued by Eric Coomer in December of 2021 or 2020.    So

24   since then, I have now dug, because somebody gave me

25   access to people that can dig under the hood and figure

1    out how they can zero in on who else was on that call.

2           I didn't have access to information that would have

3    allowed me to dig into that.  And, frankly, the last 5

4    years have been pretty tough.

5    Q.  Last question, Mr. Oltmann.  You have refused to

6    identify who got you on that call, haven't you?

7           MS. HALL:  Objection, Your Honor.

8           THE COURT:  Sustained.

9    Q.  (BY MR. KLOEWER)  Mr. Oltmann, you won't -- it is not

10   that you won't identify the source, it is that you can't

11   identify the source, isn't it?

12          MS. HALL:  Objection, Your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  It is not true.

15   Q.  (BY MR. KLOEWER)  And you can't identify the source

16   because the whole thing is made up, isn't it, Mr. Oltmann?

17   A.  No.

18          MS. HALL:  Objection, Your Honor.

19          THE COURT:  Counsel approach.

20          (A bench conference is had.)

21          THE COURT:  What is the basis of your objection?

22          MS. HALL:  Your Honor, this is going into the --

23          COURT REPORTER:  Please don't whisper, and speak

24   directly into the microphone.

25          MS. HALL:  Thank you.  I am sorry.

1        This is going the same way on questions that deal

2    with the reporter's privilege.  And if he wants to ask the

3    question, I think the Court needs to go into whether or

4    not a reporter's privilege applies.

5        MR. KACHOUROFF:  Judge, I want to make an

6    objection, that is argumentative.

7        THE COURT:  Any response?

8        MR. KLOEWER:  I am done, Your Honor.

9        THE COURT:  All right.  The objection is overruled.

10       (In the hearing of the jury.)

11       THE COURT:  Overruled.

12       Mr. Kloewer, could you re-ask the question, please.

13   Q.  (BY MR. KLOEWER)  Mr. Oltmann, you can't answer that

14   question because the whole thing is made up, isn't it?

15   A.  No, you are wrong.

16       MR. KLOEWER:  Pass the witness.

17       THE COURT:  Mr. Kachouroff.

18       MR. KACHOUROFF:  Yes, ma'am -- Your Honor, I am

19   sorry.

20       And I am under the weather, I apologize if I have a

21   nasal voice, I have a clogged sinus.

22       Would you put up Exhibit 26 for me, please.

23                    **CROSS-EXAMINATION**

24   **BY MR. KACHOUROFF:**

25   Q.  You were asked about Eric Schussler.

```
 1   A.   Yes.

 2   Q.   Were you looking for a physical therapist?

 3   A.   No.  I don't know how a physical therapist would

 4   adversely affect or be able to make sure that Trump

 5   doesn't win.

 6   Q.   So would you then click on somebody who was a

 7   physical therapist to investigate Eric Coomer?

 8   A.   No.

 9   Q.   Okay.  And would you -- Eric E. Johnson, did you

10   click on that one?

11   A.   No.

12   Q.   Why not?

13   A.   Because how is an attorney going to adversely affect

14   or make it so that Trump didn't win.

15   Q.   Okay.  How many depositions have you done?

16   A.   Total, six.

17   Q.   How many hours have you sat and answered questions?

18   A.   Sixty hours probably, 50 hours.

19   Q.   You were asked by my colleague, "we have to take you

20   at your word" about the article, do you remember that, and

21   you said you could produce the article here today.

22   A.   Yes.

23   Q.   And you are willing to produce it.

24   A.   Yes.

25        MR. KACHOUROFF:  Your Honor, I would like to have
```

 1    Mr. Oltmann --

 2            THE COURT:  Counsel, approach.

 3            (A bench conference is had.)

 4            THE COURT:  All right.  Mr. Kachouroff.

 5            MR. KACHOUROFF:  Ma'am -- I am sorry, Your Honor.

 6            THE COURT:  Go ahead.  What is the basis for him to

 7    produce things today which he should have produced --

 8            MR. KLOEWER:  He should have years ago.

 9            THE COURT:  -- in response to a subpoena.

10            MR. KACHOUROFF:  Not in this case, and he's opened

11    the door.

12            MR. KLOEWER:  The subpoena requested all documents.

13            MR. KACHOUROFF:  He also said he just located it on

14    Wayback Machine just a couple days ago.

15            MR. KLOEWER:  I'm hearing that, Your Honor, but it

16    is too late.

17            THE COURT:  I don't see how this can be admitted in

18    evidence.

19            MR. KACHOUROFF:  I would like to see what he has

20    got.

21            THE COURT:  It is not admissible --

22            MR. KLOEWER:  It is inadmissible.

23            THE COURT:  -- the way that you are presenting it.

24    I don't see any basis for admissibility.

25            MR. KACHOUROFF:  Can we do an in-camera inspection

1    so you can determine whether there is an adequate

2    foundation that I can lay, so that you can determine that

3    it is also authentic.

4          THE COURT:  That is not -- that is not the basis of

5    my concern here.  There is no way to authenticate this

6    document.  So he can say he got it off the internet.

7    There is no one here from whatever to say it is an

8    authentic document.

9          MR. KACHOUROFF:  He does IT.  He can authenticate

10   it from the Wayback Machine.  The standard for

11   admissibility or authentication under 901 is not even a

12   preponderance of the evidence, it is sufficiency to

13   support a finding.

14         THE COURT:  Overruled, Mr. Kachouroff.

15         MR. KACHOUROFF:  For the record, he has his

16   computer here, he could do it today if he wanted to.

17         THE COURT:  You can preserve the objection.

18   Overruled.

19         MR. KACHOUROFF:  Understood.  Thank you, Judge.

20         (In the hearing of the jury.)

21   Q.   (BY MR. KACHOUROFF)  Mr. Oltmann, would you tell

22   us -- there was some indication that this has been a great

23   deal, it has cost you a lot to come out and say the things

24   that you have said; correct?  You have to give me a yes, I

25   am sorry --

1    A.    Yeah.

2    Q.    -- or no, whatever it is.

3          Would you tell us -- you said, I think two days

4    later when you realized what it was going to cost you,

5    let's pick up from there.  What has this cost you, if

6    you'd tell the jury, please.

7          MR. KLOEWER:  Objection, Your Honor, relevance.

8          THE COURT:  Sustained.

9          MR. KACHOUROFF:  Your Honor, it was raised on --

10   okay.  I will move on.

11   Q.    (BY MR. KACHOUROFF)  As a result of coming out with

12   this story, did you have to hire police protection?

13         MR. KLOEWER:  Objection, relevance.

14         THE COURT:  Sustained.  Please approach.

15         (A bench conference is had.)

16         THE COURT:  All right.  Mr. Kachouroff, what is the

17   basis of the relevance of what has happened to

18   Mr. Oltmann?

19         MR. KACHOUROFF:  It's relevant to establishing his

20   credibility; that if he were telling a lie, why would he

21   spend all this money on private security, why would he

22   undergo the threats?  It is just to establish his

23   credibility.

24         THE COURT:  How is whether or not he told a lie as

25   to whether or not he was on this Antifa call and that Eric

1    Coomer is the individual identified in that Antifa call,

2    how is his credibility about that tied to what has

3    happened to him since?

4        MR. KACHOUROFF:  The insinuation is that he's told

5    a lie.  And the relevance is people that tell lies aren't

6    going to spend hundreds of thousands of dollars protecting

7    their family because they came out with a story.  They

8    would either recant or they were telling the truth.  So it

9    is going to bolster his credibility, Your Honor.

10        MR. KLOEWER:  This is all after the fact, Your

11   Honor.  It is whether it was true at the time he told it.

12   Things after the fact have no bearing on whether the story

13   was believable or whatever was true at the time he told

14   it.

15        THE COURT:  Well, whether it was true or he had a

16   substantial basis to believe it; correct?

17        MR. KACHOUROFF:  Correct.

18        THE COURT:  All right.  Sustained.

19        (In the hearing of the jury.)

20   Q.  (BY MR. KACHOUROFF)  Let's pick up with how did you

21   first come across -- why did you start investigating

22   Antifa here in Colorado?

23   A.  I was never political.  I voted for President Obama.

24   I didn't really care about Democrats or Republicans or

25   none of that, wasn't a big thing for me.  2020 hit us all

1    pretty hard with COVID and everything with COVID.  And so

2    I couldn't sit back and watch businesses that I

3    represented burn to the ground.  And the --

4    Q.    Why were they burning to the ground?

5    A.    Well, because they shut down the economy, and so you

6    had small business owners that were committing suicide,

7    you had people that were losing their companies, you had

8    all this stuff that was happening --

9           MR. KLOEWER:  Objection, Your Honor, relevance.

10          THE COURT:  I am going to let Mr. Oltmann finish

11    this sentence.  Overruled.

12          THE WITNESS:  And so --

13    Q.    (BY MR. KACHOUROFF)  Is that what led you to

14    investigate Antifa, you were talking about that.

15    A.    No, I --

16    Q.    Do you need a minute?

17          THE COURT:  All right.  Let's take a quick break.

18          (A break is taken from 4:26 p.m. to 4:34 p.m.)

19          (Outside the presence of the jury.)

20          THE COURT:  Thank you, Mr. Oltmann.

21          Everyone may be seated.

22          Could you bring the jury back in, please.

23          (In the presence of the jury.)

24          THE COURT:  Thank you.  Please be seated.

25          Mr. Oltmann, I remind you, you are still under

1    oath.

2          MR. KACHOUROFF:  Thank you, Your Honor.

3    Q.   (BY MR. KACHOUROFF)   There was entered into evidence

4    an exhibit, Exhibit 32, I believe, which was your

5    affidavit that you executed at some point in time in the

6    last couple of years.  Is that affidavit accurate to the

7    best of your knowledge, recollection, and belief?

8    A.   Yes.

9    Q.   And there was also a discussion of whether Mike --

10   you said Mike could meet you, but then not remember you.

11   A.   Yes.

12   Q.   Is that because he has a lot of people around him?

13   A.   Yes, he does.

14   Q.   A lot of people want to meet him.

15   A.   Yes.  A lot of people take advantage of him.  And,

16   frankly, Mike is his own worst enemy.  Although I told the

17   truth about everything that happened, there is not a part

18   of it that I made up, I didn't embellish it, I didn't add

19   anything to it, I didn't take anything from it --

20         MR. KLOEWER:  Objection, nonresponsive.

21   Q.   (BY MR. KACHOUROFF)  We will get to it.

22         THE COURT:  So, Mr. Oltmann, I am just going to

23   remind you of the same thing.  Mr. Kachouroff is going to

24   ask you questions, you answer the questions, he will ask

25   you follow-up questions.  I know it is not necessarily a

1   natural way of your speaking --

2           THE WITNESS:  Yes.

3           THE COURT:  -- but if you could listen to the

4   question and answer the question, it will make things move

5   a little bit faster.

6           THE WITNESS:  Apologies.

7   Q.   (BY MR. KACHOUROFF)  On direct examination you were

8   asked the question, did you have a conversation with Mike

9   Lindell about your doubts about Eric, and your answer was

10  no.

11  A.   I did not.

12  Q.   Why not?

13  A.   Because I didn't have any doubts.

14  Q.   Tell us, did you just pick Eric out the blue?  How

15  did you come across his name to begin with?

16  A.   No.  You know, it is a process that you go through

17  where you are under attack.  So how it all started, me

18  getting involved with Antifa is that up until the November

19  election of 2020 and I came out, I was the darling of the

20  tech business world, the tech business.

21  Q.   How so?  Can you explain that to us?

22  A.   I am a two time Ernst & Young Entrepreneur of the

23  Year nominee.  I was a finalist in 2020.  And they told me

24  if I would have shut my mouth that I would have won.  And

25  I didn't shut my mouth.  And so it cost me selling my

1    company for hundreds of millions of dollars.

2    Q.    Okay.  So you investigate Antifa sometime in the

3    summer, early fall of 2020.

4    A.    Yes.  So COVID led us to a place where, you know, I

5    watched people burn down.  I had clients that quit.  I had

6    people that were losing their livelihood.

7    Q.    Were you a journalist at this time?

8    A.    I was.

9    Q.    And were you operating a podcast.

10   A.    Yeah.  We had a podcast and we had Conservative

11   Daily, although the whole idea of Conservative Daily

12   wasn't necessarily conservative, it was showing that

13   people on both sides probably have similar ideologies.  So

14   since 2012, we would do things like the military officer

15   down in Mexico that was caught walking across the border

16   and had guns, you know, we got him out.  We petitioned

17   Congress to get him out.

18        We wrote articles about the Navy seaman that was

19   out and was getting his parental rights stolen from him,

20   and so we stopped the judge in that case from going in and

21   taking away his rights.

22        So we did things to kind of empower and give people

23   a voice that normally didn't have a voice.  And so we did

24   that for the --

25   Q.    Was it a small podcast, or did you have -- were you

     1     on other platforms, stations?

     2     A.    Yeah.  We were on Apple podcast, Google podcast,

     3     Spotify, Pandora, iHeartradio --

     4          COURT REPORTER:  Please slow down.

     5          THE WITNESS:  Oh, I'm sorry.  I said that very

     6     quickly.

     7          TuneIn, YouTube.  We were pretty -- were much all

     8     over the place.

     9     Q.    (BY MR. KACHOUROFF)  Going back, I want you to tell

    10     us -- I mean, just after the November election, November

    11     9th, you do your podcast on Dr. Coomer.

    12     A.    So this --

    13     Q.    -- and I am not clear how you came up with --

    14     A.    So the whole idea of being on the Antifa call wasn't

    15     my idea.  I didn't line up to do this, I was doing an FEC

    16     United meeting.

    17     Q.    Let me stop you for a second.  What do you mean by a

    18     "FEC United meeting"?

    19     A.    So during 2020 we had the whole thing with George

    20     Floyd.  And I am a little torn by the whole deal; my dad

    21     is black, my mom is white, my whole family is interracial.

    22     So you know, I had my own feelings about racism and all of

    23     the other stuff you have to deal with.

    24          But I also recognized that you have to deal with

    25     the problem.  Like you can't just go and burn down the

645

1    community.  And since I grew up in the hood, I literally

2    grew up super poor, I just felt like you had to stand up

3    for kids specifically.

4         And so we started hearing all of the things they

5    were doing to children inside the schools, and we started

6    hearing about what --

7         MR. KLOEWER:  Objection, relevance and narrative.

8         THE WITNESS:  All of this goes to --

9         THE COURT:  I think the specific question,

10   Mr. Oltmann, was, "Let me stop you for a second.  What do

11   you mean by a 'FEC United meeting?'"

12        THE WITNESS:  Well, so ma'am, I am getting to that

13   by the fact of why I started FEC United.  And the

14   organization was started on the precipice and which led me

15   to be on that call with Antifa, but I didn't seek it out.

16   I wasn't looking for Antifa at the time.  I was combatting

17   what was happening in the community.  So it is relevant to

18   the reason why we had the organization.

19        THE COURT:  Again, if you can listen to the

20   question that Mr. Kachouroff is asking you, just try to

21   limit your answer to that question and it will make things

22   move a little bit quicker.

23   Q.   (BY MR. KACHOUROFF)  Do you remember the month in

24   2020 you started FEC United?

25   A.   Yeah.  It was in -- I have some FEC United people

1    that are here, but I think it was April or May.

2    Q.    Okay.  Were there Antifa protests/riots going on in

3    Colorado at that time?

4    A.    That started with the Summer of Love, which is right

5    around June, I think, is when -- or end of May, is when

6    that all started.

7    Q.    So, again, I want to try to get to this question.

8    You just didn't come up with a -- did you go to the

9    Dominion site after the general election in 2020 and just

10   randomly pick somebody on their staff and say that is the

11   guy?  Or how do you come up with Dr. Coomer's name, is

12   what I am trying to understand.

13   A.    So somebody approached me at a FEC United meeting and

14   said that he was part of Antifa or was Antifa, and said

15   that "I was, but now I am not."  I am like, "good for

16   you."  And we would have somewhere between 500 and a

17   thousand people that would just show up at these meetings.

18        And the idea was, everyone was just looking for an

19   answer.  It was just crazy.  Do you have the COVID

20   vaccine?  Do you not have the COVID vaccine?  Is it going

21   to help you?  Is it not going to help you?  Do you wear a

22   mask?  Do you not wear a mask?  Nobody was settled on the

23   issue, and everyone in the community was tore apart.

24        So he walks up and he says, "I was Antifa."  And I

25   said, "Good for you."  I shook his hand, and that was it.

```
 1    A couple weeks go by, we have another meeting, and he
 2    shows up again says, hey, I can get you on -- those
 3    journalists that are writing those bad things about you --
 4    because by this time they had written all sorts of
 5    articles about me, which is not normal, and I am going
 6    through the process for Entrepreneur of the Year at the
 7    same time, so it is antipolitical a little bit --
 8    Q.   By the way, let me stop you.  Entrepreneur of the
 9    Year.  So you were business owner at this time.
10    A.   Yes.
11    Q.   Are you still a business owner?
12    A.   Kind of.
13    Q.   All right.  What was the business you owned back
14    then?
15    A.   PIN Business Network.
16    Q.   And what is the purpose of PIN Business Network?
17    A.   We did data.  We were a data company.
18    Q.   For those of us that don't know, what do you mean by
19    "data company"?
20    A.   Using a tool called Prometheus Intelligence
21    Technology, it basically allows us to do creepy things and
22    find out what your PPV is, propensity and probability
23    value; in other words, what you are likely to buy next.
24         So we built this tool that built -- so we have
25    clients all over the country, and we just help mostly SMBs
```

```
 1    and enterprise-level customers create an opportunity where
 2    they can find customers that have a closely related
 3    product to what people are looking for.
 4    Q.   So you know a little bit about tech yourself.
 5    A.   I do.  I am a system architect.
 6    Q.   And do you have formal training?
 7    A.   I probably went to 200 -- I am more of a math guy.
 8    But I didn't follow the traditional, like I am going to
 9    get involved in tech.  I got involved in it then went and
10    took classes everywhere.  I am the guy who just loves to
11    learn.
12    Q.   The podcast you were doing, how long have you been
13    doing the podcast?
14    A.   About 6-and-a-half years I think.
15    Q.   Okay.  So April 2020 you start FEC United and you are
16    doing the podcast then?
17    A.   Yeah.
18    Q.   And you do your investigations.  This phone call that
19    you had, was it an Antifa call, a BLM call, does it matter
20    to you which one it was?
21    A.   It does.  And I say Antifa call because the person
22    that started all this stuff, started writing bad stuff
23    about me is a part of Antifa, and then denied that she was
24    a part of Antifa, but then later, 2 years later in 2023,
25    had to admit that she was a part of Antifa.
```

649

1    Q.    You are referring to Heidi Beedle.

2    A.    Yeah.  She thought it was acceptable to kill people.

3    I mean, that was crazy.  So I had some interest in the

4    call because why wouldn't I get on a call if I could

5    identify these Antifa journalists?  But what they are

6    saying -- and they skipped over this part, and it is

7    important, and that is in October, on October 15th --

8    Q.    What happened on that date?

9    A.    -- I had a meeting at Bandimere Speedway, there was

10   about 500, 600 people there, and we talked about the fact

11   that we had infiltrated Antifa; right.  So nobody was

12   talking about elections, it was a pretty tense

13   environment.

14         But, you know, I said that I had infiltrated

15   Antifa.  I know that they are not journalists, they are

16   Antifa journalists.

17   Q.    And you were referring back to the September phone

18   call that you were on?

19   A.    Yes.  Yes.  And we had one journalist that showed up

20   there that was a part of the Colorado Times Recorder, Erik

21   Maulbetsch, and we kicked him out of the meeting because

22   he had written all these bad things about us and, yeah.

23   Q.    Do you know if the plaintiff's lawyers ever tried to

24   depose any of the people that were at this Bandimere

25   Speedway?

 1    A.    They did not.

 2    Q.    Did they ever try to depose Erik Maulbetsch to see if

 3    he was kicked out of a meeting?

 4    A.    I don't think so.  I don't know.  But John Tiegen,

 5    who is the guy that was 13 hours Benghazi, was on the

 6    roof, saved all of the Americans that were below, and

 7    watched two of his friends die on the roof, he was the one

 8    that was supposed to be on the call with me, and he ran an

 9    organization that basically kept the communities safe, and

10    stopped them from going into communities and burning it

11    down.

12    Q.    Why wasn't he on the call with you?

13    A.    He was traveling out of town to go speak at a

14    meeting.  He does speaking engagements all over the

15    country.

16    Q.    And he is willing to give an affidavit to plaintiff.

17    A.    He did give an affidavit to the plaintiff.

18    Q.    Okay.  And did the affidavit support what you were

19    saying?

20    A.    A hundred percent.

21            MR. KLOEWER:  Objection, Your Honor, hearsay.

22            THE COURT:  Sustained.

23            MR. KACHOUROFF:  Okay, Your Honor, except I never

24    asked for hearsay, I just asked whether --

25            THE COURT:  Mr. Kachouroff.

651

1    Q.    (BY MR. KACHOUROFF)   Mr. Oltmann, you know that

2    Mr. Lindell has never repeated your story directly, has

3    he?

4    A.    He has not.

5    Q.    He has never publicly come out and endorsed you.

6    A.    He has not.

7    Q.    You gave, on May 3, 2021, an interview to Brannon

8    Howse.

9    A.    Yes.

10    Q.    He wasn't there for the interview.

11    A.    I don't recall.

12    Q.    As far as you know, he didn't call you and say, hey,

13    hey, Joe, would you tell your story on Brannon's

14    interview.

15    A.    No, he did not do that.

16    Q.    Moving forward to the Cyber Symposium of August 12th,

17    can you tell this jury, that is the last day of the Cyber

18    Symposium.

19    A.    I am sorry, say that again.

20    Q.    August 12th of 2021 was the last day of the Cyber

21    Symposium.

22    A.    Yes.  I believe so, yes.

23    Q.    Was a little chaotic in there?

24    A.    It was very chaotic.

25    Q.    Did Mr. Lindell say, take the stage and tell your

652

1    story?

2    A.    No.  He had people all around him that were basically

3    grifting him in ways that I can't even imagine.  And Mike

4    has a problem with -- he just loves people.

5    Q.    Did he ask -- as far as you know, did he even know

6    you were going on stage on August 12th?

7    A.    No.

8    Q.    Were you scheduled to go on stage on August 12th?

9    A.    No, I was not.  I was never scheduled to go on stage

10   at all, but when I showed up I could see that they were

11   running a con on him, and that this Dennis Montgomery guy

12   said that there were PCAPs and magic people coming from

13   Mars that were beaming stuff down through China.  It is

14   all BS.  It is a lie.  And he grabbed onto it hook, line,

15   and sinker, like he just believed it, because he was so

16   committed to what he could see, which was the election

17   fraud, that he just -- when people brought him stuff, he

18   just believed it, it was --

19   Q.    There were a lot of experts at the Cyber Symposium,

20   would you agree with that?

21   A.    Yes.

22   Q.    Can you name a few?

23   A.    Harri Hursti was there.

24   Q.    Did you talk to Harri Hursti?

25   A.    I did.

1    Q.   And what was your impression of him?

2    A.   He is a smart guy.  He is a smart guy.  They had a

3    bunch of people, they had probably 20 people in a room

4    that were supposed to be looking at PCAPs, but the PCAPs

5    were BS, so they didn't exist.

6         Sorry, they don't exist.  He just got grifted for

7    millions of dollars pursuing something that doesn't exist.

8    Q.   But he didn't tell you to go on stage on August 12th

9    and say anything about Dr. Coomer.

10   A.   No.  No, not at all.

11   Q.   And you know David Clements; right?

12   A.   Yes.

13   Q.   And he never told David Clements to go on stage and

14   interview you and say things about Dr. Coomer.

15   A.   No.  Mike was focused, the best I can remember, was

16   focused on the PCAP story and making sure to get PCAPs to

17   the other people.  And I found myself right in the

18   middle -- like I am a CEO of a company.  I have a lot of

19   people that work for me.  I can smell garbage from a mile

20   away, and it was absolute garbage.

21        And, sorry, Mike, but that is just the truth.  And

22   I told him this at the beginning.

23   Q.   You know he disagrees with you.

24   A.   He absolutely disagrees with me.

25   Q.   And you know he has other people that have told him

654

1   that the PCAP data is legitimate.

2   A.    Yeah, and these are all people that he has had to pay

3   money to them.  These are not people that really are

4   legitimate people that understand the full concept behind

5   what went on in 2020 election.  I have a whole file full,

6   they said I saw an expose that said there was no election

7   fraud.  I literally have experts; you know, Walter

8   Daugherity.

9   Q.    You know he knows Walter Daugherity; right?

10  A.    Yeah, he does.

11  Q.    You don't think Walter Daugherity is fraudulent.

12  A.    Absolutely not.  He is absolutely legitimate, but he

13  also believes the PCAP are garbage.

14  Q.    Okay.  What evidence did you have to support all the

15  claims about the voting machines?

16  A.    So, prior to January 6, I went to Washington -- I was

17  asked to come to Washington.  I read the entire Democracy

18  Suite manuals, I got all of the RFPs.

19  Q.    What is Democracy Suite?  Tell the jury what that is.

20  A.    Democracy Suite are the manuals for how Dominion

21  works in different states.

22         MR. KLOEWER:  Objection, Your Honor, 702.

23         THE COURT:  I am going to allow a little bit of

24  this.

25         MR. KACHOUROFF:  I am not going to go in-depth.

1    Q.    (BY MR. KACHOUROFF)  Give us a brief description of

2    what that is in your mind.

3    A.    So that is the manuals for Dominion Voting Systems,

4    that runs -- every state has election software, and that

5    election software, it is what they use.  So they use

6    tabulators.  Do they have a --

7    Q.    Well, not every state uses Dominion Voting Systems;

8    correct?

9    A.    Yeah.  So give or take 50 percent of the voting

10   American people go through a Dominion Voting Systems in

11   the country.

12   Q.    You also mentioned RFPs.  What is an RFP?

13   A.    A request for proposal.  Any time they go into a

14   government contract they have --

15   Q.    I want to back up because this is cardboard -- what I

16   call eating cardboard.

17          But so Dominion contracts with the government

18   exclusively, as far as you know.

19   A.    Yes.

20   Q.    And the government says, we want you to give us a

21   proposal, and you are calling that an RFP.

22   A.    Yeah.  So they have a request for proposal and they

23   fill it out, and then you have -- basically you fill that

24   out and send it back to the government, and at that point

25   you go in, you do a presentation.  So you will present to

1    the government, or whatever the entity is, about the --

2    what Dominion has the ability to do, what gap it fills.

3          MR. KLOEWER:  Objection, lacks personal knowledge.

4          THE COURT:  Sustained.

5          THE WITNESS:  I don't lack personal knowledge.

6    Q.   (BY MR. KACHOUROFF)  Let's just talk about it.  What

7    is your basis -- do you have any prior experience working

8    with requests for proposal?

9    A.   Yes.  Yes.

10   Q.   And what is that history?

11   A.   I have CAGE codes and I have done prime contracts for

12   governments.  At one point I stepped in when my friend had

13   to step out of his company.

14   Q.   So you have been a government contractor yourself?

15   A.   Not a government contractor, me being a contractor,

16   but I have been a contractor, meaning my company was a

17   contractor.

18   Q.   Okay.  That is what I meant.  I am sorry.

19   A.   Yes.

20   Q.   So that is part of the stuff you reviewed to look at

21   all of the election claims.

22   A.   Yeah.  So I have written white papers overseas that

23   have been presented to the UN.  I have done a whole lot of

24   crazy stuff.  And so it is not like I have no

25   understanding of system architecture, but I was asked to

657

1    look into it, and when I got sued -- first, it is okay to

2    say the stuff about Eric, and I can see that correlation,

3    but can Dominion actually steal an election?  That is the

4    next step.

5    Q.   Let me stop you.  Do you think Dr. Coomer rigged or

6    stole the election himself?

7    A.   No, I believe --

8    Q.   Do you have any suggestion he did it at all?

9    A.   There was a lot of evidence in a federal case out of

10   Washington, D.C. where Patrick --

11        MR. KLOEWER:  Objection, Your Honor.

12   Q.   MR. KACHOUROFF:  Do you personally have any evidence

13   to suggest that Dr. Coomer single-handedly stole the

14   election?

15   A.   Well, he couldn't have single-handedly done it.

16   Q.   But you have no evidence to know whether he was

17   engaged in hyperbole.  If it was him on the call, could it

18   have been hyperbole from him?

19   A.   Yes.  And he is a hyperbolic guy by his own

20   reputation.

21   Q.   Do you think he is a genius, let me ask that?

22   A.   I absolutely think he is a genius.

23   Q.   Do you have respect for that academic prowess that he

24   has?

25   A.   I think I know quite a bit about Eric Coomer, I do,

1    yeah.

2    Q.   Do you have any animus against Dr. Coomer?

3    A.   I don't.

4    Q.   What other evidence have you relied upon to support

5    your claims about election fraud?

6    A.   Well, I wrote a model that went to Washington on

7    January --

8          MR. KLOEWER:  Objection, Your Honor, 702.

9          THE COURT:  Sustained.

10         MR. KACHOUROFF:  Your Honor, I am not asking for

11   his opinion, I am asking what he relied upon to

12   investigate his claim.

13         THE COURT:  Mr. Kachouroff, no speaking objections.

14         MR. KACHOUROFF:  I am sorry.  I apologize.

15         THE COURT:  If you would like to approach, you may

16   ask to approach.  So let's go ahead and approach.

17         MR. KACHOUROFF:  May I approach?

18         (A bench conference is had.)

19         THE COURT:  I understand, Mr. Kachouroff, that you

20   do not have control over this witness.  He seemed like he

21   was about to start talking about some model he was writing

22   giving some opinion based on his professional experiences

23   outside the province of a lay person.  That is why I

24   stopped you.

25         MR. KACHOUROFF:  Right.  He really has enough

1    computer experience that he's testified to as a system

2    architect.

3            THE COURT:  Right.  He has not been qualified as an

4    expert.  He has not been designated as --

5            MR. KACHOUROFF:  Allow me to finish what I was

6    saying, Your Honor.  The issue here in this case is the

7    reason for these people's beliefs.  And so by me asking

8    what he relied upon, I'm establishing whether his belief

9    was reasonable; that he didn't just concoct these

10    opinions --

11           THE COURT:  Isn't the issue whether or not he had

12    sufficient evidence of Dr. Coomer being on this call and

13    saying that he heard that Dr. Coomer said on this Antifa

14    call, don't worry about it, I F'ing -- Trump won't win.  I

15    F'ing -- he fixed it, or whatever the phrase is.

16           So whether or not he believes that there is a

17    capability that fraud can occur, how is that pertaining to

18    whether or not he said that with sufficient knowledge?

19           MR. KACHOUROFF:  You are limiting me to the scope

20    of direct, and the problem with that is, I only get to

21    call him one time, and so I also have a case-in-chief, and

22    my case-in-chief has to also establish the reasonableness

23    of the beliefs.  And that is why if I was -- if I can't

24    call him -- I will stick within the scope of direct and be

25    done, but then I can't call him back for my case,

1    following your order.

2        MR. KLOEWER:  Your Honor, these are all after the

3    fact.  Things he came up with months or years later don't

4    provide any evidence to support whether his story was true

5    in the first instance.  That's the whole point.  It is not

6    relevant to whether he was on that call, whether he said

7    those things, whether his claims are true.  If he came up

8    with a theory afterwards, that doesn't mean that his

9    beliefs at the time were reasonable.

10        MR. KACHOUROFF:  We are like two ships passing in

11    the night.  I understand the concept about the phone call,

12    and I would agree with you if that is what I was doing.

13    But I also have to get reasonableness of their beliefs,

14    and that is what the case is about; it is a first

15    amendment case on actual malice, right; did he believe at

16    the time that they did these things, did they engage in

17    reckless disregard.

18        THE COURT:  Right.  But at the time he made the

19    statements.

20        MR. KACHOUROFF:  I will clarify the scope, but that

21    wasn't the objection.  So I will clarify that scope.

22        THE COURT:  That he didn't start investigating

23    Dominion until after the call.  So how could he be relying

24    on information that he gathered after the call after -- to

25    substantiate -- I guess I just need a better timeline,

1    because I am not tracking.

2        MR. DUANE:  Could I confer with him?

3        THE COURT:  You can confer, but you cannot argue.

4        MR. DUANE:  Just one second.

5        MR. KACHOUROFF:  Thank you.

6        MR. KLOEWER:  I want to note, Mr. Oltmann is

7    flipping through the exhibit notebook right now.

8        THE COURT:  He should also not do that.

9        MR. KACHOUROFF:  This entire case is more than just

10   the phone call -- at that time, what he knew of the phone

11   call.  I get that that is their case, but my case is also

12   addressing that, plus addressing all of the other issues

13   and all other statements all the way around, including the

14   Cyber Symposium, which they are going to have experts on;

15   they already did, Harri Hursti, calling the whole thing

16   "BS," all this kind of stuff.  That is what he said, his

17   words were "BS."

18       In fact, he is calling it that, as well.  So now we

19   have the whole -- I was trying to stay out of the election

20   controversy.  I never really thought this case was about

21   the election controversy, it should have been about

22   whether Mr. Lindell endorsed Mr. Oltmann's statements, but

23   we have gone far afield of that.

24       So now I have to address the reasonableness of

25   these people's belief at the Cyber Symposium, everywhere.

662

1    So I don't think my questions are out of bounds, and I

2    wasn't planning to go a whole long time on it.  I don't

3    find this topic very interesting to begin with, Judge.

4         THE COURT:  Well, why don't we take a recess, I

5    will take it under advisement and think about it, and I

6    will issue a ruling tomorrow morning before trial starts.

7         MR. KACHOUROFF:  Okay.  Thank you.

8         (In the hearing of the jury.)

9         THE COURT:  All right.  Ladies and gentlemen of the

10   jury, it is 5 o'clock I have some issues to consider that

11   you do not need to sit and watch me consider, so I am

12   going to release for you this evening.  Just be back by

13   8:45 in the morning.  We will start again at as close to

14   9:00 as we can.

15        I give you your normal admonitions, do not talk

16   about anything about this trial to other people, do not

17   talk amongst yourselves.  I hope you have a lovely

18   evening.

19        (Outside the presence of the jury.)

20        THE COURT:  Thank you.  Please be seated.

21        All right.  Other than the issue we talked about at

22   side bar, counsel, is there anything else that you believe

23   we are going to need to address tomorrow morning or right

24   now?

25        MS. DEMASTER:  Your Honor, yes, one thing other

1    than what we had discussed this morning which we will

2    confer on tonight.

3         One thing was brought to our attention recently,

4    there are several local media outlets that are publishing

5    about this, and that is fine, they are posting details

6    about testimony, and it is not about this, it is the First

7    Amendment, and we are the last ones that want to go

8    against this.  And I know this Court provided preliminary

9    jury instructions, but these articles are all heavily very

10   slanted towards plaintiff and plaintiff's legal team and

11   plaintiff's legal case, even providing factual conclusions

12   that defendants' statements are false.  So they are very

13   misleading.

14        We know the Court has the preliminary instructions

15   for the jury, but we are only asking if the Court could

16   perhaps remind the jurors tomorrow just in general, not of

17   the preliminary instructions, just do not listen to any

18   media stories right now.

19        THE COURT:  I am happy to remind them that they

20   should not be talking to each other or anyone else about

21   this trial, they should not be deliberating about the

22   outcome, they should not be searching for media.  That was

23   my concern that I addressed with Mr. Lindell earlier about

24   their feed.  And so I am happy to reinstruct them and

25   remind them of their obligations.

1          MS. DEMASTER:  Thank you, Your Honor.

2          THE COURT:  Anything else?

3          All right.  We will resume tomorrow morning at 8:30

4     with the attorneys.

5          Ms. Hall, did you have anything?

6          MS. HALL:  No, I apologize, Your Honor.

7          THE COURT:  Thank you very much, we will be in

8     recess.

9          (Proceedings conclude at 5:03 p.m.)

10

11          R E P O R T E R ' S   C E R T I F I C A T E

12

13          I, Darlene M. Martinez, Official Certified

14     Shorthand Reporter for the United States District Court,

15     District of Colorado, do hereby certify that the foregoing

16     is a true and accurate transcript of the proceedings had

17     as taken stenographically by me at the time and place

18     aforementioned.

19

20          Dated this 3rd day of August, 2025.

21

22

23          _____

24          s/Darlene M. Martinez

25          RMR, CRR