UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER,

Plaintiff,

v.

MICHAEL J. LINDELL;
FRANKSPEECH, LLC; and
MY PILLOW, INC.,

Defendants.

_____

REPORTER'S TRANSCRIPT
(JURY TRIAL - DAY 5)
_____

        Proceedings before the HONORABLE NINA Y. WANG,
Judge, United States District Court, for the District of
Colorado, commencing at 8:37 a.m. on the 6th day of June,
2025, Alfred A. Arraj United States Courthouse, Denver,
Colorado.

A P P E A R A N C E S

FOR THE PLAINTIFF:
DAVID MATTHEW BELLER, Recht & Kornfeld, P.C., 1600 Stout
Street, Suite 1400, Denver, CO 80202
CHARLES JOSEPH CAIN, BRADLEY ADAM KLOEWER, Cain &
Skarnulis PLLC, P. O. Box 1064, Salida, CO 81201
ASHLEY N. MORGAN, Cain & Skarnulis PLLC, 303 Colorado
Street, Suite 2850, Austin, TX 78701

FOR THE DEFENDANTS:
JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite
610, Grafton, WI 53024
JAMES JOSEPH DUANE, Regent University School of Law, 1000
Regent University Drive, Robertson Hall Room 353B,
Virginia Beach, VA 23464
CHRISTOPHER I. KACHOUROFF, Dominion Law Center PC, 13649
Office Place, Suite 101, Woodbridge, VA 2219

# I N D E X

**WITNESSES:**                                                              **PAGE**

### JOE OLTMANN

CROSS-EXAMINATION (Cont'd) BY MR. KACHOUROFF            687
REDIRECT EXAMINATION BY MR. KLOEWER                     742
RECROSS-EXAMINATION BY MR. KACHOUROFF                   752
                                                        753

**MAX MCGUIRE - Video Deposition**

### HEIDI BEEDLE

DIRECT EXAMINATION BY MR. KLOEWER                       754
CROSS-EXAMINATION BY MR. KACHOUROFF                     766
REDIRECT EXAMINATION BY MR. KLOEWER                     776

### KURT OLSEN

DIRECT EXAMINATION BY MR. KLOEWER                       780
CROSS-EXAMINATION BY MR. KACHOUROFF                     803
REDIRECT EXAMINATION BY MR. KLOEWER                     820
                                                        824

**JOSHUA MERRITT - Video Deposition**

# E X H I B I T S

**NO.**                                                              **ADMITTED**

57    ........................................    781
61    ........................................    785
66    ........................................    790
86    ........................................    796
191   ........................................    798
197   ........................................    799
216   ........................................    752
218   ........................................    801
266   ........................................    717
267

**No.**                                                              **REFUSED**

49    ........................................    789

1                        **JUNE 6, 2025**

2              (Outside the presence of the jury.)

3              THE COURT:  Thank you.  Please be seated.

4              On the record in 22cv1129-NYW-SBP, Coomer v.

5        Lindell, et al.

6              Could I have appearances of counsel, and introduce

7        anybody at the table with you.

8              MR. CAIN:  Good morning, Your Honor, same lineup,

9        Charlie Cain, Brad Kloewer, David Beller, and Ashley

10       Morgan, with Dr. Coomer.

11             MR. KACHOUROFF:  Good morning, Your Honor, Chris

12       Kachouroff, Jennifer DeMaster, James Duane, and not yet,

13       Mike Lindell, who will be here in a few minutes.

14             THE COURT:  Please be seated.

15             MR. KACHOUROFF:  Your Honor, I have a few

16       preliminary things I want to add on to what I said

17       yesterday, not much but very brief.

18             THE COURT:  All right.

19             MR. KACHOUROFF:  At close of our business

20       yesterday, we made our argument to you very quickly, and I

21       want to take just a few minutes to recapture those for you

22       to ensure I explained our position.  Plaintiff has alleged

23       ten defamatory statements, intentional infliction of

24       emotional distress, and conspiracy, all based on Mike

25       Lindell's statements about voting machines.

1           Those statements initially ranged from a date of

2     apparently May 3, 2021, to the present, which they now

3     have expanded well before that date, and they have now

4     expanded to the present day, and that is what they have

5     introduced in this case.

6           In so doing, they are not only arguing over the

7     Antifa and BLM call that we talked about at the bench,

8     they are arguing whether there was fraud in the 2020

9     election.  So there are two things at issue for us;

10    whether Eric Coomer was on a phone call, the factual

11    stuff, and/or whether a phone call even occurred, quite

12    frankly; and it is also that one of our clients is being

13    accused of reckless intentional conduct.

14          So witnesses were put forward to say that

15    Mr. Lindell had not apologized.  As someone who has a

16    belief that they have done nothing wrong, need not

17    apologize.  But because of this impact, the witnesses must

18    be given an opportunity to state what their beliefs are,

19    state the basis for their beliefs, and explain how they

20    came to those beliefs.

21          And so the ultimate issue in this case, what the

22    jury is going to decide, is whether the statements that

23    they allege were true, and that he believed that they were

24    true at the time that he made them, or he acted with

25    reckless disregard to their truth or falsity.

 1              And that is why the Court has been so generous with

 2      plaintiff's witnesses who are allowed to testify for hours

 3      about why defendants know this is what propagated falsity

 4      about the basis for why the machines shouldn't be melted

 5      down.

 6              The jury has heard this testimony from Mr. Coomer,

 7      from Mr. Hursti, from Matt Crane, who was not an expert

 8      witness but who was allowed to testify about government

 9      categories of speech; disinformation, misinformation, and

10      malinformation, and this was over our objections, Your

11      Honor.

12              And so after all of the testimony you have allowed

13      in about the Cyber Symposium and the clips played about

14      Joe Oltmann, I am asking the Court to give us a little

15      latitude to explain why our clients and witnesses said the

16      things that they did at the time they said them.

17              And if the Court is concerned that the testimony

18      sounds like expert opinion testimony, I assure the Court

19      it is not.  I believe the Court can easily obviate the

20      concern with a limiting instruction.  Thank you.

21              THE COURT:  All right.  Anything further from

22      plaintiff on this issue?

23              MR. KLOEWER:  Sure, Your Honor, a couple things.

24      As we addressed yesterday, the issue is whether the story

25      about Dr. Coomer participating on an Antifa call, whether

1    it was true at the time when it was stated and whether

2    there was valid basis to believe that it was true.

3         Anything that happened subsequent to those events

4    that was, frankly, probably conducted in an effort to

5    justify those beliefs in the first instance, is not

6    relevant to whether they were plausible at the time when

7    the alleged events occurred.

8         So with the focus on the credibility as a basis for

9    the beliefs, it needs to be with respect to the time that

10   the claims about the Antifa call occurred.  So we think

11   the focus should be there.

12        Also, the defendants, it is their state of mind

13   that is relevant here with respect to whether it was

14   plausible or not to believe these claims.  So I think we

15   addressed this yesterday more thoroughly.  I don't think

16   statements by Mr. Kachouroff this morning alter the

17   discussion of the argument we had on these matters.

18        THE COURT:  All right.  So the first issue pending

19   before the Court is whether or not defense witnesses,

20   including Mr. Oltmann, will be able to testify about the

21   basis of their opinions that the 2020 election was subject

22   to fraud or some sort of tampering.

23        Defendants argue that the plaintiff has been given

24   latitude with respect to that type of information because

25   the theory of defamation and intentional infliction of

1    emotional distress has been expanded by plaintiff through

2    the plaintiff's presentation of direct testimony.

3         This Court respectfully disagrees that the scope of

4    testimony has expanded the core allegations in this case

5    that the defamation arose from Dr. Coomer's connection

6    with any sort of fraud or tampering of the election.  To

7    the contrary, both the final pretrial order and the

8    evidence that this Court has allowed on direct evidence

9    has to do with the statements that were made either at the

10   Cyber Symposium or on other platforms associated with

11   Mr. Lindell or with Mr. Lindell himself.

12        And, in addition, the Court's ability to police or

13   weigh the probative value of some of this evidence has had

14   to be made during realtime.  I will say, however, I am

15   going to give a little bit of latitude with respect to

16   these witnesses, including Mr. Oltmann, to testify about

17   general information or the basis of their research as to

18   fraud that is caused or connected to Dr. Coomer.

19        That has really been the scope that the Court has

20   allowed in direct testimony, whether or not it is

21   information about generally how the systems work, because

22   one of the allegations with respect to the defamation

23   claim is that on May 9, 2021, Mr. Lindell appeared in an

24   interview that appeared on Frankspeech where he made the

25   following statement, "It is over Dominion.  It is too late

1    to close the gate.  The cows are out of the barn.

2    Dominion, you did your best and Smartmatic to take our

3    country through China.  You did your best to corrupt

4    people.  You tried to suppress our voice.  You did it but

5    you failed.  And I am telling you Coomers of the world,

6    what's his name -- Eric Coomer.  If I'm you right now I am

7    instead of going over and making deals at Newsmax, if I am

8    you I am turning myself in and turning in the whole

9    operation so maybe just maybe that you get immunity and

10    only get to do, I don't know, 10, 20 years."

11        So that's really been the basis for me to allow

12    some additional testimony about the systems, themselves.

13    As we all know, I don't think it actually pertains to the

14    actual malice, because as plaintiff's counsel points out,

15    actual malice deals with the state of mind of these

16    individual defendants, not the state of mind of

17    Mr. Oltmann.  And Mr. Oltmann has testified clearly that

18    he did not tell Mr. Lindell the basis of his opinions.

19        However, as we all know, falsity or truth is an

20    element of defense in terms of any defamation claims.  And

21    to the extent that the defendants have not abandoned a

22    truthfulness claim, this type of evidence will be

23    permitted in a limited form.

24        But let me be very clear with respect to my ruling,

25    this is not a ruling with respect to general alleged

1    election fraud in the 2020 election, it is only evidence

2    that can be sufficiently tied and given a nexus to either

3    Dominion Voting Systems and Dr. Coomer, as alleged, or

4    stated in these various alleged defamatory statements.

5    Does that make sense to everyone?

6         MR. KACHOUROFF:  Yes, Your Honor.

7         THE COURT:  So, Mr. Kloewer, I would expect that if

8    you think it is going out of that scope, you would make an

9    objection.

10         MR. KLOEWER:  Certainly, Your Honor.  On that note,

11    multiple times yesterday we raised 702 objections.

12         THE COURT:  Those will also be entertained.

13         MR. KLOEWER:  Okay.  Thank you.

14         THE COURT:  All right.  I also understand there is

15    a second issue that defense counsel contacted chambers

16    about, the email around 11:45 p.m. last night.

17         MS. DEMASTER:  Yes, Your Honor.  Would you prefer I

18    go to -- yes, Your Honor, there is an issue with one of

19    the witnesses for both sides, for plaintiff and defense

20    counsel, Max McGuire has flown to be here.  Now, the issue

21    that was raised is that he has been listed on both

22    parties' witness lists since the parties' initial pretrial

23    motions, including the final pretrial order.

24         And we were -- we hadn't heard from Mr. McGuire

25    when the Court asked us to have the notice of deposition

1    testimony, we hadn't confirmed the date he would arrive,

2    and that was confirmed yesterday around 5:00 p.m.  He did

3    take an airplane to be here and is here in person ready to

4    testify.

5         We reached out and conferred with plaintiff's

6    counsel.  They have declined the invitation to engage in

7    that.  But as of May 29, 2025, as of last week,

8    Mr. McGuire was listed on our in-person testimony list,

9    and the defendants have taken lots of step to ensure that

10   witnesses will be here, some of which are also on

11   plaintiff's witness list.

12        And we can see today that both Mr. McGuire, and in

13   a few hours, Kurt Olsen, will be here in person.

14        THE COURT:  All right.  Let me hear from

15   plaintiff's counsel.

16        MS. MORGAN:  Good morning, Your Honor.  We are

17   opposed for a number of reasons.  We believe that putting

18   Mr. McGuire on live is inefficient at best and

19   gamesmanship at worse.  And I don't say that lightly, but

20   I want to give some context, and part of this will relate

21   to another issue, which is Mr. Montgomery's deposition

22   designations, so permit me a little bit to go into the

23   background.

24        But the Court's Pretrial Order, Docket 265, on

25   October 2, 2024, gave some deadlines for designations and

1    counter-designations.  Designations were due on March 3rd,

2    counter-designations were due on March 10th.  There were

3    no designations or counter-designations for Mr. McGuire.

4         Last night, when we gave our witness list for today

5    to defense counsel at 6:00 p.m., and gave them the list of

6    the witnesses, they did not say anything about Mr. McGuire

7    coming in live today, despite defense counsel's

8    representation to the Court in their nearly midnight email

9    last night saying that they knew around 5:00 p.m. that

10   Mr. McGuire was going to be appearing.

11        We made multiple efforts to confer with defense

12   counsel about which witnesses would be appearing live at

13   trial, including multiple email strands, which I have here

14   with me to the extent we need to get into them, from May

15   21, May 25, May 29, that all indicate that the only

16   witnesses they were working on travel arrangements for

17   would be Howse and Olsen.

18        Nothing was said about Mr. McGuire may be coming

19   in, may be flying in today.  So we, to the extent we are

20   able to make decisions about which witnesses to put on and

21   how to present our case to the jury, have made decisions

22   in reliance on the understanding that, as we represented

23   to the Court in our May 29th filing, that joint notice

24   regarding trial witnesses, that Mr. McGuire would be

25   appearing via deposition.

1          His deposition tape is about 25 minutes long.  We

2    have made decisions about how long to put on witnesses

3    that have already testified, and what content to include

4    with those witnesses in reliance on the joint

5    representations we made to the Court about who would be

6    appearing live.

7          The other relevant factor, as far as my claim of

8    potential gamesmanship, is that last night, when we gave

9    our witness list, defense counsel represented that they

10   were not prepared for Mr. Lindell to testify today.  So I

11   believe that this is an attempt to delay things today to

12   make it so that Mr. Lindell does not go on the stand, and

13   that's problematic.

14         Under Federal Rule of Evidence 611, the Court has

15   discretion to exercise control over the mode and order of

16   examining witnesses and presenting evidence.  And some of

17   the things to consider with that are making sure the

18   procedure is effective for determining the truth, and not

19   just wasting my time, Your Honor, but the Court's time in

20   deciding on the designations and the objections to the

21   designations, but most importantly the jury's time,

22   because we are delaying getting them here to hear evidence

23   today to talk about this issue when we shouldn't have.

24         Federal Rule of Civil Procedure 32 permits the use

25   of deposition testimony at trial.  I will represent to the

 1    Court that I did a search, and I couldn't find any binding

 2    case law that specifically addresses this issue, but I

 3    would point the Court to the case law that we cited in our

 4    motion to strike their designation of entire deposition

 5    transcripts, not including Mr. McGuire's, and that would

 6    be *Commodities Futures Trading Communication v. Brockbank*,

 7    at 316 Fed. Appx. 707, 713-14, that is a Tenth Circuit

 8    case from 2008, where the Court found that the trial court

 9    did not abuse its discretion to impose sanctions against a

10    party who failed to obey a scheduling or pretrial order,

11    and the Court ultimately prohibited that party from

12    presenting a witness or exhibit at trial because they did

13    not timely file their witness or exhibit list.

14         So the Court is well within its discretion to

15    disallow the defense from putting on testimony from

16    Mr. McGuire when they didn't designate any part of his

17    deposition, and failed to tell anyone that he was going to

18    be coming live until the middle of trial.  So that is the

19    reason that I am opposed, Your Honor.

20         I'd also note that we didn't find out that

21    Mr. McGuire might be live today until nearly 8 o'clock, so

22    about two hours after we sent our witness list to the

23    other side, three hours after they represented to the

24    Court they knew he was coming.  So that is the reason I am

25    opposed, Your Honor.

1          THE COURT:  Thank you.

2          MS. DEMASTER:  May I briefly respond, Your Honor?

3          THE COURT:  You may.

4          MS. DEMASTER:  With respect, Your Honor, we don't

5     believe that there has been any gamesmanship here.  We

6     reject that allegation.  In fact, we believe, we contend

7     that plaintiff's counsel has sandbagged us.  We haven't

8     known -- in fact, some of the emails that were referenced

9     earlier this week were from us, myself specifically,

10    asking what order they plan to call witnesses.  Many of

11    these witness are traveling from out of town, and they

12    have known that.

13         We are a very small resourced operation here for

14    the defense, and we are trying to ensure travel

15    arrangements and make sure everybody is here on time and

16    in person to be heard to move these proceedings along.

17         The witness list currently in possession of the

18    Court from the plaintiff had Mr. Lindell scheduled to

19    provide his testimony on May 9-10.

20         THE COURT:  June.

21         MS. DEMASTER:  I am sorry June 9-10, apologies, and

22    we never said or indicated we were not prepared for that.

23    We are prepared for any of that, but to tell us at 6:00

24    p.m. last night, despite their witness list that said they

25    would call Max McGuire, Brannon Howse, and Kurt Olsen,

1    which they have said to us many times, not only in written

2    filings, but in conferencing and in emails, were all going

3    to be within this three-day period, June 4 through June 6.

4    And that was again, Olsen, Howse, and McGuire, and that is

5    how we have tried to prepare, because we were relying on

6    certain representations.

7        That is not bad faith, it is not gaming, it is

8    stating that as of one week ago -- and, again, Mr. McGuire

9    has been on our in-person witness list for a couple months

10   now.  But as of May 9th, given the Court's request that

11   there be a notice, but we had not heard back, we hadn't

12   confirmed it, but now we have confirmed it, and we are

13   just asking for the Court's leave for his in-person

14   testimony.  We feel that is more fair, not only to the

15   jury, but to all parties and to these proceedings.  Thank

16   you.

17       THE COURT:  All right.  As counsel noted, under

18   Rule 611 of the Federal Rules of Evidence, the Court

19   should exercise reasonable control over the mode and order

20   of examination of witnesses, and presenting witnesses so

21   as to make the procedures effective for determining the

22   truth, avoid wasting time, and protect witnesses from

23   harassment or undue harassment.

24       As you all know, I raised this issue in the final

25   pretrial/trial preparation conference as to how people

1    were going to appear in this case, because it was unclear

2    to me, given the fact that some of the witnesses were

3    listed both as individuals who would be present and

4    individuals who may be present, and individuals who needed

5    to be presented by deposition testimony at trial because

6    they were outside of the subpoena power of the court.

7            Mr. McGuire was one of those individuals.

8    Mr. McGuire is listed on defendants'

9    who-will-be-present-at-trial list, that's at Docket 308,

10    page 10.  He was also listed as an individual who might

11    give deposition testimony by the plaintiff.  That is

12    Docket Entry 308, at 13.

13            With those different statements, I asked the

14    parties whether or not they were intending to present

15    certain people at trial.  As you all recall, the issue of

16    Brannon Howse came up because Mr. Howse is scheduled to

17    appear in person, and then on the first day of trial

18    defense counsel indicated that Mr. Howse had COVID, that

19    he wouldn't be able to be here in person, or he was

20    seeking to testify remotely pursuant to Rule 43.

21            Pursuant to Rule 43(a), the preferred method or the

22    expected method of presentation at trial is in person.

23    And defense counsel also asked to designate additional

24    deposition testimony of Mr. Howse if he was not present.

25            I indicated at that time, because I had been told

1    that Mr. Howse was going to be present, that he could be

2    present or the parties would have to live with their

3    deposition designations, which as plaintiff's counsel

4    indicated, we had some trouble procuring from the parties.

5         There was Docket Entry No. 345, I believe -- let me

6    just get to it.  Sorry, 296, all on March 13, 2025, that

7    granted the plaintiff's motion to strike defendants'

8    counter-designations of four witnesses because the

9    defendants had designated the depositions in their

10   entirety.

11        The case law from district courts in this circuit

12   and other circuits indicate that counter-designations must

13   be made by page and line citation, and because they had

14   not, the Court sua sponte extended the deadline for

15   defendants to submit any deposition counter-designations

16   to plaintiff, identified by page and line number the

17   portion of transcripts that defendants intended to use at

18   trial, and extended the deadline for the parties to submit

19   deposition objections to the Court by a certain date.

20        In that order, the Court also ordered that any

21   counter-designations must fall within the scope of

22   plaintiff's affirmative designations because defendants

23   had not availed themselves by the deadline of designating

24   affirmative designations.

25        So that brings up Mr. McGuire's testimony, that's

1    the focus of this court.  The Court then ordered the

2    parties to indicate to the Court who was going to appear

3    in person and who the Court needed to rule on within the

4    deposition designation.

5        On May 29, 2025, a joint notice was filed by the

6    parties in this case, it is signed by both Ms. DeMaster

7    and Mr. Kachouroff, which indicates, and I quote, "The

8    parties anticipate that the following witnesses will

9    appear by deposition at trial," and Max McGuire is listed

10   as a video deposition.  That is Docket Entry No. 345, at

11   1.

12       Pursuant to Rule 611, I am going to bind the

13   parties to that representation.  The Court has spent time

14   reviewing the designations of these various individuals

15   who were designated to appear by video.  I am going to

16   hold the parties to that.  As you all know, we are on a

17   tight schedule, and the parties have to make decisions

18   with respect to trial presentations based on what they

19   know.

20       And based on this representation that is signed by

21   all parties, both for the plaintiff and the defendants,

22   Mr. McGuire will be presented at this trial through his

23   deposition testimony.

24       All right.  Do we have anything else before we can

25   bring in the jury?

1        MR. KACHOUROFF:  Your Honor, I would like to have

2   at least two-days' notice from now on, something more than

3   12 hours, 5 o'clock the evening before, who the witnesses

4   are going to be.  I never get that information from my

5   colleagues across the aisle.

6        I think it is fundamentally unfair to expect us to

7   prepare witnesses on the fly.  Literally after court I get

8   that, 6:00 p.m.  For instance, I didn't know Heidi Beedle

9   was going to testify today until yesterday they told me.

10       Everything we had, for instance, was Mr. Lindell

11   was going to be on Monday.  So the gamesmanship that I

12   have to deal with is that.  So when we talk about, can we

13   get somebody here, can we not, it is a little absurd.

14       THE COURT:  Ms. Morgan.

15       MS. MORGAN:  With all due respect, they have known

16   who the trial witnesses have been for months, and I

17   believe that the Court specifically asked us to confer and

18   let the other side know who would be available at the end

19   of the day each day.  Everything has been changing based

20   on the amount of side-bar conversations we have had at the

21   bench with the Court and various witness availability and

22   lack of availability, so we have had to be flexible.

23       I don't believe that is gamesmanship respectfully.

24       THE COURT:  All right.  So I think it is fine for

25   it to be noon the day before, but these are all organic.

1    My general trial practice is for the parties to alert the

2    other side at 5:00 p.m. the night before because things

3    change, and timing changes.  So I am going to adhere --

4    I'll ask them to give you the witnesses by lunchtime the

5    day before so you have a little extra time and you can

6    think about it.  But two days in advance, the way trials

7    work, I just don't think is practicable.

8         MR. KACHOUROFF:  Your Honor, I appreciate what the

9    Court is saying, but this is not a three-day trial or a

10   four-day day trial, we are talking about a ten-day trial

11   with multiple witnesses.  They should have them lined up

12   already, and that enables me to plan for my case-in-chief,

13   if I ever get there, although I only have one witness, and

14   I have got to do it the same time, as the Court has

15   indicated, when they call a witness that I have also

16   identified.

17        THE COURT:  Right.  I understand that.  So I will

18   set that as noon, 12:30, every day when we break for

19   lunch.

20        MR. KACHOUROFF:  That raises the question of today,

21   what do we do about Mr. Lindell?  He's supposed to

22   testify, according to them, when I had every expectation

23   that he was going to be on Monday.  I have had zero time

24   to prepare.

25        THE COURT:  All right.

 1         MR. KACHOUROFF:  That was the representation from

 2    the plaintiff, so I relied on the representation.

 3         MS. MORGAN:  If I may, Your Honor.  I don't

 4    anticipate we are going to get to his cross.  So there is

 5    really, other than objecting, there is not a whole lot

 6    Mr. Kachouroff will have to do with respect to

 7    Mr. Lindell's testimony today.  We have enough of a lineup

 8    that he's probably going to be back on on Monday.

 9         THE COURT:  Well, I think it is fair -- Mr. Lindell

10    is the defendant in this case.  And I'm looking at the

11    witness list, and it does say that he is going to appear

12    June 9th through 10th, 2025.  As I've bound them to their

13    representations, I need to bind plaintiff's counsel to

14    their representations.

15         So you are going to need to juggle and fill that

16    time with someone else or lose that time for the day,

17    which I wouldn't suggest.  We will see how far we get, but

18    I think that it is only fair that Mr. Lindell, if you want

19    to take him first thing on Monday morning, you can, but

20    that he is not listed for today.

21         So, again, I understand the pieces are moving and

22    things -- we didn't even know whether or not Mr. Oltmann

23    was going to appear live or not, and we certainly didn't

24    know how long his testimony was going to last and what

25    kind of issues that we were going to have to deal with.

1    So I understand that we are all just trying to adjust.

2         But given the fact that Mr. Lindell is a named

3    defendant in this case, I think it is appropriate, because

4    the witness list says that he is going to be testifying on

5    June 9th and 10th, that he does testify on June 9th and

6    10th.

7         So you all should consider whether or not there is

8    another deposition or something that you can play in that

9    timeframe.

10        MS. DEMASTER:  With respect, Your Honor, we just

11   wanted one more point of clarification.  We have confirmed

12   Mr. Howse will be here in person on Monday.  He will be

13   available throughout the week.

14        THE COURT:  All right.  Anything else before we

15   bring the jury in?

16        MR. KACHOUROFF:  One final point, Your Honor.

17        MR. DUANE:  Briefly, if I may confer with counsel.

18        THE COURT:  Okay.

19        MR. KACHOUROFF:  Mr. Duane has asked me to tell you

20   to reconsider perhaps on Max McGuire's just limited

21   cross-examination.  We would abide by the Court's time

22   limits it imposes.

23        THE COURT:  Overruled.

24        Anything else, or can we bring the jury in?

25        MR. CAIN:  Yes, Your Honor.

1          MR. KACHOUROFF:  Yes, Your Honor.

2          THE COURT:  I think we have to figure out where the

3    jurors are, so we will be in recess.

4          (A break is taken from 9:06 a.m. to 9:15 a.m.)

5          THE COURT:  Thank you.  Please be seated.  All

6    right, are we ready for the jury?

7          MR. KACHOUROFF:  Yes, Your Honor.

8          THE COURT:  Madam deputy.

9          (In the presence of the jury.)

10         THE COURT:  Thank you.  Please be seated.

11         Mr. Oltmann, I remind you, you are still under

12    oath.

13                      **JOE OLTMANN**

14    having been previously duly sworn, testified as follows:

15         THE WITNESS:  Yes, ma'am.

16                 **CROSS-EXAMINATION (Cont'd)**

17    **BY MR. KACHOUROFF:**

18    Q.   Do you have any knowledge of anything Dr. Coomer has

19    said relating to this case or the allegations in this

20    case?

21    A.   Yes.

22    Q.   What is that?

23    A.   There is a video related to him talking about the

24    adjudication process.

25    Q.   What does he say in that video?

1    A.    That you can actually switch votes inside the

2    machines.

3    Q.    Did he explain how that was done in the video?

4    A.    He did.

5    Q.    I will move on now and show you a Facebook post by

6    Dr. Coomer and see if you have seen this before.

7          MR. KACHOUROFF:    Counsel, Exhibit 9, at 72.

8    Q.    (BY MR. KACHOUROFF)    Have you seen this before?

9    A.    I have.

10   Q.    And what is the date of this post on Exhibit 9?

11   A.    June 2, 2020.

12   Q.    Why is that Facebook post important -- the date of

13   that Facebook post important?

14   A.    It was a few days before the Antifa manifesto was

15   made public in news agencies, but only a day or two before

16   it was actually released from Antifa.

17   Q.    How do you know that?

18   A.    Because I did research on it.

19   Q.    What type of research did you do?

20   A.    I went to the internet to look at what kind of

21   correspondence was out there publicly about Antifa and

22   where it came from and its origins and when people started

23   talking about it.

24   Q.    And what were the origins of this post?

25   A.    The Antifa organization based out of, I guess,

1    Germany.

2    Q.   So you know that Dr. Eric Coomer did not write the

3    post here.

4    A.   He did not.

5    Q.   But he did repost it.

6    A.   He did repost it, yes, along with a lot of really

7    other disgusting stuff.

8         MR. KACHOUROFF:   Okay.  Let's turn to Exhibit 25,

9    counsel.

10   Q.   (BY MR. KACHOUROFF)   I want to be clear for the jury,

11   so would you remind us, these were taken -- you took these

12   notes personally.

13   A.   I did.

14   Q.   And you took these notes personally on what day?

15   A.   Around the September 26, 27, in that range, that

16   week.

17   Q.   So you are not exactly certain on which date, you

18   know it was about that time.

19   A.   Yes.

20   Q.   Had you seen the Facebook post that Dr. Coomer posted

21   before you took these notes?

22   A.   I had not.

23   Q.   When did you learn about Dr. Coomer's Antifa Facebook

24   post?

25   A.   On November 6th, when I was up elk hunting in

690

1    Cuchara, Colorado.

2    Q.    Okay.  Do you remember when you were questioned

3    yesterday, while under oath, by Mr. Kloewer, one of the

4    attorneys for the plaintiff?  Do you remember?  Is that a

5    yes?

6    A.    Yes, I am sorry.

7    Q.    Do you remember he asked you a long series of

8    questions about your recollection and your notes about a

9    meeting among Antifa activists in the fall of 2020?

10   A.    Yes.

11   Q.    Do you remember Mr. Kloewer asking you to admit some

12   of the details you are unwilling to share is because you

13   were making it up and because the meeting never happened?

14   A.    Correct.

15   Q.    Was that true?

16   A.    No, it was not true.

17   Q.    Just to be clear, what is the date of the meeting we

18   are talking about?

19   A.    The week of the 27th-ish.  I mean, it is clear that

20   it was within a few days of that.

21   Q.    And did this meeting actually take place?

22   A.    It did take place.

23   Q.    And how did it take place?  Was it in person, was it

24   by phone?

25   A.    It was on a Zoom call.

```
 1    Q.    Are you certain?

 2    A.    I am certain.

 3    Q.    Do you remember Mr. Kloewer asking you to confirm his

 4    suspicions that we had no choice but to take your word for

 5    it because there was nobody else who could corroborate the

 6    essential details of your recollection and your notes --

 7    A.    Yes.

 8    Q.    -- at that meeting?

 9    A.    Yes.

10    Q.    Is that true?

11    A.    No, it is not.

12    Q.    Is there someone else who has been able to

13    corroborate your testimony from yesterday or most of the

14    details?

15    A.    Yes.

16    Q.    And when did you first learn this?

17    A.    Last night.

18    Q.    And who was that individual?

19    A.    Tay Anderson.

20    Q.    What did you find out about Tay Anderson?

21    A.    I found out that since about 3-and-a-half years ago

22    they have been sitting on an affidavit from Tay Anderson

23    that basically corroborates all of the evidence.

24          MR. KLOEWER:  Objection, Your Honor, hearsay.  Can

25    we approach?
```

1            THE COURT:  Sustained.

2            MR. KACHOUROFF:  Your Honor, may we approach?

3            THE COURT:  Approach.

4            (A bench conference is had.)

5            MR. KACHOUROFF:  So, Your Honor, this is admissible

6      because they just filed this on Monday.  It is an adoptive

7      admission by them.  They filed the affidavit, otherwise it

8      would be hearsay.  But when an opponent, pursuant to

9      801(d)(2)(B), when a sworn affidavit is filed that is

10     submitted by a party to a federal court, that party has

11     manifested an adoption or belief in its truth, and that

12     affidavit is therefore admissible against the party under

13     Federal Rule of Evidence 801(d)(2)(B).  And I have several

14     cases we picked out if you want case authority on it, but

15     it is an adoptive admission.

16           THE COURT:  How is it coming in through

17     Mr. Oltmann?

18           MR. KACHOUROFF:  Because he read it last night and

19     realized it was -- for the first time -- because they

20     filed the trial brief against him when he was invoking the

21     reporter's privilege.  They chose to do that.

22           THE COURT:  Mr. Kloewer.

23           MR. KLOEWER:  Your Honor, first of all, the

24     affidavit was submitted for different purposes.  It is not

25     in evidence.  It is hearsay for purposes of this hearing.

1    Furthermore, interestingly, they state he just became

2    aware of it.  This affidavit was submitted in a case

3    against Joe Oltmann in September 2021.

4        And following that, two weeks later, he filed

5    another affidavit from his friend, Tig Tiegen, based on a

6    call on a separate date.  So if we are going to get into

7    this, we will need to go into further, further hearsay

8    about his own subsequent admissions, placing the call on a

9    different date than is even here.

10        So this is getting far into the weeds.  It's

11    objectively false testimony.  And it's hearsay straight

12    up, and this has never been admitted, he is not on the

13    list, and we don't have an opportunity to call

14    Mr. Anderson to speak to the contents of that affidavit.

15        MR. KACHOUROFF:  Your Honor, it is an exception to

16    the hearsay rule.  They filed it.  It is an adoptive

17    admission.  It's fairly simple.

18        THE COURT:  What about the 401, 403 analysis?

19        MR. KACHOUROFF:  What is the concern on the 403

20    analysis, Your Honor?

21        THE COURT:  I mean, to the extent that it hasn't

22    been vetted at all as a piece of evidence with respect to

23    this issue, how is the probative value --

24        MR. KACHOUROFF:  Well, it has been vetted, Your

25    Honor, actually they vetted it.  They procured the

1    affidavit from Mr. Tay Anderson.  They were using it

2    actively in the case, and they sat on it.  I could not

3    have used it but for the fact they get it.  They are the

4    ones that produced the affidavit, they had him sign it.

5            THE COURT:  I have not focused on this affidavit at

6    all, so I want you to move to a different area of

7    examination until I have a chance to evaluate this.  So

8    what document number is that?

9            MR. KLOEWER:  In conjunction with the --

10           THE COURT:  Has it been filed in this case?

11           MR. KACHOUROFF:  Yes, with the trial brief.

12           THE COURT:  Can you tell me what docket number?

13           MR. KLOEWER:  Not off the top of my head.  The

14    trial brief.

15           MR. KACHOUROFF:  I think it is 349, and the actual

16    affidavit is at 15, Your Honor.

17           THE COURT:  Okay.  So this issue is reserved.  So I

18    need you to move on to a different topic and then let me

19    evaluate this, then you can come back to it if I overrule

20    the objection.

21           (In the hearing of the jury.)

22    Q.   (BY MR. KACHOUROFF)  Mr. Oltmann, we are going to

23    come back to this affidavit in just a few moments.

24    A.   Okay.  I don't understand.

25    Q.   It is okay.

 1    A.    Your Honor --

 2    Q.    The Court has to have a chance to look at this,

 3    Mr. Oltmann.  Just give me a second.

 4    A.    Okay.

 5    Q.    If you would, let's go through your handwritten notes

 6    just briefly.

 7    A.    Okay.

 8    Q.    Exhibit 25.

 9    A.    Yes.

10    Q.    All right.  You have -- is this the first page of

11    that exhibit, to your knowledge?

12    A.    It is the last page.

13    Q.    Okay.  Let's scroll down until we get to what should

14    be the first page.

15    A.    Okay.  That is the first page.

16    Q.    How many pages are in these notes?

17    A.    Four pages.

18    Q.    Okay.  So they are not exactly stacked in order, so

19    we will try to go through them in the correct order so we

20    can see that.  You note the name "Heidi."  Can you circle

21    Heidi Beedle there?

22    A.    Yes (indicating).

23    Q.    You have something like "Independent.  Definitely

24    journalist," down below.  What does that refer to?

25    A.    The Colorado Springs Independent.  Heidi Beedle was

696

1    writing for the Colorado Springs Independent.  It is

2    called the Indy.

3    Q.    Who is "Chrissy or Chris"?

4    A.    I don't know.

5    Q.    And it's okay, I am not asking -- you don't have to

6    know.

7    A.    I don't remember.

8    Q.    Do you see the name "Eric??"?

9    A.    Yeah, I do.

10   Q.    Can you underline that for me, and "Dominion guy"

11   down below it.

12   A.    (Indicating.)

13   Q.    I did not understand your testimony today when you

14   said "Guy is a Jedi."  What does that mean exactly?

15   A.    In the hyperbolic statements that were being made,

16   when you say something about being able to affect the

17   outcome of the election.  And there is Obi-Wan Kenobi, who

18   says to the people, "these are not the droids you are

19   looking for."  So it is kind of a reference to Jedis; that

20   they can make things just happen.

21   Q.    And can you show us where you say that this guy Eric

22   made a statement?

23   A.    Yeah, "Trump is not going to win."

24   Q.    If you can just bracket that so we can see that.

25   A.    (Indicating.)

1    Q.   All right.  And then go to the next one, is it

2    "Micmanis"?

3    A.   "Nicknames."

4    Q.   "Nicknames."

5    A.   Sorry.  I have terrible handwriting.

6    Q.   You say "who is 243."  What does that mean?

7    A.   I didn't know who that was.  In reference to one of

8    the things that somebody said about "243," and I think I

9    looked down or might have looked down, and it was one of

10   the things on the video.

11   Q.   Can you tell us about "friendlies"?

12   A.   Yeah, so they talk about "media friendlies," like

13   people on the call.  People they have in media that they

14   feed information to, people like Kyle Clark, sitting in

15   the back there.  "Friendlies."  Guys that slander and

16   defame people regularly and target people.

17        MR. KLOEWER:  Your Honor, objection.

18        THE COURT:  Sustained.

19        Mr. Oltmann --

20        THE WITNESS:  It is the truth.

21        THE COURT:  Mr. Oltmann, you need to answer the

22   question.

23        THE WITNESS:  Okay.

24   Q.   (BY MR. KACHOUROFF)  Then what about this line

25   "Doxing Business Owners."  Was there some discussion in

```
 1    the Antifa call of putting people's names and information

 2    out on the internet --

 3    A.   Yes, there was.

 4    Q.   -- in prominent places for people to see?

 5    A.   Yes.

 6    Q.   What is the purpose of doxing somebody that way?

 7    A.   To create or instill in people in the community that

 8    they don't speak up or talk about things that are

 9    happening in their communities.

10    Q.   I see down below next to -- well, can you read that

11    for me, "next targets."

12    A.   "Next targets," yes, talking about the fact they were

13    going to have more targets, more people that they would

14    target that were working against their interests with this

15    movement.

16    Q.   And it says -- the next one, if you can put a little

17    square around that, "19 on call."

18    A.   Yes.

19    Q.   Is there anything to the next line, "CTR???  Media?

20    No idea."  What does that means?

21    A.   So "CTR," I was able to figure out means Colorado

22    Times Recorder, which is another news outlet, a friendly.

23    Q.   A friendly to Antifa?

24    A.   Yes, and beyond.

25         MR. KACHOUROFF:  Let's go ahead and go to the next
```

 1    page.  Can we see the very top of that page.

 2    Q.   (BY MR. KACHOUROFF)  "Contact."  Can you read that

 3    for us.  "Contact this Joey."  Is that what that says?

 4    A.   Yes.

 5    Q.   Underline "Joey" for me.

 6    A.   (Indicating).

 7    Q.   Did you know when you heard this name who Joey was?

 8    A.   I did not.

 9    Q.   And this next "rat," what does "rat" mean?

10    A.   They called him a "rat."

11    Q.   So this phone call was in part about Joey.

12    A.   Yes.

13    Q.   And the next line says "Tay."  Who was that?

14    A.   Tay Anderson.

15    Q.   Did you know that was Tay Anderson at the time?

16    A.   Yeah.

17    Q.   How do you know Tay Anderson?

18    A.   He has as distinct a voice as Mr. Coomer.

19    Q.   Or Dr. Coomer.

20    A.   Dr. Coomer, excuse me.

21    Q.   Is Tay Anderson also BLM or Antifa?

22         MR. KLOEWER:  Objection, lacks foundation.

23         THE COURT:  Sustained.

24    Q.   (BY MR. KACHOUROFF)  How do you know Tay is part of

25    the BLM or Antifa movement?

```
 1   A.   He has openly talked about being a part of the

 2   organization.

 3   Q.   Do you know how old he is?

 4   A.   Approximately today probably 26, 27 years old.  He

 5   was 21 when he was elected to the Denver Public School

 6   board.

 7   Q.   Underline "Tay" for me real quick.  Then the

 8   "connection to PSL/Antifa BLM," what does that mean?

 9   A.   I believe that is a socialist organization.  PSL is a

10   socialist organization.  Antifa is basically the

11   militarized arm of BLM.

12   Q.   Okay.  And that is what your understanding is.

13   A.   I think that is pretty widely known by most of the

14   population.

15        MR. KLOEWER:  Objection, Your Honor, lacks

16   foundation.

17        THE COURT:  Overruled.

18   Q.   (BY MR. KACHOUROFF)  It says "organizing for event."

19   A.   Then that is a name.

20   Q.   Can you tell me what that name is?

21   A.   "Breonna Taylor."

22   Q.   "Breonna Taylor."  Can you underline that, as well.

23   A.   (Indicating).

24   Q.   Who is Breonna Taylor?

25   A.   She was murdered by police in Aurora, Colorado.  So
```

```
 1    she was a victim of a no knock, I believe, and they came
 2    in and were looking for someone else and ended up killing
 3    her.
 4    Q.   The next line says, "last protest a success."  So it
 5    looks like they are doing logistical operations here,
 6    would you agree with that?
 7    A.   Yes.
 8    Q.   "Food -- water -- cars."
 9    A.   Yes.
10    Q.   "Recon."  So "recon" is what?
11    A.   I think the "recon" is just the logistics of what was
12    going on at the event for, you know, other organizations
13    that may be against the protest, police.
14    Q.   It is short for reconing the area to find out what it
15    is like, et cetera?
16    A.   Yeah.
17    Q.   Then it says "vandalize.  Blame on Proud Boys."  And
18    you have the word "Whoa!!"
19    A.   Yeah.  So basically they talked about what operations
20    they could do that they could get the friendlies or
21    different media to cover that would blame that on the
22    "Proud Boys," which I also didn't have any association
23    with.
24    Q.   Who are the "Proud Boys"?
25    A.   An organization -- that's a right-wing organization.
```

1    Q.    Have they caused any problems in your neck of the

2    woods?

3    A.    No.

4    Q.    Are they active in your area?

5    A.    Not in my area, no.

6    Q.    And then you write "how they communicate?"

7    A.    Yeah.  So this is where they talked about making sure

8    they had security and, you know, how they were going to

9    communicate with each other while they were at the event.

10   Q.    Right next to that it says -- the next line,

11   "security coms."  "Coms" is short for communications?

12   A.    Yes.

13   Q.    "Phones Reddit."  So this is all how they are

14   communicating.

15   A.    Yes.

16   Q.    Right next to that it says, "wait other" -- I can't

17   read your writing.  It looks like "other way."

18   A.    "Other way BLM."  I don't remember, I don't recall

19   the reason behind that.  I think that has more to do with

20   how they communicate between the organization.

21   Q.    You have mentioned "BLM" twice on this page.

22   A.    I have, yes.

23   Q.    Go ahead and underline both parts where you see that.

24   A.    (Indicating).

25   Q.    So the last thing you did is underline those two

1    BLMs.  So "Reddit" is social media.

2    A.    Yes.

3    Q.    "Slack," is that social media, as well?

4    A.    Yeah, I don't know why anyone would start a Slack

5    group to do coms.

6    Q.    What is that?

7    A.    It is a business tool, a tool you would use, my guess

8    is because it is just not something you would typically --

9    you can make groups inside Slack.  I think most courts

10   have Slack.  Most business have Slack.

11   Q.    Then "Pueblo" to "Denver."  Looks like they are

12   bringing people in from there.

13   A.    Yes.

14   Q.    They "need rides," correct?

15   A.    Yes.

16   Q.    "Peeps coming in 10 to 2-3."  That's the time of day.

17   A.    Yes, and it might be dates.

18   Q.    Okay.

19   A.    I think those are dates, and that they have some

20   "good press."  Again, people who write press.

21   Q.    "Organizer says 'unknown.'"  Who is the "organizer"

22   that was talking, do you know?

23   A.    No.

24   Q.    Is it "stays unknown" or "says unknown"?

25   A.    No, it is "says unknown."

1          MR. KACHOUROFF:  If we can go to the next page.  It

2     should be down.  All right.  Let's start there.

3     Q.   (BY MR. KACHOUROFF)  "'Fortify' training."  Can you

4     tell us what that is all about, if you recall?

5     A.   Yes, so the "fortify" is just to fortify, making sure

6     they have enough people and how they moved their

7     operations around; that they made sure they fortified the

8     area, making sure there weren't any infiltration that

9     would happen by other groups counter-protesting and/or the

10    police interfering with what they were doing.

11    Q.   And then the next line is "PSL-comrades."

12    A.   A recommendation was made that they could, you know,

13    bring other people, people from PSL to the -- I had to

14    look it up, PSL to the event.  They kept referring to them

15    as "comrades."

16    Q.   The name "Brian."

17    A.   Yes.

18    Q.   And "Tank -- Minneapolis."  What does that refer to?

19    A.   They spoke about a guy named Tank coming from

20    Minneapolis.  So from Minneapolis down to Colorado to

21    participate in the events.

22    Q.   Who is "Brian," do you know that?

23    A.   No, I don't know.  I don't recall.

24    Q.   Can you try to explain the next five or six lines,

25    "possible coverage.  Stick to plan.  What is the plan?

1    Rhetoric is incredible."

2    A.   "Rhetoric is incredible."  It became a little bit of

3    a frenzy for a little bit.

4    Q.   How so, on the phone call?

5    A.   Yeah.  The back and forth and talking over each

6    other.  But once they got it settled it was very well

7    organized.  Like they organize well what they were getting

8    ready to do.  They had some idea of logistics.

9    Q.   Just prior to this, we saw on the last page where you

10   mentioned that there was this guy Eric on the call.  So

11   your attention seems to be more focused on what their

12   activities are for logistics, is that fair to say?

13   A.   Yeah.  So they wanted to -- are you talking about the

14   part "Targets -- 'fascist events'"?

15   Q.   This whole area says "possible coverage.  Stick to

16   plan.  What is the plan?  Rhetoric is incredible."  They

17   didn't say "rhetoric is incredible," you did.

18   A.   I said the rhetoric was incredible, and it is just to

19   remember what was happening on the call.

20   Q.   Where do you have the arrow coming down?

21   A.   That is coverage for the events.  So they started

22   talking about something, then it got a little bit, you

23   know, wonky, as far as the conversation.  Then they went

24   to making sure that they had people that were going to be

25   at these events, at these "fascist events."

1    Q.   We are talking Tay Anderson is the one on the Zoom

2    call; correct?

3    A.   Yes.

4    Q.   Would you agree with us that Tay Anderson is also

5    Antifa, apparently?  Or what was he purporting to be?

6    A.   I don't think I delineate between Antifa or Black

7    Lives Matter, not in its current state, rather than what

8    it was intended to be when they started it.

9    Q.   Okay.  "Targets -- 'fascist events.'"  What do they

10   mean by that?

11   A.   Protests that would be happening at the Capitol,

12   things that would be happening, they would want to show up

13   to.

14   Q.   The next line, "Cover up -- turn over intel

15   pictures."

16   A.   Yeah.  So they were talking about who would be the

17   one to take on all of the pictures.  So the pictures they

18   would take at events they could identify people later at,

19   who was going to take that, who was going to be the person

20   that got that information.  So you had people talking

21   about how they would coordinate that information offline.

22   Q.   And what does "Sam" refer to?  Is that a person, an

23   acronym?  What is that?

24   A.   "Sam" was a person.  "Give" it to "Sam."  I don't

25   think I was able to identify who Sam was.

1    Q.    Next one, "Jojo."

2    A.    So they were pretty fixated on Joey Camp.

3    Q.    Is that the name they gave him, "Jojo"?

4    A.    Yes.

5    Q.    "Who is this guy?  They hate this guy!!"

6    A.    Yeah.

7    Q.    Do you recall what they were saying about him?

8    A.    They wanted him to die.  They literally were like

9    somebody needs to off that guy.  There was no hiding any

10   disdain or distaste for that man.

11   Q.    Did you later come to find out why they disliked Joey

12   Camp so much?

13   A.    Yeah.  He trolled them pretty well, and he was one of

14   the guys that would, you know, get involved in Antifa

15   rallies.

16   Q.    He would show up?

17   A.    I think he did more than show up.  He disrupted

18   things pretty heavily.  He would show up for just the

19   straight ability to create chaos in those environments,

20   then he would take videos of it and post those videos and

21   things in a bad light.

22   Q.    I will not have you do anymore red lines, I think we

23   all get the point, well, let's just red line "Jojo" and

24   "Joey Camp" there.

25   A.    Yes (indicating).

1    Q.   All right.  Can we go to what I think would be the

2    last page.

3    A.   It is the first page.

4    Q.   The very first page in this exhibit is the last page?

5    A.   We mixed those up.  The second page and third page I

6    think were mixed up in this, or the first page and third

7    page, excuse me.

8    Q.   So your notes afterwards -- well, is this while on

9    the call you are doing this, or just kind of a recap?

10   A.   Well, it's while I am finishing up.

11   Q.   You say, "Who is Eric Dominion guy?  Brian.  Denver?"

12   Did you find out who Brian was?

13   A.   No.

14   Q.   Looks like there is another name "Bev."

15   A.   Yeah.  I didn't figure out who Bev was either.

16   Q.   And "Yan-ni."

17   A.   Yeah.  He is -- he was pretty well known in the

18   Antifa/BLM world.  So I think everybody knew who he was.

19   Q.   You have "woman on call" and you assume that was

20   "Heidi."

21   A.   Yes.

22   Q.   And there you have "Jojo Joey Camp."  What is "hit

23   this guy"?

24   A.   It was a note to myself to reach out and figure out,

25   basically to hit him up, to figure out who this guy was.

1    I wanted to dig into the information he had, because if he

2    is coming up with a bunch of journalists and people like

3    that, maybe he would be useful.

4    Q.   Yesterday you had a screen shot, and the implication

5    was that you were somehow lying about the screen shot

6    showing your search on Google.  Do you remember that?

7    A.   Yes.

8    Q.   I think things may have gotten a little bit confused,

9    so I want to take a moment.  We went over this yesterday;

10   correct?

11   A.   Yes.  I think I showed you how to do it yesterday.

12   Q.   Right.  What is missing from this screen shot that

13   you can't see here?

14   A.   The top bar.  So if you go into Google you will have

15   a part where it will shows "All," "Images," "Videos."

16   There is like a bar that goes across the top of it.

17   Q.   Okay.  And just while we are here, just one more

18   time, you were asked about "Eric Schussler" and "Old

19   Dominion."

20   A.   Yes.

21   Q.   "Eric worked as a physical therapist for 10 years

22   prior to completing a Ph.D. at Ohio State University.  His

23   current research interests include concussion

24   compression."  Is that the type of Eric from Dominion you

25   were looking for?

1    A.    No.  It is in a different state, in Virginia, which

2    is about 1,800 miles away.

3    Q.    So you had no reason to click on that link.

4    A.    Right.

5    Q.    I have a Google search page on my screen.  So the

6    search was for "Dominion Voting Systems."  Do you see

7    that?

8    A.    Yes.

9    Q.    And you can see the bar "All," "News," "Images,"

10   "Shopping," "Videos," "Short Videos," "News Forums."  Do

11   you see that?

12   A.    Yes.

13   Q.    That wasn't shown on your snapshot, was it?

14   A.    No, it was not.

15   Q.    So tell me how to make this look like the snapshot.

16   A.    Just move up your bar real quick, it will give you

17   access to more of the stuff.  Keep going.  There you go.

18   Stop.

19   Q.    Why did you take a screen shot that way?

20   A.    So I could get more of the information that was on

21   the screen at the time.

22   Q.    So if I can pull this back down, there is the bars.

23   So that is a feature within the browser.

24   A.    Yeah.  Like a Wayback machine.  If you have a Wayback

25   machine, you can go back and look at sources.  This allows

711

1    you in the Wayback machine to go in a similar source, a

2    similar fashion, it allows you to go back and create dates

3    and look at the information that would have populated on

4    those particular dates on Google.

5    Q.   Just so we know, to get to that point you have to do

6    a custom search where you hit the tool bar.

7    A.   Yeah.  So first you have to search for it, then you

8    hit the tool bar, and then under "tools," then you hit --

9    if you go to hit that button, then you do "custom range."

10   So you can go to any hour, 24 hours, a week, a month, then

11   you put in the custom range.  Typically it is better to

12   put it in for just one day, then you get the information

13   that collects on that one day.

14        So you have the 26th or 28th, or whatever day it

15   is, it will give you that information that populated in

16   that search on a previous search for that same

17   information.

18   Q.   Okay.  So when you were creating that screen shot,

19   you were not intending to create any kind of lie, you were

20   trying to create a fuller picture of the links you saw --

21   A.   Correct.

22   Q.   -- because you wanted to keep it on one page.

23   A.   Yeah.  There are many more pages, but if you run that

24   same search today, it will come up with zero.  There is

25   nothing that will come up under that search.

1   Q.   Okay.  Having --

2   A.   In other words, if you were to run "Eric Dominion

3   Denver Colorado" it would be completely different today

4   because they completely wiped the internet; every video,

5   every link, there is nothing -- like nothing ever existed

6   with Eric Coomer prior to that that existed at all in any

7   capacity.  It is like they took everything down, which is

8   nearly impossible.  It is like --

9   Q.   Can you bring up the screen shot.  And just if you

10  can, when this stabilizes itself, show us where the menu

11  would have been.  Show us with a red line.

12          THE COURT:  What is the exhibit number?

13          MR. KACHOUROFF:  I apologize, Your Honor, 26.

14          THE COURT:  Are you intending to publish this to

15  the jury?

16          MR. KACHOUROFF:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. KACHOUROFF:  Thank you, Your Honor.  I am

19  sorry, I thought everything was being published to the

20  jury.  My mistake.  I apologize.

21  Q.   (BY MR. KACHOUROFF)  So there was a menu bar that

22  appeared where that red line is; correct?

23  A.   Yes.

24  Q.   Just by scrolling the page up, that menu bar

25  disappears.

1    A.    Yes.

2    Q.    Okay.  And then you have those links.

3    A.    Yes.

4         MR. KACHOUROFF:  Your Honor, may I have permission

5    to show that on my computer to the jury, to publish that

6    in realtime, or no?

7         THE COURT:  No.

8         MR. KACHOUROFF:  Okay.  All right.  Your Honor, can

9    we take a brief recess to address the issue we talked

10    about at the bench?

11         THE COURT:  You all can -- we can take a -- we will

12    take a brief recess.

13         Ladies and gentlemen of the jury, there is one

14    issue that I need to resolve with the attorneys outside

15    the presence of the jury.  We will take a quick 10-minute

16    recess now.  We may have an additional recess this morning

17    given these issues.  So, thank you.

18         (Outside the presence of the jury.)

19         THE COURT:  Thank you.  Please be seated.

20         Anything else before we take a brief recess?  Okay.

21    We will be in recess.

22         After I resolve this issue, how much more do you

23    have?

24         MR. KACHOUROFF:  About an hour total.

25         THE COURT:  Okay.

1          (A break is taken from 9:54 a.m. to 10:19 a.m.)

2          THE COURT:  Back on the record.  The Court took a

3     recess in order to ascertain whether or not the issue that

4     was raised at side bar was -- the admissibility of the

5     evidence discussed at side bar.  And I understand the

6     parties may have reached an agreement.

7          MR. KACHOUROFF:  Yes, Your Honor.

8          THE COURT:  All right.  So we don't need to go into

9     that agreement now, I just assume you will offer, there

10    won't be an objection, and we can proceed.

11         Is everyone ready for the jury to come back in?

12         MR. KACHOUROFF:  Yes, Your Honor.

13         THE COURT:  Just one comment.  I haven't forgotten,

14    Ms. DeMaster, your request to admonish the jurors about

15    their obligations as jurors.  And so I just thought it

16    would be more appropriate to do so at the lunch break when

17    they have been with us for a little bit.

18         MS. DEMASTER:  Thank you, Your Honor.

19         (In the presence of the jury.)

20         THE COURT:  Thank you.  Please be seated.

21         Mr. Oltmann, I remind you that you are still under

22    oath.

23         THE WITNESS:  Yes, ma'am.

24    Q.   (BY MR. KACHOUROFF)  Mr. Oltmann, I would like to

25    take us back to that section of our discussion a few

715

```
 1    minutes ago where I asked you if you remember Mr. Kloewer
 2    asking you to confirm his suspicions that we had no choice
 3    but to take your word for it because there was nobody else
 4    that could corroborate your story.  Do you recall that?
 5    A.   I do.
 6    Q.   Okay.  So, first of all, is that true?  Is there no
 7    one else to corroborate your story?
 8    A.   That is not true.
 9    Q.   Is there someone else who has been able to
10    corroborate your story?  I asked you that question, too.
11    A.   Yes.
12    Q.   Who was that person?
13    A.   Tay Anderson.
14    Q.   Who is Tay Anderson?
15    A.   He was the head of the Denver Public Schools -- I am
16    sorry, he sat on the board for the Denver Public Schools,
17    and a BLM/Antifa member.
18    Q.   When did you first learn -- or when did you first
19    learn of the need to corroborate your story, was it
20    yesterday on the stand?
21    A.   On the stand here.
22    Q.   Last night your attorney showed you a memorandum;
23    correct?
24    A.   Yeah.  It stated there was a document, a pretrial
25    order that was accompanied by a stack of, I think 30 or 40
```

1    different exhibits -- well, I don't know what the amount

2    was, but a pretty big stack of documents.

3    Q.    Over a hundred pages?

4    A.    Yes.

5    Q.    And in the motion, do you recall reading the part

6    where the plaintiff had a year-long effort monitoring your

7    publications, et cetera?

8    A.    The trial brief?

9    Q.    Yeah.  And that these monitorings led them -- led the

10   plaintiff to identify three other individuals.  Do you

11   remember that?

12   A.    Yes.

13   Q.    One was Heidi Beedle.

14   A.    Yes.

15   Q.    The other was Erik Maulbetsch.

16   A.    Yes.

17   Q.    And the other one is A-U -- Auotai, A-U-O-T-A-I,

18   Anderson.

19   A.    Yeah.

20   Q.    So that led you to Google -- is it Auotai Anderson?

21   A.    I think so, yeah.

22   Q.    Is that Tay Anderson?

23   A.    It is.

24   Q.    How did you figure that out?

25   A.    Google.

1    Q.    Okay.  That was filed by the attorneys in this case.

2    A.    It was, on Monday.

3           MR. KACHOUROFF:  All right.  Your Honor, I would

4    like to hand a copy of the exhibit to the witness.

5           THE COURT:  You may.  266?

6           MR. KACHOUROFF:  Yes, Your Honor.

7           THE COURT:  All right.

8    Q.    (BY MR. KACHOUROFF)  Take a moment to familiarize

9    yourself with that, please.  Do you recognize that?

10   A.    I do.

11          MR. KACHOUROFF:  Move to admit.

12          MR. KLOEWER:  No objection, Your Honor.

13          THE COURT:  So admitted.

14          (Exhibit No. 266 is admitted.)

15          MR. KACHOUROFF:  May I publish to the jury, Your

16   Honor?

17          THE COURT:  You may.

18          MR. KACHOUROFF:  Is it published?

19          COURTROOM DEPUTY:  Yes.

20   Q.    (BY MR. KACHOUROFF)  Very top, it says "Tay

21   Anderson."  Can you go ahead and underline or circle "Tay

22   Anderson."  Do you see that?

23   A.    Yes, "Tay Anderson."

24   Q.    And that "Tay Anderson" is in your handwritten notes

25   on the day of the call?

1    A.    Yes.

2    Q.    All right.  He says, "I am the at-large director of

3    the Denver Public School Board of Education and was

4    elected to this position in 2019."  Do you see that?

5    A.    Yes.

6    Q.    Paragraph 3, "Throughout the Spring and Summer of

7    2020, the Black Lives Matter Protest Movement grew rapidly

8    in Colorado, specifically in Denver following the murder

9    of George Floyd.  Moving your attention to similar issues

10   here in Denver, specifically with respect to concerns

11   about police brutality."  Do you see that?

12   A.    I do.

13   Q.    Okay.  So paragraph 4, "Through my consistent vocal

14   involvement in the Black Lives Matter movement" -- would

15   you underline "Black Lives Matter"?

16   A.    (Indicating).

17   Q.    -- "my public persona grew and I assumed both formal

18   and informal leadership roles within the movement."

19         Let's skip down to paragraph 6.  "One of the

20   individuals to target of Black Lives Matter activists was

21   Joseph A. Camp."  Could you quickly underline that.

22   A.    (Indicating.)

23   Q.    All three of these little notations are contained in

24   your handwritten notes.

25   A.    Yes.

719

1    Q.   We will flip over to the next page, page 3.

2    Paragraph 7 complains about his presence; right?

3    A.   Yes.

4    Q.   And then "On September 23, 2020" he -- "attended a

5    protest in Denver that I" -- meaning Tay -- "had helped

6    organize to demand justice for the murder of Breonna

7    Taylor."  Would you put a line under "Breonna Taylor."

8    A.   (Indicating).

9    Q.   And so the affidavit says in paragraph 9, "As a

10   result of Camp's increasingly aggressive and potentially

11   violent conduct, many members of the Denver progressive

12   community, including myself, were deeply concerned for our

13   own personal safety," et cetera.

14        Underline the next line and read that to me in

15   paragraph 9.

16   A.   "We scheduled a conference call to address these

17   concerns on September 25, 2020."

18   Q.   I want you to go ahead and underline that.

19   A.   (Indicating).

20   Q.   You stated the call was on or about September 27th.

21   A.   Yes.

22   Q.   That was an approximate timeframe.

23   A.   Within a week or so before that.

24   Q.   This shows there is a call; correct?

25   A.   Yes.

1    Q.   And it corroborates your story that there was a call.

2    A.   Yes.

3    Q.   Go down to the next paragraph.  "On September 25,

4    2020, I participated in a Zoom conference call with

5    roughly 15 to 20 other Denver activists where we discussed

6    the escalating threat of violence from Camp and how best

7    to counter his tactics peacefully."  Do you see that?

8    A.   Yes.

9    Q.   So underline "Zoom."  And then "roughly 15 to 20

10   other activists."

11   A.   (Indicating).

12   Q.   How many activists did you say were on the phone

13   call?

14   A.   At one time there were 19 people on the phone call.

15   Q.   You also testified it was a Zoom call.

16   A.   Yes.

17   Q.   This also corroborates your story, does it not?

18   A.   Yes.

19   Q.   Another source.

20   A.   Yes.

21   Q.   Now, one part of this affidavit does not corroborate

22   your side of the story, does it?

23   A.   Yes.

24   Q.   And what is that?

25   A.   No. 11, "During that call, no one mentioned 'Eric

```
 1    from Dominion' and I am not familiar with anyone who would

 2    meet that description."

 3    Q.   So you disagree on that point.

 4    A.   I do.  There is another part that is not consistent,

 5    and that is who is visible during the call, because they

 6    were not.

 7    Q.   Okay.  One moment.  I want to go back up to paragraph

 8    10 just for a second.  Do you see where it says, last

 9    sentence, "as the administrator of the call" --

10    A.   Yes.

11    Q.   -- "I was generally familiar."

12    A.   Yes.

13    Q.   Right there.  "Generally familiar with all of the

14    call participants," correct?

15    A.   Correct.

16    Q.   So he may not have been familiar with all of them, he

17    was just generally familiar.

18    A.   Correct.

19         MR. KLOEWER:  Objection, calls for speculation.

20         THE COURT:  Sustained.

21    Q.   (BY MR. KACHOUROFF)  The affidavit says what it says;

22    right, "generally familiar."

23    A.   Yes.

24    Q.   Tay Anderson claims he does not know Eric Coomer, nor

25    has he ever met him.
```

```
 1    A.    Yes.

 2    Q.    That is not consistent with what you have said, is

 3    it?

 4    A.    It is not.  And many of the other people that were on

 5    the call didn't know who Eric was either, which is why

 6    somebody clarified who Eric was.

 7    Q.    And they asked "who is this guy?"

 8    A.    Yes.

 9    Q.    One of your other friends has also given an affidavit

10    in this case; has he not?

11    A.    Yes.

12    Q.    That would be Tig Tiegen.

13    A.    John Tig Tiegen.

14          MR. KACHOUROFF:  I will mark the next exhibit as

15    267, and I will show the witness from the ELMO.  I just

16    want to make sure it is not published yet.

17    Q.    (BY MR. KACHOUROFF)  Do you recognize this

18    affidavit -- or declaration, I should say?

19    A.    Yeah.  It has been a few years since I have seen it

20    but, yes.

21    Q.    This is Tig Tiegen.

22    A.    Tiegen.

23          MR. KACHOUROFF:  Move to admit.

24          MR. KLOEWER:  No objection, Your Honor.

25          THE COURT:  So admitted.
```

 1            (Exhibit No. 267 is admitted.)

 2    Q.    (BY MR. KACHOUROFF)   He says -- well, who is Tig

 3    Tiegen?

 4    A.    He is a Benghazi war hero and ex-marine.

 5    Q.    So he was at the embassy in Benghazi.

 6    A.    He was.

 7    Q.    It says he was an independent contractor for 10 years

 8    for the CIA and president of the USADF, a humanitarian

 9    organization.  Do you see that?

10    A.    Yes.

11    Q.    He says he has "direct personal knowledge that Antifa

12    is an organization.  When a group of people have meetings,

13    social media accounts, organized protest marches, drives,

14    and they march under a flag and go after people like

15    myself as one group, it is an organization."  Do you see

16    that?

17    A.    Yes.

18    Q.    Do you agree with Mr. Tiegen that that is what it is?

19    A.    Yes.

20    Q.    Paragraph 7.  "Antifa members were urged to appear at

21    Black Lives Matter events and push BLM members to do

22    violence, attack people, and destroy things."  Do you

23    agree with that?

24    A.    A hundred percent.

25    Q.    "Since July 2020, Antifa journalists have been

1    attacking both me and Mr. Oltmann in newspaper articles

2    they offer."  Is that true?

3    A.    Yes, it is.

4    Q.    On September 20, he says, "I received a billing

5    statement from Antifa at my home address, which was

6    clearly fraudulent and designed to frighten and intimidate

7    me to Antifa's knowledge of my home address."  Do you have

8    any knowledge about that?

9    A.    Yes.

10   Q.    What happened with that billing statement?  What was

11   the purpose of it?

12   A.    The billing statement was sent -- ultimately this is

13   a culmination that led to the divorce of John Tiegen and

14   his wife.

15   Q.    "Due to safety concerns for myself and my family I

16   immediately contacted local police and informed them of my

17   concerns."  Do you see that?

18   A.    Yes.

19   Q.    He then says, "Immediately after I received

20   communication from Antifa, I told Mr. Oltmann, who

21   informed me that he had an opportunity to infiltrate an

22   Antifa phone call to find out more about Antifa

23   journalists, Mr. Oltmann invited me to attend and listen

24   to the call."

25           And then in 13 he says, "I was not able to be on

```
1    this call because I had to be out of town in Orlando,

2    Florida, which I flew to on September 17th and returned on

3    September 21st."  Do you see that?

4    A.   Yes.

5    Q.   Now, that doesn't exactly line up with what you said

6    or what Tay Anderson has said, which is the call occurred

7    on the 25th.

8    A.   Correct.

9    Q.   Why would John Tiegen put the 17th through the 21st

10   of September on that affidavit?

11        MR. KLOEWER:  Objection, calls for speculation.

12        THE COURT:  Sustained.

13   Q.   (BY MR. KACHOUROFF)  Do you have personal knowledge

14   of why he put September 17th through 21st on that

15   affidavit?

16   A.   I do.

17   Q.   And what is that personal knowledge from?

18   A.   A conversation with John Tiegen.

19   Q.   What did he tell you?

20        MR. KLOEWER:  Objection, hearsay.

21        THE COURT:  Sustained.  You can approach.

22        MR. KACHOUROFF:  Yes, can we approach?

23        (A bench conference is had.)

24        MR. KACHOUROFF:  Under the rules it is perfectly

25   acceptable to impeach someone, even a declarant, a hearsay
```

1    declarant on prior inconsistent statements, and that is

2    what we are doing with Mr. Oltmann, because I won't have a

3    chance to recross, you will not let me recross him after

4    Brad gets to him next.

5         So my response to the objection that it is hearsay

6    is that is not hearsay because it is being offered for

7    impeachment purposes.

8         THE COURT:  Mr. Kloewer.

9         MR. KLOEWER:  I think it is speculative as to what

10   Mr. Tiegen knew or why, why he said the things he did,

11   so --

12        MR. KACHOUROFF:  Just a prior inconsistent

13   statement, we are not trying to speculate.  We laid the

14   foundation.  You heard the statement.

15        THE COURT:  All right.  Overruled.

16        (In the hearing of the jury.)

17   Q.  (BY MR. KACHOUROFF)  Tell us why he chose -- what he

18   said to you about choosing September 17th and returning on

19   the 21st.

20   A.  He just picked a part of the calendar that he had --

21   that was -- where he recalled it closely related.  He came

22   in on -- left on the 17th and came back on the 21st, and

23   left again and came back.  So he just said, it probably

24   happened during that time there.

25   Q.  So he wasn't trying to be as precise as you would

1    like?

2    A.    No, he was not.

3    Q.    "After my return, Mr. Oltmann and I discussed it, and

4    he talked about Heidi Beedle as either being on the call

5    or mentioned on the call."  Is that accurate?

6    A.    It is.

7    Q.    "Mr. Oltmann informed me that he also heard something

8    to the effect that 'Trump wouldn't win, they were going to

9    take care of it' and thought journalists were trying to

10   get out some propaganda."  Is that true?

11   A.    It is.

12   Q.    It is not exactly the way you said it; right?

13   A.    No.  No.

14   Q.    As messages begins to get delivered from person to

15   person, it tends to change, doesn't it?

16   A.    Yeah.  He is just matter of fact.

17   Q.    And he says below, "I am not generally involved in

18   politics or political issues and do not typically watch

19   Conservative Daily."  So he wasn't a fan.

20   A.    No.

21   Q.    Once Mr. Oltmann started receiving death threats,

22   members of the UADF --

23         COURT REPORTER:  Please slow down.

24         MR. KACHOUROFF:  I am sorry, ma'am.

25   Q.   (BY MR. KACHOUROFF)  Once Mr. Oltmann started

```
 1   receiving death threats, members of UADF watched over

 2   Mr. Oltmann when he was out in public to ensure his

 3   safety; right?

 4   A.   Yes.

 5   Q.   This affidavit was signed October 21st.  Do you see

 6   that?

 7   A.   October 4th --

 8   Q.   October 4th.

 9   A.   -- of 2021.

10   Q.   Okay.  So these documents were actually filed in your

11   case years ago.

12   A.   Yes.

13   Q.   Did you recall them when they were shown to you last

14   night?

15   A.   Yes.

16   Q.   But you'd forgotten about them.

17   A.   I had, yes.

18   Q.   Last night you remembered they were there.

19   A.   Yeah.  I had never read the Tay Anderson affidavit, I

20   just knew it existed.

21   Q.   So these were filed in your case in 2021.

22   A.   Yes.

23   Q.   And do you consider these affidavits as corroborating

24   your story?

25   A.   Among other things, yes.  Can I expand on that?
```

1    Q.   Yeah, sure.  "Among other things," what you do mean

2    by that?

3    A.   So the information that you have in a realtime, is

4    realtime information.  So the more information you get

5    destroys the confirmation bias.  You are always looking

6    for information to make sure what you actually have is

7    validated so you are not trying to just make a story up in

8    your head.

9         So as you go into 2020, there is an amount of

10    information I had in December, and there were doubts based

11    on what happened, what happened in the election.  As we

12    got further into November and December and the things

13    being done either to me or around me --

14         MR. KLOEWER:  Objection, Your Honor, getting into a

15    narrative.

16         THE WITNESS:  Your Honor, there is --

17         THE COURT:  Hold on.  Counsel, approach.

18         (A bench conference is had.)

19         MR. KACHOUROFF:  I will control him a little bit.

20         THE COURT:  I allowed him to answer the

21    corroboration statement, but that is getting a little

22    close to a legal conclusion of whether or not something is

23    proper or not.  So he needs to move on from this.

24         MR. KACHOUROFF:  We will move on.  Thank you.

25         (In the hearing of the jury.)

1    Q.    (BY MR. KACHOUROFF)   I would like to turn just

2    briefly to your general knowledge, general information

3    about how the voting systems work --

4    A.    Yes.

5    Q.    -- and the basis for your research and why you

6    believed it.  Tell us how you got started doing -- just to

7    begin, what made you decide to look at the voting

8    equipment?

9    A.    Eric wrote an article in the Denver Post that stated

10   that I had lied and that he did not have a Facebook page

11   and he did not have a Twitter page, and that I --

12   Q.    Made stuff up?

13   A.    No, that I impersonated him.  And so with that came

14   massive new death threats, and those death threats led to

15   the lawsuit that I was served about a week-and-a-half

16   later.  And that led me to go, okay, so we first started

17   off with Eric Coomer --

18   Q.    Let me stop you.  Approximately what date was the

19   lawsuit filed against you?

20   A.    End of December.

21   Q.    Of what year?

22   A.    2020.

23   Q.    Okay.  So we have got your involvement with your

24   movement in July of 2020, FEC.

25   A.    Yes.

1   Q.   And then you have the Antifa/BLM conference call that

2   occurred on or about September 25, 26, 27, of 2020.

3   A.   Yes.

4   Q.   And you have got the affidavits that speak to the

5   call.

6   A.   Well, I have a video that speaks to the call, as well

7   that was published by not me, but by a journalist outfit.

8   So it was on October 16th, the day after I had a meeting,

9   which coincidentally they found all of the people that are

10  a part of this Antifa journalist group and had them all

11  write affidavits.

12  Q.   Let me ask you a question.  There was an article

13  published October 15th.

14  A.   With a video of me talking about infiltrating Antifa

15  on October 15, long before the election.  Nobody knew what

16  was going to happen at the election.  Nobody knew.  Yes,

17  it was a polarizing event.  There were a lot of things

18  happening right there.  I actually don't think that anyone

19  knew how they really felt based on all of the stuff they

20  dealt with with COVID, PTSD stuff there.

21  Q.   October 15th through the general election in

22  November, November 3 --

23  A.   November 3, yes.

24  Q.   -- anything happen in between that timeframe?

25  A.   Just -- yeah, information getting people together.  A

```
 1    lot of the things we were concentrated on was just getting

 2    people in the community to just stand together.

 3    Q.    I'm trying to help us have a timeline so that when

 4    the jury goes back to look at these things they can go to

 5    these dates.  So we started with July, the September call,

 6    October 15 meeting.  Then you have the general election,

 7    then you have you were elk hunting November 6th.

 8    A.    November 6th I was elk hunting with my friend, Gordon

 9    Beckstead, 88 years old.  He has been my best friend

10    forever.

11    Q.    On that day on November 6th, you got a text; correct?

12    A.    I did.

13    Q.    What was the text?

14    A.    It was just, "hey, you need to look at this article."

15    Q.    What did the article contain?

16    A.    Stories about what was going on in Georgia related to

17    Dominion Voting Systems, obviously three days after the

18    election.  The election had not been decided yet, it

19    wasn't decided until the 7th.

20    Q.    Did you read the article?

21    A.    I did.

22    Q.    Whose name appeared in the article?

23    A.    Eric Coomer's.

24    Q.    And is that the first time, on November 6th when you

25    got that text, that you linked up whom you believed was
```

1    Eric Coomer with the Antifa call?

2    A.    Yes.

3    Q.    Had you seen the Facebook posts at that point?

4    A.    I had not seen anything at that point related to any

5    social media.

6    Q.    You were reminded of the call, and you thought you

7    remembered it because you remembered the name Eric Coomer.

8    A.    Yes.  Actually I remembered not Eric Coomer, I

9    remembered the research I did.  And what led me to

10   actually look at it was the video that -- you know, Eric

11   has a distinctive voice.  So I linked up the videos.  I

12   knew it was him.  Then I went to do what I do, which is

13   collect data; get as much information as I possibly can to

14   corroborate whether or not he was or was not on that call.

15          Then what he said became very significant.  Prior

16   to that I wasn't looking for him, I was looking for Antifa

17   journalists.  I would never even talk about him because

18   frankly it was hyperbolic to me, it didn't seem real.

19   There was no part of what he was saying that I thought to

20   myself, this guy could really take an election.  I don't

21   think anybody did.

22   Q.    Then you have the November 9 podcast where you

23   mention him for the first time; correct?

24   A.    Yes.

25   Q.    Okay.  So you have all these events.  What leads you

1    to start looking at the election machines themselves?

2    A.    Getting sued.  I wanted to know whether or not the

3    elections could be stolen, and if they could be stolen,

4    how did it get stolen.  Since I am a system architect, I

5    just dug into it.  I read all of the manuals, got into all

6    of the information, collected all of that stuff, then took

7    it from different states, turned it sideways, compressed

8    it, then looked at the similarities of the system across

9    states to find vulnerabilities.

10         At that point, I thought I had the Holy Grail of

11   how they were going to steal the 2021 runoff election, the

12   senate runoff election in Georgia, with two senators they

13   had a secondary election.  So I picked up the phone and

14   called --

15   Q.   A "runoff election."  And I don't want to go too far

16   afield, I want to focus on general information about how

17   you know the machines worked.  You believed that there are

18   deviations shown in the vote records.

19   A.    So it is not -- it's -- the election system is a very

20   complex system, and Dominion is basically the head.  Then

21   from Dominion it goes to an organization called Sivar.

22   Sivar then transfers it to Edison.  Edison then provides

23   that information to the general public.

24         So it is what you see on the TV that gets

25   transmitted to the media environment, but prior to that,

735

1    you have this sophisticated system, the EMS system,

2    tabulators.  It is --

3    Q.    EMS stands for Election Management Server.

4    A.    Yes.

5    Q.    And what is a tabulator?  This is the dry stuff.

6    A.    You feed the ballots through the tabulator.

7    Q.    So it kind of counts.

8    A.    It is supposed to count ballots.  Counts the results

9    of the ballots.

10   Q.    If the machine doesn't count it, your understanding

11   is it goes to --

12   A.    -- adjudication.

13   Q.    Which Dr. Coomer would have invented, or co-invented;

14   right?

15   A.    Yes.  He holds the patent to the adjudication

16   process.  And when I went through the machines and turned

17   them on their side, you start out with information that is

18   backed up by his character and what he is doing and his

19   connections to Antifa.  And then from there you start to

20   build on that and collect more information on things that

21   Eric Coomer does specifically and what he has access to.

22        So you get into the adjudication process, and you

23   figure out -- you read all of the patents for that, and

24   other patents that he holds, as well, and then you read

25   the manuals, the Democracy Suite manuals.  And what

1    happened, that we were able to see from November 3, 4, and

2    5 on the election in 2020, then from there you build a

3    model.  And then that model I sent to Washington.

4    Q.   I don't want you to go into any other voting machine

5    company, we will limit this to just Dominion.

6    A.   This is Dominion.  Just Dominion.

7    Q.   Tell me about deviations and the impact of

8    deviations.

9    A.   Some of the base deviations that we saw and which

10   supported --

11   Q.   First of all, what does a "deviation" mean?

12   A.   It is a -- you know, you have normal operations, then

13   you have deviations; things that should not occur inside

14   of any system, any computer system.  So a deviation is

15   when you turn on your computer is that your password

16   disappeared.  Like when you have to put your password in,

17   it is not there, that is a deviation, and that leads you

18   to believe something is wrong with your system or that it

19   is operating differently than it would have operated had

20   you had normal operation.  Or your cellphone, when you go

21   to open your cellphone and it no longer has a password

22   protection, that would be a deviation.

23   Q.   Do you feel that you saw deviations in the November

24   2020 general election?

25   A.   Massive deviations in the election.  It wasn't

 1    related to the deviation of people, because people are

 2    going to do things that are going to be different in

 3    different areas.  In other words, there are different

 4    competency levels of people; like sending ballots through

 5    a tabulator over and over and over again.  That doesn't

 6    necessarily mean what they did was wrong.

 7         The deviations I looked for were deviations in the

 8    systems, themselves, how they operate, and then looked at

 9    behavior around that that would stop people from getting

10    access to that information.

11    Q.   Okay.  Let's move on from there.  Let's talk about --

12    you're currently in the cyber IT world; is that fair to

13    say?

14    A.   Yes.

15    Q.   You know computer systems generally.

16    A.   Generally.

17    Q.   Can they be hacked without anybody knowing?

18    A.   Yes.

19    Q.   Are the voting machines essentially computers?

20    A.   They are computers.  It is a sophisticated system

21    that has turned, what should be an easy calculation, into

22    something very sophisticated and very, very, very, very

23    untransparent.

24    Q.   Now, there is going to be the testimony of one of

25    your former colleagues in just a few moments, named Max

1    McGuire.  Do you know who he is?

2    A.    I do.

3    Q.    Who is he?

4    A.    He is an incredible guy.  He was my friend and worked

5    for me under Conservative Daily doing advocacy for about 8

6    years, 9 years before the --

7    Q.    You had a falling out for about 6 months; correct?

8    A.    Yeah.  We had a falling out that lasted longer than 6

9    months for sure.  But I know that they deposed him about 6

10   months after, and it was still pretty raw.

11   Q.    And he is going to say that you sometimes embellish

12   with, we will call it fishermen tales.  Is that correct to

13   say?

14            MR. KLOEWER:  Objection, calls for speculation.

15            THE COURT:  Sustained.

16            THE WITNESS:  Max knows everything about me.

17            THE COURT:  Mr. Oltmann, the objection has been

18   sustained, so you can't answer the question.

19   Q.    (BY MR. KACHOUROFF)  You said Max knows everything

20   about you.

21   A.    He does.

22   Q.    You all are friends to this day.

23   A.    I would consider him a friend for sure.

24   Q.    Okay.  I want to talk to you about Mr. Lindell.  You

25   and Mr. Lindell have talked about deviations before and

```
 1    things like the cast-vote records; the votes that have

 2    actually been cast; correct?

 3    A.   Yes.

 4    Q.   And that is something that you both agree on

 5    happened.

 6    A.   Absolutely.

 7    Q.   Yesterday you talked about this guy Dennis

 8    Montgomery.  You called him a fraud, and didn't believe a

 9    word that he said.

10    A.   He is a con man for sure.

11    Q.   You know Mr. Lindell disagrees with you.  You have

12    personal knowledge he disagrees with you.

13    A.   I get it, but he is wrong.

14    Q.   Let me ask you this.  Does Mr. Lindell rely only on

15    Dennis Montgomery, or the 30 or 40 other experts he talked

16    to?

17         MR. KLOEWER:  Objection, Your Honor.

18         THE COURT:  Sustained.

19    Q.   (BY MR. KACHOUROFF)  Do you know the name Dr. Walter

20    Daugherity?

21    A.   I do.

22    Q.   What do you think of Walter Daugherity?

23    A.   He is a computer scientist, an ex-professor, probably

24    one of the smartest men you will find.

25    Q.   Does he espouse positions on the election of 2020?
```

1    A.    He does.

2            MR. KLOEWER:  Objection, Your Honor.

3            THE COURT:  Sustained.  Counsel, approach.

4            (A bench conference is had.)

5            THE COURT:  Mr. Kachouroff, you can make your

6    record as you need to, and plaintiff's counsel can make

7    the objections so we can preserve them, but I have

8    sustained every single question that is improper vouching

9    as to another witness and what that witness may or may not

10   testify to, which has not been admitted into evidence yet.

11           MR. KACHOUROFF:  I am not at all having any

12   vouching, I am just trying to set the broader context,

13   because we had a guy come in named Matt Crane, who talked

14   at length about a private club of election officials who

15   were determining -- they were the tsars of free speech,

16   determining what is misinformation, what is

17   disinformation, what is malinformation.

18           And then we talked about voting machines generally

19   and how safe they were, vouching for them.  They were not

20   even the producer of the machine.  You know, they worked

21   on them.  And all I am doing is having Mr. Oltmann testify

22   about the broad universe of beliefs that existed on this

23   side of the fence.  That is it.

24           THE COURT:  All right.  Mr. Kloewer.

25           MR. KLOEWER:  Your Honor, they are using it as a

```
 1   way to back door expert testimony.  They have no experts
 2   admitted.  He is trying to get in statements from people
 3   we don't have an opportunity to take their testimony.  It
 4   is all hearsay.  So we object to this line of questioning.
 5           MR. KACHOUROFF:  You can issue a limiting
 6   instruction, Your Honor.
 7           THE COURT:  I am going to stick with my prior
 8   ruling, and you have made your record.
 9           MR. KACHOUROFF:  Okay.
10           (In the hearing of the jury.)
11   Q.  (BY MR. KACHOUROFF)  Have you seen Mr. Lindell
12   talking to other experts?
13   A.  I have.
14   Q.  A fair number of them.
15   A.  Yes.
16   Q.  A fair number that you know of.
17   A.  Yes.
18   Q.  With credentials that equal professors and --
19           MR. KLOEWER:  Objection, Your Honor.
20           THE WITNESS:  Yes.
21           MR. KACHOUROFF:  I am finished, Your Honor.
22           THE COURT:  All right.
23           MR. KACHOUROFF:  Nothing further.  I pass the
24   witness.
25           THE COURT:  Mr. Kloewer.
```

1                    **REDIRECT EXAMINATION**

2    **BY MR. KLOEWER:**

3    Q.   Mr. Oltmann, I believe you stated this morning that

4    you just became aware of an affidavit from Tay Anderson.

5    Did I hear you correctly?

6    A.   No, that is not what I said.  I said I became aware

7    it was inside of this case, because I was given that

8    information by my attorney.

9    Q.   Let's pull -- let's take a look at that affidavit for

10   Mr. Anderson, if we could.

11             MR. KLOEWER:  Is that Exhibit 265?

12             THE COURT:  266.

13   Q.   (BY MR. KLOEWER)  Take a look at 266 please.  And

14   let's go to the second page of this document.  Do you see

15   that blue text in the top right corner that says "Date

16   Filed."

17   A.   Yes.

18   Q.   That says September 17th of 2021; right?

19   A.   Yes.

20   Q.   And on the left-hand side, we see that is Eric Coomer

21   v. Donald Trump.

22   A.   Yes.

23   Q.   That is a case where you are a defendant.

24   A.   Yes.

25   Q.   Down below that we see attorneys for plaintiff.  Do

1    you see that?

2    A.    Yes.

3    Q.    Okay.  So that means that this affidavit was filed in

4    that case by Eric Coomer; right?

5    A.    Yes.

6    Q.    Okay.  And we had a hearing in that case for about

7    two days in October.  Do you remember that?

8    A.    I do not.

9    Q.    You were in the courthouse for two days at the

10   anti-SLAPP hearing.

11   A.    Is that a question?

12   Q.    Right?

13   A.    I assume.  If you say that, I will assume it is a

14   fact.

15   Q.    When we discuss this evidence that Dr. Coomer had

16   submitted against you, you were there?

17   A.    If you say I was, yes.

18   Q.    So this information about Mr. Anderson is not a

19   surprise to you.

20   A.    Actually, I didn't say that.  I said that I had not

21   read it, and I did not read it until last night.

22   Q.    Let's take a look at some of the substance of this

23   document.

24   A.    Okay.

25   Q.    Let's look at paragraph 10 here.  On page 3,

```
 1    "September 25, 2020, I participated in a Zoom conference

 2    call with roughly 10 to 20 other activists" --

 3    A.   It says "15 to 20 other activists."

 4    Q.   -- "where we discussed the escalating threat of

 5    violence from Joey Camp and how best to counter his

 6    tactics peacefully.  We discussed this" -- and he says --

 7    "as the administrator of the call, I was generally

 8    familiar with all of the call participants who were

 9    visible during the call," right?

10    A.   Yes.

11    Q.   So that can't be the call that you discussed

12    yesterday, could it?

13    A.   It could actually.

14    Q.   Well, you testified that none of the participants

15    were visible; right?

16    A.   Yes, I did.

17    Q.   Okay.  So these must be different calls.

18    A.   Well, so you got an affidavit written by the guy that

19    is the head of BLM who is accused of 62 counts of hurting

20    children.

21             THE COURT:  Mr. Oltmann, could you just answer the

22    question.

23             THE WITNESS:  You have a pedophile that literally

24    said --

25             THE COURT:  Mr. Oltmann --
```

1            THE WITNESS:  I am answering the question.

2            MR. KLOEWER:  Your Honor, objection.

3            THE COURT:  I am going to strike that last

4    statement.

5            THE WITNESS:  Oh, my gosh.

6            THE COURT:  Mr. Oltmann, can you answer

7    Mr. Kloewer's question, please.  The question was, "So

8    these must be different calls."  And if your answer is no,

9    then your answer is no.

10           THE WITNESS:  My answer is it's highly coincidental

11   that Eric Coomer would go and find someone that was on the

12   call --

13           MR. KLOEWER:  Objection, non-responsive.

14           THE WITNESS:  -- and have all of this --

15           THE COURT:  Mr. Oltmann -- can we have a side bar.

16           (A bench conference is had.)

17           THE COURT:  So, Ms. Hall, I really do not want to

18   have to admonish Mr. Oltmann in front of the jury, that is

19   not my intent.  He needs to answer the question.

20           To the extent, Mr. Kachouroff, you need very, very

21   limited recross, since he is also your witness, I will

22   permit that.  But, again, we just need to keep moving and

23   he needs to answer to question.  Again, I do not want to

24   have to admonish him.

25           MR. KACHOUROFF:  Did she tell him to just answer

1    the question?

2           THE COURT:  If he wants to come up here I am happy

3    to instruct him.

4           MR. KACHOUROFF:  Can she do that?

5           THE COURT:  Again, I want to make it clear I am not

6    trying to prejudice or bias anyone, I just need him to

7    focus on the question.

8           MS. HALL:  I understand.  May I ask him to come to

9    the bench?

10          THE COURT:  Yes.

11          Mr. Oltmann, I am not trying to prevent you from

12   saying what you feel like you need to say in response to

13   the question, but if you can listen to the question and

14   answer the question, things will go faster.

15          I told Mr. Kachouroff he will have an opportunity

16   to do some limited recross within the scope of

17   Mr. Kloewer's examination of you.  So if you can just

18   listen to Mr. Kloewer's question and please answer it.

19          I am not trying to admonish you in front of the

20   jury.  I don't want to do that.

21          THE WITNESS:  Yes, ma'am.  Thank you.

22          (In the hearing of the jury.)

23          THE COURT:  All right.  Could you re-ask the

24   question, please.

25          MR. KLOEWER:  Yes, Your Honor.

1    Q.    (BY MR. KLOEWER)   So Mr. Anderson is describing

2    different circumstances, yes?

3    A.    Yes.

4    Q.    Paragraph 11, "During that call, no one mentioned

5    Eric from Dominion.  I am not familiar with anyone who

6    would meet that description."  Do you see that?

7    A.    Yes.

8    Q.    It goes on to state, "I do not know Eric Coomer, nor

9    have I ever meet him."  Did I read that correctly?

10   A.    Yes.

11   Q.    Paragraph 13, "In all my time working in the Denver

12   community, specifically with members of the community that

13   are or have been administratively involved in the Black

14   Lives Matter movement or other related movements through

15   Social Justice, I have never heard the name Eric Coomer or

16   had any interactions with anyone who claimed to know him."

17   Do you see that?

18   A.    I do.

19   Q.    And this was filed, as we have already established,

20   on September 17, 2021; right?

21   A.    Yes.

22   Q.    All right.  Let's take a look at the affidavit of

23   Mr. Tiegen.  Let's get that pulled up, that is Exhibit

24   267.  And we talked a bit about Mr. Tiegen.  You described

25   him as "a friend," correct, Mr. Oltmann?

```
 1    A.    I would, yes.

 2    Q.    Okay.  And let's take a look at the date this was

 3    filed if we could.  Top right corner.  Top right-hand

 4    corner I am looking at the date of this document.  Is that

 5    legible there?  Can you read that, Mr. Oltmann?

 6    A.    Yes.

 7    Q.    What date is that?  October 4, 2021; right?

 8    A.    Oh, the blue marks at the top, the date filed is

 9    October 4, 2021.

10    Q.    So about two-and-a-half weeks after you received a

11    copy of Mr. Anderson's declaration in that proceeding is

12    when you submitted an affidavit from your friend,

13    Mr. Tiegen?

14    A.    What was the date of the previous one?

15    Q.    September 17th.

16    A.    Okay.  Yes.

17    Q.    In this affidavit, if we look at paragraph 13.  Let's

18    take a look at paragraph 13 there.  He says, "I was not

19    able to be on this call because I had to be out of town in

20    Orlando, Florida, which I flew to on September 17th and

21    returned on 21st."  Did I read that correctly?

22    A.    Yes.

23    Q.    So two-and-a-half weeks after you became aware of

24    Mr. Anderson's affidavit, your friend filed an affidavit

25    that, for the first time, placed the date of the call as
```

```
 1    much as 10 days prior to what you had claimed in your

 2    sworn testimony; right?

 3    A.    Yes.

 4    Q.    And placing the call between September 17th and

 5    September 21st, means it can't have been the call that

 6    Mr. Anderson described in his affidavit; right?

 7    A.    Well, we couldn't be sure of what the dates were, and

 8    to John Tiegen I said, pick a date somewhere in there that

 9    you had a trip, and it was within that time period.  So

10    there are lots of time he was out of town, he just said, I

11    think it was between this.  I told him to tell the truth

12    of what he could recall.

13    Q.    We can assume he told the truth.

14    A.    I am sorry.

15    Q.    We can assume he told the truth; right?

16    A.    Yes.

17    Q.    Okay.  Mr. Oltmann, I believe you provided sworn

18    testimony yesterday that you did not have any personal

19    animus toward Eric Coomer.  Did I hear you correctly?

20    A.    Yeah.

21    Q.    All right.  I will ask you a few yes or no questions

22    here.  If we can go to Exhibit 34.  This is a Parler post

23    attributed to Joe Oltmann.  And let's zoom in on that last

24    paragraph and the image, if we could, please.  "So it is

25    up to you.  Blow this shit up.  Share, put his name
```

1    everywhere.  No rest for this shitbag.  Eric Coomer, Eric

2    Coomer, Eric Coomer.  This shitbag and the corrupt asshats

3    in Dominion Voting systems must not steal our election and

4    our country!  Eric we are watching you..."  You posted

5    that.

6    A.    Actually, I don't think I did.

7    Q.    Mr. Oltmann, you posted this, didn't you?

8    A.    I don't think I did.  As a matter of fact, there is

9    no record of it, and we went all of the way through and

10   looked it up and went to Parler.  And you came up with

11   this, but it is not a record that they were able to

12   corroborate at all.

13   Q.    Mr. Oltmann, we have discussed this before.

14   A.    And I was very consistent in what I said before.  It

15   would have been something I said, and that is what happens

16   when you have people come to your house with guns and you

17   have people that try to do harm to your family and go to

18   your wife's work and try to do harm to her, and go to your

19   children, who have nothing to do with --

20        MR. KLOEWER:  Objection, non-responsive.

21        THE WITNESS:  I was responsive in telling you

22   exactly what happened during --

23        THE COURT:  Mr. Oltmann, do you remember our

24   discussion at side bar?

25        THE WITNESS:  Yes, ma'am.  Sorry.

 1           THE COURT:  Thank you.

 2      Q.   (BY MR. KLOEWER)  Let's pull up Exhibit 238, please.

 3      This is a Telegram post from April 6th.  Do you see that,

 4      Mr. Oltmann?

 5      A.   Yes.

 6      Q.   And this is the day after Mr. Lindell was served with

 7      this lawsuit.  I am going to read this first paragraph

 8      here.  You recognize this.

 9      A.   I don't, but I probably wrote it.

10      Q.   "Eric piece of crap Coomer sued Mike Lindell for

11      'hanging out with Joe Oltmann'..." -- and we have a few

12      laughing emojis here -- "truth is a bitch isn't it Eric.

13      I am going to eviscerate you.  At least by your own

14      admission we know what restaurant in Salida to NOT do

15      business with.  You own the Fritz, right?"  You wrote

16      that?

17      A.   I did.

18      Q.   Let's look at the last portion of this message.

19      "Yeah you are a righteous guy... shitbag.  Your attorneys

20      and you need to know... I will chase the truth till the

21      end.  I don't grow tired and I don't care what the

22      consequences are.  I will make sure you are held

23      accountable.  Because of you and Dominion, Millions of

24      Americans are suffering today.  You and your trash company

25      are the reason we have a shitbag in the White House who

1    drools on himself and can barely finish a sentence.  A

2    reckoning is coming..."  You wrote that, didn't you?

3    A.   I did.

4    Q.   Let's take a look at what is marked as Exhibit 216.

5    You see this image, Mr. Oltmann.

6    A.   I do.

7    Q.   It appears to be you on a Conservative Daily podcast.

8    A.   Yes.

9         MR. KLOEWER:  Move to admit Exhibit 216.

10        MR. KACHOUROFF:  Without objection.

11        THE COURT:  So admitted.

12        (Exhibit No. 216 is admitted.)

13        (Exhibit 216 played in open court.)

14        MR. KLOEWER:  No further questions.

15        THE COURT:  Re-cross?

16                    **RECROSS-EXAMINATION**

17    **BY MR. KACHOUROFF:**

18    Q.   In that last video you said, "should be held

19    accountable."

20    A.   Yes.

21    Q.   Did you mean held accountable in the justice system,

22    as we are in this type of situation today?

23    A.   Yeah.   The penalty for treason is the death penalty.

24    Q.   Okay.   But that would not be something that you would

25    enact.

1    A.    No.

2    Q.    How would that -- how could that possibly happen?

3    A.    Through the judiciary.

4    Q.    The court system; correct?

5    A.    Yes.  Look, in -- can I expound on this?

6         MR. KLOEWER:  Objection, Your Honor.

7         THE COURT:  No.

8         Mr. Kachouroff, ask a question.

9         MR. KACHOUROFF:  Your Honor, I have nothing further

10   at this time.

11        THE COURT:  Mr. Oltmann, you may step down, you are

12   released from your subpoena.

13        THE WITNESS:  Thank you.

14        THE COURT:  Counsel, is plaintiff ready to call

15   their next witness?

16        MS. MORGAN:  Plaintiff calls Max McGuire by video

17   deposition.

18        THE COURT:  All right.

19        (Videotaped deposition of Max McGuire played in

20   open court but not reported.)

21        THE COURT:  All right.  Mr. Cain, are you ready to

22   call your next witness?

23        MR. CAIN:  We are.

24        MR. KLOEWER:  Plaintiff calls Heidi Beedle.

25        Your Honor, we are trying to find the witness.

1    This may be a good opportunity for a slight break.

2         THE COURT:  Why don't we take a slight break.  We

3    will be back on the record when we can find the witness.

4         (A break is taken from 11:38 a.m. to 11:54 a.m.)

5         THE COURT:  Thank you.  Please be seated.

6         Are you ready for the jury?

7         MR. KLOEWER:  Yes, Your Honor.

8         THE COURT:  Madam deputy.

9         (In the presence of the jury.)

10        THE COURT:  Thank you.  Please be seated.

11        Mr. Kloewer.

12        MR. KLOEWER:  Thank you, Your Honor.  Plaintiff

13   calls Heidi Beedle.

14        COURTROOM DEPUTY:  Ms. Beedle, if you can stand up

15   here, please.

16                        **HEIDI BEEDLE**

17   having been first duly sworn, testified as follows:

18        THE WITNESS:  I do.

19        COURTROOM DEPUTY:  Please be seated.

20        Please state your name, and spell your first and

21   last name for the record.

22        THE WITNESS:  Heidi Beedle.  H-E-I-D-I B-E-E-D-L-E.

23                      **DIRECT EXAMINATION**

24   **BY MR. KLOEWER:**

25   Q.   Good morning.  Thank you for being here today.

1          Can you tell the jury what it is you do for a

2    living.

3    A.    A journalist reporter for the Colorado Times

4    Recorder.

5    Q.    Do you cover any specific subject matter for the

6    Colorado Times Recorder?

7    A.    I am a reproductive justice reporter for the Colorado

8    Time Recorder.  So I cover abortion and reproductive

9    rights and issues around that.  The Colorado Times

10   Recorder is a statewide politics blog which focuses on

11   kind of right-wing extremism and general state-level

12   politics.

13          So I cover both reproductive justice issues and

14   then also, you know, just general politics, mixed media,

15   that sort of thing.

16   Q.    How long have you been working there?

17   A.    Since February of 2022.

18   Q.    Okay.  And were you working -- how long have you been

19   working as a journalist more broadly?

20   A.    Since roughly 2017.

21   Q.    Before that time, did you ever serve in the military?

22   A.    I did.  I was in the military for 8 years, from 2003

23   to 2011.

24   Q.    And during that time, were you ever deployed abroad?

25   A.    Yes.  I spent a year in Korea, then three deployments

1    to Iraq.

2    Q.    Combat deployments.

3    A.    Yes.

4    Q.    And where did those deployments occur?

5    A.    My first deployment was in the Anbar Province in

6    between Ramadi and Fallujah.  My second was in Bagdad, in

7    Sadr City.  And my last deployment was in Basra.

8    Q.    And what sort of work were you doing on those

9    deployments?

10   A.    I was in the infantry, so patrols and raids and

11   infantry kind of things.

12   Q.    Did you receive any awards during your time in

13   service?

14   A.    Yeah.  I was awarded the Combat Infantry Badge, the

15   Bronze Star, a couple of Army Commendation Medals, an Army

16   Achievement Medal, and like a bunch of other service

17   ribbons, kind of random things they give everybody.

18   Q.    I won't go into all of those, but you mentioned a

19   Combat Infantry Badge.

20   A.    It is an award given to infantry soldiers who have

21   been engaged in ground combat with opposing forces.

22   Q.    And are you still in the Army?

23   A.    No.  I left the service in 2011.

24   Q.    Were you honorably discharged?

25   A.    I was, yes.

1    Q.    What was your rank at the time?

2    A.    Sergeant E5.

3    Q.    Okay.  That was 2011 you said.

4    A.    Yes.

5    Q.    And you began working as a journalist, I understand

6    about 2017?

7    A.    2017, yes.

8    Q.    Okay.  And in your reporting over the years you

9    mentioned a bit of the topics you covered.  Do you know

10   the name Joe Oltmann?

11   A.    I do, yes.

12   Q.    And how do you know the name Joe Oltmann?

13   A.    He founded the conservative activist group called FEC

14   United, and he made claims about Dominion Voting Systems

15   stealing the 2020 election.  He has been involved in a

16   variety of different activities, both in -- both, kind of

17   state level, like Colorado politics, as well as kind of

18   national events.

19          He worked for Clay Clark for a while.  He has a

20   podcast, and has had various figures from the political

21   right, guys like Patrick Byrne, Jovan Pulitzer are sort of

22   who -- people who are MAGA right or extreme right

23   throughout the last 5 or 6 years.

24   Q.    Have you written stories on Mr. Oltmann?

25   A.    I have, yes.

1    Q.   What was the first story you wrote on Mr. Oltmann?

2    A.   The first story on Mr. Oltmann was in October of

3    2020, following this "Patriot Muster" event that took

4    place in downtown Denver in which one of the participants

5    was killed by a security guard hired by 9News.

6    Q.   Was Mr. Oltmann involved in planning that?

7    A.   Yes.  He was one of the organizers and speakers at

8    the event.

9    Q.   Since that time, have you written additional stories

10   on Mr. Oltmann?

11   A.   I have, yes.

12   Q.   Do you know how he feels about your reporting?

13   A.   I am aware, yes.

14   Q.   You mentioned you are familiar with Mr. Oltmann's

15   claims about Eric Coomer; right?

16   A.   Yes.

17   Q.   And are you familiar with Mr. Oltmann's claim about

18   an Antifa conference call?

19   A.   Yes.

20   Q.   Were you on that call?

21   A.   I was not.

22   Q.   What do you know about the call?  Let's back up and

23   start there.

24        MR. KACHOUROFF:  Objection, Your Honor, lacks

25   personal knowledge.  She said she doesn't know about the

1    call.

2          THE COURT:  Overruled.

3    Q.   (BY MR. KLOEWER)  What do you know about

4    Mr. Oltmann's claim about the call?

5    A.   I know the claims that he, himself, made and that

6    have been republished, and claims that he made that was in

7    the affidavit that he filed with the Sidney Powell lawsuit

8    seeking to overturn the 2020 election.  Mr. Oltmann

9    essentially claimed that he was approached --

10          MR. KACHOUROFF:  Objection, Your Honor.

11          THE COURT:  Approach.

12          (A bench conference is had.)

13          THE COURT:  So, Mr. Kachouroff, can you state your

14    objection?

15          MR. KACHOUROFF:  It is hearsay within hearsay.

16    First of all, referring back to the court record, she has

17    no personal knowledge, she is reciting what she thinks she

18    read in the court record.

19          MR. KLOEWER:  She has been reporting on Mr. Oltmann

20    for years, and she has knowledge of the claims alleged

21    against her, as well as Dr. Coomer.

22          THE COURT:  So she can talk about what she knows

23    and how she reported.  I am not going to have her sit on

24    the stand and recite hearsay.  I didn't let Mr. Oltmann do

25    it, I will not let her do it.

1           MR. KACHOUROFF:  Thank you, Your Honor.

2           (In the hearing of the jury.)

3    Q.   (BY MR. KLOEWER)  Ms. Beedle, has Mr. Oltmann accused

4    you of being on that Antifa call?

5    A.   He has.

6    Q.   How did you become aware of that?

7    A.   Well, through the affidavit that I have been shown

8    and through various pronouncements and posts he has made

9    on social media and on his podcasts.

10   Q.   I asked you before, but were you ever on an Antifa

11   call?

12   A.   No.

13   Q.   Were you on any conference call with a group of

14   activists around late 2020?

15   A.   No.

16   Q.   What were you doing for a job at the time?

17   A.   I was working for the Colorado Springs Independent as

18   a general assignment reporter.

19   Q.   But prior to that time -- I do want to talk about

20   Antifa in general a little bit.  You, yourself, have been

21   associated with this concept of Antifa; right?

22   A.   That's correct.

23   Q.   And how have you been associated with Antifa?

24   A.   Starting in late 2016, I was an activist in Colorado

25   Springs, and I started a blog called Colorado Springs

1    Anti-Fascists, and I documented individuals and groups

2    that were organizing on the far right that were generally

3    kind of white nationalists and sort of extremists in

4    character, such as the Proud Boys, Identity Evropa, the

5    Traditionalist Worker Party, and later Patriot Front.

6    Q.   Have you been involved in activism outside of that?

7    A.   No.

8    Q.   During that time, were you involved with any other

9    sort of activist groups?

10    A.   No.

11    Q.   I will just ask you directly, do you know Eric

12    Coomer?

13    A.   I do not, no.

14    Q.   Have you ever met him?

15    A.   No.

16    Q.   Never spoken to him.

17    A.   No.

18    Q.   Have you ever been involved in any group that

19    Mr. Coomer is associated with, as far as you are aware?

20    A.   Not that I am aware of.

21    Q.   Are you aware of, through your reporting on this

22    issue, this idea -- or this Facebook posting of the Antifa

23    manifesto?

24    A.   I have heard of it, yes.

25    Q.   And have you had an opportunity to review that

1   through your reporting?

2   A.   Not particularly.  And I can explain why if you would

3   prefer.

4   Q.   Yeah.

5   A.   I mean, I will point out, I was one person in

6   Colorado Springs.  I had a blog.  I had some friends, and

7   we did activism.  Other people in other states operated

8   kind of similarly, you know, and the blog is anonymous,

9   and people can say and do whatever they want.  They can

10  claim whatever they want to claim, and people, you know --

11  there are lots of kind of content that is shared that is

12  popular in certain kind of activist circles.  And some of

13  it is authentic, and some of it was like taken from some

14  other place.

15       So I -- to my knowledge, there is no, like,

16  official manifesto.  Like, there is no, like, Antifa

17  instruction manual.  There are various kind of, like,

18  blogs and activists who have, like, some best practices

19  and some ideas around things.  But even within the idea of

20  Antifa or anti-fascist activism, it is very much like a

21  multi-tendency kind of thing.

22       So you will have, like, anarchists and, like,

23  Marxsists, Leninists, and Maoists, and just general

24  liberals.  It is a wide spectrum of people with differing

25  kinds of perspectives on leftist activism in general.  And

1    the thing that kind of ties them together is the

2    opposition to the far right, white nationalist, kind of

3    explicitly sort of Nazi political organizing.

4    Q.   Have you covered -- I think your prior statement --

5    well, have you covered right-wing movements in Colorado?

6    A.   I have, yes.

7    Q.   And have you also covered Black Lives Matter

8    movements?

9    A.   I have.

10    Q.   You mentioned before the affidavit that Mr. Oltmann

11    had filed.  Did you read that document?

12    A.   I did, yes.

13         MR. KACHOUROFF:  Objection, Your Honor.

14         THE COURT:  I will overrule the objection on that.

15         Go ahead, Mr. Kloewer.

16         MR. KLOEWER:  I can move on, Your Honor.

17    Q.   (BY MR. KLOEWER)  Are you aware of Mr. Oltmann

18    associating you with Antifa?

19    A.   I am, yes.

20    Q.   How did you become aware of that?

21    A.   Through, again, posts and commentary that he made on

22    his podcast.

23    Q.   And have you ever heard him associate you with any

24    other organizations?

25    A.   He has claimed that I have taken part in a group

764

1    called Our Revolution.

2    Q.    What is Our Revolution, as you understand it?

3    A.    As I understand it, it got started as kind of like a

4    support organization for Bernie Sanders during his

5    campaign in 2016.  And it is just kind of a general, like,

6    left liberal progressive sort of political advocacy group

7    at this point.

8    Q.    And how did you become aware he was associating you

9    with Our Revolution?

10   A.    Because he posted a photo of me.  In kind of October

11   2020, the media company, Project Veritas, which is kind of

12   a right wing, hidden camera, sort of gotcha journalism

13   outlet run by James O'Keefe, had talked to some organizer

14   in Our Revolution, I think here in Colorado, and the guy

15   had said some crazy things about, like, guillotines and

16   just kind of ridiculous far-left rhetoric.

17          And so Our Revolution then became this kind of

18   fixation on the right, as like this is the real Antifa

19   organization.  And around that time, shortly after those

20   Project Veritas clips came out, Mr. Oltmann posted like a

21   screen shot from one of them, or a photo that he got from

22   somewhere, and said that I was in the photo.

23   Q.    Well, are you associated with Our Revolution?

24   A.    No.

25   Q.    Were you at the time?

1    A.    No.

2    Q.    Have you ever been associated with Our Revolution?

3    A.    No.

4    Q.    And were you at that event that he claimed you were

5    at?

6    A.    I was not.

7    Q.    Are you able to confirm you weren't there?

8    A.    Yes.  Because he posted this thing about me, I was

9    able to track down the source of that picture on the Our

10   Revolution Facebook page, and during that time -- I mean,

11   it's obviously not me in the photo.  But also during that

12   time I was working at the Humane Society.  I had a regular

13   schedule working 11:00 a.m. to 7:00 p.m.  I was at work on

14   that day, and I was not in that photo.

15   Q.    Well, let's take a look at that photo since we are

16   discussing it.

17          MR. KLOEWER:  Can we pull up what is marked as

18   Exhibit 22, please.

19   Q.    (BY MR. KLOEWER)  Do you see that image on the

20   screen, Ms. Beedle?

21   A.    I do.

22   Q.    Is this an image of the event you were discussing?

23   A.    Yes.

24   Q.    Are you in this image anywhere?

25   A.    I am not.

1    Q.    Do you see the person that Oltmann claimed was you?

2    A.    I do, yes.

3    Q.    Which individual is that?

4    A.    The one with the circle on the right.

5    Q.    And I know you stated that is not you.  Do you know

6    who that is?

7    A.    I do, actually.

8    Q.    Who is that?

9    A.    That is Grace Freud.  They were a Denver area

10   comedian transgender person.  I followed them on Twitter

11   at the time.

12   Q.    And did you ever speak with Ms. Freud about this?

13   A.    I did send her a Twitter DM, and I asked if it was

14   her.  She is like, oh, yes, that's me.  And then I advised

15   her that this photo was being spread with these kind of

16   concerning accusations around Our Revolution in these

17   right-wing spheres.

18           MR. KLOEWER:  I will pass the witness.

19           THE COURT:  All right.  Mr. Kachouroff.

20           MR. KACHOUROFF:  Yes, ma'am -- yes, Your Honor,

21   sorry.

22                        **CROSS-EXAMINATION**

23   **BY MR. KACHOUROFF:**

24   Q.    Good morning.

25   A.    Good morning.

767

1    Q.    I have a clogged sinus cavity, so I apologize in

2    advance if I am not clear.

3          You were in the Army.

4    A.    I was.

5    Q.    Was your military occupational specialty 11 Bravo?

6    A.    It was.

7    Q.    What was your specialty within your company?

8    A.    I held various positions within my company, and of

9    course it changes as I went up through ranks.  First

10   deployment I was a machine gunner.  My second deployment,

11   I worked a variety of odd jobs because I was put into the

12   headquarters company.  So I ran this, like, aerostats kind

13   of detail for a couple of months.  Then I was a team

14   leader in the headquarters company.  And then in my final

15   deployment, I was a team leader in an infantry company.

16   Q.    From one 11 Bravo to another, thank you for your

17   service.

18   A.    Don't thank me, thank my recruiter.

19   Q.    You stated that your work focused on right-wing MAGA

20   groups, MAGA extremism; right?

21   A.    That's correct.

22   Q.    Why do you focus on right-wing MAGA extremism?

23   A.    Because it's prevalent and it's relevant.  I did have

24   a background in it from my years as an activist, and I

25   have seen how those connections kind of blend over into

1    conventional mainstream politics even.

2    Q.   Why do you not focus on left-wing extremism?

3    A.   I do, to the extent that it is in the news.  I have

4    covered, you know, the Black Lives Matter protests and

5    various other kind of -- the Palestine activists and

6    different groups that are going on.

7    Q.   So BLM would be left extremism?

8    A.   I mean, it is often associated with left extremism.

9    Q.   Okay.  And your view is right-wing extremism is

10   disgusting, is a deplorable belief system.  Is that fair

11   to say?

12   A.   Those aren't the words I have used.  There is some

13   concerning aspects to it, certainly.

14   Q.   What would be the concerning aspect to it?

15   A.   The tendency towards authoritarianism, the kind of

16   ethnic nationalism, particularly within like the White

17   Identity movement.  The support for, you know, the police

18   state.  The interconnection between kind of paramilitary

19   groups such as The Oath Keepers and the Three Percenters

20   and law enforcement agencies, things of that nature.

21   Q.   Well, what makes those things bad, an authoritarian

22   state?

23            MR. KLOEWER:  Objection, Your Honor, relevance.

24            THE COURT:  Sustained.

25   Q.   (BY MR. KACHOUROFF)  You said authoritarianism,

 1    nationalism, the police state.  That could be Soviet

 2    Russia; right?

 3    A.   It could.  It could also --

 4         MR. KLOEWER:  Objection, Your Honor.

 5         THE WITNESS:  -- be Nazi Germany.

 6    Q.   (BY MR. KACHOUROFF)  It could also be Nazi Germany.

 7    I am trying to understand what the distinction is, why you

 8    think that is not a left wing ideal as well.  Could you

 9    explain that?

10         MR. KLOEWER:  Objection, Your Honor, relevance.

11         THE COURT:  Sustained.  Approach.

12         (A bench conference is had.)

13         THE COURT:  Where are you going with this?

14         MR. KACHOUROFF:  She opened the door in calling

15    these things right-wing MAGA extremism.  She flagged the

16    bad things.  And I just want to see if she is unbiased.  I

17    am going towards her propensity for bias in this case, and

18    whether she can be -- she poses as an impartial

19    journalist, and I just want to show that she is not.

20         MR. KLOEWER:  That is not what is at issue in this

21    dispute.  She is here as a witness to speak to her

22    knowledge of the facts that are at issues; namely the

23    identification by Joe Oltmann, her familiarity with Eric

24    Coomer, and her familiarity with the facts surrounding

25    Antifa.

770

 1        THE COURT:  Well, I think she opened the door to

 2   some of this by her testimony on direct with respect to

 3   her focus, particularly the question with respect to what

 4   she identified as a right-wing extremism, and the question

 5   of what she identified as left-wing extremism.

 6        I will allow you to ask a few other questions to

 7   test her credibility, but I am not going to let you go

 8   very far with this.

 9        MR. KACHOUROFF:  I don't plan on going very far.

10   Thank you.

11        (In the hearing of the jury.)

12   Q.   (BY MR. KACHOUROFF)  Do you believe that right-wing

13   extremists pose a special or unusual threat of violence?

14   A.   Yeah.

15   Q.   You started the Antifa group for Colorado Springs,

16   did you not?

17   A.   Yes, I was involved in its formation.

18   Q.   Initially you denied that until people began to

19   clamor and out you as the founder of Antifa for Colorado

20   Springs.

21   A.   No, that is not true.  As soon as someone connected

22   me -- like I was initially doxed by an anonymous account

23   on Twitter sometime in 2019.  It was while I was working

24   at the Humane Society, and it was after I had stopped

25   having anything to do with any activism.  But at that time

1    on social media I admitted it.

2         While I had been working as a journalist, any time

3    I wrote a story that had to do kind of with activism or

4    politics, it included a disclosure that I was a former

5    activist involved in anti-fascist work.  The first one I

6    think was in 2018, when I covered an Occupy ICE event, and

7    they ran that disclosure then.  There had been multiple

8    subsequent disclosures run by the Colorado Springs

9    Independent during my tenure there.

10   Q.   I am going to show you an exhibit.  You just said

11   doxing is bad; right?

12   A.   I said I was doxed.

13   Q.   Okay.  It is a bad thing, though, don't you agree?

14   A.   There are problems with it certainly.

15   Q.   Just problems.  What is good about it?

16        MR. KLOEWER:  Objection, Your Honor, relevance.

17        THE COURT:  Can you approach, please.

18        (A bench conference is had.)

19        THE COURT:  Where are you going?

20        MR. KACHOUROFF:  Again, she just said that

21   doxing -- she said that she was doxed.  And I am showing

22   an exhibit where she posts online that she was attempting

23   to dox somebody and saying this is a person we should go

24   after, in order to show that she is still engaged in

25   activism even now as we speak.  I have to establish the

1    date of the Tweet, but I was getting ready to show her

2    that.

3            THE COURT:  Mr. Kloewer?

4            MR. KLOEWER:  This is getting pretty far afield of

5    what's at issue here.  As far as what is relevant to the

6    facts of this case, I don't think her statement about

7    being doxed gives rise to anything that is going to assist

8    the jury on whether she was on an Antifa call, what Joe

9    Oltmann had to say about it, or whether she knows Eric

10   Coomer.

11           MR. KACHOUROFF:  They opened the door for the

12   right-wing extremism, Judge, I didn't.  They talked about

13   it, I let it go on, and I have the right to respond.

14           MR. KLOEWER:  Well, he opened the door to the word

15   doxed.

16           THE COURT:  All right.  The objection is sustained.

17   Q.   (BY MR. KACHOUROFF)  You have actually doxed people

18   yourself, or tried to.

19   A.   I have.

20           MR. KLOEWER:  Objection, Your Honor.

21           THE COURT:  Overruled.

22   Q.   (BY MR. KACHOUROFF)  And you appeared as late as

23   December of 2022, after you started doing journalism, you

24   appear in Tweets online with an Antifa flag behind you.

25   A.   That's true, yes.

1    Q.   And in one of your posts, you wrote about how proud

2    you are that you made a bunch of people miserable.  You

3    called them "assholes," right?

4    A.   That's true, yes.

5    Q.   If you could go back in time, you would do it again?

6    A.   That is true, yes.

7    Q.   You have also, as late as December of 2022, were

8    asked if you support violence, and you said you did;

9    right?

10   A.   I did, yes.

11   Q.   And so would it be fair to say you are still an

12   activist, but you are also writing articles as a

13   journalist?

14   A.   No, I am not involved in any kind of activist

15   activity.  And I have since recanted and repented of the

16   more violent aspects of my activism.  And I would say that

17   it is important to kind of consider those statements and

18   that activism in the context of the kind of, I guess,

19   sectarian, for lack of better word, kind of confrontations

20   between leftist activists and right-wing activists, like

21   the Proud Boys, likes these white nationalist

22   organizations.

23        You know, I was an activist during the 2017 Unite

24   the Right rally.  I wasn't there, but that was something

25   on everybody's mind, when a white nationalist plowed his

1    car into a crowd of protesters, when the Proud Boys were

2    engaging in running street fights with activists in

3    Portland, Oregon.

4         And you know the people that I was engaging with,

5    the people that I, as you pointed out, referred to as

6    "assholes" were people who believed that the United States

7    should become a white ethnostate.

8    Q.   Let me stop you one second.  You mentioned Portland.

9    The Proud Boys didn't burn down Portland, did they?

10   A.   Did anyone burn down Portland?

11        MR. KLOEWER:  Objection.

12        THE COURT:  Counsel, approach.

13        (A bench conference is had.)

14        THE COURT:  All right.  So I am going to invite

15   Ms. Beedle up, and I will give her the same admonition I

16   gave Mr. Oltmann.  These questions, these follow-up

17   questions are not relevant as to whether she is credible

18   about whether or not she was on an Antifa call with

19   Mr. Oltmann or that Dr. Coomer was on that call.

20        I understand she is running, for lack of a better

21   word, amuck a little bit.  She doesn't have her own

22   attorney here.  So I am just going to ask -- to call her

23   up and do the same admonition that I gave Mr. Oltmann.

24        Ms. Beedle, would you step up here for one moment.

25        So, Ms. Beedle, I am going to ask you -- you need

775

```
 1   to listen to the question and answer the question.  I know

 2   it is a very unusual pattern of communication that we have

 3   here in court, but it will make things go quicker, and it

 4   will develop less objections that I have to rule outside

 5   of the context of the jury.

 6           THE WITNESS:  I understand.

 7           THE COURT:  All right.  Thank you.

 8           MR. KACHOUROFF:  I have 5 minutes.

 9   Q.  (BY MR. KACHOUROFF)  You posted online that a big

10   part of gravitating toward Antifa was the same excitement

11   of being in the Army; everything was heavily

12   unit-by-small-unit tactics.  Did you go to jump school?

13   A.   No.

14   Q.   Ranger school?

15   A.   No.

16   Q.   You said it was fun to be part of a team and to "fuck

17   shit up again," right?

18   A.   Yes.

19   Q.   I don't say that in a derogatory way, that is the way

20   the military talks; right?

21   A.   That's true.

22   Q.   You have very low tolerance for the rights' use of

23   faux military aesthetics.

24   A.   Yes.

25   Q.   Fair to say somebody who is committed to the cause
```

1    and considers the far right their enemy, would say and do

2    just about anything to make sure they didn't advance?

3              MR. KLOEWER:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              MR. KACHOUROFF:  I have nothing further, Your

6    Honor.

7              THE COURT:  Mr. Kloewer.

8              MR. KLOEWER:  Just a few questions.

9                      **REDIRECT EXAMINATION**

10   **BY MR. KLOEWER:**

11   Q.   Let's get back to a few important questions.  You say

12   you don't know Dr. Coomer.

13   A.   Correct.

14   Q.   Never met -- you say you've never met him.

15   A.   Never met him.

16   Q.   You say you've never spoken to him.

17   A.   No.

18   Q.   Is Eric Coomer, based on your experience with these

19   left-wing activist groups, is he what you might consider a

20   typical Antifa member?

21             MR. KACHOUROFF:  Objection, lacks personal

22   knowledge.

23             THE COURT:  Sustained.

24   Q.   (BY MR. KLOEWER)  Would a corporate executive, such

25   as Eric Coomer, be someone who would stand out in Antifa?

777

1            MR. KACHOUROFF:  Objection, Your Honor.

2            THE COURT:  Overruled.

3            THE WITNESS:  It would be odd, yes.

4            MR. KLOEWER:  No further questions, Your Honor.

5            THE COURT:  All right.  Ms. Beedle, you may step

6      down, you are released.

7            Ladies and gentlemen of the jury, it is almost

8      12:30, so you are released for lunch for 45 minutes.  We

9      will see you back here at 1:15.  I do have a longer

10     general admonition to you because we are about midway

11     through the trial, and also because there has been more

12     interest in this trial from the public than our normal

13     civil trial.

14           So do not talk to each other about the case or

15     anyone involved in the case until the end of trial when

16     you go to the jury room to decide your verdict.  Outside

17     the courtroom, do not let anyone tell you anything about

18     the case or about anyone involved in it until the trial

19     has ended.  If someone should try to talk to you about the

20     case during the trial, please report it to the courtroom

21     deputy immediately.

22           During the trial, you should not talk with or speak

23     to any parties, lawyers, or witnesses involved with the

24     case, you should not even pass the time of day with any of

25     them.  It is important not only that you do justice in

1   this case, but that you also give the appearance of doing

2   justice.

3        Do not read any news stories or articles about the

4   case or about anyone involved in it or listen to any radio

5   or television reports about the case or about anyone

6   involved in it.  Do not do any research, such as checking

7   dictionaries or making any investigation about the case on

8   your own.

9        Do not make up your mind during the trial about

10  what the verdict should be.  Keep an open mind until after

11  you have gone to the jury room to decide the case and you

12  and the other jurors have discussed all of the evidence.

13        If you need to tell me something, just let the

14  courtroom deputy know, and I will address it once she lets

15  me know.  All right.  Thank you very much.

16        (Outside the presence of the jury.)

17        THE COURT:  All right.  Thank you.  Please be

18  seated.

19        Counsel, anything to address outside the province

20  of the jury?

21        MR. CAIN:  I don't think so.  There are a few

22  things we are talking about.

23        MR. KACHOUROFF:  Nothing, Your Honor.

24        THE COURT:  So if we are going to talk about

25  anything before we bring the jury back, if you all can be

1    back here a little earlier, we can talk about that,

2    otherwise we are holding the jury up.  I am not leaving or

3    going anywhere, so you can just come back to the courtroom

4    and let my courtroom deputy know, and please also make

5    sure defense counsel knows what time to come back also.

6            All right.  We will be in recess.

7            (Lunch break is taken from 12:31 p.m. to 1:27 p.m.)

8            THE COURT:  Thank you.  Please be seated.

9            All right.  Are we ready for the jury?

10           MS. MORGAN:  Yes, Your Honor.  We discussed it, and

11   we think it is best to wait to address the Montgomery

12   issue until after the jury is dismissed for the day.

13           THE COURT:  Okay.

14           MS. DEMASTER:  After the next two witnesses?

15           MS. MORGAN:  Yes.

16           THE COURT:  Madam deputy.

17           And I just remind you that because of the jury's

18   request, we have a hard stop at 4:30 today.

19           (In the presence of the jury.)

20           THE COURT:  Thank you.  Please be seated.

21           All right.  Counsel, are you ready to call your

22   next witness?

23           MR. KLOEWER:  Yes, Your Honor.  Plaintiff calls

24   Kurt Olsen.

25           COURTROOM DEPUTY:  Mr. Olsen, if you could stand up

1    here, please.  If you will stand up here and I will swear

2    you in.

3                          **KURT OLSEN**

4    having been first duly sworn, testified as follows:

5              THE WITNESS:  I do.

6              COURTROOM DEPUTY:  Please be seated.

7              Please state your name, and spell your first and

8    last name for the record.

9              THE WITNESS:  My name is Kurt, K-U-R-T, Olsen,

10   O-L-S-E-N.

11                       **DIRECT EXAMINATION**

12   **BY MR. KLOEWER:**

13   Q.   Good afternoon, Mr. Olsen.  You are one of Mike

14   Lindell's lawyers; right?

15   A.   Correct.

16   Q.   And you are his personal lawyer; is that correct?

17   A.   I represent Mike Lindell, yes.

18   Q.   Okay.  Your practice is based out of the Maryland and

19   Washington, D.C. area; is that right?

20   A.   Correct.

21   Q.   And how long have you been practicing law?

22   A.   Since 1992.  So coming up on 33 years.

23   Q.   And prior to 2020, you had no experience -- or, well

24   you had no experience working in election law; is that

25   correct?

1   A.   That's correct.

2   Q.   But in early 2021, you left the firm you were at and

3   switched your work to election work.

4   A.   My focus shifted in November 2020, before I left the

5   firm.

6   Q.   Okay.  And subsequent to that time, is it fair to say

7   you focused your efforts on election-related litigation?

8   A.   Correct.

9        MR. KLOEWER:  Let's pull up Exhibit 57 for the

10  witness, if we could, please.  Do you recognize this

11  document, Mr. Olsen?

12  A.   Yes.

13  Q.   It has -- it indicates "Olsen Law, P.C." at the top.

14  Do you see that?

15  A.   Yes.

16  Q.   The date is February 25, 2021.

17  A.   Yes.

18  Q.   Is this the Retainer Agreement you entered into with

19  Mr. Lindell?

20  A.   Yes.

21       MR. KLOEWER:  Move to admit Exhibit 57.

22       THE COURT:  Any objection?

23       MR. KACHOUROFF:  No objection.

24       THE COURT:  So admitted.

25       (Exhibit No. 57 is admitted.)

1    Q.    (BY MR. KLOEWER)  I would like to look at a couple

2    aspects of this document for a minute.  So we already

3    noted that date there at the top, February 25, 2021.  That

4    is accurate; right?

5    A.    Yes.

6    Q.    And the top left corner there it says "Mike Lindell.

7    CEO My Pillow, Inc.," do you see that?

8    A.    Yes.

9    Q.    You don't represent My Pillow, do you?

10   A.    I do not.

11   Q.    And as he has indicated here, it is just because you

12   associated him with My Pillow at the time when you entered

13   into this.

14   A.    I think pretty much everybody associates Mike with My

15   Pillow, yeah.

16   Q.    Great.  So you would agree that -- well, let me see

17   here, let's talk about some of the substance of this.  The

18   subject title up top here indicates the scope of your

19   representation.  And I want to look at the portion that

20   starts with "Engagement."  Do you see that?

21   A.    Yes.

22   Q.    It says "Engagement Agreement to defend, investigate

23   and/or bring potential claims for election law

24   violations."  Would you agree that that sort of sets the

25   parameters of your representation?

1    A.    Yes.

2    Q.    And did you -- well, let's scroll down a little bit,

3    I want to take a look at the second paragraph, about the

4    fourth line down, "Attorney Fees."  I will draw your

5    attention, that begins with the sentence "Given."  Do you

6    see that about four lines down?

7    A.    Yes.

8    Q.    "Given the significant public interest in uncovering

9    the election fraud that has taken place, I am reducing my

10   hourly rate from $955 to $500 per hour for my services in

11   connection with this agreement."  Did I read that

12   correctly?

13   A.    Yes.

14   Q.    And you agreed to reduce your rate for Mr. Lindell

15   because you take a personal interest in these issues; is

16   that fair?

17   A.    As stated, given the significant public interest at

18   the time; correct.

19   Q.    And prior to representing Mr. Lindell, you

20   represented President Trump directly, didn't you?

21   A.    I have an attorney/client relationship, yes.

22   Q.    And he is who introduced you to Mr. Lindell

23   originally.

24   A.    Yes.

25   Q.    You ultimately have pursued litigation pursuant to

1    this agreement, right?

2    A.    Yes.

3    Q.    He filed lawsuits in Arizona, for example.

4    A.    Yes.

5    Q.    And through those lawsuits, you made various efforts

6    over the years to identify any source of election fraud;

7    is that fair?

8    A.    Yes.

9    Q.    Do you still represent Mr. Lindell pursuant to this

10   agreement?

11   A.    The agreement is still in effect, that's correct.

12   Q.    You still consider yourself to be his counsel.

13   A.    Correct.

14   Q.    You never brought any claim against Eric Coomer,

15   though, have you?

16   A.    No.

17   Q.    I want to talk about the Cyber Symposium, and that is

18   the issue that I'm primarily interested in hearing your

19   testimony on today.  But I want to start by first looking

20   at some of the communications that preceded that event.

21         MR. KLOEWER:  So can you pull up Exhibit 61,

22   please.

23   Q.    (BY MR. KLOEWER)  Do you see the email in front of

24   you, Mr. Olsen?

25   A.    I do.

```
 1    Q.   And it is from maryfanning@protonmail.  Do you see

 2    that?

 3    A.   Yes.

 4    Q.   On March 11, 2021.

 5    A.   Yes.

 6    Q.   We see this email address kurtols@protonmail.com.  Is

 7    that your email address?

 8    A.   Yes.

 9         MR. KLOEWER:  Move to admit Exhibit 61.

10         THE COURT:  Any objection?

11         MR. KACHOUROFF:  Without objection.

12         THE COURT:  So admitted.

13         (Exhibit No. 61 is admitted.)

14    Q.   (BY MR. KLOEWER)  Okay.  Mary Fanning is the

15    co-producer of Mike Lindell's film Absolute Proof; right?

16    A.   I don't know that to be a fact.

17    Q.   You know she was involved in the production of that

18    movie.

19    A.   That is my recollection; that she was involved, yes.

20    Q.   Okay.  And Mary Fanning has provided you a variety of

21    information over the years; correct?

22    A.   Well, yes.

23    Q.   Primarily related to election fraud concerns.

24    A.   Mary Fanning writes a column and has articles on

25    various national security issues and elections.  So it
```

1    would be broader than just to say elections.

2    Q.   And this email, at the top indicates "attachments,"

3    it says "20210204 Dominion Letter to the American Report."

4    Do you see that?

5    A.   Yes.

6    Q.   Who is the American Report?

7    A.   The American Report is the publication that Mary

8    Fanning authors.

9    Q.   Did you ever represent the American Report?

10   A.   No.

11   Q.   And she starts off by, "Dear, Kurt.  Thought you

12   might enjoy this letter I have attached from Clare Locke."

13   Do you see that?

14   A.   I do.

15   Q.   Who is Clare Locke?

16   A.   I believe the law firm that is representing Dominion

17   in, among other actions, the defamation cases.

18   Q.   We can set this exhibit aside.  I would like to focus

19   on the attachment she references also as having been

20   provided with that email.

21        MR. KLOEWER:  Can you pull up Exhibit 49.

22   Q.   (BY MR. KLOEWER)  All right.  Mr. Olsen, do you

23   recognize the document in front of you?

24   A.   I probably saw it, but I don't have a specific

25   recollection at this point.  But if you give me a second,

1    maybe I can look at it and refresh a little bit.

2    Q.   Sure.

3    A.   Okay.

4    Q.   And in the bottom right-hand corner it says "Olsen

5    000222."  Do you see that?

6    A.   Yes.

7    Q.   And that indicates it is a document you produced to

8    us pursuant to the subpoena we issued; right?

9    A.   Most likely, yes.

10   Q.   The subject line of this email at the top says

11   regarding "False Statements About Dominion and Its Role in

12   the Recent Elections."  Do you see that?

13   A.   Yes.

14   Q.   I want to draw your attention -- obviously we have

15   established that you don't represent the American Report.

16   Is it fair to say this was a retraction demand sent to

17   that publication and shared with Ms. Fanning?  Is that

18   your understanding of the document?

19   A.   That appears what it is.

20   Q.   Let's look at the last paragraph of that first page,

21   then we will start looking at the second page after that.

22        MR. KLOEWER:  If we can zoom in there real quick.

23        Have I admitted this exhibit yet?

24        THE COURT:  You have not.

25        MR. KLOEWER:  I move to admit Exhibit 49, if I

1    could.

2            THE COURT:  Any objection?

3            MR. KACHOUROFF:  I do have an objection, Your

4    Honor.

5            THE COURT:  All right.

6            MR. KACHOUROFF:  I said I have an objection.

7            THE COURT:  Can you approach, please.

8            (A bench conference is had.)

9            MR. KACHOUROFF:  I didn't want to stop the

10   examination.  I can't see the monitor when exhibits are

11   coming up, and actually what I was going to object to was

12   concerning attorney/client privilege grounds, but this is

13   an objection to relevance.  He has to be able to tie it up

14   that somebody else saw Clare Locke.

15           Clare Locke telling Mary Fanning about a retraction

16   has nothing to do with Mike Lindell.

17           MR. KLOEWER:  It goes to the defendants' knowledge

18   of the falsity of the claims.  Mr. Olsen was an authorized

19   representative of the defendants throughout the Cyber

20   Symposium.  This is a document that alerted him to the

21   falsity of claims surrounding Dominion Voting Systems.  It

22   speaks to their knowledge at the time of the publications.

23           MR. KACHOUROFF:  It doesn't go to falsity at all.

24   It has nothing to do with falsity.  That is an opinion

25   from a law firm that -- it is a retraction demand.

789

1          MR. KLOEWER:  It provides links to various sources

2     that can disprove the allegations of election rigging.

3          MR. KACHOUROFF:  If you want to open that door, it

4     will lead to extensive discussion from Mr. Olsen about

5     what he knows about Dominion.

6          MR. DUANE:  Slow down.

7          MR. KACHOUROFF:  If he opens that door there will

8     be extensive discussions from Mr. Olsen about what he

9     knows about Dominion and will go in-depth into what he

10    knows and how he knows it.  The allegations in this case

11    are defamation from Mike Lindell.  It is not Dominion, but

12    Mr. Coomer.

13         MR. KLOEWER:  Your Honor, if we are going to open

14    the door to Dominion claims, I asked Mr. Olsen about this

15    in his deposition, he asserted objections to

16    attorney/client privilege and work product.  If now he is

17    going to raise those --

18         THE COURT:  Sustained.

19         (Exhibit No. 49 is refused.)

20         (In the hearing of the jury.)

21    Q.   (BY MR. KLOEWER)  All right.  We will take a look at

22    some of your other communications with Ms. Fanning.

23         MR. KLOEWER:  Can you pull up what has been marked

24    as Exhibit 66, please.

25    Q.   (BY MR. KLOEWER)  Do you see this email, Mr. Olsen?

1    A.    Yes.

2    Q.    And that is your email address at the top.

3    A.    Correct.

4    Q.    Dated April 6, 2021, to Mary Fanning.  Do you see

5    that?

6    A.    Yes.

7    Q.    And, again, bottom right-hand corner, we see this was

8    produced by you to us; is that correct?

9    A.    Yes.

10          MR. KLOEWER:  I move to admit Exhibit 66.

11          THE COURT:  Any objection?

12          MR. KACHOUROFF:  Objection, relevance.

13          THE COURT:  Overruled.

14          (Exhibit No. 66 is admitted.)

15   Q.    (BY MR. KLOEWER)  This is April 2021, a few months

16   before the Cyber Symposium, that you state, "Hi, Mary.  Do

17   you know anyone else threatened with a lawsuit by

18   Dominion/Smartmatic/Coomer?"

19   A.    Yes.

20   Q.    As of April 2021, you personally were aware of

21   Dr. Coomer's other litigation, fair?

22   A.    The email says what it says.  As I am sitting here

23   today, I don't know when I learned of Coomer.  There was a

24   lot of the litigation that was beginning and threats of

25   litigation.  At the time there were -- Dominion, I think,

1    bragged about sending out 150 cease and desist letters.

2            And part of the reason for this is because Dominion

3    was sending cease and desist letters to witnesses

4    threatening them with litigation for things that had

5    nothing to do with Dominion, they just happened to file --

6    do an affidavit that was attached to a complaint that

7    didn't even say anything about Dominion.

8            But the reason why I am asking her, though, and I

9    know how to answer your question, is because Dominion took

10   a shotgun approach to threaten lawsuits against anybody,

11   whether or not they had anything to do with it.  We were

12   investigating to do a lawsuit against Dominion, a class

13   action, which we did bring.

14           THE COURT:  Mr. Olsen, just the jury has heard this

15   a few times, I have told a few witnesses, if you can

16   listen to the question that Mr. Kloewer is asking you and

17   just answer that question, defense counsel will have an

18   opportunity to cross-examine you, as well.  But it makes

19   our proceeding --

20           THE WITNESS:  I will do my best, Your Honor.

21           THE COURT:  -- go more efficiently.  Thank you.

22   Q.  (BY MR. KLOEWER)  But at this time you didn't make

23   any effort to pull the defamation complaint that

24   Dr. Coomer had filed against Joe Oltmann, for example.

25   A.  I didn't even know Joe Oltmann at this time.  I don't

1    think I hadn't ever heard anything about him.

2    Q.   That is not my question.

3    A.   No, is the short answer.

4    Q.   As an attorney, though, you do have access to court

5    filing systems and the ability to find complaints if you

6    wanted to; right?

7    A.   Certainly in the federal system, yes.

8    Q.   And you didn't reach out to Dr. Coomer in any way to

9    contact him about the validity of any claims against him,

10   did you?

11   A.   No.

12   Q.   You didn't reach out to myself, for example, or any

13   attorneys at this table requesting a copy of any

14   pleadings.

15   A.   No.

16   Q.   You didn't request any call to discuss any

17   allegations about Dr. Coomer.

18   A.   No.

19   Q.   And, in fact, you never -- you didn't read the

20   Complaint that Dr. Coomer filed against Mike Lindell, did

21   you?

22   A.   I think at the time of my deposition I was asked

23   that, and I don't recall reading it before then, no.

24   Q.   And just to be clear, your deposition took place on

25   June 15, 2023.  Does that sound correct?

1   A.   Yes.

2   Q.   And I deposed you in your office in Washington, D.C.

3   A.   Somebody's office.

4   Q.   Okay.  And just so we are clear on the timeline, the

5   lawsuit was served on Mike Lindell in April of 2022.  Does

6   that sound accurate?

7   A.   I believe so.

8   Q.   So in the 15 intervening months, you hadn't made any

9   attempt to read the Complaint filed against your client,

10  Mike Lindell.

11  A.   Correct.

12  Q.   As you sit here today, have you made any effort to

13  familiarize yourself with the allegations against

14  Mr. Lindell?

15  A.   I read the Complaint when there was some summary

16  judgment briefing that was being done.  So this was maybe

17  a year ago, I think, or maybe eight months.  It has been a

18  while.  But I did read the Complaint at that time.

19  Q.   Mid-2024; is that fair?

20  A.   That sounds about right.

21  Q.   So in the two-plus intervening years, you didn't make

22  any effort to familiarize yourself with the claims against

23  Mr. Lindell.

24       MR. KACHOUROFF:  Objection, Your Honor, relevance.

25       THE COURT:  Approach.

     1              (A bench conference is had.)

     2         THE COURT:  All right.  What is the relevance

     3    whether or not he familiarized himself with the

     4    allegations in this case?

     5         MR. KLOEWER:  Disregarding the truth, willful

     6    avoidance of the truth, disregarding of reliable sources.

     7    Actual malice factors, specifically Mr. Lindell's

     8    knowledge of the claim.

     9         We are going to share videos about when Mr. Lindell

    10    relied on Mr. Olsen for his knowledge about election

    11    systems, and his own representatives made no effort to

    12    corroborate, to confirm, to investigate, or to verify the

    13    claims at issue in this dispute.

    14         THE COURT:  All right.

    15         MR. KACHOUROFF:  Judge, as you know, Parker Daniels

    16    Kibort represented Mr. Lindell in this suit, so they would

    17    have been responsible for the suit.  He's established no

    18    foundation that Kurt was supposed to be looking at the

    19    suit or that that was part of what he was being paid to

    20    do.

    21         THE COURT:  Overruled.

    22         (In the hearing of the jury.)

    23    Q.   (BY MR. KLOEWER)  So in the more than 2 years after

    24    filing of the lawsuit, you made no effort to familiarize

    25    yourself with the allegations lodged by Dr. Coomer against

1    Mr. Lindell.

2    A.    No, that would not be true.

3    Q.    You made efforts to read the Complaint in this case

4    prior to that time?

5    A.    I understood the allegations and the nature of the

6    allegations that were made against him.  I didn't need to

7    specifically -- and I did read the Complaint, as I said

8    earlier.  But all of the claims against Mike Lindell

9    relate to his statements about Dominion Voting Systems

10   being used to rig elections and whether there is evidence

11   of that.  And so I spent the past 4 years looking at

12   evidence that shows just that.

13   Q.    Evidence that Dr. Coomer --

14   A.    Dr. Coomer, in his high position at the company, I

15   believe he was like chief of security and something, but

16   he was at a high level, and also has several patents on

17   voting systems, in my view would be responsible for the

18   architecture of these voting machines which are configured

19   to allow unauthorized access.  And, so, yes.

20   Q.    Let's talk a little bit about Mike Lindell's Cyber

21   Symposium.  You were involved in the planning for Mike

22   Lindell's Cyber Symposium; right?

23   A.    Yes.

24   Q.    You partook in discussions about the schedule leading

25   up to that event.

 1   A.   Yes.

 2        MR. KLOEWER:  Can you pull up what has been marked

 3   as Exhibit 86.

 4   Q.  (BY MR. KLOEWER)  And this is an email dated

 5   Wednesday, August 4th.  Do you see that?

 6   A.   Yes.

 7   Q.   And under the -- from an individual named James Oaks.

 8   A.   Yes.

 9   Q.   With a "cc" to Mike Lindell and Kurt Olsen, as well

10   as a handful of others.

11   A.   Yes.

12   Q.   Do you see that?

13        MR. KLOEWER:  Move to admit Exhibit 86.

14        THE COURT:  Stipulated.  So admitted.

15        (Exhibit No. 86 is admitted.)

16   Q.  (BY MR. KLOEWER)  The third page of this document --

17   I think this exhibit was split up.  We have on the third

18   page here, an attachment of the schedule for the event.

19   Can you scroll down to the third page.  This is for day

20   one.

21        MR. KLOEWER:  I would like to show you also Exhibit

22   91, which is an extension of this document, if I could

23   pull that up.

24   Q.  (BY MR. KLOEWER)  Do you recognize this document,

25   Mr. Olsen?

1    A.    I have no reason to doubt its authenticity.    I

2    haven't seen it in 5 years.  So, yes.  Generally, yes.

3    Q.    You do recall being part of the discussions planning

4    for the symposium, as we have established; right?

5    A.    Yes.

6    Q.    You were included on these discussions trying to

7    establish the schedule for speakers at that event.

8    A.    Yes.

9    Q.    Was this schedule ultimately adhered to at the Cyber

10    Symposium?

11    A.    I don't think so.

12    Q.    And that's because things got a bit hectic right

13    away; right?

14    A.    Yes.  Right away, being after the second day, Mike

15    lost his voice, and so he couldn't really speak, so things

16    became more chaotic, shall we say.

17    Q.    And ultimately speakers were put on stage that hadn't

18    been vetted; right?

19    A.    I don't know.

20    Q.    You didn't vet Joe Oltmann's claims before you put

21    him on stage, did you?

22    A.    I didn't put Joe Oltmann on stage, to my

23    recollection.

24    Q.    You didn't make any effort to investigate Joe Oltmann

25    prior to the event, though; right?

1    A.    No.

2    Q.    And you did speak with him backstage at the event a

3    number of times; correct?

4    A.    I recall speaking with him.  I don't know if it was

5    one or two times or more, but I do recall speaking with

6    him.

7    Q.    And as far as the event, itself, you also appeared on

8    stage at that event alongside Mr. Lindell; correct?

9    A.    I think I only appeared onstage at the end.

10    Q.    Well, let's pull up what has been marked as Exhibit

11    197.  And we will -- I am sorry, I haven't -- apologize

12    Your Honor, I still haven't admitted 191 into evidence.  I

13    move to admit that, please?

14         THE COURT:  So admitted, as stipulated.

15         (Exhibit No. 191 is admitted.)

16         MR. KLOEWER:  Let's pull up 197, if we could,

17    please.

18    Q.    (BY MR. KLOEWER)  I believe I heard you say you

19    appeared on the last day of the event.

20    A.    That I recall, speaking at the close of the event,

21    yes.

22         MR. KLOEWER:  All right.  I move to admit Exhibit

23    197.

24         THE COURT:  Any objection?

25         MR. KACHOUROFF:  No objection.

1           THE COURT:  So admitted.

2           (Exhibit No. 197 is admitted.)

3           MR. KLOEWER:  Let's take a look at this clip here,

4    if we could.

5           (Exhibit 197 played in open court.)

6    Q.   (BY MR. KLOEWER)  So he called you his "vetter"

7    there.  Did you hear that?

8    A.   Yes.

9    Q.   Would you agree with that characterization?

10   A.   Sure.

11   Q.   He said you would "sift through all Dominion stuff

12   and sort of flag what was important."  Did you hear that?

13   A.   I did.

14   Q.   You never flagged any information about Eric Coomer

15   in those efforts, did you?

16   A.   I don't recall Eric Coomer's name coming up, so, no.

17   Q.   And he said a lot of the people you've seen

18   onstage -- we established this was at the end of the

19   event; right?

20   A.   I'm not sure, to be honest, because I don't remember

21   what you just showed.  I remember giving a speech to thank

22   Mike and everyone for attending.  And I don't remember

23   exactly what I said to people.  That could have been that,

24   or I am not sure if I spoke before.

25   Q.   Okay.

800

1    A.    I saw the date on there, it said August 18th, but

2    that was after the event.  So, anyway --

3    Q.    So during the event, you weren't on stage until that

4    point.

5    A.    Yeah.  My recollection was I did not come up on stage

6    until at the close, that is when I came up.  That is my

7    recollection.

8    Q.    For the remainder of the event you were backstage.

9    A.    Correct.

10   Q.    You were working with the other people who presented

11   on stage throughout that event.

12   A.    No.  Many of the people that were onstage I did not

13   work with for that.  There were certain people, such as

14   was mentioned in that clip, Dr. Frank, Dr. Shiva, Phil

15   Waldron.  I worked with our -- you know, we talked about

16   this at the deposition, but the Red Team that I put

17   together of cyber experts.  So I was doing a lot of work

18   in that capacity, not -- it wasn't like vetting every

19   single person that was going to be stepping up on stage at

20   this symposium.

21   Q.    One of the members of that Red Team was Josh Merritt;

22   right?

23   A.    Yes.

24   Q.    You spoke with Mr. Merritt several times backstage

25   throughout the event; correct?

1    A.    At the event, whether backstage or not, but, yes.

2    Q.    You spoke with Mr. Oltmann backstage several times,

3    too; correct?

4    A.    Yes.

5    Q.    And you didn't prevent Mr. Oltmann from going on

6    stage or making any efforts to prevent him from going on

7    stage, did you?

8    A.    I don't recall him going up on stage.  So the answer

9    is, no, I don't.

10         MR. KLOEWER:  I want to take a look at what has

11    been marked as Exhibit 218.  If we can pull that up,

12    please.  And this is a video from March of 2023 that was

13    aired on Frankspeech of the Lindell Report.  We move to

14    admit 218.

15         THE COURT:  Any objection?

16         MR. KACHOUROFF:  No objection.

17         THE COURT:  So admitted.

18         (Exhibit No. 218 is admitted.)

19         MR. KLOEWER:  All right.  Let's take a look -- I

20    will represent before -- I understand it appears a bit

21    unclear, but this is the dimension of the screen as it was

22    originally published.  So we only see half of

23    Mr. Lindell's face, but this is how the interview was

24    published in its original context.  So let's take a look

25    and play that video 218.

802

```
 1         THE WITNESS:  Could you tell me the date again?
 2    Q.   (BY MR. KLOEWER)  The date is March, I want to say
 3    March 10 of 2023.
 4    A.   Thank you.
 5         (Exhibit 218 played in open court.)
 6    Q.   (BY MR. KLOEWER)  So he said "that was done by Kurt
 7    Olsen."  Mike Lindell was telling the truth when he said
 8    that, wasn't he?
 9    A.   I think he may have assumed it was me.  There was
10    another person, Dr. Janet Lynn, who was doing a lot of the
11    scheduling.  We were working together.  So I don't think
12    it would be a misstatement for him to think that that was
13    me, because we were working together.  But I just don't
14    recall doing anything with Joe myself.
15    Q.   You don't deny having put Mr. Oltmann on stage, do
16    you?
17    A.   I just don't recall that I did; correct.
18    Q.   You would agree it is possible you did?
19    A.   If you don't recall, then I guess anything would be
20    possible.
21    Q.   And you know about the $5 million challenge that was
22    associated with Mr. Lindell's Cyber Symposium; right?
23    A.   I do.
24    Q.   You know someone took him up on that challenge.
25    A.   Yes.
```

1    Q.   And you know that Mike Lindell has been ordered to

2    pay that $5 million by a court; correct?

3    A.   No.

4    Q.   You are not aware of the district court --

5    A.   It was by an arbitration that ordered him, and it is

6    up on appeal.

7    Q.   From the order of the district court.

8    A.   Correct.

9    Q.   Affirming the arbitration order.

10   A.   Correct.

11        MR. KLOEWER:  Pass the witness.

12        THE COURT:  Okay.  Mr. Kachouroff.

13        MR. KACHOUROFF:  Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15   **BY MR. KACHOUROFF:**

16   Q.   Would you tell the jury a little bit about your

17   background.  Where did you go to college?

18   A.   I was born and raised in Annapolis, Maryland.

19   Attended the U.S. Navy academy, as my father did, my

20   grandfather did.  After that I spent five years as a Navy

21   Seal.  Post that I went to law school.

22   Q.   Where did you go to law school?

23   A.   George Washington University.

24   Q.   When you graduated, which firm did you get a job

25   with?

```
1    A.   Worked at a firm called Kirkland & Ellis.

2    Q.   A very small firm?

3    A.   No, one of the top litigation firms, frankly, now in

4    the world, but at the time it was one of the top in the

5    country.

6    Q.   What was the specialty that you practiced while you

7    were at Kirkland & Ellis?

8    A.   At Kirkland & Ellis I represented General Motors and

9    Dow Corning in product liability litigation.  So if

10   somebody -- alleged a product was defective; a General

11   Motors' case, seatbelts, fuel tanks, things like that.  A

12   Dow Corning case, silicone implements, we would represent

13   them.

14   Q.   How long have you been in private practice, total

15   time?

16   A.   Coming up on 33 years.

17   Q.   You were asked about this topic about Joe Oltmann and

18   you not recalling.  What was the purpose of the Cyber

19   Symposium, was it to have people just go up on stage and

20   say their piece, or was the Cyber Symposium intended to

21   vet data?

22   A.   It was intended to vet data, but also to get the word

23   out about what was happening, and to give people a place

24   to come together to discuss these topics.  And so they

25   mentioned the arbitration award, there were about 30 other
```

1     cyber experts who were invited to attend who had been

2     vetted in terms, not by me, but we set up the parameters,

3     but somebody else checked their credentials.

4            So there are certain credentials that cyber

5     professionals carry, and these individuals who have those

6     credentials and qualified were invited to the symposium.

7     And it was a point to get real people, cyber

8     professionals, as well as lay people and election

9     officials and everybody else together under one roof to

10    discuss, you know, what we believed was going on with the

11    voting machines.

12    Q.   And Mr. Oltmann was not on the schedule to speak.

13    A.   Not to my knowledge.

14    Q.   Not on any of the three days of the Cyber Symposium.

15    A.   Not to my knowledge.

16    Q.   It was asked and insinuated that -- whether you knew

17    that Mr. Oltmann was invited, and your answer was no.  And

18    he said that Mike Lindell said that you would sift through

19    people and vet them.  You weren't the only one doing it;

20    right?

21    A.   Correct.  The vetting was done by another gentleman

22    who was a cybersecurity professional that did the vetting

23    to make sure all these people who submitted

24    applications -- and, as I said, there were about 30 -- 30

25    attended.  There were more that submitted.  Those were the

1    people chosen to attend.

2    Q.    You said the subject of Eric Coomer -- and he asked

3    you if you sifted through and found anything about Eric

4    Coomer, and you said Eric Coomer never came up.  I want to

5    just talk about that.

6    A.    I have no recollection about Eric Coomer.

7    Q.    Was the Cyber Symposium intended to target Eric

8    Coomer?

9    A.    No.

10    Q.    Was the Cyber Symposium intended just to allow anyone

11    to say anything about what they were thinking?

12    A.    No.  It was there to bring forward credible evidence

13    to stimulate a discussion, to give a forum where people

14    could share their views, and to bring together evidence.

15    Q.    So let's just give the jury a little context.

16    February the 5th there is a movie called *Absolute Proof*.

17    Are you aware of that?

18    A.    I have heard about it in the past, yes.

19    Q.    You didn't know Mike Lindell when that came out.

20    A.    I had not been introduced to Mike Lindell.

21    Q.    Okay.  And once you got introduced to Mike Lindell --

22    would it be later, February of 2021.

23    A.    Correct.

24    Q.    Just a few weeks after the *Absolute Proof* video.

25    A.    Correct.

807

1    Q.    And you wanted to vet data from a gentleman named

2    Dennis Montgomery.  Do you recall that?

3    A.    Yes.

4    Q.    And so you spent a fair amount of time trying to vet

5    that data; is that fair to say?

6    A.    Not only vetting the data, but vetting who Dennis

7    Montgomery was as a person.  Was he some guy off the

8    street?  Did he have the experience and credentials that

9    would suggest what he was saying was true?

10   Q.    And what did you determine about his credentials?

11   A.    His credentials were completely accurate.

12   Mr. Montgomery worked for the government as a contractor,

13   CIA, and other agencies.  He worked at a facility called

14   Fort Washington in Belvoir, Virginia.  He worked on

15   classified programs involving data collection.

16   Q.    Let me stop you.  Data collection on whom?

17   A.    Americans.

18   Q.    Has that been determined to be, as far as you know,

19   legal or illegal?

20   A.    At the time, it was illegal.  He was -- at least it

21   has been alleged to be illegal.  He also came forward with

22   litigation in 2014, alleging that Americans were being

23   unlawfully spied upon by NSA and the CIA, and submitted

24   data that is still, to my knowledge, preserved to this day

25   under seal.

808

1          So there were a number of data points when I looked

2    at Dennis Montgomery that validated that he did have the

3    experience to work on programs that involved hacking,

4    hacking any kind of equipment.  Because voting machines

5    are just a computer.  There is nothing special about them.

6    It is a Windows operating system for many of them, out of

7    date usually.

8          There was one other data point I did to validate

9    Dennis Montgomery.

10   Q.   What was that?

11   A.   A sworn declaration submitted in litigation in 2020

12   by a gentleman named --

13         MR. KLOEWER:  Objection, hearsay.

14         MR. KACHOUROFF:  I haven't asked him what the

15   affidavit said.

16   Q.   (BY MR. KACHOUROFF)  So just describe who made the

17   affidavit.

18   A.   Dr. Navid Kashavazr-Nia, K-A-S-H-A-V-A-R-Z--N-I-A.

19   First name N-A-V-I-D.

20   Q.   Before we go into Dr. Navid, I want to back up.  You

21   have been trying to get in the information that Dennis

22   Montgomery had for quite some time, and you have remarked,

23   I think in your deposition, that he was reluctant to turn

24   it over.

25   A.   So Mr. Montgomery is under a court-ordered state

```
1    secret privilege, signed by the then acting DNI, Nick

2    LaPonte.

3    Q.    What does DNI mean?

4    A.    Director of National Intelligence.

5    Q.    Okay.  And so you then fast forward to what is the

6    relevance of Dr. Navid's affidavit here?

7    A.    He validated Dennis Montgomery -- the existence of

8    the program that Dennis Montgomery said he was working on

9    and the underpinnings of the data.

10         MR. KLOEWER:  Objection, Your Honor, hearsay.

11         THE COURT:  Sustained.

12   Q.    (BY MR. KACHOUROFF)  What is Dr. Navid's background?

13   Where does he work?  You know him; right?

14   A.    I do not know him personally.  I did research his

15   background.

16   Q.    Okay.  What did your research reveal?

17   A.    He is a contractor, a cyber professional, contracted

18   at Raytheon for the CIA, the NSA, the FBI.  And part of my

19   research and due diligence on him, The New York Times came

20   out with an article before the election, before the

21   declaration he submitted, it was a 15-page exposé about a

22   fraud committed upon the CIA by another gentleman.

23   Halfway through the article, The New York Times article it

24   states --

25         MR. KLOEWER:  Objection --
```

1        THE COURT:  Sustained.

2        MR. KLOEWER:  -- hearsay.

3   Q.   (BY MR. KACHOUROFF)  It's okay.  Let's move on.

4        The purpose of the Cyber Symposium was really to

5   vet the Dennis Montgomery data, would you agree with that?

6   A.   That was one purpose, yes.

7   Q.   Did that get accomplished at the Cyber Symposium?

8   A.   No.  We were not able to determine whether it was

9   conclusive or not.  We could neither prove or disprove it.

10  When I say "we," I am talking about the Red Team of cyber

11  professionals I brought in to evaluate the data.  We were

12  given a slice -- or they were given a slice of the data,

13  and it could not be -- it was inconclusive.

14  Q.   Josh Merritt was on that Red Team.

15  A.   Correct.

16  Q.   Is he a credible expert in your opinion to have made

17  it onto the team?

18  A.   Well, so Phil Waldron is the one who helped put

19  together what I call the Red Team.  And a Red Team is

20  somebody who is there to, like, do a gut check; is this

21  real?  He brought in a number of folks, and including

22  Josh, who I did not know before.  I had some other folks

23  that I had met that were part of it.  I subsequently have

24  learned some things that would call into question his

25  credibility, yes.

1    Q.   Do you believe him to be a credible expert on the

2    election data that you are looking at?

3    A.   I think that he has certain technical capabilities

4    that are relevant.  Whether he has the capabilities to

5    evaluate the data that was presented is another question.

6    Q.   Did he ever tell Mike Lindell that Dennis

7    Montgomery's data was valid, to your recollection.  Let me

8    strike that and I will rephrase.

9         Before the Cyber Symposium, do you recall whether

10   or not he had ever indicated that he believed that Dennis

11   Montgomery's data was valid?

12   A.   I recall general conversations that we were having at

13   the time where that was communicated.  I don't recall the

14   specifics.  But going into the symposium, we had been --

15   we had been evaluating data in a couple weeks leading up

16   to it.  And the team was -- there was some positive

17   developments that indicated that it was real, because it

18   is very complicated, and there were positive developments,

19   and there was a time when people were like, hey, this is

20   checking out, but we have got to do more due diligence.

21   And so, yes, that opinion I recall generally being

22   expressed.

23   Q.   On direct examination there seemed to be some

24   indication that you knew about the Dominion equipment and

25   vulnerability in the Dominion equipment.

812

```
 1    A.   Yes.

 2    Q.   Are you aware of things happening and irregularities

 3    happening in, like, Antrim, Michigan.

 4    A.   Yes.

 5    Q.   Williamson, Tennessee.

 6    A.   Yes.

 7    Q.   Pennsylvania.

 8    A.   Yes.

 9    Q.   Georgia.

10    A.   Yes.

11    Q.   And did you investigate all of those particular

12    jurisdictions?

13    A.   Yes.

14    Q.   I don't really care to go into them unless the

15    plaintiff would like you to, but were you in contact with

16    Mike about the vulnerability and things you had found?

17    A.   Yes.

18    Q.   Were those based upon experts that Mike Lindell had

19    hired and were working with you?

20    A.   Not just experts, but in Dominion's own words, on an

21    investigation into an event in Williamson County,

22    Tennessee --

23             MR. KLOEWER:  Objection, hearsay.

24             MR. KACHOUROFF:  He is giving his investigation,

25    Your Honor, nothing else.
```

1         THE COURT:  He can characterize his investigation,

2    he cannot state an out-of-court statement for the truth of

3    the matter asserted.

4         MR. KACHOUROFF:  Okay.

5         THE WITNESS:  Your Honor, I am sorry, I didn't

6    catch the last part.

7         THE COURT:  You can characterize your

8    investigation.  I do not want you to testify to

9    out-of-court statements.

10        THE WITNESS:  Okay.

11        MR. KACHOUROFF:  Your Honor, we are not offering it

12   for its truth.

13        THE COURT:  Can you approach if you are going to

14   make an argument.

15        MR. KACHOUROFF:  I will continue, we will see if it

16   is a necessity.

17        THE COURT:  All right.

18        THE WITNESS:  There was a published report pursuant

19   to an investigation ordered by the Election Assistance

20   Commission into an event involving Dominion Voting Systems

21   in Williamson County, Tennessee, which was performed as an

22   investigation by Dominion.

23        MR. KLOEWER:  Objection, hearsay.

24        THE WITNESS:  That was part of --

25        THE COURT:  Hold on.  Counsel, approach.

814

```
 1              (A bench conference is had.)

 2              THE COURT:  All right.

 3              MR. KACHOUROFF:  It is not offered for the truth,

 4    it is being offered to show what Mr. Lindell -- what his

 5    whole belief was, what his belief was based upon.

 6              THE COURT:  Mr. Kloewer.

 7              MR. KLOEWER:  Outside the scope, first of all.  Not

 8    relevant to claims about Eric Coomer.

 9              THE COURT:  Overruled.

10              (In the hearing of the jury.)

11    Q.   (BY MR. KACHOUROFF)  If I remember correctly, we were

12    asking about the Cyber Symposium, and we went through to

13    Dr. Navid, and you were talking about the Dominion

14    reports.  Do you remember that?

15    A.   You are asking did I just vet witnesses, and my

16    discussions with Mike involved more than just witnesses,

17    there were events that I investigated.

18    Q.   We were talking about Williamson County, Tennessee.

19    A.   Correct.

20    Q.   You were describing a report from Williamson County,

21    Tennessee, with the EAC.

22    A.   Correct.

23    Q.   And the EAC is the Election Assistance Program?

24    A.   Correct.

25    Q.   And in that report that you read, did you determine
```

1    for yourself whether there were problems with Dominion's

2    code?

3    A.    Yes.

4    Q.    In fact, there was "erroneous code in Dominion's

5    systems," correct?

6    A.    That is a quote.

7    Q.    A quote from the report?

8    A.    Correct.

9    Q.    There were other problems, for instance, Atlanta,

10   Georgia, that you investigated.

11   A.    In DeKalb County, yes.

12   Q.    There were also software glitches; correct?

13   A.    There was an election that had to be reversed after

14   it was discovered.

15   Q.    Would it also be fair to say you and Mike discussed

16   all of this as a part of your investigation into what was

17   going on?

18   A.    Absolutely.

19   Q.    There was an allegation that you had not read the

20   Complaint by Dr. Coomer against Mike Lindell, My Pillow,

21   and Frankspeech.  Do you know if My Pillow was ever

22   involved in targeting Eric Coomer?

23   A.    Not to my knowledge, no.

24   Q.    So it was not involved in targeting Eric Coomer.

25   A.    No.

1   Q.   Was Frankspeech involved in targeting Eric Coomer?

2   A.   Not to my knowledge.

3        MR. KLOEWER:  Objection, Your Honor, calls for a

4   conclusion.

5        THE COURT:  Overruled.

6   Q.   (BY MR. KACHOUROFF)  Do you know whether Michael

7   Lindell ever targeted Eric Coomer?  Do you have personal

8   knowledge whether he chose to?

9   A.   No, I don't have any personal knowledge.

10  Q.   As far as you know, Mike Lindell never targeted Eric

11  Coomer; correct?

12  A.   Correct.

13  Q.   Have you ever heard Mike say that Eric Coomer is

14  Antifa?

15  A.   No.

16  Q.   Have you ever heard Mike Lindell state that Eric

17  Coomer is personally responsible for rigging the 2020

18  election?

19  A.   No.

20  Q.   You know Mike is a pretty passionate guy; right?

21  A.   That would be an understatement.  But, yes.

22  Q.   Do you have a sense of -- excuse me.  Do you have an

23  opinion on his honesty?

24  A.   Yes.

25  Q.   And what is your opinion on his honesty?

817

1    A.    I would trust Mike with my life, and I don't say that

2    lightly.

3    Q.    If Mike found out that something that he believed in

4    was wrong or incorrect, is he the type of person that

5    would re-evaluate his position?

6          MR. KLOEWER:  Objection, calls for speculation.

7          THE COURT:  Sustained.

8    Q.    (BY MR. KACHOUROFF)   There was an indication that you

9    didn't contact Dr. Coomer or his attorneys at the time

10   before the lawsuit was filed.

11   A.    Yes.

12   Q.    Did you know who Dr. Coomer was before the lawsuit

13   was filed?

14   A.    I had heard the name because it had been bantered

15   around.

16   Q.    Why wouldn't you contact him?

17   A.    I have no idea.  I was focused on investigations.

18   That was my job.  I looked at data and evidence and

19   interviewing experts.  I was not involved in representing

20   specifically Mike in the litigation.  I was not counsel of

21   record.  I provided advice, but I was not counsel of

22   record in the various litigation.

23   Q.    But before that ever came up, was there any reason

24   for you to contact, for instance, Charlie Cain, his other

25   attorney here?

1    A.    No.

2    Q.    Or Brad Kloewer, his other attorney.

3    A.    No.

4    Q.    The number of experts that were at the symposium that

5    didn't make claims against the $5 million challenge, were

6    their credentials vetted by you, any of them?

7    A.    Some, but we had a designated cyber expert to do the

8    vetting on the cyber experts.

9    Q.    And who was that?

10   A.    Todd Sanders (phonetic).

11   Q.    And were Josh Merritt's credentials lower or higher,

12   would you say, from some of the participants you

13   encountered?

14   A.    Definitely lower.  That was different than for the

15   Red Team.  Like I said, Phil Waldron helped put together

16   the Red Team for the invitees to the Cyber Symposium.  We

17   had laid out specific credentials because we wanted people

18   of all sides.  By the way, there were definitely people of

19   all political persuasions there, Harri Hursti being one of

20   them.  That was done with a very deliberate effort to

21   bring in people with all points of view to evaluate the

22   data.

23   Q.    How would you describe Mike Lindell's efforts from

24   what you know from February -- late February, when you met

25   him -- and what was his purpose.  Because he, in your

1   opinion, was the lone voice arguing that the machines were

2   defective or what have you?

3   A.   Yeah, I mean, after the 2020 election, Mike really,

4   particularly and starting with *Absolute Proof* and so

5   forth, was the lone voice calling out the issues with the

6   machines and keeping that discussion alive.  And because

7   of that, we now know a heck of a lot more than we probably

8   would have because the people that have gotten involved

9   and continue to investigate continue to bring forward

10  evidence.

11       It needed a baseline, a board to spring off of.

12  And Mike, as you said -- and he is he is very passionate

13  and believes this is about saving the country for

14  everyone, it doesn't matter if you are left or right.

15       MR. KLOEWER:  Objection, Your Honor.

16       THE COURT:  Sustained.

17  Q.   (BY MR. KACHOUROFF)  Now, Mike received -- during

18  cross-examination there was an indication -- I guess there

19  was a video played where we had a spoke, kind of a hub,

20  where Mike was trying to create a hub for data coming in

21  that was being created.  There was enormous amount of

22  information flowing in.  Would that be fair to say?

23  A.   That would, yes.

24  Q.   And about how many sources were pouring in

25  information?

 1   A.   Well, I probably spent a good 10 to 12 to 16 to 18

 2   hours a day on the phone in addition to evaluating data.

 3   These were, at the time, extraordinary times.  It was just

 4   an extraordinary amount of data, some which was not

 5   credible and was dismissed and is some which we pursued.

 6   Q.   Was Mike diligent and earnest in his desire to seek

 7   out and consider all relevant evidence on both sides of

 8   the issue?

 9   A.   Yeah.  And I think that that is exemplified when you

10   look at the cyber experts that we invited to the Cyber

11   Symposium, they were from all political persuasions.  It

12   was not one side.  And I will talk about Harri Hursti, who

13   was well known to be on the left side of the spectrum.

14   And that's just one example.  He is a very famous one.  He

15   was in a movie called *Kill Chain*, a HBO production.

16        MR. KACHOUROFF:  I have nothing further, Your

17   Honor.

18        THE COURT:  Mr. Kloewer.

19                    **REDIRECT EXAMINATION**

20   **BY MR. KLOEWER:**

21   Q.   Mr. Olsen, I believe you described Mr. Lindell being

22   very honest; is that correct?

23   A.   Yes.  Yeah.

24   Q.   Are you aware that My Pillow has an F accreditation

25   from the Better Business Bureau, and had that

1    accreditation revoked following a class action filed in

2    California?

3    A.    So what?  How does that affect somebody's honesty?

4    Q.    I believe you said -- well, let's talk about Dennis

5    Montgomery, that topic.  It is your position that Dennis

6    Montgomery is credible; correct?

7    A.    It is my position that he is who he says he is, in

8    terms of the experience that he worked with -- at the

9    federal government, that he had access to the programs, if

10   not being the creator of the program.

11   Q.    That is not my question.  Is he a credible source of

12   information about election fraud?

13   A.    Yes.

14   Q.    You said a number of things that I would like to

15   circle back on.  We were talking about the purpose of the

16   Cyber Symposium.  You said it was to "get the word out."

17   Did I hear you correctly?

18   A.    That would be one of the purposes, yes.

19   Q.    To get everyone together.

20   A.    To get people together from all sides of the

21   political spectrum, particularly with the cyber experts,

22   yeah.

23   Q.    You would agree the intent was to reach new audiences

24   for the type of information that was being presented.

25   A.    Sure.

1    Q.    You would agree that Mike Lindell wanted as many

2    people as possible to watch the event.

3    A.    Sure.

4    Q.    And you are aware that, in fact, he had people

5    reaching out to every legislator across the country, at

6    state and national levels, to invite them to the

7    symposium.

8    A.    Yes.

9    Q.    And he invited media outlets from across the country.

10   A.    I believe so.

11   Q.    And he invited, as you indicated, various cyber

12   experts?

13   A.    Yes.

14   Q.    I believe you said Harri Hursti was invited by Mike

15   Lindell.

16   A.    Yes.  Or he submitted a request to attend.

17   Q.    Okay.  And I believe you also said that Mr. Lindell

18   was the lone voice keeping the discussion alive.  Did I

19   hear that correctly?

20   A.    Correct.  That is what I said.

21   Q.    And the symposium was intended to bring forward

22   credible evidence to start a conversation.  I heard that

23   correctly, too; right?

24   A.    Correct.

25   Q.    Mr. Olsen, how much has your law firm been paid by

1    Mr. Lindell since you were retained in February of 2020?

2    A.    I never submitted a bill to Mike that was referenced

3    in the Engagement Agreement.  I did get payment from Mike

4    over the course of two years amounting to about $200,000

5    just to keep afloat, yeah.

6          MR. KLOEWER:  No further questions, Your Honor.

7          THE COURT:  All right.  Mr. Olsen, you are done.

8    You may step down.

9          Counsel, next witness.

10         MS. MORGAN:  The next witness will be about an hour

11   long, Your Honor.  I don't know if you want to take the

12   afternoon break or wait until after.

13         THE COURT:  Well, my guess is that they would

14   rather take the afternoon break now, but I also want just

15   to be mindful of the 4:30 hard stop.

16         MS. MORGAN:  Yes, Your Honor.

17         THE COURT:  So let's take the afternoon break now

18   for 15 minutes and we will see you all back here.

19         (Outside the presence of the jury.)

20         THE COURT:  All right.  Thank you.  Please be

21   seated.  Anything that we need to address during the

22   break?

23         MR. KACHOUROFF:  No, Your Honor.

24         THE COURT:  All right.  We will be in recess.

25         (A break is taken from 2:30 p.m. to 2:45 p.m.)

1           THE COURT:  Thank you.  Please be seated.

2           All right.  Counsel, are we ready?

3           MS. MORGAN:  Yes, Your Honor.

4           THE COURT:  All right, madam deputy.

5           (In the presence of the jury.)

6           THE COURT:  Thank you.  Please be seated.

7           Ms. Morgan, are you ready to call your next

8    witness?

9           MS. MORGAN:  Yes, Your Honor.  Plaintiff calls

10   Joshua Merritt by video deposition.

11          (Videotaped deposition of Joshua Merritt played in

12   open court but not reported.)

13          THE COURT:  All right.  Counsel, it is almost 4

14   o'clock.  Do we have the next witness?

15          MR. CAIN:  May we approach briefly?

16          THE COURT:  Yes.

17          (A bench conference is had.)

18          MR. CAIN:  We have the Montgomery video, but we

19   have agreed that it would be better to release the jury

20   and for us to talk about a few of the Montgomery issues,

21   perhaps, if that is all right with Your Honor.

22          THE COURT:  All right.

23          (In the hearing of the jury.)

24          THE COURT:  All right.  Ladies and gentlemen of the

25   jury, there are a few things that I need to take care of

1    outside of the province of the jury, so it is your lucky

2    day, it is Friday afternoon, and you are getting released

3    before 4 o'clock.

4         I just remind you again, and not to repeat myself,

5    but I will, that you should not speak to anyone about this

6    case or what you are hearing about this case.  You should

7    certainly not read any media or listen to any media or let

8    anyone talk to you about any media or be influenced or do

9    any sort of research that you otherwise would be able to

10   do if you were not on this case.  Please do not do that.

11   Make sure outside the courtroom you do not allow anyone to

12   approach you about this case.  You should not speak to any

13   of the parties, lawyers, witnesses, or anyone else about

14   this case.

15        I hope you have a very good weekend.  It is

16   supposed to be sunny.  If you can be back here again on

17   Monday by 8:45 a.m., I would appreciate it.  And then we

18   will proceed from there.

19        (Outside the presence of the jury.)

20        THE COURT:  All right.  Thank you.  Please be

21   seated.

22        So as I understand it, there are a few issues that

23   we need to take up outside the province of the jury.  I

24   also wanted to issue just a recommendation.  I know that

25   there are people in the gallery, members of the public,

1    other people here.  I would really appreciate it if you

2    don't approach the witnesses or the jurors in any way that

3    you may see milling about.  And when I say "witnesses,"

4    witnesses who have not yet testified because they are

5    under a sequestration order.

6         With respect to the jurors, there is, again, more

7    coverage about this trial, and I am just trying to protect

8    the integrity of our jury here.  So if you can just give

9    them space that would be much appreciated.

10        All right.  Counsel, what do we have to address?

11        MS. DEMASTER:  Your Honor, we just wanted to

12   address again the Montgomery deposition transcript

13   portions.  We provided and just a partial -- very partial

14   narrow reconsideration of that, just as to Rule 106 and

15   some of the -- whatever pertained to the plaintiff's

16   designations.

17        So the counter -- previously designated, we were

18   able to narrow down those a lot.  We have conferred with

19   opposing counsel.  Two of the ones we found -- and I did

20   not see this in the Court's order, but two of the

21   designations or counter-designations that we provided and

22   that were ruled on, opposing counsel said that they have

23   de-designated that.

24        I wasn't aware, I do not believe I saw that in the

25   Court's order, but I could be wrong.  But if that is true,

1    we are willing to waive those.  The only ones we have that

2    we would like to do --

3            THE COURT:  Let me pause you there, Ms. DeMaster,

4    just so I make sure I understand what is happening about

5    those two.  The only designations that I ruled on were the

6    ones after the de-designation.  So I did not rule on

7    testimony that had been designated then was de-designated,

8    because that wouldn't have been an efficient use of my

9    time.

10           So are you saying that two of the things that you

11   would like to introduce are now moot because I didn't --

12   they have been de-designated and they're not part of the

13   testimony, at all?

14           MS. DEMASTER:  Correct.  There is just one.

15           THE COURT:  So let's then just focus on whatever

16   else is left.

17           MS. DEMASTER:  So basically it is the statements --

18   and this has come up in testimony today from several

19   witnesses, but the statements on a software program called

20   Hammer and Scorecard, or "Scorecard" specifically.  A lot

21   of that kind of comes up in the middle, a lot of what was

22   designated on day two specifically comes -- it is very

23   incomplete with regard to specific elections at the

24   timeframe that may have been involved, or with specific

25   elections that may have been in Brazil or in Venezuela,

828

 1    and doesn't really get into the context of how he knows

 2    about that.

 3         For example, portions of his deposition talk about

 4    how he knows it, may have created it, and why he would

 5    have known that information.  Now, we do not have lots of

 6    them, although we understand and believe much of it was

 7    relevant, we were able to say that our counters would be

 8    probably no more than five minutes, but it would just

 9    provide context to a litany of information that was

10    provided without a lot of clarity or completeness.

11         THE COURT:  All right.  Ms. Morgan.

12         MS. MORGAN:  Thank you, Your Honor.  Just for

13    purposes of clarification, it is my understanding that the

14    two requested counter-designations at issue are page 51,

15    lines 6 through 9, and this is the first day of

16    Mr. Montgomery's deposition.  And then the second section,

17    also from the first day, would be page 107, line 24,

18    through page 110, line 18.  So about three pages worth of

19    testimony.

20         THE COURT:  These are supposed to be counter -- and

21    maybe this is a better question for Ms. DeMaster.  These

22    are counter-designations to designations that were already

23    made by the plaintiff?

24         MS. MORGAN:  Yes, Your Honor.  And, in essence,

25    these are counter-designations that -- to back up, were

1    made pursuant to the Court's order that they provide

2    designations that were more specific by March 17th, and --

3            THE COURT:  So -- I am sorry to interrupt you,

4    Ms. Morgan, go ahead.

5            MS. MORGAN:  I was just reminding the Court that

6    their initial counter-designation was the whole

7    transcript, we went through that this morning, so I won't

8    repeat.  But I just wanted to point out that these

9    re-urged counter-designations fall within the ambit of

10   what the Court has already ruled on, and so we stand on

11   our objections, Your Honor.  I don't believe that these

12   are necessary under Rule 106 to provide context to our

13   designations.  So that is our position, Your Honor.

14           THE COURT:  All right.

15           MS. DEMASTER:  May I respond real quick, Your

16   Honor?

17           THE COURT:  All right.

18           MS. DEMASTER:  Respectfully, and this is just to

19   complete what I was going to say.  These two, one from

20   page 51, and the one from 110 actually pertain to

21   plaintiff's designation 78, and this is on day one.  So

22   day two, what the plaintiff has designated pertains to

23   plaintiff's designations on pages 78 through 79, 119

24   through 120.

25           THE COURT:  Can you slow down, Ms. DeMaster.

 1          MS. DEMASTER:  I apologize.

 2          135 through 141, 146 through 149, 156 through 158,

 3     164 through 165, and 168 through 172, so a substantial

 4     amount of pages, most of which kind of come in the middle,

 5     asking him about specific elections or other things where

 6     Scorecard might have been used, without the context of how

 7     he would have had that information.  And even within some

 8     of those examples in day one, being able to provide how he

 9     had that kind of access to the program or knowledge in the

10     use of it.

11          And this is a very short -- again, we agreed to

12     narrow it just to 51, three lines, and then less than

13     three pages from 107 to 110.

14          THE COURT:  All right.  So I will take that under

15     advisement.  I obviously need some time to look at these

16     designations and consider your motion for reconsideration.

17          Let me just make sure the record is clear.  All

18     right.  I think it is clear enough.

19          All right.  Anything else, counsel?

20          MR. CAIN:  Just we had, and I think this is

21     unopposed, but Professor Halderman, who is our security

22     expert, is coming in, and intends to sit in on testimony

23     beginning on Monday.  And Darlene has given us a few

24     realtime transcripts that I would like to have him review.

25     There has been some quasi technical testimony today, and

 1    I'd like for him to have the opportunity to review that

 2    under 615(a)(3), and I believe that is appropriate.

 3            THE COURT:  Mr. Kachouroff?

 4            MR. KACHOUROFF:  I don't care, Your Honor.

 5            THE COURT:  I will take that as unopposed.

 6            MR. KACHOUROFF:  That's right.

 7            THE COURT:  All right.  That is fine, Mr. Cain.

 8            MR. CAIN:  That is all.

 9            THE COURT:  All right.  So I just want to talk

10    about housekeeping and logistic matters.  So obviously I

11    talked to you all about the charge conference and when the

12    best time for the charge conference might be.  It sounds

13    to me like that might fall most logically -- but, again,

14    you all have to tell me what you have left -- on Tuesday

15    or Wednesday morning.

16            I just want to be thoughtful of what we need to

17    complete, how the Court will need to turn your arguments

18    and make decisions on final instructions, and I also want

19    to be mindful that I don't want to waste the jury's time

20    sitting there while we are doing these things.

21            MR. KACHOUROFF:  Your Honor, I have spoken to

22    Mr. Cain, and we thought we would be finished by probably

23    Tuesday afternoon, maybe.

24            THE COURT:  So Tuesday morning?

25            MR. KACHOUROFF:  Maybe.  I think we are trying to

1    figure out what the rest of the schedule looks like.

2          THE COURT:  Right.  So it sounds to me like you

3    have at least Mr. Halderman and Mr. Lindell on Monday, and

4    then --

5          MR. KACHOUROFF:  Brannon Howse.  And then Doug

6    Bania and Peter Kent, those two experts are really about

7    an hour, hour-and-a-half apiece, max.

8          THE COURT:  Okay.  So it may be that we either do

9    this -- do you think, Mr. Cain or Mr. Kachouroff, that we

10   are going to be done with all evidence by Tuesday

11   afternoon, so that you all would be moving into closings

12   on Wednesday, because if that is --

13         MR. KACHOUROFF:  She is telling me no.

14         THE COURT:  I am mindful that there are people here

15   that we need to accommodate, so we would be ready to go on

16   Monday afternoon if you think that is a better time.  It

17   seems to me like Tuesday morning might be the better time

18   to do the charge conference.

19         MS. MORGAN:  We would tend to agree, Your Honor.

20   And Monday, just for clarification, Halderman will be here

21   watching --

22         THE COURT:  Oh, he will not be testifying then.

23         MS. MORGAN:  Correct.  And it will be Mr. Lindell

24   and Brannon Howse Monday.

25         THE COURT:  So it sounds to me like perhaps Tuesday

1    morning would be the better time to tell our jury that

2    they can come in a little bit later so that we can get

3    through the charge conference, go through the instructions

4    and the verdict form.  That would give the Court the day

5    to turn them, and then have them ready for you all if you

6    think you are going to closings on Wednesday.

7            MR. KACHOUROFF:  Thank you, Your Honor.

8            THE COURT:  All right.  Anything else?

9            All right.  So you know the drill.  If something

10   comes up over the weekend, do your best to alert our

11   chambers of it so we are not flatfooted on Monday.  I wish

12   you a good weekend, and we will see you back here at 8:30

13   a.m., or 9 o'clock, depending on if we have issues.

14           We will get to the Montgomery designations sooner,

15   rather than later, knowing that there are technical

16   issues.  So you should be mindful and watch for a minute

17   order with respect to that.

18           All right.  We will be in recess.

19           (Proceedings conclude at 4:06 p.m.)

20

21

22

23

24

25

**R E P O R T E R ' S   C E R T I F I C A T E**

I, Darlene M. Martinez, Official Certified
Shorthand Reporter for the United States District Court,
District of Colorado, do hereby certify that the foregoing
is a true and accurate transcript of the proceedings had
as taken stenographically by me at the time and place
aforementioned.

Dated this 3rd day of August, 2025.

_____
s/Darlene M. Martinez
RMR, CRR