# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01129-NYW-SBP

**ERIC COOMER, Ph.D.,**

**Plaintiff,**

**v.**

**MICHAEL J. LINDELL;**
**FRANKSPEECH, LLC; and**
**MY PILLOW, INC.,**

**Defendants.**

_____

### REPORTER'S TRANSCRIPT
### (JURY TRIAL - DAY 9)

_____

Proceedings before the HONORABLE NINA Y. WANG,
Judge, United States District Court, for the District of
Colorado, commencing at 8:38 a.m. on the 12th day of June,
2025, Alfred A. Arraj United States Courthouse, Denver,
Colorado.

## A P P E A R A N C E S

**FOR THE PLAINTIFF:**
DAVID MATTHEW BELLER, Recht & Kornfeld, P.C., 1600 Stout
Street, Suite 1400, Denver, CO 80202
CHARLES JOSEPH CAIN, BRADLEY ADAM KLOEWER, Cain &
Skarnulis PLLC, P. O. Box 1064, Salida, CO 81201
ASHLEY N. MORGAN, Cain & Skarnulis PLLC, 303 Colorado
Street, Suite 2850, Austin, TX 78701

**FOR THE DEFENDANTS:**
JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite
610, Grafton, WI 53024
JAMES JOSEPH DUANE, Regent University School of Law, 1000
Regent University Drive, Robertson Hall Room 353B,
Virginia Beach, VA 23464
CHRISTOPHER I. KACHOUROFF, Dominion Law Center PC, 13649
Office Place, Suite 101, Woodbridge, VA 2219

**I  N  D  E  X**

**WITNESSES:**                                                          **PAGE**

**ALEX HALDERMAN**

DIRECT EXAMINATION (Cont'd) BY MS. MORGAN          1491
CROSS-EXAMINATION BY MR. KACHOUROFF                1595
REDIRECT EXAMINATION BY MS. MORGAN                 1681

**PETER KENT**

DIRECT EXAMINATION BY MR. KACHOUROFF               1686
CROSS-EXAMINATION BY MR. BELLER                    1696
REDIRECT EXAMINATION BY MR. KACHOUROFF             1738

**E  X  H  I  B  I  T  S**

**NO.**                                                                 **ADMITTED**

31    ...........................................    1564
53    ...........................................    1670


**No.**                                                                 **REFUSED**

269    ...........................................    1657
270    ...........................................    1671

| | |
|---|---|
| 1 | **JUNE 12, 2025** |
| 2 | (Outside the presence of the jury.) |
| 3 | THE COURT:  Thank you.  Please be seated. |
| 4 | We are on the record in 22-cv-1129-NYW-SBP, Coomer |
| 5 | v. Lindell, et al. |
| 6 | Could I have appearances of counsel, and please |
| 7 | introduce anybody at the table with you. |
| 8 | MR. CAIN:  Good morning, Your Honor.  Charlie Cain, |
| 9 | Brad Kloewer, David Beller, Ashley Morgan, and Dr. Coomer, |
| 10 | for the plaintiff. |
| 11 | THE COURT:  Good morning. |
| 12 | MR. KACHOUROFF:  Christopher Kachouroff and James |
| 13 | Duane for the defense. |
| 14 | THE COURT:  Good morning.  Do we have any issues |
| 15 | before we bring in the jurors this morning? |
| 16 | MR. KACHOUROFF:  We have the willful/wanton |
| 17 | instruction.  I don't know if you want to take it up now |
| 18 | or later. |
| 19 | THE COURT:  I want to take it up now.  And then I |
| 20 | think plaintiff mentioned also another limiting |
| 21 | instruction for the videos.  Has that been discussed and |
| 22 | stipulated to or proposed by plaintiff? |
| 23 | MS. MORGAN:  Yes.  We conferred and stipulated.  I |
| 24 | will circulate a copy to the Court. |
| 25 | THE COURT:  Okay. |

1      MR. DUANE:  The only remaining topic that we have

2   not yet worked out, but we are very close, I am sure, is

3   the proposed limiting instruction that we sent to opposing

4   counsel involving Rule 408 and the settlement that was

5   submitted at trial with regard to the settlement.  We are

6   going to confer.  I think we can work that out during the

7   next break.

8      THE COURT:  Okay.  Ms. Morgan.

9      MS. MORGAN:  Exhibit 70 has not been offered and

10  admitted, Your Honor, so we don't feel that it is

11  necessary.

12     THE COURT:  Okay.  I know that we had the proposed

13  limiting instruction, so did you want to do further

14  argument with respect to that issue?

15     MR. DUANE:  Even though the exhibit was not

16  admitted, there has been testimony from several witnesses

17  about the fact that the Newsmax case was settled.  And so

18  the jury knows all about that, even though there were no

19  details about the terms of the settlement.

20     Under Rule 408, Your Honor, that evidence, although

21  admissible, cannot be used by the jury as any evidence

22  that the -- that the defendant in the case was, in fact,

23  liable, and that the claims in that case were, in fact,

24  meritorious.  And we just want the jury to get that much

25  information, that is all we need.  The wording of the

1    instruction -- well, that is all.

2         THE COURT:  All right.  Ms. Morgan?

3         MS. MORGAN:  If the Court agrees that such a

4    limiting instruction is proper, we do have a proposal that

5    is shorter than what the defense are proposing.

6         THE COURT:  Okay.  So let me hear from you all with

7    respect to the willful/wanton instruction.

8         MR. KACHOUROFF:  Us first?

9         THE COURT:  They are proposing it and you have a

10   dispute with respect to it; correct?

11        MR. KACHOUROFF:  Sorry, Your Honor.

12        THE COURT:  Go ahead, Mr. Kachouroff.

13        MR. KACHOUROFF:  I am not quite sure how to revise

14   it in the First Amendment context, because I think there

15   is a propensity for the jury to be confused over the

16   willful and wanton standard versus the reckless disregard

17   standard.  So I thought if you had the words, "by clear

18   and convincing evidence."

19        I don't know if that cures my concern with it, I

20   just feel like because this is a speech case, the

21   willful/wanton standard is going to be confusing for the

22   jury.  My preference is that we not issue it and leave

23   things as is, but --

24        THE COURT:  Okay.  Ms. Morgan.

25        MS. MORGAN:  The Colorado Jury Instructions

1   specifically call for an instruction defining willful and

2   wanton to be provided if the Court instructs the jury on

3   exemplary damages.  Just for clarity, 9:30 of the

4   instruction for willful and wanton conduct, our proposed

5   instruction is directly pulled from the Colorado Jury

6   Instructions.

7          As I understand it, the concern from the defense is

8   that the jury somehow may reach punitive damages without

9   finding actual malice or confuse the standard.  We don't

10  feel there is a risk of that because of the instructions

11  that we have already agreed to.  The jury doesn't get to

12  the issue of awarding punitive damages unless they decide

13  that there has been defamation with actual malice.

14         THE COURT:  Correct.  That is the way the verdict

15  form is also set up.  So they never reach the exemplary

16  damages question without first finding actual malice.  If

17  you look at the verdict form, it tells them to skip and

18  sign if they don't find with respect to defamation.

19         MR. KACHOUROFF:  I just always have, usually the

20  plaintiff side, which I prefer, it is always

21  willful/wanton conduct in the negligence context that I

22  see that kind of an instruction given.  Here, where we

23  have speech, I think it has to be modified according to my

24  colleague.

25         THE COURT:  Have you proposed a modification,

1    Mr. Kachouroff?

2         MR. KACHOUROFF:  That is why I was saying, I am not

3    sure how to modify it other than just maybe put in there

4    that, "You may not determine willful and wanton conduct

5    until such time as you have made a determination that

6    there has been actual malice by clear and convincing

7    evidence," something like that.

8         THE COURT:  All right.

9         MS. MORGAN:  Respectfully, that is unnecessarily

10   confusing, and the way that the Special Verdict Form is

11   set up, the jury doesn't get to the questions about

12   punitive damages unless they have decided that there is

13   actual malice.

14        And out of full candor, when I conferred yesterday

15   with Ms. DeMaster, the proposal that -- I haven't seen a

16   copy of what they are proposing, but what was discussed

17   was changing the description of the instruction to say

18   "maliciousness" or "state of mind," but I think that

19   creates more confusion for the jury --

20        THE COURT:  Right.

21        MS. MORGAN:  -- and would create an issue where

22   they don't understand the distinction between actual

23   malice and maliciousness, as that term appears.  And so I

24   just think that this is not necessary and actually would

25   create more confusion, Your Honor.

1          And, frankly, "willful and wanton conduct" is not a

2    term that most people use in their daily life, so I think

3    there does need to be an instruction describing what that

4    term really means.

5          THE COURT:  All right.

6          MR. KACHOUROFF:  Judge, I will just state one last

7    point.  According to my colleague's notes, Pattern Jury

8    Instruction 5:4 says, "In cases involving speech or

9    expression," and I think she is referring to another

10   version of 22:27, I don't know.

11         THE COURT:  All right.  Is Ms. DeMaster going to be

12   here today?

13         MR. KACHOUROFF:  She is, Your Honor.  She was up

14   late last night.

15         THE COURT:  Okay.  So we will take that under

16   advisement.

17         Anything else with respect to the final jury

18   instructions that we need -- you need me to address?

19         MS. MORGAN:  Just in terms of scheduling, Your

20   Honor.  I know we had some proposed edits to the verdict

21   form.  As far as a timeline on that, when do we expect to

22   have those?

23         THE COURT:  Hopefully sometime this morning.  My

24   law clerk has also been staying up late working very

25   consistently on these issues.

1       MS. MORGAN:  Thank you.

2       THE COURT:  With respect to the jury instructions,

3   I want to make a finding expressly on the Fifth Amendment

4   adverse inference instruction.  The four *McGillis* factors

5   weigh in favor of giving an adverse inference instruction.

6   *McGillis Investment Corporation v. First Interstate*

7   *Financial Utah, LLC*, 370 P.3d, 295, 301 to -2, Colorado

8   Appellate Court, 2015.

9       First, there is a significant financial nexus

10  between Ms. Peters and Mr. Lindell that suggest that she

11  would act for his benefit.  At various times he paid for

12  her hotel room, gave her a credit card, flew her around in

13  the private plane.  And he also testified that he gave 1

14  to $200,000 in support of her legal defense fund, or

15  somehow directly paid her attorneys on her behalf.

16      Second, although Ms. Peters wasn't Mr. Lindell's

17  employee, there is evidence that he had some control over

18  her statements about the purported defamatory statements,

19  he encouraged later to appear on Frankspeech to tell her

20  story, and she did so soon thereafter.

21      Third, Mr. Lindell's and Ms. Peters' interests are

22  closely aligned.  In addition to their financial ties,

23  both have made similar types of purported defamatory

24  statements.  In her statement on Frankspeech -- indeed,

25  her statement on Frankspeech is one of the alleged

1    defamatory statements in this case.

2         Fourth, Ms. Peters' role in this litigation is not

3    that of a disinterested third-party witness given her

4    close ties to Mr. Lindell, her repeated appearances on the

5    Frankspeech platform, and the types of claims that they

6    are making in general, including the repetition of the

7    alleged defamatory statement that Dr. Coomer was somehow

8    involved in interference with the 2020 general election.

9         Considering these factors, a reasonable jury could

10   reliably infer that Ms. Peters repeatedly invoked her

11   Fifth Amendment privilege because her answers would be

12   adverse to defendants.

13        Accordingly, the Court finds that an adverse

14   inference would sufficiently be trustworthy under the

15   circumstances to permit an adverse inference instruction.

16   That is *McGillis*, 370 P.3d, at 295.

17        All right.  So having made that ruling expressly on

18   the record, we will include that instruction.

19        Anything else you all want to address before we

20   start with the jury at 9:00?

21        MS. MORGAN:  No, thank you.

22        MR. KACHOUROFF:  No, thank you, Your Honor.

23        THE COURT:  All right.  Thank you, we will be in

24   recess until the jury is all present.

25        (A break is taken from 8:49 a.m. to 9:04 a.m.)

1          THE COURT:  Thank you.  Please be seated.

2          Are you all ready to proceed with Dr. Halderman?

3          MS. MORGAN:  Yes, Your Honor.

4          THE COURT:  Madam deputy.

5          (In the presence of the jury.)

6          THE COURT:  Thank you.  Please be seated.

7          Dr. Halderman, I remind you, you are still under

8     oath.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  You may proceed.

11          MS. MORGAN:  Thank you.  I wanted to give everyone

12     a second to get situated.

13                         **ALEX HALDERMAN**

14     having been previously duly sworn, testified as follows:

15                    **DIRECT EXAMINATION (Cont'd)**

16     **BY MS. MORGAN:**

17     Q.   Good morning, Dr. Halderman.

18     A.   Good morning.

19     Q.   I want to go back to our discussion about the

20     overview of your opinions, because I think we left one off

21     yesterday.  Focusing here on our slides on that last

22     bullet point, I want to ask you whether or not the

23     defendants' theories about Dr. Coomer and Dominion with

24     respect to the 2020 election have helped or hurt efforts

25     to secure elections?

1    A.    Oh, my gosh, they have absolutely hurt efforts.

2          MR. KACHOUROFF:  Objection to this.

3          THE COURT:  Approach.

4          (A bench conference is had.)

5          MR. KACHOUROFF:  What is the relevance of this?

6          MS. MORGAN:  It is relevant to the issue of

7    exemplary damages, Your Honor.  As we have discussed

8    during this trial at length, the Colorado Statute

9    indicates that one of the things the jury can consider is

10   whether or not the defendant acted with reckless

11   disregard, essentially to the rights and safety of others,

12   particularly the plaintiff.

13         And so it is relevant whether or not the claims at

14   issue in this case have harmed the elections industry.

15   And this is squarely with Dr. Halderman's declaration.

16   And I believe that in the Court's order on the motion to

17   exclude, that the Court permitted this testimony to be

18   had.

19         MR. KACHOUROFF:  First of all, there is no nexus

20   between the idea of this at-large election breach of

21   public trust and Mr. Lindell's statements.  First of all,

22   they have to lay a foundation as to how he knows that.

23   Secondly, it should be limited, as the Court has already

24   previously indicated, to the effect on Mr. Coomer, if he

25   knows that.  If he doesn't know that --

1    THE COURT:  I am going to have Ms. Morgan reframe

2    the question, but otherwise the objection is overruled

3    with respect to this testimony that is pertinent to

4    exemplary damages.  As previously discussed in the context

5    of the testimony of Mr. Crane, Colorado's exemplary

6    damages statute specifically contemplates that the impact

7    can extend beyond the plaintiff to others.

8         (In the hearing of the jury.)

9    Q.   (BY MS. MORGAN)  I want to make sure we understand, I

10   am framing this question specifically to the claims that

11   the defendants have made about Dr. Coomer and Dominion

12   with respect to the 2020 election.

13        Have those claims helped or hurt individuals like

14   Dr. Coomer and yourself in the elections industry?

15   A.   I think they have been a big setback to the kind of

16   work that I and others have been doing in my career for

17   almost 20 years now, trying to make elections in this

18   country more secure.

19   Q.   Have you investigated the theories espoused by the

20   defendants with respect to whether or not the 2020

21   election was rigged or hacked by Dr. Coomer and Dominion?

22   A.   Yes.

23   Q.   Based on your research, education, and training, have

24   you ruled out these theories?

25   A.   Can you clarify which theories you mean?

1    Q.    Sure.  Specifically the theory that Dr. Coomer and

2    Dominion somehow worked together with China to "murder

3    Americans' votes."

4    A.    Oh, I see.  Yes, that's just -- that didn't happen.

5    That didn't happen.  It's implausible to begin with.  And

6    now that the 2020 election has gone through just so much

7    investigation and so many audits, it's ruled out by a

8    mountain of evidence at this point.

9    Q.    And I think you testified yesterday to the effect

10   that initially right after the 2020 election, someone may

11   have thought that, but that became less plausible.  Can

12   you explain what you meant by that, just briefly?

13   A.    Yes.  So whether you trust elections or not, it is

14   not a binary.  You can have some reasonable level of doubt

15   until the evidence comes in, and that evidence comes in

16   from audits, from recounts, from investigation into

17   reported issues.  But there is a world of difference

18   between, I'm a little bit uncertain, I am going to wait to

19   see what evidence comes in, and I am utterly convinced the

20   election is stolen, and I am going to go out and make

21   movies and promise the world I will show them my "absolute

22   proof."

23   Q.    Has Mr. Lindell or Frankspeech ever cited you as

24   proof that the voting machines are vulnerable?

25   A.    They have certainly cited my research, and I think we

1    saw that in an excerpt from one of Mr. Lindell's films

2    yesterday.

3    Q.    Are they properly considering and applying your work?

4    A.    No.  No.  So my work -- what my work shows is that

5    there exists technical vulnerabilities in election

6    systems.  There are certain risks that we should be

7    working as a nation to address through better procedures,

8    through better technical processes in the development of

9    equipment and, most importantly, through making sure that

10   elections are conducted using paper ballots and rigorous

11   post-election audits, where people go and look at those

12   ballots by hand and confirm that the outcome of the

13   election was right.

14          And this is not only what my research says, this is

15   the consensus view of the National Academies.  But what

16   Lindell's theories do, what Lindell's films do, is they

17   take that science and they build a science fiction story

18   on top of it by saying that there is any evidence at all

19   that the 2020 election was actually stolen, by exploiting

20   these vulnerabilities.

21          As I said yesterday, there is no credible scientist

22   who has ever claimed that a U.S. election result was

23   changed by hacking.  That's just not something that there

24   is credible evidence for.  It's a potential risk and a

25   possibility that is important enough that it has required

1    already important policy changes that have happened, and

2    will require, to get to the point where scientists would

3    like elections to be, will require further changes.  But

4    none of that, none of that is evidence that the 2020

5    election was stolen.

6         The evidence that comes from science is evidence of

7    risk, not evidence that an attack has taken place.

8    Q.   We have heard Mr. Lindell advocate for both paper

9    ballots and hand counting.  Can you explain to the jury

10   what concerns you would have about switching to hand

11   counting.

12   A.   Well, first you say switching to hand counting, and I

13   point out that there are parts of the U.S. now that

14   already do hand count, but they tend to be smaller or

15   rural jurisdictions, and they are the exception.  Most of

16   the country today counts votes by having voters fill out

17   paper ballots, and then counts those ballots with the

18   computer scanner.

19        And then in many states, at least for a very

20   high-profile election, like the 2020 election, they now

21   conduct some kind of post-election audit of those paper

22   ballots to provide additional affirmative evidence that

23   the result was right.

24        But talking about switching to counting all of

25   those votes by hand, well, there are a couple of reasons

1    why we don't do that and why I don't think there are very

2    many experts who would advocate for that.  One reason is

3    that our elections in the U.S. tend to be very long and

4    complicated ballots.  Places around the world that hand

5    count -- and I think we heard testimony this week from,

6    perhaps from Mr. Lindell, that in other countries they

7    count ballots by hand.  Well, that is true, but most of

8    those countries that count ballots by hand tend to be ones

9    with very simple questions on the ballot.

10           In most European countries, you go to vote, there

11   is one question, who do you want to represent you in

12   parliament.  That makes it so it is actually really easy

13   for them to hand count those ballots; you separate them

14   into piles and count the piles.

15           But in the U.S., I don't know if you remember from

16   the last time you voted, but in a general election we

17   might have 30, 40 questions on the ballot.  Because we

18   just love voting that much, right, we will vote for the

19   president, we vote for congress, governor, for secretary

20   of state, for your state reps, for your mayor, for your

21   city council, for your other local offices, maybe for some

22   proposals, and we have these really complicated ballots.

23   And counting all of those contests by hand would take --

24   well, it might take 30 times as long to count 30 contests

25   as it would take to count one contest.

1          So for efficiency reasons, because we want election

2     results on election night, we tend to involve technology.

3     But the other reason, the other reason that we -- that I

4     wouldn't advocate just going back to counting votes by

5     hand, is the whole reason we introduced technology into

6     elections and vote counting in the early 20th century is

7     because when we did count everything by hand, there was a

8     ton of fraud.  And it was really well documented

9     historically, fraud in the late 19th and early 20th

10    century, where the people counting the votes would count

11    them dishonestly to come up with crooked results.

12         That is why we introduced first mechanical, then

13    electrical, and eventually computer voting machines, so it

14    would be more difficult for old-fashioned, low tech, fraud

15    to happen.

16         Now, in my view, and I think this is largely the

17    shared view of the scientific community, the best solution

18    we can come up with to the problem of fraud today, is to

19    first count the ballots with a computer, and then have

20    people go back and check the result by counting by hand

21    some of the ballots to check the computer's work.  And

22    that way, in order to tamper with the result and get away

23    with it, you would both have to somehow alter the

24    computerized records, that would take some kind of high

25    tech attack, and you would need a conspiracy of people on

1    the ground involved in that audit or hand count of the

2    ballots who would also be part of the conspiracy, who

3    would somehow have to report the same incorrect result.

4         So with this combination of an initial scan by a

5    computer, and then coming back and having people check the

6    work of the computer, we get basically the best of both

7    worlds, as long as we are doing that check to make sure

8    the computer's work is right.

9         So that's the system that is used in most of the

10   country.  The major question now, from a policy

11   perspective, is how can we get as much of that auditing as

12   possible to happen, especially in down-ballot contests?

13   Q.   And I think that we touched on this yesterday, but as

14   far as the use of paper ballots and auditing, is that

15   something that Colorado has in place currently?

16   A.   Oh, well, Colorado is -- you are all very lucky to be

17   Colorado voters, because Colorado has been at the

18   forefront of this kind of rigorous post-election auditing

19   that I and the National Academies recommend.

20        Colorado is the first state to do rigorous

21   risk-limiting audits of its ballots statewide.  It has

22   really been recognized for years as a national leader in

23   that kind of post-election auditing.

24   Q.   Were those same safeguards in place in Georgia in

25   2016, which became an issue in that *Curling* case we talked

1   about yesterday?

2   A.   In 2016, no.  So in 2016, Georgia didn't even have

3   paper ballots.  Georgia was using one of the machines that

4   you saw, one of the machines you saw people hacking into

5   in the excerpt from *Kill Chain* yesterday, a paperless DRE

6   voting machine.  This is one where there is no paper

7   ballot, you just mark your votes on a screen, and the only

8   record of your vote is some entry in a computer database

9   somewhere.

10       So that is in contrast to a paper ballot system,

11  where you fill out a piece of paper and either mail it in,

12  or in a lot of counties, feed it into a scanner yourself

13  in person.  When you have a paper ballot, it is impossible

14  by hacking to go back and change what's on that piece of

15  paper.

16       When you have only a digital record, well, if there

17  is a vulnerability in that computer system, it can

18  potentially be changed.  And in 2016, almost a third of

19  the country was, maybe 30 percent of jurisdictions, were

20  using paperless DRE systems.  It was only 10 percent by

21  2020.  I think the only state in 2020 that was still

22  entirely paperless was Louisiana.

23  Q.   And we have heard a little bit about voter intent and

24  adjudication from other witnesses, and we will get more

25  into adjudication.  But as far as hand -- a hundred

1    percent hand counting across the country, do you have any

2    concerns with how hand adjudication would work?

3    A.    Hand adjudication -- well, so adjudication -- and

4    adjudication means that let's say someone has filled out a

5    paper ballot and mailed it in, right, when you are filling

6    out your ballot there are instructions.  It says fill in

7    the oval completely or fill in the box completely if you

8    want to make a mark.  The reason that it tells you that is

9    because it's more difficult for the computers to reliably

10   scan that mark if you have just made a very light mark or

11   an indistinct one.

12        It is like when you are filling out, if you have

13   filled out a Scantron test or taking the SAT, or something

14   like that.  Adjudication is a process that many

15   jurisdictions follow, when they get those ballots back, to

16   look for marks that may not be filled out all of the way

17   or may be unclear, and correct that problem.

18   Q.    And I just that we pull up the screen.  Is this what

19   you are describing?

20   A.    Yes.  So this is an example.  This is taken from a

21   real ballot in Georgia of a voter's mark on a mail-in

22   ballot that was not following the instructions.  The

23   instructions say to fill in the mark completely.  The

24   voter just made a check.  A lot of people might do that

25   accidentally.

1           But a ballot like this is scanned by a computer,

2      the computer might not read that mark completely.  So

3      election officials, as a quality control step, will

4      conduct a process called adjudication, where they will

5      look for indistinct marks and correct them.  And this

6      process is something that is done -- traditionally it is

7      done by a review panel consisting of officials, with

8      bipartisan observers, by bipartisan workers, just to make

9      sure that there is no funny business going on.

10           They want to make sure that everybody agrees that

11      the voter's mark is clear and the correction is accurate.

12      But they would go through, and traditionally they would

13      duplicate the entire ballot onto a new fresh ballot, and

14      make the marks correctly and ensure that they matched what

15      the voter had put on the original one.  That is one

16      example, the tradition adjudication process.

17           And you asked if I had concerns about that.  Well,

18      you know, not so much concerns, because there is going to

19      be a bipartisan observation, but I am a bit concerned of

20      the potential for human error in that duplication process;

21      say if it is late at night, they have gone through a lot

22      of ballots, they might make a mistake when they are

23      copying everything over to the re-made or corrected

24      ballot.

25      Q.   And we will talk about Mr. Oltmann's theories and

1503

1    testimony some more later, but the jury heard Mr. Oltmann

2    testify that Dr. Coomer invented adjudication.  Is that

3    accurate?

4    A.   No, that is not accurate.  Adjudication is something

5    that has been done for a long time.  And we can -- I have

6    reviewed Mr. Coomer's invention, and Mr. Coomer's

7    invention relates to an improvement to something called

8    electronic adjudication.

9    Q.   And you were referring to the audit process as

10   involving bipartisan teams.  Just for those of us that

11   don't follow politics, what does "bipartisan" mean?

12   A.    That just means there is somebody who is representing

13   a Republican perspective, somebody representing a

14   Democratic perspective, either as an observer or witness

15   or as a participant in the process.  And it is very common

16   in different election steps that are sensitive or that we

17   want public transparency, to be a critical part of, like a

18   post-election audit or a hand count, to have rules that

19   say you are going to have bipartisan observers present

20   representing both of the major political parties.

21   Q.   Okay.  And I have some additional questions, but I

22   want to show you a clip that has already been admitted

23   before we get to that.

24        MS. MORGAN:  Could you pull up Exhibit 185, please.

25   Is that showing for the jury?

```
1              (Exhibit 185 played in open court.)

2    Q.   (BY MS. MORGAN)  So you heard Mr. Lindell say that

3    "these are things that I have evidence of.  The evidence

4    is there."  Do you know what he is talking about?

5    A.   Well, the evidence that he -- I hesitate only because

6    Mr. Lindell's China hacking claims are so nebulous and

7    vague that it is difficult to see that there is anything

8    technically coherent there at all.  This is just a science

9    fiction universe.

10             But as I understand it, Mr. Lindell -- the evidence

11   that Mr. Lindell was talking about there, I understand to

12   be the same as the evidence he presented at the symposium.

13             THE COURT:  There is an objection.

14             THE WITNESS:  Pardon me, Your Honor.

15             MR. KACHOUROFF:  Objection.

16             THE COURT:  Overruled.  Go ahead.

17   Q.   (BY MS. MORGAN)  You can continue, Dr. Halderman.

18   A.   My understanding, based on the totality of

19   Mr. Lindell's statements, is that the evidence he was

20   talking about there is the evidence he later said he would

21   present to the public at the Cyber Symposium.

22   Q.   Have you reviewed Mr. Lindell's movie, *Absolute*

23   *Proof*?

24   A.   Yes, I have.

25   Q.   Did you analyze the claims made in that film?
```

1    A.    Yes, I did.

2          MS. MORGAN:  We are showing the jury a slide here.

3    Q.    (BY MS. MORGAN)  If you can just look, glance at that

4    very briefly, Dr. Halderman.  From your understanding of

5    watching *Absolute Proof* and from reviewing Mr. Lindell's

6    statements at issue in this case, what does this map

7    purport to show?

8    A.    Well, the central claim in *Absolute Proof*, sort of

9    the running theme of the movie, is that a cyber attack

10   somehow occurred shortly after election day in 2020, and

11   that attackers, apparently China, but attackers from

12   foreign network locations, struck over the internet,

13   hacked into election-related computer equipment in

14   jurisdictions all across the country, and changed votes to

15   flip the election outcome.

16         And this map, which features in Lindell's films --

17   well, I wish you could see the animated version of this,

18   because the animated version kind of shows these lines

19   almost like missiles in flight coming out of locations

20   abroad, then landing in U.S. jurisdictions.  It's like

21   something out of the movie, a movie like *Tron* or

22   something.

23         Once again, this is science fiction.  In actual

24   computer security practice, we don't make maps like this.

25   Sorry, this is like something that someone who is

```
 1    imagining what computer security is like would make for a

 2    movie.  It is not -- it is not a real technical tool of

 3    any sort.

 4    Q.   And before I ask you more about this map, I think

 5    yesterday you testified that you reviewed the appetizer

 6    data that Mr. Lindell had given to CNN; is that right?

 7    A.   Yes.

 8    Q.   Then did you have a chance to review the evidence

 9    that was provided to the Cyber Symposium experts at the

10    Cyber Symposium?

11    A.   Yes.

12    Q.   How did you get ahold of that data?

13    A.   Well, one of the experts who was there at the

14    symposium was a network security expert named Robert

15    Graham, who is widely recognized in the community as an

16    actual expert.  And he participated in the symposium as

17    part of the group that was given the data.

18         Mr. Graham, he basically live blogged his

19    participation in the symposium and publicly shared at the

20    time of the symposium the data that he had received.  So I

21    obtained a copy from him and conferred with him, too, that

22    that was the data he had received.

23    Q.   The jury has heard some testimony from Mr. Lindell

24    that perhaps the data that Harri Hursti and Robert Graham

25    reviewed was not the data that he intended for them to
```

1    have, or that they got some hard drives or something they

2    weren't supposed to, something to that effect.

3           In your review, what did you find when you compared

4    the data from the Cyber Symposium with the appetizer data

5    that Mr. Lindell provided to CNN?

6    A.    It was entirely consistent with the appetizer data.

7    Q.    Based on your review of the data from Mike Lindell's

8    Cyber Symposium, what does this "pew pew" missile map

9    show?

10   A.    "Pew pew" map, I think that is an apt description of

11   it.  So what does it actually show?

12   Q.    Yes, sir.

13   A.    You mean in real life?

14   Q.    Yes.

15   A.    Well, it doesn't show anything, because all of the

16   data that is included in this is data that anyone could

17   easily make up; right.  It is entirely unauthenticated

18   data.  It is data that -- you can pick random network

19   locations abroad.  Network locations in the United States

20   are all things you can infer based on, say, the address on

21   a county's website.  So, without -- without any further

22   evidence to establish that this data is anything but

23   entirely made up, it doesn't show anything.

24   Q.    At a broad level, what is the supposed "absolute

25   proof" that China hacked the 2020 election through

1   Dr. Coomer and Dominion?

2   A.   That's a very good question.  I mean, I think at a

3   broad level -- at a broad level the supposed "absolute

4   proof" is coming from this data.  That is my understanding

5   of the core of the claim; that the data -- that

6   Mr. Lindell had somehow established that.

7        But, as I have said, this data you see in this map,

8   it is impossible to authenticate it.  It is very unlikely

9   such data would have existed in the first place just

10  because of the way networks work.  You would have to --

11  like to capture this data --  can I just explain a little

12  bit, perhaps, about what PCAPs are?

13  Q.   Sure.  Let me ask you, what are PCAPs, just to help

14  the jury understand.

15  A.   Sure.  So in network -- in computer networking, data

16  is sent over the internet, it moves in the form of what we

17  call packets.  These are just small, thick-sized chunks of

18  data that are passed from one internet provider to the

19  next to get it from, say, your computer at home, to some

20  server across the country.

21       PCAPs, or packet captures, are recordings,

22  basically, of this traffic.  The network usually doesn't

23  record traffic moving around, but if you put a device in

24  place that watches one link, one wire in the network, it

25  can record everything that is going by, the way you might

1509

1    imagine a wiretap to work in a movie or something.  It

2    makes a recording of all of those packets going by.  But

3    that normally doesn't happen in most of the networks, you

4    have to have someone who decides, I want to capture this

5    data, otherwise it is ephemeral.

6         So to capture this kind of data about attacks

7    coming from all over the world into every election office

8    in the United States, essentially you would have to have

9    machines set up observing network traffic in points all

10   around the network, or points all over the board of

11   networks in the United States, and that is not something

12   that typically happens in network security practice.

13        So, first, right, it's unlikely that such data

14   would exist at all.  But then on top of that, this data,

15   as presented in the film, is all stuff anyone could just

16   make up in a few hours of time.

17        So critical to understanding whether this purported

18   evidence actually proves anything, is establishing, well,

19   is this data somehow actually real contemporaneous data

20   from the election?  And even if this summary data was, it

21   is unlikely from just the fact that there was a connection

22   from one place to another that you could conclude that

23   that attack affected the election result, right, and for

24   several reasons.

25        One, most network traffic is encrypted, so someone

1510

1    who is just watching the wire, seeing the data go by,

2    can't make any sense of that.  And that is what one of the

3    non-profit companies that I started, that is what it

4    specializes in, adding that encryption to network traffic.

5        And today, the vast majority of network traffic is

6    encrypted, so you couldn't tell by looking at it that an

7    attack was taking place.  But to make sense of what was

8    happening, to have any hope of making sense of what was

9    happening, you would need more than just the kind of map

10   or summary shown here, you would need much more detailed

11   data, at least you would need something like PCAPs, or

12   packet captures, that would let experts analyze and

13   dissect that data to try to understand what was actually

14   going on with those connections, if they were real.

15   Q.   Based on your review of the appetizer data and the

16   data that was provided to the experts at Mike Lindell's

17   Cyber Symposium, did they have PCAPs from the 2020

18   election?

19   A.   Well, the data that was provided to Mike Lindell

20   was -- by Mike Lindell to CNN was absolutely nothing that

21   was credible data.  There was a series of different files,

22   most of them just not really any form of evidence of

23   anything.  And then there was a longer series of data that

24   was essentially just another view of connections on this

25   "pew pew" map.

1511

1    Q.    Okay.  And we'll drill down into that a little bit

2    more, but I want to ask, was the theory of Chinese

3    election hacking, and a collaboration somehow with

4    Dominion, put forth in Mr. Lindell's subsequent films

5    after *Absolute Proof*?

6    A.    Yes.

7    Q.    In your analysis of the claims made in Mr. Lindell's

8    films, did you review any criticisms of the purported

9    evidence that was presented in those films?

10   A.    Well, yes.  There was, contemporaneous with the

11   premiere of all of those films, lots of people did fact

12   checks, and there were numerous stories in the press where

13   journalists cited experts saying these theories held no

14   weight.

15            MR. KACHOUROFF:  Objection, Your Honor, hearsay.

16            THE COURT:  Dr. Halderman, I am sorry, when counsel

17   makes an objection, I need you to pause so I can rule on

18   that objection.

19            THE WITNESS:  Pardon me, Your Honor.

20            THE COURT:  All right.  Mr. Kachouroff, if you have

21   more than just that word.

22            MR. KACHOUROFF:  Just that word.

23            THE COURT:  All right.  Sustained.

24            MS. MORGAN:  May we approach, Your Honor?

25            THE COURT:  Yes.

1               (A bench conference is had.)

2          MS. MORGAN:  As an expert witness, Dr. Halderman

3    should be permitted to discuss some of the hearsay that he

4    relied upon in reaching his opinions.  The rules indicate

5    that experts can rely on evidence that might not otherwise

6    be admissible so long as it is something that they have

7    reviewed.

8          THE COURT:  He can rely on it and give opinions

9    about it, but he can't restate the hearsay.

10         MS. MORGAN:  Okay.

11             (In the hearing of the jury.)

12   Q.  (BY MS. MORGAN)  What is your opinion with respect to

13   whether or not there were publicly available criticisms of

14   the so-called "absolute proof" presented by Mr. Lindell in

15   his films?

16   A.   There were, and there were criticisms made by news

17   organizations and presented in the media shortly after the

18   premiere of each of those films that discussed in detail

19   why --

20         MR. KACHOUROFF:  Objection, Your Honor.  Again,

21   this is going right back to the hearsay.

22         THE COURT:  Overruled.

23         THE WITNESS:  -- that discussed in detail why the

24   theories were implausible or false.

25   Q.   (BY MS. MORGAN)  And I don't want you to go into the

1513

 1    substance of those statements, but in terms of the timing,

 2    were those criticisms made shortly after the release of

 3    Mr. Lindell's films?

 4    A.    Yes.

 5    Q.    What are the fundamental obstacles that would make a

 6    nationwide hack, like Mr. Lindell proposed, practically

 7    impossible?

 8    A.    Well, there are a number of things that complicate

 9    hacking a nation's election.  And I don't want to say it

10    is essentially impossible in any case, but I do want to

11    point out that we have to analyze it in any particular

12    election scenario; how close was the election, what states

13    were planning what sort of review or audit, and how many

14    of those states would have to be affected by hacking to

15    change the result?

16           But if we want to limit the analysis for now to a

17    question -- to the question of why would it be essentially

18    impossible to hack election results in every state in the

19    manner that is discussed in Mr. Lindell's films and is

20    purported by his supposed PCAPs or data, there are reasons

21    why that is, in essence, impossible.

22           One, across the country we don't just have one

23    single voting system.  There is not one place someone can

24    hack in and change votes nationally, it is a highly

25    distributed systems.  So every state runs its own voting

1    system.  In most states, the computers that actually do

2    the vote counting or tabulation are -- or even on the

3    county level, county by county, they run their own

4    separate systems, and those aren't all the same type of

5    computer.

6         Across the country there are probably 30 or so

7    different models of voting machine in use right now.  They

8    run many different versions of software behind those

9    voting machines.  So to target all of them the way that

10   the Lindell data and theory proposes, would require an

11   enormous investment in time and manpower and resources to

12   somehow find ways to attack all of those different

13   systems.  So that is one reason.

14        Another obstacle is those systems are, in general,

15   not going to be -- are usually not going to be connected

16   to the internet there are exceptions to that.  Sometimes

17   there are machines that transmit votes over

18   internet-connected networks, but those are the exception

19   rather than the rule.  And to target all jurisdictions,

20   you also have to find a way to target the systems that are

21   not at all connected to the internet, that are fully

22   disconnected.

23        And perhaps there are ways in some cases to do

24   that, but in general, it is going to be difficult and it

25   is going to require specific investment in each of those

1    locations to pull off something resembling that.

2            Finally, there is the problem that an attack is

3    very likely to be detected if it tries to attack every

4    jurisdiction nationwide.

5    Q.   Why is that?  Why would it likely be detected?

6    A.   Well, two reasons.  One, many jurisdictions are now

7    doing audits of the paper ballots.  We have ballots marked

8    on paper, and they can't be changed in a cyber attack, and

9    people are going to go back and look at enough of them to

10   tell whether or not the result was changed.

11           But, two, if you are flipping the election outcome

12   or interfering with the election outcome everywhere, well,

13   there are places where it is just going to be completely

14   implausible if the election outcome has been attacked and

15   changed.

16           Let's say if Hawaii were hacked to flip the

17   presidential outcome, Hawaii is probably the Bluest state

18   in the nation, that would be completely implausible.  So

19   there wouldn't be any reason why an attacker would try to

20   hack presidential election results in Hawaii in the

21   process of trying to flip the outcome.

22           But that is what Mr. Lindell's data is implying, is

23   the attack from China changed votes in every jurisdiction.

24   Q.   As far as if someone wanted to hack into all of the

25   computers at the same time, would that be something that

1516

1    would be easy to do or difficult?

2    A.    Well, I think it would be virtually impossible to

3    hack into all of the computers at the same time.  This is

4    a monumental amount of effort, even a nation-state like

5    China or Iran or Russian, they might rattle the doorknobs.

6    And something like that really happened in 2016, where we

7    know Russia tried to look for vulnerabilities in voter

8    registration systems across the country.

9         But that's really different from getting in and

10    actually changing votes, because voter registration

11    systems aren't necessarily hooked up to the internet,

12    because everywhere gives you a way to register or vote

13    online or to look up your records, but the systems that

14    count our vote for the most part are not.

15    Q.    If I am hearing your testimony right, was it detected

16    that Russia tried to "rattle the doorknobs," as you said?

17    A.    It was detected.  It was sort of detected

18    retroactively.  It was detected, and eventually we came to

19    understand the scope of what happened.  And we knew that

20    Russia did not change voter registration records in 2016,

21    although in one or two states they had the capability to.

22    Q.    The jury heard Mr. Oltmann testify that electronic

23    management systems can be hacked without detection.  What

24    is your reaction to that testimony?

25    A.    Well, that's possibly -- so it depends on the

1    circumstances and what the attack is trying to do.  But,

2    again, talking about an attack that is going to strike

3    everywhere across the country without detection, that is

4    virtually -- going to be virtually impossible, because a

5    lot of these systems are going to be under scrutiny,

6    right.

7            Since 2016, we have had a much higher level of

8    scrutiny by security personnel at the state level, by law

9    enforcement, and so on.  And although we can't rule out

10   that perhaps attacks could take place in some places

11   without detection, we can rule out that attacks took place

12   everywhere without detection.  That would be ridiculous.

13           And even then, the question is really, did attacks

14   take place in 2020 without detection?  And we have

15   abundant evidence that that did not happen, at least not

16   in any way that affected the outcome of the election, and

17   that is what comes from the post-election audits.

18   Q.   Why is it that it would be implausible for a real

19   adversary seeking to affect the presidential election to

20   hack votes in every single state?

21   A.   Why would it be implausible?  One reason would be

22   that the attacker would not gain anything by attacking

23   jurisdictions that weren't among the closest swing states.

24           So, look, just let me step back for a minute.  So

25   recall -- and maybe if you don't vote or follow the news

1    about elections regularly, you might not be familiar with

2    the way that voting for president works, but we have a

3    system called the electoral college, where each state has

4    a certain number of what are called electors, and in most

5    states, that number is awarded on a winner-take-all basis

6    depending on which candidate gets the most votes within

7    that state.

8              Some states tend to be more competitive than others

9    in presidential elections because they just are more

10   evenly balanced between Republicans and Democrats.  These

11   states that are more uncertain which way they are going to

12   vote, these are called the swing states.  And the swing

13   states are the ones that are maybe most in play during the

14   election.

15             Hawaii, or, I don't know, Montana, you can usually

16   predict which way those are going to come out.  They are

17   highly polarized states, they are not really swing states.

18   But Georgia or Pennsylvania, or my own state, Michigan, we

19   have gone back and forth from election to election.  We

20   are what is called a swing state, and it is much harder to

21   predict which way we will go.

22             In a real attack, if you wanted -- let's suppose an

23   attacker wanted to alter the result of a presidential

24   election, the only logical thing for them to do is to

25   focus on the swing states, because those are the only

1    states that -- those are the states where it would be at

2    least a credible result if it came out either way.  If

3    they flipped Hawaii or Montana to be the opposite of the

4    expected result, nobody would believe it, it would be

5    obvious that there was some error here and people would

6    investigate.

7         But in a state where we couldn't predict the

8    outcome very well in advance, that is one that plausibly

9    could go either way, that would be an attractive target.

10         Now, to change the result of a presidential

11    election, also you don't have to change votes in every

12    state because of the winner-take-all nature of the

13    electoral college, it would be sufficient to attack a

14    fairly small number of swing states.

15    Q.   So why not just attack all of the states to make sure

16    you have it in the bag?

17    A.   So, thank you.  The point is attacking all of the

18    states would make it much more likely you would be

19    detected without it doing anything to increase your odds

20    of success.  So no real attacker who wants to remain

21    undetected would do that.

22    Q.   I want to circle back to the CNN interview of

23    Mr. Lindell from August 6.  You had an opportunity to see

24    that video when we played it, Exhibit 190; correct?

25    A.   Yes.

1    Q.   I think you already established you were one of the

2    nine cyber security experts that analyzed that data.

3    A.   I was, yes.

4    Q.   And we touched on it, but what can you -- can you

5    give us some more information about the conclusions you

6    reached after analyzing that data?

7    A.   Well, I think I told CNN it was completely

8    ridiculous.

9    Q.   Why was that your finding?

10   A.   Because the data was purported to be "absolute

11   proof."  The claim was there would be PCAPs presented, but

12   the data didn't prove anything.  There was nothing that

13   you could establish from it.  It was impossible even to

14   tell whether any of it -- that any of it was genuine.

15   And, in fact, all of it could have been easily made up.

16   Q.   I want to jump to the data from the Cyber Symposium.

17   We have talked about the PCAPs a little bit, but other

18   than the simplicity of that data, was there anything else

19   that was a sign of problems with that data, to you.

20   A.   Of the data from the symposium?

21   Q.   Yes, sir.

22   A.   Well, so the data from the symposium -- the data from

23   the symposium was -- I am sorry, could you go back to the

24   slide, if you don't mind, that shows the spreadsheet,

25   because I don't think I quite pointed out --

1    Q.    I believe that is 16 -- 15 maybe.  I am sorry.

2    A.    Just very briefly.

3    Q.    The ones with the rows of data?

4    A.    Right.  So this is another screen shot from *Absolute

5    Proof*, but this shows another view of the same data that,

6    in the films, Mr. Lindell was purporting to have.  And you

7    can see the different fields here, that there is a "date,"

8    there is a "source," and it is "network address."  There

9    was a "designation" and "network address."  And these

10   designations are supposedly election offices in counties

11   across the country.

12        So this is the kind of data that is in the films

13   Mr. Lindell had been presenting, but then at the symposium

14   he had promised to present actual PCAPs.  That is what

15   experts like Mr. Hursti and Robert Graham had gone to

16   analyze.  But the data that I reviewed from Mr. Graham is

17   the data the experts actually presented at the symposium,

18   and it isn't any form of PCAP data at all from the 2020

19   election.

20        The data that was presented, and it's just

21   enormous, was this hard drive, filling -- a pile of data,

22   and it is not any kind of real professional security PCAP

23   data whatsoever.  It is not in any kind of standard data

24   format.  It is this enormous blob of stuff in a

25   specialized data format called a BLX data format, named

1    after this Blxware company that we heard testimony about.

2    Q.   Just briefly, is it your understanding that Blxware

3    is what Mr. Montgomery sold to Mr. Lindell for somewhere

4    between 1.5 to $1.8 million?

5    A.   Yes, that is my understanding.

6    Q.   Why was that a red flag to you that the data was in

7    BLX format?

8    A.   Well, so it was a red flag in part because of

9    Mr. Montgomery's background.

10   Q.   Okay.  Maybe we can list out the red flags, then we

11   can circle back.  So other than Mr. Montgomery's

12   background, what were the other concerns you had?

13   A.   Maybe it would help if I talked about what that data

14   format was.

15   Q.   Can you explain the data format, please?

16   A.   Yes.  So the Blxware data was in this specialized

17   format that it appears Mr. Montgomery had invented for his

18   data.  But along with the purported PCAP data file, the

19   data that the experts at the symposium received also

20   included the source code to two different computer

21   programs that were related to processing that data, and

22   that source code also appears to have been created by the

23   Blxware company, by Dennis Montgomery's company.

24        So I analyzed the PCAP "data," together with the

25   programs that were provided to process it, and those

1    programs tell you how the data file was constructed, in

2    essence.  These Blxware computer programs, one of them is

3    intended to extract the data and to supposedly analyze and

4    find evidence of attacks from within that PCAP data.

5        But when you actually start to look at the program,

6    to read what the source code does, well, the first thing

7    you see is it is written in a way that is intended to

8    obfuscate what it is doing, to hide what it is doing and

9    make that less obvious.  And that obfuscation is really

10   making -- it isn't so complicated that an expert couldn't

11   understand it, but it would take more than a few minutes

12   for someone who just has an introductory-level programming

13   to figure out what the program is really doing.

14       But Robert Graham was able to make sense of it

15   during the symposium and talked about it in realtime, and

16   even wrote his own program to complete the decoding.  But

17   I did the same thing, and I figured out what this was

18   doing if you peel away the levels of obfuscation.

19   Q.   What was it doing?

20   A.   What it was doing was -- well, so what a real PCAP

21   analyzer program does, right, would be looking at each

22   network packet one by one, trying to associate that with

23   data from other sources, known malicious sources.

24   "Indicators of compromises," is a term of art we use for

25   data on a network that shows a real attack is occurring.

1    It would be doing some kind of intense analysis to actual

2    records of network traffic.

3         What Dennis Montgomery's program, distributed with

4    this data at the symposium, did, was it basically threw

5    away the lion's share of what was in this file, which

6    appears to just be junk, and looked at specific sections

7    of it, and then peeled away a little layer -- peeled away

8    a little bit of this obfuscation.  And I will mention what

9    that means in a second.

10         What it did is it copied out essentially rows of

11   the spreadsheet already hidden in this giant data file.

12   So it threw away 99 percent of the file, which was junk,

13   and the one percent left was the hidden spreadsheet rows

14   that were almost exactly the same kind of data that we

15   first saw in that chart; the network and designation and

16   number of votes purportedly changed; right.

17         So it wasn't doing any analysis at all, and that

18   encoding, that obfuscation, it took those -- took those

19   spreadsheet rows, and they were hidden by shifting every

20   letter three places in the alphabet.

21   Q.   If we can pause there.  Is that what Harri Hursti

22   meant by ROT-3?

23   A.   I didn't hear Hursti's testimony, but that would have

24   been the same thing.  That means the same thing I am

25   saying.  So you make an A into a D and a B into an E.

1    This is not any kind of real encryption or real analysis,

2    this is just a way of -- it is just a trivial way of

3    hiding something in that bigger data file.

4    Q.    And I am sorry to pause you, but I pause you there.

5    So going back, you said you wanted to explain what you

6    meant by "layers of obfuscation."  Could you explain?

7    A.    Obfuscation, that is what I meant by that shifting

8    everything by three.  So, again, you have an enormous data

9    file, but it has been filled with junk to make it look

10   much bigger than what it really is.  What it actually is,

11   is just a big spreadsheet.  It is a big spreadsheet, just

12   in the same form as what you saw in Lindell's films, that

13   has been disguised so it looks like it is not a

14   spreadsheet, it looks like it is a big enormous set of

15   network data that this program is doing sophisticated

16   analysis to.

17        But an actual -- an actual computer security or

18   computer networking expert can, in a few minutes, just

19   look at what the extractor program is doing and tell you,

20   wait, this isn't real network data, this is not doing any

21   kind of real analysis, this is just a thinly veiled fraud.

22   Q.    We heard Mr. Lindell testify he was surprised when

23   people connected his data to Dennis Montgomery without

24   Mr. Lindell telling them he got it from Mr. Montgomery.

25   How could someone tell from the data presented at the

 1   Cyber Symposium that it originated from Dennis Montgomery?

 2   A.   Well, so one way you could tell is this extractor

 3   program had code in it that made a connection to the

 4   Blxware website in order to apparently check that the

 5   program was licensed to operate.

 6   Q.   And since we went back to Mr. Montgomery, you

 7   mentioned him being associated with this data was a red

 8   flag for you.  Can you explain what you mean by that?

 9   A.   Well, I was familiar with Mr. Montgomery's reputation

10   prior to the election.

11        MR. KACHOUROFF:  Objection, Your Honor, may we

12   approach?

13        THE COURT:  Yes.

14        (A bench conference is had.)

15        MR. KACHOUROFF:  The objection is foundation.

16   First of all, they would have to prove the details were

17   known by Mike directly, and he never talked to Mike

18   Lindell about Montgomery's background.  So unless he can

19   provide that testimony, it is not relevant, and he can't

20   lay a foundation.

21        MS. MORGAN:  He is about to testify that even doing

22   a cursory Google search of Mr. Montgomery would lead

23   someone to see that he is associated with fraud.  This is

24   something that we have established through the testimony

25   of Mr. Lindell; that he did some kind of investigation but

1    he ignored all of these signs that Montgomery -- it goes

2    to actual malice.

3            THE COURT:  It is overruled.  But, Ms. Morgan, you

4    need to reframe the question.  He is about to state

5    reputational evidence or character evidence about

6    Mr. Montgomery.  It needs to be -- you need to lay a

7    foundation of what he knows and what his opinion is.

8            MR. KACHOUROFF:  Hearsay statements.

9            THE COURT:  Again, as I previously instructed, an

10   expert witness can testify as to his opinions based on the

11   hearsay and he can reference the opinions.  He cannot

12   repeat the hearsay without violating the hearsay rule or

13   having another exception to the hearsay rule.

14           MS. MORGAN:  Okay.  To the extent that he invocates

15   the same thing that is in the exhibit that has already

16   been admitted, that Mr. Montgomery was involved in "a

17   hoax" on U.S. Government, I just want to get out in front

18   of that because I think that is what he is going to say.

19           THE COURT:  If it is already in evidence, he can

20   testify to it.

21           MR. KACHOUROFF:  He can testify to that.

22           (In the hearing of the jury.)

23   Q.   (BY MS. MORGAN)  Without getting into what anyone

24   else has said about Mr. Montgomery, what is your opinion

25   of Mr. Montgomery in terms of whether you find him to be a

1    credible source?

2    A.    Mr. Montgomery is absolutely not a credible source.

3    He is someone who I would be -- I would not trust a single

4    thing that -- a single claim that he made.

5    Q.    I want to show you an exhibit, it is going to be

6    Exhibit 83.  Were you here when we discussed the letter of

7    warning; Mr. Lindell about Mr. Montgomery?

8    A.    Yes.

9    Q.    Okay.  Do you generally agree with some of the

10   concerns that were raised in that letter?

11   A.    Yes.  Yes, absolutely.

12   Q.    I want to go to slide 19 now.  And can you give the

13   jury an example of one of the places that was supposedly

14   targeted by an attack, as reflected in the Montgomery

15   data?

16   A.    Okay.  Yes, this comes from my own analysis of the

17   data.  So just looking at -- let's suppose that -- just to

18   preface this a little bit, what I analyzed was what I have

19   already described, is that the data wasn't any kind of

20   actual network packet capture, it was just this

21   spreadsheet that had been transformed to look like

22   something much more important and sophisticated than it

23   was.

24        But then let's suppose, let's take the spreadsheet

25   at face value, and what the spreadsheet consists of is it

1    is about 3,000, I think 3,500 or 3,700 rows, each of which

2    says an attack came from this address overseas, came to

3    this election office address in the United States, and

4    changed this number of votes on this date and time.

5         Okay.  Well, let's take that at face value and ask,

6    well, is there evidence that -- can we show that that did

7    not happen?  And, in fact, there are several reasons why

8    you can say that those attacks could not possibly have

9    happened the way that the data purports to show.

10   Q.   How can you possibly say that?

11   A.   Well, you can look at what it claims.  And one claim

12   that the data makes, right, there is a row in the

13   spreadsheet that said that at 11:26 on November 6, 2020, a

14   computer in Moscow initiated an attack that infiltrated

15   the Brookfield Town Clerk's Office in Brookfield, Vermont,

16   and shifted 34 votes out of 813 from Biden to Trump.

17        Okay.  So how do we know this is fake?  We know we

18   can prove that this is fake, and here is how.  If you go

19   to the next slide, Brookfield, Vermont, is one of those

20   U.S. jurisdictions that doesn't use any kind of

21   computerized voting, it counts votes entirely by hand.

22        People show up at a town meeting, they count the

23   ballots in public, then they announce what the results

24   are, and it gets reported by the local paper.  So that

25   happened in Brookfield, Vermont, and that is how we know

1    what the election result is there.

2         It would be utterly impossible, absolutely

3    impossible for a computer overseas to hack into

4    Brookfield, Vermont, and change the election outcome.

5    Q.   Were there any other jurisdictions such as the

6    Brookfield, Vermont, example where the data from Mike

7    Lindell's Cyber Symposium indicated that there had been an

8    attack?

9    A.   Yes.  The data implied votes were changed in

10   virtually every U.S. jurisdiction, including other

11   jurisdictions that count ballots by hand, like many

12   counties in Montana, other towns and cities across New

13   England.  All or many, many of those localities, the data

14   claimed that votes were changed by hacking, but there were

15   no computers involved.

16        And then, it wasn't -- that was not the only kind

17   of problem, though.  So just places that didn't use

18   computers that the data claimed were hacked was one.

19   Q.   What were the other signs of problems that the data

20   was not credible?

21   A.   Well, the data also would imply that the attacks had

22   to go back in time.

23   Q.   What do you mean by that?

24   A.   Well, so I mentioned that each of these rows in the

25   spreadsheet claims to indicate the date and time when the

1    attack took place.  And some of those dates and times were

2    after the results were already announced and made public

3    by the jurisdictions.  And the announced results in those

4    jurisdictions are the same as what the data claims is the

5    result of hacking.

6         So, for instance, a Van Buren County, Michigan, not

7    that far from where I live, the data claimed that the

8    announced results were the result of an attack that

9    originated in Australia and shifted this many votes.

10   Well, the date and time and the dataset were two days

11   after Van Buren County announced its election night

12   results, which are the same as the final results in the

13   presidential election.

14        So, like it would be utterly impossible for the

15   attack to have taken place the way the data claimed.  The

16   attack would have had to have worked back in time.

17   Q.   Other than the timing issue, what did you find when

18   you looked at the audits and hand counts for some of those

19   jurisdictions, where the data showed there had been a

20   hack?

21   A.   Right.  This is a third category of problems.  So as

22   I say, the data implies that numbers of votes were shifted

23   in virtually every jurisdiction, this includes

24   jurisdictions that later went and hand counted all of

25   their paper ballots and confirmed the results that they

```
 1    arrived at.

 2            So an example of that is Maricopa, Arizona.

 3    Maricopa County, which is something like 60 percent of all

 4    of the votes in Arizona, it is a huge county.  And I think

 5    Mr. Lindell's data claimed that something like 90,000

 6    votes were changed in Maricopa County to produce their

 7    reported election outcome.

 8            In Maricopa County there was a hand count of all of

 9    those ballots that was, in fact, initiated by the

10    Republican Majority State Senate, and conducted by people

11    who were quite skeptical of the election outcome, and the

12    outcome of that audit in Maricopa, they found that Biden

13    should have received a few more votes than he actually was

14    announced to receive, a handful more votes than the

15    initial numbers showed.  It did not show a hundred

16    thousand votes were stolen from Donald Trump.

17            So this is what looking at the original paper

18    ballots tells you.  The original paper ballots could not

19    have been changed retroactively by hacking.

20    Q.   I would like to discuss some of the people that

21    Mr. Lindell referred to as "the experts" that he had

22    consulted.  Are you familiar with Colonel Phil Waldron?

23    A.   Yes.

24    Q.   Who is he?

25    A.   So Phil Waldron, I know he is a long-time associate
```

```
 1   of the AlliedSignal Operations Group, which I hope we will

 2   get to talk about.

 3   Q.   Is that ASOG?

 4   A.   ASOG.  He worked with ASOG.

 5   Q.   And how is it that you are familiar with Phil

 6   Waldron?

 7   A.   I think I met Phil Waldron actually -- I don't recall

 8   actually where I first heard about him.

 9   Q.   Did you have a chance to review any of his work in

10   connection with the Antrim County issues?

11   A.   Well, I reviewed ASOG's work, the purported expert

12   report.

13   Q.   What are the problems, if any, that you found with

14   ASOG's report related to Antrim County?

15   A.   Well, so the expert reports in court cases like this

16   tend to be factual, tend to be carefully written and

17   analyzed.  But the ASOG report in the Antrim County

18   lawsuit was one of the strangest and most incredible

19   expert reports that I have ever seen in my career.

20   Q.   I am sorry, before we dig into the reason why that

21   is -- was your conclusion, can you remind the jury what

22   the situation was in Antrim County, Michigan, that led up

23   to all these reports?

24   A.   Oh, yes.  Yes.  So I have mentioned that elections

25   are imperfect and have problems sometimes.  Antrim County
```

1    was one of the most prominent examples of that in 2020,

2    because on election night 2020, Antrim County, this small

3    county in the upper lower peninsula of Michigan, its

4    election night report results announced the wrong

5    presidential winner.

6            So this is a solid Red county, and it announced

7    Biden had won Antrim County by a substantial margin.  Just

8    an example of an obviously wrong result.  And what

9    happened in Antrim was they took down their -- the county

10   realized very quickly that there was some major problem

11   with their results, they took them down, they consulted

12   with the state, and they figured out the likely reason for

13   it was a human error in the configuration of their system,

14   and they went and tabulated their votes in a different way

15   to correct or attempt to correct the error.  And they

16   announced corrected results that showed the expected

17   victory for Donald Trump.

18           But there was a lawsuit filed by -- in court in

19   Antrim County by a Michigan resident who claimed that the

20   problems with the unofficial election night results were

21   evidence of some kind of fraud or some kind of attack, and

22   as a result of that lawsuit, the judge in Antrim County

23   gave the plaintiff, who was represented by Matt DePerno,

24   who you saw, the expert of Mr. Lindell, yesterday, DePerno

25   and his plaintiff won the right to do an analysis of the

1    election equipment and data in Antrim County to try to

2    prove their claims.

3    Q.    Were you involved in analyzing the issues?

4    A.    Well, so the plaintiffs brought in ASOG, which did

5    their analysis and produced this incredible report I was

6    referring to.  After they produced their report, the

7    Michigan Attorney General and Secretary of State

8    commissioned me, hired me to do my own investigation of

9    what happened and to produce my own expert report for the

10   lawsuit, my own investigation, which I did, and which

11   became public in March of 2021.

12   Q.    What did you find from your analysis?

13   A.    From my own analysis of Antrim County -- so I was

14   able to confirm the major errors in the result were the

15   result of a human error.  And basically the human error

16   was that late in the process of preparing the election,

17   after ballots had already started to be mailed out to

18   voters, and after the vote scanners had all been prepared

19   for the election, the Antrim County Clerk realized there

20   were errors on some of the ballot designs; I think in one

21   case there was a candidate who had been left off.

22        And so the Clerk had to go back and collected those

23   ballot designs and mailed out new ballots to people who

24   had already received them and update the configuration of

25   the ballot scanner so it could correctly read those

 1    repaired ballots.

 2         Now, this may be a point that hasn't come out yet

 3    in this week's testimony, but essentially every ballot

 4    scanner has to be prepared by election officials prior to

 5    voting so it knows that a mark in this place is a vote for

 6    this candidate, it knows what the ballot looks like so it

 7    can scan it and report and associate marks in different

 8    locations with different candidate names.  And that

 9    configuration happens usually a few weeks before the

10    election.

11         But what happened in Antrim County was that because

12    of these errors in the ballots, the county had to go and

13    change the configuration on the ballot scanner so they

14    knew how to scan the corrected ballots, but the Clerk made

15    a mistake in updating the configuration.

16         They should have updated the configuration in all

17    of the machines according to Dominion's documentation, but

18    instead they only updated the configuration on some of the

19    machines, and the rest of them used an outdated version of

20    the configuration to read the ballots.

21         As a result of that error in procedure by the

22    clerk, when the data from the machines was brought

23    together centrally to add up the votes from the whole

24    county, there was kind of this misalignment between the

25    data from different machines.

1537

1        So you can imagine it is like you are taking

2    columns from different spreadsheets and pasting them all

3    together and then adding up across each row to figure out

4    the total number of votes for each candidate.  Well, some

5    of the spreadsheets had an extra row in them because the

6    missing candidate had been added and some of them didn't.

7    And so when you added up across the columns, votes from

8    some of the machines got shifted into the count for the

9    wrong candidate.

10        So Mr. Biden ended up receiving Mr. Trump's votes,

11    Mr. Trump received the libertarian candidate's votes, and

12    so on down the ballot.  Mr. Biden's votes were thrown away

13    while being totaled up.  The interesting thing, each

14    machine independently still got the right count, and the

15    count for the presidential election was preserved from

16    each machine on the poll tape it printed, the cash

17    register style tape, with the total that each machine

18    produces at the end of election night.

19        But when the data from those machines was combined

20    in the central system, that is when this error occurred

21    and votes were misattributed.  So what Antrim County did

22    to fix that is they took the poll tape from each machine

23    and entered the data by hand into the central system, and

24    that got the correct presidential results.

25        So what my analysis showed -- what my analysis

1  showed was I confirmed that this was, indeed, the problem.

2  I looked back at the log files when the ballot designs had

3  changed and the way the software was working internally, I

4  then used my own tools to add up the votes from the

5  electronic records on each machine, I even went and added

6  up the poll tapes by hand.

7       What I confirmed is that the initial explanation

8  that the state had given that, oh, it was this update to

9  the ballot design that caused the problem, explained

10  exactly the deviations in the presidential result.  It was

11  just a perfect fit.  And I also could back out that error

12  and confirm in various technical ways that the final

13  result matched what the machine should have produced.

14       Then, on top of that, the state, the Secretary of

15  State's office went and hand counted all of the ballots,

16  the presidential result for all of the ballots across

17  Antrim County, and got essentially the same result as the

18  corrected totals.

19       So we can be very, very sure the cause of that

20  problem was this specific human error.

21  Q.   Before we get to the ASOG report, just to use an

22  analogy as far as the issue with the ballot scanner, would

23  this be similar to a situation where a teacher or

24  professor might add another question to a Scantron test

25  and they don't configurate the Scantron scanner?

1    A.    Yeah.   That is a reasonable analogy to what happened.

2    So the test changed, the paper changed, but the scanners

3    were not all updated to reflect what they should have been

4    reading.

5    Q.    Okay.   Now let's talk about that ASOG report.   Why

6    was that an extraordinary report in your opinion based on

7    your review?

8    A.    Right.   So I produced my own report about this, but I

9    also, in my report, analyzed the claims that were made in

10   the ASOG report and, oh, my goodness, like this is not a

11   normal expert report.

12   Q.    Why?

13   A.    So the fundamental claim that the ASOG report makes

14   is that based on ASOG's analysis of the same Antrim

15   systems, they conclude that the Dominion Voting System is

16   deliberately engineered to create systematic fraud, and it

17   does that by generating a huge number of errors while

18   scanning ballots in order to cause ballots to be sent for

19   electronic adjudication, and that then during the

20   electronic adjudication process, that allows fraud to

21   occur.

22         It alleges that in Antrim, these things happened;

23   there were a huge number of errors, that ballots were

24   electronically adjudicated, and all of the log files from

25   the electronic adjudication had been manually removed.

1540

1    Like, these are the central and really quite incendiary

2    claims that the report makes.

3    Q.   Why do you disagree with the conclusions reached in

4    the ASOG report?

5    A.   Well, because they are just very, very easily

6    falsifiable.  So the claim that -- the centerpiece of this

7    whole claim is that electronic adjudication was used to

8    somehow steal votes.  But in Antrim County, so electronic

9    adjudication -- did we talk about what that is?

10   Q.   We briefly did, but can you explain what electronic

11   adjudication is?

12   A.   Right.  So we talked about manual adjudication; that

13   you are going to have people from both parties review

14   physical ballots and they are going to have to duplicate

15   ones that have been mismarked onto fresh ballots so they

16   will scan correctly.

17        Well, electronic adjudication is something that

18   basically every modern voting system has some ability to

19   support.  It means that instead of doing that with the

20   original piece of paper, you do it on a screen, and

21   generally you are going to have a bipartisan group of

22   observers or adjudicators who are going to be conducting

23   that.

24        But so the claim was that electronic adjudication

25   was the centerpiece of Dominion Voting Systems' intended

1    fraud, and that this was suspiciously conducted at a high

2    rate in Antrim County, and that all of the log files from

3    it had been removed.

4         Well, there are several problems with this.

5    Q.   What were those problems?

6    A.   So one problem is that there wasn't, in fact, a

7    suspiciously high error rate in Antrim County.  The data

8    that ASOG purported to show a high error rate, well, they

9    were just counting the number of lines in a certain log

10   file that said error, and divided by the total number of

11   lines in the file, but that told you nothing, because it

12   is just not -- that doesn't tell you the rate of ballots

13   that had errors.

14        The errors they were claiming were sending ballots

15   to adjudication, they just didn't understand what the log

16   file messages meant.  It said that the ballot had been

17   reversed.  Well, it is not that the ballot had been sent

18   to adjudication, it is that that log file happens if I am

19   feeding my ballot into the scanner and it is a little

20   crooked, so the scanner takes it and ejects it back out

21   for me to put it back in again, just like when you are

22   feeding a bill into a vending machine and it goes in

23   crooked, you have to do it a few times.

24        That is a pretty common experience, as almost any

25   Michigan voter will tell you, because we use privacy

```
 1    sleeves for our ballot, so almost like a manila folder

 2    that your ballot is contained in for privacy so other

 3    people can't see your vote.  And that the machine grabs

 4    the ballot out of and feeds it in.  If you are holding it

 5    too tightly when you vote, it jams.  And that happens to

 6    me all of the time when I vote, so that is not unusual or

 7    a suspicious elevation.

 8            But then another problem with that theory is that

 9    adjudication, even if there were an elevated rate of error

10    and a lot of ballots had been sent to electronic

11    adjudication, electronic adjudication would be a really,

12    really lousy way of trying to cheat.

13    Q.   Why?

14    A.   Well, so maybe I can show you here on the screen just

15    a little bit of what electronic adjudication generates.

16    So it generates lots of different log files.  So when a

17    vote is adjudicated, you go through some interface on a

18    computer screen with your bipartisan review panel and make

19    a determination, and you can click a button that says --

20    in this case you would click the button that says this is

21    a vote for Donald Trump, then that would get recorded in a

22    log file that the adjudication system had corrected this

23    vote.  In the case of Dominion systems, it also gets

24    recorded right in the same file that records the picture

25    of the ballot.
```

1        So I am showing here from a real ballot in Georgia,

2    here is what that adjudication record looks like.  It says

3    this ballot was scanned on a certain scanner.  The scanner

4    here, you can see "President of the United States" is a

5    blank contest.  That is a record of what the scanner

6    originally interpreted that mark as.

7        Fortunately for the voter, it was adjudicated, and

8    the adjudicator could correct that mark to a mark for

9    Donald Trump.  And here it says, adjudicated at 9:43 p.m.

10   on 9/9/2020 by certain login name, and the adjudicated

11   vote, you see "adjudicated" in asterisks, is a vote for

12   Donald Trump.

13       So both the original record and the adjudicated

14   record, the date and time, all of that is recorded and

15   stored with the vote.  It is an extensive electronic trail

16   of every change.

17       If you wanted to cheat, you wouldn't cheat in a way

18   that leads to extensive time-stamped electronic records.

19   You probably also wouldn't want to cheat through

20   adjudication, because you have to click through ballots

21   one by one.

22       So even if, say, you didn't -- a bipartisan review

23   panel wasn't there watching and somehow someone gained

24   illicit access to this system, not only would it leave all

25   of these logs, but you would be clicking through one

1    ballot at a time, maybe for a day, for all night if you

2    are in a huge jurisdiction like Maricopa County, where you

3    allegedly, according to Lindell's data, changed a hundred

4    thousand votes nearly.

5         This is not a practical way to cheat in any kind of

6    large number.  It is, at best, one by one, and highly

7    monitored.

8    Q.   Before we leave this slide, you mentioned earlier

9    Dr. Coomer did not invent adjudication itself.  But did he

10   have any role, as far as you are aware, in the correction

11   of the AuditMark record, that process by which it is

12   created, not the specific audit mark, obviously?

13   A.   I reviewed the patents that Mr. Coomer holds, that I

14   believe it was Mr. Oltmann who had mentioned in some of

15   his writings that Eric Coomer held the patents for

16   adjudication.

17        Well, what those patents relate to are not the idea

18   of electronic adjudication, basically every vendor has

19   that option.  His patent relates to a specific improvement

20   to electronic adjudication, which is something Dominion

21   calls the AuditMark, and is literally the text that I am

22   showing here on the screen, this log of each adjudication

23   decision.  And what the AuditMark does is it takes that

24   log and it saves it literally in the same image file as

25   the ballot.  It attaches another page to that image file

1    that has this log.

2          So that any time someone receives a copy of that

3    scan of the ballot, if they are going to review the

4    electronic record of the ballot, that comes along with

5    this electronic audit mark record.  It is a log of what

6    the scanner originally saw, any adjudication that has

7    changed a mark on that ballot, and who made it and when.

8    That is what Dr. Coomer invented.

9    Q.   When you say that it is an improvement on electronic

10   adjudication, can you tell us whether or not that would

11   make it easier or more difficult to hack or rig an

12   election by "changing ballots" during the adjudication

13   process?

14   A.   It doesn't make attacking easier, it makes it more

15   difficult, because it is another log of all of those

16   events, another way to trace back and see what happened

17   and if any ballot had been changed by adjudication.  This

18   doesn't make the system more vulnerable, it makes it more

19   secure and more accurate by virtue of being able to

20   perform adjudication.

21   Q.   Turning back to your report that we discussed with

22   reference to Antrim County, Michigan, was your report made

23   publicly available?

24   A.   My report was in March of 2021.  It was published by

25   the Secretary of State's Office when the Secretary and the

```
 1    Attorney General filed it in the Antrim case.  But I
 2    should point out, I didn't finish answering your previous
 3    question.
 4    Q.   I am sorry, what other conclusions did you reach
 5    based on your analysis related to Antrim?
 6    A.   Well, the biggest problem with the ASOG report with
 7    this absolutely insane expert report that was filed, was
 8    that while they allege all these problems happened through
 9    cheating, happened through electronic adjudication, and
10    the log files were missing.  Well, Antrim County didn't
11    use electronic adjudication.  Electronic adjudication is
12    an optional feature of the Dominion system, and Antrim
13    County didn't buy it.  They didn't have the machines set
14    up in a way that would even make electronic adjudication
15    possible.  That is why there were no log files, because
16    electronic adjudication wasn't installed and didn't
17    happen.  They adjudicate ballots by hand in most Michigan
18    counties.
19         But the ASOG report just hallucinated this whole
20    theory that electronic adjudication was somehow the
21    lynchpin of a fraudulent design in the Antrim County
22    system.  It's just hard to comprehend that the purported
23    experts who wrote this report didn't realize that this
24    very basic premise of their entire theory was completely
25    wrong, was just utterly unfactual.  They didn't own the
```

1    electronic adjudication option.

2    Q.    Is that issue with the ASOG report something that you

3    would have to be a cybersecurity expert to spot?

4    A.    Well, no.  And it had already been pointed out, in

5    fact, in December of 2020, by another expert who had

6    reviewed the ASOG report.  Anyone with a basic familiarity

7    with the Dominion system or how it worked could have told

8    you that.

9    Q.    Other than your report from March of 2021, were there

10   any other investigations, commissioned by officials in the

11   State of Michigan, into the Antrim County matter?

12   A.    So the Republican -- I think the Republican Committee

13   in the State -- in the State Senate, where -- the

14   Republican Oversight Committee in the State Senate

15   performed its own report about the 2020 election and

16   reviewed various claims of fraud, and they produced this

17   report also sometime in 2021.

18   Q.    Okay.  And I believe, if you recall, there were

19   images from this report that were included in that CNN

20   piece, were they not?

21   A.    Yes.

22   Q.    Okay.  Is Exhibit 190 that video?

23   A.    Yes.  Yes, that's correct.

24   Q.    And generally, what did the Michigan Senate Oversight

25   Committee find?

1548

1    A.   Well, so they found that there was no evidence of

2    fraud.  They found that the ideas and speculation, if I

3    can quote them, "that the Antrim County election workers

4    or outside entities manipulated the vote by hand or

5    electronically are indefensible."  And they wrote that

6    "the Committee is appalled at what can only be deduced as

7    a willful ignorance or avoidance of this proof perpetuated

8    by some leading such speculation."

9    Q.   Was this report made publicly available by the

10   Michigan Senate Oversight Committee?

11   A.   Yes.

12   Q.   Approximately when was this report issued?

13   A.   Oh, it was issued late -- spring of 2021 or early

14   summer of 2021.

15   Q.   Okay.

16   A.   Prior to the Cyber Symposium.  I am sorry you have

17   the date on the screen.

18   Q.   What was that date?

19   A.   June 23rd.  So, indeed, late spring or early summer

20   of 2021.

21   Q.   Okay.  And I want to turn to some of the other

22   individuals that Mr. Lindell indicated he relied on as

23   experts.  Are you familiar with the name Dr. Shiva?

24   A.   Yes, I am.

25   Q.   Okay.  And based on, you know, your opinion,

1    education, and training, what is your opinion about

2    whether or not Dr. Shiva is a reliable source?

3    A.    Dr. Shiva is famous for making outlandish or false

4    claims, and it is not a reliable source.  For instance, he

5    claimed very prominently to have been the inventor of

6    email, I think to *Time Magazine.*  He claimed to be the

7    inventor of email, and at a date that is just

8    preposterous, because a colleague of mine already had an

9    email addresses at the time.

10    MS. MORGAN:  Before we move on to the next video,

11    Your Honor, this might be a good time to take our morning

12    break, if you would like us to.

13    THE COURT:  All right.  Ladies and gentlemen of the

14    jury, we will take our morning break slightly early, just

15    be back within 15 minutes, which would take us to about 5

16    until 11 o'clock.  Have a good break.  I remind you not to

17    talk to each other or do any research with respect to this

18    case while you are on a break.

19    (Outside the presence of the jury.)

20    THE COURT:  All right.  Thank you.  Please be

21    seated.

22    Counsel, I just have one thing, we are waiting for

23    an additional remaining instruction from you all; is that

24    correct?

25    MS. MORGAN:  Yes, Your Honor.

1      THE COURT:  So we don't have that yet.  Is that one

2   stipulated?

3      MS. MORGAN:  Yes, it is.

4      THE COURT:  We just need it so we can finalize the

5   jury instructions.  And then we should be able to get

6   those to you shortly.  We will send them first by

7   electronic mail so you have a chance to give them a once

8   over to make sure we haven't made any typographical errors

9   or anything else we need to address before we kill several

10   trees printing them out for the jury and the attorneys in

11   the case.

12      Anything else that the parties need to address?

13   And I just remind plaintiff's counsel that generally you

14   need to wrap up by lunch so defense has an opportunity to

15   present its one witness, according to the schedule that we

16   talked about yesterday.  We will take a quick break.

17      (A break is taken from 10:40 a.m. to 11:01 a.m.)

18      THE COURT:  Thank you.  Please be seated.

19      I just wanted -- you may be seated.  I wanted to

20   run over -- not run over counsel, I just wanted to check

21   with counsel what we have for the limiting instruction so

22   that we can finalize the jury instruction.  We have taken

23   your limiting instruction, we have tried to condense it

24   into one limiting instruction, so I will read it to you,

25   then I will put you on the spot and you are going to tell

1    me if you have an issue with it.

2          Limiting instruction:  Some evidence in this case

3    has been admitted only for a limited purpose.  You may

4    consider these pieces of evidence only for that limited

5    purpose.  The Court admitted Exhibits 190, CNN story

6    interview of Mr. Lindell.  229A *Absolute Proof* clips.

7    211A, *Absolute Interference* clips.  And 247, *Kill Chain*

8    clips, for a limited purpose.

9          The videos were not offered or admitted to prove

10   anything about the truth of the matters asserted in those

11   videos by anyone other than Mr. Lindell, and you should

12   not consider the video as evidence of the truth of those

13   statements.

14         You have also heard evidence about a settlement

15   that was reached in an unrelated defamation case between

16   the plaintiff and a news organization called Newsmax,

17   which is not a party to this case.  Other than otherwise

18   stipulated, you should not speculate about any of the

19   details of that case or any of the terms or conditions of

20   that settlement agreement.

21         All right.  Starting with you, Ms. Morgan, any

22   objection?

23         MS. MORGAN:  No, Your Honor.

24         THE COURT:  Mr. Kachouroff or Mr. Duane, any

25   objection on behalf of defense?

 1          MR. DUANE:  You may have misread the first

 2    instruction.  I think you referred to the excerpts from

 3    *Kill Chain* as Exhibit 247, I think you meant to say

 4    Exhibit 247A.

 5          THE COURT:  I did.  I appreciate that correction,

 6    and I just misread it, because my law clerk has drafted it

 7    correctly.

 8          MR. DUANE:  The record will so reflect.  We have no

 9    objection, thank you.

10          THE COURT:  All right.  So let me step down and

11    hand Mr. McClain this.  There is one typographical error.

12          So the record will reflect, with the correction of

13    247A, which I simply misread, and then I made a correction

14    with respect to a typographical error, the limiting

15    instruction is stipulated to by the parties and will be

16    added to the final jury instructions.

17          All right.  Are we ready for the jury?

18          MS. MORGAN:  Two very brief issues on the jury

19    instructions, Your Honor, because we hadn't talked about

20    this one yet.  Check in with the Court on the reckless

21    disregard or state of mind for defamation instruction and

22    make sure we didn't leave that one out.

23          THE COURT:  We have taken your objections, we have

24    considered them, and we have a final instruction in the

25    packet.

1553

1     MS. MORGAN:  Thank you.  Same with willful and

2     wanton?

3     THE COURT:  Correct.

4     MS. MORGAN:  Just wanted to make sure.

5     THE COURT:  At this point they are finalizing the

6     instructions and you will get a final set of instructions

7     and jury verdict forms.  You can preserve whatever

8     objections you have already preserved through the charge

9     conference, so you don't need to remake those objections

10    unless there is something materially different that the

11    Court has done that you don't feel like was addressed.

12    So we have addressed both sides' objections, we

13    have come up with final jury instructions that we

14    obviously believe are consistent with the state of the law

15    in Colorado.  We are issuing those final instructions and

16    making a statement on the record expressly that you

17    preserve those objections for appeal, if necessary, and so

18    we're not going to take any further argument with respect

19    to the set of the instructions or the verdict forms that

20    we are giving you electronically, but if we have made any

21    errors in terms of referring to exhibits, misplaced

22    commas, anything like that, before we kill trees printing

23    it out for the jury, let us know.

24    MS. MORGAN:  Okay.  Thank you.

25    THE COURT:  Anything else?

1          Madam deputy, could you bring our jury back in,

2     please.

3          COURTROOM DEPUTY:  Yes, Your Honor.

4          (In the presence of the jury.)

5          THE COURT:  Thank you.  Please be seated.

6          Dr. Halderman, I remind you, you are still under

7     oath.

8          THE WITNESS:  Thank you, Your Honor.

9     Q.   (BY MS. MORGAN)  Okay.  Dr. Halderman, I want to

10    circle back and ask you a follow-up question about Phil

11    Waldron.  Is Mr. Waldron a reliable expert in election

12    cybersecurity?

13    A.   No.

14    Q.   Circling back to Dennis Montgomery, can we pull up

15    Exhibit 83 again.  And I would draw the witness' attention

16    to page 2, paragraph 3.  Earlier I asked you if you agreed

17    with the assessment of Mr. Montgomery in this warning to

18    Mr. Lindell.  Drawing your attention to the last sentence

19    of that paragraph, is that specifically the portion with

20    which you were agreeing?

21    A.   Yes.  That he was a known "con man and fraudster."

22    Q.   Have you ever heard of the secret CIA computer Hammer

23    and Scorecard -- alleged secret computer?

24    A.   I have heard the stories, yes.  And that's just

25    another example of science fiction.  There is no credible

1555

```
 1    evidence that such a thing -- that there is any truth

 2    whatsoever to those claims.

 3    Q.   I want to turn to another person that Mr. Lindell

 4    indicates that he relied upon.  Do you know who

 5    Dr. Douglas Frank is?

 6    A.   Yes.

 7    Q.   In your view, is Dr. Frank a reliable election expert

 8    in election cybersecurity?

 9    A.   No.

10    Q.   Why not?

11    A.   I think Dr. Frank was, I believe, a former -- a high

12    school math teacher.  Do I have that right?  I don't think

13    Dr. Frank had any colorable experience in any elections or

14    security.  And the kind of analysis that he presented was

15    just very rudimentary and an unreliable statistical

16    analysis.

17    Q.   Speaking of statistical analysis and statistical

18    theories, have you had the opportunity to review

19    Dr. Shiva's theories?

20    A.   Yes, I have reviewed some of Dr. Shiva's theories.

21    Q.   What was your conclusion?

22    A.   Again, these are -- Dr. Shiva's theories were

23    fundamentally unreliable.

24         MR. KACHOUROFF:  Objection, relevance.

25         THE COURT:  Approach.
```

```
 1              (A bench conference is had.)

 2         MS. MORGAN:  The relevance is that Mr. Lindell

 3    testified that he relied on Dr. Shiva and that that was

 4    part of his investigation, part of his testimony about him

 5    doing "the most due diligence in human history."  And this

 6    testimony directly addresses that and indicates that

 7    Mr. Lindell should have been on notice that these claims

 8    that he was espousing about Dr. Coomer and Dominion were

 9    implausible because he is relying on people that have no

10    reliability or credibility within the field of election

11    cybersecurity.

12         MR. KACHOUROFF:  Your Honor, you can't have it both

13    ways.  You can't exclude all of these people because you

14    have a 702 objection and then come back and accuse them of

15    not being credible.  Dr. Shiva wasn't allowed to be shown,

16    and that is --

17         THE COURT:  Dr. Shiva had no reports that were

18    authored.

19         MR. KACHOUROFF:  Right.  We offered it to justify

20    the beliefs that Mr. Lindell had.

21         THE COURT:  So the ruling wasn't, per se, that they

22    weren't permissible under 702, so much as they were not

23    permissible under 702 because they were not disclosed.

24    You couldn't back door expert testimony in with other

25    hearsay, and then if it is not reliable, because there was
```

1    no opportunity with respect to 702 to have these

2    statements, that weren't in an expert report, questioned.

3         If you can focus, Mr. Kachouroff, on Ms. Morgan's

4    statement that is being offered right now, to prove that

5    Mr. Lindell would not have a reasonable basis to rely on

6    Dr. Shiva, and to anything he knows about that.

7         MR. KACHOUROFF:  Okay.  He cannot possibly at this

8    time represent to the jury that he has a reasonable basis,

9    because those videos are excluded.  Those videos would

10   have been his reasonable basis that he could have shown

11   the jury and said, listen, I think this guy is credible,

12   here is why, here is what he said to me, I believed it,

13   without regard to whether it is expert opinion or not.

14        So I understand the Court's reticence in saying,

15   well, it is a 702 opinion, it is a back door.  We don't

16   think so.  We think this all goes to his reasonable basis,

17   that's all.

18        MS. MORGAN:  With all due respect, this has nothing

19   to do with the clips, Your Honor.  Mr. Lindell was

20   permitted to testify from a laundry list of people that he

21   purports provided him with a basis to have these beliefs

22   that he does.  And so to the extent that he was allowed to

23   list those individuals, we should be able to indicate, put

24   on testimony about why they are not credible experts in

25   the field of cybersecurity.

```
 1          THE COURT:  All right.  So, Ms. Morgan, I am going
 2    to sustain the objection, partly in response to what
 3    Mr. Kachouroff argued.  I think that you can ask
 4    Dr. Halderman about these individuals, his understanding
 5    of them in the mainstream.  Again, but there has to be
 6    some nexus as to how that information would be available
 7    to the general public.  Because if Mr. Lindell was
 8    reckless in relying on these experts, there has to be some
 9    reason or nexus that this expert testifies to as to how
10    someone like Mr. Lindell would know that.
11          MS. MORGAN:  Okay.
12          (In the hearing of the jury.)
13    Q.  (BY MS. MORGAN)  Dr. Halderman, I want to switch
14    gears and talk about another individual that was mentioned
15    by Mr. Lindell, Dr. Andrew Appel.  Do you know Dr. Appel?
16    A.  Yes, I do.  Dr. Appel, he is the former chair of the
17    computer science department at Princeton.  I did some
18    research with him while I was an undergraduate there, and
19    he has worked in elections about the same length of time
20    as I have.  Although that is incidentally not his -- his
21    primary work is about figuring out how to construct proofs
22    that computer programs are correct.  That is an actual
23    kind of absolute proof.  But, yes, I am familiar with
24    Andrew Appel.
25    Q.  We will circle back to this, but has Dr. Appel made
```

1    publicly available his position as to whether or not the

2    2020 election was hacked?

3    A.    I have spoken with him directly, and I am sure he has

4    written in public, as well.

5    Q.    And I want to specifically ask, has Dr. Appel signed

6    any letters, that you have also signed, that have been

7    made publicly available and that were widely circulated in

8    the newspapers?

9    A.    Yes.  Yes.  So shortly after the 2020 vote, I helped

10   to organize a letter, and signed by 59 leading experts in

11   election security.

12   Q.    What was -- why did you do that?  What was the

13   purpose behind that letter?

14   A.    Well, so shortly after the presidential election in

15   2020, I think a lot of people were disappointed with the

16   result of the election, and there started to be

17   accusations made that there was evidence that the election

18   result had been hacked.

19        And other election security experts and I were all

20   very concerned that the kinds of theories that were

21   arising were not factual in nature, were not either --

22   either they didn't make any technical sense or there

23   wasn't any evidence that they were true.  Or if there were

24   anomalies, people were pointing to these anomalies as

25   having a natural explanation and were likely to be

1    determined to not be evidence of fraud.

2            So the other experts and I consider everything that

3    we were hearing at the time and wanted to make a very

4    clear public pronouncement that the -- that there was at

5    that point no credible evidence that we were aware of that

6    the 2020 election had been hacked.

7    Q.    We heard Mr. Lindell say that he respected you

8    because he had seen you speak in a snippet on that *Kill*

9    *Chain* movie.  Did Mr. Lindell ever reach out to you to get

10   your input on his theories about the 2020 election being

11   hacked or otherwise rigged by Dr. Coomer or anyone?

12   A.    No, not that I am aware of.  A lot of people do reach

13   out to me all of the time with concerns about election

14   integrity, and I usually take the time to at least

15   evaluate whether those concerns sound like a real problem

16   or not, look at them if I have to.  When I have time I try

17   to get back to people.

18           I just got a call this morning while I was on the

19   stand, in fact, from a concerned person in Iowa.  So I do

20   try to be responsive.  I can't every time when people do

21   reach out, but I don't believe Mr. Lindell did.

22   Q.    Were you invited to the Cyber Symposium as far as you

23   know?

24   A.    No.

25   Q.    Why didn't you take the initiative and reach out to

1    Mr. Lindell after his movies started coming out?

2    A.   Boy, I am not sure that it ever crossed my mind to do

3    so, because it was so obvious at that point that he was

4    committed to his preconceived beliefs.  I didn't think --

5    I wouldn't have possibly thought he would be open to

6    hearing evidence that contradicted them or that they were

7    false.

8    Q.   You mentioned earlier that the 2020 presidential

9    contest was heavily scrutinized.  What notice was

10   available to the public, including Mr. Lindell, that the

11   2020 election was not hacked?  And I would direct your

12   attention to the November/December 2020 timeframe here.

13   A.   So November/December 2020, let me try to think back.

14   We had our experts' letter that came out approximately a

15   week after the election.  I know I went on TV around that

16   same time on FOX News, and they asked me my opinion of

17   whether I thought that there was evidence that Dominion

18   had stolen the election, and I told them emphatically not;

19   that I didn't think there was any credible evidence for

20   that.

21        What else?  I know that The New York Times reached

22   out to chief election officials in every state and asked

23   them whether they had seen any evidence of fraud.  And

24   every state but one said no.  One state, Texas, didn't

25   write back.  So the *Times* reported that the officials in

1    every state said no fraud.

2         There was a statement from -- there were statements

3    from -- first, CISA, the Cybersecurity and Infrastructure

4    Security Agency, an arm of the DHS and the Federal

5    Government, which is election security.  They called

6    CISA's director, who called the 2020 election "the most

7    secure in history."

8         What else?  I know at about a month after the

9    election, the Attorney General publicly said that --

10   publicly stated that there was no evidence that fraud had

11   affected the outcome of the presidential election.

12        So you have two of the relevant federal agencies

13   within the Trump administration stating that there was no

14   outcome-changing fraud.  You have the 59 experts.  There

15   was quite a lot out there very prominently within a month

16   of election day.

17   Q.   We spoke at length about your investigation into the

18   issues in Antrim County, Michigan, and the report that you

19   generated.  Did you make any public statements addressing

20   that issue prior to your formal investigation?

21   A.   Yes, I did.  I think when -- right after the incident

22   occurred, as it was being reported in the news, I wrote a

23   thread on Twitter to try to interpret what the State of

24   Michigan's explanation was and why I thought that was

25   credible.

1        And their explanation essentially was a simplified

2    version of what I eventually found, although I eventually

3    found some other problems and complexities that were not

4    part of that, but even in the early days, there was a

5    clear and likely explanation for what the problem was, and

6    so I tried to make that more intelligible to people

7    through Twitter.

8    Q.   And you referenced the statement from CISA.  Is that

9    the Cybersecurity and Infrastructure Security Agency?

10   A.   Yes.

11   Q.   We heard some suggestion they shouldn't -- that --

12   hold on let me rephrase that.

13       MS. MORGAN:  At this time, Your Honor, I am going

14   to move to admit Exhibit 31, which is that CISA statement.

15       THE COURT:  Any objection?

16       MR. KACHOUROFF:  Objection, hearsay.

17       THE COURT:  Okay.  Let's approach.

18       (A bench conference is had.)

19       MS. MORGAN:  The exception under 803(8) for a

20   statement of a public office would apply here.  This is a

21   statement of a government agency that was posted to their

22   website.  So I also think it is already

23   self-authenticating, as well.

24       MR. KACHOUROFF:  803(8) does not apply to simple

25   statements, it applies to reports, documents that are

1   officially done in the official capacity, not an agency

2   that has a personal accounting of the election.  CISA is

3   not empowered to do election investigations.  That is not

4   their business.

5        MS. MORGAN:  CISA isn't the only government agency

6   to sign an official statement.  As an official public

7   statement from a government office, it falls within the

8   category or within in their purview.  There are other

9   signatories, including a National Association of

10  Secretaries of State.

11       THE COURT:  Overruled.

12       (In the hearing of the jury.)

13       (Exhibit No. 31 is admitted.)

14       MS. MORGAN:  Could you please show us Exhibit 31,

15  please.

16  Q.   (BY MS. MORGAN)  Is Exhibit 31 the statement that you

17  were referring to, Dr. Halderman?

18  A.   Yes.

19  Q.   As we can see on this first big paragraph here, was

20  CISA the only government agency to release this statement?

21  A.   No, CISA was joined by the other agencies, including

22  the National Association of Secretaries of State, the

23  National Association of State Election Directors, and

24  representatives from the largest voting machine makers, or

25  some of the largest voting machine makers.

1           MS. MORGAN:  If we can go back and blow up the

2      date.

3      Q.   (BY MS. MORGAN)  Okay.  I think you said it was early

4      November.  When was this statement released?

5      A.   November 12th --

6      Q.   Okay.

7      A.   -- 2020.

8      Q.   Was this statement widely publicized at the time?

9      A.   Yes.  Yes, it was.  It was.  And especially the press

10     picked up on the line that November 3rd "was the most

11     secure in American history."  "The election was the most

12     secure in American history."

13     Q.   If you can draw attention to the first paragraph on

14     that second page, please.  In addition to saying it was

15     "the most secure," what other statements were made by CISA

16     to the public?

17     A.   They also stated that "There is no evidence that any

18     voting system deleted or lost votes, changed votes, or was

19     in any way compromised."

20          MS. MORGAN:  If we can go to slide 33.

21     Q.   (BY MS. MORGAN)  You referenced that you had gone on

22     FOX News.  Can you tell the jury about when you were

23     interviewed by FOX News.

24     A.   Sure.  It was, I guess, November 13th and 14th.  So

25     less than two weeks after the election.

1    Q.   Can you tell the jury more about that interview, and

2    what you said in terms of Dominion Voting Systems.

3    A.   Sure.  So a reporter from FOX News had reached out

4    asking me to comment on the allegations about Dominion

5    that were starting to emerge.  And I told him that I

6    thought there was no truth to those allegations; that they

7    were baseless.  And he invited me to come on the air and

8    to discuss them, and I did.

9         And that is what I said on the air, that now

10   Dominion -- there is no credible evidence that Dominion

11   was involved in any kind of election manipulation.

12   Q.   A few more questions about the letter that you

13   referenced that was signed by the 59 election security

14   experts.  Was Harri Hursti one of the other experts that

15   signed the letter?

16   A.   Yes.  Yes, not only Harri Hursti, but Andrew Appel,

17   and I think three or four of the other people who were in

18   the clip from *Hacking Democracy* that we saw yesterday that

19   Lindell -- that Mr. Lindell's defense put on.  It was a

20   list of most of the people who are active and credible in

21   the election security field.

22   Q.   Was Dr. Shiva on that list?

23   A.   No.

24   Q.   Was Phil Waldron on that list?

25   A.   No.

1    Q.   Was Russ Ramsland on that list?

2    A.   No.

3         MR. KACHOUROFF:  We will stipulate that defendants'

4    experts were not on his list.

5         THE WITNESS:  None of those people.

6         THE COURT:  Hold on.  Objection overruled, insofar

7    as there is an objection.  You may proceed.

8    Q.   (BY MS. MORGAN)  Did Dennis Montgomery sign the

9    November 16 letter?

10   A.   No.

11   Q.   What was the general message conveyed to the public

12   in the November 16, 2020, letter?

13   A.   The general message was that although election

14   systems were known to have vulnerabilities, there was a

15   huge difference between the existence of vulnerabilities

16   and an election actually being altered by hacking.  And

17   that there was no credible evidence, as far as any of us

18   experts knew, that we had seen of hacking occurring during

19   the election in any way that could have affected the

20   outcome.

21        So we said several things.  First, we pointed out

22   the importance that, the significance of claiming an

23   election had been stolen by hacking, essentially this is

24   an extremely serious claim and one that would need to be

25   backed by some sort of persuasive and verifiable evidence.

1       We pointed out that merely citing the existence of

2   vulnerabilities is not enough to establish that an attack

3   occurred.  A vulnerability means there is a risk, whereas

4   an actual attack having occurred means that specific act

5   has taken place, a crime has occurred.  They are very,

6   very different kinds of claims.

7       We pointed out that as far as the claims that we

8   were aware of that the election had been hacked, that

9   these were unsubstantiated.  They were technically

10  incoherent in many cases.  And "technically incoherent"

11  means, if you understand how elections work, this claim

12  just doesn't make any sense.  So they were either

13  unsubstantiated or technically incoherent.  And then just

14  emphasizing, there was no credible evidence we were aware

15  of that hacking had occurred.

16  Q.   After the point at which these various public

17  pronouncements had been made, if anyone still had

18  lingering doubts about whether the 2020 election was

19  rigged or hacked, what other public pronouncements in late

20  2020, early 2021, could have helped dispel those doubts?

21  A.   Right.  So if people had doubts, and I could

22  understand people having some room for doubt at that

23  point, the best evidence, the affirmative evidence that

24  the election was correct, started to come in through

25  audits and recount efforts that states undertook between

1    election day and the start of 2021.

2         So, for instance, Georgia conducted a statewide

3    hand count of its paper ballots.  That was a way to

4    eliminate many different possible theories that the

5    election could have been hacked.  Michigan conducted a

6    risk-limiting audit.  Pennsylvania conducted a

7    risk-limiting audit pilot.  Wisconsin went on to conduct

8    its own form of audits.  And other states, too.

9         So if you still had doubts, the best way to allay

10   those doubts was to look at what investigations states

11   were conducting in public of those paper ballots, the

12   things that couldn't later be changed in a cyber attack,

13   what did those investigations tell you?  And every one of

14   those investigations found that the results that had been

15   announced were supported.

16   Q.  Are those states that you just listed off, are those

17   some of the "swing states"?

18   A.  Yes.  Yes.  So five out of six of the states that

19   Trump most closely lost were states that used paper

20   ballots.  And in those five states, there were hand counts

21   or other kinds of audits that involved manually looking at

22   the original ballots.

23        We care most about the states, just so the jury

24   understand why, we are focusing on the states Trump most

25   closely lost.  If your theory is that the election result

1    was changed by hacking, then the states that -- the states

2    that an attacker would want to focus on to have an attack

3    that they hoped -- they wanted to try to change the result

4    without being detected, they would have to focus on some

5    of the states with the narrowest margins, because states

6    that have large margins would be really surprising and

7    raise a lot of red flags if they suddenly flipped.

8         So some of the narrowest states would have to be

9    affected, and more than one, as well, because of the

10   number of electoral votes that would need to be changed.

11   So you would need to change I think three or more of these

12   most closely contested states to flip the result from a

13   hypothetical Trump victory to the announced Biden victory.

14        But in five of the states Trump most closely lost,

15   they had paper ballots and went back and did audits that

16   found the counts were correct or did not find any evidence

17   of deviation that indicated fraud.

18   Q.   Let's go through those.  And if we could go to the

19   next slide.  What was the publicly available result of the

20   Georgia recount -- or audit, excuse me?

21   A.   Right.  So Georgia, Georgia counted everything.  They

22   counted the presidential result statewide by hand and

23   found no significant discrepancy from the reported

24   outcome.  So the hand count audit wasn't perfect, but it

25   still is enough to lend, I think -- it is certainly enough

1571

```
 1    to rule out many different possible theories of fraud, and

 2    should be enough to give people added confidence in the

 3    outcome.

 4    Q.   Okay.  Let's move on to Arizona.  We have already

 5    touched on this so I don't want to go too far into detail,

 6    but I did want to ask you about whether or not the use of

 7    Dominion equipment was prevalent in Arizona.

 8    A.   So, yes.  I think Arizona in 2020 used Dominion

 9    equipment, at least across all of Maricopa County.  I

10    don't remember whether it was the entire state, but I

11    think most all of the state.

12    Q.   Was there an audit of the presidential contest in

13    Maricopa County?

14    A.   Yes.

15    Q.   What was the finding of that audit?

16    A.   That audit went and counted by hand every paper

17    ballot in Maricopa County and found slightly more Biden

18    votes on those ballots than were counted by the machines.

19    Q.   Let's move to Wisconsin.  What was the result of the

20    Wisconsin audit?

21    A.   In Wisconsin they did an audit where they hand

22    counted about 150,000 ballots, not all of the ballots

23    across the state, but certain randomly selected

24    jurisdictions, and they didn't find any evidence that the

25    equipment changed votes.
```

1    Q.    What about Pennsylvania?  Tell us about that audit.

2    What the findings were that were released to the public?

3    A.    So Pennsylvania conducted, I think they called it a

4    risk-limiting audit pilot that involved almost all of

5    these counties.  And a risk-limiting audit of this style

6    involves basically selecting a random sample of ballots

7    and comparing it to the announced result in order to try

8    to confirm the announced winner.

9         And the risk-limiting audit in Pennsylvania found

10   that it didn't find any evidence of fraud.  Once again, it

11   found evidence in favor of the announced outcome being

12   correct.

13   Q.    Okay.  And what about Michigan, what was the publicly

14   announced results of that audit?

15   A.    So in Michigan they did actually several kinds of

16   audits.  They did a procedural audit and they did a

17   risk-limiting audit in order to check the announced winner

18   of the presidential result.  So the risk-limiting audit

19   was statewide and agreed with the announced outcome of the

20   presidential result.  They also, as I mentioned, hand

21   counted a hundred percent the ballots in Antrim County

22   without finding any significant deviation in the

23   presidential result.

24   Q.    Before we leave Michigan, I want to address one of

25   the individuals that was in the video clips that we saw,

1    Matt DePerno.  In your view, is Matt DePerno a reliable

2    expert in election cybersecurity?

3    A.    No.  He is an attorney.  He doesn't have technical

4    expertise of his own.

5    Q.    Any publicly available information about Matt DePerno

6    that would leave a member of the public to make that same

7    conclusion?

8    A.    Well, that he introduced the ASOG report into

9    evidence when it had such obvious flaws is one thing that

10   would lead me to make that conclusion.  And today he is --

11   since then has been indicted by the Michigan Secretary --

12   Michigan Attorney General for charges related to unlawful

13   access to election equipment.

14   Q.    I want to speak to or have you address some of the

15   issues that came up in Mr. Lindell's testimony.  You were

16   here for his testimony; correct?

17   A.    I was, yes.

18   Q.    Okay.  Mr. Lindell referenced that he was concerned

19   about the election results because of some deviations, so

20   I want to ask about those.  Can you explain to the jury

21   what a Blue wave or Blue shift is first, though.

22   A.    Sure.  So actually in most general elections in

23   recent years we have had a phenomenon where the results as

24   they are coming in on election night have tended to become

25   somewhat more left-leaning as the night goes on.  I am not

1    sure that was true in 2024, but in several of the

2    preceding elections that was the case.

3         And the reason for it being that way is states tend

4    to count votes by mail ballots later than they count --

5    they start counting them on election day, and it sometimes

6    takes longer to finish that count than just the time that

7    people have to vote in person.  So your initial results

8    that you get reflect primarily the population that voted

9    in person, and there is this tendency as the night goes on

10   for the vote-by-mail ballots also to be reflected in the

11   overall totals.

12        Demographically, Democrats in recent elections have

13   voted by mail at a somewhat higher rate than Republicans,

14   but that was especially true in 2020, because the 2020

15   election, was during COVID, when a lot of people were

16   voting by mail.

17        And you had this phenomenon that Donald Trump, as a

18   candidate, had been casting doubt on the security of

19   voting by mail and urging people to vote by other means.

20   So Democrats especially tended to vote by mail more than

21   Republicans in 2020.

22        In the months leading up to the 2020 election, in

23   September, October, the beginning of November, there were

24   election experts and election officials speaking to the

25   press predicting there was likely to be this kind of

1    phenomenon of a Blue shift on election night, and just

2    pointing out that it wasn't going to be evidence of fraud,

3    this is just what you should expect to happen as election

4    results from vote-by-mail ballots start to be counted a

5    little bit later than others.

6        But there was concern expressed by some election

7    observers in the press that people would capitalize on

8    this to allege that there was cheating going on; that this

9    was evidence of fraud.  But really it was a phenomenon

10   that was predicted in advance, that was expected and that

11   has a natural explanation; that Democrats were more likely

12   than Republicans to vote by mail, and those votes in many

13   places would be counted later and the returns would come

14   in later than in-person returns.

15       So we expected on election night, and it was widely

16   publicized, that it would be expected on election night

17   for the results to get somewhat more favorable to Biden

18   relative to Trump as the night went on.  Whoever

19   ultimately won, there would be more Biden votes coming in

20   relative to Trump votes.

21   Q.   One of the other specific examples that I would like

22   to draw your attention and address, is the letter or memo

23   from John Ratcliff from the DNI that Mr. Lindell testified

24   about.

25       What is your understanding with respect to the

1576

1    conclusions that Mr. Ratcliff made in that January 7

2    letter.

3    A.   My understanding is that Mr. Ratcliff's concerns were

4    about election interference; that is disinformation,

5    attempts to -- excuse me, election influence,

6    disinformation and so forth coming from China rather than

7    necessarily about hacking specifically.

8    Q.   What is the difference between influence and

9    interference with respect to elections?

10   A.   Well, some people don't use the words as precisely as

11   others.  But in government-speak, generally when people

12   are talking about election influence, that could be trying

13   to change the way that people choose to vote through false

14   information, through bots on social media trying to make

15   it look like certain opinions are more popular than they

16   are, through, I don't know, buying political ads that are

17   illegal for a foreign government to be running, things

18   like that.

19        Whereas interference may describe -- may describe

20   attempts technologically to either access systems or could

21   describe attempts to just make it look like you have

22   accessed systems in order to create a false impression

23   that the election result was not trustworthy.

24   Q.   Okay.  And Mr. Lindell also mentioned a situation in

25   Georgia where there was a woman that had zero votes for

1   her, but she knew that she and some of her family members

2   had voted for her.  Are you familiar with that scenario?

3   A.   I don't think Mr. Lindell named the specific person,

4   but I am pretty sure that he is referring to the case of

5   Michelle Long Spears, which seems to exactly match the

6   scenario he is talking about.

7   Q.   Can you explain to the jury why that is not evidence

8   of hacking of the 2020 election?

9   A.   Well, yes.  I am quite familiar with it because I

10  helped advise this candidate through her attorney in the

11  aftermath of that incident, and I looked into what the

12  problem was.  And it was very much a case, an incident

13  similar to the Antrim County incident, that a candidate

14  had dropped out, they had made updates to the equipment

15  configuration to count the -- on the voting equipment in

16  some places but not others.  And as a consequence of that

17  error by the election officials, that they hadn't followed

18  the instructions that require them to update the equipment

19  in every relevant place, the votes had not been recorded

20  properly.

21       But what happened there, they went back and the

22  officials counted the paper ballots to determine the

23  correct result.  And that's how the case ended up being

24  resolved, and I think they had gotten to the correct

25  outcome.  But it is not evidence of fraud.  This kind of

1    problem with equipment configuration issues happens.  It

2    seems to happen in small jurisdictions or down-ballot

3    races predominantly every year or so.

4         It is a recurring issue, but it is not any kind of

5    evidence of systematic fraud.  These are human errors, and

6    we probably do need some better checks to prevent errors

7    to make sure we are getting accurate counts in every case.

8    But they are very, very different from evidence that

9    someone deliberately manipulated any piece of the system

10   in order to cause the wrong result or deny victory to this

11   candidate in Georgia.

12        There was no reason to think, based on the

13   circumstances, that there was anything malicious or

14   criminally intended because the circumstance involved an

15   unusual occurrence, an error in the ballot design that had

16   to be corrected, and then just an easy-to-make mistake by

17   the officials in the process of implementing that

18   correction.

19   Q.   Mr. Lindell mentioned an issue with respect to

20   Alabama, and specifically he indicated there were 4,662

21   people voting who were over the age of 100.  Can you

22   explain whether or not in your opinion that is evidence

23   of, like, malfeasance or some malicious intent or whether

24   or not that is a human or clerical error?

25   A.   Oh, sure, yeah.  This is talking about errors in

1    voter registration data.  And unfortunately, the voter

2    registration list is a big database, maintained over many,

3    many years, transferred between many different computer

4    systems over the length of people's lifetime.  There are

5    all sorts of things that might introduce error into some

6    of those records.

7         Maybe someone made a typo when they were entering

8    the record the first time.  Maybe someone couldn't read

9    the voter's handwriting when they wrote down the birth

10   date.  Maybe that voter registered to vote so long ago

11   that they didn't record the voter's birth date at the time

12   and they just put in a dummy value for the year they were

13   born.

14        So there are all sorts of reasons there are

15   frequently data quality issues in voter registration

16   systems, but these are not evidence of fraud, these are

17   evidence that it is really, really hard to maintain a big

18   database about lots and lots of people, especially on the

19   limited resource of the state election establishment.

20        So just one very clear reason why this is unlikely

21   to be evidence of fraud, if you wanted to register false

22   voters, you obviously wouldn't register them with birth

23   dates that indicate they are 150 years old or something

24   like that.  What reason would you have not to make up a

25   plausible birth date?

1580

1    Or if there are voters who are -- well, so those

2    are some reasons why the voter registration list data

3    might have some errors.  Another reason, by the way, is

4    that although the states do attempt to remove people from

5    the voter registration list when they die, when they move

6    away, that doesn't always happen promptly.  But more and

7    more states are checking for identification when you go to

8    vote as an alternative way of ensuring or adding

9    additional confidence to -- for the public, that the

10   people who are voting are who they say they are.

11   Q.   Are the rolls the same as the votes?  In other words,

12   is every person that is on the voter registration list

13   someone that necessarily cast a ballot?

14   A.   No, of course not.  The people who are -- the people

15   who are registered, not all of them cast a ballot in a

16   given election.

17   Q.   We heard from Mr. Lindell that he believes there was

18   computer manipulation in the cast-vote record across the

19   United States.  What is your opinion of that claim?

20   A.   I have seen no convincing evidence whatsoever for

21   that claim, and I have spent a lot of time working with

22   cast-vote records as part of other research that I have

23   done.  So a cast-vote record is -- a cast-vote record is

24   essentially a spreadsheet that shows for each ballot what

25   were the votes that were recorded on it.  So each row in

1581

1    the spreadsheet is a different ballot this time, and each

2    row shows in a different column.

3        Well, this ballot is marked in the presidential

4    contest for Trump, in the, say, governor contest for this

5    candidate, and so on and so forth.  So it is a record that

6    records specifically on a ballot-per-ballot basis what the

7    votes were.

8        And if you look at cast-vote records, there often

9    are things that might superficially look strange, like,

10   for instance, I remember just that one case from, I think

11   it was 2016, in Michigan, between Hilary Clinton and

12   Donald Trump, the margin of victory was very, very tiny,

13   like .1 percent.  But according to the cast-vote records,

14   according to the announced results, about 1 percent of

15   people left the presidential contest blank, way more than

16   the margin of victory, and doesn't that seem an anomaly?

17       Well, it does until you think about it.  A lot of

18   people were on the fence.  They wanted to vote for

19   everything else but didn't want to vote for the

20   presidency.  Then you go and look at actual ballots, which

21   most counties in Michigan conducted a complete hand count

22   of those presidential ballots, that is what is on the

23   physical ballots; they actually are blank in about 1

24   percent of the votes in the counties that did the recount,

25   so that is an actual true result.

 1        So you can't conclude just looking at the cast-vote

 2   record that something that may superficially look strange,

 3   that that is actually evidence of a fraud.  There is a lot

 4   of noise in election data.  There are a lot of patterns.

 5   Most of those patterns are perfectly natural.  And it is

 6   extremely hard to use statistics from those patterns to

 7   show that -- to show in any kind of convincing way there

 8   was fraud.

 9   Q.   We heard or saw some clips from the movie *Kill Chain*.

10   Are the machines that were featured in that *Kill Chain*

11   movie clip the same as were used in the 2020 election?

12   A.   Oh, goodness, there were a lot of different pieces of

13   equipment there, so it might take me a little bit of time

14   to think.  The piece of equipment most prominently

15   featured in that clip, I think we saw Dr. Carsten

16   Schürmann, from Denmark, wirelessly hacking into, and he

17   shut down the machine wirelessly, I think you saw that.

18   Q.   Yes.

19   A.   That was a real voting machine that was used in most

20   of Virginia until I think late 2014 or early 2015.  It was

21   called the WINVote.  An unbelievably terrible design.  It

22   ran Windows.  It ran an old version of Windows, and it was

23   controlled over wi-fi.

24        You could hack into that machine from a laptop over

25   wi-fi sitting in the parking lot.  All of that is true.

1    But, that machine also is, I think, the only example of a

2    voting machine that has been decertified by the federal

3    government, or one of very few.

4          It was officially decertified by the U.S. Election

5    Assistance Commission, I believe in 2015.  I believe it

6    was taken out of use in every state prior to the 2016

7    election.  And it represents kind of an especially

8    terrible case of election security.  I think it has been

9    called the most insecure voting machine ever.

10          But it hasn't been used -- hasn't been -- hasn't

11    been used for more than 4 years before the 2020, and used

12    nowhere in the country in the 2020 election.

13    Q.   I want to turn our attention to a witness that the

14    jury heard a lot from, Mr. Oltmann.  In your opinion, is

15    Mr. Oltmann qualified as an expert in election security?

16    A.   No.  As far as I can tell he is a dangerous crazy

17    person.

18    Q.   Does having general experience in "system

19    architecture" qualify a person to make an assessment of

20    whether an election was hacked in your opinion?

21    A.   I am not sure what "system architecture" even means.

22    This is not -- that's not something that we -- that is

23    certainly not the same as having expertise in election

24    administration or election security.

25    Q.   Mr. Oltmann testified that he read all of the

1    manuals, got into all of the stuff, collected all of the

2    stuff, and then took it from the different states, turned

3    it sideways, compressed it, and looked at the similarity

4    of the systems across states, to find vulnerabilities.

5    Does that make any sense to you?

6    A.   Most of what Mr. Oltmann talks about is basically

7    compiling information -- he talks -- I think in his

8    declaration that he filed in some of the election fraud

9    court cases at about that time, talks all about connecting

10   dots, about bringing together these disparate pieces of

11   information.  No, this is not indicative of some kind of

12   expert analysis, this is indicative of sort of how people

13   quite typically pull together things to make conspiracy

14   theories.

15   Q.   Would looking at the manuals for Dominion products

16   and the RFPs be enough to determine whether an election

17   was hacked, or certainly whether Dr. Coomer hacked the

18   election?

19   A.   No.  No.  So the manuals don't say this is the secret

20   fraud page or something like that.  This is a very, very

21   superficial level of beginning to understand what the

22   technology is.  It doesn't indicate any kind of expertise,

23   and certainly wouldn't be enough information to base a

24   credible allegation of fraud.

25   Q.   Mr. Oltmann testified that he saw deviations in the

1585

1    systems, themselves, and how they operate with respect to

2    the 2020 election.  In your opinion is there any veracity

3    to his assessment?

4    A.   Well, I think his assessment was vague.  But,

5    moreover, as I kind of explained, "deviation," this isn't

6    really something that is, in election security, that is a

7    reliable indicator of a problem.  So, like I said,

8    elections are big complicated processes, 160 million

9    Americans, real people doing real human things, like

10   voting in unpredictable ways.

11          So just looking at -- looking for -- looking for

12   statistical deviations has not historically been any kind

13   of a reliable way of identifying fraud or lending

14   confidence to an election.

15          If you looked across the country and found no

16   deviations, in fact that would be more suspicious, right,

17   because natural real-life data is going to occasionally

18   have some unusual patterns in it.  That is just how noisy

19   random functions work.  And elections are quite noisy, a

20   high-randomness kind of function.

21   Q.   Did you hear -- I will switch gears a little bit.

22   Did you hear Mr. Lindell testify that he would have liked

23   for the whole country to watch those images from Mesa

24   County?

25   A.   Oh, yes.  Yes, I did.

1    Q.    What was your reaction to that testimony?

2    A.    Well, the Mesa County images, right, this was

3    complete copies of the proprietary Dominion server that

4    was used by the county as part of its process of adding up

5    the votes from different parts of the jurisdiction in

6    order to produce the official results.

7          In the Mesa County incident, that data was copied

8    by a person not authorized under state law.  It was then

9    distributed at Mr. Lindell's symposium to the public.  And

10   I believe this is the basis of Tina Peter's Indictment and

11   conviction.

12         So distributing those images to the public is

13   harmful to election security, and in two different ways.

14   One, this software is not intended to be public.  It is

15   intended to -- it is intended or built not to be available

16   to just anyone.

17         Once it is available to just anyone, that gives

18   people who might in the future want to try to infiltrate

19   or attack a jurisdiction, a way to plan for that, a way to

20   practice that, a way to look for vulnerabilities they

21   might later exploit.  It actually does raise the risk of

22   real attacks against other jurisdictions in the future.

23         But, two, it also raises the risk that people who

24   want to create more convincing false evidence of fraud can

25   do it in a more difficult-to-unmask way by using the real

1    software or information derived from it as a basis for

2    doing that.  So I think both from, you might call it a

3    false-evidence standpoint, and from a real-future-threat

4    standpoint, making those images public raises risks.

5         I should clarify that I really think it would be

6    great to have more -- to have in the future voting systems

7    that are an open source, in a way that anyone can review

8    the code, but that is not where we are.  We are in a

9    position where the systems have previously been a closed

10   source and not available for just any adversary or anyone

11   who wants to generate a conspiracy theory to access.  And

12   based on that status quo, making that data available to

13   the public is harmful.

14   Q.   I don't think you were here for Mr. Hursti's

15   testimony.  Is my recollection accurate?

16   A.   Correct.

17   Q.   Okay.  I want to show you a part of what the jury saw

18   from Mr. Hursti, then ask you about it, okay?

19   A.   Okay.

20        (Videotaped clip of H. Hursti deposition played in

21   open court.)

22   Q.   (BY MS. MORGAN)  Do you agree with Mr. Hursti's

23   concerns?

24   A.   I certainly agree with his assessment of the risk.

25        MS. MORGAN:  Can we go to slide 45, please.

1588

1    Q.    (BY MS. MORGAN)  I want to tie things up as far as

2    the timeline of what you have testified to.  Looking at

3    and thinking of the events that happened in November

4    through December of 2020 and the publicly available

5    pronouncements about the 2020 election, do you think that

6    the public should have been on notice that the election

7    was not hacked?

8    A.    Should have been on notice in that time period?

9    Q.    Yes, sir.

10   A.    I think the public should have been on notice that it

11   was quite unlikely that the election had been hacked; that

12   there was not credible evidence that it had been hacked

13   that had been circulated so far, and I think that as the

14   -- as the audits, as the affirmative evidence came in,

15   that that would have been reasonable for even further

16   confidence and less doubt.

17          MS. MORGAN:  Can we go to the next slide, please.

18   Q.    (BY MS. MORGAN)  And as far as the timeline and when

19   the information about Antrim came out, did the information

20   from your report and the Michigan Senate Oversight

21   Committee Report come out before Mr. Lindell's Cyber

22   Symposium?

23   A.    Yes.  And there have been other expert analysis of

24   Antrim, as well, that came to the same conclusion; that it

25   wasn't evidence of fraud.

1589

1    Q.   Is it your understanding from Mr. Merritt's

2    deposition testimony that -- also Mr. Lindell's testimony

3    in this courtroom, for that matter -- that Mr. Lindell had

4    received notice from members of his own Red Team that

5    there were issues with the Cyber Symposium data?

6            MR. KACHOUROFF:  Objection, leading.

7            THE COURT:  Sustained.  Can you reframe.

8            MS. MORGAN:  Yes.

9    Q.   (BY MS. MORGAN)  What is your understanding with

10   respect to the information Mr. Lindell, himself, had

11   personally received from members of his Red Team in

12   advance of the Cyber Symposium?

13   A.   I understand that people, including Josh Merritt --

14           MR. KACHOUROFF:  I apologize, objection, this is

15   outside the knowledge of his expertise.

16           THE COURT:  Overruled.

17           THE WITNESS:  I understand that Josh Merritt says

18   he tried to raise the -- raise concerns that he looked at

19   the data and believed it to be fake.  He tried to put

20   Mr. Lindell on notice, is my understanding of his

21   testimony.

22           MS. MORGAN:  Could you please pull up Exhibit 190,

23   please, just the snippet.

24   Q.   (BY MS. MORGAN)  I will show you part of Exhibit 190.

25           (Exhibit 190 played in open court.)

1    Q.    (BY MS. MORGAN)   What impact have Mike Lindell,

2    Frankspeech, and My Pillow's proliferation of the claims

3    about Dr. Coomer and his alleged involvement in either

4    hacking the 2020 election or covering up the hack of the

5    2020 election, had on your industry, sir?

6    A.    Oh, God.  I cannot emphasize enough how much of a

7    setback all of that has been, all of Mr. Lindell's claims

8    have been for the real security of elections.  He's

9    confused the public so badly about whether there is any

10   evidence at all that the 2020 election was hacked or

11   whether Eric Coomer was involved, whether Dominion was

12   involved, all of this.

13         He has confused the public so badly it is almost

14   impossible to have a reasoned public conversation about

15   the real problems and real needs for improvement that

16   still exist in the election space.

17         Prior to 2020, I think the jury saw Republican and

18   Democratic Senators talking about bipartisan legislation

19   to better secure our elections.  That was back in the

20   timeframe 2018, 2019.  A bill called the Secure Elections

21   Act almost made it through the Senate, and it was with

22   many sponsors from both parties, and there was bipartisan

23   legislation in the House, as well.

24         But, look, now the issue has been so confused, that

25   I don't think -- that any credible reporter, credible

1   political leaders, there are very few people who want to

2   -- who are able to publicly engage with the nuanced actual

3   risks facing elections because everybody is afraid that

4   the confused public is going to just falsely associate

5   that with Mr. Lindell's baseless claims that the 2020

6   election was stolen.

7           It has made it so much harder to do the work that I

8   do and to try to move the ball forward in terms of public

9   policy and public understanding.  I mean, it has been --

10  it has been -- it has been a very, very miserable time.  I

11  think we would be there today, and we would have even more

12  auditing, we would have even more use of paper ballots

13  through federal legislation if not for the issue having

14  been so confused for the public.

15          So I feel like before 2020, you have to realize

16  that there was a community of scientists working for

17  almost 20 years to try to improve the security of our

18  elections.  That work has been hijacked for science

19  fiction, and that is the core of Mr. Lindell's films, of

20  his message, the science fiction that the 2020 election

21  was stolen.  And it is much, much harder to talk about the

22  real science in public today.

23          We'd have to take hours with all of you -- with the

24  jury here today to go through that nuance.  But most

25  people don't have time for the nuance, they have time for

1592

```
 1    -- they have time for a much faster conversation.  We

 2    can't have those faster conversations anymore because

 3    everyone just concludes you are talking election security,

 4    you must be talking about Mr. Lindell's fraudulent claims

 5    about fraud.

 6         That is so difficult.  That has made my work

 7    incredibly more difficult over the period since 2020.

 8    Q.   Did you hear Mr. Lindell testify that this is a

 9    battle of good and evil?

10    A.   I did.

11    Q.   Is that part of the problem you are discussing?

12    A.   Painting it in such black-and-white terms also makes

13    it much harder.  I don't think it is at all a battle of

14    good and evil.  We have real problems in election

15    technology and in policy in certain parts -- in certain

16    states, and not because this is good versus evil or the

17    voting machine companies are intentionally perpetrating

18    fraud, but because of really, really complex regulatory

19    incentives and funding -- underfunding election systems,

20    because the public doesn't pay enough attention to the

21    mechanics of how votes are counted.  There are a host of

22    structural reasons why we are where we are today.

23         And progress on these issues happens slowly and

24    requires effort over a long time, and requires sometimes

25    more resources, more federal resources, money, legislation
```

1593

1    to make things better.  All of that takes some amount of

2    public understanding and care for the real issue, and the

3    real issue is potential vulnerability.

4         So in that way, this painting it in black-and-white

5    terms, making it seem like some kind of partisan issue,

6    trying to overturn the presidential election has been very

7    counterproductive.

8    Q.   I want to circle back to one of the individuals that

9    I failed to address in my list, General Michael Flynn.

10   Would you consider him to be a credible cybersecurity

11   expert?

12   A.   No, because among other things, he was convicted of

13   lying to the FBI.

14   Q.   Is that publicly available information?

15   A.   Yes.  He pled guilty.

16   Q.   And specifically, did his lies to the FBI, in your

17   understanding, have anything to do with election security?

18   A.   Well, it was in the context of the -- of Russia,

19   which had been during the 2016 election, we know, and this

20   is a fact, had been attempting to hack into

21   election-related systems.

22   Q.   And just for context, we talked about your testimony

23   in the Senate Intelligence Sub-Committee.  Was that

24   testimony in the context of the 2016 election and concerns

25   about Russia's attempt to interfere?

1594

1    A.    Yes, that's right.  That's right.

2    Q.    And I want to be specific to the claims about

3    Dr. Coomer.  You were testifying about the impact that

4    Mr. Lindell's and other defendants' proliferation claims

5    have had on about election security.  How has it impacted

6    yourself and other individuals working in that industry?

7    A.    Oh, it's been awful for people working in the

8    industry, too.  So, I mean I, myself, have been -- well, I

9    know for someone working in the industry, being accused of

10   participating in hacking and fraud, that's -- it's the end

11   of your time working in that industry, because elections

12   rely very much on -- they are very much about trying to

13   honor the public's trust.

14         And even if people just falsely believe that

15   someone is involved in -- was somehow involved in fraud,

16   well, election officials are not going to want to engage

17   in business with that person anymore because that is going

18   to leave their constituents to doubt the election, whether

19   rightly or not.

20         So from working in this business for a long time, I

21   know that that kind of integrity, that kind of reputation

22   matters a lot to someone's ability to work in this

23   industry.

24         MS. MORGAN:  Pass the witness so I can save some

25   time for redirect.

1        THE COURT:  You have about 12 minutes of redirect,

2    just to be mindful of it.  Mr. Kachouroff.

3        MR. KACHOUROFF:  Your Honor, are we going to go to

4    break for lunch?

5        THE COURT:  I think it would be great if we can go

6    to the lunch break to keep things moving.  So if you can

7    use the next 12 minutes before we break at 12:30, I would

8    appreciate it.

9        MR. KACHOUROFF:  Okay.  We will start.

10                       **CROSS-EXAMINATION**

11   **BY MR. KACHOUROFF:**

12   Q.   Dr. Halderman, your job is made harder not by

13   Mr. Lindell, but by the things you do and say in public;

14   right?  Would you agree with that?

15   A.   No, I disagree with that.

16   Q.   So you disagree with the State of Georgia referring

17   to you as an "election denier"?

18   A.   I do disagree with the State of Georgia referring to

19   me as an "election denier," and so did a federal judge.

20   Q.   So they disliked your views on the voting machines

21   and what you were saying about the election; correct?

22   A.   You mean the State of Georgia did?

23   Q.   Gabriel Sterling, who is the Chief Operating Officer

24   of the State of Georgia.

25   A.   Sure.  I was an expert witness for parties that were

1596

1    suing them, but that is in the context of the *Curling*

2    case.  And the *Curling* case was not at all alleging that

3    any election -- any past-election result was stolen.

4         The *Curling* case was arguing that Georgia voters --

5    Georgia voters' rights would be infringed if the state

6    didn't take further steps to ensure that their votes were

7    going to be counted accurately and in a way that people

8    could have confidence in.

9         So I absolutely disagree with the characterization

10   that that was election denialism.

11   Q.   The federal judge dismissed the plaintiff's case in

12   *Curling*; correct?

13   A.   Over issues of standing.  And the federal judge, in a

14   PI hearing in *Curling*, earlier had -- in an earlier phase

15   of the case, agreed with the plaintiffs and ordered the

16   State of Georgia to get rid of its paperless voting

17   machines and replace them with ones that had a paper

18   trail.  That was the basis for there being any kind of

19   recount in Georgia, paper ballots in 2020.

20   Q.   But the case was dismissed, you agree with that?

21   A.   On issues of standing, I do agree.

22   Q.   Just a couple months ago.

23   A.   It is being appealed now.  But on issues of standing,

24   which is separate from whether the -- it is not a question

25   of the facts.

1597

1   Q.   So you mentioned Josh Merritt's testimony.  You found

2   him credible.

3   A.   I found his -- I am not assessing his technical

4   expertise, except to the extent that he was able to convey

5   to Mr. Lindell what ends up being true; that the data that

6   was presented was not PCAPs, was not evidence of anything.

7   Q.   You don't know about his technical background, so how

8   would you know if he was capable of recognizing something

9   as PCAP data?

10  A.   Recognizing that something is PCAP data or not

11  doesn't take a heck of a lot of technical background.

12  That is something that even someone with even a modicum of

13  network experience or security experience would be able to

14  recognize, especially in this case.

15  Q.   You just admitted you don't know what his technical

16  expertise was.

17  A.   It was apparently enough to recognize that it wasn't

18  PCAP data.

19  Q.   Did you hear him say he pulled the fire alarm as a

20  marker?

21  A.   I don't recall.

22  Q.   You don't recall his testimony saying he pulled a

23  fire alarm as a marker of time?

24  A.   That is certainly possible.  I don't remember that

25  detail.

1    Q.   That would be committing a crime just for the sake of

2    marking time.

3              MS. MORGAN:  Objection.

4              THE COURT:  Sustained.

5    Q.   (BY MR. KACHOUROFF)  Tina Peters, you have no

6    personal knowledge that Mr. Lindell was involved with that

7    case.

8    A.   Personal knowledge?  You mean -- you mean was I --

9    Q.   Maybe the question wasn't clear.  You personally do

10   not have any knowledge of whether he was connected with

11   that case.

12   A.   Well, she was on the stage during the symposium.

13   Q.   We are talking about Mesa County and the image.

14   A.   The image that was distributed at Mr. Lindell's Cyber

15   Symposium by Mr. Lindell's -- to Mr. Lindell's group of

16   invited experts.

17   Q.   Kind of like DEF CON.  He was trying to have a DEF

18   CON event, as far as you know.

19   A.   He organized a DEF CON-style event at which the

20   person who was his invited presenter on stage, worked with

21   someone else to unlawfully image the servers under her

22   care and was distributed to the attendees at Mr. Lindell's

23   event.  This certainly leads me to the conclusion that

24   Mr. Lindell was involved.

25   Q.   Dr. Halderman, you don't know the circumstances --

1   Tina Peters was an elected official.

2   A.    Yes.

3   Q.    She had control over electronic voting machines.

4   A.    Yes.

5   Q.    And so she gave somebody permission to image it.  You

6   don't know whether that was lawful or unlawful.

7   A.    I know that she was convicted for it.

8   Q.    What was she convicted of exactly, tell us?

9   A.    The case was about her unlawfully giving someone else

10  access to the equipment, and then I believe that --

11  Q.    You don't know what she was convicted of, do you?

12  A.    No.  That was the core of the case.

13  Q.    She was convicted of giving somebody a false ID;

14  isn't that right?

15  A.    In order to give him access to the machines that were

16  in her charge.

17  Q.    She wasn't convicted of giving somebody access to the

18  machines.

19  A.    Was that a question?

20  Q.    Yes, it was.

21  A.    The whole reason that Tina Peters was -- the whole

22  core of that case was the unlawful access, and perhaps the

23  charge was about having given him identification falsely.

24  But, look, her charge as an election official is to

25  protect these machines from being accessed by others.  The

1    result of her actions was that the software image of these

2    machines became public, became something that just anyone

3    who might want to use them for malicious purposes, would

4    have access to them.

5            I mean, that is a breach of public trust, and that

6    is the core of why there was a federal case over the whole

7    matter.

8    Q.   Are you finished?

9    A.   Yes.

10   Q.   Where did Mr. Lindell ever cite Joe Oltmann as

11   authority for his election research?

12   A.   Well, Mr. Lindell had him on stage during his

13   symposium, for instance.

14   Q.   You didn't attend the symposium, did you?

15   A.   I watched actually a lot of the stream of the

16   symposium at the time.

17   Q.   You don't know whether he invited Joe Oltmann on

18   stage or whether he walked on stage himself.

19   A.   We have had testimony about Mr. Lindell and the

20   symposium.

21   Q.   Where does Mr. Lindell ever say that Eric Coomer

22   hacked the election single handedly?

23   A.   Mr. Lindell's accusations, he has made all sorts of

24   statements that we have heard, and those statements --

25   those statements are often vague in their accusations.

1601

1    But Mr. Lindell -- Mr. Lindell's statements that he's a

2    traitor, that he should be in jail, et cetera, taken

3    together with the other theories about Eric Coomer that

4    Mr. Lindell broadcast through his platforms, you have to

5    understand the enormous reach of those platforms.

6    Q.   You are not testifying as a reach expert, are you?

7    A.   No, I am not testifying as a reach expert.  But it is

8    true that Mr. Lindell's platforms had enormous reach, far

9    more than mine.

10   Q.   That wasn't my question, was it?

11   A.   I believe it is relevant to your question.

12   Q.   I am sure you do.

13        Let's look at Alabama.  What was Mr. Lindell's

14   contention about the voter registration data?  He said

15   there was 4,000-some-odd people that were registered and

16   they were over a hundred years old.  What did he say about

17   that, do you know?

18   A.   Could you remind me, please?

19   Q.   That he had records of 4,000 individuals who were a

20   hundred-plus that voted.  Did you know about that?

21   A.   That he had records of 4,000 people who were a

22   hundred-plus?

23   Q.   Who voted.

24   A.   Again, 4,000 people whose ages in the database were

25   incorrectly listed.

1    Q.   And they voted.

2    A.   So what?

3         (Audible reaction from gallery.)

4         THE WITNESS:  So what?  Again, the question is

5    whether those were real voters, real authorized voters,

6    not whether the database about -- the database record

7    about their age was accurate.

8         THE COURT:  I am sorry, Dr. Halderman, can you

9    finish your statement.

10        THE WITNESS:  As I have just testified, there are

11   often data errors in voter registration lists and other

12   databases that have -- that try to keep records about

13   millions of members of the public, and that is not

14   evidence of fraud, that is evidence that we have dirty

15   data that ought to be better maintained and cleaned up

16   through more resources.

17        But just because people whose birth dates were

18   incorrectly recorded were found to have voted, I don't

19   think you can conclude from that that there was fraud, you

20   can only conclude we should be better maintaining our

21   voter registration data.

22        THE COURT:  Do you have one follow-up question,

23   Mr. Kachouroff?

24   Q.   (BY MR. KACHOUROFF)  It is at least suspicious, would

25   you agree?

1   A.   There is lots of noise in all kinds of data, and --

2   Q.   Certainly we should look at that noise and look for

3   an explanation for it; correct?

4   A.   I think it is fair to look at some of the noise and

5   look for explanations for it, but you can't take from that

6   noise that, ah-hah, there are some data errors here, that

7   means the 2020 election was stolen.  I found absolutely --

8   Q.   I didn't go that far.  I said we should look at it;

9   right?

10  A.   I am not sure you went that far, Mr. Kachouroff.

11  Q.   Thank you, sir.

12       THE COURT:  It is 12:30, we will take our lunch

13  break.  I ask you to be back here by 1:15 so we can be

14  ready to go.  Again, I remind you not to talk to anyone,

15  including your other jury members, about this case or what

16  you are hearing.  Do not engage in any media about this

17  case, and do not talk about this case with anyone else

18  outside, as well.  Thank you.

19       (Outside the presence of the jury.)

20       THE COURT:  All right.  Thank you, please be

21  seated.

22       The first thing I need to address is the gallery.

23  I appreciate that you have been quiet and respectful

24  during this trial.  You need to not audibly react to

25  anything that is going on in the courtroom, and that is

1    because we need to maintain and make sure that our jury is

2    not getting extra inputs with respect to their

3    determinations that are outside the evidence that is

4    admitted for the purposes of trial for their consideration

5    and deliberations.

6        So I'm giving you this warning.  And to the extent

7    that more audible reactions from the gallery are heard

8    that could potentially influence the integrity of our

9    jury, I will unfortunately have to request that those

10   individuals be removed from the courtroom, and of course I

11   don't want to do that.

12       There is always an overflow room.  I don't know if

13   it is set up today but -- it is set up today.  So if you

14   feel like you cannot withhold your reaction, I would

15   strongly suggest that you watch from the overflow room so

16   that I will not have to bring this up to you again.

17       This is really only to protect the integrity of our

18   jury and to make sure that they are not being influenced

19   by anything other than their own deliberations and the

20   evidence that is admitted at trial.  Thank you.

21       All right.  Counsel, anything that we need to

22   address?

23       MR. KACHOUROFF:  Not from defense.

24       MR. BELLER:  Your Honor, briefly, if I can put the

25   parties on notice.  In a brief reading of the limiting

1605

1   instruction, seeing it in black and white, it doesn't make

2   sense.  And so I have emailed back to chambers, and if I

3   can also let defense counsel know, if they can look at

4   that over the lunch hour so that you can address that.

5          THE COURT:  So we will take that up before we bring

6   the jury back.

7          MR. BELLER:  Thank you.

8          THE COURT:  All right.  So we will be in recess for

9   lunch.

10          (Lunch is taken from 12:34 p.m. to 1:20 p.m.)

11          THE COURT:  Thank you.  Please be seated.

12          All right, are you ready for the jury?

13          MR. KACHOUROFF:  Yes, ma'am -- yes, Your Honor.

14          MR. DUANE:  I want to advise the Court that

15   Mr. Beller and I met and conferred over the break as

16   promised, and we have no objection to his proposed

17   modification to your instruction.

18          THE COURT:  Thank you.  Thank you for reminding me.

19          So Mr. McClain will finalize the verdict forms and

20   jury instructions and email those to you all, and we will

21   be ready to go.

22          (In the presence of the jury.)

23          THE COURT:  Thank you.  Please be seated.

24          Mr. Kachouroff.

25          MR. KACHOUROFF:  May it please the Court.

1606

1    Q.   (BY MR. KACHOUROFF)  Dr. Halderman, returning to

2    Alabama briefly, you understand that Mr. Lindell was

3    looking at qualified voter files for his numbers; correct?

4    A.   I have no way of verifying Mr. Lindell's data, I am

5    sorry.  I will assume, if you would like, for the sake of

6    argument that his data is accurate.

7    Q.   I don't want you to assume anything.  You don't know

8    about that data?

9         MS. MORGAN:  Objection.

10        THE COURT:  Overruled.

11        THE WITNESS:  He asserts he has looked at the data

12   from Alabama.  What can I say?

13   Q.   (BY MR. KACHOUROFF)  Well, that wasn't Dennis

14   Montgomery data; right?

15   A.   Again, so what?

16   Q.   Well, just on direct examination, it is fair to say

17   you have been harping on the fact that Mr. Lindell has

18   been relying on Dennis Montgomery for the last 4 years or

19   so.

20   A.   Can you repeat the question?

21   Q.   You made it seem as though Mr. Lindell were relying

22   on Dennis Montgomery for the last 4 years.

23   A.   I was focusing on the data at the period of -- the

24   period at issue leading up to the Cyber Symposium, but I

25   am happy to talk about other data.

1607

1   Q.   After that time period, he did not depend upon Dennis

2   Montgomery's data; correct?

3   A.   Well, I don't know.  He seems to still assert that he

4   hasn't changed his beliefs.

5   Q.   Have you talked to him personally about whether he

6   has changed his beliefs?

7   A.   I have only listened to his testimony, sir.

8   Q.   Michelle Long Spears, that is the lady in Georgia who

9   was in a primary runoff; correct?

10  A.   Yes.

11  Q.   DeKalb County.

12  A.   Was it DeKalb?

13  Q.   It was DeKalb.  Doesn't matter, it was a Georgia

14  County, you know that much; right?

15  A.   Fulton or DeKalb.

16  Q.   She came in last place; right?

17  A.   Yeah.  So what happened was the -- I believe it was

18  the -- her case involved -- her case involved a change to

19  the ballot at the last minute when a candidate had dropped

20  out of the race, and actually out of a different race.

21  And as a result of that drop out, the election officials

22  had to reconfigure the equipment to reflect that the other

23  candidate was no longer running, and they reconfigured

24  only some of their equipment, but not all of it.

25       I think they reconfigured the scanners but not the

1    ballot-marking devices, and as a result of that, when the

2    ballots were scanned, the votes for Michelle Long Spears

3    weren't counted, they just weren't registered at all, so

4    she ended up with zero votes received.

5    Q.    Mike Lindell never accused Michelle Long Spears of

6    being hacked; correct?

7    A.    Accused Michelle Long Spears of being hacked?

8    Q.    Of her candidacy of being subject to hacking.  He

9    never said that, did he?

10   A.    No.  But I think he cited in his testimony, he

11   pointed to incidents like that as bolstering his overall

12   theory, his overall theories about the elections.  That

13   is -- I think that is a reasonable inference about why he

14   brought it up.

15         And my point in bringing that up is that, look, if

16   you dissect this, if you look at why it happened, a case

17   like that is not, in fact, evidence of something

18   malicious, that is a case of a kind of human error that we

19   can and should deal with.

20   Q.    It is not a machine error, it is a human error;

21   right, that is what your point is.

22   A.    No.  My point is that it is -- this is not something

23   suspicious or criminal, this is something that is -- this

24   is something that was the result of human error, and that

25   we should improve the technology to make those errors less

1    likely.

2    Q.   Well, she only found out about this, "she" being

3    Michelle Long Spears, because she went back to her

4    precinct and she found out that there were zero votes for

5    her; right?

6    A.   That's correct.

7    Q.   And she knew that she had voted, her husband voted,

8    and her daughter voted for her, but they didn't register

9    in her own precinct.

10   A.   Yes.  We are lucky that case came to light.

11   Fortunately it is not evidence that the 2020 election was

12   hacked or that Dominion had anything to do with it.

13   Q.   That was in 2022; right?

14   A.   Michelle Long Spears?

15   Q.   Correct.

16   A.   Yes.  Because that was a down-ballot race --

17   Q.   That has nothing to do --

18   A.   -- and received less scrutiny.

19        THE COURT:  Yes, I hate to interrupt, but I am

20   doing so on behalf of our court reporter.

21        MR. KACHOUROFF:  Sorry.

22        THE COURT:  Mr. Kachouroff, you need to wait until

23   the witness answers the question.

24        Dr. Halderman, you need to wait until

25   Mr. Kachouroff finishes his question.

1610

```
 1              THE WITNESS:  Yes, Your Honor.
 2    Q.   (BY MR. KACHOUROFF)  Michelle Long Spears was in
 3    2022; correct?
 4    A.   Yes, I think that's right.
 5    Q.   That had nothing to do with the 2020 election;
 6    correct?
 7    A.   I take it that Mr. Lindell has brought that up to
 8    support his overall theories about the machines somehow
 9    being rigged.
10    Q.   I am not asking you whether Mike Lindell used that
11    for some overall theory that he thinks exists about the
12    machines being rigged.  I said the 2022 Michelle Long
13    Spears case has nothing to do with the 2020 election;
14    right?
15    A.   Well, I am not quite sure what you mean "nothing to
16    do."
17    Q.   Do you think it has something to do with the 2020
18    election?
19    A.   So what it has to do with is this is a -- the
20    Michelle Long Spears case is interesting, in that it is a
21    similar problem to the human error that happened in Antrim
22    County.
23    Q.   We will get to that.
24    A.   So there is a connection there in my mind, but I am
25    not quite sure your point.
```

1    Q.   Did you look at the source code for the DeKalb County

2    race with Michelle Long Spears?

3    A.   No.  But the way I determined what happened was

4    actually a separate technical analysis.  So I was able to

5    analyze the ballot barcodes from the BMDs in order to

6    determine what the structure of that ballot was.  It was

7    composed of multiple cards, where the values were marked

8    and so forth.  So you don't really need a source code

9    analysis to analyze that.

10        I was able to do a different kind of technical

11   analysis based on understanding of the barcode structure,

12   which I derived from an analysis of the structure -- of

13   the barcode decoding program that supported Dominion

14   Voting Systems, which was used in certain parts of the

15   country.

16   Q.   Suffice it to say, when the issue was looked into,

17   she actually won the election; correct?

18   A.   Sure.  They were able to determine that conclusively

19   by counting the ballots by hand.

20   Q.   You mentioned the DNI, the Director of National

21   Intelligence, John Ratcliff.  Do you remember that?

22   A.   Yes.

23   Q.   In a letter that John Ratcliff wrote -- you tried to

24   summarize it.  I wanted to know if you recalled that the

25   thrust of the letter was he was concerned that the

1    intelligence community was suppressing evidence of China's

2    interference in the 2020 election.

3    A.   I believe the thrust of the letter was that he was

4    concerned that the intelligence community was downplaying

5    the threat of China attempting to influence the election,

6    not China trying to attempt to hack the election.

7    Q.   Did I say "hack"?

8    A.   You said "interfere."

9    Q.   And so you are splitting hairs between the

10   definitions of "interfere," "hack," and "influence," and

11   you are creating new definitions for those things.

12   A.   I want to be clear for the jury, because especially

13   in the federal government, they tend to use the words, and

14   in the intelligence community they tend to use these

15   words, "influence" and "interfere" to mean many specific

16   things.

17         "Influence," meaning trying to affect people's

18   opinion, trying to spread false information.  "Interfere"

19   can sometimes incorporate notions of hacking or mechanical

20   interference, like actually affecting the operation of

21   vote counting.

22   Q.   On direct examination she talked about an attorney

23   named Matt DePerno, and she asked if you there was any

24   publicly available information should that tell the

25   average man that Matt DePerno was not to be trusted.  Do

1    you remember that?

2    A.    Yes.

3    Q.    And your answer was, yes, he has been indicted for

4    election crime.

5    A.    Yes.

6    Q.    Okay.  And the reason why you gave that answer was

7    because you were actually trying to show that Lindell

8    should have known about Matt DePerno; right?

9    A.    I am not sure that that was the question I was asked.

10   Q.    She said, was there any public info that should tell

11   the average man that Matt DePerno was not to be trusted.

12   And your answer was that he had been indicted for election

13   crime; correct?

14   A.    Yes.

15   Q.    When was he indicted for election crime?

16   A.    Oh, I don't remember.  I don't recall.

17   Q.    Last year; right, 2024.

18   A.    I don't recall.  I couldn't tell you.

19   Q.    That would be three years after Mr. Lindell had him

20   on *Absolute Proof*; correct?

21   A.    If that's true, that would be after.  But even at the

22   time, he had sponsored and submitted to the Court and

23   Antrim County, and claimed to be true, this ASOG report

24   that had been thoroughly debunked, that was just full of

25   absolute nonsense.

1    Q.    When was it fully debunked?

2    A.    Well, I believe the first -- the first expert

3    detailed debunking was in December when there was an

4    expert rebuttal done by.  The name is going to fail me, a

5    former official from the U.S. Election Assistance

6    Committee, I think the man who used to supervise the

7    testing program at the election commission, and I believe

8    it was published by the State of Michigan in December of

9    2020.  And as pointed out already, that it was utter

10   nonsense.

11          Michigan -- Antrim County didn't use the electronic

12   adjudication that was the core of the ASOG report that

13   DePerno sponsored, and pointed out other major, major

14   problems with that asserted evidence that DePerno claimed,

15   and continued to claim, was representing the truth.  So

16   that's one example.

17   Q.    You didn't mention the date of the Indictment because

18   you knew it was after the events that were in question in

19   this case; correct?

20   A.    I honestly can't recall when he was indicted.  It was

21   for events that took place before the incident.  I am not

22   sure when he was indicted.  And, in any event, Mr. Lindell

23   apparently continues to assert the truth of his

24   statements.

25   Q.    DePerno's statements?

1615

1    A.    Of the statements at issue in this case.

2    Q.    The question wasn't about the statements at issue in

3    this case, the question was, you are trying to impugn

4    Mr. Lindell; that he should have known DePerno was not to

5    be trusted.  And you mentioned the indictment, and that

6    was your indicator for him that he should have known

7    better not to talk to Matt DePerno; correct?

8    A.    The question I was answering was not -- was not the

9    question that you are asking me now.

10   Q.    I just asked you that question.  Can you answer that

11   one?

12   A.    Can you ask it again, please?

13   Q.    Sure.  The reason why you mentioned Matt DePerno

14   having an indictment was because you were trying to set

15   him up in front of this jury to make it seem as though he

16   should have known about the indictment, when it never even

17   occurred 3 years ago; right?

18   A.    As I say, I don't recall when the indictment happened

19   exactly.  But in any event, regardless of when the

20   Indictment occurred, it is a reason why now, sitting in

21   this room, all should be on notice that DePerno is not to

22   be trusted.

23   Q.    The issue isn't today, it was 3 years ago when

24   Mr. Lindell made those statements; correct?

25   A.    "The issue"?  What issue are you speaking of, sir?

1  Q.   Their issue of Matt DePerno appearing on *Absolute*

2  *Proof* on February 5, 2021.

3  A.   I think there are multiple issues at play about Matt

4  DePerno showing up.  At the time, Mr. Lindell already

5  should have been on notice that DePerno was not to be

6  trusted because he had sponsored these obviously -- these

7  already debunked claims that were -- these implausible and

8  already debunked claims about Antrim County to the Court.

9        Today we have the additional factor that DePerno

10 has been indicted on election-related crimes.  And I do

11 believe I misspoke during my testimony earlier today and

12 said he was indicted by the Attorney General.  I believe

13 he was indicted by a Special Counsel because of the --

14 selected to ensure impartiality, because of his previous

15 verbal spars with the Attorney General and so on.

16 Q.   We will talk about Michigan next.  You talked about

17 them doing a risk-limiting audit; correct?

18 A.   Yes.

19 Q.   That risk-limiting audit was not completed until June

20 of 2021; correct?

21 A.   No, I don't think that is right.

22 Q.   In fact, it wasn't completed because 25 percent of

23 the counties never responded; isn't that true?

24 A.   No, I also don't think that is right.

25 Q.   What do you think is right?

1    A.    I believe it was completed sooner than that.    I

2    believe it was completed in January.    And they may not

3    have finished their complete report until a bit later on.

4    But they completed -- they completed their -- I believe

5    they completed the audit in January.

6    Q.    Would it surprise you that the audit was not

7    completed until April of 2021?

8          MS. MORGAN:    Object, Your Honor, foundation.

9          THE COURT:    Approach.

10          (A bench conference is had.)

11          THE COURT:    Mr. Kachouroff, what evidence that has

12    already been admitted are you relying upon to frame your

13    question?

14          MR. KACHOUROFF:    I was going to pull a report from

15    Michigan.

16          THE COURT:    Is it in evidence?

17          MR. KACHOUROFF:    Not yet.    I am getting ready to

18    show it to him.    If he doesn't remember, he doesn't

19    remember, I don't care, I will move on.

20          THE COURT:    All right.

21          (In the hearing of the jury.)

22    Q.    (BY MR. KACHOUROFF)    Then you talked briefly about

23    Georgia, and some things we will return to, Dr. Halderman.

24    Georgia, I notice you avoided talking about a

25    risk-limiting audit in Georgia.    You called it a hand

1   count; right?

2   A.   I may have referred to it as both, but go on.

3   Q.   Since you are familiar with the *Curling* case -- you

4   are very familiar with it; correct?

5   A.   Yes.  I was an expert witness in the *Curling* case.

6   Q.   It went on for 7 years.

7   A.   Yes, that's right.

8   Q.   A four-week bench trial.

9   A.   Yeah, I think that is correct.

10  Q.   It is true, isn't it, that they had -- the first

11  count was a machine count; right?

12  A.   You mean when the ballots were initially counted?

13  Q.   Correct.  Machine count ones.

14  A.   Yes.

15  Q.   Then a hand count; correct?

16  A.   Yes.

17  Q.   Then they did a second machine count.  We will call

18  that machine count two.

19  A.   Yes.

20  Q.   And none of the counts matched each other.

21  A.   None of the counts exactly matched each other.  And I

22  think there are a bunch of problems with the way that

23  Georgia conducts its elections.  That is what the *Curling*

24  case is all about.  But all of them agreed about the

25  outcome, and none of them showed a deviation that was a

1619

1    deviation that was the magnitude that it affected or could

2    affect who won.

3    Q.    You know Professor Philip Stark.

4    A.    I do.  He is a good friend.

5    Q.    Excellent at his job.

6    A.    Inventor of risk-limiting audits.  Philip, I know,

7    has lots of criticism of the Georgia RLA, some of which I

8    agree with.  They are certainly not perfect.

9    Q.    You know that he thinks Georgia should not take any

10   confidence that their votes are counted properly, much

11   less counted at all.  That is in his affidavit; right?

12   A.    So, Philip has -- that is not how I would put what

13   you can take away from the audits that were conducted in

14   Georgia.  I think the audits have some significant value

15   for helping us rule out certain kinds of theories and

16   about how the election -- about whether the election

17   result was influenced by different kinds of possible bad

18   behavior or error or fraud.

19       But, as I say, the audits in Georgia, they do have

20   -- they were imperfect.  And I think Philip takes a very

21   strong view of anything that's less than perfect, in terms

22   of the standards of an audit, has no value.  But I

23   disagree with that.  I think that "perfect" is the enemy

24   of the good here.  We should work to improve the quality

25   of the audits and, at the same time, recognizes that even

1    an imperfect audit tells us something and constrains the

2    possible attacks that could evade detection.

3    Q.   The Maricopa audit in Arizona, that took over a year

4    to complete, didn't it?

5    A.   No.

6    Q.   How long did it take?

7    A.   The report that -- the audit results were reported in

8    Maricopa -- what month was it?  I am sorry, this is 4

9    years ago now.  I believe it was during the summer of

10   2021.  It is possible I am mistaken, it has been 4 years,

11   but that is my recollection.

12   Q.   And do you know -- you have never investigated Fulton

13   County and the discrepancies in Fulton County, have you?

14   A.   That is not true.

15   Q.   So what happened to the 368,000 ballots that were

16   missing in Fulton county?

17   A.   There are 368,000 ballot images --

18           MS. MORGAN:  Objection.

19           THE COURT:  Approach.

20           (A bench conference is had.)

21           MS. MORGAN:  I don't think that there has been any

22   evidence entered in this case that supports that

23   statement.  And counsel is frankly testifying about

24   something that is not in evidence at this point.

25           MR. KACHOUROFF:  He investigated Fulton County, and

1    I am asking whether he knows about the missing ballots.

2    If he doesn't, he can say no, I don't know, or, yes, I do.

3    I am pretty sure he is going to say he does.

4         THE COURT:  So how is this related to the scope of

5    his direct, Mr. Kachouroff?

6         MR. KACHOUROFF:  Because he asserts there are no

7    problems, that it is all human error.  It is actually not

8    human error, there is a lot of machine error.  I am

9    getting ready to discuss that with Antrim County.

10        MS. MORGAN:  With all due respect, I object to

11   relevancy.  This isn't a trial of the machines.

12        MR. KACHOUROFF:  It is, Judge.  They have made it a

13   trial about the machines.

14        THE COURT:  I am not going to have you all spar

15   about what this trial is or is not about, because the

16   claims and defenses are set out and have been argued and

17   this Court has passed on the scope of the evidence that is

18   going to be permitted.

19        I am going to sustain the objection on 403 grounds.

20   To the extent that you want to move to Antrim, please move

21   to Antrim.

22        MR. KACHOUROFF:  Thank you, Your Honor.

23        (In the hearing of the jury.)

24   Q.   (BY MR. KACHOUROFF)  Dr. Halderman, do you know

25   whether the EMS server in Fulton County crashed?

1622

1    A.    Whether it crashed when?

2    Q.    During the 2020 election.

3    A.    I don't remember whether it crashed during the

4    election or not.  I don't know how that would -- I don't

5    know what bearing that would have on any of the facts

6    here.  Computer systems crash and have to be restarted at

7    various times for perfectly benign reasons.

8    Q.    It could also be a software design defect; correct?

9    A.    "A software design defect," what do you mean?

10   Q.    I think you know what I mean about the defective

11   engineering of software.

12   A.    Sure.  There are plenty of defects in the Dominion

13   system and in all of the routing vendor systems.  I am

14   certainly one of the biggest critics of the quality of

15   software used in elections.  Again, that is not evidence

16   that problems were exploited to tamper with the 2020

17   election, let alone by Dr. Coomer.  And I can't emphasize

18   enough, right, the -- what a different kind of claim that

19   is.

20         It is an ordinary claim to say software has

21   defects.  It is an extraordinary claim, something that we

22   have never seen, we have never found good evidence that it

23   has happened in the United States, to say that these

24   problems with software were exploited to change an

25   election result, right.  One is mundane, the other is

1623

1    extraordinary.  You need a different kind of evidence to

2    establish that.

3    Q.    Exhibit 31, you have this.  I think it was stated by

4    CISA, or the 57 intelligence officials, whatever they

5    were, 51.  Do you recall that?

6    A.    Yes.

7    Q.    And you believed that Mike Lindell should be on

8    notice that CISA said we had "the most secure election in

9    history," correct?

10   A.    Not only that, but CISA said they had seen no

11   credible evidence that the 2020 election had been hacked,

12   and that was part of their job -- literally part of their

13   job to be monitoring for that kind of problem.

14   Q.    And when CISA made these statements, CISA was being

15   hacked itself; correct?  The SolarWinds hack.  You know

16   about that.

17   A.    That is true.  CISA was, itself -- was, itself,

18   compromised.  And some documents that were confidential at

19   CISA, I believe were exfiltrated in that.  But that is --

20   again, that is not what CISA's claim is.  CISA's claim is

21   not that CISA got hacked, CISA's claim is they had no

22   evidence that attackers had compromised any election

23   system.

24   Q.    CISA did not know anything about the SolarWinds hack

25   until late December of 2020; correct?

1624

```
 1   A.    I don't know when CISA --

 2             MS. MORGAN:  Objection, speculation, foundation.

 3             THE COURT:  Overruled.

 4             MR. KACHOUROFF:  If you know.

 5             THE COURT:  He just said he didn't know.

 6             MR. KACHOUROFF:  I didn't hear because of the

 7   objection.  I am sorry, Your Honor.

 8             THE WITNESS:  I don't know when CISA became aware.

 9   Q.   (BY MR. KACHOUROFF)  But you do know they announced

10   "the most secure election" at the same time they were

11   being hacked, and they didn't know they were being hacked;

12   correct?

13   A.   I don't think that this is a referendum of the

14   security of the federal agency, itself.  And the people at

15   CISA who are responsible for monitoring elections were not

16   the people at CISA who were responsible for securing

17   CISA's IT system.

18   Q.   Dr. Halderman, I was quoting CISA because you quoted

19   it, fair enough?

20   A.   I suppose that is fair enough.  You are quoting CISA

21   because I quoted them, but I am not sure -- why are you

22   asking me that?

23   Q.   You were talking about Mike Lindell, that he never

24   contacted you.  You know his testimony is he tried to

25   contact you several times; correct?
```

1    A.    I have no record of that.

2    Q.    And you didn't think he would be open to you, because

3    "he was so committed"?

4    A.    No, that is not what I said.  I said I didn't think

5    that he -- I didn't think it would do any good to -- to

6    reach out to Mike Lindell, because I didn't -- I couldn't

7    imagine that he would be open to evidence challenging his

8    preconceived notions about what happened in the 2020

9    election.  And on the basis of everything he had written,

10   these films he was making, like *Absolute Proof*, really?

11        You think is it worth my time to reach out to

12   someone who thinks he has "absolute proof" that the

13   election has been hacked?  Is he going to change his mind

14   on that basis?  He apparently didn't change his mind on

15   the basis of any of the other people who warned him that

16   his data was fake or that these claims were unlikely to be

17   true.

18   Q.    You just said moments ago that he was the largest

19   voice out there, and you decided you weren't going to

20   contact him; correct?

21   A.    He had a tremendous microphone, but it still wouldn't

22   do any good.  I was convinced it wouldn't do any good for

23   me to contact him.  In any case, my views were clear.  My

24   letter was out there and widely publicized that I didn't

25   think there was any credible evidence.  The Antrim County

1626

1    report that I had completed as part of the court case was

2    out there for him to see, for anyone.  That was widely

3    reported.  My views were --

4    Q.   When you are talking about the letter -- sorry to

5    interrupt you.  When you talk about the letter, you are

6    talking about 59 experts that signed that letter.

7    A.   That's right.  It was signed by the experts that are

8    in the very footage from DEF CON that Mike Lindell points

9    to, by me, by Andrew Appel, by Harri.

10   Q.   Isn't that an appeal to authority, that we should

11   listen to you in that letter because there were 59 of you

12   signing that letter?

13   A.   I don't know that you even need to "listen to."  You

14   don't need to take my word for it that this is true

15   necessarily, but it should put you on notice.  The claim

16   that you are making, if you are Mike Lindell, it should

17   put you on notice that the claim that you are making is

18   quite likely to be false.

19        What we said in the letter was "extraordinary

20   claims require extraordinary evidence," right.  That is

21   quoting Carl Sagan, he was a great populizer of science.

22   And that is like the whole core, it is not something only

23   scientists do, it is the whole core of rational thought.

24        If someone makes an everyday claim, you can accept

25   it from their say so.  But if somebody makes an

1627

```
 1    extraordinary claim:  The 2020 election result was stolen

 2    by hackers from China with the cooperation of Eric Coomer,

 3    whatever, that requires an extraordinary degree of proof,

 4    because it is likely to be false.

 5    Q.   Did you mail the letter to Mike Lindell?

 6    A.   I arranged for it to be written about in The New York

 7    Times.  I don't know what more you want me to do, sir.  I

 8    am not Mike Lindell's -- I don't work for Mike Lindell.

 9    Q.   The largest voice out there, you said, and you don't

10    mail him the letter?

11    A.   I assume he reads the newspaper.

12    Q.   The New York Times or the New York Post?

13    A.   I assume that Mike Lindell, who said that he spent 60

14    hours -- how many hours a day, every day, for months,

15    researching the question of the 2020 election, would be

16    aware of what the experts that he, himself, cites as

17    authorities on this, think and have written and have

18    published widely about this issue, about the core of his

19    issue.

20    Q.   Dr. Halderman, you are a Princeton man; correct?

21    A.   Yes.  I have three degrees from Princeton.

22    Q.   A Ph.D. from Princeton.

23    A.   That is true.

24    Q.   A top ten school; correct?

25    A.   Yes.
```

1628

```
 1    Q.   And Mike Lindell has a high school degree or a high
 2    school diploma; correct?
 3    A.   If you say so.
 4    Q.   You are holding him to the same standard as a Ph.D.?
 5    A.   I am holding him to the standard of reading the
 6    newspaper if this is the issue that he cares about and is
 7    speaking about and producing movies about that are seen by
 8    millions of people.
 9    Q.   Now, you insist the problem is that Mike's claims
10    have made it more difficult for people to engage in, you
11    called it, "nuanced conversations."  Do you recall that?
12    A.   Conversations rooted in fact, yes.
13    Q.   How is that as bad as the effect of lawsuits like
14    this, of getting people to participate in that
15    conversation?
16         MS. MORGAN:  Objection.
17         THE COURT:  Sustained.
18    Q.   (BY MR. KACHOUROFF)  Doesn't your letter with the 59
19    experts have the same effect; that is to say, to shut
20    down, to stifle conversation?
21         MS. MORGAN:  Objection.
22         THE COURT:  Sustained.
23    Q.   (BY MR. KACHOUROFF)  You mentioned that you don't
24    find Dr. Shiva, Colonel Waldron, Dennis Montgomery,
25    Douglas Frank, you didn't find those people to be credible
```

1629

```
 1   sources -- or Dr. Douglas Frank.  I think you said

 2   Dr. Douglas Frank was a high school teacher; right?

 3   A.   I think that is what I said, yes.

 4   Q.   And when did you research Dr. Douglas Frank?

 5   A.   I don't remember exactly when.

 6   Q.   And you talked about the ASOG report.  Tell us what

 7   ASOG stands for?

 8   A.   Allied Signals Operations Group, something like that.

 9   Q.   Allied Security Operations Group?

10   A.   Maybe it is Security Operations Group, that could be

11   right.

12   Q.   You said they were debunked in December of 2020.

13   A.   Yes.

14   Q.   You wrote a report in Michigan; right, for the

15   2021 -- March of '21 you posted the report.

16   A.   Yes.

17   Q.   Tell us what that report was all about.

18   A.   That was my own independent investigation of the

19   Antrim County incident, and I wanted to figure out what

20   actually happened; whether there were other problems,

21   whether this was potentially evidence of broader problems

22   in Michigan and elsewhere, and how to make recommendations

23   to improve election procedures and technology, et cetera,

24   so that such a thing wouldn't happen again.

25   Q.   On November 6th, you were on an email chain
```

 1    concerning the Antrim County miscount.  Do you recall

 2    that?

 3              MS. MORGAN:  May we approach, Your Honor?

 4              THE COURT:  Yes.

 5              (A bench conference is had.)

 6              MS. MORGAN:  I believe that counsel is about to get

 7    into the contents of the email that we all discussed

 8    regarding the Antrim situation that was potentially

 9    procured in a manner that was not appropriate and that had

10    not been disclosed in discovery and was not on the exhibit

11    list.  So I wanted to approach before this becomes an

12    issue.

13              MR. KACHOUROFF:  Absolutely not.  This was not

14    procured by any skullduggery --

15              THE COURT:  Mr. Kachouroff, you need to slow down.

16              MR. KACHOUROFF:  This was not procured by any

17    skullduggery, that it was done -- it was an intent to get

18    you prejudiced, as though this was fruit of the poisonous

19    tree, it is not.  This is a publicly available document in

20    Michigan, as Dr. Halderman knows full well, because he is

21    a party in this case.  And this information I am bringing

22    out today, I got it off ECF, so --

23              THE COURT:  His declaration?

24              MR. KACHOUROFF:  It is an email chain that he had.

25    And all I will do is ask if he remembers the email and

1    remembers what he said.

2        MS. MORGAN:  Is this going to include the email

3    where Dr. Coomer calls him an "asswipe."

4        MR. KACHOUROFF:  He doesn't call him an "asswipe."

5        MS. MORGAN:  Because that was the email you tried

6    to introduce through Dr. Coomer.  I just wanted to make

7    sure that this is not same email chain.

8        MR. KACHOUROFF:  No, it is not.

9        (In the hearing of the jury.)

10   Q.  (BY MR. KACHOUROFF)  Dr. Halderman, you believed on

11   November 6, 2020, that the Antrim County ballot

12   definitions on the tabulator and election management

13   software being different versions was a design flaw;

14   correct, on November 6th.

15   A.  So, whether it is a design flaw, what constitutes a

16   design flaw is a little bit -- is a little bit nebulous

17   here.  I think what I would agree with is that I thought

18   from the moment of the state's first explanation of what

19   the -- what the underlying problem they believe was, that

20   I thought the election system could be engineered to

21   prevent that kind of problem from happening in the future.

22   Q.  (BY MR. KACHOUROFF)  In fact, you said "calling this

23   human error places the blame on election officials, but

24   under these facts I am saying it should instead be

25   considered a software defect, albeit one that is only

1632

1    triggered when operators miss an important step."  Right?

2    A.    That sounds accurate.  That sounds like something

3    that I would write.  But the implication of that is that

4    really my belief is that philosophically we should be

5    engineering election systems to be failsafe, so even if

6    the human operators who run them make a mistake, as human

7    beings tend to, that the system will do all it can to

8    prevent that mistake from having an effect on the accuracy

9    of the count.

10          So it is a question of usability, and making sure

11   we are engineering systems as defensively as possible in

12   the face of human error by fallible people.

13   Q.    You also thought, and I will quote you, "if

14   incompatible software versions of the tabulators and EMS

15   could result in wrong results, that seems like a serious

16   bug."  Right?

17   A.    Yes, I guess.  Although it turned out that that

18   wasn't the cause of the problem in Antrim County, it was

19   nothing about incompatible software versions.

20   Q.    We will get to that in just a few moments.

21          You then talked with the Michigan election's

22   director and found out more information about what

23   happened in Antrim County; right.

24   A.    Sure, yes.

25   Q.    That was Jonathan Rader.

1    A.    John Brader.

2    Q.    Brader, sorry.  You know Jonathan Brader.

3    A.    I do, yes.

4    Q.    After learning more about the Antrim County vote

5    miscount, you believed calling this human error places the

6    blame on election officials, but under these facts you

7    thought it should instead be considered a software defect?

8    A.    The facts were still unclear at the moment when I

9    said that.  Again, it required more of an investigation to

10   determine the full set of circumstances involved.

11   Q.    You also stated this publicly in the New York Post on

12   November 6, 2020, as well; correct?

13   A.    What did I state in the *Post*?  I don't know.

14   Q.    You said -- it says, "University of Michigan Computer

15   Science Professor, J. Alex Halderman, a voting machine

16   expert, told *The Free Press* that it is 'Plausibly human

17   error, but if a simple screw up could cause these

18   problems, that sounds like a technical design flaw.'"

19   A.    That does sound like something the technology should

20   be doing more to prevent.  In fact, that is one of the

21   recommendations I made in my Antrim County report.  But

22   just because the technology isn't doing everything it can

23   to prevent human error, is certainly not any kind of

24   evidence that the technology was deliberately engineered

25   to facilitate fraud the way that Mr. DePerno, the Antrim

1634

1    plaintiffs, and Lindell and his backers claimed.

2    Q.    You were retained in mid-2020 by the Michigan

3    Attorney General's Office as an expert to conduct an

4    investigation into the Antrim County vote miscount;

5    correct?

6    A.    Excuse me, when?

7    Q.    Mid-December 2020?

8    A.    That sounds right.

9    Q.    And through your investigation, as you've testified

10   previously, you had access to the Antrim County election

11   machines; right?

12   A.    Yes, as did the plaintiff's expert.

13   Q.    And EMS stands for Election Management Server.

14   A.    Yes.

15   Q.    You had access to forensic images of machines.

16   A.    That's correct.

17   Q.    Log data.

18   A.    Yes.

19   Q.    What else did you have available to you to

20   investigate if you can recall?

21   A.    In the Antrim County matter, forensic images, log

22   data, images of the poll tape, images of the memory core.

23   The data was collected by the plaintiffs for the most part

24   and I got a copy of it.

25   Q.    Comprehensive.  It was fairly comprehensive.

1635

1    A.   Yes, it was fairly comprehensive data.  It was the

2    kind of data that would permit the kind of complete

3    forensic investigation that I engaged in.  But it was --

4    the high-level details were already pretty clear about

5    what happened.

6         But my investigation, with that additional data,

7    was able to provide additional evidence that human error

8    was the cause and, in fact, to highlight other problems

9    and opportunities for improvement.

10   Q.   Well, you did an initial draft report on March 23,

11   2021; correct?

12   A.   Yes.

13   Q.   And that was the draft report, the initial draft

14   report; correct?

15   A.   Pardon me?

16   Q.   That was the initial draft report?

17   A.   What do you mean "the initial draft report."

18   Q.   Your initial draft was March 23, 2021.

19   A.   I wrote various drafts.

20   Q.   Okay.  But you had a draft dated March 23, 2021;

21   correct?

22   A.   I would believe that, yeah.

23   Q.   And after conducting an investigation into an Antrim

24   County vote miscount, and having access to the Election

25   Management Server, the machine data, the forensic images,

1    you concluded in that draft on March 23rd, that Dominion

2    software was a contributing factor; correct?

3    A.    So "contributing factor" is a term of art.  And I

4    think I see where you are going.  And the report that --

5    the final version of the report after the draft, I think I

6    clarified the meaning of that.

7    Q.    Are you referring to a Duke Okes analysis?

8    A.    Pardon?

9    Q.    Are you referring to Duke Okes root cause analysis?

10   A.    To the root cause analysis, yes.

11   Q.    And explain to us what root cause analysis is.

12   A.    Root cause analysis is a kind of methodology for

13   investigating the causes of a -- the causes of an incident

14   or problem that takes place.  I mean, it is something that

15   is practiced in industrial settings, in aviation and so

16   forth, to try to figure out, what are the causes and how

17   do we prevent recurrences of some kind of incident.

18   Q.    So under a root cause analysis, if Dominion were to

19   fix its software, it would fix the root cause of that

20   problem; right?

21   A.    So I didn't conclude that the Dominion software was a

22   root cause.  I concluded -- in fact, my final report that

23   reflects my views doesn't use this terminology, because

24   the terminology is actually pretty confusing and sort of

25   vague.  But my final report is not by any means -- my

1637

1    final report is pretty critical of Dominion.

2            So I think you can refer to the language that I use

3    in my final report and find plenty of problems with

4    Dominion that I cite with Dominion software.

5    Q.   But as of March 23, 2021, Dr. Halderman, I am looking

6    at your words, you concluded that the reporting error was

7    "compounded by insufficiently defensive software

8    engineering," correct?

9    A.   Yeah, well, so that's the language I used in the

10   draft.  I changed the language for the final version

11   because I was afraid that that would be misconstrued as

12   meaning more than I intended, so what.

13   Q.   Your final draft was done March 26, 2021; correct?

14   A.   You mean the final version of the report that became

15   public?

16   Q.   Right.

17   A.   Yes, I think that is right.

18   Q.   So between March 23rd and March 26th, you had two

19   meetings with the AG's Office.

20   A.   That's quite possible.  I don't recall exactly, but I

21   believe that could be true.

22   Q.   And the meeting included representatives from the

23   Attorney General's Office, and they talked about your

24   report; correct?

25   A.   Yes.  Yes, that's right.

1638

 1   Q.   And it occurred before the release of your final

 2   report; correct?

 3   A.   Yes.  That's right.

 4   Q.   And you discussed removing or changing content in

 5   your draft report; correct?

 6        MS. MORGAN:  Objection, hearsay.

 7        THE COURT:  Overruled.

 8        THE WITNESS:  I'm not sure I'm at liberty to reveal

 9   everything we discussed because I am sure they would

10   assert some privilege if they were here.  But let me -- I

11   will tell you that the substance of the -- the core of

12   what we discussed were whether there were things where my

13   meaning was not clear.

14   Q.   (BY MR. KACHOUROFF)  So from the final report that

15   was published on March 26, 2021, you no longer stated that

16   Dominion software was a contributing factor; right?

17   A.   Instead I explained what I meant, which was that the

18   Dominion software could have been engineered in a way to

19   prevent this problem, and that there should be changes to

20   make sure that in the future software does do checks to

21   prevent this kind of problem.

22   Q.   You emphasized human error as the root cause.

23   A.   Human error was the primary cause of this problem.

24   Q.   And when you talked about the inadequate software

25   design, you softened the language or removed it so it

1    wouldn't emphasize the software problems.

2    A.    I don't think that the software problems were the

3    emphasis in either case.  But the software problems, you

4    know, contributing factor has a technical meaning that is

5    not going to come -- not going to be understood by much of

6    the public.  Does the -- could the software have been

7    engineered in a way that prevented the problem?  Yes.

8    Should it be changed so that the problem doesn't happen

9    again?  Yes.

10        I also talk in my report, and in both versions -- I

11   mean, I see you are trying to imply that somehow I changed

12   my conclusions to benefit Dominion, but my final report is

13   quite critical of Dominion.  All of this, by the way was

14   just litigated in federal court in Detroit, in the -- in

15   another case, where the judge considered exactly the kinds

16   of claims that you are making, read both of those reports,

17   and concluded from that that there wasn't any basis to

18   conclude that I had changed my position in a meaningful

19   way.

20   Q.    Actually, Dr. Halderman, the case is on appeal, and

21   these draft reports were just turned over to the other

22   side in February.  You know that; right?

23   A.    I don't know when the other side received those draft

24   reports from the attorney -- from the State of Michigan,

25   but that didn't have anything to do with me.

1640

1    Q.   In your independent report, you never mentioned that

2    you had met with these government officials just days

3    earlier.

4    A.   I'm not sure why I would mention that I met with the

5    -- what I mentioned in the report was that I had been --

6    was that I had written the report for the State of

7    Michigan and the Attorney General's Office.

8    Q.   And you did not disclose in your final report that

9    you actually had discussions with Dominion's CEO before

10   you issued that final report.

11   A.   Did I have discussions with Dominion's CEO before I

12   issued the final report?  Certainly not about my report.

13   Q.   You talked about -- with John Poulos.  You know who

14   he is; right?

15   A.   I do know John Poulos, and I have talked to John

16   Poulos on various occasions.

17   Q.   And that is where he told you that his view was --

18        MS. MORGAN:   Objection.

19        THE COURT:   Sustained.

20   Q.   (BY MR. KACHOUROFF)  And you did not disclose in your

21   final report to the public that you, Dr. Halderman,

22   contacted Eric Coomer on November 12, 2020, and offered to

23   help him because of what you said President Trump was

24   doing.

25   A.   You know, I did contact Eric Coomer shortly after the

1641

1    election.  And what I told Eric Coomer was that these wild

2    accusations that were -- that were being voiced about the

3    election having been a fraud, were beyond the pale.  And

4    that although I had been -- in my scientific work and in

5    my work on elections, I had been one of Dominion's biggest

6    critics, that this was still beyond the pail of anything

7    that the kind of criticism based on facts that scientists

8    like me have been discussing could possibly support.  And

9    it was awful what people were saying about Dominion and

10   about Eric.

11       So, yeah, as a fellow human being, and as someone

12   who -- you know, I have lots of criticism of Dominion and

13   their technology.  But are they some kind of cartoonish

14   super villain?  Is this all some kind of thriller movie?

15   Absolutely not, this is real life.

16       Of course I reached out to him to offer that we

17   share a common interest in making sure that our elections

18   are secure, and that the public understands accurately

19   what our elections are about; where they can be trusted,

20   where they need to be improved.  Yes, I did.  I am very

21   proud of having reached out to him in that moment.  That

22   was human to human, across the barriers of criticism over

23   technical issues, a gesture I had to make.

24   Q.   But you didn't make the same gesture to Mike Lindell,

25   did you?

1   A.   I have not reached out to Mike Lindell, and for the

2   reasons I stated, because I didn't think Mike Lindell was

3   open to any serious consideration of evidence that

4   contradicted his predetermined conclusions about the 2020

5   election.

6   Q.   One more thing, in your draft report, on page 51, you

7   mention that you partially concurred with ASOG.  And then

8   three days later, you take that reference to ASOG out;

9   right?

10  A.   So, I said instead, and I think it is clearer, is

11  that there were certain things in the ASOG report that

12  were accurate, but those things were not the primary

13  thesis about adjudication, about Dominion being

14  deliberately engineered to commit fraud or any of that.

15       They pointed out almost parenthetically in the ASOG

16  report some observations about the security of the EMS

17  configuration that I agreed were actual security problems

18  that should be addressed.

19  Q.   And you did not disclose in the final report that

20  some of your findings had changed since the draft report

21  three days earlier.

22  A.   No.  I don't think my findings changed, not the

23  meaning of my findings, at least as I intended them.

24  Q.   And then as soon as you published that report, the

25  Michigan Secretary of State issued a press release placing

1    blame on human error; correct?

2    A.    The core of the problem was human error.

3    Q.    It didn't mention anything about software design

4    defects.

5    A.    I don't write the press releases for the Secretary of

6    the State.  But the core of the problem -- and I think

7    that is the most important thing for the public to

8    understand about the error -- was that at its core was

9    human error, not fraud.  But my report is really clear,

10   there are ways the software can be improved, there are

11   ways the processes can be improved.  There is a lot we can

12   learn from this incident to make sure our elections in the

13   future are better off.

14   Q.    And the clerks did not catch, because of the logic

15   and accuracy testing, did not alert the clerks there was a

16   problem; correct?

17   A.    There were a lot of problems in Antrim County, a lot

18   of procedural problems.

19   Q.    You were in a Brews & Views webcast to the League of

20   Women Voters on April 14, 2021.  Do you recall that?

21   A.    Vaguely.

22   Q.    And didn't you describe it then that "the Antrim vote

23   flipping is happening due to a quirk of the Dominion

24   system"?

25   A.    Well, it is a quirk.  I guess it is fair to describe

1644

1    it as a quirk of the system; that if you make this mistake

2    while configuring it, it has unintended unexpected

3    consequence.

4    Q.   You would agree with me, would you not, that

5    transparency is important in forensic investigations,

6    especially voting machines and software?

7    A.   I suppose in some general sense, sure.

8    Q.   Especially when those findings concern the integrity

9    of a national election.

10   A.   Sure, transparency in general is important.

11   Q.   Especially when your name carries academic and expert

12   authority.

13   A.   Sure.

14   Q.   And you understand the appearance of influence or

15   pressure can damage public trust.

16   A.   Yes.

17   Q.   And yet in this case your final conclusion about

18   Dominion changed after two government meetings; correct?

19   A.   No, my conclusions didn't change, my conclusions were

20   the same.  I tried to make sure that the wording most

21   accurately reflected what those conclusions were, and that

22   has become increasingly important with, as you can see,

23   work that I have done and other people have done in

24   science, is being taken out of context to support things

25   that are science fiction.

1645

```
 1              So I was extra careful with Antrim County work and

 2    what I published in the end to make sure that my words

 3    accurately reflected what really happened.

 4    Q.   And you know that Mike Lindell actually hired the

 5    ASOG group at one point.

 6    A.   I can believe it.

 7    Q.   And that is the reason why you excised them from the

 8    report, is because you didn't want to be associated with

 9    Lindell; correct?

10    A.   Why I excised ASOG from the report?  My report has a

11    long section talking about ASOG and debunking their

12    claims.

13    Q.   You are right.  I meant to say, why you excised your

14    concurrence with ASOG.  You didn't want anyone to think

15    you agreed with them on anything.

16    A.   My report still says that they correctly observed

17    these things.  I just worded it differently to avoid

18    misunderstanding and it being quoted out of context that I

19    concur with ASOG.  It is better to just say, I think

20    everyone would agree, what I concur.

21    Q.   What is your compensation in this case,

22    Dr. Halderman?

23    A.   In this matter now?

24    Q.   Yes, sir.

25    A.   Boy, I believe that -- I think I am being compensated
```

1646

1    at my customary rate that I change for expert consulting,

2    which is at the time of this engagement, $750 an hour.

3    Q.    And it is true that you are fighting the subpoena

4    still in the Michigan case.

5    A.    In which Michigan case do you mean?

6    Q.    One American News has sought your testimony.

7    A.    They have sought my testimony involuntarily, that's

8    right.  And my wife won't let me testify for them, and

9    there are various other problems.  So I am fighting the

10   subpoena to testify in that case.

11   Q.    They offered to pay for your opinion; right?

12         MS. MORGAN:  Objection, relevance.

13         THE COURT:  Sustained.

14   Q.    (BY MR. KACHOUROFF)  Let's go back to Georgia.  Tell

15   us what ICX means and BMDs.

16   A.    What ICX means?

17   Q.    Correct.

18   A.    The ICX is the ImageCast X, it is a model of

19   technology that Dominion sells.  BMD, that is a ballot

20   marking device, basically a touch screen computer that a

21   voter can use to fill out a piece of paper and print it

22   out and then scan it with other ballots.

23         BMDs are used in a lot of the country for a very

24   small fraction of votes, the ones that are cast by people

25   with, say, impaired eyesight or something like that, that

1    makes it hard for them to fill out a traditional paper

2    ballot.  But there is one state, Georgia, that uses BMDs

3    for all of its in-person voting, where everyone when you

4    go to the polls using a BMD to fill out their ballot.

5    Q.   Would you say that that is not a hand marked ballot?

6    A.   Yeah, that is a non-hand marked paper ballot.  It is

7    still a paper ballot, but not hand marked.

8    Q.   And you prefer hand marked ballots; fair to say?

9    A.   Yes.  I am probably in the majority as other experts

10   that prefer hand marked ballots because there are fewer

11   risks.  You don't have the potential vulnerable computer

12   system between the voter and the permanent record of their

13   vote.

14   Q.   And in the *Curling* case, you gave a declaration, I

15   know you remember this, on July 1, 2021, where you stated

16   that "there were numerous security vulnerabilities in

17   Georgia's ICX BMDs."

18   A.   Yes.  I did an extensive technical analysis of the

19   BMDs in Georgia, and not only wrote a report, but took a

20   series of, I think it is about a hundred page report, and

21   took a series of these vulnerabilities through what is

22   called a responsible disclosure process, mediated by CISA,

23   where the vulnerabilities get reported to Dominion, and

24   Dominion has an opportunity to use that information to

25   correct the problems.  And then CISA put out an advisory

1648

```
 1   to state it is advising them about the existence of these

 2   vulnerabilities and suggesting mitigations.

 3   Q.   And Dominion and the Georgia Secretary of State

 4   objected to you alerting CISA about these very serious

 5   security vulnerabilities; correct?

 6   A.   I believe that Georgia at one point objected to it,

 7   and then they changed their position.  I don't know if

 8   Dominion -- what Dominion's position was.  I don't know

 9   that Dominion objected.  It wasn't a party in the case,

10   so --

11   Q.   But you mentioned that Dr. Coomer testified in that

12   case.

13   A.   They weren't a party in the case.  He testified, I

14   think, for the state as a person knowledgeable about the

15   operation of the equipment, but they weren't a party to

16   the case.

17   Q.   You also hacked Dominion's ImageCast BMD in open

18   court, did you not?

19   A.   I did a demonstration during the *Curling* trial last

20   year, that's right, which I demonstrated the implications

21   of some of the vulnerabilities I discovered.

22   Q.   Did you use a pencil to do it?

23   A.   No.  I, in fact, I used a pen.

24   Q.   A pen.

25   A.   Yep.  Yep, I borrowed -- we had the machine in open
```

 1    court, and I borrowed a pen from one of the attorneys and

 2    was able to use that to basically stick it into the back

 3    of the machine, like this, and then in a few seconds get

 4    to a mode in the machine that would give me some

 5    additional control, or the ability to, in fact, influence

 6    the way voters' ballots were printed on that machine.

 7    Q.   You flipped the winner in that theoretical election;

 8    correct?

 9    A.   Well, as counted on that one machine; that's right.

10    Q.   Well, you rigged the machine to print out as many

11    ballots as you wanted; right?

12    A.   So that demonstration that I gave in *Curling* was --

13    probably could affect a single machine.  Sometimes

14    affecting a single machine at a time could be enough for a

15    very close or a very small election to influence the

16    outcome.  My biggest worry about that particular problem

17    was that it could be used to discredit the election, cast

18    doubt on it by giving the appearance of more widespread

19    fraud.

20         But there were other problems that I was very

21    concerned about from an integrity-of-the-results

22    standpoint, as well.

23    Q.   You submitted a declaration dated May 5, 2023, in

24    this case, your report, I suppose we can call it; correct?

25    A.   Yes, that's right.

```
 1   Q.   And you stated under oath, "There is no credible

 2   evidence that the 2020 election was rigged."

 3   A.   That's right.

 4   Q.   You also stated, "Dominion systems were not used to

 5   manipulate vote outcomes."

 6   A.   There is no credible evidence whatsoever for that

 7   proposition.

 8   Q.   And your declaration in this case did not raise

 9   any -- any significant concerns about vulnerabilities in

10   Dominion software systems, did it?

11   A.   My declaration noted that it is the consensus of the

12   National Academies that all voting systems have

13   vulnerabilities.  But the existence of those

14   vulnerabilities, as we wrote in the experts' letter, is

15   not -- is not in and of itself evidence that the election

16   was compromised.

17   Q.   And you know that Georgia is upset with you because

18   you referred to their voting system like the Bowing 737

19   Max; correct?

20           MS. MORGAN:  Objection.

21           THE COURT:  Sustained.

22   Q.   (BY MR. KACHOUROFF)  When you are saying there is no

23   credible evidence, you mean there was no credible evidence

24   that the ultimate outcome was affected; correct?

25   A.   I think I would go beyond that.  But there is
```

1651

```
 1   certainly no credible evidence that the outcome was

 2   affected by hacking.

 3   Q.   But hacking doesn't just -- hacking doesn't have to

 4   just affect the outcome; right?

 5   A.   No, it doesn't just have to affect the outcome, it

 6   could be merely intended to discredit the result, for

 7   instance.

 8   Q.   A breach of the public's trust.

 9   A.   Sure.

10   Q.   So you don't deny there may have been fraud; correct?

11   A.   I don't deny that there may have been fraud?

12   Q.   In the 2020 election, generally speaking.

13        MS. MORGAN:   Objection, Your Honor.

14        THE COURT:   Sustained.

15   Q.   (BY MR. KACHOUROFF)  You don't deny there were

16   machine glitches; right?

17   A.   "Glitches" is rather a fraught term.

18   Q.   Bugs, serious vulnerabilities.

19   A.   So, look, take the Antrim County example.  The Antrim

20   County example is a case of -- is a case in which, as I

21   described, we really did have an election system produce

22   the incorrect election night totals, and this is a complex

23   technological system and complex human factors involved.

24        It's absolutely true that it produced the wrong

25   result.  We eventually figured out what the right result
```

```
1    was and the problem was corrected.  You can call that what

2    you want to call it.

3    Q.   And that same -- and you are convinced the same thing

4    happened in DeKalb County, with Michelle Long Spears, a

5    year later?

6    A.   And has happened in some other instances, as well,

7    that's right.  But these are instances where this sort of

8    problem -- this specific kind of problem that these are

9    instances of, that arises from a configuration mistake.

10   There isn't evidence of it being widespread, because the

11   reason why that kind of inconsistent configuration is --

12   has happened in each of those instances, that I am aware

13   of, has been related to a last-minute change in a ballot

14   design, which is a rare occurrence.

15         Don't get me wrong, I don't think it is acceptable

16   that we have this kind of error in the election results,

17   even if it is later going to be corrected.  We have a lot

18   of work to do to raise the standard of -- to raise the

19   quality of -- the quality controls in place for elections

20   to make sure that sort of thing doesn't happen.

21         But that is something that I'm pursuing in my

22   research, my work, better ways to prevent that kind of

23   problem from happening.  And it is something my Antrim

24   report makes -- I forget how many, 15 or so detailed

25   recommendations to the state to improve its practices.
```

```
1    Q.    And you Tweeted -- I looked at your Twitter profile,

2    that is very educational, thank you, Dr. Halderman.  The

3    Tweet you gave in July of 2022 adopted Andrew Appel's

4    important problem that enunciated about BMDs.  And he

5    writes, "There is an apparent problem with BMDs.  It can

6    change votes in a way --

7              MS. MORGAN:  Objection.

8              THE COURT:  Approach please.

9              (A bench conference is had.)

10             MS. MORGAN:  Hearsay, relevance.  This Twitter post

11   is not in evidence and it is not on the exhibit list.

12             MR. KACHOUROFF:  I haven't moved to admit it yet.

13             THE COURT:  You are using it for impeachment

14   purposes; correct, Mr. Kachouroff?

15             MR. KACHOUROFF:  Correct.

16             THE COURT:  That is why it is not on the list?

17             MR. KACHOUROFF:  Correct.

18             THE COURT:  Okay.  And then you need to try to

19   refresh his recollection before you read from it.

20             MR. KACHOUROFF:  I am just asking if he remembers

21   it.  I think he will remember it, Your Honor.  And it is

22   benign, it is not an "I gotcha" moment.

23             THE COURT:  Well, still, you need to try to refresh

24   his recollection before you can read from it.

25             MR. KACHOUROFF:  I will refresh recollection if he
```

1654

1    doesn't remember.

2          THE COURT:  All right.

3          MS. MORGAN:  I think he has to give him the

4    opportunity to make an inconsistent statement.

5          THE COURT:  Right.  Before he can impeach he needs

6    to ask about the statement.  You need to ask him first if

7    he remembers it.

8          MR. KACHOUROFF:  Right.  That is what I was going

9    to do.

10          (In the hearing of the jury.)

11    Q.   (BY MR. KACHOUROFF)  Do you recall the X post in July

12    of 2022, where you adopted Andrew Appel's important

13    problem with the BMDs?

14    A.   Vaguely, yes.

15          MR. KACHOUROFF:  Your Honor, may I approach the

16    witness?

17          THE COURT:  You may.

18    Q.   (BY MR. KACHOUROFF)  Do you recognize that Tweet?

19    A.   Yes.

20    Q.   And that is something that you adopted from Professor

21    Appel's report?

22    A.   Adopted from his?

23    Q.   I should say you re-Tweeted what he pointed out and

24    you thought it was an important problem.

25    A.   It is quoting from a blog post he wrote, I believe,

1    but, yes.

2    Q.    And it states, "There is an inherent problem with

3    BMDs.  They can change votes in a way that will survive

4    any audit or recount.  Not only is there no simple

5    solution to this problem, there is no solution, period.

6    Perhaps some day a solution will be identified.  Until

7    then, BMD for all voters is dangerous, even with all known

8    mitigations."

9    A.    Yeah.  So what I am describing here, this is one of

10   the -- I think one of the current problems that is

11   especially a focus for the election security community;

12   that there are really two problems.  One, making sure that

13   we have as many voters as possible using paper ballots

14   that accurately reflect their vote.  And then making sure

15   that those votes are audited rigorously.

16        What this is referring to is that using a Ballot

17   Marking Device is not a tool for accessibility but as a

18   tool that all voters are forced to use to record their

19   ballot in person, introduces other security risks, and one

20   of those risks is that what comes out of the BMD may not

21   reflect what you put in on the screen if there is a kind

22   of error or attempted fraud.

23        Now, most voters hopefully will at least glance at

24   their ballot to check that it is right, but what we have

25   found in laboratory testing is that voters aren't actually

1656

1    all that good at spotting problems.  So --

2    Q.   We are talking about not voters, though, you say,

3    "there is an inherent problem with BMDs.  They can change

4    votes in a way that will survive any audit or recount."

5    A.   I am explaining what this means.

6    Q.   Okay.

7    A.   The problem is that -- the problem is that voters

8    don't always notice if there is a mistake, or what is

9    printed on the ballot paper doesn't reflect their choices.

10   And what that implies is that it might be possible for a

11   BMD to change a small fraction of the vote without raising

12   the alarm.

13          This is what my -- some of my research finds.  So a

14   paper trail -- a set of paper ballots that is entirely

15   marked on BMDs, lends -- is still susceptible to certain

16   possible attacks that might escape detection even though

17   we have a paper record from every vote.  So it is an

18   inferior kind of paper record that is certainly not the

19   kind of paper record that I would prefer.

20          MR. KACHOUROFF:  Move to admit Defense 269.

21          THE COURT:  Any objection?

22          MS. MORGAN:  Yes, Your Honor.

23          THE COURT:  Can you approach.

24          (A bench conference is had.)

25          MS. MORGAN:  Using it for impeachment doesn't make

1   it admissible to go back to the jury.  Also, I don't think

2   that was proper impeachment, but I kind of let it go.  He

3   didn't testify consistent with the document.

4        THE COURT:  I agree, using it for impeachment,

5   extrinsic evidence for impeachment purposes does not make

6   the piece of evidence admissible to the jury.  So what is

7   your hearsay exception to this?

8        MR. KACHOUROFF:  It is a prior inconsistent

9   statement, Your Honor.  He said that these machines, you

10  would be able to find hacks that came in and ultimately

11  would discover it.  And the blogger is saying it would

12  survive any audit or recount, meaning you couldn't detect

13  it.  Is a complete inconsistent statement.

14       THE COURT:  The objection is sustained on 403

15  grounds as potentially confusing to the jury.

16       (In the hearing of the jury.)

17       (Exhibit No. 269 is refused.)

18  Q.   (BY MR. KACHOUROFF)  Dr. Halderman, let's move to

19  *Absolute Proof*.  Did you watch that movie?

20  A.   I did years ago.

21  Q.   What do you recall that being about, that

22  documentary?

23  A.   About vulnerabilities in election technology

24  generally.  I am sorry, *Absolute Proof*?  You didn't say

25  *Kill Chain*, I am sorry.

1    Q.    Let's start with *Kill Chain* first.

2    A.    We have been here for a while.  Which movies?

3    Q.    *Kill Chain*.

4    A.    *Kill Chain*.

5    Q.    2019; right?

6    A.    Yes.

7    Q.    A year before the 2020 election; yes?

8    A.    2019 is that when it came out?  I will take your word

9    for it if that is when it released.  I think the portion

10   of it that I appear in was filmed in 2017 or early 2018 or

11   something like that.

12   Q.    And then you know that made its round on HBO;

13   correct?

14   A.    Yes, an HBO documentary.

15   Q.    And you know Mr. Lindell tried to do his own

16   documentary and, in fact, he did in February of 2021;

17   correct?

18   A.    Yes.

19   Q.    And you saw *Absolute Proof*.

20   A.    I did watch *Absolute Proof*.

21   Q.    And what was the -- in *Absolute Proof* -- I will not

22   lead you.  What was it all about, tell us.

23   A.    *Absolute Proof* -- the thesis of *Absolute Proof* was

24   that the 2020 election was stolen by some kind of hack,

25   probably from China, and that Mr. Lindell had "absolute

1    proof" that this happened.

2        MR. KACHOUROFF:  At this time I would like to --

3    one moment, Your Honor.

4    Q.  (BY MR. KACHOUROFF)  That was relying on Dennis

5    Montgomery's data, according to you?

6    A.  At least in part, yes.

7    Q.  The next movie was *Absolute Interference*, or

8    *Scientific Proof*?

9    A.  I couldn't tell you the sequence of them.

10   Q.  What was the data these other documentaries were

11   based on?

12   A.  They were largely based on the same data.  They were

13   quoting other disreputable or incredible "experts."  It

14   was largely more of the same, but I think the claims got

15   gradually more outlandish.

16   Q.  You haven't seen *Scientific Proof,* which was

17   published in 2021, have you?

18   A.  Sorry?

19   Q.  You haven't seen Lindell's documentary entitled

20   *Scientific Proof*, in March of 2021?

21   A.  I don't know if it is March of 2021.  I reviewed

22   portions of all of the documentaries.  And I don't know if

23   I watched the others other than *Absolute Proof* in their

24   entirety.  It is very repetitive.

25   Q.  If you had seen it, you would know *Scientific Proof*

1660

1    has nothing to do with Dennis Montgomery, does it?

2          MS. MORGAN:  Objection, speculation, foundation.

3          THE COURT:  Overruled.

4          You can answer the question, Dr. Halderman.

5          THE WITNESS:  I don't know.  They blend together in

6    my mind.

7    Q.   (BY MR. KACHOUROFF)  That second movie, Mr. Lindell

8    based everything on the cast-vote records, records he got

9    from secretaries of state; correct?

10          MS. MORGAN:  Objection, foundation.

11          THE COURT:  Sustained.  He just testified he didn't

12    know, Mr. Kachouroff.

13    Q.   (BY MR. KACHOUROFF)  Are you aware that Mr. Lindell

14    obtained cast-vote records from 1,100 counties?

15    A.   Obtained himself?

16    Q.   Are you aware of that?

17    A.   I would have to take your word for it if that is

18    true.  I don't know if that is true or not.

19    Q.   Are you aware that Mr. Lindell obtained voter rolls

20    from all of the states, and did his own canvassing in

21    those states?

22    A.   I heard his testimony to that effect, but I don't

23    know if it is true or not.

24    Q.   And you know he did the canvassing to try to validate

25    the machine data; correct?

 1          MS. MORGAN:  Objection, foundation.

 2          THE COURT:  Sustained.

 3     Q.   (BY MR. KACHOUROFF)  Are you aware he did canvassing

 4     to validate the machine data?

 5          MS. MORGAN:  Objection.

 6          THE COURT:  Same.  Sustained.

 7     Q.   (BY MR. KACHOUROFF)  What do you know about the data

 8     that Mr. Lindell relied upon for the second movie,

 9     *Scientific Proof*?

10     A.   As I have already said, the movies are blending

11     together in my head at this point, so I'm not sure that I

12     recall, sitting here on the stand, specifically the data

13     that he relied on.

14     Q.   You know that Mr. Lindell to this day continues to

15     push his desire to see all machines gone.

16     A.   Yes, I do.

17     Q.   And even though his candidate got into office, he is

18     still persisting in bashing the machine companies.

19     A.   Still insisting on bashing machine companies?

20     Q.   Getting rid of the voting machines.

21     A.   Yes, I take that to be his position.  I also hear he

22     doesn't -- he continues to maintain that the 2020 election

23     was stolen, and that Eric Coomer -- he continues to

24     maintain the truth of all of the statements involved in

25     this case, is my understanding.

1    Q.    And your understanding comes from the attorneys at

2    this table.

3    A.    From the testimony from -- his testimony that I

4    heard.

5    Q.    You heard Mr. Lindell say that Eric Coomer rigged the

6    election.

7    A.    I heard him say that he maintains the truth of all of

8    the statements that he made, which is what I just

9    answered.

10    Q.    Did he make a statement about Eric Coomer

11    specifically?

12    A.    He certainly implied that Eric Coomer was involved in

13    rigging the election.  He called him a traitor.  He said

14    that he was responsible for the greatest crime in history.

15    You have heard -- we heard the statements.

16    Q.    You called Eric Coomer a man of principle, did you

17    not?

18    A.    Yes, I did.

19    Q.    And you stated that he shared your goal of protecting

20    election integrity; correct?

21    A.    Yes.  And I continue to believe that.

22    Q.    You first met Dr. Coomer on February 2, 2019.  You

23    may recall in your report you said it occurred at a vendor

24    booth during a conference.

25    A.    I don't know if that is the date or not, but I did

1    first meet him at a conference.

2    Q.   And he introduced himself to you at that conference,

3    did he not?

4    A.   Yes, that's true.

5    Q.   And that was a brief interaction with Dr. Coomer.

6    A.   We had a conversation about -- focused on election

7    technology for a while.  But it was, you know, less than

8    an hour.  I don't recall how long.

9    Q.   And the only other time you interacted with him was

10   during court proceedings in the federal case, *Curling v.*

11   *Raffensperger*; yes?

12   A.   Yes.  I was impressed by the integrity of his

13   testimony there, too, where he admitted to various

14   problems, but voiced an attitude of wanting continuous

15   improvement, which is, in fact, the right attitude to have

16   if you are building any kind of technology.

17   Q.   That occurred in September of 2020; correct?

18   A.   Yes, I believe so.

19   Q.   And like you said, you disagreed on technical matters

20   at that hearing; right?

21   A.   Yes.

22   Q.   You had not worked collaboratively with Dr. Coomer on

23   any project at that time, had you?

24   A.   We haven't worked collaboratively on any project.

25   Q.   You have never audited any code he's written or

```
 1   reviewed his technical implementation decisions; correct?
 2   A.   I have been a major critic of Dominion technology and
 3   have certainly done a lot of work investigating it and
 4   writing about real problems with it.  I have been very
 5   public about that.  But that doesn't change my view of
 6   Dr. Coomer.  I think he really -- based on our
 7   interactions, I think he absolutely wanted the same thing
 8   that I do, which is to make sure that our elections have
 9   integrity and that people can trust them.
10   Q.   And you know that after that second meeting, you
11   reached out to him to assist with Antrim County; correct?
12   A.   To assist with Antrim County?  I don't recall that.
13   Q.   I withdraw the question, I am sorry.
14        The court case in Michigan, you are aware of
15   internal Dominion emails; correct?
16        MS. MORGAN:  Objection.
17        THE COURT:  Counsel, approach.
18        (A bench conference is had.)
19        THE COURT:  All right.  Mr. Kachouroff.
20        MR. KACHOUROFF:  It's impeachment, Your Honor.  I
21   know it is highly unusual.  He is aware of this because
22   this is his case, and Eric Coomer talks about him being "a
23   shill of the worst kind who flat out" --
24        THE COURT:  How is that impeachment of
25   Dr. Halderman?
```

```
 1          MR. KACHOUROFF:  I am getting ready to show you.

 2   That he is "a shill of the worst kind, and that he flat

 3   out lies."

 4          THE COURT:  Objection, sustained.

 5          (In the hearing of the jury.)

 6          MR. KACHOUROFF:  Your Honor, we are going to show

 7   video 269, and co-counsel is aware of it.

 8          THE COURT:  I am sorry, stop.  Has it been admitted

 9   in evidence?

10          MR. KACHOUROFF:  No, ma'am.  We are trying to put

11   it up on the screen.

12          THE COURT:  Does counsel know of it?  How are we

13   going to rule on the admissibility while it is being

14   played in open court?

15          MR. KACHOUROFF:  Can we approach?

16          (A bench conference is had.)

17          MS. MORGAN:  I don't know what this is, Your Honor.

18          MS. DEMASTER:  May I?  This was one of the two

19   exhibits from the Court's recent order, where the Court

20   said it could only be used in Dr. Halderman's testimony.

21   So it was clipped out as a separate exhibit.  And so that

22   is -- 269 is the next number, I believe.

23          THE COURT:  I am sorry, what exhibit is it

24   pertaining to?

25          MS. DEMASTER:  Clip No. 231, the Court said this
```

1    particular clip could not be played with Mr. Lindell's

2    testimony but could be clipped out separately for

3    Dr. Halderman's testimony.

4         THE COURT:  For impeachment purposes.

5         MS. DEMASTER:  Yes.

6         THE COURT:  What are you impeaching him on with

7    respect to this video?  What statement has he now made as

8    part of his testimony here that you are impeaching him

9    with respect to this video?

10        MS. DEMASTER:  Dr. Halderman stated that

11   Mr. Lindell had a crazy theory that nobody believed that

12   China could ever hack an election.  He says particularly

13   in that video verbatim that China is one of the foreign

14   actors that absolutely could hack the election knowing the

15   vulnerability of the voting machines.

16        THE COURT:  I actually need to see the evidence

17   that has come in and to see if that quote is said.

18        MS. DEMASTER:  It is from the Court's order.

19        THE COURT:  I understand.  I cannot rule on video

20   evidence in court.  I felt like I was very clear about

21   this, Ms. DeMaster, that before you did this, and if there

22   is an objection to the admissibility, I need to view it.

23   I can't do it on the fly in front of the jury.  So we are

24   going to have to take a recess, I will have to look at the

25   transcript, and then you all can make your argument.  I

1667

1    need to look at the video, then you can make your

2    argument, then I can make an educated ruling.

3              (In the hearing of the jury.)

4        THE COURT:  Ladies and gentlemen of the jury, we

5    are going to be on our afternoon break early today because

6    there is a ruling I need to make.  Just be ready to go in

7    about 15 minutes.  I give you your normal admonition, and

8    have a good afternoon break.

9              (Outside the presence of the jury.)

10        THE COURT:  All right.  Thank you.  I will need a

11    copy of the clip through email or some other mechanism so

12    I can review it.

13        MS. DEMASTER:  I am sending that now, and will copy

14    opposing counsel.

15        THE COURT:  Ms. DeMaster, since you weren't here

16    this morning, you need to formally enter your appearance

17    so we can get you on the minutes.

18        MS. DEMASTER:  I apologize.  Jennifer DeMaster for

19    the defendant, Mike Lindell, My Pillow, and Frankspeech.

20              (A break is taken from 2:48 p.m. to 3:04 p.m.)

21        THE COURT:  Thank you.  Please be seated.

22        All right.  Back on the record.  Any continuing

23    objection with respect to these clips?

24        MS. MORGAN:  Yes, Your Honor.  Under 403 and 613,

25    and I am going to go backwards, I apologize, but they are

1   related objections.  I don't believe that this is proper

2   impeachment evidence because Dr. Halderman has not

3   testified inconsistent with his statements that are in the

4   video clips.

5           Moreover, I'm also asserting a 403 objection

6   because there is a -- the risk of misleading the jury and

7   confusing the issues substantially outweighs any probative

8   value to these clips.  From the clips, themselves, it is

9   not clear the date range of the statements, what voting

10  systems or machines that are being referred to in the

11  video, so it doesn't move the needle on any of the issues

12  in front of the jury, because I think if he is given an

13  opportunity to explain, these clips are from the 2016,

14  2017 range and are addressing machines that were not

15  widely used in the 2020 election.

16          THE COURT:  All right, Mr. Kachouroff.

17          MR. KACHOUROFF:  Judge, as you may recall, we not

18  only raised the impeachment factor, this was part of our

19  affirmative defense with respect to what Mr. Lindell knew

20  at the time, what he believed.  This comes out of the

21  movie *Absolute Interference*.  It is not very long, and I

22  would submit it is not taken out of context.  It is

23  basically what -- you gave us the clip, and Dr. Halderman

24  said that Mr. Lindell quoted disreputable people in the

25  documentaries.  And he admitted he didn't see the others,

1    so I want to be able to show this clip.

2        THE COURT:  I will allow you to impeach him with

3    the clips.  I am not going to allow them to be admitted in

4    evidence.

5        MR. KACHOUROFF:  Okay.  Will the jury be seeing the

6    clip?

7        THE COURT:  The jury can see the clip, but it won't

8    go back to the jury.

9        MR. KACHOUROFF:  That is fine.

10       Your Honor, may I broach one other housekeeping

11   matter?

12       THE COURT:  Yes.

13       MR. KACHOUROFF:  In order to streamline this and to

14   get us to the finish line, we have Exhibit 53, which was a

15   text from Dr. Coomer between he and his brother.  It is

16   where he said, "I would love to see that clown, too."  He

17   authenticated it on the stand, it is stipulated to, but I

18   am pretty certain that we did not move to admit.

19       And rather than call Dr. Coomer up to the stand and

20   ask to admit it, I would ask the Court consider allowing

21   us to admit it right here and right now, because it was

22   already taken care of.  I asked my opposing counsel, and

23   they objected to that.

24       THE COURT:  I don't actually remember it being

25   admitted.

1670

1           MR. CAIN:  What number?

2           THE COURT:  53.  It is stipulated.  You are not

3     planning to use it with this witness, though.

4           MR. KACHOUROFF:  No, no, no.  It should have been

5     admitted with Dr. Coomer, but I don't want to recall

6     Dr. Coomer in my case for that purpose.

7           MR. CAIN:  If this is stipulated, that is fine.

8           THE COURT:  53, right?

9           MR. KACHOUROFF:  Say it again?

10          THE COURT:  Exhibit 53?

11          MR. KACHOUROFF:  Yes, Your Honor.

12          THE COURT:  So we can admit that out of order.

13          (Exhibit No. 53 is admitted.)

14          THE COURT:  And I assume that means you will not be

15    recalling Dr. Coomer.

16          MR. KACHOUROFF:  Correct.

17          THE COURT:  All right.

18          MR. KACHOUROFF:  I wanted to do an offer of proof

19    with respect to the exhibit the Court already denied and

20    make it a part of record, obviously, not admitted for

21    purposes of evidence.  I conferred with opposing counsel,

22    they don't have any objection.

23          THE COURT:  All right.  You can make the offer of

24    proof.

25          MR. KACHOUROFF:  Okay.  If allowed to put this

1    document into evidence, we would show that Dr. Halderman

2    knew of this because it was filed in his case.  It is also

3    an admission by a party opponent, Dr. Coomer, who accuses

4    Dr. Halderman of being "a shill and somebody who flat out

5    lies."  A very unusual case where you have my opponent

6    impeaching his own expert.  But I believe this is fairly

7    admissible for that purpose.

8         And I understand the Court's ruling, I am making an

9    offer of proof, I am not asking the Court to change its

10   mind.  So I would offer this as part of the court record.

11        THE COURT:  All right.

12        MR. KACHOUROFF:  We can mark it as an exhibit, just

13   not admitted, or however you want to handle it.

14        THE COURT:  We can mark it as an Exhibit.  I guess

15   that would be 270, but it is not admitted.

16        (Exhibit No. 270 is refused.)

17        MR. KACHOUROFF:  At the risk of --

18        THE COURT:  If you are asking me to reconsider, the

19   reconsideration is denied.  You had an opportunity to make

20   your objection, you preserved it, you made the offer of

21   proof.

22        MR. DUANE:  If I may be heard.

23        THE COURT:  No.

24        MR. DUANE:  Not reconsideration, just to request a

25   clarification.

```
 1          THE COURT:  One attorney argues an issue.

 2          MR. KACHOUROFF:  The clarification, Judge, is we

 3    would like to recall Dr. Eric Coomer to the stand, and

 4    would the Court permit us asking him about that?  I

 5    realize it is prejudicial.

 6          THE COURT:  No.  I already ruled on 403 grounds

 7    that it is inadmissible under 403.

 8          MR. KACHOUROFF:  Understood, Your Honor.

 9          MR. DUANE:  Thank you.

10          MS. MORGAN:  Very briefly, Your Honor.  If this is

11    going to be made part of the court record, we would ask

12    for level 1 restriction.  As clearly demonstrated in the

13    documents, it is marked "confidential."  It has Dominion's

14    Bates numbers on it.

15          MR. KACHOUROFF:  Your Honor, it is not

16    confidential, it is public record, and Dominion has

17    already released it from any confidentiality.

18          THE COURT:  We will restrict it until we have an

19    opportunity to adjudicate a motion to restrict.

20          So, Ms. Morgan, to the extent that you think it

21    should remain restricted, you know the Court's local rules

22    with respect to filing motions to restrict.  You need to

23    restrict it until that time, because once we unrestrict

24    it, you can't get the cat back.  You know how those rules

25    operate.
```

1673

1          MS. MORGAN:  Yes, Your Honor, we will do so.

2          THE COURT:  Are we all ready?

3          MR. KACHOUROFF:  I am ready, Your Honor.

4          THE COURT:  Let me get a time estimate.  I was

5    hopeful we would get to closing today, but given the time,

6    it doesn't seem like we are going to get to closings

7    today.  How much more time do you think you have with this

8    witness, Mr. Kachouroff?

9          MR. KACHOUROFF:  After this video clip, I know

10   Dr. Halderman will be relieved I am done.  And then after

11   him, 15 -- my side would be 15 to 20 minutes with Peter

12   Kent.

13         THE COURT:  So plaintiff's counsel has 12 minutes

14   left from this morning, as I calculate, for a redirect of

15   Dr. Halderman.  Then you have 15 to 20 minutes with your

16   expert.

17         MR. KACHOUROFF:  Yes.  I will have three questions

18   of Dr. Halderman, but not many.  I promise I will keep it

19   short.

20         THE COURT:  Okay.  And then there will be, I guess,

21   some cross.  So given that, and given the length of the

22   jury instructions, it doesn't make sense to me to charge

23   the jury until tomorrow morning, and then go into

24   closings.

25         Does that make sense to everybody?  I just don't

1674

 1    see how we are going to get through everything that is

 2    left today and not hold the jury over past 5 o'clock.

 3            All right.  Madam deputy.

 4            (In the presence of the jury.)

 5            THE COURT:  Thank you.  Please be seated.

 6            Dr. Halderman, I remind you, you are still under

 7    oath.

 8            THE WITNESS:  Thank you, Your Honor.

 9    Q.   (BY MR. KACHOUROFF)  Dr. Halderman, I have a few

10    quick questions.  I am not asking you to speculate here on

11    the amount or whether the ultimate result was changed, but

12    you would concede, would you not, that given the very

13    serious vulnerabilities that you have raised, that there

14    was some fraud -- there could have been some fraud?

15            MS. MORGAN:  Objection.  Can we approach?

16            THE COURT:  Yes.

17            (A bench conference is had.)

18            MS. MORGAN:  I have a few objections.  The question

19    is extremely vague, so I think I am objecting under 403,

20    but there may be some misleading of the jury.  I also

21    think this was asked and answered.

22            THE COURT:  I am going to overrule the objection as

23    to asked and answered, but I am going to sustain the

24    objection as to form.

25            (In the hearing of the jury.)

1675

```
 1    Q.    (BY MR. KACHOUROFF)   I will rephrase the question.
 2    And we are talking about specifically the 2020 election.
 3    I am not asking you to speculate, like I said before,
 4    about the amount or the ultimate result or whether the
 5    ultimate result was changed.  But you would agree that
 6    given very serious vulnerabilities -- those are your words
 7    that you raised -- that there was the possibility of some
 8    hacking?
 9    A.    My work is all about the possibility of future
10    hacking, but that's very, very different from there being
11    any evidence that hacking occurred or that that hacking
12    was sufficient to change the election outcome, which seems
13    to be the central premise of all of Mr. Lindell's films.
14    Q.    He also said that "Dominion, you failed."  Do you
15    remember that phrase?
16    A.    Pardon?  Can you repeat?
17    Q.    Mr. Lindell said, that "You did your best, Dominion,
18    you failed."
19    A.    "You did your best," pardon?
20    Q.    "You failed," meaning he was referring to Dominion
21    when he said, "you failed"?
22    A.    I didn't hear the full quote.  I am sorry, I am not
23    trying to throw you off.
24    Q.    You are not.  It is okay.  Do you recall that quote?
25    A.    I didn't hear the full quote yet.
```

1    Q.   Okay.

2    A.   I only heard the word "Dominion" and "you failed."  I

3    am just having trouble hearing you.

4    Q.   I was taking those four words, "Dominion, you did

5    your best, you failed."

6    A.   Okay.

7    Q.   So he was referring to whatever he was referring to,

8    but the idea was that if there was any hacking, they

9    failed.

10        MS. MORGAN:  Object.

11        THE COURT:  Sustained as to form.

12   Q.   (BY MR. KACHOUROFF)  Do you recall what Mr. Lindell

13   was referring to with those words?

14        MS. MORGAN:  Objection, speculation.  Can we

15   approach?

16        THE COURT:  You can approach.

17        (A bench conference is had.)

18        THE COURT:  Mr. Kachouroff, what is the basis of

19   you excerpting those words that are not a full quote of

20   the alleged defamatory statement by Mr. Lindell?

21        MR. KACHOUROFF:  Because he said Mr. Lindell

22   claimed that China hacked the election through Dominion.

23   If Dominion "failed," they obviously didn't hack.

24        THE COURT:  That is not how I interpret the

25   statement.  You are mischaracterizing the defamatory

1677

1    statement, which is up to the jury to determine.

2            MR. KACHOUROFF:  Sorry, that is what I interpreted

3    it as saying.

4            MS. MORGAN:  If he wants to play 185 again for the

5    witness, I would be fine with that.

6            MR. KACHOUROFF:  I am not interested in doing that.

7            (In the hearing of the jury.)

8            THE COURT:  Sustained.

9            MR. KACHOUROFF:  Your Honor, we are going to play

10   that video, and that will conclude my examination.

11           THE COURT:  All right.

12           (Video recording played in open court.)

13           MR. KACHOUROFF:  Just for clarification, Your

14   Honor, this is a clip from one of Mike's documentaries.

15           THE COURT:  Do you have a question?

16           MR. KACHOUROFF:  No, that's --

17           THE COURT:  You have to have a question,

18   Mr. Kachouroff.

19           MR. KACHOUROFF:  I am sorry, Your Honor, one

20   moment.

21   Q.   (BY MR. KACHOUROFF)  Dr. Halderman, you said all of

22   Mike's documentaries had disreputable people.  Do you

23   recall that?

24   A.   All of them do have disreputable people.

25   Q.   But you are not disreputable.

1   A.   Here is another example of him taking my work out of

2   context and selectively quoting what I said.  It is back

3   to what I started with at the beginning of my testimony.

4   The science on elections is about there are real

5   vulnerabilities we have to worry about and take policy

6   steps and corrective action to prevent.

7        Most importantly, if you had played -- bothered --

8   if Mike Lindell had bothered to examine the entire talk

9   from probably 2017 or so that that excerpt came from, he

10  would have seen that my point was that we needed at the

11  time to get rid of outdated voting machines, to have

12  paper, and have auditing.

13       In the 2020 election, in the critical states, we

14  had paper and we had auditing.  My actual point in that

15  talk undercuts Mike Lindell's theory, his insistent theory

16  that the 2020 election was hacked.  So I'm not quite sure

17  what point you are trying to make in showing this,

18  Mr. Kachouroff.

19       The science is that there are vulnerabilities and

20  there are steps we can take to protect our elections.  The

21  science fiction -- Mike Lindell's science fiction is that

22  there is evidence that the election was hacked and somehow

23  it is Eric Coomer's fault.

24  Q.   When you say "hacked," you mean the result was

25  changed, not just --

1679

1    A.    That the 2020 election was stolen and that Eric

2    Coomer is a traitor, that is the crazy town,

3    Mr. Kachouroff, that is the science fiction.  And I am

4    appalled that Mike Lindell chose to selectively quote my

5    work in order to back up those baseless theories, and that

6    he didn't bother -- was able to go find these old video

7    clips, he didn't bother to ask me or to see anything that

8    I had written that was widely publicized in 2020 that

9    undercut his theory.

10         It is really a very selective quotation.  He is

11   very happy to quote to me when it confirms his pre-formed

12   conception, but he's apparently not open to considering

13   the evidence that he may be wrong or his data may be

14   completely fabricated.  That his -- that the people who he

15   is bringing on with their theories in his movies may not

16   be credible or may have already been debunked.

17         He is not open to that, but he is open to going and

18   finding old selective portions of my work to back up his

19   theories.  I am not sure what point you are trying to

20   make.

21   Q.    You said, in your words in the video, and correct me

22   if I am wrong, "I'm worried about 2020."

23   A.    I was worried about 2020.  We are very lucky in some

24   ways that 2020 turned out the way it did; that we had

25   paper and we had audits in all of the closest states.

1680

1    Q.   Except audits that weren't completed in Michigan;

2    right.

3    A.   Audits had been completed in all of those states.

4    Audits were going to be completed and had been announced

5    in all of those states.  Audits that had already been

6    completed when Mike Lindell, even his first movie, was

7    aired, so --

8    Q.   Even though Professor Stark disagrees with you about

9    the audit in Georgia.

10   A.   The audit in Georgia wasn't perfect, but so what?

11   This undercuts Mike Lindell's theories.  And I haven't

12   heard Mike Lindell propose, right, any connection between

13   the limitations of that audit and his theories that the

14   election was hacked through Dominion and some crazy --

15   excuse me, and some nationwide hack from China, any of

16   these things.

17   Q.   Do you allow for the possibility that that was

18   something he believed in 2021 but not in 2022, or '23 or

19   '24?

20   A.   His own testimony is that he stands by everything he

21   said.  I have no reason to believe that Mike Lindell has

22   changed his views that the 2020 election was stolen

23   through a massive hack from China or that Eric Coomer was

24   somehow guilty as part of that.

25   Q.   He never said he stood by Joe Oltmann or Tina Peters,

1    did he?

2    A.   He's never said anything to the contrary, either.

3    Q.   And you are making him guilty by association with

4    these people; correct?

5              MS. MORGAN:  Objection.

6              THE COURT:  Sustained.

7              MR. KACHOUROFF:  I have nothing further, Your

8    Honor.

9              THE COURT:  All right.  Ms. Morgan.

10             Do you want my courtroom deputy to give you a

11   warning?

12             MS. MORGAN:  I don't think I will get close, but I

13   guess I should ask for it anyway.

14             THE COURT:  Madam deputy.

15                     **REDIRECT EXAMINATION**

16   **BY MS. MORGAN:**

17   Q.   Dr. Halderman, I know you testified you weren't a

18   hundred percent on the exact date of when the Michigan

19   audit was finished.  Do you know whether or not it was

20   finished before Mike Lindell's Cyber Symposium?

21   A.   It absolutely was finished before the Cyber

22   Symposium.

23   Q.   With respect to the issues you were questioned about

24   related to Alabama and some voters that are over age 100

25   on the rolls, do you know whether or not a voter in

1    Alabama has to present an identification card to vote?

2    A.   I believe that is a requirement statewide in Alabama

3    to vote in person, you need ID.  They are one of the

4    stricter states about voter identification.

5    Q.   You were asked about the manner in which Mr. Lindell

6    has quoted some of your work.  Is there any other

7    information that you would like the jury to have as far as

8    how Mr. Lindell has taken your work out of context?

9    A.   Well, I think he's used my work -- he has used my

10   work and the science about election vulnerabilities to try

11   to make his theories sound plausible.  But the science --

12   the science is about -- the science is about there being

13   vulnerabilities.

14        The facts that we have say nothing about an attack

15   on 2020 because there just isn't any credible evidence

16   that that attack -- that an attack took place.  So, I

17   mean, I have, myself, I have -- I think you have heard

18   several instances of this.

19        MR. KACHOUROFF:  This calls for a narrative.  I

20   want to object on that ground.

21        THE COURT:  Overruled.

22        THE WITNESS:  I think I have explained several

23   instances where there were real occurrences of problems

24   with election systems after 2020 where I, myself,

25   investigated to find out, is this a problem we can explain

1    or is this something we can learn from, is it something

2    more sinister?

3           But, like that is how science works in real life.

4    We go, we investigate, we have an open mind about what is

5    the evidence, what does it tell us, what can't it tell us,

6    how do we make progress?  That is not what Mr. Lindell was

7    doing when he was citing my work, when he was citing the

8    work of other scientists.

9           He wants to snip out pieces that are confirming the

10   beliefs he already had and not accepting any of the

11   limitations, the constraints of what that science tells

12   us, the defenses that I and other experts have been asking

13   for, which in some cases were in place in critical states

14   in 2020.

15          So that's what's very, very frustrating about that,

16   is at the end of the day he is using the work of

17   scientists to mislead people, to take them into this --

18          MR. KACHOUROFF:  Objection, Your Honor.

19          THE COURT:  Sustained.

20   Q.   (BY MS. MORGAN)  At one point during the questioning

21   by defense counsel about your opinions in the *Curling*

22   case, I heard you say that your biggest concern was the

23   casting of doubt on the integrity of U.S. elections.  Can

24   you explain what you meant by that, and why that was your

25   biggest concern?

1    A.    What I wrote in my expert report for the *Curling* case

2    was that these vulnerabilities -- and we've talked a

3    little bit about their ballot marking devices, and that

4    those vulnerabilities raised the possibility that certain

5    close elections could be -- could potentially be targeted

6    in a certain way under certain conditions.

7         But what I wrote in my report was that there was a

8    possibility that vulnerabilities could be exploited.

9    There was a near certainty that people would use the fact

10   that these vulnerabilities existed to discredit election

11   results in Georgia and to claim that elections had been

12   stolen in Georgia.

13        And I think that's the theme of how we are seeing

14   vulnerability information misused to lead science fiction

15   in the work of Mr. Lindell.  Jumping to the conclusion

16   because something -- there is a technical -- there is a

17   technical fault with the system, then therefore we can --

18        MR. KACHOUROFF:  Judge, I am going to object again.

19        THE COURT:  The objection is sustained.

20   Q.    (BY MS. MORGAN)  Why is that so important?  Why does

21   it matter whether or not there is public trust in the

22   integrity of U.S. elections?

23   A.    Gosh, elections are --

24        MR. KACHOUROFF:  Objection, Your Honor, this is

25   outside of the scope.

1685

1       THE COURT:  Sustained.

2    Q.   (BY MS. MORGAN)  With respect to the specific

3    statements published by the defendants in this case, what

4    are your concerns with respect to whether or not those

5    undermine trust in U.S. elections?

6    A.   I think that the statements that are at issue in this

7    case about Eric Coomer, about Dominion, these are leading

8    people to be very confused.

9       MR. KACHOUROFF:  Objection.  Again, Your Honor,

10   outside the scope, and he is also not answering.

11      THE COURT:  Again, counsel, if you are going to

12   make more than a word or two objection, you need to

13   approach.

14      MR. KACHOUROFF:  Sorry.

15      THE COURT:  Approach.

16      (A bench conference is had.)

17      THE COURT:  All right.  So, I don't actually find

18   what he already said objectionable, but he sounded like he

19   was going to continue on, that is why I entertained the

20   objection, Mr. Kachouroff.

21      But, Ms. Morgan, I think easiest way to remedy this

22   is ask him another question, if you have one, or complete

23   your examination.

24      MS. MORGAN:  Okay.

25      (In the hearing of the jury.)

1           MS. MORGAN:  I have no further questions for this

2      witness.

3           THE COURT:  Dr. Halderman, you may step down.

4           THE WITNESS:  Thank you, Your Honor.

5           THE COURT:  All right.  Plaintiff's counsel, any

6      further witnesses?

7           MR. CAIN:  No, Your Honor.

8           THE COURT:  All right.  Defense counsel, are you

9      ready to proceed?

10          MR. KACHOUROFF:  Yes, Your Honor.  We would call

11     Peter Kent.

12                          **PETER KENT**

13     having been first duly sworn, testified as follows:

14          THE WITNESS:  I do.

15          COURTROOM DEPUTY:  Please be seated.

16          Please state your name, and spell your first and

17     last name for the record.

18          THE WITNESS:  Peter Kent.  P-E-T-E-R K-E-N-T.

19          MR. KACHOUROFF:  One moment, Your Honor.

20          THE COURT:  All right.

21                      **DIRECT EXAMINATION**

22     **BY MR. KACHOUROFF:**

23     Q.   Mr. Kent, good afternoon.  Would you introduce

24     yourself to the jury.

25     A.   Yeah.  My name is Peter Kent.  What more do you want

1    me to say?

2    Q.    Tell us a little bit about your background,

3    education.

4    A.    So my education actually is pretty much irrelevant.

5    I have a degree in geography and geology from almost half

6    a century ago.  But I have been working in the computer

7    field since 1979, and I have worked on a lot of different

8    things over the years.

9         I have worked on originally using computer

10   equipment on oil rigs, and then helping to design systems,

11   design and use interfaces.  And we have a slide here now,

12   that is me in, I think, 1981, on an oil rig.  I helped

13   test systems, I helped design these new systems for the

14   oil field.

15        But over the years I have done a lot more.  I have

16   written a lot of books about technology, probably around

17   65 books.  I wrote *The Complete Idiot's Guide to the*

18   *Internet* in 1993, seven editions of that book.  More

19   recently I wrote *Bitcoin for Dummies*.  In between I have

20   written numerous books about doing business online.

21   Essentially seven editions of *SEO for Dummies.*  I think we

22   heard a little bit about SEOs today.

23   Q.    That means search engine optimization.

24   A.    Search engine optimization.  I wrote a book on PPC,

25   pay-per-click advertising, which we heard from Mr. Bania

1    yesterday.  I started a dotcom.  I have done a lot of

2    consulting over the years.  I consulted for Amazon on

3    certain optimization issues.  Zillow.  Lonely Planet.

4    Literally hundreds of small- to medium-sized companies.

5    Q.    And you are being offered today as a reach expert.

6    A.    Yeah.  You guys are using the term "reach."  I think

7    of myself, one aspect of what I do is related to social

8    media.  And so "reach" is we are talking about how far a

9    message can travel, in effect, on social media.  And so I

10   have been involved in social media since 1984, when it

11   wasn't even called social media back in those days.  So I

12   have been in social media, what is that, 41 years.

13   Q.    Okay.  And what was your assignment in this case?

14   A.    So I was asked to look at statements, primarily on

15   social media, although a lot of my examination ended up on

16   finding messaging on TV and magazine and newspaper and so

17   on.  But to look at messaging regarding Dr. Coomer,

18   starting with the election, within a day or two of the

19   election in 2020, up until May the 8th of 2021.

20   Q.    You mean May '9?

21   A.    Well, the day before.  May the 9th was the first time

22   Mr. Lindell made a statement about Dr. Cooper [sic], and I

23   was asked to go up until that point.

24        MR. KACHOUROFF:  Your Honor, I tender Peter Kent as

25   a reach expert and social media expert.

1689

1    THE COURT:  Any objection?

2    MR. BELLER:  No objection.

3    THE COURT:  So qualified.

4    Q.   (BY MR. KACHOUROFF)  Okay.  So the scope was the six

5    month -- approximate six-month period, November 3, 2020,

6    to May 9, 2021.

7    A.   Correct.

8    Q.   We will go to the next slide.  Your methodology.

9    Could you explain to the jury what you did?

10   A.   So Mr. Bania discussed yesterday how he investigated

11   social media, because he was starting from the point at

12   which I stopped, or actually a few days before I stopped.

13   But he was doing it to a great degree manually, as he

14   testified yesterday.  I was, too, I was following leads

15   manually and spent a lot of time traveling from site to

16   site doing a lot of Google searches, watching how these

17   messages traveled.

18        Mr. Lindell's attorneys also hired a firm called

19   SMI Aware, who also did some research, and they came back

20   with their own data, which sort of overlapped my data to

21   some degree, but also added a lot of extra data.

22        I wanted to use Brandwatch.  You heard Mr. Bania

23   talk about Brandwatch yesterday, and I had his report -- I

24   had been given Mr. Bania's report.  He wrote his report

25   before I wrote mine, and I realized he used Brandwatch.  I

1    wanted to use it myself, but they wanted a lot more money

2    than the attorneys would budget.

3    Q.    Okay.  And let's go right to the timeline.  You said

4    you start on November 9, 2020, we will ask you about that.

5    But November 9 through May 8, 2021, right, that is your

6    scope?

7    A.    Yes.

8    Q.    And Mr. Bania didn't focus on that, he focused on May

9    9 forward; correct?

10   A.    Well, he actually started at May 3.

11   Q.    May 3?

12   A.    He started May 3.  I ended May 8.

13   Q.    Okay.  And can you explain the timeline to us, what

14   you are doing here.

15   A.    So the narrative about Dr. Coomer began on November

16   the 9th, 2020, within days of the election.  Mr. Bania's

17   report started a year -- sorry, 6 months later, started on

18   May the 3rd.  So I felt that was a little bit misleading

19   if one didn't understand the full picture reading

20   Mr. Bania's report.  It is misleading because it is taken

21   out of context.

22          Again, his narrative begins on May 3, 2021, whereas

23   my narrative, or the actual story of how this information

24   about Dr. Coomer was spread, the actual story began on

25   November 9th of the year before, and it began with Joe

1691

1    Oltmann's statement.  And I believe -- I wasn't here at

2    the time, but I believe he testified here a few days ago,

3    perhaps.

4    Q.    Correct.  And this next slide is about Dr. Coomer's

5    reputation.  You note he was in hiding, by his testimony,

6    November 23rd or earlier.

7    A.    Yes.  So Dr. Coomer, himself, I believe used the term

8    "destroyed."  That his reputation had been destroyed by, I

9    think, around January of 2021.  The National Public Radio

10   reported that Dr. Coomer was in hiding by at least

11   November 23rd.  I don't know the exact date, but that

12   certainly is what they reported, and other news media

13   reports the same thing.

14   Q.    Next slide, you have other examples.

15   A.    I do.  So as I traveled through the social media, I

16   kept a list.  These are taken straight out of my report.

17   I had a dozen pages -- not five, but a dozen pages, line

18   after line of these things.  And so we can see November

19   15th, Dr. Coomer was mentioned on the FOX News TV

20   broadcast.  Rudy Giuliani was being interviewed.  He

21   didn't name him, but he told the story.  Michelle

22   Malkin --

23   Q.    Do you have any idea how many views FOX News would

24   have been compared to social media?

25   A.    Unfortunately I had no way.  I had no data showing me

1    how many viewers would see a particular program.

2    Q.   In your professional experience, would it be larger

3    than social media?

4    A.   I say -- I would assume so, but that is out of my

5    scope, out of my are area of expertise.  I don't know for

6    sure.  These are the things I picked up as I was traveling

7    around searching for these things or following these

8    leads, I would find all sorts of things; people Tweeting.

9    The story ending up on TV, ending up on radio and

10   podcasts, so on.

11        So Michelle Malkin, the first one, as you pointed

12   out, we don't know how many people saw that.  The second

13   one, well, we know that Michelle Malkin at the time had

14   perhaps 2 million followers.  I call it "possible readers"

15   here, but in a sense with social media, social media

16   presents the possibility that if you have a million

17   followers, that is a million people who might pop in and

18   see your Tweet or your post, but might not, as well.  But

19   also other people can be seeing it who are not actually

20   following.

21   Q.   There is no way to tell whether someone looked at it

22   for 10 seconds or 10 minutes.

23   A.   Correct.  Mr. Bania made this point yesterday; there

24   is no way to get absolutely rock solid numbers.  But we

25   can gather numbers like re-Tweets, quotes, likes, views,

1693

1    and so on, but there is no way to get an absolute solid

2    crisp number.

3    Q.    Moving on, November 23-24.

4    A.    Yeah, some more example.  So still in November we are

5    still more than five months from Mr. Lindell's first

6    statement, the Gateway Pundit.  We actually had traffic

7    data.  So Gateway Pundit had a website, and Mr. Bania was

8    talking about these traffic statistics you can get from

9    websites where you can see how many people visited a site,

10    how many times a page was loaded into a browser, this sort

11    of thing.

12        And Gateway Pundit provided that data to us.  So

13    these numbers, it shows that this particular first

14    article, it mentioned Dr. Coomer, it was seen 149,000.

15    149,000 page views.  So that's 149,000 times that

16    somebody's browser somewhere loaded that page.  It also

17    shows us 121,000 readers, so -- or visitors really, the

18    data files would show.  That means 121,000 people saw that

19    page, but 149,000 times.  So some of these people came

20    back and saw it a second time.

21    Q.    In November of '24, we see One America News Network

22    interview Joe Oltmann.

23    A.    That's right.  So, again, the story is spreading, and

24    we haven't even left 2020 yet.  So, again, more than six

25    months before Mr. Lindell said anything, One America News

1   Network interviewed Joe Oltmann again.  And so I don't

2   know, again, I don't have perfect data, I don't know how

3   often that was seen on One America News Network, I have no

4   idea.  But it was posted to YouTube, and YouTube reported

5   that it was seen 1.6 million times.

6   Q.   I want to move to the next slide.  This is a profile

7   of Eric Trump.

8   A.   This is Eric.  So Eric Trump tweeted about Eric

9   Coomer.  And what is the date here?  November.  This is

10  November 17.  So, again, we haven't even entered 2021 yet.

11  Eric Trump had 4.2 million followers.  Now today on X, as

12  they call it now, posts show "views."  It will tell you

13  how many times a post has been viewed.  At this time they

14  didn't have that feature, they didn't report it, so I have

15  no way of directly knowing how many views.  But what I did

16  was I extrapolated.

17       I found a more recent Tweet from Eric Trump, and I

18  looked at how many -- I think I was basing it on "likes,"

19  and we have 23,000 "likes."  Then I figured out the ratio

20  between "likes" and "views" on this more recent post, and

21  I went back and calculated -- and I calculated with this,

22  this post may have been seen 1.2 million times.

23  Q.   Okay.  Then this figure.

24  A.   This is a quick summary.  There is a lot more, by the

25  way.  And I have my report here, it has been 2 years since

1695

1    I wrote this, so I have the report here.  I can find more.

2          There are other examples, such as Donald Trump

3    re-Tweeted.  He didn't write a Tweet, himself, but he

4    re-Tweeted a message -- or three different messages.  It

5    was at the time a Twitter -- a Twitter account for Team

6    Trump, and three times Team Trump Tweeted out a message

7    about Dr. Coomer.  I think Team Trump had 1 or 2 million

8    followers.

9          But Donald Trump then re-Tweeted that post.  At the

10   time Donald Trump had something like 89 million followers.

11   So I don't know what the number is, I haven't calculated

12   it, but it could be millions upon millions of people who

13   saw those three Tweets from the President, from Mr. Trump.

14   Q.   The bottom line, if we are looking at the total

15   number of views, including extrapolated views, we are

16   looking at what, roughly 40, 45 million?

17   A.   It is hard to tell.  This is a summary I did in the

18   report, and I have to go all of the way up to May the 8th,

19   what had I found?  These are the sorts of things I found.

20   Combined video views, ones I could measure, were 9

21   million.  The Tweets, the "likes" were 313,000, which I

22   extrapolated again using this new data that Twitter -- X

23   currently, provides the "views" data, and I calculated 30

24   to 37 million potential views.

25         We have got Gateway Pundit, 2.3 million page views.

```
1    The TV broadcast, I don't know the numbers.  I know there

2    were at least eight TV broadcasts talking about

3    Dr. Coomer.  There were probably many others I am not

4    aware of, but there were at least eight on CNN and OAN and

5    so on.  I don't know the numbers.

6          Magazine and newspaper articles, I believe The New

7    York Times mentioned Dr. Coomer.  So, again, it is hard to

8    get a solid number for how many people saw all this, but

9    it is undoubtedly in the dozens or scores of millions.

10   Q.   And at the bottom line here, there are tens of

11   millions of views and listens to the statements about

12   Dr. Coomer before Lindell mentioned him.

13   A.   Yes.  This is all before Mr. Lindell said anything

14   about Dr. Coomer.

15         MR. KACHOUROFF:  I have nothing further.  I pass

16   the witness.

17         THE COURT:  All right.  Mr. Beller.

18         MR. BELLER:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. BELLER:

21   Q.   Good afternoon, Mr. Kent.

22   A.   Good afternoon.

23   Q.   So, Mr. Kent, I want to start the same place that

24   Mr. Kachouroff started off, that is with your background a

25   little bit, okay.  Fair to say over the course of your
```

```
 1    career you have had a few different jobs or a few

 2    different careers; right?

 3    A.    Yes.  They kind of overlap and merge.

 4    Q.    Sure.  And so you did, I think, mention to the jury

 5    that you wrote The Complete Idiot's Guide to the Internet;

 6    right?

 7    A.    Correct.

 8    Q.    And that was in 1993.

 9    A.    The first edition.  The seventh was in 2000.

10    Q.    Understood.  I will stick with 1993 for just a

11    moment, okay.  In 1993, you would agree with me that there

12    were about 200 websites.

13    A.    That is the number I typically use, yes.

14    Q.    Yeah.  And now, of course, this is after your job as,

15    I think, you call it mud blogging; is that right?

16    A.    Yeah.  Back in the late '70s I was a mud blogger.

17    Q.    It has to do with sort of oil exploration.

18    A.    It does.  But we use computer equipment to monitor

19    conditions on the oil rigs, partly to figure out what you

20    are drilling through, but also to understand how to drill

21    safely and quickly.

22    Q.    After you wrote, The Complete Idiot's Guide to the

23    Internet, you started a publishing company.

24    A.    I did.

25    Q.    That was Top Floor Publishing; correct?
```

1698

```
 1    A.   Correct.

 2    Q.   Then you built an e-commerce website to sell your

 3    books through, your own website.

 4    A.   I did.

 5    Q.   You worked for a company called DNAML.

 6    A.   Yeah.  I don't think they pronounce it that way, they

 7    spell it out, D-N-A-M-L.

 8    Q.   That was a company building software for publishing

 9    books, e-books.

10    A.   Correct.

11    Q.   And when you worked in that area, that was

12    introducing publishers in New York and London; right?

13    A.   New York, LA, London.

14    Q.   Yes.

15    A.   Uh-huh.

16    Q.   Okay.  Is that -- I am sorry, she doesn't have an

17    "uh-huh."  Is that a yes?

18    A.   Yes.

19    Q.   All right.  Then after that you did LeadNation.

20    A.   That is one of the things I did.  We missed a big

21    step, though.

22    Q.   Understood.  We are going through it.

23    A.   Okay.

24    Q.   LeadNation was creating websites for medical clinics;

25    is that correct?
```

1699

1    A.    Yes.  Yes.

2    Q.    Okay.  You also started a company called BuyBak; is

3    that right?

4    A.    I was sort of the second -- I didn't found it myself,

5    I worked with a close friend who started the company.

6    Q.    Good.  And that was selling used CDs, DVDs, video

7    games, laptops online.

8    A.    Correct.

9    Q.    Okay.

10   A.    Through Amazon.

11   Q.    Through Amazon.  You eventually then started Peter

12   Kent Consulting, which is where you are currently working;

13   correct?

14   A.    Correct.

15   Q.    And one of the reasons you started Peter Kent

16   Consulting is because the companies you worked for started

17   collapsing under you?

18   A.    That is true.  So that was -- I had a dotcom during

19   the internet bubble, and when the bubble burst, the

20   company went with it.

21   Q.    And at Peter Kent Consulting, your role is primarily

22   advising people on how to do business online.

23   A.    Correct.

24   Q.    At one point a few years ago, you actually got into

25   building websites; right?

1700

```
1    A.   I have been involved in building websites one way or

2    another since 19 -- again, late '93, early '94.

3    Q.   And so that is an accurate question -- or that was an

4    accurate statement on my part, and that is a few years

5    ago, you had went in and built websites.

6    A.   I certainly used to build websites.  It has been a

7    while.

8    Q.   To be fair, you don't do that anymore, but instead

9    will help a company to build a website.

10   A.   I am sorry, I didn't understand the question.

11   Q.   Yeah.  You don't actually build the websites anymore,

12   but instead you now help a company find a company to build

13   the website.

14   A.   I will sometimes project manage website building,

15   yes.

16   Q.   Okay.  Now, you said today that you have experience,

17   and I think you're tendered as an expert in social media.

18   A.   Correct.

19   Q.   Fair to say social media is not something you have a

20   focus on.

21   A.   Well, I have spent the last 40 years or so -- well,

22   30 years, since '93, 32 years, involved -- yes, 32,

23   checking my math -- involved in doing business online, and

24   social media is a big part of that.  But certainly it is

25   not -- I am not focused on social media every day,
```

 1    absolutely.  I do pay-per-click advertising, websites,

 2    marketing, websites in various ways.  One way you market a

 3    website is through social media.

 4    Q.    I appreciate that.  And I hope you will excuse me for

 5    interrupting you.  Going back to my question, my question

 6    was simply, you don't focus on social media.

 7    A.    I don't do social media a hundred percent of my time,

 8    no, absolutely not.

 9    Q.    Okay.  Now, to be fair about your expertise, you give

10    a lot of talks, however; right?

11    A.    Yes, I certainly have.

12    Q.    Sure, including the Littleton Optimists Club.  And

13    the title of that talk was, Why You Are Not Finding

14    Business Online and How to Fix It.

15    A.    That sounds right.  That has been a long time.  I

16    don't recall the content of the talk.

17    Q.    Sure.  You gave the same talk to the Castle Rock

18    Kiwanis Club; is that right?

19    A.    I did.  I assume you have it there.  I don't recall.

20    Q.    Okay.  If you don't recall, that is perfectly fine.

21    Okay.  You also gave a talk to the Rockies Venture Club,

22    and that was A Short Account of Successful Fund Raising.

23    A.    So that was when I raised $4 million for a dotcom.

24    It was funded by SoftBank, which at the time was one of

25    the biggest D.C. firms.

1   Q.   Is that a yes, you did give that talk?

2   A.   Yes.

3   Q.   Perfect.  You also gave a talk to the Rocky Mountain

4   Book Show, a panel on Promotions of Books on the Internet;

5   right?

6   A.   Yes.

7   Q.   Okay.  And so according to your website, Mr. Kent,

8   your role is to "help people dig through the garbage and

9   find the information you need," right?

10  A.   Well, I don't know what context that comes from.  I

11  don't recall writing that.  I probably did if you found it

12  there, but what is the context?

13  Q.   Well, that is a fair question.  Your website is

14  www.peterkentconsulting.com.

15  A.   Yes.

16  Q.   And there is a title on peterkentconsulting.com that

17  says "I" -- meaning Peter Kent -- "can help you dig

18  through the garbage and find the information you need."

19  Right?

20  A.   I don't recall.  I don't recall what page that was or

21  what was that promoting.

22  Q.   Okay.  Fair enough.  Your answer is you don't

23  remember; is that right?

24  A.   I don't remember.  It sounds like it is part of a

25  discussion about something, but I don't recall what it is

1    about.

2    Q.    Understood.  And for $350 an hour, a visitor to your

3    website can connect with you; correct?

4    A.    Yes.  So this is a page promoting my consulting

5    services.

6    Q.    Yeah, they can use the GoToMeeting link.

7    A.    If that is on there, that is an old link.  That

8    article has been there for years.  I don't use GoToMeeting

9    anymore.

10   Q.    To be fair, the purpose, though, is where you will

11   walk somebody through their website and point out problems

12   that you see; correct?

13   A.    Yeah.  So I have done over the years -- I have done

14   literally hundreds of these phone-based consulting

15   sessions, where we use a screen -- I was using screen

16   sharing many years ago, so using screen sharing to view

17   their website, view the competitors' website, and we

18   basically discuss how to improve their website, how to

19   improve their marketing.  We discuss things like why their

20   competitors are doing better than them.  SCL issues.  We

21   discuss pay-per-click issues, and so on.

22   Q.    Good.  I appreciate that explanation.  And at the end

23   of that $350 an hour compensation, your assistant will

24   send the individual a PayPal invoice for the session;

25   right?

1704

1  A.   Well, that is how I used to do it when it was

2  written.  That is not how I do it now.

3  Q.   But you agree that's your website as it exists today;

4  right?

5  A.   If you say so.

6  Q.   Okay.  So for $350 an hour.  Now I want to talk for

7  just a moment about what Mr. Lindell agreed to pay you,

8  okay.  So the public will pay you $350 an hour, but

9  Mr. Lindell, on the other hand, you are billing him at 600

10 an hour; correct?

11 A.   I don't think so.  I think it was 550.

12 Q.   Okay.  You would agree with me that what you have in

13 your report would be an accurate number.

14 A.   It certainly should be.  Does it say 600?

15 Q.   Sure.

16 A.   Okay.

17 Q.   Your report says $600 an hour; correct?

18 A.   Yes.

19 Q.   Okay.

20 A.   I mean, if that is what it says, I will take your

21 word for it.  Sure.

22 Q.   Understood.  And so Mr. Lindell has agreed to pay you

23 $250 more an hour than what you advertise on your publicly

24 available website; is that right?

25 A.   Yes.

1705

1   Q.   Okay.  You have also indicated that you have written,

2   did you say 50 books or 60 books?

3   A.   I think it is 60, 65, something like that.

4   Q.   I want to go through those just a little bit.  And if

5   we can pull up that slide, I believe it is the No. 2, the

6   slide that you had shown to the jury of your introduction.

7   Okay.  This is the slide that you showed to the jury

8   regarding your background; right?

9   A.   Yeah.

10  Q.   Okay.  So there are four books listed on the bottom.

11  I assume those are four of the 50 or 60 books you have

12  written.

13  A.   Yes.

14  Q.   All right.  You would agree with me that the first

15  one, which is *The Complete Idiot's Guide to the Internet*,

16  that one, I think we said, was written in 2003 -- or,

17  excuse me, 1993.

18  A.   No, the first edition was '93.

19  Q.   Then you had editions after that.  You updated.

20  A.   There were three editions.

21  Q.   We see *Poor Richard's Web Site*; is that right?

22  A.   Yes.

23  Q.   That one, sir, was written in 2000; correct?

24  A.   No, originally it was written in, I think it was '97,

25  but probably there was another edition, a second edition

1    in 2000, I don't know, somewhere around then.

2    Q.    No problem.  And I appreciate that clarification, I

3    want to be accurate.  You also have *Discover FrontPage*;

4    right?

5    A.    I do.

6    Q.    Okay.  And that one, sir, was written in 1997;

7    correct?

8    A.    That sounds about right.

9    Q.    And then you have *Netscape JavaScript.*  That is the

10   last one we have listed there; correct?

11   A.    Yeah.

12   Q.    That one was written in 1996.

13   A.    I think so.  That sounds right.

14   Q.    Very good.  So let's talk about some of the other

15   books that you have written.  More recently you wrote

16   *Cryptocurrency All-in-One Guide for Dummies*; is that

17   right?

18   A.    So I didn't write the entire book.  Some of my work

19   ended up in that book.

20   Q.    Okay.  You would agree that you have authorship

21   credit on *Cryptocurrency*.

22   A.    I do.

23   Q.    You also wrote *Bitcoin for Dummies*; right?

24   A.    I did.

25   Q.    Also *Cryptocurrency Mining for Dummies*.

```
 1    A.   Correct.

 2    Q.   And Making Money in Technical Writing.

 3    A.   That is an old, old book.

 4    Q.   I understand that.  You also have authorship credit

 5    on Making Money in Technical Writing.

 6    A.   Not just authorship credit, I wrote the book myself.

 7    Q.   Very good.  That is because you have written books on

 8    many different topics.

 9    A.   Correct.

10    Q.   In other words, your expertise is not necessarily

11    social media and internet.

12    A.   Well, I think of myself as a teacher.  Whatever I am

13    doing, I am teaching people, whether I am talking to a

14    jury, whether I am writing books, whether I am working

15    with consulting clients, I'm a teacher.  And much of what

16    I have been teaching over the last, you know, decades,

17    relates to doing business online, and part of that picture

18    is social media.

19    Q.   And that includes How to Make Money Online with eBay,

20    Yahoo!, and Google.  That is also your expertise.

21    A.   That is one of my books.

22    Q.   Okay.  You wrote The Best Sex of Your Life.  That is

23    also a book that you wrote and that is for sale.

24    A.   Yeah.  It is not a hardware manual.

25    Q.   You wrote a book in June of 2020 called Coronavirus
```

1    *and COVID-19:  What It Is, How to Avoid It, How to Survive*

2    *It, COVID-19 Facts*.  That was another one of your books.

3    A.    I should also say, I even have journalism pieces.

4    Again, I am a writer, obviously.  I have -- I am a writer.

5    I have written, as you know, scores of books over 40

6    years.  So when we were all stuck at home and nobody was

7    doing business, I thought, I am going to publish a book

8    through Kindle -- and I don't know, you probably know

9    about Kindle, Amazon's digital book platform.  And so I

10   decided to use my reporting skills to learn how to publish

11   through Kindle.

12   Q.    Fantastic.  Let's go back to my question, though.

13   You wrote a book called *Coronavirus COVID-19:  What It Is,*

14   *How to Avoid It, How to Survive It*; right?

15   A.    Yes.

16   Q.    Okay.  And that book covers in part how kissing

17   camels -- humans kissing camels made people sick in a

18   previous Coronavirus epidemic.

19   A.    It does discuss that story from a few years ago.

20   Q.    Good.  And ultimately Amazon took that book down off

21   of its marketplace; is that correct?

22   A.    Not that I know.  There was an issue.  It took a long

23   time to get published because they were refusing all books

24   about Coronavirus.  I appealed, and they eventually

25   published it.  I am unaware it has been taken down, but it

1   is possible.

2   Q.   But to be clear, I am talking about after it was on

3   Amazon in 2020, Amazon took the book down and you ended up

4   offering to give it away for free; right?

5   A.   No.  No, that is not what happened.  Amazon, they

6   didn't take it down, they wouldn't take it.  Any book

7   about Coronavirus, Amazon was blocking.  And at that point

8   I started just giving it away.  And it wasn't until I

9   appealed -- and, in fact, I emailed certain senior

10  executives at Amazon, and then the next morning the book

11  was posted.  But it wasn't -- you have your chronology

12  mistaken.

13  Q.   I very much appreciate that clarification, I want to

14  make sure we have it right.  So I guess the point of the

15  question is, you ended up giving away your hard copies on

16  your website, offering it for free?

17  A.   Not hard copies, I think I was giving away pdf

18  copies.

19  Q.   Thank you.  So I guess this is all to say that you

20  would agree with me, Mr. Kent, that your expertise is both

21  vast, but it also has limits.

22  A.   Well, I hate to say there are no limits.  I have a

23  broad range of skills, I will accept that.  But, of

24  course, these are things that have occurred over the last

25  almost half century.  I have had plenty of time to do a

1710

1    lot of different things.

2    Q.   Thank you, sir, I appreciate that.  You would agree

3    with me, Mr. Kent, you have never been retained to provide

4    an opinion on liability.

5    A.   No, I am not a liability expert.

6    Q.   You have also never been retained to provide an

7    opinion on damages.

8    A.   Correct.

9    Q.   Okay.  Now, Mr. Kent, you are actually -- you reside

10   here in Denver; right?  You are in Colorado.

11   A.   I am, yes.

12   Q.   You are also familiar with Colorado media, then.

13   A.   Well, to some degree, yes.

14   Q.   Sure.  You are familiar with some Colorado

15   journalists "to some degree," as you say.

16   A.   Yeah, to some degree.

17   Q.   Sure.  Prior to this case, Mr. Kent, you were wholly

18   unfamiliar with the podcast Conservative Daily.

19   A.   That is true.  Prior to this case, yes.

20   Q.   Wholly unfamiliar with anyone named Joe Otto or Joe

21   Oltmann.

22   A.   I did not learn of him until this case.

23   Q.   Absolutely.  You had actually never heard of him

24   until you got retained on this case in May of 2023.

25   A.   Correct.

1711

1    Q.   And so when you say, for example, the reach of Joe

2    Oltmann's statements, or the number of views that this had

3    gotten, you, as a Denver resident, as a Colorado resident,

4    had actually never heard of him until you got hired.

5    A.   So I am not sure I understand the question.  You

6    started off with "reach," and then I didn't -- I was not

7    aware.  It is certainly true I was not aware of him until

8    this, but what does that have to do with the reach of his

9    statements?  I don't understand.

10   Q.   Let me rephrase, and let me see if I can ask that in

11   a way that is a bit clearer.

12        You testified to the jury that Joe Oltmann's story

13   had received millions of views; right?

14   A.   Well, I showed it in my report.  Of course it goes

15   into more detail.  I show how that story spread.  If you

16   want to revisit it, we can go back and I will show you

17   step by step how it spread, several tens of millions.

18        If we say that this story about Dr. Cooper came --

19   Coomer, sorry, came from Joe Oltmann, that story, the

20   kernel of that story spread to tens of millions of people,

21   yes.

22   Q.   Absolutely.  And I am not disputing that, okay, it

23   spread to tens of millions.  My point, though, is despite

24   having spread to tens of millions, you had actually not

25   heard it until you got hired on this case.

1712

1    A.    Yes, that's true.

2    Q.    You were, however, familiar with Mike Lindell, and

3    you were familiar with My Pillow.

4    A.    I was.  But I wasn't familiar with his statements

5    about Dr. Cooper -- Dr. Coomer.

6    Q.    That's okay.  Thank you.  You had seen Mr. Lindell's

7    commercials, for example, about My Pillow.

8    A.    I had.

9    Q.    You had seen Mr. Lindell on television before.

10   A.    Yes.

11   Q.    And fair to say that you, as a Colorado resident,

12   would have described him as a public figure.

13   A.    Yes, I suppose so.

14   Q.    Okay.  So going back to something that you had sort

15   of introduced in response to one of my questions a few

16   minutes ago, the, I guess, scope of your work or the

17   assignment to you was to examine the story about

18   Dr. Coomer, when it began and how it spread.  Am I

19   summarizing that properly?

20   A.    Yes.

21   Q.    Very good.  So you spent time looking at the reach

22   and scope of other people's statements, other than Mike

23   Lindell's.

24   A.    Yes, absolutely.  As I mentioned, I stopped the day

25   before Mr. Lindell made his statement.  By the way, we

1713

```
1    should note that it was Joe Oltmann's story that spread

2    through social media, through various forms of media, to

3    Mr. Lindell.

4    Q.   Absolutely.  And you know you are, of course, hearing

5    this from Mr. Lindell and from his attorneys.

6    A.   Hearing what?

7    Q.   You just commented to the jury about how Mr. Lindell

8    learned about Dr. Coomer.  And I guess I am asking you

9    what the basis of that knowledge is.

10   A.   I don't know how Mr. Lindell originally encountered

11   the story.  However, it is a story that came from Joe

12   Oltmann.

13   Q.   Understood.

14   A.   And spread in the manner I have described in my

15   report.

16   Q.   Yeah.  I very much appreciate that, thank you.

17          So I want to talk a little bit about what

18   Mr. Lindell and his attorneys did not ask you to review,

19   okay.

20   A.   Okay.

21   Q.   You are aware that there are ten defamatory

22   statements that have been alleged by Dr. Coomer.

23   A.   Dr. Coomer is alleging Mr. Lindell made ten

24   statements, is that what you are saying?

25   Q.   Dr. Coomer is the plaintiff, he is my client.
```

1714

1    A.    I get that.

2    Q.    Okay.  And he has alleged that there were ten

3    defamatory statements made by the defendants.  Were you

4    aware of that?

5    A.    I hope you don't mind, I want to clarify.  You said

6    "by the defendants."

7    Q.    That's correct.  There are three defendants.  Did

8    they ask you to examine My Pillow, Frankspeech, and

9    Mr. Lindell?

10   A.    I will answer that question, it is just I think the

11   first time you asked you said ten statements by

12   Mr. Lindell, or maybe I misheard.  But most of the

13   statements weren't from Mr. Lindell, were they --

14   Q.    I completely understand that.  Stay with my question

15   for just a moment, okay.  Did the defendants ask you to

16   examine the ten statements that Dr. Coomer has alleged to

17   be defamatory?

18   A.    No, they didn't, because as I have said right from

19   the start, I was asked to examine this whole process up

20   until May the 8th.

21   Q.    Absolutely.

22   A.    So, yeah, I -- so I stopped before Mr. Lindell said

23   anything.  I don't know if they are defamatory or not, but

24   I stopped before he said a single thing.

25   Q.    Absolutely.  And so they specifically said, we want

1715

1    you to stop on this date, don't look at any of the reach

2    after, I think you said May the 8th; right?

3    A.   Yeah.  After May the 8th, they wanted to examine --

4    again, as I stated earlier, they wanted to examine how the

5    story started, how it spread.  And then when Mr. Lindell

6    starts talking about it, that is a totally different

7    phase, and I was not involved in that phase.

8    Q.   They didn't want you or ask you to look at any of

9    that; correct?

10   A.   Correct.  I mean, Mr. Bania was looking at that.

11   Q.   Well, we are going to get into that a little bit

12   further here.  So I want to make sure, because you and I

13   are having a bit of a back and forth, that you did not --

14   they did not ask you to review or look at the reach of any

15   of the ten defamatory statements.

16   A.   Yeah.  I am sorry, I am not trying to be difficult, I

17   am not trying to go back and forth, but I thought I

18   stated, yes, they asked me to go up to the point at which

19   Mr. Lindell said something, not beyond.

20   Q.   Perfect.  And you said "Mr. Lindell's statements."

21   But as we started to cover, there are three defendants in

22   this case.  Are you aware of that?

23   A.   Yes.

24   Q.   And did they ask you to examine the reach of any of

25   the alleged defamatory statements that were published on

1    Frankspeech, for example?

2    A.   Well, actually I believe there was a statement on May

3    the 3rd, wasn't there, that Mr. Bania -- or the Complaint

4    refers to a statement, not from Mr. Lindell, but from

5    somebody on Frankspeech, I believe, on May the 3rd.  I was

6    not asked to consider that.  So I guess there is a little

7    bit of overlap following up to May 8th.  But I did not

8    look at that May 3rd.  And the other statements, of

9    course, came after, quite some time after May the 9th, so

10   I obviously didn't examine them.

11   Q.   So, in other words, they did not ask you to look at

12   how many people saw Mr. Oltmann speak on Brannon Howse's

13   show.

14   A.   What date was that?

15   Q.   That was May the 3rd.  Did they ask you to look at

16   that?

17   A.   No.  I don't recall looking at the May the 3rd

18   statement.

19   Q.   Did they ask you to look and see how many people saw

20   Ms. Tina Peters speak on frankspeech.com?

21   A.   When was that?

22   Q.   I am going to ask you, did you examine that, and did

23   you examine that reach?

24   A.   Again, I think probably it is after May the 8th.

25   Q.   If it was, the answer would be no, they did not ask

1717

1    you to do that.

2    A.    Correct.

3    Q.    Okay.  Very good.  How about did they ask you to look

4    at Mr. Lindell mentioning Dominion Voting System in

5    November of 2020, December 2020, January 2021?  Did they

6    ask you to look at any of those statements of Mr. Lindell?

7    A.    No.  I am aware Mr. Lindell was making statements

8    about Dominion and various other voting issues.  I was

9    focused, as Mr. Bania was, by the way, I was focused on

10    examining statements that directly related to Dr. Coomer.

11    Q.    Absolutely.  As made by Mr. Lindell, not by anyone

12    else.

13    A.    As made by Mr. Lindell -- no, excuse me, I wasn't

14    examining Mr. Lindell's statements, you recall, because he

15    didn't make any statements in my period of study.

16    Q.    So that also means, because Michael Lindell's Cyber

17    Symposium was after May 8th, when they asked you to stop

18    looking, that you did not examine how many people viewed

19    Mike Lindell's Cyber Symposium videos about Dr. Coomer?

20    A.    Correct.

21    Q.    You were not asked to determine the reach or sale of

22    My Pillow products on any of these platforms when

23    Dr. Coomer was mentioned?

24    A.    No.  No.

25    Q.    You did not examine how many sales My Pillow had

1    using promo codes associated with defaming Dr. Coomer?

2            MR. KACHOUROFF:  Objection, Your Honor.  Can we

3    approach?

4            THE COURT:  You may.

5            (A bench conference is had.)

6            MR. KACHOUROFF:  Apart from the fact that the

7    question was rigged to say "defaming," the probative value

8    of these questions -- I have been letting it go on, I

9    haven't objected, he's testified about a noncontroversial

10   topic about what this period of time was and the numbers.

11   And he's asked him, and it was clear, he wasn't given the

12   assignment for after May 9th, that was Doug Bania.

13           I just don't see the probative value of these

14   continued questions with a witness who is very

15   noncontroversial.  You can see how quickly I went with the

16   witness to get out just the reach for the period of time

17   from November 9th to May 9th.

18           THE COURT:  Mr. Beller.

19           MR. BELLER:  Your Honor, I think it goes directly

20   to the credibility of this witness, and my ability to be

21   able to examine the amount of damage that Mr. Coomer

22   suffered.  There is an implication that somehow Dr. Coomer

23   was already defamed, therefore, there could not be any

24   piling on after that because Dr. Coomer's reputation was

25   already defamed.

1    I think the defendants offered this witness for

2 that reason.  They limited his ability to be able to

3 comment on the defamation or the impact of the defamation,

4 and that is something the jurors should be allowed to

5 consider.

6    THE COURT:  I agree.  Objection overruled.

7    (In the hearing of the jury.)

8 Q.   (BY MR. BELLER)  So, going back to the question that

9 I had asked, and that is the defendants did not ask you to

10 determine how many sales My Pillow made using promo codes

11 associated with the defamatory statements that Dr. Coomer

12 alleges.

13    MR. KACHOUROFF:  Objection to "defamatory

14 statements."

15    THE COURT:  Again, if you are going to make an

16 objection more than a word, you need to approach.  So the

17 objection is as to form.  Overruled.

18 Q.   (BY MR. BELLER)  Associated with the alleged

19 defamatory statements.

20 A.   No.  I think I got that question.  So the answer is

21 no.

22 Q.   Your opinion, Mr. Kent, is based on Mr. Lindell

23 having not discussed Dr. Coomer until 6 months after the

24 rumors about Dr. Coomer started; is that correct?

25 A.   I'm not sure what you mean by it's "based on" that.

1720

```
1    It is my understanding that Mr. Lindell did not make a

2    statement -- I don't believe you guys allege that he made

3    a statement prior to that date, and my report is based on

4    what happened prior to that date.

5    Q.   Absolutely.  I appreciate that.  And so, however, you

6    acknowledge that Mr. Lindell was speaking about Dominion

7    voting in, say, November, December, 2020, January,

8    February, 2021, et cetera.

9    A.   I beg your pardon?  Could you repeat that?

10   Q.   Yes.  That is because it was a poor question.

11   A.   Oh, okay.

12   Q.   You admit that Mr. Lindell was speaking publicly

13   about Dominion Voting Systems in the timeframe in which

14   you were examining the sort of reach of the statements,

15   the 6 months.

16   A.   Yes, I believe he was.  I don't know how often, it is

17   not something I studied.  Both Mr. Bania and I were

18   looking for statements that included Dr. Coomer.

19   Q.   Okay.  And that presumably means that the defendants

20   did not ask you to consider Mr. Lindell's Frankspeech's

21   documentary called *Absolute Proof*.

22   A.   No, that is not part of my report.  I believe I saw

23   it, but it is not -- it wasn't within the purview.

24   Q.   Sure.  And it wasn't in the purview even though

25   Mr. Lindell released that documentary on February the 5th,
```

1721

1    2021.

2    A.    I assume you are asking me a question.  Is that -- I

3    don't know what date it was.  If that is the date, that is

4    the date.

5    Q.    Fair enough.  So if *Absolute Proof* was released by

6    Mr. Lindell on February 5th of 2021, you would agree with

7    me that that was within that 6 month timeframe in which

8    you were asked to examine the reach.

9    A.    Yes, it is within that, but I don't believe he

10    mentioned Dr. Coomer.

11    Q.    Very good.

12         MR. BELLER:  Do we have that?

13         If I may have just a brief moment.

14    Q.    (BY MR. BELLER)  Sir, I am showing you what has

15    already been admitted and shown to the jury, and this is

16    the screen shot mentioning Dr. Coomer in the movie

17    *Absolute Proof.*  Do you see that on your screen?

18    A.    This is -- sorry, this is a screen shot from

19    Mr. Lindell's video?

20    Q.    Yeah.  Excuse me for interrupting you.  This is a

21    screen shot from Mr. Lindell's movie *Absolute Proof.*  Do

22    you see that?

23    A.    I do, yes.

24    Q.    And so my question is, did the defendants ask you to

25    include or to analyze the reach of *Absolute Proof*

1    mentioning Dr. Coomer?

2    A.   They didn't.  But my understanding would be that this

3    probably wasn't regarded as defamation.  In fact, you

4    guys -- right at the beginning of my study, I went to your

5    Complaint, and your Complaint said the first statement

6    from Mr. Lindell was May the 9th, 2021, so --

7    Q.   Absolutely.  And I see Mr. Lindell also nodding along

8    with your testimony.  So let me see if I can't narrow my

9    question just a little bit, and if you can respond to what

10    I am saying, okay.

11          Were you asked to examine the reach of *Absolute*

12    *Proof* that mentions Dr. Coomer?

13    A.   I don't remember ever being told to take a look at

14    this.  This is the first I have seen this.  I am not aware

15    of it.  But, again, I was told to examine allegedly

16    defamatory statements.  So I don't know if this would have

17    been regarded by the attorneys.  It wasn't regarded by you

18    guys, apparently, unless you found it later.  I don't

19    know.

20    Q.   Sure.  And I appreciate you commenting on what was in

21    my mind or what wasn't, but I am going to stick to my

22    questions, okay.  My question to you is, did the

23    defendants ask you to examine the reach?

24    A.   I am sorry --

25    Q.   Yes, or no?

1    A.    I am sorry, I thought I answered that.  I told you

2    they didn't.

3    Q.    Okay.  Very good.  How about asking you to examine

4    the reach -- you mentioned OAN, of OAN having broadcast

5    this film 13 times between May the 5th -- excuse me,

6    February 5th and February the 8th, 2021.  Did they ask you

7    to do that?

8    A.    Well, I mean, it is sort of the same answer.  No,

9    they wouldn't have, because this was the source of this

10   issue, this particular screen shot, and I wasn't asked to

11   look at this.  So, no, they wouldn't have asked me to

12   examine its distribution through OAN.

13   Q.    Understood.  So if we can have your slide -- I

14   believe it was slide 9.  So that has the timeframe that --

15   the timeline you gave to the jury, and if we can have that

16   up, please.

17         And what we have in front of you is slide 3.  And

18   slide 3 is what you showed to the jury on your direct

19   examination; right?

20   A.    Okay.  Yes.

21   Q.    Okay.  Now, this again does not include, for example,

22   as we have already covered, Mr. Lindell talking about

23   Dominion Voting during that timeframe.

24   A.    Correct.

25   Q.    It does not include Mr. Lindell's movie *Absolute*

1724

1    *Proof* in this same timeframe.

2    A.    Correct.

3    Q.    It does not include Mr. Lindell appearing on Rudy

4    Giuliani's podcast during the same timeframe.

5    A.    Did he mention Dr. Coomer or --

6    Q.    Well, to answer your question, he mentioned that the

7    movie *Absolute Proof* had been seen by 100 million people.

8    Did you see that?

9    A.    I don't recall.  If it doesn't include reference to

10   Dr. Coomer -- and I am assuming it is prior to May 9th; is

11   that right?

12   Q.    That is correct.  It is within this timeframe.

13   A.    No, it won't be in my report.

14        MR. KACHOUROFF:  I object to facts not in evidence

15   with respect to him during the Rudy Giuliani podcast.

16        THE COURT:  Overruled.

17   Q.    (BY MR. BELLER)  How about does your timeframe

18   include Mr. Lindell appearing on Mr. Oltmann's podcast on

19   March the 11th, 2021, in which Dr. Coomer is discussed?

20   Is that in your timeframe?

21   A.    Can you repeat the --

22   Q.    Mr. Lindell appearing on Mr. Oltmann's podcast on

23   March the 11th, 2021.

24        MR. KACHOUROFF:  Your Honor, may we approach?

25        THE COURT:  Yes.

1                    (A bench conference is had.)

2          MR. KACHOUROFF:  None of this is relevant.  This

3     has nothing to do with the defamatory statements.  There

4     was actually nothing bad said about Dr. Coomer on this

5     March 11th podcast.

6          MR. BELLER:  I have the title of it, and I would

7     note that both Mr. Lindell and Mr. Oltmann testified about

8     this podcast.

9          MR. KACHOUROFF:  Right.  But hammering him on

10    this -- this isn't part of the defamatory statements.

11         THE COURT:  I know, but he has been -- he has been

12    proffered as an expert in reach, and I think that --

13         MR. KACHOUROFF:  The limited scope of.

14         THE COURT:  -- the plaintiffs have the right to

15    cross-examine him on what his conclusions are and are not,

16    and how they may or may not rebut what Mr. Bania testified

17    to.  So I think that is what he is doing.

18         I am going to ask you, Mr. Beller, how much longer

19    do you think you have?

20         MR. BELLER:  I think I will be less than 10

21    minutes.

22         THE COURT:  All right.

23         (In the hearing of the jury.)

24    Q.   (BY MR. BELLER)  So my question for you, Mr. Kent, is

25    that Mr. Lindell appearing on Mr. Oltmann's March 11,

1726

```
 1    2021, podcast, is also not in this

 2    what-happened-in-6-months slide.

 3    A.    Correct.

 4    Q.    Did the defendants ask you to analyze My Pillow promo

 5    code CD21 that was run during Mr. Oltmann's podcast?

 6    A.    No.  I didn't do any analysis of pillow codes.

 7    Q.    Now, you testified, of course, that your analysis

 8    ended on May the 8th of 2021.  But to be fair, you did

 9    look at some Twitter data that went through June the 30th

10    of 2021; right?

11    A.    If I did, I don't recall.  Maybe you can point me to

12    it.

13    Q.    I am happy to.  Do you have your report in front of

14    you?

15    A.    I do.

16    Q.    Turn to page 19, paragraph 54.  Let me know when you

17    get there.

18    A.    Yes, I am there.

19    Q.    Okay.  And so you would agree with me that the

20    information that you reviewed included looking at Twitter

21    data through June the 30th of 2021.

22    A.    Hang on.  Can I just read this?

23    Q.    If you can read it to yourself, please, report page

24    19, paragraph 54.

25    A.    Yeah --
```

1   Q.   There is not a question.  I asked you to simply

2   review that.

3   A.   Okay, I have reviewed it.

4   Q.   Okay, thank you.  So going back to my question,

5   though, some of the data that you looked at, specifically

6   on Twitter, went through a time period of June the 30th of

7   2021; fair?

8   A.   I think that's a little misleading.  I am quoting

9   Mr. Bania saying he had data through that date, so I am

10  quoting Mr. Bania.

11  Q.   Absolutely.

12  A.   I am referring to the citation he used.  And some of

13  that data started in November and, yes, it overlapped into

14  June of the following year, but this isn't my citation, it

15  is not something I found, it is something Mr. Bania found.

16  Q.   To be fair, to quote you specifically, you say, "In

17  addition, I" -- meaning Peter Kent -- "was able to verify

18  that between November 8, 2020, and June 30, 2021, more

19  than a thousand unique accounts on Twitter."  That is your

20  statement.

21  A.   That is within the quotation marks.

22  Q.   Yes.  And you had the underlying data; right?

23  A.   I did have, because Mr. Bania -- Mr. Bania cited to

24  this document.

25  Q.   Absolutely.

1    A.    And I have in this paragraph his description of the

2    document.  And, yes, I was able to see the document, yes.

3    Q.    Excellent.  So you had access to and reviewed data.

4    A.    Well, of course I had access to data.  I am not sure

5    what you mean.

6    Q.    Perfect.  All I am getting at is you had access to it

7    and reviewed it.

8    A.    Okay.

9    Q.    You also testified that you considered sources such

10   as NPR, National Public Radio.

11   A.    I did at least once, yes.

12   Q.    And you knew that Dr. Coomer was -- had to go into

13   hiding following sort of this public interest in him and

14   his life; right?

15   A.    Yes.  That is what NPR reported.  I believe The New

16   York Times may have reported it, as well, per the others.

17   Q.    And the Twitter data that goes through June 30th,

18   2021, there were more than a thousand unique accounts on

19   Twitter in regards to Dr. Coomer that used the terms

20   "kill," "die," "shoot," "treason," "hang," "traitor,"

21   "arrest" and/or "attack," right?

22   A.    Yes.

23   Q.    And, of course, those thousand unique accounts that

24   reference "kill," "die," "shoot," "treason," "hang,"

25   "traitor," "arrest," and "attack," that was just on

1   Twitter.

2   A.    That was just Twitter.  And that is starting November

3   the 8th.

4   Q.    Absolutely.  That is starting November 8th and going

5   through June 30th, 2021.

6   A.    I believe it peaked within my study period.

7   Q.    Yeah.  And that also not just includes the time

8   period that you covered, that also includes the time

9   period in which Mr. Lindell called for Dr. Coomer's --

10  called Dr. Coomer "treasonist" and a "traitor."

11  A.    I hate to give a simple answer because it is so

12  misleading.  Yes, you are right, it does include that time

13  period, but it started in November and it peaked.  I can't

14  remember when Mr. Bania said it peaked, but it peaked

15  before Mr. Lindell said anything, and it was dying off at

16  the point Mr. Lindell said something.  So I don't want to

17  -- a simple yes or no answer really paints a misleading

18  picture.

19  Q.    I am absolutely not trying to be misleading, which is

20  why I am letting you answer completely.

21  A.    Thank you.

22  Q.    My question, however, was simple.  The 1,000 Twitter

23  posts -- Twitter accounts, excuse me, individual Twitter

24  accounts covered the time period in which you talk about

25  the reach of the defamatory statements and Mr. Lindell's

1    comment, first comments about Dr. Coomer.

2    A.   It does, with the caveat of what I said in the

3    previous answer.  But, yes, you are correct.

4    Q.   Absolutely.  And, again, you say that on May 3rd,

5    2021, Frankspeech hosted Mr. Oltmann on the Brannon Howse

6    show discussing Dr. Coomer.

7    A.   I beg your pardon?  Were you looking at my report

8    still?  Where?

9    Q.   This is Exhibit 179, in your outline.  You can go to

10   page 41, May 3, 2021.

11   A.   I beg your pardon, what was the date again?

12   Q.   May 3, 2021, page 41 of your report.

13   A.   Brannon Howse?

14   Q.   That's correct.

15   A.   Yes, I see it.

16   Q.   Perfect.

17        MR. BELLER:  If we can pull up that slide again,

18   please.  If we can pull up the timeline slide that

19   Mr. Kent is covering.

20        THE WITNESS:  So, there is --

21   Q.   (BY MR. BELLER)  There is not a question on the

22   table, and we have to follow rules.

23   A.   I beg your pardon.

24   Q.   Fair to say that even though Frankspeech, hosting

25   Mr. Oltmann on the Brannon Howse show discussing

1731

1   Mr. Coomer, is in your report, it is not on the timeline

2   that you showed to the jury.

3   A.   That's correct.  And this is the May 3 post we

4   actually discussed a little while ago, and I totally

5   forgot it is in my report.  I wrote this 2 years ago, so I

6   don't remember the details.  But I said at the time I

7   didn't cover that, but evidently I did.

8   Q.   Totally understood.  You agree with me that there

9   have been over 31 million viewers that have seen negative

10   or allegedly defamatory statements or stories about

11   Dr. Coomer.

12   A.   Sorry, where are you getting this number, 31 million?

13   Q.   I am getting it from your words.  These are your

14   words.  If I can turn you to page 42 of your report,

15   paragraph 89, sir.

16   A.   You are looking -- paragraph 89, that refers to --

17   could you repeat the question?  I am sorry, I want to make

18   sure I am answering the correct thing.

19   Q.   According to you and the extrapolation method you

20   described to the jury, there were more than 31 million

21   viewers having seen negative stories about Dr. Coomer.

22   A.   Well, that number only applies to Tweets, so actually

23   the number is far greater.

24   Q.   And that is because it is a relatively conservative

25   number; meaning 31 million viewers having seen stories

1    about Dr. Coomer.

2    A.   Well, no, it is because you are pulling that out from

3    Tweets.  That is only one part of that six-bullet list.

4    Q.   Yes.  That is a conservative number of people,

5    conservative, who have viewed -- and we will use Tweets --

6    about Dr. Coomer.

7    A.   Yes.  Now, if we use some Tweets, I think that gets

8    us closer to it.

9    Q.   Well, if 18 million people write Tweets about

10   Dr. Coomer -- and I will refer you to your report, page

11   44, paragraph 93.

12   A.   What was your question again?

13   Q.   Eighteen million Tweets is what you have cited.

14   A.   Paragraph, did you say 93?

15   Q.   Page 44, sir, paragraph 93, of your report.

16   A.   93.  Let me just read it.  Yes.  So in that paragraph

17   I assumed 18 million people -- 18 million views.

18   Q.   So, yes is the answer.

19   A.   I hate to do this, but can you repeat the question so

20   I make sure I am answering the right thing.

21   Q.   There were 18 million people who viewed Tweets about

22   Dr. Coomer.

23   A.   Well, that's 18 million according to SMI Aware data.

24   So that is the company I mentioned earlier on that the

25   attorneys had hired an outside company to do some

1733

1    analysis.  We found different sets of data.  I don't think

2    they found everything.  I found different numbers from

3    their numbers.

4        But this particular paragraph refers to the

5    SMI Aware numbers, that would represent 18 million.

6    Q.   Yeah, I appreciate that.  So fair to say it is a lot

7    of people, millions and millions of people.

8    A.   I believe so, yes.

9    Q.   So let's sort of finish up here, Mr. Kent.  You would

10   agree with me that a social media post can be re-posted.

11   A.   Yes.

12   Q.   And the repost can be reposted.

13   A.   Correct.  That is one of the problems Mr. Bania

14   discussed yesterday, it's next to impossible to know how

15   far everything went.

16   Q.   And that is because it can go, presumably, you know,

17   several, several times more than just the original post.

18   A.   Yes.

19   Q.   Sort of like a ripple effect; right?

20   A.   Correct.

21   Q.   You would also agree with me that the very nature of

22   social media is that most readers or viewers of a post

23   read it or view it within hours, maybe a day, of the

24   original posting date.

25   A.   Yes, that's true.

1734

```
 1    Q.   Social media platforms place posts in a user's feed

 2    in a chronological basis, meaning in time.

 3    A.   That is right.  And I discussed this issue in my

 4    report.  I make the point that after a little while, views

 5    are going to drop off dramatically after they occur, or

 6    soon after.

 7    Q.   Sure.  And so once they drop off, they are really no

 8    longer displayed in somebody's feed unless somebody seeks

 9    them out; right?

10    A.   Well, they will be in the feed, but they will be deep

11    down.

12    Q.   It won't be at the top where everybody can easily see

13    it by scrolling by.

14    A.   Correct.

15    Q.   You would agree that within the social media world,

16    sort of yesterday's post is yesterday's news.

17    A.   I am not sure -- that is a very, very general

18    statement that I hate to sign up for without knowing what

19    it means.

20    Q.   That's okay.  There can be renewed interest in posts

21    if somebody continues to repost it.

22    A.   Yes.  If it is getting re-posted, it goes to the top

23    of somebody's feed that it is being re-posted to.

24    Q.   It puts an old story back into the public's eye.

25    A.   Yes.
```

1    Q.    And so even if there was a story, hypothetically,

2    that was in November of 2020, and posted by Eric Trump in

3    January of 2021, if somebody makes new statements or new

4    posts in May, it creates new interest.

5    A.    I think that was -- your flow was a bit disjointed.

6    You said if Eric Trump created this post, then somebody

7    else posts something later, what is the connection between

8    the two?  What makes it -- are you saying Eric Trump's

9    Tweet will then appear more often?

10    Q.    No, not at all.

11    A.    Then I don't know what you are asking, sorry.

12    Q.    That is because it was a terrible question, so let me

13    try again, okay.

14          If there is a story that is generated in November

15    of 2020, and then somebody posts about it in, say, January

16    of '21, that will put the story at the top of the feed

17    again; right?

18    A.    The new post will be at the top of the feed.  But

19    what does it have to do with the old post?  I am not sure

20    what you are suggesting about the old post.

21    Q.    If there is a post in February of 2021, suddenly the

22    story or that post is at the top of everybody's feed

23    again; correct?

24    A.    The new post is at the top of everybody's feed, or

25    whoever is following the person, but the old post is still

1736

 1   buried below.

 2   Q.   Sure.  And the same is true if somebody posts in,

 3   say, May of '21, suddenly it is back in the top of

 4   everybody's feed.

 5   A.   Well, okay.  What you do mean by "it"?

 6   Q.   Any post, any statement.  If somebody posts, it will

 7   be at the top of a feed.

 8   A.   Yes, I get that.  But you are somehow -- I don't want

 9   to be led down the wrong path here, because you are saying

10   somebody posted something in the past, now somebody posts

11   something today, it is now back at the top.  If you are

12   talking about the previous post, no.  If you are talking

13   about the new post, sure.  If you post it, that goes to

14   the top.

15   Q.   Let me be far more specific.  If somebody were to

16   create a story or post about Dr. Coomer in November of

17   2020, in November of 2020 it will be at the top of

18   everybody's feed.

19   A.   Okay.

20   Q.   Is that a yes?

21   A.   Yes.  I am with you so far.

22   Q.   And if somebody creates a post and posts in January

23   of 2021, then that a story about Dr. Coomer will then be

24   at the top of everybody's feed in January of 2021.

25   A.   Yes.  But these are two unrelated occurrences.

1    Q.   I didn't ask you if they were related or unrelated.

2    I asked if somebody makes a post in January of 2021, will

3    it be at the top of a feed in January of '21?

4    A.   Well, that wasn't quite what you asked me, because

5    you started by saying, somebody posted in, when was it,

6    November.  So you are linking the two in your question.

7    Q.   I am not linking the two.  Stick with me question by

8    question.

9         If somebody makes a post in January of 2021 about

10   Dr. Coomer, will that story about Dr. Coomer be at the top

11   of a feed in January of 2021?

12   A.   It will.  It will go to the top of the followers'

13   feeds.

14   Q.   The same would be true in May of '21.

15   A.   Well, anytime.

16   Q.   Anytime.  The same would be true in August of 2021.

17   A.   Anytime one posts, one's followers, they don't

18   necessarily see it, but it goes to the top of the

19   followers' post feeds.

20   Q.   If somebody were posting about Dr. Coomer as recently

21   as, say, last week, it would be at the top of everybody's

22   feed, even last week; right?

23   A.   Well, I want to make sure -- we are using the term

24   "everybody."  It will be at the top -- I have to be more

25   specific in my answer.  It would be at the top of the

1   followers'.  If I have 10 followers, it will go to the top

2   of their feed, if they are awake that time of day and if

3   they might see it.

4   Q.   Sure.  And so sticking with that analogy, and this

5   will be my last question, if Mr. Lindell has millions of

6   followers and posts about Dr. Coomer, then it would be at

7   the top of the feed of the millions of people following

8   him.

9   A.   Yes, that's correct.

10          MR. BELLER:  Thank you.

11          Thank you, Your Honor.

12          THE COURT:  Any redirect, and briefly?

13          MR. KACHOUROFF:  Yes.

14                    **REDIRECT EXAMINATION**

15   **BY MR. KACHOUROFF:**

16   Q.   Mr. Lindell doesn't have a Twitter account, do you

17   know that?

18   A.   I did not know that.

19          MR. KACHOUROFF:  Nothing further, Your Honor.

20          THE WITNESS:  That was it?

21          THE COURT:  Mr. Kent, you may step down.

22          THE WITNESS:  Thank you.

23          THE COURT:  All right.  We are almost to 5 o'clock,

24   but let me just be sure, does the defense have any

25   additional witnesses to call tomorrow?

1739

```
1           MR. KACHOUROFF:  One moment, Your Honor.

2           MR. DUANE:  May we approach?

3           THE COURT:  You may.

4           (A bench conference is had.)

5           MR. DUANE:  Your Honor, we are contemplating the

6    possibility of asking for permission to recall the

7    plaintiff -- I am sorry, the defendant, Mr. Lindell, for a

8    few quick questions about things that have come up during

9    the trial and since his testimony.  He has expressed a

10   desire to do that, but we haven't consulted him about

11   that.

12          With your permission, we would like to have the

13   evening to meet with him, to consult with him about it,

14   make a decision, and let you know in the morning what it

15   might be.  If you give us that opportunity, there is a

16   better chance I think we can limit his testimony and make

17   it shorter than it otherwise might be.

18          THE COURT:  So what areas does he feel like he

19   needs to address that he did not have an opportunity to

20   address?

21          MR. DUANE:  I can't be specific, I haven't

22   consulted with him about it.  He communicated to us during

23   the testimony of the last couple of witnesses he would

24   like to be heard on some of the topics that have come up

25   during his testimony.
```

 1          THE COURT:  The last couple of witnesses have been

 2     experts, so how is his testimony going to address what the

 3     expert opinions are, based on the record before the

 4     experts already?

 5          MR. DUANE:  Well, to be more precise, when I said,

 6     "the last couple of witness" it might have been more

 7     accurate to say "the last several."

 8          THE COURT:  With respect to the experts, how is he

 9     prepared to present any evidence that would be relevant to

10     expert opinions that have already been propounded based on

11     the evidence before them?

12          MR. DUANE:  I am sure he has no desire to offer

13     anything that would contradict or to argue with their

14     opinions, but I think he wants to offer testimony that

15     might relate to some of the assumptions upon which their

16     opinions were based.

17          THE COURT:  All right.  Mr. Beller or Ms. Morgan.

18          MR. BELLER:  Your Honor, certainly we would object.

19     Mr. Lindell, of course, is not an expert.  The experts had

20     to have been disclosed before.  And I don't believe there

21     is a basis for any evidence in front of the jury that

22     would allow Mr. Lindell to be able to testify again.

23          Your Honor, if I may also add that he was, in fact,

24     allowed to delay his testimony to prepare, number one.

25     And, number two, he was allowed to testify in between

1    witnesses, lay witnesses, and ultimately the only

2    witnesses that have testified since he got off the stand

3    were, in fact, two experts.

4          THE COURT:  Counsel, I mean, you can consult with

5    him and make the record tomorrow morning, but I just don't

6    see how he has any evidence that could be rebuttal

7    evidence with respect to the witnesses that have gone on

8    before him and after him.

9          MR. DUANE:  Thank you.  Your willingness to give us

10   that courtesy is very much appreciated.

11         THE COURT:  All right.  We will take it up at 8:30

12   tomorrow morning, but I expect that we are going to

13   closings and argument.

14         MR. DUANE:  Thank you.

15         THE COURT:  All right.  Ladies and gentlemen of the

16   jury, you are released for the day.  Do not speak to each

17   other about this case or anyone else.  Have a very good

18   evening.  Do not talk to the media, do not approach the

19   media, do not do any research.  We will see you back here

20   at 8:45 tomorrow morning.  Have a good evening.  Thank

21   you.

22         (Outside the presence of the jury.)

23         THE COURT:  Thank you.  Please be seated.

24         All right.  With respect to the issue I spoke to

25   counsel about at side bar, to the extent that the

1   determination is that you would like to recall the witness

2   that we discussed, a proffer of the scope of the testimony

3   must be made in conjunction with that so that I can

4   appropriately evaluate whether or not it is appropriate

5   testimony.

6          All right.  Anything else that we need to address

7   tonight or tomorrow morning?

8          MR. CAIN:  I think we can discuss it internally.

9          THE COURT:  Anything on behalf of the defendants?

10          MR. KACHOUROFF:  Not at this time, Your Honor.

11          THE COURT:  Thank you very much.  We will see you

12   in the morning.

13          (Proceedings conclude at 5:00 p.m.)

14          **R E P O R T E R ' S   C E R T I F I C A T E**

15          I, Darlene M. Martinez, Official Certified

16   Shorthand Reporter for the United States District Court,

17   District of Colorado, do hereby certify that the foregoing

18   is a true and accurate transcript of the proceedings had

19   as taken stenographically by me at the time and place

20   aforementioned.

21          Dated this 3rd day of August, 2025.

22

23          _____

24          s/Darlene M. Martinez,

25          RMR, CRR