```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 22-cv-01129

 4   ERIC COOMER,

 5          Plaintiff,

 6          vs.

 7   MICHAEL J. LINDELL, et al.,

 8          Defendants.

 9   -----------------------------------------------------------

10                       REPORTER'S TRANSCRIPT

11                      Jury Trial, Vol. VI

12   -----------------------------------------------------------

13          Proceedings before the HONORABLE NINA Y. WANG, District
     Judge, United States District Court for the District of
14   Colorado, commencing on the 9th day of June, 2025, in Courtroom
     A902, United States Courthouse, Denver, Colorado.
15                       APPEARANCES
     For the Plaintiff:
16   CHARLES CAIN, BRADLEY KLOEWER and ASHLEY MORGAN, Cain &
     Skarnulis PLLC, P. O. Box 1064, Salida, Colorado 81201
17
     DAVID BELLER, Recht & Kornfeld, P.C., 1600 Stout Street, Suite
18   1400, Denver, Colorado 80202

19   For the Defendants:
     CHRISTOPHER KACHOUROFF, Dominion Law Center PC, 13649 Office
20   Place, Suite 101, Woodbridge, Virginia 22192

21   JAMES DUANE, Regent University School of Law, 1000 Regent
     University Drive, Robertson Hall Room 353B, Virginia Beach,
22   Virginia 23464

23   JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite 610,
     Grafton, Wisconsin 53024

24

25   Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street,
     Denver, CO 80294, (303)335-2105
```

                22-cv-01129   Jury Trial   June 9, 2025

```
 1              P R O C E E D I N G S

 2      (Proceedings commenced at 9:03 a.m.)

 3              THE COURT:  We are on the record in 21-cv-01129.

 4              Could I have appearances of counsel.

 5              MR. CAIN:  Good morning, your Honor.  Charlie Cain for

 6      the Plaintiffs, Brad Kloewer, Eric Coomer, David Beller, Ashley

 7      Morgan.

 8              MR. KACHOUROFF:  Good morning, your Honor.  Chris

 9      Kachouroff, James Duane and Jennifer DeMaster.

10              THE COURT:  Good morning.  We are here on day six of

11      our trial.  My understanding is there is at least one

12      logistical issue.  Mr. Howse is not appearing live, is that

13      correct, and we will need the deposition.

14              MR. KACHOUROFF:  That's correct, your Honor.

15              THE COURT:  Just for my purposes, because I need to

16      make deposition rulings, do you have a sense of where he may be

17      in the lineup?

18              MR. CAIN:  We have a lineup.

19              THE COURT:  Tomorrow?

20              MR. CAIN:  Tomorrow.

21              THE COURT:  I'll get you those lists just as soon as I

22      can.

23              MR. KACHOUROFF:  Your Honor, we would have some

24      objections to the designations and also withdraw some of our

25      objections to the testimony.
```

22-cv-01129   Jury Trial   June 9, 2025

1          THE COURT:  Are you ready to address those now,

2     Mr. Kachouroff or Ms. DeMaster?

3          MR. KACHOUROFF:  Judge, if we can do it before

4     lunchtime.

5          THE COURT:  Well, again, I need these as soon as

6     possible, because to the extent I need to make ruling, as much

7     as the technical aspect, I need to get those to the parties so

8     they can prepare the video.  So do you think we can talk about

9     that during our morning break?

10         MR. CAIN:  I think so.  Yes, your Honor.

11         THE COURT:  Are we ready for the jury?

12         MR. CAIN:  We are.

13         MR. KACHOUROFF:  We are, your Honor.

14         THE COURT:  Madam Deputy.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

                          Lindell - Direct

 1        (In open court; jury present)

 2            THE COURT:  Good morning, ladies and gentlemen of the

 3   jury.  I hope you all had a pleasant weekend.

 4            Mr. Cain.

 5            MR. CAIN:  Plaintiffs call Mike Lindell.

 6            THE COURT:  Mr. Lindell, if you could stand up here.

 7   MICHAEL LINDELL,

 8        called as a witness by the Plaintiff,

 9        having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. CAIN:

12   Q.  Good morning, Mr. Lindell.

13   A.  Good morning.

14   Q.  Mr. Lindell, you take no responsibility for what you have

15   done to Dr. Coomer's life, do you?

16   A.  No, I didn't do anything to Mr. Coomer.

17   Q.  You're going to need to speak up.

18   A.  No, I did not do anything that I know to Mr. Coomer.

19   Q.  So you take no responsibility for what you have done?

20   A.  No.

21   Q.  Okay.  And you told us at one point, in one of the videos,

22   that you stand by your words that you have stated against

23   Dr. Coomer, stand by your words.

24            Do you remember saying that?

25   A.  I would have to see it, but --


                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

                                                            839
                        Lindell - Direct

 1              MR. CAIN:  Let's look at Exhibit 224.

 2         (Media played)

 3              MR. DUANE:  Judge.

 4              THE COURT:  Is that an objection?

 5              MR. DUANE:  Yes.

 6              THE COURT:  Can you approach, please.

 7         (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindell - Direct

1          (At sidebar)

2              MR. DUANE:  Good morning, your Honor.  He was about to

3      make a reference in the video to the charge presented in this

4      case.  We object to the video being played to the jury because

5      of the obvious risk of unfair prejudice.

6              THE COURT:  I'm sorry, that objection wasn't

7      preserved.  Overruled.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindell - Direct

1        (In open court; jury present)

2    BY MR. CAIN:

3    Q.  So sir, that was Exhibit 224.  It was a statement you made

4    on March the 10th of 2023.  And then the chart that I showed to

5    the jury very quickly in my opening, that was the tenth

6    statement that we have identified in this case.

7        So in March of 2023, you stood by your words calling

8    Dr. Coomer a criminal; right?

9    A.  Yes.  Can I explain?

10   Q.  No.

11       Here is how this works, I ask a question, you answer

12   my direct question, your counsel will have an opportunity,

13   okay.

14   A.  Yes.

15   Q.  To go second.

16       Now, that was 2023.  You obviously sat through this

17   trial now for a week, and you still stand by your words, that

18   Dr. Coomer is a criminal?

19   A.  Yes.  May I explain.

20   Q.  I'll give you an opportunity.  I think we're actually going

21   to touch on what I think you want to explain, okay.

22       For now, question and answer, okay?

23   A.  Yes.

24   Q.  All right.  And since you don't take responsibility for

25   calling Dr. Coomer a criminal, you take no responsibility as

Lindell - Direct

1    well for the other statements, including associating Dr. Coomer

2    with being a traitor to the United States of America, you take

3    no responsibility for that either, do you?

4    A.  Yes.  Can I explain?

5    Q.  We'll get to it.

6              I'll take that as a yes, you do not take

7    responsibility.

8              And you know that the statements that you have made

9    about Dr. Coomer have been broadcast throughout this country?

10   A.  Yes.

11   Q.  Let's do this.  Let's start from the beginning, and then

12   maybe we'll get to your explanation.

13             In the beginning of your company, I believe that was

14   around 2004, it was before My Pillow was actually My Pillow,

15   you started inventing products such as what we know now was the

16   product My Pillow?

17   A.  Yes.

18   Q.  And then, around 2009 or 2010, you became what's called the

19   Chief Executive Officer of My Pillow; right?

20   A.  That's not correct.

21   Q.  Okay.  Correct me, please.  You can explain that.

22   A.  I quit crack cocaine on January 16th, 2009, and then we

23   formed My Pillow Inc.  And I believe I became CEO in December

24   of 2011.

25   Q.  And since December of 2011, you have been the CEO of My

Lindell - Direct

1    Pillow?

2    A.  Yes.

3    Q.  And My Pillow has a board of directors?

4    A.  Yes.

5    Q.  And they sort of oversee the overall governance of the

6    company?

7    A.  Yes.

8    Q.  And you are chairman of that board?

9    A.  I have been, yes.

10   Q.  Okay.

11   A.  There's been others.

12   Q.  And My Pillow issues stock to its shareholders; right?

13   A.  We're an employee-owned company, so yes, a lot of the

14   employees have stock, that's correct.

15   Q.  And in terms of employees, the CEO, you, own a controlling

16   interest in My Pillow?

17   A.  I have a little over 50 percent, correct.

18   Q.  So you have ultimate control over My Pillow, do you not,

19   the CEO, controlling shareholder, the board of directors?

20   A.  Board of directors has quite a bit of control too.

21   There's -- I guess it would be a -- I'd have to explain.  I

22   mean.  It would take a while to say who has control of what,

23   but I have a lot of control, yes.

24   Q.  The board can't fire you?

25   A.  No.

Lindell - Direct

1    Q.   Now, I think most people here intuitively know that My

2    Pillow has had a significant media presence throughout the

3    United States.

4    A.   Yes.  My Pillow has ran commercials since 2011, probably

5    more than any other company.

6    Q.   And I took your deposition in Minnesota in, I think, 2023,

7    March of 2023.

8         Do you remember that?

9    A.   Yes.

10   Q.   And at the time, you had indicated that My Pillow had ads

11   in over 3,000 stations, newspapers and podcasts across the

12   country; is that right?

13   A.   I -- I believe that I knew in 2016 we had already been on

14   commercials like millions of times.

15   Q.   You personally, you told me, by -- I think it was 2016, you

16   personally had been on over 3 million commercials?

17   A.   That's correct.  That they have aired that many times,

18   right.

19   Q.   And My Pillow was the number one advertiser on publications

20   like the New York Times and on television, Fox News, CNN, et

21   cetera?

22   A.   Yeah, we were one of the most successful advertisers, I

23   believe, on most of those platforms.

24   Q.   And it's fair to say, you have a number of contacts within

25   the media?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Direct

1    A.   Yes.

2    Q.   And I saw you were on your phone before we started, you

3    could literally pick up your phone and text the CEO of Newsmax,

4    Chris Ruddy, if you wanted to?

5    A.   Correct.

6    Q.   In fact, we may look at them.  We have some of those texts.

7    A.   Yes.

8    Q.   All right.  Now, speaking of Newsmax and Mr. Ruddy --

9          MR. CAIN:  Hank, let's look at -- well, before we do

10   this.

11   Q.   You were aware that Newsmax had issued a retraction about

12   Dr. Coomer in May of 2021; right?

13   A.   No.

14   Q.   You didn't see it?

15   A.   Not at that time, no.

16   Q.   You heard about it?

17   A.   No -- let me -- I don't know the conversation.  If Chris

18   Ruddy had told me that or not, I would have to look, you would

19   have to show me.  It was a long time ago.

20         MR. CAIN:  Let's look at the video and see if that

21   helps.  That's Exhibit 184.  It's in evidence.

22      (Media played)

23   BY MR. CAIN:

24   Q.   That's not the fist time you have seen this; right?

25   A.   No, that's the first time I've seen that.

Lindell - Direct

 1    Q.  This is the first time you have seen that is right here at

 2    trial?

 3    A.  Yes, sir.

 4    Q.  What caused you to have a conversation with Chris Ruddy

 5    around the time that this video initially aired?

 6    A.  I heard it somewhere that Newsmax made a deal that said

 7    Dominion Voting Systems or one of their executives or -- not

 8    sure where I heard it from.  And then I called up Chris Ruddy.

 9    And that's when I found out.  Most of the stuff was from Chris

10    Ruddy directly.

11    Q.  So you have someone telling you that this had run on

12    Newsmax?

13    A.  No, that's not true.  They didn't say that this ran on

14    Newsmax.  This was national news that just came out on papers

15    and everything.  Newsmax settled their lawfare.

16    Q.  Suffice it to say, you had never heard of Dr. Eric Coomer

17    when you picked up the phone to call Chris Ruddy, had you?

18    A.  No.  I did not know who he was or anything about him.

19    Q.  In fact, when you saw or had this discussion with

20    Mr. Ruddy, you said, quote, who the heck is that, referring to

21    Mr. Coomer.

22         Does that sound right?

23    A.  On the phone with him?

24    Q.  Yes, sir.

25    A.  I don't recall that.  I probably asked him who is this or

                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Direct

1    what -- we didn't focus on that.  We focused on Dominion, and

2    he combined them both on the phone.

3    Q.  And by "he combined them both," meaning he combined

4    Dominion and Dr. Coomer?

5    A.  Yeah, Chris Ruddy.

6    Q.  So you found out about Dr. Coomer on that call?

7    A.  The name, yes.

8    Q.  And you found out that Dr. Coomer was associated with

9    Dominion Voting Systems on that call; correct?

10   A.  Yes.

11   Q.  And then you went out and made a statement, which is

12   Exhibit 185, about Dr. Coomer around the next day?

13   A.  Yes.

14   Q.  Okay.

15   A.  Can I -- and may I explain.

16   Q.  We'll talk about it.  You answered my question.

17           So prior to making the statement and having the

18   discussion with Chris Ruddy, you didn't do any investigation to

19   find out who this gentleman is that's sitting here?

20   A.  I was told what he was, yes.

21   Q.  By whom?

22   A.  Chris Ruddy.

23   Q.  Okay.  We covered that.

24   A.  Yes.

25   Q.  Well, that wasn't quite my question, sir.  Let me recast

Lindell - Direct

1   it.

2           You got the information from Chris Ruddy.  By the way,

3   how long was that discussion?

4   A.  I don't recall.  Five minutes, it could have been longer

5   because we were really discussing something very important.

6   Q.  So you have a five-minute call, you didn't then check into

7   who Dr. Coomer was, and then you went out and made a statement

8   about him?

9   A.  You know, I don't recall what I did after that.  I only

10  know what was told to me on the phone call.  And I can explain

11  if you want me to.

12  Q.  Well, now is your chance to tell the jury if you did any

13  investigation about him before you made your first statement,

14  other than this discussion with Chris Ruddy, tell them what you

15  did.

16  A.  I don't recall.  From the time of that phone call to the

17  time I made those statements what all happened.  I would have

18  to look back and check.

19  Q.  You do remember being very upset with Dr. Coomer?

20  A.  Very upset.

21  Q.  So that gets us to 185.  You had issued a statement,

22  it's -- I say issued a statement -- you made a statement.  And

23  we'll look at the stipulation that is associated with it, but

24  I'll read the first part of the stipulation, stipulation 28.

25          On May 9 of 2021, Lindell appeared in an interview

Lindell - Direct

1    that aired on Frankspeech.  And then it goes on to list the

2    statement.

3              MR. CAIN:  Let's watch the statement.

4        (Media played)

5              MR. CAIN:  Hank, put up that stipulation, the text of

6    it, if you could for the jury.

7    BY MR. CAIN:

8    Q.  What we know from this, Mr. Lindell, is you referred to

9    Dominion Voting Systems and Smartmatic at the beginning of your

10   statement; right?

11             MR. CAIN:  Why don't you highlight that for us, Hank.

12   Q.  And the jury hasn't heard much about Smartmatic, but

13   Smartmatic you know is another voting company; correct?

14   A.  Yes, sir.

15   Q.  And obviously, Dominion Voting Systems is as well.

16             When you made this statement on May the 9th of 2021,

17   were you aware that Dominion Voting Systems were a hundred

18   percent paper based in 2020?

19   A.  Could you define what you're saying, what you mean by paper

20   based.

21   Q.  Paper ballots.

22   A.  Dominion machines are not -- they are computers, they are

23   not paper, sir.

24   Q.  That's self-evident --

25   A.  Right.

Lindell - Direct

1    Q.  -- the ballots are paper.

2    A.  They are by computer, sir, they're tabulated.  You are

3    asking me very trick questions here to me right now.

4    Q.  I'm not trying to confuse you or mislead.

5    A.  You're not confusing me.

6    Q.  They're a hundred percent paper based, meaning there is a

7    paper artifact record?

8    A.  Yes.  There is paper that it goes through the machines, you

9    are correct.

10   Q.  Okay.

11   A.  I am well aware of that.

12   Q.  All right.  And then in this statement, you say you did

13   your best to take our country through China.

14        Now, China is a specific because have been on record

15   many times saying they were involved in rigging the 2020

16   election; right?

17   A.  Correct.

18   Q.  That's why you --

19   A.  May I explain.

20   Q.  Pardon me.

21   A.  May I explain.

22   Q.  We'll get to it.  We have a lot to cover.  As everybody

23   knows, it's self-evident, I speak slowly, so I'm going to try

24   to get us through.

25        Now, China, that aspect of it was related to the data

Lindell - Direct

1    that you were bringing to the cyber symposium, the package

2    counters we heard about; right?

3    A.  That was one little piece of -- that statement was made,

4    there was many other pieces.  If you want me to explain, I can.

5    Q.  Well, let me ask you a specific question.

6         You have no evidence that Dr. Coomer was involved in

7    China at any point; right?

8    A.  No.

9    Q.  You reference, you Coomers of the world.  And then, yeah,

10   Eric Coomer.  Obviously, that's referring to my client.  And

11   you have testified that your knowledge up this point about

12   Dr. Coomer was based on a discussion with Mr. Ruddy.

13        And you do reference Newsmax.  You say, instead of

14   going over and making deals at Newsmax.  But then you go on and

15   make multiple statements.  Turn the whole operation in, the

16   voting cartel, the voting machine operation; right?

17   A.  No.  May I explain.

18   Q.  You may explain that one.

19   A.  Okay.  What you have here is what I -- for 6 months, what

20   I -- starting when Dominion sued me, I, in February, and

21   everyone where I went.  I was blocked for getting this out for

22   some reason, it was a deviation.  Why are Republicans blocking

23   me without seeing what's going on.  And this is what I consider

24   Dr. Coomer, one of these blockers, by going to Newsmax to make

25   it so I can't go on and talk about My Pillow.  And it ends up

Lindell - Direct

1   costing My Pillow company millions of dollars.  And I didn't

2   understand why he would do that or why he would block what I've

3   been trying to for 5 months to get out to our country to help

4   secure elections and save our country.

5   Q.  I knew we would get to that, and we'll talk about it.

6        You just said that Dr. Coomer went to Newsmax and

7   prevented you from going on to Newsmax to promote My Pillow

8   products?

9   A.  Dr. Coomer and/or Dominion, because they were both

10  mentioned on the phone with Chris Ruddy.  And this is what I

11  was upset about is I carved out every day for 4 months after

12  pouring money into it, was blockers.  Doesn't anybody care

13  about our country?  It didn't explain why -- I don't know a

14  Dr. Coomer and why he would do this to me and my company.  It

15  was very -- like very upsetting.

16  Q.  You were mad, and that's why you said, might be you'll only

17  serve 10 to 20 years, you're disgusting, you're treasonous, you

18  are a traitor to the United States of America, that wasn't

19  because you thought he had committed an election crime, that

20  was because you thought he went to Newsmax to prevent you from

21  going on and selling pillows?

22  A.  No.  That was control of -- the pillow thing, attacking my

23  company.  When I say blockers, there's a couple different

24  people that out and out sue me, like Dominion did, and sue My

25  Pillow for no reason.  There was cancel -- all these

Lindell - Direct

1    cancellation -- were all these cancels of all my box stores,

2    they mention my names.  They went to my banks.  People attack

3    me.  There's also people, like Dr. Coomer did with Newsmax,

4    they're blocking information to get out.  And I'm like, can't

5    we all see what's going on with these voting machines.  So not

6    only am I thinking, is he part of this, Dominion attacked me

7    once already, and now they're making this so I can't go on --

8    my company cannot go on Newsmax anymore from that day forward.

9    And why are you hiding these things from the country.

10          That's why I mentioned Brad Raffensperger and Brian

11   Kemp.  These are politicians, and I have met politicians all

12   over the country, and they would just block me going, you know,

13   I'm sorry, that deviation of 400,000 people on their voter

14   rolls, don't you care.  And they made jokes on it.  It didn't

15   make sense to me.  Everywhere you turn, it was just -- when I

16   felt it was something so important to our country.

17   Q.  You said a lot there, but let me distill it, if I can.

18          We're here with Dr. Coomer as the Plaintiff, so let's

19   focus on him.

20          You had a five-minute conversation with Chris Ruddy.

21   You believed that he was preventing you from going onto

22   Newsmax, and you made this statement?

23   A.  Chris Ruddy told --

24   Q.  Correct?

25   A.  Yes.  May I explain.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Direct

 1   Q.  We'll get to it.

 2   A.  Okay.

 3   Q.  You just did, in part, I think.

 4        And you referenced Brian Kemp and Brad Raffensperger,

 5   those individuals -- you chose their names on purpose, they

 6   were the governor and the secretary of state of Georgia; right?

 7   A.  Correct.

 8   Q.  And those were the two highest election officials in that

 9   state; right?

10   A.  Correct.

11   Q.  And Georgia, in 2022, was a swing state?

12   A.  Yes.

13   Q.  It went ultimately for Joseph Biden in 2022; right?

14   A.  Yes.

15   Q.  And then you say, after mentioning these two officials,

16   these are things that I have evidence of.  The evidence is

17   there, you know, it's sitting there.  Are you with me?

18   A.  Yes.

19   Q.  Now, that's a reference to election fraud evidence.

20   A.  That's a reference to blockers.  May I explain.

21   Q.  You just did.

22        You are saying that the statement that you made here,

23   that the jury is going to assess, you were referring to

24   blockers?

25   A.  Yes.  I can explain a really good example for blocker, if

Lindell - Direct

1    you would like me to.

2    Q.  Your counsel will have the opportunity.

3    A.  Thank you.

4    Q.  Immediately after that, Mr. Lindell, you say, why don't you

5    go turn it all in to the Supreme Court.

6            Do you see that?

7    A.  Yes.

8    Q.  And bring it to the FBI?

9    A.  Yes.

10   Q.  So the evidence that you just said of blockers, you say,

11   why don't you turn it all in to the Supreme Court and bring to

12   to the FBI, and you did turn in evidence to the Supreme Court,

13   didn't you?

14   A.  No.

15   Q.  You didn't go to the Supreme Court, sir?

16   A.  Yes, but to -- may I explain.

17   Q.  You went to the Supreme Court --

18   A.  The FBI took my phone, that had nothing to do with anything

19   else.

20   Q.  The FBI seized your phone after the cyber symposium?

21   A.  No.  It was one years from that.

22   Q.  Two years after the cyber symposium?

23   A.  Yes, I believe, one or two years later, correct.

24   Q.  So you so are saying, in this statement, the reference to

25   the Supreme Court relates to your phone being seized?

Lindell - Direct

1    A.  No.  Would you like me -- can I explain?

2    Q.  You went to the Supreme Court challenging the vote in

3    2022 -- 2020, pardon me?

4    A.  No.

5    Q.  Did the Supreme Court ever hear any election challenge that

6    you were associated with?

7    A.  No.

8    Q.  One that was specifically associated with you they declined

9    to hear?

10   A.  Could you -- could you show me what you're talking about,

11   please.

12   Q.  We'll get it, if it becomes necessary.  I'm just asking

13   based on your recollection.

14   A.  No, as far as I know.

15   Q.  Now, the evidence that we have been talking about, you say,

16   in this statement, was going to be dumped on Frank; right?

17   A.  Yes.

18   Q.  What did you dump on Frank?

19   A.  On Frankspeech, over the course of the last four years, we

20   put so many things out there of evidence, over 35 different

21   experts.  The evidence I got directly from every state I went

22   to, not just swing states, that I put tens of millions of

23   dollars into gathering.  This it what we put on Frankspeech.

24   Q.  So that's your reference to putting alleged election fraud

25   evidence or evidence that you thought was significant to

Lindell - Direct

1    fraudulent election conduct in 2020?

2    A.  That's correct, because we were getting blocked everywhere,

3    so we just put in our own.

4    Q.  And then you say, at end of this, and you know what, this

5    wasn't around November, December, this came on January 9.

6          Do you see that?

7    A.  Yes.

8    Q.  That's your reference to evidence that you got on

9    January 9, 2021; right?

10   A.  This is one piece I got that day, one little piece,

11   correct.

12   Q.  Well, it was significant enough that your mentioned the

13   date in your statement?

14   A.  Yes.  May I explain.

15   Q.  We're going to talk about it.

16   A.  Okay.

17   Q.  And that January 9 day is significant because that was

18   three days after Congress had certified the 2020 election.  You

19   knew that; right?

20   A.  What's your question?

21   Q.  You knew that -- you got this evidence on January 9th, you

22   knew that Congress had certified the election three days

23   earlier?

24   A.  Yes.

25   Q.  Well, let's visit, then, about the support you have been

Lindell - Direct

1    obtaining for this election crime evidence you say you have.

2            You reference January 9.  I want to show you an

3    exhibit that will sort of frame your election crime evidence,

4    hopefully.  And that is Exhibit 261.

5            Do you recognize this document?

6    A.  Yes.

7    Q.  It's from a fundraising page called Mike Lindell Defense

8    Fund.

9            Do you see that?

10   A.  Yes.

11   Q.  You are currently raising money in connection with this

12   trial?

13           MR. DUANE:  Objection, relevance.

14           THE COURT:  Overruled.

15           THE WITNESS:  Shall I answer?

16           THE COURT:  Yes, please.

17           THE WITNESS:  Yes, I am.  We have no money left.  I

18   personally have nothing left in the world.

19   BY MR. CAIN:

20   Q.  In the middle of what you're looking at -- I am not going

21   to get into the details of this -- but in the middle where

22   there's an address sort of by the exhibit sticker, that address

23   that's listed where people are to mail checks to is

24   1550 Audubon Road, Chaska, Minnesota 55318.

25           Do you know that address?

Lindell - Direct

1   A.  Yes.

2   Q.  That's My Pillow's headquarters?

3   A.  It's also other companies, correct.

4   Q.  I didn't ask you about other companies.

5           It's My Pillow's; correct?

6   A.  Yes.

7   Q.  And you have multiple companies, as you said, that coshare

8   that office?

9   A.  Yes.

10  Q.  And you authorized Exhibit 26 or 261 to be posted on the

11  internet?

12  A.  Yes.

13          MR. CAIN:  Offer 261.

14          THE COURT:  Any objection, other than the one you have

15  already made?

16          MR. DUANE:  No, your Honor.

17          THE COURT:  So admitted.

18      (Plaintiff's Exhibit 261 received in evidence)

19          MR. CAIN:  Let's -- is that being published?

20  BY MR. CAIN:

21  Q.  So you recorded a video, and do you remember when you made

22  this recording, Mr. Lindell?

23  A.  Yes.  Approximately a week before the trial.

24  Q.  So about a week ago, you recorded a video, it looks like

25  you were sitting in your vehicle; is that right?

Lindell - Direct

1    A.  Yes.

2    Q.  And there's a section underneath it that says, My Pillow

3    and Mike Lindell are going to jury trial June 2nd.

4         You are referring to this trial?

5    A.  Yes.

6    Q.  I'll quote to the last sentence, Now, as his historic jury

7    trial begins on June 2nd, he urgently needs your support to

8    bring the truth to life, protect our voices and restore faith

9    in our elections.

10        Do you see that?

11   A.  Yes.

12   Q.  And just below that is a donate button.

13        MR. CAIN:  Let's go to the next section.

14   Q.  By the way, while he's blowing that up, do you know how

15   much in donations you have received?

16   A.  Probably me -- I don't know the number, sir.

17   Q.  Well, you had a go fund me in relation to this?

18   A.  Yes.

19   Q.  And you show you've gotten over $350,000 from that?

20   A.  That's not correct.  May I explain.

21   Q.  Sure.

22   A.  That's combined between the two, if the number is right,

23   that would be overall, everything for the months we had

24   funds -- we have tried and raise funds since we ran completely

25   out of money, and I can't pay anyone.  I am millions of dollars

Lindell - Direct

1    in debt.

2    Q.  So let's look at -- obviously, if you are asking supporters

3    to donate money to you, you want as accurate as humanly

4    possible about what you are telling them; right?

5    A.  Yes, this is -- this is a direct to me -- this isn't a C4,

6    C3, it's not a -- I don't know what you would call it -- it's

7    basically saying here, you're gifting this to us.  It's not

8    like it's your typical fundraisers.

9    Q.  A lot of folks who aren't CEOs may not know what a C4, C3

10   reference is.

11        Those are nonprofits?

12   A.  Nonprofits.

13   Q.  Thank you.

14        And counsel handed me a note that as of last night,

15   $362,421, does that sound approximately right?

16   A.  If that is cumulative between everything, some of the

17   other -- and going back to a year before the trial, correct.

18   Q.  Let's very quickly look at this, because I want to get to

19   your evidence.

20        First paragraph, I'm not going to read it, the jury

21   can read it, I will talk slowly so maybe it will give us enough

22   time.

23        One of the things you say in that first paragraph is

24   you created LindellTV, and we have become the loudest platform

25   for election security in the world; right?

Lindell - Direct

 1    A.  Yes.

 2    Q.  And you believe that?

 3    A.  Yes.

 4    Q.  Just to draw a distinction, LindellTV.com, I typed in

 5    Frankspeech.com last night in my computer, and it forwarded me

 6    to LindellTV.com.  Are you aware of that?

 7    A.  Yes.  May I explain.

 8    Q.  There's been a corporate change?

 9    A.  Can I explain?

10    Q.  Tell us what's changed.

11    A.  There was another company, I believe it was a year ago,

12    that merged with us.  So Frankspeech became a publicly traded

13    company.  And it's in OTD.  So they had to forward anything so

14    people could find that entity.  And I believe now it's under

15    MLMC, the stock symbol itself, so they made that year ago.

16    Q.  All right.  Cognizant that corporate testimonies, but MLMC

17    is Mike Lindell Media Company?

18    A.  Media Corp.

19    Q.  Pardon me.  The company that is a party to this litigation

20    is Frankspeech LLC; is that right?

21    A.  That's not the company that we are now.  That's the company

22    back then, correct.

23    Q.  But in the course of the events that the jury has heard

24    about, Frankspeech LLC was the entity that was streaming the

25    Frankspeech content; right?

Lindell - Direct

1    A.  That's not correct at all.

2    Q.  Correct?

3    A.  Both companies were formed in the spring of 2021.  This was

4    LindellTV, Frankspeech, I think in this court so far that I

5    have seen.

6         MR. CAIN:  Hank, we'll come back to this, but put up

7    stipulation 4.

8    Q.  We have entered into stipulations that Judge Wang read to

9    the jury at the beginning of this case.  You have stipulated

10   the cyber symposium was live streamed on Frankspeech, okay.

11   A.  May I explain.

12   Q.  No.  That's your stipulation, so that is what the jury is

13   going to consider, you can't contradict it.

14        Do you understand that?

15   A.  Yes.

16   Q.  Let's go back to before this merger.  While he's pulling

17   that up, before this merger that you described, you were the

18   sole owner of Frankspeech LLC?

19   A.  No.

20   Q.  Who else had an interest in that entity?

21   A.  I would have to look at the stock to see who was on at that

22   time.

23   Q.  All right.  Were you a majority interest holder in

24   Frankspeech?

25   A.  Yes.

Lindell - Direct

 1   Q.  Did you control Frankspeech?

 2   A.  Yes.

 3   Q.  And then, as part of this merger transaction, who acquired

 4   the rights to that Frankspeech domain?

 5   A.  I don't know.  It -- I guess it would be the merged entity.

 6   Q.  The second paragraph of this request for donations, you

 7   reference that President Trump is a good friend of yours?

 8   A.  Yes.

 9   Q.  And he is?

10   A.  Yes.

11   Q.  And I think you met with the president maybe a month ago, I

12   think it was reported?

13   A.  Yes, approximately.

14   Q.  And you discussed this very case with President Trump?

15   A.  No, never.

16   Q.  Okay.  Let's go to the next paragraph.  This is a reference

17   to what you call lawfare; right?

18   A.  Yes.

19   Q.  And so Dr. Coomer's lawsuit that the jury is listening to

20   right now you would call lawfare?

21   A.  Absolutely.

22   Q.  As well as other voting companies, such as Dominion Voting

23   Systems bringing a case against Fox News?

24   A.  Yes.

25   Q.  And suffice it to say, as you say in here, all of those, to

Lindell - Direct

1    your knowledges, have been settled, but you're unwilling to do

2    so, whether it costs you everything you've got?

3    A.  The ones that I have heard of so far, either they're

4    insurance companies telling them to settle, or they were afraid

5    of going broke, so they just settled.

6    Q.  And -- I won't ask you that.

7         Let's go to the next paragraph.

8         Now, you referenced this a minute ago in your

9    testimony, you say, as you know, I have spent tens of millions

10   of dollars in borrowed money, and then it goes on.

11        Now, when I had visited with you a couple of years

12   ago, you had estimated that you had spent $40 million on this

13   election fraud campaign?

14   A.  Correct.

15   Q.  Do you think it's more than that now?

16   A.  Yes.  I'm in debt for $10 million.  I borrowed, and I have

17   nothing left.

18   Q.  And I missed the reasons, so $50 million --

19   A.  There's -- can I explain.

20   Q.  I think you did.  But the total is 50 million; right?

21   A.  Yes, but there's other -- there's other money that went to

22   fight the lawsuits, if you wanted the direction of the money.

23   But yes, the total, the entity -- getting rid of the voting

24   machines, I would have -- I went from a net worth of about

25   50 million to 10 million in the hole now, and I have lost

Lindell - Direct

1    everything.

2    Q.  Let's go back to that paragraph that I just referenced with

3    President Trump when you referenced he was your good friend.

4         And I missed the point, you testified you never talked

5    about this trial.  But in the middle, you say, I explained to

6    him that we have a case coming up.  And you go on to say that

7    you have been waiting for four and a half years.

8         So do you want to correct your statement, you did

9    explain this case to him?

10   A.  No, I did not talk about this case to him.  What I said to

11   him -- this is taken out of context, that I put it in there

12   like that and put that writing in.  What I said to him exactly

13   is, Mr. President, I will keep fighting to get rid of these

14   electronic voting machines, and I said, because I don't want

15   what you do for this country to be in vain.  That's what I said

16   to him.

17   Q.  And the voting machines, you are saying later in this

18   document that you want to go from voting machine counts to hand

19   counts?

20   A.  What I want -- all the stuff that's happened is 132

21   countries have banned electronic voting machines.  The last one

22   being Argentina.  We, in the United States, have the worst

23   voting system in the world.  We need to go to paper ballots,

24   hand counted.  I have spent millions on experts talking to

25   countries around the world.

Lindell - Direct

1    Q.  Did you speak to this man, right here, Dr. Halderman?

2    A.  No.  But he was the first expert that I asked -- that I had

3    seen about, he was the first expert that I got information

4    from.

5    Q.  You respect his opinion, don't you?

6    A.  The only time I seen his opinion was in beginning was --

7    may I explain.

8    Q.  Do you respect him as an election expert?  Let me ask a

9    broader question.

10   A.  I -- I would have to explain.  It's twofold with him, with

11   that particular person.

12   Q.  You like his opinions in certain cases and then in others

13   you don't?

14   A.  No.  I think he's -- I think he hasn't looked at

15   everything.  I think he's very narrow in his -- he's never come

16   to me and said, hey, can I see anything, he's never approached

17   me like many experts have, over 35.  It's kind of funny because

18   he was the genesis of saying there's a problem with the

19   machines, him and Mr. Hursti.

20   Q.  And you heard Mr. Hursti's testimony about your PCAPS?

21   A.  Yes.

22   Q.  And to circle back, Mr. Halderman is listening to you on

23   election related matters, you think -- and part of your crew

24   said here -- is to go back to what we used to do decades ago

25   and hand count the millions of ballots?

Lindell - Direct

```
 1    A.  No, no.  You are taking years ago, and I contacted France,

 2    Germany, the UK, the Netherlands -- this is myself -- and

 3    Taiwan, the best practices in the world where they don't use

 4    computers.  Most of the countries don't.  And we put that team,

 5    three of the years, I put together the best hand counting this

 6    world has ever seen.  And we have used them in the United

 7    States in two separate counties, Democrats, Republicans working

 8    together, and they got done at the same time as the machines

 9    with a hundred percent accuracy.

10    Q.  To that end, as you say in this piece, it says, it's call

11    coming down this, that section.  Finally, we will have a jury

12    trial and get all of this information out to the public in a

13    court of law and open a gateway to secure our elections with

14    paper ballots, hand counted.

15    A.  I see that.

16    Q.  And that's fine, that issue is the type of debate that you

17    like to see in this country, whether we should have machines

18    and how that should come about; right?

19    A.  Yes.

20    Q.  And that debate, typically, you know this, occurs every

21    year in our state legislatures?

22    A.  No.  May I explain.

23    Q.  You don't think that the legislature looks at these bills

24    related to improvement --

25    A.  I've only seen it once, and that was the Democrats, all of
```

Lindell - Direct

1   the Democrats said we have to get rid of the electronic voting
2   machines.  And I seen that in December of 2020.  And actually,
3   what I seen, Dr. Halderman and Harry Hursti were both in that
4   film and that opened my eyes, we have got problems with these
5   electronic voting machines.  But it was pretty one-sided debate
6   because it was all Democrats that -- it wasn't really a debate.
7   It was only them stating this.
8   Q.  The 50 million you have spent on this, you said, how much
9   of that has been spent with going to state legislature and
10  discussing the issue with legislators and trying to pass new
11  laws?
12  A.  Millions of dollars, probably upwards of 10 million.  That
13  was the first year, in 2021.  I went around this country, I
14  visited secretary of states, attorney generals, legislatures,
15  and I was blocked at every turn.

16          And this is the one I was going to bring up before.  I
17  will give you an example, Alabama, I met their secretary of
18  state, I bought every voter roll.  Alabama made me pay $40,000
19  for their voter rolls.  And we discovered with our experts that
20  there were 4,462 that voted that were over the page of 110
21  years old, and most of them close to 200.  I said that to the
22  secretary of state, to John Merrill, look at your own voter
23  rolls that came out the machine.  And he looked at me and said,
24  Mike, we look pretty good here in Alabama.  I thought he was
25  kidding.  But he wasn't.  He blocked me.  That was the millions

Lindell - Direct

1    of dollars I spent in the first year.  I mean no disrespect on

2    what you just said, sir.

3    Q.  So he's another blocker?

4    A.  Yes.

5    Q.  And you have been blocked at every turn?

6    A.  At every turn.  And mostly by party Republicans, some

7    Democrats, like Colorado, Jena Griswold.

8    Q.  So you have taken it into your hands -- well, actually, let

9    me ask you this.  You mention all the experts that you

10   consulted with in your efforts to get this information out to

11   the public.  So let's talk about that for a second, all right.

12          So you say, in this Exhibit 261, that you're coming

13   into this court to provide evidence to secure our elections.

14   And then you said to us, you have consulted with multiple

15   experts.  I want to talk to you a little bit about those

16   experts.

17          The jury has heard a lot of names.  So let's go to the

18   cyber symposium.

19          Do you remember that?

20   A.  Yes.

21   Q.  The cyber symposium, the jury heard a name, Colonel Phil

22   Waldron.  And Colonel Phil Waldron was one of your experts or

23   was at one time?

24   A.  Yes.

25   Q.  And he ran the red team at cyber symposium?

Lindell - Direct

```
 1   A.  Yes.

 2   Q.  And he had been hired by Kurt Olsen, your lawyer that we

 3   heard from?

 4   A.  Yes.

 5   Q.  Colonel Waldron was also in Absolute Proof, the movie that

 6   we saw a piece of?

 7   A.  Yes.

 8   Q.  Do you need some water?

 9   A.  No, I'm good.  Thank you.

10   Q.  And Waldron was sort of the captain of your red team;

11   right?

12   A.  Yes.

13   Q.  And you paid for that red team to be at the symposium

14   personally, out-of-pocket?

15   A.  No.  I believe it was paid for by Lindell Management.  And

16   I am not sure if Colonel Waldron was paid to participate or

17   not.

18          I didn't hire the red team for Olsen.  Once I got

19   there, I said, what's a red team.  And as he explained it, I

20   said, I'm not the one that said he should get paid, and then

21   he --

22   Q.  He made it happen?

23   A.  What?

24   Q.  Your lawyer made it happen?

25   A.  Yes.
```

Lindell - Direct

1   Q.  Okay.  And if Colonel Waldron was paid through Lindell

2   Management that you refer to, that's another company you own?

3   A.  Yeah, I don't recall if Colonel Waldron was paid.  I

4   believe he was just an unpaid participant.

5   Q.  But that's one of the experts that you consulted with in

6   this election; right?

7   A.  Yes.

8   Q.  And the others might be -- with the exception Josh Merritt,

9   you are not including him in that list, are you?

10  A.  One time, he was not -- he was a consultant when he

11  validated that to me, he personally, I have validated this, so

12  yes, at one time, he was.

13  Q.  Okay.

14  A.  Before the cyber symposium, which didn't come up in court.

15  Q.  Well, you have just stated it?

16  A.  Yes.

17  Q.  Russ Ramsey, do you know who he is?

18  A.  Yes.

19  Q.  He was with ASOG?

20  A.  Yes.

21  Q.  That's the probably -- that you flew down to Texas and met

22  with when you were in the cyber symposium?

23  A.  Yes.

24  Q.  He's an expert you have consulted with?

25  A.  He was doing his own thing.  I guess, he's -- I don't --

Lindell - Direct

1    when you say consultant, I was there to drop off the evidence,

2    which was the cyber 15 back in 2015, and this is where we had

3    two in this bag so that it can go to the country and we could

4    have the cyber symposium.  It's also where I met Josh Merritt.

5    Q.  Other experts you have consulted with, Dr. Shiva?

6    A.  Dr. Shiva, Mark Cook.

7    Q.  Dr. Frank?

8    A.  Yes.

9    Q.  This gentleman, Walter Daugherity?

10   A.  Walter Daugherity.

11   Q.  Dr. James Apell[ph], a Princteon professor that was

12   mentioned when counsel was talking about Arapahoe County?

13   A.  I don't recall the name.  But most experts in this country

14   have been either volunteering, either they worked for me, they

15   were doing a lot of volunteering trying to help save our

16   country.  And -- but I may not know their names directly,

17   because in every we were working with experts?

18   Q.  Conan Hayes?

19   A.  Yes.

20   Q.  Conan Hayes, Harry Hursti mentioned him in his testimony,

21   he was the surfer with the CH initials that they found in Mesa

22   County?

23   A.  I don't know about the initials, but I am very familiar

24   with Conan Hayes because I did hire him.

25   Q.  He was everyone your payroll?

Lindell - Direct

1   A.   What?

2   Q.   Conan Hayes was on your payroll?

3   A.   I believe I hired him in December of 2021.

4   Q.   Does he still work for you?

5   A.   No.

6   Q.   Now, Mr. Montgomery is the source of the packet that you

7   were talking about bringing to the cyber symposium?

8   A.   One source, correct, he was one source.

9   Q.   And you paid Mr. Montgomery 3 to $4 million for his

10  services?

11  A.   Yes.

12  Q.   At one point your were paying Mr. Montgomery, I think you

13  told me, a hundred thousand dollars a month?

14  A.   Yes.  He also has other technologies that -- yes, that is

15  correct.

16  Q.   Is he still on your payroll?

17  A.   No.  I don't have any money left.

18  Q.   Well, he's going to testify because we took his deposition,

19  and we'll play that video later.  But Mr. Lindell, of the

20  people that we just mentioned -- are there others, by the way,

21  other than -- this is getting long.

22  A.   There's many others.

23  Q.   Okay.

24  A.   There's at least 35.  We looked at them the other day.  We

25  went through them, myself and Kurt Olsen, and we're amazed.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Direct

1    It's been 35, maybe 40 across the country with all different

2    experts, because I want to save our country.

3    Q.  Well, we all want the best for our country, right, it's not

4    just you; right?

5    A.  I understand.

6    Q.  But all of these folks, the 35 folks, people on your

7    payroll, people that you came across, all of these folks, not a

8    single one of them is going to appear in this trial and raise

9    their right-hand and testify under oath in support of your

10   claims, not a single one; you know that, right?

11   A.  I don't understand the question.

12   Q.  Well, you called this the trial of the century?

13   A.  May I explain.  May I explain.

14   Q.  No.

15        You called this the trial of the century?

16   A.  Yes.

17   Q.  That's what you said, you said we're going to melt down the

18   machines, this is the trial of the century, we're going to

19   bring forth the evidence, you said all those things; right?

20   A.  Not outside, I didn't.  May I explain.

21   Q.  Well, irrespective of the venue, you have made all of those

22   statements; right?

23   A.  May I explain.

24   Q.  Is that a yes?

25   A.  Yes.

Lindell - Direct

1    Q.  Okay.  So having made all of those statements, having

2    accused Dr. Coomer of certain crimes, paid all of these

3    experts, not a single one of them is going to appear to tell

4    this jury with expert testimony how the election was rigged in

5    2020?

6    A.  Sir, this trial isn't about all the evidence that I've

7    gathered.  We would be here for months.  This trial is about

8    deflamation[ph].

9         And when I say this is the trial of the century, I

10   believe this will be the gateway to finally securing our

11   elections because lawfare will be gone.  After this trial, I'm

12   praying all of these lawsuits that were to suppress people's

13   voices and maybe people will look at the problem we have in our

14   country.

15   Q.  I take it, it's defamation, defamation is what you are

16   referring to?

17   A.  That's what your trial is about, that's what I mean.

18   Q.  You said deflamation[ph], that wasn't clear.  Never mind,

19   we'll move on.

20        But can you answer my question, irrespective of what

21   you think this case is, you don't have any expert testimony to

22   support any claim that Dr. Coomer was involved in rigging the

23   2020 election, number one?

24   A.  No, I don't have anything saying that Dr. Coomer -- experts

25   coming in saying -- because I don't believe he did.

Lindell - Direct

1    Q.  And you say your voice has been suppressed over and over

2    and over again; right?

3    A.  Probably more than anyone here.

4    Q.  You had the opportunity to bring in Waldron, Dr. Shiva, all

5    these folks here to inform the jury on a scientific basis what

6    it is you are talking about, but you haven't brought a single

7    one?

8    A.  No.

9    Q.  And you know you have accused Dr. Coomer of being part of

10   the biggest crime this world has ever seen; right?

11   A.  As a blocker, correct.

12   Q.  As a blocker?

13   A.  Yes.

14   Q.  And so your testimony before this jury is that being a

15   traitor to the United States, committing criminal conduct,

16   committing treason, you equate to not being able to go on

17   television like Newsmax and speak your truth?

18   A.  No.  And speak -- with him in particular, to talk about My

19   Pillow, the great things My Pillow has done, giving their money

20   to hurricane victims and everything we have done.  Now I can

21   never do that again.  Now, it's cost -- he did that with

22   Newsmax -- My Pillow over $20 million.  I lost hundreds of

23   employees because of this attack.

24   Q.  I know you want to reference that, so let's dive right in.

25            You are saying to the jury that Dr. Coomer was

Lindell - Direct

1    involved in blocking you from being on Newsmax?

2    A.  Correct.

3    Q.  Actually, before I segue to Newsmax, I meant to ask you one

4    thing.  Since we covered that you don't have election security

5    experts here, you yourself don't hold yourself out as a

6    cybersecurity expert; correct?

7    A.  No.  I would say my expertise is in deviations.

8    Q.  Well, it's also in products, pillows, slippers, that's your

9    day job?

10   A.  We look at deviations at My Pillow every day more than

11   anything.

12   Q.  We'll get to deviations.  You look at deviations when you

13   track your promo codes?

14   A.  That's correct.

15   Q.  Right.  We'll look at that in a minute.

16         But to my point, since you don't have testifying

17   experts, you are not a cybersecurity expert, you are not

18   here -- you have not been designated as an expert, so there is

19   going to be no evidence on this side of the room, expert

20   testimony about even generally how the 2020 election was

21   rigged?

22   A.  I don't think this trial is about whether the election of

23   2020 was rigged or not or overturned.

24   Q.  But you and I can agree, it's what they think this trial is

25   about; is that fair?

Lindell - Direct

 1   A.  Yes.

 2   Q.  Let's talk about Newsmax.  So Newsmax, when I asked you

 3   about it, you called it the dirty deal?

 4   A.  Yes.

 5   Q.  Sounds like something you would say?

 6   A.  Yes.

 7   Q.  And this dirty deal prevented you from coming on to Newsmax

 8   live to promote My Pillow products; right?

 9   A.  That was part of it, but there's more to it.

10   Q.  But every time you go onto Fox News or Newsmax or any

11   channel, you are there talking about whatever you are talking

12   about, you see a little bump in a promo code?

13   A.  Not when I'm talking about -- may I explain.

14   Q.  I didn't understand what you said.

15   A.  With My Pillow, we always give 10 percent within our bylaws

16   to teach gospel, Salvation Army, hurricane victims, flood

17   victims, fire victims, individuals.  We have done this since

18   day one.  And when we go on -- when we do that and when we go

19   on these channels like Newsmax and we talk about these things,

20   and I hire ex-addicts, hiring ex-veterans.  I was a crack

21   cocaine addict, it's a human interest story, the American

22   dream.  Our sales go up, it's amazing they go up.  Now, do I do

23   that on purpose to do that?  No.

24        We gave away, =even though I didn't have -- we gave to

25   the fire victims, the flood victims, we gave it away, because

Lindell - Direct

1    that's the right thing to do.

2         What he took away that day, Chris Ruddy said I could

3    no longer go on there and talk about My Pillow.  And from that

4    point, it has cost us 20 some million dollars.  And I knew the

5    day he made that deal, that's what would happen.

6    Q.  Well, thank you for your charitable work.  I think we all,

7    in this courtroom, try to do our best, right.  You're no

8    different from anybody, other than your platform?

9    A.  Is that a question?

10   Q.  You're not the only charitable person?

11   A.  I didn't say I was, sir.

12   Q.  Okay.  I just want to make that clear.

13        But the $20 million, I actually asked you about this

14   Newsmax issue.  And at the time, you estimated $16.7 million it

15   cost you as a result of Dr. Coomer going on and making this

16   dirty deal; right?

17   A.  That was in the date -- whatever date that was, that was up

18   to date.  The now up to date number is a little over

19   $22 million.  I just checked it had about four days ago.

20   Q.  And you know that Dr. Coomer, that Newsmax had made some

21   statements about him publicly that resulted in a lawsuit.  That

22   lawsuit ultimately was resolved.  And then we saw the

23   retraction video; right?

24   A.  I just seen the retraction just now in this courtroom, yup.

25   Q.  So Newsmax, obviously, investigated that and were willing

Lindell - Direct

1   to publicly say that Dr. Coomer was not involved?

2   A.  They were very afraid of lawfare.

3   Q.  I don't want you to speculate.  You don't know what your

4   decision --

5   A.  No, I don't.  But I know what they did to me.

6   Q.  Let's just talk about what you stipulated to first.

7           And you know, by the way, I took Chris Ruddy's

8   deposition of Newsmax, he's going to testify about this deal?

9   A.  Yes.

10  Q.  Have you seen this testimony?

11  A.  I have seen it on the paper.  I've looked at it, yes.

12          MR. CAIN:  Hank, bring up stipulation 27 -- pardon

13  me -- 24, trying to keep you on your toes.

14  Q.  Dr. Coomer's settlement agreement with Newsmax did not

15  include any provision relating to Mike Lindell or My Pillow.

16          You stipulated to that; right?

17  A.  Say that again.  Did he stipulate?

18  Q.  You stipulated to it?

19  A.  There's -- this says that, according to your -- here, it

20  says that there was nothing in the written agreement, and

21  that's what this is here, that's correct.

22  Q.  Okay.  So we agree on this, we have stipulated to it?

23  A.  Yes, yes.

24  Q.  So whatever it is that you say happened with Chris Ruddy

25  was outside of the formal documentation related to the

882
Lindell - Direct

1    settlement?

2    A.  Correct, correct.

3    Q.  Did you even know in May, early May of 2021, you didn't

4    know Dr. Coomer; right?

5    A.  No.  I had never heard his name.  And I -- I had not heard

6    his name, no.

7    Q.  Dr. Coomer hadn't filed a lawsuit against My Pillow in May

8    of 2021?

9    A.  No.  That was a year later.

10   Q.  Right, a year later.  We'll get to that too.

11          But he hadn't made any public statements about My

12   Pillow that you saw?

13   A.  No.

14   Q.  I mean, he has never, never said a single thing publicly

15   about you?

16   A.  No.  That's what was so surprising why he did this to me

17   and My Pillow.

18   Q.  Right.  It doesn't make any sense, does it?

19   A.  No, it doesn't.

20   Q.  Have we covered sort of the basis of what you are saying

21   this deal was, this one conversation, you can't come on

22   Newsmax, and that was essentially it?

23   A.  I was told directly that I could not come.  But prior to

24   that, he told me I could not come on and talk about electronic

25   voting machines.  This happened -- it will probably come up in

Lindell - Direct

1    court -- but it happened on February 4th, I believe, in 2021.

2    That's when My Pillow's Twitter account was canceled.

3          At that time, they had me on all these stations,

4    because I was the first company that got canceled, an account

5    like that.  When I went on Newsmax, they wouldn't let me talk

6    about -- they pulled the -- the voting machine, why they cancel

7    Twitter.

8          And then two hours later, he said, Mike, from now on,

9    come on, we want to keep supporting you at My Pillow, and he

10   did.  And they -- so from that point on, when he told me on the

11   phone, I'm sorry, Mike, I can't even have you come on anymore

12   to promote My Pillow, he goes my hands are tied.  Since that

13   day, I was on one other -- because if you come on, if you just

14   go after Fox News, that was his competitor, I thought, well,

15   maybe this will be the gateway to let me talk about My Pillow.

16   To this day, I asked him three months ago, I still may not go

17   on.  He says his hands are tied because he's afraid of lawfare

18   of getting sued or whatever agreement was made.

19   Q.  Okay.  You referenced -- well, actually, before I ask you

20   about this February appearance on Newsmax that you just talked

21   about, just so the jury understands the complexities of the

22   marketing, you could, My Pillow, still buy ads on Newsmax?

23   A.  That's corrects.  This is separate from my ads.

24   Q.  You are not insinuating that you couldn't do anything?

25   A.  You could buy ads.

Lindell - Direct

1    Q.  But you just couldn't personally go out because you were --

2    A.  Newsmax would do personal things because of My Pillow being

3    the company it was to help this country.  He would have me on

4    email blasts, he would have me on his website.  And this was

5    the promo code Newsmax.  So we know exactly how much money it's

6    cost us since that day.

7    Q.  And we'll talk promo codes in a second.  But generically

8    speaking, you can track -- if you go on the Capitol steps and

9    talk about Dr. Coomer and there's an L66 promo code on the

10   bottom of the -- you can go -- you can go on the phone, you can

11   go and see how many people have responded to promo code L66;

12   right?

13   A.  A lot of companies do --

14   Q.  Is my statement correct?

15   A.  Yes.

16   Q.  Okay.

17   A.  If it was used, yes.

18   Q.  And if you went on Newsmax and you did a live appearance

19   and promo code, you could see what funneled in through that?

20   A.  That's what I'm telling the jury, yes.

21   Q.  But you are telling the jury, you did have an incident

22   before this alleged deal with Dr. Coomer and the CEO of Newsmax

23   outside of their settlement agreement, you had an incident on

24   air at Newsmax just a few months prior; right?

25   A.  It was February -- I believe February 4th or February 2nd,

Lindell - Direct

1    yes.

2    Q.  And you told me in your deposition, that incident became

3    the number one story in the world?

4    A.  That's correct.

5              MR. CAIN:  Hank, bring up 173.

6    Q.  Are those the two anchors that were on the air with you?

7    A.  Yes.

8              MR. CAIN:  Offer 173.

9              THE COURT:  Any objection?

10             MR. DUANE:  No objection, your Honor.

11             THE COURT:  So admitted.

12   (Plaintiff's Exhibit 173 received in evidence)

13   (Media played)

14             MR. CAIN:  I think it cut to an ad at that point.

15        Your Honor, would this be a good time for a morning break?

16             THE COURT:  All right.  Ladies and gentlemen of the

17   jury, we'll take our morning break for 15 minutes.

18             Do not speak to each other about this case.  Enjoy

19   your break, and we'll see you back here in 15 minutes.

20             (Continued on next page)

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Counsel, let's address the Howse

3     deposition so I can make rulings effectively.

4          MS. DEMASTER:  Thank you, your Honor.

5          We just -- we only had a couple objections to the

6     designations.  But really two of them we don't object to, we

7     have dedesignations, Pages 21 through 22, and 239 through 232,

8     or 275 to 276, we don't have any objection to those

9     dedesignations.  However, 56 through 58 and 318 through 319,

10    some of the information in those pages that were designated by

11    the Plaintiff were relied upon by the Defendants in not

12    providing some of the counters, and so we would object to that,

13    these dedesignations.

14         THE COURT:  Let me slow you down.

15         MS. DEMASTER:  I'm sorry.

16         THE COURT:  So it's Page 56, Line 19 through Page 58,

17    Line 11; is that right?

18         MS. DEMASTER:  That's correct, yes.

19         THE COURT:  And then what else?

20         MS. DEMASTER:  And we object on Page 318 and 319.

21         THE COURT:  Those aren't designated at all, there was

22    no designation on 318.

23         MS. DEMASTER:  Maybe it's 218 to 219, I apologize.

24         THE COURT:  There's also no designation on 218 or 219.

25         MS. DEMASTER:  I'm not sure where I got that.  The

1    only one we have an objection to is Page 56 through 58, and

2    that's all.

3            THE COURT:  Okay.  All right.

4            Ms. Morgan.

5            MS. MORGAN:  We have no issue with re-adding that,

6    your Honor, we just ask it count against Defendants' time

7    rather than our time.  We were cutting, so as long as it counts

8    against their clock, we have no objection to re-adding that to

9    the list.

10           THE COURT:  Any objection?

11           MS. DEMASTER:  We don't have any objection to that.

12           THE COURT:  That's easy enough.  That seems that

13   settles that.  As I understand it, those designations are still

14   subject to objection, is that right, or is there no objection

15   as to 56, Line 18 through 58, Line 11?

16           MS. DEMASTER:  I apologize, your Honor.  Those are the

17   pages that we are withdrawing our objections from.

18           THE COURT:  Okay.  So that's the entire universe of

19   Howse, and I can simply go through the designations, otherwise,

20   on the cutdown version and make my rulings; is that right?

21           MS. DEMASTER:  Yes.

22           THE COURT:  Thank you.  We'll be in recess.

23           (Recess)

24           THE COURT:  Ms. DeMaster, I think I misunderstood what

25   you were saying about 318 to 319, you are opposing their

1     dedesignation?

2             MS. DEMASTER:  That's right, your Honor, and waiving

3     those objections as well.

4             THE COURT:  I don't think there were any objections

5     made to those deposition transcripts.

6             MS. MORGAN:  We have no objection or issue with adding

7     that, as long as it counts against Defendants' time.

8             THE COURT:  It sounds like it's agreed to.

9             MS. DEMASTER:  Yes, Judge.

10            THE COURT:  Are we ready for the jury?

11            MR. CAIN:  Yes, your Honor.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2              THE COURT:  Mr. Lindell, I remind you that you are

3      still under oath.

4              THE WITNESS:  Yes, thank you.

5      BY MR. CAIN:

6      Q.  Mr. Lindell, my paralegal pointed out I may have said 2022,

7      when I meant 2020, but you understood what I meant?

8      A.  I understood.

9      Q.  And we just looked at the video that you had referenced.

10     And that video, as you stated, was February of 2021, which was

11     three months before Newsmax issued its retraction; correct?

12     A.  Correct.

13     Q.  And we actually have -- well, one other distinction, I'm

14     not sure that was clear, at some point, you were allowed to do

15     live appearances on Newsmax, you just couldn't address your

16     claims of voter fraud on here; right?

17     A.  I couldn't talk about machines or the election after that,

18     what you just seen on TV.  But he said, Mike, I apologize, but

19     you can still talk about My Pillow and he had me on two hours

20     later after that, so...

21     Q.  And you have continued communicate with him and in text

22     messages and doing what they call live hits, I have seen texts

23     with him.  I mean, have you been on Newsmax?

24     A.  No, they have never allowed me on again to talk about My

25     Pillow.  And I thought it was a gateway, he wanted me to go on

1    and basically put down Fox News because that's his competitor,

2    and I did him a favor.  And I asked him, can I come on with My

3    Pillow, and he said, I'm sorry, Mike.

4    Q.  So he did let you on?

5    A.  Only for that Fox thing.  I thought maybe if I did him a

6    favor -- but he's so afraid of these lawsuits, that's why he

7    said that -- he said, I can't, I can't.  He tied it back to

8    this lawsuit.

9    Q.  And to be clear, this lawsuit is not about whether there

10   was a technical -- things of that nature, sort of the technical

11   election issues, you have said that the 2020 election was

12   stolen; right?

13   A.  Yes.

14   Q.  And you have said that Dr. Coomer is a criminal; right?

15   A.  Yes.

16   Q.  And you are making the allegation or were when you were

17   making these statements that he was involved in stealing the

18   election?

19   A.  No, absolutely not.

20   Q.  So every one of your statements that we're going to look at

21   today was -- where you were talking about Dr. Coomer, those all

22   were because of cancel culture and not being able to go on air

23   at Newsmax?

24   A.  No.  I believe part of the Newsmax -- that was the first

25   one, when he attacked me on the capitol steps in Colorado.

1    Then I believe 100 percent he was part of this blocking effort

2    to suppress my voice to get rid of the electronic voting

3    machines.  It doesn't matter the brand.  There's an all out

4    attack on me, and there has been for four years.

5         Why he did that, that's what I call -- you went after

6    a United States, USA company, you go after me to suppress my

7    voice.  Does that meaning he's clipped the election?  No.  It

8    means he, for some reason, wants me to quit talking about

9    electronic voting machines and going to paper ballots and

10    saving our country.

11    Q.  So you remember we took your deposition, Mr. Lindell, I

12    guess, over two days, it was in your lawyer's office in

13    Minnesota.

14         Do you remember that?

15    A.  Yes.

16    Q.  I remember it because your commercials were playing on Fox

17    News outside.

18         Do you remember that?

19    A.  No, I don't.

20    Q.  And you appeared as a corporate representative for My

21    Pillow and for Frankspeech and yourself individually.

22         You remember all that; right?

23    A.  Yes.

24    Q.  And let's look at one of those depositions, because as

25    hopefully everybody has had their -- not everybody has had

1  their deposition taken.  When you do, you go into a conference

2  room, there's a court reporter there, and you swear just like

3  you did, to tell the truth and the whole truth and nothing but

4  the truth; right?

5  A.  That's correct.

6  Q.  You should have a binder in front of you.

7  A.  No, I have a notepad here.

8        MR. CAIN:  May I approach.

9        THE COURT:  You may.

10 BY MR. CAIN:

11 Q.  I have turned your binder to the deposition of you as the

12 Frankspeech representative.

13        Are you with me on that?

14 A.  Yes.

15 Q.  And if you flip to the back of that deposition, there's a

16 certification with a seal on it.

17        Do you see that?

18 A.  Yes.

19 Q.  And then there's your signature as to being sworn with

20 respect to this testimony; right?

21 A.  Yes.

22 Q.  And the subject was whether or not you were accusing

23 Dr. Coomer of rigging the election.

24        Turn to 286, and that's the little page numbers in

25 this deposition transcript.

1   A.  Yes.

2   Q.  Are you with me on that?

3   A.  Yes.

4   Q.  And at Line 15, do you see where it says Mr. Kloewer?

5   A.  I'm sorry, I'm not seeing that.

6           MR. CAIN:  I'm sorry, may I assist the witness.

7           THE COURT:  You may.

8           THE WITNESS:  Okay.  Thank you.

9   BY MR. CAIN:

10  Q.  So I'll start reading Line 286 -- or excuse me -- Page 286,

11  Line 13, it says, Mr. Kloewer, and he plays a video clip.

12          Do you see that?

13  A.  Yes.

14  Q.  And the video clip runs and you say, You are evil -- this

15  is you talking -- you are evil, and you belong behind bars.  We

16  will not stop until you are behind bars.  We are going to melt

17  down your little machines and you are going to hang onto your

18  little prison bars, let me out, let me out, should have thought

19  about that, Eric Coomer, before you did crimes against the

20  United States, the world and quite frankly all of humanity.  It

21  is disgusting what you have done.  You and Daugherity, Jena

22  Griswold, all to our country.

23          And then Mr. Kloewer asks you a series of questions.

24          He says, Okay.  So crimes against the United States

25  and all of the world, I know --

 1              And then you interrupted.  Yes.

 2              Then the question:  I have heard you state your

 3      opinion about -- about My Pillow.

 4              And what was your answer?

 5      A.  I said, I stand by that too.

 6      Q.  And then he asked you:  But in this instance, you're

 7      referring to the rigging of the election?

 8              And what was your answer?

 9      A.  Absolutely, Jena Griswold, she deleted the 2020, you've got

10      to realize that my lawsuit against Dominion, Jena Griswold --

11      it says Janet -- Jena Griswold, went around with the trusted

12      bill, which we have over a hundred percent proof, it's up on

13      Frankspeech, it's sitting there, the Mesa County image that

14      took seven months of people to go out there and do the third

15      report.  It shows a hundred percent flip flop of the election

16      and she deleted it.  And Dominion covered it up.  Dominion, all

17      of the machines in Colorado, and then you just -- you just

18      served me papers, the vice president of Dominion, so yes, he's

19      either in on it or he's doing something, because you don't sue

20      My Pillow after you try to destroy him a year earlier.

21      Q.  All right.  So I guess, earlier, you talked about how you

22      analyze election-related issues, and you used the term

23      deviations.

24              Do you remember that?

25      A.  Yes.

1    Q.  And you use that in your business?

2    A.  Every day.

3    Q.  Do you use that same concept in analyzing election-related

4    issues?

5    A.  If you see data that doesn't make sense, what your -- let's

6    say you see a county that normally is 75/25 Republican and all

7    of a sudden it is 25/75 the other way.  Or here is a really

8    good example, I work with this guy in Georgia, three Democrats

9    ran, and this lady got zero votes in her own precinct that her

10   and her husband and daughter voted in, all three voted for her.

11   You look into deviations because you need a different input to

12   get out a different output.

13        Also, in my company, I look at deviations in behavior.

14   Like all 500 of my employees, hand them a direct number,

15   somebody might not be feeling good, but I would get a call and,

16   let's say, that we find out that they were on drugs or

17   addicted, we would get them -- put them in treatment, and we

18   would pay for it and pay them while they're gone.

19        So those are things we do.  And a company like that,

20   if I see a radio station that does really good, we don't say --

21   we see why it happened and you duplicate positive things.  If

22   things are bad, you say, how did it happen and make sure it

23   doesn't happen again.

24   Q.  And that's how you looked at these election fraud claims,

25   through that prism?

1   A.   No.   I look for deviations and then I hire experts,

2   millions of dollars poured into every expert that you could

3   imagine.   If I heard of an expert, didn't matter their

4   political party, I put millions of dollars of experts looking

5   into what the problem is.   I can see that there's something

6   wrong.

7          It's like if you see your bank account and say, I'm

8   missing money, you would have to go to the bank and they open

9   up the computer and say, we found it, whether it was a computer

10  error or your mistake at home, but at least you get to look

11  inside the computer.

12         I had experts look into the stuff, not me.   I'm not

13  the one that can go into a computer and check these things out.

14  Q.   The same folks that aren't here?

15  A.   There's over 35 that were here.   This trial is about my

16  beliefs, not about overturning a 2020 election.   We would be

17  here a long time.

18  Q.   That's not how I read your fund raiser, but we can agree to

19  disagree.

20         Before I leave, I'm going to transition to something

21  other than this Newsmax issue.   You mentioned the one time you

22  got back on Fox News --

23  A.   No, that's incorrect.   It's not Fox News.

24  Q.   Pardon me.

25  A.   Thank you.

1    Q.  Thank you for the clarification.

2         Take a look at Exhibit 54.  He's going to bring it up

3    on the screen for you.

4         Mr. Lindell, these were produced by you in this case.

5    Can you, from looking at the first page, tell what we're

6    looking at?

7    A.  It's a conversation, a text conversation between me and

8    Chris Ruddy after Dominion sued me and My Pillow.

9    Q.  And then it goes on for 24 pages, but we're definitely not

10   going to cover -- I don't believe this is in evidence.

11        MR. CAIN:  I would offer it.

12        THE COURT:  It's stipulated, so admitted.

13        MR. DUANE:  Yes.

14   (Plaintiff's Exhibit 54 received in evidence)

15   BY MR. CAIN:

16   Q.  So just a few items to put some more meat on the bone in

17   your relationship with Mr. Ruddy.  We're looking at

18   February 6th of 2021, so that would have been shortly after the

19   video we just saw; right?

20   A.  Yeah, it was before -- it was before Newsmax got sued.

21   Q.  But we saw the video that you walked off on it, and it's

22   stamped -- I know this, it's my birthday -- February 2nd.  So

23   this text here is starting after that walk off; right?

24   A.  Yes.

25   Q.  And then you said you were able to get back on.

1          So at the beginning of this on the 6th, I don't know

2     if you -- this is you talking; right?

3          I don't know if you watched my documentary.

4          Is that you?

5     A.  Yes, yes.

6     Q.  I think it turned out great.  I am getting flooded with

7     calls and emails and texts from people asking why Newsmax

8     didn't announce my documentary Absolute Proof.

9          Do you want me to come on this weekend?

10         And then there was no response?

11    A.  Correct.

12    Q.  And then you informed Mr. Ruddy, they sued me, Chris.  Will

13    Newsmax have me on to talk about it; correct?

14    A.  Yes.

15    Q.  That had nothing to do with Dr. Coomer; correct?

16    A.  This is when Dominion sued me, the first attack, yes.

17    Q.  And Dominion is not here, you recognize that's a separate

18    issue, a separate lawsuit?

19    A.  Correct.

20    Q.  And he says, of course, Mike, we are also doing a story.

21         So he was obviously willing to let you come on in

22    February after this event?

23    A.  No, no.  Based on here, I'm looking at the one right below,

24    it says, February 5th.  That's the day Absolute Proof dropped.

25    The text messages are before that.  And it's before the video

1    that you all seen on the jury.

2              After that time, he never let me talk about elections

3    again.  He would only let me talk about My Pillow until they

4    sued me again, until they sued Chris Ruddy, then he -- you

5    could never come on about My Pillow.  So you are correct here,

6    but you have your dates wrong.

7    Q.  Thank you for the clarification.

8    A.  They're very wrong.

9    Q.  All right.  Later, before the symposium, if we go to Page 3

10   of this exhibit, blow up the first section.  Thank you.

11             Chris, this is you, thank you for accepting my ads for

12   the symposium.  I am waiting on news from Fox.  If they deny

13   them, I will have big news for Newsmax.  We should catch up.

14             So you were able to run the cyber symposium ads on

15   Newsmax; right?

16   A.  Yes.  Every station in the country; ABC, NBC, every single

17   news outlet in the country, it was just an ad.  You know, it

18   was just an ad for this event, correct, it wasn't talking on

19   Newsmax.

20   Q.  No, I understand.

21   A.  Okay.  Thank you.

22   Q.  But he was willing to run the cyber symposium ads, and he

23   was also willing to send a reporter from Newsmax; correct?

24   A.  Yeah.  Every station in the country did.  That's not

25   megoing on the station.  He ran a paid ad.  I had to pay them.

1    Q.  I get that.  The disconnect for me is the discussions about

2    Dr. Coomer and the accusations about Dr. Coomer really only

3    related, at this time, to this one piece that you couldn't come

4    on Newsmax?

5    A.  I could not come on Newsmax to appear live.  Before

6    Dr. Coomer, this is back when Dominion sued me, I couldn't come

7    on to talk about elections at all.  And then after he went

8    after Newsmax and My Pillow, I could never go on to talk about

9    My Pillow, just like I always have everywhere in the country to

10   talk about the good things about My Pillow, not to put ads, ads

11   are separate.  This was to talk about my companies.  This is

12   the American dream.  This is what we do for homeless people,

13   millions of dollars we put into this.  This is like -- this is

14   what you want a company to be.  That's what he would not allow

15   on, and he did not allow on here.  He allowed a paid ad, like

16   everyone else in the country; NBC, ABC, CBS, everybody got

17   these paid ads to this event.

18   Q.  Isn't it true that, at that point in time, My Pillow had

19   been canceled off of Twitter, that's what you were talking

20   about in the one video; correct?

21   A.  My Pillow got canceled off of Twitter on February, I

22   believe, 2nd, maybe, of 2021.  And that was big news in the

23   country, because it's the only company that got canceled off of

24   Twitter or canceled off social media because -- and that was

25   strange too because the CEO wants to secure our elections.  And

1   that's why I went on every station in the country and

2   interviewed, why did you get canceled on Twitter because we

3   want to go to paper ballots and get rid of the electronic

4   voting machines.

5           The only one that had a problem was Newsmax because

6   they were afraid because they got sued and they were afraid.

7   That's what lawfare does, you silence the platforms, you

8   silence the voices.

9           On February 4th of 2021, when Smartmatic sued Fox

10  News, that started lawfare in our country.  And according to

11  Alan Dershowitz saying, it hadn't been done this widespread

12  since 1790s.

13  Q.  Well, let's not talk about Mr. Dershowitz.  Let's talk

14  about --

15  A.  I'm just not the one that said the fact.

16  Q.  Well, sir, you were the CEO of My Pillow during this time

17  and everybody associates -- like your lawyer said, everybody

18  associates you and My Pillow; is that right?

19  A.  Well, you know --

20  Q.  Is that true?

21  A.  Yes.

22  Q.  Okay.

23  A.  If they know that I was -- because I do my own -- I do my

24  own commercials.

25  Q.  Right.  And then you were also going out at -- on the other

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

 1   hand and talking about the election being rigged and fraud at

 2   the same time; right?

 3   A.  Yes, that was on my own time.

 4   Q.  Okay.

 5   A.  Nothing to do with My Pillow, believe me.

 6   Q.  Oh, really?

 7   A.  My Pillow and my employees, that's a separate thing.

 8   Q.  It affected My Pillow, you had box stores canceling My

 9   Pillow?

10   A.  Yup.

11   Q.  Hold on.

12       You knew that was because of the election fraud

13   material you were putting out; right?

14   A.  That's correct.  It hurt My Pillow huge.

15   Q.  Right.  And you mentioned that you have employees that are

16   shareholders of your company?

17   A.  Yes.

18   Q.  Right.  And putting the election fraud material out that

19   you were doing was hurting their company?

20   A.  Huge.  It cost my company everything.

21   Q.  And you had board members resigning because of all of this,

22   didn't you?

23   A.  Correct.

24   Q.  You mentioned to me Joe Springer resigned?

25   A.  Correct.

1    Q.  Bob Roepke?

2    A.  Correct.

3    Q.  Others?

4    A.  Correct.

5    Q.  And your family was telling you, this is a bad idea?

6    A.  No.  My family, because of the threats they had was beyond

7    anything known to man.  And my daughter called me in tears and

8    said, could you please stop.  I said, I can't.  My country,

9    we're going to lose everything.  My Pillow is nothing if we

10   don't have the country and have the American dream.

11   Q.  Had you been advised by your board to take the election

12   activism somewhere else, in one of these C3s or C4s and try to

13   disassociate that with My Pillow?

14   A.  I didn't have those back then.  By the time my board --

15   Q.  Didn't have what back then?

16   A.  One of my C3s or C4s.  I didn't have any money until I ran

17   out so we could keep going.

18   Q.  You could afford to start a nonprofit, couldn't you?

19   A.  What's that?  I could, but I didn't ask anybody for any

20   money.  I had money.  I spent it all, millions of dollars to

21   try and save our country.  When you are talking about the

22   board, I can explain when they gave me advice, if you want me

23   to go there.

24   Q.  We may come back to it.

25   A.  It was years earlier.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    Q.  You had alternatives to this, as you have now described it,

2    very destructive course of action to your business.  You could

3    have gone through a nonprofit, you could have done other things

4    than what you were doing?

5    A.  No.

6    Q.  Okay.

7    A.  You can't unsee what I saw, and you can't undo what I know

8    and had seen.

9    Q.  But you were hurting your own employees who own stock in

10   the company?

11   A.  Yes.  They were -- as far as money loss, lost $150 million

12   in sales for that year right out of the gate.

13   Q.  Do you not see how this was reckless?

14   A.  It wasn't reckless.  I had everything.  I've hired 30 some

15   experts.  I've put at least $40 million into showing this,

16   trying to get it out and camera angles from every angle, buying

17   every voter roll in the United States.  I probably did more

18   than anyone ever did on any subject in history.

19        The problem was, if anybody knew what I knew, if

20   anybody would have looked at it and opened up these machines,

21   and the media said, hey, we have a problem here, we have to be

22   like 133 other countries and get rid of these things.  They

23   don't belong in elections.

24        Was I just supposed to walk away?

25        No.  I even said two years into it, you know, you have

1    lost millions of dollars, and I said, I'm willing to lose

2    everything and borrow money so the truth can get out and save

3    our country.  And that's what I have done.

4    Q.  You mentioned 132 countries?

5    A.  132 countries.

6    Q.  What's the biggest democracy in the world?

7    A.  Biggest what?

8    Q.  Democracy?

9    A.  I think it's India.

10   Q.  They use voting machines, don't they?

11   A.  The last one to get rid of them was Argentina, it was three

12   years ago, and they improved their country, it was amazing.

13   One judge made a ruling, let's not use these.  They beat the

14   Netherlands.  They got rid of them in four months, and they had

15   a secure, fair election.  And it freed Argentina.

16        The last country that got stolen was Brazil, that

17   happened three years ago.  President Bolsonaro, who became a

18   friend of mine, they stole his whole election from him.  A guy

19   that was in prison, they brought him out of prison, crimes

20   against his country, and they put him in with these electronic

21   voting machines.

22   Q.  If the court reporter got that, she's a hero.  You may want

23   to slow down.

24   A.  Yes, I will.  I'm sorry.

25   Q.  So I guess, given what you have said, let's segue to -- we

1    might come back to those texts, but they're in evidence and

2    they'll go back to jury room.  There's a few other issues in

3    there I'm not going to cover.

4         So all of this is going through your mind, the impact

5    on your business and family, and then -- well, let's go back to

6    that stipulation that we first started on.  I think it was 28.

7         And actually, before I ask you this, since we have

8    covered a lot, everything that you have been talking about --

9    you know, I started with whether you feel responsible for

10   making attacks against, in this instance, an election worker,

11   everything we have been talking about, in your mind, justifies

12   what you did to Dr. Coomer?

13   A.  What I'm saying, the statements I made back then, he is a

14   blocker, which would be like a -- it would be compared to

15   blocking, are you the driver of a getaway car of the biggest

16   heist in history.  It didn't make sense.

17        I have been in this trial here, and I have seen other

18   things now with Mr. Coomer.  I never knew about that phone

19   call, but I see that, and I'm going, did he just want to be

20   part of this Antifa group and see that.  So maybe he just, you

21   know, is suing people to make a lot of money.  I don't know.

22        He made a comment about me, I'm going to go after that

23   pillow boy clown.  And I've seen a thing where he said this in

24   February to his brother, and that was long before he went

25   after -- before I couldn't go on Newsmax and a year before he

1    sued me.  So I'm finding stuff out about him.

2    Q.  Do you remember my question?

3    A.  Yeah.  You said, do you stand by your statements back then.

4    Back then, the ones that were made, if the jury knows, is after

5    he sued me on the steps of the state capitol in Colorado, and I

6    went, they're attacking me again, Dominion and this Coomer, I

7    believe that's when I called them a criminal crime family,

8    because I couldn't believe it.  And I never said anything about

9    Eric Coomer in the whole year.  I never mentioned his name.

10          I never knew this call, the Antifa thing, that's not

11   when I got sued because I looked at it -- I didn't even know

12   this guy then.  Why would he attack me?  I know why, they

13   didn't want to get the word out.  All I stood for is get rid of

14   the electronic voting machines in our great country.

15   Q.  Okay.  Couple of things on that so we can maybe clear the

16   deck.

17          All the time that was spent rummaging through

18   Dr. Coomer's Facebook, private Facebook pages, you saw that;

19   right?

20   A.  Just in the courtroom here for the first time.

21   Q.  Right.  So all of the statements that you have made about

22   him directly, you had no idea about this Facebook stuff?

23   A.  Absolutely not.  I had no idea about any call with Joe.

24   Q.  Right, right.

25          So now, to this January 9th thing that is on the

1    screen, you said this came on January 9th on the bottom; right?

2    A.  Yes.

3    Q.  And that was the day that Brannon Howse introduced you to a

4    person who called herself Mary Failing?

5    A.  That's correct.

6    Q.  And I say it that way, because you never personally met

7    this individual?

8    A.  Which individual of the two?

9    Q.  Good question.

10            Mary Fanning.

11   A.  Mary Fanning, no, I had never met Mary.  But he said I had

12   been on his podcasts for some period of time.

13   Q.  Mary Fanning ended up being kind of instrumental in getting

14   you to Dennis Montgomery?

15   A.  Yes.

16   Q.  And to remind everybody, Dennis Montgomery ended up being

17   the person you hired to supply the cyber symposium with the

18   data that you were going to present?

19   A.  One of the experts that I hired.  But he was the first one

20   that gave me -- do you want me to explain or should I not

21   explain?

22   Q.  I think it will move things along further if you do in this

23   instance.  But in your response, identify the other expert.

24   You said one of the experts, so identify what other expert and

25   explain your answer.

1    A.    Okay.  I'm going to take it back for the jury a little bit.

2              After the deviations on the night of the election on

3    November 3rd of 2020, I kept -- there was deviations that

4    happened, all six states stopped counting at the same time.  I

5    thought it was very strange, and it never happened in another

6    election ever.  So these deviations came down and things that

7    didn't make sense.

8              So I started doing my own investigations and looking

9    at consistencies like in -- I started in Nevada, you have to be

10    a resident for 30 days to vote, and there were literally

11    thousands of people that voted in Nevada that weren't eligible.

12    I'm going, this doesn't make sense.  I couldn't imagine people

13    going, let's go commit a crime and run across the border and

14    vote in California, or whatever it may be, and it was so

15    widespread, I'm going, this doesn't make sense.

16              And I would look at deviations, look at counties from

17    other elections, I bought voter rolls and I am seeing things

18    coming out on social media and different things.

19              Then I watched this show called Kill Chain, and I see

20    two experts in there, Dr. Halderman and Harry Hursti.  And I

21    watch them.  It was this movie saying everything could be done

22    with machines, those were my first two experts that I seen,

23    Harry Hursti and Dr. Halderman.  I go, wow, do I know their

24    credibility, no.  But it kind of answered, wow, this could

25    explain all this, yes, they did use computers.  And it was all

1    Democrats in this movie, too.

2            In my state of Minnesota, Amy Klobuchar, we had a

3    booth together at the state fair, right by mine, she was in

4    there, and I take her opinion very strongly, and she said, we

5    have voting machines that run our country.  She basically said

6    straight out, we need to get rid of them.  So we have that.

7            Then after that, on January 7th, a letter came out --

8    it kind of got lost in everything that happened on

9    January 6th -- but on January 7th, a gentleman named John

10   Ratcliff, he said DNI, which is the Department of National

11   Intelligence, he came out with a letter that day that said

12   China -- there were problems with China and the election and

13   suppressing that China was involved.  This is straight from the

14   DNI.  And I seen that.

15           On January 9th, I got a call with -- Mr. Cain said

16   from a Brannon Howse, I thought it was something about my

17   house, I spelt it like "house."  I do that in my phone --

18   Q.  I'm going to stop you there.  I thought it was going to be

19   helpful.

20   A.  This is right to the Dennis --

21   Q.  But just to move it along.

22   A.  I'll move it faster, I'm sorry.

23           She got on the phone and told me all about this guy

24   that worked with the government in the CIA and he had developed

25   this thing called Hammer Scorecard.  And it sounded like, wow,

 1    this would explain how it was so widespread across our country.

 2    And this -- and it had been used against our own country.  She

 3    was telling me this.  And she had a snippet of evidence because

 4    she was a reporter.  And she sent that to me.

 5         I believe it was a few days later, I -- we got Dennis

 6    Montgomery, I got him on the phone with my wife, and we were --

 7    we talked to him, because I wanted to make sure that this guy

 8    was legit.  I got sent a 2017 -- where he was on -- they were

 9    talking to him on Fox News, with John Sullivan and --

10    Q.  Okay.  I'm sorry to interrupt you, sir.  This is not

11    helpful, I don't think.

12    A.  I'm sorry.

13    Q.  Let's just get back to question and answer.

14    A.  Okay.

15    Q.  In terms of the chronology, I'm going to interrupt you

16    there.

17    A.  Okay.

18    Q.  In regard to Mary Fanning, you hadn't personally met her

19    during this initial introduction?

20    A.  No.

21    Q.  Her voice really is the only way that you know her, other

22    than text; right?

23    A.  Correct.

24    Q.  You have never met her in person?

25    A.  I have never met her.

1  Q.  Have you ever seen a photograph of Mary Fanning?

2  A.  Not to this day.

3  Q.  But after having, roughly, a 15-minute phone call with her

4  and Brannon Howse initially, you were convinced that she was on

5  to something at that point?

6  A.  She -- I see -- Brannon Howse said to me, listen to her,

7  you'll be interested.  And I said, okay, I'll give her -- I

8  will listen to her.

9  Q.  But you didn't know anything about her background?

10 A.  No.

11 Q.  And within about two weeks after this call, you ended up

12 flying to Tennessee to film Absolute Proof?

13 A.  No.  It was -- this was almost a month later.  In between,

14 I got ahold of my good friend, Dr. Ben Carson, who worked for

15 the government, who was secretary of health.  I went to the

16 government who had access, and said, I need to find everything

17 I can about this Dennis Montgomery.  And everything checked

18 out, except there was one problem.  His data had government

19 secret -- it's called Protective Secret Act on it.  You had to

20 have it signed in order to release it to the United States,

21 because he worked for the government.

22        I brought that to the White House to try and get

23 President Trump at that time to sign it.  That was on

24 January 15th.  Once he -- the lawyers -- I didn't get it

25 signed.  I was going back across the road, and Ben Carson

1    called me and said, did you get it signed.  I said, no, I felt

2    I let the country down.  And he said, Mike, this is god's

3    timing, maybe things have to happen before the truth can come

4    out.  And he gave me a peace.  Because I was so desperate, I

5    had to show the country this data.  So it didn't get signed.

6    Q.  Sir.

7    A.  I'm sorry.

8         But Absolute Proof was my next thing, which was

9    February 5th.

10   Q.  You've got to listen to my question.

11   A.  All right.  I'm sorry.

12   Q.  So we can move this along.

13        But you did film Absolute Proof.  Mary Fanning was

14   part of that production --

15   A.  Mary Fanning and Brannon Howse, I financed it.

16   Q.  You wrote it?

17   A.  Yes.

18   Q.  You paid for it?

19   A.  Yes.

20   Q.  Ms. Fanning appeared on it, not -- you couldn't see her,

21   but she was part of it?

22   A.  Yes.

23   Q.  And by the way, were you here -- you were here, but did you

24   see the clip I played of Dr. Coomer in Absolute Proof?

25   A.  Yes.  That was the first time I had seen it.

1    Q.  That was what I was going to ask you.  You didn't watch

2    your own movie?

3    A.  That little piece was shown.

4    Q.  And you told me, when I asked you about this, that Absolute

5    Proof was seen by 150 million people?

6    A.  Yeah.  When it came out, it was blocked everywhere.  And

7    then, according to people that have -- because it was blocked

8    on YouTube, they put Facebook fact checkers, they did not want

9    it out.  And later on, they said, it could have been

10   150 million people seen it.  And yes, I did watch my own movie,

11   sir.

12   Q.  Well, I'm going to defer to Dr. Halderman to explain sort

13   of Dennis Montgomery sort of score card and captures.  But you

14   decided you were going to invest in Dennis Montgomery and his

15   information so you could go to the cyber symposium to show

16   everyone that China was involved in hacking the election?

17   A.  No, Absolute Proof came out February 5th of 2021.  The

18   stuff that was presented on there was all kinds of experts that

19   came in.  I believe there was a problem with Michigan, I was

20   validated by two generals, two colonels from the government.

21   Those were people that were in the movie.  I don't know what

22   cyber symposium you're talking about.  The movie itself, there

23   were many, many experts and a lot of data.

24   Q.  Well, I was trying to fast forward to the point that you

25   made the decision to present this information to the cyber

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    symposium.

2    A.  That was in July I made that decision.

3    Q.  You made that decision?

4    A.  Yes.

5    Q.  And I'm not going to ask you to explain it from a technical

6    standpoint, but the idea of the symposium was to present this

7    information to technical experts that ended up like being Harry

8    Hursti to examine it, to prove that this packet capture data

9    was traveling between China on the one hand and the United

10   States?

11   A.  I couldn't get the information out because I was getting

12   blocked everywhere.  By this time, I had voter rolls from

13   everywhere in the country.  This is their own data.  The

14   problem we had is all of these computers showed computer

15   manipulation everywhere we looked.

16            And the sole purpose of the cyber symposium, I said,

17   to get the word out, I'm going to invite the media if they have

18   credentials, I'm going to invite politicians, and I'm going to

19   invite cyber experts that had to be vetted that have certain

20   qualifications.  And then I took the data to Texas because it

21   had to be -- this is Dennis Montgomery, his particular data had

22   to be put in, it's called the cyber act of 2015, Obama set up

23   and deemed our elections critical infrastructure.  And part of

24   that was the cyber 15 act -- 2015 act, where you could put

25   evidence there anonymously and go out and protect our country.

1    That's what I was trying to do in Texas before the cyber

2    symposium.  It was a way to maybe get it out there without

3    having that protective order signed.  This was a legal way to

4    do it and the right way to do it.

5    Q.  Well, you began promoting and the jury has seen your

6    promotion about your challenge --

7    A.  Yes.

8    Q.  -- you decided to do that.  And we know that's on appeal,

9    but you lost the ruling on that; correct?

10   A.  That went to -- there was a cyber person that went -- this

11   was part of blocking too.

12   Q.  Just answer my question.

13   A.  Yes.

14   Q.  Okay.  We'll move it along.

15        But as part of your promotion for the event, you

16   started doing interviews with organizations like CNN?

17   A.  Yes.

18   Q.  And others?

19   A.  Anyone who called me.

20   Q.  In fact, you did an extensive interview with CNN on

21   Anderson Cooper's show?

22   A.  Anderson cooper aired it, I believe his name was Drew or

23   something.

24   Q.  Drew Griffin?

25   A.  That's correct.  And he came to -- his whole team came to

1    Minneapolis.  Offered to go on any show, any show because we

2    had to get this out to the public.

3    Q.  And you know they addressed specifically the claims that

4    you were making at that time in the piece that CNN --

5    A.  The strange thing about the CNN interview and I had many

6    other interviews between February and the cyber symposium, I

7    never, never -- for Dennis Montgomery's protection, I never

8    mentioned his name.  But outlets like CNN came on and said, you

9    got this from Dennis Montgomery, you know it's been debunked.

10   I said, I never said I got it from Dennis Montgomery.  It was

11   weird, like blockers, like who doesn't want to get this out

12   there.  I never said Dennis Montgomery.

13   Q.  Mr. --

14   A.  I'm sorry.

15   Q.  Please listen to my question.

16        THE COURT:  Counsel, could you approach, please.

17        (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2               THE COURT:  Mr. Duane, you are handling this witness;

3     right?

4               MR. DUANE:  Yes, your Honor.

5               THE COURT:  To the extent he can listen to the

6     question, answer the question, you are going to have

7     opportunity to examine him, it would just make things a little

8     more efficient.  I don't want to admonish him in front of the

9     jury, but if you could tell him.  I'm going to say something,

10    of course if it goes on.  I'm trying not to interfere.

11              MR. DUANE:  Of course, you are suggesting I speak with

12    him now?

13              THE COURT:  I would give a warning, so you're not

14    surprised.

15              MR. DUANE:  I can slip him a note with your Honor's

16    permission.

17              THE COURT:  We'll wait, but I just wanted to give you

18    a heads up.

19              MR. DUANE:  We appreciate that.

20              (Continued on next page)

21

22

23

24

25

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                                                                        919

 1        (In open court; jury present)

 2   BY MR. CAIN:

 3   Q.  So Mr. Lindell, you did an interview with CNN, I believe it

 4   was August 6th, basically a few days before the cyber

 5   symposium; right?

 6   A.  Five days before, approximately.

 7   Q.  Let's look at Exhibit 190.  This is the CNN segment.  You

 8   remember giving this interview you Mr. Griffin?

 9   A.  Yes.

10        MR. CAIN:  Offer 190.

11        THE COURT:  Any objection?

12        MR. DUANE:  No objection.

13        THE COURT:  So admitted.

14   (Plaintiff's Exhibit 190 received in evidence)

15   (Media played)

16   BY MR. CAIN:

17   Q.  Did you watch this entire segment back then?

18   A.  Yes, I did.

19   Q.  So you knew about this before the symposium?

20   A.  Yes.

21        MR. DUANE:  Your Honor, may we approach briefly.

22        THE COURT:  Yes.

23   (Continued on next page)

24

25

                                                                920

 1        (At sidebar)

 2            MR. DUANE:  Of course we didn't object to this,

 3   because significant portions of this exhibit are statements by

 4   our client, but the expressions of opinions in that segment by

 5   the reporter and the other individual is not being offered for

 6   the truth.

 7            THE COURT:  Mr. Duane, if you have a proposed limiting

 8   instruction, propose it to the other side, they can review it.

 9   And to the extent there's an issue, we will address it then

10   during the charging conference, once the Court sees it.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2    BY MR. CAIN:

3    Q.  Going back to that interview, do you remember when the

4    reporter asked you the question:  If you're wrong, isn't that

5    very dangerous?

6    A.  Yes.

7    Q.  And you said yes?

8    A.  Yes.

9    Q.  Just like you did now?

10   A.  But I'm not wrong.

11   Q.  I'm sorry?

12   A.  I didn't say the second part.  I said yes, but I'm not

13   wrong.

14   Q.  I know, you think you are right?

15   A.  Yeah.

16   Q.  I get it.

17          But there were other warnings, not just this piece,

18   before the cyber symposium.  You know a gentleman named Jerry

19   Johnson?

20   A.  Yes.

21   Q.  Exhibit 83, let's pull that up.

22          So before you gave the interview to Drew Griffin, a

23   letter was emailed to you from Jerry Johnson -- and just to

24   segue, how do you know -- it's Dr. Johnson?

25   A.  I've known him -- he actually did some work for me.  I

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    don't know back then --

2    Q.  Someone you trust?

3    A.  Yeah, I trust him.

4    Q.  And this Exhibit 83 was produced by My Pillow.

5         MR. CAIN:  If you could pull out, Hank, and go to the

6    bottom right.

7    A.  This wasn't -- this was produced by me.  I used my My

8    Pillow email address for everything.  It wasn't produced by My

9    Pillow.  This was me personally.

10   Q.  Well, I'm just saying, the Bates stamp reflects that it was

11   produced by My Pillow, that's what they call that?

12   A.  Yes.

13   Q.  But this is your My Pillow address, Mike@MyPillow?

14   A.  Mike@MyPillow, I use it for everything, correct.

15   Q.  And you remember receiving this, don't you?

16   A.  Remember what?

17   Q.  Receiving this document -- we haven't gone into the

18   details -- but this was a document with you provided from

19   Mr. Johnson?

20   A.  I don't remember particularly from Jerry Johnson.  But I

21   expect what you are going to see is you're going to see all

22   these warnings about --

23   Q.  No, sir, I wasn't asking you --

24   A.  Okay.

25   Q.  -- about the content.

1    A.  What was the question?

2    Q.  Listen to my question.

3         You remember receiving this from Jerry Johnson?

4    A.  No, I don't remember that it came from Jerry Johnson.  I am

5    seeing it right now.  I am looking down and I see Mike Zullo.

6    I remember this name when it came in, it was disturbing.

7    Q.  You are not denying you received the document?

8    A.  No, I received it.

9    Q.  In fact, you did respond to Mr. Johnson?

10   A.  I don't know.  I'd have to see that part.

11        MR. CAIN:  Offer Exhibit 83.

12        THE COURT:  It's stipulated, so admitted.

13   (Plaintiff's Exhibit 83 received in evidence)

14   BY MR. CAIN:

15   Q.  For the jury, this is August 2nd, Mr. Johnson, it's a

16   letter about Dennis Montgomery and the symposium.  And it says

17   it's a letter from Mike Zullo to Sheriff Joe Arpaio that I

18   received tonight from Texas State Representative Steve Toth.

19        Do you see that?

20   A.  Yes.

21   Q.  Did you know any of those gentleman?

22   A.  No.

23   Q.  And Mr. Johnson --

24   A.  Can I correct my statement?

25   Q.  Sure.

1    A.  Mike Zullo, his name might have came up before, because I

2    think he came from a number of different angles about Dennis

3    Montgomery.  And nobody knew about Mr. Montgomery, I had never

4    put his name out there.  So the Zullo name, I think, came out,

5    I had warnings about him.

6          MR. CAIN:  Let's go to the next page and quickly

7    review some of this.

8    Q.  So sheriff Arpaio, he's a conservative sheriff out West;

9    right?  Do you know, Mr. Lindell?

10   A.  Do I --

11   Q.  Do you know Sheriff Arpaio is a conservative sheriff out

12   West?

13   A.  I do now.  I don't think about conservative, I know of the

14   sheriff.  I met him one time a year ago.

15   Q.  All right.  And the subject is infiltration of Mike

16   Lindell, existential threat to Donald J. Trump.

17          Do you see that?

18   A.  Yes.

19          MR. CAIN:  And if we go to the overview section, I

20   want to point out a few things.

21   Q.  The first section talks about there's a possibility that

22   you have been deliberately -- I'm paraphrasing -- set up to

23   discredit legitimate investigations into voter fraud,

24   demoralize President Trump's political base and inflict

25   political and reputational damage to President Trump.

1           Do you see that?

2    A.   Yes.

3    Q.   And if you think about this concept of what we're talking

4    about here, disinformation or bad information about elections

5    can hurt both sides of the political spectrum.  In this

6    instance, it could hurt Donald Trump or, in other instances, it

7    could hurt the other party?

8    A.   Electronic voting machine hurts everybody, the people of

9    our country.

10   Q.   But we want to make sure that everybody gets accurate

11   information?

12   A.   Yeah.  They rigged the voting machines, I agree.

13   Q.   Sure.  And in this instance, there's a lengthy discussion

14   about Dennis Montgomery where you were able to get some

15   background information, whether you chose to accept it or not;

16   right?

17   A.   Yes.

18   Q.   You were told that Dennis Montgomery is a con man and a

19   fraudster; right?

20   A.   This letter says that, yes.

21   Q.   And then there's some detail that's given.  Again, you

22   received this about 8 days before the cyber symposium.

23           MR. CAIN:  Let's flip to the next page.  Potential

24   impact on President Trump.

25   Q.   Did you read this section?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

 1              Let's just focus on the first four paragraphs.  Do you
 2      remember reviewing this, that Dennis Montgomery and journalist
 3      Mary Fanning, it's imperative for President Trump to understand
 4      who these people are and how they have interjected themselves
 5      into the situation, and then it goes on to talking about the, I
 6      guess, Absolute --
 7      A.  Are you asking if I read this?
 8      Q.  Yes, sir.
 9      A.  I had seen -- I had had numerous people over three months,
10      four months send me things like this about Dennis Montgomery
11      and Kurt Olsen, you all met Kurt Olsen, and they said, they're
12      worried about Dennis Montgomery.  Nobody knew that name, we
13      told nobody.  Not one person on the planet knew that name,
14      other than me, Kurt Olsen, Dennis and one other person.  So
15      this was -- this was just more like -- Dennis Montgomery, we've
16      got to get this out there.
17      Q.  So you took the warnings through this and you processed it,
18      and you thought, okay, they realize we've got to quash this and
19      you --
20      A.  Yeah, there was other things too, though.  We -- by this
21      time, because this is in the summer, by that time, I almost --
22      I think I had every voter roll in the United States that I had
23      paid millions for.  And I had other experts look and imagine
24      different camera angles, from completely different angles
25      looking at the data.  It was widespread computer manipulation.

1    One of them is called, the CAST vote records, which we have

2    under the Freedom of Information Act, had a right to get, and I

3    got them, one-third of the United States.  So you have all

4    these things confirming what we already knew with the Dennis

5    Montgomery data.  This was just the icing on whether you're

6    really afraid of his particular data.

7    Q.  Why would a sheriff in West Texas and a representative from

8    Texas be afraid that you're going to release Dennis

9    Montgomery's information?

10   A.  They didn't know I had Dennis Montgomery's -- that's the

11   weird part about it, that's the very strange part.  I'm going,

12   okay, more blockers.  They're very worried.  The Zullo guy, I

13   could spend a lot of time talking about the Zullos, because we

14   used a private investigator to investigate all of them.

15   Q.  You anticipated my next question.  Did you make any --

16   maybe not the right person though -- did you hire someone to

17   investigate Dennis Montgomery?

18   A.  No.  We hired people to investigate the people that were

19   attacking us.

20        My wife got a call, she got a call with people on the

21   phone, and it was very threatening, basically saying, you need

22   to back off on this Dennis Montgomery stuff.  And this guy,

23   when we did the investigation, it goes back to the Zullo and

24   many others involved who wanted to squash his particular data,

25   not the other stuff I had.  Those come right out of the

1    machine.  They feared scorecard and Dennis Montgomery.  It was

2    spooky.

3          If you ask my wife, you see her in the courtroom, very

4    spooky.  This is weird that they don't want this information

5    out, and nobody knows it was Dennis Montgomery.  He was just

6    one piece we had.

7          But it's very concerning, and that's why it was under

8    Government Secret Protective Act.  And by the way, I tried to

9    get it signed again, and they still did not release it for this

10   trial.

11         MR. CAIN:  I'm going to object as nonresponsive.

12         THE COURT:  Counsel, approach.

13      (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. DUANE:  In fairness, the question did begin with

3     the word "why," but we have no objection.

4          THE COURT:  The answer should have been no, and he

5     should have stopped.  The question was:  Did you hire someone

6     to investigate Dennis Montgomery.

7          MR. DUANE:  I apologize.  My recollection was

8     mistaken.  We have no objection if Mr. Cain thinks the witness

9     is being unresponsive and wishes to interrupt the witness.  We

10     won't object to that either.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court; jury present)

2         THE COURT:  Ladies and gentlemen of the jury, I'm

3    going to strike that after the answer no.

4         The Court would be really appreciative if you listen

5    to the question of the examiner, Mr. Cain, and answer just that

6    question.

7         THE WITNESS:  Okay.

8         THE COURT:  Your attorney will have an opportunity to

9    examine you as well.  It will make these proceedings go a

10   little more efficiently.

11        THE WITNESS:  Thank you, your Honor.

12        MR. CAIN:  Let's go to the next page of the memo.

13   Next one.

14   BY MR. CAIN:

15   Q.  Verified experts refute Montgomery's claims, it says that,

16   as he did in 2014, Montgomery has once again utilized the ruse

17   of hacking to get information under PCAPS as the identifying

18   data points that contain the evidence of vote flipping.

19   Montgomery has convinced Lindell that this information is

20   irrefutable and cannot be altered or compromised.  Lindell has

21   made this assertion numerous times to the public.  However,

22   this claim is far from accurate, according to form NSA and FBI

23   officials.  And then it goes on to talk about flipping data and

24   injecting data.

25        Now, I'm interested in the counter narrative.  Had you

```
 1   had any of the experts that you have identified that aren't
 2   going to be testifying advise you, outside of Zullo or any of
 3   these guys, did you have any expert advise you prior to the
 4   cyber symposium that Dennis Montgomery's PCAPS data was a hoax?
 5   A.  No.
 6   Q.  No one told you that?
 7   A.  No.
 8   Q.  You knew Mr. Oltmann by the time of the cyber symposium?
 9   A.  No.
10   Q.  You didn't know him?
11   A.  I had never seen him.  I went on his podcast.  We do
12   podcasts all the time to introduce My Pillow, and he wanted to
13   start selling My Pillow.  We have a whole process.  That was
14   the only time I heard his voice.  Text him.  I never met him.
15   We had text, but I had never met him.  And I did not know he
16   was coming to the cyber symposium.
17   Q.  Oh, you didn't?
18   A.  No.
19   Q.  You didn't know that he might be on the plane?
20   A.  No.  My plane went and picked up everybody all over the
21   country.
22   Q.  You are pictured with him at the cyber symposium.  Did you
23   remember being on the stage with him?
24   A.  No, I was getting off stage, and he was getting on.  You
25   showed me a clip.  There were hundreds of people there.  If you
```

1   had asked me prior to this trial, was he there, I would have

2   said, I don't know.

3   Q.  Well, you heard Mr. Oltmann say from the stand something to

4   effect of, I'm sorry, Mike, the data is not real.

5        Do you remember him saying that?

6   A.  He said that people take advantage of me to a fault or

7   something like that.

8   Q.  Okay.  And are you contending that the PCAPS data that was

9   to be presented at the cyber symposium is still actual evidence

10  of election fraud?

11  A.  You want me to explain --

12  Q.  No.  I want you to answer.  That's a yes-or-no question.

13  A.  What was the question, again?  Repeat it.

14  Q.  Are you contending that the PCAPS data that was to be

15  presented at the cyber symposium is evidence of election fraud

16  in 2020?

17  A.  I can't answer that question.  I would have to explain.

18  Because I found out something at this trial that I did not know

19  before.

20  Q.  Okay.  Prior to this trial, sir, answer my question, yes or

21  no.

22        THE WITNESS:  Can I answer, your Honor?

23        THE COURT:  Mr. Lindell, you need to answer the

24  question.

25        THE WITNESS:  Okay.

1           THE COURT:  So prior to this trial.

2           THE WITNESS:  I seen something that was presented that

3    wasn't ours that was given to Harry Hursti illegally, and I

4    don't know what was presented there by those two hard drives

5    that were brought in that room.  That wasn't what I was

6    presenting.  So now, if you ask me do I believe Dennis

7    Montgomery's stuff is real, absolutely.  You understand my

8    problem?  Because I --

9           MR. CAIN:  No.

10          THE WITNESS:  Two hard drives were taken or given to

11   Harry Hursti, and I didn't know that until this --

12          THE COURT:  Mr. Lindell, again, I --

13          THE WITNESS:  It's hard for me to answer that.

14          THE COURT:  You are going to have an opportunity.

15          THE WITNESS:  Okay.

16          THE COURT:  Just listen to the question and answer.

17   BY MR. CAIN:

18   Q.  I have asked you a couple of things that I think we got a

19   response partially.

20          You still, prior to this trial, contend that the

21   information that was -- the PCAPS data is real; right?

22   A.  Yes, that Dennis Montgomery has, yes.

23   Q.  And still, as of today, sitting in that witness chair, you

24   believe that Dr. Coomer is a criminal?

25   A.  Do I believe he's a criminal?

1  Q.  That's what you called him.

2  A.  And yourself?  I believe what you did to me and My Pillow

3  was criminal.  I stand by what you did was criminal and is

4  criminal.

5  Q.  I'm not going to go into specifics, but going back to the

6  Zullo memo, I had asked you if you had done any -- hired

7  anybody to investigate Dennis Montgomery at this time.  There's

8  some -- there's a reference in this document to a meeting in

9  June that your attorney was involved with.

10        Do you remember attending a meeting in June relating

11  to this Dennis Montgomery information?

12  A.  No.  My investigations into Dennis Montgomery were way

13  back, months before that, deep doves into his -- what he did

14  with the government.

15  Q.  By the way, have you Googled Dennis Montgomery recently?

16  A.  Oh, yeah, yeah, they've got all kinds of bad stuff about

17  him there, because they don't want to know.

18  Q.  It sounds to me like, no matter what people present to you,

19  you are going to believe Dennis Montgomery?

20  A.  No, but I believe we need to get rid of the electronic

21  voting machines.

22        I didn't stop at Dennis Montgomery.  I went with 35

23  experts, I went and got the real data from the states myself.

24  I spent millions looking at other camera angles, not just

25  relying on one source.

1    Q.  And all of the sources that you consider reliable, you have

2    listed for us?

3    A.  They all have computer manipulation, every one of them.

4    Q.  Okay.  And sources like Dr. Halderman, who has specific

5    expertise, if he were to come in here and say that there's no

6    evidence that Dr. Coomer was involved in rigging the 2020

7    election, you wouldn't have any reason to dispute that?

8    A.  I didn't say Dr. Coomer rigged the election.  But I would

9    would trust Dr. Halderman because he was one of the first guys

10   I seen in the movie Kill Chain that said one of the elections

11   could be hacked.  And he actually did it in front of a judge, a

12   few years ago, and hacked with a ballpoint pen and flipped the

13   whole election.  He's very skilled.

14        MR. CAIN:  Object as nonresponsive.

15        MR. DUANE:  I believe the answer was responsive.

16   Relatively brief.  I think it was responsive to the thrust of

17   the inquiry.

18        THE COURT:  Overruled.

19   BY MR. CAIN:

20   Q.  I feel like we've worn out Exhibit 83, so let's skip to the

21   end.  There's multiple pages.  We looked at verified experts

22   refute the claims, data contrived, Fanning's influence claim,

23   et cetera, and then attempts to caution Lindell failed, that's

24   on Page 12 of the exhibit.  Let's go to that.

25        This is what I was referring to earlier.  It says, in

1    a direct effort to bring this information to the attention of

2    Mike Lindell and his counsel, working through a number of

3    former IC officials and trusted resources over the last three

4    months, I have been in contact with Mr. Don Berlin, who was an

5    advisor to the presidential commission on voter integrity and

6    an outside advisor to senior staff at the NSC.

7              Do you know who Don Berlin is?

8    A.  No.

9    Q.  It says, currently, Mr. Berlin is an advisor for litigation

10   management and strategic services for Kurt Olsen.

11             Do you know who he is?

12   A.  Yes.

13   Q.  Who is representing several clients related to this matter.

14   I sent some of my information to Mr. Berlin, who then included

15   excerpts into a confidential and privileged document to

16   Mr. Olsen in June, which included a confidential attorney work

17   product briefing.

18             Are you with me on that?

19   A.  Yes.

20   Q.  Have you seen any memoranda relating to these events?

21   A.  No.

22   Q.  Was Mr. Olsen your attorney at the time period of

23   August 2nd of 2021?

24   A.  Yes.

25   Q.  Other sources reported this information was presented to

1    Mr. Lindell, but it does not appear as though he has excised

2    the Montgomery/Fanning materials from any of his work products,

3    which concerns me greatly.

4            So this references that you were provided some of this

5    information.  You are saying that's not true?

6    A.  I never seen any of it.

7    Q.  So let's go to the second to last page of this document,

8    right before your response.

9            MR. CAIN:  And blow that up, hank.

10   Q.  It says, this, along with what may now be Dr. Frank's

11   problematic analytical style -- pardon me, I'm butchering it.

12   So let me stop there.

13           Dr. Frank is the fellow you mentioned you had

14   consulted with, among others?

15   A.  Not about this.

16   Q.  Was he not at the cyber symposium?

17   A.  Yes, he was.

18   Q.  Okay.  That's what I thought.

19           Continuing.  This is exponentially much more

20   dangerous.  Marrying faulty data to authentic data is

21   problematic on its own.  Marrying inaccurate data to faulty

22   data opens the door to a number of more serious problems.

23           That sounds a lot like what Harry Hursti was

24   testifying to, doesn't it?

25   A.  Correct.  What Harry got -- I don't know what Harry looked

1    at.

2    Q.  Well, he was at your cyber symposium?

3    A.  Right.  But he got drives, he said earlier, from a Josh

4    Merritt.  We don't know where Josh Merritt -- went rogue, that

5    wasn't a person that I had the data -- this is what I just

6    found out, that we were missing hard drives.  Harry Hursti, if

7    he got them, it was illegal.  We don't know what was on those

8    drives.  We don't know what Josh Merritt gave him.  That's not

9    what I presented.

10            MR. CAIN:  Objection, nonresponsive.

11            THE COURT:  Sustained.

12   BY MR. CAIN:

13   Q.  Let's do this.  The author of this letter says, the best

14   outcome at this juncture would be for Lindell to postpone his

15   symposium until a thorough independent detailed examination of

16   Montgomery's data can be performed by highly skilled,

17   impeccably credentialed, qualified experts, that are not

18   currently on the Lindell payroll or influenced by Lindell or

19   his team.

20            Did anybody on your team encourage you to postpone the

21   cyber symposium?

22   A.  No.  I will say this, though.  Now I do remember this,

23   because Kurt Olsen came and he got before -- three weeks before

24   the cyber symposium, he hired -- or he got a team that were

25   completed unrelated to us; Ben Cotton, Mark Cook, there was

 1    many that I heard the names, and they were vetting it with

 2    Dennis Montgomery on the phone.  And I do -- or over computers.

 3    So that was three weeks prior.  I do remember this now.

 4            I'm sorry.

 5    Q.  Okay.  But the question is:  Did anybody on your team try

 6    to convince you not to move forward with the cyber symposium?

 7    A.  Absolutely not.

 8    Q.  Did anybody not on your team try to convince you to not

 9    move forward with the cyber symposium?

10    A.  No.

11    Q.  Now, if you go to the last page, it looks like you

12    responded to this, sent to you at 10:07 p.m., and then you must

13    have been up late on August 3rd, and you responded.

14            What did you say?

15    A.  I believe I was working 18 hours a day on trying to save

16    the country.  I said, this Zullo is a very bad man.  He was the

17    one that was involved in the call to my wife.

18    Q.  Okay.  Any other warnings that you received prior to the

19    symposium about Dennis Montgomery or his data?

20    A.  Like I said, it was many -- it was very strange.  And when

21    we checked these guys out, they were all weird government

22    people or deep state -- we didn't know.  It was very scary.  We

23    would get calls and stuff, don't put out Dennis Montgomery's

24    data.

25            Nobody knows Dennis Montgomery.  By then we had

940

 1    validated Dennis, we had validated by generals, inside of the

 2    data and cyber guys, I watched a general himself and other

 3    generals sit there, so this was all done and other --

 4    Q.  Mr. Lindell, I'm sorry to interrupt you.

 5    A.  I'm sorry.

 6         MR. CAIN:  Your Honor, I'm going to switch to

 7    promoting the cyber symposium, may we take a break.

 8         THE COURT:  Why don't we go ahead and break for lunch.

 9    It's already 12:15.

10         Ladies and gentlemen of the jury, I'm going to release

11    you for lunch a little early.  Be back here at 1 o'clock.

12         Reminder not to speak to each other with respect to

13    this case or what you're hearing in court today.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1        (In open court; jury not present)

 2            THE COURT:  Counsel, anything we need to address

 3   outside of the presence of the jury?

 4            MR. DUANE:  Yes, your Honor.

 5            I would just like to apprise the Court of the fact

 6   that, during the break, as you would surely expect, I will meet

 7   with the witness and admonish him with respect to the concerns

 8   that you expressed at sidebar.

 9            THE COURT:  I appreciate that.

10            We will be in recess.

11            (Lunch recess)

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

942

1

2                          AFTERNOON SESSION

3                              1:07 p.m.

4        (In open court; jury not present)

5             THE COURT:  Counsel, anything before we bring the jury

6    in?

7             MR. DUANE:  No, your Honor.

8             MR. CAIN:  No.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (In open court; jury present)

2             THE COURT:  Mr. Lindell, I remind you that you are

3    still under oath.

4             Mr. Cain.

5             MR. CAIN:  Thank you, your Honor.

6    BY MR. CAIN:

7    Q.  Before lunch, I had written that you said that you had the

8    PCAPS data and vetted it months before the cyber symposium; is

9    that correct?

10   A.  We vetted it for six months, and then we had extra people

11   come in for the three weeks prior.

12   Q.  But isn't it true, when you got to the symposium yourself,

13   you were in the middle of it, you didn't have any PCAPS data?

14   A.  May I explain.

15   Q.  No.  Answer my question, please.

16   A.  I had some of it, but not all of it.

17   Q.  You told Mary Fanning, during the symposium, we have no

18   PCAPS data, didn't you?

19   A.  I would have to see that.  I could have.

20   Q.  And you told Mary Fanning you needed to stall?

21   A.  No, I don't believe that.

22   Q.  Let's look at Exhibit 98.

23            MR. CAIN:  Hank, we'll have to blow this up.

24   Q.  Sir, this is a text chain from someone identified as Mary

25   Fanning on the left, and it looks like -- can you read on the

1    right something my cloud at MyPillow.com?

2    A.  Yes, I see that.

3    Q.  And this -- you remember texting with Mary Fanning during

4    that?

5    A.  No, I don't, but I'm seeing it now.

6    Q.  You have no reason to believe you weren't texting with Mary

7    Fanning?

8    A.  I guess I have no reason to believe I wasn't.

9    Q.  Well, do these look like your texts?

10   A.  Yes, yes.

11            MR. CAIN:  Move to admit.

12            THE COURT:  It's stipulated, so admitted.

13       (Plaintiff's Exhibit 98 received in evidence)

14   BY MR. CAIN:

15   Q.  So this isn't a very long text chain, Mr. Lindell.  And it

16   starts sequentially, obviously at the top, but time goes by as

17   we go down.

18            Ms. Fanning says, let's hope so.

19            You say, I know one hundred percent is it not that --

20   it's not clear to me, is it clear to you what you're referring

21   to?

22   A.  No.  But where's the timestamp on here?

23   Q.  This would have been day one; right?

24   A.  Where does it say the day and year?

25   Q.  It may not.  We can tell by context in a second, I think.

1    A.  Okay.

2    Q.  I believe it's day one.

3    A.  Because I absolutely don't remember texting Mary Fanning

4    during the cyber symposium.  I was on stage and dealing with

5    stuff.  So if it had a timestamp, it would really help me.

6    Q.  Well, let's look down and continue on, maybe it will

7    refresh your recollection.

8         She says, good, I will pass that on to our friend.  He

9    will be glad to hear that.

10        You say, this Josh guy and this team have attacked

11   Conan and Dennis for two weeks.

12        That's what reference to Josh Merritt, isn't it?

13   A.  I believe so.  Yeah, I believe so.

14   Q.  And you are referring to Conan Hayes and Dennis Montgomery?

15   A.  Correct.

16   Q.  And then Ms. Fanning says, and Dennis is perplexed that he

17   is connected to Sydney.

18        That's a reference to Sydney, the attorney?

19   A.  Yes.

20   Q.  So Josh, that is -- Josh being connected to Sydney Powell.

21        And then on the My Pillow account, you say, they

22   attacked Conan and me when we got here horrible.

23   A.  Yes.

24   Q.  Meaning Josh Merritt attacked you?

25   A.  Correct.

1    Q.  And Josh Merritt told you, you heard his testimony that

2    confirmed, he told you that the PCAPS data was not real?

3    A.  That's not true.  Can I say what he did tell me?

4    Q.  I didn't ask.

5    A.  Okay.

6    Q.  Your counsel will have a chance.

7    A.  Okay.

8    Q.  Mary Fanning says, so many infiltrators, seems like there

9    are more of them than there are good guys.  Good luck tomorrow.

10         And this does have a timestamp 6:07 a.m.

11   A.  Yes.  That tells me it was before the cyber symposium,

12   correct.

13   Q.  And then you say, in response to that, Dennis didn't give

14   us anything to bring here.  Dennis, meaning Mr. Montgomery;

15   right?

16   A.  Correct.

17   Q.  No PCAPS.  He got really upset when I picked up Conan and I

18   asked for the evidence.

19   A.  Correct.

20   Q.  You were referring to when you went to Montgomery's place,

21   I think, on the East Coast to gather the data; right?

22   A.  I went to pick up the hard drives for the symposium,

23   correct.

24   Q.  Right.  And Dennis Montgomery didn't have any data for you

25   at that point?

1    A.   That's not true.

2    Q.   Well, that's what you said?

3    A.   At that time, Conan and I left with a hard drive, not with

4    the data.

5    Q.   You left --

6    A.   I left with the hard drive, which we had to wait to get it

7    when we got there.  He didn't have it ready, my copy.  And the

8    other things were going to go by computers back and forth to

9    the symposium, with these computers I bought with hundreds of

10   thousands of dollars.

11   Q.   So you left with the hard drive to take to the symposium?

12   A.   I had to deliver it to Texas to put it in the cyber 15 act

13   of 2015, correct.

14   Q.   And you delivered it to the ASOG people in Texas?

15   A.   That's where I first met Josh Merritt, correct.

16   Q.   And then you flew with some of the red team to the cyber

17   symposium?

18   A.   I believe it was on Josh Merritt, and that was after he got

19   on a chopper and he said he had a hundred percent validated

20   Dennis Montgomery's data and it was all correct.

21   Q.   Sir, do you remember my question?

22   A.   Yeah, who I did fly with.  I think it was only Josh

23   Merritt.

24   Q.   Thank you.

25        Mary Fanning says, he told me he gave Conan stuff.

1              That's according to Dennis Montgomery; correct?

2    A.   Yes.  And that's correct.

3    Q.   And you said, he said to go to breakfast and we did and he

4    never answered my text or calls after I called him back.  No, I

5    was there, he gave a file that only contained a small amount of

6    hex data.

7              That's what you got from Dennis Montgomery?

8    A.   I didn't get anything from him.  Conan got whatever Conan

9    got.  There was stuff that Conan got.

10   Q.   Okay.  But that was hex data?

11   A.   I don't know.

12   Q.   Well, that's different than PCAPS data?

13   A.   The hex data that I got -- yeah, hex data is different, it

14   was from the 2020 election, but it was stuff that I had him

15   make.  Those spinners you showed earlier, to the CNN guy, that

16   data was hex data that showed, yes, we had stuff from the 2020

17   election.  I needed that for sure because I was going to put it

18   up for the whole world to see, and that's what I did.  That's

19   what I got.  The hex data that was shown behind the stage.

20   Q.   The hex data that looks like something from the Matrix

21   shown behind the stage?

22   A.   Yeah.  And that was validated by the --

23   Q.   That's not PCAPS data, sir, was it?

24   A.   I didn't say it was.  That's not true.  That's not PCAPS

25   data, as far as I know.  That's what --

1    Q.  And then you say, Conan and I have been stalling them and

2    have no PCAPSs.

3         You said that; right?

4    A.  The text there says that, yes.

5    Q.  You had no PCAPS?

6    A.  I don't know this is what they -- on the drive that was

7    there, I was told at that time, we didn't have it -- whatever

8    Conan got, we were getting stuff.  As we cleaned out stuff, he

9    was pulling stuff out as -- you take a hard drive, he was up in

10   the room where he's going to feed it, and he kept pulling

11   stuff.  I guess it takes -- I don't know, it took hours to pull

12   stuff off of that hard drive.

13   Q.  But sir, you had announced this challenge?

14   A.  Yes.

15   Q.  Well before this?

16   A.  Yes.

17   Q.  And you had paid for a venue to hold the cyber symposium?

18   A.  Very much so.

19   Q.  And we'll look at just a few examples, but you had sent

20   invites out to every US Congress person and every US Senator to

21   attend; right?

22   A.  Yes.

23   Q.  You had sent invites out to every state representative to

24   attend to show this evidence?

25   A.  Yes.

950

1  Q.  And many of them did.  You kept a list of those people as

2  well?

3  A.  Yes.

4  Q.  All right.  And you had folks helping you do that, I think

5  her name was Terry Petes; right?

6  A.  There was many workers.  There was a Terry Petes, yes.

7  Q.  You know who she is; right?

8  A.  Yeah, she works for management.

9  Q.  At her My Pillow email address?

10  A.  Like I said, people that work for My Pillow, we let them

11  keep their emails.

12  Q.  Even if they're working for a very different company, they

13  go to one of your other companies --

14  A.  Absolutely, 100 percent.  I'm not strict on that.  They get

15  emails from -- unless they're like a tech guy that we have to

16  forward his emails.

17  Q.  And you don't have any -- because I asked you -- you don't

18  have any sharing agreements between your various companies?

19  A.  No.

20  Q.  For example, companies that are related, who utilize

21  employees with both companies, they'll have a cost sharing

22  arrangement, you don't have anything like that, do you?

23  A.  No.  If it was Lindell Management and they do work for

24  other companies, not just My Pillow or My Store, other

25  companies, then you just bill them accordingly.

951

```
 1            MR. CAIN:  All right.  Scroll down, Hank.
 2   Q.  This is Mary Fanning.  He told me that the info is not in
 3   PCAPSs, rather it was, quote -- there's no quote, sorry -- real
 4   numbers that were collected in real time that will reveal the
 5   real outcome of the 2020 election.  Data was collected far more
 6   than packet streams were collected.  Actual files were
 7   collected from election computers.  The data reflects the
 8   adverse effect on the votes for President Trump.  This is
 9   verbatim what he told me.
10            The "he" being Dennis Montgomery; right?
11   A.  Yes, looks like it.
12   Q.  Again, he told me standard internet identifiers will be
13   presented that will show a small snapshot in time.  Billions of
14   these snapshots were collected.  Observing these billions of
15   snapshots of collected data together is like watching a movie.
16            I'll stop there.
17            That's the statement that you repeated for us at one
18   point, that it was like watching a movie of the election?
19   A.  Okay, yes.
20   Q.  I mean, you have said that before?
21   A.  Yes.
22   Q.  That's how it was explained to you?
23   A.  Yes.
24   Q.  Only in this case, one is watching a movie of the United
25   States election being stolen by foreign adversaries.
```

```
 1                 Did I read that correctly?
 2    A.  Yes, that's what Mary Fanning said in her text.
 3    Q.  And you felt like you were in the twilight zone at that
 4    point; right?
 5    A.  Yes.
 6    Q.  And to be clear, as you said, the kids were freaking out?
 7    A.  Can I explain.
 8    Q.  Well, you were highly agitated by all of this?
 9    A.  I kept telling Conan, can you get the stuff pulled off
10    there, because we didn't know what all was sent on the smaller
11    drive.  When it says on here the spinners of the six states, I
12    heard that from the cyber guy, I asked the guy is this from the
13    2020 election, he said yes.  They gave me a piece.  We did have
14    the wrong spinner.  Two states were the same.  It was a panic
15    because it was the next day.  I'm like, can you make this
16    computer go faster.
17    Q.  But you had had, what did you say, six months to vet this
18    data?
19    A.  Yes.
20    Q.  You go on to say, in the next portion, starting with Mary,
21    Mary told me I would get everything, and I bought him a
22    $2 million house and another 1.1 million earlier in the year.
23    I flew down there to pick it up and he told me to leave and
24    come back for an hour.
25                 You are referring to the money you paid Dennis
```

1    Montgomery, you got there and said come back?

2    A.   Yes.  I was purchasing it all, because like I said, we were

3    putting it all into the cyber 15 act of 2015.  It was something

4    we had to legally do because of the government protection order

5    that's on the data, so these were all lawyer things that we had

6    to do.

7    Q.   Well, you knew about government, as you call it, protection

8    order well before the cyber symposium?

9    A.   Yeah, that's why we had to do it in a different process.

10   We had to get it and bring it to Texas and put it in the cyber

11   15 act of 2015, that's where the government official, they're

12   only in certain places, we had to go to them.  That's Josh

13   Merritt.

14   Q.   In order for you to release this information to the public,

15   as you claimed that you would be doing, all of the PCAPS data

16   from the 2020 election, you had to go through this process in

17   ordered to comply with what you thought was a government order?

18   A.   That is what they told me, the attorneys, what the

19   government -- generals told me that -- actually, it was

20   colonels that said we had to go through this process.

21   Q.   Now, we're going on later in this, and I'll skip -- there's

22   a reference -- I guess I won't skip -- we have a rolling data

23   on Frank of 6 states and 2 of them are the same?

24   A.   Yes.

25   Q.   Mary Fanning says, in breakout room, it appears 2 some or

1    some woman was telling people that Dennis had a stroke and was

2    in the hospital, and that Mike gave Dennis $4 million and

3    bought him a home in Florida.

4            So you were told during the symposium that Dennis

5    Montgomery had had a stroke?

6    A.  I had not heard that.  I heard that maybe on the second or

7    third day.  I had not heard that.

8    Q.  So suddenly --

9    A.  I did hear on the first day that Conan was pulling the

10   stuff out and it -- I guess I did hear that, because I was

11   wondering why I couldn't get through to him, and they said he

12   was in the hospital with a stroke.  I don't know which day I

13   heard that, though.

14   Q.  So the source of all of this information, you were told,

15   had a stroke?

16   A.  No, what we had with us, we kept pulling it out of that

17   hard drive.  We didn't know how much we had or didn't have.

18   What we did lose is Dennis with these two computers I bought,

19   they were very expensive, I think they were $60,000 each, where

20   he was going to be feeding more stuff into the cyber symposium

21   on that other computer we brought, so we did lose that part of,

22   what we were going to be doing because we couldn't get ahold of

23   Dennis.

24   Q.  And then you got in trouble because you weren't showing

25   actual data?

1    A.   No.   I'm finding out here that it might not have even been

2    my data.   Because I see her that Josh Merritt gave Harry Hursti

3    hard drives that were not ours.

4    Q.   So you learned just the other day that maybe it wasn't your

5    data at all?

6    A.   No, that on our own monitor there, we are looking into it

7    now to see why Josh Merritt gave these two hard drives.   When

8    mine was up with Conan feeding stuff into the cyber room,

9    that's the stuff what we had to have in there.   I don't know

10   what he gave --

11   Q.   The same Josh Merritt that testified that the PCAPS data

12   was not real?

13   A.   The same Josh Merritt that told me in Texas that it was a

14   hundred percent real.   He told me that, personally, he got up

15   and said that he had fully validated everything of Dennis

16   Montgomery.

17   Q.   What I'm trying to get to is the circumstances before you

18   let speakers go on to talk about Dr. Coomer.

19          But in this instance, what I asked you just a minute

20   ago is that you were getting in trouble not showing anything.

21   And then the next text, that's exactly what you said; right?

22   A.   I don't see anywhere what time this was in the symposium at

23   all.   I don't know if this is the first day, second day.   I

24   didn't hear of any problems at all until the second day.   But I

25   wasn't on the stage, I was up at CNN, and I heard there's

1  problems with -- actually, I heard there was problems with Josh

2  Merritt because he went to a paper and tried to sabotage the

3  event, that's the problems that I had heard.

4  Q.  You told me before, when I took your deposition, that your

5  plan going into this deal was to be on stage all 3 days,

6  72 hours?

7  A.  I -- that was my plan.  I was going to get up there, I

8  needed to get this out to the country, that we needed to get

9  rid of the machines and go to paper ballots.

10  Q.  But by day two, you were up to CNN taking interviews about

11  what --

12  A.  I completely had lost my voice and I couldn't even talk

13  that morning.  So the morning, I couldn't talk.  In the

14  afternoon, if you look at that interview, it's (indicating) --

15  I couldn't talk.

16  Q.  The statement in the text, I am in trouble with not showing

17  anything, that was on day one or on day two?

18  A.  Where do you see this?

19  Q.  It's in the middle of your text.

20  A.  We don't have that.  It was a copy he said he made for me

21  that it is still in his house, I am in trouble not showing

22  any -- this was the seconds day.  I have no idea where that

23  text --

24  Q.  By the second day, you had not shown any PCAPS data?

25  A.  I don't know.  Conan was pushing it down.  I wasn't up in

1    that room.  I wasn't in the red team room.  I don't know what

2    they were doing with anything put on the stage.

3            When I went on the stage, I'm telling the public, ring

4    the alarm that we have to get rid of these machines and to

5    spread the -- to get the concern out.  The way this went down,

6    I had different sections set up.  In the cyber room, they're

7    getting evidence --

8    Q.  I didn't ask you about the different sections.

9    A.  Yeah.

10   Q.  I am asking you, you just said, you didn't know what was

11   being put up in terms of the data; right?

12   A.  It looks like when I visited the room, he said, I'm not

13   getting anything else yet.  This is what Conan said, I think,

14   this is what I'm reading this text now.

15   Q.  Was Conan Hayes working for you at that time?

16   A.  Was he on my payroll?

17   Q.  Yes, sir.

18   A.  There was a whole bunch of red team and a whole bunch of

19   people on that payroll, yes.

20           MR. CAIN:  Go down.  Is that the end of the string?

21   Okay, we can leave the text.

22   Q.  So Conan Hayes was involved.  Had you had plans -- I know

23   you said you lost your voice and you were going to be there 72

24   hours otherwise.

25           Had you had plans for any specific speaker to go up on

1    your stage?

2    A.  No.

3    Q.  Okay.  So you don't know how Tina Peters got up on your

4    stage?

5    A.  I have no idea how Tina Peters got there.  I never knew --

6    heard about her in my life.

7    Q.  You weren't texting with her before the cyber symposium?

8    A.  No.

9    Q.  And you don't know how she got on your plane to come out

10   there?

11   A.  She's a politician, so I think that's probably how she got

12   on the plane.  There was over 400 or 500 people invited.  I can

13   tell you not one did I go -- it was sent out, massive invites,

14   so I have no idea.  But she would have qualified as a

15   politician.

16         MR. CAIN:  Let's look at Exhibit 88, and I believe

17   that's been admitted -- I'm sorry, 75.  It was a deposition

18   exhibit.  Scroll down to the end of this document -- we're on

19   wrong page.  It was 88.  We're on same page here.  This on the

20   top is dated April 28th of '22.  It says, Tina new, but if you

21   scroll all the way down to the end of the exhibit, it should

22   start sequentially.

23   Q.  And this is a text string, Mr. Lindell, it says, Tina new,

24   and there's a phone number.  And it says, Mike Lindell, and

25   there's a phone number.

 1              Was that your phone number?

 2    A.  Yes.

 3    Q.  These are texts starting August 9th of 2021.

 4              Do you see that that there?

 5    A.  Yes.

 6    Q.  It was produced by you, it says Lindell in the bottom right

 7    corner?

 8    A.  Yes.

 9              MR. CAIN:  I offer Exhibit 88.

10              THE COURT:  Counsel.

11              MR. DUANE:  Objection, relevance.

12              THE COURT:  Overruled.

13         (Plaintiff's Exhibit 88 received in evidence)

14    BY MR. CAIN:

15    Q.  Let's look at this.

16              So this is August 9th, this would have been before the

17    symposium?

18    A.  That's correct.

19    Q.  And you just told us that you didn't know Tina Peters?

20    A.  That's correct.

21    Q.  This text to you says, Mr. Lindell, my name is Ty

22    Clemenger[ph], and I have copied Tina Peters on this text

23    message.  As you may know, she is county clerk of Mesa County.

24    She can confirm that the data received by Ron Watkins comes

25    from Dominion machines.

1          Did I read that correctly?

2     A.  Yes, you did.

3     Q.  Do you remember getting this text?

4     A.  No.  Where it says Tina new on my phone, it would have come

5     up just a phone number.  I had no idea who Tina Peters -- I

6     never text her, this is a text from Ty Clemenger, I don't even

7     have his numbers in here.  A lot of people were texting me.  I

8     give my number out freely.  I didn't even know -- I probably

9     didn't know who Ty Clemenger is.  And it says, as you may know.

10    Q.  Well, this text informed you of that fact, she was the Mesa

11    County Clerk, and you knew her name from this?

12    A.  If I read this, yes, which I probably did, but I didn't

13    even put her number in my phone at that time.  I can tell you

14    that I was getting stuff from everywhere.  I probably didn't

15    even know this Ty Clemenger.  Because his number is not in my

16    phone.  It doesn't say Ty Clemenger.  If you looked at my phone

17    now, it would say Ty.  I do know who he is now.  One year after

18    this, I finally knew who Ty was.

19    Q.  So the text says, she can confirm that the data received by

20    Ron Watkins comes from Dominion machines.

21         That's a reference to the data that Tina Peters

22    gathered from Mesa County, isn't it?

23    A.  Yes.  But at the time I didn't know who Ron Watkins was or

24    what data she had or didn't have, because I didn't know

25    anything about Tina Peters or any data that she had.

1   Q.  So that's a yes, this is the data from Mesa County that

2   Tina Peters was bringing to your cyber symposium?

3   A.  No, I'm -- I don't know.  I don't know, because I didn't --

4   I had -- I didn't know this text, I didn't know Tina Peters was

5   coming.  I have no idea what this is.  She was never bringing

6   data to the cyber symposium.

7         I do know -- because I know when she got there, I

8   asked about, who is this lady.  And I asked a lot of questions.

9   Q.  Well, we know for a fact, don't we, that Tina Peters --

10  because it was displayed at your cyber symposium -- the data

11  that she had procured illegally from Mesa County was displayed

12  during your cyber symposium, wasn't it?

13  A.  I don't know what was displayed of her data.  But yes,

14  there was data of hers displayed there.

15  Q.  So you didn't know what data was displayed at your cyber

16  symposium?

17  A.  I didn't even know it was going to get displayed, because I

18  was not in charge of anything on that stage.  I was

19  interviewing with CNN with a hoarse voice.  I didn't know what

20  that was.

21  Q.  You weren't in charge of Mike Lindell's cyber symposium?

22  A.  Was I in charge?  Yes.

23         Did I set it up?  Absolutely.

24  Q.  So you were in charge?

25  A.  There was a red team I hired when I got there.  They're in

1    charge of everything to make sure everything goes smooth,

2    validate data.  You know, I don't know who that -- who put it

3    up there.  To this day, I can't tell you.

4    Q.  Are you telling this jury -- we're going to look at who was

5    up there -- but are you telling them that you didn't have the

6    ability to prevent Tina Peters from showing Dominion data on

7    your screen or preventing Joe Oltmann from speaking about

8    Dr. Coomer?

9    A.  No.  There were people, Kurt Olsen, there who were making

10   decisions.  It changed when I got there, because I couldn't

11   talk.

12   Q.  So that's another thing you are not taking responsibility

13   for.

14          You are not taking responsibility for what you have

15   done to Dr. Coomer, and you are not taking responsibility for

16   who appeared on your stage?

17   A.  Well, that's your opinion.  I would have sure liked the

18   whole nation to watch that image, I wish they would have.  That

19   would have been great.  We wouldn't be here today.  We would

20   show that our country needs to get rid of electronic --

21          THE COURT:  Mr. Lindell, there's not a question.

22   BY MR. CAIN:

23   Q.  Mr. Lindell, when the PCAPS data ended up not arriving to

24   the Mike Lindell cyber symposium, you made some statements

25   about the reason it couldn't be displayed.  One of the

1    statements you say -- you said that you were attacked in the

2    elevator on the second night?

3    A.  That's correct.

4    Q.  And as a result of that, the PCAPS data was not displayed?

5    A.  No, there's two things that happened.

6    Q.  Well, that's one of them; right?

7    A.  May I explain.

8    Q.  Is that one of the reasons you couldn't show the PCAPS

9    data, you got attacked in the elevator?

10   A.  That's the reason there.  And the other reason -- it's the

11   same reason, if you let me explain.

12   Q.  So the first is that you got attacked.

13          By the way, that was an assault?

14   A.  Yes.  My wife and I with three guys and that device they

15   shoved in my side.  And it was very, very excruciating pain,

16   because the police were called.

17   Q.  And no arrests were made?

18   A.  They couldn't find the guy.  We had pictures for almost a

19   week after the fact.  The South Dakota police, we put out

20   publicly, pictures all over the nation.  They never did catch

21   the guy.  And there was never an investigation, as far as I

22   know.  It was shut down.

23   Q.  And the second reason that you couldn't display this PCAPS

24   data is that Colonel Waldron told you that there would be a

25   poison pill placed into the data; right?

1    A.   That's correct.  And that's the reason General Flynn could

2    not fly in.  And I didn't know what a poison pill was, and we

3    were going to put the Chinese evidence on the third day, that

4    was specific.  We did have that, and that was going to be put

5    down on day three.  Colonel Waldron told me that night, I don't

6    know what a poison pill is.  And general Flynn is not coming,

7    it's too dangerous.

8    Q.   So your sworn data is not that the PCAPS data wasn't real,

9    it was it couldn't be put up there because of a poison pill and

10   some folks roughed you up?

11   A.   As far as I know, that was the China data, not the PCAPS,

12   the evidence of China's breach was going to be put up on the

13   third day.  That's what I recall.

14   Q.   Well, China is in China.  So the data would have to be from

15   China to the United States.  We looked at that on the

16   visualization; right?

17   A.   Yes.

18   Q.   So those are the same thing, PCAPS data --

19   A.   I'm not a cyber expert, sir.

20   Q.   Neither am I, but I know that much.

21   A.   Okay.  I don't know more than I do now.

22   Q.   Okay.  But you agree, sir, that -- and I'll close out on

23   Tina Peters -- she did end up on the stage, and actually, she

24   ended up on the stage at the same time as you did?

25   A.   Yes.

1    Q.  And I think we have a photo or a screen capture of that.

2    Exhibit 96.

3            Do you see that?

4    A.  Yes.

5    Q.  And that's a photo of you, and you recognize Ms. Peters in

6    the middle?

7    A.  Yes.

8            MR. CAIN:  Offer 96.

9            THE COURT:  Any objection?

10           MR. DUANE:  No, your Honor.

11           THE COURT:  So admitted.

12       (Plaintiff's Exhibit 96 received in evidence)

13   BY MR. CAIN:

14   Q.  Now, is it your -- well, let me back up.

15           The Mesa County data that Tina Peters took from Mesa

16   County ended up getting posted on Frankspeech, didn't it?

17   A.  Yes.  But I don't -- I don't believe Tina Peters brought it

18   there.

19   Q.  Well, it got on your website?

20   A.  It was on the web, it was on the dark web.  From what I

21   have heard since, ended up on -- somehow ended up on the dark

22   web.  And our experts pulled it from the dark web because this

23   was breaking news, as I heard, it was breaking news.  It's

24   images on the internet.

25   Q.  And what promo code was associated with this breaking news?

1    A.  There was no promo codes.  When we live streamed the cyber

2    symposium, no advertising was done.  What you are seeing here

3    is a strip put up after the cyber symposium, when we put it up

4    on Frankspeech, on that platform.

5    Q.  What advertising was done in the after effect posting of

6    the cyber symposium?

7    A.  It looks like RSBN, but that's a company that advertises.

8    This is an RSBN feed.  This is not LindellTV or Frankspeech.

9    We have promo codes for networks all across the country, from

10   Newsmax and you name it, they all use their own promo codes.

11   That was 30 networks there.  They were airing and advertising

12   my promo.

13   Q.  What promo code was Frankspeech using?

14   A.  We were using none for this event, as far as I know.  We

15   might have been using an email for people coming there.

16   Frankspeech is -- if they advertise My Pillow or LindellTV,

17   it's completely separate entity, like any -- at LindellTV, we

18   have over 10 advertisers, and they're all tracked, everyone

19   tracks by promo codes.

20   Q.  Well, you know of a promo code "frank;" right?

21   A.  That would be a very generic code, though.

22   Q.  But that's for Frankspeech, isn't it?

23   A.  That would be a catch-all code.  You would never use that

24   to track because, like the reason we would not use a generic

25   code, you can't track individual things, you don't use My

1    Pillow.  When My Pillow first came on, for six months, we used

2    My Pillow.  You wouldn't know which advertisement is doing

3    better than others.

4          Say you have a ball team, and you don't know who is

5    batting.  So then we went to individual promo cods.  Is this

6    advertisement doing better, whether it's at CNN or newspaper in

7    Iowa, you say, how is this specific one -- if you paid a

8    thousand dollars for it, you either want to break even or make

9    money.  If you don't make money, you don't buy it again.

10   Q.  With respect to what we're looking about in the cyber

11   symposium, you have stated that the data that Ms. Peters

12   brought with her to your symposium showed that there were,

13   quote, two sets of books, close quote, created during the

14   trusted build?

15   A.  That is absolutely correct, but I did not know that then.

16   Q.  Which you say is evidence of crimes being committed by

17   Dominion and Jena Griswold?

18   A.  100 percent.

19   Q.  And Jena Griswold is a current secretary of state of --

20   A.  That's correct.

21   Q.  Let's talk a little bit about -- I'm jumping in the

22   timeline back and forth as you testify -- but I want to quickly

23   hit on the promotions that you did, a few of the promotions

24   that you did for this event, starting with Exhibit 97.

25         Do you recognize yourself in this document?

1    A.  Yes.

2    Q.  This is a flash sale promoting the cyber symposium?

3    A.  That is correct.

4    Q.  It is from www.MyPillow.com/Frankspeech?

5    A.  That is correct.

6         MR. CAIN:  Offer 97.

7         THE COURT:  Any objection?

8         MR. DUANE:  No objection.

9         THE COURT:  So admitted.

10        (Plaintiff's Exhibit 97 received in evidence)

11   BY MR. CAIN:

12   Q.  This is an example of a My Pillow advertisement for the

13   cyber symposium we have been talking about?

14   A.  This is the Frankspeech -- we have all the places that

15   advertise, they always get the forward slash, whether it's a,

16   you name it, HSBN or it's a podcaster, let's say his name is

17   Anderson, it would be forward slash Anderson, that's for their

18   platform.  So Frankspeech had their own page there, and they're

19   selling products, My Pillow products, that is absolutely

20   correct.  And that's it, yes.

21   Q.  And this particular offer expires on 8/12/2021.  What's

22   significant about that date?

23   A.  The particular sale is usually 3 days, whatever day this

24   started.  It would be 72 hours.  It would have been the last

25   day of the cyber symposium, if that's what you're asking.

1  Q.  That's what I'm asking.

2        There's a little bit of text borrowed from this, and

3  then it goes to next page.  Let's just read the text.

4        You say, hello, I'm Mike Lindell, I'm coming to you

5  with the most important commercial that I have ever done.  All

6  of you know what My Pillow and myself have gone through in the

7  last 5 months in my effort to bring the truth forward.  Well,

8  it's all come down to this.

9        Do you see that?

10  A.  Yes.

11  Q.  And then you announce, I'm having a cyber symposium on

12  August 10th, 11th and 12th.  This historical event will be live

13  streamed 72 hours straight on my new platform, Frankspeech.

14        Do you see that?

15  A.  Yes.

16  Q.  So you are promoting traffic to this new website because

17  you had just gotten Frankspeech kind of up and running at this

18  point?

19  A.  No.  It was -- Frankspeech and then LTV started in March of

20  21.  This was like four or five months later.

21  Q.  But you were promoting this to drive traffic to

22  Frankspeech?

23  A.  I was promoting this to save the country.  Because as you

24  see, I put what My Pillow and myself had gone through.

25  Dominion had sued me.  This guy had sued me.  And My Pillow had

1    already lost $150 million.

2    Q.  Now, Dr. Coomer had not sued you at this point?

3    A.  That's right.  He just made a deal so I couldn't go on and

4    hurt My Pillow, you're correct.  Correct.  I stand corrected.

5    Q.  To help support this cyber symposium, again, I am offering

6    some of the best prices on My Pillow products, but they're only

7    offered on Frankspeech.  Go to Frankspeech.com now to receive

8    these exclusive My Pillow offers.

9         So My Pillow was supporting the cyber symposium event,

10   was it not?

11   A.  Just like it is right now, because we've had to put

12   advertising up to try and make our -- to try and make it, yes.

13   Q.  That's a yes; right?

14   A.  Yes.

15   Q.  And then on this page, you click through and that gets you

16   to the Frankspeech website.  Click here for exclusive specials?

17   A.  What it is here, just to be clear for the jury, My Pillow

18   sells products on every platform in this country.  My Pillow

19   were happy Frankspeech was going to be selling them,

20   absolutely.

21   Q.  Well, you were happy with yourself, you --

22   A.  I just wanted to get the word out and save our country.

23   That was my number one thing.

24   Q.  But you were in control of both entities, so you were happy

25   with yourself when you did this?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    A.   No.  My Pillow, I worried about my employees and that

2    company.  It has nothing to do with where -- my goal was to get

3    everyone in the world to see that we have to get rid of these

4    electronic voting machines.  That was my whole goal.  It didn't

5    matter what it cost me.  And I think I have shown that.

6    Q.   Or cost Dr. Coomer?

7    A.   It cost Dr. Coomer what?

8    Q.   We'll see.

9    A.   He's out suing people trying to get money.

10   Q.   Is that what you think this is?

11   A.   After what I've seen, when he said, I'm going to go after

12   pillow boy, the clown.  Now I'm kind of wondering, is it

13   because he is a blocker and going out for money.  Now, since

14   I'm here, it's almost twofold now.  I didn't know all this

15   stuff that he said about me before he even knew who I was.

16   Q.   Okay.  So there's a video associated with this, but I think

17   it essentially repeats the same.  You recorded a video that has

18   the same language we just went through; right?

19   A.   I don't know.  I don't have the video.  I'm not sure what

20   you're saying.

21   Q.   Okay.  Well, then, let's watch it.

22        MR. CAIN:  Exhibit 188.

23   Q.   You see the language on the bottom of this?

24   A.   Yes.

25   Q.   This was the video I was referring to.

 1              MR. CAIN:  Offer 188.

 2              THE COURT:  Any objection?

 3              MR. DUANE:  No, your Honor.

 4              THE COURT:  So admitted.

 5         (Plaintiff's Exhibit 188 received in evidence)

 6         (Media played)

 7    BY MR. CAIN:

 8    Q.  And that appears to correspond with the flash sale we just

 9    saw; right?

10    A.  Yes.  I do that on every single platform, where I have

11    exclusives, where they have an exclusive the other doesn't

12    have.

13    Q.  The answer to my question is yes?

14    A.  Yes.

15    Q.  Thank you.

16              Now, I mentioned the invite list and that I might

17    reference that.  I want the jury to be able to see some of

18    that.  Exhibit 15 is an example, as I understand it, of the

19    invite list to state legislators.

20              Do you see that?

21    A.  Yes.

22    Q.  And these -- you have a separate one for Republicans.

23    These are the invites to the Democrat list that is part of this

24    process?

25    A.  I have no idea.  A group was hired to send to every

 1   legislature in the country, legislator, party.

 2   Q.  This is consistent with what you understood to be going on?

 3   A.  I don't know.  I wasn't part of --

 4   Q.  Well, you produced this document?

 5   A.  Lindell Management probably produced this.  I have never

 6   seen this.

 7   Q.  You are head of Lindell Management?

 8   A.  That's correct.

 9   Q.  And you own it 100 percent?

10   A.  Yes.

11   Q.  If an invite is sent, it says true?

12   A.  Yeah, I would assume that means they were sent an invite.

13   Q.  That makes sense.

14        MR. CAIN:  Offer Exhibit 15.

15        MR. DUANE:  No objection.

16        THE COURT:  So admitted.

17     (Plaintiff's Exhibit 15 received in evidence)

18   BY MR. CAIN:

19   Q.  And just blow up a portion of that.  This will go back with

20   the jury.

21        But the intent was -- I feel like I'm beating a little

22   bit of a horse -- but the intent was to invite every

23   legislator, every governor, every Congress person in the United

24   States?

25   A.  That is correct, anyone that would come and see this.

974

1   Q.  Okay.  And then you did keep track --

2        MR. CAIN:  Let's go to Exhibit 17.  Blow that up,

3   Hank, for Mr. Lindell.  Internally, can you -- have you seen

4   this document before?

5   A.  No.

6   Q.  But there was credentialing, whether it was cyber, media,

7   politician, that was listed with the badge type that they got?

8   A.  That's correct.

9   Q.  And this appears to you to be the guest list for the cyber

10  symposium of people who accepted your invitation?

11  A.  It looks like it, yes.

12       MR. CAIN:  Offer Exhibit 17.

13       THE COURT:  Any objection?

14       It looks like it's stipulated.

15       MR. DUANE:  It is stipulated, yes, your Honor.

16  Although, I'm just concerned with confidentiality with respect

17  to showing it to the audience.

18       THE COURT:  Do you want to approach?

19       MR. DUANE:  May we approach.

20       THE COURT:  Yes.

21     (Continued on next page)

22

23

24

25

975

1           (At sidebar)

2           MR. CAIN:  I'm not going to go through it in detail,

3    in fact at all.  I just wanted it in the record.  So I can pull

4    it down and move forward, if that works.

5           MR. DUANE:  I believe that's correct.  But it seems to

6    have personal phone numbers for government officials and

7    relatives of government officials.  I'm not sure there's a need

8    to display it to the entire gallery.

9           MR. CAIN:  I'll have Hank pull it down.  And if the

10   parties and the Court agrees, we can redact personal

11   identifying information --

12          MR. DUANE:  That's perfectly acceptable.

13          MR. CAIN:  -- before it goes to the jury.

14          THE COURT:  Okay.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2               THE COURT:  Mr. Cain.

3     BY MR. CAIN:

4     Q.  And there is another email -- I don't want to count these,

5     because they're not in numerical order -- just the politician

6     count from an email you produced was approximately 60

7     politicians.  Does that number sound in the neighborhood to

8     you?

9     A.  I honestly have no idea how many politicians or -- I was

10    worried about getting the content out to the country.  I have

11    no idea how many politicians or news outlets were there.

12    Q.  Invitations were obviously sent out that preceded what we

13    just looked at.

14              Let's look at 224.  It's an invitation to Ken Buck --

15    or maybe it's 242, I apologize.

16              MR. CAIN:  Let me get my exhibits straight before I

17    move forward.

18              244.  Two off.

19    Q.  So this email is from, if you look at the bottom,

20    TerriPietz@mypillow.com to a member, at least in the system, to

21    representative Ken Buck.

22              Do you see that on the bottom right?

23    A.  Yes.

24    Q.  Produced by My Pillow?

25    A.  Terri Pietz worked for -- at this time, she did not.

1    Q.  My question was:  It was produced by My Pillow?

2    A.  I don't know.

3    Q.  You see the stamp on the bottom right?

4    A.  Yes.

5    Q.  What does it say?

6    A.  It says My Pillow.

7            MR. CAIN:  Offer 244.

8            THE COURT:  Any objection?

9            MR. DUANE:  No, your Honor.

10           THE COURT:  So admitted.

11   (Plaintiff's Exhibit 244 received in evidence)

12   BY MR. CAIN:

13   Q.  And Mr. Lindell, whoever Terri Pietz was -- well, did she

14   work at My Pillow in your office in Minnesota?

15   A.  She worked for Lindell Management.

16   Q.  Did she ever work for My Pillow?

17   A.  I don't know.  I would have to go back and look.  I don't

18   know the answer to that, sir.

19   Q.  Is this an example, though, of the type of invitation that

20   TerriPietz@MyPillow.com was sending out?

21   A.  She had to have worked at one point because she has a My

22   Pillow email.  I stand corrected.

23   Q.  I understand.

24           And as far as Ansley Braden knew, she was a My Pillow

25   employee?

1    A.  As who would know?

2    Q.  The person receiving this email.  She's getting an email

3    from someone at My Pillow?

4    A.  If I looked up and I seen that, I would assume that, yes.

5    Q.  That's a fair inference, isn't it?

6         All right.  And obviously, this one was -- the

7    congressman was unable to attend, thank you for the invite.

8         These went out to the people that were on the lists

9    that we were looking at?

10   A.  Right.  And Terri would have probably been one of maybe a

11   team of 10 to 15 people sending them out.  So when you talk

12   about the My Pillow email address, I mean, she would be --

13   unless there was another My Pillow employee that ever worked

14   for My Pillow, they would also have that address.

15   Q.  Now, let's jump back into the cyber symposium.  You have

16   testified about the coordination of people getting on the stage

17   and the jury heard that testimony, so I won't go back to it.

18        But Mr. Olsen, you were here when he testified, he was

19   part of vetting or approving who appeared on the cyber

20   symposium stage; isn't that right?

21   A.  He -- he said that.  He mentioned a Janet Lynn and whoever

22   else, yes.

23   Q.  Okay.  But you approved of Mr. Olsen being at least

24   partially responsible for that process?

25   A.  Can I explain?  May I explain.

 1    Q.  Well, did you approve it or not?

 2    A.  No, I didn't approve what went on that stage.  And I didn't

 3    approve him approving who went on that stage, because that was

 4    never -- that was not what was going to happen at the cyber

 5    symposium.

 6    Q.  Well, what did you think was going to happen?

 7    A.  As it was originally set up, Brannon Howse was going to go

 8    around, we had a room with the cyber machines in, which you

 9    could hack into, the cyber guys -- which by the way, someone

10    hacked in four minutes, five minutes before we even had it --

11    we had set up a table outside of the room.  And then we had

12    another room set up where you could watch data in real time,

13    not PCAPS data, you could all understand, so I wanted the

14    public to understand.  And on the stage was going to be myself.

15    And we were going to go to Brannon Howse on the floor and go

16    around to people and talking to people.  In my mind, that's

17    what we were going to do, it was going to be him on the floor.

18         After the first day, that changed because I couldn't

19    talk anymore.  And the red team had kind of taken over what was

20    going to happen.  I wasn't in that room ever.  So they planned

21    what was going to go on on that second day.  Everything changed

22    the second day, I couldn't talk.  I left there to do interviews

23    and I said -- and Kurt and them said we got this all taken care

24    of, and that was it.

25    Q.  Hard to do an interview if you can't talk?

1   A.  If you watch that interview, it was -- it was very hard,

2   but I wanted to get the word out so bad.  It was so -- it was

3   critical to me to help save our country, get rid of these

4   machines.

5        I did the interview, figured it would be better to get

6   there and do the interview on CNN, because I wanted CNN, a

7   bigger audience.  Even though they were going to attack me, to

8   be able to talk and say, hey, you guys, we got a problem here.

9   Q.  Well, we're maybe dancing around this.

10       The truth is, whomever was responsible while you lost

11  your voice, it was either someone hired by you or someone hired

12  by Mr. Olsen or the red team?

13  A.  They weren't hired.  The ones that I just mentioned, a lot

14  were just volunteers.  Kurt Olsen wasn't paid to be there.  I

15  don't believe Janet Lynn was.  She did an event in Wisconsin.

16  I believe when she was there, they connected with her on the

17  spot.  They had conversations what to do.  I found that after

18  the fact.  I'm looking down from CNN going, who is that guy.

19  Q.  Ultimately, at the end of the day, you trusted your

20  attorney, Mr. Olsen, who was here, with managing that process?

21  A.  He was -- I didn't say, will you manage the stage at all.

22  He -- they basically told me, they go, you know what, you can't

23  talk -- don't worry, there were three, four people standing

24  there behind the stage.  I spoke a little in the morning, you

25  could hear my voice, they said, Mike, we'll figure out what to

1    do.  You go ahead and rest your voice.  I don't even know if

2    Kurt Olsen was standing there, to be honest with you.

3    Q.  Let's look at your deposition transcript, then, just a bit.

4    Turn to the Frankspeech deposition.  That's the one I believe

5    we looked at earlier.  You've got it in front of you.

6         Go to Page 218, Line 15.  Do you see there, the

7    question:  If there was someone you didn't want on stage, could

8    you have put a stop to that?

9         What was your answer?

10   A.  I wouldn't have known.  I wouldn't have known.  I trusted

11   my -- the attorney that was there, Kurt Olsen.  I trusted my

12   attorney.

13   Q.  That's the only person you identified as trusting to put

14   people on stage?

15   A.  That's correct.  The reason I know that is --

16   Q.  I didn't ask --

17   A.  I'm sorry.

18   Q.  Thank you.  Let's move on.

19        And forgive me, I think it was Mr. Olsen, but there

20   was testimony, something to the effect of, you didn't get

21   involved in the details; is that a fair assessment?

22   A.  Not who was going on that stage, because it was always

23   happening in real time.  And I do remember looking down from

24   the CNN booth and seeing one of the guys on the stage sitting

25   on side of the stage, and I did call down and said, would you

 1   tell him to get back in his seat.  That was the only thing I

 2   seen and changed.

 3   Q.  Well, I think I know who was up there.

 4        Let's look at Exhibit 192.  This was previously

 5   admitted, it was stipulation.

 6        And this is obviously, Mr. Oltmann on stage?

 7   A.  Yes.

 8        MR. CAIN:  Go ahead and play that.

 9   (Media played)

10        MR. CAIN:  Go back to just a screen capture of that,

11   Hank.

12   BY MR. CAIN:

13   Q.  Now, Mr. Lindell, I don't know if this is the one that you

14   were referring to where you saw someone sitting down on the

15   side of the stage.

16   A.  No, they were away from the stage actually sitting on the

17   side of the stage.  It was Dr. Frank, forgive me, it was

18   Dr. Frank.  They were not even in camera view.  And I go, we

19   should probably get them --

20   Q.  Okay.  But the folks, that was Joe Oltmann on the left;

21   correct?

22   A.  Yes, that's correct.

23   Q.  As we're looking, David Clements in the middle?

24   A.  That's correct.

25   Q.  Now, did you know David Clements at the time they appeared

1    on your stage?

2    A.   No.  Or Joe Oltmann.  And I didn't even know he was on the

3    stage.  I had to find out later.

4    Q.   And then the gentleman on the screen right as I'm looking

5    at it, you know who that is, don't you?

6    A.   Which one, in that chair?

7    Q.   Yes.

8    A.   I have no idea.

9    Q.   Would it surprise you to learn it was Josh Merritt?

10   A.   It would surprise me.  He was there, but it would surprise

11   me he was on the stage, just like I'm surprised of all of them.

12   Q.   I'm picking that up.

13         The other two gentleman are --

14   A.   That's Colonel Phil Waldron on the right.  And then the one

15   on the left is Patrick Colbeck, he's a rocket scientist,

16   seriously a rocket scientist, that's his profession.

17   Q.   Was he in one of the -- we talked about Absolute Proof, but

18   was Mr. Colbeck in some of your movies?

19   A.   That was the first time I met him at Absolute Proof.  I

20   never met a rocket scientist before, I thought he was kidding,

21   but there really are rocket scientists.

22   Q.   So assuming you agree with me that's Josh Merritt, you had

23   two members of the red team, a professor in the middle, a

24   rocket scientist and Joe Oltmann?

25   A.   Yes.  And I can't validate that's Josh Merritt because I

1   don't -- he's got a hat on.  I'm just trusting you.

2   Q.  Okay.  And as you have made it clear, you had not vetted

3   the Coomer call story internally, either Frankspeech, yourself,

4   My Pillow, prior to your symposium?

5   A.  I had never heard or about this Coomer call about Antifa or

6   the details until right in -- very detail in this courtroom.

7   Q.  And actually, the first question I asked, you are accepting

8   no responsibility for what was said on your stage and by whom?

9   A.  I had the event.  I mean, when you say "accepting," what

10  kind of responsibility?  If we get to -- if we get to one of

11  the electronic voting machines and I give some responsibility

12  for that, I would take it.  I did have the event.

13  Q.  And as it relates to Mr. Oltmann, just to kind of round out

14  a little bit of that relationship, you did get introduced to

15  him on February 22nd of 2021; right?

16  A.  But probably by phone.  I never met him in person until --

17  and I don't even know if I met him at this in person.  I don't

18  even know if he was there.  I meet hundreds of people.  I meet

19  thousands of people in a week.

20  Q.  But is my statement correct, that you first were introduced

21  to him on February 22nd?

22  A.  I don't know if your statement is correct or not.  I know I

23  didn't meet him in person.  By phone, is that an introduction,

24  sir?

25  Q.  We'll do it.  Let's do it right now.

1    A.    Okay.

2    Q.    Exhibit 55.

3              This was produced in this case.  It's from Dr. Chaps.

4              Do you know who Dr. Chaps is?

5    A.  No, I don't.

6    Q.  It's a 719 number, which folks around here know where that

7    is.

8    A.  I have no idea who Dr. Chaps is.  Once again, I get

9    thousands of calls, and I don't have them in my phone.

10   Q.  Does this appear to be a text that was sent to you and your

11   response?

12   A.  Does it have my phone number on there?  Is this from my

13   phone?  I don't know.

14   Q.  It was produced in this case.  I don't have your phone

15   number.

16   A.  Is this my phone?  He says, Mr. Lindell.  I assume he's

17   talking to me.  I assume it's my phone.

18              MR. CAIN:  I believe it's stipulated, so maybe I don't

19   need to go round and round on this.

20              THE WITNESS:  Okay.

21              THE COURT:  It's stipulated.

22              MR. CAIN:  Offer 55.

23              THE COURT:  So admitted.

24              MR. KACHOUROFF:  Pardon me one moment, your Honor.

25       (Conferring.)

1        (Plaintiff's Exhibit 55 received in evidence)

2    BY MR. CAIN:

3    Q.  Let's look at this quickly.  It says, Mr. Lindell, my

4    activist friend, Joe Oltmann, in Colorado has been sued by

5    Dominion and by the cheater programmer Eric Coomer.  Joe's cell

6    is -- there's a number -- and he has evidence that supports and

7    agrees with your legal defense.  Please collaborate or have

8    your lawyers call him this week.

9            And there's a response that says what?

10   A.  I will for sure.

11   Q.  Okay.  Does that help you remember receiving this text?

12   A.  No.

13   Q.  You don't dispute that this text was sent to you?

14   A.  I don't see my number, but he says, Mr. Lindell.  I'm going

15   to assume it was sent to me.

16   Q.  We know, because we looked at them, shortly after this is

17   when Mr. Lindell[sic] got in touch with My Pillow and was

18   issued a promo code.

19   A.  I don't know.  You would have to show me those too.

20   Q.  So February 22nd of 2021, you had no interactions with

21   Mr. Oltmann; is that your testimony?

22   A.  No.  I said, I hadn't seen him or met him.  I went on his

23   podcast to sell my pillows.  I hadn't heard a story about

24   Mr. Coomer or Antifa.  And I will tell you right there, back

25   then, I would get a hundred calls or texts like that.  Most of

1    them, if I thought they were relevant, I would turn them over

2    to Kurt Olsen.  Because we were sifting through data and people

3    calling in and I seen this and I seen that.  And A lot of them

4    that came at me were like, Dominion sent threatening letters to

5    over 150 citizens, and we had a glossary.  There were things

6    like this.  We were getting so many texts of people I don't

7    know.

8    Q.  Who was in charge, if you know, of credentialing any of the

9    experts that appeared at the cyber symposium?

10        We saw Mr. Oltmann there.

11   A.  I believe there was a team, I think, one of them's name was

12   Todd Sanders.  I don't know.  I would have to look back.  I

13   believe that was done by probably Kurt Olsen setting up the

14   team.  I know that he dealt with the people that I -- like Ben

15   Cotton, some of the people that were on the red team that I

16   never heard their names before, but they -- the people that

17   vet -- they had to have certain cyber credentials.  I think

18   that's what they said.  They have prove that they have at least

19   this level.  Because I guess we didn't want people coming and

20   saying, I'm a computer expert or a cyber guy.  You have to have

21   certain credentials.  And I don't know what those are, but

22   they -- what they were in the cyber world.

23   Q.  So whatever the credentialing level was, apparently

24   Mr. Oltmann met it; right?

25   A.  No.  Mr. Oltmann met it because he was a podcaster.  He was

1    media.  So he did not get in for being a cyber person.  He

2    would have had a badge.  When you got through, you had to get

3    badges of how you got in.

4    Q.  Shortly after the clip that we just saw, Mr. Clements

5    appeared again on stage.  Let's take a look at that.  That's

6    193.

7        (Media played)

8    BY MR. CAIN:

9    Q.  Now, you have -- I know you have indicated you are not an

10   insider expert, an election security expert, but you have

11   performed no evaluation or investigation relating to

12   Dr. Coomer's use of the adjudication function during the 2020

13   election; right?

14   A.  It was very much the adjudication process was absolutely

15   investigated by, I would say, upwards of 20 people by me that I

16   paid to do deep dives into.  Not just Dominion, but ESNS, all

17   the machines.  By the time we got into January, I knew -- and I

18   was even asked on Jimmy Kimmel, if it was reversed and your

19   friend Donald Trump was gone, would you still be sounding the

20   alarm.  I said, yes, I would.  Donald Trump is in office now,

21   and I am still fighting for what we have to do to save our

22   country.

23   Q.  Sir, my question was about Dr. Coomer.

24   A.  Yes, the adjudication -- he would have been part of

25   adjudication for other machine companies too.  So yes, that

1   part, whatever he was in charge of, would have absolutely been

2   covered by more than you could ever imagine due diligence on

3   that.  That's a big part of -- the adjudication process is

4   important on that.  You can turn a real vote -- hey, let's look

5   at this, turn it into a real vote that doesn't exist or that

6   can be changed.

7   Q.  So you agree with Professor Clements that Eric Coomer holds

8   the patent for the feature known as adjudication, which is one

9   of the tools in the tool chest to murder the American people's

10  vote, he did that?

11  A.  Eric Coomer did not -- I never accused Eric Coomer of

12  stealing the 2020 election ever.  Ever.

13  Q.  Well, you accused him of treason?

14  A.  And that was because he attacked My Pillow, and he blocked

15  me like he is now to get this out to the country.

16  Q.  We didn't see that in the statement that we looked at?

17  A.  You see, and you see in yourself in the second time you

18  guys attacked me, where I called you all criminals, what you

19  have done to myself and to My Pillow and to this country.

20          Why can't we just get the word out and get this out

21  there?

22          I don't understand.

23  Q.  You know we all have families, don't you?

24  A.  If there were rocks and knives in my pillows, I would say,

25  look inside, it's beautiful patented fill.  You guys have

1    blocked me for four years until I have nothing left.  That's

2    where we're at.  The CEO of Dominion he went on TV and said he

3    was coming at me.

4    Q.  So you have extended not just calling Dr. Coomer a

5    criminal, but you are calling me a criminal?

6    A.  What you guys did when you served me those papers and

7    served My Pillow was criminal, absolutely criminal.  What you

8    guys are doing here is criminal to me and to my company, my

9    employee-owned company.  They have nothing left.  What you guys

10   have done, this lawfare that's been done in our country is

11   horrific.

12   Q.  You believe in accountability?

13   A.  Yeah.  You guys should be held accountable, I do believe

14   that, sir.

15   Q.  That's not our choice, I guess.

16          Let's talk about something that you were tracking a

17   little more closely in the cyber symposium.  Turn to

18   Exhibit 81.  Exhibit 81 is a long text stream that's between --

19          MR. CAIN:  I'm not sure if it's stipulated.  I should

20   have prepared better.  It's stipulated.  I'll offer Exhibit 81.

21          THE COURT:  Exhibit 81, so admitted.

22     (Plaintiff's Exhibit 81 received in evidence)

23   BY MR. CAIN:

24   Q.  Okay.  Do you recognize this as texts between you and Dawn

25   Gary?

                    SADIE L. HERBERT, RPR, RCR
          901 19th Street, Denver, CO 80294  (303)335-2105

1    A.   No, I don't recognize it.  I don't know what this means.

2    Dawn Gary is a -- she's married to Gary.  I put that stuff in

3    my phone.  Yes, that would be a text.  Got it.  Just checking.

4    I don't know who DG is -- that would be her.  Yes.

5    Q.   I think she's Dawn Curtis.

6    A.   Go ahead.

7    Q.   Is that right, the same person?

8    A.   Dawn Curtis, Dawn Gary, she married Gary Dolshot[ph], so

9    Dolshot is her last name.

10   Q.   Isn't it your recollection that every day Dawn Gary/Curtis

11   texts you information on what promo codes were doing well?

12   A.   Every day she looks for deviations.  This is what I do all

13   day long.  But she gives me a preliminary report of something

14   that happened the day before, and there's a -- going, hey

15   there's a -- like this morning, for example, she sent me a

16   text, we had very low numbers yesterday and she had to go

17   through it and find what's different.  Because you go to each

18   timestamp throughout the day.  I have been in here.  I haven't

19   found the report.  She goes, there's a problem, but I'll find

20   it today.

21        There was another day during this court trial, where

22   we did extremely good.  And it was out of the ordinary in the

23   morning.  And she found out it was a podcaster that ran a

24   special on dream sheets, and we were testing a different price

25   point.

1            That's what we do every day.  And then if someone does

2    good, we got the other ones.  Your special is good, you can do

3    better.  If it's bad, we find out why.

4            For example, we found out yesterday that when a guy

5    did not run his ads -- it's their choice to run them or not --

6    it cost a lot.

7            That's what Dawn does every day.  And she deals with,

8    if you are onboarding a new podcaster, she sends them all their

9    product.  We send them all their product for their families,

10   whatever they need.  And then she has to call -- I used to do

11   this -- then she calls them back, has to say, how do you like

12   it, because I want them believing in the My Pillow products

13   before they even get to sell them.  I don't want anybody

14   selling stuff they don't believe in.  And then, from that

15   point, they can go.  And a lot of them are on -- they can put

16   it up was little as they want or as much as I want.

17   Q.  Do you remember my question?

18   A.  What does Dawn do every morning?  This is what she does.

19   Q.  Every morning, you get the financial information from the

20   prior day, do you not?

21   A.  It's in real time.  If I showed you right now, it would be

22   real time, what's happening right now.  I look at it, go,

23   there's something going wrong.  You can watch not only what

24   it's taking as a whole, every venue, Amazon or YouTube or a

25   paper or a Colorado paper, whoever is advertising, it will show

1    up these numbers.  And then I know usually what I paid for

2    those ads or what they normally would do in a day and go, hey,

3    there's something here, they didn't run the ad.  It's just, you

4    have to have that information.  Especially now, because My

5    Pillow is on the razor's edge of each day going under.  So it's

6    so important that we know all those these.  Our success is

7    right now -- it's always been important, though.

8    Q.  I think you even showed me a little bit, you can get on

9    your phone and check pretty much everything financially?

10   A.  Everything right now, what's going on in real time.  I have

11   to know.  Because in 2012, we didn't have that.  We used to

12   have one promo code, I told the jury earlier.

13        And we took in a hundred million dollars when we

14   started.  We're 6 million in the hole.  I didn't use a bank.  I

15   came up with the way to track everything.  What if this was

16   my -- like when I sold pillows out of the back of my truck for

17   years, I had to make everything the best it could be.  And if

18   you couldn't get there, then you could not run that ad.

19   Q.  Let's look at some examples leading up to the symposium.

20        MR. CAIN:  Hank, go ahead and scroll down to the text

21   page.  Okay.

22        THE WITNESS:  By the way, that picture you just put up

23   was one of our employees got killed in Shakopee that day.  I

24   don't know what the purpose of putting that up there.  But she

25   got murdered in Shakopee.  That's what Dawn was sending me, so

1    I don't know why you put that up there.  That's pretty

2    shameful.

3    Q.  Okay.  Sir, let's look at -- I think this is the second

4    page of the exhibit.  This is an example of what you were just

5    talking about, Dawn would say, promo code L66 -- remember that

6    promo code, by the way -- was $10,900, that's revenue to My

7    Pillow; correct?

8    A.  That's correct.

9    Q.  Last Wednesday was about the same, so it's a static number.

10        And the second one is Frank, and I heard your

11   testimony earlier, Mr. Lindell, Frank relates -- you said it

12   was generic.  Does it relate to Frankspeech or not?

13   A.  It was probably that, because it's used in Frank.  It could

14   have been -- it was probably emails, that was the only way I

15   would probably group it.  Back at that moment in time, it would

16   probably be email marketing that Frankspeech does.  So that's

17   what I would think.  Because if we had separate ads, they would

18   be separate, Frank23 or Frank33, whatever.

19   Q.  Let's go to the next one.  Do we have a date on this to

20   orient the time period?  Looks like July 30, so just a little

21   bit before --

22        THE WITNESS:  Your Honor, can I say something.  I

23   don't know why he put a picture of a My Pillow employee being

24   murdered.  Can I have a break for a second?

25        THE COURT:  We can take our afternoon break.  It is

```
 1    2:35 p.m.

 2              We'll be back here in 15 minutes, ladies and gentlemen

 3    of the jury.

 4              (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

996

```
 1        (In open court; jury not present)

 2            THE COURT:  We'll see you in 15.

 3            (Recess)

 4            THE COURT:  Counsel, do we need to address anything

 5    before we bring the jury in?

 6            MR. CAIN:  No, your Honor.

 7            THE COURT:  Mr. Lindell, are you ready to go?

 8            THE WITNESS:  Yes.  Thank you.

 9            THE COURT:  Madam Deputy.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     (In open court; jury present)

2          THE COURT:  Mr. Lindell, I just remind you that you

3     are still under oath.

4          THE WITNESS:  Thank you.

5          THE COURT:  Mr. Cain.

6     BY MR. CAIN:

7     Q.  Mr. Lindell, I think this will be our last block together.

8     Let's just orient the jury on a few more things on the exhibit

9     we were looking at just before the break.  It's a 186-page

10    document, so this is just to kind of get our bearings.

11         You did daily reports or Dawn did to you on your

12    totals, and then every week she would provide weekly totals;

13    right?

14    A.  What Dawn does, this is just a snapshot of hundreds and

15    hundreds of them that she does in the morning that she thinks

16    might be relevant, just a snapshot.  And then I look at my

17    phone through the day and look at all the rest of them.  So

18    this is just a preliminary snapshot.  I have what she has on my

19    own phone.  So she's not -- just kind of showing me, here's a

20    snapshot of the day.  So if there's something alarming, she

21    would let me know.

22    Q.  This example that we have in front, Frank, this looks like

23    a deviation, they did 341,000 this week and the week prior it

24    was 60?

25    A.  Yes, that would be a deviation, and I would look into it

1    immediately.

2    Q.  To find out if it's working?

3    A.  I take that back.  I don't know the week prior if that was

4    the norm at 59,000.  You have to get a base line, so to speak,

5    but it looks like here, that would be a big deviation one way

6    or another.

7    Q.  And if we go -- as you said, this is just a handful of the

8    promo codes.

9         How many promo codes do you have active?

10   A.  Thousands and thousands, tens of thousands.  Every

11   commercial you see anywhere is attached to a promo code so you

12   know if that advertising piece is doing well or not.

13   Q.  All right.  Let's jump to the next week.  I think it's on

14   Page 12.

15        So this is the day before the symposium, August 9th of

16   2021; isn't that right?

17   A.  Yes.

18   Q.  And we can see sales are pretty decent right now, up from

19   the prior week.  It looks like Frank has moved up to the number

20   two at 390,000, in terms of these data points.

21        So for the week prior to the symposium, the Frank

22   promo code, which I think you referenced was email, was at

23   390,000?

24   A.  Yeah.  I don't think -- I would have to go back, but that

25   probably wouldn't be a deviation.  That would be the norm.  I

1    look at war room, Alex Jones, they all look pretty -- it might

2    have been a deviation that Frank was low that one week.  Now, I

3    see two weeks, it would have to look at like a two-month in

4    knowing what their base line is.  It looks to me now that I see

5    this that about 350 is the baseline, that particular company,

6    then has to pay them for their advertising.

7    Q.  But there's a big jump of Newsmax for $740,000.  Were you

8    running ads on Newsmax at the time?

9    A.  Yeah, commercials.  Those are commercials.

10   Q.  And that brought in 740,000?

11   A.  It looks like it.  I don't know why she doesn't show a

12   previous week.  I don't know what that means on the bottom.

13   That's not normal.  That would be a deviation.  I would say,

14   why did you just second number.

15   Q.  Let's look at the first day of the symposium.  That's the

16   next day.  This is August 10th.

17          And so during the symposium, the numbers on the left

18   would be the sales numbers for one day, not the week; right?

19   A.  Correct.

20   Q.  And there's a reference from, I presume Dawn, sales are

21   incredible today.

22   A.  Where does it say that?

23   Q.  On the bottom.

24   A.  When you look at these, I always have her compare.  Like if

25   it's a Monday, compare to last Monday.  If it's during the

1    week, compare it to yesterday, just depends on what's going on.

2    Here, they're comparing to the previous Monday.  Frank, for

3    instance, is about the same.  War room, same.  Because we

4    didn't do any advertising at the cyber symposium.

5    Q.  But you were running around doing what you were doing at

6    the symposium, but you were tracking your sales at the same

7    time, weren't you?

8    A.  No, I -- this is on the -- I probably never looked at this.

9    I would bet I never answered her, I was too busy to look at any

10   sales for probably a month.  There was a time where I

11   couldn't -- I had to focus on getting rid of these voting

12   machines.  There's many, many, many times I don't talk to her

13   in the morning.  Like for this trial, I haven't looked at

14   anything she's texted me.

15   Q.  All right.  Let's look at the next day, the 11th.  This is

16   the Tuesday.  So you started on a Monday.  L66 went from 41,000

17   the week prior to 180,000.  Frank went to 125,000 from 36,000.

18   Newsmax made almost 300,000 in one day, et cetera.

19          Do you see that?

20   A.  Yes.

21   Q.  So suffice it to say, you got a decent bump in revenue

22   during the symposium based on --

23   A.  Which would be expected.  We didn't change our advertising.

24   Everyone was watching, maybe.  I don't know.  This would be an

25   overall lift, something had to happen during that time and

1    space.  If you show me this and I didn't know it was the

2    symposium, I would say definitely something happened over the

3    country.  We can also get affected if something tragically

4    happens in the news, because all the commercials all get

5    preempted, so they would all be low across the board.  This was

6    all because I guess more eyes on the cyber symposium for all

7    these venues, CNN, Fox, because for My Pillow, every day, we

8    don't change, doesn't matter what's going on.

9    Q.  But you know from experience -- and you have a lot -- that

10   events, if you put on an event, you get a lift?

11   A.  It just depends if you run ads or not.  Like I just said,

12   something can happen where you have more viewers on the media

13   that you never imagined.  But the commercials all get

14   preempted.  It happens to us all the time.  There will be

15   something big in the news and all the commercials you paid for,

16   you get to -- you get to rerun them, but it will be down the

17   road.  They're called preemptions and they get preempted.

18   Depends what the news is or the event.  For the symposium, I

19   didn't run any ads.  This was too important to get the word out

20   to the nation.

21   Q.  We saw a prior exhibit with an RSBN --

22   A.  They're not affiliated.  They're like a CNN here.  That's

23   what you see, these numbers higher, everybody that was

24   televising or talking about the news outlet -- or I mean, the

25   cyber symposium, they ran ads, I'm sure, for Band Aids,

1  Coca-Cola, and I'm sure they all got a lift because they had

2  more viewers that day.

3  Q.  And Frankspeech got a lift because you ran a banner on

4  Frankspeech?

5  A.  No, that was put on after the fact, sir.

6  Q.  It was put on, though?

7  A.  It was put on like a week later.  During the cyber

8  symposium, I ran no ads.

9  Q.  Let's look at the next entry.  This is on the 12th, this is

10  the last day of the symposium, L66 went from 44,000 the prior

11  Wednesday to 206,000.  That's a deviation?

12  A.  Yes.

13  Q.  Frank went from 17,000 to 200,000, that's a deviation?

14  A.  Yes.

15  Q.  Newsmax doubled.  Is that a deviation?

16  A.  Yeah.  All of them, the deviation -- it's not a deviation

17  anymore because we know what happened.

18  Q.  Okay.  And that's despite the fact that, apparently, the

19  live stream went down on Frankspeech or LindellTV, you see the

20  reference on the bottom?

21  A.  Right.

22  Q.  Let's go to Page 16.

23  A.  That's a good point, because the live stream wasn't up and

24  we still did sales.

25  Q.  Let's go to Page 16, and then we'll conclude with this

 1  exhibit.

 2         MR. CAIN:  Next page -- no.  You were on it.  Go back.

 3  Blow up the top section.

 4  Q.  Dawn here says, I'm guessing you want me to track promo

 5  code audit for Frank as well.  Yesterday was $381,000.  Today

 6  is $60,900.

 7         Do you see that?

 8  A.  Yes.

 9  Q.  And you say, audit is also Frank.  She said, got it.

10  A.  Yes.

11  Q.  You said, actually, audit is me, not Frank.  And you guys

12  go back and forth.

13         Are you with me?

14  A.  Yes.

15  Q.  So something happened with promo code audit that caused a

16  fair amount of spike to the revenue, didn't it?  Do you

17  remember that?

18  A.  Yes.

19  Q.  And if you go -- let's go down to the end of this, and

20  we'll conclude on these.  This is after the symposium.  You

21  still had a bump.  You can see kind of a recalculation of the

22  week prior, the Frank audit at 619,000.  You have L66 at about

23  another 600,000 in revenue.

24         Those are all deviations that you have defined; right?

25  A.  No, those would be -- but I knew what was happening there,

 1    because no, you gain more viewership LindellTV and Frankspeech,

 2    that platform, L66 is a LindellTV company code.  Frank audit is

 3    a, I believe -- and I can't tell by my texts, I would have to

 4    look back -- but I would know what was happening.  People stuck

 5    with the network, I guess, for the next week or two.

 6    Q.  And at the symposium, you even pitched a promo code from

 7    the stage, didn't you?

 8    A.  I don't know.  I mean, after it was over, maybe.

 9    Q.  Well, let's look at Exhibit 194.

10         Now, that's you on the stage at the cyber symposium?

11    A.  Yes, that's correct.

12    Q.  There's some folks milling down below, but do you remember

13    which day this was?

14    A.  It looks like the very end of the cyber symposium, looks

15    like people are packing up, taking pictures.

16         MR. CAIN:  Offer 194.

17         MR. DUANE:  No objection.

18         THE COURT:  So admitted.

19    (Plaintiff's Exhibit 194 received in evidence)

20    (Media played)

21    BY MR. CAIN:

22    Q.  Now, that was day three, you said?

23    A.  I believe it was the end of the symposium.

24    Q.  You got your voice back on day three?

25    A.  Mm-hmm.


                    SADIE L. HERBERT, RPR, RCR
         901 19th Street, Denver, CO 80294  (303)335-2105

1    Q.  All right.  Let's fast forward to April of 2022.  So we

2    were looking at August of 2021 and April of 2022.  And that's

3    the day that you spoke at the rally in front of the capitol

4    steps -- on the steps?

5    A.  Is this the day you guys sued me?

6    Q.  That's the day you were served with papers in this lawsuit.

7    A.  Yes, I remember.

8    Q.  Let me show you -- so you got a process server serve you

9    before you gave whatever remarks you intended to give?

10   A.  Yes.  I got served and My Pillow got sued that day too.

11   Q.  Let me show you what's been marked as Exhibit 114.

12          Do you see that, sir?

13   A.  Yes.

14   Q.  That's you under a tent next to the capitol in Colorado?

15   A.  Yes.

16   Q.  That's a gentleman next to you holding the papers that you

17   were served with?

18   A.  I don't know.

19   Q.  Do you remember getting that manila envelope with the

20   papers?

21   A.  Yeah, but it wasn't right there.  It was when all the

22   cameras were on me when I was doing my press conference.  They

23   said, here, you need this.  It was right in front of the world

24   in a press conference, right in the middle of it.  That's not

25   where I was served, here.

1    Q.  I didn't suggest it was.

2          You don't live in Colorado, so you happened to be here

3    on that day, April 5th of 2022?

4    A.  Yes, yes.

5    Q.  And then you stood under this tent prior to going onto the

6    stage?

7    A.  Yes.

8          MR. CAIN:  Offer 114.

9          MR. DUANE:  No objection.

10         THE COURT:  So admitted.

11     (Plaintiff's Exhibit 114 received in evidence)

12   BY MR. CAIN:

13   Q.  So the lawsuit that was served on you in this case, you

14   recognize that paperwork that it looks like you are kind of

15   staring down at?

16   A.  It came in a manila envelope, it could be it, yes.

17   Q.  And the gentleman that's holding the lawsuit, that's Joe

18   Oltmann, isn't it?

19   A.  I don't know.  It looks like him from the side.  That guy

20   is blocking him.  It could be.  I don't think -- I don't

21   remember Joe being there, but it could be him for sure.

22   Q.  Does that help refresh your memory, seeing this picture?

23   A.  I don't know.

24   Q.  Do you remember talking to Mr. Oltmann before you went on

25   stage?

1    A.  No.

2    Q.  Do you remember Mr. Oltmann reminding you about Eric Coomer

3    and Dominion?

4    A.  No.

5    Q.  You didn't read the lawsuit before you went on stage, did

6    you?

7    A.  I looked at who served me the papers.  That's the first

8    thing I did in front of the whole country.  I opened it up, and

9    Dominion and this Eric Coomer.  What I really noticed was they

10   also sued My Pillow.  Again, they attacked me for no reason.

11   Q.  Did you read the lawsuit or not beyond that?

12   A.  Beyond that?

13   Q.  Yes, sir.

14   A.  I read who it was from and who they were suing.  That, I

15   know for sure.  How much of it I read, I don't know, I didn't

16   have time.  I was going on stage.  They did very -- I guess,

17   planned, do it in front of the whole world, speak at the state

18   capitol, that was really important.  When I get served, I had

19   to look, now what.  Dominion and this Coomer guy, I remember

20   very much, this time at My Pillow, it had really cost us, at

21   that time, probably $8 million.  I go, you're coming at me

22   again, what did I do to you.  I didn't read the whole thing,

23   just who it was from and who they were suing.

24   Q.  And then you said some things?

25   A.  Oh, yes.

```
 1              MR. CAIN:  Let's look at Exhibit 200.

 2      (Media played)

 3  BY MR. CAIN:

 4  Q.  And that was associated with promo code L66 the one I

 5  referenced earlier?

 6  A.  That was probably put on later.  That was probably recorded

 7  or live, I have no idea.

 8  Q.  Do you remember if Mr. Oltmann fed you the line that you

 9  just said or did you come up it with yourself?

10  A.  To melt down the machines and turn them into prison bars?

11  That was my line, 100 percent.

12  Q.  And you wanted people who were at an election fraud rally

13  to know that Eric Coomer should be jailed and get rid of the

14  voting machines?

15  A.  I didn't even think of Eric Coomer on that stage until I

16  got served those papers.  I had never mentioned him in a year

17  since he attacked -- the first attack.  I didn't reference one

18  thing about Eric Coomer before he served me papers before I

19  went on that stage.

20  Q.  You wanted people at the capitol in Colorado to know that

21  Eric Coomer should be jailed for election crimes?

22  A.  Not for election -- for blocking.  Now, you are attacking

23  me.  What did I do to you for a year?

24              You cost My Pillow over $9 million.  You are blocking

25  everything I'm trying to do, amongst other machine companies.
```

1    And I get attacked again on national TV, served papers.  For

2    what?  What did I do?  What did I do that year?  Nothing to

3    this guy.

4            And now you attack me?

5            It makes you look pretty guilty that you might have

6    been driving the car for the diamond heist.  You're not only a

7    blocker now, I'm going, what are you doing.  That's what my

8    thoughts were.  It's horrible.

9    Q.  Is blocking a crime, in your book, sir?

10   A.  What you guys did is criminal, what you're doing.  Blocking

11   is -- you're blocking, you're covering up a crime to our

12   country, you're covering it up.  And I don't understand why.

13   But then you guys kept attacking me.  It's different, there's

14   blockers -- there's different reasons they don't want you to

15   get to the truth.  But when you directly attack to take down a

16   person, an employee-owned company or to take down a person for

17   no reason and you go after them and attack them, it's criminal

18   what you guys have done here.  It's criminal you all sitting

19   here in this courtroom for what you have done to me and My

20   Pillow.  And quite frankly, to the country, to block this truth

21   to get out so we can get out of what you are all partial to,

22   electronic voting machines.

23   Q.  And this all goes back to that conversation, that

24   five-minute conversation you had with Chris Ruddy, doesn't it?

25   A.  No.  This goes deeper than that.

1          Dominion sued me in February.  This goes way back to

2   when I -- I was never involved -- I was an ex-crack addict, I

3   never voted in my life.  I was about getting people off

4   addiction and getting them to god.  This came up because I seen

5   deviations in an election.  By the way, the first people I ever

6   seen that said there was problems was Alex Halderman and Harry

7   Hursti and Democrats, if you want to talk about political.

8   That's what it goes back to.

9          I get attacked by this company, Dominion.  Then I get

10  attacked by a guy that works for Dominion.  Then I get attacked

11  a year later, not just me, my employee-owned company.  It's

12  unbelievable.  It's unimaginable to me.

13         What are you going to get?  You took me into the

14  ground.  I'm 10 million in the hole.  You took everything

15  trying to get the truth out.

16  Q.  And you blame Eric Coomer for that and not your actions?

17  A.  I blame him now as much as I do you now, sir.

18  Q.  All right.  Within 24 hours, you made another video, no one

19  forced you to do it, you went on -- we'll look at Exhibit 202.

20  This was on the Lindell Report, stipulation 40.  Let's play

21  this.

22      (Media played)

23  BY MR. CAIN:

24  Q.  You said, you have been part of the biggest crime the world

25  has ever seen.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1          That's not blocking you on Newsmax?

2  A.  That's called -- that's covering up.  You are covering up

3  the biggest crime this world has ever seen.

4          And when I say that, our elections are sacred.  And

5  this is what -- this crime isn't just one election.  This crime

6  is every election.  We have to secure our elections.  Just like

7  Obama deemed them critical infrastructure.

8          If we don't get to paper ballots, hand counting, it's

9  over.  Our politicians are all selected for us.  And for you

10  guys to sit here and go after a company, that's criminal.

11          You go after me, it's criminal.  I'm sorry, it's

12  criminal.

13          You are covering up a crime that's against everything

14  we believe in, the American dream.  I go from a crack addict to

15  where I was able to build myself.  Without freedoms in this

16  country, you don't get that.

17  Q.  What evidence do you have that Dr. Coomer was part of

18  covering up the election fraud you claim in 2020?  What

19  evidence?  Dr. Coomer, right here.

20  A.  I'm living it right here.  He is suing me for no reason.  I

21  read the lawsuit, because some phone call.  I didn't even know

22  who you were, sir.  I didn't know anything about a phone call.

23  You went after My Pillow and me.  And after Dominion had sued

24  me, then you come and get me.  So I can't -- attack my --

25  there's different blocker types.  It didn't make sense,

1    deviations going -- why are you doing this?  Are you part of

2    the coverup?  Do you just want money?

3            I have changed a little bit, because I have seen that

4    you sued everybody else and you are -- they said there was an

5    Antifa call.  You said, I'm going to go after pillow boy, that

6    clown.  Maybe you are -- maybe you have two reasons.

7            What your lawyers are doing, you are taking this case

8    when I didn't even know this man.

9    Q.  You talked about -- you said in one of the clips that we

10   saw, you didn't even know the guy, we saw the clip on May 9th,

11   2021, you are talking about Dr. Coomer?

12   A.  He had just got my employee-owned company -- I knew it was

13   going to cost us millions.  As I sit here today, it's over

14   422 million it's cost me, the day he made that dirty deal with

15   Newsmax.

16   Q.  And you are the same man we saw who caused a Newsmax anchor

17   to walk off?

18   A.  Absolutely.

19   Q.  Three months before you made the statements?

20   A.  Absolutely.  They didn't tell me that I couldn't talk about

21   why my Twitter account, My Pillow, got canceled.  Every other

22   outlet I went on, why did your Twitter, My Pillow get canceled.

23   Because I want to get off of -- they have to have a reason they

24   canceled you.  Only one was Newsmax.  And they -- because why?

25   Because they were afraid of lawfare.  Because they had already

1   been sued by you guys.  So they were already -- they were

2   going, we better say, we better read the scripts in, we at

3   Newsmax believe that what we did was -- that these machines are

4   great and everything is great.  They had to do that.  You had a

5   gun to their head.

6        I didn't know that I couldn't go on and talk about

7   what I did on every other station that day in this country.

8   Chris Ruddy apologized, he said, Mike, you can come on anytime

9   to talk about your pillows.  Two hours later, he let me go back

10  on the air.  He said, please don't talk about elections or

11  anything like that now, because we have been sued.  We have

12  been sued.  And he was afraid for his company, to lose his

13  company, to fight it like I'm fighting it because we cannot

14  lose our country.

15       This is the only one, by the way, that has gone to

16  jury trial.  Everyone else had to settle because of insurance

17  companies or because they were afraid of losing everything they

18  had.  That's the truth.

19  Q.  Are you done, sir?

20  A.  What's that?

21  Q.  Are you done?

22  A.  Yes, sir.

23  Q.  If Dr. Coomer, as you stated, committed the biggest crime

24  the world has ever seen and --

25       MR. CAIN:  Put the stipulation up, Hank, if you would.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1    It's stipulation 40.

2    Q.  You called him evil, and you said he committed crimes

3    against the United States and all of humanity.  That relates to

4    this coverup you claim about the 2020 election as well, yes or

5    no?

6    A.  That's directly after he served me papers and attacked

7    someone.  Obviously, he's got a different agenda.  What would

8    that agenda -- driving a getaway car for a bank heist, I don't

9    know.

10   Q.  That statement is related to your allegation that he

11   committed election fraud in 2020, isn't it?

12   A.  Or covering up election fraud, just like you lawyers are

13   probably doing, for all I know.

14   Q.  And have you told the jury everything you know, from an

15   evidentiary standpoint, that would prove that Dr. Coomer

16   covered up the greatest crime in the 2020 election?

17   A.  I'm living it.  Unless Dr. Coomer can say, which I'm

18   finding out here -- he did say, I want to sue pillow boy, and

19   he has a habit of suing a lot of people, and I find out the

20   call was real and he wants to be in with Antifa, maybe he --

21   maybe he's not part of the big picture, but he just wanted to

22   sue me and My Pillow for money and to bring us down.  I'll let

23   him explain to you guys, though.

24   Q.  Is that your evidence, sir?

25   A.  Evidence of what?

1  Q.  Do you remember the question I --

2  A.  Evidence that we need to get rid of electronic voting

3  machines, like I said, we could spend months here.

4  Q.  People aren't in your mind.  That seems self-evident, but

5  the people that are listening to this that don't know you

6  particularly well or Dr. Coomer or about this so-called side

7  deal with Newsmax, but just the general public, anybody here

8  listening to this would want to know, how did Dr. Coomer do

9  this crime?

10        What's your evidence?

11        That's what I'm asking you.

12  A.  Dr. Coomer did not change the election.  Dr. Coomer did not

13  change it.  But he is doing -- he's a blocker.  He's doing

14  stuff to me directly to cover up so I can't get the word out.

15  And part of that is just breaking me and taking all my money,

16  which he's done, and he's destroying my company and employees

17  that I watch walk off the job every month with tears in their

18  eyes that have been with me for years because we don't have any

19  more money.

20        So you know what, do I have a problem with him and you

21  guys?

22        Yes.

23        Because why else would you come and sue me?

24        Just open up these machines and say, we have nothing

25  to hide.  It doesn't make sense.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1          So he's doing some viciously.  Did I shoot back with

2    that statement?

3          Absolutely.

4          You tell me why you're doing this to me, if you can

5    tell me that, I didn't see another reason -- I'm seeing another

6    reason when he says, I'm going to sue my pillow boy before I

7    even knew him, that's bizarre.  That was in February.  I'm

8    going after pillow boy, that clown.  That's what he said.

9          This is disgusting.  I didn't do anything to you, sir.

10   Q.  Sir, let's just take you at your word.  Crimes against the

11   United States of America and the biggest crime the world has

12   ever seen, you would agree that that would be -- and I know

13   you're not an election expert -- but an unprecedented technical

14   feat, if people were going to take you at your word, if he

15   rigged the election or covered it up --

16   A.  I never said he rigged the election.  Did I say Eric Coomer

17   ever rigged the election?

18          That is not true.  Ever.

19          Did I ever say Eric Coomer rigged and election?

20   Q.  Committed the biggest crime the world has ever seen --

21   A.  You're part of the biggest coverup of the biggest crime the

22   world has ever seen.  It's a miracle we're this far.  When you

23   see me this morning, why this trial is the trial of the

24   century, because I'm praying it's the gateway to get rid of

25   these machines, like 132 other countries have.  And we can save

1   the United States and the American dream.  That's where I'm at.

2   Q.  If we take you at your word, if he was to do this crime

3   of -- I won't use the term rigging, because we quibbled about

4   that -- but the biggest crime the world has ever seen, to start

5   with, the machines themselves would have to be hooked up to the

6   internet; right?

7   A.  Yes.  And we have a hundred percent evidence they are on

8   that.  I don't even think you should go there, sir.

9   Q.  Well, we started by saying, bring the evidence.  You have

10  promised that you were going to do that --

11  A.  This evidence isn't about whether the 2020 election was

12  rigged or not.  This evidence is about my beliefs and what I

13  said that I believe are true.  And I believe everything that I

14  have said and everything that man has done to me.

15  Q.  Okay.  The judge is going to advise the jury on what the

16  law is.

17          What I hear you suggesting is, if you think you

18  believe it, then you can say whatever you want?

19  A.  If you want -- this trial wasn't about let's bring in all

20  the evidence.  It would have took months about -- to show

21  everybody.  I spent 40 or $50 million, 35 experts and 18 hours

22  a day of people across this country in every state working for

23  4 years.  We have more evidence from -- from every angle you

24  can imagine on every single election.  And you got things that

25  happen like that Democrat gets votes in her own precinct,

1    people that have more votes than voters.  All we want is look

2    at this and make decisions.  You guys keep covering it up and

3    suppressing it.

4            I know you have your Dominion, you have an agenda.

5    Maybe you are protecting that.  That's too bad.  We have to get

6    to a certain place with paper ballots and -- there's a reason

7    132 countries have banned them.

8    Q.  I think we have exhausted this.

9            I'm asking for evidence that Dr. Coomer was involved

10   in a crime, and I think you have --

11   A.  My evidence, you're asking for machine -- my evidence is

12   what he's done to me directly, you can't explain why he did

13   this to me and My Pillow.  He started -- Dominion started it

14   way back in February of '21.  Then he does it in April.  That's

15   the first time I knew his name.  I never mentioned his name for

16   one year.  And then on the state steps of the state capitol, he

17   sued me, My Pillow and Frankspeech, and you don't think I'm

18   going to come out and say, you're a criminal, what are you

19   doing attacking this company for no reason.  It's called

20   lawfare, and it has not been done in our country since the

21   1700s.  That's horrific.

22           People that don't have money -- that's why people

23   haven't gotten this far, to a jury trial, because they would

24   have ran out of money like I did.  I borrowed money because I

25   love our country, and we have to get rid of them.  That's

```
 1   reality, sir.

 2   Q.  On May 6th, you still hadn't met Dr. Coomer, had you?

 3   A.  No.  I met him during this trial.

 4   Q.  On the 6th, Dr. Coomer had not come out and accused you of

 5   any illegal activity publicly, had he?

 6   A.  No.

 7   Q.  Now, you did say in that piece that you said what you were

 8   going to do, that's a reference to this call that Mr. Oltmann

 9   testified to, you even said what you were going to do?

10   A.  No, the call is so superfluous.  It has nothing to do with

11   anything at this trial.  I didn't know him.  I didn't know Joe

12   Oltmann.  I had to find out in real time the call you and the

13   jury have heard.

14          My whole thing is I was being attacked because I

15   wanted to get rid of the voting machines.  I have evidence that

16   there's problems -- not just problems with them, there's

17   malicious problems with them amongst other problems.  A year

18   ago Elon Musk came out, he's a smart guy, we have to get rid of

19   these voting machines.  The first time I ever seen that,

20   Democrats, that man over there, Alex Halderman, in the movie

21   Kill Chain.

22   Q.  Mr. Lindell, you need to answer my questions.  You're going

23   on a narrative.  I am trying to give you some --

24   A.  I'm sorry, sir.  I get very passionate about where things

25   are at in our country.  Go ahead.
```

1    Q.  Did Dr. Coomer force you to go on Steve Bannon's podcast

2    the next day?

3    A.  No.

4    Q.  You went on Steve Bannon's podcast the next day?

5    A.  Yes, I did.

6    Q.  And Steve Bannon has a national following?

7    A.  Yes.

8    Q.  He used to be a member of one of the prior administrations?

9    A.  Yes.

10   Q.  So the day after you accused Dr. Coomer of these things,

11   which we now know relates to lawfare and blocking you, you

12   said, the following on Exhibit 203.

13       (Media played)

14   BY MR. CAIN:

15   Q.  Now, you had self-control or at least the opportunity for

16   self-control to simply not say anything.  Why are you going on

17   a national podcast to once again talk?

18   A.  He was one of the few that let me on.  That's the other

19   thing.  Because of lawfare, all of the conservative media after

20   September 4th of 2021, when Fox News got sued by Smartmatic,

21   all of the media, the -- Fox, Salem Media, Newsmax, all of them

22   would not let you on again because they all got sued.  That's

23   what lawfare does.  All the other attack media, which we have

24   some in our courtroom here, that have been writing nasty things

25   about me, they wanted to attack this USA company, that have

1  been American, wow, the American dream, you are hiring addicts,

2  doing all this great stuff for the country, all of a sudden

3  that switched.

4         Are you all related to the machine companies?

5         Steve Bannon had me on at a very important time.

6  Because what I seen there, two more things were discovered.

7  One was our military.  It wasn't just the whistleblowers, it's

8  so horrific.  Computers being used in that realm.  They used to

9  be mailed oversees, 45 days.  Obama changed that, you can email

10  your vote.  I can't even tell you, but cast vote records came

11  out, there were many things -- like I said, the camera angles,

12  I poured money into everything.  We have so many different

13  silos.  We should be aired worldwide at that time.  Steve

14  Bannon was the only one that would have me on.

15  Q.  The truth is, sir, it was reckless of you to accuse

16  Dr. Coomer of corruption when you had no actual evidence?

17  A.  The evidence I had is he attacked me and sued me.

18         You think it's okay to sue someone for no reason?

19         That's what lawfare is.  Whoever has the most money

20  will run someone on down, and they will go to mediation or,

21  just like all the other ones did, because they were scared, I'm

22  going to lose my company forever like Mike Lindell.  If I don't

23  give in now -- there's a reason almost a hundred people were

24  sued by two machine companies and their affiliates, you guys.

25  Almost a hundred citizens and platforms were sued because they

```
 1   raised their hand.  Over 150 individuals that helped watch the
 2   2020 election were served threatening letters, threatening
 3   letters by Dominion.  I got one of them.  How dare you look at
 4   that?  You better back down.  They got security systems in
 5   their homes.  We took a lawsuit.  I financed it against
 6   Dominion for sending out those threatening letter.  It's just
 7   lawfare.  That's not reckless of me when you serve me papers
 8   and you are a part of the coverup.  You better explain to the
 9   country what are you covering up.  Either this man here because
10   of a phone call is greedy and he tried to say the phone call
11   didn't exist, and now we know it did.  I don't get it.
12           You know, he said he sues -- it's sue happy and suing
13   all these people.  I'm not going to take it.  I got sued, nine
14   lawsuits against me.  And I -- I think I -- do you think I did
15   it for money?
16           No.  I lost everything I had because I know our dream
17   will be gone if we don't get secure elections.  That's it.
18   Q.  Was it lawfare when you sued Joe Oltmann?
19   A.  I didn't sue Joe Oltmann.
20   Q.  PiDoxa?
21   A.  I didn't sue PiDoxa.  I don't sue anybody.  Attacks on me.
22   I don't sue people, sir.
23           I did once, I tried to sue Salesforce, and then I
24   learned really hard, if you don't have money -- that was years
25   ago.  What they did to me as a little businessman, and I
```

1   learned right there, people told me, if you go fight them, you

2   will run out of money, you will run out of money.  And I had to

3   back off and lose money there.  But I called them every single

4   day up to their CEO and what a horrible thing they had done to

5   me and to my employees at that time.

6   Q.  Did you also forget that you sued Josh Mayer?

7   A.  The lawyer sued him because of what he did at the cyber

8   symposium and because he stole stuff from there, and I found

9   out they -- that was -- that had to be done, according to the

10  lawyers.  That was Kurt Olsen that did that.  That wasn't me,

11  sir.

12  Q.  Well, the lawyer probably signed the pleading, but you

13  sued, you were the party?

14  A.  I don't believe that.  I didn't individually.  I didn't

15  even know about it until he said he took stuff from the cyber

16  symposium.  And then we had a recording of him and his wife

17  talking before that about how they were going to sabotage and

18  get the $5 million prize.  Which, by the way, that never got

19  admitted to a jury.  We got this after the fact.

20  Q.  I'm asking you about the suit that you filed.

21          THE COURT:  Mr. Lindell.

22          THE WITNESS:  I didn't sue Josh Mayer.

23          THE COURT:  I need you to listen to the question

24  Mr. Cain is asking and answer that question.

25          THE WITNESS:  I didn't personally sue Josh Mayer.

1   BY MR. CAIN:

2   Q.  One of your companies?

3   A.  I don't know.  I would have to look at it.  I don't know.

4   If Olsen did, maybe he was threatened with a lawsuit, I don't

5   know.

6   Q.  So if Kurt Olsen, without going into your communications

7   specifically, you were never made aware of the lawsuit against

8   Josh Mayer?

9   A.  I guess that they were going after him.  And if it had to

10  be a lawsuit to find out what he stole and did to that

11  symposium.  But I had heard that they talked to him, made a

12  deal and said, you know, it wasn't about money.  It was give us

13  back what you stole.

14  Q.  Okay.  So there was a lawsuit?

15  A.  I don't know.

16  Q.  Okay.

17  A.  Threat of a lawsuit if he didn't give it back.  I do know

18  we never got it back.

19  Q.  Okay.  You took a month off, and then you went onto Joe

20  Oltmann's podcast voluntarily, May 23rd of 2022?

21  A.  No idea.  I do a hundred podcasts a week.  If it was -- at

22  least.  I mean, I do -- that's all I do -- all I did was back

23  then, it wouldn't have been as many podcasts, because I was

24  flying around the country meeting with secretary of states,

25  attorney generals, politicians.  That's all I did for months n

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

 1    end was fly and go and say, here's what we have in your state.

 2    Remember, I bought every voter roll in this country.  I said,

 3    here's what I have in your state, Alabama.  I would get shut

 4    out.  We live pretty good here.  Or Texas or South Dakota or

 5    Hawaii.

 6    Q.  Sir, let's just look at the clip, okay.

 7    A.  Okay.

 8    Q.  I think it's 208.

 9    A.  Okay.

10        (Media played)

11    BY MR. CAIN:

12    Q.  That was the fourth statement you made about Dr. Coomer

13    after the lawsuit was served on you?

14    A.  I don't know if it was fourth.  I probably said it many,

15    many times.

16    Q.  We looked at the three in April, and this is in May of

17    2022?

18    A.  Right.

19    Q.  Is that a yes?

20    A.  Yes.

21    Q.  Okay.  She can't take down a nod.

22        In the lawsuit that was served on you, you didn't

23    actually read it until your deposition in 2023?

24    A.  Right.  The whole piece, I did not, until the night before,

25    I read it in detail.

1    Q.  Okay.  So you didn't see in the lawsuit where Dr. Coomer

2    asked probably -- or demanded that you retract the statements

3    about him relating to the 2020 election?

4    A.  I didn't say anything about him about the 2020 election.

5    Q.  Retract the statements that you made, I'll broaden it out.

6              Did you see the demand for retraction or not?

7    A.  No.

8    Q.  All right.  Let's look at Exhibit 22.

9    (Media played)

10   BY MR. CAIN:

11   Q.  What was the promo code associated with that statement?

12   A.  I have no idea.  Could you put it back on.  This runs on

13   our network, My Pillow advertiser is L66.

14   Q.  And that was about a year and a half after the cyber

15   symposium, was it not?

16   A.  March 10th, yes.

17   Q.  All right.  And throughout all of this time, you have had

18   your opportunity to compile your evidence to the extent that

19   you had any about Dr. Coomer, and we have discussed everything

20   that you have that would suggest that he covered up the

21   election or was involved in one way or the other in a crime?

22   A.  I'm living the evidence right now.  What you guys have done

23   to me, yes, I think I said it right there.  You go after My

24   Pillow and Frankspeech and myself, and I can't believe people

25   would do such a thing.  This has nothing to do with the

1   election flipping in 2020.  That's not why we're here.

2   Q.  Maybe we'll see why we're here.

3        Let me ask you.  Do you have an X account now?

4   A.  Yes, now, I do.

5   Q.  There was a time you referenced it in your -- in that clip

6   that we saw that you didn't have a Twitter account, that your

7   Twitter account and My Pillow's Twitter account had been --

8   A.  They were gone for, I believe, almost two years on my --

9   mine was taken down first, along with 1.2 million Americans'

10  platforms on January 7th and 8th, 2021.  You'll hear about that

11  during this trial.  And you'll see My Pillow got taken

12  February 3, something in there, so I didn't have a Twitter

13  account for a year or two, probably two years.  I don't know

14  how long.

15       MR. CAIN:  May I mark this.  268.  May I approach,

16  your Honor.

17       THE COURT:  You may.

18  BY MR. CAIN:

19  Q.  Is Exhibit 268 a post that you made on June 4th, 2025,

20  during this trial?

21  A.  Yes.  I have my Twitter back now.

22  Q.  And you have called this case the trial of the century and

23  the trial of the machines in the past?

24  A.  I called it the trial of the century, because I believe

25  this will be the gateway to get rid of the electronic voting

1  machines.

2  Q.  And you have now offered the sale of the century for the

3  trial of the century?

4  A.  Yes.  Absolutely.  We have to -- My Pillow can't afford to

5  be here.  So we are liquidating our sheets, some of the last

6  things we have as our inventory.

7          MR. CAIN:  Offer 268.

8          MR. DUANE:  Objection to its relevance.

9          THE COURT:  If you are going to make argument --

10          MR. DUANE:  My apologies.  May we approach briefly.

11          THE COURT:  Yes.

12      (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1029

1          (At sidebar)

2               MR. DUANE:  It's just an ad trying to sell pillows, by

3     a man who has admitted a hundred times over he sells pillows.

4     I think it has little, if any, probative value.

5               MR. CAIN:  It's a statement by a party opponent with

6     the promo code jury during a trial.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindell - Cross

1    (In open court; jury present)

2           THE COURT:  Overruled.

3           It's admitted.

4    (Plaintiff's Exhibit 268 received in evidence)

5    BY MR. CAIN:

6    Q.  Mr. Lindell, looking at 268 -- I won't put it up --

7    actually, we'll let the jury look at it if they want in the

8    back.

9           I want you to tell -- let's just characterize this a

10   little bit more.  I mentioned the sale of the century.  It

11   looks like this sale, if you use a certain promo code, you get

12   a free pillow and maybe some other things.

13          Do you see that?

14   A.  Yes.

15   Q.  And this was done on the 4th, which was Wednesday?

16   A.  Yes.

17   Q.  I want you to tell the members of this jury what promo code

18   the jury would have to put in in order to get the benefits of

19   this sale?

20   A.  Jury.

21          MR. CAIN:  Pass the witness.

22          THE COURT:  Mr. Duane.

23   CROSS-EXAMINATION

24   BY MR. DUANE:

25   Q.  Good afternoon, Mr. Lindell.

Lindell - Cross

1              Would you prefer I call you Mr. Lindell or Mike?

2    A.  Mike is fine.

3    Q.  Let me ask a couple questions.  We have heard a

4    considerable amount of evidence today on your direct

5    examination about the extent to which you or your company may

6    have made some money as a result of pillow sales in the recent

7    months; is that right?

8    A.  Yes, that's what he was saying.

9    Q.  And you have heard Mr. Cain make the suggestion, I think

10   it's fair to say, that you may have been making some of these

11   public statements of your opinions, in part, in an effort to

12   promote a drive of sales of your pillow?

13   A.  I heard him say that, yes.

14   Q.  Is that a fair description of your motivation?

15   A.  It's a hundred percent the other direction.  It's not true.

16   Q.  Tell us why you say that.

17   A.  When you go to January of 2021, when I first was the only

18   one raising my hand after I seen that this is massive, I raised

19   my hand and I started getting attacked.  And right away, we

20   lost $150 million in three weeks every year, because we lost

21   all the retailers in the country.  They had people go to my

22   banks overseas, told them not to give us credit anymore.  We

23   don't know who did that.  We were attacked.

24              At that time, I had -- I was probably worth

25   $60 million.  I had built up from being a crack addict in the

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1  streets to having all these employees.  And as we sit here

2  right now, today --

3  Q.  Excuse me, let me stop you there.

4  A.  I'm sorry.

5  Q.  You said in January '21, when you first started making

6  these public statements about your views respecting the

7  election --

8  A.  Yes.

9  Q.  -- you believe your net worth was approximately

10  $60 million?

11  A.  That's correct.

12  Q.  That was you personally?

13  A.  Yup.

14  Q.  What was, at that same time, the net worth of the

15  corporation?

16  A.  My Pillow was valued at almost a billion dollars.

17  Q.  Almost a billion dollars.

18       And you said that after you began expressing publicly

19  your views about the election and about these voting machines,

20  you lost money almost immediately?

21  A.  Immediately.

22  Q.  How much did you lose in the first month?

23  A.  That was all the retailers and the shopping channels.  That

24  was their number one product in history.  They all canceled.

25  And those alone is $150 million in revenue, just for one year.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1    But they're gone, they're not coming back.

2    Q.  All of the leading vendors that had been selling your

3    pillow?

4    A.  Yes.  Costcos, your QVCs, Bed Bath and Beyond.

5    Q.  They all canceled and refused to sell your product?

6    A.  They refused to sell My Pillow.  The CEOs would call me up

7    and say, we're sorry, we can't be involved in this, because you

8    are standing up against these companies.

9    Q.  Is there any other reason or any other evidence that has

10   ever been brought to your attention to suggest that any of

11   these vendors, these once loyal vendors, had any other motive

12   for suddenly canceling your product?

13   A.  They told me straight out.

14   Q.  That was the only reason?

15   A.  Yeah, that was it.

16   Q.  And as a result of the cancellation of these arrangements

17   that you had with these vendors, how much did you lose in the

18   first month, approximately?

19   A.  In the first month, it was $150 million of the retailers,

20   every year.  That's what we were doing in revenue.  The year

21   2021, I knew immediately, when we added them up, it would be

22   $150 million.

23            How did I know that?

24            Because we had been with them for 10 years, since

25   2012, we got all them retailers.  And we were -- I would go

Lindell - Cross

1    there, appearances.  Same with the shopping channels, QVC, HSN,

2    Oliver Cannon, they all canceled me.

3    Q.  Let's fast forward to the present time.  You said your

4    personal worth was approximately 60 million before this

5    started?

6    A.  Yes.

7    Q.  What is your personal net worth today?

8    A.  I owe $10 million, from everybody that would let me borrow.

9    Most wouldn't borrow because of these lawsuits.  I owe friends,

10   family, individuals, 10 million in the hole.

11   Q.  The corporation, how much money do you estimate the

12   corporation has lost?

13   A.  It's been --

14          MR. CAIN:  Objection, relevance.

15          THE COURT:  Overruled.

16          THE WITNESS:  It's been decimated.  Our revenue is --

17   I would say, it's probably worth now -- nobody would even look

18   at it because the lawsuits against it, and there's -- and every

19   week, including this week, I had to borrow money to make

20   payroll this week.  We live on the razor's edge.

21   BY MR. DUANE:

22   Q.  I understand.

23          During the four years, little over four years since

24   you first began publicly expressing your views about the

25   election and about these voting machines, was the decline in


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1   your profits continuous and steady, or were there occasional

2   times when you were earning as much as you did before January

3   of 2021?

4   A.  You would see maybe spikes.  You would have a defining

5   event that would be long-term.

6           For example, when they did the deal with Newsmax, we

7   can track exactly.  Since that time, it's cost My Pillow

8   $22 million in revenue, when they did that deal with Newsmax.

9   Q.  Approximately one month after, let's say, in February of

10  2021, when you first began to realize that your sales and your

11  profits were falling precipitously, did you have any reason to

12  believe that if you just hang on and kept making these claims

13  that your company would turn the corner and it would be

14  temporary, or did you suspect it was likely to be a permanent

15  problem?

16  A.  I thought maybe if I stopped, somebody would say, okay,

17  just don't do this again or whatever, I don't know.  I guess, I

18  would say, that if I had stopped and said, just like the

19  threatening letters, quit talking about this, maybe I could

20  have said, I'm sorry, I won't even worry about our election,

21  maybe they wouldn't have come.  I don't know.

22  Q.  But you never stopped, isn't that right?

23  A.  No, because we lose our country.

24  Q.  Well, if Mr. Cain is correct in his suggestion that you are

25  largely making these statements as a way of driving sales,

Lindell - Cross

1  promoting sales, making a profit, why wouldn't you stop making

2  these statements when it became clear that you and your company

3  were losing so much and so fast?

4  A.  Because I already knew that our elections -- if we don't

5  have elections -- in fact, it was brought to me when I was on

6  Jimmy Kimmel, he went to me, he said if Donald Trump was still

7  in power, would you keep sounding the alarm.  I said,

8  absolutely, I would.

9        Donald Trump is in power now, and I'm sounding it.

10  I'm completely broke.

11        Back then, my mindset was, once I seen, wow, this is

12  all people, this isn't a Republican or Democrat thing, I

13  started seeing Kill Chain with Dr. Halderman --

14  Q.  Let me stop you there.

15  A.  Yup.

16  Q.  Let me stop you there.  Before we talk about the political

17  angle.  Let me ask you about your potential financial motives.

18        Mr. Cain showed a few exhibits that appeared to show

19  there may have been some slight spikes, I think he called it a

20  bump in your revenue from day-to-day --

21  A.  Yes.

22  Q.  -- as a result of certain promo codes that were being

23  promoted --

24  A.  Yes.

25  Q.  -- during the cyber symposium.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1    Do you remember that?

2   A.  Yes.

3   Q.  These little bumps he documented for us, these slight bumps

4   in the sales you were able to generate, was it significant

5   enough to compensate for the amount of money that you lost and

6   spent on the symposium?

7   A.  No.

8   Q.  How much money did you spend?

9   A.  Upwards of 3 million.  I spent millions of dollars on the

10  cyber symposium because I wanted to get the word out.

11  Q.  Was that your personal money?

12  A.  My personal money.  Everything was my personal money.

13  Until I got sued at My Pillow, it was their money.

14  Q.  Would it be fair to say that -- Mr. Cain showed us how it

15  was that you were doing what you could to try to promote your

16  sales of pillows using promotional codes during the course of

17  the cyber symposium, that's right, isn't it?

18  A.  No, those are our advertisers out there using promo codes.

19  My Pillow is still separate.

20  Q.  Those advertisers and their efforts did generate some bump

21  in the sales of your --

22  A.  Yes, they did.

23  Q.  To show you how --

24  A.  I wanted to run commercial free.  This was too important

25  for people to be distracted buying pillows.  I never ran an ad,

Lindell - Cross

 1    I didn't put a promo code on that stream.  That was done a week

 2    or so.  I ran it commercial free, because I wanted people to

 3    focus on one thing, securing our elections and getting rid of

 4    these voting machines.

 5    Q.  If there was any additional money that came into the

 6    company as a result of the sales generated by these promotional

 7    codes --

 8    A.  Right.

 9    Q.  -- was that money enough -- would that money have been

10    enough to completely cover the costs of the symposium?

11    A.  Absolutely not.

12    Q.  Was it even close?

13    A.  No.

14    Q.  Slight bumps in your revenue, you still lost a huge sum of

15    money on the symposium?

16    A.  Yes.

17    Q.  Would it be fair to say, as Mr. Cain seems to have

18    suggested, that one of your motives in conducting the cyber

19    symposium was to put money in your pocket?

20    A.  No.  Just the opposite, it was to save our country.

21    Q.  That was your only motive?

22    A.  Yes.

23    Q.  Let's talk a little bit about your possible political

24    angle.  We have heard mention throughout the trial of the fact

25    that you don't deny you have supported President Trump and that

Lindell - Cross

1   you have met with him.  But the things that you have said in

2   public about your views and your discoveries concerning the

3   election, was that specifically to make it -- to promote the

4   election of Trump and other Republican officials?

5   A.  Could you rephrase it.

6   Q.  It's been a long day, I understand.

7        The things that we have heard -- we have learned a lot

8   about some of the things you said, expressing publicly your

9   views about voting machines and electoral fraud.  You

10  understand that?

11  A.  Yes.

12  Q.  Would it be fair to say that one of your objectives was to

13  support Republican candidates or was it both republican and

14  Democratic candidates?

15  A.  I have no problem with either party, Republicans or -- all

16  I saw was all Democrats, Alex Halderman, Dr. Halderman and

17  Harry Hursti in the movie Kill Chain in December of 2020.

18  Might remember, all my things up to those points was, it didn't

19  make sense, these deviations.  This wasn't a party thing.

20  Q.  You told Mr. Cain, you told us that you had uncovered in

21  your investigation, sometimes, evidence of electoral

22  irregularities that seem to have benefited Republicans and

23  victimized Democratic candidates?

24  A.  Absolutely.

25  Q.  Can you give us an example?

Lindell - Cross

1    A.  The example of Georgia, three Democrats running in the '22

2    primaries, in the summer of '22, and her and her husband and

3    her daughter live in that county, in their precinct, and had

4    voted, they had zero votes in their precinct.

5    Q.  Why was that so surprising?

6    A.  They all three voted for her.

7        And then you had things like more votes than voters.

8    There was a time, this is in Kansas, where I was getting

9    reports from people we had on the ground that votes were being

10   flipped from Democrat to Republican and all the stuff.  We had

11   had nothing to do with the party.  It was always about the

12   machine manipulation and computer manipulation.  That's why you

13   never heard me bad mouth the Democrat party.

14       Like I said, my background, I had never voted.  I was

15   a crack cocaine addict and all kinds of stuff in my life.  For

16   one thing, I didn't think politics matters.  So this was a

17   problem that all people have.  This wasn't a Democrat or

18   Republican.

19   Q.  Let me ask you, get back for a moment, you were telling us

20   about a female candidate in Georgia, and you said the initial

21   returns somehow reported that she had no votes?

22   A.  Right.

23   Q.  And you got involved in that situation?

24   A.  We watched it close.  And with that one, they had to --

25   that was one of the few times they had to open up the machines

Lindell - Cross

1    and show what was in there, like if you had a zero bank

2    balance, right.

3    Q.   Yes.

4    A.   And when they did that, almost immediately, they found she

5    had, I believe it was, 5,000 some votes.  She went from third

6    to first.

7              There was another candidate --

8    Q.   When you say she went to first, does that mean she actually

9    ended up being the winner of the election?

10   A.   Yes.

11   Q.   This was a democratic candidate?

12   A.   Yes.

13   Q.   And that was partially because you got involved in the

14   situation?

15   A.   Yes.  And there was another one too, another Democrat,

16   three counties over, there was three Democrats again, and this

17   lady dropped out two months before the election, and all of a

18   sudden the votes came in and she got more votes than -- I don't

19   know, like 4,000 some votes, but she wasn't on the ballot and

20   she wasn't a write-in.

21             That one, Brad Raffensperger, the secretary of state

22   of Georgia -- I have a lot of names for that guy, he's a

23   Republican.  He had to quit.  Because that was a deviation.

24   Everyone is going, what -- the media didn't grab it.  Oh, man.

25   They opened it up.  And he called it a programming error.  I

Lindell - Cross

1   said, why are elections programming and who is the one who put

2   her name down there.  And this was stuff, every day that would

3   come in.  And so it's -- this wasn't a thing on Republican or

4   Democrat.  This is a machine, a computer problem.

5   Q.  So in all of your research and investigation and public

6   advocacy you told us about, the millions of dollars, it would

7   not be fair to say you were specifically trying to help the

8   Republicans?

9   A.  Absolutely not.  People accuse me of trying to help Donald

10  Trump.  And I said it very publicly, this isn't about Donald

11  Trump.  If they would have overturned that election and put

12  Donald Trump in back in December, right away in December or

13  January 6th, we would have lost our country forever, because

14  these last four years, it would not have been uncovered how

15  horrific our elections are in this country, and it would have

16  been done, been done.

17  Q.  In the course of your investigation, in your research

18  concerning all of the problems you described for us, was there

19  ever a time that you or those working for you uncovered

20  evidence of some irregularity or possible fraud that worked to

21  the disadvantage of a Democratic candidate and you said, let's

22  bury this or let's not look at this?

23  A.  You find it everywhere.  A school board election -- what we

24  did is we found out you can get what's called the cast vote

25  record.  It's the one thing you can get under the Freedom of

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1   Information Act.  Some states call it the Sunshine Act.

2   Citizens can go request these cast vote records.  They have --

3   they're supposed to give them to you.  It comes out of the

4   machines.  And what is is it's the order the votes come in.

5          It's like if you missed a football game and you go

6   back and watch the highlights in order; first quarter, 7-7,

7   second quarter, 14-14.  All of a sudden, you get to the third

8   quarter and it's 14 to 10.  Numbers don't go in reverse.

9          So with the cast vote records, you can tell one thing,

10  you can tell if it's been computer manipulated or not.  Well,

11  you have to hold those cast vote records for 22 months, by

12  federal law, 25 months here in Colorado.  And what we did, we

13  ended up getting -- this is two years later, we got to get them

14  before September 3rd of 2022.

15         I put a call to the country, and we were able to get

16  1,100 cast vote records of 3,143 counties.  Every one of them,

17  after experts looked at them, were computer manipulated.

18  Doesn't mean they flip the election or anything.  It just means

19  computers are manipulated, or have evidence that don't make

20  sense.  Numbers don't go 1, 2, 3, 4, 5, 2, 3, 4, 5.  They don't

21  go in reverse.

22  Q.  Let me cut you off there.  We'll get there.  We've spent a

23  lot of time on the evidence that you collected and evidence you

24  have seen.

25  A.  Okay.


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1  Q.  Before we turn our attention to this, I want to bring our

2  attention to the central issue in the case.  You understand

3  that this is not a trial where the jury it going to be asked to

4  decide once and for all whether the 2020 election, that the

5  results to the election were in fact altered by fraud?

6  A.  No, that's not why we're here.  That's why when he asked

7  where are your experts, we would be here for a long time.

8  Q.  You understand there's been a lively, ongoing and

9  controversial national conversation on that topic for years

10  now?

11  A.  Yes.

12  Q.  And you understand, in this trial, the jury is not going to

13  be called upon to resolve that once and for all?

14  A.  No.

15  Q.  As you understand the central issue in this case, you are

16  the one that's on trial, not the election; right?

17  A.  That's right, what I said, right.

18  Q.  You know the Plaintiffs in this case, Mr. Coomer and his

19  attorneys, he has alleged a few things, they have alleged that

20  you have made a great number of statements.  We know that's

21  true, yes?

22  A.  Yes.

23  Q.  We have learned a lot in this trial about an extraordinary

24  number of written and oral statements that you have been

25  making?

Lindell - Cross

1   A.  About what, elections?

2   Q.  Elections and all other sorts of topics.

3   A.  Eighteen hours a day.

4   Q.  I think it's fair to say, you are an exuberant proponent of

5   free speech; isn't that right?

6   A.  Yes.

7   Q.  Of all the statements that we have heard about, let me ask

8   you what is probably the most important question in the case,

9   of all the many statements that you have made in the last five

10  years that we have heard all about from Mr. Coomer and his

11  attorneys here at this trial, did you ever make any of those

12  statements while knowing that they were false?

13  A.  No.

14  Q.  Did you ever make any of those statements while privately

15  thinking that what you were saying was possibly true, but

16  probably false?

17  A.  No.

18  Q.  Did you ever make any statements without doing your best to

19  validate or corroborate, if you could, the nature of what you

20  were saying was accurate?

21  A.  I did more due diligence than anyone ever could.

22  Q.  How many different individuals did you consult with, in the

23  course of your research, to try to see what you could learn

24  about election fraud and the voting machines?

25  A.  Cyber people, probably 30 to 35 that have the credentials.

Lindell - Cross

1  People, thousands, maybe tens of thousands.

2  Q.  Were you ever compensated in any way, or make any money

3  yourself, personally, from all that time you spent talking?

4  A.  All I did was put everything that's had a chance to show to

5  the country that what's -- here's the problem, I just poured

6  money out to help everybody.

7  Q.  How much money do you think you spent, approximately,

8  trying to investigate these suspicions and the reports that

9  you --

10  A.  40 million, everything I had.

11  Q.  How much?

12  A.  40 million at least.

13  Q.  How many hours of your own time do you think you devoted to

14  researching and investigating these suspicions?

15  A.  If you took an average over the past four and a half years,

16  ten hours a day, and that's -- if I'm not doing anything, I'm

17  thinking about how can we save our country.

18  Q.  And that's no compensation?

19  A.  No.

20  Q.  You didn't make any money from the time you spent

21  researching these things?

22  A.  No.

23  Q.  Your only motivation is to try to get to the bottom of what

24  you believe is sincere --

25  A.  Yes.

Lindell - Cross

1  Q.  Of all the opinions that you have expressed during the

2  course of this trial, were any of those opinions --

3            (Court reporter admonishment)

4            MR. DUANE:  I apologize.

5            MR. CAIN:  There's been leading.  I haven't objected

6  to leading.  I would ask that counsel not lead his witness.

7            MR. DUANE:  I gave the witness a chance to answer yes

8  or no.  I'll rephrase, your Honor.

9            THE COURT:  Thank you.

10  BY MR. DUANE:

11  Q.  Let me ask you this.  Mr. Cain asked you some questions

12  about some statements that you had made and a number of

13  questions of statements such as your opinion that you were

14  witnesses to the biggest crime the world had ever seen.

15            Do you remember that?

16  A.  Yes.

17  Q.  Those questions and that evidence.  And you remember that

18  he also asked you to confirm that you had made some statements

19  expressing your opinions that Mr. Coomer may have been a

20  criminal and guilty of treason.

21            Do you remember those statements?

22  A.  Yes.

23  Q.  Do you remember when Mr. Coomer was on the stand, earlier

24  during the trial -- you were here during his testimony, weren't

25  you?

Lindell - Cross

1  A.  Yes.

2  Q.  And you recall that he admitted on cross-examination that

3  he had likewise made some similar statements.

4        Do you remember that?

5  A.  Yes.

6  Q.  He admitted that he had publicly Tweeted that President

7  Trump was a piece of shit.

8        Do you remember that?

9  A.  Yes.

10 Q.  In his --

11 A.  Yes.

12 Q.  And he also admitted he had sent out Tweets and posts on

13 Facebook in which he said that Trump was, quote, an openly

14 admitted fascist, and quote, terrorist, close quote.

15        Do you remember that testimony?

16 A.  Yes.

17 Q.  Are you aware of any evidence that President Trump has ever

18 openly admitted that he's a fascist or a terrorist?

19 A.  Never heard that.

20 Q.  And you remember Mr. Coomer inviting us to give him some

21 slack and extend him some courtesy because he tends to speak in

22 hyperbole?

23 A.  Yes.

24 Q.  Would it be fair to say that some of your statements might

25 have been similarly hyperbolic?

Lindell - Cross

1   A.  Crimes against all humanity, but in my mind, this is so

2   serious.  And I know all the countries that have lost their

3   countries forever, or at least until they get rid of these

4   machines, so in my mind, it is pretty big.  Now, all humanity,

5   is that hyperbole, that would be subjective for one to decide

6   if you knew what I knew.

7   Q.  Fair enough.

8        Was that an honest expression of what you actually

9   believed?

10  A.  Could have been some exaggeration of what I actually

11  believe.  But I believe that this is a historic battle of good

12  and evil that we have to win.

13  Q.  All right.  Good.  Let's take a few minutes, if we could,

14  next topic I would like to talk to you about is Mr. Cain asked

15  a number of questions that were intended to reveal that or to

16  suggest that you have been mistaken --

17       MR. CAIN:  Objection to the characterization.

18       THE COURT:  Sustained.

19  Q.  We have heard evidence, I think you have admitted that you

20  might have been mistaken about some of the things, maybe some

21  of the smaller details in the case; is that right?

22  A.  Yes.

23  Q.  The jury needs to know more about why it is you may have

24  been mistaken or why you have a good excuse for being mistaken

25  about many of these things.

Lindell - Cross

1           How busy are you?

2    A.  I'm 63 years old and every day running companies.

3    Q.  How many companies do you own?

4    A.  Different -- I don't know, three, four, and trying to keep

5    them going and trying to do all this.  And I'm just busy.  I

6    have grandkids, I have a wife.  My day is filled with so many

7    things, and it's just -- it's been a long four years.

8    Q.  Over the course of the last four years, approximately how

9    many people do you typically speak with on a given day, if you

10   would give us a --

11   A.  It depends.  People come up to me everywhere I go,

12   hundreds, hundreds and hundreds just in text messages along.  I

13   probably get 200 emails.  Probably 4,000.

14   Q.  How often?

15   A.  Every day.

16   Q.  Hundreds and thousands every day?

17   A.  Mm-hmm.  I would say, probably thousands of emails, but

18   hundreds in texts.

19   Q.  How many employees do you have and supervise, how many did

20   you supervise at the height of your business?

21   A.  Probably upwards of 2,000.

22   Q.  I'd like to give you a chance to introduce yourself to the

23   jury, so just so we can learn about your background.

24           Did you come from a privileged home and a childhood?

25   A.  I came from a broken home.  And my parents divorced when I

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1  was seven years old back in 1969.  And I was put into a school

2  where I was the only kid from a divorced family.

3  Q.  Did that affect you?

4  A.  I think it did.  When I wrote my book, I look back and I

5  felt I didn't fit in.  I felt very shy.  I felt different

6  because no one else from a broken home.

7  Q.  Were your parents wealthy?

8  A.  No.  We lived in a trailer court with my two sisters.

9  Q.  Any time in your childhood or your young adult life when

10  you were given a good deal of money by anyone?

11  A.  Never.

12  Q.  Not at all?

13  A.  No.  I would do little things like a lemonade stand or

14  deliver papers, whatever I could to help out.

15  Q.  How far did you get in school?

16  A.  I went to my first quarter of college, and then I quit.

17  Q.  Did you stay in touch with your high school classmates?

18  A.  Yeah.  We had a five-year reunion, that's when I seen them

19  all.  At my five-year reunion, it was kind of devastating to me

20  because I worked at a drive in theater and a grocery store, and

21  I hadn't done anything.  We got to the five-year reunion, they

22  had finished college, they had started families, or they had

23  advanced in their job, and I had nothing.  I remember getting

24  home and just crying and balling and praying and wondering what

25  they had, at least something.  Because I definitely wanted a

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1  family.

2  Q.  At that time, did you have a family at that time?

3  A.  No.

4  Q.  And were you economically prosperous at that time?

5  A.  No.

6  Q.  Well, we have heard how the situation eventually turned

7  around for you.

8        What did you do?  What happened?

9  A.  Actually, it was from the grocery store, it was -- Mike,

10  you have to leave, you can't stay here, you can't be a lifer,

11  you need to go out, you are so smart, go do something.  So I

12  started doing little businesses.

13        One of my first ones was my sister rented a third

14  floor apartment building with a water bed, and I became a

15  carpet cleaner.  And it was very successful, and I had an old

16  truck, because I didn't have money.  I would clean houses, and

17  I also cleaned cars, interior cars.  And I dove into that.

18  That was eight, ten hours a day.  And that was just one.

19        And then there was another -- another example would be

20  during the same time, I started to be a very bad addict,

21  alcohol and I don't know if cocaine had come into play then,

22  but for sure alcohol, and I had got DWIs and stuff.  I ended up

23  in a treatment center in Minnesota, and I was in there for --

24  Q.  Treatment for what sort of --

25  A.  Treatment for -- treatment for alcohol, for addiction.

Lindell - Cross

 1          And I remember being there, and I wouldn't talk to
 2     people.  I had this fear of talking to people.  I found out
 3     later when I wrote my book, it was fear of rejection.  You
 4     don't get rejection if you don't talk.  Maybe it was a
 5     self-worth thing.
 6          I remember, in the middle of the night going down and
 7     watching TV with this guy and finally one of us talked, and I
 8     asked him what he did.  And he was from California, and he
 9     said, I have these lunch wagons where you open the side and
10     businesses would come out and eat around the beaches and
11     whatever.  I go, oh, that's intriguing.
12          And I went back to my room and did some research.  And
13     in Minneapolis, there was a company like that, and it was on
14     the other side of the cities.  So I called my friend, I said,
15     hey, I got a great idea.  I said, pick me up, I'm going to have
16     the lowest time spent, minimum 28 days, and I said, I'm going
17     to be out of here in 28.  Nobody had done that before.  But I
18     was just so excited to do this.
19          I said, come up with 8,000 and get us a truck.  And I
20     said, it's going to be great.
21          And I got done in 28 days.  And he picked me up.  And
22     I spent the next three years, two years -- almost a year
23     building these routes where I would go up and talk to these
24     presidents of companies.  I'm in a T-shirt.  But I was so
25     passionate.  I remember one company, I kept going in.  Finally,

Lindell - Cross

```
 1   I got to see higher up, like the president of the company, and

 2   he said what do you want to do.  I want to pull up, we have

 3   food on the trucks and your employees would come out.  And it

 4   was a brand new concept.  And he said --

 5   Q.  What was the brand new concept?

 6   A.  What's that?

 7   Q.  What was the brand new concept?

 8   A.  To -- you know, back then you had vending machines or

 9   people would leave to go to lunch.  Here, the truck would pull

10   up, and you flip open the side and you had ovens in the back.

11   So they would be able to come out on their break and grab food

12   and buy it off the truck.

13   Q.  Did the business become profitable?

14   A.  Yeah.  To get to him, I said, sir, please give me a try, I

15   said, I'll give every one of employees a sandwich.  And there

16   was a lot of them.  So everything we had -- and my partner

17   said, we don't have the money to do this.  I said, we have to

18   get this, it was critical to it.  And once we got that, in

19   three years, we had built five trucks, and it was an amazing --

20   lunch wagon routes and --

21   Q.  Did you employ anyone in this business?

22   A.  Yes, we had three people.

23   Q.  Did you start any other businesses after that one?

24   A.  Yes.  I had -- I ended up -- I was bartending too back

25   then.  And the owner was a big restaurant, and I -- and he
```

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1   said, he was going to be selling it, and he -- and I said,

2   well, I didn't have any money to buy it, but he said, I'll sell

3   it to you on a contract for deed, because he believed in me.  A

4   contract for deed is you don't put money on -- nobody is going

5   to offer some kid money to buy this restaurant.  So I would pay

6   him monthly payments.  In our contract, if you don't make the

7   payments, he gets it back, like a mortgage would.  So I had

8   that.  And then made that very successful.  I had to sell that

9   because there was an in-house business in there that ended up

10  leaving and that was -- once you lost them, that business could

11  not make it with those payments, so I had to sell that.

12          And then I ended up getting another restaurant bar,

13  which is actually -- was more of a bar.  And that was in 1990,

14  and I had it for 13 years.

15  Q.  You mentioned cocaine at one point in your testimony, I

16  think I cut you off, why did you mention that?

17  A.  Because I had a parallel track in my back, and addiction

18  affects everyone no matter how many forks you eat with.  But I

19  was in the streets, you have no forks, and I have people who

20  eat with four forks, you don't even know how many forks, the

21  rich people, and I was a very functioning addict, and I said in

22  my speeches and for all this stuff, addiction, so many

23  functioning addicts out there, and I really learned -- I knew

24  so much about addiction.  But back then, when I was into

25  cocaine, drugs can mask pain, and they can give you false

Lindell - Cross

1  courage.  One of the things I had, I don't know if it was my

2  self-worth, I needed to be either drinking or on cocaine.

3          I'll give you an example.  If I was in my bar and

4  someone came in, no one else was in there and I was straight

5  sober, I would give him a drink and I would be over here a

6  going please leave, please leave because I couldn't talk.  I

7  was very reserved, maybe later because it was a self-image

8  thing or self- -- you know, inside.

9  Q.  Was your use of cocaine occasional, or did you become

10 addicted?

11 A.  I became very addicted to the point, where you got into the

12 90s, almost every day.

13 Q.  How long were you -- are you still a crack addict now?

14 A.  I switched to crack cocaine in around the year 2000.  And I

15 had to sell that bar in 2003.  And it was devastating, at the

16 time.  I had actually went to -- actually, they say don't sue

17 city hall, and what I did is I brought a -- I put money -- in

18 our industry of restaurants and bars in Minnesota, they have

19 these things called pull tabs.  And they came -- these were

20 gambling devices.  And our laws were so horrible, that the

21 casinos that were brought there, the Indian casinos, we were

22 going to be out of business if those laws didn't change.  I

23 fought to change those laws and I lost on a technicality.  When

24 that happened, I wasn't even allowed to have my -- and my

25 business value dropped.  My life savings went down to nothing.

Lindell - Cross

1    But I had to sell because of that, because there's no way I

2    could keep going without those devices.  They were called pull

3    tabs --

4    Q.  What did you mean --

5    A.  Three years -- I want to finish this, please.

6    Q.  Please.

7    A.  Three years later -- it was devastating to me at the time

8    that I had to sell.  And I look back now, it was meant to be.

9    God, thank you, lord.  But three years later, to finish that

10   story, everything I fought for came true in the State of

11   Minnesota, all their things changed to exactly what had to be

12   done.  And I got calls from around the state.  Mike, we know

13   you lost everything, but you saved us and we thank you.  I look

14   back, and I would do it again.  It was right.  They would have

15   all lost.

16   Q.  You used a phrase, addiction affects everyone.  How long

17   were you addicted to cocaine and how did it affect you?

18            MR. CAIN:  Your Honor.

19            THE COURT:  Counsel, can you approach, please.

20       (Continued on next page)

21

22

23

24

25

                              Lindell - Cross

1      (At sidebar)

2              THE COURT:  Mr. Cain.

3              MR. CAIN:  Relevance.  And the issue isn't whether he

4      was addicted to crack cocaine as a justification for his

5      actions in this case.  I think it's becoming cumulative.

6              THE COURT:  Mr. Duane.

7              MR. DUANE:  This is similar to the background

8      testimony.  Mr. Coomer was allowed to tell us a considerable

9      amount.  It is by no means irrelevant.  It is the man on trial

10     who is being accused of acting maliciously.  They have to be

11     able to make an informed --

12             THE COURT:  I'm going to sustain on 403 grounds.  He's

13     had an ample opportunity to establish in response to Mr. Cain,

14     in response to your questions, what type of person he is, what

15     kind of adversity he has overcome.  Now, at this point, any

16     probative value is outweighed by the potential prejudice to the

17     jury.

18             MR. DUANE:  Let me wrap this up, confirm he's no

19     longer addicted, but that --

20             THE COURT:  That's fine.  That's the last question.

21             MR. DUANE:  Understood.

22             (Continued on next page)

23

24

25


                        SADIE L. HERBERT, RPR, RCR
              901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1          (In open court; jury present)

2     BY MR. DUANE:

3     Q.  Let me ask you one last question on this topic about your

4     background.

5          Now, you said you were addicted to alcohol and cocaine

6     and crack cocaine.  Is that still true now?

7     A.  No.  To answer that, in 2004, I had two parallel tracks.

8     On January 16th, 2009, God freed me of the desire for all of

9     it, and I have had not one thing since.

10    Q.  Congratulations.

11         Now, let's talk about My Pillow.  We have heard a lot

12    about that company in this case.

13         You know My Pillow is one of the defendants in this

14    case?

15    A.  Yes.

16    Q.  How did that company get started?

17    A.  In 2004, early 2004, I had just sold that bar and I

18    didn't -- we had four little kids and -- plus the addictions

19    and we -- one night, I was -- I always had problems with

20    pillows.  And I came up -- the name came to me, My Pillow.  One

21    of the first -- I said, where is my pillow, I thought that

22    sounded pretty good, and then I started to take apart problem,

23    solution, what are the problems I had with pillows.  I wanted

24    one that I could adjust, that would be softer, but yet stabler,

25    I wanted one that would stay cool, wash and dry.  When we

Lindell - Cross

1  started doing this, months turned into almost a year.  My son,

2  one of my youngest sons, we would try different forms which I

3  find around the neighborhood, and it was every day trying to

4  get -- this isn't good enough, I wanted it to have everything,

5  to solve every problem.  When they finally got it invented, I

6  was -- this is going to be great to help people, because it

7  helped me, that was the first thing, I wanted to help people

8  get sleep, as well as myself.

9  Q.  Who was the inventor of this product you call My Pillow?

10 A.  What's that?

11 Q.  Who was the inventor of the product you call My Pillow?

12 A.  Who was the inventor?

13 Q.  Yes.  You said --

14 A.  It was me, a hundred percent me.

15 Q.  And once you started making these pillows, how did you

16 market them?

17 A.  The first one I had, I remember going into Bed, Bath and

18 Beyond, I was so excited -- I didn't know you can't just go

19 in -- and I said, how many do you want, this is the best

20 pillow.  He said, you need to go -- I was so excited.  And he

21 said, this isn't how -- I was turned down at all the box

22 stores.

23        And I'm going, okay, I'm not going to get -- and

24 somebody said to me, why don't you do a kiosk.  I said, how do

25 you spell kiosk.  I didn't know what they were .

Lindell - Cross

 1          So we borrowed money to do that kiosk.  It was like

 2   $10,000.  A kiosk is a little square where people can walk up,

 3   and I -- especially, since I quit all my addictions -- or no, I

 4   hadn't quit then, but I would never want to be there on drugs

 5   or drinking or anything, so I was really out of my skin of

 6   talking to someone straight.  And it was very uncomfortable.

 7   So I only worked it one day.  My wife, at that time, she worked

 8   it.  Then one day I worked it, I sold my first pillow.  And I

 9   was so excited.

10          And the guy said, do you have a business card.  I'm

11   all out.  I wrote my name on a piece of paper and phone number.

12   That whole month, we ended up hardly selling anything, 20, 25

13   pillows.  We lost all the money.  And I still didn't give up.

14          And then, in January, that same guy, he called me up,

15   he said, are you the guy who invented the pillow.  I said, yes.

16   He said, this pillow changed my life.  He said, I run the

17   Minneapolis Home and Garden Show, would you like a spot.  I

18   said sure.

19          When I did that, I put a table between me and the

20   people so I could talk more and be more myself.  If I stepped

21   out, it was for me to talk.  And anyway, that day, I sold, I

22   believe it was, 18 pillows.  And I'm going, this is amazing.

23   The amazing thing came the next day, almost all of them came

24   back and paid to get back in the show and came up to the booth

25   and said, this pillow changed my life, I slept so good.  And

Lindell - Cross

1   that feeling I had, that I had helped them, the money didn't

2   matter.  I was so -- it was just amazing.

3           And I got hooked on that.  And I did shows and fairs

4   for the next, I don't know, how many years.  I just remember

5   that parallel track.  We ended up making them in our living

6   room.  My wife couldn't take it.  And we just -- that's a long

7   story.

8   Q.  You told us how you began with kiosk sales.  Did you

9   eventually move into other means of promoting or selling the

10  product?

11  A.  Yeah.  In -- like I said before, all the addiction ended on

12  January 16th, 2009.  At that time, there was a lot of -- all

13  the shows I had had been taken, and I had spent about a year

14  getting them back, because the one thing I did have, even

15  though I was an addict, my word was always good for all of the

16  show people.  So the people that copied my pillow and taken it,

17  I got it all back.  But then I said, you know, I heard about --

18  they took a picture of me once in a newspaper in Minneapolis,

19  and I was just holding a pillow, they said, this

20  entrepreneur -- by then, I had probably 30 people working, a

21  little factory going on, because we were doing shows all over

22  the country then, and then they took this picture, and sales

23  went way up.  I remember my daughters were working -- both

24  daughters were working at a kiosk in one of the malls in

25  Minnesota, and the sales went way up that day just because I

Lindell - Cross

1   was in the newspaper, in the business section.  So I thought,

2   what if I put that into an ad and made it into an ad, hold a

3   pillow, I have problems sleeping just like all of you, here is

4   my pillow, you know, family owned and operated, thank you, god

5   bless.  And I put these in -- they were called running ads, and

6   I started in newspapers in May of 2010, and it just exploded.

7   It was like -- it was so successful.  So now, we had to make

8   our -- take calls and we had more employees.

9          And then, the next thing was I said to everybody, I

10  said, you know what, if the box stores are not taking us and --

11  because you couldn't get in, I said, let's do an infomercial.

12  And I didn't know that infomercials are to get in the box

13  stores, they usually don't want work on the front end.  If you

14  pay for an ad, you don't get enough money to cover the ad.

15  It's like advertising, I found out this later, advertising that

16  you are -- less cost efficient.  Getting some sales.  Well, my

17  friends and my family, we pooled our money to make this

18  infomercial.

19         And we did have a real producer come in.  And it was

20  filmed in August of '21, and they -- I'm sorry, August of 2011.

21  And they brought this real producer in.  I remember, me and my

22  friend, we were just going to do it together.  And they said,

23  we did this, this guy is the worst I've ever seen, he'll never

24  make it on TV.  They were kind of right.  The audience was

25  there, I was so afraid, it took me an hour to do one line.  And

Lindell - Cross

1   I said, can we bring a table in and throw away the

2   teleprompter.  And we did that.

3          And it launched.  I was living in my sister's basement

4   with nothing left to -- very -- I think we had like 10

5   employees.  That launched October 7th of 2011.  30 days later,

6   about 30 days later, I had 500 employees.  We were hiring

7   everyone.  My friends, everybody.  I didn't really know what

8   was going -- I said, I just want to make pillows.  I said, we

9   need a -- we need a corporate attorney.  I said, that sounds --

10  we need an HR department, all these things.  Because we were

11  the number once infomercial in the world by the end of

12  December.

13  Q.  Mr. Cain asked you some questions about promo codes.  What

14  are those?

15  A.  Here is where the promo code came from, what I just told

16  you, over the next six months, My Pillow, from taking in

17  virtually nothing from the year before, we took in a hundred

18  million dollars, it just poured in.  But here is the bad thing.

19  I woke up in May, and we were $6 million in the hole.  And I'm

20  going, god, what did I do wrong.  And I had to dig into that.

21  And all of the -- nothing was tracked.  You were just buying

22  ads, and you didn't know some ads might be working and you paid

23  10,000 for an ad and that ad might have only made 2 grand, but

24  we didn't know it.  We only had one code, My Pillow.  So there

25  was a lot of betrayal, other companies I trusted -- that's

Lindell - Cross

1   another story -- I pulled everything in-house.  At that time,

2   there had been on TV -- there were retailers that did come

3   and -- but we were still -- by the summer of 2014, we were

4   still millions of dollars in debt.  But I pulled everything in

5   and learned what could I make this best, like emails, how could

6   I make every spot the best, what if I had to live on just one

7   ad, just like I had to live on one show that I would go there

8   with my bag of pillows and go town to town.

9   Q.  What did you do?

10  A.  I put promo codes and 1-800 numbers on every single one of

11  them.  So I would know, if -- let's say it's a ball player,

12  they're batting 300, let's say it was Fox 33, that would

13  coincide to an ad at 4:00 o'clock in the morning.  Or let's say

14  it was CNN on -- CNN6, that might coincide to a 10:00 p.m. ad.

15  If CNN6 cost $3,000, then you track and you got to bring back

16  at least enough to break even, which would be $5,000.  If you

17  made under that, why would you ever run that ad again, you just

18  lost money.  And they call it -- in branding, what most people

19  do, they don't know where their advertising dollars went.

20          Back then, because of what happened in 2012 was the

21  most amazing system to track down to the penny, is this ad

22  working or is this not.  And all of the -- Major League

23  Baseball had me come in and teach them all that two years

24  later.

25  Q.  Thanks for the background.  Let's fast forward to December

Lindell - Cross

1    of 2020, which would have been one month before you say your

2    earnings started dropping off quickly.

3    A.   Yes.

4    Q.   Where was the company started, by the way, in what city and

5    state?

6    A.   Minnesota, where I grew up and lived all my life.

7    Q.   That's where the company has its headquarters?

8    A.   Right now, yup.

9    Q.   Is that where all these products are manufactured?

10   A.   Some of them are.  Some you can't make here in the US, such

11   as My Sheets.  As we expanded to more products, we have four

12   products hundred percent made in the USA.  Some of the things

13   on here -- like there's no spinners left, so I went out to we

14   call it reinventing, I wanted to have the best sheets ever

15   made, so we had all kinds of due diligence, that took about

16   nine months to --

17   Q.   Without getting into a long list -- we don't need a lot of

18   detail.  So you mentioned sheets and pillows, any other product

19   or product lines?

20   A.   Yeah, sheets, slippers, towels, body billows, beds.  We

21   have over 250 products -- or we did.

22   Q.   And again, in December of 2020, how profitable was the

23   company, how much was the company worth?

24   A.   Upwards of a billion dollars.

25   Q.   How many employees did the company employ?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1    A.  1,500 or 2,000, maybe.  There's seasonal ones.  One of the

2    things you we do at My Pillow, you can work a season, help your

3    father, whatever, in a summer, you want to do a summer job, you

4    can take off and come back, you don't lose your place.

5    Q.  Was there anything special or unusual about your hiring

6    practices and the people you employed?

7    A.  Yeah, we hire a lot of people of -- it's a company of

8    second chances.  I come from addiction.  We hire people that

9    come out of Salvation Army, veterans or addicts that, you know,

10   they might not be able to be employed anywhere, but we give

11   them a chance.

12   Q.  Is your company driven entirely by profits?

13   A.  Absolutely not.  There's a pretty good thing, about eight

14   years ago, once we got big and we started having the board of

15   directors, I put a thing in our bylaws that the company, if

16   something happened to me, would have to tie 10 percent of all

17   their earnings to give to god or to give to people, to

18   charities, to help people.  We had a whole department that

19   would -- on a bigger scale, hurricane victims, fire victims, it

20   wouldn't matter, it was -- that's what we would do.

21   Q.  How many pillows have you given away to hurricane and flood

22   victims?

23   A.  Tens of millions.  Gosh, just on Hurricane Harvey, I

24   remember it was 80,000 pillows, with a value of $4 million.

25   Q.  Did you receive any compensation?

Lindell - Cross

1    A.  No.

2    Q.  No support from the government?

3    A.  No.  I didn't do it from that.  Even now, My Pillow doesn't

4    have anything.  Even though we can't go on media to talk about

5    it, when they had the floods in the Carolinas and the

6    hurricanes in Florida and the fires, we gave away pillows just

7    in the last few years.

8    Q.  Let me ask you one last question about the company and your

9    management style.

10        What is your philosophy towards dealing with employees

11   and the way you treat your employees?

12   A.  That's one thing I did, when I worked at that grocery store

13   way back in the day, I remember I couldn't go to a funeral of a

14   person that's very close to me.  And they said, they're not

15   close enough to you.  So things like at My Pillow, if someone

16   passes away, we don't say, is it your parent or a sibling,

17   where corporate America says, if it's your parent or sibling,

18   back in three days, uncle, one day.  If it's this -- if someone

19   dies, anyone that they know, they can -- we don't ask them who

20   it is and we pay them while they grieve.  I don't care if they

21   come back a month later, we pay them while they're out.

22        Same thing, if there's something life threatening to

23   them, if something happens and they -- their spouse or sibling

24   has life threatening -- in the hospital, they take off work, we

25   pay them every week.  They work until they're able to come

1069
Lindell - Cross

1   back.  One employee was over a year.  I just didn't -- and then

2   addicts, an addict, if you need help, like I say, we're 500

3   employees back then had my direct phone number.  Deviations, if

4   somebody came in and they're having problems and we find out

5   what addiction they have, I don't just say, you're fired.  I

6   take them, I pay for their treatment and pay them while they're

7   in treatment, because I was an addict.  I have to support my

8   family -- you probably weren't supporting them -- but you go

9   get help and you can be a much better person.

10       The last thing I will tell you is, if there's

11   individual things, too, that come up -- I got a call from a

12   deviation, an employee I had for a long time, and he was all of

13   a sudden late like two or three different times, and it got

14   reported to me.  So I called, I said, you have to find out why.

15   I called him up, I said, is there a problem, did something

16   change, he was having problems.  He said, my car broke and I

17   can't afford to get a new one right now, so I've been walking

18   14 miles to work there and back every day.  I'm going, are you

19   kidding.  And I bought him a car.

20       And another employee said, do I get a car?  I said,

21   you walk 14 miles to work for three weeks back and forth, I

22   will get you a car too.

23   Q.  Did you pay for that with corporate funds?

24   A.  No, it was my money.  It was my money.

25   Q.  What is your philosophy towards treating your customers?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

                              Lindell - Cross

 1   A.   Every customer --

 2              THE COURT:  Counsel approach.

 3        (Continued on next page)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindell - Cross

 1     (At sidebar)

 2          THE COURT:  Mr. Cain.

 3          MR. CAIN:  I think you know what I'm going to say.

 4     Bolstering.  This witness, his philosophy towards his customers

 5     is not at issue in case.

 6          THE COURT:  Mr. Duane.

 7          MR. DUANE:  This is not about his personal background.

 8     This is the nature and character of the corporation, which is a

 9     separate defendant, which is charged with defamation.  They

10     brought up earlier in the trial how it was that the corporation

11     was rated by BBB, the Better Business Bureau, how their rating

12     went from an F -- they were rated F previously.  I don't have

13     anymore questions on this, your Honor.

14          THE COURT:  How does the way he treats his employees

15     have anything to do with the Better Business Bureau?

16          MR. DUANE:  There's a claim in this case for punitive

17     damages against all three defendants and an essential element

18     requires the jury to undertake an evaluation of whether we're

19     dealing with a corporate defendant that is deserving of

20     punishment because of how it conducted itself.

21          THE COURT:  Not as to his employees.

22          MR. DUANE:  The last question was to how he handles,

23     how he relates to customers.

24          THE COURT:  All right.

25          MR. DUANE:  I only have one question on the subject.

Lindell - Cross

1       THE COURT:  I'll allow the question.  It's getting

2   cumulative.  It's 10 minutes to 5, we have to conclude by 5.

3       How much more do you have?

4       MR. DUANE:  After this, I would be moving on to other

5   subjects.

6       THE COURT:  All right.

7       (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindell - Cross

 1      (In open court; jury present)

 2   BY MR. DUANE:

 3   Q.  Mr. Lindell, my last question about the company, is there

 4   anything you wanted to tell us about how you treat your

 5   customers and the way you view your customers?

 6   A.  I view every customer like my only customer.  Example, back

 7   in the day, I get a call from this lady, her son's birthday was

 8   on a Sunday, she didn't get her package.  It wasn't My Pillow's

 9   fault.  The -- I drove from Minneapolis to Green Bay myself

10   seven hours to deliver that, and then back.  I view every

11   customer -- to this day, customer service, if someone has a big

12   problem, it will come all the way up to me, because I want that

13   person very happy.

14   Q.  Now, I would like to move on to another subject.

15        THE COURT:  Mr. Duane, didn't we talk about the

16   scheduling.  Are you going to be able to conclude this in seven

17   minutes?

18        MR. DUANE:  Let me ask one quick question about the

19   Better Business Bureau, and then wrap it up there for the day,

20   if your Honor permits.

21        THE COURT:  Go ahead.

22   BY MR. DUANE:

23   Q.  Do you recall some evidence we heard earlier in the trial

24   about your company's rating by the Better Business Bureau?

25   A.  Yeah.

Lindell - Cross

1   Q.  Can you explain what the situation was and the background

2   and how it happened?

3   A.  We had an A plus rating, the highest rating in history for

4   the Better Business Bureau.  And we were up for their award, I

5   was on the front of their website, it was -- we were their

6   example to what a company should be.  And I got called by -- I

7   didn't know Donald Trump from Adam, he was a candidate in

8   August of 2015, I met him, and I went in there, and he asked me

9   questions.  It was just him and I.  They said, whatever you do,

10  don't tell him you're an addict, your a crack addict.  First

11  thing I said, I was a former crack addict, I was going to have

12  this recovery network.  He said, I'm going to stop the -- but

13  the main reason he wanted me there was, your products are made

14  in the US, how is it going with your company.  We talked for

15  about 35, 40 minutes.  And I went out of there, and I went with

16  my wife, wow, I don't know any presidents, I didn't know

17  anything about politics, I didn't think it mattered, I went and

18  asked his employees about him, they said, great man, great

19  boss, and he had done something for all of them individually,

20  the ones we talked to.

21         So I got back to Minnesota, and I went into the press

22  release, the media at that time, how many more people are you

23  hiring, how are you doing, I did this press release -- I didn't

24  say we talked about -- to all of them saying, I met Donald

25  Trump, he invited me to meet him.  I thought some would come

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1    and do a story and interview me.  Instead, they attacked My

2    Pillow like I had never seen up until now.  This is a first.

3    But the Better Business Bureau, because of that, by the way --

4    then there was a class action lawsuit started that following

5    week that said that on -- like, for example, all my

6    testimonials, I had to send 260,000 testimonials because in

7    California they said they didn't believe them, that I just made

8    them up.  And the Better Business Bureau took me from an A plus

9    to an F, and it still is there to this day.

10   Q.  Did they ever give you an explanation as to why?

11   A.  It was political.  That's all they could say.  I know

12   someone -- and Minnesota is where the national Better Business

13   Bureau started, and they did a press release -- they had never

14   done it in history before -- on January 2nd, 2017, and I was up

15   in Canada, and I got all this notice.  I was doing the shopping

16   channel up there, I turned my phone back on and it was -- the

17   number one story, and it was the same day as when my dad went

18   in the hospital for six months.  I got off the plane going,

19   what did we do, what did we do.  I talked to people inside the

20   Better Business Bureau, this was all political.

21   Q.  My last question on this topic, and likely for the day, did

22   anyone from the Better Business Bureau give you an indication

23   that your rating had been dropped from an A plus to an F

24   because of the way you ran the company?

25   A.  We were the highest rated company.  We had no complaints.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Lindell - Cross

1    We were their gold star, highest you can get.

2             MR. DUANE:  Your Honor, due to the time and the

3    convenience of the jury, this might be a sensible place to

4    break.

5             THE COURT:  All right.  Ladies and gentlemen of the

6    jury, we are recessing for today.  I remind you of your

7    obligations, not to research this case or speak to anyone about

8    this case.

9             I am going to ask that, when you get back to jury

10   room, just stay there for five minutes.  I need to talk briefly

11   to the lawyers about scheduling and when we are going to need

12   you back for tomorrow.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court; jury not present)

2          THE COURT:  Counsel, we talked about doing the charge

3    conference tomorrow morning.  I'm not sure, given the way that

4    the testimony has gone today, if that makes sense or we should

5    do it at the end of the day and release the jury early.  I

6    would like to get the charge conference done tomorrow so we

7    have some resolution on the outstanding issues.  So what is

8    your opinion?

9          MS. MORGAN:  I agree with your assessment, your Honor.

10   We want to just make sure we get it done with sufficient time

11   to work out our closing demonstratives, our slides and exchange

12   that with opposing counsel.  Tomorrow afternoon should be

13   great.

14         MS. DEMASTER:  No objection.  We're fine with tomorrow

15   afternoon.

16         THE COURT:  Madam Deputy, if you can tell the jury to

17   be back here at 8:45 a.m.  I don't want to tell them we might

18   adjourn early tomorrow because I think it's dependent on how

19   the testimony goes.  I think, my inclination, counsel, is we

20   would adjourn a little early in order to resolve any

21   outstanding issues with respect to the proposed final jury

22   instructions and the verdict forms, which we will get to you

23   all shortly.  Thank you.

24         Anything else that we need to discuss outside of the

25   jury's presence at this time?

1            MR. CAIN:  Not from us, your Honor.

2            MR. DUANE:  Not a discussion, your Honor, just a quick

3    question about your preferences and practice.  Tomorrow, during

4    the examination of this witness, we may be offering -- we will

5    be offering into evidence a couple of exhibits on the exhibit

6    list that consist of videos.  Some of them are a little long.

7    It might be our decision to play just a couple of clips from

8    the video without playing the entire video for the jury, and we

9    wanted to know what your Honor's practice was.  I'm not asking

10   you to make a ruling today on the admissibility of any videos,

11   but would your Honor be willing to allow an attorney or allow

12   me to offer into evidence a video without playing the entire

13   video, in the interest of time, and giving the jury the

14   opportunity, if they were so disposed, to watch the remainder

15   of the video during deliberations?

16           THE COURT:  So you would have to clip out the portion

17   and tell the opposing party.  Otherwise, there is not a fair

18   opportunity for them to review it and, if they need to, under

19   Rule 106, to play the remainder of the video.

20           MR. DUANE:  So I understand.  So it's preference,

21   then, if we wish for the jury to see the entire video, if it

22   has been admitted, we should play the entire video during the

23   trial?

24           THE COURT:  Correct.  If you are going to excerpt any

25   portion, it needs to be its own exhibit, it needs to be shared

1    with either side, and then we'll take up any 106 or any other

2    issues.

3              MR. DUANE:  I appreciate the clarification, your

4    Honor.

5              THE COURT:  Anything else?

6              MR. DUANE:  I speak on behalf of all the attorneys on

7    both sides, by way of joint stipulation, I want to wish you a

8    pleasant evening.

9              THE COURT:  Thank you, Mr. Duane.  I wish you a

10   pleasant evening as well.

11             We'll be in recess.  See you back at 8:30 tomorrow

12   morning.  You know the procedure, if there are any issues I

13   need to take up before the jury gets here, please alert my

14   staff as soon as possible.

15             (Adjourned to June 10, 2025 at 8:30 a.m.)

16                            *  *  *

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination  of:                        Page

 3   MICHAEL LINDELL

 4   Direct By Mr. Cain . . . . . . . . . . . . . 838

 5   Cross By Mr. Duane . . . . . . . . . . . . .1030

 6                    PLAINTIFF EXHIBITS

 7   Exhibit No.                            Received

 8   261  . . . . . . . . . . . . . . . . . 859

 9   173  . . . . . . . . . . . . . . . . . 885

10   54   . . . . . . . . . . . . . . . . . 897

11   190  . . . . . . . . . . . . . . . . . 919

12   83   . . . . . . . . . . . . . . . . . 923

13   98   . . . . . . . . . . . . . . . . . 944

14   88   . . . . . . . . . . . . . . . . . 959

15   96   . . . . . . . . . . . . . . . . . 965

16   97   . . . . . . . . . . . . . . . . . 968

17   188  . . . . . . . . . . . . . . . . . 972

18   15   . . . . . . . . . . . . . . . . . 973

19   244  . . . . . . . . . . . . . . . . . 977

20   55   . . . . . . . . . . . . . . . . . 986

21   81   . . . . . . . . . . . . . . . . . 990

22   194  . . . . . . . . . . . . . . . . .1004

23   114  . . . . . . . . . . . . . . . . .1006

24   268  . . . . . . . . . . . . . . . . .1030

25
```

I hereby certify that the foregoing is a true and accurate
transcript, to the best of my skill and ability, from my
stenographic notes.




*Sadie L. Herbert*
Official Court Reporter
U.S. District Court