IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01129

ERIC COOMER,

　　　Plaintiff,

　　　vs.

MICHAEL J. LINDELL, et al.,

　　　Defendants.

------------------------------------------------------------

REPORTER'S TRANSCRIPT

Jury Trial, Vol. VIII

------------------------------------------------------------

Proceedings before the HONORABLE NINA Y. WANG, District Judge, United States District Court for the District of Colorado, commencing on the 11th day of June, 2025, in Courtroom A902, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:

CHARLES CAIN, BRADLEY KLOEWER and ASHLEY MORGAN, Cain & Skarnulis PLLC, P. O. Box 1064, Salida, Colorado 81201

DAVID BELLER, Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, Colorado 80202

For the Defendants:

CHRISTOPHER KACHOUROFF, Dominion Law Center PC, 13649 Office Place, Suite 101, Woodbridge, Virginia 22192

JAMES DUANE, Regent University School of Law, 1000 Regent University Drive, Robertson Hall Room 353B, Virginia Beach, Virginia 23464

JENNIFER DEMASTER, DeMaster Law LLC, 361 Falls Road, Suite 610, Grafton, Wisconsin 53024

Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street, Denver, CO 80294, (303)335-2105

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

P R O C E E D I N G S

(Proceedings commenced at 8:53 a.m.)

THE COURT:  We are on the record in 22-cv-01129, Coomer v. Lindell, et al.

Can I have appearances of counsel and introduce anyone who is at the table.

MR. CAIN:  Good morning.  Plaintiff is represented by myself, Charlie Cain, Brad Kloewer, Dr. Coomer is here, David Beller is here and Ashley Morgan is here.

THE COURT:  Good morning.

MR. KACHOUROFF:  Good morning.  Chris Kachouroff, Mike Lindell is here, I have with me James Duane and Jennifer DeMaster.

THE COURT:  I understand from Ms. DeMaster's email from last evening that there are some issues that need to be discussed; is that right?

MS. DEMASTER:  Yes, your Honor.

THE COURT:  The first one seems to be the video clips. And so let me understand what the situation is with respect to the compliance with the Court's minute order of last evening with respect to the video clips?

MS. DEMASTER:  Yes.  So when we provided -- when we said to the Court it would take maybe a few hours, that was in consideration of the clips that we had already clipped to provide those.  But to comply with the Court's order, we have

to re-clip and we want to make sure full compliance, so we don't want to rush it.  Our team, we have one tech that is out of state and is remote and is working on those, maybe one or two are done.  But we still need a little more time.  Our estimate is maybe after lunch, early afternoon.  All we were asking, to make sure everything is right and complies with the Court's order, including limiting down certain clips, that we be allowed to conduct our redirect within the scope of recross of Mr. Lindell a little later.  This time we did confer --

THE COURT:  Does someone have their phone on near a microphone because it's creating feedback?

Just make sure, if you have your phones on, not to have it near a microphone.  It will create feedback, and it makes it more difficult for the court reporter to hear.

I apologize for interrupting you, Ms. DeMaster.

MS. DEMASTER:  That was it.  We just are requesting to conduct our redirect that will be no more than 15, 20 minutes either in our case-in-chief or when Plaintiff is done with theirs.  There's not many witnesses left for the Plaintiff's side.  If we could move along with that, we'll be done by early afternoon, so if we're able to get through with the Plaintiff's remaining witnesses today, we can either do this in the afternoon, we'll be ready by then, or by tomorrow morning.

We just want the chance to make sure we comply with the Court's order by clipping down some of the other clips and

to provide them to counsel and the Court to make sure this is fully compliant.

THE COURT:  Don't you just have to clip from clips you clipped?  Doesn't your tech person just have to clip from those clips?

MS. DEMASTER:  Yes.  But some of them are extracted from that to make new clips.  They can't be shown in certain testimony.  So those were the other two.  I don't know how it goes, I just saw that lunchtime was about the --

MR. KACHOUROFF:  We'll push him.

THE COURT:  Let me hear from Plaintiff's counsel.

MR. CAIN:  Your Honor, we object.  For the sake of comity, we accommodated this situation yesterday.  My concern is we have a right to put on our case as we see fit. Mr. Lindell has shown a habit on the stand of commenting on matters that aren't within the scope of questions.  He's now seeing testimony of Mr. Ruddy.  And my concern is that he's going to come up and comment on testimony that otherwise would have been presented as we saw fit in our case, and that's concerning.  So I think it's prejudicial to us.

THE COURT:  So Mr. Cain, can't I just remedy that by giving you an opportunity to cross-examine Mr. Lindell after -- I wouldn't ordinarily give you an opportunity to recross Mr. Lindell, but given the technical difficulties -- the only other thing I can think of is if your technical person can play

the clips, then we could do it that way.

MR. CAIN:  I haven't asked.

THE COURT:  Hank.

MR. CAIN:  May I.

THE COURT:  Yes.  Mr. Kachouroff.

MR. KACHOUROFF:  Just pointing out that we actually do have a case-in-chief at some point.  We could present it, having him as a last witness is not a big deal.  I think they can also cross him, like you said.

THE COURT:  Typically, what we would do is have the witnesses appear once.  I mean, that's what I'm trying to get to so we don't have people up and down.  It would be extraordinary if I had you all recall a witness that has already been through so much testimony.

MR. KACHOUROFF:  The prejudice the Plaintiff complains about, we have been prejudiced from the get go because we don't get to present a case as we see fit.  So we're often behind the 8 ball because we don't know who the witnesses are, we start to see their case unfold, I don't have the opportunity, so I see the objection as a bit hollow.

THE COURT:  Thank you, Mr. Kachouroff.

MR. CAIN:  Did he say he doesn't know who our witnesses are?  We provided a list.

THE COURT:  He is gently complaining that my procedures require you all to put on witnesses in one fell

swoop, and so what he is suggesting is that he has also not been able to present his case in the order in which he might otherwise prefer if I allowed the parties to put people on multiple times and call them back multiple times.

Am I capturing your gentle complaint?

MR. KACHOUROFF:  You are, your Honor.

THE COURT:  Mr. Cain.

MR. CAIN:  With all of that considered and in speaking with Hank, I want them to present their evidence as they see fit, in terms of cutting their clips.  I don't want to be responsible for that.

THE COURT:  So can we have some -- go ahead, Mr. Cain.

MR. CAIN:  And so, yes, to move it along, with the understanding that I might get some latitude with Mr. Lindell, if necessary.

THE COURT:  You will get a little bit of latitude with Mr. Lindell with his additional testimony from today.  But let me be very clear, I do not want any of the parties to retread repeatedly what we have already tread before.

So does that resolve it?  We should just anticipate that we will present that evidence and be ready to present it after lunch; correct?

MR. CAIN:  Yes, your Honor.

MR. KACHOUROFF:  Yes.

MR. DUANE:  No more gentle complaints.

THE COURT:  I think that's fairly unlikely, Mr. Duane.

So the next thing on the email were objections to the -- what I assume are demonstrative exhibits that Plaintiff proposes using with the expert, their expert; is that right?

MR. KACHOUROFF:  I'm going to link up with them before lunch or at lunch or Ms. Morgan specifically to show them what I'm concerned about.

THE COURT:  All right.

MR. KACHOUROFF:  But ultimately, the Court has stated over and over that it wants evidence in that's relevant to show both the general election and against -- I took it as a conjunctive, in the context of Mr. Coomer and the defamation alleged by him, so that's the link.  And so a lot of this stuff that we're seeing now is divorced from that concept of being relevant to the defamation allegations themselves.

THE COURT:  So let me give your all some clarity, because I think that it might be helpful for me to give you the parameters of what I have been thinking with respect to the admissibility of evidence, and that might help you all guide your discussions.

The Plaintiff in this case bears the burden of proving falsity of the statements in order to prove defamation and that the statements were published by one or more of the people that are defendants and those statements include, but are not limited to, the one that we have talked about over and over,

Don't worry about the election, Trump is not going to win, I made F'ing sure of it, on the purported Antifa call.

The next allegation is of a defamatory statement and includes, It's over for Dominion, it's not too late to close the gate, cows are out of the barn, Dominion did their best and Smartmatic to take over through China, you did your best, you try to corrupt people, you tried to suppress and you did it but you failed.  And I'm telling you, you Coomers of the world -- what's his name -- yeah, Eric Coomer, if I'm you right now, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation to maybe, just maybe that you get immunity, and so that you -- and you are disgusting, you are treasonous, you are a traitor to the eyes of America.

There are additional statements that were purportedly published by Defendants where people repeat the statement attributed to Dr. Coomer.  And then there are also statements, for instance, All right, you've got a couple hitmen who are pulling triggers, the first general, if you know, is John Poulos, who is the CEO of Dominion, and he gave those remarks under oath.  And then, Eric Coomer who holds the patent for the future known as adjudication, which is one of their tools in their tool chest to murder the American people's vote.  And then there is a repeat of the allegation with respect to the Antifa call.

Then there is the statement, So everyone, if you just want to know how corrupt the corruption we are up against, Eric Coomer served, had the papers served to me before I was going on stage at the capitol.  I have never talked about Eric Coomer.  Apparently, he's the president of Dominion, the criminal crime family here in Denver, who knows what he did there, but anyway, he served papers, everybody, he sues, get this, Mike Lindell, Frankspeech and My Pillow.  Eric Coomer, you are a criminal.  Eric Coomer, your lawyers better look out.  You have been part of the biggest crime this world has ever seen.  Eric Coomer, you have even said what you did or what you are going to do.  You are disgusting, you are evil, you belong behind bars.  We will not stop until you are behind bars.  We are going to melt down your little machines and you are going to hang behind your prison bars.  Should have thought about that, Eric Coomer, before you did crimes against the United States.  And quite frankly, it is disgusting what you have done.

In order for the Plaintiff to attempt to carry his burden to prove falsity, this court has allowed the Plaintiff to present admissible evidence about voting systems, how they operate and whether they are susceptible to the actions by Dr. Coomer or Dominion Voting Systems to make F'ing sure that Trump is not going to win, that is to alter to make sure that President Trump did not win the 2020 election.

In addition, the Court permitted Mr. Crane to testify about the 2020 election, insofar as it gave context for the core of his testimony, that is the impact of the alleged defamatory statements on Dr. Coomer and for the purposes of exemplary damages on others in the election space.

Defendants' burden to prove their defense of truth, however, to prove truth, the Defendants need to prove that Dr. Coomer stated on the Antifa call that he made F'ing sure that Trump is not going to win and that Dominion and Dr. Coomer took the country through China and they did make sure that Trump wasn't going to win by manipulating the Dominion voting machines.  To the extent that Defendants wished or wish to present evidence that Dominion voting machines were used by Dr. Coomer or others to steal or interfere with the 2020 election, that evidence remains relevant and admissible subject to other rules of evidence, including Rule 403.

What is not relevant or probative or is outweighed by the prejudicial impact is that there was some other election fraud outside of Dominion and Dr. Coomer with respect to the specific alleged defamatory statements.  Furthermore, the only evidence that defendants acted with actual malice, i.e., stated the falsity or they acted with reckless disregard of the truth, pertained to the specific alleged defamatory statements, not other claims of unrelated election fraud.  I have given Defendants some leeway to present admissible evidence about the

general atmosphere of the 2020 election, to test the credibility of the witnesses and how they may have impacted Defendant's belief.

Both Mr. Oltmann and Mr. Lindell repeatedly testified they were not election experts, nor cyber experts, they were not in the red room at the cyber symposium looking at the data provided; therefore, they lacked foundation to testify to those issues and rebut witnesses through their own testimony.

While I will permit evidence, some evidence that may pertain, be probative of the Defendant's state of mind, I will not permit Defendants to introduce evidence of unvetted expert's testimony that purported to support or refute the claims of election fraud at issue in this case.

The expert's qualifications are to be examined before the expert's testimony is presented.  I will not allow Defendants to introduce backdoor testimony from purported expert witnesses that they have chosen not to identify or disclose pursuant to the Federal Rules of Civil Procedure or call as witnesses in this case.

So I wanted to give you that contour that may help you all discuss the objections or disputes with respect to the proposed demonstrative exhibits, which I assume, Mr. Cain, if you can confirm, you will not seek to admit as evidence in this case.

MR. CAIN:  I think that might be better directed to

Ms. Morgan, but yes.

THE COURT:  Ms. Morgan, I assume that the slides --

MS. MORGAN:  No, your Honor.  And just for clarification, I'm not sure I have whatever email you are talking about, where you were discussing objections to the demonstratives.  If there's an email about that, I haven't seen it.

MS. DEMASTER:  It's similar to your objection about the video clips.  I'm not sure --

MS. MORGAN:  Is there an email describing --

MS. DEMASTER:  No, we had discussed it.

THE COURT:  Anything else before we bring in the jury?

MR. KACHOUROFF:  Yes, your Honor.

I do have objection to Dr. Bania's testimony, his supplemental testimony.  I would like to be heard for three minutes on that.

THE COURT:  All right.

MR. KACHOUROFF:  Your Honor, Dr. Bania's testimony should be excluded because it fails to satisfy the requirements of Rule 702.

THE COURT:  Before you start, I'm going to allow you to argue this, but why was this not subject to a 702 motion pursuant to the Court's deadlines?

MR. KACHOUROFF:  Well, two things.  Number one, I did not receive a supplemental report.  It went to my spam folder.

22-cv-01129    Jury Trial    June 11, 2025

I did not know there was a supplemental report,

THE COURT:  When did it go to your spam folder?

MR. KACHOUROFF:  May of '24.  Last night, David was very kind to send it to me.  I went back and checked my spam folder, and indeed, I had received it from Scotty.  So I don't -- this was when I was newer into the case, your Honor, trying to do a transition from prior counsel.

THE COURT:  Okay, all right.

MR. KACHOUROFF:  Nevertheless, his opinions are not derived from the scientific method, and they are pure conjecture.  For example, he overstates the exposure.  Mr. Bania includes the entire cyber symposium view count, all three days, 1.8 million views, even though Dr. Coomer is mentioned only late on day three.  Most of the content has nothing to do with the Plaintiff, and this is not a dispute about emphasis, it's a categorical objection.  He adds all three days to the total reach count as if the content, all of it, were defamatory.

He lacks the data to support his estimate.  There's no linking to facts whatsoever.  He didn't have access to the platform level analytics, and therefore, could not isolate the views of Coomer-specific content or irrelevant content, and that's not sufficient facts or data under Rule 702(b).

But his damages model is the most difficult point here.  He proposes a $2.6 million reputation repair plan

through Google ads.  This isn't a measure of harm.  It's a theoretical remedy that all viewers believe the statements and all viewers that ad clips would fix their beliefs.  No court has ever endorsed that model under Daubert.  It presumes that every viewer was misled and must be reeducated.  It presumes perfect click through effectiveness and no real world data on actual harm or behavioral response.

His method is simply not reliable.  No peer review, no error rate, no acceptance in the relevant field.  The analysis is no more than a construct of litigation, not science.

Your Honor, under Rule 403, a jury could be misled into believing that millions of people saw the defamatory statements, when only a small subset did.  The probative value is low and the risk of unfair prejudice is extremely high.

And the bottom line here is Mr. Bania's reports rely on overinclusive data, speculative assumptions and methodologies that don't meet any accepted evidentiary standards.  They're prejudicial more than probative.  Under Daubert and Rule 702, they must be excluded.

Thank you, your Honor.

THE COURT:  Mr. Beller.

MR. BELLER:  Good morning, your Honor.  I realize the jury is waiting, I will be brief.

Your Honor, Mr. Bania's supplemental report was in fact provided to Defendants over a year ago.  In addition to

Mr. Kachouroff, it was also sent to Mr. Lindell's two prior counsels. It was sent to Mr. Kachouroff's law partner. It was also sent to My Pillow's in-house counsel who withdrew, I believe, approximately two to three weeks ago.

In addition to all of that, your Honor, I also sent our Rule 107 slides to the Defendants, I believe, early Monday morning. So I'm a bit surprised to be hearing this at approximately 8:40 this morning that there was now going to be a challenge to Mr. Bania's report, in addition to, apparently, his 107 slides reloaded to all of this. I believe the opportunity to address this was, candidly, quite a long time ago, when there was a challenge to or could have been a challenge to the 702 experts, as there was to Dr. Halderman.

Your Honor, in terms of the defense having some select objections, apparently, to some of Mr. Bania's reports, as we know through the committee's notes on the application of the rule, that goes to weight, not admissibility.

Mr. Kachouroff, obviously, has an opportunity to make objections as Mr. Bania is in fact making his testimony, giving his testimony. And ultimately, Mr. Bania will be subject to cross-examination.

As to a few limited specifics, the Defendants refused to give us any analytic reports, other than Exhibits 92 and 118. That was the only thing that the Defendants would agree to produce. Mr. Bania, as stated in his supplemental report,

specifically says that he is unable to determine how many people saw defamatory statements out of the 1.8 million who actually viewed the cyber symposium on Frankspeech, that he is unable to determine how many of those individuals may have been duplicates. And for that reason, he is not taking those numbers into account in determining the reach of any defamatory statements as to Dr. Coomer. And so all of that is already included in all of his reports. And excuse me, in the supplemental report, it says that verbatim. And I imagine that Mr. Bania is not going to be trying to speculate such that Mr. Kachouroff's concerns are ripe at this point.

And so for that reason, I don't think that there's anything specific for the Court to rule at this point. And to the extent the defense has objections, their opportunity to have made those has passed. And if there is something that is going to be a violation of 702 or 703, they certainly have the opportunity to make the objection contemporaneously when the evidence is elicited.

THE COURT: Mr. Kachouroff.

MR. KACHOUROFF: Briefly, your Honor.

This idea about not objecting to exhibits, we gave them the videos two weeks ago and yesterday we found out they had objections, so this is going both ways. It's understandable, we're all busy, we're waiting for trial.

In terms of this report, this is not purely goes to

weight, this is pure speculation. As your Honor knows, they have admitted it, he's basing his ad clicks on what he perceives to be the global viewership of this symposium.

THE COURT: Why does that not go to weight, not admissibility?

MR. KACHOUROFF: Because under Daubert, this court's function is to exclude evidence that is speculative and is not reliable. That's an admission that it's not reliable.

He put in his reach estimates, what he thinks his purported reach estimates are, but to a Google ad word, that method of, quote, repair is suspect in and of itself and unreliable. The idea of basing it on three days of a cyber symposium, where he says there's 1.8 million views there and 100,000 views here and 100,000 views there, he doesn't know if it's the defamatory content, but he seems to allude that it is, in his report, that's pure speculation. That's exactly the type of opinion the Courts exclude every day. It doesn't go to weight is what I'm trying to say.

THE COURT: Why isn't this motion untimely, given the Court's practice standards that is repeated in the standing order with respect to trial and pretrial procedures that says, unless otherwise ordered, all motions filed under Federal Rule of Evidence 702 and any motion to strike an expert on the basis of discovery violations shall be filed no later than 30 days after the discovery deadline for disclosure of witnesses?

Defense counsel specifically filed a motion for me to exclude the testimony of Dr. Halderman, that's Docket Entry 188, that's in September of 2024. I know you received a supplemental report in May of 2024, and an entire year has lapsed before trial. It was also not raised in the context of any motion in limine.

MR. KACHOUROFF: I couldn't have known about it before the motion in limine side of things.

THE COURT: What about the other lawyers, Mr. Cynkar, the in-house counsel?

MR. KACHOUROFF: Mr. Cynkar, I don't know that he got it.

THE COURT: He's on the docket as counsel of record.

MR. KACHOUROFF: I understand that. But the email I got was from counsel personally.

THE COURT: Right.

MR. KACHOUROFF: And he's referring to the two former lawyers at Parker Daniels, whom I don't speak with that often.

THE COURT: No, I'm talking about My Pillow has two in-house counsel who just withdrew from representation sometime in May, I think.

MR. KACHOUROFF: I don't know that they received -- David, can you confirm? I didn't get any word from them.

You can just say yes.

THE COURT: Regardless of whether or not they received

them, they were sent them?

MR. KACHOUROFF:  Correct.

THE COURT:  And the fact that it got caught in your spam folder for a year does not mean that they weren't properly sent.

MR. KACHOUROFF:  Judge, if we're going to be rule based, the rules do require my consent to use email, rather than hard copy, as the Court knows.  I haven't -- I don't want to get into the gotcha moment about rules.  At the end of the day, I'm not objecting to all of their evidence in Dr. Bania's report.

I'm just saying that this idea of assigning paperclips for these speculative views is improper and it's not something I realized or could have realized until I started seeing the evidence unfold.  Because I did not realize that the alleged defamation really only took place on one day, which would have been the 12th of August in the afternoon.

So I just think it's a bit unfair -- the Court's duty and role, I get it, this should have been raised earlier, but at the end of the day, it's a small change to the exhibit.  I would ask the Court to exclude that mention of the ad clicks as the, quote, repair program for Dr. Coomer's reputation.

THE COURT:  I'll take this under advisement.  I mean, again, this is also the first time I'm hearing it.  It's incredibly inefficient, but I'll need to take some time to

evaluate it.  I haven't even seen the supplemental report.

So does someone have a copy of the supplemental report that I can review?  I would prefer a clean one, if you have it.

MR. BELLER:  If I may show defense counsel, briefly.

THE COURT:  Can I hear from Plaintiff's counsel, is there a way to also email this to chambers?

MR. BELLER:  Yes, your Honor, I'm happy to.

THE COURT:  And where does Mr. Bania fit in today with respect to testimony?

MR. BELLER:  Your Honor, our plan is that we have two depositions, each one of them is going to take approximately 45 minutes.

THE COURT:  Okay.

MR. BELLER:  And then our plan is to call Mr. Bania right after those two depositions are filed.

THE COURT:  All right.

MR. BELLER:  Your Honor, for the Court, ECF 297-1 also discusses and identifies Mr. Bania, and that is on March the 17th, 2025 regarding the economic costs to repair Dr. Coomer's reputation.

THE COURT:  I'm sorry, the proposed final pretrial order?

MR. BELLER:  That's correct, your Honor, 297-1.

THE COURT:  Well, it does identify Mr. Bania.  It doesn't identify this specific opinion that Defendants seem to

be challenging.  We'll take this one under advisement.

Let's take a quick break.  Madam Deputy, is our jury ready to go?

THE DEPUTY CLERK:  I'm not sure yet.

THE COURT:  If you can check on that.  And then we'll take a look at this as well.

(Recess)

THE COURT:  Pending before the Court is this objection with respect to the supplemental report and opinions stated by Doug Bania in his supplemental report.

Counsel concedes that this report was provided to him through his email in May of 2024.  And the Court's practice standards provide that 702 motions need to be filed within 30 days of the rebuttal reports.  Here, the rebuttal report deadline was firm, and so by operation of the rule, the 702 motion should have been filed within 30 days of the May 15th, 2024 supplemental report.

However, this court has its own gatekeeping function under Rule 702 and Daubert and its progeny.  The Tenth Circuit has noted that a district court can reject as untimely Daubert motions raised late in the trial process and only in rare instances will such tardy motions be permitted.  However, in this case, I can't -- because of the timing of how the report was provided and this objection was raised, I can't really evaluate whether or not I need to exercise my gatekeeping

22-cv-01129    Jury Trial    June 11, 2025

functions with respect to the testimony until Mr. Bania

actually testifies and I can evaluate what foundation and what

basis or expertise he is relying upon in order to state these

various opinions.

One of the drawbacks of this being raised here is that

this court is not working from a full record, full briefing of

the parties, and there is no counterevidence of a rebuttal

expert or some other individual who can actually address for

the Court defense counsel's argument.

So I think what is most appropriate in this case, in

the Court's exercise of its gatekeeping functions, is to note

that it is untimely, but that it has been raised before

Mr. Bania's testimony and the Court will consider

contemporaneous objections at sidebar at the time so I can

evaluate Mr. Bania's testimony as a whole as it's coming in to

evaluate the appropriateness of the particular opinions that

the defense is now challenging.

MR. KACHOUROFF:  Thank you, your Honor.

Our expert may be coming in -- I was looking for him

moments ago -- peter Kent.  I wanted to get permission for him

to watch Mr. Bania testify.

THE COURT:  I thought that was already agreed to.

Mr. Beller.

MR. BELLER:  It was agreed to, your Honor.

THE COURT:  And you all emailed this to chambers;

correct?

MR. BELLER:  We did.

THE COURT:  Let me hand this back to you.

MR. BELLER:  If I may approach, your Honor.

THE COURT:  You may.

MR. BELLER:  Thank you.

THE COURT:  Thank you.

Are you all ready for the jury?

MR. KACHOUROFF:  Yes, your Honor.

(Continued on next page)

22-cv-01129   Jury Trial   June 11, 2025

(In open court; jury present)

THE COURT:  Mr. Cain or Ms. Morgan.

MS. MORGAN:  Plaintiff calls Dennis Montgomery, who will testify by video deposition.  It should be about 45 minutes.

(Dennis Montgomery video deposition played)

THE COURT:  Counsel, are you ready to call your next witness?

MS. MORGAN:  Yes, we are.  The video deposition will be about 45 minutes long, just wanted to let the Court know, in case you wanted to take the morning break now.

THE COURT:  I think we can proceed.

MS. MORGAN:  Plaintiff calls Brannon Howse by video deposition.

(Brannon Howse video deposition played)

MR. KLOEWER:  Your Honor, one moment.  We're checking on the video.  I apologize.  We're okay.  We thought there was an error with the video.  We can proceed.

(Brannon Howse video deposition played)

THE COURT:  Ladies and gentlemen of the jury, let's take our morning break for 15 minutes.  Just be back here by 11:20.  Don't talk to anyone or between yourselves about what you've seen or heard today.

(Continued on next page)

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

(In open court; jury not present)

THE COURT:  Counsel, anything before we take a break?

MR. BELLER:  Only to put the Court on notice that Mr. Bania is the next witness.

THE COURT:  All right.  Anything for defense?

MR. KACHOUROFF:  No, your Honor.

THE COURT:  Thank you.

(Recess)

THE COURT:  Counsel, I have a few things to go over with you all.  I think, during the examination of Mr. Howse on the deposition, there was an exhibit that was shown in conjunction with his testimony.  I'm not exactly sure what exhibit that corresponds to, in terms of the trial exhibits.  And so if you can identify that.  And I'm also not sure that it was formally admitted.

MS. DEMASTER:  It's Exhibit 117.

THE COURT:  Okay.

MR. KLOEWER:  Let me confirm that.  Yes, my co-counsel is telling me that's right, your Honor.

THE COURT:  So it hasn't been admitted, so are you proffering its admission?

MR. KLOEWER:  Your Honor, I apologize, my internet is slow.  Is it the LindellTV registration document?

MS. MORGAN:  It's from their designation.

MR. KLOEWER:  That was an email from Todd Carter

indicating that he was working with the Frankspeech website, some information on the website, that was disclosed by the Defendants, I believe it's an opposing party statement.

THE COURT:  So are Defendants moving to admit it?

MR. KACHOUROFF:  Relevance.

THE COURT:  It's part of your designation.

MR. KACHOUROFF:  Then we definitely stipulate to it.

THE COURT:  Any objection?

MR. KLOEWER:  We have no objection.

THE COURT:  It's formally admitted.

(Defendant's Exhibit 117 received in evidence)

THE COURT:  The second issue I wanted to address with you all is the timing with respect to the remainder of the testimony.  As I understand it, Mr. Kachouroff, does the Defendant have one or two live witnesses?  Because it seems like there's one will call and one may call on the remainder of your supplemental witness list.

MR. KACHOUROFF:  Two.

THE COURT:  So both Jerry Bremer and Peter Kent.

MR. KACHOUROFF:  I'm sorry, your Honor, just Peter Kent.  And I was counting Mr. Lindell.

THE COURT:  So you anticipate Mr. Kent's testimony taking about two hours?

MR. KACHOUROFF:  Maybe an hour, to be honest with you.

THE COURT:  So probably another hour with Mr. Lindell

with both the videos and the cross-examination; is that accurate?

MS. DEMASTER:  With Mr. Lindell?

THE COURT:  Yes.

MS. DEMASTER:  Yes.  Yes, it would, your Honor.

THE COURT:  So I'm just letting you all know this. Typically, in our pretrial orders, we expressly divide the time between the parties.  That doesn't really make sense in this case.  And under Rule 611, I'm going to make an adjustment to that because of the manner by which both Mr. Oltmann and Mr. Lindell testified and the fact that the Court had to remind both of them to respond to the actual question being asked and their tendency when unchecked to offer additional testimony not directly responsive.

But I think I also need to balance that with the fact that I need to make sure that Defendants have a full opportunity to put in their testimony, and I want to make sure they're not prejudiced in terms of rushing that testimony to be presented by Mr. Lindell and Mr. Kent.  So to that end, unless I hear differently from the parties about some other agreement that you all reach, the Plaintiff has to conclude its case no later than lunch tomorrow.  That gives the Defendants an opportunity to put on their testimony.  Hopefully that gets us to closing arguments on Friday morning, instead of Friday afternoon with this jury, who has been sitting here for two

weeks.

I don't know how long it will take them to deliberate, but I want to give them at least some opportunity to deliberate before the weekend.  Because once the weekend comes, then we have to bring them all back.  And I'm certain that some of them have other obligations that they need to attend to next week.

Anything else before the next witness?

MR. BELLER:  Not for the Plaintiff.

MS. DEMASTER:  Point of clarification, your Honor.  Does that mean that we'll be able to call Mr. Lindell for our final recross in our case-in-chief after they were done?

THE COURT:  I thought you all were going to be ready to do that this afternoon.

MS. DEMASTER:  We are.  I thought we were talking about our case-in-chief.

THE COURT:  I wanted to make sure you all had enough time.  So I anticipate Mr. Lindell today.  And then I'm giving Plaintiff fair warning that you all need to manage your time.

MR. BELLER:  Understood.

THE COURT:  Anything else before we bring the jury in?

MR. CAIN:  No.

MR. DUANE:  No, your Honor.

THE COURT:  Madam Deputy.

(Continued on next page)

(In open court; jury present)

THE COURT:  Counsel, are you ready to call your next witness?

MR. BELLER:  We are, your Honor.  Thank you.

Plaintiff calls Doug Bania.

DOUG BANIA,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BELLER:

Q.  Good morning, Mr. Bania.

A.  Good morning.

Q.  Could you tell the jury what you do for work, please.

A.  Yeah, so I own my own company.  It's called Nevium.  I'm located in San Diego, California.  And Nevium is an intellectual property consulting firm.

Q.  Mr. Bania, in preparation for your testimony to the jury this morning, did you prepare a slide deck to assist in your testimony?

A.  Yes.

Q.  And do you believe that that slide deck will assist the jury in their comprehension or understanding of your testimony?

A.  Yes.

MR. BELLER:  Your Honor, at this time, I would move to publish under Rule 107 the slide deck.

THE COURT:  Any objection?

MR. KACHOUROFF:  Can we see the slide deck first, and then publish after we have seen it.  There's been so many slide decks going around, your Honor, I just want to see what's going up.

THE COURT:  We can take a brief pause.

Was it not the same slide deck that was presented to the Court this morning?

MR. BELLER:  I believe it's been provided to defense, I believe, three times over the course of the last three days.

THE COURT:  I think it's the one that you attached.

MR. BELLER:  I'm happy to take it slide by slide, your Honor.

THE COURT:  All right.

MR. KACHOUROFF:  Your Honor, I thought that was Halderman's slides.

MR. BELLER:  I'm happy to take it slide by slide, your Honor, pursuant to Rule 107.

THE COURT:  Yes.

MR. BELLER:  Thank you.

If we can please publish Slide 2.

BY MR. BELLER:

Q.  Mr. Bania, does this accurately depict and describe a little of your biography?

A.  Yes, it does.

MR. BELLER:  Your Honor, at this time, I would move for the publication of Slide 2 to the deck.

MR. KACHOUROFF:  Without objection.

THE COURT:  All right.  Let's publish it.

MR. BELLER:  Thank you.

BY MR. BELLER:

Q.  Mr. Bania, would you explain to the jury what Nevium intellectual property does?

A.  Yes.  So we value intellectual property.  When I say intellectual property, I'm talking about trademarks, copyrights, patents, publicity rights.  For various reasons, mergers, acquisitions, tax reasons, you know, simple business transactions.  So beyond what an accountant does valuing a business, we can let the client know what the value of the business is, but what percent of that value is due to, say, your trademark portfolio or copyrights or other IP assets.

Q.  And does that also include, for example, the impact of something that is posted online?

A.  Yes.  So we provide brand strategy services as well.  So typically, the client will come to us, hey, I want to make more money on our brand, you know, how do we do that.  So by using the internet and social media, we're able to put programs together for them to basically better monetize their brands.

Q.  And as part of your work with Nevium, do you also sometimes serve as an expert witness?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

A.   Yeah.  So the second bucket of what Nevium does is we provide litigation support, like we are today.  So in cases, trademark infringement, copyright infringement, defamation cases, false endorsement, right of publicity cases, when somebody might use a celebrity's name and likeness without permission.

Q.   In how many cases, Mr. Bania, have you been served as an expert?

A.   I have been named approximately 150 times.

Q.   In the same areas that you have just described to the jury?

A.   Yeah, yes, basically.

Q.   And does that also sometimes include reputation and the cost for repairing reputation?

A.   Yeah, absolutely.  If it's an individual, there's a reputation.  But I also think the company has a brand, there's a reputation there as well.  So it goes both with companies, brands and individuals.

Q.   Mr. Bania, do you also have a formal education, in addition to the work that you've done?

A.   Yeah, so I have a creative background educational-wise.  I have a bachelor's degree in cinema from San Francisco State University.  And then I have a master's degree in television, film and media from San Diego State.

Q.   Do you have any specific training or experience in the area of defamation, internet and social media analytics?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

1340
Bania - Direct

A.  So part of my master's degree was the new media aspect of it.  And that's where I learned about the internet -- this is the late 90s, so before YouTube and the popularity of Google. So that's where I got first introduced to internet analytics and building, you know, films or websites for the internet.  So it was rather new.  But that's where I, you know, cut my teeth as it relates to internet analytics.

Q.  And how about training, in terms of sort of publicity disputes, do you have experience and/or education in that area?

A.  As it relates to publicity disputes, actually, that was more of a hands on training.  One of the first cases I worked on was dealing with a misuse of name and likeness in a right of publicity case.  So more of a hands on experience with publicity cases.

THE COURT:  Our court reporter needs to step out.

Ladies and gentlemen of the jury, we need to take a break.  I apologize for the interruption.

(Recess)

(Continued on next page)

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 117    . . . . . . . . . . . . . . . . . . . .1333

INDEX OF EXAMINATION

Examination  of:                               Page

DOUG BANIA

Direct By Mr. Beller . . . . . . . . . . . . .1336

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes.


*Sadie L. Herbert*
Official Court Reporter
U.S. District Court


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105