**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC, and
MY PILLOW, INC.,

      Defendant.

---

## ORDER ON POST-TRIAL MOTIONS

---

This matter is before the Court on (1) Defendants Michael J. Lindell's and Frankspeech LLC's Rule 50(b) Renewed Motion for Judgment as a Matter of Law ("Motion for JMOL"), [Doc. 386]; and (2) Plaintiff's Motion to Amend Final Judgment (together, "Motions"), [Doc. 387]. Upon review, the Court concludes that oral argument would not materially assist in the resolution of the Motions. For the reasons set forth below, the Motions are respectfully **DENIED**.

## BACKGROUND

The Court has previously discussed the background of this case, *see* [Doc. 119 at 1–5; Doc. 197 at 3–7; Doc. 261 at 2–3], and repeats it only to the extent necessary to decide the pending Motions. In brief, Plaintiff Eric Coomer ("Plaintiff" or "Dr. Coomer") sued Defendants Michael J. Lindell ("Mr. Lindell"), Frankspeech LLC ("Frankspeech"), and My Pillow, Inc. ("MyPillow") for their claims that Dr. Coomer, a former employee of Dominion Voting Systems, Inc., participated in efforts to interfere with the 2020

presidential election. [Doc. 170 at ¶ 29]. Plaintiff alleged that Defendants published false and defamatory statements—which originated from nonparty Joseph Oltmann ("Mr. Oltmann")—that Plaintiff told an "Antifa conference call" that he had "made . . . sure" that President Donald J. Trump would not win the 2020 presidential election. [*Id.*].

Plaintiff proceeded to trial on three claims: (1) defamation, (2) intentional infliction of emotional distress ("IIED"), and (3) civil conspiracy. [*Id.* at ¶¶ 146–59]; *see, e.g.*, [Doc. 375 (verdict form as to Mr. Lindell)]. The jury found Mr. Lindell liable for defamation as to two statements and found him not liable for IIED or civil conspiracy. [Doc. 375]. The jury found Frankspeech liable for defamation as to three statements, liable for IIED, and not liable for civil conspiracy. [Doc. 377]. The jury also awarded punitive damages against Frankspeech. [*Id.* at 3]. The jury found MyPillow not liable on all three claims. [Doc. 379].

The jury found both Mr. Lindell and Frankspeech liable for defamation as to the following statements:

- A statement by Mr. Lindell during a May 9, 2021, interview that aired on Frankspeech:

It's over for Dominion, it's too late to close the gate. The cows are out of the barn. Dominion, you did your best, and Smartmatic, to take our country through China. You did your best, you corrupt people, you. You tried to suppress our voice. You did it, but you failed. And I'm telling you, you Coomers of the world. What's his name? Yeah, Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation so maybe, just maybe, that you get immunity and you only get to do, I don't know, ten, twenty years. I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America. And you know what? I can say that, just like I can about Brian Kemp and Brad Raffensberger. These are things that I have evidence of. The evidence is there. You know, it's sitting there. Well Mike, 'Why don't you turn it all in to the Supreme Court and bring it to the FBI?' Oh, it's getting to the Supreme Court, everybody. But

we're going to let you the people, that's what Frank's all about, we're going to dump it.  We're not taking any chance that those nine justices, 'Nope, we don't want to look at it, because they told us in early November there was not enough to overturn the election.  And we don't want to get involved you know, because somebody might get upset.'  Well you know what?  This wasn't around in November December.  This came on January 9.

[Doc. 371 at 12–13 ¶ 28].

- Another statement by Mr. Lindell during an April 6, 2022, interview that aired on Frankspeech:

So everybody, if you want to know just how corrupt, the corruption we're up against.  Eric Coomer served, had served papers to me before I was going onstage at the Capitol.  I've never talked about Eric Coomer.  He's the, apparently he's the president of Dominion, the criminal crime family here in Denver. . . .  Who knows what he did there, but anyway, he served papers, everybody.  He has sued, everybody ready for this?  Mike Lindell, Frank Speech, and My Pillow.  Eric Coomer, you are a criminal.  Eric Coomer, your lawyers better look out.  I'm not putting up with this.  My Pillow doesn't even know who you are.  My employees, I have 2,700 employees.  Shame on you Eric Coomer.  You did a very, very stupid move, Mr. Coomer.  You're going to be the first one, right behind Raffensperger and Jena Griswold behind bars.  You're #1 on my list.  You go after my employees, go after my company again, you're disgusting. . . .  You've been a part of the biggest crime this world has ever seen.  Eric Coomer, president of Dominion, you have even said what you did or what you were going to do.  You're disgusting.  You're disgusting, you're evil, you belong behind bars, and we will not stop until you are behind bars.  We're going to melt down your little machines and you're going to hang on to your little prison bars.  "Let me out, let me out!"  Should have thought about that, Eric Coomer, before you did crimes against the United States and quite frankly all of humanity.  It's disgusting what you've done.  You and Dominion.  And Jena Griswold."

[*Id.* at 15–16 ¶ 40].

The jury also found Frankspeech liable for defamation for a statement by non-party

David Clements on August 12, 2021:

Alright, so you've got a couple of hitmen that were pulling the triggers.  The first gentleman, if you know, is John Poulos, who is the CEO of Dominion.  When he gave those remarks, it was before the legislature, under oath.  John Poulos committed perjury, time and time again.  The other gentleman at the end was a person we've heard about because of Joe Oltmann.  Eric Coomer, who holds the patent for the feature known as adjudication, which is one of

> the tools in their tool chest to murder the American people's vote.  And this
> is one of the statements he made along with, when Joe Oltmann talked about
> being on the call, this is what he heard.  And you heard from Joe Oltmann.
> You can assess whether you think he's telling the truth.  'I made f-ing sure
> that Trump's not going to win.'  That's the vice president of a company that's
> running elections in 28 states.  You've got your election cartel, you've got
> your vote trafficking organizations, and you have the man that pulled the
> trigger.

[*Id.* at 15 ¶ 36].  Mr. Clements made this statement during Mr. Lindell's Cyber Symposium, which was livestreamed by Frankspeech.  [*Id.* at 14 ¶ 34, 15 ¶ 36].

During trial, at the close of evidence, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  In relevant part, they argued that (1) Frankspeech is immune from liability under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230; (2) that Plaintiff could not prove economic damages; and (3) that Plaintiff could not prevail on his defamation claims because he had failed to prove actual malice as to any Defendant.  [Doc. 399 at 1751:17–1754:1].  The Court denied the motion.  [*Id.* at 1776:20–1791:19].

Pursuant to Rule 50(b), Mr. Lindell and Frankspeech (together, "Defendants") now renew their motion for judgment as a matter of law.  [Doc. 386].  Plaintiff has responded. [Doc. 392].  Plaintiff also seeks to amend the final judgment to increase the punitive damages award against Frankspeech pursuant to Rule 59 and Colo. Rev. Stat. § 13-21-102(3).  [Doc. 387]; Fed. R. Civ. P. 59.  Frankspeech has responded, [Doc. 404], and neither Party has sought leave to file a reply in support of its respective motion.  The Motions are therefore ripe for disposition.

4

**LEGAL STANDARDS**

**I.      Rule 50(b)**

Under Rule 50(a), a court may grant judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).   If the court denied a party's Rule 50(a) motion, Rule 50(b) permits a party to renew its motion for judgment as a matter of law after the jury has returned a verdict.  Fed. R. Civ. P. 50(b).  Courts apply the same standard of review to motions under Rule 50(a) and Rule 50(b).  *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1287 (10th Cir. 2006).

In deciding a motion for judgment as a matter of law, the Court considers all the evidence presented at trial and reviews the record "taken as a whole."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (quotation omitted).  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Id.*  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).  "Judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence conclusively favors one party such that reasonable [jurors] could not arrive at a contrary verdict."  *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (quotation omitted); *see also Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) ("Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to

5

no reasonable inferences which may support the nonmoving party's position.") (quotation omitted).

## II.    Rule 59

Rule 59 permits a party to file a "motion to alter or amend a judgment."  Fed. R. Civ. P. 59(e).  Motions under Rule 59(e) are appropriate in only a limited number of circumstances.  "Grounds warranting a motion to alter or amend the judgment pursuant to Rule 59(e) 'include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.'"  *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1203 (10th Cir. 2018) (quoting *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).  Rule 59(e) motions are not an appropriate vehicle "to revisit issues already addressed or advance arguments that could have been raised in prior briefing," *id.* (quotation omitted), or "to raise arguments or present evidence that could have been raised prior to the entry of judgment," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quotation omitted).  "[I]n determining whether to grant or deny a Rule 59(e) motion to alter or amend the judgment, the district court is vested with considerable discretion."  *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996).

## ANALYSIS

## I.    Defendants' Motion for JMOL

Defendants seek judgment as a matter of law on four grounds.  First, they ask the Court to find Frankspeech immune from suit under § 230 of the CDA.  [Doc. 386 at 2–5].  Second, they ask the Court to set aside the jury's economic damages award.  [*Id.* at 5–6].  Third, they argue that Mr. Lindell cannot be held liable for defamation based on the

6

jury's verdict.  [*Id.* at 7–9].  Fourth, they contend that Frankspeech cannot be held liable for defamation based on Mr. Lindell's or Mr. Clements's statements.  [*Id.* at 9–11].

As an initial matter, the Court notes that all of these arguments were adequately preserved in Defendants' initial Rule 50(a) motion.  Plaintiff does not dispute this point. *See* [Doc. 392].  The Court will address each argument in turn.

### A.     Section 230 of the CDA

Defendants contend that § 230 of the CDA immunizes Frankspeech from liability for the three statements the jury found to be defamatory.  [Doc. 387 at 2–5].  It is entirely unclear why Defendants waited until now to raise this issue.  Although Defendants pleaded the defense in their Answer, [Doc. 171 at 58 ¶ 5], they did not raise the issue in any pretrial motion or otherwise request a ruling on the issue at any point until the close of evidence.  The Fourth Circuit has observed that § 230 immunity should be resolved "at the earliest possible stage of the case," both to ensure that a defendant receives the full benefit of its immunity and to avoid the waste of "costly and protracted legal battles." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, 591 F.3d 250, 255 (4th Cir. 2009) (quotation omitted).  Nevertheless, Plaintiff addresses this issue on its merits, [Doc. 392 at ¶¶ 9–17], and the Court will do the same.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  This provision "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party." *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000).  "The prototypical service qualifying

7

for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009).  The Tenth Circuit has discerned three limits on the immunity provided by § 230.  *Id.*  Under this framework, a defendant is immunized under § 230 if "(1) it is a provider of an interactive computer service, (2) alleged liability is based on the defendant having acted as a 'publisher or speaker,' and (3) information is provided by another 'information content provider.'" *Roland v. Letgo, Inc.*, 644 F. Supp. 3d 907, 914 (D. Colo. 2022) (quoting *Accusearch*, 570 F.3d at 1196), *aff'd*, No. 22-1456, 2024 WL 372218 (10th Cir. 2024).

The Parties do not dispute whether Frankspeech meets the first two requirements—that is, that Frankspeech is an interactive computer service provider and faces liability for its actions as an alleged publisher.  Accordingly, the Court focuses its analysis on the third requirement for section 230 immunity:  whether the information at issue was provided by another information content provider.

Because § 230 provides immunity only for information provided by another content provider, a service provider cannot assert immunity if it is also a content provider for the information at issue.  *Accusearch*, 570 F.3d 1197.  The CDA defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  "This is a broad definition," and "there may be several information content providers with respect to a single item of information (each being 'responsible' at least 'in part' for its 'creation or development')."  *Accusearch*, 570 F.3d at 1197 (quotation omitted).

In short, the critical question for the third requirement of § 230 immunity is whether Frankspeech was "responsible for the development of the specific content that was the source of the alleged liability." *Id.* at 1198. In *Accusearch*, the Tenth Circuit explained that "development" of content involves making the content "visible," "active," or "usable," or making content "actually available or usable (something previously only potentially available or usable)." *Id.* And "a service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content." *Id.* at 1199. Put differently, "to be 'responsible' for the development of offensive content, one must be more than a neutral conduit for that content." *Id.*

Without pointing to any specific trial testimony or evidence, Defendants make the conclusory argument that Frankspeech is "like YouTube or X" in that it "published information that other content providers developed and created" rather than "generat[ing] its own content." [Doc. 386 at 3]. To start, the Court has no obligation to comb the record for specific testimony supporting Defendants' characterization of the evidence. *See Adams v. Dyer*, 223 F. App'x 757, 762 n.4 (10th Cir. 2007) ("It is not the job of this court to search the record . . . for evidence."). Regardless, Plaintiff presented sufficient evidence to permit the jury to conclude that Frankspeech, through its agents, was responsible for the development of the statements at issue. *Accusearch*, 570 F.3d at 1198.

First, Defendants argue that Frankspeech cannot be liable for Mr. Lindell's statements on May 9, 2021, and April 6, 2022. Both of these statements occurred during interviews that "aired" on Frankspeech. [Doc. 371 at 12–13 ¶ 28, 15–16 ¶ 40]. Brannon

Howse, the interviewer for both statements, testified that the May 9 statement occurred during a "general FrankSpeech broadcast." [Doc. 392-1 at 163:16–25]. The April 6 statement occurred on a broadcast called "The Lindell Report." [Doc. 371 at 15–16 ¶ 40]. Defendants contend that Frankspeech did not "control[]" the content on Mr. Howse's show and argue—without evidentiary support—that Mr. Howse "developed, edited, and created" the April 6, 2022, episode of "The Lindell Report." [Doc. 386 at 4].

Defendants ignore, however, that both of these statements were made by Mr. Lindell. As a corporate entity, Frankspeech "can only act through its agents, and their acts within the scope of their authority are the acts of [Frankspeech]." *Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) (quotation omitted). An agent has actual authority—which may be either express or implied—when the agent "subjectively hold[s] the belief that he possesses authority, and that belief must be objectively reasonable in light of the principal's actions." *Fresquez v. Trinidad Inn, Inc.*, 521 P.3d 399, 405 (Colo. App. 2022) (cleaned up). Here, Mr. Lindell founded Frankspeech. [Doc. 371 at 10 ¶ 7]. He regularly acted as its corporate representative, including at trial. He hosted his own show on Frankspeech, broadcasted it through Frankspeech, and used the Frankspeech platform to make and publish statements about Dr. Coomer. There is no evidence that anyone other than Mr. Lindell exercised any meaningful degree of control over the Frankspeech entity. By all accounts, Frankspeech was Mr. Lindell's corporate alter ego in this context. Based on this evidence, a reasonable jury could conclude that Mr. Lindell's statements on Frankspeech broadcasts were within the scope of his actual authority as

10

an agent of Frankspeech.[1]  Under agency law, that would mean Mr. Lindell's statements were Frankspeech's statements.  And for § 230 purposes, Frankspeech's defamatory statements through its agent would plainly qualify as participation in the development of those statements.  *Cf. Accusearch*, 570 F.3d at 1199 (observing that the "clear purpose" of the CDA is to protect internet service providers from liability "when *independent persons* negligently or intentionally use those services to supply harmful content" (emphasis added)).

Second, the Court turns to the statement by David Clements during the Cyber Symposium on August 12, 2021.  *See* [Doc. 371 at 15 ¶ 36].  A reasonable jury could also conclude that the individuals responsible for the development of this statement were agents of Frankspeech.  While Frankspeech may have operated "like YouTube" in some respects, it was not merely a neutral conduit for the content at the Cyber Symposium. Frankspeech—through Mr. Lindell and others—sponsored, promoted, and broadcasted the event.  Mr. Howse testified that the symposium was "promoted as a FrankSpeech affiliated event" and intended to, among other things, "educate the public."  [Doc. 392-1 at 244:12–15, 245:3–4].  Mr. Lindell promoted the event as a joint effort between himself, My Pillow, and Frankspeech.  [Doc. 392-4].  Frankspeech was depicted prominently alongside Mr. Lindell on the event's marketing materials, [Doc. 392-2], and Mr. Lindell used Frankspeech to offer a sale on My Pillow products that would "help support this Cyber Symposium event," [Doc. 392-4 at 3].  In addition to livestreaming the event, [Doc.

---

[1] The Court agrees with Defendants that § 230 generally presents a question of law, [Doc. 386 at 2], but "[w]hether an agent has been given authority to act on behalf of a principal is an issue of fact," *Citywide Banks v. Armijo*, 313 P.3d 647, 653 (Colo. App. 2011).  Courts can resolve agency issues as a matter of law only when "the facts are undisputed." *Fresquez*, 521 P.3d at 404 (quotation omitted).  The facts here are far from undisputed.

371 at 14 ¶ 34], Frankspeech displayed its logo on an on-stage backdrop at the event, [Doc. 392-3].  Dr. Coomer and Matt Crane, another of Plaintiff's witnesses, testified that they believed Frankspeech, like the other Defendants, was responsible for the relevant statements about Dr. Coomer that occurred on Frankspeech broadcasts.[2]  *See, e.g.*, [Doc. 394 at 396:3–21 (Mr. Crane testifying that the relevant statements about Dr. Coomer may cause people "who will listen to Frankspeech" to "put pressure on" elections administrators); *id.* at 468:24–469:2 ("Q. Is it your understanding that Mr. Lindell and Frankspeech gave a platform to Tina Peters and Joe Oltmann?  [Mr. Crane:]  And others."); *id.* at 296:15–18 ("Q. You don't know whether Frankspeech agreed with My Pillow or agreed with Mr. Lindell to do anything to you, do you?  [Dr. Coomer:]  I would disagree with that.")].

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Frankspeech's conduct (including its conduct through Mr. Lindell) created actual or apparent authority for Mr. Clements and other presenters at the Cyber Symposium to act as agents of Frankspeech.  *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 656 (Colo. 2017) (explaining that apparent authority exists when a third party "reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal").  And because Mr. Clements was indisputably responsible for the development of his defamatory statement at the Cyber Symposium, Frankspeech is not entitled to immunity.

---

[2] The Court does not use "responsible" in a legal sense; rather, testimony that third parties attributed statements on Frankspeech broadcasts to both Mr. Lindell and Frankspeech is evidence that a reasonable jury could consider in its agency analysis.

The Court is respectfully unpersuaded by Defendants' remaining arguments. First, to be sure, Mr. Lindell leveraged multiple entities within his control when organizing the Cyber Symposium, such as Frankspeech, My Pillow, and Lindell Management, LLC. *See* [Doc. 386 at 4; Doc. 392-4]; *cf.* [Doc. 392-1 at 318:8–319:5 (Mr. Howse testifying about a My Pillow employee who also worked with Frankspeech and Lindell Management)]. But the involvement of other entities does not entitle Frankspeech to immunity under § 230. Defendants' reference to other entities and individuals misses the point that multiple content providers may be responsible in part for the development of a single statement. *Accusearch*, 570 F.3d at 1197; [Doc. 386 at 4–5]. Next, Defendants belatedly attempt to create a fact issue over whether Frankspeech actually streamed Mr. Clements's statement. [Doc. 386 at 4–5]. This contradicts the Parties' stipulation that the Cyber Symposium was livestreamed on Frankspeech. [Doc. 371 at 14 ¶ 34]. The Court will hold Defendants to their stipulation. *See Vallejos v. C.E. Glass Co.*, 583 F.2d 507, 510 (10th Cir. 1978) ("As a general rule, a stipulation is a judicial admission binding on the parties making it, absent special considerations."). Third, Defendants argue that the evidence does not show that "Frankspeech developed, created, or had any editorial control over the Cyber Symposium, let alone Mr. Clements' statements at this event." [Doc. 386 at 4]. Again, however, Frankspeech can only act through its agents, *Dallas Creek*, 933 P.2d at 41, and statements by its agents within the scope of their authority cannot be attributed to third parties for § 230 purposes. As explained, a reasonable jury could conclude that Mr. Clements was an agent of Frankspeech when speaking at Mr. Lindell's Cyber Symposium. And given that Frankspeech sponsored, promoted, and livestreamed the Cyber Symposium—partly to advertise itself and partly to "educate the

13

public," [Doc. 392-1 at 244:19–245:4]—a reasonable jury could also conclude that Mr. Lindell was acting as an agent for Frankspeech while organizing the event. Defendants' Motion for JMOL is respectfully **DENIED** on this ground.

### B.    Economic Damages

Defendants next argue that the Court must set aside the economic damages award as a matter of law. [Doc. 386 at 5–6]. In their view, Plaintiff's reputation was already "destroyed" by statements from other parties before Defendants made any defamatory statements of their own. [*Id.*]. The Court declined to grant summary judgment on this argument, [Doc. 261 at 11–12], and reaches the same conclusion now, *see Reeves*, 530 U.S. at 150 ("[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." (quotation omitted)). At summary judgment, the Court found that "Plaintiff has introduced evidence of continued harassment and targeting that a reasonable jury could connect with Defendants' alleged defamation based on the timing of the harassment and record evidence of large audiences for events like the Cyber Symposium." [Doc. 261 at 12].

Plaintiff did the same at trial. For instance, Dr. Coomer testified that "[t]he level of attention and threats that are directly correlated with the Cyber Symposium" caused him to "reengage[] with [his] therapist." [Doc. 393 at 153:5–20]. Although he previously "never felt the need to go on any type of medication," Dr. Coomer said the fallout from the Cyber Symposium put him in "in such a state that [he and his therapist] had discussions about going on medication, and I am on that [medication] to this day." [*Id.* at 153:15–20]. Dr. Coomer also testified that Mr. Lindell's statements "popularizing and republishing . . . and accusing me of election rigging" made it "clear that [Dr. Coomer] was unlikely to ever be

14

able to work in anything related to elections again." *See* [*id.* at 155:14–156:3].  Similarly, Mr. Crane testified that while Mr. Lindell was not the "sole source" of Dr. Coomer's reputational problems, "he had the largest platform and amplified it as much as anybody else did."  [Doc. 394 at 421:6–11].  And Plaintiff's expert, Doug Bania, testified that Mr. Lindell's media appearances and the Cyber Symposium attracted large audiences that enhanced the "reach" of the defamatory statements.  *See, e.g.*, [Doc. 397 at 1356:8–24, 1360:10–1361:16,  1377:4–1379:21].    Mr.  Bania  estimated  that  the  cost  of  a "reputational  repair  program"  to  restore  Dr.  Coomer's  reputation  would  be approximately $2.7 million. *See* [*id.* at 1395:3–1398:22].

The Court appreciates that Defendants view the evidence differently, particularly Mr. Bania's testimony.  [Doc. 386 at 6].  But viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff presented evidence from which a reasonable jury could conclude that Defendants' defamatory statements caused Plaintiff at least some economic damages.  Defendants' Motion for JMOL is respectfully **DENIED** on this ground.

### C.    Actual Malice as to Defendant Lindell

Defendants' arguments as to Mr. Lindell's defamation liability stem from the fact that the jury declined to award punitive damages against Mr. Lindell.[3]  [Doc. 386 at 7–8]. Defendants start from the premise that actual malice may be found where a party makes

---

[3] To the extent Defendants simply dispute the sufficiency of the evidence as to Mr. Lindell's actual malice, the Court agrees with Plaintiff that a reasonable jury could conclude that Mr. Lindell made the relevant statements with actual malice.  *See* [Doc. 392 at ¶ 24 (summarizing some of the trial evidence that could support such a finding)].  Defendants point to Mr. Lindell's testimony that he did rely on sources when making comments about Dr. Coomer.  [Doc. 386 at 8].  But the Court cannot weigh the competing evidence at this stage.

a statement with reckless disregard for the statement's truth or falsity. [*Id.* at 7 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1968) (further citations omitted)]. Defendants equate this standard to the meaning of "willful and wanton conduct" in the punitive damages context, which encompasses conduct that "was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff." [*Id.* at 9 (quoting Doc. 371 at 64) (emphasis omitted)]; *accord* Colo. Rev. Stat. § 13-21-102(1)(b). Because the jury "found that Lindell was not reckless," Defendants argue that he is "entitled to First Amendment protection as a matter of law." [Doc. 386 at 9].

This argument fails for two reasons. First, Defendants improperly conflate "actual malice" with the common law standard for willful and wanton conduct. Actual malice, a term of art with a specific meaning in the defamation context, is distinct from common law standards of intent. *See Masson v. N.Y. Mag., Inc.*, 501 U.S. 496, 510 (1991) (actual malice distinct from common law malice); *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995) (distinguishing "willfulness and wantonness" in the punitive damages context from the actual malice standard); *Talley v. Time, Inc.*, 923 F.3d 878, 895 (10th Cir. 2019) ("Actual malice is not a negligence or gross negligence standard."). Whether Mr. Lindell acted with reckless disregard for the truth of his statements is a different question from whether he acted with disregard for the consequences, or of Dr. Coomer's rights. *Compare* [Doc. 371 at 43], *with* [*id.* at 64]. Thus, the jury's verdict that Mr. Lindell did not act willfully and wantonly in the punitive damages context does not, as a matter of law, preclude it from finding that he acted with actual malice.

16

Second, even if the standards were the same, a jury could still find actual malice without awarding punitive damages, because punitive damages are subject to a higher burden of proof.  A plaintiff must establish actual malice by clear and convincing evidence. *L.S.S. v. S.A.P.*, 23 P.3d 1280, 1289 (Colo. App. 2022) (citations omitted).  Punitive damages, by contrast, must be proven beyond a reasonable doubt.  *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1092 (Colo. 2011).  Even under Defendants' view of these standards, a jury could conclude that a plaintiff met its burden as to actual malice but failed to clear the higher bar of reasonable doubt.  The Motion for JMOL is respectfully **DENIED** on this ground.

### D.     Actual Malice as to Frankspeech

Finally, Defendants contend that they are entitled to judgment as a matter of law as to the defamation claim against Frankspeech.  [Doc. 386 at 10–11].  The Court's conclusions thus far mostly dispose of Defendants' arguments on this point.  Defendants argue, for instance, that the evidence "showed that Frankspeech's presence was merely to livestream an event that Frankspeech *did not create nor control*."  [*Id.* at 10].  But, as explained, Plaintiff presented evidence showing Frankspeech's involvement with the Cyber Symposium went further than merely livestreaming the event, and the Court has already held that a reasonable jury could conclude that Mr. Lindell and Mr. Clements were agents of Frankspeech for purposes of the Cyber Symposium.  The jury could thus reasonably hold Frankspeech liable for defamation so long as it found that Mr. Clements's statement was defamatory.  *See Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 585 (Colo. App. 2024) ("[I]f an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement." (quoting

17

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982))) (further citation omitted).   And viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Mr. Clements made his August 12, 2021, statement at the Cyber Symposium with actual malice.

As the jury was instructed, actual malice may be shown through circumstantial evidence, including "(1) the speaker's hostility toward the plaintiff; (2) inconsistencies in the source's account; (3) reasons to doubt the veracity or reliability of the source; (4) the inherent improbability of the claim; and (5) other credible information contradicting the information." *Donald J. Trump*, 552 P.3d at 592; [Doc. 371 at 43].   The jury could reasonably have inferred that Mr. Clements acted with actual malice based on several of these factors.   The jury could have perceived Mr. Clements as hostile toward Dr. Coomer based on the statement itself. *See* [Doc. 371 at 15 ¶ 36 (referring to Dr. Coomer as "the man that pulled the trigger" to "murder the American people's vote")].   The jury could have doubted the veracity or reliability of Mr. Oltmann, the source for Mr. Clements's statement, who testified at trial.   The jury could have found the claim inherently improbable or otherwise contradicted by the testimony of Dr. Coomer himself or the testimony of Dr. J. Alex Halderman, Plaintiff's election security expert.   Defendants, of course, disputed all of these sources of evidence at trial and continue to do so.   But the Court cannot conclude that "the evidence points but one way" as to Mr. Clements's actual malice. *Elm Ridge*, 721 F.3d at 1216.

For the same reasons, the Court is unpersuaded by Defendants' last argument that the punitive damages award against Frankspeech must be vacated based on Plaintiff's failure to prove actual malice.   [Doc. 386 at 10–11].   Having rejected all of

18

Defendants' asserted bases for judgment as a matter of law, the Court respectfully **DENIES** Defendants' Motion for JMOL.

## II.     Plaintiff's Motion to Amend Final Judgment

Plaintiff asks the Court to increase the punitive damages award against Frankspeech based on conduct that occurred during the pendency of the case.  [Doc. 387].  Colorado's exemplary damages statute permits a court to increase an award of punitive or exemplary damages to no more than three times the amount of actual damages.  Colo. Rev. Stat. § 13-21-102(3).  An increase is appropriate if it is shown that:

> (a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case; or
>
> (b) The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

*Id.*  The statute defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  § 13-21-102(1)(b).  The plaintiff bears the burden of proving beyond a reasonable doubt that the increased exemplary damages are appropriate.  *See Coors v. Sec. Life of Denv. Ins. Co.*, 112 P.3d 59, 67 (Colo. 2005); Colo. Rev. Stat. § 13-25-127(2) (permitting exemplary damages only when "the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in section 13-21-102").  Whether to increase a punitive damages award under § 13-21-102(3)(b) is within the trial court's discretion.  *Gen. Steel Domestic Sales, LLC v.*

19

*Bacheller*, 291 P.3d 1, 11 (Colo. 2012).  In exercising its discretion, the Court is mindful that "[t]he general purposes of punitive damages under section 13-21-102 are punishment of the defendant and deterrence against the commission of similar offenses by the defendant or others in the future."  *Coors*, 112 P.3d at 65.

Plaintiff seeks increased punitive damages under both subsections (a) and (b). [Doc. 387].  The Court addresses each in turn.

### A.      Subsection (a):  Continued Defamation

Plaintiff first argues that increased exemplary damages are appropriate based on Frankspeech's "continued . . . defamation campaign" against Dr. Coomer during the lawsuit.  [*Id.* at 8].  This conduct includes Mr. Lindell's appearance on a radio show to discuss Dr. Coomer's alleged "election crimes of 2020" and Mr. Lindell's receipt of a spreadsheet containing the personal information of individuals in Dr. Coomer's "social circles" and individuals who worked for other voting system companies.  [*Id.* at ¶¶ 15–16]. Plaintiff also points to three other statements repeating claims about Dr. Coomer:  (1) Mr. Lindell's statement on a podcast on May 23, 2022; (2) a statement by Tina Peters on September 7, 2022 that aired on Frankspeech; and (3) a statement by Mr. Lindell on March 10, 2023 that aired on Frankspeech.  [*Id.* at ¶¶ 17–19].  Plaintiff characterizes these as "additional, defamatory statements against [him] since the filing of this action on April 4, 2022."  [*Id.* at ¶ 20].  Frankspeech counters that this argument amounts to an effort to "sidestep the jury's verdict" and obtain a "second bite at the apple" on claims that the jury rejected at trial.  [Doc. 404 at 4–5].

The Court agrees with Frankspeech that increased exemplary damages are not warranted under subsection (a).  With respect to the radio show appearance, Plaintiff has

failed to demonstrate that Frankspeech can be held liable for this instance of Mr. Lindell's

conduct.  To be sure, Mr. Lindell is the founder of Frankspeech and often acted as its

representative.  [Doc. 371 at 10 ¶ 7; Doc. 387 at ¶ 13]].  But, as explained above, a

corporation is only liable for its agents' acts "within the scope of their authority."  *Dallas

Creek*, 933 P.2d at 41.  Beyond a passing reference to Mr. Lindell's connection to

Frankspeech, Plaintiff does not explain why Mr. Lindell's radio appearance was within the

scope of his authority as Frankspeech's founder and frequent representative.  Unlike

many of Mr. Lindell's other statements, there is no evidence that this statement was aired

on Frankspeech, that Frankspeech sponsored or promoted the interview, or that Mr.

Lindell mentioned Frankspeech at all during the interview.  Nor can Plaintiff rely on the

lower Rule 50 standard here—whether a reasonable jury could conclude that Mr. Lindell

made this statement as an agent of Frankspeech is not the correct inquiry, because

Plaintiff's burden in the punitive damages context is significantly higher.  Plaintiff has

failed to demonstrate beyond a reasonable doubt that this statement was within the scope

of Mr. Lindell's authority as an agent of Frankspeech.

As for Mr. Lindell's receipt of a spreadsheet, Plaintiff does not explain how this is

the same "behavior or . . . action which is the subject of the claim."  § 13-21-102(3)(a).

Plaintiff sued for defamation based on Defendants' public statements and brought

additional IIED and conspiracy claims that arose from and depended on his defamation

claims.  *See* [Doc. 371 at 28–33, 47–49, 53–54].  Mr. Lindell's alleged private receipt of

a spreadsheet containing personal information—invasive as it might be—is not the same

behavior or action as a public defamatory statement.  Nor does Plaintiff allege, let alone

provide competent evidence to show, that this spreadsheet contributed to any defamatory

statements about him or otherwise aggravated his damages.  Plaintiff fails to prove that

additional punitive damages are warranted based on the spreadsheet.

That leaves the remaining statements that repeated election-rigging claims about

Dr. Coomer.  Plaintiff refers to these statements as "additional, defamatory statements."

[Doc. 387 at ¶ 20].  But all three statements were presented to the jury in connection with

Plaintiff's defamation claim, and the jury did not find Frankspeech (or any Defendant)

liable for defamation on any of them.  [Doc. 377 at ¶¶ 1i–1k].  The Court respectfully

declines to impose punitive damages for statements that the jury found did not amount to

defamation.  Although the jury's verdict does not necessarily bind this Court's analysis

under § 13-21-102(3),[4] awarding punitive damages against Frankspeech for this conduct

would not advance the purposes of punitive damages.   For one, Frankspeech's

nondefamatory political speech is entitled to constitutional protection.  *See, e.g.*, *Milkovich*

*v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters

of public concern which does not contain a provably false factual connotation will receive

---

[4] To be clear, the Court does not adopt Frankspeech's position that awarding punitive damages for these statements under § 13-21-102(3) would violate the Seventh Amendment's Reexamination Clause.  *See* [Doc. 404 at 1–4].  The Reexamination Clause forbids courts from "re-examin[ing]" any "fact tried by a jury."  U.S. Const. amend. VII.  The Court perceives some daylight between whether Defendants engaged in fraudulent, malicious, or willful and wanton defamation—a jury question, *see* [Doc. 371 at 63; Doc. 377 at 3]—and the present inquiry of whether Defendants continued their conduct that was the subject of a defamation claim in a willful and wanton manner.  The latter inquiry does not require the conduct to actually be defamatory.   But the Court need not conclusively resolve this question.  To the extent Defendants challenge § 13-21-102(3) more broadly, the Court notes that the statute only permits a court to "increase" a jury's punitive damages award, not award punitive damages in the first instance.  The Supreme Court has held that "the level of punitive damages is not really a 'fact' 'tried' by the jury," so judicial review of the amount of an award does not implicate the Reexamination Clause.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001) (quotation omitted).

full constitutional protection."). It would make little sense to punish Frankspeech for statements that were later found to be lawful and nondefamatory and therefore protected. Nor is it clear what deterrence purpose such an award would serve. The jury has already awarded punitive damages against Frankspeech for its unlawful conduct. [Doc. 377]. Imposing punitive damages for lawful speech—merely because other, similar statements were later found to be unlawful—would deter *any* speech related to the subject of a defamation lawsuit, not just defamatory speech. The jury awarded $300,000 of punitive damages against Frankspeech for its unlawful conduct, [*id.* at 3], and the Court finds that this award is sufficient to punish Frankspeech and deter future offenses.

Finally, the Court notes that the Colorado Court of Appeals has affirmed trial courts' decisions not to increase a punitive damages award even where a jury *did* find the defendant's conduct was willful and wanton. *Harvey v. Farmers Ins. Exch.*, 983 P.2d 34, 40 (Colo. App. 1998) (finding no abuse of discretion, despite jury finding that conduct was willful and wanton, where it was not "uncontroverted" that the defendant had engaged in a continuing conduct with reckless disregard for the plaintiff's rights); *Vickery v. Vickery*, 271 P.3d 516, 520 (Colo. App. 2010) (finding no abuse of discretion in trial court's decision not to increase punitive damages, even though plaintiff had amended complaint to add defamation claims for statements during the pendency of the action, and jury had awarded compensatory and exemplary damages on those claims), *rev'd sub nom. on other grounds*, *Vickery v. Evans*, 266 P.3d 390 (Colo. 2011). The absence of any such jury finding here only bolsters the Court's conclusion that increased punitive damages are unwarranted. Thus, even assuming Plaintiff could prove that Frankspeech made the relevant statements willfully and wantonly, the Court exercises its discretion to decline to

23

increase the punitive damages award under subsection (a).  *See Netquote, Inc. v. Byrd*,
No. 07-cv-00630-DME-MEH, 2009 WL 902437, at *15–17 (D. Colo. Apr. 1, 2009) (finding
that defendant's continued conduct was willful and wanton under subsection (a) but
declining to exercise discretion to increase punitive damages award where existing award
was "sufficient").

**B.    Subsection (b):  Litigation Conduct**

Plaintiff next seeks additional punitive damages based on Mr. Lindell's litigation
conduct that "magnified, prolonged and exacerbated Dr. Coomer's damages."  [Doc. 387
at ¶ 21].  That conduct includes:  (1) Mr. Lindell's "combative" and "disrespectful" conduct
during his deposition, [*id.* at ¶ 22]; (2) Mr. Lindell's public statements criticizing Dr.
Coomer, his attorneys, his witnesses, and the lawsuit in general, [*id.* at ¶¶ 24–25, 29–36];
and (3) other litigation conduct, including two allegedly obstructive motions and Mr.
Lindell's apparent violation of the Court's order regarding the use of technology in the
courtroom, [*id.* at ¶ 37]; *see also* [Doc. 344 at 3].  Plaintiff contends that "Frankspeech
knew or should have known that its continued defamation of Dr. Coomer and public
statements about the lawsuit would cause an aggravation of Dr. Coomer damages."  [Doc.
387 at ¶ 39].  Frankspeech disputes Plaintiff's characterization of its litigation conduct.
*See* [Doc. 404 at 6–7, 11–12].  More specifically, Frankspeech responds that these
statements cannot be imputed to Frankspeech, that Plaintiff has not proved that
Defendants' litigation conduct aggravated his damages, and that Frankspeech's conduct
was not willful and wanton.  *See* [*id.* at 5–14].

The Court respectfully agrees with Frankspeech that, at a minimum, Plaintiff has
failed to prove that the litigation conduct aggravated his damages.  Plaintiff contends that

Mr. Lindell's statements "dr[ew] further attention to the defamatory statements about him."

[Doc. 387 at ¶ 21]. That argument implicitly concedes that Mr. Lindell's statements did

not repeat the election-fraud accusations against Dr. Coomer that formed the basis of his

defamation claim. Rather, the statements now invoked by Plaintiff primarily complain

about Dr. Coomer engaging in "lawfare" in general, as opposed to accusing him of

election-rigging, treason, or other crimes. *Compare, e.g.*, [Doc. 371 at 12 ¶ 28, 15 ¶ 40],

*with* [Doc. 387 at ¶¶ 24–25, 29, 32–33, 35]. Mr. Lindell's more pointed personal attacks

were instead directed at Dr. Coomer's attorneys and his expert witness, Dr. Halderman.

[Doc. 387 at ¶¶ 25, 31, 33]. Plaintiff's argument that these statements aggravated his

damages by drawing attention to previous defamatory statements is wholly conclusory.

Plaintiff has provided no explanation or evidence that these statements led to additional

harassment, further reduced his employment prospects, or even caused him renewed

emotional distress. The Court declines to comb the record or construct arguments on

Plaintiff's behalf, especially given the high burden of proof he faces at this stage. *See*

*Adams*, 223 F. App'x at 762 n.4 ("It is not the job of this court to search the record . . . for

evidence."). Plaintiff has failed to prove beyond a reasonable doubt that this conduct

aggravated his damages.

Nor does Frankspeech's other litigation conduct demonstrate aggravation of

damages, either alone or in combination with Mr. Lindell's statements. Plaintiff has

provided no evidence that his damages were aggravated by Mr. Lindell's deposition

conduct, the motions to stay discovery and continue trial, or Mr. Lindell's alleged improper

use of technology in the courtroom. He does briefly suggest that this conduct "prolonged"

his damages. [Doc. 387 at ¶ 21]. But this argument is insufficiently developed, and, in

any case, the Court finds that prejudgment interest will adequately compensate Dr. Coomer for the delay between accrual of his claims and the entry of judgment. *See* [Doc. 381 (awarding pre-judgment interest pursuant to Colo. Rev. Stat. § 13-21-101)].

Because the Court finds that increased punitive damages are not warranted under either subsection of § 13-21-102(3), the Court need not reach Frankspeech's constitutional arguments. *See supra* note 4. Plaintiff's Motion to Amend Final Judgment is respectfully **DENIED**.

### III.    Order to Show Cause

Before concluding, the Court must address Frankspeech's brief in response to Plaintiff's Motion to Amend Final Judgment. Troublingly, given the background of this case, Frankspeech's response brief misattributes a district court case to the Tenth Circuit. On the first page of its brief, Frankspeech states that "[t]he 10th Circuit recognized in *Capital Solutions, LLC v. Konica Minolta Business Solutions USA, Inc.*, 695 F.Supp.2d 1149, 1154-56 (10th Cir. 2010), that the jury's determination on this issue is entitled to finality."[5] [Doc. 404 at 1]. As the Federal Supplement reporter citation indicates, however, *Capital Solutions* is not a Tenth Circuit decision. *See Cap. Sols., LLC v. Konica Minolta*

---

[5] Although the Court is primarily concerned with counsel's erroneous citation, this description of *Capital Solutions*'s holding is also misleading. *Capital Solutions* dealt with a Kansas statute that "prescribes a procedure by which the jury first determines whether punitive damages should be allowed, and then the court determines the amount of such damages in a separate proceeding." *Cap. Sols., LLC v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 695 F. Supp. 2d 1149, 1152 (D. Kan. 2010) (citing Kan. Stat. Ann. § 60-3702(a) (2010)). Before trial, the court held that the Seventh Amendment's "trial by jury" clause—not the Reexamination Clause—entitled a plaintiff "to have the entirety of its claim for punitive damages, including the determination of the amount, decided by the jury." *Id.* at 155–56. In other words, *Capital Solutions* dealt with whether a jury should decide the amount of punitive damages in the first instance, as opposed to ruling that an award of punitive damages is "entitled to finality" in the post-trial context. *Compare id.*, *with* [Doc. 404 at 1].

*Bus. Sols. U.S.A., Inc.*, 695 F. Supp. 2d 1149 (D. Kan. 2010).  Nor was that decision appealed to the Tenth Circuit.  A reasonable review by counsel should have alerted them of the error; it is well-understood to any lawyer that the Federal Supplement is the reporter for district, not circuit, court decisions.  *See* The Bluebook:  A Uniform System of Citation 257–60 tbl. T1.1 (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025) (explaining that modern federal appellate court decisions are reported in the Federal Reporter or Federal Appendix and modern district court decisions are reported in the Federal Supplement or the Federal Rules of Decision).

The Court has previously sanctioned defense counsel under Rule 11 for, among other things, this exact type of error.  *See* [Doc. 383 at 2, 16]; Fed. R. Civ. P. 11.  At that time, defense counsel both admitted that their previous citation errors were produced by artificial intelligence but then claimed that the errors resulted from a one-off mistaken filing of the wrong draft, not a failure to properly review their citations for accuracy.  *See* [Doc. 311; Doc. 315].  The Court cannot ignore this reoccurring conduct simply because the trial is over.  Regardless of whether generative artificial intelligence was used or not, the Tenth Circuit has been clear that an attorney has a "**fundamental duty**" to the Court to confirm that all legal authorities in submissions to the Court are accurately cited, reflect accurate quotations, and stand for the propositions for which they are cited.  *See Amarsingh v. Frontier Airlines, Inc.*, No. 24-1391, 2026 WL 352016, at *7 (10th Cir. Feb. 9, 2026) (emphasis added).  And the Circuit has similarly been clear that failing to do so warrants sanctions, even for pro se litigants who may typically receive more lenience than an attorney.  *Id.*  Here, it is inexplicable how these errors—the misrepresentation to the Court that this principle came from binding Tenth Circuit authority and the mis-citation of the

27

case—occurred **yet again** after the Court's prior Order to Show Cause laying out the applicable principles under Rule 11 of the Federal Rules of Civil Procedure.  In that prior order, the Court concluded that sanctioning each defense attorney $3,000 was "the least severe sanction adequate to deter and punish defense counsel in this instance."  [Doc. 383 at 19].  It appears that the Court's prior admonitions and sanctions have had little, if any, remedial impact.

Accordingly, no later than **April 8, 2026**, Defendants are **ORDERED to SHOW CAUSE** why Frankspeech, Christopher I. Kachouroff, and Jennifer DeMaster[6] should not be sanctioned, jointly and severally, a graduated amount of $5,000 for their continued failure to check their citations as required by Rule 11 before submission to the Court, and why Mr. Kachouroff should not be referred to the State Bar of Virginia and Ms. DeMaster to the State Bar of Wisconsin for disciplinary proceedings for violations of applicable Rules of Professional Conduct as set forth in the Court's original Order to Show Cause. [Doc. 309; Doc. 383].

---

[6] That this Court permitted Ms. DeMaster to withdraw from the case in December 2025 is of no moment.  [Doc. 410].  Ms. DeMaster signed the response brief, [Doc. 404 at 15], and Rule 11 permits a court to sanction "any attorney, law firm, or party that violated the rule or is responsible for the violation," Fed. R. Civ. P. 11(c)(1).  "[S]ince the conduct subject to sanctions typically is appraised as of the time of the filing, courts properly have held that an attorney cannot immunize himself from the imposition of sanctions under Rule 11 simply by withdrawing from the case."  *United States v. RAPower-3, LLC*, No. 2:15-cv-00828-DN-DAO, 2020 WL 9148117, at *2 (D. Utah July 8, 2020) (quoting Wright & Miller's Federal Practice & Procedure § 1337.1 (4th ed., April 2020 update)); *cf. Automobile Assurance Fin. Corp. v. Syrett Corp.*, No. 96-4036, 1997 WL 49440 (10th Cir. Feb. 7, 1997) (affirming Rule 11 sanctions order where district court granted sanctioned attorney leave to withdraw before issuing sanctions).

**CONCLUSION**

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants Michael J. Lindell's and Frankspeech LLC's Rule 50(b) Renewed Motion for Judgment as a Matter of Law [Doc. 386] is **DENIED**;

(2)    Plaintiff's Motion to Amend Final Judgment [Doc. 387] is **DENIED**;

(3)    No later than **April 8, 2026**, Defendants are **ORDERED to SHOW CAUSE** why Frankspeech, Christopher I. Kachouroff, and Jennifer DeMaster should not be sanctioned, jointly and severally, a graduated amount of $5,000 for their continued failure to check their citations as required by Rule 11 before submission to the Court, and why Mr. Kachouroff should not be referred to the State Bar of Virginia and Ms. DeMaster to the State Bar of Wisconsin for disciplinary proceedings for violations of applicable Rules of Professional Conduct as set forth in the Court's original Order to Show Cause; and

(4)    Because the Court has resolved both Motions on the current record, Plaintiff's Request for Status Conference [Doc. 412] is **DENIED as moot**.

DATED:  March 25, 2026

BY THE COURT:

Nina Y. Wang
United States District Judge

29